# EXHIBIT "D"

# In The Matter Of:

*EDWARD CARTER, ET AL. vs.*
*INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.*

---

*EDWARD CARTER*
*September 16, 2008*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, New York 11501*
*516-747-9393   718-343-7227   212-581-2570*

Original File 49532.txt

Min-U-Script® with Word Index

This Page Intentionally Left Blank

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 4 of 130 PageID #: 1598

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

**Page 1**

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   --------------------------------------------X
     EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
 4   JOSEPH NOFI, and THOMAS SNYDER,
                        Plaintiffs,
 5       -against-   Case No. 07-Civ-1215
                               (SJF)(ETB)
 6   INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
     JOSEPH C. LOEFFLER, JR., individually and in
 7   his official capacity; former mayor NATALIE
     K. ROGERS, individually and in her official
 8   capacity; OCEAN BEACH POLICE DEPARTMENT;
     ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
 9   individually and in his official capacity;
     SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
10   DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
     CIVIL SERVICE; and ALISON SANCHEZ,
11   individually and in her official capacity,
                        Defendants.
12   --------------------------------------------X
13                926 Reckson Plaza
14                Uniondale, New York
15
16                September 16, 2008
17                9:52 A.M.
18
19          VIDEOTAPE DEPOSITION of EDWARD
20   CARTER, taken pursuant to the Federal Rules
21   of Civil Procedure, and Notice, held at the
22   above-mentioned time and place before Edward
23   Leto, a Notary Public of the State of New
24   York.
25
```

**Page 2**

```
 1
 2   A P P E A R A N C E S :
 3       THOMPSON WIGDOR & GILLY LLP
               Attorneys for Plaintiffs
 4             85 Fifth Avenue
               New York, New York 10003
 5       BY:   ANDREW S. GOODSTADT, ESQ.
 6   RIVKIN RADLER LLP
               Attorneys for Defendants
 7             Incorporated Village of Ocean
               Beach, Mayor Joseph C. Loeffler,
 8             Jr., former Mayor Natalie K.
               Rogers, and Ocean Beach Police
 9             Department
               926 Reckson Plaza
10             Uniondale, New York 11556
         BY:   KENNETH A. NOVIKOFF, ESQ.
11             -and-
               MICHAEL WELCH, ESQ.
12
     MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
13             Attorneys for Defendant Acting
               Deputy Police Chief George B.
14             Hess
               530 Saw Mill River Road
15             Elmsford, New York 10523
         BY:   KEVIN W. CONNOLLY, ESQ.
16
     SUFFOLK COUNTY ATTORNEY'S OFFICE
17             Attorneys for Defendants Suffolk
               County, Suffolk County Police
18             Department, Suffolk County
               Department of Civil Service, and
19             Alison Sanchez
               100 Veterans Memorial Highway
20             Hauppauge, New York 11788
         BY:   ARLENE ZWILLING, ESQ.
21
     ALSO PRESENT
22       Albert Santana, Legal Video Specialist
23
24
25
```

**Page 3**

```
 1
 2          IT IS HEREBY STIPULATED AND
 3   AGREED by and among counsel for the
 4   respective parties hereto, that the filing,
 5   sealing and certification of the within
 6   deposition shall be and the same are hereby
 7   waived;
 8          IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except to the
10   form of the question, shall be reserved to
11   the time of the trial;
12          IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed before any Notary Public with the
15   same force and effect as if signed and sworn
16   to by the Court.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          E. Carter
 2          THE VIDEOGRAPHER: This is tape
 3   number one of the videotape deposition
 4   of Edward Carter in the matter of
 5   Edward Carter, et al., Plaintiffs,
 6   versus Incorporated Village of Ocean
 7   Beach, et al., Defendants, in the
 8   United States District Court, Eastern
 9   District of New York, case number
10   07-civ-1215(SJF)(ETB), on September 16,
11   2008 at approximately 9:52 a.m.
12          My name is Albert Santana from
13   the firm of Precise Court Reporting and
14   I'm the legal video specialist.  The
15   court reporter is Ed Leto in
16   association with Precise Court
17   Reporting.  For the record, will
18   counsel please introduce themselves.
19          MR. GOODSTADT: Andrew
20   Goodstadt, Thompson Wigdor & Gilly, on
21   behalf of the Plaintiffs.
22          MR. NOVIKOFF: Ken Novikoff and
23   Michael Welch, Rivkin Radler, on behalf
24   of all Village Defendants and the
25   individual Defendants, Loeffler and
```

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 5

1           E. Carter
2   Rogers.
3          MS. ZWILLING: Arlene Zwilling
4   for Christine Malafi, Suffolk County
5   Attorney, representing the Suffolk
6   County Defendants.
7          MR. NOVIKOFF: And just for the
8   record, counsel for Mr. Hesse is not
9   here yet. He's indicated that he is
10  going to be delayed. We noticed this
11  up for 9:30, so we're going to proceed
12  with the deposition now, which is
13  approximately five to 10:00, right.
14         THE VIDEOGRAPHER: Now will the
15  court reporter please swear the
16  witness.
17  E D W A R D   C A R T E R, having first
18  been duly sworn by a Notary Public of the
19  State of New York, was examined and
20  testified as follows:
21         THE COURT REPORTER: Please
22  state your name for the record.
23         THE WITNESS: Edward Carter.
24         THE COURT REPORTER: Please
25  state your address.

Page 6

1           E. Carter
2          THE WITNESS: 55 Kansas
3   Avenue, Bay Shore, New York 11706.
4          MR. NOVIKOFF: Mr. Goodstadt,
5   regular stipulations?
6          MR. GOODSTADT: Yes. Federal
7   rules govern, local rules govern. He's
8   just going to reserve his right to
9   review and sign.
10         MR. NOVIKOFF: Just like the
11  last deposition.
12         MR. GOODSTADT: Yes.
13  EXAMINATION BY
14  MR. NOVIKOFF:
15         MR. NOVIKOFF: Good morning,
16  sir. I am Ken Novikoff and I'm going
17  to be asking you a series of questions
18  today, and if you don't understand my
19  questions, then I would invite you to
20  tell me and I will try to rephrase them
21  in such a way that you better
22  understand them.
23         You are free to talk to your
24  counsel at any time as many times as
25  you'd like. The only thing I would

Page 7

1           E. Carter
2   request is that while a question is
3   pending, you answer the question before
4   you speak with your counsel.
5   Obviously, if your counsel instructs
6   you not to answer a question, then you
7   do what you need to do.
8       Q.  Have you spoken with Mr. Nofi --
9   well, withdrawn. Are you aware that
10  Mr. Nofi has been deposed in this case?
11      A.  Yes.
12      Q.  Did you speak with Mr. Nofi after
13  his deposition?
14      A.  No.
15      Q.  Did you speak with Mr. Nofi
16  before his deposition specifically
17  concerning his deposition?
18      A.  No.
19      Q.  Have you spoken to the -- to any
20  of the other Plaintiffs in this case
21  subsequent to Mr. Nofi's deposition?
22      A.  With my attorney, yes.
23         MR. NOVIKOFF: Yes. Again,
24  let's also -- if I ask you questions
25  concerning communications you may have

Page 8

1           E. Carter
2   had with the other Plaintiffs that were
3   in the presence of your counsel, then
4   just advise me of that and I'm sure
5   your counsel will tell you not to
6   answer. Likewise, if any of my
7   questions seek information concerning
8   what you and your counsel said, I'm
9   sure your counsel will object.
10      Q.  Outside the presence of your
11  counsel, have you spoken with any of the
12  Plaintiffs subsequent to the Nofi
13  deposition?
14      A.  When we first filed the lawsuit,
15  yes.
16      Q.  Let me rephrase. Nofi was
17  deposed last week.
18      A.  Yes.
19      Q.  You're aware of that. After,
20  between that date of his deposition and
21  today, have you spoken with any of the other
22  Plaintiffs?
23      A.  Yes.
24      Q.  Whom -- with whom have you
25  spoken?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 9

1           E. Carter
2     A.   With Kevin Lamm.
3     Q.   And when did you speak with Kevin
4  Lamm?
5     A.   Prior to -- it would be Sunday.
6          (Mr. Connolly entered the room.)
7     Q.   And was that in the presence of
8  your attorney?
9     A.   No.
10     Q.   Was it by phone?
11     A.   Yes.
12     Q.   What was the sum and substance of
13  the conversation?
14     A.   I told him I was going for a
15  deposition on Tuesday and that we were
16  notified that several depositions were
17  canceled next week and the following weeks,
18  which we had taken days off for.
19     Q.   Okay.  Well, what deposition --
20  what days off did you take?
21     A.   I was going to take off  -- well,
22  I didn't -- I took off for tomorrow which is
23  Wednesday, and I was going to put in for a
24  couple days next week.
25     Q.   Why did you decide to take off

Page 10

1           E. Carter
2  for tomorrow?
3     A.   There was a deposition scheduled
4  for tomorrow.
5     Q.   Of whom?
6     A.   With Mr. Paridiso.
7     Q.   And why did you think it was
8  important for you to be at Mr. Paridiso's
9  deposition?
10     A.   With my case being as important
11  as it is to me, I think it's important for
12  me to make as many depositions as I can.
13     Q.   Fair enough.  And what did
14  Mr. Lamm say to you, if anything, on Sunday
15  after you told him you were going to be
16  deposed and that some of the depositions had
17  been canceled?
18     A.   He asked me if I knew where the
19  place was, which I was a little unsure of,
20  and I told him that -- I asked him if he was
21  going to go on Wednesday, and he said he
22  wasn't sure if he could get off from work or
23  not.
24     Q.   Was that the extent of your
25  conversation with Mr. Lamm?

Page 11

1           E. Carter
2     A.   Basically, yes.  From what I
3  recall at this time, yes.
4     Q.   Did you talk about any of the
5  substantive allegations in the complaint
6  with Mr. Lamm on Sunday?
7     A.   No.
8     Q.   Prior to Mr. Nofi's deposition
9  last week, did you speak with any of the
10  other Plaintiffs concerning Nofi's
11  deposition?
12     A.   Just the other told -- we were
13  told we were going for depositions.  Just
14  the dates.
15     Q.   Okay.  You didn't speak with the
16  other Plaintiffs concerning --
17          MR. GOODSTADT: Just -- just so
18      when you say you were told that you
19      were going for dates, don't disclose
20      any communications that came from us.
21      He's talking about only between you and
22      the other Plaintiffs.
23     Q.   Other than -- putting aside what
24  you may or may not have spoken to counsel
25  about concerning your deposition, have you

Page 12

1           E. Carter
2  spoken to anybody else concerning the fact
3  that you were being deposed today?
4     A.   No.
5     Q.   With whom are you presently
6  employed, if anybody?
7     A.   Township of Islip.
8     Q.   And what job do you presently
9  hold with the Township of Islip?
10     A.   Civil service job as a park
11  ranger two, which is a sergeant's position.
12     Q.   Are you presently employed by any
13  other entity or individual?
14     A.   No.
15     Q.   In year 2008, have you sought any
16  employment from any entity or individual?
17     A.   No.
18     Q.   In 2007, did you seek employment
19  with any entity or individual?
20     A.   No.  I couldn't for my reason for
21  termination.
22  MO       MR. NOVIKOFF: Motion to strike
23      as nonresponsive.
24     Q.   My question was a yes or no.
25     A.   No.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 13

E. Carter

1
2   Q.   So let me rephrase the question.
3        MR. GOODSTADT: Just so I don't
4   have to address your motion to strike
5   each time, we --
6        MR. NOVIKOFF: I would --
7        MR. GOODSTADT: -- oppose any
8   motion to strike.
9        MR. NOVIKOFF: I would
10  stipulate that any time I make a motion
11  to strike, you are going to oppose it
12  and we'll take that up with the court
13  at the appropriate time.
14       MR. GOODSTADT: Great.
15       MR. NOVIKOFF: Okay.
16  Q.   Sir, in 2007, did you seek any
17  employment with any entity or individual?
18  A.   No.
19  Q.   Sir, in 2006, did you seek
20  employment with any entity or individual?
21  A.   Yes. I tried to seek employment
22  with the Suffolk County Park Police.
23  Seasonally.
24  Q.   When in 2006 did you seek
25  employment with the Suffolk County Park

Page 14

E. Carter

2   Police?
3   A.   The phone call was made May,
4   early May of 2006 to the Smith Haven
5   barracks in I believe it's Mastic or
6   Shirley.
7   Q.   I'm sorry, what was the end?
8   A.   Mastic or Shirley. The location
9   of it.
10  Q.   Okay. Other than the Suffolk
11  County Park Police, did you seek any other
12  employment in 2006?
13  A.   Yes. My park ranger three
14  position with the Town of Islip, which is a
15  civil service test, promotional test. I
16  applied for it January of 2006. Took the
17  test. The test results came out September
18  2006.
19  Q.   So the test results came out
20  after you were advised that you were no
21  longer working for Ocean Beach?
22  A.   Yes.
23  Q.   Okay. And that would have been
24  instead of seeking new employment, you were
25  seeking a promotion; is that fair?

Page 15

E. Carter

1
2   A.   Furthering my career with more
3   money. Yes.
4   Q.   It would be a promotion as
5   opposed to a new job for a new employer?
6   A.   It is a new job with the same
7   employer, yes.
8   Q.   Okay. So other than the test
9   that you took for this new job with the same
10  employer and other than the Suffolk County
11  Park Police application, did you try to find
12  a job with any other entity or employer in
13  2006?
14  A.   I researched stuff and I saw
15  there were several polygraphs that I
16  couldn't apply for them, so no.
17  Q.   When you say there were
18  "several" -- I'm not asking why you couldn't
19  apply for them, I'm only now asking you
20  about your comment about there were several
21  polygraphs. So my question is, what did you
22  mean by your answer that "there were several
23  polygraphs"?
24  A.   I went on websites for armed
25  security guard, armed carriers and I saw the

Page 16

E. Carter

1
2   requirements, and it came up with a
3   polygraph. I looked into doing stock at
4   Toys R Us, I had to take a polygraph.
5   Q.   Now why was taking a polygraph a
6   problem?
7   A.   The problem was when George Hesse
8   fired me, terminated me from Ocean Beach, he
9   originally told me I was let go for
10  directives that he posted in the fall.
11  Q.   Okay.
12  A.   He further went on later on at a
13  meeting on April 2, when I was let go, that
14  I was going to wear a wire for the District
15  Attorney's office in reference to a Gilbert
16  incident, a businessman that was beat up
17  while at Ocean Beach.
18  Q.   Okay.
19  A.   Subsequent phone call to Hesse
20  later on winds up being he tells me -- there
21  was a blog, the Long Island Politics, that I
22  did official misconduct, falsified paperwork
23  for a Halloween incident. Arnold Hardman
24  calls me, reconfirms saying, "Carter" --
25  right after I was let go -- "you got scooped

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 17

E. Carter

1
2 up.  I think you got scooped up in the
3 Halloween incident," which I wasn't working
4 then.  So there were three reasons at that
5 point why he let me go.  The fourth reason
6 he gave me is I was sleeping.  There was no
7 way I could answer a polygraph why I was let
8 go.
9    Q.   But, sir, a polygraph -- to your
10 knowledge, isn't it true that a polygraph is
11 a device wherein it is asking you questions
12 to see if your responses were less than
13 truthful?
14       MR. GOODSTADT: Objection.
15    A.   Yes.
16    Q.   You have that understanding as to
17 what a polygraph is, correct?
18    A.   Yes.  Also, the question why were
19 you terminated or fired from Ocean Beach I
20 couldn't answer.
21    Q.   Well, that doesn't mean that you
22 would be lying, would it?
23       MR. GOODSTADT: Objection.
24    Q.   Were you lying in response to
25 when -- the last answer that you gave with

Page 18

E. Carter

1
2 regard to the four reasons that you say that
3 Mr. Hesse says that he gave you for being
4 fired, were you lying?
5    A.   No.
6    Q.   Okay.  So if someone asked you on
7 a polygraph question exam "why were you
8 fired" and you answered "I don't know,"
9 would that be a truthful response?
10       MR. GOODSTADT: Objection.
11    Q.   As you sit here today?  You can
12 answer.
13    A.   I'm sorry.
14       MR. GOODSTADT: You can answer.
15    Q.   You can answer the question.
16    A.   It would be truthful.
17    Q.   And if someone asked you during a
18 polygraph exam what were the reasons that
19 Mr. Hesse gave you for being fired as you
20 say you were on April 2, you would have
21 given the same answers you just gave me,
22 correct?
23       MR. GOODSTADT: Objection.
24    A.   No.  They have yes and no
25 questions and they would -- just the

Page 19

E. Carter

1
2 hearing, again, why I was let go, my blood
3 pressure would be raised, which would give
4 off on the polygraph, and I would -- I would
5 definitely not pass a polygraph, and Hesse
6 was aware of that and I made him aware of
7 that.
8    Q.   When did you make Mr. Hesse aware
9 that your blood pressure would be raised
10 during a polygraph exam?
11    A.   I made him aware -- I didn't make
12 him aware of that.
13    Q.   Okay.  When did you make
14 Mr. Hesse aware that you would fail a
15 polygraph test because of the events that
16 took place on April 2, 2006?
17       MR. GOODSTADT: Objection.
18    A.   I called -- I called him May.
19    Q.   Just answer me when.
20    A.   In May.
21    Q.   Okay.  How?
22    A.   By phone.
23    Q.   And what did you say to Mr. Hesse
24 concerning your concerns that you would
25 be -- you would fail a polygraph test?

Page 20

E. Carter

1
2    A.   I told him I would have to take a
3 polygraph for the Suffolk County Park Police
4 and a background, and I needed to know why I
5 was let go.
6    Q.   Okay.  Sir, in that conversation,
7 did you tell Mr. Hesse that you would fail a
8 polygraph test because of the events
9 concerning April 2, 2006?
10       MR. GOODSTADT: Objection.
11    Q.   Yes or no?
12    A.   I'm sure I expressed it in the
13 way I asked him, yes.
14    Q.   I don't understand what that
15 means, sir.  What do you mean you expressed
16 it in a way you asked him?  My question is
17 simple, did you advise Mr. Hesse
18 specifically "I will fail a polygraph test
19 because of the events surrounding April 2,
20 2006"?
21       MR. GOODSTADT: Objection.
22    A.   No.
23    Q.   Now since you brought it up, I'm
24 going to ask you this.  What reasons did
25 George Hesse give you at any point in time

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 21

1           E. Carter
2  for why you were no longer going to be
3  working for Ocean Beach?  I don't want to
4  know the circumstances surrounding the
5  conversation, I just want to know the
6  specific reasons that George Hesse
7  communicated to you directly.
8      A.   The original one at April 2 was
9  he had to let someone go for the directives
10  he hung up in the fall and he chose me.
11     Q.   Okay.  Next one?
12     A.   Later on, during a phone call and
13  an email, May of 2006, he told me for
14  sleeping.
15     Q.   Okay.  So he communicated to you
16  two reasons why he let you go.  One was for
17  what you labeled directives, and two is
18  because you were sleeping?
19     A.   Yes.
20     Q.   Any other reasons that he
21  communicated directly to you concerning why
22  he made the decision not to rehire you for
23  the 2006 summer season?
24         MR. GOODSTADT: Objection.
25         MR. NOVIKOFF: Well, I'll

Page 22

1           E. Carter
2  withdraw the question.
3      Q.   Other than the two reasons you
4  just gave me, are there any other reasons
5  that Mr. Hesse communicated to you directly
6  with regard to why you were no longer
7  working for Ocean Beach after April 2, 2006?
8      A.   No.
9          MR. NOVIKOFF: I'm going to ask
10     the court reporter to mark the
11     following documents as Carter-1.
12         (Notice of Claim was marked as
13     Carter Exhibit-1 for identification;
14     9/16/08, E.L.)
15     Q.   Sir, I'm going to show you what's
16  been marked as Carter-1 and ask you to
17  review it, and please advise me when you're
18  done reviewing it.
19     A.   (Reviewing).  I'm done, sir.
20     Q.   And do you recognize this
21  document?
22     A.   Yes, sir.
23     Q.   And what is this document?
24     A.   It's a Notice of Claim.
25     Q.   And are you aware what a Notice

Page 23

1           E. Carter
2  of Claim is?
3      A.   I'm a little familiar with it,
4  sir.
5      Q.   What's your understanding what a
6  Notice of Claim is?
7      A.   My understanding is a Notice of
8  Claim must be filed within a specific period
9  of time after a wrong doing is done for
10  court or legal proceedings to proceed.
11     Q.   And let's turn to the third page.
12  It says -- there's a signature, do you see
13  that?
14     A.   Yes.
15     Q.   And it's "respectfully yours,
16  Thompson Wigdor & Gilly, LLP," do you see
17  that?
18     A.   Yes.
19     Q.   Was that your lawyer -- well, was
20  that the law firm representing you at the
21  date that the Notice of Claim was filed?
22     A.   Yes.
23     Q.   And you see the date "June 30,
24  2006"?
25     A.   Yes.

Page 24

1           E. Carter
2      Q.   Did you review the Notice of
3  Claim before you  -- well, did you authorize
4  your lawyers to file the Notice of Claim on
5  your behalf?
6      A.   Yes.
7      Q.   And did you review the Notice of
8  Claim prior to it being filed by your
9  lawyers?
10     A.   Yes.
11     Q.   On how many occasions did you
12  review the Notice of Claim prior to it being
13  filed?
14     A.   One time.
15     Q.   And did you review the Notice of
16  Claim for purposes of accuracy?
17     A.   Yes.
18     Q.   And would it be correct to say
19  that if you found that there was anything
20  that was inaccurate in there, you would have
21  notified your lawyers about that?
22         MR. GOODSTADT: Objection.
23     A.   Yes.
24  RL Q.   And prior to authorizing your
25  lawyers to file the Notice of Claim, did you

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 25

E. Carter

1
2 advise them that there was anything
3 inaccurate?
4 DI      MR. GOODSTADT: Objection. I'm
5     going to instruct the witness not to
6     respond to the question as it violates
7     attorney/client communication.
8         MR. NOVIKOFF: I don't think it
9     does, but let's mark that for a ruling.
10        MR. GOODSTADT: Okay.
11    Q.   When you read this Notice of
12 Claim, was there anything inaccurate that
13 you saw?
14    A.   No.
15    Q.   And when I say "this Notice of
16 Claim," I'm talking about what's been marked
17 as Carter-1?
18    A.   No.
19    Q.   Okay. Let's look at the "nature
20 of the claim" section. Four lines from the
21 bottom, five lines from the bottom, in the
22 middle it says "and otherwise," do you see
23 it?
24    A.   Yes.
25    Q.   And just for the record, there is

Page 26

E. Carter

1
2 underlining on the Notice of Claim. I don't
3 know who put that there, but you --
4 withdrawn. I didn't put that there, so.
5 "And otherwise wrongful conduct and
6 practices engaged in by numerous senior
7 ranking officers, including but not limited
8 to Sergeant George Hesse," do you see that?
9    A.   Yes.
10    Q.   Who are the other senior ranking
11 officers that you refer to in this Notice of
12 Claim?
13    A.   The officers that had more time
14 than me, which would be Ken Bockelman, Tyree
15 Bacon.
16    Q.   Anybody else?
17    A.   Those are the examples I recall
18 at this time.
19    Q.   So your understanding of senior
20 ranking officers means that they have more
21 experience than you?
22    A.   Yes.
23    Q.   At Ocean Beach?
24    A.   Yes.
25    Q.   How do you know Ty Bacon has more

Page 27

E. Carter

1
2 experience than you?
3    A.   He started there prior to my
4 starting in 1991.
5    Q.   And was he working there
6 continuously, to your knowledge?
7    A.   To my knowledge, no.
8    Q.   Do you know how many days he
9 worked since 1991?
10    A.   No.
11    Q.   So how do you know that he worked
12 more days from the commencement of his
13 employment with Ocean Beach that you
14 worked -- than you worked?
15        MR. GOODSTADT: Objection.
16    A.   He was --
17    Q.   I just want to know --
18    A.   He was there more than a year or
19 two prior to me.
20    Q.   But he was seasonal, correct?
21    A.   Yes.
22    Q.   You're seasonal?
23    A.   Yes.
24    Q.   That means you're not working
25 five days a week, correct?

Page 28

E. Carter

1
2        MR. GOODSTADT: Objection.
3        MR. NOVIKOFF: Well, withdrawn.
4    Q.   What's your understanding of the
5 word "seasonal"?
6    A.   Seasonal is from May to
7 September.
8    Q.   Right. And you're working
9 shifts, correct?
10    A.   Yes.
11    Q.   Less than 40 hours a week on
12 average?
13    A.   Myself, yes.
14    Q.   Yes. How about Ty Bacon?
15    A.   He worked quite a few hours more.
16    Q.   How do you know?
17    A.   Because the schedules.
18    Q.   You saw the schedules since 1991
19 of when Ty Bacon worked?
20    A.   He was on the same schedule as
21 me, yes.
22    Q.   My question is, you've looked --
23 you know as you sit here today how many
24 days -- how many shifts Ty Bacon worked
25 since 1991?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 29

E. Carter

1
2     A.   No.
3          MR. GOODSTADT: Objection.
4     That wasn't the question.
5     Q.   Sir, would you agree with me that
6  you're just speculating as to whether or not
7  Mr. Bacon worked more hours at Ocean Beach
8  than you in your respective employment
9  histories?
10         MR. GOODSTADT: Objection.
11    A.   It's my belief he did.
12    Q.   And it's your belief based upon
13 what?
14    A.   Based upon the number of times I
15 seen him there.
16    Q.   Did he work nights?
17    A.   Yes.
18    Q.   Did he work the same nights you
19 worked?
20    A.   Not always.
21    Q.   And if you weren't at Ocean Beach
22 during a particular night, you don't know
23 whether he was working there that night,
24 correct?
25         MR. GOODSTADT: Objection.

Page 30

E. Carter

1
2     A.   Without looking back through the
3  blotter book, no.
4     Q.   Who's the other guy?
5     A.   Kenneth Bockelman.
6     Q.   Okay.  And how do you know he was
7  more senior than you in terms of experience
8  at Ocean Beach?
9     A.   He worked 40 hours a week, and in
10 the off season, for many more hours than I
11 did.
12    Q.   How do you know?
13    A.   Because of the schedule.
14    Q.   And when did he start working for
15 Ocean Beach?
16    A.   I don't recall the exact date.
17    Q.   You started working for Ocean
18 Beach in 1991, correct?
19    A.   Yes.
20    Q.   And then there was a period of
21 time that you stopped, right?
22    A.   Yes.
23    Q.   Was Mr. Bockelman there in 1991?
24    A.   No.
25    Q.   Was Mr. Bockelman there on the

Page 31

E. Carter

1
2  last day of your employment during your
3  first tenure with Ocean Beach?
4     A.   No.
5     Q.   When did you recommence your
6  employment with Ocean Beach after your first
7  go around?
8     A.   2001.
9     Q.   Was Mr. Bockelman there in 2001?
10    A.   Yes.
11    Q.   Do you know how long prior to
12 2001 Mr. Bockelman first showed up?
13    A.   Only from what he said.  He
14 graduated the academy couple years earlier.
15    Q.   But that doesn't necessarily mean
16 he was working for Ocean Beach, correct?
17    A.   He went right to Ocean Beach.
18    Q.   Oh, he went right to Ocean Beach.
19 And did he work nights as well?
20    A.   Yes.
21    Q.   What unlawful conduct did
22 Mr. Bacon engage in, as you refer to in
23 here?
24    A.   Drinking on duty.
25    Q.   Okay.  And what tortious conduct

Page 32

E. Carter

1
2  did Mr. Bacon engage in as you refer to in
3  here?
4          MR. GOODSTADT: Objection.
5          MR. NOVIKOFF: I'm just asking
6     him.
7          MR. GOODSTADT: Calls for a
8     legal conclusion.
9          MR. NOVIKOFF: Okay.  But this
10    is his document, so.
11    Q.   What tortious conduct did
12 Mr. Bacon engage in?
13         MR. GOODSTADT: Same objection.
14    Q.   You can answer.
15    A.   At this time, I don't recall any.
16    Q.   What wrongful conduct and
17 practices did Mr. Bacon engage in as you
18 refer to in here?
19         MR. GOODSTADT: Objection.
20    A.   The drinking on duty.
21    Q.   Okay.  Anything else?
22    A.   That I'm aware at this time, no.
23    Q.   So are you alleging here that you
24 were unlawfully terminated because you did
25 not participate with Mr. Bacon in drinking

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 33

E. Carter

1 off duty?
2    A.   Drinking with Mr. Bacon and the
3 other officers, yes.
4    Q.   And Mr. Bacon fired you?
5    A.   Mr. Hesse fired me.
6    Q.   Okay. So Mr. Bacon didn't have
7 anything to do with you being fired,
8 correct?
9    A.   Directly that I know of, no.
10   Q.   He had no authority to hire
11 you -- to fire you, to the best of your
12 knowledge, correct?
13   A.   Correct.
14   Q.   He was the same rank as you?
15   A.   Correct.
16   Q.   Okay. And Bachman, what unlawful
17 conduct did Bachman participate in as you
18 allege here?
19   A.   He also drinking on duty.
20      MR. GOODSTADT: Just so the
21 record is clear, I think it's
22 "Bockelman."
23      MR. NOVIKOFF: "Bockelman,"
24 okay.
25

Page 34

E. Carter

1    Q.   And what about tortious conduct,
2 what tortious conduct did Mr. Bockelman
3 engage in?
4      MR. GOODSTADT: Objection.
5    Q.   Okay. You can answer.
6    A.   None that I know of at this time.
7    Q.   Is there anything in your
8 possession, custody or control that would
9 refresh your recollection?
10   A.   No.
11   Q.   What wrongful conduct and
12 practices did Bockelman engage in as you
13 refer to here?
14      MR. GOODSTADT: Objection.
15   A.   The drinking on duty.
16   Q.   Okay. Anything else?
17   A.   With myself, no.
18   Q.   Right. And my questions, unless
19 I ask you differently, are just as it
20 relates to you. Was Bockelman the same rank
21 as you?
22   A.   Yes.
23   Q.   He didn't have any authority to
24 fire you, to your knowledge, did he?
25

Page 35

E. Carter

1    A.   Not that I know of, no.
2    Q.   Did he -- to your knowledge, did
3 he have anything to do directly with you
4 being fired?
5    A.   Not that I know of.
6    Q.   Any other officers that you can
7 refer -- that you can advise us of that you
8 consider to be senior ranking officers as
9 you used that term in this Notice of Claim?
10   A.   No, sir.
11   Q.   Okay. And when did you first
12 find out -- well, when did you first learn
13 that Bacon was drinking off duty?
14      MR. GOODSTADT: Objection.
15   A.   Off duty?
16      MR. NOVIKOFF: Well, withdrawn.
17   Q.   Drinking on duty as you say was
18 an unlawful conduct?
19   A.   I saw it in 2003.
20   Q.   And did you complain to anybody
21 about Mr. Bacon now specifically?
22   A.   Mr. Bacon, yes.
23   Q.   Who did you complain to?
24   A.   George Hesse.
25

Page 36

E. Carter

1    Q.   Anybody else in 2003 now?
2    A.   There were other officers
3 drinking in the station along with
4 Mr. Bacon, yes.
5    Q.   I'm only concerned now about
6 Mr. Bacon.
7    A.   No.
8    Q.   Did you complain to anyone else
9 in 2003, other than Mr. Hesse?
10   A.   No.
11   Q.   Did you complain to Mr. Hesse
12 about Mr. Bacon drinking on duty in 2004?
13   A.   Yes.
14   Q.   How many times in 2003 did you
15 complain to Mr. Hesse about Mr. Bacon
16 drinking on duty?
17   A.   Mr. Bacon would have been
18 approximately three times.
19   Q.   Do you recall when in 2003?
20   A.   Summer of 2003.
21   Q.   Three times during the summer of
22 2003; is that correct?
23   A.   That I witnessed, yes.
24   Q.   And how about -- no, not that

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 37

E. Carter

1  you witnessed.  That you complained to
2  Mr. Hesse about.
3
4      A.   Yes.
5      Q.   Three times?
6      A.   (Indicating).
7      Q.   So would it be -- yes?
8      A.   Yes.
9      Q.   So would it be fair based upon
10  your testimony -- I'm sorry, would it be a
11  fair characterization of your testimony that
12  every time that you saw Mr. Bacon drink in
13  2003 while on duty, you complained to
14  Mr. Hesse about it?
15     A.   Yes.
16     Q.   Okay.  And the first time that
17  you complained, what did you say to
18  Mr. Hesse?
19     A.   I said, "George, this is
20  bullshit.  I got to clean up all your guys'
21  beers, rocket fuel, empty cups with Bacon,
22  you and the other guys drinking."  And
23  George just said, "Shut up and do it."
24     Q.   He said shut up and what?
25     A.   Do it.

Page 38

E. Carter

1
2      Q.   So you weren't necessarily
3  complaining about Mr. Bacon drinking, you
4  were complaining about the fact that you had
5  to clean up his mess and other people's
6  mess, correct?
7          MR. GOODSTADT: Objection.
8      A.   No.  I was complaining that the
9  officers were drinking in the station and
10  leaving the mess.
11     Q.   But what specifically did you say
12  to Mr. Hesse when you say you complained to
13  him that first time?
14     A.   "George, this is bullshit.  You
15  guys are drinking in the station and leaving
16  a mess.  Beer cans, rocket fuels, cups, and
17  why do I have to clean it up?"
18     Q.   Okay.  So would it be fair to say
19  that part of your complaint was the fact
20  that you had to clean up the other officers
21  that you claim were drinking while on duty
22  in the station?
23     A.   Part of my claim, yes.
24     Q.   Okay.  Part of your complaint?
25     A.   Yes.

Page 39

E. Carter

1
2      Q.   Okay.  The second time in 2003
3  that you complained, what did you say to
4  Mr. Hesse?
5      A.   Basically the same thing.
6  "George, what's going on?"  "You know, why
7  do I have to clean up this stuff again?"
8      Q.   Okay.  Third time in 2003, what
9  was the sum and substance of your complaint
10  to Mr. Hesse?
11     A.   That the rocket fuels were
12  dropped at the front desk where I was.
13     Q.   And that you had to clean it up?
14     A.   No.  That the guys were coming in
15  picking them up and I was in the middle of
16  doing stuff.  Paperwork and stuff.
17     Q.   So what was your complaint?
18     A.   My complaint was the alcohol was
19  brought in the station.  It shouldn't have
20  been there.
21     Q.   Okay.  So it really had nothing
22  to do with the fact that you were doing
23  paperwork at the desk?
24     A.   It interfered with myself doing
25  the paperwork, yes.

Page 40

E. Carter

1
2      Q.   Got it.  And the second time that
3  you complained to Mr. Hesse, what was
4  Mr. Hesse's response?
5      A.   Again, just laughed it off and
6  walked away.
7      Q.   Third time, what was Mr. Hesse's
8  response?
9      A.   He gave me a look and said, "Just
10  cut the shit," and walked out.
11     Q.   He said to you "cut the shit"?
12     A.   Yup.
13     Q.   Now was Mr. Hesse the chief of
14  police at the time in 2003, to your
15  knowledge?
16     A.   No.
17     Q.   Who was?
18     A.   Chief Ed Paridiso.
19     Q.   Did you -- when -- well, how
20  would you characterize Mr. Hesse's response
21  to your first complaint in 2003?
22     A.   Normal George Hesse response.
23     Q.   Well, did he --
24         MR. CONNOLLY: Objection.
25         MR. NOVIKOFF: What's that?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 41

E. Carter

1
2     MR. CONNOLLY: Objection.
3     MR. NOVIKOFF: You objected.
4     Q.   Did you -- again, what did
5  Mr. Hesse say to you when you complained to
6  him the first time in 2003?
7     A.   "Cut the bullshit."
8     Q.   Now would you agree with me that
9  a fair interpretation of Mr. Hesse's
10 response was that he was not going to do
11 anything about your complaint?
12    MR. GOODSTADT: Objection.
13    Q.   Your first complaint?
14    MR. GOODSTADT: Objection.
15    A.   Yes.
16    Q.   Okay.  Did you take -- did you
17 take your first complaint to Mr. Paridiso?
18    A.   No.
19    Q.   Did you take your complaint to
20 Mayor Rogers at the time?
21    A.   No.
22    Q.   Did you take -- the first time
23 that you complained to Mr. Hesse and he did
24 not give you a favorable response, did you
25 take your complaint to any trustee?

Page 42

E. Carter

1
2     A.   No.
3     Q.   Second time in 2003, what did
4  Mr. Hesse say to you when you complained?
5     A.   He said, "Just clean it up."
6     Q.   Okay.  Would you agree with me
7  that that wasn't a favorable response on
8  Mr. Hesse's part to your complaint?
9     MR. GOODSTADT: Objection.
10    A.   Yes.
11    Q.   Did you take that second
12 complaint to Mr. Paridiso?
13    A.   No.
14    Q.   Did you take that second
15 complaint to Mayor Rogers?
16    A.   No.
17    Q.   Did you take that second
18 complaint to any trustee of the village?
19    A.   No.
20    Q.   Third time that Mr. -- that you
21 complained to Mr. Hesse I believe you said
22 that he said "cut the bullshit," right?
23    A.   Yes.
24    Q.   Again, would you agree with me
25 that that was not a favorable response to

Page 43

E. Carter

1
2  your complaint?
3     MR. GOODSTADT: Objection.
4     A.   Yes.
5     Q.   Did you take that complaint to
6  Mr. Paridiso?
7     A.   No.
8     Q.   Did you take that complaint to
9  Mayor Rogers?
10    A.   No.
11    Q.   Did you take that complaint to
12 any trustee member?
13    A.   No.
14    Q.   At any point in time in 2003, did
15 you complain to Ed Paridiso about the fact
16 that there were officers, to your
17 recollection, to your belief, drinking off
18 duty in the police station?
19    MR. GOODSTADT: Objection.
20    MR. NOVIKOFF: I'm sorry.  I'm
21 sorry.  Withdraw the question.
22    Q.   At any point in time in 2003, did
23 you complain to Ed Paridiso that there were
24 officers on duty drinking?
25    A.   No.

Page 44

E. Carter

1
2     Q.   Same question with regard to
3  Mayor Rogers?
4     A.   No.
5     Q.   Same question with regard to any
6  trustee at the time?
7     A.   No.
8     Q.   In 2003, did you communicate with
9  Ed Paridiso in any manner, shape or form
10 that there were officers drinking on duty?
11    A.   No.
12    Q.   Same question as to Mayor Rogers?
13    A.   No.
14    Q.   Same question as to the trustees?
15    A.   No.
16    Q.   Same question as to specifically
17 Mayor Loeffler -- I mean Mr. Loeffler?
18    A.   No.
19    Q.   Okay.  2004 now --
20    MR. GOODSTADT: Just so we're
21 clear, you're talking about Joe
22 Loeffler?
23    MR. NOVIKOFF: The Defendant in
24 this case, yes.  And unless I otherwise
25 indicate, if I say "Mr. Loeffler," I'm

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 45

1        E. Carter
2    referring to the present mayor and the
3    person who's now a Defendant in this
4    lawsuit.
5        Q.    How many times did you complain
6    to George Hesse in 2004 about officers
7    drinking while on duty?
8        A.    Approximately three.
9        Q.    Okay.  And when was your first in
10   2004?
11       A.    It was the summer of 2004 when I
12   had to leave two officers with a cell phone
13   and a police radio at CJ's Bar.
14   MO        MR. NOVIKOFF: Okay.  I'm going
15       to move to strike that part of the
16       answer after the time period that
17       Mr. Carter indicated in his answer.
18       Q.    So you first complained in
19   2000 -- in the summer of 2004.  When was
20   your second and third complaint?
21       A.    Also the summer of 2004.
22       Q.    Okay.  Let's talk about your
23   first complaint to Mr. Hesse.  What did you
24   specifically say to him?
25       A.    I said, "George, I'm coming in.

Page 46

1        E. Carter
2    There's no one -- there's a dock master at
3    the station."  I said, "I got to walk into
4    CJ's Bar and get the radio and the cell
5    phone from Rich and Gary Bosetti, and I
6    think it's bullshit."
7        Q.    And Rich and Gary Bosetti were
8    officers of Ocean Beach?
9        A.    Yes.
10       Q.    And when you went in on that
11   occasion to get the cell phone from them,
12   they were on duty, to the best of your
13   knowledge?
14       A.    Yes.
15       Q.    And what did Mr. Hesse say to
16   you, if anything, in response to your --
17       A.    He -- he just looked at me and
18   walked away.
19       Q.    Okay.  And how long after you had
20   to get the cell phone from the Bosettis did
21   you make the complaint to George Hesse?
22       A.    The next time I saw him.
23       Q.    Okay.  Was that the same night?
24   The next night?  Next week?
25       A.    It was within the week.

Page 47

1        E. Carter
2        Q.    Okay.  And would you
3    characterize -- well, with regard to the
4    complaint about getting the cell phone from
5    the Bosettis in 2004 that you raised with
6    Mr. Hesse, did you raise this complaint with
7    Mayor Rogers?
8        A.    No.
9        Q.    Did you raise this complaint with
10   Ed Paridiso?
11       A.    No.
12       Q.    Did you raise this complaint with
13   Mr. Loeffler?
14       A.    No.
15       Q.    Did you raise this complaint with
16   any member of the  -- any trustee?
17       A.    No.
18       Q.    Okay.  Second time, what was your
19   complaint to Mr. Hesse about concerning
20   officers drinking on duty?
21       A.    Same thing.  Relieving the
22   officers in the bar.
23       Q.    "Same thing" meaning you had to
24   go get the cell phone?
25       A.    I had to go get the cell phone

Page 48

1        E. Carter
2    and police radio from in the bar.
3        Q.    And the bar was CJ's?
4        A.    Yes.
5        Q.    And what did Mr. Hesse say to you
6    in response to your second complaint on this
7    subject in 2004?
8        A.    That he would take care of it.
9        Q.    Okay.  And did Mr. Hesse advise
10   you as to how he would take care of it?
11       A.    No.
12       Q.    Did you inquire with Mr. Hesse as
13   to how he would take care of it?
14       A.    I found out the next time I
15   relieved.
16       Q.    Did you inquire with Mr. Hesse
17   during the second complaint as to how he
18   would take care of it?
19       A.    No.
20       Q.    Okay.  Did, to your knowledge --
21   withdrawn.  To your knowledge, did Mr. Hesse
22   take care of it?
23       A.    Yes.
24       Q.    What did he do?
25       A.    He then -- I then wound up

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

E. Carter

1          E. Carter
2 relieving -- walking into the station.  A
3 dock master had the cell phone, the police
4 cell phone and the radio.
5     Q.   So what exactly did Mr. Hesse do
6 to take care of it, to the best of your
7 recollection?
8     A.   To the best of my knowledge, he
9 told them stop going out to the bars with
10 the police radio and the cell phone.
11     Q.   Okay.  And did the Bosettis stop
12 doing that after your second complaint in
13 2004?
14     A.   Yes.
15     Q.   Okay.  What was your third
16 complaint concerning officers drinking on
17 duty to Mr. Hesse in 2004?
18     A.   I'm sorry, officers drinking on
19 duty?
20     Q.   Yes.  Well, that was the only
21 thing I think you mentioned, so.
22     A.   Yes.  That was also the rocket
23 fuels being brought into the police station.
24     Q.   Okay.  And that was -- the third
25 complaint that you made to Mr. Hesse was

1          E. Carter
2 about the rocket fuels being brought into
3 the station?
4     A.   Yes.
5     Q.   What did Mr. Hesse say to you, if
6 anything, in response to your complaint on
7 this subject matter?
8     A.   Just chuckled and ignored me.
9     Q.   Okay.  And did you speak with
10 Mr. Paridiso about your third complaint
11 concerning the rocket fuel?
12     A.   No.
13     Q.   Did you speak with mayor -- did
14 you complain to Mayor Rogers?
15     A.   No.
16     Q.   Did you complain to Mr. Loeffler
17 about this third complaint?
18     A.   No.
19     Q.   Did you complain to any trustee
20 member?
21     A.   No.
22     Q.   Did you communicate, in 2004,
23 with anyone, other than Mr. Hesse,
24 concerning your complaints about officers
25 drinking on duty that you've just testified

1          E. Carter
2 to?
3     A.   No.
4     Q.   2005, did you complain to
5 Mr. Hesse about officers drinking on duty?
6     A.   Yes.
7     Q.   How many times?
8     A.   One that sticks with me at this
9 time that I recall.
10     Q.   And when was that?
11     A.   It was Labor Day weekend.
12     Q.   Labor Day, so that would have
13 been early September 2005?
14     A.   Yes.
15     Q.   And what did you say to
16 Mr. Hesse?
17     A.   I told him down at a bar,
18 Maguire's, I said, "What's going on?"  I
19 said, "I had to take off to go have one
20 drink and you guys are getting paid to have
21 a drink?"  And he just looked at me and
22 said, "Shut up."
23     Q.   What do you mean when you said
24 you had to take off to have one drink?
25     A.   I wound up -- one of the guys was

1          E. Carter
2 going over to Iraq, Hank Clemens.  We had
3 nine guys, approximately nine guys on the
4 midnight tour.  I asked George if I could
5 work half a tour from 8:00 at night to 12:00
6 and go out for two beers with Hank prior to
7 him leaving, deploying for Iraq, and George
8 says, "I have plenty of coverage.  Yes, you
9 could go."
10     Q.   So Mr. Hesse said that you could
11 take a half a shift and celebrate with the
12 person going to Iraq, correct?
13     A.   Yes.
14     Q.   So what was your complaint?
15     A.   Later, later in the morning,
16 approximately 3:30, 4:00 in the morning, I
17 walked down to Maguire's Bar, several of the
18 officers were inside drinking shots of
19 liquor while on duty.
20     Q.   So your complaint was you had to
21 go off duty to drink, but the other people
22 were on duty and drinking?
23         MR. GOODSTADT: Objection.
24     Q.   Was that your -- was that your
25 complaint to Mr. Hesse?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 53

E. Carter

2  A.  No.  My complaint is you're
3  drinking again in uniform and why did I have
4  to take off, you know.
5  Q.  Yes.  That's what I'm trying to
6  understand, sir.  Were you upset that you
7  had to take off in order to have a drink
8  with your -- with your friend who was going
9  to Iraq?
10  A.  No.
11  Q.  And the other officers could
12  drink on duty?
13  A.  I wasn't upset that I had to take
14  off, no.
15  Q.  Then what was the purpose of your
16  telling George Hesse that you had to take
17  off to drink and the others didn't?
18  A.  It just was part of what I said
19  to him.  But my complaint was they were
20  drinking while on duty.
21  Q.  So that was your complaint?
22  A.  Yes.
23  Q.  So let me go back to this
24  incident, this night.  You asked Mr. Hesse
25  to just work 8:00 to 12:00, correct?

Page 54

E. Carter

2  A.  Yes.
3  Q.  So you could have a couple of
4  drinks with your -- with your friend?
5  A.  Yes.
6  Q.  Who was an officer?
7  A.  Yes.
8  Q.  And you stopped working at 12:00
9  that night?
10  A.  Yes, I did.
11  Q.  And then at 4:00 in the morning,
12  you saw two on duty officers drinking?
13  MR. GOODSTADT: Objection.
14  Q.  Is that your testimony?
15  A.  No.
16  Q.  What was your testimony?
17  A.  Approximately 3:00, 3:30 in the
18  morning, down at Maguire's, there were
19  several officers.
20  Q.  Okay.  And where did you have
21  your drink with your friend?
22  A.  Down at Ocean Beach.
23  Q.  And is it your testimony that you
24  had two drinks in three hours?
25  A.  Yes.

Page 55

E. Carter

2  Q.  And the rest of the evening was
3  just pleasant conversation?
4  MR. GOODSTADT: Objection.
5  A.  I had one other drink later on.
6  Q.  So you had three drinks?
7  A.  Down with the officers later on,
8  yes.
9  Q.  What officers?
10  A.  George Hesse.  The ones -- Jimmy
11  Albanese.  The ones that were at Maguire's.
12  Q.  Oh.  Okay.  So the officers that
13  you were talking about that were at Jimmy
14  Maguire's that were drinking on duty, you
15  joined them for a drink?
16  A.  I didn't join them for a drink.
17  I walked in on them, and when I said that to
18  George, George told me, "Shut up," and then
19  handed me a shot.
20  Q.  And you drank it?
21  A.  He said, "Drink."  Yeah.  I was
22  off.  Yes.
23  Q.  Let me understand this now.
24  You're at one bar at Ocean Beach and you
25  have a couple drinks in a three-hour period

Page 56

E. Carter

2  of time with a fellow officer who's going
3  off to Iraq, right?
4  A.  Yes.
5  Q.  You then go to another bar,
6  right?
7  A.  Um-hum (indicating).
8  Q.  Why were you going to the other
9  bar?
10  A.  I was looking for the officers to
11  make sure when they got off at 4:00, that I
12  could get a ride out to my vehicle so I
13  could drive home.
14  Q.  And how did you know other
15  officers were going to be at Maguire's?
16  A.  I didn't.  It was at the other
17  side of the village, and that's when I was
18  walking around looking for everybody.
19  Q.  And you then show up at Maguire's
20  and you say what to George?
21  MR. GOODSTADT: Objection.
22  A.  I first couldn't -- I didn't see
23  George there at first.  He was in the front
24  part up against the bar.
25  Q.  You didn't see George when you

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 57

E. Carter

1 walked into the bar?
2
3    A.   At first, no.
4    Q.   How many people were in the bar
5 at 3:00 in the morning?
6    A.   Several.  It was Labor Day
7 weekend.  There was -- my estimate, to the
8 best of my knowledge at this time, would be
9 approximately 50 or better.
10    Q.   Okay.  So you didn't see George
11 when you walked in, but at some point in
12 time you said something to George, right?
13    A.   Yes.
14    Q.   What did you say to George?
15         MR. GOODSTADT: Objection.
16    A.   I told him, I said, "You know,
17 this is bullshit."
18    Q.   And he told you to shut up?
19    A.   Yes.
20    Q.   And then he hands you a shot?
21    A.   Couple seconds, minute later,
22 yes.
23    Q.   And you drank it?
24    A.   Yes.
25    Q.   Why?  A man just told you to shut

Page 58

E. Carter

1
2 up after you made a complaint.  He hands you
3 a shot.  This is the man that has laughed at
4 you, ignored you for two and a half years
5 concerning the issue of officers drinking on
6 duty.  Why did you drink with him that night
7 when he said "here's a shot"?
8         MR. GOODSTADT: Objection.
9    A.   I wound up drinking a shot, yes.
10    Q.   My question is why, sir?  Why did
11 you drink the shot that George Hesse gave
12 you after two and a half years of him
13 ignoring your complaints concerning officers
14 drinking on duty?
15    A.   You have to understand, when you
16 make a complaint with George and you go
17 against him, he becomes very hostile, very
18 retaliatory, and he'll -- he would basically
19 explode on you in his own words.
20    Q.   So you had a shot because you
21 were afraid that George Hesse was going to
22 yell at you?
23    A.   I had a shot because I only had
24 two prior and I wasn't  -- had a limit that
25 I would be drunk to drive home, so yes, I

Page 59

E. Carter

1 had one.
2
3    Q.   Sir, I'm not questioning your
4 inebriation or lack thereof when you had the
5 shot with Mr. Hesse.  I'm asking you -- the
6 question is based upon what you've just
7 said, did you drink that shot because you
8 were afraid that Mr. Hesse would verbally
9 explode on you?
10    A.   Drink that shot for that reason,
11 no.
12    Q.   Did you drink that shot because
13 you thought that Mr. Hesse would somehow
14 retaliate against you if you didn't?
15    A.   No.
16    Q.   So I go back to my prior
17 question, sir.  You walk into that bar that
18 night.  The man that you have complained to
19 for two and a half years concerning officers
20 on duty drinking tells you to shut up.  He
21 hands you a shot of alcohol and you drink
22 it.  Why?
23    A.   The shot was there.  I wanted it
24 and I drank it.
25    Q.   Okay.  And Mr. Hesse was on duty?

Page 60

E. Carter

1
2    A.   Yes.
3    Q.   So you engaged in drinking with
4 an on duty police officer?
5         MR. GOODSTADT: Objection.
6    Q.   Is that your testimony?
7         MR. GOODSTADT: Objection.
8    A.   I drank it and George Hesse had
9 one, yes.
10    Q.   You participated in drinking with
11 an on duty police officer?
12         MR. GOODSTADT: Objection.
13    A.   Yes.
14    Q.   The conduct that you complained
15 of for two and a half years, you
16 participated in while you were off duty,
17 correct?
18    A.   Yes.  I didn't tell him to drink
19 it, though.
20    Q.   I know.  But you participated in
21 the very conduct that you were complaining
22 about, correct?
23    A.   Yes.
24    Q.   Now in the first page of your
25 complaint, sir, you write "Plaintiffs are

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 61

1           E. Carter
2  five police officers who had the courage to
3  overcome the blue wall of silence," do you
4  recall that in your complaint?
5           MR. GOODSTADT: Objection.
6      A.   Yes.
7      Q.   You didn't show much courage that
8  night when Mr. Hesse gave you the shot, did
9  you?
10          MR. GOODSTADT: Objection.
11     A.   Again, I was off duty.  Yes.
12     Q.   You believe you showed courage?
13     A.   I didn't believe I had to show
14  courage.  I was in a legal establishment, a
15  legal drink.
16     Q.   Yeah, but Mr. Hesse was on duty,
17  right?
18     A.   Yes.
19     Q.   And that was the conduct you
20  complained of, correct?
21     A.   Yes.
22     Q.   You found it offensive that
23  police officers were drinking on duty,
24  correct?
25     A.   Yes.

Page 62

1           E. Carter
2      Q.   You believed that it violated the
3  public trust, correct?
4      A.   Yes.
5      Q.   You believed it put citizens in
6  jeopardy, correct?
7      A.   Yes.
8      Q.   So you still believe that you
9  didn't need to exercise courage and to say
10  to Mr. Hesse, "no, I'm not going to
11  participate in what I deem to be a breach of
12  the public trust"?
13          MR. GOODSTADT: Objection.
14     Q.   Is that your testimony, sir?
15          MR. GOODSTADT: Objection.
16     A.   No.
17     Q.   Okay.  In 2006, sir, I think
18  you've only  -- well, I want you to take
19  some time.  Think about any other complaint
20  in 2006 that you raised with Mr. Hesse
21  concerning on duty police officers drinking.
22     A.   2006 I didn't work many hours.
23     Q.   Regardless of how many hours you
24  worked, you just said you can recall one
25  incident during the Labor Day weekend.

Page 63

1           E. Carter
2      A.   That was 2005.
3      Q.   Oh, my question to you, sir, was
4  2006 I believe.  Oh, it was 2005.  You're
5  right.  I apologize.  In 2005, sir, other
6  than this one incident on Labor Day weekend
7  that you can recall, can you recall any
8  others?  Complaints to George Hesse
9  concerning officers drinking on duty?
10     A.   No.
11     Q.   Okay.  If I gave you five minutes
12  to think about it, do you think that would
13  refresh your recollection?
14          MR. GOODSTADT: Objection.
15     A.   Yes.  Well, 2005, Paul Conway was
16  still bringing the rocket fuels inside,
17  but --
18     Q.   My question, sir, is regardless
19  of your witnessing of certain events, I'm
20  asking you other than the complaint that you
21  raised with Mr. Hesse in McGuire's during
22  Labor Day weekend, can you recall any other
23  complaints that you raised to Mr. Hesse in
24  2005 concerning officers drinking on duty?
25     A.   Cleaning out of the beer cans in

Page 64

1           E. Carter
2  the cars.  The officers pulling up to the
3  check point with beers in their hand.
4      Q.   And you made -- and you made
5  these complaints to George Hesse?
6      A.   George Hesse was driving the one
7  night, yes.
8      Q.   No.  My question is not what
9  Mr. Hesse was doing, not what you witnessed.
10  We've gone through 2003, 2004, and 2005
11  concerning direct complaints that you raised
12  with Mr. Hesse, you would agree with me?
13     A.   Yes.
14     Q.   And you answered those questions
15  truthfully, correct?
16     A.   Yes.
17     Q.   And I believe in 2003 you made
18  three complaints, and in 2004 you said three
19  complaints, right?
20     A.   Yes.
21     Q.   And in 2005 you've told me of one
22  complaint Labor Day weekend.  So my question
23  is, are there any other complaints that you
24  can recall that you made directly to George
25  Hesse concerning the subject matter of

Precise Court Reporting
516-747-9393   718-343-7227  212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 65

E. Carter

1
2 officers drinking on duty in 2005?
3     A.    Not that I recall at this time.
4     Q.    And, again, if I gave you an
5 opportunity to think about it, do you think
6 that would refresh your recollection?
7     A.    Yes.
8     Q.    Do you want take a couple
9 minutes?
10     A.    Yes.
11     Q.    Please do.  Oh, you wanted to go
12 off the record and do that?
13     A.    Oh, I'm sorry.
14     Q.    No.  It's up to you.  However
15 you --
16     A.    I was going to use the bathroom.
17 I'm sorry.
18     Q.    You know what, then why don't we
19 do this.  Let's take a break.  You go to the
20 bathroom, you think about that, and come
21 back and tell me if it refresh yours
22 recollection.
23         THE VIDEOGRAPHER: This ends
24     tape number one.  The time is 10:45
25     a.m.  We're going off the record.

Page 66

E. Carter

1
2         (A break was taken.)
3         THE VIDEOGRAPHER: This begins
4     tape number two.  The time is 10:55
5     a.m.  Back on the record.
6     Q.    Mr. Carter, was that the only
7 time you ever drank with Mr. Hesse on Ocean
8 Beach?
9     A.    Yes.
10     Q.    Ever?
11     A.    Yes.
12     Q.    That's the only time you ever
13 drank with Mr. Hesse on Fire Island?
14     A.    Yes.
15     Q.    Ever?
16     A.    Yes.
17     Q.    Was that the first time you ever
18 drank alcohol with any other -- putting
19 aside the night -- putting aside what you
20 did between 12:00 and 3:00 that night, was
21 that the only time that you ever drank
22 alcohol with any other officer, whether on
23 duty or off duty, on Ocean Beach?
24     A.    No.
25     Q.    Did you ever drink -- prior to

Page 67

E. Carter

1
2 that time, did you ever drink with any
3 officers -- well, withdrawn.  Prior to that
4 night, did you ever drink with any on duty
5 officers on Ocean Beach?
6     A.    No.
7     Q.    So the only time you would have
8 had a drink with an officer would have been
9 when that particular officer was off duty?
10     A.    Yes.
11     Q.    How often, in 2005, did you drink
12 with an off duty police officer on Ocean
13 Beach?
14     A.    Once.
15     Q.    And that was just with Mr. Hesse?
16     A.    Mr. Hank Clemens.  Off duty with
17 Hank and then George.  The same instance.
18 Same night.
19     Q.    How about 2004?
20     A.    2004, none.
21     Q.    2003?
22     A.    2003, none.
23     Q.    2002?
24     A.    2002, none.
25     Q.    2001?

Page 68

E. Carter

1
2     A.    None.
3     Q.    So then the only time you would
4 have had a drink with any other officer,
5 whether on duty or off duty, was that night
6 during Labor Day weekend in 2005; is that
7 correct?
8     A.    No.
9     Q.    You know what, then tell me the
10 other times you would have had a drink of
11 alcohol with an off duty police officer
12 while on Ocean Beach?
13     A.    1991 we had a police party the
14 end of the year.
15     Q.    Okay.
16     A.    1992 we had a police party at the
17 end of the year.  1993, when I went out of
18 the village to Ocean Bay Park for dinner,
19 after work, I might have had a drink.
20     Q.    Okay.
21     A.    So there were a couple times in
22 '91 to '93.
23     Q.    Got it.  Let's continue on --
24 well, let's go back to 2005 for a second.
25 Did you complain to Chief Paridiso about

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 69

1          E. Carter
2 what you complained to Mr. Hesse about on
3 Labor Day weekend 2005 concerning drinking
4 while on duty?
5    A.   No.
6    Q.   Same question with regard to
7 mayor -- excuse me, Mr. Loeffler?
8    A.   No.
9    Q.   Same question with regard to
10 Mayor Rogers?
11    A.   No.
12    Q.   Same question with regard to
13 trustees?
14    A.   No.
15    Q.   Did you communicate with any
16 trustee or mayor of Ocean Beach in 2005
17 concerning your complaint to Mr. Hesse?
18    A.   No.
19    Q.   Same question with regard to
20 Mr. Paridiso?
21    A.   No.
22    Q.   2006, did you make any complaints
23 to George Hesse concerning on duty officers
24 drinking?
25    A.   No.

Page 70

1          E. Carter
2    Q.   Same question with regard to Ed
3 Paridiso?
4    A.   No.
5    Q.   Same question with regard to any
6 mayor or trustee at the time?
7    A.   No.
8    Q.   Let's now go to the second page
9 of your Notice of Claim.  "Items of damage
10 or injuries claimed," do you see that, after
11 number four, next to number four?
12    A.   Yes.
13    Q.   Let's go in the -- let's see what
14 you wrote.  "Claimant sustained damages and
15 injuries, including but not limited to,
16 monetary and/or economic damages, including
17 but not limited to, loss of past and future
18 income, compensation and benefits, legal
19 fees and costs, permanent damage to his
20 personal and professional reputation and
21 standing in the community, loss of comfort
22 and support, fear, extreme mental and
23 emotional harm and stress, impairment of
24 natural growth process, and other injuries
25 not yet fully ascertained."  How much have

Page 71

1          E. Carter
2 you paid in legal fees and costs?
3 DI     MR. GOODSTADT: Objection.
4     Don't answer the question.
5        MR. NOVIKOFF: Mr. Goodstadt,
6     it's part of his Notice of Claim that
7     this is what he's incurred.  I think
8     since you have raised it -- not you but
9     since the Plaintiff has raised this in
10     the Notice of Claim as damages he's
11     seeking to recover, I'm completely
12     entitled to asking the question how
13     much, without going into any detail
14     behind that.
15        MR. GOODSTADT: You can take it
16     up with the court.
17        MR. NOVIKOFF: You're
18     instructing him not to answer?
19        MR. GOODSTADT: I'm instructing
20     him not to answer.
21        MR. NOVIKOFF: All right.  That
22     one I'm taking up with the court, and I
23     may move for appropriate sanctions on
24     that, because that's the first I heard
25     of this.

Page 72

1          E. Carter
2        MR. GOODSTADT: Every case that
3     has statutory fee provisions, requests
4     legal fees and costs, and if you can
5     cite me to some authority where they
6     were -- a defense lawyer was entitled
7     to ask how much money was spent in
8     legal fees up to the date of
9     deposition --
10        MR. NOVIKOFF: Oh, no.  No.
11     No.  That's not my question.  And I
12     agree with you entirely, Mr. Goodstadt.
13     That should you prevail in this case,
14     your client is entitled to statutory
15     fees and costs.  That's not my
16     question.
17        Your client, in his Notice of
18     Claim, said the items of damages or
19     injuries claimed are legal fees and
20     costs.  My question is, has he paid any
21     legal fees and costs to date.  Not what
22     his ultimate damages would be, or not
23     what you could recover if you prevail.
24     But --
25        MR. GOODSTADT: That's what he

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 73

E. Carter

1  
2  was referring to there.
3      MR. NOVIKOFF:  Then if that's
4  what your answer  -- if that's what
5  you're going to put on the record, then
6  I'll move on.
7      Let the record reflect that
8  Mr. Goodstadt has indicated that when
9  legal fees and costs are referred to,
10 it's being referred to the statutory
11 fees and costs that Plaintiff would be
12 entitled to in the event he prevails.
13     MR. GOODSTADT:  That's correct.
14     MR. NOVIKOFF:  Okay.
15     Q.   "Loss of comfort and support,"
16 what did you mean by that?
17     A.   My own comfort.  My sleep.  My
18 support.  Obviously my family supported me.
19 I lost friends which I use as support.
20     Q.   Okay.  You've -- let's break it
21 down.  Loss of comfort and support you say
22 you've lost your family's comfort and
23 support?
24     A.   No.
25     Q.   Okay.  I'm sorry.  Go ahead.  You

Page 74

E. Carter

1  
2  can finish your answer.  My question to you
3  is, have you lost -- when you're using the
4  words "loss of comfort and support," have
5  you lost your family's comfort and support?
6      A.   No.
7      Q.   Okay.  What friends have you lost
8  when you are referring to "loss of comfort
9  and support"?
10     A.   Several friends that I used to
11 work with at Ocean Beach that would support
12 you just by being around you when you worked
13 and stuff.
14     Q.   And who were they?
15     A.   Who were they.  John Oley, Alan
16 Loeffler, Arnie Hardman, Paul Corallo.  I
17 could go on.
18     Q.   Please, go on.
19     A.   Pat Cherry.  I call him
20 Mr. Cherry.  He's the older Cherry.  And
21 there were other residents and stuff which
22 no longer talk to me.
23     Q.   Well, what residents no longer
24 talk to you?
25     A.   One that I just ran into the

Page 75

E. Carter

1  
2  other day was the owner of the OB Market.
3  Just looked -- kept staring at me at a
4  parking violations hearing.
5      Q.   Where?
6      A.   In Islip.
7      Q.   And he kept staring at you?
8      A.   Until I walked up to him and said
9  something.  He says, "I wasn't sure if you'd
10 talk to me."
11     Q.   I'm --
12     A.   "I wasn't sure if you'd talk to
13 me."
14     Q.   Did he talk to you?
15     A.   After a little while.
16     Q.   Okay.  So he talked to you?
17     A.   Not like he used to.
18 Differently.
19     Q.   Well, prior to that time, what --
20 actually, what is this gentleman's name?
21     A.   I don't know his first name.  He
22 owned the OB Market.
23     Q.   Okay.  So you're saying you lost
24 this friend's comfort and support, but you
25 don't know his name?

Page 76

E. Carter

1  
2      A.   No.  It was someone I saw over
3  there, and you know, I would see from day to
4  day when I was working and stuff.  "Hi."
5  "How you doing."  "What's up."  "How's
6  everything."
7      Q.   But you don't know his name?
8      A.   No.
9      Q.   What other friends that aren't on
10 the police officer -- that weren't police
11 officers at Ocean Beach -- well, withdrawn.
12 You mentioned residents.  You just mentioned
13 one.  Any other residents that you believe
14 you've lost as a result of the actions of
15 Ocean Beach?
16     A.   I believe I lost most of the
17 residents.  From what's been posted on the
18 blog and stuff, it said straight out, you
19 lost many friends.
20     Q.   Yeah.  I'm asking you, sir.  You
21 said that you lost the comfort and support
22 of friends.  You've identified one
23 individual for whom you don't know the name
24 of as a friend.  What other friend can you
25 identify for me that you've lost as a result

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 77

E. Carter

1       E. Carter
2 of the actions of Ocean Beach, other than
3 those police officers that you've
4 identified?
5     A.    None that I recall at this time.
6     Q.    Now the police officers that
7 you've lost, can you describe what you mean
8 by the phrase "you've lost them"?
9         MR. GOODSTADT: Objection.
10    Q.    You can answer.
11    A.    I can answer?  I'm sorry.  First
12 thing was after the Gilbert incident, Paul
13 Corallo, I used to relieve all the time.  He
14 would sit -- he would talk to me for a
15 little while.  He clammed right up.
16 Wouldn't talk to me when I was let go.  I
17 haven't heard from him since.
18    Q.    And when was the Gilbert
19 incident?
20    A.    Gilbert incident was August of
21 2005.
22    Q.    Okay.  And my question to you,
23 sir, is, what did you mean when you said you
24 lost the friendship of those police
25 officers?  Is that the only example that you

Page 78

1       E. Carter
2 can give me?
3     A.    No.  Their support, you know,
4 with the friendship.  A friendship.
5 Support.  You know.
6     Q.    What do you mean by "support"?
7     A.    Just being there for you to get
8 through this.
9     Q.    Get through what?
10    A.    Get through the hard part of
11 being let go.  Terminated.  Why I was
12 terminated.  Mental anguish.
13    Q.    Have you reached out to any of
14 those officers for their support and comfort
15 that you've identified?
16    A.    Yes.
17    Q.    Subsequent to being let go as you
18 say?
19    A.    John Oley.
20    Q.    Okay.  When did you reach out to
21 John Oley?  And spell his last name for me?
22    A.    O-L-E-Y.
23    Q.    Okay.  When did you reach out to
24 him?
25    A.    I saw him approximately

Page 79

1       E. Carter
2 November -- it was late 2006 and he wouldn't
3 even talk to me.
4     Q.    Okay.  But, sir, you filed this
5 Notice of Claim in June of 2006, at least
6 it's dated.  So why don't we stick with
7 prior to June 2006.  Who did you reach out
8 to prior to filing the Notice of Claim that
9 would not speak to you that was a police
10 officer at Ocean Beach for comfort and
11 support?
12        MR. GOODSTADT: Objection.
13        MR. NOVIKOFF: I'll withdraw
14     the question.  I'll rephrase it.
15    Q.    What police officer, between
16 April 2, 2006 and June 30 2006, of Ocean
17 Beach did you reach out for comfort and
18 support?  What officer?
19    A.    None.
20    Q.    None.  Okay.  Between 2000 --
21 June 30, 2006 and the date you filed the
22 complaint, which for the record is March 21,
23 2007, what police officer at Ocean Beach did
24 you reach out for comfort and support?
25    A.    John Oley.

Page 80

1       E. Carter
2     Q.    Okay.  And describe for me the
3 incident involving Mr. Oley.
4         MR. GOODSTADT: Objection.
5     A.    I saw Mr. Oley at Bay Shore
6 Dunkin Donuts.  I walked in.  He looked at
7 me, and I could tell immediately he didn't
8 want me there.  I walked up to him.  I said,
9 "How you doing, John?"  I said, "Are you
10 going to say hi?"  And he just stared at me
11 for a minute.  And he goes, "Yeah, Eddie, I
12 was going to say hi."  And when we went
13 outside, you know, I said, "John, why don't
14 you ever call me?  What was up?  You know,
15 we were good friends I thought."  I said,
16 "You know, what's going on?  And why did
17 George keep you and let me go, Tom, Kevin,
18 Joe and Frank?"  And he just looked.  He
19 said, "well," he said, "I don't know.  Why
20 did he let you go?"  And that was it.
21 Pretty much he blew me off.
22    Q.    Why did you think John should
23 have been let go as well as -- withdrawn.
24 Why do you think John should have been let
25 go if you were let go?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 81

E. Carter

1         E. Carter
2   A.  Because there was no reason to
3 let me go.
4   Q.  Then what reason was there to let
5 John go?
6   A.  None.  Same reason.
7   Q.  And prior to meeting -- prior to
8 the -- withdrawn. Prior to seeing him in
9 the Bay Shore Dunkin Donuts, did you reach
10 out to John Oley between the date of the
11 filing of the Notice of Claim and the date
12 of the filing of the complaint?
13   A.  No.
14   Q.  Other -- let's now talk about the
15 time period between March 21, 2007 and the
16 present. What police officers at Ocean
17 Beach have you reached out for comfort and
18 support?
19   A.  Alan Loeffler.
20   Q.  Alan Loeffler?
21   A.  Yes.
22   Q.  Is Alan Loeffler related at all
23 to Defendant Joseph Loeffler?
24   A.  Yes.
25   Q.  And what is their relationship?

Page 82

E. Carter

1         E. Carter
2   A.  Brothers.
3   Q.  So you reached out to the brother
4 of the person that you were suing
5 individually for comfort and support, is
6 that your testimony?
7   A.  Yes. Me and Alan Loeffler were
8 very good friends at one time.
9   Q.  When did you reach out to
10 Mr. Alan Loeffler for comfort and support?
11   A.  Originally I dropped my uniforms
12 off to him. I work with Alan in the Town of
13 Islip to let you know, and I see him from
14 day to day at different times.
15      At the time the lawsuit was
16 filed, he came around the corner and he
17 looked at me and he says, "I can't talk to
18 you." And I said, "Al, what are you talking
19 about? Cut the shit. What's going on?"
20 And he says, "Well, you filed a lawsuit." I
21 said, "Yeah." I said, "So that means our
22 friendship's over?" And he looked at me and
23 he walked -- you know, pretty much he talked
24 to me for a couple seconds. Nothing -- very
25 vague that I remember and he walked away.

Page 83

E. Carter

1         E. Carter
2 That was it. I haven't spoken to him since.
3   Q.  Are you surprised that he didn't
4 want to talk to you, given the fact that you
5 sued his brother?
6   A.  Yes.
7   Q.  You are?
8   A.  Yes.
9   Q.  Do you have a brother?
10   A.  Yes.
11   Q.  If someone sued your brother,
12 would you want to speak to them?
13      MR. GOODSTADT: Objection.
14   A.  If they were a good friend of
15 mine, yes.
16   Q.  Okay. That's interesting.
17      MR. GOODSTADT: Objection.
18   Q.  Okay. So between the date of the
19 filing of the complaint and the present, you
20 reached out to Alan Loeffler. Anybody else?
21 Any other police officer at Ocean Beach that
22 you reached out for comfort and support?
23   A.  No.
24   Q.  Okay. So we have Mr. Loeffler
25 and we have Mr. Oley, is that it?

Page 84

E. Carter

1         E. Carter
2   A.  Yes.
3   Q.  Okay. Has your wife left you?
4   A.  No.
5   Q.  Have your children abandoned you?
6   A.  No.
7   Q.  Any other friends abandon you as
8 a result of you not being let go -- you not
9 being rehired on April 2, 2006 by Ocean
10 Beach?
11      MR. GOODSTADT: Objection.
12   A.  No.
13   Q.  Okay. You mention as part of
14 your loss of comfort, that you couldn't
15 sleep. Did I fairly characterize your
16 testimony?
17   A.  Yes.
18   Q.  When did you -- when did you
19 start having difficulty sleeping in relation
20 to April 2, 2006?
21   A.  April 2, that night.
22   Q.  Okay. And how long has it
23 continued, if at all?
24   A.  It continued originally for
25 approximately a week and a half, and every

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 85

1            E. Carter
2 time I see one of these defamatory remarks
3 or whatever on that blog or someone brings
4 it up to me, I relive it.  I relive April 2.
5    Q.    Okay.  And when's the last time
6 you looked at the blog?
7    A.    Approximately one week ago.
8    Q.    Why?
9    A.    Because someone told me there was
10 posted -- something posted about me on
11 there.
12    Q.    What was posted a week ago?
13    A.    That myself and another officer
14 were doing official misconduct again by
15 falsifying time cards basically.
16    Q.    Who posted it?
17    A.    I don't know.
18    Q.    Do you know, as you sit here
19 today, the identity of anyone who posted
20 anything on this blog that you're referring
21 to?
22    A.    Yes.
23    Q.    Who?
24    A.    Tom Snyder.
25    Q.    Oh.  So Mr. Snyder's a defendant?

Page 86

1            E. Carter
2         MR. GOODSTADT: Objection.
3    Q.    Is Mr. Snyder a Plaintiff in this
4 lawsuit?
5    A.    Yes.
6    Q.    And it's your testimony that
7 Mr. Snyder posted something on the blog?
8    A.    In --
9    Q.    No.  Just -- don't tell me when.
10    A.    Yes.
11    Q.    How do you know that Mr. Snyder
12 posted something on the blog?
13    A.    He told me, and I went on the
14 blog and I saw it posted there.
15    Q.    I'm sorry?
16    A.    I went on the blog and saw it
17 posted there.
18    Q.    When did Mr. Snyder tell you he
19 posted something on the block blog?
20    A.    April of 2006.
21    Q.    Shortly after April 2, 2006?
22    A.    Within that week, yes.
23    Q.    Within that week.  Did Mr. Snyder
24 advise you as to why he was posting anything
25 on this blog?

Page 87

1            E. Carter
2    A.    Yes.
3    Q.    Why?  What did he say to you?
4    A.    He said, "Ed, someone posted
5 something about me and you, mostly about you
6 working Halloween night, doing official
7 misconduct and falsifying paperwork.  I
8 posted something in response to it saying
9 that you were not working, that you did not
10 do any of that," and he ID'd himself in that
11 blog that, "whoever you are posting this,
12 you know who I am and where to get in touch
13 with me now.  My name's Tom."
14    Q.    Okay.  Is that the only time, to
15 your knowledge, that Mr. Snyder posted
16 something on the blog?
17    A.    Yes.
18    Q.    To your knowledge, has any
19 other -- has any other Plaintiff posted
20 anything on the blog?
21    A.    No.
22    Q.    Other than Mr. Snyder, do you
23 know -- do you have personal knowledge of
24 the identity of any person who posted
25 anything on the blog since April 2, 2006

Page 88

1            E. Carter
2 through the present?
3    A.    Yes.
4    Q.    Who?
5    A.    Tyree Bacon.
6    Q.    How do you know that Tyree Bacon
7 posted anything on the blog?
8    A.    Tom Snyder had a meeting with
9 George Hesse in May of 2006 complaining
10 about the -- one of the blogs was the "OB
11 resident" the name was.  He complained that
12 even residents are posting about us, the
13 officers that were let go, and George Hesse
14 told him, "Tom, it's not the residents.
15 It's us in the police department and Tyree
16 Bacon."
17    Q.    Okay.  So you don't have personal
18 knowledge that it's Tyree Bacon, the only
19 knowledge you have is that Mr. Snyder told
20 you that Mr. Hesse told him that it was
21 Tyree Bacon?
22    A.    Yes.
23    Q.    Okay.  Have you gone to a doctor
24 with regard to your lack of ability to sleep
25 on certain occasions since April 2, 2006?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 89

E. Carter

1
2    A.   No.
3    Q.   Have you taken any medication?
4    A.   No.
5    Q.   Has it interfered with your
6  full-time job?
7    A.   Yes.
8    Q.   How has it interfered with your
9  full-time job?
10   A.   I went to work a couple nights,
11 you know, with a fogged head.  I wasn't 100
12 percent.
13   Q.   When do you work for the Town of
14 Islip?  What are your normal hours?
15   A.   I don't have normal hours.  I
16 work different shifts.  Right now I work
17 midnight to 8:00.
18   Q.   Midnight to 8:00.  And a couple
19 of -- is it your testimony that a couple of
20 occasions you went to a job -- your job at
21 night with a fogged head?
22   A.   With stuff in my head about the
23 beach, yes.
24   Q.   And how did that interfere with
25 your job?  Did you commit any acts of

Page 90

E. Carter

1
2  negligence that day?
3    A.   No.
4    Q.   Were you reprimanded at all for
5  conduct -- for anything that went on during
6  that day that you went to work with a fogged
7  head?
8    A.   No.
9    Q.   Did you lose any benefits as a
10 result of anything that took place on those
11 few occasions that you went to work with a
12 fogged head?
13   A.   No.
14   Q.   Did you get demoted at all?
15   A.   No.
16   Q.   Was there any adverse action
17 taken against you as a result of anything
18 you may have done on those few occasions
19 that you went to work with a fogged head?
20       MR. GOODSTADT: Objection.
21   A.   No.
22   Q.   Have you sought any -- have you
23 been to a psychiatrist at all with regard to
24 any issues concerning your lack of sleep?
25   A.   No.  I couldn't.

Page 91

E. Carter

1
2    Q.   You couldn't?
3    A.   No.
4    Q.   Why couldn't you go see a
5  psychiatrist?
6    A.   Because of my professional
7  full-time job, the minute you see a
8  psychiatrist, a mental health report would
9  have been forwarded there.
10   Q.   Let me understand this, if you
11 went to see a psychiatrist, you would have
12 to report that to your superior?
13   A.   To my employee assistant program,
14 yes.
15   Q.   And what is your understanding as
16 to why you would have to report that?
17   A.   As a peace officer in New York
18 State, it would go on my permanent record
19 and it would automatically be flagged and
20 sent over there.
21   Q.   And do you know what statute
22 requires you to notify anyone at your job
23 that you went to see a psychiatrist?
24       MR. GOODSTADT: Objection.
25   A.   Not at this time.

Page 92

E. Carter

1
2    Q.   Can you tell me where you get
3  this information from that you've just
4  testified to, that you're required to notify
5  your employer that you went to see a
6  psychiatrist?
7    A.   Well, my promotion pending, and
8  my belief -- my belief is that it would have
9  affected that, and I would have had to make
10 that personal knowledge, public knowledge --
11 personal knowledge at work.
12   Q.   And what is your belief based on?
13 That's really what I'm asking you.  What is
14 your belief based on that had you gone to
15 see a psychiatrist or a mental health
16 professional, you would have had to notify
17 your employer?
18   A.   Past interviews.
19   Q.   Past interviews with whom?
20   A.   With different agencies with
21 myself.
22   Q.   And what did these interviewers
23 say to you, if anything, that led you to
24 believe that were you to go to a
25 psychiatrist, you would have to notify them,

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 93

E. Carter

1 notify an employer that you went to see a
2 psychiatrist?
3    A.   I had to fill out a disclosure
4 form for the Mental Health Department for
5 New York State.
6    Q.   And what was the disclosure form?
7    A.   It was a standard New York State
8 disclosure form asking about my past
9 psychological history.  If there was any
10 contact with a psychiatrist or whatever.
11    Q.   Do you have a copy of this form
12 in your custody, possession or control?
13    A.   No.
14    Q.   Who would have -- for whom did
15 you fill this form out?
16    A.   I've had to fill it out for the
17 Town of Islip and I've seen it at Ocean
18 Beach with the applicant investigation
19 packet.
20    Q.   All right.  I'll look for that
21 form.  You write "extreme mental and
22 emotional harm and stress."  What did you
23 mean by that?
24    A.   The emotional harm and stress of

Page 94

E. Carter

1 going back -- like I said, when you see
2 stuff on the blog and reliving April 2, the
3 termination, and I -- you know, it's very
4 disturbing to me to this day.
5    Q.   What physical reactions, if
6 any -- well, what physical manifestations,
7 if any, do you believe have resulted from
8 this extreme mental and emotional harm and
9 stress?
10    A.   My heart would race.  I would get
11 severe headache.  I would take -- I would
12 have to take Tylenol with codeine.
13    Q.   Is your heart racing now?
14    A.   No.
15    Q.   You're reliving April 2 today,
16 aren't you?
17    A.   At a different point, yes.  Where
18 I'm not seeing something put in the computer
19 or whatever or put in my face that I did
20 illegally that I didn't.
21    Q.   So if we -- is it your testimony
22 that if I showed you the blog, that would
23 cause your heart to race?
24        MR. GOODSTADT: Objection.

Page 95

E. Carter

1    A.   If you showed me parts of
2 postings, yes.
3    Q.   And have you seen any doctor
4 concerning your heart racing?
5    A.   No.
6    Q.   That's pretty serious, wouldn't
7 you agree?
8    A.   No.  Because it comes and it
9 goes.
10    Q.   Okay.  So you didn't think it was
11 serious enough to see a doctor?
12    A.   No.
13    Q.   Other than your heart racing, was
14 there any other physical manifestations of
15 this extreme mental and emotional harm and
16 stress that you allege?
17    A.   The anguish.  The -- I told you I
18 had to take Tylenol with codeine a couple
19 times.
20    Q.   With codeine?
21    A.   The ones you buy over the
22 counter.
23    Q.   Oh, okay.
24    A.   I think -- I believe that's what

Page 96

E. Carter

1 they have in them.
2    Q.   And have you seen any doctor
3 concerning the headaches?
4    A.   No.
5    Q.   How many times have you had
6 headaches resulting from seeing the blog
7 that resulted -- that caused you to take
8 Tylenol?
9    A.   I couldn't give you an exact
10 amount now.  Approximately, at least a dozen
11 times.
12    Q.   Over the two and a half year time
13 period?
14    A.   Yes.  But I don't look at the
15 blog all the time.
16    Q.   I understand that.  But it's
17 about two and a half years since April 2,
18 right?
19    A.   Yes.
20    Q.   "Other injuries not yet fully
21 ascertained," do you see that?
22    A.   Yes.
23    Q.   Well, this was filed -- well,
24 this is dated June 30, 2006.  We're now in

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 97

1          E. Carter
2  September of 2008.  Have you ascertained yet
3  those other injuries?
4          MR. GOODSTADT: Objection.
5      A.   Not that I'm aware of.
6      Q.   Okay.
7      A.   Sir, if I may.
8      Q.   Sure.
9      A.   This paragraph is -- the
10  sentences in this paragraph are contained
11  obviously in a paragraph.  The paragraph as
12  a whole is what I signed the notice of
13  complaint.
14      Q.   I understand that.  And you've
15  made certain allegations in this paragraph
16  concerning what your damages are, and one of
17  them was "other injuries not yet fully
18  ascertained," and my question to you, sir,
19  if you need to respond again to it, was
20  between June 30, 2006 and today, have you
21  ascertained yet the other injuries?
22          MR. GOODSTADT: Objection.
23      A.   Not to my knowledge, no.
24      Q.   "Impairment of natural growth
25  process," what did you mean by that?

Page 98

1          E. Carter
2      A.   I've lost hair.
3      Q.   You've what?
4      A.   I've lost hair.
5      Q.   How old are you?
6      A.   I'm 43 now.
7      Q.   When did you start losing hair?
8      A.   I've lost clumps -- I started
9  losing my hair 42.
10      Q.   So -- and how old are you now?
11      A.   43.
12      Q.   So is it your testimony that
13  within the last year, you went from a full
14  set of hair to what appears now to be a
15  significantly receding hair line?
16      A.   No.
17      Q.   No.  So you started losing hair
18  before the age of 42, correct?
19      A.   Not as much as after 42.
20      Q.   Did you start losing your hair
21  before the age of 42?
22      A.   Yes.
23      Q.   When did you start losing your
24  hair, sir?
25      A.   I don't know.  I don't recall.

Page 99

1          E. Carter
2          MR. NOVIKOFF: Well, let's
3  look at what has been identified as
4  9270.  I don't have copies of it, but
5  it's a picture of Mr. Carter.  Let's
6  mark this as Exhibit-2.
7          (Document Bates stamped 9270 was
8      marked as Carter Exhibit-2 for
9      identification; 9/16/08, E.L.)
10      Q.   I'm going to show you what's been
11  marked as Exhibit-2.  If you want to show it
12  to your attorney before I ask you questions,
13  by all means do so.  Is that a picture of
14  you, sir?
15      A.   Yes, sir.
16      Q.   Do you know when this picture was
17  taken?
18      A.   I believe it was taken in 2005.
19      Q.   Okay.  Do you know for what
20  purpose it was taken in 2005?
21      A.   Grand jury subpoena.
22      Q.   A grand jury subpoena?
23      A.   Yes.
24      Q.   What grand jury subpoena?
25      A.   That George Hesse had on his desk

Page 100

1          E. Carter
2  that the grand jury subpoenaed pictures of
3  the officers for Gilbert.
4      Q.   My question to you, sir, was when
5  was your picture taken?
6      A.   In 2005.
7      Q.   Where?
8      A.   In the police station.
9      Q.   Which police station?
10      A.   Ocean Beach.
11      Q.   Okay.  And the purpose of taking
12  that picture was related to a grand jury
13  subpoena?
14      A.   Yes.
15      Q.   Okay.  And would you describe for
16  me -- well, would it be fair to say that on
17  that picture, your hair line is
18  significantly receded?
19      A.   Yes.
20      Q.   Okay.  So would you agree with me
21  that at some point in time prior to 2005,
22  your hairline has significantly -- was
23  significantly receding?
24      A.   Yes.
25      Q.   Do you have any pictures of you

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 101

E. Carter

1         E. Carter
2  prior to 2005 in your custody, possession or
3  control?
4      A.   Driver's license.
5      Q.   Do you have a driver's license on
6  you right now?
7      A.   Yes.
8      Q.   When was your driver's license
9  taken?
10     A.   I don't know at this time without
11 looking at it.
12     Q.   Can you please look at your
13 driver's license now?
14         MR. GOODSTADT: Objection.
15     Objection.  You can make a document
16     request.  He's not taking a document
17     that's not related to this case out of
18     his pocket to look at now.
19 RQ     MR. NOVIKOFF: All right.
20     We'll make a request for the driver's
21     license.
22     Q.   Do you have any other pictures in
23 your home of you, prior to 2005?
24     A.   I'm sure there are.
25 RQ     MR. NOVIKOFF: Okay.  I'm going

Page 102

1         E. Carter
2      to call for the production of copies of
3      all pictures in your custody,
4      possession or control that would show
5      what your hair looked like prior to
6      2005 going back to the time that you
7      were 21.
8         MR. GOODSTADT: Note my
9      objection, and I'll take it under
10     advisement.
11     Q.   Have you seen a doctor concerning
12 the clumps of hair that you say that have
13 left your head?
14     A.   No, sir.
15     Q.   Do you agree with me that
16 clumps -- that clumps of hair falling out of
17 your head is pretty serious, correct?
18         MR. GOODSTADT: Objection.
19     A.   I believe it was due to the
20 stress and that's what I know.
21     Q.   My question isn't what it's due
22 to.  Would you agree with me that losing
23 clumps of your hair is pretty serious?
24     A.   It's serious I guess.  Yes.
25     Q.   Cause you concern, correct?

Page 103

1         E. Carter
2  Right?
3      A.   Little bit.
4      Q.   Little bit?  Not a lot?
5         MR. GOODSTADT: Objection.
6      Q.   Have you had a history of
7  clumping of hair falling out of your head?
8      A.   No.
9      Q.   Did you go to a doctor?
10     A.   No.
11     Q.   Did you seek any type of medical
12 advice concerning why clumps of your hair
13 were falling out?
14     A.   No.
15     Q.   Okay.  When did you retain
16 Mr. Goodstadt's law firm in connection with
17 this Notice of Claim or any aspect of the
18 April 2, 2006 incident?
19         MR. GOODSTADT: Objection.
20     Q.   You can answer.
21     A.   The summer of 2006.
22     Q.   Well, the summer starts in June,
23 correct?  What do you mean by "summer"?
24 What months would be contained?
25     A.   May or June of 2006.

Page 104

1         E. Carter
2      Q.   Okay.
3      A.   June.
4      Q.   In relation to June 30, 2006 --
5      A.   Yes.
6      Q.   When  -- how long prior to June
7  30, 2006 did you retain Mr. Goodstadt's law
8  firm?
9         MR. GOODSTADT: Objection.
10     A.   I don't recall at this time.
11     Q.   Weeks earlier?
12     A.   I don't recall without a document
13 in front of me showing.
14     Q.   Okay.  Would that be -- did you
15 sign a retainer agreement with
16 Mr. Goodstadt's law firm?
17     A.   Yes.
18     Q.   Okay.  Then I'm going to leave a
19 space in the transcript for you to -- well,
20 would that be a document that would refresh
21 your recollection?
22     A.   I believe so.  Yes.
23         MR. NOVIKOFF: Then I'm going
24     to leave a space in the transcript and
25     ask you to look at that document, and

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 105

E. Carter

1          E. Carter
2    to the extent that it refreshes your
3    recollection as to the question I just
4    posed, please fill in the answer.
5          MR. GOODSTADT: Objection.
6  INSERT:
7    Q.   How did you come about first
8  meeting Mr. Goodstadt?  Now my question is,
9  I don't want to know about anything you said
10  to Mr. Goodstadt.  I don't want to know if
11  Mr. Goodstadt called you or if you called
12  Mr. Goodstadt.  My question to you is, when
13  did you first learn of Mr. Goodstadt's law
14  firm?
15    A.   In the latter part of May, early
16  June of 2006.
17    Q.   How did you learn of
18  Mr. Goodstadt's law firm?
19          MR. GOODSTADT: Objection.
20    Q.   To the extent it doesn't call for
21  you to advise me of communications between
22  you and Mr. Goodstadt's law firm or any
23  lawyers involved with his law firm.
24    A.   While doing a Google search for
25  lawyers, because I felt I had a claim and

Page 106

1          E. Carter
2  didn't want to use one on the Island, so
3  wound up coming up with Thompson Wigdor &
4  Gilly.
5    Q.   Okay.  And to your knowledge,
6  were any of the other Plaintiffs looking for
7  lawyers at that time?
8    A.   Frank Fiorillo.
9    Q.   How do you know that Frank
10  Fiorillo was looking for a law firm at that
11  time?
12    A.   Frank Fiorillo got in touch with
13  me and we talked.
14    Q.   In relation to when you did the
15  Google search, when did Mr. Fiorillo get in
16  touch with you?
17    A.   Approximately a day or so.
18    Q.   Prior to the Google search?
19    A.   Yes.
20    Q.   What did Mr. Fiorillo say to you?
21    A.   Well, I actually spoke to --
22  Frank called me because I didn't have his
23  number.  I told him about what George had
24  told me and he had gone trying to get a
25  couple jobs trying to secure him, he

Page 107

1          E. Carter
2  couldn't, and I told him about the phone
3  call about the county park police and Kevin
4  Lamm wound up having problems with the
5  Suffolk County Police, and he said, "You
6  know, this has to end."  And that's when we
7  got together.
8    Q.   So sometime in May, Mr. Fiorillo
9  and you spoke.  Mr. Fiorillo said he had
10  tried to get a few jobs in Suffolk County
11  and he couldn't?
12          MR. GOODSTADT: Objection.
13    Q.   Is that the sum and substance?
14    A.   He said he tried to get a few
15  jobs, yes.
16    Q.   Right.  And what jobs did he say
17  he tried to get?
18    A.   One was Southampton Town, and
19  another was a driver's job that I don't know
20  where it was.
21    Q.   And this was between April 2 and
22  the date in May that you and he spoke?
23          MR. GOODSTADT: Objection.
24    A.   The latter part of May, yes.
25    Q.   And at that time, had you spoken

Page 108

1          E. Carter
2  with Mr. Lamm about his job searches?
3    A.   Kevin, yes.  Kevin wound up --
4    Q.   No.  Just the answer was yes or
5  no?
6    A.   Yes.
7    Q.   When did you speak to Mr. Lamm --
8  well, in relation to when you spoke with
9  Mr. Fiorillo in late May, when did you speak
10  to Mr. Lamm concerning his job search
11  efforts?
12    A.   I kept in constant touch with
13  Kevin.  Kevin was the only one I had the
14  phone number for or I would see.
15    Q.   Why did you keep in constant
16  touch with Kevin?
17    A.   Kevin was a friend, a good
18  friend.
19    Q.   So --
20    A.   He was a partner when I was at
21  the beach.
22    Q.   So since April 2 -- between April
23  2, 2006 and the end of May, you kept in
24  constant contact with Kevin Lamm?
25    A.   Yes.  Kevin works for the Town of

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 109

E. Carter

1    Islip also.
2    Q.   Okay.  How about Mr. Snyder, did
3    you keep in constant contact with him during
4    that period of time?
5    A.   I work with Tom Snyder, yes.
6    Q.   So you would have kept in
7    constant contact with him?
8    A.   Yes.
9    Q.   So you work with Snyder, you work
10   with Lamm?
11   A.   Yes.
12   Q.   Did you keep in constant contact
13   with Nofi?
14   A.   No.
15   Q.   Did you keep in constant -- well,
16   okay.  That's about it then.  And did the
17   five of you meet to discuss hiring the
18   Goodstadt law firm before you ever
19   communicated with Mr. Goodstadt's law firm?
20   MR. GOODSTADT: Or any other
21   law firm.
22   MR. NOVIKOFF: Or any other law
23   firm, yes.  That's right.
24   A.   We discussed  -- I spoke to Tom

Page 110

E. Carter

1    and Kevin personally one on one.  I spoke to
2    Frank on the phone.  And through, you know,
3    good -- the website and stuff, we felt
4    Mr. Goodstadt's law firm was one that could
5    take  -- could help us.
6    Q.   Did you ever speak with Nofi
7    prior to  -- to your knowledge, how did Nofi
8    know to contact Mr. Goodstadt's law firm?
9    MR. GOODSTADT: Objection.
10   A.   I could only say Frank Fiorillo
11   contacted Nofi.
12   Q.   Did you ever speak to Nofi about
13   going to meet with Mr. Goodstadt's law firm?
14   A.   Only the day we were going to
15   Mr. Goodstadt's law firm.
16   Q.   "Standing in the community" you
17   make reference to in paragraph four.  What
18   community are you referring to?
19   A.   I'm sorry, paragraph four?
20   Q.   Yes.
21   A.   Standing in the community would
22   be my position as a father and as a park
23   ranger.  I heard, you know, my reputation
24   was damaged.  It was defamed.

Page 111

E. Carter

1    Q.   Well, sir, my question to you is,
2    what community are you referring to when you
3    say "standing"?
4    A.   My personal community.
5    Q.   And what does that mean when you
6    say "personal"?
7    A.   My family.  My friends.  How they
8    look at me.  The people walking down the
9    street.
10   Q.   So is it your testimony that your
11   family looks upon you worse today than they
12   did on April 2?
13   A.   They originally questioned me,
14   yes, as to when this stuff was in the paper
15   about the Gilbert thing and stuff.
16   Q.   Who is "they"?
17   A.   My mother.
18   Q.   Your mother questioned you?
19   A.   Yes.
20   Q.   What did she say?
21   A.   She said, "What's going on?  You
22   were fired from the beach.  We just saw this
23   other stuff in the paper not too long ago.
24   You said you weren't involved.  What

Page 112

E. Carter

1    happened?"
2    Q.   So your -- do you think your
3    mother thinks less of you today than she did
4    on April 2?
5    MR. GOODSTADT: Objection.
6    A.   I couldn't answer that.
7    Q.   Is there anything she's done to
8    indicate that she thinks less of you?
9    A.   No.
10   Q.   Is there anything that you could
11   point to that makes you believe that your
12   standing in your mother's eyes is less today
13   than it was on April 2, 2006?
14   A.   No.
15   Q.   How about your wife, anything
16   that you could point to today that makes you
17   think that your standing in her eyes is less
18   today than on April 2, 2006?
19   A.   Just the anguish and stuff we're
20   going through with day-to-day with like I
21   said, the blog postings and stuff.  She got
22   very, very upset and annoyed when she saw my
23   name where I worked and stuff was posted on
24   there.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 113

1            E. Carter
2 MO      MR. NOVIKOFF: Motion to
3   strike.
4     Q.   Is there anything that you can
5 point to that you believe shows  -- well,
6 you know what, let me ask you this question,
7 in your opinion, has your standing with your
8 wife decreased since April 2, 2006?
9         MR. GOODSTADT: Objection.
10    A.   A little bit, yes.
11    Q.   A little bit.  She thinks less of
12 you?
13    A.   I believe so.
14    Q.   Okay.  What about your children,
15 how old are they?
16    A.   My daughter's five and the boys
17 are two and a half.
18    Q.   Your friends, what friends have
19 you lost outside of perhaps police officers
20 as a result of you being told, on April 2,
21 2006, that you're not working at Ocean
22 Beach?
23    A.   None.
24    Q.   Has any friend of yours told you
25 that they think less of you as a result of

Page 114

1            E. Carter
2 you not being rehired on April 2, 2006?
3     A.   No.
4     Q.   Now let's go to your employment
5 with Ocean Beach for a while.  You were --
6 well, beginning in 2001, you were a
7 part-time worker, correct?
8     A.   Seasonal from May to September,
9 and then a part-time police officer from
10 September to May.
11    Q.   Okay.  So it's seasonal during
12 the summer months and then after Labor Day
13 it's part time?
14    A.   Yes.
15    Q.   Explain the difference.
16    A.   Difference is is between May and
17 September, per Civil Service Law, you can
18 work 40 hours or more a week.  I guess more
19 a week.  And after September, Labor Day or
20 sometime whatever stipulation is exactly in
21 the book to May, it would be 20 hours a
22 week.  Half of a full timer.
23    Q.   Okay.  My question to you is were
24 you a -- during the summer months, before --
25 between Memorial Day -- well, between April

Page 115

1            E. Carter
2 and Labor Day, were you a full-time worker
3 or a seasonal worker?
4         MR. GOODSTADT: Objection.
5     Q.   To the best of your knowledge?
6     A.   Seasonal.
7     Q.   Okay.  And what is your
8 understanding of what "seasonal" means?
9         MR. GOODSTADT: Objection.
10    Q.   To the extent you know?
11    A.   Seasonal is I can work 16 hours a
12 week.
13    Q.   Okay.  You could work 16 hours a
14 week as a seasonal?
15    A.   Well, it's 20 -- I believe it
16 states 20.  Half of 40 is 20, but the way
17 the tours were, 16 hours a week.
18    Q.   I didn't get that last part.
19    A.   A full timer could work 40 hours
20 a week, so it would be half of what they
21 could do.
22    Q.   Okay.  So the most you could
23 work, to your knowledge --
24    A.   Is 20 hours.
25    Q.   Is 20 hours during the --

Page 116

1            E. Carter
2     A.   Off season.
3     Q.   During the off -- no.  No.  I'm
4 talking that's when you were a part-time
5 worker?
6     A.   Yes.
7     Q.   That's after Labor Day?  Yes?
8     A.   Yes.
9     Q.   My question, though, is between
10 April and Labor Day, what's your
11 understanding of what "seasonal" means?
12        MR. GOODSTADT: Objection.
13    A.   Seasonal was you worked
14 approximately -- you could work up to 40
15 hours a week or more.
16    Q.   Now you didn't have a contract
17 with Ocean Beach, did you?
18    A.   No.
19    Q.   And every year you had to be
20 rehired, correct, to be a seasonal worker,
21 correct?
22        MR. GOODSTADT: Objection.
23    Q.   To your knowledge?
24    A.   I didn't have to be rehired.
25    Q.   No?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 117

E. Carter

1
2   A.   I handed a 42 -- 2042 in and gave
3   them the hours I could work, and the chief
4   or George, whoever it was, would put you on
5   the schedule.
6   Q.   What's a 2042?
7   A.   You have a copy of one right
8   there in front of you (indicating).
9   Q.   Okay.  Well, just tell me what it
10  is.
11  A.   It's an internal memo.
12  Correspondence.
13  Q.   So if I understand correctly,
14  before every season -- well, just so we're
15  all clear and we're all talking about the
16  same thing, what was the season, to your
17  knowledge?
18  A.   Memorial Day to Labor Day,
19  roughly.  April -- it was the end of April,
20  so April to Labor Day.
21  Q.   Okay.  So if I understand your
22  testimony correctly, what you would do,
23  since 2001, was send someone over at Ocean
24  Beach a 2042 indicating when you could work,
25  and then they would just put you on the

Page 118

E. Carter

1
2   schedule?
3   A.   My hours of availability is what
4   it was basically.
5   Q.   Okay.  So you controlled, for the
6   most part, what hours you worked during the
7   season?
8   A.   The only -- I put in what tours I
9   was available for.  I didn't get them all.
10  Q.   Right.
11  A.   I got -- it was split up among
12  the men --
13  Q.   Right.
14  A.   -- by the supervising officer.
15  Q.   Now there were officers that
16  worked during the day, correct?
17  A.   Yes.
18  Q.   But you couldn't work during the
19  day because you had a full-time job,
20  correct?
21  A.   Yes.
22  Q.   So you would put in -- what tours
23  would you normally put in for?
24       MR. GOODSTADT: Objection.
25  A.   For Ocean Beach?

Page 119

E. Carter

1
2   Q.   Yes.
3   A.   I put in -- I was off -- whatever
4   my days off were, I would put in for either
5   a 4:00 to 12:00 -- there was a 9:00 --
6   there was about 20 different tours just to
7   make you aware of it.
8   Q.   Okay.
9   A.   I would put in for 4:00 at night
10  to 12:00 at night, 6:00 at night to 2:00 in
11  the morning, 8:00 at night to 4:00 in the
12  morning.  There was a 9:00 at night to 5:00
13  in the morning, or a midnight to 8:00.
14  Q.   Okay.  So if I understand now,
15  and just tell me if I'm wrong, on your days
16  off, for your days off from your full-time
17  job, you would notify Ocean Beach, whoever
18  made the decisions, as to what tours you
19  wanted to work on, and then Ocean Beach,
20  whomever it was, would advise you as to what
21  tours you got based upon your availability?
22  A.   Basically, yes.
23       MR. NOVIKOFF: Now let's look
24  at -- let's mark the following document
25  as Carter-3.

Page 120

E. Carter

1
2       (Internal correspondence dated
3       December 6, 2005 was marked as Carter
4       Exhibit-3 for identification; 9/16/08,
5       E.L.)
6   Q.   Carter-3 appears to be a memo
7   from you to Sergeant Hesse dated December 6,
8   2005, do you see that?
9   A.   Yes, sir.
10  Q.   Do you recall sending this doc --
11  this internal correspondence to Sergeant
12  Hesse?
13  A.   Yes.
14  Q.   Okay.  You CC'd Chief Paridiso,
15  do you see that?
16  A.   Yes.
17  Q.   Now what was your knowledge as to
18  Mr. Paridiso's status at this time?
19       MR. GOODSTADT: Objection.
20  Q.   On December 6, 2005?
21       MR. GOODSTADT: Same objection.
22  A.   That he was still doing the --
23  he was still overseeing -- out of respect,
24  I did it for Chief Paridiso is what I did.
25  Q.   What do you mean "out of

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 121

E. Carter

1
2 respect"?
3    A.   Being that -- my understanding
4 was he was still with the department.
5    Q.   Well, what would make you think
6 that he wasn't, if anything, prior to
7 December 6?
8    A.   He was on disability leave.
9    Q.   When did you first learn he was
10 on disability leave?
11    A.   That was the summer of 2005.  But
12 he was still doing the schedule.  And at
13 that point, I wasn't sure who was doing the
14 schedule.
15    Q.   You just said that "but he was
16 still doing the schedule, and at that point,
17 I wasn't sure who was doing the schedule"?
18    A.   Yes.
19    Q.   That seems to be an
20 inconsistency, sir.
21        MR. GOODSTADT: Objection.
22    Q.   What did you mean?  What was your
23 knowledge as to who was doing the schedule
24 on December 6, 2005?
25    A.   I -- I'm not sure, to be honest

Page 122

E. Carter

1
2 with you.
3    Q.   Okay.  What makes you think
4 Mr. Paridiso was still doing the schedule?
5        MR. GOODSTADT: Objection.
6    A.   Because guys said he would come
7 in and hang it up prior to that.  But I
8 never -- being it was in the winter, I
9 didn't see many guys, so I don't know.
10    Q.   When did guys tell you Paridiso
11 was still coming in to do the schedule?
12    A.   The -- September of '05.
13    Q.   So you weren't CCing Mr. Paridiso
14 out of respect, you were CCing Mr. Paridiso
15 because you were not aware as to who was
16 doing the schedule, correct?
17        MR. GOODSTADT: Objection.
18    A.   Yes.
19    Q.   Okay.  And this memo is you
20 telling Sergeant Hesse and Mr. Paridiso that
21 you were unavailable for the three tour on
22 January 15, 2006, do you see that?
23    A.   Yes.
24    Q.   What's the three tour?
25    A.   That would be the midnight tour.

Page 123

E. Carter

1
2    Q.   Okay.  And December 6, 2005 --
3 I'm sorry, January 15, 2006 was not part of
4 the season as you've defined that, is it?
5    A.   Correct.
6    Q.   And tell me if I'm wrong, but you
7 would advise Ocean Beach as to when you were
8 available off season and they would
9 determine whether or not they would schedule
10 you for that particular tour?
11        MR. GOODSTADT: Objection.
12    A.   Approximately a year prior, yes.
13    Q.   A year prior?
14    A.   Back in April of 2005.
15    Q.   I don't understand your answer.
16    A.   In other words, April 2005 I put
17 in this -- an internal correspondence with
18 the tours I was available for.
19    Q.   Right.
20    A.   Not knowing that something would
21 come up January 15.  So I notified them a
22 month prior, more than a month prior that
23 I'd be unavailable for that tour.  To please
24 replace me.
25    Q.   So when you said you put in that

Page 124

E. Carter

1
2 2014, am I right?
3    A.   2042.
4    Q.   The 2042 prior to April of a
5 given season, you were advising them of your
6 availability after the season as well?
7    A.   Yes.
8    Q.   Okay.
9    A.   Basically I had steady days off.
10 At this point, I believe, best of my
11 recollection, I worked Sunday night midnight
12 and Monday night midnight.
13        MR. NOVIKOFF: And let's mark
14    the following document as Carter-4.
15        (Internal correspondence dated
16    January 23, 2006 was marked as Carter
17    Exhibit-4 for identification; 9/16/08,
18    E.L.)
19    Q.   Do you recall -- well, Carter-4
20 for the record is a memo from you to
21 Sergeant Hesse with a CC to Chief Paridiso
22 dated January 23, 2006, do you see that?
23    A.   Yes.
24    Q.   And do you recall sending this
25 correspondence to Ocean Beach?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 125

E. Carter

1
2    A.   I actually left it on Sergeant
3  Hesse's desk.
4    Q.   Okay.  And you CC'd Mr. Paridiso
5  why?
6    A.   Because he could still come back
7  as the chief.  He wasn't out on full
8  workmen's comp yet.
9    Q.   How do you know that?
10   A.   Because I had seen it not too
11 long before that, and there was -- the talk
12 between George was he was still out on comp.
13   Q.   The talk as between?
14   A.   George said the chief was still
15 out on workmen's comp.
16   Q.   Oh, so you had seen George, you
17 hadn't seen Mr. Paridiso?
18   A.   I ran into Ed Paridiso at Costco,
19 yes.
20   Q.   Between your December Carter-3
21 and your January Carter-4, you saw Ed
22 Paridiso?
23   A.   To my best of my recollection,
24 yes.
25   Q.   Did you ask him if he was

Page 126

E. Carter

1
2  involved in the scheduling when you saw him?
3    A.   No, I didn't.
4    Q.   Did you -- did your knowledge of
5  whether or not Mr. Paridiso was involved in
6  the scheduling change between Carter-3 and
7  Carter-4?
8    A.   No.  I still put him in to CC
9  Chief Paridiso, so.
10   Q.   Okay.
11   A.   It was still my belief he was
12 still there.
13   Q.   Okay.  And according to Carter-4,
14 you're advising Ocean Beach that given the
15 birth of your twins, you wanted to be
16 removed from the duty roster between
17 February 12 and April 9, 2006, do you see
18 that?
19   A.   Correct.
20   Q.   Okay.  Would it be fair to say
21 that between those dates, you did not work
22 for Ocean Beach?
23   A.   I don't recall if I worked
24 February 14, one other day, because George
25 tried to talk me out of taking this family

Page 127

E. Carter

1
2  leave.  He said -- I explained to him that I
3  didn't want to get stuck at the beach
4  because the way the vehicles were breaking
5  down, that if my wife went into labor, I
6  didn't want to be stuck over here and being
7  the fact I had twins, I had my daughter who
8  was at that time three years old, and he
9  says, "Eddie," he goes, "Listen," he goes,
10 "I'll come over, pick you up and drive you."
11 So I don't recall if I worked -- my last day
12 of work was February 12 or February 14 of
13 2006.  I don't recall.
14   Q.   Did Mr. Hesse advise you as to
15 why he was going to go out of his way to
16 pick you up so that you could work during
17 that period of time?
18   A.   So my wife -- if the truck broke
19 down, I didn't get stuck at the beach.
20   Q.   Did you have a good relationship
21 with Mr. Hesse on or -- in or about January
22 23, 2006?
23   A.   I had a fair relationship with
24 him, yes.
25   Q.   Was he -- would you consider him

Page 128

E. Carter

1
2  a friend?
3    A.   I thought he was.
4    Q.   Okay.  Even though he told you to
5  shut up on occasion and disregarded your
6  complaints?
7    A.   Yes.
8    Q.   Okay.  Did you ever socialize
9  with Mr. Hesse outside of -- well, did you
10 ever socialize with Mr. Hesse after your
11 work hours?
12   A.   No.
13   Q.   And did Mr. Hesse explain to you
14 why he tried to talk you out of taking this
15 family leave that you referred to?
16   A.   He just -- no.  He said, "Why
17 don't you keep working."  You know,
18 "don't -- I need you to work, and keep
19 working."
20   Q.   Okay.  Let's go back to the
21 Notice of Claim.  I believe that's
22 Exhibit-1.  You write on page two, second
23 full sentence, "in further retaliation for
24 Claimant's opposition, both during
25 Claimant's employment and subsequent to the

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 36 of 130 PageID #: 1630

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 129

E. Carter

1
2 unlawful termination of his employment,
3 defamatory statements have been made about
4 Claimant, both verbally and in writing on
5 the internet, in other media and to others."
6 Okay.  Who, without telling me where or what
7 they said, who do you claim, in this
8 lawsuit, has made defamatory statements
9 about you?
10     A.   George Hesse.
11          MR. GOODSTADT: Objection.
12     A.   George Hesse.
13     Q.   Anybody else that you claim to
14 have made a defamatory statement about you?
15          MR. GOODSTADT: Objection.
16     A.   Tyree Bacon.
17     Q.   Okay.  Other than Tyree Bacon and
18 George Hesse, anybody else?
19          MR. GOODSTADT: Objection.
20     A.   No.
21     Q.   Okay.  When did Tyree Bacon make
22 defamatory statements about you?
23     A.   On the blog April 6.
24     Q.   Okay.  April 6 of 2006?
25     A.   I believe it was April 6 of 2006,

Page 130

E. Carter

1
2 yes.
3     Q.   Was that the only occasion that
4 you can point to where Tyree Bacon has made
5 a defamatory statement about you that you're
6 aware of?
7     A.   That -- with the posting of the
8 blog, if you were to look at it, it falls
9 down to specific -- a form basically of
10 writing and it follows it straight through.
11     Q.   Well, my question to you, you've
12 identified, sir, April 6, 2006 as an
13 incident where Tyree Bacon defamed you?
14     A.   Yes.
15     Q.   On the blog?
16     A.   Um-hum.
17     Q.   How do you know on April 6, 2006
18 Tyree Bacon was the author of the alleged
19 defamatory statement that you've just
20 referenced?
21     A.   I believe in the statement that
22 George Hesse told Tom Snyder, that Tom
23 Snyder told me.
24     Q.   Okay.  So your knowledge of
25 Mr. Bacon's defamatory statement on April 6

Page 131

E. Carter

1
2 2006 is based on what Hesse told Snyder and
3 what Snyder told you?
4     A.   Yes.
5     Q.   Okay.  So we now have the April
6 6, 2006 defamation.  Actually, what was the
7 defamatory comment that you attribute to --
8 that you attribute to Mr. Bacon?
9     A.   That I did official misconduct
10 and falsified paperwork in reference to a
11 Halloween incident.
12     Q.   Okay.  Now have you been fired
13 from any job as a result of Mr. Bacon's
14 alleged defamatory comment?
15     A.   No.
16     Q.   Has anyone advised you that you
17 did not get any employment as a result of
18 Mr. Bacon's alleged defamatory comment on
19 April 6, 2006?
20     A.   The guys in my work in the locker
21 room said, in reference to the blog with my
22 promotion, which was offered to me
23 provisionally prior to me taking the test,
24 that I wasn't going to get it until that
25 whole thing with Ocean Beach was taken care

Page 132

E. Carter

1
2 of.
3 MO        MR. NOVIKOFF: Motion to
4 strike.
5     Q.   Sir, my question's very specific.
6 Has anyone advised you that you did not get
7 a promotion or an employment opportunity
8 directly resulting from what you claim to be
9 Mr. Bacon's alleged defamatory statement on
10 April 6, 2006?
11          MR. GOODSTADT: Objection.  He
12 just testified to it.
13     Q.   Did anyone tell you specifically
14 that?
15          MR. GOODSTADT: Objection.  He
16 just testified to it.
17          MR. NOVIKOFF: I understand.
18 You can answer.
19     A.   No.
20     Q.   Okay.  Now let's put aside the
21 April 6, 2006 alleged defamation of
22 Mr. Bacon.  Subsequent to that date, can you
23 point to another date on the blog in which
24 Tyree Bacon allegedly defamed you?
25          MR. GOODSTADT: Objection.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 133

1              E. Carter
2     A.   I can't be 100 percent sure it
3  was him or not.
4     Q.   Why can't you be 100 percent sure
5  that it was him or not?
6     A.   Because the blog is an anonymous
7  blog.  Except for Tom Snyder is the only one
8  I can go right back to.
9     Q.   Now let's talk about Mr. Hesse's
10  alleged defamatory statements.  How many
11  defamatory statements do you attribute to
12  Mr. Hesse?
13         MR. GOODSTADT: Objection.
14     A.   The firing of me would be one.
15  Why he told me at the meeting for
16  directives, failing to follow directives he
17  posted.  Wearing a wire.  Sleeping.  So
18  three.
19         MR. NOVIKOFF: Okay.  Let's
20     take a break.  We have one minute left
21     on the tape.  We'll come back and we'll
22     pick it up there.
23         THE VIDEOGRAPHER: This ends
24     tape number two.  The time is 11:54
25     a.m.  Going off the record.

Page 134

1              E. Carter
2         (A break was taken.)
3         THE VIDEOGRAPHER: This begins
4     tape number three.  The time is 12:09
5     p.m.  Back on the record.
6     Q.   Mr. Carter, you identified before
7  the ending of tape number two, three alleged
8  defamatory comments from Mr. Hesse
9  concerning you.  One involved directives,
10  one involved wearing a wire, and one
11  involved you sleeping on duty, do you recall
12  that?
13     A.   Yes.
14         MR. GOODSTADT: Objection.
15     Q.   Have you had a chance -- is there
16  anything else that you can recall that
17  Mr. Hesse said that you believe was
18  defamatory, other than what you've just
19  identified?
20         MR. GOODSTADT: Objection.
21     A.   Not that I recall at this time.
22     Q.   Okay.  Is there anything in your
23  possession, custody or control that would
24  refresh your recollection?
25     A.   Not at this time.

Page 135

1              E. Carter
2     Q.   Okay.  Let's talk about the
3  alleged defamatory statement concerning
4  directives.  What specifically -- and don't
5  tell me to whom and don't tell me what or
6  where -- but just tell me what specifically
7  did Mr. Hesse say concerning directives that
8  you believe was defamatory?
9         MR. GOODSTADT: Objection.
10     A.   He -- he wouldn't talk to me
11  about them when he fired me.  I asked him.
12  I said, "What directives are you talking
13  about?"  And he wouldn't give me an answer.
14     Q.   Okay.  I guess my question -- not
15  I guess -- my question is, what specifically
16  did Mr. Hesse say regarding directives that
17  you believe was defamatory?
18         MR. GOODSTADT: Objection.
19     A.   He fired me for something I
20  didn't do.  I followed those directives.
21     Q.   Okay.  So your belief is that
22  Mr. Hesse made a defamatory comment to you
23  when he fired you for directives?
24         MR. GOODSTADT: Objection.
25     A.   Yes.

Page 136

1              E. Carter
2     Q.   Okay.  Now where did Mr. Hesse
3  make this defamatory statement?
4     A.   In the boathouse at Ocean Beach.
5     Q.   When?
6     A.   April 2, 2006.
7     Q.   Was there anyone present when
8  Mr. Hesse made this defamatory statement
9  concerning directives?
10     A.   To me, no.
11     Q.   Okay.  So just so I understand,
12  when you say that Mr. Hesse made a
13  defamatory comment regarding directives,
14  you're referring to a statement that
15  Mr. Hesse made to you in the boathouse on
16  April 2, 2006 without any other witnesses?
17     A.   Yes.
18     Q.   Okay.  Let's talk about wearing a
19  wire.  Again, not where, when or how, just
20  what specifically did Mr. Hesse say
21  concerning wearing a wire that you believe
22  was defamatory?
23     A.   I wasn't going to wear a wire.  I
24  knew nothing about a wire.  I was never
25  approached.  I was never asked.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 137

E. Carter

1
2 MO        MR. NOVIKOFF: I understand
3    that, and I'm going to move to strike.
4    Q.   But what specifically -- well,
5 let me take a step back.  You've alleged
6 that Mr. Hesse made a defamatory statement
7 concerning you involving wearing a wire?
8    A.   Yes.
9    Q.   What specifically did Mr. Hesse
10 say concerning wearing a wire that you
11 believe was defamatory?
12        MR. GOODSTADT: Objection.
13    A.   The fact that if I was to wear a
14 wire, meant I was a rat, and I'm not.
15    Q.   What, though, did Mr. Hesse say
16 to you when you referred to wearing a wire?
17        MR. GOODSTADT: Objection.
18    A.   He didn't say it to me.  He said
19 it to the other officers at the meeting.
20    Q.   Okay then.  Now what did he say
21 to the other officers at this meeting that
22 you've just referred to?
23    A.   That -- it was the April 2
24 meeting of 2006.  That Arnold Hardman's
25 attorney said that somebody was going to

Page 138

E. Carter

1
2 wear a wire and it was going to be Ed and
3 Tom, and we were going to get the officers
4 to admit that they beat up the businessman,
5 Gilbert, for the District Attorney's office.
6    Q.   Okay.  So this meeting took place
7 where?
8    A.   The boathouse.
9    Q.   And you weren't present at this
10 meeting?
11    A.   I was fired already.  Terminated.
12 Left the Island.
13    Q.   You had -- you had gone from the
14 Island by this time?
15    A.   Yes.
16    Q.   And according to somebody at that
17 meeting, Mr. Hesse said that Arnold
18 Hardman's attorney said that you were going
19 to wear a wire?
20    A.   That somebody was going to wear a
21 wire, and George said it was me or Tom
22 Snyder.
23    Q.   Okay.  So I just want to
24 understand now what transpired.  Mr. Hesse
25 said to someone at this meeting that Arnold

Page 139

E. Carter

1
2 Hardman's attorney said that someone was
3 going to wear a wire, and then George added
4 that it was going to be you and Ed, is that
5 a fair characterization?
6    A.   No.
7    Q.   No.
8    A.   Ed and Tom.
9    Q.   Ed and Tom.
10    A.   Ed and Tom were going to wear the
11 wire.  And he said it to all the officers
12 that were present at the meeting, along with
13 the dispatchers and any dock masters that
14 were there.
15    Q.   So to your knowledge, did
16 Mr. Hesse say that you had worn a wire or
17 did Mr. Hesse say that you were going to
18 wear a wire?
19    A.   I was going to wear a wire.
20    Q.   Okay.  And who told you that
21 Mr. Hesse said this?
22    A.   Originally, Kevin Lamm told me
23 that Chris Moran said it, and I heard Chris
24 Moran later in June of 2006 say it.
25    Q.   Okay.  So you learned of this

Page 140

E. Carter

1
2 alleged defamation in one instance from
3 Mr. Lamm, who told you that Mr. Moran said
4 that George Hesse said this?
5    A.   Yes.
6    Q.   And on the other instance you
7 learned about this alleged defamatory
8 statement, you heard it directly from
9 Mr. Lamm?
10    A.   Directly from Mr. Moran.
11    Q.   From Mr. Moran.
12    A.   Yes.
13    Q.   Was that in a face-to-face
14 conversation?
15    A.   No.
16    Q.   Was it on a telephone call?
17    A.   Kevin was on a telephone call.
18    Q.   With whom?
19    A.   On speaker with Chris Moran.
20    Q.   And you were present?
21    A.   Yes.
22    Q.   Did Mr. Lamm tape this
23 conversation?
24    A.   Yes.
25    Q.   Were you aware that Mr. Lamm was

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 141

1           E. Carter
2 taping this conversation?
3     A.   Yes.
4     Q.   Where did you  -- where did
5 Mr. Lamm -- where was the speaker phone
6 present?
7     A.   It was a Nextel.  One of those
8 Nextels.
9     Q.   So you were right next to
10 Mr. Lamm when he was doing this?
11    A.   Yes.
12    Q.   And where were you and Mr. Lamm?
13    A.   In Ronkonkoma.
14    Q.   Where in Ronkonkoma?
15    A.   By the airport.
16    Q.   Why?
17         MR. GOODSTADT: Objection.
18    Q.   Why were you with Mr. Lamm on
19 this occasion in June?
20    A.   I stopped up at work.  It's part
21 of my patrol, the airport, and I met up with
22 Kevin, and he said he was about to call
23 Chris.
24    Q.   So you and Mr. Lamm were working
25 at that time?

Page 142

1           E. Carter
2     A.   I was, yes.
3     Q.   Was Mr. Lamm working?
4     A.   To the best of my knowledge, yes.
5     Q.   So you both were working for the
6 Town of Islip, and Mr. Lamm advised you that
7 he was going to call Mr. Moran?
8     A.   Yes.
9     Q.   Did Mr. Lamm tell you why he was
10 going to call Mr. Moran?
11    A.   That Chris had called him and he
12 was going to call him back, and he said, "Do
13 you want me to ask him why you were let go
14 again?"  And I said, "Sure."
15    Q.   And did Mr. Lamm tell you that he
16 was going to be recording Mr. Moran?
17    A.   No.
18    Q.   Did -- were you aware that
19 Mr. Lamm was recording Mr. Moran in his
20 conversation?
21    A.   At that point, I saw a tape
22 recorder.  I didn't know if it was on or
23 not.
24    Q.   So Mr. Lamm had his Nextel phone
25 in one hand and a tape recorder in another?

Page 143

1           E. Carter
2     A.   No.  The tape recorder was on a
3 center console of the vehicle.
4     Q.   Oh, you were in a car?
5     A.   Yes.
6     Q.   What type of tape recorder was
7 it?
8     A.   A thin one (indicating).  Silver
9 in color.
10    Q.   A little dictaphone?
11    A.   If that's what they're called,
12 yes.
13    Q.   And you saw it?
14    A.   Yes.
15    Q.   And you assumed that he was
16 taping it?
17    A.   I found out later on he was
18 taping it, yes.
19    Q.   Well, did you ask Mr. Lamm at
20 that time why there was a tape recorder on
21 the console?
22    A.   No.
23    Q.   Did you see that it was on or
24 not?
25    A.   No.

Page 144

1           E. Carter
2     Q.   Did you see Mr. Lamm go to turn
3 it on?
4     A.   No.
5     Q.   Did Mr. Lamm tell Mr. Moran that
6 he was being taped?
7     A.   No.  Not that I recall.
8     Q.   Was that the only occasion that
9 you're aware of that Mr. Lamm was taping
10 telephone conversations?
11    A.   No.
12    Q.   Was that the first time  -- well,
13 let's -- before I go there, when did you
14 learn that Mr. Lamm had tape recorded that
15 conversation with Mr. Moran?
16    A.   Afterwards.  Shortly afterwards.
17 I don't recall exactly when.
18    Q.   Seconds? Minutes? Weeks?
19 Months?
20    A.   I don't recall at this time.
21    Q.   How?  How did you learn?
22    A.   Because he had to get the
23 recording to a disc.
24    Q.   Yeah, but how did you learn
25 Mr. Lamm had recorded that conversation?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 145

E. Carter

1
2     A.   He told me he did after.  You
3  know, I don't know if it was exactly then or
4  if it was later on.
5     Q.   And prior to that conversation
6  with Mr. Moran, were you aware that Mr. Lamm
7  was telephone -- was recording telephone
8  conversations with other individuals?
9        MR. GOODSTADT: Objection.
10    A.   No.
11    Q.   No?
12    A.   No.
13    Q.   When did you learn that Mr. Lamm
14 had tape recorded other conversations, other
15 than the one that you were involved in?
16    A.   June of '06.
17    Q.   What did Mr. Lamm say to you, if
18 anything?
19    A.   He needed to have the tape
20 recordings put on a disc, and I didn't -- I
21 couldn't do it.
22    Q.   Did Mr. Lamm tell you why he was
23 tape recording conversations?
24    A.   For the defamation.  We all felt
25 that defamation was the biggest thing was me

Page 146

E. Carter

1
2  wearing a wire.  That when a park ranger
3  three position did come up for me, I wanted
4  to know why I was let go, so I could tell my
5  boss the true reason, rather that what I had
6  to tell him a couple of days after, that I
7  was let go for directives that were hanging
8  on the board that I didn't know what I was
9  fired for.
10    Q.   So you had asked Mr. Lamm to tape
11 record the conversations?
12        MR. GOODSTADT: Objection.
13    A.   No.
14    Q.   So let me understand this
15 correctly -- let me ask you this question,
16 did Mr. Lamm advise you as to why he was
17 tape recording conversations?  Not why you
18 think it was being done.  Did Mr. Lamm tell
19 you why he was tape recording conversations?
20    A.   No.
21    Q.   Did you ask Mr. Lamm to tape
22 record conversations?
23    A.   No.
24    Q.   So when you answered just before
25 about wanting to know why you were fired,

Page 147

E. Carter

1
2  what did that have to do with why Mr. Lamm
3  was tape recording a conversation?
4        MR. GOODSTADT: Objection.
5     A.   Later on, when we had talked --
6  again, I don't know if it was right then and
7  there or if I had to go -- he said, "See,
8  that's why you were let go, for wearing a
9  wire."  And I said, "Unbelievable."  I said,
10 you know, "reason number three now."
11    Q.   Okay.  So let me get this
12 straight.  Based upon a tape recorded
13 conversation between Mr. Lamm and Mr. Moran,
14 wherein Mr. Moran said that George Hesse
15 back in April said something about you
16 wearing a wire, you concluded that that was
17 why you were fired?
18        MR. GOODSTADT: Objection.
19    A.   I felt that was a big reason why
20 I was fired, because originally, I was
21 misID'd as being part  -- as being on the
22 night of the Gilbert incident and that
23 caused a lot of problems.
24    Q.   When were you misID'd as being
25 part of the Gilbert incident?

Page 148

E. Carter

1
2     A.   Back sometime 2005.
3     Q.   Where were you misID'd?
4     A.   Someone told the District
5  Attorney's office I was working that night.
6     Q.   Who told the District Attorney's
7  office?
8     A.   George Hesse told me it was Dave
9  Gerden.
10    Q.   So George Hesse told you that
11 this guy Dave told the District Attorney's
12 office that you were mis -- that you were
13 part of the Gilbert incident?
14        MR. GOODSTADT: Objection.
15    Q.   Is that your testimony?
16    A.   That he gave a statement, yes, or
17 a verbal that I was -- yeah, I was there
18 that night.
19    Q.   And you believe that that
20 misidentification contributed to you being
21 fired, you not being rehired?
22        MR. GOODSTADT: Objection.
23    A.   That caused -- yes.  Absolutely.
24    Q.   What -- what connection do you
25 see between the two?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 149

E. Carter

1
2  A.   It started in the fall of 2006,
3  District Attorney's office started
4  interviewing people with reference to the
5  Gilbert incident.  They came to me twice and
6  I had Gray -- the attorney for the beach,
7  Gray come to my house.  They called me at
8  my -- they came the first time.  Asked me a
9  bunch of questions, which I didn't
10 understand what they were asking me, and
11 they said they had information that I was
12 working that night.  I said I wasn't.  It
13 was my daughter's birthday.  I had a party
14 in the yard and I don't work Saturday
15 nights.
16      Little time later, short time
17 later, I don't recall if it was a couple
18 days, a week, they said they were going to
19 interview other people.  They -- the
20 investigator, Tom Iacopelli, called me at my
21 town job.  You got the secretary.  The boss
22 is there.  She looks at me, she goes,
23 "District Attorney's office is on the phone
24 for you."  I picked the phone up.  He says,
25 "Carter, I need to speak to you.  We're

Page 150

E. Carter

1
2  coming to your house tomorrow."  I said,
3  "No, you're not."  He said, "What do you
4  mean?"  I said, "There was a 2042, an
5  internal correspondence put out that the
6  village attorney has to be present for any
7  conversations with you.  And I don't want to
8  be fired.  I need the job.  I need the
9  money."
10      So he says, "Well, you spoke to
11 us in the past.  Why don't you speak to us
12 now."  I said, "You spoke to us first."  I
13 said, "Listen, I don't need to lose my job."
14 I said, "I'm going to call."  So I
15 immediately called George Hesse, who set an
16 appointment up with the attorney for the
17 beach at the time.  I believe he was called
18 "Gray."  He showed up at my house the next
19 day.
20      And that's when guys started
21 looking at me funny like I was talking to
22 the District Attorney's office.  I was rat.
23 Again, I'm labeled as a rat.  And I told
24 George, I said, "I had nothing -- you, know,
25 I wasn't there."  He said, "I know you

Page 151

E. Carter

1
2  weren't there, but what are you going to
3  do."
4      So the range comes around
5  November of 2005.  We meet at Stop & Shop in
6  East Islip.  There's approximately 10 guys.
7  We're all going out to the range together.
8  10 -- maybe it was even more, 15 of us.  I
9  walk up and the guy Dave says to me, "Oh,
10 the District Attorney's office talk to ya?"
11 And I looked and I said, "Dave, I wasn't
12 working that day."  And at that time, the
13 other guys said, "Dave, he wasn't working
14 that day."  It was the first time that it
15 came out three months later, two months
16 later that I wasn't working that day.
17      And subsequently, the District
18 Attorney's office never spoke to me again,
19 but George Hesse, in between that time, said
20 to me, "I don't understand why they keep
21 talking to you.  I don't know why."  And the
22 guys started looking at me funny.
23      Q.   Well, no, you testified that the
24 guys were looking at you funny before
25 Mr. Hesse said that to you about why are you

Page 152

E. Carter

1
2  working, correct?
3      A.   That was between September --
4  between the Gilbert thing and then with the
5  District Attorney's office first came over.
6      Q.   Mr. Hesse didn't misidentify you,
7  did he?
8      A.   Him, no.
9      Q.   Right.  Mr. Hesse didn't advise
10 anyone prior to April 2, 2006 that you were
11 wearing a wire, did he?
12      MR. GOODSTADT: Objection.
13      Q.   To your knowledge?
14      A.   To my knowledge, no.  Not that I
15 know of.
16      Q.   Mr. Hesse, prior to April 2,
17 2006, didn't tell anyone, to your knowledge,
18 that you were cooperating with the DA,
19 correct?
20      A.   To my knowledge, no.
21      Q.   In fact, to your knowledge --
22 withdrawn.  So what -- explain to me how you
23 attribute your termination -- I'm sorry,
24 withdrawn.  How do you attribute you not
25 being rehired on April 2, 2006 to this

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 153

E. Carter

1    E. Carter
2  misidentification of you that Mr. Hesse had
3  nothing to do with?
4        MR. GOODSTADT: Objection.
5    A.   Mr. Hesse being the senior
6  officer at that scene that night, could have
7  very easily taken care of it and explained.
8  Showed the blotter, the records that I
9  wasn't there.
10   Q.   How do you know he didn't?
11   A.   He never said he did.
12   Q.   Did you ask him?
13   A.   I said to him, I said "George" --
14  my exact words to him was, "This is pretty
15  sad.  I can't prove that I wasn't working
16  that night."
17   Q.   What do you mean you can't prove?
18  Didn't the records show you weren't working
19  that night?
20   A.   The District Attorney's office
21  originally put, in my house, with Gray
22  sitting there, that I could falsify the
23  blotter or my time sheets.
24   Q.   Oh, so it was the DA that didn't
25  necessarily believe, in your opinion, what

Page 154

1    E. Carter
2  was put on the time sheets, correct?
3    A.   I'm not  -- yes.
4    Q.   Right.  My question to you is,
5  what makes you think that George Hesse
6  didn't tell the DA that you didn't work that
7  night?
8    A.   He never said he did.
9    Q.   But did you ask him?
10   A.   No.
11   Q.   What makes you think that the DA
12  didn't believe that in fact you didn't work
13  that night?
14   A.   What makes me believe -- I'm
15  sorry, repeat the question.
16   Q.   What makes you believe -- I'll
17  withdraw the question.  I'm just trying to
18  figure out what did Mr. Hesse say concerning
19  this misidentification prior to April 2,
20  2006 that you believe resulted, in part, in
21  you not being rehired by Ocean Beach?
22   A.   I'm sorry, we're talking about
23  the wire, is what we were talking about.
24   Q.   No.  We were talking about -- you
25  said this misidentification of you being

Page 155

1    E. Carter
2  involved in the Gilbert incident was a
3  reason, in your opinion, why you weren't
4  rehired.  So my question to you is, what did
5  Mr. Hesse do with regard to this
6  misidentification that you believe resulted
7  in a decision concerning you not being
8  rehired on April 2, 2006?
9        MR. GOODSTADT: Objection.
10   Q.   You can answer.
11   A.   The wire's what started this, and
12  then I went to explain how it came about,
13  the wearing of the wire.  That somebody was
14  going to wear the wire.  I was supposedly
15  cooperating with the District Attorney's
16  office because he came to my house twice.
17  No one else apparently at that point was
18  seen twice.
19   Q.   So the misidentification had
20  nothing to do with you being terminated, is
21  that your testimony?
22        MR. GOODSTADT: Objection.
23   Q.   Let me ask you straight out then,
24  sir.  You say that you were misidentified by
25  somebody, not George Hesse, concerning the

Page 156

1    E. Carter
2  Gilbert incident, correct?
3        MR. GOODSTADT: Objection.
4    A.   Yes.
5    Q.   At some point in time prior to
6  April 2, 2006, you believe that the DA
7  thought that you were part of the Gilbert
8  incident, correct?
9    A.   Yes.
10   Q.   What did  -- do you believe that
11  this misidentification by someone other than
12  George Hesse, was a reason for you not to be
13  rehired on April 2, 2006?
14        MR. GOODSTADT: Objection.
15   A.   The Gilbert incident  --
16   Q.   Yes or no?
17   A.   Part of it, yes.
18   Q.   Okay.  What part of your
19  misidentification do you believe resulted in
20  you not being rehired on April 2, 2006?
21        MR. GOODSTADT: Objection.  He
22      just testified for five minutes about
23      it.
24   A.   The Gilbert incident as a whole
25  was part of me being misidentified.  Then

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 157

1            E. Carter
2  coming out about me wearing a wire for the
3  District Attorney's office to have these
4  guys admit that they beat up Gilbert during
5  an incident that happened in August of 2005.
6      Q.   Who is "they" that you're talking
7  about, they say you were wearing a wire?
8          MR. GOODSTADT: Objection.  He
9  already testified who said it.
10     Q.   Who's "they"?
11     A.   George Hesse.  Arnold Hardman's
12 attorney and George Hesse.
13     Q.   But that was April 2, 2006,
14 correct?
15     A.   Yes.
16     Q.   What did Mr. Hesse say about you
17 wearing a wire, if anything, prior to April
18 2, 2006?
19     A.   To myself, nothing.
20     Q.   To anybody that you're aware of,
21 prior to April 2, 2006?
22     A.   Apparently he spoke to Arnie
23 Hardman about it, because it was said at the
24 meeting.
25     Q.   Not apparently.

Page 158

1            E. Carter
2          MR. CONNOLLY: Objection.
3      Q.   What information can you point to
4  from any source that indicates that George
5  Hesse said anything to anyone, prior to
6  April 2, 2006, about you wearing a wire?
7      A.   Nothing.
8          MR. NOVIKOFF: Let's end it
9  now.  It's 12:30.  We'll pick it up at
10 1:15.
11         THE VIDEOGRAPHER: The time is
12 12:29 p.m.  We're going off the record.
13         (A break was taken.)
14         THE VIDEOGRAPHER: The time is
15 1:24 p.m.  Back on the record.
16     Q.   Mr. Carter, stay on the wire
17 issue.  You testified that you were told
18 that Mr. Hesse made a comment concerning you
19 wearing a wire on April 2, 2006.  Has anyone
20 told you that Mr. Hesse made a comment about
21 you wearing a wire at any time subsequent to
22 April 2, 2006?
23     A.   No.
24     Q.   The third alleged defamatory
25 statement that you claim or you testified

Page 159

1            E. Carter
2  that Mr. Hesse made concerning you was that
3  you were sleeping on the job; is that
4  correct?
5      A.   That I was sleeping, yes.
6      Q.   Sleeping where?
7      A.   He told me I was  -- he told
8  another boss in the Town of Islip that I was
9  cutting myself thin and sleeping while
10 coming to work.
11     Q.   Okay.  Did Mr. Hesse ever
12 communicate directly to you any defamatory
13 statement concerning you sleeping while
14 working at Ocean Beach?
15         MR. GOODSTADT: Objection.
16         MR. NOVIKOFF: Withdrawn.
17     Q.   Did Mr. Hesse ever advise you
18 that he believed that you -- withdrawn.
19 While you were working at Ocean Beach, did
20 Mr. Hesse ever advise you that he thought
21 you were sleeping while on the job?
22     A.   No.
23     Q.   On April 2, 2006, did Mr. Hesse
24 ever advise you that he believed that you
25 were sleeping while on the job at Ocean

Page 160

1            E. Carter
2  Beach?
3      A.   No.
4      Q.   Prior to April 2, 2006, did
5  anyone tell you that Mr. Hesse said that you
6  were sleeping on the job?
7      A.   No.
8      Q.   Did -- has anyone told you that
9  Mr. Hesse, on April 2, 2006, said that you
10 were sleeping on the job?
11     A.   No.
12     Q.   Now after April 2, 2006, other
13 than what you say Mr. Hesse said to one of
14 your supervisors, did  -- has anyone told
15 you that Mr. Hesse said that you were
16 sleeping on the job?
17     A.   George Hesse himself, both
18 verbally and through an email.
19     Q.   What did George Hesse say to you
20 verbally about you sleeping on the job?
21     A.   He said that I had called  -- he
22 said that I spoke to Greg DeCanio, who was
23 looking into my promotion, and I had to ask
24 him for a letter.  He said, "I didn't know
25 what letter you needed.  What you want in

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 161

E. Carter

1        E. Carter
2    the letter exactly.  And I told Greg you
3    were cutting yourself thin.  You just had
4    twin boys.  You were coming to his job,
5    going upstairs and basically sleeping the
6    night away."
7        Q.    Okay.  And he told you this when?
8        A.    May 15.
9        Q.    Okay.  And did he tell you this
10   face to face?
11       A.    On the phone.  No.  On the phone
12   and in an email.
13       Q.    Okay.  Let's talk about on the
14   phone.  Who called who?
15       A.    I called -- George had originally
16   called me.  Left a message.  I called him
17   back when I got done with the training
18   class, and he said -- I said -- he said,
19   "Eddie, did you get my email?"  I said, "No,
20   George.  Truthfully, I didn't get on the
21   computer."  And he said, "Oh, I sent you an
22   email explaining everything," and then he
23   explained it to me that he told Greg DeCanio
24   that I was cutting myself thin, I just had
25   the twin boys, and that I was sleeping while

Page 162

E. Carter

1        E. Carter
2    coming there, sleeping the tour away, and
3    that wasn't what he wanted in an employee,
4    so he let me go and that I did  -- I'm
5    trying to remember exactly.  Give me a
6    second, please.  That I'd make a great
7    lieutenant and my guys highly respect me.
8        Q.    Okay.  Other than through this
9    email and over this phone, are you aware as
10   to whether or not anyone else was advised --
11   well, withdrawn.  When did you have your
12   twin boys?
13       A.    Give me a second.  February 27,
14   2007.
15       Q.    February what?
16       A.    27, 2006.
17       MR. NOVIKOFF: Let's mark the
18   following document as Carter-5.
19       (Email dated 5/15/06 was marked
20   as Carter Exhibit-5 for identification;
21   9/16/08, E.L.)
22       Q.    Carter-5, is this the email that
23   you're referring to?
24       A.    (Reviewing).  Yes.
25       Q.    And you are wingking28?

Page 163

E. Carter

1        E. Carter
2        A.    Yes.
3        Q.    Now Mr. Hesse starts off this
4    email by saying "I called Greg personally
5    and explained to him what was going on," do
6    you see that?
7        A.    Yes.
8        Q.    Who asked -- well, do you know
9    why Mr. Hesse was calling -- was calling
10   Greg personally to explain to him what was
11   going on?
12       MR. GOODSTADT: Objection.
13       A.    No.  I gave him no permission to
14   contact anyone in the town, and I had asked
15   him for a letter as to why I was let go for
16   future employment and basically for my
17   promotion with the Town of Islip because of
18   all the allegations that were said prior
19   with the blog, with the official misconduct
20   and the falsifying the paperwork.
21       Q.    When did you ask Mr. Hesse for
22   this letter in relation to May 15, 2006?
23       A.    Approximately seven days earlier.
24       Q.    Now Mr. Hesse then goes on to say
25   "I told him that you were not involved in

Page 164

E. Carter

1        E. Carter
2    any misconduct of any sort," do you see
3    that?
4        A.    Yes.
5        Q.    That's a true statement?
6        A.    Yes.
7        Q.    According to your knowledge?
8        A.    Yes.
9        MR. GOODSTADT: Objection.
10   Well, he -- you're asking him whether
11   he was not involved in misconduct or
12   that he told him he was not involved in
13   misconduct?
14       Q.    Well, was what Mr. Hesse said a
15   true statement when I read "I told him you
16   were not involved in any misconduct of any
17   sort"?
18       A.    I was not involved in any
19   misconduct of any sort.
20       Q.    So that's a true statement?
21       A.    Yes.
22       Q.    "I told him you were let go
23   because you were spreading yourself thin
24   from job to job, coming to work tired and
25   sleeping your tour away," do you see that?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 165

E. Carter

1
2    A.   Yes.
3    Q.   It has nothing -- no reference of
4  your twins here, is there?
5         MR. GOODSTADT: Objection. The
6    document speaks for itself.
7    Q.   Any reference to your twins being
8  born in this -- in this email?
9    A.   Not in the email.
10   Q.   And, in fact, you weren't working
11 at the time that your twins were born, were
12 you?
13   A.   Correct. But in the phone call
14 he brought it up.
15   Q.   He brought what up?
16   A.   About the twins.
17   Q.   Saying what?
18   A.   Saying that I -- I was cutting
19 myself thin. I have a -- the phone call the
20 same day. I didn't read this email until
21 later is when he brought up about the twins.
22   Q.   Did you tape his phone call?
23   A.   Yes, I did.
24   Q.   Have you produced that?
25   A.   Yes.

Page 166

E. Carter

1
2    Q.   Did you respond to Mr. Hesse when
3  he mentioned the fact that he believed that
4  you were sleeping on duty as a result of
5  your twins being born?
6    A.   At that point, I wasn't getting
7  confrontational with him. I was done with
8  him. This was the fourth and final reason
9  he was coming up with defaming me, and by
10 calling another boss, I wasn't dealing -- I
11 wasn't dealing with him anymore. At that
12 point --
13   Q.   You only gave three reasons,
14 what's the fourth?
15   A.   The first one was --
16   Q.   You said directives?
17   A.   Directives.
18   Q.   Wire?
19   A.   Wearing a wire.
20   Q.   Sleeping?
21   A.   Falsifying on the blog. The
22 other reason where Arnie Hardman said also,
23 that he thought I got scooped up and he was
24 going to talk to George Hesse. The
25 Halloween incident.

Page 167

E. Carter

1
2    Q.   But Mr. Hesse never told you that
3  you were being fired because you were
4  scooped up in the Halloween incident, did
5  he?
6    A.   He never told me. It was on the
7  blog, and Arnie Hardman reconfirmed that
8  that possibly was one of the reasons by the
9  phone call he gave me after I was let go.
10   Q.   So Arnie Hardman told you that
11 that was a possible reason why you were
12 fired?
13   A.   His exact words was --
14   Q.   No. No. Is that what Arnie
15 Hartman told you?
16        MR. GOODSTADT: Objection.
17   He's about to tell you what his exact
18   words were.
19   A.   His exact words were, "Carter,
20 you got -- I think you got fired -- let go
21 because you got scooped up in the Halloween
22 incident. I'm going to talk to George when
23 he comes back from vacation and I'm going to
24 see about having you rehired," and I asked
25 George about that, and he said, "Yeah, I

Page 168

E. Carter

1
2  spoke to Arnie, and no."
3    Q.   Hesse never told you you were
4  fired for being scooped up in the Halloween
5  incident, did he?
6    A.   No.
7    Q.   So when you say there's four
8  times, that's not true, there were three
9  times according to your testimony, right?
10        MR. GOODSTADT: Objection.
11   Q.   Wire, sleeping and directives,
12 right?
13        MR. GOODSTADT: Objection.
14   A.   And the blog with the other --
15 with Arnie Hardman backing it up, I believe
16 that would be.
17   Q.   You testified as to what Hesse
18 told you?
19   A.   Yes.
20   Q.   Hesse gave you three reasons,
21 right?
22   A.   Yes.
23   Q.   Not four?
24   A.   No. Three.
25   Q.   Right.

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 169

1          E. Carter
2          MR. GOODSTADT: I don't believe
3     he actually testified that Hesse told
4     him he was wearing a wire.  Didn't he
5     tell it to the meeting?
6          MR. NOVIKOFF: We'll go on.
7     Q.    Now when Mr. Hesse told you in
8     this phone conversation that he believed
9     that you were sleeping on the job because
10    your twins were born, why didn't you tell
11    him that you weren't working at the time
12    that your twins were born?
13    A.    I did subsequently -- in that
14    conversation or another one say, "George, I
15    haven't worked since February and as
16    prior -- you know, prior to the twins," and
17    he just said no.
18    Q.    So on that tape recording that
19    you just referenced, it would say  -- it
20    would sound -- I'm sorry, it would say that
21    you told George that you weren't working, is
22    that your testimony?
23    A.    Yes.
24    Q.    Now you said there was a
25    subsequent conversation.  What subsequent

Page 170

1          E. Carter
2     conversation did you have if you said you
3     were done with him?
4     A.    The one prior -- the one prior I
5     originally spoke to him was about the blog
6     and then this one.  So it was in this
7     conversation.  We had a long conversation.
8     I asked him why he didn't let me go six to
9     eight weeks prior if he's talking about me
10    sleeping, and he said he didn't know where
11    he was going to be or where the department
12    was going.
13    Q.    So you told him in this tape
14    recorded conversation, when he said that you
15    were sleeping your tour away because the
16    twins were born, that you weren't working
17    when your twins were born, is that your
18    testimony?
19    A.    Yes.
20    Q.    Okay.  So when I play that tape,
21    if I ever get that tape -- maybe I did
22    already.
23    MR. GOODSTADT: You did.
24    Q.    Okay.  It's going to specifically
25    say on that tape recording that you told

Page 171

1          E. Carter
2     George that you weren't working?
3     A.    After February, yes.
4     Q.    Okay.  And George then goes on to
5     say "I also said that when you work, you're
6     a great employee and to expect a lot from
7     you," do you see that?
8     A.    Yes.
9     Q.    Anything false about that?
10    A.    No.
11    Q.    George then goes on to say "I
12    have no doubt you'll be a great lieutenant,
13    good luck," do you see that?
14    A.    Yes.
15    Q.    Now this guy Greg, his name is
16    Greg Decantio?
17    A.    DeCanio, yes.
18    Q.    And for whom did he work for on
19    May 15, 2006?
20    A.    He works for Long Island
21    Macarthur Airport.
22    Q.    In what capacity?
23    A.    He's the chief.
24    Q.    Chief of what?
25    A.    The Long Island Macarthur

Page 172

1          E. Carter
2     Airport.
3     Q.    Do you work with Long Island
4     Macarthur Airport?
5     A.    No.
6     Q.    Had you applied for the Long
7     Island Macarthur Airport job prior to May
8     15, 2006?
9     A.    No.  His department was doing an
10    internal investigation for our department
11    needs as far as budgeting, promotions and
12    manpower.
13    Q.    Explain that.
14    A.    The department I work for, which
15    is now under the department of parks and
16    recreation, we moved from the department of
17    code enforcement, there was a new
18    commissioner that was unaware of the
19    department needs and stuff.  So they
20    empanelled Greg DeCanio, being the chief law
21    enforcement officer of the airport, to
22    interview the guys, interview the
23    supervisors and to look into budgetary needs
24    and promotions and stuff.
25    Q.    Had you taken that test yet as of

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 173

1        E. Carter
2 May 15, 2006?
3    A.   Yes.
4    Q.   Had the test results come back?
5    A.   No.
6    Q.   And you believe that Mr. DeCantio
7 was doing an investigation into you
8 concerning your application to be promoted?
9    A.   I know that for a fact.
10    Q.   That's your testimony?
11    A.   Yes.
12    Q.   And you know that for a fact
13 based upon Mr. DeCantio telling you?
14    A.   Mr. DeCanio's interview with me,
15 yes.
16    Q.   Okay.  And when did Mr. DeCantio
17 interview you?
18    A.   It was sometime in the summer of
19 2006.
20    Q.   Okay.  After this email?
21    A.   At this time, I don't recall if
22 it was prior or after.
23    Q.   All right.  And have you spoken
24 to Mr. DeCantio about what Mr. Hesse said in
25 this email?

Page 174

1        E. Carter
2    A.   Yes.
3    Q.   When did you speak to him?
4    A.   Soon after.
5    Q.   And who initiated the
6 conversation?
7    A.   Myself.
8    Q.   How?
9    A.   I met up with him and --
10    Q.   So you met up with him?
11    A.   I met up with him.
12    Q.   So it was face to face?
13    A.   Yes.
14    Q.   Did you ask to meet with him?
15    A.   He actually called me on the
16 phone to come up there and meet him.
17    Q.   Did he tell you why he wanted to
18 meet with you?
19    A.   No.
20    Q.   Okay.  And how long was this
21 conversation?  How long was this meeting?
22    A.   The exact time frame I can't tell
23 you.  It was approximately I'd say 20
24 minutes to a half hour.
25    Q.   And was the entire subject matter

Page 175

1        E. Carter
2 of this meeting this email?
3    A.   No.
4    Q.   What else did you talk about with
5 Mr. DeCantio about -- other than this email?
6    A.   Training within the department
7 and the upgrades for the guys.
8    Q.   The up what?
9    A.   The upgrade.  Upgrading of the
10 park rangers.
11    Q.   Okay.  And was this a job
12 interview, to your knowledge?
13    A.   No.
14    Q.   What was the purpose of this
15 meeting?
16    A.   It was part of that
17 investigation.
18    Q.   Into whether or not you should be
19 promoted?
20    A.   That, and the department needs,
21 yes.
22    Q.   When you say "department needs,"
23 what do you mean?
24    A.   The budgetary, the training, the
25 upgrading of the park rangers.  Hiring more

Page 176

1        E. Carter
2 people.  Personnel.
3    Q.   Now who initiated the
4 conversation specifically with regard to
5 what Mr. Hesse said?
6    A.   I believe myself.
7    Q.   What did you say to him?
8    A.   I told him that I understand
9 George called him, and he said, "Yeah,
10 Eddie."  He goes, "I don't know why he
11 called me."  And I said to him, I said,
12 "Well, probably because I explained to him
13 when I spoke to him, that your department's
14 doing an investigation into the needs, but I
15 never told him to call you or not."
16    Q.   And what did -- what else did you
17 say about this, if anything?
18    A.   Just that what Hesse told him
19 about me sleeping was false.
20    Q.   And what did he say?
21    A.   He just shrugged it off.
22    Q.   Did -- to your knowledge, does
23 Mr. DeCantio have any involvement in whether
24 or not you get promoted?
25    A.   At that point, yes.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 177

E. Carter

1
2  Q.  What was his involvement, to the
3  best of your recollection?
4  A.  He was reporting to my
5  commissioner at that time.
6  Q.  Who was your commissioner?
7  A.  Cathy O'Bannon.
8  Q.  And do you have any knowledge as
9  to whether or not Mr. DeCantio spoke to
10 Ms. O'Bannon concerning the subject matter
11 of this email?
12 A.  It would be my belief --
13 Q.  No.  Do you have any knowledge?
14 A.  No.
15 Q.  Personal knowledge?
16 A.  No.
17 Q.  Did Mr. DeCantio ever -- well,
18 withdrawn.  Have you spoken with
19 Ms. O'Bannon concerning the subject matter
20 of this email?
21 A.  No.
22 Q.  Has anyone ever advised you that
23 the reason that you have not been promoted
24 is because of what Mr. Hesse specifically
25 said in this email?

Page 178

E. Carter

1
2  A.  No.
3  Q.  Has the position  -- well, what
4  position were you looking to be promoted to?
5  A.  Suffolk County Civil Service
6  title is park ranger three.
7  Q.  And you're a park ranger two now,
8  right?
9  A.  Yes.
10 Q.  Has the park ranger three
11 position been filled?
12 A.  No.
13 Q.  Actually, let me go back to your
14 conversation with Mr. Hesse.  Why were you
15 taping the phone call?
16 A.  I believe I answered that
17 earlier.  With the conflicting reasons why
18 he let me go.
19 Q.  Is that the only conversation you
20 taped with Mr. Hesse?
21 A.  There was two that I'm aware of
22 at this time.
23 Q.  That you taped, not that Mr. Lamm
24 taped?
25 A.  Yes.

Page 179

E. Carter

1
2  Q.  Well, who else would be aware of
3  what conversations you taped, other than
4  you?
5  A.  No.  I had to re-call him one
6  time because there was a phone -- a problem
7  with the phone lines at Ocean Beach.  If you
8  want to call that a second  -- a third time.
9  It was in the same phone, you know.
10 Q.  And -- and did you advise -- in
11 any of these two conversations, did you ever
12 advise Mr. Hesse that he was being tape
13 recorded?
14 A.  No.
15 Q.  Did you ask his permission to be
16 tape recorded?
17 A.  No.
18 Q.  So you hid from him the fact that
19 you were tape recording him?
20 A.  No.  I never disclosed it, yes.
21 Q.  Do you have -- you don't believe
22 not disclosing it is different than
23 hiding -- well, withdrawn.  Do you think
24 that not disclosing something is the same as
25 hiding?

Page 180

E. Carter

1
2  MR. GOODSTADT: Objection.
3  A.  No.
4  Q.  You think it's a difference, not
5  disclosing from hiding?
6  MR. GOODSTADT: Objection.
7  Q.  You hid the fact that you were
8  taping the conversations with Mr. Hesse;
9  isn't that true?
10 MR. GOODSTADT: Objection.
11 A.  Yes.
12 Q.  Okay.  And you were trying to get
13 evidence from Mr. Hesse concerning your
14 termination, correct?
15 MR. GOODSTADT: Objection.
16 A.  No.  I was trying to get evidence
17 in case if my promotion came up, to show
18 that Mr. Hesse was not only defaming me, he
19 was lying about why he let me go, and I can
20 show a future boss what happened.
21 Q.  And did you?
22 MR. GOODSTADT: Objection.
23 A.  No.
24 Q.  Why not?
25 A.  Never came a point.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 181

E. Carter

1
2    Q.    Never came a point.  You've never
3  gone to any employer with this information?
4    A.    No.
5    Q.    That's because you don't -- you
6  haven't applied for any other jobs that
7  needed -- that required a polygraph,
8  correct?
9        MR. GOODSTADT: Objection.
10   A.    Yes.
11   Q.    Is that your testimony?
12   A.    Yes.
13       MR. NOVIKOFF: Let's mark the
14  following document as Carter-6.
15       (Suffolk County Civil Service
16   Eligible List was marked as Carter
17   Exhibit-6 for identification; 9/16/08,
18   E.L.)
19   Q.    Prior to today, have you seen
20  this document?
21   A.    Yes, sir.
22   Q.    Is this the -- to your knowledge,
23  what is this document?
24   A.    This is the Suffolk County Civil
25  Service List number 06-5603-30 for park

Page 182

E. Carter

1
2  ranger three promotional.
3    Q.    To your knowledge -- and you
4  scored a 75 on this?
5    A.    Yes, sir.
6    Q.    To your knowledge, has Thomas
7  Grosse been promoted to park ranger three?
8    A.    Yes, he has.
9    Q.    Is that for the Town of
10  Smithtown?
11   A.    Yes, sir.
12   Q.    Is this your handwriting?
13   A.    Yes, sir.
14   Q.    And when did you make these
15  comments about Town of Smithtown park
16  rangers?
17   A.    Prior to giving it to my
18  attorney.
19   Q.    Okay.  And has Anna Morganier
20  been promoted to park ranger three?
21   A.    Not at this time, to my
22  knowledge.
23   Q.    Then why did you include
24  Ms. Morganier in the little arrow?
25   A.    Because herself and Thomas Grosse

Page 183

E. Carter

1
2  work for the Town of Smithtown.  Being the
3  fact that it's a promotional test, it's only
4  promotional within your department.  I was
5  the only park ranger two that passed the
6  test in my department.
7    Q.    And that would be Town of Islip?
8    A.    Town of Islip, I'd be number one.
9    Q.    Got it.  Okay.  And have you
10  inquired as to why, if the position  --
11  well, is the position still open?
12   A.    At this time, yes.
13   Q.    And have you inquired as to why,
14  if the position is open and you're the only
15  person who has -- who had passed the test in
16  the Town of Islip, you have not been
17  promoted?
18   A.    I asked my original boss, Marty
19  Raber, for when he --
20   Q.    The question is yes or no, have
21  you inquired?
22   A.    Yes.
23   Q.    When -- have you inquired on more
24  than one occasion?
25   A.    Yes.

Page 184

E. Carter

1
2    Q.    Okay.  When's the last time that
3  you've inquired?
4    A.    After the list came out.  I
5  showed it to Marty Raber.  I printed it out
6  sometime after August 8 and --
7    Q.    September 8?
8    A.    September -- I'm sorry, September
9  8. I asked him -- you know, I said, "I
10  passed.  I scored number one." I said, "You
11  know, what's happening?"  And he didn't give
12  me a reason.
13   Q.    You scored number one for Town of
14  Islip?
15   A.    For the Town of Islip, yes.
16   Q.    Right.  Because you're number
17  three here.
18   A.    Yes.  Well, number one for the
19  Town of Islip.
20   Q.    Right.  So number -- so Mr.
21  Raber, how do you spell his last name?
22   A.    R-A-B-E-R.
23   Q.    And Mr. Raber didn't give you a
24  reason?
25   A.    No.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 185

E. Carter

1
2    Q.    Did you -- and was Mr. Raber your
3  boss?
4    A.    Yes.  At the time, yes.
5    Q.    At the time, who was his boss, if
6  anybody?
7    A.    Cathy O'Bannon.
8    Q.    Did you go to Cathy O'Bannon to
9  inquire?
10   A.    No.
11   Q.    Did you send any writing in this
12  September 2006 time period requesting a
13  reason why you were not promoted?
14   A.    No.
15   Q.    Okay.  Now you said Mr. Raber was
16  your supervisor at that time.  Has someone
17  else taken over for Mr. Raber as your
18  supervisor?
19   A.    The position that he was in is
20  currently vacant and we're working under the
21  executive commissioner to recreation I
22  believe the title is, the new boss.
23   Q.    And who is that?
24   A.    George Schimpf.
25   Q.    Okay.  Well, we now know that

Page 186

E. Carter

1
2  you -- according to your testimony, you
3  spoke with Mr. Raber in the September 2006
4  time period concerning why you were not
5  promoted and he responded -- he didn't
6  respond to you; is that fair?
7    A.    That's fair.
8    Q.    And when was the next time that
9  you spoke with anyone at the Town of Islip
10  concerning why you were not being promoted?
11   A.    I've spoke to Mr. Schimpf about
12  it and he said at that point they're not
13  promoting anyone.
14   Q.    Well, hold on.  When did you
15  speak with Mr. Schimpf in relation to when
16  you spoke with Mr. Raber?
17   A.    2007.
18   Q.    When in 2007?
19   A.    Mid 2007.
20   Q.    Okay.  And Mr. Schimpf was what
21  at that time as it relates to the Town of
22  Islip?
23   A.    I believe his title was executive
24  commissioner, executive assistant
25  commissioner of recreation.

Page 187

E. Carter

1
2    Q.    And what did you -- and was this
3  a face-to-face conversation?
4    A.    Yes.
5    Q.    Okay.  Did you ask to meet with
6  him?
7    A.    Yes.
8    Q.    And did -- was he hesitant at
9  all, to your recollection, in meeting with
10  you?
11   A.    No.
12   Q.    Did you explain to him before the
13  meeting why you wanted to meet with him?
14   A.    No.
15   Q.    Had you met with Mr. Schimpf for
16  any reason prior to that day?
17   A.    Yes.  He was my boss.  Yes.
18   Q.    Okay.  He was your direct
19  superior at the time?
20   A.    Yes.
21   Q.    Okay.  And what did you ask
22  Mr. Schimpf at that time concerning why you
23  were not promoted?
24   A.    He was putting the budgetary
25  stuff together and he said, you know, you're

Page 188

E. Carter

1
2  doing the work of a park ranger three by
3  scheduling everybody, the whole department
4  and stuff, and you know, he would look into
5  it, and you know, for his superiors above
6  him to give it to me or not, which would be
7  the commissioner.
8    Q.    Okay.  So Schimpf told you in
9  this conversation that you asked for
10  concerning why you weren't promoted, Schimpf
11  said to you "I'll look into it, but it's for
12  my superiors to make that decision"?
13   A.    They're the ones that have to
14  push for it, yes.
15   Q.    I believe you testified, though,
16  in response to my prior question, that
17  Schimpf told you they weren't hiring; was
18  that correct?
19      MR. GOODSTADT: Objection.
20   Q.    Well, let me ask you, did Schimpf
21  tell you during this conversation that in
22  his opinion, the Town of Islip wasn't hiring
23  anyone for that position at that time?
24   A.    They weren't filling that
25  position at that time.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 189

E. Carter

1
2     Q.    And did he explain to you during
3  this conversation why they weren't filling
4  it at that time?
5     A.    No.
6     Q.    Did you ask him to  -- well, did
7  he ever get back to you after that
8  conversation with regard to what, if
9  anything, he did with regard to talking to
10  his superiors about filling that position?
11     A.    Yes.
12     Q.    Okay.  When did that next
13  conversation take place with Mr. Schimpf?
14     A.    Approximately a week ago.
15     Q.    A week ago?
16     A.    Yes.
17     Q.    So we're talking first
18  conversation with Mr. Schimpf about you
19  being promoted took place in mid January
20  of -- in mid 2007; is that correct?
21     A.    Yes.
22     Q.    And we're now in September of
23  2008, and that was your second conversation
24  with Schimpf about not being promoted yet,
25  correct?

Page 190

E. Carter

1
2     A.    I can't recall.  I'm sure we
3  spoke.  He asked me a couple other times if
4  that list was still valid, so I'm going to
5  say no.
6     Q.    He asked you a couple times if
7  the list was still valid?
8     A.    Yes.
9     Q.    Meaning what?
10     A.    Civil service lists expire.  I
11  don't know the exact time frame.  Sometimes
12  it's four years, sometimes it's longer.
13     Q.    Well, I just want to get the time
14  frame down.  We have mid January  -- I'm
15  sorry, mid 2007 you have your first
16  conversation with Schimpf about being
17  promoted to park ranger three, correct?
18     A.    Yes.
19     Q.    And he told you during that
20  conversation that he doesn't know why you're
21  not being promoted, but that's a decision
22  for his superiors, correct?
23     A.    Yes.
24     Q.    And he said he was going to look
25  into it, correct?

Page 191

E. Carter

1
2     A.    Yes.
3     Q.    And the next substantive
4  conversation you had with Mr. Schimpf
5  wherein the discussion about why you weren't
6  promoted, took place a week ago?
7          MR. GOODSTADT: Objection.
8     Q.    Is that correct?
9     A.    I'm going to answer no to that.
10     Q.    Okay.  Well, then tell me when
11  was the next time that you had a
12  conversation  -- after the mid 2007
13  conversation with Schimpf, when was the next
14  time that you had a conversation with
15  Schimpf when you inquired with him why you
16  weren't being promoted or he advised you why
17  you weren't being promoted?
18          MR. GOODSTADT: Objection.
19     A.    I don't recall exactly when it
20  was, but like I said, in the meantime, he
21  asked me a few times when the list expired,
22  if it was still valid, and that they were
23  having meetings with the chief of staff, and
24  the commissioner is the one that has to push
25  for it.

Page 192

E. Carter

1
2     Q.    Well, did you ask Schimpf why
3  there was a  -- why they weren't filling
4  that position?  Withdrawn.  Putting aside
5  the conversation in mid 2007, on any
6  occasion when Schimpf told -- asked you as
7  to whether or not the list was still valid,
8  did you inquire with him as to why the
9  position wasn't being filled?
10     A.    No.
11     Q.    Okay.
12     A.    Except he brought it up to me
13  again last week and he told me make a --
14  make a meeting, set up a meeting with the
15  commissioner, bring your resume, get all
16  your paperwork together, bring everything
17  you have, and the commissioner is going to
18  be the one to push for you.
19     Q.    Well, you had known that prior to
20  last week, right, that the commissioner had
21  to be the one to push for you, right?
22     A.    I have a new commissioner now.
23     Q.    What's that?
24     A.    I have a new commissioner now.
25     Q.    Oh, who was the old commissioner?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 193

E. Carter

1
2     A.   It was Cathy O'Bannon.
3     Q.   Okay.  And you never pushed --
4  did you ever ask for a meeting with Cathy
5  O'Bannon between the first conversation with
6  Schimpf in mid 2007 and the time
7  Ms. O'Bannon left?
8     A.   No.
9     Q.   When did Ms. O'Bannon leave?
10    A.   I don't know exactly.
11    Q.   Well, approximately?
12    A.   I don't know, sir.  I work
13 midnights and I don't --
14    Q.   Did Mr. Schimpf ever advise
15 you -- well, did Mr. Schimpf advise you last
16 week as to why you were not being promoted?
17    A.   No.
18    Q.   Okay.  Did you -- have you made
19 any written  -- have you submitted any
20 written communications to the Town of Islip
21 inquiring as to why you weren't promoted?
22    A.   No.
23    Q.   What did you do, other than have
24 one conversation with Mr. Schimpf in 2007, a
25 conversation with Mr. Schimpf last week and

Page 194

E. Carter

1
2  a few conversations in between to inquire as
3  to why you were not promoted to park ranger
4  three?
5     A.   I spoke to Mr. Raber back in
6  2006.
7     Q.   Other than that, between your
8  first conversation with Schimpf in mid 2007
9  and last week, what, if anything, did you
10 affirmatively do to inquire as to why you
11 weren't being promoted?
12    A.   Nothing at this time.
13    Q.   Did any superior of yours at the
14 Town of Islip advise you that you were not
15 being promoted because of anything that
16 Mr. Hesse said?
17    A.   Again, back to that phone call to
18 the Town of Islip from Tom Iacopelli, Marty
19 Raber was in the room, and when the
20 secretary said the DA's on the phone for
21 you, Marty Raber, when I got off, he said,
22 "Oh, you're one of those?  You speak to the
23 DA?"  And he walked away.
24    Q.   When did this conversation take
25 place?

Page 195

E. Carter

1
2     A.   This was back in September of
3  '06.  No.  I'm sorry.  September of '05.
4     Q.   Okay.  But you weren't --
5  Mr. Hesse hadn't fired you, according to
6  your complaint, in September of '05, did he?
7     A.   No.
8     Q.   Right.  You were still an
9  employee of Ocean Beach, right?
10    A.   Yes.
11    Q.   Okay.  So my question to you,
12 then, sir, is, between April 2, 2006 and the
13 present day, has any superior advised you at
14 the Town of Islip, that the reason you have
15 not been promoted is because of anything
16 that George Hesse has said about you?
17    A.   No.
18    Q.   Has any superior of yours at the
19 Town of Islip advised you that the reason
20 that you have not been promoted is because
21 of anything concerning your alleged
22 termination on April 2, 2006?
23    A.   No.
24    Q.   Now you understand that your
25 complaint is a public record, correct?

Page 196

E. Carter

1
2     A.   Yes.
3     Q.   And you understand that anyone at
4  the Town of Islip who can access a computer
5  and know where to go, could bring up your
6  complaint in this matter; isn't that true?
7     A.   Now I do.  Yes.
8     Q.   You didn't know that until I told
9  you?
10    A.   I didn't realize you could get it
11 off a computer.  No.
12    Q.   Okay.  Well, let me ask you
13 another thing on this regard.  Did you
14 attend a press conference shortly after the
15 filing of this complaint?
16    A.   Yes.
17    Q.   Who else attended that press
18 conference?
19    A.   My attorneys and the other
20 defendants.
21    Q.   And where did the press
22 conference take place?
23    A.   My attorney's office.
24    Q.   And what media outlets, if any,
25 were present at your press conference, to

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 197

E. Carter

1    the best of your recollection?
2
3    A.   I remember there being Channel 12
4    News and Newsday.
5    Q.   Okay.  And did News 12 carry a
6    story concerning your lawsuit, to the best
7    of your knowledge?
8    A.   Yes.
9    Q.   On television?
10   A.   Yes.
11   Q.   Was your face there?
12   A.   Yes.
13   Q.   Was your name mentioned --
14   A.   Yes.
15   Q.   -- by News 12?  Did Newsday carry
16   an article concerning your press conference?
17   A.   Yes.
18   Q.   Was your name mentioned?
19   A.   Yes.
20   Q.   Would you agree with me, sir,
21   that if any of your superiors at the Town of
22   Islip had been watching Newsday -- watching
23   News 12 the night of your -- of the story
24   about your press conference, they would have
25   known that you were part of a lawsuit

Page 198

E. Carter

1    against the Village of Ocean Beach?
2    MR. GOODSTADT: Objection.
3
4    A.   That I was part of a lawsuit,
5    yes, but they didn't know the whole of the
6    lawsuit.
7    Q.   I understand that.  I'm not
8    debating with you on that.  And would you
9    agree with me, sir, that if any of your
10   superiors at the Town of Islip decided to
11   read Newsday the day after your lawsuit  --
12   I'm sorry, the day after your press
13   conference, they would have read that you
14   were part of a lawsuit against Ocean Beach?
15   MR. GOODSTADT: Objection.
16   A.   Yes.
17   Q.   Sir, can you just go back to the
18   Notice of Claim for one second.  Page two.
19   Again -- withdrawn.  We've talked about
20   certain defamatory comments that you claim
21   that Mr. Hesse made about you and that
22   Mr. Bacon made about you.  On the second
23   page of your Notice of Claim, second full
24   sentence of the top paragraph, you write "in
25   further retaliation for Claimant's

Page 199

E. Carter

1    opposition both during Claimant's employment
2    and subsequent to the unlawful termination
3    of his employment, defamatory statements
4    have been made about Claimant, both verbally
5    and in writing on the internet, in other
6    media and to others"?
7    A.   Yes.
8    Q.   What other media are you
9    referring to that Mr. Hesse and/or Mr. Bacon
10   defamed you?
11   A.   The media -- the media would
12   be -- what I believe it to be is the email
13   to Greg -- the phone call to Greg DeCanio
14   and the email to me.
15   Q.   So you say you believe he defamed
16   you in the email to you?
17   A.   Yes.
18   Q.   Did he, to your knowledge, copy
19   anyone else on that email?
20   A.   No.
21   Q.   Are you aware as to whether he
22   sent that email to anybody else?
23   A.   Not at all.  No.
24   Q.   Now to your knowledge, would
25

Page 200

E. Carter

1    Ms. Morganier have to be offered the job of
2    park ranger three before you were offered it
3    under the Civil Service Laws?
4    A.   Absolutely not.  Because it's a
5    promotional position.  It's good for only
6    the town you work in.  You have to work two
7    years prior to be obtaining the test.
8    Q.   I'm just asking you.  So you
9    don't believe she has to be offered that
10   job?
11   A.   No.
12   MR. NOVIKOFF: I'm going to ask
13   the court reporter to mark this
14   Carter-7.
15   (Letter to Mr. Carter dated
16   September 8, 2006 was marked as Carter
17   Exhibit-7 for identification; 9/16/08,
18   E.L.)
19   Q.   Carter-7 is a letter dated
20   September 8, 2006 purporting to be from --
21   it's not a letter, a memo from Alan
22   Schneider, personnel director, to you.  Do
23   you see that?
24   A.   Yes.
25

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 201

E. Carter

1
2    Q.   Did you ever inquire with
3 Mr. Schneider -- well, do you recall
4 receiving this letter, this memo?
5    A.   Yes.
6    Q.   Okay.  And did you ever inquire
7 with Mr. Schneider as to what he meant when
8 he said in the second sentence -- second
9 paragraph, last sentence, "your position on
10 the list is three"?
11    A.   No.
12    Q.   Did you have an understanding as
13 to what Mr. Schneider meant when he wrote
14 "your position on the list is three"?
15    A.   Yes.
16    Q.   What did he mean?
17    A.   On the Suffolk County list, my
18 position is number three.
19    Q.   Okay.  Now did you ever inquire
20 with Mr. Schneider, between September 8,
21 2006 and today, as to why you were not being
22 promoted to park ranger three for the Town
23 of Islip?
24    A.   No.
25    Q.   To your knowledge, is

Page 202

E. Carter

2 Mr. Schneider still the personnel director?
3    A.   For Suffolk County Civil Service,
4 yes.
5         MR. NOVIKOFF: Why don't we end
6    the tape now, just take a really brief
7    three to five-minute break, and come
8    back.
9         THE VIDEOGRAPHER: This
10    completes tape number three.  The time
11    is 2:01 p.m.  Going off the record.
12         (A break was taken.)
13         THE VIDEOGRAPHER: This begins
14    tape number four.  The time is 2:11
15    p.m.  Back on the record.
16    Q.   Now, sir, had you retained
17 Mr. Goodstadt's law firm prior to the time
18 that you tape recorded your conversations
19 with Mr. Hesse?
20         MR. GOODSTADT: Objection.
21    A.   No.
22    Q.   Let's go back to your Notice of
23 Claim for one more time, hopefully.
24         MR. GOODSTADT: Can I hold you
25    to that?

Page 203

E. Carter

2         MR. NOVIKOFF: You still have
3    it.  Oh, hold me to it?
4         MR. GOODSTADT: Yes.
5    Q.   You write in the last sentence,
6 the first paragraph on page two -- up.  Up.
7 Yeah.  "Such defamatory statements have been
8 issued by or under the direct authorization
9 or direction if individuals employed by the
10 Ocean Beach Police Office Department."  I
11 presume instead of "if" you meant "of"?
12    A.   Yes.
13    Q.   Okay.  Who authorized Mr. Bacon's
14 alleged defamatory statements that you
15 referenced -- that you referred to as part
16 of the April 6, 2006 blog?
17    A.   It's my belief George Hesse.
18    Q.   And what is that belief based
19 upon?
20    A.   Because George Hesse when he
21 spoke the conversation with Tom Snyder.
22    Q.   What did George Hesse say to Tom
23 Snyder that leads you to believe that he
24 authorized Bacon to make that alleged
25 defamatory statement?

Page 204

E. Carter

2    A.   That he was aware of them.
3    Q.   Okay.  So because Hesse was aware
4 that Bacon made this blog statement, you
5 believe that that means that he authorized
6 Bacon to do it?
7    A.   That he knew of it, yes.
8    Q.   My question is, what evidence do
9 you have that Hesse either directed or
10 authorized Bacon to make the statement that
11 you say was defamatory as it appears on the
12 April 6, 2006 blog?
13         MR. GOODSTADT: Objection.
14    A.   I'm sorry, can you repeat the
15 question?
16    Q.   Yeah.  What evidence do you have
17 that Hesse directed Bacon to make the
18 statement that you claim to be defamatory?
19         MR. GOODSTADT: Objection.
20    A.   None.
21    Q.   What evidence do you have that
22 Hesse authorized Bacon to make the statement
23 that you claim to be defamatory?
24         MR. GOODSTADT: Objection.
25    That was asked and answered.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 205

E. Carter

1
2   Q.   You can answer it.
3   A.   None.  I believe I just answered.
4   Q.   Okay.  I'm going to show you
5   what's been previously marked as Defendants'
6   Exhibit-1.  Do you need a copy?  I can give
7   you one.  Now do you recognize what's been
8   labeled or what's been previously marked as
9   Defendants'-1?
10  A.   I believe it's our complaint.
11  Q.   And did you authorize your
12  attorneys to file this complaint in your
13  behalf?
14  A.   Yes.
15  Q.   Did you review any drafts of this
16  complaint prior to authorizing your
17  attorneys to file the complaint on your
18  behalf?
19  A.   Yes.
20  Q.   Did you review it for accuracy,
21  sir?
22  A.   Yes.
23  Q.   Was it important for you -- was
24  it important to you that nothing that was
25  set forth in there was inaccurate?

Page 206

E. Carter

1
2   A.   Yes.
3   Q.   Was it important that nothing
4   would be considered to be a lie as set forth
5   in that complaint?
6   A.   As a lie, yes.
7   Q.   Or wrong?
8   A.   Yes.
9   Q.   This was an important document in
10  your life, correct?
11  A.   Yes.
12       MR. GOODSTADT: Objection.
13  Q.   This was your lawsuit against
14  Ocean Beach, correct?
15  A.   Yes.
16  Q.   Would you have authorized your
17  attorney to file this if you were aware of
18  anything that was inaccurate?
19       MR. GOODSTADT: Objection.
20  A.   No.
21  Q.   Okay.  Let's look at paragraph
22  109.  It's on page 25.  Please read
23  paragraph 109 and tell me when you're done.
24  A.   (Reviewing).  Yes.
25  Q.   Accurate?

Page 207

E. Carter

1
2   A.   Yes.
3   Q.   Anything in there right now you
4   want to tell us that may not be completely
5   and 100 percent accurate?
6       MR. GOODSTADT: Objection.
7   A.   No.
8   Q.   Okay.  You allege in the first
9   sentence "upon information and belief,
10  Carter and Snyder were denied promotion to
11  the respective positions of lieutenant and
12  sergeant in the Town of Islip due to
13  unfounded negative references from Hesse."
14  A.   Yes.
15  Q.   Is the promotion you're referring
16  to, as it pertains to you only, the park
17  ranger three promotion?
18  A.   Yes.
19  Q.   Sir, the town has not indicated
20  that you have been denied a promotion, has
21  it, sir?
22       MR. GOODSTADT: Objection.
23  A.   I haven't received it.
24  Q.   Has the town ever advised you
25  that the promotion that you are seeking has

Page 208

E. Carter

1
2   been denied?
3   A.   No.
4   Q.   You write "upon information and
5   belief."  What is your information and
6   belief?
7   A.   My information is the phone call
8   to Greg DeCanio.  Also, in the locker room,
9   the guys were talking about it when the
10  Ocean Beach website showed up that there was
11  no way I was going to get that promotion
12  with the corruption.  Basically trying  --
13  they felt I was connected to it, and when I
14  dropped paperwork off at the town at the
15  personnel department after the boys were
16  born, one of the women said to me, "Are you
17  going to get arrested?"  And I looked at her
18  like confused.  I didn't know what she was
19  talking about.  And she was referring to the
20  blog again.
21       Afterwards, I sat down.  I spoke
22  to the personnel director for the town.  I
23  don't recall the exact date.  Her name is
24  Zelda, and I explained to her about what was
25  going on with the blog and the rumors that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 209

1    E. Carter
2 were running around about the official
3 misconduct and stuff, and she said for me,
4 my best -- it would be in my best interest
5 to get a letter as to what happen  -- why I
6 was let go from Ocean Beach, and if I
7 didn't, they probably would hold up the
8 position.
9    Q.   Let's talk about the locker room.
10 The guys in the locker room said what?
11    A.   They're the ones that originally
12 made me aware what was posted on the blog,
13 that on Halloween night, they said, "You did
14 official misconduct.  You falsified
15 paperwork for an incident."  I looked at
16 them confused because I said, "I didn't work
17 Halloween at Ocean Beach.  I worked for the
18 town a double tour."
19    Q.   But the boys -- the guys in the
20 locker room said what concerning you not
21 getting promoted?
22    A.   They were saying that they had
23 heard that I was involved in the corruption
24 over at Ocean Beach.
25    Q.   The guys in the locker room had

Page 210

1    E. Carter
2 heard?
3    A.   Yes.
4    Q.   Based upon reading the blog?
5    A.   That and talking to the bosses,
6 yes.
7    Q.   Oh, the guys in the locker room
8 said they were talking to the bosses?
9    A.   In conversation over coffee and
10 stuff.
11    Q.   What bosses are they referring
12 to?
13    A.   Mr. Raber.
14    Q.   Mr. Raber.  Did you ever approach
15 Mr. Raber about what the guys said to you in
16 the locker room concerning the blog?
17    A.   No.
18    Q.   No?  Okay.  Did Mr. Raber ever
19 tell you that the reason that you were not
20 being promoted was because he had read the
21 blog?
22    A.   No.
23    Q.   Did Mr. Raber ever tell you the
24 reason that you weren't being promoted is
25 because he had been told about the blog?

Page 211

1    E. Carter
2    A.   No.
3    Q.   Did anyone that replaced
4 Mr. Raber tell you that the reason you
5 weren't being promoted was because he or she
6 had read or been told what was said on the
7 blog?
8    A.   No.
9    Q.   Did any superior of Mr. Raber or
10 anyone that replaced Mr. Raber, ever advise
11 you that the reason you weren't being
12 promoted was because of something they had
13 seen or heard about on the blog?
14    A.   No.
15    Q.   So it -- would it be fair to say
16 that it's complete speculation that you were
17 not given your promotion because of what was
18 said on the blog?
19    MR. GOODSTADT: Objection.
20    A.   It's my belief that I wasn't
21 given the promotion because the incidences
22 that happened from Ocean Beach and the
23 negative references.
24    Q.   It's your belief based upon what
25 the guys in the locker room said that was

Page 212

1    E. Carter
2 told to their bosses?
3    MR. GOODSTADT: Objection.
4    Q.   Is that what is the basis of your
5 belief?
6    MR. GOODSTADT: Objection.
7    A.   Also the phone call to Greg
8 DeCanio.
9    Q.   Okay.  Well, let's talk about
10 that.  The phone call as to what was said to
11 Mr. -- the phone call to Mr. DeCantio is
12 reflected, to your knowledge, in the Hesse
13 email that I showed you, right?
14    A.   Not fully, but yes.
15    Q.   Well, was there anything else
16 that Hesse said to DeCantio that wasn't said
17 in that email by Hesse?
18    A.   I don't believe I could speculate
19 on that.  That would be either Hesse or
20 DeCanio would have to answer that.
21    Q.   Oh, so you don't -- other than
22 what was said in the email, you don't know
23 what was said between Hesse and DeCantio in
24 that phone call, do you?
25    A.   Only what Hesse told me and Greg

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 213

E. Carter

1    told me.
2    Q.   Well, did Hesse tell you that
3    anything -- anything other than what was in
4    that email?
5    A.   Hesse has lied to me in the past
6    and obviously --
7         MR. CONNOLLY: Objection.
8 MO       MR. NOVIKOFF: Motion to
9    strike.
10   Q.   Sir, did Hesse, in the phone call
11   that you're referring to, advise you of
12   anything other than what he said in the
13   email to you concerning his conversation
14   with DeCantio?
15   A.   Yes.
16        MR. GOODSTADT: Objection. He
17   already testified to stuff he said.
18   Q.   What did he say?
19   A.   I testified about the twins being
20   born. I don't believe that was in the
21   email.
22   Q.   Okay.
23   A.   Can I look back at the email?
24   Q.   Sure. Now my question, though,

Page 214

E. Carter

1    is, you said that there was a phone call
2    between Hesse and DeCantio. The email
3    reflects Hesse's phone call to DeCantio,
4    correct?
5    A.   It's telling me that he called
6    DeCanio, yes.
7    Q.   And he's telling you what he said
8    to DeCantio. Did Hesse tell you that he
9    told DeCantio anything else, other than what
10   he said in that email?
11        MR. GOODSTADT: Objection. He
12   just testified to something that he
13   told him.
14   Q.   You can answer.
15   A.   No.
16   Q.   Okay. Did DeCantio tell you that
17   Hesse said anything else concerning your
18   job, other than what Hesse told you in the
19   email?
20   A.   No.
21   Q.   Okay. You then state that a
22   person in the Town of Islip personnel office
23   asked you if you were going to jail?
24   A.   I was going to be arrested, yes.

Page 215

E. Carter

1    Q.   Okay. Who was that person?
2    A.   It was a woman. I don't know her
3    name.
4    Q.   And she said this when you were
5    dropping off papers?
6    A.   I was walking through the
7    corridor, it's a long corridor approximately
8    half the size of this, into the personnel
9    office (indicating).
10   Q.   And when did this person make
11   this statement?
12   A.   That would have been after
13   approximately mid April.
14   Q.   Of 2006?
15   A.   2006.
16   Q.   And it's your belief that based,
17   in part, upon that comment by the personnel
18   office, that Mr. Hesse's negative references
19   cost you a promotion?
20        MR. GOODSTADT: Objection.
21   A.   Again, the defamatory statements,
22   the blog, all as a whole cost me my
23   promotion, yes.
24   Q.   No. But I'm now referring to

Page 216

E. Carter

1    this person that you don't know the name of
2    in the personnel office making this comment
3    about you going to jail. Did you -- is it
4    your testimony that you believe that that
5    comment by this unnamed person contributed
6    to you not getting promoted?
7    A.   No. It was more defamatory.
8    Q.   Okay. And would you agree with
9    me  -- well, prior to this comment, did you
10   have any evidence that Mr. Hesse made any
11   defamatory comment to you on the blog?
12   A.   No.
13   Q.   And, to date, you still have --
14   you can point to no specific blog entry that
15   identifies George Hesse as the author,
16   correct?
17   A.   Correct.
18   Q.   And you certainly can't point to
19   any specific blog entry prior to the end of
20   April 2006 that specifically identifies
21   George Hesse as the author, correct?
22   A.   Correct.
23   Q.   Let's look at this conversation
24   you had with Zelda. Zelda is who again or

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 217

E. Carter

1          E. Carter
2 was who again?
3     A.   Personnel director for the Town
4 of Islip.
5     Q.   And when did you have a meeting
6 with Zelda?
7     A.   That was approximately May of
8 2006.
9     Q.   Is Zelda still the personnel
10 director?
11    A.   She's retired at this time.
12    Q.   When did she retire?
13    A.   Recently.  I believe it was
14 January or February of '07.  Oh, I'm sorry,
15 we're in '08?  '08.
16    Q.   Now let's go back to Carter-7 I
17 believe it is.  Schneider is the personnel
18 director for the County of Suffolk?
19    A.   Yes.
20    Q.   And Zelda was the personnel
21 director for the Town of Islip, is that
22 your -- is that what your testimony is?
23    A.   No.  Mr. Schneider is the
24 personnel director for the Department of
25 Civil Service.  I don't know if there's a

Page 218

1          E. Carter
2 separate personnel director for the County
3 of Suffolk.
4     Q.   Fine.  Now what did Zelda
5 specifically say to you again?
6     A.   When I was -- I was speaking, I
7 stopped in.  I was dropping some paperwork
8 off.  I was talking to her.  And I explained
9 to her about the test scores and stuff, and
10 I explained to her about the blog and what
11 was being said around the town, and you
12 know, she said, "Ed, I've known you 24
13 years, several years.  I don't believe any
14 of it.  But that you should get a letter to
15 basically say why you were let go from Ocean
16 Beach because they have to let you know."  I
17 said, "Well, Zelda, right now they're not
18 letting me know.  They're just leaving me
19 blank with directives they hung up."  And I
20 didn't even tell her about the wire part.
21 And that -- she said, "Get a letter and hold
22 on to it."
23    Q.   And when did this conversation
24 take place?
25    A.   May of 2006.

Page 219

1          E. Carter
2     Q.   All right.  And Zelda didn't tell
3 you that she was aware of the blog, did she?
4     A.   No.
5     Q.   You initiated that conversation,
6 right?
7     A.   At that time, yes.
8     Q.   Right.  And Zelda didn't advise
9 you that she had heard what was being said
10 around Islip  -- around the department, did
11 she?
12    A.   No.
13    Q.   You told her?
14    A.   Yes.
15    Q.   You initiated that conversation?
16    A.   Yes.
17    Q.   And you had been told at that
18 point as to why you were being fired, right?
19 Mr. Hesse said it was directives, right?
20         MR. GOODSTADT: Objection.
21    A.   No.
22    Q.   No?
23    A.   That was afterwards.
24    Q.   Didn't Mr. Hesse tell you that in
25 April of 2006, in April 2, 2006, that you

Page 220

1          E. Carter
2 were being fired for directives?
3     A.   Yes.
4     Q.   Now my question to you is whether
5 or not that was truthful or not, why did you
6 find it  -- why were you incapable of
7 advising Islip that that's what Mr. Hesse
8 said?
9         MR. GOODSTADT: Objection.
10    A.   I did tell Mr. Raber on a
11 Wednesday after I was let go, it was the
12 first day I saw him, that I was let go for
13 directives by the Beach that were posted
14 over the fall.  He asked what they were and
15 I told him, I explained to him exactly what
16 they were, and he says, "Oh, okay."
17    Q.   So Mr. Hesse had told you, at
18 least at that time, why you were being
19 fired?
20    A.   No.  He just said directives.  He
21 had to let someone go for directives he
22 posted on the wall.
23    Q.   He told you you were being let go
24 because of directives, according to your
25 testimony, correct?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 221

E. Carter

1
2    A.    He wouldn't tell me what
3  directive.
4    Q.    But he said directives, right?
5  He gave you a reason, correct?
6    A.    I don't believe that was a full
7  reason.
8    Q.    But he gave you a reason why you
9  were being fired, correct?  He said
10 directives, correct?
11    A.    That he had posted on the wall,
12 yes.
13    Q.    Right.  Now you didn't believe
14 him, right?
15    A.    No.
16    Q.    Right.  But at least he told you
17 what the reason was, you would agree with
18 me?  Whether or not it was truthful or not,
19 he had given you a reason?
20    A.    He said directives, but I wanted
21 to know what directives specifically.  I can
22 tell you I fired you for directives.  Why
23 did I fire you?
24    Q.    Okay.  But he had told you his
25 reasoning for firing you was directives,

Page 222

E. Carter

1
2  right?
3    A.    Yes.
4    Q.    So why did -- why couldn't you
5  just have told the Town of Islip "I was
6  fired for directives"?
7          MR. GOODSTADT: Objection.
8    A.    Because it was false.  I wasn't
9  fired.  I didn't feel I was fired for
10 directives.  I didn't do anything wrong.
11    Q.    Oh, so the issue really wasn't
12 whether or not you could tell the Town of
13 Islip or any other employer as to why your
14 directive -- you didn't believe that was the
15 legitimate reason, is that your testimony?
16          MR. GOODSTADT: Objection.
17    A.    No.
18    Q.    No.  Did you ever get the letter
19 that this woman Zelda said you should be
20 getting?
21    A.    No.
22    Q.    Did you ever ask Mr. Hesse for
23 the letter?
24    A.    Yes.
25    Q.    When?

Page 223

E. Carter

1
2    A.    May 15.
3    Q.    And did he send you the email?
4    A.    That was prior.
5    Q.    Right.  And in the email,
6  Mr. Hesse states why you were let go,
7  correct?
8          MR. GOODSTADT: Objection.
9    A.    That's a different reason from
10 the original reason.
11    Q.    I understand that, but Mr. Hesse
12 advised you in the email as to why he told
13 this Greg DeCantio you were being fired,
14 right?
15    A.    Yes.
16    Q.    That's a reason, you would agree
17 with me?  May not be a truthful reason, but
18 it was a reason, right?
19    A.    Yes.
20    Q.    You could have sent that email on
21 to anyone at the Town of Islip, correct?
22          MR. GOODSTADT: Objection.
23    A.    I wouldn't have because it was
24 false.  It wasn't true.
25    Q.    Zelda asked you to get a letter

Page 224

E. Carter

1
2  explaining why you were fired, right?
3    A.    Yes.
4    Q.    You believed that there was no
5  legitimate reason why you were fired,
6  correct?
7    A.    Yes.
8    Q.    So what letter would you ever
9  have gotten from Ocean Beach that you would
10 have sent on to your superiors if you were
11 waiting for the real reason why you were
12 being fired?
13          MR. GOODSTADT: Objection.
14    A.    One similar -- one similar to an
15 internal correspondence.  An official
16 letter.  Not an email.
17    Q.    Oh, so the email wasn't an
18 official letter, is that your testimony?
19    A.    It's not even a letter, it's an
20 email.
21    Q.    So you don't believe the email
22 reflected an official documentation that you
23 could send on to anybody concerning why you
24 were fired?
25          MR. GOODSTADT: Objection.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

1          E. Carter
2     A.   Correct.
3     Q.   Okay.  Did you ever inquire with
4  Chief Paridiso?
5     A.   No.
6     Q.   Did you ever ask Chief Paridiso
7  for a letter?
8     A.   I spoke to Chief Paridiso and I
9  told him why I was let -- why George told me
10  he let me go, and I said he said he let me
11  go for sleeping, and Ed Paridiso laughed.
12  He said, "The guy that does the most ADA
13  cases in the winter hours and all med evacs,
14  the most house checks found open, the most
15  village property found open," he says, "When
16  did you find time to sleep?"
17  MO         MR. NOVIKOFF: Motion to
18        strike.
19     Q.   Did you ever ask Mr. Paridiso for
20  a letter explaining why you were fired?
21     A.   No.
22     Q.   He was the chief at the time,
23  right?
24     A.   Yes.
25     Q.   He could have written a letter on

1          E. Carter
2  Ocean Beach -- to your knowledge, he could
3  have written a letter on Ocean Beach -- on
4  an Ocean Beach document concerning why you
5  were fired, correct?
6          MR. GOODSTADT: Objection.
7     A.   I believe at that point George
8  Hesse was the chief of Ocean Beach.
9     Q.   I thought you just said that
10  Paridiso was the chief?
11     A.   He was out on disability.
12     Q.   Oh, okay.  Did you ever inquire
13  with the mayor at the time as -- well, did
14  you ever ask the mayor for a letter
15  indicating why you were terminated?
16     A.   No.
17     Q.   Did you ever ask a trustee member
18  for a letter?
19     A.   No.
20     Q.   Did you ever  -- did your lawyer,
21  to your knowledge, ever send a letter to
22  Ocean Beach saying "listen, I need a letter
23  on an official Ocean Beach stationary
24  explaining why my client was fired"?
25          MR. GOODSTADT: Objection.

1          E. Carter
2     A.   No.
3     Q.   What efforts did you take, other
4  than asking George Hesse to get a letter on
5  Ocean Beach stationary, regarding why you
6  were fired?
7     A.   I couldn't.  George Hesse and Joe
8  Loeffler had a very good relationship, very
9  personal, and I knew I would go stonewalled
10  right into a wall.
11  MO         MR. NOVIKOFF: Motion to
12        strike.
13     Q.   What efforts, other than asking
14  George Hesse, did you undertake to get a
15  letter on Ocean Beach stationary concerning
16  the reason why you say you were fired?
17     A.   None.
18     Q.   Did you ever follow up with Zelda
19  as to why you didn't get a letter?
20     A.   I told her I never received
21  anything.
22     Q.   When did you tell her that?
23     A.   That was the next time I saw her,
24  which could have been September, October.
25     Q.   And what did she say, if

1          E. Carter
2  anything?
3     A.   She just shrugged.  You know, she
4  didn't know what -- you know, she just
5  looked at me.  She says, "You know, what are
6  you going to do."
7     Q.   Right.  She didn't have any
8  authority to promote you, did she?
9     A.   No.
10     Q.   To your knowledge, did she talk
11  to any person in authority with regard to
12  your promotion?
13     A.   No.
14     Q.   Let's mark -- well, no.  Let's
15  continue 109.  You write in the first
16  sentence "unfounded negative references," do
17  you see that?
18     A.   109?
19     Q.   Yes.  First sentence, you end it
20  by saying "due to unfounded negative
21  references from Hesse"?
22     A.   Yes.
23     Q.   Well, we know of one which is the
24  conversation that you claim to have taken
25  place between Hesse and DeCantio, correct?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 229

1          E. Carter
2     A.   Yes.
3     Q.   What was the other negative
4  reference that you're referring to in the
5  first sentence of 109 that went to the Town
6  of Islip from Hesse?
7          MR. GOODSTADT: Objection.
8     A.   None.
9     Q.   Okay.  So when you say "negative
10  references," you really mean one negative
11  reference?
12         MR. GOODSTADT: Objection.  For
13     the record, the sentence refers to
14     Carter and Snyder.
15     Q.   Okay.  Well, then my question,
16  when you're referring to yourself in the
17  first sentence concerning negative
18  references from Hesse, it's really only one
19  negative reference that you can point to?
20     A.   In reference to me, yes.
21     Q.   Right.  Okay.  Let's look at the
22  next sentence.  "Carter was also denied the
23  ability to apply for positions with Suffolk
24  County because he could not obtain
25  references from the OBPD or provide a clear

Page 230

1          E. Carter
2  explanation for his termination."  Who
3  denied you the ability to apply for
4  positions?
5     A.   George Hesse.
6     Q.   How did he deny you the ability
7  to apply for positions?
8     A.   I told him that I spoke to the
9  county recruiter, that I'd have to go
10  through a background and a polygraph, and
11  that I needed a reason, directives or
12  whatever it was why I was let go, and he
13  said with his civil service knowledge, I can
14  walk on any job and he'd get back to me, and
15  he knew at that point by giving me --
16  back to the polygraph questions, there was
17  no way I'd pass a polygraph.
18  MO       MR. NOVIKOFF: Motion to
19     strike.
20     Q.   But he had already provided you
21  in that May 15 email a reason, right?
22     A.   A separate reason from the
23  previous ones.
24     Q.   So what did you expect him to say
25  after May 15 with regard to why you were

Page 231

1          E. Carter
2  fired?
3     A.   I really -- I felt he might have
4  said budgetary cuts like he told the other
5  guys or something else.  I don't know.
6     Q.   Did you believe that the other
7  guys were fired for budgetary cuts?
8     A.   Originally, yes.  Until we saw
9  the budget was inflated.
10     Q.   When did you see when the budget
11  was inflated?
12     A.   When -- I don't have the exact
13  date, but it was in the paper.
14     Q.   So if he had said budgetary cuts
15  in May of 2006, you would have felt good
16  enough to then take a polygraph?
17         MR. GOODSTADT: Objection.
18     A.   I would have felt more
19  comfortable.
20     Q.   Even though he had, according to
21  you, lied to you the first time about
22  directives, and even though he had lied to
23  you the second time about you falling
24  asleep, it's your testimony that had he said
25  to you the third time that you were fired

Page 232

1          E. Carter
2  because of budgetary reasons, you would have
3  felt more comfortable taking a polygraph?
4          MR. GOODSTADT: Objection.
5     Q.   Is that your testimony?
6     A.   My testimony is I would have felt
7  more comfortable.  I would have had more
8  belief that I could have took the polygraph.
9     Q.   But according to you, he had lied
10  to you on two occasions, right?  Prior to
11  May 16, 2006, he had lied to you on two
12  occasions as to why you were fired, right?
13  He lied to you on April 2, right?
14     A.   Yes.
15     Q.   When he said directives?
16     A.   Yes.
17     Q.   And according to you, he lied to
18  you on May 15 when he said you were
19  sleeping, right?
20     A.   Yes.
21     Q.   So what would have made you
22  believe that after May 15, if Mr. Hesse had
23  said you were fired for budgetary reasons,
24  that that wouldn't have been a lie as well?
25     A.   Because I would have went ahead

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 233

E. Carter

1
2 and put the application, not knowing about
3 the budgetary things, and I would have set
4 up the polygraph.
5     Q.   So if he had said that you were
6 fired for budgetary reasons after May 15,
7 2006, you would have set up the polygraph
8 test?
9     A.   I would have applied for the
10 position and had it set up, yes, through
11 civil service.
12     Q.   Even though he had lied to you on
13 two prior occasions?
14        MR. GOODSTADT: Objection.
15     Asked and answered.
16     Q.   Is that correct?  I just want to
17 make sure we understand each other.  Even
18 though he had lied to you on two other
19 occasions, had he given you the budgetary
20 reason the third time, you would have
21 scheduled the polygraph test?
22     A.   The third time would have been
23 prior to the sleeping part.
24     Q.   Right.
25     A.   The sleeping part wouldn't have

Page 234

E. Carter

1
2 been in there.
3     Q.   No?  Really?  The sleeping part
4 was the second time he lied to you, right?
5 He lied to you on April 2, 2006, according
6 to your testimony, right?
7     A.   Yes.
8     Q.   And then the next time he gave
9 you a reason, it was May 15 when he said you
10 were sleeping?
11     A.   Yes.
12     Q.   And then you spoke to Zelda after
13 that, right?
14     A.   Yes.
15     Q.   And you had --
16     A.   Well, in between -- I'm sorry.
17 In between, in May I told you 2006 I spoke
18 to her.
19     Q.   Okay.  But the other job that you
20 were applying for, that you wanted to apply
21 for took place after May 15, 2007  -- 2006,
22 right?
23     A.   The park police job, no.  It was
24 prior to that.
25     Q.   Okay.  Park police.  That's the

Page 235

E. Carter

1
2 park ranger three, right?
3     A.   No.  Suffolk County park police.
4 Originally it was all at the same test.
5     Q.   When did you apply for the park
6 ranger three -- I mean the Suffolk County
7 park police job?
8     A.   I made the initial phone call the
9 beginning of May to speak to the recruiter,
10 and that's when I contacted Hesse.
11     Q.   Okay.  So if I understand your
12 testimony correctly, he lied to you on April
13 2, but had he given you the reason between
14 the 2nd and May 15 that you were fired
15 because of budgetary reasons, you would have
16 felt comfortable then setting up the
17 polygraph?
18        MR. GOODSTADT: Objection.
19     Q.   Is that your testimony now?  I'm
20 just trying to figure out what your
21 testimony is.
22     A.   I would have known -- I would
23 have felt more better.  I couldn't prove at
24 that point if he was lying or not to me.
25 When he brought up sleeping, it's an

Page 236

E. Carter

1
2 outright lie.  Where the budgetary thing, I
3 couldn't, you know, disprove or not at that
4 time.
5     Q.   Okay.  You write -- and I repeat
6 what you allege in 109 -- "Carter was also
7 denied the ability to apply for positions."
8 Well, what positions were you going to apply
9 for that you couldn't?
10     A.   That would have been the Suffolk
11 County park police.
12     Q.   Okay.
13     A.   And the park ranger three
14 position.
15     Q.   Well, park ranger three was Town
16 of Islip, right?
17     A.   Yes.
18     Q.   So -- and this refers to with
19 Suffolk County, right?
20     A.   Yes.
21     Q.   So when you say "with Suffolk
22 County," you're talking about applying for a
23 job with Suffolk County as opposed to Town
24 of Islip, right?
25     A.   Yes.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 237

E. Carter

1
2  Q.   So when you're saying "positions
3  with Suffolk County," you really mean one
4  position, right?
5  A.   Yes.
6  Q.   That was the park police
7  position, right?
8  A.   Yes.
9  Q.   Well, let's talk about that.
10  When did you first make the application for
11  that position?
12  A.   I never filled the application
13  out.  I made the phone call and spoke to the
14  recruiter.  I explained to him that I was
15  working at Ocean Beach as a police officer.
16  Q.   So you made the application while
17  you were still employed with Ocean Beach?
18  A.   No.
19  Q.   No.  So what did you explain
20  to --
21  A.   That I was a police officer for
22  Ocean Beach.  I was let go on April 2006,
23  and he asked me why, and I told him for
24  directives that were posted.  I said, "I
25  really don't know."  And he says, "Well,

Page 238

E. Carter

1
2  find out.  Don't embarrass yourself, because
3  we're going to find out."  And I asked him,
4  you know, as far as what type of testing,
5  whatever I'd have to go through, and he
6  asked me if I had a background with Suffolk
7  County Police Department, and I said, "No.
8  The Ocean Beach Police Department had done
9  it back in '91, 1991."  And he says, "I'm
10  not sure.  I'm going to have to check with
11  my chief, but you may have to do the
12  background test and take a polygraph."
13  Q.   Okay.  And then you abandoned
14  that effort because you had to take a
15  polygraph?
16  MR. GOODSTADT: Objection.
17  A.   No.  I tried to get -- I told
18  George about that, and after that point,
19  yes, I abandoned the position.
20  Q.   Well, what did you ask Mr. Hesse
21  before you abandoned the application?
22  A.   I explained to him what was going
23  on and I needed a reason why I was let go,
24  and at the end of the conversation, he said,
25  "I'll get back to you."

Page 239

E. Carter

1
2  Q.   And what was Mr. Hesse -- oh,
3  Mr. Hesse said "I'll get back to you"?
4  A.   Yes.
5  Q.   And he never did?
6  A.   May 15.
7  Q.   Okay.  He gave you a reason, but
8  you didn't believe it, right?
9  A.   No.
10  Q.   Okay.  So you felt because you
11  didn't believe the reason, you couldn't take
12  a polygraph for the Suffolk County park
13  police job?
14  A.   Correct.
15  Q.   And did you ever advise Suffolk
16  County park police that you were abandoning
17  your pursuit of their job?
18  A.   I never called the recruiter
19  back.
20  Q.   Did you ever send a letter to
21  anyone at Ocean Beach indicating that you
22  need a letter so that you can pursue this
23  job with Suffolk County?
24  A.   No.
25  Q.   Did you ever write a letter or

Page 240

E. Carter

1
2  authorize someone to write a letter to Ocean
3  Beach indicating that in order for you to
4  pursue a law enforcement job, you need to
5  get a letter from them as to why you were
6  fired?
7  A.   No.
8  Q.   Well, you filed a Notice of Claim
9  in June -- well, the Notice of Claim is
10  dated June 2006, right?
11  A.   June 30, 2006.  Yes, sir.
12  Q.   Would it be fair to say that by
13  virtue of your filing the Notice of Claim,
14  you were advising Ocean Beach that you did
15  not believe that there was any legitimate
16  reason for why you say you were fired on
17  April 2?
18  A.   Yes.
19  Q.   Okay.  So then if you believed as
20  of June 30, 2006 that there was no
21  legitimate reason for why you were fired on
22  April 2, 2006, why did you believe that you
23  couldn't go forward with polygraph tests
24  after that date?
25  A.   Because, again, I spoke -- I said

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 241

E. Carter

1  it earlier, I don't think I'd be able to
2  pass it with just bringing up the incident
3  with the Beach, the lies, and when it got to
4  those questions why you were let go, I would
5  have probably most likely came up -- I
6  forget the exact wording they use, but it's
7  not exactly calling you a liar, but it's
8  un -- not undecisive.  I don't know the
9  exact words they use on a polygraph.
10      Q.   But you testified this morning
11  that at least to your understanding,
12  polygraph tests are yes and no, right?
13      A.   Specifically, and then they go
14  with a group.  Were you ever fired for a
15  position.  My answer would be yes.
16      Q.   Right.  And they wouldn't ask
17  you, to your knowledge, on a polygraph test
18  why you were fired, because that's not a yes
19  or no question, right?
20      A.   That would have been in a --
21          MR. GOODSTADT: Objection.
22      A.   -- pre-polygraph part of the
23  questionnaire.
24      Q.   When you say "pre-polygraph,"

Page 242

E. Carter

1  what do you mean?
2      A.   There's usually anywhere from --
3  could be from zero to 100 questions you fill
4  out and answer, and then as you go through
5  the polygraph, the questions come up, and
6  then at the end, they ask you about the
7  pre-polygraph questionnaires.
8      Q.   So to your knowledge, the
9  pre-polygraph part of the test is a series
10  of questions that you have to write out
11  answers to?
12      A.   Yes.
13      Q.   Okay.  And you believe that one
14  of the questions would be why were you fired
15  from Ocean Beach?
16      A.   Yes.
17      Q.   Why couldn't you have said "I was
18  fired for no legitimate reason"?
19          MR. GOODSTADT: Objection.
20      A.   I don't think any employer would
21  have -- I could have said that, but I don't
22  think any employer would have accepted that.
23      Q.   Why not?
24      A.   I know if I was a supervisor, I

Page 243

E. Carter

1  wouldn't.
2      Q.   Why not?
3      A.   I'd want to know why you were let
4  go.
5      Q.   And you don't think by saying
6  that the reasons that they gave me were not
7  truthful wouldn't have been sufficient?
8      A.   No.
9          MR. GOODSTADT: Objection.
10      Q.   Okay.  So if I understand your
11  testimony correctly, you believed that had
12  you written on the pre-polygraph part of the
13  questionnaire that there was no legitimate
14  reason for you being fired, that that was
15  not -- that would not be accepted by your
16  employer, your potential employer?
17      A.   Correct.
18      Q.   And that is why you didn't pursue
19  jobs that required polygraphs?
20          MR. GOODSTADT: Objection.
21      Q.   Is that your testimony?
22      A.   It's why I didn't pursue the job
23  at the county park police or yes, the
24  security job, yes.

Page 244

E. Carter

1      Q.   Okay.  How about after you filed
2  the complaint, sir, this was a -- as you
3  agree with me, you understand, this was a
4  public record now, right?
5      A.   Yes.  You explained to me.  Yes.
6      Q.   And it sets forth a lot of detail
7  as to the events surrounding April 2, 2006,
8  correct?
9      A.   Yes.
10      Q.   And in this complaint, you advise
11  whoever's reading it that you don't believe
12  that there was any legitimate reason for you
13  to be -- for you being fired on April 2,
14  right?
15      A.   Correct.
16      Q.   And, in fact, you go as far as to
17  say your United States Constitutional rights
18  have been violated, right?
19      A.   Yes.
20      Q.   Why was it that after the date of
21  the filing of this complaint, which was
22  March 21, 2007, you still believed that you
23  couldn't take a polygraph test for a law
24  enforcement related job?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 245

1           E. Carter
2           MR. GOODSTADT: Objection.
3       A.   I didn't want it as part of my
4   official record if I did fail because of
5   this incident, and it would follow through
6   with me possibly with my township, with the
7   town.
8       Q.   But the town knew you had -- the
9   town knew that you had issues with Ocean
10  Beach by virtue of the blog, according to
11  your testimony, right?
12      A.   Yes.
13      Q.   The town, if they had read
14  Newsday or watched News 12, would have known
15  that you had sued Ocean Beach, right?
16      A.   Yes.
17      Q.   And had they wanted to find out
18  about the complaint, they could have gone
19  online and looked at the complaint, right?
20      A.   As you stated to me, yes.
21      Q.   So what was your concern about
22  the town finding out about you suing Ocean
23  Beach?
24          MR. GOODSTADT: Objection.
25      Q.   After you filed the complaint?

Page 246

1           E. Carter
2           MR. GOODSTADT: Objection.
3   That's not what he testified to.
4       Q.   Did you have a concern at all,
5   after you filed the complaint, as to your
6   supervisors at the town finding out that you
7   filed a complaint against Ocean Beach?
8       A.   I filed a complaint? No.
9       Q.   You didn't have a concern?
10      A.   No.  The content of the
11  complaint, yes, I would say I did.
12      Q.   You had -- so you did have a
13  concern after you filed the complaint that
14  your supervisors at the town would look
15  adversely on you given the contents of the
16  complaint, is that your testimony?
17      A.   It could have happened, yes.
18      Q.   What was your concern in that
19  regard?
20      A.   The fact that I was going to wear
21  a wire, it said I was going to wear a wire
22  was a big concern because it was totally
23  false.  And that was the biggest thing.  And
24  the defamation.  The -- you know, basically
25  I work -- just so you know, I work in a law

Page 247

1           E. Carter
2   enforcement department, so the blue wall of
3   silence is still, you know, within my
4   department, too.  The park rangers are a law
5   enforcement division.
6       Q.   Oh, so in addition to your Ocean
7   Beach having a blue wall of silence, you now
8   say the Town of Islip's law enforcement
9   agencies have a blue wall of silence?
10          MR. GOODSTADT: Objection.
11      A.   I did not state that.
12      Q.   No?
13      A.   No.
14      Q.   When you said that where you work
15  has a blue wall of silence, what are you
16  referring to?
17      A.   I work with uniformed officers is
18  what I was saying.
19      Q.   So is it your testimony today
20  that those uniform officers engage in what
21  you refer to as a "blue wall of silence"?
22          MR. GOODSTADT: Objection.
23      A.   No.
24      Q.   No?
25      A.   No.

Page 248

1           E. Carter
2       Q.   Then -- just scroll up.  Well,
3   when you say that "I work, you know, I work
4   in the law enforcement, so the blue wall of
5   silence is still, you know, within my
6   department," what department are you
7   referring to?
8       A.   I was referring to -- I work in a
9   uniform, you know, I work in a police -- I
10  work in a law enforcement division, and the
11  wire part would, you know, totally destroy
12  me, and it got out even quicker than I
13  thought it would.
14      Q.   No.  You just made reference in
15  your answer, sir, to that your department
16  still engages in the blue wall of silence.
17          MR. GOODSTADT: Objection.
18      Q.   So I'm referring -- I'm asking
19  you what department are you referring to?
20      A.   I work for the Town of Islip,
21  sir.
22      Q.   But when you answered the
23  question and you said "my department," what
24  department are you referring to?
25      A.   The only department I work for is

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 249

1              E. Carter
2 the Town of Islip.
3     Q.   Okay.  So if I understand your
4 testimony correctly, you're accusing the
5 uniformed officers of the Town of Islip in
6 engaging in the blue wall of silence?
7          MR. GOODSTADT: Objection.
8 Don't even answer the question.
9     Q.   Is that your testimony, sir?
10 DI       MR. GOODSTADT: Objection.
11 Instructing the witness not to answer
12 the question.
13          MR. NOVIKOFF: I'm just trying
14 to clarify his answer.
15          MR. GOODSTADT: You're being
16 harassing, because you're now saying
17 that he's accusing his current employer
18 of something.  There's been no
19 accusation.  The testimony speaks for
20 itself.  He testified to it five times
21 now.
22          MR. NOVIKOFF: I don't think
23 so.
24          MR. GOODSTADT: It's now
25 becoming harassing.  It is.

Page 250

1              E. Carter
2          MR. NOVIKOFF: I don't think
3 so.  I'll take away the word
4 "confusing," sir.
5     Q.   Is it your belief that the
6 uniformed officers within your department
7 engage in what you refer to as the blue wall
8 of silence?
9          MR. GOODSTADT: Objection.
10    A.   No.
11    Q.   Then who within your department,
12 as you testified to, engages in the blue
13 wall of silence?
14          MR. GOODSTADT: Objection.
15    A.   There was -- just so you know, in
16 my department there was a corruption probe
17 prior and officers were arrested and
18 supervisors by the District Attorney's
19 office.
20    Q.   So that was the blue wall of
21 silence you were referring to?
22    A.   Yes.
23          MR. GOODSTADT: Objection.
24    Q.   So there's no further blue wall
25 of silence in the Town of Islip, to your

Page 251

1              E. Carter
2 knowledge?
3     A.   No.
4     Q.   Okay.  Now you make reference in
5 paragraph 109 to you could not obtain
6 references from the Ocean Beach Police
7 Department, do you see that?
8     A.   Yes.
9     Q.   Subsequent to April 2, 2006, who
10 did you ask a reference from concerning --
11 who worked for the Ocean Beach Police
12 Department?
13    A.   Chief Paridiso had given me one
14 for my promotion with the Town of Islip back
15 in approximately 1998.
16    Q.   My question, sir, was subsequent
17 to April 2, 2006, who at the Ocean Beach
18 Police Department did you ask for a
19 reference from?
20    A.   I believe George Hesse's letter
21 would have helped me, you know, with the
22 reason I was let go.  That would have been
23 the letter.
24    Q.   So when you say "obtain a
25 reference," you're referring to a letter

Page 252

1              E. Carter
2 indicating why you were let go?
3     A.   Yes.
4     Q.   So then I don't understand.  You
5 say because you could not obtain references
6 from the OBPD or provide a clear explanation
7 for his termination.  The Hesse letter
8 you're referring to would provide that clear
9 explanation, correct?  At least that's what
10 you were hoping for, right?
11    A.   Yes.
12    Q.   So now I don't understand then.
13 What did you mean by "reference"?
14    A.   Well, when the county park police
15 or whoever would call over to the beach for
16 reference, you know, as far as my job work.
17    Q.   Your job performance?
18    A.   Yes.
19    Q.   Right.  Did you ever ask Chief
20 Paridiso to provide you with a reference?
21    A.   Yes.
22    Q.   After April 2, 2006?
23    A.   No.
24    Q.   Why not?
25    A.   At that time, George Hesse was

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 253

1          E. Carter
2 the chief of Ocean Beach.
3     Q.    But Mr. Paridiso would have been
4 aware of how -- of what you did while you
5 were employed by Ocean Beach, correct?
6     A.    I wouldn't have been able to get
7 it on official letterhead.
8     Q.    No?  You don't think so?
9     A.    No.
10    Q.    Did you ask -- did you ever ask
11 Paridiso to send a letter of reference to
12 any employer?
13    A.    Prior, yes.
14    Q.    No.  No.  After April 2, 2006?
15    A.    No.
16    Q.    Why not?
17        MR. GOODSTADT: Objection.
18    A.    Because at that point, Ed was out
19 on a disability and George Hesse was the
20 chief law enforcement officer at the Ocean
21 Beach Police Department.
22    Q.    But you didn't even try.  What
23 would have hurt by trying?
24        MR. GOODSTADT: Objection.
25    A.    For a follow-up phone call, if

Page 254

1          E. Carter
2 there needed to be one, they wouldn't be
3 able to get obviously Eddie at the Ocean
4 Beach Police Department.
5     Q.    How do you know that?
6     A.    Because he wasn't working at that
7 time.
8     Q.    But how do you know that they
9 couldn't have gotten hold of Chief Paridiso
10 and said, "you know, Mr. Carter needs a
11 letter of reference and he would like one
12 from you," how do you know that they
13 couldn't get a hold of Chief Paridiso?
14        MR. GOODSTADT: Objection.
15 That's not what he testified to.
16    A.    That's not what I testified to.
17    Q.    Okay.  What makes you believe --
18 well, you don't know that  -- well, do you
19 have any knowledge that Chief Paridiso
20 wasn't an employee of Ocean Beach at that
21 time subsequent to April 2, 2006 and before
22 you filed the Notice of Claim?
23    A.    I know he was out on workmen's
24 comp and I hadn't seen him there from I
25 guess November of -- November of '06, '05.

Page 255

1          E. Carter
2     Q.    Did you ever call Chief Paridiso
3 and say, "chief, is there any way you can
4 send me a letter of reference"?
5     A.    No, I didn't.
6     Q.    Did you ever send him an email?
7     A.    Asking that, no.
8     Q.    So you did nothing with regard to
9 Chief Paridiso in terms of getting a letter
10 of reference after April 2, 2006, right?
11    A.    Yes.
12    Q.    And the only -- and the reason
13 you didn't is because you speculate that
14 Chief Paridiso couldn't do that for you,
15 correct?
16        MR. GOODSTADT: Objection.
17    A.    Yes.  I didn't want to put him in
18 an awkward situation.
19    Q.    Oh, now you didn't want to put
20 him in an awkward situation.  Well, why did
21 you -- did you ask him if he would be put in
22 an awkward situation?
23        MR. GOODSTADT: Objection.
24    A.    No.
25    Q.    Are you aware as to whether or

Page 256

1          E. Carter
2 not Mr. Nofi received a letter of
3 recommendation from Chief Paridiso after
4 April 2, 2006?
5     A.    No.
6     Q.    Did you ever inquire with
7 Mr. Nofi as to whether or not he sought out
8 Mr. Paridiso to get a letter of reference?
9     A.    No.
10    Q.    Okay.  Did you inquire with the
11 other Plaintiffs as to whether or not they
12 got letters of reference from Chief Paridiso
13 after April 2, 2006?
14    A.    No.
15    Q.    Let's look at number 110, "upon
16 information and belief, Hesse circulates
17 false and malicious negative references
18 concerning Plaintiffs among officials
19 working for the Town of Islip," do you see
20 that?
21    A.    Yes.
22    Q.    You say "officials," do you agree
23 with me that when you use the word
24 "officials," you're suggesting more than one
25 person?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 68 of 130 PageID #: 1662

Page 257

1          E. Carter
2      MR. GOODSTADT: Objection.
3  With respect to him or generally in
4  this complaint?
5      MR. NOVIKOFF: With respect to
6  what is set forth in paragraph 110.
7      A.   110's the Plaintiffs among
8  officials.  So in my case, it was one
9  person, Greg DeCanio.
10     Q.   Okay.  That was the only person?
11     A.   That I'm aware of at this time.
12     Q.   That you're aware of.  Okay.
13 Let's go to 113.  It's alleged that "as a
14 result of false, damaging and baseless
15 allegations that have been inserted in
16 Plaintiffs' civil service records," do you
17 see that?
18     A.   Yes.
19     Q.   Have you ever -- have you looked
20 at your civil service records subsequent to
21 April 2, 2006?
22     A.   It's my belief my personnel
23 jacket, yes.
24     Q.   Have you looked at your personnel
25 jacket at civil service subsequent to April

Page 258

1          E. Carter
2  2, 2006?
3      A.   No.
4      Q.   Have you asked anyone to look at
5  your civil service jacket subsequent to
6  April 2, 2006?
7      A.   My belief is --
8      Q.   Have you asked anyone --
9      A.   No.
10     Q.   -- to look into your civil
11 service jacket subsequent to April 2, 2006?
12     A.   No.
13     Q.   To your knowledge, has your
14 lawyer asked the Suffolk County Civil
15 Service Department to produce your civil
16 service jacket in this lawsuit?
17     MR. GOODSTADT: I'll stipulate
18 that that request has been made.
19     MR. NOVIKOFF: Let's go off the
20 record for one second.
21     THE VIDEOGRAPHER: The time is
22 2:59 p.m.  we're off the record.
23     (A discussion was held off the
24 record.)
25     THE VIDEOGRAPHER: The time is

Page 259

1          E. Carter
2  2:59 p.m.  Back on the record.
3      Q.   When reference is made in
4  paragraph 113 to "Plaintiffs' civil service
5  records," what are you referring to?
6      MR. GOODSTADT: Objection.
7      A.   My town personnel jacket which
8  includes my civil service records.
9      Q.   Okay.
10     A.   To the best of my knowledge.
11     Q.   Have you looked at your Town of
12 Islip civil service jacket subsequent to
13 April 2, 2006?
14     A.   "Subsequent" being after?
15     Q.   After.
16     A.   No.
17     Q.   Have you asked anyone to look at
18 your Town of Islip civil service jacket
19 after April 2, 2006?
20     A.   No.
21     Q.   To your knowledge, has your
22 attorney subpoenaed your Town of Islip civil
23 service jacket in this lawsuit?
24     A.   I can't answer that at this time.
25 I don't know.

Page 260

1          E. Carter
2      Q.   Okay.  If you don't know, you
3  don't know.  That's a legitimate answer to
4  this question.  What document are you
5  referring to that has been put in your Town
6  of Islip civil service record that you claim
7  to be false, damaging and baseless?
8      A.   The stuff -- the interview with
9  Greg DeCanio, and I'm sure there's -- and
10 it's my belief there's going to be something
11 in there that he had a conversation with
12 George Hesse.
13     Q.   You're sure.  It's your belief.
14 Do you know, sir?
15     A.   No, sir.
16     Q.   Did you ever ask DeCantio if he
17 wrote up something?
18     A.   He told me he had to put a whole
19 package together and forward it to the
20 commissioner.
21     Q.   Did you ever ask DeCantio if he
22 put in anything in your civil service jacket
23 pertaining to Hesse's communication with
24 him?
25     A.   No.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 261

E. Carter

1
2    Q.    And in the over two-year period
3  of time since Hesse's communication, it's
4  your testimony that you never once asked to
5  look into your civil service jacket at the
6  Town of Islip to confirm the truthfulness of
7  this allegation?
8    A.   Yes.
9    Q.    So when you authorized your
10  attorney to write and file this allegation
11  that I just read, you did not know at that
12  time whether that was truthful or not
13  because you hadn't looked at your file?
14      MR. GOODSTADT: Objection.
15    Q.   Isn't that true?
16    A.   Yes.
17    Q.    Let's look at paragraph 114.  Has
18  any member of your family been confronted or
19  castigated by strangers concerning anything
20  involving your employment at Ocean Beach
21  subsequent to April 2, 2006?
22    A.   My family, no.
23    Q.    Have you been castigated by
24  strangers?
25    A.   Yes.

Page 262

E. Carter

1
2    Q.    Who has castigated you?
3    A.   I have been -- I was at a
4  retirement party for my uncle, and one of
5  the people there, a guy named Chris, came up
6  to me and said, "Hey, I see you're one of
7  those rats from Ocean Beach."  I just looked
8  at the guy.  I didn't know what to say to
9  him.  Also --
10    Q.    When did this guy Chris say this
11  to you?
12    A.   That would have been November of
13  '06.
14    Q.   Okay.
15    A.    Another time would be I was on a
16  call with the Suffolk County Police for an
17  illegal house in Bay Shore, and when I
18  pulled up, got out of the car, a couple
19  officers were talking, and one of them
20  looked and said, "Is that one of those rats
21  from Ocean Beach?"  And I just looked at the
22  guy and I walked away.  I went over to the
23  officer -- one of the officers I had known,
24  and he went over.  He said, "Listen, I'll go
25  talk to him and tell him, you know, to shut

Page 263

E. Carter

1
2  up and mind his business."
3    Q.    Did you ever find out what
4  information those officers looked at in
5  order to say that you were one of those rats
6  from Ocean Beach?
7    A.    They had worked the summers  --
8  one of them worked the summer over at Ocean
9  Beach on a quad part time, seasonal.
10  MO   Q.    Did you ever -- motion to strike.
11  Did you ever ask the officers where they
12  were getting their opinions from that you
13  were one of those rats from Ocean Beach?
14    A.   No.
15    Q.    Did you ever ask this guy Chris
16  at your uncle's retirement party what he was
17  basing his opinion on that you were one of
18  those rats from Ocean Beach?
19    A.   No.
20    Q.    You have no idea as you sit here
21  today as to what source of information, if
22  any, these officers looked at in order to
23  render an opinion that you were a rat from
24  Ocean Beach, right?
25    A.   Yes.

Page 264

E. Carter

1
2    Q.    For all you know, they could have
3  read the complaint and drawn their own
4  conclusion, right?
5      MR. GOODSTADT: Objection.
6    A.   Yes.
7    Q.    For all you know, they could have
8  read the newspaper article in Newsday and
9  drawn their own conclusion, right?
10      MR. GOODSTADT: Objection.
11    A.   Yes.
12    Q.    For all you know, they could have
13  watched News 12 that night and drawn their
14  own conclusion, right?
15      MR. GOODSTADT: Objection.
16    A.   Yes.
17    Q.    For all you know, they could have
18  talked to a host of people other than
19  Mr. Hesse and drawn that conclusion,
20  correct?
21      MR. GOODSTADT: Objection.
22    A.   Yes.
23    Q.    Same thing with this guy Chris,
24  you don't know what source of information he
25  looked at, if any, to determine -- to render

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 265

1          E. Carter
2   an opinion that you were a rat, right?
3      A.   Yes.
4      Q.   He could have looked at that
5   Newsday article and drawn his own opinion?
6          MR. GOODSTADT: Objection.
7      Q.   Right?
8      A.   Yes.
9      Q.   Could have read the complaint and
10  drawn his own opinion, right?
11     A.   Yes.
12     Q.   He could have looked at -- he
13  could have watched News 12 that night and
14  drawn his own opinion, right?
15         MR. GOODSTADT: Objection.
16     A.   Yes.
17     Q.   He could have talked to a host of
18  people other than George Hesse and drawn his
19  own opinion, right?
20         MR. GOODSTADT: Objection.
21     A.   Yes.
22         MR. NOVIKOFF: Let's mark the
23  following document as Carter-8.
24         (Email dated 3/23/07 was marked
25  as Carter Exhibit-8 for identification;

Page 266

1          E. Carter
2   9/16/08, E.L.)
3      Q.   Do you recognize this document
4   that's been identified as Carter-8, sir?
5      A.   No.
6      Q.   No?  You are wingking28@aol.com?
7      A.   Yes.
8      Q.   Do you know who KT215@aol.com is?
9      A.   I'm not 100 percent sure, but I
10  believe it's Kevin Lamm.
11     Q.   Do you know who
12  regulus816@earthlink.net is?
13     A.   Not 100 percent sure again.  I
14  believe that's Tom Snyder.
15     Q.   And do you know who
16  frankfiorillo@optonline.net is?
17     A.   Yes.
18     Q.   And who is that?
19     A.   Frank Fiorillo.
20     Q.   Okay.  And does looking at the
21  subject of this email prod your recollection
22  as to what this -- as to whether or not
23  you've ever seen this email before?
24     A.   No.
25         MR. NOVIKOFF: Okay.  Let's

Page 267

1          E. Carter
2   mark the next document as Carter-9.
3          (Email dated 3/30/2007 was marked
4   as Carter Exhibit-9 for identification;
5   9/16/08, E.L.)
6      Q.   I'm going to show you what's been
7   identified as Carter-9.  Prior to today,
8   have you seen this document before?
9      A.   Without  -- it says something
10  about a picture, an editorial.  Without the
11  full thing, I can't say yes or no.  I mean,
12  my email's on there.
13     Q.   That's all I'm asking you.  Do
14  you recall seeing this prior to today?
15     A.   Yes.  In my email, yes.
16     Q.   Do you recall seeing --
17  notwithstanding the fact that your email
18  appears on this -- on this document, do you
19  recall receiving this email on or about
20  March 30, 2007?
21     A.   I don't recall.
22     Q.   Okay.  Do you know who
23  watercop319@yahoo.com is?
24     A.   Not, again, 100 percent sure.  It
25  might be Joe Nofi.

Page 268

1          E. Carter
2      Q.   Okay.  Do you recall the subject
3   matter of the attachment?
4      A.   That's what I'm explaining to
5   you.  I don't know.
6          MR. NOVIKOFF: Okay.  The tape
7   is almost over.  Let's stop the tape
8   and take a couple minutes' break and
9   get back to it.
10         THE VIDEOGRAPHER: This ends
11  tape number four.  The time is 3:09
12  p.m.  Going off the record.
13         (A break was taken.)
14         THE VIDEOGRAPHER: This begins
15  tape number five.  The time is 3:22
16  p.m.  Back on the record.
17         MR. NOVIKOFF: Sir, we're
18  going to mark the next set of documents
19  as Carter-10, and I record them to be
20  000284 through 382 -- I'm sorry, 383.
21  But, frankly, I've not looked at every
22  single page to make sure that they are
23  consecutively numbered.
24         (Document Bates stamped 000284
25  through 000383 was marked as Carter

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 269

E. Carter

2   Exhibit-10 for identification; 9/16/08,
3   E.L.)
4       A.   Am I allowed to open them or --
5       Q.   Well, you don't need to look at
6   it yet.  Let's look at the first page which
7   is 284.  Do you -- do you know what this
8   document is?
9       A.   It's a copy of my time sheet for
10  Ocean Beach Police Department.
11      Q.   Okay.  Let's just go through it.
12  284, do you see employee's signature?
13      A.   Yes.
14      Q.   Is that your signature?
15      A.   Yes.
16      Q.   Let's look at 287.  Is that your
17  signature?
18      A.   Yes.
19      Q.   Would you agree with me that the
20  signature on 287 appears to be different
21  than the signature on 284?
22      A.   Yes.
23      Q.   Okay.  Do you have different sets
24  of signatures?
25      A.   284 is PO Carter 416, 287 is

Page 270

E. Carter

2   Edward J. Carter.
3       Q.   Okay.  How about 291, is that
4   your signature?
5       A.   291, no, that's not my signature.
6       Q.   Well, next to the word
7   "employee's signature," that's not your
8   signature?
9       A.   No.
10      Q.   What's the purpose of this
11  document, sir, to the extent you know?
12      A.   This is when the printer was
13  down.  George Hesse was doing the payroll.
14  George Hesse filled this out for me.
15      Q.   George Hesse filled this out for
16  you, is that your testimony?
17      A.   To the best of my knowledge, yes.
18      Q.   And you're saying what was down?
19      A.   The printer in the station.  We
20  had problems printing out payroll sheets
21  from time to time, and either Sergeant Hesse
22  or George Hesse or Ed Paridiso would do it
23  for us.
24      Q.   Okay.  Other than George Hesse,
25  Ed Paridiso, anybody else do it for you?

Page 271

E. Carter

2       A.   No.  Not that I'm aware of.
3       Q.   Anyone else ever sign on your
4   behalf, to your knowledge?
5       A.   Not that I know of.  No.  You can
6   tell I didn't even date it, so I know it's
7   not me.
8       Q.   Let's go to your complaint, sir,
9   Exhibit-1.  It's in front of you now.  First
10  page under "preliminary statement" you write
11  "Plaintiffs are five" -- well, it's alleged
12  that "Plaintiffs are five police officers
13  who had the courage to overcome the blue
14  wall of silence and fulfill their duty to
15  protect the public by speaking out in
16  opposition to the regime of endemic
17  corruption within the Ocean Beach Police
18  Department."  Do you see that?
19      A.   Yes.
20      Q.   Did you speak out before or after
21  you were terminated, according to your
22  allegations?
23      A.   Spoke out.  Spoke to George
24  about --
25      Q.   No.  No.  Did you speak out as

Page 272

E. Carter

2   it's used in this paragraph, in the sentence
3   that I've read, prior to April 2, 2006 or
4   after April 2, 2006?
5       A.   It's my belief both.
6       Q.   Okay.  After April 2, 2006, how
7   did you speak out?
8       A.   By the filing of this complaint.
9       Q.   And prior to April 2, 2006, to
10  whom did you speak out?
11      A.   George Hesse.
12      Q.   Anybody else?
13      A.   No.  George Hesse.
14      Q.   Ever send a letter to Newsday
15  concerning any of the issues that are raised
16  in this complaint?
17      A.   No.
18      Q.   Ever send a letter to any media
19  outlet concerning any of the issues raised
20  in this complaint?
21      A.   No.
22      Q.   You spoke before, before the last
23  break about a corruption probe in the Town
24  of Islip?
25      A.   Yes.

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 273

E. Carter

1
2    Q.    Were you part of that probe?
3    A.    No.
4    Q.    Were you involved at all in that
5  probe?
6    A.    No.
7    Q.    Did you speak to any law
8  enforcement official investigating the
9  alleged claims of corruption as part of that
10  probe?
11    A.    No.
12    Q.    How many times have you spoke to
13  the DA after you've been -- the Suffolk
14  County DA after April 2, 2006?
15    A.    I couldn't give you an exact
16  number.  I'm going to say approximately six
17  times to a dozen.
18    Q.    Concerning what?
19    A.    Concerning the case they were
20  investigating.
21    Q.    Which was?
22    A.    Partly the Gilbert incident with
23  the beating.
24    Q.    Okay.
25    A.    I also called them -- I called

Page 274

E. Carter

1
2  them within the week after I was let go to
3  find out what was going on with this me of
4  wearing a wire.  Where it came from.  If it
5  came from them or what was going on with
6  that, and when I called, I let them know,
7  you know, I was fired, what's this I was
8  going to wear a wire.  And they said, "Why
9  don't you come down, stop down."  And I went
10  to their office.
11    Q.    And what did  -- did they answer
12  your question?
13    A.    They said they had nothing to do
14  with it.
15    Q.    So they asked you to come down to
16  their office to tell you that they had
17  nothing to do with it?
18        MR. GOODSTADT: Objection.
19    Q.    Is that your testimony?
20    A.    No.
21        MR. GOODSTADT: Objection.
22    Q.    So let me understand this.  You
23  say you were fired on April 2, 2006, right?
24    A.    Yes.
25    Q.    Within a week of that date, you

Page 275

E. Carter

1
2  contact the Suffolk County DA and ask them
3  did they have anything to do with these
4  comments about you wearing a wire, right?
5    A.    Partly, yes.  I had a concern
6  about that.
7    Q.    That was part of your
8  conversation with them?
9    A.    Yes.
10    Q.    And who did you speak to?
11    A.    I spoke to a Detective Amato.
12    Q.    And this detective told you to
13  come on down to his office to talk about it?
14    A.    Well, there was more to the
15  conversation.
16    Q.    Okay.
17    A.    I told him with that, I felt that
18  something really did happen with the Gilbert
19  incident for them to say that about me.
20  When he said --
21    Q.    Something really happened with
22  the Gilbert -- what do you mean by that?
23    A.    Well, the beach was taking a
24  stance, the individuals that were working
25  that night that nothing happened with the

Page 276

E. Carter

1
2  Gilbert incident.  That he wasn't beat up or
3  anything.  And I said for them -- you know,
4  my concern and my belief was something did
5  happen for them to say I was going to wear a
6  wire and have them admit that they were
7  doing wrong, the corruption.
8    Q.    So you told this detective at the
9  Suffolk County DA that because someone made
10  a comment about you wearing a wire, that
11  means something happened with the Gilbert
12  incident?
13        MR. GOODSTADT: Objection.
14    A.    I felt it had partly connection
15  with the Gilbert incident, my firing might
16  have had something to do with that also.
17    Q.    And you told that to the DA?
18    A.    Yes.
19    Q.    Why do you think the DA cared
20  whether you were fired or not?
21    A.    I don't think they really cared
22  if I was fired or not.
23    Q.    Right.  Did you ask the DA to
24  investigate your alleged termination?
25    A.    No.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 277

E. Carter

1    Q.   So you went down to the Suffolk
2  County DA and you had a conversation with
3  this detective?
4    A.   I had a conversation with
5  approximately -- there were approximately
6  six detectives in the room and a prosecutor.
7    Q.   Concerning what?
8    A.   Ocean Beach.
9    Q.   What about Ocean Beach?
10   A.   They asked -- they went through
11 if I was working that night and if I knew
12 anything about that night, the incident on
13 the 28th of August.
14   Q.   Did you ever tell -- did you
15 tell the DA or the detectives at this time
16 any of the -- any of the allegations that
17 you raised in the complaint, other than the
18 Halloween incident?
19      MR. GOODSTADT: Objection.
20   He's testified he told them about the
21   wire incident.
22   Q.   Okay.  Did you make allegations
23 about Mr. Hesse having sexual escapades
24 while on duty, did you advise the DA during

Page 278

E. Carter

1 this conversation of that claim?
2    A.   Yes.
3    Q.   Did you advise the DA of that --
4  of Mr. Hesse's alleged involvement with
5  known drug dealers --
6    A.   Yes.
7    Q.   -- during this conversation?
8    A.   Yes.
9    Q.   Had you advised them of that
10 before this, before your termination?
11   A.   No.
12   Q.   Had you advised the DA before
13 your alleged termination of Mr. Hesse's
14 alleged sexual escapades?
15   A.   No.  They were none of my
16 business.
17   Q.   But they were your business after
18 you were fired?
19   A.   They asked me to make notes of
20 anything and anything with the on goings of
21 the beach.
22   Q.   They asked you to make notes.
23 When did they ask you to make notes?
24   A.   That was April of '06.

Page 279

E. Carter

1    Q.   And why did they ask you to make
2  notes?
3    A.   I said apparently -- I told them,
4  I said, "Apparently I know something that
5  they had to get rid of me and I don't know
6  what it is," and they said, "Well, write
7  down whatever you know."
8    Q.   You knew something -- you believe
9  that you knew something that caused them to
10 get rid of you?
11   A.   Yes.
12   Q.   But you weren't a witness to the
13 Gilbert incident, were you?
14   A.   No.  But, again, I was
15 misidentified, and in a way, I was used as a
16 scapegoat for it.
17   Q.   Well, didn't -- I guess the DA in
18 that April 2006 conversation was asking you
19 to become a snitch?
20      MR. GOODSTADT: Objection.
21   Q.   Is that what they were asking you
22 to do?
23   A.   No.
24   Q.   No.  Okay.  Let's stay on the DA

Page 280

E. Carter

1 for a while.  When was the first time you
2  had -- you had any communication with the
3  Suffolk County District Attorney concerning
4  anything to do with Ocean Beach?
5    A.   That was the fall of 2005 after
6  the Gilbert incident.
7    Q.   Okay.  And who approached you?
8    A.   Detective Amato and Iacopelli.
9    Q.   And what did they want from you?
10   A.   They wanted to know if I was
11 working that night, which I wasn't, and I
12 showed them on the schedule I wasn't, and if
13 I knew who was working that night, and if
14 anybody at the beach was, you know, rough
15 with their hands or whatever.
16   Q.   During the Gilbert incident or
17 any other time?
18   A.   Any other time.  The Gilbert
19 incident and any other time.
20   Q.   Okay.  And did you advise them
21 who in your belief was rough with their
22 hands at any other time, besides Gilbert
23 incident?
24   A.   Yes.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 281

E. Carter

1
2  Q.  You told them that?
3  A.  Yes.
4  Q.  And who did you say?
5  A.  Bob Galoppi.
6  Q.  Is that all?
7  A.  Yes.
8  Q.  And did you witness Rob Galoppi
9  being rough with his hands?
10  A.  Yes.
11  Q.  When?
12  A.  Back in 1991, '92.  '91 and '92.
13  Q.  So you told them about an
14  incident that occurred 13 years earlier, 14
15  years earlier?
16  A.  Approximately, yes.
17  Q.  Okay.  Did you advise them of
18  anybody else who you believe to be rough
19  with their hands?
20  A.  No.
21  Q.  Okay.  What else did they ask you
22  in the first communication with the DA with
23  these two individuals?
24  A.  Who else was working, and that's
25  when I invited them in my house and I gave

Page 282

E. Carter

1
2  them a copy of the schedule that I had
3  hanging up.
4  Q.  Okay.  And how long was this
5  communication with these two individuals in
6  your house?
7  A.  Approximately five, 10 minutes.
8  Maybe 15.
9  Q.  Did they ask you anything about
10  chief  -- about Mr. Hesse?
11  A.  They asked in general about any
12  individual working for the police
13  department.
14  Q.  So you -- you responded about
15  every single individual?
16  A.  No.  I didn't respond about any
17  of them at that time.
18  Q.  But what did they specifically
19  ask you about Mr. Hesse?
20  A.  Well, he would have been part of
21  a member of the police department with, you
22  know, anybody have a problem with their
23  hands, and I didn't bring him up, obviously,
24  because I never saw him do anything
25  firsthand.

Page 283

E. Carter

1
2  Q.  So did they ask you specifically
3  anything about Mr. Hesse during this first
4  conversation?
5  A.  No.
6  Q.  Okay.  When was the next time you
7  spoke with anyone associated with the
8  Suffolk County DA?
9  A.  Approximately within that week, I
10  got that phone call at work.
11  Q.  From whom?
12  A.  Detective Iacopelli.
13  Q.  What did he want?
14  A.  He wanted to come to my house the
15  following day to talk to me.  He had new
16  information.
17  Q.  What was the new information?
18  A.  He wouldn't tell me on the phone.
19  Q.  Okay.  Anything else that took
20  place during this phone conversation that
21  you can recall?
22  A.  I told him I couldn't talk to him
23  without the village attorney present.
24  Q.  Okay.
25  A.  Due to that internal

Page 284

E. Carter

1
2  correspondence and I'd have to get back to
3  him.
4  Q.  What internal correspondence?
5  A.  About they put up -- beach put up
6  an internal correspondence, any contact or
7  because he -- any contact with the District
8  Attorney's office, a village attorney must
9  be present.
10  Q.  Okay.  And did you notify Ken
11  Gray that you were contacted by the Suffolk
12  County DA?
13  A.  No.  I notified George Hesse who
14  notified Ken Gray.
15  Q.  Okay.  And after that telephone
16  conversation, what was the next time you
17  spoke with anyone associated with the
18  Suffolk County DA?
19  A.  Following day.
20  Q.  Where?
21  A.  My living room.
22  Q.  Was Ken Gray there?
23  A.  Yes.
24  Q.  Did you speak with Ken Gray prior
25  to meeting with the Suffolk County DA?

EDWARD CARTER
September 16, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 75 of 130 PageID #: 1669

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 285

E. Carter

1
2  A.   Yes.
3  Q.   What did Ken Gray say to you?
4  A.   First off, they were running
5 late, so Ken Gray's like, you know, "they
6 should have used their lights and sirens."
7 But he told me -- I explained to him that
8 they -- my feeling was they felt that I was
9 at work on the night of the Gilbert thing,
10 and he looked at me and he says, "I know you
11 weren't working."  And I said, "What do you
12 mean?"  And he was on the rescue squad that
13 night, so he knew I wasn't working, and I
14 explained to him how the schedule -- the
15 three tour was actually the day after --
16 day before, but on the schedule, like I did
17 work when the incident occurred.
18  Q.   Did Ken Gray say anything else to
19 you before you met with him and the Suffolk
20 County DA representatives?
21  A.   He was very quiet.
22  Q.   Did he tell you to lie?
23  A.   No.
24  Q.   Did he tell you to misrepresent
25 anything?

Page 286

E. Carter

1
2  A.   No.
3  Q.   Did he tell you to do anything
4 other than to tell the truth?
5  A.   No.  He didn't even tell me that.
6 He just really didn't get into any
7 conversation like that at all.
8  Q.   Did you ask Ken Gray any
9 questions?
10  A.   No.
11  Q.   Okay.  So you then spoke with the
12 representatives from the DA in your house
13 with Ken Gray present, right?
14  A.   Yes.
15  Q.   What was  -- what did they ask of
16 you at that time?
17  A.   The biggest part was my time
18 sheets with the beach.
19  Q.   Concerning you?
20  A.   Concerning the August 28
21 incident.
22  Q.   Gilbert?
23  A.   Gilbert, yes.  They showed me --
24 basically they had a stack of time sheets
25 like you have here which is Exhibit-10 of

Page 287

E. Carter

1
2 mine and other officers, and they asked me
3 to look at it and tell me when I worked.  So
4 I told them, you know, looking at it, I told
5 them when I worked.
6         And then they showed me another
7 officer's time sheets and asked me when he
8 worked, and I told them I couldn't answer
9 it.  And they asked me again, they said,
10 "Well, if you worked, for an example, on
11 that Tuesday, the three tour and he has the
12 Tuesday three tour, he worked?"  I said, "I
13 can't answer for somebody else when they
14 worked or when they didn't work."
15  Q.   Okay.  What else did they ask
16 you, other than that question?
17  A.   I don't recall at this time.
18  Q.   Did they ask you any specific
19 questions at that time about Mr. Hesse?
20  A.   I don't recall.  No.  I don't
21 recall at this time.  No.  Not to my
22 knowledge.
23  Q.   Okay.  When's the next time you
24 spoke with any representative from Suffolk
25 County DA?

Page 288

E. Carter

1
2  A.   It would have been April of '06
3 which I explained to you earlier.
4  Q.   Okay.  And the DA --
5  A.   After April 2.  You know, it was
6 approximately April 6.
7  Q.   And you called them?
8  A.   Yes.
9  Q.   And where did you have this
10 conversation?
11  A.   In their office.
12  Q.   Okay.  And how long was this
13 conversation with these six detectives and a
14 prosecutor?
15  A.   It was approximately half hour,
16 if it lasted long -- a little longer than
17 that.
18  Q.   And did they ask you any
19 questions about George Hesse?
20  A.   I don't recall if they asked
21 pinpoint questions.
22  Q.   So you volunteered the fact that
23 you believe that Mr. Hesse was having sexual
24 affairs while on duty?
25         MR. GOODSTADT: Objection.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 289

E. Carter

1
2      A.   That was probably during the
3  third meeting I had with them.
4      Q.   What third meeting?
5      A.   There was -- well, the fourth
6  meeting. I'm sorry. The fourth meeting.
7      Q.   Well, when was the fourth
8  meeting?
9      A.   Approximately -- approximately a
10  week later I had to -- the handwritten notes
11  I had, I had to bring them up to them and
12  give it to them.
13      Q.   Oh, okay. So let's go back to
14  that April meeting. They asked you to do
15  what, if anything, in this April meeting?
16      A.   When I explained to them that I
17  was let go and they saw that I was pretty
18  upset, they said, "Well, why did he -- why
19  did he let you go?" I told him about the
20  directive thing. And they said, "Well, what
21  directives?" And they looked at me
22  dumbfounded, too, like I looked at George,
23  and they said, "Well, why do you think you
24  were let go?" And I said, "I really don't
25  know." I said, "With everything going on

Page 290

E. Carter

1
2  with the Gilbert thing, I can't tell you."
3  I said, "You know, I don't know if it had
4  anything to do with the guys over there
5  being spooked because of the thing with
6  Islip town with the corruption thing where
7  the upper bosses were taken out and I never
8  spoke to the District Attorney's office." I
9  said, "I don't know. I have no idea what's
10  going on."
11          And they said, "Listen," they
12  said, "Go home, get a piece of paper, and
13  write some notes." And that's what I did.
14      Q.   Write some notes about what?
15      A.   About anything I had knowledge of
16  with Ocean Beach as far as the way the
17  police department ran. Anything.
18      Q.   So you had a choice, then, to
19  decide what you were going to tell them and
20  what you didn't, right?
21          MR. GOODSTADT: Objection.
22      A.   I was going to tell them the
23  truth.
24      Q.   Okay. And you sent a -- you
25  wrote out on a piece of paper?

Page 291

E. Carter

1
2      A.   It was -- yeah. Approximately --
3  it was looseleaf type paper, two pieces.
4      Q.   Okay. And you wrote that
5  Mr. Hesse engaged in a sexual affair while
6  on duty with women?
7      A.   I don't recall if that was in my
8  notes, but yes, he did. I know that for a
9  fact.
10      Q.   No. I'm not interested in what
11  he may not have done or done. I'm asking
12  did you advise the Suffolk County DA that --
13  in this document that you wrote, that
14  Mr. Hesse was engaging in sexual affairs
15  with women while on duty?
16          MR. GOODSTADT: Objection.
17      Asked and answered.
18      A.   Again, I don't recall at this
19  time if I did or not.
20      Q.   Did you advise the Suffolk County
21  DA in this letter -- in this document that
22  you wrote, that George Hesse asked you to or
23  asked officers to chauffeur drunken officers
24  around the village?
25      A.   No, I don't believe I did that.

Page 292

E. Carter

1
2      Q.   What did you advise the Suffolk
3  County DA on this written document that you
4  just referred to?
5      A.   There was -- basically that I
6  was -- you know, Chief Loeffler was the
7  chief. Winnie Loeffler was the court clerk.
8  There was Joe Loeffler's the mayor. Alan
9  Loeffler was working for the department.
10  They asked -- I put down about some
11  uncertified officers. Couple of incidents
12  that happened in front of me with the drinks
13  coming into the station that I recall at
14  this time. Again, there was a front, back
15  and a front, so I don't recall exactly.
16      Q.   You told them in this written
17  document that you wrote a week after the
18  April meeting with them, that Mr. Loeffler
19  was the mayor?
20      A.   No. I believe I put down he was
21  a trustee at that time.
22      Q.   He wasn't the mayor at the time,
23  right?
24      A.   I don't recall, to be honest with
25  you.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 293

E. Carter

1
2    Q.   Okay.  Okay.  When was the next
3    time after  -- well, did you hand him this
4    written document or did you mail it to him?
5    A.   I believe I dropped it off.
6    Q.   Do you have a copy of this?
7    A.   No.  They have the original.
8    Q.   You didn't make a copy?
9    A.   No, sir.
10   Q.   For your own records you made no
11   copy?
12   A.   No, sir.
13   Q.   And did you have any other
14   meetings with the Suffolk County DA after
15   you dropped off this written document?
16   A.   Yes.
17   Q.   When was the next time that you
18   had a meeting with them?
19   A.   I don't recall exactly
20   chronologically when it happened, but
21   Detective Warkenthien came to my house in
22   2007 -- 2007.  Referenced the conversation
23   we had, and, you know, again, I added more
24   to it.  The photos that were there with the
25   grand jury subpoena laying on the desk, I

Page 294

E. Carter

1
2    let them know about that.
3    Q.   What photos?
4    A.   The photos of the police
5    department offices.  I let them know right
6    after the Gilbert incident that Bill
7    Embreui, who I was misidentified as
8    apparently, shaved his mustache I recalled,
9    and you know, how everybody, you know,
10   basically isolated themselves from me.  I
11   also gave a statement in reference to
12   something Bill Embreui said to me.
13   Q.   What did Mr. Embreui say to you?
14   A.   The night of the Gilbert
15   incident, Bill Embreui came in -- well, the
16   Friday after the Gilbert incident, Bill
17   Embreui came into the police station, I was
18   working the desk around 2:00, 2:30 in the
19   morning.  He was looking, you know, standing
20   there and he said, "What's up?"  You know,
21   basically small talk, and then he says, "You
22   want to know what I know?"  I said, "I don't
23   know.  I don't really -- what do you know?"
24   So he says oh, the night of the Gilbert
25   thing, he was outside across the street on

Page 295

E. Carter

1
2    Bay Walk talking to one of Gilbert's friends
3    who was a police officer over in Europe, and
4    Gilbert was inside getting the summons.  You
5    know, he was telling the guy everything will
6    be fine.  He'll be out in a couple minutes.
7    With that, the front door opened
8    and Gilbert started yelling -- kicked the
9    door.  Bill walked across the street on Bay
10   Walk.  Walked up the deck.  Gilbert was
11   pulled back inside.  Bill went inside the
12   door, and when the shit hit the fan, he
13   turned around and he done -- he did with the
14   thumb lock.  He motioned he locked the door
15   with the thumb lock so no one else could
16   come in.
17   Q.   Now when did Bill tell you this?
18   A.   That was the Friday immediately
19   after -- Friday into Saturday morning
20   immediately after the Gilbert incident.
21   Q.   So you knew about what
22   Mr. Embreui said to you in September of
23   2005, right?
24   A.   Yes.
25   Q.   October 2005?

Page 296

E. Carter

1
2    A.   Yes.
3    Q.   You didn't say anything to the DA
4    then, did you?
5    A.   There was no reason at that  --
6    they didn't ask me about it and there was no
7    reason -- I didn't think Bill -- you know,
8    Bill locked the door at that point.
9    Q.   Oh, so you don't think Bill did
10   anything wrong by locking the door?
11   MR. GOODSTADT: Objection.
12   Q.   Well, did you think Bill did
13   anything wrong by locking the door as he
14   said he did?
15   A.   At that time, no.
16   Q.   So what was the reason for you
17   telling the DA about what Bill Embreui told
18   you, if you didn't think he did anything
19   wrong?
20   A.   They --
21   Q.   After you were allegedly fired?
22   A.   Detective Warkenthien, again -- I
23   had an April I believe it was '07 discussion
24   with him, and he asked me  -- that was
25   sometime in August I believe it was.  I gave

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 297

E. Carter

1  him the statement.
2  
3      Q.   So let me understand this, you
4  didn't make -- you didn't advise the DA of
5  anything that went on that you were told
6  involving the Gilbert incident until after
7  you were allegedly fired on April 2, 2006,
8  right?
9          MR. GOODSTADT: Objection.
10     A.   No.  Just that, you know, when
11  they were interviewing people, Arnie
12  Hardman -- no.
13     Q.   In fact, the only thing you told
14  them before you were allegedly terminated on
15  April 2, 2006 was that you weren't present
16  that night, right?
17     A.   Basically, yes.
18     Q.   Did you ever testify before the
19  grand jury?
20     A.   No.
21     Q.   Were you ever asked to?
22     A.   No.
23     Q.   The DA ever ask you to wear a
24  wire?
25     A.   No.

Page 298

E. Carter

1  
2      Q.   To your knowledge, did the DA
3  ever ask any of the other Plaintiffs to wear
4  a wire?
5      A.   No.
6      Q.   When was the last time you spoke
7  to the DA?
8      A.   Um, last time you canceled my
9  deposition.  I don't know the exact date.
10     Q.   Why was it that you spoke to the
11  DA the last time we canceled your
12  deposition?
13     A.   As the case was proceeding, I
14  would just give him a call and let him know
15  he was going for a deposition.  The last --
16  I was canceled actually I believe out of
17  three of them or two of them, and just to
18  let them know.  That didn't tell me
19  anything.  I didn't basically --
20     Q.   Why did you feel it necessary to
21  keep the DA advised of the status of this
22  case?
23          MR. GOODSTADT: Objection.
24     A.   I -- I wasn't sure with the Bill
25  Embreui statement, if I was allowed to

Page 299

E. Carter

1  disclose that or not, and my attorney told
2  me I was.
3          MR. GOODSTADT: Objection.
4      Don't testify to anything your attorney
5      told you.
6  
7      Q.   The question to you, sir, is why
8  did you feel it necessary to advise --
9  well, given that you talked to your attorney
10  about what you could or could not say, and I
11  don't really want to know what you and your
12  attorney talked about, why did you feel it
13  necessary to keep the DA advised of whether
14  or not you were being deposed in this case?
15          MR. GOODSTADT: Objection.
16     A.   I just -- they were honest with
17  me, you know, that they didn't -- I felt
18  they were honest with me about telling me I
19  never wore a wire and stuff, and they,
20  again, they got the -- they got the
21  original thing that I was working that
22  night, which I wasn't, so no.  I just made a
23  phone call.
24     Q.   They were honest with you about
25  you never wearing a wire, is that what you

Page 300

E. Carter

1  
2  testified about?
3      A.   I believe they aren't the one
4  that started that with the wire.
5      Q.   Oh, okay.  That's what you mean.
6  So how many times have you spoken to the DA
7  about this lawsuit?
8      A.   About my lawsuit in particular?
9      Q.   Yeah.  Because you called them up
10  to tell them that you weren't being deposed,
11  so --
12     A.   Deposed, maybe three times.
13     Q.   Why?
14     A.   I just -- I don't know.  I just
15  felt they should know I was going to get
16  deposed.
17     Q.   Did they ask you to call them?
18     A.   No.
19     Q.   What DA did you speak with about
20  you being deposed?
21     A.   Detective Warkenthien.
22     Q.   Detective what?
23     A.   Warkenthien.
24     Q.   Is he a DA or is he a detective?
25     A.   Detective.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 301

E. Carter

1     E. Carter
2     Q.   Have you spoken to any DA?
3     A.   Originally?
4     Q.   About you being deposed?
5     A.   No.
6     Q.   So why did this detective care,
7   to your knowledge, that you were being
8   deposed?
9         MR. GOODSTADT: Objection.
10    A.   None that I know of.
11    Q.   Have you been given any deal by
12  the Suffolk County DA to cooperate?
13    A.   Absolutely not.
14    Q.   Have you been promised anything
15  by the Suffolk County DA to cooperate in
16  their case against Ocean Beach involving
17  Gilbert?
18    A.   Absolutely not.
19    Q.   Were any of the Plaintiffs, to
20  your knowledge, given any deals to cooperate
21  with the DA involving the Gilbert case?
22    A.   No.  Absolutely not that I know
23  of.
24    Q.   Were any of the Plaintiffs on
25  duty at the time of the alleged incident

Page 302

1   involving Gilbert?
2     A.   Best of my knowledge, no.
3     Q.   Let's look at -- continue on the
4   preliminary statement, last sentence of that
5   page, "Plaintiffs' repeated and tireless
6   efforts to champion integrity and the
7   highest values of public service have met
8   with abject failure, as the department has
9   inexorably fallen under control of officers
10  and commanders who, while in uniform, drink
11  alcohol and frequent local bars," do you see
12  that?
13    A.   Yes.
14    Q.   What commanders are you referring
15  to?
16    A.   George Hesse.
17    Q.   Any other commander, other than
18  Mr. Hesse?
19    A.   No.
20    Q.   Let's look at paragraph 13, page
21  five, third sentence, "at all times," do you
22  see that, end of the third sentence?
23    A.   Yes.
24    Q.   Okay.  "At all times herein

Page 303

1     E. Carter
2   mentioned -- hereinafter mentioned,
3   Defendant Hesse was and is the official
4   responsible for the management and
5   supervision of the OBPD, including its
6   maintenance and operation, as well as the
7   hiring, promotion and discipline of
8   employees and all other employment-related
9   issues," do you see that?
10    A.   Yes.
11    Q.   Was Mr. Hesse responsible for all
12  of this in 1991?
13    A.   He wasn't there in 1991.
14    Q.   What's that?
15    A.   He wasn't there in 1991.
16    Q.   Mr. Hesse wasn't there in 1991?
17    A.   No, sir.
18    Q.   Was Mr. Hesse responsible for all
19  of this in 1992?
20    A.   I don't believe he was there in
21  1992.
22    Q.   '93?
23    A.   No.
24    Q.   Who was?
25    A.   Ed Paridiso and Chief Joe

Page 304

1     E. Carter
2   Loeffler.
3     Q.   Why do you say Chief Joe
4   Loeffler?
5     A.   Because Chief Joe Loeffler was
6   there in 1991, two and three, and Ed
7   Paridiso was a sergeant in '91, '92, '93.
8     Q.   Joe Loeffler was the chief of
9   police in 1993?  Okay.  I apologize.  How
10  about in 2001?  I apologize.  In 2001, was
11  Mr. Hesse responsible for everything that
12  you've alleged in paragraph 13?
13    A.   Yes.
14    Q.   He was?
15    A.   Himself and the chief, yes.
16    Q.   Well, who was responsible, the
17  Chief Paridiso or George Hesse?
18    A.   It was a joint -- I'm sure it was
19  a joint shareman of that.
20    Q.   How do you know?
21    A.   I'm relating to -- it's my belief
22  within my job, I'm responsible for the
23  discipline of employees -- in my position
24  with the Town of Islip, I could -- I'm
25  responsible for the managerial position and

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570
Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 305

1          E. Carter
2   supervision of the park rangers under me.
3       Q.   Well, that's all well and good,
4   but my question for you is, in 2001, how do
5   you know that George Hesse had any
6   responsibility for the management and
7   supervision of the OBPD?
8          MR. GOODSTADT: Objection.
9       Q.   How do you know that?
10      A.   He would give orders out.
11      Q.   Okay.  To whom?
12      A.   To the officers.  Myself and
13  other officers.
14      Q.   On his shift?
15      A.   Yes.
16      Q.   Okay.  I'm talking about the
17  entire Ocean Beach Police Department.  How
18  do you know that he was responsible for the
19  management and supervision of the entire
20  Ocean Beach Police Department as opposed to
21  just the men on his shift?
22      A.   Well, he would work 4:00 to
23  12:00s, but he'd give me orders on midnights
24  of stuff to do.
25      Q.   Right.  I understand that on his

Page 306

1          E. Carter
2   shift, when you were working for him, he
3   gave you orders, but this allegation doesn't
4   refer to Chief Paridiso, does it?
5       A.   No.
6       Q.   And this allegation doesn't refer
7   to your 12:00 -- your 4:00 to 12:00 shift,
8   does it?
9       A.   What 4:00 -- no.
10      Q.   This doesn't refer to any
11  specific shift, does it?
12      A.   No.
13      Q.   Your allegation says Hesse was
14  and is the official responsible for the
15  management and supervision of the Ocean
16  Beach Police Department, do you see that?
17      A.   No.  I was just trying to find
18  where you were.
19      Q.   How do you know that Hesse was
20  responsible for the management and
21  supervision of the entire Ocean Beach Police
22  Department as opposed to Chief Paridiso?
23          MR. GOODSTADT: Objection.
24      A.   I don't at this time.
25      Q.   Okay.  Great.  You go on to

Page 307

1          E. Carter
2   allege that "Hesse, at all times herein
3   mentioned, was responsible for the hiring,
4   promotion and discipline of employees," do
5   you see that?
6       A.   No, I don't.
7       Q.   Keep going.
8       A.   This line here, "promotion and
9   discipline of employees"?
10      Q.   Yes.  "The hiring, promotion and
11  discipline of employees," do you see that?
12      A.   Yes.
13      Q.   All right.  In 2001, how do you
14  know that Hesse was responsible for the
15  hiring of any Ocean Beach Police Department
16  employee as opposed to Chief Paridiso?
17      A.   In 2001, I don't know if George
18  hired anyone.
19      Q.   How about 2002?
20      A.   George had the two Bosetti
21  brothers hired.
22      Q.   How do you know he was
23  responsible for the hiring?
24      A.   He told us that.
25      Q.   Okay.  And do you know if he had

Page 308

1          E. Carter
2   to get it approved by Chief Paridiso?
3       A.   No, I don't.
4       Q.   Do you know if Chief Paridiso had
5   to get it approved by the mayor?
6       A.   No, I don't.
7       Q.   Okay.  So then my question to you
8   is, how do you know, in 2002, that Defendant
9   Hesse was the official responsible for the
10  hiring of Ocean Beach Police Department
11  employees?
12          MR. GOODSTADT: Objection.  He
13      just testified to it.
14      Q.   As opposed to a particular
15  employee?
16      A.   Those two employees that I know
17  of.  I don't recall who else came on in
18  2002.
19      Q.   Okay.  But you don't know what
20  chain of command Mr. -- if any, that
21  Mr. Hesse had to go through in order to get
22  the Bosetti brothers hired, correct?
23      A.   No.
24      Q.   And you don't know who had to
25  ultimately sign off on their hires, correct?

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 309

E. Carter

1
2   A.   No.
3   Q.   You don't know if the board of
4   trustees had to approve it, do you?
5   A.   No.
6   Q.   And you don't know if the mayor
7   had to approve it, do you?
8   A.   No.
9   Q.   Okay.  Let's look at paragraph
10  19.  Let's look at the last sentence.  You
11  write "Sanchez was and is directly
12  responsible for overseeing personnel actions
13  taken by Ocean Beach and the OBPD and for
14  ensuring that such personnel actions conform
15  to Suffolk County Civil Service regulations
16  and other applicable laws," do you see that?
17  A.   Yes.
18  Q.   Have you ever met Alison Sanchez?
19  A.   No.
20  Q.   Have you ever had a conversation
21  with Alison Sanchez?
22  A.   No.
23  Q.   If Alison Sanchez stood before
24  you right now, would you know what she  --
25  would you know what she looked like?

Page 310

E. Carter

1
2   A.   Possibly, from a picture I've
3   seen.
4   Q.   Okay.  How do you know, sir, that
5   Ms. Sanchez was and is directly responsible
6   for overseeing personnel actions by Ocean
7   Beach and the Ocean Beach Police Department?
8   A.   George Hesse stated she was in
9   charge of the account for the Ocean Beach
10  Police Department, the Village of Ocean
11  Beach.
12  Q.   And that's the basis for your
13  knowledge?
14  A.   He's the one that she was working
15  with to get the uncertified certified.
16  Q.   I'm not asking about the
17  uncertified and certified.  I'm asking about
18  being directly responsible for overseeing
19  personnel actions.
20      MR. GOODSTADT: He just
21  testified that's what his basis is.
22  Q.   Your opinion is based upon what
23  Mr. Hesse told you?
24  A.   Yes.
25  Q.   You have no independent

Page 311

E. Carter

1
2   recollection -- knowledge?
3       MR. GOODSTADT: Objection.
4   Objection.  You're misstating his
5   testimony.  He's testified that what
6   Hesse told him and that she was the one
7   who worked with him.  That's the basis.
8       MR. NOVIKOFF: Worked with
9   Hesse?
10      MR. GOODSTADT: Yes.
11  Q.   But you don't know that she
12  worked with Hesse, other than Hesse telling
13  you, right?
14  A.   That and the correspondence that
15  came back and forth from civil service with
16  her on it.
17  Q.   To whom?
18  A.   To George Hesse and the village.
19  Q.   And you saw that correspondence?
20  A.   Yes.  They were left on the desk.
21  Q.   And do you know who Ms. Sanchez's
22  superior was, if anybody, at this time?
23  A.   My guess would be --
24  Q.   No, not your guess.  Do you know
25  who, if anyone, was Ms. Sanchez's

Page 312

E. Carter

1
2   superior --
3       MR. GOODSTADT: Objection.
4   Q.   -- at any point in time between
5   2001 and the date -- and April 2, 2006?
6       MR. GOODSTADT: Objection.  You
7   can answer however you want to answer.
8   Q.   Do you know who, if anybody, was
9   Ms. Sanchez's superior between 2001 and
10  April 2, 2006?
11  A.   Through our discovery, yes.
12  Q.   Who?
13  A.   Stanley Pelt.
14  Q.   Stanley Pelt?
15  A.   Yes.
16  Q.   So other than through discovery,
17  you did not know?
18  A.   No.
19  Q.   Who is Stanley Pelt?
20  A.   He's the -- if I had the document
21  in front of me, the senior analyst I believe
22  it's called under civil service.  Civil
23  service analyst.
24  Q.   26, you allege "throughout their
25  careers with OBPD, Plaintiffs performed

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 313

E. Carter

1 their duties in an exemplary fashion and
2 were never the subject of a public
3 complaint, investigation or disciplinary
4 action." Is it your testimony, sir, that
5 while you were employed at Ocean Beach, that
6 no member of the public ever wrote a
7 complaint about you?
8 A. Yes.
9 Q. In any capacity?
10 A. Yes.
11 Q. Involving any conduct you were
12 involved in pertaining to either Ocean Beach
13 or the Town of Islip?
14 A. Yes.
15 Q. Okay. Let's look at paragraph
16 36. 36 is alleged "Plaintiffs each advised
17 Hesse on numerous occasions that the
18 department and village were left dangerously
19 short of personnel when Plaintiffs were
20 assigned to chauffeur intoxicated officers
21 and their civilian friends," do you see
22 that?
23 A. Yes.
24 Q. Did you complain to Mr. Hesse on
25

Page 314

E. Carter

1 numerous occasions about what I've just read
2 based upon your allegation in 36?
3 A. Yes.
4 Q. When's the first time that you
5 complained to Mr. Hesse about this?
6 A. When it was --
7 Q. Not -- I'm looking for a date.
8 MR. GOODSTADT: He's telling
9 you when.
10 A. Summer of 2003.
11 Q. Okay. And what did Mr. Hesse say
12 to you, if anything, when you complained to
13 him?
14 A. He ignored it at that time and it
15 continued. We explained to him that --
16 Q. No. I just want to know what his
17 reaction was. He ignored it?
18 A. He basically ignored it.
19 Shrugged it off.
20 Q. Okay. When was the next time
21 that you complained to -- you personally
22 complained to Mr. Hesse concerning what I
23 just read from paragraph 36?
24 A. The later part of that summer.
25

Page 315

E. Carter

1 Q. Okay. And what did Mr. Hesse do,
2 if anything?
3 A. He spoke to the individuals that
4 were going out to the bars drinking, and
5 told them to wait until 5:00 in the morning.
6 Q. Okay. But who assigned the
7 officers to chauffeur these other officers
8 around?
9 A. That was not with me, but George
10 told us for a while to take the officers to
11 the checkpoint from the village leaving one
12 guy in. The midnights had two officers on.
13 Q. When you say that wasn't you,
14 what do you mean?
15 A. This part of the complaint is
16 each of the Plaintiffs in the lawsuit
17 were --
18 Q. No. I'm saying, who assigned --
19 did you ever have to chauffeur anybody?
20 A. Yes.
21 Q. Who assigned you to chauffeur
22 people?
23 A. George Hesse.
24 Q. Okay. And you first complained
25

Page 316

E. Carter

1 to George Hesse in the summer of 2003,
2 right?
3 A. Yes.
4 Q. And your next complaint was when,
5 to George Hesse about this chauffeuring?
6 A. The latter part of 2003.
7 Q. And what did Mr. Hesse say to you
8 in response to your complaint, if anything?
9 A. He just basically said, "I'll
10 take care of it."
11 Q. And did he?
12 A. I noticed I wasn't leaving the
13 village as much when I came in on the
14 weekends, yes.
15 Q. When you say you weren't leaving
16 the village as much, what do you mean?
17 A. To chauffeur people back and
18 forth to the checkpoint.
19 Q. When you say "people," you mean
20 officers?
21 A. Officers, friends of George
22 Hesse.
23 Q. Okay. Did you continue to
24 chauffeur officers or friends of George
25

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 317

1            E. Carter
2  Hesse after your second complaint to
3  Mr. Hesse in 2003?
4      A.   2003, no.  It went into the
5  winter months.
6      Q.   What's that?
7      A.   It went into the off season, no.
8      Q.   What went into the off season?
9      A.   In other words, this was during
10 the summer months it was the most.  Going
11 into the winter months I worked by myself.
12     Q.   Well, no.  My question to you,
13 sir, is you complained to Mr. Hesse for a
14 second time in the summer of 2003 about
15 having to chauffeur friends of his or other
16 officers to the checkpoints.  After the
17 second complaint when Mr. Hesse said he
18 would take care of it, did you, in 2003,
19 chauffeur anybody else?
20     A.   Not that I recall.
21     Q.   Okay.  How about 2004, did you
22 chauffeur anybody at Mr. Hesse's request in
23 2004?
24     A.   Yes.
25     Q.   On how many occasions?

Page 318

1            E. Carter
2      A.   Exactly I couldn't give you a
3  number.  I'd say approximately six to eight
4  times.
5      Q.   Friends of George Hesse?
6      A.   Sometimes it was friends of
7  George Hesse.  Sometimes it was the
8  officers.
9      Q.   Okay.  And was this always at the
10 request -- at the direction of Mr. Hesse?
11     A.   Yes.
12     Q.   How many times in 2004 -- well,
13 did you complain to Mr. Hesse in 2004?
14     A.   About the taking the officers
15 after they were drinking, yes.
16     Q.   Or the friends?
17     A.   The friends, not as much.
18     Q.   Why not?
19     A.   Because he would call me and tell
20 me to wait at the checkpoint for 20 minutes,
21 30 minutes.  Somebody was coming in, a
22 friend of his, company or whatever, and I
23 would wait, and then I would pick the person
24 up and drive them into the village.
25     Q.   Okay.  But my question is, why --

Page 319

1            E. Carter
2  why did you complain to Hesse about the
3  officers, but not as much as about the
4  friends?
5      A.   Because the officers directly
6  affected me and my partner, where driving
7  the friends didn't directly affect me.
8  George waited in the village until I got
9  there.
10     Q.   George didn't wait in the village
11 when he directed you to chauffeur the
12 officers?
13     A.   No.
14     Q.   Where was George?
15     A.   He might have been upstairs
16 sleeping or he might have been home.
17     Q.   How did he direct you?  By phone?
18     A.   Prior to getting off.  I'd come
19 in at midnight.
20     Q.   Prior to you getting off or prior
21 to Hesse getting off?
22     A.   Both of us meeting at roughly
23 12:00.  Somewhere in that time.  11:30.
24     Q.   No, but I'm wondering, when
25 Hesse, in 2004, directed you to chauffeur

Page 320

1            E. Carter
2  police officers to the checkpoint, was he on
3  duty at the time?
4      A.   Yes.
5      Q.   And so what makes you say that he
6  wasn't still on duty when you were
7  chauffeuring these officers?
8      A.   The -- because he would go off
9  duty.  In other words, I'd see him while he
10 was still on duty.
11     Q.   Okay.
12     A.   And then I'd be off.  You know,
13 he'd go off duty and I'd be on for the eight
14 hours.
15     Q.   Okay.  I understand now.  So did
16 you complain to George Hesse in 2004 about
17 him directing you to chauffeur either his
18 friends or the police officers?
19     A.   Yes.
20          MR. GOODSTADT: Objection.
21     Q.   Okay.  And what did -- when was
22 the first time you complained in 2004?
23     A.   Would have been June of 2004.
24     Q.   And what did you say to him?
25     A.   "George, you know, this is

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 321

E. Carter

1  bullshit," straight out.  "It's bullshit
2  that I got to take these guys out and leave
3  either John or Kevin, Tom, whoever by
4  themselves in the village."
5      Q.   And what did Hesse say to you, if
6  anything, after your first complaint in
7  2004?
8      A.   "Just do it."
9      Q.   Okay.  And did there come a
10 second time that you complained to Hesse in
11 2004 about chauffeuring either his friends
12 or these officers?
13     A.   Yes.
14     Q.   When?
15     A.   I'd say July or August.  July.
16     Q.   What did you say to him?
17     A.   That, "Again, you're leaving the
18 village short.  You can't do this."
19     Q.   And what did he say to you?
20     A.   He shrugged it off, then walked
21 out.
22     Q.   Did you complain to him a third
23 time in 2004?
24     A.   There was, again, the complaints

Page 322

E. Carter

1  were there, they weren't being answered, so
2  at that point, you know, you wind up talking
3  to dead ears.
4      Q.   No.  I understand that.  So my
5  question is, did you complain to Mr. Hesse a
6  third time in 2004?
7      A.   I would say yes.  Right around
8  Labor Day.
9      Q.   And what did you say to Hesse?
10     A.   I said, "George, you know, again,
11 the other night we have to go -- you know,
12 we had to go gas the vehicle and stuff."  I
13 said, "I'm driving these guys out, coming
14 back to the village, then driving out of the
15 village again to go gas the vehicle.  I'm
16 leaving the village, two, two and a half
17 hours empty."
18     Q.   And what did Hesse say to you
19 this third time?
20     A.   That's when we started gassing
21 the vehicle in the morning.
22     Q.   But what did Hesse say to you in
23 response to your complaint on the third --
24 the third time in 2004?

Page 323

E. Carter

1      A.   Nothing.
2      Q.   Okay.  Did you complain a fourth
3  time in 2004?
4      A.   That I recall at this time, no.
5      Q.   How about 2005, did you complain
6  to Hesse about -- well, did Hesse ever
7  direct you, in 2005, to chauffeur either his
8  friends or -- or police officers who were
9  intoxicated?
10     A.   If there were two trucks, no.  If
11 there was the one truck, yes.
12     Q.   I'm just asking you if you recall
13 him ever directing you, regardless of how
14 many trucks there may have been?
15     A.   No.  It was just standing, drive
16 the guys out.  When they're done, just drive
17 them out.  Get them out of the village so
18 they can go home.
19     Q.   So he did direct you to chauffeur
20 these guys to the checkpoint?
21     A.   In 2004, yes.
22     Q.   How about 2005?
23     A.   Yes.
24     Q.   Did you complain to Hesse in 2005

Page 324

E. Carter

1  about doing this?
2      A.   Yes.  I'd say yes.
3      Q.   Even though your complaints in
4  2003 and 2004 were ignored?
5      A.   Yeah.  Because it wasn't as --
6  it got -- it got worse but it wasn't because
7  there were two vehicles.  So there was, you
8  know, the vehicles were in the village, so
9  they would take the keys, the guys that were
10 driving out.
11     Q.   I don't understand.  What's the
12 difference having two vehicles if you were
13 still leaving the village short, in your
14 opinion?
15     A.   I wouldn't have to leave the  --
16 when there were two vehicles, I wouldn't
17 have to leave the village short.  They would
18 just take the other vehicle.
19     Q.   Oh, the other officers?
20     A.   Yes, the other officers.
21     Q.   So my question, sir, is in 2005,
22 did Hesse direct you to chauffeur any police
23 officers to the checkpoints or his friends?
24     A.   Yes.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 325

E. Carter

1  
2    Q.    And did you complain to Hesse in
3  2005?
4    A.    Actually, me and George got into
5  a pretty big blow up that year.
6    Q.    Well, that's nice, but did you
7  complain to Mr. Hesse about --
8    A.    Yes.
9    Q.    -- this specific direction?
10    A.    Yes.
11    Q.    When?  When was the first time?
12    A.    It was I believe, as I recall, it
13  was July 4th weekend.  The truck got stuck
14  in the sand.  I was the senior officer in
15  the vehicle with the midnight guys coming
16  on.  There were approximately --
17  approximately six of us in the vehicle and
18  two females.  Arnie Hardman was driving.
19  Buried the truck in the sand.  Rich and Gary
20  Bosetti took the second truck to come pull
21  us out of the sand.  While doing so, they
22  buried that truck.  There's only George in
23  the village and I believe it was Ken
24  Bockelman.  George is on the radio
25  screaming.  Suffolk County Marine Bureau is

Page 326

E. Carter

1  
2  coming to pick us up.  I had to go on a call
3  with Suffolk County Marine Bureau to Kismet
4  for a fight because they had no back up,
5  they were pulling our vehicles out.
6        Once our vehicles got out, Arnie
7  Hardman then drove it into the mud over in
8  what's -- trying to think, just west of
9  Corneille.  I'm going to say Lonelyville
10  it's called there.  Lonelyville.  I'm not
11  100 percent sure.
12    Q.    Are you done or are you --
13  because my question was when and you said
14  July 4 --
15    A.    Yeah.  Okay.  Sorry.
16  MO        MR. NOVIKOFF: So motion to
17    strike as nonresponsive.
18    Q.    When was the first time in 2005
19  that you complained to George Hesse about
20  his direction to you to chauffeur either his
21  friends or police officers?
22    A.    July 2005.
23    Q.    Okay.  And what was Mr. -- what
24  did you say to George Hesse when you
25  complained to him?

Page 327

E. Carter

1  
2    A.    He was pretty  -- he said -- I
3  told him, I said, "George, you know, it
4  wasn't my" -- he goes, "Eddie, it is your
5  fault.  You're the senior officer.  You knew
6  better."  I said, "George, I wasn't driving
7  the truck."  He goes, "It's a weekend."  I
8  said, "George, this is what happens when we
9  drive the guys in and out, leaving one
10  person in here."  And he just got pissed off
11  and sent me to the back streets for the
12  night.  He banished me.
13    Q.    Okay.  And was there a second
14  time that you complained to George Hesse
15  about his directions to either chauffeur
16  officers or his friends to checkpoints?
17    A.    There was one other time myself
18  and -- yeah, Richard Bos -- Gary Bosetti, I
19  had to drive him and Rich out, and they were
20  very belligerent about it.  So I drove them
21  out.  I said something to George when I saw
22  him next, and he says, "Just do it.  Just do
23  it."
24    Q.    All right.  Was that the last
25  time in 2005 that you recall complaining to

Page 328

E. Carter

1  
2  Hesse about his directions for you to
3  chauffeur either officers or friends?
4    A.    Yes.
5    Q.    Okay.  In 2000 -- how about 2006?
6    A.    I had only worked approximately
7  three days, two days.
8    Q.    And when was that Bosetti
9  incident that you just -- the second
10  complaint that you made in 2005?
11    A.    That was approximately August of
12  2005.
13    Q.    Okay.  In 2003, did you ever
14  complain to Chief Paridiso about Hesse's
15  direction?
16    A.    No.
17    Q.    How about to Mayor Rogers?
18    A.    No.
19    Q.    How about to Trustee Loeffler?
20    A.    No.
21    Q.    How about to any other trustee?
22    A.    No.
23    Q.    Did you send any communication to
24  Newsday or News 12 or any other media outlet
25  concerning this complaint about you leaving

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 329

E. Carter

2 the village short of personnel because of
3 this direction to chauffeur people?
4    A.   No.
5    Q.   Same questions with regard to
6 2004, would your answers change?
7    A.   No.
8    Q.   Same questions with regard to
9 2005, would your answers change?
10   A.   No.
11   Q.   So if I understand your testimony
12 correctly, that for 2003, 2004, 2005, other
13 than to George Hesse, you made no other
14 complaints to any other person or entity
15 concerning Hesse's direction to you to
16 chauffeur police officers or friends to
17 checkpoints?
18       MR. GOODSTADT: Objection.
19   That's not what he testified to.
20   Q.   Is that correct, sir?
21   A.   No.
22   Q.   Well, I'll break it down, then.
23 You testified about 2003.  Let's go to 2004.
24 Did you complain to Chief Paridiso about
25 this direction to chauffeur people?

Page 330

E. Carter

2    A.   No.
3    Q.   Did you complain to Trustee
4 Loeffler?
5    A.   No.
6    Q.   Did you complain to Mayor Rogers?
7    A.   No.
8    Q.   Did you complain to any trustee
9 members?
10   A.   No.
11   Q.   Did you raise a complaint with
12 News 12?
13   A.   No.
14   Q.   Newsday?
15   A.   No.
16   Q.   Local village paper?
17   A.   No.
18   Q.   Any other media outlet?
19   A.   No.
20   Q.   Okay.  2005, did you complain to
21 Chief Paridiso about chauffeuring and
22 leaving the village short?
23   A.   No.
24   Q.   Did you complain to Mayor --
25 Mayor Rogers?

Page 331

E. Carter

2    A.   No.
3    Q.   Did you complain to Chief
4 Loeffler -- I'm sorry, Trustee Loeffler?
5    A.   No.
6    Q.   Did you complain to any other
7 trustee?
8    A.   No.
9    Q.   Did you raise a complaint to News
10 12?
11   A.   No.
12   Q.   Newsday?
13   A.   No.
14   Q.   Any local newspaper?
15   A.   No.
16   Q.   Any other media outlet?
17   A.   No.
18   Q.   41, how many times did Mr. Hesse
19 instruct you to remove empty beer cans and
20 other refuse that uncertified officers
21 abandoned in their vehicles and left strewn
22 about the police station after a night on
23 duty?
24   A.   Every time it happened.
25   Q.   How many times did it happen in

Page 332

E. Carter

2 2003?
3    A.   I can't give you an exact number.
4 It was approximately every other weekend or
5 every weekend that I'd come into the station
6 and be throwing the stuff out, and I, you
7 know, told him, "George, you know, this is
8 bullshit.  I'm cleaning up beers and stuff
9 in the police station."
10   Q.   How about 2004, how many times?
11   A.   Same.  It got -- 2004 -- 2005 was
12 the worst.  2004 was --
13   Q.   Did you complain in 2003 to
14 Hesse?
15   A.   About cleaning up, yes.
16   Q.   Did you complain in 2004 to
17 Hesse?
18   A.   Yes.
19   Q.   2005?
20   A.   Yes.  That's when it was really
21 bad.
22   Q.   In 2005, did you complain to
23 Chief Paridiso?
24   A.   No.
25   Q.   Trustee Loeffler?

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 87 of 130 PageID #: 1681

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 333

E. Carter

1    A.    No.
2    Q.    Mayor Rogers?
3    A.    No.
4    Q.    Any other trustee?
5    A.    No.
6    Q.    Newsday?
7    A.    No.
8    Q.    News 12?
9    A.    No.
10   Q.    Any other local paper?
11   A.    No.
12   Q.    Any other media outlet?
13   A.    No.
14   Q.    2004, did you complain to Chief
15 Paridiso?
16   A.    No.
17   Q.    Trustee Loeffler?
18   A.    No.
19   Q.    Mayor Rogers?
20   A.    No.
21   Q.    Newsday?
22   A.    No.
23   Q.    Any other trustee?
24   A.    No.

Page 335

E. Carter

1    Q.    Newsday?
2    A.    No.
3    Q.    Local newspaper?
4    A.    No.
5    Q.    Any other media outlet?
6    A.    No.
7    Q.    Okay.
8         MR. NOVIKOFF: Changing the
9 tape.
10        THE VIDEOGRAPHER: This ends
11 tape number five.  The time is 4:19
12 p.m.  Going off the record.
13        (A break was taken.)
14        THE VIDEOGRAPHER: This begins
15 tape number six.  The time is 4:30 p.m.
16 Back on the record.
17   Q.    Okay.  Sir, let's go to paragraph
18 51 of your complaint.  Can you just read it
19 and tell me when you're done?
20   A.    (Reviewing).  I'm done.
21   Q.    Did Hesse ever instruct you not
22 to issue summonses to certain bars?
23   A.    Yes.
24   Q.    And to his clique of uncertified

Page 334

E. Carter

1    Q.    News 12?
2    A.    No.
3    Q.    Any other local newspaper?
4    A.    No.
5    Q.    Any media outlet?
6    A.    No.
7    Q.    Anybody, other than Chief Hesse,
8 did you complain to in 2004?
9    A.    He wasn't the chief then, so yes.
10 No.
11   Q.    Other than Mr. Hesse, did you
12 complain to anybody?
13   A.    No.
14   Q.    Same question for 2003, did you
15 complain to Chief Paridiso?
16   A.    No.
17   Q.    Trustee Loeffler?
18   A.    No.
19   Q.    Mayor Rogers?
20   A.    No.
21   Q.    Any other trustee?
22   A.    No.
23   Q.    News 12?
24   A.    No.

Page 336

E. Carter

1 officers?  I'm sorry --
2         MR. GOODSTADT: Objection.
3    Q.    Yes, to -- so Mr. Hesse
4 instructed you not to issue summonses to
5 certain bars?
6    A.    Yes.
7    Q.    What bars?
8    A.    The bartenders at CJ's Bar.
9    Q.    Any other bar?
10   A.    It was a bar owner from
11 Maguire's.
12   Q.    Okay.  Other than CJ's and
13 Maguire's, did Hesse instruct you not to
14 issue summonses to any other bars?
15   A.    No.
16   Q.    When did he first instruct you
17 not to issue summonses to these bars?
18   A.    Mine was an incident which
19 happened at CJ's with an underaged drinker
20 in 2005.  Yeah, fall of 2005.  Barry had
21 served a drink to a minor.
22   Q.    And how do you know it was a
23 minor?
24   A.    Just looking at him, and then I

E. Carter

1         E. Carter
2 ID'd him in the police station.
3    Q.   Oh, you did ID him?
4    A.   Yes.
5    Q.   Okay.  And was the only time
6 Hesse instructed you personally not to issue
7 a summons to certain bars?
8    A.   Well, the second instance was
9 Jimmy Bets, the owner of Maguire's, was
10 driving down Bay Walk on his bicycle after
11 hours, no light.  I went to get him to write
12 him a summons for that, and Andy Bets went
13 inside.  Got George Hesse.  George came out.
14 Yelled at me.  Said, "You don't -- you don't
15 write tickets to Jimmy."  Gave Jimmy back
16 his license.  Sent him on his way.
17    Q.   When did that take place?
18    A.   That was the summer of 2005.
19    Q.   So we have one incident involving
20 CJ's in the fall of 2005 and one incident
21 involving Maguire's in the summer of 2005?
22    A.   With myself, yes.
23    Q.   Both with yourself?
24    A.   Yes.
25    Q.   Okay.  And any other incidences

E. Carter

1         E. Carter
2 where he instructed you not to issue a
3 summons to a bar or someone who owned a bar
4 or to a bartender?
5    A.   No.
6    Q.   Didn't -- how about in 2004?
7    A.   Not that I recall.  No.
8    Q.   How about in 2003?
9    A.   No.
10    Q.   Okay.  In the first instance in
11 the summer of 2005, when in the summer of
12 2005?
13    A.   It was approximately July of
14 2005.
15    Q.   Okay.  And did you complain to
16 Hesse when he made this direct  -- gave you
17 this direction?
18    A.   Yes.
19    Q.   What did you say to him?
20    A.   I said, "George, you know, what
21 do you want me to do?"  And with that he
22 just -- "just get out of here.  Get out.
23 Get the back streets."  That was his thing.
24 He threw me on the back streets for the rest
25 of the night.

E. Carter

1         E. Carter
2    Q.   The second time in the fall of
3 2005, did you complain to Hesse?
4    A.   Yes.
5    Q.   What did you say to him?
6    A.   Well, he was there when I said
7 I'm going to go write Barry a summons over
8 at CJ's.  He says, "No, you're not."  I just
9 looked at him.  He goes, "They take care of
10 us over there.  They give us, you know, food
11 and drinks.  You're not writing him a
12 summons."  I said, "George, you know, what
13 are we going to do?"
14    I got the minor.  We wound up
15 calling his parents.  I had to drive the kid
16 out to the checkpoint.  Turn him over to his
17 parents.  George said he went to school with
18 the mother of the child.  And I just looked
19 at him.
20    Q.   Other than him telling you not to
21 issue a summons -- well, withdrawn.  What
22 did you -- how did you complain to George,
23 other than saying "George, what are we to
24 do"?
25    A.   Well, when he told me not to

E. Carter

1         E. Carter
2 write the summons, I just looked at him
3 like, "What do you want me to do with this?"
4    Q.   With regard to the two instances
5 in 2005 that you just testified to, did you
6 notify Chief Paridiso?
7    A.   No.
8    Q.   Did you complain to Chief
9 Paridiso?
10    A.   No.  The second one in the fall,
11 he was --
12    Q.   My question to you is did you --
13    A.   No.
14    Q.   -- complain to Chief Paridiso?
15    A.   No.
16    Q.   Complain to Trustee Loeffler?
17    A.   No.
18    Q.   Complain to Mayor Rogers?
19    A.   No.
20    Q.   Complain to any trustee?
21    A.   No.
22    Q.   Did you advise Newsday?
23    A.   No.
24    Q.   News 12?
25    A.   No.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 341

E. Carter

1  Q.   Any local newspaper?
2  A.   No.
3  Q.   Any other media outlet?
4  A.   No.
5  Q.   On 51, you then end it by saying
6  "Plaintiffs frequently complained to Hesse
7  about his unlawful directives he selectively
8  enforced the law by disregarding crimes and
9  other violations of law committed to Hesse's
10 friends." Other than these two 2005
11 incidents, were you personally involved with
12 any other directive by Hesse to disregard
13 crimes and other violations of law committed
14 by Hesse's friends?
15 A.   There was an apartment at Ocean
16 Breeze and Bay Walk which whenever there was
17 an incident with underage -- because there
18 was underage youths up on the second floor,
19 George had to be notified, and I went there
20 with him one time.
21 Q.   Okay. So on one occasion, you
22 went to this apartment with George Hesse
23 where you believe that there was underage
24 drinking going on?

Page 342

E. Carter

1  A.   I know for a fact there was.
2  Q.   How do you know for a fact?
3  A.   Because when we got there, George
4  knocked on the door. They opened the door.
5  The youths had beer, Budweiser -- well,
6  bottles labeled Budweiser beer in their
7  hands and beer cups and other liquor laying
8  around.
9  Q.   And did you card these kids,
10 these individuals?
11 A.   No.
12 Q.   Did you do anything to verify
13 their age?
14 A.   I was aware of a couple of the
15 individuals who they were.
16 Q.   Who were these individuals?
17 A.   One was Paul Conway.
18 Q.   And who were the other
19 individuals that you knew?
20 A.   The other ones were his friends
21 which I personally never carded, but I was
22 told they were underage.
23 Q.   Who told you?
24 A.   The other officers.

Page 343

E. Carter

1  Q.   Oh, so there were other officers
2  there with you?
3  A.   At that time there was, and also,
4  from different instances of interacting with
5  these youths.
6  Q.   But you weren't there on the
7  other instances, you were only there with
8  Hesse on this one occasion?
9  A.   Yes.
10 Q.   And when was this occasion?
11 What's the month, date and year? Month and
12 year?
13 A.   The month would have been July of
14 '05.
15 Q.   Okay. And did you complain to
16 Hesse -- well, what did Hesse do when you
17 showed up with him?
18 A.   He got everybody out of the
19 apartment and sent them on their way.
20 Q.   Okay. And were there any other
21 officers with you at this time with Hesse?
22 A.   There were two which I don't
23 recall at this time.
24 Q.   Okay. And did you complain to

Page 344

E. Carter

1  Hesse about this?
2  A.   No.
3  Q.   Did you advise Paridiso of what
4  Hesse did?
5  A.   No.
6  Q.   Did you advise Loeffler?
7  A.   No.
8  Q.   Rogers?
9  A.   No.
10 Q.   Any other trustee?
11 A.   No.
12 Q.   Newsday?
13 A.   No.
14 Q.   News 12?
15 A.   No.
16 Q.   Any other media outlet?
17 A.   No.
18 Q.   Okay. So we have two
19 incidents -- two incidences in 2005
20 involving a bar owner or a bartender and
21 this incident involving minors in an
22 apartment. Any other incident that you were
23 personally involved in with Hesse where he
24 disregarded crimes and other violations of

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 345

E. Carter

1          E. Carter
2   law committed by his friends?
3      A.   No.
4      Q.   Okay.  So paragraph 54, next
5   page.  Please read 54 and advise me when
6   you're done.
7      A.   (Reviewing).  I'm finished.
8      Q.   What involvement, if any, did you
9   have in any allegation that's set forth in
10  paragraph 54?
11     A.   The apartment I was just talking
12  about is this one.
13     Q.   Okay.
14     A.   I did see the Bosettis up on the
15  balcony on another occasion with open
16  alcohol.
17     Q.   With the group -- with a group of
18  minors?
19     A.   The same minors that were there
20  the first time.
21     Q.   And did you complain to George
22  Hesse about the Bosettis being on this
23  balcony?
24     A.   No.
25     Q.   Did you complain to Paridiso?

Page 346

1          E. Carter
2      A.   No.
3      Q.   Anybody?
4      A.   No.
5      Q.   Why not?  Well, withdrawn.  Why
6   didn't you complain to Hesse about this?
7      A.   First off, I don't think Hesse
8   was on.
9      Q.   What's that?
10     A.   I don't think Hesse was working
11  at that time.
12     Q.   Who would have been in charge if
13  Hesse wasn't working?
14     A.   There was no supervisor when
15  Hesse was off or Paridiso.
16     Q.   Okay.  Why didn't you advise
17  Hesse the next time you saw him?
18     A.   I just didn't because I saw the
19  previous complaints and stuff of the
20  drinking and these guys -- these two
21  officers, Rich and Gary, were the same ones
22  with the drinking in the vehicles and stuff
23  going nowhere.  So the more  -- you know,
24  the squeaky wheel gets the attention, and
25  the attention would be I'd probably be put

Page 347

1          E. Carter
2   out the door.
3      Q.   You'd probably be put out the
4   door?
5      A.   Probably be fired is my feeling.
6      Q.   You complained in 2003 about
7   various things, correct?
8      A.   Yes.
9      Q.   You were a squeaky wheel in 2003,
10  right?
11     A.   Yes.  Because directly affecting
12  me.
13     Q.   Okay.  You weren't fired then,
14  were you?
15     A.   No.
16     Q.   You were a squeaky wheel in 2004
17  and you weren't fired then, right?
18     A.   Correct.
19     Q.   Okay.  Go to 57.  Did Hesse ever
20  ridicule you when you made a complaint to
21  him?
22     A.   I was called a rat.
23     Q.   By Hesse?
24     A.   By other officers I --
25     Q.   My question to you, sir, is did

Page 348

1          E. Carter
2   Hesse ever ridicule you?
3      A.   Yes.
4      Q.   Okay.  When did he ridicule you
5   for the first time after you made a
6   complaint?
7      A.   It was -- the one time was with
8   Jimmy Bets in 2005.
9      Q.   That was the bicycle incident?
10     A.   Yes.
11     Q.   Or the minor?
12     A.   That was the bicycle incident.
13     Q.   Okay.  How did he ridicule you?
14     A.   He sent me to the back street,
15  taking me off patrol on the Bay Walk and
16  letting everybody know what happened.
17     Q.   Well, let's -- you think putting
18  you on the back street is ridiculing you?
19     A.   It was punishment for stopping
20  Jimmy Bets.
21     Q.   Okay.  Now when you said he put
22  you on the back street, what does that mean?
23     A.   To patrol midway, there was an
24  area which basically he used partly for a
25  punishment.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 349

E. Carter

1
2    Q.    Other officers get put on the
3 back streets, to your knowledge?
4    A.    There were a couple.
5    Q.    Who?
6    A.    Frank Fiorillo.  Joe Nofi.
7    Q.    Anybody else, to your knowledge?
8    A.    No.
9    Q.    How many times did he put you on
10 the back street?
11    A.    Two that I recall at this time.
12    Q.    In -- since 2001?
13    A.    Yes.
14    Q.    Were the back streets supposed to
15 be patrolled?
16    A.    Yes.
17    Q.    Was that an assignment that was
18 given out to all of the officers at some
19 point in time, other than for punishment?
20    A.    No.
21    Q.    Then who patrolled the back
22 streets?
23    A.    We would do it -- coming off Bay
24 Walk, we would do it.  But he specifically
25 just sent me back there.

Page 350

E. Carter

1
2    Q.    No.  I understand.  You're
3 claiming in this instance -- actually, in
4 two instances that he punished you?
5    A.    Yes.
6    Q.    By putting you on the back
7 street.  I get that.  I guess my question --
8 my question to you is -- I think you
9 answered it -- was the back streets were
10 part of the normal duties and
11 responsibilities of the police officers
12 during at least your shifts, correct?
13    A.    During the regular patrol, yes.
14    Q.    Right.  And it was the
15 responsibility of some officer on a normal
16 basis to patrol the back streets, right?
17    A.    Yes.
18    Q.    All right.
19    A.    He was limiting you to just the
20 back streets.
21    Q.    I understand that.  But just so
22 I'm not confused, patrolling the back
23 streets was something that was -- was
24 something that was needed to be done as part
25 of the overall responsibilities of the

Page 351

E. Carter

1
2 police department during a particular shift,
3 correct?
4    A.    Yes.
5    Q.    All right.  Did anyone ever go
6 get beaten up on the back streets, to your
7 knowledge?
8    A.    Assaults.  You mean civilians?
9    Q.    Yes.
10    A.    Yes.
11    Q.    How many times since 2001?
12    A.    I couldn't even give you numbers.
13    Q.    Any officer ever get assaulted on
14 the back streets, to your knowledge, while
15 you were on duty?
16    A.    No.
17    Q.    What were the back streets?
18 Without looking at a map of Ocean Beach,
19 describe for me what the back streets are.
20    A.    From midway south.
21    Q.    How many blocks are we talking
22 about?
23    A.    It's approximately eight blocks
24 and nine blocks.
25    Q.    And were there lights on the back

Page 352

E. Carter

1
2 streets?
3    A.    No.
4    Q.    Did you have a flashlight?
5    A.    Yeah.
6    Q.    Okay.  Any other instance that
7 you recall Hesse ridiculing you for making a
8 complaint?
9    A.    Just what you heard secondhand,
10 not firsthand.
11    Q.    Ridicule -- okay.  So what did --
12 what did you hear that Hesse said about you
13 that you believe was ridicule after you made
14 a complaint?
15    A.    "Carter's bitching he's got to
16 clean the station."  You know, "too bad."
17 "He's bitching.  He's got to clean up after
18 you guys."
19    Q.    Okay.  Anything else?
20    A.    Not that I recall at this time.
21    Q.    Did Hesse ever undermine your
22 authority in front of a civilian?
23    A.    Yes.
24    Q.    When was the first time he did
25 this?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 353

E. Carter

1
2     A.    Jimmy Bets.
3     Q.    Okay.  So that was -- that was
4  2005?
5     A.    Yes.
6     Q.    And how did he undermine your
7  authority?
8     A.    He made me give him back his
9  license and had him ride off with the
10  bicycle.
11     Q.    Was that the first time Hesse
12  ever undermined your authority in front of a
13  civilian?
14     A.    That I recall, yes.
15     Q.    Okay.  58, 59 and 60, do you have
16  any personal knowledge of any of these
17  allegations?
18     A.    60.  Um, 60.
19     Q.    What -- what about 60 do you have
20  personal knowledge of?
21     A.    I helped Frank Fiorillo and a
22  dock master bring a file cabinet upstairs
23  from the north cellar of the police station.
24     Q.    From the what?
25     A.    North cellar of the police

Page 354

E. Carter

1
2  station, and secure it in the small bedroom
3  to the left.
4     Q.    Was this before or after
5  Mr. Bosetti alleged threw the file cabinet
6  into the Great South Bay?
7     A.    Prior.
8     Q.    Okay.  Did you ever see -- did
9  you witness Bosetti throw the file cabinet
10  into the Great South Bay?
11     A.    No.
12     Q.    So your only knowledge about
13  what's alleged in paragraph 60 is the fact
14  that you helped bring the file cabinet up
15  from the basement?
16     A.    Well, from the police station.
17     Q.    From the police station.
18     A.    Prior to the incident which had
19  the police tapes in it.
20     Q.    Okay.  How about 61 and 62, do
21  you have any personal knowledge of anything
22  that's been alleged in 61 and 62?
23     A.    61?
24     Q.    Um-hum.
25     A.    I was there 61.

Page 355

E. Carter

1
2     Q.    You were where in 61?
3     A.    I saw Frank stand at the corner
4  of Denhoff and Bay Walk and he told me he
5  was ordered to be there.
6     Q.    Okay.  So you were told by
7  Mr. Fiorillo what Mr. Hesse allegedly said
8  to him?
9     A.    Hesse stated to me prior to that
10  that he was -- he was actually pissed off at
11  Frank because he told him to wash the cars,
12  the truck, and Frank told him no, he had
13  done it the night before and there's other
14  guys in the police department that -- again,
15  this is coming from Hesse -- that he didn't
16  think it was fair for him to keep having to
17  do it.
18     Q.    Did you complain to Hesse -- did
19  you complain to Paridiso about anything in
20  61 and 62?
21     A.    Nothing -- had nothing really to
22  do with me.  No.
23     Q.    So -- and it would be fair to say
24  you didn't complain to anybody else about
25  what took place in 61 and 62, correct?

Page 356

E. Carter

1
2     A.    Correct.
3     Q.    Okay.  Now you were not in the
4  bar during the alleged Halloween incident,
5  correct?
6     A.    Correct.
7     Q.    And you were not part of any
8  investigation into the Halloween incident,
9  correct?
10     A.    Except what was put on the blog,
11  correct.  That I did official misconduct.
12  Falsified paperwork.
13     Q.    Putting aside what someone may
14  have said on the blog, you were not involved
15  in any of investigative aspect of the
16  Halloween incident, were you?
17     A.    No.  I just had firsthand
18  knowledge what George told me.
19     Q.    Other than what George told you,
20  George didn't ask you to investigate the
21  incident, did he?
22     A.    No.
23     Q.    Paridiso didn't ask you to
24  investigate?
25     A.    No.

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 357

E. Carter

1
2  Q.  No one asked you to investigate?
3  A.  No.
4  Q.  And you didn't witness it?
5  A.  No.
6  Q.  So any information you would have
7  about the Halloween incident would not come
8  from your own personal -- your own personal
9  involvement, correct?
10  A.  Except --
11  Q.  Other than -- except other than
12  what Hesse would have told you?
13  A.  Correct.
14  Q.  Okay. Let's go to paragraph 71.
15  A.  (Reviewing).
16  Q.  Well, actually, 75. I'm sorry.
17  A.  I'm sorry, 75?
18  Q.  Yes.
19  A.  (Reviewing).
20  Q.  When did Hesse advise you that he
21  thought Snyder's report was a piece of shit?
22      MR. GOODSTADT: Just make sure
23  you read it before you answer it,
24  please.
25  Q.  Just read it for one second and

Page 358

E. Carter

1
2  then tell me. Are you done?
3  A.  Yes, sir. After the incident
4  occurred, I was relieving Hesse on Sunday
5  and Mondays. The exact date I can't tell
6  you. But he held a piece of paper similar
7  to this and said, "Carter, see this? See
8  this piece of shit? This is a piece of
9  shit." He goes -- I looked at him. He
10  says, "They're fucking cops." I said, "What
11  are you talking about?" He goes, "They're
12  fucking cops. My stomach's got knots in it.
13  They're fucking cops. They should have took
14  care of them and they're fucking cops." I
15  was like, "George what are you talking
16  about?" And it was a couple -- Tom Snyder's
17  statement that George asked him to write.
18  It was basically a 2042, that internal
19  correspondence.
20  Q.  About the Halloween incident?
21  A.  Yes.
22  Q.  Did you ever look at Snyder's
23  statement prior to Hesse waving it in your
24  face and making the statement that he did?
25  A.  No.

Page 359

E. Carter

1
2  Q.  Did you ever look at Snyder's
3  statement after Hesse waved it in your face
4  and said what he said?
5  A.  I might have seen it in
6  discovery, but that would have been it.
7  Q.  Right. When I say -- I mean
8  before April 2, 2006?
9  A.  No.
10  Q.  Did you inquire with Hesse as to
11  what he meant when he said that "this was a
12  piece of shit"?
13  A.  Yeah. I had said to him, you
14  know, "What are you talking about?" He
15  said, "This -- this is bullshit. You know,
16  it's crap. I got knots in my stomach.
17  They're fucking" -- he was really enraged.
18  It was at the checkpoint, the lighthouse.
19  And you know, I never -- I told him, I said,
20  "I never read it." So he said, "This
21  isn't -- this isn't what happened." I don't
22  know.
23  Q.  Did he tell you -- did you ask --
24  did you say anything else to Hesse?
25  A.  At that time, no. He was waiting

Page 360

E. Carter

1
2  for Ann, the court clerk, to come in to
3  drive her in.
4  Q.  How about after this evening, did
5  you say anything to Hesse about Snyder's
6  report concerning the Halloween incident?
7  A.  Snyder's report, no.
8  Q.  Okay. Well, that was the report
9  he was calling a piece of shit, right?
10  A.  Yes.
11  Q.  94, page 22.
12  A.  (Reviewing).
13  Q.  Did Hesse make the statement
14  concerning a kinder and gentler police
15  department to you?
16  A.  No.
17  Q.  Were you in his presence when he
18  made this statement?
19  A.  I actually read this statement in
20  a local newspaper. I believe the Fire
21  Island News.
22  Q.  So other than what you may have
23  read, you have no personal knowledge as to
24  Hesse's alleged statement set forth in
25  paragraph 94, right?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 361

E. Carter

1
2   A.   Yes.
3   Q.   Okay.  Did you make any
4   complaints -- well, withdrawn.  95.  Did
5   anyone at the meeting  -- well, who, if
6   anyone, at the meeting, at the April 2, 2006
7   meeting advised you that Hesse said about
8   you specifically that you were a rat?
9   A.   My belief is he told everybody
10  about by wearing a wire, I'm a rat.
11  Q.   No.  But who told you  -- you
12  weren't at that meeting?
13  A.   No.
14  Q.   So who told you, if anyone, that
15  Hesse called you specifically a rat?
16  A.   That I was going to wear the
17  wire?  That would have been through Chris
18  Moran.  Otherwise --
19  Q.   Did Chris Moran ever advise you
20  that Hesse said, in Moran's presence, that
21  you, Ed Carter, was a rat?
22  A.   No.  I was accused of being a
23  civil service rat previously, but no.
24  Q.   Who accused you of being a civil
25  service rat?

Page 362

E. Carter

1
2   A.   Ty Bacon.  Rich Bosetti.  Gary
3   Bosetti.  Several of the uncertified
4   officers.
5   Q.   When did they first accuse you of
6   being a civil service rat?
7   A.   2004.
8   Q.   Okay.  And how many times did
9   they call you a rat, a civil service rat?
10  A.   Oh, it continued up until we
11  left.  I was -- 2005 I actually wound up
12  helping George Hesse trying to get the guys
13  certified to end it to show that, you know,
14  I wasn't.  Got a copy of the applicant
15  packet from Quogue Police Department from
16  Police Officer Friun that I went to the
17  academy with back in '91, because they were
18  trying to take the background and the
19  pre-polygraph questions from the Suffolk
20  County Police, which was knocking several
21  officers throughout Ocean Beach and all the
22  other towns and villages out, and they were
23  going to do their own background and
24  pre-polygraph questions.
25  MO      MR. NOVIKOFF: Motion to

Page 363

E. Carter

1
2   strike.
3   Q.   How many times were you accused
4   by these uncertified officers of being a
5   civil service rat?
6   A.   Ty Bacon, at least three times.
7   Rich and Gary Bosetti in my presence, two to
8   three times.  Bill Embreui, one time.
9   Q.   All starting in 2004?
10  A.   2004 and going into 2005, yes.
11  Q.   Right.  And did George Hesse ever
12  call you a civil service rat?
13  A.   George Hesse said to me -- did he
14  call it to my face?  No.
15  Q.   That's what I'm saying.  Did
16  George Hesse ever call you, to your face, a
17  civil service rat?
18  A.   No.
19  Q.   Did anyone ever tell you, prior
20  to April 2, 2006, that George Hesse called
21  you a civil service rat?
22  A.   No.
23  Q.   Now when did George Hesse ask you
24  to help out with getting uncertified
25  officers to be certified?

Page 364

E. Carter

1
2   MR. GOODSTADT: Objection.
3   MR. NOVIKOFF: Well, withdrawn.
4   Q.   Did George Hesse ever ask you to
5   assist him in trying to get uncertified
6   officers to become certified?
7   A.   No.
8   Q.   What involvement, if any, did you
9   have with George Hesse with regard to trying
10  to get uncertified officers to become
11  certified?
12  A.   What happened was by me being
13  called a civil service rat -- which I
14  wasn't, I never contacted civil service -- I
15  told George -- George was going through --
16  he was trying to find pre-polygraph
17  questions on the computer one day when I was
18  working with him, and I said I had a friend
19  who was the applicant investigator out at
20  Quogue Police Department, and I called Mike
21  and he faxed me that paperwork.
22  MR. NOVIKOFF: Okay.  Just give
23  me a couple minutes.  Maybe we're --
24  maybe I'm done with this aspect of it.
25  THE VIDEOGRAPHER: The time is

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 365

E. Carter

1  4:58 p.m.  Going off the record.
2  (A break was taken.)
3  THE VIDEOGRAPHER: Time is 4:59
4  p.m.  Back on the record.
5  Q.   Sir, I showed you a few emails
6  today concerning communications by and
7  between you and the other Plaintiffs in this
8  action, do you recall that?
9  A.   Yes.
10  Q.   Since April 2, 2006, have you
11  communicated with the Plaintiffs via email,
12  other than what I've showed you today?
13  A.   No, sir.
14  Q.   So these would have been -- to
15  your knowledge, these would have been the
16  only emails that exist between you and the
17  other Plaintiffs concerning the subject
18  matter of this lawsuit?
19  A.   Without going through my lawyer,
20  yes.
21  Q.   What do you mean without going
22  through your lawyer?
23  A.   I would have possibly emailed
24  stuff to my lawyer.

Page 366

E. Carter

1  Q.   Yeah.  I'm not interested in what
2  you may have emailed your lawyer.  I'm
3  talking about specifically between you and
4  any of the other Plaintiffs, without any
5  copies to your lawyers.
6  A.   Yes.
7  Q.   Have you emailed them concerning
8  the subject of this lawsuit after April 2,
9  2006, other than what I showed you?
10  A.   Not to my knowledge, no.
11  Q.   And do you have any documents in
12  your possession, custody or control that
13  would refresh your recollection?
14  A.   No.
15  Q.   Do you maintain the same computer
16  today as you did on April 2, 2006?
17  A.   Yes.
18  MR. NOVIKOFF: I have nothing
19  further.
20  EXAMINATION BY
21  MS. ZWILLING:
22  MS. ZWILLING: Good afternoon.
23  As I mentioned earlier, I represent the
24  Suffolk County Defendants.  My name is

Page 367

E. Carter

1  Arlene Zwilling.  I have just a few
2  questions for you and I promise we'll
3  get you out of here as soon as
4  possible.
5  Q.   You made some references to
6  checkpoints.  Can you explain what those
7  checkpoints are?
8  A.   It's the lighthouse, Fire Island
9  lighthouse on Ocean Beach.  Actually, it's
10  actually in Kismet on -- when you first come
11  off Robert Moses field five off the paved
12  part of the roadway, there's a lighthouse
13  there.
14  Q.   Would that be the area where
15  people park their cars to get access to the
16  rest of the Island?
17  A.   Only police officers, members of
18  Fire Island FINS.  I don't know if the
19  Suffolk County Police use that as a
20  checkpoint either.  And it's controlled by a
21  gate.
22  Q.   Did you attend the Suffolk County
23  police academy?
24  A.   Yes.

Page 368

E. Carter

1  Q.   When?
2  A.   January 1991 to June 1991.
3  Q.   And was your class composed only
4  of Ocean Beach police officers or were there
5  recruits of other departments in the class
6  as well?
7  A.   Recruits of other departments in
8  the class.
9  Q.   How many recruits were in the
10  class?
11  A.   Approximately, we started out
12  with 52 to 57.  We graduated approximately
13  30 to 31.
14  Q.   Now you mentioned that you may
15  have seen a picture of Alison Sanchez.
16  Where is it you believe you saw her photo?
17  A.   In a local paper, like the Fire
18  Island -- not the Fire Island -- excuse me.
19  The Suffolk County News.
20  Q.   Do you know which Suffolk County
21  local newspaper it was?
22  A.   The -- that's what I believe it's
23  called.  The one they send you -- they used
24  to send you for free.  They stopped sending

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 96 of 130 PageID #: 1690

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 369

E. Carter

1
2 you.
3    Q.    Would it be Suffolk Life?
4    A.    Suffolk Life.  I'm sorry.
5    Q.    And was her photo in the Suffolk
6 Life in conjunction with some sort of
7 article?
8    A.    There was a photo of her and her
9 partner.
10    Q.    And what was her partner's name?
11    A.    I don't recall.
12    Q.    Do you recall the gender of her
13 partner?
14    A.    It was a female.
15    Q.    Do you know if Alison Sanchez is
16 presently married?
17    A.    No, I don't.  According to that
18 article -- I don't know.  No.  At this time,
19 no.
20    Q.    What prosecutor from the Suffolk
21 County District Attorney's office did you
22 have contact with?
23    A.    The prosecutors?
24    Q.    Yes.
25    A.    The -- Ray Tierney and

Page 370

E. Carter

1
2 Biancavilla I believe his name.
3 Biancavilla.  I don't know if that's the
4 correct name.  The prosecutor that's
5 handling the case now with Ocean Beach.
6    Q.    Have you ever been to the Suffolk
7 County Civil Service Department on any
8 occasion?
9    A.    Yes.
10    Q.    On how many occasions have you
11 been there?
12    A.    Approximately three.
13    Q.    And can you tell me when those
14 occasions were?
15    A.    One I know of was in 2005 when I
16 was inquiring about the park ranger three
17 test.  When it was last given and if there
18 was a list.  The other time was to file for
19 the park ranger one test.
20    Q.    When was that?
21    A.    Approximately -- the year would
22 have been -- I was appointed in 1989.
23 Approximately '87 maybe.  '88.  And the
24 third time would have been to just pick up
25 the brochure.  I walked in and walked out

Page 371

E. Carter

1
2 back in the mid '90s.
3    Q.    Did you ever discuss --
4    A.    I'm sorry.  Also, I took my oral
5 psychologicals there.
6    Q.    When was that?
7    A.    For the park ranger, it would
8 have been approximately 19 -- I was
9 appointed in 1989.
10    Q.    At any time, have you ever
11 discussed any matters concerning the Ocean
12 Beach Police Department with anyone from the
13 Suffolk County Civil Service Department,
14 either in person or over the phone?
15    A.    No.
16    Q.    Have you ever exchanged
17 correspondence, either hardcopy or email,
18 with anyone from the Suffolk County Civil
19 Service Department in connection with Ocean
20 Beach Police Department matters?
21    A.    No.
22    Q.    Have you ever had a conversation
23 with Alison Sanchez, either in person or
24 over the telephone?
25    A.    Not that I'm aware of.

Page 372

E. Carter

1
2    Q.    Have you ever exchanged any
3 correspondence, either hardcopy or email,
4 with Alison Sanchez about any matter?
5    A.    No.
6    Q.    To the best of your knowledge,
7 have you ever observed George Hesse in the
8 presence of Alison Sanchez?
9    A.    Observed him, no.
10    Q.    Did George Hesse ever tell you
11 that he had any type of sexual encounter or
12 relationship with Alison Sanchez?
13    A.    He told several officers one
14 night in the station, in the summer of 2005
15 when he was taking care of the civil service
16 uncertifieds, he had said that he had taken
17 her out to lunch a couple times, and I
18 believe her name was Alison Chester.
19    Q.    Were you present when he made
20 these statements?
21    A.    Yes.
22    Q.    What exactly did he say at the
23 time?
24    A.    He said, "You guys got nothing to
25 worry about," talking to the officers that

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 373

1           E. Carter
2 were in the room.  That "I have a friend at
3 civil service.  I've taken out -- I took her
4 out to lunch the other day.  We got
5 everything squared away, and you guys have
6 no problem.  We're going to be taking over
7 the applicant investigations," and Arnold
8 Hardman looked at George and he said,
9 "George, you're banging her, aren't ya," and
10 George looked at him and laughed.  And he
11 said, "Yeah.  I'd like to get her partner,
12 too."  And with that, you know, I just
13 looked at George like "you're -- you're
14 fucked up," and I walked out of the room.
15     Q.   Is that what you said to him at
16 the time?
17     A.   I mumbled it to myself as I
18 walked out of the room.
19     Q.   And did George Hesse ever state
20 in your presence at any other time that he
21 had sexual relations with Alison Sanchez?
22     A.   No.
23     Q.   Did anyone else ever state to you
24 that George Hesse had had sexual relations
25 with Alison Sanchez?

Page 374

1           E. Carter
2     A.   No.
3           MS. ZWILLING: No further
4     questions.
5           MR. GOODSTADT: This is George
6     Hesse's lawyer.
7 EXAMINATION BY
8 MR. CONNOLLY:
9     Q.   Mr. Carter, how would town
10 employees or police officers with Ocean
11 Beach access the Island?
12     A.   There was two ways; either by
13 boat, the ferry or we would go across the
14 Robert Moses Causeway.
15     Q.   And at that point, you would park
16 your vehicle at the Fire Island Lighthouse,
17 the checkpoint?
18     A.   Yes.
19     Q.   And how would you get from the
20 checkpoint to the village?
21     A.   In -- normally, if the --
22 hopefully the truck was up and running, you
23 went by truck or water taxi, or you -- a
24 couple guys a few times had to drive their
25 own vehicles in.

Page 375

1           E. Carter
2     Q.   And, similarly, how would you get
3 from the village back to the checkpoint?
4     A.   The same way.
5     Q.   Did any officers ever pick you up
6 at the checkpoint?
7     A.   To drive me into work, yes.
8     Q.   Okay.  And did any officer ever
9 take you from the village to the checkpoint?
10     A.   Yes.
11     Q.   And were those officers on duty
12 when they did that?
13     A.   Yes.  As far as I know, yes.
14     Q.   Back when you took the
15 examination for park ranger three, did any
16 other Town of Islip employees take the test?
17     A.   Yes.
18     Q.   And to your knowledge, what was
19 the passing grade?
20           MR. GOODSTADT: Objection.
21     A.   I don't know.  I couldn't answer
22 that.
23     Q.   Did you ever learn of the scores
24 of any of the other individuals from the
25 Town of Islip as to that exam?

Page 376

1           E. Carter
2     A.   The actual score, no.  I know one
3 other person failed it.
4     Q.   And how many people took it?
5     A.   There was only two able to take
6 it in Islip and two in Smithtown.
7     Q.   Have you ever spoken to any
8 attorneys or investigators, other than your
9 attorneys in this case or the Suffolk County
10 DA attorneys, regarding either the Gilbert
11 incident or any of the allegations contained
12 in your complaint?
13           MR. GOODSTADT: Objection.  To
14     the extent that you were seeking legal
15     advice from any attorneys, that should
16     be included in the group of attorneys
17     that you're not to testify to.
18           MR. NOVIKOFF: I think he can
19     answer if he's ever spoken to them as
20     opposed to what he said to them.
21           MR. CONNOLLY: My question
22     doesn't mean anybody in connection with
23     this case.
24           MR. GOODSTADT: Or any of his
25     lawyers in connection with anything, or

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 98 of 130 PageID #:
1692

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

Page 377

1          E. Carter
2    any lawyer that he's gone to seek legal
3    advice from is privileged.  It doesn't
4    matter if it's not in connection with
5    this lawsuit.
6          MR. CONNOLLY: Fine.  I'm not
7    asking what he spoke to -- I'm not
8    concerned about any advice you may have
9    been seeking.
10         Q.   I'm concerned has anyone ever
11   approached you and asked you questions
12   regarding those incidents or those claims?
13         MR. GOODSTADT: Objection.
14   Same instruction.
15         MR. NOVIKOFF: I oppose that
16   objection.  I think if the question is
17   has any attorney approached you to
18   discuss with you X, Y and Z, that's a
19   legitimate question.  If the question
20   is what did these attorneys say to you
21   in this conversation, then I think that
22   is certainly protected.
23         MR. GOODSTADT: Well, I would
24   disagree.  If you were to ask has any
25   attorney that you've never sought legal

Page 379

1          E. Carter
2    right.
3          Q.   Has any attorneys approached you
4    to question you or get information from you
5    regarding the Gilbert matter?
6          MR. GOODSTADT: Again, same
7    instruction.
8          A.   Can I answer?
9          MR. GOODSTADT: To the extent
10   that it's not a lawyer that you have
11   sought legal advice from or who has
12   represented you in any matter, then the
13   answer is you can answer.
14   A.   No.
15         MR. CONNOLLY: I have no
16   further questions.  Thank you.
17         MR. GOODSTADT: I don't have
18   any questions.
19         (Continued on next page for
20   jurat.)
21
22
23
24
25

Page 378

1          E. Carter
2    advice from or represented you, I agree
3    with that.  But --
4          MR. NOVIKOFF: Okay.
5          MR. GOODSTADT: But just so you
6    know for the record, any topic that
7    he's ever spoken with a lawyer,
8    regardless of telling the extent of
9    what was discussed, that's still
10   privileged.  Yes, we discussed the
11   Gilbert incident.  That's privileged.
12         MR. NOVIKOFF: I think the
13   question -- and tell me if I'm wrong,
14   Kevin -- I think the question that's
15   being posed is, for example, has
16   Gilbert's attorney approached you to
17   discuss anything involving the Gilbert
18   case, and if the answer is yes, then
19   certainly the next question would go
20   into what did Gilbert's attorney say,
21   because there's no attorney/client
22   privilege there.
23         MR. GOODSTADT: That's assuming
24   there's no attorney/client privilege.
25         MR. NOVIKOFF: That's assuming,

Page 380

1          E. Carter
2          THE VIDEOGRAPHER: This
3    completes today's deposition for Edward
4    Carter on September 16, 2008.  The time
5    is 5:12 p.m. and we are off the record.
6
7    _____
8          THOMAS SNYDER
9
10   Subscribed and sworn to
11   before me this _____  day
12   of _____  2008.
13
14   _____
15   NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 381

1
2              INDEX TO EXHIBITS

3  CARTER                              PAGE

4  1    Notice of Claim.              22

5  2    Document Bates stamped 9270.   99

6  3    Internal correspondence dated

7       December 6, 2005.            120

8  4    Internal correspondence dated

9       January 23, 2006.            124

10 5    Email dated 5/15/06.          162

11 6    Suffolk County Civil Service

12      Eligible List.               181

13 7    Letter to Mr. Carter dated September

14      8, 2006.                     200

15 8    Email dated 3/23/07.          265

16 9    Email dated 3/30/2007.        267

17 10   Document Bates stamped 000284

18      through 000383.              268

19

20           INDEX TO INSERTS     PAGE

21 The date Mr. Carter retained

22      Mr. Goodstadt's law firm to

23      represent him.               105

24

25

Page 383

2              CERTIFICATION

3

5          I, Edward Leto, a Notary Public

6  in and for the State of New York, do hereby

7  certify:

8          THAT the witness(es) whose

9  testimony is herein before set forth, was

10 duly sworn by me; and

11         THAT the within transcript is a

12 true and accurate record of the testimony

13 given by said witness(es).

14         I further certify that I am not

15 related either by blood or marriage, to any

16 of the parties to this action; and

17         THAT I am in no way interested in

18 the outcome of this matter.

19         IN WITNESS WHEREOF, I have

20 hereunto set my hand this 28th day of

21 September, 2008.

22

23

24      --------------------------

25           EDWARD LETO

Page 382

1
2      I N D E X      PAGE

3  RQ(s)

4  Production of Mr. Carter's driver's

5      license.                     101

6  Production of copies of all pictures in

7      Mr. Carter's custody, possession or

8      control that would show what his

9      hair looked like prior to 2005,

10     going back to when he was 21.    101

11

12 DI (Pages) 25, 71, 249

13

14 RL (Pages) 24

15

16 MO (Pages) 12, 45, 113, 132, 137, 213, 225,

17 227, 230, 263, 326, 362

18

19 EXAMINATION BY

20     MR. NOVIKOFF: 6

21     MS. ZWILLING: 366

22     MR. CONNOLLY: 374

23

24

25

Page 384

2              ERRATA SHEET.

3      I wish to make the following changes,

4  for the following reasons:

5  PAGE LINE

6  ____ ____CHANGE:_____

7          REASON:_____

8  ____ ____CHANGE:_____

9          REASON:_____

10 ____ ____CHANGE:_____

11         REASON:_____

12 ____ ____CHANGE:_____

13         REASON:_____

14 ____ ____CHANGE:_____

15         REASON:_____

16 ____ ____CHANGE:_____

17         REASON:_____

18 ____ ____CHANGE:_____

19         REASON:_____

20 ____ ____CHANGE:_____

21         REASON:_____

22 ____ ____CHANGE:_____

23         REASON:_____

24 ____ ____CHANGE:_____

25         REASON:_____

**0**

**000284 (2)**
268:20,24
**000383 (1)**
268:25
**05 (5)**
122:12;195:3,6;
254:25;343:15
**06 (6)**
145:16;195:3;
254:25;262:13;
278:25;288:2
**06-5603-30 (1)**
181:25
**07 (2)**
217:14;296:23
**07-civ-1215SJFETB (1)**
4:10
**08 (2)**
217:15,15

**1**

**1:15 (1)**
158:10
**1:24 (1)**
158:15
**10 (3)**
151:6,8;282:7
**10:00 (1)**
5:13
**10:45 (1)**
65:24
**10:55 (1)**
66:4
**100 (9)**
89:11;133:2,4;
207:5;242:4;266:9,
13;267:24;326:11
**101 (2)**
382:5,10
**109 (7)**
206:22,23;228:15,
18;229:5;236:6;
251:5
**11:30 (1)**
319:23
**11:54 (1)**
133:24
**110 (2)**
256:15;257:6
**110's (1)**
257:7
**113 (3)**
257:13;259:4;
382:16
**114 (1)**
261:17
**11706 (1)**
6:3
**12 (18)**

126:17;127:12;
197:3,5,15,23;
245:14;264:13;
265:13;328:24;
330:12;331:10;
333:9;334:2,24;
340:24;344:15;
382:16
**12:00 (9)**
52:5;53:25;54:8;
66:20;119:5,10;
306:7,7;319:23
**12:00s (1)**
305:23
**12:09 (1)**
134:4
**12:29 (1)**
158:12
**12:30 (1)**
158:9
**13 (3)**
281:14;302:21;
304:12
**132 (1)**
382:16
**137 (1)**
382:16
**14 (3)**
126:24;127:12;
281:14
**15 (20)**
122:22;123:3,21;
151:8;161:8;163:22;
171:19;172:8;173:2;
223:2;230:21,25;
232:18,22;233:6;
234:9,21;235:14;
239:6;282:8
**16 (6)**
4:10;115:11,13,17;
232:11;380:4
**19 (2)**
309:10;371:8
**1989 (2)**
370:22;371:9
**1991 (16)**
27:4,9;28:18,25;
30:18,23;68:13;
238:9;281:12;
303:12,13,15,16;
304:6;368:3,3
**1992 (3)**
68:16;303:19,21
**1993 (2)**
68:17;304:9
**1998 (1)**
251:15

**2**

**2 (92)**
16:13;18:20;
19:16;20:9,19;21:8;

22:7;79:16;84:9,20,
21;85:4;86:21;
87:25;88:25;94:3,16;
96:18;103:18;
107:21;108:22,23;
111:13;112:5,14,19;
113:8,20;114:2;
136:6,16;137:23;
152:10,16,25;
154:19;155:8;156:6,
13,20;157:13,18,21;
158:6,19,22;159:23;
160:4,9,12;195:12,
22;219:25;232:13;
234:5;235:13;
240:17,22;244:8,14;
251:9,17;252:22;
253:14;254:21;
255:10;256:4,13;
257:21;258:2,6,11;
259:13,19;261:21;
272:3,4,6,9;273:14;
274:23;288:5;297:7,
15;312:5,10;359:8;
361:6;363:20;
365:11;366:9,17
**2:00 (2)**
119:10;294:18
**2:01 (1)**
202:11
**2:11 (1)**
202:14
**2:30 (1)**
294:18
**2:59 (2)**
258:22;259:2
**20 (9)**
114:21;115:15,16,
16,24,25;119:6;
174:23;318:20
**2000 (3)**
45:19;79:20;328:5
**2001 (15)**
31:8,9,12;67:25;
114:6;117:23;
304:10,10;305:4;
307:13,17;312:5,9;
349:12;351:11
**2002 (5)**
67:23,24;307:19;
308:8,18
**2003 (38)**
35:20;36:2,10,15,
20,21,23;37:13;39:2,
8;40:14,21;41:6;
42:3;43:14,22;44:8;
64:10,17;67:21,22;
314:11;316:2,7;
317:3,4,14,18;324:5;
328:13;329:12,23;
332:2,13;334:15;
338:8;347:6,9
**2004 (46)**

36:13;44:19;45:6,
10,11,19,21;47:5;
48:7;49:13,17;50:22;
64:10,18;67:19,20;
317:21,23;318:12,
13;319:25;320:16,
22,23;321:8,12,24;
322:7,25;323:4,22;
324:5;329:6,12,23;
332:10,11,12,16;
333:15;334:9;338:6;
347:16;362:7;363:9,
10
**2005 (73)**
51:4,13;63:2,4,5,
15,24;64:10,21;65:2;
67:11;68:6,24;69:3,
16;77:21;99:18,20;
100:6,21;101:2,23;
102:6;120:3,8,20;
121:11,24;123:2,14,
16;148:2;151:5;
157:5;280:6;295:23,
25;323:6,8,23,25;
324:22;325:3;
326:18,22;327:25;
328:10,12;329:9,12;
330:20;332:11,19,
22;336:21,21;
337:18,20,21;
338:11,12,14;339:3;
340:5;341:11;
344:20;348:8;353:4;
362:11;363:10;
370:15;372:14;382:9
**2006 (153)**
13:19,24;14:4,12,
16,18;15:13;19:16;
20:9,20;21:13,23;
22:7;23:24;62:17,20,
22;63:4;69:22;79:2,
5,7,16,16,21;84:9,20;
86:20,21;87:25;88:9,
25;96:25;97:20;
103:18,21,25;104:4,
7;105:16;108:23;
112:14,19;113:8,21;
114:2;122:22;123:3;
124:16,22;126:17;
127:13,22;129:24,
25;130:12,17;131:2,
6,19;132:10,21;
136:6,16;137:24;
139:24;149:2;
152:10,17,25;
154:20;155:8;156:6,
13,20;157:13,18,21;
158:6,19,22;159:23;
160:4,9,12;162:16;
163:22;171:19;
172:8;173:2,19;
185:12;186:3;194:6;
195:12,22;200:17,

21;201:21;203:16;
204:12;215:15,16;
216:21;217:8;
218:25;219:25,25;
231:15;232:11;
233:7;234:5,17,21;
237:22;240:10,11,
20,22;244:8;251:9,
17;252:22;253:14;
254:21;255:10;
256:4,13;257:21;
258:2,6,11;259:13,
19;261:21;272:3,4,6,
9;273:14;274:23;
279:19;297:7,15;
312:5,10;328:5;
359:8;361:6;363:20;
365:11;366:10,17
**2007 (20)**
12:18;13:16;
79:23;81:15;162:14;
186:17,18,19;
189:20;190:15;
191:12;192:5;193:6,
24;194:8;234:21;
244:23;267:20;
293:22,22
**2008 (6)**
4:11;12:15;97:2;
189:23;380:4,12
**2014 (1)**
124:2
**2042 (7)**
117:2,6,24;124:3,
4;150:4;358:18
**21 (5)**
79:22;81:15;
102:7;244:23;382:10
**213 (1)**
382:16
**22 (1)**
360:11
**225 (1)**
382:16
**227 (1)**
382:17
**23 (3)**
124:16,22;127:22
**230 (1)**
382:17
**24 (2)**
218:12;382:14
**249 (1)**
382:12
**25 (2)**
206:22;382:12
**26 (1)**
312:24
**263 (1)**
382:17
**27 (2)**
162:13,16
**28 (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 101 of 130 PageID #:
1695
EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

286:20
**284 (4)**
269:7,12,21,25
**287 (3)**
269:16,20,25
**28th (1)**
277:14
**291 (2)**
270:3,5
**2nd (1)**
235:14

### 3

**3/23/07 (1)**
265:24
**3/30/2007 (1)**
267:3
**3:00 (3)**
54:17;57:5;66:20
**3:09 (1)**
268:11
**3:22 (1)**
268:15
**3:30 (2)**
52:16;54:17
**30 (12)**
23:23;79:16,21;
96:25;97:20;104:4,7;
240:11,20;267:20;
318:21;368:14
**31 (1)**
368:14
**326 (1)**
382:17
**36 (4)**
313:17,17;314:3,
24
**362 (1)**
382:17
**366 (1)**
382:21
**374 (1)**
382:22
**382 (1)**
268:20
**383 (1)**
268:20

### 4

**4 (1)**
326:14
**4:00 (9)**
52:16;54:11;
56:11;119:5,9,11;
305:22;306:7,9
**4:19 (1)**
335:12
**4:30 (1)**
335:16
**4:58 (1)**
365:2

**4:59 (1)**
365:4
**40 (6)**
28:11;30:9;
114:18;115:16,19;
116:14
**41 (1)**
331:18
**416 (1)**
269:25
**42 (5)**
98:9,18,19,21;
117:2
**43 (2)**
98:6,11
**45 (1)**
382:16
**4th (1)**
325:13

### 5

**5/15/06 (1)**
162:19
**5:00 (2)**
119:12;315:6
**5:12 (1)**
380:5
**50 (1)**
57:9
**51 (2)**
335:19;341:6
**52 (1)**
368:13
**54 (3)**
345:4,5,10
**55 (1)**
6:2
**57 (2)**
347:19;368:13
**58 (1)**
353:15
**59 (1)**
353:15

### 6

**6 (20)**
120:3,7,20;121:7,
24;123:2;129:23,24,
25;130:12,17,25;
131:6,19;132:10,21;
203:16;204:12;
288:6;382:20
**6:00 (1)**
119:10
**60 (5)**
353:15,18,18,19;
354:13
**61 (7)**
354:20,22,23,25;
355:2,20,25
**62 (4)**

354:20,22;355:20,
25

### 7

**71 (2)**
357:14;382:12
**75 (3)**
182:4;357:16,17

### 8

**8 (6)**
184:6,7,9;200:17,
21;201:20
**8:00 (6)**
52:5;53:25;89:17,
18;119:11,13
**87 (1)**
370:23
**88 (1)**
370:23

### 9

**9 (1)**
126:17
**9/16/08 (10)**
22:14;99:9;120:4;
124:17;162:21;
181:17;200:18;
266:2;267:5;269:2
**9:00 (2)**
119:5,12
**9:30 (1)**
5:11
**9:52 (1)**
4:11
**90s (1)**
371:2
**91 (5)**
68:22;238:9;
281:12;304:7;362:17
**92 (3)**
281:12,12;304:7
**9270 (2)**
99:4,7
**93 (3)**
68:22;303:22;
304:7
**94 (2)**
360:11,25
**95 (1)**
361:4

### A

**abandon (1)**
84:7
**abandoned (5)**
84:5;238:13,19,21;
331:21
**abandoning (1)**

239:16
**ability (5)**
88:24;229:23;
230:3,6;236:7
**abject (1)**
302:9
**able (4)**
241:2;253:6;
254:3;376:5
**above (1)**
188:5
**Absolutely (5)**
148:23;200:5;
301:13,18,22
**academy (3)**
31:14;362:17;
367:24
**accepted (2)**
242:23;243:16
**access (3)**
196:4;367:16;
374:11
**according (14)**
126:13;138:16;
164:7;168:9;186:2;
195:5;220:24;
231:20;232:9,17;
234:5;245:10;
271:21;369:17
**account (1)**
310:9
**accuracy (2)**
24:16;205:20
**Accurate (2)**
206:25;207:5
**accusation (1)**
249:19
**accuse (1)**
362:5
**accused (3)**
361:22,24;363:3
**accusing (2)**
249:4,17
**across (3)**
294:25;295:9;
374:13
**action (3)**
90:16;313:5;365:9
**actions (6)**
76:14;77:2;
309:12,14;310:6,19
**acts (1)**
89:25
**actual (1)**
376:2
**actually (17)**
75:20;106:21;
125:2;131:6;169:3;
174:15;178:13;
285:15;298:16;
325:4;350:3;355:10;
357:16;360:19;
362:11;367:10,11

**ADA (1)**
225:12
**added (2)**
139:3;293:23
**addition (1)**
247:6
**address (2)**
5:25;13:4
**admit (3)**
138:4;157:4;276:6
**adverse (1)**
90:16
**adversely (1)**
246:15
**advice (6)**
103:12;376:15;
377:3,8;378:2;
379:11
**advise (42)**
8:4;20:17;22:17;
25:2;35:8;48:9;
86:24;105:21;
119:20;123:7;
127:14;146:16;
152:9;159:17,20,24;
179:10,12;193:14,
15;194:14;211:10;
213:12;219:8;
239:15;244:11;
277:25;278:4;
280:21;281:17;
291:12,20;292:2;
297:4;299:8;340:22;
344:4,7;345:5;
346:16;357:20;
361:19
**advised (17)**
14:20;131:16;
132:6;142:6;162:10;
177:22;191:16;
195:13,19;207:24;
223:12;278:10,13;
298:21;299:13;
313:17;361:7
**advisement (1)**
102:10
**advising (4)**
124:5;126:14;
220:7;240:14
**affair (1)**
291:5
**affairs (2)**
288:24;291:14
**affect (1)**
319:7
**affected (2)**
92:9;319:6
**affecting (1)**
347:11
**affirmatively (1)**
194:10
**afraid (2)**
58:21;59:8

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 102 of 130 PageID #: 1696

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

**afternoon (1)**
366:23
**Afterwards (4)**
144:16,16;208:21;
219:23
**Again (40)**
7:23;19:2;39:7;
40:5;41:4;42:24;
53:3;61:11;65:4;
85:14;97:19;136:19;
142:14;147:6;
150:23;151:18;
192:13;194:17;
198:19;208:20;
215:22;216:25;
217:2;218:5;240:25;
266:13;267:24;
279:15;287:9;
291:18;292:14;
293:23;296:22;
299:20;321:18,25;
322:11,16;355:14;
379:6
**against (9)**
56:24;58:17;
59:14;90:17;198:2,
14;206:13;246:7;
301:16
**age (3)**
98:18,21;342:14
**agencies (2)**
92:20;247:9
**ago (6)**
85:7,12;111:24;
189:14,15;191:6
**agree (19)**
29:5;41:8;42:6,24;
64:12;72:12;95:8;
100:20;102:15,22;
197:20;198:9;216:9;
221:17;223:16;
244:4;256:22;
269:19;378:2
**AGREED (3)**
3:3,9,13
**agreement (1)**
104:15
**ahead (2)**
73:25;232:25
**airport (7)**
141:15,21;171:21;
172:2,4,7,21
**al (3)**
4:5,7;82:18
**Alan (10)**
74:15;81:19,20,22;
82:7,10,12;83:20;
200:22;292:8
**Albanese (1)**
55:11
**Albert (1)**
4:12
**alcohol (7)**

39:18;59:21;
66:18,22;68:11;
302:12;345:16
**Alison (12)**
309:18,21,23;
368:16;369:15;
371:23;372:4,8,12,
18;373:21,25
**allegation (7)**
261:7,10;306:3,6,
13;314:3;345:9
**allegations (9)**
11:5;97:15;
163:18;257:15;
271:22;277:17,23;
353:17;376:11
**allege (6)**
33:19;95:17;
207:8;236:6;307:2;
312:24
**alleged (30)**
130:18;131:14,18;
132:9,21;133:10;
134:7;135:3;137:5;
140:2,7;158:24;
195:21;203:14,24;
257:13;271:11;
273:9;276:24;278:5,
14,15;301:25;
304:12;313:17;
354:5,13,22;356:4;
360:24
**allegedly (5)**
132:24;296:21;
297:7,14;355:7
**alleging (1)**
32:23
**allowed (2)**
269:4;298:25
**almost (1)**
268:7
**along (2)**
36:4;139:12
**always (2)**
29:20;318:9
**Amato (2)**
275:11;280:9
**among (4)**
3:3;118:11;
256:18;257:7
**amount (1)**
96:11
**analyst (2)**
312:21,23
**and/or (2)**
70:16;199:10
**Andrew (1)**
4:19
**Andy (1)**
337:12
**anguish (3)**
78:12;95:18;
112:20

**Ann (1)**
360:2
**Anna (1)**
182:19
**annoyed (1)**
112:23
**anonymous (1)**
133:6
**answered (11)**
18:8;64:14;
146:24;178:16;
204:25;205:3;
233:15;248:22;
291:17;322:2;350:9
**anymore (1)**
166:11
**apartment (5)**
341:16,23;343:20;
344:23;345:11
**apologize (3)**
63:5;304:9,10
**apparently (6)**
155:17;157:22,25;
279:4,5;294:8
**appears (5)**
98:14;120:6;
204:11;267:18;
269:20
**applicable (1)**
309:16
**applicant (4)**
93:19;362:14;
364:19;373:7
**application (7)**
15:11;173:8;
233:2;237:10,12,16;
238:21
**applied (4)**
14:16;172:6;
181:6;233:9
**apply (9)**
15:16,19;229:23;
230:3,7;234:20;
235:5;236:7,8
**applying (2)**
234:20;236:22
**appointed (2)**
370:22;371:9
**appointment (1)**
150:16
**approach (1)**
210:14
**approached (6)**
136:25;280:8;
377:11,17;378:16;
379:3
**appropriate (2)**
13:13;71:23
**approve (2)**
309:4,7
**approved (2)**
308:2,5
**approximately (49)**

4:11;5:13;36:19;
45:8;52:3,16;54:17;
57:9;78:25;84:25;
85:7;96:11;106:17;
116:14;123:12;
151:6;163:23;
174:23;189:14;
193:11;215:8,14;
217:7;251:15;
273:16;277:6,6;
281:16;282:7;283:9;
288:6,15;289:9,9;
291:2;318:3;325:16,
17;328:6,11;332:4;
338:13;351:23;
368:12,13;370:12,
21,23;371:8
**April (127)**
16:13;18:20;
19:16;20:9,19;21:8;
22:7;79:16;84:9,20,
21;85:4;86:20,21;
87:25;88:25;94:3,16;
96:18;103:18;
107:21;108:22,22;
111:13;112:5,14,19;
113:8,20;114:2,25;
116:10;117:19,19,
20;123:14,16;124:4;
126:17;129:23,24,
25;130:12,17,25;
131:5,19;132:10,21;
136:6,16;137:23;
147:15;152:10,16,
25;154:19;155:8;
156:6,13,20;157:13,
17,21;158:6,19,22;
159:23;160:4,9,12;
195:12,22;203:16;
204:12;215:14;
216:21;219:25,25;
232:13;234:5;
235:12;237:22;
240:17,22;244:8,14;
251:9,17;252:22;
253:14;254:21;
255:10;256:4,13;
257:21,25;258:6,11;
259:13,19;261:21;
272:3,4,6,9;273:14;
274:23;278:25;
279:19;288:2,5,6;
289:14,15;292:18;
296:23;297:7,15;
312:5,10;359:8;
361:6;363:20;
365:11;366:9,17
**area (2)**
348:24;367:15
**Arlene (2)**
5:3;367:2
**armed (2)**
15:24,25

**Arnie (11)**
74:16;157:22;
166:22;167:7,10,14;
168:2,15;297:11;
325:18;326:6
**Arnold (6)**
16:23;137:24;
138:17,25;157:11;
373:7
**around (15)**
31:7;56:18;74:12;
82:16;151:4;209:2;
218:11;219:10,10;
291:24;294:18;
295:13;315:9;322:8;
342:9
**arrested (3)**
208:17;214:25;
250:17
**arrow (1)**
182:24
**article (5)**
197:16;264:8;
265:5;369:7,18
**ascertained (5)**
70:25;96:22;97:2,
18,21
**aside (6)**
11:23;66:19,19;
132:20;192:4;356:13
**asleep (1)**
231:24
**aspect (3)**
103:17;356:15;
364:24
**assaulted (1)**
351:13
**Assaults (1)**
351:8
**assigned (4)**
313:21;315:7,19,
22
**assignment (1)**
349:17
**assist (1)**
364:5
**assistant (2)**
91:13;186:24
**associated (2)**
283:7;284:17
**association (1)**
4:16
**assumed (1)**
143:15
**assuming (2)**
378:23,25
**attachment (1)**
268:3
**attend (2)**
196:14;367:23
**attended (1)**
196:17
**attention (2)**

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

346:24,25

**Attorney (26)**
5:5;7:22;9:8;
99:12;137:25;
138:18;139:2;149:6;
150:6,16;157:12;
182:18;206:17;
259:22;261:10;
280:4;283:23;284:8;
299:2,5,9,12;377:17,
25;378:16,20

**attorney/client (3)**
25:7;378:21,24

**attorneys (10)**
196:19;205:12,17;
376:8,9,10,15,16;
377:20;379:3

**Attorney's (19)**
16:15;138:5;
148:5,6,11;149:3,23;
150:22;151:10,18;
152:5;153:20;
155:15;157:3;
196:23;250:18;
284:8;290:8;369:21

**attribute (5)**
131:7,8;133:11;
152:23,24

**August (8)**
77:20;157:5;
184:6;277:14;
286:20;296:25;
321:16;328:11

**author (3)**
130:18;216:16,22

**authority (8)**
33:11;34:24;72:5;
228:8,11;352:22;
353:7,12

**authorization (1)**
203:8

**authorize (3)**
24:3;205:11;240:2

**authorized (7)**
203:13,24;204:5,
10,22;206:16;261:9

**authorizing (2)**
24:24;205:16

**automatically (1)**
91:19

**availability (3)**
118:3;119:21;
124:6

**available (3)**
118:9;123:8,18

**Avenue (1)**
6:3

**average (1)**
28:12

**aware (35)**
7:9;8:19;19:6,6,8,
11,12,14;22:25;
32:22;97:5;119:7;

122:15;130:6;
140:25;142:18;
144:9;145:6;157:20;
162:9;178:21;179:2;
199:22;204:2,3;
206:17;209:12;
219:3;253:4;255:25;
257:11,12;271:2;
342:15;371:25

**away (11)**
40:6;46:18;82:25;
161:6;162:2;164:25;
170:15;194:23;
250:3;262:22;373:5

**awkward (3)**
255:18,20,22

**B**

**Bachman (2)**
33:17,18

**back (82)**
30:2;53:23;59:16;
65:21;66:5;68:24;
94:2;102:6;123:14;
125:6;128:20;133:8,
21;134:5;137:5;
142:12;147:15;
148:2;158:15;
161:17;167:23;
173:4;178:13;189:7;
194:5,17;195:2;
198:17;202:8,15,22;
213:24;217:16;
230:14,16;238:9,25;
239:3,19;251:14;
259:2;268:9,16;
281:12;284:2;
289:13;292:14;
295:11;311:15;
316:18;322:15;
326:4;327:11;
335:17;337:15;
338:23,24;348:14,
18,22;349:3,10,14,
21,25;350:6,9,16,20,
22;351:6,14,17,19,
25;353:8;362:17;
365:5;371:2;375:3,
14;382:10

**background (6)**
20:4;230:10;
238:6,12;362:18,23

**backing (1)**
168:15

**Bacon (49)**
26:15,25;28:14,19,
24;29:7;31:22;32:2,
12,17,25;33:3,5,7;
35:14,22,23;36:5,7,
13,16,18;37:12,21;
38:3;88:5,6,16,18,
21;129:16,17,21;

130:4,13,18;131:8;
132:22,24;198:22;
199:10;203:24;
204:4,6,10,17,22;
362:2;363:6

**Bacon's (5)**
130:25;131:13,18;
132:9;203:13

**bad (2)**
332:21;352:16

**balcony (2)**
345:15,23

**banging (1)**
373:9

**banished (1)**
327:12

**Bar (21)**
45:13;46:4;47:22;
48:2,3;51:17;52:17;
55:24;56:5,9,24;
57:2,4;59:17;336:9,
10,11;338:3,3;
344:21;356:4

**barracks (1)**
14:5

**Barry (2)**
336:21;339:7

**bars (9)**
49:9;302:12;
315:5;335:23;336:6,
8,15,18;337:7

**bartender (2)**
338:4;344:21

**bartenders (1)**
336:9

**based (16)**
29:12,14;37:9;
59:6;92:12,14;
119:21;131:2;
147:12;173:13;
203:18;210:4;
211:24;215:17;
310:22;314:3

**baseless (2)**
257:14;260:7

**basement (1)**
354:15

**Basically (23)**
11:2;39:5;58:18;
85:15;118:4;119:22;
124:9;130:9;161:5;
163:16;208:12;
218:15;246:24;
286:24;292:5;
294:10,21;297:17;
298:19;314:19;
316:10;348:24;
358:18

**basing (1)**
263:17

**basis (5)**
212:4;310:12,21;
311:7;350:16

**Bates (2)**
99:7;268:24

**bathroom (2)**
65:16,20

**Bay (14)**
6:3;68:18;80:5;
81:9;262:17;295:2,9;
337:10;341:17;
348:15;349:23;
354:6,10;355:4

**Beach (150)**
4:7;14:21;16:8,17;
17:19;21:3;22:7;
26:23;27:13;29:7,21;
30:8,15,18;31:3,6,16,
17,18;46:8;54:22;
55:24;66:8,23;67:5,
13;68:12;69:16;
74:11;76:11,15;77:2;
79:10,17,23;81:17;
83:21;84:10;89:23;
93:19;100:10;
108:21;111:23;
113:22;114:5;
116:17;117:24;
118:25;119:17,19;
123:7;124:25;
126:14,22;127:3,19;
131:25;136:4;149:6;
150:17;154:21;
159:14,19;160:2;
179:7;195:9;198:2,
14;203:10;206:14;
208:10;209:6,17,24;
211:22;218:16;
220:13;224:9;226:2,
3,4,8,22,23;227:5,15;
237:15,17,22;238:8;
239:21;240:3,14;
241:4;242:16;
245:10,15,23;246:7;
247:7;251:6,11,17;
252:15;253:2,5,21;
254:4,20;261:20;
262:7,21;263:6,9,13,
18,24;269:10;
271:17;275:23;
277:9,10;278:22;
280:5,15;284:5;
286:18;290:16;
301:16;305:17,20;
306:16,21;307:15;
308:10;309:13;
310:7,7,9,11;313:6,
13;351:18;362:21;
367:10;368:5;370:5;
371:12,20;374:11

**beat (4)**
16:16;138:4;
157:4;276:2

**beaten (1)**
351:6

**beating (1)**

273:23

**become (3)**
279:20;364:6,10

**becomes (1)**
58:17

**becoming (1)**
249:25

**bedroom (1)**
354:2

**Beer (6)**
38:16;63:25;
331:19;342:6,7,8

**beers (4)**
37:21;52:6;64:3;
332:8

**beginning (2)**
114:6;235:9

**begins (5)**
66:3;134:3;
202:13;268:14;
335:15

**behalf (6)**
4:21,23;24:5;
205:13,18;271:4

**behind (1)**
71:14

**belief (31)**
29:11,12;43:17;
92:8,8,12,14;126:11;
135:21;177:12;
203:17,18;207:9;
208:5,6;211:20,24;
212:5;215:17;232:8;
250:5;256:16;
257:22;258:7;
260:10,13;272:5;
276:4;280:22;
304:21;361:9

**belligerent (1)**
327:20

**benefits (2)**
70:18;90:9

**besides (1)**
280:23

**best (18)**
33:12;46:12;49:6,
8;57:8;115:5;
124:10;125:23;
142:4;177:3;197:2,6;
209:4,4;259:10;
270:17;302:3;372:6

**Bets (5)**
337:9,12;348:8,20;
353:2

**better (4)**
6:21;57:9;235:23;
327:6

**Biancavilla (2)**
370:2,3

**bicycle (4)**
337:10;348:9,12;
353:10

**big (3)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 104 of 130 PageID #: 1698

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

147:19;246:22;
325:5
**biggest (3)**
145:25;246:23;
286:17
**Bill (14)**
294:6,12,15,16;
295:9,11,17;296:7,8,
9,12,17;298:24;
363:8
**birth (1)**
126:15
**birthday (1)**
149:13
**bit (4)**
103:3,4;113:10,11
**bitching (2)**
352:15,17
**blank (1)**
218:19
**blew (1)**
80:21
**block (1)**
86:19
**blocks (3)**
351:21,23,24
**blog (55)**
16:21;76:18;85:3,
6,20;86:7,12,14,16,
19,25;87:11,16,20,
25;88:7;94:3,23;
96:7,16;112:22;
129:23;130:8,15;
131:21;132:23;
133:6,7;163:19;
166:21;167:7;
168:14;170:5;
203:16;204:4,12;
208:20,25;209:12;
210:4,16,21,25;
211:7,13,18;215:23;
216:12,15,20;
218:10;219:3;
245:10;356:10,14
**blogs (1)**
88:10
**blood (2)**
19:2,9
**blotter (3)**
30:3;153:8,23
**blow (1)**
325:5
**blue (14)**
61:3;247:2,7,9,15,
21;248:4,16;249:6;
250:7,12,20,24;
271:13
**board (2)**
146:8;309:3
**boat (1)**
374:13
**boathouse (3)**
136:4,15;138:8

**Bob (1)**
281:5
**Bockelman (12)**
26:14;30:5,23,25;
31:9,12;33:23,24;
34:3,13,21;325:24
**book (2)**
30:3;114:21
**born (9)**
165:8,11;166:5;
169:10,12;170:16,
17;208:16;213:21
**Bos (1)**
327:18
**Bosetti (12)**
46:5,7;307:20;
308:22;325:20;
327:18;328:8;354:5,
9;362:2,3;363:7
**Bosettis (5)**
46:20;47:5;49:11;
345:14,22
**boss (10)**
146:5;149:21;
159:8;166:10;
180:20;183:18;
185:3,5,22;187:17
**bosses (5)**
210:5,8,11;212:2;
290:7
**both (9)**
128:24;129:4;
142:5;160:17;199:2,
5;272:5;319:22;
337:23
**bottles (1)**
342:7
**bottom (2)**
25:21,21
**boys (6)**
113:16;161:4,25;
162:12;208:15;
209:19
**breach (1)**
62:11
**break (14)**
65:19;66:2;73:20;
133:20;134:2;
158:13;202:7,12;
268:8,13;272:23;
329:22;335:14;365:3
**breaking (1)**
127:4
**Breeze (1)**
341:17
**brief (1)**
202:6
**bring (7)**
192:15,16;196:5;
282:23;289:11;
353:22;354:14
**bringing (2)**
63:16;241:3

**brings (1)**
85:3
**brochure (1)**
370:25
**broke (1)**
127:18
**brother (4)**
82:3;83:5,9,11
**Brothers (3)**
82:2;307:21;
308:22
**brought (9)**
20:23;39:19;
49:23;50:2;165:14,
15,21;192:12;235:25
**budget (2)**
231:9,10
**budgetary (13)**
172:23;175:24;
187:24;231:4,7,14;
232:2,23;233:3,6,19;
235:15;236:2
**budgeting (1)**
172:11
**Budweiser (2)**
342:6,7
**bullshit (10)**
37:20;38:14;41:7;
42:22;46:6;57:17;
321:2,2;332:8;
359:15
**bunch (1)**
149:9
**Bureau (2)**
325:25;326:3
**Buried (2)**
325:19,22
**business (3)**
263:2;278:17,18
**businessman (2)**
16:16;138:4
**buy (1)**
95:22

**C**

**cabinet (4)**
353:22;354:5,9,14
**call (48)**
14:3;16:19;21:12;
74:19;80:14;102:2;
105:20;107:3;
140:16,17;141:22;
142:7,10,12;150:14;
165:13,19,22;167:9;
176:15;178:15;
179:8;194:17;
199:14;208:7;212:7,
10,11,24;213:11;
214:2,4;235:8;
237:13;252:15;
253:25;255:2;
262:16;283:10;

298:14;299:23;
300:17;318:19;
326:2;362:9;363:12,
14,16
**called (35)**
19:18,18;105:11,
11;106:22;142:11;
143:11;149:7,20;
150:15,17;160:21;
161:14,15,16,16;
163:4;174:15;176:9,
11;214:6;239:18;
273:25,25;274:6;
288:7;300:9;312:22;
326:10;347:22;
361:15;363:20;
364:13,20;368:24
**calling (6)**
163:9,9;166:10;
241:8;339:15;360:9
**calls (2)**
16:24;32:7
**came (26)**
11:20;14:17,19;
16:2;82:16;149:5,8;
151:15;152:5;
155:12,16;180:17,
25;181:2;184:4;
241:6;262:5;274:4,5;
293:21;294:15,17;
308:17;311:15;
316:14;337:13
**can (60)**
10:12;18:11,14,15;
32:14;34:6;35:7,8;
62:24;63:7,7,22;
64:24;71:15;72:4;
74:2;76:24;77:7,10,
11;78:2;92:2;101:12,
15;103:20;113:4;
114:17;115:11;
130:4;132:18,22;
133:8;134:16;
155:10;158:3;
180:19;196:4;
198:17;202:24;
204:14;205:2,6;
213:24;214:15;
216:15;221:21;
229:19;230:13;
239:22;255:3;271:5;
283:21;312:7;
323:19;335:19;
367:7;370:13;
376:18;379:8,13
**canceled (5)**
9:17;10:17;298:8,
11,16
**cans (3)**
38:16;63:25;
331:19
**capacity (2)**
171:22;313:10

**car (2)**
143:4;262:18
**card (1)**
342:10
**carded (1)**
342:22
**cards (1)**
85:15
**care (14)**
48:8,10,13,18,22;
49:6;131:25;153:7;
301:6;316:11;
317:18;339:9;
358:14;372:15
**cared (2)**
276:19,21
**career (1)**
15:2
**careers (1)**
312:25
**carriers (1)**
15:25
**carry (2)**
197:5,15
**cars (3)**
64:2;355:11;
367:16
**Carter (410)**
4:1,4,5,5:1,23;6:1;
7:1;8:1;9:1;10:1;
11:1;12:1,13:1;14:1;
15:1;16:1,24;17:1;
18:1;19:1;20:1;21:1;
22:1,13;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1,17;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1,6,
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1,5,8;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1,3;121:1;
122:1;123:1;124:1,
16;125:1;126:1;

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1,6;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1,25;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1,
16;159:1;160:1;
161:1;162:1,20;
163:1;164:1;165:1;
166:1;167:1,19;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1,16;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1,16,17;201:1;
202:1;203:1;204:1;
205:1;206:1;207:1,
10;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;
225:1;226:1;227:1;
228:1;229:1,14,22;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1,6;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1;
251:1;252:1;253:1;
254:1,10;255:1;
256:1;257:1;258:1;
259:1;260:1;261:1;
262:1;263:1;264:1;
265:1,25;266:1;
267:1,4;268:1,25;
269:1,25;270:1,2;
271:1;272:1;273:1;
274:1;275:1;276:1;
277:1;278:1;279:1;
280:1;281:1;282:1;
283:1;284:1;285:1;
286:1;287:1;288:1;
289:1;290:1;291:1;
292:1;293:1;294:1;
295:1;296:1;297:1;
298:1;299:1;300:1;
301:1;302:1;303:1;

304:1;305:1;306:1;
307:1;308:1;309:1;
310:1;311:1;312:1;
313:1;314:1;315:1;
316:1;317:1;318:1;
319:1;320:1;321:1;
322:1;323:1;324:1;
325:1;326:1;327:1;
328:1;329:1;330:1;
331:1;332:1;333:1;
334:1;335:1;336:1;
337:1;338:1;339:1;
340:1;341:1;342:1;
343:1;344:1;345:1;
346:1;347:1;348:1;
349:1;350:1;351:1;
352:1;353:1;354:1;
355:1;356:1;357:1;
358:1,7;359:1;360:1;
361:1,21;362:1;
363:1;364:1;365:1;
366:1;367:1;368:1;
369:1;370:1;371:1;
372:1;373:1;374:1,9;
375:1;376:1;377:1;
378:1;379:1;380:1,4
**Carter-1 (3)**
22:11,16;25:17
**Carter-10 (1)**
268:19
**Carter-3 (4)**
119:25;120:6;
125:20;126:6
**Carter-4 (5)**
124:14,19;125:21;
126:7,13
**Carter-5 (2)**
162:18,22
**Carter-6 (1)**
181:14
**Carter-7 (3)**
200:15,20;217:16
**Carter-8 (2)**
265:23;266:4
**Carter-9 (2)**
267:2,7
**Carter's (3)**
352:15;382:4,7
**case (20)**
4:9;7:10,20;10:10;
44:24;72:2,13;
101:17;180:17;
257:8;273:19;
298:13,22;299:14;
301:16,21;370:5;
376:9,23;378:18
**cases (1)**
225:13
**castigated (3)**
261:19,23;262:2
**Cathy (5)**
177:7;185:7,8;
193:2,4

**cause (2)**
94:24;102:25
**caused (4)**
96:8;147:23;
148:23;279:10
**Causeway (1)**
374:14
**CC (2)**
124:21;126:8
**CC'd (2)**
120:14;125:4
**CCing (2)**
122:13,14
**celebrate (1)**
52:11
**cell (10)**
45:12;46:4,11,20;
47:4,24,25;49:3,4,10
**cellar (2)**
353:23,25
**center (1)**
143:3
**certain (7)**
63:19;88:25;
97:15;198:20;
335:23;336:6;337:7
**certainly (3)**
216:19;377:22;
378:19
**certification (1)**
3:5
**certified (6)**
310:15,17;362:13;
363:25;364:6,11
**chain (1)**
308:20
**champion (1)**
302:7
**chance (1)**
134:15
**change (3)**
126:6;329:6,9
**Changing (1)**
335:9
**Channel (1)**
197:3
**characterization (2)**
37:11;139:5
**characterize (3)**
40:20;47:3;84:15
**charge (2)**
310:9;346:12
**chauffeur (22)**
291:23;313:21;
315:8,20,22;316:18,
25;317:15,19,22;
319:11,25;320:17;
323:8,20;324:23;
326:20;327:15;
328:3;329:3,16,25
**chauffeuring (4)**
316:6;320:7;
321:12;330:21

**check (2)**
64:3;238:10
**checkpoint (13)**
315:12;316:19;
318:20;320:2;
323:21;339:16;
359:18;367:21;
374:17,20;375:3,6,9
**checkpoints (6)**
317:16;324:24;
327:16;329:17;
367:7,8
**checks (1)**
225:14
**Cherry (3)**
74:19,20,20
**Chester (1)**
372:18
**chief (60)**
40:13,18;68:25;
117:3;120:14,24;
124:21;125:7,14;
126:9;171:23,24;
172:20;191:23;
225:4,6,8,22;226:8,
10;238:11;251:13;
252:19;253:2,20;
254:9,13,19;255:2,3,
9,14;256:3,12;
282:10;292:6,7;
303:25;304:3,5,8,15,
17;306:4,22;307:16;
308:2,4;328:14;
329:24;330:21;
331:3;332:23;
333:15;334:8,10,16;
340:6,8,14
**child (1)**
339:18
**children (2)**
84:5;113:14
**choice (1)**
290:18
**chose (1)**
21:10
**Chris (11)**
139:23,23;140:19;
141:23;142:11;
262:5,10;263:15;
264:23;361:17,19
**Christine (1)**
5:4
**chronologically (1)**
293:20
**chuckled (1)**
50:8
**circulates (1)**
256:16
**circumstances (1)**
21:4
**cite (1)**
72:5
**citizens (1)**

62:5
**Civil (46)**
12:10;14:15;
114:17;178:5;
181:15,24;190:10;
200:4;202:3;217:25;
230:13;233:11;
257:16,20,25;258:5,
10,14,15;259:4,8,12,
18,22;260:6,22;
261:5;309:15;
311:15;312:22,22;
361:23,24;362:6,9;
363:5,12,17,21;
364:13,14;370:7;
371:13,18;372:15;
373:3
**civilian (3)**
313:22;352:22;
353:13
**civilians (1)**
351:8
**CJ's (8)**
45:13;46:4;48:3;
336:9,13,20;337:20;
339:8
**Claim (47)**
22:12,24;23:2,6,8,
21;24:3,4,8,12,16,25;
25:12,16,20;26:2,12;
35:10;38:21,23;70:9;
71:6,10;72:18;79:5,
8;81:11;103:17;
105:25;128:21;
129:7,13;132:8;
158:25;198:18,20,
23;202:23;204:18,
23;228:24;240:8,9,
13;254:22;260:6;
278:2
**Claimant (3)**
70:14;129:4;199:5
**Claimant's (4)**
128:24,25;198:25;
199:2
**claimed (2)**
70:10;72:19
**claiming (1)**
350:3
**claims (2)**
273:9;377:12
**clammed (1)**
77:15
**clarify (1)**
249:14
**class (5)**
161:18;368:4,6,9,
11
**clean (9)**
37:20;38:5,17,20;
39:7,13;42:5;352:16,
17
**Cleaning (3)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 106 of 130 PageID #: 1700

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

63:25;332:8,15

**clear (6)**
33:22;44:21;
117:15;229:25;
252:6,8

**Clemens (2)**
52:2;67:16

**clerk (2)**
292:7;360:2

**client (3)**
72:14,17;226:24

**clique (1)**
335:25

**clumping (1)**
103:7

**clumps (6)**
98:8;102:12,16,16,
23;103:12

**code (1)**
172:17

**codeine (3)**
94:13;95:19,21

**coffee (1)**
210:9

**color (1)**
143:9

**comfort (19)**
70:21;73:15,17,21,
22;74:4,5,8;75:24;
76:21;78:14;79:10,
17,24;81:17;82:5,10;
83:22;84:14

**comfortable (4)**
231:19;232:3,7;
235:16

**coming (18)**
39:14;45:25;
106:3;122:11;150:2;
157:2;159:10;161:4;
162:2;164:24;166:9;
292:13;318:21;
322:14;325:15;
326:2;349:23;355:15

**command (1)**
308:20

**commander (1)**
302:18

**commanders (2)**
302:11,15

**commencement (1)**
27:12

**comment (14)**
15:20;131:7,14,18;
135:22;136:13;
158:18,20;215:18;
216:3,6,10,12;
276:10

**comments (4)**
134:8;182:15;
198:20;275:4

**commissioner (15)**
172:18;177:5,6;
185:21;186:24,25;

188:7;191:24;
192:15,17,20,22,24,
25;260:20

**commit (1)**
89:25

**committed (3)**
341:10,14;345:2

**communicate (4)**
44:8;50:22;69:15;
159:12

**communicated (6)**
21:7,15,21;22:5;
109:20;365:12

**communication (7)**
25:7;260:23;
261:3;280:3;281:22;
282:5;328:23

**communications (5)**
7:25;11:20;
105:21;193:20;365:7

**community (6)**
70:21;110:17,19,
22;111:3,5

**comp (4)**
125:8,12,15;
254:24

**company (1)**
318:22

**compensation (1)**
70:18

**complain (56)**
35:21,24;36:9,12,
16;43:15,23;45:5;
50:14,16,19;51:4;
68:25;313:25;
318:13;319:2;
320:16;321:23;
322:6;323:3,6,25;
325:2,7;328:14;
329:24;330:3,6,8,20,
24;331:3,6;332:13,
16,22;333:15;334:9,
13,16;338:15;339:3,
22;340:8,14,16,18,
20;343:16,25;
345:21,25;346:6;
355:18,19,24

**complained (29)**
37:2,13,17;38:12;
39:3;40:3;41:5,23;
42:4,21;45:18;59:18;
60:14;61:20;69:2;
88:11;314:6,13,22,
23;315:25;317:13;
320:22;321:11;
326:19,25;327:14;
341:7;347:6

**complaining (6)**
38:3,4,8;60:21;
88:9;327:25

**complaint (103)**
11:5;38:19,24;
39:9,17,18;40:21;

41:11,13,17,19,25;
42:8,12,15,18;43:2,5,
8,11;45:20,23;46:21;
47:4,6,9,12,15,19;
48:6,17;49:12,16,25;
50:6,10,17;52:14,20,
25;53:2,19,21;58:2,
16;60:25;61:4;
62:19;63:20;64:22;
69:17;79:22;81:12;
83:19;97:13;195:6,
25;196:6,15;205:10,
12,16,17;206:5;
244:3,11,22;245:18,
19,25;246:5,7,8,11,
13,16;257:4;264:3;
265:9;271:8;272:8,
16,20;277:18;313:4,
8;315:16;316:5,9;
317:2,17;321:7;
322:24;328:10,25;
330:11;331:9;
335:19;347:20;
348:6;352:8,14;
376:12

**complaints (16)**
50:24;58:13;63:8,
23;64:5,11,18,19,23;
69:22;128:6;321:25;
324:4;329:14;
346:19;361:4

**complete (1)**
211:16

**completely (2)**
71:11;207:4

**completes (2)**
202:10;380:3

**composed (1)**
368:4

**computer (6)**
94:19;161:21;
196:4,11;364:17;
366:16

**concern (9)**
102:25;245:21;
246:4,9,13,18,22;
275:5;276:4

**concerned (3)**
36:6;377:8,10

**concerning (84)**
7:17,25;8:7;11:10,
16,25;12:2;19:24;
20:9;21:21;47:19;
49:16;50:11,24;58:5,
13;59:19;62:21;63:9,
24;64:11,25;69:3,17,
23;90:24;95:5;96:4;
97:16;102:11;
103:12;108:10;
134:9;135:3,7;136:9,
21;137:7,10;154:18;
155:7,25;158:18;
159:2,13;173:8;

177:10,19;180:13;
186:4,10;187:22;
188:10;195:21;
197:6,16;209:20;
210:16;213:14;
214:18;224:23;
226:4;227:15;
229:17;251:10;
256:18;261:19;
272:15,19;273:18,
19;277:8;280:4;
286:19,20;314:23;
328:25;329:15;
360:6,14;365:7,18;
366:8;371:11

**concerns (1)**
19:24

**concluded (1)**
147:16

**conclusion (5)**
32:8;264:4,9,14,19

**conduct (15)**
26:5;31:21,25;
32:11,16;33:18;34:2,
3,12;35:19;60:14,21;
61:19;90:5;313:12

**conference (7)**
196:14,18,22,25;
197:16,24;198:13

**confirm (1)**
261:6

**conflicting (1)**
178:17

**conform (1)**
309:14

**confrontational (1)**
166:7

**confronted (1)**
261:18

**confused (3)**
208:18;209:16;
350:22

**confusing (1)**
250:4

**conjunction (1)**
369:6

**connected (1)**
208:13

**connection (7)**
103:16;148:24;
276:14;371:19;
376:22,25;377:4

**Connolly (10)**
9:6;40:24;41:2;
158:2;213:8;374:8;
376:21;377:6;
379:15;382:22

**consecutively (1)**
268:23

**consider (2)**
35:9;127:25

**considered (1)**
206:4

**console (2)**
143:3,21

**constant (7)**
108:12,15,24;
109:4,8,13,16

**Constitutional (1)**
244:18

**contact (11)**
93:11;108:24;
109:4,8,13;110:9;
163:14;275:2;284:6,
7;369:22

**contacted (4)**
110:12;235:10;
284:11;364:14

**contained (3)**
97:10;103:24;
376:11

**content (1)**
246:10

**contents (1)**
246:15

**continue (4)**
68:23;228:15;
302:4;316:24

**continued (5)**
84:23,24;314:16;
362:10;379:19

**continuously (1)**
27:6

**contract (1)**
116:16

**contributed (2)**
148:20;216:6

**control (8)**
34:9;93:13;101:3;
102:4;134:23;
302:10;366:13;382:8

**controlled (2)**
118:5;367:21

**conversation (73)**
9:13;10:25;20:6;
21:5;55:3;140:14,23;
141:2;142:20;
144:15,25;145:5;
147:3,13;169:8,14,
25;170:2,7,7,14;
174:6,21;176:4;
178:14,19;187:3;
188:9,21;189:3,8,13,
18,23;190:16,20;
191:4,12,13,14;
192:5;193:5,24,25;
194:8,24;203:21;
210:9;213:14;
216:24;218:23;
219:5,15;228:24;
238:24;260:11;
275:8,15;277:3,5;
278:2,8;279:19;
283:4,20;284:16;
286:7;288:10,13;
293:22;309:20;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 107 of 130 PageID #: 1701

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

371:22;377:21
**conversations (14)**
144:10;145:8,14,
23;146:11,17,19,22;
150:7;179:3,11;
180:8;194:2;202:18
**Conway (2)**
63:15;342:18
**cooperate (3)**
301:12,15,20
**cooperating (2)**
152:18;155:15
**copies (4)**
99:4;102:2;366:6;
382:6
**cops (4)**
358:10,12,13,14
**copy (10)**
93:12;117:7;
199:19;205:6;269:9;
282:2;293:6,8,11;
362:14
**Corallo (2)**
74:16;77:13
**Corneille (1)**
326:9
**corner (2)**
82:16;355:3
**correctly (7)**
117:13,22;146:15;
235:12;243:12;
249:4;329:12
**Correspondence (16)**
117:12;120:2,11;
123:17;124:15,25;
150:5;224:15;284:2,
4,6;311:14,19;
358:19;371:17;372:3
**corridor (2)**
215:8,8
**corruption (8)**
208:12;209:23;
250:16;271:17;
272:23;273:9;276:7;
290:6
**cost (2)**
215:20,23
**Costco (1)**
125:18
**costs (8)**
70:19;71:2;72:4,
15,20,21;73:9,11
**counsel (12)**
3:3;4:18;5:8;6:24;
7:4,5;8:3,5,8,9,11;
11:24
**counter (1)**
95:23
**County (65)**
5:4,6;13:22,25;
14:11;15:10;20:3;
107:3,5,10;178:5;
181:15,24;201:17;

202:3;217:18;218:2;
229:24;230:9;235:3,
6;236:11,19,22,23;
237:3;238:7;239:12,
16,23;243:24;
252:14;258:14;
262:16;273:14;
275:2;276:9;277:3;
280:4;283:8;284:12,
18,25;285:20;
287:25;291:12,20;
292:3;293:14;
301:12,15;309:15;
325:25;326:3;
362:20;366:25;
367:20,23;368:20,
21;369:21;370:7;
371:13,18;376:9
**couple (27)**
9:24;31:14;54:3;
55:25;57:21;65:8;
68:21;82:24;89:10,
18,19;95:19;106:25;
146:6;149:17;190:3,
6;262:18;268:8;
292:11;295:6;
342:15;349:4;
358:16;364:23;
372:17;374:24
**courage (6)**
61:2,7,12,14;62:9;
271:13
**Court (27)**
3:16;4:8,13,15,16;
5:15,21,24;13:12;
22:10;23:10;71:16,
22;200:14;292:7;
360:2
**coverage (1)**
52:8
**crap (1)**
359:16
**crimes (3)**
341:9,14;344:25
**cups (3)**
37:21;38:16;342:8
**current (1)**
249:17
**currently (1)**
185:20
**custody (7)**
34:9;93:13;101:2;
102:3;134:23;
366:13;382:7
**cut (5)**
40:10,11;41:7;
42:22;82:19
**cuts (3)**
231:4,7,14
**cutting (4)**
159:9;161:3,24;
165:18

**D**

**DA (50)**
152:18;153:24;
154:6,11;156:6;
194:23;273:13,14;
275:2;276:9,17,19,
23;277:3,16,25;
278:4,13;279:18,25;
281:22;283:8;
284:12,18,25;
285:20;286:12;
287:25;288:4;
291:12,21;292:3;
293:14;296:3,17;
297:4,23;298:2,7,11,
21;299:13;300:6,19,
24;301:2,12,15,21;
376:10
**damage (2)**
70:9,19
**damaged (1)**
110:25
**damages (6)**
70:14,16;71:10;
72:18,22;97:16
**damaging (2)**
257:14;260:7
**dangerously (1)**
313:19
**DA's (1)**
194:20
**date (25)**
8:20;23:21,23;
30:16;72:8,21;79:21;
81:10,11;83:18;
107:22;132:22,23;
208:23;216:14;
231:13;240:24;
244:21;271:6;
274:25;298:9;312:5;
314:8;343:12;358:5
**dated (12)**
79:6;96:25;120:2,
7;124:15,22;162:19;
200:16,20;240:10;
265:24;267:3
**dates (3)**
11:14,19;126:21
**daughter (1)**
127:7
**daughter's (2)**
113:16;149:13
**Dave (5)**
148:8,11;151:9,11,
13
**day (51)**
31:2;51:11,12;
57:6;62:25;63:6,22;
64:22;68:6;69:3;
75:2;76:3,4;82:14,
14;90:2,6;94:5;

106:17;110:15;
114:12,19,25;115:2;
116:7,10;117:18,18,
20;118:16,19;
126:24;127:11;
150:19;151:12,14,
16;165:20;187:16;
195:13;198:11,12;
220:12;283:15;
284:19;285:15,16;
322:9;364:17;373:4;
380:11
**days (16)**
9:18,20,24;27:8,
12,25;28:24;119:4,
15,16;124:9;146:6;
149:18;163:23;
328:7,7
**day-to-day (1)**
112:21
**dead (1)**
322:4
**deal (1)**
301:11
**dealers (1)**
278:6
**dealing (2)**
166:10,11
**deals (1)**
301:20
**debating (1)**
198:8
**DeCanio (11)**
160:22;161:23;
171:17;172:20;
199:14;208:8;212:8,
20;214:7;257:9;
260:9
**DeCanio's (1)**
173:14
**Decantio (22)**
171:16;173:6,13,
16,24;175:5;176:23;
177:9,17;212:11,16,
23;213:15;214:3,4,9,
10,17;223:13;
228:25;260:16,21
**December (7)**
120:3,7,20;121:7,
24;123:2;125:20
**decide (2)**
9:25;290:19
**decided (1)**
198:10
**decision (4)**
21:22;155:7;
188:12;190:21
**decisions (1)**
119:18
**deck (1)**
295:10
**decreased (1)**
113:8

**deem (1)**
62:11
**defamation (6)**
131:6;132:21;
140:2;145:24,25;
246:24
**defamatory (40)**
85:2;129:3,8,14,
22;130:5,19,25;
131:7,14,18;132:9;
133:10,11;134:8,18;
135:3,8,17,22;136:3,
8,13,22;137:6,11;
140:7;158:24;
159:12;198:20;
199:4;203:7,14,25;
204:11,18,23;
215:22;216:8,12
**defamed (5)**
110:25;130:13;
132:24;199:11,16
**defaming (2)**
166:9;180:18
**Defendant (6)**
44:23;45:3;81:23;
85:25;303:3;308:8
**Defendants (6)**
4:7,24,25;5:6;
196:20;366:25
**Defendants' (1)**
205:5
**Defendants'-1 (1)**
205:9
**defense (1)**
72:6
**defined (1)**
123:4
**definitely (1)**
19:5
**delayed (1)**
5:10
**demoted (1)**
90:14
**Denhoff (1)**
355:4
**denied (6)**
207:10,20;208:2;
229:22;230:3;236:7
**deny (1)**
230:6
**department (67)**
88:15;93:5;121:4;
170:11;172:9,10,14,
15,16,19;175:6,20,
22;183:4,6;188:3;
203:10;208:15;
217:24;219:10;
238:7,8;247:2,4;
248:6,6,15,19,23,24,
25;250:6,11,16;
251:7,12,18;253:21;
254:4;258:15;
269:10;271:18;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 108 of 130 PageID #: 1792

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

282:13,21;290:17;
292:9;294:5;302:9;
305:17,20;306:16,
22;307:15;308:10;
310:7,10;313:19;
351:2;355:14;
360:15;362:15;
364:20;370:7;
371:12,13,19,20
**departments (2)**
368:6,8
**department's (1)**
176:13
**deploying (1)**
52:7
**deposed (11)**
7:10;8:17;10:16;
12:3;299:14;300:10,
12,16,20;301:4,8
**deposition (23)**
3:6,13;4:3;5:12;
6:11;7:13,16,17,21;
8:13,20;9:15,19;
10:3,9;11:8,11,25;
72:9;298:9,12,15;
380:3
**depositions (4)**
9:16;10:12,16;
11:13
**describe (4)**
77:7;80:2;100:15;
351:19
**desk (7)**
39:12,23;99:25;
125:3;293:25;
294:18;311:20
**destroy (1)**
248:11
**detail (2)**
71:13;244:7
**Detective (13)**
275:11,12;276:8;
277:4;280:9;283:12;
293:21;296:22;
300:21,22,24,25;
301:6
**detectives (3)**
277:7,16;288:13
**determine (2)**
123:9;264:25
**device (1)**
17:11
**DI (4)**
25:4;71:3;249:10;
382:12
**dictaphone (1)**
143:10
**difference (4)**
114:15,16;180:4;
324:13
**different (10)**
82:14;89:16;
92:20;94:18;119:6;

179:22;223:9;
269:20,23;343:5
**differently (2)**
34:20;75:18
**difficulty (1)**
84:19
**dinner (1)**
68:18
**direct (8)**
64:11;187:18;
203:8;319:17;323:8,
20;324:23;338:16
**directed (4)**
204:9,17;319:11,
25
**directing (2)**
320:17;323:14
**direction (9)**
203:9;318:10;
325:9;326:20;
328:15;329:3,15,25;
338:17
**directions (2)**
327:15;328:2
**directive (4)**
221:3;222:14;
289:20;341:13
**directives (39)**
16:10;21:9,17;
133:16,16;134:9;
135:4,7,12,16,20,23;
136:9,13;146:7;
166:16,17;168:11;
218:19;219:19;
220:2,13,20,21,24;
221:4,10,20,21,22,
25;222:6,10;230:11;
231:22;232:15;
237:24;289:21;341:8
**directly (16)**
21:7,21;22:5;
33:10;35:4;64:24;
132:8;140:8,10;
159:12;309:11;
310:5,18;319:5,7;
347:11
**director (9)**
200:23;202:2;
208:22;217:3,10,18,
21,24;218:2
**disability (4)**
121:8,10;226:11;
253:19
**disagree (1)**
377:24
**disc (2)**
144:23;145:20
**disciplinary (1)**
313:4
**discipline (5)**
303:7;304:23;
307:4,9,11
**disclose (2)**

11:19;299:2
**disclosed (1)**
179:20
**disclosing (3)**
179:22,24;180:5
**disclosure (3)**
93:4,7,9
**discovery (3)**
312:11,16;359:6
**discuss (4)**
109:18;371:3;
377:18;378:17
**discussed (4)**
109:25;371:11;
378:9,10
**discussion (3)**
191:5;258:23;
296:23
**dispatchers (1)**
139:13
**disprove (1)**
236:3
**disregard (1)**
341:13
**disregarded (2)**
128:5;344:25
**disregarding (1)**
341:9
**District (21)**
4:8;9:16:14;138:5;
148:4,6,11;149:3,23;
150:22;151:10,17;
152:5;153:20;
155:15;157:3;
250:18;280:4;284:7;
290:8;369:21
**disturbing (1)**
94:5
**division (2)**
247:5;248:10
**doc (1)**
120:10
**dock (4)**
46:2;49:3;139:13;
353:22
**doctor (6)**
88:23;95:4,12;
96:3;102:11;103:9
**document (34)**
22:21,23;32:10;
99:7;101:15,16;
104:12,20,25;
119:24;124:14;
162:18;165:6;
181:14,20,23;206:9;
226:4;260:4;265:23;
266:3;267:2,8,18;
268:24;269:8;
270:11;291:13,21;
292:3,17;293:4,15;
312:20
**documentation (1)**
224:22

**documents (3)**
22:11;268:18;
366:12
**done (23)**
22:18,19;23:9;
90:18;112:8;146:18;
161:17;166:7;170:3;
206:23;238:8;
291:11,11;295:13;
323:17;326:12;
335:20,21;345:6;
350:24;355:13;
358:2;364:24
**Donuts (2)**
80:6;81:9
**door (11)**
295:7,9,12,14;
296:8,10,13;342:5,5;
347:2,4
**double (1)**
209:18
**doubt (1)**
171:12
**down (24)**
51:17;52:17;
54:18,22;55:7;73:21;
111:9;127:5,19;
130:9;190:14;
208:21;270:13,18;
274:9,9,15;275:13;
277:2;279:8;292:10,
20;329:22;337:10
**dozen (2)**
96:11;273:17
**drafts (1)**
205:15
**drank (8)**
55:20;57:23;
59:24;60:8;66:7,13,
18,21
**drawn (8)**
264:3,9,13,19;
265:5,10,14,18
**drink (31)**
37:12;51:20,21,24;
52:21;53:7,12,17;
54:21;55:5,15,16,21;
58:6,11;59:7,10,12,
21;60:18;61:15;
66:25;67:2,4,8,11;
68:4,10,19;302:11;
336:22
**drinker (1)**
336:20
**Drinking (49)**
31:24;32:20,25;
33:3,20;34:16;35:14,
18;36:4,13,17;37:22;
38:3,9,15,21;43:17,
24;44:10;45:7;
47:20;49:16,18;
50:25;51:5;52:18,22;
53:3,20;54:12;55:14;

58:5,9,14;59:20;
60:3,10;61:23;62:21;
63:9,24;65:2;69:3,
24;315:5;318:15;
341:25;346:20,22
**drinks (6)**
54:4,24;55:6,25;
292:12;339:11
**drive (12)**
56:13;58:25;
127:10;318:24;
323:16,17;327:9,19;
339:15;360:3;
374:24;375:7
**Driver's (7)**
101:4,5,8,13,20;
107:19;382:4
**driving (8)**
64:6;319:6;
322:14,15;324:11;
325:18;327:6;337:10
**dropped (5)**
39:12;82:11;
208:14;293:5,15
**dropping (2)**
215:6;218:7
**drove (2)**
326:7;327:20
**drug (1)**
278:6
**drunk (1)**
58:25
**drunken (1)**
291:23
**due (5)**
102:19,21;207:12;
228:20;283:25
**duly (1)**
5:18
**dumbfounded (1)**
289:22
**Dunkin (2)**
80:6;81:9
**during (31)**
18:17;19:10;
21:12;29:22;31:2;
36:22;48:17;62:25;
63:21;68:6;90:5;
109:4;114:11,24;
115:25;116:3;118:6,
16,18;127:16;
128:24;157:4;
188:21;189:2;
190:19;199:2;
277:25;278:8;
280:17;283:3,20;
289:2;317:9;350:12,
13;351:2;356:4
**duties (2)**
313:2;350:10
**duty (71)**
31:24;32:20;33:2,
20;34:16;35:14,16,

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 109 of 130 PageID #: 1703

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

18;36:13,17;37:13;
38:21;43:18,24;
44:10;45:7;46:12;
47:20;49:17,19;
50:25;51:5;52:19,21,
22;53:12,20;54:12;
55:14;58:6,14;59:20,
25;60:4,11,16;61:11,
16,23;62:21;63:9,24;
65:2;66:23,23;67:4,
9,12,16;68:5,5,11;
69:4,23;126:16;
134:11;166:4;
271:14;277:25;
288:24;291:6,15;
301:25;320:3,6,9,10,
13;331:23;351:15;
375:11

**E**

**earlier (9)**
31:14;104:11;
163:23;178:17;
241:2;281:14,15;
288:3;366:24
**early (3)**
14:4;51:13;105:15
**ears (1)**
322:4
**easily (1)**
153:7
**East (1)**
151:6
**Eastern (1)**
4:8
**economic (1)**
70:16
**Ed (23)**
4:15;40:18;43:15,
23;44:9;47:10;70:2;
87:4;125:18,21;
138:2;139:4,8,9,10;
218:12;225:11;
253:18;270:22,25;
303:25;304:6;361:21
**Eddie (6)**
80:11;127:9;
161:19;176:10;
254:3;327:4
**editorial (1)**
267:10
**Edward (5)**
4:4,5;5:23;270:2;
380:3
**effect (1)**
3:15
**effort (1)**
238:14
**efforts (4)**
108:11;227:3,13;
302:7
**eight (4)**

170:9;318:3;
320:13;351:23
**either (19)**
119:4;204:9;
212:19;270:21;
313:13;320:17;
321:4,12;323:8;
326:20;327:15;
328:3;367:21;
371:14,17,23;372:3;
374:12;376:10
**EL (10)**
22:14;99:9;120:5;
124:18;162:21;
181:18;200:19;
266:2;267:5;269:3
**Eligible (1)**
181:16
**else (41)**
12:2;26:16;32:21;
34:17;36:2,9;83:20;
129:13,18;134:16;
155:17;162:10;
175:4;176:16;179:2;
185:17;196:17;
199:20,23;212:15;
214:10,18;231:5;
270:25;271:3;
272:12;281:18,21,
24;283:19;285:18;
287:13,15;295:15;
308:17;317:19;
349:7;352:19;
355:24;359:24;
373:23
**email (54)**
21:13;160:18;
161:12,19,22;162:9,
19,22;163:4;165:8,9,
20;173:20,25;175:2,
5;177:11,20,25;
199:13,15,17,20,23;
212:13,17,22;213:5,
14,22,24;214:3,11,
20;223:3,5,12,20;
224:16,17,20,21;
230:21;255:6;
265:24;266:21,23;
267:3,15,17,19;
365:12;371:17;372:3
**emailed (3)**
365:24;366:3,8
**emails (2)**
365:6,17
**email's (1)**
267:12
**embarrass (1)**
238:2
**Embreui (9)**
294:7,12,13,15,17;
295:22;296:17;
298:25;363:8
**emotional (5)**

70:23;93:23,25;
94:9;95:16
**empanelled (1)**
172:20
**employed (6)**
12:6,12;203:9;
237:17;253:5;313:6
**employee (7)**
91:13;162:3;
171:6;195:9;254:20;
307:16;308:15
**employees (9)**
303:8;304:23;
307:4,9,11;308:11,
16;374:10;375:16
**employee's (1)**
269:12;270:7
**employer (15)**
15:5,7,10,12;92:5,
17;93:2;181:3;
222:13;242:21,23;
243:17,17;249:17;
253:12
**employment (21)**
12:16,18;13:17,20,
21,25;14:12,24;
27:13;29:8;31:2,6;
114:4;128:25;129:2;
131:17;132:7;
163:16;199:2,4;
261:20
**employment-related (1)**
303:8
**empty (3)**
37:21;322:18;
331:19
**encounter (1)**
372:11
**end (15)**
14:7;68:14,17;
107:6;108:23;
117:19;158:8;202:5;
216:20;228:19;
238:24;242:7;
302:23;341:6;362:13
**endemic (1)**
271:16
**ending (1)**
134:7
**ends (4)**
65:23;133:23;
268:10;335:11
**enforced (1)**
341:9
**enforcement (11)**
172:17,21;240:4;
244:25;247:2,5,8;
248:4,10;253:20;
273:8
**engage (8)**
31:22;32:2,12,17;
34:4,13;247:20;
250:7

**engaged (3)**
26:6;60:3;291:5
**engages (2)**
248:16;250:12
**engaging (2)**
249:6;291:14
**enough (3)**
10:13;95:12;
231:16
**enraged (1)**
359:17
**ensuring (1)**
309:14
**entered (1)**
9:6
**entire (4)**
174:25;305:17,19;
306:21
**entirely (1)**
72:12
**entitled (4)**
71:12;72:6,14;
73:12
**entity (7)**
12:13,16,19;13:17,
20;15:12;329:14
**entry (2)**
216:15,20
**escapades (2)**
277:24;278:15
**establishment (1)**
61:14
**estimate (1)**
57:7
**et (2)**
4:5,7
**Europe (1)**
295:3
**evacs (1)**
225:13
**even (17)**
79:3;88:12;128:4;
151:8;218:20;
224:19;231:20,22;
233:12,17;248:12;
249:8;253:22;271:6;
286:5;324:4;351:12
**evening (2)**
55:2;360:4
**event (1)**
73:12
**events (5)**
19:15;20:8,19;
63:19;244:8
**everybody (6)**
56:18;188:3;
294:9;343:19;
348:16;361:9
**evidence (6)**
180:13,16;204:8,
16,21;216:11
**exact (16)**
30:16;96:10;

153:14;167:13,17,
19;174:22;190:11;
208:23;231:12;
241:7,10;273:15;
298:9;332:3;358:5
**exactly (14)**
49:5;114:20;
144:17;145:3;161:2;
162:5;191:19;
193:10;220:15;
241:8;292:15;
293:19;318:2;372:22
**exam (4)**
18:7,18;19:10;
375:25
**EXAMINATION (5)**
6:13;366:21;
374:7;375:15;382:19
**examined (1)**
5:19
**example (3)**
77:25;287:10;
378:15
**examples (1)**
26:17
**except (4)**
3:9;133:7;192:12;
356:10;357:10,11
**exchanged (2)**
371:16;372:2
**excuse (2)**
69:7;368:19
**executive (3)**
185:21;186:23,24
**exemplary (1)**
313:2
**exercise (1)**
62:9
**Exhibit-1 (4)**
22:13;128:22;
205:6;271:9
**Exhibit-10 (1)**
269:2;286:25
**Exhibit-2 (3)**
99:6,8,11
**Exhibit-3 (1)**
120:4
**Exhibit-4 (1)**
124:17
**Exhibit-5 (1)**
162:20
**Exhibit-6 (1)**
181:17
**Exhibit-7 (1)**
200:18
**Exhibit-8 (1)**
265:25
**Exhibit-9 (1)**
267:4
**exist (1)**
365:17
**expect (2)**
171:6;230:24

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 110 of 130 PageID #:
1704
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

**experience (3)**
26:21;27:2;30:7
**expire (1)**
190:10
**expired (1)**
191:21
**Explain (10)**
114:15;128:13;
152:22;155:12;
163:10;172:13;
187:12;189:2;
237:19;367:7
**explained (17)**
127:2;153:7;
161:23;163:5;
176:12;208:24;
218:8,10;220:15;
237:14;238:22;
244:6;285:7,14;
288:3;289:16;314:16
**explaining (5)**
161:22;224:2;
225:20;226:24;268:4
**explanation (3)**
230:2;252:6,9
**explode (2)**
58:19;59:9
**expressed (2)**
20:12,15
**extent (8)**
10:24;105:2,20;
115:10;270:11;
376:14;378:8;379:9
**extreme (4)**
70:22;93:22;94:9;
95:16
**eyes (2)**
112:13,18

**F**

**face (10)**
94:20;161:10,10;
174:12,12;197:11;
358:24;359:3;
363:14,16
**face-to-face (2)**
140:13;187:3
**fact (26)**
12:2;38:4,19;
39:22;43:15;83:4;
127:7;137:13;
152:21;154:12;
165:10;166:3;173:9,
12;179:18;180:7;
183:3;244:17;
246:20;267:17;
288:22;291:9;
297:13;342:2,3;
354:13
**fail (5)**
19:14,25;20:7,18;
245:4

**failed (1)**
376:3
**failing (1)**
133:16
**failure (1)**
302:9
**Fair (16)**
10:13;14:25;37:9,
11;38:18;41:9;
100:16;126:20;
127:23;139:5;186:6,
7;211:15;240:12;
355:16,23
**fairly (1)**
84:15
**fall (9)**
16:10;21:10;
149:2;220:14;280:6;
336:21;337:20;
339:2;340:10
**fallen (1)**
302:10
**falling (4)**
102:16;103:7,13;
231:23
**falls (1)**
130:8
**false (8)**
171:9;176:19;
222:8;223:24;
246:23;256:17;
257:14;260:7
**falsified (4)**
16:22;131:10;
209:14;356:12
**falsify (1)**
153:22
**falsifying (4)**
85:15;87:7;
163:20;166:21
**familiar (1)**
23:3
**family (7)**
73:18;111:8,12;
126:25;128:15;
261:18,22
**family's (2)**
73:22;74:5
**fan (1)**
295:12
**far (6)**
172:11;238:4;
244:17;252:16;
290:16;375:13
**fashion (1)**
313:2
**father (1)**
110:23
**fault (1)**
327:5
**favorable (1)**
41:24;42:7,25
**faxed (1)**

**364:21**
**fear (1)**
70:22
**February (9)**
126:17,24;127:12,
12;162:13,15;
169:15;171:3;217:14
**Federal (1)**
6:6
**fee (1)**
72:3
**feel (4)**
222:9;298:20;
299:8,12
**feeling (2)**
285:8;347:5
**fees (9)**
70:19;71:2;72:4,8,
15,19,21;73:9,11
**fellow (1)**
56:2
**felt (18)**
105:25;110:4;
145:24;147:19;
208:13;231:3,15,18;
232:3,6;235:16,23;
239:10;275:17;
276:14;285:8;
299:17;300:15
**female (1)**
369:14
**females (1)**
325:18
**ferry (1)**
374:13
**few (8)**
28:15;90:11,18;
107:10,14;191:21;
194:2;365:6;367:2;
374:24
**field (1)**
367:12
**fight (1)**
326:4
**figure (2)**
154:18;235:20
**file (12)**
24:4,25;205:12,17;
206:17;261:10,13;
353:22;354:5,9,14;
370:18
**filed (18)**
8:14;23:8,21;24:8,
13;79:4,21;82:16,20;
96:24;240:8;244:2;
245:25;246:5,7,8,13;
254:22
**filing (9)**
3:4;79:8;81:11,12;
83:19;196:15;
240:13;244:22;272:8
**fill (5)**
93:4,16,17;105:4;

**242:4**
**filled (5)**
178:11;192:9;
237:12;270:14,15
**filling (4)**
188:24;189:3,10;
192:3
**final (1)**
166:8
**find (11)**
15:11;35:13;
220:6;225:16;238:2,
3;245:17;263:3;
274:3;306:17;364:16
**finding (2)**
245:22;246:6
**Fine (3)**
218:4;295:6;377:6
**finish (1)**
74:2
**finished (1)**
345:7
**FINS (1)**
367:19
**Fiorillo (13)**
106:8,10,12,15,20;
107:8,9;108:9;
110:11;266:19;
349:6;353:21;355:7
**fire (10)**
33:12;34:25;
66:13;221:23;
360:20;367:9,19;
368:18,19;374:16
**fired (70)**
16:8;17:19;18:4,8,
19;33:5,6,8;35:5;
111:23;131:12;
135:11,19,23;
138:11;146:9,25;
147:17,20;148:21;
150:8;167:3,12,20;
168:4;195:5;219:18;
220:2,19;221:9,22;
222:6,9,9;223:13;
224:2,5,12,24;
225:20;226:5,24;
227:6,16;231:2,7,25;
232:12,23;233:6;
235:14;240:6,16,21;
241:15,19;242:15,
19;243:15;244:14;
274:7,23;276:20,22;
278:19;296:21;
297:7;347:5,13,17
**firing (3)**
133:14;221:25;
276:15
**firm (19)**
4:13;23:20;
103:16;104:8,16;
105:14,18,22,23;
106:10;109:19,20,

22,24;110:5,9,14,16;
202:17
**first (68)**
5:17;8:14;31:3,6,
12;35:12,13;37:16;
38:13;40:21;41:6,13,
17,22;45:9,18,23;
56:22,23;57:3;60:24;
66:17;71:24;75:21;
77:11;105:7,13;
121:9;144:12;149:8;
150:12;151:14;
152:5;166:15;
189:17;190:15;
193:5;194:8;203:6;
207:8;220:12;
228:15,19;229:5,17;
231:21;237:10;
269:6;271:9;280:2;
281:22;283:3;285:4;
314:5;315:25;
320:22;321:7;
325:11;326:18;
336:17;338:10;
345:20;346:7;348:5;
352:24;353:11;
362:5;367:11
**firsthand (3)**
282:25;352:10;
356:17
**five (16)**
5:13;25:21;27:25;
61:2;63:11;109:18;
113:16;156:22;
249:20;268:15;
271:11,12;282:7;
302:22;335:12;
367:12
**five-minute (1)**
202:7
**flagged (1)**
91:19
**flashlight (1)**
352:4
**floor (1)**
341:19
**fogged (5)**
89:11,21;90:6,12,
19
**follow (3)**
133:16;227:18;
245:5
**followed (1)**
135:20
**following (9)**
9:17;22:11;
119:24;124:14;
162:18;181:14;
265:23;283:15;
284:19
**follows (2)**
5:20;130:10
**follow-up (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 111 of 130 PageID #: 1705

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

253:25

**food (1)**
339:10

**force (1)**
3:15

**forget (1)**
241:7

**form (9)**
3:10;44:9;93:5,7,9,
12,16,22;130:9

**forth (8)**
205:25;206:4;
244:7;257:6;311:15;
316:19;345:9;360:24

**forward (2)**
240:23;260:19

**forwarded (1)**
91:9

**found (6)**
24:19;48:14;
61:22;143:17;
225:14,15

**four (11)**
18:2;25:20;70:11,
11;110:18,20;168:7,
23;190:12;202:14;
268:11

**fourth (7)**
17:5;166:8,14;
289:5,6,7;323:3

**frame (3)**
174:22;190:11,14

**Frank (13)**
80:18;106:8,9,12,
22;110:3,11;266:19;
349:6;353:21;355:3,
11,12

**frankfiorillo@optonlinenet (1)**
266:16

**frankly (1)**
268:21

**free (2)**
6:23;368:25

**frequent (1)**
302:12

**frequently (1)**
341:7

**Friday (3)**
294:16;295:18,19

**friend (13)**
53:8;54:4,21;
76:24,24;83:14;
108:17,18;113:24;
128:2;318:22;
364:18;373:2

**friends (35)**
73:19;74:7,10;
76:9,19,22;80:15;
82:8;84:7;111:8;
113:18,18;295:2;
313:22;316:22,25;
317:15;318:5,6,16,
17;319:4,7;320:18;

321:12;323:9;
324:24;326:21;
327:16;328:3;
329:16;341:11,15;
342:21;345:2

**friend's (1)**
75:24

**friendship (3)**
77:24;78:4,4

**friendship's (1)**
82:22

**Friun (1)**
362:16

**front (12)**
39:12;56:23;
104:13;117:8;271:9;
292:12,14,15;295:7;
312:21;352:22;
353:12

**fucked (1)**
373:14

**fucking (5)**
358:10,12,13,14;
359:17

**fuel (2)**
37:21;50:11

**fuels (5)**
38:16;39:11;
49:23;50:2;63:16

**fulfill (1)**
271:14

**full (8)**
98:13;114:22;
115:19;125:7;
128:23;198:23;
221:6;267:11

**full-time (6)**
89:6,9;91:7;115:2;
118:19;119:16

**fully (4)**
70:25;96:21;
97:17;212:14

**funny (3)**
150:21;151:22,24

**FURTHER (9)**
3:8,12;16:12;
128:23;198:25;
250:24;366:20;
374:3;379:16

**Furthering (1)**
15:2

**future (3)**
70:17;163:16;
180:20

**G**

**Galoppi (2)**
281:5,8

**Gary (7)**
46:5,7;325:19;
327:18;346:21;
362:2;363:7

**gas (2)**
322:13,16

**gassing (1)**
322:21

**gate (1)**
367:22

**gave (28)**
17:6,25;18:3,19,
21;22:4;40:9;58:11;
61:8;63:11;65:4;
117:2;148:16;
163:13;166:13;
167:9;168:20;221:5,
8;234:8;239:7;
243:7;281:25;
294:11;296:25;
306:3;337:15;338:16

**gender (1)**
369:12

**general (1)**
282:11

**generally (1)**
257:3

**gentleman's (1)**
75:20

**gentler (1)**
360:14

**George (177)**
16:7;20:25;21:6;
26:8;35:25;37:19,23;
38:14;39:6;40:22;
45:6,25;46:21;52:4,
7;53:16;55:10,18,18;
56:20,23,25;57:10,
12,14;58:11,16,21;
60:8;63:8;64:5,6,24;
67:17;69:23;80:17;
88:9,13;99:25;
106:23;117:4;
125:12,14,16;
126:24;129:10,12,
18;130:22;138:21;
139:3;140:4;147:14;
148:8,10;150:15,24;
151:19;153:13;
154:5;155:25;
156:12;157:11,12;
158:4;160:17,19;
161:15,20;166:24;
167:22,25;169:14,
21;171:2,4,11;176:9;
185:24;195:16;
203:17,20,22;
216:16,22;225:9;
226:7;227:4,7,14;
230:5;238:18;
251:20;252:25;
253:19;260:12;
265:18;270:13,14,
15,22,24;271:23;
272:11,13;284:13;
288:19;289:22;
291:22;302:17;

304:17;305:5;
307:17,20;310:8;
311:18;315:10,24;
316:2,6,22,25;318:5,
7;319:8,10,14;
320:16,25;322:11;
325:4,22,24;326:19,
24;327:3,6,8,14,21;
329:13;332:7;
337:13,13;338:20;
339:12,17,22,23;
341:20,23;342:4;
345:21;356:18,19,
20;358:15,17;
362:12;363:11,13,
16,20,23;364:4,9,15,
15;372:7,10;373:8,9,
10,13,19,24;374:5

**Gerden (1)**
148:9

**gets (1)**
346:24

**Gilbert (49)**
16:15;77:12,18,20;
100:3;111:16;138:5;
147:22,25;148:13;
149:5;152:4;155:2;
156:2,7,15,24;157:4;
273:22;275:18,22;
276:2,11,15;279:14;
280:7,17,19,23;
285:9;286:22,23;
290:2;294:6,14,16,
24;295:4,8,10,20;
297:6;301:17,21;
302:2;376:10;
378:11,17;379:5

**Gilbert's (3)**
295:2;378:16,20

**Gilly (3)**
4:20;23:16;106:4

**given (16)**
18:21;83:4;124:5;
126:14;211:17,21;
221:19;233:19;
235:13;246:15;
251:13;299:9;
301:11,20;349:18;
370:17

**giving (2)**
182:17;230:15

**goes (14)**
80:11;95:10;
127:9,9;149:22;
163:24;171:4,11;
176:10;327:4,7;
339:9;358:9,11

**goings (1)**
278:21

**Good (13)**
6:15;80:15;82:8;
83:14;108:17;110:4;
127:20;171:13;

200:6;227:8;231:15;
305:3;366:23

**GOODSTADT (260)**
4:19,20;6:4,6,12;
11:17;13:3,7,14;
17:14,23;18:10,14,
23;19:17;20:10,21;
21:24;24:22;25:4,10;
27:15;28:2;29:3,10,
25;32:4,7,13,19;
33:21;34:5,15;35:15;
38:7;41:12,14;42:9;
43:3,19;44:20;52:23;
54:13;55:4;56:21;
57:15;58:8;60:5,7,
12;61:5,10;62:13,15;
63:14;71:3,5,15,19;
72:2,12,25;73:8,13;
77:9;79:12;80:4;
83:13,17;84:11;86:2;
90:20;91:24;94:25;
97:4,22;101:14;
102:8,18;103:5,19;
104:9;105:5,8,10,11,
12,19;107:12,23;
109:19,21;110:10;
112:6;113:9;115:4,9;
116:12,22;118:24;
120:19,21;121:21;
122:5,17;123:11;
129:11,15,19;
132:11,15,25;
133:13;134:14,20;
135:9,18,24;137:12,
17;141:17;145:9;
146:12;147:4,18;
148:14,22;152:12;
153:4;155:9,22;
156:3,14,21;157:8;
159:15;163:12;
164:9;165:5;167:16;
168:10,13;169:2;
170:23;180:2,6,10,
15,22;181:9;188:19;
191:7,18;198:3,15;
202:20,24;203:4;
204:13,19,24;
206:12,19;207:6,22;
211:19;212:3,6;
213:17;214:12;
215:21;219:20;
220:9;222:7,16;
223:8,22;224:13,25;
226:6,25;229:7,12;
231:17;232:4;
233:14;235:18;
238:16;241:22;
242:20;243:10,21;
245:2,24;246:2;
247:10,22;248:17;
249:7,10,15,24;
250:9,14,23;253:17,
24;254:14;255:16,

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 112 of 130 PageID #: 1706

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

23;257:2;258:17;
259:6;261:14;264:5,
10,15,21;265:6,15,
20;274:18,21;
276:13;277:20;
279:21;288:25;
290:21;291:16;
296:11;297:9;
298:23;299:4,15;
301:9;305:8;306:23;
308:12;310:20;
311:3,10;312:3,6;
314:9;320:20;
329:18;336:3;
357:22;364:2;374:5;
375:20;376:13,24;
377:13,23;378:5,23;
379:6,9,17

**Goodstadt's (12)**
103:16;104:7,16;
105:13,18,22;
109:20;110:5,9,14,
16;202:17

**Google (3)**
105:24;106:15,18

**govern (2)**
6:7,7

**grade (1)**
375:19

**graduated (2)**
31:14;368:13

**Grand (7)**
99:21,22,24;100:2,
12;293:25;297:19

**Gray (12)**
149:6,7;150:18;
153:21;284:11,14,
22,24;285:3,18;
286:8,13

**Gray's (1)**
285:5

**Great (7)**
13:14;162:6;
171:6,12;306:25;
354:6,10

**Greg (16)**
160:22;161:2,23;
163:4,10;171:15,16;
172:20;199:14,14;
208:8;212:7,25;
223:13;257:9;260:9

**Grosse (2)**
182:7,25

**group (4)**
241:15;345:17,17;
376:16

**growth (2)**
70:24;97:24

**guard (1)**
15:25

**guess (9)**
102:24;114:18;
135:14,15;254:25;

279:18;311:23,24;
350:7

**guy (13)**
30:4;148:11;
151:9;171:15;
225:12;262:5,8,10,
22;263:15;264:23;
295:5;315:13

**guys (44)**
37:22;38:15;
39:14;51:20,25;52:3,
3;122:6,9,10;131:20;
150:20;151:6,13,22,
24;157:4;162:7;
172:22;175:7;208:9;
209:10,19,25;210:7,
15;211:25;231:5,7;
290:4;321:3;322:14;
323:17,21;324:10;
325:15;327:9;
346:20;352:18;
355:14;362:12;
372:24;373:5;374:24

**guys' (1)**
37:20

## H

**hair (17)**
98:2,4,7,9,14,15,
17,20,24;100:17;
102:5,12,16,23;
103:7,12;382:9

**hairline (1)**
100:22

**half (17)**
52:5,11;58:4,12;
59:19;60:15;84:25;
96:13,18;113:17;
114:22;115:16,20;
174:24;215:9;
288:15;322:17

**Halloween (17)**
16:23;17:3;87:6;
131:11;166:25;
167:4,21;168:4;
209:13,17;277:19;
356:4,8,16;357:7;
358:20;360:6

**hand (3)**
64:3;142:25;293:3

**handed (2)**
55:19;117:2

**handling (1)**
370:5

**hands (9)**
57:20;58:2;59:21;
280:16,23;281:9,19;
282:23;342:8

**handwriting (1)**
182:12

**handwritten (1)**
289:10

**hang (1)**
122:7

**hanging (2)**
146:7;282:3

**Hank (4)**
52:2,6;67:16,17

**happen (4)**
209:5;275:18;
276:5;331:25

**happened (15)**
112:2;157:5;
180:20;211:22;
246:17;275:21,25;
276:11;292:12;
293:20;331:24;
336:20;348:16;
359:21;364:12

**happening (1)**
184:11

**happens (1)**
327:8

**harassing (2)**
249:16,25

**hard (1)**
78:10

**hardcopy (2)**
371:17;372:3

**Hardman (11)**
16:23;74:16;
157:23;166:22;
167:7,10;168:15;
297:12;325:18;
326:7;373:8

**Hardman's (4)**
137:24;138:18;
139:2;157:11

**harm (5)**
70:23;93:23,25;
94:9;95:16

**Hartman (1)**
167:15

**Haven (1)**
14:4

**head (9)**
89:11,21,22;90:7,
12,19;102:13,17;
103:7

**headache (1)**
94:12

**headaches (2)**
96:4,7

**health (3)**
91:8;92:15;93:5

**hear (1)**
352:12

**heard (10)**
71:24;77:17;
110:24;139:23;
140:8;209:23;210:2;
211:13;219:9;352:9

**hearing (2)**
19:2;75:4

**heart (5)**

94:11,14,24;95:5,
14

**held (2)**
258:23;358:6

**help (2)**
110:6;363:24

**helped (3)**
251:21;353:21;
354:14

**helping (1)**
362:12

**HEREBY (2)**
3:2,6

**herein (2)**
302:25;307:2

**hereinafter (1)**
303:2

**here's (1)**
58:7

**hereto (1)**
3:4

**herself (1)**
182:25

**hesitant (1)**
187:8

**Hesse (378)**
5:8;16:7,19;18:3,
19;19:5,8,14,23;
20:7,17,25;21:6;
22:5;26:8;33:6;
35:25;36:10,12,16;
37:3,14,18;38:12;
39:4,10;40:3,13,22;
41:5,23;42:4,21;
45:6,23;46:15,21;
47:6,19;48:5,9,12,16,
21;49:5,17,25;50:5,
23;51:5,16;52:10,25;
53:16,24;55:10;
58:11,21;59:5,8,13,
25;60:8;61:8,16;
62:10,20;63:8,21,23;
64:5,6,9,12,25;66:7,
13;67:15;69:2,17,23;
88:9,13,20;99:25;
120:7,12;122:20;
124:21;127:14,21;
128:9,10,13;129:10,
12,18;130:22;131:2;
133:12;134:8,17;
135:7,16,22;136:2,8,
12,15,20;137:6,9,15;
138:17,24;139:16,
17,21;140:4;147:14;
148:8,10;150:15;
151:19,25;152:6,9,
16;153:2,5;154:5,18;
155:5,25;156:12;
157:11,12,16;158:5,
18,20;159:2,11,17,
20,23;160:5,9,13,15,
17,19;163:3,9,21,24;
164:14;166:2,24;

167:2;168:3,17,20;
169:3,7;173:24;
176:5,18;177:24;
178:14,20;179:12;
180:8,13,18;194:16;
195:5,16;198:21;
199:10;202:19;
203:17,20,22;204:3,
9,17,22;207:13;
212:12,16,17,19,23,
25;213:3,6,11;214:3,
9,18,19;216:11,16,
22;219:19,24;220:7,
17;222:22;223:6,11;
226:8;227:4,7,14;
228:21,25;229:6,18;
230:5;232:22;
235:10;238:20;
239:2,3;252:7,25;
253:19;256:16;
260:12;264:19;
265:18;270:13,14,
15,21,22,24;272:11,
13;277:24;282:10,
19;283:3;284:13;
287:19;288:19,23;
291:5,14,22;302:17,
19;303:3,11,16,18;
304:11,17;305:5;
306:13,19;307:2,14;
308:9,21;310:8,23;
311:6,9,12,12,18;
313:18,25;314:6,12,
23;315:2,24;316:2,6,
8,23;317:2,3,13,17;
318:5,7,10,13;319:2,
21,25;320:16;321:6,
11;322:6,10,19,23;
323:7,7,25;324:23;
325:2,7;326:19,24;
327:14;328:2;
329:13;331:18;
332:14,17;334:8,12;
335:22;336:4,14;
337:6,13;338:16;
339:3;341:7,13,23;
343:9,17,17,22;
344:2,5,24;345:22;
346:6,7,10,13,15,17;
347:19,23;348:2;
352:7,12,21;353:11;
355:7,9,15,18;
359:3,10,24;360:5,
13;361:7,15,20;
362:12;363:11,13,
16,20,23;364:4,9;
372:7,10;373:19,24

**Hesse's (21)**
40:4,7,20;41:9;
42:8;125:3;133:9;
214:4;215:19;
251:20;260:23;

EDWARD CARTER
September 16, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 113 of 130 PageID #: 1707

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

261:3;278:5,14;
317:22;328:14;
329:15;341:10,15;
360:24;374:6
**Hey (1)**
262:6
**Hi (3)**
76:4;80:10,12
**hid (2)**
179:18;180:7
**hiding (3)**
179:23,25;180:5
**highest (1)**
302:8
**highly (1)**
162:7
**himself (3)**
87:10;160:17;
304:15
**hire (1)**
33:11
**hired (3)**
307:18,21;308:22
**hires (1)**
308:25
**hiring (10)**
109:18;175:25;
188:17,22;303:7;
307:3,10,15,23;
308:10
**histories (1)**
29:9
**history (2)**
93:10;103:6
**hit (1)**
295:12
**hold (8)**
12:9;186:14;
202:24;203:3;209:7;
218:21;254:9,13
**home (6)**
56:13;58:25;
101:23;290:12;
319:16;323:19
**honest (5)**
121:25;292:24;
299:16,18,24
**hopefully (2)**
202:23;374:22
**hoping (1)**
252:10
**host (2)**
264:18;265:17
**hostile (1)**
58:17
**hour (2)**
174:24;288:15
**hours (27)**
28:11,15;29:7;
30:9,10;54:24;62:22,
23;89:14,15;114:18,
21;115:11,13,17,19,
24,25;116:15;117:3;

118:3,6;128:11;
225:13;320:14;
322:18;337:11
**house (12)**
149:7;150:2,18;
153:21;155:16;
225:14;262:17;
281:25;282:6;
283:14;286:12;
293:21
**How's (1)**
76:5
**hung (2)**
21:10;218:19
**hurt (1)**
253:23

# I

**Iacopelli (4)**
149:20;194:18;
280:9;283:12
**ID (1)**
337:3
**ID'd (2)**
87:10;337:2
**idea (2)**
263:20;290:9
**identification (10)**
22:13;99:9;120:4;
124:17;162:20;
181:17;200:18;
265:25;267:4;269:2
**identified (9)**
76:22;77:4;78:15;
99:3;130:12;134:6,
19;266:4;267:7
**identifies (2)**
216:16,21
**identify (1)**
76:25
**identity (2)**
85:19;87:24
**ignored (6)**
50:8;58:4;314:15,
18,19;324:5
**ignoring (1)**
58:13
**illegal (1)**
262:17
**illegally (1)**
94:21
**immediately (4)**
80:7;150:15;
295:18,20
**impairment (2)**
70:23;97:24
**important (7)**
10:8,10,11;205:23,
24;206:3,9
**inaccurate (5)**
24:20;25:3,12;
205:25;206:18

**incapable (1)**
220:6
**incidences (3)**
211:21;337:25;
344:20
**incident (72)**
16:16,23;17:3;
53:24;62:25;63:6;
77:12,19,20;80:3;
103:18;130:13;
131:11;147:22,25;
148:13;149:5;155:2;
156:2,8,15,24;157:5;
166:25;167:4,22;
168:5;209:15;241:3;
245:5;273:22;
275:19;276:2,12,15;
277:13,19,22;
279:14;280:7,17,20,
24;281:14;285:17;
286:21;294:6,15,16;
295:20;297:6;
301:25;328:9;
336:19;337:19,20;
341:18;344:22,23;
348:9,12;354:18;
356:4,8,16,21;357:7;
358:3,20;360:6;
376:11;378:11
**incidents (4)**
292:11;341:12;
344:20;377:12
**include (1)**
182:23
**included (1)**
376:16
**includes (1)**
259:8
**including (4)**
26:7;70:15,16;
303:5
**income (1)**
70:18
**inconsistency (1)**
121:20
**Incorporated (1)**
4:6
**incurred (1)**
71:7
**independent (1)**
310:25
**indicate (2)**
44:25;112:9
**indicated (4)**
5:9;45:17;73:8;
207:19
**indicates (1)**
158:4
**Indicating (10)**
37:6;56:7;117:8,
24;143:8;215:10;
226:15;239:21;
240:3;252:2

**individual (9)**
4:25;12:13,16,19;
13:17,20;76:23;
282:12,15
**individually (1)**
82:5
**individuals (11)**
145:8;203:9;
275:24;281:23;
282:5;315:4;342:11,
16,17,20;375:24
**inebriation (1)**
59:4
**inexorably (1)**
302:10
**inflated (2)**
231:9,11
**information (17)**
8:7;92:3;149:11;
158:3;181:3;207:9;
208:4,5,7;256:16;
263:4,21;264:24;
283:16,17;357:6;
379:4
**initial (1)**
235:8
**initiated (4)**
174:5;176:3;
219:5,15
**injuries (8)**
70:10,15,24;72:19;
96:21;97:3,17,21
**inquire (14)**
48:12,16;185:9;
192:8;194:2,10;
201:2,6,19;225:3;
226:12;256:6,10;
359:10
**inquired (6)**
183:10,13,21,23;
184:3;191:15
**inquiring (2)**
193:21;370:16
**INSERT (1)**
105:6
**inserted (1)**
257:15
**inside (6)**
52:18;63:16;
295:4,11,11;337:13
**instance (7)**
67:17;140:2,6;
337:8;338:10;350:3;
352:6
**instances (4)**
340:4;343:5,8;
350:4
**instead (2)**
14:24;203:11
**instruct (5)**
25:5;331:19;
335:22;336:14,17
**instructed (3)**

336:5;337:6;338:2
**instructing (3)**
71:18,19;249:11
**instruction (2)**
377:14;379:7
**instructs (1)**
7:5
**integrity (1)**
302:7
**interacting (1)**
343:5
**interest (1)**
209:4
**interested (2)**
291:10;366:2
**interesting (1)**
83:16
**interfere (1)**
89:24
**interfered (3)**
39:24;89:5,8
**internal (12)**
117:11;120:2,11;
123:17;124:15;
150:5;172:10;
224:15;283:25;
284:4,6;358:18
**internet (2)**
129:5;199:6
**interpretation (1)**
41:9
**interview (7)**
149:19;172:22,22;
173:14,17;175:12;
260:8
**interviewers (1)**
92:22
**interviewing (2)**
149:4;297:11
**interviews (2)**
92:18,19
**into (41)**
16:3;46:3;49:2,23;
50:2;57:2;59:17;
71:13;74:25;125:18;
127:5;160:23;
172:23;173:7;
175:18;176:14;
188:4,11;190:25;
215:9;227:10;
258:10;261:5;286:6;
292:13;294:17;
295:19;317:4,7,8,11;
318:24;325:4;326:7;
332:5;354:6,10;
356:8;363:10;375:7;
378:20
**intoxicated (2)**
313:21;323:10
**introduce (1)**
4:18
**investigate (4)**
276:24;356:20,24;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 114 of 130 PageID #:
1708

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

357:2
**investigating (2)**
273:8,20
**investigation (7)**
93:19;172:10;
173:7;175:17;
176:14;313:4;356:8
**investigations (1)**
373:7
**investigative (1)**
356:15
**investigator (2)**
149:20;364:19
**investigators (1)**
376:8
**invite (1)**
6:19
**invited (1)**
281:25
**involved (20)**
105:23;111:25;
126:2,5;134:9,10,11;
145:15;155:2;
163:25;164:11,12,
16,18;209:23;273:4;
313:13;341:12;
344:24;356:14
**involvement (6)**
176:23;177:2;
278:5;345:8;357:9;
364:8
**involving (13)**
80:3;137:7;
261:20;297:6;
301:16,21;302:2;
313:12;337:19,21;
344:21,22;378:17
**Iraq (5)**
52:2,7,12;53:9;
56:3
**Island (17)**
16:21;66:13;
106:2;138:12,14;
171:20,25;172:3,7;
360:21;367:9,17,19;
368:19,19;374:11,16
**Islip (60)**
12:7,9;14:14;75:6;
82:13;89:14;93:18;
109:2;142:6;151:6;
159:8;163:17;183:7,
8,16;184:14,15,19;
186:9,22;188:22;
193:20;194:14,18;
195:14,19;196:4;
197:22;198:10;
201:23;207:12;
214:23;217:4,21;
219:10;220:7;222:5,
13;223:21;229:6;
236:16,24;248:20;
249:2,5;250:25;
251:14;256:19;

259:12,18,22;260:6;
261:6;272:24;290:6;
304:24;313:14;
375:16,25;376:6
**Islip's (1)**
247:8
**isolated (1)**
294:10
**issue (10)**
58:5;158:17;
222:11;335:23;
336:5,15,18;337:6;
338:2;339:21
**issued (1)**
203:8
**issues (5)**
90:24;245:9;
272:15,19;303:9
**Items (2)**
70:9;72:18

## J

**jacket (11)**
257:23,25;258:5,
11,16;259:7,12,18,
23;260:22;261:5
**jail (2)**
214:24;216:4
**January (12)**
14:16;122:22;
123:3,21;124:16,22;
125:21;127:21;
189:19;190:14;
217:14;368:3
**jeopardy (1)**
62:6
**Jimmy (8)**
55:10,13;337:9,15,
15;348:8,20;353:2
**job (53)**
12:8,10;15:5,6,9,
12;89:6,9,20,20,25;
91:7,22;107:19;
108:2,10;118:19;
119:17;131:13;
149:21;150:8,13;
159:3,21,25;160:6,
10,16,20;161:4;
164:24,24;169:9;
172:7;175:11;200:2,
11;214:19;230:14;
234:19,23;235:7;
236:23;239:13,17,
23;240:4;243:23,25;
244:25;252:16,17;
304:22
**jobs (6)**
106:25;107:10,15,
16;181:6;243:20
**Joe (10)**
44:21;80:18;
227:7;267:25;292:8;

303:25;304:3,5,8;
349:6
**John (11)**
74:15;78:19,21;
79:25;80:9,13,22,24;
81:5,10;321:4
**join (1)**
55:16
**joined (1)**
55:15
**joint (2)**
304:18,19
**Joseph (1)**
81:23
**July (7)**
321:16,16;325:13;
326:14,22;338:13;
343:14
**June (22)**
23:23;79:5,7,16,
21;96:25;97:20;
103:22,25;104:3,4,6;
105:16;139:24;
141:19;145:16;
240:9,10,11,20;
320:23;368:3
**jurat (1)**
379:20
**jury (7)**
99:21,22,24;100:2,
12;293:25;297:19

## K

**Kansas (1)**
6:2
**keep (12)**
80:17;108:15;
109:4,13,16;128:17,
18;151:20;298:21;
299:13;307:7;355:16
**Ken (13)**
4:22;6:16;26:14;
284:10,14,22,24;
285:3,5,18;286:8,13;
325:23
**Kenneth (1)**
30:5
**kept (5)**
75:3,7;108:12,23;
109:7
**Kevin (19)**
9:2,3;80:17;107:3;
108:3,3,13,13,16,17,
24,25;110:2;139:22;
140:17;141:22;
266:10;321:4;378:14
**keys (1)**
324:10
**kicked (1)**
295:8
**kid (1)**
339:15

**kids (1)**
342:10
**kinder (1)**
360:14
**Kismet (2)**
326:3;367:11
**knew (15)**
10:18;136:24;
204:7;227:9;230:15;
245:8,9;277:12;
279:9,10;280:14;
285:13;295:21;
327:5;342:20
**knocked (1)**
342:5
**knocking (1)**
362:20
**knots (2)**
358:12;359:16
**knowing (2)**
123:20;233:2
**knowledge (88)**
17:10;27:6,7;
33:13;34:25;35:3;
40:15;46:13;48:20,
21;49:8;57:8;87:15,
18,23;88:18,19;
92:10,10,11;97:23;
106:5;110:8;115:5,
23;116:23;117:17;
120:17;121:23;
126:4;130:24;
139:15;142:4;
152:13,14,17,20,21;
164:7;175:12;
176:22;177:8,13,15;
181:22;182:3,6,22;
197:7;199:19,25;
201:25;212:12;
226:2,21;228:10;
230:13;241:18;
242:9;251:2;254:19;
258:13;259:10,21;
270:17;271:4;
287:22;290:15;
298:2;301:7,20;
302:3;310:13;311:2;
349:3,7;351:7,14;
353:16,20;354:12,
21;356:18;360:23;
365:16;366:11;
372:6;375:18
**known (7)**
192:19;197:25;
218:12;235:22;
245:14;262:23;278:6
**KT215@aolcom (1)**
266:8

## L

**labeled (4)**
21:17;150:23;

205:8;342:7
**Labor (18)**
51:11,12;57:6;
62:25;63:6,22;64:22;
68:6;69:3;114:12,19;
115:2;116:7,10;
117:18,20;127:5;
322:9
**lack (1)**
59:4;88:24;90:24
**Lamm (45)**
9:2,4;10:14,25;
11:6;107:4;108:2,7,
10,24;109:11;
139:22;140:3,9,22,
25;141:5,10,12,18,
24;143:19;144:2,5,9,
14,25;145:6,13,17,
22;146:10,16,18,21;
147:2,13;178:23;
266:10
**last (28)**
6:11;8:17;11:9;
17:25;31:2;78:21;
85:5;98:13;115:18;
127:11;184:2,21;
192:13,20;193:15,
25;194:9;201:9;
203:5;272:22;298:6,
8,11,15;302:5;
309:10;327:24;
370:17
**lasted (1)**
288:16
**late (3)**
79:2;108:9;285:5
**later (19)**
16:12,20;21:12;
52:15,15;55:5,7;
57:21;139:24;
143:17;145:4;147:5;
149:16,17;151:15,
16;165:21;289:10;
314:25
**latter (3)**
105:15;107:24;
316:7
**laughed (4)**
40:5;58:3;225:11;
373:10
**law (33)**
23:20;103:16;
104:7,16;105:13,18,
22,23;106:10;
109:19,20,22,23;
110:5,9,14,16;
114:17;172:20;
202:17;240:4;
244:24;246:25;
247:4,8;248:4,10;
253:20;273:7;341:9,
10,14;345:2

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 115 of 130 PageID #:
1709

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**Laws (2)**
200:4;309:16
**lawsuit (21)**
8:14;45:4;82:15,
20;86:4;129:8;197:6,
25;198:4,6,11,14;
206:13;258:16;
259:23;300:7,8;
315:17;365:19;
366:9;377:5
**lawyer (12)**
23:19;72:6;
226:20;258:14;
365:20,23,25;366:3;
374:6;377:2;378:7;
379:10
**lawyers (9)**
24:4,9,21,25;
105:23,25;106:7;
366:6;376:25
**laying (2)**
293:25;342:8
**leads (1)**
203:23
**learn (9)**
35:13;105:13,17;
121:9;144:14,21,24;
145:13;375:23
**learned (2)**
139:25;140:7
**least (8)**
79:5;96:11;
220:18;221:16;
241:12;252:9;
350:12;363:6
**leave (11)**
45:12;104:18,24;
121:8,10;127:2;
128:15;193:9;321:3;
324:16,18
**leaving (13)**
38:10,15;52:7;
218:18;315:12;
316:13,16;321:18;
322:17;324:14;
327:9;328:25;330:22
**led (1)**
92:23
**left (12)**
84:3;102:13;
125:2;133:20;
138:12;161:16;
193:7;311:20;
313:19;331:21;
354:3;362:11
**legal (16)**
4:14;23:10;32:8;
61:14,15;70:18;71:2;
72:4,8,19,23;77:2;
376:14;377:2,25;
379:11
**legitimate (9)**
222:15;224:5;

240:15,21;242:19;
243:14;244:13;
260:3;377:19
**less (8)**
17:12;28:11;
112:4,9,13,18;
113:11,25
**Leto (1)**
4:15
**letter (48)**
160:24,25;161:2;
163:15,22;200:16,
20,22;201:4;209:5;
218:14,21;222:18,
23;223:25;224:8,16,
18,19;225:7,20,25;
226:3,14,18,21,22;
227:4,15,19;239:20,
22,25;240:2,5;
251:20,23,25;252:7;
253:11;254:11;
255:4,9;256:2,8;
272:14,18;291:21
**letterhead (1)**
253:7
**letters (1)**
256:12
**letting (2)**
218:18;348:16
**liar (1)**
241:8
**license (8)**
101:4,5,8,13,21;
337:16;353:9;382:5
**lie (5)**
206:4,6;232:24;
236:2;285:22
**lied (12)**
213:6;231:21,22;
232:9,11,13,17;
233:12,18;234:4,5;
235:12
**lies (1)**
241:4
**lieutenant (3)**
162:7;171:12;
207:11
**life (4)**
206:10;369:3,4,6
**light (1)**
337:11
**lighthouse (5)**
359:18;367:9,10,
13;374:16
**lights (2)**
285:6;351:25
**likely (1)**
241:6
**Likewise (1)**
8:6
**limit (1)**
58:24
**limited (3)**

26:7;70:15,17
**limiting (1)**
350:19
**line (3)**
98:15;100:17;
307:8
**lines (3)**
25:20,21;179:7
**liquor (2)**
52:19;342:8
**List (11)**
181:16,25;184:4;
190:4,7;191:21;
192:7;201:10,14,17;
370:18
**Listen (5)**
127:9;150:13;
226:22;262:24;
290:11
**lists (1)**
190:10
**little (12)**
10:19;23:3;75:15;
77:15;103:3,4;
113:10,11;143:10;
149:16;182:24;
288:16
**living (1)**
284:21
**LLP (1)**
23:16
**local (11)**
6:7;302:12;
330:16;331:14;
333:11;334:4;335:4;
341:2;360:20;
368:18,22
**location (1)**
14:8
**lock (2)**
295:14,15
**locked (2)**
295:14;296:8
**locker (9)**
131:20;208:8;
209:9,10,20,25;
210:7,16;211:25
**locking (2)**
296:10,13
**Loeffler (35)**
4:25;44:17,17,22,
25;47:13;50:16;
69:7;74:16;81:19,20,
22,23;82:7,10;83:20,
24;227:8;292:6,7,9,
18;304:2,4,5,8;
328:19;330:4;331:4,
4;332:25;333:18;
334:18;340:16;344:7
**Loeffler's (1)**
292:8
**Lonelyville (2)**
326:9,10

**Long (18)**
16:21;31:11;
46:19;84:22;104:6;
111:24;125:11;
170:7;171:20,25;
172:3,6;174:20,21;
215:8;282:4;288:12,
16
**longer (7)**
14:21;21:2;22:6;
74:22,23;190:12;
288:16
**look (37)**
25:19;40:9;93:21;
96:15;99:3;101:12,
18;104:25;111:9;
119:23;130:8;
172:23;188:4,11;
190:24;206:21;
213:24;216:24;
229:21;246:14;
256:15;258:4,10;
259:17;261:5,17;
269:5,6,16;287:3;
302:4,21;309:9,10;
313:16;358:22;359:2
**looked (41)**
16:3;28:22;46:17;
51:21;75:3;80:6,18;
82:17,22;85:6;102:5;
151:11;208:17;
209:15;228:5;
245:19;257:19,24;
259:11;261:13;
262:7,20,21;263:4,
22;264:25;265:4,12;
268:21;285:10;
289:21,22;309:25;
339:9,18;340:2;
358:9;373:8,10,13;
382:9
**looking (17)**
30:2;56:10,18;
101:11;106:6,10;
150:21;151:22,24;
160:23;178:4;
266:20;287:4;
294:19;314:8;
336:25;351:18
**looks (2)**
111:12;149:22
**looseleaf (1)**
291:3
**lose (2)**
90:9;150:13
**losing (5)**
98:7,9,17,20,23;
102:22
**loss (7)**
70:17,21;73:15,21;
74:4,8;84:14
**lost (18)**
73:19,22;74:3,5,7;

75:23;76:14,16,19,
21,25;77:7,8,24;
98:2,4,8;113:19
**lot (4)**
103:4;147:23;
171:6;244:7
**luck (1)**
171:13
**lunch (2)**
372:17;373:4
**lying (5)**
17:22,24;18:4;
180:19;235:24

---

**M**

**Macarthur (4)**
171:21,25;172:4,7
**Maguire's (11)**
51:18;52:17;
54:18;55:11,14;
56:15,19;336:12,14;
337:9,21
**mail (1)**
293:4
**maintain (1)**
366:16
**maintenance (1)**
303:6
**makes (9)**
112:12,17;122:3;
154:5,11,14,16;
254:17;320:5
**making (3)**
216:3;352:7;
358:24
**Malafi (1)**
5:4
**malicious (1)**
256:17
**man (3)**
57:25;58:3;59:18
**management (5)**
303:4;305:6,19;
306:15,20
**managerial (1)**
304:25
**manifestations (2)**
94:7;95:15
**manner (1)**
44:9
**manpower (1)**
172:12
**many (33)**
6:24;10:12;24:11;
27:8;28:23,24;30:10;
36:15;45:5;51:7;
57:4;62:22,23;76:19;
96:6;122:9;133:10;
273:12;300:6;
317:25;318:12;
323:15;331:18,25;
332:10;349:9;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 116 of 130 PageID #: 1710

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

351:11,21;362:8;
363:3;368:10;
370:10;376:4
**map (1)**
351:18
**March (4)**
79:22;81:15;
244:23;267:20
**Marine (2)**
325:25;326:3
**mark (12)**
22:10;25:9;99:6;
119:24;124:13;
162:17;181:13;
200:14;228:14;
265:22;267:2;268:18
**marked (15)**
22:12,16;25:16;
99:8,11;120:3;
124:16;162:19;
181:16;200:17;
205:5,8;265:24;
267:3;268:25
**Market (2)**
75:2,22
**married (1)**
369:16
**Marty (4)**
183:18;184:5;
194:18,21
**master (3)**
46:2;49:3;353:22
**masters (1)**
139:13
**Mastic (2)**
14:5,8
**matter (13)**
4:4;50:7;64:25;
174:25;177:10,19;
196:6;268:3;365:19;
372:4;377:4;379:5,
12
**matters (2)**
371:11,20
**may (56)**
3:13;7:25;11:24,
24;14:3,4;19:18,20;
21:13;28:6;71:23;
88:9;90:18;97:7;
103:25;105:15;
107:8,22,24;108:9,
23;114:8,10,16,21;
161:8;163:22;
171:19;172:7;173:2;
207:4;217:7;218:25;
223:2,17;230:21,25;
231:15;232:11,18,
22;233:6;234:9,17,
21;235:9,14;238:11;
239:6;291:11;
323:15;356:13;
360:22;366:3;
368:15;377:8

**maybe (7)**
151:8;170:21;
282:8;300:12;
364:23,24;370:23
**Mayor (29)**
41:20;42:15;43:9;
44:3,12,17;45:2;
47:7;50:13,14;69:7,
10,16;70:6;226:13,
14;292:8,19,22;
308:5;309:6;328:17;
330:6,24,25;333:3,
20;334:20;340:18
**McGuire's (1)**
63:21
**mean (37)**
15:22;17:21;
20:15;31:15;44:17;
51:23;73:16;77:7,23;
78:6;93:24;97:25;
103:23;111:6;
120:25;121:22;
150:4;153:17;
175:23;201:16;
229:10;235:6;237:3;
242:2;252:13;
267:11;275:22;
285:12;300:5;
315:15;316:17,20;
348:22;351:8;359:7;
365:22;376:22
**meaning (2)**
47:23;190:9
**means (9)**
20:15;26:20;
27:24;82:21;99:13;
115:8;116:11;204:5;
276:11
**meant (5)**
137:14;201:7,13;
203:11;359:11
**meantime (1)**
191:20
**med (1)**
225:13
**media (15)**
129:5;196:24;
199:7,9,12,12;
272:18;328:24;
330:18;331:16;
333:13;334:6;335:6;
341:4;344:17
**medical (1)**
103:11
**medication (1)**
89:3
**meet (8)**
109:18;110:14;
151:5;174:14,16,18;
187:5,13
**meeting (39)**
16:13;81:7;88:8;
105:8;133:15;

137:19,21,24;138:6,
10,17,25;139:12;
157:24;169:5;
174:21;175:2,15;
187:9,13;192:14,14;
193:4;217:5;284:25;
289:3,4,6,6,8,14,15;
292:18;293:18;
319:22;361:5,6,7,12
**meetings (2)**
191:23;293:14
**member (7)**
43:12;47:16;
50:20;226:17;
261:18;282:21;313:7
**members (2)**
330:9;367:18
**memo (6)**
117:11;120:6;
122:19;124:20;
200:22;201:4
**Memorial (2)**
114:25;117:18
**men (2)**
118:12;305:21
**mental (8)**
70:22;78:12;91:8;
92:15;93:5,22;94:9;
95:16
**mention (1)**
84:13
**mentioned (11)**
49:21;76:12,12;
166:3;197:13,18;
303:2,2;307:3;
366:24;368:15
**mess (4)**
38:5,6,10,16
**message (1)**
161:16
**met (8)**
141:21;174:9,10,
11;187:15;285:19;
302:8;309:18
**Michael (1)**
4:23
**Mid (11)**
186:19;189:19,20;
190:14,15;191:12;
192:5;193:6;194:8;
215:14;371:2
**middle (2)**
25:22;39:15
**midnight (9)**
52:4;89:17,18;
119:13;122:25;
124:11,12;319:19;
325:15
**midnights (3)**
193:13;305:23;
315:13
**midway (2)**
348:23;351:20

**might (7)**
68:19;231:3;
267:25;276:15;
319:15,16;359:5
**Mike (1)**
364:20
**mind (1)**
263:2
**mine (3)**
83:15;287:2;
336:19
**minor (4)**
336:22,24;339:14;
348:11
**minors (3)**
344:22;345:18,19
**minute (4)**
57:21;80:11;91:7;
133:20
**minutes (10)**
63:11;65:9;
144:18;156:22;
174:24;282:7;295:6;
318:20,21;364:23
**minutes' (1)**
268:8
**mis (1)**
148:12
**misconduct (13)**
16:22;85:14;87:7;
131:9;163:19;164:2,
11,13,16,19;209:3,
14;356:11
**misID'd (3)**
147:21,24;148:3
**misidentification (8)**
148:20;153:2;
154:19,25;155:6,19;
156:11,19
**misidentified (4)**
155:24;156:25;
279:16;294:7
**misidentify (1)**
152:6
**misrepresent (1)**
285:24
**misstating (1)**
311:4
**MO (13)**
12:22;45:14;
113:2;132:3;137:2;
213:9;225:17;
227:11;230:18;
263:10;326:16;
362:25;382:16
**Monday (1)**
124:12
**Mondays (1)**
358:5
**monetary (1)**
70:16
**money (3)**
15:3;72:7;150:9

**month (5)**
123:22,22;343:12,
12,14
**months (9)**
103:24;114:12,24;
144:19;151:15,15;
317:5,10,11
**Moran (17)**
139:23,24;140:3,
10,11,19;142:7,10,
16,19;144:5,15;
145:6;147:13,14;
361:18,19
**Moran's (1)**
361:20
**more (28)**
15:2;26:13,20,25;
27:12,18;28:15;29:7;
30:7,10;114:18,18;
116:15;123:22;
151:8;175:25;
183:23;202:23;
216:8;231:18;232:3,
7,7;235:23;256:24;
275:14;293:23;
346:23
**Morganier (3)**
182:19,24;200:2
**morning (14)**
6:15;52:15,16;
54:11,18;57:5;
119:11,12,13;
241:11;294:19;
295:19;315:6;322:22
**Moses (2)**
367:12;374:14
**most (8)**
76:16;115:22;
118:6;225:12,14,14;
241:6;317:10
**mostly (1)**
87:5
**mother (4)**
111:18,19;112:4;
339:18
**mother's (1)**
112:13
**Motion (13)**
12:22;13:4,8,10;
113:2;132:3;213:9;
225:17;227:11;
230:18;263:10;
326:16;362:25
**motioned (1)**
295:14
**move (4)**
45:15;71:23;73:6;
137:3
**moved (1)**
172:16
**much (11)**
61:7;70:25;71:13;
72:7;80:21;82:23;

Case 2:07-cv-01215-SJF-ETB    Document 145-8    Filed 01/15/10    Page 117 of 130 PageID #:
1711

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

98:19;316:14,17;
318:17;319:3
**mud (1)**
326:7
**mumbled (1)**
373:17
**must (2)**
23:8;284:8
**mustache (1)**
294:8
**Myself (16)**
28:13;34:18;
39:24;85:13;92:21;
157:19;159:9;
161:24;165:19;
174:7;176:6;305:12;
317:11;327:17;
337:22;373:17

## N

**name (22)**
4:12;5:22;75:20,
21,25;76:7,23;78:21;
88:11;112:24;
171:15;184:21;
197:13,18;208:23;
215:4;216:2;366:25;
369:10;370:2,4;
372:18
**named (1)**
262:5
**name's (1)**
87:13
**natural (2)**
70:24;97:24
**nature (1)**
25:19
**necessarily (3)**
31:15;38:2;153:25
**necessary (3)**
298:20;299:8,13
**need (13)**
7:7;62:9;97:19;
128:18;149:25;
150:8,8,13;205:6;
226:22;239:22;
240:4;269:5
**needed (8)**
20:4;145:19;
160:25;181:7;
230:11;238:23;
254:2;350:24
**needs (5)**
172:11,19,23;
175:20,22;176:14;
254:10
**negative (8)**
207:13;211:23;
215:19;228:16,20;
229:3,9,10,17,19;
256:17
**negligence (1)**

90:2
**New (17)**
4:9;5:19;6:3;
14:24;15:5,5,6,9;
91:17;93:6,8;172:17;
185:22;192:22,24;
283:15,17
**News (17)**
197:4,5,15,23;
245:14;264:13;
265:13;328:24;
330:12;331:9;333:9;
334:2,24;340:24;
344:15;360:21;
368:20
**Newsday (16)**
197:4,15,22;
198:11;245:14;
264:8;265:5;272:14;
328:24;330:14;
331:12;333:7,22;
335:2;340:22;344:13
**newspaper (7)**
264:8;331:14;
334:4;335:4;341:2;
360:20;368:22
**next (33)**
9:17,24;21:11;
46:22,24,24;48:14;
70:11;141:9;150:18;
186:8;189:12;191:3,
11,13;227:23;
229:22;234:8;267:2;
268:18;270:6;283:6;
284:16;287:23;
293:2,17;314:21;
316:5;327:22;345:4;
346:17;378:19;
379:19
**Nextel (2)**
141:7;142:24
**Nextels (1)**
141:8
**nice (1)**
325:6
**night (5)**
29:22,23;46:23,24;
52:5;53:24;54:9;
58:6;59:18;61:8;
64:7;66:19,20;67:4,
18;68:5;84:21;87:6;
89:21;119:9,10,10,
11,12;124:11,12;
147:22;148:5,18;
149:12;153:6,16,19;
154:7,13;161:6;
197:23;209:13;
264:13;265:13;
275:25;277:12,13;
280:12,14;285:9,13;
294:14,24;297:16;
299:22;322:12;
327:12;331:22;

338:25;355:13;
372:14
**nights (5)**
29:16,18;31:19;
89:10;149:15
**nine (3)**
52:3,3;351:24
**Nofi (15)**
7:8,10,12,15;8:12,
16;109:14;110:7,8,
12,13;256:2,7;
267:25;349:6
**Nofi's (3)**
7:21;11:8,10
**None (16)**
34:7;67:20,22,24;
68:2;77:5;79:19,20;
81:6;113:23;204:20;
205:3;227:17;229:8;
278:16;301:10
**nonresponsive (2)**
12:23;326:17
**Normal (7)**
40:22;89:14,15;
350:10,15
**normally (2)**
118:23;374:21
**north (2)**
353:23,25
**Notary (3)**
3:14;5:18;380:15
**Note (1)**
102:8
**notes (8)**
278:20,23,24;
279:3;289:10;
290:13,14;291:8
**Notice (34)**
22:12,24,25;23:6,
7,21;24:2,4,7,12,15,
25;25:11,15;26:2,11;
35:10;70:9;71:6,10;
72:17;79:5,8;81:11;
97:12;103:17;
128:21;198:18,23;
202:22;240:8,9,13;
254:22
**noticed (2)**
5:10;316:13
**notified (6)**
9:16;24:21;
123:21;284:13,14;
341:20
**notify (8)**
91:22;92:4,16,25;
93:2;119:17;284:10;
340:6
**notwithstanding (1)**
267:17
**November (5)**
79:2;151:5;
254:25,25;262:12
**Novikoff (79)**

4:22,22;5:7;6:4,10,
14,15,16;7:23;12:22;
13:6,9,15;21:25;
22:9;25:8;28:3;32:5,
9;33:24;35:17;
40:25;41:3;43:20;
44:23;45:14;71:5,17,
21;72:10;73:3,14;
79:13;99:2;101:19,
25;104:23;109:23;
113:2;119:23;
124:13;132:3,17;
133:19;137:2;158:8;
159:16;162:17;
169:6;181:13;
200:13;202:5;203:2;
213:9;225:17;
227:11;230:18;
249:13,22;250:2;
257:5;258:19;
265:22;266:25;
268:6,17;311:8;
326:16;335:9;
362:25;364:3,22;
366:19;376:18;
377:15;378:4,12,25;
382:20
**nowhere (1)**
346:23
**number (31)**
4:3,9;29:14;65:24;
66:4;70:11,11;
106:23;108:14;
133:24;134:4,7;
147:10;181:25;
183:8;184:10,13,16,
18,20;201:18;
202:10,14;256:15;
268:11,15;273:16;
318:3;332:3;335:12,
16
**numbered (1)**
268:23
**numbers (1)**
351:12
**numerous (3)**
26:6;313:18;314:2

## O

**OB (3)**
75:2,22;88:10
**O'Bannon (9)**
177:7,10,19;185:7,
8;193:2,5,7,9
**object (1)**
8:9
**objected (1)**
41:3
**Objection (220)**
17:14,23;18:10,23;
19:17;20:10,21;
21:24;24:22;25:4;

27:15;28:2;29:3,10,
25;32:4,13,19;34:5,
15;35:15;38:7;
40:24;41:2,12,14;
42:9;43:3,19;52:23;
54:13;55:4;56:21;
57:15;58:8;60:5,7,
12;61:5,10;62:13,15;
63:14;71:3;77:9;
79:12;80:4;83:13,17;
84:11;86:2;90:20;
91:24;94:25;97:4,22;
101:14,15;102:9,18;
103:5,19;104:9;
105:5,19;107:12,23;
110:10;112:6;113:9;
115:4,9;116:12,22;
118:24;120:19,21;
121:21;122:5,17;
123:11;129:11,15,
19;132:11,15,25;
133:13;134:14,20;
135:9,18,24;137:12,
17;141:17;145:9;
146:12;147:4,18;
148:14,22;152:12;
153:4;155:9,22;
156:3,14,21;157:8;
158:2;159:15;
163:12;164:9;165:5;
167:16;168:10,13;
180:2,6,10,15,22;
181:9;188:19;191:7,
18;198:3,15;202:20;
204:13,19,24;
206:12,19;207:6,22;
211:19;212:3,6;
213:8,17;214:12;
215:21;219:20;
220:9;222:7,16;
223:8,22;224:13,25;
226:6,25;229:7,12;
231:17;232:4;
233:14;235:18;
238:16;241:22;
242:20;243:10,21;
245:2,24;246:2;
247:10,22;248:17;
249:7,10;250:9,14,
23;253:17,24;
254:14;255:16,23;
257:2;259:6;261:14;
264:5,10,15,21;
265:6,15,20;274:18,
21;276:13;277:20;
279:21;288:25;
290:21;291:16;
296:11;297:9;
298:23;299:4,15;
301:9;305:8;306:23;
308:12;311:3,4;
312:3,6;320:20;
329:18;336:3;364:2;

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 118 of 130 PageID #: 1712

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

375:20;376:13;
377:13,16
**objections (1)**
3:9
**OBPD (6)**
229:25;252:6;
303:5;305:7;309:13;
312:25
**observed (2)**
372:7,9
**obtain (4)**
229:24;251:5,24;
252:5
**obtaining (1)**
200:8
**Obviously (6)**
7:5;73:18;97:11;
213:7;254:3;282:23
**occasion (12)**
46:11;128:5;
130:3;141:19;144:8;
183:24;192:6;
341:22;343:9,11;
345:15;370:8
**occasions (14)**
24:11;88:25;
89:20;90:11,18;
232:10,12;233:13,
19;313:18;314:2;
317:25;370:10,14
**occurred (3)**
281:14;285:17;
358:4
**Ocean (137)**
4:6;14:21;16:8,17;
17:19;21:3;22:7;
26:23;27:13;29:7,21;
30:8,15,17;31:3,6,16,
17,18;46:8;54:22;
55:24;66:7,23;67:5,
12;68:12,18;69:16;
74:11;76:11,15;77:2;
79:10,16,23;81:16;
83:21;84:9;93:18;
100:10;113:21;
114:5;116:17;
117:23;118:25;
119:17,19;123:7;
124:25;126:14,22;
131:25;136:4;
154:21;159:14,19,
25;179:7;195:9;
198:2,14;203:10;
206:14;208:10;
209:6,17,24;211:22;
218:15;224:9;226:2,
3,4,8,22,23;227:5,15;
237:15,17,22;238:8;
239:21;240:2,14;
242:16;245:9,15,22;
246:7;247:6;251:6,
11,17;253:2,5,20;
254:3,20;261:20;

262:7,21;263:6,8,13,
18,24;269:10;
271:17;277:9,10;
280:5;290:16;
301:16;305:17,20;
306:15,21;307:15;
308:10;309:13;
310:6,7,9,10;313:6,
13;341:16;351:18;
362:21;367:10;
368:5;370:5;371:11,
19;374:10
**October (2)**
227:24;295:25
**off (83)**
9:18,20,21,22,25;
10:22;19:4;30:10;
33:2;35:14,16;40:5;
43:17;51:19,24;
52:21;53:4,7,14,17;
55:22;56:3,11;60:16;
61:11;65:12,25;
66:23;67:9,12,16;
68:5,11;80:21;82:12;
116:2,3;119:3,4,16,
16;123:8;124:9;
133:25;158:12;
163:3;176:21;
194:21;196:11;
202:11;208:14;
215:6;218:8;258:19,
22,23;268:12;285:4;
293:5,15;308:25;
314:20;317:7,8;
319:18,20,21;320:8,
12,13;321:21;
327:10;335:13;
346:7,15;348:15;
349:23;353:9;
355:10;365:2;
367:12,12;380:5
**offensive (1)**
61:22
**offered (4)**
131:22;200:2,3,10
**office (28)**
16:15;138:5;
148:5,7,12;149:3,23;
150:22;151:10,18;
152:5;153:20;
155:16;157:3;
196:23;203:10;
214:23;215:10,19;
216:3;250:19;
274:10,16;275:13;
284:8;288:11;290:8;
369:21
**officer (33)**
54:6;56:2;60:4,11;
66:22;67:8,9,12;
68:4,11;76:10;79:10,
15,18,23;83:21;
85:13;91:17;114:9;

118:14;153:6;
172:21;237:15,21;
253:20;262:23;
295:3;325:14;327:5;
350:15;351:13;
362:16;375:8
**officers (125)**
26:7,11,13,20;
33:4;35:7,9;36:3;
38:9,20;43:16,24;
44:10;45:6,12;46:8;
47:20,22;49:16,18;
50:24;51:5;52:18;
53:11;54:12,19;55:7,
9,12;56:10,15;58:5,
13;59:19;61:2,23;
62:21;63:9,24;64:2;
65:2;67:3,5;69:23;
76:11;77:3,6,25;
78:14;81:16;88:13;
100:3;113:19;
118:15;137:19,21;
138:3;139:11;
247:17,20;249:5;
250:6,17;262:19,23;
263:4,11,22;271:12;
287:2;291:23,23;
292:11;302:10;
305:12,13;313:21;
315:8,8,11,13;
316:21,22,25;
317:16;318:8,14;
319:3,5,12;320:2,7,
18;321:13;323:9;
324:20,21,24;
326:21;327:16;
328:3;329:16;
331:20;336:2;
342:25;343:2,22;
346:21;347:24;
349:2,18;350:11;
362:4,21;363:4,25;
364:6,10;367:18;
368:5;372:13,25;
374:10;375:5,11
**officer's (1)**
287:7
**offices (1)**
294:5
**official (18)**
16:22;85:14;87:6;
131:9;163:19;209:2,
14;224:15,18,22;
226:23;245:4;253:7;
273:8;303:3;306:14;
308:9;356:11
**officials (4)**
256:18,22,24;
257:8
**often (1)**
67:11
**old (5)**
98:5,10;113:15;

127:8;192:25
**older (1)**
74:20
**Oley (8)**
74:15;78:19,21;
79:25;80:3,5;81:10;
83:25
**O-L-E-Y (1)**
78:22
**Once (3)**
67:14;261:4;326:6
**one (119)**
4:3;21:8,11,16;
24:14;46:2;51:8,19,
24,25;55:5,24;59:2;
60:9;62:24;63:6;
64:6,21;65:24;71:22;
74:25;76:13,22;82:8;
85:2,7;88:10;97:16;
106:2;107:18;
108:13;110:2,2,5;
117:7;126:24;133:7,
14,20;134:9,10,10;
140:2;141:7;142:25;
143:8;145:15;
155:17;160:13;
166:15;167:8;
169:14;170:4,4,6;
179:5;183:8,24;
184:10,13,18;
191:24;192:18,21;
193:24;194:22;
198:18;202:23;
205:7;208:16;
224:14,14;228:23;
229:10,18;237:3;
242:14;251:13;
254:2,11;256:24;
257:8;258:20;262:4,
6,19,20,23;263:5,8,
13,17;295:2,15;
300:3;310:14;311:6;
315:12;323:12;
327:9,17;337:19,20;
340:10;341:21,22;
342:18;343:9;
345:12;348:7;357:2,
25;363:8;364:17;
368:24;370:15,19;
372:13;376:2
**ones (8)**
55:10,11;95:22;
188:13;209:11;
230:23;342:21;
346:21
**online (1)**
245:19
**only (46)**
6:25;11:21;15:19;
31:13;36:6;49:20;
58:23;62:18;66:6,12,
21;67:7;68:3;77:25;
87:14;88:18;108:13;

110:11,15;118:8;
130:3;133:7;144:8;
166:13;178:19;
180:18;183:3,5,14;
200:6;207:16;
212:25;229:18;
248:25;255:12;
257:10;297:13;
325:22;328:6;337:5;
343:8;354:12;
365:17;367:18;
368:4;376:5
**open (6)**
183:11,14;225:14,
15;269:4;345:15
**opened (2)**
295:7;342:5
**operation (1)**
303:6
**opinion (13)**
113:7;153:25;
155:3;188:22;
263:17,23;265:2,5,
10,14,19;310:22;
324:15
**opinions (1)**
263:12
**opportunity (2)**
65:5;132:7
**oppose (3)**
13:7,11;377:15
**opposed (7)**
15:5;236:23;
305:20;306:22;
307:16;308:14;
376:20
**opposition (3)**
128:24;199:2;
271:16
**oral (1)**
371:4
**order (5)**
53:7;240:3;263:5,
22;308:21
**ordered (1)**
355:5
**orders (3)**
305:10,23;306:3
**original (5)**
21:8;183:18;
223:10;293:7;299:21
**originally (13)**
16:9;82:11;84:24;
111:14;139:22;
147:20;153:21;
161:15;170:5;
209:11;231:8;235:4;
301:3
**others (4)**
53:17;63:8;129:5;
199:7
**otherwise (4)**
25:22;26:5;44:24;

361:18

**out (115)**
14:17,19;35:13;
40:10;48:14;49:9;
52:6;56:12;63:25;
68:17;76:18;78:13,
20,23;79:7,17,24;
81:10,17;82:3,9;
83:20,22;93:4,16,17;
101:17;102:16;
103:7,13;120:23,25;
122:14;125:7,12,15;
126:25;127:15;
128:14;143:17;
150:5;151:7,15;
154:18;155:23;
157:2;184:4,5;
226:11;235:20;
237:13;238:2,3;
242:5,11;245:17,22;
246:6;248:12;
253:18;254:23;
256:7;262:18;263:3;
270:14,15,20;
271:15,20,23,25;
272:7,10;274:3;
290:7,25;295:6;
298:16;305:10;
315:5;321:2,3,22;
322:14,15;323:17,
18,18;324:11;
325:21;326:5,6;
327:9,19,21;332:6;
337:13;338:22,22;
339:16;343:19;
347:2,3;349:18;
362:22;363:24;
364:19;367:4;
368:12;370:25;
372:17;373:3,4,14,
18

**outlet (9)**
272:19;328:24;
330:18;331:16;
333:13;334:6;335:6;
341:4;344:17

**outlets (1)**
196:24

**outright (1)**
236:2

**Outside (5)**
8:10;80:13;
113:19;128:9;294:25

**over (10)**
52:2;76:2;82:22;
91:20;95:22;96:13;
117:23;127:6,10;
152:5;162:9;185:17;
209:24;210:9;
220:14;252:15;
261:2;262:22,24;
263:8;268:7;290:4;
295:3;326:7;339:7,

10,16;371:14,24;
373:6

**overall (1)**
350:25

**overcome (2)**
61:3;271:13

**overseeing (4)**
120:23;309:12;
310:6,18

**own (14)**
58:19;73:17;
264:3,9,14;265:5,10,
14,19;293:10;357:8,
8;362:23;374:25

**owned (2)**
75:22;338:3

**owner (4)**
75:2;336:11;
337:9;344:21

---

**P**

**package (1)**
260:19

**packet (2)**
93:20;362:15

**page (17)**
23:11;60:24;70:8;
128:22;198:18,23;
203:6;206:22;
268:22;269:6;
271:10;302:6,21;
345:5;360:11;
379:19;382:2

**Pages (3)**
382:12,14,16

**paid (3)**
51:20;71:2;72:20

**paper (10)**
111:15,24;231:13;
290:12,25;291:3;
330:16;333:11;
358:6;368:18

**papers (1)**
215:6

**paperwork (13)**
16:22;39:16,23,25;
87:7;131:10;163:20;
192:16;208:14;
209:15;218:7;
356:12;364:21

**paragraph (28)**
97:9,10,11,11,15;
110:18,20;198:24;
201:9;203:6;206:21,
23;251:5;257:6;
259:4;261:17;272:2;
302:21;304:12;
309:9;313:16;
314:24;335:18;
345:4,10;354:13;
357:14;360:25

**parents (2)**

339:15,17

**Paridiso (70)**
10:6;40:18;41:17;
42:12;43:6,15,23;
44:9;47:10;50:10;
68:25;69:20;70:3;
120:14,24;122:4,10,
13,14,20;124:21;
125:4,17,18,22;
126:5,9;225:4,6,8,11,
19;226:10;251:13;
252:20;253:3,11;
254:9,13,19;255:2,9,
14;256:3,8,12;
270:22,25;303:25;
304:7,17;306:4,22;
307:16;308:2,4;
328:14;329:24;
330:21;332:23;
333:16;334:16;
340:6,9,14;344:4;
345:25;346:15;
355:19;356:23

**Paridiso's (2)**
10:8;120:18

**park (49)**
12:10;13:22,25;
14:11,13;15:11;20:3;
68:18;107:3;110:23;
146:2;175:10,25;
178:6,7,10;181:25;
182:7,15,20;183:5;
188:2;190:17;194:3;
200:3;201:22;
207:16;234:23,25;
235:2,3,5,7;236:11,
13,15;237:6;239:12,
16;243:24;247:4;
252:14;305:2;
367:16;370:16,19;
371:7;374:15;375:15

**parking (1)**
75:4

**parks (1)**
172:15

**part (53)**
38:19,23,24;42:8;
45:15;53:18;56:24;
71:6;78:10;84:13;
105:15;107:24;
114:13;115:18;
118:6;123:3;141:20;
147:21,25;148:13;
154:20;156:7,17,18,
25;175:16;197:25;
198:4,14;203:15;
215:18;218:20;
233:23,25;234:3;
241:23;242:10;
243:13;245:3;
248:11;263:9;273:2,
9;275:7;282:20;
286:17;314:25;

315:16;316:7;
350:10,24;356:7;
367:13

**participate (3)**
32:25;33:18;62:11

**participated (3)**
60:10,16,20

**particular (6)**
29:22;67:9;
123:10;300:8;
308:14;351:2

**parties (1)**
3:4

**Partly (4)**
273:22;275:5;
276:14;348:24

**partner (5)**
108:20;319:6;
369:9,13;373:11

**partner's (1)**
369:10

**parts (1)**
95:2

**part-time (3)**
114:7,9;116:4

**party (5)**
68:13,16;149:13;
262:4;263:16

**pass (3)**
19:5;230:17;241:3

**passed (3)**
183:5,15;184:10

**passing (1)**
375:19

**past (6)**
70:17;92:18,19;
93:9;150:11;213:6

**Pat (1)**
74:19

**patrol (5)**
141:21;348:15,23;
350:13,16

**patrolled (2)**
349:15,21

**patrolling (1)**
350:22

**Paul (4)**
63:15;74:16;
77:12;342:18

**paved (1)**
367:12

**payroll (2)**
270:13,20

**peace (1)**
91:17

**Pelt (3)**
312:13,14,19

**pending (2)**
7:3;92:7

**people (17)**
52:21;57:4;111:9;
149:4,19;176:2;
262:5;264:18;

265:18;297:11;
315:23;316:18,20;
329:3,25;367:16;
376:4

**people's (1)**
38:5

**per (1)**
114:17

**percent (8)**
89:12;133:2,4;
207:5;266:9,13;
267:24;326:11

**performance (1)**
252:17

**performed (1)**
312:25

**perhaps (1)**
113:19

**period (11)**
23:8;30:20;45:16;
55:25;81:15;96:14;
109:5;127:17;
185:12;186:4;261:2

**permanent (2)**
70:19;91:18

**permission (2)**
163:13;179:15

**person (52)**
45:3;52:12;82:4;
87:24;183:15;
214:23;215:2,11;
216:2,6;228:11;
256:25;257:9,10;
318:23;327:10;
329:14;371:14,23;
376:3

**personal (15)**
70:20;87:23;
88:17;92:10,11;
111:5,7;177:15;
227:9;353:16,20;
354:21;357:8,8;
360:23

**personally (8)**
110:2;163:4,10;
314:22;337:6;
341:12;342:22;
344:24

**Personnel (24)**
176:2;200:23;
202:2;208:15,22;
214:23;215:9,18;
216:3;217:3,9,17,20,
24;218:2;257:22,24;
259:7;309:12,14;
310:6,19;313:20;
329:2

**pertaining (2)**
260:23;313:13

**pertains (1)**
207:16

**phone (56)**
9:10;14:3;16:19;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 120 of 130 PageID #: 1714

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

19:22;21:12;45:12;
46:5,11,20;47:4,24,
25;49:3,4,10;107:2;
108:14;110:3;141:5;
142:24;149:23,24;
161:11,11,14;162:9;
165:13,19,22;167:9;
169:8;174:16;
178:15;179:6,7,9;
194:17,20;199:14;
208:7;212:7,10,11,
24;213:11;214:2,4;
235:8;237:13;
253:25;283:10,18,
20;299:23;319:17;
371:14

**photo (3)**
368:17;369:5,8

**photos (3)**
293:24;294:3,4

**phrase (1)**
77:8

**physical (3)**
94:6,7;95:15

**pick (8)**
127:10,16;133:22;
158:9;318:23;326:2;
370:24;375:5

**picked (1)**
149:24

**picking (1)**
39:15

**picture (9)**
99:5,13,16;100:5,
12,17;267:10;310:2;
368:16

**pictures (5)**
100:2,25;101:22;
102:3;382:6

**piece (8)**
290:12,25;357:21;
358:6,8,8;359:12;
360:9

**pieces (1)**
291:3

**pinpoint (1)**
288:21

**pissed (2)**
327:10;355:10

**place (15)**
10:19;19:16;
90:10;138:6;189:13,
19;191:6;194:25;
196:22;218:24;
228:25;234:21;
283:20;337:17;
355:25

**Plaintiff (4)**
71:9;73:11;86:3;
87:19

**Plaintiffs (28)**
4:5,21;7:20;8:2,12,
22;11:10,16,22;

60:25;106:6;256:11,
18;257:7;271:11,12;
298:3;301:19,24;
312:25;313:17,20;
315:17;341:7;365:8,
12,18;366:5

**Plaintiffs' (3)**
257:16;259:4;
302:6

**play (1)**
170:20

**pleasant (1)**
55:3

**please (14)**
4:18;5:15,21,24;
22:17;65:11;74:18;
101:12;105:4;
123:23;162:6;
206:22;345:5;357:24

**plenty (1)**
52:8

**pm (14)**
134:5;158:12,15;
202:11,15;258:22;
259:2;268:12,16;
335:13,16;365:2,5;
380:5

**PO (1)**
269:25

**pocket (1)**
101:18

**point (40)**
17:5;20:25;43:14,
22;57:11;64:3;
94:18;100:21;
112:12,17;113:5;
121:13,16;124:10;
130:4;132:23;
142:21;155:17;
156:5;158:3;166:6,
12;176:25;180:25;
181:2;186:12;
216:15,19;219:18;
226:7;229:19;
230:15;235:24;
238:18;253:18;
296:8;312:4;322:3;
349:19;374:15

**Police (107)**
13:22;14:2,11;
15:11;20:3;40:14;
43:18;45:13;48:2;
49:3,10,23;60:4,11;
61:2,23;62:21;67:12;
68:11,13,16;76:10,
10;77:3,6,24;79:9,
15,23;81:16;83:21;
88:15;100:8,9;107:3,
5;113:19;114:9;
203:10;234:23,25;
235:3,7;236:11;
237:6,15,21;238:7,8;
239:13,16;243:24;

248:9;251:6,11,18;
252:14;253:21;
254:4;262:16;
269:10;271:12,17;
282:12,21;290:17;
294:4,17;295:3;
304:9;305:17,20;
306:16,21;307:15;
308:10;310:7,10;
320:2,18;323:9;
324:23;326:21;
329:16;331:22;
332:9;337:2;350:11;
351:2;353:23,25;
354:16,17,19;
355:14;360:14;
362:15,16,20;
364:20;367:18,20,
24;368:5;371:12,20;
374:10

**Politics (1)**
16:21

**polygraph (37)**
16:3,4,5;17:7,9,10,
17;18:7,18;19:4,5,
10,15,25;20:3,8,18;
181:7;230:10,16,17;
231:16;232:3,8;
233:4,7,21;235:17;
238:12,15;239:12;
240:23;241:10,13,
18;242:6;244:24

**polygraphs (4)**
15:15,21,23;
243:20

**posed (2)**
105:4;378:15

**position (30)**
12:11;14:14;
110:23;146:3;178:3,
4,11;183:10,11,14;
185:19;188:23,25;
189:10;192:4,9;
200:6;201:9,14,18;
209:8;233:10;
236:14;237:4,7,11;
238:19;241:16;
304:23,25

**positions (7)**
207:11;229:23;
230:4,7;236:7,8;
237:2

**possession (7)**
34:9;93:13;101:2;
102:4;134:23;
366:13;382:7

**possible (2)**
167:11;367:5

**possibly (4)**
167:8;245:6;
310:2;365:24

**posted (25)**
16:10;76:17;

85:10,10,12,16,19;
86:7,12,14,17,19;
87:4,8,15,19,24;
88:7;112:24;133:17;
209:12;220:13,22;
221:11;237:24

**posting (4)**
86:24;87:11;
88:12;130:7

**postings (2)**
95:3;112:22

**potential (1)**
243:17

**practices (3)**
26:6;32:17;34:13

**Precise (2)**
4:13,16

**preliminary (2)**
271:10;302:5

**pre-polygraph (8)**
241:23,25;242:8,
10;243:13;362:19,
24;364:16

**presence (8)**
8:3,10;9:7;360:17;
361:20;363:7;372:8;
373:20

**present (17)**
45:2;81:16;83:19;
88:2;136:7;138:9;
139:12;140:20;
141:6;150:6;195:13;
196:25;283:23;
284:9;286:13;
297:15;372:19

**presently (4)**
12:5,8,12;369:16

**press (7)**
196:14,17,21,25;
197:16,24;198:12

**pressure (2)**
19:3,9

**presume (1)**
203:11

**Pretty (9)**
80:21;82:23;95:7;
102:17,23;153:14;
289:17;325:5;327:2

**prevail (2)**
72:13,23

**prevails (1)**
73:12

**previous (2)**
230:23;346:19

**previously (3)**
205:5,8;361:23

**printed (1)**
184:5

**printer (2)**
270:12,19

**printing (1)**
270:20

**Prior (82)**

9:5;11:8;24:8,12,
24;27:3,19;31:11;
52:6;58:24;59:16;
66:25;67:3;75:19;
79:7,8;81:7,7,8;
100:21;101:2,23;
102:5;104:6;106:18;
110:8;121:6;122:7;
123:12,13,22,22;
124:4;131:23;145:5;
152:10,16;154:19;
156:5;157:17,21;
158:5;160:4;163:18;
169:16,16;170:4,4,9;
172:7;173:22;
181:19;182:17;
187:16;188:16;
192:19;200:8;
202:17;205:16;
216:10,20;223:4;
232:10;233:13,23;
234:24;250:17;
253:13;267:7,14;
272:3,9;284:24;
319:18,20,20;354:7,
18;355:9;358:23;
363:19;382:9

**privilege (2)**
378:22,24

**privileged (3)**
377:3;378:10,11

**probably (7)**
176:12;209:7;
241:6;289:2;346:25;
347:3,5

**probe (5)**
250:16;272:23;
273:2,5,10

**problem (5)**
16:6,7;179:6;
282:22;373:6

**problems (3)**
107:4;147:23;
270:20

**proceed (2)**
5:11;23:10

**proceeding (1)**
298:13

**proceedings (1)**
23:10

**process (2)**
70:24;97:25

**prod (1)**
266:21

**produce (1)**
258:15

**produced (1)**
165:24

**production (3)**
102:2;382:4,6

**professional (3)**
70:20;91:6;92:16

**program (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 121 of 130 PageID #: 1715

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

91:13
**promise (1)**
367:3
**promised (1)**
301:14
**promote (1)**
228:8
**promoted (34)**
173:8;175:19;
176:24;177:23;
178:4;182:7,20;
183:17;185:13;
186:5,10;187:23;
188:10;189:19,24;
190:17,21;191:6,16,
17;193:16,21;194:3,
11,15;195:15,20;
201:22;209:21;
210:20,24;211:5,12;
216:7
**promoting (1)**
186:13
**promotion (24)**
14:25;15:4;92:7;
131:22;132:7;
160:23;163:17;
180:17;207:10,15,
17,20,25;208:11;
211:17,21;215:20,
24;228:12;251:14;
303:7;307:4,8,10
**promotional (5)**
14:15;182:2;
183:3,4;200:6
**promotions (2)**
172:11,24
**property (1)**
225:15
**prosecutor (4)**
277:7;288:14;
369:20;370:4
**prosecutors (1)**
369:23
**protect (1)**
271:15
**protected (1)**
377:22
**prove (3)**
153:15,17;235:23
**provide (4)**
229:25;252:6,8,20
**provided (1)**
230:20
**provisionally (1)**
131:23
**provisions (1)**
72:3
**psychiatrist (10)**
90:23;91:5,8,11,
23;92:6,15,25;93:3,
11
**psychological (1)**
93:10

**psychologicals (1)**
371:5
**Public (12)**
3:14;5:18;62:3,12;
92:10;195:25;244:5;
271:15;302:8;313:3,
7;380:15
**pull (1)**
325:20
**pulled (2)**
262:18;295:11
**pulling (2)**
64:2;326:5
**punished (1)**
350:4
**punishment (3)**
348:19,25;349:19
**purporting (1)**
200:21
**purpose (5)**
53:15;99:20;
100:11;175:14;
270:10
**purposes (1)**
24:16
**pursue (4)**
239:22;240:4;
243:19,23
**pursuit (1)**
239:17
**push (4)**
188:14;191:24;
192:18,21
**pushed (1)**
193:3
**put (39)**
9:23;26:3,4;62:5;
73:5;94:19,20;117:4,
25;118:8,22,23;
119:3,4,9;123:16,25;
126:8;132:20;
145:20;150:5;154:2;
233:2;255:17,19,21;
260:5,18,22;284:5,5;
292:10,20;346:25;
347:3;348:21;349:2,
9;356:10
**putting (8)**
11:23;66:18,19;
187:24;192:4;
348:17;350:6;356:13

**Q**

**quad (1)**
263:9
**questionnaire (2)**
241:24;243:14
**questionnaires (1)**
242:8
**question's (1)**
132:5
**quicker (1)**

248:12
**quiet (1)**
285:21
**quite (1)**
28:15
**Quogue (2)**
362:15;364:20

**R**

**Raber (21)**
183:19;184:5,21,
23;185:2,15,17;
186:3,16;194:5,19,
21;210:13,14,15,18,
23;211:4,9,10;
220:10
**R-A-B-E-R (1)**
184:22
**race (2)**
94:11,24
**racing (3)**
94:14;95:5,14
**radio (6)**
45:13;46:4;48:2;
49:4,10;325:24
**Radler (1)**
4:23
**raise (6)**
47:6,9,12,15;
330:11;331:9
**raised (12)**
19:3,9;47:5;62:20;
63:21,23;64:11;71:8,
9;272:15,19;277:18
**ran (3)**
74:25;125:18;
290:17
**range (2)**
151:4,7
**ranger (25)**
12:11;14:13;
110:24;146:2;178:6,
7,10;182:2,7,20;
183:5;188:2;190:17;
194:3;200:3;201:22;
207:17;235:2,6;
236:13,15;370:16,
19;371:7;375:15
**rangers (5)**
175:10,25;182:16;
247:4;305:2
**rank (2)**
33:15;34:21
**ranking (4)**
26:7,10,20;35:9
**rat (20)**
137:14;150:22,23;
263:23;265:2;
347:22;361:8,10,15,
21,23,25;362:6,9,9;
363:5,12,17,21;
364:13

**rather (1)**
146:5
**rats (5)**
262:7,20;263:5,13,
18
**Ray (1)**
369:25
**reach (7)**
78:20,23;79:7,17,
24;81:9;82:9
**reached (5)**
78:13;81:17;82:3;
83:20,22
**reaction (1)**
314:18
**reactions (1)**
94:6
**read (23)**
25:11;164:15;
165:20;198:11,13;
206:22;210:20;
211:6;245:13;
261:11;264:3,8;
265:9;272:3;314:2,
24;335:19;345:5;
357:23,25;359:20;
360:19,23
**reading (2)**
210:4;244:12
**real (1)**
224:11
**realize (1)**
196:10
**really (20)**
39:21;92:13;
202:6;222:11;
229:10,18;231:3;
234:3;237:3,25;
275:18,21;276:21;
286:6;289:24;
294:23;299:11;
332:20;355:21;
359:17
**reason (58)**
12:20;17:5;59:10;
81:2,4,6;146:5;
147:10,19;155:3;
156:12;166:8,22;
167:11;177:23;
184:12,24;185:13;
187:16;195:14,19;
210:19,24;211:4,11;
221:5,7,8,17,19;
222:15;223:9,10,16,
17,18;224:5,11;
227:16;230:11,21,
22;233:20;234:9;
235:13;238:23;
239:7,11;240:16,21;
242:19;243:15;
244:13;251:22;
255:12;296:5,7,16
**reasoning (1)**

221:25
**reasons (18)**
17:4;18:2,18;
20:24;21:6,16,20;
22:3,4;166:13;167:8;
168:20;178:17;
232:2,23;233:6;
235:15;243:7
**recall (66)**
11:3;26:17;30:16;
32:15;36:20;51:9;
61:4;62:24;63:7,7,
22;64:24;65:3;77:5;
98:25;104:10,12;
120:10;124:19,24;
126:23;127:11,13;
134:11,16,21;144:7,
17,20;149:17;
173:21;190:2;
191:19;201:3;
208:23;267:14,16,
19,21;268:2;283:21;
287:17,20,21;
288:20;291:7,18;
292:13,15,24;
293:19;308:17;
317:20;323:5,13;
325:12;327:25;
338:7;343:24;
349:11;352:7,20;
353:14;365:9;
369:11,12
**re-call (1)**
179:5
**recalled (1)**
294:8
**receded (1)**
100:18
**receding (2)**
98:15;100:23
**received (3)**
207:23;227:20;
256:2
**receiving (2)**
201:4;267:19
**Recently (1)**
217:13
**recognize (3)**
22:20;205:7;266:3
**recollection (17)**
34:10;43:17;49:7;
63:13;65:6,22;
104:21;105:3;
124:11;125:23;
134:24;177:3;187:9;
197:2;266:21;311:2;
366:14
**recommence (1)**
31:5
**recommendation (1)**
256:3
**reconfirmed (1)**
167:7

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 122 of 130 PageID #: 1716

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

**reconfirms (1)**
16:24
**record (39)**
4:17;5:8,22;25:25;
33:22;65:12,25;66:5;
73:5,7;79:22;91:18;
124:20;133:25;
134:5;146:11,22;
158:12,15;195:25;
202:11,15;229:13;
244:5;245:4;258:20,
22,24;259:2;260:6;
268:12,16,19;
335:13,17;365:2,5;
378:6;380:5
**recorded (8)**
144:14,25;145:14;
147:12;170:14;
179:13,16;202:18
**recorder (5)**
142:22,25;143:2,6,
20
**recording (11)**
142:16,19;144:23;
145:7,23;146:17,19;
147:3;169:18;
170:25;179:19
**recordings (1)**
145:20
**records (7)**
153:8,18;257:16,
20;259:5,8;293:10
**recover (2)**
71:11;72:23
**recreation (3)**
172:16;185:21;
186:25
**recruiter (4)**
230:9;235:9;
237:14;239:18
**recruits (3)**
368:6,8,10
**refer (11)**
26:11;31:22;32:2,
18;34:14;35:8;
247:21;250:7;306:4,
6,10
**reference (27)**
16:15;110:18;
131:10,21;149:4;
165:3,7;229:4,11,19,
20;248:14;251:4,10,
19,25;252:13,16,20;
253:11;254:11;
255:4,10;256:8,12;
259:3;294:11
**referenced (4)**
130:20;169:19;
203:15;293:22
**references (12)**
207:13;211:23;
215:19;228:16,21;
229:10,18,25;251:6;

252:5;256:17;367:6
**referred (7)**
73:9,10;128:15;
137:16,22;203:15;
292:4
**referring (28)**
45:2;73:2;74:8;
85:20;110:19;111:3;
136:14;162:23;
199:10;207:15;
208:19;210:11;
213:12;215:25;
229:4,16;247:16;
248:7,8,18,19,24;
250:21;251:25;
252:8;259:5;260:5;
302:15
**refers (2)**
229:13;236:18
**reflect (1)**
73:7
**reflected (2)**
212:12;224:22
**reflects (1)**
214:4
**refresh (7)**
34:10;63:13;65:6,
21;104:20;134:24;
366:14
**refreshes (1)**
105:2
**refuse (1)**
331:20
**regard (26)**
18:2;22:6;44:2,5;
47:3;69:6,9,12,19;
70:2,5;88:24;90:23;
155:5;176:4;189:8,9;
196:13;228:11;
230:25;246:19;
255:8;329:5,8;340:4;
364:9
**regarding (6)**
135:16;136:13;
227:5;376:10;
377:12;379:5
**Regardless (4)**
62:23;63:18;
323:14;378:8
**regime (1)**
271:16
**regular (2)**
6:5;350:13
**regulations (1)**
309:15
**regulus816@earthlinknet (1)**
266:12
**rehire (1)**
21:22
**rehired (12)**
84:9;114:2;
116:20,24;148:21;
152:25;154:21;

155:4,8;156:13,20;
167:24
**related (4)**
81:22;100:12;
101:17;244:25
**relates (2)**
34:21;186:21
**relating (1)**
304:21
**relation (6)**
84:19;104:4;
106:14;108:8;
163:22;186:15
**relations (2)**
373:21,24
**relationship (5)**
81:25;127:20,23;
227:8;372:12
**relieve (1)**
77:13
**relieved (1)**
48:15
**Relieving (3)**
47:21;49:2;358:4
**relive (2)**
85:4,4
**reliving (2)**
94:3,16
**remarks (1)**
85:2
**remember (3)**
82:25;162:5;197:3
**remove (1)**
331:19
**removed (1)**
126:16
**render (2)**
263:23;264:25
**repeat (3)**
154:15;204:14;
236:5
**repeated (1)**
302:6
**rephrase (4)**
6:20;8:16;13:2;
79:14
**replace (1)**
123:24
**replaced (2)**
211:3,10
**report (7)**
91:8,12,16;357:21;
360:6,7,8
**reporter (6)**
4:15;5:15,21,24;
22:10;200:14
**Reporting (3)**
4:13,17;177:4
**represent (1)**
366:24
**representative (1)**
287:24
**representatives (2)**

285:20;286:12
**represented (2)**
378:2;379:12
**representing (2)**
5:5;23:20
**reprimanded (1)**
90:4
**reputation (2)**
70:20;110:24
**request (6)**
7:2;101:16,20;
258:18;317:22;
318:10
**requesting (1)**
185:12
**requests (1)**
72:3
**required (3)**
92:4;181:7;243:20
**requirements (1)**
16:2
**requires (1)**
91:22
**rescue (1)**
285:12
**researched (1)**
15:14
**reserve (1)**
6:8
**reserved (1)**
3:10
**resident (1)**
88:11
**residents (7)**
74:21,23;76:12,13,
17;88:12,14
**respect (6)**
120:23;121:2;
122:14;162:7;257:3,
5
**respectfully (1)**
23:15
**respective (3)**
3:4;29:8;207:11
**respond (5)**
25:6;97:19;166:2;
186:6;282:16
**responded (2)**
186:5;282:14
**response (17)**
17:24;18:9;40:4,8,
20,22;41:10,24;42:7,
25;46:16;48:6;50:6;
87:8;188:16;316:9;
322:24
**responses (1)**
17:12
**responsibilities (2)**
350:11,25
**responsibility (2)**
305:6;350:15
**responsible (17)**
303:4,11,18;

304:11,16,22,25;
305:18;306:14,20;
307:3,14,23;308:9;
309:12;310:5,18
**rest (3)**
55:2;338:24;
367:17
**result (11)**
76:14,25;84:8;
90:10,17;113:20,25;
131:13,17;166:4;
257:14
**resulted (5)**
94:8;96:8;154:20;
155:6;156:19
**resulting (2)**
96:7;132:8
**results (3)**
14:17,19;173:4
**resume (1)**
192:15
**retain (2)**
103:15;104:7
**retained (1)**
202:16
**retainer (1)**
104:15
**retaliate (1)**
59:14
**retaliation (2)**
128:23;198:25
**retaliatory (1)**
58:18
**retire (1)**
217:12
**retired (1)**
217:11
**retirement (2)**
262:4;263:16
**review (8)**
6:9;22:17;24:2,7,
12,15;205:15,20
**reviewing (9)**
22:18,19;162:24;
206:24;335:21;
345:7;357:15,19;
360:12
**Rich (7)**
46:5,7;325:19;
327:19;346:21;
362:2;363:7
**Richard (1)**
327:18
**rid (2)**
279:6,11
**ride (2)**
56:12;353:9
**ridicule (6)**
347:20;348:2,4,13;
352:11,13
**ridiculing (2)**
348:18;352:7
**right (135)**

EDWARD CARTER
September 16, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 123 of 130 PageID #: 1717

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

5:13;6:8;16:25;
28:8;30:21;31:17,18;
34:19;42:22;56:3,6;
57:12;61:17;63:5;
64:19;71:21;77:15;
89:16;93:21;96:19;
101:6,19;103:2;
107:16;109:24;
117:7;118:10,13;
123:19;124:2;133:8;
141:9;147:6;152:9;
154:4;168:9,12,21,
25;173:23;178:8;
184:16,20;192:20,
21;195:8,9;207:3;
212:13;218:17;
219:2,6,8,18,19;
221:4,13,14,16;
222:2;223:5,14,18;
224:2;225:23;
227:10;228:7;
229:21;230:21;
232:10,12,13,19;
233:24;234:4,6,13,
22;235:2;236:16,19,
24;237:4,7;239:8;
240:10;241:13,17,
20;244:5,15,19;
245:11,15,19;
252:10,19;255:10;
263:24;264:4,9,14;
265:2,7,10,14,19;
274:23;275:4;
276:23;286:13;
290:20;292:23;
294:5;295:23;297:8,
16;305:25;307:13;
309:24;311:13;
316:3;322:8;327:24;
347:10,17;350:14,
16,18;351:5;359:7;
360:9,25;363:11;
379:2

**rights (1)**
244:18

**Rivkin (1)**
4:23

**RL (2)**
24:24;382:14

**roadway (1)**
367:13

**Rob (1)**
281:8

**Robert (2)**
367:12;374:14

**rocket (7)**
37:21;38:16;
39:11;49:22;50:2,11;
63:16

**Rogers (17)**
5:2;41:20;42:15;
43:9;44:3,12;47:7;
50:14;69:10;328:17;

330:6,25;333:3,20;
334:20;340:18;344:9

**Ronkonkoma (2)**
141:13,14

**room (16)**
9:6;131:21;
194:19;208:8;209:9,
10,20,25;210:7,16;
211:25;277:7;
284:21;373:2,14,18

**roster (1)**
126:16

**rough (4)**
280:15,22;281:9,
18

**roughly (2)**
117:19;319:22

**RQ (2)**
101:19,25

**RQs (1)**
382:3

**rules (2)**
6:7,7

**ruling (1)**
25:9

**rumors (1)**
208:25

**running (3)**
209:2;285:4;
374:22

---

**S**

**sad (1)**
153:15

**same (45)**
3:6,15;15:6,9;
18:21;28:20;29:18;
32:13;33:15;34:21;
39:5;44:2,5,12,14,
16;46:23;47:21,23;
67:17,18;69:6,9,12,
19;70:2,5;81:6;
117:16;120:21;
165:20;179:9,24;
235:4;264:23;329:5,
8;332:11;334:15;
345:19;346:21;
366:16;375:4;
377:14;379:6

**Sanchez (13)**
309:11,18,21,23;
310:5;368:16;
369:15;371:23;
372:4,8,12;373:21,
25

**Sanchez's (3)**
311:21,25;312:9

**sanctions (1)**
71:23

**sand (3)**
325:14,19,21

**Santana (1)**

4:12

**sat (1)**
208:21

**Saturday (2)**
149:14;295:19

**saw (30)**
15:14,25;25:13;
28:18;35:20;37:12;
46:22;54:12;76:2;
78:25;80:5;86:14,16;
111:23;112:23;
125:21;126:2;
142:21;143:13;
220:12;227:23;
231:8;282:24;
289:17;311:19;
327:21;346:17,18;
355:3;368:17

**saying (18)**
16:24;75:23;87:8;
163:4;165:17,18;
209:22;226:22;
228:20;237:2;243:6;
247:18;249:16;
270:18;315:19;
339:23;341:6;363:15

**scapegoat (1)**
279:17

**scene (1)**
153:6

**schedule (17)**
28:20;30:13;
117:5;118:2;121:12,
14,16,17,23;122:4,
11,16;123:9;280:13;
282:2;285:14,16

**scheduled (2)**
10:3;233:21

**schedules (2)**
28:17,18

**scheduling (3)**
126:2,6;188:3

**Schimpf (25)**
185:24;186:11,15,
20;187:15,22;188:8,
10,17,20;189:13,18,
24;190:16;191:4,13,
15;192:2,6;193:6,14,
15,24,25;194:8

**Schneider (8)**
200:23;201:3,7,13,
20;202:2;217:17,23

**school (1)**
339:17

**scooped (6)**
16:25;17:2;
166:23;167:4,21;
168:4

**score (1)**
376:2

**scored (3)**
182:4;184:10,13

**scores (2)**

218:9;375:23

**screaming (1)**
325:25

**scroll (1)**
248:2

**sealing (1)**
3:5

**search (4)**
105:24;106:15,18;
108:10

**searches (1)**
108:2

**season (12)**
21:23;30:10;
116:2;117:14,16;
118:7;123:4,8;124:5,
6;317:7,8

**seasonal (15)**
27:20,22;28:5,6;
114:8,11;115:3,6,8,
11,14;116:11,13,20;
263:9

**Seasonally (1)**
13:23

**second (38)**
39:2;40:2;42:3,11,
14,17;45:20;47:18;
48:6,17;49:12;68:24;
70:8;128:22;162:6,
13;179:8;189:23;
198:18,22,23;201:8,
8;231:23;234:4;
258:20;317:2,14,17;
321:11;325:20;
327:13;328:9;337:8;
339:2;340:10;
341:19;357:25

**secondhand (1)**
352:9

**seconds (3)**
57:21;82:24;
144:18

**secretary (2)**
149:21;194:20

**section (1)**
25:20

**secure (2)**
106:25;354:2

**security (2)**
15:25;243:25

**seeing (5)**
81:8;94:19;96:7;
267:14,16

**seek (9)**
8:7;12:18;13:16,
19,21,24;14:11;
103:11;377:2

**seeking (6)**
14:24,25;71:11;
207:25;376:14;377:9

**seems (1)**
121:19

**selectively (1)**

341:8

**send (14)**
117:23;185:11;
223:3;224:23;
226:21;239:20;
253:11;255:4,6;
272:14,18;328:23;
368:24,25

**sending (3)**
120:10;124:24;
368:25

**senior (9)**
26:6,10,19;30:7;
35:9;153:5;312:21;
325:14;327:5

**sent (11)**
91:20;161:21;
199:23;223:20;
224:10;290:24;
327:11;337:16;
343:20;348:14;
349:25

**sentence (17)**
128:23;198:24;
201:8,9;203:5;207:9;
228:16,19;259:5,13,
17,22;272:2;302:5,
22,23;309:10

**sentences (1)**
97:10

**separate (2)**
218:2;230:22

**September (26)**
4:10;14:17;28:7;
51:13;97:2;114:8,10,
17,19;122:12;152:3;
184:7,8,8;185:12;
186:3;189:22;195:2,
3,6;200:17,21;
201:20;227:24;
295:22;380:4

**Sergeant (9)**
26:8;120:7,11;
122:20;124:21;
125:2;207:12;
270:21;304:7

**sergeant's (1)**
12:11

**series (2)**
6:17;242:10

**serious (5)**
95:7,12;102:17,23,
24

**served (1)**
336:22

**service (47)**
12:10;14:15;
114:17;178:5;
181:15,25;190:10;
200:4;202:3;217:25;
230:13;233:11;
257:16,20,25;258:5,
11,15,16;259:4,8,12,

Case 2:07-cv-01215-SJF-ETB  Document 145-8  Filed 01/15/10  Page 124 of 130 PageID #: 1718

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

18,23;260:6,22;
261:5;302:8;309:15;
311:15;312:22,23;
361:23,25;362:6,9;
363:5,12,17,21;
364:13,14;370:7;
371:13,19;372:15;
373:3
**set (12)**
98:14;150:15;
192:14;205:25;
206:4;233:3,7,10;
257:6;268:18;345:9;
360:24
**sets (2)**
244:7;269:23
**setting (1)**
235:16
**seven (1)**
163:23
**several (13)**
9:16;15:15,18,20,
22;52:17;54:19;
57:6;74:10;218:13;
362:3,20;372:13
**severe (1)**
94:12
**sexual (8)**
277:24;278:15;
288:23;291:5,14;
372:11;373:21,24
**shall (2)**
3:6,10
**shape (1)**
44:9
**shareman (1)**
304:19
**shaved (1)**
294:8
**sheet (1)**
269:9
**sheets (6)**
153:23;154:2;
270:20;286:18,24;
287:7
**shift (7)**
52:11;305:14,21;
306:2,7,11;351:2
**shifts (4)**
28:9,24;89:16;
350:12
**Shirley (2)**
14:6,8
**shit (9)**
40:10,11;82:19;
295:12;357:21;
358:8,9;359:12;
360:9
**Shop (1)**
151:5
**Shore (4)**
6:3;80:5;81:9;
262:17

**short (7)**
149:16;313:20;
321:19;324:14,18;
329:2;330:22
**Shortly (3)**
86:21;144:16;
196:14
**shot (15)**
55:19;57:20;58:3,
7,9,11,20,23;59:5,7,
10,12,21,23;61:8
**shots (1)**
52:18
**show (14)**
22:15;56:19;61:7,
13;99:10,11;102:4;
153:18;180:17,20;
205:4;267:6;362:13;
382:8
**showed (16)**
31:12;61:12;
94:23;95:2;150:18;
153:8;184:5;208:10;
212:13;280:13;
286:23;287:6;
343:18;365:6,13;
366:10
**showing (1)**
104:13
**shows (1)**
113:5
**shrugged (4)**
176:21;228:3;
314:20;321:21
**Shut (9)**
37:23,24;51:22;
55:18;57:18,25;
59:20;128:5;262:25
**side (1)**
56:17
**sign (4)**
6:9;104:15;271:3;
308:25
**signature (10)**
23:12;269:12,14,
17,20,21;270:4,5,7,8
**signatures (1)**
269:24
**signed (3)**
3:14,15;97:12
**significantly (4)**
98:15;100:18,22,
23
**silence (14)**
61:3;247:3,7,9,15,
21;248:5,16;249:6;
250:8,13,21,25;
271:14
**Silver (1)**
143:8
**similar (3)**
224:14,14;358:6
**similarly (1)**

375:2
**simple (1)**
20:17
**single (2)**
268:22;282:15
**sirens (1)**
285:6
**sit (5)**
18:11;28:23;
77:14;85:18;263:20
**sitting (1)**
153:22
**situation (3)**
255:18,20,22
**six (7)**
170:8;273:16;
277:7;288:13;318:3;
325:17;335:16
**size (1)**
215:9
**sleep (5)**
73:17;84:15;
88:24;90:24;225:16
**sleeping (36)**
17:6;21:14,18;
84:19;133:17;
134:11;159:3,5,6,9,
13,21,25;160:6,10,
16,20;161:5,25;
162:2;164:25;166:4,
20;168:11;169:9;
170:10,15;176:19;
225:11;232:19;
233:23,25;234:3,10;
235:25;319:16
**small (2)**
294:21;354:2
**Smith (1)**
14:4
**Smithtown (4)**
182:10,15;183:2;
376:6
**snitch (1)**
279:20
**Snyder (25)**
85:24;86:3,7,11,
18,23;87:15,22;88:8,
19;109:3,6,10;
130:22,23;131:2,3;
133:7;138:22;
203:21,23;207:10;
229:14;266:14;380:8
**Snyder's (7)**
85:25;357:21;
358:16,22;359:2;
360:5,7
**socialize (2)**
128:8,10
**somebody (7)**
137:25;138:16,20;
155:13,25;287:13;
318:21
**somehow (1)**

59:13
**someone (19)**
18:6,17;21:9;76:2;
83:11;85:3,9;87:4;
117:23;138:25;
139:2;148:4;156:11;
185:16;220:21;
240:2;276:9;338:3;
356:13
**sometime (6)**
107:8;114:20;
148:2;173:18;184:6;
296:25
**Sometimes (4)**
190:11,12;318:6,7
**Somewhere (1)**
319:23
**Soon (2)**
174:4;367:4
**sorry (33)**
14:7;18:13;37:10;
43:20,21;49:18;
65:13,17;73:25;
77:11;86:15;110:20;
123:3;152:23;
154:15,22;169:20;
184:8;190:15;195:3;
198:12;204:14;
217:14;234:16;
268:20;289:6;
326:15;331:4;336:2;
357:16,17;369:4;
371:4
**sort (4)**
164:2,17,19;369:6
**sought (5)**
12:15;90:22;
256:7;377:25;379:11
**sound (1)**
169:20
**source (3)**
158:4;263:21;
264:24
**south (3)**
351:20;354:6,10
**Southampton (1)**
107:18
**space (2)**
104:19,24
**speak (28)**
7:4,12,15;9:3;11:9,
15;50:9,13;79:9;
83:12;108:7,9;110:7,
13;149:25;150:11;
174:3;186:15;
194:22;235:9;
271:20,25;272:7,10;
273:7;275:10;
284:24;300:19
**speaker (2)**
140:19;141:5
**speaking (2)**
218:6;271:15

**speaks (2)**
165:6;249:19
**specialist (1)**
4:14
**specific (9)**
21:6;23:8;130:9;
132:5;216:15,20;
287:18;306:11;325:9
**specifically (26)**
7:16;20:18;35:22;
38:11;44:16;45:24;
132:13;135:4,6,15;
136:20;137:4,9;
170:24;176:4;
177:24;216:21;
218:5;221:21;
241:14;282:18;
283:2;349:24;361:8,
15;366:4
**speculate (2)**
212:18;255:13
**speculating (1)**
29:6
**speculation (1)**
211:16
**spell (2)**
78:21;184:21
**spent (1)**
72:7
**split (1)**
118:11
**spoke (43)**
106:21;107:9,22;
108:8;109:25;110:2;
150:10,12;151:18;
157:22;160:22;
168:2;170:5;176:13;
177:9;186:3,9,11,16;
190:3;194:5;203:21;
208:21;225:8;230:8;
234:12,17;237:13;
240:25;271:23,23;
272:22;273:12;
275:11;283:7;
284:17;286:11;
287:24;290:8;298:6,
10;315:4;377:7
**spoken (16)**
7:8,19;8:11,21,25;
11:24;12:2;83:2;
107:25;173:23;
177:18;300:6;301:2;
376:7,19;378:7
**spooked (1)**
290:5
**spreading (1)**
164:23
**squad (1)**
285:12
**squared (1)**
373:5
**squeaky (3)**
346:24;347:9,16

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 125 of 130 PageID #: 1719

**stack (1)**
286:24
**staff (1)**
191:23
**stamped (2)**
99:7;268:24
**stance (1)**
275:24
**stand (1)**
355:3
**standard (1)**
93:8
**standing (9)**
70:21;110:17,22;
111:4;112:13,18;
113:7;294:19;323:16
**Stanley (3)**
312:13,14,19
**stared (1)**
80:10
**staring (2)**
75:3,7
**start (5)**
30:14;84:19;98:7,
20,23
**started (13)**
27:3;30:17;98:8,
17;149:2,3;150:20;
151:22;155:11;
295:8;300:4;322:21;
368:12
**starting (2)**
27:4;363:9
**starts (2)**
103:22;163:3
**State (10)**
5:19,22,25;91:18;
93:6,8;214:22;
247:11;373:19,23
**stated (3)**
245:20;310:8;
355:9
**statement (37)**
129:14;130:5,19,
21,25;132:9;135:3;
136:3,8,14;137:6;
140:8;148:16;
158:25;159:13;
164:5,15,20;203:25;
204:4,10,18,22;
215:12;271:10;
294:11;297:2;
298:25;302:5;
358:17,23,24;359:3;
360:13,18,19,24
**statements (10)**
129:3,8,22;133:10,
11;199:4;203:7,14;
215:22;372:20
**States (4)**
4:8;115:16;223:6;
244:18
**station (25)**

**36:4;38:9,15,22;**
39:19;43:18;46:3;
49:2,23;50:3;100:8,
9;270:19;292:13;
294:17;331:22;
332:5,9;337:2;
352:16;353:23;
354:2,16,17;372:14
**stationary (3)**
226:23;227:5,15
**status (2)**
120:18;298:21
**statute (1)**
91:21
**statutory (3)**
72:3,14;73:10
**stay (2)**
158:16;279:25
**steady (1)**
124:9
**step (1)**
137:5
**stick (1)**
79:6
**sticks (1)**
51:8
**still (34)**
62:8;63:16;
120:22,23;121:4,12,
16;122:4,11;125:6,
12,14;126:8,11,12;
183:11;190:4,7;
191:22;192:7;195:8;
202:2;203:2;216:14;
217:9;237:17;
244:23;247:3;248:5,
16;320:6,10;324:14;
378:9
**stipulate (2)**
13:10;258:17
**STIPULATED (3)**
3:2,8,12
**stipulation (1)**
114:20
**stipulations (1)**
6:5
**stock (1)**
16:3
**stomach (1)**
359:16
**stomach's (1)**
358:12
**stonewalled (1)**
227:9
**stood (1)**
309:23
**stop (5)**
49:9,11;151:5;
268:7;274:9
**stopped (5)**
30:21;54:8;
141:20;218:7;368:25
**stopping (1)**

348:19
**story (2)**
197:6,23
**straight (5)**
76:18;130:10;
147:12;155:23;321:2
**strangers (2)**
261:19,24
**street (8)**
111:10;294:25;
295:9;348:14,18,22;
349:10;350:7
**streets (15)**
327:11;338:23,24;
349:3,14,22;350:9,
16,20,23;351:6,14,
17,19;352:2
**stress (6)**
70:23;93:23,25;
94:10;95:17;102:20
**strewn (1)**
331:21
**strike (15)**
12:22;13:4,8,11;
45:15;113:3;132:4;
137:3;213:10;
225:18;227:12;
230:19;263:10;
326:17;363:2
**stuck (4)**
127:3,6,19;325:13
**stuff (34)**
15:14;39:7,16,16;
74:13,21;76:4,18;
89:22;94:3;110:4;
111:15,16,24;
112:20,22,24;
172:19,24;187:25;
188:4;209:3;210:10;
213:18;218:9;260:8;
299:19;305:24;
322:13;332:6,8;
346:19,22;365:25
**subject (11)**
48:7;50:7;64:25;
174:25;177:10,19;
266:21;268:2;313:3;
365:18;366:9
**submitted (1)**
193:19
**subpoena (5)**
99:21,22,24;
100:13;293:25
**subpoenaed (2)**
100:2;259:22
**Subscribed (1)**
380:10
**subsequent (20)**
7:21;8:12;16:19;
78:17;128:25;
132:22;158:21;
169:25,25;199:3;
251:9,16;254:21;

257:20,25;258:5,11;
259:12,14;261:21
**subsequently (2)**
151:17;169:13
**substance (3)**
9:12;39:9;107:13
**substantive (2)**
11:5;191:3
**sued (3)**
83:5,11;245:15
**sufficient (1)**
243:8
**Suffolk (64)**
5:4,5;13:22,25;
14:10;15:10;20:3;
107:5,10;178:5;
181:15,24;201:17;
202:3;217:18;218:3;
229:23;235:3,6;
236:10,19,21,23;
237:3;238:6;239:12,
15,23;258:14;
262:16;273:13;
275:2;276:9;277:2;
280:4;283:8;284:11,
18,25;285:19;
287:24;291:12,20;
292:2;293:14;
301:12,15;309:15;
325:25;326:3;
362:19;366:25;
367:20,23;368:20,
21;369:3,4,5,20;
370:6;371:13,18;
376:9
**suggesting (1)**
256:24
**suing (2)**
82:4;245:22
**sum (3)**
9:12;39:9;107:13
**summer (24)**
21:23;36:21,22;
45:11,19,21;103:21,
22,23;114:12,24;
121:11;173:18;
263:8;314:11,25;
316:2;317:10,14;
337:18,21;338:11,
11;372:14
**summers (1)**
263:7
**summons (8)**
295:4;337:7,12;
338:3;339:7,12,21;
340:2
**summonses (4)**
335:23;336:5,15,
18
**Sunday (5)**
9:5;10:14;11:6;
124:11;358:4
**superior (9)**

91:12;187:19;
194:13;195:13,18;
211:9;311:22;312:2,
9
**superiors (7)**
188:5,12;189:10;
190:22;197:21;
198:10;224:10
**supervising (1)**
118:14
**supervision (6)**
303:5;305:2,7,19;
306:15,21
**supervisor (4)**
185:16,18;242:25;
346:14
**supervisors (5)**
160:14;172:23;
246:6,14;250:18
**support (23)**
70:22;73:15,18,19,
21,23;74:4,5,9,11;
75:24;76:21;78:3,5,
6,14;79:11,18,24;
81:18;82:5,10;83:22
**supported (1)**
73:18
**supposed (1)**
349:14
**supposedly (1)**
155:14
**sure (29)**
8:4,9;10:22;20:12;
56:11;75:9,12;97:8;
101:24;121:13,17,
25;133:2,4;142:14;
190:2;213:25;
233:17;238:10;
260:9,13;266:9,13;
267:24;268:22;
298:24;304:18;
326:11;357:22
**surprised (1)**
83:3
**surrounding (3)**
20:19;21:4;244:8
**sustained (1)**
70:14
**swear (1)**
5:15
**sworn (2)**
3:15;5:18;380:10

---

**T**

**talk (36)**
6:23;11:4;45:22;
74:22,24;75:10,12,
14;77:14,16;79:3;
81:14;82:17;83:4;
125:11,13;126:25;
128:14;133:9;135:2,
10;136:18;151:10;

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 126 of 130 PageID #: 1720

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

161:13;166:24;
167:22;175:4;209:9;
212:9;228:10;237:9;
262:25;275:13;
283:15,22;294:21
**talked (9)**
75:16;82:23;
106:13;147:5;
198:19;264:18;
265:17;299:9,12
**talking (34)**
11:21;25:16;
44:21;55:13;82:18;
116:4;117:15;
135:12;150:21;
151:21;154:22,23,
24;157:6;170:9;
189:9;17;208:9,19;
210:5,8;218:8;
236:22;262:19;
295:2;305:16;322:3;
345:11;351:21;
358:11,15;359:14;
366:4;372:25
**tape (43)**
4:2;65:24;66:4;
133:21,24;134:4,7;
140:22;142:21,25;
143:2,6,20;144:14;
145:14,19,23;
146:10,17,19,21;
147:3,12;165:22;
169:18;170:13,20,
21,25;179:12,16,19;
202:6,10,14,18;
268:6,7,11,15;
335:10,12,16
**taped (5)**
144:6;178:20,23,
24;179:3
**tapes (1)**
354:19
**taping (6)**
141:2;143:16,18;
144:9;178:15;180:8
**taxi (1)**
374:23
**telephone (7)**
140:16,17;144:10;
145:7,7;284:15;
371:24
**television (1)**
197:9
**telling (13)**
53:16;122:20;
129:6;173:13;214:6,
8;295:5;296:17;
299:18;311:12;
314:9;339:20;378:8
**tells (2)**
16:20;59:20
**tenure (1)**
31:3

**term (1)**
35:10
**terminated (10)**
16:8;17:19;32:24;
78:11,12;138:11;
155:20;226:15;
271:21;297:14
**termination (12)**
12:21;94:4;129:2;
152:23;180:14;
195:22;199:3;230:2;
252:7;276:24;
278:11,14
**terms (2)**
30:7;255:9
**test (28)**
14:15,15,17,17,19;
15:8;19:15,25;20:8,
18;131:23;172:25;
173:4;183:3,6,15;
200:8;218:9;233:8,
21;235:4;238:12;
241:18;242:10;
244:24;370:17,19;
375:16
**testified (30)**
5:20;50:25;92:4;
132:12,16;151:23;
156:22;157:9;
158:17,25;168:17;
169:3;188:15;
213:18,20;214:13;
241:11;246:3;
249:20;250:12;
254:15,16;277:21;
300:2;308:13;
310:21;311:5;
329:19,23;340:5
**testify (3)**
297:18;299:5;
376:17
**testimony (49)**
37:10,11;54:14,16,
23;60:6;62:14;82:6;
84:16;86:6;89:19;
94:22;98:12;111:11;
117:22;148:15;
155:21;168:9;
169:22;170:18;
173:10;181:11;
186:2;216:5;217:22;
220:25;222:15;
224:18;231:24;
232:5,6;234:6;
235:12,19,21;
243:12,22;245:11;
246:16;247:19;
249:4,9,19;261:4;
270:16;274:19;
311:5;313:5;329:11
**testing (1)**
238:4
**tests (2)**

240:23;241:13
**thereof (1)**
59:4
**thin (6)**
143:8;159:9;
161:3,24;164:23;
165:19
**third (24)**
23:11;39:8;40:7;
42:20;45:20;49:15,
24;50:10,17;158:24;
179:8;231:25;
233:20,22;289:3,4;
302:22,23;321:23;
322:7,20,24,25;
370:24
**Thomas (3)**
182:6,25;380:8
**Thompson (3)**
4:20;23:16;106:3
**though (11)**
60:19;116:9;
128:4;137:15;
188:15;213:25;
231:20,22;233:12,
18;324:4
**thought (9)**
59:13;80:15;
128:3;156:7;159:20;
166:23;226:9;
248:13;357:21
**three (56)**
14:13;17:4;36:19,
22;37:5;45:8;54:24;
55:6;64:18,18;
122:21,24;127:8;
133:18;134:4,7;
146:3;147:10;
151:15;166:13;
168:8,20,24;178:6,
10;182:2,7,20;
184:17;188:2;
190:17;194:4;200:3;
201:10,14,18,22;
202:7,10;207:17;
235:2,6;236:13,15;
285:15;287:11,12;
298:17;300:12;
304:6;328:7;363:6,8;
370:12,16;375:15
**three-hour (1)**
55:25
**threw (2)**
338:24;354:5
**throughout (2)**
312:24;362:21
**throw (1)**
354:9
**throwing (1)**
332:6
**thumb (2)**
295:14,15
**tickets (1)**

337:15
**Tierney (1)**
369:25
**timer (2)**
114:22;115:19
**times (40)**
6:24;29:14;36:15,
19,22;37:5;45:5;
51:7;68:10,21;82:14;
95:20;96:6,12;168:8,
9;190:3,6;191:21;
249:20;273:12,17;
300:6,12;302:22,25;
307:2;318:4,12;
331:18,25;332:10;
349:9;351:11;362:8;
363:3,6,8;372:17;
374:24
**tired (1)**
164:24
**tireless (1)**
302:6
**title (5)**
178:6;185:22;
186:23
**today (22)**
6:18;8:21;12:3;
18:11;28:23;85:19;
94:16;97:20;111:12;
112:4,13,17,19;
181:19;201:21;
247:19;263:21;
267:7,14;365:7,13;
366:17
**today's (1)**
380:3
**together (5)**
107:7;151:7;
187:25;192:16;
260:19
**told (145)**
9:14;10:15,20;
11:12,13,18;16:9;
20:2;21:13;49:9;
51:17;55:18;57:16,
18,25;64:21;85:9;
86:13;88:14,19,20;
95:18;106:23,24;
107:2;113:20,24;
128:4;130:22,23;
131:2,3;133:15;
139:20,22;140:3;
145:2;148:4,6,8,10,
11;150:23;158:17,
20;159:7,7;160:8,14;
161:2,7,23;163:25;
164:12,15,22;167:2,
6,10,15;168:3,18;
169:3,7,21;170:13,
25;176:8,15,18;
188:8,17;190:19;
192:6,13;196:8;
210:25;211:6;212:2,

25;213:2;214:10,14,
19;219:13,17;
220:15,17,23;
221:16,24;222:5;
223:12;225:9,9;
227:20;230:8;231:4;
234:17;237:23;
238:17;260:18;
275:12,17;276:8,17;
277:21;279:4;281:2,
13;283:22;285:7;
287:4,4,8;289:19;
292:16;296:17;
297:5,13;299:2,6;
307:24;310:23;
311:6;315:6,11;
327:3;332:7;339:25;
342:23,24;355:4,6,
11,12;356:18,19;
357:12;359:19;
361:9,11,14;364:15;
372:13
**Tom (22)**
80:17;85:24;
87:13;88:8,14;109:6,
25;130:22,23;133:7;
138:3,21;139:8,9,10;
149:20;194:18;
203:21,22;266:14;
321:4;358:16
**tomorrow (4)**
9:22;10:2,4;150:2
**took (18)**
9:22;14:16;15:9;
19:16;90:10;138:6;
189:19;191:6;232:8;
234:21;283:19;
325:20;355:25;
358:13;371:4;373:3;
375:14;376:4
**top (1)**
198:24
**topic (1)**
378:6
**tortious (4)**
31:25;32:11;34:2,
3
**totally (2)**
246:22;248:11
**touch (5)**
87:12;106:12,16;
108:12,16
**tour (14)**
52:4,5;122:21,24,
25;123:10,23;162:2;
164:25;170:15;
209:18;285:15;
287:11,12
**tours (7)**
115:17;118:8,22;
119:6,18,21;123:18
**Town (76)**
14:14;82:12;

EDWARD CARTER
September 16, 2008

Case 2:07-cv-01215-SJF-ETB Document 145-8 Filed 01/15/10 Page 127 of 130 PageID #: 1721

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

89:13;93:18;107:18;
108:25;142:6;
149:21;159:8;
163:14,17;182:9,15;
183:2,7,8,16;184:13,
15,19;186:9,21;
188:22;193:20;
194:14,18;195:14,
19;196:4;197:21;
198:10;200:7;
201:22;207:12,19,
24;208:14,22;
209:18;214:23;
217:3,21;218:11;
222:5,12;223:21;
229:5;236:15,23;
245:7,8,9,13,22;
246:6,14;247:8;
248:20;249:2,5;
250:25;251:14;
256:19;259:7,11,18,
22;260:5;261:6;
272:23;290:6;
304:24;313:14;
374:9;375:16,25

**towns (1)**
362:22

**Township (3)**
12:7,9;245:6

**Toys (1)**
16:4

**training (3)**
161:17;175:6,24

**transcript (2)**
104:19,24

**transpired (1)**
138:24

**trial (1)**
3:11

**tried (7)**
13:21;107:10,14,
17;126:25;128:14;
238:17

**truck (10)**
127:18;323:12;
325:13,19,20,22;
327:7;355:12;
374:22,23

**trucks (2)**
323:11,15

**true (10)**
17:10;146:5;
164:5,15,20;168:8;
180:9;196:6;223:24;
261:15

**trust (2)**
62:3,12

**trustee (25)**
41:25;42:18;
43:12;44:6;47:16;
50:19;69:16;70:6;
226:17;292:21;
328:19,21;330:3,8;

331:4,7;332:25;
333:5,18,24;334:18,
22;340:16,20;344:11

**trustees (3)**
44:14;69:13;309:4

**truth (2)**
286:4;290:23

**truthful (8)**
17:13;18:9,16;
220:5;221:18;
223:17;243:8;261:12

**truthfully (2)**
64:15;161:20

**truthfulness (1)**
261:6

**try (3)**
6:20;15:11;253:22

**trying (18)**
53:5;106:24,25;
154:17;162:5;
180:12,16;208:12;
235:20;249:13;
253:23;306:17;
326:8;362:12,18;
364:5,9,16

**Tuesday (3)**
9:15;287:11,12

**turn (3)**
23:11;144:2;
339:16

**turned (1)**
295:13

**twice (3)**
149:5;155:16,18

**twin (3)**
161:4,25;162:12

**twins (14)**
126:15;127:7;
165:4,7,11,16,21;
166:5;169:10,12,16;
170:16,17;213:20

**two (62)**
12:11;21:16,17;
22:3;27:19;45:12;
52:6;54:12,24;58:4,
12,24;59:19;60:15;
66:4;96:13,18;
113:17;128:22;
133:24;134:7;
148:25;151:15;
178:7,21;179:11;
183:5;198:18;200:7;
203:6;232:10,11;
233:13,18;281:23;
282:5;291:3;298:17;
304:6;307:20;
308:16;315:13;
322:17,17;323:11;
324:8,13,17;325:18;
328:7;340:4;341:11;
343:23;344:19,20;
346:20;349:11;
350:4;363:7;374:12;

376:5,6

**two-year (1)**
261:2

**Ty (6)**
26:25;28:14,19,24;
362:2;363:6

**Tylenol (3)**
94:13;95:19;96:9

**type (5)**
103:11;143:6;
238:4;291:3;372:11

**Tyree (13)**
26:14;88:5,6,15,
18,21;129:16,17,21;
130:4,13,18;132:24

## U

**ultimate (1)**
72:22

**ultimately (1)**
308:25

**Um (2)**
298:8;353:18

**Um-hum (3)**
56:7;130:16;
354:24

**un (1)**
241:9

**unavailable (2)**
122:21;123:23

**unaware (1)**
172:18

**Unbelievable (1)**
147:9

**uncertified (10)**
292:11;310:15,17;
331:20;335:25;
362:3;363:4,24;
364:5,10

**uncertifieds (1)**
372:16

**uncle (1)**
262:4

**uncle's (1)**
263:16

**undecisive (1)**
241:9

**under (9)**
102:9;172:15;
185:20;200:4;203:8;
271:10;302:10;
305:2;312:22

**underage (4)**
341:18,19,24;
342:23

**underaged (1)**
336:20

**underlining (1)**
26:2

**undermine (2)**
352:21;353:6

**undermined (1)**

353:12

**undertake (1)**
227:14

**unfounded (3)**
207:13;228:16,20

**uniform (4)**
53:3;247:20;
248:9;302:11

**uniformed (3)**
247:17;249:5;
250:6

**uniforms (1)**
82:11

**United (2)**
4:8;244:18

**unlawful (6)**
31:21;33:17;
35:19;129:2;199:3;
341:8

**unlawfully (1)**
32:24

**unless (2)**
34:19;44:24

**unnamed (1)**
216:6

**unsure (1)**
10:19

**up (129)**
5:11;13:12;16:2,
16,20;17:2,2;20:23;
21:10;31:12;37:20,
23,24;38:5,17,20;
39:7,13,15;42:5;
48:25;51:22,25;
55:18;56:19,24;
57:18;58:2,9;59:20;
64:2;65:14;71:16,22;
72:8;75:8;76:5;
77:15;80:8,14;85:4;
106:3,3;107:4;108:3;
116:14;118:11;
122:7;123:21;
127:10,16;128:5;
133:22;138:4;
141:20,21;146:3;
149:24;150:16,18;
151:9;157:4;158:9;
165:14,15,21;166:9,
23;167:4,21;168:4,
15;174:9,10,11,16;
175:8;180:17;
192:12,14;196:5;
203:6,6;208:10;
209:7;218:19;
227:18;233:4,7,10;
235:16,25;241:3,6;
242:6;248:2;260:17;
262:5,18;263:2;
276:2;282:3,23;
284:5,5;289:11;
294:20;295:10;
300:9;318:24;322:3;
325:5;326:2,4;332:8,

15;339:14;341:19;
343:18;345:14;
351:6;352:17;
354:14;362:10,11;
370:24;373:14;
374:22;375:5

**upgrade (1)**
175:9

**upgrades (1)**
175:7

**Upgrading (2)**
175:9,25

**upon (1)**
29:12,14;37:9;
59:6;111:12;119:21;
147:12;173:13;
203:19;207:9;208:4;
210:4;211:24;
215:18;256:15;
310:22;314:3

**upper (1)**
290:7

**upset (4)**
53:6,13;112:23;
289:18

**upstairs (3)**
161:5;319:15;
353:22

**use (7)**
65:16;73:19;
106:2;241:7,10;
256:23;367:20

**used (9)**
35:10;74:10;
75:17;77:13;272:2;
279:16;285:6;
348:24;368:24

**using (1)**
74:3

**usually (1)**
242:3

## V

**vacant (1)**
185:20

**vacation (1)**
167:23

**vague (1)**
82:25

**valid (5)**
190:4,7;191:22;
192:7

**values (1)**
302:8

**various (1)**
347:7

**vehicle (9)**
56:12;143:3;
322:13,16,22;
324:19;325:15,17;
374:16

**vehicles (10)**

Case 2:07-cv-01215-SJF-ETB   Document 145-8   Filed 01/15/10   Page 128 of 130 PageID #:
1722

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

EDWARD CARTER
September 16, 2008

127:4;324:8,9,13,
17;326:5,6;331:21;
346:22;374:25
**verbal (1)**
148:17
**verbally (5)**
59:8;129:4;
160:18,20;199:5
**verify (1)**
342:13
**versus (1)**
4:6
**via (1)**
365:12
**video (1)**
4:14
**VIDEOGRAPHER (19)**
4:2;5:14;65:23;
66:3;133:23;134:3;
158:11,14;202:9,13;
258:21,25;268:10,
14;335:11,15;
364:25;365:4;380:2
**videotape (1)**
4:3
**Village (36)**
4:6,24;42:18;
56:17;68:18;150:6;
198:2;225:15;
283:23;284:8;
291:24;310:10;
311:18;313:19;
315:12;316:14,17;
318:24;319:8,10;
321:5,19;322:15,16,
17;323:18;324:9,14,
18;325:23;329:2;
330:16,22;374:20;
375:3,9
**villages (1)**
362:22
**violated (2)**
62:2;244:19
**violates (1)**
25:6
**violations (4)**
75:4;341:10,14;
344:25
**virtue (2)**
240:13;245:10
**volunteered (1)**
288:22

## W

**wait (4)**
315:6;318:20,23;
319:10
**waited (1)**
319:8
**waiting (2)**
224:11;359:25
**waived (1)**

3:7
**walk (11)**
46:3;59:17;151:9;
230:14;295:2,10;
337:10;341:17;
348:15;349:24;355:4
**walked (21)**
40:6,10;46:18;
52:17;55:17;57:2,11;
75:8;80:6,8;82:23,
25;194:23;262:22;
295:9,10;321:21;
370:25,25;373:14,18
**walking (4)**
49:2;56:18;111:9;
215:7
**wall (17)**
61:3;220:22;
221:11;227:10;
247:2,7,9,15,21;
248:4,16;249:6;
250:7,13,20,24;
271:14
**Warkenthien (4)**
293:21;296:22;
300:21,23
**wash (1)**
355:11
**watched (3)**
245:14;264:13;
265:13
**watching (2)**
197:22,22
**water (1)**
374:23
**watercop319@yahoocom (1)**
267:23
**waved (1)**
359:3
**waving (1)**
358:23
**way (15)**
6:21;17:7;20:13,
16;115:16;127:4,15;
208:11;230:17;
255:3;279:16;
290:16;337:16;
343:20;375:4
**ways (1)**
374:12
**wear (18)**
16:14;136:23;
137:13;138:2,19,20;
139:3,10,18,19;
155:14;246:20,21;
274:8;276:5;297:23;
298:3;361:16
**Wearing (25)**
133:17;134:10;
136:18,21;137:7,10,
16;146:2;147:8,16;
152:11;155:13;
157:2,7,17;158:6,19,

21;166:19;169:4;
274:4;275:4;276:10;
299:25;361:10
**website (2)**
110:4;208:10
**websites (1)**
15:24
**Wednesday (3)**
9:23;10:21;220:11
**week (36)**
8:17;9:17,24;11:9;
27:25;28:11;30:9;
46:24,25;84:25;85:7,
12;86:22,23;114:18,
19,22;115:12,14,17,
20;116:15;149:18;
189:14,15;191:6;
192:13,20;193:16,
25;194:9;274:2,25;
283:9;289:10;292:17
**weekend (12)**
51:11;57:7;62:25;
63:6,22;64:22;68:6;
69:3;325:13;327:7;
332:4,5
**weekends (1)**
316:15
**weeks (4)**
9:17;104:11;
144:18;170:9
**Welch (1)**
4:23
**weren't (38)**
29:21;38:2;76:10;
111:25;122:13;
138:9;151:2;153:18;
155:3;165:10;
169:11,21;170:16;
171:2;188:10,17,24;
189:3;191:5,16,17;
192:3;193:21;
194:11;195:4;
210:24;211:5,11;
279:13;285:11;
297:15;300:10;
316:16;322:2;343:7;
347:13,17;361:12
**west (1)**
326:8
**what's (34)**
22:15;23:5;25:16;
28:4;39:6;40:25;
51:18;76:5,17;80:16;
82:19;99:10;111:22;
116:10;117:6;
122:24;166:14;
184:11;192:23;
205:5,7,8;267:6;
270:10;274:7;290:9;
294:20;303:14;
317:6;324:12;326:8;
343:12;346:9;354:13
**wheel (3)**

346:24;347:9,16
**whenever (1)**
341:17
**when's (4)**
85:5;184:2;
287:23;314:5
**wherein (3)**
17:11;147:14;
191:5
**whoever's (1)**
244:12
**whole (7)**
97:12;131:25;
156:24;188:3;198:5;
215:23;260:18
**whomever (1)**
119:20
**Who's (4)**
30:4;45:3;56:2;
157:10
**wife (5)**
84:3;112:16;
113:8;127:5,18
**Wigdor (3)**
4:20;23:16;106:3
**wind (1)**
322:3
**winds (1)**
16:20
**wingking28 (1)**
162:25
**wingking28@aolcom (1)**
266:6
**Winnie (1)**
292:7
**winter (4)**
122:8;225:13;
317:5,11
**wire (5)**
16:14;133:17;
134:10;136:19,21,
23,24;137:7,10,14,
16;138:2,19,21;
139:3,11,16,18,19;
146:2;147:9,16;
152:11;154:23;
155:13,14;157:2,7,
17;158:6,16,19,21;
166:18,19;168:11;
169:4;218:20;
246:21,21;248:11;
274:4,8;275:4;276:6,
10;277:22;297:24;
298:4;299:19,25;
300:4;361:10,17
**wire's (1)**
155:11
**withdraw (4)**
22:2;43:21;79:13;
154:17
**withdrawn (22)**
7:9;26:4;28:3;
35:17;48:21;67:3;

76:11;80:23;81:8;
152:22,24;159:16,
18;162:11;177:18;
179:23;192:4;
198:19;339:21;
346:5;361:4;364:3
**within (18)**
3:5,13;23:8;46:25;
86:22,23;98:13;
175:6;183:4;247:3;
248:5;250:6,11;
271:17;274:2,25;
283:9;304:22
**Without (13)**
30:2;71:13;
101:10;104:12;
129:6;136:16;267:9,
10;283:23;351:18;
365:20,22;366:5
**witness (9)**
5:16,23;6:2;25:5;
249:11;279:13;
281:8;354:9;357:4
**witnessed (3)**
36:24;37:2;64:9
**witnesses (1)**
136:16
**witnessing (1)**
63:19
**woman (2)**
215:3;222:19
**women (3)**
208:16;291:6,15
**wondering (1)**
319:24
**word (4)**
28:5;250:3;
256:23;270:6
**wording (1)**
241:7
**words (10)**
58:19;74:4;
123:16;153:14;
167:13,18,19;
241:10;317:9;320:9
**wore (1)**
299:19
**work (71)**
10:22;29:16,18;
31:19;52:5;53:25;
62:22;68:19;74:11;
82:12;89:10,13,16,
16;90:6,11,19;92:11;
109:6,10,10;114:18;
115:11,13,19,23;
116:14;117:3,24;
118:18;119:19;
126:21;127:12,16;
128:11,18;131:20;
141:20;149:14;
154:6,12;159:10;
164:24;171:5,18;
172:3,14;183:2;

EDWARD CARTER
September 16, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

188:2;193:12;200:7,
7;209:16;246:25,25;
247:14,17;248:3,3,8,
9,10,20,25;252:16;
283:10;285:9,17;
287:14;305:22;375:7

**worked (35)**
27:9,11,14,14;
28:15,19,24;29:7,19;
30:9;62:24;74:12;
112:24;116:13;
118:6,16;124:11;
126:23;127:11;
169:15;209:17;
251:11;263:7,8;
287:3,5,8,10,12,14;
311:7,8,12;317:11;
328:6

**worker (5)**
114:7;115:2,3;
116:5,20

**working (56)**
14:21;17:3;21:3;
22:7;27:5,24;28:8;
29:23;30:14,17;
31:16;54:8;76:4;
87:6,9;113:21;
128:17,19;141:24;
142:3,5;148:5;
149:12;151:12,13,
16;152:2;153:15,18;
159:14,19;165:10;
169:11,21;170:16;
171:2;185:20;
237:15;254:6;
256:19;275:24;
277:12;280:12,14;
281:24;282:12;
285:11,13;292:9;
294:18;299:21;
306:2;310:14;
346:10,13;364:18

**workmen's (3)**
125:8,15;254:23

**works (2)**
108:25;171:20

**worn (1)**
139:16

**worry (1)**
372:25

**worse (2)**
111:12;324:7

**worst (1)**
332:12

**wound (8)**
48:25;51:25;58:9;
106:3;107:4;108:3;
339:14;362:11

**write (22)**
60:25;93:22;
128:22;198:24;
203:5;208:4;228:15;
236:5;239:25;240:2;

242:11;261:10;
271:10;279:7;
290:13,14;309:11;
337:11,15;339:7;
340:2;358:17

**writing (5)**
129:4;130:10;
185:11;199:6;339:11

**written (9)**
193:19,20;225:25;
226:3;243:13;292:3,
16;293:4,15

**wrong (10)**
23:9;119:15;
123:6;206:7;222:10;
276:7;296:10,13,19;
378:13

**wrongful (3)**
26:5;32:16;34:12

**wrote (9)**
70:14;201:13;
260:17;290:25;
291:4,13,22;292:17;
313:7

## Y

**ya (2)**
151:10;373:9

**yard (1)**
149:14

**year (13)**
12:15;27:18;
68:14,17;96:13;
98:13;116:19;
123:12,13;325:5;
343:12,13;370:21

**years (13)**
31:14;58:4,12;
59:19;60:15;96:18;
127:8;190:12;200:8;
218:13,13;281:14,15

**yell (1)**
58:22

**Yelled (1)**
337:14

**yelling (1)**
295:8

**York (6)**
4:9;5:19;6:3;
91:17;93:6,8

**youths (3)**
341:19;342:6;
343:6

**Yup (1)**
40:12

## Z

**Zelda (14)**
208:24;216:25,25;
217:6,9,20;218:4,17;
219:2,8;222:19;

223:25;227:18;
234:12

**zero (1)**
242:4

**ZWILLING (7)**
5:3,3;366:22,23;
367:2;374:3;382:21

---

**worked - ZWILLING (30)**