# EXHIBIT "F"

# In The Matter Of:

*EDWARD CARTER, ET AL. vs.*
*INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.*

---

*KEVIN LAMM*
*November 19, 2008*

---

*Precise Court Reporting*

*200 Old Country Road*

*Suite 110*

*Mineola, New York 11501*

*516-747-9393   718-343-7227   212-581-2570*

Original File 49947.txt

Min-U-Script® with Word Index

This Page Intentionally Left Blank

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

---

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   -------------------------------------------X
     EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
 4   JOSEPH NOFI, and THOMAS SNYDER,
                              Plaintiffs,
 5      -against-   Case No. 07-Civ-1215
                                (SJF)(ETB)
 6   INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
     JOSEPH C. LOEFFLER, JR., individually and in
 7   his official capacity; former mayor NATALIE
     K. ROGERS, individually and in her official
 8   capacity; OCEAN BEACH POLICE DEPARTMENT;
     ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
 9   individually and in his official capacity;
     SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
10   DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
     CIVIL SERVICE; and ALISON SANCHEZ,
11   individually and in her official capacity,
                              Defendants.
12   -------------------------------------------X
13                926 Reckson Plaza
14                Uniondale, New York
15
16                November 19, 2008
17                10:03 A.M.
18
19           VIDEOTAPE DEPOSITION of KEVIN
20   LAMM, taken pursuant to the Federal Rules of
21   Civil Procedure, and Notice, held at the
22   above-mentioned time and place before Edward
23   Leto, a Notary Public of the State of New
24   York.
25
```

---

Page 2

```
 1
 2   A P P E A R A N C E S:
 3      THOMPSON WIGDOR & GILLY LLP
             Attorneys for Plaintiffs
 4           85 Fifth Avenue
             New York, New York 10003
 5      BY:  ANDREW S. GOODSTADT, ESQ.
 6   RIVKIN RADLER LLP
             Attorneys for Defendants
 7           Incorporated Village of Ocean
             Beach, Mayor Joseph C. Loeffler,
 8           Jr., former Mayor Natalie K.
             Rogers, and Ocean Beach Police
 9           Department
             926 Reckson Plaza
10           Uniondale, New York 11556
        BY:  KENNETH A. NOVIKOFF, ESQ.
11
     MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
12           Attorneys for Defendant Acting
             Deputy Police Chief George B.
13           Hesse
             530 Saw Mill River Road
14           Elmsford, New York 10523
        BY:  KEVIN W. CONNOLLY, ESQ.
15
     ALSO PRESENT
16      Albert Santana, Legal Video Specialist
        Frank Fiorillo
17      Joseph Nofi
        Thomas Snyder
18
19
20
21
22
23
24
25
```

---

Page 3

1   
2       IT IS HEREBY STIPULATED AND
3   AGREED by and among counsel for the
4   respective parties hereto, that the filing,
5   sealing and certification of the within
6   deposition shall be and the same are hereby
7   waived;
8       IT IS FURTHER STIPULATED AND
9   AGREED that all objections, except to the
10  form of the question, shall be reserved to
11  the time of the trial;
12      IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  signed before any Notary Public with the
15  same force and effect as if signed and sworn
16  to by the Court.
17  
18  
19  
20  
21  
22  
23  
24  
25  

---

Page 4

1       K. Lamm
2       THE VIDEOGRAPHER: This is tape
3   number one of the videotape deposition
4   of Kevin Lamm in the matter of Edward
5   Carter, et al., Plaintiffs, versus
6   Incorporated Village of Ocean Beach, et
7   al., Defendants, in the United States
8   District Court, Eastern District of New
9   York, case number
10  07-CIV-1215(SJF)(ETB), on November 19,
11  2008, at approximately 10:03 a.m.
12      My name is Albert Santana from
13  the firm of Precise Court Reporting and
14  I'm the legal video specialist.  The
15  court reporter is Ed Leto in
16  association with Precise Court
17  Reporting.  For the record, will
18  counsels please introduce themselves.
19      MR. NOVIKOFF: On behalf of the
20  um, Village Defendants, the Ocean Beach
21  Police Department, Mayor Rogers and
22  Mayor Loeffler, both in their
23  individual and official capacities, Ken
24  Novikoff from the law firm of Rivkin
25  Radler.

---

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 5

K. Lamm

1
2       MR. CONNOLLY: On behalf of
3   Defendant Acting Police Chief -- Active
4   Deputy Police Chief George B. Hesse,
5   Kevin Connolly of Mark, O'Neill,
6   O'Brien & Courtney.
7       MR. GOODSTADT: Andrew
8   Goodstadt, Thompson, Wigdor & Gilly, on
9   behalf of the Plaintiffs.
10      MR. NOVIKOFF: And just for the
11  record, I believe Mr. Nofi, Mr. Snyder
12  and Mr. Fiorillo are present with you
13  today, correct, Mr. Goodstadt?
14      MR. GOODSTADT: That is
15  correct.
16      MR. NOVIKOFF: Okay.  Are we
17  set?
18      THE VIDEOGRAPHER: Now will the
19  court reporter please swear in the
20  witness.
21  K E V I N   L A M M, having first been duly
22  sworn by a Notary Public of the State of New
23  York, was examined and testified as follows:
24  EXAMINATION BY
25  MR. NOVIKOFF:

Page 6

K. Lamm

1
2       THE COURT REPORTER: Please
3   state your name for the record.
4       THE WITNESS: Kevin Lamm.
5       THE COURT REPORTER: Please
6   state your address.
7       THE WITNESS: 1066 Cassel
8   Avenue, Bay Shore, New York.
9       THE COURT REPORTER: Spell it,
10  please, the street.
11      THE WITNESS: C-A-S-S-E-L,
12  Avenue.
13      THE COURT REPORTER: Try to keep
14  your voice up, please.
15  Q.   Who, if anyone, resides with you
16  at your present address?
17  A.   My mother.
18  Q.   Were you in attendance at the
19  deposition taken by your counsel yesterday
20  of Mr. Pat Cherry?
21  A.   No, I was not.
22  Q.   Were you in attendance at any of
23  the depositions?
24  A.   Yes, I was.
25  Q.   Which depositions were you in

Page 7

K. Lamm

1
2   attendance of?
3   A.   Maryanne Minerva.
4   Q.   Okay.
5   A.   And Natalie Rogers.
6   Q.   Did you take any notes during
7   Ms. Minerva's deposition?
8   A.   I wrote a few things down.
9   Q.   Do you -- are you still in
10  possession of those notes?
11  A.   No, I'm not.
12  Q.   Did you destroy them?
13  A.   Yes.
14  Q.   When did you destroy them?
15  A.   Right after the deposition was
16  over.
17  Q.   Why did you take the notes down?
18      MR. GOODSTADT: Objection.
19  This is --
20  Q.   Why did you take the notes down?
21      MR. GOODSTADT: Objection.
22  Don't -- don't answer.  This is a -- a
23  privilege question.  He took them at
24  our request for our use in preparation
25  for --

Page 8

K. Lamm

1
2       MR. NOVIKOFF: Well, that's
3   what I thought until he said he
4   destroyed them at the end.  I don't
5   think it's privileged if your client
6   takes notes down during a deposition,
7   but --
8       MR. GOODSTADT: If they're
9   not --
10      MR. NOVIKOFF: Look, I
11  understand you're objecting on the
12  basis of privilege.
13      MR. GOODSTADT: I am.
14      MR. NOVIKOFF: Okay.  Fine.
15  Q.   Did you take any notes at
16  Ms. Rogers' deposition?
17  A.   No, I didn't.
18  Q.   Okay.  So the only notes you took
19  were during Ms. Minerva's deposition?
20  A.   Yes.
21  Q.   Okay.  Now I note that you're
22  wearing a tie today.  Did you wear a tie
23  when you were present at Ms. Minerva's
24  deposition?
25      MR. GOODSTADT: Objection.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 9

K. Lamm
1
2  A.  No, I didn't.
3  Q.  What's that?
4  A.  No, I didn't.
5  Q.  Did you wear a tie when you were
6  present at Ms. Rogers' deposition?
7      MR. GOODSTADT: Objection.
8  A.  No, I didn't.
9  Q.  Okay.  And you were aware today
10 that you were going to be videotaped for
11 your deposition, correct?
12 A.  Yes.
13 Q.  Did you review the Complaint that
14 has been filed in this action prior to it
15 being filed?
16 A.  Yes.
17 Q.  For what purpose did you review
18 the Complaint?
19 A.  To read over what was in there,
20 what we stated.
21 Q.  And would it be fair to say, sir,
22 that you read over the Complaint to make
23 sure that to the extent you had knowledge of
24 the allegations, that they were accurate?
25 A.  Yes.

Page 10

K. Lamm
1
2  Q.  And would you agree with me that
3  it would be important that you -- that
4  allegations for which you had knowledge of
5  were not misrepresented in the Complaint?
6      MR. GOODSTADT: Objection.
7  A.  Correct.
8  Q.  And would you agree with me that
9  it would be important that with regard to
10 information that you had knowledge of, that
11 the information was truthful in the
12 Complaint, correct?
13     MR. GOODSTADT: Objection.
14 A.  Correct.
15 Q.  Without giving me any substance
16 of conversations between you and your
17 counsel, did you authorize your attorney to
18 file the Complaint on your behalf?
19 A.  Yes.
20 Q.  Would it be fair to say that
21 everything that you reviewed in the
22 Complaint, that at least you had knowledge
23 of, was accurate, to the best of your
24 recollection?
25 A.  Yes.

Page 11

K. Lamm
1
2  Q.  Okay.  Now do you recall alleging
3  a claim in this case of tortious
4  interference with a prospective business
5  relationship under New York law?
6  A.  I don't understand.  Can you --
7  Q.  Do you -- do you -- are you aware
8  as you sit here today that you've made
9  certain claims against the Defendants in
10 this case, correct?
11 A.  Yes.
12 Q.  And you're aware that you've
13 claimed that your 14th Amendment due process
14 rights have been violated, do you -- do you
15 understand that?
16 A.  Yes.
17 Q.  Do you understand that you've
18 claimed that your 14th Amendment liberty
19 interest claims  -- rights had been
20 violated?
21 A.  Yes.
22 Q.  Do you understand that you've
23 claimed in this case that your 1st Amendment
24 rights have been violated?
25     MR. GOODSTADT: Objection.

Page 12

K. Lamm
1
2  A.  Yes.
3  Q.  Okay.  And you've made various
4  other claims in this case, would you agree
5  with me?
6  A.  Yes.
7  Q.  Okay.  Now one of the claims in
8  the Complaint says -- is labeled "tortious
9  interference with a prospective business
10 relationship under New York law."  My
11 question to you is, do you recall that that
12 is a claim in this case that you've alleged
13 against some or all of the Defendants?
14 A.  Can you define what you mean by
15 "business"?
16 Q.  No, sir, because this is your
17 allegation.  So my question to you is -- I'm
18 not asking you to define anything.  I'm
19 asking you, do you recall alleging that as a
20 claim in this case?  If you don't recall,
21 then you don't recall.  That's fine, too.
22 A.  I recall something to that
23 effect.
24 Q.  Okay.  What new employment were
25 you scheduled to commence shortly after you

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 13

1        K. Lamm
2  were not rehired by the Ocean Beach Police
3  Department in or about April of 2006?
4        A.   I was processing for the Suffolk
5  County Police Department.
6        Q.   Is that the only employment that
7  you were scheduled to commence shortly after
8  the April 2006 time period?
9        A.   No.  There were other town and
10  village police agencies that also sent out
11  canvas letters that I responded to.
12        Q.   What other town and municipal
13  agencies I believe you testified to did you
14  send out that you received canvas letters
15  from?
16        A.   Southampton Town Police,
17  Southampton Village Police, Huntington Bay
18  Police, Lloyd Harbor Police.
19        Q.   Anything else?
20        A.   I believe that is all.
21        Q.   Okay.  Let's start with the
22  Suffolk County Police Department.  You --
23  you just indicated I believe, and if I'm
24  wrong, please tell me, that you were in the
25  process of seeking employment with the

Page 14

1        K. Lamm
2  Suffolk County Police Department; is that
3  correct?
4        MR. GOODSTADT: Objection.
5        A.   Yes.
6        Q.   What did you mean by "process"?
7        A.   Going through the processing as
8  far as backgrounds, their agility, medical.
9        Q.   Did you have to take a test in
10  order to apply for the Suffolk County Police
11  Department?
12        A.   A written test.
13        Q.   Okay.  When did you take that
14  written test?
15        A.   I believe it was in the year of
16  2003.
17        Q.   Okay.  When in 2003?
18        A.   I believe it was either May or
19  June.
20        Q.   What type of written test did you
21  have to take in May or June of 2003?
22        A.   Police test.
23        Q.   Can you describe what that police
24  test is?
25        A.   Reading comprehension test.

Page 15

1        K. Lamm
2  Individualization.  Memorization.
3        Q.   Did you pass the test?
4        A.   Yes, I did.
5        Q.   Do you know what score you got?
6        A.   92.5.
7        Q.   Okay.  And do you know, was there
8  a list that you appeared on with regard to
9  eligible employees for the Suffolk County
10  Police Department?
11        A.   Yes, there was.
12        Q.   And can you describe what that
13  list is?
14        A.   It's your number of ranking.
15        Q.   And do you know who puts out that
16  list?
17        A.   Suffolk County Civil Service.
18        Q.   And did you receive a copy of
19  that list?
20        A.   Yes.
21        Q.   After you took the test and
22  passed it?
23        A.   Not the list.  Just what my list
24  number was.
25        Q.   Okay.  And what was your list

Page 16

1        K. Lamm
2  number?
3        A.   I believe it was 303 or it was
4  313.  I believe 303.
5        Q.   Okay.  And when did you receive
6  that document that listed you as either 303
7  or 313?
8        A.   I believe somewhere close to
9  or -- the year 2004 or just before 2004 in
10  the wintertime.
11        Q.   Okay.  When you say just
12  before -- so the winter of 2003 you may have
13  received the list?
14        A.   Right.  Or it could have been
15  just when it turned 2004.
16        Q.   Okay.  And what understanding, if
17  any, did you have with regard to the
18  significance of either the 303 or the 313
19  listing?
20        MR. GOODSTADT: Objection.
21        A.   Can you please repeat --
22        Q.   Yeah.  Sure.  I'll rephrase the
23  question.  Do you have an understanding as
24  to what 303 or 313 meant with regard to your
25  application?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 17

K. Lamm

1  
2   A.   That is your rank number.
3   Q.   And what does that mean in
4  regard -- with regard to your application?
5   A.   That I was 303 on the list of
6  band score.
7   Q.   Would I be correct then in
8  understanding your answer to mean that at
9  least according to your understanding, they
10  had to -- Suffolk County had to offer 302
11  people the job first before they got to you?
12   A.   That's not accurate.
13   Q.   Okay.  What aspect of my
14  statement was inaccurate?
15   A.   That the score was band scored,
16  meaning that anybody that got the same grade
17  as me, also received the same list number as
18  me.
19   Q.   Okay.  So there could have been
20  more than one person with 303?
21   A.   There could have been more than
22  one person with a 92 and a half or 303.
23   Q.   So, theoretically, there could
24  have been more than 302 individuals who had
25  to be offered the job before it got to you;

Page 18

K. Lamm

1  
2  is that correct?
3   MR. GOODSTADT:  Objection.
4   A.   It could have been, but by the
5  time you get through process of elimination,
6  it could be less.
7   Q.   Why could it be less?
8   A.   'Cause some people may not meet
9  the standards or fail out on another part of
10  it.
11   Q.   Okay.  Got it.  But if I
12  understand, at least at the time that you
13  first received this document, theoretically,
14  there could have been more than 302 people
15  who could have been asked to take the job
16  before you?
17   MR. GOODSTADT:  Objection.
18   A.   Could have been or it could have
19  been less.
20   Q.   Okay.  Got it.  Did your number
21  ever change, to your knowledge?
22   A.   Not that I'm aware of.
23   Q.   Okay.  Now in 2004, did the
24  Suffolk County Police Department ever
25  communicate with you concerning your

Page 19

K. Lamm

1  
2  application?
3   A.   The Suffolk -- not the Suffolk
4  County Police Department.
5   Q.   That's my question.
6   A.   Right.
7   Q.   Did any other agency communicate
8  with you, in 2004, concerning your
9  application?
10   A.   Suffolk County Civil Service
11  communicated before any department.
12   Q.   Okay.  And now I'm only talking
13  about in 2004.  What communication did you
14  receive from the Suffolk County Civil
15  Service Department concerning the test that
16  you took in 2003?
17   A.   If I was interested in any other
18  police jobs working for any other villages
19  or -- or towns.
20   Q.   Okay.  Well, in this
21  communication 2004, did they specifically
22  ask you any questions concerning your
23  interest in the Suffolk County Police
24  Department job?
25   A.   No.

Page 20

K. Lamm

1  
2   Q.   Okay.  So my question is -- was
3  specific, sir.  In 2004, did the Suffolk
4  County Civil Service Department communicate
5  with you concerning your interest in the
6  Suffolk County Police Department job?
7   A.   No.
8   Q.   Okay.  Did any other agency, in
9  2004, communicate with you concerning your
10  interest in the Suffolk County Police
11  Department job?
12   A.   Other agencies did send letters,
13  but it doesn't refer to Suffolk County
14  Police.
15   Q.   That's what -- all I'm asking.
16  Then in 2005, did any entity or agency
17  contact you with regard to your interest in
18  the Suffolk County Police Department job?
19   A.   No.
20   Q.   Okay.  In 2006 now, and
21  specifically before April 2, 2006, did any
22  entity contact you with regard to your
23  interest in the Suffolk County Police
24  Department job?
25   A.   In 2006?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 21

1        K. Lamm
2    Q.   Yes.  Prior to April 2, 2006?
3    A.   Yes.
4    Q.   Okay.  Just don't tell me what,
5 just tell me who, what entity contacted you
6 before April 2, 2006?
7    A.   Suffolk County Police Department.
8    Q.   And what did they communicate to
9 you concerning your interest in the Suffolk
10 County Police Department job?
11    A.   They wanted to know if I was
12 interested in a position.
13    Q.   Okay.  Was there any  -- was this
14 communication in writing or verbal?
15    A.   It was in writing.
16    Q.   Okay.  Was there anything else on
17 this written communication from the Suffolk
18 County Police Department, other than what
19 you've just testified to?
20    A.   I don't believe so.  Just how to
21 return the letter.
22    Q.   Okay.  And did you -- do you know
23 when this letter came to you?
24    A.   For certain I don't.
25    Q.   Do you know what month?

Page 22

1        K. Lamm
2    A.   Maybe the month of March.
3    Q.   Okay.  And did you return the
4 letter?
5    A.   Yes, I did.
6    Q.   Okay.  And up until April 2,
7 2006, the only test that you took with
8 regard to the Suffolk County Police
9 Department job that you desired was this
10 written test in 2003; is that correct?
11    A.   Define what you mean by "only
12 test."
13    Q.   Well, I asked you specifically,
14 sir, what test did you take with regard to
15 this  -- with regard to the Suffolk County
16 Police Department job, and you testified a
17 written test in 2003.
18    A.   That was their test they gave.
19    Q.   That's right.  Did you undertake
20 any other test, between the written test in
21 2003 and the March letter from Suffolk
22 County Police Department, concerning your
23 interest in the Suffolk County Police
24 Department job?
25        MR. GOODSTADT: Objection.

Page 23

1        K. Lamm
2    A.   I took a Suffolk County Sheriff's
3 test.
4    Q.   Okay.  I'll withdraw the
5 question.  I was unclear.  Now I'm just
6 focusing on the Suffolk County Police
7 Department job.  Between the written test
8 that you took in 2003 and March 2006, did
9 you take any other test specifically for the
10 Suffolk County Police Department job?
11    A.   No.
12    Q.   Okay.  Subsequent to this March
13 2006 communication that you've just
14 addressed in response to one of my
15 questions, when was the next communication,
16 if any, that you received from the Suffolk
17 County Police Department concerning your
18 interest in a job with them?
19    A.   I believe the next step was I
20 got -- I got a letter to appear for an
21 agility test.
22    Q.   When did you get that letter?
23    A.   Towards the end of March I
24 believe.
25    Q.   Of 2006?

Page 24

1        K. Lamm
2    A.   That's correct.
3    Q.   Okay.
4    A.   Approximately.
5 RQ        MR. NOVIKOFF: All right.  And
6     again, Andrew, to the extent that this
7     hasn't been produced, and I'm not
8     suggesting it hasn't been, we call for
9     the production of all communications
10     from the Suffolk County Police
11     Department concerning his application.
12        MR. GOODSTADT: Take it under
13     advisement.  Send us a letter
14     afterwards.
15        MR. NOVIKOFF: Absolutely.
16    Q.   Did the Suffolk County Police
17 Department ask you to respond in any manner
18 to this communication in March concerning an
19 agility test?
20    A.   Yes.  I had to appear for an
21 agility test.
22    Q.   Okay.  And did you schedule a --
23 a date for this agility test?
24    A.   They scheduled it.
25    Q.   Okay.  And when was this

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 25

K. Lamm

1         K. Lamm
2 scheduled for?
3     A.   April 7.
4     Q.   April 7.  And did you undertake
5 the agility test?
6     A.   Yes, I did.
7     Q.   Did you pass the agility test?
8     A.   Yes, I did.
9     Q.   Okay.  What was the next
10 communication, if any, that you received
11 from the Suffolk County Police Department
12 concerning your interest in a job with them
13 after the communication concerning you
14 taking an agility test?
15     A.   I believe it was for a
16 orientation.
17     Q.   When you say you believe it was
18 for an orientation, what do you mean by
19 "orientation"?
20     A.   Where we would have to go to the
21 police academy and they would explain to us
22 some specifics about the job and -- and
23 prepare for a background investigation.
24     Q.   Okay.  And when did you receive
25 this communication?

Page 26

1         K. Lamm
2     A.   It was I believe -- actually,
3 after we finished the agility test, we had
4 to, as we were leaving, we signed a piece of
5 paper as to what day or -- what day we were
6 to appear for orientation.
7     Q.   Okay.  And what day did you  --
8 well, did you appear for orientation?
9     A.   Yes, I did.
10     Q.   And what day was that?
11     A.   The exact day I -- I don't
12 remember.
13     Q.   What month and year?
14     A.   It was in 2006.  The month  --
15 I'm not certain of the month.
16     Q.   What season?
17     A.   I believe it was springtime.
18     Q.   Okay.
19     A.   Late spring.
20     Q.   Late spring.  So -- okay.  And
21 when did you receive word that you passed
22 the agility test?
23     A.   I knew right then and there.
24     Q.   They advised you right then and
25 there that you passed the agility test?

Page 27

1         K. Lamm
2     A.   Yes.
3     Q.   Okay.  And how did they -- how
4 did the Suffolk County Police Department
5 advise you right then and there?
6     A.   After you completed a battery of
7 tests, you would just go on to the next one.
8     Q.   Okay.  Did anyone advise you
9 verbally on that day that you passed the
10 agility test?
11     A.   Yes.
12     Q.   That's what I'm asking.  Who?
13     A.   The academy instructors.
14     Q.   And do you know the academy
15 instructors' names?
16     A.   No.  I don't know who it was.
17     Q.   Okay.  So between the agility
18 test and the date that you appeared for the
19 orientation, did you receive any
20 communications from the Suffolk County
21 Police Department concerning your interest
22 in a job with them?
23     A.   Not at that time.
24     Q.   That's all I'm asking, was that
25 period of time.  How long was the

Page 28

1         K. Lamm
2 orientation session?
3     A.   Few hours.
4     Q.   Okay.  And did you have to fill
5 out any forms during the -- the orientation
6 session?
7     A.   Yes, I did.
8     Q.   What forms did you have to fill
9 out?
10     A.   Name, date of birth.  Some basic
11 things like that.  They gave us paperwork.
12     Q.   Did you have to fill out any
13 paperwork concerning your prior employment
14 history with Ocean Beach?
15     A.   Yes.
16     Q.   And do you recall what questions
17 they asked you about your prior employment
18 history with Ocean Beach?
19     A.   I believe they asked for how long
20 I worked there.
21     Q.   Okay.  Do you recall anything
22 else that they asked concerning your -- your
23 employment history with Ocean Beach?
24     A.   If we -- they asked if we
25 currently still, you know, worked there.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 29

K. Lamm
1    K. Lamm
2    Q.   And what answer did you give?
3    A.   No.
4    Q.   Okay.  Did they ask a reason?
5    Well, withdrawn.  Did they ask you to
6    explain the reason why you no longer worked
7    there?
8    A.   Yes.
9    Q.   And what was the reason that you
10   gave?
11   A.   'Cause I was fired for budget
12   cuts.
13   Q.   Did you say "fired"?  Did you use
14   the word "fired"?
15   A.   I -- I believe I did.
16   Q.   And did they ask you to give any
17   further detail, other than the explanation
18   that you were fired for budget reasons?
19   A.   No.
20   Q.   Okay.  Did they ask you for any
21   recommendations or -- I'm sorry.  Withdrawn.
22   Did they ask you for any references
23   concerning your job with the Ocean Beach
24   Police Department?
25   A.   No.

Page 30

K. Lamm
1    K. Lamm
2    Q.   Did you provide any references to
3    them on the date of this orientation
4    concerning your employment with the Ocean
5    Beach Police Department?
6    A.   No.
7    Q.   Okay.  So we are now at the point
8    in time of the orientation.  When was the
9    next communication, if any, that you
10   received from Suffolk County Police
11   Department concerning your interest in a job
12   with them?
13   A.   After the paperwork was submitted
14   in, I think it was two weeks after that.
15   Q.   Okay.
16   A.   After -- the paperwork was due
17   two weeks after the date of orientation, and
18   maybe within another month I had to appear
19   for a medical.
20   Q.   Okay.  And did you appear for --
21   did you in fact appear for the medical?
22   A.   Yes, I did.
23   Q.   Okay.  This communication about
24   you appearing for a medical, was that verbal
25   or was that written?

Page 31

K. Lamm
1    K. Lamm
2    A.   That was written.
3    Q.   Was there anything else on that
4    document that -- anything on that document
5    other than that you had to appear for a
6    medical?
7         MR. GOODSTADT: Objection.
8    A.   No.
9    Q.   Okay.  And when did you appear
10   for this medical?
11   A.   I guess towards the beginning of
12   the summer.
13   Q.   Of 2006?
14   A.   2006.
15   Q.   Did you ever -- were you ever
16   advised by the Suffolk County Police
17   Department that you passed whatever medical
18   test they gave you?
19   A.   Yes, I did pass.
20   Q.   And they advised you of this?
21   A.   Yes, they did.
22   Q.   When did they advise you of this?
23   A.   Maybe a week and a half after.
24   Q.   Okay.  And did they advise you of
25   this in writing?

Page 32

K. Lamm
1    K. Lamm
2    A.   Yes, they did.
3    Q.   Okay.  Now between the
4    orientation -- withdrawn.  No.  Between the
5    orientation and the date that you were
6    advised that you passed the medical test,
7    did you receive any other communications
8    from the Suffolk County Police Department,
9    other than what you've just testified to?
10        MR. GOODSTADT: Objection.
11   A.   Yes.
12   Q.   What did you receive?
13   A.   I had to appear for a
14   psychological.
15   Q.   Okay.  Well, I assume when you
16   said "medical," that was both physical
17   and --
18   A.   No.
19   Q.   -- and mental.  But that's fine.
20   What did they ask you with regard to you --
21   your requirement to appear for a
22   psychological test in this written
23   communication?
24   A.   I had to appear for a written
25   psychological.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 33

K. Lamm
1
2     Q.   A written psychological test?
3     A.   Yes.
4     Q.   And did you appear for a written
5   psychological test?
6     A.   Yes, I did.
7     Q.   When did you do that?
8     A.   I believe it was sometime in the
9   month of June of 2006.
10    Q.   Okay.  And did you ever receive
11  word from the Suffolk County Police
12  Department that you passed the written
13  psychological test?
14    A.   There was two phases to that
15  test.
16    Q.   Okay.  Well -- well, describe the
17  two phases to the test, and then I'll be
18  able to ask you more pointed questions.
19       MR. GOODSTADT: Objection.
20    A.   After the written test, you had
21  to be scheduled for an oral.
22    Q.   Okay.  So let's stick with the
23  written test.  When did you take the written
24  test?
25    A.   I believe it was sometime at the

Page 34

K. Lamm
1
2   beginning of June 2006.
3     Q.   Now did you ever receive word
4   from the Suffolk County Police Department
5   that you passed the written psychological
6   test?
7     A.   They don't do it separated.  They
8   do it altogether.
9     Q.   Okay.  When did you take the oral
10  psychological test?
11    A.   I believe it was a week or two
12  weeks after the written.
13    Q.   Okay.  So we're still in either
14  the June 2006 or early July 2006 time
15  period, correct?
16    A.   It would -- I would say June.
17    Q.   Okay.  That's fine.  Did you ever
18  receive communication that -- from the
19  Suffolk County Police Department that you
20  failed either of those psychological tests
21  that you've just described?
22    A.   Yes, I did.
23    Q.   Okay.  What were you -- what was
24  communicated to you?
25    A.   A letter.

Page 35

K. Lamm
1
2     Q.   When did you receive this letter?
3     A.   Approximately two days after I
4   appealed it, when I went in for an appeal.
5   MO Q.   You just mentioned that you
6   appealed something.  My question to you,
7   sir, is -- I'm going to move as
8   nonresponsive.  You took a psychological
9   written test and oral psychological test,
10  correct?
11    A.   Correct.
12    Q.   And that was required by the
13  Suffolk County Police Department?
14    A.   That is correct.
15    Q.   And I believe you testified that
16  you took this in the June 2006 time period,
17  correct?
18    A.   That's correct.
19    Q.   Did there come a time that you
20  were advised by the Suffolk County Police
21  Department that you had failed either or
22  both of these tests?
23    A.   Yes, there was.
24    Q.   Okay.  Give me the date in which
25  you were advised by the Suffolk County

Page 36

K. Lamm
1
2   Police Department of your failure.
3     A.   Suffolk County Police Department
4   didn't advise me.  It's Suffolk County Civil
5   Service that advises me.
6     Q.   Okay.  So then your answer to me
7   would have been no, the Suffolk County
8   Police Department never advised me.  So
9   that's fine.  Let stick with the Suffolk --
10    A.   I was just making it clear.
11    Q.   I appreciate that.  When did the
12  Suffolk County Civil Service Department
13  advise you that you had failed either or
14  both of the psychological tests that you've
15  just described?
16    A.   Approximately within two days
17  after.
18    Q.   Okay.  So we're still in either
19  the June 2006 time period or early July 2006
20  time period, correct?
21    A.   I would say June.
22    Q.   And how did the Suffolk County
23  Police Department advise you of your
24  failure?
25    A.   They didn't.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 37

1         K. Lamm
2     Q.   I'm sorry, withdrawn.  How did
3 the Suffolk County Civil Service Department
4 advise you of your failure?
5     A.   Letter.
6     Q.   Okay.  Do you have that letter
7 still in your possession?
8     A.   The letter is with the attorneys.
9 RQ        MR. NOVIKOFF: Okay.  I call
10       for the production of this, and I'll
11       follow it up with a letter, of all
12       communications involving the Suffolk
13       County Police Department application,
14       to the extent it hasn't been produced,
15       and again, we'll search -- we'll search
16       to see if it has been.
17        MR. GOODSTADT: It's our
18       position that we have produced every
19       document that's responsive to discovery
20       requests that have been served in this
21       case.  You said that you want to follow
22       up in writing, we'll be happy to take
23       it under advisement.
24        MR. NOVIKOFF: You got it.
25     Q.   What tests or -- well, did you

Page 38

1         K. Lamm
2 fail both tests?
3     A.   It doesn't say.
4     Q.   It just says you failed?
5     A.   It just says not qualified.
6     Q.   Okay.  So the Suffolk County
7 Civil Service Department sent you a letter
8 within two weeks after your psychological
9 test indicating that you were not qualified;
10 is that correct?
11     A.   Which test?
12     Q.   The psychological test.
13     A.   Which one?
14     Q.   You said you took both.
15     A.   Which one are you referring to?
16     Q.   Sir, I'll withdraw the question
17 and I'll ask you this again.  The Suffolk
18 County Civil Service Department sent you a
19 communication after you took both the verbal
20 and the written psychological test, correct?
21     A.   Correct.
22     Q.   And that was within a couple of
23 weeks of you taking both of those tests,
24 correct?
25     A.   That's correct.

Page 39

1         K. Lamm
2     Q.   Okay.  You understand me now?
3     A.   Now I do.
4     Q.   Did you graduate college?
5     A.   No.
6        MR. GOODSTADT: Objection.
7     Q.   How many -- how many years of
8 college did you have?
9     A.   Don't have any college.
10     Q.   You never spent a day in college?
11     A.   Never spent a day in college.
12     Q.   Did you graduate high school?
13     A.   Yes.
14     Q.   What high school did you
15 graduate?
16     A.   West Islip.
17     Q.   West Islip.  Okay.  Let's get
18 back to the Suffolk County Civil Service
19 Department communication to you.  In this
20 letter, did they say anything else, other
21 than you were not qualified?
22     A.   No.
23     Q.   Okay.  What did you do, if
24 anything, once you received this letter from
25 the Suffolk County Civil Service Department

Page 40

1         K. Lamm
2 indicating that you were not qualified?
3     A.   Well, as I told you, I did appeal
4 it and go for a re -- a re-test there.
5     Q.   Okay.  How did you know to appeal
6 it?
7     A.   Well, actually, on one of the
8 letters asked if I would be interested in an
9 appeal, so I did.
10     Q.   Okay.  And what did you have to
11 do in order to appeal?
12     A.   I had to just show up again.
13     Q.   Okay.  Did you contact  -- well,
14 where did you have to show up?
15     A.   Civil Service.
16     Q.   Okay.  Did you have to contact
17 the Civil Service Department in order to
18 schedule a time to appeal?
19     A.   I sent a letter in that I would
20 appeal and they sent me the date back.
21     Q.   Okay.  And when was the date that
22 they sent back?
23     A.   It was kind of quick.  Within --
24 within maybe a week.
25     Q.   Okay.  And did you have to submit

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 41

K. Lamm

1       K. Lamm
2   any type of documentation in order to
3   appeal?
4       A.   I didn't have to.
5       Q.   That's what -- that's what I'm
6   asking you.  Did you have to?
7       A.   I didn't have to.
8       Q.   Okay.  Did you?
9       A.   No.
10      Q.   Okay.  And who did you see, if
11  anyone, on the date that you appeared for
12  your appeal?
13          MR. GOODSTADT: Objection.
14      A.   I'm not positive of the
15  examiner's name, but I would believe it was
16  a Mr. Stone, and there was another man there
17  from Civil Service named Stanley Pelc.
18      Q.   Okay.  Had you ever met Mr. Pelc
19  before?
20      A.   I've seen him before.  Not
21  personally met him.
22      Q.   Okay.  Where did you see Mr. Pelc
23  before?
24      A.   At other tests that I've taken
25  there.

Page 42

K. Lamm

1       K. Lamm
2       Q.   Okay.  And Mr. Stone, had you
3   ever met Mr. Stone before?
4       A.   No.
5       Q.   Okay.  He was not the person
6   that -- that did the first test or tests of
7   you for your psychological, was he?
8           MR. GOODSTADT: Objection.
9       A.   No, he wasn't.
10      Q.   Okay.  And when you say -- when
11  you met Mr. Pelc and Mr. Stone, what
12  occurred, if anything, during this meeting?
13          MR. GOODSTADT: Objection.
14      A.   First thing I asked was that I
15  didn't realize I had to take another
16  psychological because I had already taken
17  one within a year's time.
18      Q.   Who said this?
19      A.   I did.  I asked that.
20      Q.   Okay.  What specifically did you
21  ask of these gentlemen?
22      A.   I asked them if -- if I did have
23  to take that psychological over because I
24  had one taken prior within a year's time.
25      Q.   When did you take the prior

Page 43

K. Lamm

1       K. Lamm
2   psychological?
3       A.   The end of June of 2005.
4       Q.   For what purpose?
5       A.   For a job where I currently am
6   now.
7       Q.   Which job was that?
8       A.   Airport security.
9       Q.   Okay.  Now did you, prior to you
10  meeting with these two gentlemen, ask anyone
11  at the Suffolk County Civil Service
12  Department as to why you were not qualified?
13      A.   They wouldn't -- they don't
14  give --
15      Q.   No.  No.  My question to you is,
16  did you ask?
17      A.   Yes, I did.
18      Q.   Okay.  Who did you ask, again,
19  between the time that you were advised that
20  you were not qualified and the time that you
21  met with these two gentlemen, Mr. Stone and
22  Mr. Pelc?
23          MR. GOODSTADT: Objection.
24      A.   Repeat it again, please.
25      Q.   Sure.  Between the time that you

Page 44

K. Lamm

1       K. Lamm
2   were advised that you were not qualified by
3   the Civil Service Department and the time
4   that you met with Mr. Stone and Mr. Pelc,
5   who did you ask why you were not qualified?
6           MR. GOODSTADT: Objection.
7       A.   They were -- they were both there
8   in the room.  I asked why I couldn't be
9   found  -- why I wasn't qualified.
10      Q.   Okay.  Now my question, sir, is
11  before you went to this meeting with these
12  two gentlemen, did you ask anybody else at
13  the Suffolk County Civil Service Department
14  why you were not qualified?
15      A.   No.
16      Q.   Did you ask anyone else at
17  Suffolk County Police Department why you
18  were not qualified?
19      A.   No, I did not.
20      Q.   Okay.  So when you fir -- when
21  you went into this room --
22      A.   Excuse me.
23      Q.   Sure.
24      A.   I just want to get a drink of
25  water.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 45

1        K. Lamm
2    Q.   Sure.  Absolutely.
3    A.   Thank you.  Excuse me.
4    Q.   You -- did you ask these two
5  gentlemen when you met with them, why you
6  were found not to be qualified?
7    A.   Yes, I did ask.
8    Q.   Okay.  And when in -- in relation
9  to the beginning of this meeting did you ask
10 these two gentlemen that question?
11       MR. GOODSTADT: Objection.
12   A.   Somewhere towards the beginning,
13 middle.
14   Q.   Okay.  And did they respond to
15 your question?
16   A.   They just said after, you know,
17 we review this, you'll get your answer.
18   Q.   When they said they review this,
19 do you -- do you know what they were
20 referring to?
21   A.   I believe it was after the
22 interview.
23   Q.   Okay.  So they didn't tell you
24 why you were initially found not to be
25 qualified when you asked them that question?

Page 46

1        K. Lamm
2    A.   No, they didn't.
3    Q.   Okay.  Now what, if anything,
4  did -- did -- well, did you have to take any
5  tests during this meeting with these two
6  gentlemen?
7    A.   They just asked me a few
8  questions, and they're basically the same
9  thing they did when I first went.
10   Q.   How long was this meeting with --
11 with these two gentlemen?
12   A.   Not very long.
13   Q.   10 minutes?
14   A.   Maybe 15.
15   Q.   Okay.  And -- and your first
16 psychological test, the written test, how
17 long was that?
18   A.   Several hours.
19   Q.   And the verbal part of the
20 psychological, how long was that?
21   A.   The first time?
22   Q.   Yeah.
23   A.   Maybe 20 minutes.
24   Q.   Now did you ask these two
25 gentlemen any other questions during this

Page 47

1        K. Lamm
2  meeting, other than the question as to why
3  you were not qualified?
4        MR. GOODSTADT: Objection.
5    He's already testified to another
6    question he asked as well.
7        MR. NOVIKOFF: Okay.  Then
8    fine.
9    Q.   You -- I recall you saying that
10 you weren't -- you asked a question as to
11 why you were not qualified.  What other
12 questions did you ask of these gentlemen?
13       MR. GOODSTADT: In addition to
14   what he's already testified to?
15       MR. NOVIKOFF: I don't recall
16   what he testified to, so I don't want
17   to put words in his mouth or
18   mischaracterize his testimony.
19   Q.   So, therefore, I'm asking you --
20       MR. GOODSTADT: That's a
21   change.  A change for the better now.
22       MR. NOVIKOFF: Oh, thank you so
23   much.
24   Q.   I recall that you just testified
25 that you asked these gentlemen why you were

Page 48

1        K. Lamm
2  not qualified.  What other questions did you
3  ask of these two gentlemen?
4    A.   I asked how can I not be found
5  qualified when I have already held a
6  position as police officer.
7    Q.   Okay.  Did they respond to that
8  question?
9    A.   Basically just with a shrug of
10 the shoulders.
11   Q.   Okay.  And any other questions --
12 well, withdrawn.  Did you ask them any other
13 questions, other than the two that you've
14 testified to this morning?
15       MR. GOODSTADT: He's testified
16   to three now, but --
17       MR. NOVIKOFF: Three questions?
18   Q.   Well, what was the third
19 question?  We have the one as to why you
20 were not qualified.  The next question that
21 I recall you testifying to was how could you
22 be found not to be qualified because you --
23 you passed a prior test.  What was the third
24 question that you asked them?
25   A.   I just said that I've already

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 16 of 122 PageID #: 1874

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 49

K. Lamm

1          K. Lamm
2  taken the test within the prior year.
3      Q.   Okay.  Other than what you've
4  testified to, can you recall any other
5  questions that you asked of these gentlemen?
6      A.   Not that I can recall at this
7  time.
8      Q.   Okay.  Well, is there anything in
9  your custody, possession or control that
10 would refresh your recollection?
11     A.   I don't think so.
12     Q.   Okay.  Did you ever -- well, what
13 was the next communication that you received
14 from the Suffolk County Civil Service
15 Department concerning your appeal, to the
16 extent you received any additional
17 communication?
18         MR. GOODSTADT: Objection.
19     A.   Just a letter.
20     Q.   When did this letter come to you?
21     A.   Just saying that, you know, I was
22 found not qualified.
23     Q.   I'm not asking you what the
24 letter was.  When did the letter come to
25 you?

Page 50

K. Lamm

1          K. Lamm
2      A.   Maybe two days after.
3      Q.   Okay.  And it came from the
4  Suffolk County Civil Service Department?
5      A.   Yes, it did.
6      Q.   And what did this letter say?
7      A.   Not qualified.
8      Q.   Okay.  And did you ever inquire
9  as to why this determination was made as
10 reflected in this -- this most recent
11 communication?
12     A.   That was it.
13     Q.   Okay.  Have you had any
14 additional communication with the Suffolk
15 County Civil Service Department concerning
16 your interest in the Suffolk County Police
17 Department position after receipt of the
18 letter that you just testified to?
19     A.   Just that I had to appear for a
20 background investigation.
21     Q.   When did you receive
22 communication that you had to appear for a
23 background investigation?
24     A.   Somewhere around the same time as
25 the psychological, approximately.

Page 51

K. Lamm

1          K. Lamm
2      Q.   Did you ever appear for a
3  background investigation?
4      A.   Yes, I did.
5      Q.   Did you appear for this
6  background investigation prior to the first
7  communication that -- wherein you were
8  advised that you were not qualified?
9      A.   I believe it was before that.
10 I -- I believe it was before that.
11     Q.   So you believe you -- you
12 appeared before -- for a background
13 investigation before you first learned that
14 you were not qualified?
15     A.   Yes.  I believe so.
16     Q.   Okay.  And did you receive any
17 communication from the Suffolk County Police
18 Department concerning the background
19 investigation that they undertook?
20     A.   No, I didn't.
21     Q.   Did you receive any communication
22 from the Suffolk County Civil Service with
23 regard to the background investigation that
24 they undertook?
25     A.   No, I didn't.

Page 52

K. Lamm

1          K. Lamm
2      Q.   Okay.  Now my question is
3  specifically, sir, you've received now,
4  after your appeal, a communication from the
5  Suffolk County Civil Service Department
6  saying that, once again, you were not
7  qualified, correct?
8      A.   Correct.
9      Q.   After receipt of that document,
10 did you receive any other communication from
11 the Suffolk County Civil Service Department
12 concerning your interest in the Suffolk
13 County Police Department job?
14     A.   No.
15     Q.   After receipt of the Suffolk
16 County Civil Service Department letter
17 indicating for a second time that you were
18 not qualified, did you receive any
19 communication from the Suffolk County Police
20 Department concerning your interest in a
21 position with them?
22     A.   No.
23     Q.   After receipt of the second
24 letter, did you receive any communication
25 from any source concerning your interest in

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 53

K. Lamm

1  the Suffolk County Police Department job?
2  A.   No.
3  Q.   Okay.  Were you represented by
4  counsel, Mr. Goodstadt's office, at the time
5  that you received the second communication
6  concerning the Civil Service Department's
7  determination that you were not qualified?
8  MR. GOODSTADT: Objection.
9  A.   Was I represented by?
10  Q.   Mr. Goodstadt's law firm.
11  A.   For the appeal?
12  Q.   No.  No.  No.  Had you retained
13  Mr. Goodstadt's law firm for any purpose,
14  and I don't want to know the purpose, but
15  for any purpose at the time that you
16  received word from the Suffolk County Civil
17  Service Department for the second time that
18  you were not qualified?
19  A.   No.
20  Q.   Okay.  Had you filed a Notice of
21  Claim against the village prior to the time
22  that you received communication from the
23  Suffolk County Civil Service Department that
24  you were not qualified for the second time?

Page 54

K. Lamm

1  A.   No.
2  Q.   How did Mr. Hesse interfere with
3  your application with the Suffolk County
4  Police Department after April 2, 2006?
5  A.   I was told by Chris Moran that
6  George Hesse wrote up an unfavorable
7  recommendation about me to the Suffolk
8  County applicant investigation unit.
9  Q.   Okay.  And who is Chris Moran?
10  A.   He works at Ocean Beach.
11  Q.   And did Chris Moran advise you as
12  to how he learned of this?
13  A.   George Hesse told him.
14  Q.   And did Mr. Moran tell you this
15  in a phone conversation?
16  A.   Yes, he did.
17  Q.   Did Mr. Moran tell you this in a
18  phone conversation in which he was being
19  tape recorded by you?
20  A.   Yes, he did.
21  Q.   Did you advise Mr. Moran during
22  this telephone conversation that you were
23  recording him?
24  A.   No, I didn't.

Page 55

K. Lamm

1  Q.   Did you tape record phone
2  conversations with Mr. Moran after April 2,
3  2006, other than the one that you've just
4  testified to?
5  A.   Yes.
6  Q.   In any of these phone
7  conversations, did you ever advise Mr. Moran
8  that he was being tape recorded?
9  A.   No.
10  Q.   Did you engage in any other phone
11  conversations with any other individuals in
12  which you tape recorded the conversations?
13  MR. GOODSTADT: Objection.
14  You're talking about ever?
15  MR. NOVIKOFF: I'm sorry.
16  Subsequent to -- well, I may adopt your
17  question.  The answer may be
18  interesting.
19  Q.   Did -- after April 2, 2006, did
20  you ever tape record a phone conversation
21  with any person, other than Chris Moran?
22  A.   I believe there might have --
23  might have been just one.
24  Q.   And who would that be?

Page 56

K. Lamm

1  A.   John Oley.
2  Q.   And who is John Oley?
3  A.   He works at Ocean Beach.
4  Q.   And when would -- if -- when
5  would you have had this conversation with
6  Mr. Oley?
7  A.   Specifically, I can't give you
8  specific time.
9  Q.   Okay.  And what time period would
10  you have had these conversations with --
11  well, withdrawn.  The conversation in which
12  you testified that Mr. Moran told you that
13  George Hesse had sent an unfavorable
14  reference to the Suffolk County Department,
15  when did this phone conversation take place?
16  MR. GOODSTADT: Objection.
17  A.   Specifically, I don't know the
18  exact time.
19  Q.   Did -- other than Mr. Moran's
20  statement to you, do you have any other
21  knowledge from whatever source, that
22  Mr. Hesse intentionally and maliciously
23  interfered with your application for the
24  Suffolk County Police Department?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 57

1          K. Lamm
2     A.   No.
3     Q.   Have you ever seen the alleged
4 unfavorable reference that Mr. Hesse,
5 according to Mr. Moran, submitted to the
6 Suffolk County Police Department?
7     A.   No.
8     Q.   Have you ever sought to look --
9 withdrawn.  Have you ever sought to look for
10 this document?
11    A.   No.
12    Q.   Have you ever filed a FOIL
13 request?
14         MR. GOODSTADT: Objection.
15    Q.   Do you know what a FOIL request
16 is?
17    A.   Yes, I do.
18    Q.   What is your understanding of a
19 FOIL request?
20    A.   No, I did not.
21    Q.   What is your understanding of a
22 FOIL request, sir?
23    A.   Freedom of information.
24    Q.   Did you ever file a FOIL request?
25    A.   No.

Page 58

1          K. Lamm
2     Q.   Are you aware of anybody acting
3 on your behalf who has communicated with the
4 Suffolk County Police Department looking
5 into finding this unfavorable recommendation
6 by George Hesse?
7          MR. GOODSTADT: Objection.  To
8     the extent that --
9          MR. NOVIKOFF: Other -- other
10    than counsel.  Exactly.  Other than
11    counsel.
12    A.   Not that I'm aware of.
13    Q.   Okay.  Did Mr. Moran ever tell
14 you what specifically George Hesse said in
15 this unfavorable recommendation?
16    A.   I don't believe so.
17    Q.   Did you ever inquire with
18 Mr. Moran as to what specifically Mr. Hesse
19 said to you -- said about you in this
20 allegedly unfavorable reference?
21    A.   Yes, I did ask.
22    Q.   And what did Mr. Moran say to you
23 in response to your question to him?
24    A.   He doesn't know exactly what was
25 written.

Page 59

1          K. Lamm
2     Q.   Okay.  Did Mr. Moran ever advise
3 you that he saw this unfavorable reference?
4     A.   He didn't  -- he saw the letter
5 that was sent to the department to George
6 Hesse, but not what was written on it.
7     Q.   What letter did Mr. Moran see?
8     A.   A letter from the police
9 department about asking, you know, about me
10 about verifying that I worked there.
11    Q.   Did Mr. Moran describe for you
12 what was in this letter, other than what
13 you've just testified to?
14    A.   No.
15    Q.   Did Mr. Moran advise you that
16 George Hesse told him specifically what
17 unfavorable information he provided to the
18 Suffolk County Police Department in response
19 to this written request?
20         MR. CONNOLLY: Objection.
21    A.   No, he didn't.
22         MR. GOODSTADT: It was probably
23    the double hearsay.
24         MR. NOVIKOFF: I'm sure it is.
25    That's what I'm trying to establish.

Page 60

1          K. Lamm
2          MR. GOODSTADT: It's not -- not
3     a basis to object at a deposition.
4          MR. NOVIKOFF: We'll see.
5     Q.   Did you ever inquire with George
6 Hesse, after receipt of this communication
7 from Mr. Moran, as to what, if anything, he
8 told the Suffolk County Police Department?
9     A.   No.
10    Q.   Have you ever spoken with
11 Mr. Hesse after April 2, 2006?
12    A.   No.
13    Q.   Did you ever register a complaint
14 to the Ocean Beach Police Department
15 concerning what Mr. Moran allegedly told
16 you?
17    A.   No.
18    Q.   Did you ever register a complaint
19 to any board of trustee member concerning
20 what Mr. Moran allegedly told you?
21    A.   No.
22    Q.   Did you ever register a complaint
23 to any mayor of Ocean Beach concerning what
24 Mr. Moran told you?
25    A.   No.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 61

1      K. Lamm
2      MR. GOODSTADT: Just so we're
3 clear, you're talking about whether he
4 did?
5      MR. NOVIKOFF: Whether he did,
6 yeah.
7      MR. GOODSTADT: Or whether we
8 did?
9      MR. NOVIKOFF: Whether he did.
10      MR. GOODSTADT: Okay.
11      Q.   Well, then let me ask you the
12 question.  Are you aware of, other than what
13 is set forth perhaps in this Complaint --
14      MR. GOODSTADT: Or the Notice
15 of Claim.
16      MR. NOVIKOFF: Or the Notice of
17 Claim.
18      MR. GOODSTADT: That's a
19 different story.
20      Q.   Right.  Other than a filing,
21 whether it was the Notice of Claim or the
22 federal Complaint, are you aware of anyone
23 on your behalf sending a communication to
24 either the mayor or the board of trustees or
25 the police department concerning what

Page 62

1      K. Lamm
2 Mr. Moran said to you?
3      A.   Not to my knowledge.
4      Q.   Okay.  As you sit here today, do
5 you have any knowledge whatsoever as to why
6 the Suffolk County Civil Service Department
7 found you, on two occasions, to be
8 unqualified for the position with the
9 Suffolk County Police Department?
10      A.   No.
11      Q.   Okay.  Let's talk about the test
12 for the Suffolk County Sheriff's position
13 that I believe you said you took.
14      A.   Yes.
15      Q.   How many tests have you taken
16 with regard to your interest in working for
17 the Suffolk County Sheriff's Department?
18      A.   Overall?
19      Q.   Yes.
20      A.   I believe just two.
21      Q.   Okay.  And what are these two?
22      A.   Written tests for an entry
23 position.
24      Q.   Entry position for what?
25      A.   Sheriff.

Page 63

1      K. Lamm
2      Q.   Okay.  When did you take this
3 written test?
4      A.   Somewhere around shortly after
5 the Suffolk Police test.  Maybe 2004.
6      Q.   Okay.  Did you take any other
7 tests with regard to your interest in a
8 position with the Suffolk County Sheriff's
9 Department?
10      A.   No.
11      Q.   Okay.  So did you take one
12 written test or two written tests?
13      A.   Well, there were two written
14 tests, but there was another one many years
15 before that.
16      Q.   Okay.  Well, let's go back to the
17 one that was many years before that.  When
18 did you take your first test for a position
19 with the Suffolk County Sheriff's
20 Department?
21      A.   Maybe four years before that.
22      Q.   So we're talking about 2000?
23      A.   Approximately.
24      Q.   And for what position was this
25 test given to you for?

Page 64

1      K. Lamm
2      A.   Entry level deputy.
3      Q.   Deputy.  Okay.  And describe the
4 test for me that was given to you in 2000.
5      A.   It's the same as it was with the
6 Suffolk Police Department test that I
7 described previously.
8      Q.   Okay.  They gave you a series of
9 questions for you to answer?
10      A.   Yes.
11      Q.   Do you recall how many questions?
12      A.   No.
13      Q.   Okay.  Did you pass that written
14 test?
15      A.   I believe so.
16      Q.   And now, again, we're talking
17 about the test in 2000, you believe you
18 passed that written test?
19      A.   I believe so.
20      Q.   Upon your passing that written
21 test, what, if anything, did you do next
22 with regard to your interest in seeking a
23 position with the Suffolk County Sheriff's
24 Department?
25      A.   Nothing.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 65

1        K. Lamm
2    Q.   Why not?
3    A.   Because you got to wait for your
4  list number to come up.  It never came up.
5    Q.   When you say you had to wait for
6  your list number to come up, what do you
7  mean?
8    A.   They go by -- they give you a
9  list of ranking.
10   Q.   Okay.  And did you ever get a
11  ranking as a result of the test that you
12  took in 2000?
13   A.   Yes.  But I wasn't reachable.
14   Q.   When you say you weren't
15  reachable, what do you mean by "reachable"?
16   A.   'Cause they only hire allotted
17  few.
18   Q.   Okay.  Fine.  What was your test
19  ranking as a result of the 2000 test that
20  you took for the Suffolk County Sheriff's
21  Department?
22   A.   I don't recall.
23   Q.   Was it above 100?
24   A.   I don't believe it was.
25   Q.   Was it above 50?

Page 66

1        K. Lamm
2    A.   No.  I don't believe it was.
3    Q.   Was it above 10?
4    A.   If it was, then I would have
5  received a letter if I wanted the job.
6    Q.   I'm sorry, say that again?
7    A.   If it was above 10, I would have
8  received a letter if I was interested in the
9  job.
10   Q.   What do you mean by that?
11   A.   I wasn't reachable.
12   Q.   No.  I understand that.  Is it
13  your  -- and explain to me, because I'm --
14  I'm not familiar with this, if you're giving
15  a ranking of number one, did you have an
16  understanding that that meant that you were
17  the first person that they would call upon
18  to see if you --
19   A.   That's correct.
20       MR. GOODSTADT: Let him just
21    finish the question.
22   Q.   To call upon to see if you still
23  wanted to take the job?
24   A.   Right.
25   Q.   That's correct.  So my question

Page 67

1        K. Lamm
2  to you -- okay.  I got it.  So it's your --
3  correct me if I'm wrong, it's your testimony
4  that your number was of such a nature that
5  you weren't reachable in terms of them
6  offering you a job?
7    A.   Right.
8    Q.   Okay.  And did this test expire
9  -- I'm sorry, did the ranking as a result of
10  this test expire at any particular point in
11  time, to your knowledge?
12   A.   Yes, it does.
13   Q.   When does it expire?
14   A.   After three or four years or
15  whenever they decide to give a test.
16   Q.   Okay.  And is that the reason why
17  you took the test a second time, that your
18  initial ranking expired?
19   A.   No.  I took it because I wanted
20  to take it.
21   Q.   Okay.  Did you pass the second
22  test?
23   A.   Yes.
24   Q.   And what was your ranking?
25   A.   I believe it was 800 something.

Page 68

1        K. Lamm
2    Q.   Okay.  That's a very high
3  ranking, to your knowledge?
4        MR. GOODSTADT: Objection.
5    A.   Ranking is ranking.
6    Q.   Okay.  That's a fair answer.
7  Between the first test and the second test,
8  had you received any communications from the
9  Sheriff's Department with regard to your
10  interest in a job with them?
11   A.   Just that I had passed the test
12  and they gave me a ranking.
13   Q.   Okay.  Did you receive any
14  communication from the Suffolk County Civil
15  Service Department, between the first test
16  and the second test for the Sheriff's
17  Department, concerning your interest in the
18  job?
19       MR. GOODSTADT: Objection.
20   A.   No.
21   Q.   Okay.  Did you receive any
22  communication from any other governmental
23  agency, between the first test and the
24  second test, concerning your interest in the
25  Suffolk County Sheriff's job?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 69

1          K. Lamm
2     A.    No.
3     Q.    Okay.  So now let's look at the
4  2004 test.  How long after the 2004 test did
5  you receive your ranking?
6     A.    After six months I believe.
7     Q.    Okay.  And what was the next
8  communication, if any, that you received
9  from the Suffolk County  -- I'm sorry, the
10 Suffolk County Sheriff's Department
11 concerning your interest in a job with them
12 after the 2004 test?
13    A.    They just gave me my grade and my
14 list number.
15    Q.    What was your grade?
16    A.    88 percent.
17    Q.    Okay.  So you were 88 percent
18 with a ranking in the 800s; is that correct?
19    A.    That's correct.
20    Q.    Okay.  What communication, if
21 any, did you receive from the Suffolk County
22 Civil Service Department with regard to your
23 interest in the Sheriff's Department job
24 after your 2004 test?
25    A.    There wasn't any.

Page 70

1          K. Lamm
2     Q.    What communication, if any, did
3  you receive from any other governmental
4  entity after the 2004 test, concerning your
5  interest in a Suffolk County Sheriff's job?
6     A.    There wasn't any.
7     Q.    Okay.  Have you done anything to
8  follow up with the Suffolk -- with the
9  Suffolk County Sheriff's Department
10 concerning your interest in a position with
11 them?
12    A.    No.
13    Q.    Are you aware if your ranking has
14 expired?
15    A.    Yes.
16    Q.    When did your ranking with the --
17 with the Suffolk County Sheriff's Department
18 expire?
19    A.    When they gave the next test.
20    Q.    When was that?
21    A.    Couple months ago.
22    Q.    Did you take that test?
23    A.    No.
24    Q.    Did anyone from the Suffolk
25 County Sheriff's Department ever advise you

Page 71

1          K. Lamm
2  that George Hesse had communicated with them
3  with regard to any of your applications for
4  employment with them?
5     A.    Did any -- say again.
6     Q.    Did anyone from the Suffolk
7  County Sheriff's Department ever advise you
8  that George Hesse had communicated with them
9  concerning any of your applications for
10 employment with them?
11    A.    No.
12    Q.    Did anyone from the Suffolk
13 County -- from the Suffolk County Civil
14 Service Department ever advise you that
15 George Hesse had communicated with the
16 Sheriff's Department concerning your
17 application with them?
18    A.    No.
19    Q.    Did Chris Moran ever tell you
20 that George Hesse sent an unfavorable
21 reference to the Suffolk County Sheriff's
22 Department concerning your application?
23    A.    No.
24    Q.    Did George Moran ever tell
25 you that -- I'm sorry.  Yes.  Withdrawn.

Page 72

1          K. Lamm
2  Did Chris Moran ever tell you that George
3  Hesse ever sent an unfavorable reference to
4  the Suffolk County Civil Service Department
5  concerning your interest in the Sheriff's
6  Department job?
7     A.    No.
8        MR. NOVIKOFF: Okay.  The tape
9     is about to end.  So let's change the
10    tape and continue.
11       THE VIDEOGRAPHER: This ends
12    tape number one.  The time is 11:02
13    a.m.  Going off the record.
14       (A break was taken.)
15       THE VIDEOGRAPHER: This begins
16    tape number two.  The time is 11:18
17    a.m.  Back on the record.
18    Q.    Okay.  Sir, you also mentioned
19 that you applied for the -- a position with
20 Southampton Town Police; is that correct?
21    A.    Yes.
22    Q.    When did you first make an
23 application for a position with the
24 Southampton Town Police?
25    A.    I believe somewhere maybe late

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 73

K. Lamm

1       K. Lamm
2   2004, 2005.
3    Q.   And how did you go about making
4   that application?
5    A.   I received a canvas letter.
6    Q.   Okay.  And who did you receive a
7   canvas letter from?
8    A.   It was from Civil Service.
9    Q.   Okay.  And -- and what
10   specifically did this canvas letter say?
11    A.   It had a -- place a checkmark if
12   you're interested in a position with
13   certain, you know, police departments that
14   were listed, and the ones that, you know, I
15   listed previously to you were on that list.
16    Q.   Okay.  So in this letter, you
17   checked off the Southampton Town Police
18   Department, the Southampton Village Police
19   Department, the Huntington Bay Police
20   Department --
21    A.   That was a separate letter.
22    Q.   Okay.
23    A.   The east end towns were one
24   letter.
25    Q.   Okay.  So let's -- let's stick

Page 74

K. Lamm

1       K. Lamm
2   with this letter then, the canvas letter
3   that you say you received.
4    A.   Yes.
5    Q.   You checked off the Southampton
6   Police Department, the Southampton Village
7   Police Department?
8    A.   Yes.
9    Q.   And what other east end police
10   departments did you check off in this
11   letter?
12    A.   That may have been it.  There
13   could have been another one, but I
14   believe -- I believe that was just the two.
15    Q.   Okay.  So let's stick now with
16   the Southampton Town Police department.
17   After you checked off that box in this
18   canvas letter, did you send it back to the
19   Civil Service Department?
20    A.   Yes, I did.
21    Q.   Okay.  And what was the next
22   communication, if any, that you received
23   from any entity concerning your interest in
24   a position with the Southampton Town Police
25   Department?

Page 75

K. Lamm

1       K. Lamm
2    A.   Southampton Village.  They
3   sent --
4    Q.   No.  No.  My question now -- I'm
5   breaking it down.  You've -- you've told me
6   that you checked off at least two boxes, one
7   for Southampton Town and one for Southampton
8   Village, correct?
9    A.   Yes.
10    Q.   So my question now is
11   specifically to the Southampton Town Police
12   Department.
13    A.   Okay.
14    Q.   After you checked off that box
15   and you sent this canvas letter back to the
16   Civil Service Department, what was the next
17   communication, if any, that you received
18   from the Southampton -- I'm sorry.  What
19   was -- withdrawn.  What was the next
20   communication, if any, that you received
21   from any governmental entity concerning your
22   interest in the Southampton Town Police
23   Department position?
24    A.   There was a letter sent back
25   stating the requirements of residency that

Page 76

K. Lamm

1       K. Lamm
2   you would need.
3    Q.   Who sent you back this letter?
4    A.   It was Civil Service.
5    Q.   Suffolk County Civil Service?
6    A.   Yes.
7    Q.   And when you say a letter was
8   sent back concerning the requirements of
9   residency, what -- what was stated in this
10   letter concerning that?
11    A.   Wanted to know if I lived there.
12    Q.   In -- in the town of Southampton?
13    A.   That's right.
14    Q.   And did you learn  -- did you
15   live in the town of Southampton at that
16   time?
17    A.   No.
18    Q.   Have you ever lived in the town
19   of Southampton?
20    A.   No.
21    Q.   And what was your understanding
22   as to why they were asking you this
23   question?
24    A.   Because they have a residency
25   list that they use first.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 77

K. Lamm

1
2    Q.   Okay.  So if I understand
3 correctly, Southampton Town Police
4 Department will -- will seek applicants
5 first from those who live in the town, and
6 then if they exhaust that list, they will go
7 outside the town?
8    A.   Correct.
9    Q.   Okay.  What was the next
10 communication, if any, that you received --
11 well, did you -- did you respond to this
12 letter from the Civil Service Department
13 concerning the residency issue?
14    A.   Yes.
15    Q.   And -- and you advised them that
16 you were not a resident?
17    A.   That's right.
18    Q.   And when did you receive this
19 letter from them?
20    A.   Shortly after -- shortly after
21 they sent me a canvas.
22    Q.   Which is we're still in the 2004
23 time period?
24    A.   Maybe 2005.
25    Q.   Okay.  And what was the next

Page 78

K. Lamm

1
2 communication, if any, that you received
3 from any governmental entity concerning your
4 interest in the Southampton Town Police
5 Department job?
6    A.   I believe that was it.
7    Q.   Okay.  To your knowledge, has
8 George Hesse sent any communication to the
9 Southampton Town Police Department regarding
10 you since your checking off the box as
11 interested in a position with them?
12    A.   I don't know if he did or not.
13    Q.   That's my question.  Do you have
14 any knowledge?
15    A.   Again, I don't know if -- I
16 don't know.
17    Q.   Well, let me ask -- let me
18 rephrase the question, sir.  Do you have any
19 knowledge as to whether or not George Hesse
20 ever communicated with the Southampton Town
21 Police Department concerning your interest
22 in a job with that department?
23    A.   No, I don't.
24    Q.   Okay.  Now let's go to the
25 Southampton Village Police Department.

Page 79

K. Lamm

1
2 Subsequent to your checking off the box
3 concerning your interest in the Southampton
4 Village Police Department, what was the next
5 communication, if any, that you received
6 from any governmental entity concerning your
7 interest in that position?
8    A.   I believe it was 2006 they sent
9 me a letter.
10    Q.   Okay.  When in 2006?
11    A.   Around the summer.
12    Q.   So this would have been after you
13 were not rehired for the position with the
14 Ocean Beach Police Department?
15       MR. GOODSTADT: Objection.  Are
16    we going to agree to --
17       MR. NOVIKOFF: Yes.
18       MR. GOODSTADT: -- terms?
19       MR. NOVIKOFF: Just so we're
20    all clear, we take the position that --
21    that Mr. Lamm and the other Plaintiffs
22    were not rehired.  The Plaintiffs,
23    through Mr. Goodstadt, take the
24    position that they were terminated.  To
25    the extent my question refers to

Page 80

K. Lamm

1
2    termination or not rehire, no answer
3    here is waiving the respective
4    positions of the parties.
5       MR. GOODSTADT: Why don't we
6    stay with "the employment ended."
7       MR. NOVIKOFF: Okay.  Fine.
8    Just read to me what my question was.
9       (The requested portion was read.)
10    Q.   So this would have been after the
11 time that your employment relationship ended
12 with Ocean Beach?
13    A.   Correct.
14    Q.   Okay.  What did the letter from
15 the Southampton Village Police Department
16 state, to the best of your recollection?
17    A.   It stated that they were looking,
18 you know, for appli -- applicants that were
19 interested in the position.
20    Q.   Okay.  And did you respond to
21 that letter?
22    A.   Yes, I did.
23    Q.   And how did you respond to that
24 letter?
25    A.   That I was interested.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 81

1           K. Lamm
2      Q.   Okay.  How did you advise them
3  that you were interested?
4      A.   Check off box.
5      Q.   Okay.  And you sent that -- that
6  document back to the Southampton Village
7  Police Department?
8      A.   Yes.
9      Q.   Indicating that you were
10 interested?
11     A.   Yes.
12     Q.   What was the next communication,
13 if any, that you had with the Southampton
14 Village Police Department concerning your
15 interest in a position with them?
16     A.   They sent me a package that I had
17 to fill out with papers, you know,
18 background, previous employment.
19     Q.   Okay.  And did you fill those
20 papers out?
21     A.   I started to.  And along with
22 those papers was an interview date.
23     Q.   My question is, did you fill out
24 all those documents?
25     A.   I started to fill out all those

Page 82

1           K. Lamm
2  documents, but --
3      Q.   Then my question to you, sir, is
4  did you complete filling out all the
5  documents that the Southampton Village
6  Police Department sent you?
7      A.   No.
8      Q.   Okay.  What documents that you
9  received from the Southampton Village Police
10 Department did you not complete?
11     A.   I don't know exactly what I did
12 not complete.
13     Q.   Okay.  Did you send any of the
14 documents that you received from the
15 Southampton Village Police Department, as
16 you've just testified to, back to the
17 village?
18     A.   No.
19     Q.   What was the next communication,
20 if any, that you received from the
21 Southampton Village Police Department?
22     A.   I didn't receive any.
23     Q.   So the last -- if I understand,
24 the last communication that you received
25 from the Southampton Village Police

Page 83

1           K. Lamm
2  Department was this package of materials
3  that they had asked you to fill out?
4      A.   Right.  But I couldn't show for
5  the interview, so I had to call and cancel.
6  MO        MR. NOVIKOFF: Hold on.  Motion
7      to strike.
8      Q.   My question, sir, is the last
9  communication  -- well, was the last
10 communication that you had with the
11 Southampton Village Police Department, the
12 package of materials that they had sent to
13 you?
14     A.   Yes, it was.
15     Q.   Okay.
16          MR. GOODSTADT: You're talking
17     about written communication or oral
18     communication?
19          MR. NOVIKOFF: Any
20     communication.  And I'm going to
21     clarify his answer, because I think in
22     a prior answer he had mentioned that he
23     had called them, so.
24     Q.   I'm referring to written
25 communication.  Was the package of materials

Page 84

1           K. Lamm
2  that you received from the Southampton
3  Village Police Department, the last written
4  communication that you received from them?
5      A.   Yes, it was.
6      Q.   Okay.  Now subsequent to the
7  receipt of these document -- of this
8  documentation, did you have any verbal
9  communication with anyone associated with
10 the Southampton Village Police Department?
11     A.   No.
12     Q.   Okay.  Did the Southampton
13 Village Police Department, in this package
14 of materials, request that you schedule an
15 interview?
16     A.   Yes.
17     Q.   Did you schedule an interview
18 with the Southampton Village Police
19 Department?
20     A.   The interview date and time was
21 already scheduled in the package.
22     Q.   Okay.  And what was the interview
23 date and time that was already scheduled in
24 the package?
25     A.   It was in July of 2006.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 85

K. Lamm

1    K. Lamm
2    Q.   Okay.  And from -- I believe from
3  your testimony you did not appear on that
4  date, did you?
5    A.   That's correct.
6    Q.   And did you advise anyone at the
7  Southampton Village Police Department that
8  you were not going to appear on that date
9  and time for the scheduled interview?
10   A.   Yes.  I called --
11   Q.   No.  My question is just yes or
12 no, sir.
13   A.   Yes, I did.
14   Q.   And who did you  -- how did you
15 communicate the fact that you were not going
16 to appear on that date and time?
17   A.   Telephone.
18   Q.   Who did you call?
19   A.   Chief.
20   Q.   Chief who?
21   A.   I don't remember the name.
22   Q.   How do you know -- how did you
23 know to call the chief?
24   A.   There was a telephone number
25 there.

Page 86

1    K. Lamm
2    Q.   Okay.  And did you speak with the
3  chief?
4    A.   No.
5    Q.   Did you leave a voicemail message
6  with the chief?
7    A.   Yes, I did.
8    Q.   What specifically did you say to
9  the chief in this voicemail message?
10   A.   That I would not be able to
11 appear for the interview date.
12   Q.   And did you give him a reason --
13 and I assume it's a him -- did you give him
14 a reason in this telephone voicemail message
15 that you left?
16   A.   Yes.
17   Q.   What was the reason that you gave
18 the chief?
19   A.   Because I had received a letter
20 from Suffolk County Civil Service stating
21 that I was not qualified after the
22 psychological, therefore, that eliminated me
23 from seeking out any future further
24 employment with any police agency.
25   Q.   And how did you know this to be

Page 87

1  the case?
2    A.   Because once when you are found
3  not qualified, you can't accept a police
4  position until you take another test and
5  time passes by.
6    Q.   Okay.  I -- I understand that
7  that's your understanding.  My question to
8  you is, where did you get this understanding
9  from?  Did you read it in a statute?  Did
10 you read it in a book?  Where did you get
11 this understanding that you just testified
12 to concerning your disqualification for any
13 other law enforcement job as a result of
14 your failure to be qualified according to
15 Civil Service?
16   A.   When I went for my interview.
17 The appeal.
18   Q.   Okay.
19   A.   That, you know, once I failed a
20 psychological, I can't accept any other
21 police job, because that list number is the
22 same list number that they use off the
23 police exam.
24   Q.   So you were told specifically

Page 88

1    K. Lamm
2  that you failed the psychological by the
3  Suffolk County Civil Service Department?
4    A.   No.
5    Q.   So how do you know that you
6  failed the -- the psychological?
7    A.   I received a letter that I
8  failed.
9    Q.   The psychological?
10   A.   Yes.
11   Q.   Okay.  See, I thought you had
12 just said you received a letter saying that
13 you were not qualified.  Did you receive --
14   A.   That's what it says, not
15 qualified, on the letter.
16   Q.   Did it say you were not qualified
17 because you failed the psychological?
18   A.   Yes.
19   Q.   Oh, okay.  So you did receive --
20 just so we're clear, you received a letter
21 from the Suffolk County Civil Service
22 Department that specifically said you are
23 not qualified because you failed the
24 psychological test; is that correct?
25   A.   The exact wording, but it's

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 89

K. Lamm

1        K. Lamm
2 pretty close.
3        Q.   Okay.  And in the second letter
4 that you received -- you received from the
5 Suffolk County Civil Service Department, did
6 it also say that you were not qualified
7 because you had failed a psychological test?
8        A.   In appeal.  Yes.
9        Q.   Okay.  And did you ever seek to
10 determine what parts of the psychological
11 test you failed?
12        A.   When I was there for the appeal,
13 I asked if I would be able to know what part
14 I had failed, and they said they don't tell
15 you.
16        Q.   Okay.  And did you ever do
17 anything to ascertain the truthfulness of
18 the statement that said they don't tell
19 people why they fail tests?
20        A.   No.
21        Q.   Okay.  Now let's go back to the
22 understanding that you had about what --
23 what disqualifications you had as a result
24 of failing the physical  -- I mean the
25 psychological and being told you were not

Page 90

1        K. Lamm
2 qualified by the Suffolk County Civil
3 Service Department.  Who told you
4 specifically, of those two individuals in
5 that meeting, that because you were not
6 qualified as a result of failing your
7 psychological, you could not apply for any
8 other job, any other law enforcement job?
9        MR. GOODSTADT: Objection.
10        A.   Stanley Pelc.
11        Q.   Okay.  What specifically did
12 Mr. Pelc say to you?
13        A.   Because you need over a year to
14 pass, time to pass in order to take another
15 psychological again.
16        Q.   Did Mr. Pelc advise you
17 specifically as a result of your failure,
18 you cannot apply or pursue any other law
19 enforcement job?
20        A.   No, he did not say that.
21        Q.   So my question to you, sir, is,
22 what is the basis for your understanding
23 that because you were determined to be not
24 qualified as a result of failing a
25 psychological, you could not go forward in

Page 91

1        K. Lamm
2 your application with the Southampton
3 Village Police Department?
4        A.   Because I had just received a
5 letter within two weeks that I was not
6 qualified from the Civil Service exam for
7 the psychological.
8        Q.   So that's the basis of your --
9 your understanding?
10        A.   Yes.
11        Q.   Have you taken a psychological
12 test subsequent to your -- subsequent to the
13 Civil Service Department's determination
14 that you were not qualified?
15        A.   I have taken other Civil Service
16 tests psychological before that.
17        Q.   I'm not interested, sir, with
18 before.  We've established that you took a
19 psych -- you took psychological tests with
20 regard to your application for a Suffolk
21 County Police Department position, correct?
22        A.   Correct.
23        Q.   We've established that you were
24 told on two occasions that you failed the
25 psychological test, and therefore, were not

Page 92

1        K. Lamm
2 qualified, correct?
3        A.   Correct.
4        Q.   You've testified, if I understand
5 you correctly, and tell me if I'm wrong,
6 that you were advised by Mr. Pelc that you
7 would have to wait one more year before you
8 could take another psychological test,
9 correct?
10        MR. GOODSTADT: Objection.
11        A.   That's correct.
12        Q.   Is that what Mr. Pelc told you?
13        A.   That's correct.
14        Q.   Have you taken another
15 psychological test since being advised that
16 you failed the test with regard to the
17 Suffolk County Police Department position?
18        A.   No.
19        Q.   Okay.  To your knowledge, did
20 George Hesse send any documentation --
21 withdrawn.  To your knowledge, did George
22 Hesse ever communicate to the -- to the
23 Southampton Village Police Department
24 concerning you with regard to your
25 application for employment?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 93

K. Lamm

1       K. Lamm
2    A.   Not to my knowledge.
3    Q.   To your knowledge, did Mr. Hesse
4 know that you were applying, at any point in
5 time, for a position with the Southampton
6 Village Police Department?
7    A.   I don't know if he did.
8    Q.   Did you ever advise Mr. Hesse?
9    A.   No.
10    Q.   Did you ever advise Mr. Hesse
11 that you were applying, at any point in
12 time, for a position with the Southampton
13 Town Police Department?
14    A.   No.
15    Q.   Sir, why have you not taken an
16 exam -- a subsequent psychological exam for
17 a law enforcement job after you were advised
18 by the Suffolk County Civil Service
19 Department that you were not qualified as a
20 result of failing the psychological test?
21      MR. GOODSTADT: Objection.
22    A.   I had no reason to take another
23 one.
24    Q.   What do you mean you had no
25 reason to take another one?

Page 94

1       K. Lamm
2    A.   After that test?
3    Q.   Yes.
4    A.   For what?
5    Q.   Were you still interested in
6 working in law enforcement?
7    A.   Yes, I was.
8    Q.   Okay. And if I understand you
9 correctly, Mr. Pelc told you that before you
10 could apply for another law enforcement job,
11 you had to wait a year and then take the
12 psychological --
13    A.   Over a year.
14    Q.   You had to wait for over a year
15 to take the psychological test again,
16 correct?
17    A.   Correct.
18    Q.   When he said "over a year," do
19 you know what he meant by "over a year"?
20    A.   A year has to pass.
21    Q.   Okay. And how often are these
22 psychological tests given, to your
23 knowledge? Well, withdrawn. Is there a set
24 period, a set day every year where
25 psychological tests are given?

Page 95

1       K. Lamm
2      MR. GOODSTADT: Objection.
3    Q.   To your knowledge?
4    A.   I don't know.
5    Q.   Okay. Well, we've established
6 now, sir, that you failed the psychological
7 tests -- test, you were advised of that, and
8 then you were advised that you had to wait
9 for over a year to take another one,
10 correct?
11    A.   Correct.
12    Q.   Okay. And we've also established
13 that you are still interested in working in
14 the law enforcement field, correct?
15    A.   Correct.
16    Q.   So then my question, sir, is why
17 haven't you taken a test, another
18 psychological test for the purposes of a law
19 enforcement position?
20    A.   'Cause I haven't had any other
21 tests taken for other law enforcement jobs.
22    Q.   What do you mean by that?
23    A.   Because I have exceeded the age
24 limit now.
25    Q.   What is the age limit?

Page 96

1       K. Lamm
2    A.   35.
3    Q.   Okay. How old were you when you
4 were advised that you had failed the
5 psychological tests for the Suffolk County
6 Police Department?
7    A.   34.
8    Q.   Okay. And when did you turn 35,
9 what date and year?
10    A.   November of 2000 -- of -- of
11 that year.
12    Q.   Of 2000 and?
13    A.   Six.
14    Q.   Six. Did you know that -- did
15 you know when you were told that you had
16 failed -- I'm sorry. Withdrawn. Did you
17 know when you were advised for the second
18 time that the Civil Service Department had
19 indicated that you were not qualified as a
20 result of failing the psychological, that
21 there was a 35 year age limit on law
22 enforcement positions?
23    A.   I knew that there was.
24    Q.   You knew that there was a 35 year
25 age --

Page 93 - Page 96 (24)

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 97

K. Lamm

1  
2  A.   In order to take the test, you --
3  you wouldn't be able to take the test if you
4  were over 35.
5  Q.   Okay.  And you knew that at the
6  time that you were told you were not
7  qualified?
8  A.   Yes.
9  Q.   Did you commence any type of
10 lawsuit between the time that you were
11 advised that you were not qualified and the
12 date of your 35th birthday concerning the
13 determination by the Suffolk County Civil
14 Service Department that you were not
15 qualified?
16     MR. GOODSTADT: Objection.
17 A.   No.
18     MR. NOVIKOFF: What's the basis
19 of the objection, counselor?
20     MR. GOODSTADT: Did he commence
21 a lawsuit?  I mean, he's commenced a
22 lawsuit here, right?
23     MR. NOVIKOFF: Well, then I'll
24 rephrase the question.
25 Q.   Did you commence a lawsuit in a

Page 98

K. Lamm

1  
2  state court, challenging the Suffolk County
3  Civil Service Department's determination
4  that you were not qualified prior to turning
5  35?
6  A.   This is the lawsuit here.
7  Q.   Well, you commenced this prior to
8  the time you turned 35?
9  A.   Yes.
10 Q.   Well, let's see.  Lawsuit's filed
11 March 21, 2007.  How old were you on March
12 21, 2007?
13 A.   35.
14 Q.   Okay.  Because you had turned 35
15 in November of 2006, correct?
16 A.   Yes.
17 Q.   Okay.  So let me ask the question
18 again, sir.  Did you file a lawsuit in any
19 state court, challenging the Civil Service
20 Department's determination that you were not
21 qualified because you failed a psychological
22 test prior to you turning 35?
23 A.   No.
24 Q.   Let's talk about Huntington Bay.
25 How did it come about that you applied for a

Page 99

K. Lamm

1  
2  job with Huntington Bay?
3  A.   They sent a canvas letter.
4  Q.   Who sent a canvas letter?
5  A.   Civil Service.
6  Q.   And when did Civil Service send
7  you a canvas letter?
8  A.   Maybe late 2004, early 2005.
9  Q.   Okay.  And what boxes, if any,
10 did you check off on that particular canvas
11 letter?
12     MR. GOODSTADT: Objection.
13 Q.   Well, withdrawn.  Did you check
14 off any boxes?  Well, even -- I'll even go
15 back further, since I don't want to have
16 another objection.  What was on this canvas
17 letter?
18 A.   Interested in employment.
19 Q.   And do you recall what entities,
20 if any, were identified in the Civil Service
21 canvas letter that you're referring to?
22 A.   Yes, I do.
23 Q.   And what were they?
24 A.   Lloyd Harbor.
25 Q.   Okay.

Page 100

K. Lamm

1  
2  A.   And Huntington Bay.
3  Q.   Huntington Bay Police Department?
4  A.   Yes.
5  Q.   Lloyd Harbor Police Department?
6  A.   Lloyd Harbor, yes.
7  Q.   Okay.  And did you check off
8  those two boxes?
9  A.   Yes.
10 Q.   And did you return that canvas
11 letter to the Civil Service Department?
12 A.   Yes, I did.
13 Q.   With regard to Huntington Bay,
14 what was the next communication, if any,
15 that you received from them concerning your
16 interest in a position with that police
17 department?
18     MR. GOODSTADT: Objection.
19 A.   I spoke to the chief and I
20 dropped off paperwork there.
21 Q.   Who was the chief?
22 A.   Chief Hobbs.
23 Q.   When did you speak with the
24 chief?
25 A.   Somewhere around the time frame

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 101

K. Lamm

1    K. Lamm
2  of 2005, springtime I believe.
3    Q.   Springtime of 2005?
4    A.   Yes.
5    Q.   Okay.  And what paperwork did you
6  drop off?
7    A.   Dropped off my police
8  certificate.
9    Q.   Okay.
10    A.   Copy of my test grade from the
11  police exam.
12    Q.   Okay.
13    A.   And some of my other training
14  documents from Suffolk Police Academy.
15    Q.   How did you know to go to -- to
16  go to the Huntington Bay Village Police
17  Department to drop off these documents?
18    A.   I just went there.
19    Q.   Did you schedule  -- did you
20  have -- did you have a communication with
21  anyone scheduling the time that you were to
22  drop off these documents?
23    A.   No.  No scheduled time.
24    Q.   Did anyone tell you to drop these
25  documents off?

Page 103

K. Lamm

1    K. Lamm
2  some of my -- here's a copy of my
3  certificate from the police academy and the
4  municipal bureau of police from New York
5  State.  He said, "Okay.  If anything, we'll
6  be in touch."  I said, "Thank you."  That
7  was really it.
8    Q.   Did the name George Hesse come up
9  at all during this brief conversation?
10    A.   No, it didn't.
11    Q.   Did the name of Ocean Beach come
12  up during the course of this brief
13  conversation?
14    A.   I said, "I work at Ocean Beach."
15    Q.   How did you describe -- did you
16  describe what you meant by you work at Ocean
17  Beach?
18    A.   That I was a police officer.
19    Q.   Did you describe to him whether
20  you were a full time or police  -- or part
21  time?
22    A.   No.
23    Q.   Did you describe to him whether
24  you were seasonal or full time?
25    A.   No.

Page 102

K. Lamm

1    K. Lamm
2    A.   No.  I did.
3    Q.   And did you have a conversation
4  with Chief Hobbs the day that you dropped
5  these documents off?
6    A.   I said to him I was --
7    Q.   No.  The question is, did you
8  have a communication with Chief Hobbs on the
9  day that you dropped these documents off?
10    A.   Brief.
11    Q.   Okay.  Was that the first time
12  you had spoken with Chief Hobbs about your
13  interest in the Huntington -- Huntington Bay
14  Police Department?
15    A.   Yes.
16    Q.   And when you say it was a brief
17  conversation, how long was it?
18    A.   Brief.  Maybe three minutes.
19    Q.   And do you recall the sum and
20  substance of the conversation?
21    A.   Some of it.
22    Q.   Want to enlighten us?
23        MR. GOODSTADT: Objection.
24    A.   Sure.  I said I was interested in
25  a position with your department and here's

Page 104

K. Lamm

1    K. Lamm
2    Q.   Don't you think that would have
3  been important for him to know?
4        MR. GOODSTADT: Objection.
5    A.   No.
6    Q.   Okay.  Well, what communication,
7  if any, did you receive from the Huntington
8  Bay Police Department after this brief
9  communication with Chief Hobbs?
10    A.   None.
11    Q.   Did you, prior to the end of your
12  employment relationship with Ocean Beach,
13  make any inquiries with the Huntington Bay
14  Police Department concerning your interest
15  in a job with them?
16    A.   No.
17    Q.   To your knowledge, did George
18  Hesse ever communicate with the Huntington
19  Bay -- Huntington Bay Police Department
20  concerning your interest in the job with
21  them?
22    A.   Repeat that, please.
23    Q.   To your knowledge, did George
24  Hesse ever communicate with the Huntington
25  Bay Police Department concerning your

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 105

1          K. Lamm
2 interest in a position with them?
3     A.   Not to my knowledge.
4     Q.   Did you ever advise Chief Hesse
5 that you had submitted an application to the
6 Huntington Bay Police Department?
7     A.   I believe I said something to
8 him.
9     Q.   When did you say something to
10 him?
11    A.   Sometime that year in 2005.
12    Q.   And do you recall what
13 Mr. Hesse's reaction was, if any?
14    A.   No, I don't.
15    Q.   Okay.  When was  -- after you
16 checked off the box for Lloyd Harbor Police
17 Department -- actually, let me take a step
18 back.  The Huntington Bay Police Department,
19 was that a full-time position that you were
20 applying for?
21    A.   Yes.
22    Q.   And how about with the two
23 Southampton police department applications,
24 was that -- was that full time?
25    A.   Yes.

Page 106

1          K. Lamm
2     Q.   Okay.  Let's then go to Lloyd
3 Harbor.  After checking off the box of the
4 canvas letter and sending the letter back to
5 the Civil Service Department, what, if
6 anything -- what -- what, if any,
7 communication did you receive from the Lloyd
8 Harbor Police Department concerning your
9 interest in the job with them?
10    A.   They sent a letter with residency
11 requirements.
12    Q.   And were you -- and when did they
13 send this letter to you?
14    A.   Within a few  -- within a few
15 weeks after I sent a letter back.
16    Q.   And did you advise them that you
17 were not a resident of Lloyd Harbor at that
18 time?
19    A.   You didn't have to be a resident.
20    Q.   Oh, okay.  So they were different
21 than Southampton Town?
22         MR. GOODSTADT: Objection.
23    Q.   To your knowledge?
24    A.   Slightly.
25    Q.   When you say "slightly," what do

Page 107

1          K. Lamm
2 you mean?
3     A.   Because Lloyd Harbor has what's
4 called a loose residency.
5     Q.   What is your understanding as to
6 what that means?
7     A.   The way they defined it?
8     Q.   Yes.  That's all I'm asking.
9     A.   The way they defined it was that
10 if you lived either in the village of Lloyd
11 Harbor or within an approximate 15 mile
12 range, you would get to be -- you would have
13 preference over anybody else that lived
14 further out.
15    Q.   Did you live in Lloyd Harbor at
16 the time you received this letter?
17    A.   No.
18    Q.   Have you ever lived in Lloyd
19 Harbor since submitting an application for
20 employment?
21    A.   No.
22    Q.   Did you live within the 15 miles
23 of this village at the time you received
24 this letter?
25    A.   Yes.  They -- they stated I was

Page 108

1          K. Lamm
2 within the range.
3     Q.   Okay.  And where did you live at
4 this time?
5     A.   Bay Shore.
6     Q.   Okay.  And did you advise  --
7 they stated that you lived in the range in
8 this letter?
9     A.   Yes.  They said that was
10 acceptable.
11    Q.   So what else, if anything, did
12 this letter state to you concerning your
13 interest in a job with them?
14    A.   They wanted to know if I had
15 already completed a police academy within
16 Suffolk County.
17    Q.   And -- and had you?
18    A.   And if I had any police
19 experience.
20    Q.   Okay.  Let's talk about the first
21 one.  Had you completed a  -- how did you
22 phrase it?
23    A.   Police academy?
24    Q.   Yeah.
25    A.   Yes, I did.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 109

1        K. Lamm
2    Q.    And did you advise them of that?
3    A.    Yes, I did.
4    Q.    And did you advise them of your
5 police experience?
6    A.    Yes, I did.
7    Q.    And how did you go about advising
8 them of your police experience and of your
9 police academy experience?
10    A.    It was through telephone.
11    Q.    Who did you speak with?
12    A.    Don't know the name.  Whoever was
13 working the desk.
14    Q.    When did you speak to them in
15 relation to when you received this letter
16 seeking this information?
17    A.    Sometime in 2005.
18    Q.    Okay.  And what was the next
19 communication, if any, that you received
20 from the Harbor -- the Lloyd Harbor Police
21 Department concerning your interest in a job
22 with them?
23    A.    To send a copy of my police
24 certificates.
25    Q.    And did you?

Page 110

1        K. Lamm
2    A.    Yes, I did.
3    Q.    How long  -- when -- when did you
4 receive this communication from them
5 concerning your police certificates?
6    A.    After the telephone conversation.
7    Q.    Okay.  And do you know who you
8 spoke to with regard to the request for the
9 police certificates?
10    A.    I don't know who it was.
11    Q.    Okay.  And how long after this
12 communication did you send the police
13 certificates to them?
14    A.    Within the next day or two.
15    Q.    Still in 2005?
16    A.    Yes.
17    Q.    Are we in the fall of 2005, the
18 summer or the winter?
19        MR. GOODSTADT: Objection.
20    Q.    Well, do you know what season you
21 were in when you had these communications?
22    A.    Springtime maybe.
23    Q.    Okay.  And after you sent the
24 police certificates to Lloyd Harbor, what
25 communications, if any, did you engage in

Page 111

1        K. Lamm
2 after that with Lloyd Harbor?
3    A.    They -- I believe they said you
4 can call back and you can talk to one of the
5 lieutenants if you have to.
6    Q.    Okay.  And did you call back?
7    A.    Yes, I did.
8    Q.    Do you know if  -- well, did you
9 speak to a live human being when you called
10 back?
11    A.    Yes, I did.
12    Q.    Do you know who you spoke to?
13    A.    It was a man I believe.  Who it
14 was, I don't know who it was.
15    Q.    How shortly after you were
16 advised you should speak to one of the
17 sergeants did you in fact call over to the
18 Lloyd Harbor Police Department?
19        MR. GOODSTADT: Objection.
20    A.    Say again, please.
21    Q.    How long after -- we've
22 established you were advised that you should
23 call over and speak to one of the sergeants,
24 correct?
25        MR. GOODSTADT: Objection.

Page 112

1        K. Lamm
2    Q.    Was that correct?
3    A.    She said lieutenant.
4    Q.    Oh, okay.  How long after you
5 were advised that you should call over and
6 speak to one of the lieutenants did you in
7 fact call over to speak to one of the
8 lieutenants?
9    A.    May have been a week later.
10    Q.    Okay.  So we're still in the 2005
11 time period?
12    A.    Yes.
13    Q.    And did you speak with any
14 lieutenants?
15    A.    I believe it was.  The name I
16 can't be for certain.
17    Q.    And do you know the name?
18    A.    The name I can't be for certain.
19    Q.    Okay.  And how long was this
20 conversation?
21    A.    It wasn't very long.
22    Q.    Two minutes?  Five minutes?  10
23 minutes?
24    A.    Six minutes.
25    Q.    Do you recall the sum and

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 113

1          K. Lamm
2  substance of this conversation?
3      A.   I asked if they received my
4  papers.  My police certificates.
5      Q.   And what was the response, if
6  any?
7      A.   Yes, they did.
8      Q.   Do you recall was someone --
9  anything else that was discussed with this
10  individual in this brief conversation?
11     A.   Yes.  That they were looking to
12  hire two people.
13     Q.   Okay.  And anything else that was
14  discussed?
15     A.   Yes.
16     Q.   What?  What was discussed?
17     A.   That being that I had already
18  graduated from the Suffolk County Police
19  Department, that I may have first preference
20  over anybody else that didn't have academy
21  experience or graduate from an accredited
22  agency.
23     Q.   Okay.
24     A.   Mainly Suffolk County Police
25  Academy.

Page 114

1          K. Lamm
2      Q.   Got it.  Anything else that was
3  discussed that you can recall?
4      A.   Not that I can recall.
5      Q.   And how did the conversation end?
6      A.   "Good-bye."  Hung up the phone.
7      Q.   Okay.  Were you advised to call
8  back at any particular time?
9      A.   No.
10     Q.   What was the next communication
11  that you engaged in with someone from the
12  Lloyd Harbor Police Department concerning
13  your interest in a position with that
14  department?
15     A.   May have been maybe another month
16  after.
17     Q.   And what type of communication
18  was this?
19     A.   Telephone.
20     Q.   Who initiated it?
21     A.   I did.
22     Q.   Who did you call?
23     A.   Lloyd Harbor Police.
24     Q.   Anyone specifically?
25     A.   Whoever was working the desk.

Page 115

1          K. Lamm
2      Q.   And what was the purpose of your
3  phone call, if any?
4      A.   To see if they were still going
5  to hire two full time people and if there
6  was a time frame.
7      Q.   And what response, if any, did
8  you get to your inquiry?
9      A.   They said that they were still
10  making a decision.
11     Q.   And how long was this
12  conversation?
13     A.   Three, four minutes.
14     Q.   Okay.  Anything else you recall
15  said between you and this person at the
16  police department?
17     A.   Not that I can recall.
18     Q.   What was the next communication,
19  if any, that you had between you and anyone
20  at the Lloyd Harbor Police Department
21  concerning your interest in a job with them?
22     A.   I don't believe there was one.
23     Q.   Did you -- did you attempt to
24  phone the Lloyd Harbor Police Department
25  after this last communication?

Page 116

1          K. Lamm
2      A.   No.  I just waited for a
3  response.
4      Q.   So we're still in  -- we're still
5  in 2005, correct?
6      A.   Correct.
7      Q.   And you made no further
8  communications with them?
9      A.   Waited for a response.
10     Q.   Before the end of your employment
11  relationship in April of 2006 with Ocean
12  Beach, did you make any inquiry with -- with
13  the Lloyd Harbor Police Department?
14     A.   No.
15     Q.   Prior to the end of your
16  employment relationship with the Lloyd  --
17  with Ocean Beach, did you become aware of
18  the fact one way or the other as to whether
19  Lloyd Harbor had filled those two full-time
20  positions?
21     A.   Don't know.
22     Q.   Did you ever inquire as to
23  whether they did?
24     A.   No.
25     Q.   To this day do you know if they

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 117

1            K. Lamm
2   did?
3       A.   I don't know.
4       Q.   Did you ever inquire between
5   April 2, 2006 and this date?
6       A.   No.
7       Q.   To your knowledge, did Mr. Hesse
8   know that you were applying for a position
9   with the Lloyd Harbor Police Department?
10      A.   I believe he did.
11      Q.   How -- what's the basis for that
12  belief?
13      A.   Because I was talking about it
14  inside the station.
15      Q.   Directly to Mr. Hesse?
16      A.   He was passing by.
17      Q.   So who were you talking to?
18      A.   I believe -- I believe it was
19  Walter Muller.
20      Q.   When?
21      A.   The exact day I don't know.
22      Q.   Month and year?
23      A.   Maybe somewhere around the time
24  frame when I received the letter and made a
25  phone call.  2005.  Month, day I cannot be

Page 118

1            K. Lamm
2   specific.
3       Q.   I think you -- you sufficiently
4   answered that question.
5       MR. GOODSTADT: Objection.
6       Q.   Did Mr. Hesse stop as he was
7   passing by to engage you in a conversation
8   concerning this?
9       A.   In passing he said, "Oh, you're
10  applying to Lloyd Harbor?"  I said, "Yes."
11      Q.   Did he say anything else?
12      A.   No.
13      Q.   To your knowledge, did Mr. -- has
14  Mr. Hesse ever communicated with Lloyd
15  Harbor concerning your interest in a
16  position with them?
17      A.   Not to my knowledge.
18      Q.   Let's  -- do you recall alleging
19  or -- withdrawn.  Do you recall stating a
20  claim for relief in your lawsuit described
21  as civil conspiracy under state law?
22      MR. GOODSTADT: Objection.
23      A.   I don't recall right now.
24      Q.   Okay.  How did Defendant Hesse
25  and Ms. Sanchez conspire to unlawfully

Page 119

1            K. Lamm
2   destroy your career?
3       MR. GOODSTADT: Objection.
4       MR. NOVIKOFF: What's the basis
5   for the objection, counselor?
6       MR. GOODSTADT: To the extent
7   that "conspire" has a legal
8   connotation, he's a fact witness and,
9   you know, shouldn't be held to knowing
10  the definition of a legal claim in his
11  Complaint.
12      MR. NOVIKOFF: Sir, I'm just
13  asking him to give me the basis for the
14  allegation that he made, and I'll quote
15  from page 186, "as set forth above,
16  Defendants Hesse and Alison Sanchez
17  conspired to unlawfully destroy
18  Plaintiffs' careers."
19      MR. GOODSTADT: There's a legal
20  connotation to the word "conspire."
21      MR. NOVIKOFF: That's fine.
22      Q.   Sir, what did Defendant Hesse and
23  Alison Sanchez do that leads you to believe
24  that they "conspired to unlawfully destroy"
25  your career?

Page 120

1            K. Lamm
2       MR. GOODSTADT: Same objection.
3       MR. NOVIKOFF: Okay.
4       A.   According to the phone
5   conversation that Ed Carter had with George
6   Hesse about myself, Frank Fiorillo and
7   Joseph Nofi would never get any law
8   enforcement careers ever again in our life.
9       Q.   Motion -- okay.  Continue.  I
10  don't want to stop your answer.
11      A.   Thank you.  And with all the
12  knowledge that he has in Civil Service right
13  now, and he snickered.
14      THE COURT REPORTER: He what?
15      THE WITNESS: He snickered.
16      Q.   He snickered?
17      A.   Laughed.
18      Q.   Who snickered?
19      A.   George Hesse.
20      Q.   Oh, okay.  When you say all the
21  knowledge that he has in Civil Service, what
22  do you mean?
23      A.   Well, he was friends with Alison
24  Sanchez.
25      Q.   And you know this how?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 121

K. Lamm

1          K. Lamm
2     A.   Because he said that he had a
3  close friend in Civil Service one time when
4  we were in the police department and showed
5  her business card.
6     Q.   Did he say this to you?
7     A.   Yes, he did.
8     Q.   And what business card did he
9  show you?
10     A.   Alison Sanchez.
11     Q.   Okay.  When did he show you this?
12     A.   Sometime within the year of 2005.
13     Q.   Okay.
14     A.   End of 2004, beginning 2005.
15     Q.   And what was the context in which
16  he was showing you this card and making the
17  statement that he had a close friend in the
18  Civil Service Department?
19     A.   Again, please.
20     Q.   What was the context that led him
21  to tell you that he had a close friend in
22  the Civil Service Department and showed you
23  the business card?
24     A.   Because at that time, he was
25  hiring people to work in the department.

Page 122

1          K. Lamm
2     Q.   Okay.  And what led him, to your
3  recollection, to state that he had a close
4  friend in the Civil Service Department?
5     A.   Because these people that he was
6  hiring were not going through any Civil
7  Service requirements.
8     Q.   Okay.  Now when you say he hired,
9  was this before Chief Paridiso left or after
10  Chief Paridiso left?
11     A.   Exactly when Chief Paridiso left,
12  I don't know the exact date when he left.
13     Q.   I'm not asking when Chief
14  Paridiso left, not the date.  My question
15  is, when you just testified that you said
16  that George Hesse was hiring, was Chief
17  Paridiso at that time still working for the
18  police department, to your knowledge?
19     A.   To my knowledge, yes, he was.
20     Q.   Okay.  Now when I asked you the
21  question about, you know, before you
22  answered that you had a conversation with Ed
23  Snyder; is that correct?
24          MR. GOODSTADT: Objection.
25     Q.   Tom Snyder?

Page 123

1          K. Lamm
2     A.   I didn't say Tom Snyder.
3     Q.   Who did you say?
4     A.   Edward Carter.
5     Q.   Okay.  Other than what Mr. Carter
6  may have told you, what else, if anything,
7  is the basis for your allegation that
8  Mr. Hesse and Ms. Sanchez "conspired to
9  unlawfully destroy" your career?
10          MR. GOODSTADT: Objection.
11     A.   That is what I heard.
12     Q.   Okay.  So other than what you
13  heard from another source concerning a
14  conversation between George Hesse and
15  Mr. Carter, you have no other basis to
16  support that conclusion, do you?
17          MR. GOODSTADT: Objection.  He
18     testified to a different conversation
19     he had with George Hesse.
20          MR. NOVIKOFF: Sir, excuse me.
21     You can object.
22          MR. GOODSTADT: Because you're
23     misstating the testimony right now.
24          MR. NOVIKOFF: Then you can
25     object.

Page 124

1          K. Lamm
2          MR. GOODSTADT: I just did.
3          MR. NOVIKOFF: I don't need to
4     hear it unless I asked for it, which I
5     have and you've responded to it.
6          MR. GOODSTADT: I'm not going
7     to let you mislead the witness.
8          MR. NOVIKOFF: Then you can
9     object, sir.
10          MR. GOODSTADT: I am.  And I'm
11     protecting the record as well.  I'm not
12     letting you mislead the witness.
13     Q.   Sir, you've testified that --
14  that you heard of a conversation between
15  Mr. Hesse and Mr. Carter, correct?
16     A.   Correct.
17     Q.   Who told you about that
18  conversation?
19     A.   Ed Carter told me and I heard  --
20     Q.   That's all I'm asking.  Who told
21  you?
22     A.   Ed Carter.
23     Q.   Okay.  Did you hear about that
24  conversation from any other source, other
25  than Mr. Carter?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 125

```
 1        K. Lamm
 2    A.   No.
 3    Q.   Okay.  And that conversation that
 4 Mr. Carter told you about was between
 5 Mr. Hesse and who?
 6    A.   The conversation was between
 7 George Hesse and Edward Carter.
 8    Q.   Okay.  Now other than this
 9 conversation with Mr. Carter, that
10 Mr. Carter told you about, is there any
11 other basis for your claim that Mr. Hesse
12 and Ms. Sanchez "conspired to unlawfully
13 destroy" your career?
14        MR. GOODSTADT: Objection.
15    Both the form, has a legal conclusion
16    required in it, and it's been asked and
17    answered.
18        MR. NOVIKOFF: Okay.
19    A.   No.
20    Q.   Okay.  What acts did Mr. Hesse
21 and Ms. Sanchez do together, if any, that
22 you believe destroyed your career?
23    A.   Exactly?
24    Q.   Yeah.
25    A.   What they did, I can't pinpoint
```

Page 126

```
 1        K. Lamm
 2 exactly.  But from their closeness and, you
 3 know, that they have had and the way George
 4 Hesse says with all his Civil Service
 5 knowledge, I don't know what he was capable
 6 of doing.
 7    Q.   Sir, my question, sir, is to you,
 8 other than your speculation as to what
 9 Mr. Hesse is capable of doing, is there any
10 basis for you to conclude that Ms. Sanchez
11 and Mr. Hesse did anything together to
12 destroy your career?
13        MR. GOODSTADT: Objection.
14    A.   I couldn't -- I couldn't be
15 specific?
16    Q.   How about generally?
17    A.   No.
18    Q.   Generally what --
19    A.   That was my answer that I just
20 gave.
21    Q.   You got it.  Did, to your
22 knowledge, Mr. Hesse and Ms. Sanchez ever
23 meet to discuss destroying your career?
24    A.   They have met, but I don't know
25 in what their discussions were.
```

Page 127

```
 1        K. Lamm
 2 MO        MR. NOVIKOFF: Motion to strike
 3    as nonresponsive.
 4    Q.   Sir, do you have any knowledge as
 5 to whether or not Mr. Hesse and Ms. Sanchez
 6 ever met to discuss destroying your career?
 7    A.   No.
 8    Q.   The answer's no?
 9    A.   No.
10    Q.   Okay.  To your knowledge, sir,
11 did Mr. Hesse and Ms. Sanchez ever enter
12 into an agreement to destroy your career?
13    A.   Not that I'm aware of.
14    Q.   Was it "not that I'm aware of,"
15 is that the answer?  Okay.  So when you
16 allege in paragraph 186 that Defendant Hesse
17 and Ms. Sanchez "shared a mutual agreement
18 and understanding regarding their objective
19 to do so," what was the basis of that
20 allegation?
21        MR. GOODSTADT: Objection.
22    A.   Repeat the question again.
23    Q.   Sure.  You've alleged in
24 paragraph 186 that Mr. Hesse and Ms. Sanchez
25 conspired to unlawfully destroy your career,
```

Page 128

```
 1        K. Lamm
 2 and then you further allege that both
 3 Mr. Hesse and Ms. Sanchez "shared a mutual
 4 agreement and understanding regarding their
 5 objective to do so."  So my question to you
 6 is, what is the basis for the truthfulness
 7 of the allegation that "Mr. Hesse" -- I'm
 8 sorry, that Mr. Hesse and Ms. Sanchez
 9 "shared a mutual agreement and understanding
10 regarding their objective" to destroy your
11 career?
12        MR. GOODSTADT: Objection.
13        MR. NOVIKOFF: Okay.
14    A.   After I was being stated as a
15 Civil Service rat, George Hesse stated that,
16 you know, we will never get law enforcement
17 jobs again, so.
18    Q.   I understand that.  But what
19 evidence do you have that Ms. Sanchez had a
20 mutual agreement with Mr. Hesse to destroy
21 your legal career -- your -- your law
22 enforcement career?
23        MR. GOODSTADT: Objection.
24    A.   I don't.
25    Q.   What evidence can you point to
```

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 129

1          K. Lamm
2    that Ms. Sanchez had a mutual understanding
3    with Mr. Hesse to destroy your law
4    enforcement career?
5       A.   I don't know.
6       Q.   You then allege in 186, sir, that
7    Mr. Hesse and Ms. Sanchez "committed
8    numerous overt acts" in furtherance of the
9    plan to destroy your law enforcement career,
10   do you recall that?
11      A.   Yes.
12      Q.   What  -- do you have an
13   understanding as to what "overt" means?
14      A.   Sure.
15      Q.   What's your understanding of the
16   word "overt"?
17      A.   That they conspired together to
18   come up with the plan and  --
19      Q.   Okay.  What act that you allege
20   was undertaken between Hesse and Sanchez to
21   destroy your law enforcement career?
22          MR. GOODSTADT: Objection.
23      A.   It appeared as if that the way
24   they had this close relationship together,
25   and through discovery and emails that they

Page 130

1          K. Lamm
2    had together, they were hiring people to
3    work there uncertified without going through
4    any processing.  Therefore, the conversation
5    that Ed Carter had with George Hesse and
6    Hesse stating that he has Civil Service
7    knowledge, and to the fact that us three
8    mutts and rats will never get another law
9    enforcement job again, believes me  -- let's
10   me believe that they had something to do
11   with something about it.
12          MR. NOVIKOFF: Motion to
13      strike.
14      A.   And that's my answer.
15   MO       MR. NOVIKOFF: Go ahead.
16      Motion to strike as not responsive,
17      sir.
18      Q.   You've alleged that Hesse and
19   Sanchez committed numerous overt acts in
20   furtherance of their mutual understanding to
21   destroy your law enforcement career.  Name
22   me one act that Ms. Sanchez engaged in with
23   Mr. Hesse that supports your position that
24   they engaged in these acts to destroy your
25   career?

Page 131

1          K. Lamm
2          MR. GOODSTADT: Objection.
3       Q.   Do you understand my question?
4       A.   I understand your question.
5       Q.   Okay.
6       A.   I can't.
7       Q.   Do you recall claiming in this
8    lawsuit, sir -- I'm sorry.  Withdrawn.  Do
9    you recall alleging as a claim for relief in
10   this lawsuit, the "negligent retention of an
11   unfit employee under state law"?
12          MR. GOODSTADT: Objection.
13      A.   I don't recall.
14      Q.   Okay.  I'm going to show you what
15   is the -- I purport to be the Complaint that
16   was filed in this action, and I'm going to
17   refer your attention to paragraph -- to page
18   41, and ask you to look at the bolded
19   language in the parenthetical under the
20   words "as and for a 12th cause of action."
21          MR. GOODSTADT: Are you marking
22      this as an exhibit?
23          MR. NOVIKOFF: No.  It's the
24      Complaint.  I don't need to mark it as
25      an exhibit.  I'm not going to be using

Page 132

1          K. Lamm
2    it, other than to refresh his
3    recollection.
4          MR. GOODSTADT: What paragraph
5      are you on?
6          MR. NOVIKOFF: Page 41.
7          MR. GOODSTADT: And what
8      paragraph are you looking at?
9          MR. NOVIKOFF: Just underneath
10     the language "as and for a 12th cause
11     of action."
12      Q.   My question to your client is,
13   sir, please look at the language underneath
14   that which is in bold and which is in
15   parentheticals, which says "negligent
16   retention of an unfit employee under state
17   law," and once you read that, can you advise
18   me if reading that refreshes your
19   recollection as to whether or not you have
20   alleged a claim against my clients entitled
21   "negligent retention of an unfit employee
22   under state law"?
23      A.   "Unfit employee," which means to
24   me is that the people they were hiring were
25   not fit.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 133

K. Lamm

1      K. Lamm
2  MO      MR. NOVIKOFF: Sir, I'm not
3  asking you what you think it means. My
4  question is specific, and I'm going to
5  move to strike.
6      Q.   Does reading that one line, and
7  that's all I've asked you to read, the line
8  that's in bold and in the parentheticals,
9  does that refresh your recollection that
10  you've alleged in this case, a cause of
11  action sounding in negligent retention of an
12  unfit employee under state law?
13      MR. GOODSTADT: Objection.
14  Objection. For the record, every
15  single motion that Mr. Novikoff
16  purports to make during this deposition
17  are all opposed, and we reserve our
18  right to oppose them to the extent that
19  he actually raises them in some form
20  that this matters.
21      MR. NOVIKOFF: That -- that
22  goes without question, sir.
23      MR. GOODSTADT: I just want to
24  make the record clear.
25      MR. NOVIKOFF: Didn't need to.

Page 134

K. Lamm

1      K. Lamm
2      Q.   So that's my question. Does that
3  refresh your recollection, Mr. Lamm?
4      A.   No, it doesn't.
5      Q.   Okay. We don't need that
6  anymore.
7      MR. GOODSTADT: Can we just
8  take a two-minute break?
9      MR. NOVIKOFF: Sure.
10  Absolutely.
11      THE VIDEOGRAPHER: The time is
12  12:11 p.m. Going off the record.
13      (A break was taken.)
14      THE VIDEOGRAPHER: This begins
15  tape number three. The time is 12:20
16  p.m. Back on the record.
17      MR. NOVIKOFF: Just read my
18  last question and answer.
19      (The requested portion was read.)
20      Q.   Sir, you've alleged in this
21  Complaint the following, and I quote,
22  "Defendant Hesse, Ocean Beach, OBPD and
23  Suffolk County Civil Service deliberately
24  retained and advanced the careers of
25  uncertified and unqualified personnel who

Page 135

K. Lamm

1      K. Lamm
2  served alongside Plaintiffs as police
3  officers." My question to you, sir, is what
4  officers -- what officers are you referring
5  to when you claim that they were
6  uncertified, and I'm just looking for their
7  identities?
8      A.   Let me make sure I get this
9  straight. The officers that were
10  uncertified you said identity?
11      Q.   Yes. You've made allegations in
12  here that there were certain uncertified
13  officers, and I'm only interested now, for
14  the purpose of my question, is for you to
15  identify those officers that you're
16  referring to in this Complaint. In this
17  allegation that I just read.
18      A.   Arnold Hardman.
19      Q.   Okay.
20      A.   William Walsh, Dan Shook, Gary
21  Bosetti, Richard Bosetti, Patrick Cherry,
22  John Patrick Cherry, however he goes by John
23  Cherry. John Patrick Cherry. Patrick John
24  Cherry.
25      Q.   Same guy?

Page 136

K. Lamm

1      K. Lamm
2      A.   Same guy.
3      Q.   Okay. Anybody else?
4      A.   Senior.
5      Q.   I understand.
6      A.   John Dyer. That's what -- that's
7  what comes to my knowledge right now at this
8  time.
9      Q.   Who hired Andrew Hardman? I'm
10  sorry. Withdrawn. When was Andrew Hardman
11  hired, to your knowledge?
12      MR. GOODSTADT: Objection.
13      A.   I don't know who Andrew Hardman
14  is.
15      Q.   Okay. When you said "Hardman,"
16  who was the first name?
17      A.   Arnold Hardman.
18      Q.   Arnold. Okay. Fine. To your
19  knowledge, when was Arnold Hardman hired by
20  Ocean Beach?
21      A.   2003.
22      Q.   To your knowledge, when was
23  Mr. Walsh hired by Ocean Beach?
24      A.   2003.
25      Q.   To your knowledge, when was Dan

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 137

1           K. Lamm
2  Shook hired by Ocean Beach?
3      A.   Could have been 2003 or 2004.
4      Q.   To your knowledge, when was Gary
5  Bosetti hired?
6      A.   2002.  Excuse me, sir.  It's
7  2002.  I'd like to add to that list Thomas
8  Schor.
9      Q.   Okay.  When was Richard Bosetti
10 hired by Ocean Beach, to your knowledge?
11     A.   2002.
12     Q.   To your knowledge, when was John
13 Pat Cherry hired?
14     A.   2004.
15     Q.   To your knowledge, when was John
16 Dyer hired?
17     A.   2004.
18     Q.   To your knowledge, when was
19 Thomas Schor hired?
20     A.   Maybe 2003, approximately.
21     Q.   To your knowledge, who made the
22 final decision to hire Mr. Hardman?
23     A.   To my knowledge, it would be
24 George Hesse.
25     Q.   What was the basis of your

Page 138

1           K. Lamm
2  knowledge?
3      A.   Because he hired them.
4      Q.   How do you know he hired them?
5      A.   Because he had a list of names of
6  people that he was looking to hire.
7      Q.   To your knowledge, did
8  Mr. Hardman's employment have to be approved
9  by Mr. Paridiso?
10     A.   Did you say "employment" or
11 "unemployment"?
12     Q.   His employment.  To your
13 knowledge, did Mr. Paridiso have to approve,
14 in any manner, the hiring of Mr. Hardman?
15     A.   I don't believe so.  George was
16 the sergeant and he was doing the hiring.
17     Q.   How do you know he was doing the
18 hiring?
19     A.   Because he had the list of names
20 on his desk saying that who he was going to
21 hire.
22     Q.   I understand that.  But my
23 question is to you, how do you know, as you
24 sit here today, that Mr. Hesse didn't have
25 to get approval by Mr. Paridiso?

Page 139

1           K. Lamm
2      A.   Maybe he did.  I --
3      Q.   That's what my question is, do
4  you know?
5      A.   That's why I said to my
6  knowledge, it was George Hesse that did the
7  hiring.
8      Q.   Then let me rephrase my question.
9  As you sit here today, do you know if
10 Mr. Hesse had to get approval by
11 Mr. Paridiso to hire Mr. Hardman?
12     A.   I don't know.
13     Q.   Same question with regard to
14 Mr. Walsh?
15     A.   I don't know.
16     Q.   Same question with regard to
17 Mr. Shook?
18     A.   I don't know.
19     Q.   Same question with regard to Gary
20 Bosetti?
21     A.   I don't know.
22     Q.   Same question with regard to
23 Richard Bosetti?
24     A.   I don't know.
25     Q.   Same question with regard to Pat

Page 140

1           K. Lamm
2  Cherry?
3      A.   I don't know.
4      Q.   Same question with regard to John
5  Dyer?
6      A.   I don't know.
7      Q.   Same question with regard to
8  Thomas Schor?
9      A.   I don't know.
10     Q.   As of the date that your
11 employment relationship ended with Ocean
12 Beach, was Mr. Hardman, to your knowledge,
13 still an employee?
14     A.   Yes, he was.
15     Q.   Same question with regard to
16 Mr. Walsh?
17     A.   I don't believe he was.
18     Q.   Same question with regard to
19 Mr. Shook?
20     A.   Not for certain.  I don't know.
21     Q.   Same question with regard to Gary
22 Bosetti?
23     A.   Yes, he was still employed.
24     Q.   Same question with regard to
25 Richard Bosetti?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 141

1        K. Lamm
2    A.   Yes, he was.
3    Q.   Same question with regard to Pat
4 Cherry?
5    A.   Yes, he was.
6    Q.   As a police officer or in some
7 other capacity?
8    A.   At that time, I believe they made
9 him a dispatcher after he was hired as a
10 police officer.
11    Q.   I got that.  Okay.  Same question
12 as regard to Mr. Dyer?
13    A.   No.  He -- at that time, no, he
14 wasn't.
15    Q.   Same question as regard to
16 Mr. Schor?
17    A.   Yes, he was still employed.
18    Q.   As a police officer?
19    A.   Yes, he was.  Excuse me,
20 Mr. Novikoff, if you don't mind.  Something
21 just came to my head if I can -- about a
22 question previously.
23    Q.   Well, what was the question?
24    A.   About George Hesse and Alison
25 Sanchez.  About how they conspired.

Page 142

1        K. Lamm
2    Q.   I'll let your counsel ask you
3 that question then.  Well, you know what,
4 tell me.  Tell me what you want to say.
5    A.   Because at the time we went to
6 Civil Service to complain, her name was
7 Alison Chester.
8    Q.   Okay.
9    A.   And we wanted to know about our
10 termination and how it was going to affect
11 previous employment, and she -- she stated
12 that it wouldn't and this would remain
13 confidential.
14    Q.   Okay.
15    A.   That meeting that we had.  So
16 after we left, and we have on Edward
17 Carter's tape, that George Hesse stated that
18 there was a phone -- telephone conversation
19 between Alison Sanchez and George Hesse
20 together about our termination.
21    Q.   Okay.  Other than that -- well,
22 do you -- do you know -- were you a
23 participant in the phone conversation with
24 George Hesse and Alison Carter, Alison
25 Chester?

Page 143

1        K. Lamm
2        MR. GOODSTADT:  Objection.
3    A.   No, I was not.
4    Q.   Do you know specifically what
5 they discussed in that phone conversation?
6    A.   No, I don't.
7    Q.   Do you know if Alison Chester --
8 do you have knowledge as you sit here today
9 as to whether Alison Chester agreed with
10 George Hesse in that phone conversation to
11 destroy your career?
12        MR. GOODSTADT:  Objection.
13    A.   No, I don't.
14    Q.   Do you know if Alison Chester, in
15 that phone conversation with Mr. Hesse,
16 agreed to do anything with Mr. Hesse to
17 destroy your career?
18        MR. GOODSTADT:  Objection.
19    A.   No, I don't.
20    Q.   Okay.  So let's go back to the
21 names that we were talking about.  You
22 allege that these officers were uncertified.
23 You also allege that they were unqualified.
24 In your mind, is there a difference between
25 being uncertified and unqualified as you use

Page 144

1        K. Lamm
2 those terms in this Complaint?
3    A.   Uncertified through Civil Service
4 and unqualified meaning the requirements as
5 per the Suffolk County Police Department.
6    Q.   With regard to unqualified, is
7 that the -- is the failure to adhere to
8 certain requirements of the Suffolk County
9 Police Department the only basis for you to
10 believe that certain officers were
11 unqualified?
12    A.   Unqualified meaning that
13 according to the standards of the Suffolk
14 County Police Department, to work in that
15 department would be unqualified.
16    Q.   Okay.  So you have a distinction
17 between uncertified and unqualified?
18    A.   Yes.
19    Q.   Okay.  Perfect.
20    A.   As my distinction.
21    Q.   Yes.  That's all.  I'm only
22 asking about your distinction.
23    A.   Just making it clear.
24    Q.   You got it.  You then go on --
25 well, there's an allegation that the careers

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 145

K. Lamm

1    K. Lamm
2  of these uncertified and unqualified
3  personnel were advanced, what do you mean by
4  "advanced"?
5      A.   They kept their jobs and we were
6  fired.
7      Q.   Okay.  Got it.  Then you allege
8  that "while Defendant Loeffler, Mayor of
9  Ocean Beach, negligently permitted Hesse to
10 do so," do you see that?
11     A.   See what?
12     Q.   I'm sorry.  Do you recall making
13 that allegation?
14     A.   You have to repeat that, sir.
15     Q.   Okay.  You've alleged in
16 paragraph 176 the following, "as set forth
17 above, Defendant Hesse, Ocean Beach, OBPD
18 and Suffolk County Civil Service
19 deliberately retained and advanced the
20 careers of uncertified and unqualified
21 personnel who served alongside Plaintiffs as
22 police officers" -- and this is the key part
23 of the allegation -- "while Defendants" --
24 I'm not asking you to refer to that, unless
25 you need it.

Page 146

1    K. Lamm
2      MR. GOODSTADT:  You just read a
3  long paragraph.
4      Q.   I understand.  "While Defendant
5  Loeffler, Mayor of Ocean Beach, negligently
6  permitted Hesse to do so."  Do you recall
7  making that allegation?
8      A.   You just read that from here?
9      Q.   Yeah.  176.
10     A.   Do you mind if I take the time to
11 read that?
12     Q.   Take the time to read that first
13 sentence of 176 and tell me when you're
14 done.
15     A.   Are you only asking me about the
16 first sentence or the whole entire thing?
17     Q.   That's -- just the first
18 sentence.  If I ask you about the second
19 sentence, you be more than happy to read it.
20     A.   Just making sure.
21     Q.   You got it.
22     A.   All right.  And what was your
23 question to that?
24     Q.   Well, the question was, do you
25 recall making that allegation?

Page 147

1    K. Lamm
2      A.   Right.  Because they kept their
3  jobs.
4      Q.   No.  No.  The question is just do
5  you recall making that allegation?
6      A.   Yes.
7      Q.   Okay.  So now let's focus
8  specifically on that part of the allegation
9  that refers to Defendant Loeffler, do you
10 see that?
11     A.   Yes.
12     Q.   Now on April 2, 2006, when you
13 say your relationship with the Ocean Beach
14 Police Department ended, was Mr. Loeffler
15 the mayor?
16     A.   No.  I believe Natalie Rogers
17 was.
18     Q.   And I believe you've alleged that
19 the -- the advancement of the careers that
20 you state in this paragraph refers to the
21 fact that you no longer were employed by
22 Ocean Beach, but other uncertified and
23 unqualified officers kept their jobs; is
24 that correct?
25     A.   Yes.

Page 148

1    K. Lamm
2      Q.   Okay.  What specifically can you
3  tell the jury that is going to be watching
4  this videotape, that Mr. Loeffler did prior
5  to April 2, 2006, that you allege permitted
6  Hesse to advance the careers of these
7  unqualified and uncertified officers?
8      A.   Loeffler was the police liaison
9  of the department, so anything that happened
10 in that department, he would have known.
11     Q.   How do you know that?
12     A.   Because --
13     Q.   Not that he was police liaison.
14 How do you know what the duties and
15 responsibilities are of the police liaison?
16     A.   The police liaison, as to what I
17 understand it to be, is the overseer of the
18 department.
19     Q.   How do you -- what is your
20 understanding based on?  Did you read
21 something?
22     A.   I didn't read anything.
23     Q.   So you haven't read anything that
24 described what the duties and
25 responsibilities of the police liaison were,

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 149

K. Lamm

1
2 were you? Did you?
3    A.    No.
4    Q.    Did Mr. Loeffler ever tell you
5 what the duties and responsibilities of the
6 police liaison was?
7    A.    No.
8    Q.    How about Mayor Rogers, did she
9 ever tell you?
10   A.    No.
11   Q.    Did George Hesse ever tell you?
12   A.    No.
13   Q.    Did sergeant -- I'm sorry, did
14 Chief Paridiso ever tell you?
15   A.    No.
16   Q.    Did any board of trustee member
17 ever tell you?
18   A.    No.
19   Q.    Did any village official ever
20 tell you what the duties and
21 responsibilities of a police liaison were?
22   A.    No.
23   Q.    Did Mr. Nofi ever tell you?
24   A.    No.
25   Q.    How about Mr. Carter?

Page 150

K. Lamm

1
2    A.    No.
3    Q.    How about Mr. Snyder?
4    A.    No.
5    Q.    How about Mr. Fiorillo?
6    A.    No.
7    Q.    Any police officer ever tell you
8 what the duties and responsibilities of the
9 police liaison was who worked for Ocean
10 Beach?
11   A.    No.
12   Q.    Did any human being ever tell you
13 what the duties and responsibilities were of
14 the police liaison for the Ocean Beach
15 Police Department prior to April 2, 2006?
16   A.    No.
17   Q.    Let's stick with you now,
18 Mr. Lamm. What danger were you exposed to
19 by the negligent retention of what you claim
20 to be unfit employees? Now my question is
21 not what damages have you suffered, my
22 question is, what dangers have you been
23 exposed to?
24   A.    The dangers are --
25   Q.    Or were you exposed to?

Page 151

K. Lamm

1
2    A.    Exposed to was that these
3 officers that were -- what did you say,
4 unfit?
5    Q.    Well, you said unfit, sir.
6    A.    Well, just now I'm saying what
7 you said.
8    Q.    Okay.
9    A.    Unfit, uncertified, unqualified.
10 You know, they were drinking on duty and
11 carrying a loaded fire arm. That could have
12 put anybody in danger. Also, for the fact
13 that being that they did not complete the
14 Suffolk County Police Academy, they did not
15 know the proper radio procedure as to call
16 in assistance or for back up or acknowledge
17 radio transmissions from any other officer.
18   Q.    But my question to you, sir, is
19 what danger were you specifically exposed
20 to?
21       MR. GOODSTADT: Objection. He
22    just testified to it.
23       MR. NOVIKOFF: Okay. I don't
24    think he did, but I'm asking the
25    question again.

Page 152

K. Lamm

1
2    A.    That was all possible dangers
3 that could have happened.
4    Q.    Okay. Then let me ask you this,
5 Mr. Lamm. What dangers in fact happened as
6 it pertains to you specifically that you
7 claim resulted from the negligent retention
8 of an unfit employee?
9       MR. GOODSTADT: Objection.
10   A.    To me specifically, none. But to
11 the public, it could have been.
12   Q.    Well, thank you for protecting
13 the public.
14   A.    You're welcome.
15 MO   Q.    But my question is to you, sir --
16 and I'm going to move to strike the
17 answer -- what dangers specifically occurred
18 to you as a result of what you claim to be
19 the negligent retention of an unfit
20 employee?
21       MR. GOODSTADT: Objection.
22   A.    None to me.
23   Q.    Okay. In paragraph 178 -- and
24 I'll read it, it's a short paragraph -- "as
25 a direct and proximate result of Defendants

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 153

K. Lamm

1 Hesse, OBPD, Loeffler and Ocean Beach's
2 breach of duty to supervise, Plaintiffs have
3 been injured and have incurred damages
4 thereby." How have you, Mr. Lamm, been
5 injured as a result of Hesse, OBPD, Loeffler
6 and Ocean Beach's breach of a duty to
7 supervise?
8
9         MR. GOODSTADT: Objection.
10     A.   I'm going -- what was that, 178?
11        MR. GOODSTADT: That's 178.
12     A.   I'd like to look at that, if
13 that's okay.
14     Q.   You can certainly look at it.
15 Take as much time as you want.
16     A.   Thank you. (Reviewing).
17     Q.   Would you like the question
18 repeated?
19     A.   Sure.
20        MR. NOVIKOFF: If the court
21 reporter can read the question back.
22        (The requested portion was read.)
23     A.   Nothing that directly pertains to
24 me.
25     Q.   What damages have you incurred --

Page 154

K. Lamm

1
2 withdrawn. What monetary damages have you
3 incurred as a result of what you claim to be
4 Defendants' Hesse, OBPD, Loeffler and Ocean
5 Beach's breach of duty to supervise?
6        MR. GOODSTADT: Objection.
7     A.   None that I can think of at this
8 time.
9     Q.   What injuries have you suffered,
10 Mr. Lamm, as a result of what you claim to
11 be a negligent retention of unfit employees?
12        MR. GOODSTADT: Objection.
13     A.   Damages that I have suffered
14 is --
15     Q.   No. The injuries. Not damages.
16 What injuries have you suffered. We'll get
17 to damages in the next question.
18        MR. GOODSTADT: Objection.
19     Q.   So I'll repeat the question.
20 What injuries, what physical injuries have
21 you suffered as a result of what you claim
22 to be a negligent retention of unfit
23 officers?
24        MR. GOODSTADT: Objection.
25     Q.   By Ocean Beach, by the Mayor --

Page 155

K. Lamm

1
2 Mayor Loeffler, by Hesse and by any other
3 Defendant?
4        MR. GOODSTADT: Objection.
5     A.   No -- no physical injury.
6     Q.   What mental injury have you
7 suffered as a result of what you claim to be
8 the negligent retention of an unfit police
9 officer by Ocean Beach?
10     A.   Just mentally I feel that after
11 all that I have been through to get that job
12 as a police officer and being certified,
13 it's disheartening to see that I no longer
14 work there and there are people that are
15 uncertified that still hold a police
16 position.
17        MR. GOODSTADT: Guys, let me
18        just note my objection to that last
19        question as well.
20     Q.   What monetary damages do you
21 claim to have suffered as a result of what
22 you allege to be a negligent retention of an
23 unfit employee?
24        MR. GOODSTADT: Objection.
25     A.   Furthering my career as a police

Page 156

K. Lamm

1
2 officer where I could have advanced, and
3 also, I could have been working full time
4 for the Ocean Beach Police Department if I
5 had received a canvas letter after passing
6 that police test.
7 MO       MR. NOVIKOFF: Motion to strike
8        as nonresponsive.
9     Q.   Sir, you claim in this lawsuit
10 that while you were still employed by Ocean
11 Beach, they hired officers who were both
12 uncertified and unqualified, correct?
13     A.   Correct.
14     Q.   Okay. Now, my question to you
15 is, prior to the last day of your employment
16 with Ocean Beach, what monetary damages did
17 you suffer as a result of the retention of
18 what you claim to be uncertified and
19 unqualified police officers while you were
20 still employed by Ocean Beach?
21        MR. GOODSTADT: Objection.
22        MR. NOVIKOFF: Okay.
23     A.   None that I can think of at this
24 time.
25     Q.   Let's go to paragraph 177, and

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 157

1         K. Lamm
2  there's a reference to an incident that
3  occurred on October 30, 2004, do you see
4  that?
5     A.   177?
6     Q.   Yeah, 177.
7     A.   Of the same page?
8     Q.   It starts on page 41 and goes on
9  to page 42.  So if you need to read the
10  whole paragraph, that's fine, too.
11        MR. GOODSTADT: Why don't you
12  do that.
13    Q.   And then tell me when you're done
14  reading it.
15    A.   (Reviewing).  Okay.  I'm
16  completed.
17    Q.   You've completed reading that?
18    A.   Yes, sir.
19    Q.   Okay.  Now you see there's a
20  reference to an incident that took place on
21  October 30, 2004?
22    A.   Okay.
23    Q.   Would -- yes?
24    A.   Go ahead.
25    Q.   And would you agree with me that

Page 158

1         K. Lamm
2  you've described this incident in the
3  Complaint as the Halloween incident?
4     A.   Yes, sir.
5     Q.   Okay.  And we'll get into the
6  details of that after lunch, but would you
7  agree with me it involved allegations of a
8  fight involving a police officer and three
9  civilians?
10    A.   Yes.  Uncertified police officer.
11    Q.   Well,  thank you for adding that,
12  but police officers?
13    A.   Just want to make it correct.
14    Q.   Sure.
15    A.   Welcome.
16    Q.   Do you have any knowledge as to
17  whether or not any of these three civilians
18  who were involved in this alleged attack,
19  ever pled guilty to any crimes relating to
20  this incident?
21    A.   If they ever pled guilty?
22    Q.   Yeah.
23    A.   To that crime?
24    Q.   To any crimes involving the
25  events taken place on October 30, 2004 and

Page 159

1         K. Lamm
2  to October 31, 2004?
3     A.   I don't know.  I'm unaware.
4     Q.   You don't know if -- if
5  Mr. Vankoot ever allocuted to a charge as it
6  pertains to the events concerning the
7  Halloween incident?
8     A.   My personal knowledge of whatever
9  he said of it, no.  From --
10    Q.   My question to you is, are you
11  aware of whether you were in a courtroom on
12  a particular date, whether you read it in
13  the newspaper, whether someone told you or
14  whether a rock was thrown through your
15  window, are you aware as to whether
16  Mr. Vankoot ever allocuted to a charge?
17    A.   Yes.  Yes.
18    Q.   Okay.  Are you aware as to
19  whether or not any of the other two
20  civilians ever allocuted to a charge
21  concerning any of the events that took place
22  in what is referred to as the Halloween
23  incident?
24        MR. GOODSTADT: Objection.
25    A.   Yes.

Page 160

1         K. Lamm
2     Q.   Okay.  What other civilian --
3  what other of the two civilians pled or
4  allocuted to a charge?
5     A.   Chris Shalick.  And I believe --
6  I believe it was John Tesoro, if that's
7  correct with the name.
8     Q.   So if I understand correctly, all
9  three of the civilians that were involved in
10  the Halloween incident, allocuted to certain
11  criminal charges concerning the events of
12  that evening?
13        MR. GOODSTADT: Objection.
14        Just so we're clear, which three
15        civilians are you talking about,
16        because I think Gary Bosetti was a
17        civilian also that night and so was
18        Richie Bosetti?
19    Q.   We're talking about -- okay.  The
20  three you just mentioned, Tesoro, Shalick
21  and -- and Vankoot, those three civilians.
22    A.   I'm not accurate about Tesoro
23  about a charge or not, but Christopher
24  Shalick, yes.
25    Q.   Okay.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 161

K. Lamm
1
2  A.   And --
3  Q.   Vankoot?
4  A.   Vankoot, yes.
5  Q.   What charge are you aware of that
6  Vankoot allocuted to?
7  A.   I'm not specific if it was a
8  disorderly conduct or not, but I know that
9  there was something.
10  Q.   What charge did Shalick allocute
11  to, to your knowledge?
12  A.   Could have been a disorderly
13  conduct as well.
14  Q.   How long after the Halloween
15  incident, to your knowledge, did these two
16  individuals allocute to these charges?
17  A.   Several months after the incident
18  I believe.
19  Q.   So we're still in the 2004 time
20  period?
21  A.   No.  I believe it was after that.
22  Q.   You believe it was -- when you
23  say several months, if the incident was
24  October 30, 2004, what do you mean by
25  "several months"?  Where does -- where does

Page 162

K. Lamm
1
2  that take us in the calendar?
3  A.   Probably sometime around the
4  month of June.
5  Q.   June of 2005?
6  A.   Um-hum.
7  Q.   So you believe several months
8  is -- is eight months?
9  A.   From by the  -- I believe that's
10  when -- I didn't know anything about --
11  about this until June of 2005 as -- as to
12  know what exactly happened over it because
13  we were kept out of the loop of any type of
14  investigation.  So I can only tell you from
15  that time span as to what I have heard.
16  MO       MR. NOVIKOFF: Motion to strike
17  as nonresponsive.
18  Q.   Is your definition of "several
19  months," eight months, sir?
20  MR. GOODSTADT: Objection.
21  A.   Approximately seven months.
22  Q.   And is it your testimony, sir,
23  that after the incident, the Halloween
24  incident, you were unaware of what
25  transpired regarding any of the alleged

Page 163

K. Lamm
1
2  victims until June of 2005?
3  A.   We were kept out of --
4  Q.   Is that your testimony, yes or
5  no, that between the October 30 incident and
6  June of 2005, you were unaware of what
7  transpired with regard to these victims?
8  MR. GOODSTADT: Answer the
9  question the way you want to answer it.
10  Q.   Can you answer that yes or no?
11  A.   I don't know what fully happened.
12  How the termination was made.
13  Q.   Can you answer the question yes
14  or no?  If you can't, then you can't and
15  you'll tell me that.  So I'm going to ask
16  you the question again.  Is it your
17  testimony that after your involvement in
18  investigating the incident on the evening of
19  Halloween until June of 2005, you were
20  unaware of what transpired with regard to
21  the alleged victims?
22  MR. GOODSTADT: Objection.
23  Q.   And if I'll ask --
24  MR. GOODSTADT: The testimony
25  is his testimony.

Page 164

K. Lamm
1
2  Q.   I'm asking for a yes or no, sir,
3  and if you can't answer yes or no, then
4  please tell me and I'll choose whether or
5  not to ask you a follow-up question.
6  MR. GOODSTADT: Objection.
7  A.   No.  I only know of what happened
8  after the time frame had passed.
9  MR. NOVIKOFF: Got it.  Okay.
10  Let's take a lunch break.  It's now
11  12:51.
12  THE VIDEOGRAPHER: The time is
13  12:51 p.m.  Going off the record.
14  (A break was taken.)
15  THE VIDEOGRAPHER: The time is
16  1:38 p.m.  Back on the record.
17  Q.   Sir, do you recall in this
18  Complaint, asserting a cause of action
19  entitled "termination in violation of public
20  policy under state law"?
21  A.   I don't recall right -- right
22  now.
23  Q.   Well, I would ask you, since you
24  have the Complaint in front of you, to look
25  at page 40, and specifically, just the bold

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 165

K. Lamm

1       K. Lamm
2  language in parentheticals under the "as and
3  for an 11th cause of action," and then once
4  you just look at that one sentence, tell me
5  if that refreshes your recollection.
6       A.   (Reviewing).
7       Q.   Sir, does reading that one
8  sentence refresh your recollection?
9       A.   No.
10      Q.   Okay.  Well, what public policy
11 of New York State do you claim in this
12 lawsuit that my clients have violated?
13      MR. GOODSTADT: Objection.
14      Q.   Okay.  Now the answer won't be
15 there.  That's why I'm asking the question.
16 What public policy of New York State are you
17 claiming in this lawsuit that my clients
18 have violated?
19      MR. GOODSTADT: Objection.
20      You can read the section if you want.
21      A.   I can?
22      MR. GOODSTADT: Unless he
23      instructs you not to.
24      Q.   Yeah.  I don't think I need you
25 to read that to answer the question.  If you

Page 166

1       K. Lamm
2  don't know, you don't know.
3       A.   I don't know at this time.
4       Q.   Do you think reading the five
5  allegations set forth under the 11th cause
6  of action would help you answer that
7  question?
8       MR. GOODSTADT: Objection.
9       A.   It may.
10      Q.   Then why don't you go read
11 paragraphs 170 to 174, and tell me, after
12 you read that, if you can -- as to what
13 public policy of New York State you claim my
14 clients have violated?
15      MR. GOODSTADT: Objection.
16      A.   (Reviewing).  The exact public
17 policy I just -- I don't know.
18      Q.   And if I asked you the same
19 question with regard to any of the
20 Defendants, would your answer be the same?
21      MR. GOODSTADT: Objection.
22      A.   I can't speak for any of the
23 other Defendants.
24      Q.   Oh no.  My question is, what
25 public policy do you claim in this lawsuit

Page 167

1       K. Lamm
2  that any of the Defendants violated as
3  alleged in your 11th cause of action?
4       MR. GOODSTADT: Objection.
5       A.   At this time, I don't recall.
6       Q.   Is there anything in your
7  possession, custody or control that would
8  refresh your recollection?
9       MR. GOODSTADT: Objection.
10      Q.   Do you understand my question,
11 sir?
12      A.   Why don't you try to rephrase it
13 a little better for me.
14      Q.   Oh no.  I think I phrased it
15 particularly well, so I'll ask the court
16 reporter to read the question back.
17      (The requested portion was read.)
18      MR. GOODSTADT: Note my
19      objection again.
20      A.   I don't know.
21      Q.   Let's go to paragraph 171, sir.
22 You allege the following, in part, "as set
23 forth above, Defendants terminated
24 Plaintiffs' employment because Plaintiffs
25 complied with and/or refused to violate laws

Page 168

1       K. Lamm
2  and regulations governing law enforcement
3  personnel in Ocean Beach, Suffolk County and
4  the State of New York," do you see that?
5       A.   Yes.
6       Q.   What law and regulations
7  governing law enforcement personnel in Ocean
8  Beach, Suffolk County and the State of New
9  York did you comply with as you refer to it
10 in this allegation?
11      MR. GOODSTADT: Objection.
12      A.   I complied with being an ethical
13 police officer.
14      Q.   What law can you point to that
15 refers to being an ethical police officer?
16      MR. GOODSTADT: Objection.
17      A.   I don't know.
18      Q.   What regulation that's referenced
19 in paragraph 71 can you identify that refers
20 to being an ethical police officer?
21      MR. GOODSTADT: Objection.
22      A.   Code of conduct in Ocean Beach.
23      Q.   Okay.  Any -- anything else?
24      MR. GOODSTADT: Objection.
25      A.   Nothing at this time.

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 46 of 122 PageID #: 1904

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 169

K. Lamm

1         K. Lamm
2    Q.   Okay.  So you've testified that
3  you were terminated because you complied
4  with being an ethical police officer.  What
5  other law or regulation, other than being an
6  ethical police officer, did you comply with
7  as you refer to it in this paragraph of the
8  Complaint?
9         MR. GOODSTADT: Objection.
10   A.   I'm not for sure.
11   Q.   Okay.  Take the flip of it now.
12  What law or regulation governing law
13  enforcement personnel in Ocean Beach,
14  Suffolk County and the State of New York did
15  you refuse to violate?
16        MR. GOODSTADT: Objection.
17   Q.   As you refer to it in paragraph
18  171 of the Complaint?
19        MR. GOODSTADT: Objection.
20   A.   Repeat that, please.
21        MR. NOVIKOFF: Court reporter.
22        (The requested portion was read.)
23   A.   I don't know.
24   Q.   Did you know it when you read the
25  Complaint for truthfulness and accuracy?

Page 170

K. Lamm

1         K. Lamm
2         MR. GOODSTADT: Objection.
3    A.   I may have.
4    Q.   But you don't know it now?
5         MR. GOODSTADT: Objection.
6    Q.   Is that your testimony?
7    A.   My answer was my answer.
8    Q.   Okay.  Do you recall if you've
9  alleged as against Defendant Hesse and the
10  Ocean Beach Police Department, defamation
11  per se under state law in this Complaint?
12   A.   Do I -- I don't think I
13  understand what you said there.
14   Q.   Do you recall if you've alleged
15  against Hesse and the Defendant Ocean Beach
16  Police Department, that they have engaged in
17  what you identify as defamation per se under
18  state law in this Complaint?
19        MR. GOODSTADT: Objection.  You
20        just said he identified it in the
21        Complaint.
22   Q.   Do you recall doing that?
23   A.   Yes.
24   Q.   Did Mr. Loeffler defame you in
25  any manner?

Page 171

K. Lamm

1         K. Lamm
2    A.   Not that I'm aware of.
3    Q.   Did Mayor Rogers defame you in
4  any manner?
5    A.   Not that I'm aware of.
6         MR. GOODSTADT: Objection.
7  Over objection.
8    Q.   I'm sorry, as your counsel was
9  objecting, you were answering, so.
10   A.   Not that I'm aware of.
11        MR. GOODSTADT: Just note my
12        objection to the question before it as
13        well.
14        MR. NOVIKOFF: It's noted.
15   Q.   Let's look at 164A.  You allege
16  "Defendants Hesse and OBPD published
17  defamatory statements about Plaintiffs,
18  including without limitation assertions
19  that:  A. (Plaintiffs were dishonest men,
20  "rats" and rogue law enforcement officers)
21  April 2, 2006)."  What did you mean when you
22  referred to April 2, 2006?
23   A.   That was the day we were fired.
24   Q.   Does that day have anything to do
25  with subparagraph A?

Page 172

K. Lamm

1         K. Lamm
2    A.   Because I was accused of being a
3  Civil Service rat.
4    Q.   Okay.  Who accused you of being a
5  Civil Service rat?
6    A.   George Hesse, Rich Bosetti and
7  Gary Bosetti.
8    Q.   Okay.  Well, did they do it
9  altogether?  Yes or no.  Were they together
10  at the same time when they accused you of
11  being a Civil Service rat?
12   A.   No.
13   Q.   Okay.  When on April 2, 2006 did
14  George Hesse call you a Civil Service rat?
15   A.   He didn't on April 2.
16   Q.   When did George Hesse at any time
17  call you a Civil Service rat?
18   A.   Approximately towards the summer
19  season of 2004.
20   Q.   Did Mr. Hesse call you a Civil
21  Service rat in your presence, yes or no?
22   A.   Not in my direct presence, but
23  within proximity.
24   Q.   Did you hear Mr. Hesse call you a
25  Civil Service rat when you were in close

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 173

1        K. Lamm
2 proximity of him in the summer season of
3 2004?
4      A.   Yes.
5      Q.   Who else, if anybody, was
6 present, to your recollection, when
7 Mr. Hesse called you a Civil Service rat in
8 2000 -- in the summer season of 2004?
9      A.   I don't recall.
10     Q.   Okay.  What specifically do you
11 recall hearing Mr. Hesse say with regard to
12 you being a Civil Service rat in the summer
13 season of 2004?
14     A.   He stated that he's one of the
15 Civil Service rats.
16     Q.   And did he use your name
17 specifically in this communication?
18     A.   Yes.
19     Q.   So what specifically did he say?
20        MR. GOODSTADT: Objection.
21 Asked and answered.
22     Q.   In regard to him using your name?
23 You just testified that he said "he is one
24 of the Civil Service rats."  Did he mention
25 your name specifically in this defamatory

Page 174

1        K. Lamm
2 statement?
3      A.   The name came out of Richard
4 Bosetti.  My name.
5      Q.   I'm only talking about George
6 Hesse now, sir.  Did George Hesse
7 specifically refer to you, Kevin Lamm, by
8 name when he said the term "a Civil Service
9 rat"?
10     A.   No.  I don't believe so.
11     Q.   Did he point at you when he said
12 this?
13     A.   No.
14     Q.   Where did this communication take
15 place?
16     A.   That was inside the police
17 station.
18     Q.   Now did he call you a Civil
19 Service rat, using those exact words, at any
20 point in time after the summer season of
21 2004?
22     A.   That I don't recall.
23     Q.   Did Mr. Hesse refer to you
24 specifically as a dishonest man at any point
25 in time?

Page 175

1        K. Lamm
2      A.   No.
3      Q.   Did Mr. Hesse say anything in
4 your -- well, withdrawn.  What, if
5 anything, did Mr. Hesse say that led you to
6 allege that he defamed you by asserting that
7 you were a dishonest man as you say in 164A?
8        MR. GOODSTADT: Objection.
9      A.   Say the question again, please.
10        MR. NOVIKOFF: The court
11 reporter can read it back.
12        (The requested portion was read.)
13     A.   I don't recall.
14     Q.   Is there anything in your
15 possession, custody or control that would
16 refresh your recollection?
17     A.   I don't think so.
18     Q.   Did Mr. Hesse, in your -- well,
19 did Mr. Hesse ever call you "a rogue law
20 enforcement officer"?
21     A.   I don't believe so.
22     Q.   What, if anything, did George
23 Hesse say, that you are aware of, that led
24 you to allege in this Complaint that
25 Mr. Hesse asserted that you were a "rogue

Page 176

1        K. Lamm
2 law enforcement officer"?
3      A.   That one direct line may not
4 pertain to me.
5      Q.   Did Mr. Hesse ever call you a
6 rat, separate and apart from calling you a
7 Civil Service rat in the summer season of
8 2004?
9        MR. GOODSTADT: Objection.
10     A.   Just so that I clarify this, are
11 you saying the word "rat" separate from
12 "Civil Service rat"?
13     Q.   Yeah.  You've -- you've testified
14 I believe that in the summer season of 2004,
15 Mr. Hesse referred to you as a Civil Service
16 rat; am I correct?
17     A.   Correct.
18     Q.   Putting aside that specific
19 communication, did Mr. Hesse ever call you a
20 rat, to your knowledge?
21     A.   Not to my knowledge.
22     Q.   Let's look at 164B.  Well,
23 actually, let's go back to Civil Service rat
24 in the summer season.  When -- when did
25 Mr. Richard Bosetti call you a Civil Service

Page 177

K. Lamm

1 rat?
2
3     A.    Around the same time frame.
4     Q.    Was it at the same time that
5 Mr. Hesse called you that?
6     A.    Around the same time frame.
7     Q.    Okay.  How about Mr. Gary
8 Bosetti?
9     A.    Around the same time frame as
10 well.
11     Q.    Was anyone present when Richard
12 Bosetti called you a Civil Service rat?
13     A.    Yes.
14     Q.    Were you present?
15     A.    Yes.
16     Q.    Who else was present?
17     A.    Outside the police station, Tom
18 Snyder.
19     Q.    Anybody else?
20     A.    There may have been others there,
21 but I don't recall.
22     Q.    Who else -- who was present when
23 Gary Bosetti called you a Civil Service rat?
24     A.    I don't recall.
25     Q.    Were you present?

Page 178

K. Lamm

1
2     A.    I'm not sure.
3     Q.    Did you respond to Richard
4 Bosetti when he called you a Civil Service
5 rat?
6     A.    Yes.  We spoke.
7     Q.    What did you say to him?
8     A.    He asked me a question if I did
9 go to Civil Service, and my answer was no.
10     Q.    Was Tom Snyder present when
11 Mr. Bosetti asked you this question?
12     A.    Tom Snyder was outside the police
13 station.  The conversation took place
14 inside.
15     Q.    Now did Mr. Bosetti's
16 communication regarding you being a Civil
17 Service rat take place inside or outside the
18 police station?
19     A.    When I walked into the police
20 station, it was out -- it was outside.
21     Q.    Now was that the extent of your
22 conversation with Mr. Bosetti, Richard
23 Bosetti, you asked him  -- he asked you if
24 spoke to the Civil Service Department and
25 you said no, is that the extent of it?

Page 179

K. Lamm

1
2     A.    No.  There was a little more to
3 it.
4     Q.    Tell us.
5     A.    Okay.  He wanted to know if I
6 went to Civil Service and said anything
7 about him not being certified to try to make
8 him go through the testing procedure, and I
9 said, "No, I did not do that."  He said,
10 "Then who did it?"  I said, "I don't know
11 anything about this."
12     Q.    Gary Bosetti, did you ever talk
13 to Gary Bosetti about him calling you a
14 Civil Service rat?
15     A.    No.
16     Q.    Ever talk to George Hesse about
17 him calling you a Civil Service rat?
18     A.    My only response was that I did
19 not go to Civil Service.
20     Q.    Okay.  So when Mr. Hesse called
21 you a Civil Service rat, what, if anything,
22 did you say at that point in time to
23 Mr. Hesse?
24     A.    Not at that time.  After I spoke
25 to Richard Bosetti and later on sometime

Page 180

K. Lamm

1
2 that night I said to George Hesse that I'm
3 not the one that went to Civil Service.  I
4 don't know anything about it.  I spoke to
5 Richie.
6     Q.    Are you aware of anyone who went
7 to Civil Service on this issue?
8         MR. GOODSTADT: Objection.
9     A.    I'm not aware of anyone that did.
10 But the only thing that led to the
11 understanding of it was that there were
12 officers from another department that were
13 seeking employment with other town, village
14 police departments, and when they found out
15 they had to go through requirements for
16 Civil Service, that's when it came about
17 that they stated that you don't need these
18 requirements to work in Ocean Beach.
19 MO     MR. NOVIKOFF: Motion to strike
20         as nonresponsive.
21     Q.    Let's go to 164B.  You allege
22 that "Plaintiffs had conspired to inculpate
23 innocent police officers for acts of
24 brutality against innocent citizens (April
25 2, 2006)."  What did you mean when you used

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 181

1         K. Lamm
2 the word "inculpate" --
3         MR. GOODSTADT: Objection.
4    Q.   -- in this allegation?
5         MR. GOODSTADT: Objection.
6    A.   That may not specifically pertain
7 to me.
8    Q.   Okay.  So you don't think B
9 pertains to you?
10   A.   It may not.  There's five --
11 there's five of us on this lawsuit.
12   Q.   Sir, I'm asking you.  This is
13 your deposition.  Does subparagraph B apply
14 to you, because if it doesn't, then I can
15 move on to C.
16        MR. GOODSTADT: Objection.
17   A.   No.  Not me.
18   Q.   Okay.  Let's go to C, then.  You
19 allege that Hesse and the OBPD asserted that
20 "Plaintiffs had conspired to disqualify
21 fellow officers from continued employment
22 with the OBPD without cause (April 2,
23 2006)."  Does C apply to you?
24        MR. GOODSTADT: Objection.
25   A.   Yes.

Page 182

1         K. Lamm
2    Q.   Okay.  Then let me ask you a
3 question.  What did Mr. Hesse say that forms
4 the basis for your allegation that he
5 asserted that "Plaintiffs had conspired to
6 disqualify fellow officers from continued
7 employment with the OBPD without cause"?
8    A.   Because I couldn't continue my
9 employment there.  I -- I was seeking out a
10 full-time job there off that -- off a list,
11 and I couldn't continue employment because I
12 was fired.
13 MO      MR. NOVIKOFF: Well, motion to
14    strike.
15   Q.   I'm asking you, sir,
16 specifically, what did Mr. Hesse say which
17 you allege was published, that leads you to
18 form the allegation in C that "Plaintiffs
19 had conspired to disqualify fellow officers
20 from continuing employment with the OBPD
21 without cause"?
22   A.   I don't recall.
23   Q.   And is there anything in your
24 possession, custody or control that would
25 refresh your recollection?

Page 183

1         K. Lamm
2    A.   I don't believe so.
3    Q.   Okay.  Let's look at D.  When did
4 Mr. Hesse assert "Officer Lamm is a loser
5 and no one likes him"?
6    A.   He said that when he gave a case
7 of beer back to an underage minor, Paul
8 Conway, and to the friends of his outside
9 the police station.  I heard Hesse say it
10 when I was standing behind his back.
11 MO      MR. NOVIKOFF: I'm going to
12    move to strike.
13   Q.   When, sir?  What -- what time
14 period?
15   A.   It was the springtime.  I believe
16 it was approximately 2004.
17   Q.   Okay.  When did Mr. Hesse assert,
18 as you allege, that your, Officer Lamm's
19 "lawful directives should be freely
20 ignored"?
21   A.   At that same time when he gave a
22 case of beer back to the individuals on the
23 date I just stated.
24   Q.   Okay.  Let's look at E.  What
25 specific employer did Mr. Hesse advise, with

Page 184

1         K. Lamm
2 regard to you, that you were terminated for
3 cause and that you, Mr. Lamm, was litigious?
4    A.   Did you say E?  We're looking at
5 E?
6    Q.   E, yeah.  164E.
7    A.   Okay.  Can we go over that again,
8 please?
9         MR. NOVIKOFF: You know what,
10    we got about a half minute left of the
11    tape.  Why don't we change the tape,
12    stay here, and we'll get right back on
13    the record.
14        THE VIDEOGRAPHER: This ends
15    tape number three.  The time is 2:05
16    p.m.  We're going off the record.
17        (A break was taken.)
18        THE VIDEOGRAPHER: This begins
19    tape number four.  The time is 2:11
20    p.m.  Back on the record.
21   Q.   Sir, what -- let's go back to
22 164E.  You allege that "Defendant Hesse and
23 OBPD published defamatory statements about
24 Plaintiffs including without limitation
25 assertions that," now let's go to E.  "By

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 185

1           K. Lamm
2 repeatedly advising prospective employers
3 that he had terminated Plaintiffs for
4 cause," do you see that?
5     A.   Yes.
6     Q.   What employer did Mr. Hesse
7 advise -- withdrawn.  What prospective
8 employer did Mr. Hesse advise that you,
9 Mr. Lamm, was terminated for cause?
10    A.   That would be the unfavorable
11 recommendation that he wrote about on me
12 that I found out through Chris Moran to
13 Suffolk County application section.
14    Q.   What you testified to this
15 morning?
16    A.   Yes.
17    Q.   Okay.  What prospective employer
18 did Mr. Hesse advise that you, Mr. Lamm,
19 were "litigious"?
20    A.   I don't recall at this time.
21    Q.   Did Mr. Moran ever tell you that
22 Mr. Hesse told him that he had told the
23 Suffolk County Police Department that you
24 were "litigious"?
25    A.   I don't recall.

Page 186

1           K. Lamm
2     Q.   What prospective employer did
3 Mr. Hesse advise that with regard to you,
4 Mr. Lamm, that he could not comment
5 favorably on your performance as a police
6 officer?
7     A.   That -- that one thing may not
8 pertain to me.
9     Q.   Okay.  Let's go to paragraph 168.
10 Without going through, again, what the
11 alleged defamatory comments were that you've
12 testified to, how have they caused you
13 "severe mental anguish and pain" as you
14 allege in 168?
15        MR. GOODSTADT: Objection.
16    A.   The fact -- the fact that I'll
17 never be a police officer again.
18    Q.   No.  I understand that.  But my
19 question is -- well, okay.  I'll ask you
20 this question then.  Describe the severe
21 mental anguish and pain that you have
22 suffered as a result of the defamatory
23 communications that you've testified to
24 today.
25    A.   I'm sorry, can you repeat that?

Page 187

1 I was focusing on the --
2        (The requested portion was read.)
3     A.   It's just very disheartening that
4 I will never be a police officer again or
5 further myself in any type of law
6 enforcement capacity like that.  That's it.
7     Q.   Have you seen a mental health
8 professional concerning what you claim to be
9 the suffering of severe mental pain and
10 anguish?
11    A.   No, I haven't.
12    Q.   Have you seen any medical
13 professional concerning what you claim to be
14 the suffering of severe mental anguish and
15 pain?
16    A.   No, I haven't.
17    Q.   What financial obligations have
18 you been unable to meet as a result of the
19 defamatory conduct -- communications that
20 you allege to have taken place as you
21 testified to?
22        MR. GOODSTADT: Objection.
23    A.   That one statement may not
24 pertain to me directly.

Page 188

1           K. Lamm
2     Q.   Well, may not or does not?
3     A.   Does not.
4     Q.   Okay.  Is it your claim in this
5 case that because of the alleged defamatory
6 communications testified to today, that you
7 have been prevented from enjoying life?
8     A.   Yes.  I enjoyed my life as a
9 police officer and I am no longer a police
10 officer.
11    Q.   So is it your claim in this case
12 that as of the date of the alleged
13 defamatory statements that you claim to have
14 been made, you stopped enjoying all aspects
15 of life?
16        MR. GOODSTADT: Objection.
17    A.   I enjoyed my life as a police
18 officer.
19    Q.   My question to you, sir, is, have
20 you stopped enjoying all aspects of life as
21 a result of the alleged defamatory
22 statements you claim to be made by
23 Mr. Hesse?
24        MR. GOODSTADT: Objection.
25    A.   I was forced to stop enjoying

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 51 of 122 PageID #: 1909

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 189

K. Lamm

1 life as a police officer.
2
3    Q.   Okay.  So other than enjoying
4 life as a police officer, you continue to
5 enjoy life?
6         MR. GOODSTADT: Objection.
7    A.   As -- as best as I can.
8    Q.   Okay.  What emotional injury have
9 you suffered as you allege it to have taken
10 place in 168?
11        MR. GOODSTADT: Objection.
12   A.   The injury knowing that I will
13 never be a police officer or work in a law
14 enforcement capacity again.
15   Q.   Other than that, any other
16 emotional injury that you claim to have
17 been -- have suffered in this case as a
18 result of the defamatory statements by
19 Mr. Hesse?
20        MR. GOODSTADT: Same objection.
21   A.   That is all.
22   Q.   Okay.  Let's look at  -- well, do
23 you recall alleging a claim for relief in
24 this Complaint, asserting a violation by the
25 Ocean Beach Police Department and the -- and

Page 190

K. Lamm

1
2 the village of Ocean Beach under the New
3 York Labor Law, Section 740?
4    A.   I don't recall.
5    Q.   Turn to page 38.  Read the bolded
6 language in the parentheticals under "Ninth
7 Cause of Action" and tell me if that
8 refreshes your recollection?
9    A.   (Reviewing).  Which number was
10 that?
11   Q.   Page 38 of your Complaint.
12        MR. GOODSTADT: He's talking
13 about these two bolded lines
14 (indicating).
15   A.   What about it?
16   Q.   Does reading that one line that
17 your counsel pointed to refresh your
18 recollection as to whether you have claimed
19 in this case that Defendants have violated
20 New York State Labor Law, Section 40?
21   A.   I don't recall.
22   Q.   Okay.  Let's look at 158, and
23 I'll read what you've alleged.  "While
24 employed by the OBPD and Ocean Beach,
25 Plaintiffs had repeated exposure to

Page 191

K. Lamm

1
2 activities, policies and practices of OBPD,
3 Ocean Beach and Defendant Hesse, which
4 create a substantial and specific danger to
5 the public health and safety and which
6 violate applicable laws, rules and
7 regulations including," do you see that?
8    A.   Yes, I do.
9    Q.   Let's look at number one.
10 "Police officers drinking while on duty (in
11 the police station, in local bars and while
12 driving OBPD vehicles both inside and out of
13 Ocean Beach)."  How many times did you,
14 Mr. Lamm, personally witness police officers
15 drinking while on duty in the police
16 station?  I'm just looking for a number now.
17   A.   You're gonna get it.
18   Q.   Okay.
19   A.   Approximately seven times.
20   Q.   How many times in 2000?
21   A.   In 2000.  I don't recall in 2000.
22   Q.   How many times in 2001, if any?
23   A.   I don't recall in 2001.
24   Q.   How many times in 2001?
25        MR. GOODSTADT: Objection.

Page 192

K. Lamm

1
2    Asked and answered.
3    Q.   Did I ask you 2000 -- oh, yeah.
4 I'm sorry.  How many times in 2002?
5    A.   I believe twice.
6    Q.   How many times in 2003?
7    A.   I think twice.
8    Q.   How many times in 2004?
9    A.   Three times.
10   Q.   How many times in 2005?
11   A.   I don't recall 2005.
12   Q.   How many times in 2006?
13   A.   Didn't work there 2006.
14   Q.   How many times did you see police
15 officers drinking in local bars while you
16 were employed by Ocean Beach?
17   A.   For what year?
18   Q.   All years, and then we'll break
19 it down.  While on duty now.  This is all
20 I'm interested in.
21   A.   Approximately in the area of 10.
22   Q.   How many times in 2000 zero?  How
23 many times in 2000?
24   A.   I don't recall.
25   Q.   How many times in 2001?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 193

1        K. Lamm
2    A.   I don't recall.
3    Q.   How many times in 2002?
4    A.   Two or three times.
5    Q.   How many times in '03?
6    A.   Approximately four times.
7    Q.   How many times in '04?
8    A.   Approximately four.
9    Q.   How many times in '05?
10   A.   Don't recall 2005.
11   Q.   Now let's look at 159.  You
12   allege that "Plaintiffs repeatedly notified
13   Hesse, their superior and direct superior,
14   of these violations of laws, rules and
15   regulations," do you see that?
16        MR. GOODSTADT: Objection.
17   A.   Yes.
18   Q.   That's a truthful and accurate
19   statement, sir?
20   A.   On behalf of myself, yes.
21   Q.   Yeah.  Again, all I'm asking you
22   is about you now.  Is that a truthful and
23   accurate statement?
24   A.   Yes.
25   Q.   And when you say -- you use the

Page 194

1        K. Lamm
2    phrase "their superior and direct superior,"
3    you're just referring to George Hess, right?
4        MR. GOODSTADT: It says "direct
5        superior."
6    Q.   Oh, I'm sorry.  When you use the
7    phrase "their superior and direct
8    supervisor," you're referring to Mr. Hesse?
9    A.   Mr. Hesse, and also, whoever he
10   may have directed to be supervisor that
11   night if he wasn't there.
12   Q.   Okay.  Well, with regard to --
13   Mr. Lamm, to you, Mr. Lamm, did you ever
14   repeatedly complain to anyone other than
15   Mr. Hesse with regard to 158, 1?
16   A.   Another officer.
17   Q.   Yes.
18   A.   Yes.
19   Q.   Who?
20   A.   Ken Bockelman.
21   Q.   Was Ken Bockelman a supervisor of
22   that night shift at that time you complained
23   to him?
24   A.   He was put in charge of that
25   night.

Page 195

1        K. Lamm
2    Q.   By Mr. Hesse?
3    A.   Yes.
4    Q.   So other than Mr. Bockelman on
5    that one  -- was it only one occasion that
6    you complained to Mr. Bockelman?
7    A.   I believe it was twice.
8    Q.   Twice.  When?  What year did you
9    first complain to Mr. Bockelman?
10   A.   I think it was -- I believe it
11   was 2004.
12   Q.   And the second time you
13   complained to Bockelman?
14   A.   Of the same year.
15   Q.   Okay.  So if 159 is correct, you
16   complained to only Mr. Hesse in 2002,
17   correct, about 158, 1?
18   A.   Only to Hesse and --
19   Q.   No.  In -- in 2002 I'm talking
20   about.  I'll -- I'll rephrase the question.
21   If 159 is correct, in 2002, you only
22   complained to Mr. Hesse concerning on duty
23   officers drinking in the police station and
24   in local bars, correct?
25        MR. GOODSTADT: Objection.

Page 196

1        K. Lamm
2    He's the only superior or supervisor.
3        MR. NOVIKOFF: I don't know
4        what you mean.  You got an objection,
5        that's fine.
6    Q.   Sir, the question is -- and I'll
7    repeat it -- if 159 is correct, then the
8    only person in 2002 that you complained to
9    was Mr. Hesse concerning police officers
10   drinking while on duty in the police station
11   and in local bars?
12        MR. GOODSTADT: Objection.
13   A.   At that time for 2002, something
14   was said to Hesse.  Yes.
15   Q.   Right.  Only -- only asking about
16   you now.  And if 159 is correct, then in
17   2003 the only person that you complained to
18   with regard to police officers drinking
19   while on duty in the police station and in
20   local bars was Mr. Hesse, correct?
21   A.   Correct.
22   Q.   In 2004, you would have
23   complained to Mr. Hesse and on two occasions
24   Mr. Bockelman?
25   A.   Correct.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 197

K. Lamm

1
2    Q.   Okay.  Do you have any -- well,
3  were you present in an OBPD vehicle while it
4  was in motion that a police officer, while
5  on duty, was drinking?
6    A.   Yes, I was.
7    Q.   Okay.  On how many occasions were
8  you present in a moving Ocean Beach Police
9  Department vehicle when a police officer who
10  was on duty was drinking?
11    A.   Twice.
12    Q.   What -- when was the first time
13  that you were present?
14    A.   2003.
15    Q.   When was the second time?
16    A.   Later of that same year.
17    Q.   Okay.  When you say "later of
18  that same year," are you referring to --
19    A.   Later in the season.
20    Q.   Okay.  The first time in 2003,
21  when in the season did you -- were you
22  present?
23    A.   Towards the beginning of the
24  season.
25    Q.   Okay.  That would have been when?

Page 198

K. Lamm

1
2  When's -- when do you view the beginning of
3  the season to be?
4    A.   I'm going to go with the
5  beginning of the season somewhere around the
6  month of May, June.
7    Q.   Okay.  And who was driving the
8  vehicle?
9    A.   Rich Bosetti.
10    Q.   Was he driving the vehicle on
11  both occasions in 2003?
12    A.   Yes.
13    Q.   Was he drinking while he was
14  driving?
15    A.   Yes.
16    Q.   Okay.  Did he physically have a
17  container of alcohol in his hand while he
18  was driving?
19    A.   Yes.  Labeled "Budweiser."
20    Q.   Okay.  So he had a Budweiser.
21  Was he, in your opinion, inebriated while he
22  was driving on either of these two
23  occasions?
24    A.   Depending on how much he had, you
25  know.

Page 199

K. Lamm

1
2    Q.   Sir, you're the police officer.
3  In your opinion, was Mr. Bosetti, on either
4  of these two occasions, inebriated while
5  driving the OBPD vehicle in which you were
6  present?
7    A.   Depending on what he had
8  beforehand, you know, I don't know how much
9  he drank beforehand, but --
10    Q.   Given your observation of him,
11  did you have an opinion as to whether or not
12  he was inebriated?
13    A.   The first time I would say no.
14    Q.   The second time?
15    A.   The second time I would have to
16  say yes.
17    Q.   Okay.  And this was in 2003,
18  correct?
19    A.   That's correct.
20    Q.   And who else, if anybody, was
21  present in the vehicle the first time?
22    A.   I don't recall.
23    Q.   Who else, if anybody, was present
24  in the vehicle the second time?
25    A.   I don't recall at this time.

Page 200

K. Lamm

1
2    Q.   Where were you sitting?
3    A.   Back seat.
4    Q.   Both times?
5    A.   Yes.
6    Q.   Do you know if anyone was present
7  in the front seat?
8    A.   There was, but I don't recall who
9  it was.
10    Q.   Okay.  So now you know that
11  someone was present, but you don't know who
12  it was?
13    A.   Yes.
14    Q.   Okay.  With regard to the second
15  occasion -- well, would it -- would it be
16  fair, sir, that if 159 of your Complaint is
17  accurate, you complained only to George
18  Hesse on each of these occasions that
19  Mr. Bosetti was driving with a Budweiser can
20  in his hand?
21    A.   Yes.
22    Q.   Okay.  Now the second time when
23  Mr. Bosetti, in your opinion, was
24  inebriated, did you advise Mr. Hesse that he
25  was inebriated?

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 201

```
 1          K. Lamm
 2    A.   Yes.
 3    Q.   Did you attempt to arrest
 4 Mr. Richie Bosetti for driving under the
 5 influence of alcohol?
 6    A.   No.
 7    Q.   Is driving with an open container
 8 a violation of the law?
 9    A.   The open container --
10    Q.   Is driving with an open container
11 of alcohol --
12    A.   -- occurred outside the village
13 of Ocean Beach, which is outside our
14 jurisdiction.
15    Q.   Sir, is, to your knowledge,
16 driving in New York State with an open
17 container of alcohol a violation of the law?
18    A.   Yes, it is.
19    Q.   Okay.  Would you agree with me
20 that it's a violation of New York State law
21 to drive while inebriated?
22    A.   Yes.
23    Q.   Okay.  Now the first time that
24 Mr. Bosetti was driving in your presence,
25 where was the  -- where was the vehicle in
```

Page 202

```
 1          K. Lamm
 2 motion when you saw that Mr. Bosetti was
 3 drinking a Budweiser?
 4    A.   On the beach.
 5    Q.   In Ocean Beach?
 6    A.   It was outside of Ocean Beach.
 7    Q.   Where did the vehicle start its
 8 journey from, sir?
 9    A.   Ocean Beach.
10    Q.   Did Mr. Bosetti wait until he
11 went outside the jurisdiction of Ocean Beach
12 before he opened up the can of Budweiser?
13    A.   Exactly when the can was opened I
14 don't know, but when I saw him drink it, it
15 was outside of Ocean Beach.
16    Q.   What jurisdiction was Mr. Bosetti
17 in in the car when he had the open container
18 of alcohol?
19    A.   National seashore.
20    Q.   National seashore?
21    A.   Yes.
22    Q.   Is that a village?
23    A.   No.  It's federal property.
24    Q.   Oh, so Mr. Bosetti was driving
25 with an open container of alcohol on federal
```

Page 203

```
 1          K. Lamm
 2 property, is that your testimony?
 3    A.   Yes.  And it's also Suffolk
 4 County as well.
 5    Q.   Okay.  Second time, where  --
 6 when did Mr. Bosetti begin his journey in
 7 this car, in this vehicle?
 8    A.   Started in Ocean Beach.
 9    Q.   Was he inebriated, in your
10 opinion, when he started the vehicle up in
11 Ocean Beach?
12    A.   I don't know.  That I don't know.
13    Q.   Where did the vehicle end up?
14    A.   The Fire Island Lighthouse.
15    Q.   Okay.  The second time when you
16 complained to Mr. Hesse about Mr. Bosetti
17 specifically being inebriated, what was
18 Mr. Hesse's reaction?
19    A.   He says, "I'll take care of it."
20    Q.   And did he?
21    A.   I don't know if he ever spoke to
22 him or not.
23    Q.   Okay.  Would you agree with me
24 that someone driving in a car under the
25 state of alcohol -- withdrawn.  Would you
```

Page 204

```
 1          K. Lamm
 2 agree with me that someone driving a vehicle
 3 in an inebriated state poses a severe and
 4 significant risk to the public?
 5    A.   Yes.
 6    Q.   Okay.  Did you complain to
 7 sergeant -- to Chief Paridiso about this --
 8 about the fact that Mr. Bosetti was driving
 9 a village vehicle while drunk?
10    A.   No.  I spoke to George Hesse, my
11 supervisor.  The chain of command.
12    Q.   Did you complain to Mr. Paridiso,
13 sir?
14    A.   No.  I spoke to George Hesse, my
15 supervisor, chain of command.
16    Q.   Did you complain to Mayor Rogers,
17 sir?  I understand.
18         MR. GOODSTADT: You got to let
19 him finish the answer.  You can make
20 your --
21         MR. NOVIKOFF: He says he's
22 complained to Mr. Hesse.
23         MR. GOODSTADT: You can make
24 your motion to strike if you want, but
25 you got to let the guy finish his
```

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 205

1        K. Lamm
2    answer.
3        Q.   My question, sir, yes or no, for
4    the jury, if you want to look at the jury --
5        A.   I've already answered it.
6        Q.   Did you complain to Chief
7    Paridiso about the fact that you witnessed
8    Richard Bosetti driving drunk in a Ocean
9    Beach vehicle?
10       A.   No. I responded  -- spoke to
11   George Hesse, my immediate supervisor.  Went
12   through the chain of command.
13   MO       MR. NOVIKOFF: Motion to strike
14       as nonresponsive after the word "no."
15       Q.   Sir, did you complain to any
16   trustee concerning the fact that you
17   witnessed Richard Bosetti driving drunk in a
18   village vehicle?
19       A.   No.
20       Q.   Did you complain to Mayor Rogers
21   concerning the fact that you witnessed
22   May -- Richard Bosetti driving drunk in a
23   village vehicle?
24       A.   No.
25       Q.   Would you agree with me, sir,

Page 206

1        K. Lamm
2    that  -- well, is it your opinion, sir, that
3    a -- a police officer who is drinking while
4    on duty, in any setting, poses a risk to the
5    public health and safety?
6        A.   Yes.
7        Q.   Did you ever complain to any
8    trustee concerning your witnessing, on no
9    less than 17 occasions, the fact that police
10   officers were drinking while on duty?
11       A.   No.
12       Q.   Can you tell the jury, sir, who's
13   going to see this videotape, whether or not
14   you ever complained to either Trustee
15   Loeffler or Mayor Rogers concerning the fact
16   on no less than 17 occasions, you saw on
17   duty police officers drinking alcoholic
18   beverages?
19       A.   No. I spoke to Sergeant Hesse,
20   who was my immediate supervisor, and he
21   stated he would take care of the situation.
22   Chain of command.
23   MO       MR. NOVIKOFF: Motion to strike
24       as nonresponsive after the word "no."
25       Q.   But you know what, sir, Mr. Hesse

Page 207

1        K. Lamm
2    didn't take care of the situation in 2003,
3    did he?
4        A.   I don't know what he said to
5    them.
6        Q.   Well, sir, they -- according to
7    your testimony, you witnessed in 2004
8    incidents of police officers drinking while
9    on duty, correct?
10       A.   Yes.
11       Q.   Would that lead you to conclude
12   that Mr. Hesse didn't take care of the
13   situation after you complained to him in
14   2003?
15       A.   I don't know what he had said to
16   them.
17       Q.   Would you agree with me, sir,
18   that the fact that the drinking continued in
19   2004, would mean that Mr. Hesse didn't take
20   care of the situation in 2003?
21       A.   I don't know what he could have
22   said to them.  I don't know if there was any
23   -- any type of punishment given.  I don't
24   know.
25       Q.   Okay.  Would you agree with me,

Page 208

1        K. Lamm
2    sir -- withdrawn.  Let's look at 158, 2.
3    You allege that "failure to follow
4    department policy regarding proper
5    supervision of police weapons."  What policy
6    are you referring to?
7        A.   (Reviewing).  There would be
8    loaded weapons upstairs in the police
9    barracks with the lockers open.
10       Q.   Yes. I'm aware of what you're
11   alleging. But my question is, what policy
12   regarding proper supervision of police
13   weapons are you referring to?  What is the
14   specific policy?
15       A.   I can't recall at this time.
16       Q.   Okay.  Now was this policy that
17   you can't recall at this  -- well,
18   withdrawn.  Is there anything in your
19   custody, possession or control that would
20   refresh your recollection as to what the
21   specific policy was?
22       A.   Not that I'm aware of.
23       Q.   Well, was this policy that you
24   don't recall at this point in time, violated
25   in 2000?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 209

1        K. Lamm
2   A.   No.
3   Q.   2001?
4   A.   No.
5   Q.   2002?
6   A.   No.
7   Q.   2003?
8   A.   No.
9   Q.   2004?
10  A.   I believe that is somewhere
11  around the time frame.
12  Q.   2005?
13  A.   I don't recall.
14  Q.   How many times in 2004 was this
15  policy violated that you are aware of?
16  A.   I'm not sure the specific number.
17  Q.   Was it at least one?
18  A.   Yes.
19  Q.   If 159 of your Complaint is
20  accurate, did you complain to George Hesse?
21  I'm sorry, was George Hesse the only person
22  you complained to?
23  A.   Yes.
24  Q.   Okay.  When in 2004 did you
25  complain to Mr. Hesse for the first time?

Page 210

1        K. Lamm
2        MR. GOODSTADT: Objection.
3   A.   Approximately in the middle of
4   the summer season.
5   Q.   Okay.  Look at number three, sir.
6   You allege "directives from Hesse insisting
7   that police officers allow drug dealers and
8   other criminals to violate the law with
9   impunity in Ocean Beach," do you see that?
10  A.   Yes, I do.
11  Q.   When you use the word
12  "directive," is it a written directive or a
13  verbal directive?
14  A.   Verbal.
15  Q.   Okay.  Did Mr. Hesse give you
16  a -- well, withdrawn.  What drug dealer, if
17  any, are you referring to when you make this
18  allegation?
19  A.   Mitch Burns.
20  Q.   And Mitch Burns, is he -- has he
21  been convicted of anything, to your
22  knowledge?
23  A.   I don't recall.
24  Q.   So if you don't recall if he's
25  been convicted of anything, how do you claim

Page 211

1        K. Lamm
2   that he was a known drug dealer?
3   A.   From Hesse.
4   Q.   What did he  -- okay.  Go ahead.
5   I don't mean to interrupt.  From Hesse.
6   Continue.
7   A.   From Hesse, he said that he gets
8   his information from Mitch Burns because he
9   had these Fentanyl lollipops that he has
10  been handing out, and he was -- we were told
11  not to touch him.
12  Q.   Any other source, other than what
13  Mr. Hesse said, that leads you to believe
14  that Mitch Burns is a known drug dealer?
15  A.   I can't recall at this time.
16  Q.   What's a Fentanyl lollipop?
17  A.   To my understanding, it was some
18  type of relaxer that was a drug in the shape
19  of a lollipop on a stick.
20  Q.   Okay.  When you say -- when you
21  say "relaxer," what do you mean?
22  A.   That was my only understanding of
23  it.  Just made you seem relaxed.  I don't
24  know.  Don't know too much about it.
25  Q.   But if I understand your

Page 212

1        K. Lamm
2   testimony correctly, you are aware -- you
3   were aware in 2004 that there was someone on
4   Ocean Beach handing out lollipops that were
5   illegal narcotics; is that true?
6   A.   How many of them, I don't know.
7   Q.   I didn't ask you how many.  I
8   just said -- and I'll re-ask the question --
9   if I understand your testimony correctly,
10  you were aware, in 2004, that there was an
11  individual in Ocean Beach that was handing
12  out at least one lollipop that was really an
13  illegal narcotic; is this correct?
14  A.   I only knew that from George
15  Hesse.
16  Q.   Okay.  So you knew that from
17  George Hesse?
18  A.   Only from George Hesse.
19  Q.   You didn't think it would have
20  been appropriate to advise Chief Paridiso
21  that there was a known drug addict handing
22  out lollipops that were illegal narcotics?
23       MR. GOODSTADT: Objection.
24  A.   I am sure George Hesse, being
25  that he's a supervisor, would take care of

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 213

1          K. Lamm
2 that and make the proper memorandums.
3     Q.    Wait a minute.  Let me understand
4 your testimony.  On one hand, Mr. Hesse is
5 telling you to lay off a known drug dealer,
6 and on the other hand you're saying you were
7 sure that Mr. Hesse was going to go up the
8 chain of command with this information, is
9 that your testimony?
10     A.    My testimony was that we were
11 told to stay away from Mitch Burns, but at
12 the same fact, through George Hesse, he said
13 that he has what is called a Fentanyl
14 lollipop.
15     Q.    Okay.
16     A.    Okay?
17     Q.    I think I got your answer.  So,
18 again, is it your testimony that you knew,
19 you were aware through Mr. Hesse that there
20 was a known drug dealer handing out illegal
21 narcotics in the form of a lollipop and you
22 didn't advise Chief Paridiso?
23     A.    I don't know if he was handing
24 them out.  As I said, it was only
25 information from George Hesse.

Page 214

1          K. Lamm
2     Q.    Did you advise Chief Paridiso of
3 anything with regard to a known drug dealer
4 possessing an illegal narcotic in the form
5 of a lollipop?
6     A.    No.
7     Q.    And you didn't advise Mayor
8 Rogers, did you?
9     A.    No.
10     Q.    And you didn't advise any
11 internal affairs officer of the Suffolk
12 County Police Department, did you?
13     A.    No.
14     Q.    And you didn't advise anyone from
15 the Suffolk County Police Department, did
16 you?
17     A.    No.
18     Q.    In fact, other than complaining
19 to George Hesse as you allege, you did
20 nothing, correct?
21     A.    I listened to what George Hesse
22 said.
23     Q.    Other than complaining to George
24 Hesse as you claim in 159, you did nothing
25 with regard to advising any other human

Page 215

1          K. Lamm
2 being in a position of authority that there
3 was a drug dealer on Ocean Beach possessing
4 an illegal narcotic in the form of a
5 lollipop, true?
6     A.    No.  I did nothing.
7     Q.    And in fact, this is a lollipop,
8 sir, correct, that you were referring to,
9 right?
10     A.    Again --
11     Q.    Right?  It was a lollipop?
12     A.    Again, I don't know the specifics
13 of it.
14     Q.    Well, Mr. Hesse said he had a
15 lollipop, right?  Mr. Hesse said that
16 Mr. Burns had an illegal narcotic in the
17 shape of a lollipop, correct?
18     A.    Whether it was on him or not, I
19 don't know.
20     Q.    Lollipops, in your experience,
21 are things that children like to eat and
22 suck on, correct?
23     A.    Not all children, but maybe.
24     Q.    Not all, but some children, you'd
25 agree with me, right?  When you were a

Page 216

1          K. Lamm
2 child, did you suck on a lollipop?
3          MR. GOODSTADT: Objection.
4     A.    Maybe I have.
5     Q.    Okay.  Wasn't it a concern of
6 yours that there was a person, according to
7 Mr. Hesse, on Ocean Beach, that had an
8 illegal narcotic that looked like a
9 lollipop, that God forbid a child would have
10 found on the street and started eating,
11 wasn't that a concern of yours as a police
12 officer?
13          MR. GOODSTADT: Objection.
14     A.    Lots of things could have --
15 could have happened I'm sure.
16     Q.    I'll take that as a yes.
17          MR. GOODSTADT: Objection.
18     Q.    Let's look at 160.  I'm sorry,
19 162.  What promotional opportunities were
20 you denied of as a direct and proximate
21 result of what you alleged in 158, 159, 160
22 and 161?
23     A.    Promotional opportunities could
24 have been my full-time position with Ocean
25 Beach.

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 217

1          K. Lamm
2      Q.   Were you ever offered a full-time
3  position at Ocean Beach?
4      A.   No.
5      Q.   Did a full-time position ever
6  open up at Ocean Beach while you were
7  employed by Ocean Beach?
8      A.   After I was fired.
9      Q.   Okay.  My question to you, sir,
10  is before the time that you -- that your
11  employment relationship with Ocean Beach
12  ended, did a full-time position open up at
13  Ocean Beach?
14      A.   There was a full-time position
15  open because before I was fired, George
16  Hesse made mention that the village was
17  looking to hire somebody full time.
18      Q.   And how long before the end of
19  your employment relationship did George
20  Hesse make this comment?
21      A.   Approximately four months.
22      Q.   And was that position filled
23  before the date that your employment
24  relationship ended?
25      A.   Not that I'm aware of.  I

Page 218

1          K. Lamm
2  wouldn't know.
3      Q.   Okay.  Well, did you learn, prior
4  to the last day of your employment, that
5  that full-time position had been filled?
6      A.   Not that I'm aware of.
7      Q.   And do you really believe that
8  you had the requisite skill set to be given
9  a full-time position with the Ocean Beach
10  Police Department?
11      A.   Sure.
12      Q.   Okay.  You were a part-time cop,
13  weren't you?
14      A.   Yes.
15      Q.   Never had a full-time position as
16  a police officer, did you?
17      A.   Depends how you specify full
18  time.
19      Q.   Were you ever a consistent 40
20  hour per week police officer for an entire
21  year?
22      A.   No.
23      Q.   In fact, you were just a summer
24  cop, right?
25          MR. GOODSTADT: Objection.

Page 219

1          K. Lamm
2      A.   A cop is a cop.
3      Q.   That's your position, a cop is a
4  cop?
5      A.   That's correct.  My certificate
6  says so, which the uncertified officers
7  didn't have.
8      Q.   Suffolk County never hired you,
9  did you -- did they?
10      A.   I went to their academy and was
11  trained by them.  The ones that are working
12  there, they don't have the certificate, I
13  do.
14      Q.   Suffolk County never hired you,
15  did you -- did they?
16      A.   I completed their academy after
17  seven months.
18      Q.   Did they ever hire you, sir?
19      A.   For the academy I was.
20      Q.   Did they ever hire you as a
21  police officer?
22      A.   No, they didn't.
23      Q.   Nassau County ever hire you as a
24  police officer?
25      A.   Never applied there.

Page 220

1          K. Lamm
2      Q.   New York City ever hire you as a
3  police officer?
4      A.   Never applied there.
5          MR. GOODSTADT: Why don't we go
6  through every jurisdiction in the
7  country.
8          MR. NOVIKOFF: I may.
9          MR. GOODSTADT: Okay.
10      A.   Cool.
11      Q.   Westchester County ever hire you?
12      A.   Never applied there.
13      Q.   Any other police officer in the
14  entire land ever hire you as a police
15  officer before you became 35?
16      A.   No.
17      Q.   Haven't you been referred to as a
18  glorified security guard while you were
19  working for Ocean Beach?
20      A.   By who?
21      Q.   By anybody?
22      A.   I don't recall.
23      Q.   You don't recall?  You mean it's
24  a possibility?
25      A.   I don't recall.

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 221

1      K. Lamm
2    Q.   In your presence, isn't it true
3  that you were referred to as a glorified
4  security guard while you were working for
5  Ocean Beach?
6    A.   I don't recall.
7    Q.   Okay.  Let's look at your eighth
8  cause of action.  Do you recall alleging a
9  violation of the New York Civil Service Law,
10  Section 75-B in this lawsuit?
11    A.   I don't recall.
12    Q.   Page 37 of your Complaint.  Just
13  read the bold language in the parentheticals
14  and tell me if you recall.
15    A.   (Reviewing).  The bold letters,
16  no, I don't recall.
17    Q.   Okay.  155, you allege the
18  following, "Defendants' termination of
19  Plaintiffs' employment was a -- was an
20  "adverse personnel action" taken in
21  violation of New York Civil Service Law 75-B
22  on the sole basis that Plaintiffs each
23  disclosed what they reasonably believed to
24  be "improper governmental action" as that
25  term is defined in New York Civil Service

Page 222

1      K. Lamm
2  Law, Section 75-B," do you see that?
3    A.   I see it.
4    Q.   Who did you, Mr. Lamm, disclose
5  the "improper governmental action" to?
6    MR. GOODSTADT: Objection.
7    A.   I don't recall at this time.
8    Q.   Do you recall is there anything
9  in your custody, possession or control that
10  would refresh your recollection?
11    A.   Not that I'm aware of.
12    Q.   Do you have an understanding as
13  to what the phrase "improper governmental
14  action" means as you use it in paragraph
15  155?
16    A.   Yes.
17    MR. GOODSTADT: Objection.
18    Q.   What is your understanding?
19    A.   Not done correctly.
20    Q.   What was not done correctly?
21    A.   What it states here.
22    Q.   It doesn't state anything in
23  paragraph 155, other than the fact that you
24  disclosed what you reasonably believed to be
25  "improper governmental action."  So I ask

Page 223

1      K. Lamm
2  the question again, sir, when you use the
3  words "improper governmental action," what
4  do you mean?
5    MR. GOODSTADT: Objection.
6    A.   Not ethical.
7    Q.   Is that it, not ethical?
8    A.   That's it.
9    Q.   Let's look at -- on page 36,
10  paragraph 148.  You allege, in part,
11  "Defendants Hesse, Loeffler, OBPD, Ocean
12  Beach, Sanchez and Suffolk County Civil
13  Service subjected Plaintiffs to arbitrary
14  and irrational discrimination by selectively
15  terminating Plaintiffs' employment with a
16  malicious or bad faith intent to injure
17  Plaintiffs," do you see that?
18    A.   Yes.
19    Q.   Simple question, sir, how did
20  Loeffler subject you, Mr. Lamm, to arbitrary
21  and irrational discrimination by selectively
22  terminating you in April of 2 -- on April 2,
23  2006 as you've alleged?
24    MR. GOODSTADT: Objection.
25    A.   Don't know for sure.

Page 224

1      K. Lamm
2    Q.   What evidence do you have that
3  Mr. Loeffler acted in bad faith as you sit
4  here today, other than the fact that you say
5  you were terminated on April 2 of 2006?
6    A.   I don't know.
7    Q.   Other than the fact that you were
8  terminated as you say on April 2, 2006, what
9  evidence do you have that Mr. Loeffler acted
10  maliciously with regard to anything
11  involving you?
12    MR. GOODSTADT: Objection.
13    A.   I don't know.
14    MR. GOODSTADT: Whenever is a
15  good time, Ken, can we just take a
16  break?
17    MR. NOVIKOFF: One more
18  question.
19    MR. GOODSTADT: Yup.  Yup.
20  That's why I said whenever's a good
21  time.
22    MR. NOVIKOFF: 149.  Actually,
23  you know what, I don't need to go over
24  149.  Let's take a five-minute break.
25    MR. GOODSTADT: That's fine.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 225

1          K. Lamm
2          MR. NOVIKOFF: How much time is
3 left on the -- on the tape?
4          THE VIDEOGRAPHER: 16 minutes.
5          MR. NOVIKOFF: Okay.
6          THE VIDEOGRAPHER: The time is
7 2:56 p.m.  Going off the record.
8          (A break was taken.)
9          (Mr. Gray, general counsel for
10 Ocean Beach, entered the deposition.)
11          THE VIDEOGRAPHER: This begins
12 tape number five.  The time is 3:16
13 p.m.  Back on the record.
14          Q.   Sir, who do you presently work
15 for?
16          A.   Town of Islip.
17          Q.   Any particular department within
18 the Town of Islip?
19          A.   Airport.
20          Q.   Are you a security guard?
21          A.   Yes.
22          Q.   When did you first start working
23 for Town of Islip?
24          A.   2005.
25          Q.   At MacArthur Airport?

Page 226

1          K. Lamm
2          A.   Yes.
3          Q.   As a security guard?
4          A.   Yes.
5          Q.   So you've been a security guard
6 throughout your tenure at -- at the Town of
7 Islip?
8          A.   Yes.
9          Q.   Okay.  Let's go to the Complaint,
10 sir.  Actually, before we go to the
11 Complaint, have you been up for any
12 promotions at the Town of Islip?
13          A.   No.
14          Q.   Have you been denied any
15 promotional opportunities as a result of
16 anything Mr. Hesse did, to your knowledge --
17          A.   No.
18          Q.   -- at the Town of Islip?  No?
19          A.   No.
20          Q.   Let's look at the first page.
21 You write -- you allege under the
22 preliminary statement, "Plaintiffs are five
23 police officers who had the courage to
24 overcome the "blue wall of silence" and
25 fulfill their duty to protect the public by

Page 227

1          K. Lamm
2 speaking out in opposition to the regime of
3 endemic corruption within the Police --
4 Ocean Beach Police Department ("OBPD" or the
5 "department)."  Do you see that?
6          A.   Yes.
7          Q.   What did you mean by "blue wall
8 of silence"?
9          A.   Because if we were to talk about
10 anything, well, this is what happened.  We
11 lost our jobs.
12          Q.   No.  I understand that.  When you
13 say "blue wall of silence," what are you
14 referring to?
15          A.   That everybody else there in the
16 department was just quiet and wouldn't, you
17 know, raise the fact of issues of what was
18 happening, so we did.
19          Q.   Well, you refer to a duty to
20 protect the public by speaking out in
21 opposition, do you see that?
22          A.   Yes.
23          Q.   Other than talking to Mr. Hesse,
24 you didn't do anything with regard to your
25 knowledge that there was a known drug dealer

Page 228

1          K. Lamm
2 who had lollipops that contained illegal
3 narcotics, did you?
4          A.   Well --
5          Q.   Did you?
6          A.   We have made mention to Mr. Hesse
7 that we should bring the narcotics team
8 over.
9          Q.   Well, thank you.  You spoke to
10 Mr. Hesse.  So my question to you, sir, is
11 in your duty to protect the public from this
12 known drug dealer who had lollipops in the
13 form of an illegal narcotic, you didn't do
14 anything, other than talk to Mr. Hesse, did
15 you?
16          A.   He was the chain of command.
17          Q.   I understand that.  You didn't do
18 anything, other than talk to Mr. Hesse, did
19 you?
20          A.   He was the chain of command.
21          Q.   Okay.  Tell the jury, sir, with
22 regard to seeing a police officer drive
23 intoxicated, what, other than talking to
24 Mr. Hesse, did you do to protect the public?
25          A.   It was brought to George Hesse's

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 229

K. Lamm

1      K. Lamm
2  attention, who was the supervising officer,
3  chain of command.
4      Q.   Other than talking to Mr. Hesse,
5  what did you do?
6      A.   That's what I did.
7      Q.   Okay.  When you saw police
8  officers drinking on duty and posing a risk
9  to the health and safety of the public in
10 doing so, other than Mr. Hesse, other than
11 talking to Mr. Hesse, what did you do to
12 protect the public?
13     A.   That's what was done.  Spoke to
14 George Hesse.  Chain of command.
15     Q.   Other than -- well, other than --
16 well, withdrawn.  When you believed that
17 there was a cover up involving the Halloween
18 incident, you didn't notify Sergeant --
19 Chief Paridiso of your belief that there was
20 a cover up, did you?
21     A.   We were kept out of the loop of
22 all the investigation for several months.
23 MO      MR. NOVIKOFF: Motion to
24     strike, sir.
25     Q.   You formed a belief at some point

Page 230

K. Lamm

1      K. Lamm
2  in time that there was a cover up involving
3  certain police officers concerning the
4  Halloween incident, correct?  You formed a
5  belief, correct?
6      A.   We were kept out of the loop of
7  the investigation.
8  MO      MR. NOVIKOFF: Motion to
9      strike.
10         MR. GOODSTADT: Let -- let him
11     answer the question.  Then make your
12     motion to strike.
13     Q.   Sir, yes or no, did you form an
14 opinion at some point in time that there was
15 a cover up involving the Halloween incident?
16     A.   Yes.
17     Q.   And, sir, in your duty to protect
18 the public from this cover up, did you
19 notify Chief Paridiso of your opinion that
20 there was a cover up, yes or no?  And if you
21 can't answer yes or no, that's fine.  Just
22 tell me.
23     A.   No.  Because we were unsure as to
24 what was going on because the investigation
25 that was taking place, we were kept out of

Page 231

K. Lamm

1      K. Lamm
2  the loop.
3  MO      MR. NOVIKOFF: Motion to strike
4      everything after "no."
5      Q.   Sir, in your duty to protect the
6  public, when you came to believe that there
7  was a cover up involving the Halloween
8  incident, you didn't notify Mayor Rogers,
9  did you, yes or no?  And if you can't answer
10 yes or no, tell me.
11     A.   No.  She wasn't part of the chain
12 of command.
13 MO      MR. NOVIKOFF: Okay.  Motion to
14     strike everything after "no."
15     Q.   In your duty to protect the
16 public, after you formed the opinion that
17 there was a cover up involving the Halloween
18 incident, you didn't notify Trustee
19 Loeffler, did you?
20     A.   Loeffler was there during the
21 Halloween incident.
22     Q.   My question, sir, is --
23 MO      MR. NOVIKOFF: Motion to
24     strike.
25     Q.   When you formed the opinion that

Page 232

K. Lamm

1      K. Lamm
2  there was a cover up -- withdrawn.  After
3  you formed the opinion that there was a
4  cover up, in your duty to protect the
5  public, did you notify Trustee Loeffler that
6  you believed that there was a cover up, yes
7  or no, and if you can't answer yes or no,
8  then tell me?
9      A.   No.  Because I believe he became
10 part of that because it was kept away from
11 us for several months and we were not part
12 of the investigation.
13 MO      MR. NOVIKOFF: Motion to strike
14     everything after "no."
15     Q.   Sir, in your duty to protect the
16 public and speaking out in opposition to the
17 regime of endemic corruption, after you
18 believed that there was a cover up involving
19 the Halloween incident, did you contact
20 Newsday?
21     A.   Immediately after it happened?
22     Q.   Yeah.
23     A.   Not immediately after it
24 happened, because we didn't know everything
25 that had taken place.  We were kept out of

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 233

1           K. Lamm
2 the investigation.
3 MO        MR. NOVIKOFF: Motion to strike
4     everything after "not immediately
5     thereafter."
6     Q.   Sir, prior to your last day of
7 employment with Ocean Beach, did you ever
8 advise Newsday that you believed that there
9 was a cover up involving the Halloween
10 incident in your duty to protect the public
11 and speak out in opposition?
12    A.   No.  We were kept out of the loop
13 of the investigation.  It was kept away from
14 us.
15 MO        MR. NOVIKOFF: Motion to strike
16     everything after "no."
17    Q.   In your duty to protect the
18 public and speak out against the regime of
19 endemic corruption, before your last day of
20 employment with Ocean Beach, did you advise
21 any media source that you believed that
22 there was a cover up involving the Halloween
23 incident?
24    A.   No, I did not, because we were
25 kept out of the investigation of all that

Page 234

1           K. Lamm
2 time and everything that was going on.
3 MO        MR. NOVIKOFF: Motion to strike
4     everything after the word "no."
5     Q.   In your duty to protect the
6 public and speak out against -- in
7 opposition to the regime of endemic
8 corruption, did you, before the last day of
9 your employment with Ocean Beach, speak with
10 the Suffolk County District Attorney's
11 office concerning the belief that you held
12 that there was a cover up involving the
13 Halloween incident?
14    A.   No.
15    Q.   Did you ever speak, before your
16 last day of employment with Ocean Beach, in
17 your duty to protect the public and speak
18 out in opposition -- withdrawn.  Did you
19 ever, before the last day of your employment
20 with Ocean Beach, notify the Suffolk County
21 District Attorney's office, in your duty to
22 protect the public and speak out, that there
23 were police officers, while on duty,
24 drinking alcoholic beverages?
25    A.   No.

Page 235

1           K. Lamm
2     Q.   In your duty to speak out and
3 protect the public good, did you ever advise
4 the Suffolk County District Attorney's
5 office that there were police officers
6 driving while intoxicated on Ocean Beach?
7     A.   No.  It was brought to George
8 Hesse's attention.  He was the immediate
9 supervisor.  Went through the chain of
10 command.
11 MO        MR. NOVIKOFF: Motion to strike
12     everything after the word "no."
13    Q.   Did you, in your duty to protect
14 the public and speak out in opposition, did
15 you ever advise the Suffolk County District
16 Attorney's office, before the last day of
17 your employment with Ocean Beach, that there
18 was a known drug dealer on Ocean Beach who
19 had illegal narcotics in the form of a
20 lollipop?
21    A.   No.  It was words given by George
22 Hesse who later he was told that the
23 narcotics team should be brought in to the
24 village.
25 MO        MR. NOVIKOFF: Motion to strike

Page 236

1           K. Lamm
2 everything after the word "no."
3     Q.   Let's go to paragraph 13.  You
4 allege in paragraph 13 the following,
5 "Defendant George B. Hesse was and is
6 employed by Ocean Beach and the OBPD, with
7 his principle place of business at Bay and
8 Bayberry Walks, Ocean Beach, New York.  Upon
9 information and belief, Hesse resides in
10 Suffolk County, New York.  At all times
11 hereinafter mentioned, Defendant Hesse was
12 and is the official responsible for the
13 management and supervision of the OBPD,
14 including its maintenance and operation, as
15 well as the hiring, promotion and discipline
16 of employees and all other
17 employment-related issues," do you see that?
18    A.   Okay.
19    Q.   Did -- have you done anything to
20 confirm the accuracy of what I've just read
21 prior to authorizing your attorney to file
22 this Complaint?
23    A.   No.
24    Q.   When you allege in the second
25 sentence of paragraph 13 that "at all times

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 237

1       K. Lamm
2 herein mentioned, Defendant Hesse was and is
3 the official responsible for" -- and now I'm
4 going to go a little bit further -- "the
5 hiring, promotion and discipline of
6 employees and all other employment-related
7 issues," what did you mean by that?
8       MR. GOODSTADT: Objection.
9    A.   Well, which part are we talking
10 about here, again, please?
11   Q.   Let's look at the second
12 sentence.  You see --
13       MR. GOODSTADT: It's actually
14    the third sentence.
15   Q.   Paragraph 13.  The second
16 sentence.  Do you see you start off by
17 saying "at all times hereinafter mentioned,"
18 do you see that?
19   A.   Go ahead.
20   Q.   Okay.  You write "Defendant
21 Hesse," do you see that?
22   A.   I see it.
23   Q.   "Was and is the official
24 responsible," do you see that?
25   A.   Go ahead.

Page 238

1       K. Lamm
2    Q.   What do you mean by "was and is
3 the official responsible"?
4       MR. GOODSTADT: Objection.
5    Q.   What is your understanding of
6 what that phrase means?
7       MR. GOODSTADT: Objection.
8    A.   'Cause he was the supervising
9 officer of the night shift and that is what
10 we worked.
11   Q.   Okay.  And then you write -- you
12 make some other allegations, you write "for
13 the management and supervision of the OBPD,"
14 do you see that?
15   A.   Yes.
16   Q.   I don't -- I'm not going to ask
17 you about that.  Then you write "including
18 its maintenance and operation," do you see
19 that?
20   A.   Yes.
21   Q.   I'm not going to ask you about
22 that.  This is what I'm going to ask you
23 about, "as well as the hiring, promotion and
24 discipline of employees and all other
25 employment-related issues."  Do you see

Page 239

1       K. Lamm
2 that?
3    A.   Yes.
4    Q.   What did you mean by the language
5 that I just read to you?
6       MR. GOODSTADT: Objection.
7    A.   "As well as hiring."
8    Q.   Yeah.  What do you mean by that?
9    A.   He made himself the applicant
10 investigation section unit and began to hire
11 individuals that were uncertified.
12   Q.   How about in terms -- you use "as
13 well as the hiring, promotion and discipline
14 of employees," do you see that?
15   A.   Yes.
16   Q.   You then go on to say "and all
17 other employment-related issues," do you see
18 that?
19   A.   Yes.
20   Q.   Is termination an
21 employment-related issue that you are
22 referring to?
23   A.   Yes.
24   Q.   Okay.  Non-hiring an
25 employment-related issue that you are

Page 240

1       K. Lamm
2 referring to?
3    A.   That George Hesse was in charge
4 in -- of?
5    Q.   Yes.
6    A.   Yes.
7    Q.   Okay.  So if I understand what
8 you're saying, in 2003, George Hesse was the
9 person responsible for deciding whether or
10 not you, Mr. Lamm, was either going to be
11 rehired or terminated from the Ocean Beach
12 police department, correct?
13       MR. GOODSTADT: Objection.
14   Q.   Is that what you mean when you
15 use this --
16   A.   He -- he was the one doing the
17 hiring in 2003, so that very well could
18 have -- could have been the answer.
19   Q.   No.  I'm asking you, you know,
20 based upon your testimony, sir, in your
21 opinion, was Mr. Hesse the person that
22 was the -- had the authority to decide in
23 2003 whether or not you would be terminated
24 from your position as a police officer for
25 Ocean Beach?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 241

K. Lamm

1         K. Lamm
2    A.   He may have been because he was
3 hiring in 2003.  So I would assume that he
4 is in charge of hiring and -- and could have
5 been firing in 2003.
6    Q.   Same thing for 2004, correct?
7    A.   Could have been.
8    Q.   How about 2005?
9    A.   May have been.
10   Q.   Okay.  Now with regard to the
11 Ocean -- the Halloween incident, that
12 occurred in October of 2004, correct?
13   A.   Yes.
14   Q.   And by that time, you had made
15 numerous complaints to Mr. Hesse about
16 various misconduct of other police officers,
17 correct?
18   A.   Yes.
19   Q.   Okay.  And you had criticized in
20 these complaints, Mr. Hesse's supervision of
21 these other police officers, correct?
22   A.   Yes.
23   Q.   Okay.  And you complained -- did
24 you ever complain to Mr. Hesse about what
25 you believed to be a cover up involving the

Page 242

1         K. Lamm
2 Halloween incident?
3    A.   Yes, I did.
4    Q.   When?
5    A.   In June of 2005.
6    Q.   Did Mr. Hesse fire you in June of
7 2005?
8    A.   No, he didn't.
9    Q.   Did he fire you in July of 2005?
10   A.   No, he didn't.
11   Q.   Did he fire you in August of
12 2005?
13   A.   No, he didn't.
14   Q.   Did he fire you in September of
15 2005?
16   A.   No, he didn't.
17   Q.   Did he fire you in October of
18 2005?
19   A.   No.  But when I brought it to his
20 attention --
21   Q.   I don't think there's a question,
22 sir.
23   A.   Well, I'm putting it on the
24 record anyway.
25   Q.   You go right ahead.

Page 243

1         K. Lamm
2    A.   That he tells me that the
3 incidents that occurred here in my statement
4 were not true about the Halloween incident,
5 and I said, "Well, how do you know?  You
6 weren't there."
7    Q.   Are you done with your statement
8 on the record?
9    A.   I am finished for now.
10 MO      MR. NOVIKOFF: Move to strike
11 because there was no question pending.
12   Q.   Anything else you want to state?
13   A.   No.  Not yet.
14   Q.   Okay.  Paragraph 26.  Did you
15 read paragraph 26 before you authorized your
16 attorney to file this on your behalf?
17   A.   I believe so.
18   Q.   Okay.  Is 26 accurate?
19   A.   I believe it to be.
20   Q.   So is it your testimony that no
21 member of the public ever complained about
22 you in your role as a police officer for
23 Ocean Beach, to your knowledge?
24   A.   Not that I'm aware of.
25       MR. NOVIKOFF: Let's mark the

Page 244

1         K. Lamm
2 following document as Lamm-1.
3       (Allegations of Official
4    Misconduct was marked as Lamm Exhibit-1
5    for identification; 11/19/08, E.L.)
6    Q.   Sir, I'm going to show you what's
7 been marked as Lamm-1, and I'm not going to
8 ask you to read the document.  I'm just
9 going to ask you to read the first
10 paragraph, to yourself now, of the
11 allegation under the heading "allegations of
12 official misconduct" and tell me when you're
13 done reading those two sentences.
14   A.   (Reviewing).  Okay.
15   Q.   As you sit here today, are you
16 familiar with a person named Jolly-Johanna
17 L. Northrop?
18   A.   I'm not sure.
19   Q.   You're not sure if you are
20 familiar with that name?  I'm asking you, as
21 you sit here today, do you recognize the
22 name Jolly-Johanna L. Northrop?
23   A.   I don't recall it.
24   Q.   Okay.  Do you recall ever being
25 accused of abusing the public trust

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 245

K. Lamm
1  K. Lamm
2  involving an incident concerning Brody
3  Santoro?
4      A.   I don't recall it.
5      Q.   So it's possible, but as you sit
6  here today, you don't recall it?
7      A.   I'm not familiar with this.
8      Q.   Okay.  Let's move on then.  Let's
9  go to paragraph 32, sir.  Did Mr. Hesse ever
10 instruct you to chauffeur intoxicated
11 colleagues both inside and out of Ocean
12 Beach?
13     A.   He has asked me to take --
14     Q.   My question is just a yes or no.
15     A.   Yes, he has.
16     Q.   On how many occasions did
17 Mr. Hesse instruct you to chauffeur
18 intoxicated police officers both inside and
19 out of Ocean Beach?
20     A.   Just one time for me.
21     Q.   When?
22     A.   Somewhere around the season of
23 2003.
24     Q.   And who was the intoxicated
25 colleague that Mr. Hesse directed you to

Page 246

1  K. Lamm
2  chauffeur?
3      A.   Gary Bosetti and Rich Bosetti.
4      Q.   Oh, so there was two.  Okay.
5  Where did Mr. Hesse ask you to chauffeur
6  them to?
7      A.   He wanted me to bring them back
8  to the lighthouse.
9      Q.   Okay.  Were they on duty at the
10 time, Gary and Richie Bosetti?
11     A.   No.  That time they were off
12 duty.
13     Q.   What time of the day did
14 Mr. Hesse ask you to chauffeur the Bosetti
15 brothers in their inebriated state?
16     A.   Approximately 3:00 in the
17 morning.
18     Q.   Did you witness them getting into
19 a vehicle after you chauffeured them to the
20 lighthouse?
21     A.   No, I did not.
22     Q.   Do you know why they were being
23 chauffeured to the lighthouse?
24     A.   No.  He just told me to take them
25 to the lighthouse and I did.

Page 247

1  K. Lamm
2      Q.   Did you inquire with Mr. Hesse as
3  to why you were taking them to the
4  lighthouse?
5      A.   No, I didn't.
6      Q.   Did the Bosettis, in their
7  inebriated state, tell you why you were
8  taking them to the lighthouse?
9      A.   No.  They said they wanted to get
10 to the lighthouse.
11     Q.   Do you -- did you witness them
12 doing anything once you dropped them off at
13 the lighthouse?
14     A.   No, I didn't.
15     Q.   Did you stay around to make sure
16 that they didn't do any harm to themselves
17 in their inebriated state?
18     A.   No, I didn't.
19     Q.   Were you on  -- were you on duty
20 at the time?
21     A.   Yes, I was.
22     Q.   Are automobiles parked at the
23 lighthouse?
24     A.   Excuse me?
25     Q.   Are automobiles parked at the

Page 248

1  K. Lamm
2  lighthouse?
3      A.   Yes.
4      Q.   Was it your belief that you were
5  chauffeuring the Bosetti brothers to their
6  automobiles to take off the island?
7      A.   Either that or they were going to
8  walk to the next town, Kismet.
9      Q.   And how far away is Kismet?
10     A.   Just several --
11          MR. GOODSTADT: Objection.
12     Q.   What's that?
13     A.   Just several 100 feet down the
14 road.
15     Q.   Okay.  Could you have driven to
16 Kismet?
17     A.   Yes.
18     Q.   Okay.  Did you stay around to
19 make sure that the Bosettis didn't get into
20 their respective automobiles and drive under
21 the state of intoxication?
22     A.   No.
23     Q.   Wouldn't you agree, sir, that as
24 a police officer, it would have been
25 important for the safety of the public that

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 249

K. Lamm

1 the Bosettis, in their inebriated state, did
2 not get into their automobiles and drive
3 away?
5 MR. GOODSTADT: Objection.
6 Q. Yes or no, or if you can't answer
7 yes or no, that's fine, too.
8 A. I can't answer that. They --
9 they could have just sat there and talked.
10 Q. Oh, no. I understand that. But
11 my question, sir, is, would you agree with
12 me that it would be important for the public
13 health and safety, to make sure that the
14 Bosettis weren't going to get into their
15 cars in an inebriated state that night?
16 A. Yes, it would be.
17 Q. Okay. Did you undertake any
18 activity to ensure that the Bosettis did not
19 get into their car after you dropped them
20 off?
21 A. I don't recall.
22 Q. Okay. When Mr. Hesse asked you
23 to do this, did you complain to him?
24 A. Yes. I -- I told him that being
25 that, you know, we're short staffed in the

Page 250

K. Lamm

1 village, I don't think that we should be
2 leaving the village with one less officer.
4 Q. When you say you were short
5 staffed, what do you mean?
6 A. 'Cause at nighttime, we didn't
7 have that many officers at times that were
8 working.
9 Q. So there were sometimes that you
10 have sufficient officers in the village at
11 night and there are times when you're short
12 staffed?
13 A. Depending on who's scheduled and
14 depending on the crowd that is there that
15 night.
16 Q. So it was your opinion that by
17 you taking the Bosettis to the lighthouse,
18 that left the village short staffed,
19 correct?
20 A. Yes.
21 Q. Mr. Hesse had a contrary opinion,
22 correct?
23 A. Maybe he did.
24 Q. Well, did he respond to you when
25 you said that you believed that you were

Page 251

K. Lamm

1 leaving the village short staffed?
2 A. He said yeah, but nothing
3 happened.
5 Q. So he had a contrary opinion --
6 oh, no. So he agreed with you that it was
7 short staffed?
8 A. Yes.
9 Q. Okay. And you felt by leaving
10 the village short staffed, that was
11 compromising the public health and safety of
12 the village -- of the people on Ocean Beach?
13 A. Yes.
14 Q. Did you advise Chief Paridiso
15 that Mr. Hesse's direction, in your opinion,
16 compromised the public health and safety of
17 the people on Ocean Beach? Yes or no or you
18 can't answer yes or no?
19 A. I spoken to him about -- about
20 it, saying that I -- I just don't feel that
21 it's right to drive them off if we're short
22 staffed during the summer season.
23 Q. So you spoke to Chief Paridiso?
24 A. Just that one time.
25 Q. When did you speak to Chief

Page 252

K. Lamm

1 Paridiso?
2 A. That was a few weeks after it.
3 Q. And did Chief Paridiso say
4 anything to you in response to your
5 communication to him?
6 A. I don't recall what he said.
7 Q. Okay. To your knowledge, after
8 you were asked to chauffeur the Bosettis,
9 were any of the other Plaintiffs in this
10 lawsuit asked to chauffeur any other
11 inebriated police officers anywhere within
12 or without Ocean Beach?
13 A. I can't answer for -- for someone
14 else.
15 Q. I'm just asking if you are aware,
16 not whether you can answer or not. Are you
17 aware that after you complained to Chief
18 Paridiso, did Hesse ever order any other of
19 the Plaintiffs in this lawsuit to chauffeur
20 intoxicated police officers within or
21 without Ocean Beach?
22 A. I'm not for certain, but there --
23 it was stated to Hesse that we aren't going
24 to drive anybody out to the lighthouse or

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 253

1    K. Lamm
2 anything if they're here off duty, and then
3 there was a memo saying that if you have to
4 leave the village, use a water taxi.
5 MO    MR. NOVIKOFF: Move to strike
6    as nonresponsive.
7    Q.   My question is simple, Mr. Lamm,
8 and if you don't know, then you don't know
9 and that's fine.  That's -- that's a fine
10 answer.  After you complained to
11 Mr. Paridiso, are you aware of any time that
12 one of the Plaintiffs in this action, at the
13 direction of Mr. Hesse, chauffeured an
14 intoxicated police officer anywhere within
15 or without Ocean Beach?
16    A.   I'm not for certain.
17    Q.   Great.  Let's look at paragraph
18 33.  Did you ever -- were you ever asked by
19 Mr. Hesse to give money for rocket fuel?
20    A.   No.
21    Q.   Are you aware if any of the
22 Plaintiffs in this action were ever -- were
23 ever asked by Hesse to give money for rocket
24 fuel?
25    A.   I don't believe so.  Not that I

Page 254

1    K. Lamm
2 know of.
3    Q.   Okay.  Did you personally ever
4 witness Hesse asking any police officer for
5 money so he can purchase rocket fuel?
6    A.   No.
7    Q.   Okay.  Let's look at paragraph
8 34.  In the last sentence of paragraph 34,
9 you allege, Mr. Lamm, "these newly hired
10 uncertified officers soon aligned themselves
11 with Hesse and his friends on the force,
12 further marginalizing the influence of
13 Plaintiffs and other dedicated and properly
14 certified OBPD officers."  In May 2002, what
15 influence did you have as a part-time
16 seasonal police officer for Ocean Beach?
17    MR. GOODSTADT: Objection.
18    A.   I don't understand the question.
19    Q.   Well, I don't understand the
20 allegation, so that's why I'm asking you the
21 question.  You allege here that by virtue of
22 Mr. Hesse hiring uncertified officers who
23 then aligned themselves with Hesse and his
24 friends, your influence was further
25 marginalized, do you see that?

Page 255

1    K. Lamm
2    A.   Um-hum.
3    Q.   My question to you is, what
4 influence did you have in May of 2002 as you
5 refer to it in paragraph 34?
6    A.   They were Hesse's -- they were
7 Hesse's buddies, and you know, we were just
8 distanced.
9    Q.   I understand that.  What
10 influence did you have, though, that's what
11 I'm asking?
12    A.   I personally may have had no
13 influence.
14    Q.   Okay.  Paragraph 36, "Plaintiffs
15 each advised Hesse on numerous occasions
16 that the department and village were left
17 dangerous -- dangerously short of personnel
18 when Plaintiffs were assigned to chauffeur
19 intoxicated officers and their civilian
20 friends and while such uncertified officers
21 were drinking in local bars," do you see
22 that?
23    A.   Yes.
24    Q.   Were you ever asked to chauffeur
25 a civilian friend of any intoxicated

Page 256

1    K. Lamm
2 officer?
3    A.   No.
4    Q.   How many communications did you
5 have with Mr. Hesse concerning your con --
6 your belief that the village was short
7 staffed because officers were drinking in
8 local bars?
9    A.   How many what?
10    Q.   Communications did you have?  Let
11 me break it down.  We know you spoke with
12 Mr. Hesse about your opinion that the
13 village was left short staffed when you had
14 to chauffeur the Bosettis that one time in
15 2003, correct?
16    A.   Correct.
17    Q.   How many communications did you
18 have with Hesse about your opinion that the
19 village was left short staffed because
20 officers were drinking in the local bars?
21    A.   May have been two occasions.
22    Q.   When was the first one?
23    A.   2003.
24    Q.   When was the second one?
25    A.   2004.

Precise Court Reporting
516-747-9393  718-343-7227  212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 257

1    K. Lamm
2    Q.   Okay.
3    A.   End of 2003 and the beginning
4  season of 2004.
5    Q.   Okay.  And would you agree with
6  me, sir, that if there were police officers
7  while on duty drinking in local bars, and
8  that left, in your opinion, the village
9  short staffed, that that posed a risk to
10 people on Ocean Beach?
11   A.   Yes, it could.
12   Q.   And in your duty to protect the
13 public and speak out against the endemic
14 corruption that you alleged, did you ever
15 advise Chief Paridiso of your concern that
16 on duty police officers were drinking in
17 local bars?
18   A.   No.  It was spoken to Hesse.
19 Immediate supervisor, chain of command.
20 MO    MR. NOVIKOFF: Motion to strike
21   everything after "no."
22   Q.   Same question with regard to
23 Mayor Rogers?
24   A.   She wasn't part of the chain of
25 command.

Page 258

1    K. Lamm
2    Q.   So the answer would be no?
3    A.   She wasn't part of the chain of
4  command.
5    Q.   Okay.  Same question with regard
6  to Trustee Loeffler?
7    A.   No.
8    Q.   Same question with regard to any
9  other trustee?
10   A.   No.  They weren't part of chain
11 of command.
12   Q.   Same question with regard to any
13 media outlet?
14   A.   No.
15   Q.   Now when you witnessed police
16 officers while on duty drinking in local
17 bars, were they eating a meal at the time?
18   A.   I don't believe so.
19   Q.   Okay.  So they were either at the
20 bar or they were -- they were at a table
21 drinking?
22   A.   At the bar, yes.
23   Q.   Okay.  Let's look at paragraph
24 39.  You allege "in addition, Hesse allowed
25 the uncertified officers to assign dock

Page 259

1    K. Lamm
2  masters to "cover" their shifts at the OBPD
3  blithely entrusting law enforcement power
4  and responsibility to untrained and
5  unsupervised civilians," do you see that?
6    A.   Yes, I do.
7    Q.   What did you mean "blithely"?
8      MR. GOODSTADT: Objection.
9    A.   Don't exactly know.
10   Q.   When you read this for accuracy
11 and truthfulness, did you know?
12   A.   That they put -- that they put
13 their trust in it.
14   Q.   Okay.  What uncertified officers
15 were assigned to dock masters?  I'm sorry.
16 Who are you referring to in 39 when you
17 write "uncertified officers"?  I'm looking
18 for the identity of the officers that you're
19 referring to in 39.
20   A.   Rich Bosetti and Gary Bosetti.
21   Q.   Do you have personal knowledge
22 that Hesse allowed the Bosetti brothers to
23 assign dock masters to cover their shifts?
24   A.   If Hesse wasn't there that day or
25 if he had already left, those two officers

Page 260

1    K. Lamm
2  are in charge.  Therefore, if there -- if
3  there's a dock master there, which there
4  was, was assigned to take over the desk, and
5  they had left the village without a police
6  officer down there.
7 MO    MR. NOVIKOFF: Motion to strike
8    as nonresponsive, sir.
9    Q.   Did you personally witness Hesse
10 directing the Bosettis to assign dock
11 masters to cover their shifts?
12     MR. GOODSTADT: Objection.
13   A.   No, I did not.
14   Q.   Did you ever partner with any
15 dock master while you were working for Ocean
16 Beach?
17   A.   No.
18   Q.   During any shifts that you had
19 while at Ocean Beach, was there a dock
20 master that was acting as a police officer
21 during that same shift, to your knowledge?
22   A.   As far as acting as a police
23 officer, they were left alone in the
24 village, there would be nobody there, so
25 they would have to act by answering the

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 261

1        K. Lamm
2 phone.
3 MO        MR. NOVIKOFF: Motion to strike
4     as nonresponsive, sir.
5     Q.  Sir, while you were working for
6 Ocean Beach, did you ever become aware that
7 there was a dock master working as a police
8 officer during your shift?
9     A.  No.
10    Q.  Okay.  40, "Hesse also allowed
11 the uncertified officers to drink beer while
12 patrolling in police vehicles."  Were you
13 ever in a police vehicle, other than the one
14 instance that you testify  -- the two
15 instances that you testified to, wherein an
16 uncertified officer was drinking beer?
17    A.  Other than from what I stated.
18    Q.  Right.  So the answer would be
19 no, other -- no, correct?
20    A.  Not that I can recall.
21    Q.  Okay.  Did Hesse ever tell you,
22 Mr. Lamm, what types of beer to confiscate?
23    A.  No, he did not.  But I have heard
24 Rich Bosetti say it when Frank Fiorillo was
25 patrolling the beach, if he can get certain

Page 262

1        K. Lamm
2 kinds of beer.
3     Q.  You happy you got that out?
4     A.  If he confiscated anything.
5     Q.  You done with what you want to
6 say?
7     A.  He made a request.
8        MR. GOODSTADT: Objection.
9 MO        MR. NOVIKOFF: Motion to strike
10     as nonresponsive everything other than
11     after "no."
12    Q.  Did Hesse ever instruct you, as
13 you allege in paragraph 41, to remove empty
14 beer cans and other refuse from the
15 uncertified officers' abandoned vehicles?
16        MR. GOODSTADT: Objection.
17        MR. NOVIKOFF: Fine.  I'll
18     withdraw the question.
19    Q.  Let's look at 41.  "Rather than
20 address Plaintiffs' num -- numerous
21 complaints about these violations of law and
22 department policy, Hesse instructed
23 Plaintiffs to remove empty beer cans and
24 other refuse that the uncertified officers
25 abandoned in their vehicles and left strewn

Page 263

1        K. Lamm
2 about the police station after a night on
3 duty."  Did Hesse ever instruct you,
4 Mr. Lamm, to do that which is being alleged
5 in paragraph 41?
6     A.  No, he didn't.
7     Q.  Let's look at paragraph 45.  Read
8 paragraph 45 to yourself and tell me when
9 you're done.
10    A.  (Reviewing).  Okay.
11    Q.  Is this an accurate allegation,
12 to the best of your recollection?
13        MR. GOODSTADT: Objection.
14    A.  Yes.  Frank was ridiculed and
15 called a fucking moron and to let Walter
16 Muller do whatever he wanted because that's
17 his close friend.
18 MO        MR. NOVIKOFF: Motion to strike
19     everything after the word "yes."
20    Q.  In your presence, how did Hesse
21 chide Officer Fiorillo?
22    A.  He belittled him.
23    Q.  What did he say?
24    A.  He called him a moron.  Said he
25 was stupid.

Page 264

1        K. Lamm
2     Q.  Okay.  Did Mr. Hesse say anything
3 else in your presence?
4     A.  He said that "that's a close
5 personal friend of mine and he can do what
6 he wants here."
7     Q.  Okay.  And did you think that
8 Mr. Hesse  -- and when did this take place,
9 sir?
10    A.  I believe it was approximately
11 2002.
12    Q.  Okay.  And this involved a fight,
13 correct?
14    A.  I believe it was a fight, yes.
15    Q.  Between who and whom?
16    A.  Walter Muller and I believe
17 either it was another party involved which I
18 didn't see.  I only came to the police
19 station to see the ending effects of it.
20    Q.  And was this person who came into
21 the police station a police officer or a
22 civilian?
23    A.  The fight didn't occur in the
24 police station.
25    Q.  But the person that you saw that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 265

K. Lamm

1 came into the police station, was it a
2 civilian or was it a police officer who you
3 say you saw the effects of the altercation?
4   A.   The one that involved -- that was
5 involved was Walter Muller, who was a police
6 officer dressed in regular clothes.  At the
7 time I believe he was off duty.
8   Q.   I understand that.  But did he
9 get into a fight with another police officer
10 or with a civilian, to the best of your
11 knowledge?
12   A.   From what I understand and I
13 believe, it was another civilian.
14   Q.   So Mr. Hesse, instruct --
15 according to your allegation and testimony,
16 was basically saying it's okay for Muller to
17 beat up a civilian because he's a close
18 personal friend of mine; is that correct?
19   A.   I don't know what happened prior
20 to me getting there, but I was there for the
21 remarks he made to Frank Fiorillo.
22   Q.   Right.  And what did you
23 understand the remarks  -- did you
24 understand his remarks to mean that -- that

Page 266

K. Lamm

1 Mr. Muller can beat up a civilian because
2 Mr. Muller is a close personal friend of
3 his?
4   A.   I believe the remarks were just
5 made to belittle Frank and embarrass him,
6 and -- and Hesse show that Walter Muller is
7 his friend and just to leave him be.
8   Q.   I understand that. But you write
9 in the last sentence, Mr. -- you allege in
10 the last sentence, Mr. Lamm, that "rather
11 than disciplining this officer, Hesse
12 insisted that his friends in the OBPD be
13 afforded the freedom to violate the law with
14 impunity," do you see that?
15   A.   I see that.
16   Q.   So would you agree with me that
17 Hesse was instructing you and Fiorillo in
18 2002 that Mr. Muller, a police officer,
19 should be allowed to beat up civilians
20 because he's a close personal friend of his?
21     MR. GOODSTADT: Objection.
22   Q.   Isn't that what you understood
23 Mr. Hesse to be saying?
24     MR. GOODSTADT: Objection.

Page 267

K. Lamm

1   A.   I wouldn't say it to that extent.
2 The only person that knows what he said is
3 George Hesse himself.
4   Q.   But you graduated high school,
5 sir.  What did you understand Mr. Hesse to
6 mean when he insisted, according to your
7 allegation, that his friends in the OBPD be
8 afforded the freedom to violate the law with
9 impunity?
10     MR. GOODSTADT: Objection.  I
11 don't know what his graduating high
12 school has to do with anything, but to
13 the extent that you're trying to harass
14 the witness, I'm going to instruct him
15 not to answer the next time that you
16 refer to high school education.
17     MR. NOVIKOFF: Go ahead.
18     MR. GOODSTADT: Unless you can
19 tell me what the relevance is.
20     MR. NOVIKOFF: You can answer
21 the question.
22     MR. GOODSTADT: I didn't think
23 so.
24   A.   My answer was my answer that I

Page 268

K. Lamm

1 stated before.
2   Q.   Okay.  Did you ever advise Chief
3 Paridiso that it was your belief that Hesse
4 was permitting an officer, in 2002, to
5 violate the law with impunity?
6   A.   No.  I didn't speak to Chief
7 Paridiso.
8   Q.   Don't you believe that in your
9 duty to protect the public and speak out
10 against endemic corruption, that it would be
11 important for Chief Paridiso to know that
12 Sergeant Hesse was advising various police
13 officers to allow another police officer to
14 violate the law with impunity?
15   A.   I wasn't there for the incident.
16   Q.   Oh, okay.  Did you ever advise
17 Mayor Rogers or Trustee Loeffler, in 2002,
18 that you had heard directly from Mr. Hesse
19 that his buddies on the police force were
20 free to violate the law with impunity?
21   A.   No, I did not.
22   Q.   Now I guess is that another
23 example where you didn't protect the public
24 and speak out against corruption?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 269

1        K. Lamm
2        MR. GOODSTADT: Objection.
3        A.   I didn't witness the incident,
4  so, therefore, I don't know exactly what
5  happened. Like I said in my statement
6  before, I was only there for whatever
7  happened at the end inside the police
8  station with the ridicule against Frank
9  Fiorillo.
10 MO      MR. NOVIKOFF: Motion to strike
11  as nonresponsive.
12      Q.   Let's look at paragraph 46. Read
13  it and tell me when you're done reading it.
14      A.   (Reviewing). Okay.
15      Q.   Do you have any personal
16  knowledge of the allegations in paragraph
17  46?
18      A.   No personal knowledge.
19      Q.   Let's look at paragraph 48. Did
20  Mr. Hesse ever admit to you, Mr. Lamm, that
21  he regularly spent the night at a known drug
22  dealer's residence in Ocean Beach and
23  Manhattan?
24      A.   Yes, he did.
25      Q.   Who was the known drug dealer?

Page 270

1        K. Lamm
2        A.   Mitch Burns.
3        Q.   Okay. When did Mr. Hesse advise
4  you that he regularly spent the evenings in
5  Manhattan and Ocean Beach with Mitch --
6  Mitch -- the drug dealer's residence?
7        A.   After he came back one early
8  morning from being at Mitch Burns' house in
9  Ocean Beach and he bragged about having sex
10  with Elyse Miller with no condom in the hot
11  tub.
12 MO      MR. NOVIKOFF: Elyse Miller,
13  okay. I'm going to move to strike the
14  answer.
15      Q.   Sir, when did you -- when did
16  Mr. Hesse first advise you that he slept in
17  a known drug dealer's residence in Ocean
18  Beach or Manhattan?
19      MR. GOODSTADT: He just told
20  you when. When he came back --
21      MR. NOVIKOFF: Thank you.
22  You're not testifying, Mr. Goodstadt.
23      MR. GOODSTADT: You're asking
24  the same question that you just moved
25  to strike.

Page 271

1        K. Lamm
2        MR. NOVIKOFF: So move to
3  strike. Just because you don't like
4  the answers you're getting --
5        MR. GOODSTADT: I actually like
6  that one.
7        MR. NOVIKOFF: No, sir.
8        MR. GOODSTADT: You moved to
9  strike it. Now you're asking the same
10  question.
11      Q.   What month, what year, sir?
12      A.   I believe it -- summertime of --
13  summer of 2002.
14      Q.   Did you think it was appropriate
15  in the summertime of 2002 that the sergeant
16  of the Ocean Beach Police Department was
17  residing, on a regular basis, in a known
18  drug dealer's residence?
19      A.   It may not have been proper.
20      Q.   Is that your answer, "it may not
21  have been proper"?
22      A.   It may not have been proper, but
23  that's what he chose to do. I can't speak
24  for his actions.
25      Q.   I'm not asking you to speak for

Page 272

1        K. Lamm
2  him. I'm only asking about your actions,
3  though. Did you ever tell Chief Paridiso?
4        MR. GOODSTADT: Objection.
5        A.   I don't recall if I did.
6        Q.   Did you ever tell Mayor Rogers or
7  Trustee Loeffler that Sergeant Hesse was
8  residing regularly in a known drug dealer's
9  residence?
10      A.   No, I didn't.
11      Q.   Did you ever chauffeur Mr. Hesse
12  to engage in a sexual escapade?
13      A.   Not that I can recall.
14      Q.   Did Mr. Hesse ever instruct you
15  not to issue summonses to his friends?
16      A.   Yes. CJ's Bar.
17      Q.   Is that the only occasion in
18  which you recall that Mr. Hesse instructed
19  you not to issue a summons to CJ's Bar?
20      A.   Also, to the corner house on
21  Ocean Breeze and Bay Walk. Not to go in
22  there as well.
23      Q.   Well, I'm not talking about
24  going. I'm talking about issuing summonses
25  now.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 273

K. Lamm

1         K. Lamm
2    A.   Same goes for that, too.
3    Q.   Same goes.  So we have two
4  occasions.  One CJ's Bar?
5    A.   Yes.
6    Q.   And one the corner house that you
7  referred to?
8    A.   Yes.
9    Q.   Any other examples of when
10  Mr. Hesse advised you not to issues
11  summonses to his friends?
12   A.   That's all that I can recall
13  right now.
14   Q.   When did Mr. Hesse advise you not
15  to issue a summons to CJ's Bar?
16   A.   In 2000 -- end of 2004.
17   Q.   And did you believe that this
18  was, at that time, a proper directive from
19  the sergeant of the Ocean Beach Police
20  Department?
21   A.   No.  I don't believe so.
22   Q.   Did you advise Chief Paridiso
23  that you believed that Sergeant Hesse was
24  giving you unlawful directives?
25   A.   No, I did not.  But George Hesse

Page 274

K. Lamm

1         K. Lamm
2  was my immediate supervisor, and I had to
3  listen to what he said.
4  MO        MR. NOVIKOFF: Motion to strike
5      as nonresponsive after the word "no."
6    Q.   Did you advise Trustee Loeffler
7  or Mayor Rogers, after Hesse directed you
8  not to issue summonses to CJ's, that you
9  believed he was issuing unlawful directives?
10   A.   No, I did not.
11   Q.   When did Mr. Hesse tell you not
12  to issue summonses to that corner house that
13  you testified to?
14   A.   After the incident when they --
15   Q.   When in terms --
16   A.   -- poured beer down the top --
17  the roof of the establishment in 2004 in the
18  month of May.
19  MO        MR. NOVIKOFF: May when?
20      Motion to strike.
21   Q.   What date, what month and year
22  did Mr. Hesse instruct you not to issue
23  summonses to this house?
24          MR. GOODSTADT: Objection.  He
25      just answered the question.

Page 275

K. Lamm

1         K. Lamm
2          MR. NOVIKOFF: Good.  Thank
3  you.
4          MR. GOODSTADT: He said May
5  2004.
6    Q.   What date, what month and year?
7          MR. GOODSTADT: Objection.
8    A.   It was the month of May, 2004.
9    Q.   Did you believe that this was a
10  lawful directive from Mr. Hesse?
11   A.   No, I did not.
12   Q.   Did you advise Chief Paridiso
13  that you were receiving unlawful directives
14  from the sergeant?
15   A.   No.  George Hesse was the
16  immediate supervisor at nighttime and he was
17  my boss.
18  MO        MR. NOVIKOFF: Motion to strike
19      as nonresponsive after the word "no."
20   Q.   Did you advise Mayor Rogers or
21  Trustee Loeffler that, in your belief, Chief
22  Hesse was issuing to you an unlawful
23  directive concerning this corner house?
24   A.   No, I did not.  You mind if I
25  stretch my legs?

Page 276

K. Lamm

1         K. Lamm
2          MR. NOVIKOFF: We got five
3  minutes to go on the tape.  Can we just
4  go for three more minutes?
5          THE WITNESS: That's fine.
6    Q.   Paragraph 58.  Did you witness
7  the incident that's alleged in paragraph 58,
8  Mr. Lamm?
9    A.   Can I take the time to read it,
10  please?
11   Q.   Absolutely.
12   A.   (Reviewing).  No, I did not.
13   Q.   Look at paragraph 60 and read it,
14  if you can, to yourself, and then tell me if
15  you personally witnessed the events alleged
16  in paragraph 60.
17   A.   (Reviewing).  No, I wasn't.
18          MR. NOVIKOFF: Okay.  Why don't
19      we take a break while the tape is being
20      changed.  Can we limit it to about five
21      minutes?
22          MR. GOODSTADT: Sure.
23          MR. NOVIKOFF: Thanks.
24          THE VIDEOGRAPHER: This ends
25      tape number five.  The time is 4:14

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 277

1        K. Lamm
2    p.m. going off the record.
3        (A break was taken.)
4        (Mr. Gray left the deposition.)
5        THE VIDEOGRAPHER: This begins
6    tape number six. The time is 4:29 p.m.
7    Back on the record.
8    Q.    Mr. Lamm, did you receive a call
9    on October 30, 2004 concerning a fight at
10   Houser's?
11   A.    Yes.
12   Q.    Did you personally receive the
13   call or did one of your partners receive the
14   call?
15   A.    First call that was received was
16   somebody said -- that said "come to
17   Houser's" and they hung up.
18   Q.    Okay. And did you -- did you
19   personally receive that call?
20   A.    Yes, I did.
21   Q.    Did that call come from the
22   dispatcher?
23   A.    There is no dispatcher.
24   Q.    Okay. So do you know who made
25   that call?

Page 278

1        K. Lamm
2    A.    No, I don't.
3    Q.    Did you receive that call on your
4    cell phone?
5    A.    It was on the police phone.
6    Q.    On the what?
7    A.    On the police department phone.
8    Q.    And where were you when you
9    received this call?
10   A.    In the village. Patrolling.
11   Q.    You were patrolling?
12   A.    Yes.
13   Q.    And did you have a phone with you
14   at the time of your -- of your patrol?
15   A.    Yes.
16   Q.    Okay. And is that what you meant
17   when you said the police department phone?
18   A.    Yes.
19   Q.    Okay. And can civilians call
20   directly to the police department phone that
21   you carry with you?
22   A.    Yes.
23   Q.    Okay. Did you receive another
24   call?
25   A.    I didn't receive it. Tom Snyder

Page 279

1        K. Lamm
2    received it.
3    Q.    Okay. When you first received
4    the call -- well, was Tom Snyder with you
5    when he received that -- a call?
6    A.    Yes.
7    Q.    All right. And did he receive it
8    on the police department phone as well?
9    A.    Yes.
10   Q.    Did you have different numbers?
11       MR. GOODSTADT: Objection.
12   Q.    Well, did your phone -- did your
13   respective police department phones have
14   different phone numbers?
15       MR. GOODSTADT: Objection.
16   A.    It was forwarded, the phone.
17   Q.    It was what?
18   A.    The phone is forwarded to ring on
19   the cell phone.
20   Q.    From where?
21   A.    From the police phone in the --
22   in the station house.
23   Q.    Okay. And is it forwarded
24   automatically or does a human being have to
25   forward the call?

Page 280

1        K. Lamm
2    A.    You would have to set it up that
3    way. The person.
4    Q.    Well, the night of October 30,
5    2004, did a human being forward, to your
6    knowledge, the call that you received or was
7    it automatic?
8    A.    The phone was already forwarded.
9    Q.    Okay. How much time elapsed
10   between the time that you got your phone
11   call and the time that Mr. Snyder got his
12   phone call?
13   A.    Maybe less than a minute.
14   Q.    Where were you and Mr. -- well,
15   were you with Mr. Snyder at the time that
16   you got your phone call?
17   A.    Yes.
18   Q.    Were you in a car?
19   A.    I was in a vehicle. SUV.
20   Q.    You were in an SUV. Where -- and
21   was Mr. Snyder with you?
22   A.    Yes, he was.
23   Q.    Was anyone else with you?
24   A.    Yes.
25   Q.    Who?

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 74 of 122 PageID #: 1922

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 281

|  |
| --- |
| K. Lamm |

1       K. Lamm
2    A.   Frank Fiorillo.
3    Q.   Is it common that three police
4  officers patrol Ocean Beach at night?
5    A.   Yes.
6    Q.   Together?
7    A.   Yes.
8    Q.   Okay.  And where were you located
9  when you got your phone call?
10    A.   By the school.
11    Q.   At the school?
12    A.   Yeah.
13    Q.   Where is the school in relation
14  to Houser's?
15    A.   It's -- it's on the border.  It's
16  on the border.
17    Q.   Border of what?
18    A.   On the border of Corneil is where
19  the school is.  It is just -- what is that?
20  Trying to remember over there.  It's west of
21  Houser's.
22    Q.   I understand that.  You said
23  border.  Border of what?
24    A.   The border.  It's on the
25  borderline before  -- you would have to pass

Page 282

1       K. Lamm
2  the school before you would go into another
3  town, but we were by the school.
4    Q.   Right.  So what were you at the
5  border of?  It was Ocean Beach --
6    A.   Ocean Beach and Corneil.
7    Q.   Okay.  And how long of a drive is
8  it from where you received the phone call to
9  Houser's?
10    A.   It's several blocks down.
11    Q.   So how long does it -- would it
12  normally take for you to drive from when you
13  received -- from where you were to Houser's?
14    A.   It all depends how many people
15  were out on the street.
16    Q.   Let's assume no one was out on
17  the street.
18    A.   It wouldn't take very long.
19    Q.   Well, tell me.
20    A.   Not long.
21    Q.   Well, what's "not long"?  10
22  seconds?  30 seconds?  Five minutes?  "Not
23  long" is a relative phrase.
24    A.   Well, considering that it was
25  dark and -- and there was parties going on,

Page 283

1       K. Lamm
2  you'd have to use caution.  So maybe you can
3  get there in about, I don't know, two
4  minutes.
5    Q.   Okay.  How long did it take you
6  to get to Houser's once you got the phone
7  call?
8    A.   Just about that time.
9    Q.   Were you at Houser's by the time
10  that Snyder got his phone call?
11    A.   No.  At the time when he was
12  getting the phone call, I was turning the
13  vehicle around because that's a dead end
14  street.
15    Q.   So once you got the phone call,
16  you had to turn the vehicle around, is that
17  your testimony?
18    A.   Yes.
19    Q.   Okay.  Did Snyder, before you got
20  to Houser's, advise you as to what was said
21  to him on the phone call?
22    A.   He  -- he said that the Bosettis
23  are in a fight.
24    Q.   Did Snyder tell you who called
25  him?

Page 284

1       K. Lamm
2    A.   I don't recall.
3    Q.   Okay.  Did Snyder put the
4  phone -- when Snyder got the phone call, did
5  he put it on speaker so that everyone could
6  hear it?
7    A.   No.  Not that I can recall.  I
8  don't believe he did.
9    Q.   You don't believe he did?
10    A.   No.
11    Q.   Okay.  Now when you got to
12  Snyder's  -- when you got to Houser's,
13  describe what was going on outside of
14  Houser's when you -- when you got there.
15    A.   There was people out in the
16  street.
17    Q.   Okay.
18    A.   And people, as we got there,
19  people were exiting the establishment.
20    Q.   Okay.  Did you attempt  -- did
21  you personally, Mr. Lamm, attempt to stop
22  anyone from leaving before you entered
23  Houser's?
24    A.   No.  I saw Rich Bosetti outside
25  and --

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 285

K. Lamm

1
2  Q.   No.  The question is yes or no,
3  did you attempt to stop anyone from leaving
4  once you got to Houser's?
5  A.   No.
6  Q.   Okay.  You exited the vehicle; is
7  that true?
8  A.   Yes.
9  Q.   And Mr. Snyder and Mr. Fiorillo
10 exited the vehicle?
11 A.   Yes.
12 Q.   Did the three of you walk
13 together to the entrance of Houser's?
14 A.   No.  We walked over towards Rich
15 Bosetti.
16 Q.   Now where was Rich Bosetti in
17 relation to the car when you exited the
18 vehicle?
19 A.   He was to the left of the
20 vehicle.
21 Q.   How far away from the vehicle to
22 the left was he?
23 A.   To give an exact answer, I
24 couldn't tell you exactly how many feet
25 exactly.

Page 286

K. Lamm

1
2  Q.   Can you approximate?
3  A.   Or make an approximated guess.
4  Q.   You couldn't do either one of the
5  two?
6  A.   I could, but it may not be
7  accurate.
8  Q.   That's fine.  I'll accept your
9  answer with that -- with that caution.
10 A.   Maybe about -- I don't know.
11 Could be 40 feet maybe.  Maybe.
12 Q.   Okay.  How many people did --
13 were outside of Houser's as you rolled up?
14 A.   For an exact count, I'm not sure.
15 Q.   More than 10?
16 A.   Yes.  More than 10.
17 Q.   More than 20?
18 A.   Maybe -- maybe close -- close to
19 25 maybe.
20 Q.   Okay.  And were you in the car
21 when you spotted Richard Bosetti?
22 A.   When I got out of the vehicle is
23 when I saw Rich Bosetti.
24 Q.   Did Richard Bosetti wave you down
25 or did you spot Mr. Bosetti independently of

Page 287

K. Lamm

1
2  anything that Mr. Bosetti did?
3  A.   Spotted --
4       MR. GOODSTADT: Objection.
5  Q.   What's that?
6  A.   Spotted him on my own.
7  Q.   Okay.  And did you approach
8  Mr. Bosetti or did Mr. Bosetti approach you
9  once you spotted him?
10 A.   Myself and Tom Snyder approached
11 Rich Bosetti.
12 Q.   Okay.  And was Mr. Bosetti
13 inebriated, in your opinion?
14 A.   He -- he had what appeared to be
15 an alcoholic drink.  Smelled the alcohol on
16 him.
17 Q.   Okay.  And did you have a
18 conversation with Mr. Bosetti when you
19 approached him outside of Houser's when you
20 first rolled up?
21 A.   I asked him what happened.
22 Q.   And what did Mr. Bosetti say to
23 you?
24 A.   He said there was someone being
25 choked.

Page 288

K. Lamm

1
2  Q.   What was that?
3  A.   He said someone was being choked.
4  Q.   Choked, is that all he said?
5  A.   And I said, "Who was being
6  choked?"
7  Q.   And what was his response?
8  A.   He didn't answer.  Then the
9  person that is now known to me as Chris
10 Shalick, he said, "My friend was the one
11 being choked."
12 Q.   Okay.  So Chris Shalick was
13 standing next to Richard Bosetti while you
14 and Mr. Snyder were talking to him?
15 A.   Again, please.
16 Q.   Was -- was Mr. Shalick standing
17 next to Mr. Bosetti, Richard Bosetti when
18 you and Snyder were talking to him?
19 A.   Yes.
20 Q.   Okay.  Had he always been there
21 or did he come up while you were speaking
22 with Mr. Bosetti?
23 A.   Both of them were there together
24 upon the approach.
25 Q.   Okay.  Were they involved in an

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 289

K. Lamm

1
2 altercation at that time, to the best of
3 your recollection?
4   A.   That's what we were asking.
5   Q.   No.  No.  When you saw
6 Mr. Bosetti and you approached him and
7 Mr. Shalick was there with him, was him and
8 Mr. Shalick engaged in any type of
9 altercation?
10   A.   I don't know if it was an
11 altercation.  They seemed to be in close
12 together, but I don't know if it was an
13 altercation.
14   Q.   And this was outside of Houser's?
15   A.   Yes.
16   Q.   Did you see either one of them
17 throw a fist?
18   A.   No, I did not.
19   Q.   Did you see either one of them
20 have their hands on the other?
21   A.   No, I did not.
22   Q.   Did either one of them appear to
23 you to be yelling at the other?
24   A.   I don't believe they were.
25   Q.   Did either one of them have their

Page 290

K. Lamm

1
2 finger in the other's face?
3   A.   Not that I -- not that I can
4 recall.
5   Q.   Okay.  So now you went up and you
6 approached Mr. Bosetti.  Did you ask who the
7 other individual was before you started
8 talking to Mr. Bosetti?
9   A.   Which?  The one that was there
10 with Rich Bosetti?
11   Q.   Yes.  You said it was Chris
12 Shalick, so --
13   A.   Who I understand to be known now.
14   Q.   Yeah.  Did you -- before you
15 started talking to Mr. Bosetti, did you
16 inquire with this other individual who he
17 was?
18   A.   Right.  Well, after we asked, you
19 know, what happened, the individual, Chris
20 Shalick, said, "It was my friend being
21 choked."  Tommy asked Rich Bosetti  -- Tom
22 Snyder asked Rich Bosetti, "Rich, what's
23 going on here?"  And Rich walked away.
24 MO      MR. NOVIKOFF: Motion to strike
25   as nonresponsive.

Page 291

K. Lamm

1
2   Q.   As you walked up to Mr. Bosetti
3 and before you spoke to Mr. Bosetti, did you
4 ask who this individual was that was
5 standing in close proximity to Mr. Bosetti,
6 yes or no?
7   A.   Yes.
8   Q.   Okay.  And did he -- before you
9 spoke to Mr. Bosetti, did this individual
10 identify himself?
11   A.   I asked him what his name was.
12 He said, "Chris."
13   Q.   And did you ask him his last
14 name?
15   A.   I don't know if I asked him his
16 last name at that time.
17   Q.   Okay.  And you asked  -- what
18 was -- what was the first question that you
19 asked Mr. Richard Bosetti?
20       MR. GOODSTADT: Objection.
21   A.   I said, "What's going on here?"
22   Q.   And did he answer you?
23   A.   Yes.
24   Q.   Okay.  And I think you advised us
25 of his answer.  Then what was the second

Page 292

K. Lamm

1
2 question?
3       MR. GOODSTADT: Objection.
4   A.   I said, "Who is this person?"
5   Q.   You asked Mr. Bosetti who is this
6 person?
7   A.   Um-hum.
8   Q.   But you had known this person
9 because you had asked him before you spoke
10 to Mr. Bosetti who he was and he said Chris,
11 correct?
12       MR. GOODSTADT: Objection.
13   That distorts the testimony.
14   A.   My understanding of the question
15 you just asked.
16   Q.   I'm just trying to understand
17 what you said to the respective individuals.
18 Before you spoke to Mr. Richard Bosetti, did
19 you inquire with this individual what his
20 name was?
21   A.   No.
22   Q.   Oh.  Okay.  Fine.
23   A.   Because I figured Rich would tell
24 me because he worked for the department.
25 MO      MR. NOVIKOFF: Motion to

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 293

K. Lamm

1  strike.
2
3  A.  And tell me what happened.
4 MO  MR. NOVIKOFF: Motion to strike
5  as nonresponsive after "no."
6  MR. GOODSTADT: Just objection.
7  Just to be clear, when you say "this
8  person," are you referring to -- I'm
9  not sure who you're referring to.  I
10  think you're both referring to two
11  different people.
12  Q.  Well, let's see.  He testified --
13  correct me if I'm wrong -- that when he
14  approached Mr. Richard Bosetti, there was a
15  gentleman standing in close proximity to
16  him, correct?
17  A.  Correct.
18  Q.  And that's a person that you now
19  know to be Chris Shalick, correct?
20  A.  That is correct.
21  Q.  Was there another person standing
22  next to Mr. -- Mr. Bosetti?
23  A.  No.  Other than myself and Thomas
24  Snyder.
25  Q.  That's right.  Now before you

Page 294

K. Lamm

2  spoke to Mr. Bosetti, did you inquire with
3  this individual standing next to him who he
4  was?
5  A.  No.  I asked Richard Bosetti
6  first.
7  Q.  Okay.  Well, so you asked
8  Mr. Bosetti who this individual was?
9  A.  No.  I had asked Rich Bosetti as
10  to what had happened first.
11  Q.  That's right.  And -- and he --
12  did he answer you?
13  A.  Yes.
14  Q.  Okay.  And then the next question
15  to Mr. Bosetti was what?
16  A.  Who was the person --
17  Q.  Standing next to him?
18  A.  That was being --
19  Q.  No?  Okay.  What was the
20  question?
21  A.  Let me finish.
22  MR. GOODSTADT: That's where
23  the confusion came before.
24  A.  Who was this person that was
25  being choked.

Page 295

K. Lamm

1  Q.  And what did he say, if anything?
3  A.  That's when Chris Shalick jumped
4  in and said, "It was my friend being
5  choked."
6  Q.  Okay.  Did you ask Mr. Bosetti a
7  question after Mr. Shalick spoke?
8  A.  I'm sorry.  Say that again.
9  Q.  Did you ask Mr. Bosetti a
10  question after Mr. Shalick spoke?
11  A.  I asked him, "Well, Rich, what's
12  the story?"  And he did not answer.
13  Q.  Did you ask him again?
14  A.  That's when Chris Shalick spoke
15  up and said, "My friend was in a choke --
16  was in a choke hold and I went to go pull
17  him out."
18  Q.  Okay.  So Mr. Shalick had said
19  two things to you then.  One, who he was,
20  and two, that his friend was being choked;
21  is that correct?
22  A.  That's right.
23  Q.  Okay.  Did you ask Mr. Bosetti
24  any other questions?
25  A.  No.  He had walked away.

Page 296

K. Lamm

2  Q.  Did you advise Mr. Bosetti to
3  stay there so that you can further
4  investigate the incident before he left
5  away?
6  A.  I figured that being that he
7  worked for the department, he would have
8  stayed there and helped us out.
9 MO  MR. NOVIKOFF: Motion to strike
10  as nonresponsive.
11  Q.  Did you ask Mr. Bosetti to stay
12  there so that you can continue your
13  investigation before he walked away?
14  A.  No.  Figured that he worked for
15  the department, he would stay there and help
16  us out.
17 MO  MR. NOVIKOFF: Motion to strike
18  as nonresponsive after the word "no."
19  Q.  Okay.  When Mr. Bosetti walked
20  away, did you continue in your conversation
21  with Chris Shalick?
22  A.  Yes, I did.
23  Q.  Okay.  During any of your
24  conversation with Mr. Bosetti, did you form
25  an opinion as to whether he was intoxicated

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 297

K. Lamm

1        K. Lamm
2   or not?
3        A.   That who was intoxicated?
4        Q.   Mr. Bosetti.
5        A.   As I've said before, he appeared
6   to have an alcoholic beverage in his hand
7   and he smelled of alcohol.
8        Q.   How about from his speech, did
9   you form an opinion from his speech whether
10  or not he was intoxicated?
11       A.   No, I couldn't, because it was
12  too short of an answer for him to continue
13  speaking.
14       Q.   Did you look into his eyes and
15  determine or form an opinion as to whether
16  or not he was intoxicated?
17       A.   I don't recall that.
18       Q.   Did any aspect of his physical --
19  of his physicality indicate to you, in your
20  experience as a police officer, whether or
21  not he was intoxicated?
22            MR. GOODSTADT: Objection.
23       A.   That I don't recall.
24       Q.   How about Mr. Shalick, was he, in
25  your opinion, intoxicated?

Page 298

K. Lamm

1        K. Lamm
2        A.   They had all been drinking, so.
3        Q.   Well, sir, we know that you
4   weren't in the bar at the time of this
5   incident, correct?
6        A.   Correct.
7        Q.   So hear my question.  When you
8   were speaking to Mr. Shalick, did you
9   have -- form an opinion as to whether or not
10  he was intoxicated?
11       A.   He smelled of alcohol.
12       Q.   Mr. Shalick did?
13       A.   Yes.
14       Q.   Did he have a drink in his hand?
15       A.   No, he didn't.
16       Q.   Okay.  How long did you speak
17  with Mr. Shalick outside of Houser's?
18       A.   Just a short while.  Then we
19  asked, myself and Tom Snyder, if he can
20  identify the person.
21       Q.   All right.  How long was the
22  conversation?  I know you say it's a short
23  while, but that doesn't help me or
24  Mr. Goodstadt.  How long was the
25  conversation?

Page 299

K. Lamm

1        K. Lamm
2            MR. GOODSTADT: Objection.
3            MR. NOVIKOFF: Okay.
4        A.   Maybe three minutes.
5        Q.   Okay.  What else did Mr. Shalick
6   say to you, other than what you've testified
7   to so far?
8        A.   That he was hit with a pool cue.
9        Q.   That Shalick was hit with a pool
10  cue?
11       A.   Yeah.  In attempt to pull his
12  friend out of a choke hold.
13       Q.   Did Shalick indicate to you if
14  the pool cue broke or not?
15       A.   I believe they said it broke.
16       Q.   Okay.  During your conversation
17  with him outside of Houser's?
18       A.   From what I can recall.
19       Q.   That's -- that's all I'm asking
20  you to do.  Now in this three-minute
21  conversation with Mr. Shalick, do you recall
22  him saying anything else to you that you
23  haven't already testified to?
24       A.   I believe he stated that one of
25  the individuals was a cop.

Page 300

K. Lamm

1        K. Lamm
2        Q.   Okay.  Do you recall anything
3   else?  Well, did you ask him what is the
4   basis for his belief that one of the
5   individuals was a cop?  Now, again, this is
6   just outside of Houser's.
7        A.   That's right.  I asked him, "How
8   did you know that?"  And he said the
9   individual stated it and he had a shield
10  around his neck.
11       Q.   Okay.  And by -- did you form an
12  opinion by speaking with Mr. Shalick,
13  whether or not he was intoxicated at the
14  time that you were speaking with him?
15       A.   I didn't form any opinion at that
16  time.
17       Q.   Did you inquire with Mr. Shalick
18  as to how many drinks he had had that night
19  while you were speaking to him outside?
20       A.   Not at that moment I didn't.
21       Q.   That's all I'm asking you.  About
22  that moment.  Did you ask him?
23       A.   I don't believe I did at that
24  moment.
25       Q.   Okay.  Anything else you can

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 301

K. Lamm

1 recall Shalick saying to you during this
2 three-minute conversation outside of
3 Houser's?
4 A. No. I don't recall.
5 Q. What did you personally do next,
6 Mr. Lamm, after you ended your conversation
7 with Mr. Shalick, if anything?
8 A. Another person walked over and he
9 said -- that was a person John Tesoro --
10 and he said that he was hit as well. And I
11 said, "Can you identify who it was if you go
12 back in the bar?" He said yes.
13 Q. How long was your conversation
14 with Mr. Tesoro?
15 A. Maybe a little over a minute.
16 Q. In your opinion, was Mr. Tesoro
17 inebriated at the time you were speaking
18 with him?
19 A. He didn't appear to be very
20 inebriated, but --
21 Q. Well --
22 A. I -- they have all been drinking,
23 so.
24 Q. Well, again, you weren't there at
25

Page 302

K. Lamm

1 the time of the incident, so you don't know
2 firsthand whether or not they were drinking,
3 correct?
4 A. No. But just the -- the smell of
5 alcohol.
6 Q. Well, inebriation is like
7 pregnancy, sir, you either are inebriated or
8 you're not. So my question is whether or
9 not he was a little inebriated or a lot
10 inebriated, was he inebriated, in your
11 opinion, when you were speaking with him?
12 MR. GOODSTADT: Objection.
13 A. Yes.
14 Q. Okay. Did you ask Mr. Tesoro at
15 that time how many drinks he had consumed
16 that night?
17 A. No. I don't believe so.
18 Q. Okay. So did Mr. Tesoro say
19 anything to you, other than what you've just
20 testified to, in this conversation outside
21 of Houser's?
22 A. Not that I can recall.
23 Q. Okay. And what did you do next,
24 you personally, Mr. Lamm?
25

Page 303

K. Lamm

1 A. Went behind the two individuals.
2 Thomas Snyder took the lead. You had the
3 two individuals and then myself and
4 proceeded to go into Houser's Bar.
5 Q. Did you speak to anybody, other
6 than these two individuals, before you went
7 into Houser's Bar?
8 MR. GOODSTADT: And Gary -- and
9 Richie Bosetti.
10 MR. NOVIKOFF: Yes. And
11 Richard.
12 A. No.
13 Q. Did any civilians approach you
14 before you walked into Houser's Bar?
15 A. Not that --
16 MR. GOODSTADT: Other than the
17 three people?
18 MR. NOVIKOFF: Yes.
19 A. Not that I can recall.
20 Q. Did you attempt to talk to any
21 of -- any civilians, other than the three
22 people we've been talking about, before you
23 went into the bar?
24 A. No.
25

Page 304

K. Lamm

1 Q. Okay. You went into the bar.
2 Did any bouncer stop you from going into the
3 bar?
4 A. The bouncer stopped Thomas
5 Snyder.
6 Q. Okay. So before you and
7 Mr. Snyder went in the first time, a bouncer
8 stopped you?
9 A. Not me. Thomas Snyder.
10 Q. Okay. Where were you when this
11 bouncer stopped Mr. Snyder?
12 A. As I said before, it was Thomas
13 Snyder, the two individuals and myself in
14 behind.
15 Q. Okay. And did you witness the
16 bouncer stopping Mr. Snyder?
17 A. Yes. I saw that.
18 Q. Did you hear what the bouncer had
19 said to Mr. Snyder, if anything?
20 A. I don't know what the bouncer
21 said to -- to Thomas Snyder.
22 Q. Do you know what Mr. Snyder said
23 to the bouncer, if anything?
24 A. Yes, I do.
25

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 305

K. Lamm
1
2    Q.   And you heard this?
3    A.   Yes.
4    Q.   What did you hear?
5    A.   He says, "You can step aside or
6  you -- or you can be arrested for impeding a
7  police investigation."
8    Q.   And did the bouncer step aside?
9    A.   Yes, he did.
10   Q.   So how long did it take between
11 the time that Mr. Snyder approached the
12 entrance to Houser's and the time that
13 Mr. Snyder went into Houser's?
14   A.   To give an exact figure on it, I
15 couldn't tell you.  I wasn't time clocking
16 it.
17   Q.   I understand you weren't time
18 clocking it, but was it five seconds?
19   A.   No.  Maybe a little longer than
20 that.
21   Q.   10 seconds?
22   A.   That the doorman was preventing
23 Thomas Snyder from getting in?
24   Q.   Yeah.  So it was about 10
25 seconds?

Page 306

K. Lamm
1
2    A.   I would use that for now.  10
3  seconds.
4    Q.   I don't want you to agree with me
5  just for the sake of agreeing with me, sir.
6  I mean, I think it's clear you testified
7  that Snyder --
8    A.   I may recall later that it might
9  have been a different time, but for now, 10
10 seconds seems to be pretty somewhat fair.
11   Q.   Okay.  Great.  What did you
12 personally do next once the bouncer
13 permitted you, Snyder, Tesoro and Shalick to
14 go in the bar?
15       MR. GOODSTADT: Objection.
16   A.   We told them to look around.
17   Q.   You told who to look around?
18   A.   Chris Shalick.
19   Q.   Okay.
20   A.   John Tesoro.
21   Q.   Did you tell them -- what did you
22 tell them to look for, if anything?
23   A.   If they can identify the
24 individual.
25   Q.   Okay.  And what did you do after

Page 307

K. Lamm
1
2  you told them to  -- and did you tell them
3  to look around or did Snyder tell them to
4  look around?
5    A.   We both did.
6    Q.   Same time?
7    A.   Yeah.  Well --
8    Q.   In stereo?  At the same time you
9  told them both to look around?
10   A.   As we got in there -- Tom --
11 Thomas Snyder said, you know, "Look around.
12 See if you can identify anyone."  And we
13 walked to the back of the  -- of the
14 establishment out onto the back deck, and
15 that's when I said, "If you can -- if you
16 can identify anyone, let us know."
17   Q.   So Shalick and Tesoro walked with
18 you through the bar to the back deck?
19   A.   They did.
20   Q.   Okay.  Now you had known that the
21 Bosettis -- withdrawn.  By virtue of the
22 call to Snyder, you were aware that someone
23 had alleged that the Bosettis were involved
24 in a fight, correct?
25   A.   It may have only been one.

Page 308

K. Lamm
1
2    Q.   Sir, let's go back to what --
3  let's go back to what you testified to.  You
4  said Snyder got a call, right?
5    A.   Yes.
6    Q.   And you said that Snyder told you
7  that the Bosettis were in a fight, correct?
8    A.   Correct.
9    Q.   So at least as of the time that
10 you rolled up to Houser's and spoke to
11 Richard Bosetti, you had no idea as to
12 whether it was either Richard or Gary
13 Bosetti in the fight, all you knew is that
14 someone had said the Bosettis were in a
15 fight, correct?
16   A.   Correct.
17   Q.   And given the knowledge that you
18 knew, according to the phone call, that the
19 Bosettis were in a fight, you permitted
20 Richard Bosetti to leave a potential crime
21 scene, correct?
22       MR. GOODSTADT: Objection.
23   A.   I didn't give him any potential
24 to leave.  He worked for the department.
25   Q.   Was he a civilian at the time or

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 309

K. Lamm

1    was he on duty at the time?
2        A.    He was a civilian at the time.
3    He was a civilian then, too, because he was
4    never certified to be a police officer.
5        Q.    Yeah.  I get that, sir.  But he
6    wasn't on duty at the time, was he?
7        A.    No, he wasn't.  But if he worked
8    for the department, you figured he would
9    have helped us out.
10   MO        MR. NOVIKOFF: Motion to
11       strike.
12       Q.    Was he on duty at the time, sir?
13       A.    No, he wasn't.
14       Q.    Okay.  And you know of no
15   impediment, no law that says you can't
16   arrest an off duty police officer who may be
17   involved in a physical altercation, do you?
18       A.    Not that I'm aware of.
19       Q.    Are you aware of any law in the
20   State of New York that says you can't detain
21   an off duty police officer who you have
22   become aware of may be involved in a crime?
23       A.    Not that I'm aware of.
24       Q.    Right.  Okay.  So now you're in

Page 310

K. Lamm

1    the bar and you have knowledge that the
2    Bosettis have been in a fight, correct, at
3    least according to the phone call to Snyder,
4    right?
5        A.    Yes.
6        Q.    You knew what Gary Bosetti looked
7    like -- looked like, correct?
8        A.    Yes.
9        Q.    There was no doubt as to what
10   Gary Bosetti looked like, in your opinion,
11   right?
12       A.    That's right.
13       Q.    So can you explain for the jury
14   if you were aware as to who may have been
15   involved in the fight, why you needed the
16   civilians to see if Gary Bosetti was in the
17   bar?
18       A.    Because they were there for the
19   incident and they had to identify the person
20   that was in this altercation with them.
21       Q.    Did you look by yourself --
22   withdrawn.  Did you look for Gary Bosetti
23   while you were in the bar?
24       A.    Myself and Thomas Snyder

Page 311

K. Lamm

1    approached Rich Bosetti and asked, "Where's
2    your brother?"
3        Q.    I'm not talking about what took
4    place outside.  When you were in the bar,
5    did you look for Gary Bosetti?  You
6    personally?
7        A.    When I was inside the bar --
8        Q.    Yes.  That's what I'm asking.
9        A.    I -- I'm giving you the answer.
10       Q.    Okay.
11       A.    I asked Rich Bosetti, "Where is
12   your brother?"
13       Q.    You said Rich Bosetti walked
14   away?
15       A.    He went back into the bar.
16       Q.    Oh, so while you were talking
17   with Shalick, Bosetti walked away and went
18   back into the bar, is that your testimony?
19       A.    Yes.
20       Q.    Okay.  So when you were in the
21   bar, you approached Richard Bosetti?
22       A.    Yes.
23       Q.    And what did you ask him?
24       A.    "Where's your brother?"

Page 312

K. Lamm

1        Q.    And what did he say?
2        A.    He didn't answer.
3        Q.    Did you ask him anything else?
4        A.    Thomas Snyder.
5        Q.    No.  You.  Did you ask him
6    anything else?
7        A.    I said, "What happened in here?"
8    And he still didn't answer.
9        Q.    But you had already asked him
10   that outside, right?
11       A.    Yes.
12       Q.    Did you -- why didn't you ask him
13   outside where his brother was, since you had
14   known by that time that the Bosettis were
15   involved in a fight?
16       A.    Because we didn't have all the
17   facts yet.
18       Q.    You didn't have any more facts
19   when you walked in, did you?
20       A.    That's why they had to go inside
21   and identify.
22       Q.    But, sir, you were told on the
23   phone call that the Bosettis were in a
24   fight, right?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 313

K. Lamm

1
2  A.   I was not told that.
3  Q.   You heard that from Snyder?
4  A.   Yes.
5  Q.   You knew what Snyder had told you
6  when you first approached Bosetti outside,
7  right?
8  A.   Yes.
9  Q.   But you didn't ask Richard
10 Bosetti when you were outside where his
11 brother was, did you?
12 A.   No.
13 Q.   Okay.  So let's go back inside.
14 You asked Bosetti where his brother was and
15 he didn't answer you, right?
16 A.   Right.
17 Q.   You asked Richard Bosetti what
18 went on and he didn't answer you?
19 A.   Right.
20 Q.   Did you believe he was being
21 uncooperative in the investigation?
22 A.   Yes.
23 Q.   Okay.  So if I understand this
24 correctly, you are aware from a phone call
25 that Mr. Richard Bosetti was potentially

Page 314

K. Lamm

1
2  involved in hitting someone with a pool cue,
3  he was being uncooperative in an
4  investigation, and you allowed him to leave
5  the bar; is that correct?
6  A.   We didn't know if Rich Bosetti
7  hit anyone with a pool cue.
8  Q.   That wasn't my question, sir.
9  Sir, you were advised by Mr. Snyder that
10 someone had called up and said the Bosettis
11 were in a fight, right?
12 A.   Yes.
13 Q.   You were told by Shalick and
14 Tesoro that someone had swung and hit them
15 with a pool cue, right?
16 A.   Yes.
17 Q.   Okay.  Bosetti was in the bar,
18 right?
19       MR. GOODSTADT: Objection.
20 Q.   Correct?
21       MR. GOODSTADT: Which Bosetti?
22 A.   At what time?
23 Q.   Rich Bosetti, when you first
24 walked in the bar, right?
25 A.   He went back into the bar, and

Page 315

K. Lamm

1
2  when we walked in there, he was in there.
3  Q.   And you asked him two questions
4  which he didn't answer?
5  A.   Right.
6  Q.   At some point in time, did Rich
7  Bosetti leave the bar?
8  A.   I'm sure he did, after we left.
9  Q.   So while you were still there,
10 Richard Bosetti was there?
11 A.   Yes.
12 Q.   Is that your testimony?
13 A.   Yes.
14 Q.   Okay.  So let's stay there.  Did
15 you ask Richard Bosetti any other questions
16 concerning the incident while you were in
17 Houser's for the first time?
18 A.   I believe -- I -- just from what
19 I remember, I asked him, "What happened in
20 here and where's your brother?"
21 Q.   Okay.  So those are the only two
22 questions you recall asking him?
23 A.   From what I can recall, yes.
24 Q.   Did Mr. Snyder, in your presence,
25 ask Mr. Richard Bosetti any questions?

Page 316

K. Lamm

1
2  A.   Yes.
3  Q.   What did Mr. Snyder ask him?
4  A.   From what I can recall, I
5  remember him asking basically the same
6  thing.  "Where's your brother?"
7  Q.   Okay.  And was Mr. Richard
8  Bosetti as uncooperative with regard to
9  Snyder's questions as he was with yours?
10 A.   Yes.
11 Q.   Okay.  Did Mr. Fiorillo, in your
12 presence, ask Mr. Richard Bosetti any
13 questions while you were in the bar?
14 A.   Mr. Fiorillo was not inside the
15 bar.
16 Q.   Okay.  Was Mr. Fiorillo ever
17 inside the bar while you and Mr. Snyder were
18 in the bar?
19 A.   I don't believe so.
20 Q.   Okay.  That's -- that's fine.  So
21 Richard Bosetti was uncooperative in
22 response to your two questions.  What, if
23 anything, did you do next?  Well, let me ask
24 you a question.  Did you talk to Richard
25 Bosetti as soon as you got into the bar?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 317

K. Lamm

1
2    A.   No.  As soon as we got into the
3  bar, we went to the back deck for them to
4  make an ID.
5    Q.   And did they make an ID?
6    A.   They said, "He's not in here."
7  But they pointed to Rich Bosetti and they
8  said, "He was with this guy and he looked
9  like this guy."
10    Q.   Okay.  Did you -- well, what did
11  you do next after  -- well, who said "he
12  looked like this guy"?
13    A.   Chris Shalick.
14    Q.   After Chris Shalick made this
15  statement to you, what, if anything, did you
16  do next?
17    A.   I went over by the bar itself and
18  there was somebody there by the name of Dan
19  McKenna, and I asked him what he seen in
20  here tonight.
21    Q.   And what did he say?
22    A.   "I didn't see anything.  I'm
23  going home."
24    Q.   Okay.  And what, if anything, did
25  you do next?

Page 318

K. Lamm

1
2    A.   We had them continue looking
3  around by the bathrooms.
4    Q.   Okay.
5    A.   And they said, "He's not in
6  here."
7    Q.   And what, if anything, did you
8  personally do next?
9    A.   They said that they had injuries,
10  and I asked out loud if anybody seen
11  anything happen in here tonight.
12    Q.   And what, if anything, came back
13  to you in response?
14    A.   There was no response.
15    Q.   Okay.  How many people were in
16  the bar at that time?
17    A.   At that time, maybe 10 or less
18  than 10 at that time.
19    Q.   Did you take the names down of
20  the people that were in the bar at that
21  time?
22    A.   No.
23    Q.   Did you inquire with Mr. Tesoro
24  or Mr. Shalick as to whether Richard Bosetti
25  was involved in the physical altercation?

Page 319

K. Lamm

1
2    A.   I don't remember at that time if
3  I did or not.
4    Q.   Specifically you now, did you ask
5  Mr. Tesoro what happened  -- while you were
6  in the bar now, did you ask Mr. Tesoro his
7  version of the events?
8    A.   He said that --
9    Q.   My question is, did you ask
10  Mr. Tesoro to describe for you his version
11  of the events that happened?
12    A.   I asked him to tell me, but
13  exactly where I asked him, whether I was
14  inside the bar at that time or just had
15  left, I don't remember where I asked him.
16    Q.   Okay.  Next -- same question with
17  regard to Mr. Shalick?
18    A.   Same thing.
19    Q.   Okay.  How long were you in the
20  bar for?  You personally now.  I'm not
21  asking you about Snyder.
22    A.   Maybe close to 10 minutes.
23    Q.   Okay.  Had any further
24  conversations with Mr. Richard Bosetti while
25  you were in the bar for these 10 minutes

Page 320

K. Lamm

1
2  maybe?
3    A.   No.
4    Q.   Okay.  Did you instruct
5  Mr. Bosetti to come with you to the police
6  station to give a statement prior to you
7  leaving the bar?
8    A.   I don't remember exactly, but at
9  that time, we needed to aide the  -- aide the
10  victims.  Get them first aid.
11  MO   Q.   My question to you, sir, is --
12  and motion to strike -- did you ask
13  Mr. Bosetti, Richard Bosetti to accompany
14  you to the police station to give his
15  version of the events?
16    A.   I don't recall.
17    Q.   Okay.  Did you look for the pool
18  cue that Mr. Shalick had said was broken in
19  half?
20    A.   Yes, we did.
21    Q.   Did you find it?
22    A.   No.
23    Q.   How long did you look for it?
24    A.   For as long as we were in there.
25    Q.   You looked under every table?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 321

K. Lamm

1          K. Lamm
2     A.    From what I can remember, there
3  were small tables up against the wall.  The
4  floor was opened.
5     Q.    What did -- did you look under
6  the pool table?
7     A.    Yes.
8     Q.    Okay.
9     A.    And on the pool rack.
10    Q.    Okay.  What did you -- so you saw
11  no evidence of a broken pool cue, correct?
12    A.    No.
13    Q.    What did you personally do next
14  upon your leaving Houser's?
15    A.    Escorted the two individuals back
16  to the police station.
17    Q.    Did you ever go back to Houser's
18  the morning of the 31st to further
19  investigate the incident?
20    A.    No.
21    Q.    Are you aware if Mr. Snyder ever
22  went to -- back to Houser's the morning of
23  the 31st to further investigate the
24  incident?
25    A.    I'm not aware if he did.

Page 322

1          K. Lamm
2     Q.    How about Mr. Fiorillo?
3     A.    I'm not aware if he did.
4     Q.    Okay.  Now did any patron state,
5  in your presence in Houser's Bar, that they
6  were afraid that there was going to be a
7  cover up when you were in the bar?
8     A.    Chris Shalick said something that
9  this -- this is going to be covered up.
10  Exactly where and when he stated that, I'm
11  not sure if it was inside the bar, outside
12  the bar, but he said it inside the police
13  station.
14    Q.    Other than Mr. Shalick, in the
15  bar itself, did any other individual say
16  that they believed that there was going to
17  be a cover up?
18    A.    I don't recall.
19    Q.    Before you walked into Houser's,
20  did you hear anybody say that there was
21  going to be a cover up?
22    A.    I don't remember at this time.
23    Q.    As -- when you left Houser's and
24  before you got to the police station, did
25  anyone state, in your presence, that there

Page 323

1          K. Lamm
2  was going to be a cover up?
3     A.    I believe going back to the
4  police station, that's when Chris Shalick
5  said that this is going to be a cover up.
6     Q.    Sir, my question to you is, other
7  than Mr. Shalick, between the time that you
8  left Houser's Bar and the time you got to
9  the police station, did anybody say to you
10  that they believed it was -- there was going
11  to be a cover up?
12    A.    Not that I can recall.
13    Q.    Okay.  Did you have Gary
14  Bosetti's cell phone number?
15    A.    Not personally on me.
16    Q.    Could you have acquired that cell
17  phone number?
18    A.    Yes, I could have.
19    Q.    How could you have?
20    A.    I would have to go through the
21  police Rolodex.
22    Q.    And that was in the police
23  station?
24    A.    Yes.
25    Q.    Did you attempt to reach Gary

Page 324

1          K. Lamm
2  Bosetti via cell phone the morning of
3  October 31, 2004?
4     A.    No, I did not.
5     Q.    Did you call Sergeant Hesse at
6  any point in time during the morning of
7  October 31, 2004?  You personally now, I'm
8  not asking you about anybody else.
9     A.    No, I did not call Sergeant
10  Hesse.
11    Q.    Did you call Chief Paridiso at
12  any time during the morning of October 31,
13  2004?
14    A.    No, I did not.
15    Q.    Okay.  Did you call Mayor Rogers?
16    A.    No.
17    Q.    Okay.  Now what -- when you got
18  to the police station, what time was it?
19    A.    Close -- close to 3:00 a.m.
20    Q.    Okay.  What, if anything, did you
21  do next at 3:00 a.m. when you went to the
22  police station with Shalick and Tesoro?  You
23  personally now, not anybody else.
24    A.    I asked about his -- about his
25  injury and he was holding his arm.  And I

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 325

1        K. Lamm
2  gave him an ice pack at that time.
3        Q.    Did you ask him -- and who is
4  this again?
5        A.    Shalick.
6        Q.    Did you ask Shalick to -- to
7  describe for you his version of the events
8  when he was in the police station?
9        A.    Yes.  That's -- we took out
10  statement forms.
11        Q.    Okay.  And did you take notes
12  down as he was writing before you put --
13  well, who wrote the statement, you or
14  Shal -- you or Shalick?
15        A.    Chris Shalick wrote the statement
16  I believe.
17        Q.    Okay.  Did you take any notes of
18  anything that Mr. Shalick said?
19        A.    I may have.  I don't recall that.
20        Q.    Okay.  Did you take any  -- did
21  you have any communication with Vankoot that
22  evening?
23        A.    Yes, I did.  When we got back to
24  the station, Frank, shortly after, brought
25  another  -- a third individual back who was

Page 326

1        K. Lamm
2  Brian Vankoot, who had injuries to his face
3  and -- and his throat.
4        Q.    And what communications, if any,
5  did you have with Vankoot?
6        A.    He said that he was in a choke --
7  choke hold.
8        Q.    Did you ask him -- I mean, what
9  precipitated him telling you this
10  specifically?
11        A.    I don't remember exactly.
12        Q.    Is that the only communication
13  that you had with Vankoot -- Vankoot while
14  he was in the police station?
15        A.    There may have been more, but I
16  don't remember.
17        Q.    Okay.  Did you have any
18  communications with Tesoro when he was in
19  the police station?
20        A.    Yes, I did.
21        Q.    Describe for me the
22  communications that you had with Tesoro.
23        A.    He said that he was hit with a
24  fist or a foot about the head.
25        Q.    What precipitated Mr. Tesoro

Page 327

1        K. Lamm
2  telling you this?
3        A.    I asked him about what had
4  happened.
5        Q.    Was it your responsibility that
6  night to take Mr. Tesoro's statement?
7        A.    Yes.  He was there.  I took his
8  statement.
9        Q.    You took -- as opposed to Snyder
10  or Fiorillo, you took Mr. Tes -- Mr.
11  Tesoro's statement?
12        A.    I believe I took his statement.
13        Q.    And as opposed to Snyder and
14  Fiorillo, you took Shalick's statement?
15        A.    I took Shalick's statement, yes.
16        Q.    Did you take Vankoot's statement?
17        A.    I think one of the other officers
18  took Vankoot's statement.
19        Q.    And did you take any  -- any
20  notes with regard to what Tesoro said to
21  you?
22        A.    I don't recall.  I took -- I had
23  taken photos of the injuries and rescue was
24  called.
25        Q.    Okay.  Where did Tesoro write out

Page 328

1        K. Lamm
2  his statement?
3        A.    I believe it was -- it was in the
4  police station.
5        Q.    Was Richard Bosetti in the police
6  station at any point in time between the
7  time that you arrived at the police station
8  with Tesoro and Shalick and the time that
9  rescue came?
10        A.    Yes.  Rich Bosetti did come in
11  the police station.
12        Q.    And did you attempt to question
13  him?
14        A.    When he came in there, he said he
15  was going to use the bathroom, and that's
16  when Chris Shalick pointed and said, "This
17  is going to be a cover up," and we asked
18  Rich to leave because he was disrupting
19  the -- the victims.
20        Q.    Well, what was he doing that was
21  disruptive?
22        A.    Because when he came in there,
23  they seemed to get a little rambunctious,
24  and we asked Rich to leave.
25        Q.    What do you mean by rambunk --

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 329

K. Lamm

1 "rambunctious"?
2 
3    A.    Because they were say -- Chris
4 Shalick was saying that this is going to be
5 a cover up, and he seemed to get agitated,
6 so that's when we asked Rich to leave.
7    Q.    Did Vankoot get agitated?
8    A.    No.
9    Q.    Did Vankoot say there was going
10 to be a cover up?
11    A.    I don't recall.
12    Q.    Did Tesoro get agitated?
13    A.    I don't recall.
14    Q.    Did Tesoro get -- did Tesoro say
15 there was going to be a cover up?
16    A.    I don't recall.
17    Q.    So how long did you personally
18 see Richard Bosetti in the  -- in the police
19 station?
20    A.    Maybe two minutes.
21    Q.    Okay.  And how long  -- was there
22 any other civilians in the police station
23 when Vankoot, Shalick and Tesoro were in the
24 police station?
25    A.    I think later one of the friends,

Page 330

K. Lamm

1 
2 a girlfriend came by the station when he was
3 in there.  Vankoot.
4    Q.    And did you take the statement of
5 the girlfriend?
6    A.    I myself didn't.
7    Q.    Did you ask the girlfriend what
8 happened?
9    A.    Not me myself, no.
10    Q.    Okay.  Other than the girlfriend
11 and the three individuals that we're talking
12 about and Richard Bosetti, were there any
13 other civilians in the police station?
14    A.    If you want to consider the EMTs
15 civilians.
16    Q.    How long after you arrived did
17 the EMT people come?
18    A.    Well, when they were called, they
19 came to the station.
20    Q.    Yeah.  How long was it?
21    A.    Were they there at the station
22 or --
23    Q.    You arrived at 3:00.  When did
24 they arrive?
25    A.    Quickly.  Maybe within  -- maybe

Page 331

K. Lamm

1 
2 within four minutes.
3    Q.    And how long did they stay?
4    A.    They stayed for quite a while,
5 because we had to call a Suffolk County
6 police boat to come transport the aided off
7 the island.
8    Q.    When did  -- when did  -- when did
9 the three gentlemen that were alleged
10 victims leave the police station?
11    A.    Well, I believe my -- I believe
12 one of them, which is Bri -- Vankoot, he was
13 taken off by police boat.  And exact time,
14 I -- I don't know an exact time.  But he
15 was -- EMTs said that he had an unaligned
16 trachea.
17 MO    MR. NOVIKOFF: Okay.  Motion to
18    strike as nonresponsive.
19    Q.    When -- how did the other two
20 alleged victims leave the police station?
21    A.    I believe they walked out, from
22 what I can remember.
23    Q.    How long after -- well, did they
24 leave -- did they walk out before or after
25 Vankoot was taken out of the police station?

Page 332

K. Lamm

1 
2    A.    I think after Vankoot left on the
3 boat is when they left.
4    Q.    How long after Vankoot left on
5 the boat did the individuals leave, the
6 other two individuals?
7    A.    It was around the same time
8 frame.
9    Q.    And after Tesoro gave his
10 statement, did you have any further
11 communications with him while he was in the
12 police station?
13    A.    If I did, I don't recall it.
14    Q.    After -- I'm sorry, let me ask
15 the question again.  After Tesoro wrote out
16 his statement, did you have any further
17 communications with him in the police
18 station?
19    A.    I may have, but I -- I don't
20 recall.  Rescue came in there and was
21 administering treatment.
22 MO    MR. NOVIKOFF: Motion to strike
23    everything after "I don't recall."
24    Q.    After Shalick wrote out his
25 statement, did you have any further

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 333

1        K. Lamm
2  communications with him while he was in the
3  police station?
4     A.   Yes.
5     Q.   And what did  -- what was the sum
6  and substance of this communication?
7     A.   He stated that his friend was in
8  a choke hold and he went to pull his friend
9  out of the choke hold, and that's when he
10 got hit with the pool cue.
11    Q.   All right.  Did he say anything
12 else about what led up to the incident?
13 Actually, let me rephrase the question.  Did
14 Shalick ever discuss with you, outside of
15 his written statement, what he perceived to
16 have happened that led up to the alleged
17 physical altercation with Gary Bosetti?
18    A.   I don't recall that.
19    Q.   Did you ask him that?
20    A.   I may have.
21    Q.   Do you recall as you sit here
22 today doing it?
23    A.   At this time, I don't.
24    Q.   With Tesoro, did you ever ask
25 Tesoro, independent of his written

Page 334

1        K. Lamm
2  statement, what he perceived took place that
3  led up to the physical altercation with Gary
4  Bosetti?
5     A.   I believe he went in to  -- to
6  help his friend, from what he had stated,
7  and that's when he was hit as well.
8  MO       MR. NOVIKOFF: Motion to strike
9        as nonresponsive.
10    Q.   My question to you is, did you
11 ask Tesoro what his version of the events
12 were that led up to the physical
13 altercation, independent of -- of what he
14 may have written in his written statement?
15    A.   I may have, but I don't recall
16 that.
17    Q.   Fine.  What forms did you fill
18 out  -- well, when did you leave  -- when
19 did your shift end that night?
20    A.   Mine ended at 5:00 a.m.
21    Q.   5:00 a.m. on October 31?
22    A.   Yes.
23    Q.   You came into the police station
24 at 3:00 with the alleged victims, correct?
25    A.   Approximately.

Page 335

1        K. Lamm
2     Q.   How soon prior to the end of your
3  5:00 shift did every alleged victim leave
4  the police station?
5        MR. GOODSTADT: Objection.
6        MR. NOVIKOFF: Yeah, I know.
7  It was ugly form, but it's late.
8     A.   To give an exact timing, I
9  couldn't.
10    Q.   Approximate?
11    A.   But maybe we'll say 4:30.
12    Q.   Okay.  What forms did you
13 personally fill out, if any, before the end
14 of your shift on October 31, 2004?
15    A.   It was just one of the statement
16 forms I -- that they had wrote on.  I had to
17 sign it.
18    Q.   Okay.  And whose did you sign?
19    A.   Chris Shalick's.
20    Q.   Okay.  You didn't sign Tesoro's?
21    A.   I'm not sure if I did.
22    Q.   Okay.  Why did you have to sign
23 Shalick's form?
24    A.   I was the officer there that he
25 was giving the statement to.

Page 336

1        K. Lamm
2     Q.   Okay.  Other than you signing off
3  on Shalick's form and maybe Tesoro's form,
4  what other forms, if any, did you personally
5  write out before the end of your shift on
6  October 31, 2004?
7     A.   I don't believe I personally
8  wrote out any other forms.
9     Q.   That's -- that's fine.  Did you
10 write out any forms after October 31, 2004
11 concerning the Halloween incident?
12    A.   I was asked to write a statement.
13    Q.   My question isn't what you were
14 asked.  Did you write out any official
15 police forms, after October 31, 2004,
16 concerning the Halloween incident?
17    A.   Handwritten as you say "write
18 out"?
19    Q.   Yeah.
20    A.   No.
21    Q.   Did you type out?
22    A.   Yes.
23    Q.   What did you type out?
24    A.   I was asked to give a statement
25 as to what the events were of that incident.

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 88 of 122 PageID #: 1846

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 337

K. Lamm

1
2    Q.    Who asked you?
3    A.    George Hesse.
4    Q.    When did George Hesse ask you
5 this?
6    A.    A few days after.  Maybe four
7 days, five days after.
8    Q.    Now this was off season, correct?
9    A.    Yes.
10    Q.    Did George Hesse ask you -- I
11 mean, did he ask you this over the phone?
12    A.    I don't know if it was in phone
13 or it was the next day when I was working.
14 But he did -- he did ask me.
15    Q.    It could have been -- could have
16 been the evening of October  -- of November
17 1?
18    A.    It could have been.  It could
19 have been the next day I was working.
20    Q.    What did Mr. Hesse ask you?
21    A.    For me to write out a statement
22 as to what had happened.
23    Q.    Did Mr. Hesse ask you why he
24 wanted you to write out a statement?
25        MR. GOODSTADT: Objection.

Page 338

K. Lamm

1
2    A.    I don't recall.  But it was an
3 uncommon practice.
4    Q.    Well, I was going to get to that.
5 But my question to you is, did Mr. --
6 Mr. Hesse -- no.  I'm sorry.  Did Mr. Hesse
7 advise you as to why he was asking you --
8 advising you -- did Mr. Hess advise you as
9 to why he was asking you to write out the
10 statement, type out the statement?
11    A.    He just said he wanted to know
12 what had happened.
13    Q.    And did you make -- did you
14 respond to him in any way?
15    A.    I said yes, okay, and I typed
16 something out.
17    Q.    And did -- who did you give it
18 to?
19    A.    It was sent to George Hesse.
20    Q.    How did you send it to George
21 Hesse?
22    A.    Through an email.
23    Q.    What was your next communication
24 with George -- oh, through an email?
25    A.    Yes.

Page 339

K. Lamm

1
2    Q.    Okay.
3    A.    Again, uncommon practice.
4 MO      MR. NOVIKOFF: I got that.
5    Motion to strike.
6    Q.    How long was this statement?
7    A.    I believe two pages.
8    Q.    Okay.  And what was the next
9 communication -- well, did you have any
10 communication with Chief Paridiso concerning
11 the Halloween incident?
12        MR. GOODSTADT: At any time or
13    in that time frame?
14        MR. NOVIKOFF: In the time
15    frame between the Halloween incident
16    and the end of the year.
17    A.    I don't -- I don't believe I
18 did.  I may have, but I'm not for certain.
19    Q.    Before  -- between the end  --
20 between the new year and June, the end of
21 June 2005, did you have any communication
22 with Chief Paridiso concerning the Halloween
23 incident?
24    A.    Other than the fact that John
25 Cherry, Patrick Cherry was the one doing an

Page 340

K. Lamm

1
2 investigation on it.  That was it.
3    Q.    Well, when did you have a
4 communication with Chief Paridiso concerning
5 Pat Cherry doing the investigation?
6    A.    I received that communication
7 from actually George Hesse about Cherry
8 doing the investigation on the Halloween
9 incident.
10    Q.    Okay.  So my question to you is,
11 what communications did you have with Chief
12 Paridiso before the end of June '05
13 concerning the Halloween incident?
14    A.    I don't believe -- if I did have
15 any, I don't recall it.
16    Q.    That's fine.  After you emailed
17 your statement to Chief  -- to Mr. Hesse,
18 when was your next communication, if any,
19 with Mr. Hesse concerning the Halloween
20 incident?
21    A.    The next time I saw him when
22 working, I asked him what's going on with
23 the -- with the incident.
24    Q.    And what did he say to you, if
25 anything?

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 341

K. Lamm

1       K. Lamm
2       A.   He said -- he said it's under
3   investigation.
4       Q.   And what did you say to him, if
5   anything?
6       A.   I said, "Okay.  Well, let me know
7   if you need anything."
8       Q.   And what did he say?
9       A.   "Okay."
10      Q.   What was your next communication
11  with Mr. Hesse after that communication
12  concerning the Halloween incident?
13      A.   I asked him one more time.  It
14  was approximately -- maybe another month or
15  so, five weeks after, and I said, "Anything
16  happen with the investigation of the
17  Halloween incident?"  He says, "It's still
18  under investigation."
19      Q.   Was that your last communication
20  with Mr. Hesse concerning the Halloween
21  incident before the end of the year?
22      A.   End of the year as in what year?
23      Q.   2004?
24      A.   No.  I said at first I had a
25  communication with him after I wrote the

Page 342

1       K. Lamm
2   statement, so maybe it was just the
3   beginning of the -- the new year.
4       Q.   Oh, okay.
5       A.   Two communications.
6       Q.   Between -- and other than those
7   two communications that you've just
8   testified to, when was the next time, if
9   any, that you had a communication with
10  Mr. Hesse concerning the Halloween incident?
11      A.   The next time he spoke to me was
12  in June of 2005.
13      Q.   And what, if anything, did he
14  say?
15      A.   He said, "I just wanted to tell
16  you that the Halloween investigation is
17  over."
18      Q.   And what did you say in response,
19  if anything?
20      A.   I said, "How come we weren't
21  asked to appear in court or -- or asked our
22  side of the story?"
23      Q.   And what, if anything, did he
24  respond?
25      A.   He said, "You weren't needed."

Page 343

1       K. Lamm
2       Q.   And what, if anything, did you
3   respond?
4       A.   I said, "How were we not needed?
5   We were there for it."
6       Q.   And what, if anything, did Hesse
7   respond?
8       A.   He said, "The statement you wrote
9   was no good and that's not what happened."
10      Q.   And what -- okay.  I'm sorry.
11  Did --
12      A.   Yes, you interrupted me.  It's
13  okay.  I said, "How do you know what
14  happened?  You weren't there.  I was."
15      Q.   And what, if anything, did Hesse
16  say to you?
17      A.   He says, "What you wrote wasn't
18  any good," and he pointed to himself, and he
19  says, "I know what happened," and he held up
20  a folder, and he said, "This is what
21  happened."
22      Q.   And what, if anything, did you
23  say in response to Hesse?
24      A.   I said, "The statement that I
25  wrote is what happened."

Page 344

1       K. Lamm
2       Q.   And what, if anything, did Hesse
3   say to you?
4       A.   He goes, "I want you to take a
5   look at this and -- and see what we have."
6       MR. NOVIKOFF: Okay.  Let --
7   we're going to continue with this.  We
8   have to change the tape.  Can we just
9   stay in the room instead --
10      MR. GOODSTADT: I have to use
11  the restroom.  I won't --
12      MR. NOVIKOFF: Yeah.  Let's not
13  take long because I don't think I have
14  all that much, and I'd just as soon get
15  done in the next 10 or 15 minutes
16  instead of waiting 10 or 15 minutes.
17      MR. GOODSTADT: Yeah.
18  That's --
19      THE VIDEOGRAPHER: This ends
20  tape number six.  The time is 5:29 p.m.
21  We're going off the record.
22      (A break was taken.)
23      THE VIDEOGRAPHER: This begins
24  tape number seven.  The time is 5:37
25  p.m.  Back on the record.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 345

```
 1              K. Lamm
 2      Q.   Now, Mr. Lamm, we were talking
 3  about your conversation with Mr. Hesse in
 4  June of 2005, do you recall that?
 5      A.   Yes.
 6      Q.   What else was said in this
 7  conversation, other than what you've already
 8  testified to?
 9      A.   When Hesse said that this is what
10  happened, he pointed to himself and said, "I
11  know what happened.  This is what happened,
12  and I want you to read it."  And I said,
13  "That's not what happened."  And then I told
14  him what had happened.  And I also told him
15  that Joe Loeffler was there at the -- at the
16  police station that stated it was an assault
17  second.
18      Q.   Now you told him what happened
19  based upon what the alleged victims told you
20  what happened, correct?
21      A.   Correct.  And --
22      Q.   Yes or no, correct?
23      A.   Yes.
24      Q.   Okay.
25      A.   And what Joe Loeffler said about
```

Page 346

```
 1              K. Lamm
 2  it being an assault second.
 3  MO        MR. NOVIKOFF: Okay.  Did you
 4      tell -- well, I'm going to move to
 5      strike everything other than the word
 6      "yes."
 7          MR. GOODSTADT: Okay.
 8      Q.   And other than  -- after you told
 9  Mr. Hesse what Mr. Loeffler said, what, if
10  anything, did Hesse say to you?
11      A.   He said, "I want you to read this
12  folder."
13      Q.   And what, if anything, did you
14  say to Hesse in response?
15      A.   So I looked at it, and as I was
16  looking at it, I said, "These are just
17  statements written from your friends."
18      Q.   What did Mr. Hesse say in
19  response to that?
20      A.   He said --
21      Q.   If anything?
22      A.   He said, "Well, that's what
23  happened.  Those were the witnesses."
24      Q.   And what, if anything, did you
25  say to Hesse?
```

Page 347

```
 1              K. Lamm
 2      A.   I said, "How come they didn't
 3  give us any statements?"
 4      Q.   How come who didn't give you any
 5  statements?
 6      A.   The ones that were there that
 7  gave statements.  How come they didn't
 8  cooperate with us.  And also, I said, "How
 9  come we don't have the Bosettis in here to
10  discuss this?"
11      Q.   And what, if anything, did Hesse
12  say to you in response?
13      A.   He said, "Gary Bosetti was wrong
14  for leaving the scene."
15      Q.   And what, if anything, did you
16  say?
17      A.   I said, "Well, how come we
18  weren't asked to appear in court for any of
19  this?  And how come we weren't asked all
20  these months that have passed by to be part
21  of this investigation?"
22      Q.   And what, if anything, did Hesse
23  say?
24      A.   He said, "You weren't needed."
25      Q.   I think we established that.  So
```

Page 348

```
 1              K. Lamm
 2  is there anything else that you said to
 3  Hesse, other than what you've already
 4  testified to?
 5      A.   No.  I said, "that's not" -- I
 6  said, "The way you're -- you're saying it,
 7  that's not what happened."
 8      Q.   Okay.  And you've said that.  Now
 9  is there anything else that you recall
10  saying to Hesse or Hesse saying to you,
11  other than what you've just testified to?
12      A.   Hesse told me that after the
13  incident occurred, that Matt the plumber
14  took Gary Bosetti off the Island and drove
15  him to the Fire Island Lighthouse so he
16  could leave.
17      Q.   Great.
18      A.   In his own personal vehicle.
19      Q.   What else, if anything, do you
20  recall being said between you and Hesse,
21  other than what you just testified to?
22      A.   I believe that's all for now.
23      Q.   How long was this phone
24  conversation with Hesse?
25      A.   I was -- it was in person in the
```

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 349

1          K. Lamm
2  police station.
3     Q.   How long was this in person
4  conversation?
5     A.   About 15 minutes.
6     Q.   Was anyone else present with you?
7     A.   Not with me.  But John Cherry was
8  there.
9     Q.   Okay.  Anyone else, besides
10 Cherry, Chief -- well, Sergeant Hesse and
11 you?
12    A.   That was it.  That I'm aware of.
13    Q.   Well, you would have been aware
14 of who was in the room, right?
15    A.   I would have, yes.
16    Q.   Okay.
17    A.   But there could have been, you
18 know, somebody in the back room by the cells
19 that I didn't know was there.
20    Q.   Okay.  But in the room that you
21 were in, those were the only two people that
22 were present?
23    A.   From what I seen.
24    Q.   Okay.  Did you have any other
25 communications with Mr. Hesse concerning the

Page 350

1          K. Lamm
2  Halloween incident after this June 2005
3  conversation?
4     A.   I don't believe so.
5     Q.   After this June 2005
6  conversation, did you ever have a
7  conversation with Chief Paridiso before
8  you -- before your last day of employment
9  concerning the Halloween incident?
10    A.   I don't believe so.
11    Q.   Did you ever advise May -- Mayor
12 Rogers of your concerns regarding the
13 investigation after this June 2005
14 conversation with Hesse?
15    A.   No.
16    Q.   Did you ever advise Trustee
17 Loeffler of your concerns concerning this
18 2000 -- this investigation after your June
19 2005 conversation with Hesse?
20    A.   No.  He was there.  He drove the
21 ambulance and saw it and stated it was an
22 assault second.
23 MO      MR. NOVIKOFF: Yeah.  Thanks.
24    You already said that.  Motion to
25    strike after the word "no."

Page 351

1          K. Lamm
2     Q.   Have you spoken to Chief
3  Paridiso, you personally, concerning this
4  lawsuit?
5     A.   No.
6     Q.   Have you spoken to Chief Paridiso
7  concerning the fact that you say you were
8  terminated from employment?
9     A.   No.
10    Q.   Have you had any communications
11 with Chief Paridiso after April 2, 2006?
12    A.   Yes, I have.
13    Q.   What communications did you have
14 with him?
15    A.   He needed a parking pass to park
16 his vehicle when he went away.
17    Q.   Parking pass from whom?
18    A.   For the airport to park.
19    Q.   And did you provide it for him?
20    A.   As a courtesy, the department
21 does that for people.
22    Q.   I'm just asking you if you
23 provided it for him?
24    A.   Yes.  Not -- I didn't personally
25 hand it to him or anything, but, you know,

Page 352

1          K. Lamm
2  he was given his pass so he could park his
3  vehicle.
4     Q.   Other than that interchange, did
5  you have any other communication with Chief
6  Paridiso after April 2, 2006?
7     A.   Not that I can recall.
8     Q.   And during this discussion
9  concerning the parking pass, did you discuss
10 any issues concerning this lawsuit?
11    A.   No.
12    Q.   Did you discuss any issues
13 concerning your termination?
14    A.   No.
15    Q.   Did you discuss any issues
16 concerning George Hesse?
17    A.   No.
18    Q.   Okay.  And how long was this
19 conversation with Chief Paridiso?
20    A.   It was short.  Two, three
21 minutes.
22    Q.   Okay.  Did you ever post any
23 blogs on any site concerning Ocean Beach
24 after you were -- after your last day of
25 employment with Ocean Beach?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570
Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 353

1            K. Lamm
2    A.    No, I did not.
3    Q.    Have you ever posted a blog where
4  the issue concerning Ocean Beach was
5  discussed?
6    A.    No.
7    Q.    You understand when I say
8  "posting a blog"?
9    A.    Yes, I understand when you say
10  posting a blog.  I know things have been
11  posted of me.
12    Q.    On what blog?
13    A.    On Long Island Politics Blog, the
14  Schwartz Report.
15    Q.    Okay.  So my question is, have
16  you ever posted on The Schwartz Report, a
17  blog?
18    A.    No, I have not.  But from my
19  understanding, it was told to Tom Snyder
20  that members of the department and Tyree
21  Bacon were posting things about me on that
22  blog about my character.
23    Q.    You happy?  You done with your
24  answer?
25    A.    That's my answer.

Page 354

1            K. Lamm
2  MO        MR. NOVIKOFF: Motion to strike
3      as nonresponsive.  After the fact --
4      after the testimony where he says he
5      didn't post any blogs.  I'm done.  No.
6      No.  Mr. Connolly.
7  EXAMINATION BY
8  MR. CONNOLLY:
9    Q.    Mr. Lamm, I want to bring your
10  attention back to 2006.  When you went for
11  the psychological evaluation in order to
12  gain employment with what was it, the
13  Suffolk County Police Department?
14    A.    Yes.
15    Q.    Had you had the background check
16  before either the written or oral
17  evaluation?
18    A.    The background check pertaining
19  to that specific job?
20    Q.    Yes.
21    A.    No.  It was just kind of
22  commencing at the same time.
23    Q.    Okay.  So did you get the results
24  of the psychological evaluation before you
25  submitted any paperwork regarding the

Page 355

1            K. Lamm
2  background evaluation?
3        MR. GOODSTADT: Objection.
4    A.    No.  I think I may have submitted
5  the background paperwork first.
6    Q.    And then you never got a response
7  in connection with the background check
8  because you had gotten a response in
9  connection with the evaluation?
10    A.    Correct.
11    Q.    Earlier I believe in connection
12  with your testimony regarding Mitch Burns,
13  you indicated that George Hesse had been
14  told to bring in the narcotics team, would
15  that be correct?
16    A.    Yes.
17    Q.    Who told George Hesse?
18    A.    Myself and other members of the
19  department suggested that we should have a
20  narcotics team come into the village.
21    Q.    Okay.  And where would that
22  narcotics team come from?
23    A.    Suffolk County.
24    Q.    And when did this conversation --
25  withdrawn.  On how many occasions did you

Page 356

1            K. Lamm
2  make that suggestion to George Hesse?
3    A.    Maybe twice, three times maybe.
4    Q.    And when did these two or three
5  occasions occur?
6    A.    2001, 2002.
7    Q.    And did these conversations occur
8  while you were on duty?
9    A.    Yes.
10    Q.    Would it have been in the station
11  house?
12    A.    Station house or sometimes
13  outside.
14    Q.    Was anybody else with you when
15  you had these particular conversations?
16    A.    Not -- not for all of them.
17    Q.    For any of them?
18    A.    There may have been other
19  officers there.  I can't recall who they
20  were.
21    Q.    Okay.  I believe you indicated
22  that other officers had made these similar
23  suggestion to Mr. --- to George Hesse?
24    A.    Yes.
25    Q.    Okay.  Who were those other

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 357

K. Lamm

1 officers?
2
3    A.    Edward Carter. Tom Snyder. John
4 Oley.
5    Q.    Okay. And how do you know this?
6    A.    Because one -- one time speaking
7 to John -- John Oley, he told me he
8 suggested it to George, and talking with Tom
9 and Eddie, they had told me that they
10 suggested it as well.
11    Q.    Okay. And when did Tom Snyder
12 tell you this?
13    A.    Exactly the time frame, I don't
14 know the exact time frame.
15    Q.    Can you tell me the year?
16    A.    Around probably 2002.
17    Q.    And how about Ed Carter, when did
18 he tell you?
19    A.    Same time frame.
20    Q.    And John Oley?
21    A.    Somewhere in that same time
22 frame. Summer season 2002.
23    Q.    And this -- did this suggestion
24 or suggestions to George Hesse, were they
25 verbal?

Page 358

K. Lamm

1
2    A.    Yes.
3    Q.    Okay. Did you ever memorialize
4 them in writing?
5    A.    No.
6    Q.    In regard to the Houser's
7 incident, did you ever see Brian Van -- an
8 individual you later learned to be Brian
9 Vankoot at Houser's when you first arrived
10 at the scene?
11    A.    Did I see him there?
12    Q.    Yes.
13    A.    When I first arrive at the scene?
14    Q.    Yes.
15    A.    No, I -- I don't believe I did.
16 No.
17    Q.    When was the first time that
18 morning you saw Brian Vankoot?
19    A.    From -- from what I can recall,
20 is when Frank brought him into the police
21 station.
22    Q.    Did you ever learn where
23 Mr. Vankoot was between the time of the
24 incident and the time Officer Fiorillo
25 brought him into the station?

Page 359

K. Lamm

1
2    A.    That's something you'd have to
3 ask Frank Fiorillo as to exactly where he --
4 he got him.
5    Q.    Did you ever ask Officer Fiorillo
6 as to where he located Mr. Vankoot?
7    A.    Yes. I'm sorry. I believe he
8 found him at his house.
9    Q.    And when did you first learn
10 that?
11    A.    Sometime later that night I
12 believe. After the incident was -- after
13 they were getting treatment. I -- I believe
14 that's when I found out.
15    Q.    Do you mean later that morning?
16    A.    Yes.
17    Q.    From the point in time you and
18 the other officers received a call to go to
19 Houser's to the point in time you got to
20 Houser's, was there any conversation in the
21 vehicle?
22    A.    I don't recall if there was
23 specific.
24    Q.    And did you recognize -- you took
25 the first call, would that be correct?

Page 360

K. Lamm

1
2    A.    Yes.
3    Q.    Did you recognize the voice on
4 the call?
5    A.    No.
6    Q.    Was it a male or -- male voice?
7    A.    From what it appeared to sound
8 like, it -- it could have been a male voice.
9    Q.    And back in 2004, how did the
10 phone system work? Earlier you indicated
11 that calls would bounce out from the station
12 house if it was set to do so, would that be
13 correct?
14    A.    Yes. It's --
15    Q.    Was there an order of preference
16 on which -- withdrawn. Did each individual
17 officer back at this time have a cell phone
18 for business purposes?
19    A.    No. It was just one cell phone.
20 It was the department's phone.
21    Q.    Why did  -- did you have the cell
22 phone for the first call?
23    A.    It wasn't on my person. It was
24 in the middle of the vehicle and I answered
25 it.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

Page 361

1         K. Lamm
2    Q.   Since April 2 of 2006, have you
3  applied for any other employment, other than
4  what you've testified to today?
5    A.   No, I --
6    Q.   And that would include non-law
7  enforcement fields?
8    A.   No, I haven't.
9    Q.   During your employment with the
10  Ocean Beach Police Department, how did you
11  get to work?
12    A.   I'm sorry?
13    Q.   How did you get to work?
14    A.   To Ocean Beach?
15    Q.   To Ocean Beach.
16    A.   I drove to the lighthouse, and
17  from the lighthouse, we would take a police
18  vehicle and drive to Ocean Beach or a water
19  taxi.
20    Q.   And when -- on those occasions
21  when you took a police vehicle, was there a
22  vehicle for use when you arrived at the
23  lighthouse?
24    A.   Not all the time.
25    Q.   Would you make a call?

Page 362

1         K. Lamm
2    A.   Well, the shift coming out
3  driving out, we would get the vehicle.
4  Sometimes we would have to make the call
5  because the vehicle wasn't there and --
6    Q.   Thank you.  During -- during your
7  employment at Ocean Beach, were there any
8  occasions that on duty officers drove you to
9  the lighthouse?
10    A.   So if they were already working a
11  mid shift, they would come and pick me up
12  and they would drop me off at the
13  lighthouse.  But as far as coming on duty, I
14  don't believe there was.
15    MR. CONNOLLY: Thank you.  I
16  have no further questions.
17    MR. GOODSTADT: I have no
18  questions.  I just want to reserve
19  Mr. Lamm's right to review and correct
20  the transcript.
21    (Continued on next page for
22  jurat.)
23
24
25

Page 363

1         K. Lamm
2    THE VIDEOGRAPHER: This
3  completes today's deposition for Kevin
4  Lamm on November 19, 2008.  The time is
5  5:55 p.m. and we are off the record.
6    (TIME NOTED: 5:55 P.M.)
7
8  _____
9         KEVIN LAMM
10
11  Subscribed and sworn to
12  before me this _____ day
13  of _____ 2008.
14
15  _____
16    NOTARY PUBLIC
17
18
19
20
21
22
23
24
25

Page 364

1
2            INDEX TO EXHIBITS
3  LAMM EXHIBIT                        PAGE
4  1    Allegations of Official Misconduct. 244
5
6            I N D E X             PAGE
7  RQ(s)
8  Production of all communications from
9     the Suffolk County Police Department
10     concerning Mr. Lamm's application.  24
11  Production of letter from Civil Service
12     advising Mr. Lamm of his failure.   37
13
14  MO (Pages) 35, 83, 127, 130, 133, 152, 156,
15  162, 180, 182, 183, 205, 206, 229, 230, 231,
16  232, 233, 234, 235, 243, 253, 257, 260, 261,
17  262, 263, 269, 270, 274, 275, 290, 293, 296,
18  309, 320, 331, 332, 334, 339, 346, 350, 354
19
20  EXAMINATION BY
21    MR. NOVIKOFF:        5
22    MR. CONNOLLY:      354
23
24
25

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 365

```
 1
 2                    CERTIFICATION
 3
 4
 5          I, Edward Leto, a Notary Public
 6  in and for the State of New York, do hereby
 7  certify:
 8          THAT the witness(es) whose
 9  testimony is herein before set forth, was
10  duly sworn by me; and
11          THAT the within transcript is a
12  true and accurate record of the testimony
13  given by said witness(es).
14          I further certify that I am not
15  related either by blood or marriage, to any
16  of the parties to this action; and
17          THAT I am in no way interested in
18  the outcome of this matter.
19          IN WITNESS WHEREOF, I have
20  hereunto set my hand this 7th day of
21  December, 2008.
22
23
24     ---------------------------
25          EDWARD LETO
```

Page 366

```
 1
 2               ERRATA SHEET
 3     I wish to make the following changes,
 4  for the following reasons:
 5  PAGE LINE
 6  _____ ___CHANGE:_____
 7         REASON:_____
 8  _____ ___CHANGE:_____
 9         REASON:_____
10  _____ ___CHANGE:_____
11         REASON:_____
12  _____ ___CHANGE:_____
13         REASON:_____
14  _____ ___CHANGE:_____
15         REASON:_____
16  _____ ___CHANGE:_____
17         REASON:_____
18  _____ ___CHANGE:_____
19         REASON:_____
20  _____ ___CHANGE:_____
21         REASON:_____
22  _____ ___CHANGE:_____
23         REASON:_____
24  _____ ___CHANGE:_____
25         REASON:_____
```

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 96 of 122 PageID #: 1954

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

## 0

**03 (1)**
193:5
**04 (1)**
193:7
**05 (2)**
193:9;340:12
**07-CIV-1215SJFETB (1)**
4:10

## 1

**1 (3)**
194:15;195:17;
337:17
**1:38 (1)**
164:16
**10 (18)**
46:13;66:3,7;
112:22;192:21;
282:21;286:15,16;
305:21,24;306:2,9;
318:17,18;319:22,
25;344:15,16
**10:03 (1)**
4:11
**100 (2)**
65:23;248:13
**1066 (1)**
6:7
**11/19/08 (1)**
244:5
**11:02 (1)**
72:12
**11:18 (1)**
72:16
**11th (3)**
165:3;166:5;167:3
**12:11 (1)**
134:12
**12:20 (1)**
134:15
**12:51 (2)**
164:11,13
**12th (2)**
131:20;132:10
**13 (4)**
236:3,4,25;237:15
**148 (1)**
223:10
**149 (2)**
224:22,24
**14th (2)**
11:13,18
**15 (6)**
46:14;107:11,22;
344:15,16;349:5
**155 (3)**
221:17;222:15,23
**158 (5)**
190:22;194:15;

195:17;208:2;216:21
**159 (9)**
193:11;195:15,21;
196:7,16;200:16;
209:19;214:24;
216:21
**16 (1)**
225:4
**160 (2)**
216:18,21
**161 (1)**
216:22
**162 (1)**
216:19
**164A (2)**
171:15;175:7
**164B (2)**
176:22;180:21
**164E (2)**
184:6,22
**168 (3)**
186:9,14;189:10
**17 (2)**
206:9,16
**170 (1)**
166:11
**171 (2)**
167:21;169:18
**174 (1)**
166:11
**176 (3)**
145:16;146:9,13
**177 (3)**
156:25;157:5,6
**178 (3)**
152:23;153:10,11
**186 (4)**
119:15;127:16,24;
129:6
**19 (2)**
4:10;363:4
**1st (1)**
11:23

## 2

**2 (26)**
20:21;21:2,6;22:6;
54:5;55:3,20;60:11;
117:5;147:12;148:5;
150:15;171:21,22;
172:13,15;180:25;
181:22;208:2;
223:22,22;224:5,8;
351:11;352:6;361:2
**2:05 (1)**
184:15
**2:11 (1)**
184:19
**2:56 (1)**
225:7
**20 (2)**
46:23;286:17

**2000 (17)**
63:22;64:4,17;
65:12,19;96:10,12;
173:8;191:20,21,21;
192:3,22,23;208:25;
273:16;350:18
**2001 (6)**
191:22,23,24;
192:25;209:3;356:6
**2002 (22)**
137:6,7,11;192:4;
193:3;195:16,19,21;
196:8,13;209:5;
254:14;255:4;
264:11;266:19;
268:5,18;271:13,15;
356:6;357:16,22
**2003 (32)**
14:16,17,21;16:12;
19:16;22:10,17,21;
23:8;136:21,24;
137:3,20;192:6;
196:17;197:14,20;
198:11;199:17;
207:2,14,20;209:7;
240:8,17,23;241:3,5;
245:23;256:15,23;
257:3
**2004 (65)**
16:9,9,15;18:23;
19:8,13,21;20:3,9;
63:5;69:4,4,12,24;
70:4;73:2;77:22;
99:8;121:14;137:3,
14,17;157:3,21;
158:25;159:2;
161:19,24;172:19;
173:3,8,13;174:21;
176:8,14;183:16;
192:8;195:11;
196:22;207:7,19;
209:9,14,24;212:3,
10;241:6,12;256:25;
257:4;273:16;
274:17;275:5,8;
277:9;280:5;324:3,7,
13;335:14;336:6,10,
15;341:23;360:9
**2005 (40)**
20:16;43:3;73:2;
77:24;99:8;101:2,3;
105:11;109:17;
110:15,17;112:10;
116:5;117:25;
121:12,14;162:5,11;
163:2,6,19;192:10,
11;193:10;209:12;
225:24;241:8;242:5,
7,9,12,15,18;339:21;
342:12;345:4;350:2,
5,13,19
**2006 (48)**
13:3,8;20:20,21,

25;21:2,6;22:7;23:8,
13,25;26:14;31:13,
14;33:9;34:2,14,14;
35:16;36:19,19;54:5;
55:4,20;60:11;79:8,
10;84:25;98:15;
116:11;117:5;
147:12;148:5;
150:15;171:21,22;
172:13;180:25;
181:23;192:12,13;
223:23;224:5,8;
351:11;352:6;
354:10;361:2
**2007 (2)**
98:11,12
**2008 (3)**
4:11;363:4,13
**21 (2)**
98:11,12
**25 (1)**
286:19
**26 (3)**
243:14,15,18

## 3

**3:00 (5)**
246:16;324:19,21;
330:23;334:24
**3:16 (1)**
225:12
**30 (8)**
157:3,21;158:25;
161:24;163:5;277:9;
280:4;282:22
**302 (3)**
17:10,24;18:14
**303 (8)**
16:3,4,6,18,24;
17:5,20,22
**31 (9)**
159:2;324:3,7,12;
334:21;335:14;
336:6,10,15
**313 (4)**
16:4,7,18,24
**31st (2)**
321:18,23
**32 (1)**
245:9
**33 (1)**
253:18
**34 (4)**
96:7;254:8,8;
255:5
**35 (11)**
96:2,8,21,24;97:4;
98:5,8,13,14,22;
220:15
**35th (1)**
97:12
**36 (2)**

25;21:2,6;22:7;23:8,
13,25;26:14;31:13,
14;33:9;34:2,14,14;
35:16;36:19,19;54:5;
55:4,20;60:11;79:8,
10;84:25;98:15;
116:11;117:5;
147:12;148:5;
150:15;171:21,22;
172:13;180:25;
181:23;192:12,13;
223:23;224:5,8;
351:11;352:6;
354:10;361:2
**2007 (2)**
98:11,12
**2008 (3)**
4:11;363:4,13
**21 (2)**
98:11,12
**25 (1)**
286:19
**26 (3)**
243:14,15,18

223:9;255:14
**37 (1)**
221:12
**38 (2)**
190:5,11
**39 (3)**
258:24;259:16,19

## 4

**4:14 (1)**
276:25
**4:29 (1)**
277:6
**4:30 (1)**
335:11
**40 (5)**
164:25;190:20;
218:19;261:10;
286:11
**41 (6)**
131:18;132:6;
157:8;262:13,19;
263:5
**42 (1)**
157:9
**45 (2)**
263:7,8
**46 (2)**
269:12,17
**48 (1)**
269:19

## 5

**5:00 (3)**
334:20,21;335:3
**5:29 (1)**
344:20
**5:37 (1)**
344:24
**5:55 (2)**
363:5,6
**50 (1)**
65:25
**58 (2)**
276:6,7

## 6

**60 (2)**
276:13,16

## 7

**7 (2)**
25:3,4
**71 (1)**
168:19
**740 (1)**
190:3
**75-B (3)**
221:10,21;222:2

**KEVIN LAMM**
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

## 8

**800 (1)**
67:25
**800s (1)**
69:18
**88 (2)**
69:16,17

## 9

**92 (1)**
17:22
**92.5 (1)**
15:6

## A

**abandoned (2)**
262:15,25
**able (4)**
33:18;86:10;
89:13;97:3
**above (7)**
65:23,25;66:3,7;
119:15;145:17;
167:23
**Absolutely (4)**
24:15;45:2;
134:10;276:11
**abusing (1)**
244:25
**academy (14)**
25:21;27:13,14;
101:14;103:3;
108:15,23;109:9;
113:20,25;151:14;
219:10,16,19
**accept (3)**
87:4,21;286:8
**acceptable (1)**
108:10
**accompany (1)**
320:13
**according (11)**
17:9;57:5;87:15;
120:4;144:13;207:6;
216:6;265:16;267:7;
308:18;310:4
**accredited (1)**
113:21
**accuracy (3)**
169:25;236:20;
259:10
**accurate (11)**
9:24;10:23;17:12;
160:22;193:18,23;
200:17;209:20;
243:18;263:11;286:7
**accused (4)**
172:2,4,10;244:25
**acknowledge (1)**

151:16
**acquired (1)**
323:16
**act (3)**
129:19;130:22;
260:25
**acted (2)**
224:3,9
**Acting (4)**
5:3;58:2;260:20,
22
**action (19)**
9:14;131:16,20;
132:11;133:11;
164:18;165:3;166:6;
167:3;190:7;221:8,
20,24;222:5,14,25;
223:3;253:12,22
**actions (2)**
271:24;272:2
**Active (1)**
5:3
**activities (1)**
191:2
**activity (1)**
249:18
**acts (5)**
125:20;129:8;
130:19,24;180:23
**actually (11)**
26:2;40:7;105:17;
133:19;176:23;
224:22;226:10;
237:13;271:5;
333:13;340:7
**add (1)**
137:7
**addict (1)**
212:21
**adding (1)**
158:11
**addition (2)**
47:13;258:24
**additional (2)**
49:16;50:14
**address (3)**
6:6,16;262:20
**addressed (1)**
23:14
**adhere (1)**
144:7
**administering (1)**
332:21
**admit (1)**
269:20
**adopt (1)**
55:17
**advance (1)**
148:6
**advanced (5)**
134:24;145:3,4,19;
156:2
**advancement (1)**

147:19
**adverse (1)**
221:20
**advise (60)**
27:5,8;31:22,24;
36:4,13,23;37:4;
54:12,22;55:8;59:2,
15;70:25;71:7,14;
81:2;85:6;90:16;
93:8,10;105:4;
106:16;108:6;109:2,
4;132:17;183:25;
185:7,8,18;186:3;
200:24;212:20;
213:22;214:2,7,10,
14;233:8,20;235:3,
15;251:14;257:15;
268:3,17;270:3,16;
273:14,22;274:6;
275:12,20;283:20;
296:2;338:7,8;
350:11,16
**advised (27)**
26:24;31:16,20;
32:6;35:20,25;36:8;
43:19;44:2;51:8;
77:15;92:6,15;93:17;
95:7,8;96:4,17;
97:11;111:16,22;
112:5;114:7;255:15;
273:10;291:24;314:9
**advisement (2)**
24:13;37:23
**advises (1)**
36:5
**advising (5)**
109:7;185:2;
214:25;268:13;338:8
**affairs (1)**
214:11
**affect (1)**
142:10
**afforded (2)**
266:14;267:9
**afraid (1)**
322:6
**afterwards (1)**
24:14
**again (43)**
24:6;37:15;38:17;
40:12;43:18,24;52:6;
64:16;66:6;71:5;
78:15;90:15;94:15;
98:18;111:20;120:8;
121:19;127:22;
128:17;130:9;
151:25;163:16;
167:19;175:9;184:7;
186:10,17;187:5;
189:14;193:21;
213:18;215:10,12;
223:2;237:10;
288:15;295:8,13;

300:5;301:25;325:4;
332:15;339:3
**against (14)**
11:9;12:13;53:22;
132:20;170:9,15;
180:24;233:18;
234:6;257:13;
268:11,25;269:8;
321:3
**age (4)**
95:23,25;96:21,25
**agencies (3)**
13:10,13;20:12
**agency (6)**
19:7;20:8,16;
68:23;86:24;113:22
**agility (13)**
14:8;23:21;24:19,
21,23;25:5,7,14;
26:3,22,25;27:10,17
**agitated (3)**
329:5,7,12
**ago (1)**
70:21
**agree (18)**
10:2,8;12:4;79:16;
157:25;158:7;
201:19;203:23;
204:2;205:25;
207:17,25;215:25;
248:23;249:11;
257:5;266:17;306:4
**AGREED (6)**
3:3,9,13;143:9,16;
251:6
**agreeing (1)**
306:5
**agreement (5)**
127:12,17;128:4,9,
20
**ahead (7)**
130:15;157:24;
211:4;237:19,25;
242:25;267:18
**aid (3)**
320:9,9,10
**aided (1)**
331:6
**Airport (4)**
43:8;225:19,25;
351:18
**al (2)**
4:5,7
**Albert (1)**
4:12
**alcohol (11)**
198:17;201:5,11,
17;202:18,25;
203:25;287:15;
297:7;298:11;302:6
**alcoholic (4)**
206:17;234:24;
287:15;297:6

**aligned (2)**
254:10,23
**Alison (12)**
119:16,23;120:23;
121:10;141:24;
142:7,19,24,24;
143:7,9,14
**allegation (23)**
12:17;119:14;
123:7;127:20;128:7;
135:17;144:25;
145:13,23;146:7,25;
147:5,8;168:10;
181:4;182:4,18;
210:18;244:11;
254:20;263:11;
265:16;267:8
**allegations (9)**
9:24;10:4;135:11;
158:7;166:5;238:12;
244:3,11;269:16
**allege (35)**
127:16;128:2;
129:6,19;143:22,23;
145:7;148:5;155:22;
167:22;171:15;
175:6,24;180:21;
181:19;182:17;
183:18;184:22;
186:14;187:21;
189:9;193:12;208:3;
210:6;214:19;
221:17;223:10;
226:21;236:4,24;
254:9,21;258:24;
262:13;266:10
**alleged (33)**
12:12;57:3;
127:23;130:18;
132:20;133:10;
134:20;145:15;
147:18;158:18;
162:25;163:21;
167:3;170:9,14;
186:11;188:5,12,21;
190:23;216:21;
223:23;257:14;
263:4;276:7,15;
307:23;331:9,20;
333:16;334:24;
335:3;345:19
**allegedly (3)**
58:20;60:15,20
**alleging (7)**
11:2;12:19;
118:18;131:9;
189:23;208:11;221:8
**allocute (2)**
161:10,16
**allocuted (6)**
159:5,16,20;160:4,
10;161:6
**allotted (1)**

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB Document 145-10 Filed 01/15/10 Page 98 of 122 PageID #: 1956

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

65:16
**allow (2)**
210:7;268:14
**allowed (5)**
258:24;259:22;
261:10;266:20;314:4
**alone (1)**
260:23
**along (1)**
81:21
**alongside (2)**
135:2;145:21
**altercation (11)**
265:4;289:2,9,11,
13;309:18;310:21;
318:25;333:17;
334:3,13
**altogether (2)**
34:8;172:9
**always (1)**
288:20
**ambulance (1)**
350:21
**Amendment (3)**
11:13,18,23
**among (1)**
3:3
**and/or (1)**
167:25
**Andrew (5)**
5:7;24:6;136:9,10,
13
**anguish (4)**
186:13,21;187:11,
15
**answered (8)**
118:4;122:22;
125:17;173:21;
192:2;205:5;274:25;
360:24
**answer's (1)**
127:8
**anymore (1)**
134:6
**apart (1)**
176:6
**appeal (15)**
35:4;40:3,5,9,11,
18,20;41:3,12;49:15;
52:4;53:12;87:18;
89:8,12
**appealed (2)**
35:4,6
**appear (25)**
23:20;24:20;26:6,
8;30:18,20,21;31:5,
9;32:13,21,24;33:4;
50:19,22;51:2,5;
85:3,8,16;86:11;
289:22;301:20;
342:21;347:18
**appeared (8)**
15:8;27:18;41:11;

51:12;129:23;
287:14;297:5;360:7
**appearing (1)**
30:24
**appli (1)**
80:18
**applicable (1)**
191:6
**applicant (2)**
54:9;239:9
**applicants (2)**
77:4;80:18
**application (18)**
16:25;17:4;19:2,9;
24:11;37:13;54:4;
56:24;71:17,22;
72:23;73:4;91:2,20;
92:25;105:5;107:19;
185:13
**applications (3)**
71:3,9;105:23
**applied (6)**
72:19;98:25;
219:25;220:4,12;
361:3
**apply (6)**
14:10;90:7,18;
94:10;181:13,23
**applying (5)**
93:4,11;105:20;
117:8;118:10
**appreciate (1)**
36:11
**approach (4)**
287:7,8;288:24;
303:14
**approached (9)**
287:10,19;289:6;
290:6;293:14;
305:11;311:2,22;
313:6
**appropriate (2)**
212:20;271:14
**approval (2)**
138:25;139:10
**approve (1)**
138:13
**approved (1)**
138:8
**approximate (3)**
107:11;286:2;
335:10
**approximated (1)**
286:3
**approximately (20)**
4:11;24:4;35:3;
36:16;50:25;63:23;
137:20;162:21;
172:18;183:16;
191:19;192:21;
193:6,8;210:3;
217:21;246:16;
264:10;334:25;

341:14
**April (30)**
13:3,8;20:21;21:2,
6;22:6;25:3,4;54:5;
55:3,20;60:11;
116:11;117:5;
147:12;148:5;
150:15;171:21,22;
172:13,15;180:24;
181:22;223:22,22;
224:5,8;351:11;
352:6;361:2
**arbitrary (2)**
223:13,20
**area (1)**
192:21
**arm (2)**
151:11;324:25
**Arnold (4)**
135:18;136:17,18,
19
**around (26)**
50:24;63:4;79:11;
100:25;117:23;
162:3;177:3,6,9;
198:5;209:11;
245:22;247:15;
248:18;283:13,16;
300:10;306:16,17;
307:3,4,9,11;318:3;
332:7;357:16
**arrest (2)**
201:3;309:17
**arrested (1)**
305:6
**arrive (2)**
330:24;358:13
**arrived (5)**
328:7;330:16,23;
358:9;361:22
**ascertain (1)**
89:17
**aside (3)**
176:18;305:5,8
**aspect (2)**
17:13;297:18
**aspects (2)**
188:14,20
**assault (3)**
345:16;346:2;
350:22
**assert (2)**
183:4,17
**asserted (3)**
175:25;181:19;
182:5
**asserting (3)**
164:18;175:6;
189:24
**assertions (2)**
171:18;184:25
**assign (3)**
258:25;259:23;

260:10
**assigned (3)**
255:18;259:15;
260:4
**assistance (1)**
151:16
**associated (1)**
84:9
**association (1)**
4:16
**assume (4)**
32:15;86:13;
241:3;282:16
**attack (1)**
158:18
**attempt (9)**
115:23;201:3;
284:20,21;285:3;
299:11;303:21;
323:25;328:12
**attendance (3)**
6:18,22;7:2
**attention (5)**
131:17;229:2;
235:8;242:20;354:10
**attorney (3)**
10:17;236:21;
243:16
**attorneys (1)**
37:8
**Attorney's (4)**
234:10,21;235:4,
16
**August (1)**
242:11
**authority (2)**
215:2;240:22
**authorize (1)**
10:17
**authorized (1)**
243:15
**authorizing (1)**
236:21
**automatic (1)**
280:7
**automatically (1)**
279:24
**automobiles (5)**
247:22,25;248:6,
20;249:3
**Avenue (2)**
6:8,12
**aware (50)**
9:9;11:7,12;18:22;
58:2,12;61:12,22;
70:13;116:17;
127:13,14;159:11,
15,18;161:5;171:2,5,
10;175:23;180:6,9;
208:10,22;209:15;
212:2,3,10;213:19;
217:25;218:6;
222:11;243:24;

252:16,18;253:11,
21;261:6;307:22;
309:19,20,23,24;
310:15;313:24;
321:21,25;322:3;
349:12,13
**away (14)**
213:11;232:10;
233:13;248:9;249:4;
285:21;290:23;
295:25;296:5,13,20;
311:15,18;351:16

---

**B**

**back (64)**
39:18;40:20,22;
63:16;72:17;74:18;
75:15,24;76:3,8;
81:6;82:16;89:21;
99:15;105:18;106:4,
15;111:4,6,10;114:8;
134:16;143:20;
151:16;153:21;
164:16;167:16;
175:11;176:23;
183:7,10,22;184:12,
20,21;200:3;225:13;
246:7;270:7,20;
277:7;301:13;
307:13,14,18;308:2,
3;311:16,19;313:13;
314:25;317:3;
318:12;321:15,17,
22;323:3;325:23,25;
344:25;349:18;
354:10;360:9,17
**background (14)**
25:23;50:20,23;
51:3,6,12,18,23;
81:18;354:15,18;
355:2,5,7
**backgrounds (1)**
14:8
**Bacon (1)**
353:21
**bad (2)**
223:16;224:3
**band (2)**
17:6,15
**bar (49)**
258:20,22;272:16,
19;273:4,15;298:4;
301:13;303:5,8,15,
24;304:2,4;306:14;
307:18;310:2,18,24;
311:5,8,16,19,22;
314:5,17,24,25;
315:7;316:13,15,17,
18,25;317:3,17;
318:16,20;319:6,14,
20,25;320:7;322:5,7,
11,12,15;323:8

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**barracks (1)**
208:9
**bars (11)**
191:11;192:15;
195:24;196:11,20;
255:21;256:8,20;
257:7,17;258:17
**based (3)**
148:20;240:20;
345:19
**basic (1)**
28:10
**basically (4)**
46:8;48:9;265:17;
316:5
**basis (20)**
8:12;60:3;90:22;
91:8;97:18;117:11;
119:4,13;123:7,15;
125:11;126:10;
127:19;128:6;
137:25;144:9;182:4;
221:22;271:17;300:4
**bathroom (1)**
328:15
**bathrooms (1)**
318:3
**battery (1)**
27:6
**Bay (20)**
6:8;13:17;73:19;
98:24;99:2;100:2,3,
13;101:16;102:13;
104:8,13,19,19,25;
105:6,18;108:5;
236:7;272:21
**Bayberry (1)**
236:8
**Beach (123)**
4:6,20;13:2;28:14,
18,23;29:23;30:5;
54:11;56:4;60:14,23;
79:14;80:12;103:11,
14,17;104:12;
116:12,17;134:22;
136:20,23;137:2,10;
140:12;145:9,17;
146:5;147:13,22;
150:10,14;154:25;
155:9;156:4,11,16,
20;168:3,8,22;
169:13;170:10,15;
180:18;189:25;
190:2,24;191:3,13;
192:16;197:8;
201:13;202:4,5,6,9,
11,15;203:8,11;
205:9;210:9;212:4,
11;215:3;216:7,25;
217:3,6,7,11,13;
218:9;220:19;221:5;
223:12;225:10;
227:4;233:7,20;

234:9,16,20;235:6,
17,18;236:6,8;
240:11,25;243:23;
245:12,19;251:12,
17;252:13,22;
253:15;254:16;
257:10;260:16,19;
261:6,25;269:22;
270:5,9,18;271:16;
273:19;281:4;282:5,
6;352:23,25;353:4;
361:10,14,15,18;
362:7
**Beach's (3)**
153:2,7;154:5
**beat (3)**
265:18;266:2,20
**became (2)**
220:15;232:9
**become (3)**
116:17;261:6;
309:23
**beer (9)**
183:7,22;261:11,
16,22;262:2,14,23;
274:16
**beforehand (2)**
199:8,9
**began (1)**
239:10
**begin (1)**
203:6
**beginning (10)**
31:11;34:2;45:9,
12;121:14;197:23;
198:2,5;257:3;342:3
**begins (6)**
72:15;134:14;
184:18;225:11;
277:5;344:23
**behalf (8)**
4:19;5:2,9;10:18;
58:3;61:23;193:20;
243:16
**behind (3)**
183:10;303:2;
304:15
**belief (11)**
117:12;229:19,25;
230:5;234:11;236:9;
248:4;256:6;268:4;
275:21;300:4
**believes (1)**
130:9
**belittle (1)**
266:6
**belittled (1)**
263:22
**besides (1)**
349:9
**best (6)**
10:23;80:16;
189:7;263:12;

265:11;289:2
**better (2)**
47:21;167:13
**beverage (1)**
297:6
**beverages (2)**
206:18;234:24
**birth (1)**
28:10
**birthday (1)**
97:12
**bit (1)**
237:4
**blithely (2)**
259:3,7
**blocks (1)**
282:10
**blog (7)**
353:3,8,10,12,13,
17,22
**blogs (2)**
352:23;354:5
**blue (3)**
226:24;227:7,13
**board (3)**
60:19;61:24;
149:16
**boat (4)**
331:6,13;332:3,5
**Bockelman (7)**
194:20,21;195:4,6,
9,13;196:24
**bold (5)**
132:14;133:8;
164:25;221:13,15
**bolded (3)**
131:18;190:5,13
**book (1)**
87:11
**border (8)**
281:15,16,17,18,
23,23,24;282:5
**borderline (1)**
281:25
**Bosetti (143)**
135:21,21;137:5,9;
139:20,23;140:22,
25;160:16,18;172:6,
7;174:4;176:25;
177:8,12,23;178:4,
11,22,23;179:12,13,
25;198:9;199:3;
200:19,23;201:4,24;
202:2,10,16,24;
203:6,16;204:8;
205:8,17,22;246:3,3,
10,14;248:5;259:20,
20,22;261:24;
284:24;285:15,16;
286:21,23,24,25;
287:2,8,8,11,12,18,
22;288:13,17,17,22;
289:6;290:6,8,10,15,

21,22;291:2,3,5,9,19;
292:5,10,18;293:14,
22;294:2,5,8,9,15;
295:6,9,23;296:2,11,
19,24;297:4;303:10;
308:11,13,20;310:7,
11,17,23;311:2,6,12,
14,18,22;313:6,10,
14,17,25;314:6,17,
21,23;315:7,10,15,
25;316:8,12,21,25;
317:7;318:24;
319:24;320:5,13,13;
324:2;328:5,10;
329:18;330:12;
333:17;334:4;
347:13;348:14
**Bosettis (20)**
247:6;248:19;
249:2,14,18;250:17;
252:9;256:14;
260:10;283:22;
307:21,23;308:7,14,
19;310:3;312:15,24;
314:10;347:9
**Bosetti's (2)**
178:15;323:14
**boss (1)**
275:17
**both (21)**
4:22;32:16;35:22;
36:14;38:2,14,19,23;
44:7;125:15;128:2;
156:11;191:12;
198:11;200:4;
245:11,18;288:23;
293:10;307:5,9
**bounce (1)**
360:11
**bouncer (10)**
304:3,5,8,12,17,19,
21,24;305:8;306:12
**box (7)**
74:17;75:14;
78:10;79:2;81:4;
105:16;106:3
**boxes (4)**
75:6;99:9,14;
100:8
**bragged (1)**
270:9
**breach (3)**
153:3,7;154:5
**break (14)**
72:14;134:8,13;
164:10,14;184:17;
192:18;224:16,24;
225:8;256:11;
276:19;277:3;344:22
**breaking (1)**
75:5
**Breeze (1)**
272:21

21,22;291:2,3,5,9,19;
292:5,10,18;293:14,
22;294:2,5,8,9,15;
295:6,9,23;296:2,11,
19,24;297:4;303:10;
308:11,13,20;310:7,
11,17,23;311:2,6,10,
14,17,25;316:4,6,17,
21,23;315:7,10,15,
25;316:8,12,21,25;
317:7;318:24;
319:24;320:5,13,13;
324:2;328:5,10;
329:18;330:12;
333:17;334:4;
347:13;348:14

**Bri (1)**
331:12
**Brian (4)**
326:2;358:7,8,18
**Brief (7)**
102:10,16,18;
103:9,12;104:8;
113:10
**bring (4)**
228:7;246:7;
354:9;355:14
**Brody (1)**
245:2
**broke (2)**
299:14,15
**broken (2)**
320:18;321:11
**brother (8)**
311:3,13,25;
312:14;313:11,14;
315:20;316:6
**brothers (3)**
246:15;248:5;
259:22
**brought (7)**
228:25;235:7,23;
242:19;325:24;
358:20,25
**brutality (1)**
180:24
**buddies (2)**
255:7;268:20
**budget (2)**
29:11,18
**Budweiser (5)**
198:19,20;200:19;
202:3,12
**bureau (1)**
103:4
**Burns (8)**
210:19,20;211:8,
14;213:11;215:16;
270:2;355:12
**Burns' (1)**
270:8
**business (6)**
11:4;12:9,15;
121:5,8,23;236:7;
360:18

## C

**calendar (1)**
162:2
**call (70)**
24:8;37:9;66:17,
22;83:5;85:18,23;
111:4,6,17,23;112:5,
7;114:7,22;115:3;
117:25;151:15;
172:14,17,20,24;
174:18;175:19;
176:5,19,25;277:8,

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 100 of 122 PageID #:
1958

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

13,14,15,19,21,25;
278:3,9,19,24;279:4,
5,25;280:6,11,12,16;
281:9;282:8;283:7,
10,12,15,21;284:4;
307:22;308:4,18;
310:4;312:24;
313:24;324:5,9,11,
15;331:5;359:18,25;
360:4,22;361:25;
362:4

**called (17)**
83:23;85:10;
107:4;111:9;173:7;
177:5,12,23;178:4;
179:20;213:13;
263:15,24;283:24;
314:10;327:24;
330:18

**calling (3)**
176:6;179:13,17

**calls (1)**
360:11

**came (21)**
21:23;50:3;65:4;
141:21;174:3;
180:16;231:6;
264:18,20;265:2;
270:7,20;294:23;
318:12;328:9,14,22;
330:2,19;332:20;
334:23

**Can (88)**
11:6;12:14;14:23;
15:12;16:21;48:4;
49:4,6;111:4,4;
114:3,4;115:17;
123:21,24;124:8;
128:25;132:17;
134:7;141:21;148:2;
153:14,21;154:7;
156:23;162:14;
163:10,13;165:20,
21;166:12;168:14,
19;175:11;181:14;
184:7;186:25;189:7;
200:19;202:12,13;
204:19,23;206:12;
224:15;252:17;
254:5;261:20,25;
264:5;266:2;267:19,
21;272:13;273:12;
276:3,9,14,20;
278:19;283:2;284:7;
286:2;290:3;296:3,
12;298:19;299:18;
300:25;301:12;
302:23;303:20;
305:5,6;306:23;
307:12,15,16;
310:14;315:23;
316:4;321:2;323:12;
331:22;344:8;352:7;

357:15;358:19

**cancel (1)**
83:5

**cans (2)**
262:14,23

**canvas (18)**
13:11,14;73:5,7,
10;74:2,18;75:15;
77:21;99:3,4,7,10,16,
21;100:10;106:4;
156:5

**capable (2)**
126:5,9

**capacities (1)**
4:23

**capacity (3)**
141:7;187:7;
189:14

**car (7)**
202:17;203:7,24;
249:19;280:18;
285:17;286:20

**card (1)**
121:5,8,16,23

**care (6)**
203:19;206:21;
207:2,12,20;212:25

**career (21)**
119:2,25;123:9;
125:13,22;126:12,
23;127:6,12,25;
128:11,21,22;129:4,
9,21;130:21,25;
143:11,17;155:25

**careers (7)**
119:18;120:8;
134:24;144:25;
145:20;147:19;148:6

**carry (1)**
278:21

**carrying (1)**
151:11

**cars (1)**
249:15

**Carter (18)**
4:5;120:5;123:4,5,
15;124:15,19,22,25;
125:4,7,9,10;130:5;
142:24;149:25;
357:3,17

**Carter's (1)**
142:17

**case (16)**
4:9;11:3,10,23;
12:4,12,20;37:21;
87:2;133:10;183:6,
22;188:5,11;189:17;
190:19

**Cassel (1)**
6:7

**C-A-S-S-E-L (1)**
6:11

**Cause (21)**

18:8;29:11;65:16;
95:20;131:20;
132:10;133:10;
164:18;165:3;166:5;
167:3;181:22;182:7,
21;184:3;185:4,9;
190:7;221:8;238:8;
250:6

**caused (1)**
186:12

**caution (2)**
283:2;286:9

**cell (8)**
278:4;279:19;
323:14,16;324:2;
360:17,19,21

**cells (1)**
349:18

**certain (16)**
11:9;21:24;26:15;
73:13;112:16,18;
135:12;140:20;
144:8,10;160:10;
230:3;252:23;
253:16;261:25;
339:18

**certainly (1)**
153:14

**certificate (4)**
101:8;103:3;
219:5,12

**certificates (6)**
109:24;110:5,9,13,
24;113:4

**certification (1)**
3:5

**certified (4)**
155:12;179:7;
254:14;309:5

**chain (15)**
204:11,15;205:12;
206:22;213:8;
228:16,20;229:3,14;
231:11;235:9;
257:19,24;258:3,10

**challenging (2)**
98:2,19

**change (6)**
18:21;47:21,21;
72:9;184:11;344:8

**changed (1)**
276:20

**character (1)**
353:22

**charge (11)**
159:5,16,20;160:4,
23;161:5,10;194:24;
240:3;241:4;260:2

**charges (2)**
160:11;161:16

**chauffeur (12)**
245:10,17;246:2,5,
14;252:9,11,20;

255:18,24;256:14;
272:11

**chauffeured (3)**
246:19,23;253:13

**chauffeuring (1)**
248:5

**check (8)**
74:10;81:4;99:10,
13;100:7;354:15,18;
355:7

**checked (6)**
73:17;74:5,17;
75:6,14;105:16

**checking (3)**
78:10;79:2;106:3

**checkmark (1)**
73:11

**Cherry (15)**
6:20;135:21,22,23,
24,24;137:13;140:2;
141:4;339:25,25;
340:5,7;349:7,10

**Chester (5)**
142:7,25;143:7,9,
14

**chide (1)**
263:21

**Chief (57)**
5:3,4;85:19,20,23;
86:3,6,9,18;100:19,
21,22,24;102:4,8,12;
104:9;105:4;122:9,
10,11,13,16;149:14;
204:7;205:6;212:20;
213:22;214:2;
229:19;230:19;
251:14,23,25;252:4,
18;257:15;268:3,7,
12;272:3;273:22;
275:12,21;324:11;
339:10,22;340:4,11,
17;349:10;350:7;
351:2,6,11;352:5,19

**child (2)**
216:2,9

**children (3)**
215:21,23,24

**choke (7)**
295:15,16;299:12;
326:6,7;333:8,9

**choked (9)**
287:25;288:3,4,6,
11;290:21;294:25;
295:5,20

**choose (1)**
164:4

**chose (1)**
271:23

**Chris (27)**
54:6,10,12;55:22;
71:19;72:2;160:5;
185:12;288:9,12;
290:11,19;291:12;

292:10;293:19;
295:3,14;296:21;
306:18;317:13,14;
322:8;323:4;325:15;
328:16;329:3;335:19

**Christopher (1)**
160:23

**citizens (1)**
180:24

**City (1)**
220:2

**Civil (108)**
15:17;19:10,14;
20:4;36:4,12;37:3;
38:7,18;39:18,25;
40:15,17;41:17;
43:11;44:3,13;49:14;
50:4,15;51:22;52:5,
11,16;53:7,17,24;
62:6;68:14;69:22;
71:13;72:4;73:8;
74:19;75:16;76:4,5;
77:12;86:20;87:16;
88:3,21;89:5;90:2;
91:6,13,15;93:18;
96:18;97:13;98:3,19;
99:5,6,20;100:11;
106:5;118:21;
120:12,21;121:3,18,
22;122:4,6;126:4;
128:15;130:6;
134:23;142:6;144:3;
145:18;172:3,5,11,
14,17,20,25;173:7,
12,15,24;174:8,18;
176:7,12,15,23,25;
177:12,23;178:4,9,
16,24;179:6,14,17,
19,21;180:3,7,16;
221:9,21,25;223:12

**civilian (13)**
160:2,17;255:19,
25;264:22;265:3,11,
14,18;266:2;308:25;
309:3,4

**civilians (16)**
158:9,17;159:20;
160:3,9,15,21;259:5;
266:20;278:19;
303:14,22;310:17;
329:22;330:13,15

**CJ's (5)**
272:16,19;273:4,
15;274:8

**claim (36)**
11:3;12:12,20;
53:22;61:15,17,21;
118:20;119:10;
125:11;131:9;
132:20;135:5;
150:19;152:7,18;
154:3,10,21;155:7,
21;156:9,18;165:11;

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

166:13,25;187:9,14;
188:4,11,13,22;
189:16,23;210:25;
214:24
**claimed (4)**
11:13,18,23;
190:18
**claiming (2)**
131:7;165:17
**claims (4)**
11:9,19;12:4,7
**clarify (2)**
83:21;176:10
**clear (9)**
36:10;61:3;79:20;
88:20;133:24;
144:23;160:14;
293:7;306:6
**client (2)**
8:5;132:12
**clients (4)**
132:20;165:12,17;
166:14
**clocking (2)**
305:15,18
**close (21)**
16:8;89:2;121:3,
17,21;122:3;129:24;
172:25;263:17;
264:4;265:18;266:3,
21;286:18,18;
289:11;291:5;
293:15;319:22;
324:19,19
**closeness (1)**
126:2
**clothes (1)**
265:7
**Code (1)**
168:22
**colleague (1)**
245:25
**colleagues (1)**
245:11
**college (5)**
39:4,8,9,10,11
**coming (2)**
362:2,13
**command (15)**
204:11,15;205:12;
206:22;213:8;
228:16,20;229:3,14;
231:12;235:10;
257:19,25;258:4,11
**commence (5)**
12:25;13:7;97:9,
20,25
**commenced (2)**
97:21;98:7
**commencing (1)**
354:22
**comment (2)**
186:4;217:20

**comments (1)**
186:11
**committed (2)**
129:7;130:19
**common (1)**
281:3
**communicate (9)**
18:25;19:7;20:4,9;
21:8;85:15;92:22;
104:18,24
**communicated (8)**
19:11;34:24;58:3;
71:2,8,15;78:20;
118:14
**communication (89)**
19:13,21;21:14,17;
23:13,15;24:18;
25:10,13,25;30:9,23;
32:23;34:18;38:19;
39:19;49:13,17;
50:11,14,22;51:7,17,
21;52:4,10,19,24;
53:6,23;60:6;61:23;
68:14,22;69:8,20;
70:2;74:22;75:17,20;
77:10;78:2,8;79:5;
81:12;82:19,24;83:9,
10,17,18,20,25;84:4,
9;100:14;101:20;
102:8;104:6,9;106:7;
109:19;110:4,12;
114:10,17;115:18,
25;173:17;174:14;
176:19;178:16;
252:6;325:21;
326:12;333:6;
338:23;339:9,10,21;
340:4,6,18;341:10,
11,19,25;342:9;
352:5
**communications (26)**
24:9;27:20;32:7;
37:12;68:8;110:21,
25;116:8;186:23;
187:20;188:6;256:4,
10,17;326:4,18,22;
332:11,17;333:2;
340:11;342:5,7;
349:25;351:10,13
**complain (14)**
142:6;194:14;
195:9;204:6,12,16;
205:6,15,20;206:7;
209:20,25;241:24;
249:23
**complained (18)**
194:22;195:6,13,
16,22;196:8,17,23;
200:17;203:16;
204:22;206:14;
207:13;209:22;
241:23;243:21;
252:18;253:10

**complaining (2)**
214:18,23
**Complaint (37)**
9:13,18,22;10:5,
12,18,22;12:8;60:13,
18,22;61:13,22;
119:11;131:15,24;
134:21;135:16;
144:2;158:3;164:18,
24;169:8,18,25;
170:11,18,21;
175:24;189:24;
190:11;200:16;
209:19;221:12;
226:9,11;236:22
**complaints (3)**
241:15,20;262:21
**complete (4)**
82:4,10,12;151:13
**completed (6)**
27:6;108:15,21;
157:16,17;219:16
**completes (1)**
363:3
**complied (3)**
167:25;168:12;
169:3
**comply (2)**
168:9;169:6
**comprehension (1)**
14:25
**compromised (1)**
251:16
**compromising (1)**
251:11
**con (1)**
256:5
**concern (3)**
216:5,11;257:15
**concerning (104)**
18:25;19:8,15,22;
20:5,9;21:9;22:22;
23:17;24:11,18;
25:12,13;27:21;
28:13,22;29:23;30:4,
11;49:15;50:15;
51:18;52:12,20,25;
53:7;60:15,19,23;
61:25;68:17,24;
69:11;70:4,10;71:9,
16,22;72:5;74:23;
75:21;76:8,10;77:13;
78:3,21;79:3,6;
81:14;87:13;92:24;
97:12;100:15;
104:14,20,25;106:8;
108:12;109:21;
110:5;114:12;
115:21;118:8,15;
123:13;159:6,21;
160:11;187:9,14;
195:22;196:9;
205:16,21;206:8,15;

230:3;234:11;245:2;
256:5;275:23;277:9;
315:16;336:11,16;
339:10,22;340:4,13,
19;341:12,20;
342:10;349:25;
350:9,17;351:3,7;
352:9,10,13,16,23;
353:4
**concerns (2)**
350:12,17
**conclude (2)**
126:10;207:11
**conclusion (2)**
123:16;125:15
**condom (1)**
270:10
**conduct (4)**
161:8,13;168:22;
187:20
**confidential (1)**
142:13
**confirm (1)**
236:20
**confiscate (1)**
261:22
**confiscated (1)**
262:4
**confusion (1)**
294:23
**connection (3)**
355:7,9,11
**CONNOLLY (6)**
5:2,5;59:20;354:6,
8;362:15
**connotation (2)**
119:8,20
**consider (1)**
330:14
**considering (1)**
282:24
**consistent (1)**
218:19
**conspiracy (1)**
118:21
**conspire (3)**
118:25;119:7,20
**conspired (11)**
119:17,24;123:8;
125:12;127:25;
129:17;141:25;
180:22;181:20;
182:5,19
**consumed (1)**
302:16
**contact (5)**
20:17,22;40:13,16;
232:19
**contacted (1)**
21:5
**contained (1)**
228:2
**container (7)**

198:17;201:7,9,10,
17;202:17,25
**context (2)**
121:15,20
**continue (11)**
72:10;120:9;
182:8,11;189:4;
211:6;296:12,20;
297:12;318:2;344:7
**continued (4)**
181:21;182:6;
207:18;362:21
**continuing (1)**
182:20
**contrary (2)**
250:21;251:5
**control (6)**
49:9;167:7;
175:15;182:24;
208:19;222:9
**conversation (60)**
54:16,19,23;55:21;
56:6,12,16;102:3,17,
20;103:9,13;110:6;
112:20;113:2,10;
114:5;115:12;118:7;
120:5;122:22;
123:14,18;124:14,
18,24;125:3,6,9;
130:4;142:18,23;
143:5,10,15;178:13,
22;287:18;296:20,
24;298:22,25;
299:16,21;301:3,7,
14;302:21;345:3,7;
348:24;349:4;350:3,
6,7,14,19;352:19;
355:24;359:20
**conversations (9)**
10:16;55:3,8,12,
13;56:11;319:24;
356:7,15
**convicted (2)**
210:21,25
**Conway (1)**
183:8
**Cool (1)**
220:10
**cooperate (1)**
347:8
**cop (8)**
218:12,24;219:2,2,
3,4;299:25;300:5
**copy (4)**
15:18;101:10;
103:2;109:23
**Corneil (1)**
281:18;282:6
**corner (4)**
272:20;273:6;
274:12;275:23
**correctly (9)**
77:3;92:5;94:9;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 102 of 122 PageID #: 1960

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

160:8;212:2,9;
222:19,20;313:24
**corruption (7)**
227:3;232:17;
233:19;234:8;
257:14;268:11,25
**counsel (10)**
3:3;6:19;10:17;
53:5;58:10,11;142:2;
171:8;190:17;225:9
**counselor (2)**
97:19;119:5
**counsels (1)**
4:18
**count (1)**
286:14
**country (1)**
220:7
**County (143)**
13:5,22;14:2,10;
15:9,17;17:10;18:24;
19:4,10,14,23;20:4,6,
10,13,18,23;21:7,10,
18;22:8,15,22,23;
23:2,6,10,17;24:10,
16;25:11;27:4,20;
30:10;31:16;32:8;
33:11;34:4,19;35:13,
20,25;36:3,4,7,12,22;
37:3,13;38:6,18;
39:18,25;43:11;
44:13,17;49:14;50:4,
15,16;51:17,22;52:5,
11,13,16,19;53:2,17,
24;54:4,9;56:15,25;
57:6;58:4;59:18;
60:8;62:6,9,12,17;
63:8,19;64:23;65:20;
68:14,25;69:9,10,21;
70:5,9,17,25;71:7,13,
13,21;72:4;76:5;
86:20;88:3,21;89:5;
90:2;91:21;92:17;
93:18;96:5;97:13;
98:2;108:16;113:18,
24;134:23;144:5,8,
14;145:18;151:14;
168:3,8;169:14;
185:13,23;203:4;
214:12,15;219:8,14,
23;220:11;223:12;
234:10,20;235:4,15;
236:10;331:5;
354:13;355:23
**couple (2)**
38:22;70:21
**courage (1)**
226:23
**course (1)**
103:12
**Court (19)**
3:16;4:8,13,15,16;
5:19;6:2,5,9,13;98:2,

19;120:14;153:20;
167:15;169:21;
175:10;342:21;
347:18
**courtesy (1)**
351:20
**Courtney (1)**
5:6
**courtroom (1)**
159:11
**cover (29)**
229:17,20;230:2,
15,18,20;231:7,17;
232:2,4,6,18;233:9,
22;234:12;241:25;
259:2,23;260:11;
322:7,17,21;323:2,5,
11;328:17;329:5,10,
15
**covered (1)**
322:9
**create (1)**
191:4
**crime (3)**
158:23;308:20;
309:23
**crimes (2)**
158:19,24
**criminal (1)**
160:11
**criminals (1)**
210:8
**criticized (1)**
241:19
**crowd (1)**
250:14
**cue (9)**
299:8,10,14;314:2,
7,15;320:18;321:11;
333:10
**currently (2)**
28:25;43:5
**custody (6)**
49:9;167:7;
175:15;182:24;
208:19;222:9
**cuts (1)**
29:12

---

# D

**damages (9)**
150:21;153:4,25;
154:2,13,15,17;
155:20;156:16
**Dan (3)**
135:20;136:25;
317:18
**danger (4)**
150:18;151:12,19;
191:4
**dangerous (1)**
255:17

**dangerously (1)**
255:17
**dangers (5)**
150:22,24;152:2,5,
17
**dark (1)**
282:25
**date (29)**
24:23;27:18;
28:10;30:3,17;32:5;
35:24;40:20,21;
41:11;81:22;84:20,
23;85:4,8,16;86:11;
96:9;97:12;117:5;
122:12,14;140:10;
159:12;183:23;
188:12;217:23;
274:21;275:6
**day (32)**
26:5,5,7,10,11;
27:9;39:10,11;94:24;
102:4,9;110:14;
116:25;117:21,25;
156:15;171:23,24;
218:4;233:6,19;
234:8,16,19;235:16;
246:13;259:24;
337:13,19;350:8;
352:24;363:12
**days (6)**
35:3;36:16;50:2;
337:6,7,7
**dead (1)**
283:13
**dealer (11)**
210:16;211:2,14;
213:5,20;214:3;
215:3;227:25;
228:12;235:18;
269:25
**dealers (1)**
210:7
**dealer's (5)**
269:22;270:6,17;
271:18;272:8
**decide (2)**
67:15;240:22
**deciding (1)**
240:9
**decision (2)**
115:10;137:22
**deck (3)**
307:14,18;317:3
**dedicated (1)**
254:13
**defamation (2)**
170:10,17
**defamatory (10)**
171:17;173:25;
184:23;186:11,22;
187:20;188:5,13,21;
189:18
**defame (2)**

170:24;171:3
**defamed (1)**
175:6
**Defendant (18)**
5:3;118:24;
119:22;127:16;
134:22;145:8,17;
146:4;147:9;155:3;
170:9,15;184:22;
191:3;236:5,11;
237:2,20
**Defendants (14)**
4:7,20;11:9;12:13;
119:16;145:23;
152:25;166:20,23;
167:2,23;171:16;
190:19;223:11
**Defendants' (2)**
154:4;221:18
**define (3)**
12:14,18;22:11
**defined (3)**
107:7,9;221:25
**definition (2)**
119:10;162:18
**deliberately (2)**
134:23;145:19
**denied (2)**
216:20;226:14
**Department (231)**
4:21;13:3,5,22;
14:2,11;15:10;18:24;
19:4,11,15,24;20:4,6,
11,18,24;21:7,10,18;
22:9,16,22,24;23:7,
10,17;24:11,17;
25:11;27:4,21;29:24;
30:5,11;31:17;32:8;
33:12;34:4,19;35:13,
21;36:2,3,8,12,23;
37:3,13;38:7,18;
39:19,25;40:17;
43:12;44:3,13,17;
49:15;50:4,15,17;
51:18;52:5,11,13,16,
20;53:2,18,24;54:5;
56:15,25;57:6;58:4;
59:5,9,18;60:8,14;
61:25;62:6,9,17;
63:9,20;64:6,24;
65:21;68:9,15,17;
69:10,22,23;70:9,17,
25;71:7,14,16,22;
72:4,6;73:18,19,20;
74:6,7,16,19,25;
75:12,16,23;77:4,12;
78:5,9,21,22,25;79:4,
14;80:15;81:7,14;
82:6,10,15,21;83:2,
11;84:3,10,13,19;
85:7;88:3,22;89:5;
90:3;91:3,21;92:17,
23;93:6,13,19;96:6,

18;97:14;100:3,5,11,
17;101:17;102:14,
25;104:8,14,19,25;
105:6,17,18,23;
106:5,8;109:21;
111:18;113:19;
114:12,14;115:16,
20,24;116:13;117:9;
121:4,18,22,25;
122:4,18;144:5,9,14,
15;147:14;148:9,10,
18;150:15;156:4;
170:10,16;178:24;
180:12;185:23;
189:25;197:9;208:4;
214:12,15;218:10;
225:17;227:4,5,16;
240:12;255:16;
262:22;271:16;
273:20;278:7,17,20;
279:8,13;292:24;
296:7,15;308:24;
309:9;351:20;
353:20;354:13;
355:19;361:10
**departments (3)**
73:13;74:10;
180:14
**Department's (5)**
53:7;91:13;98:3,
20;360:20
**Depending (4)**
198:24;199:7;
250:13,14
**Depends (2)**
218:17;282:14
**deposition (18)**
3:6,13;4:3;6:19;
7:7,15;8:6,16,19,24;
9:6,11;60:3;133:16;
181:13;225:10;
277:4;363:3
**depositions (2)**
6:23,25
**Deputy (3)**
5:4;64:2,3
**describe (14)**
14:23;15:12;
33:16;59:11;64:3;
103:15,16,19,23;
186:20;284:13;
319:10;325:7;326:21
**described (6)**
34:21;36:15;64:7;
118:20;148:24;158:2
**desired (1)**
22:9
**desk (4)**
109:13;114:25;
138:20;260:4
**destroy (19)**
7:12,14;119:2,17,
24;123:9;125:13;

**KEVIN LAMM**
November 19, 2008

EDWARD CARTER, ET AL: vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

126:12;127:12,25;
128:10,20;129:3,9,
21;130:21,24;
143:11,17
**destroyed (2)**
8:4;125:22
**destroying (2)**
126:23;127:6
**detail (1)**
29:17
**details (1)**
158:6
**detain (1)**
309:21
**determination (6)**
50:9;53:8;91:13;
97:13;98:3,20
**determine (2)**
89:10;297:15
**determined (1)**
90:23
**difference (1)**
143:24
**different (7)**
61:19;106:20;
123:18;279:10,14;
293:11;306:9
**direct (8)**
152:25;172:22;
176:3;193:13;194:2,
4,7;216:20
**directed (3)**
194:10;245:25;
274:7
**directing (1)**
260:10
**direction (2)**
251:15;253:13
**directive (6)**
210:12,12,13;
273:18;275:10,23
**directives (5)**
183:19;210:6;
273:24;274:9;275:13
**Directly (5)**
117:15;153:23;
187:25;268:19;
278:20
**discipline (4)**
236:15;237:5;
238:24;239:13
**disciplining (1)**
266:12
**disclose (1)**
222:4
**disclosed (2)**
221:23;222:24
**discovery (2)**
37:19;129:25
**discrimination (2)**
223:14,21
**discuss (7)**
126:23;127:6;

333:14;347:10;
352:9,12,15
**discussed (6)**
113:9,14,16;114:3;
143:5;353:5
**discussion (1)**
352:8
**discussions (1)**
126:25
**disheartening (2)**
155:13;187:4
**dishonest (3)**
171:19;174:24;
175:7
**disorderly (2)**
161:8,12
**dispatcher (3)**
141:9;277:22,23
**disqualification (1)**
87:13
**disqualifications (1)**
89:23
**disqualify (3)**
181:20;182:6,19
**disrupting (1)**
328:18
**disruptive (1)**
328:21
**distanced (1)**
255:8
**distinction (3)**
144:16,20,22
**distorts (1)**
292:13
**District (6)**
4:8,8;234:10,21;
235:4,15
**dock (8)**
258:25;259:15,23;
260:3,10,15,19;
261:7
**document (11)**
16:6;18:13;31:4,4;
37:19;52:9;57:10;
81:6;84:7;244:2,8
**documentation (3)**
41:2;84:8;92:20
**documents (11)**
81:24;82:2,5,8,14;
101:14,17,22,25;
102:5,9
**done (15)**
70:7;146:14;
157:13;222:19,20;
229:13;236:19;
243:7;244:13;262:5;
263:9;269:13;
344:15;353:23;354:5
**doorman (1)**
305:22
**double (1)**
59:23
**doubt (1)**

310:10
**down (14)**
7:8,17,20;8:6;
75:5;192:19;248:13;
256:11;260:6;
274:16;282:10;
286:24;318:19;
325:12
**drank (1)**
199:9
**dressed (1)**
265:7
**drink (5)**
44:24;202:14;
261:11;287:15;
298:14
**drinking (29)**
151:10;191:10,15;
192:15;195:23;
196:10,18;197:5,10;
198:13;202:3;206:3,
10,17;207:8,18;
229:8;234:24;
255:21;256:7,20;
257:7,16;258:16,21;
261:16;298:2;
301:23;302:3
**drinks (2)**
300:18;302:16
**drive (9)**
201:21;228:22;
248:20;249:3;
251:21;252:25;
282:7,12;361:18
**driven (1)**
248:15
**driving (22)**
191:12;198:7,10,
14,18,22;199:5;
200:19;201:4,7,10,
16,24;202:24;
203:24;204:2,8;
205:8,17,22;235:6;
362:3
**drop (5)**
101:6,17,22,24;
362:12
**dropped (6)**
100:20;101:7;
102:4,9;247:12;
249:19
**drove (4)**
348:14;350:20;
361:16;362:8
**drug (19)**
210:7,16;211:2,14,
18;212:21;213:5,20;
214:3;215:3;227:25;
228:12;235:18;
269:21,25;270:6,17;
271:18;272:8
**drunk (4)**
204:9;205:8,17,22

**due (2)**
11:13;30:16
**duly (1)**
5:21
**during (25)**
7:6;8:6,19;28:5;
42:12;46:5,25;54:22;
103:9,12;133:16;
231:20;251:22;
260:18,21;261:8;
296:23;299:16;
301:2;324:6,12;
352:8;361:9;362:6,6
**duties (6)**
148:14,24;149:5,
20;150:8,13
**duty (52)**
151:10;153:3,7;
154:5;191:10,15;
192:19;195:22;
196:10,19;197:5,10;
206:4,10,17;207:9;
226:25;227:19;
228:11;229:8;
230:17;231:5,15;
232:4,15;233:10,17;
234:5,17,21,23;
235:2,13;246:9,12;
247:19;253:2;257:7,
12,16;258:16;263:3;
265:8;268:10;309:2,
7,13,17,22;356:8;
362:8,13
**Dyer (4)**
136:6;137:16;
140:5;141:12

## E

**Earlier (2)**
355:11;360:10
**early (4)**
34:14;36:19;99:8;
270:7
**east (2)**
73:23;74:9
**Eastern (1)**
4:8
**eat (1)**
215:21
**eating (2)**
216:10;258:17
**Ed (7)**
4:15;120:5;
122:22;124:19,22;
130:5;357:17
**Eddie (1)**
357:9
**education (1)**
267:17
**Edward (5)**
4:4;123:4;125:7;
142:16;357:3

**effect (2)**
3:15;12:23
**effects (2)**
264:19;265:4
**eight (2)**
162:8,19
**eighth (1)**
221:7
**either (25)**
14:18;16:6,18;
34:13,20;35:21;
36:13,18;61:24;
107:10;198:22;
199:3;206:14;
240:10;248:7;
258:19;264:17;
286:4;289:16,19,22,
25;302:8;308:12;
354:16
**EL (1)**
244:5
**elapsed (1)**
280:9
**eligible (1)**
15:9
**eliminated (1)**
86:22
**elimination (1)**
18:5
**else (45)**
13:19;21:16;
28:22;31:3;39:20;
44:12,16;107:13;
108:11;113:9,13,20;
114:2;115:14;
118:11;123:6;136:3;
168:23;173:5;
177:16,19,22;
199:20,23;227:15;
243:12;252:15;
264:3;280:23;299:5,
22;300:3,25;312:4,7;
324:8,23;333:12;
345:6;348:2,9,19;
349:6,9;356:14
**Elyse (2)**
270:10,12
**email (2)**
338:22,24
**emailed (1)**
340:16
**emails (1)**
129:25
**embarrass (1)**
266:6
**emotional (2)**
189:8,16
**employed (9)**
140:23;141:17;
147:21;156:10,20;
190:24;192:16;
217:7;236:6
**employee (9)**

**Precise Court Reporting**
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 104 of 122 PageID #:
1962
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
KEVIN LAMM
November 19, 2008

131:11;132:16,21,
23;133:12;140:13;
152:8,20;155:23
**employees (7)**
15:9;150:20;
154:11;236:16;
237:6;238:24;239:14
**employer (5)**
183:25;185:6,8,17;
186:2
**employers (1)**
185:2
**employment (51)**
12:24;13:6,25;
28:13,17,23;30:4;
71:4,10;80:6,11;
81:18;86:24;92:25;
99:18;104:12;
107:20;116:10,16;
138:8,10,12;140:11;
142:11;156:15;
167:24;180:13;
181:21;182:7,9,11,
20;217:11,19,23;
218:4;221:19;
223:15;233:7,20;
234:9,16,19;235:17;
350:8;351:8;352:25;
354:12;361:3,9;
362:7
**employment-related (6)**
236:17;237:6;
238:25;239:17,21,25
**empty (2)**
262:13,23
**EMT (1)**
330:17
**EMTs (2)**
330:14;331:15
**end (27)**
8:4;23:23;43:3;
72:9;73:23;74:9;
104:11;114:5;
116:10,15;121:14;
203:13;217:18;
257:3;269:7;273:16;
283:13;334:19;
335:2,13;336:5;
339:16,19,20;
340:12;341:21,22
**ended (8)**
80:6,11;140:11;
147:14;217:12,24;
301:7;334:20
**endemic (6)**
227:3;232:17;
233:19;234:7;
257:13;268:11
**ending (1)**
264:19
**ends (4)**
72:11;184:14;
276:24;344:19

**enforcement (28)**
87:14;90:8,19;
93:17;94:6,10;95:14,
19,21;96:22;120:8;
128:16,22;129:4,9,
21;130:9,21;168:2,7;
169:13;171:20;
175:20;176:2;187:7;
189:14;259:3;361:7
**engage (4)**
55:11;110:25;
118:7;272:12
**engaged (5)**
114:11;130:22,24;
170:16;289:8
**enjoy (1)**
189:5
**enjoyed (2)**
188:8,17
**enjoying (5)**
188:7,14,20,25;
189:3
**enlighten (1)**
102:22
**ensure (1)**
249:18
**enter (1)**
127:11
**entered (2)**
225:10;284:22
**entire (3)**
146:16;218:20;
220:14
**entities (1)**
99:19
**entitled (2)**
132:20;164:19
**entity (8)**
20:16,22;21:5;
70:4;74:23;75:21;
78:3;79:6
**entrance (2)**
285:13;305:12
**entrusting (1)**
259:3
**entry (3)**
62:22,24;64:2
**escapade (1)**
272:12
**Escorted (1)**
321:15
**establish (1)**
59:25
**established (6)**
91:18,23;95:5,12;
111:22;347:25
**establishment (3)**
274:17;284:19;
307:14
**et (2)**
4:5,6
**ethical (7)**
168:12,15,20;

169:4,6;223:6,7
**evaluation (5)**
354:11,17,24;
355:2,9
**even (2)**
99:14,14
**evening (4)**
160:12;163:18;
325:22;337:16
**evenings (1)**
270:4
**events (11)**
158:25;159:6,21;
160:11;276:15;
319:7,11;320:15;
325:7;334:11;336:25
**everybody (1)**
227:15
**everyone (1)**
284:5
**evidence (5)**
128:19,25;224:2,9;
321:11
**exact (14)**
26:11;56:19;
88:25;117:21;
122:12;166:16;
174:19;285:23;
286:14;305:14;
331:13,14;335:8;
357:14
**Exactly (18)**
58:10,24;82:11;
122:11;125:23;
126:2;162:12;
202:13;259:9;269:4;
285:24,25;319:13;
320:8;322:10;
326:11;357:13;359:3
**exam (5)**
87:24;91:6;93:16,
16;101:11
**EXAMINATION (2)**
5:24;354:7
**examined (1)**
5:23
**examiner's (1)**
41:15
**example (1)**
268:24
**examples (1)**
273:9
**exceeded (1)**
95:23
**except (1)**
3:9
**Excuse (6)**
44:22;45:3;
123:20;137:6;
141:19;247:24
**exhaust (1)**
77:6
**exhibit (2)**

131:22,25
**Exhibit-1 (1)**
244:4
**exited (3)**
285:6,10,17
**exiting (1)**
284:19
**experience (7)**
108:19;109:5,8,9;
113:21;215:20;
297:20
**expire (4)**
67:8,10,13;70:18
**expired (2)**
67:18;70:14
**explain (4)**
25:21;29:6;66:13;
310:14
**explanation (1)**
29:17
**exposed (5)**
150:18,23,25;
151:2,19
**exposure (1)**
190:25
**extent (12)**
9:23;24:6;37:14;
49:16;58:8;79:25;
119:6;133:18;
178:21,25;267:2,14
**eyes (1)**
297:14

**F**

**face (2)**
290:2;326:2
**fact (30)**
30:21;85:15;
111:17;112:7;
116:18;119:8;130:7;
147:21;151:12;
152:5;186:16,16;
204:8;205:7,16,21;
206:9,15;207:18;
213:12;214:18;
215:7;218:23;
222:23;224:4,7;
227:17;339:24;
351:7;354:3
**facts (2)**
312:18,19
**fail (3)**
18:9;38:2;89:19
**failed (19)**
34:20;35:21;
36:13;38:4;87:20;
88:2,6,8,17,23;89:7,
11,14;91:24;92:16;
95:6;96:4,16;98:21
**failing (5)**
89:24;90:6,24;
93:20;96:20

**failure (7)**
36:2,24;37:4;
87:15;90:17;144:7;
208:3
**fair (5)**
9:21;10:20;68:6;
200:16;306:10
**faith (2)**
223:16;224:3
**fall (1)**
110:17
**familiar (4)**
66:14;244:16,20;
245:7
**far (6)**
14:8;248:9;
260:22;285:21;
299:7;362:13
**favorably (1)**
186:5
**federal (3)**
61:22;202:23,25
**feel (2)**
155:10;251:20
**feet (3)**
248:13;285:24;
286:11
**fellow (3)**
181:21;182:6,19
**felt (1)**
251:9
**Fentanyl (3)**
211:9,16;213:13
**few (8)**
7:8;28:3;46:7;
65:17;106:14,14;
252:3;337:6
**field (1)**
95:14
**fields (1)**
361:7
**fight (17)**
158:8;264:12,14,
23;265:10;277:9;
283:23;307:24;
308:7,13,15,19;
310:3,16;312:16,25;
314:11
**figure (1)**
305:14
**figured (4)**
292:23;296:6,14;
309:9
**file (5)**
10:18;57:24;
98:18;236:21;243:16
**filed (6)**
9:14,15;53:21;
57:12;98:10;131:16
**filing (2)**
3:4;61:20
**fill (10)**
28:4,8,12;81:17,

19,23,25;83:3;
334:17;335:13
**filled (3)**
116:19;217:22;
218:5
**filling (1)**
82:4
**final (1)**
137:22
**financial (1)**
187:18
**find (1)**
320:21
**finding (1)**
58:5
**Fine (25)**
8:14;12:21;32:19;
34:17;36:9;47:8;
65:18;80:7;119:21;
136:18;157:10;
196:5;224:25;
230:21;249:7;253:9,
9;262:17;276:5;
286:8;292:22;
316:20;334:17;
336:9;340:16
**finger (1)**
290:2
**finish (4)**
66:21;204:19,25;
294:21
**finished (2)**
26:3;243:9
**Fiorillo (19)**
5:12;120:6;150:5;
261:24;263:21;
265:22;266:18;
269:9;281:2;285:9;
316:11,14,16;322:2;
327:10,14;358:24;
359:3,5
**fir (1)**
44:20
**fire (8)**
151:11;203:14;
242:6,9,11,14,17;
348:15
**fired (9)**
29:11,13,14,18;
145:6;171:23;
182:12;217:8,15
**firing (1)**
241:5
**firm (4)**
4:13,24;53:11,14
**first (56)**
5:21;17:11;18:13;
42:6,14;46:9,15,21;
51:6,13;63:18;66:17;
68:7,15,23;72:22;
76:25;77:5;102:11;
108:20;113:19;
136:16;146:12,16,

17;195:9;197:12,20;
199:13,21;201:23;
209:25;225:22;
226:20;244:9;
256:22;270:16;
277:15;279:3;
287:20;291:18;
294:6,10;304:8;
313:6;314:23;
315:17;320:10;
341:24;355:5;358:9,
13,17;359:9,25;
360:22
**firsthand (1)**
302:3
**fist (2)**
289:17;326:24
**fit (1)**
132:25
**Five (13)**
112:22;166:4;
181:10,11;225:12;
226:22;276:2,20,25;
282:22;305:18;
337:7;341:15
**five-minute (1)**
224:24
**flip (1)**
169:11
**floor (1)**
321:4
**focus (1)**
147:7
**focusing (2)**
23:6;187:2
**FOIL (5)**
57:12,15,19,22,24
**folder (2)**
343:20;346:12
**follow (4)**
37:11,21;70:8;
208:3
**following (6)**
134:21;145:16;
167:22;221:18;
236:4;244:2
**follows (1)**
5:23
**follow-up (1)**
164:5
**foot (1)**
326:24
**forbid (1)**
216:9
**force (3)**
3:15;254:11;
268:20
**forced (1)**
188:25
**form (20)**
3:10;125:15;
133:19;182:18;
213:21;214:4;215:4;

228:13;230:13;
235:19;296:24;
297:9,15;298:9;
300:11,15;335:7,23;
336:3,3
**formed (5)**
229:25;230:4;
231:16,25;232:3
**forms (11)**
28:5,8;182:3;
325:10;334:17;
335:12,16;336:4,8,
10,15
**forth (5)**
61:13;119:15;
145:16;166:5;167:23
**forward (3)**
90:25;279:25;
280:5
**forwarded (4)**
279:16,18,23;
280:8
**found (13)**
44:9;45:6,24;48:4,
22;49:22;62:7;87:3;
180:14;185:12;
216:10;359:8,14
**four (9)**
63:21;67:14;
115:13;184:19;
193:6,8;217:21;
331:2;337:6
**frame (15)**
100:25;115:6;
117:24;164:8;177:3,
6,9;209:11;332:8;
339:13,15;357:13,
14,19,22
**Frank (10)**
120:6;261:24;
263:14;265:22;
266:6;269:8;281:2;
325:24;358:20;359:3
**free (1)**
268:21
**Freedom (3)**
57:23;266:14;
267:9
**freely (1)**
183:19
**friend (10)**
121:3,17,21;122:4;
255:25;263:17;
264:5;265:19;266:3,
8,21;288:10;290:20;
295:4,15,20;299:12;
333:7,8;334:6
**friends (11)**
120:23;183:8;
254:11,24;255:20;
266:13;267:8;
272:15;273:11;
329:25;346:17

**front (2)**
164:24;200:7
**fucking (1)**
263:15
**fuel (3)**
253:19,24;254:5
**fulfill (1)**
226:25
**full (7)**
103:20,24;105:24;
115:5;156:3;217:17;
218:17
**full-time (11)**
105:19;116:19;
182:10;216:24;
217:2,5,12,14;218:5,
9,15
**fully (1)**
163:11
**FURTHER (20)**
3:8,12;29:17;
86:23;99:15;107:14;
116:7;128:2;187:6;
237:4;254:12,24;
296:3;319:23;
321:18,23;332:10,
16,25;362:16
**furtherance (2)**
129:8;130:20
**Furthering (1)**
155:25
**future (1)**
86:23

## G

**gain (1)**
354:12
**Gary (26)**
135:20;137:4;
139:19;140:21;
160:16;172:7;177:7,
23;179:12,13;246:3,
10;259:20;303:9;
308:12;310:7,11,17,
23;311:6;323:13,25;
333:17;334:3;
347:13;348:14
**gave (15)**
22:18;28:11;
29:10;31:18;64:8;
68:12;69:13;70:19;
86:17;126:20;183:6,
21;325:2;332:9;
347:7
**general (1)**
225:9
**generally (2)**
126:16,18
**gentleman (1)**
293:15
**gentlemen (14)**
42:21;43:10,21;

44:12;45:5,10;46:6,
11,25;47:12,25;48:3;
49:5;331:9
**George (90)**
5:4;54:7,14;56:14;
58:6,14;59:5,16;
60:5;71:2,8,15,20,
24;72:2;78:8,19;
92:20,21;103:8;
104:17,23;120:5,19;
122:16;123:14,19;
125:7;126:3;128:15;
130:5;137:24;
138:15;139:6;
141:24;142:17,19,
24;143:10;149:11;
172:6,14,16;174:5,6;
175:22;179:16;
180:2;194:3;200:17;
204:10,14;205:11;
209:20,21;212:14,
17,18,24;213:12,25;
214:19,21,23;
217:15,19;228:25;
229:14;235:7,21;
236:5;240:3,8;267:4;
273:25;275:15;
337:3,4,10;338:19,
20,24;340:7;352:16;
355:13,17;356:2,23;
357:8,24
**gets (1)**
211:7
**Gilly (1)**
5:8
**girlfriend (4)**
330:2,5,7,10
**given (10)**
63:25;64:4;94:22,
25;199:10;207:23;
218:8;235:21;
308:17;352:2
**giving (5)**
10:15;66:14;
273:24;311:10;
335:25
**glorified (2)**
220:18;221:3
**God (1)**
216:9
**goes (6)**
133:22;135:22;
157:8;273:2,3;344:4
**gonna (1)**
191:17
**good (6)**
224:15,20;235:3;
275:2;343:9,18
**Good-bye (1)**
114:6
**GOODSTADT (239)**
5:7,8,13,14;7:18,
21;8:8,13,25;9:7;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 106 of 122 PageID #: 1964

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

10:6,13;11:25;14:4;
16:20;18:3,17;22:25;
24:12;31:7;32:10;
33:19;37:17;39:6;
41:13;42:8,13;43:23;
44:6;45:11;47:4,13,
20;48:15;49:18;
53:9;55:14;56:17;
57:14;58:7;59:22;
60:2;61:2,7,10,14,
18;66:20;68:4,19;
79:15,18,23;80:5;
83:16;90:9;92:10;
93:21;95:2;97:16,20;
99:12;100:18;
102:23;104:4;
106:22;110:19;
111:19,25;118:5,22;
119:3,6,19;120:2;
122:24;123:10,17,
22;124:2,6,10;
125:14;126:13;
127:21;128:12,23;
129:22;131:2,12,21;
132:4,7;133:13,23;
134:7;136:12;143:2,
12,18;146:2;151:21;
152:9,21;153:9,11;
154:6,12,18,24;
155:4,17,24;156:21;
157:11;159:24;
160:13;162:20;
163:8,22,24;164:6;
165:13,19,22;166:8,
15,21;167:4,9,18;
168:11,16,21,24;
169:9,16,19;170:2,5,
19;171:6,11;173:20;
175:8;176:9;180:8;
181:3,5,16,24;
186:15;187:23;
188:16,24;189:6,11,
20;190:12;191:25;
193:16;194:4;
195:25;196:12;
204:18,23;210:2;
212:23;216:3,13,17;
218:25;220:5,9;
222:6,17;223:5,24;
224:12,14,19,25;
230:10;237:8,13;
238:4,7;239:6;
240:13;248:11;
249:5;254:17;259:8;
260:12;262:8,16;
263:13;266:22,25;
267:11,19,23;269:2;
270:19,22,23;271:5,
8;272:4;274:24;
275:4,7;276:22;
279:11,15;287:4;
291:20;292:3,12;
293:6;294:22;

297:22;298:24;
299:2;302:13;303:9,
17;306:15;308:22;
314:19,21;335:5;
337:25;339:12;
344:10,17;346:7;
355:3;362:17
**Goodstadt's (3)**
53:5,11,14
**governing (3)**
168:2,7;169:12
**governmental (10)**
68:22;70:3;75:21;
78:3;79:6;221:24;
222:5,13,25;223:3
**grade (4)**
17:16;69:13,15;
101:10
**graduate (4)**
39:4,12,15;113:21
**graduated (2)**
113:18;267:5
**graduating (1)**
267:12
**Gray (2)**
225:9;277:4
**Great (3)**
253:17;306:11;
348:17
**guard (5)**
220:18;221:4;
225:20;226:3,5
**guess (3)**
31:11;268:23;
286:3
**guilty (2)**
158:19,21
**guy (6)**
135:25;136:2;
204:25;317:8,9,12
**Guys (1)**
155:17

**H**

**half (4)**
17:22;31:23;
184:10;320:19
**Halloween (35)**
158:3;159:7,22;
160:10;161:14;
162:23;163:19;
229:17;230:4,15;
231:7,17,21;232:19;
233:9,22;234:13;
241:11;242:2;243:4;
336:11,16;339:11,
15,22;340:8,13,19;
341:12,17,20;
342:10,16;350:2,9
**hand (7)**
198:17;200:20;
213:4,6;297:6;

298:14;351:25
**handing (6)**
211:10;212:4,11,
21;213:20,23
**hands (1)**
289:20
**Handwritten (1)**
336:17
**happen (2)**
318:11;341:16
**happened (41)**
148:9;152:3,5;
162:12;163:11;
164:7;216:15;
227:10;232:21,24;
251:4;265:20;269:5,
7;287:21;290:19;
293:3;294:10;312:8;
315:19;319:5,11;
327:4;330:8;333:16;
337:22;338:12;
343:9,14,19,21,25;
345:10,11,11,13,14,
18,20;346:23;348:7
**happening (1)**
227:18
**happy (4)**
37:22;146:19;
262:3;353:23
**harass (1)**
267:14
**Harbor (26)**
13:18;99:24;
100:5,6;105:16;
106:3,8,17;107:3,11,
15,19;109:20,20;
110:24;111:2,18;
114:12,23;115:20,
24;116:13,19;117:9;
118:10,15
**Hardman (11)**
135:18;136:9,10,
13,15,17,19;137:22;
138:14;139:11;
140:12
**Hardman's (1)**
138:8
**harm (1)**
247:16
**head (2)**
141:21;326:24
**heading (1)**
244:11
**health (7)**
187:8;191:5;
206:5;229:9;249:13;
251:11,16
**hear (8)**
124:4,23;172:24;
284:6;298:7;304:19;
305:4;322:20
**heard (10)**
123:11,13;124:14,

19;162:15;183:9;
261:23;268:19;
305:2;313:3
**hearing (1)**
173:11
**hearsay (1)**
59:23
**held (4)**
48:5;119:9;
234:11;343:19
**help (4)**
166:6;296:15;
298:23;334:6
**helped (2)**
296:8;309:10
**HEREBY (2)**
3:2,6
**herein (1)**
237:2
**hereinafter (2)**
236:11;237:17
**here's (2)**
102:25;103:2
**hereto (1)**
3:4
**Hess (2)**
194:3;338:8
**Hesse (312)**
5:4;54:3,7,14;
56:14,23;57:4;58:6,
14,18;59:6,16;60:6,
11;71:2,8,15,20;
72:3;78:8,19;92:20,
22;93:3,8,10;103:8;
104:18,24;105:4;
117:7,15;118:6,14,
24;119:16,22;120:6,
19;122:16;123:8,14,
19;124:15;125:5,7,
11,20;126:4,9,11,22;
127:5,11,16,24;
128:3,7,8,15,20;
129:3,7,20;130:5,6,
18,23;134:22;
137:24;138:24;
139:6,10;141:24;
142:17,19,24;
143:10,15,16;145:9,
17;146:6;148:6;
149:11;153:2,6;
154:4;155:2;170:9,
15;171:16;172:6,14,
16,20,24;173:7,11;
174:6,6,23;175:3,5,
18,19,23,25;176:5,
15,19;177:5;179:16,
20,23;180:2;181:19;
182:3,16;183:4,9,17,
25;184:22;185:6,8,
18,22;186:3;188:23;
189:19;191:3;
193:13;194:8,9,15;
195:2,16,18,22;

196:9,14,20,23;
200:18,24;203:16;
204:10,14,22;
205:11;206:19,25;
207:12,19;209:20,
21,25;210:6,15;
211:3,5,7,13;212:15,
17,18,24;213:4,7,12,
19,25;214:19,21,24;
215:14,15;216:7;
217:16,20;223:11;
226:16;227:23;
228:6,10,14,18,24;
229:4,10,11,14;
235:22;236:5,9,11;
237:2,21;240:3,8,21;
241:15,24;242:6;
245:9,17,25;246:5,
14;247:2;249:22;
250:21;252:19,24;
253:13,19,23;254:4,
11,22,23;255:15;
256:5,12,18;257:18;
258:24;259:22,24;
260:9;261:10,21;
262:12,22;263:3,20;
264:2,8;265:15;
266:7,12,18,24;
267:4,6;268:4,13,19;
269:20;270:3,16;
272:7,11,14,18;
273:10,14,23,25;
274:7,11,22;275:10,
15,22;324:5,10;
337:3,4,10,20,23;
338:6,6,19,21;340:7,
17,19;341:11,20;
342:10;343:6,15,23;
344:2;345:3,9;346:9,
10,14,18,25;347:11,
22;348:3,10,10,12,
20,24;349:10,25;
350:14,19;352:16;
355:13,17;356:2,23;
357:24
**Hesse's (8)**
105:13;203:18;
228:25;235:8;
241:20;251:15;
255:6,7
**high (6)**
39:12,14;68:2;
267:5,12,17
**himself (5)**
239:9;267:4;
291:10;343:18;
345:10
**hire (15)**
65:16;113:12;
115:5;137:22;138:6,
21;139:11;217:17;
219:18,20,23;220:2,
11,14;239:10

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**hired (18)**
122:8;136:9,11,19,
23;137:2,5,10,13,16,
19;138:3,4;141:9;
156:11;219:8,14;
254:9
**hiring (18)**
121:25;122:6,16;
130:2;132:24;
138:14,16,18;139:7;
236:15;237:5;
238:23;239:7,13;
240:17;241:3,4;
254:22
**history (3)**
28:14,18,23
**hit (8)**
299:8,9;301:11;
314:7,14;326:23;
333:10;334:7
**hitting (1)**
314:2
**Hobbs (5)**
100:22;102:4,8,12;
104:9
**Hold (7)**
83:6;155:15;
295:16;299:12;
326:7;333:8,9
**holding (1)**
324:25
**home (1)**
317:23
**hot (1)**
270:10
**hour (1)**
218:20
**hours (2)**
28:3;46:18
**house (11)**
270:8;272:20;
273:6;274:12,23;
275:23;279:22;
356:11,12;359:8;
360:12
**Houser's (40)**
277:10,17;281:14,
21;282:9,13;283:6,9,
20;284:12,14,23;
285:4,13;286:13;
287:19;289:14;
298:17;299:17;
300:6;301:4;302:22;
303:5,8,15;305:12,
13;308:10;315:17;
321:14,17,22;322:5,
19,23;323:8;358:6,9;
359:19,20
**human (5)**
111:9;150:12;
214:25;279:24;280:5
**Hung (2)**
114:6;277:17

**Huntington (17)**
13:17;73:19;
98:24;99:2;100:2,3,
13;101:16;102:13,
13;104:7,13,18,19,
24;105:6,18

## I

**ice (1)**
325:2
**ID (2)**
317:4,5
**idea (1)**
308:11
**identification (1)**
244:5
**identified (2)**
99:20;170:20
**identify (11)**
135:15;168:19;
170:17;291:10;
298:20;301:12;
306:23;307:12,16;
310:20;312:22
**identities (1)**
135:7
**identity (2)**
135:10;259:18
**ignored (1)**
183:20
**illegal (11)**
212:5,13,22;
213:20;214:4;215:4,
16;216:8;228:2,13;
235:19
**immediate (6)**
205:11;206:20;
235:8;257:19;274:2;
275:16
**Immediately (3)**
232:21,23;233:4
**impediment (1)**
309:16
**impeding (1)**
305:6
**important (6)**
10:3,9;104:3;
248:25;249:12;
268:12
**improper (5)**
221:24;222:5,13,
25;223:3
**impunity (6)**
210:9;266:15;
267:10;268:6,15,21
**inaccurate (1)**
17:14
**incident (61)**
157:2,20;158:2,3,
20;159:7,23;160:10;
161:15,17,23;
162:23,24;163:5,18;

**229:18;230:4,15;**
231:8,18,21;232:19;
233:10,23;234:13;
241:11;242:2;243:4;
245:2;268:16;269:3;
274:14;276:7;296:4;
298:5;302:2;310:20;
315:16;321:19,24;
333:12;336:11,16,
25;339:11,15,23;
340:9,13,20,23;
341:12,17,21;
342:10;348:13;
350:2,9;358:7,24;
359:12
**incidents (2)**
207:8;243:3
**include (1)**
361:6
**including (5)**
171:18;184:24;
191:7;236:14;238:17
**Incorporated (1)**
4:6
**inculpate (2)**
180:22;181:2
**incurred (3)**
153:4,25;154:3
**independent (2)**
333:25;334:13
**independently (1)**
286:25
**indicate (2)**
297:19;299:13
**indicated (5)**
13:23;96:19;
355:13;356:21;
360:10
**indicating (5)**
38:9;40:2;52:17;
81:9;190:14
**individual (17)**
4:23;113:10;
212:11;290:7,16,19;
291:4,9;292:19;
294:3,8;300:9;
306:24;322:15;
325:25;358:8;360:16
**Individualization (1)**
15:2
**individuals (17)**
17:24;55:12;90:4;
161:16;183:22;
239:11;292:17;
299:25;300:5;303:2,
4,7;304:14;321:15;
330:11;332:5,6
**inebriated (22)**
198:21;199:4,12;
200:24,25;201:21;
203:9,17;204:3;
246:15;247:7,17;
249:2,15;252:12;

**287:13;301:18,21;**
302:8,10,11,11
**inebriation (1)**
302:7
**influence (7)**
201:5;254:12,15,
24;255:4,10,13
**information (9)**
10:10,11;57:23;
59:17;109:16;211:8;
213:8,25;236:9
**initial (1)**
67:18
**initially (1)**
45:24
**initiated (1)**
114:20
**injure (1)**
223:16
**injured (2)**
153:4,6
**injuries (8)**
154:9,15,16,20,20;
318:9;326:2;327:23
**injury (6)**
155:5,6;189:8,12,
16;324:25
**innocent (2)**
180:23,24
**inquire (11)**
50:8;58:17;60:5;
116:22;117:4;247:2;
290:16;292:19;
294:2;300:17;318:23
**inquiries (1)**
104:13
**inquiry (2)**
115:8;116:12
**inside (5)**
117:14;174:16;
178:14,17;191:12;
245:11,18;269:7;
311:8;312:21;
313:13;316:14,17;
319:14;322:11,12
**insisted (2)**
266:13;267:7
**insisting (1)**
210:6
**instance (1)**
261:14
**instances (1)**
261:15
**instead (2)**
344:9,16
**instruct (9)**
245:10,17;262:12;
263:3;265:15;
267:15;272:14;
274:22;320:4
**instructed (2)**
262:22;272:18
**instructing (1)**

**266:18**
**instructors (1)**
27:13
**instructors' (1)**
27:15
**instructs (1)**
165:23
**intent (1)**
223:16
**intentionally (1)**
56:23
**interchange (1)**
352:4
**interest (45)**
11:19;19:23;20:5,
10,17,23,21:9;22:23;
23:18;25:12;27:21;
30:11;50:16;52:12,
20,25;62:16;63:7;
64:22;68:10,17,24;
69:11,23;70:5,10;
72:5;74:23;75:22;
78:4,21;79:3,7;
81:15;100:16;
102:13;104:14,20;
105:2;106:9;108:13;
109:21;114:13;
115:21;118:15
**interested (17)**
19:17;21:12;40:8;
66:8;73:12;78:11;
80:19,25;81:3,10;
91:17;94:5;95:13;
99:18;102:24;
135:13;192:20
**interesting (1)**
55:19
**interfere (1)**
54:3
**interfered (1)**
56:24
**interference (2)**
11:4;12:9
**internal (1)**
214:11
**interrupt (1)**
211:5
**interrupted (1)**
343:12
**interview (10)**
45:22;81:22;83:5;
84:15,17,20,22;85:9;
86:11;87:17
**into (32)**
44:21;58:5;
127:12;158:5;
178:19;246:18;
248:19;249:3,14,19;
264:20;265:2,10;
282:2;297:14;303:5,
8,15,24;304:2,3;
305:13;311:16,19;
314:25;316:25;

---

**hired - into (12)**

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 108 of 122 PageID #: 1966

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

317:2;322:19;
334:23;355:20;
358:20,25
**intoxicated (17)**
228:23;235:6;
245:10,18,24;
252:21;253:14;
255:19,25;296:25;
297:3,10,16,21,25;
298:10;300:13
**intoxication (1)**
248:21
**introduce (1)**
4:18
**investigate (3)**
296:4;321:19,23
**investigating (1)**
163:18
**investigation (32)**
25:23;50:20,23;
51:3,6,13,19,23;
54:9;162:14;229:22;
230:7,24;232:12;
233:2,13,25;239:10;
296:13;305:7;
313:21;314:4;340:2,
5,8;341:3,16,18;
342:16;347:21;
350:13,18
**involved (15)**
158:7,18;160:9;
264:12,17;265:5,6;
288:25;307:23;
309:18,23;310:16;
312:16;314:2;318:25
**involvement (1)**
163:17
**involving (15)**
37:12;158:8,24;
224:11;229:17;
230:2,15;231:7,17;
232:18;233:9,22;
234:12;241:25;245:2
**irrational (2)**
223:14,21
**Island (6)**
203:14;248:6;
331:7;348:14,15;
353:13
**Islip (8)**
39:16,17;225:16,
18,23;226:7,12,18
**issue (11)**
77:13;180:7;
239:21,25;272:15,
19;273:15;274:8,12,
22;353:4
**issues (9)**
227:17;236:17;
237:7;238:25;
239:17;273:10;
352:10,12,15
**issuing (3)**

272:24;274:9;
275:22

---

## J

**job (55)**
17:11,25;18:15;
19:24;20:6,11,18,24;
21:10;22:9,16,24;
23:7,10,18;25:12,22;
27:22;29:23;30:11;
43:5,7;52:13;53:2;
66:5,9,23;67:6;
68:10,18,25;69:11,
23;70:5;72:6;78:5,
22;87:14,22;90:8,8,
19;93:17;94:10;
99:2;104:15,20;
106:9;108:13;
109:21;115:21;
130:9;155:11;
182:10;354:19
**jobs (7)**
19:18;95:21;
128:17;145:5;147:3,
23;227:11
**Joe (2)**
345:15,25
**John (19)**
56:2,3;135:22,22,
23,23;136:6;137:12,
15;140:4;160:6;
301:10;306:20;
339:24;349:7;357:3,
7,7,20
**Jolly-Johanna (2)**
244:16,22
**Joseph (1)**
120:7
**journey (2)**
202:8;203:6
**July (4)**
34:14;36:19;
84:25;242:9
**jumped (1)**
295:3
**June (28)**
14:19,21;33:9;
34:2,14,16;35:16;
36:19,21;43:3;162:4,
5,11;163:2,6,19;
198:6;242:5,6;
339:20,21;340:12;
342:12;345:4;350:2,
5,13,18
**jurat (1)**
362:22
**jurisdiction (4)**
201:14;202:11,16;
220:6
**jury (6)**
148:3;205:4,4;
206:12;228:21;

310:14

---

## K

**keep (1)**
6:13
**Ken (4)**
4:23;194:20,21;
224:15
**kept (13)**
145:5;147:2,23;
162:13;163:3;
229:21;230:6,25;
232:10,25;233:12,
13,25
**Kevin (6)**
4:4;5:6;4;174:7;
363:3,9
**key (1)**
145:22
**kind (2)**
40:23;354:21
**kinds (1)**
262:2
**Kismet (3)**
248:8,9,16
**knew (11)**
26:23;96:23,24;
97:5;212:14,16;
213:18;308:13,18;
310:7;313:5
**knowing (2)**
119:9;189:12
**knowledge (73)**
9:23;10:4,10,22;
18:21;56:22;62:3,5;
67:11;68:3;78:7,14,
19;92:19,21;93:2,3;
94:23;95:3;104:17,
23;105:3;106:23;
117:7;118:13,17;
120:12,21;122:18,
19;126:5,22;127:4,
10;130:7;136:7,11,
19,22,25;137:4,10,
12,15,18,21,23;
138:2,7,13;139:6;
140:12;143:8;
158:16;159:8;
161:11,15;176:20,
21;201:15;210:22;
226:16;227:25;
243:23;252:8;
259:21;260:21;
265:12;269:16,18;
280:6;308:17;310:2
**known (20)**
148:10;211:2,14;
212:21;213:5,20;
214:3;227:25;
228:12;235:18;
269:21,25;270:17;
271:17;272:8;288:9;

290:13;292:8;
307:20;312:15
**knows (1)**
267:3

---

## L

**labeled (2)**
12:8;198:19
**Labor (2)**
190:3,20
**Lamm (396)**
4:1,4;5:1;6:1,4;
7:1;8:1;9:1;10:1;
11:1;12:1;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1,21;80:1;81:1;
82:1;83:1;84:1;85:1;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:1;97:1;
98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1,3;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;
146:1;147:1;148:1;
149:1;150:1,18;
151:1;152:1,5;153:1,
5;154:1,10;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1,7;175:1;176:1;

177:1;178:1;179:1;
180:1;181:1;182:1;
183:1,4;184:1,3;
185:1,9,18;186:1,4;
187:1;188:1;189:1;
190:1;191:1,14;
192:1;193:1;194:1,
13,13;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1,4;223:1,
20;224:1;225:1;
226:1;227:1;228:1;
229:1;230:1;231:1;
232:1;233:1;234:1;
235:1;236:1;237:1;
238:1;239:1;240:1,
10;241:1;242:1;
243:1;244:1,4;245:1;
246:1;247:1;248:1;
249:1;250:1;251:1;
252:1;253:1,7;254:1,
9;255:1;256:1;
257:1;258:1;259:1;
260:1;261:1,22;
262:1;263:1,4;264:1;
265:1;266:1,11;
267:1;268:1;269:1,
20;270:1;271:1;
272:1;273:1;274:1;
275:1;276:1,8;277:1,
8;278:1;279:1;
280:1;281:1;282:1;
283:1;284:1,21;
285:1;286:1;287:1;
288:1;289:1;290:1;
291:1;292:1;293:1;
294:1;295:1;296:1;
297:1;298:1;299:1;
300:1;301:1,7;302:1,
25;303:1;304:1;
305:1;306:1;307:1;
308:1;309:1;310:1;
311:1;312:1;313:1;
314:1;315:1;316:1;
317:1;318:1;319:1;
320:1;321:1;322:1;
323:1;324:1;325:1;
326:1;327:1;328:1;
329:1;330:1;331:1;
332:1;333:1;334:1;
335:1;336:1;337:1;
338:1;339:1;340:1;
341:1;342:1;343:1;
344:1;345:1,2;346:1;
347:1;348:1;349:1;
350:1;351:1;352:1;

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

353:1;354:1,9;355:1;
356:1;357:1;358:1;
359:1;360:1;361:1;
362:1;363:1,4,9
**Lamm-1 (2)**
244:2,7
**Lamm's (2)**
183:18;362:19
**land (1)**
220:14
**language (7)**
131:19;132:10,13;
165:2;190:6;221:13;
239:4
**last (24)**
82:23,24;83:8,9;
84:3;115:25;134:18;
155:18;156:15;
218:4;233:6,19;
234:8,16,19;235:16;
254:8;266:10,11;
291:13,16;341:19;
350:8;352:24
**Late (5)**
26:19,20;72:25;
99:8;335:7
**later (11)**
112:9;179:25;
197:16,17,19;
235:22;306:8;
329:25;358:8;
359:11,15
**Laughed (1)**
120:17
**law (61)**
4:24;11:5;12:10;
53:11,14;87:14;90:8,
18;93:17;94:6,10;
95:14,18,21;96:21;
118:21;120:7;
128:16,21;129:3,9,
21;130:8,21;131:11;
132:17,22;133:12;
164:20;168:2,6,7,14;
169:5,12,12;170:11,
18;171:20;175:19;
176:2;187:6;189:13;
190:3,20;201:8,17,
20;210:8;221:9,21;
222:2;259:3;262:21;
266:14;267:9;268:6,
15,21;309:16,20
**lawful (2)**
183:19;275:10
**laws (3)**
167:25;191:6;
193:14
**lawsuit (19)**
97:10,21,22,25;
98:6,18;118:20;
131:8,10;156:9;
165:12,17;166:25;
181:11;221:10;

252:11,20;351:4;
352:10
**Lawsuit's (1)**
98:10
**lay (1)**
213:5
**lead (2)**
207:11;303:3
**leads (3)**
119:23;182:17;
211:13
**learn (4)**
76:14;218:3;
358:22;359:9
**learned (3)**
51:13;54:13;358:8
**least (8)**
10:22;17:9;18:12;
75:6;209:17;212:12;
308:9;310:4
**leave (18)**
86:5;253:4;266:8;
308:20,24;314:4;
315:7;328:18,24;
329:6;331:10,20,24;
332:5,6;334:18;
335:3;348:16
**leaving (9)**
26:4;250:3;251:2,
9;284:22;285:3;
320:7;321:14;347:14
**led (9)**
121:20;122:2;
175:5,23;180:10;
333:12,16;334:3,12
**left (29)**
86:15;122:9,10,11,
12,14;142:16;
184:10;225:3;
250:18;255:16;
256:13,19;257:8;
259:25;260:5,23;
262:25;277:4;
285:19,22;296:4;
315:8;319:15;
322:23;323:8;332:2,
3,4
**legal (6)**
4:14;119:7,10,19;
125:15;128:21
**legs (1)**
275:25
**less (8)**
18:6,7,19;206:9,
16;250:3;280:13;
318:17
**Leto (1)**
4:15
**letter (78)**
21:21,23;22:4,21;
23:20,22;24:13;
34:25;35:2;37:5,6,8,
11;38:7;39:20,24;

40:19;49:19,20,24,
24;50:6,18;52:16,24;
59:4,7,8,12;66:5,8;
73:5,7,10,16,21,24;
74:2,2,11,18;75:15,
24;76:3,7,10;77:12,
19;79:9;80:14,21,24;
86:19;88:7,12,15,20;
89:3;91:5;99:3,4,7,
11,17,21;100:11;
106:4,4,10,13,15;
107:16,24;108:8,12;
109:15;117:24;156:5
**letters (5)**
13:11,14;20:12;
40:8;221:15
**letting (1)**
124:12
**level (1)**
64:2
**liaison (9)**
148:8,13,15,16,25;
149:6,21;150:9,14
**liberty (1)**
11:18
**lieutenant (1)**
112:3
**lieutenants (4)**
111:5;112:6,8,14
**life (9)**
120:8;188:7,8,15,
17,20;189:2,4,5
**Lighthouse (19)**
203:14;246:8,20,
23,25;247:4,8,10,13,
23;248:2;250:17;
252:25;348:15;
361:16,17,23;362:9,
13
**likes (1)**
183:5
**limit (4)**
95:24,25;96:21;
276:20
**limitation (2)**
171:18;184:24
**line (4)**
133:6,7;176:3;
190:16
**lines (1)**
190:13
**list (23)**
15:8,13,16,19,23,
23,25;16:13;17:5,17;
65:4,6,9;69:14;
73:15;76:25;77:6;
87:22,23;137:7;
138:5,19;182:10
**listed (3)**
16:6;73:14,15
**listen (1)**
274:3
**listened (1)**

214:21
**listing (1)**
16:19
**litigious (3)**
184:3;185:19,24
**little (7)**
167:13;179:2;
237:4;301:16;
302:10;305:19;
328:23
**live (6)**
76:15;77:5;
107:15,22;108:3;
111:9
**lived (6)**
76:11,18;107:10,
13,18;108:7
**Lloyd (26)**
13:18;99:24;
100:5,6;105:16;
106:2,7,17;107:3,10,
15,18;109:20;
110:24;111:2,18;
114:12,23;115:20,
24;116:13,16,19;
117:9;118:10,14
**loaded (2)**
151:11;208:8
**local (11)**
191:11;192:15;
195:24;196:11,20;
255:21;256:8,20;
257:7,17;258:16
**located (2)**
281:8;359:6
**lockers (1)**
208:9
**Loeffler (30)**
4:22;145:8;146:5;
147:9,14;148:4,8;
149:4;153:2,6;154:4;
155:2;170:24;
206:15;223:11,20;
224:3,9;231:19,20;
232:5;258:6;268:18;
272:7;274:6;275:21;
345:15,25;346:9;
350:17
**lollipop (14)**
211:16,19;212:12;
213:14,21;214:5;
215:5,7,11,15,17;
216:2,9;235:20
**lollipops (6)**
211:9;212:4,22;
215:20;228:2,12
**long (46)**
27:25;28:19;
46:10,12,17,20;69:4;
102:17;110:3,11;
111:21;112:4,19,21;
115:11;146:3;
161:14;217:18;

282:7,11,18,20,21,
23;283:5;298:16,21,
24;301:14;305:10;
319:19;320:23,24;
329:17,21;330:16,
20;331:3,23;332:4;
339:6;344:13;
348:23;349:3;
352:18;353:13
**longer (5)**
29:6;147:21;
155:13;188:9;305:19
**Look (49)**
8:10;57:8,9;69:3;
131:18;132:13;
153:12,14;164:24;
165:4;171:15;
176:22;183:3,24;
189:22;190:22;
191:9;193:11;205:4;
208:2;210:5;216:18;
221:7;223:9;226:20;
237:11;253:17;
254:7;258:23;
262:19;263:7;
269:12,19;276:13;
297:14;306:16,17,
22;307:3,4,9,11;
310:22,23;311:6;
320:17,23;321:5;
344:5
**looked (8)**
216:8;310:7,8,11;
317:8,12;320:25;
346:15
**looking (12)**
58:4;80:17;
113:11;132:8;135:6;
138:6;184:4;191:16;
217:17;259:17;
318:2;346:16
**loop (5)**
162:13;229:21;
230:6;231:2;233:12
**loose (1)**
107:4
**loser (1)**
183:4
**lost (1)**
227:11
**lot (1)**
302:10
**Lots (1)**
216:14
**loud (1)**
318:10
**lunch (2)**
158:6;164:10

**M**

**MacArthur (1)**
225:25

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 110 of 122 PageID #: 1968

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

**Mainly (1)**
113:24
**maintenance (2)**
236:14;238:18
**making (10)**
36:10;73:3;
115:10;121:16;
144:23;145:12;
146:7,20,25;147:5
**male (3)**
360:6,6,8
**malicious (1)**
223:16
**maliciously (2)**
56:23;224:10
**man (4)**
41:16;111:13;
174:24;175:7
**management (2)**
236:13;238:13
**Manhattan (3)**
269:23;270:5,18
**manner (4)**
24:17;138:14;
170:25;171:4
**many (39)**
39:7;62:15;
63:14,17;64:11;
191:13,20,22,24;
192:4,6,8,10,12,14,
22,23,25;193:3,5,7,9;
197:7;209:14;212:6,
7;245:16;250:7;
256:4,9,17;282:14;
285:24;286:12;
300:18;302:16;
318:15;355:25
**March (8)**
22:2,21;23:8,12,
23;24:18;98:11,11
**marginalized (1)**
254:25
**marginalizing (1)**
254:12
**Mark (3)**
5:5;131:24;243:25
**marked (2)**
244:4,7
**marking (1)**
131:21
**Maryanne (1)**
7:3
**master (4)**
260:3,15,20;261:7
**masters (4)**
259:2,15,23;
260:11
**materials (4)**
83:2,12,25;84:14
**Matt (1)**
348:13
**matter (1)**
4:4

**matters (1)**
133:20
**may (54)**
3:13;14:18,21;
16:12;18:8;55:17,18;
74:12;112:9;113:19;
114:15;123:6;166:9;
170:3;176:3;177:20;
181:6,10;186:7;
187:24;188:2;
194:10;198:6;
205:22;220:8;241:2,
9;254:14;255:4,12;
256:21;271:19,20,
22;274:18,19;275:4,
8;286:6;306:8;
307:25;309:17,23;
310:15;325:19;
326:15;332:19;
333:20;334:14,15;
339:18;350:11;
355:4;356:18
**Maybe (45)**
22:2;30:18;31:23;
40:24;46:14,23;50:2;
63:5,21;72:25;77:24;
99:8;102:18;110:22;
114:15;117:23;
137:20;139:2;
215:23;216:4;
250:23;280:13;
283:2;286:10,11,11,
18,18,19;299:4;
301:16;305:19;
318:17;319:22;
320:2;329:20;
330:25,25;335:11;
336:3;337:6;341:14;
342:2;356:3,3
**Mayor (23)**
4:21,22;60:23;
61:24;145:8;146:5;
147:15;149:8;
154:25;155:2;171:3;
204:16;205:20;
206:15;214:7;231:8;
257:23;268:18;
272:6;274:7;275:20;
324:15;350:11
**McKenna (1)**
317:19
**meal (1)**
258:17
**mean (40)**
12:14;14:6;17:3,8;
22:11;25:18;65:7,15;
66:10;89:24;93:24;
95:22;97:21;107:2;
120:22;145:3;
161:24;171:21;
180:25;196:4;
207:19;211:5,21;
220:23;223:4;227:7;

237:7;238:2;239:4,8;
240:14;250:5;259:7;
265:25;267:7;306:6;
326:8;328:25;
337:11;359:15
**meaning (3)**
17:16;144:4,12
**means (6)**
107:6;129:13;
132:23;133:3;
222:14;238:6
**meant (5)**
16:24;66:16;
94:19;103:16;278:16
**media (2)**
233:21;258:13
**medical (10)**
14:8;30:19,21,24;
31:6,10,17;32:6,16;
187:13
**meet (3)**
18:8;126:23;
187:19
**meeting (9)**
42:12;43:10;
44:11;45:9;46:5,10;
47:2;90:5;142:15
**member (3)**
60:19;149:16;
243:21
**members (2)**
353:20;355:18
**memo (1)**
253:3
**memorandums (1)**
213:2
**memorialize (1)**
358:3
**Memorization (1)**
15:2
**men (1)**
171:19
**mental (7)**
32:19;155:6;
186:13,21;187:8,10,
15
**mentally (1)**
155:10
**mention (3)**
173:24;217:16;
228:6
**mentioned (7)**
35:5;72:18;83:22;
160:20;236:11;
237:2,17
**message (3)**
86:5,9,14
**met (9)**
41:18,21;42:3,11;
43:21;44:4;45:5;
126:24;127:6
**mid (1)**
362:11

**middle (3)**
45:13;210:3;
360:24
**might (3)**
55:23,24;306:8
**mile (1)**
107:11
**miles (1)**
107:22
**Miller (2)**
270:10,12
**mind (4)**
141:20;143:24;
146:10;275:24
**mine (3)**
264:5;265:19;
334:20
**Minerva (1)**
7:3
**Minerva's (3)**
7:7;8:19,23
**minor (1)**
183:7
**minute (4)**
184:10;213:3;
280:13;301:16
**minutes (23)**
46:13,23;102:18;
112:22,22,23,24;
115:13;225:4;276:3,
4,21;282:22;283:4;
299:4;319:22,25;
329:20;331:2;
344:15,16;349:5;
352:21
**mischaracterize (1)**
47:18
**misconduct (3)**
241:16;244:4,12
**mislead (2)**
124:7,12
**misrepresented (1)**
10:5
**misstating (1)**
123:23
**Mitch (10)**
210:19,20;211:8,
14;213:11;270:2,5,6,
8;355:12
**MO (50)**
35:5;83:6;127:2;
130:15;133:2;
152:15;156:7;
162:16;180:19;
182:13;183:11;
205:13;206:23;
229:23;230:8;231:3,
13,23;232:13;233:3,
15;234:3;235:11,25;
243:10;253:5;
257:20;260:7;261:3;
262:9;263:18;
269:10;270:12;

274:4,19;275:18;
290:24;292:25;
293:4;296:9,17;
309:11;320:11;
331:17;332:22;
334:8;339:4;346:3;
350:23;354:2
**moment (4)**
300:20,22,24
**monetary (3)**
154:2;155:20;
156:16
**money (3)**
253:19,23;254:5
**month (18)**
21:25;22:2;26:13,
14,15;30:18;33:9;
114:15;117:22,25;
162:4;198:6;271:11;
274:18,21;275:6,8;
341:14
**months (15)**
69:6;70:21;
161:17,23,25;162:7,
8,19,19,21;217:21;
219:17;229:22;
232:11;347:20
**Moran (28)**
54:6,10,12,15,18,
22;55:3,8,22;56:13;
57:5;58:13,18,22;
59:2,7,11,15;60:7,15,
20,24;62:2,7;71:19,24;
72:2;185:12,21
**Moran's (1)**
56:20
**more (16)**
17:20,21,24;18:14;
33:18;92:7;146:19;
179:2;224:17;276:4;
286:15,16,17;
312:19;326:15;
341:13
**morning (11)**
48:14;185:15;
246:17;270:8;
321:18,22;324:2,6,
12;358:18;359:15
**moron (2)**
263:15,24
**most (1)**
50:10
**mother (1)**
6:17
**Motion (49)**
83:6;120:9;127:2;
130:12,16;133:15;
156:7;162:16;
180:19;182:13;
197:4;202:2;204:24;
205:13;206:23;
229:23;230:8,12;
231:3,13,23;232:13;

233:3,15;234:3;
235:11,25;257:20;
260:7;261:3;262:9;
263:18;269:10;
274:4,20;275:18;
290:24;292:25;
293:4;296:9,17;
309:11;320:12;
331:17;332:22;
334:8;339:5;350:24;
354:2
**mouth (1)**
47:17
**move (11)**
35:7;133:5;
152:16;181:15;
183:12;243:10;
245:8;253:5;270:13;
271:2;346:4
**moved (2)**
270:24;271:8
**moving (1)**
197:8
**much (8)**
47:23;153:15;
198:24;199:8;
211:24;225:2;280:9;
344:14
**Muller (9)**
117:19;263:16;
264:16;265:6,17;
266:2,3,7,19
**municipal (2)**
13:12;103:4
**mutts (1)**
130:8
**mutual (6)**
127:17;128:3,9,20;
129:2;130:20
**myself (12)**
120:6;187:6;
193:20;287:10;
293:23;298:19;
303:4;304:14;
310:25;330:6,9;
355:18

## N

**name (28)**
4:12;6:3;28:10;
41:15;85:21;103:8,
11;109:12;112:15,
17,18;130:21;
136:16;142:6;160:7;
173:16,22,25;174:3,
4,8;244:20,22;
291:11,14,16;
292:20;317:18
**named (2)**
41:17;244:16
**names (5)**
27:15;138:5,19;

143:21;318:19
**narcotic (6)**
212:13;214:4;
215:4,16;216:8;
228:13
**narcotics (10)**
212:5,22;213:21;
228:3,7;235:19,23;
355:14,20,22
**Nassau (1)**
219:23
**Natalie (2)**
7:5;147:16
**National (1)**
202:19,20
**nature (1)**
67:4
**neck (1)**
300:10
**need (12)**
76:2;90:13;124:3;
131:24;133:25;
134:5;145:25;157:9;
165:24;180:17;
224:23;341:7
**needed (6)**
310:16;320:9;
342:25;343:4;
347:24;351:15
**negligent (11)**
131:10;132:15,21;
133:11;150:19;
152:7,19;154:11,22;
155:8,22
**negligently (2)**
145:9;146:5
**New (26)**
4:8;5:22;6:8;11:5;
12:10,24;103:4;
165:11,16;166:13;
168:4,8;169:14;
190:2,20;201:16,20;
220:2;221:9,21,25;
236:8,10;309:21;
339:20;342:3
**newly (1)**
254:9
**Newsday (2)**
232:20;233:8
**newspaper (1)**
159:13
**next (54)**
23:15,19;25:9;
27:7;30:9;48:20;
49:13;64:21;69:7;
70:19;74:21;75:16,
19;77:9,25;79:4;
81:12;82:19;100:14;
109:18;110:14;
114:10;115:18;
154:17;248:8;
267:16;288:13,17;
293:22;294:3,14,17;

301:6;302:24;
306:12;316:23;
317:11,16,25;318:8;
319:16;321:13;
324:21;337:13,19;
338:23;339:8;
340:18,21;341:10;
342:8,11;344:15;
362:21
**night (18)**
160:17;180:2;
194:11,22,25;238:9;
249:15;250:11,15;
263:2;269:21;280:4;
281:4;300:18;
302:17;327:6;
334:19;359:11
**nighttime (2)**
250:6;275:16
**Ninth (1)**
190:6
**nobody (1)**
260:24
**Nofi (3)**
5:11;120:7;149:23
**None (5)**
104:10;152:10,22;
154:7;156:23
**Non-hiring (1)**
239:24
**non-law (1)**
361:6
**nonresponsive (21)**
35:8;127:3;156:8;
162:17;180:20;
205:14;206:24;
253:6;260:8;261:4;
262:10;269:11;
274:5;275:19;
290:25;293:5;
296:10,18;331:18;
334:9;354:3
**normally (1)**
282:12
**Northrop (2)**
244:17,22
**Notary (3)**
3:14;5:22;363:16
**note (4)**
8:21;155:18;
167:18;171:11
**noted (2)**
171:14;363:6
**notes (10)**
7:6,10,17,20;8:6,
15,18;325:11,17;
327:20
**Notice (4)**
53:21;61:14,16,21
**notified (1)**
193:12
**notify (6)**
229:18;230:19;

231:8,18;232:5;
234:20
**November (5)**
4:10;96:10;98:15;
337:16;363:4
**NOVIKOFF (130)**
4:19,24;5:10,16,
25;8:2,10,14;24:5,
15;37:9,24;47:7,15,
22;48:17;55:16;
58:9;59:24;60:4;
61:5,9,16;72:8;
79:17;90:8;97:7;83:6,
19;97:18,23;119:4,
12,21;120:3;123:20,
24;124:3,8;125:18;
127:2;128:13;
130:12,15;131:23;
132:6,9;133:2,15,21,
25;134:9,17;141:20;
151:23;153:20;
156:7,22;162:16;
164:9;169:21;
171:14;175:10;
180:19;182:13;
183:11;184:9;196:3;
204:21;205:13;
206:23;220:8;
224:17,22;225:2,5;
229:23;230:8;231:3,
13,23;232:13;233:3,
15;234:3;235:11,25;
243:10,25;253:5;
257:20;260:7;261:3;
262:9,17;263:18;
267:18,21;269:10;
270:12,21;271:2,7;
274:4,19;275:2,18;
276:2,18,23;290:24;
292:25;293:4;296:9,
17;299:3;303:11,19;
309:11;331:17;
332:22;334:8;335:6;
339:4,14;344:6,12;
346:3;350:23;354:2
**num (1)**
262:20
**number (33)**
4:3,9;15:14,24;
16:2;17:2,17;18:20;
65:4,6;66:15;67:4;
69:14;72:12,16;
85:24;87:22,23;
134:15;184:15,19;
190:9;191:9,16;
209:16;210:5;
225:12;276:25;
277:6;323:14,17;
344:20,24
**numbers (2)**
279:10,14
**numerous (5)**
129:8;130:19;

241:15;255:15;
262:20

## O

**object (4)**
60:3;123:21,25;
124:9
**objecting (2)**
8:11;171:9
**Objection (175)**
7:18,21;8:25;9:7;
10:6,13;11:25;14:4;
16:20;18:3,17;22:25;
31:7;32:10;33:19;
39:6;41:13;42:8,13;
43:23;44:6;45:11;
47:4;49:18;53:9;
55:14;56:17;57:14;
58:7;59:20;68:4,19;
79:15;90:9;92:10;
93:21;95:2;97:16,19;
99:12,16;100:18;
102:23;104:4;
106:22;110:19;
111:19,25;118:5,22;
119:3,5;120:2;
122:24;123:10,17;
125:14;126:13;
127:21;128:12,23;
129:22;131:2,12;
133:13,14;136:12;
143:2,12,18;151:21;
152:9,21;153:9;
154:6,12,18,24;
155:4,18,24;156:21;
159:24;160:13;
162:20;163:22;
164:6;165:13,19;
166:8,15,21;167:4,9,
19;168:11,16,21,24;
169:9,16,19;170:2,5,
19;171:6,7,12;
173:20;175:8;176:9;
180:8;181:3,5,16,24;
186:15;187:23;
188:16,24;189:6,11,
20;191:25;193:16;
195:25;196:4,12;
210:2;212:23;216:3,
13,17;218:25;222:6,
17;223:5,24;224:12;
237:8;238:4,7;239:6;
240:13;248:11;
249:5;254:17;259:8;
260:12;262:8,16;
263:13;266:22,25;
267:11;269:2;272:4;
274:24;275:7;
279:11,15;287:4;
291:20;292:3,12;
293:6;297:22;299:2;
302:13;306:15;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 112 of 122 PageID #: 1870

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

308:22;314:19;
335:5;337:25;355:3
**objections (1)**
3:9
**objective (3)**
127:18;128:5,10
**obligations (1)**
187:18
**OBPD (25)**
134:22;145:17;
153:2,6;154:4;
171:16;181:19,22;
182:7,20;184:23;
190:24;191:2,12;
197:3;199:5;223:11;
227:4;236:6,13;
238:13;254:14;
259:2;266:13;267:8
**O'Brien (1)**
5:6
**observation (1)**
199:10
**occasion (3)**
195:5;200:15;
272:17
**occasions (18)**
62:7;91:24;
196:23;197:7;
198:11,23;199:4;
200:18;206:9,16;
245:16;255:15;
256:21;273:4;
355:25;356:5;
361:20;362:8
**occur (3)**
264:23;356:5,7
**occurred (7)**
42:12;152:17;
157:3;201:12;
241:12;243:3;348:13
**Ocean (126)**
4:6,20;13:2;28:14,
18,23;29:23;30:4;
54:11;56:4;60:14,23;
79:14;80:12;103:11,
14,16;104:12;
116:11,17;134:22;
136:20,23;137:2,10;
140:11;145:9,17;
146:5;147:13,22;
150:9,14;153:2,7;
154:4,25;155:9;
156:4,10,16,20;
168:3,7,22;169:13;
170:10,15;180:18;
189:25;190:2,24;
191:3,13;192:16;
197:8;201:13;202:5,
6,9,11,15;203:8,11;
205:8;210:9;212:4,
11;215:3;216:7,24;
217:3,6,7,11,13;
218:9;220:19;221:5;

223:11;225:10;
227:4;233:7,20;
234:9,16,20;235:6,
17,18;236:6,8;
240:11,25;241:11;
243:23;245:11,19;
251:12,17;252:13,
22;253:15;254:16;
257:10;260:15,19;
261:6;269:22;270:5,
9,17;271:16;272:21;
273:19;281:4;282:5,
6;352:23,25;353:4;
361:10,14,15,18;
362:7
**October (19)**
157:3,21;158:25;
159:2;161:24;163:5;
241:12;242:17;
277:9;280:4;324:3,7,
12;334:21;335:14;
336:6,10,15;337:16
**off (50)**
72:13;73:17;74:5,
10,17;75:6,14;78:10;
79:2;81:4;87:23;
99:10,14;100:7,20;
101:6,7,17,22,25;
102:5,9;105:16;
106:3;134:12;
164:13;182:10,10;
184:16;213:5;225:7;
237:16;246:11;
247:12;248:6;
249:20;251:21;
253:2;265:8;277:2;
309:17,22;331:6,13;
336:2;337:8;344:21;
348:14;362:12;363:5
**offer (1)**
17:10
**offered (2)**
17:25;217:2
**offering (1)**
67:6
**office (5)**
53:5;234:11,21;
235:5,16
**officer (77)**
48:6;103:18;
141:6,10,18;150:7;
151:17;155:9,12;
156:2;158:8,10;
168:13,15,20;169:4,
6;175:20;176:2;
183:4,18;186:6,17;
187:5;188:9,10,18;
189:2,4,13;194:16;
197:4,9;199:2;206:3;
214:11;216:12;
218:16,20;219:21,
24;220:3,13,15;
228:22;229:2;238:9;

240:24;243:22;
248:24;250:3;
253:14;254:4,16;
256:2;260:6,20,23;
261:8,16;263:21;
264:21;265:3,7,10;
266:12,19;268:5,14;
297:20;309:5,17,22;
335:24;358:24;
359:5;360:17
**officers (70)**
135:3,4,4,9,13,15;
143:22;144:10;
145:22;147:23;
148:7;151:3;154:23;
156:11,19;158:12;
171:20;180:12,23;
181:21;182:6,19;
191:10,14;192:15;
195:23;196:9,18;
206:10,17;207:8;
210:7;219:6;226:23;
229:8;230:3;234:23;
235:5;241:16,21;
245:18;250:7,10;
252:12,21;254:10,
14,22;255:19,20;
256:7,20;257:6,16;
258:16,25;259:14,
17,18,25;261:11;
262:24;268:14;
281:4;327:17;
356:19,22;357:2;
359:18;362:8
**officers' (1)**
262:15
**official (9)**
4:23;149:19;
236:12;237:3,23;
238:3;244:3,12;
336:14
**often (1)**
94:21
**old (2)**
96:3;98:11
**Oley (6)**
56:2,3,7;357:4,7,
20
**once (12)**
39:24;52:6;87:3,
20;132:17;165:3;
247:12;283:6,15;
285:4;287:9;306:12
**one (91)**
4:3;12:7;17:20,22;
23:14;27:7;38:13,15;
40:7;42:17,24;48:19;
55:4,24;63:11,14,17;
66:15;72:12;73:23;
74:13;75:6,7;92:7;
93:23,25;95:9;
108:21;111:4,16,23;
112:6,7;115:22;

116:18;121:3;
130:22;133:6;165:4,
7;173:14,23;176:3;
180:3;183:5;186:7;
187:24;190:16;
191:9;195:5,5;
209:17;212:12;
213:4;224:17;
240:16;245:20;
250:3;251:24;
253:12;256:14,22,
24;261:13;265:5;
270:7;271:6;273:4,6;
277:13;282:16;
286:4;288:10;
289:16,19,22,25;
290:9;295:19;
299:24;300:4;
307:25;327:17;
329:25;331:12;
335:15;339:25;
341:13;357:6,6;
360:19
**O'Neill (1)**
5:5
**ones (3)**
73:14;219:11;
347:6
**only (39)**
8:18;13:6;19:12;
22:7,11;65:16;
135:13;144:9,21;
146:15;162:14;
164:7;174:5;179:18;
180:10;195:5,16,18,
21;196:2,8,15,15,17;
200:17;209:21;
211:22;212:14,18;
213:24;264:18;
267:3;269:6;272:2,
17;307:25;315:21;
326:12;349:21
**onto (1)**
307:14
**open (10)**
201:7,9,10,16;
202:17,25;208:9;
217:6,12,15
**opened (3)**
202:12,13;321:4
**operation (2)**
236:14;238:18
**opinion (30)**
198:21;199:3,11;
200:23;203:10;
206:2;230:14,19;
231:16,25;232:3;
240:21;250:16,21;
251:5,15;256:12,18;
257:8;287:13;
296:25;297:9,15,25;
298:9;300:12,15;
301:17;302:12;

310:11
**opportunities (3)**
216:19,23;226:15
**oppose (1)**
133:18
**opposed (3)**
133:17;327:9,13
**opposition (7)**
227:2,21;232:16;
233:11;234:7,18;
235:14
**oral (5)**
33:21;34:9;35:9;
83:17;354:16
**order (9)**
14:10;40:11,17;
41:2;90:14;97:2;
252:19;354:11;
360:15
**orientation (13)**
25:16,18,19;26:6,
8;27:19;28:2,5;30:3,
8,17;32:4,5
**others (1)**
177:20
**other's (1)**
290:2
**out (89)**
13:10,14;15:15;
18:9;28:5,9,12;
81:17,20,23,25;82:4;
83:3;86:23;107:14;
162:13;163:3;174:3;
178:20;180:14;
182:9;185:12;
191:12;211:10;
212:4,12,22;213:20,
24;227:2,20;229:21;
230:6,25;232:6,25;
233:11,12,18,25;
234:6,18,22;235:2,
14;245:11,19;
252:25;257:13;
262:3;268:10,25;
282:15,16;284:15;
286:22;295:17;
296:8,16;299:12;
307:14;309:10;
318:10;325:9;
327:25;331:21,24,
25;332:15,24;333:9;
334:18;335:13;
336:5,8,10,14,18,21,
23;357:21,24;338:9,
10,16;359:14;
360:11;362:2,3
**outlet (1)**
258:13
**outside (30)**
77:7;177:17;
178:12,17,20;183:8;
201:12,13;202:6,11,
15;284:13,24;

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 113 of 122 PageID #: 1971

286:13;287:19;
289:14;298:17;
299:17;300:6,19;
301:3;302:21;311:5;
312:11,14;313:6,10;
322:11;333:14;
356:13
**over (30)**
7:16;9:19,22;
42:23;90:13;94:13,
14,18,19;95:9;97:4;
107:13;111:17,23;
112:5,7;113:20;
162:12;171:7;184:7;
224:23;228:8;260:4;
281:20;285:14;
301:9,16;317:17;
337:11;342:17
**Overall (1)**
62:18
**overcome (1)**
226:24
**overseer (1)**
148:17
**overt (4)**
129:8,13,16;
130:19
**own (2)**
287:6;348:18

**P**

**pack (1)**
325:2
**package (7)**
81:16;83:2,12,25;
84:13,21,24
**page (13)**
119:15;131:17;
132:6;157:7,8,9;
164:25;190:5,11;
221:12;223:9;
226:20;362:21
**pages (1)**
339:7
**pain (4)**
186:13,21;187:10,
16
**paper (1)**
26:5
**papers (4)**
81:17,20,22;113:4
**paperwork (8)**
28:11,13;30:13,16;
100:20;101:5;
354:25;355:5
**paragraph (45)**
127:16,24;131:17;
132:4,8;145:16;
146:3;147:20;
152:23,24;156:25;
157:10;167:21;
168:19;169:7,17;

186:9;222:14,23;
223:10;236:3,4,25;
237:15;243:14,15;
244:10;245:9;
253:17;254:7,8;
255:5,14;258:23;
262:13;263:5,7,8;
269:12,16,19;276:6,
7,13,16
**paragraphs (1)**
166:11
**parenthetical (1)**
131:19
**parentheticals (5)**
132:15;133:8;
165:2;190:6;221:13
**Paridiso (42)**
122:9,10,11,14,17;
138:9,13,25;139:11;
149:14;204:7,12;
205:7;212:20;
213:22;214:2;
229:19;230:19;
251:14,23;252:2,4,
19;253:11;257:15;
268:4,8,12;272:3;
273:22;275:12;
324:11;339:10,22;
340:4,12;350:7;
351:3,6,11;352:6,19
**park (3)**
351:15,18;352:2
**parked (1)**
247:22,25
**parking (3)**
351:15,17;352:9
**part (16)**
18:9;46:19;89:13;
103:20;145:22;
147:8;167:22;
223:10;231:11;
232:10,11;237:9;
257:24;258:3,10;
347:20
**participant (1)**
142:23
**particular (6)**
67:10;99:10;
114:8;159:12;
225:17;356:15
**particularly (1)**
167:15
**parties (3)**
3:4;80:4;282:25
**partner (1)**
260:14
**partners (1)**
277:13
**parts (1)**
89:10
**part-time (2)**
218:12;254:15
**party (1)**

264:17
**pass (13)**
15:3;25:7;31:19;
64:13;67:21;90:14,
14;94:20;281:25;
351:15,17;352:2,9
**passed (13)**
15:22;26:21,25;
27:9;31:17;32:6;
33:12;34:5;48:23;
64:18;68:11;164:8;
347:20
**passes (1)**
87:6
**passing (5)**
64:20;117:16;
118:7,9;156:5
**Pat (5)**
6:20;137:13;
139:25;141:3;340:5
**Patrick (5)**
135:21,22,23,23;
339:25
**patrol (2)**
278:14;281:4
**patrolling (4)**
261:12,25;278:10,
11
**patron (1)**
322:4
**Paul (1)**
183:7
**Pelc (12)**
41:17,18,22;42:11;
43:22;44:4;90:10,12,
16;92:6,12;94:9
**pending (1)**
243:11
**people (28)**
17:11;18:8,14;
89:19;113:12;115:5;
121:25;122:5;130:2;
132:24;138:6;
155:14;251:12,17;
257:10;282:14;
284:15,18,19;
286:12;293:11;
303:18,23;318:15,
20;330:17;349:21;
351:21
**per (4)**
144:5;170:11,17;
218:20
**perceived (2)**
333:15;334:2
**percent (2)**
69:16,17
**Perfect (1)**
144:19
**performance (1)**
186:5
**perhaps (1)**
61:13

**period (12)**
13:8;27:25;34:15;
35:16;36:19,20;
56:10;77:23;94:24;
112:11;161:20;
183:14
**permitted (5)**
145:9;146:6;
148:5;306:13;308:19
**permitting (1)**
268:5
**person (33)**
17:20,22;42:5;
55:22;66:17;115:15;
196:8,17;209:21;
216:6;240:9,21;
244:16;264:20,25;
267:3;280:3;288:9;
292:4,6,8;293:8,18,
21;294:16,24;
298:20;301:9,10;
310:20;348:25;
349:3;360:23
**personal (7)**
159:8;259:21;
264:5;265:19;266:3,
21;269:15,18;348:18
**personally (25)**
41:21;191:14;
254:3;255:12;260:9;
276:15;277:12,19;
284:21;301:6;
302:25;306:12;
311:7;318:8;319:20;
321:13;323:15;
324:7,23;329:17;
335:13;336:4,7;
351:3,24
**personnel (8)**
134:25;145:3,21;
168:3,7;169:13;
221:20;255:17
**pertain (4)**
176:4;181:6;
186:8;187:25
**pertaining (1)**
354:18
**pertains (4)**
152:6;153:23;
159:6;181:9
**phases (2)**
33:14,17
**phone (59)**
54:16,19;55:2,7,
11,21;56:16;114:6;
115:3,24;117:25;
120:4;142:18,23;
143:5,10,15;261:2;
278:4,5,7,13,17,20;
279:8,12,14,16,18,
19,21;280:8,10,12,
16;281:9;282:8;
283:6,10,12,15,21;

284:4,4;308:18;
310:4;312:24;
313:24;323:14,17;
324:2;337:11,12;
348:23;360:10,17,
19,20,22
**phones (1)**
279:13
**photos (1)**
327:23
**phrase (6)**
108:12;194:2,7;
222:13;238:6;282:23
**phrased (1)**
167:14
**physical (10)**
32:16;89:24;
154:20;155:5;
297:18;309:18;
318:25;333:17;
334:3,12
**physicality (1)**
297:19
**physically (1)**
198:16
**pick (1)**
362:11
**piece (1)**
26:4
**pinpoint (1)**
125:25
**place (16)**
56:16;73:11;
157:20;158:25;
159:21;174:15;
178:13,17;187:21;
189:10;230:25;
232:25;236:7;264:8;
311:5;334:2
**Plaintiffs (30)**
4:5;5:9;79:21,22;
135:2;145:21;153:3;
167:24;171:17,19;
180:22;181:20;
182:5,18;184:24;
185:3;190:25;
193:12;221:22;
223:13,17;226:22;
252:10,20;253:12,
22;254:13;255:14,
18;262:23
**Plaintiffs' (5)**
119:18;167:24;
221:19;223:15;
262:20
**plan (2)**
129:9,18
**please (20)**
4:18;5:19;6:2,5,10,
14;13:24;16:21;
43:24;104:22;
111:20;121:19;
132:13;164:4;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 114 of 122 PageID #: 1972

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

169:20;175:9;184:8;
237:10;276:10;
288:15
**pled (3)**
158:19,21;160:3
**plumber (1)**
348:13
**pm (14)**
134:12,16;164:13,
16;184:16,20;225:7,
13;277:2,6;344:20,
25;363:5,6
**point (18)**
30:7;67:10;93:4,
11;128:25;168:14;
174:11,20,24;
179:22;208:24;
229:25;230:14;
315:6;324:6;328:6;
359:17,19
**pointed (6)**
33:18;190:17;
317:7;328:16;
343:18;345:10
**Police (354)**
4:21;5:3,4;13:2,5,
10,16,17,18,18,22;
14:2,10,22,23;15:10;
18:24;19:4,18,23;
20:6,10,14,18,23;
21:7,10,18,22:8,16,
22,23;23:6,10,17;
24:10,16;25:11,21;
27:4,21;29:24;30:5,
10;31:16;32:8;
33:11;34:4,19;35:13,
20;36:2,3,8,23;
37:13;44:17;48:6;
50:16;51:17;52:13,
19;53:2;54:5;56:25;
57:6;58:4;59:8,18;
60:8,14;61:25;62:9;
63:5;64:6;72:20,24;
73:13,17,18,19;74:6,
7,9,16,24;75:11,22;
77:3;78:4,9,21,25;
79:4,14;80:15;81:7,
14;82:6,9,15,21,25;
83:11;84:3,10,13,18;
85:7;86:24;87:4,22,
24;91:3,21;92:17,23;
93:6,13;96:6;100:3,
5,16;101:7,11,14,16;
102:14;103:3,4,18,
20;104:8,14,19,25;
105:6,16,18,23;
106:8;108:15,18,23;
109:5,8,9,20,23;
110:5,9,12,24;
111:18;113:4,18,24;
114:12,23;115:16,
20,24;116:13;117:9;
121:4;122:18;135:2;

141:6,10,18;144:5,9,
14;145:22;147:14;
148:8,13,15,16,25;
149:6,21;150:7,9,14,
15;151:14;155:8,12,
15,25;156:4,6,19;
158:8,10,12;168:13,
15,20;169:4,6;
170:10,16;174:16;
177:17;178:12,18,
19;180:14,23;183:9;
185:23;186:5,17;
187:5;188:9,9,17;
189:2,4,13,25;
191:10,11,14,15;
192:14;195:23;
196:9,10,18,19;
197:4,8,9;199:2;
206:3,9,17;207:8;
208:5,8,12;210:7;
214:12,15;216:11;
218:10,16,20;
219:21,24;220:3,13,
14;226:23;227:3,4;
228:22;229:7;230:3;
234:23;235:5;
240:12,24;241:16,
21;243:22;245:18;
248:24;252:12,21;
253:14;254:4,16;
257:6,16;258:15;
260:5,20,22;261:7,
12,13;263:2;264:18,
21,21,24;265:2,3,6,
10;266:19;268:13,
14,20;269:7;271:16;
273:19;278:5,7,17,
20;279:8,13,21;
281:3;297:20;305:7;
309:5,17,22;320:5,
14;321:16;322:12,
24;323:4,9,21,22;
324:18,22;325:8;
326:14,19;328:4,5,7,
11;329:18,22,24;
330:13;331:6,10,13,
20,25;332:12,17;
333:3;334:23;335:4;
336:15;345:16;
349:2;354:13;
358:20;361:10,17,21
**policies (1)**
191:2
**policy (15)**
164:20;165:10,16;
166:13,17,25;208:4,
5,11,14,16,21,23;
209:15;262:22
**Politics (1)**
353:13
**pool (11)**
299:8,9,14;314:2,
7,15;320:17;321:6,9,

11;333:10
**portion (7)**
80:9;134:19;
153:22;167:17;
169:22;175:12;187:3
**posed (1)**
257:9
**poses (2)**
204:3;206:4
**posing (1)**
229:8
**position (53)**
21:12;37:18;48:6;
50:17;52:21;62:8,12,
23,24;63:8,18,24;
64:23;70:10;72:19,
23;73:12;74:24;
75:23;78:11;79:7,13,
20,24;80:19;81:15;
87:5;91:21;92:17;
93:5,12;95:19;
100:16;102:25;
105:2,19;114:13;
117:8;118:16;
130:23;155:16;
215:2;216:24;217:3,
5,12,14,22;218:5,9,
15;219:3;240:24
**positions (3)**
80:4;96:22;116:20
**positive (1)**
41:14
**possessing (2)**
214:4;215:3
**possession (8)**
7:10;37:7;49:9;
167:7;175:15;
182:24;208:19;222:9
**possibility (1)**
220:24
**possible (2)**
152:2;245:5
**post (2)**
352:22;354:5
**posted (3)**
353:3,11,16
**posting (3)**
353:8,10,21
**potential (2)**
308:20,23
**potentially (1)**
313:25
**poured (1)**
274:16
**power (1)**
259:3
**practice (2)**
338:3;339:3
**practices (1)**
191:2
**precipitated (2)**
326:9,25
**Precise (2)**

4:13,16
**preference (3)**
107:13;113:19;
360:15
**pregnancy (1)**
302:8
**preliminary (1)**
226:22
**preparation (1)**
7:24
**prepare (1)**
25:23
**presence (10)**
172:21,22;201:24;
221:2;263:20;264:3;
315:24;316:12;
322:5,25
**present (22)**
5:12;6:16;8:23;
9:6;173:6;177:11,14,
16,22,25;178:10;
197:3,8,13,22;199:6,
21,23;200:6,11;
349:6,22
**presently (1)**
225:14
**pretty (2)**
89:2;306:10
**prevented (1)**
188:7
**preventing (1)**
305:22
**previous (2)**
81:18;142:11
**previously (3)**
64:7;73:15;141:22
**principle (1)**
236:7
**prior (26)**
9:14;21:2;28:13,
17;42:24,25;43:9;
48:23;49:2;51:6;
53:22;83:22;98:4,7,
22;104:11;116:15;
148:4;150:15;
156:15;218:3;233:6;
236:21;265:20;
320:6;335:2
**privilege (2)**
7:23;8:12
**privileged (1)**
8:5
**probably (3)**
59:22;162:3;
357:16
**procedure (2)**
151:15;179:8
**proceeded (1)**
303:5
**process (4)**
11:13;13:25;14:6;
18:5
**processing (3)**

13:4;14:7;130:4
**produced (3)**
24:7;37:14,18
**production (2)**
24:9;37:10
**professional (2)**
187:9,14
**promotion (4)**
236:15;237:5;
238:23;239:13
**promotional (3)**
216:19,23;226:15
**promotions (1)**
226:12
**proper (8)**
151:15;208:4,12;
213:2;271:19,21,22;
273:18
**properly (1)**
254:13
**property (2)**
202:23;203:2
**prospective (6)**
11:4;12:9;185:2,7,
17;186:2
**protect (20)**
226:25;227:20;
228:11,24;229:12;
230:17;231:5,15;
232:4,15;233:10,17;
234:5,17,22;235:3,
13;257:12;268:10,24
**protecting (2)**
124:11;152:12
**provide (2)**
30:2;351:19
**provided (2)**
59:17;351:23
**proximate (2)**
152:25;216:20
**proximity (4)**
172:23;173:2;
291:5;293:15
**psych (1)**
91:19
**psychological (55)**
32:14,22,25;33:2,
5,13;34:5,10,20;
35:8,9;36:14;38:8,
12,20;42:7,16,23;
43:2;46:16,20;50:25;
86:22;87:21;88:2,6,
9,17,24;89:7,10,25;
90:7,15,25;91:7,11,
16,19,25;92:8,15;
93:16,20;94:12,15,
22,25;95:6,18;96:5,
20;98:21;354:11,24
**Public (41)**
3:14;5:22;152:11,
13;164:19;165:10,
16;166:13,16,25;
191:5;204:4;206:5;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 115 of 122 PageID #: 1973

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL: vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

226:25;227:20;
228:11,24;229:9,12;
230:18;231:6,16;
232:5,16;233:10,18;
234:6,17,22;235:3,
14;243:21;244:25;
248:25;249:12;
251:11,16;257:13;
268:10,24;363:16

**published (3)**
171:16;182:17;
184:23

**pull (3)**
295:16;299:11;
333:8

**punishment (1)**
207:23

**purchase (1)**
254:5

**purport (1)**
131:15

**purports (1)**
133:16

**purpose (7)**
9:17;43:4;53:14,
15,16;115:2;135:14

**purposes (2)**
95:18;360:18

**pursue (1)**
90:18

**put (8)**
47:17;151:12;
194:24;259:12,12;
284:3,5;325:12

**puts (1)**
15:15

**Putting (2)**
176:18;242:23

---

# Q

**qualified (49)**
38:5,9;39:21;40:2;
43:12,20;44:2,5,9,14,
18;45:6,25;47:3,11;
48:2,5,20,22;49:22;
50:7;51:8,14;52:7,
18;53:8,19,25;86:21;
87:4,15;88:13,15,16,
23;89:6;90:2,6,24;
91:6,14;92:2;93:19;
96:19;97:7,11,15;
98:4,21

**quick (1)**
40:23

**Quickly (1)**
330:25

**quiet (1)**
227:16

**quite (1)**
331:4

**quote (2)**
119:14;134:21

---

# R

**rack (1)**
321:9

**radio (2)**
151:15,17

**Radler (1)**
4:25

**raise (1)**
227:17

**raises (1)**
133:19

**rambunctious (2)**
328:23;329:2

**rambunk (1)**
328:25

**range (3)**
107:12;108:2,7

**rank (1)**
17:2

**ranking (16)**
15:14;65:9,11,19;
66:15;67:9,18,24;
68:3,5,5,12;69:5,18;
70:13,16

**rat (27)**
128:15;172:3,5,11,
14,17,21,25;173:7,
12;174:9,19;176:6,7,
11,12,16,20,23;
177:2,12,23;178:5,
17;179:14,17,21

**Rather (2)**
262:19;266:11

**rats (4)**
130:8;171:20;
173:15,24

**re (1)**
40:4

**reach (1)**
323:25

**reachable (5)**
65:13,15,15;66:11;
67:5

**reaction (2)**
105:13;203:18

**read (50)**
9:19,22;80:8,9;
87:10,11;132:17;
133:7;134:17,19;
135:17;146:2,8,11,
12,19;148:20,22,23;
152:24;153:21,22;
157:9;159:12;
165:20,25;166:10,
12;167:16,17;
169:22,24;175:11,
12;187:3;190:5,23;
221:13;236:20;
239:5;243:15;244:8,
9;259:10;263:7;
269:12;276:9,13;

345:12;346:11

**Reading (10)**
14:25;132:18;
133:6;157:14,17;
165:7;166:4;190:16;
244:13;269:13

**realize (1)**
42:15

**really (3)**
103:7;212:12;
218:7

**re-ask (1)**
212:8

**reason (9)**
29:4,6,9;67:16;
86:12,14,17;93:22,
25

**reasonably (2)**
221:23;222:24

**reasons (1)**
29:18

**recall (130)**
11:2;12:11,19,20,
21,22;28:16,21;47:9,
15,24;48:21;49:4,6;
64:11;65:22;99:19;
102:19;105:12;
112:25;113:8;114:3,
4;115:14,17;118:18,
19,23;129:10;131:7,
9,13;145:12;146:6,
25;147:5;164:17,21;
167:5;170:8,14,22;
173:9,11;174:22;
175:13;177:21,24;
182:22;185:20,25;
189:23;190:4,21;
191:21,23;192:11,
24;193:2,10;199:22,
25;200:8;208:15,17,
24;209:13;210:23,
24;211:15;220:22,
23,25;221:6,8,11,14,
16;222:7,8;244:23,
24;245:4,6;249:21;
252:7;261:20;272:5,
13,18;273:12;284:2,
7;290:4;297:17,23;
299:18,21;300:2;
301:2,5;302:23;
303:20;306:8;
315:22,23;316:4;
320:16;322:18;
323:12;325:19;
327:22;329:11,13,
16;332:13,20,23;
333:18,21;334:15;
338:2;340:15;345:4;
348:9,20;352:7;
356:19;358:19;
359:22

**receipt (6)**
50:17;52:9,15,23;

60:6;84:7

**receive (39)**
15:18;16:5;19:14;
25:24;26:21;27:19;
32:7,12;33:10;34:3,
18;35:2;50:21;51:16,
21;52:10,18,24;
68:13,21;69:5,21;
70:3;73:6;77:18;
82:22;88:13,19;
104:7;106:7;110:4;
277:8,12,13,19;
278:3,23,25;279:7

**received (57)**
13:14;16:13;
17:17;18:13;23:16;
25:10;30:10;39:24;
49:13,16;52:3;53:6,
17,23;66:5,8;68:8;
69:8;73:5;74:3,22;
75:17,20;77:10;78:2;
79:5;82:9,14,20,24;
84:2,4;86:19;88:7,
12,20;89:4,4;91:4;
100:15;107:16,23;
109:15,19;113:3;
117:24;156:5;
277:15;278:9;279:2,
3,5;280:6;282:8,13;
340:6;359:18

**receiving (1)**
275:13

**recent (1)**
50:10

**recognize (3)**
244:21;359:24;
360:3

**recollection (20)**
10:24;49:10;
80:16;122:3;132:3,
19;133:9;134:3;
165:5,8;167:8;173:6;
175:16;182:25;
190:8,18;208:20;
222:10;263:12;289:3

**recommendation (4)**
54:8;58:5,15;
185:11

**recommendations (1)**
29:21

**record (26)**
4:17;5:11;6:3;
55:2,21;72:13,17;
124:11;133:14,24;
134:12,16;164:13,
16;184:13,16,20;
225:7,13;242:24;
243:8;277:2,7;
344:21,25;363:5

**recorded (3)**
54:20;55:9,13

**recording (1)**
54:24

**refer (11)**
20:13;131:17;
145:24;168:9;169:7,
17;174:7,23;227:19;
255:5;267:17

**reference (8)**
56:15;57:4;58:20;
59:3;71:21;72:3;
157:2,20

**referenced (1)**
168:18

**references (2)**
29:22;30:2

**referred (6)**
159:22;171:22;
176:15;220:17;
221:3;273:7

**referring (21)**
38:15;45:20;
83:24;99:21;135:4,
16;194:3,8;197:18;
208:6,13;210:17;
215:8;227:14;
239:22;240:2;
259:16,19;293:8,9,
10

**refers (5)**
79:25;147:9,20;
168:15,19

**reflected (1)**
50:10

**refresh (11)**
49:10;132:2;
133:9;134:3;165:8;
167:8;175:16;
182:25;190:17;
208:20;222:10

**refreshes (3)**
132:18;165:5;
190:8

**refuse (3)**
169:15;262:14,24

**refused (1)**
167:25

**regard (64)**
10:9;15:8;16:17,
24;17:4,4;20:17,22;
22:8,14,15;32:20;
51:23;62:16;63:7;
64:22;68:9;69:22;
71:3;91:20;92:16,24;
100:13;110:8;
139:13,16,19,22,25;
140:4,7,15,18,21,24;
141:3,12,15;144:6;
163:7,20;166:19;
173:11,22;184:2;
186:3;194:12,15;
196:18;200:14;
214:3,25;224:10;
227:24;228:22;
241:10;257:22;
258:5,8,12;316:8;

---

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 116 of 122 PageID #:
1974
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
KEVIN LAMM
November 19, 2008

319:17;327:20;358:6

**regarding (11)**
78:9;127:18;
128:4,10;162:25;
178:16;208:4,12;
350:12;354:25;
355:12

**regime (4)**
227:2;232:17;
233:18;234:7

**register (3)**
60:13,18,22

**regular (2)**
265:7;271:17

**regularly (3)**
269:21;270:4;
272:8

**regulation (3)**
168:18;169:5,12

**regulations (4)**
168:2,6;191:7;
193:15

**rehire (1)**
80:2

**rehired (4)**
13:2;79:13,22;
240:11

**relating (1)**
158:19

**relation (4)**
45:8;109:15;
281:13;285:17

**relationship (12)**
11:5;12:10;80:11;
104:12;116:11,16;
129:24;140:11;
147:13;217:11,19,24

**relative (1)**
282:23

**relaxed (1)**
211:23

**relaxer (2)**
211:18,21

**relevance (1)**
267:20

**relief (3)**
118:20;131:9;
189:23

**remain (1)**
142:12

**remarks (4)**
265:22,24,25;
266:5

**remember (13)**
26:12;85:21;
281:20;315:19;
316:5;319:2,15;
320:8;321:2;322:22;
326:11,16;331:22

**remove (2)**
262:13,23

**repeat (9)**
16:21;43:24;

104:22;127:22;
145:14;154:19;
169:20;186:25;196:7

**repeated (2)**
153:18;190:25

**repeatedly (3)**
185:2;193:12;
194:14

**rephrase (7)**
16:22;78:18;
97:24;139:8;167:12;
195:20;333:13

**Report (2)**
353:14,16

**reporter (11)**
4:15;5:19;6:2,5,9,
13;120:14;153:21;
167:16;169:21;
175:11

**Reporting (2)**
4:13,17

**represented (2)**
53:4,10

**request (10)**
7:24;57:13,15,19,
22,24;59:19;84:14;
110:8;262:7

**requested (7)**
80:9;134:19;
153:22;167:17;
169:22;175:12;187:3

**requests (1)**
37:20

**required (2)**
35:12;125:16

**requirement (1)**
32:21

**requirements (8)**
75:25;76:8;
106:11;122:7;144:4,
8;180:15,18

**requisite (1)**
218:8

**rescue (3)**
327:23;328:9;
332:20

**reserve (2)**
133:17;362:18

**reserved (1)**
3:10

**residence (5)**
269:22;270:6,17;
271:18;272:9

**residency (6)**
75:25;76:9,24;
77:13;106:10;107:4

**resident (3)**
77:16;106:17,19

**resides (2)**
6:15;236:9

**residing (2)**
271:17;272:8

**respective (5)**

3:4;80:3;248:20;
279:13;292:17

**respond (12)**
24:17;45:14;48:7;
77:11;80:20,23;
178:3;250:24;
338:14;342:24;
343:3,7

**responded (3)**
13:11;124:5;
205:10

**response (20)**
23:14;58:23;
59:18;113:5;115:7;
116:3,9;179:18;
252:5;288:7;316:22;
318:13,14;342:18;
343:23;346:14,19;
347:12;355:6,8

**responsibilities (6)**
148:15,25;149:5,
21;150:8,13

**responsibility (2)**
259:4;327:5

**responsible (5)**
236:12;237:3,24;
238:3;240:9

**responsive (2)**
37:19;130:16

**restroom (1)**
344:11

**result (25)**
65:11,19;67:9;
87:14;89:23;90:6,17,
24;93:20;96:20;
152:18,25;153:6;
154:3,10,21;155:7,
21;156:17;186:22;
187:19;188:21;
189:18;216:21;
226:15

**resulted (1)**
152:7

**results (1)**
354:23

**retained (3)**
53:13;134:24;
145:19

**retention (12)**
131:10;132:16,21;
133:11;150:19;
152:7,19;154:11,22;
155:8,22;156:17

**re-test (1)**
40:4

**return (3)**
21:21;22:3;100:10

**review (5)**
9:13,17;45:17,18;
362:19

**reviewed (1)**
10:21

**Reviewing (12)**

153:16;157:15;
165:6;166:16;190:9;
208:7;221:15;
244:14;263:10;
269:14;276:12,17

**Rich (29)**
172:6;198:9;
246:3;259:20;
261:24;284:24;
285:14,16;286:23;
287:11;290:10,21,
22,22,23;292:23;
294:9;295:11;311:2,
12,14;314:6,23;
315:6;317:7;328:10,
18,24;329:6

**Richard (42)**
135:21;137:9;
139:23;140:25;
174:3;176:25;
177:11;178:3,22;
179:25;205:8,17,22;
286:21,24;288:13,
17;291:19;292:18;
293:14;294:5;
303:12;308:11,12,
20;311:22;313:9,17,
25;315:10,15,25;
316:7,12,21,24;
318:24;319:24;
320:13;328:5;
329:18;330:12

**Richie (5)**
160:18;180:5;
201:4;246:10;303:10

**ridicule (1)**
269:8

**ridiculed (1)**
263:14

**Right (64)**
7:15;16:14;19:6;
22:19;24:5;26:23,24;
27:5;61:20;66:24;
67:7;76:13;77:17;
83:4;97:22;118:23;
120:12;123:23;
133:18;136:7;
146:22;147:2;
164:21,21;184:12;
194:3;196:15;215:9,
11,15,25;218:24;
242:25;251:21;
261:18;265:23;
273:13;279:7;282:4;
290:18;293:25;
294:11;295:22;
298:21;300:7;308:4;
309:25;310:5,12,13;
312:11,25;313:7,15,
16,19;314:11,15,18,
24;315:5;333:11;
349:14;362:19

**rights (3)**

11:14,19,24

**ring (1)**
279:18

**risk (4)**
204:4;206:4;
229:8;257:9

**Rivkin (1)**
4:24

**road (1)**
248:14

**rock (1)**
159:14

**rocket (3)**
253:19,23;254:5

**Rogers (17)**
4:21;7:5;147:16;
149:8;171:3;204:16;
205:20;206:15;
214:8;231:8;257:23;
268:18;272:6;274:7;
275:20;324:15;
350:12

**Rogers' (2)**
8:16;9:6

**rogue (1)**
171:20;175:19,25

**role (1)**
243:22

**rolled (3)**
286:13;287:20;
308:10

**Rolodex (1)**
323:21

**roof (1)**
274:17

**room (6)**
44:8,21;344:9;
349:14,18,20

**RQ (2)**
24:5;37:9

**rules (2)**
191:6;193:14

---

**S**

---

**safety (7)**
191:5;206:5;
229:9;248:25;
249:13;251:11,16

**sake (1)**
306:5

**same (58)**
3:6,15;17:16,17;
46:8;50:24;64:5;
87:23;120:2;135:25;
136:2;139:13,16,19,
22,25;140:4,7,15,18,
21,24;141:3,11,15;
157:7;166:18,20;
172:10;177:3,4,6,9;
183:21;189:20;
195:14;197:16,18;
213:12;241:6;

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

257:22;258:5,8,12;
260:21;270:24;
271:9;273:2,3;307:6,
8;316:5;319:16,18;
332:7;354:22;
357:19,21
**Sanchez (25)**
118:25;119:16,23;
120:24;121:10;
123:8;125:12,21;
126:10,22;127:5,11,
17,24;128:3,8,19;
129:2,7,20;130:19,
22;141:25;142:19;
223:12
**Santana (1)**
4:12
**Santoro (1)**
245:3
**sat (1)**
249:9
**saw (16)**
59:3,4;202:2,14;
206:16;229:7;
264:25;265:4;
284:24;286:23;
289:5;304:18;
321:10;340:21;
350:21;358:18
**saying (20)**
47:9;49:21;52:6;
88:12;138:20;151:6;
176:11;213:6;
237:17;240:8;
251:20;253:3;
265:17;266:24;
299:22;301:2;329:4;
348:6,10,10
**scene (4)**
308:21;347:14;
358:10,13
**schedule (5)**
24:22;40:18;
84:14,17;101:19
**scheduled (10)**
12:25;13:7;24:24;
25:2;33:21;84:21,23;
85:9;101:23;250:13
**scheduling (1)**
101:21
**school (11)**
39:12,14;267:5,13,
17;281:10,11,13,19;
282:2,3
**Schor (4)**
137:8,19;140:8;
141:16
**Schwartz (2)**
353:14,16
**score (3)**
15:5;17:6,15
**scored (1)**
17:15

**se (2)**
170:11,17
**sealing (1)**
3:5
**search (2)**
37:15,15
**seashore (2)**
202:19,20
**season (21)**
26:16;110:20;
172:19;173:2,8,13;
174:20;176:7,14,24;
197:19,21,24;198:3,
5;210:4;245:22;
251:22;257:4;337:8;
357:22
**seasonal (2)**
103:24;254:16
**seat (2)**
200:3,7
**second (30)**
52:17,23;53:6,18,
25;67:17,21;68:7,16,
24;89:3;96:17;
146:18;195:12;
197:15;199:14,15,
24;200:14,22;203:5,
15;236:24;237:11,
15;256:24;291:25;
345:17;346:2;350:22
**seconds (7)**
282:22,22;305:18,
21,25;306:3,10
**section (7)**
165:20;185:13;
190:3,20;221:10;
222:2;239:10
**security (6)**
43:8;220:18;
221:4;225:20;226:3,
5
**seeing (1)**
228:22
**seek (2)**
77:4;89:9
**seeking (6)**
13:25;64:22;
86:23;109:16;
180:13;182:9
**seem (1)**
211:23
**seemed (3)**
289:11;328:23;
329:5
**seems (1)**
306:10
**selectively (2)**
223:14,21
**send (11)**
13:14;20:12;
24:13;74:18;82:13;
92:20;99:6;106:13;
109:23;110:12;

338:20
**sending (2)**
61:23;106:4
**Senior (1)**
136:4
**sent (28)**
13:10;38:7,18;
40:19,20,22;56:14;
59:5;71:20;72:3;
75:3,15,24;76:3,8;
77:21;78:8;79:8;
81:5,16;82:6;83:12;
99:3,4;106:10,15;
110:23;338:19
**sentence (13)**
146:13,16,18,19;
165:4,8;236:25;
237:12,14,16;254:8;
266:10,11
**sentences (1)**
244:13
**separate (3)**
73:21;176:6,11
**separated (1)**
34:7
**September (1)**
242:14
**sergeant (14)**
138:16;149:13;
204:7;206:19;
229:18;268:13;
271:15;272:7;
273:19,23;275:14;
324:5,9;349:10
**sergeants (2)**
111:17,23
**series (1)**
64:8
**served (3)**
37:20;135:2;
145:21
**Service (107)**
15:17;19:10,15;
20:4;36:5,12;37:3;
38:7,18;39:18,25;
40:15,17;41:17;
43:11;44:3,13;49:14;
50:4,15;51:22;52:5,
11,16;53:7,18,24;
62:6;68:15;69:22;
71:14;72:4;73:8;
74:19;75:16;76:4,5;
77:12;86:20;87:16;
88:3,21;89:5;90:3;
91:6,13,15;93:18;
96:18;97:14;98:3,19;
99:5,6,20;100:11;
106:5;120:12,21;
121:3,18,22;122:4,7;
126:4;128:15;130:6;
134:23;142:6;144:3;
145:18;172:3,5,11,
14,17,21,25;173:7,

12,15,24;174:8,19;
176:7,12,15,23,25;
177:12,23;178:4,9,
17,24;179:6,14,17,
19,21;180:3,7,16;
221:9,21,25;223:13
**session (2)**
28:2,6
**set (11)**
5:17;61:13;94:23,
24;119:15;145:16;
166:5;167:22;218:8;
280:2;360:12
**setting (1)**
206:4
**seven (4)**
162:21;191:19;
219:17;344:24
**Several (11)**
46:18;161:17,23,
25;162:7,18;229:22;
232:11;248:10,13;
282:10
**severe (5)**
186:13,20;187:10,
15;204:3
**sex (1)**
270:9
**sexual (1)**
272:12
**Shal (1)**
325:14
**Shalick (56)**
160:5,20,24;
161:10;288:10,12,
16;289:7,8;290:12,
20;293:19;295:3,7,
10,14,18;296:21;
297:24;298:8,12,17;
299:5,9,13,21;
300:12,17;301:2,8;
306:13,18;307:17;
311:18;314:13;
317:13,14;318:24;
319:17;320:18;
322:8,14;323:4,7;
324:22;325:5,6,14,
15,18;328:8,16;
329:4,23;332:24;
333:14
**Shalick's (5)**
327:14,15;335:19,
23;336:3
**shall (2)**
3:6,10
**shape (2)**
211:18;215:17
**shared (3)**
127:17;128:3,9
**Sheriff (1)**
62:25
**Sheriff's (20)**
23:2;62:12,17;

12,15,24;174:8,19;
63:8,19;64:23;65:20;
68:9,16,25;69:10,23;
70:5,9,17,25;71:7,16,
21;72:5
**shield (1)**
300:9
**shift (10)**
194:22;238:9;
260:21;261:8;
334:19;335:3,14;
336:5;362:2,11
**shifts (4)**
259:2,23;260:11,
18
**Shook (4)**
135:20;137:2;
139:17;140:19
**Shore (2)**
6:8;108:5
**short (18)**
152:24;249:25;
250:4,11,18;251:2,7,
10,21;255:17;256:6,
13,19;257:9;297:12;
298:18,22;352:20
**shortly (7)**
12:25;13:7;63:4;
77:20,20;111:15;
325:24
**shoulders (1)**
48:10
**show (8)**
40:12,14;83:4;
121:9,11;131:14;
244:6;266:7
**showed (2)**
121:4,22
**showing (1)**
121:16
**shrug (1)**
48:9
**side (1)**
342:22
**sign (4)**
335:17,18,20,22
**signed (3)**
3:14,15;26:4
**significance (1)**
16:18
**significant (1)**
204:4
**signing (1)**
336:2
**silence (3)**
226:24;227:8,13
**similar (1)**
356:22
**Simple (2)**
223:19;253:7
**single (1)**
133:15
**sit (10)**
11:8;62:4;138:24;

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 118 of 122 PageID #:
1976
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
KEVIN LAMM
November 19, 2008

139:9;143:8;224:3;
244:15,21;245:5;
333:21
**site (1)**
352:23
**sitting (1)**
200:2
**situation (4)**
206:21;207:2,13,
20
**six (6)**
69:6;96:13,14;
112:24;277:6;344:20
**skill (1)**
218:8
**slept (1)**
270:16
**Slightly (2)**
106:24,25
**small (1)**
321:3
**smell (1)**
302:5
**Smelled (3)**
287:15;297:7;
298:11
**snickered (4)**
120:13,15,16,18
**Snyder (61)**
5:11;122:23,25;
123:2;150:3;177:18;
178:10,12;278:25;
279:4;280:11,15,21;
283:10,19,24;284:3,
4;285:9;287:10;
288:14,18;290:22;
293:24;298:19;
303:3;304:6,8,10,12,
14,17,20,22,23;
305:11,13,23;306:7,
13;307:3,11,22;
308:4,6;310:4,25;
312:5;313:3,5;314:9;
315:24;316:3,17;
319:21;321:21;
327:9,13;353:19;
357:3,11
**Snyder's (2)**
284:12;316:9
**sole (1)**
221:22
**somebody (4)**
217:17;277:16;
317:18;349:18
**someone (15)**
113:8;114:11;
159:13;200:11;
203:24;204:2;212:3;
252:14;287:24;
288:3;307:22;
308:14;314:2,10,14
**sometime (8)**
33:8,25;105:11;

109:17;121:12;
162:3;179:25;359:11
**sometimes (3)**
250:9;356:12;
362:4
**somewhat (1)**
306:10
**somewhere (11)**
16:8;45:12;50:24;
63:4;72:25;100:25;
117:23;198:5;
209:10;245:22;
357:21
**soon (5)**
254:10;316:25;
317:2;335:2;344:14
**sorry (27)**
29:21;37:2;55:16;
66:6;67:9;69:9;
71:25;75:18;96:16;
128:8;131:8;136:10;
145:12;149:13;
171:8;186:25;192:4;
194:6;209:21;
216:18;259:15;
295:8;332:14;338:6;
343:10;359:7;361:12
**sought (2)**
57:8,9
**sound (1)**
360:7
**sounding (1)**
133:11
**source (6)**
52:25;56:22;
123:13;124:24;
211:12;233:21
**Southampton (45)**
13:16,17;72:20,24;
73:17,18;74:5,6,16,
24;75:2,7,7,11,18,22;
76:12,15,19;77:3;
78:4,9,20,25;79:3;
80:15;81:6,13;82:5,
9,15,21,25;83:11;
84:2,10,12,18;85:7;
91:2;92:23;93:5,12;
105:23;106:21
**span (1)**
162:15
**speak (29)**
86:2;100:23;
109:11,14;111:9,16,
23;112:6,7,13;
166:22;233:11,18;
234:6,9,15,17,22;
235:2,14;251:25;
257:13;268:7,10,25;
271:23,25;298:16;
303:6
**speaker (1)**
284:5
**speaking (12)**

227:2,20;232:16;
288:21;297:13;
298:8;300:12,14,19;
301:18;302:12;357:6
**specialist (1)**
4:14
**specific (14)**
20:3;56:9;118:2;
126:15;133:4;161:7;
176:18;183:25;
191:4;208:14,21;
209:16;354:19;
359:23
**specifically (39)**
19:21;20:21;
22:13;23:9;42:20;
52:3;56:8,18;58:14,
18;59:16;73:10;
75:11;86:8;87:25;
88:22;90:4,11,17;
114:24;143:4;147:8;
148:2;151:19;152:6,
10,17;164:25;
173:10,17,19,25;
174:7;24;181:6;
182:16;203:17;
319:4;326:10
**specifics (2)**
25:22;215:12
**specify (1)**
218:17
**speculation (1)**
126:8
**speech (2)**
297:8,9
**Spell (1)**
6:9
**spent (4)**
39:10,11;269:21;
270:4
**spoke (26)**
100:19;110:8;
111:12;178:6,24;
179:24;180:4;
203:21;204:10,14;
205:10;206:19;
228:9;229:13;
251:23;256:11;
291:3,9;292:9,18;
294:2;295:7,10,14;
304:10;342:11
**spoken (6)**
60:10;102:12;
251:19;257:18;
351:2,6
**spot (1)**
286:25
**spotted (4)**
286:21;287:3,6,9
**spring (2)**
26:19,20
**springtime (5)**
26:17;101:2,3;

110:22;183:15
**staffed (12)**
249:25;250:5,12,
18;251:2,7,10,22;
256:7,13,19;257:9
**standards (2)**
18:9;144:13
**standing (8)**
183:10;288:13,16;
291:5;293:15,21;
294:3,17
**Stanley (2)**
41:17;90:10
**start (4)**
13:21;202:7;
225:22;237:16
**started (7)**
81:21,25;203:8,10;
216:10;290:7,15
**starts (1)**
157:8
**State (40)**
5:22;6:3,6;80:16;
98:2,19;103:5;
108:12;118:21;
122:3;131:11;
132:16,22;133:12;
147:20;164:20;
165:11,16;166:13;
168:4,8;169:14;
170:11,18;190:20;
201:16,20;203:25;
204:3;222:22;
243:12;246:15;
247:7,17;248:21;
249:2,15;309:21;
322:4,25
**stated (23)**
9:20;76:9;80:17;
107:25;108:7;
128:14,15;142:11,
17;173:14;180:17;
183:23;206:21;
252:24;261:17;
268:2;299:24;300:9;
322:10;333:7;334:6;
345:16;350:21
**statement (46)**
17:14;56:21;
89:18;121:17;174:2;
187:24;193:19,23;
226:22;243:3,7;
269:5;317:15;320:6;
325:10,13,15;327:6,
8,11,12,14,15,16,18;
328:2;330:4;332:10,
16,25;333:15;334:2,
14;335:15,25;
336:12,24;337:21,
24;338:10,10;339:6;
340:17;342:2;343:8,
24
**statements (9)**

171:17;184:23;
188:13,22;189:18;
346:17;347:3,5,7
**States (2)**
4:7;222:21
**stating (4)**
75:25;86:20;
118:19;130:6
**station (59)**
117:14;174:17;
177:17;178:13,18,
20;183:9;191:11,16;
195:23;196:10,19;
263:2;264:19,21,24;
265:2;269:8;279:22;
320:6,14;321:16;
322:13,24;323:4,9,
23;324:18,22;325:8,
24;326:14,19;328:4,
6,7,11;329:19,22,24;
330:2,13,19,21;
331:10,20,25;
332:12,18;333:3;
334:23;335:4;
345:16;349:2;
356:10,12;358:21,
25;360:11
**statute (1)**
87:10
**stay (11)**
80:6;184:12;
213:11;247:15;
248:18;296:3,11,15;
315:14;331:3;344:9
**stayed (2)**
296:8;331:4
**step (4)**
23:19;105:17;
305:5,8
**stereo (1)**
307:8
**stick (5)**
33:22;36:9;73:25;
74:15;150:17;211:19
**still (26)**
7:9;28:25;34:13;
36:18;37:7;66:22;
77:22;94:5;95:13;
110:15;112:10;
115:4,9;116:4,4;
122:17;140:13,23;
141:17;155:15;
156:10,20;161:19;
312:9;315:9;341:17
**STIPULATED (3)**
3:2,8,12
**Stone (6)**
41:16;42:2,3,11;
43:21;44:4
**stop (6)**
118:6;120:10;
188:25;284:21;
285:3;304:3

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 119 of 122 PageID #: 1977

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**stopped (5)**
188:14,20;304:5,9,
12
**stopping (1)**
304:17
**story (3)**
61:19;295:12;
342:22
**straight (1)**
135:9
**street (6)**
6:10;216:10;
282:15,17;283:14;
284:16
**stretch (1)**
275:25
**strewn (1)**
262:25
**strike (55)**
83:7;127:2;
130:13,16;133:5;
152:16;156:7;
162:16;180:19;
182:14;183:12;
204:24;205:13;
206:23;229:24;
230:9,12;231:3,14,
24;232:13;233:3,15;
234:3;235:11,25;
243:10;253:5;
257:20;260:7;261:3;
262:9;263:18;
269:10;270:13,25;
271:3,9;274:4,20;
275:18;290:24;
293:2,4;296:9,17;
309:12;320:12;
331:18;332:22;
334:8;339:5;346:5;
350:25;354:2
**stupid (1)**
263:25
**subject (1)**
223:20
**subjected (1)**
223:13
**submit (1)**
40:25
**submitted (5)**
30:13;57:5;105:5;
354:25;355:4
**submitting (1)**
107:19
**subparagraph (2)**
171:25;181:13
**Subscribed (1)**
363:11
**Subsequent (7)**
23:12;55:17;79:2;
84:6;91:12,12;93:16
**substance (4)**
10:15;102:20;
113:2;333:6

**substantial (1)**
191:4
**suck (2)**
215:22;216:2
**suffer (1)**
156:17
**suffered (10)**
150:21;154:9,13,
16,21;155:7,21;
186:22;189:9,17
**suffering (2)**
187:10,15
**sufficient (1)**
250:10
**sufficiently (1)**
118:3
**Suffolk (147)**
13:4,22;14:2,10;
15:9,17;17:10;18:24;
19:3,3,10,14,23;20:3,
6,10,13,18,23;21:7,9,
17;22:8,15,21,23;
23:2,6,10,16;24:10,
16;25:11;27:4,20;
30:10;31:16;32:8;
33:11;34:4,19;35:13,
20,25;36:3,4,7,9,12,
22;37:3,12;38:6,17;
39:18,25;43:11;
44:13,17;49:14;50:4,
14,16;51:17,22;52:5,
11,12,15,19;53:2,17,
24;54:4,8;56:15,25;
57:6;58:4;59:18;
60:8;62:6,9,12,17;
63:5,8,19;64:6,23;
65:20;68:14,25;69:9,
10,21;70:5,8,9,17,24;
71:6,12,13,21;72:4;
76:5;86:20;88:3,21;
89:5;90:2;91:20;
92:17;93:18;96:5;
97:13;98:2;101:14;
108:16;113:18,24;
134:23;144:5,8,13;
145:18;151:14;
168:3,8;169:14;
185:13,23;203:3;
214:11,15;219:8,14;
223:12;234:10,20;
235:4,15;236:10;
331:5;354:13;355:23
**suggested (3)**
355:19;357:8,10
**suggesting (1)**
24:8
**suggestion (3)**
356:2,23;357:23
**suggestions (1)**
357:24
**sum (3)**
102:19;112:25;
333:5

**summer (16)**
31:12;79:11;
110:18;172:18;
173:2,8,12;174:20;
176:7,14,24;210:4;
218:23;251:22;
271:13;357:22
**summertime (2)**
271:12,15
**summons (2)**
272:19;273:15
**summonses (6)**
272:15,24;273:11;
274:8,12,23
**superior (6)**
193:13,13;194:2,2,
7;196:2
**supervise (3)**
153:3,8;154:5
**supervising (2)**
229:2;238:8
**supervision (5)**
208:5,12;236:13;
238:13;241:20
**supervisor (14)**
194:5,8,10,21;
196:2;204:11,15;
205:11;206:20;
212:25;235:9;
257:19;274:2;275:16
**support (1)**
123:16
**supports (1)**
130:23
**sure (33)**
9:23;16:22;43:25;
44:23;45:2;59:24;
102:24;127:23;
129:14;134:9;135:8;
146:20;153:19;
158:14;169:10;
178:2;209:16;
212:24;213:7;
216:15;218:11;
223:25;244:18,19;
247:15;248:19;
249:13;276:22;
286:14;293:9;315:8;
322:11;335:21
**SUV (2)**
280:19,20
**swear (1)**
5:19
**sworn (3)**
3:15;5:22;363:11
**swung (1)**
314:14
**system (1)**
360:10

**T**

**table (3)**

258:20;320:25;
321:6
**tables (1)**
321:3
**talk (11)**
62:11;98:24;
108:20;111:4;
179:12,16;227:9;
228:14,18;303:21;
316:24
**talked (1)**
249:9
**talking (31)**
19:12;55:15;61:3;
63:22;64:16;83:16;
117:13,17;143:21;
160:15,19;174:5;
190:12;195:19;
227:23;228:23;
229:4,11;237:9;
272:23,24;288:14,
18;290:8,15;303:23;
311:4,17;330:11;
345:2;357:8
**tape (25)**
4:2;54:20;55:2,9,
13,21;72:8,10,12,16;
134:15;142:17;
184:11,11,15,19;
225:3,12;276:3,19,
25;277:6;344:8,20,
24
**taxi (2)**
253:4;361:19
**team (5)**
228:7;235:23;
355:14,20,22
**telephone (8)**
54:23;85:17,24;
86:14;109:10;110:6;
114:19;142:18
**telling (3)**
213:5;326:9;327:2
**tells (1)**
243:2
**tenure (1)**
226:6
**term (2)**
174:8;221:25
**terminated (11)**
79:24;167:23;
169:3;184:2;185:3,9;
224:5,8;240:11,23;
351:8
**terminating (2)**
223:15,22
**termination (8)**
80:2;142:10,20;
163:12;164:19;
221:18;239:20;
352:13
**terms (5)**
67:5;79:18;144:2;

239:12;274:15
**Tes (1)**
327:10
**Tesoro (32)**
160:6,20,22;
301:10,15,17;
302:15,19;306:13,
20;307:17;314:14;
318:23;319:5,6,10;
324:22;326:18,22,
25;327:20,25;328:8;
329:12,14,14,23;
332:9,15;333:24,25;
334:11
**Tesoro's (4)**
327:6,11;335:20;
336:3
**test (111)**
14:9,12,14,20,22,
24,25;15:3,21;19:15;
22:7,10,12,14,17,18,
20,20;23:3,7,9,21;
24:19,21,23;25:5,7,
14;26:3,22,25;27:10,
18;31:18;32:6,22;
33:2,5,13,15,17,20,
23,24;34:6,10;35:9,
9;38:9,11,12,20;
42:6;46:16,16;48:23;
49:2;62:11;63:3,5,
12,18,25;64:4,6,14,
17,18,21;65:11,18,
19;67:8,10,15,17,22;
68:7,7,11,15,16,23,
24;69:4,4,12,24;
70:4,19,22;87:5;
88:24;89:7,11;91:12,
25;92:8,15,16;93:20;
94:2,15;95:7,17,18;
97:2,3;98:22;101:10;
156:6
**testified (46)**
5:23;13:13;21:19;
22:16;32:9;35:15;
47:5,14,16,24;48:14,
15;49:4;50:18;55:5;
56:13;59:13;82:16;
87:12;92:4;122:15;
123:18;124:13;
151:22;169:2;
173:23;176:13;
185:14;186:12,23;
187:22;188:6;
261:15;274:13;
293:12;299:6,23;
302:21;306:6;308:3;
342:8;345:8;348:4,
11,21;361:4
**testify (1)**
261:14
**testifying (2)**
48:21;270:22
**testimony (27)**

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 120 of 122 PageID #: 1978

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

KEVIN LAMM
November 19, 2008

47:18;67:3;85:3;
123:23;162:22;
163:4,17,24,25;
170:6;203:2;207:7;
212:2,9;213:4,9,10,
18;240:20;243:20;
265:16;283:17;
292:13;311:19;
315:12;354:4;355:12
**testing (1)**
179:8
**tests (23)**
27:7;34:20;35:22;
36:14;37:25;38:2,23;
41:24;42:6;46:5;
62:15,22;63:7,12,14;
89:19;91:16,19;
94:22,25;95:7,21;
96:5
**Thanks (2)**
276:23;350:23
**theoretically (2)**
17:23;18:13
**thereafter (1)**
233:5
**thereby (1)**
153:5
**therefore (6)**
47:19;86:22;
91:25;130:4;260:2;
269:4
**third (4)**
48:18,23;237:14;
325:25
**Thomas (13)**
137:7,19;140:8;
293:23;303:3;304:5,
10,13,22;305:23;
307:11;310:25;312:5
**Thompson (1)**
5:8
**though (2)**
255:10;272:3
**thought (2)**
8:3;88:11
**three (28)**
48:16,17;67:14;
102:18;115:13;
130:7;134:15;158:8,
17;160:9,14,20,21;
184:15;192:9;193:4;
210:5;276:4;281:3;
285:12;299:4;
303:18,22;330:11;
331:9;352:20;356:3,
4
**three-minute (2)**
299:20;301:3
**throat (1)**
326:3
**throughout (1)**
226:6
**throw (1)**

289:17
**thrown (1)**
159:14
**tie (3)**
8:22,22;9:5
**times (29)**
191:13,19,20,22,
24;192:4,6,8,9,10,12,
14,22,23,25;193:3,4,
5,6,7,9;200:4;
209:14;236:10,25;
237:17;250:7,11;
356:3
**timing (1)**
335:8
**today (16)**
5:13;8:22;9:9;
11:8;62:4;138:24;
139:9;143:8;186:24;
188:6;224:4;244:15,
21;245:6;333:22;
361:4
**today's (1)**
363:3
**together (11)**
125:21;126:11;
129:17,24;130:2;
142:20;172:9;281:6;
285:13;288:23;
289:12
**told (53)**
40:3;54:6,14;
56:13;59:16;60:8,15,
20,24;75:5;87:25;
89:25;90:3;91:24;
92:12;94:9;96:15;
97:6;123:6;124:17,
19,20;125:4,10;
159:13;185:22,22;
211:10;213:11;
235:22;246:24;
249:24;270:19;
306:16,17;307:2,9;
308:6;312:23;313:2,
5;314:13;345:13,14,
18,19;346:8;348:12;
353:19;355:14,17;
357:7,9
**Tom (15)**
122:25;123:2;
177:17;178:10,12;
278:25;279:4;
287:10;290:21;
298:19;307:10;
353:19;357:3,8,11
**Tommy (1)**
290:21
**tonight (2)**
317:20;318:11
**took (36)**
7:23;8:18;15:21;
19:16;22:7;23:2,8;
35:8,16;38:14,19;

62:13;65:12,20;
67:17,19;91:18,19;
157:20;159:21;
178:13;303:3;311:4;
325:9;327:7,9,10,12,
14,15,18,22;334:2;
348:14;359:24;
361:21
**top (1)**
274:16
**tortious (2)**
11:3;12:8
**touch (2)**
103:6;211:11
**Towards (6)**
23:23;31:11;
45:12;172:18;
197:23;285:14
**town (31)**
13:9,12,16;72:20,
24;73:17;74:16,24;
75:7,11,22;76:12,15,
18;77:3,5,7;78:4,9,
20;93:13;106:21;
180:13;225:16,18,
23;226:6,12,18;
248:8;282:3
**towns (2)**
19:19;73:23
**trachea (1)**
331:16
**trained (1)**
219:11
**training (1)**
101:13
**transcript (1)**
362:20
**transmissions (1)**
151:17
**transpired (3)**
162:25;163:7,20
**transport (1)**
331:6
**treatment (2)**
332:21;359:13
**trial (1)**
3:11
**true (5)**
212:5;215:5;
221:2;243:4;285:7
**trust (2)**
244:25;259:13
**trustee (14)**
60:19;149:16;
205:16;206:8,14;
231:18;232:5;258:6,
9;268:18;272:7;
274:6;275:21;350:16
**trustees (1)**
61:24
**truthful (1)**
10:11;193:18,22
**truthfulness (4)**

89:17;128:6;
169:25;259:11
**Try (3)**
6:13;167:12;179:7
**trying (4)**
59:25;267:14;
281:20;292:16
**tub (1)**
270:11
**turn (3)**
96:8;190:5;283:16
**turned (3)**
16:15;98:8,14
**turning (3)**
98:4,22;283:12
**twice (6)**
192:5,7;195:7,8;
197:11;356:3
**two (73)**
30:14,17;33:14,17;
34:11;35:3;36:16;
38:8;43:10,21;44:12;
45:4,10;46:5,11,24;
48:3,13;50:2;62:7,
20,21;63:12,13;
72:16;74:14;75:6;
90:4;91:5,24;100:8;
105:22;110:14;
112:22;113:12;
115:5;116:19;
159:19;160:3;
161:15;190:13;
193:4;196:23;
198:22;199:4;
244:13;246:4;
256:21;259:25;
261:14;273:3;283:3;
286:5;293:10;
295:19,20;303:2,4,7;
304:14;315:3,21;
316:22;321:15;
329:20;331:19;
332:6;339:7;342:5,7;
349:21;352:20;356:4
**two-minute (1)**
134:8
**type (12)**
14:20;41:2;97:9;
114:17;162:13;
187:6;207:23;
211:18;289:8;
336:21,23;338:10
**typed (1)**
338:15
**types (1)**
261:22
**Tyree (1)**
353:20

---

**U**

**ugly (1)**
335:7

**um (1)**
4:20
**Um-hum (3)**
162:6;255:2;292:7
**unable (1)**
187:19
**unaligned (1)**
331:15
**unaware (4)**
159:3;162:24;
163:6,20
**uncertified (30)**
130:3;134:25;
135:6,10,12;143:22,
25;144:3,17;145:2,
20;147:22;148:7;
151:9;155:15;
156:12,18;158:10;
219:6;239:11;
254:10,22;255:20;
258:25;259:14,17;
261:11,16;262:15,24
**unclear (1)**
23:5
**uncommon (2)**
338:3;339:3
**uncooperative (4)**
313:21;314:3;
316:8,21
**under (26)**
11:5;12:10;24:12;
37:23;118:21;
131:11,19;132:16,
22;133:12;164:20;
165:2;166:5;170:11,
17;190:2,6;201:4;
203:24;226:21;
244:11;248:20;
320:25;321:5;341:2,
18
**underage (1)**
183:7
**underneath (2)**
132:9,13
**understood (1)**
266:23
**undertake (3)**
22:19;25:4;249:17
**undertaken (1)**
129:20
**undertook (2)**
51:19,24
**unemployment (1)**
138:11
**unfavorable (11)**
54:7;56:14;57:4;
58:5,15,20;59:3,17;
71:20;72:3;185:10
**unfit (15)**
131:11;132:16,21,
23;133:12;150:20;
151:4,5,9;152:8,19;
154:11,22;155:8,23

KEVIN LAMM
November 19, 2008

EDWARD CARTER, ET AL: vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**unit (2)**
54:9;239:10
**United (1)**
4:7
**unlawful (4)**
273:24;274:9;
275:13,22
**unlawfully (6)**
118:25;119:17,24;
123:9;125:12;127:25
**unless (4)**
124:4;145:24;
165:22;267:19
**unqualified (17)**
62:8;134:25;
143:23,25;144:4,6,
11,12,15,17;145:2,
20;147:23;148:7;
151:9;156:12,19
**unsupervised (1)**
259:5
**unsure (1)**
230:23
**untrained (1)**
259:4
**up (70)**
6:14;22:6;37:11,
22;40:12,14;54:7;
65:4,4,6;70:8;103:8,
12;114:6;129:18;
151:16;202:12;
203:10,13;213:7;
217:6,12;226:11;
229:17,20;230:2,15,
18,20;231:7,17;
232:2,4,6,18;233:9,
22;234:12;241:25;
265:18;266:2,20;
277:17;280:2;
286:13;287:20;
288:21;290:5;291:2;
295:15;308:10;
314:10;321:3;322:7,
9,17,21;323:2,5,11;
328:17;329:5,10,15;
333:12,16;334:3,12;
343:19;362:11
**Upon (8)**
64:20;66:17,22;
236:8;240:20;
288:24;321:14;
345:19
**upstairs (1)**
208:8
**use (19)**
7:24;29:13;76:25;
87:23;143:25;
173:16;193:25;
194:6;210:11;
222:14;223:2;
239:12;240:15;
253:4;283:2;306:2;
328:15;344:10;

361:22
**used (1)**
180:25
**using (3)**
131:25;173:22;
174:19

## V

**Van (1)**
358:7
**Vankoot (23)**
159:5,16;160:21;
161:3,4,6;325:21;
326:2,5,13,13;329:7,
9,23;330:3;331:12,
25;332:2,4;358:9,18,
23;359:6
**Vankoot's (2)**
327:16,18
**various (1)**
12:3;241:16;
268:13
**vehicle (38)**
197:3,9;198:8,10;
199:5,21,24;201:25;
202:7;203:7,10,13;
204:2,9;205:9,18,23;
246:19;261:13;
280:19;283:13,16;
285:6,10,18,20,21;
286:22;348:18;
351:16;352:3;
359:21;360:24;
361:18,21,22;362:3,
5
**vehicles (4)**
191:12;261:12;
262:15,25
**verbal (8)**
21:14;30:24;
38:19;46:19;84:8;
210:13,14;357:25
**verbally (1)**
27:9
**verifying (1)**
59:10
**version (5)**
319:7,10;320:15;
325:7;334:11
**versus (1)**
4:5
**via (1)**
324:2
**victim (1)**
335:3
**victims (9)**
163:2,7,21;320:10;
328:19;331:10,20;
334:24;345:19
**video (1)**
4:14
**VIDEOGRAPHER (18)**

4:2;5:18;72:11,15;
134:11,14;164:12,
15;184:14,18;225:4,
6,11;276:24;277:5;
344:19,23;363:2
**videotape (3)**
4:3;148:4;206:13
**videotaped (1)**
9:10
**view (1)**
198:2
**Village (59)**
4:6,20;13:10,17;
53:22;73:18;74:6;
75:2,8;78:25;79:4;
80:15;81:6,14;82:5,
9,15,17,21,25;83:11;
84:3,10,13,18;85:7;
91:3;92:23;93:6;
101:16;107:10,23;
149:19;180:13;
190:2;201:12;
202:22;204:9;
205:18,23;217:16;
235:24;250:2,3,10,
18;251:2,10,12;
253:4;255:16;256:6,
13,19;257:8;260:5,
24;278:10;355:20
**villages (1)**
19:18
**violate (9)**
167:25;169:15;
191:6;210:8;266:14;
267:9;268:6,15,21
**violated (10)**
11:14,20,24;
165:12,18;166:14;
167:2;190:19;
208:24;209:15
**violation (7)**
164:19;189:24;
201:8,17,20;221:9,
21
**violations (2)**
193:14;262:21
**virtue (2)**
254:21;307:21
**voice (4)**
6:14;360:3,6,8
**voicemail (3)**
86:5,9,14

## W

**wait (8)**
65:3,5;92:7;94:11,
14;95:8;202:10;
213:3
**waited (2)**
116:2,9
**waiting (1)**
344:16

**waived (1)**
3:7
**waiving (1)**
80:3
**walk (4)**
248:8;272:21;
285:12;331:24
**walked (18)**
178:19;285:14;
290:23;291:2;
295:25;296:13,19;
301:9;303:15;
307:13,17;311:14,
18;312:20;314:24;
315:2;322:19;331:21
**Walks (1)**
236:8
**wall (4)**
226:24;227:7,13;
321:3
**Walsh (4)**
135:20;136:23;
139:14;140:16
**Walter (5)**
117:19;263:15;
264:16;265:6;266:7
**wants (1)**
264:6
**watching (1)**
148:3
**water (3)**
44:25;253:4;
361:18
**wave (1)**
286:24
**way (9)**
107:7,9;116:18;
126:3;129:23;163:9;
280:3;338:14;348:6
**weapons (3)**
208:5,8,13
**wear (2)**
8:22;9:5
**wearing (1)**
8:22
**week (5)**
31:23;34:11;
40:24;112:9;218:20
**weeks (9)**
30:14,17;34:12;
38:8,23;91:5;106:15;
252:3;341:15
**welcome (2)**
152:14;158:15
**weren't (15)**
47:10;65:14;67:5;
218:13;243:6;
258:10;298:4;
301:25;305:17;
342:20,25;343:14;
347:18,19,24
**West (3)**
39:16,17;281:20

**Westchester (1)**
220:11
**What's (15)**
9:3;97:18;107:3;
117:11;119:4;
129:15;211:16;
244:6;248:12;
282:21;287:5;
290:22;291:21;
295:11;340:22
**whatsoever (1)**
62:5
**whenever (2)**
67:15;224:14
**whenever's (1)**
224:20
**When's (1)**
198:2
**wherein (2)**
51:7;261:15
**Where's (4)**
311:2,25;315:20;
316:6
**whole (2)**
146:16;157:10
**who's (2)**
206:12;250:13
**whose (1)**
335:18
**Wigdor (1)**
5:8
**William (1)**
135:20
**window (1)**
159:15
**winter (2)**
16:12;110:18
**wintertime (1)**
16:10
**withdraw (3)**
23:4;38:16;262:18
**withdrawn (30)**
29:5,21;32:4;37:2;
48:12;56:12;57:9;
71:25;75:19;92:21;
94:23;96:16;99:13;
118:19;131:8;
136:10;154:2;175:4;
185:7;203:25;208:2,
18;210:16;229:16;
232:2;234:18;
307:21;310:23;
355:25;360:16
**within (28)**
3:5,13;30:18;
36:16;38:8,22;40:23,
24;42:17,24;49:2;
91:5;106:14,14;
107:11,22;108:2,15;
110:14;121:12;
172:23;225:17;
227:3;252:12,21;
253:14;330:25;331:2

**unit - within (26)**

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-10   Filed 01/15/10   Page 122 of 122 PageID #:
1980

EDWARD CARTER, ET AL. vs.                                                    KEVIN LAMM
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.                          November 19, 2008

**Without (13)**
10:15;130:3;
133:22;171:18;
181:22;182:7,21;
184:24;186:10;
252:13,22;253:15;
260:5

**witness (18)**
5:20;6:4,7,11;
119:8;120:15;124:7,
12;191:14;246:18;
247:11;254:4;260:9;
267:15;269:3;276:5,
6;304:16

**witnessed (6)**
205:7,17,21;207:7;
258:15;276:15

**witnesses (1)**
346:23

**witnessing (1)**
206:8

**word (21)**
26:21;29:14;
33:11;34:3;53:17;
119:20;129:16;
176:11;181:2;
205:14;206:24;
210:11;234:4;
235:12;236:2;
263:19;274:5;
275:19;296:18;
346:5;350:25

**wording (1)**
88:25

**words (5)**
47:17;131:20;
174:19;223:3;235:21

**work (13)**
103:14,16;121:25;
130:3;144:14;
155:14;180:18;
189:13;192:13;
225:14;360:10;
361:11,13

**worked (11)**
28:20,25;29:6;
59:10;150:9;238:10;
292:24;296:7,14;
308:24;309:8

**working (20)**
19:18;62:16;94:6;
95:13;109:13;
114:25;122:17;
156:3;219:11;
220:19;221:4;
225:22;250:8;
260:15;261:5,7;
337:13,19;340:22;
362:10

**works (2)**
54:11;56:4

**write (16)**
226:21;237:20;

238:11,12,17;
259:17;266:9;
327:25;336:5,10,12,
14,17;337:21,24;
338:9

**writing (6)**
21:14,15;31:25;
37:22;325:12;358:4

**written (44)**
14:12,14,20;21:17;
22:10,17,20;23:7;
30:25;31:2;32:22,24;
33:2,4,12,20,23,23;
34:5,12;35:9;38:20;
46:16;58:25;59:6,19;
62:22;63:3,12,12,13;
64:13,18,20;83:17,
24;84:3;210:12;
333:15,25;334:14,
14;346:17;354:16

**wrong (5)**
13:24;67:3;92:5;
293:13;347:13

**wrote (13)**
7:8;54:7;185:11;
325:13,15;332:15,
24;335:16;336:8;
341:25;343:8,17,25

## Y

**year (37)**
14:15;16:9;26:13;
49:2;90:13;92:7;
94:11,13,14,18,19,
20,24;95:9;96:9,11,
21,24;105:11;
117:22;121:12;
192:17;195:8,14;
197:16,18;218:21;
271:11;274:21;
275:6;339:16,20;
341:21,22,22;342:3;
357:15

**years (6)**
39:7;63:14,17,21;
67:14;192:18

**year's (2)**
42:17,24

**yelling (1)**
289:23

**yesterday (1)**
6:19

**York (23)**
4:9;5:23;6:8;11:5;
12:10;103:4;165:11,
16;166:13;168:4,9;
169:14;190:3,20;
201:16,20;220:2;
221:9,21,25;236:8,
10;309:21

**Yup (2)**
224:19,19

## Z

**zero (1)**
192:22