EXHIBIT "G"

# In The Matter Of:

*EDWARD CARTER, ET AL. vs.*
*INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.*

---

*THOMAS SNYDER*
*September 24, 2008*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, New York 11501*
*516-747-9393   718-343-7227   212-581-2570*

Original File 49603.txt

Min-U-Script® with Word Index

This Page Intentionally Left Blank

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 4 of 164 PageID #: 1884

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 1

```
1
2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    ------------------------------------------X
     EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
4    JOSEPH NOFI, and THOMAS SNYDER,
                         Plaintiffs,
5        -against-   Case No. 07-Civ-1215
                                  (SJF)(ETB)
6    INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
     JOSEPH C. LOEFFLER, JR., individually and in
7    his official capacity; former mayor NATALIE
     K. ROGERS, individually and in her official
8    capacity; OCEAN BEACH POLICE DEPARTMENT;
     ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
9    individually and in his official capacity;
     SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
10   DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
     CIVIL SERVICE; and ALISON SANCHEZ,
11   individually and in her official capacity,
                         Defendants.
12   ------------------------------------------X
13                926 Reckson Plaza
14                Uniondale, New York
15
16                September 24, 2008
17                10:17 A.M.
18
19          VIDEOTAPE DEPOSITION of THOMAS
20   SNYDER, taken pursuant to the Federal Rules
21   of Civil Procedure, and Notice, held at the
22   above-mentioned time and place before Edward
23   Leto, a Notary Public of the State of New
24   York.
25
```

Page 2

```
1
2    A P P E A R A N C E S :
3        THOMPSON WIGDOR & GILLY LLP
                Attorneys for Plaintiffs
4               85 Fifth Avenue
                New York, New York 10003
5        BY:   ANDREW S. GOODSTADT, ESQ.
6        RIVKIN RADLER LLP
                Attorneys for Defendants
7               Incorporated Village of Ocean
                Beach, Mayor Joseph C. Loeffler,
8               Jr., former Mayor Natalie K.
                Rogers, and Ocean Beach Police
9               Department
                926 Reckson Plaza
10              Uniondale, New York 11556
         BY:   KENNETH A. NOVIKOFF, ESQ.
11              -and-
                MICHAEL WELCH, ESQ.
12
         MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
13              Attorneys for Defendant Acting
                Deputy Police Chief George B.
14              Hesse
                530 Saw Mill River Road
15              Elmsford, New York 10523
         BY:   KEVIN W. CONNOLLY, ESQ.
16
         SUFFOLK COUNTY ATTORNEY'S OFFICE
17              Attorneys for Defendants Suffolk
                County, Suffolk County Police
18              Department, Suffolk County
                Department of Civil Service, and
19              Alison Sanchez
                100 Veterans Memorial Highway
20              Hauppauge, New York 11788
         BY:   CHRISTOPHER M. GATTO, ESQ.
21
     ALSO PRESENT
22       Albert Santana, Legal Video Specialist
23
24
25
```

Page 3

```
1
2        IT IS HEREBY STIPULATED AND
3    AGREED by and among counsel for the
4    respective parties hereto, that the filing,
5    sealing and certification of the within
6    deposition shall be and the same are hereby
7    waived;
8        IT IS FURTHER STIPULATED AND
9    AGREED that all objections, except to the
10   form of the question, shall be reserved to
11   the time of the trial;
12       IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed before any Notary Public with the
15   same force and effect as if signed and sworn
16   to by the Court.
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        T. Snyder
2        THE VIDEOGRAPHER: This is tape
3    number one of the videotape deposition
4    of Thomas Snyder in the matter of
5    Edward Carter, et al., Plaintiffs,
6    versus Incorporated Village of Ocean
7    Beach, et al., Defendants, in the
8    United States District Court, Eastern
9    District of New York, case number
10   07-CIV-1215(SJF)(ETB).
11       This deposition is being held at
12   Rivkin Radler, 926 Rexcorp Plaza,
13   Uniondale, New York, on September 24,
14   2008, at approximately 10:17 a.m.
15       My name is Albert Santana from
16   the firm of Precise Court Reporting,
17   and I'm the legal video specialist.
18   The court reporter is Ed Leto in
19   association with Precise Court
20   Reporting.
21       For the record, will counsel
22   please introduce themselves.
23       MR. GOODSTADT: Andrew
24   Goodstadt, Thompson Wigdor & Gilly, on
25   behalf of the Plaintiffs.
```

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 5

1          T. Snyder
2          MR. NOVIKOFF: For the Village
3    Defendants, Defendant Loeffler and
4    Defendant Rogers, Ken Novikoff and
5    Michael Welch, Rivkin Radler LLP.
6          MR. CONNOLLY: For Defendant
7    Hesse, Kevin W. Connolly of Mark,
8    O'Neill, O'Brien & Courtney.
9          MR. GATTO: And for Suffolk
10   County and Alison Sanchez, Christopher
11   Gatto, G-A-T-T-O, from the Suffolk
12   County Attorney's Office.
13         THE VIDEOGRAPHER: Now would
14   the court reporter please swear in the
15   witness.
16   T H O M A S   S N Y D E R, having first
17   been duly sworn by a Notary Public of the
18   State of New York, was examined and
19   testified as follows:
20         THE REPORTER: Please state
21   your name for the record.
22         THE WITNESS: Thomas Snyder.
23         THE REPORTER: Please state your
24   address.
25         THE WITNESS: 1 Blue Point

Page 6

1          T. Snyder
2    Road -- Blue Point is two words --
3    Sound Beach -- which is two words --
4    New York 11789.
5          MR. NOVIKOFF: Regular
6    stipulations like the last two
7    depositions?
8          MR. GOODSTADT: Yes.
9          MR. NOVIKOFF: Okay.
10   EXAMINATION BY
11   MR. NOVIKOFF:
12   Q.   Mr. Snyder, have you ever filed
13   an application for employment with Suffolk
14   County?
15   A.   For employment with the county of
16   Suffolk itself or for civil service
17   positions in the county?
18   Q.   For a civil service position
19   within the county?
20   A.   Yes, I have.
21   Q.   And have you done it on more than
22   one occasion?
23   A.   Yes, I have.
24   Q.   Have you ever lied on any of
25   those applications?

Page 7

1          T. Snyder
2    A.   No, I have not.
3          MR. NOVIKOFF: Let's mark the
4    following document as Snyder-1.
5          (Suffolk County Application For
6     Employment was marked as Snyder
7     Exhibit-1 for identification; 9/24/08,
8     E.L.)
9    Q.   Sir, I'm showing you what's been
10   marked as Snyder-1, and for the record, it's
11   a four-page document.  On the first page
12   it's entitled "Suffolk County Application
13   For Employment, Open-Competitive
14   Examinations and Non-Competitive
15   Appointments."
16         MR. GOODSTADT: Just before you
17   answer, do we have the Bates stamp
18   numbers?
19         MR. NOVIKOFF: The copy I have
20   does not have a Bates stamp, but I
21   believe it has been produced.
22         MR. WELCH: Yes.  I believe so.
23         MR. NOVIKOFF: And we'll try to
24   get you those Bates stamp numbers
25   before the end of the day.

Page 8

1          T. Snyder
2    Q.   And the last page starts with on
3    top saying "be sure to sign the declaration
4    at the bottom of this page.  Unsigned
5    applications will be declared illegible."
6    There is a date of 7/24/04 and a signature
7    which appears to be that of Thomas A.
8    Snyder.  Do you maintain the document that
9    I've just described in front of you right
10   now as Snyder-1?
11   A.   Yes.  That's my signature.
12   Q.   You anticipated my question.  Is
13   that your signature on the last page?
14   A.   Yes, it is.
15   Q.   And the 7/24/04 reflects the date
16   upon which you signed this document?
17   A.   Yes, it does.  If that's when I
18   signed my signature, yes.
19   Q.   Do you recall  -- and for the
20   record, it appears that this is Bates stamp
21   number 009776 through 9779.  And do you
22   recall why you would have executed this
23   application on or about July 24, 2004?
24   A.   No, I don't recall what this was
25   for.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 9

1    T. Snyder
2    Q.   Okay.  And do you see above your
3  signature, it says "declaration"?
4    A.   Yes, I do.
5    Q.   And it starts "I declare subject
6  to the penalties of perjury," do you see
7  that?
8    A.   Yes, I do.
9    Q.   And do you understand what the
10 penalties of perjury means, meant as it was
11 stated in this document?
12   A.   Yes, I do.
13   Q.   What was your understanding?
14   A.   That if you -- you lied, you
15 know, signed this document and you lied,
16 that you could be held liable for it.
17   Q.   Now, sir, at any point in time in
18 your life, were you a member of the
19 military?
20   A.   Yes, I was.
21   Q.   And for whom were you a member
22 of?
23   A.   I served with the United States
24 Navy.
25   Q.   And for how many years?

Page 10

1    T. Snyder
2    A.   I think it was maybe just a
3  little less than four years actually.
4    Q.   And were you discharged?
5    A.   Yes, I was.
6    Q.   And were you discharged for bad
7  conduct?
8    A.   That's correct.
9    Q.   And were you convicted by a
10 general court marshal?
11   A.   In general court marshal.  That's
12 correct.  Yes.
13   Q.   Okay.  Now, sir, let's look back
14 at Snyder-1.  The first page, seven, "check
15 appropriate box to the right of each
16 question," do you see that?
17   A.   Yes, I do.
18   Q.   E, "did you ever receive a
19 discharge from the armed forces of the
20 United States which was other than honorable
21 or which was issued under other than
22 honorable circumstances," do you see that?
23   A.   Yes, I do.
24   Q.   And you checked "no," do you see
25 that?

Page 11

1    T. Snyder
2    A.   Yes, I do.
3    Q.   That is not correct; isn't that
4  true, sir?
5    A.   No, it's not, and I'm quite
6  surprised I checked that that way.
7    Q.   Well, did you review this
8  document before you signed it?
9    A.   No, I didn't.  I guess I filled
10 this out too quickly to actually realize I
11 checked the wrong box.
12   Q.   Is it your testimony to the jury
13 that is going to be seeing this videotape,
14 that on an application to Suffolk County,
15 where the specific question was raised
16 regarding whether or not you were ever
17 honorably discharged, you filled out the
18 wrong box because you didn't look at it
19 thoroughly?
20      MR. GOODSTADT: Objection.
21   Q.   Is that your testimony?
22   A.   Apparently I didn't fill out the
23 correct box on this, yes.  I made a mistake
24 on this.
25      MR. NOVIKOFF: Okay.  Let's

Page 12

1    T. Snyder
2  mark the following document as Exhibit
3  Snyder-2.
4      (Suffolk County Application For
5  Employment, 11/09/90 was marked as
6  Snyder Exhibit-2 for identification;
7  9/24/08, E.L.)
8    Q.   And, sir, I'm going to show you
9  what's been marked as Snyder-2, and it's
10 977 -- Bates stamped number 009772 through
11 009775, do you see that?
12   A.   Yes, I do.
13   Q.   And I'm going to refer your
14 attention to the last page which is 9775.
15 Is that your signature?
16   A.   Yes, it is.
17   Q.   And do you recall why you would
18 have executed this document on or about
19 November 9, 1990?
20   A.   This is when I was being
21 interviewed for the police officer job in
22 Ocean Beach.
23   Q.   So this application is in
24 specific reference to the Ocean Beach job,
25 is that your testimony?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 13

1          T. Snyder
2      A.   Yes, it is, if it's during 11/9
3  of 1990.  Yes.
4      Q.   Okay.  Let's look at eight on the
5  first page.  "Check appropriate box to the
6  right of each question," do you see that?
7      A.   Yes.
8      Q.   Let's look at E, "did you ever
9  receive a discharge from the armed forces of
10 the United States which was other than
11 honorable or which was issued under other
12 than honorable circumstances," do you see
13 that?
14     A.   Yes, I do.
15     Q.   You wrote -- you checked "yes" on
16 this?
17     A.   Yes, I did.
18     Q.   So --
19     A.   That's the correct box.
20     Q.   So you would agree with me that
21 at least based upon your prior answer, you
22 would have thoroughly reviewed this document
23 prior to signing it?
24     A.   This one apparently I did review
25 thoroughly and did check the proper box on,

Page 14

1  yes.
2      Q.   Now let's look at the comments
3  under 11.  Above that, the application
4  says -- and, again, this is the Suffolk
5  County Application For Employment
6  Open-Competitive Examinations and
7  Non-Competitive Appointments, above number
8  11 on the first page, "if you checked yes,
9  please describe the type"  -- I'm sorry.
10 Number 11 it says, "comments."  You write "I
11 was discharged from the United States Navy
12 due to a hardship at home with family," do
13 you see that?
14     A.   That's correct.
15     Q.   You didn't mention anywhere in
16 here that you were discharged for bad
17 conduct, did you?
18     A.   MR. GOODSTADT: Objection.
19     A.   It's not mentioned here, but I
20 did at the interview state to the people
21 interviewing me.
22 MO       MR. NOVIKOFF: Motion to
23     strike.  My question to you, and,
24     again, Andrew, I understand any time I

Page 15

1          T. Snyder
2      make a motion to strike, based upon
3      what we did the last depositions,
4      you're reserving your rights to object
5      to that motion.
6      Q.   Sir, on this document, is there
7  any reference to you stating that you were
8  discharged for bad conduct?
9          MR. GOODSTADT: Objection.  The
10     documents speaks for itself.
11     Q.   Is there anything on this
12 document?
13     A.   Not on this front page.
14     Q.   Well, take a whole look at the
15 document.
16     A.   I don't see anywhere on -- in any
17 four of these documents anywhere where it
18 says anything that's written about that.
19     Q.   In the "comments" section, you
20 don't make reference to the fact that you
21 were convicted -- and let me just get the
22 right wording -- you were convicted by a
23 general court marshal, do you?
24     A.   No, because they didn't ask that
25 question.

Page 16

1          T. Snyder
2      Q.   Sir, you wrote the comment,
3  right?
4      A.   That was the reason why I was
5  discharged.
6      Q.   Okay.
7      A.   It was my understanding when I
8  checked "yes," that I had to explain why I
9  was discharged.  That was the reason why I
10 was discharged.
11     Q.   Then you put a comment down, sir,
12 "I was discharged from the United States
13 Navy due to a hardship at home with family,"
14 do you see that?
15     A.   That's correct.
16     Q.   Didn't say anything about being
17 convicted at a general court marshal?
18         MR. GOODSTADT: Objection.
19     Q.   Did you?
20     A.   There's no question that asked me
21 that, but I did explain it in the interview.
22 I had to explain what happened in my
23 discharge.
24     Q.   On this document?
25         MR. GOODSTADT: Objection.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

---

Page 17

T. Snyder

1 A. It's not stated anywhere on this
2 document, sir, so no, I wouldn't write that
3 there. But during the verbal interview with
4 Chief Loeffler and Sergeant Paridiso, I did
5 explain -- in fact, gave them a copy of my
6 discharge.
7 MO      MR. NOVIKOFF: Motion to strike
8    as nonresponsive.
9 Q. Sir, why were you convicted by
10 general court marshal?
11 A. For what it says right here. I
12 was AWOL because I had problems at home with
13 my family and I was very young and immature
14 and I could not deal with being in the navy
15 and being away from my family at home.
16 I came home to help my mom is
17 what I did, all right. My pay had gotten
18 screwed up in the navy and it was taking
19 months to get it straightened out. I was
20 sending money home to help her and I
21 couldn't do it, so 19 years old and being a
22 little immature at that age, I made a very
23 rash and unwise decision.
24 Q. Okay. Which you exacerbated by

---

Page 18

T. Snyder

1 lying on an application?
2 DI      MR. GOODSTADT: Objection.
3    Don't answer that. That's harassing.
4 Q. Sir, did you lie on any of the
5 two applications I've shown you?
6 A. No, I didn't lie.
7 Q. Okay. And let's see. And did
8 you have a trial by this court marshal?
9 A. I don't recall exactly. Yeah,
10 there was a trial, but it was -- it seemed
11 very informal to me. It was only several
12 people in the --
13 Q. Okay.
14 A. It was a general court marshal.
15 That's what they called it.
16 Q. And were you represented by
17 counsel at the time?
18 A. By the military. By a marine
19 corps.
20 Q. So you had counsel at the time?
21 A. He was a marine corps attorney I
22 would assume, yeah.
23 Q. Okay. And other than being
24 discharged dishonorably, were there any

---

Page 19

T. Snyder

1 other ramifications --
2 A. I wasn't discharged dishonorably.
3 MR. GOODSTADT: Objection.
4 Objection. You're assuming facts that
5 haven't been put in the record.
6 Q. You were not discharged
7 dishonorably?
8 A. No, I was not. I did not receive
9 a dishonorable discharge. I received a bad
10 conduct discharge. It's a separate
11 category.
12 Q. Okay. And other than receiving a
13 bad conduct discharge, were there any other
14 ramifications resulting from your general
15 court marshal?
16 A. I was reduced in rank to the
17 lowest rank in E1.
18 Q. And anything else?
19 A. And I was just discharged from
20 the service.
21 MR. NOVIKOFF: Okay. Let's
22 mark this as Snyder-3, and it's Bates
23 stamp number 9771.
24 (Certificate of Release or

---

Page 20

T. Snyder

1 Discharge From Active Duty was marked
2 as Snyder Exhibit-3 for identification;
3 9/24/08, E.L.)
4 Q. Do you recognize this document,
5 sir?
6 A. Yes, I do.
7 Q. And what is this document?
8 A. This a copy of my DD 214, which
9 is your discharge from active duty from the
10 military.
11 Q. Okay. Thank you. Sir, prior
12 to -- well, let me take a step back. Have
13 you talked to Mr. Nofi concerning the fact
14 that he was deposed a few weeks ago?
15 A. I haven't talked to him about it,
16 no.
17 Q. Have you spoken to Mr. Nofi at
18 all within the last month?
19 A. He called me --
20 Q. Again, now outside the presence
21 of your attorney and not part of any
22 conversation you may have been having with
23 your attorney?
24 A. He called me the other day to

---

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 21

1            T. Snyder
2  tell me that his deposition went well, but
3  that's about all he said.
4      Q.    And did you ask him anything?
5      A.    No. I didn't ask any questions
6  about it.
7      Q.    How long was this conversation?
8      A.    It was pretty brief.
9      Q.    Okay.
10      A.    I wasn't -- I was in New York
11  City with a friend and I was walking down
12  the street. I could barely hear him. So
13  that was it. It was a pretty brief
14  conversation.
15      Q.    And have you spoken with
16  Mr. Carter concerning his deposition?
17      A.    Again, too, very briefly.
18      Q.    When did that take place?
19      A.    When we were passing. He works
20  at the Town of Islip with me. He works a
21  different tour. He works the midnight tour.
22  He's a supervisor on the midnight tour and I
23  work 8:00 to 4:00. So we saw each other in
24  passing. As he was going off duty, I was
25  coming on.

Page 22

1            T. Snyder
2      Q.    And when did this take place?
3      A.    Within the last week or so.
4      Q.    And did you and him discuss his
5  deposition?
6      A.    No. We don't discuss anything at
7  work about anything related to this.
8      Q.    Other than this passing at work,
9  have you discussed Mr. Carter's deposition
10  with him at all --
11      A.    No.
12      Q.    -- since he had it last week?
13      A.    Not at all.
14      MR. GOODSTADT: Just let
15  Mr. Novikow finish his question
16  completely before you answer.
17      A.    Oh, sorry. Go ahead.
18      Q.    Have you spoken to Mr. Lamm
19  concerning your deposition within the last
20  month?
21      A.    No, I have not.
22      Q.    Have you spoken with Mr. Fiorillo
23  concerning your deposition within the --
24  within the last month?
25      A.    No, I have not.

Page 23

1            T. Snyder
2      Q.    Have you spoken with any of the
3  other Plaintiffs within the last month
4  concerning this lawsuit, outside the
5  presence of your counsel?
6      A.    I've spoken to Frank and Kevin.
7  We're friends. We do talk.
8      Q.    I'm sure you do talk. My
9  question is more specific, about this
10  lawsuit?
11      A.    No, we have not.
12      Q.    Okay. When is the last time
13  you've spoken to Kevin about this lawsuit
14  outside the presence of your attorney?
15      A.    I have no idea. Probably several
16  weeks ago.
17      Q.    And what was the substance of
18  that conversation?
19      A.    Just how -- when our depositions
20  are going to be scheduled and who can make
21  it and who can't.
22      Q.    Okay. With regard to
23  Mr. Fiorillo, have you discussed --
24      A.    Same exact conversation was going
25  on.

Page 24

1            T. Snyder
2      MR. GOODSTADT: Again, just let
3  him finish the question.
4      THE WITNESS: Oh, I'm sorry.
5      MR. GOODSTADT: You don't know
6  what he's actually asking until he
7  ends.
8      MR. NOVIKOFF: I generally
9  don't know what I'm asking until I end.
10      Q.    With regard to Mr. Fiorillo, when
11  was the -- when was the last time that you
12  have spoken with him concerning this
13  litigation, outside the presence of your
14  counsel?
15      A.    Within the last several weeks
16  when he told me about the deposition
17  schedule and whether or not I was available.
18      Q.    Okay. And prior -- other than
19  talking about deposition scheduling, when's
20  the last time you had spoken with Mr. Lamm
21  concerning the substance of this litigation?
22      A.    I haven't.
23      MR. GOODSTADT: Again, with the
24  same caveat, outside the presence of
25  counsel?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 25

T. Snyder

1
2     MR. NOVIKOFF: Yes.
3  Absolutely.
4     A.  I haven't talken to him about it
5  at all recently.
6     Q.  When you say "recently," what do
7  you mean?
8     A.  Well, the last time I did talk
9  about it was when we met with counsel.
10     Q.  Okay.  I'm talking outside the
11  presence of your counsel --
12     A.  I have not --
13     Q.  -- whether in person or over the
14  phone?
15     A.  I have not spoken to him about
16  it.
17     Q.  Over how long a period of time?
18     A.  Probably several months.  The
19  last time, again, was when we  -- that was
20  back in August.
21     MR. GOODSTADT: Don't.  Don't.
22     Q.  Same question with regard to
23  Fiorillo?
24     A.  Same thing.  Exact same thing.
25     Q.  And same question with regard to

Page 26

T. Snyder

1
2  Carter?
3     A.  Same thing with Eddie and the
4  same with Joe.
5     MR. NOVIKOFF: Okay.  Let's
6     mark the following document as
7     Snyder-4.
8     (Document Bates stamped 009735
9     was marked as Snyder Exhibit-4 for
10     identification; 9/24/08, E.L.)
11     Q.  Do you recall when Snyder-4 was
12  taken?
13     A.  No, I do not.
14     Q.  Do you know how long ago?
15     A.  I have no idea, sir.
16     MR. GOODSTADT: For the record,
17  I'll be willing to stipulate that he
18     was bald in this picture.
19     MR. NOVIKOFF: You got it.  We
20     don't have to go through what we went
21     through with Mr. Carter with the hair.
22     That's fine.
23     Q.  Before we get to the complaint,
24  sir, you worked for Ocean Beach starting
25  when?

Page 27

T. Snyder

1
2     A.  I was interviewed for the
3  position in -- in November of '90 and I
4  started -- well, I went to the academy in
5  January of 1990 and I started actually in
6  May of 1990.  Excuse me, January of 1991 and
7  started in May of 1991.
8     Q.  And did there ever come a time
9  that you quit -- I'm sorry.  Did there ever
10  come a time that you -- that you indicated
11  to Ocean Beach that you didn't want to work
12  anymore?
13     A.  Yes.  That's correct.
14     Q.  When did that take place?
15     A.  I believe it was either 1996 or
16  '97.  I'm not quite sure exactly what year
17  that was.
18     Q.  Okay.  Could it have been 1995?
19     A.  It could have been, but I don't
20  think so.  I believe I worked there in '96.
21     Q.  Okay.
22     A.  Even if it was only for a few
23  days, I believe I worked there in '96.
24     MR. NOVIKOFF: Okay.  Let's
25     mark the following document as

Page 28

T. Snyder

1
2  Snyder-5.
3     (Income Execution document
4     Pertaining to Thomas Snyder was marked
5     as Snyder Exhibit-5 for identification;
6     9/24/08, E.L.)
7     Q.  Now Snyder-5 is Bates stamped
8  number 3600, and I presume that you had
9  nothing to do with drafting of this document
10  or any of the handwriting on this document,
11  correct?
12     A.  Yeah.  That's correct.
13     Q.  Okay.  Let's look at under
14  "note."  "Date employment terminated,
15  9/1/95, reason for termination, he quit," do
16  you see that?
17     A.  Yes, I do.
18     Q.  And your name is mentioned in
19  this box, do you see that?
20     A.  Yes.  Yes, it is.
21     Q.  And this document does purport to
22  be addressed to Ocean Beach, Inc. Village,
23  do you see that?
24     A.  Yes, it does.
25     Q.  Does this document refresh your

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 29

1           T. Snyder
2  recollection as to when you advised Ocean
3  Beach at any point in time that you did not
4  want to work for them anymore?
5      A.   It does, but I'm not quite sure
6  that that's the correct date on that.  There
7  was some kind of problem with when I had
8  called the state retirement system, they had
9  me listed as working up until '96.  There --
10 there was a problem with me trying to get it
11 straight with the village to get properly
12 credited in my retirement.
13     Q.   That's fine.  So you --
14 regardless of what the date may be, there
15 did come a point in time that you advised
16 Ocean Beach that you didn't want to work for
17 them anymore?
18     A.   That's correct.
19     Q.   And was there a year, whether it
20 was '94, '95 or '96, when you didn't have
21 -- when you didn't work any hours for Ocean
22 Beach?
23     A.   Yes.  That's correct.
24     Q.   Okay.  How many years was that
25 gap in your employment for Ocean Beach?

Page 30

1           T. Snyder
2      A.   Between the time that I quit and
3  the time that I was rehired, several years.
4      Q.   Okay.
5      A.   Four, five years maybe.  Four
6  years.
7      Q.   Okay.  And what was the reason
8  for you quitting?
9      A.   At the time, they were forming a
10 PBA, the police department was forming a PBA
11 and they were at odds with the village
12 administration, and it was my understanding,
13 in fact, it was told to me by the
14 sergeant -- not only the sergeant, but also
15 George Hesse that because I had served at
16 least four or five years, I was going to
17 have a vote in this PBA even being a
18 part-time employee and that they were going
19 to layoff all the part timers so we could
20 not vote for it, because they were at odds
21 with the village about this.
22     Q.   Who was going to layoff all the
23 part-time cops?
24     A.   The village was going to layoff
25 all the part-time cops so we could not get a

Page 31

1           T. Snyder
2  vote in this PBA.
3      Q.   So because you were told that you
4  were -- I just want to understand this.  Is
5  it your testimony that because you were told
6  by someone that the village was going to
7  layoff the part-time cops, you decided to
8  quit?
9      A.   Well, they did layoff some of the
10 part-time cops that I was working with
11 there, so I was probably going to be next.
12     Q.   So before they laid you off, you
13 decided to quit?
14     A.   I told them that I didn't  -- I
15 enjoyed working for the village, I have a
16 good rapport with the village administration
17 and the people in the police department, and
18 I didn't want to cause any problems, I
19 didn't want to get laid off, so I would just
20 resign my position.
21     Q.   Okay.  And what precipitated you
22 in asking to come back how many years later?
23     A.   Actually, I had a meeting with Ed
24 Paridiso, the chief of police.  He had saw
25 me one day -- actual -- and he said to me,

Page 32

1           T. Snyder
2  "Tom, you know, I'm looking for experienced
3  police officers.  I would like to rehire
4  you.  Are you willing to come back and work
5  for me?"
6      Q.   And what did you say?
7      A.   I said, "Sure."  And I asked him
8  some questions about, you know, the pen and
9  he -- how the situation is over there with
10 the PBA and all that.
11     Q.   And when did this take place?
12     A.   In May or -- I think it was early
13 June of 2001.
14     Q.   Okay.  Now in the interim,
15 whatever period of time that was when you
16 weren't working for Ocean Beach, did you
17 seek employment with any other law
18 enforcement agency?
19     A.   No, I did not at that time.
20     Q.   Okay.  Prior to you quitting,
21 whenever that was in the '90s -- I think we
22 all agree it took place in the '90s --
23 between your first day that you worked for
24 Ocean Beach and your last day during your
25 first go around with them, had you applied

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 33

T. Snyder

1
2 for any other law enforcement jobs?
3    A.   Yes, I did.  I -- the New York
4 City Police Department.
5    Q.   When did you apply for the New
6 York City Police Department?
7    A.   I want to say 1992 or '93.
8    Q.   And what did you have to do to
9 apply for a position with the New York City
10 Police Department?
11    A.   Basically the same requirements
12 as if you applied for a position as a
13 Suffolk County police officer or any police
14 officer.  You would have to take a test,
15 pass it, and then go through all the -- the
16 background qualifications.
17    Q.   And did you take the test?
18    A.   Yes, I did.
19    Q.   Did you pass the test?
20    A.   Yes, I did.
21    Q.   And did you go through all the
22 background tests that were required?
23    A.   I didn't did go through all of
24 them.  I went through half of them and then
25 during the course of going through them, I

Page 34

T. Snyder

1
2 changed my idea and decided I didn't want to
3 go to New York City anymore.  So I removed
4 myself from consideration.
5    Q.   Okay.  And had you failed any of
6 the other tests --
7    A.   No, I had not.
8    Q.   -- that you had taken?
9    A.   No, I had not.
10    MR. GOODSTADT:  Just let him
11    finish the question.
12    Q.   Were you advised -- other than
13 the test that you say you passed, were you
14 advised, up until the time you decided to
15 pull your name from consideration, that you
16 had either passed or failed any test?
17    A.   I had gone for my medical and
18 they didn't tell me that I had failed it.
19    Q.   Did they tell you you had passed
20 it?
21    A.   I don't recall.
22    Q.   Did you get the results back?
23    A.   Honestly, I don't recall
24 honestly.  It's been so long ago.  I really
25 don't recall.

Page 35

T. Snyder

1
2    Q.   Did you apply for a position with
3 the Nassau County Police Department?
4    A.   No, I did not.
5    Q.   Why not?  Again, this is between
6 your first day at Ocean Beach and the day
7 that you quit, according to that document?
8    A.   I didn't apply for Nassau because
9 I wasn't interested in working for them.  I
10 was interested in working for the city and
11 then changed my mind and decided I didn't
12 want to work for them.  I decided I wanted
13 to stay with the Town of Islip.
14    Q.   Okay.  And did you apply for the
15 Suffolk -- why didn't -- did you apply for
16 the Suffolk County Police Department?
17    A.   I did take a test for the Suffolk
18 County police job I think '97, but I'm not
19 quite sure.
20    Q.   And did you pass that test?
21    A.   I believe the first time I did,
22 yeah.
23    Q.   You took it more than once?
24    A.   Yes, I did.
25    Q.   When was the second time you took

Page 36

T. Snyder

1
2 the Suffolk County Police Department test?
3    A.   I think it was shortly after
4 that.  I know I took two tests, and one of
5 them I passed, one I failed.
6    Q.   Well, the first one you say you
7 passed?
8    A.   Um-hum.
9    Q.   And did you -- after you passed
10 that test, did you pursue a job with Suffolk
11 County Police Department?
12    A.   They threw out that test because
13 there was lawsuits filed against it about
14 the way it was given.  So that -- that whole
15 thing was thrown out.  We had to retake it.
16    (Mr. Gray entered the room.)
17    MR. NOVIKOFF:  And just for the
18    record, Mr. Gray, general counsel to
19    Ocean Beach, has just walked into the
20    room.
21    MR. GRAY:  Good morning,
22    gentlemen.  Sorry I'm late.
23    Q.   So that test was thrown out.  How
24 long after the first test did you take the
25 second test for Suffolk County Police

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 37

1          T. Snyder
2  Department?
3     A.   Actually, I may be wrong in my
4  memory of this.  I may have taken the state
5  police test first and then that test was
6  thrown out and then take the Suffolk test,
7  and because it was the same test, it's my
8  understanding that the whole thing was a
9  boondoggle.  They threw one out and I
10 re-took the other one and I failed that one.
11    Q.   So whether it was the New York
12 State test or the Suffolk County test, you
13 failed that test?
14    A.   One of them I did fail, yeah.  I
15 don't recall.  I believe it was the Suffolk
16 test is the one I failed, though.  That was
17 the last one.
18    Q.   Okay.  Now have you applied --
19 well, let's go then to when you started back
20 with Ocean Beach in '90 or '91, whenever the
21 second round of your employment with Ocean
22 Beach started.  From that day to January 1,
23 2006, had you applied for any law
24 enforcement job?
25    A.   I applied with Brookhaven Town as

Page 38

1          T. Snyder
2  a park ranger.
3     Q.   As a park ranger?
4     A.   Yes.
5     Q.   When did you apply for that job?
6     A.   I believe it was June of '07.
7     Q.   Okay.  Let's put -- let's put
8  anything after January 1, 2006 out.  My
9  question is more specific.  From the point
10 in time that you came back to Ocean Beach
11 until January 1, 2006, did you apply for any
12 other law enforcement related job?
13    A.   No, I did not.
14        MR. NOVIKOFF: Okay.  Let's now
15 go to the complaint which has been
16 previously marked as Defendants' --
17 okay.  Let's re-mark it as -- as
18 Snyder-6.
19        (Complaint was marked as Snyder
20 Exhibit-6 for identification; 9/24/08,
21 E.L.)
22        MR. GOODSTADT: I'll take
23 another copy of this well drafted
24 document.
25        MR. WELCH: (Handing).

Page 39

1          T. Snyder
2     Q.   Sir, I'm showing you what's been
3  marked as Snyder-6 and I -- and I purport
4  that this is a true and accurate copy of the
5  complaint that was filed on your behalf in
6  or about on March 21, 2007.  Have you seen
7  this document prior to today?
8     A.   Oh, yes, I have.
9     Q.   Did you review this document
10 prior to its filing on March 21, 2007?
11    A.   It was reviewed, yes.
12    Q.   Did you review it?
13    A.   I don't recall if I reviewed it
14 or not prior to it being filed.
15    Q.   So when you just testified that
16 it was reviewed, who were you -- what were
17 you referring to?
18    A.   I would assume my attorneys
19 reviewed it before they filed it.
20    Q.   Okay.  But you don't recall if
21 you reviewed it?
22    A.   I don't recall if I reviewed just
23 right prior to it being filed.
24    Q.   I'm asking did you review any
25 drafts of the complaint prior to it being

Page 40

1          T. Snyder
2  filed?
3     A.   A draft of it, yes.
4     Q.   That's what I'm saying.
5     A.   Okay.  Yes.
6     Q.   Okay.  And would you consider
7  this document to be an important document?
8     A.   Yes, I would.
9     Q.   Would you agree with me that one
10 of the reasons you wanted to review the
11 document was to make sure that everything in
12 there was accurate to the best of your
13 recollection?
14    A.   Yes.
15    Q.   And was it important that
16 everything in there be accurate to the best
17 of your recollection?
18    A.   Yes.
19    Q.   And it would be important that if
20 there was a mistake in there as to a fact
21 that you were aware of, that you would not
22 want that mistake to be filed?
23    A.   Yes.
24    Q.   And did you, when you reviewed
25 the draft, notice any mistakes or

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 41

T. Snyder

1  misrepresentations of the facts as you knew
2  them to be?
3      MR. GOODSTADT: Objection. I'm
4  going to instruct the witness not to
5  answer the question. That's work
6  product and attorney/client
7  communication.
8      MR. NOVIKOFF: I'm just --
9  Andrew, I'm just asking him if he
10  noticed it. I'm not going to ask what
11  he did with it, who he talked to about
12  it. Just want -- I think it's an
13  appropriate question to ask.
14      MR. GOODSTADT: The question is
15  whether he noticed any --
16      MR. NOVIKOFF: Whether in any
17  draft that he looked at, did he see any
18  mistake or misrepresentation of a fact
19  that he was aware of.
20      MR. GOODSTADT: I'll let you
21  answer yes or no on that or you don't
22  recall.
23  A.   I don't recall, to be honest with
24  you.

Page 42

T. Snyder

1  Q.   Okay. And as the facts as
2  alleged pertaining to you specifically,
3  everything that is set forth in this
4  complaint is true and accurate, correct?
5      MR. GOODSTADT: And we're
6  talking about the filed complaint?
7      MR. NOVIKOFF: The filed
8  complaint.
9  A.   Yes.
10  Q.   Right. Let's look at paragraph
11  109. Actually, you know what, before we get
12  to 109, this was filed March 21, 2007. Did
13  you all have a press conference subsequent
14  to filing this complaint?
15  A.   I believe it was after the
16  complaint was filed.
17  Q.   After?
18  A.   Yeah.
19  Q.   And were you -- did you
20  participate in that press conference?
21  A.   Yes, I did.
22  Q.   And were there television cameras
23  at that press conference?
24  A.   Yes, there were.

Page 43

T. Snyder

1  Q.   And did you make any statements
2  to any television reporter?
3  A.   Yes, I did.
4  Q.   Do you know what station you
5  would have made statements to?
6  A.   I don't recall. No. There was
7  numerous television stations there. I don't
8  recall which one exactly.
9  Q.   Was News 12 there?
10  A.   I think they were. Yes.
11  Q.   Okay. And do you know if George
12  Hesse was indicted in March of 2007 for any
13  alleged crimes that he may have committed?
14  A.   Yes, he was.
15  Q.   And do you know what specific
16  date Mr. Hesse was indicted?
17  A.   I don't recall the specific date,
18  no.
19  Q.   If I told you it was within a
20  week of your filing of this complaint, would
21  that refresh your recollection?
22  A.   I know it was sometime around
23  there, but I don't know the specific date.
24  Q.   Had you had any communications,

Page 44

T. Snyder

1  you personally, with any member of the
2  District Attorney's office for Suffolk
3  County prior to you filing the complaint?
4  A.   Prior to my filing the complaint?
5  Q.   Yeah.
6  A.   Yes, I have.
7  Q.   With whom had you had
8  discussions?
9  A.   There was numerous people. ADA
10  Ray Tierney. Detective Walter Warkenthien.
11  I believe Detective John Burke. Detective
12  Tom Iacopelli. And there was others in the
13  room, but I don't recall their names.
14  Q.   On how many occasions prior to
15  your filing of this complaint had you spoken
16  with the Suffolk County District Attorney's
17  office, whether it was a DA or an
18  investigator?
19      MR. GOODSTADT: In connection
20  with Ocean Beach?
21      MR. NOVIKOFF: Sure. In
22  connection with Ocean Beach. Sure.
23  A.   In connection with Ocean Beach,
24  two or maybe three times.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 45

1           T. Snyder
2      Q.   Okay.
3      A.   Only very few times.
4      Q.   And what was the -- when was the
5  first time that you spoke with anyone at --
6  at the Suffolk County District Attorney's
7  office concerning Ocean Beach?
8      A.   When they called my house and
9  left a message on my machine saying they
10 wanted me -- to speak to me in regard to
11 Ocean Beach.
12     Q.   And when was that?
13     A.   That was sometime after I was
14 fired from Ocean Beach.
15     Q.   Okay.  Can you quantify what
16 "sometime" means?  Was it days?  Was it
17 weeks?  Was it months?
18     A.   I'm not sure exactly time frame.
19 It wasn't months.  It was days or maybe
20 weeks.
21     Q.   Okay.  And -- so if I understand
22 your testimony correctly, you did not
23 precipitate the conversation with the DA,
24 they called you?
25     A.   That's correct.  They initially

Page 46

1  called me.  That's correct.
2      Q.   Are you aware if Mr. Lamm ever
3  reached out to the Suffolk County District
4  Attorney's office to provide them
5  information unsolicited after he was
6  allegedly terminated?
7      A.   No, I was not aware of that.
8      Q.   Are -- you're not aware one way
9  or the other?
10     A.   I was aware that he was speaking
11 to them, too.  I assumed he got contacted
12 like I did.
13     Q.   How about Mr. Fiorillo, are
14 you --
15     A.   The same with him.
16          MR. GOODSTADT: Just let him
17     finish the question.
18     Q.   Are you aware as to whether he
19 reached out unsolicited to the Suffolk
20 County DA's office to provide them
21 information?
22     A.   No, I was not aware of that.
23     Q.   Same question with regard to
24 Nofi?

Page 47

1           T. Snyder
2      A.   Same with him as well.
3      Q.   Same question with regard to
4  Carter?
5      A.   Eddie Carter was a little
6  different.  Eddie Carter, they I think
7  reached out to him with regard to a separate
8  incident in Ocean Beach where they
9  mistakenly thought he was involved in.
10     Q.   Well, my question was if
11 Mr. Carter reached out to the DA's office
12 unsolicited.  Are you aware as to whether he
13 did that?
14     A.   I'm not aware of that, no.
15     Q.   Okay.  Now, so the DA called you
16 up and left a message?
17     A.   That's correct.
18     Q.   And did you respond to that
19 message?
20     A.   Yes, I did.
21     Q.   How did you respond?
22     A.   I called them back and asked what
23 they wanted to speak about and why they
24 wanted me to come in.
25     Q.   And who did you speak with?

Page 48

1           T. Snyder
2      A.   Tom Iacopelli, the guy who left a
3  message initially.
4      Q.   And what did -- what did this
5  gentleman by the name Tom say to you when
6  you called back?
7      A.   He said to me that he had heard I
8  was recently fired from Ocean Beach and that
9  he wanted me to come in because he thought I
10 had some information that could help them
11 with regard to investigations that were
12 occurring in Ocean Beach.
13     Q.   What investigations?
14     A.   He didn't name them specifically.
15     Q.   Did you ask?
16     A.   I didn't ask on the phone, no.
17     Q.   And what -- what transpired --
18 well, did he say anything else about what
19 they were investigating Ocean Beach about,
20 other than what you've just testified to?
21     A.   No, he didn't.  We just set up
22 when it was convenient for me to come in.
23 We set up a date.
24     Q.   And when did that take -- that
25 meeting take place?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 49

T. Snyder

1
2    A.    Soon after that phone call.  I'm
3  not sure exactly when.
4    Q.    Days?  Weeks?  Months?
5    A.    I think it was days after.  Maybe
6  even a week.
7    Q.    When -- where did you meet?
8    A.    In the Suffolk District
9  Attorney's office.
10    Q.    Who was present at this meeting?
11    A.    The people I stated before.  ADA
12  Ray Tierney, Tom Iacopelli, Walter
13  Warkenthien, John Burke, and there was
14  several others, but I don't recall their
15  names.
16    Q.    Prior -- and was this -- would
17  this meeting have taken place before you
18  filed the Notice of Claim in this case?
19    A.    Before  -- yes, it did.  Yes.
20  Because we filed this in 2007, yes.
21    Q.    No.  This is the complaint
22  (indicating).  You filed a Notice of Claim
23  in 2006 and I believe it was sometime in the
24  June, July time frame.  If I gave you the
25  June, July time frame as a point of

Page 50

T. Snyder

1
2  reference --
3    A.    Right.
4    Q.    Was your first face-to-face
5  meeting with any member of the Suffolk
6  County DA prior to you filing your Notice of
7  Claim?
8    A.    I'm not sure if it was prior to
9  or right after, but it was very  -- both of
10  them were very close together.
11    Q.    Had you retained counsel,
12  Mr. Goodstadt's office, prior to your first
13  meeting with the Suffolk County District
14  Attorney's office?
15    A.    I don't recall if it was right
16  before or right after.
17    Q.    Okay.  So you don't know as you
18  sit here today, as to whether or not
19  Mr. Goodstadt's law firm was representing
20  you when you first met with the DA's office?
21    A.    I don't recall exactly.  No.
22    Q.    Okay.  So you had this meeting
23  with ADA Tierney and a number of other
24  individuals, correct?
25    A.    That's correct.

Page 51

T. Snyder

1
2    Q.    It took place at Suffolk County
3  District Attorney's office?
4    A.    That's correct.
5    Q.    How long was this meeting?
6    A.    An hour or so.
7    Q.    What did they ask you?
8    A.    They asked me if I knew any
9  information about the Gilbert beating.
10    Q.    Okay.  Other than asking you
11  about the Gilbert beating as you refer to
12  it, did they ask you any other questions?
13    A.    They asked me about the Halloween
14  incident.
15    Q.    Okay.  And were you present at
16  what you refer to as the Halloween incident?
17    A.    Yes, I was.
18    Q.    You were in the bar when the
19  alleged assault took place?
20    A.    No, I was not.  I was working as
21  a police officer that night.
22    Q.    Okay.  All right.  So any
23  information you would have regarding the
24  Halloween incident, would be based upon
25  whatever investigation you may have

Page 52

T. Snyder

1
2  undertaken subsequent to the incident?
3    A.    Right.
4        MR. GOODSTADT: Objection.
5    Q.    Is that true?
6    A.    Whatever I investigated that
7  night would be while I was working --
8    Q.    Okay.
9    A.    -- that night.
10    Q.    Other than the Halloween incident
11  and other than the Gilbert incident as you
12  refer to it, did Ocean Beach ask you any
13  other questions?  I'm sorry, did the Suffolk
14  County District Attorney ask you any other
15  questions concerning Ocean Beach or any
16  members of the Ocean Beach Police
17  Department?
18    A.    I believe they asked about the
19  PBA.
20    Q.    What about the PBA did the
21  District Attorney ask you about?
22    A.    How it was formed.  Was I a
23  member.  Did I sign any sort of official
24  documents.  Do I have a PBA card.  Things of
25  that nature.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 53

T. Snyder

1
2  Q.   Did they ever advise you why they
3  were asking you about the PBA?
4  A.   No, they didn't.  They just were
5  curious about it and wanted to know what
6  information I had about it.
7  Q.   Did they ever ask you why they
8  were asking about the Gilbert incident?
9  A.   They wanted to know if -- what
10 information I had about it.
11 Q.   But did they advise you why they
12 wanted to know this information, not
13 specifically what they were seeking?
14 A.   I don't recall them asking why.
15 They just wanted to know if I had any kind
16 of information.
17 Q.   And did they ask -- did the
18 Suffolk County District Attorneys advise you
19 why they were looking into or asking you
20 questions about the Halloween incident?
21 A.   Um, I don't recall them asking
22 why.  That they were, again, investigating
23 numerous things over there.  That was one of
24 several things they were investigating.
25 Q.   Okay.  Well, let's talk about

Page 54

T. Snyder

1
2  that.  You said they were investigating the
3  PBA.  They were investigating the Halloween
4  incident.  They were investigating Gilbert.
5  Did they advise you during that first
6  meeting what else they were investigating?
7  A.   I don't recall, no.
8  Q.   Okay.  And did you advise them of
9  what you knew about the Gilbert incident?
10 Without telling me what you said, did you
11 advise them as to what you knew about the
12 Gilbert incident?
13 A.   Right.  I did.
14 Q.   Now if I understand correctly,
15 the Gilbert incident involved an alleged --
16 an alleged use of physical force against a
17 gentleman named Gilbert by members of the
18 Ocean Beach Police Department, correct?
19 A.   Yes.
20 Q.   Were you present during the
21 alleged use of force?
22 A.   No, I was not.
23 Q.   So would it be fair to say that
24 whatever you told the District Attorneys,
25 was not based upon your own personal

Page 55

T. Snyder

1
2  knowledge?
3  MR. GOODSTADT: Objection.
4  Q.   Of what took place or didn't take
5  place during that incident?
6  A.   Not my -- not my direct personal
7  knowledge, but.
8  Q.   That's all I'm asking about, your
9  direct personal knowledge.
10 A.   No.  I wasn't present during that
11 incident.  I was not working that night.
12 Q.   Okay.  You weren't even on the
13 beach that night?
14 A.   No, I was not.
15 Q.   Okay.  And would it also be fair
16 to say that anything you told the District
17 Attorney regarding the Halloween incident
18 that took place in the bar, was not based
19 upon your direct personal knowledge, but
20 based upon your investigation?
21 MR. GOODSTADT: Objection.
22 Q.   Correct?
23 MR. GOODSTADT: Objection.
24 A.   I would say that that was more my
25 direct knowledge.  I was working and I was

Page 56

T. Snyder

1
2  called to the scene to investigate that.
3  Q.   Right.  But you weren't present
4  when the alleged incident took place, were
5  you?
6  A.   I wasn't present when the alleged
7  incident took place, no.
8  Q.   Okay.  All right.  So we've
9  now -- we've now talked about this first
10 meeting.  Well, during this first meeting,
11 did you -- well, withdrawn.  When was the
12 next time that you spoke with any person
13 associated with the Suffolk County DA's
14 office concerning Ocean Beach?
15 A.   Um, I think it was several weeks
16 later.  Two or three weeks later.
17 Q.   And with whom did you have this
18 conversation or meeting with?
19 A.   With Tom Iacopelli.
20 Q.   Over the phone or in person?
21 A.   I had called him.  I had called
22 him over the phone and asked to come in to
23 see him.
24 Q.   Why did you call Mr. Iacopelli
25 over the phone to ask to come in to see him?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 57

T. Snyder

1        T. Snyder
2     A.   I had found a letter that I
3  received, a threatening letter I received in
4  the mail prior to that that I felt that they
5  needed to look at because it came from Ocean
6  Beach.
7     Q.   A threatening letter?
8     A.   Yes.
9     Q.   Was -- did you receive this
10  threatening letter before or after you had
11  retained Mr. Goodstadt's law firm?
12     A.   I received it before.
13     Q.   Okay.  So if you had received  --
14  did you receive this threatening letter
15  before your first meeting with ADA Tierney
16  and the others that we've just discussed?
17     A.   Yes, I did.
18     Q.   Did you bring this letter up to
19  them during this meeting?
20     A.   I may have.  I don't recall if I
21  did.
22     Q.   Is there a reason why you didn't
23  bring this letter to the first meeting that
24  you had with ADA Tierney and the others?
25     A.   I just stated that I just

Page 58

1        T. Snyder
2  recently had found it after I had spoken to
3  them and wanted to show this to them.
4     Q.   When you say you had just
5  recently found it, what does that mean?
6     A.   Among my documents at home.  I
7  didn't -- I was looking through it and I
8  found the thing and I said oh, I want to
9  bring this to them and let them know what
10  happened here.
11     Q.   When did you receive this letter?
12     A.   Um, several months after the
13  Halloween incident.
14     Q.   Oh okay.  So this was a letter
15  that you had received prior to the -- your
16  last day of employment in March or --
17     A.   Yes.
18     Q.   -- April of 2006?
19     A.   Yes.
20     Q.   Okay.  And do you know if you've
21  produced this letter in the course of
22  discovery?
23     A.   Yes, I did.
24 RQ     MR. NOVIKOFF: Okay.  Well, I
25     don't know if we've -- I don't believe

Page 59

1        T. Snyder
2  I've seen that, but I'll check my
3  records.  If it's been produced, then
4  it's been produced.  If it hasn't been,
5  then I will call for the production of
6  that letter.
7     Q.   Sir, what --
8        MR. GOODSTADT: We take that
9  under advisement, and follow up in
10  writing like we've agreed to.
11        MR. NOVIKOFF: Okay.
12     Q.   Who wrote the letter?
13     A.   I'm not sure who wrote it.  I
14  assumed it was --
15     Q.   No.  Don't assume.  Was there
16  someone -- was there someone's signature on
17  that letter?
18     A.   There was no signature on the
19  letter.
20     Q.   Was there someone's address on
21  the letter envelope?
22     A.   No, there was no address.  It
23  just came from  -- it was stamped from the
24  Ocean Beach police -- excuse me  -- Ocean
25  Beach Post Office.

Page 60

1        T. Snyder
2     Q.   Okay.  What was said on this
3  letter?  What was said in the letter?
4     A.   It was -- there was a lot of
5  misspellings.  It was -- they were addressed
6  to DA Tom Spota.  It was addressed to Town
7  of Islip Supervisor Pete McGowan.  It was
8  addressed to Suffolk County Civil Service
9  Alan Schneider.  And it said that myself and
10  Eddie Carter were -- somehow we were double
11  dipping.
12     Q.   Okay.
13     A.   And that they were concerned
14  about some kind of safety in the village
15  with regard to  -- I don't know how, but
16  with regard to me and Eddie.  There was -- I
17  haven't read the letter recently, but there
18  was other things in there.
19     Q.   Okay.  And just for the record,
20  again, why did you feel it was necessary to
21  show this letter to the DA after April 2006
22  and after your first meeting with them?
23     A.   Because they were investigating
24  Ocean Beach.  I thought this may have been
25  something they may want to investigate.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 61

T. Snyder

1    This letter.  So when I found it, I brought
2  it to their attention.
3     Q.   Did you feel physical  -- did
4  you -- did you feel any type of fear when
5  you received this letter back in after the
6  Halloween incident?
7     A.   I felt concerned that somebody
8  was trying to wrongly accuse me of things
9  and trying to ruin my -- my career, my work.
10    Q.   Okay.
11    A.   With the town and with Ocean
12  Beach.
13    Q.   And did you ever investigate who
14  sent this letter?
15    A.   I brought it to George Hesse's
16  attention and to Chief Paridiso's attention.
17    Q.   Okay.  And what did Mr. Hesse say
18  when --
19    A.   They said they were going to look
20  into it.
21    Q.   Well, let's talk about Mr. Hesse
22  first.
23    A.   Okay.
24    Q.   What did you say to Mr. Hesse

Page 62

T. Snyder

1  when you received this letter?
2     A.   I said I felt that this letter
3  came from the individuals involved in the
4  Halloween incident because the handwriting
5  is very similar, and he said that he would
6  speak to them individuals about it.
7     Q.   The handwriting is very similar?
8     A.   Yes.
9        MR. NOVIKOFF: Okay.  Let's
10    mark the following document as
11    Snyder-8.  I apologize, I don't have a
12    copy of this, but we will make copies.
13       MR. GOODSTADT: Do you want to
14    take a break to make a couple quick
15    copies?
16       MR. NOVIKOFF: You know what,
17    I'll show it to you and you both can
18    look at it at the same time.
19       MR. GOODSTADT: Just so we're
20    clear on the record, you now agree that
21    that's been produced?
22       MR. NOVIKOFF: Well, we're
23    going to --
24       MR. WELCH: That was actually a

Page 63

T. Snyder

1  part of the Suffolk County production,
2  civil service production.
3        MR. NOVIKOFF: I don't know
4     what this is yet, so that's why I'm
5     asking the witness.  So let's look
6     at -- let's mark this as Snyder-8.
7     Snyder-7.
8        (Letter Dear Sir from Concerned
9     Citizen of Ocean Beach was marked as
10    Snyder Exhibit-7 for identification;
11    9/24/08, E.L.)
12    Q.   Now I'm going to show you what is
13  referred to or marked as Snyder-7.  Please
14  feel free to show it to your counsel and
15  tell me when you're ready to answer my
16  questions.
17    A.   (Reviewing).  Okay.
18    Q.   Is this the letter that you were
19  referring to?
20    A.   Yes, this is it.
21    Q.   Is there any handwriting on that
22  letter?
23    A.   Not handwriting on the letter,
24  but on the envelope there was.

Page 64

T. Snyder

1     Q.   Okay.  So when you made reference
2  to handwriting in response to my prior
3  answer, you were referring to what was on --
4     A.   Yes.
5     Q.   On the envelope?
6     A.   On the envelope of the letter.
7  Yes.
8     Q.   Okay.  Fine.  We don't need to go
9  over that document anymore.  Okay.  So you
10  told Mr. Hesse about this letter and he said
11  he'd speak -- he would speak to the
12  individuals or he would investigate, what
13  did Mr. Hesse say to you?
14    A.   I don't recall exactly what he
15  said, but it was along the lines of I felt
16  it came from the individuals involved in the
17  Halloween incident, it was soon after the
18  incident, and they were concerned about how
19  we investigated it.  They thought that we
20  were trying to jam them up as they put it.
21 MO      MR. NOVIKOFF: Motion to strike
22    as nonresponsive.
23    Q.   You spoke to Mr. Hesse and said
24  you believed that this letter came from the

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 65

T. Snyder

1           T. Snyder
2  individuals involved in the alleged
3  Halloween incident, right?
4      A.   Yes, I did.
5      Q.   And Mr. Hesse said he would look
6  into it?
7      A.   He did say he would look into it,
8  yes.
9      Q.   Okay.  And then when did you
10  speak to Mr. Paridiso about this letter?
11      A.   Soon after I spoke to George
12  Hesse about it.
13      Q.   The next day?
14      A.   It was within a day or two.
15      Q.   Did Mr. Hesse attempt to prevent
16  you from talking to Mr. Paridiso about this?
17      A.   No, he did not.
18      Q.   And how did you go about tracking
19  down Mr. Paridiso to talk to him about this
20  letter?
21      A.   I saw him at work while I was --
22  he was coming on duty and I was going off.
23      Q.   Okay.  Was it common for
24  Mr. Paridiso to come on duty while you were
25  going off duty?

Page 66

1           T. Snyder
2      A.   It happened on a number of
3  occasions, yeah.
4      Q.   Okay.  Well, how often?
5      A.   Depending on if I worked the
6  midnight to 8:00 tour and he was working
7  8:00 to 4:00.  Sometimes we would see each
8  other.
9      Q.   Okay.  And what did Mr. Paridiso
10  say?
11      A.   I had told him about the letter.
12  He looked at it and he frowned and said that
13  he would speak as well.
14      Q.   And did Mr. Paridiso ever get
15  back to you with regard to your inquiry with
16  him concerning this letter?
17      A.   He said that he would -- we would
18  have a meeting about it with the individuals
19  that we suspected, and I said okay.
20      Q.   Now did this take place  -- well,
21  now I'm a little confused.  You -- you
22  reached out to Ed Paridiso to show him the
23  letter?
24      A.   Um-hum.
25      Q.   You say Mr. Paridiso frowned and

Page 67

1           T. Snyder
2  said he would look into it, right?
3      A.   Yes.
4      Q.   And did he say at that time as
5  well that there would be a meeting or was
6  that a subsequent --
7      A.   That was -- that was the same
8  time.  He said that we would  -- he would
9  speak to somebody and talk about it.
10      Q.   And did Paridiso say who he was
11  going to speak to?
12      A.   Um, I had told him I thought it
13  came from the -- Richie and Gary Bosetti,
14  the Bosetti brothers.
15      Q.   I got that from your prior
16  answer.
17      A.   Okay.
18      Q.   My question to you is, in
19  response to your answer to me that he said
20  he would speak to someone, did he tell you
21  who he was going to speak to?  Did he give
22  you a name?
23      A.   He said to me he would talk to
24  the brothers about it.
25      Q.   Okay.  And did Paridiso ever get

Page 68

1           T. Snyder
2  back to you concerning your conversation
3  with him about this letter?
4      A.   No, he did not.
5      Q.   Did you ever follow up with
6  Paridiso?
7      A.   I had asked when we were going to
8  have the meeting sometime after that, and --
9      Q.   So sometime after your first
10  conversation with Paridiso, you approached
11  Paridiso again and said "when are we going
12  to have that meeting"?
13      A.   Right.
14      Q.   And what did Paridiso say to you?
15      A.   He said that he's going to
16  schedule a meeting again.
17      Q.   And did Paridiso ever get back to
18  you?
19      A.   No, he did not.
20      Q.   Did you ever follow up with
21  Paridiso again?
22      A.   No, I did not.
23      Q.   Okay.  Were you ever investigated
24  by the Suffolk County District Attorney's
25  office concerning the allegations that you

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 69

T. Snyder

1  were in fact double dipping, the allegations
2  that you were double dipping?
4    A.   Not that I'm aware of.
5    Q.   Okay.  Were you investigated by
6  any governmental agency concerning the
7  allegations that you were double dipping?
8    A.   Not that I'm aware of.
9    Q.   And when we refer to "double
10 dipping," the allegation was that you were
11 falsifying time records concerning when you
12 were working for Ocean Beach and when you
13 were working for the other Suffolk County
14 job that you had, correct?
15   A.   Yes.  That's correct.  The Town
16 of Islip.
17   Q.   The allegation was that you --
18 you put down on time sheets that you were
19 working at the same time for both of these
20 employers?
21   A.   That's what I assume that they
22 were writing about in that letter.
23   Q.   Okay.  And did you ever ask Hesse
24 about when this meeting was going to take
25 place?

Page 70

T. Snyder

2    A.   I did, yes.
3    Q.   And what did Hesse say to you?
4    A.   He said the same thing the chief
5  did.  That we got to get together and work
6  this out.
7    Q.   And did you ever follow up with
8  Hesse about this?
9    A.   I had asked him when the chief
10 was going to reschedule the meeting, and I
11 got the same answer, you know.  It's
12 going -- sometime.  We're going to do it
13 sometime soon.
14   Q.   Did you ever approach any trustee
15 about this letter?
16   A.   No, I did not.
17   Q.   Did you ever approach Mayor
18 Rogers about this letter?
19   A.   No, I did not.
20   Q.   All right.  Let's go back to your
21 communication with the District Attorney's
22 office.  So you called up this detective and
23 said, "Hey, I got this letter.  I found this
24 letter.  I want to show it to you"?
25   A.   Yes.

Page 71

T. Snyder

2    Q.   Okay.  Anything else you said to
3  him in this phone conversation?
4    A.   I don't recall.  I think it was
5  just specifically about that letter.
6    Q.   And did he tell you to come on in
7  and talk to him?
8    A.   Actually, he came to my house.
9  He drove to my house and picked the letter
10 up.
11   Q.   That day?
12   A.   No.  But it was a day or two
13 after.
14   Q.   And did you talk to him when he
15 came to your house to pick it up?
16   A.   Very briefly.
17   Q.   What was the sum and substance of
18 the conversation?
19   A.   I showed him the envelope.  I
20 showed him the letter.  He looked at it.  He
21 made me sign, initial, both of them, and he
22 took it from me and that was it.
23   Q.   Okay.  And when was the next time
24 you had any type of communication with the
25 District Attorney's office?

Page 72

T. Snyder

2    A.   I'm not sure when, but it was
3  some  -- a long period after that.
4    Q.   Months?  Years?
5    A.   I think it was months after that.
6    Q.   And who initiated this
7  communication?
8    A.   I don't recall if it was them or
9  me.
10   Q.   And what was the sum and
11 substance of this communication?
12   A.   In this instance, I think it was
13 more to -- there was a new ADA on the case,
14 Robert Biancavilla, and I think he wanted
15 just to meet me because of the whole
16 incident that they were investigating, so he
17 had never saw me or talked to me, so.
18   Q.   And did you in fact meet with
19 this new ADA on the case?
20   A.   Yes.  Very briefly.
21   Q.   By phone or in person?
22   A.   No.  In person.
23   Q.   Where?
24   A.   At the DA's office.
25   Q.   And what was the sum and

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 73

T. Snyder

1
2 substance of the conversation?
3    A.   He just asked how long I was
4 working there, and you know, basically some
5 of the same questions.  He said, "I had
6 never met you.  I want to talk to you.  I
7 want to meet you."
8    Q.   Okay.  Same questions as were
9 asked in your first meeting with the DAs?
10    A.   Yes.  Very similar.
11    Q.   And how long did this meeting
12 take place?
13    A.   It didn't take long at all.  It
14 was maybe 20 minutes tops.
15    Q.   Okay.  And had you filed the
16 complaint by this time in this matter?
17    A.   Yes.  I believe the complaint was
18 filed by that time.
19    Q.   And did he ask you any questions
20 about any of your allegations in the
21 complaint?
22    A.   He asked me about the Halloween
23 incident.  He asked about how long I was
24 working there.  He stated to me that,
25 "You're, you know, you're an old timer.

Page 74

T. Snyder

1
2 You've been there a long time."  He asked if
3 I knew anything about beatings that had
4 taken place.  Some of the prior beatings
5 that apparently were coming to light.
6    MR. NOVIKOFF: Okay.  And --
7 well, I'm actually going to move to
8 strike that answer because my question
9 was about did he ask you -- no.
10 Withdrawn.  I'm not going to move to
11 strike that answer.
12    Q.   Was that the last conversation
13 you had with anyone from Ocean  -- from the
14 DA's office concerning Ocean Beach?
15    A.   Yeah, I believe that's correct.
16 I don't believe I've talked to them since.
17    Q.   Have you ever testified before a
18 grand jury?
19    A.   I have --
20    MR. GOODSTADT: In connection
21 with Ocean Beach?
22    Q.   In connection with Ocean Beach?
23    A.   No, I have not.
24    Q.   Are you aware if any of the other
25 Plaintiffs have testified before a grand

Page 75

T. Snyder

1
2 jury?
3    MR. GOODSTADT: In connection
4 with Ocean Beach?
5    MR. NOVIKOFF: Ocean Beach,
6 yeah.
7    A.   No, I don't believe they have.
8    Q.   Well, have you ever testified
9 before a grand jury in connection with
10 George Hesse?
11    A.   No, I have not.
12    Q.   How about the other Plaintiffs?
13    A.   No, I have not.
14    Q.   Okay.  Have you ever worn a wire
15 at the request of the DA's office?
16    A.   No, I have not.
17    Q.   Were you ever involved in any
18 tape recording of conversations concerning
19 anything involving Ocean Beach?
20    A.   No, I have not.
21    Q.   Are you aware if any of the other
22 Plaintiffs were involved in tape recordings
23 of conversations concerning Ocean Beach?
24    A.   I am aware of at least one -- one
25 instance.

Page 76

T. Snyder

1
2    Q.   And what is that instance?
3    A.   That Sergeant Carter -- I call
4 him "Sergeant Carter" because he does work
5 with me in the town -- was actually taping
6 somebody.  I don't recall who.
7    MR. NOVIKOFF: Okay.  Why
8 don't we take a break and we'll pick up
9 with that when we get back.
10    THE VIDEOGRAPHER: This ends
11 tape number one.  The time is 11:14
12 a.m.  We're going off the record.
13    (A break was taken.)
14    (Mr. Gray left the deposition.)
15    THE VIDEOGRAPHER: This begins
16 tape number two.  The time is 11:29
17 a.m.  Back on the record.
18    Q.   Mr. Snyder, you said you were
19 aware that on one instance that Mr. Carter
20 tape recorded a conversation --
21    A.   Yes.
22    Q.   -- with an individual?  Do you
23 know who that individual was?
24    A.   George Hesse.
25    Q.   And how are you aware that

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 77

1          T. Snyder
2  Mr. Carter taped this conversation?
3      A.   From filing of this lawsuit
4  (indicating).
5      Q.   Okay.  So if I understand
6  correctly, you had no knowledge prior to the
7  filing of this lawsuit, that Mr. Carter had
8  made any tape recordings of any
9  conversations he had with Mr. Hesse?
10     A.   Not until the filing of the
11 lawsuit, no.
12     Q.   And are you aware of as to
13 whether Mr. Lamm has ever tape recorded any
14 conversations with any person associated
15 with Ocean Beach?
16     A.   Again, not until the filing of
17 the lawsuit.
18     Q.   What about the filing of the
19 lawsuit made -- caused you to become aware
20 that Carter had tape recorded a conversation
21 he had with Mr. Hesse?
22         MR. GOODSTADT:  Objection.  I
23     just want to instruct you to the extent
24     that you learned it from any of your
25     lawyers or during a meeting where your

Page 78

1          T. Snyder
2      lawyers were present, I instruct you
3      not to answer that question.
4      Q.   In light of what your attorney
5  has just told you, can you answer my
6  question?
7      A.   I'm not sure I understand
8  exactly.
9      Q.   Okay.  Let's -- let me break it
10 down.  Prior to the filing of this lawsuit,
11 you indicated -- you were not aware that
12 Carter had tape recorded any conversation
13 with Hesse, were you?
14     A.   No, I was not aware.
15     Q.   Okay.  So at some point in time
16 after the filing of this lawsuit, you became
17 aware of that fact, correct?
18     A.   Yes.
19     Q.   How did you become aware of that
20 fact?  Well, withdrawn.
21         MR. GOODSTADT:  Objection.
22     Q.   Did you learn of this fact in any
23 communication outside the presence of your
24 attorneys?
25     A.   No, I did not.

Page 79

1          T. Snyder
2      Q.   Okay.  So if I -- just so, if I
3  understand, you would have learned this fact
4  while your attorney was present during a
5  conversation?
6          MR. GOODSTADT:  Objection.
7          MR. NOVIKOFF:  I just want to
8      be clear.  I'm not going to ask him who
9      said what.
10         MR. GOODSTADT:  I understand,
11     but just the fact that the topic was
12     discussed I think is privilege.  I
13     think that you have the information you
14     need on the question without going any
15     further.
16         MR. NOVIKOFF:  I just want to
17     be sure that it was he learned it
18     during --
19         MR. GOODSTADT:  Well, if you
20     asked if he learned it during the
21     conversation, doesn't that encroach
22     upon what we discussed or may have
23     discussed?  He told you he did not
24     learn outside the presence of his
25     attorney.

Page 80

1          T. Snyder
2          MR. NOVIKOFF:  Fair enough.
3      Okay.
4      Q.   And did you ever learn that Lamm
5  had tape recorded conversations?
6      A.   Again, it would be the same
7  situation.  It would be in the presence of
8  my attorneys.
9          MR. GOODSTADT:  Again, don't --
10     just -- it's the same situation.
11     Q.   How about Fiorillo, did you ever
12 become aware of the fact that Fiorillo had
13 taped any conversation?
14     A.   I'm not aware --
15         MR. GOODSTADT:  Objection.
16     That's assuming a fact.
17     Q.   Are you aware if Fiorillo has
18 ever tape recorded a conversation?
19         MR. GOODSTADT:  That's a
20     different question.
21     A.   I'm not aware if Frank ever
22 recorded.
23     Q.   Are you aware if Nofi ever tape
24 recorded a conversation?
25     A.   I'm not aware of -- of Nofi ever

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 81

T. Snyder

1          T. Snyder
2  recording.
3      Q.   How did it come  -- well, did you
4  discuss suing Ocean Beach at any point in
5  time prior to retaining  -- prior to meeting
6  Mr. Goodstadt's law firm?
7          MR. GOODSTADT: Objection.
8      Q.   Outside the presence of any other
9  attorneys?
10         MR. GOODSTADT: I just want
11  to --
12         MR. NOVIKOFF: I'll break it
13  down.  I'll break the question down.
14     Q.   Putting aside any communications
15  you may have had in the presence of
16  Mr. Goodstadt and his office and putting
17  aside any communications you may have had
18  with any other lawyer or law firm, did you
19  have any communications with any of the
20  other Plaintiffs concerning filing a lawsuit
21  against Ocean Beach after April 2, 2006?
22     A.   Yes.  One instance.
23     Q.   When was that instance?
24     A.   The day before I met my
25  attorneys.

Page 82

1          T. Snyder
2      Q.   Okay.  Who did you have a
3  conversation with?
4      A.   With Ed Carter.
5      Q.   And what did you and Mr. Carter
6  talk about?
7      A.   Eddie had called me.  I was home
8  sick in bed.  He called me and said that --
9  that the four of us were going to go meet
10  with attorneys, and he thought it would be
11  wise if I came along as well because I'm
12  part of a lot of the events that are
13  occurring there, and I just recently was
14  fired as well, along with them.
15     Q.   How long after the date that you
16  just say you were fired did Carter have this
17  phone call with you?
18     A.   It was within a week.
19     Q.   So within the  -- just so I'm
20  clear then, within a week of April 2,
21  2000 --
22     A.   Wait.  I'm -- I'm wrong.  It
23  wasn't within a week.  It was actually it -- it
24  was after that.
25     Q.   Well, it was certainly after you

Page 83

1          T. Snyder
2  were -- you say you were fired, right?
3      A.   Yes.  More than a week.
4      Q.   A month?
5      A.   Yeah.  It was actually I think
6  several months.  Two months.
7      Q.   Okay.  So you were -- you say you
8  were fired.  Just so the record's clear,
9  when were you fired?
10     A.   I was advised I was fired by
11  George Hesse on -- on or about April 20 of
12  2006.
13     Q.   Okay.  Had you had this
14  conversation with Ed Carter before that
15  date?
16     A.   No, I did not.
17     Q.   In relation to April 20, 2006,
18  when did you have this conversation with Ed
19  Carter?
20     A.   About two months after that.
21  Roughly two months after that.
22     Q.   Okay.  So it would have been in
23  the June time period?
24     A.   Yes.
25     Q.   Okay.  Let's go to the complaint

Page 84

1          T. Snyder
2  that's in front of you, paragraph 109, which
3  appears on page 25.
4      A.   (Reviewing).
5      Q.   You allege in the first sentence
6  "upon information and belief, Carter and
7  Snyder were denied promotions to the
8  respective positions of lieutenant and
9  sergeant in the Town of Islip due to
10  unfounded negative references from Hesse."
11  I'm not interested today in Carter, I'm only
12  interested in you.  And if I read this
13  allegation correctly, you allege that you
14  were denied a promotion to sergeant; is that
15  correct?
16     A.   Yes.
17     Q.   Okay.  What was specifically the
18  negative reference from Hesse that you are
19  referring to in the sentence that I just
20  read?
21     A.   That Hesse was accusing me of
22  being the rat or the rat to civil service.
23  I was a rat.
24     Q.   So is -- am I correct when I read
25  your allegation, that you are alleging in

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 85

T. Snyder

1 this lawsuit that George Hesse provided a
2 reference to someone at the Town of Islip
3 that you were a rat?
4     A.   That's correct.  I had no reason
5 to believe that he wouldn't say I was a rat
6 to anybody else.  He said it to me.
7     Q.   Okay.  Well, that's what I'm
8 trying to find out now.  So I'm going to
9 repeat the question, because I think you
10 expanded on it a little bit.  Am I correct
11 in understanding your allegation in this
12 lawsuit that it is your belief that George
13 Hesse advised someone at the Town of Islip,
14 in a reference for you for a promotion, that
15 you were a rat?
16     A.   Yes, it is my belief.
17     Q.   Okay.  Has anyone from the Town
18 of Islip ever advised you that George Hesse
19 called you a rat with regard to their
20 consideration for you to be promoted to the
21 position of sergeant?
22     A.   Numerous people had came up to me
23 and said that they had heard that I was
24 fired from Ocean Beach because I was a rat.

Page 86

T. Snyder

1     Q.   Okay.  I'm not interested in
2 numerous people, unless these numerous
3 people were from the town -- from your
4 employer, the Town of Islip.  So my question
5 is, has anyone from the Town of Islip with
6 whom you had any contact with concerning
7 your promotion to the position of sergeant,
8 advised you that, in a reference, Mr. Hesse
9 called you a rat?
10     A.   Yes.  Several of the people I
11 work with in my department, as well as
12 people over at the personnel department in
13 the town had stated they had heard.
14     Q.   Okay.  Let's -- then let's start
15 with that, the personnel department.  Give
16 me the names.
17     A.   The people that work in
18 personnel.  I'm not sure.
19     Q.   That spoke to you, that you just
20 testified to, who are the people at the
21 personnel department, their names?
22     A.   I don't recall their names.  Some
23 of the women that work there.
24     Q.   Some of the women?

Page 87

T. Snyder

1     A.   Yeah.  I'm not sure.  I don't
2 recall their names.
3     Q.   Okay.  And these women knew that
4 you had applied to be promoted?
5     A.   They knew that we had taken a
6 promotional exam and that it was recently
7 scored and that we -- myself and Eddie as
8 well were up for a promotion.
9     Q.   Okay.  And how would these women
10 know that, according to your knowledge?
11     A.   Well, I would assume that the
12 records from your promotional exam would
13 come from civil service to the Town of Islip
14 personnel department.
15     Q.   I'm asking you, how do you know
16 that these women specifically knew that you
17 had taken a test to be promoted?
18     MR. GOODSTADT: He just
19    testified to --
20     Q.   Without assuming, what is your
21 knowledge, other than an assumption?
22     A.   That's -- my knowledge is that
23 that's how it would -- they request the
24 test, the town requests the tests through

Page 88

T. Snyder

1 Suffolk County and Suffolk County posts, and
2 you go take the test and then the results
3 get brought back to the town.
4     Q.   The -- some of the women that you
5 referred to that you can't identify by name,
6 did any of them tell you "I know that you
7 just took a test" --
8     A.   No.
9     Q.   -- "to be promoted"?
10     A.   Not directly.  No.
11     Q.   Okay.  Did anyone -- did any of
12 these "some of the women" that you testified
13 to advise you that they were aware that you
14 were up for a promotion?
15     A.   Um, they said that they knew
16 people in the department were up.  Not me
17 specifically, no.
18     Q.   Okay.  Fine.  Now did any of
19 these women that you can't name, advise you
20 that they were told by George Hesse --
21     A.   No.
22     Q.   -- that you were a rat?
23     MR. GOODSTADT: Let him finish
24    the question.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 89

T. Snyder

1
2    A.   No, they did not.
3    Q.   Did any of these women advise you
4  that they had seen a piece of paper in which
5  George Hesse had called you a rat?
6    A.   No, they did not.
7    Q.   Who are your superiors at the
8  Town of Islip at this time?
9    A.   At this time, the assistant
10  director to parks and recreation, George
11  Schimpf.  It's S-C-H-I-M-P-F.
12    Q.   Okay.
13    A.   He was the -- well, he still is
14  the assistant.  He's running the department
15  now.  The director is -- is no longer there.
16    Q.   At the time these women that you
17  can't identify made whatever statements they
18  made to you, who was your superior?
19    A.   Marty Raber.  He was the
20  executive assistant to the Town of Islip
21  supervisor, Pete McGowan.
22    Q.   Did any of these women ever tell
23  you that Mr. Raber had told them that George
24  Hesse had said to Mr. Raber you were a rat?
25    A.   No, they did not.

Page 90

T. Snyder

1
2    Q.   Did any of these women that you
3  can't identify ever advise you that George
4  Hesse had advised George Schimpf that you
5  were a rat?
6    A.   No, they did not.
7    Q.   Did Raber ever advise you that
8  George Hesse had told you  -- that had told
9  him that you were a rat?
10    A.   No, he did not, but he did
11  know -- he did know that we were fired from
12  Ocean Beach and he knew the situation.
13 MO      MR. NOVIKOFF: Motion to strike
14    as not responsive.
15    Q.   I'll ask the question again.  Did
16  Mr. Raber ever advise you that George Hesse
17  had told him that you were a rat?
18    A.   No, he did not.
19    Q.   Did Mr. Schimpf ever advise you
20  that George Hesse had told him that you were
21  a rat?
22    A.   No, he did not.
23    Q.   Now when you make reference to "a
24  reference" in paragraph 109, what
25  specifically are you referring to?

Page 91

T. Snyder

1
2    A.   A reference you mean like a job
3  reference?  I'm not sure --
4    Q.   I'm asking you what you meant by
5  the word "reference" in paragraph 109.
6    A.   The reference would be that I was
7  the rat to civil service that ratted out the
8  uncertified officers who were working there
9  at Ocean Beach, among other things.
10    Q.   When -- okay.  I understand that
11  that's what you're claiming George Hesse
12  said about you.  My question to you is, when
13  you refer to a negative reference, are you
14  referring to a reference in the context of
15  an employment opportunity that you would
16  seek from your prior employer?
17    A.   Yes.  That, along with my -- the
18  reference, the negative reference that I was
19  a rat as well.
20    Q.   Okay.  Now have you ever asked
21  the Town of Islip to show you your personnel
22  file to ascertain whether there was any
23  documentation in there that references
24  George Hesse calling you a rat?
25    A.   I have seen my personnel file,

Page 92

T. Snyder

1
2  yes.
3    Q.   Well, was there any reference in
4  there that George Hesse called you a rat?
5    A.   Not that I seen.
6    Q.   Okay.  When did you look at your
7  personnel file?
8    A.   Probably I think about a year ago
9  or so.
10    Q.   How did you go about looking at
11  it?
12    A.   You have to notify your -- your
13  boss that you would like to see your
14  personnel file.  He calls personnel and then
15  they basically set up an appointment for you
16  to come over so you can look at it.
17    Q.   Other than your belief that
18  George Hesse somehow said to someone at Town
19  of Islip that you were a rat, is there any
20  other negative reference that you are
21  referring to when you use that phrase in
22  paragraph 109?
23        MR. GOODSTADT: Objection.
24        MR. NOVIKOFF: I'll withdraw
25    the question.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 93

1          T. Snyder
2     Q.   Other than you being called a
3  rat, is there any other negative reference
4  that you're attributing to Mr. Hesse as you
5  used that phrase in paragraph 109?
6     A.   What I explained before.  That
7  how I was a rat and that, you know, I'm not
8  trustworthy and he wasn't going to give me a
9  reference for future employment.  I
10 actually --
11    Q.   Go ahead.
12    A.   I requested a reference from the
13 day he fired me, so I could seek employment
14 elsewhere.
15    Q.   And what did Hesse say to you
16 with regard to --
17    A.   He didn't answer.
18    Q.   Did you ever ask him again?
19    A.   I never spoke to him about it
20 again.
21    Q.   Okay.  Well, did Raber ever --
22 well, did anyone at the Town of Islip ever
23 tell you that Hesse told them that you were
24 not trustworthy?
25    A.   Not directly, no.

Page 94

1          T. Snyder
2     Q.   Okay.  Now you mentioned some
3  other people other than these women in
4  reference to Hesse calling you a rat.  Who
5  were these other people?
6     A.   Well, some of my coworkers I work
7  with.
8     Q.   Okay.
9     A.   Tom Keane, Craig Cain.
10    Q.   Craig what?
11    A.   Craig Cain, C-A-I-N.  Eddie
12 Carter, he was one.
13    Q.   Okay.
14    A.   Tony Riccardi.  Pretty much every
15 member of my department.  Also, members of
16 the Town of Islip harbor master's
17 department.  All the officers down there as
18 well, of which George used to work with them
19 part time.
20    Q.   And Tom Keane, did he have any --
21 did he advise you that he spoke with George
22 Hesse?
23    A.   Not directly.  No.
24    Q.   Well, when you mean "not
25 directly," just so I have an understanding,

Page 95

1  what do you mean?
2     A.   He heard the rumors from the
3  officers down at the harbor master's office
4  where George worked for the town part time.
5     Q.   Okay.  How did Craig Cain --
6     A.   The same thing.
7     Q.   Hold on.  You got to let me
8  finish the question.  Did Craig Cain ever
9  advise you that he had spoken to George
10 Hesse about you?
11    A.   No, he did not.
12    Q.   Okay.  Did Tony Riccardi ever
13 advise you that he had spoken to George
14 Hesse about you?
15    A.   No, he had not.
16    Q.   Did any person that you worked
17 with in your department as you use that
18 phrase, ever advise you that they had spoken
19 with George Hesse?
20    A.   No, they had not.
21    Q.   Okay.  Let's talk about the
22 harbor master department.  Who works
23 at the -- who worked between April 2006 and
24 today at the harbor master's department?

Page 96

1          T. Snyder
2     A.   I don't know the guy's name
3  specifically.  They have some new officers
4  now, but I know Bobby Sgroi was one of the
5  officers that George worked with.  He's now
6  running the department down there, and Alan
7  Loeffler at the time was also down there.
8     Q.   Well, when -- when did Alan
9  Loeffler stop being down there?
10    A.   When he retired I want to say
11 2006.  Sometime in 2006 he retired.
12    Q.   Did he retire before or after you
13 were told you were no longer working there?
14    A.   He retired and then came back
15 pending a waiver or something to that
16 effect.  I'm not sure, though.
17    Q.   Well, did you speak to Alan
18 Loeffler concerning anything that George
19 Hesse said to him, if anything?
20    A.   I spoke to him, but not directly
21 about that.  No.
22    Q.   Okay.  Did Alan Loeffler ever
23 advise you that George Hesse said anything
24 to him concerning you?
25    A.   He never spoke -- he never said

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 97

T. Snyder

1 to me directly, no.
2     Q.   Did Bobby Sgroi ever advise you
3 that George Hesse had spoken to him about
4 you after you say you were fired from Ocean
5 Beach in 2006?
6     A.   He says he spoke to him, but he
7 wanted to stay out of it.
8     Q.   Okay.  So Sgroi said he talked to
9 Hesse, but he didn't tell you what was said?
10     A.   Right.  He wouldn't -- he said he
11 wanted to remain neutral because he liked me
12 and he liked George and he didn't want to be
13 involved in it.
14     Q.   So he didn't tell you anything
15 about their conversation?
16     A.   No, he didn't.  There's also --
17     Q.   Hold on.  Hold on.
18         MR. GOODSTADT: He was still
19     answering the question.
20         MR. NOVIKOFF: No.  My question
21     was specific did Bobby Sgroi.  If the
22     answer is going to be about what Bobby
23     Sgroi said to you, then by all means
24     continue.  If it's not, then I don't

Page 98

T. Snyder

1 need to hear it.
2         MR. GOODSTADT: We'll put it in
3     an affidavit then.  That's fine.
4     Q.   Is your answer going to be what
5 Bobby Sgroi said to you?
6     A.   No.
7     Q.   Okay.  Then did anyone else who
8 worked for the harbor master department
9 between April 20, 2006 and the present day,
10 tell you that they have spoken to George
11 Hesse?
12     A.   Um, no, they have not.  Not in
13 reference to me.
14     Q.   Right.  Who at the Town of Islip
15 has advised you that they have spoken with
16 George Hesse?
17     A.   Um, other than Bobby Sgroi and
18 Alan, because he worked with Alan, I'm not
19 sure.  There may be other people.  He did --
20 he did work there.
21     Q.   That's not my question, sir, and
22 I don't even know if you've told me that
23 Alan Loeffler told you that he spoke to
24 George Hesse about it, so I'll ask that

Page 99

T. Snyder

1 question.  Did Alan Loeffler tell you that
2 he had spoken to George Hesse about you
3 after April 20, 2006?
4     A.   If he did, he wouldn't tell me.
5     Q.   That's not my question, sir.
6 Please, just answer my question.
7     A.   Okay.
8     Q.   Yes or no, did Alan Loeffler,
9 after April 20, 2006, advise you that he had
10 spoken to George Hesse concerning you?
11         MR. GOODSTADT: Objection.
12     Q.   Yes or no?
13     A.   No, he did not.
14     Q.   Okay.  So my question, because I
15 don't think you answered it, other than
16 Bobby Sgroi, was there anyone else employed
17 by the Town of Islip who has ever advised
18 you that they have spoken to George Hesse
19 about you after April 20, 2006?
20     A.   No one has spoken to me and said
21 that, no.
22     Q.   Okay.  Now let's go between April
23 2 and April 20, 2006.  Has anyone ever
24 advised you, between those two dates, that

Page 100

T. Snyder

1 they have spoken -- withdrawn.  Has anyone
2 employed by the Town of Islip ever advised
3 you that between April 2, 2006 and April 20,
4 2006, they have spoken to George Hesse about
5 you?
6     A.   No.  I don't recall anybody
7 within that time frame.
8     Q.   After April 20, 2006, did you ask
9 Chief Paridiso if he would provide you a
10 reference?
11     A.   The chief was out on disability
12 then and I was -- was no longer employed
13 with them, so no, I had no contact with the
14 police chief.
15 MO      MR. NOVIKOFF: Motion to strike
16     as nonresponsive.
17     Q.   Sir, after April 20, 2006, did
18 you ever ask Chief Paridiso if he could
19 provide you a reference?
20     A.   I don't recall speaking to him,
21 no.
22     Q.   Okay.  After April 20, 2006, did
23 you ever put down Chief Paridiso as a
24 reference for an employer to call or

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 101

1            T. Snyder
2 potential employer to call?
3      A.   Yeah, I think I did actually.
4      Q.   Okay.  Did you talk to Chief
5 Paridiso prior to putting his name down as
6 to whether or not it was okay with him for
7 you to put his name down?
8      A.   He previous to that had said that
9 we could use him as a reference prior  -- in
10 other words, prior to me being fired.  This
11 is going back a number of years.
12     Q.   How many year was this going
13 back?
14     A.   Several years.
15     Q.   Well, more than five?
16     A.   No.  It was less than that.  It
17 was during my -- time I was employed
18 there.
19     Q.   So if I understand your testimony
20 correctly, you believe that George Hesse
21 said that you are untrustworthy and that you
22 were a rat, but no one that was employed by
23 the Town of Islip has ever advised you that
24 George Hesse said that to them; is that
25 correct?

Page 102

1            T. Snyder
2      A.   No, they never directly said it
3 to my face.  No.
4      Q.   Right.  And likewise, sir, you
5 have never seen through your  -- you did not
6 see through a review of your personnel
7 records, that George Hesse ever wrote on any
8 document that was given to the Town of Islip
9 that you were untrustworthy or that you were
10 a rat?
11          MR. GOODSTADT: Objection.
12     A.   I never saw a document.  No.
13     Q.   Okay.  And none of your superiors
14 have ever told you that the reason that you
15 have not been promoted is as a result of
16 what Mr. Hesse -- withdrawn.  Would you
17 agree with me that none of your supervisors
18 have ever told you that the reason you have
19 not been promoted is because George Hesse
20 has called you a rat or untrustworthy?
21     A.   No.  Not directly to my face they
22 haven't.  No.
23     Q.   Okay.  Have you ever asked any of
24 your supervisors why you have not been
25 promoted?

Page 103

1            T. Snyder
2      A.   Yes, I did.
3      Q.   And --
4      A.   Their --
5      Q.   Hold on.  Which supervisor or
6 supervisors have you asked?
7      A.   Both Marty Raber and George
8 Schimpf.
9      Q.   And when did you talk to
10 Mr. Raber about why you were not promoted or
11 have not been promoted?
12     A.   It would have to be prior to him
13 leaving, so it would be after the results of
14 the test came back, between September of '06
15 and December of '06 when he left.
16     Q.   And when -- and what did he say?
17     A.   He said, "I made my
18 recommendations and that's it."  He put his
19 hand up.  He didn't want to talk.
20     Q.   And did he say he made  -- did he
21 say he recommended you?
22     A.   He just said, "I made my
23 recommendations."  He didn't want to talk.
24     Q.   How about Schimpf, have you ever
25 spoke to Schimpf about the fact that you

Page 104

1            T. Snyder
2 have yet to be promoted to sergeant?
3      A.   Yes.  And within the last year.
4 Yeah.
5      Q.   Was that after you filed the
6 lawsuit?
7      A.   Yes.
8      Q.   And was that after you had the
9 press conference?
10     A.   Yes.
11     Q.   Was that after Newsday had run an
12 article, at least one article concerning
13 this?
14     A.   Yes.
15     Q.   Was that after News 12 had run at
16 least one story about this?
17     A.   Yes.  I believe so.  Yes.
18     Q.   Was it after a number of other
19 television stations and media outlets had
20 run stories about this?
21     A.   I believe so.  Yes.
22     Q.   And what did Mr. Schimpf say to
23 you when you inquired with him as to why you
24 had yet to be promoted?
25     A.   He said the same thing that Marty

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 105

T. Snyder

1     Raber said, "I've made my recommendations,"
2     and he didn't want to talk about it either.
3        Q.   Okay.  Let's look at the next
4     sentence of paragraph 109.  Well, actually,
5     the next sentence doesn't refer to you, does
6     it?
7           MR. GOODSTADT: Objection.
8        A.   No, it doesn't.
9        Q.   Do you have any knowledge one way
10    or the other as to what -- as to the basis
11    of Mr. Carter's allegation?
12       A.   Not direct knowledge.
13       Q.   Just through what Mr. Carter told
14    you?
15       A.   Yes.
16       Q.   Okay.  Let's look at paragraph
17    110, "upon information and belief, Hesse
18    circulated false and malicious negative
19    references concerning Plaintiffs among
20    officials working for the Town of Islip," do
21    you see that?
22       A.   Yes, I do.
23       Q.   What do you mean by the word
24    "circulated"?

Page 106

T. Snyder

1        A.   Spread rumors.  Discussed our
2     employment and our firing with them.
3        Q.   Okay.  So you understand
4     "circulated" to being spreading rumors and
5     discussing the reasons for your terminations
6     with officials working for the Town of
7     Islip?
8        A.   Yes.
9        Q.   Okay.  What officials?
10       A.   The same ones we just talked
11    about.  This is --
12       Q.   Schimpf and --
13       A.   And Raber.
14       Q.   Okay.
15       A.   Um, among others.
16       Q.   Well, that's what I'm trying to
17    find out.
18       A.   I would imagine Bobby Sgroi.
19       Q.   I don't want you to imagine.  I
20    want you to advise me when you made the
21    allegation of "officials," what officials
22    were you referring to.  So you got Raber,
23    you got Schimpf?
24       A.   Right.

Page 107

T. Snyder

1        Q.   Sgroi?
2        A.   Bobby Sgroi, and probably the
3     personnel department.  The people in the
4     personnel department.
5        Q.   Okay.  And just so I'm clear,
6     you've never spoken to anyone at the
7     personnel department who said that they have
8     received these circulated false and
9     malicious negative references directly from
10    Hesse, have you?
11       A.   No, not directly.
12       Q.   And Sgroi has never told you that
13    he has personally received these false and
14    malicious negative references directly from
15    Hesse?
16       A.   No.  He stated he didn't want to
17    discuss it.
18       Q.   I understand.  And neither
19    Schimpf -- and Schimpf has never advised you
20    that he has directly received, from Hesse,
21    any false and malicious negative references?
22       A.   No.  He didn't want to discuss it
23    either.
24       Q.   Okay.  And -- well, let me, now

Page 108

T. Snyder

1     that you -- did you ever ask Schimpf if
2     Hesse has spoken to him?
3        A.   I asked him about the -- when I
4     spoke to him about the promotion and what
5     was holding it up, and you know.
6        Q.   Did you ever ask him "has Hesse
7     spoken to you"?
8        A.   No, I didn't ask him directly.
9        Q.   Have you ever asked Raber,
10    whatever his name was, if Hesse directly
11    spoke to him?
12          MR. GOODSTADT: Objection.
13       A.   No, I haven't asked him directly.
14       Q.   Okay.  And has -- and Raber has
15    never told you that he has received, from
16    Hesse, any false and malicious negative
17    references, correct?
18       A.   Right.  He said he didn't want to
19    discuss it, just like all the others.
20       Q.   Well, sir, he said he didn't want
21    to discuss your promotion, right?
22       A.   Right.
23       Q.   He didn't say he didn't want to
24    discuss Hesse, right?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 109

T. Snyder

1      A.   No, he didn't say that.
2      Q.   Because you never asked him about
3  Hesse, right?
4      A.   No.  But it was common knowledge
5  what happened.
6      Q.   Regardless of what is or not
7  common knowledge, you've never asked anyone
8  at the Town of Islip have they spoken to
9  George Hesse concerning your employment,
10  have you?
11      A.   Spoken to them in which way?
12  That I work there?
13      Q.   In the way human beings speak to
14  each other.
15      A.   You mean about me working there
16  or --
17      Q.   Yes.
18      A.   -- or me being fired?  I've
19  spoken to plenty of people about me working
20  there.
21      Q.   Then I'll rephrase the question.
22  You have never spoken to any of your
23  superiors concerning whether or not they
24  have spoken to Hesse about why you were

Page 110

T. Snyder

1  fired, right?
2      A.   No, I have not.
3      Q.   And you haven't spoken to anyone
4  at the personnel department concerning any
5  communications they may have had with Hesse
6  about why you were fired?
7          MR. GOODSTADT: Objection.
8      Q.   Right?
9      A.   No, I have not.
10      Q.   Okay.  So when you say "upon
11  information and belief," your information
12  and belief is just your speculation,
13  correct?
14          MR. GOODSTADT: Objection.
15      A.   It's not speculation.
16      Q.   No?  You have personal knowledge
17  as to what Hesse told any of your superiors?
18      A.   I don't have personal knowledge.
19      Q.   That's all I'm asking.  Let's go
20  to paragraph 113.  You allege "as a result
21  of false, damaging and baseless allegations
22  that have been inserted in Plaintiffs' civil
23  service records," do you see that?
24      A.   Um-hum.  Yes, I do.

Page 111

T. Snyder

1      Q.   Have you ever looked at your
2  civil service records?
3          MR. GOODSTADT: Objection.
4      A.   I have never seen it, no.  Not
5  with civil service, no.
6      Q.   Have you ever sought to look at
7  your civil service records?
8      A.   Um, well, I guess in a way I did
9  when I called the state retirement system
10  and asked them when was the last day I was
11  registered as a police officer.
12      Q.   When did you call them?
13      A.   Soon after I was fired.
14      Q.   Okay.
15      A.   And they stated to me that they
16  had me last working as a police officer in
17  Ocean Beach on March 31, 2006.
18      Q.   Okay.  What were the false --
19  well, then, sir, to your knowledge, what
20  document has been inserted into your civil
21  service records that contain a false and
22  damaging and baseless allegation?
23      A.   I would imagine when George Hesse
24  talked to Alison Sanchez in civil service

Page 112

T. Snyder

1  and said that he was firing us, that that
2  would be the false and malicious
3  allegations.
4      Q.   You imagine?
5      A.   Well, he did -- he did say that
6  we were -- that we were rats and we were
7  being fired because of it.
8  MO      MR. NOVIKOFF: Motion to
9      strike, sir.
10      Q.   You just said you imagine.  Other
11  than your imagination, can you tell me what
12  specific document you are aware of that
13  Mr. Hesse has sent to civil service that
14  contains a false, damaging and baseless
15  allegation?
16          MR. GOODSTADT: Objection.
17      A.   He spoke to Alison Sanchez.  I
18  know he submitted documents upon our firing
19  of why we were being fired.  So I would
20  assume in those documents that that's where
21  it's written.
22  MO      MR. NOVIKOFF: Motion to
23      strike.
24      Q.   Have you ever seen a document

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 32 of 164 PageID #: 2012

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

T. Snyder

1       T. Snyder
2  that you claim went to civil service that
3  contains a false, damaging and baseless
4  allegation from Mr. Hesse?
5      A.   I don't recall seeing one, no.
6      Q.   Okay.  And what is the basis for
7  your belief or -- withdrawn.  What is the
8  basis for your imagination that subsequent
9  to April 20, 2006, Mr. Hesse spoke with
10  Ms. Sanchez?
11          MR. GOODSTADT: Objection.
12      Q.   Concerning you?
13          MR. GOODSTADT: Objection.
14      A.   When I called the retirement
15  system and found out that I was fired and I
16  was fired prior to I was notified being
17  fired.
18      Q.   All right.  Well, did that
19  department that you spoke to say that Hesse
20  spoke to Sanchez?
21      A.   No.  They said that they received
22  documents from Ocean Beach and from Suffolk
23  County Civil Service saying that I was no
24  longer employed as a police officer.
25      Q.   So my question to you, sir, what

T. Snyder

1       T. Snyder
2  evidence can you point to -- well,
3  withdrawn.  My question then is, what is the
4  basis for your belief that Sanchez and Hesse
5  ever spoke about you after April 20, 2006?
6      A.   It would be within those
7  documents that  -- after April 20, 2006?
8      Q.   Yes.
9      A.   I'm not aware of them speaking
10  after April 20, 2006.
11      Q.   Okay.  Then what is the basis for
12  your belief that they had spoken about your
13  termination after April 2, 2006?
14      A.   I'm not aware they spoke before
15  April 2.  I assume they spoke before --
16  prior to that, because apparently I was
17  fired before I was notified I was fired.
18      Q.   What makes you believe that Hesse
19  notified Sanchez prior to April 2, 2006 that
20  you in your words were being fired?
21      A.   I believe in some of the
22  documents in discovery we got from civil
23  service department shows that they had
24  regular communication.
25      Q.   Concerning why you were fired?

T. Snyder

1       T. Snyder
2      A.   Concerning everything in Ocean
3  Beach.
4      Q.   No, sir.  My question is more
5  specific than that, because this is about
6  your allegations in this complaint and your
7  testimony.  What evidence have you seen to
8  suggest to you that prior to April 2, 2006,
9  Hesse and Sanchez spoke about your
10  termination?
11      A.   I haven't seen any direct
12  evidence.
13      Q.   Thank you.  Let's go to the next
14  part of this allegation, and I'll start from
15  the beginning, "as a result of the false,
16  damaging and baseless allegations that have
17  been inserted in Plaintiffs' civil service
18  records, as well as Hesse's calculated plan
19  to prevent Plaintiffs from obtaining
20  subsequent law enforcement jobs through his
21  pattern of malicious and false negative
22  references" -- I'm going to end there.
23  Again, I'm not talking about the other
24  Plaintiffs.  I'm talking about you
25  specifically, sir.  What has Hesse done to

T. Snyder

1       T. Snyder
2  prevent you specifically from obtaining
3  subsequent law enforcement jobs?
4      A.   Well, he's, again, spoken to
5  Alison Sanchez and said that he was firing
6  us.  Um, he allowed other officers in the
7  department to write on a public blog about
8  us being rats.  He even told me who -- who
9  wrote.  He said, "It was us and the police
10  department who was writing it."  And he
11  refused to give me a reference when I asked
12  him.
13      Q.   Let's talk about Alison Sanchez.
14  You have no evidence that he's ever spoken
15  to Alison Sanchez about you, correct?
16      A.   I don't have any evidence, no.
17      Q.   Okay.  And you've seen no
18  document that suggests that he spoke to
19  Alison Sanchez about why you were
20  terminated?
21      A.   As of yet, I haven't seen no
22  document.  No.
23      Q.   Right.  Let's talk about refused
24  to give you a reference.  You asked him one
25  time for a reference on the day that you

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 117

T. Snyder

1
2 found out you were fired, right?
3     A.    The day he told me I was fired,
4 yes.
5     Q.    Right.  How many employment
6 applications have you put in for any job
7 after you found out that you were, as you
8 say, fired from Ocean Beach?
9     A.    I believe three.
10    Q.    To whom?
11    A.    To Brookhaven Town, to Brookhaven
12 National Lab, and to the John T. Mather
13 Memorial Hospital.
14    Q.    John what?
15    A.    John T. Mather, M-A-T-H-E-R,
16 Memorial Hospital.
17    Q.    Where is the John T. Mather
18 Memorial Hospital?
19    A.    In Port Jefferson, New York.
20    Q.    And what job were you looking for
21 at the hospital?
22    A.    For a position in the safety and
23 security department.
24    Q.    And when did you make the
25 application?  When did you apply for the

Page 118

T. Snyder

1
2 job?
3     A.    I applied actually several times.
4 I applied -- the first time I applied was
5 in -- I believe it was in June of '07.
6     Q.    And when was the next time for
7 the hospital only?
8     A.    Hospital only, it was back in
9 August of '07.
10    Q.    So just two times to the
11 hospital?
12    A.    Yes.  After the second -- after
13 the second application, I was then hired.
14    Q.    You were hired?
15    A.    Yeah.
16    Q.    Oh.  Okay then.  So that was over
17 a year ago?
18    A.    Yes.  That's correct.
19    Q.    Now you applied in 6/07, right?
20    A.    Initially, yes.  In June of '07.
21    Q.    And why did you have to apply a
22 second time?
23    A.    The first time they -- they
24 wouldn't hire me.  They just said that --
25 just said they weren't hiring at that time.

Page 119

T. Snyder

1
2     Q.    Okay.  They didn't tell you that
3 they had spoken to Hesse, did they?
4     A.    No.  They wouldn't talk about it.
5 They did -- they did mention to me about the
6 Ocean Beach incident, though.  Or Ocean
7 Beach.  That I was a former employee there.
8     Q.    Well, did you disclose to them on
9 the application that you were a former
10 employer?
11    A.    On my --
12    Q.    That you were a former employee?
13    A.    On my resume, yes.
14    Q.    Okay.  And who did you speak to
15 there?
16    A.    Um, the director.  I don't recall
17 his name right now, but the director of that
18 safety and security division.  Bob.  I'm not
19 sure his last name right now.
20    Q.    And what is -- was it Bob that
21 spoke to you about Ocean Beach?
22    A.    Yes, he did.
23    Q.    And what did he say to you?
24    A.    He asked me -- when he saw my
25 resume, he asked me, "Are you one of those

Page 120

T. Snyder

1
2 guys that's involved in all the beatings
3 over there?"  I said, "No."
4     Q.    Okay.  Did he say anything else
5 about Ocean Beach?
6     A.    He asked why I was fired.
7     Q.    Okay.  Anything else about Ocean
8 Beach?
9     A.    That was it really.
10    Q.    Okay.  So let me just -- just so
11 we're all clear and understand.  Bob, the
12 director of John T. Mather Memorial
13 Hospital, during an interview for you -- of
14 you for a position that you applied for in
15 or about June of '07, asked you if you were
16 one of the officers involved in the beatings
17 at Ocean Beach; is that correct?
18    A.    Yes.
19    Q.    And you answered him no?
20    A.    Right.
21    Q.    On that subject, did he ask you
22 any other questions?  "The subject" being
23 what he labeled the beatings at Ocean Beach?
24    A.    He didn't ask any questions.  He
25 just -- that was it.  He just went on to the

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 121

T. Snyder

2 next --
3     Q.   Right.  He asked you a question
4 if you were involved?
5     A.   Right.
6     Q.   And you said no?
7     A.   I said, "No, I was not."  "I
8 wasn't one of the bad cops," I said.
9     Q.   And on that issue, there was no
10 further discussion?
11     A.   No.
12     Q.   And you made specific reference
13 to bad cops in your answer?
14     A.   That was my answer to him.  I
15 said, "I was not -- I'm not one of the bad
16 cops over there, I'm one of the good cops."
17     Q.   Okay.  And then the next issue
18 that he asked you about in -- concerning
19 Ocean Beach was why you were fired?
20     A.   Yeah.  We discussed it.
21     Q.   Well, what did he specifically
22 ask you?
23     A.   He asked why I was fired.
24     Q.   And what did you say to him?
25     A.   I told him I was fired because

Page 122

T. Snyder

2 the -- the sergeant at the time, George
3 Hesse, my supervisor at the time, decided
4 that I was a rat.
5     Q.   So you --
6     A.   So I said --
7     Q.   Hold on.  Just so I'm clear, you
8 said initially in response to his question
9 about why you were fired, you said that
10 George Hesse, who was your supervisor at the
11 time?
12     A.   I said -- yeah, my supervisor.
13 Right.
14     Q.   Your supervisor at the time
15 decided that you were a rat?
16     A.   He -- that's what he said to me.
17 I was a rat.
18     Q.   Okay.  Fine.  And did you say
19 anything else to the director of security at
20 the hospital before he asked you any
21 follow-up questions about that?
22     A.   No.  That's when I said, "I'm not
23 one of the bad guys over there, I'm one of
24 the good guys."  That's -- that's how I
25 followed up.  And he said, "Okay."

Page 123

T. Snyder

2     Q.   But when did he ask you about the
3 beatings, before or after he asked you about
4 why you were terminated?
5     A.   Before, because he had -- it was
6 all in the news at that time.  So as soon as
7 he saw Ocean Beach, he goes, "Oh, are you
8 one of the bad guys over there?  Were you
9 involved in the beatings?"
10     Q.   What was all in the news?
11     A.   The whole story about Ocean
12 Beach.
13     Q.   What story?
14     A.   About the Gilbert incident that
15 happened in August of '05.
16     Q.   Okay.  So at your interview, he
17 asked you if you were an officer, if you
18 were involved in the beatings, and you said
19 no?
20     A.   Right.
21     Q.   And then he asked you why you
22 were fired or no longer worked for Ocean
23 Beach?
24     A.   Right.
25     Q.   And you told him that your

Page 124

T. Snyder

2 superior at the time, Hesse, said that you
3 were a rat, and then you followed up by
4 saying you were one of the good cops, not
5 the bad cops?
6     A.   Right.  I said that actually
7 twice I said that.
8     Q.   Okay.  Did he say anything else
9 to you -- did he ask you anything else about
10 Ocean Beach?
11     A.   No, he didn't at that time.
12     Q.   Did you say anything else to him
13 about Ocean Beach?
14     A.   No.
15     Q.   Other than what you've just
16 testified to?
17     A.   No, I did not.
18     Q.   Okay.  And when did he  -- well,
19 who advised you at the hospital that they
20 weren't hiring anybody?
21     A.   Oh, he did initially.
22     Q.   Before the interview even
23 started?
24     A.   He did initially  -- this is the
25 second time.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 125

1           T. Snyder
2     Q.   Sir --
3     A.   I think we're getting confused
4 here.
5     Q.   No.  My question -- sir, my
6 question to you was very specific when we
7 started this.  Was in June of '07, your
8 first application, why weren't you hired,
9 and you told me that they said to you they
10 weren't hiring.  So now we're going to have
11 to go back.  You made an application in June
12 of '07, correct?
13     A.   Right.
14     Q.   Okay.  When -- why did you make a
15 second application?
16     A.   Okay.  Because they didn't hire
17 me the first time.
18     Q.   And why, to your knowledge,
19 didn't they hire you the first time?
20     A.   I have no idea why they didn't
21 hire me the first time.  He didn't even want
22 to discuss it when I showed him my resume.
23 He looked at it and said that we're not
24 hiring at this time.
25     Q.   Oh, so this was -- was this an

Page 126

1           T. Snyder
2 unsolicited call at the hospital?
3           MR. GOODSTADT: Objection.
4           MR. NOVIKOFF: Well, withdrawn.
5     Q.   How did you -- how did it come
6 about that you were showing the director of
7 security at the hospital your resume?
8     A.   I was trying to find employment,
9 a part-time job, which I needed.
10     Q.   Okay.  Did you just walk up to
11 him and say "hi, my name is" and show him
12 your resume?
13     A.   No.  I had went to the hospital.
14 I asked some of the security officers and
15 they said they were hiring.
16     Q.   Okay.  And you then, based upon
17 what the security officers said, did what
18 next?
19     A.   I -- I filled out a resume and
20 then I made an appointment to go see him.  I
21 called him up.
22     Q.   And did you meet with him that
23 same day that you filled out the
24 application?
25     A.   No.  No.  It was after that.

Page 127

1           T. Snyder
2 Sometime after.  Shortly after that.
3     Q.   And then you met with him?
4     A.   Yes.
5     Q.   And he stated to you at the
6 beginning of this meeting that they're not
7 hiring?
8     A.   He -- he took my resume.  I told
9 him who I was, and he looked at me, and he
10 says, "Well, we're not hiring at this time."
11     Q.   Okay.  And that was the extent of
12 your conversation?
13     A.   That was the first time, yes.
14     Q.   And you said thank you very
15 much --
16     A.   And I walked out.
17     Q.   -- and you went on your way?
18     A.   Yes.
19     Q.   Okay.  And then what caused you,
20 if anything, to resubmit your application
21 or -- or seek employment again for the
22 hospital?
23     A.   I just wanted to go back there
24 and try it again.
25     Q.   Okay.  And so how did you go

Page 128

1           T. Snyder
2 about that?
3     A.   I -- I did the same thing again.
4 I called up and made an appointment.
5 Apparently, he -- he must not have
6 recognized that I was the same guy he talked
7 to.
8     Q.   Okay.  So he did meet with you
9 this time?
10     A.   The second time, yeah.
11     Q.   The second time.  Now in the
12 first time in June, was the Gilbert case in
13 the papers, to your knowledge?
14     A.   Oh, short  -- before that.  It
15 happened in August of '05.
16     Q.   Okay.
17     A.   Or September of '05.
18     Q.   But you just testified, though,
19 that it was in the newspapers when you were
20 interviewing?
21     A.   Well, it was prior to that.
22     Q.   Oh, okay.
23     A.   And then the whole scandal with
24 the DA saying he's investigating Ocean Beach
25 was in December of '05.  There was a big

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 129

T. Snyder

1
2 headline news.
3      Q.   Okay.  So you went to the
4 hospital.  You got to see the director.
5 Apparently he didn't recognize you from the
6 last time?
7      A.   It didn't appear to me he did.
8      Q.   And you had a conversation with
9 him?  An interview with him, right?
10      A.   At that time, yes, I did.
11      Q.   And this is where he asked you if
12 you were one of the cops involved in the
13 beating --
14      A.   Right.
15      Q.   -- that we talked about, and he
16 also asked you why you were terminated and
17 we talked about that, right?
18      A.   Yes.
19      Q.   Okay.  Were you given -- were you
20 offered the job at that interview?
21      A.   Yes, I was, at the end of the
22 interview.
23      Q.   Okay.  How did he go about
24 offering you the job?
25      A.   He said, "Well, this is what  --

Page 130

T. Snyder

1
2 this is the opening I have.  You know, can
3 you do this?"
4      Q.   Okay.
5      A.   And I said, "I will fit it into
6 my schedule.  Yeah, I will do it.  I need
7 the job."
8      Q.   And how much do you earn?
9      A.   $13 and change an hour.
10      Q.   And how many hours do you work
11 per week?
12      A.   Every other week, a total of
13 seven and a half, so we're talking what, 15
14 hours every other week.
15      Q.   Okay.  So if I understand your
16 testimony correctly, after you had discussed
17 whether or not you were one of the cops
18 involved in the beating at Ocean Beach, and
19 after you had specifically told him that
20 your supervisor had called you a rat, this
21 director of security for the John T. Mather
22 Memorial Hospital hired you?
23      A.   Yeah, he did.
24      Q.   Okay.
25      A.   I told him I wasn't one of the

Page 131

T. Snyder

1
2 bad cops, I was one of the good cops.  That
3 I was falsely accused over there.
4      Q.   So when you say "Plaintiffs have
5 been unable to secure new and comparable
6 employment in the law enforcement
7 profession," do you consider this job to be
8 new comparable employment in the law
9 enforcement profession?
10      A.   No, I do not.  It pays less money
11 and I don't have status as a police officer
12 in the security department.
13      Q.   Okay.  That's what I want to
14 know.  Okay.  Now Brookhaven Town, what job
15 were you seeking with Brookhaven Town?
16      A.   Park ranger.
17      Q.   Okay.  And when did you seek that
18 job?
19      A.   Around the same time I put an
20 application in and sent my resume to them.
21      Q.   Now was that a full-time job?
22      A.   I put in for a part-time position
23 there.
24      Q.   Okay.  And did you have any
25 interviews?

Page 132

T. Snyder

1
2      A.   No, I did not.
3      Q.   Did they advise you that they
4 would not hire you?
5      A.   They said that they were still
6 going through everybody's resumes.
7      Q.   Okay.  And did you ever follow up
8 to see --
9      A.   I did.
10      Q.   Hold on.  Let me finish the
11 question.  Did you ever follow up with the
12 Town of Brookhaven to determine whether or
13 not they had finished going through their
14 resumes?
15      A.   Yes, I did.
16      Q.   And when was this?
17      A.   Several weeks after that.  It was
18 also during the same time frame that I was
19 applying at --
20      Q.   Okay.
21      A.   -- at Mather.
22      Q.   And when they said they had, what
23 did you say to them, if anything?
24      A.   I asked them if -- what's going
25 on with the hiring.  You know, have you seen

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 133

1           T. Snyder
2 my resume, and they said that they're still
3 reviewing the paperwork, and that's what
4 their answer was.
5     Q.   Okay.  And was this for a law
6 enforcement type job?
7     A.   Yes.
8     Q.   Similar to what you were doing at
9 Ocean Beach?
10    A.   Yes, it was for a similar type
11 job.  It was a peace officer rather than
12 police officer, but it was similar.  It was
13 law enforcement.
14    Q.   And have you had any other
15 communications with the Town of Brookhaven
16 concerning this job, other than what you've
17 just testified to?
18    A.   No, I have not.
19    Q.   Have you ever followed up with
20 them as to whether or not they are still
21 looking to hire someone?
22    A.   I haven't followed up since, no.
23    Q.   Do you know if they hired
24 anybody?
25    A.   They have hired people now, yes.

Page 134

1           T. Snyder
2 Just recently.
3     Q.   Do you know if they hired anyone
4 for the position that you were looking for?
5     A.   They hired I believe 10 park
6 rangers, yes.
7     Q.   And how do you know that?
8     A.   It was in the newspapers.  They
9 put out a press release.
10    Q.   Okay.  When did this press
11 release come out?
12    A.   Within the last month.
13    Q.   Okay.  And you had looked for a
14 job in the Town of Brookhaven in August of
15 '07?
16    A.   Right.  Right.  August '07.
17    Q.   So are you aware between August
18 '07 and last month, as to whether the Town
19 of Brookhaven hired anyone for a park ranger
20 position?
21    A.   Yes, I am.
22    Q.   And when did they?
23    A.   Just what I just stated.
24    Q.   Okay.  Other than what you just
25 stated, the 10 that you say were hired last

Page 135

1           T. Snyder
2 month --
3          MR. GOODSTADT: Objection.
4     Q.   Well, when were these park
5 rangers hired?
6     A.   Within the last month it was --
7 they just got hired.
8     Q.   Okay.  So other than the 10 that
9 were hired within the last month, are you
10 aware of any other park rangers that were
11 hired between the date of your application
12 and last month?
13    A.   No, I'm not aware.
14          MR. NOVIKOFF: Okay.  Let's
15    mark the next document as Snyder-8.
16          (Application for Town of
17    Brookhaven was marked as Snyder
18    Exhibit-8 for identification; 9/24/08,
19    E.L.)
20    A.   (Reviewing).
21    Q.   Sir, do you recognize Snyder-8?
22    A.   Yes, I do.
23    Q.   And what is Snyder-8?
24    A.   This is the application I filled
25 out for the -- the position as a park

Page 136

1           T. Snyder
2 ranger.
3     Q.   And for the record, it's TOB0010
4 to TOB0011, and you filled out this
5 application on or about June 28, 2007?
6     A.   Yes, I did.
7     Q.   And you put down Ed Paridiso as
8 your supervisor here?
9     A.   Yes.  Because Ed Paridiso still
10 technically was chief at Ocean Beach.
11    Q.   And was Ed Paridiso your
12 supervisor while you worked at Ocean Beach?
13    A.   When I worked with him on his
14 tour, yes, I was.  Yes, he was.  Excuse me.
15    Q.   Sir, what does that mean, when
16 you worked with him on your tour?  This --
17 this question says "who is your supervisor,"
18 you wrote "Ed Paridiso, chief."  Was Ed
19 Paridiso your supervisor throughout your
20 tenure at Ocean Beach?
21    A.   He was one of my supervisors.
22 There was another one.  George Hesse was the
23 second supervisor.  And on occasions, Walter
24 Muller, police officer, was designated as
25 the duty officer, and he was also my

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 137

T. Snyder

1 supervisor.
2 Q. Okay. So why didn't you put down
3 Walter Muller?
4 A. Because Walter Muller is not
5 going to give me a reference. He's not
6 running the department. Chief Paridiso was.
7 Q. Why didn't you put Ed -- why
8 didn't you put -- well, they weren't asking
9 for a reference, were they? They were
10 saying "state employment experience. Start
11 with your present and last job, include
12 military service and volunteer activities,"
13 and then they write "employer" and you write
14 what?
15 A. What -- what line are you looking
16 at? I'm sorry.
17 Q. Okay. I am looking at "employer
18 name and address." You write "Incorporated
19 Village of Ocean Beach," do you see that?
20 A. Okay. Yes, I see that.
21 Q. You then give a phone number.
22 You then give how much you were making per
23 hour?
24 A. Yes. That's correct.

Page 138

T. Snyder

1 Q. You then give your duties that
2 you performed, right?
3 A. Yes.
4 Q. And then you write "supervisor,
5 Ed Paridiso, chief," do you see that?
6 A. Yes.
7 Q. Why didn't you put Hesse down?
8 A. Because --
9 MR. GOODSTADT: Objection.
10 Q. Hesse was your supervisor, right?
11 A. He was the supervisor when I --
12 when I worked underneath him in his tour,
13 yes.
14 Q. Did you ever --
15 A. He was -- at this point, he
16 wasn't the chief, as far as I knew. The
17 chief of police is the only one who can
18 give -- who could -- they would want to
19 speak to. They didn't want to speak to
20 George Hesse.
21 Q. You got it. Okay. You didn't
22 put down your military experience, did you?
23 A. No. I don't see anywhere on here
24 where I had to fill it out.

Page 139

T. Snyder

1 Q. Let's see. 26, "employment
2 experience. Start with your present and
3 last job, including military service and
4 volunteer activities," do you see that?
5 A. Yes.
6 Q. You had military service, right?
7 A. Yes, I did.
8 Q. You didn't put that down, did
9 you?
10 A. No. But I put it on my resume.
11 Q. Okay. You submitted a resume?
12 A. I did submit a resume to them.
13 Yes.
14 Q. Okay. Did you advise them on
15 your resume that you were -- you were
16 discharged after a court marshal?
17 A. No, I didn't write that on my
18 resume.
19 Q. Okay. Let's talk about the
20 Brookhaven National Laboratory. What job
21 were you looking for with them?
22 A. In their -- they have a police
23 department there.
24 Q. Okay. What -- you were looking

Page 140

T. Snyder

1 for the position of police officer?
2 A. Yes, I was.
3 Q. Full time or part time?
4 A. I was hoping to work part time
5 there.
6 Q. Okay. When did you apply?
7 A. I sent them a resume, um, I think
8 it was around the same time frame. Maybe a
9 little earlier. Sometime in the same time
10 frame as these.
11 Q. When you say you sent a resume,
12 did you have to fill out any application
13 along with that resume?
14 A. I had to submit -- I was told to
15 submit a resume first.
16 Q. Okay. And did you get any
17 feedback from the Brookhaven National
18 Laboratory once you sent their -- your
19 resume to them?
20 A. I -- I was told that they
21 received the resume and that they were
22 discussing when they were going to have
23 another police class, because apparently
24 they do their own training as far as

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 141

1           T. Snyder
2  specific to their property.
3       Q.   Was it the same resume that you
4  sent to Brookhaven town?
5       A.   It was the  -- yes.  The same
6  resume.
7       Q.   Was it the same resume that you
8  sent to the John T. Mather Hospital?
9       A.   Yes, it was the same.
10      Q.   Okay.  And have you had any
11 further communication with the Brookhaven
12 National Lab concerning this potential job
13 opening?
14      A.   Just one other phone call and
15 they told me that at the time, they hadn't
16 hired anybody yet.  They weren't hiring or
17 hadn't hired anybody yet.
18      Q.   And when was that?
19      A.   Um, several months after they got
20 my resume.
21      Q.   So that would have been sometime
22 in the fall to early winter of 2007?
23      A.   I think so, but I'm not sure.
24      Q.   Okay.
25      A.   It was somewhere within that time

Page 142

1  frame, though.
2       Q.   Okay.  And how did you know  --
3  what -- what prompted you to send your
4  resume to the Brookhaven National Lab?
5       A.   I had heard from someone who
6  worked there that they actually have a
7  police force there and they hire people.
8       Q.   Okay.  And are you aware as to
9  whether or not Brookhaven National Lab has
10 hired any police officers since you
11 submitted your resume?
12      A.   I am not aware, no.
13      Q.   Have you followed up since 2007
14 with them concerning your resume?
15      A.   I haven't followed up since then,
16 no.
17      Q.   Okay.  Have you had any
18 conversations with anyone at the Brookhaven
19 National Laboratory concerning any
20 statements that George Hesse made, may have
21 made about you?
22      A.   No.  I didn't even get that far
23 along in the process.
24      Q.   Did you discuss with anyone over

Page 143

1           T. Snyder
2  at the Brookhaven National Lab, any issues
3  concerning your employment with Ocean Beach?
4       A.   No.  Again, I didn't get that far
5  along in the process.
6       Q.   Okay.  So other than -- well,
7  let's -- let's get specific now.  You
8  write -- you allege you have been unable to
9  secure new comparable employment in the law
10 enforcement profession.  What employers have
11 you sent your resume to concerning securing
12 new and comparable employment in the law
13 enforcement profession since April 20, 2006?
14      A.   Just those three.  That's it.
15      Q.   Okay.
16      A.   Or, actually, I wouldn't even
17 consider them -- Mather comparable.
18      Q.   Well, that's what I'm going to
19 say.  I mean, you didn't testify that all
20 three of these are comparable.  Are any
21 three of these comparable to what you had at
22 Ocean Beach, in your opinion?
23      A.   Brookhaven National Lab I would
24 say is comparable because they have a police
25 force, and I would say the park ranger job

Page 144

1           T. Snyder
2  would be comparable.
3       Q.   Okay.  And other than those two
4  jobs, have you sent your resume or applied
5  for any other comparable law enforcement
6  profession -- job?
7       A.   No, I have not at this time.
8       Q.   When -- okay.  Has any member of
9  your family  -- has any member of your
10 family been confronted concerning your Ocean
11 Beach termination?
12      A.   I wouldn't -- I don't know if
13 you want to say "confronted."  People have
14 brought it up to them, yeah.
15      Q.   Well, let's just look at
16 paragraph 114, the last sentence.  You write
17 "nevertheless, Plaintiffs and their families
18 have been repeatedly confronted and
19 castigated by strangers who have assumed
20 that these baseless and malicious
21 allegations against Plaintiffs are true," do
22 you see that?
23      A.   Yes, I do.
24      Q.   Has your family been -- has any
25 family member been confronted and

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 145

T. Snyder

1
2 castigated?
3    A.   Some members of my family have.
4    Q.   Who?
5    A.   My daughter.  My daughter,
6 Larissa, who works in Brookhaven town.
7 People have mentioned to her about the blog.
8 What's on the blog.
9    Q.   About the blog?
10    A.   Yup.  As well as people coming up
11 to me and mentioning about the blog, too.
12    Q.   Okay.  How about anyone else in
13 your family?
14    A.   No one -- none -- they haven't
15 said anything to me about it, no.
16    Q.   So you believe that the fact that
17 some people in the Town of Islip have
18 addressed with your daughter what may have
19 appeared on the blog  --
20    A.   No, not with the Town of Islip.
21    Q.   Okay.  You believe because some
22 people have addressed with your daughter the
23 fact that your name has appeared on the
24 blog, that has -- that is what you consider
25 to be castigated and confronted?

Page 146

T. Snyder

1
2    A.   My name has been publicly smeared
3 in the blog, yeah, as being a rat and being
4 a bad cop.
5    MR. NOVIKOFF: Okay.  We're
6    going to go through the blog at the
7    next break, after the next break.  So
8    why don't we take a break now and we'll
9    come back.
10    THE VIDEOGRAPHER: This ends
11    tape number two.  The time is 12:28
12    p.m.  Going off the record.
13    (A break was taken.)
14    THE VIDEOGRAPHER: This begins
15    tape number three.  The time is 12:40
16    p.m.  Back on the record.
17    Q.   Sir, you made reference to a blog
18 before the break, and I believe when we
19 spoke about your allegations in paragraph
20 113, you testified that part of Hesse's plan
21 was that he allowed other officers to write
22 in a blog, do you recall that?
23    A.   Yes, I do.
24    Q.   Okay.  What blog are you
25 referring to?

Page 147

T. Snyder

1
2    A.   Um, The Schwartz Report I believe
3 it's called.
4    Q.   Have you ever read this blog?
5    A.   Yeah, I -- I have.
6    Q.   Have you ever participated in
7 this blog?
8    A.   On one occasion.
9    Q.   You wrote something in this blog?
10    A.   Yes, I did.
11    Q.   Okay.  And how many times have
12 you read this blog?
13    A.   Several times.
14    Q.   Well --
15    A.   I haven't -- not recently,
16 though.
17    Q.   Well, define "several"?
18    A.   I would say probably maybe a half
19 dozen times.
20    Q.   Okay.  Would that have been in
21 2006?
22    A.   Yeah, 2006.  Yes.
23    MR. NOVIKOFF: I'm going to ask
24    the court reporter to mark the
25    following document as Snyder-9, and for

Page 148

T. Snyder

1
2 the record, it's going to be Hesse
3 00012 through Hesse 000206.
4    (Document Bates stamped Hesse
5    00012 through Hesse 000206 was marked
6    as Snyder Exhibit-9 for identification;
7    9/24/08, E.L.)
8    A.   (Reviewing).
9    Q.   Now I'm not going to ask you yet
10 to go through the whole thing.  I'm just
11 going to ask you  -- but if you need to,
12 then go through every page.  Is this the
13 blog or part of the blog that you were just
14 referring to?
15    A.   Yes.  This is it.
16    Q.   Okay.  Now when you say that
17 Hesse allowed other officers to write on the
18 blog, what do you mean by "allowed"?
19    A.   Well, he told me who was writing
20 when -- during the day he fired me.  He said
21 who was writing on the blog about me.
22    Q.   Okay.  How did it come about that
23 you and him started talking about this blog?
24    A.   Um, it was when he requested my
25 gun and shield back when he was firing me, I

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 149

T. Snyder

1
2 said that people are writing, you know,
3 false information about me on the blog and
4 spreading lies and malicious rumors about me
5 on the blog, and it's not true.
6    Q.   And what did Hesse say?
7    A.   I said -- actually, I elaborated
8 a little more.  I says, "you know, there's
9 people -- village residents now accusing me
10 of this stuff."  He goes, "Tommy, there is
11 no village residents that are writing."  He
12 goes, "That's us in the police department."
13 Says, "You know who wrote that about you?
14 Ty Bacon wrote that about you."  Ty is one
15 of the officers I work with over there.
16 Also one of the uncertified officers over
17 there.
18 MO        MR. NOVIKOFF: Well, move to
19    strike that part about the uncertified
20    officers.
21    Q.   Did he -- did Hesse mention to
22 you on April 20, any other officer that was
23 writing on this blog?
24    A.   No.  That -- that was who he said
25 wrote that -- that specific blog that I

Page 150

T. Snyder

1
2 responded to.
3    Q.   Okay.  So why don't you go in
4 this document and tell me what page on the
5 lower right-hand column you're referring to
6 with regard to the blog that you wrote?
7    A.   Here it is right here
8 (indicating).
9    Q.   Just tell me --
10    A.   I'm sorry.  000019 would be the
11 page.
12    Q.   000 --
13    A.   Page I guess that would be it,
14 right?  That's the --
15    Q.   Well, that's Hesse 000019?
16    A.   Yes.  I'm sorry.  Yeah.
17    Q.   Which -- which blog are you
18 referring to?
19    A.   The one that's titled
20 "excaliber."
21    Q.   Okay.  Is that your name?
22    A.   That's the name that I blogged
23 under that day, yes.
24    Q.   Okay.  You blogged and you were
25 responding to the quote by "anonymous"

Page 151

T. Snyder

1
2 saying "and let's not forget the two clowns
3 from Islip, Ed and Tom.  They too got canned
4 for not doing their jobs.  But do we need to
5 bring up the Halloween incident.  They are
6 lucky that they didn't get charged with
7 official misconduct and falsely reporting an
8 incident," do you see that?
9    A.   Yes, I do.
10    Q.   And then -- you then write, "this
11 is the Tom referred to in this post," do you
12 see that?
13    A.   Yes, I do.
14    Q.   Is that the only time you
15 wrote -- you wrote on this blog?
16    A.   Yes, it is.  Yes.
17    Q.   How did you go about -- this is
18 something I think we all discussed at the
19 break.  How do you go about writing on a
20 blog, because I have no clue?  How do --
21    A.   I don't understand.  What do you
22 mean how you go about --
23        MR. GOODSTADT: Just for the
24    record, we didn't all discuss.
25        MR. NOVIKOFF: Well,

Page 152

T. Snyder

1
2    Mr. Goodstadt wasn't part of this
3    conversation.  Nor was the court
4    reporter or the videographer.
5    Q.   Describe how you went about
6 putting this blog on what's referred to as
7 "The Schwartz Report"?
8    A.   Okay.  This was a public blog
9 that was known prior to my firing by
10 everybody not only in the police department,
11 but in the Town of Islip.  It's known to
12 everybody, okay.  631 Politics and The
13 Schwartz Report is where a lot of civil
14 service employees go to blog.  That's like
15 sort of common public knowledge.
16    Q.   Okay.
17    A.   Okay?  It was brought to my
18 attention by numerous people I work with in
19 the town, and also by some of my coworkers I
20 got fired with at Ocean Beach who said, you
21 know, there's stuff on the blog about you,
22 and I went to see what was written.
23    Q.   Okay.  So you did.  So how do go
24 about -- just describe for me the process.
25 Do you type something?  Do you send a letter

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 153

T. Snyder

2 to someone to put it on the blog?
3    A.   Oh no.  You type something in.
4    Q.   Okay.  So you go in.  You give
5 yourself a name?
6    A.   Right.  This is the name that I
7 blogged under.
8    Q.   You don't always have to use the
9 same name, right?  You can use any name you
10 want?
11    A.   I have no idea.  I only did it
12 once.
13    Q.   Right.
14    A.   So I don't know.
15    Q.   Okay.  And there's a section on
16 the thing that said "name" and you put in --
17    A.   This is the name that I decided
18 to put in.  Right.
19       MR. GOODSTADT: Just let him
20    finish the question.
21    A.   Okay.
22    Q.   Why didn't you just say "Tom
23 Snyder"?  Why did you use the name
24 "excaliber"?
25    A.   Because I refer to myself right

Page 154

T. Snyder

2 here.
3    Q.   Okay.
4    A.   And then it's -- obviously
5 it's -- the people who are writing about me
6 know who I am because they wrote where I
7 work and what my name was and my coworker.
8    Q.   And then you typed this out?
9    A.   Yes.
10    Q.   And you hit a send button?
11    A.   You send it to their site I
12 guess.
13    Q.   Okay.  Okay.  And did Joe Nofi,
14 to your knowledge, ever blog --
15    A.   Not to my knowledge.
16    Q.   -- on The Schwartz Report?
17       MR. GOODSTADT: Let him finish
18    the question.
19    A.   Not to my knowledge.
20    Q.   Did anyone ever tell you that Joe
21 Nofi had put a blog on The Schwartz Report?
22    A.   No, they did not.
23    Q.   Okay.  Did Ed Carter ever place a
24 blog on The Schwartz Report?
25    A.   Not to my knowledge.

Page 155

T. Snyder

2    Q.   Did anyone ever tell you that Ed
3 Carter did?
4    A.   No.
5    Q.   How about Kevin Lamm?
6    A.   Same thing with him.  Not to my
7 knowledge.
8    Q.   You have no knowledge as you sit
9 here today as to whether or not Kevin Lamm
10 ever blogged on The Schwartz Report?
11    A.   That's correct.  I have no
12 knowledge.
13    Q.   Did Kevin Lamm ever tell you that
14 he did so?
15    A.   No, he did not.
16    Q.   Did anyone ever tell you that Ken
17 Lamm did so?
18    A.   No, they did not.
19    Q.   In reading any of the blogs on
20 The Schwartz Report in your half dozen
21 times, did you ever recognize a blog that
22 appeared to have come from Kevin Lamm?
23    A.   No, I did not.
24    Q.   Okay.  How about Frank Fiorillo?
25    A.   Same thing with him.  No.

Page 156

T. Snyder

2    Q.   So with regard to Frank Fiorillo,
3 you don't have any knowledge that Frank
4 Fiorillo ever blogged?
5    A.   That's right.  That's correct.  I
6 have no knowledge of anybody blogging, other
7 than myself this one time.
8    Q.   Did you ever ask Lamm if he
9 blogged on The Schwartz Report?
10    A.   No, I never did.
11    Q.   Did you ever ask Fiorillo?
12    A.   I never did either.  I didn't
13 have to.  They told me they didn't.
14    Q.   Lamm told you he didn't?
15    A.   Yeah.
16    Q.   And Fiorillo told you he didn't?
17    A.   They said that they're not
18 blogging.  They're having a conversation
19 with themselves, these guys.  That's what
20 was told to me.
21    Q.   Who's having a conversation with
22 themselves?
23    A.   The members of the police
24 department.  That these people, whoever's
25 blogging, they're having a conversation with

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 157

1          T. Snyder
2 themselves.
3    Q.   They're having a conversation
4 with themselves?
5    A.   Right.  "It's a joke.  They're
6 having a conversation with themselves.  None
7 of us are blogging and you're the only one
8 who wrote that one time and you identified
9 yourself."
10    Q.   "You" being you?
11    A.   Me.  Right.
12    Q.   Okay.  And well, who told you
13 that they're having a conversation among
14 themselves?
15    A.   Frank did, when he said he went
16 on the blog one time and looked at it.  He
17 says, "Tommy, I see what you wrote."  He
18 goes, "They're having a conversation with
19 themselves."
20    Q.   And George Hesse, again, he only
21 advised you that Ty Bacon was doing blogs,
22 correct?
23       MR. GOODSTADT: Objection.
24    Q.   Well, did George Hesse ever
25 advise you that anyone, other than Ty Bacon,

Page 158

1          T. Snyder
2 had written a blog on The Schwartz Report
3 concerning the termination of the Plaintiffs
4 in this case?
5    A.   What he said to me, the exact
6 words were, "Tommy, that's us in the police
7 department writing, and the guy who wrote
8 that, the person who wrote that about you
9 that you're responding to was Ty Bacon."
10    Q.   Okay.  Let's look at the first
11 page.
12       MR. GOODSTADT: The first page
13    of the blog?
14    A.   Of the blog?
15    Q.   Yeah.  000012.  Is it your
16 contention that this first blog that starts
17 with "seems our new chief at Ocean Beach PD
18 is purging some men from his force," that
19 was written by someone on the Ocean Beach
20 Police Department after April 2, 2006?
21    A.   I have no idea who wrote that.
22    Q.   Okay.  Well, other than the post
23 that you were responding to -- and let's
24 find it.  It's on -- it's on page 19,
25 000019.  Can you identify the author of any

Page 159

1          T. Snyder
2 particular blog on The Schwartz Report that
3 has been marked as Snyder Exhibit-9?
4    A.   Can I identify?  What do you mean
5 can I identify?
6    Q.   Can you look at any blog and tell
7 me who wrote it specifically?
8    A.   No, I cannot.
9    Q.   Right.  And can you identify for
10 me any other blog that you believe was
11 defamatory as it concerns you?
12       MR. GOODSTADT: Objection.
13    A.   I would have to go through each
14 and every page here and look and see if
15 there's anything else in here about me.
16 Because like I said, I didn't go on this all
17 the time.
18    Q.   Okay.  Well, let's talk about up
19 through April 19.  I'm sorry, let's talk
20 about up through April 13.  Do you see that?
21    A.   Yes.
22    Q.   Prior to April 13, can you point
23 to any blog that is part of the exhibit I
24 gave you that you believe contained false
25 and malicious information about you?

Page 160

1          T. Snyder
2    A.   Well, this one here.  The one I
3 responded to (indicating).
4    Q.   Right.  Other than that one?
5    A.   Here's something here
6 (indicating).
7    Q.   Just give me the number on the
8 page.
9    A.   Oh, page 16.  Hesse 16.
10    Q.   Okay.
11    A.   That was definitely a concern of
12 mine.  That's why I posted --
13    Q.   Just tell me which one.
14    A.   The "ridiculous."  "OB resident,"
15 which is, again, reason why I suspected an
16 OB resident was writing.
17    Q.   "I heard that it was some "Town
18 Employees" that got fired?  Which causes me
19 to wonder what the town officials would
20 think if they found out that these people
21 were fired from a police department?
22 Hmmmm."  No mention of you on this, is
23 there?
24    A.   No.  But it was pretty obvious
25 who the town employees were that were

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 161

T. Snyder

1
2  working at Ocean Beach and also working in
3  the town.  It was common knowledge.
4      Q.   Well, is there a thread that's
5  attached to this blog?
6      A.   Well, when I received a letter
7  stating --
8      Q.   No.  Is there a thread that
9  appears on this blog that makes reference to
10  any other blog?
11      A.   Not to any other blog, no.
12      Q.   Okay.  Anything else prior to
13  April 13, 2006 that you believe refers to
14  you in a false and malicious manner?
15      A.   This one right here (indicating).
16      Q.   Just give me the number.
17      A.   Page number 17.
18      Q.   Okay.
19      A.   It says "p.o. OBPD."
20      Q.   "p.o." -- okay.
21      A.   It says "why don't you ladies
22  grow a pair and sign your name.  You write
23  and hide under anonymity.  Just like you
24  hide under your shield.  Lucky for you
25  public floggings are considered barbaric.  I

Page 162

T. Snyder

1
2  personally know of 30 other police officers
3  that are trustworthy and reliable who would
4  love nothing more than to flog you publicly.
5  Luckily for you are here in the United
6  States."  I considered that against us.
7      Q.   I'm talking about against you
8  personally.
9      A.   Okay.  I considered that myself
10  as against me.  I was one of the guys fired,
11  and they were assuming we were -- we were
12  blogging.
13      Q.   And who is "they" assuming?
14      A.   The police officers in the police
15  department, because they were responding.
16  Plus what George told me that they were
17  responding.
18      Q.   So this is dated April 8, 2006,
19  right?
20      A.   Right.
21      Q.   And the other one you showed me
22  on Hesse 16 is dated April 7, 2006, correct?
23      A.   Right.
24      Q.   You testified this morning that
25  you didn't know you were fired until April

Page 163

T. Snyder

1
2  20, 2006; isn't that correct?
3      A.   That's when -- that's correct.
4  That's when he told me I was fired.
5      Q.   But you just told me that you --
6  you viewed these two posts as being
7  defamatory?
8          MR. GOODSTADT:  He views them
9  now as being defamatory.
10      Q.   Oh, you didn't see these then?
11      A.   No.  I did see these then.  I
12  called over -- after the four people that
13  were fired along with me, okay, I called
14  over that -- the next night to find out what
15  my status was, because I didn't attend the
16  meeting where they got fired.
17      Q.   Okay.  So -- and when you called
18  over to get your status, what -- what was
19  told?
20      A.   I was told that George Hesse was
21  on vacation and he wouldn't be back for
22  another week or so.
23      Q.   So according to these blogs, you
24  believe that you were fired, right?
25      A.   They told me -- I spoke to Kevin

Page 164

T. Snyder

1
2  that night.  He says, "Tommy, you're not
3  going to believe this.  We were fired and we
4  think you're next."  So I called over to
5  find out what my status was.
6      Q.   So you -- you had seen some blogs
7  that led you to believe that you were going
8  to be fired?
9      A.   That's correct.  Plus the
10  information that I received from the state
11  retirement system saying that I was fired on
12  or stopped working on the 31st of March.
13      Q.   Okay.
14      A.   I didn't know that until I made a
15  follow-up phone call after I was fired.
16      Q.   Any other blogs prior to the one
17  that appears on Hesse 19 that you believe
18  was defamatory or malicious as against you?
19      A.   Is this prior to April 13?
20      Q.   Yeah.  Prior to April 13.  Yes.
21      A.   (Reviewing).  No.  Not -- that
22  was it.
23      Q.   All right.  So now let's talk
24  about what you testified that Hesse allowed
25  them.  Other than telling them not to do it,

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 165

T. Snyder

1
2 how could George Hesse have stopped anyone
3 from putting a blog on this report?
4      MR. GOODSTADT: Objection.
5      A.   Well, he could write a directive.
6 He could tell them that they're subject to
7 disciplinary action just like any other
8 person can do.
9      Q.   George Hesse can advise a citizen
10 of the United States that they are subject
11 to discipline if they exercise their First
12 Amendment rights?
13      A.   No.  He can advise the police
14 officers in the police department he was
15 supervising, because after all, he did tell
16 me that that's who was writing.
17      Q.   So you believe that -- that
18 George Hesse could have, if he wanted to,
19 have stopped any officers from blogging?
20      MR. GOODSTADT: Objection.
21      Q.   Is that your testimony?
22      A.   Yeah, I believe he could have.
23 In fact, I believe he may have even blogged
24 himself.  How do I know he didn't?
25      Q.   But you don't know if he did?

Page 166

T. Snyder

1
2      A.   I don't know for a fact, but how
3 do I know he didn't?
4      Q.   And you don't know for a fact,
5 other than what Hesse told you about Bacon,
6 as to whether or not any other police
7 officer blogged, correct?
8      A.   I don't know that for a fact, no.
9 I just know what he told me, that officers
10 in the police department were blogging.
11      Q.   And you don't know for a fact as
12 to whether or not Hesse authorized anyone to
13 blog, do you?
14      A.   I don't know specifically if he
15 did, no.
16      Q.   And you don't know if Hesse
17 directed anyone to blog, do you?
18      A.   No, I don't know that
19 specifically.
20      Q.   All you can tell us is that based
21 upon your conversation with Hesse, that
22 Hesse was aware that certain officers were
23 blogging?
24      A.   That's correct.  He told me that
25 they were -- police officers in the

Page 167

T. Snyder

1
2 department were blogging.
3      Q.   Okay?
4      A.   That's what he told me.
5      Q.   In any of your half a dozen
6 reviews of the blog, did you discover any
7 other blogs that you believed spread false
8 and malicious information about you, other
9 than what we were just looking at?
10      A.   There were several others I seen.
11 I couldn't -- I'd have to go through each
12 and every page to find it.
13      Q.   Well, you know what, I think it's
14 important enough that you should.  So how do
15 you want -- we can do it now on the video.
16 We can take it at lunch and come back and
17 tell me.  I'll do whatever you want to do.
18      MR. GOODSTADT: I certainly
19 think it should be done on the record.
20      MR. NOVIKOFF: Well, the
21 question I have is would you prefer us
22 to take a break, him look at the blog
23 over lunch, and then come back and
24 testify as to what is  -- what he
25 believes is malicious and defamatory,

Page 168

T. Snyder

1
2 or do you want to stay on the record
3 now in front of the video and your
4 client can look at it right now?  I'll
5 do whatever you want to do.
6      MR. GOODSTADT: I think we
7 should stay on the record and him
8 review it and we'll see how long we go.
9 Maybe we'll break for lunch in between,
10 unless you want to do it all in one
11 shot.  We can come back and he can
12 review it after lunch.
13      MR. NOVIKOFF: Well, then why
14 don't we start it your way.
15      MR. GOODSTADT: I think the
16 review should be done as part of the
17 record.
18      MR. NOVIKOFF: Then let's start
19 the review now.
20      A.   Okay.  (Reviewing).
21      Q.   The only thing I would ask you,
22 stop when you've come to one.
23      A.   Okay.  I've come to one.
24      Q.   Okay.  What page?
25      A.   21.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 169

T. Snyder

2  Q.  Okay.  Which one?
3  A.  "Still employed."  It says
4  "junior member."
5  Q.  Okay.  What -- what aspect of
6  this do you believe represents a false
7  and/or malicious rumor about you or
8  information about you?
9  A.  The one about where it says "do
10  you need more cops to rat on?  Once a rat
11  always a rat.  You want to bring up the
12  Halloween incident?  Let's talk about it.
13  The only cover up there was was how bad a
14  job you did investigating it.  Did you ever
15  wonder why no one would talk to you guys
16  during your shitty investigation?  Everyone
17  hates you.  Everyone knew then you were a
18  rat.  Did you know that when the case was
19  ran through the DA's office, they wanted to
20  investigate you and your rat partners?  Did
21  you know that it was the sergeant who
22  protected you from being investigated?  How
23  about the time you and your asshole partner
24  beat up those three girls and one of them
25  got away in handcuffs.  That was really

Page 170

T. Snyder

2  funny you moron.  What a lawsuit that was
3  going to be.  But wait, it was the sergeant
4  once again who protected your asses.
5  Amazing.  Truly amazing.  This sergeant I
6  talk of is currently the acting chief.  Do
7  you know why he's the acting chief?  It's
8  because he knows how to protect his men, the
9  department and the village and cares enough
10  to do so.  The previous administration --
11  chief in parentheses -- doesn't care about
12  you, the police department or the village.
13  So suck up the fact that you were let go and
14  get on with yourself.  See you around.  Oh,
15  wait.  No, I won't."
16  Q.  So now this is responding to
17  someone called "the village idiot," right?
18  A.  It's obviously responding to
19  us --
20  Q.  Sir, was this referring to
21  someone called "the village idiot"?
22  A.  I am not sure.  He could be
23  referring to village idiot.  He could be
24  referring to some of the previous blogs.
25  The way a blog works is sometimes people

Page 171

T. Snyder

2  respond to previous blogs maybe a day or
3  maybe four, five previous ones.
4  Q.  Okay.  But this is saying "hey
5  village idiot," right?
6  A.  That's what it's saying, yeah.
7  Q.  And does it refer to any other
8  name in here, other than "village idiot"?
9  A.  No, it doesn't.
10  Q.  Does it refer to your name at
11  all?
12  A.  No.  But it refers to me --
13  Q.  Does it refer to your name?
14  A.  Doesn't refer to me by name.
15  Q.  Okay.  Next one.  Continue.
16  A.  (Reviewing).
17  Q.  And, again, you don't know who is
18  still employed, right, you don't know the
19  identity of who wrote this?
20  A.  I don't know.  No.  Not
21  specifically.  (Reviewing).  I would assume
22  this one here would be (indicating) --
23  Q.  I don't want you to assume.
24  A.  Okay.  I feel this one here is.
25  Q.  Which one?

Page 172

T. Snyder

2  A.  23.  There's -- there's things
3  in here that -- that they're referring to me
4  about.
5  Q.  Which one?  Without reading it,
6  just say which one.  There's one that says
7  "still employed" and the other one says
8  "concern for you."
9  A.  "Still employed, junior member."
10  Q.  Okay.  Is your name mentioned at
11  all in this one?
12  A.  No, it's not.
13  Q.  Okay.  Next one.
14  A.  (Reviewing).  I would say this
15  one here on page 27.
16  Q.  Just tell me --
17  A.  "Make fun of -- make fun of chief
18  123."
19  Q.  Is your name mentioned anywhere
20  in there?
21  A.  Not specifically.  No.
22  Q.  Is your blog -- is your specific
23  blog that you previously entered mentioned
24  anywhere in here?
25  A.  Not specifically, no.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 173

T. Snyder

1    Q.   Okay.  Next one?
2    A.   (Reviewing).  I would say this
3  post on page 28 refers to me as well, or
4  myself and others.
5    Q.   Well, which one?
6    A.   "OBPD lover."
7    Q.   Okay.  Is your name mentioned
8  anywhere?
9    A.   No, it's not specifically.
10   Q.   Is your blog mentioned anywhere?
11   A.   No, it's not specifically.
12   Q.   Okay.
13      MR. CONNOLLY: Can I make a
14  recommendation?  If we're going to
15  refer to any blogs, maybe we can refer
16  to the blog entry numbers?
17      MR. NOVIKOFF: Okay.  It says
18  number 34.
19      THE WITNESS: Number -- okay.
20  Sure.
21      MR. CONNOLLY: This way it's a
22  little clearer in case there's two
23  entries of the same --
24      THE WITNESS: Sure.

Page 174

T. Snyder

1       MR. NOVIKOFF: You know what,
2  it's 1:10 now.  Why don't we take a
3  break, and on the record, when we come
4  back, if you want to during lunch,
5  identify the other ones just by name
6  and number and we can go forward, or we
7  can leave a space in the transcript and
8  he can do it at his leisure.
9       MR. GOODSTADT: Well, this is
10  part of your deposition and you have
11  seven hours, so if you want him to read
12  a 200-page document as part of your
13  deposition, that's part of the record.
14      MR. NOVIKOFF: I may.  That's
15  why I'm throwing it out to you.  What
16  do you want to do?
17      MR. GOODSTADT: I want to put
18  it on the record and have it as record
19  time.
20      MR. NOVIKOFF: Okay.  So let's
21  take a break for lunch and I'll pick it
22  up, if I want to.
23      THE WITNESS: Okay.
24      MR. NOVIKOFF: You got it.

Page 175

T. Snyder

1       THE VIDEOGRAPHER: The time is
2  1:09 p.m.  We're going off the record.
3       (A break was taken.)
4       THE VIDEOGRAPHER: The time is
5  2:04 p.m.  Back the record.
6       MR. NOVIKOFF: Sir, as I just
7  said while we were off the record, with
8  regard to the last question that you
9  haven't finished answering, what I'm
10  going to do is move on to another
11  subject and come back to this question,
12  fully acknowledging that I have asked
13  this question and I have given you the
14  opportunity to go through every page of
15  the blog.  You haven't yet completed
16  every page of the blog, and we'll
17  probably pick that up towards the end
18  of the deposition.
19   Q.   Let's go to paragraph 115.  You
20  allege that you have suffered and continue
21  to suffer severe mental anguish and
22  emotional distress.  Describe for me your
23  mental anguish and emotional -- withdrawn.
24  Describe for me your severe mental anguish

Page 176

T. Snyder

1  and emotional distress.
2    A.   Well, I -- I haven't been
3  sleeping well at nights because of it.  I've
4  had a lot of stomach aches because of it.
5  At the time that this was occurring, I was
6  under doctor's care for a severe illness to
7  begin with, and it just exacerbated that.
8    Q.   You have a doctor that has
9  rendered an opinion that this -- this
10  incident involving Ocean Beach has
11  exacerbated your medical condition?
12      MR. GOODSTADT: Objection.
13   A.   I don't have a doctor's opinion
14  of that, but no.  It did -- it did make me
15  feel a lot worse than what I was feeling
16  when I was sick.
17   Q.   What -- what medical condition
18  were you under doctor's care for?
19   A.   I had hepatitis.
20   Q.   Which hepatitis?
21   A.   Hepatitis C.
22   Q.   You still do, correct?
23   A.   That's correct.  Yeah.  It's --
24  it's under control right now.  At the time

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 177

T. Snyder

1    it was -- it was pretty severe.  I was
2    severely ill.
3        Q.   When you say "severely ill,"
4    describe for me what that means?
5        A.   My liver enzymes were out of wack
6    and I found out that when they did some  --
7    some CAT scans of my liver, they found out
8    there was some damage to it.
9        Q.   When were you first diagnosed
10   with hepatitis C?
11       A.   2000  -- December 2003 or four.
12   I'm not sure exactly what year, but it was
13   in that time frame.
14       Q.   Okay.  And have you sought the
15   help of any medical professional with regard
16   to your severe mental anguish and emotional
17   distress?
18       A.   No, I didn't.
19       Q.   Okay.
20       A.   Not at that time I hadn't.
21       Q.   Well, have you today -- well,
22   I'll withdraw the question.  Between the
23   date that you were advised that you were
24   terminated as you say it and today, have you

Page 178

T. Snyder

1    sought the assistance of any medical
2    professional with regard to what you claim
3    to be severe mental anguish and emotional
4    distress?
5        A.   No, I haven't, because I
6    currently work a civil service position, and
7    I figured if I go to a doctor and state
8    that, that they may say -- if there's
9    something psychologically wrong with me,
10   they may psych me out of my -- my full-time
11   job as well.  I was very concerned about
12   that.
13       Q.   And who has told you that if you
14   went to seek the help of a medical
15   professional, that you could lose your job?
16       A.   It's happened to other police
17   officers in the past.
18       Q.   That's not my question, sir.
19       A.   No one has told me specifically.
20       Q.   And where can you point to that
21   says if you go to a mental health
22   professional, you can lose your job?
23       MR. GOODSTADT: Objection.
24       Q.   Can you point to anything that

Page 179

T. Snyder

1    you've ever seen that says if you go to a
2    medical health professional, you can lose
3    your job?
4        A.   I know of a Suffolk County police
5    officer who was psyched out of his job
6    because of it.
7        Q.   I'm not asking you about an
8    individual who you believe may or may not
9    have been, as you say, psyched out of a job.
10   Have you seen any written documentation from
11   any governmental agency, indicating that if
12   you go to seek the assistance of a medical
13   health professional, you may be psyched out
14   of a job?
15       A.   No, I have not.
16       Q.   Okay.  And what are -- what are
17   your issues that you are concerned about
18   that you believe would psych you out of a
19   job?
20       A.   Well, if I explained to them that
21   I was under extreme emotional distress or
22   emotional distress about this and that I was
23   suffering loss of sleep and a lot of anxiety
24   and stress and tension over it, that that

Page 180

T. Snyder

1    would  -- they would say, you know, this --
2    this could cause you to have a problem with
3    your current job.
4        Q.   Have you ever missed work?
5    Withdrawn.  Have you -- have you gone beyond
6    your allotted sick days due to any mental
7    anguish or emotional -- well, withdrawn.
8    How many sick days are you allowed when you
9    work for the town?
10       A.   You can accumulate -- 13 a year
11   you get.  Up to 13.
12       Q.   And have you -- have you called
13   in sick -- withdrawn.  And do you have any
14   days still allotted to you?
15       A.   Um, I do, but very few left.  But
16   that --
17       Q.   How many -- how many do you have
18   left?
19       A.   I only have 28 hours sick on the
20   books right now.
21       Q.   Through the end of the year?
22       A.   No.  It's accumulating at two
23   hours a week.  So I'm up to 28 now.  I was
24   down to two hours at one point.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 181

T. Snyder

1
2    Q.   And have you received any
3    disciplinary -- has there been any
4    disciplinary action against you at work
5    since -- since April 20, 2006?
6         MR. GOODSTADT: Objection.
7    A.   Since April 20, 2006?
8    Q.   Yeah.
9    A.   No.  Not that I can recall.
10   Q.   Has there been any disciplinary
11   action against you since January 1, 2002 at
12   your full-time job?
13   A.   At the Town of Islip?
14   Q.   Yeah.
15   A.   There has been, yes.
16   Q.   And what -- what is that?
17   A.   It was for failing  -- not
18   following procedure, proper procedure.  I
19   forget the exact wording they used.
20   Q.   And when did this take place?
21   A.   Um, I'm not sure if it was 2006
22   or 2007.  I'm not sure.  I'd have to look at
23   it to see.  I don't recall exactly what
24   year.
25   Q.   And what -- did you explain to

Page 182

T. Snyder

1
2    them -- well, what exactly didn't you
3    follow?
4    A.   I was -- I called in a foot post
5    that -- actually, I was in a patrol vehicle,
6    but I called in a post that I was supposed
7    to be patrolling while I was on the outside
8    of it, not on the inside of the property.
9    Q.   And do you attribute this -- this
10   violation of policy, at least your employer
11   believes you did, you undertook, as being
12   related to your mental anguish and emotional
13   distress?
14   A.   I was under severe stress at that
15   time, but the reason why I did it was not --
16   I did it because I needed to find a
17   bathroom.  That's the reason why I did it.
18   Q.   Well, what severe stress were you
19   under at this time?
20   A.   I was under a lot of pressure
21   from the situation about not being able to
22   find secondary employment because the Ocean
23   Beach situation, and what the rumors that
24   were spreading around the town about us, and
25   my boss was really coming down hard on me.

Page 183

T. Snyder

1
2    Q.   Your boss was coming down hard on
3    you about what?
4    A.   About all of this.  He didn't
5    like me.  He likes me now, but he didn't
6    like me then.  I think he realizes the
7    situation.
8    Q.   Who's your boss?
9    A.   George Schimpf.
10   Q.   And when did George Schimpf start
11   coming down hard on you?
12   A.   He started coming down hard on me
13   soon after he got there.
14   Q.   And when was that?
15   A.   2000 -- late 2005, 2006.
16   Something in that frame.  In that time
17   frame.
18   Q.   So he started coming down hard on
19   you as soon as he got there?
20   A.   It was sometime right afterwards.
21   Q.   Did he come down hard on you
22   before you were terminated from Ocean Beach?
23   A.   I don't think he might  -- I
24   don't believe he was employed with the town
25   then.

Page 184

T. Snyder

1
2    Q.   Well, your last day of
3    employment  -- you were -- you had worked
4    for the town in March of 2006, right?
5    A.   Oh, that's correct.  That's a
6    mistake.  He was, yeah.  He was coming down
7    on me before then, too.
8    Q.   Why was he -- how do you
9    attribute what took place in April of 2006
10   to Mr. Schimpf coming down hard on you prior
11   to that date?
12   A.   Well, I think he just -- he added
13   on to it once he found out the knowledge of
14   what was going on.
15   Q.   You think?
16   A.   I'm pretty confident that he was
17   coming down on me like that.
18   Q.   But he's coming down on you
19   before you were fired from Ocean Beach,
20   correct?
21   A.   Yeah.  But it got more severe
22   afterwards.
23   Q.   Well, why was he coming down on
24   you before you got fired from Ocean Beach?
25   A.   I think he -- generally he was

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 185

T. Snyder

1          T. Snyder
2  coming down on everybody in the department.
3      Q.   Okay.  So you weren't singled out
4  by Mr. Schimpf prior to your termination in
5  terms of how hard he came down on you, did
6  he -- was he?
7      A.   In some cases I was.
8      Q.   Okay.  Before you were terminated
9  by Ocean Beach?
10     A.   Yeah.
11     Q.   Okay.  So then why was Schimpf
12  coming down harder on you before you were
13  fired from Ocean Beach than others, in your
14  opinion?
15     A.   I felt that he knew that  -- what
16  happened at Ocean Beach and he was listening
17  to the rumors about us being, you know, bad
18  cops and rats, and he wanted me out of
19  there.
20     Q.   What rumors were there before
21  April 2, 2006?
22     A.   The whole Halloween incident
23  happened in 2004.  That was well known
24  around the town.  Around the harbor
25  master's, around the town and around Ocean

Page 186

1          T. Snyder
2  Beach.
3      Q.   So you believe that Schimpf knew
4  about the rumors, whatever they were, prior
5  to your termination, and that's why he was
6  coming down harder on you than others?
7      A.   Yeah, I believe that.
8      Q.   Okay.  And did Hesse spread any
9  rumors about the Halloween incident prior to
10  April 2, 2006, to your knowledge?
11     A.   Not specifically.
12     Q.   Did anyone at Ocean Beach spread
13  any of these rumors prior to April 2, 2006,
14  to your knowledge?
15     A.   It was well known around town
16  that we were the officers that were working
17  that night and that we were considered rats
18  and we tried to jam up these guys.
19     Q.   Who made it well known around
20  town?
21     A.   Every village resident.  Every
22  person that came there was -- again, just
23  like it said in the blog.  "That's why no
24  one talks to you and no one likes you.  It's
25  all known."

Page 187

1          T. Snyder
2      Q.   Who made it known to everyone,
3  prior to April 2, 2006, who made it known?
4  That's what I'm asking you.  Not that it was
5  known, who made it known?
6      A.   I would assume it was the members
7  of the police department, since they were
8  aware of the situation, and then they told
9  the people working there.  And, as well as
10  the people who were present at the Halloween
11  incident.  The village residents that were
12  present.
13     Q.   You assume.  Do you know?
14     A.   Not specifically, no.
15     Q.   Okay.  Now did Schimpf, prior to
16  April 2, 2006, advise you that he didn't
17  like you because of anything involving Ocean
18  Beach?
19     A.   No.  He didn't come out and say
20  that.
21     Q.   Well, then let's not be vague.
22  Did he ever tell you that he didn't  -- he
23  was coming down hard on you because of
24  anything involving Ocean Beach prior to
25  April 2, 2006?

Page 188

1          T. Snyder
2          MR. GOODSTADT: Objection.  He
3      just answered the question.
4          MR. NOVIKOFF: My question --
5          MR. GOODSTADT: He said no, he
6      didn't come out and say that.
7      Q.   What did he say?  Did he say
8  anything?
9      A.   He didn't say anything, no.
10     Q.   Did he -- did he infer anything,
11  prior to April 2, 2006?
12     A.   He didn't say anything to me.
13     Q.   Did he drop any hints to you?
14     A.   He said he didn't -- he didn't
15  like me.  He didn't like my -- I guess the
16  way I -- I conducted myself.
17     Q.   Your boss told you, prior to
18  April 2, 2006, that he didn't like you and
19  he didn't like the way you conducted
20  yourself, is that your testimony?
21     A.   Yeah.  He made it very well known
22  to me and members of the department that he
23  thought I was a problem and he was  --
24  wanted to fire me.
25     Q.   Oh.  Okay.  Let's stay on this,

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 189

1           T. Snyder
2 then.  What specifically did Schimpf say to
3 you prior to April 2, 2006, with regard to
4 why you were a problem?
5     A.   He -- my performance.
6 Apparently he -- he claimed my performance
7 was wrong, which I have my -- my what do you
8 call it?  At the time I was going -- working
9 with the town, I was also under the doctor's
10 care for the hepatitis, so I was receiving
11 chemo treatment and working at the same
12 time.  So my production went down at some
13 cases.
14           He thought that that was a sign
15 that I was -- wasn't, you know, a
16 productive worker or good worker.  And it
17 was explained to him that the man is under a
18 doctor's care and he's only working because
19 he's, you know, he's working with chemo.  He
20 has no choice.  He's got to support a
21 family.  He can't go out on disability.
22 MO       MR. NOVIKOFF: Motion to strike
23     that part as nonresponsive.
24     Q.   So prior to April 2, 2006,
25 Schimpf had told you directly that he

Page 190

1           T. Snyder
2 thought you were a problem?
3     A.   Yeah, he did.
4     Q.   Schimpf told you directly, prior
5 to April 2, 2006, that he didn't like your
6 work performance?
7     A.   Yeah, he did.
8     Q.   Schimpf told you, prior to April
9 2, 2006, that he wanted to fire you?
10     A.   Yeah, he did.  And so -- and
11 Marty Raber as well.  I had a conversation
12 with him, too.
13     Q.   Marty Raber also told you prior
14 to --
15     A.   He said --
16     Q.   Hold on.  Marty Raber also told
17 you, prior to April 2, 2006, that he wanted
18 to fire you?
19     A.   Just prior to that he did.  He
20 said that, "Tom, you're a better cop than
21 that."  You know, and he said, "look at your
22 stats for the month."  I said, "Marty, I
23 told you I'm undergoing a doctor's care and
24 this may happen.  My production may go down.
25 I may be very -- too sick to work.  I may

Page 191

1           T. Snyder
2 actually have to go home some days because I
3 can't work."  And he said, "Well, you can do
4 better than this."
5           And I did.  I started stepping it
6 up quite a bit.  Became one of the more
7 active people in the department while I was
8 on chemotherapy.
9 MO       MR. NOVIKOFF: Motion to strike
10     as nonresponsive.
11     Q.   Sir, my question to you is, did
12 Marty Raber, prior to April 2, 2006, tell
13 you that you were a problem?
14           MR. GOODSTADT: Objection.  He
15     just told you what he said.
16     A.   Yes, he did.
17     Q.   Okay.  Did Marty Raber, prior to
18 April 2, 2006, tell you that he wanted to
19 fire you?
20     A.   No, he didn't.
21     Q.   Okay.  Now, April 2, 2006, let's
22 use that date as the guide post.  How long
23 after April 2, 2006 was Marty Raber still
24 your supervisor, if at all?
25     A.   I believe he was -- I believe he

Page 192

1           T. Snyder
2 left in December of 2006.  I think that's
3 when he left.
4     Q.   Okay.  And how long after April
5 2, 2006 was Schimpf still your supervisor?
6     A.   He was the deputy at the time to
7 Marty and he continued on.  He's -- he's
8 still in the department.
9     Q.   Okay.  Now after April 2, 2006,
10 did Mr. Schimpf tell you that he still had
11 problems with you?
12     A.   Yes, he did.
13     Q.   What did he say to you and when
14 was the first time -- when was the first
15 time he said he had problems with you after
16 April 2, 2006?
17     A.   Um, I -- I don't recall
18 specifically when, but it was sometime after
19 that.  Again, it was about my work
20 production --
21     Q.   Just I'm asking you when, sir.
22     A.   I -- I don't recall specifically.
23     Q.   Was it weeks after?  Months
24 after?
25     A.   I believe it was months after.

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

T. Snyder

1
2    Q.   Okay.  And what did -- what did
3 Mr. Schimpf say to you in this conversation,
4 this first conversation after April 2, 2006?
5    A.   Um, I don't -- I believe he said
6 he didn't like the way I handled a specific
7 call.  This was several months after I
8 believe.
9    Q.   And what was the specific call?
10    A.   It was for, um, it was a
11 disturbance call for a suspicious male that
12 was knocking on the door of a senior center
13 or banging on the windows or something like
14 that.
15    Q.   And did he say anything to you in
16 that conversation about Ocean Beach?
17    A.   No, not in that conversation.
18 No.
19    Q.   Oh, okay.  When was the next --
20 did Mr. Schimpf advise you in that
21 conversation that he wanted to fire you?
22    A.   Um, he didn't advise me he wanted
23 to fire me, but he had  -- he said that he
24 had a problem with -- with my work and that,
25 you know, he was basically threatening

T. Snyder

1
2 disciplinary action against me.
3    Q.   What was he threatening you with?
4    A.   To bring me up on charges for not
5 properly doing my job or adhering to
6 procedures or something to that effect.
7    Q.   Okay.  And did he ever bring you
8 up on any charges?
9    A.   No, he didn't, because it was
10 explained to him that  --
11 MO    MR. NOVIKOFF:  Motion to
12    strike.
13    Q.   Did he ever bring you up on
14 charges, yes or no?
15    A.   No, he didn't.
16    Q.   Okay.  When was the next time
17 that Mr. Schimpf criticized you with regard
18 to your work performance, if ever?
19    MR. GOODSTADT:  Objection.  You
20    can answer.
21    Q.   Well, I'll withdraw the question.
22 Was there another time that after this
23 conversation we were just talking about,
24 that Schimpf criticized your work
25 performance to you?

T. Snyder

1
2    A.   Yes.  It was that one incident I
3 just referred to about where I was outside
4 the post.
5    Q.   And in that incident, did he
6 bring up Ocean Beach?
7    A.   No, he did not.
8    Q.   Was there any other occasion,
9 after that second incident post April 2,
10 that Schimpf criticized your work
11 performance?
12    A.   No, there wasn't.
13    Q.   Okay.  Now you say that -- in
14 that second incident post April 2, did
15 Schimpf bring up Ocean Beach?
16    A.   No.  Not in the second incident.
17 No.
18    Q.   Well, in any subsequent
19 conversation, did Schimpf bring up Ocean
20 Beach?
21    A.   Not with me he didn't.
22    Q.   That's all I'm talking about.
23 With you.
24    A.   No, he didn't with me.  But with
25 some of my coworkers.

T. Snyder

1
2    Q.   I'm just asking with you, sir.
3    A.   No, not with me.
4    Q.   Okay.  Now has Schimpf ever told
5 you that he likes you more now than he used
6 to?
7    A.   Yeah, actually, he did.
8    Q.   What did he say to you?
9    A.   If you want to believe this, he
10 said, "you know, Tom, you're -- you're my
11 prince now in the department.  You write a
12 lot of summonses.  You're very productive.
13 I see you differently now."
14    Q.   And when did he tell you this?
15    A.   Within the last two months.
16    Q.   Okay.
17    A.   About two months ago.
18    Q.   Now in your Notice of Claim, you
19 allege that as part of your damages, you
20 have lost comfort and support.  What did you
21 mean by that?
22    MR. GOODSTADT:  Objection.
23    Q.   Well, you can answer.
24    A.   Well, comfort is as far as being
25 secure and comfortable knowing that I had

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 197

T. Snyder

1
2 that second job providing me an income so I
3 could support my family and contribute
4 towards my retirement, and the support is
5 basically would be the same thing.
6 Financial support.
7    Q.    Okay.  So when you say "loss of
8 comfort and support," you're referring to
9 financial comfort and financial support?
10    A.    Yeah.  As well as securing
11 knowing that I have a job and that I no
12 longer, you know, have to worry about how
13 I'm going to support my family and how it
14 applies to my -- my health and the way I
15 was -- the tension and the stress I was
16 under.
17    Q.    Now -- yeah, you mentioned that
18 you -- yes, that you were stressed because
19 of your inability to find a second job,
20 right?
21    A.    Yes.  That was part of it.
22    Q.    And you were, as you say,
23 terminated from Ocean Beach in April of
24 2006, right?
25    A.    Yes.  That's when --

Page 198

T. Snyder

1
2    Q.    And you looked for the job at the
3 John T. Mather Memorial Hospital in June of
4 2007, right?
5    A.    Yes.
6    Q.    And you looked for the Brook --
7 Brookhaven town job in the same time period,
8 right?
9    A.    Yes.
10    Q.    And you looked for the Brookhaven
11 National Laboratory job --
12    A.    Shortly after that.
13    Q.    Right.  So would you agree with
14 me, sir, that between April 2006 and June of
15 2007, you didn't look for any other
16 employment?
17    A.    No, I wouldn't agree with you.
18    Q.    What other employment did you
19 look for?
20    A.    Suffolk County park police job.
21    Q.    Okay.  And to whom did you submit
22 your resume to?
23    A.    I never did get a chance to
24 submit my resume.
25    Q.    Who stopped you from submitting

Page 199

T. Snyder

1
2 your resume?
3    A.    Well --
4    Q.    No.  What person stopped you from
5 submitting your resume?
6    A.    No one stopped me from submitting
7 it.
8    Q.    That's my -- that's the answer
9 then.  Did you ever fill out an application
10 for this Suffolk County job?
11    A.    No.  I never got the opportunity
12 to.
13    Q.    Who stopped you from submitting
14 an application?
15    A.    Nobody physically stopped me.
16    Q.    Okay.  Who at Suffolk County told
17 you don't submit the application?
18    A.    Nobody spoke to me directly.
19    Q.    Okay.  Did you ever put pen to
20 paper in terms of looking for this job with
21 Suffolk County?
22         MR. GOODSTADT: Objection.
23    A.    I had my resume.  I was all ready
24 to submit it along with trying to get the
25 recommendation from George, but no.

Page 200

T. Snyder

1
2    Q.    What do you mean trying to get
3 the recommendation from George?
4    A.    I had requested a recommendation
5 from him.  I was going to take that along
6 with my resume and submit it to the Suffolk
7 County park police as soon as after I got
8 fired by them.
9    Q.    And because George Hesse wouldn't
10 give a recommendation as you requested on
11 the day he told you you were fired, you
12 didn't submit the application, is that your
13 testimony?
14    A.    That was part of it, yes.
15    Q.    Well, is that part of the reason
16 that you didn't submit your application?
17    A.    Yes -- yes, it is.
18         MR. GOODSTADT: He testified to
19    that, didn't he?
20         MR. NOVIKOFF: Excuse me.  I'm
21    asking the question.
22         MR. GOODSTADT: I know, but
23    you're asking the question again and
24    you're putting words in his mouth he
25    didn't say.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 201

T. Snyder

1      T. Snyder
2          MR. NOVIKOFF: Sir, you can
3   object.
4          MR. GOODSTADT: That's my
5   objection.
6          MR. NOVIKOFF: Fine.  You don't
7   have to speak your objection.  You know
8   that's inappropriate.
9          MR. GOODSTADT: Well, it's also
10  inappropriate for you to be badgering
11  him and misstating his testimony.  You
12  know that's inappropriate as well.
13         MR. NOVIKOFF: You can object,
14  sir.  You're entitled to object.
15         MR. GOODSTADT: That's what I
16  did, and you jumped on me.
17         MR. NOVIKOFF: I don't want to
18  hear your voice.
19         MR. GOODSTADT: Guess what?
20         MR. NOVIKOFF: Just say object.
21         MR. GOODSTADT: Guess what?
22  Guess what?  Unfortunately for you, I'm
23  defending and you're going to hear my
24  voice.
25         MR. NOVIKOFF: Sir, object.

Page 202

1      T. Snyder
2   That's all.  That's all you're entitled
3   to.  Object to the form.
4          MR. GOODSTADT: I'm entitled to
5   object to form?  You can make whatever
6   motions you want with my objection.
7      Q.   Sir, is it your testimony to the
8   jury that's hearing this -- that's going to
9   watch this video, that you didn't submit an
10  application because George Hesse didn't give
11  you a reference?
12     A.   That's part of the reason, yes.
13     Q.   And what's the other part of the
14  reason?
15     A.   The other part is that Ed Carter
16  had spoken to -- I don't recall the
17  officer's name, but I guess the person that
18  does the applicant hiring over at the
19  Suffolk County park police, and said, "You
20  guys, if you don't have a resume, then don't
21  even bother -- don't embarrass yourselves.
22  If you can't get" -- I'm sorry, not a
23  resume -- "if you can't get a recommendation
24  from George stating why you were fired,
25  don't embarrass yourselves."

Page 203

T. Snyder

1      T. Snyder
2      Q.   Did you ever talk to this guy --
3      A.   I never did.
4      Q.   Excuse me.  Did you ever talk to
5   this guy that Ed Carter talked to?
6      A.   No, I never did.  I was about to,
7   but I never --
8   MO       MR. NOVIKOFF: Motion to
9   strike.
10     Q.   Did you ever talk to this guy
11  that Ed Carter said he spoke to?
12     A.   No, I did not.
13     Q.   So let me understand this.
14  You're under this enormous emotional pain
15  and suffering, you're under this emotional
16  stress because you now lost your second job,
17  and you didn't submit an application because
18  Ed Carter told you that some guy told him
19  don't submit an application without a
20  reference?
21     A.   Not some guy.  It was the man
22  who -- who hires the people over at the
23  Suffolk County park police.  I don't recall
24  the officer's name.
25     Q.   Again, you don't recall his name?

Page 204

1      T. Snyder
2      A.   Right.
3          MR. GOODSTADT: Objection.  He
4      just testified to that.
5      Q.   Another person you don't recall
6   the name of?
7   DI       MR. GOODSTADT: Objection.
8      Don't answer that.  It's harassing.
9      Q.   So I'm asking you the question,
10  sir.  You decided not to submit any
11  application because of what Ed Carter told
12  you?
13     A.   Because of what Ed Carter said
14  and because I couldn't get a resume from
15  George.
16     Q.   You mean a reference from George?
17     A.   Excuse me, a reference from
18  George.  I'm sorry.
19     Q.   Okay.  Other than this Suffolk
20  County job, was there any other employer,
21  between April 2006 and June of 2007, for
22  whom you sought employment from?
23     A.   Not at that time, no.
24     Q.   What do you mean "not at that
25  time"?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 205

T. Snyder

1
2  A.  I didn't submit any applications
3  until June of 2007.  So between then, no.
4     Q.  Now how much -- you were making
5  $19 an hour at Ocean Beach?
6     A.  I think it was like 19.95 I think
7  is what it was.  I'm not sure exactly.  I
8  think it was 19.95 when I left.
9     Q.  Did you inquire into any other
10 job, other than in the law enforcement
11 agency, that could pay you close to $19 an
12 hour on a part-time basis in that 14-month
13 time period?
14    A.  No.  I didn't apply for any job
15 or inquire during that 14-month time period.
16 I was sick.
17 MO      MR. NOVIKOFF: Move to strike.
18    Q.  In your Notice of Claim, you
19 write that as part of the damages that you
20 have sustained, it was impairment of the
21 natural growth process.  What do you mean by
22 that?
23       MR. GOODSTADT: Objection.
24    A.  Well, I was working part time at
25 Ocean Beach.  I was there -- I was a long

Page 206

T. Snyder

1
2  time serving officer at Ocean Beach.  I had
3  originally started in '91.  You know, there
4  was a possibility that this employment could
5  become full time.  I -- I did inquire about
6  it.
7     Q.  When did you inquire about this?
8     A.  When I took the Suffolk police
9  test.
10    Q.  Which was when?
11    A.  The -- the second time I took it.
12 It was when I went back there.  I was -- I
13 was on the eligible list for the Suffolk
14 County police.  They can pull off the list
15 for villages and towns as well, and I did
16 inquire about it at that time.
17    Q.  You inquired --
18    A.  I inquired with George and with
19 the chief at that time.
20    Q.  What year was this?  Give me a
21 time frame.
22    A.  I think it was 2001.
23    Q.  You inquired with George and the
24 chief as to whether you could become a
25 full-time police officer?

Page 207

T. Snyder

1
2  A.  Right.  There was a slot open.
3     Q.  Yes -- yes or no?
4     A.  Yes, I did.
5        MR. GOODSTADT: Objection.
6     Q.  Was there a slot open in 2001 for
7  a full-time police officer?
8     A.  Yes, there was.
9     Q.  And who got that?
10    A.  At that time they didn't fill it.
11 They didn't fill it until just recently.  I
12 think last year I believe they filled it.
13    Q.  Okay.  Who were the only full
14 time police officers between 2001 and April
15 2, 2006, to your knowledge?
16    A.  Ed Paridiso and George Hesse.
17    Q.  And how many -- to your
18 knowledge, how many full-time police
19 officers are there, to your knowledge, right
20 now at Ocean Beach?
21    A.  To my knowledge, I hear there's
22 three or four right now.  I think there's
23 four.  I think they hired two more
24 full-timers.
25    Q.  Okay.  And who are they?

Page 208

T. Snyder

1
2  A.  I don't know their names.  I've
3  never met the individuals.
4     Q.  Okay.  And how do you know that
5  they've hired two more?
6     A.  Because we see it in the
7  newspapers.
8     Q.  Okay.  And it's your belief that
9  you would have been thought of to have that
10 full-time position?
11    A.  Yes.  It was a possibility.
12    Q.  When you say it's a possibility,
13 what do you mean?
14    A.  Well, there was a possibility
15 prior to that  -- prior to them filling
16 those positions.  Once that list expired, I
17 was out of the running.  Once they expire a
18 civil service list, you're -- that's it.
19 You're done.
20    Q.  When did your list expire?
21    A.  I don't remember when, but it was
22 sometime between 2001 and 2004 or five.
23    Q.  Oh, so the list expired before
24 you were terminated?
25       MR. GOODSTADT: Objection.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 209

T. Snyder

2 That's not what he testified to.
3     Q.    Well, to your knowledge, did that
4 list expire before you were terminated?
5     A.    To my knowledge it did, yes.
6     Q.    Okay.  And to your knowledge and
7 understanding of the Civil Service Laws,
8 once that list expired, you would not have
9 been eligible to be hired as a full-time
10 police officer, correct?
11     A.    Right.  I would have to retake a
12 test.
13     Q.    Well, did you ever retake the
14 test prior to your termination?
15     A.    No.  I couldn't take the test
16 then.
17     Q.    Before you were terminated you
18 couldn't take the test?
19     A.    No, I couldn't -- yeah.  I
20 couldn't take the test.  I had reached the
21 age where I was aged out.
22     Q.    Okay.  So let me -- let me just
23 understand this, then.  You took some exam
24 which would have made you eligible for a
25 full-time position with Ocean Beach prior to

Page 210

T. Snyder

2 you being terminated, correct?
3     A.    Yes.
4     Q.    Okay.  And you -- you had taken
5 this test prior to 2001, correct?
6     A.    Yeah.  I think it was the year
7 2000.
8     Q.    Okay.  And in around 2001, you
9 inquired with Hesse and Paridiso about the
10 possibility of becoming a full-time police
11 officer, right?
12     A.    Yes, I did.
13     Q.    And 2001 they didn't hire you as
14 a full-time police officer, right?
15     A.    No, they did not.
16     Q.    2002 they didn't?
17     A.    No, they did not.
18     Q.    2003 they didn't?
19     A.    No, they did not.
20     Q.    2004 they didn't?
21     A.    No, they did not.
22     Q.    When I say "they," I mean Ocean
23 Beach, right?
24     A.    Right.
25     Q.    Okay.  And then at some point in

Page 211

T. Snyder

2 time before you were terminated, that list
3 expired, right?
4     A.    Yes.  I believe it did.
5     Q.    And when it expired, it's your
6 understanding that you were too old to
7 retake the test?
8     A.    I was too old.  When I called the
9 county about it, they said once you reach
10 the age of 40, that's it.  You can't take it
11 no more.
12     Q.    So, again, tell me if I'm wrong,
13 prior to you being terminated, you were
14 unable to take the test that was necessary
15 for you to be considered to be a full-time
16 police officer for Ocean Beach?
17     A.    Just prior to it, yeah.
18         MR. NOVIKOFF: Okay.
19         THE VIDEOGRAPHER: This ends
20     tape number three.  The time is 2:33
21     p.m.  Going off the record.
22         (A break was taken.)
23         (Notice of Claim was marked as
24     Snyder Exhibit-10 for
25     identification; 9/24/08, E.L.)

Page 212

T. Snyder

2         THE VIDEOGRAPHER: This begins
3     tape number four.  The time is 2:42
4     p.m.  Back on the record.
5     Q.    Sir, I'm going to show you what's
6 been marked as Snyder-10, and please advise
7 me if you recognize this document?
8     A.    Yes, I do.
9     Q.    And what is it?
10     A.    It's the Notice of Claim.
11     Q.    That you authorized your attorney
12 to file on your behalf?
13     A.    Yes.
14     Q.    Okay.  Now let's go to the first
15 page under the "nature of claims."  You
16 write -- well, you allege in the second
17 sentence, specifically "claimant's a highly
18 qualified officer with an exceptional record
19 of service, was unlawfully terminated from
20 his position as a part-time police officer
21 in the Ocean Beach Police Department without
22 cause, in retaliation for his opposition to
23 and refusal to participate in unlawful
24 tortious and other wrongful conduct and
25 practices engaged in by numerous senior

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 213

1              T. Snyder
2  ranking officers, including but not limited
3  to Sergeant George Hesse."  What other
4  senior ranking officers --
5      A.   The --
6      Q.   -- are you referring to, other
7  than Sergeant George Hesse?
8          MR. GOODSTADT: Objection.
9      A.   The only other one I'm referring
10 to would be Walter Muller.  He was, at times
11 I worked with him, George says, "When I'm
12 not here, that Walter is the DO, the duty
13 officer," and I did work with him on some
14 occasions when.
15     Q.   Quantify "some."
16     A.   Only -- it was a few handful of
17 occasions I worked with him.
18     Q.   What's a handful?  Less than
19 five?  More than five?  Less than 10?
20     A.   Something -- around five I guess.
21     Q.   Okay.  So other than Sergeant
22 Hesse, the only other senior ranking officer
23 that you're referring to in your Notice of
24 Claim would be Mr. Muller?
25     A.   Yes.  That's correct.

Page 214

1              T. Snyder
2      Q.   Now when Mr. Muller was acting as
3  your senior officer on those handful of
4  occasions, what did he ask you to do, if
5  anything, that you believe was unlawful?
6  Now I'm just asking you about those times
7  when he was your senior officer those
8  handful of occasions.
9      A.   Well, there was one occasion
10 where he -- when I was working with him, he
11 -- he -- let me see if I can remember it.
12 He -- well, there was one occasion where
13 he -- when I was coming on duty and I was
14 supposed to be working with him.  He was
15 coming from his other job, and he was
16 calling in that he was on duty prior to
17 actually getting to the beach.
18     Q.   Okay.  Let me understand this.
19 You were coming on duty, right?
20     A.   Yeah.  There was one --
21     Q.   Wait.  When did this take place?
22 What year?
23     A.   Um, I'm not sure exactly what
24 year.  It was -- I'm not sure exactly what
25 year it was.

Page 215

1              T. Snyder
2      Q.   2002?
3      A.   No.  I think it was after that.
4      Q.   2004?
5      A.   Maybe 2004.  Maybe 2003.  Maybe
6  somewhere in that area.
7      Q.   Okay.  So Muller was -- you were
8  coming on duty?
9      A.   Well, I was --
10     Q.   You were coming on duty?
11     A.   Yeah.  I was supposed to be
12 working with him.
13     Q.   Okay.  And what shift are you
14 referring to?
15     A.   It would be the 4:00 to 12:00
16 shift.
17     Q.   4:00 to 12:00 shift.  Okay.  4:00
18 in the afternoon to 12:00 midnight?
19     A.   Yes.
20     Q.   And you were scheduled to work
21 with him?
22     A.   Yes.
23     Q.   Was Hesse there during that
24 shift?
25     A.   No, he wasn't because --

Page 216

1              T. Snyder
2      Q.   No.  Was Hesse there during that
3  shift?
4      A.   No, he wasn't.
5      Q.   Was Paridiso there during that
6  shift?
7      A.   No, he wasn't.
8      Q.   Had you been told that Muller was
9  your superior for that shift by Hesse?
10     A.   Not that day, no.
11     Q.   Okay.  So there were days when
12 Hesse wasn't there that he didn't tell you
13 that Muller was your supervisor, right?
14     A.   Yes.  That's correct.
15     Q.   Okay.  So my question to you is
16 on those handful of occasions when you were
17 told that Muller was your supervisor, what
18 illegal or improper acts did he ask you to
19 engage in?
20         MR. GOODSTADT: Objection.
21     Q.   If any?
22     A.   He didn't ask me to engage in any
23 specifically.
24     Q.   Okay.  Give me an example when
25 Muller, on those handful of occasions, was

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 217

1       T. Snyder
2 your superior that he asked you to
3 participate in an unlawful, tortious or
4 otherwise wrongful conduct?
5       MR. GOODSTADT: Objection.
6    A.   He didn't specifically ask me to
7 engage in anything like that.
8    Q.   Okay.  When Muller was your
9 superior on those handful of occasions, tell
10 me when he asked you to cover up any
11 unlawful, tortious or otherwise wrongful
12 conduct and practices?
13   A.   He didn't specifically ask me to.
14   Q.   Okay.  On those handful of
15 occasions when Muller was your superior,
16 please advise me as to what, if anything, he
17 ever asked you to do that you believed was
18 improper.
19   A.   He didn't ask me anything
20 specifically to do, something to do that's
21 improper.  Just the conduct that he was
22 conducting himself with while he was working
23 with me.
24   Q.   Okay.  We're not talking about
25 while he was working with you.  We're

Page 218

1       T. Snyder
2 talking about now when he was your superior
3 on those handful of occasions.  What can you
4 point to that you claim was inappropriate
5 conduct by Mr. Muller?  Again, we're only
6 talking about those handful of occasions
7 when he was your superior.
8    A.   Well, he was drinking on duty
9 while I was working with him.
10   Q.   Was he your superior?
11   A.   I believed he was at that time,
12 yes.
13   Q.   Was this one of the occasions --
14 handful of occasions that you're referring
15 to?
16   A.   Yes.
17   Q.   Okay.  This is one of the handful
18 occasions when Hesse said "Muller is your
19 superior"?
20   A.   He had stated to us that when I'm
21 not here, Muller would be the DO.
22   Q.   I thought you had testified a few
23 answers ago that there were occasions when
24 Muller wasn't your DO when Hesse wasn't
25 there?

Page 219

1       T. Snyder
2       MR. GOODSTADT: Objection.
3 That's not what he testified to.
4    A.   There was occasion --
5       MR. NOVIKOFF: You made your
6    objection.  You can answer.
7    A.   Sometimes it was unclear who was
8 the DO.  Sometimes he was, sometimes he
9 wasn't.  We weren't exactly sure.
10   Q.   Fine.  When you were sure that
11 Muller was the DO, on those handful of
12 occasions that you've testified to, what
13 conduct, if any, did Muller engage in that
14 you thought was improper?
15   A.   The one like I referred to before
16 was the drinking.  The drinking on duty.
17   Q.   Okay.  When did this take place?
18   A.   Um, sometime in 2004.  Exactly
19 specifically I don't know.  I wasn't keeping
20 notes of the incident.
21   Q.   Sometime during the summer of
22 2004?
23   A.   Yes.
24   Q.   And when you say Muller was
25 drinking on duty, what do you mean?

Page 220

1       T. Snyder
2    A.   I watched him walk over to walk
3 right into the bar when I  -- after I, um,
4 sat down at the desk.  I watched him walk
5 over and go straight into it.
6    Q.   Was he  -- what time  -- was he
7 on the same shift that you were on?
8    A.   Yes, he was.
9    Q.   Was he your partner at the time
10 on this shift?
11   A.   Well, he was one of the officers
12 I was working with.  He wasn't my partner.
13   Q.   Okay.  And how close to the end
14 of the shift was this?
15   A.   Um, I'd say approximately halfway
16 through it I guess maybe.
17   Q.   He walked into the bar.  Did you
18 follow him into the bar?
19   A.   No, I didn't.  I was on the desk.
20   Q.   Okay.  Did you see him drink?
21   A.   I didn't physically see him
22 drink, no.
23   Q.   Did he come out of the bar?
24   A.   Yes, he did.
25   Q.   How long was he in the bar?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 221

T. Snyder

2 A. Um, I'm not sure. I wasn't
3 watching the bar the whole time.
4 Q. Well, could you see the bar from
5 your desk?
6 A. Yeah, I could. Right through the
7 window. I could see the front door.
8 Q. But you weren't staring at the
9 bar the entire time?
10 A. No. I was conducting other
11 business behind the desk.
12 Q. Did you ever see -- did you ever
13 see him walking out of the bar?
14 A. No, I didn't.
15 Q. So you don't really know how long
16 he was in the bar for?
17 A. I have no idea.
18 Q. And you don't know what he was
19 doing in the bar?
20 A. No, I don't.
21 Q. Right. Did he have alcohol on
22 his -- did you speak to him at all after he
23 went into the bar?
24 A. When he -- yeah. When he came
25 back for -- to end his tour for relief.

Page 222

T. Snyder

2 Q. And did you smell his breath?
3 A. Yeah. He looked intoxicated to
4 me.
5 Q. I didn't ask you that question.
6 Did you smell his breath?
7 A. No, I didn't smell his breath.
8 Q. But he looked intoxicated?
9 A. Yes.
10 Q. And this was -- he went into the
11 bar, according to you, halfway through his
12 tour?
13 A. Roughly halfway through, yeah.
14 Q. And it's an eight hour tour?
15 A. Yes.
16 Q. And you believe he was
17 intoxicated --
18 A. I believe he was drinking.
19 Q. -- at the end of his tour?
20 A. I believed he was drinking.
21 Q. But you never saw it?
22 A. I didn't physically see it, no.
23 Q. Right. And, again, you don't
24 know how long he was in the bar for?
25 A. On that occasion, no.

Page 223

T. Snyder

2 Q. And you don't know for what
3 purpose he went into the bar, correct?
4 A. At that time, no, I didn't.
5 Q. Well, at any time, do you know
6 why he went into that bar on that specific
7 occasion?
8 A. Sometimes he went in to drink. I
9 mean, he came out drunk.
10 MO MR. NOVIKOFF: No. No. Sir,
11 motion to strike.
12 Q. We're talking about that one
13 instance.
14 A. No, not on that one instance.
15 Q. Have you ever discovered why he
16 went into the bar on that one instance?
17 A. No, I haven't.
18 Q. Okay. Well, that's one example
19 you've told me of when you were absolutely
20 certain that Muller was your superior that
21 he engaged in improper conduct. Give me
22 another example, if you have one, when you
23 were absolutely sure on those handful of
24 occasions that Muller was your DO, that he
25 engaged in any acts of impropriety, in your

Page 224

T. Snyder

2 opinion?
3 A. I can't recall any at the moment,
4 no.
5 Q. Is there anything in your
6 possession, custody or control that would
7 refresh your recollection?
8 A. No, not that I'm aware of.
9 Q. Okay. Now to a prior question,
10 you said something about Muller coming --
11 you going off duty, Muller coming on duty
12 and him signing in, do you recall that
13 answer?
14 MR. GOODSTADT: Objection.
15 That's not what he testified to.
16 Q. Or anything close to that answer?
17 A. Wait. Say that again.
18 Q. I believe you testified to an
19 incident when you and Muller were coming on
20 duty and he signed on, but he really wasn't
21 on duty. Do you recall giving that answer?
22 A. Yes, I do.
23 Q. Can you describe what you meant
24 by that?
25 A. He would be coming from, um, his

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 225

T. Snyder

1 job, his full-time job in the courts in
2 Hempstead, and he would be coming on duty at
3 4:00, but he wasn't getting there at 4:00.
4 So he was getting there after 4:00, but he
5 was signing himself in the log as working
6 4:00 to 12:00.
7     Q.    And did you ever advise anyone of
8 this?
9     A.    The sergeant was aware of it.
10     Q.    No.  No.  Did you ever advise
11 anyone of this?
12     A.    No, I didn't specifically.
13     Q.    And did Muller do this on every
14 occasion?
15     A.    I don't know if he did on every
16 occasion.  I didn't see it all the time.  I
17 didn't see every occasion.
18     Q.    How many times did you see Muller
19 sign in at say starting at 4:00, but really
20 not working at 4:00?
21     A.    Only on a few occasions that --
22 that we crossed paths like that.
23     Q.    And on those few occasions, did
24 you -- did you approach Muller and ask him

Page 226

T. Snyder

1 what he was doing?
2     A.    No, I did not.
3     Q.    Did you complain to Hesse about
4 this?
5     A.    A --
6     Q.    Again, just pertaining to Muller
7 now?
8     A.    No, I did not.
9     Q.    Did you complain to Paridiso?
10     A.    No, I did not.
11     Q.    Did you complain to any trustee?
12     A.    No.  I never saw any trustees.
13     Q.    Did you complain to the mayor?
14     A.    No.  I never saw the mayor
15 either.
16     Q.    The question isn't whether you
17 saw them or not.  Did you ever complain to
18 the mayor?
19     A.    No, I did not.
20     Q.    Did you ever complain to the
21 trustees about what Muller did?
22     A.    No, I did not.
23     Q.    And you never confronted Muller
24 about it?

Page 227

T. Snyder

1     A.    No, I never confronted him.  No.
2     Q.    Is Muller the only person that
3 you know that did this?
4     A.    A -- no.
5     Q.    Personal knowledge?
6     A.    No.  There's other officers that
7 did it.
8     Q.    Did you ever do it?
9     A.    I've never done it, no.
10     Q.    You've never once signed in that
11 you started your shift on a specific time,
12 even though you were a little late?
13     A.    Well, actually, yeah.  Maybe
14 there was.  Maybe I should explain that.
15 There was numerous occasions where I was at
16 the relief point, which is at the
17 lighthouse, the Fire Island Lighthouse at
18 midnight waiting to come on duty, okay, and
19 the 4:00 to 12:00 tour, which consisted of
20 the two Bosetti brothers and Muller most
21 days, were still in the village.  They
22 weren't working.  They were hanging out in
23 the bars drinking, and then they would drive
24 out to us, sometimes 12:30, sometimes 1:00.

Page 228

T. Snyder

1 And when we would call wondering where our
2 relief was, we're sitting here waiting to go
3 in the village, okay, we were told -- when
4 we called the police department, we were
5 told they're out partying.  They're out
6 cocktailing.  They'll be there shortly.
7     Q.    Who told you that?
8     A.    The desk officer.  Or actually,
9 the -- excuse me, no.  It was the dock
10 master, because they left the dock master in
11 control of the police department while they
12 were out.
13 MO        MR. NOVIKOFF: Okay.  Motion to
14     strike as nonresponsive.
15     Q.    Sir, you've just now testified
16 that you would show up for your shift on
17 time, wait -- and were waiting for someone
18 to pick you up, and no one came to pick you
19 up, right?
20     A.    Right.  They had --
21     Q.    No.  Just -- yes, right?  No one
22 was there to pick you up?
23     A.    Right.
24     Q.    And you would call in to say

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 229

1           T. Snyder
2   where were the people that were supposed to
3   pick me up and --
4       A.   Where's our relief.  They're
5   supposed to drop the truck off.
6       Q.   Right.  And you got some answer,
7   right?
8       A.   Right.
9       Q.   And then you would finally get
10  the truck, so you were able then to go to
11  Ocean Beach and sign in, right?
12      A.   Right.
13      Q.   And when you signed in, did you
14  sign in for the time that you were supposed
15  to start or did you sign in --
16      A.   I didn't --
17      Q.   At the time that you actually got
18  there?
19      A.   I didn't always sign the log.
20  Sometimes it was the dock master who signed
21  in.
22      Q.   I'm asking you, sir, because this
23  whole line of answers and questions started
24  from you saying yes, there were times that I
25  didn't sign in at  -- that I did sign in

Page 230

1           T. Snyder
2   when I was supposed to start, even though I
3   was late and you wanted to explain.  So my
4   question is, on those occasions that you
5   were waiting for the truck and you didn't
6   get to the sign-in book at the time that you
7   were supposed to start your shift, did you
8   sign in at the time you got to the book or
9   did you sign in at the time you were
10  supposed to start your shift?
11      A.   I signed in at the time we were
12  supposed to start our shift, because we were
13  on duty ready to go waiting at the relief
14  point.  We were there ready to go.
15      Q.   But you're supposed to sign the
16  book when you show up, right?
17      A.   Well, usually the --
18           MR. GOODSTADT: Objection.
19      Q.   Sir, are you supposed to sign in
20  the book when you get to the book?
21      A.   No.  That wasn't a hard and fast
22  rule.
23      Q.   No?
24      A.   No.  The dock master or the duty
25  officer would just change the shifts as they

Page 231

1           T. Snyder
2   were sitting there.
3       Q.   Then how do you know that Muller
4   wasn't similarly delayed by not get -- not
5   having a truck get to him on time?
6       A.   Because Muller was in the village
7   drinking in the village with the Bosettis or
8   whoever.
9       Q.   You're saying on those two
10  occasions -- on those few occasions that you
11  saw Muller sign in -- wait a minute.
12      A.   No, we're talking about
13  different --
14      Q.   No, we're not talking about that.
15  You said about Muller that there were times,
16  a few times that he would come from his job
17  in Hempstead late, but he would sign in as
18  if he showed up on time, right?
19      A.   Right.  That's correct.
20      Q.   Okay.  We're not talking about
21  him drinking.  We're talking about him
22  coming late to work, right?
23      A.   That's correct.
24      Q.   Right.  Something you didn't
25  complain to anyone about, right?

Page 232

1           T. Snyder
2       A.   I think we talked about that.
3   Yes.
4       Q.   Right.  Right.  How do you know
5   that Muller wasn't at the checkpoint on time
6   and also didn't have somebody get there on
7   time to pick him up with the truck?
8       A.   Well, on some occasions  --
9       Q.   How do you know?
10      A.   Honestly, I don't know.
11      Q.   Thank you.  Let's go to paragraph
12  36 of the complaint.  Oh, by the way, with
13  regard to Muller and him coming in late and
14  signing as if he came in on time, did you
15  ever complain to George Hesse about that?
16      A.   George was aware of it.
17      Q.   Did you ever complain to George
18  Hesse about it?
19      A.   No, not specifically.
20      Q.   Paragraph 36, you allege that
21  "Plaintiffs each advised Hesse on numerous
22  occasions that the department and village
23  were left dangerously short of personnel
24  when Plaintiffs were assigned to chauffeur
25  intoxicated officers and their civilian

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 233

T. Snyder

1          T. Snyder
2 friends, and while -- and while such
3 uncertified officers were drinking in the
4 local bars."  To your knowledge, did there
5 come ever a time when a certified officer
6 drank while on duty in a bar?
7      A.   No, not to my knowledge.
8      Q.   So to your knowledge, the only
9 people -- the only officers that ever drank
10 while on duty in an Ocean Beach bar were
11 uncertified?
12     A.   Well, to my specific knowledge,
13 yes.
14     Q.   Okay.  Now you write -- it's
15 written that each advised Hesse on numerous
16 occasions.  Did you advise Hesse on numerous
17 occasions that the department and the
18 village were left dangerously short of
19 personnel --
20     A.   I had mentioned it --
21     Q.   For the reasons that are set
22 forth in paragraph 36?
23     A.   Yes, I did.
24     Q.   You did?
25     A.   Yes.

Page 234

T. Snyder

1          T. Snyder
2      Q.   When was the first time you
3 mentioned it to Hesse?
4      A.   I think back in like 2002 or
5 2003.
6      Q.   Okay.  And -- and what did you
7 say to Hesse?
8      A.   I had complained about us being
9 left at the checkpoint on -- on some
10 occasions, on numerous occasions, and that
11 we could not come in to go to duty because
12 they were out cocktailing, and they were
13 coming back -- or we would get  -- there
14 would be two trucks and we'd already be able
15 to drive ourselves in, okay, and we'd have
16 to drive them out.  He said to take them out
17 when they're done, and we would say, "We
18 can't do that.  We're going to leave the
19 tour short."
20     Q.   And what did Hesse say?
21     A.   Well, they complained to him  --
22 we complained -- they -- let's put it this
23 way, they wanted us to go to take them out.
24 We said no.  They started complaining to
25 Hesse that we wouldn't take them out.  He

Page 235

T. Snyder

1          T. Snyder
2 then told us, "I want you to take the
3 Bosettis out when they're done cocktailing,
4 they're done partying."
5      Q.   Okay.
6      A.   And we complained about saying,
7 "You know, George, we can't do that because
8 we're leaving the tour short if we take a
9 guy or two to do that."
10     Q.   I'm only talking now about the
11 first time you complained to Hesse in 2002
12 or 2003, whenever it was, what did Hesse say
13 to you when you said we're leaving the
14 village too short of personnel by making
15 us chauffeur the Bosettis?
16     A.   They started relieving in the
17 village then.
18     Q.   No.  I'm asking what did Hesse
19 say to you?
20     A.   He said that he would take care
21 of it.  He would speak to them.
22     Q.   Okay.  And when was the next time
23 you complained to Hesse about the village
24 being left dangerously short of personnel
25 because Plaintiffs were assigned to

Page 236

T. Snyder

1          T. Snyder
2 chauffeur intoxicated officers and their
3 civilian friends?
4      A.   It was sometime after that.
5      Q.   Same year?
6      A.   Yeah.  It could have been.
7      Q.   Do you know?
8      A.   I'm not sure, because I know
9 there were several times even after that,
10 too.
11     Q.   Okay.  And when did you complain
12 to Hesse, what did he say the second time?
13     A.   The same thing.  That he would --
14 he would look into it.  He would speak to
15 the chief about the matter.
16     Q.   Okay.  And did you follow up with
17 Hesse after that second time?
18     A.   No.  We complained to him because
19 he -- he was my supervisor when I was
20 working with him.  I assumed he was telling
21 the chief.
22     Q.   Well, I'm saying  --
23     A.   He said he was telling the chief.
24     Q.   Well, I'm saying after the second
25 time that you complained in either 2002 or

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 237

1           T. Snyder
2 2003, did you follow up with Hesse with
3 regard to this issue that's referenced in
4 paragraph 36?
5     A.    That's when they changed where we
6 relieved.  Instead we relieved in the
7 village.  So they started solving that
8 problem, but then what would end up
9 happening is --
10    Q.    No.  No.  So they started solving
11 the chauffeur problem --
12    A.    Yes.
13    Q.    In -- sometime in 2002, 2003?
14    A.    Yes.  I believe so.  Yes.
15    Q.    Okay.  So at least at some point
16 in time after you complained to Hesse, you
17 no longer were asked to chauffeur
18 intoxicated and civilian friends to the
19 checkpoints?
20          MR. GOODSTADT: Objection.
21    Q.    Is that true?
22    A.    No.  There was -- there was other
23 times.  Personal friends, not just police
24 officers.
25    Q.    Okay.  Let's -- let's then stick

Page 238

1           T. Snyder
2 to the police officers.
3     A.    Okay.
4     Q.    After they changed the policy
5 that you just said --
6     A.    Right.
7     Q.    After Hesse changed it, you no
8 longer were asked  -- you personally were no
9 longer asked to chauffeur any officers who
10 were --
11          MR. GOODSTADT: Objection.
12    Q.    -- intoxicated to the checkpoint,
13 correct?
14          MR. GOODSTADT: Objection.
15    A.    I was no longer personally asked,
16 no.
17    Q.    Right.  Were you ever asked to
18 chauffeur intoxicated officers prior to that
19 time?
20    A.    Yeah, I was.
21    Q.    On how many occasions?
22    A.    I don't know.  Several occasions.
23 Numerous occasions.  Whenever they -- they
24 were out partying almost every night.  So
25 whenever I was coming on duty and they were

Page 239

1           T. Snyder
2 coming off, it would be a problem.
3     Q.    Prior to that change in policy?
4     A.    They only started working there
5 in 2002, so.
6     Q.    No.  I understand that.  But I'm
7 saying, you just testified that you made a
8 couple of complaints and then -- and then
9 someone changed the policy with regard to
10 the checkpoints, right?
11          MR. GOODSTADT: Objection.
12    A.    Right.
13    Q.    What did you mean by that?
14    A.    Of changing the policy?
15    Q.    Yeah.
16    A.    That they -- the relief now was
17 going to be done -- there was a directive
18 posted on the board saying that the relief
19 was going to be done in the village now
20 rather than at the checkpoint, because the
21 village is being left short of personnel.
22    Q.    Did it say that in the directive?
23    A.    I think it did.  Yeah.  I don't
24 remember.
25    Q.    You're not sure?

Page 240

1           T. Snyder
2     A.    It's going back several years
3 now.  I don't remember exactly what the
4 words were, and I don't have a copy of that
5 directive.
6     Q.    But you know that the directive
7 was changed with regard to the checkpoint?
8     A.    Yes.
9     Q.    That you were going to now be
10 relieved at the village police office?
11    A.    Right.  They wanted us to come
12 before the other tour went off.
13    Q.    Okay.  So when it's alleged that
14 Hesse ignored Plaintiffs repeated -- let's
15 go to 36 again.  The last sentence, "Hesse
16 ignored Plaintiffs repeated complaints
17 without regard for any resulting threat to
18 public safety and Plaintiffs own safety,"
19 that isn't necessarily true, because as it
20 pertains to chauffeuring intoxicated
21 officers, that did stop at some point in
22 time, correct?
23          MR. GOODSTADT: Objection.
24    A.    It stopped, but then started up
25 again when --

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 241

T. Snyder

1
2   Q.   When did it start up again?
3   A.   Sometime back -- not too long
4   afterwards.  Probably in 2003 it started up
5   again, because they lost the second truck.
6   They lost it in the ocean.
7   Q.   Oh, so the directive came out in
8   2002, and then it was ignored in 2003?
9       MR. GOODSTADT: Objection.
10   A.   Well, they were back down to one
11   truck again.
12   Q.   I'm not asking why it was
13   ignored, I'm just asking, in your opinion,
14   was this directive ignored in 2003 after
15   being implemented in 2002?
16       MR. GOODSTADT: Objection.
17   A.   Yeah, it was.
18   Q.   What's that?
19   A.   It was then.
20   Q.   Okay.  And in 2003, were you ever
21   asked to chauffeur an intoxicated officer to
22   the checkpoint?
23   A.   It went back to the way it was.
24   Q.   I'm asking you, sir, in 2003,
25   were you ever asked to chauffeur an

Page 242

T. Snyder

1
2   intoxicated officer to the checkpoint?
3   A.   There was some occasions where
4   he -- when he was working, he would ask us
5   to do it, yes.
6   Q.   Not "us," sir.  You.
7   A.   Okay.  Not me specifically.  No.
8   Q.   That's all I'm asking.
9   A.   Not me specifically.
10   Q.   Did Hesse ever ask you
11   specifically to chauffeur an intoxicated
12   officer in 2003 to the checkpoint?
13   A.   I don't recall if he did in 2003,
14   no.
15   Q.   Did Hesse ever ask you in 2004 to
16   chauffeur an intoxicated officer to the
17   checkpoint?
18   A.   I don't recall if he did in 2004
19   or not.
20   Q.   Did Hesse ever, in 2005, ask you
21   to chauffeur an intoxicated officer to the
22   checkpoint?
23   A.   I don't recall if they did or
24   not.
25   Q.   Not "they," Hesse?

Page 243

T. Snyder

1
2   A.   That's what I meant.  Excuse me.
3   I don't recall if Hesse did or not.
4   Q.   Okay.  Did Hesse, in 2002, ever
5   ask you to chauffeur an intoxicated --
6   well, withdrawn.  Did Hesse ever ask you, in
7   2002, to chauffeur a civilian to the
8   checkpoint?
9   A.   In 2002 and up through --
10   Q.   I'm just asking you 2002, sir.
11   A.   Yes, he did.
12   Q.   Okay.  And was this -- and was
13   this civilian intoxicated?
14   A.   Some of them were, yeah.
15   Q.   And were you the only person
16   chauffeuring or was there another officer in
17   the truck?
18   A.   No.  Sometimes there was another
19   officer.
20   Q.   How often would there be another
21   officer?
22   A.   Generally, most of the times.
23   Usually whoever I was working with, I was
24   partnered with would be probably be going
25   with me.

Page 244

T. Snyder

1
2   Q.   Why?  Did Hesse ask you both to
3   go?
4   A.   Well, we were out patrolling in
5   the truck and he would call us to the
6   station and say, "Can you do me a favor.
7   Take this person -- it's a friend of mine, a
8   personal friend of mine.  Take them out to
9   the lighthouse."
10   Q.   How long was the trip to the
11   lighthouse from where you were in the truck?
12   A.   Several miles I guess.
13   Q.   How long a drive?
14   A.   Down the beach, I would say it's
15   probably half hour I guess maybe both ways.
16   Or half hour -- excuse me, about 15, 20
17   minutes one way, 15, 20 minutes back.
18   Q.   Okay.  And in 2002, Hesse would
19   ask you that.  Did you complain to Hesse
20   about taking civilians?  Did you personally,
21   not anybody else, you personally?
22   A.   I didn't personally, no.
23   Q.   You didn't personally complain to
24   Hesse?
25   A.   Not then, no.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 245

T. Snyder

1
2    Q.   Okay.  In 2003, did Hesse ask you
3 to chauffeur civilians in the truck to the
4 checkpoint?
5    A.   Yes, he did in 2003.
6    Q.   And did you complain to Hesse in
7 2003 about chauffeuring civilians in the
8 truck to the checkpoint?
9    A.   Yes, I complained.
10    Q.   To Hesse?
11    A.   Yes, I did.
12    Q.   How many times in 2003 did you
13 complain to Hesse?
14    A.   On several occasions.
15    Q.   What would you say to Hesse?
16    A.   I told him that, you know, we're
17 leaving  -- you're taking us out of the
18 village to chauffeur this person and we're
19 leaving the tour short.  We got -- you know,
20 two officers are going out or one officer is
21 going out and you're leaving the tour short.
22    Q.   Okay.  And what -- what would
23 Hesse say to you?
24    A.   He just asked me to do that favor
25 for him.

Page 246

T. Snyder

1
2    Q.   Okay.
3    A.   He said, "Just -- just take him
4 out."
5    Q.   Okay.
6    A.   "They're a personal friend of
7 mine.  Take them out."
8    Q.   And in 2004, did Hesse ask you
9 personally to chauffeur a civilian to the
10 checkpoint?
11    A.   I'm sure there was occasion where
12 he did.  I just can't recall exactly
13 specifically.
14    Q.   I'm not asking you if you're
15 sure.  I'm asking if you recall or if you
16 don't recall.
17    A.   I don't recall if he did.
18    Q.   In 2005 -- well, did Hesse ask
19 you to chauffeur a civilian to the
20 checkpoint?
21    A.   I don't recall if he did or not.
22    Q.   Did you, when you made the
23 complaints to Hesse -- well, withdrawn.
24 With regard to you being asked to chauffeur
25 either intoxicated officers or civilians,

Page 247

T. Snyder

1
2 did you ever complain to Paridiso?
3    A.   No, I didn't.  I complained to
4 George.
5    Q.   My question is, did you ever
6 complain to Paridiso?
7    A.   No, I did not.
8    Q.   Did you ever complain to the
9 trustees?
10    A.   No, I did not.
11    Q.   Did you ever complain to the
12 mayor?
13    A.   No, I did not.
14    Q.   Did you ever complain to Newsday?
15    A.   No, I did not.
16    Q.   Did you ever complain to News 12?
17    A.   No, I did not.
18    Q.   Did you ever complain to any
19 media outlet?
20    A.   No, I did not.
21    Q.   So if I understand your testimony
22 correctly, you know with certainty that at
23 least through 2003, you made a few
24 complaints to George Hesse about the
25 chauffeuring issue and leaving the village

Page 248

T. Snyder

1
2 short because of it, right?
3        MR. GOODSTADT: Objection.
4    A.   Yes, I did.
5    Q.   And -- but in 2004 and 2005, you
6 have no recollection as to whether or not
7 Hesse ever asked you to do it?
8    A.   We -- I complained.
9    Q.   No, not complained.  You have no
10 recollection as to whether Hesse asked you,
11 in 2004, 2005, to chauffeur either
12 intoxicated officers or civilians?
13    A.   I don't recall at this time, no.
14    Q.   Right.  And do you have any
15 recollection in 2004, 2005 of personally
16 complaining to Hesse about you chauffeuring
17 anyone?
18    A.   I was trying to say I -- over the
19 course of 2002 through my termination, there
20 was several occasions where he would ask me,
21 yes, over the course of those years, and I
22 would tell him the same story, "You're
23 leaving the tour short."
24    Q.   But we've established that this
25 took place in 2002 and 2003.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 249

T. Snyder

1
2    A.   Right.
3    Q.   But you don't have any
4  recollection of it in 2004, 2005, right?
5    A.   Well, I was trying to say it was
6  occurring over that period.  That time
7  period.
8    Q.   So you do now -- so you now
9  recall in 2004?
10    A.   Well, I was trying to say that
11  before, but you wouldn't let me say that.
12    Q.   Sir, my question to you is very
13  simple, sir.  In 2004, did Hesse ask you to
14  chauffeur a civilian to the checkpoint?
15    A.   Yeah, I'm sure he did.  I just
16  don't recall specifically when.
17    Q.   Okay.  Same question with 2005?
18    A.   Yeah.  I would say the same
19  thing.  Yes.
20    Q.   And did you complain to Hesse in
21  2004?
22    A.   Yeah.  I used to say the same
23  thing.  "We're leaving the tour short.  We
24  can't do this."
25    Q.   And did you complain to Hesse in

Page 250

T. Snyder

1
2  2005?
3    A.   I'm sure I did, yes.
4    Q.   But you don't know with
5  certainty?
6    A.   I just don't recall specifically
7  the incident or when it happened.
8    Q.   But you know it happened?
9    A.   Yeah.  It happened on a regular,
10  you know, basis -- excuse me.  Occasionally
11  throughout those time frames.
12    Q.   Okay.  And in 2004, did you
13  complain to Ed Paridiso?
14    A.   No, I did not.
15    Q.   In 2004, did you complain to any
16  trustee?
17    A.   No, I did not.
18    Q.   In 2005 -- I'm sorry, in 2004,
19  did you complain to any mayor?
20    A.   No, I did not.
21    Q.   Did you complain to any newspaper
22  or radio or television station?
23    A.   No, I did not.
24    Q.   About the public safety issue
25  that you have complained about for three

Page 251

T. Snyder

1
2  years?
3    A.   No, I did not.
4    Q.   In 2005, did you complain to Ed
5  Paridiso?
6    A.   No, I did not.
7    Q.   In 2005, did you complain to any
8  trustee?
9    A.   No, I did not.
10    Q.   In 2005, did you complain to any
11  mayor?
12    A.   No, I did not.
13    Q.   In 2005, did you complain to any
14  newspaper, radio or television outlet
15  concerning this public safety issue that you
16  had been complaining about to Hesse for four
17  years?
18    MR. GOODSTADT: Just so we're
19    clear for the record, you're talking
20    about just the chauffeuring at this
21    point?
22    MR. NOVIKOFF: Just the
23    chauffeuring.
24    A.   Yeah.  No, I did not.
25    Q.   Did you put it on any blog?

Page 252

T. Snyder

1
2    A.   No, I did not.
3    Q.   Why did you keep complaining to
4  Hesse in 2004 and 2005 if he clearly was
5  ignoring your prior complaints in 2002 and
6  2003?
7    A.   He was my direct supervisor when
8  I was working with him.
9    Q.   No.  I understand that.  But he
10  ignored you in 2002 and 2003 because he kept
11  asking you to chauffeur people, right?
12    A.   He told us that he would speak to
13  the chief about it and that he was in fact
14  speaking to the chief about it.  So we
15  assumed that that's what was happening.
16    Q.   You assumed for four years that
17  Hesse was telling you the truth, even though
18  he continually asked you and others to
19  chauffeur people, is that your testimony?
20    A.   I assumed he was taking care of
21  the problem, yeah.  Or speaking about it.
22    Q.   But the problem didn't go away.
23    A.   It did.  It went away.  It would
24  come back.  It would go away.  It was, like
25  I said, it was on occasions.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 253

T. Snyder

1
2    Q.   When did it go away in 2004?
3    A.   If he didn't ask me, I wasn't
4  doing it then.
5    Q.   But others were, to your
6  knowledge?
7    A.   Yeah.  Apparently others may have
8  been doing it.  Yes.
9    Q.   Apparently others may have been
10 doing it.  In 2004, sir, were other -- were
11 other police officers being asked to
12 chauffeur civilians or intoxicated officers
13 to the checkpoint?
14   A.   Yes, they were, because they were
15 complaining to us in the police department.
16 They were complaining that they had to do
17 it.  The same as I had complained.
18   Q.   Okay.  So it's clear your
19 complaints weren't being listened to by
20 Hesse because nothing had changed, right, in
21 2004?
22   A.   Well, yeah, I guess.
23   Q.   Right.  What other officers
24 complained to you?
25   A.   The ones I was working with on

Page 254

T. Snyder

2  the tour.
3    Q.   I wasn't working with you, so I
4  don't know.  Can you just tell me who they
5  were?
6    A.   Well, Kevin Lamm, John Oley,
7  Frank Fiorillo, Joe Nofi, Ed Carter.  There
8  were other officers that also worked with us
9  during that time frame.  I don't recall
10 their names.  Some of them don't work there
11 no more.
12   Q.   But they complained also?
13   A.   They used to say the same thing.
14 We can't do this because it's -- you're
15 leaving the tour short.  If we're taking
16 personnel out, something goes down in the
17 village, we're short police officers.
18   Q.   So Hesse was, in addition to
19 asking you and the other four Plaintiffs, he
20 was asking other officers to chauffeur
21 people, right?
22   A.   He was, yes.
23   Q.   Yes or no?
24   A.   Yes.
25   Q.   Okay.  During your -- during your

Page 255

T. Snyder

1
2  12:00 to 4:00 shift  -- I'm sorry, during
3  your 12:00 to 8:00 shifts, how many officers
4  were on duty at the time?
5    A.   It varied.  Sometimes there could
6  be three.  Sometimes there could be two.
7  Sometimes I could be working by myself.
8  Sometimes it could be five.
9    Q.   It varied?
10   A.   Yes, it varied.
11   Q.   So when -- were there times when
12 you were the only one that was on duty
13 between 12:00 and 8:00?
14   A.   Yeah, there were times.  Yes.
15   Q.   Well, how about during the summer
16 months, how about between Memorial Day and
17 Labor Day, were there any times when you
18 were the only person on the 12:00 to 8:00
19 shift?
20   A.   I think there was very few
21 occasions when that happened, yes.
22   Q.   How about when there were only
23 two people?
24   A.   That happened more frequently.
25   Q.   Okay.  And did you work any other

Page 256

T. Snyder

1
2  shifts?  During the summer months now, not
3  after Labor Day, but between Memorial Day
4  and Labor Day?
5    A.   Sometimes I worked a 9:00 at
6  night to 5:00 in the morning or 8:00 at
7  night to 4:00 in the morning.
8    Q.   Okay.  Let's talk about those two
9  shifts, 9:00 to 5:00, 8:00 to 4:00.  How
10 many people -- how many officers would
11 normally be on duty during those shifts in
12 the summer months?
13   A.   Generally there would be usually
14 three officers, two or three officers on the
15 4:00 to 12:00.  Then I would sometimes come
16 on at 8:00 by myself, sometimes I'd come on
17 with another officer, or sometimes I would
18 come on at 9:00 by myself or with another
19 officer.
20   Q.   So, again, at any given point
21 during that shift, what was the average
22 number of officers?
23   A.   There could be anywhere between
24 three and four officers.
25   Q.   Okay.  Let's go to paragraph 40.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 257

T. Snyder

1    "Hesse also allowed the uncertified officers
2    to drink beer while patrolling in police
3    vehicles.  In fact, when Plaintiffs would
4    confiscate beer from people on the beach,
5    Hesse and the uncertified officers would
6    drink the confiscated beer and even would
7    tell Plaintiffs what brand of beer to
8    confiscate."  Did Hesse ever tell you what
9    brands of beer to confiscate?
10       A.   No.  He didn't say that to me.
11   He said it to the other Plaintiffs in the
12   lawsuit.
13       MO        MR. NOVIKOFF: That's all.
14   Motion to strike.
15       Q.   I'm just asking you, sir.
16       A.   Yeah.  No.  He never --
17       Q.   Let me ask you the question.  Did
18   Hesse ever tell you what brand of beer to
19   confiscate?
20       A.   No, he did not.
21       Q.   Okay.  "Plaintiffs each
22   frequently complained to Hesse about this
23   unlawful dangerous conduct," do you see
24   that?

Page 258

T. Snyder

1        A.   Yes, I do.
2        Q.   And I believe the unlawful
3    dangerous conduct is being referenced in the
4    first two sentences of paragraph 40, do you
5    see that?
6        A.   Yes.
7        Q.   Did you complain to Hesse
8    personally?
9        A.   Yes, I did.
10       Q.   When did you first complain to
11   Hesse about this?
12       A.   Numerous occasions all throughout
13   the entire -- between 2002 and 2006 I'd say,
14   or five.
15       Q.   In 2002, how many times did you
16   complain to Hesse?
17       A.   Several times.
18       Q.   What would you say to Hesse?
19       A.   Tell him that these guys, again,
20   were not relieving us properly on time, and
21   when they were showing up, they were showing
22   up drinking beers, driving the police
23   vehicle, in civilian clothes sometimes,
24   sometimes in uniform, or they were leaving

Page 259

T. Snyder

1    beer caps and empty beer cans in there and
2    we'd end up having to clean the truck out.
3        Q.   Let's put aside cleaning the
4    truck out for the time being.
5        A.   Okay.
6        Q.   You allege in there that Hesse
7    allowed uncertified officers to drink beer
8    while patrolling in police vehicles, do you
9    see that?
10       A.   Yes.
11       Q.   Did you ever see a police officer
12   drinking a beer while he was operating a
13   police vehicle?
14       A.   Yes, I did.
15       Q.   While on duty?
16       A.   Yes, I did.
17       Q.   Who?
18       A.   I saw the Bosetti brothers and I
19   saw Muller in particular.  Those three.
20       Q.   On how many occasions did you see
21   a police officer while on duty drink a beer
22   while driving a police vehicle?
23       A.   Numerous occasions.
24       Q.   Tell me how many.  I don't know

Page 260

T. Snyder

1    what "numerous" means.
2        A.   Numerous is more than 10
3    occasions.
4        Q.   Since 2002?
5        A.   Yes.  Over the course of between
6    2002 and 2005 or six.
7        Q.   Okay.  And you complained to
8    Hesse in 2002 about this, right?
9        A.   Yes.  We told him.
10       Q.   Not "we."  Did you complain?
11       A.   Yes, I told him.
12       Q.   Okay.  Did you -- what did Hesse
13   say to you when you first complained to him
14   in 2002?
15       A.   He said the same thing.  He would
16   speak to them about it.  Every time I talked
17   to him about the conduct of these other
18   guys, he said he would talk to them about
19   it.
20       Q.   And when you spoke to -- when you
21   complained again in 2002, Hesse would give
22   you the same response?
23       A.   Yes.
24       Q.   How about in 2003, did you ever

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 261

T. Snyder

1 complain to Hesse about the fact that there
2 were officers drinking while patrolling in
3 police vehicles?
5     A.   Yes, I did.
6     Q.   And what did Hesse say at that
7 time?
8     A.   The same thing.  He would talk to
9 them about it.
10     Q.   Okay.  How many times in 2003 did
11 you complain to Hesse?
12     A.   I don't recall specifically.
13 I -- probably several occasions, but I just
14 don't remember how many.
15     Q.   How about 2004?
16     A.   I would say the same thing.
17     Q.   You complained to Hesse?
18     A.   Yes.  I continually complained to
19 him.
20     Q.   Hold on.  And Hesse would give
21 you the same answer?
22     A.   Yes.
23     Q.   2005?
24     A.   Yes.  I would say the same thing.
25     Q.   Why did you continue to complain

Page 262

T. Snyder

1 to Hesse in 2004 when he had ignored your
2 complaints in 2002 and 2003?
4     A.   Because he was my direct
5 supervisor and I was told that that's who I
6 had to complain to.  He's in charge -- he's
7 tasked with your tour.  He's the one who's
8 responsible for it.
9     Q.   I understand that, but why if
10 your direct and only superior during the
11 tour was ignoring your complaints for two
12 years, did you feel it still necessary to
13 complain to him in 2004?  That's really what
14 I'm asking.  He ignored your complaints in
15 2002, right?
16     A.   Yes.  I guess he did.
17     Q.   He ignored your complaints in
18 2003, right?
19     A.   Yes.  I guess he did.
20     Q.   Okay.  Why did you complain to
21 him in 2004?
22     A.   I wanted to continually complain
23 to him to point out to him what was going on
24 there.  Letting him know.
25     Q.   Even though he was ignoring you?

Page 263

T. Snyder

1     A.   Well, at some point we did talk
2 to the chief or I did talk to the chief
3 about it.
5     Q.   When did you talk to the chief
6 about it?
7     A.   In 2004.
8     Q.   Really?
9     A.   Yes.
10     Q.   When?
11     A.   Right after the Halloween
12 incident.
13     Q.   Okay.  What did you say to the
14 chief?
15     A.   I told him that there was, you
16 know, numerous instances of this situation
17 with the Bosettis among other things I went
18 through, and I told him about it, and he
19 said then that he -- he's "George is
20 responsible for his tour, I'm responsible
21 for my tour.  You have any issues or
22 complaints, you got to bring them to
23 George."  And I said, "That's what we've
24 been doing."
25     Q.   So let me understand this, you

Page 264

T. Snyder

1 had already -- this was right after the
2 Halloween incident?
4     A.   Yes, it was.
5     Q.   Was this during the course of
6 your investigation into the Halloween
7 incident?
8     A.   It was -- no.  This wasn't part
9 of the investigation.
10     Q.   No.  But was this while you were
11 investigating the Halloween incident?
12     A.   No, it wasn't while.
13     Q.   How long after you concluded your
14 investigation did you complain to Paridiso
15 about the Bosettis drinking?
16     A.   My invest -- I didn't -- we
17 didn't even get to really investigate.  We
18 just did a preliminary investigation.
19     Q.   Then fine.  Let's take that.  How
20 long after your preliminary investigation
21 ended did you complain to Paridiso?
22     A.   I think several days or a week or
23 so.  It was right within that time frame.
24     Q.   And Paridiso said to you "not my
25 problem, it's Hesse's problem"?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 265

T. Snyder

2 A. Said that --
3 Q. "Because Hesse is your superior
4 during that shift"?
5 A. Yes, he did.
6 Q. Okay. Was that the only time you
7 complained to Paridiso about the Bosettis
8 and anybody else drinking beers while
9 patrolling in police vehicles?
10 A. That was the only time I did
11 specifically.
12 Q. That's all I'm asking you, is
13 you.
14 A. Yes.
15 Q. Okay. 2005, did you complain to
16 Paridiso?
17 A. No, I did not.
18 Q. At any point in time between 2002
19 and the end of 2005, did you complain to any
20 trustee?
21 A. No, I did not.
22 Q. Did you complain to Loeffler?
23 A. No, I did not. Joel Loeffler
24 wasn't --
25 Q. Did you complain to Joe Loeffler

Page 266

T. Snyder

2 at all?
3 A. No, I did not.
4 Q. Did you complain to Mayor Rogers?
5 A. No, I did not.
6 Q. Did -- with regard to officers
7 while on duty drinking beers while
8 patrolling in police vehicles, did you,
9 between 2002 and 2005, ever notify Newsday,
10 News 12 or any other media outlet?
11 A. No, I did not.
12 Q. Did you ever put it on a blog?
13 A. No, I did not.
14 Q. Prior to the end of 2005?
15 A. No, I did not.
16 Q. So let me understand so far.
17 Prior to the Halloween incident, you had
18 raised complaints to Hesse about the
19 Bosettis drinking while in patrol cars, as
20 well as drinking in bars while on duty and
21 not picking you up on time, right?
22 A. Right. Among other things as
23 well.
24 Q. What other things prior to the
25 Halloween incident did you complain to Hesse

Page 267

T. Snyder

2 specifically about concerning the Bosettis?
3 A. Not knowing the radio codes. Not
4 responding to calls.
5 Q. I'm just talking about the
6 Bosettis now.
7 A. I am -- that's who I'm referring
8 to.
9 Q. Okay. Okay. Okay. Go ahead.
10 A. Leaving the empty beer cans and
11 containers of alcohol around the police
12 station, which we were cleaning up.
13 Q. Okay. What else, again, just
14 specifically to the Bosettis?
15 A. Yeah. That's -- that's pretty
16 much it right there.
17 Q. Okay. And what incident were you
18 involved in with the Bosettis which leads
19 you to believe that they did not know the
20 codes?
21 A. While I was on desk duty, I would
22 get a call for either disturbance or
23 whatever the call was, and I would call
24 their shield number, and you know, tell them
25 to give them a call, and they wouldn't even

Page 268

T. Snyder

2 sometimes even know what their own shield
3 number was. They wouldn't even answer me.
4 Q. Well, I'm not talking about not
5 answering the phone. We'll get to that in a
6 second. I'm talking about not knowing the
7 codes. Give me an example that you can
8 point to where you believe shows -- that you
9 believe shows that the Bosettis didn't know
10 the codes?
11 A. Well, when I was speaking to them
12 about responding to a certain scene for a
13 fight or something, they didn't know -- when
14 I was using the police radio code, they
15 didn't know what I was talking about. They
16 had no idea. I had to actually explain to
17 them in plain language what it was.
18 Q. And how do you know they didn't
19 know?
20 A. Because they said they didn't
21 know. They didn't know what a 16 was or
22 what a 17 was.
23 Q. So they asked you what was a 16?
24 A. Yeah, they said that.
25 Q. And you told them?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 269

1          T. Snyder
2     A.    Sometimes they just didn't
3 respond at all.
4     Q.    Well, I'm not talking about when
5 they didn't respond.  When they did respond
6 and told you that they didn't know a code,
7 you would tell them what the code was?
8     A.    Yeah, we did.
9     Q.    What is a 16?
10    A.    16 is a fight.
11    Q.    Again, hold on.  Not "we did,"
12 I'm asking you, sir.  You, not anybody else.
13    A.    A 16 is a fight.
14    Q.    Okay.  So you said it's a fight?
15    A.    Right.
16    Q.    All right.  How long did that
17 take?
18    A.    How long did it take for what?
19    Q.    For you to explain to them what a
20 16 was?
21    A.    Several seconds I guess.
22    Q.    Do you think the public was in
23 jeopardy in those couple of seconds that it
24 took you to explain what code 16 was?
25    A.    Well --

Page 270

1          T. Snyder
2     Q.    Yes or no?
3     A.    When I had to explain it to them
4 routinely, you know, repetitively because
5 they apparently didn't learn it.
6     Q.    Regardless of what they knew or
7 not knew, when you had to explain to them in
8 those few seconds what a code 16 was, do you
9 think the public was in jeopardy in those
10 two seconds?
11    A.    They could be.  Yes.
12    Q.    They could be?
13    A.    Yes.
14    Q.    That's your testimony to this
15 jury, they could be?
16    A.    If it takes someone -- it could
17 only take a split second for somebody to get
18 hurt, so.  You know, if they're taking -- if
19 they're wondering when I'm talking about and
20 they don't know and they're sitting around
21 somewhere or not doing what they're supposed
22 to be doing.
23    Q.    Well, we're not talking about
24 them not doing what they're supposed to be
25 doing.  The only issue right now is they

Page 271

1          T. Snyder
2 didn't know the code.
3     A.    Right.
4     Q.    So you would call them up.  You
5 don't know where they were, right?
6          MR. GOODSTADT: Objection.
7     Q.    When you called them up, right?
8     A.    I have no idea where they were
9 sometimes.
10    Q.    Well, no.  No.  When you called
11 them up, did you know where they were
12 physically?
13          MR. GOODSTADT: Objection.
14    Q.    When you called them on their
15 radio?
16    A.    No, sometimes I did not.
17    Q.    Well, how would you know where
18 they were before you called them?
19    A.    Well, we knew what area of
20 town --
21    Q.    I understand you knew what area
22 of town.
23          MR. GOODSTADT: Objection.  Let
24     him answer the question.
25    Q.    Did you ever know, when you

Page 272

1          T. Snyder
2 called them on the phone, on the radio,
3 where they were physically located?
4     A.    No.
5     Q.    Okay.
6     A.    Not all the times.
7     Q.    Well, any time?
8     A.    Sometimes when I was out on foot
9 patrol, I could see where they were
10 positioned on the other side of town or a
11 few blocks away.
12    Q.    Well, when you were on foot
13 patrol, were you calling them on the radio
14 to send them out on a call?
15    A.    Yes.  Sometimes we were.  We used
16 to have to all respond.  To a 16, all
17 officers go.  I mean, this could be a big
18 bar brawl, so.  That was important.
19    Q.    I understand that, but when you
20 were not the dispatcher --
21    A.    Right.
22    Q.    -- would you call the Bosettis up
23 and just tell them to go somewhere?
24    A.    I would tell them when they
25 didn't respond when they were being told

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 273

T. Snyder

1         T. Snyder
2   from the desk officer or they were being
3   told by another officer it's a 16, you know,
4   and it's a bar close to where they are, they
5   didn't -- "what's a 16," and I would chime
6   in as I'm going over there, "it's a bar
7   fight." You know.
8       Q.   Okay. I understand now. And
9   they did this repeatedly before the
10  Halloween incident, not know what the codes
11  were, right?
12      A.   Yeah, they did that repeatedly.
13  Yeah.
14      Q.   To your knowledge, of course.
15  That's all I'm asking about.
16      A.   Yes.
17      Q.   And they also didn't respond to
18  calls that you made on the radio, right? Is
19  that your testimony?
20      A.   That's when I was -- yes. When I
21  was on the desk, yes.
22      Q.   And you complained to Hesse about
23  this?
24      A.   Yes, I did.
25      Q.   Right. And you believed the

Page 274

T. Snyder

1         T. Snyder
2   Bosettis weren't acting in accordance with
3   how police officers should act, right?
4       A.   Yes.
5       Q.   And this was all before the
6   police incident?
7         MR. GOODSTADT: Objection.
8       Q.   I mean the Halloween incident,
9   right?
10      A.   This was before the Halloween
11  incident, yes.
12      Q.   Right. And Kevin Lamm shared
13  your views?
14        MR. GOODSTADT: Objection. How
15  would he know?
16        MR. NOVIKOFF: Well, I'm asking
17  him.
18      Q.   Do you know if Kevin Lamm shared
19  your views?
20      A.   I think he did, yeah.
21      Q.   And did -- and this is prior to
22  the Halloween incident, right?
23      A.   Prior to the Halloween incident?
24      Q.   Right.
25      A.   Yeah.

Page 275

T. Snyder

1         T. Snyder
2       Q.   And prior to the Halloween
3   incident, did Frank Fiorillo share your
4   views about the Bosettis' conduct as police
5   officers?
6         MR. GOODSTADT: Objection.
7       Q.   You can answer.
8       A.   Yeah, I would say he did.
9       Q.   And you would say he did based
10  upon your communication -- your
11  conversations with Frank?
12      A.   No. It would be based on his
13  personal knowledge as well. These guys
14  worked with them sometimes when I wasn't
15  there and they would tell me things that
16  happened as well.
17      Q.   Well, that's what I'm saying.
18  Your opinion of what Frank Fiorillo may
19  have -- how he would have viewed the
20  Bosettis prior to the Halloween incident was
21  based upon Fiorillo talking to you about it,
22  right?
23      A.   Oh, yes. Yes.
24      Q.   Same thing with Lamm, your view
25  of how Lamm viewed the Bosettis prior to the

Page 276

T. Snyder

1         T. Snyder
2   Halloween incident was based upon what Lamm
3   would say to you about his interaction with
4   the Bosettis, right?
5         MR. GOODSTADT: Objection.
6       A.   Right. Both in conversations and
7   both where we were all working together
8   where I can personally --
9       Q.   I understand that. Okay. I just
10  want to know what was the basis of your
11  opinions. And with regard to leaving beer
12  cans, where would the Bosettis leave beer
13  cans?
14      A.   In the -- in this police truck.
15      Q.   And this was in -- when did this
16  start?
17      A.   2002, 2003. It was sometime
18  after they started working there.
19      Q.   And when did you start realizing
20  that the Bosettis didn't know the codes?
21      A.   It was around that same time
22  frame.
23      Q.   Okay. And when did you start,
24  um, believing that the Bosettis didn't
25  respond to your radio calls?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 277

1           T. Snyder
2    A.   When I was  -- in that same time
3 frame.
4    Q.   2002?
5    A.   Yeah.
6    Q.   And did you complain to Hesse
7 about the Bosettis not knowing the codes in
8 2002?
9    A.   Yeah.  We said that.
10   Q.   Not "we," you.
11   A.   I'm sorry.  I said that.  Yes.
12   Q.   Okay.  And what was Hesse's
13 responses with regard to the Bosettis not
14 knowing the codes, your complaints?
15   A.   The same thing as before.  That
16 he would speak to them about it.
17   Q.   Okay.  And did you make more than
18 one complaint in 2002 about the Bosettis not
19 knowing the codes?
20   A.   I don't believe so.
21   Q.   How about in 2003, did you
22 complain to Hesse about the Bosettis not
23 knowing the codes?
24   A.   That, and other things as well.
25   Q.   No.  I'm just talking about the

Page 278

1           T. Snyder
2 codes now.
3    A.   Yeah.
4    Q.   Did you complain to Hesse --
5 well, what did Hesse say to you in 2003?
6    A.   The same thing he always said.
7    Q.   Which was?
8    A.   Which was that I will speak to
9 them about it, about them, you know,
10 learning the codes.
11   Q.   2004, did you complain to Hesse
12 about the Bosettis not knowing the codes?
13   A.   Yes, I did.
14   Q.   And what was Hesse's response in
15 2004?
16   A.   The same as before.
17   Q.   2005, same question, did you
18 complain to Hesse?
19   A.   I don't recall if I did, but I
20 probably did, yes.
21   Q.   And do you recall what Hesse's
22 response was?
23   A.   The same as before.
24   Q.   Okay.  2002, did you complain to
25 Hesse about the Bosettis not responding to

Page 279

1           T. Snyder
2 your radio calls as opposed to not knowing
3 the codes.
4    A.   I'm not sure if it was 2002 or
5 2003.
6    Q.   Okay.  But you complained at
7 least in one of those years?
8    A.   Yes.
9    Q.   How many times in those years did
10 you complain to Hesse?
11        MR. GOODSTADT: About not
12 returning --
13        MR. NOVIKOFF: Not responding
14 to the calls, yeah.
15   A.   I would say at least on one
16 occasion I did.
17   Q.   How about 2004?
18   A.   2004, no.
19   Q.   How about 2005?
20   A.   2005, no.
21   Q.   Okay.  In 2002 or three when you
22 did complain, what was Hesse's response?
23   A.   The same as he always did.  "I
24 will talk to them about it."
25   Q.   How about leaving beer cans, did

Page 280

1           T. Snyder
2 you complain to Hesse in 2002?
3    A.   Yes, I did.
4    Q.   And how many times?
5    A.   At least one occasion.
6    Q.   Okay.  And what was Hesse's --
7    A.   Maybe 2003.  I may be wrong.
8    Q.   We're not there yet, 2003.  I'm
9 still on 2002.
10   A.   I'm not sure if it's 2002 or
11 2003.
12   Q.   Okay.  So let's put 2002 and 2003
13 together.  How many times in those two years
14 do you think -- do you recall complaining --
15   A.   At least one occasion.
16   Q.   Do you recall complaining to
17 Hesse about the beer cans?
18   A.   At least one occasion, yes.
19   Q.   What was Hesse's response?
20   A.   Always the same response.
21   Q.   How about 2004, did you complain
22 about leaving the beer cans in the police
23 vehicles?
24   A.   I don't recall if I did in 2004
25 or not.

Precise Court Reporting
516-747-9393  718-343-7227  212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 281

T. Snyder

1
2    Q.   How about 2005?
3    A.   I don't recall if I did in 2005
4  or not.
5    Q.   Okay.  On any occasion with
6  regard to your complaints to Hesse -- well,
7  with regard to your -- with regard to the
8  Bosettis not knowing codes, did you ever
9  complain to Paridiso?
10   A.   Um, I did complain to Paridiso,
11 yes.
12   Q.   When?
13   A.   Actually, this was in 2004.
14   Q.   When?
15   A.   Again, after the Halloween
16 incident.
17   Q.   And what was Paridiso's response?
18   A.   His response to me at that time
19 was is that -- that George is responsible
20 for his tour, I'm responsible for my tour.
21 Just -- that was also part of the same
22 conversation with the other thing we were
23 talking about.
24   Q.   Okay.  And did you complain to
25 any trustee in 2004?

Page 282

T. Snyder

1
2    A.   No, I did not.
3    Q.   About Bosettis not knowing the
4  codes?
5    A.   No, I did not.
6    Q.   Did you complain to any mayor in
7  2004 about the Bosettis not knowing the
8  codes?
9    A.   No, I did not.
10   Q.   Did you complain to Newsday, News
11 12 or any other media outlet?
12   A.   No, I did not.
13   Q.   Did you put it in a blog?
14   A.   No, I did not.
15   Q.   Okay.  How about not responding
16 to sales call -- to radio calls, did you
17 ever complain to Paridiso?
18   A.   Again, that was part of the same
19 conversation.
20   Q.   We've been through that.  How
21 about did you complain to -- ever complain
22 to any trustee?
23   A.   No, I did not.
24   Q.   Did you ever complain to any
25 mayor?

Page 283

T. Snyder

1
2    A.   No, I did not.
3    Q.   Did you ever complain to Newsday,
4  News 12 or any media outlet?
5    A.   No, I did not.
6    Q.   Leaving beer cans in police
7  vehicles, did you ever complain to Paridiso?
8    A.   It was during that 2004
9  conversation.  All this stuff had come up.
10   Q.   Okay.  Did you ever complain to
11 any trustee?
12   A.   No, I did not.
13   Q.   Did you ever complain to any
14 mayor?
15   A.   No, I did not.
16   Q.   Did you ever complain to any --
17 to News 12, Newsday or any other media
18 outlet?
19   A.   No, I did not.
20   Q.   Let's look at paragraph 41.  You
21 allege the following, "rather than address
22 Plaintiffs numerous complaints about these
23 violations of law and department policy,
24 Hesse instructed Plaintiffs to remove empty
25 beer cans and other refuse that the

Page 284

T. Snyder

1
2  uncertified officers abandoned in their
3  vehicles and left strewn about the police
4  station after a night on duty."  What other
5  officers, besides the Bosettis -- well,
6  did -- were you ever instructed to remove
7  beer cans?
8    A.   No.  This -- this doesn't refer
9  to me.  This refers to the other Plaintiffs.
10 I wasn't specifically instructed by him.
11   Q.   So just so we're clear, with
12 regard to paragraph 41, you were never
13 instructed by Hesse to remove empty beer
14 cans and other refuse that the other
15 uncertified officers abandoned?
16   A.   Right.  This -- this is not
17 referring to me.
18   Q.   Then we don't need to talk about
19 it.  Let's look at 42.  "Hesse's policy of
20 allowing the uncertified officers to become
21 intoxicated while on duty became even more
22 expansive during the summer of 2004."  What
23 personal knowledge do you have that supports
24 this allegation, not that there were
25 uncertified officers becoming intoxicated

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 285

T. Snyder

2 while on duty, but that it became even more
3 expansive during the summer of 2004?
4    A.    The situation with not being
5 properly relieved, the situation with the
6 beer cans in the truck, all that started
7 getting worse and worse.  It became almost
8 an every night thing when they were working.
9    Q.    It became an almost what?
10    A.    An every night occurrence when
11 they were working.
12    Q.    Every night?
13    A.    Well, when they were working.  It
14 became almost an every night occurrence when
15 they were working.
16    Q.    Okay.  And did it get worse in
17 2005?
18    A.    Um, in 2005, I think it was
19 basically the same.
20    Q.    Okay.
21    A.    It -- it went from 2003 up until
22 then.
23    Q.    Did you ever complain -- did you
24 ever personally complain to Paridiso when
25 you first began to realize, in 2004, that

Page 286

T. Snyder

2 this behavior was becoming more expansive?
3        MR. GOODSTADT: Other than for
4     the time in 2004 that he already
5     testified that he complained to
6     Paridiso?
7        MR. NOVIKOFF: Well, if that's
8     the only time, then that will be the
9     only time.  I was specific in my prior
10     questions to what he was complaining to
11     Paridiso about.
12    Q.    So my question is, did you ever
13 complain to Paridiso, at any point in time
14 in 2004, when you first came to realize that
15 the behavior being complained about in 42
16 became more expansive?
17    A.    No.  Not until -- this is part
18 of the same conversation as before.
19    Q.    Okay.  So it wasn't until after
20 the Halloween incident?
21    A.    That's correct.
22    Q.    Okay.  Let's look at 43.  Can you
23 read 43 and then tell me when you're done
24 reading it.
25    A.    You want me to read it out loud?

Page 287

T. Snyder

2    Q.    No.  To yourself.
3    A.    (Reviewing).  Okay.
4    Q.    Do you have any personal
5 knowledge as to what was alleged in
6 paragraph 43?
7    A.    Yes.
8        MR. GOODSTADT: Objection.
9    A.    I was the desk officer on duty.
10    Q.    Okay.  So describe for me what
11 occurred based upon your recollection.
12    A.    These were on the occasions where
13 I was working either 8:00 or 9:00 to 4:00 in
14 the morning or 9:00 at night to 5:00 in the
15 morning.
16    Q.    All right.  And when did this
17 take place?
18    A.    I believe in 2002, 2003.  In that
19 time frame.
20    Q.    Did it ever take place in 2004?
21    A.    No, it did not then.
22    Q.    Did it ever take place in 2005?
23    A.    No, it did not.
24    Q.    Okay.  And did you complain to
25 Hesse in 2002?

Page 288

T. Snyder

2    A.    I didn't then, no.
3    Q.    Did you complain to Paridiso in
4 2002?
5    A.    No, I did not.
6    Q.    Did you complain to anybody in
7 2002?
8    A.    No, I did not.
9    Q.    About what is being referred to
10 in 43?
11    A.    Just my fellow police officers.
12    Q.    And who were your fellow police
13 officers?
14    A.    The police officers that are in
15 the department itself.
16    Q.    Yeah.  Who are they?
17    A.    I don't have a roster.  If I had
18 a roster of the police officers of that
19 year, I could tell you.
20    Q.    Oh, so you complained to
21 everybody?
22    A.    Pretty much all of them knew
23 about it.  Yeah.
24    Q.    Through you?
25    A.    Yeah.  They knew what happened.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 289

T. Snyder

1   I was working.  I told them what happened.
2   Q.   So if I understand correctly, and
3   what officers are you referring to here?
4   A.   The ones that were -- which
5   officers are you talking about now?
6   Q.   The officers that are being
7   referred to in paragraph 43.
8   A.   The uncertified ones?
9   Q.   Yes.
10  A.   In particular, the two Bosetti
11  brothers, Gary and Richie Bosetti.
12  Q.   So in 2002, you complained to all
13  of the officers at Ocean Beach concerning
14  the Bosettis' conduct as it relates to
15  paragraph 43?
16  MR. GOODSTADT: Objection.
17  Q.   Yes or no?
18  A.   I complained to a fair amount of
19  them.  Most of them I guess.
20  Q.   Okay.  2003, did you complain to
21  Hesse?
22  A.   Um, I don't think I did.  No.
23  Q.   Did you complain to Paridiso?
24  MR. GOODSTADT: Just so we're

Page 290

T. Snyder

1   clear, about 43?
2   MR. NOVIKOFF: About 43, yeah.
3   About 43.
4   A.   At that time, no.
5   Q.   At any time in 2003, did you
6   complain to Hesse about what's being
7   referred to in 43?
8   A.   I had mentioned to him that I
9   didn't want to work this tour anymore
10  because I didn't feel safe working the tour
11  with the officers I was working with.
12  Q.   And who were the officers that
13  you were working with that you're referring
14  to?
15  A.   Gary Bosetti, Richard Bosetti and
16  Walter Muller.  Those three in particular.
17  Q.   Okay.  And what did Hesse say to
18  you in 2003 when you made this complaint?
19  A.   He didn't really  -- he didn't
20  say anything.  He just -- I just told him
21  that I was now removing myself from the
22  tour.
23  Q.   So the fact when you say nothing
24  took place in 2004 and 2005, to your

Page 291

T. Snyder

1   knowledge, that was because you were no
2   longer on the same tours with the Bosettis?
3   MR. GOODSTADT: Objection.
4   A.   I was no longer --
5   Q.   You can explain.
6   A.   I was no longer working that 9:00
7   at night to 5:00 in the morning or 8:00 to
8   4:00 in the morning tour.
9   Q.   Okay.
10  A.   And if I did work after that
11  doing that, I only did -- the people I was
12  working with were, you know, I trusted.
13  Q.   What does that mean?
14  A.   That some of the cops I was
15  working with, I trusted them a lot more than
16  I trusted the Bosetti brothers.
17  Q.   What do you mean you didn't trust
18  the Bosettis?
19  A.   Well, I saw the way they
20  conducted themselves in that village and I
21  didn't trust my safety when I worked with
22  them.
23  Q.   And that's when you told Hesse in
24  2003 that you no longer wanted to work on

Page 292

T. Snyder

1   the same shift with -- with the Bosettis?
2   A.   That's correct.
3   Q.   And after 2003, you no longer
4   worked on the same shift with the Bosettis?
5   A.   Right.  That's correct.  The only
6   other occasion we would overlap after that.
7   Q.   Right.  On how many occasions in
8   2004, 2005?
9   A.   It was numerous from 2004 through
10  2005.
11  Q.   That you overlapped?
12  A.   Yes.
13  Q.   So when you told Hesse you didn't
14  want to work on the same shift, if you were
15  starting at 9:00 and ending at 5:00, you
16  didn't want the Bosettis starting at 9:00
17  and working at 5:00 -- ending at 5:00,
18  right?
19  A.   No, they didn't.  They worked
20  4:00 to 12:00 and I would come in at 9:00,
21  so that would be the overlap.  But on these
22  occasions that I'm referring to, I was sole
23  officer coming on and working with them.  On
24  those other occasions, I had other officers

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 293

T. Snyder

2 that were working 9:00 to 5:00 with me.
3     Q.   Again, now I'm a little confused
4 and it's probably me.  When you told Hesse
5 in 2003 that you didn't want to work with
6 the Bosettis and Muller, what did you mean
7 by that?
8     A.   I meant that specifically that I
9 didn't trust -- I didn't feel safe working
10 with these guys because they didn't answer
11 calls, they didn't know the radio codes.  I
12 seen them going into bars while on duty and
13 disappearing.  I didn't see anybody
14 patrolling the village, and I had to
15 sometimes actually lock up the police
16 station and go handle the call myself,
17 leaving the desk to do it.
18     Q.   I understand that.  But when you
19 were telling him that you didn't want to
20 work the shift with them, what did that
21 exactly mean?
22     A.   It meant that I didn't feel safe
23 working with these guys.  That's what it
24 meant.
25     Q.   But what shift were you referring

Page 294

T. Snyder

2 to?
3     A.   Either the 8:00 or 9:00 to 4:00
4 in the morning or 9:00 at night to 5:00 in
5 the morning.  That's the shift I worked
6 during these occasions.
7     Q.   And they worked what shift?
8     A.   They worked 4:00 to 12:00.  So
9 there would be that overlap period between
10 8:00 and midnight if I was working with
11 them, or 9:00 to midnight when I was working
12 with them.
13     Q.   Okay.  But you didn't want to
14 work the 4:00 to 12:00 with them?
15     A.   I couldn't work the 4:00 to 12:00
16 with them.
17     Q.   Okay.  So even though you told
18 Hesse that you didn't want to work with
19 them, there was always an overlap that you
20 worked with them?
21          MR. GOODSTADT: Objection.
22     Q.   Is that what you're testifying
23 to?
24     A.   I'm not sure exactly -- I know
25 exactly what you mean.

Page 295

T. Snyder

2          MR. NOVIKOFF: How much time do
3 I have left?
4          THE VIDEOGRAPHER: A minute.
5     Q.   You said you told Hesse in 2003
6 you didn't want to work with them anymore?
7     A.   Right.
8     Q.   But then you testified that on
9 numerous occasions in 2004 and 2005, there
10 was an overlap?
11     A.   There was occasions where I
12 was -- I said I would work 9:00 at night to
13 5:00 in the morning or 8:00 to 4:00, but I
14 had other officers working with me other
15 than the Bosettis.
16     Q.   Oh, so you didn't want to be the
17 only person --
18     A.   Right.
19     Q.   Only officer that worked with the
20 Bosettis and Muller?
21     A.   That's correct.  Right.
22     Q.   And did Hesse, after you
23 complained, ever put you in a shift where
24 you were the only person that was working
25 with the Bosettis and Muller?

Page 296

T. Snyder

2     A.   I don't recall if he did at this
3 time.  No.
4          MR. NOVIKOFF: Okay.
5          THE VIDEOGRAPHER: This ends
6 tape number four.  The time is 3:41
7 p.m.  Going off the record.
8          (A break was taken.)
9          THE VIDEOGRAPHER: This begins
10 tape number five.  The time is 3:49
11 p.m.  Back on the record.
12     Q.   Sir, let's turn -- can you just
13 turn your attention to paragraph 49.  You
14 allege in paragraph 49 the following:
15 "Hesse also required Plaintiffs, during
16 their tour of duty, to chauffeur him to and
17 from different residences both inside and
18 out of Ocean Beach so Hesse could engage in
19 sexual escapades."  When you refer to "out
20 of Ocean Beach," what are you referring to?
21     A.   This doesn't apply to me.  This
22 is to some of the other Plaintiffs in this
23 lawsuit.
24     Q.   Okay.  So let's just be clear.
25 Whatever's being referenced in 49 in this

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 297

T. Snyder

1 
2 complaint does not refer to you?
3    A.   That's correct.
4       MR. GOODSTADT: Just read the
5 whole paragraph to make sure of that
6 before you answer that question.
7 You're talking about the whole
8 paragraph or just the first sentence?
9       MR. NOVIKOFF: The whole
10 paragraph.
11       MR. GOODSTADT: Make sure you
12 read the whole paragraph to make sure
13 that's true before you answer.
14    A.   This doesn't apply to me. I
15 mean, he bragged about, you know, numerous
16 women that he slept with, but I was never
17 asked by him to chauffeur him specifically
18 to a location.
19    Q.   Okay.  So that aspect of the
20 allegation doesn't refer to you?
21    A.   This one does not refer to me.
22 It refers to the other Plaintiffs in the
23 lawsuit.
24    Q.   But Hesse did brag to you about
25 his sexual escapades?

Page 298

T. Snyder

1 
2    A.   Yes, he did.
3    Q.   Okay.  And did he make the
4 comment to you that's in quotes, "she just
5 had the German sausage"?
6    A.   He didn't make that to me, no.
7    Q.   Okay.  Did any other officer,
8 while you were employed by Ocean Beach, ever
9 brag about their sexual escapades?
10    A.   Not to me, no.
11    Q.   51, you allege the following:
12 "Clearly outraged by Plaintiffs' enforcement
13 of the laws against his friends and
14 acquaintances, Hesse instructed Plaintiffs
15 and other officers under his command not to
16 issue summonses to certain bars that Hesse
17 and his clique of uncertified officers
18 frequented both on and off duty, even though
19 those bars regularly served alcohol to
20 minors," do you see that?
21    A.   Yes, I do.
22    Q.   Did Hesse instruct you not to
23 issue summonses to certain bars?
24    A.   He told us not to --
25    Q.   Not "us," sir.  You.

Page 299

T. Snyder

1 
2    A.   He told me not to -- when I
3 complained to him about the underage
4 minor -- the underage and the minors
5 drinking in certain bars, I told him that we
6 were walking through the bars and IDing
7 people who were underage.  I was walking
8 through the bars with my partner, and he did
9 say that to us.
10 MO       MR. NOVIKOFF: Again, move to
11 strike.
12    Q.   My question was just simply yes
13 or no.  Did Hesse ever instruct you not to
14 issue summonses to certain bars?
15    A.   He did, yes.
16    Q.   Okay.  When did Hesse first
17 instruct you not to issue summonses to
18 certain bars?
19    A.   It had to be when I complained
20 about the underage drinking.  I'm uncertain
21 as to exactly what year that was.
22    Q.   Would it have been early  --
23 2002, 2003 or closer to 2004, 2005?
24    A.   I think it was probably around
25 2002, 2003.  It was an ongoing problem.

Page 300

T. Snyder

1 
2    Q.   Since when?
3    A.   The entire time I worked there.
4    Q.   Going back to 1991?
5    A.   The underage drinking was a
6 problem there going back to '91, but in this
7 specific instance where he told me, that
8 would be I guess 2002, 2003.
9    Q.   Okay.  And what bars did Hesse
10 tell you not to issue summonses to?
11    A.   Well, in particular, CJ's is one,
12 because that was the bar that the cops
13 frequented, and the other one would be
14 Houser's.
15    Q.   And when Hesse told you not to
16 issue summonses, I guess my question is what
17 summonses would you issue a bar?
18    A.   Violation of the alcohol and
19 beverage control law for serving alcohol to
20 minors.
21    Q.   Okay.  Would that be the only
22 summonses you would issue to bars?
23    A.   Probably to -- maybe to the
24 individuals themselves.  But I know Hesse
25 told me he had already previously issued

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 301

T. Snyder

1 Houser's and he didn't want us to re-violate
2 them because they may lose their liquor
3 license.
4   Q.   Okay.  Now you had power to
5 arrest, didn't you?
6   A.   Yes, I did.
7   Q.   And underage drinking is a crime,
8 right?
9   A.   Underage drinking?
10   Q.   Well, let me ask you a question,
11 my daughter was 15 and she was on Ocean
12 Beach --
13   A.   She's a minor.
14   Q.   And she's a minor and she goes
15 into a bar, and you see her go into a bar
16 and she has a shot of alcohol, she's in
17 violation of the law, right?
18   A.   She's -- yes.  That's correct.
19   Q.   And you could arrest her, right?
20   A.   She's a minor.  I really can't
21 arrest her.  I actually can arrest you.
22 You're the parent.
23   Q.   Assume -- assume I'm off the
24 island and just my daughter's there.

Page 302

T. Snyder

1   A.   Right.  I couldn't write her a
2 ticket.  I'd have to write you the summons.
3   Q.   You couldn't arrest --
4   A.   She's 15.
5   Q.   You couldn't arrest a minor for
6 violating the law?
7   A.   I could take her in custody.  I
8 can't -- you know, I'm not arresting her for
9 that.  She's a minor.  I would actually -- I
10 would have to issue you the summons.
11   Q.   Why would you issue -- well, let
12 me ask you a question.  If a 15 year old
13 stabs someone on Ocean Beach, could you
14 arrest them?
15   A.   I certainly would arrest them if
16 they stabbed somebody.
17   Q.   Because they violated the law,
18 right?
19   A.   Yeah.  That's a serious crime.
20   Q.   So what was the distinction
21 between when you could arrest a minor and
22 when you couldn't arrest a minor for a --
23 for a violation of the law?
24       MR. GOODSTADT: Objection.

Page 303

T. Snyder

1   Q.   That's what I'm trying to figure
2 out.  If a 15 year old stabbed someone,
3 that's a violation of the law, right?
4   A.   Yeah.
5   Q.   And you?
6   A.   But this is not what we're
7 talking about here.
8   Q.   And you were authorized to arrest
9 people who violated the law, right?
10   A.   Um-hum.
11   Q.   And there was no prohibition with
12 regard to you arresting a minor who stabbed
13 someone, right?
14   A.   No.  I wouldn't think so.
15   Q.   Okay.  Now a minor who is
16 underage -- who is drinking in a bar, that's
17 also a violation of the law?
18   A.   Yes.  A lesser violation.
19   Q.   But it's still a violation of the
20 law?
21       MR. GOODSTADT: Objection.
22   A.   Yeah.
23   Q.   And you could arrest them, right?
24   A.   Yeah, I could arrest them.  Yeah.

Page 304

T. Snyder

1 Take them in custody.
2   Q.   Okay.  So my question to you is,
3 putting aside the fact that you say Hesse
4 instructed you not to issue summonses to the
5 bar, what would have prevented you from
6 putting that underaged drinker in custody?
7   A.   He told us to stay away from the
8 bars.  To don't violate them.  Don't go
9 there.  Don't -- don't do what we told him
10 we had to do.
11   Q.   And this was an ongoing thing
12 that Hesse told you from around 2002?
13   A.   Yeah.  He told us that in the
14 beginning of 2002 and we didn't -- we stayed
15 away from those bars, even though we saw
16 people.  In fact, on occasion, I did go in
17 and ID people.  I didn't see them drinking,
18 but they were underage in the bar as young
19 as 14.
20   Q.   Okay.  So now let's go back to
21 2002.  Did you complain to Hesse about his
22 instructions to you in 2002?
23   A.   Yeah.  And he told us about
24 Houser's, because Houser's had a very bad

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 305

T. Snyder

1          T. Snyder
2  problem with that.
3     Q.   And in 2003, did Hesse instruct
4  you to do the same thing or you just knew --
5     A.   No.  He didn't continually.  He
6  said it that one -- one occasion.  "I
7  violated them myself.  If you guys violate
8  them, they may lose their liquor license."
9  He didn't want -- he didn't want that to
10  happen apparently.
11     Q.   So if I understand your testimony
12  correctly, Hesse told you in or about 2002
13  with regard to certain bars, not to  -- not
14  to issue summonses to them for underage
15  drinking, right?
16     A.   Yeah.  That's correct.
17     Q.   And he never told you after that
18  to do that, correct?
19     A.   No.  I did walk through certain
20  other bars and find underage people in them.
21     Q.   I'm not suggesting  -- my
22  question is not what you did after that.  My
23  question is focusing on Hesse now.  Hesse
24  told you in 2002 not to issue summonses to
25  certain bars, CJ's and Houser's for underage

Page 306

1          T. Snyder
2  drinking?
3     A.   I believe the Mermaid as well.
4     Q.   Okay.  For underage drinking,
5  right?
6     A.   Um-hum.
7     Q.   And he didn't tell you after 2002
8  to do that, right?
9     A.   No.  I don't believe he did.  No.
10     Q.   You believe that his direction in
11  2002 carried forward in 2003, 2004 --
12     A.   Well, there was --
13     Q.   -- and 2005, right?
14          MR. GOODSTADT: Let him finish
15       the question.
16     A.   There was an occasion where I
17  went into the Mermaid Restaurant and the
18  owner of the Mermaid happened to be a
19  village board member, Scotty Hirsch, and he
20  complained to George and the chief about it.
21  That we were going in his bar walking
22  around.
23     Q.   Did Hesse -- when this guy Scott
24  Hirsch complained to Hesse and who else?
25     A.   I believe he complained to the

Page 307

1          T. Snyder
2  chief, but I'm not sure.
3     Q.   Okay.  But you know he complained
4  to Hesse, right?
5     A.   At least.  Yes.
6     Q.   How do you know that?
7     A.   Cause we used to see Scotty and
8  he complained to us about why are we coming
9  down on him, and he said he was going to
10  talk to George about it.
11     Q.   Well, did he say "why are you
12  coming down on me and not on CJ's and
13  Houser's" or did he --
14     A.   No, he didn't say that.
15     Q.   -- say "why are you coming down
16  on me"?
17     A.   He just asked why were we -- why
18  were we walking through his bar IDing people
19  who looked underage.
20     Q.   And he said he was going to talk
21  to George about it?
22     A.   Yes, he did.
23     Q.   Did George ever talk to you about
24  Hirsch's complaint, any complaint by Hirsch?
25     A.   No, he didn't.

Page 308

1          T. Snyder
2     Q.   All right.  So let's go back to
3  what Hesse said to you in 2002.  He advised
4  you, directed you, according to your
5  testimony, not to issue summonses to
6  certainly Houser's and CJ's, right?
7     A.   Right.
8     Q.   He didn't tell you this in 2003,
9  right?
10     A.   I don't recall him telling.
11     Q.   He didn't tell you this in 2004,
12  right?
13     A.   No.  I don't recall him saying
14  that.
15     Q.   He didn't tell you this in 2005,
16  right?
17     A.   No, I don't recall him saying
18  that.  But we did have conversations about
19  the ongoing underage drinking problem.
20     Q.   You had conversation -- not "we."
21     A.   Yes.
22     Q.   Did you have conversations with
23  Hesse?
24     A.   Yeah, I did.  Several occasions
25  over the course of that time frame.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 309

1           T. Snyder
2     Q.    And what were the sum and
3  substance of these conversations?
4     A.    That the underage drinking was a
5  serious problem here, especially on our
6  tour, the midnight tour, and that, you know,
7  we needed to do something about it.
8     Q.    And what did Hesse say to you?
9     A.    He said that, again, he repeated
10 that, "I already violated Houser's in
11 particular where it was really bad," and he
12 said, "I violated that place.  And if you
13 continue -- you guys violate them, they may
14 lose their liquor license."
15    Q.    And that was his stock answer any
16 time you complained?
17    A.    No.  That -- that was the answer
18 he gave the second time as well.
19    Q.    Well, when was --
20    A.    The first time was back in 2002
21 we talked about it.
22    Q.    And when was the second time?
23    A.    The second time was probably 2004
24 or five or -- I'm not sure exactly when.
25    Q.    Okay.  So there could have been

Page 310

1  as long as a three-year span between your
2  conversations with Hesse about violating
3  some of these bars for serving minors
4  alcohol?
5           MR. GOODSTADT: Objection.
6     A.    Well, we talked to him -- I
7  talked to him continually about how we need
8  to do something about it.  It's a bad
9  problem.
10    Q.    Okay, when you say "continually,"
11 what do you mean?  Let's start with 2002,
12 did you talk to him on more than one
13 occasion in 2002?
14    A.    I think at least on one occasion.
15    Q.    How about 2003?
16    A.    Maybe one or two occasions, and
17 the same in 2003, 2004.
18    Q.    And did he ever tell you that he
19 was going to take care of the problem?
20    A.    He didn't say anything sometimes.
21    Q.    Now -- so is it your
22 understanding that if -- if a bar got two
23 violations, they could lose their liquor
24 license?

Page 311

1           T. Snyder
2     A.    Well, that's what he said to me.
3  That they may be losing their liquor license
4  because of it.  He had said he had recently
5  violated them himself.
6     Q.    Did you, given your concern over
7  the underage drinking problem on Ocean
8  Beach, sir, did you complain to Paridiso?
9     A.    I believe I did complain to
10 Paridiso, yeah.  I don't remember exactly
11 when.
12    Q.    Do you recall what you would have
13 said to Paridiso?
14    A.    No, I don't, actually.  Probably
15 the same thing, though.
16    Q.    What?
17    A.    That there was an underage
18 drinking problem in that village, and you
19 know, we have problems on our tour in
20 particular.
21    Q.    And did you complain to Joe
22 Loeffler?
23    A.    No.  I didn't even know Joe
24 Loeffler at that time.  I don't think he was
25 a village board member during some of those

Page 312

1  periods of time.
2     Q.    Did you complain to any trustee?
3     A.    No, I did not.
4     Q.    Did you complain to any mayor?
5     A.    No, I did not.
6     Q.    Given the significant problem of
7  minors drinking in Ocean Beach, did you
8  complain to Newsday, News 12 or any other
9  media outlet?
10    A.    No, I did not.
11    Q.    Did you put it on a blog?
12    A.    No, I did not.
13    Q.    Did you send an anonymous letter
14 to anyone?
15    A.    No, I did not.
16    Q.    Let's look at the last sentence.
17          MR. GOODSTADT: What paragraph
18 are we on?
19    Q.    51.  "Plaintiffs frequently
20 complained to Hesse about his unlawful
21 directives to selectively enforce the law by
22 disregarding crimes and other violations of
23 law committed by Hesse's friends," do you
24 see that?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 313

T. Snyder

1  A. Yes, I do.
2  Q. Now we've talked about the bars.
3  A. Um-hum.
4  Q. Did Hesse ever advise you to
5  disregard any other law concerning any of
6  his other friends?
7  A. No. I don't recall if he did.
8  Q. Is there anything in your
9  custody, possession or control that would
10 refresh your recollection?
11 A. No, I don't believe there is.
12 Q. So to your knowledge, at least as
13 you sit here today, the only times that
14 Hesse would have told you to disregard the
15 law concerning any of his friends, related
16 to not issuing summonses to some of the bars
17 in Ocean Beach?
18 A. Yes. That's correct.
19 Q. Okay. Let's look at 52. "In yet
20 another incident in or around May 2004,
21 Officer Snyder and Lamm were on a foot post
22 at Bay and Ocean Breeze Walks when they
23 witnessed a down pour of beer fall at their
24 feet, as well as a laughing crowd on the

Page 314

T. Snyder

1  third floor balcony above," do you recall
2  that incident?
3  A. Yes, I do.
4  Q. You then go on to allege that
5  "Officer Snyder and Lamm contacted Hesse for
6  assistance, and when he arrived, the trio
7  proceeded to the apartment, where they
8  observed a large group of underage youths
9  drinking alcohol without any adult
10 supervision, as well as an extensive
11 collection of elicit drug paraphernalia," do
12 you see that?
13 A. Yes, I do.
14 Q. Well, actually, let's go back to
15 the alcohol issue in term -- in paragraph
16 51. Do you have any friends in any other
17 Suffolk County police department?
18        MR. GOODSTADT: Objection.
19 Q. Do you have any contacts? Do you
20 know anyone in any other Suffolk County
21 police department?
22 A. I know some people, yeah. In
23 Suffolk County police?
24 Q. Yeah, Suffolk County police.

Page 315

T. Snyder

1  A. People that I know during my
2  course of employment with the Town of Islip,
3  we have a conditioned -- occasion to run
4  into them.
5  Q. Did you ever communicate to them
6  that there was an underage drinking problem
7  on Ocean Beach that you were concerned
8  about?
9  A. Um, I communicated to the -- to
10 the chief. I communicated to George.
11 Q. No. No. I'm talking about --
12 A. Other Suffolk County police
13 officers?
14 Q. Yes.
15 A. Well, it wasn't their
16 jurisdiction. It was off island.
17 Q. I understand that, but did you
18 make complaints with any other police
19 department concerning the underage drinking
20 problem on Ocean Beach?
21 A. No other police department, no.
22 Q. Okay. Did you call the DA up?
23 A. No, I did not.
24 Q. Did you send an anonymous note to

Page 316

T. Snyder

1  the DA?
2  A. No, I did not.
3  Q. Let's then go back to 52. What
4  building is being referred to in 52?
5  A. The building on the corner of
6  Ocean Breeze and -- and Bay Walk.
7  Q. Is it an apartment building? Is
8  it a private house? What is it?
9  A. On the first floor it's
10 businesses, like a florist, I think maybe
11 even a liquor store, and then above that
12 there's apartments on the second and third
13 floor.
14 Q. Now when you called Hesse for
15 assistance, did you tell him what was going
16 on?
17 A. Yeah. I told him that we were
18 standing on the corner and somebody had
19 thrown beer down, you know, over our heads
20 from that apartment.
21 Q. And did he tell you in response
22 to just forget it and ignore it?
23 A. No. He said he would be right
24 over.

Page 317

T. Snyder

1
2    Q.   Okay.  Let's go to 53 then.
3    "Oblivious to the evident harm that could
4    befall a group of intoxicated minors who had
5    no compunctions about openly pouring beer
6    off a balcony, Hesse directed Officers Lamm
7    and Snyder not to issue any citations or
8    make any arrests, despite the fact that the
9    youths were breaking the law," is that
10   accurate?
11   A.   Yeah.  That's correct.
12   Q.   Did Hesse specifically tell you
13   not to issue any summonses?
14   A.   Yes, he did.
15   Q.   Did he explain why?
16   A.   He didn't say why, no.
17   Q.   Did you ask him why?
18   A.   No, I did not.
19   Q.   Why not?
20   A.   He was the supervisor.  He
21   confiscated the two bongs that he saw.  Told
22   Kevin, who had the -- one of the underage
23   youth's ID, to give it back to him.  Don't
24   write any summonses and that's it.  Yelled
25   at the kids saying, "The reason that they

Page 318

T. Snyder

1
2    stand here is because I assign them to this
3    foot post," because they were complaining
4    why we were standing there.  And that's --
5    that's basically what happened in that
6    conversation.
7    Q.   Okay.  So Hesse -- Hesse took the
8    bongs away?
9    A.   Um-hum.
10   Q.   Was -- was that the only elicit
11   drug paraphernalia that is being referred to
12   as "an extensive collection" in paragraph
13   52?
14   A.   That's all that I saw.
15   Q.   Okay.  And did you witness any
16   bottles of beer or alcohol?
17   A.   They were spread throughout the
18   apartment, yes.  All in there and on the
19   outside deck right, you know, where we
20   walked up.
21   Q.   Empty or full?
22   A.   Some were -- some were full, some
23   were half full, some were empty.
24   Q.   Did Hesse remove any of the half
25   full or full bottles of alcohol or beer?

Page 319

T. Snyder

1
2    A.   No, he did not.
3    Q.   Did you or Lamm do that?
4    A.   No, we did not.
5    Q.   Did Hesse tell you not to do
6    that?
7    A.   No.  He just told us not to write
8    summonses.  He confiscated the two bongs
9    that were in open sight.  Said something --
10   yelled at them about why we were standing
11   there.  And "the reason they're there is
12   because I assigned them there," and that was
13   it.  We walked away.
14   Q.   Now these were underaged kids,
15   right?
16   A.   Some of them were, yeah.  We
17   didn't get a chance to identify everyone in
18   the apartment, though.
19   Q.   Well, how many kids did you --
20   how many kids did you personally identify as
21   being underage?
22   A.   I was about to, but he stopped me
23   from doing it.  I was about to get an ID
24   from somebody and I didn't actually get it.
25   But there was other people in that apartment

Page 320

T. Snyder

1
2    that were minors that were known to us to
3    being minors previously because we had seen
4    them.
5    Q.   My question to you, sir, is how
6    many -- how may people did you get
7    identifications from that you ascertained
8    were a minor that night?
9          MR. GOODSTADT:  Just so we're
10   clear, you're talking about that he got
11   the ID in that apartment?
12         MR. NOVIKOFF:  Yes.  Right.
13         MR. GOODSTADT:  Or he had
14   gotten the ID before that by the same
15   people?
16         MR. NOVIKOFF:  No.  In that
17   apartment.
18   Q.   In that apartment, how many IDs
19   did you look to ascertain?
20   A.   I wasn't --
21   Q.   To ascertain that any particular
22   individual was underage?
23   A.   I wasn't given the opportunity to
24   ascertain anybody.
25   Q.   My question is how many.  Not why

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 321

T. Snyder

1  not, just how many?
2      A.   None.
3      Q.   Okay.  And how many people were
4  in that apartment?
5      A.   I don't recall the specific
6  number, but there was probably more than
7  five or six I would say.  Probably more than
8  that even.
9      Q.   And how many -- you said you knew
10  from prior experiences that there were a
11  couple that were minors?
12      A.   There were several, yeah, that we
13  saw that we recognized.  Previously we had
14  seen them and stopped them because we saw
15  them come out of a bar and we stopped them
16  before they walked up into the apartment to
17  ask how old they were and ID'd them and
18  found out.
19      Q.   And -- and how many were there in
20  the apartment that you knew from prior
21  experiences?
22      A.   There -- at least two.  Maybe
23  three.
24      Q.   And what were their names?

Page 322

T. Snyder

1      A.   I don't remember the two girls'
2  names.  The one male's name was I think Paul
3  Conway.
4      Q.   And do you know if they were
5  drinking?
6      A.   Yes, they were.
7      Q.   How do you know?
8      A.   They had beers scattered all out
9  all over, and they -- some of them were
10  holding beers, some were, you know.
11      Q.   The people that weren't holding
12  beers, how do you know that they drank
13  anything?
14      A.   Well, it's pretty assumed that
15  they were drinking if they were standing
16  there next to an empty  -- a half full beer
17  or they're holding a beer.
18      Q.   I know that -- I'm not talking
19  about what they were holding.  I'm talking
20  about for those people that weren't holding
21  any bottles of alcohol, how do you know that
22  they had drank anything?
23      A.   I didn't know at that time.
24      Q.   Okay.

Page 323

T. Snyder

1      A.   Specifically.
2      Q.   But you assumed?
3      A.   I assumed they were drinking
4  since they were at the beer party, yeah.
5      Q.   Okay.  Now you write "oblivious
6  to the evident harm."  What was the evident
7  harm?
8          MR. GOODSTADT: Make sure you
9  read the whole paragraph.
10      A.   (Reviewing).  Well, the harm to
11  myself and Officer Lamm since they were
12  pouring stuff and dropping stuff down over
13  our heads, that could -- there was beer cans
14  and beer bottles right on the edge there
15  that could have fallen down on top of us, in
16  particular, and as far as the minors go, if
17  they're drunk and intoxicated, they could --
18  some harm could definitely befall them.
19      Q.   Right.  What -- what is the
20  evident harm that you're referring to?
21      A.   They could get -- they could be
22  extremely sick from drinking, and you know,
23  maybe overdose on alcohol.
24      Q.   Or fall off the balcony?

Page 324

T. Snyder

1      A.   Or fall off the balcony, yes.
2      Q.   Or do harm to others?
3      A.   Yes.
4      Q.   Do harm to you?
5      A.   Yes.
6      Q.   If one of those beer bottles hit
7  you in the head, that would have caused a
8  significant problem, right?
9      A.   Yeah.  To me, yes.
10      Q.   Yeah.  It could have killed you?
11      A.   It could have.
12      Q.   Right.  Now -- and this is
13  just -- this is more serious than just some
14  kid drinking in a bar knocking down a few
15  beers, right?
16          MR. GOODSTADT: Objection.
17      Q.   Would you agree with me as a
18  police officer, that when you have six or
19  seven drunken underage individuals dropping
20  beer bottles from a third floor balcony,
21  that's a little bit more serious than some
22  kid just knocking back a beer in a bar?
23          MR. GOODSTADT: Objection.
24      Q.   Would you agree with me?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 325

T. Snyder

1
2   A.   I would say it's more serious.
3   Q.   Certainly to your safety, right?
4   A.   As it respect to this question,
5 yes.
6   Q.   Right.  Did you complain to
7 Paridiso about this incident?
8   A.   I don't recall complaining to
9 Paridiso about this incident.
10   Q.   Sir, come on.  This isn't --
11 this is an important incident.  This is
12 someone dropping a beer bottle near your
13 body, right?
14       MR. GOODSTADT: Objection.
15   A.   Right.
16   Q.   You could have been really
17 injured?
18   A.   Well, they didn't actually drop
19 the beer bottle.  They dropped the beer.
20   Q.   They dropped a beer.  But they
21 could have just as easy dropped a beer
22 bottle?  They were drunk, right?
23       MR. GOODSTADT: Objection.
24   You're asking him to hypothesize now?
25   Q.   Right?  Right?  They could have

Page 326

T. Snyder

1
2 just as easily dropped a beer bottle,
3 right?
4   A.   Yes.  It could have fallen down.
5   Q.   Right.  It could have smashed you
6 right in the head, right?
7       MR. GOODSTADT: Objection.
8   You're asking him to hypothesize what
9   could happen?
10   Q.   Did you complain to Paridiso at
11 all the next day or the next week or the
12 next month about what you believe was
13 clearly a dangerous situation?
14   A.   I don't recall when I complained
15 to him about it.
16   Q.   Do you recall ever complaining to
17 Paridiso about this specific incident?
18   A.   I don't recall about this
19 specific incident, but I think he was aware
20 of the incident, though.
21   Q.   I'm not really interested in what
22 you think he was aware of.  My question is
23 to you, sir, did you complain to Paridiso?
24   A.   I don't recall complaining to him
25 about it at this time.

Page 327

T. Snyder

1
2   Q.   Did you complain to Loeffler?
3   A.   I don't recall complaining to
4 Loeffler about it because I don't believe
5 Joe Loeffler was in any position at this
6 time.  He may have been a board member.  I
7 don't know.  He wasn't the mayor, as far as
8 I know.
9   Q.   So when you say he wasn't in any
10 position, you mean you don't think he was a
11 trustee?
12   A.   I think he was just -- right.  I
13 think he may have just been a citizen then.
14 I'm not sure when he was a trustee or --
15   Q.   Did you complain to any trustee?
16   A.   No, I did not.
17   Q.   Did you complain to any mayor?
18   A.   No, I did not.
19   Q.   Did you raise this clearly  --
20 did you raise this clear risk that you
21 perceived to Newsday or News 12?
22   A.   No, I did not.
23   Q.   Did you call the DA up?
24   A.   No, I did not.
25   Q.   Did you send an anonymous letter

Page 328

T. Snyder

1
2 to the DA?
3   A.   No, I did not.
4   Q.   Did you complain to any other
5 police station or police department
6 concerning this incident?
7   A.   No, not concerning this incident.
8   Q.   Were you part of a union at this
9 time?
10   A.   No.  Not -- not in Ocean Beach.
11 No.
12   Q.   Okay.  Let's look at 54.
13 "Subsequently, the OBPD received complaints
14 that occupants of the same apartment were
15 violating noise ordinances and endangering
16 pedestrians by throwing objects onto the
17 sidewalk," do you see that?
18   A.   Yes, I do.
19   Q.   What's your personal knowledge
20 that substantiates what I just read from
21 your allegation?
22   A.   There was occasions where I was
23 working and -- and I heard over the police
24 radio calls coming  -- going out over the
25 police radio in reference to that -- that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 329

T. Snyder

1       T. Snyder
2    apartment about what you just described.
3       Q.   This would -- this would have
4    been after this incident, right?
5       A.   Um, I believe it may have been a
6    little before and a little after.
7       Q.   Okay.  Because you only say
8    "subsequently" in paragraph 54.
9       A.   Okay.  Then it was after.
10      Q.   "The department also was notified
11   that the youths were continuing to
12   unlawfully consume alcohol and use other
13   illegal drugs," do you see that?
14      A.   Yes, I do.
15      Q.   What other illegal drugs are you
16   referring to?
17      A.   I believe that would be
18   marijuana.
19      Q.   Okay.  And how was the department
20   notified?
21      A.   As to?
22      Q.   The use of illegal drugs?
23      A.   Well, the department knew it from
24   our personal knowledge.  We were there in
25   particular.

Page 330

1       T. Snyder
2       Q.   Well, sir, you start the
3    paragraph by saying "subsequently."  So if I
4    understand that correctly, it's subsequent
5    to the incident involving the beer being
6    thrown from the balcony, right?
7       A.   Right.
8       Q.   Which was in 2004, right?
9       A.   Yes.
10      Q.   So now we're in the period of
11   time after this beer throwing incident.  How
12   was the  -- when was the department notified
13   after this incident that the youths were
14   continuing to unlawfully consume alcohol and
15   use other illegal drugs?
16      A.   I think residents or -- or people
17   who were staying over in the village were
18   calling about disturbances at that place
19   involving youth parties, alcohol, marijuana,
20   etcetera.
21      Q.   Did you ever see, subsequent to
22   what was referenced in paragraph 52 and 53,
23   any illegal drugs in that apartment
24   subsequent to the incident?
25      A.   No.  I never had the chance to

Page 331

1       T. Snyder
2    actually go up to that apartment after that.
3       Q.   Okay.  Then we can continue on by
4    you say "however, Hesse continued to
5    prohibit Plaintiffs' investigation of these
6    alleged crimes by instructing them to stay
7    away from the apartment," do you see that?
8       A.   Yes, I do.
9       Q.   Did Hesse, subsequent to the beer
10   dropping incident, instruct you to stay away
11   from the apartment?
12      A.   Yes, he did.
13      Q.   What did he say?
14      A.   He said not to go up to that
15   apartment.  Don't go up there and check IDs
16   or go snooping around for their parties or
17   whatever.
18      Q.   And when did he say this to you?
19      A.   Sometime after that incident.  I
20   don't recall exactly when, but --
21      Q.   On how many occasions did he tell
22   you that?
23      A.   At least on one occasion.
24      Q.   Okay.  Are you aware as to who
25   else he would have said this to?

Page 332

1       T. Snyder
2       A.   I believe he would have said it
3    to Officer Lamm, too, because he -- he
4    worked with me on numerous times there.
5       Q.   To your knowledge, did he say
6    this to all the police officers?
7       A.   I don't know.  No.
8       Q.   So you would agree with me that
9    you didn't work every single 8:00 to 4:00
10   shift -- well, what was your normal shift in
11   2004?
12      A.   Normally, in 2004, it would be
13   probably midnights.  The majority of the
14   shifts I worked.
15      Q.   So you would agree with me that
16   you didn't work every midnight to 8:00 shift
17   during the week?
18      A.   Yes.  That's correct.
19      Q.   And neither did Lamm?
20      A.   I wouldn't know exactly what
21   Kevin's shifts were.  But --
22      Q.   Okay.  How about the other
23   Plaintiffs, do you know when their shifts
24   were?
25      A.   Um, I wouldn't know exactly what

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 333

T. Snyder

1 T. Snyder
2 their shifts were. Sometimes they worked
3 midnights. Sometimes they worked --
4 sometimes we all worked all over the
5 schedule.
6 Q. To your knowledge, did -- did
7 Hesse instruct police officers at Ocean
8 Beach, other than you, not to go to that
9 apartment?
10 A. Um, other than me, not to my
11 knowledge. No.
12 Q. Okay. Is there any reason for
13 you to believe that he wouldn't have told
14 other officers the same thing he told you?
15 MR. GOODSTADT: Objection.
16 A. I wouldn't have any idea.
17 Q. One way or the other?
18 A. Right.
19 Q. Okay. "Indeed" -- this is
20 continuing, 54 -- "on another occasion,
21 Plaintiffs even observed certain of the
22 uncertified officers on the apartment
23 balcony drinking and socializing with the
24 same group of minors," do you see that?
25 A. Yes, I do.

Page 334

1 T. Snyder
2 Q. Did you personally witness this?
3 A. I personally did, yes.
4 Q. And who was this?
5 A. Gary Bosetti.
6 Q. Any other?
7 A. He was the only one that I had
8 saw.
9 Q. Okay. So let me understand,
10 then, correctly your testimony, prior to the
11 Halloween incident, you specifically saw
12 Gary Bosetti on this balcony with these
13 underage kids drinking?
14 MR. GOODSTADT: Objection.
15 A. On that one occasion, yes.
16 Q. Right. That's all I'm asking.
17 Just that one occasion?
18 A. Yes.
19 Q. Okay. Did you complain to Hesse
20 about what you saw regarding Gary Bosetti?
21 A. I don't believe I did. No.
22 Q. Did you complain to Paridiso?
23 A. I don't believe so, no.
24 Q. Did you complain to anybody?
25 A. No. I don't believe so.

Page 335

1 T. Snyder
2 Q. Did you complain to Gary Bosetti?
3 A. I don't believe so. No.
4 Q. You didn't say, "Gary, listen,
5 you do what you want to do, but you
6 shouldn't be doing it with minors"?
7 A. I don't believe I said that to
8 him, no. Gary and I didn't talk much, so.
9 We didn't work together too much, so we
10 really didn't talk much.
11 Q. I didn't ask you about how much
12 you worked. I'm just saying did you ever
13 say that to Gary?
14 A. No. I didn't really have an
15 occasion to speak to him.
16 Q. You're telling me there was
17 absolutely no occasion, subsequent to your
18 witnessing Gary Bosetti on the balcony,
19 where you could have said to him "you know
20 what you're doing is absolutely wrong being
21 on the balcony with these underage kids"?
22 A. I'm sure there may have been an
23 occasion where I could have said it, but no,
24 I didn't say it to him.
25 Q. How about that night?

Page 336

1 T. Snyder
2 A. Not that night, no. I didn't
3 know where he was after -- I was walking by
4 when I saw him up there with them and they
5 were shooting beer caps down. That's what
6 made us look up.
7 Q. You and who?
8 A. Myself, Officer Lamm and Officer
9 Fiorillo.
10 Q. So the three of you could have
11 gone upstairs and said "Gary, what are you
12 you doing," right?
13 MR. GOODSTADT: Objection.
14 A. We could have, but we didn't.
15 Q. Right. You didn't. Okay. Let's
16 go to 56. I'm sorry, 55. "In yet" -- this
17 is what you allege -- "in yet another
18 instance of Hesse encouraging minors to
19 abuse alcohol, Hesse intervened when another
20 officer issued a citation to a minor
21 carrying a case of beer." Did you witness
22 this?
23 A. I only witnessed the very tail
24 end of this. I didn't witness the actual --
25 when the incident first started.

Precise Court Reporting
516-747-9393 718-343-7227 212-581-2570

Min-U-Script®

Page 337

T. Snyder

1         T. Snyder
2    Q.   How did you -- how did it come
3 about that you witnessed this?
4    A.   I was walking up to the front of
5 the police station when the group of minors
6 who -- the one individual, I believe Paul
7 Conway, was with this group was being issued
8 a summons by another officer.
9    Q.   Which officer?
10    A.   John Dyer.
11    Q.   John Dyer?
12    A.   Yes.
13    Q.   And did -- and then it's further
14 alleged that "in the presence of Officers
15 Lamm and Snyder, as well as the officer who
16 had attempted to issue the citation, Hesse
17 returned the case of beer to the underage
18 youth," did you see that?
19    A.   That's the part I did see, yes.
20    Q.   And did you complain to Hesse
21 about that?
22    A.   We said, "What are you doing?
23 What are you giving the beer back to him
24 for." Myself and Officer Lamm said that.
25 And Officer Dyer as well.

Page 338

T. Snyder

1         T. Snyder
2    Q.   And this was in 2004?
3    A.   This was in -- I believe it was
4 in the summer of 2004, yes.
5    Q.   Okay.  And what did Hesse say to
6 you?
7    A.   He didn't speak to me directly.
8 He -- he said to the group of kids, "Don't
9 listen to him," meaning Kevin. "Nobody
10 likes him. He's a loser. And here. Here's
11 your beer. Go have fun." And I was
12 standing behind George witnessing this. I
13 couldn't understand what the hell was going
14 on. And then Kevin walked out of the police
15 station. He said, "You just gave that beer
16 back to them?" He said, "John Dyer is
17 writing him a ticket for that." And Dyer
18 was like looking at him as well, standing
19 there writing the ticket. He was like,
20 "What are you doing?"
21    Q.   So you witnessed Hesse making
22 that statement about Lamm?
23    A.   Yes, I did.  I was standing right
24 behind him.
25    Q.   And did you say anything to Hesse

Page 339

T. Snyder

1         T. Snyder
2 about that?
3    A.   I just shook my head. I couldn't
4 believe he was saying it.
5    Q.   Did you complain to Hesse about
6 it?
7    A.   No, I didn't.  Kevin I think --
8    Q.   I'm asking you.
9    A.   I didn't specifically, no.
10    Q.   Did you complain to Paridiso?
11    A.   No, I didn't specifically.
12    Q.   Did you complain to anyone about
13 Hesse disparaging another officer in the
14 presence of -- of citizens?
15    A.   No, I did not.
16    Q.   Let's look at 56.  This is -- 56
17 is referring to exactly what you just told
18 me, correct?
19      MR. GOODSTADT: Make sure you
20    read it.
21    A.   Part of it I believe is referring
22 to that incident, and part of it is probably
23 referring to the previous stuff we talked
24 about about the bongs.
25    Q.   The part -- let's read the second

Page 340

T. Snyder

1         T. Snyder
2 sentence.  "Although Hesse did confiscate
3 certain -- confiscated certain illegal drugs
4 and related drug paraphernalia," what is
5 that referring to?
6    A.   I believe that may have been
7 about the incident with the bongs.
8    Q.   Okay.  But you're not sure?
9    A.   That's what it sounds like to me.
10    Q.   I'm asking you if you -- if you
11 have personal knowledge of the accuracy of
12 that allegation?
13    A.   Yeah.  This is -- the second part
14 of this is referring to that incident with
15 the bongs where he took them out of the
16 apartment.
17    Q.   Okay.  And then you go on later
18 to say "he later failed to properly secure
19 and inventory these items and did not issue
20 any citations to the youths."  Let's talk
21 about the properly securing and inventorying
22 of the items.  Do you have personal
23 knowledge that that took place?
24    A.   Yes, I do.
25    Q.   What -- what's the basis for your

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 341

```
 1            T. Snyder
 2 belief that Hesse did not properly secure
 3 and inventory these items?
 4     A.   The bongs were sitting over his
 5 desk on a shelf above his desk.  They
 6 weren't put in an evidence locker or
 7 destroyed or whatever the department does
 8 with them.
 9     Q.   And did you advise Hesse that
10 he -- what he was doing was improper?
11     A.   I did not, no.  He's the
12 supervisor.  He should know better.
13 MO     MR. NOVIKOFF: Motion to
14     strike.
15     Q.   Did you advise Paridiso?
16     A.   I did not, no.
17     Q.   Anybody else that you advised
18 about Hesse doing this inventory improperly?
19     A.   I did not, no.
20     Q.   Okay.  You then further allege
21 "in fact, Hesse used his unsecured desk
22 drawer and a shelf above his desk to store
23 evidence, including, without limitation,
24 illegal narcotics and paraphernalia," do you
25 see that?
```

Page 342

```
 1            T. Snyder
 2     A.   What question are we on?
 3     Q.   Same thing, last sentence.  "In
 4 fact, Hesse used his unsecured desk drawer"?
 5     A.   Yes, I see that.
 6     Q.   Do you have personal knowledge of
 7 that?
 8     A.   Yes, I do.
 9     Q.   What's the basis of your personal
10 belief?
11     A.   I used to watch him open the desk
12 drawer right next to him and drop the stuff
13 in there.  You could look and see all the
14 drug paraphernalia and what not that he had
15 confiscated.
16     Q.   Do you know what he did with that
17 drug paraphernalia after he put it in his
18 desk?
19     A.   I have no idea.  A lot of that
20 stuff stayed in there for quite some time.
21     Q.   Did you ever ask him what he did
22 with it?
23     A.   I never asked him, no.
24     Q.   Did you ever ask him if he
25 ultimately secured it properly and
```

Page 343

```
 1            T. Snyder
 2 inventoried it properly?
 3         MR. GOODSTADT: Objection.
 4     Q.   Did you?
 5     A.   I never asked him, no.
 6     Q.   Did you ever complain to the DA
 7 about the improper storage of illegal
 8 narcotics?
 9     A.   Yes, I did.
10     Q.   When?
11     A.   After I was fired when they asked
12 about it.
13     Q.   Well, my question is prior to you
14 being fired?
15     A.   Not prior to my being fired.
16         MR. GOODSTADT: Objection.
17     That wasn't your question.
18         MR. NOVIKOFF: I didn't say
19     that was my question.
20     Q.   My question was, prior to you
21 being fired, did you ever complain to the DA
22 about what you claimed to be the improper
23 storing of illegal narcotics?
24     A.   I did not, no.
25     Q.   Did you ever complain to
```

Page 344

```
 1            T. Snyder
 2 Paridiso?
 3     A.   I did not, no.
 4     Q.   Ever complain to any of the
 5 trustees?
 6     A.   I did not, no.
 7     Q.   The mayor?
 8     A.   No.  Not the mayor either.
 9     Q.   Newsday, News 12?
10     A.   No, I did not.
11     Q.   Okay.  57, you allege
12 "Plaintiffs' complaints about Hesse's
13 selective enforcement and blatant
14 undermining of their authority and duties
15 were met with disdain and derision by Hesse,
16 who not only ignored Plaintiffs' complaints,
17 but actually ridiculed them in response."
18 When did Hesse ever ridicule you in
19 response?  Not Lamm, not Carter, not anybody
20 else, you?
21     A.   I don't recall him actually
22 ridiculing me to my face, so.
23     Q.   Okay.  When did Hesse ever
24 respond to any of your complaints with
25 disdain and derision?  Derision,
```

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 345

T. Snyder

1 D-E-R-I-S-I-O-N?
2   A.   You mean derision?
3   Q.   Derision, yes.
4   A.   Well, I heard it from other
5 police officers in the department.
6   Q.   My question to you is when did he
7 respond to you personally?
8   A.   Okay.  Not to me specifically.
9      MR. NOVIKOFF: Okay.  All
10   right.  How much time is left on that
11   tape?
12      THE VIDEOGRAPHER: 23 minutes.
13      MR. NOVIKOFF: Oh.  I thought
14   you said it was five minutes left.  Oh,
15   okay.  I thought that tape was going
16   pretty quick.
17   Q.   Let's look at 58.  "In yet
18 another example of corruption at OBPD, in
19 early September 2004, Officers Dyer and
20 Fiorillo witnessed Officer Richie Bosetti
21 plying an alleged domestic abuse victim with
22 alcohol.  Officer Dyer explained to Officer
23 Snyder and Bockelman that Bosetti was trying
24 to talk the victim out of filing a domestic

Page 346

T. Snyder

1 incident report," do you see that?
2   A.   Yes, I do.
3   Q.   You didn't personally witness
4 what Bosetti was doing, right?
5   A.   I only came in at the tail end of
6 him talking to her.
7   Q.   Did you ever see Bosetti plying
8 this alleged domestic violence victim with
9 alcohol?
10   A.   There was an open cup, a plastic
11 cup of wine that he had that he had given to
12 her prior to that.
13   Q.   Did you ever see him give that to
14 her prior to that?
15   A.   I didn't see him, no.
16   Q.   That's all I'm asking you, sir.
17 Did you ever see?
18   A.   No, I didn't see him give it to
19 her.
20   Q.   Did you ever witness personally
21 Bosetti trying to talk to the victim out of
22 filing a domestic complaint?
23   A.   Yes.  He was talking to her when
24 I walked in, and he was trying to talk her

Page 347

T. Snyder

1 out of it.
2   Q.   What was he saying?
3   A.   He was telling her that, you
4 know, Frank has got numerous complaints
5 against him with you regarding this, and,
6 you know, he'll end up going to jail for a
7 long time.
8   Q.   Who's Frank?
9   A.   Frank Tutone.  That was her
10 boyfriend on and off I guess.
11   Q.   And did you ever ask Bosetti why
12 he was trying to talk this woman out of
13 making the complaint?
14   A.   I didn't, no.  Ken Bockelman
15 spoke to him, I didn't.
16   Q.   I'm just asking about you?
17   A.   No.  I didn't, no.
18   Q.   Did you -- did you find Bosetti's
19 behavior to be appropriate for a police
20 officer?
21   A.   No, I did not.
22   Q.   Okay.  Did you ever complain to
23 Hesse about this incident?  At least the
24 part that you witnessed?

Page 348

T. Snyder

1   A.   I don't recall speaking to him,
2 no.
3   Q.   Did you speak to Paridiso?
4   A.   Um, I don't recall speaking to
5 Eddie about this, no.
6   Q.   And September 4 -- September 2004
7 was before the Halloween incident, right?
8   A.   Yes, it was.
9   Q.   Paragraph 61, there's an
10 allegation in 61 that "Hesse ordered Officer
11 Fiorillo to spend three consecutive shifts
12 standing motionless behind a streetlight at
13 the intersection of Dehnhoff, D-E-H-N-O --
14 I'm sorry, D-E-H-N-H-O-F-F, Walk and Bay
15 Walk," do you see that?
16   A.   Yes, I do.
17   Q.   Did you witness this?
18   A.   I witnessed it on just one
19 occasion.
20   Q.   One --
21   A.   One of those nights.
22   Q.   One of the three shifts?
23   A.   Yes.
24   Q.   Now did Fiorillo stand for eight

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 349

T. Snyder
1
2 hours under this light, to your knowledge?
3     A.    I saw him standing there.  I
4 don't know how long he was standing there
5 for.
6     Q.    Did he tell you he had to stand
7 for --
8     A.    Yes, he did.  I walked up to him.
9         MR. GOODSTADT: Let him finish
10 the question.
11     Q.    Did Fiorillo tell you that he was
12 forced to stand there for eight hours?
13     A.    He told me he was forced to stand
14 there by George, yes.
15     Q.    For eight hours?
16     A.    He was forced -- he didn't say
17 eight hours specifically.  He said he was
18 being forced to stand from that foot post
19 and not to move from it.
20     Q.    Did he ever move from that foot
21 post, to your knowledge?
22     A.    Not to my knowledge, no.  I
23 didn't see him all night long.  I was on
24 patrol in another part of the village.
25     Q.    Okay.  Let's talk about the

Page 350

T. Snyder
1
2 Halloween incident.  As I understand what
3 took place in the bar very simply, there was
4 an apparent altercation between one or both
5 of the Bosettis and a number of citizens,
6 correct?  Civilians, right?
7     A.    Yes.  That's correct.
8     Q.    Did you witness any aspect of
9 this altercation?
10     A.    Not the altercation itself, no.
11     Q.    When did you -- and what bar did
12 this take place at?
13     A.    This was in Houser's Bar.
14     Q.    When  -- well, did you receive a
15 call to go to Houser's Bar that night?
16     A.    Actually, two calls.  I only
17 answered the second call, though.
18     Q.    Why didn't you answer the first
19 call?
20     A.    Because the first call the phone
21 was picked up by Kevin, Kevin Lamm.
22     Q.    Okay.  Were you patrolling with
23 Kevin Lamm?
24     A.    Yes, I was, and with Frank.
25     Q.    With Frank.  The three of you?

Page 351

T. Snyder
1
2     A.    Yes.
3     Q.    Together?
4     A.    Yes.
5     Q.    October?
6     A.    Yes.
7     Q.    It was the end of the summer?
8     A.    Yes.
9     Q.    And the three of you were walking
10 together?
11     A.    No.  We were driving together in
12 the truck.
13     Q.    Okay.  Anyone else on duty that
14 night?
15     A.    Just us three.
16     Q.    To cover the entire island?
17     A.    No.  Just that village.
18     Q.    I mean the Village of Ocean
19 Beach?
20     A.    That's correct.
21     Q.    So when the first call came in,
22 how was it that Kevin responded if he was in
23 the car with you?
24     A.    He -- we had the department cell
25 phone.  We would lock up the police station

Page 352

T. Snyder
1
2 and call forward the phone to the cell phone
3 so we can go on patrol and answer the calls
4 when people call in.
5     Q.    Okay.
6     A.    But that -- that was a procedure
7 over there.
8     Q.    So Kevin responded to the call?
9     A.    All three of us did.  We were
10 altogether.
11     Q.    But you said you didn't respond
12 to the first call?
13     A.    No.  What I meant is Kevin picked
14 up the phone and answered the first phone
15 call.  I answered the second one.
16     Q.    Okay.  And then the three of you
17 arrived at Houser's together?
18     A.    That's correct.
19     Q.    Okay.  And were you prevented
20 from going into Houser's?
21     A.    At some point after we got there,
22 yes.  Just briefly.
23     Q.    Well, you got to Houser's, right?
24     A.    Yes.
25     Q.    You walked up to the door that

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 353

T. Snyder

1   people go through, right?
2   A.   Right.  Well, we didn't actually
3   get to the door when we first got there,
4   because people were piling out and walking
5   down the walks, and there was a group of
6   people arguing with some people standing in
7   the doorway.
8   Q.   Okay.  And who was arguing with
9   who?
10  A.   The group that was arguing --
11  that was standing on the walkway arguing was
12  the group that -- them had been assaulted
13  and their friend had been assaulted, and
14  they were arguing with the bouncer and
15  several other patrons of the bar who I don't
16  recall exactly who they were.
17  Q.   So two of the civilians that you
18  claimed to have been assaulted were arguing
19  with the bouncer?
20  A.   Yes.  But I didn't claim they
21  were assaulted.  They were assaulted.
22  Q.   You just used the word
23  "assaulted."
24  A.   That's what you just said.

Page 354

T. Snyder

1   Q.   Doesn't assault have with it some
2   kind of connotation?
3   A.   Yes, it does.
4   Q.   And what --
5   A.   You said claim.  I'm not claiming
6   they were assaulted.  They were assaulted.
7   That's why we were called there.
8   Q.   How do you know they were
9   assaulted?  What does "assault" mean?
10  A.   Assault?
11  Q.   Yes.
12      MR. GOODSTADT: Objection.
13  A.   Assault means physically --
14  physically grab or hit or punch or somebody
15  kick them.  To physically hit them.
16  Q.   Oh, so assault just means to
17  be -- to have been hit?
18  A.   You could be -- well, you could
19  be I guess verbally assaulted.  People can
20  look at it that way, too.
21  Q.   Okay.  But we're not talking
22  about physically assaulted.  You mean they
23  just happen to have been hit with something
24  that night, whether it was a fist or a pool

Page 355

T. Snyder

1   stick or a chair?
2   A.   Yes.  That's correct.  That's
3   what they were claiming when we got there.
4   Q.   Okay.  So these two individuals
5   who claim that they were assaulted were
6   arguing with the bouncer when you arrived?
7   A.   A bouncer and there was other
8   people up there, too.  I don't recall
9   exactly who.  And there was also people
10  leaving, walking passed this whole thing at
11  the same time.  So it was very chaotic.
12  Q.   Okay.  And what did you do?
13  A.   Well, I tried to calm the
14  situation down to find out exactly what's
15  going on here.
16  Q.   How did you go about doing that?
17  A.   By walking in between the two
18  groups and trying to stop them from arguing
19  and try to find somebody calm enough to talk
20  to us and tell us exactly what happened.
21  Q.   What two groups were you talking
22  about?  We have one group of the people that
23  were allegedly assaulted --
24  A.   And then the group that was

Page 356

T. Snyder

1   standing in the doorway, that was, you know,
2   arguing back and forth with them.
3   Q.   What group was that?
4   A.   That would be the bouncer and
5   several other people I just said who I
6   don't --
7   Q.   Why were they arguing?  What were
8   they saying?
9   A.   Well, they had just gotten thrown
10  out of the bar, and they were claiming that
11  they just got beat up in that bar, and they
12  were -- that's what they were arguing about.
13  You know, "we got beat up in that bar."
14  Q.   Yeah, but what was the other
15  group saying?
16  A.   No.  That's what I meant.
17  Q.   It takes two to argue.  We got
18  the people that were allegedly assaulted
19  saying something.  What was the other group
20  saying?
21  A.   I don't remember specifically.
22  Probably telling them to go home or
23  something.  They just threw them out of the
24  bar.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 357

T. Snyder

1
2    Q.   Okay.  So what did you do after
3 you tried to calm the situation down?
4    A.   We started to get the story
5 from -- from the group that was saying that
6 they got beat, saying that the person that
7 beat them was in the bar.
8    Q.   Okay.
9    A.   And that he was actually -- he
10 still was in the bar.
11    Q.   Okay.  And then what did you do,
12 you personally?
13    A.   Well, then I -- the one person I
14 talked to I said, "Well, if he's -- let's go
15 in the bar.  Point him out to me, this
16 person who did this to you."
17    Q.   And then what happened?
18    A.   Well, we attempted to walk
19 through the door, and that's when the
20 bouncer stepped in front of the door and he
21 wouldn't let us in.  He stepped in front of
22 the door and folded his arms.
23    Q.   And what did the bouncer say?
24    A.   He said, "Can I help you?"
25    Q.   You had your uniform on, right?

Page 358

T. Snyder

1
2    A.   Yes, I did.  We had the police
3 truck right in front of -- we're the ones
4 who pulled up.  They're the ones who called
5 us.
6    Q.   And Lamm was there with you?
7    A.   Yes.  And so was Frank.
8    Q.   And the three of you tried to go
9 in?
10    A.   I know Lamm was following me in.
11 I don't specifically recall where Frank was
12 at that time.  He was still out there also
13 with -- because it was a large group of
14 people.
15    Q.   And how big was the bouncer?
16    A.   He was a fairly large man.  He
17 was taller than me.  He was huskier than me.
18    Q.   And what did you say when this
19 bouncer tried to prevent you from going into
20 the bar?
21    A.   I said to him, "You can step
22 aside because you're impeding -- or I'm
23 going to arrest you for impeding a police
24 investigation."
25    Q.   And what did he do?

Page 359

T. Snyder

1
2    A.   He just stepped aside.  He didn't
3 say anything.
4    Q.   So this whole interaction with
5 the bouncer took about what, five seconds?
6        MR. GOODSTADT: Objection.
7    A.   It wasn't that long.
8    Q.   What's that?
9    A.   It wasn't that long.
10    Q.   10 seconds?
11    A.   I guess maybe.  Yeah.
12    Q.   So you went in?
13    A.   Right.  We walked in the bar.
14    Q.   And Lamm was right behind you?
15    A.   I believe Lamm was -- was right
16 behind me.  Yes.
17    Q.   Okay.
18    A.   I'm not sure exactly how far or
19 how close, but.
20    Q.   Okay.  And then what did you do?
21    A.   Well, when we walked in the bar,
22 there was very few people left in the bar.
23    Q.   Okay.
24    A.   You know, I'm not sure exactly
25 the number.  But there was a few people left

Page 360

T. Snyder

1
2 in the bar, and it was pretty quiet in
3 there.  The music was off.  And I told the
4 one individual I was in there with, I said,
5 "Well, take a look around.  Point out the
6 person who did this to you."  And he looked
7 around.  He said, "He's not in here."  I
8 said, "Well, go take a look in the back
9 deck, there's a back area here where you can
10 also hang out.  There's tables back there."
11 So we talked back there.
12    Q.   Okay.
13    A.   And he looked around.  Didn't see
14 anybody back there.  And he goes, "He's not
15 here, but he looked exactly like him," and
16 he pointed.
17    Q.   Who did he point to?
18    A.   At Richie Bosetti.
19    Q.   So he looked exactly like Richie
20 Bosetti?
21    A.   He said he looked just like him,
22 only shorter is what he said.
23    Q.   Did he claim that Richie Bosetti
24 hit him?
25    A.   At that time, no.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 361

T. Snyder

1
2    Q.   At any time did he claim that
3  Richie Bosetti hit him?
4    A.   I don't recall, but he was part
5  of -- he was very agitated at Richie for
6  being part of the incident, though.
7    Q.   I'm not asking you whether he was
8  agitated or not.  Did he ever --
9    A.   He didn't say specifically.
10   Q.   That night, did he ever claim to
11 you that Richie Bosetti hit him?
12   A.   He didn't say it at that time,
13 no.
14   Q.   But he said the person that hit
15 him looked exactly like Richie Bosetti?
16   A.   Right.
17   Q.   Okay.  What did you do next after
18 he said that a guy that looks exactly like
19 him hit me?
20   A.   We took them outside and then I
21 said to Kevin and to Frank, "Let's take him
22 to the police station to get looked at.
23 Make sure they didn't have any underlining
24 injuries.  Let's call rescue and have it
25 looked at.  Let's document what they're

Page 362

T. Snyder

1
2  claiming.  Write it up."
3    Q.   Okay.  And how many were there,
4  two or three?
5        MR. GOODSTADT: Objection.  How
6    many what were there?
7    Q.   How many people were alleging
8  that they were assaulted?
9    A.   Well, there was two there at that
10 time.
11   Q.   Okay.  So how many people -- how
12 many did you take to the police station, two
13 or three?
14   A.   We took two, and then there was
15 several women with them.  I forget.  Two or
16 three women with them.
17   Q.   Okay.  But only two civilians
18 said that they were assaulted?
19   A.   At that time, yes.
20   Q.   Well, at any other time was there
21 more?
22   A.   There was one more, yeah.
23   Q.   Okay.  And who was that?
24   A.   Brian Vankoot.
25   Q.   And when did he show up, if at

Page 363

T. Snyder

1
2  all, that night?
3    A.   He came a little white later.
4  Frank brought him in a little while later
5  when we were in the police station and
6  rescue was looking at the individuals.
7    Q.   And did this guy Vankoot say why
8  he wasn't in the bar at the time that you
9  showed up?
10   A.   No.  He didn't -- he didn't say
11 at all.  He was beat up pretty bad.
12 MO        MR. NOVIKOFF: I didn't ask you
13    that, so I'm going to move to strike.
14   Q.   Okay.  So you took these two
15 gentlemen to the police station, right?
16   A.   Yes.
17   Q.   And who -- who was present in the
18 police station when you first arrived with
19 these two individuals?
20   A.   Well, Kevin Lamm was with me and
21 Frank was with me.
22   Q.   When did Frank -- was Frank --
23 when did Frank go get this guy Vankoot?
24   A.   Apparently while we were in the
25 bar, Frank was talking with people outside,

Page 364

T. Snyder

1
2  the girls in that larger group, and found
3  out there was another victim, and he found
4  out where that person was, and he walked
5  back with us to the police station, and at
6  some point he called rescue, and afterwards
7  he got in the police truck and drove to the
8  location where the third victim was.
9    Q.   So when you went in -- into the
10 police station with Lamm and these two guys,
11 was Frank with you?
12   A.   Yes, he was, initially.
13   Q.   Was Frank with you with this guy
14 Vankoot?
15   A.   Yes.  He brought him into the
16 station.  Yes.
17   Q.   So the three of you and the three
18 alleged assault victims went into the police
19 station together?
20        MR. GOODSTADT: Objection.
21   A.   No.  No.
22   Q.   That's what I'm trying to find
23 out.  When you and Lamm went with these two
24 alleged victims to the police station, was
25 Fiorillo with you?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 365

T. Snyder

1   A.   Yes, he was.
2   Q.   Was he with you with Vankoot?
3   A.   Yes.  But at some later point, I
4 told you, he just got on the phone and
5 called rescue while we were sitting down
6 with the victims.  And he called rescue.  He
7 then left at some point.
8   Q.   Left the police station?
9   A.   Right.  To go -- because he had
10 found out the address of a third victim.
11   Q.   Okay.  And then he went to get
12 the third victim?
13   A.   Yes.
14   Q.   So he didn't -- okay.  I got it.
15 All right.  Did anyone -- was anyone else
16 present in the police station, other than
17 the alleged victims, you, Frank and Kevin,
18 and these women that were with the victims?
19   A.   There came a point in time when
20 there was other people, yes.
21   Q.   What other people?
22   A.   Originally, Richie Bosetti came
23 walking in.
24   Q.   Okay.  And why did you permit
25

Page 366

T. Snyder

1 Bosetti to come into the police station?
2   A.   Well, we didn't.  He just walked
3 in and walked right in the back passed us to
4 go into the back room.
5   Q.   Was he on duty at the time?
6   A.   No, he was not.
7   Q.   Did either -- did you ask him to
8 leave?
9   A.   At some point I did, yes.
10   Q.   No.  When he first walked in, did
11 you ask him to leave?
12   A.   Not when he first walked in, no.
13   Q.   Did Lamm ask him to leave?
14   A.   Not when he first walked in.
15   Q.   Did Fiorillo ask him to leave?
16   A.   No, not when he first walked in.
17   Q.   And when did you ask Bosetti to
18 leave?
19   A.   When he walked passed the
20 victims, they started -- they looked at him
21 and said, "What's he doing here?"  And they
22 started getting agitated again and getting,
23 you know, out of control loud.  We had to
24 calm them down again.  They said, "Who is
25

Page 367

T. Snyder

1 he?  What is he?  Who is he?  What's he
2 doing here?"  And I said, "He's a police
3 officer in the village."  And they said,
4 "We -- I knew it.  We knew it.  You guys are
5 trying to cover this up."  I said, "Calm
6 down.  Nobody's trying to cover anything
7 up."
8   Q.   And then what -- when did you go
9 to Bosetti to ask him to leave?
10   A.   We asked him, we said, "Richie,
11 can you please leave because" --
12   Q.   Not "we," you.
13   A.   Okay.  Myself and the other
14 officers, but myself, I asked him, "Richie,
15 can you please leave because they're getting
16 very agitated by seeing you, you know,
17 because of this incident that just occurred.
18 So can you please leave so we can calm them
19 down."
20   Q.   And did he?
21   A.   He did leave, yes.
22   Q.   Through the same front door that
23 he came in?
24   A.   Yes.  He walked back out passed
25

Page 368

T. Snyder

1 them and out the front door.
2   Q.   Okay.  And then anybody else show
3 up at the police station?
4   A.   A short time after that the
5 rescue department, Ocean Beach Rescue showed
6 up.
7   Q.   And did you recognize anyone at
8 the time with Ocean Beach?
9   A.   Um, I recognized several people,
10 yeah.
11   Q.   Okay.  And who were they?
12   A.   Well, one of them was Dale.  I
13 can't think of her last name at the moment.
14 She was one of the EMTs there.  She was also
15 the post master, so that's why I knew her.
16 There were other ones who were village
17 residents that I knew them by face.  I just
18 didn't know their names.  And Joe Loeffler,
19 who was driving the ambulance that day.
20   Q.   Okay.  And did Joe Loeffler say
21 anything while he was in the police station?
22   A.   Yes, he did.
23   Q.   What did he say?
24   A.   At some point, Kevin -- excuse
25

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 369

T. Snyder

1
2 me -- Frank came walking back in at this
3 point with the third victim Vankoot.
4     Q.   Okay.
5     A.   And when he walked him in and we
6 saw him, I said to Kevin, "You got to
7 photograph him," and I looked at his face.
8 He was beat up pretty badly.
9     Q.   I'm still waiting to hear what
10 Loeffler said.
11     A.   Okay.  And then Kevin said -- he
12 says, "I'm on it, Tommy."  He was picking
13 the camera up to photograph him.  I said,
14 "Because it's at least an assault third,"
15 and Joe Loeffler, who was standing in the
16 doorway watching all this go on, said, "It's
17 an assault third?  It's an assault second
18 with a dangerous instrument."
19     Q.   Okay.  When you say Loeffler was
20 watching this all go on, what was he
21 watching?
22     A.   He was driving the ambulance --
23     Q.   What was going on that you just
24 referred to?
25     A.   Rescue was treating them, looking

Page 370

T. Snyder

1
2 at their injuries where they were claiming
3 they were hurt, and we were attempting to
4 take statements from them at the same time.
5 It was very difficult because the way that
6 police station is situated, there's really
7 not like an interview room.  So we had a
8 large amount of people in a very small room.
9 Smaller than this room.
10     Q.   Okay.  So you make the statement
11 to Lamm you think it's an assault third?
12     A.   I said, "It's at least an assault
13 third."
14     Q.   And Loeffler goes "no, I think
15 it's an assault second with a deadly
16 weapon"?
17     A.   Assault second with a dangerous
18 instrument.  He corrected me.
19     Q.   Okay.  Did Loeffler say anything
20 else?
21     A.   That's all he said at that time.
22     Q.   Loeffler was there driving the
23 ambulance, right?
24     A.   Yes.  That's the reason why he
25 was there.

Page 371

T. Snyder

1
2     Q.   He wasn't the mayor at the time,
3 was he?
4     A.   I don't believe he was the mayor
5 at the time, no.  But he was the police
6 liaison to the village.
7     Q.   How do you know that?
8     A.   Because he was village trustee at
9 that time.
10     Q.   How do you know he was a police
11 liaison?
12     A.   Because it was told to us by not
13 only George, but also by the chief.
14     Q.   Paridiso told you that Loeffler
15 was the police liaison?
16     A.   And so did George Hesse, yes.
17     Q.   Okay.  And to your -- so what
18 does that mean to you that he was the police
19 liaison?  What significance did the fact
20 that he was the police liaison have with
21 regard to what he said to you that night, if
22 anything?
23     A.   I guess he was the -- the person
24 that spoke to the board with regard to
25 police issues.

Page 372

T. Snyder

1
2     Q.   Right.  I understand that.  But
3 you volunteered in your answer for some
4 reason that he was the police liaison.  So
5 I'm asking you, sir, what significance do
6 you attribute to that?
7     A.   I assumed that --
8     Q.   -- to the fact that he, in your
9 opinion, was the police liaison with regard
10 to what he said that night?
11         MR. GOODSTADT: Objection.
12     A.   Well, I would think that being
13 the police liaison, that when he heard the
14 call, he wanted to be there to see what's
15 going on.
16     Q.   You said he was driving the
17 ambulance?
18     A.   Well, that as well.  I mean, a
19 lot of times --
20     Q.   He was -- he was on, sir, call
21 that night as part of rescue, right?
22         MR. GOODSTADT: Objection.
23     A.   I have no idea if he was on call
24 or not.
25     Q.   You just think he popped into the

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 373

T. Snyder

1
2  ambulance because he was the police liaison?
3      MR. GOODSTADT: Objection.
4      A.   It's possible he was driving the
5  ambulance because they didn't have anybody
6  else.  I don't know.  I have no idea.
7      Q.   Do you think for a moment he
8  showed up that night because he was the
9  police liaison?
10     MR. GOODSTADT: Objection.
11     A.   It's possible.  Yes.
12     Q.   Did he ever show up to any other
13 incident, to your knowledge, in the
14 ambulance?
15     A.   Not to me specifically, no.  But
16 he was there others -- on other incidents,
17 yes.
18     Q.   Did Loeffler say anything else
19 that night?
20     A.   That's the only thing he said
21 that I heard.
22     Q.   Did Loeffler impede your
23 investigation that night?
24     A.   No.  That's all he said to me
25 that night.

Page 374

T. Snyder

1
2      Q.   I'm asking --
3      A.   He didn't -- he didn't --
4      Q.   I'm asking -- sir, I'm asking you
5  now did he impede any part of your
6  investigation that night?
7      A.   No, he didn't.
8      Q.   Did he tell you to do anything or
9  not to do anything?
10     A.   No, he did not.
11     Q.   How long was Loeffler in the
12 police station?
13     A.   I don't recall exactly how long,
14 but he was there as long as rescue was
15 there.  He was driving the ambulance.
16     Q.   And then he left?
17     A.   Yes.  With rescue.
18     Q.   Did you have any conversations
19 with Loeffler after that night concerning
20 the Halloween incident?
21     A.   No, I did not.
22     Q.   Did you approach him to discuss
23 it with him at all?
24     A.   No, I did not.
25     Q.   Okay.  Now you allege that the

Page 375

T. Snyder

1
2  village engaged in a cover up concerning the
3  Halloween incident, right?
4      MR. GOODSTADT: Objection.
5      Q.   Do you?
6      A.   It's in my complaint, right?
7  Yes.
8      Q.   So you allege that the village
9  engaged in a cover up concerning the
10 Halloween incident, right?
11     MR. GOODSTADT: Objection.
12     A.   Yes.
13     Q.   Okay.  What did Loeffler do as
14 part of this cover up, if anything, to your
15 knowledge?
16     A.   Well, to my knowledge, George
17 told me when he found out about the
18 incident, he asked me to write a 42 with
19 regard -- because he was investigating it,
20 he said that Joe Loeffler said, "We have to
21 turn this around."  Those were his exact
22 words.
23     Q.   Hesse said to you --
24     A.   Said to me in a phone
25 conversation.

Page 376

T. Snyder

1
2      Q.   That Joe said "we have to turn
3  this around"?
4      A.   That's correct.
5      Q.   Okay.  Anything else that you
6  attribute to Loeffler that makes you believe
7  that he was part of a conspiracy to cover up
8  the Halloween incident?
9      A.   No.  There's nothing that I can
10 recall.
11     Q.   That's all I'm asking.  Okay.  So
12 now you called rescue.  Rescue came there.
13 Rescue left.  Were the three alleged victims
14 still in the police station after rescue
15 left?
16     A.   Um, no.  The one victim, Vankoot,
17 was the one that they insisted be
18 transported because they thought he had an
19 unaligned trachea.  His neck, they didn't
20 like what they saw, and they -- they
21 requested that we call Suffolk Police Marine
22 Boat to transport him off to the hospital
23 off the island.
24     Q.   So who was left in the police
25 station after rescue left?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 377

T. Snyder

1
2     A.   Well, the victims -- the two
3  other victims and their friends, they all
4  went back to wherever they were staying.
5  Rescue had left.  So left in the police
6  station, after we called the marine boat and
7  they took the one victim, Vankoot, and one
8  of the girls with him, I don't recall her
9  name, it was then me, myself and Kevin.
10     Q.   Okay.  You --
11     A.   Me, Frank and Kevin.  Excuse me.
12     Q.   Okay.  So just go through, you,
13  Kevin, Frank and who else?
14     A.   That would be it then, after
15  everybody left.
16     Q.   And then what did you do?
17     A.   Well, we put together the whole
18  package of the police report, the PCRs,
19  which is the report that the medical
20  personnel write up on people, the
21  photographs, and we just put that
22  altogether.
23     Q.   Did you fill out any of the
24  reports that night before you left?
25     A.   The field report, yes.

Page 378

T. Snyder

1
2     Q.   Okay.  And what's the field
3  report?
4     A.   The field report is a document
5  you create for any call for service or any
6  incident that the police respond to.
7     Q.   Okay.  Did you look for Gary
8  Bosetti that night?
9     A.   I did not, no.
10     Q.   Do you know if Kevin or Frank
11  did?
12     A.   Um, as far as I know, they did
13  not either.
14     Q.   Was Hesse on duty that night?
15     A.   No, he wasn't.
16     Q.   How close to the end of the shift
17  did the Halloween incident take place?  End
18  of your shift?
19     A.   It's sometime around 2:30 I guess
20  is when we initially got the call.
21     Q.   So it was towards the beginning
22  of your shift?
23     A.   Towards the beginning, yes.
24          MR. NOVIKOFF: Okay.  Tape is
25  over.  Let's take a break.

Page 379

T. Snyder

1
2          THE VIDEOGRAPHER: This ends
3  tape number five.  The time is 4:49
4  p.m.  We're off the record.
5          (A break was taken.)
6          THE VIDEOGRAPHER: This begins
7  tape number six.  The time is 5:01 p.m.
8  Back on the record.
9          MR. NOVIKOFF: And just for the
10  record, counsel for the civil service
11  will be asking a few questions because
12  he has to leave.
13  EXAMINATION BY
14  MR. GATTO:
15          MR. GATTO: Good afternoon,
16  Mr. Sanchez.  I'd like to reintroduce
17  myself to you.  My name is Chris Gatto,
18  and I represent the County and Alison
19  Sanchez.  I'd just like to ask you a
20  few questions about the complaint.
21     Q.   And I'd like to talk first about
22  the alleged relationship between George
23  Hesse and Alison Sanchez.  Were you aware if
24  Hesse and Sanchez were in a relationship?
25     A.   Yes, I was.

Page 380

T. Snyder

1
2     Q.   And how were you aware -- how
3  were you aware of that?
4     A.   George bragged that he was -- he
5  slept with her and he I guess had dated her.
6     Q.   And do you know when he told you
7  that?
8     A.   Um, sometime I think in 2005.  I
9  think summer of 2005.
10     Q.   Did you ever see Hesse and
11  Sanchez together?
12     A.   I never personally saw them
13  together, no.
14     Q.   Did you ever drive Hesse to meet
15  Sanchez?
16     A.   I never drove Hesse to meet
17  Sanchez, no.
18     Q.   Do you know if any other officers
19  drove Hesse to meet Sanchez?
20     A.   I have no knowledge of any other
21  officers doing that.
22     Q.   Did you ever see them out on a
23  date together?
24     A.   I didn't see them out on a date
25  together, no.  But I know she did come to

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 381

T. Snyder

1 the island and was at the beach.  I had
2 heard that.
3    Q.   I'd like to now talk about
4 your -- any contacts you may have had with
5 Alison Sanchez.  Were you present at the
6 meeting with Alison Sanchez that's at
7 paragraph 99 in the complaint with the other
8 Plaintiffs?
9    A.   No, I was not at that meeting.
10    MR. GOODSTADT: Just make sure
11    you read the paragraph before you
12    answer the question.
13    Q.   Did you ever have any contact
14 with Alison Sanchez?
15    A.   I had no personal contact with
16 her, no.
17    Q.   Did you ever find out what
18 happened at the meeting with the other
19 Plaintiffs and Alison Sanchez?
20    MR. GOODSTADT: Objection.
21    Before you answer, I just caution you,
22    to the extent that you learned it from
23    a lawyer that represents you or a
24    lawyer that you sought legal advice

Page 382

T. Snyder

1 from, or during a meeting at which any
2 of those attorneys or lawyers that you
3 sought legal advice were present, I
4 would instruct you not to answer the
5 question.
6    A.   That's correct.  That's when it
7 did happen.
8    MR. GOODSTADT: So you can't
9    answer the question?
10    THE WITNESS: So no, I cannot
11    answer the question.
12    Q.   So other than -- other than
13 speaking with your lawyer -- your lawyers
14 about this, you had no contact with Alison
15 Sanchez?
16    A.   No, I did not.
17    Q.   You also mentioned that you
18 attended the police academy.  Were you
19 referring to the Suffolk County Police
20 Academy?
21    A.   Yes, I was.
22    Q.   And when did you go to the
23 Suffolk County Police Academy?
24    A.   In -- from January 1991 to May of

Page 383

T. Snyder

1 1991.
2    Q.   When did you graduate?
3    A.   In May of 1991.
4    Q.   Do you have any training in
5 firearms?
6    A.   Yes, I do.
7    Q.   And what kind of training do you
8 have?
9    A.   I was originally trained in the
10 .38 caliber police revolver.  That was the
11 issued weapon at the time.  And then they
12 upgraded it to the nine millimeter glock.
13    Q.   Do you have any firearm
14 certification?
15    A.   Certified in what way?
16    Q.   You tell me.  Do you have any
17 kind of certification in firearms?
18    MR. GOODSTADT: Objection.
19    A.   I'm certified to use the weapon.
20 I was certified on the police range.
21    Q.   And how were -- who certified
22 you to do that?
23    A.   I was certified by the Suffolk
24 County police, the pistol bureau, and also

Page 384

T. Snyder

1 Suffolk County Sheriff pistol bureau at some
2 time.
3    Q.   And when did you obtain a pistol
4 permit?
5    A.   I didn't need a pistol permit.  I
6 was a police officer.
7    Q.   And when did you first obtain
8 your permission to use a pistol?
9    MR. GOODSTADT: Objection.
10    A.   When I graduated the police
11 academy.
12    MR. GATTO: I have no further
13    questions.
14    (Mr. Gatto left the deposition.)
15 EXAMINATION BY
16 MR. NOVIKOFF:
17    MR. NOVIKOFF: Okay.
18    Q.   Sir, let's go back to the night
19 of the Halloween incident.  Other than --
20 well, did you take -- did you personally
21 interview any of the alleged victims?
22    A.   Yes.  One of them I did.
23    Q.   Who did you --
24    A.   John Tesoro.

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 385

T. Snyder

1
2  Q.   And how long did you talk to him?
3  A.   I'm not sure exactly how long,
4  but while he was in the police station, it
5  was also -- during while he was being looked
6  at by rescue at the same time.
7  Q.   Okay.  And who spoke to Vankoot?
8  A.   Um, I believe it was Frank, but
9  I'm not quite sure.
10  Q.   And who spoke to the other
11  individual?
12  A.   I believe Kevin spoke to Shalick.
13  Q.   And did you  -- did you do any
14  investigation that evening into the
15  incident?
16      MR. GOODSTADT: Objection.  I
17  think he testified to a bunch of stuff
18  he's already done.
19  Q.   I'm asking, other thank talking
20  to John Tesoro, did you do any other
21  investigation?
22  A.   Just what we investigated at the
23  scene and then what we brought back to the
24  police station.
25  Q.   And when you say what you

Page 386

T. Snyder

1
2  investigated at the scene, what did you
3  investigate?
4  A.   What I already testified to.
5  What I told you I did.
6  Q.   Fine.  And did you talk to any
7  alleged witnesses of -- that night, before
8  you left at the end of your shift, did you
9  talk to any alleged witnesses to the alleged
10  assault?
11  A.   I attempted to talk to them in
12  the bar.  Nobody would talk to us or
13  cooperate with us.  And then everybody had
14  left and gone home, the bar had closed, so
15  there was no one else to talk to.
16  Q.   Putting aside whether they
17  cooperated with you or not, the answer is
18  no, you didn't talk to any alleged witnesses
19  to the indent?
20  A.   No.  No witnesses would talk to
21  me.
22      MR. GOODSTADT: Objection.
23  Q.   And you took no statement from
24  anybody witnessing the event, other than
25  John Tesoro, correct?

Page 387

T. Snyder

1
2  A.   I personally only took John
3  Tesoro's statement.
4  Q.   Right.  Are you aware as to
5  whether or not Lamm took the statement of
6  any witness, other than one of the alleged
7  victims?
8  A.   I believe he took the statement
9  of one of the other victims, yes.
10  Q.   Right.  But other than the victim
11  or the alleged victim, to your knowledge,
12  Lamm didn't take a statement from any
13  alleged witness, right?
14  A.   Not to my knowledge, no.
15  Q.   And same thing for Fiorillo,
16  other than perhaps talking to Vankoot,
17  you're not aware as to whether he
18  undertook -- whether he got any statement
19  from any alleged witness?
20  A.   Not to my knowledge, no.
21  Q.   Okay.  Now, the two -- the women
22  that came with you to the bar -- I mean to
23  the police station, did you speak to them?
24  A.   They -- while they were sitting
25  there with their boyfriends, I assume that's

Page 388

T. Snyder

1
2  who they were with, yes.
3  Q.   Well, you assumed?  Did you ask
4  them if they were their boyfriend?
5  A.   I didn't ask if they were
6  boyfriend/girlfriend, no.  But they were
7  with  -- they were paired off, so it
8  appeared to me like they were
9  boyfriend/girlfriend.
10  Q.   Wouldn't that have been important
11  to know, if they were the girlfriends of the
12  alleged victims?
13      MR. GOODSTADT: Objection.
14  Q.   You're a police officer?
15  A.   It could have been important.
16  But at this point, I was focused on the
17  victims at the moment.  They -- they weren't
18  assaulted.  They weren't part of the
19  assault, so I wasn't talking to them.
20  Q.   But wasn't it also part of your
21  job trying to ascertain, to the best -- to
22  the best of your ability, what took place?
23  A.   Yes, it was.  But like I said, it
24  was very chaotic to take people's statements
25  because it was a very small room.  With

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 389

T. Snyder

1  rescue personnel all in there, there had to
2  be almost a dozen people with all of us.
3     Q.   Well, how long did it take --
4  how long did it take rescue to get there?
5  Withdrawn.  How long were you in the police
6  station before rescue came?
7     A.   I'm not sure exactly how long,
8  but it wasn't that long.
9     Q.   While rescue was taking care of
10  the alleged victims, didn't you have an
11  opportunity then to talk to the girlfriends,
12  the women?
13     A.   I guess we would have had an
14  opportunity then, yes.
15     Q.   Not would have.  Did you have an
16  opportunity while rescue was working on the
17  alleged victims, to talk to -- to talk to
18  these girls?
19     A.   I guess I did, yes.
20     Q.   You had an opportunity, right?
21     A.   I guess I did, yes.
22     Q.   Did you?
23     A.   I guess I did, yes.
24     Q.   No, not did you -- not guess.

Page 390

T. Snyder

1  Did you speak to any of the women that went
2  to the police station with you?
3     A.   I did speak to them at the scene
4  when they were -- when we were calming down
5  what happened.  They were telling us what
6  happened, and we spoke to them in the police
7  station when they were sitting next to --
8     Q.   Not "we" now, you?
9     A.   Yes, I did.
10     Q.   Okay.  Did you take any
11  statements from the women that you spoke to?
12     A.   No.  No, I did not.
13     Q.   Did Lamm take any statements from
14  the women?
15     A.   I -- not to my knowledge, no.
16     Q.   Did Fiorillo take any statements
17  from the women?
18     A.   Not to my knowledge, no.
19     Q.   In your reports, did you make any
20  reference to anything that the women said?
21     A.   In my reports, not to my
22  knowledge, no.  In my 42 I think I did.
23     Q.   I'm talking about the report you
24  did that night.  Did you make any reference

Page 391

T. Snyder

1  to anything the woman said?
2     A.   Not to my knowledge, no.
3     Q.   Did Fiorillo, in whatever report
4  he may have done that night, did he make any
5  reference to what any of the women may have
6  said?
7     A.   Not -- not to my knowledge, no.
8     Q.   Same question with Lamm?
9     A.   Not to my knowledge, no.
10     Q.   Who did -- of the women, who did
11  you speak to?
12     A.   I'm not sure what her name was.
13  It was either Alanna or Diane, but I'm not
14  very sure.
15     Q.   How long did you speak to her
16  for?
17     A.   Just very briefly.  She was
18  sitting right next to John when I was
19  interviewing John, and basically she was
20  listening, and then when Richie walked in,
21  she, you know, was getting all agitated,
22  too, with them.
23     Q.   I didn't ask you about when
24  Richie came in.  What did you ask of this

Page 392

T. Snyder

1  woman that you spoke to in the police
2  station?
3     A.   Well, I spoke to her outside in
4  front of the bar originally.  I didn't
5  really speak to her too much in the police
6  station.
7     Q.   Okay.  Then let's go to the bar.
8  What did you ask her at the bar?
9     A.   About what had happened, and
10  she -- she reiterated that, you know, her
11  friends got beat up in the bar by guys who
12  allegedly were off duty cops.
13     Q.   The woman told you at the bar --
14     A.   Yes.  Outside the bar.
15        MR. GOODSTADT: Let him finish.
16     Q.   Is that your testimony, that when
17  you showed up at the bar, the woman that you
18  interviewed, that you talked to said that
19  her boyfriend was beat up allegedly by an
20  off duty policeman?
21     A.   They were all saying that when we
22  first got there.  And they were all claiming
23  we were going to cover it up.
24     Q.   Who is "they all"?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 393

T. Snyder

1
2    A.   The victims of the assault.
3    Q.   They claimed --
4    A.   Chris, John, and the girls.
5    Q.   They claimed at the bar that you
6  were going to cover it up?
7    A.   Yes, they did.  They were yelling
8  that out in the street.
9    Q.   Okay.
10   A.   When we first pulled up.
11   Q.   What else did you ask of this
12 woman at the bar?
13   A.   I just -- what happened that
14 night.  What happened then.
15   Q.   And what did she say
16 specifically?
17   A.   That they had gotten into a fight
18 with these people who were playing pool who
19 was off duty cops and beat up his friends.
20 They beat them up actually.
21   Q.   Did she give you any specifics?
22   A.   Saying that they got -- just a
23 regular fight with, you know, fists and
24 kicked and punched and a pool cue was
25 involved.

Page 394

T. Snyder

1
2    Q.   Were you writing down at this
3  time what she was saying?
4    A.   No, I wasn't, because everyone
5  was still --
6    Q.   My question to you was did you
7  write anything down?
8    A.   No, I was not.
9    Q.   Isn't that normal protocol when
10 you're asking a potential witness to an
11 event like this what happened, to write down
12 what he or she was saying?
13      MR. GOODSTADT: Objection.
14   A.   I couldn't interview her properly
15 in normal protocol because the situation was
16 still out of control.
17   Q.   That wasn't my question.  Is it
18 normal policy to write down what an alleged
19 witness is saying to you about an event that
20 you investigated?
21   A.   Yes.  If I'm sitting down and
22 doing normal protocol with that.
23   Q.   The answer is yes, right?  Normal
24 protocol, right?
25      MR. GOODSTADT: His answer is

Page 395

T. Snyder

1
2  what he testified to.  That's his
3  answer.
4    Q.   Yes or no, is it normal protocol
5  to write down what a witness is telling you
6  about an incident?
7      MR. GOODSTADT: Objection.  If
8  you can answer yes or no, then answer
9  yes or no.  If you can't, answer it the
10 way you want to answer it.  If he wants
11 to make whatever --
12   Q.   That's fine.  If you can answer
13 it yes or no, answer it yes or no.
14      MR. GOODSTADT: -- objections
15 and motions or whatever he wants to do,
16 let him do that, but answer the
17 question.
18   A.   I answered it the way I answered
19 it.
20   Q.   Is it normal protocol to write
21 down what a witness says?
22   A.   I'll answer the way I answered it
23 before.
24   Q.   Yes or no?  If you can't answer
25 it yes or no, that's fine.

Page 396

T. Snyder

1
2    A.   I can't answer it yes or no.
3    Q.   That's fine.  Now it wasn't
4  chaotic in the police station, was it?
5    A.   Yes, it was.  I testified that
6  there was a whole bunch of people there
7  walking back and forth, getting in each
8  others way, and couldn't properly take
9  statements from these people at the time.
10   Q.   Did you write down in the police
11 station anything this woman said?
12   A.   I wrote down a partial statement
13 of what the victim, Brian Vankoot, said.  I
14 didn't write down anything in the station
15 what she said, because I couldn't barely
16 even get the statement from him.
17   Q.   You said you didn't talk to Brian
18 Vankoot.  You said you spoke to John Tesoro.
19   A.   I'm sorry, John Tesoro.  I made a
20 mistake.  John Tesoro.
21   Q.   Okay.  So my question to you,
22 sir, is yes or no, did you write down
23 anything the woman said to you in the police
24 station?
25      MR. GOODSTADT: Objection.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 397

T. Snyder

1    Q.   Yes or no?
2    A.   I didn't write anything down from
3    the woman in the police station.
4    Q.   All right.  Did you ask this
5    woman to stay after rescue left in order to
6    properly take her statement?
7    A.   No, I did not.
8    Q.   Okay.  Did Lamm ask any of these
9    women to stay after the rescue left to
10   properly take their statement?
11   A.   I have no knowledge if he did or
12   not.
13   Q.   Did Fiorillo ask any of these
14   women to stay in order to take -- properly
15   take their statements?
16   A.   I have no knowledge if he did or
17   not.
18   Q.   Okay.  Did you talk to Richie
19   Bosetti that night with regard to what
20   transpired?
21   A.   I didn't speak to Richie Bosetti
22   personally, no.
23   Q.   Why not?
24   A.   Because after we asked him to

Page 398

T. Snyder

1    leave, because they were getting agitated,
2    he left and I didn't see Richie Bosetti
3    after that.  I didn't know where Richie was
4    at that point.
5    Q.   Well, sir, would you agree with
6    me that based upon what you knew of what
7    transpired, Richard Bosetti was in the -- in
8    the bar at the time of the incident?
9    A.   Yes.
10   Q.   Right.  So at least it was your
11   belief that night that Bosetti had witnessed
12   what went on?
13   A.   Yes, I did.
14   Q.   Okay.  And is it your testimony
15   at no time during that evening, you asked
16   Richard Bosetti to give you a statement?
17   A.   I didn't ask for a statement.  I
18   did talk to Richie very briefly in -- when
19   we first arrived there when everybody was
20   arguing back and forth.
21   Q.   What did you say to Richie?
22   A.   Richie was blurting out something
23   about a woman being choked, and I turned to
24   him when they were yelling back, "no woman

Page 399

T. Snyder

1    was being choked," and I turned to him, I
2    said, "What woman, Richie?"  Because he was
3    standing off to the side behind me.  I said,
4    "What woman, Richie?  Where is she?"  And he
5    looked around.  And I said, "There's no
6    woman here.  Where's your brother?"  And
7    that was it.
8    Q.   And when Richie went into the
9    police station, you didn't ask him at that
10   point in time, "listen, hang around, I want
11   to take a statement from you"?
12   A.   We wanted -- we asked him to
13   leave the station because they were getting
14   very agitated.  I said, "Please, Richie can
15   you leave so we can have them treated and we
16   can take a statement from them."
17   Q.   I got that.
18   A.   And he left.
19   Q.   I got that's what you said to
20   Bosetti.  My question to you is a little
21   different, sir.  At any point in time while
22   Bosetti, Richie Bosetti was in the police
23   station, did you ask him to hang around for
24   a while so that you can take his statement,

Page 400

T. Snyder

1    even if it meant he was hanging around down
2    the block?
3    A.   No, I didn't say that to him.
4    Q.   Okay.  Did Lamm say that?
5    A.   Not to my knowledge.
6    Q.   Fiorillo?
7    A.   I have no idea if Frank or Kevin
8    spoke to him about it.
9    Q.   So if I understand this
10   correctly, other than the victim the alleged
11   victims and who you believe were their
12   girlfriends, the only witness that you had,
13   that you knew about to this incident, you
14   didn't interview?
15       MR. GOODSTADT:  Objection.
16   A.   The only witness?
17   Q.   Yeah.
18   A.   The only witness who --
19   Q.   That you knew about.
20       MR. GOODSTADT:  Objection.
21   Q.   Correct?
22   A.   There was plenty of witnesses.
23   Q.   But you didn't know the names of
24   them, right?  Did you know the identity of

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 401

T. Snyder

1  any witness that evening, other than the
2  victims and the girlfriends that you --
3  A.   No.  Like I said before, a lot of
4  people --
5  Q.   I understand.
6  A.   Left and wouldn't cooperate.
7  Q.   I understand you said a lot of
8  people spread out and they didn't cooperate.
9  I get that.  Do you -- did you know that
10 night of any -- of the identity of any
11 witness, other than Richard Bosetti, the
12 victims and the victims' girlfriends?
13 A.   At that night I did not.
14 Q.   So if I understand your testimony
15 correctly, other than the girlfriend and the
16 victims, the only witness that you knew,
17 Richard Bosetti, you didn't take a statement
18 from that night?
19 A.   Not at that time I didn't, no.
20 Q.   Okay.  And, in fact, you and Lamm
21 and Fiorillo allowed him to leave before you
22 had an opportunity to take his statement,
23 correct?
24 A.   We asked him to leave.  Just

Page 402

T. Snyder

2  leave that room.  We didn't tell him where
3  to go at that point.
4  Q.   You didn't tell him to stay
5  anywhere, right?
6  A.   He's a police officer.  He should
7  know what to do as well as us, right?
8  MO      MR. NOVIKOFF: I'm moving to
9  strike.
10 Q.   Isn't it true that you, Fiorillo
11 and Lamm allowed Richard Bosetti --
12 A.   Yes, we did.
13 Q.   -- to leave without taking his
14 statement?
15 A.   Yes, we did, because of the
16 situation.
17 MO      MR. NOVIKOFF: Motion to
18 strike.
19 Q.   I'll ask it again, sir, yes or
20 no, isn't it true that you, Fiorillo and
21 Lamm allowed Richard Bosetti to leave
22 without taking his statement?
23       MR. GOODSTADT: Objection.
24 Answer it the way you want to answer
25 it.  Let him make whatever motion,

Page 403

T. Snyder

1  whatever he wants to do.
2  Q.   Yes or no?
3  A.   I answered it before.
4  Q.   Can you answer the question yes
5  or no?
6  A.   No, I can't.
7  Q.   Okay.  Did you, Lamm or Fiorillo
8  go to the checkpoint at any point in time
9  that night to make sure Gary Bosetti didn't
10 leave the island?
11 A.   I didn't, no.  None of us did
12 actually.
13 Q.   That was my question.  Did you,
14 Lamm or Fiorillo go to the ferry station to
15 make sure, to the best of your ability, that
16 Bosetti didn't jump on a ferry?
17 A.   Well, he couldn't, because there
18 was no ferries running at then.
19 Q.   Okay.  So the only way you could
20 have gotten off the island that night was at
21 the checkpoint?
22       MR. GOODSTADT: Objection.
23 A.   No.  He could have gotten off
24 another way.

Page 404

T. Snyder

1  Q.   How?
2  A.   By a personal boat.
3  Q.   Okay.  Are you aware  -- well,
4  and where would the personal boats have left
5  from?
6  A.   Probably right from either behind
7  one of the bars or right from the marina
8  itself.
9  Q.   Did you do anything to try to
10 prevent Gary Bosetti from leaving the island
11 that night from a private boat?
12 A.   I didn't see Gary -- once I got
13 to the scene, I didn't see Gary leaving the
14 scene.
15 Q.   That's not my question, sir.
16 A.   I had no -- I didn't know where
17 Gary was.  It would be impossible for me to
18 prevent him from leaving.
19 Q.   Obviously that's why I'm asking
20 the question.  Did you take any action that
21 night to prevent Gary Bosetti from leaving
22 the island --
23 A.   I --
24 Q.   -- from a private boat?

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 405

T. Snyder

1
2  A.   No, I did not.
3  Q.   Okay.  Where did Gary Bosetti
4 live?  Withdrawn.  Did you know at that time
5 where Gary Bosetti lived?
6  A.   I did not know.
7  Q.   Okay.  Did you inquire as to
8 where Gary Bosetti lived?
9  A.   Inquire with who?
10  Q.   With anybody?
11  A.   No, I didn't.
12  Q.   Did you ask Lamm, "Hey, Kevin, do
13 you know where Bosetti lives"?
14  A.   No, I did not.
15  Q.   Did you ask Fiorillo, "Hey,
16 Frank, where does Bosetti live"?
17  A.   No, I did not.
18  Q.   Did you look through any
19 documents at the police station to ascertain
20 where Gary Bosetti lived?
21  A.   No, I did not.
22  Q.   Did you call George Hesse that
23 night to inquire as to where Gary Bosetti
24 lived?
25  A.   No.  Because George was on

Page 406

T. Snyder

1
2 vacation.  That's the reason why I was
3 working.
4  Q.   Did you call Ed Paridiso to
5 inquire as to where Gary Bosetti lived?
6  A.   No, because the Chief Paridiso
7 was going to be calling us in a few hours to
8 get a rundown on what was going on after the
9 Halloween party.
10  Q.   That's not my question.  My
11 question to you is that night, sir, after
12 you learned that one of the witnesses said
13 that the person who attacked the alleged
14 victims looked exactly like Richard Bosetti,
15 did you call up Ed Paridiso and inquire with
16 him as to where Gary Bosetti lived?
17  A.   No, I did not.
18  Q.   Are you aware if Lamm or Fiorillo
19 did any of that?
20  A.   I am not aware if they did or
21 not.
22  Q.   When Loeffler came into the
23 station, he was the trustee at the time,
24 right?
25  A.   I believe he was a trustee and

Page 407

T. Snyder

1
2 the police liaison at the time.
3  Q.   Right.  Did you advise him that
4 you have information to believe that Gary
5 Bosetti was involved in this incident?
6  A.   I didn't advise him that.  He was
7 listening to the whole conversation.
8  Q.   My question to you, sir, is this,
9 yes or no, and if you can't answer yes or
10 no, then you can't answer it yes or no.  Yes
11 or no, did you advise Loeffler, when he came
12 to the police station that night with the
13 ambulance, that you have information to
14 believe that Gary Bosetti was involved in
15 the altercation?
16       MR. GOODSTADT: Objection.
17    Answer the question the way you feel
18    necessary to answer the question.  He
19    can make whatever motion or whatever he
20    wants to do about it.
21  Q.   Yes or no?
22  A.   I can't answer it yes or no.  I
23 answered it the way I did before.  He was
24 listening to the conversations in the police
25 department -- in the interview.

Page 408

T. Snyder

1
2  Q.   Sir, you, from your mouth to his
3 ears, did you say to him, "Mr. Loeffler, I
4 have information to believe that Gary
5 Bosetti was involved in this altercation?
6  A.   No, I didn't say that.
7  Q.   Thank you.  Well, did any of the
8 victims say the name "Gary Bosetti" in the
9 police station?
10  A.   No, they did not.
11  Q.   Okay.  Did any of the girlfriends
12 say in the police station "Gary Bosetti"?
13  A.   No, they did not.
14  Q.   Okay.
15  A.   I don't believe they knew his
16 name.
17  Q.   Exactly.  Did you inquire with
18 Mayor Loeffler at the time as to whether he
19 knew where Gary Bosetti lives in the police
20 station that night?
21  A.   Mayor Loeffler wasn't the mayor
22 at the time.  He --
23  Q.   Fine.  Thank you.  I'll make
24 it -- I'll make it more precise.  When
25 Mr. Loeffler came into the police station

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 409

T. Snyder

1
2 that night, sir, did you ask him where Gary
3 Bosetti lived?
4    A.   No. I didn't -- wouldn't believe
5 he knew where he lived.
6    Q.   What makes you think he wouldn't
7 know? He was the police liaison. Maybe he
8 had access to Gary's information. My
9 question to you is, did you ask Mayor --
10 Mr. Loeffler?
11    MR. GOODSTADT: Objection.
12    A.   I did not ask him.
13    Q.   So if I understand you correctly,
14 you had information to believe that Gary
15 Bosetti was involved in the vicious and --
16 using your words -- brutal assault on a --
17 on a civilian that night, and you did
18 absolutely nothing to ascertain his
19 location?
20    A.   Not at that moment we didn't, no.
21    Q.   Well, that moment I'm including
22 the entire night.
23    A.   Well, it was only several hours
24 later when the police chief came in and we
25 handed it over to him.

Page 410

T. Snyder

1
2    Q.   Okay. But I'm talking before the
3 police chief came?
4    A.   Not before the police chief came,
5 because --
6    Q.   You did -- you did absolutely
7 nothing to ascertain where Gary Bosetti
8 lived?
9    A.   We couldn't because we were
10 treating the victims and that did take some
11 time. And we also had to wait for the
12 police boat to come, and that took some time
13 as well.
14    Q.   Okay. It took three of you to
15 treat the victims?
16    A.   They -- we still had a crowd of
17 people in the -- in the police station, so
18 we were standing around with them while
19 rescue was with them.
20    Q.   What crowd was there?
21    A.   Well, we have the girls --
22    Q.   We have the victims, we have the
23 girlfriends and -- and we have rescue,
24 right?
25    A.   Right.

Page 411

T. Snyder

1
2    Q.   When rescue left, all you had
3 were the three victims and the girls, right?
4    A.   No. They all left at that time.
5    Q.   Oh.
6    A.   This was -- this was I would say
7 I think it was after 4:00, 4:45 when we
8 finally closed out the CC on this.
9    Q.   Okay. When did rescue get there?
10    A.   I'm not sure exactly what time.
11 It was sometime after we got to the police
12 station and called them. It wasn't that
13 long, but I don't know exactly when.
14    Q.   And when did rescue leave? Well,
15 better yet, how long was rescue in the
16 police station?
17    A.   They were there for quite some
18 time.
19    Q.   What does that mean?
20    A.   More than a half hour. Maybe
21 even an hour at least.
22    Q.   Okay. And then rescue left?
23    A.   At some point after that they
24 did.
25    Q.   Did they leave with the victims?

Page 412

T. Snyder

1
2    A.   Um, they helped transport him.
3 They stayed with him while we were there as
4 well until the police boat came. We had to
5 wait for the police boat to come to
6 transport him.
7    Q.   Okay. And while you were waiting
8 for the police boat, the only people in the
9 police station was rescue, the victims and
10 the women, plus you, Frank and Kevin?
11    A.   Right. The -- the whole group of
12 us were still there.
13    Q.   Right. Okay. And once the
14 police boat came, how long was it until the
15 end of your shift?
16    A.   Um, maybe three hours I guess.
17    Q.   Okay. So in that three hours,
18 you did absolutely -- you did absolutely
19 nothing to ascertain where Gary Bosetti
20 could have been?
21    A.   Well, I finished writing the
22 police report and putting the whole package
23 together, and then I wouldn't even know
24 where to begin to look for Gary in the
25 village.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 413

T. Snyder

1
2   Q.   Yeah.  Okay.  Um, then Chief
3   Paridiso came.  When did he come?
4   A.   Well, he called in in the morning
5   which he routinely did after the Halloween
6   party, and he called in sometime -- I guess
7   it was sometime after 8:00 after I went off
8   duty.
9   Q.   He would routinely call in after
10  the Halloween party?
11  A.   Yes.  The Halloween party was a
12  big party there, it was sort of an end of
13  the year bash, and they've had prior
14  problems with the Halloween party.
15  Q.   And did -- were you on call in
16  those prior years?
17  A.   One year I was, yes.
18  Q.   So how do you know, then, if you
19  were only on call one year, that
20  Mr. Paridiso would routinely call in after
21  the Halloween party?
22  A.   Because I heard from other
23  officers who I worked with saying that he
24  called in last year and he was -- did make a
25  point that he was going to call in this year

Page 414

T. Snyder

1
2   as well.
3   Q.   Okay.  So he called in at what
4   time?
5   A.   It had to be after I went off
6   duty.  After 8:00 sometime.
7   Q.   Did you -- did you answer the
8   call?
9   A.   No.  I was not there.  Frank did.
10  Q.   Frank did that.  Okay.  When was
11  the -- when was  -- well, after your --
12  after that evening, when was the first time
13  that you spoke to Paridiso about what took
14  place?
15  A.   Well, I drove him home from Ocean
16  Beach to my house, and when I got home, my
17  son told me there was two phone messages
18  from Ocean Beach; one from Chief Paridiso,
19  one from Frank.
20  Q.   Okay.  And what did Frank want?
21  A.   Um, I called back and Frank
22  answered the phone, and I asked to speak to
23  chief, and he says, "He's not here.  He's
24  out looking for Gary."
25  Q.   And what did -- what did Paridiso

Page 415

T. Snyder

1
2   want on the answering machine message?
3   A.   I guess he wanted to talk to me
4   about the Halloween incident.
5   Q.   Okay.  And did you speak to
6   Paridiso that day about the Halloween
7   incident?
8   A.   Um, I spoke to him later on
9   that -- the day -- the day after.  Well, I
10  guess it was Halloween then.  Later on that
11  day, yes.
12  Q.   So you spoke to Paridiso, via
13  phone or in person?
14  A.   By phone.
15  Q.   Okay.  How long was the phone
16  call?
17  A.   I don't recall exactly how long.
18  Q.   What did Paridiso ask you?
19  A.   Um, he had --
20  Q.   Or say to you?
21  A.   He said to me that the victims
22  had come back to file a complaint.
23  Q.   Okay.
24  A.   That they came back, and that
25  while he was talking to them, they saw a

Page 416

T. Snyder

1
2   picture of Gary Bosetti on the wall of the
3   police station, and they pointed to him and
4   said, "That's the guy who did it."
5   Q.   Okay.  And what else did Paridiso
6   say to you?
7   A.   Paridiso said that he doesn't
8   condone that type of action, that type of
9   conduct from his police officers, and he
10  promised them that he was going to fire
11  Gary.
12  Q.   Did Paridiso ask you anything
13  during that phone conversation?
14  A.   Um, well, he asked me what
15  happened.  I explained -- I was explaining
16  the situation to him on the phone.
17  Q.   And what did you explain to him?
18  A.   Just what I explained here about
19  the Halloween incident.  How we got the
20  call.  We went there.  What happened.  What
21  we did afterwards.
22  Q.   And what specific -- just so I'm
23  clear, what specific report did you file
24  that evening?
25  A.   A field report of the incident.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 417

T. Snyder

2 Q. Okay. Okay. And who did you
3 submit it to?
4 A. I wrote the report and left it
5 with -- I said, with the package of the PCR,
6 which is the medical reports that the rescue
7 took of the victims, the pictures of Brian
8 Vankoot, put it altogether and left it for
9 the chief to look at. Left it on his desk.
10 Q. Okay. And then you spoke to the
11 chief the day of Halloween by phone?
12 A. Yes. Later on that day.
13 Q. Okay. Did the chief say anything
14 else, other than what you've just testified
15 to?
16 A. He said that, um, he went to look
17 for Gary in the village, but he couldn't
18 find him, and he had developed information
19 from somebody that Gary I think believed was
20 taken off by boat from the village.
21 Q. Did he say anything else that you
22 haven't testified about in that conversation
23 on Halloween day?
24 A. He told me that he had -- he was
25 firing Gary and he expected Richie to

Page 418

T. Snyder

2 follow -- to leave as well because those two
3 are tied at the hip.
4 Q. He said he was firing Gary before
5 he ever did any investigation?
6 A. He said he was in the process.
7 That's what he said. "I don't condone
8 that," and he said, "I promised the victims
9 that I was going to fire Gary for what had
10 happened."
11 Q. Okay. Did Paridiso say anything
12 else in this conversation that you can
13 recall, other than what you've testified to?
14 A. Not that I can recall. No.
15 Q. Did you say anything else to
16 Paridiso in that telephone conversation,
17 other than what you've just testified to?
18 A. I said to him, I said, "Chief,
19 there's a lot of things that are occurring
20 in this village that I can bring to your
21 attention," and he said, "Tommy" -- he
22 didn't want to hear about it. He said, you
23 know, that he's firing Gary and that's it.
24 Q. Didn't you testify earlier today
25 that you told Paridiso in this conversation

Page 419

T. Snyder

2 that all about the beer cans, the drinking,
3 the patrols cars and the other things?
4 Didn't you testify to that earlier today?
5 A. Yeah. He was aware of it. Yes.
6 Q. No. No. You testified that you
7 spoke to him after the Halloween incident
8 about those issues.
9 A. Oh, that's correct. Yes. There
10 was a number of things I tried to -- to tell
11 him, and while I was telling him, he was
12 like, "Tommy, you know, I don't want to hear
13 it. I'm firing Gary and that's the end of
14 it."
15 Q. Oh, okay. So you told --
16 A. So, yeah, it was during that
17 conversation while I was bringing up all
18 this other stuff as well.
19 Q. So while you -- while Paridiso
20 was talking to you about a specific
21 Halloween incident, you felt it was -- it
22 was your obligation to finally tell Chief
23 Paridiso about all of the other incidents
24 involving the Bosettis; is that true?
25 MR. GOODSTADT: Objection.

Page 420

T. Snyder

2 A. I felt at that time I had an
3 opportunity to discuss it with him, since he
4 was asking me what happened, and so I -- I
5 mentioned it to him.
6 Q. You felt you never had the
7 opportunity to discuss it with him prior to
8 that?
9 A. I didn't feel I had the
10 opportunity, no.
11 Q. Well, you felt like you could
12 never have called him up and told him?
13 A. He had told us previous to that
14 back in 2002 or three, when George was taken
15 off the midnight tour because of complaints
16 about him, public complaints about him and
17 put on the day tour and the chief went back
18 to the night tour, when we asked why this
19 was occurring, he said that because of
20 people had come to a board meeting,
21 complained about what was occurring while
22 George was supervising the midnight tour,
23 and they wanted him on days so they could
24 watch him.
25 MO     MR. NOVIKOFF: Motion to

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 421

T. Snyder

1    strike.
2        Q.    I'm asking you, sir, is it your
3    testimony that you felt that prior to
4    Halloween day, you didn't have the
5    opportunity to raise these complaints about
6    the Bosettis to Chief Paridiso?
7            MR. GOODSTADT: Objection.
8        A.    He was aware of them.  I didn't
9    think I needed to -- to bring them to his
10   attention.  He was quite aware of what was
11   going on.
12       Q.    Based upon your belief?
13       A.    And others, yes.
14       Q.    Okay.  All right.  So you spoke
15   to Paridiso that -- that October, that
16   Halloween day.  When was the next time you
17   spoke to Paridiso concerning the Halloween
18   incident, if at all?
19       A.    Actually, I don't believe I spoke
20   to chief at all about that after this.
21       Q.    Okay.  Is there anything that
22   perhaps would refresh your recollection as
23   to whether or not you did?
24       A.    I have no idea if there is or

Page 422

T. Snyder

1    not.
2        Q.    Okay.  Then when was the -- were
3    you instructed by Paridiso to undertake any
4    investigation, other than what you had
5    already done?
6        A.    I was never instructed by him to
7    do that.
8        Q.    That's all I'm asking you.  Did
9    Paridiso, in this phone conversation,
10   instruct you to undertake any other
11   investigation, besides what you had done?
12           MR. GOODSTADT: Objection.
13       A.    No.  It was my impression --
14       Q.    Yes or no, sir?
15       A.    -- that he was doing it.
16       Q.    Did Paridiso instruct you?
17       A.    No, he didn't.
18       Q.    Okay.  When was the first time
19   that you spoke to Hesse concerning the
20   Halloween incident?
21       A.    I think it was roughly a -- a
22   week later or so.
23       Q.    Okay.  And who -- who initiated
24   this communication?

Page 423

T. Snyder

1        A.    He called me.  I believe he
2    called me.
3        Q.    And what did he say?
4        A.    He had asked me to write a 42 in
5    regard to the incident.
6        Q.    And what's a 42?
7        A.    A 1042 is an internal
8    correspondence.  It's sort of like a letter.
9        Q.    Okay.  Did he explain to you why
10   he wanted you to do this?
11       A.    Um, he said that he and along
12   with -- he hired Pat Cherry or he had Pat
13   Cherry as a special investigator, were going
14   to investigate this Halloween thing.
15       Q.    Okay.  Now you said earlier it
16   was your understanding that Paridiso was
17   going to investigate this.  What was that
18   based upon?
19       A.    That phone call when I spoke to
20   him and he said he went out looking for
21   Gary, I was under the assumption that the
22   chief was investigating it then.
23       Q.    Okay.  And did you -- in the
24   period of time between that conversation and

Page 424

T. Snyder

1    when you spoke to Hesse, did anything else
2    take place that led you to believe that
3    Paridiso was investigating the incident?
4        A.    I didn't speak to the chief or
5    George in that time frame, so I have -- I
6    have no idea.
7        Q.    Well, no.  My question is between
8    the time that you spoke to Paridiso
9    Halloween day and the time you spoke to
10   Hesse about a week later, other than what
11   Paridiso said to you in the phone
12   conversation, was there anything else that
13   led you to believe that Paridiso was in fact
14   investigating the incident?
15       A.    No, there was not.
16       Q.    Okay.  Did anyone call you in
17   that period of time as part of any
18   investigation?
19       A.    No.  No one ever spoke to me
20   about it.
21       Q.    Okay.  Paragraph 71, you
22   allege -- and this is on page 18, second
23   sentence -- "upon information and belief,
24   the field report was then rewritten by or at

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 425

T. Snyder

1          T. Snyder
2   the direction of Hesse without Officer
3   Fiorillo, Lamm and Snyder's knowledge or
4   input, despite the fact that they were the
5   only officers on duty in Ocean Beach at the
6   time of the incident," do you see that?
7       A.   Yes, I do.
8       Q.   What information and belief are
9   you relying upon?
10      A.   Um, I believe -- actually, if I'm
11  not mistaken, George rewrote a field report
12  of the incident and included it in the
13  official investigation.
14      Q.   And what's the basis for that
15  belief?  That's all I'm asking you.
16      A.   I believe I saw that field report
17  when he -- with his folder with the
18  investigation.
19      Q.   Did he show it to you?
20      A.   Um, he didn't show it to me
21  specifically.  I believe it was right there
22  on his desk and we were looking through it.
23      Q.   Who's "we"?
24      A.   Myself and the other officers
25  that were working.  There was a number of us

Page 426

1          T. Snyder
2   working.  I mean, it was right out in the
3   open for everyone to see.
4       Q.   Who were the other officers?
5       A.   All -- it was not just myself
6   and the guys that were working midnight.  It
7   was all the other tours as well.  Everybody
8   was well aware of what was going on.
9       Q.   No.  I understand that.  But you
10  said there's a specific field report that
11  you claim that -- that Hesse rewrote, and
12  the basis for that is you said that you
13  looked at this report along with other
14  officers because the report was out in the
15  open on Hesse's desk, right?
16      A.   Yeah.  The file was at one point,
17  yes.
18      Q.   Did Hesse give you permission to
19  go through the file?
20      A.   He had told us that this is what
21  he was doing and it was right there.
22      Q.   Did Hesse give you permission to
23  go through the file?
24      A.   I don't remember if he said go
25  through the file, but he left it open for us

Page 427

1          T. Snyder
2   to see.
3       Q.   Did Hesse say you can go look at
4   it?
5       A.   I don't recall specifically if he
6   said that.
7       Q.   Okay.  Then my question is, other
8   than you, who else was in your presence when
9   you were going through the report?
10      A.   I don't recall who was with me
11  then at that time.
12      Q.   Okay.  72.  Okay.  We talked
13  about 72.  73, "on October 31, 2004, Chief
14  Paridiso terminated Gary Bosetti's
15  employment."  What's your knowledge as to
16  that?
17      A.   From the chief telling me in that
18  phone conversation that he was  -- he was
19  reaching out to Gary to terminate his
20  employment.  I think he got Gary by phone,
21  if I'm not mistaken.
22      Q.   Well, Paridiso told you that he
23  was not going to tolerate his officers
24  engaging in such conduct and he was going to
25  fire Bosetti, is that your testimony?

Page 428

1          T. Snyder
2       A.   That's what he said to the
3   victims who came back to file the complaint.
4       Q.   Right.  Did Paridiso, in that
5   phone conversation, tell you that he had
6   fired Gary Bosetti?
7       A.   No, he didn't at that time.  No.
8       Q.   Okay.  Did Paridiso tell you in
9   any conversation within a month of the
10  Halloween incident, that he had fired Gary
11  Bosetti?
12      A.   I -- I think he did, yes, when he
13  told me that he had found that Gary had left
14  the island.
15      Q.   That was in the same
16  conversation, sir.  You testified that you
17  had one conversation with Chief Paridiso,
18  correct?  That's the time -- yes or no?
19      A.   I'm trying to recall what we're
20  talking about right now.
21      Q.   Halloween day.
22      A.   Okay.
23      Q.   After the Halloween incident and
24  after Chief Paridiso had checked in in the
25  morning, you testified that Chief Paridiso

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 429

T. Snyder

1  2  and you had a phone call?
3     A.  Yes.
4     Q.  Right.  That was after Paridiso
5  had left a message on your machine at home,
6  right?
7     A.  Yes.
8     Q.  In that phone conversation --
9  well, withdrawn.  You testified that there
10  was only one phone conversation with
11  Paridiso that day, correct?
12     A.  Yes.  I think I only had one
13  conversation that day.
14     Q.  Okay.  And in that conversation,
15  you testified that Paridiso said to you he
16  had learned through some evidence that
17  Bosetti had been taken off the island by
18  someone in a private boat, correct?
19     A.  I believe he said it to me then,
20  yes.
21     Q.  Right.  And he also said that he
22  told the victims that he doesn't condone
23  such conduct by police officers, right?
24     A.  Yes.
25     Q.  And in that conversation, he had

Page 430

T. Snyder

1  2  told you that he had told the victims that
3  he was going to fire Gary Bosetti, correct?
4     A.  That's correct.  Yes.
5     Q.  He didn't tell you in that
6  conversation that he had fired Gary Bosetti,
7  did he?
8     A.  Not during that conversation, no.
9     Q.  Right.  And then you testified
10  that you don't think you had any other
11  conversations with Gary  -- with Chief
12  Paridiso about the Halloween incident,
13  correct?
14        MR. GOODSTADT: Objection.
15     A.  I don't recall having another
16  one.  I may have, though.  I just don't
17  recall.
18     Q.  But you don't recall?
19     A.  Right.
20     Q.  So my question is this, sir, did
21  Chief Paridiso advise you, within a month of
22  the Halloween incident, through any means,
23  whether it's phone call or a letter, that he
24  had, indeed, fired Gary Bosetti?
25     A.  Um, I don't recall if he did or

Page 431

T. Snyder

1  2  not at this point.
3     Q.  Okay.  Paragraph 73.  "After
4  demanding Bosetti's shield and side arm,
5  Paridiso offered Bosetti the opportunity to
6  submit a resignation letter," do you see
7  that?
8     A.  Yes, I do.
9     Q.  Did Paridiso tell you that?
10     A.  No, he didn't say this to me.
11     Q.  Okay.
12     A.  Specifically.
13     Q.  Generally?
14     A.  No.  He just -- he didn't say
15  this to me.
16     Q.  Okay.
17     A.  He said this to I believe other
18  officers.
19     Q.  Okay.  But not to you?
20     A.  Not to me.
21     Q.  Because that's really all I care
22  about today.
23     A.  No, not to me.
24     Q.  Paragraph 74.  "Within the same
25  week, Hesse asked Officer Snyder, Fiorillo

Page 432

T. Snyder

1  2  and Lamm to submit a department internal
3  correspondence 1042 regarding the Halloween
4  incident and requested that each officer
5  provide an individual statement concerning
6  the incident," do you see that?
7     A.  Yes, I do.
8     Q.  Did that take place in that first
9  phone conversation with Hesse that you were
10  referring to?
11     A.  Yes, it did.
12     Q.  Okay.  And did you provide a
13  department internal correspondence 1042?
14     A.  Yes, I did.
15     Q.  And did you provide an individual
16  statement concerning the incident?
17     A.  Well, that was my statement that
18  I provided.
19     Q.  Okay.
20     A.  I wasn't due back in work.  He
21  had asked me, "When are you back at work,
22  Tommy?"  And I said, "Not until the end of
23  the week."  And he needed it right away he
24  said.  So I wrote the -- typed it actually,
25  the 42, at home.

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 433

T. Snyder

1
2    Q.   Okay.
3    A.   And he said, "When can you get it
4 to me?"
5    Q.   So your 1042 was the same as the
6 individual statement that's being referred
7 to in --
8    A.   Yes.
9    Q.   In paragraph 74?
10   A.   Yes, it is.
11   Q.   Okay.  75, "Officer Snyder --
12 after Officer Snyder complied with Hesse's
13 directive to complete his statement, Hesse
14 claimed that 'there's some discrepancies
15 between what you and Officer Richard Bosetti
16 say,'" and Officer Richard is in brackets,
17 do you see that?
18   A.   Yes, I do.
19   Q.   When did Hesse tell you this?
20   A.   This was a follow-up phone call,
21 um, when I faxed it to him, I then followed
22 up with a phone call to see if he received
23 it.
24   Q.   And what did Hesse specifically
25 say to you with regard to anything in this

Page 434

T. Snyder

1
2 conversation?
3    A.   He said that he did -- "Yes, I
4 did get your 42," and that's exactly what he
5 said.  "Tommy, I'm going to tell you,
6 there's some discrepancies between what you
7 and Richie say."
8    Q.   And did Hesse tell you what the
9 discrepancies were?
10   A.   He didn't go into it then, no.
11   Q.   Did you ask what the
12 discrepancies were?
13   A.   I didn't ask him, no.
14   Q.   Okay.  "Although Officer Snyder
15 reaffirmed that his report was fully
16 accurate, Hesse later insisted to Officer
17 Carter that Snyder's report was 'a piece of
18 shit,'" do you see that?
19   A.   Yes, I do.
20   Q.   When did Carter tell you that?
21   A.   Um, sometime after the incident.
22 I'm not sure exactly when, but it was after
23 the incident.
24   Q.   Did you ever approach Hesse and
25 ask him why he told Carter that your report

Page 435

T. Snyder

1
2 was a piece of shit?
3    A.   I didn't ask specifically about
4 that.  I asked him if he -- when we were
5 going to talk about the incident.
6    Q.   Okay.  Why didn't you ask him why
7 he said to Carter that your report was a
8 piece of shit?
9    A.   Because I probably didn't recall
10 him saying that at that time when I was
11 talking to him.
12   Q.   Well, when did you -- in relation
13 to when Snyder told you that Hesse said your
14 report was a piece of shit, when did you
15 talk to Hesse?
16   A.   Um, I'm not sure exactly when I
17 talked to him after that.
18   Q.   Days later?  Weeks later?  Months
19 later?
20   A.   It could have been weeks later.
21 I'm not sure exactly when.
22   Q.   And is it your testimony that you
23 just simply forgot that Hesse had told
24 Carter that your report was a piece of shit?
25       MR. GOODSTADT: Objection.

Page 436

T. Snyder

1
2    A.   I didn't simply forget.  I just
3 may not have remembered it at the time when
4 I asked him when we were going to talk about
5 the -- the incident.
6    Q.   Did Hesse normally say -- call
7 your reports pieces of shit?
8    A.   Not to my knowledge.
9    Q.   Right.  So this would have been
10 the first time, to your knowledge, that
11 Hesse ever said that your report was a piece
12 of shit?
13   A.   Yeah.  But he didn't say it to
14 me, he said it to somebody else.
15   Q.   I understand.  But then again,
16 you didn't -- you didn't approach Hesse
17 about this either?
18   A.   I didn't approach him
19 specifically about this, no.
20   Q.   And the allegation continues,
21 "and indicated that Officer Snyder needed to
22 protect Bosetti rather than the victims," do
23 you see that?
24   A.   Yes, I see that.
25       MR. GOODSTADT: Objection.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 437

T. Snyder

1
2    Q.   Is that what Carter told you
3  Hesse said?
4    A.   Yes.  As well as Frank, too.  He
5  said the same to Frank I believe.
6    Q.   Well, that was the next
7  allegation that I was going to get to.
8    A.   Oh, okay.
9    Q.   Let's look at 76.  "Hesse then
10 directed an uncertified OBPD Officer, John
11 Pat Cherry, who was not on duty and did not
12 witness the fight at Houser's, to
13 investigate the incident," do you see that?
14   A.   Yes, I do.
15   Q.   Was Pat Cherry a police officer
16 with New York City at any point in time?
17   A.   Not to my knowledge.
18   Q.   How about Nassau County?
19   A.   With Nassau County, at one point
20 he was.
21   Q.   How long was he an officer with
22 Nassau County?
23   A.   I have no idea how long he was an
24 officer with them.  He retired from the job,
25 so I -- I don't know.

Page 438

T. Snyder

1
2    Q.   So he had worked full time as a
3  police officer, right?
4    A.   To my knowledge, from what he
5  said, yes.
6    Q.   And other than him being, as you
7  claim, uncertified, you had no knowledge one
8  way or the other as to what his experience
9  was in investigating assaults, do you?
10   A.   No.  Right.  I had no knowledge.
11   Q.   For all you know, he could have
12 been the king of investigations?
13       MR. GOODSTADT: Objection.
14   Q.   You didn't know it one way or the
15 other, right?
16       MR. GOODSTADT: Objection.
17   A.   How am I supposed to answer that?
18 I have no idea what you're talking about.
19   Q.   Well, that's right.  I'm asking
20 you, you don't know what Mr. Cherry's
21 background was with regard to his
22 investigative skills, do you?
23       MR. GOODSTADT: Objection.
24       Asked and answered.
25   Q.   Do you?

Page 439

T. Snyder

1
2    A.   I have no idea what his
3  background would be.
4    Q.   Right.  So you don't know if he
5  had gotten hundreds of commendations while
6  he was a Nassau County police officer, do
7  you?
8    A.   I have no idea if he did or not.
9    Q.   All you know -- all you claim is
10 that he was somehow uncertified, correct?
11   A.   Well, he was uncertified.
12   Q.   Right.  And that's based upon
13 what?  What knowledge?
14   A.   Based upon the knowledge that
15 when he came to work originally as a police
16 officer in the department, he didn't go
17 through all the background requirements with
18 Suffolk County.
19   Q.   And did he ever become certified,
20 to your knowledge?
21   A.   To my knowledge, I don't know if
22 he was or wasn't certified.  When I was
23 working there, he wasn't certified.
24   Q.   Okay.  And you know that for a
25 fact?

Page 440

T. Snyder

1
2    A.   Yeah.  Because there was an issue
3  with civil service contacting the beach and
4  letting them know that they had a group of
5  people who were certified and a group of
6  officers who were not certified, and they in
7  fact had a list of that.
8    Q.   And you think because this
9  retired police officer from Nassau County
10 was allegedly uncertified, that meant that
11 he was unqualified to perform an
12 investigation?
13       MR. GOODSTADT: Objection.
14   Q.   Is that your testimony?
15       MR. GOODSTADT: Objection.
16   A.   He was unqualified then.  He
17 wasn't a certified police officer in Suffolk
18 County.
19   Q.   So you're saying because he was
20 uncertified, he could not conduct an
21 investigation in the proper manner?
22   A.   Not as a police officer.
23   Q.   Okay.  Now you then -- you also
24 allege that "he was not on duty and did not
25 witness the fight," do you see that?

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 441

T. Snyder

1
2  A.   Yes.
3  Q.   You didn't witness the fight
4  either, did you?
5  A.   No, I did not.
6  Q.   All right.  "To investigate the
7  incident."  You didn't take any witness
8  statement from anyone other than the
9  victims, did you?
10  A.   I couldn't.  No one would
11  cooperate with me.
12  Q.   Not my question.  You didn't take
13  any --
14  A.   I think I testified to that
15  already.  That no, I didn't.
16  Q.   Right.  Right.  Okay.  And would
17  it be fair to say, sir, that as it pertained
18  to the Bosettis, you had already complained
19  on numerous occasions to Mr. Hesse about
20  their conduct, right?
21  A.   Yes.  Myself and other officers.
22  Q.   I'm just talking about you, sir.
23  A.   Yes.
24  Q.   And isn't it true that Fiorillo
25  had also complained on multiple occasions to

Page 442

T. Snyder

1
2  George Hesse about the Bosettis?
3  A.   I -- I know there was other
4  occasions.  I don't know how much multiple
5  would be.
6  Q.   Then let's just stick to you.
7  You had complained, prior to the Halloween
8  incident, on multiple occasions going back
9  to 2002 about the Bosettis, right?
10  A.   Yes.
11  Q.   You had complained about their
12  conduct as police officers to George Hesse,
13  right?
14  A.   Yes, I did.
15  Q.   You had complained to George
16  Hesse about the fact that you believed that
17  they were drunk on duty, correct?
18  A.   On -- yes.  Among other things,
19  yes.
20  Q.   Among many other things, right?
21  A.   Yes.
22  Q.   Would you say that you were
23  objective with regard to your views about
24  the Bosettis?
25     MR. GOODSTADT: Objection.

Page 443

T. Snyder

1
2  Q.   On -- in October of 2004?
3     MR. GOODSTADT: Objection.
4  A.   Yes, I did, because I didn't
5  write anywhere in my report that the
6  Bosettis were involved in the incident.
7  Q.   But you know that the Bosettis
8  were involved or at least allegedly involved
9  in the incident.
10  A.   Alleged involved in the incident.
11  Q.   So you didn't write in the field
12  report that one of the victims stated that
13  his attacker looked exactly like Richard
14  Bosetti?
15  A.   No.  I wouldn't write that in the
16  field report.  That would probably be more
17  in their statements, which we couldn't
18  properly take because of the situation.
19  Q.   Prior to you finding out that Pat
20  Cherry was investigating this incident, did
21  you ever advise Hesse, whether in a document
22  or verbally, that you had information to
23  believe that Gary Bosetti was involved in
24  the alleged assault?
25  A.   No.  Not prior to, no.

Page 444

T. Snyder

1
2  Q.   But you certainly had talked to
3  Ed Paridiso Halloween day about that, right?
4  A.   I -- that day, yes.
5  Q.   Right.  So certainly Ed Paridiso,
6  to your knowledge, would have known that
7  Gary Bosetti may have been involved in the
8  assault, correct?
9  A.   Yes.  I -- I would assume so.
10  Yes.
11  Q.   Do you think it was
12  appropriate -- would have been appropriate
13  for George Hesse to allow you to investigate
14  the alleged assault by Gary Bosetti, knowing
15  that for three years prior to that date, you
16  had made multiple complaints about him?
17     MR. GOODSTADT: Objection.
18  A.   Well, I believe I should have
19  been part of the investigation, since I was
20  working that night and --
21  Q.   Do you think it was
22  appropriate -- would have been appropriate
23  for him to include you in that
24  investigation?
25  A.   I think so, yes.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 445

T. Snyder

1
2 Q. Even though you had made multiple
3 complaints against Gary Bosetti in the past?
4 MR. GOODSTADT: Objection. You
5 just answered the question, but you can
6 answer again.
7 A. I -- I think so. Yes.
8 Q. Okay. "Cherry conducted a sham
9 investigation that included" -- this is what
10 you allege -- "that included consulting with
11 some of Hesse's friends who had been at
12 Houser's Bar on the night of October 30 and
13 the morning of October 31," do you see that?
14 A. Yes, I do.
15 Q. It seems to me, based upon your
16 allegation, that Cherry had conducted an
17 investigation as to potential witnesses to
18 the events, correct?
19 MR. GOODSTADT: Objection.
20 A. The witnesses that wouldn't
21 discuss anything with us, yes.
22 Q. Yeah. But they discussed it with
23 Cherry?
24 A. Yeah. Which we found very
25 strange. Why would they talk to him and not

Page 446

T. Snyder

1
2 us?
3 Q. Well, what did Hesse have to do
4 with that?
5 MR. GOODSTADT: Objection.
6 A. Well, these people -- these
7 people knew Hesse. They were friends of
8 his.
9 Q. Who were these people?
10 A. The people -- a lot of the people
11 that were in the bar that wouldn't cooperate
12 with us that finally came forward
13 afterwards.
14 Q. And who were these people that
15 you're referring to in 76?
16 A. I don't recall most of their
17 names, but, um -- I don't recall these
18 people's names, but I know it was part of
19 the official  -- their official
20 investigation.
21 Q. So you believe that Hesse was
22 somehow involved in a cover up because
23 people that night, who were potential
24 witnesses, wouldn't cooperate with you, even
25 though Hesse was on vacation and nowhere

Page 447

T. Snyder

1
2 near the incident, is that your testimony?
3 MR. GOODSTADT: Objection.
4 MR. NOVIKOFF: Okay.
5 A. I'm not sure I'm following
6 exactly what you're saying.
7 Q. Well, you're alleging that Hesse
8 was part of a conspiracy to cover up
9 something on Halloween night, right?
10 A. Yes.
11 Q. And you -- Hesse wasn't there
12 Halloween night?
13 A. No, he was not.
14 Q. In fact, Hesse was on vacation
15 Halloween night?
16 A. He was off that night, yes.
17 Q. So you believe the fact that some
18 of the people who are witnesses that night
19 who couldn't cooperate with you, were
20 somehow being directed by Hesse not to
21 cooperate with you?
22 MR. GOODSTADT: Objection.
23 A. From my understanding is when
24 they talked to Cherry and Hesse, they said
25 that we were lying and we were not telling

Page 448

T. Snyder

1
2 the truth.
3 Q. Could it be that there were
4 people in -- in Ocean Beach that -- who were
5 present that night at Houser's Bar who
6 didn't think much of you as a police
7 officer?
8 MR. GOODSTADT: Objection.
9 A. I have no idea.
10 Q. Didn't think much of Lamm as a
11 police officer?
12 MR. GOODSTADT: Objection.
13 A. I wouldn't have any idea of that.
14 Q. Didn't think much of Fiorillo as
15 a police officer?
16 MR. GOODSTADT: Objection.
17 A. I wouldn't have any idea of that
18 as well.
19 Q. Didn't like you?
20 MR. GOODSTADT: Objection.
21 A. I wouldn't have any idea. No one
22 ever said to me that they didn't like me.
23 Q. Okay. You just think that it was
24 surprising that no one spoke to you that
25 night?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 449

T. Snyder

1     A.   I found it very surprising when
2     we were trying to talk to people, that they
3     didn't see nothing, they didn't see nothing,
4     they kept walking away.  But they were
5     willing to come forward afterwards.
6     Q.   That's what I'm asking you.  How
7     many people were willing to come forward
8     afterwards?
9     A.   I'm not sure exactly how many.  I
10    know there were a number of witness
11    statements that George said he had taken,
12    that Cherry had taken.
13    Q.   Could it be because Pat Cherry
14    was better at doing an investigation than
15    you?
16          MR. GOODSTADT: Objection.
17    A.   I wouldn't have any knowledge of
18    that.
19    Q.   That's right.  So for all you
20    know, the witnesses who spoke to Cherry and
21    gave statements to Cherry did so because
22    Cherry was just better at it than you?
23          MR. GOODSTADT: Objection.
24    A.   That's your opinion.

Page 450

T. Snyder

1     Q.   No.  I don't have an opinion one
2     way or the other.  I'm just saying, isn't
3     that a possibility?
4           MR. GOODSTADT: Objection.
5     A.   Not a possibility in my mind.
6     Q.   Okay.  Of course not.
7     A.   I -- I was not thinking of Pat
8     Cherry as, again, he was not a certified
9     police officer.
10    Q.   Oh.  Okay.  "Upon information and
11    belief" -- well, let's continue that
12    allegation.  "Cherry conducted a sham
13    investigation."  Well, why was it a sham
14    investigation, sir?  What aspect of the
15    investigation would you consider to be a
16    sham that Pat Cherry undertook?
17    A.   They never  -- Pat Cherry or
18    George never interviewed us about the
19    incident.  Never involved us in the
20    investigation.
21    Q.   He had your reports, though,
22    right?
23    A.   He just had a 42 from us.  He
24    never spoke to us at all.  In fact, no

Page 451

T. Snyder

1     village prosecutor, George, nobody spoke to
2     us about this incident.
3     Q.   Well, what didn't you put in the
4     42 or that field report that -- well,
5     withdrawn.  What didn't you put in the 42
6     and the field report that you believe you
7     would have told Hesse or Cherry had they
8     investigated -- had they talked to you?
9           MR. GOODSTADT: Objection.
10    Q.   What was missing, that's what I'm
11    asking you?
12    A.   There was nothing missing.
13    Q.   Okay.  So everything you wanted
14    to say was in the field report or the 42,
15    correct?
16          MR. GOODSTADT: Objection.
17    Q.   Yes?
18          MR. GOODSTADT: Maybe Cherry is
19    such a great investigator, he could
20    have asked him some questions.
21          MR. NOVIKOFF: Mr. Goodstadt,
22    that's fine.  I'm asking the question.
23          MR. GOODSTADT: I understand.
24    Q.   Sir, was there anything missing

Page 452

T. Snyder

1     from the 42 or the field report that you
2     drafted?
3     A.   I think that that's a good
4     synopsis of the events as I witnessed them
5     that night.
6     Q.   I think you may have answered my
7     question, but I'm not sure, so I'm going to
8     ask you again.  Was there anything in the
9     field report or the 42 that wasn't included
10    that you felt was important?
11          MR. GOODSTADT: Objection.
12    A.   Not that I recall, no.  I think
13    everything was there.
14    Q.   So then my question is, what did
15    Cherry or Hesse need to talk to you about
16    that wasn't otherwise included in your field
17    report or the 42?
18    A.   I wouldn't know what they wanted
19    to talk to me about, but I would think they
20    would talk to me if I was the first -- one
21    of the first officers responding to the
22    scene.  Besides my 42, okay, what did you --
23    maybe I would recall a fact I didn't write
24    in my 42.

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 453

1        T. Snyder
2    Q.   Okay.  Other than Hesse and
3 Cherry not talking to you, Lamm or Fiorillo
4 as part of their investigation, what else
5 was a sham about that investigation, if
6 anything?
7    A.   Well, George said that he was --
8 they were going to be making an arrest, they
9 were going to be wrapping this investigation
10 up and making an arrest, and, in fact, that
11 Gary was going to be the arresting officer,
12 and I found that sort of incredulous.  How
13 could Gary arrest if he was going to be
14 fired or if he was fired.
15    Q.   Okay.  Putting aside what went on
16 after the investigation and what happened
17 regarding any arrest, what aspect of the
18 investigation that Pat Cherry undertook,
19 other than not talking to you, do you
20 consider to be a sham?
21    A.   At this point, that's all I
22 considered.
23    Q.   Okay.  Did Gary Bosetti actually
24 do the arrest?
25    A.   I believe he did, yes.

Page 454

1        T. Snyder
2    Q.   Okay.  Now, as continuing on with
3 your allegations in 76, you allege that
4 "Cherry asked these individuals to submit
5 false and misleading statements concerning
6 the events surrounding the fight and the
7 fight itself," do you see that?
8    A.   Yes.
9    Q.   Okay.  What evidence do you have
10 that Cherry asked these individuals to
11 submit false and misleading statements as
12 you allege?
13    A.   I don't -- I don't have any
14 evidence.  I don't have any evidence on me.
15    Q.   Okay.  No, I don't mean on you, I
16 mean what evidence can you point to?
17    A.   I don't have any evidence that I
18 can point to at this time.
19    Q.   Okay.  Did you ever have any
20 evidence and it's just a matter of not
21 remembering it?
22    A.   No.  I don't have any specific
23 evidence of it.
24    Q.   Okay.  Then you write "upon
25 information" -- allege, I'm sorry -- "upon

Page 455

1        T. Snyder
2 information and belief, Cherry and Hesse
3 ratified these false statements to cover up
4 the Bosetti brothers' involvement in the
5 Halloween incident and by attempting to
6 shift blame to the victims."  What is your
7 information and belief as it's alleged here?
8    A.   My information and belief would
9 be that they turned the situation around,
10 and in fact, Gary was making the arrest, and
11 I couldn't understand how he could be making
12 an arrest if he was fired.
13    Q.   No.  You're saying upon
14 information and belief, Cherry and Hesse
15 ratified these false statements for which
16 you don't have any evidence of.  My question
17 to you is, what is your information and
18 belief, and if don't have any information
19 and belief, then that's fine, too.
20        MR. GOODSTADT: Objection.
21    Q.   So what's your information and
22 belief?
23    A.   I don't have any information or
24 belief.
25    Q.   Okay.

Page 456

1        T. Snyder
2        MR. NOVIKOFF: How much time is
3 left?
4        THE VIDEOGRAPHER: Two minutes.
5        MR. NOVIKOFF: Okay.  Let's
6 take a break.
7        THE VIDEOGRAPHER: This ends
8 tape number six.  The time is 5:59 p.m.
9 We're going off the record.
10        (A break was taken.)
11        THE VIDEOGRAPHER: This begins
12 tape number seven.  The time is 6:08
13 p.m.  Back on the record.
14    Q.   Page 19, paragraph 80.  It's
15 alleged or you allege that "Hesse then
16 showed Officer Snyder's statement to Officer
17 Fiorillo, who noticed that his statement and
18 Officer Snyder's agreed as to the events of
19 October 31.  Hesse then disparaged Officer
20 Snyder's statement as well.  Hesse then
21 insisted that only Officer Cherry's report
22 described what really happened."  Did
23 Fiorillo tell you that Hesse disparaged your
24 statement in his presence?
25    A.   Yes, he did.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 457

T. Snyder

1
2    Q.   What did Snyder  -- what did
3    Fiorillo say Hesse said that he believed was
4    disparaging?
5        A.   Similar to what he said to Eddie.
6    That my report -- my field report was a
7    piece of shit and that I was  -- words along
8    those lines.  I'm not sure exactly what he
9    said.  I wasn't there.
10       Q.   Now prior to you doing the 1042
11   by typing it that day, had you spoken to
12   Fiorillo concerning what to put in the 1042?
13       A.   No, I did not.
14       Q.   Did you speak to Lamm about what
15   to put in the 1042?
16       A.   No, I did not.
17       Q.   Did you talk to them at all
18   between the night of the incident and the
19   time you typed up the 1042 concerning the
20   events that evening?
21       A.   No, I did not.
22       Q.   Okay.  Paragraph 83.  "In or
23   around the week following the incident,
24   Hesse rehired Gary Bosetti to work as an
25   OBPD officer," do you see that?

Page 458

T. Snyder

1
2        A.   Yes, I do.
3        Q.   Do you have any personal
4    knowledge as to this allegation?
5        A.   Other than what I was told, I
6    forget exactly who told me, but that he was
7    rehired.  I think Hesse actually told me.
8    Said he was going to rehire Gary and he was
9    going to be making the arrest.
10       Q.   So your knowledge is based upon
11   what Hesse told you?
12       A.   I think that's what happened.
13   Yes.  I'm not -- I'm not exactly sure.
14       Q.   Okay.  Did you discuss with Hesse
15   in this conversation that perhaps took
16   place, how he was going about hiring Gary
17   Bosetti when Paridiso said he was going to
18   fire Bosetti?
19       A.   No.  I don't recall saying that
20   to him.
21       Q.   Did you ever inquire with
22   Paridiso as to why Bosetti is still working
23   when he said he was going to fire him?
24       A.   I never spoke to Eddie about
25   that, no.

Page 459

T. Snyder

1
2        Q.   85, you allege that "the charges
3    that were filed against Brian Vankoot and
4    Christopher Shalick were false," do you see
5    that?
6        A.   In 85?
7        Q.   Yeah.
8        A.   My 85 says it's a pattern and
9    practice of attempting to cover up numerous
10   criminal assaults.
11       Q.   Right.  You write -- you allege
12   "this was part of Hesse's pattern and
13   practice of attempting to cover up numerous
14   criminal assaults of civilians by OBPD
15   officers by filing false criminal charges
16   against the victims of such brutal attacks,"
17   do you see that?
18       A.   Yes, I do.
19       Q.   To your knowledge, did the DA
20   indict Vankoot and/or Shalick?
21       A.   Not to my knowledge, no.
22       Q.   To your knowledge, do you know if
23   they -- if Vankoot pled guilty to any
24   charge?
25       A.   I found out later on sometime

Page 460

T. Snyder

1
2    that he pled guilty to an assault I believe.
3        Q.   And to your knowledge, did
4    Shalick plead guilty to any charge?
5        A.   Not to my knowledge, no.
6        Q.   Okay.  So let's stick with
7    Vankoot.  Is it your contention in this
8    lawsuit, that the Suffolk County DA didn't
9    do a proper investigation into the incident?
10       A.   I don't believe the Suffolk
11   County DA even investigated it.  I'm not
12   aware that they did.
13       Q.   Is it your testimony that it's
14   your belief that the Suffolk County DA, um,
15   brought charges against Vankoot without
16   doing any investigation?
17           MR. GOODSTADT: Objection.
18       A.   I am not aware that the Suffolk
19   County DA even investigated this case.
20       Q.   Okay.  Are you -- is it your
21   contention that Vankoot pled guilty to
22   charges that -- to a crime that he didn't
23   commit?
24       A.   I'm aware that he pled guilty to
25   charges in the village court.  I have no

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 461

T. Snyder

1 idea. I wasn't present when it happened. I
2 idea. I wasn't present when it happened. I
3 just heard --
4    Q.   Okay.
5    A.   -- about it.
6    Q.   Is Vankoot a resident of Ocean
7 Beach, to your knowledge?
8    A.   To my knowledge, he's not. No.
9    Q.   To your knowledge, did he have a
10 girlfriend in Ocean Beach at -- during the
11 night of the October Halloween incident?
12       MR. GOODSTADT: Objection.
13    A.   Well, to my knowledge, I have no
14 idea if he has a girlfriend that lives or
15 resides in Ocean Beach.
16    Q.   Did you inquire with any of the
17 girls that you took to the police station,
18 as to whether or not they were residing in
19 Ocean Beach that evening?
20    A.   No. They were residing in I
21 think Sea View I think is where they were
22 staying. Whether or not they own that home
23 or were renting that, I don't know.
24    Q.   86, "Hesse later stated to
25 Officers Fiorillo and Carter that Officer

Page 462

T. Snyder

1
2 Snyder's report of the fight 'makes me
3 sick,'" do you see that?
4    A.   Yes, I do.
5    Q.   When did Fiorillo -- well, who
6 told you this?
7    A.   Actually, Eddie Carter told me
8 this first, and then Frank actually
9 confirmed that later on sometime.
10    Q.   When did Eddie Carter tell you
11 this?
12    A.   This was sometime after the
13 incident. I don't remember exactly when,
14 but it was sometime after the incident. He
15 had mentioned to me that George had spoken
16 to him one day when they met at the relief
17 point.
18    Q.   And did Carter ever explain to
19 you why Hesse said that your report made you
20 sick?
21    A.   He didn't say why. He just said
22 that -- that the -- my 42 makes me sick and
23 he said that, um, he should be cut -- he
24 should be protecting cops or something to
25 that effect. Protecting cops and not give

Page 463

T. Snyder

1
2 them up.
3    Q.   Did you ever ask George Hesse why
4 he said to Carter and Fiorillo that your 42
5 made him sick?
6    A.   No. But -- I didn't ask him
7 that.
8    Q.   Yes or no?
9    A.   No, I didn't ask him that.
10    Q.   You then continue to allege the
11 following, "and indicated that he believed
12 Officer Snyder 'had it in for Gary Bosetti'
13 implying that Officer Snyder had willfully
14 submitted a false report implicating the
15 Bosettis," who told you this?
16    A.   Eddie Carter said that to me
17 when -- during that same conversation.
18    Q.   Did you approach George Hesse at
19 any time to say to him that you did not have
20 it in for Gary Bosetti?
21    A.   Not at that time I didn't, no.
22    Q.   At any time did you ever?
23    A.   Long after that, yes.
24    Q.   When did you tell George Hesse
25 that you didn't have it in for Gary Bosetti?

Page 464

T. Snyder

1
2    A.   When he -- the day he fired me,
3 and then at a meeting about I guess a month
4 or so after.
5    Q.   Well, the day he fired you was
6 when? April 20?
7    A.   April 20.
8    Q.   Okay. And how did it come about
9 that you would have told Hesse on that date
10 that you didn't have it in for Gary Bosetti?
11    A.   He said to me that -- he told me
12 that I was the civil service rat and that --
13 that I was going to be fired because of it.
14 That he was firing me because of it.
15    Q.   No. Okay. My question to you is
16 more specific.
17    A.   I said -- we were also talking
18 about the incidents -- the Halloween
19 incident in particular we mentioned briefly,
20 and I said, "I didn't do anything wrong. I
21 just did what I was trained to do. I
22 handled the incident the way I should have
23 handled it and I didn't have it in for
24 them."
25    Q.   Were you ever trained to do

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 465

T. Snyder

1          T. Snyder
2 investigations?
3     A.   I was trained to do preliminary
4 investigations.
5     Q.   What's a preliminary
6 investigation?
7     A.   Well, you start -- as a police
8 officer, you start an investigation when you
9 respond to a call, okay, and then I put this
10 thing together and left it for the chief to
11 go look in further, because it was alleging
12 that police officers were involved in this.
13    Q.   As part of that investigation --
14 training, were you ever taught how to secure
15 a crime scene?
16    A.   Yes, I was, but --
17    Q.   Okay.  As part of that --
18        MR. GOODSTADT: Objection.
19    Q.   -- training, were you ever
20 instructed with regard to taking witness
21 statements?
22        MR. GOODSTADT: Objection.  I
23        just ask you to let him finish the
24        answer before you ask the next
25        question.

Page 466

1          T. Snyder
2        MR. NOVIKOFF: My question is
3 yes or no.  If he can't answer it yes
4 or no, then he can tell me he can't
5 answer it yes or no.  I am not going to
6 permit him, on a yes or no question, to
7 start speaking about anything he wants
8 to speak.
9        MR. GOODSTADT: Well, if it has
10 nothing to do with the question, you
11 can make your motion to strike, you can
12 do whatever you want to do.  But he's
13 entitled to answer the question the way
14 he wants to answer the question.
15        MR. NOVIKOFF: I made it
16 quite clear to him.  Your instructions
17 were perfect.  You said when there's a
18 yes or no question, to answer "yes,"
19 "no" or "I can't answer it yes or no,"
20 and I will accept "I can't answer it
21 yes or no."  That's legitimate.
22        MR. GOODSTADT: But if he can't
23 answer it yes or no, he should be able
24 to explain his answer to the question.
25 And then you can move to strike and

Page 467

1          T. Snyder
2 take it up with the judge.
3        MR. NOVIKOFF: My question is
4 yes or no.  If he can't answer it yes
5 or no, then it's incumbent upon me, if
6 I want to, to inquire why with him as
7 to why he can't or I move on.  So my
8 question --
9        MR. GOODSTADT: And he can
10 answer the question the way he wants to
11 answer the question, and if you want to
12 move to strike, you can do that.  If
13 you want to make a motion to the court,
14 you can do that.
15        MR. NOVIKOFF: What's my last
16 question that I asked before I was
17 interrupted.
18        (The requested portion was read.)
19    Q.   As part of your training, were
20 you ever instructed as to how to take
21 witness statements?
22    A.   A brief overview, yes.
23    Q.   When you say "brief overview,"
24 how brief was this overview?
25    A.   In the academy, they didn't --

Page 468

1          T. Snyder
2 they didn't spend hours or days on it.  It
3 was one course, you know, maybe 15, 20
4 minutes I guess.
5    Q.   Okay.  Perfect.  Did Gary -- did
6 Officer Hesse ever direct you to cover up,
7 you personally, any aspect of the Halloween
8 incident?
9    A.   Not me personally, no.
10    Q.   Okay.  Did George Hesse ever
11 direct you to participate in a cover up of
12 the Halloween incident?
13    A.   No, he did not.
14    Q.   When did George Hesse tell you
15 that chief  -- that Mr. Loeffler said "we
16 have to turn this around"?
17    A.   It was during the phone
18 conversation when he called and asked for me
19 to write the 42.
20    Q.   Did you ask Mr. Loeffler --
21 Mr. Hesse what he -- what Mr. Loeffler meant
22 when he said "we have to turn this around"?
23    A.   Actually, let me correct that.
24 I'm wrong.  It wasn't the first conversation
25 when he asked to write the 42.  It was when

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 469

1         T. Snyder
2 I faxed it to him and then I made the
3 follow-up phone call to see if he got the
4 fax.  It was during that conversation.
5     Q.   Did you ask George Hesse what
6 Loeffler meant when he used the phrase "we
7 have to turn this around"?
8     A.   I didn't ask him what he meant.
9 It was pretty apparent to me what he meant.
10    Q.   My question to you, sir, is did
11 you ask Chief Hesse what Joe Loeffler meant
12 when he said --
13    A.   I didn't ask him at that time,
14 no.
15    Q.   Okay.  Did you ever ask Hesse
16 what Joe Loeffler meant when he said "we
17 have to turn this around"?
18    A.   I don't recall ever asking him,
19 no.
20    Q.   Did Hesse ever elaborate, during
21 that conversation, as to what Joe Loeffler
22 said about turning this around?
23    A.   He didn't elaborate, no.  He just
24 stated that.
25    Q.   Was there anyone else on this

Page 470

1         T. Snyder
2 phone call?
3     A.   Not to my knowledge.  Just myself
4 and George.
5     Q.   Okay.  So, essentially, the
6 only -- withdrawn.  Now there was a
7 departmental meeting on April 2, 2006?
8     A.   Yes.
9     Q.   Were you present at that meeting?
10    A.   No, I was not.
11    Q.   Let's go to paragraph 117.  It's
12 on page 27.  117 starts off by stating "as
13 set forth above, by among other things,
14 reportedly -- repeatedly reporting endemic
15 corruption and abuse of power by members of
16 the OBPD to their superiors at the OBPD and
17 to the Suffolk County Civil Service
18 Department, Plaintiffs engaged in activity
19 protected by the First Amendment," do you
20 see that?
21    A.   Yes, I do.
22    Q.   What are you referring to when
23 you use the words "superiors at the OBPD"?
24    A.   In particular, George Hesse.
25    Q.   And anybody else?

Page 471

1         T. Snyder
2     A.   Not myself specifically, no.
3     Q.   Okay.  Then with regard to
4 "Suffolk County Civil Service," do you see
5 that?
6     A.   Yes, I do.
7     Q.   Who specifically did you complain
8 to repeatedly as it's referred to in 117?
9     A.   I didn't.
10        MR. GOODSTADT: Objection.
11        MR. NOVIKOFF: I'll rephrase
12    the question.
13    Q.   Who, if anyone, at Suffolk County
14 Civil Service Department did you complain to
15 concerning the endemic corruption and abuse
16 of power?
17    A.   I didn't complain to anybody at
18 the Suffolk County Civil Service Department.
19    Q.   Okay.  Let's look at paragraph
20 135.  There's reference to "defamatory
21 statements," do you see that?
22    A.   Yes, I do.
23    Q.   What defamatory statement can you
24 point to that George Hesse made --
25        MR. GOODSTADT: Objection.

Page 472

1         T. Snyder
2     Q.   -- about you subsequent to April
3 2, 2006?
4        MR. GOODSTADT: Objection.
5     A.   I would assume one of them would
6 be the statement he made -- he made to Frank
7 and Kevin -- Frank and Eddie about my 1042.
8     Q.   Well, that's before, sir.
9     A.   I'm sorry.
10    Q.   April 2, 2006.  What defamatory
11 statement did George Hesse make concerning
12 you subsequent to April 2, 2006?
13        MR. GOODSTADT: Objection.
14    A.   Subsequent to April 2 or on April
15 2?
16    Q.   Okay.  Let's do on.
17    A.   I'm not sure what he said about
18 me on April 2 at the -- at the meeting.  I
19 don't know.
20    Q.   Okay.  Then let's talk about
21 after.  What defamatory statement did George
22 Hesse make about you after April 2, 2006?
23        MR. GOODSTADT: Objection.
24    A.   When he was firing me, he called
25 me a rat.  He said, "You're -- I -- you're

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 473

T. Snyder

1        T. Snyder
2 the rat and that's the reason you're being
3 fired."
4    Q.   Was there anyone present in this
5 room when Mr. Hesse called you a rat?
6    A.   No.  We weren't even in a room.
7 We were in two vehicles side by side on a
8 dock.
9    Q.   Okay.  Other than this statement,
10 what other defamatory statement do you
11 contend in this lawsuit George Hesse made
12 about you after April 2, 2006?
13        MR. GOODSTADT: Objection.
14    A.   I can't recall one at the moment.
15    Q.   Okay.  Do you understand what I
16 mean by "defamatory"?
17    A.   Yes, I do.
18    Q.   And what is your understanding,
19 so that we're all on the same page?
20    A.   Something that defames you.  It
21 discredits you.  Impugns your integrity.
22    Q.   And is there anything in your
23 possession, custody or control that would
24 refresh your recollection?
25    A.   No, there is not.

Page 474

1        T. Snyder
2        MR. NOVIKOFF: All right.  I'm
3    going to leave a space in the
4    transcript, and just as to this aspect
5    of the deposition, I will leave it open
6    when I conclude today, and I would ask
7    you to advise me, subsequent to April
8    2, 2006, of any statements that you
9    claim in this lawsuit to be defamatory
10    that were made by George Hesse about
11    you.
12        MR. GOODSTADT: Objection.
13        MR. NOVIKOFF: Okay.
14 INSERT:
15
16    Q.   Paragraph 138, there's a
17 reference to "stigmatizing conduct," do you
18 see that?
19    A.   Yes, I do.
20    Q.   What has George Hesse done,
21 subsequent to April 2, 2006, that you
22 believe is stigmatizing conduct as it's used
23 in paragraph 138?
24    A.   The fact that he will not write
25 a -- a reference for me, which is just

Page 475

T. Snyder

1        T. Snyder
2 stigmatizing me from receiving other
3 employment at a police department.
4 Somewhere in another police department.
5    Q.   Okay.  What else?
6    A.   The stuff that's been on the blog
7 about me.
8    Q.   Okay.  Can you point to any
9 reference in that blog -- withdrawn.  Can
10 you point to any blog in that exhibit that I
11 showed you that was authored by George
12 Hesse?
13    A.   I'm not sure which ones were
14 authored by him or not.
15    Q.   Are you sure that any of them
16 were authored by George Hesse?
17    A.   I'm not sure any were authored by
18 him, but --
19    Q.   That's all.
20    A.   -- he did state that police
21 officers in the department were writing.
22    Q.   I'm just asking you about George
23 Hesse.  Can you point to any entry in that
24 blog that you can state with certainty was
25 authored by George Hesse?

Page 476

1        T. Snyder
2    A.   I cannot state with any certainty
3 at this time, no.
4    Q.   Okay.  Let's look at paragraph
5 159.  Paragraph 159 says "Plaintiffs
6 repeatedly notified Hesse, their superior
7 and direct superior, of these violations of
8 laws, rules and regulations," do you see
9 that?
10    A.   Yes, I do.
11    Q.   Now I believe that's referring to
12 what was alleged in 158, do you see that?
13    A.   I'd have to read 158 to  --
14    Q.   Then please do.
15    A.   (Reviewing).  Okay.
16    Q.   Now do you believe, as you sit
17 here today, that 159 was referring to what
18 was stated in 158?
19        MR. GOODSTADT: Objection.
20    A.   Yes, I do.
21    Q.   Okay.  Were you referring to
22 anyone else in 159, other than Hesse?
23    A.   No, I was not.
24    Q.   Okay.  Let's look at page 39,
25 164, and I would ask you to read it to

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 477

T. Snyder

1          T. Snyder
2 yourself, and then tell me when you're done
3 reading it.
4     A.    (Reviewing).  Okay.
5     Q.    Let's look at E.  E says "Hesse
6 and" -- well, 164 starts off by saying
7 "Defendants Hesse and OBPD published
8 defamatory statements about Plaintiffs,
9 including without limitations -- without
10 limitations, assertions that."  Now let's go
11 to E.  "By repeatedly advising prospective
12 employers that he had terminated Plaintiffs
13 for cause, that Plaintiffs were litigious,
14 and that he could not comment favorably on
15 Plaintiffs' performance as police officers."
16 Let's start with the first part of that.
17 What employer did George Hesse advise that
18 you were terminated for cause?
19     A.    I believe this may be referring
20 to some of the other Plaintiffs in the
21 lawsuit, not me.
22     Q.    I'm just asking you.  If it
23 doesn't apply to you, then you've said that
24 to me before and I'll accept that as the
25 answer.  What employer did George Hesse

Page 478

1          T. Snyder
2 advise that you were terminated for cause?
3     A.    I don't believe, at this time,
4 that there is any prospective employer that
5 he was -- he was advising.
6     Q.    What prospective employer did
7 George Hesse advise that you were litigious?
8     A.    He didn't do that in my
9 situation, as far as I know.
10     Q.    That's all I'm asking.  What
11 prospective employer did George Hesse advise
12 that he could not comment favorably on your
13 performance as a police officer?
14     A.    Again, I wouldn't have any
15 knowledge of what prospective employer he
16 spoke to or not.
17     Q.    Okay.  Let's look at paragraph
18 176.  You allege the following, "as set
19 forth above, Defendants Hesse, Ocean Beach
20 OBPD and Suffolk County Civil Service,
21 deliberately retained and advanced the
22 careers of uncertified and unqualified
23 personnel who served alongside Plaintiffs as
24 police officers, while Defendant Loeffler,
25 mayor of Ocean Beach, negligently permitted

Page 479

1          T. Snyder
2 Hesse to do so," do you see that?
3     A.    Yes, I do.
4     Q.    Mr. Loeffler was not mayor of the
5 village while you were employed by the
6 village, was he?
7     A.    I think he was for a small
8 portion of when I was employed there.
9     Q.    Really?  What time period was
10 Mayor Loeffler the -- was Joe Loeffler the
11 mayor prior to April 2, 2006?
12     A.    I'm not sure exactly when, but I
13 believe he was mayor just prior to that.
14     Q.    And if he wasn't, would that
15 change your allegation in 176?
16          MR. GOODSTADT:  Objection.
17     A.    It wouldn't change the
18 allegation, no.  I mean, the -- they did
19 conspire to -- to keep the uncertified
20 officers and fire us.
21     Q.    What did Joe Loeffler do that you
22 believe was part of this conspiracy?
23     A.    Well, I'm not sure specifically
24 what he did.
25     Q.    That's what I'm asking, sir.

Page 480

1          T. Snyder
2 As you sit here today, what specifically did
3 Joe Loeffler do as part of the conspiracy
4 that you allege pertaining to the
5 advancement of the careers of uncertified
6 and unqualified personnel who served
7 alongside you?
8     A.    I'm not  -- I'm not specific  --
9 I'm not sure at this time what exactly he
10 did and did do.
11     Q.    Fine.  Let's go to 177.
12 "Defendant Loeffler had direct knowledge of
13 the undue risk of harm to which Plaintiffs
14 and the public were exposed to due to the
15 retention of unfit village police officers,
16 as Defendant Loeffler was present in the
17 police station on the night of October 30,
18 2004, when the victims of Officer Gary
19 Bosetti's assault arrived from Houser's Bar
20 and identified Officer Gary Bosetti as their
21 attacker," do you see that?
22     A.    Yes, I do.
23     Q.    What victim in the police station
24 used the phrase "Gary Bosetti," because,
25 sir, I believe you testified earlier that no

Page 481

T. Snyder

1  one did?
2  A.  No.  No one at that time had --
3  had identified Gary Bosetti.  No.
4  Q.  Okay.  So this allegation that I
5  just read that refers to the victim of
6  Officer Gary Bosetti's assault identifying
7  Gary Bosetti as their attacker did not take
8  place in the police station, correct?
9  MR. GOODSTADT: Objection.
10  A.  I'm sorry, repeat that.
11  Q.  Well, I'll rephrase the question.
12  Based upon your testimony, the allegation
13  that the victims in the police station in
14  Joe Loeffler's presence identified Gary
15  Bosetti as their attacker is not accurate,
16  is it?
17  MR. GOODSTADT: Objection.
18  A.  That's correct.  That's not
19  accurate.
20  Q.  It's not accurate?
21  A.  That's correct.  That's not
22  accurate.
23  Q.  Okay.  When did the investigation
24  into the Halloween incident end, to the best
25

Page 482

T. Snyder

1  of your knowledge?
2  A.  Um, you know, I'm not sure.
3  Q.  Months after?  Weeks after?  By
4  the end of 2004?
5  A.  I believe it was before the end
6  of 2004, but I'm not sure exactly when.
7  Q.  Okay.  Certainly Joe Loeffler was
8  not mayor in 2004, was he?
9  A.  I don't recall if he was or not
10  at that time.
11  Q.  Okay.  If I told you that Joe
12  Loeffler didn't become mayor until June of
13  2006, would that refresh your recollection?
14  A.  I wouldn't know that because I
15  wasn't there in June of 2006.
16  MR. NOVIKOFF: Okay.  I'm just
17  asking if it refreshed your
18  recollection.  Just give me two
19  minutes.  I may be done.
20  THE VIDEOGRAPHER: Go off?
21  MR. NOVIKOFF: No.  Stay on for
22  a minute.  Let's not go off.  You know
23  what, I'm done.  Subject to that
24  limited -- um, subject to that limited
25

Page 483

T. Snyder

1  inclusion in the deposition transcript
2  concerning the other defamatory
3  statements that I reserve my right to
4  question the witness on, I'm completed
5  with the examination.
6  MR. GOODSTADT: We have our
7  objection on the record already then.
8  MR. NOVIKOFF: I figured that.
9  EXAMINATION BY
10  MR. CONNOLLY:
11  Q.  Mr. Snyder, I'm going to draw
12  your attention to the Halloween incident.
13  When you first got the call that there was a
14  fight at Houser's Bar, who called it in?
15  A.  I don't know who made the first
16  phone call.  It was somebody within the bar.
17  Q.  Okay.  And there was a second
18  phone call; is that correct?
19  A.  Yes.  That's the one I answered.
20  Q.  And who had called the second
21  call in?
22  A.  Ian Levine.
23  Q.  And what, if anything, did
24  Mr. Levine tell you at that time?
25

Page 484

T. Snyder

1  A.  He said, "You better get here
2  right away.  The Bosettis are in a fight."
3  Q.  And when you got to the scene,
4  was Mr. Levine present?
5  A.  Yes.  He was walking out and
6  walking away with that crowd of people.
7  Q.  Okay.  And did you speak to
8  Mr. Levine at that time about the incident?
9  A.  Yeah, I tried to, but I -- when I
10  saw him walking out, I said, "Ian, what's
11  going on?"  And, "I don't know, I don't
12  know."  And he kept walking away.  In the
13  meantime, this big crowd was -- they were
14  arguing with the bouncers, as I stated
15  before, and whoever else was on the deck,
16  and I tried to calm that down, because that
17  looked like that was going to break out
18  again into a fight.
19  Q.  How long were you, Officer Lamm
20  and Officer Fiorillo at the scene from the
21  point you arrived to the point you went back
22  to the police station?
23  A.  I'm not sure exactly how long,
24  but I guess maybe 20 minutes to a half hour.
25

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 485

1        T. Snyder
2  Maybe a little more or a little less.
3  I'm -- I'm not sure exactly how long.
4        Q.    Now there came a point in time in
5  the early morning hours of October 31 in
6  2004 that you came to the belief that Gary
7  Bosetti was involved in the incident at
8  Houser's Bar; is that correct?
9        A.    I had information to believe that
10  he was involved somehow, yeah.
11        Q.    Okay.  And what information was
12  that?
13        A.    Well, number one, Ian Levine said
14  that they were in a fight, the Bosettis were
15  in a fight in the phone call when he called
16  to ask us to get there.  And number two
17  would be one of the victims pointing to
18  Richie and said, "He looks just like him,
19  but only shorter."
20        Q.    All right.  And that was not at
21  the scene, that was  -- oh, that was at the
22  scene?
23        A.    That was at the scene, yes.
24        Q.    Did you ever take the names of
25  any of the ladies you believed to be the

Page 486

1        T. Snyder
2  girlfriends of the alleged victims?
3        A.    I only know the first names.  I
4  don't have their full names.
5        Q.    Did you ever write them down?
6        A.    I don't recall where if I wrote
7  them down.  I honestly don't recall.
8        Q.    At some point in time, the girls
9  and the alleged victims were released or
10  allowed to leave the police station that
11  morning; is that correct?
12        A.    They left with the -- with two of
13  the other victims, yeah.  They went back to
14  wherever they were staying in Sea View I
15  believe is where they were staying.
16        Q.    Did you tell them they could
17  leave?
18        A.    Um, I didn't tell them
19  specifically.  Um, after the rescue was
20  wrapping up, I guess everybody decided at
21  that point that they were going to go back
22  to the house.
23        Q.    Do you know if any of the other
24  officers told them they could leave?
25        A.    I'm not aware of -- sure if any

Page 487

1        T. Snyder
2  of the officers said anything to them.
3        Q.    I want to draw your attention to
4  some testimony you gave earlier in the day
5  regarding your discharge from the service.
6  What was the specific conduct that the bad
7  conduct discharge made reference to?
8        A.    As I testified earlier, it was
9  for when I was AWOL.  When I had the
10  problems at home and I went home to help
11  out.
12        Q.    Have you yourself personally ever
13  made a complaint to Suffolk County Civil
14  Service regarding uncertified officers?
15        A.    I have not personally made a
16  complaint to them, no.
17        Q.    Earlier I believe you indicated
18  that you and Ed Carter work together in the
19  Town of Islip?
20        A.    Yes, we do.
21        Q.    Okay.  What is the relationship,
22  and by that I mean what is the working
23  relationship between the two of you?
24        A.    We have a good working
25  relationship.  A good rapport.

Page 488

1        T. Snyder
2        Q.    Do you report to him?
3        A.    No, I don't.  He works a separate
4  tour than I do.
5        Q.    And you work what hours?
6        A.    I work 8:00 to 4:00.
7        Q.    And he works?
8        A.    And he works midnight to 8:00.
9        Q.    I'm going to draw your attention
10  to the exhibit -- I'm unsure of the number,
11  but it was the complaint.
12        A.    Okay.
13        Q.    And paragraph 58.
14        MR. GOODSTADT: Just for the
15  record, it's Snyder-6.
16        MR. CONNOLLY: Snyder-6.  Thank
17  you.
18        MR. NOVIKOFF: 58?
19        MR. CONNOLLY: 58.
20        Q.    What's the name of the alleged
21  domestic violence victim?
22        A.    Just give me a few seconds to get
23  there.
24        Q.    Sure.
25        A.    I believe her name was Lisa

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

Page 489

1        T. Snyder
2  Campbell.
3      Q.   And did you learn the name of
4  that woman that evening or had you known her
5  before or something else?
6      A.   I had known previously.  She's
7  a -- I believe she's a resident there.
8  She's been there for a number of years while
9  I worked there.
10      MR. CONNOLLY: I have no
11  further questions.  Thank you.
12      MR. GOODSTADT: I have nothing,
13  but similar to the previous
14  depositions, I just want to reserve the
15  witness' right to review and sign.
16      MR. NOVIKOFF: Absolutely.  And
17  we're off the record now.
18      (Continued on next page for
19  jurat.)
20
21
22
23
24
25

Page 490

1        T. Snyder
2      THE VIDEOGRAPHER: This
3  completes today's deposition for Thomas
4  Snyder on September 24, 2008.  The time
5  is 6:45 p.m. and we are off the record.
6
7  _____
8      THOMAS SNYDER
9
10  Subscribed and sworn to
11  before me this _____ day
12  of _____ 2008.
13
14  _____
15      NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

Page 491

1
2        INDEX TO EXHIBITS
3  SNYDER EXHIBIT                    PAGE
4  1    Suffolk County Application For
5        Employment.                    7
6  2    Suffolk County Application For
7        Employment, 11/09/90.         12
8  3    Certificate of Release or Discharge
9        From Active Duty.             19
10  4    Document Bates stamped 009735.  26
11  5    Income Execution document pertaining
12        to Thomas Snyder.             28
13  6    Complaint.                      38
14  7    Letter Dear Sir from Concerned
15        Citizen of Ocean Beach.       63
16  8    Application for Town of Brookhaven. 135
17  9    Document Bates stamped Hesse 00012
18        through Hesse 000206.         148
19  10   Notice of Claim.               211
20
21            INDEX TO INSERTS       PAGE
22  Any defamatory statements Mr. Snyder
23        claims in this lawsuit that
24        Mr. Hesse made about him subsequent
25        to April 2, 2006.             474

Page 492

1
2        I N D E X        PAGE
3  RQ(s)
4  Production of threatening letter
5      Mr. Snyder received from Ocean
6      Beach prior to his last day of
7      employment.              58
8
9  DI (Pages) 18, 204
10
11  MO (Pages) 14, 17, 64, 90, 100, 112, 149,
12  189, 191, 194, 203, 205, 223, 228, 257, 299,
13  341, 363, 402, 420
14
15  EXAMINATION BY
16      MR. NOVIKOFF: 6, 384
17      MR. GATTO: 379
18      MR. CONNOLLY: 483
19
20
21
22
23
24
25

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 493

```
1
2                    CERTIFICATION
3

4

5           I, Edward Leto, a Notary Public
6    in and for the State of New York, do hereby
7    certify:
8           THAT the witness(es) whose
9    testimony is herein before set forth, was
10   duly sworn by me; and
11          THAT the within transcript is a
12   true and accurate record of the testimony
13   given by said witness(es).
14          I further certify that I am not
15   related either by blood or marriage, to any
16   of the parties to this action; and
17          THAT I am in no way interested in
18   the outcome of this matter.
19          IN WITNESS WHEREOF, I have
20   hereunto set my hand this 5th day of
21   October, 2008.
22

23

24   ---------------------------
25           EDWARD LETO
```

Page 494

```
1
2           ERRATA SHEET.
3        I wish to make the following changes,
4    for the following reasons:
5    PAGE LINE
6    _____ ___CHANGE:_____
7           REASON:_____
8    _____ ___CHANGE:_____
9           REASON:_____
10   _____ ___CHANGE:_____
11          REASON:_____
12   _____ ___CHANGE:_____
13          REASON:_____
14   _____ ___CHANGE:_____
15          REASON:_____
16   _____ ___CHANGE:_____
17          REASON:_____
18   _____ ___CHANGE:_____
19          REASON:_____
20   _____ ___CHANGE:_____
21          REASON:_____
22   _____ ___CHANGE:_____
23          REASON:_____
24   _____ ___CHANGE:_____
25          REASON:_____
```

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 128 of 164 PageID #: 2108

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

## $

**$13 (1)**
130:9
**$19 (2)**
205:5,11

## 0

**000 (1)**
150:12
**000012 (1)**
158:15
**000019 (3)**
150:10,15;158:25
**00012 (2)**
148:3,5
**000206 (2)**
148:3,5
**009735 (1)**
26:8
**009772 (1)**
12:10
**009775 (1)**
12:11
**009776 (1)**
8:21
**05 (4)**
123:15;128:15,17,
25
**06 (2)**
103:14,15
**07 (10)**
38:6;118:5,9,20;
120:15;125:7,12;
134:15,16,18
**07-CIV-1215SJFETB (1)**
4:10

## 1

**1 (5)**
5:25;37:22;38:8,
11;181:11
**1:00 (1)**
227:25
**1:09 (1)**
175:3
**1:10 (1)**
174:3
**10 (6)**
134:5,25;135:8;
213:19;260:3;359:10
**10:17 (1)**
4:14
**100 (1)**
492:11
**1042 (9)**
423:8;432:3,13;
433:5;457:10,12,15,
19;472:7
**109 (8)**

42:12,13;84:2;
90:24;91:5;92:22;
93:5;105:5
**11 (3)**
14:4,9,11
**11/09/90 (1)**
12:5
**11/9 (1)**
13:2
**11:14 (1)**
76:11
**11:29 (1)**
76:16
**110 (1)**
105:18
**112 (1)**
492:11
**113 (2)**
110:21;146:20
**114 (1)**
144:16
**115 (1)**
175:20
**117 (3)**
470:11,12;471:8
**11789 (1)**
6:4
**12 (10)**
43:10;104:15;
247:16;266:10;
282:11;283:4,17;
312:9;327:21;344:9
**12:00 (14)**
215:15,17,18;
225:7;227:20;255:2,
3,13,18;256:15;
292:21;294:8,14,15
**12:28 (1)**
146:11
**12:30 (1)**
227:25
**12:40 (1)**
146:15
**123 (1)**
172:18
**13 (7)**
159:20,22;161:13;
164:19,20;180:11,12
**135 (1)**
471:20
**138 (2)**
474:16,23
**14 (2)**
304:20;492:11
**149 (1)**
492:11
**14-month (2)**
205:12,15
**15 (8)**
130:13;244:16,17;
301:12;302:5,13;
303:3;468:3
**158 (3)**

476:12,13,18
**159 (4)**
476:5,5,17,22
**16 (14)**
160:9,9;162:22;
268:21,23;269:9,10,
13,20,24;270:8;
272:16;273:3,5
**164 (2)**
476:25;477:6
**17 (3)**
161:17;268:22;
492:11
**176 (2)**
478:18;479:15
**177 (1)**
480:11
**18 (2)**
424:23;492:9
**189 (1)**
492:12
**19 (5)**
17:22;158:24;
159:19;164:17;
456:14
**19.95 (2)**
205:6,8
**191 (1)**
492:12
**194 (1)**
492:12
**1990 (4)**
12:19;13:3;27:5,6
**1991 (6)**
27:6,7;300:4;
382:25;383:2,4
**1992 (1)**
33:7
**1995 (1)**
27:18
**1996 (1)**
27:15

## 2

**2 (45)**
81:21;82:20;
99:24;100:4;114:13,
15,19;115:8;158:20;
185:21;186:10,13;
187:3,16,25;188:11,
18;189:3,24;190:5,9,
17;191:12,18,21,23;
192:5,9,16;193:4;
195:9,14;207:15;
470:7;472:3,10,12,
14,15,18,22;473:12;
474:8,21;479:11
**2:04 (1)**
175:6
**2:30 (1)**
378:19
**2:33 (1)**

211:20
**2:42 (1)**
212:3
**20 (27)**
73:14;83:11,17;
98:10;99:4,10,20,24;
100:4,9,18,23;113:9;
114:5,7,10;143:13;
149:22;163:2;181:5,
7;244:16,17;464:6,7;
468:3;484:25
**2000 (4)**
82:21;177:12;
183:15;210:7
**2001 (8)**
32:13;206:22;
207:6,14;208:22;
210:5,8,13
**2002 (63)**
181:11;210:16;
215:2;234:4;235:11;
236:25;237:13;
239:5;241:8,15;
243:4,7,9,10;244:18;
248:19,25;252:5,10;
258:14,16;260:5,7,9,
15,22;262:3,15;
265:18;266:9;
276:17;277:4,8,18;
278:24;279:4,21;
280:2,9,10,12;
287:18,25;288:4,7;
289:13;299:23,25;
300:8;304:13,15,22,
23;305:12,24;306:7,
11;308:3;309:20;
310:12,14;420:14;
442:9
**2003 (51)**
177:12;210:18;
215:5;234:5;235:12;
237:2,13;241:4,8,14,
20,24;242:12,13;
245:2,5,7,12;247:23;
248:25;252:6,10;
260:25;261:10;
262:3,18;276:17;
277:21;278:5;279:5;
280:7,8,11,12;
285:21;287:18;
289:21;290:6,19;
291:25;292:4;293:5;
295:5;299:23,25;
300:8;305:3;306:11;
308:8;310:16,18
**2004 (70)**
8:23;185:23;
208:22;210:20;
215:4,5;219:18,22;
242:15,18;246:8;
248:5,11,15;249:4,9,
13,21;250:12,15,18;
252:4;253:2,10,21;

261:15;262:2,13,21;
263:7;278:11,15;
279:17,18;280:21,
24;281:13,25;282:7;
283:8;284:22;285:3,
25;286:4,14;287:20;
290:25;292:9,10;
295:9;299:23;
306:11;308:11;
309:23;310:18;
313:21;330:8;
332:11,12;338:2,4;
345:20;348:7;
427:13;443:2;
480:18;482:5,7,9;
485:6
**2005 (38)**
183:15;242:20;
246:18;248:5,11,15;
249:4,17;250:2,18;
251:4,7,10,13;252:4;
260:7;261:23;
265:15,19;266:9,14;
278:17;279:19,20;
281:2,3;285:17,18;
287:22;290:25;
292:9,11;295:9;
299:23;306:13;
308:15;380:8,9
**2006 (83)**
37:23;38:8,11;
49:23;58:18;60:21;
81:21;83:12,17;
95:24;96:11,11;97:6;
98:10;99:4,10,20,24;
100:4,5,9,18,23;
111:18;113:9;114:5,
7,10,13,19;115:8;
143:13;147:21,22;
158:20;161:13;
162:18,22;163:2;
181:5,7,21;183:15;
184:4,9;185:21;
186:10,13;187:3,16,
25;188:11,18;189:3,
24;190:5,9,17;
191:12,18,21,23;
192:2,5,9,16;193:4;
197:24;198:14;
204:21;207:15;
258:14;470:7;472:3,
10,12,22;473:12;
474:8,21;479:11;
482:14,16
**2007 (13)**
39:6,10;42:13;
43:13;49:20;136:5;
141:22;142:14;
181:22;198:4,15;
204:21;205:3
**2008 (3)**
4:14;490:4,12
**200-page (1)**

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

174:13
**203 (1)**
    492:12
**204 (1)**
    492:9
**205 (1)**
    492:12
**21 (4)**
    39:6,10;42:13;
    168:25
**214 (1)**
    20:9
**223 (1)**
    492:12
**228 (1)**
    492:12
**23 (2)**
    172:2;345:13
**24 (3)**
    4:13;8:23;490:4
**25 (1)**
    84:3
**257 (1)**
    492:12
**26 (1)**
    139:2
**27 (2)**
    172:15;470:12
**28 (4)**
    136:5;173:4;
    180:20,24
**299 (1)**
    492:12

---

**3**

**3:41 (1)**
    296:6
**3:49 (1)**
    296:10
**30 (3)**
    162:2;445:12;
    480:17
**31 (5)**
    111:18;427:13;
    445:13;456:19;485:5
**31st (1)**
    164:12
**34 (1)**
    173:19
**341 (1)**
    492:13
**36 (5)**
    232:12,20;233:22;
    237:4;240:15
**3600 (1)**
    28:8
**363 (1)**
    492:13
**379 (1)**
    492:17
**38 (1)**
    383:11

**384 (1)**
    492:16
**39 (1)**
    476:24

---

**4**

**4 (1)**
    348:7
**4:00 (27)**
    21:23;66:7;
    215:15,17,17;225:4,
    4,5,7,20,21;227:20;
    255:2;256:7,9,15;
    287:13;291:9;
    292:21;294:3,8,14,
    15;295:13;332:9;
    411:7;488:6
**4:45 (1)**
    411:7
**4:49 (1)**
    379:3
**40 (3)**
    211:10;256:25;
    258:5
**402 (1)**
    492:13
**41 (2)**
    283:20;284:12
**42 (21)**
    284:19;286:15;
    375:18;390:23;
    423:5,7;432:25;
    434:4;450:24;451:5,
    6,15;452:2,10,18,23,
    25;462:22;463:4;
    468:19,25
**420 (1)**
    492:13
**43 (10)**
    286:22,23;287:6;
    288:10;289:8,16;
    290:2,3,4,8
**483 (1)**
    492:18
**49 (3)**
    296:13,14,25

---

**5**

**5:00 (10)**
    256:6,9;287:14;
    291:8;292:16,18,18;
    293:2;294:4;295:13
**5:01 (1)**
    379:7
**5:59 (1)**
    456:8
**51 (3)**
    298:11;312:20;
    314:17
**52 (5)**
    313:20;316:4,5;

318:13;330:22
**53 (2)**
    317:2;330:22
**54 (3)**
    328:12;329:8;
    333:20
**55 (1)**
    336:16
**56 (3)**
    336:16;339:16,16
**57 (1)**
    344:11
**58 (5)**
    345:18;488:13,18,
    19;492:7

---

**6**

**6 (1)**
    492:16
**6/07 (1)**
    118:19
**6:08 (1)**
    456:12
**6:45 (1)**
    490:5
**61 (2)**
    348:10,11
**631 (1)**
    152:12
**64 (1)**
    492:11

---

**7**

**7 (1)**
    162:22
**7/24/04 (2)**
    8:6,15
**71 (1)**
    424:22
**72 (2)**
    427:12,13
**73 (2)**
    427:13;431:3
**74 (2)**
    431:24;433:9
**75 (1)**
    433:11
**76 (3)**
    437:9;446:15;
    454:3

---

**8**

**8 (1)**
    162:18
**8:00 (20)**
    21:23;66:6,7;
    255:3,13,18;256:6,9,
    16;287:13;291:8;
    294:3,10;295:13;
    332:9,16;413:7;

414:6;488:6,8
**80 (1)**
    456:14
**83 (1)**
    457:22
**85 (3)**
    459:2,6,8
**86 (1)**
    461:24

---

**9**

**9 (1)**
    12:19
**9/1/95 (1)**
    28:15
**9/24/08 (10)**
    7:7;12:7;20:4;
    26:10;28:6;38:20;
    63:12;135:18;148:7;
    211:25
**9:00 (14)**
    256:5,9,18;287:13,
    14;291:7;292:16,17,
    21;293:2;294:3,4,11;
    295:12
**90 (3)**
    27:3;37:20;492:11
**90s (2)**
    32:21,22
**91 (3)**
    37:20;206:3;300:6
**926 (1)**
    4:12
**93 (1)**
    33:7
**94 (1)**
    29:20
**95 (1)**
    29:20
**96 (4)**
    27:20,23;29:9,20
**97 (2)**
    27:16;35:18
**977 (1)**
    12:10
**9771 (1)**
    19:24
**9775 (1)**
    12:14
**9779 (1)**
    8:21
**99 (1)**
    381:8

---

**A**

**abandoned (2)**
    284:2,15
**ability (2)**
    388:22;403:16
**able (4)**
    182:21;229:10;

234:14;466:23
**above (9)**
    9:2;14:4,8;314:2;
    316:12;341:5,22;
    470:13;478:19
**Absolutely (10)**
    25:3;223:19,23;
    335:17,20;409:18;
    410:6;412:18,18;
    489:16
**abuse (4)**
    336:19;345:22;
    470:15;471:15
**academy (3)**
    27:4;382:19,21,24;
    384:12;467:25
**accept (2)**
    466:20;477:24
**access (1)**
    409:8
**accordance (1)**
    274:2
**according (5)**
    35:7;87:11;
    163:23;222:11;308:4
**accumulate (1)**
    180:11
**accumulating (1)**
    180:23
**accuracy (1)**
    340:11
**accurate (10)**
    39:4;40:12,16;
    42:5;317:10;434:16;
    481:16,20,21,23
**accuse (2)**
    61:9
**accused (1)**
    131:3
**accusing (2)**
    84:21;149:9
**aches (1)**
    176:5
**acknowledging (1)**
    175:13
**acquaintances (1)**
    298:14
**act (1)**
    274:3
**acting (4)**
    170:6,7;214:2;
    274:2
**action (6)**
    165:7;181:4,11;
    194:2;404:21;416:8
**Active (3)**
    20:2,10;191:7
**activities (2)**
    137:13;139:5
**activity (1)**
    470:18
**acts (2)**
    216:18;223:25

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB Document 145-11 Filed 01/15/10 Page 130 of 164 PageID #: 2110

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

**actual (2)**
31:25;336:24
**actually (53)**
10:3;11:10;24:6;
27:5;31:23;37:3;
42:12;62:25;71:8;
74:7;76:5;82:23;
83:5;93:10;101:3;
105:5;118:3;124:6;
142:7;143:16;149:7;
182:5;191:2;196:7;
214:17;227:14;
228:9;229:17;
268:16;281:13;
293:15;301:22;
302:10;311:14;
314:15;319:24;
325:18;331:2;
344:17,21;350:16;
353:3;357:9;393:20;
403:13;421:20;
425:10;432:24;
453:23;458:7;462:7,
8;468:23
**ADA (7)**
44:10;49:11;
50:23;57:15,24;
72:13,19
**added (1)**
184:12
**addition (1)**
254:18
**address (6)**
5:24;59:20,22;
137:19;283:21;
365:11
**addressed (6)**
28:22;60:5,6,8;
145:18,22
**adhering (1)**
194:5
**administration (3)**
30:12;31:16;
170:10
**adult (1)**
314:10
**advanced (1)**
478:21
**advancement (1)**
480:5
**advice (2)**
381:25;382:4
**advise (47)**
53:2,11,18;54:5,8,
11;88:14,20;89:3;
90:3,7,16,19;94:21;
95:10,14,19;96:23;
97:3;99:10;106:21;
132:3;139:15;
157:25;165:9,13;
187:16;193:20,22;
212:6;217:16;225:8,
11;233:16;313:5;

341:9,15;407:3,6,11;
430:21;443:21;
474:7;477:17;478:2,
7,11
**advised (22)**
29:2,15;34:12,14;
83:10;85:14,19;86:9;
90:4;98:16;99:18,25;
100:3;101:23;
107:20;124:19;
157:21;177:24;
232:21;233:15;
308:3;341:17
**advisement (1)**
59:9
**advising (2)**
477:11;478:5
**affidavit (1)**
98:4
**afternoon (2)**
215:18;379:15
**afterwards (8)**
183:20;184:22;
241:4;364:6;416:21;
446:13;449:6,9
**again (62)**
14:5,25;20:21;
21:17;24:2,23;25:19;
35:5;53:22;60:20;
68:11,16,21;77:16;
80:6,9;90:15;93:18,
20;115:23;116:4;
127:21,24;128:3;
143:4;157:20;
160:15;170:4;
171:17;186:22;
192:19;200:23;
203:25;211:12;
218:5;222:23;
224:17;226:7;
240:15,25;241:2,5,
11;256:20;258:20;
260:22;267:13;
269:11;281:15;
282:18;293:3;
299:10;309:9;
366:23,25;402:19;
436:15;445:6;450:9;
452:9;478:14;484:19
**against (17)**
36:13;54:16;
81:21;144:21;162:6,
7,10;164:18;181:4,
11;194:2;298:13;
347:6;445:3;459:3,
16;460:15
**age (3)**
17:23;209:21;
211:10
**aged (1)**
209:21
**agency (4)**
32:18;69:6;

179:12;205:11
**agitated (7)**
361:5,8;366:23;
367:17;391:22;
398:2;399:15
**ago (8)**
20:15;23:16;
26:14;34:24;92:8;
118:17;196:17;
218:23
**agree (12)**
13:20;32:22;40:9;
62:21;102:17;
198:13,17;324:18,
25;332:8,15;398:6
**AGREED (5)**
3:3,9,13;59:10;
456:18
**ahead (3)**
22:17;93:11;267:9
**al (2)**
4:5,7
**Alan (10)**
60:9;96:6,8,17,22;
98:19,19,24;99:2,9
**Alanna (1)**
391:14
**Albert (1)**
4:15
**alcohol (19)**
221:21;267:11;
298:19;300:18,19;
301:17;310:5;
314:10,16;318:16,
25;322:22;323:24;
329:12;330:14,19;
336:19;345:23;
346:10
**Alison (14)**
5:10;111:25;
112:18;116:5,13,15,
19;379:18,23;381:6,
7,15,20;382:15
**allegation (25)**
69:10,17;84:13,25;
85:12;105:12;
106:22;111:23;
112:16;113:4;
115:14;284:24;
297:20;328:21;
340:12;348:11;
436:20;437:7;
445:16;450:13;
458:4;479:15,18;
481:5,13
**allegations (11)**
68:25;69:2,7;
73:20;110:22;112:4;
115:6,16;144:21;
146:19;454:3
**allege (30)**
84:5,13;110:21;
143:8;175:21;

196:19;212:16;
232:20;259:7;
283:21;296:14;
298:11;314:5;
336:17;341:20;
344:11;374:25;
375:8;424:23;
440:24;445:10;
454:3,12,25;456:15;
459:2,11;463:10;
478:18;480:4
**alleged (44)**
42:3;43:14;51:19;
54:15,16,21;56:4,6;
65:2;240:13;287:5;
331:6;337:14;
345:22;346:9;
364:18,24;365:18;
376:13;379:22;
384:22;386:7,9,9,18;
387:6,11,13,19;
388:12;389:11,18;
394:18;400:11;
406:13;443:10,24;
444:14;455:7;
456:15;476:12;
486:2,9;488:20
**allegedly (7)**
46:7;355:24;
356:19;392:13,20;
440:10;443:8
**alleging (4)**
84:25;362:7;
447:7;465:11
**allotted (2)**
180:7,15
**allow (1)**
444:13
**allowed (12)**
116:6;146:21;
148:17,18;164:24;
180:9;257:2;259:8;
401:22;402:11,21;
486:10
**allowing (1)**
284:20
**almost (5)**
238:24;285:7,9,14;
389:3
**along (13)**
64:16;82:11,14;
91:17;140:14;
142:24;143:5;
163:13;199:24;
200:5;423:12;
426:13;457:7
**alongside (2)**
478:23;480:7
**altercation (5)**
350:4,9,10;407:15;
408:5
**Although (2)**
340:2;434:14

**altogether (3)**
352:10;377:22;
417:8
**always (7)**
153:8;169:11;
229:19;278:6;
279:23;280:20;
294:19
**Amazing (2)**
170:5,5
**ambulance (9)**
368:20;369:22;
370:23;372:17;
373:2,5,14;374:15;
407:13
**Amendment (2)**
165:12;470:19
**among (11)**
3:3;58:6;91:9;
105:20;106:16;
157:13;263:17;
266:22;442:18,20;
470:13
**amount (2)**
289:19;370:8
**and/or (2)**
169:7;459:20
**Andrew (3)**
4:23;14:25;41:10
**anguish (7)**
175:22,24,25;
177:17;178:4;180:8;
182:12
**anonymity (1)**
161:23
**anonymous (4)**
150:25;312:14;
315:25;327:25
**answered (16)**
99:16;120:19;
188:3;350:17;
352:14,15;395:18,
18,22;403:4;407:23;
414:22;438:24;
445:5;452:7;483:20
**anticipated (1)**
8:12
**anxiety (1)**
179:24
**anymore (7)**
27:12;29:4,17;
34:3;64:10;290:10;
295:6
**apartment (22)**
314:8;316:8,21;
318:18;319:18,25;
320:11,17,18;321:5,
17,21;328:14;329:2;
330:23;331:2,7,11,
15;333:9,22;340:16
**apartments (1)**
316:13
**apologize (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 131 of 164 PageID #:
2111

THOMAS SNYDER                                                          EDWARD CARTER, ET AL. vs.
September 24, 2008                                   INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

62:12

**apparent (2)**
350:4;469:9

**Apparently (13)**
11:22;13:24;74:5;
114:16;128:5;129:5;
140:24;189:6;253:7,
9;270:5;305:10;
363:24

**appear (1)**
129:7

**appeared (4)**
145:19,23;155:22;
388:8

**appears (5)**
8:7,20;84:3;161:9;
164:17

**applicant (1)**
202:18

**application (33)**
6:13;7:5,12;8:23;
11:14;12:4,23;14:4,
6;18:2;117:25;
118:13;119:9;125:8,
11,15;126:24;
127:20;131:20;
135:11,16,24;136:5;
140:13;199:9,14,17;
200:12,16;202:10;
203:17,19;204:11

**applications (5)**
6:25;8:5;18:6;
117:6;205:2

**applied (12)**
32:25;33:12;
37:18,23,25;87:5;
118:3,4,4,19;120:14;
144:4

**applies (1)**
197:14

**apply (15)**
33:5,9;35:2,8,14,
15;38:5,11;117:25;
118:21;140:7;
205:14;296:21;
297:14;477:23

**applying (1)**
132:19

**appointment (3)**
92:15;126:20;
128:4

**Appointments (2)**
7:15;14:8

**approach (8)**
70:14,17;225:25;
374:22;434:24;
436:16,18;463:18

**approached (1)**
68:10

**appropriate (8)**
10:15;13:5;41:14;
347:20;444:12,12,
22,22

**approximately (2)**
4:14;220:15

**April (82)**
58:18;60:21;
81:21;82:20;83:11,
17;95:24;98:10;99:4,
10,20,23,24;100:4,4,
9,18,23;113:9;114:5,
7,10,13,15,19;115:8;
143:13;149:22;
158:20;159:19,20,
22;161:13;162:18,
22,25;164:19,20;
181:5,7;184:9;
185:21;186:10,13;
187:3,16,25;188:11,
18;189:3,24;190:5,8,
17;191:12,18,21,23;
192:4,9,16;193:4;
195:9,14;197:23;
198:14;204:21;
207:14;464:6,7;
470:7;472:2,10,12,
14,14,18,22;473:12;
474:7,21;479:11

**area (4)**
215:6;271:19,21;
360:9

**argue (1)**
356:18

**arguing (13)**
353:7,9,11,12,15,
19;355:7,19;356:3,8,
13;398:21;484:15

**arm (1)**
431:4

**armed (2)**
10:19;13:9

**arms (1)**
357:22

**around (40)**
32:25;43:23;
131:19;140:9;
170:14;182:24;
185:24,24,25,25;
186:15,19;210:8;
213:20;267:11;
270:20;276:21;
299:24;304:13;
306:22;313:21;
331:16;360:5,7,13;
375:21;376:3;
378:19;399:6,11,24;
400:2;410:18;455:9;
457:23;468:16,22;
469:7,17,22

**arrest (22)**
301:6,20,22,22;
302:4,6,15,16,22,23;
303:9,24,25;358:23;
453:8,10,13,17,24;
455:10,12;458:9

**arresting (3)**

**302:9;303:13;**
453:11

**arrests (1)**
317:8

**arrived (7)**
314:7;352:17;
355:7;363:18;
398:20;480:19;
484:22

**article (2)**
104:12,12

**ascertain (9)**
91:22;320:19,21,
24;388:21;405:19;
409:18;410:7;412:19

**ascertained (1)**
320:7

**aside (8)**
81:14,17;259:4;
304:4;358:22;359:2;
386:16;453:15

**aspect (7)**
169:5;297:19;
350:8;450:15;
453:17;468:7;474:4

**assault (24)**
51:19;354:2,10,11,
14,17;364:18;
369:14,17,17;
370:11,12,15,17;
386:10;388:19;
393:2;409:16;
443:24;444:8,14;
460:2;480:19;481:7

**assaulted (17)**
353:13,14,19,22,
22,24;354:7,7,10,20,
23;355:6,24;356:19;
362:8,18;388:18

**assaults (3)**
438:9;459:10,14

**assertions (1)**
477:10

**asses (1)**
170:4

**asshole (1)**
169:23

**assign (1)**
318:2

**assigned (3)**
232:24;235:25;
319:12

**assistance (4)**
178:2;179:13;
314:7;316:16

**assistant (3)**
89:9,14,20

**associated (2)**
56:13;77:14

**association (1)**
4:19

**assume (16)**
18:23;39:18;

**59:15;69:21;87:12;**
112:21;114:15;
171:21,23;187:6,13;
301:24,24;387:25;
444:9;472:5

**assumed (2)**
46:12;59:14;
144:19;236:20;
252:15,16,20;
322:15;323:3,4;
372:7;388:3

**assuming (5)**
19:5;80:16;87:21;
162:11,13

**assumption (2)**
87:22;423:22

**attached (1)**
161:5

**attacked (1)**
406:13

**attacker (4)**
443:13;480:21;
481:8,16

**attacks (1)**
459:16

**attempt (1)**
65:15

**attempted (3)**
337:16;357:18;
386:11

**attempting (4)**
370:3;455:5;
459:9,13

**attend (1)**
163:15

**attended (1)**
382:19

**attention (11)**
12:14;61:3,17,17;
152:18;296:13;
418:21;421:11;
483:13;487:3;488:9

**attorney (11)**
18:22;20:22,24;
23:14;52:14,21;
55:17;78:4;79:4,25;
212:11

**attorney/client (1)**
41:7

**attorneys (9)**
39:18;53:18;
54:24;78:24;80:8;
81:9,25;82:10;382:3

**Attorney's (11)**
5:12;44:3,17;45:6;
46:5;49:9;50:14;
51:3;68:24;70:21;
71:25

**attribute (4)**
182:9;184:9;
372:6;376:6

**attributing (1)**
93:4

**August (7)**
25:20;118:9;
123:15;128:15;
134:14,16,17

**author (1)**
158:25

**authored (5)**
475:11,14,16,17,
25

**authority (1)**
344:14

**authorized (3)**
166:12;212:11;
303:9

**available (1)**
24:17

**average (1)**
256:21

**aware (62)**
40:21;41:20;46:3,
8,9,11,19,23;47:12,
14;69:4,8;74:24;
75:21,24;76:19,25;
77:12,19;78:11,14,
17,19;80:12,14,17,
21,23,25;88:14;
112:13;114:9,14;
134:17;135:10,13;
142:9,13;166:22;
187:8;224:8;225:10;
232:16;326:19,22;
331:24;379:23;
380:2,3;387:4,17;
404:4;406:18,20;
419:5;421:9,11;
426:8;460:12,18,24;
486:25

**away (18)**
17:16;169:25;
252:22,23,24;253:2;
272:11;304:8,16;
318:8;319:13;331:7,
10;432:23;449:5;
484:3,7,13

**AWOL (2)**
17:13;487:9

**B**

**back (89)**
10:13;20:13;
25:20;31:22;32:4;
34:22;37:19;38:10;
47:22;48:6;61:6;
66:15;68:2,17;70:20;
76:9,17;88:4;96:14;
101:11,13;103:14;
118:8;125:11;
127:23;146:9,16;
148:25;163:21;
167:16,23;168:11;
174:5;175:6,12;
206:12;212:4;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 132 of 164 PageID #: 2112

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

221:25;234:4,13;
240:2;241:3,10,23;
244:17;252:24;
296:11;300:4,6;
304:21;308:2;
309:20;314:15;
316:4;317:23;
324:23;337:23;
338:16;356:3;360:8,
9,10,11,14;364:5;
366:4,5;367:25;
369:2;377:4;379:8;
384:19;385:23;
396:7;398:21,25;
414:21;415:22,24;
420:14,17;428:3;
432:20,21;442:8;
456:13;484:22;
486:13,21

**background (5)**
33:16,22;438:21;
439:3,17

**Bacon (5)**
149:14;157:21,25;
158:9;166:5

**bad (20)**
10:6;14:17;15:8;
19:10,14;121:8,13,
15;122:23;123:8;
124:5;131:2;146:4;
169:13;185:17;
304:25;309:11;
310:9;363:11;487:6

**badgering (1)**
201:10

**badly (1)**
369:8

**balcony (10)**
314:2;317:6;
323:25;324:2,21;
330:6;333:23;
334:12;335:18,21

**bald (1)**
26:18

**banging (1)**
193:13

**bar (76)**
51:18;55:18;
220:3,17,18,23,25;
221:3,4,9,13,16,19,
23;222:11,24;223:3,
6,16;233:6,10;
272:18;273:4,6;
300:12,17;301:16,
16;303:17;304:6,19;
306:21;307:18;
310:23;321:16;
324:15,23;350:3,11,
13,15;353:16;
356:11,12,14,25;
357:7,10,15;358:20;
359:13,21,22;360:2;
363:8,25;386:12,14;

387:22;392:5,8,9,12,
14,15,18;393:5,12;
398:9;445:12;
446:11;448:5;
480:19;483:15,17;
485:8

**barbaric (1)**
161:25

**barely (2)**
21:12;396:15

**bars (23)**
227:24;233:4;
266:20;293:12;
298:16,19,23;299:5,
6,8,14,18;300:9,22;
304:9,16;305:13,20,
25;310:4;313:3,17;
404:8

**based (21)**
13:21;15:2;51:24;
54:25;55:18,20;
126:16;166:20;
275:9,12,21;276:2;
287:11;398:7;
421:13;423:19;
439:12,14;445:15;
458:10;481:13

**baseless (6)**
110:22;111:23;
112:15;113:3;
115:16;144:20

**bash (1)**
413:13

**Basically (8)**
33:11;73:4;92:15;
193:25;197:5;
285:19;318:5;391:20

**basis (12)**
105:11;113:6,8;
114:4,11;205:12;
250:10;276:10;
340:25;342:9;
425:14;426:12

**Bates (9)**
7:17,20,24;8:20;
12:10;19:23;26:8;
28:7;148:4

**bathroom (1)**
182:17

**Bay (3)**
313:23;316:7;
348:15

**Beach (145)**
4:7;6:3;12:22,24;
26:24;27:11;28:22;
29:3,16,22,25;32:16,
24;35:6;36:19;37:20,
22;38:10;44:21,23,
24;45:7,11,14;47:8;
48:8,12,19;52:12,15,
16;54:18;55:13;
56:14;57:6;59:24,25;
60:24;61:13;63:10;

69:12;74:14,21,22;
75:4,5,19,23;77:15;
81:4,21;85:25;90:12;
91:9;97:6;111:18;
113:22;115:3;117:8;
119:6,7,21;120:5,8,
17,23;121:19;123:7,
12,23;124:10,13;
128:24;130:18;
133:9;136:10,12,20;
137:20;143:3,22;
144:11;152:20;
158:17,19;161:2;
176:11;182:23;
183:22;184:19,24;
185:9,13,16;186:2,
12;187:18,24;
193:16;195:6,15,20;
197:23;205:5,25;
206:2;207:20;
209:25;210:23;
211:16;212:21;
214:17;229:11;
233:10;244:14;
257:5;289:14;
296:18,20;298:8;
301:13;302:14;
311:8;312:8;313:18;
315:8,21;328:10;
333:8;351:19;368:6,
9;381:2;414:16,18;
425:5;440:3;448:4;
461:7,10,15,19;
478:19,25;492:6

**beat (11)**
169:24;356:12,14;
357:6,7;363:11;
369:8;392:12,20;
393:19,20

**beating (4)**
51:9,11;129:13;
130:18

**beatings (8)**
74:3,4;120:2,16,
23;123:3,9,18

**became (8)**
78:16;191:6;
284:21;285:2,7,9,14;
286:16

**become (8)**
77:19;78:19;
80:12;206:5,24;
284:20;439:19;
482:13

**becoming (3)**
210:10;284:25;
286:2

**bed (1)**
82:8

**beer (51)**
257:3,5,7,8,10,19;
259:2,2,8,13,22;
267:10;276:11,12;

279:25;280:17,22;
283:6,25;284:7,13;
285:6;313:24;
316:20;317:5;
318:16,25;322:17,
18;323:5,14,15;
324:7,21,23;325:12,
19,19,20,21;326:2;
330:5,11;331:9;
336:5,21;337:17,23;
338:11,15;419:2

**beers (7)**
258:23;265:8;
266:7;322:9,11,13;
324:16

**befall (2)**
317:4;323:19

**began (1)**
285:25

**begin (2)**
176:8;412:24

**beginning (5)**
115:15;127:6;
304:15;378:21,23

**begins (6)**
76:15;146:14;
212:2;296:9;379:6;
456:11

**behalf (3)**
4:25;39:5;212:12

**behavior (3)**
286:2,15;347:20

**behind (8)**
221:11;338:12,24;
348:13;359:14,16;
399:4;404:7

**beings (1)**
109:14

**belief (29)**
84:6;85:13,17;
92:17;105:18;
110:12,13;113:7;
114:4,12;208:8;
341:2;342:10;
398:12;421:13;
424:24;425:8,15;
450:12;455:2,7,8,14,
18,19,22,24;460:14;
485:6

**believes (2)**
167:25;182:11

**believing (1)**
276:24

**besides (3)**
284:5;422:12;
452:23

**best (6)**
40:12,16;388:21,
22;403:16;481:25

**better (7)**
190:20;191:4;
341:12;411:15;
449:15,23;484:2

**beverage (1)**
300:19

**beyond (1)**
180:6

**Biancavilla (1)**
72:14

**big (5)**
128:25;272:17;
358:15;413:12;
484:14

**bit (5)**
85:11;191:6;
324:22

**blame (1)**
455:6

**blatant (1)**
344:13

**block (1)**
400:3

**blocks (1)**
272:11

**blog (72)**
116:7;145:7,8,9,
11,19,24;146:3,6,17,
22,24;147:4,7,9,12;
148:13,13,18,21,23;
149:3,5,23,25;150:6,
17;151:15,20;152:6,
8,14,21;153:2;
154:14,21,24;
155:21;157:16;
158:2,13,14,16;
159:2,6,10,23;161:5,
9,10,11;165:3;
166:13,17;167:6,22;
170:25;172:22,23;
173:11,17;175:16,
17;186:23;251:25;
266:12;282:13;
312:12;475:6,9,10,
24

**blogged (8)**
150:22,24;153:7;
155:10;156:4,9;
165:23;166:7

**blogging (9)**
156:6,18,25;157:7;
162:12;165:19;
166:10,23;167:2

**blogs (9)**
155:19;157:21;
163:23;164:6,16;
167:7;170:24;171:2;
173:16

**Blue (2)**
5:25;6:2

**blurting (1)**
398:23

**board (6)**
239:18;306:19;
311:25;327:6;
371:24;420:20

**Boat (12)**

Case 2:07-cv-01215-SJF-ETB    Document 145-11    Filed 01/15/10    Page 133 of 164 PageID #: 2113

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

376:22;377:6;
404:3,12,25;410:12;
412:4,5,8,14;417:20;
429:18
**boats (1)**
404:5
**Bob (3)**
119:18,20;120:11
**Bobby (9)**
96:4;97:3,22,23;
98:6,18;99:17;
106:19;107:3
**Bockelman (2)**
345:24;347:15
**body (1)**
325:13
**bongs (7)**
317:21;318:8;
319:8;339:24;340:7,
15;341:4
**book (5)**
230:6,8,16,20,20
**books (1)**
180:21
**boondoggle (1)**
37:9
**Bosetti (99)**
67:13,14;227:21;
259:19;289:11,12;
290:16,16;291:17;
334:5,12,20;335:2,
18;345:21,24;346:5,
8,22;347:12;360:18,
20,23;361:3,11,15;
365:23;366:2,18;
367:10;378:8;
397:20,22;398:3,8,
12,17;399:21,23,23;
401:12,18;402:11,
21;403:10,17;
404:11,22;405:3,5,8,
13,16,20,23;406:5,
14,16;407:5,14;
408:5,8,12,19;409:3,
15;410:7;412:19;
416:2;427:25;428:6,
11;429:17;430:3,6,
24;431:5;433:15;
436:22;443:14,23;
444:7,14;445:3;
453:23;455:4;
457:24;458:17,18,
22;463:20,25;
464:10;480:20,24;
481:4,8,16;485:7
**Bosetti' (1)**
463:12
**Bosettis (51)**
231:7;235:3,15;
263:17;264:15;
265:7;266:19;267:2,
6,14,18;268:9;
272:22;274:2;

275:20,25;276:4,12,
20,24;277:7,13,18,
22;278:12,25;281:8;
282:3,7;284:5;291:3,
19;292:2,5,17;293:6;
295:15,20,25;350:5;
419:24;421:7;
441:18;442:2,9,24;
443:6,7;463:15;
484:3;485:14
**Bosetti's (5)**
347:19;427:14;
431:4;480:19;481:7
**Bosettis' (2)**
275:4;289:15
**boss (5)**
92:13;182:25;
183:2,8;188:17
**both (12)**
50:9;62:18;69:19;
71:21;103:7;244:2,
15;276:6,7;296:17;
298:18;350:4
**bother (1)**
202:21
**bottle (4)**
325:12,19,22;
326:2
**bottles (6)**
318:16,25;322:22;
323:15;324:7,21
**bottom (1)**
8:4
**bouncer (10)**
353:15,20;355:7,8;
356:5;357:20,23;
358:15,19;359:5
**bouncers (1)**
484:15
**box (8)**
10:15;11:11,18,23;
13:5,19,25;28:19
**boyfriend (3)**
347:11;388:4;
392:20
**boyfriend/girlfriend (2)**
388:6,9
**boyfriends (1)**
387:25
**brackets (1)**
433:16
**brag (2)**
297:24;298:9
**bragged (2)**
297:15;380:4
**brand (2)**
257:8,19
**brands (1)**
257:10
**brawl (1)**
272:18
**break (24)**
62:15;76:8,13;

78:9;81:12,13;146:7,
7,8,13,18;151:19;
167:22;168:9;174:4,
22;175:4;211:22;
296:8;378:25;379:5;
456:6,10;484:18
**breaking (1)**
317:9
**breath (3)**
222:2,6,7
**Breeze (2)**
313:23;316:7
**Brian (5)**
362:24;396:13,17;
417:7;459:3
**brief (5)**
21:8,13;467:22,23,
24
**briefly (7)**
21:17;71:16;
72:20;352:22;
391:18;398:19;
464:19
**bring (14)**
57:18,23;58:9;
151:5;169:11;194:4,
7,13;195:6,15,19;
263:22;418:20;
421:10
**bringing (1)**
419:17
**Brook (1)**
198:6
**Brookhaven (22)**
37:25;117:11,11;
131:14,15;132:12;
133:15;134:14,19;
135:17;139:21;
140:18;141:4,11;
142:5,10,19;143:2,
23;145:6;198:7,10
**brother (1)**
399:7
**brothers (6)**
67:14,24;227:21;
259:19;289:12;
291:17
**brothers' (1)**
455:4
**brought (9)**
61:2,16;88:4;
144:14;152:17;
363:4;364:15;
385:23;460:15
**brutal (2)**
409:16;459:16
**building (3)**
316:5,6,8
**bunch (2)**
385:17;396:6
**bureau (2)**
383:25;384:2
**Burke (2)**

44:12;49:13
**business (1)**
221:11
**businesses (1)**
316:11
**button (1)**
154:10

**C**

**Cain (4)**
94:9,11;95:6,9
**C-A-I-N (1)**
94:11
**calculated (1)**
115:18
**caliber (1)**
383:11
**call (72)**
49:2;56:24;59:5;
76:3;82:17;100:25;
101:2;111:13;126:2;
141:14;164:15;
189:8;193:7,9,11;
228:2,25;244:5;
267:22,23,23,25;
271:4;272:14,22;
282:16;293:16;
315:23;327:23;
350:15,17,19,20;
351:21;352:2,4,8,12,
15;361:24;372:14,
20,23;376:21;378:5,
20;405:22;406:4,15;
413:9,15,19,20,25;
414:8;415:16;
416:20;423:20;
424:17;429:2;
430:23;433:20,22;
436:6;465:9;469:3;
470:2;483:14,17,19,
22;485:15
**called (67)**
18:16;20:20,25;
29:8;45:8,24;46:2;
47:15,22;48:6;56:2,
21,21;70:22;82:7,8;
85:20;86:10;89:5;
92:4;93:2;102:20;
111:10;113:14;
126:21;128:4;
130:20;147:3;
163:12,13,17;164:4;
170:17,21;180:13;
182:4,6;211:8;228:5;
271:7,10,14,18;
272:2;316:15;354:8;
358:4;364:6;365:6,7;
376:12;377:6;
411:12;413:4,6,24;
414:3,21;420:12;
423:2,3;468:18;
472:24;473:5;

483:15,21;485:15
**calling (6)**
91:24;94:4;
214:16;272:13;
330:18;406:7
**calls (11)**
92:14;267:4;
273:18;276:25;
279:2,14;282:16;
293:11;328:24;
350:16;352:3
**calm (7)**
355:14,20;357:3;
366:25;367:6,19;
484:17
**calming (1)**
390:5
**came (48)**
17:17;38:10;57:5;
59:23;62:4;64:17,25;
67:13;71:8,15;82:11;
85:23;96:14;103:14;
185:5;186:22;
221:24;223:9;
228:19;232:14;
241:7;286:14;346:6;
351:21;363:3;
365:20,23;367:24;
369:2;376:12;
387:22;389:7;
391:25;406:22;
407:11;408:25;
409:24;410:3,4;
412:4,14;413:3;
415:24;428:3;
439:15;446:12;
485:4,6
**camera (1)**
369:13
**cameras (1)**
42:23
**Campbell (1)**
489:2
**can (95)**
23:20;45:15;
62:18;78:5;92:16;
112:12;114:2;130:2;
138:18;153:9;
158:25;159:4,5,6,9,
22;165:8,9,13;
166:20;167:15,16;
168:4,11,11;173:14,
16;174:7,8,9;178:21,
23,25;179:3;180:11;
181:9;191:3;194:20;
196:23;201:2,13;
202:5;206:14;
214:11;218:3;219:6;
224:23;244:6;254:4;
268:7;275:7;276:8;
286:22;291:6;
296:12;301:22;
331:3;352:3;354:20;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 134 of 164 PageID #: 2114

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

357:24;358:21;
360:9;367:12,16,19,
19;376:9;395:8,12;
399:15,16,17,25;
403:5;407:19;
418:12,14,20;427:3;
433:3;445:5;454:16,
18;466:4,11,11,25;
467:9,12,14;471:23;
475:8,9,23,24
**canned (1)**
151:3
**cans (14)**
259:2;267:10;
276:12,13;279:25;
280:17,22;283:6,25;
284:7,14;285:6;
323:14;419:2
**caps (2)**
259:2;336:5
**car (1)**
351:23
**card (1)**
52:24
**care (11)**
170:11;176:7,19;
189:10,18;190:23;
235:20;252:20;
310:20;389:10;
431:21
**career (1)**
61:10
**careers (2)**
478:22;480:5
**cares (1)**
170:9
**carried (1)**
306:11
**carrying (1)**
336:21
**cars (2)**
266:19;419:3
**Carter (48)**
4:5;21:16;26:2,21;
47:4,5,6,11;60:10;
76:3,4,19;77:2,7,20;
78:12;82:4,5,16;
83:14,19;84:6,11;
94:12;105:14;
154:23;155:3;
202:15;203:5,11,18;
204:11,13;254:7;
344:19;434:17,20,
25;435:7,24;437:2;
461:25;462:7,10,18;
463:4,16;487:18
**Carter's (2)**
22:9;105:12
**case (11)**
4:9;49:18;72:13,
19;128:12;158:4;
169:18;173:23;
336:21;337:17;

460:19
**cases (2)**
185:7;189:13
**castigated (3)**
144:19;145:2,25
**CAT (1)**
177:8
**category (1)**
19:12
**cause (7)**
31:18;180:3;
212:22;307:7;
477:13,18;478:2
**caused (3)**
77:19;127:19;
324:8
**causes (1)**
160:18
**caution (1)**
381:22
**caveat (1)**
24:24
**CC (1)**
411:8
**cell (2)**
351:24;352:2
**center (1)**
193:12
**certain (14)**
166:22;223:20;
268:12;298:16,23;
299:5,14,18;305:13,
19,25;333:21;340:3,
3
**certainly (8)**
82:25;167:18;
302:16;308:6;325:3;
444:2,5;482:8
**certainty (4)**
247:22;250:5;
475:24;476:2
**Certificate (1)**
19:25
**certification (3)**
3:5;383:15,18
**certified (13)**
233:5;383:16,20,
21,22,24;439:19,22,
23;440:5,6,17;450:9
**chair (1)**
355:2
**chance (3)**
198:23;319:17;
330:25
**change (5)**
130:9;230:25;
239:3;479:15,17
**changed (8)**
34:2;35:11;237:5;
238:4,7;239:9;240:7;
253:20
**changing (1)**
239:14

**chaotic (3)**
355:12;388:24;
396:4
**charge (3)**
262:6;459:24;
460:4
**charged (1)**
151:6
**charges (8)**
194:4,8,14;459:2,
15;460:15,22,25
**chauffeur (27)**
232:24;235:15;
236:2;237:11,17;
238:9,18;241:21,25;
242:11,16,21;243:5,
7;245:3,18;246:9,19,
24;248:11;249:14;
252:11,19;253:12;
254:20;296:16;
297:17
**chauffeuring (7)**
240:20;243:16;
245:7;247:25;
248:16;251:20,23
**check (5)**
10:14;13:5,25;
59:2;331:15
**checked (7)**
10:24;11:6,11;
13:15;14:9;16:8;
428:24
**checkpoint (19)**
232:5;234:9;
238:12;239:20;
240:7;241:22;242:2,
12,17,22;243:8;
245:4,8;246:10,20;
249:14;253:13;
403:9,22
**checkpoints (2)**
237:19;239:10
**chemo (2)**
189:11,19
**chemotherapy (1)**
191:8
**Cherry (27)**
423:13,14;437:11,
15;443:20;445:8,16,
23;447:24;449:13,
14,21,22,23;450:9,
13,17,18;451:8,19;
452:16;453:3,18;
454:4,10;455:2,14
**Cherry's (2)**
438:20;456:21
**Chief (64)**
17:5;31:24;61:17;
70:4,9;100:10,12,15,
19,24;101:4;136:10,
18;137:7;138:6,17,
18;158:17;170:6,7,
11;172:17;206:19,

24;236:15,21,23;
252:13,14;263:3,3,5,
14;306:20;307:2;
315:11;371:13;
406:6;409:24;410:3,
4;413:2;414:18,23;
417:9,11,13;418:18;
419:22;420:17;
421:7,21;423:23;
424:5;427:13,17;
428:17,24,25;
430:11,21;465:10;
468:15;469:11
**chime (1)**
273:5
**choice (1)**
189:20
**choked (2)**
398:24;399:2
**Chris (2)**
379:17;393:4
**Christopher (2)**
5:10;459:4
**circulated (4)**
105:19,25;106:5;
107:9
**circumstances (2)**
10:22;13:12
**citation (2)**
336:20;337:16
**citations (2)**
317:7;340:20
**Citizen (3)**
63:10;165:9;
327:13
**citizens (2)**
339:14;350:5
**City (7)**
21:11;33:4,6,9;
34:3;35:10;437:16
**civil (31)**
6:16,18;60:8;63:3;
84:22;87:14;91:7;
110:23;111:3,6,8,21,
25;112:14;113:2,23;
114:22;115:17;
152:13;178:7;
208:18;209:7;
379:10;440:3;
464:12;470:17;
471:4,14,18;478:20;
487:13
**civilian (10)**
232:25;236:3;
237:18;243:7,13;
246:9,19;249:14;
258:24;409:17
**civilians (10)**
244:20;245:3,7;
246:25;248:12;
253:12;350:6;
353:18;362:17;
459:14

**CJ's (4)**
300:11;305:25;
307:12;308:6
**Claim (21)**
49:18,22;50:7;
113:2;178:3;196:18;
205:18;211:23;
212:10;213:24;
218:4;353:21;354:6;
355:6;360:23;361:2,
10;426:11;438:7;
439:9;474:9
**claimant's (1)**
212:17
**claimed (6)**
189:6;343:22;
353:19;393:3,5;
433:14
**claiming (7)**
91:11;354:6;
355:4;356:11;362:2;
370:2;392:23
**claims (1)**
212:15
**class (1)**
140:24
**clean (1)**
259:3
**cleaning (2)**
259:4;267:12
**clear (16)**
62:21;79:8;82:20;
83:8;107:6;120:11;
122:7;251:19;
253:18;284:11;
290:2;296:24;
320:10;327:20;
416:23;466:16
**clearer (1)**
173:23
**clearly (4)**
252:4;298:12;
326:13;327:19
**client (1)**
168:4
**clique (1)**
298:17
**close (7)**
50:10;205:11;
220:13;224:16;
273:4;359:19;378:16
**closed (2)**
386:14;411:8
**closer (1)**
299:23
**clothes (1)**
258:24
**clowns (1)**
151:2
**clue (1)**
151:20
**cocktailing (3)**
228:7;234:12;

THOMAS SNYDER
September 24, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 135 of 164 PageID #: 2115

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

235:3

**code (6)**
268:14;269:6,7,24;
270:8;271:2

**codes (18)**
267:3,20;268:7,10;
273:10;276:20;
277:7,14,19,23;
278:2,10,12;279:3;
281:8;282:4,8;
293:11

**collection (2)**
314:12;318:12

**column (1)**
150:5

**comfort (4)**
196:20,24;197:8,9

**comfortable (1)**
196:25

**coming (38)**
21:25;65:22;74:5;
145:10;182:25;
183:2,11,12,18;
184:6,10,17,18,23;
185:2,12;186:6;
187:23;214:13,15,
19;215:8,10;224:10,
11,19,25;225:3;
231:22;232:13;
234:13;238:25;
239:2;292:24;307:8,
12,15;328:24

**command (1)**
298:15

**commendations (1)**
439:5

**comment (5)**
16:2,11;298:4;
477:14;478:12

**comments (3)**
14:3,11;15:19

**commit (1)**
460:23

**committed (2)**
43:14;312:24

**common (5)**
65:23;109:5,8;
152:15;161:3

**communicate (1)**
315:6

**communicated (2)**
315:10,11

**communication (10)**
41:8;70:21;71:24;
72:7,11;78:23;
114:24;141:11;
275:10;422:25

**communications (6)**
43:25;81:14,17,19;
110:6;133:15

**comparable (10)**
131:5,8;143:9,12,
17,20,21,24;144:2,5

**complain (113)**
226:4,10,12,14,18,
21;231:25;232:15,
17;236:11;244:19,
23;245:6,13;247:2,6,
8,11,14,16,18;
249:20,25;250:13,
15,19,21;251:4,7,10,
13;258:8,11,17;
260:11;261:2,11,25;
262:6,13,20,22;
264:14,21;265:15,
19,22,25;266:4,25;
277:6,22;278:4,11,
18,24;279:10,22;
280:2,21;281:9,10,
24;282:6,10,17,21,
21,24;283:3,7,10,13,
16;285:23,24;
286:13;287:24;
288:3,6;289:21,24;
290:7;304:22;311:8,
9,21;312:3,5,9;
325:6;326:10,23;
327:2,15,17;328:4;
334:19,22,24;335:2;
337:20;339:5,10,12;
343:6,21,25;344:4;
347:23;471:7,14,17

**complained (48)**
234:8,21,22;235:6,
11,23;236:18,25;
237:16;245:9;247:3;
248:8,9;250:25;
253:17,24;254:12;
257:23;260:8,14,22;
261:17,18;265:7;
273:22;279:6;286:5,
15;288:20;289:13,
19;295:23;299:3,19;
306:20,24,25;307:3,
8;309:16;312:21;
326:14;420:21;
441:18,25;442:7,11,
15

**complaining (14)**
234:24;248:16;
251:16;252:3;
253:15,16;280:14,
16;286:10;318:3;
325:8;326:16,24;
327:3

**complaint (36)**
26:23;38:15,19;
39:5,25;42:5,7,9,15,
17;43:21;44:4,5,16;
49:21;73:16,17,21;
83:25;115:6;232:12;
277:18;290:19;
297:2;307:24,24;
346:23;347:14;
375:6;379:20;381:8;
415:22;428:3;

487:13,16;488:11

**complaints (26)**
239:8;240:16;
246:23;247:24;
252:5;253:19;262:3,
11,14,17;263:22;
266:18;277:14;
281:6;283:22;
315:19;328:13;
344:12,16,24;347:5;
420:15,16;421:6;
444:16;445:3

**complete (1)**
433:13

**completed (2)**
175:16;483:5

**completely (1)**
22:16

**completes (1)**
490:3

**complied (1)**
433:12

**compunctions (1)**
317:5

**concern (3)**
160:11;172:8;
311:6

**concerned (7)**
60:13;61:8;63:9;
64:19;178:12;
179:18;315:8

**concerning (61)**
20:14;21:16;
22:19,23;23:4;24:12,
21;45:7;52:15;
56:14;66:16;68:2,25;
69:6,11;74:14;75:18,
23;81:20;86:7;96:18,
24;99:11;104:12;
105:20;109:10,24;
110:5;113:12;
114:25;115:2;
121:18;133:16;
141:12;142:15,20;
143:3,11;144:10;
158:3;251:15;267:2;
289:14;313:6,16;
315:20;328:6,7;
374:19;375:2,9;
421:18;422:20;
432:5,16;454:5;
457:12,19;471:15;
472:11;483:3

**concerns (1)**
159:11

**conclude (1)**
474:6

**concluded (1)**
264:13

**condition (2)**
176:12,18

**conditioned (1)**
315:4

**condone (3)**
416:8;418:7;
429:22

**conduct (27)**
10:7;14:18;15:8;
19:11,14;212:24;
217:4,12,21;218:5;
219:13;223:21;
257:24;258:4;
260:18;275:4;
289:15;416:9;
427:24;429:23;
440:20;441:20;
442:12;474:17,22;
487:6,7

**conducted (6)**
188:16,19;291:21;
445:8,16;450:13

**conducting (2)**
217:22;221:10

**conference (4)**
42:14,21,24;104:9

**confident (1)**
184:16

**confirmed (1)**
462:9

**confiscate (5)**
257:5,9,10,20;
340:2

**confiscated (5)**
257:7;317:21;
319:8;340:3;342:15

**confronted (7)**
144:10,13,18,25;
145:25;226:24;227:2

**confused (5)**
66:21;125:3;293:3

**connection (7)**
44:20,23,24;74:20,
22;75:3,9

**CONNOLLY (9)**
5:6,7;173:14,22;
483:11;488:16,19;
489:10;492:18

**connotation (1)**
354:3

**consecutive (1)**
348:12

**consider (6)**
40:6;131:7;
143:17;145:24;
450:16;453:20

**consideration (3)**
34:4,15;85:21

**considered (6)**
161:25;162:6,9;
186:17;211:15;
453:22

**consisted (1)**
227:20

**conspiracy (4)**
376:7;447:8;
479:22;480:3

**conspire (1)**
479:19

**consulting (1)**
445:10

**consume (2)**
329:12;330:14

**contact (5)**
86:7;100:14;
381:14,16;382:15

**contacted (2)**
46:12;314:6

**contacting (1)**
440:3

**contacts (2)**
314:20;381:5

**contain (1)**
111:22

**contained (1)**
159:24

**containers (1)**
267:11

**contains (2)**
112:15;113:3

**contend (1)**
473:11

**contention (3)**
158:16;460:7,21

**context (1)**
91:14

**continually (6)**
252:18;261:18;
262:22;305:5;310:8,
11

**continue (8)**
97:25;171:15;
175:21;261:25;
309:13;331:3;
450:12;463:10

**continued (3)**
192:7;331:4;
489:18

**continues (1)**
436:20

**continuing (4)**
329:11;330:14;
333:20;454:2

**contribute (1)**
197:3

**control (8)**
176:25;224:6;
228:12;300:19;
313:10;366:24;
394:16;473:23

**convenient (1)**
48:22

**conversation (82)**
20:23;21:7,14;
23:18,24;45:23;
56:18;68:2,10;71:3,
18;73:2;74:12;
76:20;77:2,20;78:12;
79:5,21;80:13,18,24;
82:3;83:14,18;97:16;

Case 2:07-cv-01215-SJF-ETB Document 145-11 Filed 01/15/10 Page 136 of 164 PageID #: 2116

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

127:12;129:8;152:3;
156:18,21,25;157:3,
6,13,18;166:21;
190:11;193:3,4,16,
17,21;194:23;
195:19;281:22;
282:19;283:9;
286:18;308:20;
318:6;375:25;407:7;
416:13;417:22;
418:12,16,25;
419:17;422:10;
423:25;424:13;
427:18;428:5,9,16,
17;429:8,10,13,14,
25;430:6,8;432:9;
434:2;458:15;
463:17;468:18,24;
469:4,21
**conversations (15)**
75:18,23;77:9,14;
80:5;142:19;275:11;
276:6;308:18,22;
309:3;310:3;374:18;
407:24;430:11
**convicted (5)**
10:9;15:21,22;
16:17;17:10
**Conway (2)**
322:4;337:7
**cooperate (8)**
386:13;401:7,9;
441:11;446:11,24;
447:19,21
**cooperated (1)**
386:17
**cop (2)**
146:4;190:20
**copies (2)**
62:13,16
**cops (22)**
30:23,25;31:7,10;
121:8,13,16,16;
124:4,5;129:12;
130:17;131:2,2;
169:10;185:18;
291:15;300:12;
392:13;393:19;
462:24,25
**copy (7)**
7:19;17:6;20:9;
38:23;39:4;62:13;
240:4
**corner (2)**
316:6,19
**corps (2)**
18:20,22
**corrected (1)**
370:18
**correctly (14)**
45:22;54:14;77:6;
84:13;101:20;
130:16;247:22;

289:3;305:12;330:4;
334:10;400:11;
401:16;409:13
**correspondence (3)**
423:9;432:3,13
**corruption (3)**
345:19;470:15;
471:15
**counsel (13)**
3:3;4:21;18:18,21;
23:5;24:14,25;25:9,
11;36:18;50:11;
63:15;379:10
**County (75)**
5:10,12;6:14,15,
17,19;7:5,12;11:14;
12:4;14:6;33:13;
35:3,16,18;36:2,11,
25;37:12;44:4,17;
45:6;46:4,21;50:6,
13;51:2;52:14;
53:18;56:13;60:8;
63:2;68:24;69:13;
88:2,2;113:23;179:5;
198:20;199:10,16,
21;200:7;202:19;
203:23;204:20;
206:14;211:9;
314:18,21,24,25;
315:13;379:18;
382:20,24;383:25;
384:2;437:18,19,22;
439:6,18;440:9,18;
460:8,11,14,19;
470:17;471:4,13,18;
478:20;487:13
**couple (4)**
62:15;239:8;
269:23;321:12
**course (11)**
33:25;58:21;
248:19,21;260:6;
264:5;273:14;
308:25;315:3;450:7;
468:3
**Court (19)**
3:16;4:8,16,18,19;
5:14;10:10,11;15:23;
16:17;17:11;18:9,15;
19:16;139:17;
147:24;152:3;
460:25;467:13
**Courtney (1)**
5:8
**courts (1)**
225:2
**cover (18)**
169:13;217:10;
351:16;367:6,7;
375:2,9,14;376:7;
392:24;393:6;
446:22;447:8;455:3;
459:9,13;468:6,11

**coworker (1)**
154:7
**coworkers (3)**
94:6;152:19;
195:25
**Craig (5)**
94:9,10,11;95:6,9
**create (1)**
378:5
**credited (1)**
29:12
**crime (4)**
301:8;302:20;
460:22;465:15
**crimes (3)**
43:14;312:23;
331:6
**criminal (3)**
459:10,14,15
**criticized (3)**
194:17,24;195:10
**crossed (1)**
225:23
**crowd (5)**
313:25;410:16,20;
484:7,14
**cue (1)**
393:24
**cup (2)**
346:11,12
**curious (1)**
53:5
**current (1)**
180:4
**currently (2)**
170:6;178:7
**custody (6)**
224:6;302:8;
304:2,7;313:10;
473:23
**cut (1)**
462:23

## D

**DA (18)**
44:18;45:23;
47:15;50:6;60:6,21;
128:24;315:23;
316:2;327:23;328:2;
343:6,21;459:19;
460:8,11,14,19
**Dale (1)**
368:13
**damage (1)**
177:9
**damages (2)**
196:19;205:19
**damaging (5)**
110:22;111:23;
112:15;113:3;115:16
**dangerous (5)**
257:24;258:4;

326:13;369:18;
370:17
**dangerously (3)**
232:23;233:18;
235:24
**DAs (1)**
73:9
**DA's (8)**
46:21;47:11;
50:20;56:13;72:24;
74:14;75:15;169:19
**date (19)**
8:6,15;28:14;29:6,
14;43:17,18,24;
48:23;82:15;83:15;
135:11;177:24;
184:11;191:22;
380:23,24;444:15;
464:9
**dated (3)**
162:18,22;380:5
**dates (1)**
99:25
**daughter (5)**
145:5,5,18,22;
301:12
**daughter's (1)**
301:25
**day (56)**
7:25;20:25;31:25;
32:23,24;35:6,6;
37:22;58:16;65:13,
14;71:11,12;81:24;
93:13;98:10;111:11;
116:25;117:3;
126:23;148:20;
150:23;171:2;184:2;
200:11;216:10;
255:16,17;256:3,3,4;
326:11;368:20;
415:6,9,9,11;417:11,
12,23;420:17;421:5,
17;424:10;428:21;
429:11,13;444:3,4;
457:11;462:16;
464:2,5;487:4;
490:11;492:6
**days (15)**
27:23;45:16,19;
49:4,5;180:7,9,15;
191:2;216:11;
227:22;264:22;
420:23;435:18;468:2
**DD (1)**
20:9
**deadly (1)**
370:15
**deal (1)**
17:15
**Dear (1)**
63:9
**December (4)**
103:15;128:25;

177:12;192:2
**decided (11)**
31:7,13;34:2,14;
35:11,12;122:3,15;
153:17;204:10;
486:20
**decision (1)**
17:24
**deck (3)**
318:19;360:9;
484:16
**declaration (2)**
8:3;9:3
**declare (1)**
9:5
**declared (1)**
8:5
**defamatory (14)**
159:11;163:7,9;
164:18;167:25;
471:20,23;472:10,
21;473:10,16;474:9;
477:8;483:3
**defames (1)**
473:20
**Defendant (6)**
5:3,4,6;478:24;
480:12,16
**Defendants (4)**
4:7;5:3;477:7;
478:19
**Defendants' (1)**
38:16
**defending (1)**
201:23
**define (1)**
147:17
**definitely (2)**
160:11;323:19
**Dehnhoff (1)**
348:14
**D-E-H-N-H-O-F-F (1)**
348:15
**D-E-H-N-O (1)**
348:14
**delayed (1)**
231:4
**deliberately (1)**
478:21
**demanding (1)**
431:4
**denied (2)**
84:7,14
**department (87)**
30:10;31:17;33:4,
6,10;35:3,16;36:2,
11;37:2;52:17;
54:18;86:12,13,16,
22;87:15;88:17;
89:14;94:15,17;
95:18,23,25;96:6;
98:9;107:4,5,8;
110:5;113:19;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 137 of 164 PageID #: 2117

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

114:23;116:7,10;
117:23;131:12;
137:7;139:24;
149:12;152:10;
156:24;158:7,20;
160:21;162:15;
165:14;166:10;
167:2;170:9,12;
185:2;187:7;188:22;
191:7;192:8;196:11;
212:21;228:5,12;
232:22;233:17;
253:15;283:23;
288:15;314:18,22;
315:20,22;328:5;
329:10,19,23;
330:12;341:7;345:6;
351:24;368:6;
407:25;432:2,13;
439:16;470:18;
471:14,18;475:3,4,
21
**departmental (1)**
470:7
**Depending (1)**
66:5
**deposed (1)**
20:15
**deposition (20)**
3:6,13;4:3,11;21:2,
16;22:5,9,19,23;
24:16,19;76:14;
174:11,14;175:19;
384:15;474:5;483:2;
490:3
**depositions (4)**
6:7;15:3;23:19;
489:14
**deputy (1)**
192:6
**derision (5)**
344:15,25,25;
345:3,4
**D-E-R-I-S-I-O-N (1)**
345:2
**describe (8)**
14:10;152:5,24;
175:23,25;177:5;
224:23;287:10
**described (3)**
8:9;329:2;456:22
**designated (1)**
136:24
**desk (20)**
220:4,19;221:5,11;
228:9;267:21;273:2,
21;287:9;293:17;
341:5,5,21,22;342:4,
11,18;417:9;425:22;
426:15
**despite (2)**
317:8;425:4
**destroyed (1)**

341:7
**Detective (4)**
44:11,12,12;70:22
**determine (1)**
132:12
**developed (1)**
417:18
**DI (3)**
18:3;204:7;492:9
**diagnosed (1)**
177:10
**Diane (1)**
391:14
**different (6)**
21:21;47:6;80:20;
231:13;296:17;
399:22
**differently (1)**
196:13
**difficult (1)**
370:5
**dipping (5)**
60:11;69:2,3,7,10
**direct (13)**
55:6,9,19,25;
105:13;115:11;
252:7;262:4,10;
468:6,11;476:7;
480:12
**directed (5)**
166:17;308:4;
317:6;437:10;447:20
**direction (2)**
306:10;425:2
**directive (8)**
165:5;239:17,22;
240:5,6;241:7,14;
433:13
**directives (1)**
312:22
**directly (19)**
88:11;93:25;
94:23,25;96:20;97:2;
102:2,21;107:10,12,
15,21;108:9,11,14;
189:25;190:4;
199:18;338:7
**director (9)**
89:10,15;119:16,
17;120:12;122:19;
126:6;129:4;130:21
**disability (2)**
100:12;189:21
**disappearing (1)**
293:13
**discharge (11)**
10:19;13:9;16:23;
17:7;19:10,11,14;
20:10;487:5,7
**discharged (15)**
10:4,6;11:17;
14:12,17;15:8;16:5,
9,10,12;18:25;19:3,

7,20;139:17
**disciplinary (5)**
165:7;181:3,4,10;
194:2
**discipline (1)**
165:11
**disclose (1)**
119:8
**discover (1)**
167:6
**discovered (1)**
223:15
**discovery (2)**
58:22;114:22
**discredits (1)**
473:21
**discrepancies (4)**
433:14;434:6,9,12
**discuss (16)**
22:4,6;81:4;
107:18,23;108:20,
22,25;125:22;
142:25;151:24;
374:22;420:3,7;
445:21;458:14
**discussed (11)**
22:9;23:23;57:16;
79:12,22,23;106:2;
121:20;130:16;
151:18;445:22
**discussing (2)**
106:6;140:23
**discussion (1)**
121:10
**discussions (1)**
44:9
**disdain (2)**
344:15,25
**dishonorable (1)**
19:10
**dishonorably (3)**
18:25;19:3,8
**disparaged (2)**
456:19,23
**disparaging (2)**
339:13;457:4
**dispatcher (1)**
272:20
**disregard (2)**
313:6,15
**disregarding (1)**
312:23
**distinction (1)**
302:21
**distress (7)**
175:23;176:2;
177:18;178:5;
179:22,23;182:13
**District (17)**
4:8,9;44:3,17;
45:6;46:4;49:8;
50:13;51:3;52:14,21;
53:18;54:24;55:16;

68:24;70:21;71:25
**disturbance (2)**
193:11;267:22
**disturbances (1)**
330:18
**division (1)**
119:18
**dock (5)**
228:10,11;229:20;
230:24;473:8
**doctor (2)**
176:9;178:8
**doctor's (6)**
176:7,14,19;189:9,
18;190:23
**document (50)**
7:4,11;8:8,16;9:11,
15;11:8;12:2,18;
13:22;15:6,12,15;
16:24;17:3;20:5,8;
26:6,8;27:25;28:3,9,
10,21,25;35:7;38:24;
39:7,9;40:7,7,11;
62:11;64:10;102:8,
12;111:21;112:13,
25;116:18,22;
135:15;147:25;
148:4;150:4;174:13;
212:7;361:25;378:4;
443:21
**documentation (2)**
91:23;179:11
**documents (10)**
15:10,17;52:24;
58:6;112:19,21;
113:22;114:7,22;
405:19
**domestic (5)**
345:22,25;346:9,
23;488:21
**done (20)**
6:21;115:25;
167:19;168:16;
208:19;227:10;
234:17;235:3,4;
239:17,19;286:23;
385:18;391:5;422:6,
12;474:20;477:2;
482:20,24
**door (9)**
193:12;221:7;
352:25;353:4;
357:19,20,22;
367:23;368:2
**doorway (3)**
353:8;356:2;
369:16
**double (5)**
60:10;69:2,3,7,9
**down (77)**
16:11;21:11;
65:19;69:18;78:10;
81:13,13;94:17;95:4;

96:6,7,9;100:24;
101:5,7;136:7;137:3;
138:8,23;139:9;
180:25;182:25;
183:2,11,12,18,21;
184:6,10,17,18,23;
185:2,5,12;186:6;
187:23;189:12;
190:24;220:4;
241:10;244:14;
254:16;307:9,12,15;
313:24;316:20;
323:13,16;324:15;
326:4;336:5;353:6;
355:15;357:3;365:6;
366:25;367:7,20;
390:5;394:2,7,11,18,
21;395:5,21;396:10,
12,14,22;397:3;
400:2;484:17;486:5,
7
**dozen (4)**
147:19;155:20;
167:5;389:3
**draft (3)**
40:3,25;41:18
**drafted (2)**
38:23;452:3
**drafting (1)**
28:9
**drafts (1)**
39:25
**drank (4)**
233:6,9;322:13,23
**draw (3)**
483:12;487:3;
488:9
**drawer (3)**
341:22;342:4,12
**drink (7)**
220:20,22;223:8;
257:3,7;259:8,22
**drinker (1)**
304:7
**drinking (44)**
218:8;219:16,16,
25;222:18,20;
227:24;231:7,21;
233:3;258:23;
259:13;261:3;
264:15;265:8;266:7,
19,20;299:5,20;
300:5;301:8,10;
303:17;304:18;
305:15;306:2,4;
308:19;309:4;311:7,
18;312:8;314:10;
315:7,20;322:6,16;
323:4,23;324:15;
333:23;334:13;419:2
**drive (3)**
227:24;234:15,16;
244:13;380:14

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 138 of 164 PageID #:
2118

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

**driving (9)**
258:23;259:23;
351:11;368:20;
369:22;370:22;
372:16;373:4;374:15
**drop (4)**
188:13;229:5;
325:18;342:12
**dropped (4)**
325:19,20,21;
326:2
**dropping (4)**
323:13;324:20;
325:12;331:10
**drove (5)**
71:9;364:7;
380:16,19;414:15
**drug (5)**
314:12;318:11;
340:4;342:14,17
**drugs (6)**
329:13,15,22;
330:15,23;340:3
**drunk (4)**
223:9;323:18;
325:22;442:17
**drunken (1)**
324:20
**due (6)**
14:13;16:13;84:9;
180:7;432:20;480:14
**duly (1)**
5:17
**during (55)**
13:2;17:4;32:24;
33:25;54:5,20;55:5,
10;56:10;57:19;
77:25;79:4,18,20;
101:17;120:13;
132:18;148:20;
169:16;174:5;
205:15;215:23;
216:2,5;219:21;
254:9,25,25;255:2,
15;256:2,11,21;
262:10;264:5;265:4;
283:8;284:22;285:3;
294:6;296:15;
311:25;315:2;
332:17;382:2;385:5;
398:16;416:13;
419:16;430:8;
461:10;463:17;
468:17;469:4,20
**duties (2)**
138:2;344:14
**Duty (55)**
20:2,10;21:24;
65:22,24,25;136:25;
213:12;214:13,16,
19;215:8,10;218:8;
219:16,25;224:11,
11,20,21;225:3;

227:19;230:13,24;
233:6,10;234:11;
238:25;255:4,12;
256:11;259:16,22;
266:7,20;267:21;
284:4,21;285:2;
287:9;293:12;
296:16;298:18;
351:13;366:6;
378:14;392:13,21;
393:19;413:8;414:6;
425:5;437:11;
440:24;442:17
**Dyer (7)**
337:10,11,25;
338:16,17;345:20,23

**E**

**E1 (1)**
19:18
**earlier (8)**
140:10;418:24;
419:4;423:16;
480:25;487:4,8,17
**early (5)**
32:12;141:22;
299:22;345:20;485:5
**earn (1)**
130:8
**ears (1)**
408:3
**easily (1)**
326:2
**Eastern (1)**
4:8
**easy (1)**
325:21
**Ed (31)**
4:18;31:23;66:22;
82:4;83:14,18;136:7,
9,11,18,18;137:8;
138:6;151:3;154:23;
155:2;202:15;203:5,
11,18;204:11,13;
207:16;250:13;
251:4;254:7;406:4,
15;444:3,5;487:18
**Eddie (15)**
26:3;47:5,6;60:10,
16;82:7;87:8;94:11;
348:6;457:5;458:24;
462:7,10;463:16;
472:7
**edge (1)**
323:15
**Edward (1)**
4:5
**effect (4)**
3:15;96:16;194:6;
462:25
**eight (6)**
13:4;222:14;

348:25;349:12,15,17
**either (19)**
27:15;34:16;
105:3;107:24;
156:12;226:16;
236:25;246:25;
248:11;267:22;
287:13;294:3;344:8;
366:8;378:13;
391:14;404:7;
436:17;441:4
**EL (10)**
7:8;12:7;20:4;
26:10;28:6;38:21;
63:12;135:19;148:7;
211:25
**elaborate (2)**
469:20,23
**elaborated (1)**
149:7
**elicit (2)**
314:12;318:10
**eligible (3)**
206:13;209:9,24
**else (50)**
19:19;48:18;54:6;
71:2;85:7;98:8;
99:17;120:4,7;
122:19;124:8,9,12;
145:12;159:15;
161:12;244:21;
265:8;267:13;
269:12;306:24;
331:25;341:17;
344:20;351:13;
365:16;368:3;
370:20;373:6,18;
376:5;377:13;
386:15;393:11;
416:5;417:14,21;
418:12,15;424:2,13;
427:8;436:14;453:4;
469:25;470:25;
475:5;476:22;
484:16;489:5
**elsewhere (1)**
93:14
**embarrass (2)**
202:21,25
**emotional (11)**
175:23,24;176:2;
177:17;178:4;
179:22,23;180:8;
182:12;203:14,15
**employed (14)**
99:17;100:3,13;
101:17,22;113:24;
169:3;171:18;172:7,
9;183:24;298:8;
479:5,8
**employee (3)**
30:18;119:7,12
**employees (3)**

152:14;160:18,25
**employer (15)**
86:5;91:16;
100:25;101:2;
119:10;137:14,18;
182:10;204:20;
477:17,25;478:4,6,
11,15
**employers (3)**
69:20;143:10;
477:12
**employment (37)**
6:13,15;7:6,13;
12:5;14:6;28:14;
29:25;32:17;37:21;
58:16;91:15;93:9,13;
106:3;109:10;117:5;
126:8;127:21;131:6,
8;137:11;139:2;
143:3,9,12;182:22;
184:3;198:16,18;
204:22;206:4;315:3;
427:15,20;475:3;
492:7
**empty (7)**
259:2;267:10;
283:24;284:13;
318:21,23;322:17
**EMTs (1)**
368:15
**encouraging (1)**
336:18
**encroach (1)**
79:21
**end (27)**
7:25;24:9;115:22;
129:21;175:18;
180:22;220:13;
221:25;222:19;
237:8;259:3;265:19;
266:14;336:24;
346:6;347:7;351:7;
378:16,17;386:8;
412:15;413:12;
419:13;432:22;
481:25;482:5,6
**endangering (1)**
328:15
**ended (1)**
264:21
**endemic (2)**
470:14;471:15
**ending (2)**
292:16,18
**ends (7)**
24:7;76:10;
146:10;211:19;
296:5;379:2;456:7
**enforce (1)**
312:22
**enforcement (16)**
32:18;33:2;37:24;
38:12;115:20;116:3;

131:6,9;133:6,13;
143:10,13;144:5;
205:10;298:12;
344:13
**engage (5)**
216:19,22;217:7;
219:13;296:18
**engaged (6)**
212:25;223:21,25;
375:2,9;470:18
**engaging (1)**
427:24
**enjoyed (1)**
31:15
**enormous (1)**
203:14
**enough (4)**
80:2;167:14;
170:9;355:20
**entered (2)**
36:16;172:23
**entire (5)**
221:9;258:14;
300:3;351:16;409:22
**entitled (5)**
7:12;201:14;
202:2,4;466:13
**entries (1)**
173:24
**entry (2)**
173:17;475:23
**envelope (5)**
59:21;63:25;64:6,
7;71:19
**enzymes (1)**
177:6
**escapades (3)**
296:19;297:25;
298:9
**especially (1)**
309:5
**essentially (1)**
470:5
**established (1)**
248:24
**et (2)**
4:5,7
**etcetera (1)**
330:20
**Even (40)**
27:22;30:17;49:6;
55:12;98:23;116:8;
124:22;125:21;
142:23;143:16;
165:23;202:21;
227:13;230:2;236:9;
252:17;257:7;
262:25;264:17;
267:25;268:2,3;
284:21;285:2;
294:17;298:18;
304:16;311:23;
316:12;321:9;

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

333:21;396:16;
400:2;411:21;
412:23;445:2;
446:24;460:11,19;
473:6
**evening (8)**
385:14;398:16;
401:2;414:12;
416:24;457:20;
461:19;489:4
**event (3)**
386:24;394:11,19
**events (6)**
82:12;445:18;
452:5;454:6;456:18;
457:20
**everybody (9)**
152:10,12;185:2;
288:21;377:15;
386:13;398:20;
426:7;486:20
**everybody's (1)**
132:6
**Everyone (6)**
169:16,17;187:2;
319:17;394:4;426:3
**evidence (16)**
114:2;115:7,12;
116:14,16;341:6,23;
429:16;454:9,14,14,
16,17,20,23;455:16
**evident (4)**
317:3;323:7,7,21
**exacerbated (3)**
17:25;176:8,12
**exact (5)**
23:24;25:24;
158:5;181:19;375:21
**exactly (6)**
18:10;27:16;43:9;
45:18;49:3;50:21;
64:15;78:8;177:13;
181:23;182:2;205:7;
214:23,24;219:9,18;
240:3;246:12;
293:21;294:24,25;
299:21;309:24;
311:10;331:20;
332:20,25;339:17;
353:17;355:10,15,
21;359:18,24;
360:15,19;361:15,
18;374:13;385:3;
389:8;406:14;
408:17;411:10,13;
415:17;434:4,22;
435:16,21;443:13;
447:6;449:10;457:8;
458:6,13;462:13;
479:12;480:9;482:7;
484:24;485:3
**exam (3)**
87:7,13;209:23

**EXAMINATION (6)**
6:10;379:13;
384:16;483:6,10;
492:15
**Examinations (2)**
7:14;14:7
**examined (1)**
5:18
**example (5)**
216:24;223:18,22;
268:7;345:19
**excaliber (2)**
150:20;153:24
**except (1)**
3:9
**exceptional (1)**
212:18
**Excuse (12)**
27:6;59:24;
136:14;200:20;
203:4;204:17;
228:10;243:2;
244:16;250:10;
368:25;377:11
**executed (2)**
8:22;12:18
**Execution (1)**
28:3
**executive (1)**
89:20
**exercise (1)**
165:11
**Exhibit (4)**
12:2;159:23;
475:10;488:10
**Exhibit-1 (1)**
7:7
**Exhibit-10 (1)**
211:24
**Exhibit-2 (1)**
12:6
**Exhibit-3 (1)**
20:3
**Exhibit-4 (1)**
26:9
**Exhibit-5 (1)**
28:5
**Exhibit-6 (1)**
38:20
**Exhibit-7 (1)**
63:11
**Exhibit-8 (1)**
135:18
**Exhibit-9 (2)**
148:6;159:3
**expanded (1)**
85:11
**expansive (4)**
284:22;285:3;
286:2,16
**expected (1)**
417:25
**experience (4)**

137:11;138:23;
139:3;438:8
**experienced (1)**
32:2
**experiences (2)**
321:11,22
**expire (3)**
208:17,20;209:4
**expired (5)**
208:16,23;209:8;
211:3,5
**explain (18)**
16:8,21,22;17:6;
181:25;227:15;
230:3;268:16;
269:19,24;270:3,7;
291:6;317:15;
416:17;423:10;
462:18;466:24
**explained (7)**
93:6;179:21;
189:17;194:10;
345:23;416:15,18
**explaining (1)**
416:15
**exposed (1)**
480:14
**extensive (2)**
314:11;318:12
**extent (3)**
77:23;127:11;
381:23
**extreme (1)**
179:22
**extremely (1)**
323:23

## F

**face (5)**
102:3,21;344:22;
368:18;369:7
**face-to-face (1)**
50:4
**fact (48)**
15:20;17:6;20:14;
30:13;40:20;41:19;
69:2;72:18;78:17,20,
22;79:3,11;80:12,16;
103:25;145:16,23;
165:23;166:2,4,8,11;
170:13;252:13;
257:4;261:2;290:24;
304:4,17;317:8;
341:21;342:4;
371:19;372:8;
401:21;424:14;
425:4;439:25;440:7;
442:16;447:14,17;
450:25;452:24;
453:10;455:10;
474:24
**facts (3)**

19:5;41:2;42:2
**fail (1)**
37:14
**failed (8)**
34:5,16,18;36:5;
37:10,13,16;340:18
**failing (1)**
181:17
**fair (5)**
54:23;55:15;80:2;
289:19;441:17
**fairly (1)**
358:16
**fall (4)**
141:22;313:24;
323:25;324:2
**fallen (2)**
323:16;326:4
**false (25)**
105:19;107:9,14,
22;108:17;110:22;
111:19,22;112:3,15;
113:3;115:15,21;
149:3;159:24;
161:14;167:7;169:6;
454:5,11;455:3,15;
459:4,15;463:14
**falsely (2)**
131:3;151:7
**falsifying (1)**
69:11
**families (1)**
144:17
**family (13)**
14:13;16:13;
17:14,16;144:9,10,
24,25;145:3,13;
189:21;197:3,13
**far (11)**
138:17;140:25;
142:23;143:4;
196:24;266:16;
323:17;327:7;
359:18;378:12;478:9
**fast (1)**
230:21
**favor (2)**
244:6;245:24
**favorably (2)**
477:14;478:12
**fax (1)**
469:4
**faxed (2)**
433:21;469:2
**fear (1)**
61:5
**feedback (1)**
140:18
**feel (12)**
60:20;61:4,5;
63:15;171:24;
176:16;262:12;
290:11;293:9,22;

407:17;420:9
**feeling (1)**
176:16
**feet (1)**
313:25
**fellow (2)**
288:11,12
**felt (11)**
57:4;61:8;62:3;
64:16;185:15;
419:21;420:2,6,11;
421:4;452:11
**ferries (1)**
403:19
**ferry (2)**
403:15,17
**few (21)**
20:15;27:22;45:3;
180:16;213:16;
218:22;225:22,24;
231:10,16;247:23;
255:20;270:8;
272:11;324:15;
359:22,25;379:11,
20;406:7;488:22
**field (17)**
377:25;378:2,4;
416:25;424:25;
425:11,16;426:10;
443:11,16;451:5,7,
15;452:2,10,17;
457:6
**fight (18)**
268:13;269:10,13,
14;273:7;393:17,23;
437:12;440:25;
441:3;454:6,7;462:2;
483:15;484:3,19;
485:14,15
**figure (1)**
303:2
**figured (2)**
178:8;483:9
**file (12)**
91:22,25;92:7,14;
212:12;415:22;
416:23;426:16,19,
23,25;428:3
**filed (19)**
6:12;36:13;39:5,
14,19,23;40:2,22;
42:7,8,13,17;49:18,
20,22;73:15,18;
104:5;459:3
**filing (19)**
3:4;39:10;42:15;
43:21;44:4,5,16;
50:6;77:3,7,10,16,
18;78:10,16;81:20;
345:25;346:23;
459:15
**fill (7)**
11:22;138:25;

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 140 of 164 PageID #:
2120

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

140:13;199:9;
207:10,11;377:23
**filled (7)**
11:9,17;126:19,23;
135:24;136:4;207:12
**filling (1)**
208:15
**finally (4)**
229:9;411:8;
419:22;446:12
**Financial (3)**
197:6,9,9
**find (17)**
85:9;106:18;
126:8;158:24;
163:14;164:5;
167:12;182:16,22;
197:19;305:20;
347:19;355:15,20;
364:22;381:18;
417:18
**finding (1)**
443:19
**fine (17)**
26:22;29:13;64:9;
88:19;98:4;122:18;
201:6;219:10;
264:19;386:6;
395:12,25;396:3;
408:23;451:23;
455:19;480:11
**finish (13)**
22:15;24:3;34:11;
46:18;88:24;95:9;
132:10;153:20;
154:17;306:14;
349:9;392:16;465:23
**finished (3)**
132:13;175:10;
412:21
**Fiorillo (49)**
22:22;23:23;
24:10;25:23;46:14;
80:11,12,17;155:24;
156:2,4,11,16;254:7;
275:3,18,21;336:9;
345:21;348:12,25;
349:11;364:25;
366:16;387:15;
390:17;391:4;
397:14;400:7;
401:22;402:10,20;
403:8,15;405:15;
406:18;425:3;
431:25;441:24;
448:14;453:3;
456:17,23;457:3,12;
461:25;462:5;463:4;
484:21
**fire (14)**
188:24;190:9,18;
191:19;193:21,23;
227:18;416:10;

418:9;427:25;430:3;
458:18,23;479:20
**firearm (1)**
383:14
**firearms (2)**
383:6,18
**fired (70)**
45:14;48:8;82:14,
16;83:2,8,9,10;
85:25;90:11;93:13;
97:5;101:10;109:19;
110:2,7;111:14;
112:8,20;113:15,16,
17;114:17,17,20,25;
117:2,3,8;120:6;
121:19,23,25;122:9;
123:22;148:20;
152:20;160:18,21;
162:10,25;163:4,13,
16,24;164:3,8,11,15;
184:19,24;185:13;
200:8,11;202:24;
343:11,14,15,21;
428:6,10;430:6,24;
453:14,14;455:12;
464:2,5,13;473:3
**firing (12)**
106:3;112:2,19;
116:5;148:25;152:9;
417:25;418:4,23;
419:13;464:14;
472:24
**firm (5)**
4:16;50:19;57:11;
81:6,18
**first (85)**
5:16;7:11;10:14;
13:5;14:9;32:23,25;
35:6,21;36:6,24;
37:5;45:5;50:4,12,
20;54:5;56:9,10;
57:15,23;60:22;
61:23;68:9;73:9;
84:5;118:4,23;125:8,
17,19,21;127:13;
128:12;140:16;
158:10,12,16;
165:11;177:10;
192:14,14;193:4;
212:14;234:2;
235:11;258:5,11;
260:14;285:25;
286:14;297:8;
299:16;309:20;
316:10;336:25;
350:18,20;351:21;
352:12,14;353:4;
363:18;366:11,13,
15,17;379:21;384:8;
392:23;393:10;
398:20;414:12;
422:19;432:8;
436:10;452:21,22;

462:8;468:24;
470:19;477:16;
483:14,16;486:3
**fist (1)**
354:25
**fists (1)**
393:23
**fit (1)**
130:5
**five (16)**
30:5,16;101:15;
171:3;208:22;
213:19,19,20;255:8;
258:15;296:10;
309:24;321:8;
345:15;359:5;379:3
**flog (1)**
162:4
**floggings (1)**
161:25
**floor (4)**
314:2;316:10,14;
324:21
**florist (1)**
316:11
**focused (1)**
388:16
**focusing (1)**
305:23
**folded (1)**
357:22
**folder (1)**
425:17
**follow (11)**
59:9;68:5,20;70:7;
132:7,11;182:3;
220:18;236:16;
237:2;418:2
**followed (7)**
122:25;124:3;
133:19,22;142:14,
16;433:21
**following (15)**
7:4;12:2;26:6;
27:25;62:11;147:25;
181:18;283:21;
296:14;298:11;
358:10;447:5;
457:23;463:11;
478:18
**follows (1)**
5:19
**follow-up (4)**
122:21;164:15;
433:20;469:3
**foot (7)**
182:4;272:8,12;
313:22;318:3;
349:18,20
**force (6)**
3:15;54:16,21;
142:8;143:25;158:18
**forced (4)**

349:12,13,16,18
**forces (2)**
10:19;13:9
**forget (6)**
151:2;181:19;
316:23;362:15;
436:2;458:6
**forgot (1)**
435:23
**form (3)**
3:10;202:3,5
**formed (1)**
52:22
**former (3)**
119:7,9,12
**forming (2)**
30:9,10
**forth (5)**
42:4;233:22;
356:3;396:7;398:21;
470:13;478:19
**forward (6)**
174:7;306:11;
352:2;446:12;449:6,
8
**found (23)**
57:2;58:2,5,8;
61:2;70:23;113:15;
117:2,7;160:20;
177:7,8;184:13;
321:19;364:2,3;
365:11;375:17;
428:13;445:24;
449:2;453:12;459:25
**four (17)**
10:3;15:17;30:5,5,
16;82:9;163:12;
171:3;177:12;
207:22,23;212:3;
251:16;252:16;
254:19;256:24;296:6
**four-page (1)**
7:11
**frame (19)**
45:18;49:24,25;
100:8;132:18;140:9,
11;142:2;177:14;
183:16,17;206:21;
254:9;264:23;
276:22;277:3;
287:19;308:25;424:6
**frames (1)**
250:11
**Frank (45)**
23:6;80:21;
155:24;156:2,3;
157:15;254:7;275:3,
11,18;347:5,9,10;
350:24,25;358:7,11;
361:21;363:4,21,22,
22,23,25;364:11,13;
365:18;369:2;
377:11,13;378:10;

385:8;400:8;405:16;
412:10;414:9,10,19,
20,21;437:4,5;462:8;
472:6,7
**free (1)**
63:15
**frequented (2)**
298:18;300:13
**frequently (3)**
255:24;257:23;
312:20
**friend (5)**
21:11;244:7,8;
246:6;353:14
**friends (15)**
23:7;233:2;236:3;
237:18,23;298:13;
312:24;313:7,16;
314:17;377:3;
392:12;393:19;
445:11;446:7
**front (12)**
8:9;15:13;84:2;
168:3;221:7;337:4;
357:20,21;358:3;
367:23;368:2;392:5
**frowned (2)**
66:12,25
**Full (11)**
140:4;206:5;
207:13;318:21,22,
23,25,25;322:17;
438:2;486:4
**full-time (13)**
131:21;178:11;
181:12;206:25;
207:7,18;208:10;
209:9,25;210:10,14;
211:15;225:2
**full-timers (1)**
207:24
**fully (2)**
175:13;434:15
**fun (3)**
172:17,17;338:11
**funny (1)**
170:2
**FURTHER (10)**
3:8,12;79:15;
121:10;141:11;
337:13;341:20;
384:13;465:11;
489:11
**future (1)**
93:9

### G

**gap (1)**
29:25
**Gary (82)**
67:13;289:12;
290:16;334:5,12,20;

THOMAS SNYDER
September 24, 2008

Case: 2:07-cv-01215-SJF-ETB Document 145-11 Filed 01/15/10 Page 141 of 164 PageID #: 2121

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

335:2,4,8,13,18;
336:11;378:7;
403:10;404:11,13,
14,18,22;405:3,5,8,
20,23;406:5,16;
407:4,14;408:4,8,12,
19;409:2,14;410:7;
412:19,24;414:24;
416:2,11;417:17,19,
25;418:4,9,23;
419:13;423:22;
427:14,19,20;428:6,
10,13;430:3,6,11,24;
443:23;444:7,14;
445:3;453:11,13,23;
455:10;457:24;
458:8,16;463:12,20,
25;464:10;468:5;
480:18,20,24;481:4,
7,8,15;485:6

**Gary's (1)**
409:8

**GATTO (8)**
5:9,11;379:14,15,
17;384:13,15;492:17

**G-A-T-T-O (1)**
5:11

**gave (7)**
17:6;49:24;
159:24;309:18;
338:15;449:22;487:4

**general (8)**
10:10,11;15:23;
16:17;17:11;18:15;
19:15;36:18

**generally (5)**
24:8;184:25;
243:22;256:13;
431:13

**gentleman (2)**
48:5;54:17

**gentlemen (2)**
36:22;363:15

**George (134)**
30:15;43:12;
61:16;65:11;75:10;
76:24;83:11;85:2,13,
19;88:21;89:5,10,23;
90:3,4,8,16,20;91:11,
24;92:4,18;94:18,21;
95:5,10,14,20;96:5,
18,23;97:4,13;98:11,
17,25;99:3,11,19;
100:5;101:20,24;
102:7,19;103:7;
109:10;111:24;
122:2,10;136:22;
138:21;142:21;
157:20,24;162:16;
163:20;165:2,9,18;
183:9,10;199:25;
200:3,9;202:10,24;
204:15,16,18;

206:18,23;207:16;
213:3,7,11;232:15,
16,17;235:7;247:4,
24;263:19,23;
281:19;306:20;
307:10,21,23;
315:11;338:12;
349:14;371:13,16;
375:16;379:22;
380:4;405:22,25;
420:14,22;424:6;
425:11;442:2,12,15;
444:13;449:12;
450:19;451:2;453:7;
462:15;463:3,18,24;
468:10,14;469:5;
470:4,24;471:24;
472:11,21;473:11;
474:10,20;475:11,
16,22,25;477:17,25;
478:7,11

**German (1)**
298:5

**Gilbert (11)**
51:9,11;52:11;
53:8;54:4,9,12,15,
17;123:14;128:12

**Gilly (1)**
4:24

**girlfriend (3)**
401:16;461:10,14

**girlfriends (8)**
388:11;389:12;
400:13;401:3,13;
408:11;410:23;486:2

**girls (9)**
169:24;364:2;
377:8;389:19;393:4;
410:21;411:3;
461:17;486:8

**girls' (1)**
322:2

**given (9)**
36:14;102:8;
129:19;175:14;
256:20;311:6;312:7;
320:23;346:12

**giving (2)**
224:21;337:23

**glock (1)**
383:13

**goes (8)**
123:7;149:10,12;
157:18;254:16;
301:15;360:14;
370:14

**good (11)**
31:16;36:21;
121:16;122:24;
124:4;131:2;189:16;
379:15;452:4;
487:24,25

**GOODSTADT (236)**

4:23,24;6:8;7:16;
11:20;14:19;15:9;
16:18,25;18:3;19:4;
22:14;24:2,5,23;
25:21;26:16;34:10;
38:22;41:4,15,21;
42:6;44:20;46:17;
52:4;55:3,21,23;
59:8;62:14,20;74:20;
75:3;77:22;78:21;
79:6,10,19;80:9,15,
19;81:7,10,16;87:19;
88:24;92:23;97:19;
98:3;99:12;102:11;
105:8;108:13;110:8,
15;111:4;112:17;
113:11,13;126:3;
135:3;138:10;
151:23;152:2;
153:19;154:17;
157:23;158:12;
159:12;163:8;165:4,
20;167:18;168:6,15;
174:10,18;176:13;
178:24;181:6;188:2,
5;191:14;194:19;
196:22;199:22;
200:18,22;201:4,9,
15,19,21;202:4;
204:3,7;205:23;
207:5;208:25;213:8;
216:20;217:5;219:2;
224:14;230:18;
237:20;238:11,14;
239:11;240:23;
241:9,16;248:3;
251:18;271:6,13,23;
274:7,14;275:6;
276:5;279:11;286:3;
287:8;289:17,25;
291:4;294:21;297:4,
11;302:25;303:22;
306:14;310:6;
312:18;314:19;
320:9,13;323:9;
324:17,24;325:14,
23;326:7;333:15;
334:14;336:13;
339:19;343:3,16;
349:9;354:13;359:6;
362:5;364:20;
372:11,22;373:3,10;
375:4,11;381:11,21;
382:9;383:19;
384:10;385:16;
386:22;388:13;
392:16;394:13,25;
395:7,14;396:25;
400:16,21;402:23;
403:23;407:16;
409:11;419:25;
421:8;422:13;
430:14;435:25;

436:25;438:13,16,
23;440:13,15;
442:25;443:3;
444:17;445:4,19;
446:5;447:3,22;
448:8,12,16,20;
449:17,24;450:5;
451:10,17,19,22,24;
452:12;455:20;
460:17;461:12;
465:18,22;466:9,22;
467:9;471:10,25;
472:4,13,23;473:13;
474:12;476:19;
479:16;481:10,18;
483:7;488:14;489:12

**Goodstadt's (4)**
50:12,19;57:11;
81:6

**governmental (2)**
69:6;179:12

**grab (1)**
354:15

**graduate (1)**
383:3

**graduated (1)**
384:11

**grand (3)**
74:18,25;75:9

**Gray (4)**
36:16,18,21;76:14

**great (1)**
451:20

**group (20)**
314:9;317:4;
333:24;337:5,7;
338:8;353:6,11,13;
355:23,25;356:4,16,
20;357:5;358:13;
364:2;412:11;440:4,
5

**groups (2)**
355:19,22

**grow (1)**
161:22

**growth (1)**
205:21

**guess (39)**
11:9;111:9;
150:13;154:12;
188:15;201:19,21,
22;202:17;213:20;
220:16;244:12,15;
253:22;262:16,19;
269:21;289:20;
300:8,16;347:11;
354:20;359:11;
371:23;378:19;
380:5;389:14,20,22,
24,25;412:16;413:6;
415:3,10;464:3;
468:4;484:25;486:20

**guide (1)**

191:22

**guilty (5)**
459:23;460:2,4,21,
24

**gun (1)**
148:25

**guy (15)**
48:2;128:6;158:7;
203:2,5,10,18,21;
235:9;306:23;
361:18;363:7,23;
364:13;416:4

**guys (20)**
120:2;122:23,24;
123:8;156:19;
162:10;169:15;
186:18;202:20;
258:20;260:19;
275:13;293:10,23;
305:7;309:13;
364:10;367:5;
392:12;426:6

**guy's (1)**
96:2

---

## H

**hair (1)**
26:21

**half (12)**
33:24;130:13;
147:18;155:20;
167:5;244:15,16;
318:23,24;322:17;
411:20;484:25

**halfway (3)**
220:15;222:11,13

**Halloween (81)**
51:13,16,24;52:10;
53:20;54:3;55:17;
58:13;61:7;62:5;
64:18;65:3;73:22;
151:5;169:12;
185:22;186:9;
187:10;263:11;
264:3,6,11;266:17,
25;273:10;274:8,10,
22,23;275:2,20;
276:2;281:15;
286:20;334:11;
348:8;350:2;374:20;
375:3,10;376:8;
378:17;384:20;
406:9;413:5,10,11,
14,21;415:4,6,10;
416:19;417:11,23;
419:7,21;421:5,17,
18;422:21;423:15;
424:10;428:10,21,
23;430:12,22;432:3;
442:7;444:3;447:9,
12,15;455:5;461:11;
464:18;468:7,12;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 142 of 164 PageID #:
2122

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

481:25;483:13

**hand (1)**
103:19
**handcuffs (1)**
169:25
**handed (1)**
409:25
**handful (14)**
213:16,18;214:3,8;
216:16,25;217:9,14;
218:3,6,14,17;
219:11;223:23
**Handing (1)**
38:25
**handle (1)**
293:16
**handled (3)**
193:6;464:22,23
**handwriting (6)**
28:10;62:5,8;
63:22,24;64:3
**hang (3)**
360:10;399:11,24
**hanging (2)**
227:23;400:2
**happen (5)**
190:24;305:10;
326:9;354:24;382:8
**happened (36)**
16:22;58:10;66:2;
109:6;123:15;
128:15;178:17;
185:16,23;250:7,8,9;
255:21,24;275:16;
288:25;289:2;
306:18;318:5;
355:21;357:17;
381:19;390:6,7;
392:10;393:13,14;
394:11;416:15,20;
418:10;420:4;
453:16;456:22;
458:12;461:2
**happening (2)**
237:9;252:15
**harassing (2)**
18:4;204:8
**harbor (6)**
94:16;95:4,23,25;
98:9;185:24
**hard (10)**
182:25;183:2,11,
12,18,21;184:10;
185:5;187:23;230:21
**harder (2)**
185:12;186:6
**hardship (2)**
14:13;16:13
**harm (9)**
317:3;323:7,8,11,
19,21;324:3,5;
480:13
**hates (1)**

169:17
**head (3)**
324:8;326:6;339:3
**headline (1)**
129:2
**heads (2)**
316:20;323:14
**health (4)**
178:22;179:3,14;
197:14
**hear (8)**
21:12;98:2;
201:18,23;207:21;
369:9;418:22;419:12
**heard (13)**
48:7;85:24;86:14;
95:3;142:6;160:17;
328:23;345:5;
372:13;373:21;
381:3;413:22;461:3
**hearing (1)**
202:8
**held (2)**
4:11;9:16
**hell (1)**
338:13
**help (7)**
17:17,21;48:10;
177:16;178:15;
357:24;487:10
**helped (1)**
412:2
**Hempstead (2)**
225:3;231:17
**hepatitis (5)**
176:20,21,22;
177:11;189:10
**HEREBY (2)**
3:2,6
**Here's (2)**
160:5;338:10
**hereto (1)**
3:4
**Hesse (391)**
5:7;30:15;43:13,
17;61:18,22,25;
64:11,14,24;65:5,12,
15;69:23;70:3,8;
75:10;76:24;77:9,21;
78:13;83:11;84:10,
18,21;85:2,14,19;
86:9;88:21;89:5,24;
90:4,8,16,20;91:11,
24;92:4,18;93:4,15,
23;94:4,22;95:11,15,
20;96:19,23;97:4,10;
98:12,17,25;99:3,11,
19;100:5;101:20,24;
102:7,16,19;105:18;
107:11,16,21;108:3,
7,11,17,25;109:4,10,
25;110:6,18;111:24;
112:14;113:4,9,19;

114:4,18;115:9,25;
119:3;122:3,10;
124:2;136:22;138:8,
11,21;142:21;148:2,
3,4,5,17;149:6,21;
150:15;157:20,24;
160:9;162:22;
163:20;164:17,24;
165:2,9,18;166:5,12,
16,21,22;186:8;
200:9;202:10;
207:16;210:9;213:3,
7,22;215:23;216:2,9,
12;218:18,24;226:4;
232:15,18,21;
233:15,16;234:3,7,
20,25;235:11,12,18,
23;236:12,17;237:2,
16;238:7;240:14,15;
242:10,15,20,25;
243:3,4,6;244:2,18,
19,24;245:2,6,10,13,
15,23;246:8,18,23;
247:24;248:7,10,16;
249:13,20,25;
251:16;252:4,17;
253:20;254:18;
257:2,6,9,19,23;
258:8,12,17,19;
259:7;260:9,13,22;
261:2,6,11,17,20;
262:2;265:3;266:18,
25;273:22;277:6,22;
278:4,5,11,18,25;
279:10;280:2,17;
281:6;283:24;
284:13;287:25;
289:22;290:7,18;
291:24;292:14;
293:4;294:18;295:5,
22;296:15,18;
297:24;298:14,16,
22;299:13,16;300:9,
15,24;304:4,13,22;
305:3,12,23,23;
306:23,24;307:4;
308:3,23;309:8;
310:3;312:21;313:5,
15;314:6;316:15;
317:6,12;318:7,7,24;
319:5;331:4,9;333:7;
334:19;336:18,19;
337:16,20;338:5,21,
25;339:5,13;340:2;
341:2,9,18,21;342:4;
344:15,18,23;
347:24;348:11;
371:16;375:23;
378:14;379:23,24;
380:10,14,16,19;
405:22;422:20;
424:2,11;425:2;
426:11,18,22;427:3;

431:25;432:9;
433:13,19,24;434:8,
16,24;435:13,15,23;
436:6,11,16;437:3,9;
441:19;442:2,12,16;
443:21;444:13;
446:3,7,21,25;447:7,
11,14,20,24;451:8;
452:16;453:2;455:2,
14;456:15,19,20,23;
457:3,24;458:7,11,
14;461:24;462:19;
463:3,18,24;464:9;
468:6,10,14,21;
469:5,11,15,20;
470:24;471:24;
472:11,22;473:5,11;
474:10,20;475:12,
16,23,25;476:6,22;
477:5,7,17,25;478:7,
11,19;479:2
**Hesse's (17)**
61:16;115:18;
146:20;264:25;
277:12;278:14,21;
279:22;280:6,19;
284:19;312:24;
344:12;426:15;
433:12;445:11;
459:12
**Hey (4)**
70:23;171:4;
405:12,15
**hi (1)**
126:11
**hide (2)**
161:23,24
**highly (1)**
212:17
**himself (4)**
165:24;217:22;
225:6;311:5
**hints (1)**
188:13
**hip (1)**
418:3
**hire (8)**
118:24;125:16,19,
21;132:4;133:21;
142:8;210:13
**hired (21)**
118:13,14;125:8;
130:22;133:23,25;
134:3,5,19,25;135:5,
7,9,11;141:16,17;
142:11;207:23;
208:5;209:9;423:13
**hires (1)**
203:22
**hiring (11)**
118:25;124:20;
125:10,24;126:15;
127:7,10;132:25;

141:16;202:18;
458:16
**Hirsch (3)**
306:19,24;307:24
**Hirsch's (1)**
307:24
**hit (11)**
154:10;324:7;
354:15,16,18,24;
360:24;361:3,11,14,
19
**Hmmmm (1)**
160:22
**Hold (9)**
95:8;97:18,18;
103:5;122:7;132:10;
190:16;261:20;
269:11
**holding (6)**
108:6;322:11,12,
18,20,21
**home (18)**
14:13;16:13;
17:13,16,17,21;58:6;
82:7;191:2;356:23;
386:14;414:15,16;
429:5;432:25;
461:22;487:10,10
**honest (1)**
41:24
**Honestly (4)**
34:23,24;232:10;
486:7
**honorable (4)**
10:20,22;13:11,12
**honorably (1)**
11:17
**hoping (1)**
140:5
**Hospital (19)**
117:13,16,18,21;
118:7,8,11;120:13;
122:20;124:19;
126:2,7,13;127:22;
129:4;130:22;141:8;
198:3;376:22
**hour (11)**
51:6;130:9;
137:24;205:5,12;
222:14;244:15,16;
411:20,21;484:25
**hours (18)**
29:21;130:10,14;
174:12;180:20,24,
25;349:2,12,15,17;
406:7;409:23;
412:16,17;468:2;
485:5;488:5
**house (7)**
45:8;71:8,9,15;
316:9;414:16;486:22
**Houser's (19)**
300:14;301:2;

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

304:25,25;305:25;
307:13;308:6;
309:10;350:13,15;
352:17,20,23;
437:12;445:12;
448:5;480:19;
483:15;485:8
**human (1)**
109:14
**hundreds (1)**
439:5
**hurt (2)**
270:18;370:3
**huskier (1)**
358:17
**hypothesize (2)**
325:24;326:8

**I**

**Iacopelli (5)**
44:13;48:2;49:12;
56:19,24
**Ian (3)**
483:23;484:11;
485:13
**ID (5)**
304:18;317:23;
319:23;320:11,14
**ID'd (1)**
321:18
**idea (26)**
23:15;26:15;34:2;
125:20;153:11;
158:21;221:17;
268:16;271:8;
333:16;342:19;
372:23;373:6;400:8;
421:25;424:7;
437:23;438:18;
439:2,8;448:9,13,17,
21;461:2,14
**identification (10)**
7:7;12:6;20:3;
26:10;28:5;38:20;
63:11;135:18;148:6;
211:25
**identifications (1)**
320:7
**identified (4)**
157:8;480:20;
481:4,15
**identify (10)**
88:6;89:17;90:3;
158:25;159:4,5,9;
174:6;319:17,20
**identifying (1)**
481:7
**identity (3)**
171:19;400:25;
401:11
**IDing (2)**
299:6;307:18

**idiot (5)**
170:17,21,23;
171:5,8
**IDs (2)**
320:18;331:15
**ignore (1)**
316:23
**ignored (10)**
240:14,16;241:8,
13,14;252:10;262:2,
14,17;344:16
**ignoring (3)**
252:5;262:11,25
**ill (2)**
177:3,4
**illegal (5)**
216:18;329:13,15,
22;330:15,23;340:3;
341:24;343:7,23
**illegible (1)**
8:5
**illness (1)**
176:7
**imagination (2)**
112:12;113:8
**imagine (5)**
106:19,20;111:24;
112:5,11
**immature (1)**
17:14,23
**impairment (1)**
205:20
**impede (2)**
373:22;374:5
**impeding (2)**
358:22,23
**implemented (1)**
241:15
**implicating (1)**
463:14
**implying (1)**
463:13
**important (9)**
40:7,15,19;167:14;
272:18;325:11;
388:10,15;452:11
**impossible (1)**
404:18
**impression (1)**
422:14
**improper (8)**
216:18;217:18,21;
219:14;223:21;
341:10;343:7,22
**improperly (1)**
341:18
**impropriety (1)**
223:25
**Impugns (1)**
473:21
**inability (1)**
197:19
**inappropriate (4)**

201:8,10,12;218:4
**Inc (1)**
28:22
**incident (152)**
47:8;51:14,16,24;
52:2,10,11;53:8,20;
54:4,9,12,15;55:5,11,
17;56:4,7;58:13;
61:7;62:5;64:18,19;
65:3;72:16;73:23;
119:6;123:14;151:5,
8;169:12;176:11;
185:22;186:9;
187:11;195:2,5,9,14,
16;219:20;224:19;
250:7;263:12;264:3,
7,11;266:17,25;
267:17;273:10;
274:6,8,11,22,23;
275:3,20;276:2;
281:16;286:20;
313:21;314:3;325:7,
9,11;326:17,19,20;
328:6,7;329:4;330:5,
11,13,24;331:10,19;
334:11;336:25;
339:22;340:7,14;
346:2;347:24;348:8;
350:2;361:6;367:18;
373:13;374:20;
375:3,10,18;376:8;
378:6,17;384:20;
385:15;395:6;398:9;
400:14;407:5;415:4,
7;416:19,25;419:7,
21;421:19;422:21;
423:6;424:4,15;
425:6,12;428:10,23;
430:12,22;432:4,6,
16;434:21,23;435:5;
436:5;437:13;441:7;
442:8;443:6,9,10,20;
447:2;450:20;451:3;
455:5;457:18,23;
460:9;461:11;
462:13,14;464:19,
22;468:8,12;481:25;
483:13;484:9;485:7
**incidents (3)**
373:16;419:23;
464:18
**include (2)**
137:12;444:23
**included (5)**
425:12;445:9,10;
452:10,17
**including (5)**
139:4;213:2;
341:23;409:21;477:9
**inclusion (1)**
483:2
**Income (2)**
28:3;197:2

**Incorporated (2)**
4:6;137:19
**incredulous (1)**
453:12
**incumbent (1)**
467:5
**Indeed (2)**
333:19;430:24
**indent (1)**
386:19
**indicated (5)**
27:10;78:11;
436:21;463:11;
487:17
**indicating (8)**
49:22;77:4;150:8;
160:3,6;161:15;
171:22;179:12
**indict (1)**
459:20
**indicted (2)**
43:13,17
**individual (10)**
76:22,23;179:9;
320:22;337:6;360:4;
385:11;432:5,15;
433:6
**individuals (15)**
50:24;62:4,7;
64:13,17;65:2;66:18;
208:3;300:24;
324:20;355:5;363:6,
19;454:4,10
**infer (1)**
188:10
**informal (1)**
18:12
**information (40)**
46:6,22;48:10;
51:9,23;53:6,10,12,
16;79:13;84:6;
105:18;110:12,12;
149:3;159:25;
164:10;167:8;169:8;
407:4,13;408:4;
409:8,14;417:18;
424:24;425:8;
443:22;450:11;
454:25;455:2,7,8,14,
17,18,21,23;485:9,11
**initial (1)**
71:21
**initially (8)**
45:25;48:3;
118:20;122:8;
124:21,24;364:12;
378:20
**initiated (2)**
72:6;422:24
**injured (1)**
325:17
**injuries (2)**
361:24;370:2

**input (1)**
425:4
**inquire (14)**
205:9,15;206:5,7,
16;405:7,9,23;406:5,
15;408:17;458:21;
461:16;467:6
**inquired (5)**
104:23;206:17,18,
23;210:9
**inquiry (1)**
66:15
**INSERT (1)**
474:14
**inserted (3)**
110:23;111:21;
115:17
**inside (2)**
182:8;296:17
**insisted (3)**
376:17;434:16;
456:21
**instance (11)**
72:12;75:25;76:2,
19;81:22,23;223:13,
14,16;300:7;336:18
**instances (1)**
263:16
**Instead (1)**
237:6
**instruct (12)**
41:5;77:23;78:2;
298:22;299:13,17;
305:3;331:10;333:7;
382:5;422:11,17
**instructed (10)**
283:24;284:6,10,
13;298:14;304:5;
422:4,7;465:20;
467:20
**instructing (1)**
331:6
**instructions (2)**
304:23;466:16
**instrument (2)**
369:18;370:18
**integrity (1)**
473:21
**interaction (2)**
276:3;359:4
**interested (6)**
35:9,10;84:11,12;
86:2;326:21
**interim (1)**
32:14
**internal (3)**
423:8;432:2,13
**interrupted (1)**
467:17
**intersection (1)**
348:14
**intervened (1)**
336:19

**human - intervened (16)**

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 144 of 164 PageID #: 2124

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

**interview (14)**
14:21;16:21;17:4;
120:13;123:16;
124:22;129:9,20,22;
370:7;384:22;
394:14;400:15;
407:25
**interviewed (4)**
12:21;27:2;
392:19;450:19
**interviewing (3)**
14:22;128:20;
391:20
**interviews (1)**
131:25
**into (43)**
36:19;53:19;
61:21;65:6,7;67:2;
111:21;130:5;205:9;
220:3,5,17,18;
221:23;222:10;
223:3,6,16;236:14;
264:6;293:12;
301:16,16;306:17;
315:5;321:17;
352:20;358:19;
364:9,15,18;366:2,5;
372:25;385:14;
393:17;399:9;
406:22;408:25;
434:10;460:9;
481:25;484:19
**intoxicated (23)**
222:3,8,17;232:25;
236:2;237:18;
238:12,18;240:20;
241:21;242:2,11,16,
21;243:5,13;246:25;
248:12;253:12;
284:21,25;317:4;
323:18
**introduce (1)**
4:22
**inventoried (1)**
343:2
**inventory (3)**
340:19;341:3,18
**inventorying (1)**
340:21
**invest (1)**
264:16
**investigate (12)**
56:2;60:25;61:14;
64:13;169:20;
264:17;386:3;
423:15,18;437:13;
441:6;444:13
**investigated (11)**
52:6;64:20;68:23;
69:5;169:22;385:22;
386:2;394:20;451:9;
460:11,19
**investigating (18)**

48:19;53:22,24;
54:2,3,4,6;60:23;
72:16;128:24;
169:14;264:11;
375:19;423:23;
424:4,15;438:9;
443:20
**investigation (43)**
51:25;55:20;
169:16;264:6,9,14,
18,20;331:5;358:24;
373:23;374:6;
385:14,21;418:5;
422:5,12;424:19;
425:13,18;440:12,
21;444:19,24;445:9,
17;446:20;449:15;
450:14,15,16,21;
453:4,5,9,16,18;
460:9,16;465:6,8,13;
481:24
**investigations (5)**
48:11,13;438:12;
465:2,4
**investigative (1)**
438:22
**investigator (3)**
44:19;423:14;
451:20
**involved (32)**
47:9;54:15;62:4;
64:17;65:2;75:17,22;
97:14;120:2,16;
121:4;123:9,18;
129:12;130:18;
267:18;393:25;
407:5,14;408:5;
409:15;443:6,8,8,10,
23;444:7;446:22;
450:20;465:12;
485:7,10
**involvement (1)**
455:4
**involving (7)**
75:19;176:11;
187:17,24;330:5,19;
419:24
**Island (12)**
227:18;301:25;
315:17;351:16;
376:23;381:2;
403:11,21;404:11,
23;428:14;429:17
**Islip (32)**
21:20;35:13;60:7;
69:16;84:9;85:3,14,
19;86:5,6;87:14;
89:8,20;91:21;92:19;
93:22;94:16;98:15;
99:18;100:3;101:23;
102:8;105:21;106:8;
109:9;145:17,20;
151:3;152:11;

181:13;315:3;487:19
**issue (27)**
121:9,17;237:3;
247:25;250:24;
251:15;270:25;
298:16,23;299:14,
17;300:10,16,17,22;
302:11,12;304:5;
305:14,24;308:5;
314:16;317:7,13;
337:16;340:19;440:2
**issued (6)**
10:21;13:11;
300:25;336:20;
337:7;383:12
**issues (5)**
143:2;179:18;
263:21;371:25;419:8
**issuing (1)**
313:17
**items (3)**
340:19,22;341:3

### J

**jail (1)**
347:7
**jam (2)**
64:21;186:18
**January (7)**
27:5,6;37:22;38:8,
11;181:11;382:25
**Jefferson (1)**
117:19
**jeopardy (2)**
269:23;270:9
**job (61)**
12:21,24;35:18;
36:10;37:24;38:5,12;
69:14;91:2;117:6,20;
118:2;126:9;129:20,
24;130:7;131:7,14,
18,21;133:6,11,16;
134:14;137:12;
139:4,21;141:12;
143:25;144:6;
169:14;178:12,16,
23;179:4,6,10,15,20;
180:4;181:12;194:5;
197:2,11,19;198:2,7,
11,20;199:10,20;
203:16;204:20;
205:10,14;214:15;
225:2,2;231:16;
388:21;437:24
**jobs (5)**
33:2;115:20;
116:3;144:4;151:4
**Joe (22)**
26:4;154:13,20;
254:7;265:25;
311:21,23;327:5;
368:19,21;369:15;

375:20;376:2;
469:11,16,21;
479:10,21;480:3;
481:15;482:8,12
**Joel (1)**
265:23
**John (25)**
44:12;49:13;
117:12,14,15,17;
120:12;130:21;
141:8;198:3;254:6;
337:10,11;338:16;
384:25;385:20;
386:25;387:2;
391:19,20;393:4;
396:18,19,20;437:10
**joke (1)**
157:5
**judge (1)**
467:2
**July (3)**
8:23;49:24,25
**jump (1)**
403:17
**jumped (1)**
201:16
**June (18)**
32:13;38:6;49:24,
25;83:23;118:5,20;
120:15;125:7,11;
128:12;136:5;198:3,
14;204:21;205:3;
482:13,16
**junior (2)**
169:4;172:9
**jurat (1)**
489:19
**jurisdiction (1)**
315:17
**jury (6)**
11:12;74:18;75:2,
9;202:8;270:15

### K

**Keane (2)**
94:9,20
**keep (2)**
252:3;479:19
**keeping (1)**
219:19
**Ken (3)**
5:4;155:16;347:15
**kept (3)**
252:10;449:5;
484:13
**Kevin (36)**
5:7;23:6,13;155:5,
9,13,22;163:25;
254:6;274:12,18;
317:22;338:9,14;
339:7;350:21,21,23;
351:22;352:8,13;

361:21;363:20;
365:18;368:25;
369:6,11;377:9,11,
13;378:10;385:12;
400:8;405:12;
412:10;472:7
**Kevin's (1)**
332:21
**kick (1)**
354:16
**kicked (1)**
393:24
**kid (2)**
324:15,23
**kids (7)**
317:25;319:14,19,
20;334:13;335:21;
338:8
**killed (1)**
324:11
**kind (6)**
29:7;53:15;60:14;
354:3;383:8,18
**king (1)**
438:12
**knew (37)**
41:2;51:8;54:9,11;
74:3;87:4,6,17;
88:16;90:12;138:17;
169:17;185:15;
186:3;270:6,7;
271:19,21;288:22,
25;305:4;321:10,21;
329:23;367:5,5;
368:16,18;398:7;
400:14,20;401:17;
408:15,19;409:5;
443:7;446:7
**knocking (3)**
193:12;324:15,23
**knowing (14)**
196:25;197:11;
267:3;268:6;277:7,
14,19,23;278:12;
279:2;281:8;282:3,7;
444:14
**knowledge (107)**
55:2,7,9,19,25;
77:6;87:11,22,23;
105:10,13;109:5,8;
110:17,19;111:20;
125:18;128:13;
152:15;154:14,15,
19,25;155:7,8,12;
156:3,6;161:3;
184:13;186:10,14;
207:15,18,19,21;
209:3,5,6;227:6;
233:4,7,8,12;253:6;
273:14;275:13;
284:23;287:5;291:2;
313:13;328:19;
329:24;332:5;333:6,

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 145 of 164 PageID #: 2125

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

11;340:11,23;342:6;
349:2,21,22;373:13;
375:15,16;380:20;
387:11,14,20;
390:16,19,23;391:3,
8,10;397:12,17;
400:6;425:3;427:15;
436:8,10;437:17;
438:4,7,10;439:13,
14,20,21;444:6;
449:18;458:4,10;
459:19,21,22;460:3,
5;461:7,8,9,13;
470:3;478:15;
480:12;482:2

**known (15)**
152:9,11;185:23;
186:15,19,25;187:2,
3,5,5;188:21;320:2;
444:6;489:4,6

**knows (1)**
170:8

**L**

**Lab (6)**
117:12;141:12;
142:5,10;143:2,23

**labeled (1)**
120:23

**Labor (3)**
255:17;256:3,4

**Laboratory (4)**
139:21;140:19;
142:20;198:11

**ladies (2)**
161:21;485:25

**laid (2)**
31:12,19

**Lamm (60)**
22:18;24:20;46:3;
77:13;80:4;155:5,9,
13,17,22;156:8,14;
254:6;274:12,18;
275:24,25;276:2;
313:22;314:6;317:6;
319:3;323:12;332:3,
19;336:8;337:15,24;
338:22;344:19;
350:21,23;358:6,10;
359:14,15;363:20;
364:10,23;366:14;
370:11;387:5,12;
390:14;391:9;397:9;
400:5;401:21;
402:11,21;403:8,15;
405:12;406:18;
425:3;432:2;448:10;
453:3;457:14;484:20

**language (1)**
268:17

**large (4)**
314:9;358:13,16;

370:8

**larger (1)**
364:2

**Larissa (1)**
145:6

**last (46)**
6:6;8:2,13;12:14;
15:3;20:19;22:3,12,
19,24;23:3,12;24:11,
15,20;25:8,19;32:24;
37:17;58:16;74:12;
104:3;111:11,17;
119:19;129:6;
134:12,18,25;135:6,
9,12;137:12;139:4;
144:16;175:9;184:2;
196:15;207:12;
240:15;312:17;
342:3;368:14;
413:24;467:15;492:6

**late (7)**
36:22;183:15;
227:13;230:3;
231:17,22;232:13

**later (22)**
31:22;56:16,16;
340:17,18;363:3,4;
365:4;409:24;415:8,
10;417:12;422:23;
424:11;434:16;
435:18,18,19,20;
459:25;461:24;462:9

**laughing (1)**
313:25

**law (33)**
32:17;33:2;37:23;
38:12;50:19;57:11;
81:6,18;115:20;
116:3;131:6,8;133:5,
13;143:9,12;144:5;
205:10;283:23;
300:19;301:18;
302:7,18,24;303:4,
10,18,21;312:22,24;
313:6,16;317:9

**Laws (3)**
209:7;298:13;
476:8

**lawsuit (22)**
23:4,10,13;77:3,7,
11,17,19;78:10,16;
81:20;85:2,13;104:6;
170:2;257:13;
296:23;297:23;
460:8;473:11;474:9;
477:21

**lawsuits (1)**
36:13

**lawyer (4)**
81:18;381:24,25;
382:14

**lawyers (4)**
77:25;78:2;382:3,

14

**layoff (5)**
30:19,22,24;31:7,9

**leads (1)**
267:18

**learn (5)**
78:22;79:24;80:4;
270:5;489:3

**learned (7)**
77:24;79:3,17,20;
381:23;406:12;
429:16

**learning (1)**
278:10

**least (24)**
13:21;30:16;
75:24;104:12,16;
182:10;237:15;
247:23;279:7,15;
280:5,15,18;307:5;
310:15;313:13;
321:23;331:23;
347:24;369:14;
370:12;398:11;
411:21;443:8

**leave (31)**
174:8;234:18;
276:12;366:9,12,14,
16,19;367:10,12,16,
19,22;379:12;398:2;
399:14,16;401:22,
25;402:2,13,21;
403:11;411:14,25;
418:2;474:3,5;
486:10,17,24

**leaving (22)**
103:13;235:8,13;
245:17,19,21;
247:25;248:23;
249:23;254:15;
258:25;267:10;
276:11;279:25;
280:22;283:6;
293:17;355:11;
404:11,14,19,22

**led (3)**
164:7;424:3,14

**left (54)**
45:9;47:16;48:2;
76:14;103:15;
180:16,19;192:2,3;
205:8;228:11;
232:23;233:18;
234:9;235:24;
239:21;284:3;295:3;
345:11,15;359:22,
25;365:8,9;374:16;
376:13,15,24,25;
377:5,5,15,24;
384:15;386:8,14;
397:6,10;398:3;
399:19;401:7;404:5;
411:2,4,22;417:4,8,

9;426:25;428:13;
429:5;456:3;465:10;
486:12

**legal (3)**
4:17;381:25;382:4

**legitimate (1)**
466:21

**leisure (1)**
174:9

**less (6)**
10:3;101:16;
131:10;213:18,19;
485:2

**lesser (1)**
303:19

**Leto (1)**
4:18

**letter (53)**
57:2,3,7,10,14,18,
23;58:11,14,21;59:6,
12,17,19,21;60:3,3,
17,21;61:2,6,15;
62:2,3;63:9,19,23,
24;64:7,11,25;65:10,
20;66:11,16,23;68:3;
69:22;70:15,18,23,
24;71:5,9,20;152:25;
161:6;312:14;
327:25;423:9;
430:23;431:6;492:4

**Letting (2)**
262:24;440:4

**Levine (5)**
483:23,25;484:5,9;
485:13

**liable (1)**
9:16

**liaison (12)**
371:6,11,15,19,20;
372:4,9,13;373:2,9;
407:2;409:7

**license (5)**
301:4;305:8;
309:14;310:25;311:3

**lie (2)**
18:5,7

**lied (3)**
6:24;9:14,15

**lies (1)**
149:4

**lieutenant (1)**
84:8

**life (1)**
9:18

**light (3)**
74:5;78:4;349:2

**lighthouse (4)**
227:18,18;244:9,
11

**liked (2)**
97:12,13

**likes (4)**
183:5;186:24;

196:5;338:10

**likewise (1)**
102:4

**limitation (1)**
341:23

**limitations (2)**
477:9,10

**limited (3)**
213:2;482:25,25

**line (2)**
137:16;229:23

**lines (2)**
64:16;457:8

**liquor (6)**
301:3;305:8;
309:14;310:24;
311:3;316:12

**Lisa (1)**
488:25

**list (10)**
206:13,14;208:16,
18,20,23;209:4,8;
211:2;440:7

**listed (1)**
29:9

**listen (3)**
335:4;338:9;
399:11

**listened (1)**
253:19

**listening (4)**
185:16;391:21;
407:7,24

**litigation (2)**
24:13,21

**litigious (2)**
477:13;478:7

**little (18)**
10:3;17:23;47:5;
66:21;85:11;140:10;
149:8;173:23;
227:13;293:3;
324:22;329:6,6;
363:3,4;399:21;
485:2,2

**live (2)**
405:4,16

**lived (9)**
405:5,8,20,24;
406:5,16;409:3,5;
410:8

**liver (2)**
177:6,8

**lives (3)**
405:13;408:19;
461:14

**LLP (1)**
5:5

**local (1)**
233:4

**located (1)**
272:3

**location (3)**

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 146 of 164 PageID #:
2126
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
THOMAS SNYDER
September 24, 2008

297:18;364:8;
409:19
**lock (2)**
293:15;351:25
**locker (1)**
341:6
**Loeffler (57)**
5:3;17:5;96:7,9,18,
22;98:24;99:2,9;
265:22,23,25;
311:22,24;327:2,4,5;
368:19,21;369:10,
15,19;370:14,19,22;
371:14;373:18,22;
374:11,19;375:13,
20;376:6;406:22;
407:11;408:3,18,21,
25;409:10;468:15,
20,21;469:6,11,16,
21;478:24;479:4,10,
10,21;480:3,12,16;
482:8,13
**Loeffler's (1)**
481:15
**log (2)**
225:6;229:19
**long (55)**
21:7;25:17;26:14;
34:24;36:24;51:5;
72:3;73:3,11,13,23;
74:2;82:15;168:8;
191:22;192:4;
205:25;220:25;
221:15;222:24;
241:3;244:10,13;
264:13,20;269:16,
18;310:2;347:8;
349:4,23;359:7,9;
374:11,13,14;385:2,
3;389:4,5,6,8,9;
391:16;411:13,15;
412:14;415:15,17;
437:21,23;463:23;
484:20,24;485:3
**longer (15)**
89:15;96:13;
100:13;113:24;
123:22;197:12;
237:17;238:8,9,15;
291:3,5,7,25;292:4
**look (58)**
10:13;11:18;13:4,
8;14:3;15:14;28:13;
42:11;57:5;61:20;
62:19;63:6;65:5,7;
67:2;92:6,16;105:4,
17;111:7;144:15;
158:10;159:6,14;
167:22;168:4;
181:22;190:21;
198:15,19;236:14;
283:20;284:19;
286:22;312:17;

313:20;320:19;
328:12;336:6;
339:16;342:13;
345:18;354:21;
360:5,8;378:7;
405:18;412:24;
417:9,16;427:3;
437:9;465:11;
471:19;476:4,24;
477:5;478:17
**looked (30)**
41:18;66:12;
71:20;111:2;125:23;
127:9;134:13;
157:16;198:2,6,10;
222:3,8;307:19;
360:6,13,15,19,21;
361:15,22,25;
366:21;369:7;385:5;
399:6;406:14;
426:13;443:13;
484:18
**looking (19)**
32:2;53:19;58:7;
92:10;117:20;
133:21;134:4;
137:16,18;139:22,
25;167:9;199:20;
338:18;363:6;
369:25;414:24;
423:21;425:22
**looks (2)**
361:18;485:18
**lose (2)**
178:16,23;179:3;
301:3;305:8;309:14;
310:24
**loser (1)**
338:10
**losing (1)**
311:3
**loss (2)**
179:24;197:7
**lost (4)**
196:20;203:16;
241:5,6
**lot (15)**
60:4;82:12;
152:13;176:5,16;
179:24;182:20;
196:12;291:16;
342:19;372:19;
401:4,8;418:19;
446:10
**loud (2)**
286:25;366:24
**love (1)**
162:4
**lover (1)**
173:7
**lower (1)**
150:5
**lowest (1)**

19:18
**Luckily (1)**
162:5
**lucky (2)**
151:6;161:24
**lunch (6)**
167:16,23;168:9,
12;174:5,22
**lying (2)**
18:2;447:25

# M

**machine (3)**
45:9;415:2;429:5
**mail (1)**
57:4
**maintain (1)**
8:8
**majority (1)**
332:13
**makes (6)**
114:18;161:9;
376:6;409:6;462:2,
22
**making (10)**
137:23;205:4;
235:14;338:21;
347:14;453:8,10;
455:10,11;458:9
**male (1)**
193:11
**male's (1)**
322:3
**malicious (15)**
105:19;107:10,15,
22;108:17;112:3;
115:21;144:20;
149:4;159:25;
161:14;164:18;
167:8,25;169:7
**man (3)**
189:17;203:21;
358:16
**manner (2)**
161:14;440:21
**many (46)**
9:25;29:24;31:22;
44:15;101:12;117:5;
130:10;147:11;
180:9,18,18;207:17,
18;225:19;238:21;
245:12;255:3;
256:10,10;258:16;
259:21,25;261:10,
14;279:9;280:4,13;
292:8;319:19,20;
320:6,18,25;321:2,4,
10,20;331:21;362:3,
6,7,11,12;442:20;
449:8,10
**March (8)**
39:6,10;42:13;

43:13;58:16;111:18;
164:12;184:4
**marijuana (2)**
329:18;330:19
**marina (1)**
404:8
**marine (4)**
18:19,22;376:21;
377:6
**Mark (10)**
5:7;7:3;12:2;
19:23;26:6;27:25;
62:11;63:7;135:15;
147:24
**marked (17)**
7:6,10;12:5,9;
20:2;26:9;28:4;
38:16,19;39:3;63:10,
14;135:17;148:5;
159:3;211:23;212:6
**marshal (9)**
10:10,11;15:23;
16:17;17:11;18:9,15;
19:16;139:17
**Marty (11)**
89:19;103:7;
104:25;190:11,13,
16,22;191:12,17,23;
192:7
**master (7)**
95:23;98:9;
228:11,11;229:20;
230:24;368:16
**master's (4)**
94:16;95:4,25;
185:25
**Mather (9)**
117:12,15,17;
120:12;130:21;
132:21;141:8;
143:17;198:3
**M-A-T-H-E-R (1)**
117:15
**matter (4)**
4:4;73:16;236:15;
454:20
**may (57)**
3:13;20:23;27:6,7;
29:14;32:12;37:3,4;
43:14;51:25;57:20;
60:24,25;79:22;
81:15,17;98:20;
110:6;142:21;
145:18;165:23;
174:15;178:9,11;
179:9,9,14;190:24,
24,25,25;253:7,9;
275:18;280:7;301:3;
305:8;309:13;311:3;
313:21;320:6;327:6,
13;329:5;335:22;
340:6;381:5;382:25;
383:4;391:5,6;

430:16;436:3;444:7;
452:7;477:19;482:20
**maybe (34)**
10:2;30:5;44:25;
45:19;49:5;73:14;
140:9;147:18;168:9;
171:2,3;173:16;
215:5,5,5;220:16;
227:14,15;244:15;
280:7;300:23;
310:17;316:11;
321:23;323:24;
359:11;409:7;
411:20;412:16;
451:19;452:24;
468:3;484:25;485:2
**Mayor (29)**
70:17;226:14,15,
19;247:12;250:19;
251:11;266:4;282:6,
25;283:14;312:5;
327:7,17;344:7,8;
371:2,4;408:18,21,
21;409:9;478:25;
479:4,10,11,13;
482:9,13
**McGowan (2)**
60:7;89:21
**mean (46)**
25:7;58:5;91:2;
94:24;95:2;105:24;
109:16;136:15;
143:19;148:18;
151:22;159:4;
196:21;200:2;
204:16,24;205:21;
208:13;210:22;
219:25;223:9;
239:13;272:17;
274:8;291:14,18;
293:6,21;294:25;
297:15;310:12;
351:18;354:10,23;
371:18;372:18;
387:22;411:19;
426:2;454:15,16;
473:16;479:18;
487:22
**meaning (1)**
338:9
**means (8)**
9:10;45:16;97:24;
177:5;260:2;354:14,
17;430:22
**meant (17)**
9:10;91:4;224:23;
243:2;293:8,22,24;
352:13;356:17;
400:2;440:10;
468:21;469:6,8,9,11,
16
**meantime (1)**

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

484:14
**media (7)**
104:19;247:19;
266:10;282:11;
283:4,17;312:10
**medical (10)**
34:17;176:12,18;
177:16;178:2,15;
179:3,13;377:19;
417:6
**meet (10)**
49:7;72:15,18;
73:7;82:9;126:22;
128:8;380:14,16,19
**meeting (38)**
31:23;48:25;
49:10,17;50:5,13,22;
51:5;54:6;56:10,10,
18;57:15,19,23;
60:22;66:18;67:5;
68:8,12,16;69:24;
70:10;73:9,11;77:25;
81:5;127:6;163:16;
381:7,10,19;382:2;
420:20;464:3;470:7,
9;472:18
**member (14)**
9:18,21;44:2;50:5;
52:23;94:15;144:8,9,
25;169:4;172:9;
306:19;311:25;327:6
**members (8)**
52:16;54:17;
94:15;145:3;156:23;
187:6;188:22;470:15
**Memorial (8)**
117:13,16,18;
120:12;130:22;
198:3;255:16;256:3
**memory (1)**
37:4
**men (2)**
158:18;170:8
**mental (8)**
175:22,24,25;
177:17;178:4,22;
180:7;182:12
**mention (4)**
14:16;119:5;
149:21;160:22
**mentioned (17)**
14:20;28:18;94:2;
145:7;172:10,19,23;
173:8,11;197:17;
233:20;234:3;290:9;
382:18;420:5;
462:15;464:19
**mentioning (1)**
145:11
**Mermaid (3)**
306:3,17,18
**message (6)**
45:9;47:16,19;

48:3;415:2;429:5
**messages (1)**
414:17
**met (8)**
25:9;50:20;73:6;
81:24;127:3;208:3;
344:15;462:16
**Michael (1)**
5:5
**midnight (13)**
21:21,22;66:6;
215:18;227:19;
294:10,11;309:6;
332:16;420:15,22;
426:6;488:8
**midnights (2)**
332:13;333:3
**might (1)**
183:23
**miles (1)**
244:12
**military (7)**
9:19;18:19;20:11;
137:13;138:23;
139:4,7
**millimeter (1)**
383:13
**mind (2)**
35:11;450:6
**mine (4)**
160:12;244:7,8;
246:7
**minor (12)**
299:4;301:14,15,
21;302:6,10,22,23;
303:13,16;320:8;
336:20
**minors (14)**
298:20;299:4;
300:20;310:4;312:8;
317:4;320:2,3;
321:12;323:17;
333:24;335:6;
336:18;337:5
**minute (3)**
231:11;295:4;
482:23
**minutes (9)**
73:14;244:17,17;
345:13,15;456:4;
468:4;482:20;484:25
**misconduct (1)**
151:7
**misleading (2)**
454:5,11
**misrepresentation (1)**
41:19
**misrepresentations (1)**
41:2
**missed (1)**
180:5
**missing (3)**
451:11,13,25

**misspellings (1)**
60:5
**misstating (1)**
201:11
**mistake (6)**
11:23;40:20,22;
41:19;184:6;396:20
**mistaken (2)**
425:11;427:21
**mistakenly (1)**
47:9
**mistakes (1)**
40:25
**MO (23)**
14:23;17:8;64:22;
90:13;100:16;112:9,
23;149:18;189:22;
191:9;194:11;203:8;
205:17;223:10;
228:14;257:14;
299:10;341:13;
363:12;402:8,17;
420:25;492:11
**mom (1)**
17:17
**moment (7)**
224:3;368:14;
373:7;388:17;
409:20,21;473:14
**money (2)**
17:21;131:10
**month (16)**
20:19;22:20,24;
23:3;83:4;134:12,18;
135:2,6,9,12;190:22;
326:12;428:9;
430:21;464:3
**months (23)**
17:20;25:18;
45:17,19;49:4;58:12;
72:4,5;83:6,6,20,21;
141:19;192:23,25;
193:7;196:15,17;
255:16;256:2,12;
435:18;482:4
**more (41)**
6:21;23:9;35:23;
38:9;55:24;72:13;
83:3;101:15;115:4;
149:8;162:4;169:10;
184:21;191:6;196:5;
207:23;208:5;
211:11;213:19;
254:11;255:24;
260:3;277:17;
284:21;285:2;286:2,
16;291:16;310:13;
321:7,8;324:14,22;
325:2;362:21,22;
408:24;411:20;
443:16;464:16;485:2
**morning (16)**
36:21;162:24;

256:6,7;287:14,15;
291:8,9;294:4,5;
295:13;413:4;
428:25;445:13;
485:5;486:11
**moron (1)**
170:2
**most (4)**
227:21;243:22;
289:20;446:16
**Motion (23)**
14:23;15:2,5;17:8;
64:22;90:13;100:16;
112:9,23;189:22;
191:9;194:11;203:8;
223:11;228:14;
257:15;341:13;
402:17,25;407:19;
420:25;466:11;
467:13
**motionless (1)**
348:13
**motions (2)**
202:6;395:15
**mouth (2)**
200:24;408:2
**move (12)**
74:7,10;149:18;
175:11;205:17;
299:10;349:19,20;
363:13;466:25;
467:7,12
**moving (1)**
402:8
**much (19)**
94:14;127:15;
130:8;137:23;205:4;
267:16;288:22;
295:2;335:8,9,10,11;
345:11;392:6;442:4;
448:6,10,14;456:2
**Muller (44)**
136:24;137:4,5;
213:10,24;214:2;
215:7;216:8,13,17,
25;217:8,15;218:5,
18,21,24;219:11,13,
24;223:20,24;
224:10,11,19;
225:14,19,25;226:7,
22,24;227:3,21;
231:3,6,11,15;232:5,
13;259:20;290:17;
293:6;295:20,25
**multiple (5)**
441:25;442:4,8;
444:16;445:2
**music (1)**
360:3
**must (1)**
128:5
**myself (26)**
34:4;60:9;87:8;

153:25;156:7;162:9;
173:5;188:16;255:7;
256:16,18;290:22;
293:16;305:7;
323:12;336:8;
337:24;367:14,15;
377:9;379:17;
425:24;426:5;
441:21;470:3;471:2

**N**

**name (52)**
4:15;5:21;28:18;
34:15;48:5,14;67:22;
88:6,20;96:2;101:5,
7;108:11;119:17,19;
126:11;137:19;
145:23;146:2;
150:21,22;153:5,6,9,
9,16,17,23;154:7;
161:22;171:8,10,13,
14;172:10,19;173:8;
174:6;202:17;
203:24,25;204:6;
322:3;368:14;377:9;
379:17;391:13;
408:8,16;488:20,25;
489:3
**named (1)**
54:17
**names (17)**
44:14;49:15;
86:17,22,23;87:3;
208:2;254:10;
321:25;322:3;
368:19;400:24;
446:17,18;485:24;
486:3,4
**narcotics (3)**
341:24;343:8,23
**Nassau (7)**
35:3,8;437:18,19,
22;439:6;440:9
**National (10)**
117:12;139:21;
140:18;141:12;
142:5,10,20;143:2,
23;198:11
**natural (1)**
205:21
**nature (2)**
52:25;212:15
**Navy (5)**
9:24;14:12;16:13;
17:15,19
**near (2)**
325:12;447:2
**necessarily (1)**
240:19
**necessary (4)**
60:20;211:14;
262:12;407:18

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 148 of 164 PageID #: 2128

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

**neck (1)**
376:19
**need (7)**
64:9;79:14;98:2;
130:6;148:11;151:4;
169:10;284:18;
310:8;384:6;452:16
**needed (7)**
57:5;126:9;
182:16;309:7;
421:10;432:23;
436:21
**negative (12)**
84:10,18;91:13,18;
92:20;93:3;105:19;
107:10,15,22;
108:17;115:21
**negligently (1)**
478:25
**neither (2)**
107:19;332:19
**neutral (1)**
97:12
**nevertheless (1)**
144:17
**New (20)**
4:9,13;5:18;6:4;
21:10;33:3,5,9;34:3;
37:11;72:13,19;96:3;
117:19;131:5,8;
143:9,12;158:17;
437:16
**News (13)**
43:10;104:15;
123:6,10;129:2;
247:16;266:10;
282:10;283:4,17;
312:9;327:21;344:9
**Newsday (9)**
104:11;247:14;
266:9;282:10;283:3,
17;312:9;327:21;
344:9
**newspaper (2)**
250:21;251:14
**newspapers (3)**
128:19;134:8;
208:7
**next (34)**
31:11;56:12;
65:13;71:23;105:4,6;
115:13;118:6;121:2,
17;126:18;135:15;
146:7,7;163:14;
164:4;171:15;
172:13;173:2;
193:19;194:16;
235:22;322:17;
326:11,11,12;
342:12;361:17;
390:8;391:19;
421:17;437:6;
465:24;489:18

**night (77)**
51:21;52:7,9;
55:11,13;163:14;
164:2;186:17;
238:24;256:6,7;
284:4;285:8,10,12,
14;287:14;291:8;
294:4;295:12;320:8;
335:25;336:2;
349:23;350:15;
351:14;354:25;
361:10;363:2;
371:21;372:10,21;
373:8,19,23,25;
374:6,19;377:24;
378:8,14;384:19;
386:7;390:25;391:5;
393:14;397:20;
398:12;401:11,14,
19;403:10,21;
404:12,22;405:23;
406:11;407:12;
408:20;409:2,17,22;
420:18;444:20;
445:12;446:23;
447:9,12,15,16,18;
448:5,25;452:6;
457:18;461:11;
480:17
**nights (2)**
176:4;348:22
**nine (1)**
383:13
**Nobody (5)**
199:15,18;338:9;
386:12;451:2
**Nobody's (1)**
367:7
**Nofi (8)**
20:14,18;46:25;
80:23,25;154:13,21;
254:7
**noise (1)**
328:15
**Non-Competitive (2)**
7:14;14:8
**none (6)**
102:13,17;145:14;
157:6;321:3;403:12
**nonresponsive (6)**
17:9;64:23;
100:17;189:23;
191:10;228:15
**Nor (1)**
152:3
**normal (8)**
332:10;394:9,15,
18,22,23;395:4,20
**normally (3)**
256:11;332:12;
436:6
**Notary (3)**
3:14;5:17;490:15

**note (2)**
28:14;315:25
**notes (1)**
219:20
**notice (9)**
40:25;49:18,22;
50:6;196:18;205:18;
211:23;212:10;
213:23
**noticed (3)**
41:11,16;456:17
**notified (7)**
113:16;114:17,19;
329:10,20;330:12;
476:6
**notify (2)**
92:12;266:9
**November (2)**
12:19;27:3
**NOVIKOFF (117)**
5:2,4;6:5,9,11;7:3,
19,23;11:25;14:23;
17:8;19:22;22:15;
24:8;25:2;26:5,19;
27:24;36:17;38:14;
41:9,17;42:8;44:22;
58:24;59:11;62:10,
17,23;63:4;64:22;
74:6;75:5;76:7;79:7,
16;80:2;81:12;
90:13;92:24;97:21;
100:16;112:9,23;
126:4;135:14;146:5;
147:23;149:18;
151:25;167:20;
168:13,18;173:18;
174:2,15,21,25;
175:7;188:4;189:22;
191:9;194:11;
200:20;201:2,6,13,
17,20,25;203:8;
205:17;211:18;
219:5;223:10;
228:14;251:22;
257:14;274:16;
279:13;286:7;290:3;
295:2;296:4;297:9;
299:10;320:12,16;
341:13;343:18;
345:10,14;363:12;
378:24;379:9;
384:17,18;402:8,17;
420:25;447:4;
451:22;456:2,5;
466:2,15;467:3,15;
471:11;474:2,13;
482:17,22;483:9;
488:18;489:16;
492:16
**nowhere (1)**
446:25
**number (44)**
4:3,9;8:21;12:10;

14:8,11;19:24;28:8;
50:23;66:2;76:11,16;
101:11;104:18;
137:22;146:11,15;
160:7;161:16,17;
173:19,20;174:7;
211:20;212:3;
256:22;267:24;
268:3;296:6,10;
321:7;350:5;359:25;
379:3,7;419:10;
425:25;449:11;
456:8,12;485:13,16;
488:10;489:8
**numbers (3)**
7:18,24;173:17
**numerous (28)**
43:8;44:10;53:23;
85:23;86:3,3;152:18;
212:25;227:16;
232:21;233:15,16;
234:10;238:23;
258:13;259:24;
260:2,3;261:16;
283:22;292:10;
295:9;297:15;332:4;
347:5;441:19;459:9,
13

# O

**OB (2)**
160:14,16
**object (8)**
15:4;201:3,13,14,
20,25;202:3,5
**Objection (163)**
11:20;14:19;15:9;
16:18,25;18:3;19:4,
5;41:4;52:4;55:3,21,
23;77:22;78:21;
79:6;80:15;81:7;
92:23;99:12;102:11;
105:8;108:13;110:8,
15;111:4;112:17;
113:11,13;126:3;
135:3;138:10;
157:23;159:12;
165:4,20;176:13;
178:24;181:6;188:2;
191:14;194:19;
196:22;199:22;
201:5,7;202:6;204:3,
7;205:23;207:5;
208:25;213:8;
216:20;217:5;219:2,
6;224:14;230:18;
237:20;238:11,14;
239:11;240:23;
241:9,16;248:3;
271:6,13,23;274:7,
14;275:6;276:5;
287:8;289:17;291:4;

294:21;302:25;
303:22;310:6;
314:19;324:17,24;
325:14,23;326:7;
333:15;334:14;
336:13;343:3,16;
354:13;359:6;362:5;
364:20;372:11,22;
373:3,10;375:4,11;
381:21;383:19;
384:10;385:16;
386:22;388:13;
394:13;395:7;
396:25;400:16,21;
402:23;403:23;
407:16;409:11;
419:25;421:8;
422:13;430:14;
435:25;436:25;
438:13,16,23;
440:13,15;442:25;
443:3;444:17;445:4,
19;446:5;447:3,22;
448:8,12,16,20;
449:17,24;450:5;
451:10,17;452:12;
455:20;460:17;
461:12;465:18,22;
471:10,25;472:4,13,
23;473:13;474:12;
476:19;479:16;
481:10,18;483:8
**objections (2)**
3:9;395:14
**objective (1)**
442:23
**objects (1)**
328:16
**obligation (1)**
419:22
**Oblivious (2)**
317:3;323:6
**OBPD (12)**
161:19;173:7;
328:13;345:19;
437:10;457:25;
459:14;470:16,16,
23;477:7;478:20
**O'Brien (1)**
5:8
**observed (2)**
314:9;333:21
**obtain (2)**
384:4,8
**obtaining (2)**
115:19;116:2
**obvious (1)**
160:24
**obviously (3)**
154:4;170:18;
404:20
**occasion (32)**
6:22;147:8;195:8;

THOMAS SNYDER
September 24, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 149 of 164 PageID #: 2129

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

214:9,12;219:4;
222:25;223:7;
225:15,17,18;
246:11;279:16;
280:5,15,18;281:5;
292:7;304:17;305:6;
306:16;310:14,15;
315:4;331:23;
333:20;334:15,17;
335:15,17,23;348:20
**Occasionally (1)**
250:10
**occasions (59)**
44:15;66:3;
136:23;213:14,17;
214:4,8;216:16,25;
217:9,15;218:3,6,13,
14,18,23;219:12;
223:24;225:22,24;
227:16;230:4;
231:10,10;232:8,22;
233:16,17;234:10,
10;238:21,22,23;
242:3;245:14;
248:20;252:25;
255:21;258:13;
259:21,24;260:4;
261:13;287:12;
292:8,23,25;294:6;
295:9,11;308:24;
310:17;328:22;
331:21;441:19,25;
442:4,8
**occupants (1)**
328:14
**occurred (2)**
287:11;367:18
**occurrence (2)**
285:10,14
**occurring (7)**
48:12;82:13;
176:6;249:6;418:19;
420:19,21
**Ocean (142)**
4:6;12:22,24;
26:24;27:11;28:22;
29:2,16,21,25;32:16,
24;35:6;36:19;37:20,
21;38:10;44:21,23,
24;45:7,11,14;47:8;
48:8,12,19;52:12,15,
16;54:18;56:14;
57:5;59:24,24;60:24;
61:12;63:10;69:12;
74:13,14,21,22;75:4,
5,19,23;77:15;81:4,
21;85:25;90:12;
91:9;97:5;111:18;
113:22;115:2;117:8;
119:6,6,21;120:5,7,
17,23;121:19;123:7,
11,22;124:10,13;
128:24;130:18;

133:9;136:10,12,20;
137:20;143:3,22;
144:10;152:20;
158:17,19;161:2;
176:11;182:22;
183:22;184:19,24;
185:9,13,16,25;
186:12;187:17,24;
193:16;195:6,15,19;
197:23;205:5,25;
206:2;207:20;
209:25;210:22;
211:16;212:21;
229:11;233:10;
241:6;289:14;
296:18,20;298:8;
301:12;302:14;
311:7;312:8;313:18,
23;315:8,21;316:7;
328:10;333:7;
351:18;368:6,9;
414:15,18;425:5;
448:4;461:6,10,15,
19;478:19,25;492:5
**October (10)**
351:5;421:16;
427:13;443:2;
445:12,13;456:19;
461:11;480:17;485:5
**odds (2)**
30:11,20
**off (47)**
21:24;31:12,19;
65:22,25;76:12;
146:12;175:3,8;
206:14;211:21;
224:11;229:5;239:2;
240:12;296:7;
298:18;301:24;
315:17;317:6;
323:25;324:2;
347:11;360:3;
376:22,23;379:4;
388:7;392:13,21;
393:19;399:4;
403:21,24;413:7;
414:5;417:20;
420:15;429:17;
447:16;456:9;
470:12;477:6;
482:21,23;489:17;
490:5
**offered (2)**
129:20;431:5
**offering (1)**
129:24
**Office (24)**
5:12;44:3,18;45:7;
46:5,21;47:11;49:9;
50:12,14,20;51:3;
56:14;59:25;68:25;
70:22;71:25;72:24;
74:14;75:15;81:16;

95:4;169:19;240:10
**officer (117)**
12:21;33:13,14;
51:21;111:12,17;
113:24;123:17;
131:11;133:11,12;
136:24,25;140:2;
149:22;166:7;179:6;
206:2,25;207:7;
209:10;210:11,14;
211:16;212:18,20;
213:13,22;214:3,7;
228:9;230:25;233:5;
241:21;242:2,12,16,
21;243:16,19,21;
245:20;256:17,19;
259:12,22;273:2,3;
287:9;292:24;
295:19;298:7;
313:22;314:6;
323:12;324:19;
332:3;336:8,8,20;
337:8,9,15,24,25;
339:13;345:21,23,
23;347:21;348:11;
367:4;384:7;388:14;
402:6;425:2;431:25;
432:4;433:11,12,15,
16;434:14,16;
436:21;437:10,15,
21,24;438:3;439:6,
16;440:9,17,22;
448:7,11,15;450:10;
453:11;456:16,16,
18,19,21;457:25;
461:25;463:12,13;
465:8;468:6;478:13;
480:18,20;481:7;
484:20,21
**officers (118)**
32:3;91:8;94:17;
95:4;96:3,5;116:6;
120:16;126:14,17;
142:11;146:21;
148:17;149:15,16,
20;162:2,14;165:14,
19;166:9,22,25;
178:18;186:16;
207:14,19;213:2,4;
220:11;227:7;
232:25;233:3,9;
236:2;237:24;238:2,
9,18;240:21;245:20;
246:25;248:12;
253:11,12,23;254:8,
17,20;255:3;256:10,
14,14,22,24;257:2,6;
259:8;261:3;266:6;
272:17;274:3;275:5;
284:2,5,15,20,25;
288:11,13,14,18;
289:4,6,7,14;290:12,
13;292:25;295:14;

298:15,17;315:14;
317:6;332:6;333:7,
14,22;337:14;345:6,
20;367:15;380:18,
21;413:23;416:9;
425:5,24;426:4,14;
427:23;429:23;
431:18;440:6;
441:21;442:12;
452:22;459:15;
461:25;465:12;
475:21;477:15;
478:24;479:20;
480:15;486:24;
487:2,14
**officer's (2)**
202:17;203:24
**official (5)**
52:23;151:7;
425:13;446:19,19
**officials (6)**
105:21;106:7,10,
22,22;160:19
**often (2)**
66:4;243:20
**old (7)**
17:22;73:25;
211:6,8;302:13;
303:3;321:18
**Oley (1)**
254:6
**once (13)**
35:23;140:19;
153:12;169:10;
170:4;184:13;
208:16,17;209:8;
211:9;227:11;
404:13;412:13
**one (185)**
4:3;6:22;13:24;
31:25;36:4,5,6;37:9,
10,10,14,16,17;40:9;
43:9;46:9;53:23;
75:24,24;76:11,19;
81:22;94:12;96:4;
99:21;101:22;
104:12,16;105:10;
113:5;116:24;
119:25;120:16;
121:8,15,16;122:23,
23;123:8;124:4;
129:12;130:17,25;
131:2;136:21,22;
138:18;141:14;
145:14;147:8;
149:14,16;150:19;
156:7;157:7,8,16;
160:2,2,4,13;161:15;
162:10,21;164:16;
168:10,22,23;169:2,
9,15,24;171:15,22,
24,25;172:5,6,6,7,11,
13,15;173:2,6;

178:20;180:25;
186:24,24;191:6;
195:2;199:6;213:9;
214:9,12,20;218:13,
17;219:15;220:11;
223:12,14,16,18,22;
228:19,22;241:10;
244:17;245:20;
255:12;262:7;
277:18;279:7,15;
280:5,15,18;297:21;
300:11,13;305:6,6;
310:13,15,17;
317:22;322:3;324:7;
331:23;333:17;
334:7,15,17;337:6;
348:19,21,22,23;
350:4;352:15;
355:23;357:13;
360:4;362:22;
368:13,15;376:16,
17;377:7,7;384:23;
386:15;387:6,9;
404:8;406:12;
413:17,19;414:18,
19;424:20;426:16;
428:17;429:10,12;
430:16;437:19;
438:7,14;441:10;
443:12;448:21,24;
450:2;452:21;
462:16;468:3;472:5;
473:14;481:2,3;
483:20;485:13,17
**O'Neill (1)**
5:8
**ones (10)**
106:11;171:3;
174:6;253:25;289:5,
9;358:3,4;368:17;
475:13
**ongoing (3)**
299:25;304:12;
308:19
**only (73)**
18:12;27:22;
30:14;45:3;84:11;
118:7,8;138:18;
151:14;152:10;
153:11;157:7,20;
168:21;169:13;
180:20;189:18;
207:13;213:9,16,22;
218:5;225:22;227:3;
233:8,9;235:10;
239:4;243:15;
255:12,18,22;
262:10;265:6,10;
270:17,25;286:8,9;
291:12;292:6;
295:17,19,24;
300:21;313:14;
318:10;329:7;334:7;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 150 of 164 PageID #:
2130

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

336:23;344:16;
346:6;350:16;
360:22;362:17;
371:13;373:20;
387:2;400:13,17,19;
401:17;403:20;
409:23;412:8;
413:19;425:5;
429:10,12;456:21;
470:6;485:19;486:3
**onto (1)**
328:16
**open (9)**
207:2,6;319:9;
342:11;346:11;
426:3,15,25;474:5
**Open-Competitive (2)**
7:13;14:7
**opening (2)**
130:2;141:13
**openly (1)**
317:5
**operating (1)**
259:13
**opinion (10)**
143:22;176:10,14;
185:14;224:2;
241:13;275:18;
372:9;449:25;450:2
**opinions (1)**
276:11
**opportunity (14)**
91:15;175:15;
199:11;320:23;
389:12,15,17,21;
401:23;420:3,7,10;
421:6;431:5
**opposed (1)**
279:2
**opposition (1)**
212:22
**order (2)**
397:6,15
**ordered (1)**
348:11
**ordinances (1)**
328:15
**originally (5)**
206:3;365:23;
383:10;392:5;439:15
**others (18)**
44:13;49:14;
57:16,24;106:16;
108:20;167:10;
173:5;185:13;186:6;
252:18;253:5,7,9;
324:3;373:16;396:8;
421:14
**otherwise (3)**
217:4,11;452:17
**ourselves (1)**
234:15
**out (134)**

11:10,17,22;17:20;
36:12,15,23;37:6,9;
38:8;46:4,20;47:7,
11;66:22;70:6;85:9;
91:7;97:8;100:12;
106:18;113:15;
117:2,7;126:19,23;
127:16;134:9,11;
135:25;136:4;
138:25;140:13;
154:8;160:20;
163:14;164:5;
174:16;177:6,7,8;
178:11;179:6,10,14,
19;184:13;185:3,18;
187:19;188:6;
189:21;199:9;
208:17;209:21;
220:23;221:13;
223:9;227:23,25;
228:6,6,13;234:12,
16,16,23,25;235:3;
238:24;241:7;244:4,
8;245:17,20,21;
246:4,7;254:16;
259:3,5;262:23;
272:8,14;286:25;
296:18,19;303:3;
321:16,19;322:9;
328:24;338:14;
340:15;345:25;
346:22;347:2,13;
353:5;355:15;
356:11,24;357:15;
358:12;360:5,10;
364:3,4,23;365:11;
366:24;367:25;
368:2;375:17;
377:23;380:22,24;
381:18;393:8;
394:16;398:23;
401:9;411:8;414:24;
423:21;426:2,14;
427:19;443:19;
459:25;484:6,11,18;
487:11
**outlet (7)**
247:19;251:14;
266:10;282:11;
283:4,18;312:10
**outlets (1)**
104:19
**outraged (1)**
298:12
**outside (16)**
20:21;23:4,14;
24:13,24;25:10;
78:23;79:24;81:8;
182:7;195:3;318:19;
361:20;363:25;
392:4,15
**over (48)**
25:13,17;32:9;

53:23;56:20,22,25;
64:10;86:13;92:16;
118:16;120:3;
121:16;122:23;
123:8;131:3;142:25;
149:15,16;163:12,
14,18;164:4;167:23;
179:25;202:18;
203:22;220:2,5;
248:18,21;249:6;
260:6;273:6;308:25;
311:6;316:20,25;
322:10;323:13;
328:23,24;330:17;
333:4;341:4;352:7;
378:25;409:25
**overdose (1)**
323:24
**overlap (5)**
292:7,22;294:9,19;
295:10
**overlapped (1)**
292:12
**overview (3)**
467:22,23,24
**own (5)**
54:25;140:25;
240:18;268:2;461:22
**owner (1)**
306:18

## P

**package (3)**
377:18;412:22;
417:5
**page (35)**
7:11;8:2,4,13;
10:14;12:14;13:5;
14:9;15:13;84:3;
148:12;150:4,11,13;
158:11,12,24;
159:14;160:8,9;
161:17;167:12;
168:24;172:15;
173:4;175:15,17;
212:15;424:23;
456:14;470:12;
473:19;476:24;
489:18;492:2
**Pages (2)**
492:9,11
**pain (1)**
203:14
**pair (1)**
161:22
**paired (1)**
388:7
**paper (2)**
89:4;199:20
**papers (1)**
128:13
**paperwork (1)**

133:3
**paragraph (53)**
42:11;84:2;90:24;
91:5;92:22;93:5;
105:5,17;110:21;
144:16;146:19;
175:20;232:11,20;
233:22;237:4;
256:25;258:5;
283:20;284:12;
287:6;289:8,16;
296:13,14;297:5,8,
10,12;312:18;
314:16;318:12;
323:10;329:8;330:3,
22;348:10;381:8,12;
424:22;431:3,24;
433:9;456:14;
457:22;470:11;
471:19;474:16,23;
476:4,5;478:17;
488:13
**paraphernalia (6)**
314:12;318:11;
340:4;341:24;
342:14,17
**parent (1)**
301:23
**parentheses (1)**
170:11
**Paridiso (114)**
17:5;31:24;65:10,
16,19,24;66:9,14,22,
25;67:10,25;68:6,10,
11,14,17,21;100:10,
19,24;101:5;136:7,9,
11,18,19;137:7;
138:6;207:16;210:9;
216:5;226:10;247:2,
6;250:13;251:5;
264:14,21,24;265:7,
16;281:9,10;282:17;
283:7;285:24;286:6,
11,13;288:3;289:24;
311:8,10,13;325:7,9;
326:10,17,23;
334:22;339:10;
341:15;344:2;348:4;
371:14;406:4,6,15;
413:3,20;414:13,18,
25;415:6,12,18;
416:5,7,12;418:11,
16,25;419:19,23;
421:7,16,18;422:4,
10,17;423:17;424:4,
9,12,14;427:14,22;
428:4,8,17,24,25;
429:4,11,15;430:12,
21;431:5,9;444:3,5;
458:17,22
**Paridiso's (2)**
61:17;281:17
**park (13)**

38:2,3;131:16;
134:5,19;135:4,10,
25;143:25;198:20;
200:7;202:19;203:23
**parks (1)**
89:10
**part (60)**
20:22;30:19;63:2;
82:12;94:19;95:5;
115:14;140:4,5;
146:20;148:13;
149:19;152:2;
159:23;168:16;
174:11,13,14;
189:23;196:19;
197:21;200:14,15;
202:12,13,15;
205:19,24;264:8;
281:21;282:18;
286:17;328:8;
337:19;339:21,22,
25;340:13;347:25;
349:24;361:4,6;
372:21;374:5;
375:14;376:7;
388:18,20;424:18;
444:19;446:18;
447:8;453:4;459:12;
465:13,17;467:19;
477:16;479:22;480:3
**partial (1)**
396:12
**participate (4)**
42:21;212:23;
217:3;468:11
**participated (1)**
147:6
**particular (12)**
159:2;259:20;
289:11;290:17;
300:11;309:11;
311:20;320:21;
323:17;329:25;
464:19;470:24
**parties (3)**
3:4;330:19;331:16
**partner (4)**
169:23;220:9,12;
299:8
**partnered (1)**
243:24
**partners (1)**
169:20
**part-time (9)**
30:18,23,25;31:7,
10;126:9;131:22;
205:12;212:20
**party (8)**
323:5;406:9;
413:6,10,11,12,14,21
**partying (3)**
228:6;235:4;
238:24

THOMAS SNYDER
September 24, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 151 of 164 PageID #:
2131

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**pass (3)**
33:15,19;35:20
**passed (10)**
34:13,16,19;36:5,
7,9;355:11;366:4,20;
367:25
**passing (3)**
21:19,24;22:8
**past (2)**
178:18;445:3
**Pat (10)**
423:13,13;437:11,
15;443:19;449:14;
450:8,17,18;453:18
**paths (1)**
225:23
**patrol (6)**
182:5;266:19;
272:9,13;349:24;
352:3
**patrolling (9)**
182:7;244:4;
257:3;259:9;261:3;
265:9;266:8;293:14;
350:22
**patrols (1)**
419:3
**patrons (1)**
353:16
**pattern (3)**
115:21;459:8,12
**Paul (2)**
322:3;337:6
**pay (2)**
17:18;205:11
**pays (1)**
131:10
**PBA (10)**
30:10,10,17;31:2;
32:10;52:19,20,24;
53:3;54:3
**PCR (1)**
417:5
**PCRs (1)**
377:18
**PD (1)**
158:17
**peace (1)**
133:11
**pedestrians (1)**
328:16
**pen (2)**
32:8;199:19
**penalties (2)**
9:6,10
**pending (1)**
96:15
**people (105)**
14:21;18:13;
31:17;44:10;49:11;
85:23;86:3,4,11,13,
18,21;88:17;94:3,5;
98:20;107:4;109:20;

133:25;142:8;
144:13;145:7,10,17,
22;149:2,9;152:18;
154:5;156:24;
160:20;163:12;
170:25;187:9,10;
191:7;203:22;229:2;
233:9;252:11,19;
254:21;255:23;
256:10;257:5;
291:12;299:7;
303:10;304:17,18;
305:20;307:18;
314:23;315:2;
319:25;320:6,15;
321:4;322:12,21;
330:16;352:4;353:2,
5,7,7;354:20;355:9,
10,23;356:6,19;
358:14;359:22,25;
362:7,11;363:25;
365:21,22;368:10;
370:8;377:20;389:3;
393:18;396:6,9;
401:5,9;410:17;
412:8;420:20;440:5;
446:6,7,9,10,10,14,
23;447:18;448:4;
449:3,8;484:7
**people's (2)**
388:24;446:18
**per (2)**
130:11;137:23
**perceived (1)**
327:21
**perfect (2)**
466:17;468:5
**perform (1)**
440:11
**performance (8)**
189:5,6;190:6;
194:18,25;195:11;
477:15;478:13
**performed (1)**
138:3
**perhaps (3)**
387:16;421:23;
458:15
**period (14)**
25:17;32:15;72:3;
83:23;198:7;205:13,
15;249:6,7;294:9;
330:10;423:25;
424:18;479:9
**periods (1)**
312:2
**perjury (2)**
9:6,10
**permission (3)**
384:9;426:18,22
**permit (2)**
365:25;384:5,6;
466:6

**permitted (1)**
478:25
**person (29)**
25:13;56:12,20;
72:21,22;77:14;
95:17;158:8;165:8;
186:22;199:4;
202:17;204:5;227:3;
243:15;244:7;
245:18;255:18;
295:17,24;357:6,13,
16;360:6;361:14;
364:4;371:23;
406:13;415:13
**personal (23)**
54:25;55:6,9,19;
110:17,19;227:6;
237:23;244:8;246:6;
275:13;284:23;
287:4;328:19;
329:24;340:11,22;
342:6,9;381:16;
404:3,5;458:3
**personally (30)**
44:2;107:14;
162:2,8;238:8,15;
244:20,21,22,23;
246:9;248:15;258:9;
276:8;285:24;
319:20;334:2,3;
345:8;346:4,21;
357:12;380:12;
384:21;387:2;
397:23;468:7,9;
487:12,15
**personnel (25)**
86:13,16,19,22;
87:15;91:21,25;92:7,
14,14;102:6;107:4,5,
8;110:5;232:23;
233:19;235:14,24;
239:21;254:16;
377:20;389:2;
478:23;480:6
**pertained (1)**
441:17
**Pertaining (4)**
28:4;42:3;226:7;
480:4
**pertains (1)**
240:20
**Pete (2)**
60:7;89:21
**phone (49)**
25:14;48:16;49:2;
56:20,22,25;71:3;
72:21;82:17;137:22;
141:14;164:15;
268:5;272:2;350:20;
351:25;352:2,2,14,
14;365:5;375:24;
414:17,22;415:13,
14,15;416:13,16;

417:11;422:10;
423:20;424:12;
427:18,20;428:5;
429:2,8,10;430:23;
432:9;433:20,22;
468:17;469:3;470:2;
483:17,19;485:15
**photograph (2)**
369:7,13
**photographs (1)**
377:21
**phrase (5)**
92:21;93:5;95:19;
469:6;480:24
**physical (2)**
54:16;61:4
**physically (9)**
199:15;220:21;
222:22;271:12;
272:3;354:14,15,16,
23
**pick (9)**
71:15;76:8;
174:22;175:18;
228:19,19,23;229:3;
232:7
**picked (3)**
71:9;350:21;
352:13
**picking (2)**
266:21;369:12
**picture (2)**
26:18;416:2
**pictures (1)**
417:7
**piece (8)**
89:4;434:17;
435:2,8,14,24;
436:11;457:7
**pieces (1)**
436:7
**piling (1)**
353:5
**pistol (5)**
383:25;384:2,4,6,9
**place (40)**
21:18;22:2;27:14;
32:11,22;48:25;
49:17;51:2,19;55:4,
5,18;56:4,7;66:20;
69:25;73:12;74:4;
154:23;181:20;
184:9;214:21;
219:17;248:25;
287:17,20,22;
290:25;309:12;
330:18;340:23;
350:3,12;378:17;
388:22;414:14;
424:3;432:8;458:16;
481:9
**plain (2)**
268:17

**Plaintiffs (45)**
4:5,25;23:3;74:25;
75:12,22;81:20;
105:20;115:19,24;
131:4;144:17,21;
158:3;232:21,24;
235:25;240:14,16,
18;254:19;257:4,8,
12,22;283:22,24;
284:9;296:15,22;
297:22;298:14;
312:20;332:23;
333:21;381:9,20;
470:18;476:5;477:8,
12,13,20;478:23;
480:13
**Plaintiffs' (7)**
110:23;115:17;
298:12;331:5;
344:12,16;477:15
**plan (2)**
115:18;146:20
**plastic (1)**
346:11
**playing (1)**
393:18
**Plaza (1)**
4:12
**plead (1)**
460:4
**please (14)**
4:22;5:14,20,23;
14:10;63:14;99:7;
212:6;217:16;
367:12,16,19;
399:15;476:14
**pled (4)**
459:23;460:2,21,
24
**plenty (2)**
109:20;400:23
**Plus (3)**
162:16;164:9;
412:10
**plying (2)**
345:22;346:8
**pm (13)**
146:12,16;175:3,6;
211:21;212:4;296:7,
11;379:4,7;456:8,13;
490:5
**po (1)**
161:19,20
**Point (64)**
5:25;6:2;9:17;
29:3,15;38:9;49:25;
78:15;81:4;114:2;
138:16;159:22;
178:21,25;180:25;
210:25;218:4;
227:17;230:14;
237:15;240:21;
251:21;256:20;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 152 of 164 PageID #:
2132

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

262:23;263:2;
265:18;268:8;
286:13;352:21;
357:15;360:5,17;
364:6;365:4,8,20;
366:10;368:25;
369:3;388:16;398:5;
399:11,22;402:3;
403:9;411:23;
413:25;426:16;
431:2;437:16,19;
453:21;454:16,18;
462:17;471:24;
475:8,10,23;484:22,
22;485:4;486:8,21
**pointed (2)**
360:16;416:3
**pointing (1)**
485:17
**police (235)**
12:21;30:10;
31:17,24;32:3;33:4,
6,10,13,13;35:3,16,
18;36:2,11,25;37:5;
51:21;52:16;54:18;
59:24;100:15;
111:12,17;113:24;
116:9;131:11;
133:12;136:24;
138:18;139:23;
140:2,24;142:8,11;
143:24;149:12;
152:10;156:23;
158:6,20;160:21;
162:2,14,14;165:13,
14;166:6,10,25;
170:12;178:17;
179:5;187:7;198:20;
200:7;202:19;
203:23;206:8,14,25;
207:7,14,18;209:10;
210:10,14;211:16;
212:20,21;228:5,12;
237:23;238:2;
240:10;253:11,15;
254:17;257:3;
258:23;259:9,12,14,
22,23;261:4;265:9;
266:8;267:11;
268:14;274:3,6;
275:4;276:14;
280:22;283:6;284:3;
288:11,12,14,18;
293:15;314:18,22,
24,25;315:13,19,22;
324:19;328:5,5,23,
25;332:6;333:7;
337:5;338:14;345:6;
347:20;351:25;
358:2,23;361:22;
362:12;363:5,15,18;
364:5,7,10,18,24;
365:9,17;366:2;

367:3;368:4,22;
370:6;371:5,10,15,
18,20,25;372:4,9,13;
373:2,9;374:12;
376:14,21,24;377:5,
18;378:6;382:19,20,
24;383:11,21,25;
384:7,11;385:4,24;
387:23;388:14;
389:6;390:3,7;392:2,
6;396:4,10,23;397:4;
399:10,23;402:6;
405:19;407:2,12,24;
408:9,12,19,25;
409:7,24;410:3,4,12,
17;411:11,16;412:4,
5,8,9,14,22;416:3,9;
429:23;437:15;
438:3;439:6,15;
440:9,17,22;442:12;
448:6,11,15;450:10;
461:17;465:7,12;
475:3,4,20;477:15;
478:13,24;480:15,
17,23;481:9,14;
484:23;486:10
**policeman (1)**
392:21
**policy (8)**
182:10;238:4;
239:3,9,14;283:23;
284:19;394:18
**Politics (1)**
152:12
**pool (3)**
354:25;393:18,24
**popped (1)**
372:25
**Port (1)**
117:19
**portion (2)**
467:18;479:8
**position (21)**
6:18;27:3;31:20;
33:9,12;35:2;85:22;
86:8;117:22;120:14;
131:22;134:4,20;
135:25;140:2;178:7;
208:10;209:25;
212:20;327:5,10
**positioned (1)**
272:10
**positions (3)**
6:17;84:8;208:16
**possession (3)**
224:6;313:10;
473:23
**possibility (7)**
206:4;208:11,12,
14;210:10;450:4,6
**possible (2)**
373:4,11
**Post (15)**

59:25;151:11;
158:22;173:4;182:4,
6;191:22;195:4,9,14;
313:22;318:3;
349:18,21;368:16
**posted (2)**
160:12;239:18
**posts (2)**
88:2;163:6
**potential (5)**
101:2;141:12;
394:10;445:17;
446:23
**pour (1)**
313:24
**pouring (2)**
317:5;323:13
**power (3)**
301:5;470:15;
471:16
**practice (2)**
459:9,13
**practices (2)**
212:25;217:12
**precipitate (1)**
45:23
**precipitated (1)**
31:21
**Precise (3)**
4:16,19;408:24
**prefer (1)**
167:21
**preliminary (4)**
264:18,20;465:3,5
**presence (16)**
20:21;23:5,14;
24:13,24;25:11;
78:23;79:24;80:7;
81:8,15;337:14;
339:14;427:8;
456:24;481:15
**present (23)**
49:10;51:15;
54:20;55:10;56:3,6;
78:2;79:4;98:10;
137:12;139:3;
187:10,12;363:17;
365:17;381:6;382:4;
448:5;461:2;470:9;
473:4;480:16;484:5
**press (6)**
42:14,21,24;104:9;
134:9,10
**pressure (1)**
182:20
**presume (1)**
28:8
**pretty (14)**
21:8,13;94:14;
160:24;177:2;
184:16;267:15;
288:22;322:15;
345:17;360:2;

363:11;369:8;469:9
**prevent (7)**
65:15;115:19;
116:2;358:19;
404:11,19,22
**prevented (2)**
304:6;352:19
**previous (8)**
101:8;170:10,24;
171:2,3;339:23;
420:13;489:13
**previously (6)**
38:16;172:23;
300:25;320:3;
321:14;489:6
**prince (1)**
196:11
**prior (102)**
13:21,23;20:12;
24:18;32:20;39:7,10,
14,23,25;44:4,5,15;
49:16;50:6,8,12;
57:4;58:15;64:3;
67:15;74:4;77:6;
78:10;81:5,5;91:16;
101:5,9,10;103:12;
113:16;114:16,19;
115:8;128:21;152:9;
159:22;161:12;
164:16,19,20;
184:10;185:4;186:4,
9,13;187:3,15,24;
188:11,17;189:3,24;
190:4,8,13,17,19;
191:12,17;208:15,
15;209:14,25;210:5;
211:13,17;214:16;
224:9;238:18;239:3;
252:5;266:14,17,24;
274:21,23;275:2,20,
25;286:9;321:11,21;
334:10;343:13,15,
20;346:13,15;
413:13,16;420:7;
421:4;442:7;443:19,
25;444:15;457:10;
479:11,13;492:6
**private (4)**
316:9;404:12,25;
429:18
**privilege (1)**
79:12
**Probably (25)**
23:15;25:18;
31:11;92:8;107:3;
147:18;175:18;
241:4;243:24;
244:15;261:13;
278:20;293:4;
299:24;300:23;
309:23;311:14;
321:7,8;332:13;
339:22;356:23;

404:7;435:9;443:16
**problem (28)**
29:7,10;180:3;
188:23;189:4;190:2;
191:13;193:24;
237:8,11;239:2;
252:21,22;264:25,
25;299:25;300:6;
305:2;308:19;309:5;
310:10,20;311:7,18;
312:7;315:7,21;
324:9
**problems (7)**
17:13;31:18;
192:11,15;311:19;
413:14;487:10
**procedure (3)**
181:18,18;352:6
**procedures (1)**
194:6
**proceeded (1)**
314:8
**process (5)**
142:24;143:5;
152:24;205:21;418:6
**produced (5)**
7:21;58:21;59:3,4;
62:22
**product (1)**
41:7
**production (7)**
59:5;63:2,3;
189:12;190:24;
192:20;492:4
**productive (2)**
189:16;196:12
**profession (5)**
131:7,9;143:10,13;
144:6
**professional (6)**
177:16;178:3,16,
23;179:3,14
**prohibit (1)**
331:5
**prohibition (1)**
303:12
**promised (2)**
416:10;418:8
**promoted (11)**
85:21;87:5,18;
88:10;102:15,19,25;
103:10,11;104:2,24
**promotion (7)**
84:14;85:15;86:8;
87:9;88:15;108:5,22
**promotional (2)**
87:7,13
**promotions (1)**
84:7
**prompted (1)**
142:4
**proper (4)**
13:25;181:18;

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

440:21;460:9

**properly (15)**
29:11;194:5;
258:21;285:5;
340:18,21;341:2;
342:25;343:2;
394:14;396:8;397:7,
11,15;443:18

**property (2)**
141:2;182:8

**prosecutor (1)**
451:2

**prospective (5)**
477:11;478:4,6,11,
15

**protect (2)**
170:8;436:22

**protected (3)**
169:22;170:4;
470:19

**protecting (2)**
462:24,25

**protocol (6)**
394:9,15,22,24;
395:4,20

**provide (7)**
46:5,21;100:10,20;
432:5,12,15

**provided (2)**
85:2;432:18

**providing (1)**
197:2

**psych (2)**
178:11;179:19

**psyched (3)**
179:6,10,14

**psychologically (1)**
178:10

**Public (14)**
3:14;5:17;116:7;
152:8,15;161:25;
240:18;250:24;
251:15;269:22;
270:9;420:16;
480:14;490:15

**publicly (2)**
146:2;162:4

**published (1)**
477:7

**pull (2)**
34:15;206:14

**pulled (2)**
358:4;393:10

**punch (1)**
354:15

**punched (1)**
393:24

**purging (1)**
158:18

**purport (2)**
28:21;39:3

**purpose (1)**
223:3

**pursue (1)**
36:10

**put (47)**
16:11;19:6;38:7,7;
64:21;69:18;98:3;
100:24;101:7;
103:18;117:6;
131:19,22;134:9;
136:7;137:3,8,9;
138:8,23;139:9,11;
153:2,16,18;154:21;
174:18;199:19;
234:22;251:25;
259:4;266:12;
280:12;282:13;
295:23;312:12;
341:6;342:17;
377:17,21;417:8;
420:17;451:4,6;
457:12,15;465:9

**Putting (11)**
81:14,16;101:5;
152:6;165:3;200:24;
304:4,7;386:16;
412:22;453:15

## Q

**qualifications (1)**
33:16

**qualified (1)**
212:18

**quantify (2)**
45:15;213:15

**quick (2)**
62:15;345:17

**quickly (1)**
11:10

**quiet (1)**
360:2

**quit (6)**
27:9;28:15;30:2;
31:8,13;35:7

**quite (10)**
11:5;27:16;29:5;
35:19;191:6;342:20;
385:9;411:17;
421:11;466:16

**quitting (2)**
30:8;32:20

**quote (1)**
150:25

**quotes (1)**
298:4

## R

**Raber (19)**
89:19,23,24;90:7,
16;93:21;103:7,10;
105:2;106:14,23;
108:10,15;190:11,
13,16;191:12,17,23

**radio (14)**
250:22;251:14;
267:3;268:14;
271:15;272:2,13;
273:18;276:25;
279:2;282:16;
293:11;328:24,25

**Radler (2)**
4:12;5:5

**raise (3)**
327:19,20;421:6

**raised (2)**
11:15;266:18

**ramifications (2)**
19:2,15

**ran (1)**
169:19

**range (1)**
383:21

**ranger (6)**
38:2,3;131:16;
134:19;136:2;143:25

**rangers (3)**
134:6;135:5,10

**rank (2)**
19:17,18

**ranking (3)**
213:2,4,22

**rapport (2)**
31:16;487:25

**rash (1)**
17:24

**rat (42)**
84:22,22,23;85:4,
6,16,20,25;86:10;
88:23;89:5,24;90:5,
9,17,21;91:7,19,24;
92:4,19;93:3,7;94:4;
101:22;102:10,20;
122:4,15,17;124:3;
130:20;146:3;
169:10,10,11,18,20;
464:12;472:25;
473:2,5

**rather (4)**
133:11;239:20;
283:21;436:22

**ratified (2)**
455:3,15

**rats (4)**
112:7;116:8;
185:18;186:17

**ratted (1)**
91:7

**Ray (2)**
44:11;49:12

**reach (1)**
211:9

**reached (6)**
46:4,20;47:7,11;
66:22;209:20

**reaching (1)**
427:19

**read (20)**
60:17;84:12,20,24;
147:4,12;174:12;
286:23,25;297:4,12;
323:10;328:20;
339:20,25;381:12;
467:18;476:13,25;
481:6

**reading (4)**
155:19;172:5;
286:24;477:3

**ready (4)**
63:16;199:23;
230:13,14

**reaffirmed (1)**
434:15

**realize (3)**
11:10;285:25;
286:14

**realizes (1)**
183:6

**realizing (1)**
276:19

**really (22)**
34:24;120:9;
169:25;182:25;
221:15;224:20;
225:20;262:13;
263:8;264:17;
290:20;301:21;
309:11;325:16;
326:21;335:10,14;
370:6;392:6;431:21;
456:22;479:9

**reason (21)**
16:4,9;28:15;30:7;
57:22;85:5;102:14,
18;160:15;182:15,
17;200:15;202:12,
14;317:25;319:11;
333:12;370:24;
372:4;406:2;473:2

**reasons (3)**
40:10;106:6;
233:21

**recall (115)**
8:19,22,24;12:17;
18:10;26:11;34:21,
23,25;37:15;39:13,
20,22;41:23,24;43:7,
9,18;44:14;49:14;
50:15,21;53:14,21;
54:7;57:20;64:15;
71:4;72:8;76:6;
86:23;87:3;100:7,21;
113:5;119:16;
146:22;181:9,23;
192:17,22;202:16;
203:23,25;204:5;
224:3,12,21;242:13,
18,23;243:3;246:12,
15,16,17,21;248:13;
249:9,16;250:6;

254:9;261:12;
278:19,21;280:14,
16,24;281:3;296:2;
308:10,13,17;
311:12;313:8;314:2;
321:6;325:8;326:14,
16,18,24;327:3;
331:20;344:21;
348:2,5;353:17;
355:9;358:11;361:4;
374:13;376:10;
377:8;415:17;
418:13,14;427:5,10;
428:19;430:15,17,
18,25;435:9;446:16,
17;452:13,24;
458:19;469:18;
473:14;482:10;
486:6,7

**receive (7)**
10:18;13:9;19:9;
57:9,14;58:11;
350:14

**received (20)**
19:10;57:3,3,12,
13;58:15;61:6;62:2;
107:9,14,21;108:16;
113:21;140:22;
161:6;164:10;181:2;
328:13;433:22;492:5

**receiving (3)**
19:13;189:10;
475:2

**recently (12)**
25:5,6;48:8;58:2,
5;60:17;82:13;87:7;
134:2;147:15;
207:11;311:4

**recognize (6)**
20:5;129:5;
135:21;155:21;
212:7;368:8

**recognized (3)**
128:6;321:14;
368:10

**recollection (15)**
29:2;40:13,17;
43:22;224:7;248:6,
10,15;249:4;287:11;
313:11;421:23;
473:24;482:14,19

**recommendation (6)**
173:15;199:25;
200:3,4,10;202:23

**recommendations (3)**
103:18,23;105:2

**recommended (1)**
103:21

**record (42)**
4:21;5:21;7:10;
8:20;19:6;26:16;
36:18;60:19;62:21;
76:12,17;136:3;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 154 of 164 PageID #:
2134

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

146:12,16;148:2;
151:24;167:19;
168:2,7,17;174:4,14,
19,19;175:3,6,8;
211:21;212:4,18;
251:19;296:7,11;
379:4,8,10;456:9,13;
483:8;488:15;
489:17;490:5
**recorded (8)**
76:20;77:13,20;
78:12;80:5,18,22,24
**recording (2)**
75:18;81:2
**recordings (2)**
75:22;77:8
**records (9)**
59:3;69:11;87:13;
102:7;110:24;111:3,
8,22;115:18
**record's (1)**
83:8
**recreation (1)**
89:10
**reduced (1)**
19:17
**refer (19)**
12:13;51:11,16;
52:12;69:9;91:13;
105:6;153:25;171:7,
10,13,14;173:16,16;
284:8;296:19;297:2,
20,21
**reference (51)**
12:24;15:7,20;
50:2;64:2;84:18;
85:3,15;86:9;90:23,
24;91:2,3,5,6,13,14,
18,18;92:3,20;93:3,
9,12;94:4;98:14;
100:11,20,25;101:9;
116:11,24,25;
121:12;137:6,10;
146:17;161:9;
202:11;203:20;
204:16,17;328:25;
390:21,25;391:6;
471:20;474:17,25;
475:9;487:7
**referenced (4)**
237:3;258:4;
296:25;330:22
**references (8)**
84:10;91:23;
105:20;107:10,15,
22;108:18;115:22
**referred (14)**
63:14;88:6;
151:11;152:6;195:3;
219:15;288:9;289:8;
290:8;316:5;318:11;
369:24;433:6;471:8
**referring (44)**

39:17;63:20;64:4;
84:19;90:25;91:14;
92:21;106:23;
146:25;148:14;
150:5,18;170:20,23,
24;172:3;197:8;
213:6,9,23;215:14;
218:14;267:7;
284:17;289:4;
290:14;292:23;
293:25;296:20;
323:21;329:16;
339:17,21,23;340:5,
14;382:20;432:10;
446:15;470:22;
476:11,17,21;477:19
**refers (6)**
161:13;171:12;
173:4;284:9;297:22;
481:6
**reflects (1)**
8:15
**refresh (7)**
28:25;43:22;
224:7;313:11;
421:23;473:24;
482:14
**refreshed (1)**
482:18
**refusal (1)**
212:23
**refuse (2)**
283:25;284:14
**refused (2)**
116:11,23
**regard (47)**
23:22;24:10;
25:22,25;45:10;
46:24;47:3,7;48:11;
60:15,16;66:15;
85:20;93:16;150:6;
156:2;175:9;177:16;
178:3;189:3;194:17;
232:13;237:3;239:9;
240:7,17;246:24;
266:6;276:11;
277:13;281:6,7,7;
284:12;303:13;
305:13;371:21,24;
372:9;375:19;
397:20;423:6;
433:25;438:21;
442:23;465:20;471:3
**regarding (9)**
11:16;51:23;
55:17;334:20;347:6;
432:3;453:17;487:5,
14
**regardless (3)**
29:14;109:7;270:6
**registered (1)**
111:12
**Regular (4)**

6:5;114:24;250:9;
393:23
**regularly (1)**
298:19
**regulations (1)**
476:8
**rehire (2)**
32:3;458:8
**rehired (3)**
30:3;457:24;458:7
**reintroduce (1)**
379:16
**reiterated (1)**
392:11
**related (5)**
22:7;38:12;
182:12;313:16;340:4
**relates (1)**
289:15
**relation (2)**
83:17;435:12
**relationship (5)**
379:22,24;487:21,
23,25
**Release (3)**
19:25;134:9,11
**released (1)**
486:9
**reliable (1)**
162:3
**relief (8)**
221:25;227:17;
228:3;229:4;230:13;
239:16,18;462:16
**relieved (4)**
237:6,6;240:10;
285:5
**relieving (2)**
235:16;258:21
**relying (1)**
425:9
**remain (1)**
97:12
**re-mark (1)**
38:17
**remember (10)**
208:21;214:11;
239:24;240:3;
261:14;311:10;
322:2;356:22;
426:24;462:13
**remembered (1)**
436:3
**remembering (1)**
454:21
**remove (4)**
283:24;284:6,13;
318:24
**removed (1)**
34:3
**removing (1)**
290:22
**rendered (1)**

176:10
**renting (1)**
461:23
**repeat (7)**
85:10;481:11
**repeated (3)**
240:14,16;309:9
**repeatedly (7)**
144:18;273:9,12;
470:14;471:8;476:6;
477:11
**repetitively (1)**
270:4
**rephrase (3)**
109:22;471:11;
481:12
**Report (54)**
147:2;152:7,13;
154:16,21,24;
155:10,20;156:9;
158:2;159:2;165:3;
346:2;377:18,19,25;
378:3,4;390:24;
391:4;412:22;
416:23,25;417:4;
424:25;425:11,16;
426:10,13,14;427:9;
434:15,17,25;435:7,
14,24;436:11;443:5,
12,16;451:5,7,15;
452:2,10,18;456:21;
457:6,6;462:2,19;
463:14;488:2
**reportedly (1)**
470:14
**reporter (7)**
4:18;5:14,20,23;
43:3;147:24;152:4
**Reporting (4)**
4:16,20;151:7;
470:14
**reports (6)**
377:24;390:20,22;
417:6;436:7;450:22
**represent (1)**
379:18
**represented (1)**
18:17
**representing (1)**
50:19
**represents (2)**
169:6;381:24
**request (2)**
75:15;87:24
**requested (7)**
93:12;148:24;
200:4,10;376:21;
432:4;467:18
**requests (1)**
87:25
**required (2)**
33:22;296:15
**requirements (2)**

33:11;439:17
**reschedule (1)**
70:10
**rescue (35)**
361:24;363:6;
364:6;365:6,7;368:6,
6;369:25;372:21;
374:14,17;376:12,
12,13,14,25;377:5;
385:6;389:2,5,7,10,
17;397:6,10;410:19,
23;411:2,9,14,15,22;
412:9;417:6;486:19
**reserve (2)**
483:4;489:14
**reserved (1)**
3:10
**reserving (1)**
15:4
**residences (1)**
296:17
**resident (5)**
160:14,16;186:21;
461:6;489:7
**residents (5)**
149:9,11;187:11;
330:16;368:18
**resides (1)**
461:15
**residing (2)**
461:18,20
**resign (1)**
31:20
**resignation (1)**
431:6
**respect (1)**
325:4
**respective (2)**
3:4;84:8
**respond (15)**
47:18,21;171:2;
269:3,5,5;272:16,25;
273:17;276:25;
344:24;345:8;
352:11;378:6;465:9
**responded (4)**
150:2;160:3;
351:22;352:8
**responding (13)**
150:25;158:9,23;
162:15,17;170:16,
18;267:4;268:12;
278:25;279:13;
282:15;452:22
**response (14)**
64:3;67:19;122:8;
260:23;278:14,22;
279:22;280:19,20;
281:17,18;316:22;
344:17,19
**responses (1)**
277:13
**responsible (5)**

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

262:8;263:20,20;
281:19,20
**responsive (1)**
90:14
**Restaurant (1)**
306:17
**resubmit (1)**
127:20
**result (3)**
102:15;110:21;
115:15
**resulting (2)**
19:15;240:17
**results (3)**
34:22;88:3;103:13
**resume (38)**
119:13,25;125:22;
126:7,12,19;127:8;
131:20;133:2;
139:11,12,13,16,19;
140:8,12,14,16,20,
22;141:3,6,7,20;
142:5,12,15;143:11;
144:4;198:22,24;
199:2,5,23;200:6;
202:20,23;204:14
**resumes (2)**
132:6,14
**retained (3)**
50:11;57:11;
478:21
**retaining (1)**
81:5
**retake (4)**
36:15;209:11,13;
211:7
**retaliation (1)**
212:22
**retention (1)**
480:15
**retire (1)**
96:12
**retired (5)**
96:10,11,14;
437:24;440:9
**retirement (6)**
29:8,12;111:10;
113:14;164:11;197:4
**re-took (1)**
37:10
**returned (1)**
337:17
**returning (1)**
279:12
**review (12)**
11:7;13:24;39:9,
12,24;40:10;102:6;
168:8,12,16,19;
489:15
**reviewed (8)**
13:22;39:11,13,16,
19,21,22;40:24
**Reviewing (15)**

63:18;84:4;133:3;
135:20;148:8;
164:21;168:20;
171:16,21;172:14;
173:3;287:3;323:11;
476:15;477:4
**reviews (1)**
167:6
**re-violate (1)**
301:2
**revolver (1)**
383:11
**rewritten (1)**
424:25
**rewrote (2)**
425:11;426:11
**Rexcorp (1)**
4:12
**Riccardi (2)**
94:14;95:13
**Richard (1)**
290:16;398:8,17;
401:12,18;402:11,
21;406:14;433:15,
16;443:13
**Richie (30)**
67:13;289:12;
345:21;360:18,19,
23;361:3,5,11,15;
365:23;367:11,15;
391:21,25;397:19,
22;398:3,4,19,22,23;
399:3,5,9,15,23;
417:25;434:7;485:18
**ridicule (1)**
344:18
**ridiculed (1)**
344:17
**ridiculing (1)**
344:22
**ridiculous (1)**
160:14
**right (303)**
8:9;10:15;13:6;
15:22;16:3;17:12,18;
39:23;42:11;50:3,9,
15,16;51:22;52:3;
54:13;56:3,8;65:3;
67:2;68:13;70:20;
83:2;97:11;98:15;
102:4;106:25;
108:19,22,23,25;
109:4;110:2,9;
113:18;116:23;
117:2,5;118:19;
119:17,19;120:20;
121:3,5;122:13;
123:20,24;124:6;
125:13;129:9,14,17;
134:16,16;138:3,11;
139:7;150:7,14;
153:6,9,13,18,25;
156:5;157:5,11;

159:9;160:4;161:15;
162:19,20,23;
163:24;164:23;
168:4;170:17;171:5,
18;176:25;180:21;
183:20;184:4;
197:20,24;198:4,8,
13;204:2;207:2,19,
22;209:11;210:11,
14,23,24;211:3;
214:19;216:13;
220:3;221:6,21;
222:23;228:20,21,
22,24;229:6,7,8,11,
12;230:16;231:18,
19,22,24,25;232:4,4;
238:6,17;239:10,12;
240:11;248:2,14;
249:2,4;252:11;
253:20,23;254:21;
260:9;262:15,18;
263:11;264:2,23;
266:21,22;267:16;
269:15,16;270:25;
271:3,5,7;272:21;
273:11,18,25;274:3,
9,12,22,24;275:22;
276:4,6;284:16;
287:16;292:6,8,19;
295:7,18,21;301:9,
18,20;302:2,19;
303:4,10,14,24;
305:15;306:5,8,13;
307:4;308:2,6,7,9,12,
16;316:24;318:19;
319:15;320:12;
323:15,20;324:9,13,
16;325:3,6,13,15,22,
25,25;326:3,5,6,6;
327:12;329:4;330:6,
7,8;333:18;334:16;
336:12,15;338:23;
342:12;345:11;
346:5;348:8;350:6;
352:23;353:2,3;
357:25;358:3;
359:13,14,15;
361:16;363:15;
365:10,16;366:4;
370:23;372:2,21;
375:3,6,10;387:4,10,
13;389:21;391:19;
394:23,24;397:5;
398:11;400:25;
402:5,7;404:7,8;
406:24;407:3;
410:24,25;411:3;
412:11,13;421:15;
425:21;426:2,15,21;
428:4,20;429:4,6,21,
23;430:9,19;432:23;
436:9;438:3,10,15,
19;439:4,12;441:6,

16,16,20;442:9,13,
20;444:3,5;447:9;
449:20;450:23;
459:11;474:2;483:4;
484:3;485:20;489:15
**right-hand (1)**
150:5
**rights (2)**
15:4;165:12
**risk (2)**
327:20;480:13
**Rivkin (2)**
4:12;5:5
**Road (1)**
6:2
**Robert (1)**
72:14
**Rogers (3)**
5:4;70:18;266:4
**room (11)**
36:16,20;44:14;
366:5;370:7,8,9;
388:25;402:2;473:5,
6
**roster (2)**
288:17,18
**Roughly (3)**
83:21;222:13;
422:22
**round (1)**
37:21
**routinely (4)**
270:4;413:5,9,20
**RQ (1)**
58:24
**RQs (1)**
492:3
**ruin (1)**
61:10
**rule (1)**
230:22
**rules (1)**
476:8
**rumor (1)**
169:7
**rumors (10)**
95:3;106:2,5;
149:4;182:23;
185:17,20;186:4,9,
13
**run (4)**
104:11,15,20;
315:4
**rundown (1)**
406:8
**running (5)**
89:14;96:6;137:7;
208:17;403:19

## S

**safe (3)**
290:11;293:9,22

**safety (9)**
60:14;117:22;
119:18;240:18,18;
250:24;251:15;
291:22;325:3
**sales (1)**
282:16
**same (99)**
3:6,15;23:24;
24:24;25:22,24,24,
25;26:3,4;33:11;
37:7;46:16,24;47:2,
3;62:19;67:7;69:19;
70:4,11;73:5,8;80:6,
10;95:7;104:25;
106:11;126:23;
128:3,6;131:19;
132:18;140:9,10;
141:3,5,7,9;153:9;
155:6,25;173:24;
189:11;197:5;198:7;
220:7;236:5,13;
248:22;249:17,18,
22;253:17;254:13;
260:16,23;261:8,16,
21,24;275:24;
276:21;277:2,15;
278:6,16,17,23;
279:23;280:20;
281:21;282:18;
285:19;286:18;
291:3;292:2,5,15;
305:4;310:18;
311:15;320:14;
328:14;333:14,24;
342:3;355:12;
367:23;370:4;385:6;
387:15;391:9;
428:15;431:24;
433:5;437:5;463:17;
473:19
**Sanchez (25)**
5:10;111:25;
112:18;113:10,20;
114:4,19;115:9;
116:5,13,15,19;
379:16,19,23,24;
380:11,15,17,19;
381:6,7,15,20;
382:16
**Santana (1)**
4:15
**sat (1)**
220:4
**sausage (1)**
298:5
**saw (31)**
21:23;31:24;
65:21;72:17;102:12;
119:24;123:7;
222:21;226:13,15,
18;231:11;259:19,
20;291:20;304:16;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 156 of 164 PageID #:
2136
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
THOMAS SNYDER
September 24, 2008

317:21;318:14;
321:14,15;334:8,11,
20;336:4;349:3;
369:6;376:20;
380:12;415:25;
425:16;484:11
**say' (1)**
433:16
**saying (45)**
8:3;40:4;45:9;
113:23;124:4;
128:24;137:11;
151:2;164:11;171:4,
6;229:24;231:9;
235:6;236:22,24;
239:7,18;275:17;
308:13,17;317:25;
330:3;335:12;339:4;
347:3;356:9,16,20,
21;357:5,6;392:22;
393:22;394:3,12,19;
413:23;435:10;
440:19;447:6;450:3;
455:13;458:19;477:6
**scandal (1)**
128:23
**scans (1)**
177:8
**scattered (1)**
322:9
**scene (14)**
56:2;268:12;
385:23;386:2;390:4;
404:14,15;452:23;
465:15;484:4,21;
485:21,22,23
**schedule (4)**
24:17;68:16;
130:6;333:5
**scheduled (2)**
23:20;215:20
**scheduling (1)**
24:19
**Schimpf (33)**
89:11;90:4,19;
103:8,24,25;104:22;
106:13,24;107:20,
20;108:2;183:9,10;
184:10;185:4,11;
186:3;187:15;189:2,
25;190:4,8;192:5,10;
193:3,20;194:17,24;
195:10,15,19;196:4
**S-C-H-I-M-P-F (1)**
89:11
**Schneider (1)**
60:9
**Schwartz (11)**
147:2;152:7,13;
154:16,21,24;
155:10,20;156:9;
158:2;159:2
**scored (1)**

87:8
**Scott (1)**
306:23
**Scotty (2)**
306:19;307:7
**screwed (1)**
17:19
**Sea (2)**
461:21;486:14
**sealing (1)**
3:5
**second (39)**
35:25;36:25;
37:21;118:12,13,22;
124:25;125:15;
128:10,11;136:23;
195:9,14,16;197:2,
19;203:16;206:11;
212:16;236:12,17,
24;241:5;268:6;
270:17;309:18,22,
23;316:13;339:25;
340:13;350:17;
352:15;369:17;
370:15,17;424:23;
483:18,21
**secondary (1)**
182:22
**seconds (7)**
269:21,23;270:8,
10;359:5,10;488:22
**section (2)**
15:19;153:15
**secure (6)**
131:5;143:9;
196:25;340:18;
341:2;465:14
**secured (1)**
342:25
**securing (3)**
143:11;197:10;
340:21
**security (8)**
117:23;119:18;
122:19;126:7,14,17;
130:21;131:12
**seeing (3)**
11:13;113:5;
367:17
**seek (7)**
32:17;91:16;
93:13;127:21;
131:17;178:15;
179:13
**seeking (2)**
53:13;131:15
**seemed (1)**
18:11
**seems (2)**
158:17;445:15
**selective (1)**
344:13
**selectively (1)**

312:22
**send (8)**
142:4;152:25;
154:10,11;272:14;
312:14;315:25;
327:25
**sending (1)**
17:21
**senior (6)**
193:12;212:25;
213:4,22;214:3,7
**sent (10)**
61:15;112:14;
131:20;140:8,12,19;
141:4,8;143:11;
144:4
**sentence (12)**
84:5,19;105:5,6;
144:16;212:17;
240:15;297:8;
312:17;340:2;342:3;
424:24
**sentences (1)**
258:5
**separate (3)**
19:11;47:7;488:3
**September (7)**
4:13;103:14;
128:17;345:20;
348:7,7;490:4
**Sergeant (18)**
17:5;30:14,14;
76:3,4;84:9,14;
85:22;86:8;104:2;
122:2;169:21;170:3,
5;213:3,7,21;225:10
**serious (5)**
302:20;309:5;
324:14,22;325:2
**served (5)**
9:23;30:15;
298:19;478:23;480:6
**service (38)**
6:16,18;19:21;
60:8;63:3;84:22;
87:14;91:7;110:24;
111:3,6,8,22,25;
112:14;113:2,23;
114:23;115:17;
137:13;139:4,7;
152:14;178:7;
208:18;209:7;
212:19;378:5;
379:10;440:3;
464:12;470:17;
471:4,14,18;478:20;
487:5,14
**serving (3)**
206:2;300:19;
310:4
**set (7)**
42:4;48:21,23;
92:15;233:21;

470:13;478:18
**seven (5)**
10:14;130:13;
174:12;324:20;
456:12
**several (36)**
18:12;23:15;
24:15;25:18;30:3;
49:14;53:24;56:15;
58:12;83:6;86:11;
101:14;118:3;
132:17;141:19;
147:13,17;167:10;
193:7;236:9;238:22;
240:2;244:12;
245:14;248:20;
258:18;261:13;
264:22;269:21;
308:24;321:13;
353:16;356:6;
362:15;368:10;
409:23
**severe (9)**
175:22,25;176:7;
177:2,17;178:4;
182:14,18;184:21
**severely (2)**
177:3,4
**sexual (3)**
296:19;297:25;
298:9
**Sgroi (12)**
96:4;97:3,9,22,24;
98:6,18;99:17;
106:19;107:2,3,13
**Shalick (4)**
385:12;459:4,20;
460:4
**shall (2)**
3:6,10
**sham (6)**
445:8;450:13,14,
17;453:5,20
**share (1)**
275:3
**shared (2)**
274:12,18
**sheets (1)**
69:18
**shelf (2)**
341:5,22
**Sheriff (1)**
384:2
**shield (5)**
148:25;161:24;
267:24;268:2;431:4
**shift (36)**
215:13,16,17,24;
216:3,6,9;220:7,10,
14;227:12;228:17;
230:7,10,12;255:2,
19;256:21;265:4;
292:2,5,15;293:20,

25;294:5,7;295:23;
332:10,10,16;
378:16,18,22;386:8;
412:15;455:6
**shifts (11)**
230:25;255:3;
256:2,9,11;332:14,
21,23;333:2;348:12,
23
**shit (7)**
435:2,8,14,24;
436:7,12;457:7
**shit' (1)**
434:18
**shitty (1)**
169:16
**shook (1)**
339:3
**shooting (1)**
336:5
**short (16)**
128:14;232:23;
233:18;234:19;
235:8,14,24;239:21;
245:19,21;248:2,23;
249:23;254:15,17;
368:5
**shorter (2)**
360:22;485:19
**shortly (4)**
36:3;127:2;
198:12;228:7
**shot (2)**
168:11;301:17
**show (18)**
12:8;58:3;60:21;
62:18;63:13,15;
66:22;70:24;91:21;
126:11;212:5;
228:17;230:16;
362:25;368:3;
373:12;425:19,20
**showed (11)**
71:19,20;125:22;
162:21;231:18;
363:9;368:6;373:8;
392:18;456:16;
475:11
**showing (5)**
7:9;39:2;126:6;
258:22,22
**shown (1)**
18:6
**shows (3)**
114:23;268:8,9
**sick (12)**
82:8;176:17;
180:7,9,14,20;
190:25;205:16;
323:23;462:20,22;
463:5
**sick' (1)**
462:3

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**side (5)**
272:10;399:4;
431:4;473:7,7
**sidewalk (1)**
328:17
**sight (1)**
319:9
**sign (19)**
8:3;52:23;71:21;
161:22;189:14;
225:20;229:11,14,
15,19,25,25;230:8,9,
15,19;231:11,17;
489:15
**signature (8)**
8:6,11,13,18;9:3;
12:15;59:16,18
**signed (11)**
3:14,15;8:16,18;
9:15;11:8;224:20;
227:11;229:13,20;
230:11
**significance (2)**
371:19;372:5
**significant (2)**
312:7;324:9
**sign-in (1)**
230:6
**signing (4)**
13:23;224:12;
225:6;232:14
**similar (8)**
62:6,8;73:10;
133:8,10,12;457:5;
489:13
**similarly (1)**
231:4
**simple (1)**
249:13
**simply (4)**
299:12;350:3;
435:23;436:2
**single (1)**
332:9
**singled (1)**
185:3
**sit (5)**
50:18;155:8;
313:14;476:16;480:2
**site (1)**
154:11
**sitting (9)**
228:3;231:2;
270:20;341:4;365:6;
387:24;390:8;
391:19;394:21
**situated (1)**
370:6
**situation (20)**
32:9;80:7,10;
90:12;182:21,23;
183:7;187:8;263:16;
285:4,5;326:13;

355:15;357:3;
394:15;402:16;
416:16;443:18;
455:9;478:9
**six (5)**
260:7;321:8;
324:19;379:7;456:8
**skills (1)**
438:22
**sleep (1)**
179:24
**sleeping (1)**
176:4
**slept (2)**
297:16;380:5
**slot (2)**
207:2,6
**small (3)**
370:8;388:25;
479:7
**Smaller (1)**
370:9
**smashed (1)**
326:5
**smeared (1)**
146:2
**smell (3)**
222:2,6,7
**snooping (1)**
331:16
**Snyder (524)**
4:1,4;5:1,22;6:1,
12;7:1,6;8:1,8;9:1;
10:1;11:1;12:1,6;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1,
3;21:1;22:1;23:1;
24:1;25:1;26:1,9;
27:1;28:1,4,5;29:1;
30:1;31:1;32:1;33:1;
34:1;35:1;36:1;37:1;
38:1,19;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1,11;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1,18;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1,7;85:1;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:1;97:1;
98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;

116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1,17;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1,6;149:1;150:1;
151:1;152:1;153:1,
23;154:1;155:1;
156:1;157:1;158:1;
159:1,3;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1,24;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1;
251:1;252:1;253:1;
254:1;255:1;256:1;
257:1;258:1;259:1;
260:1;261:1;262:1;
263:1;264:1;265:1;
266:1;267:1;268:1;
269:1;270:1;271:1;
272:1;273:1;274:1;
275:1;276:1;277:1;
278:1;279:1;280:1;
281:1;282:1;283:1;
284:1;285:1;286:1;
287:1;288:1;289:1;
290:1;291:1;292:1;
293:1;294:1;295:1;
296:1;297:1;298:1;
299:1;300:1;301:1;

302:1;303:1;304:1;
305:1;306:1;307:1;
308:1;309:1;310:1;
311:1;312:1;313:1,
22;314:1,6;315:1;
316:1;317:1,7;318:1;
319:1;320:1;321:1;
322:1;323:1;324:1;
325:1;326:1;327:1;
328:1;329:1;330:1;
331:1;332:1;333:1;
334:1;335:1;336:1;
337:1,15;338:1;
339:1;340:1;341:1;
342:1;343:1;344:1;
345:1,24;346:1;
347:1;348:1;349:1;
350:1;351:1;352:1;
353:1;354:1;355:1;
356:1;357:1;358:1;
359:1;360:1;361:1;
362:1;363:1;364:1;
365:1;366:1;367:1;
368:1;369:1;370:1;
371:1;372:1;373:1;
374:1;375:1;376:1;
377:1;378:1;379:1;
380:1;381:1;382:1;
383:1;384:1;385:1;
386:1;387:1;388:1;
389:1;390:1;391:1;
392:1;393:1;394:1;
395:1;396:1;397:1;
398:1;399:1;400:1;
401:1;402:1;403:1;
404:1;405:1;406:1;
407:1;408:1;409:1;
410:1;411:1;412:1;
413:1;414:1;415:1;
416:1;417:1;418:1;
419:1;420:1;421:1;
422:1;423:1;424:1;
425:1;426:1;427:1;
428:1;429:1;430:1;
431:1,25;432:1;
433:1,11,12;434:1,
14;435:1,13;436:1,
21;437:1;438:1;
439:1;440:1;441:1;
442:1;443:1;444:1;
445:1;446:1;447:1;
448:1;449:1;450:1;
451:1;452:1;453:1;
454:1;455:1;456:1;
457:1,2;458:1;459:1;
460:1;461:1;462:1;
463:1,12,13;464:1;
465:1;466:1;467:1;
468:1;469:1;470:1;
471:1;472:1;473:1;
474:1;475:1;476:1;
477:1;478:1;479:1;
480:1;481:1;482:1;

483:1,12;484:1;
485:1;486:1;487:1;
488:1;489:1;490:1,4,
8;492:5
**Snyder-1 (4)**
7:4,10;8:10;10:14
**Snyder-10 (1)**
212:6
**Snyder-2 (2)**
12:3,9
**Snyder-3 (1)**
19:23
**Snyder-4 (2)**
26:7,11
**Snyder-5 (2)**
28:2,7
**Snyder-6 (4)**
38:18;39:3;
488:15,16
**Snyder-7 (2)**
63:8,14
**Snyder-8 (5)**
62:12;63:7;
135:15,21,23
**Snyder-9 (1)**
147:25
**Snyder's (6)**
425:3;434:17;
456:16,18,20;462:2
**socializing (1)**
333:23
**sole (1)**
292:23
**solving (2)**
237:7,10
**somebody (13)**
61:8;67:9;76:6;
232:6;270:17;
302:17;316:19;
319:24;354:15;
355:20;417:19;
436:14;483:17
**somehow (6)**
60:10;92:18;
439:10;446:22;
447:20;485:10
**someone (20)**
31:6;59:16;67:20;
85:3,14;92:18;
133:21;142:6;153:2;
158:19;170:17,21;
228:18;239:9;
270:16;302:14;
303:3,14;325:12;
429:18
**someone's (2)**
59:16,20
**sometime (33)**
43:23;45:13,16;
49:23;68:8,9;70:12,
13;96:11;127:2;
140:10;141:21;
183:20;192:18;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 158 of 164 PageID #: 2188

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

208:22;219:18,21;
236:4;237:13;241:3;
276:17;331:19;
378:19;380:8;
411:11;413:6,7;
414:6;434:21;
459:25;462:9,12,14
**Sometimes (32)**
66:7;170:25;
219:7,8,8;223:8;
227:25,25;229:20;
243:18;255:5,6,7,8;
256:5,15,16,17;
258:24,25;268:2;
269:2;271:9,16;
272:8,15;275:14;
293:15;310:21;
333:2,3,4
**somewhere (5)**
141:25;215:6;
270:21;272:23;475:4
**son (1)**
414:17
**Soon (9)**
49:2;64:18;65:11;
70:13;111:14;123:6;
183:13,19;200:7
**sorry (21)**
14:10;22:17;24:4;
27:9;36:22;52:13;
137:17;150:10,16;
159:19;202:22;
204:18;250:18;
255:2;277:11;
336:16;348:15;
396:19;454:25;
472:9;481:11
**sort (5)**
52:23;152:15;
413:12;423:9;453:12
**sought (6)**
111:7;177:15;
178:2;204:22;
381:25;382:4
**Sound (1)**
6:3
**sounds (1)**
340:9
**space (2)**
174:8;474:3
**span (1)**
310:2
**speak (41)**
45:10;47:23,25;
62:7;64:12,12;65:10;
66:13;67:9,11,20,21;
96:17;109:14;
119:14;138:20,20;
201:7;221:22;
235:21;236:14;
252:12;260:17;
277:16;278:8;
335:15;338:7;348:4;

387:23;390:2,4;
391:12,16;392:6;
397:22;414:22;
415:5;424:5;457:14;
466:8;484:8
**speaking (10)**
46:11;100:21;
114:9;252:14,21;
268:11;348:2,5;
382:14;466:7
**speaks (1)**
15:10
**special (1)**
423:14
**specialist (1)**
4:17
**specific (34)**
11:15;12:24;23:9;
38:9;43:16,18,24;
97:22;112:13;115:5;
121:12;125:6;141:2;
143:7;149:25;
172:22;193:6,9;
223:6;227:12;
233:12;286:9;300:7;
321:6;326:17,19;
416:22,23;419:20;
426:10;454:22;
464:16;480:8;487:6
**specifically (71)**
42:3;48:14;53:13;
71:5;84:17;87:17;
88:18;90:25;96:3;
115:25;116:2;
121:21;130:19;
159:7;166:14,19;
171:21;172:21,25;
173:10,12;178:20;
186:11;187:14;
189:2;192:18,22;
212:17;216:23;
217:6,13,20;219:19;
225:13;232:19;
242:7,9,11;246:13;
249:16;250:6;
261:12;265:11;
267:2,14;284:10;
293:8;297:17;
317:12;323:2;
334:11;339:9,11;
345:9;349:17;
356:22;358:11;
361:9;373:15;
393:16;425:21;
427:5;431:12;
433:24;435:3;
436:19;471:2,7;
479:23;480:2;486:19
**specifics (1)**
393:21
**speculation (2)**
110:13,16
**spend (2)**

348:12;468:2
**split (1)**
270:17
**spoke (60)**
45:5;56:12;64:24;
65:11;86:20;93:19;
94:21;96:20,25;97:7;
98:24;103:25;108:5,
12;112:18;113:9,19,
20;114:5,14,15;
115:9;116:18;
119:21;146:19;
163:25;199:18;
203:11;260:21;
347:16;371:24;
385:7,10,12;390:7,
12;392:2,4;396:18;
400:9;414:13;415:8,
12;417:10;419:7;
421:15,18,20;
422:20;423:20;
424:2,9,10,20;
448:24;449:21;
450:25;451:2;
458:24;478:16
**spoken (40)**
20:18;21:15;
22:18,22;23:2,6,13;
24:12,20;25:15;
44:16;58:2;95:10,14,
19;97:4;98:11,16;
99:3,11,19,21;100:2,
5;107:7;108:3,8;
109:9,12,20,23,25;
110:4;114:12;116:4,
14;119:3;202:16;
457:11;462:15
**Spota (1)**
60:6
**Spread (6)**
106:2;167:7;
186:8,12;318:17;
401:9
**spreading (3)**
106:5;149:4;
182:24
**stabbed (3)**
302:17;303:3,13
**stabs (1)**
302:14
**stamp (5)**
7:17,20,24;8:20;
19:24
**stamped (5)**
12:10;26:8;28:7;
59:23;148:4
**stand (6)**
318:2;348:25;
349:6,12,13,18
**standing (16)**
316:19;318:4;
319:10;322:16;
338:12,18,23;

348:13;349:3,4;
353:7,12;356:2;
369:15;399:4;410:18
**staring (1)**
221:8
**start (22)**
86:15;115:14;
137:11;139:3;
168:14,18;183:10;
229:15;230:2,7,10,
12;241:2;276:16,19,
23;310:12;330:2;
465:7,8;466:7;
477:16
**started (27)**
27:4,5,7;37:19,22;
124:23;125:7;
148:23;183:12,18;
191:5;206:3;227:12;
229:23;234:24;
235:16;237:7,10;
239:4;240:24;241:4;
276:18;285:6;
336:25;357:4;
366:21,23
**starting (4)**
26:24;225:20;
292:16,17
**starts (5)**
8:2;9:5;158:16;
470:12;477:6
**State (14)**
5:18,20,23;14:21;
29:8;37:4,12;111:10;
137:11;164:10;
178:8;475:20,24;
476:2
**stated (17)**
9:11;17:2;49:11;
57:25;73:24;86:14;
107:17;111:16;
127:5;134:23,25;
218:20;443:12;
461:24;469:24;
476:18;484:15
**statement (37)**
338:22;370:10;
386:23;387:3,5,8,12,
18;396:12,16;397:7,
11;398:17,18;
399:12,17,25;
401:18,23;402:14,
22;432:5,16,17;
433:6,13;441:8;
456:16,17,20,24;
471:23;472:6,11,21;
473:9,10
**statements (24)**
43:2,6;89:17;
142:21;370:4;
388:24;390:12,14,
17;396:9;397:16;
443:17;449:12,22;

454:5,11;455:3,15;
465:21;467:21;
471:21;474:8;477:8;
483:4
**States (8)**
4:8;9:23;10:20;
13:10;14:12;16:12;
162:6;165:10
**stating (4)**
15:7;161:7;
202:24;470:12
**station (66)**
43:5;244:6;
250:22;267:12;
284:4;293:16;328:5;
337:5;338:15;
351:25;361:22;
362:12;363:5,15,18;
364:5,10,16,19,24;
365:9,17;366:2;
368:4,22;370:6;
374:12;376:14,25;
377:6;385:4,24;
387:23;389:7;390:3,
8;392:3,7;396:4,11,
14,24;397:4;399:10,
14,24;403:15;
405:19;406:23;
407:12;408:9,12,20,
25;410:17;411:12,
16;412:9;416:3;
461:17;480:17,23;
481:9,14;484:23;
486:10
**stations (2)**
43:8;104:19
**stats (1)**
190:22
**status (4)**
131:11;163:15,18;
164:5
**stay (13)**
35:13;97:8;168:2,
7;188:25;304:8;
331:6,10;397:6,10,
15;402:4;482:22
**stayed (3)**
304:15;342:20;
412:3
**staying (5)**
330:17;377:4;
461:22;486:14,15
**step (2)**
20:13;358:21
**stepped (3)**
357:20,21;359:2
**stepping (1)**
191:5
**stick (4)**
237:25;355:2;
442:6;460:6
**stigmatizing (3)**
474:17,22;475:2

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**still (29)**
89:13;97:19;
132:5;133:2,20;
136:9;169:3;171:18;
172:7,9;176:23;
180:15;191:23;
192:5,8,10;227:22;
262:12;280:9;
303:20;357:10;
358:12;369:9;
376:14;394:5,16;
410:16;412:12;
458:22
**stipulate (1)**
26:17
**STIPULATED (3)**
3:2,8,12
**stipulations (1)**
6:6
**stock (1)**
309:15
**stomach (1)**
176:5
**stop (4)**
96:9;168:22;
240:21;355:19
**stopped (12)**
164:12;165:2,19;
198:25;199:4,6,13,
15;240:24;319:22;
321:15,16
**storage (1)**
343:7
**store (2)**
316:12;341:22
**stories (1)**
104:20
**storing (1)**
343:23
**story (5)**
104:16;123:11,13;
248:22;357:4
**straight (2)**
29:11;220:5
**straightened (1)**
17:20
**strange (1)**
445:25
**strangers (1)**
144:19
**street (2)**
21:12;393:8
**streetlight (1)**
348:13
**stress (5)**
179:25;182:14,18;
197:15;203:16
**stressed (1)**
197:18
**strewn (1)**
284:3
**strike (28)**
14:24;15:2;17:8;

64:22;74:8,11;90:13;
100:16;112:10,24;
149:19;189:22;
191:9;194:12;203:9;
205:17;223:11;
228:15;257:15;
299:11;341:14;
363:13;402:9,18;
421:2;466:11,25;
467:12
**stuff (11)**
149:10;152:21;
283:9;323:13,13;
339:23;342:12,20;
385:17;419:18;475:6
**subject (8)**
9:5;120:21,22;
165:6,10;175:12;
482:24,25
**submit (20)**
139:13;140:15,16;
198:21,24;199:17,
24;200:6,12,16;
202:9;203:17,19;
204:10;205:2;417:3;
431:6;432:2;454:4,
11
**submitted (4)**
112:19;139:12;
142:12;463:14
**submitting (1)**
198:25;199:5,6,13
**Subscribed (1)**
490:10
**subsequent (17)**
42:14;52:2;67:6;
113:8;115:20;116:3;
195:18;330:4,21,24;
331:9;335:17;472:2,
12,14;474:7,21
**Subsequently (3)**
328:13;329:8;
330:3
**substance (6)**
23:17;24:21;
71:17;72:11;73:2;
309:3
**substantiates (1)**
328:20
**suck (1)**
170:13
**suffer (1)**
175:22
**suffered (1)**
175:21
**suffering (2)**
179:24;203:15
**Suffolk (71)**
5:9,11;6:13,16;7:5,
12;11:14;12:4;14:5;
33:13;35:15,16,17;
36:2,10,25;37:6,12,
15;44:3,17;45:6;

46:4,20;49:8;50:5,
13;51:2;52:13;
53:18;56:13;60:8;
63:2;68:24;69:13;
88:2,2;113:22;179:5;
198:20;199:10,16,
21;200:6;202:19;
203:23;204:19;
206:8,13;314:18,21,
24,25;315:13;
376:21;382:20,24;
383:24;384:2;
439:18;440:17;
460:8,10,14,18;
470:17;471:4,13,18;
478:20;487:13
**suggest (1)**
115:8
**suggesting (1)**
305:21
**suggests (1)**
116:18
**suing (1)**
81:4
**sum (4)**
71:17;72:10,25;
309:2
**summer (9)**
219:21;255:15;
256:2,12;284:22;
285:3;338:4;351:7;
380:9
**summons (3)**
302:3,11;337:8
**summonses (17)**
196:12;298:16,23;
299:14,17;300:10,
16,17,22;304:5;
305:14,24;308:5;
313:17;317:13,24;
319:8
**superior (15)**
89:18;124:2;
216:9;217:2,9,15;
218:2,7,10,19;
223:20;262:10;
265:3;476:6,7
**superiors (6)**
89:7;102:13;
109:24;110:18;
470:16,23
**supervising (2)**
165:15;420:22
**supervision (1)**
314:11
**supervisor (27)**
21:22;60:7;89:21;
103:5;122:3,10,12,
14;130:20;136:8,12,
17,19,23;137:2;
138:5,11,12;191:24;
192:5;216:13,17;
236:19;252:7;262:5;

317:20;341:12
**supervisors (4)**
102:17,24;103:6;
136:21
**support (8)**
189:20;196:20;
197:3,4,6,8,9,13
**supports (1)**
284:23
**supposed (15)**
182:6;214:14;
215:11;229:2,5,14;
230:2,7,10,12,15,19;
270:21,24;438:17
**sure (88)**
8:3;23:8;27:16;
29:5;32:7;35:19;
40:11;44:22,23;
45:18;49:3;50:8;
59:13;72:2;78:7;
79:17;86:19;87:2;
91:3;96:16;98:20;
119:19;141:23;
170:22;173:21,25;
177:13;181:21,22;
205:7;214:23,24;
219:9,10;221:2;
223:23;236:8;
239:25;246:11,15;
249:15;250:3;279:4;
280:10;294:24;
297:5,11,12;307:2;
309:24;323:9;
327:14;335:22;
339:19;340:8;
359:18,24;361:23;
381:11;385:3,9;
389:8;391:13,15;
403:10,16;411:10;
434:22;435:16,21;
447:5;449:10;452:8;
457:8;458:13;
472:17;475:13,15,
17;479:12,23;480:9;
482:3,7;484:24;
485:3;486:25;488:24
**surprised (1)**
11:6
**surprising (2)**
448:24;449:2
**surrounding (1)**
454:6
**suspected (2)**
66:19;160:15
**suspicious (1)**
193:11
**sustained (1)**
205:20
**swear (1)**
5:14
**sworn (3)**
3:15;5:17;490:10
**synopsis (1)**

452:5
**system (4)**
29:8;111:10;
113:15;164:11

---

**T**

**tables (1)**
360:10
**tail (2)**
336:23;346:6
**talk (79)**
23:7,8;25:8;53:25;
61:22;65:19;67:9,23;
71:7,14;73:6;82:6;
95:22;101:4;103:9,
19,23;105:3;116:13,
23;119:4;139:20;
159:18,19;164:23;
169:12,15;170:6;
203:2,4,10;256:8;
260:19;261:8;263:2,
3,5;279:24;284:18;
307:10,20,23;
310:13;335:8,10;
340:20;345:25;
346:22,25;347:13;
349:25;355:20;
379:21;381:4;385:2;
386:6,9,11,12,15,18,
20;389:12,18,18;
396:17;397:19;
398:19;415:3;435:5,
15;436:4;445:25;
449:3;452:16,20,21;
461:17;472:20
**talked (28)**
20:14,16;41:12;
56:9;72:17;74:16;
97:9;106:11;111:25;
128:6;129:15,17;
203:5;232:2;260:17;
309:21;310:7,8;
313:3;339:23;
357:14;360:11;
392:19;427:12;
435:17;444:2;
447:24;451:9
**talken (1)**
25:4
**talking (57)**
24:19;25:10;42:7;
65:16;115:23,24;
130:13;148:23;
162:7;194:23;
195:22;217:24;
218:2,6;223:12;
231:12,14,20,21;
235:10;251:19;
267:5;268:4,6,15;
269:4;270:19,23;
275:21;277:25;
281:23;289:6;297:7;

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 160 of 164 PageID #: 2140

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

303:8;315:12;
320:10;322:19,20;
346:7,24;354:22;
355:22;363:25;
385:19;387:16;
388:19;390:24;
410:2;415:25;
419:20;428:20;
435:11;438:18;
441:22;453:3,19;
464:17
**talks (1)**
186:24
**taller (1)**
358:17
**tape (26)**
4:2;75:18,22;
76:11,16,20;77:8,13,
20;78:12;80:5,18,23;
146:11,15;211:20;
212:3;296:6,10;
345:12,16;378:24;
379:3,7;456:8,12
**taped (2)**
77:2;80:13
**taping (1)**
76:5
**tasked (1)**
262:7
**taught (1)**
465:14
**technically (1)**
136:10
**telephone (1)**
418:16
**television (6)**
42:23;43:3,8;
104:19;250:22;
251:14
**telling (15)**
54:10;164:25;
236:20,23;252:17;
293:19;308:10;
335:16;347:4;
356:23;390:6;395:5;
419:11;427:17;
447:25
**tension (2)**
179:25;197:15
**tenure (1)**
136:20
**term (1)**
314:16
**terminate (1)**
427:19
**terminated (20)**
28:14;46:7;
116:20;123:4;
129:16;177:25;
183:22;185:8;
197:23;208:24;
209:4,17;210:2;
211:2,13;212:19;

427:14;477:12,18;
478:2
**termination (9)**
28:15;114:13;
115:10;144:11;
158:3;185:4;186:5;
209:14;248:19
**terminations (1)**
106:6
**terms (2)**
185:5;199:20
**Tesoro (6)**
384:25;385:20;
386:25;396:18,19,20
**Tesoro's (1)**
387:3
**test (35)**
33:14,17,19;34:13,
16;35:17,20;36:2,10,
12,23,24,25;37:5,5,6,
7,12,12,13,16;87:18,
25;88:3,8;103:14;
206:9;209:12,14,15,
18,20;210:5;211:7,
14
**testified (44)**
5:19;39:15;48:20;
74:17,25;75:8;86:21;
87:20;88:13;124:16;
128:18;133:17;
146:20;162:24;
164:24;200:18;
204:4;209:2;218:22;
219:3,12;224:15,18;
228:16;239:7;286:5;
295:8;385:17;386:4;
395:2;396:5;417:14,
22;418:13,17;419:6;
428:16,25;429:9,15;
430:9;441:14;
480:25;487:8
**testify (4)**
143:19;167:24;
418:24;419:4
**testifying (1)**
294:22
**testimony (31)**
11:12,21;12:25;
31:5;45:22;101:19;
115:7;130:16;
165:21;188:20;
200:13;201:11;
202:7;247:21;
252:19;270:14;
273:19;305:11;
308:5;334:10;
392:17;398:15;
401:15;421:4;
427:25;435:22;
440:14;447:2;
460:13;481:13;487:4
**tests (4)**
33:22;34:6;36:4;

87:25
**thinking (1)**
450:8
**third (11)**
314:2;316:13;
324:21;364:8;
365:11,13;369:3,14,
17;370:11,13
**Thomas (6)**
4:4;5:22;8:7;28:4;
490:3,8
**Thompson (1)**
4:24
**thoroughly (3)**
11:19;13:22,25
**though (22)**
37:16;96:16;
119:6;128:18;142:2;
147:16;227:13;
230:2;252:17;
262:25;294:17;
298:18;304:16;
311:15;319:18;
326:20;350:17;
361:6;430:16;445:2;
446:25;450:22
**thought (15)**
47:9;48:9;60:24;
64:20;67:12;82:10;
188:23;189:14;
190:2;208:9;218:22;
219:14;345:14,16;
376:18
**thread (2)**
161:4,8
**threat (1)**
240:17
**threatening (7)**
57:3,7,10,14;
193:25;194:3;492:4
**three (40)**
44:25;56:16;
117:9;143:14,20,21;
146:15;169:24;
207:22;211:20;
250:25;255:6;
256:14,14,24;
259:20;279:21;
290:17;321:24;
336:10;348:12,23;
350:25;351:9,15;
352:9,16;358:8;
362:4,13,16;364:17,
17;376:13;410:14;
411:3;412:16,17;
420:14;444:15
**three-year (1)**
310:2
**threw (3)**
36:12;37:9;356:24
**throughout (4)**
136:19;250:11;
258:13;318:17

**throwing (3)**
174:16;328:16;
330:11
**thrown (6)**
36:15,23;37:6;
316:20;330:6;356:10
**ticket (3)**
302:3;338:17,19
**tied (1)**
418:3
**Tierney (5)**
44:11;49:12;
50:23;57:15,24
**timer (1)**
73:25
**timers (1)**
30:19
**times (8)**
44:25;45:3;118:3,
10;147:11,13,19;
155:21;213:10;
214:6;225:19;
229:24;231:15,16;
236:9;237:23;
243:22;245:12;
255:11,14,17;
258:16,18;261:10;
272:6;279:9;280:4,
13;313:14;332:4;
372:19
**titled (1)**
150:19
**TOB0010 (1)**
136:3
**TOB0011 (1)**
136:4
**today (14)**
39:7;50:18;84:11;
95:25;155:9;177:22,
25;313:14;418:24;
419:4;431:22;474:6;
476:17;480:2
**today's (1)**
490:3
**together (18)**
50:10;70:5;276:7;
280:13;335:9;351:3,
10,11;352:17;
364:19;377:17;
380:11,13,23,25;
412:23;465:10;
487:18
**told (156)**
24:16;30:13;31:3,
5,14;43:20;54:24;
55:16;64:11;66:11;
67:12;78:5;79:23;
88:21;89:23;90:8,8,
17,20;93:23;96:13;
98:23,24;102:14,18;
105:14;107:13;
108:16;110:18;
116:8;117:3;121:25;

123:25;125:9;127:8;
130:19,25;140:15,
21;141:15;148:19;
156:13,14,16,20;
157:12;162:16;
163:4,5,19,20,25;
166:5,9,24;167:4;
178:14,20;187:8;
188:17;189:25;
190:4,8,13,16,23;
191:15;196:4;
199:16;200:11;
203:18,18;204:11;
216:8,17;223:19;
228:4,6,8;235:2;
245:16;252:12;
260:10,12;262:5;
263:15,18;268:25;
269:6;272:25;273:3;
289:2;290:21;
291:24;292:14;
293:4;294:17;295:5;
298:24;299:2,5;
300:7,15,25;304:8,
10,13,14,24;305:12,
17,24;313:15;
316:18;317:21;
319:7;333:13,14;
339:17;349:13;
360:3;365:5;371:12,
14;375:17;380:6;
386:5;392:14;
414:17;417:24;
418:25;419:15;
420:12,13;426:20;
427:22;428:13;
429:22;430:2,2;
434:25;435:13,23;
437:2;451:8;458:5,6,
7,11;462:6,7;463:15;
464:9,11;482:12;
486:24
**tolerate (1)**
427:23
**Tom (14)**
32:2;44:13;48:2,5;
49:12;56:19;60:6;
94:9,20;151:3,11;
153:22;190:20;
196:10
**Tommy (9)**
149:10;157:17;
158:6;164:2;369:12;
418:21;419:12;
432:22;434:5
**Tony (2)**
94:14;95:13
**took (40)**
32:22;35:23,25;
36:4;51:2,19;55:4,
18;56:4,7;71:22;
88:8;127:8;184:9;
206:8,11;209:23;

THOMAS SNYDER
September 24, 2008

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 161 of 164 PageID #: 2141

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

248:25;269:24;
290:25;318:7;
340:15,23;350:3;
359:5;361:20;
362:14;363:14;
377:7;386:23;387:2,
5,8;388:22;410:12,
14;414:13;417:7;
458:15;461:17
**top (2)**
8:3;323:16
**topic (1)**
79:11
**tops (1)**
73:14
**tortious (3)**
212:24;217:3,11
**total (1)**
130:12
**tour (40)**
21:21,22;66:6;
136:14,16;138:13;
221:25;222:12,14,
19;227:20;234:19;
235:8;240:12;
245:19,21;248:23;
249:23;254:2,15;
262:7,11;263:20,21;
281:20,20;290:10,
11,23;291:9;296:16;
309:6,6;311:19;
420:15,17,18,22;
488:4
**tours (2)**
291:3;426:7
**towards (4)**
175:18;197:4;
378:21,23
**Town (67)**
21:20;35:13;
37:25;60:6;61:12;
69:15;76:5;84:9;
85:3,14,18;86:4,5,6,
14;87:14,25;88:4;
89:8,20;91:21;92:18;
93:22;94:16;95:5;
98:15;99:18;100:3;
101:23;102:8;
105:21;106:7;109:9;
117:11;131:14,15;
132:12;133:15;
134:14,18;135:16;
141:4;145:6,17,20;
152:11,19;160:17,
19,25;161:3;180:10;
181:13;182:24;
183:24;184:4;
185:24,25;186:15,
20;189:9;198:7;
271:20,22;272:10;
315:3;487:19
**towns (1)**
206:15

**trachea (1)**
376:19
**tracking (1)**
65:18
**trained (4)**
383:10;464:21,25;
465:3
**training (6)**
140:25;383:5,8;
465:14,19;467:19
**transcript (2)**
174:8;474:4;483:2
**transpired (3)**
48:17;397:21;
398:8
**transport (3)**
376:22;412:2,6
**transported (1)**
376:18
**treat (1)**
410:15
**treated (1)**
399:16
**treating (2)**
369:25;410:10
**treatment (1)**
189:11
**trial (3)**
3:11;18:9,11
**tried (8)**
186:18;355:14;
357:3;358:8,19;
419:10;484:10,17
**trio (1)**
314:7
**trip (1)**
244:10
**truck (19)**
229:5,10;230:5;
231:5;232:7;241:5,
11;243:17;244:5,11;
245:3,8;259:3,5;
276:14;285:6;
351:12;358:3;364:7
**trucks (1)**
234:14
**true (13)**
11:4;39:4;42:5;
52:5;144:21;149:5;
237:21;240:19;
297:13;402:10,20;
419:24;441:24
**Truly (1)**
170:5
**trust (3)**
291:18,22;293:9
**trusted (3)**
291:13,16,17
**trustee (15)**
70:14;226:12;
250:16;251:8;
265:20;281:25;
282:22;283:11;

312:3;327:11,14,15;
371:8;406:23,25
**trustees (4)**
226:13,22;247:9;
344:5
**trustworthy (3)**
93:8,24;162:3
**truth (2)**
252:17;448:2
**try (4)**
7:23;127:24;
355:20;404:10
**trying (24)**
29:10;61:9,10;
64:21;85:9;106:17;
126:8;199:24;200:2;
248:18;249:5,10;
303:2;345:24;
346:22,25;347:13;
355:19;364:22;
367:6,7;388:21;
428:19;449:3
**turn (8)**
296:12,13;375:21;
376:2;468:16,22;
469:7,17
**turned (3)**
398:24;399:2;
455:9
**turning (1)**
469:22
**Tutone (1)**
347:10
**twice (1)**
124:7
**two (72)**
6:2,3,6;18:6;36:4;
44:25;56:16;65:14;
71:12;76:16;83:6,20,
21;99:25;118:10;
144:3;146:11;151:2;
163:6;173:23;
180:23,25;196:15,
17;207:23;208:5;
227:21;231:9;
234:14;235:9;
245:20;255:6,23;
256:8,14;258:5;
262:11;270:10;
280:13;289:11;
310:17,23;317:21;
319:8;321:23;322:2;
350:16;353:18;
355:5,18,22;356:18;
362:4,9,12,14,15,17;
363:14,19;364:10,
23;377:2;387:21;
414:17;418:2;456:4;
473:7;482:19;
485:16;486:12;
487:23
**Ty (5)**
149:14,14;157:21,

25;158:9
**type (9)**
14:10;61:5;71:24;
133:6,10;152:25;
153:3;416:8,8
**typed (3)**
154:8;432:24;
457:19
**typing (1)**
457:11

## U

**ultimately (1)**
342:25
**Um (63)**
53:21;56:15;
58:12;67:12;88:16;
98:13,18;106:16;
111:9;116:6;119:16;
140:8;141:19;147:2;
148:24;180:16;
181:21;192:17;
193:5,10,22;214:23;
219:18;220:3,15;
221:2;224:25;
276:24;281:10;
285:18;289:23;
315:10;329:5;
332:25;333:10;
348:5;368:10;
376:16;378:12;
380:8;385:8;412:2,
16;413:2;414:21;
415:8,19;416:14;
417:16;423:12;
425:10,20;430:25;
433:21;434:21;
435:16;446:17;
460:14;462:23;
482:3,25;486:18,19
**Um-hum (7)**
36:8;66:24;
110:25;303:11;
306:6;313:4;318:9
**unable (3)**
131:5;143:8;
211:14
**unaligned (1)**
376:19
**uncertain (1)**
299:20
**uncertified (25)**
91:8;149:16,19;
233:3,11;257:2,6;
259:8;284:2,15,20,
25;289:9;298:17;
333:22;437:10;
438:7;439:10,11;
440:10,20;478:22;
479:19;480:5;487:14
**unclear (1)**
219:7

**under (25)**
10:21;13:11;14:4;
28:13;59:9;150:23;
153:7;161:23,24;
176:7,19,25;179:22;
182:14,19,20;189:9,
17;197:16;203:14,
15;212:15;298:15;
349:2;423:22
**underage (28)**
299:3,4,7,20;
300:5;301:8,10;
303:17;304:19;
305:14,20,25;306:4;
307:19;308:19;
309:4;311:7,17;
314:9;315:7,20;
317:22;319:21;
320:22;324:20;
334:13;335:21;
337:17
**underaged (2)**
304:7;319:14
**undergoing (1)**
190:23
**underlining (1)**
361:23
**undermining (1)**
344:14
**underneath (1)**
138:13
**undertake (2)**
422:4,11
**undertaken (1)**
52:2
**undertook (4)**
182:11;387:18;
450:17;453:18
**undue (1)**
480:13
**unfit (1)**
480:15
**Unfortunately (1)**
201:22
**unfounded (1)**
84:10
**uniform (2)**
258:25;357:25
**union (1)**
328:8
**Uniondale (1)**
4:13
**United (8)**
4:8;9:23;10:20;
13:10;14:12;16:12;
162:5;165:10
**unlawful (7)**
212:23;214:5;
217:3,11;257:24;
258:3;312:21
**unlawfully (3)**
212:19;329:12;
330:14

Case 2:07-cv-01215-SJF-ETB   Document 145-11   Filed 01/15/10   Page 162 of 164 PageID #:
2142

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

THOMAS SNYDER
September 24, 2008

**unless (2)**
86:3;168:10
**unqualified (4)**
440:11,16;478:22;
480:6
**unsecured (2)**
341:21;342:4
**Unsigned (1)**
8:4
**unsolicited (4)**
46:6,20;47:12;
126:2
**unsure (1)**
488:10
**untrustworthy (3)**
101:21;102:9,20
**unwise (1)**
17:24
**up (144)**
17:19;29:9;34:14;
47:16;48:21,23;
57:18;59:9;64:21;
68:5,20;70:7,22;
71:10,15;76:8;85:23;
87:9;88:15,17;92:15;
103:19;108:6;
122:25;124:3;
126:10,21;128:4;
132:7,11;133:19,22;
142:14,16;144:14;
145:10;151:5;
159:18,20;169:11,
13,24;170:13;
174:23;175:18;
180:12,24;186:18;
191:6;194:4,8,13;
195:6,15,19;217:10;
228:17,19,20,23;
229:3;230:16;
231:18;232:7;
236:16;237:2,8;
240:24;241:2,4;
243:9;258:22,23;
259:3;266:21;
267:12;271:4,7,11;
272:22;283:9;
285:21;293:15;
315:23;318:20;
321:17;327:23;
331:2,14,15;336:4,6;
337:4;347:7;349:8;
350:21;351:25;
352:14,25;355:9;
356:12,14;358:4;
362:2,25;363:9,11;
367:6,8;368:4,7;
369:8,13;373:8,12;
375:2,9,14;376:7;
377:20;392:12,18,
20,24;393:6,10,19,
20;406:15;419:17;
420:12;433:22;
446:22;447:8;

453:10;455:3;
457:19;459:9,13;
463:2;467:2;468:6,
11;486:20
**upgraded (1)**
383:13
**upon (33)**
8:16;13:21;15:2;
51:24;54:25;55:19,
20;79:22;84:6;
105:18;110:11;
112:19;126:16;
166:21;275:10,21;
276:2;287:11;398:7;
421:13;423:19;
424:24;425:9;
439:12,14;445:15;
450:11;454:24,25;
455:13;458:10;
467:5;481:13
**upstairs (1)**
336:11
**use (15)**
54:16,21;92:21;
95:18;101:9;153:8,9,
23;191:22;329:12,
22;330:15;383:20;
384:9;470:23
**used (15)**
93:5;94:18;
181:19;196:5;
249:22;254:13;
272:15;307:7;
341:21;342:4,11;
353:23;469:6;
474:22;480:24
**using (2)**
268:14;409:16
**usually (3)**
230:17;243:23;
256:13

## V

**vacation (4)**
163:21;406:2;
446:25;447:14
**vague (1)**
187:21
**Vankoot (20)**
362:24;363:7,23;
364:14;365:3;369:3;
376:16;377:7;385:7;
387:16;396:13,18;
417:8;459:3,20,23;
460:7,15,21;461:6
**varied (4)**
255:5,9,10
**vehicle (4)**
182:5;258:24;
259:14,23
**vehicles (9)**
257:4;259:9;

261:4;265:9;266:8;
280:23;283:7;284:3;
473:7
**verbal (1)**
17:4
**verbally (2)**
354:20;443:22
**versus (1)**
4:6
**via (1)**
415:12
**vicious (1)**
409:15
**victim (18)**
345:22,25;346:9,
22;364:3,8;365:11,
13;369:3;376:16;
377:7;387:10,11;
396:13;400:11;
480:23;481:6;488:21
**victims (46)**
364:18,24;365:7,
18,19;366:21;
376:13;377:2,3;
384:22;387:7,9;
388:12,17;389:11,
18;393:2;400:12;
401:3,13,17;406:14;
408:8;410:10,15,22;
411:3,25;412:9;
415:21;417:7;418:8;
428:3;429:22;430:2;
436:22;441:9;
443:12;455:6;
459:16;480:18;
481:14;485:17;
486:2,9,13
**victims' (1)**
401:13
**video (4)**
4:17;167:15;
168:3;202:9
**VIDEOGRAPHER (22)**
4:2;5:13;76:10,15;
146:10,14;152:4;
175:2,5;211:19;
212:2;295:4;296:5,9;
345:13;379:2,6;
456:4,7,11;482:21;
490:2
**videotape (2)**
4:3;11:13
**view (3)**
275:24;461:21;
486:14
**viewed (3)**
163:6;275:19,25
**views (5)**
163:8;274:13,19;
275:4;442:23
**Village (63)**
4:6;5:2;28:22;
29:11;30:11,21,24;

31:6,15,16;60:14;
137:20;149:9,11;
170:9,12,17,21,23;
171:5,8;186:21;
187:11;227:22;
228:4;231:6,7;
232:22;233:18;
235:14,17,23;237:7;
239:19,21;240:10;
245:18;247:25;
254:17;291:21;
293:14;306:19;
311:18,25;330:17;
349:24;351:17,18;
367:4;368:17;371:6,
8;375:2,8;412:25;
417:17,20;418:20;
451:2;460:25;479:5,
6;480:15
**villages (1)**
206:15
**violate (3)**
304:9;305:7;
309:13
**violated (6)**
302:18;303:10;
305:7;309:10,12;
311:5
**violating (3)**
302:7;310:3;
328:15
**violation (8)**
182:10;300:18;
301:18;302:24;
303:4,18,19,20
**violations (4)**
283:23;310:24;
312:23;476:7
**violence (2)**
346:9;488:21
**voice (2)**
201:18,24
**volunteer (2)**
137:13;139:5
**volunteered (1)**
372:3
**vote (3)**
30:17,20;31:2

## W

**wack (1)**
177:6
**Wait (9)**
82:22;170:3,15;
214:21;224:17;
228:18;231:11;
410:11;412:5
**waiting (7)**
227:19;228:3,18;
230:5,13;369:9;
412:7
**waived (1)**

3:7
**waiver (1)**
96:15
**walk (9)**
126:10;220:2,2,4;
305:19;316:7;
348:15,16;357:18
**walked (23)**
36:19;127:16;
220:17;318:20;
319:13;321:17;
338:14;346:25;
349:8;352:25;
359:13,21;364:4;
366:3,4,11,13,15,17,
20;367:25;369:5;
391:21
**walking (20)**
21:11;221:13;
299:6,7;306:21;
307:18;336:3;337:4;
351:9;353:5;355:11,
18;365:24;369:2;
396:7;449:5;484:6,7,
11,13
**Walks (2)**
313:23;353:6
**walkway (1)**
353:12
**wall (1)**
416:2
**Walter (8)**
44:11;49:12;
136:23;137:4,5;
213:10,12;290:17
**wants (7)**
395:10,15;403:2;
407:20;466:7,14;
467:10
**Warkenthien (2)**
44:11;49:13
**watch (3)**
202:9;342:11;
420:24
**watched (2)**
220:2,4
**watching (4)**
221:3;369:16,20,
21
**way (39)**
11:6;36:14;46:9;
105:10;109:12,14;
111:9;127:17;
168:14;170:25;
173:22;188:16,19;
193:6;197:14;
232:12;234:23;
241:23;244:17;
291:20;333:17;
354:21;370:5;
383:16;395:10,18,
22;396:8;402:24;
403:20,25;407:17,

THOMAS SNYDER
September 24, 2008

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

23;438:8,14;450:3;
464:22;466:13;
467:10

**ways (1)**
244:15

**weapon (3)**
370:16;383:12,20

**week (21)**
22:3,12;43:21;
49:6;82:18,20,23;
83:3;130:11,12,14;
163:22;180:24;
264:22;326:11;
332:17;422:23;
424:11;431:25;
432:23;457:23

**weeks (13)**
20:15;23:16;
24:15;45:17,20;49:4;
56:15,16;132:17;
192:23;435:18,20;
482:4

**Welch (4)**
5:5;7:22;38:25;
62:25

**weren't (21)**
32:16;55:12;56:3;
118:25;124:20;
125:8,10;137:9;
141:16;185:3;219:9;
221:8;227:23;
253:19;274:2;
322:12,21;341:6;
388:17,18;473:6

**Whatever's (1)**
296:25

**what's (29)**
7:9;12:9;39:2;
132:24;145:8;152:6;
202:13;212:5;
213:18;241:18;
273:5;290:7;328:19;
340:25;342:9;
355:15;359:8;
366:22;367:2;
372:14;378:2;423:7;
425:14;427:15;
455:21;465:5;
467:15;484:11;
488:20

**whenever (5)**
32:21;37:20;
235:12;238:23,25

**when's (1)**
24:19

**Where's (2)**
229:4;399:7

**wherever (2)**
377:4;486:14

**white (1)**
363:3

**whoever's (1)**
156:24

**whole (22)**
15:14;36:14;37:8;
72:15;123:11;
128:23;148:10;
185:22;221:3;
229:23;297:5,7,9,12;
323:10;355:11;
359:4;377:17;396:6;
407:7;412:11,22

**Who's (5)**
156:21;183:8;
262:7;347:9;425:23

**Wigdor (1)**
4:24

**willfully (1)**
463:13

**willing (4)**
26:17;32:4;449:6,
8

**window (1)**
221:7

**windows (1)**
193:13

**wine (1)**
346:12

**winter (1)**
141:22

**wire (1)**
75:14

**wise (1)**
82:11

**withdraw (3)**
92:24;177:23;
194:21

**withdrawn (20)**
56:11;74:10;
78:20;100:2;102:16;
113:7;114:3;126:4;
175:24;180:6,8,14;
243:6;246:23;389:6;
405:4;429:9;451:6;
470:6;475:9

**within (29)**
3:5,13;6:19;20:19;
22:3,19,23,24;23:3;
24:15;43:20;65:14;
82:18,19,20,23;
100:8;104:3;114:6;
134:12;135:6,9;
141:25;196:15;
264:23;428:9;
430:21;431:24;
483:17

**Without (15)**
54:10;79:14;
87:21;172:5;203:19;
212:21;240:17;
314:10;341:23;
402:13,22;425:2;
460:15;477:9,9

**witness (39)**
5:15,22,25;24:4;
41:5;63:6;173:20,25;

174:24;318:15;
334:2;336:21,24;
346:4,21;348:18;
350:8;382:11;387:6,
13,19;394:10,19;
395:5,21;400:13,17,
19;401:2,12,17;
437:12;440:25;
441:3,7;449:11;
465:20;467:21;483:5

**witness' (1)**
489:15

**witnessed (9)**
313:24;336:23;
337:3;338:21;
345:21;347:25;
348:19;398:12;452:5

**witnesses (11)**
386:7,9,18,20;
400:23;406:12;
445:17,20;446:24;
447:18;449:21

**witnessing (3)**
335:18;338:12;
386:24

**woman (16)**
347:13;391:2;
392:2,14,18;393:12;
396:11,23;397:4,6;
398:24,25;399:3,5,7;
489:4

**women (29)**
86:24,25;87:4,10,
17;88:5,13,20;89:3,
16,22;90:2;94:3;
297:16;362:15,16;
365:19;387:21;
389:13;390:2,12,15,
18,21;391:6,11;
397:10,15;412:10

**wonder (2)**
160:19;169:15

**wondering (2)**
228:2;270:19

**word (3)**
91:5;105:24;
353:23

**wording (2)**
15:22;181:19

**words (11)**
6:2,3;101:10;
114:20;158:6;
200:24;240:4;
375:22;409:16;
457:7;470:23

**work (64)**
21:23;22:7,8;
27:11;29:4,16,21;
32:4;35:12;41:6;
61:10;65:21;70:5;
76:4;86:12,18,24;
94:6,18;98:21;
109:13;130:10;

140:5;149:15;
152:18;154:7;178:7;
180:5,10;181:4;
190:6,25;191:3;
192:19;193:24;
194:18,24;195:10;
213:13;215:20;
231:22;254:10;
255:25;290:10;
291:11,25;292:15;
293:5,20;294:14,15,
18;295:6,12;332:9,
16;335:9;432:20,21;
439:15;457:24;
487:18;488:5,6

**worked (41)**
26:24;27:20,23;
32:23;66:5;95:5,17,
24;96:5;98:9,19;
123:22;136:12,13,
16;138:13;142:7;
184:3;213:11,17;
254:8;256:5;275:14;
291:22;292:5,20;
294:5,7,8,20;295:19;
300:3;332:4,14;
333:2,3,4;335:12;
413:23;438:2;489:9

**worker (2)**
189:16,16

**working (85)**
29:9;31:10,15;
32:16;35:9,10;51:20;
52:7;55:11,25;66:6;
69:12,13,19;73:4,24;
91:8;96:13;105:21;
106:7;109:16,20;
111:17;161:2,2;
164:12;186:16;
187:9;189:8,11,18,
19;205:24;214:10,
14;215:12;217:22,
25;218:9;220:12;
225:6,21;227:23;
236:20;239:4;242:4;
243:23;252:8;
253:25;254:3;255:7;
276:7,18;285:8,11,
13,15;287:13;289:2;
290:11,12,14;291:7,
13,16;292:18,24;
293:2,9,23;294:10,
11;295:14,24;
328:23;389:17;
406:3;425:25;426:2,
6;439:23;444:20;
458:22;487:22,24

**works (9)**
21:19,20,21;95:23;
145:6;170:25;488:3,
7,8

**worn (1)**
75:14

**worry (1)**
197:12

**worse (4)**
176:16;285:7,7,16

**wrapping (2)**
453:9;486:20

**write (47)**
14:11;17:3;116:7;
137:14,14,19;138:5;
139:18;143:8;
144:16;146:21;
148:17;151:10;
161:22;165:5;
196:11;205:19;
212:16;233:14;
302:2,3;317:24;
319:7;323:6;362:2;
375:18;377:20;
394:7,11,18;395:5,
20;396:10,14,22;
397:3;423:5;443:5,
11,15;452:24;
454:24;459:11;
468:19,25;474:24;
486:5

**writing (18)**
59:10;69:22;
116:10;148:19,21;
149:2,11,23;151:19;
154:5;158:7;160:16;
165:16;338:17,19;
394:2;412:21;475:21

**written (7)**
15:18;112:22;
152:22;158:2,19;
179:11;233:15

**wrong (11)**
11:11,18;37:3;
82:22;178:10;189:7;
211:12;280:7;
335:20;464:20;
468:24

**wrongful (3)**
212:24;217:4,11

**wrongly (1)**
61:9

**wrote (26)**
13:15;16:2;59:12,
13;102:7;116:9;
136:18;147:9;
149:13,14,25;150:6;
151:15,15;154:6;
157:8,17;158:7,8,21;
159:7;171:19;
396:12;417:4;
432:24;486:6

# Y

**year (26)**
27:16;29:19;92:8;
101:12;104:3;
118:17;177:13;

180:11,22;181:24;
206:20;207:12;
210:6;214:22,24,25;
236:5;288:19;
299:21;302:13;
303:3;413:13,17,19,
24,25
**years (24)**
9:25;10:3;17:22;
29:24;30:3,5,6,16;
31:22;72:4;101:11,
14;240:2;248:21;
251:2,17;252:16;
262:12;279:7,9;
280:13;413:16;
444:15;489:8
**Yelled (2)**
317:24;319:10
**yelling (2)**
393:7;398:25
**York (12)**
4:9,13;5:18;6:4;
21:10;33:3,6,9;34:3;
37:11;117:19;437:16
**young (2)**
17:14;304:19
**youth (2)**
330:19;337:18
**youths (5)**
314:9;317:9;
329:11;330:13;
340:20
**youth's (1)**
317:23
**Yup (1)**
145:10