# EXHIBIT "L"

# In The Matter Of:

*EDWARD CARTER, ET AL. vs.*
*INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.*

---

*FRANK FIORELLO*
*February 20, 2009*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, New York 11501*
*516-747-9393   718-343-7227   212-581-2570*

Original File 51060.txt
**Min-U-Script® with Word Index**

This Page Intentionally Left Blank

Case 2:07-cv-01215-SJF-ETB  Document 145-18  Filed 01/15/10  Page 4 of 158 PageID #: 2374

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

**Page 1**

```
 1
 2  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
 3  --------------------------------------------X
    EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
 4  JOSEPH NOFI, and THOMAS SNYDER,
                         Plaintiffs,
 5      -against-   Case No. 07-Civ-1215
                                 (SJF)(ETB)
 6  INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
    JOSEPH C. LOEFFLER, JR., individually and in
 7  his official capacity; former mayor NATALIE
    K. ROGERS, individually and in her official
 8  capacity; OCEAN BEACH POLICE DEPARTMENT;
    ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
 9  individually and in his official capacity;
    SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
10  DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
    CIVIL SERVICE; and ALISON SANCHEZ,
11  individually and in her official capacity,
                         Defendants.
12  --------------------------------------------X
13              85 Fifth Avenue
14           New York, New York
15
16           February 20, 2009
17           10:03 A.M.
18
19        VIDEOTAPE DEPOSITION of FRANK
20  FIORILLO, taken pursuant to the Federal
21  Rules of Civil Procedure, and Notice, held
22  at the above-mentioned time and place before
23  Edward Leto, a Notary Public of the State of
24  New York.
25
```

**Page 2**

```
 1
 2  A P P E A R A N C E S :
 3     THOMPSON WIDGOR & GILLY LLP
             Attorneys for Plaintiffs
 4           85 Fifth Avenue
             New York, New York 10003
 5     BY:   ANDREW S. GOODSTADT, ESQ.
 6     RIVKIN RADLER LLP
             Attorneys for Defendants
 7           Incorporated Village of Ocean
             Beach, Mayor Joseph C. Loeffler,
 8           Jr., former Mayor Natalie K.
             Rogers, and Ocean Beach Police
 9           Department
             926 Reckson Plaza
10           Uniondale, New York 11556
       BY:   KENNETH A. NOVIKOFF, ESQ.
11
       MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
12           Attorneys for Defendant Acting
             Deputy Police Chief George B.
13           Hesse
             530 Saw Mill River Road
14           Elmsford, New York 10523
       BY:   KEVIN W. CONNOLLY, ESQ.
15
       SUFFOLK COUNTY ATTORNEY'S OFFICE
16           Attorneys for Defendants Suffolk
             County, Suffolk County Police
17           Department, Suffolk County
             Department of Civil Service, and
18           Alison Sanchez
             100 Veterans Memorial Highway
19           Hauppauge, New York 11788
       BY:   ARLENE ZWILLING, ESQ.
20
21  ALSO PRESENT
       Kenneth Gray, General Counsel, Ocean
22         Beach Police Department
       Albert Santana, Legal Video Specialist
23
24
25
```

**Page 3**

```
 1
 2         IT IS HEREBY STIPULATED AND
 3  AGREED by and among counsel for the
 4  respective parties hereto, that the filing,
 5  sealing and certification of the within
 6  deposition shall be and the same are hereby
 7  waived;
 8         IT IS FURTHER STIPULATED AND
 9  AGREED that all objections, except to the
10  form of the question, shall be reserved to
11  the time of the trial;
12         IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  signed before any Notary Public with the
15  same force and effect as if signed and sworn
16  to by the Court.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1         F. Fiorillo
 2         THE VIDEOGRAPHER: This is tape
 3  number one in the videotape deposition
 4  of Frank Fiorillo in the matter of
 5  Edward Carter, et al, Plaintiffs,
 6  versus Incorporated Village of Ocean
 7  Beach, et al, Defendants, in the United
 8  States District Court, Eastern District
 9  of New York, case number
10  07-CIV-1215(SJF)(ETB), on February 20,
11  2009 at approximately 10:16 a.m.
12         I'm Albert Santana from the firm
13  of Precise Court Reporting and I am the
14  legal video specialist.  The court
15  reporter is Ed Leto in association with
16  Precise Court Reporting.
17         For the record, will counsel
18  please introduce themselves.
19         MR. GOODSTADT: Andrew
20  Goodstadt, Thompson, Wigdor & Gilly, on
21  behalf of the Plaintiffs.
22         MR. NOVIKOFF: On behalf of all
23  the Village Defendants, except Sergeant
24  Hesse, Ken Novikoff, Rivkin Radler.
25         MR. CONNOLLY: On behalf of
```

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 5 of 158 PageID #: 2375

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 5

1        F. Fiorillo
2    Defendant George B. Hesse, Kevin W.
3    Connolly of Mark, O'Neill, O'Brien &
4    Courtney.
5        MR. GRAY: Kenneth Gray from
6    the law firm Bee Ready Fishbein Hatter
7    & Donovan, Village attorneys, Village
8    of Ocean Beach.
9        MS. ZWILLING: For the County
10   Defendants, Arlene Zwilling for
11   Christine Malafi, Suffolk County
12   Attorney.
13       THE VIDEOGRAPHER: Now will the
14   court reporter please swear in the
15   witness.
16   F R A N K   F I O R I L L O, having first
17   been duly sworn by a Notary Public of the
18   State of New York, was examined and
19   testified as follows:
20       THE REPORTER: Please state
21   your name for the record.
22       THE WITNESS: Frank Fiorillo.
23       THE REPORTER: Please state
24   your address.
25       THE WITNESS: 7 Wellwood

Page 6

1        F. Fiorillo
2    Avenue, Farmingdale, New York 11735.
3        THE REPORTER: Thank you.
4        MR. NOVIKOFF: Andrew, regular
5    stips?
6        MR. GOODSTADT: Yes.
7        MR. NOVIKOFF: Okay.
8    EXAMINATION BY
9    MR. NOVIKOFF:
10   Q.   Mr. Fiorillo, at any point in
11   time in the year 2005, did you receive
12   unemployment benefits?
13   A.   No.  I think it was 2006.
14   Q.   So the answer would be "no"?
15   A.   The answer would be, to the best
16   of my recollection, I was -- I was
17   working --
18   Q.   I don't need  -- my answer was
19   just yes or no or if you don't recall, you
20   don't recall?
21   A.   I don't recall 2005.
22   Q.   How about 2004?
23   A.   No.  I was working then.
24   Q.   How about 2003?
25   A.   No.

Page 7

1        F. Fiorillo
2    Q.   How about 2006?
3    A.   I believe so.
4    Q.   When did you first apply for
5    unemployment benefits?
6    A.   In I would say the spring of
7    2006.
8    Q.   Was it before or after you were
9    advised by Ocean Beach that you would not be
10   working for them for the 2006 season?
11       MR. GOODSTADT: Just so we're
12   on the same agreement --
13       MR. NOVIKOFF: Same
14   understanding.  In fact, I even phrased
15   the question so we wouldn't have to do
16   that.
17       MR. GOODSTADT: Right.  Right.
18   A.   I'm not quite sure what month it
19   started, but it was in the springtime of
20   2006 I believe.
21   Q.   No.  My question is in what
22   month, sir.  It's in relation to when you
23   were advised by Ocean Beach.  So let me
24   maybe back it up a little bit.  Do you
25   recall being advised by anyone at Ocean

Page 8

1        F. Fiorillo
2    Beach that you would not be working for them
3    for the 2006 season?
4    A.   Well, let's see.  On April 2,
5    2006, that was the day I was fired.
6 MO       MR. NOVIKOFF: Well, that's
7    nice.  Motion to strike.
8    Q.   My answer is, do you recall --
9    it's a yes or no question, sir -- do you
10   recall being advised by anyone at Ocean
11   Beach that you were not going to work for
12   them for the 2006 season, yes or no?
13   A.   At what time?
14   Q.   I'll rephrase the question.  Were
15   you advised at any point in time in 2006
16   that you were not going to work for Ocean
17   Beach for the 2006 season?
18   A.   Yes.
19   Q.   Were you advised by someone at
20   Ocean Beach?
21   A.   Yes.
22   Q.   Who were you advised by?
23   A.   George Hesse.
24   Q.   Okay.  What month were you
25   advised by George Hesse?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 9

F. Fiorillo

1
2    A.   April.
3    Q.   What day in April?
4    A.   The second day.
5    Q.   Okay.  Now with regard to
6  unemployment benefits, did you apply for
7  unemployment benefits before April 2, 2006?
8    A.   I might have.  I'm not -- I don't
9  recall.
10   Q.   Okay.  Were you working at any
11 job in 2006 prior to April 2, 2006?
12   A.   Yes.
13   Q.   What were you working  -- what
14 job were you working at?
15   A.   I was working as a driver.  As a
16 driver.
17   Q.   For whom?
18   A.   For LLC Maintenance.
19   Q.   Okay.  And how much -- were you
20 an hourly employee or an annual salaried
21 employee?
22        MR. GOODSTADT: Objection.
23   A.   How did they base it.  I -- I
24 guess it was based on, um, an annual salary.
25   Q.   What was your annual salary?

Page 10

F. Fiorillo

1
2    A.   I didn't work the whole year, so.
3    Q.   I understand, but when you first
4  started, did they tell you what your annual
5  salary would be?
6    A.   I think, approximately, the base
7  salary was 60,000.
8    Q.   Okay.  Now in 2006, prior to
9  April 2, 2006, were you working for any
10 other company or individual for which you
11 were paid a salary?
12   A.   Yes.
13   Q.   For whom?
14   A.   In which year?
15   Q.   2006, prior to April 2?
16   A.   Oh, in 2006?  Ocean Beach.
17   Q.   Okay.  And were you a seasonal
18 employee in 2006 prior to April 2, 2006?
19        MR. GOODSTADT: Objection.
20   A.   No.
21   Q.   Well, do you understand what I
22 meant by the term "seasonal employee"?
23   A.   Absolutely.
24   Q.   What was your understanding?
25   A.   My understanding was if you

Page 11

F. Fiorillo

1
2  worked two weeks  -- approximately two weeks
3  before Memorial Day and approximately two
4  weeks after Labor Day, you were considered
5  seasonal.
6    Q.   Okay.  Were you a part -- to your
7  understanding, in 2006, prior to April 2,
8  were you a part-time employee for Ocean
9  Beach?
10   A.   Yes.
11   Q.   Okay.  Other than for Ocean Beach
12 and other than for a driver, were you  -- as
13 a driver for that company, were you employed
14 by any other entity or individual in 2006
15 prior to April 2, 2006?
16   A.   I don't believe so.
17   Q.   Okay.  After April 2, 2006 -- and
18 we're only now in the year 2006 -- were you
19 employed by anybody?
20   A.   After April 2, 2006?
21   Q.   Yes.
22   A.   No.
23   Q.   Okay.  So if I -- tell me if
24 I'm wrong -- if I understood your testimony
25 correctly, after April 2, 2006, for the

Page 12

F. Fiorillo

1
2  remaining year 2006, you did not work for
3  anybody for which you were paid?
4    A.   I don't believe so.
5    Q.   Okay.  I notice you're wearing a
6  suit today, sir.  Have you been appearing at
7  every deposition in this case?
8    A.   No.
9         MR. GOODSTADT: Objection.
10   Q.   Do you recall what deposition you
11 didn't appear for?
12        MR. GOODSTADT: Objection.
13   A.   I'm not sure.
14   Q.   Okay.  Were you at Mr. Richard
15 Bosetti's deposition?
16   A.   Yes.
17   Q.   That was last week, correct?
18   A.   Um, I don't recall the exact day.
19   Q.   But do you recall it was last
20 week?
21   A.   I would  -- that would be fair to
22 say.
23   Q.   Were you at Ms. Sanchez's
24 deposition yesterday?
25   A.   No.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 13

F. Fiorillo
1
2    Q.   You were not at Ms. Sanchez's
3  deposition yesterday?
4    A.   No, I was not.
5        MS. ZWILLING: Two days ago.
6    Q.   I'm sorry, two days ago?
7    A.   Yes.
8    Q.   Okay.  It seemed like yesterday.
9  Were you wearing a suit in Ms. Sanchez's
10  deposition?
11        MR. GOODSTADT: Objection.
12    A.   I didn't know I was required to
13  wear a suit.
14    Q.   That wasn't my question, sir.
15  Did you wear a suit at Ms. Sanchez's
16  deposition?
17        MR. GOODSTADT: Objection.
18    A.   No.
19    Q.   Did you wear a suit at
20  Mr. Bosetti's deposition?
21    A.   I didn't know --
22        MR. GOODSTADT: Objection.
23    A.   -- I was required to.
24    Q.   That's interesting, but my
25  question to you, yes or no, did you wear a

Page 14

F. Fiorillo
1
2  suit at Mr. Bosetti's deposition?
3        MR. GOODSTADT: Objection.
4    A.   I didn't know I had to.
5    Q.   Yes or no, sir?
6        MR. GOODSTADT: Objection.
7    Q.   Did you wear a suit at
8  Mr. Bosetti's deposition?
9    A.   Nobody --
10        MR. GOODSTADT: Objection.
11    A.   -- told me I had to.
12    Q.   Is that a "no, I did not wear a
13  suit"?
14    A.   I didn't wear one, but I wasn't
15  advised to wear one.  If I was advised to
16  wear one, I would have.
17    Q.   So my question as to whether or
18  not -- you know what, have you worn a suit
19  at any other deposition?
20        MR. GOODSTADT: Objection.
21    A.   As --
22        MR. NOVIKOFF: What's the basis
23  of the objection?
24        MR. GOODSTADT: Well, first of
25  all, any other deposition you mean with

Page 15

F. Fiorillo
1
2  respect to this case?  And second of
3  all, this is so patently irrelevant,
4  that going --
5        MR. NOVIKOFF: Sir, at this --
6        MR. GOODSTADT: Let me finish.
7  You asked for the basis.
8        MR. NOVIKOFF: You told me.  It
9  was patently irrelevant.  And I
10  understand that.  And you said form.
11  I'm rephrasing the form.
12        MR. GOODSTADT: And you've
13  actually instructed your witnesses not
14  to answer on patent irrelevancy.
15  That's why we have to bring a witness
16  back.
17        MR. NOVIKOFF: You happy you
18  got that in, Andrew?
19        MR. GOODSTADT: I'm just
20  explaining to you.  You asked for the
21  basis for it.
22        MR. NOVIKOFF: And you told me
23  form.  Patent irrelevancy.
24        MR. GOODSTADT: I'm not done
25  yet.  You asked a question, let me

Page 16

F. Fiorillo
1
2  finish the question.  I want to answer
3  the question.
4        MR. NOVIKOFF: Go finish what
5  you want to say.
6        MR. GOODSTADT: Otherwise don't
7  ask me the question.
8        MR. NOVIKOFF: So finish.
9        MR. GOODSTADT: I'm not
10  instructing him not to answer at this
11  point, but there's absolutely no basis
12  for these questions.  It's patently
13  irrelevant and form.
14    Q.   At any other deposition that
15  you've appeared on this case, have you worn
16  a suit?
17        MR. GOODSTADT: Objection.
18    A.   No.
19    Q.   The answer is "no"?
20    A.   Correct.
21    Q.   Okay.  Sir, do you recall filing
22  a Complaint or having your attorneys file a
23  Complaint on your behalf in this matter?
24    A.   Yes.
25    Q.   Okay.  And do you recall having

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 17

F. Fiorillo

1
2 your attorneys file a Notice of Claim on
3 your behalf?
4     A.   Yes.
5     Q.   With Ocean Beach?
6     A.   Yes.
7     Q.   Okay.  And with regard to the
8 Notice of Claim, was your attorney
9 Mr. Goodstadt's law firm?
10    A.   Well, the firm, Mr. Goodstadt.
11    Q.   Mr. Goodstadt's law firm, was
12 Mr. Goodstadt's law firm your attorney when
13 you filed a Notice of Claim?
14    A.   Yes.
15    Q.   And was Mr. Goodstadt's law firm
16 your attorney when the Complaint in this
17 matter was filed?
18    A.   Yes.
19    Q.   And do you recall reviewing any
20 drafts of the Complaint before they were
21 filed?
22    A.   I don't recall.
23    Q.   Okay.  You don't recall whether
24 or not you've ever seen  -- well, prior to
25 the filing in federal court of the

Page 18

F. Fiorillo

1
2 Complaint, did you review it for accuracy?
3     A.   I'm not sure.
4     Q.   Is there anything in your
5 possession, custody or control that would
6 refresh your recollection?
7     A.   No.
8     Q.   Would you agree with me, sir,
9 that filing a federal lawsuit in which you
10 and the four other Plaintiffs are seeking in
11 excess of $25,000,000, is an important
12 matter in your life?
13    A.   Yes.
14        MR. GOODSTADT: Objection.
15    Q.   And would you agree with me that
16 the allegations in the Complaint are what
17 you are accusing Ocean Beach and other
18 Defendants of doing during the course of
19 your employment with Ocean Beach?
20    A.   Yes.
21    Q.   And would you agree with me that
22 it would be important to make sure that your
23 allegations against the Defendants were
24 accurate and truthful, to the best of your
25 knowledge?

Page 19

F. Fiorillo

1
2        MR. GOODSTADT: Objection.
3     A.   Yes.
4     Q.   Okay.  And would you agree with
5 me that you would want to ensure, by any way
6 possible, that what was being filed in this
7 action was truthful and accurate?
8     A.   Yes.
9     Q.   Okay.  And do you have any reason
10 to believe that what was filed by you in
11 this Complaint was in fact truthful and
12 accurate?
13    A.   It was truthful and accurate.
14 Correct.
15    Q.   And how do you know that if you
16 didn't read this?
17        MR. GOODSTADT: Objection.
18    A.   No.  You -- I think you asked me
19 before -- like the day it was filed, did I
20 review it then?
21    Q.   No.
22    A.   No?
23    Q.   My question was, prior to it was
24 filed, did you review it for accuracy?
25    A.   Yes, because --

Page 20

F. Fiorillo

1
2     Q.   My question is just yes or no.
3     A.   Yes.
4     Q.   So I'll -- so the record is
5 clear.  Did you review the Complaint prior
6 to it being filed for accuracy?
7     A.   Yes.
8     Q.   And to your knowledge, was
9 everything that was set forth in there
10 truthful and accurate?
11    A.   Yes.
12    Q.   And with regard to the
13 allegations that pertain to you, you had
14 firsthand knowledge of those acc -- those
15 accusations?
16    A.   Yes.
17    Q.   And what's your understanding of
18 "firsthand knowledge"?
19    A.   I was a direct witness.
20    Q.   You were a direct witness?
21    A.   (Indicating).
22    Q.   I'm going to show you what I
23 purport to be a true and accurate copy of
24 the Complaint that was filed by your
25 attorneys on your behalf, as well as the

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 21

F. Fiorillo
2 other four Plaintiffs. And it was filed on
3 March 21, 2007.
4          MR. GOODSTADT: You want to
5 mark this?
6          MR. NOVIKOFF: Do we need to?
7 I mean, I will -- all right. Let's
8 mark it number one. Fiorillo-1.
9          (Complaint was marked as Fiorillo
10 Exhibit-1 for identification; 2/20/09,
11 E.L.)
12     Q.   Can you take Exhibit-1, and I'm
13 going to be asking you a series of questions
14 about that for the next couple hours. Can
15 you show it to him?
16          MR. GOODSTADT: Ask him a
17 question.
18          MR. NOVIKOFF: Okay. That's
19 fine.
20     Q.   Please turn to page 44 of the
21 Complaint. Actually, page 43 of the
22 Complaint.
23     A.   Can I separate this (indicating)?
24     Q.   If that makes it easier for you,
25 sure. Are you on page 44? I'm sorry, 43?

Page 22

F. Fiorillo
2     A.   43.
3     Q.   Yeah. Let's go to paragraph 186.
4     A.   Yes.
5     Q.   You allege as follows "as set
6 forth above, Defendants Hesse and Alison
7 Sanchez conspired to unlawfully destroy
8 Plaintiffs' careers and shared a mutual
9 agreement and understanding regarding their
10 objective to do so and the manner in which
11 their common objective was to be achieved,
12 and committed numerous overt acts in
13 furtherance thereof," do you see that?
14     A.   Yes.
15     Q.   Did you personally -- were you --
16 withdrawn. Were you a direct witness to the
17 overt acts between -- engaged in by Hesse
18 and Alison Sanchez that you claim to be the
19 basis for conspiracy?
20          MR. GOODSTADT: Objection.
21     Q.   Yes or no? If you can't answer
22 yes or no, that's fine, too. Then you tell
23 me that.
24     A.   I can't answer that question yes
25 or no.

Page 23

F. Fiorillo
2     Q.   Okay. Why can't you answer that
3 question yes or no?
4     A.   Because I have to explain the
5 situation that precipitated this allegation.
6     Q.   Okay. Then let's break it down,
7 sir. There's a reference to "numerous overt
8 acts." Let's put Mr. Hesse aside. What
9 were Alison Sanchez's overt acts as you
10 allege them in 186?
11          MR. GOODSTADT: Objection.
12     A.   Her overt acts are in reference
13 to getting officers qualified in Ocean Beach
14 that were allowed to work in Ocean Beach
15 without being qualified. She did not take
16 action on keeping or preventing the officers
17 that were working who were not qualified to
18 work in Ocean Beach. In other words, these
19 officers were working in Ocean Beach without
20 the qualifications set forth by Suffolk
21 County Civil Service.
22     Q.   And how do you know that it was
23 Mrs. Sanchez's responsibility to -- well,
24 actually, you know what, let me just see
25 that question so I have -- use your words

Page 24

F. Fiorillo
2 correctly. (Reviewing). How did you know
3 that it was -- well, withdrawn. What is the
4 basis of your opinion that it was
5 Ms. Sanchez's responsibility to take action
6 to ensure that only officers that were
7 qualified under the Civil Service Law were
8 allowed to work at Ocean Beach?
9     A.   Well, I happened to be there on
10 several occasions when she called the
11 station, and she -- I asked her who was
12 calling because she was calling for George
13 Hesse. So I asked who was calling, and she
14 was the -- she responded that she was
15 the -- oh, the -- she handled the account
16 for Ocean Beach in Civil Service. "Just
17 tell George Hesse it's Alison." He'll know
18 who she is.
19     Q.   So what exactly did Alison
20 Sanchez say to you on the phone that leads
21 you to believe that she was the person
22 responsible for making sure that only
23 qualified officers worked at Ocean Beach?
24     A.   Because during the course of when
25 they found out that the officers weren't

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 25

F. Fiorillo

1  F. Fiorillo
2  qualified or certified, she was the one that
3  was handling all the -- the process,
4  because in the department, all the cops were
5  talking about what they had to go through,
6  and she was the one that was setting up the
7  stages that they had to go through.
8 MO        MR. NOVIKOFF: Move to strike.
9      Q.   My question to you, sir, is the
10 following, and I'll repeat it, what did
11 Alison Sanchez say to you when she called
12 the station house and you picked up the
13 phone, that led you to believe, as you've
14 testified to, that she was the person
15 responsible -- responsible for ensuring that
16 only qualified officers worked at Ocean
17 Beach?
18     A.   She told me she was the account
19 representative for Ocean Beach.
20     Q.   Did she say anything else to you?
21     A.   No.
22     Q.   Okay.  And other -- prior to
23 April 2, other than one or two phone calls
24 that you picked up at the station in which
25 Alison Sanchez was on the other line, had

Page 26

F. Fiorillo

1  F. Fiorillo
2  you ever spoken to Ms. Sanchez?
3         MR. GOODSTADT: Objection.
4      A.   I might have.  I -- I don't know.
5      Q.   Okay.  And on how many occasions
6  do you recall picking up the phone at the
7  station house and hearing that it was Alison
8  Sanchez on the other line?
9      A.   At least three times.
10     Q.   Okay.  And do you recall the sum
11 and substance of any of the other
12 conversations that you had with Ms. Sanchez
13 in those three times that you picked up the
14 phone?
15     A.   No.
16     Q.   Okay.  Now you mentioned the
17 overt act of Ms. Sanchez's being responsible
18 for ensuring the compliance of -- of the
19 officers with the qualifications of Civil
20 Service.  What law imposes the obligation of
21 Ms. Sanchez to be responsible for ensuring
22 compliance with the Civil Service Laws of
23 the officers of Ocean Beach?
24         MR. GOODSTADT: Objection.
25     A.   What law?

Page 27

F. Fiorillo

1  F. Fiorillo
2      Q.   Yeah.  Are you aware of any law?
3         MR. GOODSTADT: Objection.
4      A.   I'm not aware of any law.
5      Q.   What law are you aware of that
6  requires the Suffolk County Civil Service to
7  be responsible for ensuring compliance with
8  their laws with regard to police officers at
9  Ocean Beach?
10         MR. GOODSTADT: Objection.
11     A.   Well, I can tell you for a fact
12 that I was one of them that had to go
13 through the process -- through the whole
14 process to become a police officer in Ocean
15 Beach.
16     Q.   I'm not asking you about what you
17 had to do.  Are you --
18     A.   Well, that's the basis -- that's
19 a little bit of the basis for the question.
20     Q.   No, sir.  Trust me, it's not.
21 My question to you --
22         MR. GOODSTADT: Objection.
23     Q.   -- to the extent that you know,
24 what law can you point to that requires
25 Civil Service to ensure that Ocean Beach is

Page 28

F. Fiorillo

1  F. Fiorillo
2  following the laws concerning the
3  qualification of police officers?
4         MR. GOODSTADT: Objection.
5      A.   I don't know.
6      Q.   Okay.  Now you mentioned that --
7  the qualification issue with regard to the
8  overt acts, right?
9      A.   Yes.
10     Q.   Okay.  And that occurred prior
11 to -- your conversations with Ms. Sanchez on
12 this issue occurred prior to April 2, 2006,
13 right?
14         MR. GOODSTADT: Objection.
15     Q.   Well, I'll withdraw.
16     A.   That's not the -- no.
17     Q.   I'll withdraw the question.
18 There's an objection.  How did
19 Mrs. Sanchez's alleged failure to ensure
20 compliance with Civil Service Laws destroy
21 your career?
22     A.   Well, if the -- if the officers
23 that were working in Ocean Beach were
24 prevented from working in Ocean Beach and
25 stopped by Civil Service, then I probably

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 29

F. Fiorillo

1 would have -- I still would have my job
2
3 there.
4    Q.    Why do you say that?
5    A.    Why do I say that?  Because --
6    Q.    Let me be specific.  Why do you
7 say specifically that you think you would
8 still have your job there?
9    A.    Because I was -- I had to go
10 through the process.  It takes -- it takes
11 a while to go through the process and become
12 a police officer in Ocean Beach.
13    Q.    No.  And I understand that.
14 And --
15    A.    So in other words, in that time
16 period, I would be making more money.  I
17 wouldn't be fired.
18    Q.    Well, that's my question, sir.
19 Let's -- you've now stated that one of the
20 overt acts of Ms. Sanchez, as alleged in
21 186, was that she didn't do whatever her job
22 was with regard to ensuring that the
23 officers that work for Ocean Beach were
24 qualified, correct?
25    A.    Correct.

Page 30

F. Fiorillo

1
2    Q.    And you allege also in 186 that
3 in a conspiracy with Defendant Hesse,
4 Ms. Sanchez engaged in this overt act to
5 unlawfully destroy your career, do you see
6 that?
7    A.    Yes.
8    Q.    And when I asked you the question
9 as to how Ms. Sanchez's act, as you
10 testified to, destroyed your career, you
11 said, in part, that you would still probably
12 be at Ocean Beach if she did her job, right?
13    A.    I would think so.
14    Q.    Okay.  So here's my question to
15 you, sir, why do you think you would still
16 have your job at Ocean Beach if Ms. Sanchez
17 had done her job, as you allege that she
18 should have?
19    A.    Well, first of all, George Hesse
20 wasn't a sergeant.  From my understanding,
21 you have to go through Civil Service and
22 pass a test to become a sergeant.
23    Q.    Okay.  All right.  So how did the
24 fact that George Hesse was not a sergeant
25 play into the destruction of your career as

Page 31

F. Fiorillo

1
2 it relates to what Ms. Sanchez didn't do?
3    A.    Because George Hesse ultimately
4 became the -- I don't know what title he
5 had.  It was either acting deputy chief,
6 deputy chief, acting chief or chief.  I
7 don't know.  But he ultimately became a
8 person in charge that ultimately fired me.
9    Q.    Okay.  So I understand now.  And
10 tell me if I'm wrong, because I -- I just
11 want to make sure this is clear, and if I'm
12 wrong in any regard, tell me.  You believe
13 that because Ms. Sanchez didn't do her job,
14 George Hesse was allowed to become in a
15 position at Ocean Beach in which he was then
16 allowed to fire you for no reason?
17    MR. GOODSTADT: Objection.
18    Q.    Is that accurate?
19    A.    Pretty accurate.
20    Q.    What -- okay.  Go on.
21    A.    Because it could have been --
22 okay.  It could have been Alison Sanchez and
23 maybe her superior --
24    Q.    Okay.  Continue.
25    A.    That -- that didn't, um, oversee

Page 32

F. Fiorillo

1
2 what should have been, um, upheld by Civil
3 Service.
4    Q.    Okay.
5    A.    That's my belief.
6    Q.    And that's all I'm asking you
7 about, your belief and the facts as you know
8 them or you believe you know them.  So just
9 so we're clear, and based upon what you've
10 just told me, you believe that the reason
11 why your career was destroyed, as it relates
12 to Alison Sanchez, is that if Alison Sanchez
13 and perhaps her superiors had done the right
14 job, Mr. Hesse would never have been in a
15 position to be able to fire you?
16    A.    I didn't say "never," but maybe
17 highly unlikely.
18    Q.    Okay.  And that's because, in
19 your opinion, Mr. Hesse was not qualified to
20 be a sergeant because he didn't pass
21 whatever Civil Service requirements there
22 were?
23    A.    From my understanding.
24    Q.    That's all I'm asking.  From your
25 understanding, right?  Correct?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 33

F. Fiorillo

1
2　A.　Yes.
3　　Q.　And, therefore, had he  -- had
4　the fact that his lack of qualifications
5　been enforced by Civil Service, he would
6　never have been put in a position to have
7　the authority to make a decision whether or
8　not to fire you as you say he did?
9　A.　I would think so.
10　Q.　Okay.  Great.  What other overt
11　act, if any, did Alison Sanchez engage in,
12　other than what you've just testified to,
13　that you believe led to the destruction of
14　your career?
15　A.　I believe that Alison Sanchez,
16　from what Alison Sanchez told me when I went
17　to her office shortly thereafter when I was
18　fired that week, the week of I believe it
19　was April 5, Wednesday afternoon, when I
20　went into her office, we spoke about me
21　being fired, Kevin Lamm being fired, Joe
22　Nofi being fired and Eddie Carter being
23　fired at the time.  Tommy Snyder was not
24　fired at this time.
25　Q.　Okay.

Page 34

F. Fiorillo

1
2　A.　Okay?  So I believe that from
3　what she told me, she  -- she told me and
4　Kevin and Joe that she had spoke to George
5　Hesse and Maryanne Minerva, and she was
6　expecting us.  She said that she spoke to
7　them prior to us getting fired, so,
8　therefore, I believe that they came up with
9　whatever they were going to do before April
10　2, and then April 2 we were blind-sided and
11　fired.
12　Q.　Okay.  So, again, just so I'm
13　clear, you believe that -- and let's assume
14　for the purposes of the question that
15　Ms. Sanchez spoke with Mr. Hesse
16　specifically about certain employment
17　decisions relating to you and the other
18　Plaintiffs prior to April 2.  So we're --
19　A.　Yes. I follow.
20　Q.　We're going to make that
21　assumption for the purpose of my questions.
22　You believe that an overt act to destroy
23　your career was the fact that Ms. Sanchez
24　engaged in a conversation with at least
25　Mr. Hesse concerning the fact that Mr. Hesse

Page 35

F. Fiorillo

1
2　wanted to terminate you prior to April 2?
3　A.　Well, it was painfully apparent.
4　Q.　No.  No.  I'm just confirming,
5　that's what you believe the overt act was?
6　A.　Absolutely.
7　Q.　That there was a conversation
8　between Mr. Hesse and Ms. Sanchez prior to
9　April 2?
10　A.　At least those two.
11　Q.　At least those two, exactly, at
12　least those two, concerning Mr. Hesse's
13　decision to fire you?
14　A.　Yes.
15　Q.　Okay.
16　A.　Including Maryanne Minerva,
17　because that's what I was told.
18　Q.　According to you, by Ms. Sanchez?
19　A.　Well, she told me that.
20　Q.　I'm not challenging what you
21　said.  This is what you've said.  I'm just
22　trying to understand it.  So you believe
23　that certainly Sanchez had a conversation
24　with Hesse prior to April 2, and based upon
25　what you say Sanchez told you, she had a

Page 36

F. Fiorillo

1
2　conversation with Minerva prior to April 2
3　concerning Hesse's decision to terminate?
4　A.　Well, I don't know if it was
5　Hesse's decision.
6　Q.　Okay.
7　A.　But, ultimately, it was Hesse's
8　decision because he's the one who fired us.
9　Q.　Okay.  Well, whose decision could
10　it have been, in your opinion, if it wasn't
11　Hesse?
12　A.　I don't know who else was
13　involved.
14　Q.　Okay.  But you believe, based
15　upon what Sanchez told you, she had a
16　conversation with --
17　A.　She only told me Hesse and
18　Minerva.
19　MR. GOODSTADT: Let him finish
20　the question.
21　Q.　At least based upon your
22　testimony, Sanchez had a conversation with
23　Hesse, prior to April 2, that concerned the
24　possibility of you being, as you say, fired
25　from Ocean Beach?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 37

1            F. Fiorillo
2      A.    She told me both Hesse and
3  Minerva.
4      Q.    I understand.  We're with Hesse
5  now, right?
6      A.    Okay.
7      Q.    And you also believe that Sanchez
8  had a conversation with Minerva?
9      A.    Based on what Alison Sanchez told
10  me.
11      Q.    Right.  So we're on the same
12  page.  Were you a party to the conversation
13  between Hesse and Sanchez?
14      A.    No.
15      Q.    Were you a party to the
16  conversation between Minerva and Sanchez?
17      A.    No.
18      Q.    Do you have any idea, based upon
19  any document that you've seen, as to what
20  the conversation between Hesse and Sanchez
21  involved?
22      A.    No.
23      Q.    Okay.  Do you have any idea,
24  based upon any document that you've seen, as
25  to what the sum and substance of the

Page 38

1            F. Fiorillo
2  conversation was between Sanchez and
3  Minerva?
4      A.    No.
5      Q.    Now were you -- you were there
6  yesterday when Ms. Sanchez testified about
7  her conversation with Hesse concerning
8  Hesse's thoughts about not rehiring certain
9  police officers for the 2006 season,
10  correct?
11          MR. GOODSTADT: Objection.
12      Q.    I'm sorry, two days ago.  Were
13  you present at Ms. Sanchez's deposition?
14      A.    Yes.
15      Q.    Do you recall her testifying with
16  regard to the sum and substance of her
17  communications with Mr. Hesse prior to April
18  2, concerning the decision -- the ultimate
19  decision regarding you not being rehired for
20  the 2006 season?
21          MR. GOODSTADT: Objection.
22      A.    I don't know what specifically
23  was said about me.
24      Q.    Okay.  Then I'll withdraw the
25  question.  Do you recall Ms. Sanchez

Page 39

1            F. Fiorillo
2  testifying about a conversation she had with
3  Mr. Hesse, prior to April 2, concerning what
4  the rights and obligations were of certain
5  officers under the Civil Service Law?
6      A.    To be honest with you, I don't
7  recall exactly what she said.
8      Q.    Do you recall the conversation --
9      A.    I don't recall the conversation.
10  I really don't.
11      Q.    Do you recall -- do you recall
12  Ms. Sanchez even testifying about that
13  subject matter?
14      A.    I can't even remember, to tell
15  you the truth.
16      Q.    Not a problem.  Okay.  So we have
17  the fact that she had a conversation with
18  Mr. Hesse and Mr. Minerva as --
19      A.    Ms. Minerva.
20      Q.    Ms. Minerva as an overt act.  We
21  have the fact, according to your testimony,
22  that you believe that she didn't do her job
23  with regard to the certification of certain
24  officers at Ocean Beach.  Any other overt
25  act that you believe Ms. Sanchez engaged in

Page 40

1            F. Fiorillo
2  that you claim led to the destruction of
3  your career?
4      A.    Not to my knowledge.
5      Q.    Okay.  You make reference in
6  paragraph 180 -- 186 to a mutual agreement
7  and understanding regarding their objective
8  to destroy your career, do you see that?
9      A.    Yes.
10      Q.    Okay.  What evidence do you have
11  that Ms. Sanchez had the intent to destroy
12  your career?
13          MR. GOODSTADT: Objection.
14      A.    What evidence?
15      Q.    Well, I'll rephrase the question.
16  What forms the basis for your opinion that
17  Ms. Sanchez formed the intent, prior to
18  April 2, 2006, to destroy your career?
19          MR. GOODSTADT: Objection.
20      A.    Well, my belief is that there was
21  a conspiracy between at least Alison Sanchez
22  and George Hesse to get rid of us five for
23  sure.
24      Q.    Okay.  Were there anybody else,
25  other than the five Plaintiffs in this case,

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 41

F. Fiorillo

1  that were not rehired for the 2006 season,
2  and, again, we have an understanding of the
3  phrase that I just used?
4      A.   There were two other officers,
5  but they didn't work there  -- Billy Powell,
6  if he worked one day, I think he worked one
7  day.  Maybe, okay?  But it wasn't -- in
8  other words, us five, we were part time.  We
9  worked all year round.  Um, and we were more
10  consistent on the work level.
11  MO      MR. NOVIKOFF: And I'm going to
12      move to strike that part of the answer
13      that was not responsive.
14      Q.   My question to you, sir, is were
15  there any other officers, other than the
16  five Plaintiffs in this action, that were
17  not rehired for the 2006 season?
18          MR. GOODSTADT: Objection.
19      Q.   Yes or no?
20          MR. GOODSTADT: Objection.
21      Q.   To the best of your knowledge?
22      A.   Well, I only know up until April
23  2, so.
24      Q.   That's what I'm saying.  Up

Page 42

F. Fiorillo

1  through -- other than the five Plaintiffs in
2  this action, were there any other officers
3  that were not rehired for the 2006 season,
4  that you are aware of, yes or no?
5          MR. GOODSTADT: Objection.
6      A.   Then I can't -- I can say I don't
7  know.
8      Q.   Okay.  Fine.  Now, so you believe
9  that Ms. Sanchez engaged in a conspiracy
10  with Hesse and that's the reason why she
11  formed the intent to destroy your career.
12  My question to you is, what evidence, if
13  any, do you have as to when Ms. Sanchez
14  formed the intent to destroy your career?
15          MR. GOODSTADT: Objection.
16      A.   I don't have any evidence.
17      Q.   What evidence can you point to
18  and that you can advise the jury that will
19  be watching this videotape that you believe
20  shows that Ms. Sanchez formed the intent to
21  destroy your career, your police career
22  prior to April 2, 2006?
23          MR. GOODSTADT: Objection.
24      A.   What evidence?

Page 43

F. Fiorillo

1      Q.   Yeah, that you can point to?
2      A.   Well, I can point to it, but it's
3  not  -- in other words, it could be
4  produced.
5      Q.   Okay.  Tell me.  I'm giving you
6  the opportunity to tell the jury --
7      A.   All right.
8      Q.   -- what evidence do you think --
9      A.   I'm going to tell the jury right
10  now --
11      Q.   Hold on.  Excuse me.  That you
12  think -- evidence you think exists to
13  demonstrate that Alison Sanchez formed the
14  intent, prior to April 2, 2006, to destroy
15  your career?
16          MR. GOODSTADT: Objection.
17      A.   I'm going to tell the jury right
18  now that I believe that the Suffolk County
19  Civil Service Department, through Suffolk --
20  through the County of Suffolk, can produce
21  phone records, prior to April 2, from
22  conversations going from Ocean Beach to
23  Civil Service and back and forth.  That
24  would be evidence.

Page 44

F. Fiorillo

1      Q.   Okay.  Let's assume that you are
2  100 percent correct, that prior to April 2,
3  there will be phone records that demonstrate
4  that Civil Service and Ocean Beach had
5  discussions over the phone.  What evidence
6  can you tell the jury that on these phone
7  calls, Ms. Sanchez formed the intent to
8  destroy your career prior to April 2, 2006?
9          MR. GOODSTADT: Objection.
10      A.   Well, we might get that out of
11  George Hesse.
12      Q.   I'm not asking about what we may
13  get out of whom.
14      A.   Well, he's a party in the
15  conversation.
16      Q.   Mr. Fiorillo, I'm asking you
17  about Ms. Sanchez.  What evidence can you
18  tell the jury right now, and it's been
19  almost two years since you filed this
20  Complaint, that you could tell the jury
21  shows that Alison Sanchez formed the intent,
22  prior to April 2, 2006, to destroy your
23  police career?
24          MR. GOODSTADT: Objection.  He

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 15 of 158 PageID #: 2385

FRANK FIORELLO                                                          EDWARD CARTER, ET AE. vs.
February 20, 2009                              INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 45

F. Fiorillo

1  already testified to a lot of it.
2  Q.   Okay.  I'm asking you a question.
3  A.   Well, I just -- I just said what
4  I said about the phone records.  That could
5  be evidence.
6  Q.   Okay.
7  A.   I mean, it could -- it could
8  be -- it could be discovered -- it could be,
9  um --
10  Q.   So other than what --
11  A.   Follow up --
12  Q.   Go ahead.
13  A.   It could be followed up and maybe
14  something will come out of that.  I don't
15  know.  But it could be.  It's evidence.
16  It's -- it's a trail.  A paper trail.
17  Q.   Okay.  So I understand it now.
18  Other than what may be -- tell me if I'm
19  wrong, other than what may be discovered in
20  additional documents, and other than what
21  Mr. Hesse may say, and other than what may
22  be said by other witnesses that may come
23  down the pike in this matter, you don't have
24  any evidence that you can point to right

Page 46

F. Fiorillo

1  now --
2  A.   No.
3  Q.   -- to suggest that Ms. Sanchez
4  formed the intent, prior to April 2, to
5  destroy your career?
6  MR. GOODSTADT: Objection.
7  Other than what he already testified
8  to?
9  Q.   I'm sorry, what was your answer?
10  A.   Well, I just said about the
11  evidence that I stated prior to this
12  question.  But I don't have any other
13  evidence.
14  Q.   Great.  Okay.  I'll accept that
15  answer.  Thank you.  And what you've
16  testified prior to the last question with
17  regard to Ms. Sanchez was that she told you
18  she had a conversation with Hesse and
19  Minerva?
20  A.   Correct.
21  Q.   And that you don't believe she
22  did her job correctly with regard to the
23  qualifications of police officers at Ocean
24  Beach?

Page 47

F. Fiorillo

1  A.   That's my belief.
2  Q.   That -- that's fine.  Great.
3  When do you believe Mr. Hesse and
4  Ms. Sanchez formed the common objective, as
5  you've alleged in 186, to destroy your
6  career?
7  MR. GOODSTADT: Objection.
8  A.   Prior to April 2.
9  Q.   Okay.  When prior to April 2?
10  A.   That I don't know, because --
11  Q.   Months prior to April 2?  Years
12  prior to April 2?  Weeks?
13  A.   Well, I don't know, but I can
14  explain further on -- on the context of what
15  happened prior to April 2 that would give
16  you a partial answer to that question.
17  Q.   No.  I'm only interested right
18  now as to when you believe Hesse and Sanchez
19  formed the common objective to destroy your
20  career?
21  MR. GOODSTADT: Objection.
22  A.   I would say between March 11 and
23  April 2.
24  Q.   Okay.  And March 11, what

Page 48

F. Fiorillo

1  significance does March 11 have?
2  A.   Very significant.
3  Q.   I'm asking you, what significance
4  does it have?
5  A.   I got a letter from the Ocean
6  Beach Police Department from George Hesse
7  that stated that we were going to have a
8  departmental meeting on April 2, and that
9  new ID would be issued to all.  Now my
10  understanding is I'm part of "all" in that
11  -- in that letter.
12  Q.   Okay.
13  A.   Okay?
14  Q.   Sure.
15  A.   So I was  -- I was upset.  I was
16  beside myself.  I was -- I was  -- I was
17  traumatized, okay, that day when I was
18  fired.  Because that letter was not true,
19  okay?  It was  -- it was a ploy on the part
20  of Hesse to fire us.
21  MO  Q.   Okay.  Well, that's my question,
22  sir, and I'm going to move to strike that
23  aspect of the answer that's not responsive.
24  But you say there was a ploy on the part of

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 49

F. Fiorillo

1 Hesse, and I understand that that's one of
2 your -- your allegations in this Complaint.
3 My question to you is more specifically,
4 when do you think Ms. Sanchez joined in the
5 ploy as you call it with Mr. Hesse to
6 specifically destroy your career?
7         MR. GOODSTADT: Objection.
8     A.    Prior to April 2, because she
9 told me that.
10     Q.    That she told you that she joined
11 in with Hesse to destroy your career?
12     A.    Well, "joining in" could mean
13 that what she told me was she spoke to
14 George Hesse and Maryanne Minerva. So I
15 consider that to be, you know, they -- they
16 talked between themselves -- amongst
17 themselves.
18     Q.    Even though you don't know what
19 they talked about specifically?
20     A.    I have no idea.
21     Q.    Okay. Let me ask you to turn to
22 page 23. Do you see in the middle it says
23 "Alison Sanchez conspires with Hesse to
24 destroy Plaintiffs' careers"?

Page 50

F. Fiorillo

1     A.    Yes.
2     Q.    Okay. And paragraph 99 reflects
3 the fact that you met with Nofi and Lamm
4 with Ms. Sanchez a few days after April 2;
5 is that correct?
6     A.    That's correct.
7     Q.    Okay. And you allege "upon
8 information and belief, Sanchez was
9 responsible for appointing and approving the
10 hiring of the uncertified officers at the
11 OBPD," do you see that?
12     A.    Yes.
13     Q.    What's the basis for your belief
14 as to the accuracy of what I just read?
15     A.    Okay. Alison Sanchez was the
16 account holder for Ocean Beach. She was
17 responsible for getting actually civilians
18 together to go forward to, um, their
19 qualifying tests. So based on their passing
20 those qualifying exams, she would then --
21 it's her say to Ocean Beach that she
22 would -- she would tell them if they were
23 qualified or certified, whichever word you
24 want to use, same difference.

Page 51

F. Fiorillo

1     Q.    Right.
2     A.    That they can go forward and they
3 would be appointed, and then Ocean Beach can
4 either hire them or fire them or not hire
5 them. I'm sorry.
6     Q.    Okay. Well, you allege in this
7 that she was responsible for approving the
8 hiring of the uncertified officers, do you
9 see that?
10     A.    Yes.
11     Q.    What information can you advise
12 the jury that you have or that you've seen
13 to support the allegation that Ms. Sanchez
14 had the responsibility to approve the
15 hiring?
16         MR. GOODSTADT: Objection.
17     A.    Well, I want to state that based
18 on her approving the qualified candidates,
19 then the hiring would take place. She would
20 be ultimately in the process, I would think.
21     Q.    And if she indicated that the
22 qualifications were not met, what authority
23 did she have, if any, to your knowledge, to
24 prevent Ocean Beach from filing -- from

Page 52

F. Fiorillo

1 hiring certain officers?
2         MR. GOODSTADT: Objection.
3     A.    Well, I think that she would have
4 to report to Ocean Beach that they wouldn't
5 be certified to work there.
6     Q.    Right. So now my question to you
7 is let's assume that she did that. To your
8 knowledge, since you made this allegation,
9 did she have the authority to stop Ocean
10 Beach from hiring an unqualified officer?
11         MR. GOODSTADT: Objection.
12     A.    I don't know that part.
13     Q.    Sir, you've alleged here "upon
14 information and belief, Sanchez was
15 responsible for appointing and approving the
16 hiring." Okay.
17     A.    I think her responsibility
18 probably entails all of that.
19     Q.    Do you know that for a fact?
20     A.    No.
21     Q.    Do you know specifically what
22 Ms. Sanchez's responsibilities were with
23 regard to the hiring and appointing of
24 police officers at Ocean Beach?

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 17 of 158 PageID #: 2387

FRANK FIORELLO                                                           EDWARD CARTER, ET AL. vs.
February 20, 2009                              INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 53

F. Fiorillo

1
2  A.  No.
3       MR. GOODSTADT: Objection.
4  Q.  Do you know what authority she
5  has to go to court and stop Ocean Beach from
6  hiring unqualified officers?
7       MR. GOODSTADT: Objection.
8  A.  I don't know.
9  Q.  Do you know anything about what
10 Ms. Sanchez's specific responsibilities and
11 authority was with regard to the hiring of
12 officers at Ocean Beach?
13      MR. GOODSTADT: Objection.
14 A.  I don't know.
15 Q.  You've approved, though, sir, the
16 suing of Ms. Sanchez in her individual
17 capacity; is that correct?
18 A.  Yes.
19 Q.  And you're seeking money damages
20 from Ms. Sanchez, correct?
21 A.  Yes.
22 Q.  And if I understand you
23 correctly, you have no idea what Ms. Sanchez
24 ever said to Mr. Hesse on the phone call
25 that she said she had, correct?

Page 54

F. Fiorillo

1
2       MR. GOODSTADT: Objection.
3  A.  Correct.
4  Q.  And you have no idea what
5  Ms. Sanchez's authority and responsibilities
6  were with regard to the appointment and the
7  hiring of officers at Ocean Beach, correct?
8       MR. GOODSTADT: Objection.
9  A.  Correct.
10 Q.  And, in fact, you don't have any
11 idea as to what her authority and
12 responsibilities were with regard to any
13 issue at Ocean Beach; isn't that correct?
14      MR. GOODSTADT: Objection.
15 A.  No.
16 Q.  No.
17 A.  That's not correct.
18 Q.  Okay. Let's go to paragraph 100.
19 You allege the following, "Sanchez assured
20 Officers Fiorillo, Nofi and Lamm that their
21 conversation would remain confidential," do
22 you see that?
23 A.  Yes.
24 Q.  Did she tell you, Mr. Fiorillo,
25 that the conversation would be confidential?

Page 55

F. Fiorillo

1
2  A.  She told me specifically.
3  Q.  What did she specifically say to
4  you?
5  A.  She said that this conversation
6  amongst us would be confidential, because I
7  explained to her when we first initially
8  walked in, I said, "We all have livelihoods.
9  We want this to remain confidential," and
10 especially for Joe Nofi because he worked
11 for the Suffolk County Health Department.
12 Q.  Now you were here yesterday when
13 Ms. Sanchez test -- I mean two days ago --
14 withdrawn. You were at the County's office
15 during Ms. Sanchez's deposition two days
16 ago, right?
17 A.  Yes.
18 Q.  And you recall her specifically
19 denying that she ever said that she told you
20 that the conversation would be confidential,
21 correct?
22 A.  Correct.
23 Q.  So would it be fair to say and
24 you can tell the jury that with regard to
25 this specific issue, Ms. Sanchez was lying?

Page 56

F. Fiorillo

1
2  A.  Absolutely she was lying.
3  Q.  Okay. Now did you ask
4  Ms. Sanchez if she was a lawyer?
5       MR. GOODSTADT: Objection.
6  A.  If she's a lawyer?
7  Q.  During that meeting?
8  A.  No.
9  Q.  Are you aware of any provision in
10 the Civil Service Law that would require
11 Ms. Sanchez to keep your conversations
12 confidential?
13      MR. GOODSTADT: Objection.
14 A.  Why would she say that she would
15 if she --
16 Q.  I'm just asking -- no, that's not
17 my question, sir. Are you aware of any
18 requirements in the Civil Service Law that
19 would require Ms. Sanchez from keeping your
20 conversations confidential?
21 A.  I don't know. I don't know
22 anything about that requirement.
23 Q.  Okay. And had you known at the
24 time that you met with her that -- on
25 April -- a few days after April 2, that

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 18 of 158 PageID #: 2388

EDWARD CARTER, ET AL. vs.                                                    FRANK FIORELLO
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.                           February 20, 2009

Page 57

F. Fiorillo

1  George Hesse had bragged about having a
2  sexual relationship with Ms. Sanchez?
3     A.   George Hesse bragged about it.
4     Q.   Yes, sir.  My question -- please,
5  listen to my question.  Were you aware,
6  prior to meeting Ms. Sanchez a few days
7  after April 2, that George Hesse had bragged
8  about having sex with Alison Sanchez?
9     A.   Yes.
10    Q.   Okay.  Because you've alleged
11 that in this Complaint, correct?
12    A.   Well, yes, because --
13    Q.   No.  I'm just asking --
14    A.   Yes.
15    Q.   Yes.  So notwithstanding  -- if I
16 understand, notwithstanding the fact that
17 you believed at the time of this meeting
18 with Alison Sanchez that George Hesse had
19 bragged about having sex with her, you
20 trusted Ms. Sanchez to keep whatever you
21 said confidential?
22    A.   What did  -- what did --
23    Q.   My --
24    A.   -- one thing have to do with the

Page 58

F. Fiorillo

1  other?
2     Q.   Well, that's my question to you,
3  sir, and I'll rephrase it.  Is it your
4  contention that notwithstanding the fact
5  that you knew that George Hesse had bragged
6  about having sex with Alison Sanchez prior
7  to the meeting that we're talking about, you
8  nevertheless trusted her to keep what you
9  said to her confidential?
10    A.   I didn't know what to do at the
11 time.  The only thing that I could possibly
12 do was go to Civil Service, okay?  I -- I
13 trusted that I was going to a person, a
14 professional person that had to do with the
15 hiring or -- not the hiring, but the  -- the
16 Civil Service process in -- in getting a
17 police officer appointed to a position of
18 police officer based on their passing the
19 qualifying exams, that at least I could talk
20 to somebody in that regard because of what
21 was going on in Ocean Beach.
22    Q.   Are you done?
23    A.   So that's what I felt.  I felt
24 that -- I had no -- I didn't know what to

Page 59

F. Fiorillo

1  do.  I was fired.  Do you know what it's
2  like being fired as a police officer?
3     MR. GOODSTADT:  Frank, just
4  answer the question.
5     THE WITNESS:  No.  But I'm
6  upset.
7     MR. GOODSTADT:  I understand.
8  Just answer the question.
9  MO     MR. NOVIKOFF:  Thank you
10 because I'm going to move to strike.  I
11 don't think you answered the question.
12    Q.   Sir, you say you and your other
13 two Plaintiffs who met with Ms. Sanchez that
14 day asked to be -- the conversation to be
15 confidential, right?
16    A.   Yes.
17    Q.   And you're saying that
18 Ms. Sanchez said yes, it would be
19 confidential, right?
20    A.   Yes, she did.
21    Q.   And you knew prior to that
22 conversation that Ms. Sanchez, according to
23 George Hesse, had had sex with him, right?
24    A.   I knew that he had sex with her?

Page 60

F. Fiorillo

1     Q.   According to George Hesse?
2     A.   According to what he said.
3     Q.   That's right.  That's all I'm
4  asking.  I'm not saying that you witnessed
5  it.  I'm not saying whether it happened or
6  not.  But George Hesse had bragged,
7  according to you, that he had had sex with
8  Alison Sanchez?
9     A.   Yes.
10    Q.   So my question is, sir,
11 notwithstanding your knowledge that George
12 Hesse had bragged about having an intimate
13 sexual relationship with Alison Chester, you
14 nevertheless trusted her to keep whatever
15 you said confidential?
16    MR. GOODSTADT:  Objection.
17 He's already answered that question.
18    Q.   Yes or no, did you trust her?
19    MR. GOODSTADT:  Objection.  You
20 answered the question.
21    A.   Did I trust her?
22    Q.   Yes.
23    A.   Absolutely.
24    Q.   Okay.  And you had no concern

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 19 of 158 PageID #: 2389

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 61

F. Fiorillo

1 whatsoever during this meeting that what you
2 would have said to her, wasn't going to
3 immediately go back to George Hesse?
4     A.   Not for one minute.
5     Q.   Not for -- not for one second?
6     A.   Why would I think -- I would
7 think that she would be professional enough
8 to keep her word and not -- what's so funny?
9     Q.   I'm sorry.  Can you answer my
10 question?  I don't think anyone's laughing,
11 but go ahead.
12     MR. GOODSTADT: Yes.
13 Ms. Sanchez  -- Ms. Zwilling was
14 laughing.
15     MS. ZWILLING: No, I wasn't.  I
16 would have to disagree with you.  I
17 haven't spoken to your client, so I
18 don't know why he has to --
19     MR. NOVIKOFF: I didn't hear
20 anything.
21     MR. GOODSTADT: You don't have
22 a microphone.
23     A.   Excuse me, sir.  I need for you
24 to repeat the question.

Page 62

F. Fiorillo

1     Q.   It's okay.  Now did Ms. Sanchez,
2 in your opinion, breach that
3 confidentiality?
4     A.   In my opinion?
5     Q.   Yeah.
6     A.   Yes.
7     Q.   Did she tell Mr. Hesse about the
8 conversation that you had with her on a few
9 days after April 2?
10     A.   Did she tell Mr. Hesse?
11     Q.   Yeah.  That's what I'm asking
12 you.
13     A.   As far as I know.
14     Q.   Okay.  What's the basis for your
15 knowledge?
16     A.   Um, it was -- it was relayed to
17 me through I want to say Tommy Snyder
18 that -- it was either Tommy Snyder or Eddie
19 Carter, I'm not quite sure which one, but
20 one of those two, it was relayed back to us
21 that -- because Eddie and Tommy talked to
22 George Hesse after we were fired, and
23 through one of them, he stated that Hesse
24 stated that Alison Sanchez called him after

Page 63

F. Fiorillo

1 Kevin, Joe and myself went to Civil Service.
2     Q.   Okay.  So if I understand your
3 testimony correctly, you have no direct
4 knowledge of whether or not Sanchez ever
5 called Hesse to discuss the meeting that you
6 had with him?
7     MR. GOODSTADT: Objection.
8     A.   No.
9     Q.   And, in fact, the only knowledge
10 that you have is based upon the word of two
11 other Plaintiffs  -- one or two of the other
12 Plaintiffs in this action, correct?
13     MR. GOODSTADT: Objection.
14     A.   Well, it could have been the word
15 of three others.
16     Q.   Okay.
17     A.   Hesse was the third.
18     Q.   But you didn't talk to Hesse
19 about this?
20     A.   No.  But he talked to --
21     Q.   My question to you is, who do
22 you -- what is the basis of your knowledge,
23 correct?  And you said it was either -- it
24 was either Snyder or Carter told me --

Page 64

F. Fiorillo

1     A.   Who talked to Hesse.
2     Q.   Who talked to Hesse?
3     A.   Correct.
4     Q.   You never talked to Hesse about
5 this?
6     A.   (Indicating).
7     Q.   So the only knowledge that you
8 can base the allegation that Sanchez
9 breached the confidentiality, is based upon
10 the word of either one or two of the
11 Plaintiffs in this action, correct?
12     MR. GOODSTADT: Objection.
13     A.   Yes.
14     Q.   Okay.  Now did Snyder tell you
15 what Hesse said to  -- let's assume it's
16 Snyder.  Well, you know what, let's not
17 assume it's Snyder.  Did either Snyder or
18 Carter tell you specifically what Sanchez
19 said to Hesse about your meeting?
20     A.   What  -- what Hesse said to
21 either Snyder or Carter about the meeting?
22     Q.   No.
23     A.   About what Sanchez said to Hesse?
24     Q.   Yes.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

F. Fiorillo

1          F. Fiorillo
2      A.   That we went to Civil Service
3  and, um, he called us rats for going to
4  Civil Service.
5  MO        MR. NOVIKOFF: Okay.  I'm going
6      to move to strike.
7      Q.   I'm not asking you about what
8  Hesse said about what you guys did.  My
9  question is more specific.  Did either
10 Carter or Snyder tell you specifically what
11 Hesse said Sanchez said to Hesse about what
12 went on during that meeting?
13     A.   No.
14     Q.   Okay.  So for all you know,
15 Sanchez --
16     A.   Other than the fact that she said
17 that we went to Civil Service.
18     Q.   Right.  So all you know, the
19 conversation between Sanchez and Hesse could
20 have been that Sanchez said "by the way,
21 three of the officers came to see me, but I
22 can't tell you what they said because it's
23 confidential."
24     MR. GOODSTADT: Objection.
25     Q.   Right?

F. Fiorillo

1          F. Fiorillo
2      A.   I don't know.
3      Q.   Right.  You don't -- exactly.
4  You don't know what Sanchez said, do you?
5      A.   No.  I wasn't there.
6      Q.   In paragraph 100, you allege that
7  you disclosed your decision to Sanchez to
8  seek recourse for Hesse and the OBPD's
9  unlawful termination, do you see that?
10     A.   Yes.
11     Q.   Okay.  What specifically did you
12 advise Sanchez in this meeting with regard
13 to what I just read?
14     A.   I don't understand this.
15     MR. GOODSTADT: I don't think
16     that that refers to Fiorillo.
17     MR. NOVIKOFF: Well, if it
18     doesn't, then like other witnesses, he
19     can tell me if this aspect of the
20     allegation doesn't refer to him.
21     MR. GOODSTADT: I think it
22     says, if you read the whole paragraph,
23     it says "particularly because Officer
24     Nofi was a full-time employee of
25     Suffolk County, disclosure of his

F. Fiorillo

1          F. Fiorillo
2  decision to seek recourse."
3      MR. NOVIKOFF: Well, I didn't
4      really understand the allegation.
5      A.   That's why I didn't understand
6  that.
7      Q.   Then I'll ask you a more pointed
8  question in regard to this.  Did you ever
9  advise  -- did you personally, Mr. Fiorillo,
10 not Nofi and Lamm, did you ever advise
11 Sanchez during this meeting that you had
12 made a decision to seek recourse against
13 Hesse and the Ocean Beach Police Department?
14     A.   Well, I asked her what we
15 could -- what we could do through Civil
16 Service is what I did.
17     Q.   I'm not there yet.  We'll get
18 there after we change the tape.  My question
19 to you is, at any point in time in this
20 meeting with Sanchez, did you tell Sanchez
21 that you had already made a decision to seek
22 recourse against Hesse and the Ocean Beach
23 Police Department?
24     A.   Well, I  -- I -- what I said was
25 that I wasn't happy with the -- the decision

F. Fiorillo

1          F. Fiorillo
2  that she was telling me and I'm going to
3  pursue it further.
4      Q.   Oh, okay.  So you did tell her
5  you were going to pursue it further?
6      A.   Yes.
7      Q.   Okay.  And this was a few days
8  after the  -- the meeting  -- I'm sorry,
9  after the decision not to hire you, right?
10     A.   Right.
11     Q.   So I'm clear, a few days after
12 the decision was made not to rehire you at
13 Ocean Beach -- and I know you say
14 "terminate" -- you had already decided that
15 you were going to take it further?
16     A.   Right.
17     Q.   Okay.  What was the next step
18 that you engaged in to take it further after
19 this meeting?
20     A.   Well, I didn't immediately the
21 next day --
22     Q.   I'm not asking you --
23     A.   -- take any action.
24     Q.   Hold on.  I'm not asking you what
25 you did the next day.  I'm just asking you

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 21 of 158 PageID #: 2391

FRANK FIORELLO                                                      EDWARD CARTER, ET AE. vs.
February 20, 2009                                 INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 69

1          F. Fiorillo
2  what was your next step?  Could have been a
3  day later, it could have been a week later,
4  it could have been a month later.  I don't
5  care.  What I'm asking you is, what was the
6  next step that you engaged in to take it
7  further?
8          MR. GOODSTADT: You mean after
9  he left the meeting with Ms. Sanchez?
10         MR. NOVIKOFF: After he left
11  the meeting, yeah.
12    A.   Like I said, that -- I didn't do
13  anything that particular day.
14    Q.   I understand.
15    A.   Actually, I didn't know what the
16  next step was going to be because I was
17  never in a position like this before, so.
18    Q.   Okay.
19    A.   Time went by, because what I did
20  was I applied with other police departments,
21  okay?  So maybe, um, April, May, June --
22  maybe two months went by, not quite two
23  months, and then I was getting exhausted
24  because things were not going  -- were -- I
25  was applying to every police department that

Page 70

1          F. Fiorillo
2  was -- was hiring in Suffolk County, every
3  village or, you know, town police
4  department, and I wasn't get -- getting a
5  job or I don't know.  It just seemed to me
6  like something was wrong.
7  MO       MR. NOVIKOFF: Okay.  I'm
8      going to move to strike because you
9      didn't tell me what your next step was
10     to take it further.
11    Q.   My question to you is, what was
12  the next step to take it further with regard
13  to the decision to seek recourse against
14  Hesse and Ocean Beach Police Department?
15    A.   Okay.  What I did was I tried to
16  obtain employment as a police officer within
17  the next I would say maybe two months after
18  I was fired.
19    Q.   Okay.
20    A.   And then time was running out
21  because they wouldn't hire maybe after a
22  certain point for -- to start in their
23  department, um, you know, part time.  In
24  other words, if we had advanced notice that
25  we were going to be fired on April 2, I

Page 71

1          F. Fiorillo
2  could have at least applied earlier and got
3  my name in the system to obtain a job as a
4  police officer, instead of doing it this
5  way.
6  MO       MR. NOVIKOFF: I'm going to
7      move to strike.  You didn't answer my
8      question, but we're going to change the
9      tape and then I'm going to ask you it
10     again.
11         THE VIDEOGRAPHER: This ends
12  tape number one.  The time is 11:18
13  a.m.  We're going off the record.
14         (A break was taken.)
15         THE VIDEOGRAPHER: This begins
16  tape number two.  The time is 11:24
17  a.m.  Back on the record.
18    Q.   Sir, you've  -- you testified
19  before the end of the first tape that you
20  told Ms. Sanchez, because you weren't happy
21  about what she was telling you, that you
22  were going to take it to the next step,
23  right?
24    A.   Right.
25    Q.   Okay.  Now I'm not interested in

Page 72

1          F. Fiorillo
2  what job searches you did, at least for the
3  time being, and we'll get to that, just now
4  with regard to the next step, what was that
5  next step?
6    A.   The next step would be something
7  that I didn't know what the next step was
8  going to be, because she basically told me I
9  had no next step.
10    Q.   I understand that, but you took a
11  next step.  At some point in time, we know
12  you retained Mr. Goodstadt, right?
13    A.   Yes.
14    Q.   Okay.
15    A.   But she told me that I didn't
16  have a leg to stand on.
17    Q.   Sir, sir, I understand that.  But
18  you retained Mr. Goodstadt, right?
19    A.   Yes.
20    Q.   Okay.  So we have -- we have the
21  meeting with Ms. Sanchez on a few days after
22  April 2, right, and then we know that you
23  retained Mr. Goodstadt's law firm at some
24  particular date, we don't know what that
25  date is yet.  So we got meeting, retain

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 73

F. Fiorillo

1         F. Fiorillo
2 Goodstadt, right?
3    A.   Right.
4    Q.   After the meeting and before you
5 retained Goodstadt, what was your next step,
6 if any?
7    A.   I basically didn't have a next
8 step at that time because she said you
9 didn't have a leg to stand on.  So I didn't
10 know what to do.
11    Q.   But you took a next step?
12    A.   Absolutely I took a next step.
13    Q.   Was retaining Mr. Goodstadt the
14 next step?
15    A.   Yes.  Yeah.  Ultimately.
16    Q.   No, not ultimately.  We know that
17 retaining Mr. Goodstadt was a step to
18 seeking recourse because he filed a Notice
19 of Claim on your behalf, right?
20    A.   Yes.
21    Q.   And you would agree with me that
22 would be a step to taking recourse, right?
23    A.   Absolutely.
24    Q.   Okay.  So we got that.  Was
25 retaining Mr. Goodstadt the next step in

Page 74

1         F. Fiorillo
2 seeking recourse or was there a step before
3 that that you took?
4    A.   That was my next step.
5    Q.   Fine.  Did you meet with any
6 other attorneys prior to your first meeting
7 or communication with Mr. Goodstadt?
8    A.   No.
9    Q.   Okay.  How did you learn of
10 Mr. Goodstadt's law firm?
11    A.   It came to a point in time when
12 Eddie Carter and I were talking about what
13 could -- what would be our next step.  What
14 is -- what can we do.  It seems like we
15 couldn't do anything.  But then it's like it
16 was unfair.
17        So Eddie was describing, um, a
18 case that had to do with, um, I think it was
19 a male subject or a male -- some person who
20 was working for Wal-Mart on Long Island.  It
21 was something that was done unfairly to --
22 to this person.  I don't know the whole
23 case.
24        Anyway, Eddie was more familiar
25 with it.  So what -- what he did was he

Page 75

1         F. Fiorillo
2 Googled I think the Wal-Mart case is what it
3 was, something like to that effect, and he
4 found the firm of Thompson Wigdor & Gilly.
5 It wasn't Andrew Goodstadt.
6    Q.   I understand that.  I know.  I
7 understand.
8    A.   So what I did was when Eddie told
9 me, he said "I got -- I got this firm."  He
10 said, "It's not on Long Island."  I said,
11 "Well, I don't think it's a good idea if we
12 get a firm on Long Island," okay?  Only
13 because I just didn't -- I felt very
14 uncomfortable at this time with a lot of
15 things, okay?  As far as being fired on Long
16 Island and other things that were going on.
17 So what I did was I initially made the phone
18 call.
19    Q.   To -- to the Thompson Wigdor law
20 firm?
21    A.   Yeah.  But it wasn't here.
22    Q.   Where was it?
23    A.   It was in the Empire State
24 Building.
25    Q.   Okay.  The same law firm, but a

Page 76

1         F. Fiorillo
2 different address?
3    A.   Yes.
4    Q.   Okay.  And when did you make that
5 phone call?
6        MR. GOODSTADT: Objection.
7        MR. NOVIKOFF: When?
8        MR. GOODSTADT: But when he
9 engaged us, when he started receiving
10 advice from us, I don't think that's
11 relevant.
12        MR. NOVIKOFF: Oh, I think one
13 it's completely relevant, and two, even
14 if it's not relevant, it's not
15 privileged, and you can't object and
16 instruct the witness not to answer on
17 the grounds of relevance.  I'm not
18 asking for any communications that he
19 had with you.  I'm asking him when he
20 first met with you.  Just like you
21 asked my clients when they met with me.
22        MR. GOODSTADT: Well, that's
23 different.
24        MR. NOVIKOFF: And they
25 answered when.  I'll call Judge Boyle

FRANK FIORELLO
February 20, 2009

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 23 of 158 PageID #:
2393

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 77

F. Fiorillo

1   up. I don't think there's any issue
2   with me asking your client, to the
3   extent he can recall, when he met with
4   you the first time, especially since
5   you put it into play in your
6   allegation.
7       MR. GOODSTADT: I don't think
8   that's right.
9       MR. NOVIKOFF: You did. But he
10  when he first met with you and who he
11  met with. But even putting aside the
12  second part of that, when he first met
13  with you is not  -- is not privileged.
14  And if you want to call Judge Boyle on
15  it, we'll call Judge Boyle on that.
16      MR. GOODSTADT: I just instruct
17  you not to disclose anything that was
18  said --
19      MR. NOVIKOFF: Absolutely.
20      MR. GOODSTADT: -- at any point
21  in time between you and any other
22  lawyers.
23  Q.   And just so you know, my
24  questions, unless I specifically ask you,

Page 78

F. Fiorillo

1   which I don't think I'm going to, I don't
2   want to know what you may have spoken to
3   about with any lawyers at this law firm or,
4   for that matter, any lawyers at any other
5   law firm. So I'm going to ask you the
6   question. When did you first have a
7   communication with somebody from the
8   Thompson Wigdor law firm?
9       MR. GOODSTADT: I just want to
10      instruct you that to the extent you can
11      remember, only when is what he's asking
12      you.
13  Q.   Only when. Only when.
14  A.   Okay. It was sometime after
15  April 2 and before I would say the 4th of
16  July.
17  Q.   Okay. Well, if I told you you
18  filed -- if I told you the Notice of Claim
19  was filed June 30, would you agree with me
20  that it was sometime between April 2 and
21  June 30?
22  A.   Okay. Yes.
23  Q.   Okay. And did you review the
24  Notice of Claim before it was filed?

Page 79

F. Fiorillo

1   A.   I believe I reviewed it. I
2   believe I reviewed it.
3   Q.   Okay. Between the time that you
4   reviewed the Notice of Claim, how long prior
5   to that time did you first have a
6   communication with someone from the Thompson
7   Wigdor law firm? And again, I don't want to
8   know what that communication was, I'm just
9   looking for a time period, whether it was
10  days, weeks or months?
11  A.   I'm sorry, before --
12  Q.   Okay. You looked -- the Notice
13  of Claim was dated June 30?
14  A.   Okay.
15  Q.   You just testified that you
16  believed you reviewed the Notice of Claim
17  before it was filed with the Village, right?
18  A.   Correct.
19  Q.   Okay. How long prior to you
20  reviewing the Notice of Claim before it was
21  filed did you first have a communication
22  with the Thompson Wigdor law firm?
23  A.   I don't remember.
24  Q.   Days?

Page 80

F. Fiorillo

1   A.   To be honest with you, I don't
2   know at what point in time and then at what
3   point in time the file  -- the claim was
4   filed.
5   Q.   Well, the claim was filed June
6   30.
7   A.   No. I know that. But I don't
8   know how long before it started.
9   Q.   Days? Weeks? Really, that's all
10  I'm asking.
11  A.   I don't -- I don't want to guess.
12  Q.   Then you don't. Um, did you
13  have -- after you had a phone communication
14  with someone at this law firm, did there
15  come a time that you personally met with
16  anyone at the Thompson Wigdor law firm?
17  And, again, I don't want to know anything
18  that was discussed at the meeting.
19  A.   Yes.
20  Q.   Okay. Between the phone call and
21  the meeting, what period of time elapsed?
22  A.   To be honest with you, I can't
23  remember that timeline. I -- I just don't
24  recall exactly the -- the sequence of

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 81

F. Fiorillo

1         F. Fiorillo
2 events.
3    Q.   Was it the same day?
4    A.   I can't recall  -- what do you
5 mean, the same day it was filed?
6    Q.   Well, no.  You had a telephone
7 conversation, right?  Wait.  Hold on.
8 You -- you phoned the law firm of Thompson
9 Wigdor, right?
10   A.   Correct.
11   Q.   Okay.  And you had a face-to-face
12 meeting with someone at Thompson Wigdor,
13 right?
14   A.   Yes.
15   Q.   Did you have that face-to-face
16 meeting on the same day that you had the
17 phone communication?
18   A.   No.
19   Q.   Okay.  How many days or weeks
20 transpired between the phone call and the
21 meeting with Thompson Wigdor?
22   A.   I don't recall.
23   Q.   Okay.  Did you have more than one
24 face-to-face meeting with someone at
25 Thompson Wigdor before June 30, 2004, which

Page 82

F. Fiorillo

1         F. Fiorillo
2 is the date of the Notice of Claim?
3 DI      MR. GOODSTADT: Objection.  I'm
4    going to instruct him not to answer
5    that.
6         MR. NOVIKOFF: Why?
7         MR. GOODSTADT: Because the
8    amount of times he met with lawyers,
9    how long he met with lawyers, when he
10   met with them, that's not relevant.
11        MR. NOVIKOFF: Well, your --
12   well, you can't stop him  --
13        MR. GOODSTADT: I think it's
14   privileged.  I think it's --
15        MR. NOVIKOFF: Are you
16   instructing your witness not to answer?
17        MR. GOODSTADT: I just did.
18        MR. NOVIKOFF: Because you have
19   alleged that your client reasonably
20   relied on the advice of Ms. Sanchez,
21   and this goes directly to the
22   reasonability of their reliance and any
23   damages that flow from there.  And --
24        MS. ZWILLING: I would
25   absolutely have to agree.

Page 83

F. Fiorillo

1         F. Fiorillo
2         MR. GOODSTADT: I didn't think
3    you wouldn't agree, but I'm instructing
4    him not to answer.
5         MR. NOVIKOFF: We will make the
6    appropriate motion then.
7         MR. GOODSTADT: Make the
8    appropriate motion.
9         MR. NOVIKOFF: That's fine.
10   Q.   In your first meeting with
11 Thompson Wigdor, who among the other
12 Plaintiffs met with you, if any?
13 DI      MR. GOODSTADT: Objection.  I
14   instruct you not to answer that
15   question.
16        MR. NOVIKOFF: On what grounds?
17        MR. GOODSTADT: On the grounds
18   that's privileged.  It was at the
19   meeting.  You can ask him if there were
20   any non-lawyers there who were not
21   being represented, and the privilege
22   is --
23        MR. NOVIKOFF: Mr. Goodstadt, I
24   think you've already taken positions in
25   motions in this case that are

Page 84

F. Fiorillo

1         F. Fiorillo
2 fundamentally opposite to the position
3 you're taking now.  And that's fine.
4         MR. GOODSTADT: That's not
5    correct.
6         MR. NOVIKOFF: I can't tell you
7    what to do.
8         MR. GOODSTADT: The positions I
9    take have to do with what somebody does
10   to prepare for a deposition.  That's
11   the position.  The Case Law is clear.
12   You can ask those questions in terms of
13   what somebody did to prepare and
14   refresh their recollection for a
15   deposition.
16        MR. NOVIKOFF: Okay.  No
17   problem.  I just want to make it known
18   you are instructing your client not to
19   answer that question.
20        MR. GOODSTADT: I am.
21        MR. NOVIKOFF: I don't think
22   there's a good faith basis to assert
23   privilege, but I'll move on.  We'll
24   have another motion.
25        MR. GOODSTADT: Sure.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 25 of 158 PageID #: 2395

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 85

F. Fiorillo

1   Q.   101, you allege that "Officers
2   Fiorillo, Nofi and Lamm then relayed the
3   substance of their employment experience at
4   the OBPD, including their termination
5   without notice or cause in retaliation for
6   complaints regarding repeated instances of
7   obstruction of justice, abuse of power and
8   other unlawful conduct committed by or at
9   the direction of Hesse," do you see that?
10  A.   Yes.
11  Q.   Now I'm not going to ask you
12  specifics yet.  My question is a little bit
13  more focused.  With regard to the complaints
14  that you allege in 101, did you make these
15  Complaints to George Hesse?
16       MR. GOODSTADT: Objection.
17  Q.   I'll rephrase the question.  You
18  see the word "complaints" in 101?
19  A.   This is -- this is to Alison
20  Sanchez?
21  Q.   Yes.  You said --
22  A.   Okay.  Okay.  I want to make that
23  clear.
24  Q.   In 101, you allege that you told

Page 86

F. Fiorillo

1   Ms. Sanchez that you were fired in
2   retaliation for making certain complaints,
3   do you see that?
4   A.   Yes.
5   Q.   Okay.  I read that correctly,
6   right?
7   A.   Yes.
8   Q.   Okay.  Now with regard to the
9   complaints that you spoke of with
10  Ms. Sanchez, prior to that day, had you made
11  those complaints to George Hesse?
12  A.   About the uncertified officers?
13  Q.   About whatever you're referring
14  to in 101.
15  A.   About what I complained to Alison
16  Sanchez about?
17  Q.   Yes.
18  A.   Yeah.
19  Q.   Let me take a step back.
20  A.   Yes.  The answer is yes.
21  Q.   Well, 101 -- I think you may be a
22  little confused by my question.  101, you
23  are making the allegation that you told
24  Alison Sanchez that you were terminated

Page 87

F. Fiorillo

1   without cause and in retaliation for making
2   complaints regarding repeated instances of
3   obstruction of justice, abuse of power and
4   other unlawful conduct committed by or at
5   the direction of Hesse, do you see that?
6   A.   Yes.
7   Q.   Now I don't want to know what the
8   complaints are yet.  We'll have plenty of
9   time to go over that this afternoon.  But
10  with regard to the complaints that you were
11  referring to when you spoke to Alison
12  Sanchez and that are set forth in paragraph
13  101, had you raised those complaints with
14  George Hesse prior to April 2, 2006?
15  A.   Yes.
16  Q.   Okay.  Had you raised those
17  complaints with Anthony Paridiso -- I'm
18  sorry, with Chief Paridiso prior to April 2,
19  2006?
20  A.   Yes.
21  Q.   Had you raised those complaints
22  with Mayor Rogers?
23  A.   No.
24  Q.   Had you raised those complaints

Page 88

F. Fiorillo

1   with Trustee Loeffler?
2   A.   Yes.
3   Q.   Okay.  What specific complaint or
4   complaints did you raise with Trustee
5   Loeffler prior to April 2, 2006?
6   A.   That the -- the complaint was
7   that -- was specific to the -- to Gary
8   Bosetti and Richard Bosetti, first of all.
9   Q.   I'm asking you --
10  A.   That was my complaint
11  specifically about them.
12  Q.   Yeah.  I'm asking you what this
13  complaint was.
14  A.   Okay.  My complaint was --
15  Q.   To Loeffler now.
16  A.   To Joe Loeffler.
17  Q.   Right.
18  A.   Exactly.  Joe Loeffler, Jr.
19  Q.   Right.
20  A.   The current mayor.
21  Q.   Right.
22  A.   I com -- I spoke to him and
23  complained about Gary Bosetti and Richard
24  Bosetti running amuck in the Village,

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 89

F. Fiorillo

1      F. Fiorillo
2  constantly drinking.  And he knew that
3  because we had a conversation.
4      Q.   Sir, I'm just asking you about
5  what your complaint was --
6      A.   That was my complaint.
7  MO      MR. NOVIKOFF: Okay.  Motion to
8      strike what you think Trustee Loeffler
9      knew or not.
10     Q.   Okay.  When did you make this
11  complaint to Joe Loeffler about the Bosettis
12  running amuck, constantly drinking in the
13  Village?
14     A.   In I would say it was 2005.
15     Q.   When in 2005?
16     A.   Summertime.
17     Q.   Where did you make this
18  Complaint?
19     A.   It was -- he was riding his
20  bike.  He came -- he was actually walking
21  his bike to the corner of Cottage Walk and
22  Bay Walk.  He was on the  -- he was on
23  the -- let me see what the direction was.
24  He was on the southeast corner by the hero
25  shop across from the post office -- the

Page 90

F. Fiorillo

1      F. Fiorillo
2  village offices.
3      Q.   And was this during the daytime?
4      A.   Yes.
5      Q.   Were you on duty?
6      A.   Yes.
7      Q.   What month?
8      A.   It was I would say -- I would say
9  July.
10     Q.   Okay.  And before or after July
11  4th?
12     A.   Before or after July 4th.  I'm
13  trying to think.  I think we had the parade
14  already, so I would say the best of my
15  recollection is after the 4th of July.
16     Q.   And what specifically did you say
17  to Joe Loeffler?
18     A.   I said that "The Bosettis are
19  poisoning this village."
20     Q.   What else did you say, because I
21  presume you didn't just end it at "poisoning
22  the village"?
23     A.   No.  We were talking about Gary
24  and Richard Bosetti.
25     Q.   Who started the conversation?

Page 91

F. Fiorillo

1      F. Fiorillo
2      A.   Um, he  -- well, it was like
3  this; he was going to run for mayor.
4      Q.   No.  I'm not interested --
5      A.   I'm telling how it started.
6      Q.   No.  Did he start the
7  conversation with you or did you start the
8  conversation?
9      A.   Well, we greeted each other
10  hello.
11     Q.   Who said the first words after
12  "hello"?
13     A.   Um, I did.
14     Q.   Okay.  What did you say to him
15  after you both said hello?
16     A.   I said "Joe, I hear you're going
17  to run for mayor."
18     Q.   Good.  What did he say after
19  that?
20     A.   He said he was going to run for
21  mayor.
22     Q.   What did you say?
23     A.   And I said, "Well, when you
24  became -- when you become mayor, I hope you
25  clean up the village."

Page 92

F. Fiorillo

1      F. Fiorillo
2      Q.   And did you say anything else
3  before he responded?
4      A.   Did I say anything else?
5      Q.   Right.  Did you explain why you
6  wanted him to clean up the village before he
7  responded?
8      A.   Yeah.  In the conversation,
9  that's what I said.
10     Q.   Fine.  You said you hope he
11  cleans up the village, and what did Loeffler
12  say in response to you --
13     A.   Joe said when he becomes mayor,
14  he's going to clean up the village.
15     Q.   Okay.  And did you say anything
16  else after Joe  -- after Joe said that?
17     A.   Yes, I did.
18     Q.   What did you say?
19     A.   I said, "Well, I hope you  -- you
20  know, you take action on what's going on in
21  this village, because it's, you know,
22  getting  -- it was getting pretty bad."
23     Q.   And what did he say to that?
24     A.   And I said  -- well, what I said
25  was --

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 27 of 158 PageID #: 2397

FRANK FIORELLO                                                    EDWARD CARTER, ET AE. vs.
February 20, 2009                        INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 93

1          F. Fiorillo
2     Q.   Yeah.  Tell me.
3     A.   What I said was, "Gary Bosetti
4  and Richard Bosetti are really taking this
5  village down."
6     Q.   Okay.
7     A.   And what Joe Loeffler said was,
8  "Well, when I become mayor, they're going to
9  be the first two that I fire."
10     Q.   Okay.  And did you tell Joe
11  during that conversation why the Bosetti
12  brothers were taking the village down as you
13  say?
14     A.   No.  Well, after I said that, he
15  said, "I know because they're involved in
16  everything here."  That was his exact words.
17     Q.   They were involved in everything.
18  Did you tell Joe Loeffler anything else
19  about the Bosettis during that conversation
20  that you said you complained about drinking
21  in the village and running amuck?  That's
22  what you said.  You said --
23     A.   That's exactly what I said.
24     Q.   That's what I've been asking you.
25  When did you say that the Bosettis were

Page 94

1          F. Fiorillo
2  running amuck?
3     A.   When did I say that?  In the
4  conversation.
5     Q.   Yeah.  When in the conversation?
6     A.   During the course of the
7  conversation.
8     Q.   We've just gone through it.  When
9  did -- in response to what -- in response
10  to what did you say --
11     A.   He said he was going to  clean up
12  the village.
13     Q.   And then what did you say?
14     A.   And then I said  -- what happened
15  was  -- I said that the Bosettis were taking
16  this village down.
17     Q.   Right.
18     A.   I said they were -- actually, I
19  said they were poisoning the village.
20     Q.   Right.  Okay.
21     A.   Okay?  And what he said was when
22  he became mayor, that those were going to be
23  the first two guys that he was going to
24  fire.
25     Q.   Okay.  When did you tell Mayor

Page 95

1          F. Fiorillo
2  Loeffler that they were constantly drinking
3  in the village?
4     A.   He said that he knew  -- he knew
5  it, too.  He -- it wasn't something that he
6  didn't know.
7     Q.   Sir, I'm not asking you yet what
8  Loeffler said to you.  My question to you
9  is, you testified earlier that you
10  complained to Joe Loeffler about the
11  Bosettis constantly drinking in the village.
12  Were those your words?  Did you say --
13     A.   Yes.
14     Q.   Did you say to Loeffler in this
15  conversation outdoors while you were on duty
16  in July, after the parade, after July 4th,
17  that the Bosettis were constantly drinking
18  in the village?
19     A.   Yes.
20     Q.   What were your exact words?
21     A.   Those were my words.
22     Q.   Okay.  And what did he say in
23  response to that?
24     A.   When he becomes mayor --
25     Q.   Okay.

Page 96

1          F. Fiorillo
2     A.   Okay, that was going to be one of
3  the first actions he takes.
4     Q.   Okay.
5     A.   That he told me.  He said, "Those
6  are going to be the first two guys I fire."
7     Q.   Okay.  Now let me ask you this.
8  Was Mayor Loeffler the mayor on April 2,
9  2006?
10     A.   On April 2, 2006?  No.
11     Q.   Um, had  -- do you know if Mayor
12  Loeffler became mayor at any point in time
13  in 2006?
14     A.   Yes.
15     Q.   All right.  Do you know as of
16  today if the Bosettis are still employed by
17  Ocean Beach?
18     A.   I don't know.
19       MR. GOODSTADT: Hold on.  Let's
20  take a break while Arlene's phone is
21  ringing.
22       MS. ZWILLING: Sorry about
23  that.
24     Q.   You have no knowledge one way or
25  the other as to whether Richard Bosetti is

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 97

F. Fiorillo

1     still employed by Ocean Beach?
2     MR. GOODSTADT: Objection.
3     A.   I don't -- I don't know how they
4  do their employing.  In other words, I don't
5  know if they go back and  -- I don't know.
6  I don't know.
7     Q.   You never heard of Mr. Bosetti
8  being fired by Ocean Beach after  -- after
9  April 2, 2006?
10    A.   I don't know what's going on in
11 Ocean Beach right now.
12    Q.   You have no idea about Gary
13 Bosetti being fired by Ocean Beach?
14    A.   I have no knowledge of that
15 whatsoever.
16    Q.   Have you ever heard that Gary
17 Bosetti is no --
18    A.   This is news to me.
19    Q.   So you're testifying today under
20 oath that February 20, 2008 is the first
21 that you have learned that Gary Bosetti is
22 no longer employed by Ocean Beach?
23    MR. GOODSTADT: Objection.
24    A.   Yes.

Page 98

F. Fiorillo

1     Q.   And were you here during the
2  testimony of Richard Bosetti?
3     A.   Yes.
4     Q.   Do you recall Mr. Bosetti
5  testifying that Joe Loeffler fired him after
6  Loeffler caught him sleeping in the police
7  station?
8     A.   You asked me about Gary.
9     Q.   I know.  Now I'm asking you about
10 Rich.
11    A.   Richie --
12    Q.   Are you  -- were you at the
13 testimony of Richard Bosetti a week ago --
14    A.   Okay.
15    Q.   Wherein -- yes or no, were you at
16 the testimony of Richard Bosetti when he
17 testified that Loeffler fired him after
18 Loeffler saw him sleeping in the police
19 station?
20    MR. GOODSTADT: Objection.
21    A.   That's not true.
22    Q.   Were you here when Bosetti said
23 that?
24    MR. GOODSTADT: Objection.

Page 99

F. Fiorillo

1     A.   But he didn't say that.
2     Q.   What did he say?
3     A.   He said that he was sleeping in
4  the fire hall.
5     Q.   Okay.  I'm sorry.  Were you here
6  during Richard Bosetti's deposition when
7  Richard Bosetti said that Loeffler caught
8  him sleeping in the fire hall and fired him?
9     A.   Yes.
10    Q.   Okay.  Is it your testimony that
11 that was the first time you had ever learned
12 that Richard Bosetti was no longer employed
13 by the Village?
14    A.   That -- that's not my testimony.
15    Q.   When did you first learn that
16 Richard Bosetti was no longer employed by
17 the Village?
18    A.   When Kevin Lamm got a call from
19 John Oley at 6:00 in the morning from Ocean
20 Beach and told Kevin  -- John Oley told
21 Kevin that Richie Bosetti was fired the day
22 after the -- the George Hesse, Paul Corallo,
23 Arnold Hardman indictment fundraiser, the
24 next day he was fired.

Page 100

F. Fiorillo

1     Q.   Indictment fundraiser?
2     A.   Yeah.  They had an indictment
3  fundraiser.
4     Q.   Oh, for their legal fees?
5     A.   For their legal fees.
6     Q.   Oh, okay.  And when was that?
7     A.   Um, I would say  -- I would say
8  sometime in September of  -- let's see --
9  2007.
10    Q.   Okay.  Now let's get back to your
11 conversation with Joe Loeffler.  So he said
12 to you when he becomes mayor, he would get
13 rid of  -- he would fire the Bosettis.  Was
14 that the only time that you complained to
15 Joe Loeffler about drinking in the Village?
16    A.   No.  I complained to Joe Loeffler
17 when the Hal  -- there was a Halloween
18 fight.
19    Q.   Right.
20    A.   And he was the ambulance driver.
21    Q.   Right.
22    A.   And he was at the station at the
23 time.
24    Q.   Right.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 101

F. Fiorillo

1
2     A.   And we were going through the
3   whole process of with the victims and the
4   complainants and --
5     Q.   Right.
6     A.   And the whole scene.  And I said,
7   "This is a result of the Bosettis drinking."
8     Q.   Now the Bosettis were off duty at
9   the time, right?
10     A.   What do you mean by "off duty"?
11     Q.   Well, the night of the Halloween
12   incident, were the Bosettis on duty at the
13   time of the fight?
14     A.   Well, at the time of the fight,
15   they represented themselves as police
16   officers.
17     Q.   Were they on duty?
18     A.   I don't know.
19     Q.   You don't know?  You never found
20   out?  Mr. Fiorillo, you investigated the
21   Halloween incident, correct?
22     A.   They claimed --
23     Q.   Sir, you --
24     A.   -- they were off duty.
25     Q.   Sir, you investigated the

Page 102

F. Fiorillo

1
2   Halloween incident, didn't you?
3     A.   Yes.
4     Q.   Did you ever inquire with regard
5   to whether the Bosettis were on duty that
6   night?
7     A.   In my opinion, they were off
8   duty.  They weren't working with us.
9     Q.   Fine.  So when I asked you the
10   question --
11     A.   But there's a reason why I
12   answered that question that way.
13     Q.   I'm sure there is a reason,
14   Mr. Fiorillo.  And Mr. Loeffler wasn't just
15   hanging out in the police station that
16   night, right?
17     A.   Well, he --
18     Q.   Right?  He wasn't just hanging
19   out, he had a job that night, correct?
20     A.   Yeah.  But he was --
21     Q.   He was with --
22     A.   -- hanging out.  He was waiting.
23     Q.   He was with the ambulance?
24     A.   Yeah.  But he wasn't doing
25   anything.  He was basically hanging out.

Page 103

F. Fiorillo

1
2     Q.   Sir --
3     A.   I mean, he was doing his job.
4     Q.   Sir, was Mr. Loeffler at the
5   police station before the ambulance arrived?
6     A.   No.
7     Q.   Okay.  And Mr. Loeffler was part
8   of the ambulance crew that night, correct?
9     A.   He was the driver.
10     Q.   Right.  And when the ambulance
11   left, so did Mr. Loeffler, right?
12     A.   Correct.
13     Q.   Given that he was the driver.
14   Okay.  So you had told Mr. Loeffler the
15   night of the Halloween incident that this is
16   the result of the Bosettis drinking, right?
17   You had this so called conversation with
18   Mr. Loeffler in July of 2005 when you said
19   the Bosettis are constantly drinking in the
20   Village, correct?
21     A.   Which he knew.
22     Q.   Fine.  You had that conversation,
23   correct?
24     A.   Yes.
25     Q.   Okay.  Were there any other times

Page 104

F. Fiorillo

1
2   that you complained to Joe Loeffler about
3   drinking in the Village?
4     A.   No.
5     Q.   Okay.  Were there any other times
6   that you made any complaints to Joe
7   Loeffler, other than what you've just
8   testified to, with regard to what you stated
9   to Ms. Sanchez during that April meeting
10   with her?
11     A.   I don't --
12     MR. GOODSTADT:  Just so we're
13     clear, you're asking whether he
14     complained to Loeffler about anything
15     that he said?
16     MR. NOVIKOFF:  Right.
17     Q.   We started out this whole line of
18   questioning with what you said to Sanchez in
19   that meeting.  You generally said to her
20   that you were being fired for -- in
21   retaliation for making certain complaints,
22   right, concerning  --
23     A.   What I said --
24     Q.   Excuse me.
25     A.   Sure.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 105

F. Fiorillo

1      F. Fiorillo
2    Q.   Concerning obstruction of
3  justice, abuse of power and other unlawful
4  conduct, right?
5    A.   Now you -- I was complaining to
6  Alison Sanchez at this point.
7    Q.   Yes.
8    A.   Okay.  Yes.
9    Q.   And then I asked you a series of
10 questions, Mr. Fiorillo.  I said with regard
11 to what you believe was complaints that
12 formed the basis of the retaliatory action,
13 did you complain to George Hesse, and you --
14   A.   Yes.
15   Q.   -- said yes.  I asked you if you
16 complained to Paridiso.  You said yes.
17   A.   Yes.
18   Q.   Then I asked you if you
19 complained to Loeffler, and you gave me two
20 instances.
21   A.   Right.
22   Q.   With regard to any of the
23 complaints that you repeatedly made that
24 formed your belief that you were retaliated
25 against, did you make any complaints to Joe

Page 106

1      F. Fiorillo
2  Loeffler?
3    A.   Any other than the two mentioned?
4    Q.   Right.
5    A.   No.
6    Q.   Okay.  And you're certain of
7  that?
8    A.   Yeah.  I don't believe I ever
9  spoke to Joe Loeffler after that.
10   Q.   I'm talking about before.  At any
11 time.  You started working there in 2002,
12 right?
13   A.   Yeah, but it wasn't --
14   Q.   Sir --
15   A.   Yes.  Yes.
16   Q.   In 2002, did you ever make a
17 Complaint to Trustee Loeffler?
18   A.   No.
19   Q.   In 2003, did you ever make a
20 Complaint to Trustee Loeffler?
21   A.   No.
22   Q.   In 2004, did you ever make a
23 Complaint to Trustee Loeffler?
24       MR. GOODSTADT:  Other than the
25   ones he already testified to?

Page 107

1      F. Fiorillo
2    A.   Yes.  Yes.  Yes.
3    Q.   Well, yes.  Other than the
4  Halloween incident.
5    A.   That's 2004.
6    Q.   Right.  So other than the
7  Halloween incident, did you make any other
8  complaints to Trustee Loeffler?
9    A.   In 2004?
10   Q.   Right.
11   A.   No.
12   Q.   In 2005, other than this one time
13 you spoke about in July, did you make any
14 other complaints to Trustee Loeffler?
15   A.   No.
16   Q.   2006, did you --
17   A.   No.
18   Q.   Okay.  So you -- is it your
19 opinion that the Bosettis drinking in the
20 Village created a public safety hazard?
21   A.   Absolutely.
22   Q.   And when did you first form this
23 belief?
24   A.   Well, you can't -- you can't keep
25 on going out drinking when  -- after --

Page 108

1      F. Fiorillo
2    Q.   Sir --
3    A.   Well, I'm going to explain -- I'm
4  going to answer the question.
5    Q.   Sir, right now I don't care about
6  why you think that.  I'm asking you, you
7  stated that you formed the belief that the
8  Bosettis drinking in the Village created a
9  public safety issue, right?
10   A.   Yes.
11   Q.   When did you first form that
12 belief?
13   A.   It -- it  -- well, let's see,
14 after I started working there in 2002.
15   Q.   When in 2002 did you first form
16 that belief?
17   A.   When I first started to get to
18 know both Richie and Gary and their
19 behavior.
20   Q.   So you formed this belief in
21 2002?
22   A.   Yes.  And it strengthened then as
23 the years went by.
24   Q.   And we're going to get to that
25 right now.  So in 2002, you formed the

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 109

1          F. Fiorillo
2 belief that the drinking by the Bosettis
3 were creating a public safety issue, right?
4     A.   Yes.
5     Q.   And did you complain to Hesse in
6 2002?
7     A.   No, not in 2002.
8     Q.   Okay.  Did you complain to
9 Paridiso in 2002?
10    A.   Not in 2002.
11    Q.   Did you -- did you write any
12 letters to the Suffolk County DA?
13    A.   No.
14    Q.   Did you complain to the DA in
15 2002?
16    A.   Why would I complain to the DA?
17    Q.   Sir, my question is not why you
18 would or why you wouldn't.  In 2002, when
19 you first formed the belief that the
20 drinking by the Bosettis created a public
21 safety issue, did you complain to the
22 Suffolk County District Attorney's office?
23    A.   No.
24    Q.   Did you complain to any police
25 department on Long Island?

Page 110

1          F. Fiorillo
2     A.   Well, indirectly.
3     Q.   No.  Directly.  You, making a
4 complaint.
5     A.   When you say "any police
6 department" --
7     Q.   Other than Ocean Beach -- well,
8 you didn't make a complaint to Hesse and you
9 didn't make a complaint to Paridiso.  So
10 other than Ocean Beach, did you make a
11 complaint to any other police department in
12 Long Island concerning the Bosettis drinking
13 in 2002 and your belief that their drinking
14 created a public safety issue?
15    A.   Yes.
16    Q.   To whom?
17    A.   Suffolk County Police.
18    Q.   Which person?
19    A.   Mike Santarpia.
20    Q.   And who is Michael Santarpia?
21    A.   He's an academy instructor at the
22 Suffolk County Police Academy.
23    Q.   And what did you say to Michael
24 Santarpia?
25    A.   I said that, "I can't believe the

Page 111

1          F. Fiorillo
2 department that I'm in and what's going on,
3 because what you taught me is absolutely not
4 what  -- what is happening in this police
5 department."
6     Q.   And what was Mr. Santarpia's
7 position at the time?
8     A.   He was an academy instructor.
9     Q.   Was he a captain in the police
10 department, in any police department?
11    A.   He was the academy instructor for
12 the Suffolk County Police.
13    Q.   Was he in charge of any type of
14 precinct in Suffolk County?
15    A.   No.
16    Q.   Okay.  And why did you complain
17 to Mr. Santarpia?
18    A.   Because I had a rapport with
19 Mr. Santarpia going through the academy.
20    Q.   And you complained to him that
21 the Bosettis were drinking and creating a
22 public safety issue?
23    A.   Yes.
24    Q.   Okay.  And what did Mr. Santarpia
25 say he was going to do?  Anything?

Page 112

1          F. Fiorillo
2     A.   Um, he  -- he didn't say he was
3 going to do anything in particular.
4     Q.   That's my question.
5     A.   No.
6     Q.   Did you ask him to do anything in
7 particular?
8     A.   No.  But he just --
9     Q.   My question to you, sir, is did
10 you ask him to do anything in particular?
11    A.   No.
12    Q.   Other than to Mr. Santarpia, did
13 you complain to any other police department
14 in Long Island in 2002 about your belief
15 that the Bosettis drinking created a public
16 safety issue?
17    A.   Now when you say police
18 department or police officer in another
19 department --
20    Q.   Police department.
21    A.   Okay.  No.
22    Q.   Okay.  Who else did you complain
23 to in 2002 that was part of the police  -- a
24 police department on Long Island?
25    A.   Jane Harrigan.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 32 of 158 PageID #: 2402

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 113

F. Fiorillo

1
2    Q.   Spell it, please.
3    A.   H-A-R-R-I-G-A-N.
4    Q.   And what did you say to
5  Mr. Harrigan?
6    A.   Ms.
7    Q.   Ms. Harrigan?
8    A.   Jane.  Jane.
9    Q.   What did you say to her?
10    A.   I explained to her that Ocean
11  Beach hired retired city cops that just
12  didn't conform with what we were taught in
13  the academy.
14    Q.   Okay.  And did you complain to
15  any other police officer outside of Ocean
16  Beach in 2002?
17    A.   Not that I can recall at this
18  time.
19    Q.   Did you communicate with anyone
20  from the Suffolk County District Attorney's
21  office with regard to your belief in 2002
22  that we've been discussing?
23    A.   No.
24    Q.   Did you communicate with anyone
25  from Newsday in 2002 with regard to your

Page 114

F. Fiorillo

1
2  belief that we've been discussing?
3    A.   No.
4    Q.   Did you communicate with any
5  other  -- with any media outlet with regard
6  to the belief that you formed in 2002 that
7  we've been discussing?
8    A.   No.
9    Q.   And you understand what I mean by
10  "media outlet," correct?
11    A.   Yes.
12    Q.   What do you -- what's your
13  understanding, just so we're clear?
14    A.   The press.
15    Q.   Correct.  Radio?  TV?
16    A.   Yeah.
17    Q.   Did you -- did you create any
18  blog in 2002?
19    A.   No.
20    Q.   Did you post any blog in 2002
21  that reflected your belief that we've been
22  talking about?
23    A.   No.
24    Q.   Okay.  Did you attend any board
25  meeting in 2000  -- of the Village in 2002?

Page 115

F. Fiorillo

1
2    A.   No.
3    Q.   Did you attend any Suffolk County
4  Legislative meeting in 2002?
5    A.   No.
6    Q.   Did you make any type of public
7  statement in 2002 concerning your belief
8  that we've been talking about?
9    A.   No.
10    MR. GOODSTADT: Objection.
11  What do you mean by "public statement"?
12  He already testified to two people he's
13  spoken to.
14    Q.   Other than the two people that
15  you've spoken to?
16    A.   I don't believe so.
17    Q.   Okay.  How about 2003, did you
18  complain to George Hesse about the Bosettis
19  drinking in 2003?
20    A.   Yes.
21    Q.   Did you complain to Paridiso in
22  2003 about the Bosettis drinking?
23    A.   It was an ongoing thing.
24    Q.   I'm asking --
25    A.   Yes.

Page 116

F. Fiorillo

1
2    Q.   What did Paridiso say?
3    A.   That he would address it.
4    Q.   Did he?
5    A.   He tried to.
6    Q.   Was he successful?
7    A.   No.
8    Q.   When you say "he tried to," what
9  did he do?
10    A.   He posted a note saying that
11  the -- that officers were supposed to leave
12  their  -- get out of Ocean Beach after their
13  tours instead of frequenting the bars.
14    Q.   Okay.  So when you were
15  complaining about the Bosettis drinking, it
16  would include the time that they were
17  drinking while they were off duty, correct?
18    A.   Well --
19    Q.   It may -- I'm not suggesting that
20  it didn't also include when they were on
21  duty.
22    A.   Yes.
23    Q.   I'm just saying, for the purpose
24  of my question, when you started complaining
25  about the Bosettis drinking in the village,

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 117

1           F. Fiorillo
2  it would include those occasions when they
3  were off duty as well, right?
4      A.   Only because of --
5      Q.   I just need a --
6      A.   Well, yes.  It encompassed that
7  also.
8      Q.   Right.  Okay.  And in 2003, did
9  you complain to Mayor Rogers?
10     A.   No.
11     Q.   And you still had the belief that
12 the drinking of the Bosettis created a
13 public safety hazard?
14     A.   Absolutely.
15     Q.   And did you complain to Trustee
16 Loeffler?
17     A.   Not in 2003.
18     Q.   Did you complain to any media
19 outlet?
20     A.   No.
21     Q.   Did you communicate with the
22 Suffolk County District Attorney's office?
23     A.   No.
24     Q.   Did you speak about your opinion
25 that we've been discussing in 2003 with any

Page 118

1           F. Fiorillo
2  police department or police officer from any
3  police department outside of Ocean Beach?
4      A.   No.
5      Q.   Did you attend any Village of
6  Ocean Beach board meetings?
7      A.   No.
8      Q.   Did you attend any Suffolk County
9  Legislative meetings?
10     A.   No.
11     Q.   Did you do anything beyond
12 speaking to Hesse and Paridiso in 2003 with
13 regard to your opinion that the Bosettis
14 drinking created a public safety issue?
15     A.   Did I do anything?
16     Q.   Yeah.  Other than what you said
17 you did with Hesse and Paridiso?
18     A.   I didn't do anything.
19     Q.   Right.  Let me make it clear.
20     A.   I mean, they --
21     Q.   Other than complaining to Hesse
22 and Paridiso in 2003, did you do anything
23 else with regard to advising anyone in the
24 entire world that, in your belief, the
25 Bosettis drinking created a public safety

Page 119

1           F. Fiorillo
2  problem?
3          MR. GOODSTADT: Including other
4      police officers in Ocean Beach Police
5      Department?
6          MR. NOVIKOFF: Excluding that.
7          MR. GOODSTADT: Okay.
8      A.   I didn't do anything.
9      Q.   Right.  2004, did you complain to
10 Hesse about the Bosettis drinking?
11     A.   Yes.
12     Q.   And did you complain to Paridiso?
13     A.   Yes.
14     Q.   And what did Paridiso say to you?
15     A.   That he was going to address it.
16     Q.   Even though he tried to address
17 it in 2003?
18     A.   Exactly.
19     Q.   What did he say specifically?
20     A.   That he was going to talk to them
21 about -- because it all  -- it revolved
22 around the Halloween incident.
23     Q.   Okay.  Did you complain to
24 Paridiso before the Halloween incident about
25 the Bosettis drinking?

Page 120

1           F. Fiorillo
2      A.   Yes.
3      Q.   And what did he say to you before
4  the Halloween incident?
5      A.   He was going to talk to them
6  about it then also.
7      Q.   Okay.  And did he?
8      A.   I don't know.  I wasn't there.
9      Q.   Okay.  So would you agree with me
10 that notwithstanding your complaints in
11 2002, 2003 and 2004, prior to the Halloween
12 incident, there was nothing that was done
13 to, in your opinion, lessen the public
14 safety issue that revolved around the
15 Bosettis drinking?
16     A.   In my opinion, Hesse didn't do
17 anything about it and Paridiso didn't do
18 anything about it.
19     Q.   Right.
20     A.   That's my opinion.
21     Q.   And in 2004, you believe the
22 public safety issue with regard to the
23 drinking by the Bosettis was stronger than
24 it was in 2002, right?
25     A.   I believe so.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 121

F. Fiorillo

1
2    Q.    You believed it was getting
3 worse?
4    A.    I definitely do.  That's my
5 opinion.
6    Q.    And that's all I'm asking you.
7 And you believe that, in fact, between 2002
8 and 2004, the public's safety was even more
9 at risk?
10    A.    I believe so.
11    Q.    In 2004, right?
12    A.    Well, apparently --
13    Q.    Than it was in 2002?
14    A.    It was pretty apparent.
15    Q.    Yes or no?
16    A.    Yes.
17    Q.    Okay.  And in 2004, did you
18 complain to the board of trustees of the
19 Village?
20    A.    In 2004?
21    Q.    Yeah.
22         MR. GOODSTADT: Other than for
23 Loeffler, who was a trustee at the
24 time?
25    Q.    Other than -- other than for what

Page 122

F. Fiorillo

2 you said --
3    A.    I spoke to him.
4    Q.    Hold on.  Other than for what you
5 said -- withdrawn.  Other than for what you
6 testified that you said to Loeffler the
7 night of the Halloween incident, did you
8 ever complain to any other trustee in 2004
9 about the public safety issue that we've
10 been discussing?
11    A.    I don't believe so.
12    Q.    Did you ever complain to Mayor
13 Rogers --
14    A.    No.
15    Q.    -- in 2004?  Did you ever attend
16 a Village board meeting?
17    A.    No.
18    Q.    Did you ever communicate with the
19 Suffolk County District Attorney's office
20 concerning your belief as to the public
21 safety issue?
22    A.    No.
23    Q.    Did you ever communicate to any
24 media outlet with regard to your opinion?
25    A.    No.

Page 123

F. Fiorillo

1
2    Q.    No?
3    A.    No.
4         MR. GOODSTADT: You're still
5 talking about '04?
6         MR. NOVIKOFF: '04.  Only in
7 '04.
8    A.    No.
9    Q.    Did you complain to any other
10 police department in Long Island?
11    A.    No.
12    Q.    So, again, let me understand then
13 your testimony correctly.  Other than --
14 well, withdrawn.  In 2004, you -- you
15 believed that there was a public safety
16 issue concerning the Bosettis drinking in
17 the Village, correct?
18    A.    I'm sorry.
19    Q.    In 2004 --
20    A.    In 2004, yes.
21    Q.    And notwithstanding this belief,
22 the only communications that you had on this
23 matter were with Hesse, Paridiso and the one
24 time with Loeffler on Halloween night?
25    A.    In 2004.

Page 124

F. Fiorillo

1
2    Q.    Right.
3    A.    Yes.
4    Q.    Yes.  Okay.  Now --
5         MR. GOODSTADT: And you're
6 excluding other officers in the Ocean
7 Beach Police Department?
8         MR. NOVIKOFF: Yes.  I'm
9 excluding other officers.
10    Q.    The only superiors you had at the
11 Ocean Beach Police Department were Hesse and
12 Paridiso, right?
13    A.    Well, if they weren't working,
14 then it would be the senior officer over me
15 who had the most experience.
16    Q.    But on -- as for the full-time
17 officers --
18    A.    There was only two at the time.
19    Q.    Hesse and Paridiso?
20    A.    Correct.
21    Q.    Okay.  And how -- let's go to
22 2005 with regard to the Bosettis drinking.
23 Did you complain to Hesse about the Bosettis
24 drinking in 2005?
25    A.    Not in 2005.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 125

F. Fiorillo

1
2  Q.   No?  Why not?
3  A.   Because what was going on -- the
4  department was starting to fragment in I
5  would say after -- after the Halloween
6  incident.  So, um, to be honest with you, we
7  were -- we were -- "we" meaning myself,
8  Kevin Lamm, and Tommy Snyder -- were being,
9  um, let's see.  We were being alienated
10  so -- so to speak.
11  Q.   Okay.  By whom were you being
12  alienated?
13  A.   Richard Bosetti, Gary Bosetti,
14  George Hesse.
15  Q.   How were the Bosettis alienating
16  you?
17  A.   And, also, there was another --
18  Pat -- Pat Cherry also.
19  Q.   How were the Bosettis alienating
20  you?
21  A.   Well, when -- if I came on duty
22  and I was relieving one of them, they
23  wouldn't talk to you.  They wouldn't let you
24  know what's going on in the Village.  They
25  would actually be in their car at the relief

Page 126

F. Fiorillo

1
2  point, and the radio and the phone would be
3  in the police vehicle, and as soon as they'd
4  seen me drive up, they would go.
5  Q.   How was Cherry alienating you?
6  A.   He wouldn't talk to me because of
7  the Halloween incident.
8  MO      MR. NOVIKOFF: Move to strike.
9  Q.   I'm just asking you how did
10  Cherry alienate you.  I'm not asking why you
11  think he was alienating you.  I'm just
12  asking how did he alienate you.
13      MR. GOODSTADT: He answered the
14      question.  You made your motion.  Let's
15      move on.
16  Q.   How did -- how did he alienate
17  you?
18  A.   Well, that was part of the
19  alienation.  I mean, he wouldn't speak to
20  me.
21  Q.   He wouldn't speak to you?
22  A.   Yeah.
23  Q.   Is that it?
24  A.   Well, yeah.
25  Q.   Okay.  How did Hesse alienate you

Page 127

F. Fiorillo

1
2  in 2005?
3  A.   Hesse was very -- he was keeping
4  me out of the loop on -- basically the
5  Halloween incident was paramount at this
6  time between the -- between like Halloween
7  of 2004 all the way through 2005, and until
8  the day I was fired actually.
9  MO      MR. NOVIKOFF: Okay.  Move to
10      strike.
11  Q.   How did Hesse alienate you --
12  A.   Didn't I answer the question?
13      MR. GOODSTADT: You did.
14  Q.   How?  How?  Not why.  Not why you
15  think he did.  How?  How did Hesse alienate
16  you in 2005?
17      MR. GOODSTADT: He just
18      answered the question, but he can
19      answer it again.
20  Q.   That's fine.  How did Hesse
21  alienate you?  What did he do or didn't do?
22  A.   He kept me out of the loop of --
23  okay.  Let's say there was a Christmas
24  party, okay?
25  Q.   Right.

Page 128

F. Fiorillo

1
2  A.   In 2004.
3  Q.   We're not talking about 2004.
4  We're talking 2005 now.
5  A.   No.  You told me how -- how he
6  alienated me --
7  Q.   In 2005.
8  A.   Since Halloween.
9  Q.   No, not since Halloween.  You
10  said that in 2005 --
11  A.   Okay, so -- okay.
12  Q.   Four people started alienating
13  you.  You talked about the Bosettis --
14  A.   Well, it started -- it started --
15  A.   Oh, okay.
16  A.   It started from -- I'm going to
17  tell you when it started.  It started from
18  the Halloween incident.
19  Q.   Okay.
20  A.   That's when it started.
21  Q.   Okay.
22  A.   That's when the department really
23  started to fragment.
24  Q.   Okay.  How did Hesse alienate
25  you?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 129

F. Fiorillo

1  A.   Okay.  If I was in the station,
2  okay, and I came in, he would close the
3  door.  The Bosettis, Hardman and whoever
4  else was in the room -- those people I know
5  were in the room, but I don't know, there
6  might have been other officers -- closed the
7  door.  Slammed the door.  So now I'm on the
8  outside, they're on the inside.
9  Q.   Okay.
10  Q.   Okay?
11  Q.   Any other instances?
12  A.   It happened numerous times.
13  Q.   Any other examples, different
14  from what you just said?
15  MR. GOODSTADT: In addition to
16  keeping him out of the loop and the
17  Christmas party?
18  MR. NOVIKOFF: I don't know
19  about putting him out of the loop.
20  That's what I'm asking.
21  A.   What's that?
22  Q.   You testified that an example
23  which happened numerous occasions was Hesse
24  would slam the door on you and he had

Page 130

F. Fiorillo

1  Hardman and other people in his office,
2  right?
3  A.   Gary Bosetti, Richard, Hardman.
4  Q.   Any other examples of how Hesse
5  alienated you in 2005?
6  MR. GOODSTADT: In addition to
7  keeping him out of the loop and in
8  addition to the Christmas party?
9  MR. NOVIKOFF: I don't know
10  what the loop is, so.
11  A.   I remember that there was a
12  Christmas party in 2005.  Um, it just so
13  happened we weren't invited.  All the other
14  members --
15  Q.   "We" being who?
16  A.   Excuse me?
17  Q.   "We" being who?
18  A.   Okay.  "We" being Tommy Snyder,
19  Kevin Lamm, myself.
20  Q.   Okay.  Any other examples of how
21  he alienated you, "he" being Hesse, in 2005?
22  A.   Well, in 2005, it became -- let's
23  see.  I'm trying to figure it.  In 2005, at
24  a certain point in time, he took over the

Page 131

F. Fiorillo

1  scheduling, and what happened was I worked
2  all year round on the schedule, and all of a
3  sudden, there came a point in time, I don't
4  know, maybe October of 2005 that I was off
5  the schedule, because I normally worked
6  Thanksgiving.  I worked every Thanksgiving
7  since I started there, and, um, I didn't
8  work Thanksgiving.  But I didn't work any
9  tours at all.
10  Q.   Oh, okay.  So after --
11  A.   Only, okay, from after --
12  from -- let's see.  I didn't work any tour
13  at a certain point in time in -- I don't
14  know -- I want to say October.  From after
15  October, the only tour I worked was, to the
16  best of my memory, is New Year's Eve and New
17  Year's Day.  So it would be like the end of
18  2005, the first day in 2006, and that was my
19  last tour.  I didn't get any tours all the
20  way to April 2, 2006, the day where I was
21  fired.  So that, to me, I was being
22  alienated.
23  Q.   Okay.  So if I understand you
24  correctly, at some point in time in October

Page 132

F. Fiorillo

1  of 2005, in your opinion, Hesse became in
2  control of scheduling?
3  A.   I don't  -- I don't know exactly
4  if who became in -- in control.
5  Q.   Well, you said you believed Hesse
6  did.
7  A.   Yeah.  But I don't know if it was
8  him, you know -- I think quite possibly it
9  was him.
10  Q.   Well, you just said Hesse was and
11  then after that you didn't get many tours.
12  A.   Right.
13  Q.   Right.
14  A.   I'm saying I believe it was him.
15  Q.   Right.  Okay.  That's what I'm
16  asking you.
17  A.   Okay.  I'm sorry.
18  Q.   So in 2000 -- after the season
19  was over -- well --
20  A.   No.  Don't go by the season,
21  because I worked --
22  Q.   Sir --
23  MR. GOODSTADT: Let him ask the
24  question.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 133

F. Fiorillo

1
2    Q.   October is after the season,
3 right?
4    A.   No.  But I think I worked a tour
5 in October.  That's what I'm trying --
6    Q.   I'm not --
7    A.   Or late September.
8    Q.   Sir, I'm not asking you that
9 question.  I just want to understand what
10 your knowledge is.  October is after the
11 season, right?
12    A.   For the seasonals.
13    Q.   Right.
14    A.   Yes.
15    Q.   The season is two weeks before --
16    A.   For the seasonals.
17    Q.   Sir, the season is two weeks
18 before Memorial Day to two weeks after Labor
19 Day, right?
20    A.   Correct.
21    Q.   So we can all agree that October
22 is after the "season," right?
23    A.   For the seasonal police officers.
24    Q.   Right.
25    A.   Correct.

Page 134

F. Fiorillo

1
2    Q.   So if I understand your
3 testimony, at some point after the 2005
4 season ended, Hesse began to assume control
5 of the scheduling and your tours ended?
6    A.   Yes.
7    Q.   Fine.  You were hired for the
8 2005 season, right?
9    A.   I was hired --
10    Q.   You were hired by the Village of
11 Ocean Beach for the 2005 season, correct?
12    MR. GOODSTADT: Objection.
13    A.   I kept on working.
14    MR. GOODSTADT: Before.
15    A.   I was hired in 2002.
16    MR. GOODSTADT: Yeah.
17    Q.   Did you work for the Village in
18 the 2005 season?
19    A.   Yes.
20    Q.   Okay.  And Mr. Hesse was there at
21 the time, correct?
22    A.   Yes.
23    Q.   Okay.  And that was after the
24 Halloween incident?
25    A.   Yes.

Page 135

F. Fiorillo

1
2    Q.   Any other examples of how Hesse
3 alienated you in 2005?
4    A.   Um, I believe there was a party
5 for Hank Clemens because he was coming home
6 from I think it was Iraq, and his wife told
7 Hesse to post the, um, date that Hank was
8 going to come back because she was having a
9 party for him, and Hesse took the, um, the
10 invitation off the bulletin board so that
11 Kevin, myself and Tommy, we never  -- what
12 happened was Kevin saw Hank's wife later on
13 after the party and said, "How come you
14 didn't come?"  And then he said, "Well, I
15 didn't even know about it."  And then she
16 said that she gave George the invitation to
17 put on the bulletin board, and that's --
18 that's how I felt we were alienated.  You
19 know.
20    Q.   Any other examples?  Listen, I'm
21 not challenging how you feel.
22    A.   The Christmas party.
23    Q.   I'm just asking you to give me
24 some examples.
25    A.   The Christmas party.

Page 136

F. Fiorillo

1
2    Q.   You told me that.
3    A.   No.  In 2005.
4    Q.   Right.  I think you've mentioned
5 that.
6    A.   Okay.
7    Q.   Any other examples of alienation
8 at the hands of George Hesse in 2005?
9    A.   I would say, to the best of my
10 memory right now, those are -- those that I
11 gave you.
12    Q.   Okay.  Now let's -- let me ask
13 you this, and maybe it could prevent me from
14 having to ask you numerous questions.
15 You've alleged in paragraph 101 that you
16 believed you were retaliated against because
17 of complaints that you made concerning
18 various instances of obstruction of justice,
19 abuse of power and other unlawful conduct?
20    A.   Absolutely.
21    Q.   Okay.  Did you ever complain to
22 Mayor Rogers about any of the examples of
23 what you say you complained about?
24    A.   No.
25    Q.   Okay.  Did you ever complain to

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 137

F. Fiorillo

1     F. Fiorillo
2  Trustee Loeffler about any of the complaints
3  that -- any of the examples that you've
4  complained about that's referenced in 101,
5  other than what you've already testified to?
6     A.   No.
7     Q.   The answer's no?
8     A.   Right.
9     Q.   And we understand what you've
10 already testified to, right?
11    A.   Yes.  Yes.  Yes.
12    Q.   Did you ever complain  -- same
13 question now with regard to the board of
14 trustees as a group, did you ever complain
15 to them?
16    A.   No.
17    Q.   And this is from 2002 through
18 April 2, 2006, correct?
19    A.   (Indicating).
20    Q.   You never complained to them?
21    A.   No.
22    Q.   Did you ever complain to the
23 Suffolk County District Attorney's office?
24    A.   No.
25    Q.   Did you ever communicate with the

Page 138

1     F. Fiorillo
2  Suffolk County District Attorney's office
3  before April 2, 2006 about the complaints
4  that you say you were fired for in
5  retaliation for making the complaints?  Do
6  you want me to rephrase the question?
7     A.   Yes, please.
8     Q.   You got it.  With regard to those
9  complaints that you are referencing in
10 paragraph 101, did you ever communicate with
11 the Suffolk County District Attorney's
12 office prior to April 2, 2006?
13    A.   Yes.
14    Q.   Okay.  On what issue or issues
15 did you complain to the Suffolk County
16 District Attorney's office about prior to
17 April 2, 2006?
18    A.   The Halloween fight.
19    Q.   Okay.
20    A.   The Jesse Prisco incident.
21    Q.   Okay.
22    A.   The Samuel Gilbert incident.
23    Q.   Okay.
24    A.   Those things.
25    Q.   Okay.  Jesse Prisco, what was

Page 139

1     F. Fiorillo
2  that incident?  What are you talking about
3  when you say "Jesse Prisco"?  I understand
4  the Halloween.  I think I know what the
5  Gilbert incident is.  Prisco I don't know.
6     A.   Prisco was --
7       MR. GOODSTADT: That's because
8     you didn't let him answer any questions
9     about Prisco, otherwise you would know.
10      MR. NOVIKOFF: Okay.
11    A.   Jesse Prisco was a, um, a --
12 let's see, how can I put this?  He was a
13 renter in a house.
14    Q.   Um-hum.
15    A.   He was a lawyer.
16    Q.   Right.
17    A.   There was a  -- do you want me to
18 explain the whole thing or how far, you
19 know, like --
20    Q.   I just need a description of what
21 you're referring to.  I mean --
22    A.   All right.  There was --
23    Q.   Was it a police brutality?  Was
24 it an unlawful --
25    A.   I'll shorten it up.  I'll shorten

Page 140

1     F. Fiorillo
2  it up.  It was a police brutality incident.
3     Q.   When did it take place, at least
4  in your opinion?
5     A.   That took place I want to say
6  in -- I want to say that took place sometime
7  in 2004.
8     Q.   Okay.  Now you say you
9  communicated with the Suffolk County
10 District Attorney's office.  With regard to
11 the Halloween incident that you just
12 testified to, did you contact the Suffolk
13 County DA's or did they contact you?
14    A.   The Halloween incident, they
15 contacted me.
16    Q.   Okay.  When did the Suffolk
17 County DA's office contact you about the
18 Halloween incident?
19    A.   I don't recall.  I don't know the
20 timeline.
21    Q.   Well, was it in 2004?
22    A.   I think it was in 2005.
23    Q.   And who contacted you at the DA's
24 office?
25    A.   Let's see.  I believe it was  --

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 141

F. Fiorillo

1 it started with the Samuel Gilbert incident
2 in 2005.
3    Q.   Okay.
4    A.   Okay?  That was around the end of
5 August 2005.
6    Q.   Okay.  So then let me just stop
7 you, because I don't mean to interrupt your
8 answer.
9    A.   Because I'm trying to get the
10 timeline.
11    Q.   That's what I'm trying to focus
12 on.  So is it your testimony that the first
13 time you would have communicated with the
14 Suffolk County District Attorney's office
15 concerning the Halloween incident was after
16 the Gilbert incident in August of 2005?
17    A.   I believe so.
18    Q.   Okay.  And when  --
19    A.   I didn't -- they contacted me.
20    Q.   Well, you've established that from the Halloween.
21 I think we're going to be able to clear this
22 up in a couple minutes.  When the Suffolk
23 County District Attorney's office first
24
25

Page 142

F. Fiorillo

1 communicated with you with regard to
2 anything involving Ocean Beach, was it
3 specifically with regard to the Halloween
4 incident or was it with regard to the
5 Gilbert incident as well?
6    A.   Both.
7    Q.   Okay.  And --
8    A.   Actually, actually, the three of
9 them -- all three.
10    Q.   Okay.  So with regard to Prisco,
11 Gilbert and the Halloween incident, you
12 would have not communicated with the DA's
13 office until after the Gilbert incident; is
14 that correct?
15    A.   Yeah.  Because they contacted me
16 in --
17    Q.   Right.
18    A.   After the Gilbert incident.
19    Q.   And who did you speak to?
20    A.   Well, initially the, um,
21 initially they came to my house.
22    Q.   I'm just saying, who?
23    A.   Well, many people.
24    Q.   Who was the first one?
25

Page 143

F. Fiorillo

1    A.   Tom Iacopelli and an investigator
2 Cori -- Corallao.  Something like -- I'm not
3 familiar with -- with the name.
4       MR. NOVIKOFF:  Now -- and I
5    think the tape -- how much time do I
6    have left on the tape?
7       THE VIDEOGRAPHER:  Two minutes.
8    Q.   So -- and we'll get more -- in
9 more detail with the DA's conversations with
10 you.  Did you ever advise -- well, did you
11 ever report to the Ocean Beach Police
12 Department that the Suffolk County District
13 Attorney's office communicated to you with
14 regard to Gilbert, Prisco and the Halloween
15 incident?
16    A.   I spoke to George Hesse.
17    Q.   What did you say to George Hesse?
18    A.   I said they contacted me.
19    Q.   And what did he say?
20    A.   He said, "It's not a big deal."
21 He goes, "I'm not even worried about it."
22    Q.   Did he tell you to lie?
23    A.   Did he tell me to lie?
24    Q.   Yeah.
25

Page 144

F. Fiorillo

1    A.   No.  We didn't discuss anything
2 that was --
3    Q.   Did he tell you -- did he
4 threaten you when you reported this to him?
5    A.   No.
6    Q.   Did he do anything, in your
7 opinion, that you believed indicated that he
8 wanted you to be less than truthful with the
9 Suffolk County District Attorney's office?
10    A.   Of course not.
11       MR. NOVIKOFF:  Okay.  Let's
12    switch the tape.
13       THE VIDEOGRAPHER:  This ends
14    tape number two.  The time is 12:25
15    p.m.  We're going off the record.
16       (A break was taken.)
17       THE VIDEOGRAPHER:  This begins
18    tape number three.  The time is 1:16
19    p.m.  Back on the record.
20    Q.   Mr. Fiorillo, we left before the
21 lunch break discussing generally the time --
22 the initial time that the Suffolk County
23 District Attorney contacted you, and I think
24 you testified that it was at some point in

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 145

F. Fiorillo

1   F. Fiorillo
2 time after the Gilbert incident in August of
3 2005; is that correct?
4   A.   Correct.
5   Q.   Okay.  On how many occasions
6 between 2005 -- August 2005 and April 2 of
7 2006 did you and someone from the Suffolk
8 County District Attorney's office
9 communicate concerning Ocean Beach?
10   A.   I don't recall how many times
11 specifically.
12   Q.   Between one and five?
13   A.   I would say.
14   Q.   More than five?
15   A.   I don't think so.
16   Q.   Okay.  And I'll get back to
17 that -- to those conversations shortly.
18 Once -- well, between April 2, 2006 and the
19 time that you retained the Thompson Wigdor
20 law firm, had you spoken to the Suffolk
21 County District Attorney's office?
22   A.   Yes.
23   Q.   Okay.  Did you communicate with
24 them or did they contact you?
25     MR. GOODSTADT: Objection.

Page 146

1   F. Fiorillo
2   Q.   Well, withdrawn.  Who -- who
3 reached out to whom between April 2, 2006
4 and the time you retained the Goodstadt law
5 firm?
6     MR. GOODSTADT: The Thompson
7 law firm?  I'm fine with that.
8   Q.   The Thompson Wigdor law firm.
9 Yes.
10   A.   I'm not sure if they called me
11 first or if I called them first.
12   Q.   Well, let me ask you
13 specifically.  Did you -- did you call the
14 Suffolk County District Attorney's office to
15 advise them that you were fired?
16   A.   I think, yes, there came a
17 certain -- a point in time that I did call
18 them about that.
19   Q.   Okay.  Was that before or after
20 you first communicated with the Thompson
21 Wigdor law firm?
22   A.   Well, I don't know.  I don't
23 know.
24   Q.   Who did you call -- I'm sorry.
25 Who did you communicate with with regard to

Page 147

1   F. Fiorillo
2 advising them that you were fired by Ocean
3 Beach as you say you were?
4   A.   I -- I called the -- the
5 specific group that handles the government
6 corruption in Suffolk County.
7   Q.   Okay.
8   A.   That's what I -- that's who I
9 looked up.  And they transferred me to a
10 person in that office.
11   Q.   And who was that person?
12   A.   There were two people at the
13 time.
14   Q.   And who were they?
15   A.   There were Walter Warkenthien and
16 Richard Burke, and thereafter, Robert
17 Biancavilla.
18   Q.   Okay.  Can you -- do you know the
19 spellings of any of those names?  If you
20 don't, that's fine.  Just for the court
21 reporter.  Never mind.  And what did you say
22 on the first occasion -- on the occasion
23 that you called to advise the Suffolk County
24 DA that you were fired, what did you say?
25   A.   I told them what had happened.

Page 148

1   F. Fiorillo
2   Q.   Okay.  And what was that?
3   A.   That, initially, I was -- I
4 received a letter in the mail stating that I
5 was to appear at a Ocean Beach Police
6 Department meeting on April 2, 2006 at
7 12:00, and that the letter stated that we
8 would all be issued new IDs.  And then when
9 I got there, George Hesse made an
10 announcement that he wanted all the officers
11 to line up in line at the boathouse, and
12 what happened was the only officers that
13 lined up at the boathouse was Eddie Carter,
14 myself, Joe Nofi and Kevin Lamm.  Everybody
15 else was down by the police station.  Like
16 a -- it's like a block away.
17   Q.   When did -- when did Hesse --
18 and I know I'm going off the line of
19 questioning -- when did Hesse tell all the
20 officers to line up?
21   A.   When we got -- when we got --
22 when we were outside the boathouse --
23   Q.   Okay?
24   A.   -- we were going to have a
25 meeting in the boathouse.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 149

F. Fiorillo

1
2    Q.   Right.
3    A.   But he said before the meeting,
4  he wants us all to line up.  He was going to
5  talk to us one at a time.  But then when we
6  lined up, it wasn't like the whole
7  department lined up.  It was only four of
8  us.
9    Q.   Got it.  Okay.  Um, and what else
10 did you say to the District Attorney's
11 office in your first conversation with them
12 about you being fired?
13   A.   I told  -- I told the District
14 Attorney's office that I thought that there
15 was, um  -- that it was unfair, and I didn't
16 know what was going on over there, but I
17 felt that George Hesse was retaliating
18 against me because of the Halloween fight.
19   Q.   Okay.  Did you tell them anything
20 else with regard to you not being hired --
21 rehired by the Ocean Beach  -- Village of
22 Ocean Beach?
23       MR. GOODSTADT: Objection.
24   Q.   In that first conversation?
25   A.   Well, I think in the first

Page 150

F. Fiorillo

1
2  conversation, it  -- it  -- it went from me
3  telling him about the  -- the firing, to him
4  like questioning more  -- questioning me
5  more about the Halloween fight.
6    Q.   That's  -- that's fine.  I'm not
7  questioning you what anyone said.  I'm just
8  trying to find out --
9    A.   No.  That's how it went.
10   Q.   Okay.
11   A.   It wasn't -- you know.  It was
12 yes, I told him about the firing, and then
13 he went back to the Halloween fight, and he
14 asked me if I  -- if he thought that I
15 thought that had anything to do with it.
16   Q.   Okay.
17   A.   And I said yes.
18   Q.   Now did he give you any  -- did
19 this Suffolk County District Attorney's
20 office employee give you any advice on what
21 you should do with regard to being -- I'm
22 sorry, with regard to your rights concerning
23 being fired in this first conversation?
24   A.   Um, I'm trying to think if I --
25 if I asked him  -- let me just think this

Page 151

F. Fiorillo

1
2  out.  I think it was his suggestion  -- his
3  suggestion that, you know, I think you need
4  a lawyer.
5    Q.   Okay.  And did you tell him
6  during this first conversation that you had
7  talked to a lawyer?
8        MR. GOODSTADT: Objection.
9    A.   It was  -- it was right after we
10 had gotten fired, so I didn't contact a
11 lawyer at this time.
12   Q.   Okay.  Then --
13   A.   It was like a short time later.
14 Within a couple of weeks.
15   Q.   Okay.  So within a couple of
16 weeks of you not being rehired by Ocean
17 Beach, you contacted the Suffolk County
18 District Attorney to tell them about what
19 happened on April 2?
20   A.   Yes.
21       MR. GOODSTADT: Objection.
22       MR. NOVIKOFF: Is the objection
23 as to how I characterized the firing or
24 not being rehired, because we have an
25 agreement?

Page 152

F. Fiorillo

1
2        MR. GOODSTADT: I know we have
3  an agreement.  There were a couple of
4  points.
5        MR. NOVIKOFF: Okay.  That's
6  fine.  As long as it wasn't just that.
7        MR. GOODSTADT: It was that
8  and --
9        MR. NOVIKOFF: Because we
10 have -- we have the agreement.
11       MR. GOODSTADT: Okay.
12   Q.   What was -- when was the next
13 time that you spoke with someone from the
14 District Attorney's office concerning the
15 fact that you weren't hired -- rehired on
16 April 2, 2006, if there was one?
17   A.   They didn't take that issue up so
18 much as far as other issues --
19   Q.   Okay.
20   A.   -- they were more concerned
21 about.  In other words, that was my  -- that
22 was me personally.  It had nothing to do
23 with them or anything they were
24 investigating as far as me being fired.
25   Q.   Got it.  So now let's go back to

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 153

F. Fiorillo

1
2 between the time period of August 2005 and
3 April 2, 2006. You say you spoke to the
4 District Attorney around no more than five
5 times concerning --
6     A.   I would say.
7     Q.   -- issues involving Ocean Beach,
8 right?
9     A.   Right. Well, up until which
10 point in time?
11     Q.   Between August 2005 and April 2,
12 2006.
13     A.   Right.
14     Q.   Okay. And you did not personally
15 witness anything involving the Gilbert
16 incident, did you?
17     A.   Nothing whatsoever.
18     Q.   And you didn't personally witness
19 anything involving the Prisco incident, did
20 you?
21     A.   Yes.
22     Q.   Oh, you did. What did you
23 witness?
24     A.   I was at the scene when Prisco
25 was handcuffed and put into the police

Page 154

F. Fiorillo

1
2 vehicle.
3     Q.   Okay.
4     A.   I also wrote summonses on the --
5 at the scene.
6     Q.   Did you witness any alleged
7 brutality --
8     A.   No.
9     Q.   -- involving Mr. Prisco?
10     A.   No.
11     Q.   Okay.
12     A.   They asked me that also.
13     Q.   Well, I would hope they would
14 have. Have you given any grand jury
15 testimony?
16     A.   Not yet.
17     Q.   Well, has anyone told you that
18 you have to give -- you're going to be
19 giving grand jury testimony?
20     A.   Yes.
21     Q.   Who has told you that you're
22 going to be giving grand jury testimony?
23     A.   District Attorney's office.
24     Q.   With regard to what issue?
25     A.   The Halloween fight.

Page 155

F. Fiorillo

1
2     Q.   Okay. And when did the District
3 Attorney say that you were going to be
4 giving grand jury testimony regarding the
5 Halloween fight?
6     A.   Um, about a month ago.
7     Q.   And when did they say you were
8 going to give the testimony?
9     A.   Bob Biancavilla said he's going
10 to call me back.
11     Q.   Did he say approximately what
12 time period you would be giving this
13 testimony?
14     A.   He didn't give me a time period,
15 but he did say that the Gilbert case is the
16 first case that they're going to deal with,
17 and then they said they're going to proceed
18 with the other cases. So that's -- that's
19 what I was told.
20     Q.   Okay. Have you given any sworn
21 statements to the Suffolk County District
22 Attorney's office prior to today?
23     A.   No.
24     Q.   Do you understand what I mean by
25 "sworn statement"?

Page 156

F. Fiorillo

1
2     A.   Under oath or --
3     Q.   Right.
4     A.   Notarized?
5     Q.   Right. No?
6     A.   No.
7          MR. GOODSTADT: Just so it's
8 clear, when you say "prior to today,"
9 he didn't give one today.
10          MR. NOVIKOFF: I just used
11 today --
12          MR. GOODSTADT: It was a little
13 loaded I guess.
14          MR. NOVIKOFF: No. No. I'm
15 just using today as a period of
16 reference.
17          MR. GOODSTADT: Understood.
18     Q.   And --
19          MR. GOODSTADT: It could be
20 inferred that you meant prior today.
21 That he gave one today.
22     Q.   Have you provided the District
23 Attorney's office any documentation with
24 regard to any of their investigations?
25     A.   No documentation.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 157

F. Fiorillo

1       F. Fiorillo
2   Q.   Have you provided the District
3 Attorney with copies of any audio tapes
4 prior to today concerning any of their
5 investigations?
6   A.   No.
7   Q.   Have you provided the District
8 Attorney with anything, other than your own
9 statements, concerning any of the issues
10 that they're investigating, prior to today?
11   A.   Have I provided anything other
12 than my own statements?
13   Q.   Right.
14   A.   Yes.
15   Q.   What have you provided?
16   A.   Um, well, emails as far as back
17 and forth information.  Instead of using the
18 phone, email.
19   Q.   Emails --
20   A.   As far as when they need
21 information pertaining to whatever they are
22 asking me, I'll email them back.
23   Q.   Oh, okay.  Well, beyond you
24 either emailing them communications or
25 talking to them over the phone or in person,

Page 158

F. Fiorillo

1       F. Fiorillo
2 have you provided them anything else with
3 regard to the issues that they're
4 investigating concerning Ocean Beach?
5   A.   I don't think I provided them
6 with any paperwork, anything like that.
7   Q.   Okay.  And are you aware if any
8 of the other Plaintiffs have testified
9 before a grand jury involving any of the
10 issues that the Suffolk County District
11 Attorney's investigating?
12   A.   Any of --
13   Q.   Are you aware of --
14   A.   Who else like?
15   Q.   If any of the other Plaintiffs in
16 this case --
17   A.   This case.
18   Q.   -- have testified in a grand jury
19 concerning any investigation by the Suffolk
20 County District Attorney concerning Ocean
21 Beach?
22   A.   I don't know.
23   Q.   Okay.  And -- withdrawn.  Okay.
24 So now let's go back to complaints that you
25 raised in 2005 with regard to -- and I know

Page 159

F. Fiorillo

1       F. Fiorillo
2 it's been a while, so let's go back to
3 paragraph 101.  Now, again, with regard to
4 the complaints that you spoke of with
5 Ms. Sanchez in that April meeting with her
6 that was attended by Nofi and Lamm, did you
7 complain in 2005 to any media outlet with
8 regard to those issues?
9   A.   No.
10   Q.   Okay.  Did you complain to any
11 other police officer outside of the Village
12 of Ocean Beach in 2005?
13   A.   I don't believe so.
14   Q.   Did you attend any Suffolk County
15 Legislative board meetings?
16   A.   No.
17   Q.   Any Village board meetings in
18 2005?
19   A.   No.
20   Q.   Same question for 2006,
21 between -- between January 1, 2006 and April
22 2, 2006, did you complain  -- did you
23 communicate any complaints to the -- to a
24 media outlet?
25   A.   No.  Oh, wait.  In 2006?

Page 160

F. Fiorillo

1       F. Fiorillo
2   Q.   Between January 1, 2006 and April
3 2, 2006, did you make any  -- did you
4 communicate with any media outlet concerning
5 any issues --
6   A.   No.
7   Q.   -- pertaining to Ocean Beach?
8   A.   Nothing.
9       MR. GOODSTADT: Let him finish
10 the question.
11   A.   Oh.
12   Q.   Let's break it down.  Between
13 April 1, 2006 and -- I'm sorry, between
14 January 1, 2006 and April 2, 2006, did you
15 raise any  -- did you communicate with any
16 media outlet concerning any issues
17 pertaining to Ocean Beach?
18   A.   No.
19   Q.   Okay.  Did you communicate with
20 the Suffolk County District Attorney's
21 office -- withdrawn.  We talked about that.
22 Did you attend any Suffolk County
23 Legislative meetings?
24   A.   No.
25   Q.   Did you attend any Village board

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 161

F. Fiorillo

1
2 meetings in that time period?
3    A.   No.
4    Q.   Did you complain to Mayor
5 Loeffler about anything in that time period
6 in 2006?
7    A.   No.
8    Q.   Did you complain to any
9 particular trustee of the Village?
10    A.   No.
11    Q.   Okay.  Did you complain to
12 Paridiso about anything in that time period?
13    A.   No.
14    Q.   Did you complain to Hesse about
15 anything in that time period?
16    A.   No.
17    Q.   And I'm going to ask you similar
18 questions, but I think it may alleviate
19 another long line of questions.  You've made
20 a lot of allegations in this Complaint about
21 conduct and behavior at Ocean Beach while
22 you were a police officer there, right?
23    A.   Yes.
24    Q.   And they range anywhere from
25 drinking to police brutality to cover ups,

Page 162

F. Fiorillo

1
2 correct?
3    A.   Correct.
4    Q.   And you're familiar with all of
5 the allegations that you've made in the
6 complaint, correct?
7        MR. GOODSTADT:  Objection.
8    A.   Yes.
9    Q.   Okay.  With regards to any
10 complaint that you have referenced in your
11 Complaint that you filed, did you ever
12 complain to a media outlet prior to April 2,
13 2006?
14    A.   No.
15    Q.   Did you ever complain to Mayor
16 Rogers?
17    A.   No.
18    Q.   Other than for the two instances
19 that we've discussed with Mr. Loeffler, did
20 you ever complain to Mr. Loeffler?
21    A.   No.
22    Q.   Did you ever attend a board
23 meeting for the purpose of raising any issue
24 that's referenced in this Complaint?
25    A.   Hold on.  Let me get that again.

Page 163

F. Fiorillo

1
2 Other --
3    Q.   Did you ever -- did you ever
4 attend a Village board meeting --
5    A.   No.
6    Q.   -- for the purpose of
7 communicating any concerns about anything
8 that you've referenced in this Complaint?
9    A.   No.  Can I get back to one other
10 question you just said?
11    Q.   You know what, hold that thought.
12 Let me just finish the line.  Couple more
13 questions --
14    A.   I'm not clear on one question.
15    Q.   And then you can come back to me
16 and tell me where you're not clear.  With
17 regard to any of the issues raised in this
18 Complaint, did you ever attend a Suffolk
19 County Legislative meeting for the purpose
20 of raising issues that are reflected in this
21 Complaint?
22    A.   No.
23    Q.   Did you ever write a letter to
24 the Suffolk County Civil Service Department
25 concerning any issues that are raised in

Page 164

F. Fiorillo

1
2 this Complaint prior to April 2, 2006?
3    A.   No.
4    Q.   Did you ever write a letter to
5 any police department, prior to April 2,
6 2006, concerning any of the issues raised in
7 this Complaint?
8    A.   No.
9    Q.   Did anyone ever -- withdrawn.
10 Did anyone associated with the Village ever
11 threaten you with any disciplinary action if
12 you communicated any concern to the media
13 concerning any issues raised in this
14 Complaint?
15        MR. GOODSTADT:  Objection.
16    A.   Did any associate --
17    Q.   Did any employee of the
18 Village -- withdrawn.  Did any  -- did any
19 employee of the Village ever prevent you
20 from making any complaints concerning the
21 issues raised in this Complaint to any media
22 outlet?
23    A.   Not that I can recall.
24    Q.   Same question with regard to
25 complaints to the Village board?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 165

F. Fiorillo

1
2    A.    Not that I can recall.
3    Q.    Same question with regard to
4 either Mayor Rogers or Trustee Loeffler?
5    A.    Can you just break that question
6 down with Mayor Rogers, because I want to --
7    Q.    Same question with regard to
8 Mayor Rogers.
9    A.    Now the question? Just give
10 me --
11    Q.    Did anyone prevent you from
12 raising any complaint with Mayor Rogers
13 concerning any issue reflected in your
14 Complaint?
15    A.    Not that I can recall.
16    Q.    Did anyone prevent you from
17 raising -- withdrawn. Did anyone ever
18 prevent you from making a complaint to Mayor
19 Loeffler or then Trustee Loeffler concerning
20 any issue raised in your Complaint?
21    A.    Not that I can recall.
22    Q.    Did anyone ever prevent you from
23 raising a complaint concerning any issue in
24 your Federal Complaint with the Suffolk
25 County legislature?

Page 166

F. Fiorillo

1
2    A.    Not that I can recall.
3    Q.    Did any -- you don't recall?
4    A.    Not that I can recall.
5    Q.    Okay. Did anyone ever prevent
6 you from raising any complaints with the
7 Suffolk County District Attorney's office
8 concerning any issue that's raised in this
9 Complaint?
10    A.    Not that I can recall.
11    Q.    Okay. Now you -- when you  --
12 when you met about five times with the
13 Suffolk County District Attorney's office
14 between August '05 and April '06, did you
15 report to George Hesse with regard to any of
16 those conversations?
17    A.    Let me get this straight. You
18 know what it is, I have a question in my --
19 in my mind that I wanted to ask you
20 pertaining to a question you asked me.
21    Q.    You know what --
22    A.    And I'm not clear.
23    Q.    Why don't you ask me that
24 question.
25    A.    I'm not paying close attention.

Page 167

F. Fiorillo

1
2 When you said that did I try to complain to
3 Natalie Rogers?
4    Q.    No, I didn't say if you tried to
5 complain. I said did you complain?
6    A.    Well, what I did was I wrote a
7 letter.
8    Q.    Right.
9    A.    Okay. I really wanted to talk to
10 her and I tried calling the Village, and
11 what happened was I tried calling the
12 Village to talk to Maryanne Minerva, because
13 I wanted to complain about what happened
14 on -- I called the Monday after we were
15 fired.
16    Q.    Okay. Now I'm going to get to
17 that.
18    A.    Okay.
19    Q.    But all of my questions --
20    A.    Have nothing to do with that.
21    Q.    -- were before April 2, 2006.
22    A.    Okay. All right. I was just --
23    Q.    Okay. That's the time -- do I
24 need to go over all the questions again?
25    A.    No. I got you.

Page 168

F. Fiorillo

1
2    Q.    Okay. Between August 2005 and
3 January -- and April 2000 -- April 2, 2006,
4 did you advise Mr. Hesse with regard to the
5 substance of any of the conversations you
6 had with the Suffolk County District
7 Attorney's office?
8    A.    I know I had a conversation with
9 him about who came by, when they came by,
10 and they were asking me questions if I was
11 involved and how come they claimed I was on
12 duty, myself and Joe Nofi, because we were
13 never signed off.
14    Q.    Claimed you were on duty when?
15    A.    The night of the -- are you
16 talking about the Gilbert incident?
17    Q.    No. No. I'm not talking about
18 anything specific, and I'll rephrase the
19 question.
20    A.    Oh, I see. I know what it is. I
21 got it.
22    Q.    Hold on. So the record is clear.
23    A.    I got it.
24    Q.    You testified that approximately
25 five times, could be a little less, could be

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 169

F. Fiorillo

1 a little more, you spoke to the District
2 Attorney's office concerning Ocean Beach
3 issues between August '05 and April 2, 2006,
4 correct?
5     A.   Correct.
6     Q.   Did you -- other than advising
7 Mr. Hesse the first time the District
8 Attorney contacted you to speak to you, did
9 you ever advise Mr. Nofi about the substance
10 of any of the conversations you had with
11 them?
12         MR. GOODSTADT:  Objection.
13     A.   Mr. Hesse -- you mean --
14     Q.   Mr. Hesse.  I'm sorry, Mr. Hesse.
15     A.   Okay.  So Mr. Nofi's out of it?
16     Q.   Mr. Nofi's out of it.
17     A.   Okay.  Yes.
18     Q.   Okay.  What did you advise
19 Mr. Hesse with regard to the substance of
20 anything that was discussed with the Suffolk
21 County District Attorney's office?
22     A.   Okay.  At first, I told him that
23 they dropped by my house and they wanted to
24 know essentially what happened that night,

Page 170

F. Fiorillo

1 and I told them I wasn't working, and they
2 had me on the -- I wasn't in the blotter as
3 being off duty.
4     Q.   Okay.
5     A.   Myself and Joe Nofi.
6     Q.   Right.
7     A.   Okay?  But, in fact, I was,
8 because I was on the 1:00 ferry that left
9 Ocean Beach that night.
10     Q.   Okay.
11     A.   But I think they later on got it
12 all squared away, where it was -- it just
13 wasn't put in the blotter.
14     Q.   Right.  Now, Mr. Fiorillo --
15     A.   So I told him --
16     Q.   I'm sorry.  Go ahead.
17     A.   So I told him about that.
18     Q.   Okay.
19     A.   And then I told him about --
20 let's see.  They -- I told them -- I told
21 him that they went to Eddie Carter's house
22 and thought that Eddie Carter was involved
23 in the Gilbert fight, but George said it's
24 impossible because he wasn't working that

Page 171

F. Fiorillo

1 night.
2     Q.   Okay.
3     A.   So that -- but, basically it was
4 only those two times.
5     Q.   Okay.  Did you ever advise George
6 Hesse of -- as to anything that you
7 specifically said to the DA concerning
8 either the Halloween incident, the Gilbert
9 incident or the Prisco incident, other than
10 what you've just testified to?
11     A.   No.
12     Q.   Okay.  Now I'm going to go into
13 this line of questioning a little later
14 concerning your job searches, but I don't
15 think I asked you this question.  When did
16 you stop working for that company for which
17 you were a driver in 2006?
18     A.   It was a very short period of
19 time.  It was maybe February of 2006.
20     Q.   Okay.  And why did you stop
21 working for them?
22     A.   Because they hired initially for
23 two days driving, and then what happened was
24 they -- I don't know what happened because I

Page 172

F. Fiorillo

1 didn't know the other drivers, but
2 apparently they couldn't get the other
3 driver that was working on a Saturday
4 anymore and they wanted me to work Saturday,
5 so I told them that I couldn't work Saturday
6 because upcoming, I work Saturdays in Ocean
7 Beach.
8     Q.   Okay.
9     A.   So what they said was this isn't
10 working out and they had to get somebody
11 else that was going to work the Saturdays
12 for them.  So I  -- I, um -- I couldn't work
13 for them anymore, because I didn't want to
14 give up Ocean Beach.  It was either give up
15 Ocean Beach, drive, or -- or not give up
16 Ocean Beach and give up the driving.
17     Q.   Okay.  Now that job would have
18 paid you $60,000 a year; is that correct?
19     A.   Correct.
20     Q.   In 2005, how much did you earn
21 from Ocean Beach?
22     A.   I don't even know.  20 something.
23     Q.   How about --
24     A.   But I worked another job, you

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 173

F. Fiorillo

1  know what I mean?  I worked two jobs.
2  Q.  How about in 2004, how much did
3  you earn from Ocean Beach?
4  A.  I don't know.  Approximately 20.
5  I would -- approximately 20.
6  Q.  How about 2003?
7  A.  I would say approximately -- you
8  know, I don't know exactly.
9  Q.  Right.
10  A.  I would say around that figure.
11  Q.  And in 2006, you had no other job
12  prior to April 2, 2006, other than the few
13  days that you worked for that company,
14  correct?
15  A.  Correct.
16  Q.  Okay.  And had you had, prior to
17  April 2, any job offers for any other jobs?
18  MR. GOODSTADT: Objection.
19  A.  Prior -- prior to April 2?
20  Q.  Yeah.  Well, let me rephrase the
21  question --
22  A.  No.  No.
23  Q.  -- so there's no objection.
24  Prior to April 2, 2006, had you been offered
25

Page 174

F. Fiorillo

1  employment by any other entity or
2  individual, other than this company that you
3  drove for?
4  A.  I don't recall.  I don't think I
5  did.  But I wouldn't -- I wouldn't -- okay.
6  No.
7  Q.  Now let's go back to the
8  Complaint.  Actually, let's go back to
9  Paridiso.  What specifically -- and list to
10  me the issues that you complained to
11  Paridiso about prior -- between the first
12  day of your employment and the last day of
13  your employment?
14  A.  I complained to him about
15  officers drinking.  I complained to him
16  about Hesse, um -- one incident in
17  particular where 3:30 in the morning he
18  called me into the station.  You want me to
19  give you the particulars or you want me --
20  Q.  No.  I want you to give me, if
21  you can --
22  A.  Just the two things.
23  Q.  Just the generally and then we'll
24  get to it.  Right.
25

Page 175

F. Fiorillo

1  A.  Okay.  So you got -- I have the,
2  um, the officers drinking.  That was the
3  Paridiso.  Is that what you're saying?
4  Q.  Okay.  That's all I'm asking.
5  What did you complain to Paridiso about?
6  A.  I complained to Paridiso about
7  Hesse singling me out on cleaning  --
8  cleaning.  Let's put it that way.  Cleaning.
9  Because it was a two day period where it
10  just happened to be me.
11  Q.  Okay.
12  A.  Um, that's all I can recall at
13  this time.
14  Q.  Is there anything that you think
15  if I gave you a couple more minutes to think
16  about it, would that help you come up with
17  any more examples, if in fact there were
18  more?
19  A.  Oh, to Paridiso?
20  Q.  Yeah.  Just to Paridiso.
21  A.  I complained -- I complained to
22  him about my statement in the Halloween
23  fight because Hesse was pretty adamant on my
24  statement, and I was the one on the scene
25

Page 176

F. Fiorillo

1  and Hesse wasn't, and it got -- got to be an
2  issue.
3  Q.  Okay.  Anything else?  You
4  mentioned you complained to Paridiso about
5  officers drinking.
6  A.  Right.
7  Q.  You've complained to Paridiso
8  about Hesse singling you out for cleaning,
9  using your words, and then you've complained
10  to Hesse  -- to Paridiso about your
11  statement in the Halloween fight as it
12  relates to Hesse?
13  A.  Correct.
14  Q.  Okay.  Anything else?
15  A.  Let's see.  That's what I can
16  remember as of right now.
17  Q.  Like I said, if I gave you a few
18  minutes to think about it, do you think that
19  would help jog your memory to the extent
20  there's any more examples?
21  A.  I don't know.  I think as we go
22  along, if there are any, I'll -- I'll bring
23  it to your attention.
24  Q.  Okay.  Is there anything in your

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 177

F. Fiorillo

1  custody -- is there any document in your
2  custody, possession or control that would
3  refresh your recollection with regard to
4  what issues you would have complained to
5  Paridiso, other than what you just testified
6  to?
7     A.  Do I have any documents?  No.
8     Q.  Yeah.  Or is there anything you
9  can think of that would jog your memory on
10 this issue?
11    A.  I don't know right now.
12    Q.  Okay.  Are you nervous right now,
13 is that why you think --
14    A.  No, I'm not nervous.  I'm
15 trying -- I'm trying to think.
16    Q.  That's what I said.  I mean,
17 I'm -- I'll give as much time as you need to
18 think.  Do you think taking two or three
19 minutes just to think about this one issue
20 without listening to my voice  --
21    A.  About -- about --
22    Q.  -- would jog your memory?
23        MR. GOODSTADT:  Promise?
24    Q.  I'll give you five minutes of

Page 178

F. Fiorillo

1  silence if it helps.
2     A.  I can't -- I can't think of
3  anything else at this time.
4     Q.  Okay.  Now let's talk about
5  officers drinking.  You've talked about your
6  complaints to Paridiso about the Bosettis.
7  Any other officers?
8     A.  Just one other.
9     Q.  Which one?
10    A.  Walter Muller.
11    Q.  And what were you complaining to
12 Paridiso about with regard to Walter Muller?
13    A.  That I had to pull him out of a
14 bar when he was on duty on a -- I had a drug
15 overdose, um  -- there was a young man in
16 the Village who had ingested brownies laced
17 with pot.
18    Q.  Okay.
19    A.  Or hasheesh.  I didn't know what
20 it was at the time.  But it was one of them.
21    Q.  Okay.
22    A.  So that was  -- that was another
23 complaint.
24    Q.  No.  I get that.  You complained

Page 179

F. Fiorillo

1  about Walter Muller drinking and you've told
2  me that you had to pull him out of a bar.
3  What was the specific complaint that you
4  made, unless it was just the fact that you
5  had to pull him out of a bar while he was on
6  duty?
7     A.  No.  That I needed assistance on
8  the call.  It was just me and him that
9  night.
10    Q.  It was you and Muller that night?
11    A.  That's it.
12    Q.  Okay.  So let me go through this.
13 It was you and Muller that night, and there
14 was a call with regard to a possible drug
15 overdose?
16    A.  Correct.
17    Q.  And --
18    A.  Doug Meyer was the kid.
19    Q.  Okay.
20    A.  Doug Meyer, Jr. I believe.
21    Q.  And what year was this?
22    A.  I can't recall exactly, but there
23 is a field report on it.
24    Q.  Was it closer to the first day of

Page 180

F. Fiorillo

1  your employment or closer to the last day?
2     A.  No.  Closer to like in the
3  middle.  It wasn't towards the last.
4     Q.  So it was around 2003 or four?
5     A.  Yeah.
6     Q.  Okay.  Fine.  And what time --
7  when was this?  Was it in season or out of
8  season?
9     A.  Um, I would say that based on
10 that night, it was either right after the,
11 you know, after Labor Day or the spring,
12 because I remember -- I think I remember it
13 was a colder night.  It wasn't  -- it wasn't
14 -- it was more desolate for sure.  So it
15 wasn't populated.
16    Q.  Okay.  And you and Muller were
17 the only people -- the only officers on
18 duty?
19    A.  Yes.
20    Q.  And it was a midnight to eight
21 shift?
22    A.  No.  It was the four to 12.
23    Q.  Four to 12.  Okay.  And was Hesse
24 in the station that night?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 181

1          F. Fiorillo
2     A.   No.  It was just  -- we were the
3  only two officers.
4     Q.   Okay.  And a call came in about a
5  possible drug overdose, right?
6     A.   Right.
7     Q.   And where --
8     A.   Well, it wasn't possible drug
9  overdose at the time.  It was that he was --
10  I got the call from his father that he was
11  apparently ill.  Very ill.
12     Q.   Fine.  Where were you at the time
13  that the call came in?
14     A.   I was patrolling the Village.
15     Q.   By yourself?
16     A.   Yes.
17     Q.   Where was Muller?
18     A.   He was in a bar.
19     Q.   Did you know that?
20     A.   I didn't know that.  I didn't
21  know where he was.
22     Q.   But you were the only two that
23  were on duty that night, right?
24     A.   Yeah.  Walter stayed in the
25  station or I'll go in the truck or I'll stay

Page 182

1          F. Fiorillo
2  in the station or we go together.  It
3  depends.
4     Q.   Okay.
5     A.   It's not a routine thing where,
6  um, two guys stay in the truck.  Sometimes
7  there's three guys in the truck.  It depends
8  on the day, the time of the year.  Sometimes
9  there's no truck at all because it's
10  populated, so everybody's on foot.  Most
11  people.
12     Q.   So if I understand what the
13  common -- the common practice was, and there
14  may have been exceptions, and this night may
15  have been one of them, if there were only
16  two police officers on duty, one would be --
17  one would be at the station and one would be
18  patrolling?
19     A.   Sometimes.
20     Q.   Right.
21     A.   Like I said, there was no set --
22     Q.   Okay.
23     A.   You know, sometimes like somebody
24  would want to stay at the station and handle
25  the call from the station.  Otherwise, the

Page 183

1          F. Fiorillo
2  phone was call forwarded when nobody was in
3  the station.
4     Q.   Got it.  Um, so the call came in
5  and you did what right after you got the
6  call?
7     A.   I responded to the call.
8     Q.   Did you try to get Walter Muller?
9     A.   I tried to get him on the radio.
10     Q.   That's what I'm asking you.
11     A.   Oh, yeah.  Yeah.
12     Q.   So you called him on the radio
13  and what happened?
14     A.   I got no response.
15     Q.   Okay.  So what did you do after
16  that?
17     A.   Continued to the call.  I had an
18  emergency.
19     Q.   That's fine.  I'm just trying to
20  figure out what you did.  So you went to the
21  call?
22     A.   Right.
23     Q.   And --
24     A.   I called for rescue.
25     Q.   Called for rescue.  That wasn't

Page 184

1          F. Fiorillo
2  Muller, that was just rescue?
3     A.   What do you mean?
4     Q.   When you say you called for
5  rescue, who comes?
6     A.   The Ocean Beach Fire Department.
7  The rescue.  The Ocean Beach --
8     Q.   Fine.
9     A.   -- rescue.
10     Q.   And you went to the scene, right?
11     A.   Correct.
12     Q.   You did what you needed to do?
13     A.   Correct.
14     Q.   At some point in time you left
15  the scene, right?
16     A.   Yeah.  After the boy was attended
17  to by the medical personnel, yes.
18     Q.   What did you do next?
19     A.   Um, I had all the information
20  from the boy on where the party was that he
21  -- where he ingested  -- where they had this
22  pot-laced brownies.
23     Q.   Okay.
24     A.   So with that, um, I came back to
25  the station.  The door was locked.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 185

F. Fiorillo

1
2    Q.   Okay.
3    A.   I go across the street, Walter's
4  in the bar.
5    Q.   Okay.  And was Walter drunk, in
6  your opinion?
7    A.   I didn't have a breathalyzer, so
8  in my opinion, how could I --
9    Q.   I'm just asking you.  I mean,
10 you're a police officer.  I would presume --
11   A.   Yeah.  But you can't tell if
12 somebody is legally drunk.
13   Q.   Okay.
14   A.   You can't tell that without
15 having something to administer --
16   Q.   Fair enough.  And where was
17 Mr. Muller when you first saw him in the
18 bar?
19   A.   At the bar.  On the stool at the
20 bar, drinking.
21   Q.   Drinking what?
22   A.   He told me what he was drinking.
23   Q.   What was he drinking?
24   A.   It was Captain Morgan's and Coke.
25   Q.   Okay.  And so when you say you

Page 186

F. Fiorillo

2  dragged him out of the bar --
3    A.   I didn't drag him.
4    Q.   Well, those were your words.
5  That's why I was asking you that.
6    A.   I said "drag"?
7    Q.   You said "drag."
8    A.   Okay.  I told him I needed his
9  assistance on a call.
10   Q.   Okay.
11   A.   To be fair.
12   Q.   And did he tell you to go "F off"
13 or did he --
14   A.   No.
15   Q.   Well, I'm asking you.  Or did he
16 just go with you?
17   A.   No.  He went with me.
18   Q.   Okay.  And --
19   A.   He took his drink.
20   Q.   Okay.  Good for him.  Did, um,
21 did you call Chief Paridiso up before the
22 end of your shift to complain?
23   A.   No.
24   Q.   Did you call Chief Hesse up
25 before the end of your shift to complain?

Page 187

F. Fiorillo

1
2    A.   No.
3    Q.   When did you call Chief  -- when
4  did you complain to Chief Hesse?
5    A.   I didn't say I complained to
6  Chief Hesse.
7    Q.   I'm sorry, when did you complain
8  to Chief Paridiso?
9    A.   It was my next tour.
10   Q.   Which was when?
11   A.   I don't know if it was the next
12 day or the next time I saw the chief.  See,
13 it was -- I think it was in the -- either in
14 the beginning of the season, like prior to
15 Memorial Day or shortly thereafter.  I'm not
16 sure on the time period, but it was  -- it
17 was the desolate part of the season on --
18 which end I'm not sure.
19   Q.   Well, why did you wait until your
20 next shift?  Why didn't you just call him up
21 the next day?
22   A.   Because I just brought it to his
23 attention in person.
24   Q.   Okay.  And what did you say to
25 Chief Hesse  -- I mean Chief -- what did you

Page 188

F. Fiorillo

2  say to Chief Paridiso, I'm sorry?
3    A.   I told him about what had
4  happened.
5    Q.   And what was his reaction, if
6  any?
7    A.   He  -- he didn't have a reaction.
8  He just -- I just told him the story and he,
9  you know, he didn't have a reaction.
10 Nothing that I could remember which was
11 reactionary.
12   Q.   Did he just shrug his shoulders?
13   A.   I don't even know if he shrugged
14 his shoulders.  I think he just, you know,
15 acknowledged what I told him and that's it.
16   Q.   Did you make this complaint to
17 Mr. Hesse prior to you going to Chief
18 Paridiso?
19   A.   No.
20   Q.   Why didn't you go to Mr. Hesse
21 first, if any  -- if there was any reason?
22   A.   Because I had a problem with
23 George Hesse and Walter Muller when I first
24 started, um, working as a cop there, and
25 there was a  -- they had a friendship and a

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 189

F. Fiorillo

1 F. Fiorillo
2 bond that was -- they were close. They
3 were close friends.
4 Q. So you felt that it would not
5 have been in your best interest to complain
6 to Mr. Hesse about Mr. Muller?
7 A. I felt that if I did complain to
8 Hesse, that -- you have to understand,
9 there was an incident where he went off on
10 me in front of other officers about Walter
11 Muller and it was another situation where
12 Walter Muller was drinking. So, in my mind,
13 I was going to have a problem with Hesse in
14 relation to Muller again, and I didn't want
15 to lose my job as to be hon -- exactly why I
16 went to the chief.
17 Q. And that's your testimony and
18 that's fine. So I just -- I'm just asking
19 you a question. So you believed that had
20 you complained to Hesse concerning Muller,
21 that you -- there may have been some
22 ramifications for your job?
23 A. Absolutely.
24 Q. Right. And so you bypassed
25 Mr. Hesse and you made your complaint to

Page 190

1 F. Fiorillo
2 Chief Paridiso?
3 A. Correct.
4 Q. Got it. And did Mr. Hesse ever
5 prevent you from making any complaints to
6 Mr. Paridiso concerning any issues at Ocean
7 Beach?
8 A. Not that I can recall.
9 Q. All right. Did you ever feel
10 intimidated by Mr. Hesse with regard to
11 making a complaint to Mr. Paridiso?
12 A. At times I did feel intimidated
13 by -- by George Hesse.
14 Q. No, not intimidated by George
15 Hesse. I'll rephrase the question. Did --
16 did Mr. Hesse ever threaten you with any
17 disciplinary action with regard to a
18 complaint -- withdrawn. Did Hesse ever
19 threaten you with any type of disciplinary
20 action with regard to making complaints to
21 Chief Paridiso?
22 A. Did he ever --
23 Q. For example --
24 A. -- intimidate --
25 Q. Okay. Withdrawn. Did Chief --

Page 191

1 F. Fiorillo
2 did Hesse ever say to you, in sum or
3 substance, if you make any complaints to
4 Chief Paridiso, you're going to lose your
5 job?
6 A. Not that I can recall.
7 Q. Did Hesse ever say to you "if you
8 make any complaints to Chief Paridiso, I'm
9 going to put you on crappy shifts"?
10 A. Not that I can recall.
11 Q. Did Hesse ever say anything to
12 you with regard to you making complaints to
13 Paridiso?
14 A. He said something about me, you
15 know, crying to the chief.
16 Q. What did he say?
17 A. He said that in reference to, um,
18 there was a filing cabinet incident --
19 well, there was a filing cabinet.
20 Q. Actually, I'm just interested
21 in -- and we'll get to why.
22 A. Okay.
23 Q. But I'm just interested in what
24 did Hesse say to you with regard to, as you
25 say, crying to the chief?

Page 192

1 F. Fiorillo
2 A. Well, it was in reference to
3 these two things.
4 Q. What -- what did he specifically
5 say to you? I'm looking for what his words
6 were, in sum and substance. Right now I
7 don't need the back story.
8 A. Okay.
9 Q. I just need to know what Hesse
10 said to you with regard to crying to the
11 chief.
12 A. Like whenever there was something
13 that I didn't like, I would go crying to the
14 chief.
15 Q. And when did he say that to you?
16 A. He said that to me the day --
17 the -- it was a Saturday -- let's see.
18 I'll try to get the timeline. It was -- it
19 was after the night that he told me that he
20 wanted the truck clean, because I went to
21 the chief.
22 Q. Okay. And what year was that?
23 A. 2004.
24 Q. Okay. And do you recall
25 specifically what Mr. Hesse said to you,

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 193

          F. Fiorillo
1
2 other than just very generically crying to
3 the chief?  Did he say "I don't want you
4 crying to the chief"?
5     A.   No.  He just said that, you know,
6 "whenever something like this happens, you
7 always go crying to the chief."
8     Q.   Okay.  Um, and was that the only
9 time he ever used the expression "crying to
10 the chief"?
11     A.   Well, as far as with me.
12     Q.   Yes.  That's what I'm saying.
13 All I'm asking is with you.  That was the
14 only time?
15     A.   That I could recall.
16     Q.   Okay.  And on how many occasions
17 did you complain to Paridiso about the
18 Bosettis drinking?
19     A.   Numerous.
20     Q.   Okay.  And -- and --
21     A.   It was  -- it was an ongoing
22 thing.
23     Q.   And at any point in time, were
24 you satisfied that Chief Paridiso handled
25 the situation concerning the Bosettis

Page 194

          F. Fiorillo
1
2 drinking in the Village?
3     A.   Well, this is how it went.
4     Q.   No.  My question is --
5        MR. GOODSTADT: Well, he has to
6     answer.
7     Q.   If you can't answer it yes or no,
8 you can tell me.  Yes or no --
9     A.   Okay.
10     Q.   Were you ever satisfied that in
11 response to your --
12     A.   Only for --
13     Q.   In response to your complaint,
14 Chief Paridiso addressed the situation
15 concerning the Bosettis drinking in the
16 Village?
17     A.   Only for a little while.
18     Q.   And when did that take place?
19 What year?
20     A.   That was in -- I'm pretty sure it
21 was in 2004.
22     Q.   Now why in 2004 did you complain
23 to Paridiso instead of just Mr. Hesse?
24     A.   Because that's what I was getting
25 at before.  Because  -- because George Hesse

Page 195

          F. Fiorillo
1
2 did not  -- he let these guys do whatever
3 they wanted to do.  He did not -- what's the
4 word?  Supervise them, in my opinion,
5 accordingly.
6     Q.   Would it be  -- would it be also
7 fair to say that Chief Paridiso didn't
8 supervise these guys accordingly?
9     A.   But you have to --
10     Q.   Mr. Fiorillo, yes or no?  Would
11 it be your opinion that Chief Paridiso also
12 didn't supervise these gentlemen
13 accordingly?
14        MR. GOODSTADT: Answer the
15     question the way you want.
16     A.   But he did.  But the chief did --
17 what I'm trying to say is, that's what I'm
18 trying -- I just want you to get the
19 picture.  The chief -- what the chief did
20 was he had the Bosettis for a little while
21 not frequenting -- frequenting the bars.
22     Q.   Okay.
23     A.   And Hesse was supposed to be in
24 charge of overseeing that.
25     Q.   Okay.

Page 196

          F. Fiorillo
1
2     A.   And then, but it didn't last
3 long.  If I -- if I tell you it lasted a
4 week, really, it lasted a week.
5     Q.   Now in 2004, did Hesse report to
6 Paridiso or did Paridiso report to Hesse?
7     A.   In 2004, Hesse reported to
8 Paridiso.
9     Q.   So would you agree with me
10 that -- that had Paridiso wanted to, he
11 would have had the authority to fire the
12 Bosettis?
13     A.   I don't know --
14        MR. GOODSTADT: Objection.
15     A.   -- who had the authority to hire
16 and fire in Ocean Beach.  I don't.
17     Q.   You don't know?
18     A.   Well, I don't know in that
19 Village.  It was -- it was questionable as
20 to how they hired and how they fired.
21     Q.   Who hired you?
22     A.   The Village of Ocean Beach.
23     Q.   Who -- who told you that you were
24 hired?
25     A.   I'm not so sure that anybody

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 197

1           F. Fiorillo
2 really told me specifically I was hired.
3 But I had to go to the Village office and
4 swear in.
5      Q.   Who interview  -- okay.  Go
6 ahead.  I'm sorry.
7      A.   With I forget her name.  Anyway,
8 Baldar -- Maryanne Baldaro.  You would know.
9 I don't know.
10     MR. WELCH: Do you want her
11 name?
12     MR. NOVIKOFF: No.  It's okay.
13     A.   I don't know.  Something like to
14 that -- to that effect.
15     Q.   Who did you interview with before
16 you got hired by Ocean Beach in 2002?
17     A.   Chief Paridiso.
18     Q.   Did you interview with Hesse?
19     A.   No.
20     Q.   Was it your belief, based upon
21 your experience at Ocean Beach, that through
22 2002 through 2004 -- from 2002 through 2004,
23 that Chief Paridiso was the highest ranking
24 officer, police officer at Ocean Beach?
25     A.   I believe so.

Page 198

1           F. Fiorillo
2      Q.   And would that answer be true for
3 2005?
4      A.   I don't know in all of 2005.
5      Q.   At any point in 2005?
6      A.   I'm sure at one point.
7      Q.   Okay.  Now -- and would you agree
8 with me that you complained to Chief
9 Paridiso about the Bosettis drinking because
10 you were getting nowhere complaining to
11 Mr. Hesse about that?
12     A.   It's not that I was getting
13 nowhere complaining to Mr. Hesse about that.
14 He wouldn't do anything about it anyway.  He
15 would actually be drinking with them.
16     Q.   And this started in 2002?
17     A.   Not initially.  No.
18     Q.   How about 2003?
19     A.   No.  No.  No.  The Bosettis
20 drinking started in 2002.
21     Q.   And your complaints to Hesse
22 started in 2002?
23     A.   Yes.
24     Q.   Okay.  And let's talk about Hesse
25 singling you out for cleaning.  You used the

Page 199

1           F. Fiorillo
2 word "cleaning."  When did that take place?
3      A.   That took place in 2004.
4      Q.   Okay.  And what were you
5 referring to?
6      A.   There was a particular point in
7 time when it was a Friday night in the
8 beginning of the season of 2004 and he
9 called me about 3:30 in the morning.  It was
10 actually Saturday morning.
11     Q.   Okay.
12     A.   So it was 3:30 in the morning.
13 He called me and he told me that he wanted
14 the inside of the station cleaned out.
15     Q.   Um-hum.
16     A.   There was like old tires, filing
17 cabinet, old uniforms.
18     Q.   Right.
19     A.   A lot of miscellaneous stuff.
20     Q.   Okay.
21     A.   You know, clutter.  And -- and --
22 and Ocean Beach police files.  You know.
23     Q.   Okay.  And why did you think you
24 were being singled out?
25     A.   Well, no.  No.  No.  Not so much

Page 200

1           F. Fiorillo
2 this time.  I mean, I did it.  That was
3 okay.  I had no problem with that.
4      Q.   Okay.
5      A.   You know?
6      Q.   Well, I'm interested in the
7 time --
8      A.   But there was -- the very next
9 night --
10     Q.   Okay.
11     A.   Okay?  In other words --
12     Q.   You don't think you should have
13 gone back to back nights cleaning?
14     A.   Well, it wasn't that.  It was the
15 purpose of cleaning.  In other words, the --
16 the glass on the vehicle had smoke -- a
17 smoke film.
18     Q.   Right.
19     A.   I don't smoke.
20     Q.   Okay.
21     A.   Okay.  I think that after the
22 night before and -- what happened was this,
23 I had -- I worked the night before.  I
24 came -- I came off duty.  I went to court
25 that morning.  It was a Saturday morning.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

F. Fiorillo
1
2   So, um, you want me to explain this or you
3   want to question me?
4       Q.   No.  No.  That's all right.  I
5   asked you.
6       A.   Okay.  So this is what happened.
7   I go to court.  Coming back from court --
8           MR. GOODSTADT: Go ahead.
9           THE WITNESS: You want me to
10  finish?
11          MR. GOODSTADT: Yeah.  I'm just
12  laughing at Ken's comment.
13          THE WITNESS: He's fine.
14          MR. GOODSTADT: You're doing
15  good.
16      A.   So I go to court.  I'm coming
17  back from court.  Chuck that.  I'm going to
18  court, okay?  One of the dock masters comes
19  up to me and says there's a filing cabinet
20  in the bay.
21      Q.   Okay.
22      A.   Okay?  I said, "You got to be
23  kidding me?"  So I walked over there and I
24  saw it.  I said, "I can't do anything about
25  it now."  I said, "I gotta go to court."  I

F. Fiorillo
1
2   said, "Ronnie's at the desk.  Have him get
3   somebody from the Village to take care of
4   this matter."
5       Q.   Okay.
6       A.   Okay?  So I go to court.  Finish
7   my day in court.  I'm coming back on Bay
8   Walk and Richie Bosetti is in CJ's drinking
9   a beer.  He calls me from the  -- from CJ's.
10  It's very close to the street, so I could
11  see him.  The doors are open.  I can see
12  him, he can see me.  And he says "Frank, can
13  you give me a hand?"  I said, "With what?"
14  And he said, "Me and my brother got drunk
15  last night and we threw the filing cabinet
16  in the bay."  I said, "I'm not gonna touch
17  that, Richie."  I said, "You guys got
18  yourself into it, you guys gotta get
19  yourself out of it."  I said, "I gotta go
20  home, because I gotta come back to work
21  tonight."  So --
22      Q.   Go ahead.
23      A.   So I went into the station and I
24  said, "Hey, chief, you're not gonna believe
25  this."  I said -- and I told him.  I told

F. Fiorillo
1
2   him the story.  I said, "Richie pulls me
3   aside over there and he says, you know, he
4   needs help pulling the filing cabinet out of
5   the bay because him and his brother got
6   drunk last night," and he started laughing.
7       Q.   So if I understand what you just
8   said, Richie Bosetti asked you for your
9   assistance to help him pull a file cabinet
10  out of the bay that he threw in with his
11  brother, right?
12      A.   Him and his brother.  Yeah.
13      Q.   Right.  You said no?
14      A.   Right.
15      Q.   You said "you got yourself into
16  this mess, you get yourself out."  Okay.  So
17  you declined to help him out.  And then you
18  proceeded to go to Chief Paridiso and say
19  "by the way, the Bosettis just asked me to
20  help them pull the file cabinet out" --
21      A.   I didn't say "by the way."  I
22  said, "Chief, you're never gonna believe
23  this."
24      Q.   Okay.  And why did you feel the
25  need to tell Chief Paridiso about this?

F. Fiorillo
1
2       A.   It was a file cabinet with all
3   the surveillance tapes.
4       Q.   How did you know it was all the
5   surveillance tapes?
6       A.   Because I looked in the filing
7   cabinet before I took it upstairs.
8       Q.   Oh, so you took the filing
9   cabinet upstairs?
10      A.   From the station.  Because the
11  filing cabinet was in the station with all
12  the other miscellaneous stuff.  So --
13      Q.   And where did you put it?
14      A.   In the storage room in the -- in
15  the barracks.
16      Q.   Did you put it near a bed?
17      A.   No.  I put it by the lockers.
18      Q.   Okay.  So you then told Chief
19  Paridiso "you're not going to believe this,
20  but the Bosettis threw a filing cabinet"?
21      A.   In the bay.
22      Q.   And did you tell him that the
23  video surveillance tapes were in the filing
24  cabinet?
25      A.   Oh, he knew  -- chief -- okay.  I

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 205

1           F. Fiorillo
2  didn't tell him that.
3      Q.   Is it your belief that the chief
4  knew that the video surveillance tapes were
5  in the filing cabinet?
6      A.   Yes.
7      Q.   And it's your testimony that
8  Chief Paridiso laughed when you told him
9  that the Bosettis threw the filing cabinet
10 into the bay?
11     A.   Well, he chuckled.
12     Q.   He chuckled.  Did he say anything
13 else other than chuckled?
14     A.   No.  Because I had to go.  So I
15 just -- I relayed the information, and it
16 was up to him to do whatever he did.
17     Q.   You would agree with me that
18 throwing a filing cabinet full of
19 surveillance tapes is a pretty important
20 thing to do, into the bay?
21     A.   I would agree with you on this.
22     Q.   Yes?
23     A.   Yes.
24     Q.   And you would think that the
25 chief would be concerned about that?

Page 206

1           F. Fiorillo
2      A.   I would think so.
3      Q.   And are you aware of what, if
4  anything, the chief did, other than chuckle?
5      A.   I don't know.  I left.
6      Q.   Did you ever follow up?
7      A.   One of the --
8      Q.   I'm asking you.  Did you ever
9  follow up?
10     A.   Did I ever follow up personally?
11     Q.   Yeah.  Right.
12     A.   No.
13     Q.   You felt it important enough --
14     A.   I heard what happened thereafter.
15 I didn't follow up.
16     Q.   Okay.  What happened?  What did
17 you hear happened thereafter?
18     A.   That -- I don't know.  I don't
19 know who got Jonathan Bucksbaum to get a
20 couple of lifeguards or something to pull
21 the filing cabinet out of the bay, but
22 that's what I heard.  I never -- I never
23 heard, you know, anything else after that.
24     Q.   Did you follow up with Chief
25 Paridiso as to what discipline, if any, he

Page 207

1           F. Fiorillo
2  was going to give to the Bosettis for
3  throwing the filing cabinet into the bay?
4      A.   Well, he obviously didn't fire
5  them because they were still working.
6      Q.   I'm asking you if you followed up
7  with Chief Paridiso?
8      A.   Why -- why was I supposed to
9  follow up?
10     Q.   Well --
11     A.   I left it in -- I gave it -- what
12 I did was I -- I brought -- I brought it to
13 his attention.
14     Q.   Okay.
15     A.   And then he's the chief.  I mean,
16 I'm -- I'm just a cop under him, you know.
17 He should follow  -- he should do what he
18 has to do.
19     Q.   Did you ever inquire with anyone
20 as to whether Chief Paridiso disciplined the
21 Bosettis at all with regard to this
22 incident?
23     A.   I just couldn't believe why --
24 how they didn't get disciplined.
25     Q.   Well, my question to you is, did

Page 208

1           F. Fiorillo
2  you ever follow up with Chief Paridiso  --
3  I'm sorry.  Did you ever follow up with
4  anyone with regard to whether or not the
5  Bosettis were disciplined for this?
6      A.   No.
7      Q.   To your knowledge, were the
8  Bosettis disciplined for this?
9      A.   Well, I don't know.
10     Q.   Okay.
11     A.   But they weren't fired and they
12 weren't suspended, so -- but I don't know
13 when you say "disciplined," something else
14 could have happened that I don't know.
15     Q.   But they weren't fired and they
16 weren't suspended?
17     A.   Yes.
18     Q.   And it's your un -- it is your
19 testimony to a certainty that you told Chief
20 Paridiso about this?
21     A.   Oh, absolutely.
22     Q.   No doubt in your mind?
23     A.   No doubt in my mind.
24     Q.   Okay.  Let's talk about your
25 complaint to Paridiso concerning your

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 209

F. Fiorillo

1  statement involving the Halloween incident.
2  What did you specifically complain to
3  Paridiso about?
4     A.   That George Hesse wanted me to
5  change my statement.
6     Q.   And what did you  -- and when in
7  relation to the Halloween incident did you
8  tell Paridiso this?
9     A.   Shortly thereafter.
10    Q.   Days?  Hours?
11    A.   Well, the next time --
12    Q.   Weeks?
13    A.   Let's see.  The next time that I
14 saw the chief in Ocean Beach, when I worked.
15 I don't remember --
16    Q.   Okay.
17    A.   -- the timeline.  I don't
18 remember which day I worked.
19    Q.   Okay.  And what did you
20 specifically, in sum and substance, tell  --
21 yeah, that was bad.  What did you, in sum
22 and substance, tell Paridiso about what
23 Chief Hesse wanted you to do?
24    A.   He said that he wanted me to

Page 210

F. Fiorillo

1  change the statement as far as the Halloween
2  incident went.
3     Q.   Is that all you told Chief
4  Paridiso or did you go into more detail as
5  to what Hesse said?
6     A.   Hesse said that's not the way it
7  happened.
8     Q.   And -- and did you tell that to
9  Paridiso?
10    A.   Yes.
11    Q.   Did you tell Paridiso anything
12 else about what Hesse said?  And the purpose
13 of my question isn't trying to catch you.  I
14 really am just trying to find out what --
15 everything that you said to Paridiso
16 concerning your claim that Hesse wanted you
17 to change the statement.
18    A.   Well, I'm telling you.
19       MR. GOODSTADT: Objection.
20    Q.   So just tell me everything.
21    A.   Well, that was basically it.
22    Q.   All right.
23    A.   You know, I couldn't  -- what I
24 said was, "I'm not going to change the

Page 211

F. Fiorillo

1  statement because that's the way it
2  happened.  I was there."
3     Q.   Okay.  But you didn't witness the
4  fight?
5     A.   I didn't put that in my
6  statement.
7     Q.   I understand.  But my question
8  is, you didn't witness the fight?
9     A.   No.
10    Q.   So you told Paridiso -- and if
11 I'm wrong, tell me, or if I mischaracterize
12 your testimony, tell me -- that Hesse wanted
13 you to change your statement because,
14 according to Hesse, that's not the way it
15 happened?
16    A.   Correct.
17    Q.   And you told Hesse that you
18 wouldn't?
19    A.   I told him I wouldn't.
20    Q.   Okay.  And then -- and you told
21 Paridiso that you told Hesse that you
22 wouldn't?
23    A.   Correct.
24    Q.   Why did you feel the need to

Page 212

F. Fiorillo

1  complain to Paridiso if you had already told
2  Hesse that you wouldn't do it?
3     A.   Because I think that he should
4  have been aware of what I was going through
5  on my end as being a cop who was on the
6  scene and having  -- what happened was
7  George started an investigation, and all of
8  a sudden our statements were no good, okay?
9  He had Pat Cherry and himself or Pat Cherry
10 was the lead investigator on the Halloween
11 incident.
12 MO Q.   Okay.  But, sir, I'm concerned
13 not so much with what Hesse did -- and I'm
14 going to move to strike --
15    A.   Well --
16    Q.   -- with regard to the
17 investigation.  I'm asking you about what
18 Hesse said to you specifically.
19    A.   That's what I was getting to.
20    Q.   Well, then let's get to that.
21 What did Hesse specifically say to you with
22 regard to your statement?
23    A.   That my statement was not the way
24 it happened.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 213

F. Fiorillo

1   Q.   Okay.  And then --
2   A.   And neither was Tommy's
3   statement, because he showed me Tommy's
4   statement.
5   Q.   Okay.  And he wanted you to
6   change it?
7   A.   Yes.
8   Q.   And you said to Hesse "no"?
9   A.   "No."
10       MR. NOVIKOFF: All right.  Then
11  we'll pick up with this when we change
12  the tape.
13       THE VIDEOGRAPHER: This ends
14  tape number three.  The time is 2:17
15  p.m.  Off the record.
16       (A break was taken.)
17       THE VIDEOGRAPHER: This begins
18  tape number four.  The time is 2:29
19  p.m.  Back on the record.
20  Q.   Sir, right after the answer to
21  the last question, I don't know if the
22  videographer or the court reporter got this,
23  but you seemed that you wanted to say
24  something else or clarify what your

Page 214

F. Fiorillo

1   testimony was.  So why don't you tell me
2   what you wanted to say?
3   A.   I need you to ask me the question
4   again and I can just answer it correctly.  I
5   don't think it sounded like I said "no"
6   meaning no or "no" agreeing with you.  I
7   want to get that clear.
8       MR. NOVIKOFF: Okay.  So let me
9   look at the court reporter's transcript
10      and see if I can get the question for
11      you. (Reviewing.)
12  A.   It might be clear, but it sounded
13  like it wasn't clear.
14  Q.   I asked you "Okay.  And he wanted
15  you to change it?"  You answered, "Yes."  My
16  question was, "And you said to Hesse "no"?
17  Answer, "No."  So let me ask you this.  When
18  Hesse asked you to change your statement,
19  what did you say to Hesse, if anything?
20  A.   "No."
21  Q.   Okay.  Now did Hesse ask you --
22  did Hesse use the words "falsify" in
23  relation to changing your statement?
24  A.   I don't recall.

Page 215

F. Fiorillo

1   Q.   Did he say to you "I want you to
2   lie in your statement"?
3   A.   I don't recall.
4   Q.   You don't recall?  Wouldn't -- is
5   that -- wouldn't you think that was
6   important?
7       MR. GOODSTADT: Objection.
8   Q.   With regard to this incident as
9   to whether or not Hesse used the word "lie"
10  or "falsify" with regard --
11  A.   I don't recall him saying that.
12  Q.   Oh, okay.  So your answer is "no,
13  I don't recall him saying that"?
14  A.   Yes.
15  Q.   Okay.  And all you can recall
16  Hesse saying is simply "I want you to change
17  your statement because that's not the way it
18  happened"?
19  A.   Right.
20  Q.   And you were upset because --
21  A.   I said, "I was there and this is
22  what happened."
23  Q.   Okay.  And Hesse said what, if
24  anything, in response to that?

Page 216

F. Fiorillo

1   A.   He just was adamant that that's
2   not the way it happened.
3   Q.   Okay.  When you say he was
4   adamant, was he throwing a chair around the
5   room?  Was he screaming?
6   A.   No.  But he -- he has a tendency
7   to raise his voice when he gets, you know,
8   boisterous.
9   Q.   Okay.  So when you said "no" to
10  him and you explained why, what did he say
11  in a raised voice?
12  A.   He said, "That's not the way it
13  happened."  But it wasn't just directed
14  towards my statement.  It was directed to
15  all of our -- the three of us.
16  Q.   No.  I understand that.  But you
17  were in the room, right?
18  A.   Absolutely.
19  Q.   Nofi wasn't in the room?
20  A.   No.  Nofi -- no.  Joe was --
21  Q.   I'm sorry, Lamm wasn't in the
22  room with you?
23  A.   No.
24  Q.   And who else was on duty that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 217

1          F. Fiorillo
2 night, Carter or Snyder?
3     A.    Tommy Snyder.
4     Q.    Okay.  Snyder wasn't in the room
5 with you with Hesse, was he?
6     A.    No.  It was just me.
7     Q.    Okay.  So I'm just trying to
8 figure out, what else did Hesse say to you,
9 if anything, in that meeting after you told
10 him that no, you weren't going to change
11 your statement?
12    A.    That's just what I can recall --
13    Q.    Okay.
14    A.    -- that happened.
15    Q.    And the only thing that you can
16 recall that you said is what you just
17 testified to, correct?
18    A.    Exactly.
19    Q.    Okay.  And then you went to
20 complain to Paridiso about this?
21    A.    Correct.
22    Q.    And that was the next time you
23 had a shift?
24    A.    Yes.
25    Q.    Okay.  And you don't recall how

Page 218

1          F. Fiorillo
2 long the period of time was?
3     A.    It could have been the following
4 weekend.  I'm not sure.  I -- I don't want
5 to guess.
6     Q.    And what did Paridiso say, if
7 anything, to you when you complained?
8     A.    He said he was going to talk to
9 George about it because Cherry was taking,
10 um, witness statements.
11    Q.    Okay.  Did Paridiso say anything
12 else?
13    A.    That's it.
14    Q.    Okay.  And did you ever follow up
15 with Paridiso after that to see if he did
16 talk to Hesse?
17    A.    Well, I think that he would have
18 came back to me and said something, if
19 anything.
20    Q.    No.  My question is did you --
21    A.    Oh, no.
22    Q.    -- follow up with Paridiso?
23    A.    I didn't follow -- I didn't
24 follow up with him.
25    Q.    And did Paridiso advise you after

Page 219

1          F. Fiorillo
2 that conversation with you that he had
3 spoken to Hesse about your Complaint?
4     A.    No.
5     Q.    Okay.  And let's see.  And you
6 have now testified to the entirety of your
7 recollection concerning your conversation
8 with Paridiso when you complained about
9 Hesse wanting you to change your statement;
10 is that correct?
11    A.    Yes.
12    Q.    You can't think of anything else
13 that was said between you and Paridiso?
14    A.    As far as the Halloween fight
15 or --
16    Q.    As far as your complaint to him
17 that Hesse wanted you to change your
18 statement?
19    A.    Only on the statement, yeah.
20 That that was probably --
21    Q.    Right.
22    A.    -- everything.
23    Q.    Okay.  And after Hesse asked you
24 to change your statement, did you have any
25 other communications with Hesse concerning

Page 220

1          F. Fiorillo
2 anything involving your investigation that
3 night?
4     A.    Later on, you know, months --
5 months after that.
6     Q.    Yeah.
7     A.    Yes.
8     Q.    What did he say?
9     A.    He said that, um  -- well, it's
10 not so much what he said.  It's what  --
11 what he did and what he showed me.  In other
12 words, you want me to explain?
13    Q.    Sure.
14    A.    Okay.  What happened was later on
15 in 2005, he and Pat Cherry got a hold of
16 me -- when I say "got a hold of me," they
17 asked me to come into the station into
18 the -- by George's desk and sit down and
19 they handed me a file.  And George said,
20 "Now you know how it happened because this
21 is how it really happened."  And he gave me
22 the file, and he goes, "I want you to read
23 these statements, because this man right
24 here went out of his way to get all the
25 statements, and this is what happened that

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 59 of 158 PageID #:
2429

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 221

F. Fiorillo

1  night." So I had to sit there and read all
2  these witness statements.
3      Q.   Okay. And did you say anything
4  to Hesse while you were reading the witness
5  statements?
6      A.   Not while. After.
7      Q.   Did you say anything to Hesse
8  after --
9      A.   Yes.
10     Q.   -- you read the statements? What
11 did you say?
12     A.   I said, "That's not the way it
13 happened." I said -- this is what I said.
14 I said, "From what I got that night, my
15 statement reflects what happened when I got
16 on the scene."
17     Q.   And your statement reflected what
18 the three alleged victims of Gary Bosetti's
19 pool swinging said, right?
20     A.   Well, not so much that. What I
21 observed.
22     Q.   Well, you didn't observe the
23 fight, correct?
24     A.   No. No. No. What I observed

Page 222

F. Fiorillo

1  when I arrived on the scene.
2      Q.   Right.
3      A.   My statement had, you know, a
4  synopsis of what actually I saw.
5      Q.   Okay. But I just -- I just need
6  to clarify and I think the jury needs to
7  have an understanding, you weren't at the
8  scene at the time of the fight?
9      A.   No.
10     Q.   You came in after the fight was
11 over?
12     A.   Correct.
13     Q.   And you made a statement,
14 correct?
15     A.   Correct.
16     Q.   And you didn't talk to Richard
17 Bosetti about anything that he may have
18 observed, correct?
19         MR. GOODSTADT: Objection.
20     A.   No. Well --
21     Q.   Well, did you -- did you put in
22 your statement anything that Richard Bosetti
23 said to you?
24     A.   No.

Page 223

F. Fiorillo

1      Q.   Did you put in your statement
2  anything that Gary Bosetti may have said to
3  you?
4      A.   No.
5      Q.   In fact, you didn't speak to Gary
6  Bosetti that night about the events, did
7  you?
8      A.   No.
9      Q.   And you didn't speak to Richard
10 Bosetti about what he observed that night,
11 did you?
12     A.   No.
13     Q.   Okay. So we've established that
14 you didn't speak to Richard Bosetti and you
15 didn't speak to Gary Bosetti.
16     A.   I was on -- okay.
17     Q.   And you didn't speak to, um --
18 you know what, let me go through. You
19 didn't speak to Bud Jaegger that night, did
20 you?
21     A.   I don't even know who Bud Jaegger
22 is.
23     Q.   But that was one of the
24 statements that you read, correct?

Page 224

F. Fiorillo

1      A.   Yes.
2      Q.   You didn't speak to Jeannie
3  Jaegger that night, did you? Right?
4      A.   No.
5      Q.   And you are aware, at least now,
6  that Jeannie Jaegger is the woman that says
7  she was being choked by one of the three
8  individuals that went to the police station
9  that night?
10     A.   I'm aware of that. I don't --
11     Q.   I'm not suggesting you can verify
12 it. I'm not suggesting you saw it.
13     A.   I'm aware of that.
14     Q.   You're aware of that by virtue of
15 reading --
16     A.   One of the statements.
17     Q.   Right. You didn't talk to Ian
18 Levine that night, did you?
19     A.   Yes, I did.
20     Q.   You did? And what did Ian Levine
21 say to you that night?
22     A.   Well, it's what I asked him. I
23 said, "Ian, what did you -- what happened
24 here?" He goes, "I don't know." He was

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 225

1           F. Fiorillo
2   walking out of the bar.
3     Q.   Okay.
4     A.   Because I was on the outside.  I
5   wasn't inside.
6     Q.   Then Ian Levine put in a
7   statement, correct?
8     A.   He didn't put in a statement that
9   he spoke to me.
10    Q.   No.  He put in a statement
11  concerning the occurrence?
12    A.   Oh, yeah.  Yeah.
13    Q.   And let's see.  Who else?  Shawn
14  O'Rourke, did you take a statement of Shawn
15  O'Rourke that night?
16    A.   No.  He was inside the bar.
17    Q.   Right.  And he put in a statement
18  that you read, right?
19    A.   Yes.
20    Q.   Okay.  So you have no knowledge
21  one way or the other as to whether Shawn
22  O'Rourke was telling the truth in his
23  statement?
24    A.   Do I have any knowledge if he was
25  or not?

Page 226

1           F. Fiorillo
2     Q.   Right.
3     A.   I have no knowledge.
4     Q.   And you have no knowledge one way
5   or the other as to whether Jeannie Jaegger
6   was telling the truth?
7     A.   No knowledge.
8     Q.   And you have no knowledge as to
9   whether Bud Jaegger was telling the truth,
10  correct?
11    A.   No knowledge.
12    Q.   And you have no knowledge as to
13  whether Ian Levine was telling the truth?
14    A.   Correct.
15    Q.   Right.  Danny McKenna, was he the
16  bartender that night?
17    A.   I didn't go in the bar.  I don't
18  know.
19    Q.   So you have -- you have no
20  knowledge who the bartender was that night?
21    A.   I didn't go in the bar.
22    Q.   Do you know if Lamm went in the
23  bar?
24    A.   Yes, he did.
25    Q.   Did Lamm ever advise you who the

Page 227

1           F. Fiorillo
2   bartender was?
3     A.   I think -- I think he did say
4   that -- but you were asking me if I knew.
5     Q.   That's right.  And you said you
6   didn't know.  And now I'm asking --
7     A.   Lamm told me afterwards that
8   Danny McKenna was the bartender in the bar.
9     Q.   Afterwards that night or
10  afterwards the next day or the next --
11    A.   No.  No.  That night.
12    Q.   Did you ever seek out Danny
13  McKenna to get a statement from him that
14  night?
15    A.   No.  I wasn't in the bar.
16    Q.   No.  I understand that.
17    A.   I don't know what they -- what
18  they did in the bar.  I didn't --
19    Q.   Sir, did you -- did you
20  personally ever seek out Danny McKenna that
21  night to get a statement from him?
22    A.   No.  I didn't know at that -- at
23  that time that Danny McKenna was involved in
24  any --
25    Q.   Well, Mr. Lamm told you at some

Page 228

1           F. Fiorillo
2   point in time that evening that Dan McKenna
3   was --
4     A.   Later on, yeah.  After --
5     Q.   In the evening?  In the early
6   morning?
7     A.   In the morning, yeah.
8     Q.   Right.  Before you left your
9   shift?
10    A.   Yes.
11    Q.   So before you left your shift
12  that night, you knew that Danny McKenna was
13  the bartender, right, from Mr. Lamm?
14    A.   I'm trying to think of the
15  timeline.  We  -- we never discussed who the
16  bartender was shortly thereafter because we
17  were tending to the victims.  So I don't
18  know when that came  -- when that actual
19  statement came up that Danny McKenna was the
20  bartender.  I don't know.
21    Q.   Oh, so it could have been not
22  that morning, but after your shift ended, is
23  that what you're saying?
24    A.   I can't recall that particular --
25  you know what it was, it didn't  -- I was on

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 229

F. Fiorillo

1    the outside and I didn't know who was in the
2    inside. I didn't know who was tending bar.
3    I didn't know that. I didn't -- I didn't
4    visualize it. I didn't have it in my head
5    who was --
6        Q.   Did you ask at any point in time
7    prior to you leaving the island at the end
8    of your shift, who the bartender was that
9    night?
10       A.   No. I didn't do that.
11       Q.   Did you know -- did you ever take
12   a statement from Doug Wyckoff that night?
13       A.   No.
14       Q.   Were you aware that Doug Wyckoff
15   was a witness?
16       A.   In the witness statement.
17       Q.   Right.
18       A.   Yes.
19       Q.   Are you aware now that Doug
20   Wyckoff said he was a witness to the events
21   that night?
22       A.   Yes. Yes.
23       Q.   Were you aware that night?
24       A.   No.

Page 230

F. Fiorillo

1        Q.   And like you would have no
2    knowledge one way or the other as to whether
3    or not Doug Wyckoff was truthful in his
4    witness statement, correct?
5        A.   I would have no knowledge of
6    that.
7        Q.   How about Elyse Miller, did you
8    speak to Elyse Miller that night?
9        A.   No. At that night, yes. Earlier
10   in the evening.
11       Q.   But after the incident?
12       A.   No.
13       Q.   You saw Elyse Miller's statement
14   when George Hesse gave you the --
15       A.   Yes.
16       Q.   Right. And do you have any
17   reason to know one way or the other as to
18   whether Elyse Miller was telling the truth?
19       A.   No.
20       Q.   And you've alleged a cover up of
21   the incident, correct?
22       A.   Yes.
23       Q.   So if I understand your
24   allegations correctly, in order for there to

Page 231

F. Fiorillo

1    have been a cover up, Richard Bosetti, Gary
2    Bosetti, Elyse Miller, Doug Wyckoff, Ian
3    Levine, Bud Jaegger, Bud Jaegger's wife and
4    everyone else that gave a witness statement
5    that night, other than the alleged victims,
6    were lying?
7        A.   I didn't say they were lying.
8        Q.   Well, sir --
9        A.   You've just established that I
10   had no knowledge if they were telling the
11   truth or not.
12       Q.   But, sir, here's my question to
13   you. You're alleging a cover up, right?
14       A.   Yes.
15       Q.   What is your understanding of
16   what the concept of a cover up means?
17       A.   Okay.
18       Q.   Generically. Not as it pertains
19   to the Halloween incident. Generically.
20       A.   Generically, something that
21   happened that was altered to view  -- to
22   have looked like it happened in another
23   manner.
24       Q.   Okay. Got it. So if I

Page 232

F. Fiorillo

1    understand your allegations correctly, you
2    are alleging that the Ocean Beach Police
3    Department covered up the Halloween
4    incident, correct?
5        A.   Yes.
6        Q.   And that George Hesse was a
7    participant in this cover up?
8        A.   Yes.
9        Q.   And the cover up was for the
10   purpose of benefitting Gary Bosetti?
11       A.   Well, I don't know if that was
12   the whole purpose.
13       Q.   Well, what was the purpose of the
14   cover up to your -- based upon your
15   allegations?
16       A.   Not to have Gary Bosetti fired.
17       Q.   Okay.
18       A.   To clear him of any criminal
19   charges.
20       Q.   Right.
21       A.   It essentially, you know, made
22   Hesse -- he tried to make himself look like
23   he was conducting an investigation that we
24   handled that made him look like we didn't do

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 233

1         F. Fiorillo
2  our job correctly.
3     Q.   Okay.  Okay.  Anything else?
4     A.   Um, well, sure.  Because Gary
5  Bosetti was the person who was involved in
6  the fight.
7     Q.   Right.
8     A.   And he wound up being the
9  arresting officer, and he left the scene.
10    Q.   Okay.  So you've --
11    A.   So sure.
12    Q.   You've just told me what you
13 believed the purpose of the cover up was?
14    A.   Correct.
15    Q.   I'm not fighting you on that.  I
16 just wanted to know what you thought.  So
17 given what you've now testified to was the
18 purpose of the cover up, and you've defined
19 for the jury what your understanding of what
20 a cover up is, Bud Jaegger would have been a
21 participant in this cover up because he gave
22 a statement, correct?
23    A.   I don't know if Bud Jaegger was
24 there or not.  I didn't take --
25    Q.   But in order for your cover up

Page 234

1         F. Fiorillo
2  allegation to -- to be accurate, you would
3  agree with me that Bud Jaegger would have
4  had to have lied in his witness statement --
5         MR. GOODSTADT:  Objection.
6     Q.   -- that you read, correct?
7     A.   I can't say that he lied.  You
8  know --
9     Q.   You would have to agree with me
10 that Jeannie Jaegger was lying in her
11 witness statement, right?
12        MR. GOODSTADT:  Objection.
13    Q.   Well, let me state it a different
14 way.  If all of the individuals who gave
15 witness statements were telling the truth,
16 putting aside Gary Bosetti and Richard
17 Bosetti.
18    A.   Okay.
19    Q.   All the civilians.
20    A.   Okay.
21    Q.   Would you still agree that there
22 was a cover up to protect Gary Bosetti?
23    A.   Absolutely.
24    Q.   How do you explain that?
25    A.   They were all drinking buddies.

Page 235

1         F. Fiorillo
2  Every single one of them.
3     Q.   The civilians you're talking
4  about?
5     A.   They're all civilians.
6     Q.   So you're suggesting that the
7  civilians were lying to protect Gary
8  Bosetti?
9     A.   Yes.
10    Q.   Right.  That's -- that's what I'm
11 trying to find out.
12    A.   Okay.  I'm sorry.
13    Q.   So you -- it would be your belief
14 that Bud Jaegger was lying in his witness
15 statement?
16    A.   Yes.
17    Q.   It would be your belief that
18 Jeannie Jaegger was lying in her witness --
19    A.   Yes.
20    Q.   -- statement?  Let me finish.  It
21 would be your belief that Ian Levine was
22 lying in his witness statement, correct?
23    A.   Yes.
24    Q.   It would be your belief that Doug
25 Wyckoff was lying in his witness statement?

Page 236

1         F. Fiorillo
2     A.   Yes.
3     Q.   It would be your belief that
4  Elyse Miller was lying in her witness
5  statement?
6     A.   Yes.
7     Q.   It would be your belief that
8  Shawn O'Rourke was lying in his witness
9  statement?
10    A.   Yes.
11    Q.   It would be your belief that
12 Richard Bosetti was lying in his statement?
13    A.   Yes.
14    Q.   It would be your belief that
15 whatever statement Gary Bosetti gave, he was
16 lying?
17    A.   Yes.
18    Q.   Okay.  And it would be your
19 contention that all of the civilians,
20 putting aside the Bosettis, that lied in
21 their witness statements, subjecting
22 themselves to potential criminal penalty,
23 lied because they were drinking buddies with
24 the Bosettis?
25    A.   Absolutely.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 237

F. Fiorillo

1     Q.   Okay.  And what about the
2  prosecutor in this case -- withdrawn.  Are
3  you aware that Mr. Vankoot pled guilty to a
4  crime as it relates to this incident?
5     A.   Yes.
6     Q.   What is your understanding with
7  regard to what Mr. Vankoot pled guilty to?
8     A.   I don't exactly know what the
9  deal was.  They -- they had a plea deal.
10     Q.   Right.  Is it your belief that
11  the prosecutor that day for the Village was
12  in on the cover up, since he prosecuted
13  Mr. Vankoot?
14     A.   I have no knowledge of that.
15     Q.   Okay.  Is it your contention that
16  the judge, Mr. Wexler, was in on the cover
17  up that day because he accepted the plea of
18  guilty by Brian Vankoot?
19     A.   I have no knowledge of that.
20     Q.   Are you aware that Mr. Wexler is
21  the son of Judge Wexler in the federal court
22  in which this lawsuit is being filed?
23     A.   I have no knowledge of that.
24     Q.   Are you alleging that Brian
25

Page 238

F. Fiorillo

1  Vankoot, when he allocuted, when he stated
2  on the record what he did that night that
3  formed the basis of his plea of guilty, was
4  lying to the judge?
5     A.   Do you want me to  --
6     Q.   I'm asking you your belief, sir.
7     A.   I don't -- can you rephrase that
8  question?
9     Q.   Sure.  I'll break it down even
10  simpler.  At least I'll try to break it down
11  more simply.  Brian Vankoot told you or told
12  Mr. Lamm or told Mr. Snyder that night that
13  he was attacked by Gary Bosetti, correct?
14     A.   We didn't know who he was
15  attacked by.
16     Q.   He was attacked by someone saying
17  that they were a police officer?
18     A.   Right.  But we didn't know who he
19  was attacked by at the time.
20     Q.   That's fine.  Mr. Vankoot advised
21  you and the other officers that he was
22  attacked by someone who claimed that they
23  were  -- he was a police officer, correct?
24     A.   Correct.
25

Page 239

F. Fiorillo

1     Q.   Okay.  He did not state to you
2  that he started the fight, correct?
3     A.   Correct.
4     Q.   He didn't tell you that he kicked
5  the person who was claiming to be a police
6  officer, correct?
7     A.   Correct.
8     Q.   In fact, if I recall correctly,
9  all Mr. Vankoot told you was that he was
10  attacked by someone who was a police officer
11  and he was knocked unconscious?
12     A.   Correct.
13     Q.   At no point in time did
14  Mr. Vankoot ever tell you or any of the
15  other two officers that he struck any person
16  identifying himself as a police officer that
17  night, correct?
18     A.   Correct.
19     Q.   Okay.  Now Mr. Vankoot, within
20  the next two to three months, pled guilty to
21  striking an individual that night.  Do you
22  have that understanding?
23     A.   Yes.
24     Q.   Okay.  So would you agree with me
25

Page 240

F. Fiorillo

1  that either Mr. Vankoot was lying to you the
2  night of the Halloween incident or he was
3  lying to the judge at the time he took the
4  plea?
5          MR. GOODSTADT: Objection.
6     A.   I can't agree with you on that.
7     Q.   Why not?  How could Mr. Vankoot
8  have been telling the truth the night of the
9  Halloween incident when he told you that he
10  did nothing in terms of striking this
11  individual, but when he pled guilty, he
12  admitted to striking that individual?
13          MR. GOODSTADT: Objection.
14     Q.   How can you reconcile those two
15  statements?  You're a police officer, you've
16  done investigations, right?
17     A.   Yes.
18     Q.   If someone told you on day one
19  that the sky was blue, and then told you on
20  day 10 that the sky was black, wouldn't you
21  agree with me that either they were wrong on
22  day one or they were wrong on day 10?
23          MR. GOODSTADT: Objection.
24     A.   I don't know how to answer that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 241

F. Fiorillo

1 question based on the Brian Vankoot pleading
2 guilty.
3    Q.   I'm not asking you now about
4 Brian Vankoot.  I'm saying you're a police
5 officer, sir, right?  Or you were at least?
6    A.   I'm a fired police officer.
7    Q.   Right.  But you were a police
8 officer, right?
9    A.   Yes.
10    Q.   And you believe you had the
11 experience to do investigations, right?
12    A.   Yes.
13    Q.   And you would agree with me that
14 you had at least a sufficient education and
15 experience to ask questions and receive
16 information, right?
17    A.   Yes.
18    Q.   So, if one -- let's assume on day
19 one of your investigation an individual
20 tells you that he was hit with a bat, right?
21    A.   Right.
22    Q.   And then on day 10 he tells
23 someone else "no, I wasn't hit with a bat,
24 in fact, I hit that person with a bat," you

Page 242

F. Fiorillo

1 would agree with me that those are two
2 completely different stories, correct?
3    MR. GOODSTADT: Objection.
4    A.   Absolutely.
5    MR. GOODSTADT: Objection.
6    Q.   Okay.  So you would also agree
7 with me, sir, that either that person was
8 lying on day one or he was lying on day 10,
9 correct?
10    MR. GOODSTADT: Objection.
11    Q.   Given your experience?
12    A.   I can't say that because that --
13 there were circumstances involved in -- in
14 Brian Vankoot's situation, I was there.
15    Q.   What were the circumstances that
16 would have caused Mr. Vankoot to tell you
17 that he was attacked on that night, but then
18 in front of the judge, tell the judge that
19 he was the one that hit the individual?
20    A.   Brian Vankoot did not want to
21 plead guilty that day.
22    Q.   How do you know that?
23    A.   I was standing right next to him.
24    Q.   Did you talk to Brian Vankoot?

Page 243

F. Fiorillo

1    A.   I didn't talk to him.
2    Q.   Did he ever tell you before that
3 that he didn't want to plead guilty?
4    A.   Yes.  He, told -- well, not me.
5 No.
6    Q.   I'm talking to you.  Did he ever
7 tell you --
8    A.   Not to me.
9    Q.   -- that he wanted -- he didn't
10 want to plead guilty?
11    A.   Not to me.
12    Q.   So then what you're telling me is
13 when he pled guilty that day in court, he
14 was in fact lying to the court about the
15 events of that evening?
16    MR. GOODSTADT: Objection.
17    Q.   Would you agree with me, sir?
18    A.   I can't say that because that's
19 not the way -- I mean, it's easy for you to
20 say that, but I was in the room.
21    Q.   Did he state to the judge what
22 went on that night in his own words?  You
23 were there?
24    A.   I was there.

Page 244

F. Fiorillo

1    Q.   Sir --
2    A.   But he was very reluctant.
3    Q.   Sir, I'm not asking about his
4 reluctance.  Yes or no, did he stand up and
5 tell the judge what he -- what occurred
6 that night before he accepted the plea of
7 guilty?
8    MR. GOODSTADT: Objection.
9    Answer it the way you need to answer
10 it, and make your motion to strike if
11 you need to make a motion to strike.
12    Q.   Do you want me to ask the
13 question again?
14    A.   No.  But I want to answer it
15 truthfully.
16    Q.   Well, I'm asking the question.
17 Did Mr. Vankoot stand up and speak to the
18 judge and tell the judge what went on that
19 night as it pertains to him?
20    A.   Well, he actually -- he -- what
21 happened was he backed off from talking to
22 the judge because he told his lawyer that he
23 wasn't going to plead guilty.  He didn't
24 want to plead guilty.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 245

1              F. Fiorillo
2     Q.   And you heard this?
3     A.   Yes.
4     Q.   How did you hear this?
5     A.   I was right next to him.
6     Q.   You were in the well when he was
7  being --
8     A.   No.  It's the courtroom.
9     Q.   You were standing right next to
10 him?
11    A.   In the Ocean Beach Village Court,
12 the judge is  -- is up on top and he was
13 with his lawyer.  We were situated right on
14 the floor.  Not in the well.  It's not --
15 it's not like you think like in a formal
16 trial as in a big court.
17    Q.   And so my question is, now that
18 you said what you wanted to say, did
19 Mr. Vankoot stand up and talk to the judge
20 about what went on?
21    A.   So, there were things going back and
22 forth with the judge and his lawyer and him
23 and his lawyer and it was --
24    Q.   At any point in time, sir --
25    A.   He did talk to the judge.

Page 246

1              F. Fiorillo
2     Q.   Thank you.  Did -- isn't it true,
3  sir, that he told the judge that he kicked a
4  person now known to be Gary Bosetti?
5     A.   I don't know if  -- I don't
6  recall his whole testimony because --
7     Q.   Well, what do you recall, sir?
8  You were standing there.  You recall
9  specifically that he didn't want to take the
10 plea.  So are you telling the jury that you
11 remembered that, but you don't remember what
12 Mr. Vankoot said?
13    A.   Well, that stuck out in my mind.
14 I'm telling you the truth.  I don't know --
15 it was going back and forth from the judge
16 to the lawyer, from the lawyer to the judge
17 to Vankoot.  It was  -- it wasn't cut and
18 dry plead guilty and case over.  It
19 wasn't -- it didn't go down like that.
20    Q.   But he did plead guilty?
21    A.   Ultimately he did.
22    Q.   He pled guilty to striking Gary
23 Bosetti?
24    A.   I don't know what -- the plea
25 deal.

Page 247

1              F. Fiorillo
2     Q.   No.  I'm not asking about --
3     A.   I don't know what he pled guilty
4  to exactly.  I don't.
5     Q.   Okay.  On the day of the plea, do
6  you believe that Vankoot was committing
7  perjury?
8            MR. GOODSTADT: Objection.
9     A.   How would I know?
10    Q.   You said you were there.  You
11 were there at the incident and you were
12 there at the plea.  Who better than you
13 would know?
14           MR. GOODSTADT: Objection.
15    A.   Well --
16    Q.   Other than Mr. Vankoot?
17    A.   How do I know if he's pleading --
18 if he's committing perjury?  How do I know
19 that?
20    Q.   That's right.  How would you know
21 that?  So, likewise, how would you know if
22 he was committing perjury to you that night
23 when he told you what was going on?
24    A.   Well, how do I know that all
25 these witnesses weren't committing perjury

Page 248

1              F. Fiorillo
2  on the statements?
3     Q.   That's right.  So you don't know
4  as you sit here today as to whether
5  Mr. Vankoot was telling you the truth the
6  night you took his statement on the night of
7  the Halloween incident, correct?
8     A.   Correct.
9     Q.   Okay.  Also, now did you,
10 Mr. Lamm or Mr. Snyder secure the crime
11 scene, did you?  Isn't that true, the night
12 of the Halloween incident?
13    A.   We -- well, what I did was  --
14 well, you want to tell me -- I can tell
15 you --
16    Q.   You know what --
17    A.   I don't know what they did.
18    Q.   Let me ask you what you did.
19 You're 100 percent right.  I'm only to ask
20 you what you did or what you observed.  Did
21 you security the crime scene?
22    A.   I was tending to the victims
23 outside in the street.
24    Q.   Yes or no, sir, did you secure
25 the crime scene?  You asked me to ask you

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 249

F. Fiorillo

1 specifically about you, so that's what I'm
2 doing. And I agree with you. I should only
3 be asking you about what you did. Did you
4 secure the crime scene that night?
5     A. I didn't.
6     Q. Did you instruct Lamm or Snyder
7 to secure the crime scene that night?
8     A. I got to tell you, I was tending
9 to the victims. My -- my -- my initial
10 concern was to get these people medical
11 attention. That was my concern.
12    Q. Sir, my question to you is
13 simple, did you ask Lamm or Snyder to secure
14 the crime scene that night?
15    A. No.
16    Q. Did -- do you have an
17 understanding as to what "secure the crime
18 scene" is?
19    A. Yes.
20    Q. For the jury who hasn't watched
21 Law & Order for the last 20 years, can you
22 tell them what you -- what your
23 understanding is of securing the crime
24 scene?

Page 250

F. Fiorillo

1     A. To keep all the evidence intact
2 and not touched.
3     Q. Are you aware, as you sit here
4 today, as to whether Lamm or Snyder
5 undertook any efforts to secure the crime
6 scene that night?
7     A. I don't recall.
8     Q. Did you take any effort to find
9 the pool stick that was allegedly used to
10 strike one or all of the three alleged
11 victims that night?
12    A. Well, I tended to the victims, so
13 I wasn't --
14    Q. So your answer would be no?
15    A. My answer was -- well, because I
16 wasn't in the bar.
17    Q. I understand that.
18    A. Yes. My answer is no.
19    Q. Right. Okay. At any point in
20 time prior to you leaving the island after
21 the end of your shift, did you call Chief
22 Paridiso to tell him what had gone on?
23    A. He called me.
24    Q. Did you call Paridiso?

Page 251

F. Fiorillo

1     A. No.
2     Q. Now would it -- isn't it true,
3 sir, that you knew at a minimum, that
4 Richard Bosetti had witnessed something that
5 had gone on that night, right?
6     A. Well, I didn't speak to Richie on
7 what happened inside the bar.
8     Q. But were you aware before the end
9 of your shift that Richard Bosetti had
10 witnessed something that went on?
11    A. He didn't come up to me and tell
12 me that he witnessed anything. In other
13 words --
14    Q. So is your answer no?
15    A. No. The answer is no.
16    Q. Okay. You were aware, though,
17 that there was a claim that someone who
18 identified themselves as a police officer
19 was involved?
20    A. Yes.
21    Q. And you're aware that, at least
22 according to one or three of the individuals
23 that you took to the police station that
24 night, someone pulled out a police shield

Page 252

F. Fiorillo

1 that was involved in the incident that
2 night?
3     A. Yes.
4     Q. Did you call up Chief -- I mean
5 did you call up Mr. Hesse to advise him that
6 there may be an officer that was involved in
7 an altercation?
8     A. No.
9     Q. Did you call up Mayor Rogers at
10 the time, prior to the -- to you leaving the
11 island that morning, that there may have
12 been an officer involved in an -- in an
13 altercation?
14    A. No.
15    Q. Did you advise Mr. Loeffler, when
16 he came with the ambulance, that there may
17 have been an officer involved in an
18 altercation?
19    A. He knew that there was an officer
20 involved in the altercation.
21    Q. How did he know that?
22    A. From what Tommy told him.
23    Q. Okay. But did you tell Loeffler?
24    A. No. Because --

Case 2:07-cv-01215-SJF-ETB Document 145-18 Filed 01/15/10 Page 67 of 158 PageID #: 2437

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 253

F. Fiorillo

1
2     Q.    Did Loeffler advise you that he
3   knew that there was an officer involved?
4     A.    Did Loeffler advise me?
5     Q.    Yeah.
6     A.    No.
7     Q.    Okay.  Did you advise the Third
8   Precinct that there was an altercation that
9   required medical attention involving
10   possibly an officer of the Ocean Beach
11   Police Department?
12     A.    Why would I have to  -- hold on.
13     Q.    Did you?  My question is did you?
14     A.    No.
15     Q.    Okay.  When did you first become
16   aware that Gary Bosetti was involved in the
17   Halloween incident?
18     A.    The morning of -- let's see.
19   That would be Sunday morning.
20     Q.    And how -- and how did you first
21   learn of this?  Sunday morning --
22     A.    Wait.  Do I have the timeline
23   right?
24     Q.    In relation to the incident, the
25   incident occurred around 2:30, 3:00 the

Page 254

F. Fiorillo

1
2   morning of October 31, correct?
3     A.    Okay.  So it was Sunday, October
4   31 in the morning.
5     Q.    Before or after the end of your
6   shift?
7     A.    Well, that -- I can't -- I'll
8   have to answer the question so you
9   understand what I did.
10     Q.    Sure.
11     A.    I worked a double shift, so I
12   didn't  -- I didn't go off duty.
13     Q.    Oh, you didn't go off duty.  So
14   when your shift ended -- when did your first
15   shift end?
16     A.    It ended at 8:00 in the morning.
17     Q.    Okay.
18     A.    So it really didn't end.  I was
19   continuing --
20     Q.    Right.  Prior to the end of your
21   first shift, how did you learn that Gary
22   Bosetti was involved?
23     A.    I think it was the beginning of
24   my second shift.  The beginning of my second
25   shift I learned that he was involved.

Page 255

F. Fiorillo

1
2     Q.    I'm sorry, how soon after the end
3   of your first shift did you learn that Gary
4   Bosetti was involved?
5     A.    It was the begin  -- how soon
6   after my first shift?  It was the beginning
7   of my second shift.
8     Q.    How soon after the beginning of
9   your --
10     A.    Okay.  So it was within the
11   next -- within the next two hours.
12     Q.    Who told you or how did you
13   learn?
14     A.    Well, the chief -- the chief  --
15   well, what happened was the chief called me
16   up and I told him what happened from the
17   night before, and he said he was going to
18   come in on the next ferry.
19          He comes in on the next ferry.
20   The parties involved from the incident from
21   the night before came to the station when
22   the chief came to the station.  It was like
23   they came -- I think -- I'm not sure, but I
24   think they were on the boat with him.  I'm
25   not sure, but I think that's how it went,

Page 256

F. Fiorillo

1
2   how that transpired, because I didn't see
3   the chief come off the ferry, but I think
4   they came in together.
5     Q.    Right.
6     A.    Anyway, they were in the  -- they
7   were in the  -- in the office by George
8   Hesse's desk, and the chief was interviewing
9   everybody involved, and what one of the -- I
10   think it was Chris Shalick pointed to a
11   picture above George Hesse's desk of Gary
12   Bosetti.  So he told the chief, Chief
13   Paridiso, that that's the person that was
14   involved in the fight and hit him with the
15   pool cue.
16     Q.    Okay.  Let's go back to the time
17   that you say a few months after the incident
18   that Chief Hesse called you and gave you the
19   folder and told you that John Cherry had
20   gone out of his way to do the investigation
21   and I want you to read all of the
22   statements, do you recall that?
23     A.    Yes.
24     Q.    When in relation to the start of
25   the season did that take place?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 257

F. Fiorillo

1
2    A.   I think pretty close to the start
3 of the season.  You know --
4    Q.   Okay.  And after you read those
5 statements, what, if anything, did you say
6 to Hesse?
7    A.   That that's not the way it
8 happened.
9    Q.   Okay.  Did you say anything else?
10    A.   I don't recall saying anything
11 else.
12    Q.   Did you say anything to
13 anybody -- to Chief Paridiso about the
14 incident after you read the statements that
15 Hesse made you read?
16    A.   No.  Because I think at the time
17 that I read the statements, I think the case
18 was over.  I don't think it was ongoing.  I
19 think it was -- I think I got the statements
20 after everything was completed.
21    Q.   No.  I believe you're right on
22 that.  But nevertheless, after you read the
23 statements, you told Hesse that that's not
24 the way it happened, right?  Right?
25    A.   Yes.

Page 258

F. Fiorillo

1
2    Q.   And so my question to you is, did
3 you tell Paridiso after you read those
4 statements that that's not the way it
5 happened?
6    A.   No.  I told him that when
7 initially --
8    Q.   I'm only asking you about --
9    A.   Not then.  No.
10    Q.   Okay.  Now did you form the
11 belief at that  -- did you have the belief
12 at that time that there was a cover up?
13    A.   Yes.
14    Q.   I'm talking specifically about
15 the time that you read the statements.
16    A.   Yes.
17    Q.   Okay.  Did you go to Chief
18 Hesse -- I'm sorry, did you go to Chief
19 Paridiso and advise him that you believed
20 there was a cover up?
21    A.   No.
22    Q.   Did you go before  -- before
23 August 1 of 2005, did you go to Mayor Rogers
24 and complain that there was a cover up?
25    A.   No.

Page 259

F. Fiorillo

1
2    Q.   Did you go to Trustee Loeffler
3 and complain that there was a cover up?
4    A.   No.
5    Q.   Did you go to the Suffolk County
6 District Attorney's office and complain that
7 there was a cover up?
8    A.   When?
9    Q.   Prior to August 1, 2005?
10 Regarding the Halloween incident?
11    A.   Prior to August 1?
12    Q.   Right.
13    A.   No.
14    Q.   And, in fact, if I recall your
15 testimony correctly, the Suffolk County
16 District Attorney contacted you?
17    A.   Correct.
18    Q.   You never contacted them
19 initially about any alleged cover up,
20 correct?
21    A.   I don't recall doing that.
22    Q.   And you never went to any media
23 outlet?
24    A.   No.
25    Q.   And you never presented yourself

Page 260

F. Fiorillo

1
2 to a board of trustees meeting?
3    A.   No.
4    Q.   And say that there was a cover
5 up?
6    A.   No.
7    Q.   You never went to the Suffolk
8 County Legislature to say that there was a
9 cover up?
10    A.   No.
11    Q.   In fact, isn't it fair to say
12 that other than your communications with the
13 Suffolk County District Attorney's office,
14 prior to the time that you were not rehired
15 or fired as you claim, you did absolutely
16 nothing to publicize your opinion that there
17 was a cover up, other than to other officers
18 at Ocean Beach?
19    A.   Correct.
20    Q.   And what other officers did you
21 say -- did you claim that there was a cover
22 up prior to your last day  -- prior to April
23 2, 2006?
24    A.   Who did -- who did I talk to
25 about that incident being a cover up?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 261

F. Fiorillo

1
2  Q.  Yeah.
3  A.  Kevin Lamm.
4  Q.  Um-hum.
5  A.  Tommy Snyder.
6  Q.  Um-hum.
7  A.  Eddie Carter.
8  Q.  Okay.
9  A.  Joe Nofi.
10 Q.  Okay.
11 A.  Prior to -- excuse me.  Can I go
12 back to that?
13 Q.  Sure.
14 A.  Prior to me being fired or what
15 was the date?
16 Q.  Prior to April 2, 2006.
17 A.  Dave Gerden.
18 Q.  And who's Dave Gerden?
19 A.  He was also a police officer on
20 Ocean Beach.
21 Q.  And what did you say to Dave
22 Gerden?
23 A.  I told him what happened with the
24 Halloween incident, and you know, that I
25 felt that there was a cover up.

Page 262

F. Fiorillo

1
2  Q.  And what did you  -- what did
3  Gerden say to you, if anything?
4  A.  Let me think.  He told me that
5  Gary Bosetti hit that guy with the pool cue
6  because Gary Bosetti told him that he hit
7  the guy with the pool cue.
8  Q.  Dave Gerden says that Gary
9  Bosetti told him that he hit the guy with
10 the pool cue?
11 A.  Yes.
12 Q.  Okay.  And have you told the DA
13 that?
14 A.  Yes.
15 Q.  Let's go back to the Complaint.
16 Let's go to page 44.
17 A.  (Reviewing).  Okay.
18 Q.  Let's look at paragraph 189.
19 A.  (Reviewing).
20 Q.  It's under the Fifteenth Cause of
21 Action, which is entitled "Tortious
22 Interference With A Prospective Business
23 Relationship Under New York Law," do you see
24 that?
25 A.  189?

Page 263

F. Fiorillo

1
2  Q.  Yeah.  Well, I'm reading the bold
3  language.
4  A.  Oh.  Oh.  I'm sorry.
5  Q.  Do you see where I'm referring
6  to?  Are you at page 44?
7  A.  Yes.
8  Q.  Paragraph 189?
9  A.  Yes.
10 Q.  Look up above about four lines,
11 you see the bold lettering?
12 A.  Okay.  I got you.
13 Q.  Okay.  Paragraph 189, you say "as
14 set forth above, Plaintiffs were variously
15 scheduled to commence new employment at a
16 number of employers, including without
17 limitation, the Suffolk County Police
18 Department, the Suffolk -- the Southampton
19 Police Department, the Town of Islip, and
20 the Collier County, Florida Sheriff's
21 Department," do you see that?
22 A.  Yes.
23 Q.  Sir, were you scheduled, prior to
24 June 30, 2006, to commence a new -- a new
25 employment relationship with any entity or

Page 264

F. Fiorillo

1
2  individual?
3  A.  From this list?
4  Q.  From any list?
5  A.  No.  But from what you just
6  stated in 189?
7  Q.  Right.  189 says --
8  A.  Yes.  The answer is yes.
9  Q.  "Plaintiffs were scheduled."
10 A.  Yes.
11 Q.  Okay.  Who were you scheduled to
12 start new employment with?
13 A.  The Southampton Police
14 Department.  The Town of Southampton.
15 Q.  When were you advised that you
16 were to start employment with them?
17 A.  Well, I was scheduled for an
18 interview.
19 Q.  So you would agree with me that
20 being scheduled for an interview isn't the
21 same as being scheduled to commence work,
22 right?
23 A.  No.  But I had a very high chance
24 of obtaining this position.
25 Q.  Okay.  But you would agree --

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 70 of 158 PageID #: 2440

EDWARD CARTER, ET AL. vs.                                                    FRANK FIORELLO
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.                        February 20, 2009

Page 265

1        F. Fiorillo
2    A.   Very likely.
3    Q.   But, sir, you would agree with me
4 that notwithstanding the likelihood of
5 anything, an interview isn't the same as a
6 job offer?
7    A.   I understand that.
8    Q.   Is that -- you agree with me?
9    A.   I agree with you.
10   Q.   Okay.  So you did not have any
11 scheduled start date for the Town of
12 Southampton Police Department, did you?
13   A.   No.
14   Q.   Okay.  So that reference in 189
15 is not a completely accurate statement, is
16 it?
17       MR. GOODSTADT: Objection.
18   A.   Well, it had the potential to be.
19   Q.   But you don't say "potential" in
20 189.  Sir, you say "Plaintiffs were
21 variously scheduled to commence new
22 employment," and then you list the
23 Southampton Police Department, right?
24   A.   Yes.
25   Q.   So you would agree with me that

Page 266

1        F. Fiorillo
2 that's not the most completely accurate
3 statement?
4       MR. GOODSTADT: Objection.
5    Q.   I'm not calling you a liar.  I'm
6 just saying it's not the most accurate
7 statement, you would agree with me?
8    A.   Yes.
9    Q.   Okay.  What other employers or
10 entities or individuals were you scheduled
11 to commence employment with prior to June
12 30, 2006?
13   A.   Out of 189?
14   Q.   Well, 189 is your -- just so
15 we're clear --
16   A.   Just the Town of Southampton had
17 to do with me.
18   Q.   Okay.  Well, let's take it
19 outside of 189.  Other than -- name me  --
20 identify for me the other jobs that you were
21 scheduled to commence working prior to June
22 30, 2006.
23   A.   I had a job interview, and it
24 wasn't only an interview, I spoke to this
25 person, his name was Tom Dolan, a week prior

Page 267

1        F. Fiorillo
2 to me being fired.  He is the owner of a
3 firm called TMJ I believe it's Protection
4 Services.  I'm not quite sure if it's
5 Protective or Protection, but it's TMJ.  His
6 name is Tom Dolan.  I spoke to him.  We went
7 over what position he had available.  He
8 said he could use me.  He said all I had to
9 do was come in Monday morning at 10:30,
10 Oct -- April 3, 2006, and the job is mine.
11       So, to me, that was a very good
12 opportunity where I had his word that I was
13 going to commence that particular job.  But
14 when I was fired on April 2, I had to call
15 him up 10:30 in the morning, um, on April 3
16 that I didn't have a police ID anymore, and
17 therefore, I couldn't fulfill that position.
18   Q.   Okay.  And what did he say then?
19   A.   He was very  -- he felt bad for
20 me.  He had, you know -- he said, you
21 know -- he just felt bad for me.  I don't
22 know exactly like what he 100 percent said.
23 He just said he felt bad.
24   Q.   Sir, you would agree with me
25 given that you were not rehired on April 2,

Page 268

1        F. Fiorillo
2 and you then spoke to this gentleman on
3 April 3 --
4    A.   Well, I spoke to him a week
5 before April 3.
6    Q.   But you spoke to him on April 3?
7    A.   I had to.
8    Q.   Right.
9    A.   Because he was expecting me.
10   Q.   Just listen to my question.  You
11 would agree with me that given that April 2
12 was the date that you were told you were no
13 longer going to be working for Ocean Beach,
14 and the next morning on April 3 you called
15 up this gentleman to tell him that, that the
16 reason you didn't get that job had nothing
17 to do with any defamatory statements that
18 Mr. Hesse made about you after April 2?
19   A.   Not on April 3.  Not at that
20 time.
21   Q.   Right.  In fact, to your
22 knowledge, the only reason you didn't get
23 that job was because you no longer had the
24 job at Ocean Beach, right?
25   A.   Yes.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 269

F. Fiorillo

1
2   Q.   It had nothing to do with any
3   defamatory or disparaging comments that you
4   allege that Hesse made about you?
5   A.   Not at that time.
6   Q.   Right.  Okay.  So what other
7   job -- I'm sorry, what other employment,
8   prior to June 30, 2006, did you have
9   scheduled to start?  You mentioned --
10   A.   I didn't have any other jobs to
11   start.
12   Q.   Okay.  How about between June 30,
13   2006 and the end of 2006, what jobs, if any,
14   did you have scheduled to start in that time
15   period?
16   A.   From April 2, 2000 --
17   Q.   No.  From June 30, 2006 through
18   the end of the year.
19   A.   I didn't have any jobs to start I
20   don't believe.
21   Q.   Okay.  Let's then go back to the
22   Southampton, um, interview.  When did you
23   have an interview scheduled with
24   Southampton?
25   A.   I believe it was May 11 of 2006.

Page 270

F. Fiorillo

1
2   Q.   Okay.
3   A.   And at 2:30 in the afternoon.
4   Q.   When did you schedule that
5   interview?
6   A.   On  -- it was earlier in the
7   week.  Maybe  -- maybe the eighth or the
8   ninth or maybe it was  -- it was earlier in
9   the week.  With -- within a week time period
10   I would say.
11   Q.   Okay.  So at some point in time
12   in the beginning of May, you scheduled an
13   interview with someone at the Town of
14   Southampton --
15   A.   Correct.
16   Q.   -- Police Department concerning a
17   potential job there?
18   A.   Correct.
19   Q.   What was the position in which
20   you were interviewing for?
21   A.   Police officer.
22   Q.   Full time or part time?
23   A.   Part time.
24   Q.   Okay.  Now, when did you start
25   the application process for that job?

Page 271

F. Fiorillo

1
2   A.   Let's see.  After I was fired.
3   Q.   Okay.  How did you go about
4   starting the application process?
5   A.   I called my friend Jane Harrigan
6   and -- because she was in my academy class,
7   and she was working as a police officer in
8   Southampton Town.
9   Q.   Okay.
10   A.   So I asked Jane, I said, "Are
11   there any openings coming up because" -- I
12   explained my situation, and she said,
13   "Sure."  She goes, "I'll just let them know,
14   you know, you were in my class and how you
15   are and we'll get you scheduled," and you
16   know -- she basically told me they'll hire
17   you.
18   Q.   Okay.  And --
19   A.   Through her reference.
20   Q.   Through her reference.  Was she a
21   full time or part time?
22   A.   At that time, full time.
23   Q.   Okay.  So you scheduled an
24   interview.  Who were you going to interview
25   with?

Page 272

F. Fiorillo

1
2   A.   Scott Foster.  Sergeant Scott
3   Foster.
4   Q.   Did you ever have an interview
5   with him?
6   A.   No, I did not.
7   Q.   And who canceled the interview?
8   A.   He did.
9   Q.   And how did you learn that he
10   canceled the interview?
11   A.   He called me up on --
12   Q.   Well, just tell me how you
13   learned.
14   A.   Okay.  He called me up.
15   Q.   Okay.  And he said that the
16   interview was canceled?  Well, what did he
17   say?
18   A.   He didn't say that exactly.
19   Q.   Tell me what he said.
20   A.   He said this.  He said that he
21   just spoke to a Sergeant Hesse over at Ocean
22   Beach Police Department.
23   Q.   Um-hum.
24   A.   And he was getting a reference on
25   me, and Sergeant Hesse gave me a bad

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

---

Page 273

F. Fiorillo

1  reference. He said that I was involved --
2  Hesse said that I was involved in an
3  incident at Ocean Beach and that -- he
4  stated to me that -- oh, what happened was
5  I said, "Well, what incident did he say that
6  I was involved in?" He said, "You should
7  know the incident that you were involved in.
8  I don't have to tell you." So I said,
9  "Well, I'm just trying to find out, sir."
10  He said, "Listen, you picked the wrong
11  department." And I couldn't even talk. He
12  hung up the phone. That was the end of
13  the -- the, um, conversation. That's
14  exactly how it happened.
15  Q.   So you don't know, as you sit
16  here today, what specifically Mr. Hesse said
17  to this Mr. Foster?
18  A.   I have no idea.
19  Q.   Okay. And did you ever inquire
20  with George Hesse as to what he said to
21  Mr. Foster?
22  A.   You expect me to --
23  Q.   I'm just asking you, sir.
24  A.   I wasn't going to call George

---

Page 274

F. Fiorillo

1  Hesse after that.
2  Q.   Okay.
3  A.   He fired me on April 2. I'm
4  going to call -- he didn't even give me a
5  letter of recommendation.
6  Q.   Did you ask Mr. Hesse for a
7  letter of recommendation?
8  A.   That's the least he could have
9  did.
10  Q.   Did you ask Mr. Hesse for one?
11  A.   I asked him for one at the table
12  when he fired me.
13  Q.   And what did he say to you?
14  A.   He said, "We'll get that off to
15  you."
16  Q.   Okay. Did you expect Mr. Hesse
17  to be -- to give you a good recommendation?
18  A.   Why not? I was a good police
19  officer.
20  Q.   Did he like you?
21  A.   You'd have to ask him.
22  Q.   Well, you worked with him, sir.
23  Do you have an opinion as to whether
24  Mr. Hesse liked you?

---

Page 275

F. Fiorillo

1  A.   I think that he was -- I wasn't
2  part of his clique, and he disliked me
3  because I listened to the chief.
4  Q.   When you say you listened to the
5  chief, what are you talking about?
6  A.   Well, the chief wanted me to
7  write summonses. George Hesse didn't want
8  me to write summonses. They were -- they
9  had a love/hate relationship between George
10  Hesse and the chief, and it was reflected
11  upon me because the chief -- my order was
12  to go out and write summonses because the
13  Village, the board was getting on the
14  chief's case that the department wasn't
15  writing enough summonses and a lot of the
16  residents were getting upset because the
17  officers were in the Village on Main Street,
18  just disregarding the violations that were
19  occurring in front of them and nothing was
20  being done.
21  Q.   So George Hesse had asked you to
22  write more summonses?
23  A.   No.
24  Q.   Less summonses?

---

Page 276

F. Fiorillo

1  A.   Less.
2  Q.   And you didn't follow his order,
3  you followed Paridiso's order to write more?
4  A.   Naturally.
5  Q.   All right.
6  A.   Sure.
7  Q.   Not a question. I'm just trying
8  to get the facts out, sir.
9  A.   Yeah. Because what happened
10  is --
11  Q.   No. That's -- that's fine. You
12  established it. Hesse wanted you to write
13  less?
14  A.   Correct.
15  Q.   Paridiso wanted you to write
16  more. You listened to Paridiso and not
17  Hesse?
18  A.   Correct.
19  Q.   And you said "naturally." Why
20  "naturally"?
21  A.   Because the chief -- you
22  don't -- okay. When you -- when you go
23  through a police academy, you learn that the
24  highest ranking officer gives -- when the

---

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 277

F. Fiorillo

1 highest ranking officer gives an order,
2 somebody under him cannot say, "don't do
3 that, do this."  Absolutely not.  Doesn't go
4 like that in the police department.
5     Q.    And in your opinion, Paridiso was
6 the highest ranking officer?
7     A.    According to the chart in Ocean
8 Beach.
9     Q.    Okay.  Any other reasons --
10 okay.  So -- so my question to you then, if
11 Hesse disliked you, why did you think that
12 he would give you a recommendation?
13     A.    Well, that's the least he could
14 have did, if he was going to get rid of us,
15 right?  Firing us  -- first of all, it was
16 all retaliation, in my opinion, because he
17 sent a letter to us, all right, and he had
18 us under the assumption that we were all
19 getting new IDs.  I had no idea I was going
20 to be fired.  I didn't -- I couldn't prepare
21 my life prior to that, you know, that day to
22 do something else if I had a chance.  In
23 other words, from March 11 to April 2, I was
24 getting new ID.  April 2 I'm fired.

Page 278

F. Fiorillo

2 MO        MR. NOVIKOFF: But motion to
3     strike, sir.  You didn't answer my
4     question.
5     Q.    Why would you think that if Hesse
6 disliked you, that he would have given you a
7 recommendation saying that you were a good
8 police officer?
9         MR. GOODSTADT: Objection.
10     A.    Well, I just couldn't -- I didn't
11 understand the guy.  I mean, why  -- why
12 would he fire us and then keep on sticking
13 it to us?
14     Q.    I understand that.
15     A.    I mean, that's  -- that's like --
16     Q.    But why did you think that --
17     A.    So unethical.  So --
18     Q.    Why did you think Hesse would
19 have given you a good recommendation, given
20 the fact that, as you say, he fired you?
21         MR. GOODSTADT: Objection.
22     Q.    For no reason, according to you?
23         MR. GOODSTADT: Objection.
24     A.    Well, I'm sure he had a reason.
25     Q.    Okay.

Page 279

F. Fiorillo

1     A.    I'm not there.  I'm fired.
2     Q.    Okay.  Now this Jane Harrigan --
3     A.    Yes.
4     Q.    Is this the same person that you
5 mentioned earlier that you had complained
6 to?
7     A.    Yes.
8     Q.    Did you ever inquire with her as
9 to perhaps looking into what Hesse said to
10 this guy Foster?
11     A.    I did.
12     Q.    You did, and what did Harrigan
13 say to you?  Well, what did you say to
14 Harrigan?
15     A.    I asked Jane, I said, "Jane, can
16 you find out like what happened, because I
17 really -- I don't know what's going on."  I
18 mean, the phone call was so abrupt.  And I
19 was polite.  I didn't know like what I did
20 wrong.  I was -- I was mortified by just
21 like what was happening.  Everything was
22 falling apart in my life, okay?  You know,
23 like little by little.  And it was like
24 unjustified, in my opinion.

Page 280

F. Fiorillo

1     Q.    Well, what else was falling apart
2 in your life, sir?  You worked for Ocean
3 Beach -- you said you worked for Ocean
4 Beach as a part-time employee.  You no longer
5 worked for them.  You gave up a --
6     A.    Yeah.  But I had a job offering
7 the day after.  That fell apart.  In other
8 words, piece by piece.
9     Q.    Yeah.  What other pieces?  I'm
10 trying to figure this out.
11     A.    Well, I couldn't -- I applied
12 with other police departments.
13     Q.    Okay.  Well, let's stick with
14 Southampton for a while.  What did Jane
15 Harrigan say to you?
16     A.    Jane Harrigan said that she
17 didn't work on the same tour as Scott
18 Foster, so they didn't  -- I don't know.
19 They didn't, um, interact.
20     Q.    So she couldn't help you out?
21     A.    Well, I didn't ask her to help me
22 out.  I just --
23     Q.    What did you ask her to do?
24     A.    To find out like -- help me out.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 281

F. Fiorillo

1  F. Fiorillo
2  Yeah.
3      Q.    So she couldn't help you out
4  because she didn't really work with the guy?
5      A.    Exactly.
6      Q.    Okay.  And how -- did you advise
7  Foster before that phone call where he hung
8  up on you that you had worked for Ocean
9  Beach?
10     A.    I sent him my paperwork.
11     Q.    Okay.  So he was aware that you
12  had worked for Ocean Beach?
13     A.    Oh yeah.
14     Q.    And is it your understanding that
15  he was reaching out to George Hesse to get a
16  recommendation about you as part of the
17  interviewing process?
18     A.    I don't know what he was doing,
19  you know.  I assume.
20     Q.    Did you ever tell Hesse that you
21  were interviewing with the Town of
22  Southampton?
23     A.    I was fired.
24     Q.    Did you -- that's my question to
25  you.  Did you ever tell Hesse that you were

Page 282

1  F. Fiorillo
2  interviewing with the Town of Southampton?
3      A.    Why would I tell him that?
4      Q.    Sir, stranger things -- stranger
5  things have occurred.
6      A.    Okay.  No.
7      Q.    You didn't tell Hesse, right?
8      A.    No.
9      Q.    Did you tell Paridiso?
10     A.    No.
11     Q.    Why didn't you give Paridiso down
12  on your paperwork as a reference?
13     A.    I didn't give anybody down as a
14  reference.
15     Q.    Oh, you just gave Ocean Beach?
16     A.    They called the Ocean Beach
17  Police Department.
18     Q.    Got it.  Okay.  Now what other
19  jobs in the law enforcement field did you
20  apply for in the first six months of 2006,
21  other than Town of Southampton?
22     A.    Um, after I was fired?  Because
23  that's when I applied.
24     Q.    Fine.  After you were fired.  In
25  fact, you know what, I'll withdraw the

Page 283

1  F. Fiorillo
2  question.  You said that you exhausted your
3  search for a new job?
4      A.    Exactly.  As far as a police
5  officer.
6      Q.    That's right.  I understand that.
7  What happen -- what police departments or
8  similar law enforcement agencies did you
9  apply for in 2006 after you were fired?
10     A.    Okay.  I applied -- Quogue sent
11  me a letter stating what they wanted.  I
12  sent them back all the information that they
13  wanted.  There was an opening in Quogue.  I
14  applied there.  Riverhead, I filed a Suffolk
15  County Civil Service form because that's
16  what they required, so I did that, and I did
17  that with Joe Nofi also.  We did that
18  together.  As a matter of fact, we did that
19  the day that we were fired --
20     Q.    Okay.
21     A.    -- on April 2.
22     Q.    Okay.
23     A.    So we did that.  And Joe
24  actually --
25     Q.    I don't want to know about Joe.

Page 284

1  F. Fiorillo
2      A.    Okay.  Okay.
3      Q.    I had the pleasure of speaking
4  with Joe.
5      A.    Okay.  So.  So --
6      Q.    I got Quogue.  I got Riverhead.
7  What else?
8      A.    Northport Village.  Chief
9  Bruckenthal.
10     Q.    Okay.
11     A.    Huntington Bay, Chief Hubbs.
12  Chief Hegermiller in Riverhead you got.
13     Q.    Right.  So I got Quogue,
14  Riverhead, Northport Village, Huntington
15  Bay.  What else?
16     A.    I called other police departments
17  to see if they were hiring.  I called
18  Asharoken and I called Head of the Harbor.
19     Q.    Hold on.  Asharoken?
20     A.    Head of the Harbor.  Lloyd
21  Harbor.  I called Amityville, but you had to
22  be a resident, so I couldn't do anything
23  there.  I called Southampton Village.
24     Q.    Okay.
25     A.    I called Westhampton Beach.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 285

F. Fiorillo

1
2   Q.   Okay.
3   A.   Um, that's -- that's pretty
4   close.
5   Q.   So let me just distinguish
6   between the categories of police
7   departments.  You submitted some type of
8   information to Quogue, Riverhead, Northport
9   Village and Huntington Bay?
10  A.   Only those.
11  Q.   Right.  You called to inquire if
12  there were any openings at Asharoken, Head
13  of the Harbor, Lloyd Harbor, Amityville,
14  Southampton Village and Westhampton Beach?
15  A.   Yeah.  There could be a couple
16  others, but I'm not -- that's what I can
17  recall right now.
18  Q.   Couple of others that you called?
19  A.   Correct.
20  Q.   Okay.  Now when you called
21  Asharoken, did they tell you there was an
22  opening?
23  A.   Asharoken, no.  See, that's why
24  the ones that I called --
25  Q.   That's your --

Page 286

F. Fiorillo

1
2   A.   -- that I didn't send any
3   paperwork, weren't hiring.
4   Q.   Well, let's just go through the
5   list.  Head of the Harbor, were they hiring?
6   A.   According to what they told me,
7   no.
8   Q.   That's fine.  Lloyd Harbor?
9   A.   According to what they told me,
10  no.
11  Q.   Amityville?
12  A.   According to what they told me,
13  you had to be a resident.
14  Q.   And you weren't?
15  A.   No.
16  Q.   Southampton Village, were they
17  hiring?
18  A.   No.
19  Q.   Westhampton Beach?
20  A.   No.
21  Q.   Okay.  And they told you they
22  weren't hiring during the phone call that
23  you reached out to them for?
24  A.   Correct.
25  Q.   Okay.  So the only communication

Page 287

F. Fiorillo

1
2   you had with any of these villages was your
3   phone call?
4   A.   That's right.
5   Q.   Okay.  Quogue, what did you
6   submit to them?
7   A.   I think I submitted my police
8   academy certificate and my state MPTC
9   certificate.
10  Q.   Ever have an interview with them?
11  A.   No.
12  Q.   Riverhead, what did you submit to
13  them?
14  A.   I submitted the, um, the Suffolk
15  County Civil Service form that comes out of
16  Ms. Zwilling's office.
17      MS. ZWILLING: Not out of my
18      office.
19  A.   Well, the Suffolk County Civil
20  Service Department.  I'm sorry.  I'm sorry
21  about that.
22  Q.   Okay.  Anything else?
23  A.   Um, to Riverhead?
24  Q.   Yeah.
25  A.   I think that was it.  That's what

Page 288

F. Fiorillo

1
2   they required.
3   Q.   Ever have an interview with them?
4   A.   No.
5   Q.   Northport Village, what did you
6   submit?
7   A.   I submitted my -- my academy
8   certificate and my MPTC I believe and -- I
9   don't recall.  I think  -- they didn't send
10  me an application, because I just faxed them
11  that stuff.  Or maybe a copy of my driver's
12  license.
13  Q.   Did you ever -- did you ever have
14  an interview with Northport Village?
15  A.   No.
16  Q.   Huntington Bay, did you ever have
17  an interview with them?
18  A.   No.
19  Q.   What did you submit to them?
20  A.   Um, my academy certificate and my
21  MPTC, because Chief Hubbs gave me the
22  address, I mailed it to his department and
23  never heard back from him.
24  Q.   Did Quogue indicate that there
25  were openings or did they just say "send me

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 289

F. Fiorillo

1
2 your information"?
3     A.    They indicated there were
4 openings.
5     Q.    How about Riverhead?
6     A.    Yes.
7     Q.    How about Northport Village?
8     A.    Yes.
9     Q.    How about Huntington Bay?
10     A.    Possibly.  Chief Hubbs was like,
11 "We might hire somebody.  You know, if you
12 send me your stuff, I'll look at it."
13     Q.    Do you know if Quogue ever hired
14 anyone in that time period for the job that
15 you were looking for?
16     A.    I don't know.
17     Q.    How about Riverhead?
18     A.    I don't know.
19     Q.    How about Northport Village?
20     A.    I don't know.
21     Q.    Did anyone at Quogue speak to you
22 about anything that George Hesse said to
23 them?  Well, withdrawn.  In any
24 communication with Quogue, did they advise
25 you that someone spoke to George Hesse about

Page 290

F. Fiorillo

1
2 you?
3     A.    No.
4     Q.    In any communication involving
5 Riverhead, did anyone say that they spoke to
6 George Hesse about you?
7     A.    No.
8     Q.    In any communication with
9 Northport Village, did anyone say that they
10 spoke to George Hesse about you?
11     A.    No.  They never got back to me.
12     Q.    Fine.  That's what I'm asking.
13 So other than after you submitted the
14 paperwork to Quogue, Riverhead or
15 Northport Village got back to you?
16     A.    No.  There was -- Riverhead was
17 the best chance of getting hired at the
18 time, and I spoke to the secretary of the
19 chief, her name was Mary, and I must have
20 called her numerous, numerous times.  She
21 never called me back.  I left messages
22 numerous times.  She never called me back.
23     Q.    But you have no basis, as you sit
24 here today, to -- to conclude that George
25 Hesse had called Northport Village?

Page 291

F. Fiorillo

1
2     A.    No.  I just think that the stigma
3 around Ocean Beach was well known in the
4 police community, and ultimately affected me
5 as a candidate -- a potential employee.
6     Q.    The stigma around Ocean Beach,
7 right?
8     A.    Yes.
9     Q.    Not anything that George Hesse
10 particularly said to you?
11     A.    Well, he was part of it.
12     Q.    But I'm talking about not
13 anything that George Hesse said to any of
14 these employees about you?
15     A.    I don't know.
16     Q.    You have no knowledge one way or
17 the other of what George Hesse said?
18     A.    No.
19     Q.    Right.  And you don't have any
20 knowledge that George Hesse was even aware
21 that you applied to Quogue, Riverhead or
22 Northport Village, right?
23     A.    No.
24        THE VIDEOGRAPHER: This ends
25 tape number four.  The time is 3:33

Page 292

F. Fiorillo

1
2 p.m.  Going off the record.
3        (A break was taken.)
4        THE VIDEOGRAPHER: This begins
5 tape number five.  The time is 3:48
6 p.m.  Back on the record.
7     Q.    Mr. Fiorillo, would you
8 characterize, um, your desire to work in
9 Quogue for the Quogue Police Department as a
10 pending employment?
11        MR. GOODSTADT: Objection.
12     Q.    Well, I'll be specific.
13 Paragraph 190 you allege that "Defendant
14 Hesse had knowledge of Plaintiffs' pending
15 employment and/or business relationship with
16 these employees -- employers," do you see
17 that?
18     A.    He did at Quogue.
19     Q.    I'm saying, did Mr. Hesse know
20 that you submitted paperwork to Quogue?
21     A.    He might have found out because
22 he had --
23     Q.    Sir, I'm not interested in what
24 he might have found out.
25     A.    Okay.  I don't know.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 77 of 158 PageID #: 2447

FRANK FIORELLO                                          EDWARD CARTER, ET AE. vs.
February 20, 2009                        INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 293

F. Fiorillo

1        Q.   Okay.  Did you advise Mr. Hesse
2  that you were submitting an application or
3  paperwork to Quogue?
4        A.   This is after I was fired.
5        Q.   Yeah.  After you were fired, did
6  you advise Mr. Hesse?
7        A.   Well --
8        Q.   Yes or no?  I know it's unlikely
9  that someone that was fired would tell their
10  supervisor that they're seeking another job.
11  I get that.  But my question to you is, did
12  you advise Mr. Hesse that you wanted to seek
13  a job with Quogue?
14        A.   After what he did with me in
15  Southampton Town, I wasn't going to advise
16  him or call him, because look what happened.
17  I mean, I got -- I got --
18  MO      MR. NOVIKOFF: Move to strike.
19  I'm just going to -- it's a simple yes
20  or no, sir.
21        Q.   Did you ever advise Hesse that
22  you were interested in a position with
23  Quogue?
24        A.   No.


---

Page 293

F. Fiorillo

1        Q.   Okay.  Did you advise Mr. Hesse
2  that you were submitting an application or
3  paperwork to Quogue?
4        A.   This is after I was fired.
5        Q.   Yeah.  After you were fired, did
6  you advise Mr. Hesse?
7        A.   Well --
8        Q.   Yes or no?  I know it's unlikely
9  that someone that was fired would tell their
10  supervisor that they're seeking another job.
11  I get that.  But my question to you is, did
12  you advise Mr. Hesse that you wanted to seek
13  a job with Quogue?
14        A.   After what he did with me in
15  Southampton Town, I wasn't going to advise
16  him or call him, because look what happened.
17  I mean, I got -- I got --
18  MO      MR. NOVIKOFF: Move to strike.
19  I'm just going to -- it's a simple yes
20  or no, sir.
21        Q.   Did you ever advise Hesse that
22  you were interested in a position with
23  Quogue?
24        A.   No.

Page 294

F. Fiorillo

1
2        Q.   Did you ever advise Hesse that
3  you were interested in a position in
4  Riverhead?
5        A.   No.
6        Q.   Did you ever advise Hesse that
7  you were interested in a position with
8  Northport Village?
9        A.   No.
10       Q.   Did you ever advise Hesse that
11  you were interested in a position with
12  Huntington Bay?
13       A.   No.
14       Q.   So you would agree with me that
15  at least as to those four departments, the
16  allegation in paragraph 90 where it's
17  alleged that Hesse had knowledge of
18  Plaintiffs' pending employment, is not
19  accurate?
20       MR. GOODSTADT: Objection.
21       A.   I don't know if he had knowledge
22  of my pending employment.
23       Q.   Well, you didn't write "upon
24  information and belief," did you?  This
25  is -- this is -- did you?

Page 295

F. Fiorillo

1        A.   Well, I'm not a lawyer.  I
2  don't --
3        Q.   This is a pretty declar -- this
4  is a pretty straight forward statement,
5  wouldn't you agree?  Sir, you said
6  "Defendant Hesse had knowledge of
7  Plaintiffs' pending employment."  You didn't
8  say I think he had knowledge.  You didn't
9  say maybe he had knowledge.  You allege that
10  Hesse had knowledge of Plaintiffs' pending
11  employment.
12       A.   Yeah, but it goes a little
13  further.  He had business relationships with
14  these employers.
15       Q.   No.  This is not his
16  relationships, these are your relationships.
17  This is what you allege.  And I want to get
18  this clear, because it's important.
19  Paragraph 190, "Defendant Hesse had
20  knowledge of Plaintiffs' pending employment
21  and/or business relationship with these
22  employers," do you see that?
23       A.   Well, he did with Southampton
24  Town.

Page 296

F. Fiorillo

1
2        Q.   I'm not talking about Southampton
3  Town.
4        A.   Oh, okay.
5        Q.   I'm talking about Quogue,
6  Riverhead, Northport Village and Huntington
7  Bay?
8        A.   Not my knowledge.
9        Q.   So as to those four entities,
10  this allegation isn't completely accurate?
11       MR. GOODSTADT: Objection.
12       Q.   Correct?
13       MR. GOODSTADT: Objection.
14       Q.   And I'll get to Southampton in a
15  second.
16       MR. GOODSTADT: Let me -- he
17  testified he doesn't know if it's
18  accurate.
19       Q.   Is that your testimony, you don't
20  know if it's accurate?  I'll take that if
21  that's going to be your answer.
22       A.   I'm trying -- like I really don't
23  know.
24       Q.   That's fine.  And the only basis
25  that you are aware that Hesse knew about

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 78 of 158 PageID #: 2448

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

F. Fiorillo

2  your potential interest in the Town of
3  Southampton is because of what this
4  Mr. Foster said to you?
5      A.   Right.
6      Q.   Right.  Okay.  When you go on in
7  paragraph 191 to say "Defendant Hesse
8  intentionally and maliciously interfered
9  with these pending employment and/or
10 business relationships through fraudulent,
11 deceitful and/or illegal means," that's not
12 accurate with regard to Quogue, right?
13     A.   Correct.
14     Q.   That's not accurate with regard
15 to Riverhead, correct?
16         MR. GOODSTADT: Objection.
17     A.   Well, you know, I really  -- to
18 be honest with you, like the last answer, I
19 don't know.
20     Q.   What evidence can you point me to
21 right now that -- that would show, in your
22 opinion, that Hesse interfered with anything
23 involving Quogue?
24     A.   Well, there's a history with
25 Hesse and Quogue.  That's why I don't know.

F. Fiorillo

2  And I can explain further if you  -- if you
3  want.
4      Q.   Other than a history, is there
5  any evidence that you can point to that
6  you've seen in this case that would point to
7  Hesse interfering with you with Quogue?
8      A.   Not that I recall.
9      Q.   Right.  And you're only
10 speculating that given Hesse's history as
11 you say with Quogue, he may have interfered
12 in your application?
13     A.   Quite possibly.
14     Q.   It's a speculation, right?
15         MR. GOODSTADT: Objection.
16     A.   It's a good possibility.
17     Q.   Isn't a good possibility a
18 speculation?
19         MR. GOODSTADT: Objection.
20     A.   Speculation is a little less than
21 a good possibility.
22     Q.   Well, what's a good -- you know
23 what, tell me, tell the jury, what's a good
24 possibility that Hesse interfered with your
25 application with Quogue, sir?

F. Fiorillo

2      A.   Well, Hesse had  -- what happened
3  was in the department, Hesse, for some
4  reason, took over from the Suffolk County
5  Department of Civil Service to do background
6  investigations, and what he did was he
7  contacted Quogue and got all the information
8  from Quogue and all the paperwork that
9  Quogue had, because one of his buddies works
10 in Quogue as a police officer.
11     Q.   Okay.
12     A.   So that's my belief that Hesse
13 dealing with Quogue and getting the
14 information, you know, for all his
15 background investigation paperwork, because
16 he became  -- he became the chief of the
17 applicant investigation section in Ocean
18 Beach at a certain point in time.  But
19 with -- but that paperwork came from Quogue.
20 That was the paperwork that he used to
21 conduct background investigations.
22     Q.   So that's the history that you
23 were referring to?
24     A.   Well, his dealing --
25     Q.   You said that Hesse had a

F. Fiorillo

2  history.  Is that what you're referring to
3  when you say "history"?
4      A.   Well, he had a connection.
5      Q.   Right.  That was a history, that
6  he took over some investigation for Ocean
7  Beach, called up Quogue to get their
8  paperwork and is using Quogue paperwork, is
9  that the history?
10     A.   Well, he called up the police
11 officer that he knows in Quogue and they
12 forwarded him the paperwork in order to --
13     Q.   And who was the police officer
14 that he knows in Quogue?
15     A.   I don't know.
16     Q.   Oh.  Okay.
17     A.   But I do know that that's where
18 it came from and he does have ties in
19 Quogue.
20     Q.   Okay.  Ties with just one police
21 officer that you're aware of?  That you're
22 aware of, sir?
23     A.   At least one.
24     Q.   Okay.  And it's based upon that
25 that you think that there is a good

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 301

F. Fiorillo

1    possibility that Hesse interfered in your
2    desire to work for the Quogue Police
3    Department?
4        A.   Good possibility.
5        Q.   Okay.  Northport Village, 191 is
6    not accurate with regard to Northport
7    Village, is it?
8        A.   I don't know.
9            MR. GOODSTADT: Objection.
10       A.   I don't know.
11       Q.   Okay.  Huntington Bay, it's not
12   accurate either, is it?
13           MR. GOODSTADT: Objection.
14       A.   I don't know.
15       Q.   You don't know?  Well, given the
16   fact that you don't know what Hesse told
17   Mr. Foster, if anything, with regard to Town
18   of Southampton, you have no evidence that
19   you can point me to that said that Hesse
20   acted deceitfully in any information that he
21   gave to Mr. Foster, can you?
22       A.   I don't know.
23       Q.   Okay.  Same question with regard
24   to illegal means?  You don't know, right?
25       A.   He could have.

Page 302

F. Fiorillo

1        Q.   But you don't know, right?
2        A.   It's possible.
3        Q.   But you don't know?
4        A.   It's possible.  And I don't know
5    if, you know.
6        Q.   Right.  Now let's talk about
7    19 -- I'm sorry, 2007.  What police
8    department jobs did you apply for, if any,
9    in 2007 or law enforcement related jobs?
10       A.   In 2007?
11       Q.   Yeah.  We've talked about 2006.
12   Talk to me about 2007 now.
13       A.   I don't -- I don't even remember.
14   It might have been -- in 2007, I called up
15   Collier County Sheriff's -- Sheriff's
16   Office.
17       Q.   Okay.  Well, are you aware that
18   Mr. Nofi also applied for Collier County?
19       A.   Well, what happened was when I
20   called --
21       Q.   I'm just asking, are you aware
22   that Mr. Nofi applied --
23       A.   Yes.  Very aware.  Because he's
24   the one that told me there were openings in

Page 303

F. Fiorillo

1    Collier County.
2        Q.   And did you submit the same type
3    of paperwork for Collier County that
4    Mr. Nofi did?
5        A.   I didn't -- what happened was --
6    do you want me to explain?
7        Q.   Sure.
8        A.   The answer is "no" to your
9    question with an explanation the reason why.
10       Q.   Okay.  What's the reason why?
11       A.   Okay.  When I called up the
12   investigator, his name was Mr. Donahoe, he
13   told me that, um, Joe Nofi applied and --
14   let me get this the way -- the timeline.
15   Joe applied -- okay.  This is what happened.
16   Joy applied with Collier County.  I then
17   requested paperwork for the same department.
18       Q.   Okay.
19       A.   He sent me the paperwork, and in
20   the time period from when Joe -- Joe
21   actually went to Florida.  He passed all,
22   you know, his background, except for when he
23   came back, they went for a reference and
24   they contacted Hesse, and Hesse apparently

Page 304

F. Fiorillo

1    gave him a bad reference, and Donahoe
2    stopped the application process.  So what I
3    did was --
4        Q.   Who told you this, that Hesse
5    gave a bad reference?
6        A.   Joe.
7        Q.   Oh, okay.
8        A.   Joe -- Joe told me --
9        Q.   Fine.
10       A.   -- exactly what happened.
11       Q.   According to Joe?
12       A.   Well, Joe didn't lie.  Joe didn't
13   lie.
14       Q.   Oh, Joe's never lied to you?
15       A.   No.  Joe --
16       Q.   No?
17       A.   Joe told me exactly what
18   happened.
19       Q.   So it's your testimony that
20   everything that Joe has said or alleged in
21   this case is the absolute truth?
22       A.   I don't know what he said.
23       Q.   Okay.  So continue.  So Joe told
24   you that Hesse gave him a bad reference?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 305

F. Fiorillo

1
2    A.   Right.  Because he got some
3  paperwork back that Hesse apparently
4  signed -- I don't know.  You know, I'm just
5  giving you what I got.
6    Q.   You tell me what Nofi told you.
7  I got it.
8    A.   Right.  So with that, I wasn't
9  going to go through the same process and
10  then get  -- go through all the expense of
11  going to Florida, going through the process
12  and coming back and him calling Hesse and
13  Hesse saying whatever, and then me not
14  getting that opportunity.
15    Q.   Okay.
16    A.   So I didn't apply.
17    Q.   Okay.  So --
18    A.   Based on what happened to Joe.
19    Q.   Yeah.  So let me just understand
20  this, if I'm clear.  You reached out to
21  Collier County for an application?
22    A.   Correct.
23    Q.   Before you ever actually applied,
24  Nofi said to you what he believes Hesse did
25  to him with regard to Collier County, and

Page 306

F. Fiorillo

1
2  because of that, you didn't want to waste
3  your time to seek it out -- to seek a job
4  there, because you were concerned that Hesse
5  would do the same thing to you that he did
6  to Nofi?
7    A.   Good possibility.
8    Q.   Okay.
9    A.   I mean, that was pretty
10  reasonable on -- I think.  I don't know.
11    Q.   Sure.
12    A.   I think so.
13    Q.   Okay.  Other than Collier County,
14  did you contact any other law enforcement
15  agency in 2007 for a job?
16    A.   No.  Because at that point in
17  time, it just became apparent that every
18  police department that I would apply for
19  would have to go through Ocean Beach, and
20  ultimately, talk to Hesse.
21    Q.   Why not Paridiso?
22    A.   Because Paridiso wasn't the chief
23  in Ocean Beach.
24    Q.   Yeah.  But didn't you get a
25  letter of recommendation from Paridiso?

Page 307

F. Fiorillo

1
2    A.   Did I get a letter of  --
3    Q.   In 2006?
4    A.   I didn't get a letter of
5  recommendation from Paridiso.
6    Q.   No?  You never got a letter?  You
7  never put down in any application after you
8  were fired that Chief Paridiso was a
9  reference?
10    A.   I got a reference letter.  I
11  got --
12    Q.   Oh, so you have -- you think
13  there's a difference between a reference
14  letter and a letter of recommendation?
15    A.   I'm trying to -- I'm trying to
16  think about that letter.  I don't -- I'm
17  trying to remember that letter.
18    Q.   Let's --
19    A.   But --
20    Q.   Sir, let's get this clear.  I've
21  pre-marked this exhibit Fiorillo-8.  Can you
22  just do your magic.
23        (Letter dated September 16, 2006
24      from Edward T. Paridiso was marked as
25      Fiorillo Exhibit-8 for identification;

Page 308

F. Fiorillo

1
2    2/20/09, E.L.)
3    Q.   This is a letter purportedly from
4  Chief Paridiso to a "dear sir or madam"
5  dated September 16, 2006, do you see that?
6    A.   Yes.
7    Q.   And it appears that it went from
8  Mr. -- it was delivered from Mr. Paridiso to
9  you, do you see that?
10    A.   Okay.  I remember this.
11    Q.   You recall getting this?
12    A.   Yes.
13    Q.   And this is a letter -- September
14  16, 2006, right?
15    A.   Now I remember it.
16    Q.   Mr. Paridiso's identifying
17  himself as chief of police, right?
18    A.   Yes.
19    Q.   To your knowledge, was he lying
20  at the time when he identified himself as
21  chief of police?
22    A.   Not to my knowledge.
23    Q.   And, in fact, Mr. Paridiso sent
24  you this letter at your request, right?
25    A.   Yes.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 309

F. Fiorillo

1        F. Fiorillo
2   Q.  And when did you request
3 Mr. Paridiso send you a letter of
4 recommendation?
5   A.  What I had to do in --
6   Q.  When, sir?
7   A.  When?
8   Q.  Yeah.
9   A.  Prior to September 16, 2006.
10   Q.  In relation to April 2, when?
11   A.  After April 2.
12   Q.  How far after April 2?  Weeks?
13 Months?
14   A.  Probably pretty close to
15 September 16.
16   Q.  So -- and you had asked
17 Mr. Paridiso to send you this letter with
18 the intent that once you received it, you
19 would send it out to potential employers,
20 correct?
21   A.  Incorrect.  That's not true.
22   Q.  Oh really?  Then what was the
23 need for you to get this letter, if you
24 weren't going to send it out to potential
25 employers?

Page 310

F. Fiorillo

1        F. Fiorillo
2   A.  I'm trying to think about this
3 letter.  Let me just -- give me a little
4 time.
5   Q.  Take as much time as you want,
6 sir.
7   A.  This had to do with not a job
8 application.  What I had to do was I had to
9 apply for an armed guard's license in
10 Albany, and they didn't  -- they needed a
11 letter from the chief of police to verify my
12 employment.  That's what this letter is
13 about.  I remember.  I couldn't get an armed
14 guard's license because I wasn't -- I needed
15 a reference  -- that's what I needed.  I
16 needed a reference letter from the chief of
17 police.
18   Q.  And is it your opinion that you
19 could not have sent this letter out to any
20 future potential employers that you were
21 seeking a job from?
22      MR. GOODSTADT: Objection.
23   A.  Well, look  -- look --
24   Q.  Really?  Look where?  Tell me.
25 And I'll read this letter into the record.

Page 311

F. Fiorillo

1        F. Fiorillo
2 "Plead accept this letter as verification of
3 past employment of Frank Fiorillo as a
4 seasonal/part time police officer with the
5 Ocean Beach Police Department.  Mr. Fiorillo
6 entered the Suffolk County Police Academy in
7 October 2001 and graduated in May 2002.  He
8 began regular patrol with the department on
9 May 28, 2002."  And this is where it get --
10 it gets goods for you.  "He performed all of
11 the typical duties and functions of a police
12 officer.  Mr. Fiorillo always made himself
13 available for additional hours.  Working
14 weekends or on holidays was never an issue.
15 His attendance and deportment were qualities
16 the department could always depend on.
17 Mr. Fiorillo's employment ended on April 2,
18 2006 due to budget reductions.  If you need
19 additional information, please call me at
20 631-581-1816."  What was bad about that?
21      MR. GOODSTADT: Objection.
22   Q.  That's a glowing recommendation,
23 don't you think?
24      MR. GOODSTADT: Objection.
25   Q.  Would you agree with me that

Page 312

F. Fiorillo

1        F. Fiorillo
2 that's a good recommendation, yes or no?
3   A.  I would agree with you on that
4 part.
5   Q.  And wouldn't you agree with me,
6 sir, that had you wanted to, this is
7 something that you could have sent to a
8 potential employer to say that "hey, look at
9 me, I'm a good cop and I have a chief of
10 police of a Suffolk County municipality
11 saying so"?
12      MR. GOODSTADT: Objection.
13   A.  But based on what happened
14 with -- with myself in Southampton Town and
15 Joe in Collier County and Kevin with Suffolk
16 County and Tommy and Eddie in the Town of
17 Islip, I felt that once -- if they did get a
18 letter like this, okay, they still have to
19 go back to Ocean Beach and find out was it
20 really due to budget reductions.  You know,
21 what was the problem.  What -- what was it.
22   Q.  So what your testimony is, is
23 that you stopped looking for law enforcement
24 related jobs in 2007 because you believe
25 that Hesse said something bad about you to

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 313

F. Fiorillo

1
2 Southampton and the other Plaintiffs said to
3 you that they think that Hesse said
4 something bad about them?
5      MR. GOODSTADT: Objection.
6   Q.   Is that a fair characterization
7 of why you stopped looking for a job in 2007
8 in the law enforcement field?
9   A.   Well, I know for a fact that he
10 said something about me.
11   Q.   How do you know?
12   A.   Because Scott Foster called me.
13   Q.   Right.  All Foster told you is
14 that, according to your testimony, is that
15 you were involved in an incident, right?
16   A.   Well, if Hesse told him about an
17 incident I was involved in, then why didn't
18 I get the interview for the position?
19   Q.   But all you know is that Hesse
20 said that you were involved in an incident,
21 right?
22   A.   Yes.
23   Q.   You don't know anything else that
24 Hesse said, if he did say anything else?
25   A.   I don't.

Page 314

F. Fiorillo

1
2   Q.   Right.  And so is it fair  -- is
3 it a fair characterization of your testimony
4 that you stopped looking for jobs in the law
5 enforcement field in 2007 because of what
6 you think Hesse said about you to the Town
7 of Southampton and what the other Plaintiffs
8 said Hesse said about them?
9   A.   Well, I got to tell you, I still
10 haven't really stopped.  That's -- that's my
11 answer.
12   Q.   Oh, you really haven't stopped
13 yet?
14   A.   No.
15   Q.   Okay.  Then tell me in 2007, who
16 did you apply  -- what entities did you
17 apply to for a law enforcement job?
18   A.   Um, in 2007, I'd say it was only
19 Collier County.  But what I'm --
20   Q.   In 2008, what law enforcement
21 jobs did you apply for?
22   A.   I didn't apply for any in 2008.
23   Q.   Thank you.
24   A.   Wait a second.  Law enforcement?
25   Q.   Law enforcement related jobs?

Page 315

F. Fiorillo

1
2 That's what I'm --
3   A.   Yes, I did.  Park ranger.
4   Q.   For whom?
5   A.   For Brookhaven.
6   Q.   Okay.  And that was in 2007 or
7 2008?
8   A.   2008.  Maybe it was --
9   Q.   Tell you what, I'll give you a
10 hint, June 2, 2007.
11   A.   Okay.
12      MR. NOVIKOFF: Let's mark -- do
13   your magic on what's been marked
14   Fiorillo-35.
15      (Application for Employment with
16   Town of Brookhaven was marked as
17   Fiorillo Exhibit-35 for identification;
18   2/20/09, E.L.)
19   A.   (Reviewing).
20   Q.   Do you recognize this document?
21   A.   Yes.
22   Q.   This is the application for the
23 park ranger job, right?
24   A.   Correct.
25   Q.   You filled it out, right?

Page 316

F. Fiorillo

1
2   A.   Correct.
3   Q.   You filled it out truthfully and
4 accurately?
5   A.   Yes.
6   Q.   George Hesse's name anywhere on
7 this application?
8   A.   No.
9   Q.   In fact, you put down as a
10 reference, Edward Paridiso, correct?
11   A.   Correct.
12   Q.   That's on the first page?
13   A.   Correct.
14   Q.   Second page, in employment
15 experience, you don't mention George Hesse
16 there, do you?
17   A.   Because he wasn't my super --
18 Chief Hesse was the chief.
19   Q.   That's right.  You put down Chief
20 Edward Paridiso as the supervisor, right?
21   A.   Correct.
22   Q.   And the reasons for leaving,
23 "budgetary constraints," you see that?
24   A.   Correct.
25   Q.   So if I understand this document

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 317

F. Fiorillo

1 and your testimony correctly, over a year
2 after you were no longer working for Ocean
3 Beach, you put down Mr. Paridiso as a
4 reference, and you, in your own handwriting,
5 wrote "budgetary constraints" as the reason
6 for you leaving, right?
7 A. Yes.
8 Q. And, in fact, this was after you
9 filed a lawsuit in this action, right?
10 A. Yes.
11 Q. This is after you made all the
12 allegations that you made in the Complaint
13 that it was everything but budgetary
14 constraints, right?
15 A. Well, I was only going by this
16 letter.
17 Q. By --
18 A. This says -- I took the language
19 that Chief Paridiso used.
20 Q. That's exactly right. Thank you.
21 Did you have an interview with that -- with
22 Brookhaven for the park ranger position?
23 A. No.
24 Q. No? Why not?

Page 318

F. Fiorillo

1 A. I don't know why.
2 Q. Did they ever call you back?
3 A. No.
4 Q. So you submitted an application
5 and you never heard from them?
6 A. Correct.
7 Q. Did you ever tell Hesse you were
8 applying for the Brookhaven job?
9 A. No.
10 Q. Did you tell Paridiso you were?
11 A. No.
12 Q. Do you have any knowledge one way
13 or the other as to whether Hesse knew that
14 you were applying for the Brookhaven job?
15 A. No idea.
16 Q. Do you have any knowledge one way
17 or the other as to whether Hesse interfered
18 with this job application?
19 A. Not to my knowledge.
20 Q. Okay. So we've now established
21 that in 2007, you applied to one job in the
22 law enforcement field. Any others that you
23 can think of now?
24 A. I don't recall.

Page 319

F. Fiorillo

1 Q. Other than what you claim took
2 place in the Town of Southampton in 2006,
3 with regard to any job that you sought
4 employment for, do you have any knowledge
5 one way or the other as to whether Hesse
6 knew that you were applying for those jobs,
7 whether in the law enforcement field or
8 outside the law enforcement field?
9 A. No.
10 Q. And, likewise, you have no idea
11 one way or the other as to whether Hesse
12 interfered in any of your potential jobs
13 that you sought employment for?
14 A. I have no --
15 Q. Whether in law enforcement or
16 outside of law enforcement?
17 A. I have no knowledge of that.
18 Q. Let's go to page 42. You allege
19 a RICO violation in the Thirteenth Cause of
20 Action, do you see that?
21 A. Yes.
22 Q. Paragraph 180, you allege, "as
23 set forth above, Defendant Hesse, a natural
24 person, has violated the provisions of the

Page 320

F. Fiorillo

1 Racketeer Influenced and Corrupt
2 Organizations Act by, among other things,
3 engaging in two or more acts of obstruction
4 of justice within 10 years, including
5 without limitation," do you see that?
6 A. Yes.
7 Q. "A, ordering Plaintiffs to
8 falsify official police records and
9 ultimately terminating Plaintiffs'
10 employment when they refused to do so," do
11 you see that?
12 A. Yes.
13 Q. As it pertains to you, does A
14 reference the time after the Halloween
15 incident when Hesse told you that he wanted
16 you to change your report because this is
17 what happened? Well, you know what, I like
18 it when you tell me what it is. What is A
19 referring to?
20 A. A?
21 Q. Yeah. Subparagraph A, "ordering
22 Plaintiffs to falsify official police
23 records and ultimately terminating
24 Plaintiffs' employment when they refused to

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 321

F. Fiorillo

1    F. Fiorillo
2  do so," as it pertains to you, what does A
3  mean?
4    A.   A is the Halloween incident.
5    Q.   That we've already testified to?
6    A.   Correct.
7    Q.   Anything else you want to add to
8  that?
9    A.   That's the only thing that had to
10 do with falsifying official  -- let me just
11 think for a second.
12   Q.   Okay.
13   A.   What about summonses?
14   Q.   Tell me.
15   A.   That's official police records
16 that he  -- that he altered.
17   Q.   No, not that he altered.  He's
18 asking you to falsify.  Did police  -- did
19 Hesse ever order you to falsify a summons?
20 Not whether he did.  Whether he ordered you
21 to do it.  That's my question.
22   A.   Okay.  The one off the top of my
23 head is the Halloween statement.
24   Q.   Okay.  But my question is, did
25 Hesse ever order you to falsify a summons?

Page 322

F. Fiorillo

1    F. Fiorillo
2  Putting aside the Halloween incident, did
3  Hesse ever order you to falsify a summons?
4         MR. GOODSTADT: Objection.
5    A.   Well, technically, yes.
6    Q.   Technically or untechnically, why
7  don't you tell me?
8    A.   I had to go get a summons that I
9  issued from the violator, bring it back to
10 the station with the owner of the
11 business -- okay.  You want me to explain it
12 to you?
13   Q.   Well, you said technically --
14   A.   Yes.  The answer is yes.
15   Q.   Well, then tell me -- tell me how
16 Hesse ordered you to falsify a summons?
17   A.   Okay.  I was on patrol and in the
18 Village of Ocean Beach they have a code that
19 at a certain point in time, bicycle riding
20 is restricted.  So the residents of the
21 Village want this code enforced.  I enforce
22 the law in the Village as a police officer,
23 and this one subject was violating the code.
24 So I issued him a summons.
25   Q.   Okay.

Page 323

F. Fiorillo

1    F. Fiorillo
2    A.   Okay?  So what happened was the
3  father of the son went to the police
4  station.
5    Q.   Okay.
6    A.   Okay?  And first of all, when I
7  issued the summons to the son, the father
8  said, "What are you doing?"  He said, "You
9  got to take this back."  He said, "I take
10 care of the Bosettis," okay?
11   Q.   Okay.
12   A.   So I said, "You're gonna have to
13 go to court with that, and you know, you go
14 to court and the judge is going to decide
15 whatever he's going to decide.  I have
16 nothing to do with it after I issue the
17 summons."
18   Q.   And you had already issued the
19 summons?
20   A.   I already issued it.
21   Q.   Okay.  So go on.
22   A.   So then what he did was he got
23 upset and he went to the station.  I went to
24 the station with him.
25   Q.   Okay.

Page 324

F. Fiorillo

1    F. Fiorillo
2    A.   Okay?  So he was ranting and
3  raving how much he pays in taxes in the
4  Village of Ocean Beach.
5    Q.   Um-hum.
6    A.   And what Hesse did was he took
7  the summons back.  Then he had me go get the
8  summons from the -- because what I have to
9  do is have to give a copy to the, um, the
10 violator.
11   Q.   So the -- how old was the
12 violator?
13   A.   Maybe 19 or 20.
14   Q.   Okay.
15   A.   Um, it was  -- it was the, um,
16 son of this business owner.
17   Q.   Okay.
18   A.   Okay?  So what happened was --
19   Q.   Hesse told you to go get the
20 summons from the violator?
21   A.   Right.
22   Q.   Did you?
23   A.   Yeah.
24   Q.   And what did you do with it?
25   A.   I gave it to Hesse.

Case 2:07-cv-01215-SJF-ETB  Document 145-18  Filed 01/15/10  Page 85 of 158 PageID #: 2455

FRANK FIORELLO                                        EDWARD CARTER, ET AE. vs.
February 20, 2009              INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 325

F. Fiorillo

1        Q.   Okay.  So did you falsify
2   anything on the summons that you had issued
3   after you issued it?
4        A.   Well, he ordered me to take the
5   summons back.  I mean, that's pretty --
6        Q.   Sir, you're alleging "ordered
7   Plaintiffs to falsify official police
8   records."  Did you change the writing on the
9   summons after you issued it?
10       A.   I didn't change it at all.
11       Q.   That's fine.  And you didn't
12  refuse Hesse's direction to get the summons
13  back?
14       A.   No.
15       Q.   Right.  Well, you write in
16  paragraph A, "Ordered Plaintiffs to falsify
17  official police records and ultimately
18  terminating Plaintiffs' employment when they
19  refused to do so."  So this one really
20  wouldn't apply to that summons, would it,
21  because you didn't refuse Hesse's direction?
22            MR. GOODSTADT: Objection.
23       Q.   Right?
24       A.   Okay.

Page 326

F. Fiorillo

1        Q.   Okay.  So other than the
2   Halloween police report that you've
3   testified about already, any other police
4   records that Hesse ordered you to falsify
5   that you refused to do?
6        A.   Not that I can recall at this
7   time.
8        Q.   Okay.  Let's go to B,
9   "Prohibiting Plaintiffs from interfering
10  with the unlawful activities of a known drug
11  dealer operating within the jurisdiction of
12  the OBPD," do you see that?
13       A.   Yes.
14       Q.   Who was this known drug dealer?
15       A.   Mitch Burns.
16       Q.   Okay.  And are you -- is it your
17  allegation that George Hesse prohibited you
18  specifically from interfering with the
19  unlawful activities of Mr. Burns operating
20  within the jurisdiction?
21       A.   Yes.
22       Q.   Okay.  Now, did you ever witness
23  Mr. Burns selling drugs in the jurisdiction
24  of the Ocean Beach Police Department?

Page 327

F. Fiorillo

1        A.   There was an incident at the
2   church where --
3        Q.   We'll get to that.  But my
4   question to you, sir, did you ever witness
5   Mitchell Burns selling drugs in the
6   jurisdiction of the Ocean Beach Police
7   Department?
8        A.   I witnessed what appeared to be a
9   drug transaction by Mitch Burns.
10       Q.   Okay.  And describe for me your
11  witnessing of the drug transaction involving
12  Mitch Burns.
13       A.   Um, it was a  -- it was about
14  2:30 in the morning at the church on Ocean
15  Road and Midway Walk.
16       Q.   Okay.  What year?
17       A.   I would say that was 2004.
18       Q.   Okay.  What did you witness?
19       A.   I witnessed, um, Mitch Burns and
20  this male subject, his name was Adam, he was
21  on the Ocean Beach basketball team, and they
22  were making a -- an exchange of what
23  appeared to be cocaine.
24       Q.   Well, what made -- gave you the

Page 328

F. Fiorillo

1   impression that what you saw would appear to
2   be cocaine?
3        A.   It was a white powdery substance
4   in a -- like a glazing bag.
5        Q.   How far away were you when you
6   witnessed this transaction?
7        A.   Pretty close.  Like pretty close
8   (indicating).
9        Q.   Were you in uniform?
10       A.   Yeah.  I was on duty.
11       Q.   So you're standing about three
12  feet, four to five feet away from Mitch
13  Burns and this other individual, and you saw
14  Mitch Burns hand him a vial of cocaine?
15       A.   No.  Not vial.
16       Q.   A bag?
17       A.   It's a little bag like this
18  (indicating).
19       Q.   Transparent?
20       A.   Yeah.
21       Q.   And did you see the individual
22  give Mitch Burns money?
23       A.   No.
24       Q.   Okay.  Did Mitch Burns know that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 329

F. Fiorillo

1
2 you were standing five feet away from him?
3      A.   No.
4      Q.   Okay.  So was George Hesse with
5 you?
6      A.   No.
7      Q.   Was anyone with you?
8      A.   Yes.
9      Q.   Who was with you?
10     A.   Joe Nofi.
11     Q.   Okay.  Oh, Joe Nofi.  Okay.  And
12 what police action did you take upon your
13 witnessing of what you believed to be was a
14 drug deal?
15     A.   I didn't take any police action.
16     Q.   Why not?
17     A.   Because George Hesse told me
18 whatever -- whatever -- if anything has to
19 do with Mitch Burns, hands off.  Look the
20 other way.
21     Q.   And when did George Hesse tell
22 you this?
23     A.   This was -- the night that he
24 told me?
25     Q.   Yeah.

Page 330

F. Fiorillo

1
2      A.   I was called to the station to
3 pick him up and then I was in the gem car.
4 And then what I did was I dropped him off at
5 Mitch Burns' house.  He said, "Whatever
6 happens here with -- between the drugs and
7 the girls, we look the other way."
8      Q.   George Hesse said that?
9      A.   George Hesse said that.
10     Q.   Okay.  In the same season that
11 you saw Mitch Burns hand this other
12 individual what you thought to be cocaine?
13     A.   Yes.
14     Q.   And how old was this other
15 individual?  You said he played for the
16 Ocean Beach Police -- basketball team?
17     A.   Yes.
18     Q.   How old was he?
19     A.   I would say in his 30s.
20     Q.   Okay.
21          MR. GOODSTADT: It's a well
22 known team.
23          MR. NOVIKOFF: Yeah.  I guess.
24     A.   It's not the Ocean Beach team.
25 It's the Ocean Beach league they have in the

Page 331

F. Fiorillo

1
2 summertime.
3      Q.   Okay.  And did you say anything
4 to these two individuals?
5      A.   I asked them what they were doing
6 on the property.
7      Q.   And what did they say?
8      A.   Well, then Mitch just broke out
9 to a -- to a real big sweat.
10     Q.   Okay.
11     A.   And they didn't have an answer.
12 They were just hanging out.
13     Q.   And did you take the substance
14 away from the individual?
15     A.   No.
16     Q.   No?  Well, why not?
17     A.   Because I had a feeling that if I
18 did anything with Mitch Burns, my job was
19 going to be in jeopardy.  Because at the
20 time, George Hesse was sleeping at Mitch
21 Burns' house because he was having marital
22 problems with his wife.
23     Q.   So you allowed an individual in
24 your presence to walk away with what you
25 believed to be cocaine, right?

Page 332

F. Fiorillo

1
2      A.   Yes.
3      Q.   Notwithstanding whatever health
4 concerns or public safety concerns could
5 result from that, is that your testimony?
6      A.   Based on what George Hesse told
7 me.
8      Q.   Now you had  -- you complained --
9 did you complain to Paridiso about this?
10     A.   No.
11     Q.   Now you complained to Paridiso
12 about the Bosettis throwing a cabinet into
13 the bay, right?
14     A.   That's right.
15     Q.   And you complained to Paridiso
16 about Hesse telling you that he wanted you
17 to change your report, right?
18     A.   Right.
19     Q.   And you complained to Paridiso
20 about the Bosettis drinking in the Village
21 and Muller drinking in the Village, right?
22     A.   Right.
23     Q.   So is it your contention to this
24 jury that notwithstanding the fact that you
25 witnessed an illegal transaction, you made

Case 2:07-cv-01215-SJF-ETB Document 145-18 Filed 01/15/10 Page 87 of 158 PageID #: 2457

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 333

1           F. Fiorillo
2 no complaints to the chief of police?
3           MR. GOODSTADT: Objection.
4     Q.    Is that your  -- is that what
5 your testimony is?
6     A.    Well, I never  -- I never checked
7 the substance, so I don't know if it was
8 drugs.
9     Q.    Oh.  Okay.
10    A.    But in my opinion, it was a good
11 possibility.
12    Q.    A good possibility that what two
13 individuals exchanged was drugs.  Fine.  Did
14 you even go to Chief Paridiso and tell him
15 that you were prevented from enforcing your
16 job, putting the public safety at risk,
17 because of what Chief Hesse  -- what
18 Mr. Hesse told you?
19    A.    No.
20    Q.    And Mr. Hesse had previously told
21 you, sir, that not to do anything with
22 regard to the known drug dealer, right?
23    A.    Yes.
24    Q.    And at no time did you advise
25 Mr. Paridiso about this, correct?

Page 334

1           F. Fiorillo
2     A.    Correct.
3     Q.    Even though you swore to uphold
4 the law, correct?
5     A.    Correct.
6     Q.    Even though the primary objective
7 of being a police officer was to ensure the
8 safety of the individual citizens within the
9 jurisdiction and anyone else within the
10 jurisdiction, correct?
11    A.    Yes.
12    Q.    So if I understand you correctly,
13 and please tell the jury this,
14 notwithstanding the fact that you were told
15 by Mr. Hesse not to enforce the law against
16 Mr. Burns, and that the public safety could
17 be at issue because of what Mr. Burns was
18 doing, you did not go to your superior,
19 Mr. Paridiso, and make a complaint?
20          MR. GOODSTADT: Objection.
21    Q.    Correct?
22    A.    Correct.
23    Q.    So you knowingly allowed a drug
24 dealer to do whatever he was doing in Ocean
25 Beach that could put the safety of the

Page 335

1           F. Fiorillo
2 citizens in jeopardy, correct?
3     A.    Not only me.  What about George
4 Hesse?
5     Q.    You're -- you're answering the
6 question, sir, that I'm asking you.  You
7 would agree with me, right?
8     A.    Yes.
9     Q.    And you didn't tell Mayor Rogers?
10    A.    No.
11    Q.    You didn't tell any trustees?
12    A.    No.
13    Q.    You didn't -- you didn't even
14 send an anonymous -- well, let me ask you,
15 did you send any anonymous notes or
16 communications to anyone at Ocean Beach
17 about this?
18    A.    No.
19    Q.    No, right?
20    A.    Right.
21    Q.    You didn't send any anonymous
22 communications to the DA, right?
23    A.    No.
24    Q.    You didn't send any anonymous
25 communications to any media outlet, right?

Page 336

1           F. Fiorillo
2     A.    Well, when you say "anonymous" --
3     Q.    Did you call up News 12 and say
4 "hey, listen, I can't tell you who my name
5 is, but I'm being told by my police sergeant
6 not to enforce the laws against a drug
7 dealer"?
8     A.    No.  But I did tell the DA's
9 office.
10    Q.    After August 2005, right?
11    A.    Yes.
12    Q.    And that was after they came to
13 you about the Gilbert incident, correct?
14    A.    Correct.
15    Q.    You didn't voluntarily go to the
16 DA with this information, did you?
17    A.    No.
18    Q.    Right.  You then write in
19 subparagraph C, "ordering Plaintiffs to
20 facilitate other officers' dereliction of
21 duty, including without limitation, by
22 allowing those officers to imbibe
23 intoxicating beverages while on duty," what
24 do you mean by that?
25    A.    Well, we were -- we were told to

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 337

F. Fiorillo

1      F. Fiorillo
2 look the other way with the, um, with the --
3 as far as the Bosettis go.
4    Q.   What were you told with regard to
5 looking the other way?
6    A.   Well, I was told not to go crying
7 to the chief.
8    Q.   Anything else that you were told?
9    A.   Well, I was told to drive
10 officers to the checkpoint.
11   Q.   Okay.  Anything else?
12   A.   I was told to pick them up at the
13 bars.
14   Q.   The Bosettis.  Anything else.
15 Well, the Bosettis you're referring to?
16   A.   Well, the Bosettis.  Walter
17 Muller.
18   Q.   Okay.
19   A.   Sometimes Ty Bacon.  It wasn't
20 always the Bosettis.  It was, you know,
21 there were other officers also.
22   Q.   Okay.  Anything else?
23   A.   Well, that's all I can recall at
24 this time.
25   Q.   Were you the only person to ever

Page 338

F. Fiorillo

1      F. Fiorillo
2 be directed by Mr. Hesse to drive officers
3 to the checkpoint?
4    A.   No.
5      MR. GOODSTADT: Objection.
6    Q.   To your knowledge, who else
7 was -- was directed by Hesse to drive
8 officers to the checkpoint?
9    A.   I think Joe Nofi.
10   Q.   Um-hum.
11   A.   Tommy Snyder.  Kevin Lamm.  Eddie
12 Carter.
13   Q.   Were you aware if any other
14 officers who were on different shifts would
15 drive police officers to checkpoints at the
16 end of their shifts?
17   A.   If I wasn't there, I wouldn't
18 know who he had.
19   Q.   Well, you did come to the
20 checkpoint when you started your shift,
21 right?
22   A.   No.  I came on the ferry.
23   Q.   Okay.  Then let's talk about D.
24 Well, did you ever send a -- an anonymous
25 communication to anyone concerning the fact

Page 339

F. Fiorillo

1      F. Fiorillo
2 that you were being directed by Hesse to
3 drive officers off to the checkpoint or take
4 them out of the bars?
5      MR. GOODSTADT: Objection.
6    A.   Say that -- I'm sorry.
7    Q.   Well, did you ever complain by
8 way of any communication, um, that you were
9 being directed by George Hesse to drive the
10 Bosettis and other officers to the
11 checkpoint?
12   A.   Did I ever complain about that?
13 No.
14   Q.   And I think you mentioned you
15 had -- you were ordered to take some of the
16 officers out of bars?
17   A.   Yeah.  Pick them up at the bars
18 when they were coming out of the bars.
19   Q.   And take them where, if anywhere?
20   A.   To the checkpoint.
21   Q.   So that's all in one, take them
22 out of the bar?
23   A.   Yeah.  Basically through Ocean
24 Beach to the checkpoint.
25   Q.   Did you ever complain about that?

Page 340

F. Fiorillo

1      F. Fiorillo
2    A.   Um, there was one night in
3 particular that I complained about, um,
4 Richie Bosetti driving the vehicle  -- well,
5 I wasn't driving that night.  You want to
6 hear about that?
7    Q.   No.  I'm just interested in if
8 you complained.
9    A.   Well, it's in reference to a
10 complaint.
11   Q.   What did you complain about?
12   A.   About Richie Bosetti driving the
13 police vehicle to the checkpoint and
14 offering a Marine Bureau police -- Suffolk
15 County Marine Bureau police officer a beer,
16 while the Marine Bureau police officer was
17 on duty.
18   Q.   And who did you complain to?
19   A.   The chief.
20   Q.   Chief Paridiso?
21   A.   (Indicating).
22   Q.   So that's another complaint that
23 you --
24   A.   Well, I just remember that one
25 now because of the transporting.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 89 of 158 PageID #: 2459

FRANK FIORELLO                                                    EDWARD CARTER, ET AL. vs.
February 20, 2009                              INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 341

F. Fiorillo

1          Q.   And when did that take place?
2          A.   That was in 2004.
3          Q.   And why didn't you complain to
4    Hesse first about that?
5          A.   Because at that time, that was
6    when the chief was trying to enforce the
7    rules in the Village, and Hesse wasn't doing
8    anything to enforce them himself.
9          Q.   Okay.  So if I understand your
10   testimony then, at some point in time in
11   2004, you witnessed Richard Bosetti offering
12   a --
13         A.   Suffolk County police -- Marine
14   Bureau police officer on duty in his
15   vehicle --
16         Q.   A beer?
17         A.   A beer.
18         Q.   Did that police officer take the
19   beer?
20         A.   No.
21         Q.   And you felt the need to complain
22   to Chief Paridiso about that?
23         A.   That made the department look
24   so -- I mean, it was  -- it was a disgrace.

Page 342

F. Fiorillo

1    I felt that to be a disgrace that here he
2    is, I mean, embarrassing us basically.
3          Q.   Did the marine officer indicate
4    that it was an embarrassment to be offered a
5    beer while on duty in your presence?  I'm
6    only asking --
7          MR. GOODSTADT: Objection.
8          A.   In my presence, I think he was
9    pretty shocked by his reaction.
10         Q.   Okay.  What was his reaction?
11         A.   His recollection was, "No way."
12   He goes, "I'm on duty," you know.
13         Q.   Did you complain to anybody else?
14         A.   No.
15         Q.   Let's go to D, "conspiring with
16   Alison Sanchez to prevent Plaintiffs from
17   taking any action that might prevent Hesse
18   from perpetrating similar acts on an ongoing
19   basis"?
20         A.   Where is this?
21         Q.   D, on the bottom of 42.
22         A.   Bottom of 42?
23         MR. GOODSTADT: What's the
24   question about it?

Page 343

F. Fiorillo

1          MR. NOVIKOFF: What did he mean
2    by that.
3          MR. GOODSTADT: Objection.
4          A.   Well, Alison Sanchez was the one
5    who we went to -- Joe Nofi, Kevin Lamm and
6    myself -- and she actually told us that we
7    couldn't go on any further than her.  So she
8    basically prevented us from -- from going
9    forward which -- which might have prevented
10   Hesse from perpetrating similar acts on an
11   ongoing basis.
12         Q.   Might have.  You said Alison
13   Sanchez prevented you.  Would you agree with
14   me the fact that I've been asking you
15   questions for five hours at a deposition in
16   a complaint that you filed alleging all of
17   these activities involving Mr. Hesse,
18   indicates that you weren't in fact prevented
19   by anyone to -- trying to ensure that George
20   Hesse didn't do this anymore?
21         MR. GOODSTADT: Objection.
22         Q.   Do you understand what I'm
23   saying?
24         A.   Not really.

Page 344

F. Fiorillo

1          Q.   All right.  Well, you just said
2    in the Complaint and in your testimony that
3    Alison Sanchez conspired with George Hesse
4    to prevent you from preventing Hesse from
5    perpetrating similar acts that were alleged
6    in your Complaint, do you see that?
7          A.   Yes.
8          Q.   You filed a lawsuit, right?
9          A.   Yes.
10         Q.   In this lawsuit, you've alleged
11   that Hesse has committed a lot of unlawful
12   acts, right?
13         A.   Yes.
14         Q.   And a lot of acts that weren't
15   nice to you, right?
16         A.   Yes.
17         Q.   How could you have done that if
18   Alison Sanchez, as you've testified,
19   prevented you from doing this?
20         MR. GOODSTADT: Objection.
21         Q.   It's a mind twister, isn't it?
22         MR. GOODSTADT: Objection.
23         A.   I'm trying to think of how to
24   answer it.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 345

F. Fiorillo

1 Q. I'm trying to think how you're
2 going to answer it.
3 MR. GOODSTADT: Objection.
4 A. Well, what Alison Sanchez and
5 Hesse did to Joe, Kevin and myself and they
6 got away with doing that, if they got away
7 with doing that, then they can continue to
8 do that on an ongoing basis if -- if we
9 didn't do anything about it.
10 Q. Yeah. But that -- what you've
11 alleged is that Sanchez prevented you from
12 preventing Hesse from perpetrating similar
13 acts on an ongoing basis, sir. You filed
14 this lawsuit, correct?
15 A. Correct.
16 Q. So explain to the jury how Alison
17 Sanchez prevented you from doing anything?
18 MR. GOODSTADT: Objection.
19 A. Well, she initially was the cause
20 of these officers who came to Ocean Beach as
21 civilians that were working for a -- a few
22 years.
23 Q. She initially was the cause, is
24 that your testimony?

Page 346

F. Fiorillo

1 A. Well, she had -- she -- with --
2 her and Hesse, both of them involved.
3 Q. I'll move on. I just want to go
4 back to some questions about your
5 employment. When you first joined the
6 police department at Ocean Beach, were you
7 qualified as you've alleged other officers
8 weren't?
9 A. Absolutely I was qualified. 100
10 percent.
11 Q. You were qualified? You passed
12 all your tests?
13 A. Everything.
14 Q. At no time did you have any
15 retake any tests?
16 A. None.
17 Q. Okay. Now prior to January 1,
18 2006 -- well, let's just go back. Between
19 the time you first started at Ocean Beach
20 and January 1, 2006, what jobs in the law
21 enforcement field did you apply for?
22 A. Prior to -- excuse me?
23 Q. Between your first day at Ocean
24 Beach in 2002 and January 1, 2006, what jobs

Page 347

F. Fiorillo

1 in the law enforcement field had you applied
2 for?
3 A. I believe I only applied for one
4 job.
5 Q. In the entire span of that time?
6 A. That I can remember.
7 Q. What job was that?
8 A. FBI.
9 Q. Did you get it?
10 A. No.
11 Q. In fact, didn't Ty Bacon give you
12 a recommendation?
13 A. I don't know who gave
14 recommendations.
15 Q. Did you ever ask Ty Bacon to give
16 you a recommendation for that job?
17 A. No.
18 Q. Did you ask Ty Bacon to do
19 anything with regard to that job?
20 A. No. What happened was the --
21 Q. I'm just asking a question. So
22 Ty Bacon, you asked nothing of Ty Bacon with
23 regard to your application to the FBI, is
24 that your testimony?

Page 348

F. Fiorillo

1 A. I have to say "no" with an
2 explanation.
3 Q. Fine. Give me the explanation.
4 A. I didn't ask anybody for a
5 reference because what the investigator did
6 was he went to Ocean Beach and Chief
7 Paridiso gave him the names to give the
8 investigator, um, recommend -- the
9 reference. I had nothing to do with it.
10 Q. Let's go to page 41. 176, do you
11 see that?
12 A. Yes.
13 Q. Now above that this is the
14 Twelfth Cause of Action, right?
15 A. Yes.
16 Q. And you entitle it "Negligent
17 Retention of an Unfit Employee Under State
18 Law," do you see that?
19 A. Yes.
20 Q. Let's go to 176. You write or
21 you allege "as set forth above, Defendants
22 Hesse, Ocean Beach, OBPD and Suffolk County
23 Civil Service, deliberately retained and
24 advanced the careers of uncertified and

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 91 of 158 PageID #: 2461

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 349

F. Fiorillo

1  unqualified personnel who served alongside
2  Plaintiffs as police officers," do you see
3  that?
4     A.   Yes.
5     Q.   How come you didn't make the same
6  allegation about Chief Paridiso?
7        MR. GOODSTADT: Objection.
8     A.   What do you mean by that?
9     Q.   Well, Chief Paridiso was
10 Defendant Hesse's superior in 2002, 2003,
11 2004 and part of 2005, correct?  Right?
12    A.   Yeah.  But George Hesse --
13    Q.   Sir, was --
14    A.   Yes.
15    Q.   Yes?
16    A.   Yes.
17    Q.   And you testified earlier that
18 you don't know who had the authority at
19 Ocean Beach to hire people, right?
20    A.   Yes.
21    Q.   So my question to you, sir, is
22 why didn't you include Chief Paridiso in
23 this allegation?
24       MR. GOODSTADT: Objection.  To

Page 350

F. Fiorillo

1  the extent that -- I just want to
2  caution you -- to the extent that the
3  decision was made in consultation with
4  your lawyers or any strategic decisions
5  who to sue and not to sue was made in
6  consultation with a lawyer, I'm going
7  to instruct you not to answer.
8        THE WITNESS: Okay.
9     Q.   You can't answer that?
10    A.   Based on my attorney's advice.
11    Q.   Okay.  You then go on -- I don't
12 know if I continued -- "who served alongside
13 Plaintiffs as police officers, while
14 Defendant Loeffler, mayor of Ocean Beach,
15 negligently permitted Hesse to do so," do
16 you see that?
17    A.   Where?  41?
18    Q.   176 on page 41.
19    A.   Yup.
20    Q.   Do you see reference to --
21    A.   Okay.  I got it.
22    Q.   -- Defendant Loeffler?
23    A.   Yes.
24    Q.   On April 2, 2006, Loeffler wasn't

Page 351

F. Fiorillo

1  the mayor, was he?
2     A.   No.
3        MR. GOODSTADT: Objection.
4     It's pretty clear on 177 that he
5     wasn't.
6        MR. NOVIKOFF: Okay.
7     Q.   So Loeffler was not the mayor?
8     A.   Correct.
9     Q.   So how could Mayor Loeffler have
10 negligently permitted Hesse to do so if he
11 wasn't the mayor?
12       MR. GOODSTADT: Objection.
13    Q.   In your opinion?
14       MR. GOODSTADT: Objection.
15    It's set forth in 177.
16       MR. NOVIKOFF: That's nice.  If
17    you need to read it, you can read it.
18       MR. GOODSTADT: I'll object to
19    the question.  It calls for a legal
20    conclusion.
21       MR. NOVIKOFF: Okay.  You can
22    answer.
23    Q.   I'll make my question even
24 simpler.  If Hesse was not the mayor at the

Page 352

F. Fiorillo

1  time that you left --
2     A.   If Loeffler.
3     Q.   If Loeffler was not the mayor at
4  the time that you left on April 2, 2006, how
5  could he have negligently permitted the --
6  the continuation of the careers --
7        MR. GOODSTADT: Objection.
8     Q.   Of these unqualified officers?
9        MR. GOODSTADT: Same objection.
10    A.   As the village trustee, he did.
11    Q.   And what's the basis for your
12 opinion that the village trustee, Hesse, had
13 the authority --
14    A.   No.
15    Q.   I mean Loeffler had the authority
16 to hire or fire any employee by himself?
17    A.   No.  No.  I don't know that.
18    Q.   Oh, you don't know that?
19    A.   (Indicating).
20    Q.   Okay.
21    A.   But he has a direct vote I would
22 imagine.
23    Q.   One of five, right?
24    A.   Right.

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 353

1         F. Fiorillo
2    Q.   Okay.  Do you have any indication
3 one way or the other as to whether Loeffler
4 ever voted on this issue?
5    A.   I don't know.
6    Q.   Right.  Okay.  You then go on
7 "Defendant Hesse had knowledge of the undue
8 risk of harm to which Plaintiffs were
9 thereby exposed."  Let me ask you this
10 question, sir --
11   A.   Where are you?  I'm sorry.
12   Q.   Same 176.
13   A.   Okay.
14   Q.   "Negligently permitted Hesse to
15 do so.  Defendant Hesse had knowledge of the
16 undo risk of harm to which Plaintiffs were
17 thereby exposed," do you see that?
18   A.   Okay.
19   Q.   Tell the jury, in your own words,
20 how you, Mr. Fiorillo, have been physically
21 injured as a result of the uncertified and
22 unqualified personnel serving alongside you?
23        MR. GOODSTADT: Objection.
24   A.   We had the risk of physical
25 injury.

Page 354

1         F. Fiorillo
2    Q.   Oh, I can read, sir.  I'm asking
3 you to tell the jury what physical injuries
4 you've suffered as a result of the
5 uncertified and unqualified personnel that
6 you served alongside?
7        MR. GOODSTADT: Objection.
8    A.   I think because of them being
9 unfit to be qualified for the position of
10 police officer, that's why I'm -- I'm in the
11 position I am in right now.
12   Q.   Oh, no.  I get that aspect of
13 your claim.
14   A.   So physically it affected me.
15   Q.   Tell the jury specifically what
16 physical injury you have suffered as a
17 result of serving alongside of uncertified
18 and unqualified personnel?
19        MR. GOODSTADT: Objection.
20   Q.   Okay.
21   A.   Physical injury?
22   Q.   Physical injury.
23   A.   I think I'm damaged, to be honest
24 with you, physically.
25   Q.   That's what I'm asking.

Page 355

1         F. Fiorillo
2    A.   I'm damaged.  It affected me
3 physically.
4    Q.   What physical injury have you
5 suffered?  Have you suffered a broken arm?
6 Well, you know what, let me make it -- let
7 me see.  You got one more minute left?
8 Prior to April 2, 2006, what physical injury
9 did you suffer as a result of working
10 alongside uncertified and unqualified
11 officers?
12        MR. GOODSTADT: Objection.
13   A.   Well, physically working with
14 uncertified officers in -- in the, um, in
15 working as a police officer in Ocean Beach,
16 there was -- there was -- physically you
17 weren't assured that you had a police
18 officer on your side or backing you up in an
19 emergency situation that, number one, knew
20 the ten codes, number two, knew how to
21 handle a situation without  -- without being
22 under the influence of drug  -- alcohol.
23 Excuse me.  Alcohol.
24   Q.   Actually, we're running out of
25 time.  Do you want to just pick that answer

Page 356

1         F. Fiorillo
2 up when we're done?  We can read what you
3 had said so far and then you can continue?
4    A.   Whatever you want.
5        MR. NOVIKOFF: Yeah.  Let's do
6 that.
7        THE VIDEOGRAPHER: This ends
8 tape number five.  The time it 4:50
9 p.m.  Going off the record.
10       (A break was taken.)
11       THE VIDEOGRAPHER: This begins
12 tape number six.  The time is 5:01 p.m.
13 Back on the record.
14       MR. NOVIKOFF: I'm going to ask
15 the court reporter to read back your
16 answer so that -- since we stopped
17 because the tape ended, so that if you
18 want to finish it or complete it, by
19 all means do so.
20       THE WITNESS: Okay.
21       (The requested portion was read.)
22   Q.   Do you want to finish your
23 answer?
24   A.   Yes.
25   Q.   Go ahead.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 357

F. Fiorillo

1    A.   Um, with that, there was always
2  the potential to, um, have the risk of
3  injury, but at that time, I didn't get
4  any -- I didn't receive any injuries.
5  MO        MR. NOVIKOFF: Okay. I'm going
6    to move to strike that answer. And
7    just so that the record's clear, and I
8    know your counsel's going to object,
9    and that's fine.
10   Q.   Prior to April 2, 2006, what
11 physical injury, if any, did you suffer as a
12 result of serving alongside unqualified and
13 uncertified officers?
14        MR. GOODSTADT: Objection.
15   A.   No physical injury.
16   Q.   Okay. Let's go to page 40.
17 Paragraph 171. Now, sir, in the Eleventh
18 Cause of Action, you title it "Termination
19 in Violation of Public Policy Under State
20 Law," do you see that?
21   A.   Yes.
22   Q.   Please tell the jury what the
23 Public Policy of New York State is that you
24 believe my clients have violated?

Page 358

F. Fiorillo

1        MR. GOODSTADT: Objection.
2    It's a legal conclusion. That's a
3    strictly legal question.
4        MR. NOVIKOFF: I'm asking the
5    witness.
6        MR. GOODSTADT: Did you want to
7    explain what section 1983 is also?
8    Q.   Sir, please identify the public
9  policy.
10       MR. GOODSTADT: That's a legal
11   conclusion. I'm going to object.
12       MR. NOVIKOFF: Your objection's
13   noted.
14   A.   That would be a legal policy.
15   Q.   Yeah. I'm -- what's the public
16 policy of New York State that my clients
17 have violated?
18       MR. GOODSTADT: Objection. You
19   can answer, if you know.
20   Q.   If you don't know, then you say
21 "I don't know."
22   A.   I don't know.
23   Q.   Okay. Let's go to paragraph 171.
24 "As set forth above, Defendants terminated

Page 359

F. Fiorillo

1  Plaintiffs' employment because Plaintiffs
2  complied with and/or refused to violate laws
3  and regulations governing law enforcement
4  personnel in Ocean Beach, Suffolk County."
5  Sir, were the criminal procedure laws of New
6  York State be applicable to Ocean Beach
7  police officers?
8        MR. GOODSTADT: Objection.
9    Q.   In terms of how they go about
10 enforcing the law?
11   A.   Yes.
12   Q.   Okay.
13   A.   With and including the Ocean
14 Beach Village code.
15   Q.   Fine. And is it against the law,
16 to your knowledge, to sell cocaine to an
17 individual?
18   A.   Yes.
19   Q.   Is it a felony to sell --
20   A.   Yes.
21   Q.   -- cocaine?
22   A.   Yes.
23   Q.   And would you agree with me that
24 as an officer, a police officer, it's your

Page 360

F. Fiorillo

1  obligation under the law that if you witness
2  a felony, such as the sale of narcotics, you
3  are required to make the arrest?
4    A.   Yes.
5    Q.   Would you also agree with me that
6  when you witnessed Mitch Burns engaged in a
7  drug transaction involving cocaine, you
8  declined to arrest him?
9    A.   I didn't know if he was selling
10 cocaine.
11   Q.   Well, okay.
12   A.   I didn't test it. In other
13 words --
14   Q.   You didn't even get it?
15   A.   Right. So I couldn't even -- I
16 couldn't tell the truth that it was cocaine.
17   Q.   Okay. Isn't it true, sir, that
18 Mr. Hesse, according to your -- well,
19 withdrawn. Sir, according to your
20 testimony, Mr. Hesse ordered you to
21 disregard the law when it came to Mitch
22 Burns and turn the other way, correct?
23   A.   Yes.
24   Q.   And in 171, you allege that you

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 361

F. Fiorillo

1
2 refused to violate the law, do you see that?
3     A.   Yes.
4     Q.   Isn't it true that at least with
5 regard to Mr. Burns, according to your
6 testimony, you agreed with Mr. Hesse to
7 violate the law with regard to Mitch Burns'
8 conduct?
9     A.   Well, I didn't violate the law
10 because I didn't know -- actually, I didn't
11 know what he was selling, so technically,
12 was the law broken?  I don't know because I
13 don't know if in fact what appeared to be a
14 drug transaction to me, I didn't -- I didn't
15 have the possession, I didn't test it, I
16 didn't pursue it.
17     Q.   Let me ask you a question.  Had
18 Mr. Hesse, according to you, not given you
19 that direction, would you have apprehended
20 Mr. Burns and placed him under arrest?
21     A.   Well, I would have had to see --
22     MR. GOODSTADT: Objection.
23     A.   I would have to further
24 investigate the scene.
25     Q.   What would have you done to

Page 362

F. Fiorillo

1
2 further investigate the scene?
3     MR. GOODSTADT: Objection.
4     A.   Well, I would have had to search.
5     Q.   Did you believe you had probable
6 cause to search him?
7     A.   At that time?
8     Q.   That's all I'm asking.  Your
9 opinion.
10     A.   My opinion, I probably did.
11     Q.   Okay.  And given that you believe
12 you had probable cause to invest -- to
13 search Mr. Burns, your practice would have
14 been to search Mr. Burns, right?
15     A.   Yes.
16     Q.   And had you found, um, narcotics
17 on Mr. Burns  -- well, would you have also
18 searched the other person?
19     MR. GOODSTADT: Objection.
20     A.   Oh yeah.
21     Q.   Had you found -- had you searched
22 him and you got possession of the bag with
23 the substance in it, what would you have
24 done next?
25     MR. GOODSTADT: Objection.

Page 363

F. Fiorillo

1
2     A.   I would have had to take him down
3 to the station and then we have a test kit.
4     Q.   Right.
5     A.   Test it to confirm.
6     Q.   Okay.  And that would have
7 been --
8     A.   Grounds to arrest him.
9     Q.   If there was narcotics?
10     A.   Correct.
11     Q.   And you did none of that?
12     A.   No.
13     Q.   So would you agree with me that
14 you -- rather than refusing to violate the
15 law and regulations, you, in fact, complied
16 with Mr. Hesse's instructions to you not to
17 do what your job and the regulations
18 required, correct?
19     MR. GOODSTADT: Objection.
20     A.   In that instance, yes.
21     Q.   So would you agree with me, sir,
22 that you, in fact, violated the public
23 policy of New York State --
24     MR. GOODSTADT: Objection.
25     Q.   -- by -- by turning a blind eye

Page 364

F. Fiorillo

1
2 to what you believed was probable cause of
3 criminal activity?
4     MR. GOODSTADT: Same objection.
5     A.   It would have to go  -- there
6 would have to be a progression on that.
7 Like, initially, I didn't know if it was
8 cocaine.  In other words, I would have to
9 take the first step.
10     Q.   Not even talking about whether or
11 not it was cocaine or not, sir, isn't it
12 true that as with regard to Mr. Burns, you
13 violated your obligation to  -- to act as a
14 police officer and investigate what you
15 believed to be a crime?
16     MR. GOODSTADT: Objection.
17     A.   I followed Hesse's orders is what
18 I did.
19     Q.   Okay.  Now I appreciate the Nazi
20 defense, but I'm asking you this, sir.
21 Isn't it true that you violated your
22 obligations as a police officer by not
23 pursuing what you believed was a violation
24 of the criminal laws of New York State with
25 regard to Mitch Burns?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 365

F. Fiorillo

1    MR. GOODSTADT: Objection. To
2 analogize his statement to a Nazi
3 defense is offensive.
4    A.   I don't know what that means, the
5 Nazi defense.
6    Q.   Sir, isn't it true that you
7 knowingly and intentionally acted in
8 contradiction to your obligations as a
9 police officer by not investigating what you
10 believed to be a narcotics sale?
11    MR. GOODSTADT: Objection.
12    A.   I'm not sure.
13    Q.   Let's go to page 39. Tell me
14 when you're there. Are you there?
15    A.   Okay.
16    Q.   Page nine, paragraph 164, do you
17 see where I'm referring to?
18    A.   Page 39.
19    Q.   Page 39, yes.
20    A.   Paragraph?
21    Q.   39. I'm sorry, paragraph 164.
22    A.   Got it.
23    Q.   This is within the Tenth Cause of
24 Action, do you see that?

Page 366

F. Fiorillo

1    A.   Yes.
2    Q.   Defamation per se Under State
3 Law --
4    A.   Yes.
5    Q.   -- do you see that? 164,
6 "Defendants Hesse and OBPD published
7 defamatory statements about Plaintiffs,
8 including without limitation, assertions
9 that," do you see where I'm at?
10    A.   Yes.
11    Q.   Let's go to A. "Plaintiffs
12 were" -- bless you -- "Plaintiffs were
13 dishonest men, 'rats' and rogue law
14 enforcement officers (April 2, 2006)." What
15 does the reference to "April 2, 2006" mean
16 as it's used in paragraph 164A?
17    MR. GOODSTADT: Objection.
18    A.   That reference is a reference
19 that was made at the Ocean Beach department
20 meeting.
21    Q.   Now were you present at the
22 meeting?
23    A.   No.
24    Q.   Okay. And, in fact, if I recall

Page 367

F. Fiorillo

1 your testimony correctly, and tell me if I'm
2 wrong, because I don't want to
3 mischaracterize your testimony, all the
4 officers -- well, a number of officers were
5 on Ocean Beach for the organizational
6 meeting on April 2, 2006, correct?
7    A.   Correct.
8    Q.   And at some point in time, Hesse
9 said that everyone should line up, right?
10    A.   Correct.
11    Q.   And -- at the boathouse?
12    A.   Correct.
13    Q.   And then when you went to the
14 boathouse, it was only you, Lamm, Carter and
15 Nofi and nobody else?
16    A.   Correct.
17    Q.   Okay. Now where did you --
18 where did you hear Hesse say go to the
19 boathouse? Where were you standing when he
20 said that?
21    A.   Where was I standing?
22    Q.   Yeah. When Hesse said "everyone
23 to the boathouse"?
24    A.   I was pretty much right by the

Page 368

F. Fiorillo

1 boathouse. Right by the steps.
2    Q.   And were the other officers by
3 the boathouse?
4    A.   Kind of spread out. Like, you
5 know, in a -- in a spread out area.
6    Q.   Okay. And when I say "other
7 officers," I'm including those in addition
8 to Lamm, Nofi and Carter, right?
9    A.   Yeah.
10    Q.   Okay.
11    A.   Well --
12    Q.   Okay. Go ahead. Tell me.
13    A.   Okay. When -- when -- I just
14 want to get clear. When we were lining up,
15 before we were lining up?
16    Q.   Yeah.
17    A.   Everybody was all spread out.
18    Q.   Okay.
19    A.   Then Hesse made a statement to
20 line up at the boathouse and he was going to
21 talk to everybody one at a time.
22    Q.   And --
23    A.   Then --
24    Q.   You proceeded to line up, right?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 369

F. Fiorillo

1
2     A.    Then that's when one group went
3  this way and --
4     Q.    Got it.
5     A.    -- only four people were on line.
6     Q.    Okay.  So you went into the
7  boathouse, right?
8     A.    Yes.
9     Q.    What transpired next?
10    A.    I went in.  I -- Eddie -- Eddie
11 Carter went in first.
12    Q.    Um-hum.
13    A.    And I saw Eddie Carter's shield
14 on the table.
15    Q.    Okay.  Wait a minute.
16    A.    Where Hesse  -- Hesse was inside.
17 He was at a table sitting down.
18    Q.    Did you see Eddie Carter leave
19 the boathouse after he went in?
20    A.    Yeah, he came -- he came out.  He
21 exited and I entered.
22    Q.    Did Eddie say anything to you as
23 he was exiting and you were entering?
24    A.    Not a word.
25    Q.    Okay.  So you went in?

Page 370

F. Fiorillo

1
2     A.    So I went in.
3     Q.    And you saw Ed Carter's shield,
4  right?
5     A.    (Indicating).
6     Q.    And what did Hesse say to you, if
7  anything?
8     A.    Well, of course he did.  He
9  said --
10    Q.    Well, I have to say "if
11 anything," or else your attorney may object.
12    A.    Okay.  What he did was he said
13 that "I'm letting you go for budget cuts."
14    Q.    Okay.
15    A.    "So I need your firearm," so I
16 had to make it safe.  Took that.  And then
17 he needed my shield, my ID card and he took
18 the jacket off my back.
19    Q.    And did he say anything else
20 while you were in the boathouse?
21    A.    Yes, he did.
22    Q.    What did he say?
23    A.    He said, "Now that I'm taking
24 over, it's not going to be like when Ed
25 Paridiso was here.  I'm going to make this a

Page 371

F. Fiorillo

1
2  kinder and gentler police department," and,
3  um, and also, to addition to budgetary cuts,
4  he said that, "You were one officer -- you
5  were one of the officers that wrote way too
6  many summonses for my liking."
7     Q.    Okay.  So if I understand your
8  testimony correctly, in this boathouse
9  meeting when you were told you were not
10 going to be hired or terminated as you've
11 said, Hesse gave you two reasons why you
12 were being fired?
13    A.    Correct.
14    Q.    One, budgetary cuts?
15    A.    Correct.
16    Q.    And two, that you wrote too many
17 summonses for his liking?
18    A.    Correct.
19    Q.    And he also said that he wanted a
20 warmer and fuzzier --
21    A.    Gentler -- gentler -- kinder and
22 gentler police department.
23    Q.    Okay.  And did you ask him what
24 he meant by that?
25    A.    No.  I was -- I was -- I was

Page 372

F. Fiorillo

1
2  physically upset.  I didn't even -- I was --
3  you know, it was very upsetting.
4     Q.    And did you say anything to Hesse
5  in response to --
6     A.    No.
7     Q.    -- anything he said to you?
8     A.    I was -- I was beside myself.  I
9  couldn't believe what was happening.
10    Q.    So now if I understand your
11 testimony correctly, Hesse said he wants a
12 warmer and --
13    A.    Kinder -- kinder and gentler --
14    Q.    Right.
15    A.    -- police department.
16    Q.    That you were being fired for
17 budgetary -- you were not being hired for
18 budgetary cuts and that --
19    A.    I wrote too many summonses.
20    Q.    And that was the extent of the
21 conversation?
22    A.    That's it.
23    Q.    And then you walked out?
24    A.    That's it.  Well, I gave my
25 shield and everything.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 373

F. Fiorillo

1
2    Q.   Right.
3    A.   And he wanted -- I was leaving
4  and he goes, "I want the jacket." So I gave
5  him the jacket off my back.
6    Q.   So you went back out.  Who did
7  you pass, if anybody, on your way out?
8  Well, Carter had already --
9    A.   Well, there was only Joe and
10  Kevin left.
11    Q.   Right.  So you passed Joe and
12  Kevin.  Did you say anything to them on your
13  way out?
14    A.   No.
15    Q.   Okay.
16    A.   Because, actually, as I was
17  walking out, they were walking in.
18    Q.   Okay.  Now where did you go from
19  there?
20    A.   Oh, I'm sorry.  One more thing.
21    Q.   Sure.
22    A.   If I could add.  Hesse said that
23  he made arrangements for a water taxi.  "Ty
24  Bacon's on the other side.  He's going to
25  come over with it, and then you guys can

Page 374

F. Fiorillo

1
2  leave the island." That's what he said.
3  That was the last thing he said.
4    Q.   And where did you go from the
5  boathouse?
6    A.   We went back to Bay Shore.
7    Q.   Well, did you wait -- no --
8    A.   Oh, we had to wait for Ty Bacon
9  to come over the bay.
10    Q.   Right.
11    A.   The water taxi was there, and by
12  that time, Joe was fired and Kevin was
13  fired.
14    Q.   So they met you where the water
15  taxi was going to go?  Well, let me ask
16  you --
17    A.   Yeah.  Yeah.  We all walked to
18  the water taxi, but not together.
19    Q.   Okay.  Fine.  So you didn't wait
20  for Kevin and Joe?
21    A.   Well, we weren't running.  You
22  know what I mean?
23    Q.   Right.
24    A.   We were just -- we walked to the
25  water taxi.

Page 375

F. Fiorillo

1
2    Q.   Now what did Carter say to you
3  about what Nof -- what Hesse said to him?
4  Well, withdrawn.  Did Carter advise you
5  before you got on that water taxi what Hesse
6  had said to him?
7    A.   No.  We were just talking about
8  the whole aspect of what just happened, but
9  not anything in particular.
10    Q.   Did Lamm advise you what Hesse
11  said to him in the boathouse?
12    A.   Nobody did.
13    Q.   No one did?
14    A.   We weren't talking about anything
15  that he said in particular.  We just talked
16  about what we just went through as far as
17  going over there and what happened and how
18  we left.
19    Q.   Okay.  Now where, in your
20  opinion, did Hesse call you a dishonest man
21  on April 2, 2006?
22    A.   Well, we were told by Chris --
23  well, "we" -- Kevin had a communication with
24  Chris Moran who was in the boathouse at the
25  time of the meeting.  Chris Moran was a

Page 376

F. Fiorillo

1
2  dispatcher.
3    Q.   Okay.
4    A.   Okay?  Follow me?
5    Q.   When you say "meeting," there was
6  another meeting then?
7    A.   Our -- our -- our meeting was
8  not a meeting.
9    Q.   Okay.
10    A.   Okay?
11    Q.   Got it.
12    A.   They had their meeting, the
13  department meeting after we were fired.
14    Q.   Um-hum.
15    A.   That's the way it went.  That was
16  the progression.
17    Q.   Okay.  Fine.  So at this
18  department meeting --
19    A.   Chris Moran was attending the
20  meeting, okay, and he relayed back to Kevin
21  what was said in the meeting.
22    Q.   And what did Chris tell Kevin?
23    A.   From what Kevin told me --
24    Q.   Right.  Exactly.
25    A.   That Chris said, Chris said that

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 377

F. Fiorillo

1    F. Fiorillo
2  he called us rats, and you know, he -- Chris
3  Moran said that, um -- you want to know just
4  what Hesse said?
5     Q.   Yeah.  Because you're alleging
6  that Hesse defamed you.
7     A.   Exactly.
8     Q.   Right.
9     A.   He said that we were the ones
10 that were the problems in the police
11 department and -- Kevin would be the person
12 to ask because he got it straight from
13 Chris.  I'm only paraphrasing.
14    Q.   Well, that's what I'm asking you.
15    A.   Yeah.
16    Q.   Now so --
17    A.   He said that we were mutts.  We
18 were the rats.  We were the Civil Service
19 rats.
20    Q.   Okay.
21    A.   Chris hasn't -- you know, he was
22 there.
23    Q.   Okay.
24    A.   He also told us what other
25 members in the meeting did when Hesse told

Page 378

1    F. Fiorillo
2  them that we were fired.
3     Q.   What did they do?
4     A.   Richie Bosetti said "it's about
5  time" and he cheered.  And Chris said that
6  Richie said that Hesse should pay him for --
7  I don't know how to -- let me just think
8  about this.  Chris said that Richie said --
9  let's see.  Hesse said to Richie that he
10 should pay him for what he just did.
11    Q.   Now what did Chris tell Kevin
12 that Hesse said that leads you to the
13 allegation that Hesse called you a dishonest
14 man?
15       MR. GOODSTADT: Objection.
16 Other than what he's testified to?
17    Q.   Okay.  Other than what you've
18 testified to.
19    A.   Well, I can only tell you what --
20 Kevin got it firsthand.
21    Q.   I understand that.
22    A.   So I'm only --
23    Q.   I'm asking you what Kevin told you.
24    A.   From what I remember, this is
25 what I remember.

Page 379

1    F. Fiorillo
2     Q.   Um-hum.
3     A.   That what I just said is
4  basically what I remember.
5     Q.   Okay.  What about B, "Plaintiffs
6  had conspired to inculpate innocent police
7  officers for acts of brutality against
8  innocent citizens (April 2, 2006)."  What
9  does that mean, to the extent you know?
10    A.   This is what Hesse said, is this
11 what you're telling me?
12    Q.   I'm asking you what is meant by
13 subparagraph B, what I just read.  I didn't
14 write this.  And if you don't know, then you
15 don't know.  That's -- that's fine, too.  "I
16 don't know" is a legitimate answer.
17    A.   Well, Hesse blamed us for being
18 the Civil Service rats in order to get all
19 the uncertified officers removed from the
20 police department.
21    Q.   Yeah, sir, but B doesn't refer to
22 that.  B refers to --
23       MR. GOODSTADT: Yeah.  You're
24 looking at C.
25    A.   What is it, B?

Page 380

1    F. Fiorillo
2     Q.   B.
3     A.   Oh.  I'm looking at C.  I'm
4  sorry.
5     Q.   Okay.
6     A.   Okay.  Let's see.  (Reviewing).
7  Oh, okay.  This had to do with the Halloween
8  incident.  How -- how Hesse -- Hesse blamed
9  us for trying to, um, get basically Gary
10 Bosetti fired from the -- from the Halloween
11 incident.  Because he thought that we were
12 conspiring against Gary Bosetti and Richie
13 Bosetti, but Gary Bosetti because he was
14 directly involved, and that was his
15 allegation against us.
16    Q.   Now did Kevin Lamm tell you that
17 Chris Moran said that George Hesse made
18 comments about this issue on April 2, 2006?
19    A.   You'll have to ask Kevin.  I
20 don't remember.
21    Q.   That's perfect.  With regard to
22 C, did Kevin Lamm tell you that Chris Moran
23 told him that Hesse made references in that
24 organizational meeting to what's set forth
25 in paragraph  -- in subparagraph C?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AE. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 381

1          F. Fiorillo
2     A.    Kevin said they talked about --
3  they talked about that at the meeting, so.
4     Q.    But you don't know
5  specifically -- do you recall specifically
6  what Lamm said Moran told him?
7     A.    Not specifically.
8     Q.    Okay. Let's look at E, because I
9  don't think you -- I need to talk to you
10 about Kevin Lamm being a loser. E says "by
11 repeatedly advising prospective employees
12 that he had terminated Plaintiffs for cause,
13 that Plaintiffs were litigious and that he
14 could not comment favorably on Plaintiffs'
15 performance as police officers," do you see
16 that?
17    A.    This is C?
18    Q.    This is E.
19    A.    E?
20    Q.    Yeah.
21    A.    Wait a second.
22    Q.    164E at the bottom. D talks
23 about Kevin Lamm being a loser.
24    A.    Oh, okay. It looks like C.
25 Okay. I got it. I got it (reviewing).

Page 382

1          F. Fiorillo
2  Well, this has to do with the meeting in
3  Ocean Beach?
4     Q.    Sir, I didn't write this.
5     A.    No. You would -- okay.
6     Q.    Do you see what was written in E?
7     A.    (Reviewing).
8     Q.    Tell me when you're done reading
9  E.
10    A.    Okay. (Reviewing). Well, this
11 has to do with the job applications.
12    Q.    Yeah. I just wanted you to tell
13 me when you were done with E?
14    A.    Okay.
15    Q.    Now my question to you, sir, is
16 which -- which entity for which you
17 submitted an application for, did Hesse
18 advise that you were terminated for cause?
19    A.    Well, I would think Southampton
20 Town.
21    Q.    And that's based upon what you've
22 testified to concerning what Mr. Foster told
23 you?
24    A.    Yes.
25    Q.    We don't need to go over that

Page 383

1          F. Fiorillo
2  again, do we?
3     A.    No.
4     Q.    Nothing you want to add to that
5  about what Foster said?
6     A.    I mean, that was the sum and
7  substance of the conversation.
8     Q.    Perfect. Any other entity that
9  you claim Hesse advised that you were
10 terminated for cause?
11    A.    Well, I don't know the -- I don't
12 know if there was. There could have been.
13    Q.    But you don't know?
14    A.    Based on what happened with
15 Southampton Town, I would say there's a good
16 possibility that might have happened.
17    Q.    But you don't know?
18    A.    I don't know.
19    Q.    Great. What entity did Mr. Hesse
20 say -- what entity concerning an application
21 that you made did Hesse advise that you were
22 litigious?
23    A.    I don't think that had to do with
24 me.
25    Q.    Okay. What entity did Hesse --

Page 384

1          F. Fiorillo
2     A.    It could -- it could have --
3  let's see. I'm trying to think.
4     Q.    That you know. Not that it could
5  have happened. That you know.
6     A.    Well, it basically stopped me
7  from applying for Collier County because
8  Mr. Donahoe said that the reference that he
9  got from Hesse is that Joe was suing the
10 department.
11    Q.    So Donahoe -- Donahoe told you
12 that, is that your testimony, because I
13 don't think you said that the last time?
14    A.    No. Donahoe didn't tell me that.
15    Q.    Oh, okay.
16    A.    No.
17    Q.    Donahoe told Nofi and Nofi told
18 you?
19    A.    Yeah.
20    Q.    Okay. That's your testimony.
21    A.    Because Donahoe called Chief
22 Paridiso.
23    Q.    Oh. And what -- what did Nofi
24 tell you that Donahoe said about Chief
25 Paridiso?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 385

F. Fiorillo

1     F. Fiorillo
2    A.   No.  Chief -- Donahoe called
3 Chief Paridiso.
4    Q.   Right.
5    A.   And talked to the chief about
6 Joe.
7    Q.   Right.
8    A.   And Donahoe told Chief Paridiso
9 that Hesse gave Donahoe a very bad reference
10 about Joe, and Donahoe told the chief that
11 Joe was suing the department.
12    Q.   Okay.
13    A.   So the chief notified Joe.
14    Q.   Got it.  So at least according to
15 Nofi, Donahoe had reached out to Paridiso?
16    A.   To Hesse first.
17    Q.   At least according to Nofi, sir,
18 Donahoe had reached out to Paridiso
19 concerning Nofi's application, right?
20    A.   Yes.
21    Q.   So my question to you is very
22 simple, sir.  What law enforcement agency do
23 you contend that Hesse, as it relates solely
24 to you, said that you were litigious?
25    A.   Um, I don't know.

Page 386

1     F. Fiorillo
2    Q.   Okay.  Let's go to the next page,
3 same cause of action, paragraph 168.  What
4 mental -- well, 168 refers to you suffering
5 severe mental anguish and pain, do you see
6 that?
7    A.   Yes.
8    Q.   What severe mental anguish and
9 pain have you suffered as a result of what
10 you allege Chief Hesse and the OBPD did as
11 set forth in 164?
12    A.   Well, it was  -- I suffered
13 severe mental anguish ever since April 2,
14 2006 until today.  I'm still going through
15 it.
16    Q.   Describe your severe mental
17 anguish for me and pain.
18    A.   Look at me.  Am I happy?  I'm a
19 fired police officer who couldn't get a
20 police officer job since then.
21    Q.   I don't know if you're happy,
22 sir.  I'm asking you to describe your severe
23 mental anguish and pain.
24    A.   Well, my mental anguish is that
25 I'm always constantly thinking about that

Page 387

1     F. Fiorillo
2 day.  It's in my mind.  It pains me.
3    Q.   Have you sought  --
4    A.   It affected me.
5    Q.   Are you finished?
6    A.   No, I'm not finished.
7    Q.   Then keep going.
8    A.   My -- my mental anguish is that I
9 had to tell my son, okay, that I was fired
10 as a police officer, okay?  You know what
11 that's like?
12    Q.   How old is your son?
13    A.   23.
14    Q.   How old was he when you had to
15 tell him that you were fired as a police
16 officer?
17    A.   20.  Well, yeah.
18    Q.   Okay.
19    A.   But -- but still, age has nothing
20 to do with it.
21    Q.   Okay.  Have you --
22    A.   It's just that he looked up --
23 you know, he looked up to me, okay?  I -- I
24 worked full time.  I went through a police
25 academy for seven months.  It was  -- it was

Page 388

1     F. Fiorillo
2 something that I showed him if you try hard,
3 you can just about do anything you want if
4 you really try.
5    Q.   You worked full time for Ocean
6 Beach?
7    A.   No.  I worked full time for
8 another company while I went through the
9 academy.
10    Q.   Okay.  Now have you sought the
11 assistance of any medical professional with
12 regard to your alleged severe mental anguish
13 and pain?
14    A.   No.  I don't even have health
15 insurance.
16    Q.   Have you sought the advice of a
17 priest or rabbi or any religious leader with
18 regard to your severe mental anguish and
19 pain?
20    A.   It's funny you should say that.
21 I was thinking about that yesterday.  God's
22 honest truth.
23    Q.   Going to a rabbi?
24    A.   No.
25    Q.   Priest?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 389

F. Fiorillo

1
2    A.   Priest.
3    Q.   Well, have you?
4    A.   Well, I was thinking about it
5  yesterday because I'm just  -- I'm so
6  distraught over what I'm going through right
7  now, you can't  -- you can't even begin to
8  imagine what I'm going through.
9    Q.   So have you?
10   A.   I haven't as of today.
11   Q.   Okay.  What indignity have you
12 suffered as a result of the defamatory
13 comments you say Hesse and the police
14 department published?
15   A.   Well, they published a blog,
16 okay?
17   Q.   Who did?
18   A.   The Ocean Beach Police
19 Department.
20   Q.   They actually have a blog under
21 the title --
22   A.   Ocean Beach -- it's -- it's
23 under -- it's in the Schwartz Report on Long
24 Island Politics.
25   Q.   Okay.

Page 390

F. Fiorillo

1
2    A.   And they have a blog in police
3  issues.
4    Q.   So, when you say the police
5  department posted a blog, there is not a --
6  a blog created by the Ocean Beach Police
7  Department, this was a different website in
8  which people could blog certain entries,
9  right, the Schwartz Report?
10   A.   No.  No.  No.  In other words,
11 the police department could have started the
12 blog, okay?  I don't know who started the
13 blog.
14   Q.   Oh, okay.  That -- that's fine.
15 So when you referred to the blog being
16 created by the Ocean Beach Police
17 Department, you don't really know if they
18 did that or not?
19         MR. GOODSTADT: Objection.
20   A.   Well, according to  -- according
21 to, um, according to Tommy Snyder who had a
22 meeting with George Hesse at the police
23 station after he was fired, because he got
24 fired subsequent to us getting fired --
25   Q.   Okay.

Page 391

F. Fiorillo

1
2    A.   He had a meeting with George
3  Hesse, and they were discussing the blog,
4  and George Hesse told Tommy Snyder that it
5  was the police department that was blogging
6  and Ty Bacon was one of the police officers
7  in the department that was doing a lot of
8  it.
9    Q.   Okay.  So this is not Hesse
10 telling you, this is Snyder telling you that
11 Hesse told him?
12   A.   This is  -- when Snyder had a
13 meeting with Hesse, Hesse told Snyder about
14 them blogging at the police department.
15   Q.   And have you ever looked at the
16 blog?
17   A.   Yes.
18   Q.   Can you identify by name -- well,
19 does any name appear on the blog identifying
20 the person writing it?
21         MR. GOODSTADT: Objection.
22   A.   Is there any name identifying the
23 person?
24   Q.   Yeah.  For instance, does it
25 say --

Page 392

F. Fiorillo

1
2    A.   It has --
3    Q.   Does it say "written by Ty
4  Bacon"?
5    A.   No.  But it has code words,
6  numbers, such and such.  You know.
7    Q.   So based upon code words and
8  numbers, you presume --
9    A.   No.  No.  I'm not presuming
10 anything.
11   Q.   -- you can identify who wrote it?
12         MR. GOODSTADT: Objection.
13   A.   Well, um, we can pick some out
14 and have a pretty good idea of -- of who --
15 who would write whatever blog that was
16 posted.
17   Q.   But you can't tell from the
18 posting with -- with 100 degree certainty --
19   A.   No.
20   Q.   -- who wrote it?
21   A.   No.
22   Q.   Right.  And did you ever write a
23 blog?
24   A.   No.
25   Q.   Now you raised the issue with the

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 393

```
1            F. Fiorillo
2  health insurance.  Did you have health
3  insurance when you worked for the Village?
4     A.   Ocean Beach?
5     Q.   Yeah.
6     A.   No.
7     Q.   Okay.  So the fact that you don't
8  have any health insurance isn't -- isn't
9  related in any degree to your loss of the
10 job at Ocean Beach, was it?
11    A.   No.  But you asked me if I was
12 seeking any medical --
13    Q.   I understand.
14    A.   -- professional.  That kind of
15 thing.
16    Q.   And have you been diagnosed with
17 any mental disease or defect in conjunction
18 with your alleged severe mental anguish and
19 pain?
20    A.   I haven't gone to anybody.
21    Q.   So you haven't been diagnosed?
22    A.   Exactly.
23    Q.   Let's look at the Eighth Cause of
24 Action, "New York Civil Service Law 75-B"
25 which is on page 37.
```

Page 394

```
1            F. Fiorillo
2     A.   (Reviewing).
3     Q.   Now in paragraph 155, which is
4  the bottom of 37, you've alleged as follows,
5  "Defendants' termination of Plaintiffs'
6  employment was a 'adverse personnel action'
7  taken in violation of New York Civil Service
8  Law 75-B on the sole basis that Plaintiffs
9  each disclosed what they reasonably believed
10 to be 'improper governmental action' as that
11 term is defined in New York Civil Service
12 Law 75-B."  What improper governmental
13 action, other than what you've already
14 testified today, do you allege that you
15 complained about?
16        MR. GOODSTADT: Objection.
17    A.   I think this is a legal question
18 that I don't know what the legal -- legality
19 of it is of New York Civil Service Law 75-B.
20    Q.   I'm not asking you about the
21 legality of that.  There's a phrase used,
22 "improper governmental action."
23        MR. GOODSTADT: Which is
24    defined in the statute.
25    Q.   What, in your opinion, did you
```

Page 395

```
1            F. Fiorillo
2  disclose that you characterize as "improper
3  governmental action"?
4        MR. GOODSTADT: Objection.
5     Q.   Other than what you've testified
6  today?
7     A.   We feel that --
8     Q.   Not "we."
9     A.   Me.  I feel --
10    Q.   Okay.
11    A.   -- that Ocean Beach and Civil
12 Service, um, handled the situation
13 improperly, and if it was handled properly,
14 I don't think we would be sitting here at
15 this table today.  That's my opinion.
16    Q.   Let me just see the answer.
17 (Reviewing).  So you're referring to the
18 certification qualification issue?
19    A.   I'm referring to the
20 certification qualification issue because
21 that was ultimately what got us fired, in
22 my -- in my opinion.
23    Q.   Really?  Your complaints about
24 that?
25    A.   Yeah, my complaints about that.
```

Page 396

```
1            F. Fiorillo
2     Q.   And just again, when did you
3  first start complaining about that issue?
4     A.   It was  -- well, it wasn't so
5  much me complaining about the issues.  It
6  was the longevity of the police officer --
7  or the civilians working as police officers
8  for a prolonged period of time that caused
9  us to be fired, because if -- I got to tell
10 you, if the Bosettis were not certified,
11 okay, they shouldn't have been working in
12 Ocean Beach.  That Halloween fight would
13 have never happened and we would have had
14 our jobs.  So it stems  -- it's like a
15 domino effect that -- that uncertified
16 personnel in Ocean Beach.
17    Q.   Okay.
18    A.   It affected us that way.
19    Q.   Just so I'm clear, did you ever
20 complain to the Civil Service Department of
21 Suffolk County with regard to the issue
22 concerning uncertified, unqualified officers
23 working there?
24    A.   I didn't have to complain.  Ocean
25 Beach knew about it.  It was well known.
```

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 397

F. Fiorillo
1
2    Q.   I'm asking did you ever complain?
3    A.   Well, I didn't -- no.  Sorry.
4    Q.   Did you ever complain to the
5  Suffolk County District Attorney's office on
6  this issue specifically?
7    A.   Afterwards.
8    Q.   Yeah.  I'm talking before the
9  last day of your employment?
10    A.   No.
11    Q.   Did you ever complain to the
12  Village board?
13    A.   No.
14    Q.   Did you ever complain to
15  Loeffler?
16    A.   What do you mean, before or
17  after?
18    Q.   Always before April 2.
19    A.   Well, my testimony represents
20  what --
21    Q.   Okay.  That's fine.  And you
22  certainly never complained to a media outlet
23  about this?
24    A.   No.
25    Q.   Okay.  Now let's go to a -- how

Page 398

F. Fiorillo
1
2  much time do I have left?
3        THE VIDEOGRAPHER:  15.
4        MR. NOVIKOFF:  15?  I think --
5  I think I can get it done in 15.
6        MS. ZWILLING:  I'm still going
7    to have a few questions.
8        MR. NOVIKOFF:  Oh,  yeah.  Yeah.
9    I'm going to try to get through the
10    rest of this stuff pretty quickly.
11    Q.   Turn to page -- let's see --
12  paragraph 58, which is on page 15, you write
13  in paragraph 58 that "in yet another example
14  of corruption at the OBPD in early September
15  2004, Officers Dyer and Fiorillo witnessed
16  Officer Richard Bosetti plying an alleged
17  domestic abuse victim with alcohol.  Officer
18  Dyer explained to Officers Snyder and
19  Bockelman that Bosetti was "trying to talk
20  (the victim) out of filing a domestic
21  incident report," do you see that?
22    A.   Yes.  Yes, I do.
23    Q.   Now what did you mean by
24  "plying"?
25    A.   By -- excuse me?

Page 399

F. Fiorillo
1
2    Q.   By the use of the word "plying,"
3  P-L-Y-I-N-G, what did you mean?
4        MR. GOODSTADT:  Objection.
5    A.   Well, he was  -- he was actually
6  feeding her, um, wine.
7    Q.   How many glasses?
8    A.   One glass that I saw when I was
9  there.
10    Q.   How big was the glass?
11    A.   It was a cup.  (Indicating).  It
12  wasn't --
13    Q.   And did she drink the whole cup?
14    A.   I don't know if she drank the
15  whole cup, but she was definitely drinking.
16    Q.   Do you know how much of the cup
17  she drank?
18    A.   At least half.
19    Q.   Okay.  How many ounces?
20    A.   It was about a 12 ounce cup.
21    Q.   And he filled it to the top?
22    A.   No.  It wasn't to the top.
23    Q.   Okay.
24    A.   It was about three quarters
25  actually.

Page 400

F. Fiorillo
1
2    Q.   And did this violate any
3  regulation or procedure as an officer of
4  Ocean Beach, that you're aware of?
5    A.   Well, first of all, this -- this
6  person was beaten up by her boyfriend and
7  he's feeding her wine?  He's -- he actually
8  got wine for her to drink to try to calm her
9  down.
10    Q.   Okay.  So Mr. Bosetti got wine --
11    A.   He didn't call -- he's giving her
12  wine instead of calling for rescue.
13    Q.   As you say, to try to calm her
14  down, right?
15    A.   Well, calm her down or --
16    Q.   Well, what made you say that he
17  did it to calm her down?
18    A.   That's what I'm saying.  I don't
19  know what he did it for.
20    Q.   Okay.
21    A.   I mean, she was -- she was
22  distraught.
23    Q.   Okay.  I'll accept what you said,
24  that, in your opinion, he was giving her
25  wine to calm her down.  Here's my question,

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 401

```
 1          F. Fiorillo
 2  sir, is that proper police procedure?
 3      A.   No.
 4      Q.   And did he -- did the victim
 5  ever file a report, to your knowledge?
 6      A.   Well, ultimately, the boyfriend
 7  was arrested shortly thereafter.
 8      Q.   Okay.  So presumably she filed a
 9  report, right?
10      A.   Yeah.  I wasn't on this call as
11  far as the field report.
12      Q.   Okay.
13      A.   So.
14      Q.   And it wasn't proper procedure to
15  give a victim wine as you state.  My
16  question, sir, did you complain to George
17  Hesse about this?
18      A.   No.  The chief knew about it.
19      Q.   How did the chief know about it?
20      A.   He was right there in the morning
21  when we went to arrest her boyfriend.
22      Q.   Did you tell the chief what
23  Bosetti did?
24      A.   Yes.  He knew.
25      Q.   Well, I'm asking you, did you
```

Page 402

```
 1          F. Fiorillo
 2  tell the chief?
 3      A.   Yes.  Yes.
 4      Q.   So this is another example where
 5  you bypassed Mr. Hesse and you told
 6  Mr. Paridiso?
 7      A.   Mr. Hesse wasn't there.
 8      Q.   I understand that.  But Mr. Hesse
 9  was your immediate superior, wasn't he?
10      A.   Yeah, but the chief --
11      Q.   Was Mr. Hesse your immediate
12  superior?
13      A.   When he was working there.  But
14  he wasn't working there.  That's what I'm
15  trying to say.  The chief was the supervisor
16  in the morning.
17      Q.   And what did you say to
18  Mr. Paridiso?
19      A.   That Richie Bosetti was --
20  offered, um, Lisa Campbell a cup of wine and
21  she was drinking wine in the station.
22      Q.   And what did Mr. Paridiso say?
23      A.   He said he was going to take that
24  up with Richie Bosetti.
25      Q.   Okay.  Well, turn to 159, sir,
```

Page 403

```
 1          F. Fiorillo
 2  paragraph -- on page 38.
 3      A.   Right.
 4      Q.   Here you state with regard to all
 5  of the issues in 158, that "Plaintiffs
 6  repeatedly notified Hesse, their superior
 7  and directed supervisor, of these violations
 8  of laws, rules and regulations," do you see
 9  that?
10      A.   Where are we?
11      Q.   158 at the bottom.
12      A.   Wait.  What page?
13      Q.   On page 38.
14      A.   Okay.  But he wasn't working that
15  night.
16      Q.   Sir, I'm just looking at 159
17  right now.  You've alleged --
18      A.   But this is in reference to what
19  you --
20      Q.   Sir, you write, "Plaintiffs
21  repeatedly notified Hesse, their superior
22  and direct superior, of these violations of
23  laws, rules and regulations," do you see
24  that?
25      A.   But this --
```

Page 404

```
 1          F. Fiorillo
 2      Q.   Yes or no, do you see that?
 3      A.   I see that.
 4      Q.   You don't mention Paridiso there,
 5  right?  Yes or no?
 6      A.   I have an explanation.
 7      Q.   You don't --
 8      A.   I don't.
 9      Q.   And you don't qualify this by
10  saying only when Hesse was on duty, do you?
11      A.   No.  Because when I was working,
12  Hesse wasn't working.  I was working on
13  the -- on the chief's tour.
14      Q.   All the time?
15      A.   Almost all the time.
16      Q.   Okay.  So then 159 wouldn't
17  really apply to you?
18      A.   Well, that's what I was trying --
19  that's why I wanted to explain that to you.
20      Q.   So 159 would not really apply to
21  you?
22      A.   Generally, almost -- almost
23  never.  Only on certain instances.
24  Instances when I worked maybe four hours or
25  five hours on an overlap shift.
```

FRANK FIORILLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 405

F. Fiorillo

1      MR. GOODSTADT: Just so we're
2  clear what he's answering to, what part
3  of 159?  The fact that he repeatedly
4  notified Hesse or the fact that Hesse
5  was his superior and direct supervisor?
6      MR. NOVIKOFF: I asked the
7  question and I think it was clear.
8      MR. GOODSTADT: I don't think
9  it's clear.
10     A.   For the most part, the chief was
11 my supervisor because I worked his tour.
12     Q.   Okay.  Then let's go on to
13 paragraph 36.  You allege in paragraph 36
14 that --
15     A.   Paragraph 36?
16     Q.   Yeah.  On page nine.
17     A.   Hold on.
18     Q.   Did you ever complain to Hesse
19 about leaving the Village dangerously short
20 of personnel?
21     MR. GOODSTADT: Let him get to
22 the paragraph.
23     MR. NOVIKOFF: Okay.  You got
24 it.

Page 406

F. Fiorillo

1      A.   Yes.  When we -- when we had to
2  take -- as I said before in my testimony,
3  when we had to take the, um, officers from
4  Ocean Beach to the checkpoint.
5      Q.   Okay.  So you've testified about
6  that already I think?
7      A.   Yeah.
8      Q.   Okay.  And did you complain to
9  Paridiso about that as well?
10     A.   Yes.
11     Q.   And when was the first time that
12 you remember complaining to Hesse about
13 this?
14     A.   When -- there was one night in
15 particular where Walter Muller was --
16     Q.   I'm just asking you about the
17 year, sir.
18     A.   Oh, the year?  I would say that
19 might have been 2000 --
20     Q.   The first time that you
21 complained.
22     A.   That was probably 2003 with
23 Walter Muller.
24     Q.   Okay.  Now in -- did you ever

Page 407

F. Fiorillo

1  chauffeur George Hesse to, um, a sexual
2  encounter?
3      A.   Yes, I did.
4      Q.   When?
5      A.   In 2004.
6      Q.   And how do you know it was a
7  sexual encounter?
8      A.   Because he told me about it.
9      Q.   What did he ask you to do?
10     A.   He told me to take him to Andrea
11 Nimberger's house on Wilmot Road.
12     Q.   That's on -- in the Village?
13     A.   In the Village of Ocean Beach.
14     Q.   Was he on duty at the time?
15     A.   Yes.
16     Q.   And did you -- is that proper
17 procedure for an on duty police officer to
18 go to a resident's home and have sex with
19 them?
20     A.   I don't think so.
21     Q.   He told you he was having sex?
22     A.   Yes.  He bragged about it.
23     Q.   And did you tell Chief Paridiso
24 about this?

Page 408

F. Fiorillo

1      A.   No.
2      Q.   Did you tell anyone about this?
3      A.   No.
4      Q.   Why not?
5      A.   Well, to be honest with you, I
6  think if I told anybody about it, I was
7  going to -- my job would be in jeopardy.
8      Q.   Did he say to you "if you tell
9  anyone about this, you're fired"?
10     A.   No.  But --
11     Q.   Yes or no?
12     A.   George Hesse has a -- no.
13     Q.   Okay.  Let's look at paragraph
14 61.  When did Mr. Hesse order you to spend
15 three consecutive shifts standing motionless
16 beneath a streetlight at the intersection of
17 Dehnhoff Walk and Bay Walk?
18     A.   Hold on a second.  Page 16?
19     Q.   Page 16.
20     A.   Okay.  This was the -- this was
21 in conjunction with the filing cabinet
22 incident in the bay.  There was a sequence
23 of events that happened.  The filing cabinet
24 was thrown in the bay.  I didn't help Richie

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 409

F. Fiorillo

1 Bosetti get it out of the bay.
2
3      Q.    Um-hum.
4      A.    I came back to work that night.
5 I was working an eight -- eight to eight.
6      Q.    Okay.
7      A.    Okay?  8:00 at night to 8:00 the
8 next morning.  And it was about 20 after
9 seven.  We were -- "we" meaning myself,
10 George Hesse, Paul Corallo and John Dyer --
11 were in the police vehicle going to Ocean
12 Beach to go on duty.  And he instructed me
13 that when we got back to the station, he
14 wanted me to clean the truck.
15      Q.    Okay.  Continue.
16      A.    So what --
17      Q.    Because I presume you said
18 something that caused him to punish you?
19           MR. GOODSTADT: Objection.
20      Q.    All right.  Continue.
21      A.    Because what happened was we were
22 on the  -- we were going on the beach to
23 the -- we were going through the cut on the
24 beach going to Ocean Beach.  So I said,
25 "Wait a second."  I said, "I just cleaned

Page 410

F. Fiorillo

1
2 the station last night."  I said, "Why don't
3 you just spread it around."  I said, "It's
4 just not fair for me to -- you know, I
5 cleaned the station.  I took everything up.
6 The filing cabinet wound up in the bay and
7 here I am you want me to clean the truck.
8 The dock masters usually clean the truck."
9           So what happened was he got
10 offended with me because I voiced my opinion
11 in front of Paul Corallo and John Dyer, and
12 then he said that night, but my next tour  -- my
13 next three tours, he stuck me under the
14 light and he said, "That's your post."
15      Q.    And you stood there motionless
16 for your next three tours?
17      A.    I stayed there.
18      Q.    Yeah.  But motionless?
19      A.    Just about motionless.
20      Q.    Like the guys from England in
21 front of the Palace?
22      A.    Just like -- almost like that.
23 "Stand in that spot and don't move."
24      Q.    You didn't move at all?
25      A.    No.

Page 411

F. Fiorillo

1
2      Q.    You didn't go to the bathroom?
3      A.    No, I didn't go to the bathroom.
4      Q.    You didn't eat?
5      A.    Nope.  Didn't eat.
6      Q.    He told you you couldn't go to
7 the bathroom?
8      A.    He didn't tell me I couldn't go.
9 He told me to stand there.  I was afraid I
10 was going to lose my job at this point.  I
11 did what I was told.
12      Q.    And what year was this?
13      A.    This was 2004.
14      Q.    Okay.  During the season?
15      A.    Just before the  -- it was just
16 when Paul Corallo and John Dyer came on as
17 police officers.
18      Q.    And when was that, right before
19 the season or right after the season?
20      A.    Well -- well, I think it was
21 Labor Day -- Memorial Day weekend.
22      Q.    Perfect.  Okay.  Let's go to
23 paragraph 86 which is on page 20.  When --
24 okay.
25      A.    Okay.

Page 412

F. Fiorillo

1
2      Q.    When did Hesse tell you that he
3 thought Snyder's report made him sick?
4      A.    Okay.  I got a phone call at home
5 from George Hesse shortly after the
6 Halloween fight, um, and what he said was he
7 wanted me to go to  -- to write a statement,
8 go to a Kinko's and fax him the statement.
9      Q.    Okay.
10      A.    So what I said was, "I got to go
11 to work tonight.  There's no way I can do
12 it."  He said, "Well, you got"  -- it was,
13 you know, "I'm here" -- he said, "I'm here
14 'til like 11:30, whatever it was."  He said,
15 "You got this much time to do it."  I said,
16 "It's impossible.  I'm just not going to do
17 it."
18           So what happened was that next
19 day, what I did was in between my stops -- I
20 used to work for a book company -- so in
21 between deliveries and stuff, I managed to
22 hand write a statement based on the
23 Halloween fight.
24      Q.    Okay.
25      A.    Because he needed my statement.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 413

F. Fiorillo

1
2  Q.  Okay.
3  A.  So what I did was when I got
4  home, I called him up.  I told him I had the
5  statement.  "What do you want me to do?"  He
6  said, "Meet me at the check -- meet me at
7  the checkpoint."  And what I did was I sat
8  in his truck.  He had my statement.  He
9  showed me Tommy Snyder's statement.
10  Q.  Yeah.
11  A.  So he said, "Here, I want you to
12  read this."  So I read it.  So what happened
13  is he said, "This -- this statement's no
14  good."  I said, "What do you mean?"  He
15  said, "Don't you see how Tommy's" -- this
16  is in reference to on page 20?
17  Q.  Yes.  I know.
18  A.  Okay.  Um, this is in reference
19  to 81?
20  MR. GOODSTADT: 86.
21  A.  Oh, 86.  Okay.  Yeah.  Snyder's.
22  That's right.
23  MR. GOODSTADT: The question is
24  when did he tell you it makes him sick.
25  A.  Right.  Okay.  I'm just getting

Page 414

F. Fiorillo

1
2  my timeline -- I gotta get my timeline
3  straight.  Okay.  So I'm in his truck.  I'm
4  reading Tommy's statement.  That was shortly
5  thereafter the Halloween fight.  The night
6  that I gave him my statement.
7  Q.  Right.  Okay.
8  A.  So what he said was -- um, I was
9  reading the statement.  I read the whole
10  thing.  And he said, "What do you think?"  I
11  said, "Well, that's -- that's what happened.
12  That's pretty good -- pretty accurate
13  statement."  So he said, "It's not."  He
14  said, "Can't you see how Tommy has it in for
15  Gary Bosetti?  See how he's implicating him
16  in the fight?"  I said, "George, he's not --
17  if you read this, it doesn't -- it doesn't
18  say that."
19  Q.  Okay.
20  A.  All right?
21  Q.  So when did he say it made him
22  sick?
23  A.  That's when he said it made him
24  sick.
25  Q.  Okay.

Page 415

F. Fiorillo

1
2  A.  He said -- he grabbed it.  He
3  goes, "This statement makes me sick."  He
4  said it's  -- it was disgusting.
5  Q.  Okay.
6  A.  That's what he told me.  And
7  that's it.
8  Q.  Did George Hesse specifically
9  ever use the word "cover up" with you with
10  regard to anything involving the Halloween
11  incident?
12  A.  Not with me.
13  MR. NOVIKOFF: How much time
14  left?
15  THE VIDEOGRAPHER: One minute.
16  MR. NOVIKOFF: Why don't we
17  change tape and I'll see if I have
18  anything else.
19  THE VIDEOGRAPHER: This ends
20  tape number six.  The time is 6:02 p.m.
21  Going off the record.
22  (A break was taken.)
23  THE VIDEOGRAPHER: This begins
24  tape number seven.  The time is 6:10
25  p.m.  Back on the record.

Page 416

F. Fiorillo

1
2  Q.  Okay.  Mr. Fiorillo, hopefully I
3  will just have a few more questions, and
4  they're basically regarding what's on page
5  17 of the Complaint.  Just tell me when you
6  get there.
7  A.  Okay.
8  Q.  Sir, I'm not going to ask you to
9  read anything yet.  Just -- I don't know if
10  I asked you this, at any point in time
11  during the Halloween incident that you
12  investigated, did you take any pictures of
13  the bar in which the, um, alleged
14  incident took place?
15  A.  I didn't.
16  Q.  Did anyone, to your knowledge?
17  A.  Yes.  Yes.
18  Q.  When I say "anyone," I mean
19  Lamm --
20  A.  Pat Cherry.
21  Q.  No.  During your initial
22  investigation that night, did either you,
23  Snyder or Lamm take pictures of the alleged
24  crime scene?
25  A.  I don't know that because I -- I

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 417

1           F. Fiorillo
2  left the scene.
3       Q.   Are you aware, as you sit here
4  today, as to whether Lamm or Snyder took
5  pictures?
6       A.   I know pictures were taken of the
7  bar.
8       Q.   Right.  But do you know --
9       A.   I don't know who took them.
10      Q.   But you didn't?
11      A.   I didn't take them.
12      Q.   Okay.  Let's look at 65.  65 says
13 "During Officers Snyder, Fiorillo and Lamm's
14 initial investigation of the incident,
15 Officer Richard Bosetti, who was drinking
16 with his brother Gary Bosetti at the
17 Halloween party at Houser's Bar, told them
18 that they 'did not understand' what had
19 happened and then refused to answer further
20 questions about either the incident or his
21 brother, Officer Gary Bosetti's whereabouts,
22 and also refused to assist in the
23 investigation," do you see that?
24      A.   Yes.
25      Q.   Did you speak to Richard Bosetti

Page 418

1           F. Fiorillo
2  about what's alleged in paragraph 65 that
3  night during your initial investigation
4  during your first tour?
5       A.   I wasn't with Richie Bosetti.
6       Q.   So then the answer with regard to
7  you is no?
8       A.   No.
9       Q.   Did -- with regard to the
10 acknowledgment in paragraph 65 that Gary
11 Bosetti -- that you didn't know what Gary
12 Bosetti's whereabouts were, did you -- were
13 you discussing it with anybody with regard
14 to the whereabouts of Mr. Bosetti that
15 night?
16      A.   We had no idea where his
17 whereabouts were.
18      Q.   Well, did you discuss with Lamm
19 or with Snyder the fact that Gary Bosetti
20 was still on the island, but you didn't know
21 where his whereabouts were?
22      A.   We didn't know if he was still on
23 the island.
24      Q.   Well, did you have any
25 discussions with Lamm or Snyder during that

Page 419

1           F. Fiorillo
2  morning, before the end of your first shift,
3  as to where Gary Bosetti was?
4       A.   At this point in time, we didn't
5  know that Gary Bosetti was involved in the
6  fight.  It was only when the  -- when the,
7  um, one of the victims pointed him out when
8  the chief was, um  -- it appeared to be that
9  Gary Bosetti was the person in the fight.
10 But we didn't know it.
11      Q.   Well, according to 65, as I read
12 it, Richard Bosetti advised one of you guys,
13 Snyder or Lamm or you, that Gary Bosetti was
14 involved in the fight?
15      A.   Yeah.  But we couldn't -- okay.
16      Q.   Do you agree with me, that's
17 how --
18      A.   Yes.
19      Q.   -- it looks like --
20      A.   No.  I follow you.  I understand
21 now.
22      Q.   Right.  So if during the initial
23 investigation before Chief Paridiso came on
24 to the island --
25      A.   Okay.

Page 420

1           F. Fiorillo
2       Q.   -- did you, Fiorillo, or Snyder
3  have a conversation with Richard Bosetti
4  about his brother being involved in the
5  fight, my question to you is did either you,
6  Snyder or Lamm have any discussions that
7  evening about the whereabouts of Gary
8  Bosetti, that you can recall?  And if you
9  can't recall, then you can't recall.  That's
10 fine.
11      A.   Let me just think of how  -- of
12 how this happened.  Okay.  Tommy asked
13 Richie, "Where's your brother?"  That's what
14 happened.
15      Q.   Okay.
16      A.   And Richie said he didn't know.
17      Q.   And was that in your presence?
18      A.   Yes.  I heard that.  That's why
19 I'm telling you.  I heard that.
20      Q.   And why did Tommy ask Richie that
21 question, to the best of your understanding?
22      A.   Because from what Tommy told me
23 later on, Richie said that Gary was the one
24 who was involved in the fight.  So then I
25 said, "Well, if Gary was involved in the

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 421

F. Fiorillo

1      F. Fiorillo
2 fight, then why did he leave the scene?"
3    Q.  Okay. And that was certainly
4 before Paridiso came on?
5    A.  Yeah. Yeah. It was before.
6    Q.  So my question to you is, did any
7 one of you try to call Gary Bosetti on his
8 cell phone?
9    A.  I didn't -- I didn't have his
10 cell phone number.
11    Q.  Did you try to -- did any one of
12 you three try to inquire with Chief Paridiso
13 as to Gary Bosetti's cell phone?
14      MR. GOODSTADT: Objection.
15    A.  Well, the chief did call.
16    Q.  I mean during the evening, during
17 the initial investigation that morning
18 before Paridiso came on board?
19    A.  No.
20    Q.  Okay. Did any one of the three
21 of you ask anyone where Gary Bosetti was
22 sleeping that night?
23    A.  No.
24    Q.  Okay. Let's look at paragraph
25 66.

Page 422

F. Fiorillo

1      F. Fiorillo
2    A.  Well, I can't say "no" to the
3 last question because I wasn't at the
4 station all the time. I -- I don't know.
5    Q.  Let's go to paragraph 66. "In
6 reaction to Officer Richard Bosetti's
7 silence, the patrons who remained at
8 Houser's Bar and had not fled the scene of
9 the fight, raised concerns of a 'cover up'
10 by the police department," do you see that?
11    A.  Yes.
12    Q.  Name me who these patrons are.
13    A.  It was the victims. Christopher
14 Shalick. He's the one that blurted out that
15 "you guys are going to cover it up."
16    Q.  Oh. So when in paragraph 66,
17 you're referring to the patrons who remained
18 at Houser's Bar and had not fled the scene
19 of the fight, you're referring to
20 Christopher Shalick?
21    A.  I heard him say that.
22    Q.  Are you referring to anybody
23 else? I'm trying to understand, patrons to
24 me --
25    A.  Well, he was a patron in the bar.

Page 423

F. Fiorillo

1      F. Fiorillo
2    Q.  Okay.
3    A.  Well, I'm telling you what
4 happened. I heard him say that to me.
5    Q.  So I'm --
6    A.  Not generally to me. But an
7 outward statement.
8    Q.  Other than -- other than
9 Mr. Shalick, did any other patron who
10 remained at the bar use the word "cover up"?
11      MR. GOODSTADT: Objection.
12    A.  He was the only one that was --
13 he was the only one that was very
14 boisterous.
15    Q.  So the answer would be "no," no
16 other patron, other than --
17    A.  Well, I wasn't -- I wasn't in the
18 bar.
19    Q.  Only in your presence, sir.
20    A.  Okay.
21    Q.  The only thing I'm asking you is
22 in your presence.
23    A.  In my presence.
24    Q.  In your presence?
25    A.  He was the only one.

Page 424

F. Fiorillo

1      F. Fiorillo
2    Q.  Was Mr. Shalick the only "patron"
3 as that word is used in 66, that used the
4 phrase "cover up"?
5    A.  As far as I know.
6    Q.  Okay. Now 66 says "Officer
7 Snyder assured the patrons," do you see
8 that?
9    A.  I think that's what he was
10 referring to, because he was -- he was
11 speaking to them, and that's when Shalick
12 blurted it out. I heard that.
13    Q.  So you heard Snyder assure the
14 patrons that --
15    A.  That it was not going to be a
16 cover up. I heard Tommy say that.
17    Q.  And how many patrons were left in
18 the bar after the fight, to your knowledge?
19      MR. GOODSTADT: Objection.
20    A.  I was outside. I didn't count
21 the people inside. But there was -- it was
22 chaos. There was -- there was people all
23 over the place.
24    Q.  Okay. Did you, Lamm and Snyder
25 have any discussions about taking the names

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 425

F. Fiorillo

1       F. Fiorillo
2  of the witnesses that remained in the bar
3  that night?
4       A.   Well, I tried getting witnesses
5  outside the bar.
6       Q.   I'm only asking --
7       A.   And Kevin and Tommy were trying
8  to do that inside the bar.
9       Q.   And neither you, Tommy or Kevin
10  got any names of witnesses?
11      A.   Nobody would cooperate with us
12  that night.
13      Q.   Okay.  And paragraph 67, what is
14  the name of the bartender that's referenced
15  in paragraph -- of the bouncer that was
16  referenced in paragraph 67?
17      A.   67?  Shawn O'Rourke.
18      MR. NOVIKOFF: Okay.  Did
19  you -- withdrawn.  I think I'm done.
20  So whoever wants to go, can go.
21      MS. ZWILLING: Okay.  Do you
22  want to go or --
23      MR. CONNOLLY: I'll go first.
24  Can I have your microphone?
25      MR. NOVIKOFF: You got it.

Page 426

F. Fiorillo

1       F. Fiorillo
2  EXAMINATION BY
3  MR. CONNOLLY:
4       Q.   Mr. Fiorillo, earlier today you
5  testified that on the night of the Halloween
6  incident, you spoke to Elyse Miller before
7  the Halloween incident?
8       A.   Yes.
9       Q.   Okay.  Where did you speak with
10  her?
11      A.   She was in front of the station
12  with Gary Bosetti and Richie Bosetti.
13      Q.   Okay.  And what was the sum and
14  substance of that conversation?
15      A.   She said that Gary drew something
16  on her breast.  Part of her Halloween
17  costume.
18      Q.   And had you known Elyse Miller
19  before that night?
20      A.   Yes.  She was a, um, a what do
21  you call it?  Like a seasonal renter.
22      Q.   And you had known her for a
23  couple of years?
24      A.   I've known her -- yeah.  At least
25  two years that I've seen her around.  I

Page 427

F. Fiorillo

1  mean, she was always around the Village.
2       Q.   Um, can you give me some current
3  pedigree information?  Are you presently
4  married?
5       A.   Oh, no.  No.
6       Q.   Are you divorced?
7       A.   Yes.
8       Q.   Okay.  Um, and you mentioned
9  earlier you had a son?
10      A.   Yes, I do.
11      Q.   Do you have any other children?
12      A.   No.
13      Q.   Okay.  And with whom, if anyone,
14  do you presently reside?
15      A.   No one.
16      Q.   Okay.
17      A.   Just myself.
18      Q.   Are you presently employed?
19      A.   Yes.
20      Q.   By whom?
21      A.   The name of the company is
22  People's Accident Information Service.
23      Q.   And what does that company do?
24      A.   Security.

Page 428

F. Fiorillo

1       Q.   And would you be a security guard
2  with that company?
3       A.   Yes.
4       Q.   Okay.  And where would you work?
5       A.   Wherever they send me.
6       Q.   Okay.  It would depend upon the
7  shift?
8       A.   It depends on the location.
9  Like, um, they have different jobs in
10  different locations.
11      Q.   And how long have you worked for
12  People's?
13      A.   Um, I've worked there since I
14  want to say July of 2007 or -- or late June.
15  Thereabouts.
16      Q.   And have you held any other
17  employment?
18      A.   No.
19      Q.   Have you held any employment
20  since April of 2006?
21      A.   Since April of 2006?
22      Q.   Right.
23      A.   That was the only job.
24      Q.   Since you filed -- withdrawn.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 429

1        F. Fiorillo
2  Since the Notice of Claim was filed in your
3  behalf, have you had any conversations with
4  Ed Paridiso?
5      A.   Yes.
6      Q.   Okay.  On how many occasions have
7  you spoken to Mr. Paridiso since that time?
8      A.   I would say when I asked him for
9  the verification letter that I worked in
10 Ocean Beach for the security guard license.
11 For -- I spoke to him when his, um, mother
12 died.  I spoke to him when his father died.
13 And that's it.
14     Q.   On the two occasions you spoke to
15 him on the death of his parents, did you
16 discuss anything other than possibly
17 expressing your sympathy?
18     A.   He wouldn't talk about  -- we --
19 what we did was we had a -- when I say "we,"
20 um, Kevin, um, Joe -- the five of us, we all
21 went there to pay our respects, and we
22 weren't talking about anything that had to
23 do with Ocean Beach whatsoever.
24     Q.   And when you went there, you
25 meant the wake?

Page 430

1        F. Fiorillo
2      A.   Yeah.  At that time, it was just
3  not a good time.
4      Q.   Earlier when you were testifying
5  regarding the blog, you said something to
6  the effect of "we thought we could tell who
7  wrote the blogs."  Who do you mean by "we"?
8      MR. GOODSTADT: Objection.
9      A.   Well, "we" meaning who the blogs
10 were directed to.  Like Kevin, Tommy, Eddie,
11 myself and Joe.
12     Q.   Okay.  But when you say "we," are
13 you referring to --
14     A.   Us.
15     Q.   The Plaintiffs?
16     A.   Yeah.  Us.
17     Q.   Okay.  And did you read the blogs
18 together?
19     A.   No.  Like in other words, you
20 know, if -- um, it was always separate.
21     Q.   Okay.
22     A.   Because we would talk on the
23 phone.
24     MR. CONNOLLY: I have no other
25     questions.  Thank you.  Your witness.

Page 431

1        F. Fiorillo
2  EXAMINATION BY
3  MS. ZWILLING:
4      MS. ZWILLING: I have just a
5  few.
6      Q.   Did you post on the blogs?
7      THE REPORTER: Hold on a
8  second.  We have to switch the mic
9  over.
10     Q.   Did you post on the blogs?
11     A.   Never.
12     MR. GOODSTADT: Objection.
13 It's been asked and answered.
14     A.   Not even once.
15     Q.   Do you know if any of the other
16 Plaintiffs did?
17     A.   Yes, I do.
18     Q.   Which ones posted on the blogs?
19     A.   Only one.  One person that -- in
20 our group out of the Plaintiffs posted on
21 the blog.
22     Q.   Who was that?
23     A.   Tommy Snyder.
24     Q.   Do you know what names he posted
25 under when he posted on the blogs?

Page 432

1        F. Fiorillo
2      A.   Wow.
3      MR. GOODSTADT: It's in the
4  record already.  Tommy Snyder testified
5  to it.
6      A.   I don't know what name he used,
7  but I know he posted.
8      Q.   When were you divorced?
9      A.   Officially, March 17 --
10 St. Patrick's Day 1997.
11     Q.   Have you ever seen Alison Sanchez
12 at any time, other than the other day at her
13 deposition and when you met with her in her
14 office at Civil Service?
15     A.   I saw her on Ocean Beach.
16     Q.   How many times did you see her in
17 Ocean Beach?
18     A.   Once.
19     Q.   And when was that?
20     A.   Um, let's see.  The year I think
21 was I want to say 2005.  She was going over
22 the records with George Hesse, the, um --
23 they had a lot of problems with Civil
24 Service qualification exams with people who
25 were not certified there and they were

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 433

F. Fiorillo

1  trying to get them certified and it was a
3  mess.
4      Q.   Have you ever seen her at any --
5  on any other occasion, other than those
6  three times?
7      A.   No.
8      Q.   When you saw her in Ocean Beach
9  going over the records with George Hesse,
10 did you hear them having any personal
11 conversation?
12     A.   Did I?  No.
13     Q.   Have you ever seen her in George
14 Hesse's presence at any other time?
15     A.   No.
16     Q.   Other than what Mr. Carter told
17 you, do you have any basis to believe that
18 she had on any occasion ever had sexual
19 relations with George Hesse?
20     A.   Do I have any belief?
21     Q.   Yes.
22     A.   No.
23     Q.   Do you have any reason to believe
24 that?
25     A.   No.

Page 434

F. Fiorillo

2      Q.   You heard her testify the other
3  day that she was a lesbian.  Um, when for
4  the first time did you learn that Alison
5  Sanchez was a lesbian?
6      A.   We knew this when she came out
7  and posted it in the Newsday.
8      Q.   And when was that?
9      A.   When she got married.
10     Q.   Was that before or after your
11 employment was terminated?
12     A.   It was I believe after.
13     Q.   Was it before or after you met
14 with her at Civil Service?
15     A.   I believe it was after also.
16     Q.   Now are you claiming that Alison
17 Sanchez gave information to George Hesse
18 which enabled him to terminate your
19 employment?
20     A.   I don't know what Alison Sanchez,
21 um, gave George Hesse, but between the both
22 of them and Maryanne Minerva, ultimately,
23 the five of us were fired.
24     Q.   Well, do you have any knowledge
25 of Alison Sanchez giving any information to

Page 435

F. Fiorillo

1  George Hesse which enabled him to terminate
3  your employment, yes or no?
4          MR. GOODSTADT: Objection.
5      A.   No.
6      Q.   Are you contending that Alison
7  Sanchez took action which enabled George
8  Hesse to terminate your employment, yes or
9  no?
10         MR. GOODSTADT: Objection.
11     A.   Yes.
12     Q.   What -- identify for me the
13 actions taken by Alison Sanchez which
14 enabled George Hesse to terminate your
15 employment?
16     A.   Well, ultimately, she took action
17 with Hesse on trying to get these officers
18 certified.  She also --
19     Q.   I'm asking you only with
20 respect --
21         MR. GOODSTADT: Excuse me, he's
22     answering the question.  Let him
23     answer -- let him finish answering
24     before --
25         MS. ZWILLING: Fine.  Fine.

Page 436

F. Fiorillo

2      A.   George Hesse and Alison Sanchez
3  were involved in, um  -- they had knowledge
4  that these civilians came on to the Ocean
5  Beach Police Department without being
6  certified.
7      Q.   Okay.  I'm asking about the
8  termination of your employment.
9      A.   I wasn't finished.  The --
10 ultimately, because of those officers --
11 those civilians actually not being certified
12 as police officers until three years later
13 or thereabouts, that caused a lot of
14 friction in our department.
15     If Alison Sanchez did her job, in
16 my opinion, in 2002, Richie Bosetti and Gary
17 Bosetti would have had to go through the
18 same qualifications that I had to go
19 through, Joe Nofi would have -- that Joe
20 Nofi went through, Kevin Lamm went through,
21 Tommy Snyder and Eddie Carter to be
22 certified.
23     Q.   Are you claiming that Alison
24 Sanchez took actions in 2006 which enabled
25 George Hesse to terminate your employment?

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 437

F. Fiorillo

1
2    A.   Yes.
3    Q.    Identify the actions taken by
4  Alison Sanchez in 2006 which enabled George
5  Hesse to terminate your employment?
6    A.   She had a meeting with Maryanne
7  Minerva and George Hesse to -- to find a way
8  to -- Alison Sanchez relayed the information
9  to George Hesse and Maryanne Minerva, by her
10  own admission, because she said she spoke to
11  them about us before we were fired.  Not
12  when we were fired, before we were fired.
13    Q.    And what did Alison Sanchez relay
14  to you that she had told George Hesse and
15  Ms. Minerva?
16    A.    That they did everything that
17  they had to do the right way.
18    Q.    And do you have any reason to
19  believe that that information was incorrect?
20    A.    Well, I don't know what the right
21  way is.  But certainly it wasn't the right
22  way to let people come on a police
23  department, work, wear a firearm, a shield
24  and have a police ID, and go on to the
25  county range actually, and not even be

Page 438

F. Fiorillo

1
2  certified through Suffolk County Civil
3  Service.
4    Q.    Do you have any basis to believe
5  that Alison Sanchez had a desire to see you
6  terminated from your position, yes or no?
7        MR. GOODSTADT: Objection.
8    A.   Yes.
9    Q.    Okay.  What is the basis for your
10  belief that Alison Sanchez had a desire to
11  see you terminated from your position?
12    A.    Because we were -- meaning myself
13  and the four others -- were the catalysts
14  for the -- the civilians who were working in
15  Ocean Beach to, in my opinion, get
16  certified.
17    Q.    Okay.  I'm not asking about your
18  opinion.  I'm asking you what evidence do
19  you have that prior to your termination, it
20  was Alison Sanchez's desire to see your
21  employment terminated?
22        MR. GOODSTADT: Objection.
23    That is evidence.
24    A.    Well, it's almost -- to me, it's
25  like she was  -- she, in my opinion --

Page 439

F. Fiorillo

1
2    Q.    Again, respectfully,
3  Mr. Fiorillo, you've told me twice you want
4  to give your opinion.  I understand your
5  opinion.
6    A.    Okay.  I think --
7    Q.    Please, I didn't interrupt you,
8  sir.  I'm going to ask you allow me the same
9  courtesy now.  Let's put the opinions aside.
10  What evidence do you have?  What did
11  Ms. Sanchez say to you prior to your
12  termination, what did she do prior to your
13  termination which led you to believe that
14  she wished to see your employment
15  terminated?
16        MR. GOODSTADT: Objection.
17    A.    She didn't say anything to me.
18  She did say in the meeting, though, that she
19  had a discussion with Maryanne Minerva and
20  George Hesse about us.
21    Q.    And is that the full extent of
22  what she told you in the meeting about the
23  discussion at that prior meeting with
24  Minerva and Hesse?
25    A.    Yeah.  Because she said we didn't

Page 440

F. Fiorillo

1
2  have a leg to stand on.
3    Q.    Okay.  Did she tell you anything
4  more about what was discussed at the meeting
5  she had with Minerva and Hesse, other than
6  to say there was a meeting?
7    A.    She didn't tell me the contents
8  of the meeting.
9    Q.    Okay.  Did Alison Sanchez do
10  things to you, prior to your termination,
11  which led you to believe she wished to see
12  your employment terminated?
13    A.    She didn't do anything to me
14  personally.
15    Q.    Did you ever have any discussion
16  with Alison Sanchez, prior to your
17  termination, about your employment, yes or
18  no?
19    A.    No.
20    Q.    Prior to your termination, did
21  you know who she was as being --
22    A.    Yes.
23    Q.    The Civil Service person
24  involved --
25    A.    Yes.  I spoke to her on the phone

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 441

F. Fiorillo

1          F. Fiorillo
2 at least three times.
3      Q.   Was that about your employment?
4      A.   No.
5      Q.   Did you ever speak to Alison
6 Sanchez about your employment, prior to your
7 termination?
8      A.   No.
9      Q.   Did you ever speak to her prior
10 to your termination?
11     A.   No.
12     Q.   Do you have any reason to believe
13 that she bore some animosity toward you?
14     A.   Well, I sense -- I sense it.
15     Q.   When for the first time did you
16 sense animosity towards you on the part of
17 Alison Sanchez?
18     A.   When I was in her office.  She
19 didn't even care.  It was like she had no
20 respect -- we were coming in there just to
21 talk to her, and it was like frivolous for
22 her to just -- to just entertain us.  It was
23 like very unprofessional, in my opinion.
24     Q.   Prior to your termination, did
25 she ever do anything or say anything to you

Page 442

1          F. Fiorillo
2 to indicate that she had a personal dislike
3 for you?
4          MR. GOODSTADT: Objection.
5      A.   Prior to my termination?
6      Q.   Yes.
7      A.   No.
8      Q.   Now when Alison Sanchez did these
9 things to you that you appear to believe
10 were improper, did you complain to Stan
11 Pelc?
12     A.   I tried calling Stan Pelc and I
13 spoke to -- I either spoke to Stan Pelc or
14 Alan Schneider.
15     Q.   What, if anything, did they tell
16 you?
17     A.   Talk to Alison Sanchez.
18     Q.   Did you inform them that you felt
19 that her -- she gave you some wrong advice?
20         MR. GOODSTADT: Objection.
21     A.   Well, I -- when Alison Sanchez
22 told us that we didn't have a leg to stand
23 on, we -- I just -- you know, it was like
24 how could that be?  How could that be the
25 end of the road?  It was just too abrupt.

Page 443

1          F. Fiorillo
2      Q.   Okay.  So what did you do to have
3 Ms. Sanchez's supervisors review her action
4 after you became dissatisfied with it?
5          MR. GOODSTADT: Objection.
6 He's testified --
7      A.   I didn't.  I just took her word
8 for what it was and  -- and went from there.
9      Q.   Well, did you ever call Stan
10 Pelc?
11         MR. GOODSTADT: Objection.
12     A.   Yeah, I did.
13     Q.   Was it before or after you met
14 with Alison Sanchez?
15         MR. GOODSTADT: We're going in
16     circles here.  He's already answered
17     when he called him.  What the telephone
18     call was about.  What Stan Pelc or Alan
19     Schneider told him.  You asked the same
20     exact question.
21         MS. ZWILLING: That's not quite
22     the case, Mr. Goodstadt.
23         MR. GOODSTADT: That's exactly
24     the case.  We can have the testimony
25     read back.

Page 444

1          F. Fiorillo
2      Q.   When did you call Stan Pelc?
3      A.   I called Stan Pelc that Monday
4 after I was fired.
5      Q.   Was that prior to your meeting
6 with Alison Sanchez?
7      A.   That was prior to meeting with
8 Alison Sanchez.
9      Q.   Did you call Stan Pelc or attempt
10 to call Stan Pelc after your meeting with
11 Alison Sanchez?
12     A.   Then I think I tried calling Alan
13 Schneider.
14     Q.   My question was about Stan Pelc.
15 Did you call Stan Pelc or try to call Stan
16 Pelc after your meeting with Alison Sanchez?
17     A.   No.
18     Q.   Did you call Phil Cohen after
19 your meeting with Alison Sanchez?
20     A.   I didn't even know who -- to be
21 honest with you, I never heard the name.
22     Q.   Did you ever call Alan Schneider?
23     A.   Yes.
24     Q.   When?
25     A.   That same day.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 115 of 158 PageID #: 2485

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 445

F. Fiorillo

1     Q.   What same day?
2     A.   Monday.  Monday.  That Monday.
3     Q.   Prior to your meeting with Alison
4  Sanchez?
5     A.   Yes.
6     Q.   Did you ever call Alan Schneider
7  after your meeting with Alison Sanchez?
8     A.   No.  Because after Alison --
9  after they told me to -- that's why I called
10 Alison Sanchez.  Because she was the one
11 that handled the Ocean Beach account.
12    Q.   Now it's your belief that Alison
13 Sanchez was engaged in some sort of
14 conspiracy along with George Hesse against
15 you?
16    MR. GOODSTADT: Just to --
17    A.   I think there was something going
18 on there.
19    MR. GOODSTADT: Just to be
20 clear, are you asking then or now?
21    Q.   You believe it now?
22    A.   Well, I don't  -- it's after the
23 fact.  I believe it happened then.
24    Q.   Well, when you walked out of

Page 446

F. Fiorillo

1  Ms. Sanchez's office that day, did you think
2  she was in cahoots or suspect she was in
3  cahoots with George Hesse?
4     A.   Yes.
5     Q.   And when you walked out there
6  that day believing she was in cahoots with
7  George Hesse, what did you do to let Stan
8  Pelc know that someone who worked beneath
9  him was conspiring with someone else to do
10 something illegal?
11    A.   I got to tell you, I didn't do
12 anything, because I was -- I felt like we
13 exhausted everything that we could do.  But
14 I just felt it wasn't --
15 MO    MS. ZWILLING: Move to strike
16    that portion which is nonresponsive.
17    MR. GOODSTADT: He wasn't even
18 done yet.  He's not even done yet and
19 you're jumping in on him.
20    Q.   Is it --
21    MR. GOODSTADT: Finish your
22 answer.  Finish your answer.
23    MS. ZWILLING: Mr. Goodstadt,
24 you know --

Page 447

F. Fiorillo

1     MR. GOODSTADT: You have to let
2  him finish his answer.  You have to.
3  Otherwise get on the phone with the
4  court if you want, and we'll explain to
5  the court that you're cutting him off
6  halfway through your -- halfway through
7  his answer and you're jumping in with
8  another question.
9     Let him finish the answer, just
10 like you yelled at him for jumping in
11 on your question.
12    MS. ZWILLING: The reason --
13    MR. GOODSTADT: Can I finish
14 now?  Now you're interrupting me.  Now
15 you're interrupting me.
16    MS. ZWILLING: Mr. Goodstadt,
17 you interrupted me.  You interrupted
18 me.  And I also --
19    MR. GOODSTADT: I interrupted
20 you because you interrupted my client.
21    MS. ZWILLING: Go ahead.
22    MR. GOODSTADT: You didn't let
23 him finish the answer.  If you want to
24 ever get done here, let him finish his

Page 448

F. Fiorillo

1  answers, then you ask your next
2  question.  You can make whatever
3  motions you want to make and raise them
4  at whatever time you think it may be
5  appropriate to raise them in the
6  future, but we're never going to get
7  done unless you ask the question, let
8  him answer the question, and then ask
9  the question again.
10    MS. ZWILLING: I can't help
11 observing, Mr. Goodstadt, that we've
12 sat here for many hours and you're
13 taking a rather shall we say different
14 tone toward me than to other counsel.
15    MR. GOODSTADT: Because other
16 counsel, although he made his motions,
17 when -- when our client asked if he can
18 explain, he said "yeah, explain to me,"
19 and he did.  He let him answer the
20 questions.
21    MS. ZWILLING: Your client can
22 finish his answer, and then if we need
23 to narrow it down or a motion needs to
24 be made, we can do that.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 116 of 158 PageID #: 2486

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 449

F. Fiorillo

1
2     MR. GOODSTADT: That's all I'm
3  asking for.
4     MS. ZWILLING: Fine.
5  A.   Can I answer?
6     MR. GOODSTADT: Finish your
7  answer.  Can you read back his answer
8  so he can finish it.
9     (The requested portion was read.)
10  A.   I just felt that there was
11  something else we could do after that, but I
12  didn't know what it was at the time.  But I
13  just didn't feel comfortable with just being
14  fired in one day and there's nothing we
15  could do about it.
16  Q.   So you felt that contacting Stan
17  Pelc would be useless?
18  A.   I contacted him.  I tried
19  contact -- I called him first.
20  Q.   Mr. Fiorillo, we're talking now
21  about after the meeting with Alison Sanchez.
22  Did you feel that it would be useless to
23  contact Mr. Pelc after the meeting with
24  Ms. Sanchez?
25  A.   I felt that after I spoke to

Page 450

F. Fiorillo

1
2  Alison Sanchez, it didn't make any sense to
3  go -- what I think I was doing was I was
4  going into a -- it was like a futile effort
5  because I had no -- it was like I was
6  going -- chasing my tail.  I was going in a
7  circle.
8  Q.   Okay.  So you felt it would be
9  futile to contact Mr. Pelc after the
10  meeting?
11  A.   I didn't say that.  I said the --
12  the -- what I was going through was just
13  not -- it was a futile effort between going
14  from Alison Sanchez, who tells me I don't
15  have a leg to stand on, to Stan Pelc telling
16  me to talk to Alison Sanchez.  I mean,
17  everybody was trying to pass the ball, and
18  at the end of that meeting with Alison
19  Sanchez, I was just exhaust -- let me tell
20  you the frame of mind I was in.  I wasn't in
21  a good frame of mind.  I just got fired.  I
22  didn't know what to do.
23  Q.   Did you contact Cynthia DeStefano
24  after your meeting with Alison Sanchez?
25  A.   No.

Page 451

F. Fiorillo

1
2  Q.   Did you contact Phil Cohen after
3  your meeting --
4  A.   I didn't even know --
5  Q.   -- with Alison Sanchez?
6  A.   No.
7  Q.   Did you contact Alan Schneider
8  after your meeting with --
9  A.   No.
10  Q.   -- Alison Sanchez?  Did you send
11  any letters or make any phone calls to the
12  County Executive's office after your meeting
13  with Alison Sanchez?
14  A.   No.
15  Q.   Did you inform the District
16  Attorney that you felt that she was in some
17  sort of elicit conspiracy with George Hesse?
18  A.   I spoke about Alison Sanchez at
19  the District Attorney's office.
20  Q.   On how many occasions?
21  A.   On the occasion, um -- on one
22  occasion.
23  Q.   And was that before or after your
24  meeting with her?
25  A.   That was after.

Page 452

F. Fiorillo

1
2  Q.   Who did you speak to in that
3  time?
4  A.   I spoke to Walter Warkenthien and
5  Richie Burke.
6  Q.   What did you tell them?
7  A.   I told them about how we were
8  fired and what we did.  We went to Civil
9  Service and we spoke to Alison Sanchez, and
10  we were told that, you know, we didn't have
11  a leg to stand on.
12  Q.   Did you tell the representatives
13  at that District Attorney's offices that you
14  felt that Alison Sanchez was in some sort of
15  illegal conspiracy with George Hesse?
16  A.   I -- I told Walter -- I expressed
17  my view that, um, Hesse was involved with
18  Civil Service somehow because the -- the
19  people who were underneath, um, Alison
20  Sanchez's, um -- I don't know what you want
21  to call, um -- control in Ocean Beach as far
22  as getting them certified, was, um, was
23  probably the cause of why we were fired.
24  Q.   Okay.  I appreciate when you tell
25  me that you told the District Attorney about

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 453

F. Fiorillo

1  what George Hesse did.  But now I'm
2  asking --
3     A.   But it was --
4     Q.   Please allow me to finish my
5  question.  I'm asking specifically about
6  what you told the District Attorney about
7  Alison Sanchez.  Did you tell anyone at the
8  District Attorney's office that you believed
9  that Alison Sanchez had conspired with
10  George Hesse to do something illegal?  Did
11  you tell them that?
12     A.   I didn't tell them that in those
13  words.  In your words.
14     Q.   Now when you began your
15  employment with the Village, did you receive
16  any letter informing you that you were being
17  given employment?
18     A.   Did I receive any letter?
19     Q.   Yes.
20     A.   No.  I was sponsored by Ocean
21  Beach.  I wasn't -- I didn't, um  -- it
22  wasn't -- I wasn't -- in other words, I had
23  an interview with the chief.
24     Q.   Did they ever send you a letter

Page 454

F. Fiorillo

1  making a formal written offer of employment?
2     A.   Who?
3     Q.   The Village of Ocean Beach.
4     A.   Um, I know I filled out an
5  application.  It might have been in that
6  application.  I'm not sure.  I can't -- I
7  can't be for certain.
8     Q.   I'd like you to take a look at
9  page 24 of the Complaint.
10     A.   24.
11     Q.   Specifically paragraph 103, the
12  last sentence, where it stated "Sanchez made
13  these false statements with an intent to
14  deceit Plaintiffs and prevent them from
15  seeking legal recourse in connection with
16  their termination."  Prior to your meeting
17  with Alison Sanchez, what were the steps, if
18  any, that you were planning to take to seek
19  legal recourse for your termination?
20     A.   Prior to meeting with --
21     Q.   Before you met with Alison
22  Sanchez, what were the steps, if any, that
23  you were planning to take to seek legal
24  recourse for your termination that you refer

Page 455

F. Fiorillo

1  to in paragraph 103?
2     A.   Ma'am, I just got fired on a
3  Sunday and I saw Alison Sanchez on a
4  Wednesday.  So there wasn't much time for me
5  to do anything from the time that we were
6  fired to the time that we met with Alison
7  Sanchez.
8     Q.   Well, at the time you met with
9  Alison Sanchez, had you planned at that
10  point to retain an attorney?
11     A.   I didn't  -- I have to tell you
12  the truth, I didn't know what to do.  I
13  didn't know what we had.  But when --
14  after -- after she told us that we had no
15  leg to stand on, I found that very hard -- I
16  couldn't accept that.
17     Q.   Okay.  Again, I'm focusing now on
18  the time before the meeting.  Had you
19  decided to retain a lawyer before you met
20  with Alison Sanchez, yes or no?
21     A.   We -- I got to tell you, we
22  talked about it prior to meeting with Alison
23  Sanchez.  We didn't know if we could.  If
24  we -- what we were going to do.  We just

Page 456

F. Fiorillo

1  talked about a lot of things, because it
2  was -- everything was so up in the air.  All
3  I wanted out of the whole thing was just to
4  get another police job.  That's all I
5  wanted.  I didn't want to go through this,
6  okay?
7     Q.   So if I understand you correctly,
8  prior to you meeting with Alison Sanchez,
9  you had not made up your mind to retain a
10  lawyer, would that be correct?
11     A.   We didn't -- it wasn't fixed in
12  stone that, you know, we're going to go out
13  Monday morning and get a lawyer, because we
14  didn't even have time to digest this.
15     Q.   Fair enough.  When for the first
16  time did you and the other Plaintiffs make
17  the decision to seek counsel?
18     MR. GOODSTADT: Objection.
19     A.   After -- after we met with Alison
20  Sanchez.
21     Q.   How soon after you met with
22  Alison Sanchez was the decision made to hire
23  a lawyer?
24     A.   I don't know the timeline.  I

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 457

F. Fiorillo

1 don't know.  It was -- it was before -- it
2 was after that meeting and obviously before
3 June 30.  So in that time period, right then
4 and there.  That was the concentration of
5 it.
6
7       Q.    Okay.  I'd like you to focus now
8 on that sentence, again, where you say that
9 Alison Sanchez prevented you from seeking
10 legal recourse.  Identify for me the steps
11 Ms. Sanchez took to prevent you from
12 obtaining legal counsel.
13          MR. GOODSTADT: Objection.
14 That's not what the paragraph says.
15          MS. ZWILLING: Fine.  Okay.
16      Q.    Identify for me the steps Alison
17 Sanchez took to prevent you from seeking
18 legal recourse?
19          MR. GOODSTADT: Objection.
20 Same objection.  You're misquoting the
21 paragraph.
22          MS. ZWILLING: I'm reading from
23 it.
24          MR. GOODSTADT: No, you're not.
25          MS. ZWILLING: Well, the

Page 458

F. Fiorillo

1
2 question stands.
3          MR. GOODSTADT: Well, then I'm
4 going to object to it.
5          MS. ZWILLING: All right.
6 Fine.  I'll read from it all night if
7 you'd like.  And you can, again, say
8 you'll get the court on the phone at
9 7:30 on a Friday night.
10      Q.    Can you identify the steps you
11 claim Alison Sanchez took to -- and I'm
12 reading from paragraph 103 now -- "prevent
13 them" -- meaning you and the other
14 Plaintiffs -- "from seeking legal recourse"?
15 What --
16          MR. GOODSTADT: Same objection.
17 You're reading half of a sentence.
18          MS. ZWILLING: Fine.  I'll read
19 the first sentence.
20          MR. GOODSTADT: Read the
21 whole -- read the whole sentence and
22 you'll understand that what you're
23 saying is not what that paragraph
24 indicates.  It's saying that she made
25 the statement "and you have no leg to

Page 459

F. Fiorillo

1
2 stand on," with an intent to prevent
3 them from doing something.  She didn't
4 physically prevent them.  She made a
5 statement to them with the intent to
6 prevent them from going forward.
7 That's what paragraph 103 says.
8          MS. ZWILLING: Again,
9 Mr. Goodstadt, I can't help but notice
10 that you're taking a very different
11 tone with me.  Please don't interrupt
12 me like you did with other counsel.
13          MR. GOODSTADT: Because your
14 questions are different.  It's a
15 different set of circumstances.
16          MS. ZWILLING: I mean, it's
17 beginning to make me wonder perhaps
18 there's another reason for it.
19          MR. GOODSTADT: Woe.  Woe.
20 Woe.  You've just now accused
21 something -- you just accused another
22 professional of doing something for
23 another reason.  What's the other
24 reason that you're referring to?
25          MS. ZWILLING: I said I hope --

Page 460

F. Fiorillo

1
2          MR. GOODSTADT: I want to know
3 what your basis is.
4          MS. ZWILLING: I said I --
5          MR. GOODSTADT: No.  No.
6 You've now accused me on the record --
7          MS. ZWILLING: That's not true.
8          MR. GOODSTADT: -- that you
9 believe there's another reason, other
10 than the fact that your questions,
11 particularly the last one which is
12 taking a sentence, a half of a sentence
13 out of the Complaint, taken out of
14 context, you said that you're beginning
15 to believe that there's another reason
16 for it.  What's the reason that you're
17 beginning to believe?
18          MS. ZWILLING: You know, it's
19 Friday night.  It's just about 7:00.  I
20 mean, perhaps we're all getting a bit
21 testy.
22          MR. GOODSTADT: I'm not getting
23 testy.  You've accused me now of
24 something, and I want to know what
25 you're accusing me of on the record.

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 461

F. Fiorillo

1
2     MS. ZWILLING: I didn't accuse
3  you of anything.
4     MR. GOODSTADT: Yes, you did.
5     MS. ZWILLING: I'm sorry if you
6  perceived it that way.
7     MR. NOVIKOFF: You said to me
8  that you believe that there's another
9  reason, other than for what I stated.
10  What's that reason?
11     MS. ZWILLING: That's not what
12  I said.
13     MR. GOODSTADT: Can you read
14  back what she said, please.
15     MR. NOVIKOFF: You really want
16  to --
17     MR. GOODSTADT: This is a joke
18  that, on the record, she's accusing
19  another attorney of having some --
20     MR. NOVIKOFF: But you've asked
21  her --
22     MR. GOODSTADT: -- basis.
23     MR. NOVIKOFF: You've asked her
24  to explain.  She's given you her
25  explanation.

Page 462

F. Fiorillo

1
2     MR. GOODSTADT: She hasn't.
3     MR. NOVIKOFF: Do you need to
4  review the record?  I mean, because I
5  can guarantee you --
6     MR. GOODSTADT: I want to know
7  what basis she's referring to.
8     MR. NOVIKOFF: Andrew, but I
9  can guarantee what's going to happen is
10  the court reporter is going to read the
11  record back, you're going to make the
12  same comments to her that you just
13  made, and counsel's going to make the
14  same response to you, and you'll be
15  going in a circle.
16     MR. GOODSTADT: Right.  But
17  in --
18     MS. ZWILLING: I'd really
19  rather not begin making any response.
20     MR. GOODSTADT: -- she was able
21  to intimidate or attempt to intimidate
22  my colleague, Ariel Graff, last week or
23  a couple days ago, the same is not
24  going to happen right here.  And she's
25  now accused me of doing something.  And

Page 463

F. Fiorillo

1  I want to know what she's accusing me
2
3  of doing.
4     MS. ZWILLING: Your colleague
5  didn't seem to be the least bit
6  intimidated.  Well --
7     MR. NOVIKOFF: Now you've just
8  accused her of doing something.  Why
9  don't we --
10     MR. GOODSTADT: The record is
11  what it is.
12     MS. ZWILLING: To say he was
13  intimidated -- I don't want to say
14  anything that's going to cast a
15  dispersion on Mr. Graff, but if you had
16  been there, you would perhaps take a
17  different view.
18     MR. NOVIKOFF: Why don't we --
19  I don't see much being accomplished
20  between the two of you.
21     MR. GOODSTADT: I understand
22  that.  But I've now been accused on the
23  record by another professional in a
24  federal court litigation of having some
25  ulterior motive of making an objection,

Page 464

F. Fiorillo

1  and I want to know what that accusation
2
3  is.  I think I have a right to know
4  what it is.
5     MS. ZWILLING: Mr. Goodstadt,
6  you can have the record read back if
7  you want, but that was not what I said,
8  okay?  Now can we just finish the
9  deposition?
10     MR. GOODSTADT: I would love
11  to.  If you can ask appropriate
12  questions, then we'll finish the
13  deposition.
14     MS. ZWILLING: Okay.
15     Q.   Referring your attention to
16  paragraph 103, specifically the sentence
17  that reads "moreover, Sanchez made these
18  false statements with an intention to deceit
19  Plaintiffs and prevent them from seeking
20  legal recourse in connection with their
21  termination."  I would like you to identify
22  the things that Alison Sanchez did or the
23  steps she took to "prevent (them) from
24  seeking legal recourse in connection with
25  their termination"?

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 465

F. Fiorillo

1
2    MR. GOODSTADT: Same objection.
3    You can answer, if you know what she's
4    even talking about.
5    A.    Ma'am, I'm a little confused on
6    what just happened, and I don't know  -- I
7    need it to be simplified.
8    Q.    What did Alison Sanchez do to
9    prevent you personally from seeking legal
10   recourse in connection with your
11   termination?
12       MR. GOODSTADT: Objection.
13   A.    She stated to me that I didn't
14   have a leg to stand on.
15   Q.    And how did that stop you, if it
16   did, from getting a lawyer?
17       MR. GOODSTADT: Objection.
18   A.    Well, at that point in time,
19   she's Civil Service, so I'm going by what
20   she's telling me.  And she  -- she knows
21   more than I do, because I don't know
22   anything about Civil Service.
23   Q.    Well, other than that statement
24   that you don't have a leg to stand on, can
25   you identify for me all of the other things

Page 466

F. Fiorillo

1
2    she did, if any, to prevent you from seeking
3    legal recourse for your termination?
4        MR. GOODSTADT: Objection.
5    A.    I don't believe she told us the
6    truth.
7    Q.    Okay.  And how did that prevent
8    you from seeking legal recourse for your
9    termination?
10       MR. GOODSTADT: Objection.
11   Q.    If it did?
12   A.    Well, ultimately, this is what
13   happened.  When she stated what she stated
14   to me, that I didn't have a leg to stand on,
15   I thought that was the end of the road,
16   because she told me, "That's it.  You don't
17   have a leg to stand on."
18   Q.    But that wasn't the end of the
19   road, correct?
20   A.    Well, obviously we're here.
21   Q.    Obviously.  Now you mentioned
22   that you had a conversation with someone
23   from the District Attorney's office who
24   stated to you I believe -- I believe the
25   words you used were "I think you need a

Page 467

F. Fiorillo

1
2    lawyer."  Who is it that made that statement
3    to you?
4    A.    Walter Warkenthien.
5    Q.    And when was it he made that
6    statement to you?
7    A.    When I met with him.
8    Q.    When was that?
9    A.    After -- I'm not quite sure of
10   the timeline on this.  I'm not even  -- I
11   don't even want to guess.  I don't -- I
12   don't even know the timeline anymore.
13   Q.    Was it before or after you
14   retained Mr. Goodstadt?
15       MR. GOODSTADT: Objection.
16   When he obtained us, I mean, A, he's
17   testified to the best of his
18   recollection --
19       MS. ZWILLING: Fine.  I'll
20   withdraw the question.
21 DI    MR. GOODSTADT: When he
22   actually engaged us, I'm going to
23   instruct him not to answer for the same
24   reason as before.
25       MS. ZWILLING: Fine.

Page 468

F. Fiorillo

1
2    Q.    Was that before or after your
3    meeting with Alison Sanchez?
4    A.    I'm trying to think of -- I met
5    Walter Warkenthien before, um  -- I'm trying
6    to think.  I think the Samuel Gilbert
7    incident was the first incident when I had
8    contact with the District Attorney's office.
9    Q.    I'm just trying to place the date
10   of that remark.  Was it made before or after
11   you met with Alison Sanchez?
12   A.    I can't remember, ma'am.
13   Q.    Was it before or after you spoke
14   to an attorney for the first time?
15       MR. GOODSTADT: Objection.
16   A.    Wait a second.  Was the  -- when
17   we retained a lawyer, was it after met --
18       MR. GOODSTADT: She didn't ask
19   you about retaining a lawyer.
20   Q.    That's not my question.  Why
21   don't I withdraw the question and rephrase
22   it this way.  Was that statement made to you
23   before or after you or the other Plaintiffs
24   contacted the firm that's presently
25   representing you?

FRANK FIORILLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Page 469

F. Fiorillo

1       F. Fiorillo
2       MR. GOODSTADT: Objection.
3    A.   I didn't have a lawyer --  I
4  didn't have a lawyer at the time.
5    Q.   So it was before you contacted
6  the firm that's presently representing you?
7    A.   Right.
8    Q.   When did you first learn that
9  George Hesse had boasted about having a
10  sexual relationship with Alison Sanchez?
11    A.   He said that he took her out to
12  lunch, and he explained what he did with
13  her, and that was the first time.
14    Q.   Did he say that to you?
15    A.   Yes.
16    Q.   And what did he say he did with
17  her?
18    A.   What did he say?
19    Q.   Yeah.
20    A.   He said he had sexual intercourse
21  with her.
22    Q.   And when did he say this to you?
23    A.   This was in 2005 I believe.
24    Q.   And did you believe him at the
25  time?

Page 470

F. Fiorillo

1       F. Fiorillo
2    A.   Well, George Hesse, if you know
3  him, he tends to brag about his conquests.
4  So I didn't doubt him for a minute.
5    Q.   Well, if he tended to brag, why
6  wouldn't you doubt him?
7       MR. GOODSTADT: Objection.
8    A.   Say that again.
9    Q.   If he tended to brag, why
10  wouldn't you doubt him?
11       MR. GOODSTADT: Objection.
12    A.   Because from what he did in Ocean
13  Beach, it was well known that who he had sex
14  with was who he had sex with.
15    Q.   Now do you have any other basis
16  to believe that he had a sexual relationship
17  with her, other than that statement he made
18  to you?
19    A.   No.  That's the only  -- that's
20  the only statement.
21    Q.   Did you ever take any steps to
22  determine who in Civil Service had, um, veto
23  power over Alison Sanchez's decisions?
24    A.   No, I did not.
25       MR. GOODSTADT: Objection.

Page 471

F. Fiorillo

1       F. Fiorillo
2       MS. ZWILLING: Nothing further.
3  EXAMINATION BY
4  MR. CONNOLLY:
5       MR. CONNOLLY: I have one
6    question.  Can you hear me?
7    Q.   Mr. Fiorillo, when you
8  had that -- when you had that conversation
9  with Mr. Hesse regarding relations -- his
10  relations with Ms. Sanchez, was anybody else
11  present?
12    A.   No.
13       MR. CONNOLLY: I have no
14  further questions.
15       MR. GOODSTADT: I have no
16  questions.
17       MR. NOVIKOFF: I have, but I'm
18  not asking them.
19       MR. GOODSTADT: So this
20  concludes the deposition?
21       MR. NOVIKOFF: Yes.
22       THE VIDEOGRAPHER: This
23  concludes today's deposition for Frank
24  Fiorillo on February 20, 2009.  The
25  time is 6:58 p.m.  We are off the

Page 472

F. Fiorillo

1       F. Fiorillo
2    record.
3
4     _____
5          FRANK FIORILLO
6
7  Subscribed and sworn to
8  before me this _____ day
9  of _____ 2009.
10
11 _____
12    NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

Page 473

1
2                    INDEX TO EXHIBITS

3   FIORILLO EXHIBIT                      PAGE

4   1    Complaint.                        21

5   8    Letter dated September 16, 2006 from

6        Edward T. Paridiso.              307

7   35   Application for Employment with Town

8        of Brookhaven.                   315

9

10                  I N D E X

11

12  DI (Pages) 82, 83, 467

13

14  MO (Pages) 8, 25, 41, 48, 59, 65, 70, 71,

15  89, 126, 127, 212, 278, 293, 357, 446

16

17  EXAMINATION BY

18      MR. NOVIKOFF:      6

19      MR. CONNOLLY:     426, 471

20      MS. ZWILLING:     431

21

22

23

24

25

Page 475

1
2                    ERRATA SHEET

3       I wish to make the following changes,

4   for the following reasons:

5   PAGE LINE

6   _____ ___CHANGE:_____

7         REASON:_____

8   _____ ___CHANGE:_____

9         REASON:_____

10  _____ ___CHANGE:_____

11        REASON:_____

12  _____ ___CHANGE:_____

13        REASON:_____

14  _____ ___CHANGE:_____

15        REASON:_____

16  _____ ___CHANGE:_____

17        REASON:_____

18  _____ ___CHANGE:_____

19        REASON:_____

20  _____ ___CHANGE:_____

21        REASON:_____

22  _____ ___CHANGE:_____

23        REASON:_____

24  _____ ___CHANGE:_____

25        REASON:_____

Page 474

1
2                    CERTIFICATION

3

4

5         I, Edward Leto, a Notary Public

6   in and for the State of New York, do hereby

7   certify:

8            THAT the witness(es) whose

9   testimony is herein before set forth, was

10  duly sworn by me; and

11           THAT the within transcript is a

12  true and accurate record of the testimony

13  given by said witness(es).

14       I further certify that I am not

15  related either by blood or marriage, to any

16  of the parties to this action; and

17           THAT I am in no way interested in

18  the outcome of this matter.

19           IN WITNESS WHEREOF, I have

20  hereunto set my hand this ^  ^  day of ^

21  2009.

22

23

24       --------------------------

25           EDWARD LETO

This Page Intentionally Left Blank

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 124 of 158 PageID #:
2494

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

**$**

**$25,000,000 (1)**
18:11
**$60,000 (1)**
172:19

**0**

**04 (3)**
123:5,6,7
**05 (2)**
166:14;169:4
**06 (1)**
166:14
**07-CIV-1215SJFETB (1)**
4:10

**1**

**1 (10)**
159:21;160:2,13,
14;258:23;259:9,11;
346:18,21,25
**1:00 (1)**
170:9
**1:16 (1)**
144:19
**10 (5)**
240:21,23;241:23;
242:9;320:5
**10:16 (1)**
4:11
**10:30 (2)**
267:9,15
**100 (7)**
44:3;54:18;66:6;
248:19;267:22;
346:10;392:18
**101 (12)**
85:2,15,19,25;
86:15,22,23;87:14;
136:15;137:4;
138:10;159:3
**103 (5)**
454:12;455:2;
458:12;459:7;464:16
**11 (5)**
47:23,25;48:2;
269:25;277:24
**11:18 (1)**
71:12
**11:24 (1)**
71:16
**11:30 (1)**
412:14
**11735 (1)**
6:2
**12 (4)**
180:23,24;336:3;
399:20
**12:00 (1)**

148:7
**12:25 (1)**
144:15
**15 (4)**
398:3,4,5,12
**155 (1)**
394:3
**158 (2)**
403:5,11
**159 (5)**
402:25;403:16;
404:16,20;405:4
**16 (7)**
307:23;308:5,14;
309:9,15;408:19,20
**164 (4)**
365:17,22;366:6;
386:11
**164A (1)**
366:17
**164E (1)**
381:22
**168 (2)**
386:3,4
**17 (2)**
416:5;432:9
**171 (3)**
357:18;358:24;
360:25
**176 (4)**
348:11,21;350:19;
353:12
**177 (2)**
351:5,16
**180 (2)**
40:6;319:23
**186 (6)**
22:3;23:10;29:21;
30:2;40:6;47:6
**189 (11)**
262:18,25;263:8,
13;264:6,7;265:14,
20;266:13,14,19
**19 (2)**
302:8;324:13
**190 (2)**
292:13;295:20
**191 (2)**
297:7;301:6
**1983 (1)**
358:8
**1997 (1)**
432:10

**2**

**2 (108)**
8:4;9:7,11;10:9,15,
18;11:7,15,17,20,25;
25:23;28:12;34:10,
10,18;35:2,9,24;
36:2,23;38:18;39:3;
40:18;41:24;42:23;

43:15,22;44:3,9,23;
46:5;47:9,10,12,13,
16,24;48:9;49:9;
50:5;56:25;57:8;
62:10;70:25;72:22;
78:16,21;87:15,19;
88:6;96:8,10;97:10;
131:21;137:18;
138:3,12,17;145:6,
18;146:3;148:6;
151:19;152:16;
153:3,11;159:22;
160:3,14;162:12;
164:2,5;167:21;
168:3;169:4;173:13,
18,20,25;260:23;
261:16;267:14,25;
268:11,18;269:16;
274:4;277:24,25;
283:21;309:10,11,
12;311:17;315:10;
350:25;352:5;355:8;
357:11;366:15,16;
367:7;375:21;379:8;
380:18;386:13;
397:18
**2/20/09 (3)**
21:10;308:2;
315:18
**2:17 (1)**
213:15
**2:29 (1)**
213:19
**2:30 (3)**
253:25;270:3;
327:15
**20 (12)**
4:10;97:21;
172:23;173:5,6;
249:22;324:13;
387:17;409:8;
411:23;413:16;
471:24
**2000 (5)**
114:25;132:19;
168:3;269:16;406:20
**2001 (1)**
311:7
**2002 (41)**
106:11,16;108:14,
15,21,25;109:6,7,9,
10,15,18;110:13;
112:14,23;113:16,
21,25;114:6,18,20,
25;115:4,7;120:11,
24;121:7,13;134:15;
137:17;197:16,22,
22;198:16,20,22;
311:7,9;346:25;
349:11;436:16
**2003 (17)**
6:24;106:19;
115:17,19,22;117:8,

17,25;118:12,22;
119:17;120:11;
173:7;180:5;198:18;
349:11;406:23
**2004 (40)**
6:22;81:25;
106:22;107:5,9;
119:9;120:11,21;
121:8,11,17,20;
122:8,15;123:14,19,
20,25;127:7;128:2,3;
140:7,21;173:3;
192:23;194:21,22;
196:5,7;197:22,22;
199:3,8;327:18;
341:3,12;349:12;
398:15;407:6;411:13
**2005 (55)**
6:11,21;89:14,15;
103:18;107:12;
124:22,24,25;127:2,
7,16;128:4,7,10;
130:6,13,22,23,24;
131:5,19;132:2;
134:3,8,11,18;135:3;
136:3,8;140:22;
141:3,6,17;145:3,6,
6;153:2,11;158:25;
159:7,12,18;168:2;
172:21;198:3,4,5;
220:15;258:23;
259:9;336:10;
349:12;432:21;
469:23
**2006 (119)**
6:13;7:2,7,10,20;
8:3,5,12,15,17;9:7,
11,11;10:8,9,15,16,
18,18;11:7,14,15,17,
18,20,25;12:2;28:12;
38:9,20;40:18;41:2,
18;42:4,23;43:15;
44:9,23;87:15,20;
88:6;96:9,10,13;
97:10;107:16;
131:19,21;137:18;
138:3,12,17;145:7,
18;146:3;148:6;
152:16;153:3,12;
159:20,21,22,25;
160:2,3,13,14;
161:6;162:13;164:2,
6;167:21;168:3;
169:4;171:18,20;
173:12,13,25;
260:23;261:16;
263:24;266:12,22;
267:10;269:8,13,13,
17,25;282:20;283:9;
302:12;307:3,23;
308:5,14;309:9;
311:18;319:3;
346:19,21,25;

17,25;118:12,22;
119:17;120:11;
173:7;180:5;198:18;
349:11;406:23 — (continuation above)
350:25;352:5;355:8;
357:11;366:15,16;
367:7;375:21;379:8;
380:18;386:14;
428:21,22;436:24;
437:4
**2007 (17)**
21:3;100:10;
302:8,10,11,13,15;
306:15;312:24;
313:7;314:5,15,18;
315:6,10;318:22;
428:15
**2008 (5)**
97:21;314:20,22;
315:7,8
**2009 (3)**
4:11;471:24;472:9
**21 (1)**
21:3
**23 (2)**
49:23;387:13
**24 (2)**
454:10,11
**28 (1)**
311:9

**3**

**3 (7)**
267:10,15;268:3,5,
6,14,19
**3:00 (1)**
253:25
**3:30 (3)**
174:18;199:9,12
**3:33 (1)**
291:25
**3:48 (1)**
292:5
**30 (12)**
78:20,22;79:14;
80:7;81:25;263:24;
266:12,22;269:8,12,
17;457:4
**30s (1)**
330:19
**31 (2)**
254:2,4
**36 (3)**
405:14,14,16
**37 (2)**
393:25;394:4
**38 (2)**
403:2,13
**39 (4)**
365:14,19,20,22

**4**

**4:50 (1)**
356:8
**40 (1)**

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL: vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 125 of 158 PageID #: 2495

357:17

**41 (3)**
348:11;350:18,19
**42 (3)**
319:19;342:22,23
**43 (3)**
21:21,25;22:2
**44 (4)**
21:20,25;262:16;
263:6
**4th (5)**
78:16;90:11,12,15;
95:16

**5**

**5 (1)**
33:19
**5:01 (1)**
356:12
**58 (2)**
398:12,13

**6**

**6:00 (1)**
99:20
**6:02 (1)**
415:20
**6:10 (1)**
415:24
**6:58 (1)**
471:25
**60,000 (1)**
10:7
**61 (1)**
408:15
**631-581-1816 (1)**
311:20
**65 (5)**
417:12,12;418:2,
10;419:11
**66 (5)**
421:25;422:5,16;
424:3,6
**67 (3)**
425:13,16,17

**7**

**7 (1)**
5:25
**7:00 (1)**
460:19
**7:30 (1)**
458:9
**75-B (4)**
393:24;394:8,12,
19

**8**

**8:00 (3)**

254:16;409:7,7
**81 (1)**
413:19
**86 (3)**
411:23;413:20,21

**9**

**90 (1)**
294:16
**99 (1)**
50:3

**A**

**able (3)**
32:15;141:23;
462:20
**above (8)**
22:6;256:11;
263:10,14;319:24;
348:14,22;358:25
**abrupt (2)**
279:19;442:25
**absolute (1)**
304:22
**Absolutely (22)**
10:23;16:11;35:6;
56:2;60:24;73:12,23;
77:20;82:25;107:21;
111:3;117:14;
136:20;189:23;
208:21;216:19;
234:23;236:25;
242:5;260:15;277:4;
346:10
**abuse (5)**
85:8;87:4;105:3;
136:19;398:17
**academy (14)**
110:21,22;111:8,
11,19;113:13;271:6;
276:24;287:8;288:7,
20;311:6;387:25;
388:9
**acc (1)**
20:14
**accept (4)**
46:15;311:2;
400:23;455:17
**accepted (2)**
237:18;244:7
**Accident (1)**
427:23
**accomplished (1)**
463:19
**According (25)**
35:18;39:21;
59:23;60:2,3,8;
211:15;251:23;
277:8;278:22;286:6,
9,12;304:12;313:14;
360:19,20;361:5,18;

385:14,17;390:20,
20,21;419:11
**accordingly (3)**
195:5,8,13
**account (4)**
24:15;25:18;
50:17;445:12
**accuracy (4)**
18:2;19:24;20:6;
50:15
**accurate (21)**
18:24;19:7,12,13;
20:10,23;31:18,19;
234:2;265:15;266:2,
6;294:19;296:10,18,
20;297:12,14;301:7,
12;414:12
**accurately (1)**
316:4
**accusation (1)**
464:2
**accusations (1)**
20:15
**accuse (1)**
461:2
**accused (7)**
459:20,21;460:6,
23;462:25;463:8,22
**accusing (4)**
18:17;460:25;
461:18;463:2
**achieved (1)**
22:11
**acknowledged (1)**
188:15
**acknowledgment (1)**
418:10
**across (2)**
89:25;185:3
**act (10)**
26:17;30:4,9;
33:11;34:22;35:5;
39:20,25;320:3;
364:13
**acted (2)**
301:20;365:8
**acting (2)**
31:5,6
**action (30)**
19:7;23:16;24:5;
41:17;42:3;63:13;
64:12;68:23;92:20;
105:12;164:11;
190:17,20;262:21;
317:10;319:21;
329:12,15;342:18;
348:15;357:19;
365:25;386:3;
393:24;394:13,22;
395:3;435:7,16;
443:3
**action' (2)**
394:6,10

**actions (4)**
96:3;435:13;
436:24;437:3
**activities (3)**
326:11,20;343:18
**activity (1)**
364:3
**acts (15)**
22:12,17;23:8,9,
12;28:8;29:20;
320:4;342:19;
343:11;344:6,13,15;
345:14;379:7
**actual (1)**
228:18
**actually (31)**
15:13;21:21;
23:24;50:18;69:15;
89:20;94:18;125:25;
127:8;142:9,9;174:9;
191:20;198:15;
199:10;222:5;
244:21;283:24;
303:22;305:23;
343:7;355:24;
361:10;373:16;
389:20;399:5,25;
400:7;436:11;
437:25;467:22
**Adam (1)**
327:21
**adamant (3)**
175:24;216:2,5
**add (3)**
321:7;373:22;
383:4
**addition (5)**
129:16;130:7,9;
368:8;371:3
**additional (3)**
45:21;311:13,19
**address (6)**
5:24;76:2;116:3;
119:15,16;288:22
**addressed (1)**
194:14
**administer (1)**
185:15
**admission (1)**
437:10
**admitted (1)**
240:13
**advanced (2)**
70:24;348:25
**adverse (1)**
394:6
**advice (6)**
76:10;82:20;
150:20;350:11;
388:16;442:19
**advise (3)**
42:19;51:12;
66:12;67:9,10;

143:11;146:15;
147:23;168:4;
169:10,19;171:6;
218:25;226:25;
252:6,16;253:2,4,7;
258:19;281:6;
289:24;293:2,7,13,
16,22;294:2,6,10;
333:24;375:4,10;
382:18;383:21
**advised (14)**
7:9,23,25;8:10,15,
19,22,25;14:15,15;
238:21;264:15;
383:9;419:12
**advising (4)**
118:23;147:2;
169:7;381:11
**affected (5)**
291:4;354:14;
355:2;387:4;396:18
**afraid (1)**
411:9
**afternoon (3)**
33:19;87:10;270:3
**afterwards (4)**
227:7,9,10;397:7
**again (22)**
34:12;41:3;71:10;
79:8;80:18;123:12;
127:19;159:3;
162:25;167:24;
189:14;214:5;
244:14;383:2;396:2;
439:2;448:10;
455:18;457:8;458:7;
459:8;470:8
**against (14)**
18:23;67:12,22;
70:13;105:25;
136:16;149:18;
334:15;336:6;
359:16;379:7;
380:12,15;445:15
**age (1)**
387:19
**agencies (1)**
283:8
**agency (2)**
306:15;385:22
**ago (8)**
13:5,6;38:12;
55:13,16;98:14;
155:6;462:23
**agree (46)**
18:8,15,21;19:4;
73:21;78:20;82:25;
83:3;120:9;133:21;
196:9;198:7;205:17,
21;234:3,9,21;
239:25;240:7,22;
241:14;242:2,7;
243:18;249:3;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 126 of 158 PageID #: 2496

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

264:19,25;265:3,8,9,
25;266:7;267:24;
268:11;294:14;
295:6;311:25;312:3,
5;335:7;343:14;
359:24;360:6;
363:13,21;419:16
**AGREED (4)**
3:3,9,13;361:6
**agreeing (1)**
214:7
**agreement (6)**
7:12;22:9;40:6;
151:25;152:3,10
**ahead (9)**
45:13;61:12;
170:17;197:6;201:8;
202:22;356:25;
368:13;447:22
**air (1)**
456:3
**al (2)**
4:5,7
**Alan (6)**
442:14;443:18;
444:12,22;445:7;
451:7
**Albany (1)**
310:10
**Albert (1)**
4:12
**alcohol (3)**
355:22,23;398:17
**alienate (8)**
126:10,12,16,25;
127:11,15,21;128:24
**alienated (8)**
125:9,12;128:6;
130:6,22;131:23;
135:3,18
**alienating (5)**
125:15,19;126:5,
11;128:12
**alienation (2)**
126:19;136:7
**Alison (106)**
22:6,18;23:9;
24:17,19;25:11,25;
26:7;31:22;32:12,12;
33:11,15,16;37:9;
40:21;43:14;44:22;
49:24;50:16;57:9,19;
58:7;60:9,14;62:25;
85:20;86:16,25;
87:12;105:6;342:17;
343:5,13;344:4,19;
345:5,17;432:11;
434:4,16,20,25;
435:6,13;436:2,15,
23;437:4,8,13;438:5,
10,20;440:9,16;
441:5,17;442:8,17,
21;443:14;444:6,8,

11,16,19;445:4,8,9,
11,13;449:21;450:2,
14,16,18,24;451:5,
10,13,18;452:9,14,
19;453:8,10;454:18,
22;455:4,7,10,21,23;
456:9,20,23;457:9,
16;458:11;464:22;
465:8;468:3,11;
469:10;470:23
**allegation (16)**
23:5;51:14;52:9;
64:9;66:20;67:4;
77:7;86:24;234:2;
294:16;296:10;
326:18;349:7,24;
378:13;380:15
**allegations (10)**
18:16,23;20:13;
49:3;161:20;162:5;
230:25;232:2,16;
317:13
**allege (22)**
22:5;23:10;30:2,
17;50:8;51:7;54:19;
66:6;85:2,15,25;
269:4;292:13;
295:10,18;319:19,
23;348:22;360:25;
386:10;394:14;
405:14
**alleged (27)**
28:19;29:20;47:6;
52:14;57:11;82:19;
136:15;154:6;
221:19;230:21;
231:6;250:11;
259:19;294:17;
304:21;344:6,11;
345:12;346:8;
388:12;393:18;
394:4;398:16;
403:17;416:13,23;
418:2
**allegedly (1)**
250:10
**alleging (6)**
231:14;232:3;
237:25;325:7;
343:17;377:5
**alleviate (1)**
161:18
**allocuted (1)**
238:2
**allow (2)**
439:8;453:5
**allowed (6)**
23:14;24:8;31:14,
16;331:23;334:23
**allowing (1)**
336:22
**almost (6)**
44:20;404:15,22,

22;410:22;438:24
**along (2)**
176:23;445:15
**alongside (7)**
349:2;350:13;
353:22;354:6,17;
355:10;357:13
**altercation (5)**
252:8,14,19,21;
253:8
**altered (3)**
231:22;321:16,17
**although (1)**
448:17
**always (9)**
193:7;311:12,16;
337:20;357:2;
386:25;397:18;
427:2;430:20
**ambulance (6)**
100:21;102:23;
103:5,8,10;252:17
**Amityville (3)**
284:21;285:13;
286:11
**among (3)**
3:3;83:11;320:3
**amongst (2)**
49:17;55:6
**amount (1)**
82:8
**amuck (4)**
88:25;89:12;
93:21;94:2
**analogize (1)**
365:3
**and/or (5)**
292:15;295:22;
297:9,11;359:3
**Andrea (1)**
407:11
**Andrew (5)**
4:19;6:4;15:18;
75:5;462:8
**anguish (10)**
386:5,8,13,17,23,
24;387:8;388:12,18;
393:18
**animosity (2)**
441:13,16
**announcement (1)**
148:10
**annual (4)**
9:20,24,25;10:4
**anonymous (6)**
335:14,15,21,24;
336:2;338:24
**answered (10)**
59:12;60:18,21;
76:25;102:12;
126:13;127:18;
214:16;431:13;
443:16

**answer's (1)**
137:7
**Anthony (1)**
87:18
**anymore (5)**
172:5,14;267:16;
343:21;467:12
**apart (3)**
279:23;280:2,8
**apparent (3)**
35:3;121:14;
306:17
**apparently (5)**
121:12;172:3;
181:11;303:25;305:3
**appear (5)**
12:11;148:5;
328:2;391:19;442:9
**appeared (5)**
16:15;327:9,24;
361:13;419:8
**appearing (1)**
12:6
**appears (1)**
308:7
**applicable (1)**
359:7
**applicant (1)**
299:17
**application (21)**
270:25;271:4;
288:10;293:3;
298:12,25;304:3;
305:21;307:7;310:8;
315:15,22;316:7;
318:5,19;347:24;
382:17;383:20;
385:19;454:6,7
**applications (1)**
382:11
**applied (16)**
69:20;71:2;
280:12;282:23;
283:10,14;291:21;
302:19,23;303:14,
16,17;305:23;
318:22;347:2,4
**apply (16)**
7:4;9:6;282:20;
283:9;302:9;305:16;
306:18;310:9;
314:16,17,21,22;
325:21;346:22;
404:17,20
**applying (5)**
69:25;318:9,15;
319:7;384:7
**appointed (2)**
51:4;58:18
**appointing (3)**
50:10;52:16,24
**appointment (1)**
54:6

**appreciate (2)**
364:19;452:24
**apprehended (1)**
361:19
**appropriate (4)**
83:6,8;448:6;
464:11
**approve (1)**
51:15
**approved (1)**
53:15
**approving (4)**
50:10;51:8,19;
52:16
**approximately (9)**
4:11;10:6;11:2,3;
155:11;168:24;
173:5,6,8
**April (126)**
8:4;4:9:2,3,7,11;
10:9,15,18;11:7,15,
17,20,25;25:23;
28:12;33:19;34:9,10,
18;35:2,9,24;36:2,
23;38:17;39:3;
40:18;41:23;42:23;
43:15,22;44:3,9,23;
46:5;47:9,10,12,13,
16,24;48:9;49:9;
50:5;56:25,25;57:8;
62:10;69:21;70:25;
72:22;78:16,21;
87:15,19;88:6;96:8,
10;97:10;104:9;
131:21;137:18;
138:3,12,17;145:6,
18;146:3;148:6;
151:19;152:16;
153:3,11;159:5,21;
160:2,13,14;162:12;
164:2,5;166:14;
167:21;168:3,3;
169:4;173:13,18,20,
25;260:22;261:16;
267:10,14,15,25;
268:3,5,6,11,14,18,
19;269:16;274:4;
277:24,25;283:21;
309:10,11,12;
311:17;350:25;
352:5;355:8;357:11;
366:15,16;367:7;
375:21;379:8;
380:18;386:13;
397:18;428:21,22
**area (1)**
368:6
**Ariel (1)**
462:22
**Arlene (1)**
5:10
**Arlene's (1)**
96:20

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**arm (1)**
355:5
**armed (2)**
310:9,13
**Arnold (1)**
99:24
**around (13)**
119:22;120:14;
141:5;153:4;173:11;
180:5;216:5;253:25;
291:3,6;410:3;
426:25;427:2
**arrangements (1)**
373:23
**arrest (5)**
360:4,9;361:20;
363:8;401:21
**arrested (1)**
401:7
**arresting (1)**
233:9
**arrived (2)**
103:5;222:2
**Asharoken (5)**
284:18,19;285:12,
21,23
**aside (7)**
23:8;77:12;203:3;
234:16;236:20;
322:2;439:9
**aspect (4)**
48:24;66:19;
354:12;375:8
**assert (1)**
84:22
**assertions (1)**
366:9
**assist (1)**
417:22
**assistance (4)**
179:8;186:9;
203:9;388:11
**associate (1)**
164:16
**associated (1)**
164:10
**association (1)**
4:15
**assume (8)**
34:13;44:2;52:8;
64:16,18;134:4;
241:19;281:19
**assumption (2)**
34:21;277:19
**assure (1)**
424:13
**assured (3)**
54:19;355:17;
424:7
**attacked (7)**
238:14,16,17,20,
23;239:11;242:18
**attempt (2)**

444:9;462:21
**attend (11)**
114:24;115:3;
118:5,8;122:15;
159:14;160:22,25;
162:22;163:4,18
**attendance (1)**
311:15
**attended (2)**
159:6;184:16
**attending (1)**
376:19
**attention (7)**
166:25;176:24;
187:23;207:13;
249:12;253:9;464:15
**Attorney (20)**
5:12;17:8,12,16;
144:24;151:18;
153:4;155:3;157:3,8;
158:20;169:9;
259:16;370:11;
451:16;452:25;
453:7;455:11;
461:19;468:14
**attorneys (5)**
5:7;16:22;17:2;
20:25;74:6
**Attorney's (39)**
109:22;113:20;
117:22;122:19;
137:23;138:2,11,16;
140:10;141:15,25;
143:14;144:10;
145:8,21;146:14;
149:10,14;150:19;
152:14;154:23;
155:22;156:23;
158:11;160:20;
166:7,13;168:7;
169:3,22;259:6;
260:13;350:11;
397:5;451:19;
452:13;453:9;
466:23;468:8
**audio (1)**
157:3
**August (13)**
141:6,17;145:2,6;
153:2,11;166:14;
168:2;169:4;258:23;
259:9,11;336:10
**authority (12)**
33:7;51:23;52:10;
53:4,11;54:5,11;
196:11,15;349:19;
352:14,16
**available (2)**
267:7;311:13
**Avenue (1)**
6:2
**aware (36)**
27:2,4,5;42:5;56:9,

17;57:6;158:7,13;
206:3;212:5;224:6,
11,14,15;229:15,20,
24;237:4,21;250:4;
251:9,17,22;253:16;
281:11;291:20;
296:25;300:21,22;
302:18,22,24;
338:13;400:4;417:3
**away (9)**
148:16;170:13;
328:6,13;329:2;
331:14,24;345:7,7

---

## B

**back (73)**
7:24;15:16;43:24;
61:4;62:21;71:17;
86:20;97:6;100:11;
135:8;144:20;
145:16;150:13;
152:25;155:10;
157:16,22;158:24;
159:2;163:9,15;
174:8,9;184:24;
192:7;200:13,13;
201:7,17;202:7,20;
213:20;218:18;
245:21;246:15;
256:16;261:12;
262:15;269:21;
283:12;288:23;
290:11,15,21,22;
292:6;303:24;305:3,
12;312:19;318:3;
322:9;323:9;324:7;
325:6,14;346:5,19;
356:13,15;370:18;
373:5,6;374:6;
376:20;409:4,13;
415:25;443:25;
449:7;461:14;
462:11;464:6
**backed (1)**
244:22
**background (4)**
299:5,15,21;
303:23
**backing (1)**
355:18
**Bacon (9)**
337:19;347:12,16,
19,23,23;374:8;
391:6;392:4
**Bacon's (1)**
373:24
**bad (13)**
92:22;209:22;
267:19,21,23;
272:25;304:2,6,25;
311:20;312:25;
313:4;385:9

**bag (4)**
328:5,17,18;
362:22
**Baldar (1)**
197:8
**Baldaro (1)**
197:8
**ball (1)**
450:17
**bar (33)**
178:15;179:3,6;
181:18;185:4,18,19,
20;186:2;225:2,16;
226:17,21,23;227:8,
15,18;229:3;250:17;
251:8;339:22;
416:13;417:7,17;
422:8,18,25;423:10,
18;424:18;425:2,5,8
**barracks (1)**
204:15
**bars (7)**
116:13;195:21;
337:13;339:4,16,17,
18
**bartender (9)**
226:16,20;227:2,8;
228:13,16,20;229:9;
425:14
**base (3)**
9:23;10:6;64:9
**based (26)**
9:24;32:9;35:24;
36:14,21;37:9,18,24;
50:20;51:18;58:19;
63:11;64:10;180:10;
197:20;232:15;
241:2;300:24;
305:18;312:13;
332:6;350:11;
382:21;383:14;
392:7;412:22
**basically (14)**
72:8;73:7;102:25;
127:4;171:4;210:22;
271:16;339:23;
342:3;343:9;379:4;
380:9;384:6;416:4
**basis (30)**
14:22;15:7,21;
16:11;22:19;24:4;
27:18,19;40:16;
50:14;62:15;63:23;
84:22;105:12;238:4;
290:23;296:24;
342:20;343:12;
345:9,14;352:12;
394:8;433:17;438:4,
9;460:3;461:22;
462:7;470:15
**basketball (2)**
327:22;330:16
**bat (3)**

241:21,24,25
**bathroom (3)**
411:2,3,7
**Bay (27)**
89:22;201:20;
202:7,16;203:5,10;
204:21;205:10,20;
206:21;207:3;
284:11,15;285:9;
288:16;289:9;
294:12;296:7;
301:11;332:13;
374:6,9;408:18,23,
25;409:2;410:6
**Beach (191)**
4:7;5:8;7:9,23;8:2,
11,17,20;10:16;11:9,
11;17:5;18:17,19;
23:13,14,18,19;24:8,
16,23;25:17,19;
26:23;27:9,15,25;
28:23,24;29:12,23;
30:12,16;31:15;
36:25;39:24;43:23;
44:5;46:25;48:7;
50:17,22;51:4,25;
52:5,11,25;53:5,12;
54:7,13;58:22;67:13,
22;68:13;70:14;
96:17;97:2,9,12,14,
23;99:21;110:7,10;
113:11,16;116:12;
118:3,6;119:4;124:7,
11;134:11;142:3;
143:12;145:9;147:3;
148:5;149:21,22;
151:17;153:7;158:4,
21;159:12;160:7,17;
161:21;169:3;
170:10;172:8,15,16,
17,22;173:4;184:6,7;
190:7;196:16,22;
197:16,21,24;
199:22;209:15;
232:3;245:11;
253:10;260:18;
261:20;268:13,24;
272:22;273:4;277:9;
280:4,4;281:9,12;
282:15,16;284:25;
285:14;286:19;
291:3,6;299:18;
300:7;306:19,23;
311:5;312:19;317:4;
322:18;324:4;
326:25;327:7,22;
330:16,24,25;
334:25;335:16;
339:24;345:21;
346:7,20,25;348:7,
23;349:20;350:15;
355:15;359:5,7,15;
366:20;367:6;382:3;

Case 2:07-cv-01215-SJF-ETB Document 145-18 Filed 01/15/10 Page 128 of 158 PageID #: 2498

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

388:6;389:18,22;
390:6,16;393:4,10;
395:11;396:12,16,
25;400:4;406:5;
407:14;409:12,22,
24,24;429:10,23;
432:15,17;433:8;
436:5;438:15;
445:12;452:21;
453:22;454:4;470:13
**beaten (1)**
400:6
**became (12)**
31:4,7;91:24;
94:22;96:12;130:23;
132:2,5;299:16,16;
306:17;443:4
**become (8)**
27:14;29:11;
30:22;31:14;91:24;
93:8;253:15
**becomes (3)**
92:13;95:24;
100:13
**bed (1)**
204:16
**Bee (1)**
5:6
**beer (6)**
202:9;340:15;
341:17,18,20;342:6
**began (3)**
134:4;311:8;
453:15
**begin (3)**
255:5;389:7;
462:19
**beginning (10)**
187:14;199:8;
254:23,24;255:6,8;
270:12;459:17;
460:14,17
**begins (6)**
71:15;144:18;
213:18;292:4;
356:11;415:23
**behalf (8)**
4:21,22,25;16:23;
17:3;20:25;73:19;
429:3
**behavior (2)**
108:19;161:21
**belief (45)**
32:5,7;40:20;47:2;
50:9,14;52:15;
105:24;107:23;
108:7,12,16,20;
109:2,19;110:13;
112:14;113:21;
114:2,6,21;115:7;
117:11;118:24;
122:20;123:21;
197:20;205:3;

235:13,17,21,24;
236:3,7,11,14;
237:11;238:7;
258:11,11;294:24;
299:12;433:20;
438:10;445:13
**believes (1)**
305:24
**believing (1)**
446:7
**beneath (2)**
408:17;446:9
**benefits (4)**
6:12;7:5;9:6,7
**benefitting (1)**
232:11
**beside (2)**
48:17;372:8
**best (10)**
6:15;18:24;41:22;
90:14;131:17;136:9;
189:5;290:17;
420:21;467:17
**better (1)**
247:12
**beverages (1)**
336:23
**beyond (2)**
118:11;157:23
**Biancavilla (2)**
147:17;155:9
**bicycle (1)**
322:19
**big (4)**
143:21;245:16;
331:9;399:10
**bike (2)**
89:20,21
**Billy (1)**
41:6
**bit (5)**
7:24;27:19;85:13;
460:20;463:5
**black (1)**
240:21
**blamed (2)**
379:17;380:8
**bless (1)**
366:13
**blind (1)**
363:25
**blind-sided (1)**
34:10
**block (1)**
148:16
**blog (18)**
114:18,20;389:15,
20;390:2,5,6,8,12,13,
15;391:3,16,19;
392:15,23;430:5;
431:21
**blogging (2)**
391:5,14

**blogs (7)**
430:7,9,17;431:6,
10,18,25
**blotter (2)**
170:3,14
**blue (1)**
240:20
**blurted (2)**
422:14;424:12
**board (17)**
114:24;118:6;
121:18;122:16;
135:10,17;137:13;
159:15,17;160:25;
162:22;163:4;
164:25;260:2;
275:14;397:12;
421:18
**boasted (1)**
469:9
**boat (1)**
255:24
**boathouse (18)**
148:11,13,22,25;
367:12,15,20,24;
368:2,4,21;369:7,19;
370:20;371:8;374:5;
375:11,24
**Bob (1)**
155:9
**Bockelman (1)**
398:19
**boisterous (2)**
216:9;423:14
**bold (2)**
263:2,11
**bond (1)**
189:2
**book (1)**
412:20
**bore (1)**
441:13
**Bosetti (93)**
88:9,9,24,25;
90:24;93:3,4,11;
96:25;97:8,14,18,22;
98:3,5,14,17,23;99:8,
13,17,22;125:13,13;
130:4;202:8;203:8;
222:18,23;223:3,7,
11,15,16;231:2,3;
232:11,17;233:5;
234:16,17,22;235:8;
236:12,15;238:14;
246:4,23;251:5,10;
253:16;254:22;
255:4;256:12;262:5,
6,9;340:4,12;341:12;
378:4;380:10,12,13,
13;398:16,19;
400:10;401:23;
402:19,24;409:2;
414:15;417:15,16,

25;418:5,11,14,19;
419:3,5,9,12,13;
420:3,8;421:7,21;
426:12,12;436:16,17
**Bosettis (67)**
89:11;90:18;
93:19,25;94:15;
95:11,17;96:16;
100:14;101:7,8,12;
102:5;103:16,19;
107:19;108:8;109:2,
20;110:12;111:21;
112:15;115:18,22;
116:15,25;117:12;
118:13,25;119:10,
25;120:15,23;
123:16;124:22,23;
125:15,19;128:13;
129:4;178:7;193:18,
25;194:15;195:20;
196:12;198:9,19;
203:19;204:20;
205:9;207:2,21;
208:5,8;236:20,24;
323:10;332:12,20;
337:3,14,15,16,20;
339:10;396:10
**Bosetti's (10)**
12:15;13:20;14:2,
8;99:7;221:19;
417:21;418:12;
421:13;422:6
**both (6)**
37:2;91:15;
108:18;142:7;346:3;
434:21
**bottom (5)**
342:22,23;381:22;
394:4;403:11
**bouncer (1)**
425:15
**boy (2)**
184:16,20
**boyfriend (3)**
400:6;401:6,21
**Boyle (3)**
76:25;77:15,16
**brag (3)**
470:3,5,9
**bragged (8)**
57:2,4,8,20;58:6;
60:7,13;407:23
**breach (1)**
62:3
**breached (1)**
64:10
**break (13)**
23:6;71:14;96:20;
144:17,22;160:12;
165:5;213:17;
238:10,11;292:3;
356:10;415:22
**breast (1)**

426:16
**breathalyzer (1)**
185:7
**Brian (8)**
237:19,25;238:12;
241:2,5;242:15,21,
25
**bring (3)**
15:15;176:23;
322:9
**broke (1)**
331:8
**broken (2)**
355:5;361:12
**Brookhaven (5)**
315:5,16;317:23;
318:9,15
**brother (8)**
202:14;203:5,11,
12;417:16,21;420:4,
13
**brothers (1)**
93:12
**brought (3)**
187:22;207:12,12
**brownies (2)**
178:17;184:22
**Bruckenthal (1)**
284:9
**brutality (5)**
139:23;140:2;
154:7;161:25;379:7
**Bucksbaum (1)**
206:19
**Bud (9)**
223:20,22;226:9;
231:4,4;233:20,23;
234:3;235:14
**buddies (3)**
234:25;236:23;
299:9
**budget (3)**
311:18;312:20;
370:13
**budgetary (7)**
316:23;317:6,14;
371:3,14;372:17,18
**Building (1)**
75:24
**bulletin (2)**
135:10,17
**Bureau (4)**
340:14,15,16;
341:15
**Burke (2)**
147:16;452:5
**Burns (25)**
326:16,20,24;
327:6,10,13,20;
328:14,15,23,25;
329:19;330:11;
331:18;334:16,17;
360:7,23;361:5,20;

FRANK FIORELLO
February 20, 2009

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 129 of 158 PageID #: 2499

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

362:13,14,17;
364:12,25
**Burns'** (2)
330:5;331:21;
361:7
**Business** (7)
262:22;292:15;
295:14,22;297:10;
322:11;324:16
**bypassed** (2)
189:24;402:5

## C

**cabinet** (23)
191:18,19;199:17;
201:19;202:15;
203:4,9,20;204:2,7,9,
11,20,24;205:5,9,18;
206:21;207:3;
332:12;408:22,24;
410:6
**cahoots** (3)
446:3,4,7
**call** (65)
49:6;53:24;75:18;
76:5,25;77:15,16;
80:21;81:20;99:19;
146:13,17,24;
155:10;179:9,15;
181:4,10,13;182:25;
183:2,4,6,7,17,21;
186:9,21,24;187:3,
20;250:22,25;252:5,
6,10;267:14;273:25;
274:5;279:19;281:7;
286:22;287:3;
293:17;311:19;
318:3;336:3;375:20;
400:11;401:10;
412:4;421:7,15;
426:21;443:9,18;
444:2,9,10,15,15,18,
22;445:7;452:21
**called** (57)
24:10;25:11;
62:25;63:6;65:3;
103:17;146:10,11;
147:4,23;167:14;
174:19;183:12,24,
25;184:4;199:9,13;
250:24;255:15;
256:18;267:3;
268:14;271:5;
272:11,14;282:16;
284:16,17,18,21,23,
25;285:11,18,20,24;
290:20,21,22,25;
300:7,10;302:15,21;
303:12;313:12;
330:2;377:2;378:13;
384:21;385:2;413:4;
443:17;444:3;

445:10;449:19
**calling** (10)
24:12,12,13;
167:10,11;266:5;
305:12;400:12;
442:12;444:12
**calls** (5)
25:23;44:8;202:9;
351:20;451:11
**calm** (5)
400:8,13,15,17,25
**came** (42)
34:8;65:21;74:11;
89:20;125:21;129:3;
131:4;142:22;
146:16;168:9,9;
181:4,13;183:4;
184:24;200:24,24;
218:18;222:11;
228:18,19;252:17;
255:21,22,23;256:4;
299:19;300:18;
303:24;336:12;
338:22;345:21;
360:22;369:20,20;
409:4;411:16;
419:23;421:4,18;
434:6;436:4
**Campbell** (1)
402:20
**Can** (115)
21:12,14,23;27:11,
24;42:7,18,19;43:2,
3,21;44:7,18;45:25;
47:14;51:3,4,12;
55:24;61:10;64:9;
66:19;74:14;77:4;
78:11;83:19;84:12;
113:17;127:18;
133:21;139:12;
147:18;163:9,15;
164:23;165:2,5,15,
21;166:2,4,10;
174:22;175:13;
176:16;177:10;
190:8;191:6,10;
194:8;202:11,12,12;
214:5,11;215:16;
217:12,15;224:12;
238:8;240:15;
248:14;249:22;
261:11;279:16;
285:16;297:20;
298:2,5;301:19,21;
307:21;318:24;
326:7;337:23;345:8;
347:7;351:18,22;
354:2;356:2,3;
358:20;373:25;
378:19;388:3;
391:18;392:11,13;
398:5;412:11;420:8;
425:20,24;427:3;

443:24;447:14;
448:3,18,22,25;
449:5,7,8;458:7,10;
461:13;462:5,9;
464:6,8,11;465:3,24;
471:6
**canceled** (3)
272:7,10,16
**candidate** (1)
291:5
**candidates** (1)
51:19
**capacity** (1)
53:17
**captain** (2)
111:9;185:24
**car** (2)
125:25;330:3
**card** (1)
370:17
**care** (3)
69:5;108:5;202:3;
323:10;441:19
**career** (23)
28:21;30:5,10,25;
32:11;33:14;34:23;
40:3,8,12,18;42:12,
15,22,22;43:16;44:9,
24;46:6;47:7,21;
49:7,12
**careers** (4)
22:8;49:25;
348:25;352:7
**Carter** (22)
4:5;33:22;62:20;
63:25;64:19,22;
65:10;74:12;148:13;
170:23;217:2;261:7;
338:12;367:15;
368:9;369:11,18;
373:8;375:2,4;
433:16;436:21
**Carter's** (3)
170:22;369:13;
370:3
**case** (22)
4:9;12:7;15:2;
16:15;40:25;74:18,
23;75:2;83:25;
84:11;155:15,16;
158:16,17;237:3;
246:18;257:17;
275:15;298:6;
304:22;443:22,24
**cases** (1)
155:18
**cast** (1)
463:14
**catalysts** (1)
438:13
**catch** (1)
210:14
**categories** (1)

285:6
**caught** (2)
98:7;99:8
**cause** (18)
85:6;87:2;262:20;
319:20;345:20,24;
348:15;357:19;
362:6,12;364:2;
365:24;381:12;
382:18;383:10;
386:3;393:23;452:23
**caused** (4)
242:17;396:8;
409:18;436:13
**caution** (1)
350:3
**cell** (3)
421:8,10,13
**certain** (17)
34:16;38:8;39:4,
23;52:2;70:22;86:3;
104:21;106:6;
130:25;131:14;
146:17;299:18;
322:19;390:8;
404:23;454:8
**certainly** (4)
35:23;397:22;
421:3;437:21
**certainty** (2)
208:19;392:18
**certificate** (4)
287:8,9;288:8,20
**certification** (4)
3:5;39:23;395:18,
20
**certified** (13)
25:2;50:24;52:6;
396:10;432:25;
433:2;435:18;436:6,
11,22;438:2,16;
452:22
**chair** (1)
216:5
**challenging** (2)
35:20;135:21
**chance** (3)
264:23;277:23;
290:17
**change** (21)
67:18;71:8;209:6;
210:2,18,25;211:14;
213:7,12;214:16,19;
215:17;217:10;
219:9,17,24;320:17;
325:9,11;332:17;
415:17
**changing** (1)
214:24
**chaos** (1)
424:22
**characterization** (2)
313:6;314:3

**characterize** (2)
292:8;395:2
**characterized** (1)
151:23
**charge** (3)
31:8;111:13;
195:24
**charges** (1)
232:20
**chart** (1)
277:8
**chasing** (1)
450:6
**chauffeur** (1)
407:2
**check** (1)
413:6
**checked** (1)
333:6
**checkpoint** (11)
337:10;338:3,8,20;
339:3,11,20,24;
340:13;406:5;413:7
**checkpoints** (1)
338:15
**cheered** (1)
378:5
**Cherry** (9)
125:18;126:5,10;
212:10,10;218:9;
220:15;256:19;
416:20
**Chester** (1)
60:14
**chief** (133)
31:5,6,6,6;87:19;
186:21,24;187:3,4,6,
8,12,25,25;188:2,17;
189:16;190:2,21,25;
191:4,8,15,25;
192:11,14,21;193:3,
4,7,10,24;194:14;
195:7,11,16,19,19;
197:17,23;198:8;
202:24;203:18,22,
25;204:18,25;205:3,
8,25;206:4,24;207:7,
15,20;208:2,19;
209:15,24;210:4;
250:22;252:5;
255:14,14,15,22;
256:3,8,12,12,18;
257:13;258:17,18;
275:4,6,7,11,12;
276:22;284:8,11,12;
288:21;289:10;
290:19;299:16;
306:22;307:8;308:4,
17,21;310:11,16;
312:9;316:18,18,19;
317:20;333:2,14,17;
337:7;340:19,20;
341:7,23;348:7;

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

349:7,10,23;384:21,
24;385:2,3,5,8,10,13;
386:10;401:18,19,
22;402:2,10,15;
405:11;407:24;
419:8,23;421:12,15;
453:24

**chief's (2)**
275:15;404:13

**children (1)**
427:12

**choked (1)**
224:8

**Chris (16)**
256:10;375:22,24,
25;376:19,22,25,25;
377:2,13,21;378:5,8,
11;380:17,22

**Christine (1)**
5:11

**Christmas (6)**
127:23;129:18;
130:9,13;135:22,25

**Christopher (2)**
422:13,20

**Chuck (1)**
201:17

**chuckle (1)**
206:4

**chuckled (3)**
205:11,12,13

**church (2)**
327:3,15

**circle (2)**
450:7;462:15

**circles (1)**
443:16

**circumstances (3)**
242:14,16;459:15

**citizens (3)**
334:8;335:2;379:8

**city (1)**
113:11

**Civil (50)**
23:21;24:7,16;
26:19,22;27:6,25;
28:20,25;30:21;32:2,
24;44:5;56:10,18;
58:13,17;63:2;65:2,
4,17;67:15;163:24;
283:15;287:15,19;
299:5;348:24;
377:18;379:18;
393:24;394:7,11,19;
395:11;396:20;
432:14,23;434:14;
438:2;440:23;452:8,
18;465:19,22;470:22

**civilians (11)**
50:18;234:19;
235:3,5,7;236:19;
345:22;396:7;436:4,

11;438:14

**CJ's (2)**
202:8,9

**Claim (24)**
17:2,8,13;22:18;
40:2;73:19;78:19,25;
79:5,14,17,21;80:4,
6;82:2;210:17;
251:18;260:15,21;
319:2;354:13;383:9;
429:2;458:11

**claimed (4)**
101:22;168:11,14;
238:23

**claiming (3)**
239:6;434:16;
436:23

**clarify (2)**
213:25;222:7

**class (2)**
271:6,14

**clean (8)**
91:25;92:6,14;
94:11;192:20;
409:14;410:7,8

**cleaned (3)**
199:14;409:25;
410:5

**cleaning (8)**
175:8,9,9;176:9;
198:25;199:2;
200:13,15

**cleans (1)**
92:11

**clear (32)**
20:5;31:11;32:9;
34:13;68:11;84:11;
85:24;104:13;
114:13;118:19;
141:23;156:8;
163:14,16;166:22;
168:22;214:8,13,14;
232:19;266:15;
295:19;305:20;
307:20;351:5;357:8;
368:15;396:19;
405:3,8,10;445:21

**Clemens (1)**
135:5

**client (7)**
61:18;77:3;82:19;
84:18;447:21;
448:18,22

**clients (3)**
76:21;357:25;
358:17

**clique (1)**
275:3

**close (10)**
129:3;166:25;
189:2,3;202:10;
257:2;285:4;309:14;
328:8,8

**closed (1)**
129:7

**closer (3)**
179:25;180:2,3

**clutter (1)**
199:21

**cocaine (12)**
327:24;328:3,15;
330:12;331:25;
359:17,22;360:8,11,
17;364:8,11

**code (6)**
322:18,21,23;
359:15;392:5,7

**codes (1)**
355:20

**Cohen (2)**
444:18;451:2

**Coke (1)**
185:24

**colder (1)**
180:14

**colleague (2)**
462:22;463:4

**Collier (12)**
263:20;302:16,19;
303:2,4,17;305:21,
25;306:13;312:15;
314:19;384:7

**com (1)**
88:23

**comfortable (1)**
449:13

**coming (8)**
135:5;201:7,16;
202:7;271:11;
305:12;339:18;
441:20

**commence (7)**
263:15,24;264:21;
265:21;266:11,21;
267:13

**comment (2)**
201:12;381:14

**comments (4)**
269:3;380:18;
389:13;462:12

**committed (4)**
22:12;85:9;87:5;
344:12

**committing (4)**
247:6,18,22,25

**common (5)**
22:11;47:5,20;
182:13,13

**communicate (15)**
113:19,24;114:4;
117:21;122:18,23;
137:25;138:10;
145:9,23;146:25;
159:23;160:4,15,19

**communicated (7)**
140:9;141:14;

142:2,13;143:14;
146:20;164:12

**communicating (1)**
163:7

**communication (14)**
74:7;78:8;79:9,
22;80:14;81:17;
286:25;289:24;
290:4,8;338:25;
339:8;375:23

**communications (9)**
38:17;76:18;
123:22;157:24;
219:25;260:12;
335:16,22,25

**community (1)**
291:4

**company (10)**
10:10;11:13;
171:17;173:14;
174:3;388:8;412:20;
427:22,24;428:3

**complain (7)**
105:13;109:5,8,14,
16,21,24;111:16;
112:13,22;113:14;
115:18,21;117:9,15,
18;119:9,12,23;
121:18;122:8,12;
123:9;124:23;
136:21,25;137:12,
14,22;138:15;159:7,
10,22;161:4,8,11,14;
162:12,15,20;167:2,
5,5,13;175:6;186:22,
25;187:4,7;189:5,7;
193:17;194:22;
209:3;212:2;217:20;
258:24;259:3,6;
332:9;339:7,12,25;
340:11,18;341:4,22;
342:14;396:20,24;
397:2,4,11,14;
401:16;405:19;
406:9;442:10

**complainants (1)**
101:4

**complained (40)**
86:16;88:24;
93:20;95:10;100:15,
17;104:2,14;105:16,
19;111:20;136:23;
137:4,20;174:11,15,
16;175:7,22,22;
176:5,8,10;177:5;
178:25;187:5;
189:20;198:8;218:7;
219:8;279:6;332:8,
11,15,19;340:3,8;
394:15;397:22;
406:22

**complaining (10)**
105:5;116:15,24;

118:21;178:12;
198:10,13;396:3,5;
406:13

**Complaint (72)**
16:22,23;17:16,20;
18:2,16;19:11;20:5,
24;21:9,21,22;44:21;
49:3;57:12;88:4,7,
11,14,15;89:5,6,11,
18;106:17,20,23;
110:4,8,9,11;161:20;
162:6,10,11,24;
163:8,18,21;164:2,7,
14,21;165:12,14,18,
20,23,24;166:9;
174:9;178:24;179:4;
188:16;189:25;
190:11,18;194:13;
208:25;219:3,16;
262:15;317:13;
334:19;340:10,22;
343:17;344:3,7;
416:5;454:10;460:13

**complaints (44)**
85:7,14,16,19;
86:3,10,12;87:3,9,11,
14,18,22,25;88:5;
104:6,21;105:11,23,
25;107:8,14;120:10;
136:17;137:2;138:3,
5,9;158:24;159:4,23;
164:20,25;166:6;
178:7;190:5,20;
191:3,8,12;198:21;
333:2;395:23,25

**complete (1)**
356:18

**completed (1)**
257:20

**completely (5)**
76:13;242:3;
265:15;266:2;296:10

**compliance (4)**
26:18,22;27:7;
28:20

**complied (2)**
359:3;363:15

**concentration (1)**
231:17

**concept (1)**
231:17

**concern (4)**
60:25;164:12;
249:11,12

**concerned (5)**
36:23;152:20;
205:25;212:13;306:4

**concerning (52)**
28:2;34:25;35:12;
36:3;38:7,18;39:3;
104:22;105:2;
110:12;115:7;
122:20;123:16;

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL: vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

136:17;141:16;
145:9;150:22;
152:14;153:5;157:4,
9;158:4,19,20;160:4,
16;163:25;164:6,13,
20;165:13,19,23;
166:8;169:3;171:8,
15;189:20;190:6;
193:25;194:15;
208:25;210:17;
219:7,25;225:11;
270:16;338:25;
382:22;383:20;
385:19;396:22
**concerns (4)**
163:7;332:4,4;
422:9
**conclude (1)**
290:24
**concludes (2)**
471:20,23
**conclusion (3)**
351:21;358:3,12
**conduct (7)**
85:9;87:5;105:4;
136:19;161:21;
299:21;361:8
**conducting (1)**
232:24
**confidential (13)**
54:21,25;55:6,9,
20;56:12,20;57:22;
58:10;59:16,20;
60:16;65:23
**confidentiality (2)**
62:4;64:10
**confirm (1)**
363:5
**confirming (1)**
35:4
**conform (1)**
113:12
**confused (2)**
86:23;465:5
**conjunction (2)**
393:17;408:22
**connection (5)**
300:4;454:16;
464:20,24;465:10
**CONNOLLY (8)**
4:25;5:3;425:23;
426:3;430:24;471:4,
5,13
**conquests (1)**
470:3
**consecutive (1)**
408:16
**consider (1)**
49:16
**considered (1)**
11:4
**consistent (1)**
41:11

**conspiracy (7)**
22:19;30:3;40:21;
42:10;445:15;
451:17;452:15
**conspired (4)**
22:7;344:4;379:6;
453:10
**conspires (1)**
49:24
**conspiring (3)**
342:16;380:12;
446:10
**constantly (7)**
89:2,12;95:2,11,
17;103:19;386:25
**constraints (3)**
316:23;317:6,15
**consultation (2)**
350:4,7
**contact (13)**
140:12,13,17;
145:24;151:10;
306:14;449:19,23;
450:9,23;451:2,7;
468:8
**contacted (15)**
140:15,23;141:20;
142:16;143:19;
144:24;151:17;
169:9;259:16,18;
299:7;303:25;
449:18;468:24;469:5
**contacting (1)**
449:16
**contend (1)**
385:23
**contending (1)**
435:6
**contention (4)**
58:5;236:19;
237:16;332:23
**contents (1)**
440:7
**context (2)**
47:15;460:14
**continuation (1)**
352:7
**Continue (6)**
31:24;304:24;
345:8;356:3;409:15,
20
**Continued (2)**
183:17;350:13
**continuing (1)**
254:19
**contradiction (1)**
365:9
**control (7)**
18:5;132:3,5;
134:4;177:3;452:21
**conversation (57)**
34:24;35:7,23;
36:2,16,22;37:8,12,

16,20;38:2,7;39:2,8,
9,17;44:16;46:19;
54:21,25;55:5,20;
59:15,23;62:9;65:19;
81:7;89:3;90:25;
91:7,8;92:8;93:11,
19;94:4,5,7;95:15;
100:12;103:17,22;
149:11,24;150:2,23;
151:6;168:8;219:2,7;
273:14;372:21;
383:7;420:3;426:14;
433:11;466:22;471:8
**conversations (11)**
26:12;28:11;
43:23;56:11,20;
143:10;145:17;
166:16;168:5;
169:11;429:3
**cooperate (1)**
425:11
**cop (4)**
188:24;207:16;
212:6;312:9
**copies (1)**
157:3
**cops (2)**
25:4;113:11
**copy (3)**
20:23;288:11;
324:9
**Corallao (1)**
143:3
**Corallo (4)**
99:23;409:10;
410:11;411:16
**Cori (1)**
143:3
**corner (2)**
89:21,24
**correctly (20)**
11:25;24:2;46:23;
53:23;63:4;86:6;
123:13;131:25;
214:5;230:25;232:2;
233:2;239:9;259:15;
317:2;334:12;367:2;
371:8;372:11;456:8
**Corrupt (1)**
320:2
**corruption (2)**
147:6;398:14
**costume (1)**
426:17
**Cottage (1)**
89:21
**counsel (7)**
3:3;4:17;448:15,
17;456:18;457:12;
459:12
**counsel's (2)**
357:9;462:13
**count (1)**

424:20
**County (85)**
5:9,11;23:21;27:6;
43:19,21;55:11;
66:25;70:2;109:12,
22;110:17,22;
111:12,14;113:20;
115:3;117:22;118:8;
122:19;137:23;
138:2,11,15;140:9,
13,17;141:15,25;
143:13;144:10,23;
145:8,21;146:14;
147:6,23;150:19;
151:17;155:21;
158:10,20;159:14;
160:20,22;163:19,
24;165:25;166:7,13;
168:6;169:22;259:5,
15;260:8,13;263:17,
20;283:15;287:15,
19;299:4;302:16,19;
303:2,4,17;305:21,
25;306:13;311:6;
312:10,15,16;
314:19;340:15;
341:14;348:23;
359:5;384:7;396:21;
397:5;437:25;438:2;
451:12
**County's (1)**
55:14
**couple (12)**
21:14;141:24;
151:14,15;152:3;
163:12;175:16;
206:20;285:15,18;
426:23;462:23
**course (5)**
18:18;24:24;94:6;
144:11;370:8
**Court (33)**
3:16;4:8,13,14,16;
5:14;17:25;53:5;
147:20;200:24;
201:7,7,16,17,18,25;
202:6,7;213:23;
214:10;237:22;
243:14,15;245:11,
16;323:13,14;
356:15;447:5,6;
458:8;462:10;463:24
**courtesy (1)**
439:9
**Courtney (1)**
5:4
**courtroom (1)**
245:8
**cover (34)**
161:25;230:21;
231:2,14,17;232:8,
10,15;233:13,18,20,
21,25;234:22;

237:13,17;258:12,
20,24;259:3,7,19;
260:4,9,17,21,25;
261:25;415:9;422:9,
15;423:10;424:4,16
**covered (1)**
232:4
**crappy (1)**
191:9
**create (1)**
114:17
**created (10)**
107:20;108:8;
109:20;110:14;
112:15;117:12;
118:14,25;390:6,16
**creating (1)**
109:3;111:21
**crew (1)**
103:8
**crime (12)**
237:5;248:10,21,
25;249:5,8,15,18,24;
250:6;364:15;416:24
**criminal (5)**
232:19;236:22;
359:6;364:3,24
**crying (9)**
191:15,25;192:10,
13;193:2,4,7,9;337:6
**cue (4)**
256:15;262:5,7,10
**cup (6)**
399:11,13,15,16,
20;402:20
**current (2)**
88:21;427:3
**custody (3)**
18:5;177:2,3
**cut (2)**
246:17;409:23
**cuts (4)**
370:13;371:3,14;
372:18
**cutting (1)**
447:6
**Cynthia (1)**
450:23

**D**

**DA (8)**
109:12,14,16;
147:24;171:8;
262:12;335:22;
336:16
**damaged (2)**
354:23;355:2
**damages (2)**
53:19;82:23
**Dan (1)**
228:2
**dangerously (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 132 of 158 PageID #: 2502

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

405:20
**Danny (7)**
226:15;227:8,12,
20,23;228:12,19
**DA's (6)**
140:13,17,23;
142:13;143:10;336:8
**date (8)**
72:24,25;82:2;
135:7;261:15;
265:11;268:12;468:9
**dated (3)**
79:14;307:23;
308:5
**Dave (4)**
261:17,18,21;
262:8
**day (73)**
8:5;9:3,4;11:3,4;
12:18;19:19;41:7,8;
48:18;59:15;68:21,
25;69:3,13;81:3,5,
16;86:11;99:22,25;
127:8;131:18,19,21;
133:18,19;174:13,
13;175:10;179:25;
180:2,12;182:8;
187:12,15,21;
192:16;202:7;
209:19;227:10;
237:12,18;240:19,
21,23,23;241:19,23;
242:9,9,22;243:14;
247:5;260:22;
277:22;280:8;
283:19;346:24;
387:2;397:9;411:21,
21;412:19;432:10,
12;434:3;444:25;
445:2;446:2,7;
449:14;472:8
**days (20)**
13:5,6;38:12;50:5;
55:13,15;56:25;57:7;
62:10;68:7,11;72:21;
79:11,25;80:10;
81:19;171:24;
173:14;209:11;
462:23
**daytime (1)**
90:3
**deal (6)**
143:21;155:16;
237:10,10;246:25;
329:14
**dealer (5)**
326:12,15;333:22;
334:24;336:7
**dealing (2)**
299:13,24
**dear (1)**
308:4
**death (1)**

429:15
**deceit (2)**
454:15;464:18
**deceitful (1)**
297:11
**deceitfully (1)**
301:20
**decide (2)**
323:14,15
**decided (2)**
68:14;455:20
**decision (19)**
33:7;35:13;36:3,5,
8,9;38:18,19;66:7;
67:2,12,21,25;68:9,
12;70:13;350:4;
456:18,23
**decisions (3)**
34:17;350:5;
470:23
**declar (1)**
295:4
**declined (2)**
203:17;360:9
**Defamation (1)**
366:3
**defamatory (4)**
268:17;269:3;
366:8;389:12
**defamed (1)**
377:6
**defect (1)**
393:17
**Defendant (12)**
5:2;30:3;292:13;
295:7,20;297:7;
319:24;349:11;
350:15,23;353:7,15
**Defendants (9)**
4:7,23;5:10;18:18,
23;22:6;348:22;
358:25;366:7
**Defendants' (1)**
394:5
**defense (3)**
364:20;365:4,6
**defined (3)**
233:18;394:11,24
**definitely (2)**
121:4;399:15
**degree (2)**
392:18;393:9
**Dehnhoff (1)**
408:18
**deliberately (1)**
348:24
**delivered (1)**
308:8
**deliveries (1)**
412:21
**demonstrate (2)**
43:14;44:4
**denying (1)**

55:19
**department (90)**
25:4;43:20;48:7;
55:11;67:13,23;
69:25;70:4,14,23;
109:25;110:6,11;
111:2,5,10,10;
112:13,18,19,20,24;
118:2,3;119:5;
123:10;124:7,11;
125:4;128:22;
143:13;148:6;149:7;
163:24;164:5;184:6;
232:4;253:11;
263:18,19,21;
264:14;265:12,23;
270:16;272:22;
273:12;275:15;
277:5;282:17;
287:20;288:22;
292:9;299:3,5;301:4;
302:9;303:18;
306:18;311:5,8,16;
326:25;327:8;
341:24;346:7;
366:20;371:2,22;
372:15;376:13,18;
377:11;379:20;
384:10;385:11;
389:14,19;390:5,7,
11,17;391:5,7,14;
396:20;422:10;
436:5,14;437:23
**departmental (1)**
48:9
**departments (6)**
69:20;280:13;
283:7;284:16;285:7;
294:15
**depend (2)**
311:16;428:7
**depends (3)**
182:3,7;428:9
**deportment (1)**
311:15
**deposition (27)**
3:6,13;4:3;12:7,10,
15,24;13:3,10,16,20;
14:2,8,19,25;16:14;
38:13;55:15;84:10,
15;99:7;343:16;
432:13;464:9,13;
471:20,23
**deputy (2)**
31:5,6
**dereliction (1)**
336:20
**describe (3)**
327:11;386:16,22
**describing (1)**
74:17
**description (1)**
139:20

**desire (5)**
292:8;301:3;
438:5,10,20
**desk (4)**
202:2;220:18;
256:8,11
**desolate (2)**
180:15;187:17
**DeStefano (1)**
450:23
**destroy (19)**
22:7;28:20;30:5;
34:22;40:8,11,18;
42:12,15,22;43:15;
44:9,23;46:6;47:6,
20;49:7,12,25
**destroyed (2)**
30:10;32:11
**destruction (3)**
30:25;33:13;40:2
**detail (2)**
143:10;210:5
**determine (1)**
470:22
**DI (3)**
82:3;83:13;467:21
**diagnosed (2)**
393:16,21
**died (2)**
429:12,12
**difference (2)**
50:25;307:13
**different (14)**
76:2,23;129:14;
234:13;242:3;
338:14;390:7;
428:10,11;448:14;
459:10,14,15;463:17
**digest (1)**
456:15
**direct (7)**
20:19,20;22:16;
63:4;352:22;403:22;
405:6
**directed (8)**
216:14,15;338:2,7;
339:2,9;403:7;
430:10
**direction (6)**
85:10;87:6;89:23;
325:13,22;361:19
**directly (3)**
82:21;110:3;
380:14
**disagree (1)**
61:17
**disciplinary (3)**
164:11;190:17,19
**discipline (1)**
206:25
**disciplined (5)**
207:20,24;208:5,8,
13

**disclose (1)**
77:18;395:2
**disclosed (2)**
66:7;394:9
**disclosure (1)**
66:25
**discovered (2)**
45:9,20
**discuss (4)**
63:6;144:2;
418:18;429:16
**discussed (5)**
80:19;162:19;
169:21;228:15;440:4
**discussing (8)**
113:22;114:2,7;
117:25;122:10;
144:22;391:3;418:13
**discussion (3)**
439:19,23;440:15
**discussions (4)**
44:6;418:25;
420:6;424:25
**disease (1)**
393:17
**disgrace (2)**
341:25;342:2
**disgusting (1)**
415:4
**dishonest (3)**
366:14;375:20;
378:13
**dislike (1)**
442:2
**disliked (3)**
275:3;277:12;
278:6
**disparaging (1)**
269:3
**dispatcher (1)**
376:2
**dispersion (1)**
463:15
**disregard (1)**
360:22
**disregarding (1)**
275:19
**dissatisfied (1)**
443:4
**distinguish (1)**
285:5
**distraught (2)**
389:6;400:22
**District (52)**
4:8,8;109:22;
113:20;117:22;
122:19;137:23;
138:2,11,16;140:10;
141:15,25;143:13;
144:10,24;145:8,21;
146:14;149:10,13;
150:19;151:18;
152:14;153:4;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 133 of 158 PageID #:
2503

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

154:23;155:2,21;
156:22;157:2,7;
158:10,20;160:20;
166:7,13;168:6;
169:2,8,22;259:6,16;
260:13;397:5;
451:15,19;452:13,
25;453:7,9;466:23;
468:8
**divorced (2)**
427:7;432:8
**dock (2)**
201:18;410:8
**document (5)**
37:19,24;177:2;
315:20;316:25
**documentation (2)**
156:23,25
**documents (2)**
45:21;177:8
**Dolan (2)**
266:25;267:6
**domestic (2)**
398:17,20
**domino (1)**
396:15
**Donahoe (15)**
303:13;304:2;
384:8,11,11,14,17,
21,24;385:2,8,9,10,
15,18
**done (20)**
15:24;30:17;
32:13;58:23;74:21;
120:12;240:17;
275:21;344:18;
356:2;361:25;
362:24;382:8,13;
398:5;425:19;
446:19,19;447:25;
448:8
**Donovan (1)**
5:7
**door (5)**
129:4,8,8,25;
184:25
**doors (1)**
202:11
**double (1)**
254:11
**doubt (5)**
208:22,23;470:4,6,
10
**Doug (8)**
179:19,21;229:13,
15,20;230:4;231:3;
235:24
**down (26)**
23:6;45:24;93:5,
12;94:16;148:15;
160:12;165:6;
220:18;238:10,11;
246:19;282:11,13;

307:7;316:9,19;
317:4;363:2;369:17;
400:9,14,15,17,25;
448:24
**drafts (1)**
17:20
**drag (3)**
186:3,6,7
**dragged (1)**
186:2
**drank (2)**
399:14,17
**drew (1)**
426:15
**drink (3)**
186:19;399:13;
400:8
**drinking (60)**
89:2,12;93:20;
95:2,11,17;100:16;
101:7;103:16,19;
104:3;107:19,25;
108:8;109:2,20;
110:12,13;111:21;
112:15;115:19,22;
116:15,17,25;
117:12;118:14,25;
119:10,25;120:15,
23;123:16;124:22,
24;161:25;174:16;
175:3;176:6;178:6;
179:2;185:20,21,22,
23;189:12;193:18;
194:2,15;198:9,15,
20;202:8;234:25;
236:23;332:20,21;
399:15;402:21;
417:15
**drive (8)**
126:4;172:16;
337:9;338:2,7,15;
339:3,9
**driver (9)**
9:15,16;11:12,13;
100:21;103:9,13;
171:18;172:4
**drivers (1)**
172:2
**driver's (1)**
288:11
**driving (5)**
171:24;172:17;
340:4,5,12
**dropped (2)**
169:24;330:4
**drove (1)**
174:4
**drug (15)**
178:15;179:15;
181:5,8;326:11,15;
327:10,12;329:14;
333:22;334:23;
336:6;355:22;360:8;

361:14
**drugs (5)**
326:24;327:6;
330:6;333:8,13
**drunk (4)**
185:5,12;202:14;
203:6
**dry (1)**
246:18
**due (2)**
311:18;312:20
**duly (1)**
5:17
**during (26)**
18:18;24:24;
55:15;56:7;61:2;
65:12;67:11;90:3;
93:11,19;94:6;98:2;
99:7;104:9;151:6;
286:22;411:14;
416:11,21;417:13;
418:3,4,25;419:22;
421:16,16
**duties (1)**
311:11
**duty (36)**
90:5;95:15;101:8,
10,12,17,24;102:5,8;
116:17,21;117:3;
125:21;168:12,14;
170:4;178:15;179:7;
180:19;181:23;
182:16;200:24;
216:25;254:12,13;
328:11;336:21,23;
340:17;341:15;
342:6,13;404:10;
407:15,18;409:12
**Dyer (5)**
398:15,18;409:10;
410:11;411:16

## E

**earlier (10)**
71:2;95:9;230:10;
270:6,8;279:6;
349:18;426:4;
427:10;430:4
**early (2)**
228:5;398:14
**earn (2)**
172:21;173:4
**easier (1)**
21:24
**Eastern (1)**
4:8
**easy (1)**
243:20
**eat (2)**
411:4,5
**Ed (4)**
4:15;370:3,24;

429:4
**Eddie (20)**
33:22;62:19,22;
74:12,17,24;75:8;
148:13;170:22,23;
261:7;312:16;
338:11;369:10,10,
13,18,22;430:10;
436:21
**education (1)**
241:15
**Edward (4)**
4:5;307:24;
316:10,20
**effect (5)**
3:15;75:3;197:14;
396:15;430:6
**effort (3)**
250:9;450:4,13
**efforts (1)**
250:6
**eight (4)**
180:21;409:5,5,5
**eighth (2)**
270:7;393:23
**either (23)**
31:5;51:5;62:19;
63:24,25;64:11,18,
22;65:9;157:24;
165:4;171:9;172:15;
180:11;187:13;
240:2,22;242:8;
301:12;416:22;
417:20;420:5;442:13
**EL (3)**
21:11;308:2;
315:18
**elapsed (1)**
80:22
**Eleventh (1)**
357:18
**elicit (1)**
451:17
**else (58)**
25:20;36:12;
40:24;90:20;92:2,4,
16;93:18;112:22;
118:23;129:5;
148:15;149:9,20;
158:2,14;172:12;
176:4,15;178:4;
205:13;206:23;
208:13;210:13;
213:25;216:25;
217:8;218:12;
219:12;225:13;
231:5;233:3;241:24;
257:9,11;277:23;
280:2;284:7,15;
287:22;313:23,24;
321:7;334:9;337:8,
11,14,22;338:6;
342:14;367:16;

370:11,19;415:18;
422:23;446:10;
449:11;471:10
**Elyse (8)**
230:8,9,14,19;
231:3;236:4;426:6,
18
**email (2)**
157:18,22
**emailing (1)**
157:24
**emails (2)**
157:16,19
**embarrassing (1)**
342:3
**embarrassment (1)**
342:5
**emergency (2)**
183:18;355:19
**Empire (1)**
75:23
**employed (8)**
11:13;19:9;96:16;
97:2,23;99:13,17;
427:19
**employee (13)**
9:20,21;10:18,22;
11:8;66:24;150:20;
164:17,19;280:5;
291:5;348:18;352:17
**employees (3)**
291:14;292:16;
381:11
**employer (1)**
312:8
**employers (8)**
263:16;266:9;
292:16;295:15,23;
309:19,25;310:20
**employing (1)**
97:5
**employment (56)**
18:19;34:16;
70:16;85:4;174:2,13,
14;180:2;263:15,25;
264:12,16;265:22;
266:11;269:7;
292:10,15;294:18,
22;295:8,12,21;
297:9;310:12;311:3,
17;315:15;316:14;
319:5,14;320:11,25;
325:19;346:6;359:2;
394:6;397:9;428:18,
20;434:11,19;435:3,
8,15;436:8,25;437:5;
438:21;439:14;
440:12,17;441:3,6;
453:16,18;454:2
**enabled (6)**
434:18;435:2,7,14;
436:24;437:4
**encompassed (1)**

117:6

**encounter (2)**
407:3,8

**end (25)**
71:19;90:21;
131:18;141:5;
186:22,25;187:18;
212:6;229:8;250:22;
251:9;254:5,15,18,
20;255:2;269:13,18;
273:13;338:16;
419:2;442:25;
450:18;466:15,18

**ended (7)**
134:4,5;228:22;
254:14,16;311:17;
356:17

**ends (6)**
71:11;144:14;
213:14;291:24;
356:7;415:19

**enforce (5)**
322:21;334:15;
336:6;341:7,9

**enforced (2)**
33:5;322:21

**enforcement (21)**
282:19;283:8;
302:10;306:14;
312:23;313:8;314:5,
17,20,24,25;318:23;
319:8,9,16,17;
346:22;347:2;359:4;
366:15;385:22

**enforcing (2)**
333:15;359:11

**engage (1)**
33:11

**engaged (11)**
22:17;30:4;34:24;
39:25;42:10;68:18;
69:6;76:9;360:7;
445:14;467:22

**engaging (1)**
320:4

**England (1)**
410:20

**enough (5)**
61:8;185:16;
206:13;275:16;
456:16

**ensure (6)**
19:5;24:6;27:25;
28:19;334:7;343:20

**ensuring (5)**
25:15;26:18,21;
27:7;29:22

**entails (1)**
52:19

**entered (2)**
311:6;369:21

**entering (1)**
369:23

**entertain (1)**
441:22

**entire (2)**
118:24;347:6

**entirety (1)**
219:6

**entities (3)**
266:10;296:9;
314:16

**entitle (1)**
348:17

**entitled (1)**
262:21

**entity (8)**
11:14;174:2;
263:25;382:16;
383:8,19,20,25

**entries (1)**
390:8

**especially (2)**
55:10;77:5

**essentially (2)**
169:25;232:22

**established (6)**
141:21,22;223:14;
231:10;276:13;
318:21

**et (2)**
4:5,7

**Eve (1)**
131:17

**even (41)**
7:14;39:12,14;
49:19;76:13;77:12;
119:16;121:8;
135:15;143:22;
172:23;188:13;
223:22;238:10;
273:12;274:5;
291:20;302:14;
333:14;334:3,6;
335:13;351:24;
360:15,16;364:10;
372:2;388:14;389:7;
431:14;437:25;
441:19;444:20;
446:18,19;451:4;
456:15;465:4;
467:10,11,12

**evening (6)**
228:2,5;230:11;
243:16;420:7;421:16

**events (5)**
81:2;223:7;
229:21;243:16;
408:24

**Everybody (5)**
148:14;256:9;
368:18,22;450:17

**everybody's (1)**
182:10

**everyone (3)**
231:5;367:10,23

**evidence (23)**
40:10,14;42:13,17,
18,25;43:9,13,25;
44:6,18;45:6,16,25;
46:12,14;250:2;
297:20;298:5;
301:18;438:18,23;
439:10

**exact (4)**
12:18;93:16;
95:20;443:20

**exactly (27)**
24:19;35:11;39:7;
66:3;80:25;88:19;
93:23;119:18;132:4;
173:9;179:23;
189:15;217:18;
237:9;247:4;267:22;
272:18;273:15;
281:5;283:4;304:11,
18;317:21;376:24;
377:7;393:22;443:23

**EXAMINATION (4)**
6:8;426:2;431:2;
471:3

**examined (1)**
5:18

**example (4)**
129:23;190:23;
398:13;402:4

**examples (11)**
129:14;130:5,21;
135:2,20,24;136:7,
22;137:3;175:18;
176:21

**exams (3)**
50:21;58:20;
432:24

**except (3)**
3:9;4:23;303:23

**exceptions (1)**
182:14

**excess (1)**
18:11

**exchange (1)**
327:23

**exchanged (1)**
333:13

**Excluding (3)**
119:6;124:6,9

**Excuse (9)**
43:12;61:24;
104:24;130:17;
261:11;346:23;
355:23;398:25;
435:21

**Executive's (1)**
451:12

**exhaust (1)**
450:19

**exhausted (3)**
69:23;283:2;
446:14

**exhibit (1)**
307:21

**Exhibit-1 (2)**
21:10,12

**Exhibit-35 (1)**
315:17

**Exhibit-8 (1)**
307:25

**exists (1)**
43:13

**exited (1)**
369:21

**exiting (1)**
369:23

**expect (2)**
273:23;274:17

**expecting (2)**
34:6;268:9

**expense (1)**
305:10

**experience (7)**
85:4;124:15;
197:21;241:12,16;
242:12;316:15

**explain (18)**
23:4;47:15;92:5;
108:3;139:18;201:2;
220:12;234:24;
298:2;303:7;322:11;
345:17;358:8;
404:19;447:5;
448:19,19;461:24

**explained (6)**
55:7;113:10;
216:11;271:12;
398:18;469:12

**explaining (1)**
15:20

**explanation (5)**
303:10;348:3,4;
404:6;461:25

**exposed (2)**
353:9,17

**expressed (1)**
452:16

**expressing (1)**
429:17

**expression (1)**
193:9

**extent (9)**
27:23;77:4;78:11;
176:20;350:2,3;
372:20;379:9;439:21

**eye (1)**
363:25

---

**F**

---

**face-to-face (3)**
81:11,15,24

**facilitate (1)**
336:20

**fact (52)**

7:14;19:11;27:11;
30:24;33:4;34:23,25;
39:17,21;50:4;52:20;
54:10;57:17;58:5;
63:10;65:16;121:7;
152:15;170:8;
175:18;179:5;223:6;
239:9;241:25;
243:15;259:14;
260:11;268:21;
278:20;282:25;
283:18;301:16;
308:23;313:9;316:9;
317:9;332:24;
334:14;338:25;
343:15,19;347:12;
361:13;363:15,22;
366:25;393:7;405:4,
5;418:19;445:24;
460:10

**facts (2)**
32:7;276:9

**failure (1)**
28:19

**fair (11)**
12:21;55:23;
185:16;186:11;
195:7;260:11;313:6;
314:2,3;410:4;
456:16

**faith (1)**
84:22

**falling (2)**
279:23;280:2

**false (2)**
454:14;464:18

**falsify (13)**
214:23;215:11;
320:9,23;321:18,19,
25;322:3,16;325:2,8,
17;326:5

**falsifying (1)**
321:10

**familiar (3)**
74:24;143:4;162:4

**far (20)**
62:14;75:15;
139:18;152:18,24;
157:16,20;193:11;
210:2;219:14,16;
283:4;309:12;328:6;
337:3;356:3;375:16;
401:11;424:5;452:21

**Farmingdale (1)**
6:2

**father (3)**
181:10;323:3,7;
429:12

**favorably (1)**
381:14

**fax (1)**
412:8

**faxed (1)**

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

288:10

**FBI (2)**
347:9,24

**February (4)**
4:10;97:21;
171:20;471:24

**federal (5)**
17:25;18:9;
165:24;237:22;
463:24

**feeding (2)**
399:6;400:7

**feel (9)**
135:21;190:9,12;
203:24;211:25;
395:7,9;449:13,22

**feeling (1)**
331:17

**fees (2)**
100:5,6

**feet (3)**
328:13,13;329:2

**fell (1)**
280:8

**felony (2)**
359:20;360:3

**felt (24)**
58:24,24;75:13;
135:18;149:17;
189:4,7;206:13;
261:25;267:19,21,
23;312:17;341:22;
342:2;442:18;
446:13,15;449:10,
16,25;450:8;451:16;
452:14

**ferry (5)**
170:9;255:18,19;
256:3;338:22

**few (14)**
50:5;56:25;57:7;
62:9;68:7,11;72:21;
173:13;176:18;
256:17;345:22;
398:7;416:3;431:5

**field (10)**
179:24;282:19;
313:8;314:5;318:23;
319:8,9;346:22;
347:2;401:11

**Fifteenth (1)**
262:20

**fight (35)**
100:19;101:13,14;
138:18;149:18;
150:5,13;154:25;
155:5;170:24;
175:24;176:12;
211:5,9;219:14;
221:24;222:9,11;
233:6;239:3;256:14;
396:12;412:6,23;
414:5,16;419:6,9,14;

420:5,24;421:2;
422:9,19;424:18

**fighting (1)**
233:15

**figure (5)**
130:24;173:11;
183:20;217:8;280:11

**file (9)**
16:22;17:2;80:4;
203:9,20;204:2;
220:19,22;401:5

**filed (30)**
17:13,17,21;19:6,
10,19,24;20:6,24;
21:2;44:20;73:18;
78:19,20,25;79:18,
22;80:5,6;81:5;
162:11;237:23;
283:14;317:10;
343:17;344:9;
345:14;401:8;
428:25;429:2

**files (1)**
199:22

**filing (25)**
3:4;16:21;17:25;
18:9;51:25;191:18,
19;199:16;201:19;
202:15;203:4;204:6,
8,11,20,23;205:5,9,
18;206:21;207:3;
398:20;408:22,24;
410:6

**filled (4)**
315:25;316:3;
399:21;454:5

**film (1)**
200:17

**find (9)**
150:8;210:15;
235:11;250:9;
273:10;279:17;
280:25;312:19;437:7

**fine (48)**
21:19;22:22;42:9;
47:3;74:5;83:9;84:3;
92:10;102:9;103:22;
127:20;134:7;146:7;
147:20;150:6;152:6;
180:7;181:12;
183:19;184:8;
189:18;201:13;
238:21;276:12;
282:24;286:8;
290:12;296:24;
304:10;325:12;
333:13;348:4;
357:10;359:16;
374:19;376:17;
379:15;390:14;
397:21;420:10;
435:25,25;449:4;
457:15;458:6,18;

467:19,25

**finish (26)**
15:6;16:2,4,8;
36:19;160:9;163:12;
201:10;202:6;
235:20;356:18,22;
435:23;446:22,23;
447:3,10,14,24,25;
448:23;449:6,8;
453:5;464:8,12

**finished (3)**
387:5,6;436:9

**Fiorillo (502)**
4:1,4;5:1,22;6:1,
10;7:1;8:1;9:1;10:1;
11:1;12:1;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1,9;
22:1;23:1;24:1;25:1;
26:1;27:1;28:1;29:1;
30:1;31:1;32:1;33:1;
34:1;35:1;36:1;37:1;
38:1;39:1;40:1;41:1;
42:1;43:1;44:1,17;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1,20,24;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1,
16;67:1,9;68:1;69:1;
70:1;71:1;72:1;73:1;
74:1;75:1;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1,
3;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;
100:1;101:1,20;
102:1,14;103:1;
104:1;105:1,10;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1,
21;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;

168:1;169:1;170:1,
15;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1,10;
196:1;197:1;198:1;
199:1;200:1;201:1;
202:1;203:1;204:1;
205:1;206:1;207:1;
208:1;209:1;210:1;
211:1;212:1;213:1;
214:1;215:1;216:1;
217:1;218:1;219:1;
220:1;221:1;222:1;
223:1;224:1;225:1;
226:1;227:1;228:1;
229:1;230:1;231:1;
232:1;233:1;234:1;
235:1;236:1;237:1;
238:1;239:1;240:1;
241:1;242:1;243:1;
244:1;245:1;246:1;
247:1;248:1;249:1;
250:1;251:1;252:1;
253:1;254:1;255:1;
256:1;257:1;258:1;
259:1;260:1;261:1;
262:1;263:1;264:1;
265:1;266:1;267:1;
268:1;269:1;270:1;
271:1;272:1;273:1;
274:1;275:1;276:1;
277:1;278:1;279:1;
280:1;281:1;282:1;
283:1;284:1;285:1;
286:1;287:1;288:1;
289:1;290:1;291:1;
292:1,7;293:1;294:1;
295:1;296:1;297:1;
298:1;299:1;300:1;
301:1;302:1;303:1;
304:1;305:1;306:1;
307:1,25;308:1;
309:1;310:1;311:1,3,
5,12;312:1;313:1;
314:1;315:1,17;
316:1;317:1;318:1;
319:1;320:1;321:1;
322:1;323:1;324:1;
325:1;326:1;327:1;
328:1;329:1;330:1;
331:1;332:1;333:1;
334:1;335:1;336:1;
337:1;338:1;339:1;
340:1;341:1;342:1;
343:1;344:1;345:1;
346:1;347:1;348:1;
349:1;350:1;351:1;

352:1;353:1,20;
354:1;355:1;356:1;
357:1;358:1;359:1;
360:1;361:1;362:1;
363:1;364:1;365:1;
366:1;367:1;368:1;
369:1;370:1;371:1;
372:1;373:1;374:1;
375:1;376:1;377:1;
378:1;379:1;380:1;
381:1;382:1;383:1;
384:1;385:1;386:1;
387:1;388:1;389:1;
390:1;391:1;392:1;
393:1;394:1;395:1;
396:1;397:1;398:1,
15;399:1;400:1;
401:1;402:1;403:1;
404:1;405:1;406:1;
407:1;408:1;409:1;
410:1;411:1;412:1;
413:1;414:1;415:1;
416:1,2;417:1,13;
418:1;419:1;420:1,2;
421:1;422:1;423:1;
424:1;425:1;426:1,4;
427:1;428:1;429:1;
430:1;431:1;432:1;
433:1;434:1;435:1;
436:1;437:1;438:1;
439:1,3;440:1;441:1;
442:1;443:1;444:1;
445:1;446:1;447:1;
448:1;449:1,20;
450:1;451:1;452:1;
453:1;454:1;455:1;
456:1;457:1;458:1;
459:1;460:1;461:1;
462:1;463:1;464:1;
465:1;466:1;467:1;
468:1;469:1;470:1;
471:1,7,24;472:1,5

**Fiorillo-1 (1)**
21:8

**Fiorillo-35 (1)**
315:14

**Fiorillo-8 (1)**
307:21

**Fiorillo's (1)**
311:17

**fire (18)**
31:16;32:15;33:8;
35:13;48:21;51:5;
93:9;94:24;96:6;
99:5,9;100:14;184:6;
196:11,16;207:4;
278:12;352:17

**firearm (2)**
370:15;437:23

**fired (92)**
8:5;29:17;31:8;
33:18,21,21,22,23,
24;34:7,11;36:8,24;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 136 of 158 PageID #:
2606
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.
FRANK FIORELLO
February 20, 2009

48:19;59:2,3;62:23;
70:18,25;75:15;86:2;
97:9,14;98:6,18;
99:9,22,25;104:20;
127:8;131:22;138:4;
146:15;147:2,24;
149:12;150:23;
151:10;152:24;
167:15;196:20;
208:11,15;232:17;
241:7;260:15;
261:14;267:2,14;
271:2;274:4,13;
277:21,25;278:20;
279:2;281:23;
282:22,24;283:9,19;
293:5,6,10;307:8;
371:12;372:16;
374:12,13;376:13;
378:2;380:10;
386:19;387:9,15;
390:23,24,24;
395:21;396:9;
408:10;434:23;
437:11,12,12;444:4;
449:14;450:21;
452:8,23;455:3,7
**firing (4)**
150:3,12;151:23;
277:16
**firm (30)**
4:12;5:6;17:9,10,
11,12,15;72:23;
74:10;75:4,9,12,20,
25;78:4,6,9;79:8,23;
80:15,17;81:8;
145:20;146:5,7,8,21;
267:3;468:24;469:6
**first (84)**
5:16;7:4;10:3;
14:24;30:19;55:7;
71:19;74:6;76:20;
77:5,11,13;78:7;
79:6,22;83:10;88:9;
91:11;93:9;94:23;
96:3,6;97:21;99:12,
16;107:22;108:11,
15,17;109:19;
131:19;141:13,25;
142:25;146:11,11,
20;147:22;149:11,
24,25;150:23;151:6;
155:16;169:8,23;
174:12;179:25;
185:17;188:21,23;
253:15,20;254:14,
21;255:3,6;277:16;
282:20;316:12;
323:6;341:5;346:6,
20,24;364:9;369:11;
385:16;396:3;400:5;
406:12,21;418:4;
419:2;425:23;434:4;

441:15;449:19;
456:16;458:19;
468:7,14;469:8,13
**firsthand (3)**
20:14,18;378:20
**Fishbein (1)**
5:6
**five (20)**
40:22,25;41:9,17;
42:2;145:12,14;
153:4;166:12;
168:25;177:25;
292:5;328:13;329:2;
343:16;352:24;
356:8;404:25;
429:20;434:23
**fixed (1)**
456:12
**fled (2)**
422:8,18
**floor (1)**
245:14
**Florida (3)**
263:20;303:22;
305:11
**flow (1)**
82:23
**focus (2)**
141:12;457:7
**focused (1)**
85:14
**focusing (1)**
455:18
**folder (1)**
256:19
**follow (18)**
34:19;45:12;
206:6,9,10,15,24;
207:9,17;208:2,3;
218:14,22,23,24;
276:3;376:4;419:20
**followed (4)**
45:14;207:6;
276:4;364:17
**following (4)**
25:10;28:2;54:19;
218:3
**follows (3)**
5:19;22:5;394:4
**foot (1)**
182:10
**force (1)**
3:15
**forget (1)**
197:7
**form (11)**
3:10;15:10,11,23;
16:13;107:22;
108:11,15;258:10;
283:15;287:15
**formal (2)**
245:15;454:2
**formed (18)**

40:17;42:12,15,21;
43:14;44:8,22;46:5;
47:5,20;105:12,24;
108:7,20,25;109:19;
114:6;238:4
**forms (1)**
40:16
**forth (15)**
20:9;22:6;23:20;
43:24;87:13;157:17;
245:22;246:15;
263:14;319:24;
348:22;351:16;
358:25;380:24;
386:11
**forward (5)**
50:19;51:3;295:5;
343:10;459:6
**forwarded (2)**
183:2;300:12
**Foster (14)**
272:2,3;273:18,22;
279:11;280:19;
281:7;297:4;301:17,
21;313:12,13;
382:22;383:5
**found (8)**
24:25;75:4;
101:19;292:21,24;
362:16,21;455:16
**four (16)**
18:10;21:2;
128:12;149:7;180:5,
23,24;213:19;
263:10;291:25;
294:15;296:9;
328:13;369:5;
404:24;438:13
**fragment (2)**
125:4;128:23
**frame (2)**
450:20,21
**Frank (7)**
4:4;5:22;59:4;
202:12;311:3;
471:23;472:5
**fraudulent (1)**
297:10
**frequenting (3)**
116:13;195:21,21
**friction (1)**
436:14
**Friday (3)**
199:7;458:9;
460:19
**friend (1)**
271:5
**friends (1)**
189:3
**friendship (1)**
188:25
**frivolous (1)**
441:21

**front (6)**
189:10;242:19;
275:20;410:11,21;
426:11
**fulfill (1)**
267:17
**full (8)**
205:18;270:22;
271:21,22;387:24;
388:5,7;439:21
**full-time (2)**
66:24;124:16
**functions (1)**
311:11
**fundamentally (1)**
84:2
**fundraiser (3)**
99:24;100:2,4
**funny (2)**
61:9;388:20
**FURTHER (18)**
3:8,12;47:15;68:3,
5,15,18;69:7;70:10,
12;295:14;298:2;
343:8;361:23;362:2;
417:19;471:2,14
**furtherance (1)**
22:13
**futile (3)**
450:4,9,13
**future (2)**
310:20;448:7
**fuzzier (1)**
371:20

## G

**Gary (55)**
88:8,24;90:23;
93:3;97:13,17,22;
98:9;108:18;125:13;
130:4;221:19;223:3,
6,16;231:2;232:11,
17;233:4;234:16,22;
235:7;236:15;
238:14;246:4,22;
253:16;254:21;
255:3;256:11;262:5,
6,8;380:9,12,13;
414:15;417:16,21;
418:10,11,19;419:3,
5,9,13;420:7,23,25;
421:7,13,21;426:12,
15;436:16
**gave (34)**
105:19;135:16;
136:11;156:21;
175:16;176:18;
207:11;220:21;
230:15;231:5;
233:21;234:14;
236:15;256:18;
272:25;280:6;

282:15;288:21;
301:21;304:2,6,25;
324:25;327:25;
347:14;348:8;
371:11;372:24;
373:4;385:9;414:6;
434:17,21;442:19
**gem (1)**
330:3
**generally (5)**
104:19;144:22;
174:24;404:22;423:6
**generically (4)**
193:2;231:19,20,
21
**gentleman (2)**
268:2,15
**gentlemen (1)**
195:12
**gentler (5)**
371:2,21,21,22;
372:13
**George (119)**
5:2;8:23,25;24:12,
17;30:19,24;31:3,14;
34:4;40:22;44:12;
48:7;49:15;57:2,4,8,
19;58:6;59:24;60:2,
7,12;61:4;62:23;
85:16;86:12;87:15;
99:23;105:13;
115:18;125:14;
135:16;136:8;
143:17,18;148:9;
149:17;166:15;
170:24;171:6;
188:23;190:13,14;
194:25;209:5;212:8;
218:9;220:19;
230:15;232:7;256:7,
11;273:21,25;275:8,
10,22;281:15;
289:22,25;290:6,10,
24;291:9,13,17,20;
316:6,15;326:18;
329:4,17,21;330:8,9;
331:20;332:6;335:3;
339:9;343:20;344:4;
349:13;380:17;
390:22;391:2,4;
401:16;407:2;
408:13;409:10;
412:5;414:16;415:8;
432:22;433:9,13,19;
434:17,21;435:2,7,
14;436:2,25;437:4,7,
9,14;439:20;445:15;
446:4,8;451:17;
452:15;453:2,11;
469:9;470:2
**George's (1)**
220:18
**Gerden (5)**

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

261:17,18,22;
262:3,8
**gets (2)**
216:8;311:10
**Gilbert (17)**
138:22;139:5;
141:2,17;142:6,12,
14,19;143:15;145:2;
153:15;155:15;
168:16;170:24;
171:9;336:13;468:6
**Gilly (2)**
4:20;75:4
**girls (1)**
330:7
**Given (16)**
103:13;154:14;
155:20;233:17;
242:12;267:25;
268:11;278:6,19,19;
298:10;301:15;
361:18;362:11;
453:18;461:24
**gives (2)**
276:25;277:2
**giving (9)**
43:6;154:19,22;
155:4,12;305:5;
400:11,24;434:25
**glass (3)**
200:16;399:8,10
**glasses (1)**
399:7
**glazing (1)**
328:5
**glowing (1)**
311:22
**God's (1)**
388:21
**goes (9)**
82:21;143:22;
220:22;224:25;
271:13;295:13;
342:13;373:4;415:3
**gonna (4)**
202:16,24;203:22;
323:12
**good (29)**
75:11;84:22;
91:18;186:20;
201:15;212:9;
267:11;274:18,19;
278:7,19;298:16,17,
21,22,23;300:25;
301:5;306:7;312:2,9;
333:10,12;383:15;
392:14;413:14;
414:12;430:3;450:21
**goods (1)**
311:10
**GOODSTADT (329)**
4:19,20;6:6;7:11,
17;9:22;10:19;12:9,

12;13:11,17,22;14:3,
6,10,20,24;15:6,12,
19,24;16:6,9,17;
17:10;18:14;19:2,17;
21:4,16;22:20;23:11;
26:3,24;27:3,10,22;
28:4,14;31:17;36:19;
38:11,21;40:13,19;
41:19,21;42:6,16,24;
43:17;44:10,25;46:7;
47:8,22;49:8;51:17;
52:3,12;53:3,7,13;
54:2,8,14;56:5,13;
59:4,8;60:17,20;
61:13,22;63:8,14;
64:13;65:24;66:15,
21;69:8;72:12,18;
73:2,5,13,17,25;
74:7;75:5;76:6,8,22;
77:8,17,21;78:10;
82:3,7,13,17;83:2,7,
13,17,23;84:4,8,20,
25;85:17;96:19;97:3,
24;98:21,25;104:12;
106:24;115:10;
119:3,7;121:22;
123:4;124:5;126:13;
127:13,17;129:16;
130:7;132:24;
134:12,14,16;139:7;
145:25;146:4,6;
149:23;151:8,21;
152:2,7,11;156:7,12,
17,19;160:9;162:7;
164:15;169:13;
173:19;177:24;
194:5;195:14;
196:14;201:8,11,14;
210:20;215:8;
222:20;234:5,12;
240:6,14,24;242:4,6,
11;243:17;244:9;
247:8,14;265:17;
266:4;278:9,21,23;
292:11;294:20;
296:11,13,16;
297:16;298:15,19;
301:9,13;310:22;
311:21,24;312:12;
313:5;322:4;325:23;
330:21;333:3;
334:20;338:5;339:5;
342:8,24;343:4,22;
344:21,23;345:4,19;
349:8,25;351:4,13,
15,19;352:8,10;
353:23;354:7,19;
355:12;357:15;
358:2,7,11,19;359:9;
361:22;362:3,19,25;
363:19,24;364:14,16;
365:2,12;366:18;
378:15;379:23;

390:19;391:21;
392:12;394:16,23;
395:4;399:4;405:2,9,
22;409:19;413:20,
23;421:14;423:11;
424:19;430:8;
431:12;432:3;435:4,
10,21;438:7,22;
439:16;442:4,20;
443:5,11,15,22,23;
445:17,20;446:18,
22,24;447:2,14,17,
20,23;448:12,16;
449:2,6;456:19;
457:13,19,24;458:3,
16,20;459:9,13,19;
460:2,5,8,22;461:4,7,
13,17,22;462:2,6,16,
20;463:10,21;464:5,
10;465:2,12,17;
466:4,10;467:14,15,
21;468:15,18;469:2;
470:7,11,25;471:15,
19
**Goodstadt's (6)**
17:9,11,12,15;
72:23;74:10
**Googled (1)**
75:2
**gotta (5)**
201:25;202:18,19,
20;414:2
**governing (1)**
359:4
**government (1)**
147:5
**governmental (4)**
394:10,12,22;
395:3
**grabbed (1)**
415:2
**graduated (1)**
311:7
**Graff (2)**
462:22;463:15
**grand (6)**
154:14,19,22;
155:4;158:9,18
**Gray (2)**
5:5,5
**Great (4)**
33:10;46:15;47:3;
383:19
**greeted (1)**
91:9
**grounds (4)**
76:17;83:16,17;
363:8
**group (4)**
137:14;147:5;
369:2;431:20
**guarantee (2)**
462:5,9

**guard (2)**
428:2;429:10
**guard's (2)**
310:9,14
**guess (6)**
9:24;80:12;
156:13;218:5;
330:23;467:11
**guilty (18)**
237:4,8,19;238:4;
239:21;240:12;
241:3;242:22;243:4,
11,14;244:8,24,25;
246:18,20,22;247:3
**guy (6)**
262:5,7,9;278:11;
279:11;281:4
**guys (13)**
65:8;94:23;96:6;
182:6,7;195:2,8;
202:17,18;373:25;
410:20;419:12;
422:15

# H

**Hal (1)**
100:18
**half (3)**
399:18;458:17;
460:12
**halfway (2)**
447:7,7
**hall (2)**
99:5,9
**Halloween (70)**
100:18;101:11,21;
102:2;103:15;107:4,
7;119:22,24;120:4,
11;122:7;123:24;
125:5;126:7;127:5,6;
128:8,9,18;134:24;
138:18;139:4;
140:11,14,18;
141:16,22;142:4,12;
143:15;149:18;
150:5,13;154:25;
155:5;171:9;175:23;
176:12;209:2,8;
210:2;212:11;
219:14;231:20;
232:4;240:3,10;
248:7,12;253:17;
259:10;261:24;
320:15;321:4,23;
322:2;326:3;380:7,
10;396:12;412:6,23;
414:5;415:10;
416:11;417:17;
426:5,7,16
**hand (4)**
202:13;328:15;
330:11;412:22

**handcuffed (1)**
153:25
**handed (1)**
220:19
**handle (2)**
182:24;355:21
**handled (6)**
24:15;193:24;
232:25;395:12,13;
445:12
**handles (1)**
147:5
**handling (1)**
25:3
**hands (2)**
136:8;329:19
**handwriting (1)**
317:5
**hanging (5)**
102:15,18,22,25;
331:12
**Hank (2)**
135:5,7
**Hank's (1)**
135:12
**happen (5)**
283:7;462:9,24
**happened (89)**
24:9;47:16;60:6;
94:14;129:13,24;
130:14;131:2;
135:12;147:25;
148:12;151:19;
167:11,13;169:25;
171:24,25;175:11;
183:13;188:4;
200:22;201:6;
206:14,16,17;
208:14;210:8;211:3,
16;212:7,25;215:19,
23;216:3,14;217:14;
220:14,20,21,25;
221:14,16;224:24;
231:22,23;244:22;
251:8;255:15,16;
257:8,24;258:5;
261:23;273:5,15;
276:10;279:17;
293:17;299:2;
302:20;303:6,16;
304:11,19;305:18;
312:13;320:18;
323:2;324:18;
347:21;375:8,17;
383:14,16;384:5;
396:13;408:24;
409:21;410:9;
412:18;413:12;
414:11;417:19;
420:12,14;423:4;
445:24;465:6;466:13
**happening (3)**
111:4;279:22;

Min-U-Script®

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

372:9

**happens (2)**
193:6;330:6

**happy (5)**
15:17;67:25;
71:20;386:18,21

**Harbor (7)**
284:18,20,21;
285:13,13;286:5,8

**hard (2)**
388:2;455:16

**Hardman (4)**
99:24;129:4;
130:2,4

**harm (2)**
353:8,16

**Harrigan (9)**
112:25;113:5,7;
271:5;279:3,13,15;
280:16,17

**H-A-R-R-I-G-A-N (1)**
113:3

**hasheesh (1)**
178:20

**Hatter (1)**
5:6

**hazard (2)**
107:20;117:13

**head (6)**
229:5;284:18,20;
285:12;286:5;321:23

**Health (6)**
55:11;332:3;
388:14;393:2,2,8

**hear (8)**
61:20;91:16;
206:17;245:4;340:6;
367:19;433:10;471:6

**heard (17)**
97:8,17;206:14,22,
23;245:2;288:23;
318:6;420:18,19;
422:21;423:4;
424:12,13,16;434:2;
444:21

**hearing (1)**
26:7

**Hegermiller (1)**
284:12

**held (2)**
428:17,20

**hello (3)**
91:10,12,15

**help (13)**
175:17;176:20;
203:4,9,17,20;
280:21,22,25;281:3;
408:25;448:11;459:9

**helps (1)**
178:2

**HEREBY (2)**
3:2,6

**here's (3)**

30:14;231:13;
400:25

**hereto (1)**
3:4

**hero (1)**
89:24

**Hesse (451)**
4:24;5:2;8:23,25;
22:6,17;23:8;24:13,
17;30:3,19,24;31:3,
14;32:14,19;34:5,15,
25,25;35:8,24;36:11,
17,23;37:2,4,13,20;
38:7,17;39:3,18;
40:22;42:11;44:12;
45:22;46:19;47:4,19;
48:7,21;49:2,6,12,15,
24;53:24;57:2,4,8,
19;58:6;59:24;60:2,
7,13;61:4;62:8,11,
23,24;63:6,18,19;
64:2,3,5,16,20,21,24;
65:8,11,11,19;66:8;
67:13,22;70:14;
85:10,16;86:12;87:6,
15;99:23;105:13;
109:5;110:8;115:18;
118:12,17,21;
119:10;120:16;
123:23;124:11,19,
23;125:14;126:25;
127:3,11,15,20;
128:24;129:24;
130:5,22;132:2,6,11;
134:4,20;135:2,7,9;
136:8;143:17,18;
148:9,17,19;149:17;
161:14;166:15;
168:4;169:8,14,15,
15,20;171:7;174:17;
175:8,24;176:2,9,11,
13;180:24;186:24;
187:4,6,25;188:17,
20,23;189:6,8,13,20,
25;190:4,10,13,15,
16,18;191:2,7,11,24;
192:9,25;194:23,25;
195:23;196:5,6,7;
197:18;198:11,13,
21,24;209:5,24;
210:6,7,13,17;
211:13,15,18,22;
212:3,14,19,22;
213:9;214:17,19,20,
22,23;215:10,17,24;
217:5,8;218:16;
219:3,9,17,23,25;
221:5,8;230:15;
232:7,23;252:6;
256:18;257:6,15,23;
258:18;268:18;
269:4;272:21,25;
273:3,17,21;274:2,7,

11,17,25;275:8,11,
22;276:13,18;
277:12;278:5,18;
279:10;281:15,20,
25;282:7;289:22,25;
290:6,10,25;291:9,
13,17,20;292:14,19;
293:2,7,13,22;294:2,
6,10,17;295:7,11,20;
296:25;297:7,22,25;
298:7,24;299:2,3,12,
25;301:2,16,19;
303:25,25;304:5,25;
305:3,12,13,24;
306:4,20;312:25;
313:3,16,19,24;
314:6,8;316:15,18;
318:8,14,18;319:6,
12,24;320:16;
321:19,25;322:3,16;
324:6,19,25;326:5,
18;329:4,17,21;
330:8,9;331:20;
332:6,16;333:17,18,
20;334:15;335:4;
338:2,7;339:2,9;
341:5,8;342:18;
343:11,18,21;344:4,
5,12;345:6,13;346:3;
348:23;349:13;
350:16;351:11,25;
352:13;353:7,14,15;
360:19,21;361:6,18;
366:7;367:9,19,23;
368:20;369:16,16;
370:6;371:11;372:4,
11;373:22;375:3,5,
10,20;377:4,6,25;
378:6,9,12,13;
379:10,17;380:8,8,
17,23;382:17;383:9,
19,21,25;384:9;
385:9,16,23;386:10;
389:13;390:22;
391:3,4,9,11,13,13;
401:17;402:5,7,8,11;
403:6,21;404:10,12;
405:5,5,19;406:13;
407:2;408:13,15;
409:10;412:2,5;
415:8;432:22;433:9,
19;434:17,21;435:2,
8,14,17;436:2,25;
437:5,7,9,14;439:20,
24;440:5;445:15;
446:4,8;451:17;
452:15,17;453:2,11;
469:9;470:2;471:9

**Hesse's (15)**
35:12;36:3,5,7;
38:8;256:8,11;
298:10;316:6;
325:13,22;349:11;

363:16;364:17;
433:14

**Hey (3)**
202:24;312:8;
336:4

**high (1)**
264:23

**highest (4)**
197:23;276:25;
277:2,7

**highly (1)**
32:17

**himself (8)**
212:10;232:23;
239:17;308:17,20;
311:12;341:9;352:17

**hint (1)**
315:10

**hire (10)**
51:5,5;68:9;70:21;
196:15;271:16;
289:11;349:20;
352:17;456:23

**hired (17)**
113:11;134:7,9,10,
15;149:20;152:15;
171:23;196:20,21,
24;197:2,16;289:13;
290:17;371:10;
372:17

**hiring (8)**
50:11;51:9,16,20;
52:2,11,17,24;53:6,
11;54:7;58:16,16;
70:2;284:17;286:3,5,
17,22

**history (8)**
297:24;298:4,10;
299:22;300:2,3,5,9

**hit (8)**
241:21,24,25;
242:20;256:14;
262:5,6,9

**Hold (15)**
43:12;68:24;81:7;
96:19;122:4;162:25;
163:11;168:22;
220:15,16;253:12;
284:19;405:18;
408:19;431:7

**holder (1)**
50:17

**holidays (1)**
311:14

**home (5)**
135:5;202:20;
407:19;412:4;413:4

**hon (1)**
189:15

**honest (9)**
39:6;80:2,23;
125:6;297:18;
354:23;388:22;

408:6;444:21

**hope (5)**
91:24;92:10,19;
154:13;459:25

**hopefully (1)**
416:2

**hourly (1)**
9:20

**hours (8)**
21:14;209:11;
255:11;311:13;
343:16;404:24,25;
448:13

**house (9)**
25:12;26:7;
139:13;142:22;
169:24;170:22;
330:5;331:21;407:12

**Houser's (1)**
417:17;422:8,18

**Hubbs (3)**
284:11;288:21;
289:10

**hung (2)**
273:13;281:7

**Huntington (6)**
284:11,14;285:9;
288:16;289:9;
294:12;296:6;301:11

**I**

**Iacopelli (1)**
143:2

**Ian (7)**
224:18,21,24;
225:6;226:13;231:3;
235:21

**ID (5)**
48:10;267:16;
277:25;370:17;
437:24

**idea (14)**
37:18,23;49:21;
53:23;54:4,11;75:11;
97:13;273:19;
277:20;318:16;
319:11;392:14;
418:16

**identification (3)**
21:10;307:25;
315:17

**identified (2)**
251:19;308:20

**identify (11)**
266:20;358:9;
391:18;392:11;
435:12;437:3;
457:10,16;458:10;
464:21;465:25

**identifying (4)**
239:17;308:16;
391:19,22

FRANK FIORELLO
February 20, 2009

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 139 of 158 PageID #: 2509

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**IDs (2)**
148:8;277:20

**ill (2)**
181:11,11

**illegal (6)**
297:11;301:24;
332:25;446:11;
452:15;453:11

**imagine (2)**
352:23;389:8

**imbibe (1)**
336:22

**immediate (2)**
402:9,11

**immediately (2)**
61:4;68:20

**implicating (1)**
414:15

**important (6)**
18:11,22;205:19;
206:13;215:7;295:19

**imposes (1)**
26:20

**impossible (2)**
170:25;412:16

**impression (1)**
328:2

**improper (5)**
394:10,12,22;
395:2;442:10

**improperly (1)**
395:13

**incident (93)**
101:12,21;102:2;
103:15;107:4,7;
119:22,24;120:4,12;
122:7;125:6;126:7;
127:5;128:18;
134:24;138:20,22;
139:2,5;140:2,11,14,
18;141:2,16,17;
142:5,6,12,14,19;
143:16;145:2;
153:16,19;168:16;
171:9,10,10;174:17;
189:9;191:18;
207:22;209:2,8;
210:3;212:12;215:9;
230:12,22;231:20;
232:5;237:5;240:3,
10;247:11;248:7,12;
252:2;253:17,24,25;
255:20;256:17;
257:14;259:10;
260:25;261:24;
273:4,6,8;313:15,17,
20;320:16;321:4;
322:2;327:2;336:13;
380:8,11;398:21;
408:23;415:11;
416:11,14;417:14,
20;426:6,7;468:7,7

**include (4)**

116:16,20;117:2;
349:23

**Including (9)**
35:16;85:5;119:3;
263:16;320:5;
336:21;359:14;
366:9;368:8

**Incorporated (1)**
4:6

**Incorrect (2)**
309:21;437:19

**inculpate (1)**
379:6

**indicate (3)**
288:24;342:4;
442:2

**indicated (3)**
51:22;144:8;289:3

**indicates (2)**
343:19;458:24

**Indicating (10)**
20:21;21:23;64:7;
137:19;328:9,19;
340:21;352:20;
370:5;399:11

**indication (1)**
353:2

**indictment (3)**
99:24;100:2,3

**indignity (1)**
389:11

**indirectly (1)**
110:2

**individual (18)**
10:10;11:14;
53:16;174:3;239:22;
240:12,13;241:20;
242:20;264:2;
243:22;342:10,12,
15;331:14,23;334:8;
359:18

**individuals (6)**
224:9;234:14;
251:23;266:10;
331:4;333:13

**inferred (1)**
156:20

**influence (1)**
355:22

**Influenced (1)**
320:2

**inform (2)**
442:18;451:15

**information (23)**
50:9;51:12;52:15;
157:17,21;184:19;
205:15;241:17;
283:12;285:8;289:2;
294:24;299:7,14;
301:20;311:19;
336:16;427:4,23;
434:17,25;437:8,19

**informing (1)**

453:17

**ingested (2)**
178:17;184:21

**initial (7)**
144:23;249:10;
416:21;417:14;
418:3;419:22;421:17

**initially (12)**
55:7;75:17;
142:21,22;148:3;
171:23;198:17;
258:7;259:19;
345:20,24;364:7

**injured (1)**
353:21

**injuries (2)**
354:3;357:5

**injury (9)**
353:25;354:16,21,
22;355:4,8;357:4,12,
16

**innocent (2)**
379:6,8

**inquire (6)**
102:4;207:19;
273:20;279:9;
285:11;421:12

**inside (9)**
129:9;199:14;
225:5,16;229:3;
251:8;369:16;
424:21;425:8

**instance (2)**
363:20;391:24

**instances (8)**
85:7;87:3;105:20;
129:12;136:18;
162:18;404:23,24

**instead (5)**
71:4;116:13;
157:17;194:23;
400:12

**instruct (8)**
76:16;77:17;
78:11;82:4;83:14;
249:7;350:8;467:23

**instructed (2)**
15:13;409:12

**instructing (4)**
16:10;82:16;83:3;
84:18

**instructions (1)**
363:16

**instructor (3)**
110:21;111:8,11

**insurance (4)**
388:15;393:2,3,8

**intact (1)**
250:2

**intent (13)**
40:11,17;42:12,15,
21;43:15;44:8,22;
46:5;309:18;454:14;

459:2,5

**intention (1)**
464:18

**intentionally (2)**
297:8;365:8

**interact (1)**
280:20

**intercourse (1)**
469:20

**interest (2)**
189:5;297:2

**interested (12)**
47:18;71:25;91:4;
191:20,23;200:6;
292:23;293:23;
294:3,7,11;340:7

**interesting (1)**
13:24

**interfered (7)**
297:8,22;298:11,
24;301:2;318:18;
319:13

**Interference (1)**
262:22

**interfering (3)**
298:7;326:10,19

**interrupt (3)**
141:8;439:7;
459:11

**interrupted (4)**
447:18,18,20,21

**interrupting (2)**
447:15,16

**intersection (1)**
408:17

**interview (25)**
197:5,15,18;
264:18,20;265:5;
266:23,24;269:22,
23;270:5,13;271:24,
24;272:4,7,10,16;
287:10;288:3,14,17;
313:18;317:22;
453:24

**interviewing (5)**
256:8;270:20;
281:17,21;282:2

**intimate (1)**
60:13

**intimidate (3)**
190:24;462:21,21

**intimidated (5)**
190:10,12,14;
463:6,13

**into (20)**
30:25;33:20;77:6;
153:25;171:13;
174:19;202:18,23;
203:15;205:10,20;
207:3;210:5;220:17,
17;279:10;310:25;
332:12;369:6;450:4

**intoxicating (1)**

336:23

**introduce (1)**
4:18

**invest (1)**
362:12

**investigate (3)**
361:24;362:2;
364:14

**investigated (3)**
101:20,25;416:12

**investigating (5)**
152:24;157:10;
158:4,11;365:10

**investigation (16)**
158:19;212:8,18;
220:2;232:24;
241:20;256:20;
299:15,17;300:6;
416:22;417:14,23;
418:3;419:23;421:17

**investigations (6)**
156:24;157:5;
240:17;241:12;
299:6,21

**investigator (5)**
143:2;212:11;
303:13;348:6,9

**invitation (2)**
135:10,16

**invited (1)**
130:14

**involved (40)**
36:13;37:21;
93:15,17;168:11;
170:23;227:23;
233:5;242:14;
251:20;252:2,7,13,
18,21;253:3,16;
254:22,25;255:4,20;
256:9,14;273:2,3,7,
8;313:15,17,20;
346:3;380:14;419:5,
14;420:4,24,25;
436:3;440:24;452:17

**involving (15)**
142:3;153:7,15,19;
154:9;158:9;209:2;
220:2;253:9;290:4;
297:23;327:12;
343:18;360:8;415:10

**Iraq (1)**
135:6

**irrelevancy (2)**
15:14,23

**irrelevant (3)**
15:3,9;16:13

**Island (17)**
74:20;75:10,12,16;
109:25;110:12;
112:14,24;123:10;
229:8;250:21;
252:12;374:2;
389:24;418:20,23;

Case 2:07-cv-01215-SJF-ETB Document 145-18 Filed 01/15/10 Page 140 of 158 PageID #: 2510

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

419:24
**Islip (2)**
263:19;312:17
**issue (39)**
28:7,12;54:13;
55:25;77:2;108:9;
109:3,21;110:14;
111:22;112:16;
118:14;120:14,22;
122:9,21;123:16;
138:14;152:17;
154:24;162:23;
165:13,20,23;166:8;
176:3;177:11,20;
311:14;323:16;
334:17;353:4;
380:18;392:25;
395:18,20;396:3,21;
397:6
**issued (10)**
48:10;148:8;
322:9,24;323:7,18,
20;325:3,4,10
**issues (22)**
138:14;152:18;
153:7;157:9;158:3,
10;159:8;160:5,16;
163:17,20,25;164:6,
13,21;169:4;174:11;
177:5;190:6;390:3;
396:5;403:5

**J**

**jacket (3)**
370:18;373:4,5
**Jaegger (13)**
223:20,22;224:4,7;
226:5,9;231:4;
233:20,23;234:3,10;
235:14,18
**Jaegger's (1)**
231:4
**Jane (10)**
112:25;113:8,8;
271:5,10;279:3,16,
16;280:15,17
**January (7)**
159:21;160:2,14;
168:3;346:18,21,25
**Jeannie (5)**
224:3,7;226:5;
234:10;235:18
**jeopardy (3)**
331:19;335:2;
408:8
**Jesse (4)**
138:20,25;139:3,
11
**job (68)**
9:11,14;29:2,8,21;
30:12,16,17;31:13;
32:14;39:22;46:23;

70:5;71:3;72:2;
102:19;103:3;
171:15;172:18,25;
173:12,18;189:15,
22;191:5;233:2;
265:6;266:23;
267:10,13;268:16,
23,24;269:7;270:17,
25;280:7;283:3;
289:14;293:11,14;
306:3,15;310:7,21;
313:7;314:17;
315:23;318:9,15,19,
22;319:4;331:18;
333:16;347:5,8,17,
20;363:17;382:11;
386:20;393:10;
408:8;411:10;
428:24;436:15;456:5
**jobs (19)**
173:2,18;266:20;
269:10,13,19;
282:19;302:9,10;
312:24;314:4,21,25;
319:7,13;346:21,25;
396:14;428:10
**Joe (67)**
33:21;34:4;55:10;
63:2;88:17,19;89:11;
90:17;91:16;92:13,
16,16;93:7,10,18;
95:10;98:6;100:12,
16,17;104:2,6;
105:25;106:9;
148:14;168:12;
170:6;216:21;261:9;
283:17,23,25;284:4;
303:14,16,21,21;
304:7,9,9,12,13,13,
16,18,21,24;305:18;
312:15;329:10,11;
338:9;343:6;345:6;
373:9,11;374:12,20;
384:9;385:6,10,11,
13;429:20;430:11;
436:19,19
**Joe's (1)**
304:15
**jog (3)**
176:20;177:10,23
**John (6)**
99:20,21;256:19;
409:10;410:11;
411:16
**joined (3)**
49:5,11;346:6
**joining (1)**
49:13
**joke (1)**
461:17
**Jonathan (1)**
206:19
**Joy (1)**

303:17
**Jr (2)**
88:19;179:21
**Judge (22)**
76:25;77:15,16;
237:17,22;238:5;
240:4;242:19,19;
243:22;244:6,19,19,
23;245:12,19,22,25;
246:3,15,16;323:14
**July (10)**
78:17;90:9,10,12,
15;95:16,16;103:18;
107:13;428:15
**jumping (3)**
446:20;447:8,11
**June (15)**
69:21;78:20,22;
79:14;80:6;81:25;
263:24;266:11,21;
269:8,12,17;315:10;
428:15;457:4
**jurisdiction (6)**
326:12,21,24;
327:7;334:9,10
**jury (27)**
42:19;43:7,10,18;
44:7,19,21;51:13;
55:24;154:14,19,22;
155:4;158:9,18;
222:7;233:19;
246:10;249:21;
298:23;332:24;
334:13;345:17;
353:19;354:3,15;
357:23
**justice (5)**
85:8;87:4;105:3;
136:18;320:5

**K**

**keep (9)**
56:11;57:21;58:9;
60:15;61:9;107:24;
250:2;278:12;387:7
**keeping (5)**
23:16;56:19;
127:3;129:17;130:8
**Ken (1)**
4:24
**Kenneth (1)**
5:5
**Ken's (1)**
201:12
**kept (2)**
127:22;134:13
**Kevin (40)**
5:2;33:21;34:4;
63:2;99:19,21,22;
125:8;130:20;
135:11,12;148:14;
261:3;312:15;

338:11;343:6;345:6;
373:10,12;374:12,
20;375:23;376:20,
22,23;377:11;
378:11,20,23;
380:16,19,22;381:2,
10,23;425:7,9;
429:20;430:10;
436:20
**kicked (2)**
239:5;246:3
**kid (1)**
179:19
**kidding (1)**
201:23
**Kind (2)**
368:5;393:14
**kinder (5)**
371:2,21;372:12,
13,13
**Kinko's (1)**
412:8
**kit (1)**
363:3
**knew (24)**
58:6;59:22,25;
89:2,9;95:4,4;
103:21;204:25;
205:4;227:4;228:12;
251:4;252:20;253:3;
296:25;318:14;
319:7;355:19,20;
396:25;401:18,24;
434:6
**knocked (1)**
239:12
**knowingly (2)**
334:23;365:8
**knowledge (61)**
18:25;20:8,14,18;
40:4;41:22;51:24;
52:9;60:12;62:16;
63:5,10,23;64:8;
96:24;97:15;133:10;
208:7;225:20,24;
226:3,4,7,8,11,12,20;
230:3,6;231:11;
237:15,20,24;
268:22;291:16,20;
292:14;294:17,21;
295:7,9,10,11,21;
296:8;308:19,22;
318:13,17,20;319:5,
18;338:6;353:7,15;
359:17;401:5;
416:16;424:18;
434:24;436:3
**known (13)**
56:23;84:17;
246:4;291:3;326:11,
15;330:22;333:22;
396:25;426:18,22,
24;470:13

knows (3)
300:11,14;465:20

**L**

**Labor (4)**
11:4;133:18;
180:12;411:21
**laced (1)**
178:17
**lack (1)**
33:4
**Lamm (41)**
33:21;50:4;54:20;
67:10;85:3;99:19;
125:8;130:20;
148:14;159:6;
216:22;226:22,25;
227:7,25;228:13;
238:13;248:10;
249:7,14;250:5;
261:3;338:11;343:6;
367:15;368:9;
375:10;380:16,22;
381:6,10,23;416:19,
23;417:4;418:18,25;
419:13;420:6;
424:24;436:20
**Lamm's (1)**
417:13
**language (2)**
263:3;317:19
**last (22)**
12:17,19;46:17;
131:20;174:13;
180:2,4;196:2;
202:15;203:6;
213:22;249:22;
260:22;297:18;
374:3;384:13;397:9;
410:2;422:3;454:13;
460:11;462:22
**lasted (2)**
196:3,4
**late (2)**
133:7;428:15
**later (12)**
69:3,3,4;135:12;
151:13;170:12;
171:14;220:4,14;
228:4;420:23;436:12
**laughed (1)**
205:8
**laughing (4)**
61:11,15;201:12;
203:6
**law (75)**
5:6;17:9,11,12,15;
24:7;26:20,25;27:2,
4,5,24;39:5;56:10,
18;72:23;74:10;
75:19,25;78:4,6,9;
79:8,23;80:15,17;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 141 of 158 PageID #:
2511

FRANK FIORELLO                                                    EDWARD CARTER, ET AL. vs.
February 20, 2009                                  INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

81:8;84:11;145:20;
146:4,7,8,21;249:22;
262:23;282:19;
283:8;302:10;
306:14;312:23;
313:8;314:4,17,20,
24,25;318:23;319:8,
9,16,17;322:22;
334:4,15;346:21;
347:2;348:19;
357:21;359:4,11,16;
360:2,22;361:2,7,9,
12;363:15;366:4,14;
385:22;393:24;
394:8,12,19

**Laws (10)**
26:22;27:8;28:2,
20;336:6;359:3,6;
364:24;403:8,23

**lawsuit (6)**
18:9;237:23;
317:10;344:9,11;
345:15

**lawyer (24)**
56:4,6;139:15;
151:4,7,11;244:23;
245:13,22,23;
246:16,16;295:2;
350:7;455:20;
456:11,14,24;
465:16;467:2;
468:17,19;469:3,4

**lawyers (6)**
77:23;78:4,5;82:8,
9;350:5

**lead (1)**
212:11

**leader (1)**
388:17

**leads (2)**
24:20;378:12

**league (1)**
330:25

**learn (10)**
74:9;99:16;
253:21;254:21;
255:3,13;272:9;
276:24;434:4;469:8

**learned (4)**
97:22;99:12;
254:25;272:13

**least (27)**
26:9;34:24;35:10,
11,12;36:21;40:21;
58:20;71:2;72:2;
140:3;224:6;238:11;
241:6,15;251:22;
274:9;277:14;
294:15;300:23;
361:4;385:14,17;
399:18;426:24;
441:2;463:5

**leave (4)**

116:11;369:18;
374:2;421:2

**leaving (7)**
229:8;250:21;
252:11;316:22;
317:7;373:3;405:20

**led (5)**
25:13;33:13;40:2;
439:13;440:11

**left (22)**
69:9,10;103:11;
143:7;144:21;170:9;
184:14;206:5;
207:11;228:8,11;
233:9;290:21;352:2,
5;355:7;373:10;
375:18;398:2;
415:14;417:2;424:17

**leg (12)**
72:16;73:9;440:2;
442:22;450:15;
452:11;455:16;
458:25;465:14,24;
466:14,17

**legal (22)**
4:14;100:5,6;
351:20;358:3,4,11,
15;394:17,18;
454:16,20,24;
457:10,12,18;
458:14;464:20,24;
465:9;466:3,8

**legality (2)**
394:18,21

**legally (1)**
185:12

**Legislative (5)**
115:4;118:9;
159:15;160:23;
163:19

**legislature (2)**
165:25;260:8

**legitimate (1)**
379:16

**lesbian (2)**
434:3,5

**less (6)**
144:9;168:25;
275:25;276:2,14;
298:20

**lessen (1)**
120:13

**Leto (1)**
4:15

**letter (41)**
48:6,12,19;148:4,
7;163:23;164:4;
167:7;274:6,8;
277:18;283:11;
306:25;307:2,4,6,10,
14,14,16,17,23;
308:3,13,24;309:3,
17,23;310:3,11,12,

16,19,25;311:2;
312:18;317:17;
429:9;453:17,19,25

**lettering (1)**
263:11

**letters (2)**
109:12;451:11

**letting (1)**
370:13

**level (1)**
41:11

**Levine (6)**
224:19,21;225:6;
226:13;231:4;235:21

**liar (1)**
266:5

**license (4)**
288:12;310:9,14;
429:10

**lie (6)**
143:23,24;215:3,
10;304:13,14

**lied (5)**
234:4,7;236:20,23;
304:15

**life (4)**
18:12;277:22;
279:23;280:3

**lifeguards (1)**
206:20

**light (1)**
410:14

**liked (1)**
274:25

**likelihood (1)**
265:4

**likely (1)**
265:2

**likewise (2)**
247:21;319:11

**liking (2)**
371:6,17

**limitation (4)**
263:17;320:6;
336:21;366:9

**line (15)**
25:25;26:8;
104:17;148:11,11,
18,20;149:4;161:19;
163:12;171:14;
367:10;368:21,25;
369:5

**lined (3)**
148:13;149:6,7

**lines (1)**
263:10

**lining (2)**
368:15,16

**Lisa (1)**
402:20

**list (5)**
174:10;264:3,4;
265:22;286:5

**listen (5)**
57:6;135:20;
268:10;273:11;336:4

**listened (3)**
275:4,5;276:17

**listening (1)**
177:21

**litigation (1)**
463:24

**litigious (3)**
381:13;383:22;
385:24

**little (17)**
7:24;27:19;85:13;
86:23;156:12;
168:25;169:2;
171:14;194:17;
195:20;279:24,24;
295:13;298:20;
310:3;328:18;465:5

**livelihoods (1)**
55:8

**LLC (1)**
9:18

**Lloyd (3)**
284:20;285:13;
286:8

**loaded (1)**
156:13

**location (1)**
428:9

**locations (1)**
428:11

**locked (1)**
184:25

**lockers (1)**
204:17

**Loeffler (68)**
88:2,6,16,17,19;
89:8,11;90:17;92:11;
93:7,18;95:2,8,10,
14;96:8,12;98:6,7,
18,19;99:8;100:12,
16,17;102:14;103:4,
7,11,14,18;104:2,7,
14;105:19;106:2,9,
17,20,23;107:8,14;
117:16;121:23;
122:6;123:24;137:2;
161:5;162:19,20;
165:4,19,19;252:16,
24;253:2,4;259:2;
350:15,23,25;351:8,
10;352:3,4,16;353:3;
397:15

**Long (19)**
74:20;75:10,12,15;
79:5,20;80:9;82:9;
109:25;110:12;
112:14,24;123:10;
152:6;161:19;196:3;
218:2;389:23;428:12

**longer (7)**

97:23;99:13,17;
268:13,23;280:5;
317:3

**longevity (1)**
396:6

**look (22)**
214:10;232:23,25;
262:18;263:10;
289:12;293:17;
310:23,23,24;312:8;
329:19;330:7;337:2;
341:24;381:8;
386:18;393:23;
408:14;417:12;
421:24;454:9

**looked (7)**
79:13;147:9;
204:6;231:23;
387:22,23;391:15

**looking (11)**
79:10;192:5;
279:10;289:15;
312:23;313:7;314:4;
337:5;379:24;380:3;
403:16

**looks (2)**
381:24;419:19

**loop (6)**
127:4,22;129:17,
20;130:8,11

**lose (3)**
189:15;191:4;
411:10

**loser (2)**
381:10,23

**loss (1)**
393:9

**lot (11)**
45:2;75:14;
161:20;199:19;
275:16;344:12,15;
391:7;432:23;
436:13;456:2

**love (1)**
464:10

**love/hate (1)**
275:10

**lunch (2)**
144:22;469:12

**lying (21)**
55:25;56:2;231:7,
8;234:10;235:7,14,
18,22,25;236:4,8,12,
16;238:5;240:2,4;
242:9,9;243:15;
308:19

---

# M

**Ma'am (3)**
455:3;465:5;
468:12

**madam (1)**

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 142 of 158 PageID #: 2612

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

308:4

**magic (2)**
307:22;315:13

**mail (1)**
148:4

**mailed (1)**
288:22

**Main (1)**
275:18

**Maintenance (1)**
9:18

**makes (3)**
21:24;413:24;
415:3

**making (18)**
24:22;29:16;86:3,
24;87:2;104:21;
110:3;138:5;164:20;
165:18;190:5,11,20;
191:12;327:23;
454:2;462:19;463:25

**Malafi (1)**
5:11

**male (3)**
74:19,19;327:21

**maliciously (1)**
297:8

**man (4)**
178:16;220:23;
375:20;378:14

**managed (1)**
412:21

**manner (2)**
22:10;231:24

**many (17)**
26:5;81:19;
132:12;142:24;
145:5,10;193:16;
371:6,16;372:19;
399:7,19;424:17;
429:6;432:16;
448:13;451:20

**March (6)**
21:3;47:23,25;
48:2;277:24;432:9

**Marine (3)**
340:14,15,16;
341:14;342:4

**marital (1)**
331:21

**Mark (4)**
5:3;21:5,8;315:12

**marked (4)**
21:9;307:24;
315:13,16

**married (2)**
427:5;434:9

**Mary (1)**
290:19

**Maryanne (9)**
34:5;35:16;49:15;
167:12;197:8;
434:22;437:6,9;

439:19

**masters (2)**
201:18;410:8

**matter (10)**
4:4;16:23;17:17;
18:12;39:13;45:24;
78:5;123:23;202:4;
283:18

**may (27)**
3:13;44:13;45:19,
20,22,22,23;69:21;
78:3;86:22;116:19;
161:18;182:14,14;
189:21;222:18;
223:3;252:7,12,17;
269:25;270:12;
298:11;311:7,9;
370:11;448:5

**maybe (20)**
7:24;31:23;32:16;
41:8;45:14;69:21,22;
70:17,21;131:5;
136:13;171:20;
270:7,7,8;288:11;
295:10;315:8;
324:13;404:24

**Mayor (36)**
87:23;88:21;91:3,
17,21,24;92:13;93:8;
94:22,25;95:24;96:8,
8,11,12;100:13;
117:9;122:12;
136:22;161:4;
162:15;165:4,6,8,12,
18;252:10;258:23;
335:9;350:15;351:2,
8,10,12,25;352:4

**McKenna (8)**
226:15;227:8,13,
20,23;228:2,12,19

**mean (57)**
14:25;21:7;45:8;
49:13;55:13;69:8;
81:5;101:10;103:3;
114:9;115:11;
118:20;126:19;
139:21;141:8;
155:24;169:14;
173:2;177:17;184:3;
185:9;187:25;200:2;
207:15;243:20;
252:5;278:11,15;
279:19;293:18;
306:9;321:3;325:6;
336:24;341:25;
342:3;343:2;349:9;
352:16;366:16;
374:22;379:9;383:6;
397:16;398:23;
399:3;400:21;
413:14;416:18;
421:16;427:2;430:7;
450:16;459:16;

460:20;462:4;467:16

**meaning (6)**
125:7;214:7;
409:9;430:9;438:12;
458:13

**means (5)**
231:17;297:11;
301:24;356:19;365:5

**meant (5)**
10:22;156:20;
371:24;379:12;
429:25

**media (14)**
114:5,10;117:18;
122:24;159:7,24;
160:4,16;162:12;
164:12,21;259:22;
335:25;397:22

**medical (5)**
184:17;249:11;
253:9;388:11;393:12

**meet (3)**
74:5;413:6,6

**meeting (94)**
48:9;56:7;57:7,18;
58:8;61:2;63:6;
64:20,22;65:12;
66:12;67:11,20;68:8,
19;69:9,11;72:21,25;
73:4;74:6;80:19,22;
81:12,16,21,24;
83:10,19;104:9,19;
114:25;115:4;
122:16;148:6,25;
149:3;159:5;162:23;
163:4,19;217:9;
260:2;366:21,23;
367:7;371:9;375:25;
376:5,6,7,8,12,13,18,
20,21;377:25;
380:24;381:3;382:2;
390:22;391:2,13;
437:6;439:18,22,23;
440:4,6,8;444:5,7,10,
16,19;445:4,8;
449:21,23;450:10,
18,24;451:3,8,12,24;
454:17,21;455:19,
23;456:9;457:3;
468:3

**meetings (6)**
118:6,9;159:15,17;
160:23;161:2

**members (2)**
130:15;377:25

**Memorial (4)**
11:3;133:18;
187:15;411:21

**memory (5)**
131:17;136:10;
176:20;177:10,23

**men (1)**
366:14

**mental (12)**
386:4,5,8,13,16,23,
24;387:8;388:12,18;
393:17,18

**mention (2)**
316:15;404:4

**mentioned (10)**
26:16;28:6;106:3;
136:4;176:5;269:9;
279:6;339:14;427:9;
466:21

**mess (2)**
203:16;433:3

**messages (1)**
290:21

**met (30)**
50:4;51:23;56:24;
59:14;76:20,21;77:4,
11,12,13;80:16;82:8,
9,10;83:12;166:12;
374:14;432:13;
434:13;443:13;
454:22;455:7,9,20;
456:20,22;467:7;
468:4,11,17

**Meyer (2)**
179:19,21

**mic (1)**
431:8

**Michael (2)**
110:20,23

**microphone (2)**
61:23;425:24

**middle (2)**
49:23;180:4

**midnight (1)**
180:21

**Midway (1)**
327:16

**might (15)**
9:8;26:4;44:11;
129:7;214:13;
289:11;292:21,24;
302:15;342:18;
343:10,13;383:16;
406:20;454:6

**Mike (1)**
110:19

**Miller (7)**
230:8,9,19;231:3;
236:4;426:6,18

**Miller's (1)**
230:14

**mind (11)**
147:21;166:19;
189:12;208:22,23;
246:13;344:22;
387:2;450:20,21;
456:10

**mine (1)**
267:10

**Minerva (21)**
34:5;35:16;36:2,

18;37:3,8,16;38:3;
39:18,19,20;46:20;
49:15;167:12;
434:22;437:7,9,15;
439:19,24;440:5

**minimum (1)**
251:4

**minute (5)**
61:5;355:7;
369:15;415:15;470:4

**minutes (6)**
141:24;143:8;
175:16;176:19;
177:20,25

**miscellaneous (2)**
199:19;204:12

**mischaracterize (2)**
211:12;367:4

**misquoting (1)**
457:20

**Mitch (18)**
326:16;327:10,13,
20;328:13,15,23,25;
329:19;330:5,11;
331:8,18,20;360:7,
22;361:7;364:25

**Mitchell (1)**
327:6

**MO (16)**
8:6;25:8;41:12;
48:22;59:10;65:5;
70:7;71:6;89:7;
126:8;127:9;212:13;
278:2;293:19;357:6;
446:16

**Monday (7)**
167:14;267:9;
444:3;445:3,3,3;
456:14

**money (3)**
29:16;53:19;
328:23

**month (6)**
7:18;22:8;24:69:4;
90:7;155:6

**Months (12)**
47:12;69:22,23;
70:17;79:11;220:4,5;
239:21;256:17;
282:20;309:13;
387:25

**Moran (7)**
375:24,25;376:19;
377:3;380:17,22;
381:6

**more (34)**
29:16;41:10;49:4;
65:9;67:7;74:24;
81:23;85:14;121:8;
143:9,10;145:14;
150:4,5;152:20;
153:4;163:12;169:2;
175:16,18,19;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 143 of 158 PageID #: 2513

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

176:21;180:15;
210:5;238:12;
275:23;276:4,17;
320:4;355:7;373:20;
416:3;440:4;465:21
**moreover (1)**
464:17
**Morgan's (1)**
185:24
**morning (27)**
99:20;174:18;
199:9,10,12;200:25,
25;228:6,7,22;
252:12;253:18,19,
21;254:2,4,16;267:9,
15;268:14;327:15;
401:20;402:16;
409:8;419:2;421:17;
456:14
**mortified (1)**
279:21
**most (5)**
124:15;182:10;
266:2,6;405:11
**mother (1)**
429:11
**Motion (10)**
8:7;83:6,8;84:24;
89:7;126:14;244:11,
12;278:2;448:24
**motionless (4)**
408:16;410:15,18,
19
**motions (3)**
83:25;448:4,17
**motive (1)**
463:25
**Move (18)**
25:8;41:13;48:23;
59:11;65:6;70:8;
71:7;84:23;126:8,15;
127:9;212:15;
293:19;346:4;357:7;
410:23,24;446:16
**MPTC (3)**
287:8;288:8,21
**Mrs (2)**
23:23;28:19
**much (20)**
9:19;143:6;
152:18;172:21;
173:3;177:18;
199:25;212:14;
220:10;221:21;
310:5;324:3;367:25;
396:5;398:2;399:16;
412:15;415:13;
455:5;463:19
**Muller (21)**
178:11,13;179:2,
11,14;180:17;
181:17;183:8;184:2;
185:17;188:23;

189:6,11,12,14,20;
332:21;337:17;
406:16,24
**municipality (1)**
312:10
**must (1)**
290:19
**mutts (1)**
377:17
**mutual (2)**
22:8;40:6
**myself (16)**
48:17;63:2;125:7;
130:20;135:11;
148:14;168:12;
170:6;312:14;343:7;
345:6;372:8;409:9;
427:18;430:11;
438:12

# N

**name (21)**
5:21;71:3;143:4;
197:7,11;266:19,25;
267:6;290:19;
303:13;316:6;
327:21;336:4;
391:18,19,22;
422:12;425:14;
427:22;432:6;444:21
**names (5)**
147:19;348:8;
424:25;425:10;
431:24
**narcotics (4)**
360:3;362:16;
363:9;365:11
**narrow (1)**
448:24
**Natalie (1)**
167:3
**natural (1)**
319:24
**Naturally (3)**
276:5,20,21
**Nazi (3)**
364:19;365:3,6
**near (1)**
204:16
**need (28)**
6:18;21:6;61:24;
117:5;139:20;151:3;
157:20;167:24;
177:18;192:7,9;
203:25;211:25;
214:4;222:6;244:10,
12;309:23;311:18;
341:22;351:18;
370:15;381:9;
382:25;448:23;
462:3;465:7;466:25
**needed (9)**

179:8;184:12;
186:8;310:10,14,15,
16;370:17;412:25
**needs (3)**
203:4;222:7;
448:24
**Negligent (1)**
348:17
**negligently (4)**
350:16;351:11;
352:6;353:14
**neither (3)**
213:3;290:14;
425:9
**nervous (2)**
177:13,15
**nevertheless (3)**
58:9;60:15;257:22
**New (25)**
4:9;5:18;6:2;
48:10;131:17,17;
148:8;262:23;
263:15,24,24;
264:12;265:21;
277:20,25;283:3;
357:24;358:17;
359:6;363:23;
364:24;393:24;
394:7,11,19
**news (2)**
97:19;336:3
**Newsday (2)**
113:25;434:7
**next (57)**
21:14;68:17,21,25;
69:2,6,16;70:9,12,
17;71:22;72:4,5,6,7,
9,11;73:5,7,11,12,14,
25;74:4,13;99:25;
152:12;184:18;
187:9,11,12,20,21;
200:8;209:12,14;
217:22;227:10,10;
239:21;242:24;
245:5,9;255:11,11,
18,19;268:14;
362:24;369:9;386:2;
409:8;410:12,13,16;
412:18;448:2
**nice (3)**
8:7;344:16;351:17
**night (98)**
101:11;102:6,16,
19;103:8,15;122:7;
123:24;168:15;
169:25;170:10;
171:2;179:10,11,14;
180:11,14,25;
181:23;182:14;
192:19;199:7;200:9,
22,23;202:15;203:6;
217:2;220:3;221:2,
15;223:7,11,20;

224:4,10,19,22;
225:15;226:16,20;
227:9,11,14,21;
228:12;229:10,13,
22,24;230:9,10;
231:6;238:3,13;
239:18,22;240:3,9;
242:18;243:23;
244:7,20;247:22;
248:6,6,11;249:5,8,
15;250:7,12;251:6,
25;252:3;255:17,21;
329:23;340:2,5;
403:15;406:15;
409:4,7;410:2,12;
414:5;416:22;418:3,
15;421:22;425:3,12;
426:5,19;458:6,9;
460:19
**nights (1)**
200:13
**Nimberger's (1)**
407:12
**nine (2)**
365:17;405:17
**ninth (1)**
270:8
**Nobody (5)**
14:9;183:2;
367:16;375:12;
425:11
**Nof (1)**
375:3
**Nofi (36)**
33:22;50:4;54:20;
55:10;66:24;67:10;
85:3;148:14;159:6;
168:12;169:10;
170:6;216:20,21;
261:9;283:17;
302:19,23;303:5,14;
305:6,24;306:6;
329:10,11;338:9;
343:6;367:16;368:9;
384:17,17,23;
385:15,17;436:19,20
**Nofi's (3)**
169:16,17;385:19
**None (2)**
346:17;363:11
**non-lawyers (1)**
83:20
**nonresponsive (1)**
446:17
**Nope (1)**
411:5
**normally (1)**
131:6
**Northport (15)**
284:8,14;285:8;
288:5,14;289:7,19;
290:9,15,25;291:22;
294:8;296:6;301:6,7

**Notarized (1)**
156:4
**Notary (3)**
3:14;5:17;472:12
**note (1)**
116:10
**noted (1)**
358:14
**notes (1)**
335:15
**notice (16)**
12:5;17:2,8,13;
70:24;73:18;78:19,
25;79:5,13,17,21;
82:2;85:6;429:2;
459:9
**notified (4)**
385:13;403:6,21;
405:5
**notwithstanding (10)**
57:16,17;58:5;
60:12;120:10;
123:21;265:4;332:3,
24;334:14
**NOVIKOFF (92)**
4:22,24;6:4,7,9;
7:13;8:6;14:22;15:5,
8,17,22;16:4,8;21:6,
18;25:8;41:12;
59:10;61:20;65:5;
66:17;67:3;69:10;
70:7;71:6;76:7,12,
24;77:10,20;82:6,11,
15,18;83:5,9,16,23;
84:6,16,21;89:7;
104:16;119:6;123:6;
124:8;126:8;127:9;
129:19;130:10;
139:10;143:5;
144:12;151:22;
152:5,9;156:10,14;
197:12;213:11;
214:9;278:2;293:19;
315:12;330:23;
343:2;351:7,17,22;
356:5,14;357:6;
358:5,13;398:4,8;
405:7,24;415:13,16;
425:18,25;461:15,
20,23;462:3,8;463:7,
18;471:17,21
**nowhere (2)**
198:10,13
**number (20)**
4:3,9;21:8;71:12,
16;144:15,19;
213:15,19;263:16;
291:25;292:5;
355:19,20;356:8,12;
367:5;415:20,24;
421:10
**numbers (2)**
392:6,8

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 144 of 158 PageID #: 2814

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

**numerous (9)**
22:12;23:7;
129:13,24;136:14;
193:19;290:20,20,22

# O

**oath (2)**
97:21;156:2
**object (6)**
76:15;351:19;
357:9;358:12;
370:11;458:4
**Objection (193)**
9:22;10:19;12:9,
12;13:11,17,22;14:3,
6,10,20,23;16:17;
18:14;19:2,17;22:20;
23:11;26:3,24;27:3,
10,22;28:4,14,18;
31:17;38:11,21;
40:13,19;41:19,21;
42:6,16,24;43:17;
44:10,25;46:7;47:8,
22;49:8;51:17;52:3,
12;53:3,7,13;54:2,8,
14;56:5,13;60:17,20;
63:8,14;64:13;65:24;
76:6;82:3;83:13;
85:17;97:3,24;98:21,
25;115:10;134:12;
145:25;149:23;
151:8,21,22;162:7;
164:15;169:13;
173:19,24;196:14;
210:20;215:8;
222:20;234:5,12;
240:6,14,24;242:4,6,
11;243:17;244:9;
247:8,14;265:17;
266:4;278:9,21,23;
292:11;294:20;
296:11,13;297:16;
298:15,19;301:9,13;
310:22;311:21,24;
312:12;313:5;322:4;
325:23;333:3;
334:20;338:5;339:5;
342:8;343:4,22;
344:21,23;345:4,19;
349:8,25;351:4,13,
15;352:8,10;353:23;
354:7,19;355:12;
357:15;358:2,19;
359:9;361:22;362:3,
19,25;363:19,24;
364:4,16;365:2,12;
366:18;378:15;
390:19;391:21;
392:12;394:16;
395:4;399:4;409:19;
421:14;423:11;
424:19;430:8;

431:12;435:4,10;
438:7,22;439:16;
442:4,20;443:5,11;
456:19;457:13,19,
20;458:16;463:25;
465:2,12,17;466:4,
10;467:15;468:15;
469:2;470:7,11,25
**objections (1)**
3:9
**objection's (1)**
358:13
**objective (6)**
22:10,11;40:7;
47:5,20;334:6
**obligation (3)**
26:20;360:2;
364:13
**obligations (3)**
39:4;364:22;365:9
**OBPD (7)**
50:12;85:5;
326:13;348:23;
366:7;386:10;398:14
**OBPD's (1)**
66:8
**O'Brien (1)**
5:3
**observe (1)**
221:23
**observed (5)**
221:22,25;222:19;
223:11;248:20
**observing (1)**
448:12
**obstruction (5)**
85:8;87:4;105:2;
136:18;320:4
**obtain (2)**
70:16;71:3
**obtained (1)**
467:16
**obtaining (2)**
264:24;457:12
**obviously (4)**
207:4;457:3;
466:20,21
**occasion (6)**
147:22,22;433:5,
18;451:21,22
**occasions (9)**
24:10;26:5;117:2;
129:24;145:5;
193:16;429:6,14;
451:20
**occurred (5)**
28:10,12;244:6;
253:25;282:5
**occurrence (1)**
225:11
**occurring (1)**
275:20
**Ocean (187)**

4:6;5:8;7:9,23,25;
8:10,16,20;10:16;
11:8,11;17:5;18:17,
19;23:13,14,18,19;
24:8,16,23;25:16,19;
26:23;27:9,14,25;
28:23,24;29:12,23;
30:12,16;31:15;
36:25;39:24;43:23;
44:5;46:24;48:6;
50:17,22;51:4,25;
52:5,10,25;53:5,12;
54:7,13;58:22;67:13,
22;68:13;70:14;
96:17;97:2,9,12,14,
23;99:20;110:7,10;
113:10,15;116:12;
118:3,6;119:4;124:6,
11;134:11;142:3;
143:12;145:9;147:2;
148:5;149:21,22;
151:16;153:7;158:4,
20;159:12;160:7,17;
161:21;169:3;
170:10;172:7,15,16,
17,22;173:4;184:6,7;
190:6;196:16,22;
197:16,21,24;
199:22;209:15;
232:3;245:11;
253:10;260:18;
261:20;268:13,24;
272:21;273:4;277:8;
280:3,4;281:8,12;
282:15,16;291:3,6;
299:17;300:6;
306:19,23;311:5;
312:19;317:3;
322:18;324:4;
326:25;327:7,15,22;
330:16,24,25;
334:24;335:16;
339:23;345:21;
346:7,20,24;348:7,
23;349:20;350:15;
355:15;359:5,7,14;
366:20;367:6;382:3;
388:5;389:18,22;
390:6,16;393:4,10;
395:11;396:12,16,
24;400:4;406:5;
407:14;409:11,24;
429:10,23;432:15,
17;433:8;436:4;
438:15;445:12;
452:21;453:21;
454:4;470:12
**Oct (1)**
267:10
**October (11)**
131:5,15,16,25;
133:2,5,10,21;254:2,
3;311:7

**off (33)**
71:13;101:8,10,24;
102:7;116:17;117:3;
131:5;135:10;
144:16;148:18;
168:13;170:4;
186:12;189:9;
200:24;213:16;
244:22;254:12,13;
256:3;274:15;292:2;
321:22;329:19;
330:4;339:3;356:9;
370:18;373:5;
415:21;447:6;471:25
**offended (1)**
410:10
**offensive (1)**
365:4
**offer (2)**
265:6;454:2
**offered (3)**
173:25;342:5;
402:20
**offering (3)**
280:7;340:14;
341:12
**offers (1)**
173:18
**office (55)**
33:17,20;55:14;
89:25;109:22;
113:21;117:22;
122:19;130:2;
137:23;138:2,12,16;
140:10,17,24;
141:15,25;142:14;
143:14;144:10;
145:8,21;146:14;
147:10;149:11,14;
150:20;152:14;
154:23;155:22;
156:23;160:21;
166:7,13;168:7;
169:3,22;197:3;
256:7;259:6;260:13;
287:16,18;302:17;
336:9;397:5;432:14;
441:18;446:2;
451:12,19;453:9;
466:23;468:8
**officer (79)**
27:14;29:12;
52:11;58:18,19;59:3;
66:23;70:16;71:4;
112:18;113:15;
118:2;124:14;
159:11;161:22;
185:10;197:24,24;
233:9;238:18,24;
239:7,11,17;240:16;
241:6,7,9;251:19;
252:7,13,18,20;
253:3,10;261:19;

270:21;271:7;
274:20;276:25;
277:2,7;278:8;283:5;
299:10;300:11,13,
21;311:4,12;322:22;
334:7;340:15,16;
341:15,19;342:4;
354:10;355:15,18;
359:25,25;364:14,
22;365:10;371:4;
386:19,20;387:10,
16;396:6;398:16,17;
400:3;407:18;
417:15,21;422:6;
424:6
**officers (95)**
23:13,16,19;24:6,
23,25;25:16;26:19,
23;27:8;28:3,22;
29:23;38:9;39:5,24;
41:5,16;42:3;46:24;
50:11;51:9;52:2,25;
53:6,12;54:7,20;
65:21;85:2;86:13;
101:16;116:11;
119:4;124:6,9,17;
129:7;133:23;
148:10,12,20;
174:16;175:3;176:6;
178:6,8;180:18;
181:3;182:16;
189:10;238:22;
239:16;260:17,20;
275:18;336:22;
337:10,21;338:2,8,
14,15;339:3,10,16;
345:21;346:8;349:3;
350:14;352:9;
355:11,14;357:14;
359:8;366:15;367:5,
5;368:3,8;371:5;
379:7,19;381:15;
391:6;396:7,22;
398:15,18;406:4;
411:17;417:13;
435:17;436:10,12
**officers' (1)**
336:20
**offices (2)**
90:2;452:13
**official (6)**
320:9,23;321:10,
15;325:8,18
**Officially (1)**
432:9
**old (7)**
199:16,17;324:11;
330:14,18;387:12,14
**Oley (2)**
99:20,21
**Once (5)**
145:18;309:18;
312:17;431:14;

FRANK FIORELLO
February 20, 2009

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 145 of 158 PageID #: 2515

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

432:18

**one (121)**
4:3;14:14,15,16;
21:8;25:2,6,23;
27:12;29:19;36:8;
41:7,7;49:2;57:25;
61:5,6;62:20,21,24;
63:12;64:11;71:12;
76:12;81:23;96:2,24;
107:12;123:23;
125:22;142:25;
145:12;149:5;
152:16;156:9,21;
163:9,14;174:17;
175:25;177:20;
178:9,10,21;182:15,
16,17,17;198:6;
201:18;206:7;
223:24;224:8,17;
225:21;226:4;230:3,
18;235:2;240:19,23;
241:19,20;242:9,20;
250:11;251:23;
256:9;274:11,12;
291:16;299:9;
300:20,23;302:25;
318:13,17,22;319:6,
12;321:22;322:23;
325:20;339:21;
340:2,24;343:5;
347:4;352:24;353:3;
355:7,19;368:22;
369:2;371:4,5,14;
373:20;375:13;
391:6;399:8;406:15;
415:15;419:7,12;
420:23;421:7,11,20;
422:14;423:12,13,
25;427:16;431:19,
19;445:11;449:14;
451:21;460:11;471:5

**O'Neill (1)**
5:3

**ones (4)**
106:25;285:24;
377:9;431:18

**ongoing (7)**
115:23;193:21;
257:18;342:19;
343:12;345:9,14

**only (73)**
11:18;24:6,22;
25:16;36:17;41:23;
47:18;58:12;63:10;
64:8;75:12;78:12,14,
14;100:15;117:4;
123:6,22;124:10,18;
131:12,16;148:12;
149:7;171:5;180:18,
18;181:3,22;182:15;
193:8,14;194:12,17;
217:15;219:19;
248:19;249:3;258:8;

266:24;268:22;
285:10;286:25;
296:24;298:9;
314:18;317:16;
321:9;335:3;337:25;
342:7;347:4;367:15;
369:5;373:9;377:13;
378:19,22;404:10,
23;419:6;423:12,13,
19,21,25;424:2;
425:6;428:24;
431:19;435:19;
470:19,20

**open (1)**
202:11

**opening (2)**
283:13;285:22

**openings (5)**
271:11;285:12;
288:25;289:4;302:25

**operating (2)**
326:12,20

**opinion (47)**
24:4;32:19;36:10;
40:16;62:3,5;102:7;
107:19;117:24;
118:13;120:13,16,
20;121:5;122:24;
132:2;140:4;144:8;
185:6,8;195:4,11;
260:16;274:24;
277:6,17;279:25;
297:22;310:18;
333:10;351:14;
352:13;362:9,10;
375:20;394:25;
395:15,22;400:24;
410:10;436:16;
438:15,18,25;439:4,
5;441:23

**opinions (1)**
439:9

**opportunity (3)**
43:7;267:12;
305:14

**opposite (1)**
84:2

**order (13)**
230:25;233:25;
249:22;275:12;
276:3,4;277:2;
300:12;321:19,25;
322:3;379:18;408:15

**ordered (8)**
321:20;322:16;
325:5,7,17;326:5;
339:15;360:21

**ordering (3)**
320:8,22;336:19

**orders (1)**
364:17

**organizational (2)**
367:6;380:24

**Organizations (1)**
320:3

**O'Rourke (5)**
225:14,15,22;
236:8;425:17

**others (5)**
63:16;285:16,18;
318:23;438:13

**Otherwise (4)**
16:6;139:9;
182:25;447:4

**ounce (1)**
399:20

**ounces (1)**
399:19

**out (111)**
24:25;44:11,14;
45:15;70:20;101:20;
102:15,19,22,25;
104:17;107:25;
116:12;127:4,22;
129:17,20;130:8;
146:3;150:8;151:2;
169:16,17;172:11;
175:8;176:9;178:14;
179:3,6;180:8;
183:20;186:2;
198:25;199:14,24;
202:19;203:4,10,16,
17,20;206:21;
210:15;217:8;
220:24;225:2;
227:12,20;235:11;
246:13;251:25;
256:20;266:13;
273:10;275:13;
276:9;279:17;
280:11,21,23,25,25;
281:3,15;286:23;
287:15,17;292:21,
24;305:20;306:3;
309:19,24;310:19;
312:19;315:25;
316:3;331:8,12;
339:4,16,18,22;
355:24;368:5,6,18;
369:20;372:23;
373:6,7,13,17;
385:15,18;392:13;
398:20;409:2;419:7;
422:14;424:12;
431:20;434:6;
445:25;446:6;454:5;
456:4,13;460:13,13;
469:11

**outdoors (1)**
95:15

**outlet (13)**
114:5;10;117:19;
122:24;159:7,24;
160:4,16;162:12;
164:22;259:23;
335:25;397:22

**outside (13)**
113:15;118:3;
129:9;148:22;
159:11;225:4;229:2;
248:23;266:19;
319:9,17;424:20;
425:5

**outward (1)**
423:7

**over (29)**
44:6;87:10;
124:14;130:25;
132:20;149:16;
157:25;167:24;
201:23;203:3;
222:12;246:18;
257:18;267:7;
272:21;299:4;300:6;
317:2;370:24;
373:25;374:9;
375:17;382:25;
389:6;424:23;431:9;
432:21;433:9;470:23

**overdose (2)**
178:16;179:16;
181:5,9

**overlap (1)**
404:25

**oversee (1)**
31:25

**overseeing (1)**
195:24

**overt (14)**
22:12,17;23:7,9,
12;26:17;28:8;
29:20;30:4;33:10;
34:22;35:5;39:20,24

**own (6)**
157:8,12;243:23;
317:5;353:19;437:10

**owner (3)**
267:2;322:10;
324:16

**P**

**page (31)**
21:20,21,25;37:12;
49:23;262:16;263:6;
316:12,14;319:19;
348:11;350:19;
357:17;365:14,17,
19,20;386:2;393:25;
398:11,12;403:2,12,
13;405:17;408:19,
20;411:23;413:16;
416:4;454:10

**paid (3)**
10:11;12:3;172:19

**pain (7)**
386:5,9,17,23;
388:13,19;393:19

**painfully (1)**

35:3

**pains (1)**
387:2

**Palace (1)**
410:21

**paper (1)**
45:17

**paperwork (18)**
158:6;281:10;
282:12;286:3;
290:14;292:20;
293:4;299:8,15,19,
20;300:8,8,12;303:4,
18,20;305:3

**parade (2)**
90:13;95:16

**paragraph (53)**
22:3;40:6;50:3;
54:18;66:6,22;87:13;
136:15;138:10;
159:3;262:18;263:8,
13;292:13;294:16;
295:20;297:7;
319:23;325:17;
357:18;358:24;
365:17,21,22;
366:17;380:25;
386:3;394:3;398:12,
13;403:2;405:14,14,
16,23;408:14;
411:23;418:2,10;
421:24;422:5,16;
425:13,15,16;
454:12;455:2;
457:14,21;458:12,
23;459:7;464:16

**paramount (1)**
127:5

**paraphrasing (1)**
377:13

**parents (1)**
429:15

**Paridiso (142)**
87:18,19;105:16;
109:9;110:9;115:21;
116:2;118:12,17,22;
119:12,14,24;
124:12,19;161:12;
174:10,12;175:4,6,7,
20,21;176:5,8,11;
177:6;178:7,13;
186:21;187:8;188:2,
18;190:2,6,11,21;
191:4,8,13;193:17,
24;194:14,23;195:7,
11;196:6,6,8,10;
197:17,23;198:9;
203:18,25;204:19;
205:8;206:25;207:7,
20;208:2,20,25;
209:4,9,23;210:5,10,
12,16;211:11,22;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 146 of 158 PageID #: 2616

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

212:2;217:20;218:6,
11,15,22,25;219:8,
13;250:23,25;
256:13;257:13;
258:3,19;276:16,17;
277:6;282:9,11;
306:21,22,25;307:5,
8,24;308:4,8,23;
309:3,17;316:10,20;
317:4,20;318:11;
332:9,11,15,19;
333:14,25;334:19;
340:20;341:23;
348:8;349:7,10,23;
370:25;384:22,25;
385:3,8,15,18;402:6,
18,22;404:4;406:10;
407:24;419:23;
421:4,12,18;429:4,7

**Paridiso's (2)**
276:4;308:16

**Park (3)**
315:3,23;317:23

**part (26)**
11:6;30:11;41:9,
13;48:11,20,25;
52:13;70:23;77:13;
103:7;112:23;
126:18;187:17;
270:22,23;271:21;
275:3;281:16;
291:11;312:4;
349:12;405:3,11;
426:16;441:16

**partial (1)**
47:17

**participant (2)**
232:8;233:21

**particular (14)**
69:13;72:24;
112:3,7,10;161:9;
174:18;199:6;
228:24;267:13;
340:3;375:9,15;
406:16

**particularly (3)**
66:23;291:10;
460:11

**particulars (1)**
174:20

**parties (2)**
3:4;255:20

**part-time (2)**
11:8;280:5

**party (14)**
37:12,15;44:15;
127:24;129:18;
130:9,13;135:4,9,13,
22,25;184:20;417:17

**pass (4)**
30:22;32:20;
373:7;450:17

**passed (3)**

303:22;346:12;
373:11

**passing (2)**
50:20;58:19

**past (1)**
311:3

**Pat (6)**
125:18,18;212:10,
10;220:15;416:20

**patent (2)**
15:14,23

**patently (3)**
15:3,9;16:12

**Patrick's (1)**
432:10

**patrol (2)**
311:8;322:17

**patrolling (2)**
181:14;182:18

**patron (4)**
422:25;423:9,16;
424:2

**patrons (7)**
422:7,12,17,23;
424:7,14,17

**Paul (4)**
99:23;409:10;
410:11;411:16

**pay (3)**
378:6,10;429:21

**paying (1)**
166:25

**pays (1)**
324:3

**pedigree (1)**
427:4

**Pelc (17)**
442:11,12,13;
443:10,18;444:2,3,9,
10,14,15,16;446:9;
449:17,23;450:9,15

**penalty (1)**
236:22

**pending (8)**
292:10,14;294:18,
22;295:8,11,21;
297:9

**people (18)**
115:12,14;128:12;
129:5;130:2;142:24;
147:12;180:18;
182:11;249:11;
349:20;369:5;390:8;
424:21,22;432:24;
437:22;452:19

**People's (2)**
427:23;428:13

**per (1)**
366:3

**perceived (1)**
461:6

**percent (4)**
44:3;248:19;

267:22;346:11

**perfect (3)**
380:21;383:8;
411:22

**performance (1)**
381:15

**performed (1)**
311:10

**perhaps (5)**
32:13;279:10;
459:17;460:20;
463:16

**period (21)**
29:16;79:10;
80:22;153:2;155:12,
14;156:15;161:2,5,
12,15;171:19;
175:10;187:16;
218:2;269:15;270:9;
289:14;303:21;
396:8;457:4

**perjury (4)**
247:7,18,22,25

**permitted (4)**
350:16;351:11;
352:6;353:14

**perpetrating (4)**
342:19;343:11;
344:6;345:13

**person (31)**
24:21;25:14;31:8;
58:14,15;74:19,22;
110:18;147:10,11;
157:25;187:23;
233:5;239:6,16;
241:25;242:8;246:4;
256:13;266:25;
279:5;319:25;
337:25;362:18;
377:11;391:20,23;
400:6;419:9;431:19;
440:23

**personal (2)**
433:10;442:2

**personally (10)**
22:15;67:9;80:16;
152:22;153:14,18;
206:10;227:20;
440:14;465:9

**personnel (9)**
184:17;349:2;
353:22;354:5,18;
359:5;394:6;396:16;
405:21

**pertain (1)**
20:13

**pertaining (4)**
157:21;160:7,17;
166:20

**pertains (4)**
231:19;244:20;
320:14;321:2

**Phil (2)**

444:18;451:2

**phone (36)**
24:20;25:13,23;
26:6,14;43:22;44:4,
6,7;45:5;53:24;
75:17;76:5;80:14,21;
81:17,20;96:20;
126:2;157:18,25;
183:2;273:13;
279:19;281:7;
286:22;287:3;412:4;
421:8,10,13;430:23;
440:25;447:4;
451:11;458:8

**phoned (1)**
81:8

**phrase (3)**
41:4;394:21;424:4

**phrased (1)**
7:14

**physical (9)**
353:24;354:3,16,
21,22;355:4,8;
357:12,16

**physically (8)**
353:20;354:14,24;
355:3,13,16;372:2;
459:4

**pick (6)**
213:12;330:3;
337:12;339:17;
355:25;392:13

**picked (4)**
25:12,24;26:13;
273:11

**picking (1)**
26:6

**picture (2)**
195:19;256:11

**pictures (4)**
416:12,23;417:5,6

**piece (2)**
280:9,9

**pieces (1)**
280:10

**pike (1)**
45:24

**place (13)**
51:20;140:3,5,6;
194:18;199:2,3;
256:25;319:3;341:2;
416:14;424:23;468:9

**placed (1)**
361:20

**Plaintiffs (49)**
4:5,21;18:10;21:2;
34:18;40:25;41:17;
42:2;59:14;63:12,13;
64:12;83:12;158:8,
15;263:14;264:9;
265:20;313:2;314:7;
320:8,23;325:8,17;
326:10;336:19;

342:17;349:3;
350:14;353:8,16;
359:2;366:8,12,13;
379:5;381:12,13;
394:8;403:5,20;
430:15;431:16,20;
454:15;456:17;
458:14;464:19;
468:23

**Plaintiffs' (13)**
22:8;49:25;
292:14;294:18;
295:8,11,21;320:10,
25;325:19;359:2;
381:14;394:5

**planned (1)**
455:10

**planning (2)**
454:19,24

**play (2)**
30:25;77:6

**played (1)**
330:15

**plea (9)**
237:10,18;238:4;
240:5;244:7;246:10,
24;247:5,12

**plead (8)**
242:22;243:4,11;
244:24,25;246:18,
20;311:2

**pleading (2)**
241:2;247:17

**please (16)**
4:18;5:14,20,23;
21:20;57:5;113:2;
138:7;311:19;
334:13;357:23;
358:9;439:7;453:5;
459:11;461:14

**pleasure (1)**
284:3

**pled (7)**
237:4,8;239:21;
240:12;243:14;
246:22;247:3

**plenty (1)**
87:9

**ploy (3)**
48:20,25;49:6

**plying (3)**
398:16,24;399:2

**P-L-Y-I-N-G (1)**
399:3

**pm (11)**
144:16,20;213:16,
20;292:2,6;356:9,12;
415:20,25;471:25

**point (51)**
6:10;8:15;16:11;
27:24;42:18;43:2,3;
45:25;67:19;70:22;
72:11;74:11;77:21;

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

80:3,4;96:12;105:6;
126:2;130:25;131:4,
14,25;134:3;144:25;
146:17;153:10;
184:14;193:23;
198:5,6;199:6;228:2;
229:7;239:14;
245:24;250:20;
270:11;297:20;
298:5,6;299:18;
301:19;306:16;
322:19;341:11;
367:9;411:10;
416:10;419:4;
455:11;465:18
**pointed (1)**
67:7;256:10;419:7
**points (1)**
152:4
**poisoning (3)**
90:19,21;94:19
**police (193)**
27:8,14;28:3;
29:12;38:9;42:22;
44:24;46:24;48:7;
52:25;58:18,19;59:3;
67:13,23;69:20,25;
70:3,14,16;71:4;
98:7,19;101:15;
102:15;103:5;
109:24;110:5,11,17,
22;111:4,9,10,12;
112:13,17,18,20,23,
24;113:15;118:2,2,3;
119:4,4;123:10;
124:7,11;126:3;
133:23;139:23;
140:2;143:12;148:5,
15;153:25;159:11;
161:22,25;164:5;
182:16;185:10;
197:24;199:22;
224:9;232:3;238:18,
24;239:6,11,17;
240:16;241:5,7,8;
251:19,24,25;
253:11;261:19;
263:17,19;264:13;
265:12,23;267:16;
270:16,21;271:7;
272:22;274:19;
276:24;277:5;278:8;
280:13;282:17;
283:4,7;284:16;
285:6;287:7;291:4;
292:9;299:10;
300:10,13,20;301:3;
302:8;306:18;
308:17,21;310:11,
17;311:4,5,6,11;
312:10;320:9,23;
321:15,18;322:22;
323:3;325:8,18;

326:3,4,25;327:7;
329:12,15;330:16;
333:2;334:7;336:5;
338:15;340:13,14,
15,16;341:14,15,19;
346:7;349:3;350:14;
354:10;355:15,17;
359:8,25;364:14,22;
365:10;371:2,22;
372:15;377:10;
379:6,20;381:15;
386:19,20;387:10,
15,24;389:13,18;
390:2,4,6,11,16,22;
391:5,6,14;396:6,7;
401:2;407:18;
409:11;411:17;
422:10;436:5,12;
437:22,24;456:5
**Policy (6)**
357:20,24;358:10,
15,17;363:23
**polite (1)**
279:20
**Politics (1)**
389:24
**pool (6)**
221:20;250:10;
256:15;262:5,7,10
**populated (2)**
180:16;182:10
**portion (3)**
356:21;446:17;
449:9
**position (22)**
31:15;32:15;33:6;
58:18;69:17;84:2,11;
111:7;264:24;267:7,
17;270:19;293:23;
294:3,7,11;313:18;
317:23;354:9,11;
438:6,11
**positions (2)**
83:24;84:8
**possession (4)**
18:5;177:3;
361:15;362:22
**possibility (11)**
36:24;298:16,17,
21,24;301:2,5;306:7;
333:11,12;383:16
**possible (6)**
19:6;179:15;
181:5,8;302:3,5
**possibly (6)**
58:12;132:9;
253:10;289:10;
298:13;429:16
**post (6)**
89:25;114:20;
135:7;410:14;431:6,
10
**posted (9)**

116:10;390:5;
392:16;431:18,20,
24,25;432:7;434:7
**posting (1)**
392:18
**pot (1)**
178:18
**potential (12)**
236:22;265:18,19;
270:17;291:5;297:2;
309:19,24;310:20;
312:8;319:13;357:3
**pot-laced (1)**
184:22
**powdery (1)**
328:4
**Powell (1)**
41:6
**power (5)**
85:8;87:4;105:3;
136:19;470:23
**practice (2)**
182:13;362:13
**precinct (2)**
111:14;253:8
**precipitated (1)**
23:5
**Precise (2)**
4:13,16
**pre-marked (1)**
307:21
**prepare (3)**
84:10,13;277:21
**presence (9)**
331:24;342:6,9;
420:17;423:19,22,
23,24;433:14
**present (3)**
38:13;366:22;
471:11
**presented (1)**
259:25
**presently (5)**
427:4,15,19;
468:24;469:6
**press (1)**
114:14
**presumably (1)**
401:8
**presume (4)**
90:21;185:10;
392:8;409:17
**presuming (1)**
392:9
**Pretty (22)**
31:19;92:22;
121:14;175:24;
194:20;205:19;
257:2;285:3;295:4,5;
306:9;309:14;325:6;
328:8,8;342:10;
351:5;367:25;
392:14;398:10;

414:12,12
**prevent (24)**
51:25;136:13;
164:19;165:11,16,
18,22;166:5;190:5;
342:17,18;344:5;
454:15;457:11,17;
458:12;459:2,4,6;
464:19,23;465:9;
466:2,7
**prevented (10)**
28:24;333:15;
343:9,10,14,19;
344:20;345:12,18;
457:9
**preventing (3)**
23:16;344:5;
345:13
**previously (1)**
333:20
**priest (3)**
388:17,25;389:2
**primary (1)**
334:6
**prior (107)**
9:11;10:8,15,18;
11:7,15;17:24;19:23;
20:5;25:22;28:10,12;
34:7,18;35:2,8,24;
36:2,23;38:17;39:3;
40:17;42:23;43:15,
22;44:3,9,23;46:5,
12,17;47:9,10,12,13,
16;49:9;57:7;58:7;
59:22;74:6;79:5,20;
86:11;87:15,19;88:6;
120:11;138:12,16;
155:22;156:8,20;
157:4,10;162:12;
164:2,5;173:13,17,
20,20,25;174:12;
187:14;188:17;
229:8;250:21;
252:11;254:20;
259:9,11;260:14,22,
22;261:11,14,16;
263:23;266:11,21,
25;269:8;277:22;
309:9;346:18,23;
355:8;357:11;
438:19;439:11,12,
23;440:10,16,20;
441:6,9,24;442:5;
444:5,7;445:4;
454:17,21;455:23;
456:9
**Prisco (13)**
138:20,25;139:3,5,
6,9,11;142:11;
143:15;153:19,24;
154:9;171:10
**privilege (2)**
83:21;84:23

**privileged (4)**
76:15;77:14;
82:14;83:18
**probable (3)**
362:5,12;364:2
**probably (8)**
28:25;30:11;
52:19;219:20;
309:14;362:10;
406:23;452:23
**problem (7)**
39:16;84:17;
119:2;188:22;
189:13;200:3;312:21
**problems (3)**
331:22;377:10;
432:23
**procedure (5)**
359:6;400:3;
401:2,14;407:18
**proceed (1)**
155:17
**proceeded (2)**
203:18;368:25
**process (14)**
25:3;27:13,14;
29:10,11;51:21;
58:17;101:3;270:25;
271:4;281:17;304:3;
305:9,11
**produce (1)**
43:21
**produced (1)**
43:5
**professional (6)**
58:15;61:8;
388:11;393:14;
459:22;463:23
**progression (2)**
364:6;376:16
**prohibited (1)**
326:18
**Prohibiting (1)**
326:10
**prolonged (1)**
396:8
**Promise (1)**
177:24
**proper (3)**
401:2,14;407:17
**properly (1)**
395:13
**property (1)**
331:6
**prosecuted (1)**
237:13
**prosecutor (2)**
237:3,12
**Prospective (2)**
262:22;381:11
**protect (2)**
234:22;235:7
**Protection (2)**

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 148 of 158 PageID #: 2818

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

267:3,5
**Protective (1)**
267:5
**provided (7)**
156:22;157:2,7,11,
15;158:2,5
**provision (1)**
56:9
**provisions (1)**
319:25
**Public (28)**
3:14;5:17;107:20;
108:9;109:3,20;
110:14;111:22;
112:15;115:6,11;
117:13;118:14,25;
120:13,22;122:9,20;
123:15;332:4;
333:16;334:16;
357:20,24;358:9,16;
363:22;472:12
**publicize (1)**
260:16
**public's (1)**
121:8
**published (3)**
366:7;389:14,15
**pull (6)**
178:14;179:3,6;
203:9,20;206:20
**pulled (1)**
251:25
**pulling (1)**
203:4
**pulls (1)**
203:2
**punish (1)**
409:18
**purport (1)**
20:23
**purportedly (1)**
308:3
**purpose (12)**
34:21;116:23;
162:23;163:6,19;
200:15;210:13;
232:11,13,14;
233:13,18
**purposes (1)**
34:14
**pursue (3)**
68:3,5;361:16
**pursuing (1)**
364:23
**put (25)**
23:8;33:6;77:6;
135:17;139:12;
153:25;170:14;
175:9;191:9;204:13,
16,17;211:6;222:22;
223:2;225:6,8,10,17;
307:7;316:9,19;
317:4;334:25;439:9

**putting (6)**
77:12;129:20;
234:16;236:20;
322:2;333:16

**Q**

**qualification (5)**
28:3,7;395:18,20;
432:24
**qualifications (6)**
23:20;26:19;33:4;
46:24;51:23;436:18
**qualified (15)**
23:13,15,17;24:7,
23;25:2,16;29:24;
32:19;50:24;51:19;
346:8,10,12;354:9
**qualify (1)**
404:9
**qualifying (3)**
50:20,21;58:20
**qualities (1)**
311:15
**quarters (1)**
399:24
**questionable (1)**
196:19
**quickly (1)**
398:10
**quite (8)**
7:18;62:20;69:22;
132:9;267:4;298:13;
443:21;467:9
**Quogue (38)**
283:10,13;284:6,
13;285:8;287:5;
288:24;289:13,21,
24;290:14;291:21;
292:9,9,18,20;293:4,
14,24;296:5;297:12,
23,25;298:7,11,25;
299:7,8,9,10,13,19;
300:7,8,11,14,19;
301:3

**R**

**rabbi (2)**
388:17,23
**Racketeer (1)**
320:2
**Radio (4)**
114:15;126:2;
183:9,12
**Radler (1)**
4:24
**raise (5)**
88:5;160:15;
216:8;448:4,6
**raised (15)**
87:14,17,22,25;
158:25;163:17,25;

164:6,13,21;165:20;
166:8;216:12;
392:25;422:9
**raising (6)**
162:23;163:20;
165:12,17,23;166:6
**ramifications (1)**
189:22
**range (2)**
161:24;437:25
**ranger (3)**
315:3,23;317:23
**ranking (4)**
197:23;276:25;
277:2,7
**ranting (1)**
324:2
**rapport (1)**
111:18
**rather (3)**
363:14;448:14;
462:19
**rats (5)**
65:3;377:2,18,19;
379:18
**rats' (1)**
366:14
**raving (1)**
324:3
**reached (5)**
146:3;286:23;
305:20;385:15,18
**reaching (1)**
281:15
**reaction (6)**
188:5,7,9;342:10,
11;422:6
**reactionary (1)**
188:11
**read (44)**
19:16;50:15;
66:13,22;86:6;
220:22;221:2,11;
223:25;225:18;
234:6;256:21;257:4,
14,15,17,22;258:3,
15;310:25;351:18,
18;354:2;356:2,15,
21;379:13;413:12,
12;414:9,17;416:9;
419:11;430:17;
443:25;449:7,9;
458:6,18,20,21;
461:13;462:10;464:6
**reading (9)**
221:5;224:16;
263:2;382:8;414:4,9;
457:22;458:12,17
**reads (1)**
464:17
**Ready (1)**
5:6
**real (1)**

331:9
**really (29)**
39:10;67:4;80:10;
93:4;128:22;167:9;
196:4;197:2;210:15;
220:21;254:18;
279:18;281:4;
296:22;297:17;
309:22;310:24;
312:20;314:10,12;
325:20;343:25;
388:4;390:17;
395:23;404:17,20;
461:15;462:18
**reason (29)**
19:9;31:16;32:10;
42:11;102:11,13;
188:21;230:18;
268:16,22;278:22,
24;299:4;303:10,11;
317:6;433:23;
437:18;441:12;
447:13;459:18,23,
24;460:9,15,16;
461:9,10;467:24
**reasonability (1)**
82:22
**reasonable (1)**
306:10
**reasonably (2)**
82:19;394:9
**reasons (3)**
277:10;316:22;
371:11
**recall (80)**
6:19,20,21;7:25;
8:8,10;9:9;12:10,18,
19;16:21,25;17:19,
22,23;26:6,10;38:15,
25;39:7,8,9,11,11;
55:18;77:4;80:25;
81:4,22;98:5;113:17;
140:19;145:10;
164:23;165:2,15,21;
166:2,3,4,10;174:5;
175:13;179:23;
190:8;191:6,10;
192:24;193:15;
214:25;215:4,5,12,
14,16;217:12,16,25;
228:24;239:9;246:6,
7,8;250:8;256:22;
257:10;259:14,21;
285:17;288:9;298:8;
308:11;318:25;
326:7;337:23;
366:25;381:5;420:8,
9,9
**receive (5)**
6:11;241:16;
357:5;453:16,19
**received (2)**
148:4;309:18

**receiving (1)**
76:9
**recognize (1)**
315:20
**recollection (8)**
6:16;18:6;84:14;
90:15;177:4;219:7;
342:12;467:18
**recommend (1)**
348:9
**recommendation (15)**
274:6,8,18;277:13;
278:7,19;281:16;
306:25;307:5,14;
309:4;311:22;312:2;
347:13,17
**recommendations (1)**
347:15
**reconcile (1)**
240:15
**record (28)**
4:17;5:21;20:4;
71:13,17;144:16,20;
168:22;213:16,20;
238:3;292:2,6;
310:25;356:9,13;
415:21,25;432:4;
460:6,25;461:18;
462:4,11;463:10,23;
464:6;472:2
**records (11)**
43:22;44:4;45:5;
320:9,24;321:15;
325:9,18;326:5;
432:22;433:9
**record's (1)**
357:8
**recourse (19)**
66:8;67:2,12,22;
70:13;73:18,22;74:2;
454:16,20,25;
457:10,18;458:14;
464:20,24;465:10;
466:3,8
**reductions (2)**
311:18;312:20
**refer (3)**
66:20;379:21;
454:25
**reference (37)**
23:7,12;40:5;
156:16;191:17;
192:2;265:14;
271:19,20;272:24;
273:2;282:12,14;
303:24;304:2,6,25;
307:9,10,13;310:15,
16;316:10;317:5;
320:15;340:9;348:6,
10;350:21;366:16,
19,19;384:8;385:9;
403:18;413:16,18
**referenced (6)**

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

137:4;162:10,24;
    163:8;425:14,16
**references (1)**
    380:23
**referencing (1)**
    138:9
**referred (1)**
    390:15
**referring (20)**
    86:14;87:12;
    139:21;199:5;263:5;
    299:23;300:2;
    320:20;337:15;
    365:18;395:17,19;
    422:17,19,22;
    424:10;430:13;
    459:24;462:7;464:15
**refers (3)**
    66:16;379:22;
    386:4
**reflected (5)**
    114:21;163:20;
    165:13;221:18;
    275:11
**reflects (2)**
    50:3;221:16
**refresh (3)**
    18:6;84:14;177:4
**refuse (2)**
    325:13,22
**refused (8)**
    320:11,25;325:20;
    326:6;359:3;361:2;
    417:19,22
**refusing (1)**
    363:14
**regard (101)**
    9:5;17:7;20:12;
    27:8;28:7;29:22;
    31:12;38:16;39:23;
    46:18,23;52:24;
    53:11;54:6,12;55:24;
    58:21;66:12;67:8;
    70:12;72:4;85:14;
    86:9;87:11;102:4;
    104:8;105:10,22;
    113:21,25;114:5;
    118:13,23;120:22;
    122:24;124:22;
    137:13;138:8;
    140:10;142:2,4,5,11;
    143:15;146:25;
    149:20;150:21,22;
    154:24;156:24;
    158:3,25;159:3,8;
    163:17;164:24;
    165:3,7;166:15;
    168:4;169:20;177:4;
    178:13;179:15;
    190:10,17,20;
    191:12,24;192:10;
    207:21;208:4;
    212:17,23;215:9,11;

237:8;297:12,14;
    301:7,17,23;305:25;
    319:4;333:22;337:4;
    347:20,24;361:5,7;
    364:12,25;380:21;
    388:12,18;396:21;
    403:4;415:10;418:6,
    9,13
**regarding (10)**
    22:9;38:19;40:7;
    85:7;87:3;155:4;
    259:10;416:4;430:5;
    471:9
**regards (1)**
    162:9
**regular (2)**
    6:4;311:8
**regulation (1)**
    400:3
**regulations (5)**
    359:4;363:15,17;
    403:8,23
**rehire (1)**
    68:12
**rehired (10)**
    38:19;41:2,18;
    42:4;149:21;151:16,
    24;152:15;260:14;
    267:25
**rehiring (1)**
    38:8
**related (4)**
    302:10;312:24;
    314:25;393:9
**relates (5)**
    31:2;32:11;
    176:13;237:5;385:23
**relating (1)**
    34:17
**relation (7)**
    7:22;189:14;
    209:8;214:24;
    253:24;256:24;
    309:10
**relations (3)**
    433:19;471:9,10
**relationship (9)**
    57:3;60:14;
    262:23;263:25;
    275:10;292:15;
    295:22;469:10;
    470:16
**relationships (4)**
    295:14,17,17;
    297:10
**relay (1)**
    437:13
**relayed (6)**
    62:17,21;85:3;
    205:15;376:20;437:8
**relevance (1)**
    76:17
**relevant (4)**

76:11,13,14;82:10
**reliance (1)**
    82:22
**relied (1)**
    82:20
**relief (1)**
    125:25
**relieving (1)**
    125:22
**religious (1)**
    388:17
**reluctance (1)**
    244:5
**reluctant (1)**
    244:3
**remain (2)**
    54:21;55:9
**remained (4)**
    422:7,17;423:10;
    425:2
**remaining (1)**
    12:2
**remark (1)**
    468:10
**remember (25)**
    39:14;78:12;
    79:24;80:24;130:12;
    176:17;180:13,13;
    188:10;209:16,19;
    246:11;302:14;
    307:17;308:10,15;
    310:13;340:24;
    347:7;378:24,25;
    379:4;380:20;
    406:13;468:12
**remembered (1)**
    246:11
**removed (1)**
    379:19
**renter (2)**
    139:13;426:21
**repeat (2)**
    25:10;61:25
**repeated (2)**
    85:7;87:3
**repeatedly (5)**
    105:23;381:11;
    403:6,21;405:4
**rephrase (10)**
    8:14;40:15;58:4;
    85:18;138:6;168:18;
    173:21;190:15;
    238:8;468:21
**rephrasing (1)**
    15:11
**report (16)**
    52:5;143:12;
    166:15;179:24;
    196:5,6;320:17;
    326:3;332:17;
    389:23;390:9;
    398:21;401:5,9,11;
    412:3

**reported (2)**
    144:5;196:7
**reporter (10)**
    4:15;5:14,20,23;
    6:3;147:21;213:23;
    356:15;431:7;462:10
**reporter's (1)**
    214:10
**Reporting (2)**
    4:13,16
**representative (1)**
    25:19
**representatives (1)**
    452:12
**represented (2)**
    83:21;101:15
**representing (2)**
    468:25;469:6
**represents (1)**
    397:19
**request (2)**
    308:24;309:2
**requested (3)**
    303:18;356:21;
    449:9
**require (2)**
    56:10,19
**required (7)**
    13:12,23;253:9;
    283:16;288:2;360:4;
    363:18
**requirement (1)**
    56:22
**requirements (2)**
    32:21;56:18
**requires (2)**
    27:6,24
**rescue (7)**
    183:24,25;184:2,5,
    7,9;400:12
**reserved (1)**
    3:10
**reside (1)**
    427:15
**resident (2)**
    284:22;286:13
**residents (2)**
    275:17;322:20
**resident's (1)**
    407:19
**respect (3)**
    15:2;435:20;
    441:20
**respectfully (1)**
    439:2
**respective (1)**
    3:4
**respects (1)**
    429:21
**responded (4)**
    24:14;92:3,7;
    183:7
**response (11)**

92:12;94:9,9;
    95:23;183:14;
    194:11,13;215:25;
    372:5;462:14,19
**responsibilities (4)**
    52:23;53:10;54:5,
    12
**responsibility (4)**
    23:23;24:5;51:15;
    52:18
**responsible (10)**
    24:22;25:15,15;
    26:17,21;27:7;50:10,
    18;51:8;52:16
**responsive (2)**
    41:14;48:24
**rest (1)**
    398:10
**restricted (1)**
    322:20
**result (10)**
    101:7;103:16;
    332:5;353:21;354:4,
    17;355:9;357:13;
    386:9;389:12
**retain (4)**
    72:25;455:11,20;
    456:10
**retained (9)**
    72:12,18,23;73:5;
    145:19;146:4;
    348:24;467:14;
    468:17
**retaining (4)**
    73:13,17,25;
    468:19
**retake (1)**
    346:16
**retaliated (2)**
    105:24;136:16
**retaliating (1)**
    149:17
**retaliation (6)**
    85:6;86:3;87:2;
    104:21;138:5;277:17
**retaliatory (1)**
    105:12
**Retention (1)**
    348:18
**retired (1)**
    113:11
**review (7)**
    18:2;19:20,24;
    20:5;78:24;443:3;
    462:4
**reviewed (4)**
    79:2,3,5,17
**reviewing (13)**
    17:19;24:2;79:21;
    214:12;262:17,19;
    315:19;380:6;
    381:25;382:7,10;
    394:2;395:17

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 150 of 158 PageID #:
2520

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

**revoled (2)**
119:21;120:14
**Rich (1)**
98:11
**Richard (32)**
12:14;88:9,24;
90:24;93:4;96:25;
98:3,14,17;99:7,8,13,
17;125:13;130:4;
147:16;222:17,23;
223:10,15;231:2;
234:16;236:12;
251:5,10;341:12;
398:16;417:15,25;
419:12;420:3;422:6
**Richie (26)**
98:12;99:22;
108:18;202:8,17;
203:2,8;251:7;340:4,
12;378:4,6,8,9;
380:12;402:19,24;
408:25;418:5;
420:13,16,20,23;
426:12;436:16;452:5
**RICO (1)**
319:20
**rid (3)**
40:22;100:14;
277:15
**riding (2)**
89:19;322:19
**Right (316)**
7:17,17;21:7;28:8,
13;30:12,23;32:13,
25;37:5,11;43:8,10,
18;44:19;45:25;
47:18;51:2;52:7;
55:16;59:16,20,24;
60:4;65:18,25;66:3;
68:9,10,16;71:23,24;
72:12,18,22;73:2,3,
19,22;77:9;79:18;
81:7,9,13;86:7;
88:18,20,22;92:5;
94:17,20;96:15;
97:12;100:20,22,25;
101:5,9;102:16,18;
103:10,11,16;
104:16,22;105:4,21;
106:4,12;107:6,10;
108:5,9,25;109:3;
117:3,8;118:19;
119:9;120:19,24;
121:11;124:2,12;
127:25;130:3;
132:13,14,16;133:3,
11,13,19,22,24;
134:8;136:4,10;
137:8,10;139:16,22;
142:18;149:2;151:9;
153:8,9,13;156:3,5;
157:13;161:22;
167:8,22;170:7,15;

173:10;174:25;
176:7,17;177:12,13;
180:11;181:5,6,23;
182:20;183:5,22;
184:10,15;189:24;
190:9;192:6;199:18;
200:18;201:4;
203:11,13,14;
206:11;210:23;
213:11,21;215:20;
216:18;219:21;
220:23;221:20;
222:3;224:4,18;
225:17,18;226:2,15;
227:5;228:8,13;
229:18;230:17;
231:14;232:21;
233:7;234:11;
235:10;237:11;
238:19;240:17;
241:6,8,9,12,17,21,
22;242:24;245:5,9,
13;247:20;248:3,19;
250:20;251:6;
253:23;254:20;
256:5;257:21,24,24;
259:12;264:7,22;
265:23;268:8,21,24;
269:6;276:6;277:16,
18;282:7;283:6;
284:13;285:11,17;
287:4;291:7,19,22;
297:5,6,12,21;298:9,
14;300:5;301:24;
302:2,7;305:2,8;
308:14,17,24;
313:13,15,21;314:2;
315:23,25;316:19,
20;317:7,10,15,21;
324:21;325:16,24;
331:25;332:13,14,
17,18,21,22;333:22;
335:7,19,20,22,25;
336:10,18;338:21;
344:2,9,13,16;
348:15;349:12,20;
352:24,25;353:6;
354:11;360:16;
362:14;363:4;
367:10,25;368:2,9,
25;369:7;370:4;
372:14;373:2,11;
374:10,23;376:24;
377:8;385:4,7,19;
389:6;390:9;392:22;
400:14;401:9,20;
403:3,17;404:5;
409:20;411:18,19;
413:22,25;414:7,20;
417:8;419:22;
428:23;437:17,20,
21;457:4;458:5;
462:16,24;464:3;

469:7
**rights (2)**
39:4;150:22
**ringing (1)**
96:21
**risk (6)**
121:9;333:16;
353:8,16,24;357:3
**Riverhead (16)**
283:14;284:6,12,
14;285:8;287:12,23;
289:5,17;290:5,14,
16;291:21;294:4;
296:6;297:15
**Rivkin (1)**
4:24
**Road (5)**
327:16;407:12;
442:25;466:15,19
**Robert (1)**
147:16
**Rogers (13)**
87:23;117:9;
122:13;136:22;
162:16;165:4,6,8,12;
167:3;252:10;
258:23;335:9
**rogue (1)**
366:14
**Ronnie's (1)**
202:2
**room (9)**
129:5,6;204:14;
216:6,18,20,23;
217:4;243:21
**round (2)**
41:10;131:3
**routine (1)**
182:5
**rules (3)**
341:8;403:8,23
**run (3)**
91:3,17,20
**running (7)**
70:20;88:25;
89:12;93:21;94:2;
355:24;374:21

---

# S

**safe (1)**
370:16
**safety (21)**
107:20;108:9;
109:3,21;110:14;
111:22;112:16;
117:13;118:14,25;
120:14,22;121:8;
122:9,21;123:15;
332:4;333:16;334:8,
16,25
**salaried (1)**
9:20

**salary (5)**
9:24,25;10:5,7,11
**sale (2)**
360:3;365:11
**same (42)**
3:6,15;7:12,13;
37:11;50:25;75:25;
81:3,5,16;137:12;
159:20;164:24;
165:3,7;264:21;
265:5;279:5;280:18;
301:23;303:3,18;
305:9;306:5;330:10;
349:6;352:10;
353:12;364:4;386:3;
436:18;439:8;
443:19;444:25;
445:2;457:20;
458:16;462:12,14,
23;465:2;467:23
**Samuel (3)**
138:22;141:2;
468:6
**Sanchez (188)**
22:7,18;24:20;
25:11,25;26:2,8,12,
21;28:11;29:20;30:4,
16;31:2,13,22;32:12,
12;33:11,15,16;
34:15,23;35:8,18,23,
25;36:15,22;37:7,9,
13,16,20;38:2,6,25;
39:12,25;40:11,17,
21;42:10,14,21;
43:14;44:8,18,22;
46:4,18;47:5,19;
49:5,24;50:5,9,16;
51:14;52:15;53:16,
20,23;54:19;55:13,
25;56:4,11,19;57:3,
7,9,19,21;58:7;
59:14,19,23;60:9;
61:14;62:2,25;63:5;
64:9,19,24;65:11,15,
19,20;66:4,7,12;
67:11,20,20;69:9;
71:20;72:21;82:20;
85:21;86:2,11,17,25;
87:13;104:9,18;
105:6;159:5;342:17;
343:5,14;344:4,19;
345:5,12,18;432:11;
434:5,17,20,25;
435:7,13;436:2,15,
24;437:4,8,13;438:5,
10;439:11;440:9,16;
441:6,17;442:8,17,
21;443:14;444:6,8,
11,16,19;445:5,8,11,
14;449:21,24;450:2,
14,16,19,24;451:5,
10,13,18;452:9,14;
453:8,10;454:13,18,

23;455:4,8,10,21,24;
456:9,21,23;457:9,
11,17;458:11;
464:17,22;465:8;
468:3,11;469:10;
471:10
**Sanchez's (20)**
12:23;13:2,9,15;
23:9,23;24:5;26:17;
28:19;30:9;38:13;
52:23;53:10;54:5;
55:15;438:20;443:3;
446:2;452:20;470:23
**Santana (1)**
4:12
**Santarpia (7)**
110:19,20,24;
111:17,19,24;112:12
**Santarpia's (1)**
111:6
**sat (2)**
413:7;448:13
**satisfied (2)**
193:24;194:10
**Saturday (6)**
172:4,5,6;192:17;
199:10;200:25
**Saturdays (2)**
172:7,12
**saw (18)**
98:19;135:12;
185:17;187:12;
201:24;209:15;
222:5;224:13;
230:14;328:2,14;
330:11;369:13;
370:3;399:8;432:15;
433:8;455:4
**saying (27)**
41:25;59:18;60:5,
6;116:10,23;132:15;
142:23;175:4;
193:12;215:12,14,
17;228:23;238:17;
241:5;257:10;266:6;
278:7;292:19;
305:13;312:11;
343:24;400:18;
404:10;458:23,24
**scene (27)**
101:6;153:24;
154:5;175:25;
184:10,15;212:7;
221:17;222:2,9;
233:9;248:11,21,25;
249:5,8,15,19,25;
250:7;361:24;362:2;
416:24;417:2;421:2;
422:8,18
**schedule (3)**
131:3,6;270:4
**scheduled (17)**
263:15,23;264:9,

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

11,17,20,21;265:11,
21;266:10,21;269:9,
14,23;270:12;
271:15,23
**scheduling (3)**
131:2;132:3;134:5
**Schneider (6)**
442:14;443:19;
444:13,22;445:7;
451:7
**Schwartz (2)**
389:23;390:9
**Scott (6)**
272:2,2;280:18;
313:12
**screaming (1)**
216:6
**se (1)**
366:3
**sealing (1)**
3:5
**search (5)**
283:3;362:4,6,13,
14
**searched (2)**
362:18,21
**searches (2)**
72:2;171:15
**season (31)**
7:10;8:3,12,17;
38:9,20;41:2,18;
42:4;132:19,21;
133:2,11,15,17,22;
134:4,8,11,18;180:8,
9;187:14,17;199:8;
256:25;257:3;
330:10;411:14,19,19
**seasonal (5)**
10:17,22;11:5;
133:23;426:21
**seasonal/part (1)**
311:4
**seasonals (2)**
133:12,16
**second (16)**
9:4;15:2;61:6;
77:13;254:24,24;
255:7;296:15;
314:24;316:14;
321:11;381:21;
408:19;409:25;
431:8;468:16
**secretary (1)**
290:18
**section (2)**
299:17;358:8
**secure (7)**
248:10,24;249:5,8,
14,18;250:6
**securing (1)**
249:24
**security (4)**
248:21;427:25;

428:2;429:10
**seek (13)**
66:8;67:2,12,21;
70:13;227:12,20;
293:13;306:3,3;
454:19,24;456:18
**seeking (16)**
18:10;53:19;
73:18;74:2;293:11;
310:21;393:12;
454:16;457:9,17;
458:14;464:19,24;
465:9;466:2,8
**seem (1)**
463:5
**seemed (3)**
13:8;70:5;213:24
**seems (1)**
74:14
**sell (2)**
359:17,20
**selling (4)**
326:24;327:6;
360:10;361:11
**send (16)**
286:2;288:9,25;
289:12;309:3,17,19,
24;335:14,15,21,24;
338:24;428:6;
451:10;453:25
**senior (1)**
124:14
**sense (4)**
441:14,14,16;
450:2
**sent (8)**
277:18;281:10;
283:10,12;303:20;
308:23;310:19;312:7
**sentence (8)**
454:13;457:8;
458:17,19,21;
460:12,12;464:16
**separate (2)**
21:23;430:20
**September (8)**
100:9;133:7;
307:23;308:5,13;
309:9,15;398:14
**sequence (2)**
80:25;408:23
**Sergeant (9)**
4:23;30:20,22,24;
32:20;272:2,21,25;
336:5
**series (2)**
21:13;105:9
**served (3)**
349:2;350:13;
354:6
**Service (51)**
23:21;24:7,16;
26:20,22;27:6,25;

28:20,25;30:21;32:3,
21;33:5;39:5;43:20,
24;44:5;56:10,18;
58:13,17;63:2;65:2,
4,17;67:16;163:24;
283:15;287:15,20;
299:5;348:24;
377:18;379:18;
393:24;394:7,11,19;
395:12;396:20;
427:23;432:14,24;
434:14;438:3;
440:23;452:9,18;
465:19,22;470:22
**Services (1)**
267:4
**serving (3)**
353:22;354:17;
357:13
**set (13)**
20:9;22:5;23:20;
87:13;182:21;
263:14;319:24;
348:22;351:16;
358:25;380:24;
386:11;459:15
**setting (1)**
25:6
**seven (3)**
387:25;409:9;
415:24
**several (1)**
24:10
**severe (8)**
386:5,8,13,16,22;
388:12,18;393:18
**sex (10)**
57:9,20;58:7;
59:24,25;60:8;
407:19,22;470:13,14
**sexual (8)**
57:3;60:14;407:2,
8;433:18;469:10,20;
470:16
**Shalick (6)**
256:10;422:14,20;
423:9;424:2,11
**shall (3)**
3:6,10;448:14
**shared (1)**
22:8
**Shawn (5)**
225:13,14,21;
236:8;425:17
**Sheriff's (3)**
263:20;302:16,16
**shield (6)**
251:25;369:13;
370:3,17;372:25;
437:23
**shift (25)**
180:22;186:22,25;
187:20;217:23;

228:9,11,22;229:9;
250:22;251:10;
254:6,11,14,15,21,
24,25;255:3,6,7;
338:20;404:25;
419:2;428:8
**shifts (4)**
191:9;338:14,16;
408:16
**shocked (1)**
342:10
**shop (1)**
89:25
**Shore (1)**
374:6
**short (3)**
151:13;171:19;
405:20
**shorten (2)**
139:25,25
**shortly (8)**
33:17;145:17;
187:15;209:10;
228:16;401:7;412:5;
414:4
**shoulders (2)**
188:12,14
**show (3)**
20:22;21:15;
297:21
**showed (4)**
213:4;220:11;
388:2;413:9
**shows (2)**
42:21;44:22
**shrug (1)**
188:12
**shrugged (1)**
188:13
**sick (5)**
412:3;413:24;
414:22,24;415:3
**side (2)**
355:18;373:24
**signed (4)**
3:14,15;168:13;
305:4
**significance (2)**
48:2,4
**significant (1)**
48:3
**silence (2)**
178:2;422:7
**similar (6)**
161:17;283:8;
342:19;343:11;
344:6;345:13
**simple (3)**
249:14;293:20;
385:22
**simpler (2)**
238:11;351:25
**simplified (1)**

465:7
**simply (2)**
215:17;238:12
**single (1)**
235:2
**singled (1)**
199:24
**singling (3)**
175:8;176:9;
198:25
**sit (7)**
220:18;221:2;
248:4;250:4;273:16;
290:23;417:3
**sitting (2)**
369:17;395:14
**situated (1)**
245:13
**situation (9)**
23:5;189:11;
193:25;194:14;
242:15;271:12;
355:19,21;395:12
**six (3)**
282:20;356:12;
415:20
**sky (2)**
240:20,21
**slam (1)**
129:25
**Slammed (1)**
129:8
**sleeping (6)**
98:7,19;99:4,9;
331:20;421:22
**smoke (3)**
200:16,17,19
**Snyder (42)**
33:23;62:18,19;
63:25;64:15,17,18,
18,22;65:10;125:8;
130:19;217:2,3,4;
238:13;248:10;
249:7,14;250:5;
261:5;338:11;
390:21;391:4,10,12,
13;398:18;416:23;
417:4,13;418:19,25;
419:13;420:2,6;
424:7,13,24;431:23;
432:4;436:21
**Snyder's (3)**
412:3;413:9,21
**sole (1)**
394:8
**solely (1)**
385:23
**somebody (10)**
58:21;78:8;84:9,
13;172:11;182:23;
185:12;202:3;277:3;
289:11
**somehow (1)**

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 152 of 158 PageID #:
2622
EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

452:18

**someone (20)**
8:19;79:7;80:15;
81:12,24;145:7;
152:13;238:17,23;
239:11;240:19;
241:24;251:18,25;
270:13;289:25;
293:10;446:9,10;
466:22

**sometime (4)**
78:15,21;100:9;
140:6

**Sometimes (5)**
182:6,8,19,23;
337:19

**son (7)**
237:22;323:3,7;
324:16;387:9,12;
427:10

**soon (5)**
126:3;255:2,5,8;
456:22

**sorry (38)**
13:6;21:25;38:12;
46:10;51:6;61:10;
68:8;79:12;87:19;
96:22;99:6;123:18;
132:18;146:24;
150:22;160:13;
169:15;170:17;
187:7;188:2;197:6;
208:3;216:22;
235:12;255:2;
258:18;263:4;269:7;
287:20,20;302:8;
339:6;353:11;
365:22;373:20;
380:4;397:3;461:5

**sort (3)**
445:14;451:17;
452:14

**sought (5)**
319:4,14;387:3;
388:10,16

**sounded (2)**
214:6,13

**Southampton (29)**
263:18;264:13,14;
265:12,23;266:16;
269:22,24;270:14;
271:8;280:15;
281:22;282:2,21;
284:23;285:14;
286:16;293:16;
295:24;296:2,14;
297:3;301:18;
312:14;313:2;314:7;
319:3;382:19;383:15

**southeast (1)**
89:24

**span (1)**
347:6

**speak (22)**
117:24;125:10;
126:19,21;142:20;
169:9;223:6,10,15,
16,18,20;224:3;
230:9;244:18;251:7;
289:21;417:25;
426:9;441:5,9;452:2

**speaking (3)**
118:12;284:3;
424:11

**specialist (1)**
4:14

**specific (10)**
29:6;53:10;55:25;
65:9;88:4,8;147:5;
168:18;179:4;292:12

**specifically (43)**
29:7;34:16;38:22;
49:4,7,20;52:22;
55:2,3,18;64:19;
65:10;66:11;77:25;
88:12;90:16;119:19;
142:4;145:11;
146:13;171:8;
174:10;192:4,25;
197:2;209:3,21;
212:19,22;246:9;
249:2;258:14;
273:17;326:19;
354:15;381:5,5,7;
397:6;415:8;453:6;
454:12;464:16

**specifics (1)**
85:13

**speculating (1)**
298:10

**speculation (3)**
298:14,18,20

**Spell (1)**
113:2

**spellings (1)**
147:19

**spend (1)**
408:15

**spoke (40)**
33:20;34:4,6,15;
49:14;86:10;87:12;
88:23;106:9;107:13;
122:3;143:17;
152:13;153:3;159:4;
169:2;225:9;266:24;
267:6;268:2,4,6;
272:21;289:25;
290:5,10,18;426:6;
429:11,12,14;
437:10;440:25;
442:13,13;449:25;
451:18;452:4,9;
468:13

**spoken (8)**
26:2;61:18;78:3;
115:13,15;145:20;

219:3;429:7

**sponsored (1)**
453:21

**spot (1)**
410:23

**spread (4)**
368:5,6,18;410:3

**spring (2)**
7:6;180:12

**springtime (1)**
7:19

**squared (1)**
170:13

**St (1)**
432:10

**stages (1)**
25:7

**Stan (15)**
442:10,12,13;
443:9,18;444:2,3,9,
10,14,15,15;446:8;
449:16;450:15

**stand (17)**
72:16;73:9;244:5,
18;245:19;410:23;
411:9;440:2;442:22;
450:15;452:11;
455:16;459:2;
465:14,24;466:14,17

**standing (8)**
242:24;245:9;
246:8;328:12;329:2;
367:20,22;408:16

**stands (1)**
458:2

**start (14)**
70:22;91:6,7;
256:24;257:2;
264:12,16;265:11;
269:9,11,14,19;
270:24;396:3

**started (32)**
7:19;10:4;76:9;
80:9;90:25;91:5;
104:17;106:11;
108:14,17;116:24;
128:12,14,14,16,17,
17,20,23;131:8;
141:2;188:24;
198:16,20,22;203:6;
212:8;239:3;338:20;
346:20;390:11,12

**starting (2)**
125:4;271:4

**State (19)**
5:18,20,23;51:18;
75:23;234:13;239:2;
243:22;287:8;
348:18;357:20,24;
358:17;359:7;
363:23;364:24;
366:3;401:15;403:4

**stated (17)**

29:19;46:12;48:8;
62:24,25;104:8;
108:7;148:7;238:2;
264:6;273:5;454:13;
461:9;465:13;
466:13,13,24

**statement (87)**
115:7,11;155:25;
175:23,25;176:12;
209:2,6;210:2,18;
211:2,7,14;212:23,
24;213:4,5;214:19,
24;215:3,18;216:15;
217:11;219:9,18,19,
24;221:16,18;222:4,
14,23;223:2;225:7,8,
10,14,17,23;227:13,
21;228:19;229:13,
17;230:5,14;231:5;
233:22;234:4,11;
235:15,20,22,25;
236:5,9,12,15;248:6;
265:15;266:3,7;
295:5;321:23;365:3;
368:20;412:7,8,22,
25;413:5,8,9;414:4,
6,9,13;415:3;423:7;
458:25;459:5;
465:23;467:2,6;
468:22;470:17,20

**statements (28)**
155:21;157:9,12;
212:9;218:10;
220:23,25;221:3,6,
11;223:25;224:17;
234:15;236:21;
240:16;248:2;
256:22;257:5,14,17,
19,23;258:4,15;
268:17;366:8;
454:14;464:18

**statement's (1)**
413:13

**States (1)**
4:8

**stating (2)**
148:4;283:11

**station (42)**
24:11;25:12,24;
26:7;98:8,20;100:23;
102:15;103:5;129:2;
148:15;174:19;
180:25;181:25;
182:2,17,24,25;
183:3;184:25;
199:14;202:23;
204:10,11;220:17;
224:9;251:24;
255:21,22;322:10;
323:4,23,24;330:2;
363:3;390:23;
402:21;409:13;
410:2,5;422:4;

426:11

**statute (1)**
394:24

**stay (3)**
181:25;182:6,24

**stayed (2)**
181:24;410:17

**stems (1)**
396:14

**step (26)**
68:17;69:2,6,16;
70:9,12;71:22;72:4,
5,6,7,9,11;73:5,8,11,
12,14,17,22,25;74:2,
4,13;86:20;364:9

**steps (8)**
368:2;454:18,23;
457:10,16;458:10;
464:23;470:21

**stick (2)**
250:10;280:14

**sticking (1)**
278:12

**stigma (2)**
291:2,6

**still (17)**
29:2,8;30:11,15;
96:16;97:2;117:11;
123:4;207:5;234:21;
312:18;314:9;
386:14;387:19;
398:6;418:20,22

**stips (1)**
6:5

**STIPULATED (3)**
3:2,8,12

**stone (1)**
456:13

**stood (1)**
410:15

**stool (1)**
185:19

**stop (7)**
52:10;53:5;82:12;
141:7;171:17,21;
465:15

**stopped (9)**
28:25;304:3;
312:23;313:7;314:4,
10,12;356:16;384:6

**stops (1)**
412:19

**storage (1)**
204:14

**stories (1)**
242:3

**story (3)**
188:8;192:7;203:2

**straight (4)**
166:17;295:5;
377:12;414:3

**stranger (2)**
282:4,4

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**strategic (1)**
350:5
**street (4)**
185:3;202:10;
248:23;275:18
**streetlight (1)**
408:17
**strengthened (1)**
108:22
**strictly (1)**
358:4
**strike (19)**
8:7;25:8;41:13;
48:23;59:11;65:6;
70:8;71:7;89:8;
126:8;127:10;
212:15;244:11,12;
250:11;278:3;
293:19;357:7;446:16
**striking (4)**
239:22;240:11,13;
246:22
**stronger (1)**
120:23
**struck (1)**
239:16
**stuck (2)**
246:13;410:13
**stuff (6)**
199:19;204:12;
288:11;289:12;
398:10;412:21
**subject (4)**
39:13;74:19;
322:23;327:21
**subjecting (1)**
236:21
**submit (5)**
287:6,12;288:6,19;
303:3
**submitted (8)**
285:7;287:7,14;
288:7;290:13;
292:20;318:5;382:17
**submitting (1)**
293:3
**Subparagraph (4)**
320:22;336:19;
379:13;380:25
**Subscribed (1)**
472:7
**subsequent (1)**
390:24
**substance (17)**
26:11;37:25;
38:16;85:4;168:5;
169:10,20;191:3;
192:6;209:21,23;
328:4;331:13;337:7;
362:23;383:7;426:14
**successful (1)**
116:6
**sudden (2)**

**sue (2)**
350:6,6
**suffer (2)**
355:9;357:12
**suffered (7)**
354:4,16;355:5,5;
386:9,12;389:12
**suffering (1)**
386:4
**sufficient (1)**
241:15
**Suffolk (72)**
5:11;23:20;27:6;
43:19,20,21;55:11;
66:25;70:2;109:12,
22;110:17,22;
111:12,14;113:20;
115:3;117:22;118:8;
122:19;137:23;
138:2,11,15;140:9,
12,16;141:15,24;
143:13;144:10,23;
145:7,20;146:14;
147:6,23;150:19;
151:17;155:21;
158:10,19;159:14;
160:20,22;163:18,
24;165:24;166:7,13;
168:6;169:21;259:5,
15;260:7,13;263:17,
18;283:14;287:14,
19;299:4;311:6;
312:10,15;340:14;
341:14;348:23;
359:5;396:21;397:5;
438:2
**suggest (1)**
46:4
**suggesting (4)**
116:19;224:12,13;
235:6
**suggestion (2)**
151:2,3
**suing (3)**
53:16;384:9;
385:11
**suit (10)**
12:6;13:9,13,15,
19;14:2,7,13,18;
16:16
**sum (9)**
26:10;37:25;
38:16;191:2;192:6;
209:21,22;383:6;
426:13
**Summertime (2)**
89:16;331:2
**summons (17)**
321:19,25;322:3,8,
16,24;323:7,17,19;
324:7,8,20;325:3,6,
10,13,21

**summonses (11)**
154:4;275:8,9,13,
16,23,25;321:13;
371:6,17;372:19
**Sunday (4)**
253:19,21;254:3;
455:4
**super (1)**
316:17
**superior (9)**
31:23;334:18;
349:11;402:9,12;
403:6,21,22;405:6
**superiors (2)**
32:13;124:10
**Supervise (3)**
195:4,8,12
**supervisor (6)**
293:11;316:20;
402:15;403:7;405:6,
12
**supervisors (1)**
443:3
**support (1)**
51:14
**supposed (3)**
116:11;195:23;
207:8
**sure (39)**
7:18;12:13;18:3,
22;21:25;24:22;
31:11;40:23;48:15;
62:20;84:25;102:13;
104:25;146:10;
180:15;187:16,18;
194:20;196:25;
198:6;218:4;220:13;
233:4,11;238:10;
254:10;255:23,25;
261:13;267:4;
271:13;276:7;
278:24;303:8;
306:11;365:13;
373:21;454:7;467:9
**surveillance (5)**
204:3,5,23;205:4,
19
**suspect (1)**
446:3
**suspended (2)**
208:12,16
**swear (2)**
5:14;197:4
**sweat (1)**
331:9
**swinging (1)**
221:20
**switch (2)**
144:13;431:8
**swore (1)**
334:3
**sworn (5)**
3:15;5:17;155:20,

25;472:7
**sympathy (1)**
429:17
**synopsis (1)**
222:5
**system (1)**
71:3

---

**T**

---

**table (4)**
274:12;369:14,17;
395:15
**tail (1)**
450:6
**talk (34)**
58:20;63:19;
119:20;120:5;
125:23;126:6;149:5;
167:9,12;178:5;
198:24;208:24;
218:8,16;222:17;
224:18;242:25;
243:2;245:19,25;
260:24;273:12;
302:7,13;306:20;
338:23;368:22;
381:9;398:19;
429:18;430:22;
441:21;442:17;
450:16
**talked (18)**
49:17,20;62:22;
63:21;64:2,3,5;
128:13;151:7;
160:21;178:6;
302:12;375:15;
381:2,3;385:5;
455:23;456:2
**talking (29)**
25:5;58:8;74:12;
90:23;106:10;
114:22;115:8;123:5;
128:3,4;139:2;
157:25;168:16,17;
235:3;243:7;244:22;
258:14;275:6;
291:12;296:2,5;
364:10;375:7,14;
397:8;429:22;
449:20;465:4
**talks (1)**
381:22
**tape (22)**
4:2;67:18;71:9,12,
16,19;143:6,7;
144:13,15,19;
213:13,15,19;
291:25;292:5;356:8,
12,17;415:17,20,24
**tapes (6)**
157:3;204:3,5,23;
205:4,19

25;472:7

**taught (2)**
111:3;113:12
**taxes (1)**
324:3
**taxi (6)**
373:23;374:11,15,
18,25;375:5
**team (4)**
327:22;330:16,22,
24
**technically (4)**
322:5,6,13;361:11
**telephone (2)**
81:6;443:17
**telling (25)**
68:2;71:21;91:5;
150:3;210:19;
225:22;226:6,9,13;
230:19;231:11;
234:15;240:9;
243:13;246:10,14;
248:5;332:16;
379:11;391:10,10;
420:19;423:3;
450:15;465:20
**tells (3)**
241:21,23;450:14
**ten (2)**
355:20
**tended (3)**
250:13;470:5,9
**tendency (1)**
216:7
**tending (4)**
228:17;229:3;
248:22;249:9
**tends (1)**
470:3
**Tenth (1)**
365:24
**term (2)**
10:22;394:11
**terminate (9)**
35:2;36:3;68:14;
434:18;435:2,8,14;
436:25;437:5
**terminated (12)**
86:25;358:25;
371:10;381:12;
382:18;383:10;
434:11;438:6,11,21;
439:15;440:12
**terminating (3)**
320:10,24;325:19
**termination (23)**
66:9;85:5;357:19;
394:5;436:8;438:19;
439:12,13;440:10,
17,20;441:7,10,24;
442:5;454:17,20,25;
464:21,25;465:11;
466:3,9
**terms (3)**

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 154 of 158 PageID #: 2524

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

84:12;240:11;
359:10
**test (6)**
30:22;55:13;
360:13;361:15;
363:3,5
**testified (44)**
5:19;25:14;30:10;
33:12;38:6;45:2;
46:8,17;71:18;79:16;
95:9;98:18;104:8;
106:25;115:12;
122:6;129:23;137:5,
10;140:12;144:25;
158:8,18;168:24;
171:11;177:6;
217:17;219:6;
233:17;296:17;
321:5;326:4;344:19;
349:18;378:16,18;
382:22;394:14;
395:5;406:6;426:5;
432:4;443:6;467:17
**testify (1)**
434:2
**testifying (6)**
38:15;39:2,12;
97:20;98:6;430:4
**testimony (48)**
11:24;36:22;
39:21;63:4;98:3,14,
17;99:11,15;123:13;
134:3;141:13;
154:15,19,22;155:4,
8,13;189:17;205:7;
208:19;211:13;
214:2;246:6;259:15;
296:19;304:20;
312:22;313:14;
314:3;317:2;332:5;
333:5;341:11;344:3;
345:25;347:25;
360:21;361:6;367:2,
4;371:8;372:11;
384:12,20;397:19;
406:3;443:24
**tests (3)**
50:20;346:13,16
**testy (2)**
460:21,23
**Thanksgiving (3)**
131:7,7,9
**Thereabouts (2)**
428:16;436:13
**thereafter (9)**
33:17;147:16;
187:15;206:14,17;
209:10;228:16;
401:7;414:5
**thereby (2)**
353:9,17
**therefore (3)**
33:3;34:8;267:17

**thereof (1)**
22:13
**thinking (3)**
386:25;388:21;
389:4
**third (2)**
63:18;253:7
**Thirteenth (1)**
319:20
**Thompson (16)**
4:20;75:4,19;78:9;
79:7,23;80:17;81:8,
12,21,25;83:11;
145:19;146:6,8,20
**though (7)**
49:19;53:15;
119:16;251:17;
334:3,6;439:18
**thought (11)**
149:14;150:14,15;
163:11;170:23;
233:16;330:12;
380:11;412:3;430:6;
466:15
**thoughts (1)**
38:8
**threaten (4)**
144:5;164:11;
190:16,19
**three (26)**
26:9,13;63:16;
65:21;142:9,10;
144:19;177:19;
182:7;213:15;
216:16;221:19;
224:8;239:21;
250:11;251:23;
328:12;399:24;
408:16;410:13,16;
421:12,20;433:6;
436:12;441:2
**threw (4)**
202:15;203:10;
204:20;205:9
**throwing (4)**
205:18;207:3;
216:5;332:12
**thrown (1)**
408:25
**ties (2)**
300:18,20
**til (1)**
412:14
**timeline (13)**
80:24;140:20;
141:11;192:18;
209:18;228:15;
253:22;303:15;
414:2,2;456:25;
467:10,12
**times (17)**
26:9,13;82:8;
103:25;104:5;

129:13;145:10;
153:5;166:12;
168:25;171:5;
190:12;290:20,22;
432:16;433:6;441:2
**tires (1)**
199:16
**title (1)**
31:4;357:19;
389:21
**TMJ (2)**
267:3,5
**today (23)**
12:6;96:16;97:20;
155:22;156:8,9,11,
15,20,21;157:4,10;
248:4;250:5;273:17;
290:24;386:14;
389:10;394:14;
395:6,15;417:4;
426:4
**today's (1)**
471:23
**together (6)**
50:19;182:2;
256:4;283:18;
374:18;430:18
**told (177)**
14:11;15:8,22;
25:18;32:10;33:16;
34:3,3;35:17,19,25;
36:15,17;37:2,9;
46:18;49:10,11,14;
55:2,19;63:25;71:20;
72:8,15;75:8;78:18,
19;85:25;86:24;
96:5;99:21,21;
103:14;128:5;135:6;
136:2;147:25;
149:13,13;150:12;
154:17,21;155:19;
169:23;170:2,16,18,
20,21,21;172:6;
179:2;185:22;186:8;
188:3,8,15;192:19;
196:23;197:2;
199:13;202:25,25;
204:18;205:8;
208:19;210:4;
211:11,18,20,21,22;
212:2;217:9;227:7,
25;233:12;238:12,
12,13;239:10;
240:10,19,20;243:5;
244:23;246:3;
247:23;252:23;
255:12,16;256:12,
19;257:23;258:6;
261:23;262:4,6,9,12;
268:12;271:16;
286:6,9,12,21;
301:16;302:25;
303:14;304:5,9,18,

24;305:6;313:13,16;
320:16;324:19;
329:17,24;332:6;
333:18,20;334:14;
336:5,25;337:4,6,8,9,
12;343:7;371:9;
375:22;376:23;
377:24,25;378:23;
380:23;381:6;
382:22;384:11,17,
17;385:8,10;391:4,
11,13;402:5;407:9,
11,22;408:7;411:6,9,
11;413:4;415:6;
417:17;420:22;
433:16;437:14;
439:3,22;442:22;
443:19;445:10;
452:7,10,16,25;
453:7;455:15;466:5,
16
**Tom (3)**
143:2;266:25;
267:6
**Tommy (26)**
33:23;62:18,19,22;
125:8;130:19;
135:11;217:3;
252:23;261:5;
312:16;338:11;
390:21;391:4;413:9;
414:14;420:12,20,
22;424:16;425:7,9;
430:10;431:23;
432:4;436:21
**Tommy's (4)**
213:3,4;413:15;
414:4
**tone (2)**
448:15;459:11
**tonight (2)**
202:21;412:11
**took (35)**
72:10;73:11,12;
74:3;130:25;135:9;
140:5,6;186:19;
199:3;204:7,8;240:4;
248:6;251:24;299:4;
300:6;317:19;319:2;
324:6;370:16,17;
410:5;416:14;417:4,
9;435:7,16;436:24;
443:7;457:11,17;
458:11;464:23;
469:11
**top (4)**
245:12;321:22;
399:21,22
**Tortious (1)**
262:21
**touch (1)**
202:16
**touched (1)**

250:3
**tour (10)**
131:13,16,20;
133:4;187:9;280:18;
404:13;405:12;
410:12;418:4
**tours (7)**
116:13;131:10,20;
132:12;134:5;
410:13,16
**toward (2)**
441:13;448:15
**towards (5)**
180:4;216:15;
441:16
**town (22)**
70:3;263:19;
264:14;265:11;
266:16;270:13;
271:8;281:21;282:2,
21;293:16;295:25;
296:3;297:2;301:17;
312:14,16;314:6;
315:16;319:3;
382:20;383:15
**trail (2)**
45:17,17
**transaction (6)**
327:10,12;328:7;
332:25;360:8;361:14
**transcript (1)**
214:10
**transferred (1)**
147:9
**Transparent (1)**
328:20
**transpired (3)**
81:20;256:2;369:9
**transporting (1)**
340:25
**traumatized (1)**
48:18
**trial (2)**
3:11;245:16
**tried (13)**
70:15;116:5,8;
119:16;167:4,10,11;
183:9;232:23;425:4;
442:12;444:12;
449:18
**truck (10)**
181:25;182:6,7,9;
192:20;409:14;
410:7,8;413:8;414:3
**true (14)**
20:23;48:19;
98:22;198:2;246:2;
248:11;251:3;
309:21;360:18;
361:4;364:12,21;
365:7;460:7
**Trust (3)**
27:20;60:19,22

FRANK FIORELLO
February 20, 2009

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

**trusted (4)**
57:21;58:9,14;
60:15
**Trustee (18)**
88:2,5;89:8;
106:17,20,23;107:8,
14;117:15;121:23;
122:8;137:2;161:9;
165:4,19;259:2;
352:11,13
**trustees (4)**
121:18;137:14;
260:2;335:11
**truth (16)**
39:15;225:22;
226:6,9,13;230:19;
231:12;234:15;
240:9;246:14;248:5;
304:22;360:17;
388:22;455:13;466:6
**truthful (7)**
18:24;19:7,11,13;
20:10;144:9;230:4
**truthfully (2)**
244:16;316:3
**try (13)**
167:2;183:8;
192:18;238:11;
388:2,4;398:9;400:8,
13;421:7,11,12;
444:15
**trying (43)**
35:22;90:13;
130:24;133:5;
141:10,12;150:8,24;
177:16,16;183:19;
195:17,18;210:14,
15;217:7;228:14;
235:11;273:10;
276:8;280:11;
296:22;307:15,15,
17;310:2;341:7;
343:20;344:24;
345:2;380:9;384:3;
398:19;402:15;
404:18;422:23;
425:7;433:2;435:17;
450:17;468:4,5,9
**turn (5)**
21:20;49:22;
360:23;398:11;
402:25
**turning (1)**
363:25
**TV (1)**
114:15
**Twelfth (1)**
348:15
**twice (1)**
439:3
**twister (1)**
344:22
**two (64)**

11:2,2,3;13:5,6;
25:23;35:10,11,12;
38:12;41:5;44:23;
55:13,15;59:14;
62:21;63:11,12;
64:11;69:22,22;
70:17;71:16;76:13;
93:9;94:23;96:6;
105:19;106:3;
115:12,14;124:18;
133:15,17,18;143:8;
144:15;147:12;
162:18;171:5,24;
173:2;174:23;
175:10;177:19;
181:3,22;182:6,16;
192:3;239:16,21;
240:15;242:2;
255:11;320:4;331:4;
333:12;355:20;
371:11,16;426:25;
429:14;463:20
**Ty (10)**
337:19;347:12,16,
19,23,23;373:23;
374:8;391:6;392:3
**type (5)**
111:13;115:6;
190:19;285:7;303:3
**typical (1)**
311:11

## U

**ulterior (1)**
463:25
**ultimate (1)**
38:18
**ultimately (19)**
31:3,7,8;36:7;
51:21;73:15,16;
246:21;291:4;
306:20;320:10,24;
325:18;395:21;
401:6;434:22;
435:16;436:10;
466:12
**um (119)**
9:24;12:18;31:25;
32:2;41:10;45:10;
50:19;62:17;65:3;
69:21;70:23;74:17,
18;80:13;91:2,13;
96:11;100:8;112:2;
125:6,9;130:13;
131:8;135:4,7,9;
139:11;142:21;
149:9,15;150:24;
155:6;157:16;
172:13;174:17;
175:3,13;178:16;
180:10;182:6;183:4;
184:19,24;186:20;

188:24;191:17;
193:8;201:2;218:10;
220:9;223:18;233:4;
267:15;269:22;
273:14;280:20;
282:22;285:3;
287:14,23;288:20;
292:8;303:14;
314:18;324:9,15,15;
327:14,20;337:2;
339:8;340:2,3;348:9;
355:14;357:2,3;
362:16;371:3;377:3;
380:9;385:25;
390:21;392:13;
395:12;399:6;
402:20;406:4;407:2;
412:6;413:18;414:8;
416:13;419:7,8;
426:20;427:3,9;
428:10,14;429:11,
20,20;430:20;
432:20,22;434:3,21;
436:3;451:21;
452:17,19,20,21,22;
453:22;454:5;468:5;
470:22
**Um-hum (11)**
139:14;199:15;
261:4,6;272:23;
324:5;338:10;
369:12;376:14;
379:2;409:3
**un (1)**
208:18
**uncertified (13)**
50:11;51:9;86:13;
348:25;353:21;
354:5,17;355:10,14;
357:14;379:19;
396:15,22
**uncomfortable (1)**
75:14
**unconscious (1)**
239:12
**under (9)**
24:7;39:5;97:20;
156:2;207:16;
262:20,23;277:3,19;
348:18;355:22;
357:20;360:2;
361:20;366:3;
389:20,23;410:13;
431:25
**underneath (1)**
452:19
**understand' (1)**
417:18
**understood (2)**
11:24;156:17
**undertook (1)**
250:6
**undo (1)**

353:16
**undue (1)**
353:7
**unemployment (4)**
6:12;7:5;9:6,7
**unethical (1)**
278:17
**unfair (2)**
74:16;149:15
**unfairly (1)**
74:21
**Unfit (2)**
348:18;354:9
**uniform (1)**
328:10
**uniforms (1)**
199:17
**United (1)**
4:7
**unjustified (1)**
279:25
**unlawful (9)**
66:9;85:9;87:5;
105:3;136:19;
139:24;326:11,20;
344:12
**unlawfully (2)**
22:7;30:5
**unless (3)**
77:25;179:5;448:8
**unlikely (2)**
32:17;293:9
**unprofessional (1)**
441:23
**unqualified (10)**
52:11;53:6;349:2;
352:9;353:22;354:5,
18;355:10;357:13;
396:22
**untechnically (1)**
322:6
**up (130)**
7:24;25:6,12,24;
26:6,13;34:8;41:23,
25;45:12,14;77:2;
91:25;92:6,11,14;
94:11;126:4;139:25;
140:2;141:24;147:9;
148:11,13,20;149:4,
6,7;152:17;153:9;
172:15,15,16,17;
175:17;186:21,24;
187:20;201:19;
205:16;206:6,9,10,
15,24;207:6,9;208:2,
3;213:12;218:14,22,
24;228:19;230:21;
231:2,14,17;232:4,8,
10,15;233:8,13,18,
20,21,25;234:22;
237:13,18;244:5,18;
245:12,19;251:12;
252:5,6,10;255:16;

258:12,20,24;259:3,
7,19;260:5,9,17,22,
25;261:25;263:10;
267:15;268:15;
271:11;272:11,14;
273:13;280:6;281:8;
300:7,10;302:15;
303:12;330:3;336:3;
337:12;339:17;
355:18;356:2;
367:10;368:15,16,
21,25;387:22,23;
400:6;402:24;410:5,
6;413:4;415:9;
422:15;423:10;
424:4,16;456:3,10
**up' (1)**
422:9
**upcoming (1)**
172:7
**upheld (1)**
32:2
**uphold (1)**
334:3
**upon (19)**
32:9;35:24;36:15,
21;37:18,24;50:8;
52:14;63:11;64:10;
197:20;232:15;
275:12;294:23;
300:24;329:12;
382:21;392:7;428:7
**ups (1)**
161:25
**upset (6)**
48:16;59:7;
215:21;275:17;
323:23;372:2
**upsetting (1)**
372:3
**upstairs (2)**
204:7,9
**use (7)**
23:25;50:25;
214:23;267:8;399:2;
415:9;423:10
**used (15)**
41:4;156:10;
193:9;198:25;
215:10;250:10;
299:20;317:20;
366:17;394:21;
412:20;424:3,3;
432:6;466:25
**useless (2)**
449:17,22
**using (4)**
156:15;157:17;
176:10;300:8
**usually (1)**
410:8

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

Min-U-Script®

Case 2:07-cv-01215-SJF-ETB Document 145-18 Filed 01/15/10 Page 156 of 158 PageID #: 2626

EDWARD CARTER, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

FRANK FIORELLO
February 20, 2009

## V

**Vankoot (24)**
237:4,8,14,19;
238:2,12,21;239:10,
15,20;240:2,8;241:2,
5;242:17,21,25;
244:18;245:19;
246:12,17;247:6,16;
248:5
**Vankoot's (1)**
242:15
**various (1)**
136:18
**variously (2)**
263:14;265:21
**vehicle (7)**
126:3;154:2;
200:16;340:4,13;
341:16;409:11
**verification (2)**
311:2;429:9
**verify (2)**
224:12;310:11
**versus (1)**
4:6
**veto (1)**
470:22
**vial (2)**
328:15,16
**victim (4)**
398:17,20;401:4,
15
**victims (10)**
101:3;221:19;
228:17;231:6;
248:22;249:10;
250:12,13;419:7;
422:13
**video (3)**
4:14;204:23;205:4
**VIDEOGRAPHER (19)**
4:2;5:13;71:11,15;
143:8;144:14,18;
213:14,18,23;
291:24;292:4;356:7,
11;398:3;415:15,19,
23;471:22
**videotape (2)**
4:3;42:20
**view (3)**
231:22;452:17;
463:17
**Village (101)**
4:6,23;5:7,7;70:3;
79:18;88:25;89:13;
90:2,19,22;91:25;
92:6,11,14,21;93:5,
12,21;94:12,16,19;
95:3,11,18;99:14,18;
100:16;103:20;
104:3;107:20;108:8;

114:25;116:25;
118:5;121:19;
122:16;123:17;
125:24;134:10,17;
149:21;159:11,17;
160:25;161:9;163:4;
164:10,18,19,25;
167:10,12;178:17;
181:14;194:2,16;
196:19,22;197:3;
202:3;237:12;
245:11;275:14,18;
284:8,14,23;285:9,
14;286:16;288:5,14;
289:7,19;290:9,15,
25;291:22;294:8;
296:6;301:6,8;
322:18,21,22;324:4;
332:20,21;341:8;
352:11,13;359:15;
393:3;397:12;
405:20;407:13,14;
427:2;453:16;454:4
**villages (1)**
287:2
**violate (6)**
359:3;361:2,7,9;
363:14;400:2
**violated (6)**
319:25;357:25;
358:18;363:22;
364:13,21
**violating (1)**
322:23
**violation (4)**
319:20;357:20;
364:23;394:7
**violations (3)**
275:19;403:7,22
**violator (4)**
322:9;324:10,12,
20
**virtue (1)**
224:15
**visualize (1)**
229:5
**voice (3)**
177:21;216:8,12
**voiced (1)**
410:10
**voluntarily (1)**
336:15
**vote (1)**
352:22
**voted (1)**
353:4

## W

**Wait (13)**
81:7;159:25;
187:19;253:22;
314:24;369:15;

374:7,8,19;381:21;
403:12;409:25;
468:16
**waiting (1)**
102:22
**waived (1)**
3:7
**wake (1)**
429:25
**Walk (7)**
89:21,22;202:8;
327:16;331:24;
408:18,18
**walked (7)**
55:8;201:23;
372:23;374:17,24;
445:25;446:6
**walking (4)**
89:20;225:2;
373:17,17
**Wal-Mart (2)**
74:20;75:2
**Walter (17)**
147:15;178:11,13;
179:2;181:24;183:8;
185:5;188:23;
189:10,12;337:16;
406:16,24;452:4,16;
467:4;468:5
**Walter's (1)**
185:3
**wants (3)**
149:4;372:11;
425:20
**Warkenthien (4)**
147:15;452:4;
467:4;468:5
**warmer (2)**
371:20;372:12
**waste (1)**
306:2
**watched (1)**
249:21
**watching (1)**
42:20
**water (6)**
373:23;374:11,14,
18,25;375:5
**way (58)**
19:5;65:20;71:5;
96:24;102:12;127:7;
131:21;175:9;
195:15;203:19,21;
210:7;211:2,15;
212:24;215:18;
216:3,13;220:24;
221:13;225:21;
226:4;230:3,18;
234:14;243:20;
244:10;256:20;
257:7,24;258:4;
291:16;303:15;
318:13,17;319:6,12;

329:20;330:7;337:2,
5;339:8;342:12;
353:3;360:23;369:3;
371:5;373:7,13;
376:15;396:18;
412:11;437:7,17,21,
22;461:6;468:22
**wear (10)**
13:13,15,19,25;
14:7,12,14,15,16;
437:23
**wearing (2)**
12:5;13:9
**website (1)**
390:7
**Wednesday (2)**
33:19;455:5
**week (14)**
12:17,20;33:18,18;
69:3;98:14;196:4,4;
266:25;268:4;270:7,
9,9;462:22
**weekend (2)**
218:4;411:21
**weekends (1)**
311:14
**weeks (14)**
11:2,2,4;47:13;
79:11;80:10;81:19;
133:15,17,18;
151:14,16;209:13;
309:12
**WELCH (1)**
197:10
**Wellwood (1)**
5:25
**weren't (24)**
24:25;71:20;
102:8;124:13;
130:14;152:15;
208:11,12,15,16;
217:10;222:8;
247:25;286:3,14,22;
309:24;343:19;
344:15;346:9;
355:17;374:21;
375:14;429:22
**Westhampton (3)**
284:25;285:14;
286:19
**Wexler (3)**
237:17,21,22
**What's (27)**
14:22;20:17;
50:14;61:9;62:15;
92:20;97:11;111:2;
114:12;125:24;
129:22;195:3;
279:18;298:22,23;
303:11;315:13;
342:24;352:12;
358:16;380:24;
416:4;418:2;459:23;

460:16;461:10;462:9
**whatsoever (4)**
61:2;97:16;
153:17;429:23
**whenever (2)**
192:12;193:6
**whereabouts (6)**
417:21;418:12,14,
17,21;420:7
**Wherein (1)**
98:16
**Where's (1)**
420:13
**Wherever (1)**
428:6
**whichever (1)**
50:24
**white (1)**
328:4
**whole (18)**
10:2;27:13;66:22;
74:22;101:3,6;
104:17;139:18;
149:6;232:13;246:6;
375:8;399:13,15;
414:9;456:4;458:21,
21
**who's (1)**
261:18
**whose (1)**
36:9
**wife (4)**
135:6,12;231:4;
331:22
**Wigdor (15)**
4:20;75:4,19;78:9;
79:8,23;80:17;81:9,
12,21,25;83:11;
145:19;146:8,21
**Wilmot (1)**
407:12
**wine (9)**
399:6;400:7,8,10,
12,25;401:15;
402:20,21
**wished (2)**
439:14;440:11
**withdraw (6)**
28:15,17;38:24;
282:25;467:20;
468:21
**withdrawn (19)**
22:16;24:3;55:14;
122:5;123:14;146:2;
158:23;160:21;
164:9,18;165:17;
190:18,25;237:3;
289:23;360:20;
375:4;425:19;428:25
**within (15)**
3:5,13;70:16;
151:14,15;239:20;
255:10,11;270:9;

Case 2:07-cv-01215-SJF-ETB   Document 145-18   Filed 01/15/10   Page 157 of 158 PageID #: 2527

FRANK FIORELLO                                                    EDWARD CARTER, ET AL: vs.
February 20, 2009                              INCORPORATED VILLAGE OF OCEAN BEACH, ET AL.

320:5;326:12,21;
334:8,9;365:24
**without (13)**
23:15,19;85:6;
87:2;177:21;185:14;
263:16;320:6;
336:21;355:21,21;
366:9;436:5
**witness (44)**
5:15,22,25;15:15;
20:19,20;22:16;59:6;
76:16;82:16;153:15,
18,23;154:6;201:9,
13;211:4,9;218:10;
221:3,5;229:16,17,
21;230:5;231:5;
234:4,11,15;235:14,
18,22,25;236:4,8,21;
326:23;327:5,19;
350:9;356:20;358:6;
360:2;430:25
**witnessed (11)**
60:5;251:5,11,13;
327:9,20;328:7;
332:25;341:12;
360:7;398:15
**witnesses (7)**
15:13;45:23;
66:18;247:25;425:2,
4,10
**witnessing (2)**
327:12;329:13
**Woe (3)**
459:19,19,20
**woman (1)**
224:7
**wonder (1)**
459:17
**word (16)**
50:24;61:9;63:11,
15;64:11;85:19;
195:4;199:2;215:10;
267:12;369:24;
399:2;415:9;423:10;
424:3;443:7
**words (35)**
23:18,25;29:15;
41:9;43:4;70:24;
91:11;93:16;95:12,
20,21;97:5;152:21;
176:10;186:4;192:5;
200:11,15;214:23;
220:12;243:23;
251:14;277:24;
280:9;353:19;
360:14;364:8;
390:10;392:5,7;
430:19;453:14,14,
23;466:25
**work (31)**
8:11,16;10:2;12:2;
23:14,18;24:8;29:23;
41:6,11;52:6;131:9,

9,13;134:17;172:5,6,
7,12,13;202:20;
264:21;280:18;
281:4;292:8;301:3;
409:4;412:11,20;
428:5;437:23
**worked (36)**
11:2;24:23;25:16;
41:7,7,10;55:10;
131:2,6,7,16;132:22;
133:4;172:25;173:2,
14;200:23;209:15,
19;254:11;274:23;
280:3,4,6;281:8,12;
387:24;388:5,7;
393:3;404:24;
405:12;428:12,14;
429:9;446:9
**working (47)**
6:17,23;7:10;8:2;
9:10,13,14,15;10:9;
23:17,19;28:23,24;
74:20;102:8;106:11;
108:14;124:13;
134:13;170:2,25;
171:17,22;172:4,11;
188:24;207:5;
266:21;268:13;
271:7;311:13;317:3;
345:22;355:9,13,15;
396:7,11,23;402:13,
14;403:14;404:11,
12,12;409:5;438:14
**works (1)**
299:9
**world (1)**
118:24
**worn (2)**
14:18;16:15
**worried (1)**
143:22
**worse (1)**
121:3
**wound (2)**
233:8;410:6
**Wow (1)**
432:2
**write (22)**
109:11;163:23;
164:4;275:8,9,13,23;
276:4,13,16;294:23;
325:16;336:18;
348:21;379:14;
382:4;392:15,22;
398:12;403:20;
412:7,22
**writing (3)**
275:16;325:9;
391:20
**written (3)**
382:6;392:3;454:2
**wrong (12)**
11:24;31:10,12;

45:20;70:6;211:12;
240:22,23;273:11;
279:21;367:3;442:19
**wrote (9)**
154:4;167:6;
317:6;371:5,16;
372:19;392:11,20;
430:7
**Wyckoff (6)**
229:13,15,21;
230:4;231:3;235:25

## Y

**year (19)**
6:11;10:2,14;
11:18;12:2;41:10;
131:3;172:19;
179:22;182:8;
192:22;194:19;
269:18;317:2;
327:17;406:18,19;
411:12;432:20
**years (9)**
44:20;47:12;
108:23;249:22;
320:5;345:23;
426:23,25;436:12
**Year's (2)**
131:17,18
**yelled (1)**
447:11
**yesterday (7)**
12:24;13:3,8;38:6;
55:12;388:21;389:5
**York (13)**
4:9;5:18;6:2;
262:23;357:24;
358:17;359:7;
363:23;364:24;
393:24;394:7,11,19
**young (1)**
178:16
**Yup (1)**
350:20

## Z

**ZWILLING (44)**
5:9,10;13:5;61:14,
16;82:24;96:22;
287:17;398:6;
425:21;431:3,4;
435:25;443:21;
446:16,24;447:13,
17,22;448:11,22;
449:4;457:15,22,25;
458:5,18;459:8,16,
25;460:4,7,18;461:2,
5,11;462:18;463:4,
12;464:5,14;467:19,
25;471:2
**Zwilling's (1)**

287:16