1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
4   JOSEPH NOFI, and THOMAS SNYDER,
                              Plaintiffs,

5              -against-   Case No. 07-Civ-1215
                                    (SJF)(ETB)

6   INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
    JOSEPH C. LOEFFLER, JR., individually and in

7   his official capacity; former mayor NATALIE
    K. ROGERS, individually and in her official

8   capacity; OCEAN BEACH POLICE DEPARTMENT;
    ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,

9   individually and in his official capacity;
    SUFFOLK COUNTY; SUFFOLK COUNTY POLICE

10  DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
    CIVIL SERVICE; and ALISON SANCHEZ,

11  individually and in her official capacity,
                              Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

13                    926 Reckson Plaza

14                    Uniondale, New York

15

16                    September 16, 2008

17                    9:52 A.M.

18

19            VIDEOTAPE DEPOSITION of EDWARD

20   CARTER, taken pursuant to the Federal Rules

21   of Civil Procedure, and Notice, held at the

22   above-mentioned time and place before Edward

23   Leto, a Notary Public of the State of New

24   York.

25

1

2   A P P E A R A N C E S:

3       THOMPSON WIGDOR & GILLY LLP
                Attorneys for Plaintiffs
4               85 Fifth Avenue
                New York, New York 10003
5       BY:    ANDREW S. GOODSTADT, ESQ.

6       RIVKIN RADLER LLP
                Attorneys for Defendants
7               Incorporated Village of Ocean
                Beach, Mayor Joseph C. Loeffler,
8               Jr., former Mayor Natalie K.
                Rogers, and Ocean Beach Police
9               Department
                926 Reckson Plaza
10              Uniondale, New York 11556
        BY:    KENNETH A. NOVIKOFF, ESQ.
11                    -and-
                MICHAEL WELCH, ESQ.
12

        MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
13              Attorneys for Defendant Acting
                Deputy Police Chief George B.
14              Hess
                530 Saw Mill River Road
15              Elmsford, New York 10523
        BY:    KEVIN W. CONNOLLY, ESQ.
16

        SUFFOLK COUNTY ATTORNEY'S OFFICE
17              Attorneys for Defendants Suffolk
                County, Suffolk County Police
18              Department, Suffolk County
                Department of Civil Service, and
19              Alison Sanchez
                100 Veterans Memorial Highway
20              Hauppauge, New York 11788
        BY:    ARLENE ZWILLING, ESQ.
21

   ALSO PRESENT
22      Albert Santana, Legal Video Specialist

23

24

25

1

2    IT IS HEREBY STIPULATED AND

3 AGREED by and among counsel for the

4 respective parties hereto, that the filing,

5 sealing and certification of the within

6 deposition shall be and the same are hereby

7 waived;

8    IT IS FURTHER STIPULATED AND

9 AGREED that all objections, except to the

10 form of the question, shall be reserved to

11 the time of the trial;

12    IT IS FURTHER STIPULATED AND

13 AGREED that the within deposition may be

14 signed before any Notary Public with the

15 same force and effect as if signed and sworn

16 to by the Court.

17

18

19

20

21

22

23

24

25

```
 1                    E. Carter
 2          THE VIDEOGRAPHER:    This is tape
 3     number one of the videotape deposition
 4     of Edward Carter in the matter of
 5     Edward Carter, et al., Plaintiffs,
 6     versus Incorporated Village of Ocean
 7     Beach, et al., Defendants, in the
 8     United States District Court, Eastern
 9     District of New York, case number
10     07-civ-1215(SJF)(ETB), on September 16,
11     2008 at approximately 9:52 a.m.
12          My name is Albert Santana from
13     the firm of Precise Court Reporting and
14     I'm the legal video specialist.  The
15     court reporter is Ed Leto in
16     association with Precise Court
17     Reporting.  For the record, will
18     counsel please introduce themselves.
19          MR. GOODSTADT:    Andrew
20     Goodstadt, Thompson Wigdor & Gilly, on
21     behalf of the Plaintiffs.
22          MR. NOVIKOFF:    Ken Novikoff and
23     Michael Welch, Rivkin Radler, on behalf
24     of all Village Defendants and the
25     individual Defendants, Loeffler and
```

1                    E. Carter

2          Rogers.

3                    MS. ZWILLING:     Arlene Zwilling

4          for Christine Malafi, Suffolk County

5          Attorney, representing the Suffolk

6          County Defendants.

7                    MR. NOVIKOFF:     And just for the

8          record, counsel for Mr. Hesse is not

9          here yet.  He's indicated that he is

10         going to be delayed.  We noticed this

11         up for 9:30, so we're going to proceed

12         with the deposition now, which is

13         approximately five to 10:00, right.

14                   THE VIDEOGRAPHER:     Now will the

15         court reporter please swear the

16         witness.

17   E  D  W  A  R  D     C  A  R  T  E  R, having first

18   been duly sworn by a Notary Public of the

19   State of New York, was examined and

20   testified as follows:

21                   THE COURT REPORTER:     Please

22         state your name for the record.

23                   THE WITNESS:     Edward Carter.

24                   THE COURT REPORTER:     Please

25         state your address.

```
1                    E. Carter
2          THE WITNESS:    55 Kansas
3     Avenue, Bay Shore, New York 11706.
4          MR. NOVIKOFF:    Mr. Goodstadt,
5     regular stipulations?
6          MR. GOODSTADT:    Yes.  Federal
7     rules govern, local rules govern.  He's
8     just going to reserve his right to
9     review and sign.
10          MR. NOVIKOFF:    Just like the
11     last deposition.
12          MR. GOODSTADT:    Yes.
13  EXAMINATION BY
14  MR. NOVIKOFF:
15          MR. NOVIKOFF:    Good morning,
16     sir.  I am Ken Novikoff and I'm going
17     to be asking you a series of questions
18     today, and if you don't understand my
19     questions, then I would invite you to
20     tell me and I will try to rephrase them
21     in such a way that you better
22     understand them.
23          You are free to talk to your
24     counsel at any time as many times as
25     you'd like.  The only thing I would
```

1                          E. Carter

2          request is that while a question is

3          pending, you answer the question before

4          you speak with your counsel.

5          Obviously, if your counsel instructs

6          you not to answer a question, then you

7          do what you need to do.

8          Q.     Have you spoken with Mr. Nofi --

9    well, withdrawn.  Are you aware that

10   Mr. Nofi has been deposed in this case?

11         A.     Yes.

12         Q.     Did you speak with Mr. Nofi after

13   his deposition?

14         A.     No.

15         Q.     Did you speak with Mr. Nofi

16   before his deposition specifically

17   concerning his deposition?

18         A.     No.

19         Q.     Have you spoken to the -- to any

20   of the other Plaintiffs in this case

21   subsequent to Mr. Nofi's deposition?

22         A.     With my attorney, yes.

23                MR. NOVIKOFF:    Yes.  Again,

24         let's also -- if I ask you questions

25         concerning communications you may have

1                    E. Carter

2          had with the other Plaintiffs that were

3          in the presence of your counsel, then

4          just advise me of that and I'm sure

5          your counsel will tell you not to

6          answer.  Likewise, if any of my

7          questions seek information concerning

8          what you and your counsel said, I'm

9          sure your counsel will object.

10         Q.     Outside the presence of your

11    counsel, have you spoken with any of the

12    Plaintiffs subsequent to the Nofi

13    deposition?

14         A.     When we first filed the lawsuit,

15    yes.

16         Q.     Let me rephrase.  Nofi was

17    deposed last week.

18         A.     Yes.

19         Q.     You're aware of that.  After,

20    between that date of his deposition and

21    today, have you spoken with any of the other

22    Plaintiffs?

23         A.     Yes.

24         Q.     Whom -- with whom have you

25    spoken?

1                         E. Carter

2          A.      With Kevin Lamm.

3          Q.      And when did you speak with Kevin

4   Lamm?

5          A.      Prior to -- it would be Sunday.

6                  (Mr. Connolly entered the room.)

7          Q.      And was that in the presence of

8   your attorney?

9          A.      No.

10         Q.      Was it by phone?

11         A.      Yes.

12         Q.      What was the sum and substance of

13  the conversation?

14         A.      I told him I was going for a

15  deposition on Tuesday and that we were

16  notified that several depositions were

17  canceled next week and the following weeks,

18  which we had taken days off for.

19         Q.      Okay.  Well, what deposition --

20  what days off did you take?

21         A.      I was going to take off  -- well,

22  I didn't -- I took off for tomorrow which is

23  Wednesday, and I was going to put in for a

24  couple days next week.

25         Q.      Why did you decide to take off

```
 1                          E. Carter
 2    for tomorrow?
 3          A.      There was a deposition scheduled
 4    for tomorrow.
 5          Q.      Of whom?
 6          A.      With Mr. Paridiso.
 7          Q.      And why did you think it was
 8    important for you to be at Mr. Paridiso's
 9    deposition?
10          A.      With my case being as important
11    as it is to me, I think it's important for
12    me to make as many depositions as I can.
13          Q.      Fair enough.  And what did
14    Mr. Lamm say to you, if anything, on Sunday
15    after you told him you were going to be
16    deposed and that some of the depositions had
17    been canceled?
18          A.      He asked me if I knew where the
19    place was, which I was a little unsure of,
20    and I told him that -- I asked him if he was
21    going to go on Wednesday, and he said he
22    wasn't sure if he could get off from work or
23    not.
24          Q.      Was that the extent of your
25    conversation with Mr. Lamm?
```

1                    E. Carter

2        A.     Basically, yes.  From what I

3    recall at this time, yes.

4        Q.     Did you talk about any of the

5    substantive allegations in the complaint

6    with Mr. Lamm on Sunday?

7        A.     No.

8        Q.     Prior to Mr. Nofi's deposition

9    last week, did you speak with any of the

10   other Plaintiffs concerning Nofi's

11   deposition?

12       A.     Just the other told -- we were

13   told we were going for depositions.  Just

14   the dates.

15       Q.     Okay.  You didn't speak with the

16   other Plaintiffs concerning --

17            MR. GOODSTADT:    Just -- just so

18        when you say you were told that you

19        were going for dates, don't disclose

20        any communications that came from us.

21        He's talking about only between you and

22        the other Plaintiffs.

23       Q.     Other than -- putting aside what

24   you may or may not have spoken to counsel

25   about concerning your deposition, have you

```
 1                      E. Carter

 2    spoken to anybody else concerning the fact

 3    that you were being deposed today?

 4         A.    No.

 5         Q.    With whom are you presently

 6    employed, if anybody?

 7         A.    Township of Islip.

 8         Q.    And what job do you presently

 9    hold with the Township of Islip?

10         A.    Civil service job as a park

11    ranger two, which is a sergeant's position.

12         Q.    Are you presently employed by any

13    other entity or individual?

14         A.    No.

15         Q.    In year 2008, have you sought any

16    employment from any entity or individual?

17         A.    No.

18         Q.    In 2007, did you seek employment

19    with any entity or individual?

20         A.    No.  I couldn't for my reason for

21    termination.

22    MO         MR. NOVIKOFF:    Motion to strike

23         as nonresponsive.

24         Q.    My question was a yes or no.

25         A.    No.
```

1                        E. Carter

2        Q.      So let me rephrase the question.

3                MR. GOODSTADT:      Just so I don't

4        have to address your motion to strike

5        each time, we --

6                MR. NOVIKOFF:    I would --

7                MR. GOODSTADT:    -- oppose any

8        motion to strike.

9                MR. NOVIKOFF:    I would

10       stipulate that any time I make a motion

11       to strike, you are going to oppose it

12       and we'll take that up with the court

13       at the appropriate time.

14               MR. GOODSTADT:    Great.

15               MR. NOVIKOFF:    Okay.

16       Q.      Sir, in 2007, did you seek any

17   employment with any entity or individual?

18       A.      No.

19       Q.      Sir, in 2006, did you seek

20   employment with any entity or individual?

21       A.      Yes.  I tried to seek employment

22   with the Suffolk County Park Police.

23   Seasonally.

24       Q.      When in 2006 did you seek

25   employment with the Suffolk County Park

                         E. Carter

1    Police?

2         A.      The phone call was made May,

3    early May of 2006 to the Smith Haven

4    barracks in I believe it's Mastic or

5    Shirley.

6         Q.      I'm sorry, what was the end?

7         A.      Mastic or Shirley.  The location

8    of it.

9         Q.      Okay.  Other than the Suffolk

10   County Park Police, did you seek any other

11   employment in 2006?

12        A.      Yes.  My park ranger three

13   position with the Town of Islip, which is a

14   civil service test, promotional test.  I

15   applied for it January of 2006.  Took the

16   test.  The test results came out September

17   2006.

18        Q.      So the test results came out

19   after you were advised that you were no

20   longer working for Ocean Beach?

21        A.      Yes.

22        Q.      Okay.  And that would have been

23   instead of seeking new employment, you were

24   seeking a promotion; is that fair?

1                           E. Carter

2          A.     Furthering my career with more

3    money.  Yes.

4          Q.     It would be a promotion as

5    opposed to a new job for a new employer?

6          A.     It is a new job with the same

7    employer, yes.

8          Q.     Okay.  So other than the test

9    that you took for this new job with the same

10   employer and other than the Suffolk County

11   Park Police application, did you try to find

12   a job with any other entity or employer in

13   2006?

14         A.     I researched stuff and I saw

15   there were several polygraphs that I

16   couldn't apply for them, so no.

17         Q.     When you say there were

18   "several" -- I'm not asking why you couldn't

19   apply for them, I'm only now asking you

20   about your comment about there were several

21   polygraphs.  So my question is, what did you

22   mean by your answer that "there were several

23   polygraphs"?

24         A.     I went on websites for armed

25   security guard, armed carriers and I saw the

```
 1                      E. Carter

 2  requirements, and it came up with a

 3  polygraph.  I looked into doing stock at

 4  Toys R Us, I had to take a polygraph.

 5         Q.     Now why was taking a polygraph a

 6  problem?

 7         A.     The problem was when George Hesse

 8  fired me, terminated me from Ocean Beach, he

 9  originally told me I was let go for

10  directives that he posted in the fall.

11         Q.     Okay.

12         A.     He further went on later on at a

13  meeting on April 2, when I was let go, that

14  I was going to wear a wire for the District

15  Attorney's office in reference to a Gilbert

16  incident, a businessman that was beat up

17  while at Ocean Beach.

18         Q.     Okay.

19         A.     Subsequent phone call to Hesse

20  later on winds up being he tells me -- there

21  was a blog, the Long Island Politics, that I

22  did official misconduct, falsified paperwork

23  for a Halloween incident.  Arnold Hardman

24  calls me, reconfirms saying, "Carter" --

25  right after I was let go -- "you got scooped
```

1                          E. Carter

2    up.  I think you got scooped up in the

3    Halloween incident," which I wasn't working

4    then.  So there were three reasons at that

5    point why he let me go.  The fourth reason

6    he gave me is I was sleeping.  There was no

7    way I could answer a polygraph why I was let

8    go.

9          Q.     But, sir, a polygraph -- to your

10   knowledge, isn't it true that a polygraph is

11   a device wherein it is asking you questions

12   to see if your responses were less than

13   truthful?

14              MR. GOODSTADT:     Objection.

15         A.     Yes.

16         Q.     You have that understanding as to

17   what a polygraph is, correct?

18         A.     Yes.  Also, the question why were

19   you terminated or fired from Ocean Beach I

20   couldn't answer.

21         Q.     Well, that doesn't mean that you

22   would be lying, would it?

23              MR. GOODSTADT:     Objection.

24         Q.     Were you lying in response to

25   when -- the last answer that you gave with

1                    E. Carter
2    regard to the four reasons that you say that
3    Mr. Hesse says that he gave you for being
4    fired, were you lying?
5         A.    No.
6         Q.    Okay.  So if someone asked you on
7    a polygraph question exam "why were you
8    fired" and you answered "I don't know,"
9    would that be a truthful response?
10             MR. GOODSTADT:    Objection.
11        Q.    As you sit here today?  You can
12   answer.
13        A.    I'm sorry.
14             MR. GOODSTADT:    You can answer.
15        Q.    You can answer the question.
16        A.    It would be truthful.
17        Q.    And if someone asked you during a
18   polygraph exam what were the reasons that
19   Mr. Hesse gave you for being fired as you
20   say you were on April 2, you would have
21   given the same answers you just gave me,
22   correct?
23             MR. GOODSTADT:    Objection.
24        A.    No.  They have yes and no
25   questions and they would -- just the

```
 1                    E. Carter
 2   hearing, again, why I was let go, my blood
 3   pressure would be raised, which would give
 4   off on the polygraph, and I would -- I would
 5   definitely not pass a polygraph, and Hesse
 6   was aware of that and I made him aware of
 7   that.
 8        Q.    When did you make Mr. Hesse aware
 9   that your blood pressure would be raised
10   during a polygraph exam?
11        A.    I made him aware -- I didn't make
12   him aware of that.
13        Q.    Okay.  When did you make
14   Mr. Hesse aware that you would fail a
15   polygraph test because of the events that
16   took place on April 2, 2006?
17              MR. GOODSTADT:    Objection.
18        A.    I called -- I called him May.
19        Q.    Just answer me when.
20        A.    In May.
21        Q.    Okay.  How?
22        A.    By phone.
23        Q.    And what did you say to Mr. Hesse
24   concerning your concerns that you would
25   be -- you would fail a polygraph test?
```

1                    E. Carter

2        A.    I told him I would have to take a

3    polygraph for the Suffolk County Park Police

4    and a background, and I needed to know why I

5    was let go.

6        Q.    Okay.  Sir, in that conversation,

7    did you tell Mr. Hesse that you would fail a

8    polygraph test because of the events

9    concerning April 2, 2006?

10            MR. GOODSTADT:    Objection.

11       Q.    Yes or no?

12       A.    I'm sure I expressed it in the

13    way I asked him, yes.

14       Q.    I don't understand what that

15    means, sir.  What do you mean you expressed

16    it in a way you asked him?  My question is

17    simple, did you advise Mr. Hesse

18    specifically "I will fail a polygraph test

19    because of the events surrounding April 2,

20    2006"?

21            MR. GOODSTADT:    Objection.

22       A.    No.

23       Q.    Now since you brought it up, I'm

24    going to ask you this.  What reasons did

25    George Hesse give you at any point in time

1                          E. Carter

2    for why you were no longer going to be

3    working for Ocean Beach?  I don't want to

4    know the circumstances surrounding the

5    conversation, I just want to know the

6    specific reasons that George Hesse

7    communicated to you directly.

8         A.    The original one at April 2 was

9    he had to let someone go for the directives

10   he hung up in the fall and he chose me.

11        Q.    Okay.  Next one?

12        A.    Later on, during a phone call and

13   an email, May of 2006, he told me for

14   sleeping.

15        Q.    Okay.  So he communicated to you

16   two reasons why he let you go.  One was for

17   what you labeled directives, and two is

18   because you were sleeping?

19        A.    Yes.

20        Q.    Any other reasons that he

21   communicated directly to you concerning why

22   he made the decision not to rehire you for

23   the 2006 summer season?

24             MR. GOODSTADT:    Objection.

25             MR. NOVIKOFF:    Well, I'll

```
 1                    E. Carter
 2          withdraw the question.
 3          Q.     Other than the two reasons you
 4     just gave me, are there any other reasons
 5     that Mr. Hesse communicated to you directly
 6     with regard to why you were no longer
 7     working for Ocean Beach after April 2, 2006?
 8          A.     No.
 9               MR. NOVIKOFF:   I'm going to ask
10          the court reporter to mark the
11          following documents as Carter-1.
12               (Notice of Claim was marked as
13           Carter Exhibit-1 for identification;
14           9/16/08, E.L.)
15          Q.     Sir, I'm going to show you what's
16     been marked as Carter-1 and ask you to
17     review it, and please advise me when you're
18     done reviewing it.
19          A.     (Reviewing).  I'm done, sir.
20          Q.     And do you recognize this
21     document?
22          A.     Yes, sir.
23          Q.     And what is this document?
24          A.     It's a Notice of Claim.
25          Q.     And are you aware what a Notice
```

1                           E. Carter

2      of Claim is?

3           A.      I'm a little familiar with it,

4      sir.

5           Q.      What's your understanding what a

6      Notice of Claim is?

7           A.      My understanding is a Notice of

8      Claim must be filed within a specific period

9      of time after a wrong doing is done for

10     court or legal proceedings to proceed.

11          Q.      And let's turn to the third page.

12     It says -- there's a signature, do you see

13     that?

14          A.      Yes.

15          Q.      And it's "respectfully yours,

16     Thompson Wigdor & Gilly, LLP," do you see

17     that?

18          A.      Yes.

19          Q.      Was that your lawyer -- well, was

20     that the law firm representing you at the

21     date that the Notice of Claim was filed?

22          A.      Yes.

23          Q.      And you see the date "June 30,

24     2006"?

25          A.      Yes.

1                          E. Carter

2          Q.      Did you review the Notice of

3   Claim before you  -- well, did you authorize

4   your lawyers to file the Notice of Claim on

5   your behalf?

6          A.      Yes.

7          Q.      And did you review the Notice of

8   Claim prior to it being filed by your

9   lawyers?

10         A.      Yes.

11         Q.      On how many occasions did you

12  review the Notice of Claim prior to it being

13  filed?

14         A.      One time.

15         Q.      And did you review the Notice of

16  Claim for purposes of accuracy?

17         A.      Yes.

18         Q.      And would it be correct to say

19  that if you found that there was anything

20  that was inaccurate in there, you would have

21  notified your lawyers about that?

22              MR. GOODSTADT:      Objection.

23         A.      Yes.

24  RL    Q.      And prior to authorizing your

25  lawyers to file the Notice of Claim, did you

```
 1                        E. Carter
 2    advise them that there was anything
 3    inaccurate?
 4    DI          MR. GOODSTADT:    Objection.  I'm
 5          going to instruct the witness not to
 6          respond to the question as it violates
 7          attorney/client communication.
 8                MR. NOVIKOFF:    I don't think it
 9          does, but let's mark that for a ruling.
10                MR. GOODSTADT:    Okay.
11          Q.    When you read this Notice of
12    Claim, was there anything inaccurate that
13    you saw?
14          A.    No.
15          Q.    And when I say "this Notice of
16    Claim," I'm talking about what's been marked
17    as Carter-1?
18          A.    No.
19          Q.    Okay.  Let's look at the "nature
20    of the claim" section.  Four lines from the
21    bottom, five lines from the bottom, in the
22    middle it says "and otherwise," do you see
23    it?
24          A.    Yes.
25          Q.    And just for the record, there is
```

1                           E. Carter

2    underlining on the Notice of Claim.  I don't

3    know who put that there, but you --

4    withdrawn.  I didn't put that there, so.

5    "And otherwise wrongful conduct and

6    practices engaged in by numerous senior

7    ranking officers, including but not limited

8    to Sergeant George Hesse," do you see that?

9         A.     Yes.

10        Q.     Who are the other senior ranking

11   officers that you refer to in this Notice of

12   Claim?

13        A.     The officers that had more time

14   than me, which would be Ken Bockelman, Tyree

15   Bacon.

16        Q.     Anybody else?

17        A.     Those are the examples I recall

18   at this time.

19        Q.     So your understanding of senior

20   ranking officers means that they have more

21   experience than you?

22        A.     Yes.

23        Q.     At Ocean Beach?

24        A.     Yes.

25        Q.     How do you know Ty Bacon has more

1                        E. Carter

2    experience than you?

3         A.      He started there prior to my

4    starting in 1991.

5         Q.      And was he working there

6    continuously, to your knowledge?

7         A.      To my knowledge, no.

8         Q.      Do you know how many days he

9    worked since 1991?

10        A.      No.

11        Q.      So how do you know that he worked

12   more days from the commencement of his

13   employment with Ocean Beach that you

14   worked -- than you worked?

15               MR. GOODSTADT:      Objection.

16        A.      He was --

17        Q.      I just want to know --

18        A.      He was there more than a year or

19   two prior to me.

20        Q.      But he was seasonal, correct?

21        A.      Yes.

22        Q.      You're seasonal?

23        A.      Yes.

24        Q.      That means you're not working

25   five days a week, correct?

```
 1                    E. Carter
 2           MR. GOODSTADT:    Objection.
 3           MR. NOVIKOFF:    Well, withdrawn.
 4      Q.    What's your understanding of the
 5  word "seasonal"?
 6      A.    Seasonal is from May to
 7  September.
 8      Q.    Right.  And you're working
 9  shifts, correct?
10      A.    Yes.
11      Q.    Less than 40 hours a week on
12  average?
13      A.    Myself, yes.
14      Q.    Yes.  How about Ty Bacon?
15      A.    He worked quite a few hours more.
16      Q.    How do you know?
17      A.    Because the schedules.
18      Q.    You saw the schedules since 1991
19  of when Ty Bacon worked?
20      A.    He was on the same schedule as
21  me, yes.
22      Q.    My question is, you've looked --
23  you know as you sit here today how many
24  days -- how many shifts Ty Bacon worked
25  since 1991?
```

1                         E. Carter

2           A.     No.

3                  MR. GOODSTADT:     Objection.

4           That wasn't the question.

5           Q.     Sir, would you agree with me that

6    you're just speculating as to whether or not

7    Mr. Bacon worked more hours at Ocean Beach

8    than you in your respective employment

9    histories?

10                 MR. GOODSTADT:     Objection.

11          A.     It's my belief he did.

12          Q.     And it's your belief based upon

13   what?

14          A.     Based upon the number of times I

15   seen him there.

16          Q.     Did he work nights?

17          A.     Yes.

18          Q.     Did he work the same nights you

19   worked?

20          A.     Not always.

21          Q.     And if you weren't at Ocean Beach

22   during a particular night, you don't know

23   whether he was working there that night,

24   correct?

25                 MR. GOODSTADT:     Objection.

```
 1                    E. Carter
 2        A.     Without looking back through the
 3   blotter book, no.
 4        Q.     Who's the other guy?
 5        A.     Kenneth Bockelman.
 6        Q.     Okay.  And how do you know he was
 7   more senior than you in terms of experience
 8   at Ocean Beach?
 9        A.     He worked 40 hours a week, and in
10   the off season, for many more hours than I
11   did.
12        Q.     How do you know?
13        A.     Because of the schedule.
14        Q.     And when did he start working for
15   Ocean Beach?
16        A.     I don't recall the exact date.
17        Q.     You started working for Ocean
18   Beach in 1991, correct?
19        A.     Yes.
20        Q.     And then there was a period of
21   time that you stopped, right?
22        A.     Yes.
23        Q.     Was Mr. Bockelman there in 1991?
24        A.     No.
25        Q.     Was Mr. Bockelman there on the
```

1                    E. Carter

2    last day of your employment during your

3    first tenure with Ocean Beach?

4         A.    No.

5         Q.    When did you recommence your

6    employment with Ocean Beach after your first

7    go around?

8         A.    2001.

9         Q.    Was Mr. Bockelman there in 2001?

10        A.    Yes.

11        Q.    Do you know how long prior to

12   2001 Mr. Bockelman first showed up?

13        A.    Only from what he said.  He

14   graduated the academy couple years earlier.

15        Q.    But that doesn't necessarily mean

16   he was working for Ocean Beach, correct?

17        A.    He went right to Ocean Beach.

18        Q.    Oh, he went right to Ocean Beach.

19   And did he work nights as well?

20        A.    Yes.

21        Q.    What unlawful conduct did

22   Mr. Bacon engage in, as you refer to in

23   here?

24        A.    Drinking on duty.

25        Q.    Okay.  And what tortious conduct

```
 1                    E. Carter
 2    did Mr. Bacon engage in as you refer to in
 3    here?
 4              MR. GOODSTADT:    Objection.
 5              MR. NOVIKOFF:    I'm just asking
 6         him.
 7              MR. GOODSTADT:    Calls for a
 8         legal conclusion.
 9              MR. NOVIKOFF:    Okay.  But this
10         is his document, so.
11         Q.    What tortious conduct did
12    Mr. Bacon engage in?
13              MR. GOODSTADT:    Same objection.
14         Q.    You can answer.
15         A.    At this time, I don't recall any.
16         Q.    What wrongful conduct and
17    practices did Mr. Bacon engage in as you
18    refer to in here?
19              MR. GOODSTADT:    Objection.
20         A.    The drinking on duty.
21         Q.    Okay.  Anything else?
22         A.    That I'm aware at this time, no.
23         Q.    So are you alleging here that you
24    were unlawfully terminated because you did
25    not participate with Mr. Bacon in drinking
```

1                    E. Carter

2    off duty?

3         A.      Drinking with Mr. Bacon and the

4    other officers, yes.

5         Q.      And Mr. Bacon fired you?

6         A.      Mr. Hesse fired me.

7         Q.      Okay.  So Mr. Bacon didn't have

8    anything to do with you being fired,

9    correct?

10        A.      Directly that I know of, no.

11        Q.      He had no authority to hire

12   you -- to fire you, to the best of your

13   knowledge, correct?

14        A.      Correct.

15        Q.      He was the same rank as you?

16        A.      Correct.

17        Q.      Okay.  And Bachman, what unlawful

18   conduct did Bachman participate in as you

19   allege here?

20        A.      He also drinking on duty.

21             MR. GOODSTADT:   Just so the

22        record is clear, I think it's

23        "Bockelman."

24             MR. NOVIKOFF:    "Bockelman,"

25        okay.

1                        E. Carter

2          Q.     And what about tortious conduct,

3    what tortious conduct did Mr. Bockelman

4    engage in?

5                MR. GOODSTADT:     Objection.

6          Q.     Okay.  You can answer.

7          A.     None that I know of at this time.

8          Q.     Is there anything in your

9    possession, custody or control that would

10   refresh your recollection?

11         A.     No.

12         Q.     What wrongful conduct and

13   practices did Bockelman engage in as you

14   refer to here?

15                MR. GOODSTADT:     Objection.

16         A.     The drinking on duty.

17         Q.     Okay.  Anything else?

18         A.     With myself, no.

19         Q.     Right.  And my questions, unless

20   I ask you differently, are just as it

21   relates to you.  Was Bockelman the same rank

22   as you?

23         A.     Yes.

24         Q.     He didn't have any authority to

25   fire you, to your knowledge, did he?

```
 1                      E. Carter

 2        A.      Not that I know of, no.

 3        Q.      Did he -- to your knowledge, did

 4   he have anything to do directly with you

 5   being fired?

 6        A.      Not that I know of.

 7        Q.      Any other officers that you can

 8   refer -- that you can advise us of that you

 9   consider to be senior ranking officers as

10   you used that term in this Notice of Claim?

11        A.      No, sir.

12        Q.      Okay.  And when did you first

13   find out -- well, when did you first learn

14   that Bacon was drinking off duty?

15             MR. GOODSTADT:      Objection.

16        A.      Off duty?

17             MR. NOVIKOFF:      Well, withdrawn.

18        Q.      Drinking on duty as you say was

19   an unlawful conduct?

20        A.      I saw it in 2003.

21        Q.      And did you complain to anybody

22   about Mr. Bacon now specifically?

23        A.      Mr. Bacon, yes.

24        Q.      Who did you complain to?

25        A.      George Hesse.
```

```
 1                      E. Carter

 2        Q.      Anybody else in 2003 now?

 3        A.      There were other officers

 4   drinking in the station along with

 5   Mr. Bacon, yes.

 6        Q.      I'm only concerned now about

 7   Mr. Bacon.

 8        A.      No.

 9        Q.      Did you complain to anyone else

10   in 2003, other than Mr. Hesse?

11        A.      No.

12        Q.      Did you complain to Mr. Hesse

13   about Mr. Bacon drinking on duty in 2004?

14        A.      Yes.

15        Q.      How many times in 2003 did you

16   complain to Mr. Hesse about Mr. Bacon

17   drinking on duty?

18        A.      Mr. Bacon would have been

19   approximately three times.

20        Q.      Do you recall when in 2003?

21        A.      Summer of 2003.

22        Q.      Three times during the summer of

23   2003; is that correct?

24        A.      That I witnessed, yes.

25        Q.      And how about  -- no, not that
```

```
 1                    E. Carter
 2   you witnessed.  That you complained to
 3   Mr. Hesse about.
 4        A.    Yes.
 5        Q.    Three times?
 6        A.    (Indicating).
 7        Q.    So would it be -- yes?
 8        A.    Yes.
 9        Q.    So would it be fair based upon
10   your testimony -- I'm sorry, would it be a
11   fair characterization of your testimony that
12   every time that you saw Mr. Bacon drink in
13   2003 while on duty, you complained to
14   Mr. Hesse about it?
15        A.    Yes.
16        Q.    Okay.  And the first time that
17   you complained, what did you say to
18   Mr. Hesse?
19        A.    I said, "George, this is
20   bullshit.  I got to clean up all your guys'
21   beers, rocket fuel, empty cups with Bacon,
22   you and the other guys drinking."  And
23   George just said, "Shut up and do it."
24        Q.    He said shut up and what?
25        A.    Do it.
```

1                        E. Carter

2       Q.      So you weren't necessarily

3    complaining about Mr. Bacon drinking, you

4    were complaining about the fact that you had

5    to clean up his mess and other people's

6    mess, correct?

7                  MR. GOODSTADT:      Objection.

8       A.      No.  I was complaining that the

9    officers were drinking in the station and

10   leaving the mess.

11      Q.      But what specifically did you say

12   to Mr. Hesse when you say you complained to

13   him that first time?

14      A.      "George, this is bullshit.  You

15   guys are drinking in the station and leaving

16   a mess.  Beer cans, rocket fuels, cups, and

17   why do I have to clean it up?"

18      Q.      Okay.  So would it be fair to say

19   that part of your complaint was the fact

20   that you had to clean up the other officers

21   that you claim were drinking while on duty

22   in the station?

23      A.      Part of my claim, yes.

24      Q.      Okay.  Part of your complaint?

25      A.      Yes.

1                    E. Carter

2        Q.      Okay.  The second time in 2003

3    that you complained, what did you say to

4    Mr. Hesse?

5        A.      Basically the same thing.

6    "George, what's going on?"  "You know, why

7    do I have to clean up this stuff again?"

8        Q.      Okay.  Third time in 2003, what

9    was the sum and substance of your complaint

10   to Mr. Hesse?

11       A.      That the rocket fuels were

12   dropped at the front desk where I was.

13       Q.      And that you had to clean it up?

14       A.      No.  That the guys were coming in

15   picking them up and I was in the middle of

16   doing stuff.  Paperwork and stuff.

17       Q.      So what was your complaint?

18       A.      My complaint was the alcohol was

19   brought in the station.  It shouldn't have

20   been there.

21       Q.      Okay.  So it really had nothing

22   to do with the fact that you were doing

23   paperwork at the desk?

24       A.      It interfered with myself doing

25   the paperwork, yes.

                        E. Carter

1

2      Q.     Got it.  And the second time that

3   you complained to Mr. Hesse, what was

4   Mr. Hesse's response?

5      A.     Again, just laughed it off and

6   walked away.

7      Q.     Third time, what was Mr. Hesse's

8   response?

9      A.     He gave me a look and said, "Just

10  cut the shit," and walked out.

11     Q.     He said to you "cut the shit"?

12     A.     Yup.

13     Q.     Now was Mr. Hesse the chief of

14  police at the time in 2003, to your

15  knowledge?

16     A.     No.

17     Q.     Who was?

18     A.     Chief Ed Paridiso.

19     Q.     Did you -- when -- well, how

20  would you characterize Mr. Hesse's response

21  to your first complaint in 2003?

22     A.     Normal George Hesse response.

23     Q.     Well, did he --

24            MR. CONNOLLY:    Objection.

25            MR. NOVIKOFF:    What's that?

1                    E. Carter

2          MR. CONNOLLY:    Objection.

3          MR. NOVIKOFF:    You objected.

4      Q.    Did you -- again, what did

5  Mr. Hesse say to you when you complained to

6  him the first time in 2003?

7      A.    "Cut the bullshit."

8      Q.    Now would you agree with me that

9  a fair interpretation of Mr. Hesse's

10  response was that he was not going to do

11  anything about your complaint?

12          MR. GOODSTADT:    Objection.

13      Q.    Your first complaint?

14          MR. GOODSTADT:    Objection.

15      A.    Yes.

16      Q.    Okay.  Did you take -- did you

17  take your first complaint to Mr. Paridiso?

18      A.    No.

19      Q.    Did you take your complaint to

20  Mayor Rogers at the time?

21      A.    No.

22      Q.    Did you take -- the first time

23  that you complained to Mr. Hesse and he did

24  not give you a favorable response, did you

25  take your complaint to any trustee?

1                          E. Carter

2          A.      No.

3          Q.      Second time in 2003, what did

4    Mr. Hesse say to you when you complained?

5          A.      He said, "Just clean it up."

6          Q.      Okay.  Would you agree with me

7    that that wasn't a favorable response on

8    Mr. Hesse's part to your complaint?

9                  MR. GOODSTADT:     Objection.

10         A.      Yes.

11         Q.      Did you take that second

12   complaint to Mr. Paridiso?

13         A.      No.

14         Q.      Did you take that second

15   complaint to Mayor Rogers?

16         A.      No.

17         Q.      Did you take that second

18   complaint to any trustee of the village?

19         A.      No.

20         Q.      Third time that Mr.  -- that you

21   complained to Mr. Hesse I believe you said

22   that he said "cut the bullshit," right?

23         A.      Yes.

24         Q.      Again, would you agree with me

25   that that was not a favorable response to

```
 1                      E. Carter
 2   your complaint?
 3              MR. GOODSTADT:     Objection.
 4        A.     Yes.
 5        Q.     Did you take that complaint to
 6   Mr. Paridiso?
 7        A.     No.
 8        Q.     Did you take that complaint to
 9   Mayor Rogers?
10        A.     No.
11        Q.     Did you take that complaint to
12   any trustee member?
13        A.     No.
14        Q.     At any point in time in 2003, did
15   you complain to Ed Paridiso about the fact
16   that there were officers, to your
17   recollection, to your belief, drinking off
18   duty in the police station?
19              MR. GOODSTADT:     Objection.
20              MR. NOVIKOFF:     I'm sorry.  I'm
21        sorry.  Withdraw the question.
22        Q.     At any point in time in 2003, did
23   you complain to Ed Paridiso that there were
24   officers on duty drinking?
25        A.     No.
```

1                        E. Carter

2          Q.      Same question with regard to

3    Mayor Rogers?

4          A.      No.

5          Q.      Same question with regard to any

6    trustee at the time?

7          A.      No.

8          Q.      In 2003, did you communicate with

9    Ed Paridiso in any manner, shape or form

10   that there were officers drinking on duty?

11         A.      No.

12         Q.      Same question as to Mayor Rogers?

13         A.      No.

14         Q.      Same question as to the trustees?

15         A.      No.

16         Q.      Same question as to specifically

17   Mayor Loeffler -- I mean Mr. Loeffler?

18         A.      No.

19         Q.      Okay.  2004 now --

20              MR. GOODSTADT:    Just so we're

21         clear, you're talking about Joe

22         Loeffler?

23              MR. NOVIKOFF:    The Defendant in

24         this case, yes.  And unless I otherwise

25         indicate, if I say "Mr. Loeffler," I'm

```
 1                    E. Carter
 2        referring to the present mayor and the
 3        person who's now a Defendant in this
 4        lawsuit.
 5        Q.      How many times did you complain
 6   to George Hesse in 2004 about officers
 7   drinking while on duty?
 8        A.      Approximately three.
 9        Q.      Okay.  And when was your first in
10   2004?
11        A.      It was the summer of 2004 when I
12   had to leave two officers with a cell phone
13   and a police radio at CJ's Bar.
14   MO           MR. NOVIKOFF:   Okay.  I'm going
15        to move to strike that part of the
16        answer after the time period that
17        Mr. Carter indicated in his answer.
18        Q.      So you first complained in
19   2000 -- in the summer of 2004.  When was
20   your second and third complaint?
21        A.      Also the summer of 2004.
22        Q.      Okay.  Let's talk about your
23   first complaint to Mr. Hesse.  What did you
24   specifically say to him?
25        A.      I said, "George, I'm coming in.
```

```
 1                          E. Carter
 2     There's no one -- there's a dock master at
 3     the station."  I said, "I got to walk into
 4     CJ's Bar and get the radio and the cell
 5     phone from Rich and Gary Bosetti, and I
 6     think it's bullshit."
 7          Q.     And Rich and Gary Bosetti were
 8     officers of Ocean Beach?
 9          A.     Yes.
10          Q.     And when you went in on that
11     occasion to get the cell phone from them,
12     they were on duty, to the best of your
13     knowledge?
14          A.     Yes.
15          Q.     And what did Mr. Hesse say to
16     you, if anything, in response to your --
17          A.     He -- he just looked at me and
18     walked away.
19          Q.     Okay.  And how long after you had
20     to get the cell phone from the Bosettis did
21     you make the complaint to George Hesse?
22          A.     The next time I saw him.
23          Q.     Okay.  Was that the same night?
24     The next night?  Next week?
25          A.     It was within the week.
```

1                    E. Carter

2          Q.     Okay.  And would you

3    characterize -- well, with regard to the

4    complaint about getting the cell phone from

5    the Bosettis in 2004 that you raised with

6    Mr. Hesse, did you raise this complaint with

7    Mayor Rogers?

8          A.     No.

9          Q.     Did you raise this complaint with

10   Ed Paridiso?

11         A.     No.

12         Q.     Did you raise this complaint with

13   Mr. Loeffler?

14         A.     No.

15         Q.     Did you raise this complaint with

16   any member of the  -- any trustee?

17         A.     No.

18         Q.     Okay.  Second time, what was your

19   complaint to Mr. Hesse about concerning

20   officers drinking on duty?

21         A.     Same thing.  Relieving the

22   officers in the bar.

23         Q.     "Same thing" meaning you had to

24   go get the cell phone?

25         A.     I had to go get the cell phone

```
 1                      E. Carter

 2  and police radio from in the bar.

 3        Q.     And the bar was CJ's?

 4        A.     Yes.

 5        Q.     And what did Mr. Hesse say to you

 6  in response to your second complaint on this

 7  subject in 2004?

 8        A.     That he would take care of it.

 9        Q.     Okay.  And did Mr. Hesse advise

10  you as to how he would take care of it?

11        A.     No.

12        Q.     Did you inquire with Mr. Hesse as

13  to how he would take care of it?

14        A.     I found out the next time I

15  relieved.

16        Q.     Did you inquire with Mr. Hesse

17  during the second complaint as to how he

18  would take care of it?

19        A.     No.

20        Q.     Okay.  Did, to your knowledge --

21  withdrawn.  To your knowledge, did Mr. Hesse

22  take care of it?

23        A.     Yes.

24        Q.     What did he do?

25        A.     He then -- I then wound up
```

```
 1                    E. Carter
 2   relieving -- walking into the station.  A
 3   dock master had the cell phone, the police
 4   cell phone and the radio.
 5        Q.    So what exactly did Mr. Hesse do
 6   to take care of it, to the best of your
 7   recollection?
 8        A.    To the best of my knowledge, he
 9   told them stop going out to the bars with
10   the police radio and the cell phone.
11        Q.    Okay.  And did the Bosettis stop
12   doing that after your second complaint in
13   2004?
14        A.    Yes.
15        Q.    Okay.  What was your third
16   complaint concerning officers drinking on
17   duty to Mr. Hesse in 2004?
18        A.    I'm sorry, officers drinking on
19   duty?
20        Q.    Yes.  Well, that was the only
21   thing I think you mentioned, so.
22        A.    Yes.  That was also the rocket
23   fuels being brought into the police station.
24        Q.    Okay.  And that was -- the third
25   complaint that you made to Mr. Hesse was
```

1                    E. Carter

2    about the rocket fuels being brought into

3    the station?

4         A.    Yes.

5         Q.    What did Mr. Hesse say to you, if

6    anything, in response to your complaint on

7    this subject matter?

8         A.    Just chuckled and ignored me.

9         Q.    Okay.  And did you speak with

10   Mr. Paridiso about your third complaint

11   concerning the rocket fuel?

12        A.    No.

13        Q.    Did you speak with mayor -- did

14   you complain to Mayor Rogers?

15        A.    No.

16        Q.    Did you complain to Mr. Loeffler

17   about this third complaint?

18        A.    No.

19        Q.    Did you complain to any trustee

20   member?

21        A.    No.

22        Q.    Did you communicate, in 2004,

23   with anyone, other than Mr. Hesse,

24   concerning your complaints about officers

25   drinking on duty that you've just testified

1                    E. Carter

2     to?

3          A.      No.

4          Q.      2005, did you complain to

5     Mr. Hesse about officers drinking on duty?

6          A.      Yes.

7          Q.      How many times?

8          A.      One that sticks with me at this

9     time that I recall.

10         Q.      And when was that?

11         A.      It was Labor Day weekend.

12         Q.      Labor Day, so that would have

13    been early September 2005?

14         A.      Yes.

15         Q.      And what did you say to

16    Mr. Hesse?

17         A.      I told him down at a bar,

18    Maguire's, I said, "What's going on?"  I

19    said, "I had to take off to go have one

20    drink and you guys are getting paid to have

21    a drink?"  And he just looked at me and

22    said, "Shut up."

23         Q.      What do you mean when you said

24    you had to take off to have one drink?

25         A.      I wound up -- one of the guys was

1                    E. Carter

2    going over to Iraq, Hank Clemens.  We had

3    nine guys, approximately nine guys on the

4    midnight tour.  I asked George if I could

5    work half a tour from 8:00 at night to 12:00

6    and go out for two beers with Hank prior to

7    him leaving, deploying for Iraq, and George

8    says, "I have plenty of coverage.  Yes, you

9    could go."

10        Q.    So Mr. Hesse said that you could

11   take a half a shift and celebrate with the

12   person going to Iraq, correct?

13        A.    Yes.

14        Q.    So what was your complaint?

15        A.    Later, later in the morning,

16   approximately 3:30, 4:00 in the morning, I

17   walked down to Maguire's Bar, several of the

18   officers were inside drinking shots of

19   liquor while on duty.

20        Q.    So your complaint was you had to

21   go off duty to drink, but the other people

22   were on duty and drinking?

23            MR. GOODSTADT:    Objection.

24        Q.    Was that your -- was that your

25   complaint to Mr. Hesse?

1                        E. Carter

2         A.      No.  My complaint is you're

3    drinking again in uniform and why did I have

4    to take off, you know.

5         Q.      Yes.  That's what I'm trying to

6    understand, sir.  Were you upset that you

7    had to take off in order to have a drink

8    with your -- with your friend who was going

9    to Iraq?

10        A.      No.

11        Q.      And the other officers could

12   drink on duty?

13        A.      I wasn't upset that I had to take

14   off, no.

15        Q.      Then what was the purpose of your

16   telling George Hesse that you had to take

17   off to drink and the others didn't?

18        A.      It just was part of what I said

19   to him.  But my complaint was they were

20   drinking while on duty.

21        Q.      So that was your complaint?

22        A.      Yes.

23        Q.      So let me go back to this

24   incident, this night.  You asked Mr. Hesse

25   to just work 8:00 to 12:00, correct?

1                      E. Carter

2          A.      Yes.

3          Q.      So you could have a couple of

4      drinks with your -- with your friend?

5          A.      Yes.

6          Q.      Who was an officer?

7          A.      Yes.

8          Q.      And you stopped working at 12:00

9      that night?

10         A.      Yes, I did.

11         Q.      And then at 4:00 in the morning,

12     you saw two on duty officers drinking?

13              MR. GOODSTADT:      Objection.

14         Q.      Is that your testimony?

15         A.      No.

16         Q.      What was your testimony?

17         A.      Approximately 3:00, 3:30 in the

18     morning, down at Maguire's, there were

19     several officers.

20         Q.      Okay.  And where did you have

21     your drink with your friend?

22         A.      Down at Ocean Beach.

23         Q.      And is it your testimony that you

24     had two drinks in three hours?

25         A.      Yes.

1                    E. Carter

2        Q.     And the rest of the evening was

3    just pleasant conversation?

4               MR. GOODSTADT:     Objection.

5        A.     I had one other drink later on.

6        Q.     So you had three drinks?

7        A.     Down with the officers later on,

8    yes.

9        Q.     What officers?

10       A.     George Hesse.  The ones -- Jimmy

11   Albanese.  The ones that were at Maguire's.

12       Q.     Oh.  Okay.  So the officers that

13   you were talking about that were at Jimmy

14   Maguire's that were drinking on duty, you

15   joined them for a drink?

16       A.     I didn't join them for a drink.

17   I walked in on them, and when I said that to

18   George, George told me, "Shut up," and then

19   handed me a shot.

20       Q.     And you drank it?

21       A.     He said, "Drink."  Yeah.  I was

22   off.  Yes.

23       Q.     Let me understand this now.

24   You're at one bar at Ocean Beach and you

25   have a couple drinks in a three-hour period

```
 1                    E. Carter
 2  of time with a fellow officer who's going
 3  off to Iraq, right?
 4        A.     Yes.
 5        Q.     You then go to another bar,
 6  right?
 7        A.     Um-hum (indicating).
 8        Q.     Why were you going to the other
 9  bar?
10        A.     I was looking for the officers to
11  make sure when they got off at 4:00, that I
12  could get a ride out to my vehicle so I
13  could drive home.
14        Q.     And how did you know other
15  officers were going to be at Maguire's?
16        A.     I didn't.  It was at the other
17  side of the village, and that's when I was
18  walking around looking for everybody.
19        Q.     And you then show up at Maguire's
20  and you say what to George?
21              MR. GOODSTADT:    Objection.
22        A.     I first couldn't -- I didn't see
23  George there at first.  He was in the front
24  part up against the bar.
25        Q.     You didn't see George when you
```

```
 1                      E. Carter
 2   walked into the bar?
 3        A.      At first, no.
 4        Q.      How many people were in the bar
 5   at 3:00 in the morning?
 6        A.      Several.  It was Labor Day
 7   weekend.  There was -- my estimate, to the
 8   best of my knowledge at this time, would be
 9   approximately 50 or better.
10        Q.      Okay.  So you didn't see George
11   when you walked in, but at some point in
12   time you said something to George, right?
13        A.      Yes.
14        Q.      What did you say to George?
15             MR. GOODSTADT:      Objection.
16        A.      I told him, I said, "You know,
17   this is bullshit."
18        Q.      And he told you to shut up?
19        A.      Yes.
20        Q.      And then he hands you a shot?
21        A.      Couple seconds, minute later,
22   yes.
23        Q.      And you drank it?
24        A.      Yes.
25        Q.      Why?  A man just told you to shut
```

1                    E. Carter

2    up after you made a complaint.  He hands you

3    a shot.  This is the man that has laughed at

4    you, ignored you for two and a half years

5    concerning the issue of officers drinking on

6    duty.  Why did you drink with him that night

7    when he said "here's a shot"?

8              MR. GOODSTADT:    Objection.

9         A.    I wound up drinking a shot, yes.

10         Q.    My question is why, sir?  Why did

11    you drink the shot that George Hesse gave

12    you after two and a half years of him

13    ignoring your complaints concerning officers

14    drinking on duty?

15         A.    You have to understand, when you

16    make a complaint with George and you go

17    against him, he becomes very hostile, very

18    retaliatory, and he'll -- he would basically

19    explode on you in his own words.

20         Q.    So you had a shot because you

21    were afraid that George Hesse was going to

22    yell at you?

23         A.    I had a shot because I only had

24    two prior and I wasn't  -- had a limit that

25    I would be drunk to drive home, so yes, I

1                        E. Carter

2      had one.

3           Q.      Sir, I'm not questioning your

4      inebriation or lack thereof when you had the

5      shot with Mr. Hesse.  I'm asking you -- the

6      question is based upon what you've just

7      said, did you drink that shot because you

8      were afraid that Mr. Hesse would verbally

9      explode on you?

10          A.      Drink that shot for that reason,

11     no.

12          Q.      Did you drink that shot because

13     you thought that Mr. Hesse would somehow

14     retaliate against you if you didn't?

15          A.      No.

16          Q.      So I go back to my prior

17     question, sir.  You walk into that bar that

18     night.  The man that you have complained to

19     for two and a half years concerning officers

20     on duty drinking tells you to shut up.  He

21     hands you a shot of alcohol and you drink

22     it.  Why?

23          A.      The shot was there.  I wanted it

24     and I drank it.

25          Q.      Okay.  And Mr. Hesse was on duty?

```
 1                    E. Carter

 2        A.    Yes.

 3        Q.    So you engaged in drinking with

 4   an on duty police officer?

 5              MR. GOODSTADT:    Objection.

 6        Q.    Is that your testimony?

 7              MR. GOODSTADT:    Objection.

 8        A.    I drank it and George Hesse had

 9   one, yes.

10        Q.    You participated in drinking with

11   an on duty police officer?

12              MR. GOODSTADT:    Objection.

13        A.    Yes.

14        Q.    The conduct that you complained

15   of for two and a half years, you

16   participated in while you were off duty,

17   correct?

18        A.    Yes.  I didn't tell him to drink

19   it, though.

20        Q.    I know.  But you participated in

21   the very conduct that you were complaining

22   about, correct?

23        A.    Yes.

24        Q.    Now in the first page of your

25   complaint, sir, you write "Plaintiffs are
```

1                     E. Carter

2    five police officers who had the courage to

3    overcome the blue wall of silence," do you

4    recall that in your complaint?

5              MR. GOODSTADT:    Objection.

6         A.    Yes.

7         Q.    You didn't show much courage that

8    night when Mr. Hesse gave you the shot, did

9    you?

10             MR. GOODSTADT:    Objection.

11        A.    Again, I was off duty.  Yes.

12        Q.    You believe you showed courage?

13        A.    I didn't believe I had to show

14   courage.  I was in a legal establishment, a

15   legal drink.

16        Q.    Yeah, but Mr. Hesse was on duty,

17   right?

18        A.    Yes.

19        Q.    And that was the conduct you

20   complained of, correct?

21        A.    Yes.

22        Q.    You found it offensive that

23   police officers were drinking on duty,

24   correct?

25        A.    Yes.

1                    E. Carter

2       Q.      You believed that it violated the

3   public trust, correct?

4       A.      Yes.

5       Q.      You believed it put citizens in

6   jeopardy, correct?

7       A.      Yes.

8       Q.      So you still believe that you

9   didn't need to exercise courage and to say

10  to Mr. Hesse, "no, I'm not going to

11  participate in what I deem to be a breach of

12  the public trust"?

13              MR. GOODSTADT:    Objection.

14      Q.      Is that your testimony, sir?

15              MR. GOODSTADT:    Objection.

16      A.      No.

17      Q.      Okay.  In 2006, sir, I think

18  you've only  -- well, I want you to take

19  some time.  Think about any other complaint

20  in 2006 that you raised with Mr. Hesse

21  concerning on duty police officers drinking.

22      A.      2006 I didn't work many hours.

23      Q.      Regardless of how many hours you

24  worked, you just said you can recall one

25  incident during the Labor Day weekend.

1                         E. Carter

2          A.      That was 2005.

3          Q.      Oh, my question to you, sir, was

4    2006 I believe.  Oh, it was 2005.  You're

5    right.  I apologize.  In 2005, sir, other

6    than this one incident on Labor Day weekend

7    that you can recall, can you recall any

8    others?  Complaints to George Hesse

9    concerning officers drinking on duty?

10         A.      No.

11         Q.      Okay.  If I gave you five minutes

12   to think about it, do you think that would

13   refresh your recollection?

14              MR. GOODSTADT:     Objection.

15         A.      Yes.  Well, 2005, Paul Conway was

16   still bringing the rocket fuels inside,

17   but --

18         Q.      My question, sir, is regardless

19   of your witnessing of certain events, I'm

20   asking you other than the complaint that you

21   raised with Mr. Hesse in McGuire's during

22   Labor Day weekend, can you recall any other

23   complaints that you raised to Mr. Hesse in

24   2005 concerning officers drinking on duty?

25         A.      Cleaning out of the beer cans in

1                      E. Carter

2      the cars.  The officers pulling up to the

3      check point with beers in their hand.

4           Q.     And you made -- and you made

5      these complaints to George Hesse?

6           A.     George Hesse was driving the one

7      night, yes.

8           Q.     No.  My question is not what

9      Mr. Hesse was doing, not what you witnessed.

10     We've gone through 2003, 2004, and 2005

11     concerning direct complaints that you raised

12     with Mr. Hesse, you would agree with me?

13          A.     Yes.

14          Q.     And you answered those questions

15     truthfully, correct?

16          A.     Yes.

17          Q.     And I believe in 2003 you made

18     three complaints, and in 2004 you said three

19     complaints, right?

20          A.     Yes.

21          Q.     And in 2005 you've told me of one

22     complaint Labor Day weekend.  So my question

23     is, are there any other complaints that you

24     can recall that you made directly to George

25     Hesse concerning the subject matter of

1                    E. Carter

2    officers drinking on duty in 2005?

3         A.    Not that I recall at this time.

4         Q.    And, again, if I gave you an

5    opportunity to think about it, do you think

6    that would refresh your recollection?

7         A.    Yes.

8         Q.    Do you want take a couple

9    minutes?

10        A.    Yes.

11        Q.    Please do.  Oh, you wanted to go

12   off the record and do that?

13        A.    Oh, I'm sorry.

14        Q.    No.  It's up to you.  However

15   you --

16        A.    I was going to use the bathroom.

17   I'm sorry.

18        Q.    You know what, then why don't we

19   do this.  Let's take a break.  You go to the

20   bathroom, you think about that, and come

21   back and tell me if it refresh yours

22   recollection.

23              THE VIDEOGRAPHER:    This ends

24        tape number one.  The time is 10:45

25        a.m.  We're going off the record.

```
 1                    E. Carter

 2              (A break was taken.)

 3              THE VIDEOGRAPHER:    This begins

 4         tape number two.  The time is 10:55

 5         a.m.  Back on the record.

 6         Q.    Mr. Carter, was that the only

 7    time you ever drank with Mr. Hesse on Ocean

 8    Beach?

 9         A.    Yes.

10         Q.    Ever?

11         A.    Yes.

12         Q.    That's the only time you ever

13    drank with Mr. Hesse on Fire Island?

14         A.    Yes.

15         Q.    Ever?

16         A.    Yes.

17         Q.    Was that the first time you ever

18    drank alcohol with any other -- putting

19    aside the night -- putting aside what you

20    did between 12:00 and 3:00 that night, was

21    that the only time that you ever drank

22    alcohol with any other officer, whether on

23    duty or off duty, on Ocean Beach?

24         A.    No.

25         Q.    Did you ever drink -- prior to
```

1                          E. Carter

2       that time, did you ever drink with any

3       officers -- well, withdrawn.  Prior to that

4       night, did you ever drink with any on duty

5       officers on Ocean Beach?

6              A.     No.

7              Q.     So the only time you would have

8       had a drink with an officer would have been

9       when that particular officer was off duty?

10             A.     Yes.

11             Q.     How often, in 2005, did you drink

12      with an off duty police officer on Ocean

13      Beach?

14             A.     Once.

15             Q.     And that was just with Mr. Hesse?

16             A.     Mr. Hank Clemens.  Off duty with

17      Hank and then George.  The same instance.

18      Same night.

19             Q.     How about 2004?

20             A.     2004, none.

21             Q.     2003?

22             A.     2003, none.

23             Q.     2002?

24             A.     2002, none.

25             Q.     2001?

1                    E. Carter

2         A.       None.

3         Q.       So then the only time you would

4    have had a drink with any other officer,

5    whether on duty or off duty, was that night

6    during Labor Day weekend in 2005; is that

7    correct?

8         A.       No.

9         Q.       You know what, then tell me the

10   other times you would have had a drink of

11   alcohol with an off duty police officer

12   while on Ocean Beach?

13        A.       1991 we had a police party the

14   end of the year.

15        Q.       Okay.

16        A.       1992 we had a police party at the

17   end of the year.  1993, when I went out of

18   the village to Ocean Bay Park for dinner,

19   after work, I might have had a drink.

20        Q.       Okay.

21        A.       So there were a couple times in

22   '91 to '93.

23        Q.       Got it.  Let's continue on --

24   well, let's go back to 2005 for a second.

25   Did you complain to Chief Paridiso about

1                    E. Carter

2    what you complained to Mr. Hesse about on

3    Labor Day weekend 2005 concerning drinking

4    while on duty?

5         A.    No.

6         Q.    Same question with regard to

7    mayor -- excuse me, Mr. Loeffler?

8         A.    No.

9         Q.    Same question with regard to

10   Mayor Rogers?

11        A.    No.

12        Q.    Same question with regard to

13   trustees?

14        A.    No.

15        Q.    Did you communicate with any

16   trustee or mayor of Ocean Beach in 2005

17   concerning your complaint to Mr. Hesse?

18        A.    No.

19        Q.    Same question with regard to

20   Mr. Paridiso?

21        A.    No.

22        Q.    2006, did you make any complaints

23   to George Hesse concerning on duty officers

24   drinking?

25        A.    No.

```
 1                    E. Carter
 2        Q.      Same question with regard to Ed
 3   Paridiso?
 4        A.      No.
 5        Q.      Same question with regard to any
 6   mayor or trustee at the time?
 7        A.      No.
 8        Q.      Let's now go to the second page
 9   of your Notice of Claim.  "Items of damage
10   or injuries claimed," do you see that, after
11   number four, next to number four?
12        A.      Yes.
13        Q.      Let's go in the -- let's see what
14   you wrote.  "Claimant sustained damages and
15   injuries, including but not limited to,
16   monetary and/or economic damages, including
17   but not limited to, loss of past and future
18   income, compensation and benefits, legal
19   fees and costs, permanent damage to his
20   personal and professional reputation and
21   standing in the community, loss of comfort
22   and support, fear, extreme mental and
23   emotional harm and stress, impairment of
24   natural growth process, and other injuries
25   not yet fully ascertained."  How much have
```

```
 1                    E. Carter
 2   you paid in legal fees and costs?
 3   DI        MR. GOODSTADT:    Objection.
 4        Don't answer the question.
 5             MR. NOVIKOFF:   Mr. Goodstadt,
 6        it's part of his Notice of Claim that
 7        this is what he's incurred.  I think
 8        since you have raised it -- not you but
 9        since the Plaintiff has raised this in
10        the Notice of Claim as damages he's
11        seeking to recover, I'm completely
12        entitled to asking the question how
13        much, without going into any detail
14        behind that.
15             MR. GOODSTADT:    You can take it
16        up with the court.
17             MR. NOVIKOFF:    You're
18        instructing him not to answer?
19             MR. GOODSTADT:    I'm instructing
20        him not to answer.
21             MR. NOVIKOFF:    All right.  That
22        one I'm taking up with the court, and I
23        may move for appropriate sanctions on
24        that, because that's the first I heard
25        of this.
```

1           E. Carter

2           MR. GOODSTADT:   Every case that

3    has statutory fee provisions, requests

4    legal fees and costs, and if you can

5    cite me to some authority where they

6    were -- a defense lawyer was entitled

7    to ask how much money was spent in

8    legal fees up to the date of

9    deposition --

10          MR. NOVIKOFF:   Oh, no.  No.

11   No.  That's not my question.  And I

12   agree with you entirely, Mr. Goodstadt.

13   That should you prevail in this case,

14   your client is entitled to statutory

15   fees and costs.  That's not my

16   question.

17          Your client, in his Notice of

18   Claim, said the items of damages or

19   injuries claimed are legal fees and

20   costs.  My question is, has he paid any

21   legal fees and costs to date.  Not what

22   his ultimate damages would be, or not

23   what you could recover if you prevail.

24   But --

25          MR. GOODSTADT:   That's what he

```
 1                    E. Carter
 2       was referring to there.
 3              MR. NOVIKOFF:    Then if that's
 4       what your answer  -- if that's what
 5       you're going to put on the record, then
 6       I'll move on.
 7              Let the record reflect that
 8       Mr. Goodstadt has indicated that when
 9       legal fees and costs are referred to,
10       it's being referred to the statutory
11       fees and costs that Plaintiff would be
12       entitled to in the event he prevails.
13              MR. GOODSTADT:    That's correct.
14              MR. NOVIKOFF:    Okay.
15       Q.    "Loss of comfort and support,"
16   what did you mean by that?
17       A.    My own comfort.  My sleep.  My
18   support.  Obviously my family supported me.
19   I lost friends which I use as support.
20       Q.    Okay.  You've -- let's break it
21   down.  Loss of comfort and support you say
22   you've lost your family's comfort and
23   support?
24       A.    No.
25       Q.    Okay.  I'm sorry.  Go ahead.  You
```

1                           E. Carter

2     can finish your answer.  My question to you

3     is, have you lost -- when you're using the

4     words "loss of comfort and support," have

5     you lost your family's comfort and support?

6         A.     No.

7         Q.     Okay.  What friends have you lost

8     when you are referring to "loss of comfort

9     and support"?

10        A.     Several friends that I used to

11    work with at Ocean Beach that would support

12    you just by being around you when you worked

13    and stuff.

14        Q.     And who were they?

15        A.     Who were they.  John Oley, Alan

16    Loeffler, Arnie Hardman, Paul Corallo.  I

17    could go on.

18        Q.     Please, go on.

19        A.     Pat Cherry.  I call him

20    Mr. Cherry.  He's the older Cherry.  And

21    there were other residents and stuff which

22    no longer talk to me.

23        Q.     Well, what residents no longer

24    talk to you?

25        A.     One that I just ran into the

1                          E. Carter

2     other day was the owner of the OB Market.

3     Just looked -- kept staring at me at a

4     parking violations hearing.

5          Q.     Where?

6          A.     In Islip.

7          Q.     And he kept staring at you?

8          A.     Until I walked up to him and said

9     something.  He says, "I wasn't sure if you'd

10    talk to me."

11         Q.     I'm --

12         A.     "I wasn't sure if you'd talk to

13    me."

14         Q.     Did he talk to you?

15         A.     After a little while.

16         Q.     Okay.  So he talked to you?

17         A.     Not like he used to.

18    Differently.

19         Q.     Well, prior to that time, what --

20    actually, what is this gentleman's name?

21         A.     I don't know his first name.  He

22    owned the OB Market.

23         Q.     Okay.  So you're saying you lost

24    this friend's comfort and support, but you

25    don't know his name?

E. Carter

2    A.    No.  It was someone I saw over

3  there, and you know, I would see from day to

4  day when I was working and stuff.  "Hi."

5  "How you doing."  "What's up."  "How's

6  everything."

7    Q.    But you don't know his name?

8    A.    No.

9    Q.    What other friends that aren't on

10  the police officer -- that weren't police

11  officers at Ocean Beach -- well, withdrawn.

12  You mentioned residents.  You just mentioned

13  one.  Any other residents that you believe

14  you've lost as a result of the actions of

15  Ocean Beach?

16    A.    I believe I lost most of the

17  residents.  From what's been posted on the

18  blog and stuff, it said straight out, you

19  lost many friends.

20    Q.    Yeah.  I'm asking you, sir.  You

21  said that you lost the comfort and support

22  of friends.  You've identified one

23  individual for whom you don't know the name

24  of as a friend.  What other friend can you

25  identify for me that you've lost as a result

1                    E. Carter

2    of the actions of Ocean Beach, other than

3    those police officers that you've

4    identified?

5          A.    None that I recall at this time.

6          Q.    Now the police officers that

7    you've lost, can you describe what you mean

8    by the phrase "you've lost them"?

9                MR. GOODSTADT:    Objection.

10         Q.    You can answer.

11         A.    I can answer?  I'm sorry.  First

12   thing was after the Gilbert incident, Paul

13   Corallo, I used to relieve all the time.  He

14   would sit -- he would talk to me for a

15   little while.  He clammed right up.

16   Wouldn't talk to me when I was let go.  I

17   haven't heard from him since.

18         Q.    And when was the Gilbert

19   incident?

20         A.    Gilbert incident was August of

21   2005.

22         Q.    Okay.  And my question to you,

23   sir, is, what did you mean when you said you

24   lost the friendship of those police

25   officers?  Is that the only example that you

```
1                    E. Carter
2    can give me?
3         A.    No.  Their support, you know,
4    with the friendship.  A friendship.
5    Support.  You know.
6         Q.    What do you mean by "support"?
7         A.    Just being there for you to get
8    through this.
9         Q.    Get through what?
10        A.    Get through the hard part of
11   being let go.  Terminated.  Why I was
12   terminated.  Mental anguish.
13        Q.    Have you reached out to any of
14   those officers for their support and comfort
15   that you've identified?
16        A.    Yes.
17        Q.    Subsequent to being let go as you
18   say?
19        A.    John Oley.
20        Q.    Okay.  When did you reach out to
21   John Oley?  And spell his last name for me?
22        A.    O-L-E-Y.
23        Q.    Okay.  When did you reach out to
24   him?
25        A.    I saw him approximately
```

1                    E. Carter

2    November -- it was late 2006 and he wouldn't

3    even talk to me.

4         Q.     Okay.  But, sir, you filed this

5    Notice of Claim in June of 2006, at least

6    it's dated.  So why don't we stick with

7    prior to June 2006.  Who did you reach out

8    to prior to filing the Notice of Claim that

9    would not speak to you that was a police

10   officer at Ocean Beach for comfort and

11   support?

12              MR. GOODSTADT:     Objection.

13              MR. NOVIKOFF:     I'll withdraw

14         the question.  I'll rephrase it.

15         Q.     What police officer, between

16   April 2, 2006 and June 30 2006, of Ocean

17   Beach did you reach out for comfort and

18   support?  What officer?

19         A.     None.

20         Q.     None.  Okay.  Between 2000 --

21   June 30, 2006 and the date you filed the

22   complaint, which for the record is March 21,

23   2007, what police officer at Ocean Beach did

24   you reach out for comfort and support?

25         A.     John Oley.

```
 1                        E. Carter
 2        Q.      Okay.  And describe for me the
 3   incident involving Mr. Oley.
 4             MR. GOODSTADT:     Objection.
 5        A.      I saw Mr. Oley at Bay Shore
 6   Dunkin Donuts.  I walked in.  He looked at
 7   me, and I could tell immediately he didn't
 8   want me there.  I walked up to him.  I said,
 9   "How you doing, John?"  I said, "Are you
10   going to say hi?"  And he just stared at me
11   for a minute.  And he goes, "Yeah, Eddie, I
12   was going to say hi."  And when we went
13   outside, you know, I said, "John, why don't
14   you ever call me?  What was up?  You know,
15   we were good friends I thought."  I said,
16   "You know, what's going on?  And why did
17   George keep you and let me go, Tom, Kevin,
18   Joe and Frank?"  And he just looked.  He
19   said, "well," he said, "I don't know.  Why
20   did he let you go?"  And that was it.
21   Pretty much he blew me off.
22        Q.      Why did you think John should
23   have been let go as well as -- withdrawn.
24   Why do you think John should have been let
25   go if you were let go?
```

1                    E. Carter

2          A.      Because there was no reason to

3     let me go.

4          Q.      Then what reason was there to let

5     John go?

6          A.      None.  Same reason.

7          Q.      And prior to meeting -- prior to

8     the -- withdrawn.  Prior to seeing him in

9     the Bay Shore Dunkin Donuts, did you reach

10    out to John Oley between the date of the

11    filing of the Notice of Claim and the date

12    of the filing of the complaint?

13         A.      No.

14         Q.      Other -- let's now talk about the

15    time period between March 21, 2007 and the

16    present.  What police officers at Ocean

17    Beach have you reached out for comfort and

18    support?

19         A.      Alan Loeffler.

20         Q.      Alan Loeffler?

21         A.      Yes.

22         Q.      Is Alan Loeffler related at all

23    to Defendant Joseph Loeffler?

24         A.      Yes.

25         Q.      And what is their relationship?

1                          E. Carter

2         A.      Brothers.

3         Q.      So you reached out to the brother

4    of the person that you were suing

5    individually for comfort and support, is

6    that your testimony?

7         A.      Yes.  Me and Alan Loeffler were

8    very good friends at one time.

9         Q.      When did you reach out to

10   Mr. Alan Loeffler for comfort and support?

11        A.      Originally I dropped my uniforms

12   off to him.  I work with Alan in the Town of

13   Islip to let you know, and I see him from

14   day to day at different times.

15               At the time the lawsuit was

16   filed, he came around the corner and he

17   looked at me and he says, "I can't talk to

18   you."  And I said, "Al, what are you talking

19   about?  Cut the shit.  What's going on?"

20   And he says, "Well, you filed a lawsuit."  I

21   said, "Yeah."  I said, "So that means our

22   friendship's over?"  And he looked at me and

23   he walked -- you know, pretty much he talked

24   to me for a couple seconds.  Nothing -- very

25   vague that I remember and he walked away.

```
 1                    E. Carter
 2  That was it.  I haven't spoken to him since.
 3       Q.     Are you surprised that he didn't
 4  want to talk to you, given the fact that you
 5  sued his brother?
 6       A.     Yes.
 7       Q.     You are?
 8       A.     Yes.
 9       Q.     Do you have a brother?
10       A.     Yes.
11       Q.     If someone sued your brother,
12  would you want to speak to them?
13            MR. GOODSTADT:     Objection.
14       A.     If they were a good friend of
15  mine, yes.
16       Q.     Okay.  That's interesting.
17            MR. GOODSTADT:     Objection.
18       Q.     Okay.  So between the date of the
19  filing of the complaint and the present, you
20  reached out to Alan Loeffler.  Anybody else?
21  Any other police officer at Ocean Beach that
22  you reached out for comfort and support?
23       A.     No.
24       Q.     Okay.  So we have Mr. Loeffler
25  and we have Mr. Oley, is that it?
```

1                        E. Carter

2          A.      Yes.

3          Q.      Okay.   Has your wife left you?

4          A.      No.

5          Q.      Have your children abandoned you?

6          A.      No.

7          Q.      Any other friends abandon you as

8    a result of you not being let go -- you not

9    being rehired on April 2, 2006 by Ocean

10   Beach?

11                 MR. GOODSTADT:     Objection.

12         A.      No.

13         Q.      Okay.   You mention as part of

14   your loss of comfort, that you couldn't

15   sleep.   Did I fairly characterize your

16   testimony?

17         A.      Yes.

18         Q.      When did you -- when did you

19   start having difficulty sleeping in relation

20   to April 2, 2006?

21         A.      April 2, that night.

22         Q.      Okay.   And how long has it

23   continued, if at all?

24         A.      It continued originally for

25   approximately a week and a half, and every

                          E. Carter

1      time I see one of these defamatory remarks

2      or whatever on that blog or someone brings

3      it up to me, I relive it.  I relive April 2.

4          Q.    Okay.  And when's the last time

5      you looked at the blog?

6          A.    Approximately one week ago.

7          Q.    Why?

8          A.    Because someone told me there was

9      posted -- something posted about me on

10     there.

11         Q.    What was posted a week ago?

12         A.    That myself and another officer

13     were doing official misconduct again by

14     falsifying time cards basically.

15         Q.    Who posted it?

16         A.    I don't know.

17         Q.    Do you know, as you sit here

18     today, the identity of anyone who posted

19     anything on this blog that you're referring

20     to?

21         A.    Yes.

22         Q.    Who?

23         A.    Tom Snyder.

24         Q.    Oh.  So Mr. Snyder's a defendant?

1                        E. Carter

2              MR. GOODSTADT:    Objection.

3         Q.    Is Mr. Snyder a Plaintiff in this

4    lawsuit?

5         A.    Yes.

6         Q.    And it's your testimony that

7    Mr. Snyder posted something on the blog?

8         A.    In --

9         Q.    No.  Just -- don't tell me when.

10        A.    Yes.

11        Q.    How do you know that Mr. Snyder

12   posted something on the blog?

13        A.    He told me, and I went on the

14   blog and I saw it posted there.

15        Q.    I'm sorry?

16        A.    I went on the blog and saw it

17   posted there.

18        Q.    When did Mr. Snyder tell you he

19   posted something on the block blog?

20        A.    April of 2006.

21        Q.    Shortly after April 2, 2006?

22        A.    Within that week, yes.

23        Q.    Within that week.  Did Mr. Snyder

24   advise you as to why he was posting anything

25   on this blog?

1                          E. Carter

2          A.      Yes.

3          Q.      Why?  What did he say to you?

4          A.      He said, "Ed, someone posted

5    something about me and you, mostly about you

6    working Halloween night, doing official

7    misconduct and falsifying paperwork.  I

8    posted something in response to it saying

9    that you were not working, that you did not

10   do any of that," and he ID'd himself in that

11   blog that, "whoever you are posting this,

12   you know who I am and where to get in touch

13   with me now.  My name's Tom."

14         Q.      Okay.  Is that the only time, to

15   your knowledge, that Mr. Snyder posted

16   something on the blog?

17         A.      Yes.

18         Q.      To your knowledge, has any

19   other -- has any other Plaintiff posted

20   anything on the blog?

21         A.      No.

22         Q.      Other than Mr. Snyder, do you

23   know -- do you have personal knowledge of

24   the identity of any person who posted

25   anything on the blog since April 2, 2006

```
 1                    E. Carter

 2    through the present?

 3         A.    Yes.

 4         Q.    Who?

 5         A.    Tyree Bacon.

 6         Q.    How do you know that Tyree Bacon

 7    posted anything on the blog?

 8         A.    Tom Snyder had a meeting with

 9    George Hesse in May of 2006 complaining

10    about the -- one of the blogs was the "OB

11    resident" the name was.  He complained that

12    even residents are posting about us, the

13    officers that were let go, and George Hesse

14    told him, "Tom, it's not the residents.

15    It's us in the police department and Tyree

16    Bacon."

17         Q.    Okay.  So you don't have personal

18    knowledge that it's Tyree Bacon, the only

19    knowledge you have is that Mr. Snyder told

20    you that Mr. Hesse told him that it was

21    Tyree Bacon?

22         A.    Yes.

23         Q.    Okay.  Have you gone to a doctor

24    with regard to your lack of ability to sleep

25    on certain occasions since April 2, 2006?
```

1                         E. Carter

2          A.      No.

3          Q.      Have you taken any medication?

4          A.      No.

5          Q.      Has it interfered with your

6     full-time job?

7          A.      Yes.

8          Q.      How has it interfered with your

9     full-time job?

10         A.      I went to work a couple nights,

11    you know, with a fogged head.  I wasn't 100

12    percent.

13         Q.      When do you work for the Town of

14    Islip?  What are your normal hours?

15         A.      I don't have normal hours.  I

16    work different shifts.  Right now I work

17    midnight to 8:00.

18         Q.      Midnight to 8:00.  And a couple

19    of -- is it your testimony that a couple of

20    occasions you went to a job -- your job at

21    night with a fogged head?

22         A.      With stuff in my head about the

23    beach, yes.

24         Q.      And how did that interfere with

25    your job?  Did you commit any acts of

                              E. Carter

1

2   negligence that day?

3        A.     No.

4        Q.     Were you reprimanded at all for

5   conduct -- for anything that went on during

6   that day that you went to work with a fogged

7   head?

8        A.     No.

9        Q.     Did you lose any benefits as a

10  result of anything that took place on those

11  few occasions that you went to work with a

12  fogged head?

13       A.     No.

14       Q.     Did you get demoted at all?

15       A.     No.

16       Q.     Was there any adverse action

17  taken against you as a result of anything

18  you may have done on those few occasions

19  that you went to work with a fogged head?

20              MR. GOODSTADT:    Objection.

21       A.     No.

22       Q.     Have you sought any -- have you

23  been to a psychiatrist at all with regard to

24  any issues concerning your lack of sleep?

25       A.     No.  I couldn't.

1                      E. Carter

2         Q.      You couldn't?

3         A.      No.

4         Q.      Why couldn't you go see a

5    psychiatrist?

6         A.      Because of my professional

7    full-time job, the minute you see a

8    psychiatrist, a mental health report would

9    have been forwarded there.

10        Q.      Let me understand this, if you

11   went to see a psychiatrist, you would have

12   to report that to your superior?

13        A.      To my employee assistant program,

14   yes.

15        Q.      And what is your understanding as

16   to why you would have to report that?

17        A.      As a peace officer in New York

18   State, it would go on my permanent record

19   and it would automatically be flagged and

20   sent over there.

21        Q.      And do you know what statute

22   requires you to notify anyone at your job

23   that you went to see a psychiatrist?

24               MR. GOODSTADT:      Objection.

25        A.      Not at this time.

```
 1                    E. Carter

 2        Q.    Can you tell me where you get

 3   this information from that you've just

 4   testified to, that you're required to notify

 5   your employer that you went to see a

 6   psychiatrist?

 7        A.    Well, my promotion pending, and

 8   my belief -- my belief is that it would have

 9   affected that, and I would have had to make

10   that personal knowledge, public knowledge --

11   personal knowledge at work.

12        Q.    And what is your belief based on?

13   That's really what I'm asking you.  What is

14   your belief based on that had you gone to

15   see a psychiatrist or a mental health

16   professional, you would have had to notify

17   your employer?

18        A.    Past interviews.

19        Q.    Past interviews with whom?

20        A.    With different agencies with

21   myself.

22        Q.    And what did these interviewers

23   say to you, if anything, that led you to

24   believe that were you to go to a

25   psychiatrist, you would have to notify them,
```

```
 1                    E. Carter
 2   notify an employer that you went to see a
 3   psychiatrist?
 4         A.    I had to fill out a disclosure
 5   form for the Mental Health Department for
 6   New York State.
 7         Q.    And what was the disclosure form?
 8         A.    It was a standard New York State
 9   disclosure form asking about my past
10   psychological history.  If there was any
11   contact with a psychiatrist or whatever.
12         Q.    Do you have a copy of this form
13   in your custody, possession or control?
14         A.    No.
15         Q.    Who would have -- for whom did
16   you fill this form out?
17         A.    I've had to fill it out for the
18   Town of Islip and I've seen it at Ocean
19   Beach with the applicant investigation
20   packet.
21         Q.    All right.  I'll look for that
22   form.  You write "extreme mental and
23   emotional harm and stress."  What did you
24   mean by that?
25         A.    The emotional harm and stress of
```

1                    E. Carter

2    going back -- like I said, when you see

3    stuff on the blog and reliving April 2, the

4    termination, and I -- you know, it's very

5    disturbing to me to this day.

6        Q.     What physical reactions, if

7    any -- well, what physical manifestations,

8    if any, do you believe have resulted from

9    this extreme mental and emotional harm and

10   stress?

11       A.     My heart would race.  I would get

12   severe headache.  I would take -- I would

13   have to take Tylenol with codeine.

14       Q.     Is your heart racing now?

15       A.     No.

16       Q.     You're reliving April 2 today,

17   aren't you?

18       A.     At a different point, yes.  Where

19   I'm not seeing something put in the computer

20   or whatever or put in my face that I did

21   illegally that I didn't.

22       Q.     So if we -- is it your testimony

23   that if I showed you the blog, that would

24   cause your heart to race?

25              MR. GOODSTADT:    Objection.

1                        E. Carter

2          A.      If you showed me parts of

3     postings, yes.

4          Q.      And have you seen any doctor

5     concerning your heart racing?

6          A.      No.

7          Q.      That's pretty serious, wouldn't

8     you agree?

9          A.      No.  Because it comes and it

10    goes.

11         Q.      Okay.  So you didn't think it was

12    serious enough to see a doctor?

13         A.      No.

14         Q.      Other than your heart racing, was

15    there any other physical manifestations of

16    this extreme mental and emotional harm and

17    stress that you allege?

18         A.      The anguish.  The -- I told you I

19    had to take Tylenol with codeine a couple

20    times.

21         Q.      With codeine?

22         A.      The ones you buy over the

23    counter.

24         Q.      Oh, okay.

25         A.      I think -- I believe that's what

1                          E. Carter

2     they have in them.

3          Q.     And have you seen any doctor

4     concerning the headaches?

5          A.     No.

6          Q.     How many times have you had

7     headaches resulting from seeing the blog

8     that resulted -- that caused you to take

9     Tylenol?

10         A.     I couldn't give you an exact

11    amount now.  Approximately, at least a dozen

12    times.

13         Q.     Over the two and a half year time

14    period?

15         A.     Yes.  But I don't look at the

16    blog all the time.

17         Q.     I understand that.  But it's

18    about two and a half years since April 2,

19    right?

20         A.     Yes.

21         Q.     "Other injuries not yet fully

22    ascertained," do you see that?

23         A.     Yes.

24         Q.     Well, this was filed -- well,

25    this is dated June 30, 2006.  We're now in

1                           E. Carter

2      September of 2008.  Have you ascertained yet

3      those other injuries?

4                MR. GOODSTADT:     Objection.

5           A.     Not that I'm aware of.

6           Q.     Okay.

7           A.     Sir, if I may.

8           Q.     Sure.

9           A.     This paragraph is -- the

10     sentences in this paragraph are contained

11     obviously in a paragraph.  The paragraph as

12     a whole is what I signed the notice of

13     complaint.

14          Q.     I understand that.  And you've

15     made certain allegations in this paragraph

16     concerning what your damages are, and one of

17     them was "other injuries not yet fully

18     ascertained," and my question to you, sir,

19     if you need to respond again to it, was

20     between June 30, 2006 and today, have you

21     ascertained yet the other injuries?

22               MR. GOODSTADT:     Objection.

23          A.     Not to my knowledge, no.

24          Q.     "Impairment of natural growth

25     process," what did you mean by that?

1                        E. Carter

2          A.      I've lost hair.

3          Q.      You've what?

4          A.      I've lost hair.

5          Q.      How old are you?

6          A.      I'm 43 now.

7          Q.      When did you start losing hair?

8          A.      I've lost clumps -- I started

9    losing my hair 42.

10         Q.      So -- and how old are you now?

11         A.      43.

12         Q.      So is it your testimony that

13   within the last year, you went from a full

14   set of hair to what appears now to be a

15   significantly receding hair line?

16         A.      No.

17         Q.      No.  So you started losing hair

18   before the age of 42, correct?

19         A.      Not as much as after 42.

20         Q.      Did you start losing your hair

21   before the age of 42?

22         A.      Yes.

23         Q.      When did you start losing your

24   hair, sir?

25         A.      I don't know.  I don't recall.

1                      E. Carter

2               MR. NOVIKOFF:    Well, let's

3          look at what has been identified as

4          9270.  I don't have copies of it, but

5          it's a picture of Mr. Carter.  Let's

6          mark this as Exhibit-2.

7               (Document Bates stamped 9270

8           was marked as Carter Exhibit-2 for

9           identification; 9/16/08, E.L.)

10          Q.    I'm going to show you what's been

11     marked as Exhibit-2.  If you want to show it

12     to your attorney before I ask you questions,

13     by all means do so.  Is that a picture of

14     you, sir?

15          A.    Yes, sir.

16          Q.    Do you know when this picture was

17     taken?

18          A.    I believe it was taken in 2005.

19          Q.    Okay.  Do you know for what

20     purpose it was taken in 2005?

21          A.    Grand jury subpoena.

22          Q.    A grand jury subpoena?

23          A.    Yes.

24          Q.    What grand jury subpoena?

25          A.    That George Hesse had on his desk

1                          E. Carter

2     that the grand jury subpoenaed pictures of

3     the officers for Gilbert.

4          Q.     My question to you, sir, was when

5     was your picture taken?

6          A.     In 2005.

7          Q.     Where?

8          A.     In the police station.

9          Q.     Which police station?

10         A.     Ocean Beach.

11         Q.     Okay.  And the purpose of taking

12    that picture was related to a grand jury

13    subpoena?

14         A.     Yes.

15         Q.     Okay.  And would you describe for

16    me -- well, would it be fair to say that on

17    that picture, your hair line is

18    significantly receded?

19         A.     Yes.

20         Q.     Okay.  So would you agree with me

21    that at some point in time prior to 2005,

22    your hairline has significantly -- was

23    significantly receding?

24         A.     Yes.

25         Q.     Do you have any pictures of you

```
 1                    E. Carter
 2   prior to 2005 in your custody, possession or
 3   control?
 4        A.    Driver's license.
 5        Q.    Do you have a driver's license on
 6   you right now?
 7        A.    Yes.
 8        Q.    When was your driver's license
 9   taken?
10        A.    I don't know at this time without
11   looking at it.
12        Q.    Can you please look at your
13   driver's license now?
14             MR. GOODSTADT:    Objection.
15             Objection.  You can make a document
16             request.  He's not taking a document
17             that's not related to this case out of
18             his pocket to look at now.
19   RQ        MR. NOVIKOFF:    All right.
20             We'll make a request for the driver's
21             license.
22        Q.    Do you have any other pictures in
23   your home of you, prior to 2005?
24        A.    I'm sure there are.
25   RQ        MR. NOVIKOFF:    Okay.  I'm going
```

1                         E. Carter

2          to call for the production of copies of

3          all pictures in your custody,

4          possession or control that would show

5          what your hair looked like prior to

6          2005 going back to the time that you

7          were 21.

8                 MR. GOODSTADT:    Note my

9          objection, and I'll take it under

10         advisement.

11         Q.    Have you seen a doctor concerning

12    the clumps of hair that you say that have

13    left your head?

14         A.    No, sir.

15         Q.    Do you agree with me that

16    clumps -- that clumps of hair falling out of

17    your head is pretty serious, correct?

18                MR. GOODSTADT:    Objection.

19         A.    I believe it was due to the

20    stress and that's what I know.

21         Q.    My question isn't what it's due

22    to.  Would you agree with me that losing

23    clumps of your hair is pretty serious?

24         A.    It's serious I guess.  Yes.

25         Q.    Cause you concern, correct?

```
 1                      E. Carter
 2   Right?
 3         A.      Little bit.
 4         Q.      Little bit?  Not a lot?
 5                 MR. GOODSTADT:     Objection.
 6         Q.      Have you had a history of
 7   clumping of hair falling out of your head?
 8         A.      No.
 9         Q.      Did you go to a doctor?
10         A.      No.
11         Q.      Did you seek any type of medical
12   advice concerning why clumps of your hair
13   were falling out?
14         A.      No.
15         Q.      Okay.  When did you retain
16   Mr. Goodstadt's law firm in connection with
17   this Notice of Claim or any aspect of the
18   April 2, 2006 incident?
19                 MR. GOODSTADT:     Objection.
20         Q.      You can answer.
21         A.      The summer of 2006.
22         Q.      Well, the summer starts in June,
23   correct?  What do you mean by "summer"?
24   What months would be contained?
25         A.      May or June of 2006.
```

1                           E. Carter

2          Q.      Okay.

3          A.      June.

4          Q.      In relation to June 30, 2006 --

5          A.      Yes.

6          Q.      When  -- how long prior to June

7     30, 2006 did you retain Mr. Goodstadt's law

8     firm?

9                  MR. GOODSTADT:    Objection.

10         A.      I don't recall at this time.

11         Q.      Weeks earlier?

12         A.      I don't recall without a document

13    in front of me showing.

14         Q.      Okay.  Would that be -- did you

15    sign a retainer agreement with

16    Mr. Goodstadt's law firm?

17         A.      Yes.

18         Q.      Okay.  Then I'm going to leave a

19    space in the transcript for you to -- well,

20    would that be a document that would refresh

21    your recollection?

22         A.      I believe so.  Yes.

23                 MR. NOVIKOFF:    Then I'm going

24         to leave a space in the transcript and

25         ask you to look at that document, and

1               E. Carter

2          to the extent that it refreshes your

3          recollection as to the question I just

4          posed, please fill in the answer.

5               MR. GOODSTADT:    Objection.

6     INSERT:

7          Q.    How did you come about first

8     meeting Mr. Goodstadt?  Now my question is,

9     I don't want to know about anything you said

10    to Mr. Goodstadt.  I don't want to know if

11    Mr. Goodstadt called you or if you called

12    Mr. Goodstadt.  My question to you is, when

13    did you first learn of Mr. Goodstadt's law

14    firm?

15         A.    In the latter part of May, early

16    June of 2006.

17         Q.    How did you learn of

18    Mr. Goodstadt's law firm?

19              MR. GOODSTADT:    Objection.

20         Q.    To the extent it doesn't call for

21    you to advise me of communications between

22    you and Mr. Goodstadt's law firm or any

23    lawyers involved with his law firm.

24         A.    While doing a Google search for

25    lawyers, because I felt I had a claim and

1                    E. Carter

2  didn't want to use one on the Island, so

3  wound up coming up with Thompson Wigdor &

4  Gilly.

5        Q.     Okay.  And to your knowledge,

6  were any of the other Plaintiffs looking for

7  lawyers at that time?

8        A.     Frank Fiorillo.

9        Q.     How do you know that Frank

10 Fiorillo was looking for a law firm at that

11 time?

12       A.     Frank Fiorillo got in touch with

13 me and we talked.

14       Q.     In relation to when you did the

15 Google search, when did Mr. Fiorillo get in

16 touch with you?

17       A.     Approximately a day or so.

18       Q.     Prior to the Google search?

19       A.     Yes.

20       Q.     What did Mr. Fiorillo say to you?

21       A.     Well, I actually spoke to --

22 Frank called me because I didn't have his

23 number.  I told him about what George had

24 told me and he had gone trying to get a

25 couple jobs trying to secure him, he

1                    E. Carter

2     couldn't, and I told him about the phone

3     call about the county park police and Kevin

4     Lamm wound up having problems with the

5     Suffolk County Police, and he said, "You

6     know, this has to end."  And that's when we

7     got together.

8          Q.    So sometime in May, Mr. Fiorillo

9     and you spoke.  Mr. Fiorillo said he had

10    tried to get a few jobs in Suffolk County

11    and he couldn't?

12               MR. GOODSTADT:    Objection.

13         Q.    Is that the sum and substance?

14         A.    He said he tried to get a few

15    jobs, yes.

16         Q.    Right.  And what jobs did he say

17    he tried to get?

18         A.    One was Southampton Town, and

19    another was a driver's job that I don't know

20    where it was.

21         Q.    And this was between April 2 and

22    the date in May that you and he spoke?

23               MR. GOODSTADT:    Objection.

24         A.    The latter part of May, yes.

25         Q.    And at that time, had you spoken

```
 1                    E. Carter
 2   with Mr. Lamm about his job searches?
 3        A.     Kevin, yes.  Kevin wound up --
 4        Q.     No.  Just the answer was yes or
 5   no?
 6        A.     Yes.
 7        Q.     When did you speak to Mr. Lamm --
 8   well, in relation to when you spoke with
 9   Mr. Fiorillo in late May, when did you speak
10   to Mr. Lamm concerning his job search
11   efforts?
12        A.     I kept in constant touch with
13   Kevin.  Kevin was the only one I had the
14   phone number for or I would see.
15        Q.     Why did you keep in constant
16   touch with Kevin?
17        A.     Kevin was a friend, a good
18   friend.
19        Q.     So --
20        A.     He was a partner when I was at
21   the beach.
22        Q.     So since April 2 -- between April
23   2, 2006 and the end of May, you kept in
24   constant contact with Kevin Lamm?
25        A.     Yes.  Kevin works for the Town of
```

1                    E. Carter

2   Islip also.

3          Q.     Okay.  How about Mr. Snyder, did

4   you keep in constant contact with him during

5   that period of time?

6          A.     I work with Tom Snyder, yes.

7          Q.     So you would have kept in

8   constant contact with him?

9          A.     Yes.

10         Q.     So you work with Snyder, you work

11  with Lamm?

12         A.     Yes.

13         Q.     Did you keep in constant contact

14  with Nofi?

15         A.     No.

16         Q.     Did you keep in constant -- well,

17  okay.  That's about it then.  And did the

18  five of you meet to discuss hiring the

19  Goodstadt law firm before you ever

20  communicated with Mr. Goodstadt's law firm?

21             MR. GOODSTADT:    Or any other

22        law firm.

23             MR. NOVIKOFF:    Or any other law

24        firm, yes.  That's right.

25         A.     We discussed  -- I spoke to Tom

PRECISE COURT REPORTING
(516) 747-9393   (718) 343-7227   (212) 581-2570

                              E. Carter

1   and Kevin personally one on one.  I spoke to

2   Frank on the phone.  And through, you know,

3   good -- the website and stuff, we felt

4   Mr. Goodstadt's law firm was one that could

5   take -- could help us.

6       Q.    Did you ever speak with Nofi

7   prior to  -- to your knowledge, how did Nofi

8   know to contact Mr. Goodstadt's law firm?

9           MR. GOODSTADT:    Objection.

10      A.    I could only say Frank Fiorillo

11  contacted Nofi.

12      Q.    Did you ever speak to Nofi about

13  going to meet with Mr. Goodstadt's law firm?

14      A.    Only the day we were going to

15  Mr. Goodstadt's law firm.

16      Q.    "Standing in the community" you

17  make reference to in paragraph four.  What

18  community are you referring to?

19      A.    I'm sorry, paragraph four?

20      Q.    Yes.

21      A.    Standing in the community would

22  be my position as a father and as a park

23  ranger.  I heard, you know, my reputation

24  was damaged.  It was defamed.

                          E. Carter

1

2        Q.      Well, sir, my question to you is,

3    what community are you referring to when you

4    say "standing"?

5        A.      My personal community.

6        Q.      And what does that mean when you

7    say "personal"?

8        A.      My family.  My friends.  How they

9    look at me.  The people walking down the

10   street.

11       Q.      So is it your testimony that your

12   family looks upon you worse today than they

13   did on April 2?

14       A.      They originally questioned me,

15   yes, as to when this stuff was in the paper

16   about the Gilbert thing and stuff.

17       Q.      Who is "they"?

18       A.      My mother.

19       Q.      Your mother questioned you?

20       A.      Yes.

21       Q.      What did she say?

22       A.      She said, "What's going on?  You

23   were fired from the beach.  We just saw this

24   other stuff in the paper not too long ago.

25   You said you weren't involved.  What

1                       E. Carter

2    happened?"

3         Q.     So your -- do you think your

4    mother thinks less of you today than she did

5    on April 2?

6              MR. GOODSTADT:     Objection.

7         A.     I couldn't answer that.

8         Q.     Is there anything she's done to

9    indicate that she thinks less of you?

10        A.     No.

11        Q.     Is there anything that you could

12   point to that makes you believe that your

13   standing in your mother's eyes is less today

14   than it was on April 2, 2006?

15        A.     No.

16        Q.     How about your wife, anything

17   that you could point to today that makes you

18   think that your standing in her eyes is less

19   today than on April 2, 2006?

20        A.     Just the anguish and stuff we're

21   going through with day-to-day with like I

22   said, the blog postings and stuff.  She got

23   very, very upset and annoyed when she saw my

24   name where I worked and stuff was posted on

25   there.

1                    E. Carter

2    MO          MR. NOVIKOFF:     Motion to

3         strike.

4         Q.     Is there anything that you can

5    point to that you believe shows  -- well,

6    you know what, let me ask you this question,

7    in your opinion, has your standing with your

8    wife decreased since April 2, 2006?

9              MR. GOODSTADT:     Objection.

10        A.     A little bit, yes.

11        Q.     A little bit.  She thinks less of

12   you?

13        A.     I believe so.

14        Q.     Okay.  What about your children,

15   how old are they?

16        A.     My daughter's five and the boys

17   are two and a half.

18        Q.     Your friends, what friends have

19   you lost outside of perhaps police officers

20   as a result of you being told, on April 2,

21   2006, that you're not working at Ocean

22   Beach?

23        A.     None.

24        Q.     Has any friend of yours told you

25   that they think less of you as a result of

```
 1                    E. Carter
 2   you not being rehired on April 2, 2006?
 3        A.     No.
 4        Q.     Now let's go to your employment
 5   with Ocean Beach for a while.  You were --
 6   well, beginning in 2001, you were a
 7   part-time worker, correct?
 8        A.     Seasonal from May to September,
 9   and then a part-time police officer from
10   September to May.
11        Q.     Okay.  So it's seasonal during
12   the summer months and then after Labor Day
13   it's part time?
14        A.     Yes.
15        Q.     Explain the difference.
16        A.     Difference is is between May and
17   September, per Civil Service Law, you can
18   work 40 hours or more a week.  I guess more
19   a week.  And after September, Labor Day or
20   sometime whatever stipulation is exactly in
21   the book to May, it would be 20 hours a
22   week.  Half of a full timer.
23        Q.     Okay.  My question to you is were
24   you a -- during the summer months, before --
25   between Memorial Day -- well, between April
```

1                      E. Carter

2    and Labor Day, were you a full-time worker

3    or a seasonal worker?

4              MR. GOODSTADT:    Objection.

5         Q.    To the best of your knowledge?

6         A.    Seasonal.

7         Q.    Okay.  And what is your

8    understanding of what "seasonal" means?

9              MR. GOODSTADT:    Objection.

10        Q.    To the extent you know?

11        A.    Seasonal is I can work 16 hours a

12   week.

13        Q.    Okay.  You could work 16 hours a

14   week as a seasonal?

15        A.    Well, it's 20 -- I believe it

16   states 20.  Half of 40 is 20, but the way

17   the tours were, 16 hours a week.

18        Q.    I didn't get that last part.

19        A.    A full timer could work 40 hours

20   a week, so it would be half of what they

21   could do.

22        Q.    Okay.  So the most you could

23   work, to your knowledge --

24        A.    Is 20 hours.

25        Q.    Is 20 hours during the --

1                          E. Carter

2          A.      Off season.

3          Q.      During the off -- no.   No.   I'm

4    talking that's when you were a part-time

5    worker?

6          A.      Yes.

7          Q.      That's after Labor Day?   Yes?

8          A.      Yes.

9          Q.      My question, though, is between

10   April and Labor Day, what's your

11   understanding of what "seasonal" means?

12                 MR. GOODSTADT:     Objection.

13         A.      Seasonal was you worked

14   approximately -- you could work up to 40

15   hours a week or more.

16         Q.      Now you didn't have a contract

17   with Ocean Beach, did you?

18         A.      No.

19         Q.      And every year you had to be

20   rehired, correct, to be a seasonal worker,

21   correct?

22                 MR. GOODSTADT:     Objection.

23         Q.      To your knowledge?

24         A.      I didn't have to be rehired.

25         Q.      No?

                            E. Carter

1
2          A.     I handed a 42 -- 2042 in and gave

3    them the hours I could work, and the chief

4    or George, whoever it was, would put you on

5    the schedule.

6          Q.     What's a 2042?

7          A.     You have a copy of one right

8    there in front of you (indicating).

9          Q.     Okay.  Well, just tell me what it

10   is.

11         A.     It's an internal memo.

12   Correspondence.

13         Q.     So if I understand correctly,

14   before every season -- well, just so we're

15   all clear and we're all talking about the

16   same thing, what was the season, to your

17   knowledge?

18         A.     Memorial Day to Labor Day,

19   roughly.  April  -- it was the end of April,

20   so April to Labor Day.

21         Q.     Okay.  So if I understand your

22   testimony correctly, what you would do,

23   since 2001, was send someone over at Ocean

24   Beach a 2042 indicating when you could work,

25   and then they would just put you on the

1                        E. Carter

2     schedule?

3          A.     My hours of availability is what

4     it was basically.

5          Q.     Okay.  So you controlled, for the

6     most part, what hours you worked during the

7     season?

8          A.     The only -- I put in what tours I

9     was available for.  I didn't get them all.

10         Q.     Right.

11         A.     I got -- it was split up among

12    the men --

13         Q.     Right.

14         A.     -- by the supervising officer.

15         Q.     Now there were officers that

16    worked during the day, correct?

17         A.     Yes.

18         Q.     But you couldn't work during the

19    day because you had a full-time job,

20    correct?

21         A.     Yes.

22         Q.     So you would put in -- what tours

23    would you normally put in for?

24                MR. GOODSTADT:    Objection.

25         A.     For Ocean Beach?

1                      E. Carter

2          Q.     Yes.

3          A.     I put in -- I was off -- whatever

4    my days off were, I would put in for either

5    a 4:00 to 12:00 -- there was a 9:00  --

6    there was about 20 different tours just to

7    make you aware of it.

8          Q.     Okay.

9          A.     I would put in for 4:00 at night

10   to 12:00 at night, 6:00 at night to 2:00 in

11   the morning, 8:00 at night to 4:00 in the

12   morning.  There was a 9:00 at night to 5:00

13   in the morning, or a midnight to 8:00.

14         Q.     Okay.  So if I understand now,

15   and just tell me if I'm wrong, on your days

16   off, for your days off from your full-time

17   job, you would notify Ocean Beach, whoever

18   made the decisions, as to what tours you

19   wanted to work on, and then Ocean Beach,

20   whomever it was, would advise you as to what

21   tours you got based upon your availability?

22         A.     Basically, yes.

23                MR. NOVIKOFF:    Now let's look

24         at -- let's mark the following document

25         as Carter-3.

```
 1                    E. Carter

 2              (Internal correspondence dated

 3          December 6, 2005 was marked as

 4          Carter Exhibit-3 for identification;

 5          9/16/08, E.L.)

 6       Q.    Carter-3 appears to be a memo

 7  from you to Sergeant Hesse dated December 6,

 8  2005, do you see that?

 9       A.    Yes, sir.

10       Q.    Do you recall sending this doc --

11  this internal correspondence to Sergeant

12  Hesse?

13       A.    Yes.

14       Q.    Okay.  You CC'd Chief Paridiso,

15  do you see that?

16       A.    Yes.

17       Q.    Now what was your knowledge as to

18  Mr. Paridiso's status at this time?

19              MR. GOODSTADT:    Objection.

20       Q.    On December 6, 2005?

21              MR. GOODSTADT:    Same objection.

22       A.    That he was still doing the  --

23  he was still overseeing  -- out of respect,

24  I did it for Chief Paridiso is what I did.

25       Q.    What do you mean "out of
```

1                        E. Carter

2      respect"?

3          A.      Being that -- my understanding

4      was he was still with the department.

5          Q.      Well, what would make you think

6      that he wasn't, if anything, prior to

7      December 6?

8          A.      He was on disability leave.

9          Q.      When did you first learn he was

10     on disability leave?

11         A.      That was the summer of 2005.  But

12     he was still doing the schedule.  And at

13     that point, I wasn't sure who was doing the

14     schedule.

15         Q.      You just said that "but he was

16     still doing the schedule, and at that point,

17     I wasn't sure who was doing the schedule"?

18         A.      Yes.

19         Q.      That seems to be an

20     inconsistency, sir.

21                 MR. GOODSTADT:      Objection.

22         Q.      What did you mean?  What was your

23     knowledge as to who was doing the schedule

24     on December 6, 2005?

25         A.      I -- I'm not sure, to be honest

1                    E. Carter

2    with you.

3          Q.     Okay.  What makes you think

4    Mr. Paridiso was still doing the schedule?

5                    MR. GOODSTADT:     Objection.

6          A.     Because guys said he would come

7    in and hang it up prior to that.  But I

8    never -- being it was in the winter, I

9    didn't see many guys, so I don't know.

10         Q.     When did guys tell you Paridiso

11   was still coming in to do the schedule?

12         A.     The -- September of '05.

13         Q.     So you weren't CCing Mr. Paridiso

14   out of respect, you were CCing Mr. Paridiso

15   because you were not aware as to who was

16   doing the schedule, correct?

17                    MR. GOODSTADT:     Objection.

18         A.     Yes.

19         Q.     Okay.  And this memo is you

20   telling Sergeant Hesse and Mr. Paridiso that

21   you were unavailable for the three tour on

22   January 15, 2006, do you see that?

23         A.     Yes.

24         Q.     What's the three tour?

25         A.     That would be the midnight tour.

1                    E. Carter

2        Q.      Okay.  And December 6, 2005 --

3    I'm sorry, January 15, 2006 was not part of

4    the season as you've defined that, is it?

5        A.      Correct.

6        Q.      And tell me if I'm wrong, but you

7    would advise Ocean Beach as to when you were

8    available off season and they would

9    determine whether or not they would schedule

10   you for that particular tour?

11              MR. GOODSTADT:    Objection.

12       A.      Approximately a year prior, yes.

13       Q.      A year prior?

14       A.      Back in April of 2005.

15       Q.      I don't understand your answer.

16       A.      In other words, April 2005 I put

17   in this -- an internal correspondence with

18   the tours I was available for.

19       Q.      Right.

20       A.      Not knowing that something would

21   come up January 15.  So I notified them a

22   month prior, more than a month prior that

23   I'd be unavailable for that tour.  To please

24   replace me.

25       Q.      So when you said you put in that

```
 1                    E. Carter
 2    2014, am I right?
 3         A.    2042.
 4         Q.    The 2042 prior to April of a
 5    given season, you were advising them of your
 6    availability after the season as well?
 7         A.    Yes.
 8         Q.    Okay.
 9         A.    Basically I had steady days off.
10    At this point, I believe, best of my
11    recollection, I worked Sunday night midnight
12    and Monday night midnight.
13              MR. NOVIKOFF:    And let's mark
14         the following document as Carter-4.
15              (Internal correspondence dated
16         January 23, 2006 was marked as
17         Carter Exhibit-4 for identification;
18         9/16/08, E.L.)
19         Q.    Do you recall -- well, Carter-4
20    for the record is a memo from you to
21    Sergeant Hesse with a CC to Chief Paridiso
22    dated January 23, 2006, do you see that?
23         A.    Yes.
24         Q.    And do you recall sending this
25    correspondence to Ocean Beach?
```

1                           E. Carter

2          A.      I actually left it on Sergeant

3    Hesse's desk.

4          Q.      Okay.  And you CC'd Mr. Paridiso

5    why?

6          A.      Because he could still come back

7    as the chief.  He wasn't out on full

8    workmen's comp yet.

9          Q.      How do you know that?

10         A.      Because I had seen it not too

11   long before that, and there was -- the talk

12   between George was he was still out on comp.

13         Q.      The talk as between?

14         A.      George said the chief was still

15   out on workmen's comp.

16         Q.      Oh, so you had seen George, you

17   hadn't seen Mr. Paridiso?

18         A.      I ran into Ed Paridiso at Costco,

19   yes.

20         Q.      Between your December Carter-3

21   and your January Carter-4, you saw Ed

22   Paridiso?

23         A.      To my best of my recollection,

24   yes.

25         Q.      Did you ask him if he was

1                     E. Carter

2    involved in the scheduling when you saw him?

3         A.      No, I didn't.

4         Q.      Did you -- did your knowledge of

5    whether or not Mr. Paridiso was involved in

6    the scheduling change between Carter-3 and

7    Carter-4?

8         A.      No.  I still put him in to CC

9    Chief Paridiso, so.

10        Q.      Okay.

11        A.      It was still my belief he was

12   still there.

13        Q.      Okay.  And according to Carter-4,

14   you're advising Ocean Beach that given the

15   birth of your twins, you wanted to be

16   removed from the duty roster between

17   February 12 and April 9, 2006, do you see

18   that?

19        A.      Correct.

20        Q.      Okay.  Would it be fair to say

21   that between those dates, you did not work

22   for Ocean Beach?

23        A.      I don't recall if I worked

24   February 14, one other day, because George

25   tried to talk me out of taking this family

1                    E. Carter
2    leave.  He said -- I explained to him that I
3    didn't want to get stuck at the beach
4    because the way the vehicles were breaking
5    down, that if my wife went into labor, I
6    didn't want to be stuck over here and being
7    the fact I had twins, I had my daughter who
8    was at that time three years old, and he
9    says, "Eddie," he goes, "Listen," he goes,
10   "I'll come over, pick you up and drive you."
11   So I don't recall if I worked -- my last day
12   of work was February 12 or February 14 of
13   2006.  I don't recall.
14        Q.    Did Mr. Hesse advise you as to
15   why he was going to go out of his way to
16   pick you up so that you could work during
17   that period of time?
18        A.    So my wife -- if the truck broke
19   down, I didn't get stuck at the beach.
20        Q.    Did you have a good relationship
21   with Mr. Hesse on or -- in or about January
22   23, 2006?
23        A.    I had a fair relationship with
24   him, yes.
25        Q.    Was he -- would you consider him

```
 1                    E. Carter
 2   a friend?
 3        A.     I thought he was.
 4        Q.     Okay.  Even though he told you to
 5   shut up on occasion and disregarded your
 6   complaints?
 7        A.     Yes.
 8        Q.     Okay.  Did you ever socialize
 9   with Mr. Hesse outside of -- well, did you
10   ever socialize with Mr. Hesse after your
11   work hours?
12        A.     No.
13        Q.     And did Mr. Hesse explain to you
14   why he tried to talk you out of taking this
15   family leave that you referred to?
16        A.     He just  -- no.  He said, "Why
17   don't you keep working."  You know,
18   "don't -- I need you to work, and keep
19   working."
20        Q.     Okay.  Let's go back to the
21   Notice of Claim.  I believe that's
22   Exhibit-1.  You write on page two, second
23   full sentence, "in further retaliation for
24   Claimant's opposition, both during
25   Claimant's employment and subsequent to the
```

```
 1                    E. Carter
 2    unlawful termination of his employment,
 3    defamatory statements have been made about
 4    Claimant, both verbally and in writing on
 5    the internet, in other media and to others."
 6    Okay.  Who, without telling me where or what
 7    they said, who do you claim, in this
 8    lawsuit, has made defamatory statements
 9    about you?
10         A.    George Hesse.
11              MR. GOODSTADT:    Objection.
12         A.    George Hesse.
13         Q.    Anybody else that you claim to
14    have made a defamatory statement about you?
15              MR. GOODSTADT:    Objection.
16         A.    Tyree Bacon.
17         Q.    Okay.  Other than Tyree Bacon and
18    George Hesse, anybody else?
19              MR. GOODSTADT:    Objection.
20         A.    No.
21         Q.    Okay.  When did Tyree Bacon make
22    defamatory statements about you?
23         A.    On the blog April 6.
24         Q.    Okay.  April 6 of 2006?
25         A.    I believe it was April 6 of 2006,
```

1                    E. Carter

2  yes.

3          Q.     Was that the only occasion that

4  you can point to where Tyree Bacon has made

5  a defamatory statement about you that you're

6  aware of?

7          A.     That -- with the posting of the

8  blog, if you were to look at it, it falls

9  down to specific -- a form basically of

10 writing and it follows it straight through.

11         Q.     Well, my question to you, you've

12 identified, sir, April 6, 2006 as an

13 incident where Tyree Bacon defamed you?

14         A.     Yes.

15         Q.     On the blog?

16         A.     Um-hum.

17         Q.     How do you know on April 6, 2006

18 Tyree Bacon was the author of the alleged

19 defamatory statement that you've just

20 referenced?

21         A.     I believe in the statement that

22 George Hesse told Tom Snyder, that Tom

23 Snyder told me.

24         Q.     Okay.  So your knowledge of

25 Mr. Bacon's defamatory statement on April 6

1                    E. Carter
2    2006 is based on what Hesse told Snyder and
3    what Snyder told you?
4         A.    Yes.
5         Q.    Okay.  So we now have the April
6    6, 2006 defamation.  Actually, what was the
7    defamatory comment that you attribute to --
8    that you attribute to Mr. Bacon?
9         A.    That I did official misconduct
10   and falsified paperwork in reference to a
11   Halloween incident.
12        Q.    Okay.  Now have you been fired
13   from any job as a result of Mr. Bacon's
14   alleged defamatory comment?
15        A.    No.
16        Q.    Has anyone advised you that you
17   did not get any employment as a result of
18   Mr. Bacon's alleged defamatory comment on
19   April 6, 2006?
20        A.    The guys in my work in the locker
21   room said, in reference to the blog with my
22   promotion, which was offered to me
23   provisionally prior to me taking the test,
24   that I wasn't going to get it until that
25   whole thing with Ocean Beach was taken care

                          E. Carter

 1

 2    of.

 3    MO         MR. NOVIKOFF:     Motion to

 4    strike.

 5         Q.     Sir, my question's very specific.

 6    Has anyone advised you that you did not get

 7    a promotion or an employment opportunity

 8    directly resulting from what you claim to be

 9    Mr. Bacon's alleged defamatory statement on

10    April 6, 2006?

11              MR. GOODSTADT:     Objection.  He

12         just testified to it.

13         Q.     Did anyone tell you specifically

14    that?

15              MR. GOODSTADT:     Objection.  He

16         just testified to it.

17              MR. NOVIKOFF:     I understand.

18         You can answer.

19         A.     No.

20         Q.     Okay.  Now let's put aside the

21    April 6, 2006 alleged defamation of

22    Mr. Bacon.  Subsequent to that date, can you

23    point to another date on the blog in which

24    Tyree Bacon allegedly defamed you?

25              MR. GOODSTADT:     Objection.

                              E. Carter

1

2        A.     I can't be 100 percent sure it

3  was him or not.

4        Q.     Why can't you be 100 percent sure

5  that it was him or not?

6        A.     Because the blog is an anonymous

7  blog.  Except for Tom Snyder is the only one

8  I can go right back to.

9        Q.     Now let's talk about Mr. Hesse's

10  alleged defamatory statements.  How many

11  defamatory statements do you attribute to

12  Mr. Hesse?

13             MR. GOODSTADT:    Objection.

14        A.     The firing of me would be one.

15  Why he told me at the meeting for

16  directives, failing to follow directives he

17  posted.  Wearing a wire.  Sleeping.  So

18  three.

19             MR. NOVIKOFF:    Okay.  Let's

20        take a break.  We have one minute left

21        on the tape.  We'll come back and we'll

22        pick it up there.

23             THE VIDEOGRAPHER:    This ends

24        tape number two.  The time is 11:54

25        a.m.  Going off the record.

1              E. Carter

2              (A break was taken.)

3              THE VIDEOGRAPHER:    This begins

4         tape number three.  The time is 12:09

5         p.m.  Back on the record.

6         Q.    Mr. Carter, you identified before

7    the ending of tape number two, three alleged

8    defamatory comments from Mr. Hesse

9    concerning you.  One involved directives,

10   one involved wearing a wire, and one

11   involved you sleeping on duty, do you recall

12   that?

13        A.    Yes.

14             MR. GOODSTADT:    Objection.

15        Q.    Have you had a chance -- is there

16   anything else that you can recall that

17   Mr. Hesse said that you believe was

18   defamatory, other than what you've just

19   identified?

20             MR. GOODSTADT:    Objection.

21        A.    Not that I recall at this time.

22        Q.    Okay.  Is there anything in your

23   possession, custody or control that would

24   refresh your recollection?

25        A.    Not at this time.

1                    E. Carter

2        Q.      Okay.  Let's talk about the

3    alleged defamatory statement concerning

4    directives.  What specifically -- and don't

5    tell me to whom and don't tell me what or

6    where -- but just tell me what specifically

7    did Mr. Hesse say concerning directives that

8    you believe was defamatory?

9            MR. GOODSTADT:      Objection.

10       A.      He -- he wouldn't talk to me

11   about them when he fired me.  I asked him.

12   I said, "What directives are you talking

13   about?"  And he wouldn't give me an answer.

14       Q.      Okay.  I guess my question -- not

15   I guess -- my question is, what specifically

16   did Mr. Hesse say regarding directives that

17   you believe was defamatory?

18           MR. GOODSTADT:      Objection.

19       A.      He fired me for something I

20   didn't do.  I followed those directives.

21       Q.      Okay.  So your belief is that

22   Mr. Hesse made a defamatory comment to you

23   when he fired you for directives?

24           MR. GOODSTADT:      Objection.

25       A.      Yes.

                         E. Carter

1

2        Q.      Okay.  Now where did Mr. Hesse

3   make this defamatory statement?

4        A.      In the boathouse at Ocean Beach.

5        Q.      When?

6        A.      April 2, 2006.

7        Q.      Was there anyone present when

8   Mr. Hesse made this defamatory statement

9   concerning directives?

10       A.      To me, no.

11       Q.      Okay.  So just so I understand,

12   when you say that Mr. Hesse made a

13   defamatory comment regarding directives,

14   you're referring to a statement that

15   Mr. Hesse made to you in the boathouse on

16   April 2, 2006 without any other witnesses?

17       A.      Yes.

18       Q.      Okay.  Let's talk about wearing a

19   wire.  Again, not where, when or how, just

20   what specifically did Mr. Hesse say

21   concerning wearing a wire that you believe

22   was defamatory?

23       A.      I wasn't going to wear a wire.  I

24   knew nothing about a wire.  I was never

25   approached.  I was never asked.

1                          E. Carter

2     MO          MR. NOVIKOFF:     I understand

3          that, and I'm going to move to strike.

4          Q.     But what specifically -- well,

5     let me take a step back.  You've alleged

6     that Mr. Hesse made a defamatory statement

7     concerning you involving wearing a wire?

8          A.     Yes.

9          Q.     What specifically did Mr. Hesse

10    say concerning wearing a wire that you

11    believe was defamatory?

12               MR. GOODSTADT:     Objection.

13         A.     The fact that if I was to wear a

14    wire, meant I was a rat, and I'm not.

15         Q.     What, though, did Mr. Hesse say

16    to you when you referred to wearing a wire?

17               MR. GOODSTADT:     Objection.

18         A.     He didn't say it to me.  He said

19    it to the other officers at the meeting.

20         Q.     Okay then.  Now what did he say

21    to the other officers at this meeting that

22    you've just referred to?

23         A.     That -- it was the April 2

24    meeting of 2006.  That Arnold Hardman's

25    attorney said that somebody was going to

1                    E. Carter

2    wear a wire and it was going to be Ed and

3    Tom, and we were going to get the officers

4    to admit that they beat up the businessman,

5    Gilbert, for the District Attorney's office.

6          Q.    Okay.  So this meeting took place

7    where?

8          A.    The boathouse.

9          Q.    And you weren't present at this

10   meeting?

11         A.    I was fired already.  Terminated.

12   Left the Island.

13         Q.    You had -- you had gone from the

14   Island by this time?

15         A.    Yes.

16         Q.    And according to somebody at that

17   meeting, Mr. Hesse said that Arnold

18   Hardman's attorney said that you were going

19   to wear a wire?

20         A.    That somebody was going to wear a

21   wire, and George said it was me or Tom

22   Snyder.

23         Q.    Okay.  So I just want to

24   understand now what transpired.  Mr. Hesse

25   said to someone at this meeting that Arnold

1                    E. Carter

2    Hardman's attorney said that someone was

3    going to wear a wire, and then George added

4    that it was going to be you and Ed, is that

5    a fair characterization?

6          A.    No.

7          Q.    No.

8          A.    Ed and Tom.

9          Q.    Ed and Tom.

10         A.    Ed and Tom were going to wear the

11   wire.  And he said it to all the officers

12   that were present at the meeting, along with

13   the dispatchers and any dock masters that

14   were there.

15         Q.    So to your knowledge, did

16   Mr. Hesse say that you had worn a wire or

17   did Mr. Hesse say that you were going to

18   wear a wire?

19         A.    I was going to wear a wire.

20         Q.    Okay.  And who told you that

21   Mr. Hesse said this?

22         A.    Originally, Kevin Lamm told me

23   that Chris Moran said it, and I heard Chris

24   Moran later in June of 2006 say it.

25         Q.    Okay.  So you learned of this

```
 1                    E. Carter
 2    alleged defamation in one instance from
 3    Mr. Lamm, who told you that Mr. Moran said
 4    that George Hesse said this?
 5         A.      Yes.
 6         Q.      And on the other instance you
 7    learned about this alleged defamatory
 8    statement, you heard it directly from
 9    Mr. Lamm?
10         A.      Directly from Mr. Moran.
11         Q.      From Mr. Moran.
12         A.      Yes.
13         Q.      Was that in a face-to-face
14    conversation?
15         A.      No.
16         Q.      Was it on a telephone call?
17         A.      Kevin was on a telephone call.
18         Q.      With whom?
19         A.      On speaker with Chris Moran.
20         Q.      And you were present?
21         A.      Yes.
22         Q.      Did Mr. Lamm tape this
23    conversation?
24         A.      Yes.
25         Q.      Were you aware that Mr. Lamm was
```

```
 1                    E. Carter
 2  taping this conversation?
 3       A.    Yes.
 4       Q.    Where did you  -- where did
 5  Mr. Lamm -- where was the speaker phone
 6  present?
 7       A.    It was a Nextel.  One of those
 8  Nextels.
 9       Q.    So you were right next to
10  Mr. Lamm when he was doing this?
11       A.    Yes.
12       Q.    And where were you and Mr. Lamm?
13       A.    In Ronkonkoma.
14       Q.    Where in Ronkonkoma?
15       A.    By the airport.
16       Q.    Why?
17            MR. GOODSTADT:   Objection.
18       Q.    Why were you with Mr. Lamm on
19  this occasion in June?
20       A.    I stopped up at work.  It's part
21  of my patrol, the airport, and I met up with
22  Kevin, and he said he was about to call
23  Chris.
24       Q.    So you and Mr. Lamm were working
25  at that time?
```

1                          E. Carter

2          A.      I was, yes.

3          Q.      Was Mr. Lamm working?

4          A.      To the best of my knowledge, yes.

5          Q.      So you both were working for the

6    Town of Islip, and Mr. Lamm advised you that

7    he was going to call Mr. Moran?

8          A.      Yes.

9          Q.      Did Mr. Lamm tell you why he was

10   going to call Mr. Moran?

11         A.      That Chris had called him and he

12   was going to call him back, and he said, "Do

13   you want me to ask him why you were let go

14   again?"  And I said, "Sure."

15         Q.      And did Mr. Lamm tell you that he

16   was going to be recording Mr. Moran?

17         A.      No.

18         Q.      Did -- were you aware that

19   Mr. Lamm was recording Mr. Moran in his

20   conversation?

21         A.      At that point, I saw a tape

22   recorder.  I didn't know if it was on or

23   not.

24         Q.      So Mr. Lamm had his Nextel phone

25   in one hand and a tape recorder in another?

1                          E. Carter

2          A.     No.   The tape recorder was on a

3    center console of the vehicle.

4          Q.     Oh, you were in a car?

5          A.     Yes.

6          Q.     What type of tape recorder was

7    it?

8          A.     A thin one (indicating).  Silver

9    in color.

10         Q.     A little dictaphone?

11         A.     If that's what they're called,

12   yes.

13         Q.     And you saw it?

14         A.     Yes.

15         Q.     And you assumed that he was

16   taping it?

17         A.     I found out later on he was

18   taping it, yes.

19         Q.     Well, did you ask Mr. Lamm at

20   that time why there was a tape recorder on

21   the console?

22         A.     No.

23         Q.     Did you see that it was on or

24   not?

25         A.     No.

1                          E. Carter

2          Q.     Did you see Mr. Lamm go to turn

3    it on?

4          A.     No.

5          Q.     Did Mr. Lamm tell Mr. Moran that

6    he was being taped?

7          A.     No.  Not that I recall.

8          Q.     Was that the only occasion that

9    you're aware of that Mr. Lamm was taping

10   telephone conversations?

11         A.     No.

12         Q.     Was that the first time  -- well,

13   let's -- before I go there, when did you

14   learn that Mr. Lamm had tape recorded that

15   conversation with Mr. Moran?

16         A.     Afterwards.  Shortly afterwards.

17   I don't recall exactly when.

18         Q.     Seconds?  Minutes?  Weeks?

19   Months?

20         A.     I don't recall at this time.

21         Q.     How?  How did you learn?

22         A.     Because he had to get the

23   recording to a disc.

24         Q.     Yeah, but how did you learn

25   Mr. Lamm had recorded that conversation?

1                      E. Carter

2          A.      He told me he did after.   You

3    know, I don't know if it was exactly then or

4    if it was later on.

5          Q.      And prior to that conversation

6    with Mr. Moran, were you aware that Mr. Lamm

7    was telephone -- was recording telephone

8    conversations with other individuals?

9                  MR. GOODSTADT:      Objection.

10         A.      No.

11         Q.      No?

12         A.      No.

13         Q.      When did you learn that Mr. Lamm

14   had tape recorded other conversations, other

15   than the one that you were involved in?

16         A.      June of '06.

17         Q.      What did Mr. Lamm say to you, if

18   anything?

19         A.      He needed to have the tape

20   recordings put on a disc, and I didn't -- I

21   couldn't do it.

22         Q.      Did Mr. Lamm tell you why he was

23   tape recording conversations?

24         A.      For the defamation.   We all felt

25   that defamation was the biggest thing was me

1                       E. Carter

2    wearing a wire.  That when a park ranger

3    three position did come up for me, I wanted

4    to know why I was let go, so I could tell my

5    boss the true reason, rather that what I had

6    to tell him a couple of days after, that I

7    was let go for directives that were hanging

8    on the board that I didn't know what I was

9    fired for.

10        Q.     So you had asked Mr. Lamm to tape

11   record the conversations?

12               MR. GOODSTADT:     Objection.

13        A.     No.

14        Q.     So let me understand this

15   correctly -- let me ask you this question,

16   did Mr. Lamm advise you as to why he was

17   tape recording conversations?  Not why you

18   think it was being done.  Did Mr. Lamm tell

19   you why he was tape recording conversations?

20        A.     No.

21        Q.     Did you ask Mr. Lamm to tape

22   record conversations?

23        A.     No.

24        Q.     So when you answered just before

25   about wanting to know why you were fired,

1                    E. Carter

2    what did that have to do with why Mr. Lamm

3    was tape recording a conversation?

4              MR. GOODSTADT:    Objection.

5         A.    Later on, when we had talked --

6    again, I don't know if it was right then and

7    there or if I had to go -- he said, "See,

8    that's why you were let go, for wearing a

9    wire."  And I said, "Unbelievable."  I said,

10   you know, "reason number three now."

11        Q.    Okay.  So let me get this

12   straight.  Based upon a tape recorded

13   conversation between Mr. Lamm and Mr. Moran,

14   wherein Mr. Moran said that George Hesse

15   back in April said something about you

16   wearing a wire, you concluded that that was

17   why you were fired?

18             MR. GOODSTADT:    Objection.

19        A.    I felt that was a big reason why

20   I was fired, because originally, I was

21   misID'd as being part  -- as being on the

22   night of the Gilbert incident and that

23   caused a lot of problems.

24        Q.    When were you misID'd as being

25   part of the Gilbert incident?

```
 1                      E. Carter
 2        A.    Back sometime 2005.
 3        Q.    Where were you misID'd?
 4        A.    Someone told the District
 5   Attorney's office I was working that night.
 6        Q.    Who told the District Attorney's
 7   office?
 8        A.    George Hesse told me it was Dave
 9   Gerden.
10        Q.    So George Hesse told you that
11   this guy Dave told the District Attorney's
12   office that you were mis -- that you were
13   part of the Gilbert incident?
14             MR. GOODSTADT:    Objection.
15        Q.    Is that your testimony?
16        A.    That he gave a statement, yes, or
17   a verbal that I was -- yeah, I was there
18   that night.
19        Q.    And you believe that that
20   misidentification contributed to you being
21   fired, you not being rehired?
22             MR. GOODSTADT:    Objection.
23        A.    That caused -- yes.  Absolutely.
24        Q.    What -- what connection do you
25   see between the two?
```

1                      E. Carter

2         A.       It started in the fall of 2006,

3    District Attorney's office started

4    interviewing people with reference to the

5    Gilbert incident.  They came to me twice and

6    I had Gray -- the attorney for the beach,

7    Gray come to my house.  They called me at

8    my -- they came the first time.  Asked me a

9    bunch of questions, which I didn't

10   understand what they were asking me, and

11   they said they had information that I was

12   working that night.  I said I wasn't.  It

13   was my daughter's birthday.  I had a party

14   in the yard and I don't work Saturday

15   nights.

16              Little time later, short time

17   later, I don't recall if it was a couple

18   days, a week, they said they were going to

19   interview other people.  They -- the

20   investigator, Tom Iacopelli, called me at my

21   town job.  You got the secretary.  The boss

22   is there.  She looks at me, she goes,

23   "District Attorney's office is on the phone

24   for you."  I picked the phone up.  He says,

25   "Carter, I need to speak to you.  We're

1                      E. Carter

2    coming to your house tomorrow."  I said,

3    "No, you're not."  He said, "What do you

4    mean?"  I said, "There was a 2042, an

5    internal correspondence put out that the

6    village attorney has to be present for any

7    conversations with you.  And I don't want to

8    be fired.  I need the job.  I need the

9    money."

10              So he says, "Well, you spoke to

11    us in the past.  Why don't you speak to us

12    now."  I said, "You spoke to us first."  I

13    said, "Listen, I don't need to lose my job."

14    I said, "I'm going to call."  So I

15    immediately called George Hesse, who set an

16    appointment up with the attorney for the

17    beach at the time.  I believe he was called

18    "Gray."  He showed up at my house the next

19    day.

20              And that's when guys started

21    looking at me funny like I was talking to

22    the District Attorney's office.  I was rat.

23    Again, I'm labeled as a rat.  And I told

24    George, I said, "I had nothing -- you, know,

25    I wasn't there."  He said, "I know you

1                    E. Carter

2    weren't there, but what are you going to

3    do."

4              So the range comes around

5    November of 2005.  We meet at Stop & Shop in

6    East Islip.  There's approximately 10 guys.

7    We're all going out to the range together.

8    10 -- maybe it was even more, 15 of us.  I

9    walk up and the guy Dave says to me, "Oh,

10   the District Attorney's office talk to ya?"

11   And I looked and I said, "Dave, I wasn't

12   working that day."  And at that time, the

13   other guys said, "Dave, he wasn't working

14   that day."  It was the first time that it

15   came out three months later, two months

16   later that I wasn't working that day.

17             And subsequently, the District

18   Attorney's office never spoke to me again,

19   but George Hesse, in between that time, said

20   to me, "I don't understand why they keep

21   talking to you.  I don't know why."  And the

22   guys started looking at me funny.

23        Q.    Well, no, you testified that the

24   guys were looking at you funny before

25   Mr. Hesse said that to you about why are you

1                    E. Carter

2    working, correct?

3         A.    That was between September --

4    between the Gilbert thing and then with the

5    District Attorney's office first came over.

6         Q.    Mr. Hesse didn't misidentify you,

7    did he?

8         A.    Him, no.

9         Q.    Right.  Mr. Hesse didn't advise

10   anyone prior to April 2, 2006 that you were

11   wearing a wire, did he?

12              MR. GOODSTADT:    Objection.

13        Q.    To your knowledge?

14        A.    To my knowledge, no.  Not that I

15   know of.

16        Q.    Mr. Hesse, prior to April 2,

17   2006, didn't tell anyone, to your knowledge,

18   that you were cooperating with the DA,

19   correct?

20        A.    To my knowledge, no.

21        Q.    In fact, to your knowledge --

22   withdrawn.  So what -- explain to me how you

23   attribute your termination -- I'm sorry,

24   withdrawn.  How do you attribute you not

25   being rehired on April 2, 2006 to this

1                        E. Carter

2    misidentification of you that Mr. Hesse had

3    nothing to do with?

4              MR. GOODSTADT:    Objection.

5         A.    Mr. Hesse being the senior

6    officer at that scene that night, could have

7    very easily taken care of it and explained.

8    Showed the blotter, the records that I

9    wasn't there.

10        Q.    How do you know he didn't?

11        A.    He never said he did.

12        Q.    Did you ask him?

13        A.    I said to him, I said "George" --

14   my exact words to him was, "This is pretty

15   sad.  I can't prove that I wasn't working

16   that night."

17        Q.    What do you mean you can't prove?

18   Didn't the records show you weren't working

19   that night?

20        A.    The District Attorney's office

21   originally said, in my house, with Gray

22   sitting there, that I could falsify the

23   blotter or my time sheets.

24        Q.    Oh, so it was the DA that didn't

25   necessarily believe, in your opinion, what

1                    E. Carter

2    was put on the time sheets, correct?

3         A.      I'm not  -- yes.

4         Q.      Right.  My question to you is,

5    what makes you think that George Hesse

6    didn't tell the DA that you didn't work that

7    night?

8         A.      He never said he did.

9         Q.      But did you ask him?

10        A.      No.

11        Q.      What makes you think that the DA

12   didn't believe that in fact you didn't work

13   that night?

14        A.      What makes me believe -- I'm

15   sorry, repeat the question.

16        Q.      What makes you believe -- I'll

17   withdraw the question.  I'm just trying to

18   figure out what did Mr. Hesse say concerning

19   this misidentification prior to April 2,

20   2006 that you believe resulted, in part, in

21   you not being rehired by Ocean Beach?

22        A.      I'm sorry, we're talking about

23   the wire, is what we were talking about.

24        Q.      No.  We were talking about -- you

25   said this misidentification of you being

1                    E. Carter

2   involved in the Gilbert incident was a

3   reason, in your opinion, why you weren't

4   rehired.  So my question to you is, what did

5   Mr. Hesse do with regard to this

6   misidentification that you believe resulted

7   in a decision concerning you not being

8   rehired on April 2, 2006?

9              MR. GOODSTADT:    Objection.

10        Q.    You can answer.

11        A.    The wire's what started this, and

12  then I went to explain how it came about,

13  the wearing of the wire.  That somebody was

14  going to wear the wire.  I was supposedly

15  cooperating with the District Attorney's

16  office because he came to my house twice.

17  No one else apparently at that point was

18  seen twice.

19        Q.    So the misidentification had

20  nothing to do with you being terminated, is

21  that your testimony?

22              MR. GOODSTADT:    Objection.

23        Q.    Let me ask you straight out then,

24  sir.  You say that you were misidentified by

25  somebody, not George Hesse, concerning the

1                    E. Carter

2    Gilbert incident, correct?

3              MR. GOODSTADT:    Objection.

4         A.    Yes.

5         Q.    At some point in time prior to

6    April 2, 2006, you believe that the DA

7    thought that you were part of the Gilbert

8    incident, correct?

9         A.    Yes.

10        Q.    What did -- do you believe that

11   this misidentification by someone other than

12   George Hesse, was a reason for you not to be

13   rehired on April 2, 2006?

14             MR. GOODSTADT:    Objection.

15        A.    The Gilbert incident  --

16        Q.    Yes or no?

17        A.    Part of it, yes.

18        Q.    Okay.  What part of your

19   misidentification do you believe resulted in

20   you not being rehired on April 2, 2006?

21             MR. GOODSTADT:    Objection.  He

22        just testified for five minutes about

23        it.

24        A.    The Gilbert incident as a whole

25   was part of me being misidentified.  Then

1                      E. Carter

2     coming out about me wearing a wire for the

3     District Attorney's office to have these

4     guys admit that they beat up Gilbert during

5     an incident that happened in August of 2005.

6          Q.     Who is "they" that you're talking

7     about, they say you were wearing a wire?

8               MR. GOODSTADT:      Objection.   He

9          already testified who said it.

10         Q.     Who's "they"?

11         A.     George Hesse.   Arnold Hardman's

12    attorney and George Hesse.

13         Q.     But that was April 2, 2006,

14    correct?

15         A.     Yes.

16         Q.     What did Mr. Hesse say about you

17    wearing a wire, if anything, prior to April

18    2, 2006?

19         A.     To myself, nothing.

20         Q.     To anybody that you're aware of,

21    prior to April 2, 2006?

22         A.     Apparently he spoke to Arnie

23    Hardman about it, because it was said at the

24    meeting.

25         Q.     Not apparently.

1                    E. Carter

2              MR. CONNOLLY:    Objection.

3       Q.    What information can you point to

4    from any source that indicates that George

5    Hesse said anything to anyone, prior to

6    April 2, 2006, about you wearing a wire?

7       A.    Nothing.

8              MR. NOVIKOFF:    Let's end it

9         now.  It's 12:30.  We'll pick it up at

10        1:15.

11             THE VIDEOGRAPHER:    The time is

12        12:29 p.m.  We're going off the record.

13             (A break was taken.)

14             THE VIDEOGRAPHER:    The time is

15        1:24 p.m.  Back on the record.

16      Q.    Mr. Carter, stay on the wire

17   issue.  You testified that you were told

18   that Mr. Hesse made a comment concerning you

19   wearing a wire on April 2, 2006.  Has anyone

20   told you that Mr. Hesse made a comment about

21   you wearing a wire at any time subsequent to

22   April 2, 2006?

23      A.    No.

24      Q.    The third alleged defamatory

25   statement that you claim or you testified

1                          E. Carter

2      that Mr. Hesse made concerning you was that

3      you were sleeping on the job; is that

4      correct?

5           A.      That I was sleeping, yes.

6           Q.      Sleeping where?

7           A.      He told me I was  -- he told

8      another boss in the Town of Islip that I was

9      cutting myself thin and sleeping while

10     coming to work.

11          Q.      Okay.  Did Mr. Hesse ever

12     communicate directly to you any defamatory

13     statement concerning you sleeping while

14     working at Ocean Beach?

15               MR. GOODSTADT:     Objection.

16               MR. NOVIKOFF:     Withdrawn.

17          Q.      Did Mr. Hesse ever advise you

18     that he believed that you -- withdrawn.

19     While you were working at Ocean Beach, did

20     Mr. Hesse ever advise you that he thought

21     you were sleeping while on the job?

22          A.      No.

23          Q.      On April 2, 2006, did Mr. Hesse

24     ever advise you that he believed that you

25     were sleeping while on the job at Ocean

```
 1                    E. Carter
 2   Beach?
 3        A.     No.
 4        Q.     Prior to April 2, 2006, did
 5   anyone tell you that Mr. Hesse said that you
 6   were sleeping on the job?
 7        A.     No.
 8        Q.     Did -- has anyone told you that
 9   Mr. Hesse, on April 2, 2006, said that you
10   were sleeping on the job?
11        A.     No.
12        Q.     Now after April 2, 2006, other
13   than what you say Mr. Hesse said to one of
14   your supervisors, did  -- has anyone told
15   you that Mr. Hesse said that you were
16   sleeping on the job?
17        A.     George Hesse himself, both
18   verbally and through an email.
19        Q.     What did George Hesse say to you
20   verbally about you sleeping on the job?
21        A.     He said that I had called  -- he
22   said that I spoke to Greg DeCanio, who was
23   looking into my promotion, and I had to ask
24   him for a letter.  He said, "I didn't know
25   what letter you needed.  What you want in
```

1                    E. Carter

2    the letter exactly.  And I told Greg you

3    were cutting yourself thin.  You just had

4    twin boys.  You were coming to his job,

5    going upstairs and basically sleeping the

6    night away."

7         Q.    Okay.  And he told you this when?

8         A.    May 15.

9         Q.    Okay.  And did he tell you this

10   face to face?

11        A.    On the phone.  No.  On the phone

12   and in an email.

13        Q.    Okay.  Let's talk about on the

14   phone.  Who called who?

15        A.    I called -- George had originally

16   called me.  Left a message.  I called him

17   back when I got done with the training

18   class, and he said -- I said -- he said,

19   "Eddie, did you get my email?"  I said, "No,

20   George.  Truthfully, I didn't get on the

21   computer."  And he said, "Oh, I sent you an

22   email explaining everything," and then he

23   explained it to me that he told Greg DeCanio

24   that I was cutting myself thin, I just had

25   the twin boys, and that I was sleeping while

```
 1                    E. Carter
 2   coming there, sleeping the tour away, and
 3   that wasn't what he wanted in an employee,
 4   so he let me go and that I did  -- I'm
 5   trying to remember exactly.  Give me a
 6   second, please.  That I'd make a great
 7   lieutenant and my guys highly respect me.
 8        Q.    Okay.  Other than through this
 9   email and over this phone, are you aware as
10   to whether or not anyone else was advised --
11   well, withdrawn.  When did you have your
12   twin boys?
13        A.    Give me a second.  February 27,
14   2007.
15        Q.    February what?
16        A.    27, 2006.
17        MR. NOVIKOFF:    Let's mark the
18        following document as Carter-5.
19             (Email dated 5/15/06 was marked
20          as Carter Exhibit-5 for
21          identification; 9/16/08, E.L.)
22        Q.    Carter-5, is this the email that
23   you're referring to?
24        A.    (Reviewing).  Yes.
25        Q.    And you are wingking28?
```

1                    E. Carter

2         A.     Yes.

3         Q.     Now Mr. Hesse starts off this

4    email by saying "I called Greg personally

5    and explained to him what was going on," do

6    you see that?

7         A.     Yes.

8         Q.     Who asked -- well, do you know

9    why Mr. Hesse was calling -- was calling

10   Greg personally to explain to him what was

11   going on?

12               MR. GOODSTADT:     Objection.

13        A.     No.   I gave him no permission to

14   contact anyone in the town, and I had asked

15   him for a letter as to why I was let go for

16   future employment and basically for my

17   promotion with the Town of Islip because of

18   all the allegations that were said prior

19   with the blog, with the official misconduct

20   and the falsifying the paperwork.

21        Q.     When did you ask Mr. Hesse for

22   this letter in relation to May 15, 2006?

23        A.     Approximately seven days earlier.

24        Q.     Now Mr. Hesse then goes on to say

25   "I told him that you were not involved in

```
 1                        E. Carter
 2    any misconduct of any sort," do you see
 3    that?
 4         A.    Yes.
 5         Q.    That's a true statement?
 6         A.    Yes.
 7         Q.    According to your knowledge?
 8         A.    Yes.
 9              MR. GOODSTADT:    Objection.
10         Well, he -- you're asking him whether
11         he was not involved in misconduct or
12         that he told him he was not involved in
13         misconduct?
14         Q.    Well, was what Mr. Hesse said a
15    true statement when I read "I told him you
16    were not involved in any misconduct of any
17    sort"?
18         A.    I was not involved in any
19    misconduct of any sort.
20         Q.    So that's a true statement?
21         A.    Yes.
22         Q.    "I told him you were let go
23    because you were spreading yourself thin
24    from job to job, coming to work tired and
25    sleeping your tour away," do you see that?
```

1                          E. Carter

2          A.      Yes.

3          Q.      It has nothing -- no reference of

4     your twins here, is there?

5                  MR. GOODSTADT:      Objection.   The

6          document speaks for itself.

7          Q.      Any reference to your twins being

8     born in this -- in this email?

9          A.      Not in the email.

10         Q.      And, in fact, you weren't working

11    at the time that your twins were born, were

12    you?

13         A.      Correct.   But in the phone call

14    he brought it up.

15         Q.      He brought what up?

16         A.      About the twins.

17         Q.      Saying what?

18         A.      Saying that I -- I was cutting

19    myself thin.   I have a -- the phone call the

20    same day.   I didn't read this email until

21    later is when he brought up about the twins.

22         Q.      Did you tape his phone call?

23         A.      Yes, I did.

24         Q.      Have you produced that?

25         A.      Yes.

1                    E. Carter

2          Q.      Did you respond to Mr. Hesse when

3      he mentioned the fact that he believed that

4      you were sleeping on duty as a result of

5      your twins being born?

6          A.      At that point, I wasn't getting

7      confrontational with him.  I was done with

8      him.  This was the fourth and final reason

9      he was coming up with defaming me, and by

10     calling another boss, I wasn't dealing -- I

11     wasn't dealing with him anymore.  At that

12     point --

13         Q.      You only gave three reasons,

14     what's the fourth?

15         A.      The first one was --

16         Q.      You said directives?

17         A.      Directives.

18         Q.      Wire?

19         A.      Wearing a wire.

20         Q.      Sleeping?

21         A.      Falsifying on the blog.  The

22     other reason where Arnie Hardman said also,

23     that he thought I got scooped up and he was

24     going to talk to George Hesse.  The

25     Halloween incident.

1                       E. Carter

2          Q.      But Mr. Hesse never told you that

3    you were being fired because you were

4    scooped up in the Halloween incident, did

5    he?

6          A.      He never told me.  It was on the

7    blog, and Arnie Hardman reconfirmed that

8    that possibly was one of the reasons by the

9    phone call he gave me after I was let go.

10         Q.      So Arnie Hardman told you that

11   that was a possible reason why you were

12   fired?

13         A.      His exact words was --

14         Q.      No.  No.  Is that what Arnie

15   Hartman told you?

16              MR. GOODSTADT:      Objection.

17         He's about to tell you what his exact

18         words were.

19         A.      His exact words were, "Carter,

20   you got -- I think you got fired -- let go

21   because you got scooped up in the Halloween

22   incident.  I'm going to talk to George when

23   he comes back from vacation and I'm going to

24   see about having you rehired," and I asked

25   George about that, and he said, "Yeah, I

1                       E. Carter

2    spoke to Arnie, and no."

3         Q.      Hesse never told you you were

4    fired for being scooped up in the Halloween

5    incident, did he?

6         A.      No.

7         Q.      So when you say there's four

8    times, that's not true, there were three

9    times according to your testimony, right?

10              MR. GOODSTADT:      Objection.

11        Q.      Wire, sleeping and directives,

12   right?

13              MR. GOODSTADT:      Objection.

14        A.      And the blog with the other --

15   with Arnie Hardman backing it up, I believe

16   that would be.

17        Q.      You testified as to what Hesse

18   told you?

19        A.      Yes.

20        Q.      Hesse gave you three reasons,

21   right?

22        A.      Yes.

23        Q.      Not four?

24        A.      No.   Three.

25        Q.      Right.

1                          E. Carter

2                MR. GOODSTADT:    I don't believe

3          he actually testified that Hesse told

4          him he was wearing a wire.  Didn't he

5          tell it to the meeting?

6                MR. NOVIKOFF:    We'll go on.

7          Q.    Now when Mr. Hesse told you in

8     this phone conversation that he believed

9     that you were sleeping on the job because

10    your twins were born, why didn't you tell

11    him that you weren't working at the time

12    that your twins were born?

13         A.    I did subsequently -- in that

14    conversation or another one say, "George, I

15    haven't worked since February and as

16    prior -- you know, prior to the twins," and

17    he just said no.

18         Q.    So on that tape recording that

19    you just referenced, it would say  -- it

20    would sound -- I'm sorry, it would say that

21    you told George that you weren't working, is

22    that your testimony?

23         A.    Yes.

24         Q.    Now you said there was a

25    subsequent conversation.  What subsequent

1                    E. Carter

2    conversation did you have if you said you

3    were done with him?

4         A.    The one prior -- the one prior I

5    originally spoke to him was about the blog

6    and then this one.  So it was in this

7    conversation.  We had a long conversation.

8    I asked him why he didn't let me go six to

9    eight weeks prior if he's talking about me

10   sleeping, and he said he didn't know where

11   he was going to be or where the department

12   was going.

13        Q.    So you told him in this tape

14   recorded conversation, when he said that you

15   were sleeping your tour away because the

16   twins were born, that you weren't working

17   when your twins were born, is that your

18   testimony?

19        A.    Yes.

20        Q.    Okay.  So when I play that tape,

21   if I ever get that tape -- maybe I did

22   already.

23             MR. GOODSTADT:    You did.

24        Q.    Okay.  It's going to specifically

25   say on that tape recording that you told

1                          E. Carter

2       George that you weren't working?

3           A.      After February, yes.

4           Q.      Okay.  And George then goes on to

5       say "I also said that when you work, you're

6       a great employee and to expect a lot from

7       you," do you see that?

8           A.      Yes.

9           Q.      Anything false about that?

10          A.      No.

11          Q.      George then goes on to say "I

12      have no doubt you'll be a great lieutenant,

13      good luck," do you see that?

14          A.      Yes.

15          Q.      Now this guy Greg, his name is

16      Greg Decantio?

17          A.      DeCanio, yes.

18          Q.      And for whom did he work for on

19      May 15, 2006?

20          A.      He works for Long Island

21      Macarthur Airport.

22          Q.      In what capacity?

23          A.      He's the chief.

24          Q.      Chief of what?

25          A.      The Long Island Macarthur

```
 1                    E. Carter
 2   Airport.
 3          Q.     Do you work with Long Island
 4   Macarthur Airport?
 5          A.     No.
 6          Q.     Had you applied for the Long
 7   Island Macarthur Airport job prior to May
 8   15, 2006?
 9          A.     No.  His department was doing an
10   internal investigation for our department
11   needs as far as budgeting, promotions and
12   manpower.
13          Q.     Explain that.
14          A.     The department I work for, which
15   is now under the department of parks and
16   recreation, we moved from the department of
17   code enforcement, there was a new
18   commissioner that was unaware of the
19   department needs and stuff.  So they
20   empanelled Greg DeCanio, being the chief law
21   enforcement officer of the airport, to
22   interview the guys, interview the
23   supervisors and to look into budgetary needs
24   and promotions and stuff.
25          Q.     Had you taken that test yet as of
```

1                          E. Carter

2    May 15, 2006?

3          A.      Yes.

4          Q.      Had the test results come back?

5          A.      No.

6          Q.      And you believe that Mr. DeCantio

7    was doing an investigation into you

8    concerning your application to be promoted?

9          A.      I know that for a fact.

10         Q.      That's your testimony?

11         A.      Yes.

12         Q.      And you know that for a fact

13   based upon Mr. DeCantio telling you?

14         A.      Mr. DeCanio's interview with me,

15   yes.

16         Q.      Okay.  And when did Mr. DeCantio

17   interview you?

18         A.      It was sometime in the summer of

19   2006.

20         Q.      Okay.  After this email?

21         A.      At this time, I don't recall if

22   it was prior or after.

23         Q.      All right.  And have you spoken

24   to Mr. DeCantio about what Mr. Hesse said in

25   this email?

1                         E. Carter

2          A.      Yes.

3          Q.      When did you speak to him?

4          A.      Soon after.

5          Q.      And who initiated the

6    conversation?

7          A.      Myself.

8          Q.      How?

9          A.      I met up with him and --

10         Q.      So you met up with him?

11         A.      I met up with him.

12         Q.      So it was face to face?

13         A.      Yes.

14         Q.      Did you ask to meet with him?

15         A.      He actually called me on the

16   phone to come up there and meet him.

17         Q.      Did he tell you why he wanted to

18   meet with you?

19         A.      No.

20         Q.      Okay.  And how long was this

21   conversation?  How long was this meeting?

22         A.      The exact time frame I can't tell

23   you.  It was approximately I'd say 20

24   minutes to a half hour.

25         Q.      And was the entire subject matter

1                     E. Carter

2  of this meeting this email?

3         A.      No.

4         Q.      What else did you talk about with

5  Mr. DeCantio about -- other than this email?

6         A.      Training within the department

7  and the upgrades for the guys.

8         Q.      The up what?

9         A.      The upgrade.  Upgrading of the

10  park rangers.

11         Q.      Okay.  And was this a job

12  interview, to your knowledge?

13         A.      No.

14         Q.      What was the purpose of this

15  meeting?

16         A.      It was part of that

17  investigation.

18         Q.      Into whether or not you should be

19  promoted?

20         A.      That, and the department needs,

21  yes.

22         Q.      When you say "department needs,"

23  what do you mean?

24         A.      The budgetary, the training, the

25  upgrading of the park rangers.  Hiring more

1                    E. Carter

2    people.  Personnel.

3         Q.    Now who initiated the

4    conversation specifically with regard to

5    what Mr. Hesse said?

6         A.    I believe myself.

7         Q.    What did you say to him?

8         A.    I told him that I understand

9    George called him, and he said, "Yeah,

10   Eddie."  He goes, "I don't know why he

11   called me."  And I said to him, I said,

12   "Well, probably because I explained to him

13   when I spoke to him, that your department's

14   doing an investigation into the needs, but I

15   never told him to call you or not."

16        Q.    And what did -- what else did you

17   say about this, if anything?

18        A.    Just that what Hesse told him

19   about me sleeping was false.

20        Q.    And what did he say?

21        A.    He just shrugged it off.

22        Q.    Did -- to your knowledge, does

23   Mr. DeCantio have any involvement in whether

24   or not you get promoted?

25        A.    At that point, yes.

                          E. Carter

2        Q.      What was his involvement, to the

3    best of your recollection?

4        A.      He was reporting to my

5    commissioner at that time.

6        Q.      Who was your commissioner?

7        A.      Cathy O'Bannon.

8        Q.      And do you have any knowledge as

9    to whether or not Mr. DeCantio spoke to

10   Ms. O'Bannon concerning the subject matter

11   of this email?

12       A.      It would be my belief --

13       Q.      No.  Do you have any knowledge?

14       A.      No.

15       Q.      Personal knowledge?

16       A.      No.

17       Q.      Did Mr. DeCantio ever -- well,

18   withdrawn.  Have you spoken with

19   Ms. O'Bannon concerning the subject matter

20   of this email?

21       A.      No.

22       Q.      Has anyone ever advised you that

23   the reason that you have not been promoted

24   is because of what Mr. Hesse specifically

25   said in this email?

1                          E. Carter

2          A.     No.

3          Q.     Has the position  -- well, what

4    position were you looking to be promoted to?

5          A.     Suffolk County Civil Service

6    title is park ranger three.

7          Q.     And you're a park ranger two now,

8    right?

9          A.     Yes.

10          Q.     Has the park ranger three

11    position been filled?

12          A.     No.

13          Q.     Actually, let me go back to your

14    conversation with Mr. Hesse.  Why were you

15    taping the phone call?

16          A.     I believe I answered that

17    earlier.  With the conflicting reasons why

18    he let me go.

19          Q.     Is that the only conversation you

20    taped with Mr. Hesse?

21          A.     There was two that I'm aware of

22    at this time.

23          Q.     That you taped, not that Mr. Lamm

24    taped?

25          A.     Yes.

1                    E. Carter

2        Q.    Well, who else would be aware of

3    what conversations you taped, other than

4    you?

5        A.    No.   I had to re-call him one

6    time because there was a phone -- a problem

7    with the phone lines at Ocean Beach.  If you

8    want to call that a second  -- a third time.

9    It was in the same phone, you know.

10       Q.    And -- and did you advise -- in

11   any of these two conversations, did you ever

12   advise Mr. Hesse that he was being tape

13   recorded?

14       A.    No.

15       Q.    Did you ask his permission to be

16   tape recorded?

17       A.    No.

18       Q.    So you hid from him the fact that

19   you were tape recording him?

20       A.    No.   I never disclosed it, yes.

21       Q.    Do you have -- you don't believe

22   not disclosing it is different than

23   hiding -- well, withdrawn.  Do you think

24   that not disclosing something is the same as

25   hiding?

1                    E. Carter

2          MR. GOODSTADT:     Objection.

3     A.     No.

4     Q.     You think it's a difference, not

5  disclosing from hiding?

6          MR. GOODSTADT:     Objection.

7     Q.     You hid the fact that you were

8  taping the conversations with Mr. Hesse;

9  isn't that true?

10          MR. GOODSTADT:     Objection.

11     A.     Yes.

12     Q.     Okay.  And you were trying to get

13  evidence from Mr. Hesse concerning your

14  termination, correct?

15          MR. GOODSTADT:     Objection.

16     A.     No.  I was trying to get evidence

17  in case if my promotion came up, to show

18  that Mr. Hesse was not only defaming me, he

19  was lying about why he let me go, and I can

20  show a future boss what happened.

21     Q.     And did you?

22          MR. GOODSTADT:     Objection.

23     A.     No.

24     Q.     Why not?

25     A.     Never came a point.

                        E. Carter

1

2        Q.      Never came a point.  You've never

3   gone to any employer with this information?

4        A.      No.

5        Q.      That's because you don't -- you

6   haven't applied for any other jobs that

7   needed -- that required a polygraph,

8   correct?

9              MR. GOODSTADT:     Objection.

10       A.      Yes.

11       Q.      Is that your testimony?

12       A.      Yes.

13              MR. NOVIKOFF:     Let's mark the

14       following document as Carter-6.

15              (Suffolk County Civil Service

16        Eligible List was marked as Carter

17        Exhibit-6 for identification;

18        9/16/08, E.L.)

19       Q.      Prior to today, have you seen

20   this document?

21       A.      Yes, sir.

22       Q.      Is this the -- to your knowledge,

23   what is this document?

24       A.      This is the Suffolk County Civil

25   Service List number 06-5603-30 for park

```
 1                    E. Carter

 2  ranger three promotional.

 3         Q.      To your knowledge -- and you

 4  scored a 75 on this?

 5         A.      Yes, sir.

 6         Q.      To your knowledge, has Thomas

 7  Grosse been promoted to park ranger three?

 8         A.      Yes, he has.

 9         Q.      Is that for the Town of

10  Smithtown?

11         A.      Yes, sir.

12         Q.      Is this your handwriting?

13         A.      Yes, sir.

14         Q.      And when did you make these

15  comments about Town of Smithtown park

16  rangers?

17         A.      Prior to giving it to my

18  attorney.

19         Q.      Okay.  And has Anna Morganier

20  been promoted to park ranger three?

21         A.      Not at this time, to my

22  knowledge.

23         Q.      Then why did you include

24  Ms. Morganier in the little arrow?

25         A.      Because herself and Thomas Grosse
```

```
 1                      E. Carter
 2    work for the Town of Smithtown.  Being the
 3    fact that it's a promotional test, it's only
 4    promotional within your department.  I was
 5    the only park ranger two that passed the
 6    test in my department.
 7           Q.     And that would be Town of Islip?
 8           A.     Town of Islip, I'd be number one.
 9           Q.     Got it.  Okay.  And have you
10    inquired as to why, if the position  --
11    well, is the position still open?
12           A.     At this time, yes.
13           Q.     And have you inquired as to why,
14    if the position is open and you're the only
15    person who has -- who had passed the test in
16    the Town of Islip, you have not been
17    promoted?
18           A.     I asked my original boss, Marty
19    Raber, for when he --
20           Q.     The question is yes or no, have
21    you inquired?
22           A.     Yes.
23           Q.     When -- have you inquired on more
24    than one occasion?
25           A.     Yes.
```

1                          E. Carter

2          Q.      Okay.   When's the last time that

3     you've inquired?

4          A.      After the list came out.   I

5     showed it to Marty Raber.   I printed it out

6     sometime after August 8 and --

7          Q.      September 8?

8          A.      September -- I'm sorry, September

9     8.   I asked him -- you know, I said, "I

10    passed.   I scored number one."   I said, "You

11    know, what's happening?"   And he didn't give

12    me a reason.

13         Q.      You scored number one for Town of

14    Islip?

15         A.      For the Town of Islip, yes.

16         Q.      Right.   Because you're number

17    three here.

18         A.      Yes.   Well, number one for the

19    Town of Islip.

20         Q.      Right.   So number -- so Mr.

21    Raber, how do you spell his last name?

22         A.      R-A-B-E-R.

23         Q.      And Mr. Raber didn't give you a

24    reason?

25         A.      No.

```
 1                    E. Carter
 2        Q.     Did you -- and was Mr. Raber your
 3   boss?
 4        A.     Yes.  At the time, yes.
 5        Q.     At the time, who was his boss, if
 6   anybody?
 7        A.     Cathy O'Bannon.
 8        Q.     Did you go to Cathy O'Bannon to
 9   inquire?
10        A.     No.
11        Q.     Did you send any writing in this
12   September 2006 time period requesting a
13   reason why you were not promoted?
14        A.     No.
15        Q.     Okay.  Now you said Mr. Raber was
16   your supervisor at that time.  Has someone
17   else taken over for Mr. Raber as your
18   supervisor?
19        A.     The position that he was in is
20   currently vacant and we're working under the
21   executive commissioner to recreation I
22   believe the title is, the new boss.
23        Q.     And who is that?
24        A.     George Schimpf.
25        Q.     Okay.  Well, we now know that
```

1                      E. Carter

2    you -- according to your testimony, you

3    spoke with Mr. Raber in the September 2006

4    time period concerning why you were not

5    promoted and he responded -- he didn't

6    respond to you; is that fair?

7          A.     That's fair.

8          Q.     And when was the next time that

9    you spoke with anyone at the Town of Islip

10   concerning why you were not being promoted?

11         A.     I've spoke to Mr. Schimpf about

12   it and he said at that point they're not

13   promoting anyone.

14         Q.     Well, hold on.  When did you

15   speak with Mr. Schimpf in relation to when

16   you spoke with Mr. Raber?

17         A.     2007.

18         Q.     When in 2007?

19         A.     Mid 2007.

20         Q.     Okay.  And Mr. Schimpf was what

21   at that time as it relates to the Town of

22   Islip?

23         A.     I believe his title was executive

24   commissioner, executive assistant

25   commissioner of recreation.

1                    E. Carter

2        Q.        And what did you -- and was this

3    a face-to-face conversation?

4        A.        Yes.

5        Q.        Okay.  Did you ask to meet with

6    him?

7        A.        Yes.

8        Q.        And did -- was he hesitant at

9    all, to your recollection, in meeting with

10   you?

11       A.        No.

12       Q.        Did you explain to him before the

13   meeting why you wanted to meet with him?

14       A.        No.

15       Q.        Had you met with Mr. Schimpf for

16   any reason prior to that day?

17       A.        Yes.  He was my boss.  Yes.

18       Q.        Okay.  He was your direct

19   superior at the time?

20       A.        Yes.

21       Q.        Okay.  And what did you ask

22   Mr. Schimpf at that time concerning why you

23   were not promoted?

24       A.        He was putting the budgetary

25   stuff together and he said, you know, you're

1                        E. Carter

2    doing the work of a park ranger three by

3    scheduling everybody, the whole department

4    and stuff, and you know, he would look into

5    it, and you know, for his superiors above

6    him to give it to me or not, which would be

7    the commissioner.

8         Q.      Okay.  So Schimpf told you in

9    this conversation that you asked for

10   concerning why you weren't promoted, Schimpf

11   said to you "I'll look into it, but it's for

12   my superiors to make that decision"?

13        A.      They're the ones that have to

14   push for it, yes.

15        Q.      I believe you testified, though,

16   in response to my prior question, that

17   Schimpf told you they weren't hiring; was

18   that correct?

19             MR. GOODSTADT:      Objection.

20        Q.      Well, let me ask you, did Schimpf

21   tell you during this conversation that in

22   his opinion, the Town of Islip wasn't hiring

23   anyone for that position at that time?

24        A.      They weren't filling that

25   position at that time.

1                    E. Carter

2        Q.      And did he explain to you during

3    this conversation why they weren't filling

4    it at that time?

5        A.      No.

6        Q.      Did you ask him to  -- well, did

7    he ever get back to you after that

8    conversation with regard to what, if

9    anything, he did with regard to talking to

10   his superiors about filling that position?

11       A.      Yes.

12       Q.      Okay.  When did that next

13   conversation take place with Mr. Schimpf?

14       A.      Approximately a week ago.

15       Q.      A week ago?

16       A.      Yes.

17       Q.      So we're talking first

18   conversation with Mr. Schimpf about you

19   being promoted took place in mid January

20   of -- in mid 2007; is that correct?

21       A.      Yes.

22       Q.      And we're now in September of

23   2008, and that was your second conversation

24   with Schimpf about not being promoted yet,

25   correct?

1                    E. Carter

2        A.     I can't recall.  I'm sure we

3   spoke.  He asked me a couple other times if

4   that list was still valid, so I'm going to

5   say no.

6        Q.     He asked you a couple times if

7   the list was still valid?

8        A.     Yes.

9        Q.     Meaning what?

10       A.     Civil service lists expire.  I

11  don't know the exact time frame.  Sometimes

12  it's four years, sometimes it's longer.

13       Q.     Well, I just want to get the time

14  frame down.  We have mid January  -- I'm

15  sorry, mid 2007 you have your first

16  conversation with Schimpf about being

17  promoted to park ranger three, correct?

18       A.     Yes.

19       Q.     And he told you during that

20  conversation that he doesn't know why you're

21  not being promoted, but that's a decision

22  for his superiors, correct?

23       A.     Yes.

24       Q.     And he said he was going to look

25  into it, correct?

1                            E. Carter

2          A.      Yes.

3          Q.      And the next substantive

4    conversation you had with Mr. Schimpf

5    wherein the discussion about why you weren't

6    promoted, took place a week ago?

7                  MR. GOODSTADT:      Objection.

8          Q.      Is that correct?

9          A.      I'm going to answer no to that.

10         Q.      Okay.  Well, then tell me when

11   was the next time that you had a

12   conversation  -- after the mid 2007

13   conversation with Schimpf, when was the next

14   time that you had a conversation with

15   Schimpf when you inquired with him why you

16   weren't being promoted or he advised you why

17   you weren't being promoted?

18                 MR. GOODSTADT:      Objection.

19         A.      I don't recall exactly when it

20   was, but like I said, in the meantime, he

21   asked me a few times when the list expired,

22   if it was still valid, and that they were

23   having meetings with the chief of staff, and

24   the commissioner is the one that has to push

25   for it.

E. Carter

1

2    Q.    Well, did you ask Schimpf why

3    there was a  -- why they weren't filling

4    that position?  Withdrawn.  Putting aside

5    the conversation in mid 2007, on any

6    occasion when Schimpf told -- asked you as

7    to whether or not the list was still valid,

8    did you inquire with him as to why the

9    position wasn't being filled?

10    A.    No.

11    Q.    Okay.

12    A.    Except he brought it up to me

13    again last week and he told me make a --

14    make a meeting, set up a meeting with the

15    commissioner, bring your resume, get all

16    your paperwork together, bring everything

17    you have, and the commissioner is going to

18    be the one to push for you.

19    Q.    Well, you had known that prior to

20    last week, right, that the commissioner had

21    to be the one to push for you, right?

22    A.    I have a new commissioner now.

23    Q.    What's that?

24    A.    I have a new commissioner now.

25    Q.    Oh, who was the old commissioner?

1                    E. Carter

2          A.      It was Cathy O'Bannon.

3          Q.      Okay.  And you never pushed  --

4    did you ever ask for a meeting with Cathy

5    O'Bannon between the first conversation with

6    Schimpf in mid 2007 and the time

7    Ms. O'Bannon left?

8          A.      No.

9          Q.      When did Ms. O'Bannon leave?

10         A.      I don't know exactly.

11         Q.      Well, approximately?

12         A.      I don't know, sir.  I work

13   midnights and I don't  --

14         Q.      Did Mr. Schimpf ever advise

15   you -- well, did Mr. Schimpf advise you last

16   week as to why you were not being promoted?

17         A.      No.

18         Q.      Okay.  Did you -- have you made

19   any written  -- have you submitted any

20   written communications to the Town of Islip

21   inquiring as to why you weren't promoted?

22         A.      No.

23         Q.      What did you do, other than have

24   one conversation with Mr. Schimpf in 2007, a

25   conversation with Mr. Schimpf last week and

1                       E. Carter

2    a few conversations in between to inquire as

3    to why you were not promoted to park ranger

4    three?

5         A.      I spoke to Mr. Raber back in

6    2006.

7         Q.      Other than that, between your

8    first conversation with Schimpf in mid 2007

9    and last week, what, if anything, did you

10   affirmatively do to inquire as to why you

11   weren't being promoted?

12        A.      Nothing at this time.

13        Q.      Did any superior of yours at the

14   Town of Islip advise you that you were not

15   being promoted because of anything that

16   Mr. Hesse said?

17        A.      Again, back to that phone call to

18   the Town of Islip from Tom Iacopelli, Marty

19   Raber was in the room, and when the

20   secretary said the DA's on the phone for

21   you, Marty Raber, when I got off, he said,

22   "Oh, you're one of those?  You speak to the

23   DA?"  And he walked away.

24        Q.      When did this conversation take

25   place?

```
 1                      E. Carter
 2         A.      This was back in September of
 3     '06.  No.  I'm sorry.  September of '05.
 4         Q.      Okay.  But you weren't --
 5     Mr. Hesse hadn't fired you, according to
 6     your complaint, in September of '05, did he?
 7         A.      No.
 8         Q.      Right.  You were still an
 9     employee of Ocean Beach, right?
10         A.      Yes.
11         Q.      Okay.  So my question to you,
12     then, sir, is, between April 2, 2006 and the
13     present day, has any superior advised you at
14     the Town of Islip, that the reason you have
15     not been promoted is because of anything
16     that George Hesse has said about you?
17         A.      No.
18         Q.      Has any superior of yours at the
19     Town of Islip advised you that the reason
20     that you have not been promoted is because
21     of anything concerning your alleged
22     termination on April 2, 2006?
23         A.      No.
24         Q.      Now you understand that your
25     complaint is a public record, correct?
```

1                           E. Carter

2          A.      Yes.

3          Q.      And you understand that anyone at

4     the Town of Islip who can access a computer

5     and know where to go, could bring up your

6     complaint in this matter; isn't that true?

7          A.      Now I do.  Yes.

8          Q.      You didn't know that until I told

9     you?

10         A.      I didn't realize you could get it

11    off a computer.  No.

12         Q.      Okay.  Well, let me ask you

13    another thing on this regard.  Did you

14    attend a press conference shortly after the

15    filing of this complaint?

16         A.      Yes.

17         Q.      Who else attended that press

18    conference?

19         A.      My attorneys and the other

20    defendants.

21         Q.      And where did the press

22    conference take place?

23         A.      My attorney's office.

24         Q.      And what media outlets, if any,

25    were present at your press conference, to

```
 1                    E. Carter
 2   the best of your recollection?
 3        A.     I remember there being Channel 12
 4   News and Newsday.
 5        Q.     Okay.  And did News 12 carry a
 6   story concerning your lawsuit, to the best
 7   of your knowledge?
 8        A.     Yes.
 9        Q.     On television?
10        A.     Yes.
11        Q.     Was your face there?
12        A.     Yes.
13        Q.     Was your name mentioned --
14        A.     Yes.
15        Q.     -- by News 12?  Did Newsday carry
16   an article concerning your press conference?
17        A.     Yes.
18        Q.     Was your name mentioned?
19        A.     Yes.
20        Q.     Would you agree with me, sir,
21   that if any of your superiors at the Town of
22   Islip had been watching Newsday -- watching
23   News 12 the night of your -- of the story
24   about your press conference, they would have
25   known that you were part of a lawsuit
```

1                    E. Carter

2    against the Village of Ocean Beach?

3              MR. GOODSTADT:    Objection.

4         A.    That I was part of a lawsuit,

5    yes, but they didn't know the whole of the

6    lawsuit.

7         Q.    I understand that.  I'm not

8    debating with you on that.  And would you

9    agree with me, sir, that if any of your

10   superiors at the Town of Islip decided to

11   read Newsday the day after your lawsuit  --

12   I'm sorry, the day after your press

13   conference, they would have read that you

14   were part of a lawsuit against Ocean Beach?

15             MR. GOODSTADT:    Objection.

16        A.    Yes.

17        Q.    Sir, can you just go back to the

18   Notice of Claim for one second.  Page two.

19   Again -- withdrawn.  We've talked about

20   certain defamatory comments that you claim

21   that Mr. Hesse made about you and that

22   Mr. Bacon made about you.  On the second

23   page of your Notice of Claim, second full

24   sentence of the top paragraph, you write "in

25   further retaliation for Claimant's

1                    E. Carter

2    opposition both during Claimant's employment

3    and subsequent to the unlawful termination

4    of his employment, defamatory statements

5    have been made about Claimant, both verbally

6    and in writing on the internet, in other

7    media and to others"?

8         A.    Yes.

9         Q.    What other media are you

10   referring to that Mr. Hesse and/or Mr. Bacon

11   defamed you?

12        A.    The media -- the media would

13   be -- what I believe it to be is the email

14   to Greg -- the phone call to Greg DeCanio

15   and the email to me.

16        Q.    So you say you believe he defamed

17   you in the email to you?

18        A.    Yes.

19        Q.    Did he, to your knowledge, copy

20   anyone else on that email?

21        A.    No.

22        Q.    Are you aware as to whether he

23   sent that email to anybody else?

24        A.    Not at all.  No.

25        Q.    Now to your knowledge, would

1                    E. Carter

2   Ms. Morganier have to be offered the job of

3   park ranger three before you were offered it

4   under the Civil Service Laws?

5          A.    Absolutely not.  Because it's a

6   promotional position.  It's good for only

7   the town you work in.  You have to work two

8   years prior to be obtaining the test.

9          Q.    I'm just asking you.  So you

10  don't believe she has to be offered that

11  job?

12         A.    No.

13              MR. NOVIKOFF:   I'm going to ask

14         the court reporter to mark this

15         Carter-7.

16              (Letter to Mr. Carter dated

17           September 8, 2006 was marked as

18           Carter Exhibit-7 for identification;

19           9/16/08, E.L.)

20         Q.    Carter-7 is a letter dated

21  September 8, 2006 purporting to be from --

22  it's not a letter, a memo from Alan

23  Schneider, personnel director, to you.  Do

24  you see that?

25         A.    Yes.

1                          E. Carter

2          Q.      Did you ever inquire with

3    Mr. Schneider -- well, do you recall

4    receiving this letter, this memo?

5          A.      Yes.

6          Q.      Okay.  And did you ever inquire

7    with Mr. Schneider as to what he meant when

8    he said in the second sentence -- second

9    paragraph, last sentence, "your position on

10   the list is three"?

11         A.      No.

12         Q.      Did you have an understanding as

13   to what Mr. Schneider meant when he wrote

14   "your position on the list is three"?

15         A.      Yes.

16         Q.      What did he mean?

17         A.      On the Suffolk County list, my

18   position is number three.

19         Q.      Okay.  Now did you ever inquire

20   with Mr. Schneider, between September 8,

21   2006 and today, as to why you were not being

22   promoted to park ranger three for the Town

23   of Islip?

24         A.      No.

25         Q.      To your knowledge, is

1                    E. Carter

2    Mr. Schneider still the personnel director?

3         A.    For Suffolk County Civil Service,

4    yes.

5              MR. NOVIKOFF:   Why don't we end

6         the tape now, just take a really brief

7         three to five-minute break, and come

8         back.

9              THE VIDEOGRAPHER:   This

10        completes tape number three.  The time

11        is 2:01 p.m.  Going off the record.

12             (A break was taken.)

13             THE VIDEOGRAPHER:   This begins

14        tape number four.  The time is 2:11

15        p.m.  Back on the record.

16        Q.    Now, sir, had you retained

17   Mr. Goodstadt's law firm prior to the time

18   that you tape recorded your conversations

19   with Mr. Hesse?

20             MR. GOODSTADT:   Objection.

21        A.    No.

22        Q.    Let's go back to your Notice of

23   Claim for one more time, hopefully.

24             MR. GOODSTADT:   Can I hold you

25        to that?

1                    E. Carter

2              MR. NOVIKOFF:    You still have

3         it.  Oh, hold me to it?

4              MR. GOODSTADT:    Yes.

5         Q.    You write in the last sentence,

6    the first paragraph on page two -- up.  Up.

7    Yeah.  "Such defamatory statements have been

8    issued by or under the direct authorization

9    or direction if individuals employed by the

10   Ocean Beach Police Office Department."   I

11   presume instead of "if" you meant "of"?

12        A.    Yes.

13        Q.    Okay.  Who authorized Mr. Bacon's

14   alleged defamatory statements that you

15   referenced -- that you referred to as part

16   of the April 6, 2006 blog?

17        A.    It's my belief George Hesse.

18        Q.    And what is that belief based

19   upon?

20        A.    Because George Hesse when he

21   spoke the conversation with Tom Snyder.

22        Q.    What did George Hesse say to Tom

23   Snyder that leads you to believe that he

24   authorized Bacon to make that alleged

25   defamatory statement?

```
 1                           E. Carter

 2          A.      That he was aware of them.

 3          Q.      Okay.  So because Hesse was aware

 4    that Bacon made this blog statement, you

 5    believe that that means that he authorized

 6    Bacon to do it?

 7          A.      That he knew of it, yes.

 8          Q.      My question is, what evidence do

 9    you have that Hesse either directed or

10    authorized Bacon to make the statement that

11    you say was defamatory as it appears on the

12    April 6, 2006 blog?

13                  MR. GOODSTADT:    Objection.

14          A.      I'm sorry, can you repeat the

15    question?

16          Q.      Yeah.  What evidence do you have

17    that Hesse directed Bacon to make the

18    statement that you claim to be defamatory?

19                  MR. GOODSTADT:    Objection.

20          A.      None.

21          Q.      What evidence do you have that

22    Hesse authorized Bacon to make the statement

23    that you claim to be defamatory?

24                  MR. GOODSTADT:    Objection.

25                  That was asked and answered.
```

1                      E. Carter

2          Q.     You can answer it.

3          A.     None.   I believe I just answered.

4          Q.     Okay.   I'm going to show you

5     what's been previously marked as Defendants'

6     Exhibit-1.   Do you need a copy?   I can give

7     you one.   Now do you recognize what's been

8     labeled or what's been previously marked as

9     Defendants'-1?

10         A.     I believe it's our complaint.

11         Q.     And did you authorize your

12    attorneys to file this complaint in your

13    behalf?

14         A.     Yes.

15         Q.     Did you review any drafts of this

16    complaint prior to authorizing your

17    attorneys to file the complaint on your

18    behalf?

19         A.     Yes.

20         Q.     Did you review it for accuracy,

21    sir?

22         A.     Yes.

23         Q.     Was it important for you -- was

24    it important to you that nothing that was

25    set forth in there was inaccurate?

1                          E. Carter

2          A.      Yes.

3          Q.      Was it important that nothing

4    would be considered to be a lie as set forth

5    in that complaint?

6          A.      As a lie, yes.

7          Q.      Or wrong?

8          A.      Yes.

9          Q.      This was an important document in

10   your life, correct?

11         A.      Yes.

12                 MR. GOODSTADT:      Objection.

13         Q.      This was your lawsuit against

14   Ocean Beach, correct?

15         A.      Yes.

16         Q.      Would you have authorized your

17   attorney to file this if you were aware of

18   anything that was inaccurate?

19                 MR. GOODSTADT:      Objection.

20         A.      No.

21         Q.      Okay.  Let's look at paragraph

22   109.  It's on page 25.  Please read

23   paragraph 109 and tell me when you're done.

24         A.      (Reviewing).  Yes.

25         Q.      Accurate?

1                           E. Carter

2          A.      Yes.

3          Q.      Anything in there right now you

4     want to tell us that may not be completely

5     and 100 percent accurate?

6                  MR. GOODSTADT:      Objection.

7          A.      No.

8          Q.      Okay.  You allege in the first

9     sentence "upon information and belief,

10    Carter and Snyder were denied promotion to

11    the respective positions of lieutenant and

12    sergeant in the Town of Islip due to

13    unfounded negative references from Hesse."

14         A.      Yes.

15         Q.      Is the promotion you're referring

16    to, as it pertains to you only, the park

17    ranger three promotion?

18         A.      Yes.

19         Q.      Sir, the town has not indicated

20    that you have been denied a promotion, has

21    it, sir?

22                 MR. GOODSTADT:      Objection.

23         A.      I haven't received it.

24         Q.      Has the town ever advised you

25    that the promotion that you are seeking has

1                          E. Carter

2     been denied?

3          A.     No.

4          Q.     You write "upon information and

5     belief."  What is your information and

6     belief?

7          A.     My information is the phone call

8     to Greg DeCanio.  Also, in the locker room,

9     the guys were talking about it when the

10    Ocean Beach website showed up that there was

11    no way I was going to get that promotion

12    with the corruption.  Basically trying  --

13    they felt I was connected to it, and when I

14    dropped paperwork off at the town at the

15    personnel department after the boys were

16    born, one of the women said to me, "Are you

17    going to get arrested?"  And I looked at her

18    like confused.  I didn't know what she was

19    talking about.  And she was referring to the

20    blog again.

21              Afterwards, I sat down.  I spoke

22    to the personnel director for the town.  I

23    don't recall the exact date.  Her name is

24    Zelda, and I explained to her about what was

25    going on with the blog and the rumors that

1                    E. Carter

2   were running around about the official

3   misconduct and stuff, and she said for me,

4   my best -- it would be in my best interest

5   to get a letter as to what happen  -- why I

6   was let go from Ocean Beach, and if I

7   didn't, they probably would hold up the

8   position.

9         Q.    Let's talk about the locker room.

10  The guys in the locker room said what?

11        A.    They're the ones that originally

12  made me aware what was posted on the blog,

13  that on Halloween night, they said, "You did

14  official misconduct.  You falsified

15  paperwork for an incident."  I looked at

16  them confused because I said, "I didn't work

17  Halloween at Ocean Beach.  I worked for the

18  town a double tour."

19        Q.    But the boys -- the guys in the

20  locker room said what concerning you not

21  getting promoted?

22        A.    They were saying that they had

23  heard that I was involved in the corruption

24  over at Ocean Beach.

25        Q.    The guys in the locker room had

1                      E. Carter

2   heard?

3        A.     Yes.

4        Q.     Based upon reading the blog?

5        A.     That and talking to the bosses,

6   yes.

7        Q.     Oh, the guys in the locker room

8   said they were talking to the bosses?

9        A.     In conversation over coffee and

10  stuff.

11       Q.     What bosses are they referring

12  to?

13       A.     Mr. Raber.

14       Q.     Mr. Raber.  Did you ever approach

15  Mr. Raber about what the guys said to you in

16  the locker room concerning the blog?

17       A.     No.

18       Q.     No?  Okay.  Did Mr. Raber ever

19  tell you that the reason that you were not

20  being promoted was because he had read the

21  blog?

22       A.     No.

23       Q.     Did Mr. Raber ever tell you the

24  reason that you weren't being promoted is

25  because he had been told about the blog?

1                        E. Carter

2          A.      No.

3          Q.      Did anyone that replaced

4     Mr. Raber tell you that the reason you

5     weren't being promoted was because he or she

6     had read or been told what was said on the

7     blog?

8          A.      No.

9          Q.      Did any superior of Mr. Raber or

10    anyone that replaced Mr. Raber, ever advise

11    you that the reason you weren't being

12    promoted was because of something they had

13    seen or heard about on the blog?

14         A.      No.

15         Q.      So it -- would it be fair to say

16    that it's complete speculation that you were

17    not given your promotion because of what was

18    said on the blog?

19              MR. GOODSTADT:      Objection.

20         A.      It's my belief that I wasn't

21    given the promotion because the incidences

22    that happened from Ocean Beach and the

23    negative references.

24         Q.      It's your belief based upon what

25    the guys in the locker room said that was

1                        E. Carter

2    told to their bosses?

3                   MR. GOODSTADT:     Objection.

4        Q.     Is that what is the basis of your

5    belief?

6                   MR. GOODSTADT:     Objection.

7        A.     Also the phone call to Greg

8    DeCanio.

9        Q.     Okay.  Well, let's talk about

10   that.  The phone call as to what was said to

11   Mr. -- the phone call to Mr. DeCantio is

12   reflected, to your knowledge, in the Hesse

13   email that I showed you, right?

14       A.     Not fully, but yes.

15       Q.     Well, was there anything else

16   that Hesse said to DeCantio that wasn't said

17   in that email by Hesse?

18       A.     I don't believe I could speculate

19   on that.  That would be either Hesse or

20   DeCanio would have to answer that.

21       Q.     Oh, so you don't -- other than

22   what was said in the email, you don't know

23   what was said between Hesse and DeCantio in

24   that phone call, do you?

25       A.     Only what Hesse told me and Greg

1          E. Carter

2  told me.

3     Q.    Well, did Hesse tell you that

4  anything -- anything other than what was in

5  that email?

6     A.    Hesse has lied to me in the past

7  and obviously --

8          MR. CONNOLLY:    Objection.

9  MO      MR. NOVIKOFF:    Motion to

10        strike.

11     Q.    Sir, did Hesse, in the phone call

12  that you're referring to, advise you of

13  anything other than what he said in the

14  email to you concerning his conversation

15  with DeCantio?

16     A.    Yes.

17          MR. GOODSTADT:    Objection.  He

18        already testified to stuff he said.

19     Q.    What did he say?

20     A.    I testified about the twins being

21  born.  I don't believe that was in the

22  email.

23     Q.    Okay.

24     A.    Can I look back at the email?

25     Q.    Sure.  Now my question, though,

1                          E. Carter

2      is, you said that there was a phone call

3      between Hesse and DeCantio.  The email

4      reflects Hesse's phone call to DeCantio,

5      correct?

6           A.    It's telling me that he called

7      DeCanio, yes.

8           Q.    And he's telling you what he said

9      to DeCantio.  Did Hesse tell you that he

10     told DeCantio anything else, other than what

11     he said in that email?

12               MR. GOODSTADT:    Objection.  He

13          just testified to something that he

14          told him.

15          Q.    You can answer.

16          A.    No.

17          Q.    Okay.  Did DeCantio tell you that

18     Hesse said anything else concerning your

19     job, other than what Hesse told you in the

20     email?

21          A.    No.

22          Q.    Okay.  You then state that a

23     person in the Town of Islip personnel office

24     asked you if you were going to jail?

25          A.    I was going to be arrested, yes.

1                         E. Carter

2          Q.    Okay.  Who was that person?

3          A.    It was a woman.  I don't know her

4    name.

5          Q.    And she said this when you were

6    dropping off papers?

7          A.    I was walking through the

8    corridor, it's a long corridor approximately

9    half the size of this, into the personnel

10   office (indicating).

11         Q.    And when did this person make

12   this statement?

13         A.    That would have been after

14   approximately mid April.

15         Q.    Of 2006?

16         A.    2006.

17         Q.    And it's your belief that based,

18   in part, upon that comment by the personnel

19   office, that Mr. Hesse's negative references

20   cost you a promotion?

21               MR. GOODSTADT:    Objection.

22         A.    Again, the defamatory statements,

23   the blog, all as a whole cost me my

24   promotion, yes.

25         Q.    No.  But I'm now referring to

1                    E. Carter

2    this person that you don't know the name of

3    in the personnel office making this comment

4    about you going to jail.  Did you -- is it

5    your testimony that you believe that that

6    comment by this unnamed person contributed

7    to you not getting promoted?

8          A.    No.  It was more defamatory.

9          Q.    Okay.  And would you agree with

10   me  -- well, prior to this comment, did you

11   have any evidence that Mr. Hesse made any

12   defamatory comment to you on the blog?

13         A.    No.

14         Q.    And, to date, you still have --

15   you can point to no specific blog entry that

16   identifies George Hesse as the author,

17   correct?

18         A.    Correct.

19         Q.    And you certainly can't point to

20   any specific blog entry prior to the end of

21   April 2006 that specifically identifies

22   George Hesse as the author, correct?

23         A.    Correct.

24         Q.    Let's look at this conversation

25   you had with Zelda.  Zelda is who again or

1                    E. Carter

2   was who again?

3           A.      Personnel director for the Town

4   of Islip.

5           Q.      And when did you have a meeting

6   with Zelda?

7           A.      That was approximately May of

8   2006.

9           Q.      Is Zelda still the personnel

10  director?

11          A.      She's retired at this time.

12          Q.      When did she retire?

13          A.      Recently.  I believe it was

14  January or February of '07.  Oh, I'm sorry,

15  we're in '08?  '08.

16          Q.      Now let's go back to Carter-7 I

17  believe it is.  Schneider is the personnel

18  director for the County of Suffolk?

19          A.      Yes.

20          Q.      And Zelda was the personnel

21  director for the Town of Islip, is that

22  your -- is that what your testimony is?

23          A.      No.  Mr. Schneider is the

24  personnel director for the Department of

25  Civil Service.  I don't know if there's a

1                        E. Carter

2    separate personnel director for the County

3    of Suffolk.

4         Q.      Fine.  Now what did Zelda

5    specifically say to you again?

6         A.      When I was -- I was speaking, I

7    stopped in.  I was dropping some paperwork

8    off.  I was talking to her.  And I explained

9    to her about the test scores and stuff, and

10   I explained to her about the blog and what

11   was being said around the town, and you

12   know, she said, "Ed, I've known you 24

13   years, several years.  I don't believe any

14   of it.  But that you should get a letter to

15   basically say why you were let go from Ocean

16   Beach because they have to let you know."  I

17   said, "Well, Zelda, right now they're not

18   letting me know.  They're just leaving me

19   blank with directives they hung up."  And I

20   didn't even tell her about the wire part.

21   And that -- she said, "Get a letter and hold

22   on to it."

23        Q.      And when did this conversation

24   take place?

25        A.      May of 2006.

1                    E. Carter

2        Q.      All right.  And Zelda didn't tell

3    you that she was aware of the blog, did she?

4        A.      No.

5        Q.      You initiated that conversation,

6    right?

7        A.      At that time, yes.

8        Q.      Right.  And Zelda didn't advise

9    you that she had heard what was being said

10   around Islip  -- around the department, did

11   she?

12       A.      No.

13       Q.      You told her?

14       A.      Yes.

15       Q.      You initiated that conversation?

16       A.      Yes.

17       Q.      And you had been told at that

18   point as to why you were being fired, right?

19   Mr. Hesse said it was directives, right?

20              MR. GOODSTADT:      Objection.

21       A.      No.

22       Q.      No?

23       A.      That was afterwards.

24       Q.      Didn't Mr. Hesse tell you that in

25   April of 2006, in April 2, 2006, that you

                        E. Carter

1
2    were being fired for directives?

3        A.     Yes.

4        Q.     Now my question to you is whether

5    or not that was truthful or not, why did you

6    find it  -- why were you incapable of

7    advising Islip that that's what Mr. Hesse

8    said?

9             MR. GOODSTADT:    Objection.

10       A.     I did tell Mr. Raber on a

11   Wednesday after I was let go, it was the

12   first day I saw him, that I was let go for

13   directives by the Beach that were posted

14   over the fall.  He asked what they were and

15   I told him, I explained to him exactly what

16   they were, and he says, "Oh, okay."

17       Q.     So Mr. Hesse had told you, at

18   least at that time, why you were being

19   fired?

20       A.     No.  He just said directives.  He

21   had to let someone go for directives he

22   posted on the wall.

23       Q.     He told you you were being let go

24   because of directives, according to your

25   testimony, correct?

1                    E. Carter

2        A.      He wouldn't tell me what

3    directive.

4        Q.      But he said directives, right?

5    He gave you a reason, correct?

6        A.      I don't believe that was a full

7    reason.

8        Q.      But he gave you a reason why you

9    were being fired, correct?  He said

10   directives, correct?

11       A.      That he had posted on the wall,

12   yes.

13       Q.      Right.  Now you didn't believe

14   him, right?

15       A.      No.

16       Q.      Right.  But at least he told you

17   what the reason was, you would agree with

18   me?  Whether or not it was truthful or not,

19   he had given you a reason?

20       A.      He said directives, but I wanted

21   to know what directives specifically.  I can

22   tell you I fired you for directives.  Why

23   did I fire you?

24       Q.      Okay.  But he had told you his

25   reasoning for firing you was directives,

```
 1                     E. Carter
 2   right?
 3        A.     Yes.
 4        Q.     So why did -- why couldn't you
 5   just have told the Town of Islip "I was
 6   fired for directives"?
 7             MR. GOODSTADT:     Objection.
 8        A.     Because it was false.  I wasn't
 9   fired.  I didn't feel I was fired for
10   directives.  I didn't do anything wrong.
11        Q.     Oh, so the issue really wasn't
12   whether or not you could tell the Town of
13   Islip or any other employer as to why your
14   directive -- you didn't believe that was the
15   legitimate reason, is that your testimony?
16             MR. GOODSTADT:     Objection.
17        A.     No.
18        Q.     No.  Did you ever get the letter
19   that this woman Zelda said you should be
20   getting?
21        A.     No.
22        Q.     Did you ever ask Mr. Hesse for
23   the letter?
24        A.     Yes.
25        Q.     When?
```

```
 1                    E. Carter
 2         A.    May 15.
 3         Q.    And did he send you the email?
 4         A.    That was prior.
 5         Q.    Right.  And in the email,
 6   Mr. Hesse states why you were let go,
 7   correct?
 8              MR. GOODSTADT:   Objection.
 9         A.    That's a different reason from
10   the original reason.
11         Q.    I understand that, but Mr. Hesse
12   advised you in the email as to why he told
13   this Greg DeCantio you were being fired,
14   right?
15         A.    Yes.
16         Q.    That's a reason, you would agree
17   with me?  May not be a truthful reason, but
18   it was a reason, right?
19         A.    Yes.
20         Q.    You could have sent that email on
21   to anyone at the Town of Islip, correct?
22              MR. GOODSTADT:   Objection.
23         A.    I wouldn't have because it was
24   false.  It wasn't true.
25         Q.    Zelda asked you to get a letter
```

1                        E. Carter

2    explaining why you were fired, right?

3         A.      Yes.

4         Q.      You believed that there was no

5    legitimate reason why you were fired,

6    correct?

7         A.      Yes.

8         Q.      So what letter would you ever

9    have gotten from Ocean Beach that you would

10   have sent on to your superiors if you were

11   waiting for the real reason why you were

12   being fired?

13                MR. GOODSTADT:    Objection.

14        A.      One similar -- one similar to an

15   internal correspondence.   An official

16   letter.   Not an email.

17        Q.      Oh, so the email wasn't an

18   official letter, is that your testimony?

19        A.      It's not even a letter, it's an

20   email.

21        Q.      So you don't believe the email

22   reflected an official documentation that you

23   could send on to anybody concerning why you

24   were fired?

25                MR. GOODSTADT:    Objection.

```
 1                    E. Carter

 2         A.     Correct.

 3         Q.     Okay.  Did you ever inquire with

 4    Chief Paridiso?

 5         A.     No.

 6         Q.     Did you ever ask Chief Paridiso

 7    for a letter?

 8         A.     I spoke to Chief Paridiso and I

 9    told him why I was let -- why George told me

10    he let me go, and I said he said he let me

11    go for sleeping, and Ed Paridiso laughed.

12    He said, "The guy that does the most ADA

13    cases in the winter hours and all med evacs,

14    the most house checks found open, the most

15    village property found open," he says, "When

16    did you find time to sleep?"

17    MO         MR. NOVIKOFF:    Motion to

18         strike.

19         Q.     Did you ever ask Mr. Paridiso for

20    a letter explaining why you were fired?

21         A.     No.

22         Q.     He was the chief at the time,

23    right?

24         A.     Yes.

25         Q.     He could have written a letter on
```

1                        E. Carter

2    Ocean Beach -- to your knowledge, he could

3    have written a letter on Ocean Beach -- on

4    an Ocean Beach document concerning why you

5    were fired, correct?

6               MR. GOODSTADT:    Objection.

7         A.    I believe at that point George

8    Hesse was the chief of Ocean Beach.

9         Q.    I thought you just said that

10   Paridiso was the chief?

11        A.    He was out on disability.

12        Q.    Oh, okay.  Did you ever inquire

13   with the mayor at the time as -- well, did

14   you ever ask the mayor for a letter

15   indicating why you were terminated?

16        A.    No.

17        Q.    Did you ever ask a trustee member

18   for a letter?

19        A.    No.

20        Q.    Did you ever  -- did your lawyer,

21   to your knowledge, ever send a letter to

22   Ocean Beach saying "listen, I need a letter

23   on an official Ocean Beach stationary

24   explaining why my client was fired"?

25               MR. GOODSTADT:    Objection.

1                      E. Carter

2          A.     No.

3          Q.     What efforts did you take, other

4    than asking George Hesse to get a letter on

5    Ocean Beach stationary, regarding why you

6    were fired?

7          A.     I couldn't.  George Hesse and Joe

8    Loeffler had a very good relationship, very

9    personal, and I knew I would go stonewalled

10   right into a wall.

11   MO          MR. NOVIKOFF:    Motion to

12         strike.

13         Q.     What efforts, other than asking

14   George Hesse, did you undertake to get a

15   letter on Ocean Beach stationary concerning

16   the reason why you say you were fired?

17         A.     None.

18         Q.     Did you ever follow up with Zelda

19   as to why you didn't get a letter?

20         A.     I told her I never received

21   anything.

22         Q.     When did you tell her that?

23         A.     That was the next time I saw her,

24   which could have been September, October.

25         Q.     And what did she say, if

1                    E. Carter

2    anything?

3        A.    She just shrugged.  You know, she

4    didn't know what -- you know, she just

5    looked at me.  She says, "You know, what are

6    you going to do."

7        Q.    Right.  She didn't have any

8    authority to promote you, did she?

9        A.    No.

10       Q.    To your knowledge, did she talk

11   to any person in authority with regard to

12   your promotion?

13       A.    No.

14       Q.    Let's mark -- well, no.  Let's

15   continue 109.  You write in the first

16   sentence "unfounded negative references," do

17   you see that?

18       A.    109?

19       Q.    Yes.  First sentence, you end it

20   by saying "due to unfounded negative

21   references from Hesse"?

22       A.    Yes.

23       Q.    Well, we know of one which is the

24   conversation that you claim to have taken

25   place between Hesse and DeCantio, correct?

1                           E. Carter

2           A.      Yes.

3           Q.      What was the other negative

4    reference that you're referring to in the

5    first sentence of 109 that went to the Town

6    of Islip from Hesse?

7                   MR. GOODSTADT:    Objection.

8           A.      None.

9           Q.      Okay.  So when you say "negative

10   references," you really mean one negative

11   reference?

12                  MR. GOODSTADT:    Objection.  For

13          the record, the sentence refers to

14          Carter and Snyder.

15          Q.      Okay.  Well, then my question,

16   when you're referring to yourself in the

17   first sentence concerning negative

18   references from Hesse, it's really only one

19   negative reference that you can point to?

20          A.      In reference to me, yes.

21          Q.      Right.  Okay.  Let's look at the

22   next sentence.  "Carter was also denied the

23   ability to apply for positions with Suffolk

24   County because he could not obtain

25   references from the OBPD or provide a clear

1                    E. Carter

2   explanation for his termination."  Who

3   denied you the ability to apply for

4   positions?

5        A.    George Hesse.

6        Q.    How did he deny you the ability

7   to apply for positions?

8        A.    I told him that I spoke to the

9   county recruiter, that I'd have to go

10  through a background and a polygraph, and

11  that I needed a reason, directives or

12  whatever it was why I was let go, and he

13  said with his civil service knowledge, I can

14  walk on any job and he'd get back to me, and

15  he knew at that point that by giving me --

16  back to the polygraph questions, there was

17  no way I'd pass a polygraph.

18  MO          MR. NOVIKOFF:     Motion to

19       strike.

20       Q.    But he had already provided you

21  in that May 15 email a reason, right?

22       A.    A separate reason from the

23  previous ones.

24       Q.    So what did you expect him to say

25  after May 15 with regard to why you were

1                      E. Carter

2    fired?

3          A.     I really -- I felt he might have

4    said budgetary cuts like he told the other

5    guys or something else.  I don't know.

6          Q.     Did you believe that the other

7    guys were fired for budgetary cuts?

8          A.     Originally, yes.  Until we saw

9    the budget was inflated.

10         Q.     When did you see when the budget

11   was inflated?

12         A.     When -- I don't have the exact

13   date, but it was in the paper.

14         Q.     So if he had said budgetary cuts

15   in May of 2006, you would have felt good

16   enough to then take a polygraph?

17              MR. GOODSTADT:     Objection.

18         A.     I would have felt more

19   comfortable.

20         Q.     Even though he had, according to

21   you, lied to you the first time about

22   directives, and even though he had lied to

23   you the second time about you falling

24   asleep, it's your testimony that had he said

25   to you the third time that you were fired

1                        E. Carter

2    because of budgetary reasons, you would have

3    felt more comfortable taking a polygraph?

4              MR. GOODSTADT:     Objection.

5         Q.     Is that your testimony?

6         A.     My testimony is I would have felt

7    more comfortable.  I would have had more

8    belief that I could have took the polygraph.

9         Q.     But according to you, he had lied

10   to you on two occasions, right?  Prior to

11   May 16, 2006, he had lied to you on two

12   occasions as to why you were fired, right?

13   He lied to you on April 2, right?

14        A.     Yes.

15        Q.     When he said directives?

16        A.     Yes.

17        Q.     And according to you, he lied to

18   you on May 15 when he said you were

19   sleeping, right?

20        A.     Yes.

21        Q.     So what would have made you

22   believe that after May 15, if Mr. Hesse had

23   said you were fired for budgetary reasons,

24   that that wouldn't have been a lie as well?

25        A.     Because I would have went ahead

1                    E. Carter

2    and put the application, not knowing about

3    the budgetary things, and I would have set

4    up the polygraph.

5         Q.     So if he had said that you were

6    fired for budgetary reasons after May 15,

7    2006, you would have set up the polygraph

8    test?

9         A.     I would have applied for the

10   position and had it set up, yes, through

11   civil service.

12        Q.     Even though he had lied to you on

13   two prior occasions?

14             MR. GOODSTADT:     Objection.

15   Asked and answered.

16        Q.     Is that correct?  I just want to

17   make sure we understand each other.  Even

18   though he had lied to you on two other

19   occasions, had he given you the budgetary

20   reason the third time, you would have

21   scheduled the polygraph test?

22        A.     The third time would have been

23   prior to the sleeping part.

24        Q.     Right.

25        A.     The sleeping part wouldn't have

1                    E. Carter

2    been in there.

3         Q.    No?  Really?  The sleeping part

4    was the second time he lied to you, right?

5    He lied to you on April 2, 2006, according

6    to your testimony, right?

7         A.    Yes.

8         Q.    And then the next time he gave

9    you a reason, it was May 15 when he said you

10   were sleeping?

11        A.    Yes.

12        Q.    And then you spoke to Zelda after

13   that, right?

14        A.    Yes.

15        Q.    And you had --

16        A.    Well, in between -- I'm sorry.

17   In between, in May I told you 2006 I spoke

18   to her.

19        Q.    Okay.  But the other job that you

20   were applying for, that you wanted to apply

21   for took place after May 15, 2007  -- 2006,

22   right?

23        A.    The park police job, no.  It was

24   prior to that.

25        Q.    Okay.  Park police.  That's the

1                    E. Carter

2      park ranger three, right?

3           A.      No.   Suffolk County park police.

4      Originally it was all at the same test.

5           Q.      When did you apply for the park

6      ranger three -- I mean the Suffolk County

7      park police job?

8           A.      I made the initial phone call the

9      beginning of May to speak to the recruiter,

10     and that's when I contacted Hesse.

11          Q.      Okay.   So if I understand your

12     testimony correctly, he lied to you on April

13     2, but had he given you the reason between

14     the 2nd and May 15 that you were fired

15     because of budgetary reasons, you would have

16     felt comfortable then setting up the

17     polygraph?

18               MR. GOODSTADT:     Objection.

19          Q.      Is that your testimony now?   I'm

20     just trying to figure out what your

21     testimony is.

22          A.      I would have known -- I would

23     have felt more better.   I couldn't prove at

24     that point if he was lying or not to me.

25     When he brought up sleeping, it's an

1                    E. Carter

2    outright lie.  Where the budgetary thing, I

3    couldn't, you know, disprove or not at that

4    time.

5          Q.    Okay.  You write -- and I repeat

6    what you allege in 109 -- "Carter was also

7    denied the ability to apply for positions."

8    Well, what positions were you going to apply

9    for that you couldn't?

10         A.    That would have been the Suffolk

11   County park police.

12         Q.    Okay.

13         A.    And the park ranger three

14   position.

15         Q.    Well, park ranger three was Town

16   of Islip, right?

17         A.    Yes.

18         Q.    So -- and this refers to with

19   Suffolk County, right?

20         A.    Yes.

21         Q.    So when you say "with Suffolk

22   County," you're talking about applying for a

23   job with Suffolk County as opposed to Town

24   of Islip, right?

25         A.    Yes.

1                    E. Carter

2         Q.      So when you're saying "positions

3    with Suffolk County," you really mean one

4    position, right?

5         A.      Yes.

6         Q.      That was the park police

7    position, right?

8         A.      Yes.

9         Q.      Well, let's talk about that.

10   When did you first make the application for

11   that position?

12        A.      I never filled the application

13   out.  I made the phone call and spoke to the

14   recruiter.  I explained to him that I was

15   working at Ocean Beach as a police officer.

16        Q.      So you made the application while

17   you were still employed with Ocean Beach?

18        A.      No.

19        Q.      No.  So what did you explain

20   to --

21        A.      That I was a police officer for

22   Ocean Beach.  I was let go on April 2006,

23   and he asked me why, and I told him for

24   directives that were posted.  I said, "I

25   really don't know."  And he says, "Well,

1                          E. Carter

2     find out.  Don't embarrass yourself, because

3     we're going to find out."  And I asked him,

4     you know, as far as what type of testing,

5     whatever I'd have to go through, and he

6     asked me if I had a background with Suffolk

7     County Police Department, and I said, "No.

8     The Ocean Beach Police Department had done

9     it back in '91, 1991."  And he says, "I'm

10    not sure.  I'm going to have to check with

11    my chief, but you may have to do the

12    background test and take a polygraph."

13          Q.     Okay.  And then you abandoned

14    that effort because you had to take a

15    polygraph?

16          MR. GOODSTADT:     Objection.

17          A.     No.  I tried to get -- I told

18    George about that, and after that point,

19    yes, I abandoned the position.

20          Q.     Well, what did you ask Mr. Hesse

21    before you abandoned the application?

22          A.     I explained to him what was going

23    on and I needed a reason why I was let go,

24    and at the end of the conversation, he said,

25    "I'll get back to you."

1               E. Carter

2        Q.      And what was Mr. Hesse -- oh,

3   Mr. Hesse said "I'll get back to you"?

4        A.      Yes.

5        Q.      And he never did?

6        A.      May 15.

7        Q.      Okay.  He gave you a reason, but

8   you didn't believe it, right?

9        A.      No.

10       Q.      Okay.  So you felt because you

11  didn't believe the reason, you couldn't take

12  a polygraph for the Suffolk County park

13  police job?

14       A.      Correct.

15       Q.      And did you ever advise Suffolk

16  County park police that you were abandoning

17  your pursuit of their job?

18       A.      I never called the recruiter

19  back.

20       Q.      Did you ever send a letter to

21  anyone at Ocean Beach indicating that you

22  need a letter so that you can pursue this

23  job with Suffolk County?

24       A.      No.

25       Q.      Did you ever write a letter or

1                    E. Carter

2    authorize someone to write a letter to Ocean

3    Beach indicating that in order for you to

4    pursue a law enforcement job, you need to

5    get a letter from them as to why you were

6    fired?

7          A.    No.

8          Q.    Well, you filed a Notice of Claim

9    in June  -- well, the Notice of Claim is

10   dated June 2006, right?

11         A.    June 30, 2006.  Yes, sir.

12         Q.    Would it be fair to say that by

13   virtue of your filing the Notice of Claim,

14   you were advising Ocean Beach that you did

15   not believe that there was any legitimate

16   reason for why you say you were fired on

17   April 2?

18         A.    Yes.

19         Q.    Okay.  So then if you believed as

20   of June 30, 2006 that there was no

21   legitimate reason for why you were fired on

22   April 2, 2006, why did you believe that you

23   couldn't go forward with polygraph tests

24   after that date?

25         A.    Because, again, I spoke -- I said

1                    E. Carter

2    it earlier, I don't think I'd be able to

3    pass it with just bringing up the incident

4    with the Beach, the lies, and when it got to

5    those questions why you were let go, I would

6    have probably most likely came up -- I

7    forget the exact wording they use, but it's

8    not exactly calling you a liar, but it's

9    un -- not undecisive.  I don't know the

10   exact words they use on a polygraph.

11        Q.    But you testified this morning

12   that at least to your understanding,

13   polygraph tests are yes and no, right?

14        A.    Specifically, and then they go

15   with a group.  Were you ever fired for a

16   position.  My answer would be yes.

17        Q.    Right.  And they wouldn't ask

18   you, to your knowledge, on a polygraph test

19   why you were fired, because that's not a yes

20   or no question, right?

21        A.    That would have been in a --

22             MR. GOODSTADT:    Objection.

23        A.    -- pre-polygraph part of the

24   questionnaire.

25        Q.    When you say "pre-polygraph,"