1

2      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK

3      ------------------------------------------X
       EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,

4      JOSEPH NOFI and THOMAS SNYDER,
                                    Plaintiffs,

5      ·              -against-
       INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR

6      JOSEPH . LOEFFLER, JR., individually and in
       his official capacity; former mayor NATALIE

7      K. ROGERS, individually and in her official
       capacity; OCEAN BEACH POLICE DEPARTMENT;

8      ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
       individually and in his official capacity;

9      SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
       DEPARTMENT; SUFFOLK COUNTY DEPARTMENT OF

10     CIVIL SERVICE, and ALISON SANCHEZ,
       individually and in her official capacity,

11                            Defendants.
       ------------------------------------------X

12

                      926 Rexcorp Plaza
13                    Uniondale, New York

14

15                    September 9, 2008

16                    10:32 A.M.

17

18

19            DEPOSITION of JOSEPH NOFI, taken

20     pursuant to the Federal Rules of Civil

21     Procedure and Notice, held at the

22     above-mentioned time and place before Arlene

23     Sarica and Patricia Wor, Notaries Public of

24     the State of New York.

25

ORIGINAL

```
 1
 2    A P P E A R A N C E S:
 3         THOMPSON, WIGDOR & GILLY, LLP
                  Attorneys for Plaintiffs
 4                85 Fifth Avenue
                  New York, New York 10003
 5         BY:    ANDREW S. GOODSTADT, ESQ.
                  ARI GRAFF, ESQ.
 6
           RIVKIN, RADLER, LLP
 7                Attorneys for Defendants
                  Incorporated Village of Ocean
 8                Beach, Joseph C. Loeffler,
                  Natalie K. Rogers and Ocean Beach
 9                Police Department
                  926 RexCorp Plaza
10                Uniondale, New York 11556
           BY:    KENNETH NOVIKOFF, ESQ.
11                MICHAEL WELSCH, ESQ.
12
13         BEE, READY, FISHBEIN,
           HATTER & DONOVAN, LLP
14                Co-Counsel for Defendant
                  Incorporated Village of Ocean
15                Beach
                  170 Old Country Road
16                Mineola, New York 11501
           BY:    KENNETH A. GRAY, ESQ.
17
           LAW OFFICES of MARKS, O'NEILL,
18         O'BRIEN & COURTNEY, P.C.
                  Attorneys for Defendant
19                George B. Hesse
                  530 Saw Mill River Road
20                Elmsford, New York 10523
           BY:    KEVIN W. CONNOLLY, ESQ.
21
22
23
24
25
```

```
 1
        A P P E A R A N C E S: (CONTINUED)
 2
              SUFFOLK COUNTY DEPARTMENT OF LAW
 3                    Attorneys for Defendants
                      Suffolk County, Suffolk County
 4                    Police Department, Suffolk County
                      Department of Civil Service, and
 5                    Alison Sanchez
                      H. Lee Dennison Building
 6                    100 Veterans Memorial Highway
                      Hauppauge, New York 11788
 7          BY:   ARLENE S. ZWILLING, ESQ.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2              IT IS HEREBY STIPULATED AND

 3    AGREED by and among counsel for the

 4    respective parties hereto, that the filing,

 5    sealing and certification of the within

 6    deposition shall be and the same are hereby

 7    waived;

 8              IT IS FURTHER STIPULATED AND

 9    AGREED that all objections, except to the

10    form of the question, shall be reserved to

11    the time of the trial;

12              IT IS FURTHER STIPULATED AND

13    AGREED that the within deposition may be

14    signed before any Notary Public with the

15    same force and effect as if signed and sworn

16    to by the Court.

17              IT IS FURTHER STIPULATED AND

18    AGREED that counsel for the witness examined

19    herein shall be furnished with a copy of the

20    within deposition without charge.

21

22

23

24

25
```

1

2          (Complaint was premarked as

3     Defendant's Exhibit-1 for

4     identification; 9-9-08, A.S.)

5          THE VIDEOGRAPHER:  This is tape

6     number one of the videotaped deposition

7     of Joseph Nofi, in the matter of Edward

8     Carter, et al, the plaintiffs, versus

9     Incorporated Village of Ocean Beach, et

10    al, defendants, in the United States

11    District Court, Eastern District of New

12    York, on September 9, 2008 at

13    approximately 10:31 a.m.

14         My name is Albert Santana from

15    the firm of Precise Court Reporting.

16    I'm the legal video specialist.  The

17    court reporter is Arlene Sarica in

18    association with Precise Court

19    Reporting.

20         For the record, would counsel

21    please introduce themselves.

22         MR. NOVIKOFF:  For all of the

23    defendants except defendant Hesse and

24    the Suffolk County defendants, Ken

25    Novikoff and Michael Welsch from the

                    Precise Court Reporting
          (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                     J. Nofi

 2           law firm of Rivkin, Radler and Ken Gray

 3           of --

 4                MR. GRAY:   Bee, Ready, Fishbein,

 5           Hatter and Donovan, village attorney of

 6           Ocean Beach.

 7                MR. CONNOLLY:   Kevin Connolly of

 8           Marks, O'Neill, O'Brien and Courtney

 9           for the defendant Hesse.

10                MS. ZWILLING:   Assistant Town

11           Attorney Arlene Zwilling, for Suffolk

12           County Attorney Christine Malafi, for

13           the defendants Alison Sanchez, Suffolk

14           County, Suffolk County Police

15           Department and Suffolk County

16           Department of Civil Service.

17                MR. GOODSTADT:   Andrew Goodstadt

18           along with Ari Graff from Thompson,

19           Wigdor and Gilly representing the

20           plaintiffs.

21                THE VIDEOGRAPHER:   Now, would

22           the court reporter please swear in the

23           witness.

24      J O S E P H   N O F I, having first been

25      duly sworn by a Notary Public of the State
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2    of New York, was examined and testified as

 3    follows:

 4    EXAMINATION BY

 5    MR. NOVIKOFF:

 6         Q.    Good morning, Mr. Nofi, my name

 7    is Ken Novikoff.

 8         A.    It's Nofi.

 9         Q.    Nofi, sorry.

10              I'm going to be asking you a

11    series of questions today.  To the extent

12    you don't understand my questions, please

13    feel free and advise me and I will try to

14    rephrase them in such a way that you can

15    better understand them.

16              You are obviously free at any

17    point in time of this deposition, and as

18    many times as you want, to consult with your

19    counsel.  The only thing I would ask you is

20    not to consult with your counsel while

21    there's a question pending.  Just answer the

22    question.  Obviously if your lawyer

23    instructs you not to answer, then we will

24    deal with that situation, if it may occur.

25              Do you recall having your
```

```
 1                     J. Nofi

 2    deposition taken prior to today concerning

 3    any issues that were raised in the lawsuit

 4    filed by you against my client?

 5         A.    I think there was a deposition

 6    taken like a long time ago with that office.

 7         Q.    Okay, is that the only time you

 8    recall being deposed prior to today

 9    concerning any issues in your lawsuit that

10    you brought against the village?

11         A.    You mean talking to a lawyer like

12    this?

13         Q.    Yes, with a court reporter under

14    oath?

15         A.    Yes.

16         Q.    And you were under oath at that

17    time?

18         A.    Yes, sir. I wasn't sure what it

19    was about actually, the whole thing but,

20    yes.

21         Q.    If I said it was a 50h

22    deposition, would that refresh your

23    recollection as to what it was about?

24         A.    I think that's what it was, yes.

25         Q.    And, again, I think I may have
```

```
 1                    J. Nofi

 2     asked you this, you testified under oath at

 3     that time?

 4          A.    Yes.

 5          Q.    And everything you answered

 6     during that deposition was true and

 7     accurate, to the best of your recollection?

 8          A.    To the best of my recollection,

 9     from understanding the questions I was

10     asked.

11          Q.    And do you recall filing a

12     lawsuit in the case that brings you here

13     today for your deposition?

14          A.    Yes.

15          Q.    Do you recall reviewing the

16     complaint prior to it being filed with the

17     court?

18          A.    I don't understand the question.

19          Q.    Okay, I'm going to show you

20     what's been premarked as Defendant's 1, and

21     I represent to you as an officer of the

22     court that this is a true and accurate copy

23     of the complaint that was filed in this

24     matter on your behalf by your attorneys

25     against, among others, the Village of Ocean
                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                      J. Nofi

 2    Beach.

 3         A.   Okay, yes.

 4         Q.   Do you recall seeing this

 5    complaint prior to today?

 6         A.   It looks like I have, yeah.  I'm

 7    not 100 percent sure.  It looks like the

 8    same thing.

 9         Q.   Well, would you need to review

10    the document?

11         A.   Yes, can I look at them?

12         Q.   Yes, please do.

13         A.   This looks like the same thing.

14    I did see this, yes.

15         Q.   Well, just so the record is

16    clear, is this, to the best of your

17    recollection, is this a true and accurate

18    copy of the complaint that you authorized

19    your attorney to file on your behalf?

20         A.   Yes, it looks like it, yes.

21         Q.   Okay, and was your attorney that

22    you authorized Mr. Goodstadt who's sitting

23    here today?

24         A.   Yes.

25         Q.   Prior to the filing of this
```

```
 1                      J. Nofi

 2    complaint --

 3              MR. NOVIKOFF:  Withdrawn.

 4        Q.   When did you retain Mr. Goodstadt

 5    to be your attorney, and I don't want to

 6    know any conversations that you had with

 7    him, all I want to know is when did you

 8    retain Mr. Goodstadt to represent you?

 9              MR. GOODSTADT:  I just want to

10         instruct you that, as Mr. Novikoff

11         said, don't disclose anything that was

12         stated between myself or my firm and

13         yourself, just tell him the time

14         period, that's all he's looking for.

15        A.   After we got -- after I got let go

16    for budget cuts.

17        Q.   I understand that.  Now let's --

18    you say you were let go, we have a different

19    characterization.  Let's just use April 2nd

20    as the date in which Mr. Hesse made certain

21    comments to you concerning your employment

22    at Ocean Beach.

23              Can you agree with me that April

24    2nd is the date that Mr. Hesse told you that

25    you were not going to work for Ocean Beach
```

```
 1                     J. Nofi

 2     anymore, is that correct?

 3          A.    That's not what he told me

 4     though.

 5          Q.    Let's use April 2nd then as the

 6     date.

 7                In relation to April 2, 2006,

 8     when did you retain Mr. Goodstadt?

 9          A.    Shortly after, I believe.  I

10     don't know, I'm not 100 percent sure, I

11     don't remember.

12          Q.    When you say "shortly after," you

13     are talking days, weeks, months?

14          A.    I'm not sure.  Maybe a couple of

15     months maybe.  I'm not sure, I don't

16     remember.

17          Q.    Okay, but it's within a two-month

18     time period?

19          A.    I'm not sure.  I really can't

20     answer, I don't remember.

21          Q.    Do you have any documents in your

22     possession, custody or control that would

23     refresh your recollection as to when you

24     retained Mr. Goodstadt?

25          A.    Not on me, no.
```

```
 1                        J. Nofi

 2        Q.    No, when I say that I mean in

 3   your house, in any folder?

 4        A.    I don't know.

 5        Q.    Did you execute a retainer

 6   agreement with Mr. Goodstadt or his office?

 7        A.    I guess, I'm not really sure what

 8   a retainer is.

 9        Q.    Well, did Mr. Goodstadt send you

10   a letter saying you hereby authorize me and

11   my office to represent you in this lawsuit?

12        A.    Yes.

13        Q.    Okay, and did you retain a copy

14   of that?

15        A.    I might have it.  I would have to

16   look for it.  I'm not 100 percent sure.

17   RQ          MR. NOVIKOFF:    I call for

18          production of that letter, only to the

19          extent that it shows the date, it shows

20          his signature, if it's set forth on

21          that document, and it shows that it

22          went to you and your office.  I don't

23          need to see anything in between that,

24          or we can stipulate to the date you

25          were retained.  You can take it under
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                        J. Nofi

 2          advisement.

 3                  MR. GOODSTADT:    I will take that

 4          under advisement.

 5                  MR. NOVIKOFF:    That's all I'm

 6          calling for.

 7                  MR. GOODSTADT:    Usually my

 8          practice is to follow up with a written

 9          request.

10                  MR. NOVIKOFF:    That's fine,

11          how ever you want to do it.

12                  MR. GOODSTADT:    We'll do it that

13          way.

14                  MR. NOVIKOFF:    Or better still,

15          in addition to that, let's leave a

16          space in the transcript and please

17          review that document and tell me when

18          you retained Mr. Goodstadt.

19   INSERT:

20          A.    You want me to look, if I have

21   the paper at home?

22          Q.    Yes, and if you find the paper at

23   home, we are leaving a space in the

24   transcript, and you just fill in the

25   transcript when you receive it as to the
```

1                         J. Nofi

2      date in which you retained Mr. Goodstadt.

3               MR. GOODSTADT:   Just mark the

4          record my objection to that request.

5          Q.    Let's look at Defendant's Exhibit

6      1 again.  When you reviewed this, did you

7      review it for accuracy?

8          A.    Yes.

9          Q.    And it was important that

10     everything that was set forth in there at

11     least to your knowledge was true, correct?

12         A.    Yes.

13         Q.    You knew this was going to be

14     filed in federal court, correct?

15         A.    Yes.

16         Q.    And you knew that the allegations

17     that were set forth in here were going to be

18     the basis of your lawsuit against the

19     village and other defendants?

20         A.    Yes, to the best of my knowledge,

21     yes.

22         Q.    And would you agree with me, to

23     the extent that you saw something in an

24     allegation as it pertained to you, that was

25     not accurate, you would have notified your
                    Precise Court Reporting
          (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2    attorney and told him as such?

 3              MR. GOODSTADT:   Objection.  You

 4         can answer.

 5         A.   I didn't get the question.

 6         Q.   Fine, sir.  Would you agree with

 7    me that, to the extent in your review of the

 8    complaint prior to it being filed, if you

 9    saw something that was inaccurate, you would

10    have notified your attorney that something

11    in the complaint was inaccurate to your

12    knowledge?

13         A.   I guess if I didn't notice or

14    understand something I would call him, yes.

15         Q.   Now, I appreciate that answer but

16    that really wasn't my question.

17              We have established, Mr. Nofi,

18    that this was an important document and you

19    reviewed it for accuracy, correct?

20         A.   Right.

21         Q.   Would you agree with me that if

22    you saw something in the complaint that you

23    knew was inaccurate, prior to it being

24    filed, you would have notified Mr.

25    Goodstadt?
```

```
 1                        J. Nofi

 2         A.   Okay, now I got you.  So you are

 3    saying, if I seen something in here and I

 4    didn't think it was accurate I would have

 5    notified him afterwards?

 6         Q.   You would have notified him?

 7         A.   I would have notified him

 8    afterwards is what you are saying?

 9         Q.   No, that's not my question.

10              You reviewed the complaint prior

11    to it being filed in court, correct?

12         A.   Right.

13         Q.   And you reviewed the complaint

14    for accuracy, correct?

15         A.   Right.

16         Q.   Would you agree with me that had

17    you seen an allegation in the complaint that

18    you knew not to be accurate, you would have

19    notified your attorney prior to it being

20    filed, that there was an inaccuracy?

21         A.   I believe I would have, yes.

22         Q.   To your recollection, again

23    without telling me the sum and substance of

24    your conversation with counsel, do you

25    recall ever advising your counsel there was
```

```
 1                          J. Nofi
 2    something in the complaint that was
 3    inaccurate?
 4    DI            MR. GOODSTADT:  Objection, I'm
 5         going to instruct him not to answer the
 6         question.
 7    RL            MR. NOVIKOFF:  Okay, let's mark
 8         that for a ruling.  I don't think
 9         that's protected but I'm not going to
10         fight with you for ten minutes on that.
11         Q.    Let's turn to page 25.  I'm going
12    to refer your attention to paragraph 112.
13    Do you see that?
14         A.    Yes.
15         Q.    It's the bottom paragraph and it
16    goes into page 26.
17         A.    It goes from 112 to page 26?
18         Q.    It goes from 25 to 26, paragraph
19    112.  I'm just going to read it into the
20    record, the first two sentences.  Hesse's
21    concerted and unlawful retaliatory efforts
22    did not end in the State of New York.
23    Specifically, Officer Nofi was denied a law
24    enforcement job in Florida as deputy sheriff
25    for Collier County due to malicious and
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                         J. Nofi
 2      false references from Hesse.
 3                  Do you see that?
 4           A.     Yes.
 5           Q.     Okay, when did you first apply
 6      for the job in Collier County?
 7           A.     I think a couple of months
 8      afterwards.
 9           Q.     After April 2nd?
10           A.     Yes.
11           Q.     Okay, are you certain as you sit
12      here today that it was a couple of months
13      afterwards?
14           A.     I'm not 100 percent sure but I
15      believe it was, not too long after.
16           Q.     And did there come a point in
17      time that Collier County said that they were
18      not going to hire you?
19           A.     I got a phone call from my
20      investigator stating that he talked to
21      George Hesse and that George Hesse said some
22      things about me and the chief of police
23      Edward Paradiso I called and he stated to me
24      on the phone that he talked to my
25      investigator and he told me that George
```

1                      J. Nofi

2    Hesse said really bad things about me to the

3    investigator.  That's what I was told, and

4    also the statement that I have back from

5    them shows that he said stuff about me in

6    the paperwork.  I don't know if you have it

7    or not.

8    MO          MR. NOVIKOFF:  Motion to strike

9          as not responsive.

10         Q.   My question simply, sir, is did

11   there come a time that Collier County

12   advised you that they were not going to hire

13   you, yes or no?

14         A.   Did they call me and tell me they

15   weren't going to hire me?

16         Q.   Whether they called you, wrote

17   you, threw a rock through your window.

18         A.   I believe it was by phone.

19         Q.   My question is, sir, did there

20   come a time, yes or no, that Collier County

21   advised you that they were not going to hire

22   you?

23         A.   Yes.

24         Q.   And when was that in relation to

25   April 2, 2006?

```
 1                     J. Nofi

 2        A.    How many months after April 2nd?

 3        Q.    Yes.

 4        A.    I don't remember, it's so long

 5   ago.

 6        Q.    Was it in 2006?

 7        A.    Probably 2006 or 2007 it could

 8   have been.

 9        Q.    Now, you just stated in response

10   to a question that you may not remember

11   because it was so long ago.

12              Is it your testimony that your

13   recollection may not be accurate pertaining

14   to events two, three or four years ago

15   because it was so long ago?

16              MR. GOODSTADT:  Objection.

17        A.    No.

18        Q.    But in this instance you're not

19   sure because it was so long ago?

20              MR. GOODSTADT:  Objection.  You

21        asked him about a specific date, he

22        didn't recall, not an event.

23        Q.    Okay, did Collier County ever

24   advise you they could not hire you because

25   of a medical condition?
```

1                        J. Nofi

2          A.    No.  I took a stress test, and

3     then I went back for the dye test and I

4     passed it.

5     MO          MR. NOVIKOFF:  Sir, motion to

6          strike as not responsive.

7          Q.    Did Collier County ever advise

8     you in writing that they were not going to

9     hire you due to a medical condition?

10         A.    I don't believe I seen that, no,

11    I'm not sure.  I think it was by phone, I'm

12    not sure.

13         Q.    After you were advised by Collier

14    County that they were not going to hire you,

15    did you ask for them to review their

16    decision?

17         A.    No, I just -- the investigator

18    called me and he said --

19         Q.    My question to you is just yes or

20    no, sir.

21         A.    Give me the question again.

22         Q.    Fine.

23               After you were advised by Collier

24    County that you were not going to be hired

25    as a deputy sheriff, did you seek to appeal

```
 1                      J. Nofi

 2      or ask Collier County to review their

 3      decision?

 4          A.     I don't think it came down to

 5      review, I just asked them why and they told

 6      me why.  That's what they said.

 7               MR. GOODSTADT:    Just focus on

 8          the question he's asking.

 9          Q.     To your knowledge did your lawyer

10      Mr. Goodstadt send a letter to Collier

11      County asking them to explain certain

12      reasons behind not hiring you?

13          A.     No.  I asked him to send me the

14      records myself.

15          Q.     My question to you, sir, are you

16      aware as to whether or not Mr. Goodstadt

17      sent a letter to Collier County asking them

18      to explain the basis for certain reasons for

19      them not hiring you?

20          A.     I might have asked him.

21          Q.     But you're not sure?

22          A.     I think, I'm pretty sure, I did

23      ask him, yeah, if I remember right.

24          Q.     So, now, let's go to the second

25      sentence that I read in paragraph 112.
```

```
 1                         J. Nofi

 2                 You refer to malicious and false

 3      references from Hesse, do you see that?

 4          A.      Where is that?

 5          Q.      Paragraph 112, second sentence,

 6      you make reference --

 7          A.      I don't have no malicious.  112,

 8      page 25?

 9          Q.      Turn to the next page, sir.

10          A.      You said 25.

11          Q.      You see on the top line it says

12      due to malicious and false references from

13      Hesse?

14          A.      Yes.

15          Q.      Now, you said you received that

16      at some point in time documentation from

17      Collier County that referred to Mr. Hesse.

18      Do you recall that?

19          A.      Yes.

20          Q.      When did you receive that

21      documentation?

22          A.      After the phone call I called

23      back Collier County and asked them to send

24      me the records.

25          Q.      And did they send you the
```

```
 1                     J. Nofi

 2   records?

 3       A.    Yes, they did.

 4       Q.    When did they send the records to

 5   you?

 6       A.    A couple of days later, came in

 7   the mail.

 8       Q.    What year are we talking about?

 9       A.    2006.

10       Q.    So it would have been prior to

11   you filing this lawsuit, is that correct?

12       A.    After the filing of the lawsuit?

13       Q.    Did you receive the documents

14   from Collier County prior to the filing of

15   the lawsuit?

16       A.    After the lawsuit you mean,

17   correct?

18       Q.    No, my question to you, sir, is

19   did you receive the documentation from

20   Collier County prior to filing this lawsuit?

21       A.    Is that before or after is what

22   I'm asking you, before the lawsuit?

23       Q.    Okay, I'll rephrase the question.

24       A.    Okay.

25       Q.    Sir, did you receive the
                     Precise Court Reporting
         (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                    J. Nofi
 2    documents from Collier County before or
 3    after --
 4         A.   After.
 5         Q.   -- filing this lawsuit?
 6         A.   After.
 7         Q.   How long after?
 8         A.   2006, I'm not sure of what date.
 9         Q.   Do you know when you filed this
10    lawsuit?
11         A.   Yes.
12         Q.   When did you file this lawsuit?
13         A.   I think like just right after we
14    got let go.
15         Q.   So you filed this lawsuit March
16    21, 2007, that's almost a year after you got
17    let go.
18         A.   Okay.
19         Q.   You just testified, at least to
20    your recollection, you received the
21    documents in 2006.  So, I'm going to ask you
22    the question so maybe we can clarify the
23    record.
24              When did you receive the
25    documents from Collier County that you
                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                     J. Nofi
 2     requested, was it before or after you filed
 3     this lawsuit on March 21, 2007?
 4         A.    I don't remember.
 5         Q.    You don't remember now?
 6         A.    I don't recall.  I thought it was
 7     after, it was before, I really don't know. I
 8     would have to look at the paperwork to tell
 9     you.
10         Q.    Do you still have those documents
11     in your possession?
12         A.    I might have them, yes.
13         Q.    Would there have been any reason
14     that you would have thrown them out?
15         A.    No.
16         Q.    So, any reason that you think
17     that they would be lost?
18         A.    Yes.
19         Q.    Why?
20         A.    Because my daughter moved back
21     with her husband, because he came back from
22     Florida to New York, and we started moving
23     rooms all around.  He took up the upstairs
24     and all the stuff from upstairs we put in
25     the basement in boxes so I would have to
                  Precise Court Reporting
         (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                         J. Nofi

 2    look for it.

 3         Q.    But the Collier County documents

 4    are pretty important?

 5         A.    Yes, they are.

 6         Q.    So you would agree --

 7         A.    I would have to look.

 8         Q.    You would agree with me those are

 9    documents that you would be concerned about

10    keeping in tact and not losing them,

11    correct?

12         A.    Yes.

13         Q.    Okay, do you recall producing

14    documents to your attorney that were

15    requested by the various defendants in this

16    case pertaining to the issues in this

17    lawsuit?

18         A.    Yes.

19         Q.    Do you recall producing those

20    Collier County documents to your attorney?

21         A.    Yes, I think he has copies.

22         Q.    Okay, from you?

23         A.    From me, yes.

24         Q.    Now, did you ever see a document

25    that referenced George Hesse making a
```

```
 1                    J. Nofi

 2   malicious or false reference about you from

 3   Collier County?

 4       A.    Yes, I seen a copy.

 5       Q.    My question is yes or no.

 6       A.    Yes.

 7       Q.    Did you ever see a document from

 8   Collier County referring to a false or

 9   malicious reference from Mr. Hesse?

10       A.    Let me rephrase that, let me ask

11   you a question.

12       Q.    No, sir, I ask the questions.  If

13   you don't understand my questions, then tell

14   me and I'll be happy to rephrase it.

15       A.    Now, malicious, do you mean by

16   malicious, does that mean in the boxes where

17   he asked for references and he just crosses

18   out, is that malicious?

19       Q.    I don't know.  You wrote the word

20   malicious in the complaint, what do you mean

21   by the word malicious as you use it in

22   paragraph 112, sir?

23            MR. GOODSTADT:   Objection.

24       Q.    What is your understanding of the

25   word malicious as it's used in paragraph
```

1          J. Nofi

2     112?

3          A.    When someone says something about

4     you and writes something about you and

5     doesn't fill in the boxes and writes in

6     that's he's suing us for whatever.  I think

7     that's malicious.

8          Q.    Okay, what boxes are you

9     referring to?

10         A.    In the investigation, when I got

11    investigated, there's boxes for references

12    where they ask you, you know, was he a good

13    police officer, was he a good worker, so on

14    and so on.  He just crossed out everything

15    and didn't answer anything and then wrote on

16    the bottom.

17         Q.    What did he write on the bottom,

18    sir?

19         A.    This officer is suing the Village

20    of Ocean Beach and myself, George Hesse.

21         Q.    Isn't it true, sir, that Mr.

22    Hesse wrote on that document that you're

23    referring to that he can't answer any

24    questions concerning you because there was a

25    lawsuit?

                Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                          J. Nofi

 2          A.    Yes, after he wrote the other

 3    stuff first on the bottom.

 4          Q.    What stuff?

 5          A.    What I just told you.

 6          Q.    That you're suing him?

 7          A.    Yes.

 8          Q.    And the Village?

 9          A.    And he crossed everything else

10    off.

11          Q.    The document that you are

12    referring to, that you believe is malicious,

13    was a document wherein Mr. Hesse crossed out

14    the boxes?

15          A.    Uh-huh.

16          Q.    Wrote that you were suing the

17    village and him, yes?

18          A.    Yes.

19          Q.    And that he could not answer any

20    questions concerning you because of the

21    lawsuit?

22          A.    Yes.  Also --

23          Q.    No, no, so we're on that

24    document.

25          A.    Okay.
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                       J. Nofi

 2        Q.    Was there anything else on that

 3   document that you can recall that you

 4   believe was malicious?

 5        A.    I just told you.

 6        Q.    I know you said he crossed out

 7   boxes, he wrote that you were suing him.

 8        A.    Not crossed out the boxes, put a

 9   line right through the whole thing.

10        Q.    That you were suing him and the

11   village, right?

12        A.    Yes.

13        Q.    And that he couldn't answer the

14   questions about you because of the lawsuit,

15   right?

16        A.    I think I seen that part of it.

17        Q.    So, now, my question to you, sir,

18   is very simple, other than those three

19   instances that you believe were malicious,

20   was there anything else on that particular

21   document that you can recall being

22   malicious?

23        A.    No, just the phone calls.

24        Q.    Okay, but we're only on this

25   document now, right.
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                          J. Nofi
 2                  Now, the lawsuit, the fact that
 3        you sued the village, was true, right?
 4            A.   Uh-huh.
 5            Q.   And Mr. Paradiso was also
 6        contacted by Collier County, correct?
 7            A.   Yes.
 8            Q.   And isn't it true that
 9        Mr. Paradiso also told Collier County that
10        you and other plaintiffs were suing the
11        village?
12            A.   I don't know if he told them
13        that, I believe he did.
14            Q.   On a document?
15            A.   I believe so, yes.
16            Q.   So you recall seeing a document
17        from Collier County where it's referenced
18        Mr. Paradiso advised them that you were
19        suing the village, correct?
20            A.   Yes.
21            Q.   Okay, did you think that was
22        malicious?
23            A.   No, because he didn't say nothing
24        on the phone to them.
25            Q.   I'm only talking about the
                        Precise Court Reporting
             (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                      J. Nofi

 2    document, sir.

 3         A.     I understand but I'm telling you

 4    what he said on the phone.

 5         Q.     Mr. Nofi, the question is, do you

 6    believe that what Mr. Paradiso wrote on that

 7    document, according to Collier County,

 8    concerning you suing the village was

 9    malicious?

10         A.     No, because he didn't cross out

11    the line and wrote everything good about me

12    in it, it's a big difference.

13         Q.     Did Hesse write anything bad

14    about you on that document that you can

15    recall?

16         A.     Absolutely, he crossed everything

17    out.  So what do you think that means?

18         Q.     Okay, so the fact that he crossed

19    everything on that document out, you

20    interpret it as being bad?

21         A.     And so did they.

22         Q.     What do you mean so did they?

23         A.     The investigator of Collier

24    County.

25         Q.     And what's the investigator's
```

```
 1                          J. Nofi

 2      name?

 3           A.    Donaho, Officer Donaho.

 4           Q.    Officer Donaho?

 5           A.    Yes, sir.

 6           Q.    And when did you speak to Officer

 7      Donaho?

 8           A.    On the phone, 2007.

 9           Q.    2007, okay.

10           A.    Now that you refreshed my

11      recollection.

12           Q.    Did Mr. Donaho advise you

13      according to Collier County you failed the

14      lie detector test?

15           A.    I never failed any lie detector,

16      they never advised me of that.

17           Q.    Never advised you?

18           A.    No.  I was told I passed the lie

19      detector test.

20           Q.    Who told you that?

21           A.    And the psychological.

22                 The lie detector person, who took

23      the lie detector test.

24           Q.    He did?

25           A.    Yes, he did, and also I passed
```

```
 1                          J. Nofi

 2     the psychological.

 3         Q.    Did you receive any documents

 4     from Collier County concerning your lie

 5     detector test?

 6         A.    Nope, absolutely not.

 7         Q.    Do you recall receiving any

 8     other --

 9              MR. NOVIKOFF:  Withdrawn.

10         Q.    Do you recall seeing any other

11     documents from Collier County concerning

12     Mr. Hesse's statements about you?

13         A.    No.

14         Q.    You make reference to the fact in

15     the third sentence, now we are on page 26,

16     in fact, this is what you write, not only

17     did Hesse provide an unfavorable reference,

18     but he explicitly told the investigator in

19     Florida that Officer Nofi had filed a

20     lawsuit against him.

21         A.    Correct.

22         Q.    Okay, what do you mean by an

23     unfavorable reference?

24         A.    An unfavorable reference?

25         Q.    Yes, as it's used in paragraph
```

```
 1                          J. Nofi

 2      112.

 3               MR. GOODSTADT:   Objection.   You

 4          can answer.

 5          A.    I would say it wasn't a good

 6      reference.

 7          Q.    Okay, why wasn't it a good

 8      reference?

 9          A.    Because if I sent you documents,

10      okay, and say you sent me papers and I was

11      your boss, for a job, and they asked me more

12      questions and I just went sha and that, you

13      now put that down on the bottom, what do you

14      think that would mean?

15          Q.    That is what you believe

16      unfavorable reference means?

17          A.    Yes, also with the phone calls.

18          Q.    Then you write but he explicitly

19      told the investigator in Florida that

20      Officer Nofi had filed a lawsuit against

21      him, do you see that?

22          A.    Yes.

23          Q.    And is the investigator that's

24      being referred in this case Officer Donaho?

25          A.    Yes.
```

```
 1                         J. Nofi
 2         Q.    Is there anything else, is there
 3    any other reference in this complaint to
 4    your knowledge -- well, let's go back to
 5    page 25, okay, sir.
 6                Starts off by saying Hesse
 7    unlawfully interferes with plaintiffs
 8    efforts to obtain new employment. Do you
 9    see that, top of page 25?
10         A.    106 you mean?
11         Q.    Yes, but there's a title there,
12    do you see that?
13         A.    Okay, yes.
14         Q.    And then you go onto page 25, you
15    go on page 26 and you end at the top of page
16    27, do you see that?
17         A.    Yes.
18         Q.    Now, let's go back to paragraph
19    112. You allege in paragraph 112, page 26
20    that Hesse explicitly told the investigator
21    in Florida that Officer Nofi had filed a
22    lawsuit against him, do you see that?
23         A.    Uh-huh.
24         Q.    Okay, is there any other
25    reference between paragraph 106 and
```

```
 1                         J. Nofi

 2      paragraph 115 to what Mr. Hesse explicitly

 3      told Officer Donaho concerning Collier

 4      County?

 5              MR. GOODSTADT:   Objection, the

 6          document speaks for itself.

 7              MR. NOVIKOFF:   That's fine, you

 8          can answer.

 9              MR. GOODSTADT:   You can read it

10          and answer it.

11      Q.   Please do.

12      A.   So you want me to read from 113

13      all the way to 115?

14              MR. GOODSTADT:   I think he

15          said --

16      Q.   106 to --

17      A.   You want me to read 106 to what?

18      Q.   To 115, and tell me if there's

19      any other reference in these paragraphs

20      concerning what Mr. Hesse may or may not

21      have explicitly told the investigator in

22      Collier County.

23              MR. GOODSTADT:   Objection.

24              MR. NOVIKOFF:   I understand.

25      A.   You want me to go to the top of
```

```
 1                          J. Nofi

 2    page 27 too?

 3         Q.    If that's where it ends, yes.

 4         A.    Yes, finished.

 5         Q.    So now my question, sir, is there

 6    any other reference between 106 and 115

 7    wherein you identify what Hesse explicitly

 8    told the investigator in Florida other than

 9    the fact that you had filed a lawsuit

10    against him?

11              MR. GOODSTADT:   Objection, the

12         document speaks for itself.

13         A.    The phone calls.

14         Q.    Sir, that's not my question.

15    You've taken the opportunity to review 106

16    through 115.

17         A.    Right.

18         Q.    My question to you, sir, is there

19    anything within those paragraphs that you've

20    just read other than you alleging that Hesse

21    told the investigator in Florida that you

22    were suing him, that refers to any other

23    explicit comments made by Hesse to the

24    investigator?

25              MR. GOODSTADT:   Objection.
```

```
 1                         J. Nofi
 2         A.    Not in this, it doesn't show.
 3         Q.    And this is an important document
 4    to your case, correct?
 5               MR. GOODSTADT:  Objection.
 6         A.    Yes.
 7         Q.    In fact this is the most
 8    important document because this is the
 9    complaint that you filed, sir?
10               MR. GOODSTADT:  Objection.
11         Q.    Yes?
12               MR. GOODSTADT:  Objection.
13         Q.    Can't answer it?
14         A.    I can answer it, yes.
15         Q.    The answer is yes, and you would
16    want to make sure that if there was
17    something that was said by Mr. Hesse that
18    you believe was malicious it would have been
19    in here, correct?
20               MR. GOODSTADT:  Objection.
21         Q.    Yes?
22         A.    I would like to answer it as the
23    way it was written, I guess, there's things
24    I didn't understand when I was asked
25    questions, but the thing I should have put
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2    in with the phone calls, is that what you

 3    are telling me?

 4         Q.    I'm not telling you anything,

 5    sir, I just asked you a question.

 6         A.    He did a lot more than that, yes.

 7         Q.    It's not in the complaint, is it?

 8         A.    Yes.

 9         Q.    Okay, so let's talk about the

10    phone call.

11         A.    Okay, go ahead.

12         Q.    Mr. Donaho told you that

13    Mr. Hesse made certain comments?

14         A.    Yes.  He told me that he spoke --

15         Q.    All right, I didn't ask the

16    question yet.

17                When did you have that

18    conversation with Mr. Donaho?

19         A.    After everything, when I came

20    back from Florida in 2007, whatever.

21         Q.    What do you mean when you came

22    back from Florida?

23         A.    I went down there.

24         Q.    To do what?

25         A.    To get tested and everything
```

```
 1                          J. Nofi

 2     else, waste of my time and everything to go

 3     down there, a lot of money.

 4          Q.    You said it was a waste of your

 5     time?

 6          A.    Because what happened when I came

 7     back, and I found out that was written about

 8     me and told about me by Chief Paradiso.

 9          Q.    Chief Paradiso told you?

10          A.    Yes, and he also explained to me

11     that it was Chief Hesse and I told him Chief

12     Hesse was not a chief at that time.

13          Q.    We'll get into what Mr. Hesse's

14     duties were.

15                I'm guess what I'm trying to

16     figure out, sir, is when did you have this

17     purported conversation with Inspector

18     Donaho?

19          A.    Investigator Donaho.

20          Q.    Investigator Donaho.

21          A.    When did I have this conversation

22     with him?

23          Q.    Yes, this verbal conversation.

24          A.    When I get back home.

25          Q.    And when was that?
```

1                              J. Nofi

2          A.    2007.  You told me 2007, that's

3     when it must have been.

4          Q.    I didn't tell you anything.

5                Do you have any documents in your

6     possession, custody or control that would

7     refresh your recollection?

8          A.    If I find them at home, yes.  If

9     I got them at home, yes.

10         Q.    And what would those documents

11    be?

12         A.    What you just told me two seconds

13    ago when you opened the page, it said 2007,

14    you told me.

15         Q.    I'm showing you the document,

16    sir, does that refresh your recollection as

17    to when you had this conversation with

18    Mr. Donaho?

19         A.    Not in here it doesn't, no.

20         Q.    Well, what document do you recall

21    being in your possession that would refresh

22    your recollection?

23         A.    The ones I got from Florida.

24         Q.    Oh, it was those documents, okay.

25                And how many conversations did

                    Precise Court Reporting
          (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                      J. Nofi

 2     you have with Mr. Donaho?

 3          A.    Two.

 4          Q.    Over the phone?

 5          A.    Two.

 6          Q.    After you got back from Florida?

 7          A.    Yeah, two maybe.

 8          Q.    Who initiated the first call?

 9          A.    I don't remember.

10          Q.    Who initiated the second call?

11          A.    I probably did, I called up Chief

12     Paradiso.

13          Q.    I only care about your

14     conversations with Mr. Donaho, sir.  So

15     let's go back.

16                How many conversations did you

17     have with Mr. Donaho after you came back

18     from Florida?

19          A.    I don't know, two, three.

20          Q.    Oh, it could be three now?

21          A.    Two or three.

22          Q.    Were they on the cell phone?

23          A.    No, my house phone.

24          Q.    What call plan do you use,

25     Verizon, Cablevision?
```

```
 1                    J. Nofi

 2         A.   Cablevision.

 3    RQ          MR. NOVIKOFF:   Okay, I call for

 4         the production of the Cablevision phone

 5         records that would reflect, to the

 6         extent they exist, phone calls to

 7         Collier County, Florida.

 8              MR. GOODSTADT:    Take it under

 9         advisement.

10              MR. NOVIKOFF:   Sure.

11         Q.   How long was this first

12    conversation?

13         A.   Ten minutes.

14         Q.   Where were you?

15         A.   In my house.

16         Q.   Where in your house?

17         A.   In the living room.

18         Q.   Okay, and what was the purpose of

19    the phone call?

20         A.   To find out what was going on.

21         Q.   You hadn't been told yet that you

22    were not going to be hired?

23         A.   I was never told I wasn't going

24    to be hired.

25         Q.   So you were calling to find out?
```

```
 1                         J. Nofi

 2          A.    To find out what was going on,

 3    yes.

 4          Q.    And how did you know to talk to

 5    Mr. Donaho?

 6          A.    Because he's my investigator.  He

 7    told me to call him whenever I wanted to.

 8    He gave me his card.

 9          Q.    Do you still have his card?

10          A.    I might have it at home, yes.

11   RQ          MR. NOVIKOFF:  Call for the

12          production of Mr. Donaho's card.

13              MR. GOODSTADT:  Take that under

14          advisement.

15          Q.    What did you ask Mr. Donaho --

16              THE WITNESS:  What about the

17          phone calls between them two?

18              MR. GOODSTADT:  Just answer the

19          question.

20              THE WITNESS:  Okay.

21          Q.    What did you ask Mr. Donaho, if

22    anything, in this first conversation?

23          A.    What did I ask him?

24          Q.    Yes, if anything.

25          A.    I asked him basic stuff what you
```

```
 1                         J. Nofi

 2      ask investigators, how's it going, is there

 3      anymore information, am I getting the job,

 4      and he told me that --

 5           Q.    Wait, we are not there yet.

 6                 What else did you ask him?

 7           A.    I asked him how everything was

 8      going.  He said right now everything is

 9      going good and that everybody he called was

10      excellent references, that he stated who

11      they called, who they call up to investigate

12      on, and I had seven people call me and tell

13      me I had the job 100 percent.

14           Q.    Seven people called you?

15           A.    Yes.

16           Q.    Who were they?

17           A.    People that he called up and

18      asked about, you know, my background, all

19      that kind of stuff.

20           Q.    So the seven people that you

21      called -- I'm sorry, so that the seven

22      people that told you that you had the job

23      100 percent?

24           A.    After they got off the phone with

25      him.
```

```
 1                        J. Nofi

 2        Q.    Did not work for Collier County?

 3        A.    No.

 4        Q.    They were your references?

 5        A.    Yes.

 6        Q.    Who were they?

 7        A.    I don't remember all the names.

 8  I got to say all the names now?

 9        Q.    If you can recall them.

10        A.    People I work with.

11        Q.    If you can recall them, sir,

12  answer, if you can't you can't.

13        A.    My boss.

14        Q.    Doesn't help me.

15        A.    Lloyd Benacasa; another lady I

16  work with and I don't know her last name,

17  Moran, she got married; Dennis Flynn; Eric

18  Paradiso, I believe it was too; Mark

19  Interante; Walter Going, Walter Going, who

20  else?  Bob Morshoff, I don't know how to

21  pronounce his last name, he works too with

22  Suffolk County.  That's all I can remember

23  names right now.

24        Q.    And what did Mr. Donaho say to

25  you in this conversation, if anything,
```

```
 1                    J. Nofi

 2    concerning comments made by Mr. Hesse?

 3         A.    I mean you really expect me to

 4    remember?  Sometimes I don't remember what I

 5    ate the next day.  I mean all the way that

 6    far back?  I mean all I know is that he said

 7    something bad about me, because Chief

 8    Paradiso called me up and told me that he

 9    had a bad reference from Donaho.  He just

10    got off the phone with the investigator and

11    he told me he said all this stuff about me.

12              MR. GOODSTADT:  Just answer the

13         question.

14         A.    And he tried to fix the

15    conversation and talked to him and explained

16    to him what was going on.

17         Q.    Paradiso tried to fix the

18    conversation?

19         A.    He talked to my investigator.

20         Q.    Okay, here's my question.

21         A.    Go ahead.

22         Q.    I'm going to ask it again.

23         A.    Go ahead, ask me again.

24         Q.    What did Donaho say to you in

25    this conversation concerning what Mr. Hesse
```

```
 1                    J. Nofi

 2   said about you, if anything?

 3        A.    Just that he talked to him.

 4        Q.    What malicious statement did

 5   Donaho say to you in this first phone

 6   conversation concerning Hesse?

 7        A.    He said to me that he talked to

 8   Hesse.  He said Chief Hesse, or whatever it

 9   was.  I just said as soon as he said that, I

10   said he is not the chief of police, Chief

11   Paradiso was the chief of police, which he

12   was at the time, and he said, oh, because I

13   didn't get a very good, you know, out of him

14   view, whatever, whatever, he spoke to him.

15   He didn't say something malicious, he just

16   said what was said wasn't good, and I told

17   him to please contact Chief Paradiso and

18   talk to him, and that's it.

19        Q.    Did Donaho tell you specifically

20   what Hesse said?

21        A.    Of course not.  He just said it

22   in a round about way, a nice way.  He's not

23   going to tell me, he's my investigator.

24        Q.    He just said to you that Hesse

25   didn't give you a favorable?
```

```
 1                        J. Nofi
 2         A.    Not, just around it, just in a
 3   round about way.
 4         Q.    What did he say?
 5         A.    Trying to remember, it wasn't
 6   good, it wasn't good.
 7         Q.    How about the second conversation
 8   that you say you may have had with
 9   Mr. Donaho?
10         A.    Yes.
11         Q.    Did Mr. Donaho advise you as to
12   what Mr. Hesse said during any conversation?
13         A.    No, he just told me he was going
14   to contact Chief Paradiso, and he did.
15         Q.    Same question in regard to the
16   possible third conversation that you had
17   with Donaho, did Donaho advise you in this
18   conversation as to what Hesse may or may not
19   have said about you?
20         A.    No, just told me he contacted
21   Chief Paradiso and everything was, you know,
22   a lot better then, after he talked to Chief
23   Paradiso.
24         Q.    Okay, and why --
25         A.    He had a much better reference.
```

```
 1                        J. Nofi

 2        Q.   He said Paradiso gave you a much

 3   better reference?

 4        A.   And Paradiso told me he gave me a

 5   very good reference, the truth.

 6   MO        MR. NOVIKOFF:   Move to strike.

 7        Q.   Did Donaho advise you as to what

 8   Paradiso said about you?

 9        A.   No, not that I remember.

10        Q.   Let me just understand, is there

11   anything that would refresh your

12   recollection?

13        A.   No.

14        Q.   Sir, this conversation that you

15   had with Mr. Donaho, you would agree with me

16   is an important conversation, right?

17             MR. GOODSTADT:   Objection.

18        Q.   Right, yes?

19        A.   Yes, I would say so.

20        Q.   You are claiming in this lawsuit

21   that Mr. Hesse defamed you in his

22   communications with Donaho, right?

23        A.   Once again it was a long time

24   ago, it's hard to remember.

25        Q.   You would agree with me, sir,
```

```
 1                          J. Nofi

 2      that as a basis for your claim Mr. Hesse

 3      defamed you by saying malicious things about

 4      you in his communications with Donaho,

 5      right, that is a basis for your claim here?

 6           A.    From the paper I got from Florida

 7      and also from what was in the conversation,

 8      from what I was told.

 9           Q.    Just so I'm clear, sir, you can't

10      tell anyone in this room --

11           A.    Yes, I can, chief told.

12           Q.    You can't tell anybody in this

13      room, sir, what specifically Hesse said

14      about you to Donaho, can you?

15           A.    He didn't say good things, nice

16      things about me.  He said not good things to

17      me.  That is what I was told.  He is not

18      going to tell me what he said.  It just

19      wasn't good, period, it was not good.

20           Q.    Let's look at paragraph 107.  You

21      allege by way of example only Hesse gave bad

22      references and forwarded false information

23      regarding Officers Nofi and Fiorillo to the

24      South Hampton Police Department, thereby

25      directly causing them to lose offers of new
```

                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi

 2    employment with the department.  Do you see

 3    that?

 4         A.   Yes, I do.

 5         Q.   Okay, what false information did

 6    Hesse give to the South Hampton Police

 7    Department?

 8         A.   Okay, I was told by my boss,

 9    okay, in Suffolk County health services, she

10    called me and said I can't believe --

11    MO        MR. NOVIKOFF:  You know what,

12         I'm going to move to strike.  I'm not

13         interested yet in who told who what.

14         Q.   My question to you is --

15         A.   I'm answering your question.

16         Q.   I just want to know specifically,

17    sir, what false information are you aware

18    of, regardless of who it came from, are you

19    aware of that Hesse gave to the South

20    Hampton Police Department about you?

21         A.   Yes.

22         Q.   What was the false information?

23    Don't tell me who said what to whom.

24         A.   I was just told I got a bad

25    reference, that he said bad things about me.
```

```
 1                      J. Nofi

 2        Q.    Were you ever told what

 3   specifically --

 4        A.    No.

 5        Q.    Let me finish the question, sir.

 6              Were you ever told specifically

 7   what Hesse said about you concerning a bad

 8   reference?

 9        A.    No, just that it was bad.

10        Q.    That you were a bad guy?

11        A.    No, just that he said bad stuff

12   about me.   That's what I was told.

13        Q.    So you were told by somebody that

14   Hesse told somebody else bad things about

15   you?

16        A.    Yes.

17        Q.    Who told you that Hesse gave you

18   a bad reference to the South Hampton Police

19   Department?

20        A.    My boss, who is the director of

21   Suffolk County Health Services.

22        Q.    What is your boss' name?

23        A.    Laurie Benicasa, B-E-N-I-C-A-S-O

24   or C-A-S-A.

25        Q.    Did Mr. Benicasa advise you
```

```
 1                          J. Nofi

 2     specifically what Hesse said to someone at

 3     South Hampton?

 4          A.    Yes.

 5          Q.    What did Benicasa say to you?

 6          A.    Her husband works for South

 7     Hampton town, he's the senior building

 8     inspector.

 9          Q.    Whose husband?

10          A.    Her, Laurie Benicasa's husband.

11          Q.    Oh Laurie Benicasa is a woman?

12          A.    Yes, she's a female.  Laurie, I

13     would say so.

14          Q.    I thought you said Lloyd.

15          A.    I said Laurie.

16          Q.    So what did Laurie Benicasa say

17     to you specifically --

18               MR. NOVIKOFF:   Withdrawn.

19          Q.    What specifically, again without

20     telling me who Laurie got it from?

21          A.    Okay.

22          Q.    What specifically did Laurie

23     advise you that Mr. Hesse said bad about

24     you?

25          A.    I just told you, she said that
                   Precise Court Reporting
           (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                    J. Nofi

 2     she got -- she said to me -- she called me

 3     in the office and said I can't even tell you

 4     this because I can't believe I heard

 5     something come back bad about you, but her

 6     husband stated to her that said gave me a

 7     bad reference and said things about me and

 8     that's why I didn't get hired, exact just

 9     like that.

10          Q.    Okay, and when did that

11     conversation take place with Laurie?

12          A.    In the office.  I don't know,

13     when I went for the job, I don't remember.

14          Q.    2007?

15          A.    I don't know.

16          Q.    You don't know?

17          A.    No.

18          Q.    So let me understand this, the

19     linkage that leads up to you.

20                Laurie Benicasa is your boss?

21          A.    Yes.

22          Q.    At where?

23          A.    Suffolk County Health Services.

24          Q.    Okay, she brought you into the

25     office and told you that her husband had a
```

```
 1                        J. Nofi
 2    conversation with whom concerning
 3    Mr. Hesse's reference?
 4         A.    I don't know.
 5         Q.    Okay, well, did Mr. Hesse have
 6    the conversation with Laurie Benicasa's
 7    husband?
 8         A.    No.
 9         Q.    Okay, so Laurie speaks to you,
10    tells you that her husband had a
11    conversation with somebody else wherein her
12    husband learned that Hesse gave you a bad
13    reference?
14         A.    Yes, because her husband works
15    there.  I asked him for a reference to find
16    out if I could get a job at South Hampton --
17    MO          MR. NOVIKOFF:   Motion to
18         strike.
19         Q.    I just want to understand the
20    chain of communications.
21               You had a conversation with
22    Laurie, correct?
23         A.    Yes.
24         Q.    And Laurie told you that her
25    husband had a conversation with someone that
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                         J. Nofi

 2    you don't recall?

 3         A.     He worked for South Hampton town.

 4         Q.     Okay, someone who worked for

 5    South Hampton town?

 6         A.     Yes.

 7         Q.     Who told Laurie's husband that

 8    Mr. Hesse gave you a bad reference?

 9         A.     That is correct.

10         Q.     And you don't know specifically

11    what, if anything, Mr. Hesse said other than

12    the fact that it was a bad reference?

13         A.     She didn't want to tell me.  She

14    just said it was a very bad reference.

15         Q.     But she didn't want to tell you?

16         A.     Of course not.

17         Q.     So you don't know --

18         A.     She said bad.

19         Q.     You don't know specifically what

20    Hesse said?

21         A.     No, just bad stuff.

22         Q.     Let's look at paragraph 110.

23    Upon information and belief Hesse circulated

24    false and malicious negative references

25    concerning plaintiffs among officials
```

```
 1                        J. Nofi

 2    working for the Town of Islip.

 3         A.    Right.

 4         Q.    Does this allegation pertain to

 5    you?

 6         A.    I don't work for the Town of

 7    Islip.

 8         Q.    That's why I'm asking the

 9    question, sir, does this allegation pertain

10    to you?

11         A.    No.

12         Q.    Okay, let's look at paragraph

13    113.  As a result of false, damaging and

14    baseless allegations that have been inserted

15    in  plaintiffs civil service records, do you

16    see that?

17         A.    Yes.

18         Q.    What civil service records are --

19    well, let me ask you the first question,

20    does this allegation pertain to you?

21         A.    Yes.

22         Q.    Okay.

23         A.    Absolutely.

24         Q.    Have you looked at your civil

25    service records --
```

```
 1                      J. Nofi
 2           MR. NOVIKOFF:   I'm sorry,
 3       withdrawn.
 4       Q.   Between the time, between April
 5   2, 2006 and the date that you filed this
 6   complaint, which is March of 2007, did you
 7   ever inspect your civil service records?
 8       A.   I just got something, a
 9   statement, from civil service stating when I
10   was terminated, and that was it.  That's
11   what I looked at.
12       Q.   My question to you, sir, is did
13   you ever undertake an investigation into
14   your civil service records between April 2,
15   2006 and the date you filed this lawsuit?
16       A.   I went there to make a complaint
17   to civil service.
18       Q.   I understand that.
19            Did you look at your civil
20   service records?
21       A.   What do you mean by civil service
22   record?  I don't understand what you're
23   saying.
24       Q.   Did you ask can I look at my
25   file, at any point between April 2nd and the
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi

 2   date you filed this lawsuit?

 3        A.    We went there.  We just talked to

 4   the girl.  No, I don't think I looked at

 5   anything, but that one statement, the one

 6   that said I was terminated.

 7        Q.    Anything else on that document

 8   other than the fact that you were

 9   terminated?

10        A.    Just that it was saying I was

11   terminated in January of '06 but I worked in

12   January '06 and I wasn't told I was

13   terminated.

14        Q.    Other than that one document,

15   well, other than what you just said, was

16   there anything else on that document that

17   you recall being stated about you?

18        A.    Yes.  It was two jobs at the same

19   time, terminated at the exact same date,

20   according to that record.

21        Q.    What two jobs?

22        A.    The other job I had, they

23   terminated me the exact same day with that

24   one.

25        Q.    What was the other job?
```

```
 1                         J. Nofi

 2          A.    The Smithtown.

 3          Q.    You were fired from Smithtown?

 4          A.    No, not fired.  No, they said I

 5     was terminated because of what was going on

 6   ` with the lawsuit.

 7          Q.    Smithtown?

 8          A.    Uh-huh.

 9          Q.    And what did Smithtown say?

10          A.    They didn't say anything.  It was

11     in the paperwork, I was terminated the exact

12     same dates as Ocean Beach.

13          Q.    Did you ever -- what was your job

14     at Smithtown?

15          A.    Bay constable.

16          Q.    And was that a part-time job?

17          A.    Yes.

18          Q.    When did you work that part-time

19     job?

20          A.    2006, 2007; 2006.  There was a

21     list, 2005, 2006.

22          Q.    Were those the only years you

23     worked as a bay constable for Smithtown?

24          A.    Because I switched over to

25     Babylon town instead.
```

```
 1                     J. Nofi
 2        Q.    When did you switch to Babylon?
 3        A.    Two years ago.  I had to redo
 4   everything, take a psychological test all
 5   over again, but it's security enforcement.
 6        Q.`   So after April 2nd you got a job
 7   at Babylon?
 8        A.    No, no, way after.  I was trying
 9   to get a job forever but nobody would hire
10   me.
11        Q.    But you were hired by Babylon?
12        A.    Yes, because I had a friend
13   there.
14        Q.    But you were hired from Babylon?
15        A.    Yes.
16        Q.    When?
17        A.    Two years ago.
18        Q.    Okay, so this is now September of
19   2008, so that would have been September of
20   2006?
21        A.    Yes, right, maybe 2007.
22        Q.    Well, which is it?
23        A.    I'm not sure, 2007.
24              MR. GOODSTADT:   Objection.
25        A.    I'm not sure, 2007.
                 Precise Court Reporting
      (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                        J. Nofi

 2   RQ          MR. NOVIKOFF:    I call for

 3        production of documents reflecting when

 4        Mr. Nofi was hired by Babylon.

 5                  MR. GOODSTADT:    I will take it

 6        under advisement.

 7                  MR. NOVIKOFF:    Sure.  Well,

 8        actually it should have been produced

 9        only because it goes to potential

10        mitigation, but if you still want to

11        take it under advisement, that's fine,

12        we will discuss it after the

13        deposition.

14        Q.    So, my question, sir, is back to

15   paragraph 113, what was the -- well, what

16   document is being referred to when it's

17   alleged that there are false, damaging and

18   baseless allegations that have been inserted

19   in plaintiffs civil service records?

20                  MR. GOODSTADT:    Objection.

21        Q.    To the extent you know.

22        A.    From when we went there and

23   talked to her, that's the only thing I know

24   that was, that I understand about that, when

25   we went there.
```

```
 1                          J. Nofi
 2           Q.    When you talked to Alison
 3      Sanchez?
 4           A.    Alison Chester, who is now Alison
 5      Sanchez, but at the time she was Alison
 6      Chester.
 7           Q.    Just so I understand this, sir,
 8      when it's alleged in paragraph 113 that as a
 9      result of false, damaging and baseless
10      allegations that have been inserted in
11      plaintiffs civil service records, you don't
12      know of any document that exists today that
13      contains false, damaging and baseless
14      allegations that have been inserted in your
15      civil service record, do you?
16                 MR. GOODSTADT:    Objection.
17           A.    Oh, now, do you mean just in
18      paperwork or do you mean --
19           Q.    Yes.
20           A.    -- from anywhere?
21           Q.    What is your understanding of the
22      word records?
23           A.    Oh, there was a blog about us
24      when we went to civil service.
25           Q.    Was the blog in the civil service
```

```
 1                      J. Nofi

 2     records?

 3          A.     No, I don't think so.

 4          Q.     I'm only concerned, sir, you are

 5     familiar with civil service, right?

 6          A.     Yes.

 7          Q.     And in fact after April 2nd you

 8     went to Miss Chester at the civil service,

 9     correct?

10          A.     Yes.

11          Q.     And you are aware that you have a

12     civil service record that contains certain

13     information about you, correct?

14          A.     Yes.

15          Q.     And in fact you received a

16     document from the civil service concerning

17     your Ocean Beach job after April 2, 2006,

18     right?

19          A.     Yes.

20          Q.     Okay, what document did you --

21                 MR. NOVIKOFF:    Withdrawn.

22          Q.     Can you point out any document

23     that is in your civil service record that

24     contains what you believe to be a false,

25     damaging or baseless allegation?
```

```
 1                      J. Nofi

 2            MR. GOODSTADT:   Objection.

 3      Q.    To the extent you know.

 4      A.    No.   They wouldn't let us see

 5 anything, they didn't give us anything.

 6      Q.    Who wouldn't let you see

 7 anything?

 8      A.    Alison Chester.  She told us we

 9 had no rights of what was going on.

10      Q.    So you made this allegation

11 notwithstanding the fact you had never seen

12 your civil service records, is that your

13 testimony, sir?

14            MR. GOODSTADT:   Objection.

15      A.    I don't understand what you are

16 trying to say.

17      Q.    Sir, I will break it down for you

18 as simply as I can.

19      A.    Okay, break it down.

20      Q.    You make an allegation here that

21 as a result of false, damaging and baseless

22 allegations that have been inserted in

23 plaintiffs civil service records, do you see

24 that?

25      A.    Right.
```

```
 1                    J. Nofi
 2        Q.    What is your understanding of the
 3   word inserted?  Stop, what is your
 4   understanding of the word inserted?
 5        A.    I believe that I thought it meant
 6   that when we went there and seen her.
 7   That's what I thought this was about.
 8        Q.    What is your understanding of the
 9   word inserted?
10        A.    That we went and told her --
11              MR. GOODSTADT:    Listen to the
12        question, Joe.
13        Q.    What is your understanding of the
14   word inserted?
15        A.    I don't know.    You tell me.
16        Q.    No, I'm asking you, sir.
17        A.    I don't know.
18        Q.    What is your understanding of the
19   word records?
20        A.    Records, you know, when people
21   give you records, or documents, or papers.
22        Q.    So the question, and you've now
23   testified that you asked to look at your
24   record during this meeting with Miss Chester
25   and she told you you couldn't see it?
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

 1                      J. Nofi

 2             MR. GOODSTADT:    Objection, the

 3       testimony is on the record.

 4             Q.    Fine, did you ever ask Miss

 5       Chester to see your civil service records?

 6             A.    No, I don't believe we did

 7       because we got pushed out of there fast.

 8       You know, we just went there to ask

 9       questions about what our rights were.

10             Q.    And did you ever ask anyone else

11       at civil service before you filed this

12       complaint to look at your civil service

13       record?

14             A.    Before I filed the complaint?

15             Q.    Yes.

16             A.    I believe I went to civil service

17       on one or two occasions because I work right

18       across and asked them for papers, but they

19       said they weren't allowed to give any

20       paperwork out, that I remember.

21             Q.    Who is they?

22             A.    In civil service.

23             Q.    Who?

24             A.    The people at the desk.  I don't

25       know their names, they don't tell you their

```
 1                         J. Nofi

 2    names.

 3         Q.    Okay, did you advise your

 4    attorney about this?

 5               MR. GOODSTADT:   Objection.

 6               MR. NOVIKOFF:   Withdrawn.

 7         Q.    Was your attorney retained by

 8    this time?

 9         A.    Might have been; might have not

10    been.

11         Q.    But Miss Chester never refused a

12    request by you to look at your civil service

13    records?

14         A.    We didn't ask to look at civil

15    service.  I didn't ask.

16         Q.    That's right, you didn't?

17         A.    I just asked for that one paper

18    and I got it.

19         Q.    Let me understand this correctly,

20    prior to you filing this complaint and prior

21    to you authorizing your attorney to make the

22    allegation in paragraph 113, you had never

23    looked at your civil service records, did

24    you?

25               MR. GOODSTADT:   Objection.
```

```
 1                         J. Nofi
 2         A.    I don't even know why I would
 3    look at my civil service records.
 4         Q.    Fair enough.
 5               What false, damaging and baseless
 6    allegations do you allege is contained in
 7    your civil service records?
 8               MR. GOODSTADT:   Objection, asked
 9         and answered.
10               MR. NOVIKOFF:   No, not
11         specifically that question.
12         Q.    So, what false, damaging and
13    baseless allegation do you allege has been
14    inserted in your civil service records?
15         A.    Because when we went there --
16         Q.    No, my question is -- I don't
17    need the time line, sir.  My question is
18    very specific.
19               You make an allegation that there
20    are false, damaging and baseless allegations
21    that have been inserted in your civil
22    service records.  My question to you is,
23    what were the false, damaging and baseless
24    allegations that are being alleged in
25    paragraph 113?
```

```
 1                   J. Nofi

 2         A.    Just the only thing I can tell

 3    you is when we went there.  That's from what

 4    we were told, and then after we got out, we

 5    found out after a couple of weeks the blog

 6    came out started saying, you know, things

 7    about me.  I never went on the blog but I

 8    was told.

 9    MO          MR. NOVIKOFF:  Motion to strike

10         as not responsive.

11         Q.    Yes or no, sir, can you tell

12    everyone in this room what the false,

13    damaging and baseless allegations were that

14    are being referred to in paragraph 113?

15         A.    The only thing I can think of is

16    when I went for the psychological test, the

17    first time when I went, I don't know.

18               MR. NOVIKOFF:  That's fine.  I

19         think we are running out of tape, so

20         let's change it, just take a

21         five-minute break and we will come

22         back.

23               THE VIDEOGRAPHER:  This ends

24         tape number one.  The time is 11:30

25         a.m. and we are off the record.

                Precise Court Reporting
       (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                          J. Nofi

 2                  (A discussion was held off the

 3           record.)

 4                  THE VIDEOGRAPHER:   This begins

 5           tape number two.  The time is 11:45

 6           a.m., back on the record.

 7       Q.   Sir, have you sued the Town of

 8   Smithtown for unlawful termination?

 9       A.   I didn't get unlawful

10   termination, they hired all Suffolk County

11   PD guys there.

12       Q.   All right, let me understand.

13       A.   And I went to another job.

14       Q.   What other job is that, the

15   Babylon job?

16       A.   Babylon town public safety.

17       Q.   You were notified by civil

18   service that on April 2, 2006 you were no

19   longer employed by the Town of Smithtown?

20       A.   Just from what the papers said.

21       Q.   That's what I'm asking you.

22                  On a piece of paper you received

23   from civil service --

24       A.   I didn't even know I was

25   terminated.
```

```
 1                        J. Nofi
 2         Q.    Sir, on a piece of paper that you
 3    received --
 4         A.    Yes.
 5         Q.    -- from civil service, you were
 6    advised as of April 2, 2006 you were no
 7    longer working for the Town of Smithtown?
 8         A.    Yes.
 9         Q.    What was your job with the Town
10    of Smithtown again?
11         A.    Just public safety.
12         Q.    And how long had you worked it?
13         A.    Maybe two years.
14         Q.    That was a part-time position?
15         A.    Yes.
16         Q.    And you just testified that you
17    have not sued them for unlawful termination,
18    is that correct?
19         A.    No, because it wasn't unlawful
20    termination.
21         Q.    And that's because they just
22    decided to hire Suffolk County PD?
23         A.    And I knew I wasn't going to be
24    there long because it was too far for me to
25    go, it was too far for me to drive.
```

```
 1                        J. Nofi

 2        Q.      Had you advised them of it?

 3        A.      Yeah, they knew.

 4        Q.      So they knew prior to April 2nd?

 5        A.      No, afterwards.

 6        Q.      Why did you advise them

 7    afterwards that it was too far?  Why did you

 8    advise the Town of Smithtown after you

 9    received that document from civil service

10    that it was too long for you to drive there?

11        A.      Well, for myself, it was too long

12    for me.  I didn't advise them.  It was too

13    long for me.

14        Q.      That's what I'm asking you.

15        A.      No, I just advised them what

16    happened and the guy told me, one of the

17    workers there said, because of what was

18    going on in Ocean Beach they can't keep

19    someone under litigation because it's not

20    good for the, you know, the lawsuit, you

21    know, they can't do that for the law.

22    MO       MR. NOVIKOFF:  I'm going to move

23             to strike that.

24        A.      Under litigation.

25    MO       MR. NOVIKOFF:  Move to strike
```

```
 1                        J. Nofi

 2           that as not responsive.

 3           Q.   Sir, I'm just trying to

 4   understand, the Town of Smithtown, you

 5   didn't file an unlawful termination lawsuit

 6   against them, correct?

 7           A.   No.

 8           Q.   And that's because you believe

 9   that they have only hired Suffolk County

10   Police Department?

11                MR. GOODSTADT:   Objection.

12           A.   No.

13           Q.   Then why didn't you file an

14   unlawful termination suit against them?

15                MR. GOODSTADT:   Objection.

16           A.   Because they didn't do anything

17   to me.

18           Q.   They didn't do anything, in your

19   opinion, that was wrong?

20           A.   No, they didn't say bad things

21   about me afterwards.

22           Q.   Okay, let's go back to paragraph

23   107.  It's alleged in paragraph 107 that

24   false information was forwarded regarding

25   you to the South Hampton Police Department,
                       Precise Court Reporting
            (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                          J. Nofi
 2    do you see that?
 3         A.    Yes.
 4         Q.    What false information was
 5    forwarded, regardless of from whom it came
 6    from, what was the false information that is
 7    being alleged?
 8         A.    Just what I told you.
 9         Q.    You've got to tell me, I didn't
10    ask you this question yet, what false
11    information was forwarded?
12         A.    What was told to me.
13         Q.    What was told to you?
14         A.    What I told you before.
15         Q.    Which was what?
16         A.    About what my boss told me.
17         Q.    Laurie?
18         A.    Yes.
19         Q.    That Hesse gave you a bad
20    reference?
21         A.    Yes.
22         Q.    Okay, let's look at paragraph
23    113, last sentence.  Plaintiffs have been
24    unable to secure new comparable employment
25    in the law enforcement profession, do you
```

```
 1                      J. Nofi

 2     see that?

 3          A.   Yes.

 4          Q.   Is the Babylon job in the law

 5     enforcement profession?

 6          A.   Security enforcement.

 7          Q.   You would not consider that to be

 8     law enforcement?

 9          A.   Security, we carry guns under

10     permits only.  We are not law enforcement

11     security.

12          Q.   But you carry a gun?

13          A.   Yes, only when we're working, but

14     you have to have a license permit, which I

15     had to go and get, which took a very long

16     time too.

17          Q.   You carried a gun for Ocean

18     Beach, correct?

19          A.   Yes, but that was under the

20     shield, you didn't have to have a permit.

21          Q.   My question is, did you carry a

22     gun for Ocean Beach?

23          A.   Yes.

24          Q.   And you carried it while you were

25     off duty as well?
```

```
 1                         J. Nofi
 2         A.    No, I never did.
 3         Q.    Were you permitted to?
 4         A.    Yes.
 5         Q.    Are you permitted to carry a gun
 6    off duty now?
 7         A.    No.
 8               MR. GOODSTADT:    Just let him
 9         finish the question before you answer.
10         Q.    So advise me what other jobs --
11               MR. NOVIKOFF:    Well, withdrawn.
12         Q.    What jobs do you believe you did
13    not get because of something that Mr. Hesse
14    said?
15         A.    A lot.
16         Q.    Well, just give me the list.
17         A.    What other jobs?  Well --
18         Q.    I don't want to know what he
19    said, don't want to know who told you.
20         A.    It's a small county, okay.  All
21    of a sudden, when word goes out, okay, and
22    it goes out, it's very bad, okay.  I went to
23    a lot of places, SPCA, which is a volunteer
24    organization for animals, okay, which they
25    all know each other; South Hampton town PD,
```

```
 1                      J. Nofi

 2     Shelter Island PD, Riverhead PD, Florida

 3     Collier County, Northport PD, Babylon town,

 4     which didn't hire me for the longest time

 5     until I explained to them what was going on,

 6     and they took a chance on me.  That's what I'

 7     was told.

 8          Q.   Are you done with your list?

 9          A.   Yes.

10     MO          MR. NOVIKOFF:   I'm going to move

11          to strike all aspects of that answer

12          other than the list of potential

13          employers that Mr. Nofi believes did

14          not hire him as a result of something

15          that Mr. Hesse said.

16               MR. GOODSTADT:   Just for the

17          record, you're welcome to make whatever

18          motion you want to the Court, we would

19          obviously object to that.

20               MR. NOVIKOFF:   I get that.

21          Q.   You indicated when word goes out,

22     what do you mean word goes out?

23          A.   You know, he spread bad rumors

24     about us.

25          Q.   What bad rumors, do you know,
```

```
 1                     J. Nofi

 2    that he spread about you?

 3          A.    On the blog, take a look at the

 4    blog.

 5          Q.    So you are referring to the blog,

 6    anything else?

 7          A.    Just from hearsay.

 8          Q.    So other than the blog and other

 9    than hearsay you can't identify what bad

10    rumors Mr. Hesse spread about you?

11          A.    That should be enough.

12          Q.    Sir, my question to you is, other

13    than the blog and other than hearsay, as

14    you've testified to --

15          A.    Yes.

16          Q.    -- what other bad rumors did

17    Mr. Hesse spread about you specifically?

18                MR. GOODSTADT:    Objection, to

19          the extent it calls for a legal

20          conclusion, but you can answer.

21          A.    Just what was written, I guess

22    what I seen in documents, like I said, from

23    Collier County, what was put on there.

24          Q.    So, now, other than the Collier

25    County document that you have testified
```

```
 1                     J. Nofi

 2    about, other than the blog and hearsay, what

 3    other bad rumors do you know that Mr. Hesse

 4    spread about you?

 5              MR. GOODSTADT:  Objection.

 6         A.   I'm not sure.

 7         Q.   Okay, let's talk about the blog.

 8              Paragraph 114, second sentence,

 9    upon information and belief these postings

10    were created by OBPD Officer Tyrie Bacon, at

11    the direction of and or with approval from

12    Hesse.  Do you see that?

13         A.   Yes.

14         Q.   What is the information and

15    belief that is being alleged?

16         A.   I didn't say that though.

17         Q.   Sir, this is your complaint,

18    correct?  Sir, is this your complaint?

19         A.   Yes, it's with all of us, not

20    just me.

21         Q.   Sir, is this your complaint?

22              MR. GOODSTADT:  Objection.

23         Q.   Paragraph 14 starts with

24    plaintiffs, do you see that?

25              MR. GOODSTADT:  Objection, it's
```

```
 1                      J. Nofi

 2          114.

 3          Q.    Are you one of the plaintiffs in

 4     this lawsuit?

 5          A.    Yes.

 6          Q.    It's alleged by you in this

 7     lawsuit the following, plaintiffs have been

 8     humiliated and defamed by malicious and

 9     utterly baseless attacks on their integrity

10     and record of public service that have

11     appeared on publicly accessible internet

12     blogs.  Do you see that?

13          A.    Yes.

14          Q.    When you read this, you believed

15     it to be accurate, correct?

16          A.    Yes.

17          Q.    It then goes on, you then go on

18     to allege, as I have just read, upon

19     information and belief these postings were

20     created by OBPD Officer Tyrie Bacon at the

21     direction of and or with approval of Hess.

22     Do you see that?

23          A.    Yes.

24          Q.    What is the information and

25     belief that you are referring to?
```

86

```
 1                      J. Nofi

 2          A.    By the way he talked and said the

 3    things on it.  That's how he talked at the

 4    station and as we worked with him, same,

 5    same, you know, when you talk to somebody

 6    and hang out with them or work with him for

 7    years, you know their slang and how they

 8    talk.  You can tell what they would say, and

 9    blah, blah, blah.

10          Q.    Any other basis for your

11    allegations of upon information and belief?

12          A.    Yes.  The other four guys in the

13    lawsuit with this agreed that it's him too.

14          Q.    Other than that, how do you know

15    this was done by Tyrie Bacon?

16          A.    Just what I just told you, I

17    explained to you.

18          Q.    By your looking at the words that

19    were used and --

20          A.    By the way it's stated.

21          Q.    By looking at the words that were

22    used, and how they were said, you drew the

23    conclusion that it was Hesse who wrote it?

24                MR. GOODSTADT:  Objection.

25          A.    Either Hesse or Tyrie Bacon, it
```

                    Precise Court Reporting
        (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                      J. Nofi

 2    was ordered by Hesse.

 3         Q.    Does Bacon have a signature way

 4    of speaking that you were able to identify

 5    it on a blog?

 6         A.    Yes.  The way he talked on the

 7    blog, the way he talked about us all the

 8    time, like that, especially me.  The way

 9    things were said on the blog, you know,

10    retard, stupid, asshole.

11         Q.    Tyrie Bacon called you a retard?

12         A.    George did many times and he

13    agreed.

14    MO         MR. NOVIKOFF:  I'm just talking

15         about the blog so I'm going to move to

16         strike.

17         Q.    Did Tyrie Bacon call you a retard

18    on the blog?

19         A.    I believe it was Tyrie Bacon,

20    yes, talking for Hesse, yes.

21         Q.    How do you know Tyrie Bacon was

22    talking for Hesse?

23         A.    Just by the way it was being

24    said.

25         Q.    That's just your speculation that
```

1                          J. Nofi

2    it was?

3          A.    That's his friend.

4          Q.    You are just speculating it was

5    Tyrie Bacon talking on behalf of Hesse,

6    correct?

7          A.    Because --

8          Q.    Yes or no, it's just speculation?

9          A.    Yes.

10         Q.    And Tyrie Bacon has never

11   acknowledged to you that he was the author

12   of any of these blogs, correct?

13         A.    Never talked to him.

14         Q.    And Hesse has never admitted to

15   you that he was the one that was writing on

16   these blogs, has he?

17         A.    Do you think he would?

18         Q.    I'm asking you, sir, has Hesse

19   ever admitted to you?

20         A.    No.

21         Q.    Has anyone advised you that Hesse

22   identified that it was him who was writing

23   on these blogs?

24         A.    No.

25         Q.    So you don't know who was writing

                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2     on these blogs?

 3          A.    Speculation.

 4          Q.    That's what I thought, thank you.

 5          A.    Because he has favorites.

 6     MO          MR. NOVIKOFF:  Motion to strike

 7          that last part.

 8          Q.    Paragraph 114, last sentence, you

 9     allege, nevertheless plaintiffs and their

10     families have been repeatedly confronted and

11     castigated by strangers who have assumed

12     that these baseless allegations against

13     plaintiffs are true.  Do you see that?

14          A.    Yes, I do.

15          Q.    Were you confronted and

16     castigated by strangers, sir?

17          A.    Absolutely.  I work for the

18     county.  I had people come up to me and ask

19     me all kinds of questions.  I had people

20     call me from Arizona, people call me from

21     Florida.

22     MO          MR. NOVIKOFF:  Motion to strike

23          as not responsive.

24          Q.    Sir, have you been confronted,

25     repeatedly confronted, and castigated by
                     Precise Court Reporting
           (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                        J. Nofi

 2    strangers, yes or no?

 3         A.    Yes.

 4         Q.    Do you know the identity of any

 5    of the strangers that have confronted you

 6    and castigated you?

 7         A.    Also my wife was too at her job.

 8         Q.    I'm asking you now, sir, we will

 9    get to your wife in a few minutes, do you

10    know the name of any of these strangers?

11         A.    No.

12         Q.    On how many occasions have you

13    physically been confronted and or --

14         A.    Actually I do know one name, yes,

15    sorry.

16         Q.    Okay.

17         A.    Excuse me, at work at Babylon

18    when I first started I was working and I was

19    called over to Mike Diggle, who is the

20    senior bay constable, and said to me how did

21    you get this job, who did you rat out in the

22    DA's office for your job.

23         Q.    That was Mike?

24         A.    Diggle, yes.

25         Q.    And how did you respond?
```

```
 1                      J. Nofi
 2        A.    I said I didn't rat out anybody.
 3   How did you think I'm going to respond?
 4        Q.    I don't know, I'm asking you the
 5   question, sir.
 6        A.    And I answered it.
 7        Q.    Did you rat out anybody?
 8        A.    Did I rat out anybody?  No, I
 9   didn't rat anybody out.  I just did what was
10   supposed to be done, the truth.
11        Q.    Have you spoken to the DA?
12        A.    Yes.
13        Q.    Have you ever been part of a
14   wiretap?
15        A.    No.
16        Q.    Do you know of any of the
17   plaintiffs who have been part of a wiretap
18   at the instructions of the DA?
19        A.    Never heard any wiretaps, never
20   seen any wiretaps, absolutely not.
21        Q.    You have no knowledge as to
22   whether Mr. Lamm was part of a wiretap?
23        A.    No.
24        Q.    Do you know if Mr. Lamm ever tape
25   recorded any conversations he had with
```

1                    J. Nofi

2    Mr. Hesse?

3         A.    No.  The only thing I know is

4    that I think, just what was said on the

5    blog, and I know they went to the DA's

6    office too.  I'm not sure what they did but

7    I know they had a conversation with the DA's

8    office.  I went to the DA's office by

9    myself.

10   MO          MR. NOVIKOFF:  Move to strike.

11        Q.    My question to you, sir, is are

12   you aware as to whether Mr. Lamm has ever

13   tape recorded any phone conversations with

14   George Hesse after April 2, 2006?

15        A.    Kevin Lamm?

16        Q.    Yes.

17        A.    No, absolutely not.

18        Q.    Are you aware if any plaintiffs

19   have tape recorded phone conversations with

20   Mr. Hesse after April 2, 2006?

21        A.    Not to my knowledge, no.

22        Q.    Has anyone advised you other than

23   perhaps counsel, and I'm not suggesting that

24   counsel has advised you, putting aside any

25   communications you've had with counsel, has

```
 1                          J. Nofi

 2      anyone ever advised you that after April 2,

 3      2006 any of the plaintiffs have tape

 4      recorded phone conversations with Mr. Hesse?

 5           A.    No, the only one --

 6           Q.    Yes or no, sir.

 7           A.    I think one of them I think

 8      supposedly recorded, one time that I know

 9      of.

10           Q.    Who's one of them?

11           A.    Do I have to say his name?

12                 MR. GOODSTADT:    Yes.

13           A.    Ed Carter, but I never heard it.

14           Q.    Who told you that Ed Carter had

15      tape recorded the conversation?

16           A.    Ed Carter.

17           Q.    What did Ed Carter say?

18           A.    That's it, nothing else.

19           Q.    You didn't inquire?

20           A.    No.

21           Q.    You didn't ask any --

22           A.    No.

23           Q.    Did you ask any of the details?

24           A.    No.

25           Q.    How did it come about that
```

```
1                          J. Nofi
2    Mr. Carter told you that he was tape
3    recording a conversation with Mr. Hesse?
4         A.    He just told me.
5         Q.    Where?
6         A.    I don't know.  When we went to
7    some office up in Huntington or something
8    like that.
9              MR. GOODSTADT:  Objection.  This
10        is privileged, if I was present during
11        these discussions then.
12             THE WITNESS:  No, you weren't,
13        you weren't present actually.
14        Q.    And here's the ground rules for
15   those questions.  If your attorney was
16   present --
17        A.    I know, don't answer.  He wasn't.
18        Q.    Who was present when Mr. Carter
19   told you?
20        A.    Just me and Carter.
21        Q.    How did it come about that Carter
22   told you this?
23        A.    He just told me I got something
24   good.
25        Q.    And what did he say?
```

```
 1                    J. Nofi

 2        A.    I just told you what he said,

 3   okay.  He said that he taped something and

 4   that was it.  I didn't care what was on it,

 5   I don't know what it is.  I don't know what

 6   was said.  The only thing I care is about

 7   how he destroyed my name and my life.

 8   MO         MR. NOVIKOFF:  Motion to strike.

 9        Q.    You didn't ask Mr. Carter who he

10   was taping?

11        A.    He said George.

12        Q.    So he said that he had something

13   good and he was taping George?

14        A.    Right.

15        Q.    You didn't ask what George Hesse

16   said?

17        A.    No.

18        Q.    Did anyone advise you -- well, do

19   you have any knowledge as to whether or not

20   Mr. Lamm taped recorded any conversations

21   after April 2, 2006 with any Ocean Beach

22   employee?

23        A.    No.

24        Q.    Did anyone ever advise you that

25   Mr. Lamm undertook such a tape recording?
```

```
 1                     J. Nofi

 2             MR. GOODSTADT:  Objection.

 3       A.   No.

 4             MR. GOODSTADT:  Again, to the

 5       extent that either myself or anyone

 6       from my office advised you, that is

 7       privileged.

 8       A.   No.

 9       Q.   Did anyone ever advise you that

10  any of the other plaintiffs had tape

11  recorded a conversation with an Ocean Beach

12  employee?

13             MR. GOODSTADT:  Same

14       instruction.

15       A.   The only thing I know, like I

16  said, when I talked to him that one time, it

17  was a five minute conversation, and just

18  that I heard that it was going around,

19  flying around, word of mouth, that the day

20  they let us go, that someone else there,

21  somebody supposedly told somebody what was

22  said after we left, some bad things were

23  said in that room.

24       Q.   I'm talking about tape recording,

25  sir.
```

```
 1                          J. Nofi

 2         A.    Not that I know of.

 3         Q.    To your knowledge did anyone tape

 4    recorded by Mr. Hesse --

 5         A.    No, just Carter.

 6         Q.    Excuse me, can you tell me to

 7    your knowledge did anyone tape-record on

 8    April 2, 2006 anything that Mr. Hesse said?

 9         A.    After April?

10         Q.    No.

11               To your knowledge did anyone tape

12    record anything that Mr. Hesse said on April

13    2, 2006?

14         A.    I have no idea.

15         Q.    Did anyone ever advise you that a

16    tape-recording exists as to what Mr. Hesse

17    said on April 2, 2006?

18         A.    Not that I know of, I can't

19    recollect.

20         Q.    You can't recollect?

21         A.    No, just talking to Carter, I

22    know that they did some taping, that was it.

23         Q.    Who's they?

24         A.    Carter.

25         Q.    So when you say they, you mean
                    Precise Court Reporting
              (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                      J. Nofi

 2    Carter?

 3         A.    Carter, I don't know what other

 4    guys were involved, I don't know.

 5         Q.    So you were confronted and

 6    castigated by strangers.  You've identified

 7    one instance.  Can you identify any others?

 8         A.    Yes, my wife got --

 9         Q.    No, you now, sir, you.

10         A.    Yes, just working people saying I

11    can't believe what's going on because what

12    happened was --

13         Q.    No, can you identify another

14    example.

15         A.    I'm getting to it.

16         Q.    Just tell me examples.

17              MR. GOODSTADT:    But he's

18         answering your question.

19         A.    I'm answering your question.

20         Q.    I just want an example.

21              MR. GOODSTADT:    And you are more

22         than welcome to move to strike, you are

23         asking for all of his examples.

24              MR. NOVIKOFF:    Any other

25         example, okay.  You're right, I will
```

```
 1                         J. Nofi

 2          rephrase the question.

 3          Q.    Provide me another example where

 4     you believe you were castigated and

 5     confronted by a stranger?

 6          A.    Another example, sure, while

 7     working.

 8          Q.    Okay.

 9          A.    While going out.

10          Q.    Just stick with while you were

11     working.  Give me an example of what

12     happened while you were working.

13          A.    Just someone coming up and

14     saying, you know, talking to me about the

15     problem, what's going on, saying that, you

16     know, I can't believe that you ratted people

17     out.  I said I didn't rat anybody out, and

18     they would say that on the blog they are

19     calling us rats.  I said I had nothing to do

20     with that because I never went on any blog.

21     I didn't even know this was on the blog

22     until I was told I was on the blog.

23          Q.    And this was a stranger at work?

24          A.    Yes.

25          Q.    What job?
```

 1                    J. Nofi

 2          A.    Suffolk County is pretty damn

 3    big, a lot of people.

 4          Q.    Okay, any other examples that

 5    Suffolk County that you were confronted and

 6    castigated?

 7          A.    Just, you know, remarks, not

 8    castigated, remarks.

 9          Q.    Well, I'm interested in what you

10    allege.  You allege confronted and

11    castigated.

12          A.    Well, that was from my wife, is

13    what I mean, my wife and me together.

14          Q.    So what you really meant in this

15    allegation was there was an instance when

16    your wife and you were together that you

17    were confronted and castigated?

18          A.    Yes.  My wife was with me a

19    couple of times too and when I work people

20    saying things when I went -- what I do, I do

21    what's called job fairs, you know, health

22    department fairs.  You go all over the place

23    and so, you know, you cover a lot of ground

24    in Suffolk County and different areas and I

25    had people come up to me and say to me, you

```
 1                    J. Nofi

 2    know, and always bring up Ocean Beach,

 3    because they thought I was one of the perps

 4    that beat that guy up with the beating, but

 5    I never worked that night but they had

 6    different things that's what was going

 7    around in the rumor, because when I got

 8    called by the DA's office I was told that I

 9    was working, which I was not.

10    MO        MR. NOVIKOFF:  Motion to strike.

11         Q.   My question to you, sir, is when

12    you were confronted and castigated with your

13    wife, where did this take place?

14         A.   I don't remember.

15         Q.   What was said to you in your

16    wife's presence?

17         A.   Just not nice things.

18         Q.   That's what I'm asking you, sir,

19    what was said.

20         A.   I just told you, not nice things.

21         Q.   You can't recall specifically?

22         A.   No, not nice things.

23         Q.   And was your wife ever confronted

24    and castigated outside of your presence?

25         A.   Yes.
```

```
1                          J. Nofi

2         Q.    When?

3         A.    At her job.

4         Q.    Where is her job?

5         A.    Brookhaven Hospital.

6         Q.    Who confronted and castigated

7    her?

8         A.    A male and a female.

9         Q.    What were their names?

10        A.    I don't know their names, she

11   knows their names.

12        Q.    What did they say?

13        A.    He went up to her and said I

14   can't believe your husband was involved with

15   Ocean Beach.  Was he one of the guys that

16   beat the guy, and is he going against the

17   guys at the job, whatever, something like

18   that.  Then another girl that works there

19   was like, she's been there a pretty long

20   time, and she is a good worker, great worker

21   and smart woman, thank God she's smart, and

22   she was told by her that, you know, these

23   guys couldn't do that, you know, I can't

24   believe your husband is going against them,

25   that's ridiculous.  George Hesse is not like
```

```
 1                      J. Nofi
 2     that, because I worked there, she used to be
 3     a cop there by the way.
 4          Q.    The person who confronted your
 5     wife?
 6          A.    Yes, one of the persons.  The
 7     other person was friends with the Pisettis.
 8          Q.    When did the DA approach you
 9     concerning anything involving Ocean Beach?
10          A.    They came to my house, asked me
11     questions about the Gilbert beating.
12          Q.    Okay, and have you ever met with
13     the DA himself?
14          A.    What do you mean the DA himself,
15     Spoda?
16          Q.    Yes.
17          A.    No.
18          Q.    How many occasions have you met
19     with the district attorney's office
20     concerning --
21          A.    After that incident, twice maybe.
22          Q.    And when was the first time?
23          A.    I don't know.  I just remember
24     after that beating they came to my house and
25     asked me questions because they thought I
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                          J. Nofi

 2      was working that night and I told them I

 3      wasn't.

 4              Q.    That was prior to you filing this

 5      complaint, correct?

 6              A.    Yes, I was still working.

 7              Q.    Okay, after you stopped working

 8      at Ocean Beach, have you had any

 9      communications with the DA?

10              A.    Yes.

11              Q.    How many?

12              A.    Twice, three times.

13              Q.    So how many communications with

14      the DA did you have prior to your last day

15      of employment with Ocean Beach?

16              A.    Before I got let go?

17              Q.    Before your last day of

18      employment, yes.

19              A.    Just that one time.

20              Q.    Okay, and they came to your

21      house?

22              A.    Yes, they did.

23              Q.    Did they ask you questions?

24              A.    A female and male, yes.

25              Q.    And did you advise Chief Paradiso
                          Precise Court Reporting
            (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                          J. Nofi
 2      at the time you were approached by the DA?
 3          A.     No, it was at night time.
 4          Q.     Well, the sun came up the next
 5      day, correct?
 6          A.     Yes, I advised even George, he
 7      was kind of nervous.
 8          Q.     My question to you, sir --
 9      MO          MR. NOVIKOFF:    And I move to
10          strike the testimony about what
11          Mr. Hesse's reaction was.
12          Q.     Sir, you were approached by
13      people from the district attorney's office
14      at some point in time during the night after
15      the alleged Gilbert incident, correct?
16          A.     Yes.
17          Q.     Did you advise Chief Paradiso
18      after your meeting with the DA that they had
19      come to your house?
20          A.     Oh, yeah, I let them know.
21          Q.     Not them, Mr. Paradiso, did you
22      advise Mr. Paradiso?
23          A.     I believe I let him know, yes,
24      and George also.
25          Q.     My question is only Mr. Paradiso.
```

```
 1                    J. Nofi

 2         A.    Okay, yes, I believe I did.

 3         Q.    When did you advise Mr. Paradiso?

 4         A.    I don't know, maybe next day when

 5   I seen him again.

 6         Q.    Okay, and when did you advise

 7   Mr. Hesse, if at all?

 8         A.    When I seen him again.

 9         Q.    And what did you tell Mr. Hesse?

10         A.    Just that the DA came to my house

11   asking questions about the Gilbert case.

12         Q.    And what did you advise

13   Mr. Paradiso?

14         A.    When I seen him again.

15         Q.    And what did you advise him?

16         A.    Same thing.

17         Q.    Did you advise the mayor at the

18   time?

19         A.    No.

20         Q.    Did you advise any board members?

21         A.    No.

22         Q.    Did you ask for any legal

23   representation from the village at that

24   time?

25         A.    No, because I wasn't there.
```

1                    J. Nofi

2          Q.   When you say you weren't there,

3    you were not present?

4          A.   I was off duty at 1:30.  It

5    happened at 3:30, supposedly 4:00, that's

6    what they told me, so I wasn't there.

7          Q.   So, after your last day of

8    employment you say you met with the district

9    attorney's office two or three times,

10   correct?

11         A.   Yes.

12         Q.   For what purpose?

13         A.   15 minutes, 20 minutes, they

14   wanted to ask me questions.

15         Q.   About what?

16         A.   About the Halloween incident,

17   which I wasn't there either so I couldn't

18   tell them anything about that either.

19         Q.   So let's on at Halloween

20   incident, let's get this right on the table.

21              With regard to the allegations in

22   the complaint concerning the Halloween

23   incident, you have no first-hand knowledge

24   about anything concerning that event because

25   you weren't there?

```
 1                     J. Nofi

 2      A.    The Halloween incident?

 3            MR. GOODSTADT:  Objection, if he

 4      can read the paragraphs.

 5            MR. NOVIKOFF:  What's that?

 6            MR. GOODSTADT:  Objection, if he

 7      can read these paragraphs.

 8            THE WITNESS:  I can tell him.

 9      Q.    I think it's --

10      A.    The only knowledge I have of that

11      was after the fact that happened on

12      Halloween night was that I know that Pisetti

13      was fired the day after by Chief Paradiso.

14      Q.    But that's because what someone

15      told you?

16      A.    It's not from what someone told

17      me, it's fact, he got fired by the chief.

18      Q.    Were you there when the chief

19      fired him?

20      A.    No, I was told, he got fired by

21      the chief.

22      Q.    Thank you, Mr. Nofi.

23            My question, sir, with regard to

24      the Halloween incident that is alleged in

25      this complaint -- well, let me take a step
```

```
 1                         J. Nofi

 2     back.

 3                    You are aware that in your

 4     complaint there are certain allegations

 5     about the Halloween incident?

 6          A.    Can I tell you now?

 7          Q.    No, sir, are you aware that

 8     within your complaint that you filed in this

 9     case there are allegations concerning what

10     is referred to as the Halloween incident?

11          A.    Yes.

12          Q.    And you just testified that you

13     were not present --

14          A.    Yes.

15          Q.    -- during the Halloween incident,

16     correct?

17          A.    Yes.

18          Q.    So would it be fair to say, sir,

19     that, concerning the allegations that are

20     set forth in this complaint, you have no

21     first-hand personal knowledge of any of the

22     allegations?

23                    MR. GOODSTADT:    Objection.

24          Before he answers the question, why

25          doesn't he read the paragraphs.  You've
```

```
 1                          J. Nofi

 2           established he wasn't there, but when you

 3           say the allegations, he needs to review

 4           it.

 5           Q.    Sure, take a look at it, review

 6    it.

 7           A.    What page is it?

 8           Q.    Let's see, I'll tell you in a

 9    second.  Let's look at page 16, page 63,

10    through --

11           A.    Page 63?

12                 MR. GOODSTADT:    Page 16,

13           paragraph 63.

14                 THE WITNESS:    Oh, page 16, I was

15           going to say we don't have any 63.

16           Q.    Well, the Halloween incident

17    allegations is between page 16 and page 21.

18    So, my question to you, sir, is were you

19    present at the Halloween incident?

20           A.    That night --

21                 MR. GOODSTADT:    That is not the

22           question that was pending.

23                 MR. NOVIKOFF:    I know, so I'm

24           withdrawing that question.

25           Q.    Were you present during the
```

```
 1                        J. Nofi

 2    Halloween incident?

 3         A.    At night, no.

 4         Q.    Were you involved in any of the

 5    investigation of the Halloween incident?

 6         A.    Yes.

 7         Q.    What was the nature of your

 8    involvement in the investigation of the

 9    Halloween incident?

10         A.    I was at the village court when

11    they brought in VanCoot, he was one of the

12    subjects --

13         Q.    Other than that --

14         A.    -- that got beaten.

15         Q.    Other than that were you --

16    MO          MR. NOVIKOFF:    Motion to strike

17         as not responsive.

18               MR. GOODSTADT:    You asked him

19         his involvement, he's telling you his

20         involvement.

21               MR. NOVIKOFF:    He told me, and

22         he then went on.

23               MR. GOODSTADT:    You didn't like

24         the way he answered the question.

25               MR. NOVIKOFF:    No, not at all.
```

```
 1                       J. Nofi

 2        A.    You can't tell the truth here,

 3   it's like ridiculous.  You stop me every

 4   time I say something.

 5        Q.    Other than your appearance in the

 6   court that day, what other involvement, if

 7   any, did you have with the Halloween

 8   incident?

 9        A.    Before the court date?

10        Q.    No.

11        A.    Yes, before the court date,

12   that's what you just asked me.

13        Q.    Sir, other than your presence in

14   court when they brought VanCoot in, what

15   other involvement, if any, did you have in

16   the investigation of the Halloween incident?

17        A.    Well, as a public servant and as

18   a police officer there, okay, and a good

19   police officer, I was told, you know, what

20   happened from another police officer, you

21   know, just told me a little bit what

22   happened, because we all work together and I

23   was in there, but the week after, whatever

24   it was, two weeks afterwards, when the court

25   came up, I was there when VanCoot was there,
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                    J. Nofi

 2   and I was talking to the kid because he was

 3   a young kid and he was hysterical crying and

 4   I just said relax, you know, whatever it is,

 5   tell the truth in the court, and I was in

 6   the back by the chambers and Gary Pisetti

 7   was there with George Hesse, and they said

 8   that fucking guy is going to be fucking

 9   dead.  He's never getting a job as a New

10   York City police officer because he has to

11   come fucking through me and I'm the king and

12   he ain't going nowhere with his life, and I

13   just looked at him and walked away because I

14   couldn't believe what he said.

15   MO          MR. NOVIKOFF:  Motion to strike

16        as not responsive.

17        Q.   Sir, I'm asking you the question,

18   you say you weren't present?

19        A.   The night of the Halloween

20   incident?

21        Q.   Excuse me, I'm asking the

22   question.

23        A.   Okay.

24        Q.   You say you weren't present on

25   the night of the alleged Halloween incident,
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                          J. Nofi

 2     correct?

 3          A.    Yes, I am.

 4          Q.    Were you part of any

 5     investigation into the events surrounding

 6     the alleged Halloween incident?

 7          A.    No.

 8          Q.    You were in court one day when

 9     VanCoot came in, correct?

10          A.    Yes.

11          Q.    That was not part of the

12     investigation of the Halloween incident, was

13     it?

14          A.    No. I guess you could say it is

15     in a way.

16          Q.    Did someone tell you to be there

17     specifically in reference to the Halloween

18     incident?

19          A.    For court?

20          Q.    Yes.

21          A.    I was told to go to court, yes.

22          Q.    Because of the Halloween

23     incident?

24          A.    No, but it was for the Halloween

25     incident though.
```

```
 1                         J. Nofi

 2          Q.    Oh, it was for the Halloween

 3    incident?

 4          A.    It wasn't the Halloween incident,

 5    but I was told to go there because it was a

 6    Halloween incident, you know, from before

 7    but --

 8          Q.    And you believed that was an

 9    investigation, you being told to be present?

10          A.    No.   It was just being there,

11    doing my job as, you know, almost court

12    officer.

13          Q.    So you weren't present and you

14    didn't investigate, right?

15          A.    Right.

16          Q.    So any knowledge that you know of

17    of the Halloween incident would be based

18    upon what someone would have told you,

19    correct?

20                MR. GOODSTADT:    Objection.

21          Q.    Or what you would have read in

22    the papers or read in a document, correct?

23                MR. GOODSTADT:    Objection.

24          A.    Yes, from what, you know,

25    everybody works together, you know, and
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi

 2     talks.

 3         Q.    That's what I thought.  So you

 4     have no first-hand knowledge as to either

 5     the investigation of the Halloween incident

 6     or the incident itself, isn't that true?

 7         A.    Just from what I heard from the

 8     subject and from people I worked with.

 9         Q.    Good, that's what I thought.

10         A.    It's perfect.

11         Q.    Sir, do you recall filing a

12     lawsuit against Meenan Oil?

13         A.    No, I resigned to become a cop.

14         Q.    Sir, do you recall ever filing a

15     lawsuit against Meenan Oil?

16         A.    To get compensated for my pension

17     fund, yes.

18         Q.    Sir, do you recall filing a

19     lawsuit against Meenan Oil?

20         A.    Yes.

21         Q.    And was that settled?

22         A.    Yes.

23         Q.    Did you receive any monetary --

24         A.    Really nothing compared to what I

25     should have got.
```

```
 1                        J. Nofi
 2        Q.    That's not my question.
 3              Did you receive any monetary
 4   recovery?
 5        A.    Yes.
 6        Q.    What did you receive?
 7        A.    I don't remember, 50,000, 60,000,
 8   I don't even know.
 9        Q.    Is there a document that reflects
10   what you would have received from them?
11        A.    If I find it, if I have it, yes.
12   RQ            MR. NOVIKOFF:    I call for the
13              production of that.
14              MR. GOODSTADT:    We'll take that
15              under advisement.
16        Q.    You make reference in here to
17   your devote Christian beliefs.  Do you see
18   that?
19        A.    Yes.
20        Q.    When did you first form these
21   devote Christian beliefs?
22              MR. GOODSTADT:    Objection.
23              You're asking him something that is
24              completely irrelevant to this lawsuit.
25              MR. NOVIKOFF:    Well, it's stated
```

```
 1                      J. Nofi

 2           in the complaint.

 3                MR. GOODSTADT:   Not in this

 4           lawsuit.

 5           Q.   When did your first form this

 6      belief --

 7      DI          MR. GOODSTADT:   Okay, I'm going

 8           to instruct you not to answer.

 9                MR. NOVIKOFF:   Based upon

10           relevancy?

11                MR. GOODSTADT:   Based on

12           harassment, asking about his religious

13           beliefs.

14                MR. NOVIKOFF:   He makes the

15           reference.

16                MR. GOODSTADT:   Not in this case

17           he doesn't.  Show me what paragraph in

18           the current complaint --

19                MR. NOVIKOFF:   Okay, we will

20           move on.

21           Q.   Let's talk about Alison Sanchez.

22           A.   Chester.

23           Q.   Sir, the caption says Alison

24      Sanchez, do you see that?

25           A.   Well, when I talked to her, it
```

```
 1                        J. Nofi

 2     was Alison Chester.

 3          Q.    Let's talk about Alison Sanchez.

 4          A.    Okay.

 5          Q.    Let's go to page 23, paragraph

 6     99.

 7          A.    99?

 8          Q.    Yes.

 9          A.    Okay.

10          Q.    You allege within days of their

11     termination Officers Fiorillo, Nofi and Lamm

12     met with Alison Sanchez, the Suffolk County

13     civil service official responsible for

14     overseeing service compliance in Ocean

15     Beach.  Do you see that?

16          A.    Yes.

17          Q.    How did you know at that time

18     that she was the civil service person

19     responsible for overseeing civil service

20     compliance?

21          A.    Frank told us that he made a

22     phone call, whatever, he knew, Frank knew

23     she was the head of the Ocean Beach civil

24     service.

25          Q.    You didn't know, Frank told you?
```

```
 1                     J. Nofi

 2        A.    Yeah, we knew when we went there.

 3        Q.    That's all I'm asking, how did

 4   you know, Frank told you?

 5        A.    Yes.

 6        Q.    Upon information and belief    `

 7   Sanchez was responsible for appointing and

 8   approving the hiring of the uncertified

 9   officers at the OBPD, do you see that?

10        A.    Yes.

11        Q.    How did you know that? Was it

12   from you or from what someone told you?

13        A.    We knew by word of mouth, by

14   going around. They were all nervous, asking

15   questions all the time.

16        Q.    Sir, the allegation is about

17   Sanchez being responsible. I know you want

18   to get in what you want to say. My question

19   to you is this, how did you know that

20   Sanchez was responsible for appointing and

21   approving the hiring of the uncertified

22   offices at the OBPD, as you allege?

23        A.    I think it was on the blog,

24   someone was saying something about it. Also

25   on the blog, and also that she just knew, I
```

```
 1                        J. Nofi

 2      don't know, because they didn't have

 3      certificates.  They didn't have no

 4      psychologicals, how could you not know?

 5      They didn't go through any of the programs

 6      that we went through.  That's how.

 7      MO          MR. NOVIKOFF:  Move to strike.

 8          Q.    Sir, the allegation here is

 9      Sanchez was responsible.  Here's my

10      question, how did you know that Sanchez was

11      responsible?

12          A.    I just told you, because we knew

13      that they weren't certified, so how can she

14      not know.  She's head of civil service.

15          Q.    She was head of civil service?

16          A.    Yes, for that department, for

17      Ocean Beach.

18          Q.    So it was your speculation she

19      must have known?

20          A.    Absolutely.

21          Q.    That she must have know?

22          A.    They didn't go through anything

23      we went through and we knew it, and how did

24      we know, they told us.

25          Q.    I'm only concerned about Sanchez
                      Precise Court Reporting
            (516) 747-9393 (718) 343-7227 (212) 581-2570
```

1                            J. Nofi

2      being responsible.

3           A.    I just told you.

4           Q.    So it was your speculation based

5      upon Sanchez' position with civil service

6      that to the extent uncertified officers were

7      hired that were not certified she had to

8      have known?

9           A.    Uh-huh.

10                MR. GOODSTADT:    Objection.

11          Q.    When did you --

12                MR. NOVIKOFF:    Well, withdrawn.

13          Q.    To your knowledge did there come

14     a point in time while you were employed by

15     Ocean Beach that Ocean Beach stopped hiring

16     uncertified officers?

17          A.    Say that again?

18          Q.    Did there come a point in time

19     when you were working for Ocean Beach that

20     Ocean Beach stopped the practice that you've

21     alleged of hiring uncertified officers?

22          A.    Did I know when they weren't

23     hiring uncertified officers?

24          Q.    No, sir, let's break it down.

25          A.    Go ahead, break it down.

                    Precise Court Reporting
          (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                       J. Nofi

 2          Q.    You make an allegation here that

 3     Ocean Beach was hiring --

 4          A.    But --

 5          Q.    '99, we haven't moved off '99,

 6     you see that '99?

 7          A.    Uh-huh.

 8          Q.    You make an allegation that

 9     Sanchez was responsible for appointing and

10     approving the hiring of uncertified

11     officers.  Do you see that?

12          A.    Yes.

13          Q.    Did there come a point in time

14     while you were working for Ocean Beach that

15     you learned that the village stopped the

16     practice of hiring uncertified officers?

17          A.    No, I don't remember, I don't

18     know.

19          Q.    You don't know?

20          A.    No.

21          Q.    Did you ever investigate that?

22          A.    Just when we went to civil

23     service.

24          Q.    No, did you ever investigate

25     while you were employed as to whether the
```

1                    J. Nofi

2     village had stopped the practice of hiring

3     uncertified officers?

4          A.    Oh, just hearsay.  We knew they

5     weren't going to do it anymore because we

6     made complaints about it.  So I'm sure they

7     stopped it as soon as we started making

8     complaints.

9          Q.    Okay, so you believe based upon

10    hearsay --

11         A.    Not hearsay, the guy John Dyer,

12    who used to work there as a police officer,

13    which he no longer does, he told us that his

14    friend that was a state park police guy, and

15    they got rid of all of them, he went to a

16    job for East Hampton town and he wasn't

17    certified.  He had to go through everything

18    again, and the guy told him that East

19    Hampton town supposedly told him Ocean Beach

20    hires people without going through anything

21    so something like that.  Just hearsay, I

22    just heard.

23         Q.    My question to you, sir, that you

24    answered, was did there come a time that you

25    learned that Ocean Beach stopped the

                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi
 2    practice of hiring uncertified officers?
 3         A.   I don't know.  Did they stop?  I
 4    don't know.
 5         Q.   That's what I'm asking you.  You
 6    tell me, I don't know.  Did they stop?
 7         A.   I don't know, you tell me, I
 8    don't know.
 9         Q.   So you don't know?
10         A.   No.
11              MR. GOODSTADT:  Objection.  He
12         just told you four times.
13              MR. NOVIKOFF:  I don't
14         understand half the things he's saying
15         but that's okay.
16         Q.   Let's move onto paragraph 11.
17    MO        MR. GOODSTADT:  Objection, move
18         to strike that.
19         Q.   Were you concerned at all when
20    you -- well, prior to you going to Miss
21    Sanchez did you know of any relationship
22    that she was having with Mr. Hesse?
23         A.   No, I didn't know.  It's just
24    hearsay.
25         Q.   When you say hearsay what do you
```

```
 1                        J. Nofi

 2    mean?

 3        A.    People talk.

 4        Q.    Well, did anyone tell you prior

 5    to your visit to Miss Sanchez that Mr. Hesse

 6    and Miss Sanchez were having a relationship?

 7        A.    I just answered you, hearsay.

 8        Q.    Sir, my question to you is what

 9    were you advised as to the relationship

10    between Mr. Hesse and Miss Sanchez?

11        A.    George stated that he -- do you

12    want me to say it -- that he banged her.

13        Q.    That's all I'm asking you.

14        A.    I didn't want to say it in front

15    of the women.  I mean, you asked me, I will

16    tell you.

17        Q.    Well, you talk about Mr. Hesse

18    talking about his German sausage in this

19    complaint, don't you?

20        A.    That wasn't me saying that.

21        Q.    This is your complaint, sir.

22        A.    It doesn't matter, I didn't say

23    that statement though.

24        Q.    So Mr. Hesse told you he was

25    having a sexual relationship with Miss
```

```
 1                          J. Nofi

 2     Sanchez?

 3          A.    That's not what I said.

 4          Q.    What did you say?

 5          A.    I just said what I said, that he

 6     banged her, okay.

 7          Q.    What do you mean by banged?

 8               MR. GOODSTADT:    Answer the

 9          question.

10          Q.    What do you mean by banged?

11          A.    Having sex, I would imagine.

12          Q.    So when I say sexual

13     relationship, that doesn't mean the same to

14     you as having sex?

15          A.    I don't know.  To me, no, not the

16     way he said it, it was pretty disgusting, I

17     don't know.

18          Q.    Sexual relationship was

19     disgusting?

20          A.    No, the way he said it was

21     disgusting.

22          Q.    Banged?

23          A.    Banged.

24          Q.    So I tried to clean it up.  So my

25     question so we're clear, according to you
```

```
 1                         J. Nofi
 2     Mr. Hesse advised you that he was having a
 3     sexual --
 4          A.    He didn't come to me and say it,
 5     he just said it and I heard him say it.
 6          Q.    Fine, then you heard Mr. Hesse
 7     say that he was having a sexual relationship
 8     with Miss Sanchez?
 9          A.    Yes.
10          Q.    How long prior to your meeting
11     did Mr. Hesse tell you this or say this in
12     your presence?
13          A.    I don't know.
14          Q.    Months?
15          A.    I have no idea.
16          Q.    Years?
17          A.    I don't know.
18          Q.    Okay, now, how long was this
19     meeting with Miss Sanchez?
20          A.    Maybe 20 minutes to 30 minutes,
21     could be a little bit longer.
22          Q.    Who decided to go see Miss
23     Sanchez?
24          A.    All three of us.
25          Q.    Why not the other two plaintiffs
```

```
 1                          J. Nofi

 2    in this case?

 3         A.    Because Ed Carter already made an

 4    appointment but he couldn't come to that.

 5         Q.    And how about the other

 6    plaintiff?

 7         A.    Tommy Snyder, I don't know he

 8    even knew he was gone yet.

 9         Q.    And did you schedule an

10    appointment with Miss Sanchez?

11         A.    Yes.

12         Q.    Did she agree to meet with you?

13         A.    Yes, we went.

14         Q.    Was this within the week of April

15    2nd?

16         A.    I would say April 2nd.

17               MR. GOODSTADT:   Just let him

18         finish the question.

19         Q.    Was it within a week of April

20    2nd?

21         A.    Yes, I believe so.

22         Q.    And what was said at the time?

23         A.    Well, we asked what our rights

24    were and stuff like that, and she said that

25    she already knew, that she expected us
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                      J. Nofi
 2      coming, and we were like, you know, we
 3      couldn't understand that she knew that we
 4      were going to come.
 5           Q.   You said you scheduled a meeting
 6      with her?
 7           A.   Right, but she knew we were
 8      coming before that.  I didn't schedule a
 9      meeting with her.
10           Q.   What did she say to you that led
11      you to believe that she knew that you were
12      coming to meet with her prior to you
13      scheduling a meeting with her?
14           A.   Just by the things she said.
15           Q.   What did she say?
16           A.   I don't remember.  It was a long
17      time ago but it was things that, she just
18      stated she knew we were coming.
19           Q.   That's all you can recall her
20      saying?
21           A.   Yes, and also that I explained to
22      her I worked for Suffolk County just like
23      her, and we got the same boss, Steve Levy,
24      and I didn't want this to go or leave this
25      office.  She told me by law it has to stay
```

```
 1                    J. Nofi

 2    here because of confidentiality, and I found

 3    out it was all over the blog.  That we came

 4    and it was all over the blog, that she

 5    talked to George about it on the blog,

 6    stating that the three rats, the three

 7    mutts, came with their heads between legs.

 8    MO           MR. NOVIKOFF:  Motion to strike

 9         as not responsive.

10         Q.   I'm talking about the meeting

11    now, sir.  An appointment was scheduled with

12    Miss Sanchez, correct?

13         A.   I believe Frank scheduled us to

14    go, yes.

15         Q.   How many days after April 2nd was

16    this meeting scheduled, did Frank schedule

17    this meeting?

18         A.   How many days after?

19         Q.   Was it the day after, the same

20    day, a couple of days?

21         A.   I don't know, a week maybe, a

22    couple of days, next day, I don't know, it

23    was quick.

24         Q.   Miss Sanchez told you that

25    everything that was going to be in this
```

```
 1                      J. Nofi

 2     meeting was to be confidential, correct?

 3           A.     Yes.  I asked her please because

 4     I work right in front of the building across

 5     the street from her.

 6           Q.     And what evidence do you have

 7     that suggests that Miss Sanchez disclosed

 8     anything that took place in that meeting?

 9           A.     Oh, Ed Carter told me that George

10     told him that he talked to Alison Sanchez

11     about the meeting we had.

12           Q.     So your evidence that you know of

13     is that Ed Carter said that George said that

14     Alison told --

15           A.     Yes.

16           Q.     -- George about your meeting?

17           A.     Something like that.

18           Q.     Well, what did you say to Miss

19     Sanchez during this meeting that you wanted

20     to keep confidential?

21           A.     Everything we talked about.

22           Q.     What did you talk about?

23           A.     I said I don't want it getting

24     out because I work for the county.  I don't

25     want nobody, you know, knowing that I'm
```

1                    J. Nofi

2       going to be suing and I got let go.  I

3       didn't want nobody to know because, you

4       know, you don't want nobody to know your

5       business.  I do work for a big county job

6       and I didn't want anybody to know what was'

7       going on, my business, and she told me

8       definitely it would be confidential.

9           Q.    You didn't want -- you were

10      telling Miss Sanchez that you didn't want

11      her to tell anyone about the meeting because

12      you were going to sue the village?

13          A.    No.  I just said I didn't want

14      nobody to know that we came here, stating

15      anything I said because I work for the

16      county, I don't want it getting out.

17          Q.    Well, that's my questions.  I

18      understand what instructions you gave Miss

19      Sanchez.  My question to you is, what did

20      you say to Miss Sanchez during that meeting

21      that you didn't want to get out?

22          A.    We asked her what our rights

23      were.

24          Q.    Rights concerning what?

25          A.    About getting our job back or how

                    Precise Court Reporting
        (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                        J. Nofi

 2      did we fight back, is it legal, all that

 3      kind of stuff.

 4           Q.    What did Miss Sanchez tell you?

 5           A.    We had no rights.

 6           Q.    Is that what she said?

 7           A.    Yes.

 8           Q.    You had no rights?

 9           A.    No rights.

10           Q.    And did she give you a reason why

11      you have no rights?

12           A.    Not really.  Frank and Kevin were

13      asking more questions.

14           Q.    Did Frank and Kevin ask Miss

15      Sanchez why she believed you had no rights?

16           A.    No.  I was in pretty shock, I

17      wasn't paying attention.  I was in shock

18      when she told me I had no rights.

19           Q.    So you weren't paying attention

20      to what Miss Sanchez was saying in this

21      meeting?

22           A.    Not everything, no.

23           Q.    What do you recall?

24           A.    I don't remember, it was a long

25      time ago.
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                         J. Nofi
 2         Q.    What were you paying attention
 3   to?
 4         A.    Just listening to what she was
 5   saying but I don't remember.
 6         Q.    But you were in shock?
 7         A.    Yes.
 8         Q.    So you don't remember what she
 9   said?
10         A.    Yes, a couple of things.  I just
11   told you.
12         Q.    So the only things you told me
13   were the only things that you remembered?
14         A.    I told her I wanted to remain
15   confidentiality.
16         Q.    And that's the only thing you
17   recall about the conversation?
18         A.    No.  I asked her that I have been
19   there for a certain amount of years, and I
20   said how could they fire me because we
21   didn't do anything wrong.  I was a good cop,
22   is it possible that they are allowed to do
23   this and questions like that.  She just kept
24   saying yeah, yeah, yeah.
25         Q.    Okay, so you do recall what she
```

 1                          J. Nofi

 2    was saying?

 3          A.    Yes.

 4          Q.    So you were paying attention?

 5          A.    Yes.

 6          Q.    Okay, I just wanted to make sure

 7    of what your testimony is.

 8          A.    Yes.

 9          Q.    So you remember paying attention

10    too Miss Sanchez.  Why did Miss Sanchez tell

11    you that you had no rights?

12                MR. GOODSTADT:    Objection.

13          A.    I don't know.

14          Q.    And Fiorillo and Lamm asked her?

15          A.    My honest opinion?

16          Q.    I just care what Miss Sanchez

17    said, not your opinion.

18                MR. GOODSTADT:    You asked him

19          why.

20          Q.    Did Miss Sanchez explain to you

21    why she believed you had no --

22                MR. NOVIKOFF:    Then I'll

23          rephrase the question.

24          Q.    Did Miss Sanchez explain to you

25    why she said you had no rights?

                       Precise Court Reporting
            (516) 747-9393  (718) 343-7227  (212) 581-2570

 1                         J. Nofi

 2          A.    Okay, now, my answer, what I

 3      believe, is that what you're asking me?

 4      MO          MR. NOVIKOFF:   Motion to strike,

 5           no, sir.

 6          Q.    The question is, did Miss Sanchez

 7      advise you, Lamm and Fiorillo, why she

 8      believed you all had no rights?

 9          A.    Yes, because she's George's

10      friend, that's why.

11          Q.    Oh, she said that, she said you

12      have no rights because I'm George's friend?

13          A.    No, but we found out down the

14      road.

15      MO          MR. NOVIKOFF:   Motion to strike

16           as not responsive.

17          Q.    Sir, I know you want to get all

18      this out and I appreciate it, but did Miss

19      Sanchez advise you during this meeting why

20      she believed that you had no rights?

21          A.    Did she explain to me why I had

22      no rights?

23          Q.    You or Lamm or Fiorillo.

24          A.    I believe she did but I didn't

25      understand.  You would have to ask Frank and

```
 1                         J. Nofi
 2     Kevin, they would understand better.
 3          Q.    And why didn't you understand
 4     her?
 5          A.    Because I just -- I guess I
 6     didn't understand what she was saying.
 7          Q.    Did you graduate high school?
 8          A.    Yeah, I got my diploma back in
 9     college.  Are you trying to make fun of me
10     saying I'm stupid because I didn't know?
11          Q.    Were there any words that she
12     said that you didn't understand?
13          A.    Yes.
14          Q.    Okay, did you ask her to explain
15     it?
16          A.    Not really because she was
17     talking to Frank and Kevin after that point.
18          Q.    And in relation to the meeting
19     with Miss Sanchez, when did you retain
20     Mr. Goodstadt?
21          A.    After that?
22          Q.    Yes, in relation to that meeting,
23     was it a few weeks later?
24          A.    I guess, you have the dates, was
25     it 2007, I believe?
```

```
 1                         J. Nofi

 2         Q.    Sir, I'm asking you.

 3         A.    I belive a couple of months, a

 4    year after that, I don't remember, 2007.

 5         Q.    Sir, do you recall filing a

 6    notice of claim in this lawsuit?

 7         A.    Yes.

 8         Q.    And were you being represented by

 9    Mr. Goodstadt at that time?

10         A.    Yes.

11         Q.    And if I told you that you filed

12    this notice of claim -- I'm sorry, that it

13    was dated --

14         A.    2007.

15         Q.    Sir, if I told you that your

16    notice of claim was dated June 30, 2006 --

17         A.    2006, okay.

18         Q.    -- would that be accurate?

19         A.    If that's what it says, yes.

20         Q.    And do you know how long prior to

21    June 30, 2006 you had retained

22    Mr. Goodstadt?

23         A.    No.

24         Q.    You make an allegation -- is the

25    answer no when you shook your head?
```

```
 1                    J. Nofi
 2         A.    I didn't get the question.
 3         Q.    All right, well, the notice of
 4    claim is dated June 30, 2006, do you see
 5    that?
 6         A.    Right.
 7         Q.    And, according to the third page
 8    of the notice of claim, which was marked at
 9    your 50h deposition as Exhibit A, it was
10    signed by someone at the Thompson, Wigdor
11    and Gilly, LLP law firm, correct?
12         A.    Uh-huh.
13         Q.    And underneath the signature line
14    it's Scott P. Gilly, Douglas H. Wigdor,
15    Kenneth P. Thompson and Andrew S. Goodstadt.
16    Would you agree with me that those four
17    names appear?
18         A.    Yes.
19         Q.    Okay, and my question to you,
20    sir, is given the fact that this is dated
21    June 30, 2006, and purportedly signed by
22    your attorneys, one of whom is sitting here
23    today, in relation to June 30, 2006 when did
24    you retain Mr. Goodstadt's law firm?
25         A.    Isn't that the date right there?
                  Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                       J. Nofi
 2    You just told me, June 6, 2006, you just
 3    said.
 4         Q.    No, sir, that's when the notice
 5    of claim was signed purportedly by your
 6    attorneys.
 7         A.    I would say before that date
 8    then.
 9         Q.    That's my question, how long
10    before that day?
11         A.    I don't know.
12         Q.    Weeks?
13         A.    I don't know.
14         Q.    Did you have meetings with
15    Mr. Goodstadt in his office prior to the
16    notice of claim?
17              MR. GOODSTADT:    Objection.
18         A.    I don't know.
19              MR. GOODSTADT:    Don't answer it.
20         Q.    And, sir, you've alleged in
21    paragraph 103 the following:    Upon
22    information and belief Sanchez knew that her
23    statements to plaintiffs were false, that
24    plaintiffs reasonably believed her
25    statements to be true, and that plaintiffs
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                         J. Nofi

 2     likely would act in reasonable reliance of

 3     her statements.  Do you see where I'm

 4     reading?

 5          A.   Yes.

 6          Q.   ` You then allege, moreover,

 7     Sanchez made these false statement with an

 8     intent to deceive plaintiffs and prevent

 9     them from seeking legal recourse in

10     connection with their termination.

11          A.   Now I remember, thank you.

12          Q.   You remember what?

13          A.   You just refreshed my memory.

14     She told me we couldn't even get counsel

15     because we had no rights, and then we took

16     it upon ourselves to get counsel.

17          Q.   And did you ask counsel what

18     those rights were?

19               MR. GOODSTADT:   Objection.

20               MR. NOVIKOFF:   See, here's where

21          I will take it to the Judge, Andrew,

22          not today, and if you want to take it

23          outside, I think it's best not to have

24          your client here when we discuss this

25          issue.  If so, if you can, just excuse
                    Precise Court Reporting
         (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                     J. Nofi

 2       him for two minutes so we can discuss

 3       it outside his presence.

 4            MR. GOODSTADT:   Right now?

 5            MR. NOVIKOFF:   Yes, right now.

 6            THE VIDEOGRAPHER:   Off the

 7       record?

 8            MR. NOVIKOFF:   No, we're going

 9       to stay on.  You and I are going to

10       stay on the record but if your witness

11       can leave just for two minutes.

12            (Whereas the witness was

13       excused.)

14            MR. NOVIKOFF:   You are alleging,

15       not you but your clients are alleging a

16       civil service conspiracy involving the

17       civil service department, Hesse and my

18       clients.

19            MR. GOODSTADT:   Correct.

20            MR. NOVIKOFF:   You've made

21       allegations here about reasonable

22       reliance.  My understanding of the law,

23       and someone can correct me, is that you

24       had, your clients had four months to

25       file an Article 78 petition challenging
```

1           J. Nofi

2      the decision, seeking a name clearing

3      hearing or due process type hearing.

4      The notice of claim is within that four

5      month period.  For them to have made

6      these allegations brings into play the

7      reasonability of their reliance and the

8      civil conspiracy issues.

9           So, what you may have said to

10     them is relevant, and I do believe that

11     you can't, not you but your clients

12     can't fall behind the privilege claim

13     unless they want to withdraw those

14     claims because in my opinion, and again

15     I'm going to fight this out today,

16     we'll bring it up with the Judge, you

17     can't allege reasonable reliance and

18     you can't allege a civil conspiracy

19     claim and seek damages for that based

20     upon what Sanchez may or may not have

21     said, when you were retained prior to

22     that four month period.

23          MR. GOODSTADT:   We'll take it up

24     with the Judge.

25          MR. NOVIKOFF:   Okay, sure.

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                      J. Nofi
 2             MR. GOODSTADT:    And I disagree
 3        with what you are saying but we will
 4        take it up with the Judge.
 5             MR. NOVIKOFF:    Okay.
 6             MS. ZWILLING:    Before your
 7        client returns, would you object to my
 8        moving to the other side of the table
 9        just because it's freezing in here?
10             MR. GOODSTADT:    No, I don't.
11             MS. ZWILLING:    I won't look over
12        your shoulder or read any notes.
13             MR. NOVIKOFF:    Why don't we
14        finish the tape and then move onto
15        lunch.
16             (Whereas the witness entered the
17        hearing room.)
18        Q.    Sir, let's look at paragraph --
19        A.    Excuse me, hold on.
20        Q.    Sure.
21        A.    Go ahead.
22        Q.    Let's look at paragraph 104 on
23   page 24.  You write, when Officers Fiorillo,
24   Nofi and Lamm left Sanchez' office, Sanchez
25   immediately called Hesse and notified him of
```

```
 1                     J. Nofi

 2    the substance of her conversation with

 3    plaintiffs, in flagrant disregard of keeping

 4    plaintiffs conversation confidential.  Do

 5    you see that?

 6         A.   Yes.

 7         Q.   What is the evidence that you

 8    rely upon that Sanchez immediately called

 9    Hesse?

10         A.   The blog was one of them, okay,

11    and I believe what Ed Carter said.

12         Q.   That George Hesse told him that

13    Sanchez had called?

14         A.   Not that he told me, that he had

15    a conversation, that George had a

16    conversation with Alison Chester.

17         Q.   Now, you then go on or plaintiffs

18    then go on to allege, it is not surprising

19    that Sanchez breached her promise to

20    Officers Fiorillo, Nofi and Lamm, as Hesse

21    had bragged to Officer Carter about having a

22    sexual relationship in the past.  Do you see

23    that?

24         A.   Yes.

25         Q.   Were you aware of Hesse's
```

```
 1                      J. Nofi

 2    relation to Sanchez prior to your meeting

 3    with Sanchez?

 4         A.    I told you, yes.  I'm not sure of

 5    the date, I'm just stating what he said, but

 6    I'm not sure of the date.

 7         Q.    And my question, sir, and I

 8    understand what you testified to, were you

 9    aware of Hesse's bragging about this alleged

10    sexual relationship prior to your meeting

11    with Sanchez?

12         A.    I'm not sure of the date but he

13    bragged so much, I can't remember.

14         Q.    The answer is either yes, no or I

15    don't know.

16         A.    I don't remember.

17              MR. NOVIKOFF:  Okay, fine.

18              Let's mark the next document as

19         Exhibit 2.

20              (One-page letter dated 7-7-06 was

21          marked as Defendant's Exhibit-2 for

22          identification; 9-9-08, A.S.)

23         Q.    Sir, I'm showing you what's been

24    marked as Exhibit 2, and it's Bates stamp

25    number  CCSO0083.  Do you see that?
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                       J. Nofi

 2        A.    Yes.

 3        Q.    Do you recall receiving this

 4   document from Collier County?

 5        A.    Not this one specifically, no, I

 6   don't.

 7        Q.    Do you have an understanding, and

 8   let's look at paragraph three, we were

 9   unable to obtain medical clearance, do you

10   see that?

11        A.    Yes.

12        Q.    It's dated July 7, 2006.  Do you

13   have an understanding as to what Miss

14   Standish was referring to when she made this

15   statement?

16        A.    I took a stress test and failed

17   it.  They made me go back for the dye test

18   and I passed.

19        Q.    So prior to this date you had

20   taken a stress test as part of your

21   application for Collier County and you had

22   failed that.  Collier County in this letter

23   was advising you that they need medical

24   clearance.  You then subsequently took

25   another test that you passed?
```

```
 1                        J. Nofi

 2         A.    Yes.

 3         Q.    Fine.

 4         A.    It was a dye test, don't ask me

 5    what it was about.

 6              MR. NOVIKOFF:    Let's mark the

 7         following document as Exhibit 3.

 8              (One-page letter dated 10-31-06

 9         was marked as Defendant's Exhibit-3

10         for identification; 9-9-08, A.S.)

11         Q.    Sir, I'm going to ask you to look

12    at what's Exhibit 3, and after you review it

13    advise me if you recall receiving this

14    letter before.

15         A.    I definitely don't remember

16    seeing this here, absolutely not.

17         Q.    You don't remember ever seeing

18    this?

19         A.    No.   I don't remember reading

20    anything like that, no.   No, I was never

21    told I failed the polygraph.

22         Q.    Where are you referring to, sir?

23         A.    Doesn't it say here --

24         Q.    I'm asking you for the record to

25    point out to me where you just made
```

```
 1                      J. Nofi
 2   reference to the polygraph test.  Is it the
 3   fourth paragraph?
 4        A.    Yeah, looks like the fourth one,
 5   yes.
 6        Q.    So let me read that into the
 7   record.  Paragraph four, in an October 31,
 8   2006 letter, states as follows:  Also of
 9   concern to the reviewers was that after
10   careful analysis of the polygrams from your
11   polygraph examination, it is the
12   polygrapher's opinion that you displayed
13   significant or consistent physiological
14   reactions indicative to deceptions of
15   relevant questions in this examination.  Had
16   the remainder of your processing been more
17   favorable, we would have invited you back
18   for a second polygraph to attempt to clear
19   up those areas.
20             Is it your testimony, sir, that
21   you never received this letter from Collier
22   County?
23        A.    I don't remember ever seeing a
24   letter like this.
25        Q.    So your answer would be, no, you
```

```
 1                      J. Nofi
 2   don't have any recollection of seeing this
 3   letter?
 4        A.    Not this one, no.
 5              MR. NOVIKOFF:   Okay, let's look
 6        at the next document, Exhibit D, I'm
 7        sorry, Exhibit 4.
 8              (One-page document dated 11-14-06
 9         was marked as Defendant's Exhibit-4
10         for identification; 9-9-08, A.S.)
11        Q.    Sir, do you recall seeing Exhibit
12   4 prior to today?
13        A.    I don't remember.  I probably did
14   but I don't remember.  Overnight delivery,
15   yeah, I think I might have seen this one.
16        Q.    But you don't have a recollection
17   of seeing a letter from your attorney to
18   Collier County dated November 14, 2007?
19        A.    Can I read this?
20        Q.    Read as much as you need to.
21        A.    Yes, I did see this.
22        Q.    Let's look at the second
23   sentence.  Mr. Goodstadt states we have been
24   informed that Mr. Nofi was denied a position
25   with your office due to an alleged
```

```
 1                       J. Nofi

 2    disciplinary action at a former employer

 3    which was disclosed during his background

 4    checks performed by your office.

 5              Do you have an understanding as

 6    to what Mr. Goodstadt was referring in this

 7    letter, in this sentence?

 8              MR. GOODSTADT:   Objection.

 9         A.   Yes, he was my attorney.

10         Q.   I understand that, I'm not

11    questioning that.

12              What was Mr. Goodstadt referring

13    to when he writes of a disciplinary action

14    at a former employer?

15         A.   I don't know, you have to ask

16    him.

17         Q.   Is that what you want me to do,

18    you want me to ask your attorney?

19         A.   I don't know what you mean by

20    this.

21         Q.   Well, this is your attorney

22    writing the letter, right?

23         A.   Right.

24         Q.   So I'm asking you, do you have

25    an understanding as to what Mr. Goodstadt
```

           1                    J. Nofi

           2    was referencing when he says that there was

           3    an alleged disciplinary action at a former

           4    employer concerning you?

           5         A.    I guess he was writing for me for

           6    Collier County because I didn't get the job.

           7         Q.    I understand that, but were you

           8    ever disciplined by a former employer?

           9         A.    Was I ever disciplined by a

          10    former employer?  No, not that I know of,

          11    absolutely not.

          12         Q.    Right, so my question to you,

          13    sir, do you have any understanding as to

          14    what Mr. Goodstadt meant when he was making

          15    reference to the fact that Collier County

          16    denied your position due to an alleged

          17    disciplinary action at a former employer?

          18             MR. GOODSTADT:  Objection.

          19         A.    Oh, yes, I would say Ocean Beach,

          20    I guess he means.

          21         Q.    I'm not asking you to guess or

          22    speculate.

          23         A.    I'm not guessing.  I would say he

          24    means Ocean Beach.  He probably just didn't

          25    put or misunderstood disciplinary action, in

                        Precise Court Reporting
             (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                          J. Nofi

 2     other words, for what was said about me in

 3     Ocean Beach.

 4          Q.   So now you are reading alleged

 5     disciplinary action as being what was said

 6     about you?

 7          A.   Right.

 8          Q.   By Mr. Hesse?

 9          A.   Right.

10               MR. NOVIKOFF:   I think we are

11          good to stop there.

12               THE VIDEOGRAPHER:   This ends

13          tape number two.   The time is 12:46

14          p.m., we are off the record.

15               (Whereas a luncheon recess was

16          taken.)

17               THE VIDEOGRAPHER:   This begins

18          tape number three, the time is 1:40

19          p.m., back on the record.

20               MR. NOVIKOFF:   Sir, we left off

21          looking at some documents concerning

22          Collier County.  Let's mark the

23          following document as Exhibit 5.

24               (Two-page document dated 11-16-06

25          was marked as Defendant's Exhibit-5
```

```
 1                    J. Nofi

 2        for identification; 9-9-08, A.S.)

 3           MR. NOVIKOFF:  And, for the

 4        record, Exhibit 5 is CCSO 87 to 88.

 5     Q.   Sir, I'm going to ask you to

 6  review Exhibit 5 and when you're done tell

 7  me.

 8     A.   I'm done.

 9     Q.   Now, this is a letter from

10  Collier County, Gail Addison, to you dated

11  November 16, 2006.  Do you see that?

12     A.   Uh-huh.

13     Q.   Did you receive this document?

14     A.   Yes, I did.

15     Q.   Do you recall seeing this

16  document?

17     A.   Yes.

18     Q.   Do you recall seeing this

19  document on or about November 16, 2006?

20     A.   I guess that's when it came in,

21  yes.

22     Q.   Around that time?

23     A.   Yes.

24     Q.   And this is in response to

25  Mr. Goodstadt's letter that I showed you
```

```
 1                         J. Nofi

 2     before lunch, would you agree with me?

 3          A.    Yes.

 4          Q.    And in fact in this letter

 5     Collier County is saying that there was no

 6     indication of any disciplinary action taken

 7     against you by any employer, correct?

 8               MR. GOODSTADT:  Objection.  The

 9          letter speaks for itself.

10          Q.    And, sir, Collier County is

11     advising you in this letter as to why they

12     didn't hire you, correct?

13          A.    Yes.

14          Q.    And one of the reasons was, if

15     you look at the second page, is that you

16     didn't satisfy their requirement of two

17     years of full-time experience in the

18     position of law enforcement officer,

19     correct?

20          A.    Yes, I see it.

21          Q.    Is that an accurate statement

22     regarding your employment history as a law

23     enforcement officer at this time?

24          A.    What line was that again?

25          Q.    Second paragraph, second page.
```

```
 1                      J. Nofi

 2     Go to the second page.

 3          A.    Oh, second page, okay.

 4          Q.    The position of law enforcement

 5     officer requires a minimum of two years of

 6     full-time experience, do you see that?

 7          A.    Yes.

 8          Q.    Any reason to believe that

 9     Collier County was lying with regard to what

10     their requirement was?

11          A.    I don't see why they would be,

12     no.

13          Q.    They then go on to write, when we

14     sought to verify that you met this

15     prerequisite, we were advised that all of

16     your law enforcement experience has been

17     part time and slash or seasonal, do you see

18     that?

19          A.    Yes.

20          Q.    And in fact that's a true

21     statement, correct, as of this time?

22          A.    Yes and no.

23          Q.    Okay, why wouldn't this be a true

24     statement as of that time?

25          A.    Because my police certificate
```

```
 1                      J. Nofi

 2    through Suffolk County, that I worked for

 3    the Suffolk County Health Department,

 4    through the certificate I could work, if

 5    they needed emergency, to do law enforcement

 6    for them when I had my police certificate,

 7    and it was good.

 8         Q.    For Suffolk County, what was that

 9    job again?

10         A.    The health department, it was

11    just in an emergency.

12         Q.    Did you spend two years of

13    full-time for the Suffolk County Health

14    Department as a law enforcement officer?

15         A.    No.

16         Q.    So you would agree with me that

17    your job at Suffolk County Health did not

18    satisfy the two year prerequisite, correct?

19         A.    That's what they're stating, yes.

20         Q.    Would you agree with that?

21         A.    Not really, no.

22         Q.    Did you work two years at Suffolk

23    County Health as a law enforcement officer

24    on a continuous basis?

25         A.    No.
```

```
 1                      J. Nofi

 2          Q.    So, let me ask you a question,

 3    wouldn't you agree with the statement, with

 4    my statement, that, as it pertains to the

 5    Suffolk County Health Department job, you

 6    did not have two years of continuous and

 7    full-time police officer experience?

 8          A.    According to that letter, yeah.

 9          Q.    No, according to you, did you or

10    did you not?

11          A.    It's hard to say because

12    seasonal, part time you work all year round

13    anyway.  I worked all year round.

14          Q.    We are not talking Ocean Beach,

15    we are talking Suffolk County Health, okay?

16          A.    Yeah.

17          Q.    Okay, did you spend two years of

18    full-time service at the Department of

19    Health for Suffolk County --

20          A.    No.

21          Q.    -- in a law enforcement job?

22          A.    No.

23          Q.    Now, Ocean Beach -- well, other

24    than Ocean Beach, any other law enforcement

25    experience?
```

```
 1                    J. Nofi

 2         A.    Ocean Beach.

 3         Q.    Just Ocean Beach, right?

 4         A.    Yes.

 5         Q.    So Ocean Beach was the only job

 6   that you had up until this date where you

 7   were involved in law enforcement, correct?

 8         A.    Yes.

 9         Q.    Now, was --

10              MR. NOVIKOFF:    Withdrawn.

11         Q.    Your job at Ocean Beach was part

12   time, correct?

13         A.    I'm not sure if it was seasonal

14   or part time.  I don't know how they

15   pronounce that.

16         Q.    Was it seasonal?

17         A.    I'm not sure.

18         Q.    What was your understanding of

19   what it was?

20         A.    I worked all year round, that's

21   all I know.

22         Q.    40 hours a week?

23         A.    No, not always, no.  I did work

24   all year round.

25         Q.    Did you ever work 40 hours a
```

```
 1                         J. Nofi

 2     week?

 3          A.    I believe so, yes.

 4          Q.    How many times?

 5          A.    I'm not sure.

 6          Q.    Less than five?

 7          A.    I don't know, but that letter was

 8     given to me after the fact.

 9          Q.    Sir, were you a full-time

10     employee of Ocean Beach?

11          A.    No.

12          Q.    Were you a full-time police

13     officer for Ocean Beach?

14          A.    No.

15          Q.    You were a part-time police

16     officer, correct?

17          A.    Yes.

18          Q.    So, with regard to your Ocean

19     Beach experience, the paragraph that I just

20     read from this letter would be true,

21     correct?

22          A.    I'd say so, yes.

23          Q.    Let's look at the first paragraph

24     of the second page.  Collier County is

25     advising you that an additional concern they
```

```
 1                        J. Nofi

 2      had regarding your job history was, quote,

 3      your failure to disclose all prior

 4      employers, parenthesis, until after you

 5      signed the conditional offer of employment,

 6      closed parenthesis, do you see that?

 7           A.    No, I don't.

 8           Q.    No, first paragraph, second page?

 9           A.    Yes, okay.

10           Q.    Was that an accurate statement,

11      that you failed to disclose all your prior

12      employers?

13           A.    Not to my knowledge, I could have

14      sworn I gave them everything.

15           Q.    Did you ever ask them to review

16      that statement upon receipt of this letter?

17           A.    I asked them to mail me something

18      back.

19           Q.    Did you ever write to them or

20      have your attorney write to them that they

21      were wrong, that you had disclosed all your

22      prior employers?

23           A.    I'm not sure.

24           Q.    Okay, let's look at the first

25      page.  Anything on the first page that you
```

```
 1                    J. Nofi

 2    believe was inaccurate?

 3         A.    Yes, there's inaccurates.

 4         Q.    What are the inaccurates?

 5         A.    I don't know where they got this

 6    from.  There must have been a miswriting

 7    from whoever wrote this, I have no idea.

 8         Q.    What's inaccurate?

 9         A.    This came from my job, Suffolk

10    County.  I don't know where liquor

11    enforcement came from.  That must have been

12    a type error from, you know, when he sent in

13    to work there, because there's no such

14    thing.  I worked for tobacco education

15    enforcement, nothing to do with liquor.

16         Q.    Okay, anything else that's

17    inaccurate on the first page of this letter?

18         A.    I don't see anything really

19    besides that, I think.

20              MR. NOVIKOFF:   Let's mark the

21         next document as Exhibit 6.

22              (Five-page document was marked as

23          Defendant's Exhibit-6 for

24          identification; 9-9-08, A.S.)

25         Q.    Sir, let's go back to Exhibit 5.
```

```
 1                       J. Nofi
 2    It's right in front of you over there.
 3                Given your receipt on or about
 4    November 16, 2006 of this, do you still
 5    maintain that you were denied the Collier
 6    County position because of something
 7    Mr. Hesse may have said to the investigator?
 8         A.    Yes.  I believe so, yes.
 9         Q.    Notwithstanding what was said in
10    this letter?
11         A.    No, because this was after the
12    fact.
13         Q.    This was after what?
14         A.    After his conversation I got
15    this.
16         Q.    I understand. Is it still your
17    testimony, given what Collier County wrote
18    in a letter about your lack of experience,
19    that you didn't get the job because of
20    something Mr. Hesse said?
21         A.    You're going to have to wait a
22    second.
23         Q.    I will wait.
24         A.    I can't really hear you.  Okay,
25    go ahead.
```

```
 1                    J. Nofi

 2       Q.    Okay, given that this letter from

 3  Collier County --

 4       A.    Where in this letter, which

 5  sentence?

 6       Q.    The second page.

 7       A.    Second page?

 8       Q.    Second page.

 9       A.    Okay.

10       Q.    Given the fact that Collier

11  County has advised you that you did not have

12  the requisite two years full-time

13  experience, do you still maintain the

14  position that you were denied the job at

15  Collier County because of something

16  Mr. Hesse said or wrote?

17       A.    Yes.

18       Q.    Let's look at Exhibit 6.

19       A.    This page here now?

20       Q.    Yes.

21             Just review Exhibit 6 and tell me

22  when you're done.

23             MR. NOVIKOFF:   Well, withdrawn.

24       Q.    Do you recall receiving Exhibit 6

25  at any point in time prior to today?
```

```
 1                      J. Nofi

 2        A.    I have to look at it.

 3        Q.    If you need to look at it, then

 4   go ahead.

 5              MR. NOVIKOFF:    And, for the

 6        record, it's CCSO 93 through 97.

 7        Q.    Let me stop you after the first

 8   page, sir.

 9        A.    Okay, go ahead.

10        Q.    Do you recall ever receiving the

11   first page of this document?

12        A.    This one here, right here?

13        Q.    Yes.

14        A.    What do you mean?

15        Q.    Did you -- is this part of the

16   documents that you received from Collier

17   County when you asked for documents about

18   you, that you've previously testified to?

19        A.    I think I got this one here.  I'm

20   not sure about this one here.  I probably

21   did but I'm not 100 percent sure.

22        Q.    Then go through the rest of the

23   documents.

24        A.    Sure.  You want me to read the

25   rest of this stuff?
```

```
 1                        J. Nofi

 2        Q.    If you feel you need to.

 3              MR. GOODSTADT:    Read it.

 4        Q.    Do you feel you need to read the

 5   rest of the documents?

 6   `   A.    Yes.

 7        Q.    Okay, then go ahead.

 8        A.    Okay.

 9        Q.    You have now read this document,

10   this exhibit.  Did you receive this in the

11   documents received from Collier County?  Did

12   you make a request as you have previously

13   testified to?

14        A.    My only request from Collier

15   County the papers, you know, for the

16   investigation itself.  I'm not sure if I got

17   this one but I might have, but I got a bunch

18   of papers.

19        Q.    All I'm asking, is this a

20   document you recall getting from Collier

21   County when you made the request?

22        A.    I don't know, it's possible.

23        Q.    Okay, let's go through it.

24        A.    I know the second one, I remember

25   this because I said that was wrong.
```

```
 1                          J. Nofi
 2          Q.    You are referring to page 94?
 3          A.    Yes.
 4          Q.    What was wrong on page 94?
 5          A.    Somebody put liquor stuff, I
 6    don't know why.
 7          Q.    What?
 8          A.    Misunderstanding, the liquor
 9    stuff.
10          Q.    Oh, on 10-23-06.
11          A.    Yeah, it's tobacco, they must
12    have misunderstood her.
13          Q.    So you called up the investigator
14    and told them that they were wrong?
15          A.    I don't know.  I don't know if I
16    let him know after the fact when he talked
17    to me, most likely I probably I did, yeah.
18          Q.    Did you talk to the investigator
19    after this?
20          A.    I don't know when the date was,
21    when this was.  I talked to the investigator
22    after I was denied.  That's the only time I
23    talked to him.  I called him up, and I might
24    have called him before, one time before too,
25    but that was just about how it was going.
```

```
 1                         J. Nofi

 2         Q.    Now, on page two is there any

 3    indication with regard to what Mr. Hesse

 4    said, that he defamed you or said anything

 5    malicious against you?

 6         A.    On what page?

 7         Q.    On page 94.

 8              MR. GOODSTADT:    Objection.

 9         Q.    The second page of this document,

10    let's look on 9-15-2006.

11         A.    9-15-2006, okay.

12         Q.    Deputy Chief Hesse verified, do

13    you see that paragraph?

14         A.    Yes.

15         Q.    Anything in that paragraph that

16    you believe was defamatory about you?

17              MR. GOODSTADT:    Objection.

18         Q.    I will make it simpler because I

19    think your attorney is objecting because you

20    may not know what defamatory means.

21         A.    I know what it means.

22         Q.    Anything in that paragraph that

23    you believe was a lie from Mr. Hesse?

24         A.    No, not in that paragraph.

25         Q.    Anything in that paragraph that
```

```
 1                      J. Nofi
 2   you believe that Mr. Hesse was being
 3   malicious towards you?
 4        A.    Yes.  When he mentioned that we
 5   were suing the department, that probably
 6   destroyed it right there.
 7        Q.    Let's look at the paragraph
 8   before.  It says Chief Paradiso also said
 9   that you were suing the department, do you
10   see that?
11        A.    Yes.
12        Q.    Okay, was that malicious?
13        A.    He didn't add other stuff.
14        Q.    What other stuff, sir?
15        A.    Stuff that George said over the
16   phone, not on paper.
17        Q.    But you don't know what George
18   said over the phone?
19        A.    From what I was told.
20        Q.    All you were told, sir, was that
21   Mr. Hesse gave you a bad reference, right?
22        A.    Right, and he didn't say very
23   nice things about me, according to Chief
24   Paradiso.
25        Q.    But you don't know specifically?
```

```
 1                    J. Nofi

 2         A.    Of course not, I can't find out.

 3    How am I going to find out?  He's not going

 4    to tell me, he's an investigator.

 5         Q.    Okay, and also you would agree

 6    with me, sir, that your filing -- you filed

 7    a complaint --

 8              MR. NOVIKOFF:  Well, withdrawn.

 9              Well, no, actually I'm not going to

10              withdraw that.

11         Q.    According to Mr. Paradiso, you

12    had already filed a complaint prior to him

13    and Mr. Paradiso speaking to the

14    investigator, correct?

15              MR. GOODSTADT:  Objection.

16         A.    What do you mean, filed a

17    complaint?

18         Q.    Did you file a notice of claim

19    prior to Mr. Paradiso speaking with the

20    investigator, according to this document?

21              MR. GOODSTADT:  Objection.

22         A.    I don't know.  I don't know the

23    date.

24         Q.    You don't recall, okay.  Let's

25    look at the third page, page 95.
```

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                        J. Nofi

 2                 It references towards the bottom,

 3       three paragraphs up, see docket 8814303, do

 4       you see that?

 5            A.    No, I don't.  Page 95 you said,

 6       correct?

 7            Q.    Yes, three paragraphs from the

 8       bottom.  Nope, go from the bottom and go up

 9       three paragraphs.

10            A.    Okay, from the bottom, okay, go

11       ahead.

12            Q.    This makes reference to a

13       judgement of divorce on 10-7-88.

14            A.    What?

15            Q.    Do you see that paragraph?

16            A.    Where is that?

17                 MR. GOODSTADT:  It's right here.

18            A.    Okay, you got the wrong person.

19            Q.    Well, I don't have anything.  I'm

20       asking you the question, does this pertain

21       to you?

22            A.    No.

23            Q.    That's all I wanted to know.

24       Let's look at the next page.

25            A.    Okay.
```

```
 1                          J. Nofi
 2         Q.    Page 96.
 3         A.    96?
 4         Q.    96, let's look at the middle
 5    starting on 06-26-2006, do you see that?
 6         A.    Yes.
 7         Q.    Let's look at that fourth
 8    paragraph starting with the applicant states
 9    he was arrested, do you see that?
10         A.    No.
11         Q.    The applicant states he was
12    arrested when he was 19 years of age.
13         A.    Yes.
14         Q.    Do you see that?
15         A.    I got it.
16         Q.    For filing a false stolen vehicle
17    police report, correct?
18         A.    Yes, which was thrown out.
19    MO         MR. NOVIKOFF:  Motion to strike
20         as not responsive.
21         Q.    The question I have for you, sir,
22    is the statement pertaining to the fact that
23    you were arrested is a true statement,
24    correct?
25         A.    Yes, it was false though.
```

```
 1                      J. Nofi

 2        Q.    You were arrested, sir, correct?

 3        A.    Yes.

 4        Q.    Were you arrested when you were

 5   19 or 25?

 6        A.    I don't know how old I was.

 7        Q.    Or 24?

 8        A.    I was about 22, 23, maybe.  I

 9   don't remember, it was a long time ago.

10        Q.    How many times have you been

11   arrested, sir?

12        A.    Never in my life.

13        Q.    Other than that one time?

14        A.    Never even had a ticket in my

15   life.

16        Q.    You don't know as you sit here

17   today whether you were 19 or 24?

18        A.    No, it was a long time ago, 30

19   years ago, 32 years ago, I don't know.

20        Q.    Just trying to verify that you

21   don't recall your age when you were

22   arrested.

23        A.    Never been arrested, never been

24   in trouble.

25        Q.    The investigator believes you
```

```
 1                    J. Nofi
 2    told him you were 19, do you see that?
 3              MR. GOODSTADT:   Objection.
 4         A.   That's false.
 5         Q.   Did you ever advise the
 6    investigator that he was wrong as to what he
 7    says you told him?
 8         A.   That's false.
 9         Q.   Okay.
10         A.   Not true.
11         Q.   Now, you said the case was later
12    dismissed.  I'm sorry, the investigator says
13    that you told him that the case was later
14    dismissed.
15         A.   I told the investigator, yes, it
16    was thrown out.  It was sealed, thrown out.
17    I was told by the judge in Mineola it was
18    sealed and thrown out because it was a
19    mistake, because I signed a piece of paper
20    and I didn't know what I was signing.  When
21    I went to court the judge told me case
22    dismissed, mailed my documents back, we
23    burned them up in the garbage pail.
24         Q.   Sir, did you ever plead guilty?
25         A.   Yes, to a violation.
```

```
 1                         J. Nofi

 2         Q.    And did you pay a fine?

 3         A.    $250, I believe it was.

 4         Q.    You pled guilty to a violation?

 5         A.    Yes.

 6         Q.    What's your understanding of what

 7    a violation is?

 8         A.    Liking a parking ticket.

 9         Q.    Okay, then you believe it was

10    thrown out?

11         A.    It was thrown out.  It was

12    sealed, the judge told me right to my face

13    it was sealed.

14         Q.    And who was the judge?

15         A.    I don't remember 30 something

16    years ago.

17         Q.    Okay, no problem.

18         A.    I have no idea.

19              MR. NOVIKOFF:    Let's move onto

20         the next document, Exhibit 7.

21              (Two-page document dated 9-15-06

22          was marked as Defendant's Exhibit-7

23          for identification; 9-9-08, A.S.)

24         Q.    Take a look at Exhibit 7, and

25    advise me if you recognize this document?
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

1                          J. Nofi

2         A.    I'm not sure, probably, yeah.

3         Q.    I don't want you to be probable,

4   I don't want you to guess. I don't want you

5   to speculate. Do you recall seeing this

6   document prior to today?

7         A.    I'm not sure, I really can't tell

8   you, I don't know.

9         Q.    Do you recall ever receiving this

10  document from Collier County after you made

11  the request?

12        A.    No, I don't believe I did see

13  this.

14        Q.    Okay, let's move on.

15        A.    I'm not 100 percent sure.

16              MR. NOVIKOFF:    Let's go to

17        Exhibit 8.   Mark the following document

18        as Exhibit 8.

19              (Two-page document was marked as

20        Defendant's Exhibit-8 for

21        identification; 9-9-08, A.S.)

22              MR. NOVIKOFF:   Actually, for the

23        record, before you mark that, Exhibit 7

24        was CCSO 124 to 125.

25              (Two-page document was marked as

```
 1                    J. Nofi
 2          Defendant's Exhibit-8 for
 3          identification; 9-9-08, A.S.)
 4              MR. NOVIKOFF:   And for the
 5          record Exhibit 8 is CCSO 1047 to 0148.
 6          Q.   And just read it for me to
 7     yourself and tell when you're done reading
 8     it.
 9          A.   Okay, I've seen this.
10          Q.   Now, when did you first see this?
11          A.   When they mailed it to me, when I
12     asked for this.
13          Q.   So this was part of the documents
14     you received from Collier County subsequent
15     to your request?
16          A.   Yes.
17          Q.   Okay, and this is the
18     investigator's notes concerning his
19     conversation with Mr. Paradiso, to the best
20     of your knowledge?
21          A.   Yes, that's what he put on there.
22          Q.   And Mr. Paradiso is
23     acknowledging, well, according to the
24     investigator, Mr. Paradiso indicated that
25     you were in fact suing the village, correct?
```

```
 1                    J. Nofi

 2        A.    That's what he says here.

 3        Q.    Anything in this document that

 4   you believe was malicious on the part of

 5   Mr. Paradiso?

 6        A.    Absolutely not.  Look at it,

 7   excellent on everything he put, why would I?

 8              MR. NOVIKOFF:  I'm just asking

 9         you.  Okay, let's look at the next

10         document, Exhibit 9.

11              (Two-page document was marked as

12          Defendant's Exhibit-9 for

13          identification; 9-9-08, A.S.)

14              MR. NOVIKOFF:  And, for the

15         record, Exhibit 9 is CCSO 149 to 150.

16        Q.    Now, we spoke at length, sir --

17   well, let me ask you a question.

18              Is this part of the documents

19   that you received from Collier County?

20        A.    Yes.

21        Q.    And you would have received this

22   prior to today, correct?

23        A.    Before today, yes.

24        Q.    Right, at your request of Collier

25   County they sent this to you?
```

1                         J. Nofi

2          A.    Yes.

3          Q.    Now, I believe we talked somewhat

4     at length this morning about a document that

5     you recall receiving from Collier County.

6     Do you recall that?

7          A.    Yes.

8          Q.    Was this the document that you

9     were referring to?

10         A.    One of them, yes.

11         Q.    Right, well, this was the

12    document that you said there was a cross out

13    on, correct?

14         A.    Yes.

15         Q.    And the cross out you are

16    referring to is what appears at the bottom

17    of 149?

18         A.    And the top of both, on the

19    bottom of the first page and this.

20         Q.    I'm only concerned about 149 now.

21         A.    Okay.

22         Q.    Now, I believe you testified that

23    that was Mr. Hesse crossing that out,

24    correct?

25         A.    I never said that, did I?

```
 1                        J. Nofi

 2        Q.    I believe you did.  The record

 3   will say what you said, but that's okay?

 4        A.    Then I must have misunderstood.

 5        Q.    Do you have any knowledge as to

 6   who crossed this out?

 7        A.    I'm sure the investigator, what

 8   Hesse told him to cross it out.

 9        Q.    What was the answer?

10        A.    I guess the investigator, when he

11   talked to him, must have crossed this out,

12   I'm not sure.

13        Q.    Do you have any reason to believe

14   Mr. Hesse had anything to do with the

15   crossing out?

16        A.    Yeah, those are his words, he

17   didn't put those words in his mouth, did he?

18        Q.    I'm talking about, did Mr. Hesse

19   actually cross this line out, to the best of

20   your knowledge?

21        A.    By over the phone, not by hand.

22   I don't know.

23        Q.    Oh, okay, and the second page

24   there's a cross out, do you see that?

25        A.    Yes.
```

```
 1                      J. Nofi
 2         Q.    And these were all questions
 3    concerning your role as a seasonal police
 4    officer at Ocean Beach, do you see that?
 5         A.    Yes.
 6              MR. GOODSTÄDT:   Objection.
 7         Q.    Would you -- is that your
 8    understanding as to what these questions
 9    pertain to?  You can read them, if you want.
10         A.    Yes, I guess so.
11         Q.    You guess so?  You need to take
12    more time to read it?
13         A.    No.
14         Q.    Well, let's look, the bottom of
15    149 it says rate the applicant in the
16    following areas, do you see that?   Then it
17    says example, good, fair and poor, right?
18         A.    Yes.
19         Q.    You would agree with me that that
20    pertains to your time at the Ocean Beach
21    Police Department, correct?
22         A.    Yes.
23         Q.    Okay, then the next question is
24    would you recommend the applicant for a
25    position with agency.  You would agree with
```

```
 1                        J. Nofi

 2      me that pertains to the Ocean Beach Police

 3      Department?

 4          A.    Yes.

 5          Q.    Then let's look at the next page.

 6               Would you agree with me that all

 7      these questions that were set forth on this

 8      page pertain to your employment history at

 9      Ocean Beach?

10          A.    Uh-huh.

11          Q.    Yes?

12          A.    Yes.

13          Q.    Okay, now let's look at the

14      second page.  It's written under please

15      provide any additional information, Deputy

16      Chief Hesse states, quote, his police

17      department is being sued by the applicant

18      for, quote, wrongful parenthesis job

19      termination, closed quote, do you see that?

20          A.    Uh-huh.

21          Q.    Chief Hesse states he cannot

22      comment on the APP apostrophe S reason he

23      was let go or his job history at the PD due

24      to the ongoing lawsuit, do you see that?

25          A.    Yep.
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2        Q.    So you have no reason to believe,

 3   based upon this document, that Mr. Hesse

 4   said anything bad about you?  No?

 5        A.    Definitely disagree with what

 6   you're saying.

 7        Q.    What in that document points to

 8   something that Mr. Hesse said that you

 9   belief was bad about you?

10        A.    I'm not that dumb.  Just look at

11   it and read it for yourself and you tell me.

12        Q.    I'm asking you.

13        A.    I'm asking you, just look at it.

14        Q.    We can go over this all day.

15   Mr. Hesse, according to the investigator,

16   says he can't comment because of the lawsuit,

17   right?

18        A.    Right.

19        Q.    So I'm asking you, sir, what in

20   this document, can you point to the Judge

21   and the jury, since you're on videotape and

22   we are going to be playing this at trial --

23        A.    Good.

24        Q.    -- if it gets there, that you

25   believe Mr. Hesse said that was derogatory
```

```
 1                        J. Nofi

 2     towards you?

 3          A.    Can I answer now?

 4          Q.    By all means.

 5          A.    Look at the difference from that

 6     one to that one, big difference.

 7          Q.    Sir, explain?

 8          A.    I just explained it to you.

 9          Q.    For the record --

10          A.    I'm answering you.

11          Q.    Sir, on this document, Exhibit 9,

12     what did Mr. Hesse say about you that you

13     believe was derogatory?

14               MR. GOODSTADT:    Objection, asked

15          and answered.

16          Q.    That's fine but you can answer.

17          A.    I answered, I just told you,

18     that's my answer.

19          Q.    That's your answer?

20          A.    Yes.

21          Q.    Okay.

22               MR. GOODSTADT:    And just so the

23          record is clear, when he said compare

24          the two, he is comparing Exhibit 9 to

25          Exhibit 8.
```

```
 1                    J. Nofi

 2            MR. NOVIKOFF:   That's fine.   I

 3       think his testimony says what it says.

 4            Let's look at the next document,

 5       let's mark that Exhibit 10.

 6            (Three-page document was marked

 7        as Defendant's Exhibit-10 for

 8        identification; 9-9-08, A.S.)

 9            MR. NOVIKOFF:   For the record,

10       Exhibit 10 is CCSO 218, 219 and 220, I

11       believe.

12       Q.   Review this document please and

13  tell me when you're done.

14       A.   Who is this from?

15       Q.   Sir, just read it and tell me if

16  you've seen it, and when you're done reading

17  it, and then I will ask the questions.

18       A.   I can't say if I did see it, I

19  don't even know who this is from.

20  Background investigation, is this from

21  Suffolk County or Florida?  I don't even

22  know.

23       Q.   Just tell me when you're done

24  reading this.

25            MR. GOODSTADT:   Just wait for
```

```
 1                     J. Nofi

 2          him to ask a question.

 3          A.    I don't remember seeing this.

 4          Q.    On page two of this exhibit

 5     there's a reference to a quote, towards the

 6     bottom.

 7                MR. GOODSTADT:   Of 219, are you

 8          on 219?

 9          Q.    Look under if yes, give details,

10     do you see that?

11          A.    Yes.

12          Q.    Then it says see addendum, do you

13     see that?

14          A.    See what?

15          Q.    See addendum?

16          A.    Yes.

17          Q.    After that it says, quote, PO

18     tricked me into signing a, and I can't read

19     what that word is.

20          A.    Stolen MVP report.

21          Q.    Do you recall telling the

22     investigator that?

23          A.    Yes.

24          Q.    Just do you recall telling the

25     investigator that?
```

1                          J. Nofi

2          A.    Yes.

3          Q.    Well, can you explain to me what

4     you meant when you told the investigator

5     that you were tricked into signing a stolen

6     MVP report?

7          A.    We would have to go to the

8     Suffolk County police academy and they have

9     records of it, because I had to write a

10    report on it before I got hired, and then I

11    had to check it up with the detectives and

12    the Court, but I still got hired.

13         Q.    You just testified that you told

14    the investigator that you were tricked?

15         A.    Not the investigator, the

16    polygraph guy, I believe it was the

17    polygraph guy.

18         Q.    You told somebody that you were

19    tricked?

20         A.    I think the polygraph guy.

21         Q.    But you told somebody, right?

22         A.    Yes.

23         Q.    What did you mean when you told

24    somebody that you were tricked into signing

25    that report?

                    Precise Court Reporting
         (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                    J. Nofi

 2        A.    Okay, you want me to explain?

 3        Q.    I asked the question, please go

 4   ahead.

 5        A.    I had one car when I was young.

 6   I was the only one with a car.  So my friend

 7   borrowed my car.  Okay, two detectives came

 8   to my house.  My grandmother didn't speak

 9   English, she's Cuban American, okay,

10   Spanish.  She didn't understand English, she

11   let him in the house.  They came to me and

12   asked do you own such and such car.  I said

13   yes.  They said was your car lent to a

14   friend and I told him yes.  He said sign

15   those papers, I signed the papers.  I had no

16   idea what I was signing, and then they

17   called me back about a week later and said

18   come in and talk to them.  They arrested me,

19   and then I explained to them I signed papers

20   because you told me to sign it, and it was

21   thrown out in court, and was dismissed the

22   whole thing.  It was a big misunderstanding.

23   If it wasn't, I wouldn't have been a cop and

24   it wouldn't have been thrown out.

25        Q.    You are saying that there are no
```

```
 1                    J. Nofi

 2   cops that have been arrested?

 3            MR. GOODSTADT:   Objection,

 4        that's not what he said.

 5        Q.   What do you mean by saying you

 6   wouldn't have been a cop?

 7        A.   I wouldn't have been hired as a

 8   cop if I had been convicted.

 9        Q.   Oh, and it's your belief that as

10   a seasonal part-time employee at Ocean Beach

11   you were a cop?

12        A.   Absolutely.

13            MR. GOODSTADT:   Objection.

14        Q.   Did you ever try to be a

15   full-time cop for Suffolk County?

16        A.   No.

17        Q.   Ever try being a full-time cop

18   for Nassau County?

19        A.   No.  I took the job because when

20   I moved on down south, they hire police.

21        Q.   Did you ever apply for a job in

22   Nassau County as a police officer?

23        A.   Nassau County, no.

24        Q.   Did you ever apply for a New York

25   City Police Department job?
```

```
 1                          J. Nofi

 2          A.    No.

 3          Q.    Sir, what did you mean that you

 4    were tricked?  I understand what your

 5    testimony is regarding the events

 6    surrounding your arrest.  What did you mean

 7    when you said you were tricked, who tricked

 8    you?

 9          A.    The two detectives that came to

10    my house.

11          Q.    How did they trick you?

12          A.    They told me to sign something

13    and I signed it, and I was stupid.

14          Q.    So you were stupid instead of

15    being tricked, is that your testimony?

16                MR. GOODSTADT:  Objection.

17          A.    Both.

18          Q.    Okay, so now you were both stupid

19    and tricked, right?

20                MR. GOODSTADT:  Objection.

21          Q.    Is that your testimony?

22          A.    I guess so.

23                MR. NOVIKOFF:  Okay, let's mark

24          the next document as Exhibit 11.

25                (Two-page document was marked as
                       Precise Court Reporting
             (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                       J. Nofi

 2          Defendant's Exhibit-11 for

 3          identification; 9-9-08, A.S.)

 4               MR. NOVIKOFF:   Now, for the

 5          record, Exhibit 11 is CCS 225 through

 6          226, two pages.

 7     Q.    Are you done reading that?

 8     A.    Uh-huh.

 9     Q.    Have you ever seen that document

10     prior to today?

11     A.    I don't believe so, no.

12     Q.    Let's move on then.

13     A.    It's a good document.

14     Q.    Why is it a good document, sir?

15     A.    Because you asked me a question

16     on this here, where is it?  I seen it, I see

17     it now.  Like I said, about the arrest

18     history, the way it states the charge is

19     dismissed.

20     Q.    Is that why you think this is a

21     good document?

22     A.    Yes, because what you asked me

23     before, it's stating what I said.

24     Q.    Doesn't this document also say

25     that you admitted to committing statutory
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                        J. Nofi

 2     rape when you were 18?

 3              MR. GOODSTADT:    Objection.

 4         A.   No, it doesn't say that at all.

 5         Q.   Doesn't this document indicate

 6     that the polygraph indicates that some of

 7     your responses were indicative of deception?

 8         A.   No, I don't see where it says

 9     that.

10         Q.   Let's read it.

11         A.   What page?

12         Q.   Second page.

13         A.   Okay.

14         Q.   It says a preemployment

15     examination was conducted on this date.

16     Upon completion and review of the

17     examination there was significant responses

18     indicative of deception noted to relevant

19     questions regarding --

20         A.   Oh, yes, okay, that's excellent,

21     I'm glad you brought it up.

22         Q.   Still think it's a good document?

23         A.   Yes, I do.   That was question

24     asked about Ocean Beach.

25         Q.   Okay, let's go back to Exhibit 1.
```

```
 1                         J. Nofi
 2     Let's go to page 27, paragraph 117.
 3                It is alleged on your behalf the
 4     following:  As set forth above by among
 5     other things repeatedly reporting endemic
 6     corruption and abuse of power by members of
 7     the OBPD to their superiors at the OBPD and
 8     to the Suffolk County civil service
 9     department, plaintiffs engaged in activity
10     protected by the first amendment.  Do you
11     see that?
12          A.    Uh-huh.
13          Q.    Did you repeatedly, did you,
14     Mr. Nofi, repeatedly report endemic
15     corruption and abuse of power as it's alleged
16     in this complaint?
17          A.    I did report it, yes.
18          Q.    Did you repeatedly report it?
19          A.    It depends on what you mean by
20     repeatedly.
21          Q.    What do you mean by repeatedly
22     since this is your complaint and this is
23     your allegation?
24                MR. GOODSTADT:   Objection.
25          A.    This is made by five of us
```

```
 1                    J. Nofi

 2    though, not just me.

 3         Q.   I understand that but, sir, what

 4    understanding --

 5         A.   I don't know how to answer that.

 6    How do you know it was me who said that, is

 7    what I'm saying.

 8         Q.   And that's what I'm here to find

 9    out, what is your understanding --

10         A.   I'm telling you I complained.

11         Q.   What is your understanding of the

12    word repeated?

13         A.   A couple of times.

14         Q.   A couple of times, what, two

15    times, three times?

16         A.   More than two times.

17         Q.   Less than ten?

18         A.   No, 12 to 14 times.

19         Q.   12 to 14, that is repeated?

20         A.   Yes.

21         Q.   We will go into the details later

22    but there's a reference to endemic

23    corruption?

24         A.   Yes.

25         Q.   What endemic corruption did you
```

```
 1                        J. Nofi

 2   repeatedly report, just you?

 3             MR. GOODSTADT:   Objection.

 4        A.    People drinking in the bars, cops

 5   drinking in bars.

 6        Q.    Cops drinking in bars, okay.

 7        A.    Staying overnight after duty when

 8   they were told not to, in bars getting drunk

 9   with known drug activity people that sell

10   drugs or do drugs who were busted by the

11   same cops they were hanging out with.

12        Q.    Okay.

13        A.    Okay, which is unbelievable.

14   Going into homes, we knew that was known.

15        Q.    I'm sorry, your counsel coughed,

16   I didn't hear that.

17        A.    You know, going, hanging out in

18   people's houses that were known to sell

19   drugs or do drugs and drink and party

20   parties.

21        Q.    Any other examples of what you

22   consider to be endemic corruption?

23        A.    Yes, absolutely.

24        Q.    Well, give them to me, that's

25   what we're here for.
```

```
 1                    J. Nofi

 2         A.    Going home, dropping them off in

 3    the mornings or at night, leaving the

 4    village unmanned, unsafe, while we had to

 5    leave and take drunken alcoholics, totally

 6    drunk out of their minds where they couldn't

 7    stand, back to the check point which is the

 8    43, where we used to park our cars, and not

 9    knowing whether they were going to kill

10    somebody leaving that section going home,

11    driving drunk like that, and George knew

12    because he told us to take them off.

13    MO         MR. NOVIKOFF:    Sir, I move to

14         strike that.

15         A.    And I'm answering you.

16         Q.    Well, I'm just looking for

17    examples of endemic corruption.    Like I

18    said, we will get into the details later.

19              Any other examples of what you

20    allege to be endemic corruption?

21         A.    It could be a lot of things.

22         Q.    I'm asking you, what are they?

23    This is your time to tell me.

24         A.    Leaving me at the dispatching by

25    myself at night while they go to bed, sleep
```

```
 1                      J. Nofi
 2    or go whatever they were doing.  Putting me
 3    in the back streets by myself, not knowing
 4    what I was doing when I first started,
 5    sending me back there.
 6         Q.    I'm sorry, when you said you
 7    didn't know what you were doing?
 8         A.    When I was getting trained, I
 9    didn't get any formal training, just going
10    back to the fucking back streets, shut your
11    mouth and do what I tell you what to do, in
12    that manner, exactly like that.
13         Q.    Okay, when you first started?
14         A.    No, after about a year or two it
15    started.
16         Q.    Okay, anything else?
17         A.    That's all I can remember right
18    now.
19              MR. NOVIKOFF:   We will leave a
20         space in the transcript in case you can
21         remember anything else.
22              THE WITNESS:   Okay.
23    INSERT:
24         Q.    Now, what about abuse of power as
25    it's alleged?  Give me examples of abusive
```

```
 1                        J. Nofi

 2      power?

 3                MR. GOODSTADT:   Objection.

 4           Q.    As it's alleged in paragraph 117.

 5           A.    Other people?

 6           Q.    No, no.

 7           A.    I'm answering you, I'm answering

 8      you, give me a chance here.

 9           Q.    Okay.

10           A.    Other people driving a truck

11      drunk to the check point, leaving the police

12      vehicle with a flat tire, remaining at the

13      check point for not one day, not two days,

14      not three days, not four days, not five

15      days, not six days, not seven days, without

16      getting a flat tire fixed, which the other

17      cops made, and I come in and George would

18      say fix the tire, change the tire, after

19      someone else made it flat.

20                Not once but twice I was told to

21      fix flat tires, which I didn't give the

22      trucks flat tires, told that if anybody

23      drives on the beach and gets caught driving

24      on the beach, when you're told not to go on

25      the beach, you will be fired.  One of the
```

```
 1                      J. Nofi

 2     officers drove on the beach and the truck got

 3     lost because the truck got stuck on the beach

 4     when he was told not to drive on the beach

 5     and the ocean swallowed it up and he never

 6     got reprimanded for it.  If it was me, I

 7     would have been ripped a new rear end and

 8     fired in two minutes flat because I wasn't

 9     one of his cronies.

10                      It's another time and I can go on

11     and on.  Telling other officers, I was there

12     when he told Frank Fiorillo stand on the

13     corner under the street light, don't move,

14     don't eat, don't get nothing to drink for

15     three, two, three days and told him to stay

16     and humiliated him and I was there for the

17     whole damn thing.

18                      Another time another drunken

19     officer came off the water taxi, drunk out of

20     his mind.  He was fighting with the girl,

21     supposedly punched her in the face.  Fiorillo

22     responded, I responded two minutes after

23     that, and he grabbed -- he didn't know he was

24     a cop because he never met him.  He

25     identified himself, I'm a police officer with
```

```
 1                      J. Nofi
 2    you guys Ocean Beach. He said I don't care
 3    who you are, you just hit a girl, brought him
 4    back to the station, George shut the door and
 5    me, I think it was Kevin Lamm, me and a
 6    couple of other officers went into George and
 7    Frank Fiorillo, and balled him out and cursed
 8    him out and said I don't give a shit, you
 9    should know who works here. I don't give a
10    shit if he was drunk, you don't ever do that
11    to a superior officer ever again. Meanwhile,
12    not respecting his rights to do the right
13    thing as a police officer who was assaulting
14    a girl. He embarrassed him and balled him
15    out.
16         Q.   And you complained about all of
17    this?
18         A.   Complained, I was right there.
19         Q.   Did you complain, sir?
20         A.   Absolutely.
21         Q.   To whom?
22         A.   Right to his face.
23         Q.   Well, let's go back to 117. You
24    state that you repeatedly reported endemic
25    corruption, abuse of power by members of the
                  Precise Court Reporting
          (516) 747-9393 (718) 343-7227 (212) 581-2570
```

1                          J. Nofi

2        OBPD.  Who did you mean by members?

3             A.    Chief Paradiso, George Hesse,

4        mostly George Hesse because chief never

5        really worked at night, George was on at

6        night.

7             Q.    Okay, other than Mr. Hesse, what

8        other members of the OBPD engaged in endemic

9        corruption and abuse of power?

10            A.    Oh, us guys, us five.

11                  MR. GOODSTADT:  Are you asking

12            who he complained to?

13                  MR. NOVIKOFF:  No.  Right now he

14            alleges that he repeatedly reported

15            endemic corruption, abuse of power by

16            members.  He's identified Hesse.  I

17            believe he said it's not Paradiso

18            because Paradiso didn't work nights.

19            A.    I complained to Paradiso.

20                  MR. GOODSTADT:  He's asking you

21            who engaged in corruption.

22                  THE WITNESS:  Oh, who engaged in

23            corruption, I'm sorry.

24                  MR. GOODSTADT:  Which police

25            officers in addition to Hesse are you

```
 1                      J. Nofi

 2          alleging engaged in corruption, is that

 3          correct?

 4                MR. NOVIKOFF:   Yes.

 5          A.    And I didn't say George engaged

 6     in corruption, I said he allowed it.

 7          Q.    I'm reading off of your

 8     allegation, sir.  This is your writing.  You

 9     write repeatedly reporting endemic

10     corruption and abuse of power by members.

11     When you say members, you have identified

12     Hesse?

13          A.    Right.

14          Q.    Who is the other people?

15          A.    The Pisettis, the Pisetti

16     brothers, Gary and Richie Pisetti.

17          Q.    Who else?

18          A.    Hardman I would say.

19          Q.    Hardman?

20          A.    Yes.

21          Q.    What's his first name?

22          A.    I don't know, everybody called

23     him Hardman, Arnold Hardman.

24          Q.    Okay.

25          A.    Walter Moller.
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi

 2        Q.    Okay.

 3        A.    Some new guy, I can't remember

 4   his last name.  I think his name was Joe.  I

 5   don't know his last name but some new guy.

 6   I'm not sure exactly of his last name, he

 7   was coming on as we was getting let go.

 8   Actually I only met him like once or twice,

 9   three times.

10              I wouldn't say it was corruption

11   but I seen Tyrie Bacon sleeping in back of

12   the basketball court, snoring, sound asleep,

13   which is a very dangerous situation with

14   your gun, sound asleep.  I wouldn't say it's

15   corruption but it was a dangerous situation,

16   that's for sure.

17        Q.    And who did you personally

18   complain to with all of the examples you

19   just gave?

20        A.    To George.

21        Q.    Anybody else?

22        A.    The chief once or twice.

23        Q.    How many times did you complain

24   to Hesse?

25        A.    I don't know, plenty of times, it
```

Precise Court Reporting

(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                         J. Nofi

 2     went nowhere.

 3          Q.    More than two?

 4          A.    Yes.

 5          Q.    More than ten?

 6          A.    Yes.

 7          Q.    More than 20?

 8          A.    Yes, I would say so.

 9          Q.    More than 30?

10          A.    I don't know, I can't remember.

11     It was different times.  Can I say one

12     thing?

13          Q.    No.

14                MR. GOODSTADT:     If it's

15          responsive to your question he

16          certainly can.

17          Q.    Did you 20, 30, ten?

18          A.    I don't remember.

19          Q.    Those are the questions, sir.

20          A.    I was responding to another

21     corruption thing now.

22          Q.    I'll get to more examples.

23                Sir, did you ever put your

24     complaints to Mr. Hesse in writing?

25          A.    I think I did one or two in
                       Precise Court Reporting
             (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                    J. Nofi

 2    writing but it was more, he was our acting

 3    supervisor so I told him right to his face.

 4         Q.    Did you ever put a complaint in

 5    writing to Mr. Paradiso about what you just

 6    testified to?

 7         A.    I might have, yes, I think I did,

 8    yes.

 9         Q.    You are pointing to something on

10    my desk.

11         A.    I see the correspondence, the

12    42s.

13         Q.    Okay, so based upon what you

14    think you are looking at on my pile of

15    documents, that refreshes your recollection?

16         A.    It looks like 42s.  Sometimes you

17    can write 42s for explanations.

18         Q.    What are 42s?

19         A.    If you want to take a day off or

20    you can't make the work or you want to

21    change your shift or you want to report

22    something that you don't think is right.

23    You really didn't do 42s because you did

24    want people to know what you were talking

25    about, to the other people.  You know, you
```

                         Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                      J. Nofi
 2    didn't want retaliation.
 3    MO          MR. NOVIKOFF:  Okay, motion to
 4          strike as not responsive.
 5                MR. GOODSTADT:  Just so the
 6          record is clear --
 7                MR. NOVIKOFF:  I know you are
 8          objecting to all of it, I understand.
 9          Q.   When you testified that you got
10    no where with Hesse, right?
11                MR. GOODSTADT:  Objection, but
12          the record will reflect what he
13          testified to.
14          Q.   Isn't it true that you testified
15    that you got no where with your complaints
16    to Mr. Hesse?
17          A.   I don't think I said that.
18          Q.   No?
19          A.   I don't think I said it that way.
20                MR. NOVIKOFF:  Can we go back to
21          Mr. Nofi's answer about three or four
22          minutes ago.  It was part of a very
23          long winded answer.
24                (The requested portion was read.)
25          Q.   You testified, according to the
```

```
 1                          J. Nofi
 2      court reporter's read back, that your
 3      complaints to Hesse went nowhere?
 4          A.    Right.
 5          Q.    So you agree with me, you said
 6      that?
 7          A.    Okay, go ahead.
 8          Q.    Did you complain to Mayor Rogers?
 9          A.    No.
10          Q.    Did you complain to Trustee
11      Loeffler?
12          A.    I think the other guys did all
13      the complaining.
14          Q.    I don't care what the other guys
15      did.
16          A.    I answered you.
17          Q.    The question to you is did you
18      complain?
19          A.    No, because the other guys did.
20          Q.    Excuse me, did you complain to
21      Trustee Loeffler?
22          A.    Loeffler wasn't in power till the
23      very end.
24          Q.    Did you complain to Trustee
25      Loeffler?
```

1                         J. Nofi

2          A.     I think I might have, yes.

3          Q.     You think so?

4          A.     It's possible I did one time in

5     the street, yes.

6          Q.     When do you think you did this?

7          A.     I think there was another officer

8     by me when I did complain.  In fact I think

9     Officer Gerden, Dave Gerden, might have been

10    there.

11         Q.     And what did you complain to

12    Mr. Loeffler about?

13         A.     Things that were going on, people

14    in bars.  I don't remember if I told him, I

15    can't remember, but I know I had

16    conversations with him.  I don't know what

17    it could have been about.

18         Q.     When did this complaint take

19    place?

20         A.     I don't know, in the street when

21    I ran into him.

22         Q.     What year?

23         A.     When he got in power, just before

24    he got in power.

25         Q.     When you say he got in power what

                    Precise Court Reporting
            (516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                         J. Nofi

 2      do you mean?

 3           A.    As the mayor.

 4           Q.    He wasn't mayor until after April

 5      2nd.

 6           A.    So it must have been --

 7                 MR. GOODSTADT:    That is what he

 8           testified to.

 9           Q.    So your testimony is now you

10      complained on at least one occasion to

11      Trustee Loeffler?

12           A.    I would say, yes.

13           Q.    And what was the complaint about?

14           A.    Most likely probably just about

15      guys drinking.

16           Q.    Most likely probably?

17           A.    Probably drinking.

18           Q.    Do you have any recollection

19      other than your speculation as to what you

20      complained to Mayor Loeffler about?

21                 MR. GOODSTADT:    Objection.

22           Q.    I mean Trustee Loeffler about?

23                 MR. GOODSTADT:    Objection.

24           A.    No.

25           Q.    You don't recall what year this
```

```
 1                    J. Nofi

 2    was, do you?

 3         A.    It had to be before he was mayor

 4    because Dave Gerden was a police officer and

 5    they were talking, because he used to work

 6    with him, something like that.  I'm not

 7    sure.

 8         Q.    You're not sure?

 9         A.    I think Frank Fiorillo was with

10    me actually when we were complaining.

11         Q.    Did you ever put a complaint in

12    writing to the board?

13         A.    No.

14              MR. NOVIKOFF:   Let's mark the

15         following document as Exhibit 12.

16              (One-page document dated 10-4-06

17         was marked as Defendant's Exhibit-12

18         for identification; 9-9-08, A.S.)

19         Q.    Sir?

20         A.    Yes.

21         Q.    Do you recognize this document?

22         A.    It's been a long time but, yes,

23    you know, a little bit, yeah.

24         Q.    Do you recall writing this

25    document?
```

```
 1                        J. Nofi
 2         A.     Not writing, typing it.
 3         Q.     Where would you have typed this
 4  document, sir?
 5         A.     Where we used to do the dispatch
 6  in the computer.
 7         Q.     Can you explain to me how you
 8  could have typed this document on October 4,
 9  2006 when, according to your allegations,
10  you were told on April 2, 2006 that you were
11  no longer going to be employed by the
12  Village of Ocean Beach?
13                MR. GOODSTADT:    Objection.
14         A.     I think Tommy Snyder and me put
15  it together.  He probably asked me about the
16  questions and I told him about it beforehand
17  and he probably typed it up.
18         Q.     Tommy Snyder?
19         A.     Yes.  It says right there, P.O.
20  Snyder, right there up in the corner, the
21  left-hand corner.
22         Q.     Tommy Snyder is a plaintiff in
23  this action, correct?
24         A.     Yes.  He wasn't a plaintiff at
25  that time though.
```

```
 1                      J. Nofi

 2           Q.    So Tommy Snyder's last date of

 3      employment wasn't April 2nd?

 4           A.    He wasn't there on the day we got

 5      let go.  So I don't nothing about Tommy

 6      Snyder that day or the day after.  I found

 7      out nothing about that, no.  I only knew

 8      about the guys that were there that day,

 9      which was Carter, Lamm, Frank Fiorillo and

10      myself, whatever it was, April 2, 2006.

11           Q.    So it's your testimony that

12      sometime before your last day of employment

13      at Ocean Beach you told Snyder about the

14      subject matter of this memo and then at some

15      time thereafter Mr. Snyder wrote this memo?

16                 MR. GOODSTADT:   Objection.

17           A.    Yes.  I'm not sure but it could

18      be a typo on the date, he could have put the

19      wrong date, I don't know, it's possible.

20           Q.    Do you recall why you were

21      complaining about this?

22           A.    Yes.

23           Q.    Why?

24           A.    Well, they are called dock

25      masters.  They used to have them, I think
```

```
 1                     J. Nofi

 2   they got rid of them for a while because

 3   they were getting in trouble.  They had

 4   police uniforms on and everything, badges

 5   that looked like police officers and

 6   actually some of them acted like police

 7   officers, but I did complain about that too,

 8   by the way, numerous times to George Hesse,

 9   more than once, probably 20 times.  What

10   happened was one of the guys who was written

11   in here, we had what's called a barracks

12   where people used to go up and get changed,

13   and we had shotguns in there and I didn't

14   even know we had shotguns, George Hesse told

15   me they were there and showed me the

16   shotguns, and this guy left the door open,

17   so I wrote a memo on it.

18        Q.   So you felt it was your

19   obligation to write a memo?

20        A.   Yes, I did.

21             MR. GOODSTADT:  I just want to

22        mark the record that you're leaning

23        back and looking up at the ceiling is

24        inappropriate during a deposition.

25             MR. NOVIKOFF:  One, I don't
                 Precise Court Reporting
         (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                    J. Nofi

 2          think that's what I was doing.  I was

 3          leaning back and thinking about what my

 4          next question would be.  If you think

 5          it's inappropriate that I lean back at

 6          a deposition, then that's fine.  I mean

 7          that's up to you, okay.  There's a

 8          first for everything.

 9               MR. GOODSTADT:    What was that

10          last question?

11               MR. NOVIKOFF:    There is a first

12          for everything I said.

13  MO           MR. GOODSTADT:    Move to strike

14          that statement as irrelevant, harassing

15          both to the witness and to myself.

16          Q.    Sir, this was the only document

17     that we found indicating a complaint that

18     you made.

19               To your knowledge did you make

20     any other written complaints concerning

21     anything that you just testified to?

22          A.    I could have made a million of

23     them.

24          Q.    Is it your testimony that the

25     village perhaps destroyed documents from
```

```
 1                          J. Nofi

 2     you?

 3          A.    Absolutely.

 4          Q.    What is your evidence that they

 5     did?

 6          A.    We are suing them.

 7          Q.    So the fact that you are suing

 8     them is your evidence that the village

 9     destroyed documents?

10          A.    Not the village.

11          Q.    Who?

12          A.    Who's in command, George.

13          Q.    So it's George destroyed

14     documents?

15          A.    Well, if I was being sued, and

16     someone was coming after me, I would be

17     scared too.

18          Q.    Is it your testimony that if

19     someone was suing you, you would destroy

20     documents?

21          A.    No.

22                MR. GOODSTADT:   Objection.

23          A.    No.

24                MR. NOVIKOFF:   Let's take a

25          break, one minute left on the tape.
```
                    Precise Court Reporting
          (516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                    J. Nofi
 2          THE VIDEOGRAPHER:  This ends
 3      tape number three.  The time is 2:40
 4      p.m., we are going off the record.
 5          (A discussion was held off the
 6      record.)
 7          THE VIDEOGRAPHER:  This begins
 8      tape number four.  The time is 2:54
 9      p.m., back on the record.
10      Q.   Sir, let's go back to 117.  We've
11  talked about who you believe you reported
12  certain things to.  There's also, as part of
13  that allegation, it says that the plaintiffs
14  made these reports to the Suffolk County
15  civil service department.  Do you see that?
16      A.   Yes.
17      Q.   Did you ever complain to the
18  Suffolk County civil service department
19  concerning any of the examples of endemic
20  corruption or abuse of power that you just
21  testified to?
22      A.   I brought up when I was there,
23  also, which I forgot to tell you before,
24  about how many police officers were
25  uncertified police officers.  I forgot to
```

```
 1                      J. Nofi

 2      bring that up to you, which is very

 3      important, a lot of them were uncertified.

 4      MO         MR. NOVIKOFF:   Motion to strike.

 5          Q.    My question to you, sir, is did

 6      you make any, did you personally make any

 7      complaints about any of the examples you

 8      have testified to to the Suffolk County

 9      civil service department?

10          A.    I think just about the

11      uncertified police officers.

12          Q.    When did you make the complaint

13      to the Suffolk County civil service

14      department --

15          A.    I guess that day.

16          Q.    Let me finish the question.

17               When did you make the complaint

18      to the Suffolk County civil service

19      department about uncertified police

20      officers?

21          A.    I don't know the date.

22          Q.    Before or after your last day of

23      employment?

24          A.    Could have been after, could have

25      been before.  I'm not sure, probably was
```

1                      J. Nofi

2      after.

3          Q.    Why do you say it was probably

4      after?

5          A.    I guess because that day we went

6      to go see the civil service.

7          Q.    Did you ever go see the civil

8      service before your last day of employment

9      concerning any complaints?

10         A.    I'm not sure but I think the

11     other guys did.

12         Q.    All I care about is you, sir.

13         A.    I don't think I did, no, I don't

14     remember.

15         Q.    Did you ever submit a writing to

16     the civil service department concerning any

17     of your complaints of endemic corruption and

18     abuse of power prior to your last day of

19     employment?

20         A.    No, because I went through the

21     chain of command, which was my supervisor,

22     where it's supposed to go from there and it

23     never went anywhere.

24     MO       MR. NOVIKOFF:    Motion to strike.

25         Q.    Did you ever make a writing, send

```
 1                        J. Nofi

 2     a writing, to the civil service department

 3     prior to your last day of employment

 4     concerning any of the complaints of endemic

 5     corruption and abuse of power that you

 6     testified to?

 7         A.     I don't think I did by letter,

 8     no.  I'm not sure, I don't think I did.

 9         Q.     Let's look at paragraph 125.

10     Paragraph 125 alleges the following:  At all

11     times relevant hereto plaintiffs had a

12     valuable property interest in their

13     employment with the OBPD, their reputation

14     and their status.  By engaging in the scheme

15     as set forth above, including, without

16     limitation, failing to provide plaintiffs

17     with a predetermination hearing, refusing to

18     provide a name clearing hearing for

19     plaintiffs, and willfully deceiving

20     plaintiffs by leading them to believe they

21     were not entitled to such hearings or to any

22     other form of legal process.  Defendants

23     Hesse, Loeffler, OBPD, Suffolk County,

24     Suffolk County civil service and Sanchez

25     impermissibly deprived plaintiffs of their
```

```
 1                       J. Nofi

 2   property without due process of law.  Then

 3   it goes on to cite the provisions of the

 4   constitution that have been violated.  Do

 5   you see that?

 6        A.    Yes.

 7        Q.    How did Mr. Loeffler willfully

 8   deceive you with regard to any hearings or

 9   any form of legal process that you were

10   entitled to?

11             MR. GOODSTADT:   Objection.

12        Q.    If he did at all.

13             MR. GOODSTADT:   Same objection.

14             MR. NOVIKOFF:   I will rephrase

15        the question.

16        Q.    Did Mr. Loeffler willfully

17   deceive you concerning the allegation as to

18   whether you were entitled to such hearings

19   or any other form of legal process, as you

20   allege in paragraph 125?

21             MR. GOODSTADT:   Objection.

22        A.    I believe he did, yes.

23        Q.    How did he do that?

24        A.    By not looking into the

25   complaints and, you know, knowing what was
```

```
 1                      J. Nofi

 2   going on, stuff like that.

 3        Q.    Sir, paragraph 125 specifically

 4   refers to what you were entitled to after

 5   you were told you were not going to be

 6   employed by Ocean Beach, do you agree with

 7   me?

 8            MR. GOODSTADT:  Objection.

 9        Q.    No, I'll tell you what, since

10   this is your complaint, sir, and you read it

11   for accuracy, and it was accurate prior to

12   its filing, why don't you tell me what 125

13   refers to, then I will ask you the question.

14            MR. GOODSTADT:  Objection.

15        Q.    Go ahead.

16            MR. GOODSTADT:  Objection.

17        Q.    That's fine, what did you mean by

18   125?

19        A.    They are talking about our

20   reputation, correct?

21        Q.    Sir, I'm asking you.

22        A.    I'm answering you, just asking

23   you.

24        Q.    What do you mean by paragraph

25   125?
```

```
 1                    J. Nofi

 2            MR. GOODSTADT:  Objection.  He

 3       didn't draft it, you know, it has a lot

 4       of legal terms in it, he's not a

 5       lawyer.

 6            MR. NOVIKOFF:  Counselor, he's

 7       answering these questions and that's

 8       why I have to go down this way.

 9            MR. GOODSTADT:  That's just my

10       objection to it.

11            MR. NOVIKOFF:  I understand.

12       A.    Well, from what I'm getting out

13  of it is that, we were told we didn't have

14  any rights and we did have rights through

15  civil service, according to the document,

16  and also that Loeffler, since he became

17  chief, should have investigated it and sat

18  down and had a meeting, I would believe.  If

19  I was the new mayor and coming to a new

20  place, I would want to know what was going

21  on.

22       Q.    So when you say Loeffler became

23  chief, you mean mayor?

24       A.    Not chief, mayor.

25       Q.    When you were talking about you
```

```
 1                        J. Nofi
 2    had no rights, that's what Miss Sanchez told
 3    you during that meeting and the two others
 4    had with her shortly after April 2nd?
 5         A.   Yes.
 6         Q.   Now we are all on the same page.
 7              How do you know, as you sit here
 8    today, that Loeffler knew what you allege
 9    that Sanchez said to you during that
10    meeting?
11         A.   Because he said to me and Frank
12    Fiorillo that the first thing he's going to
13    do when he becomes mayor of the village,
14    he's going to fire the Pisetti brothers
15    because of the things that they do, that was
16    his first thing in order.  I forget how he
17    put it, my first priority is to get rid of
18    them, fire them the minute I become the
19    mayor.
20         Q.   I don't think you were responsive
21    is my question but that's fine.
22              When did Loeffler tell you --
23         A.   I don't know.
24         Q.   Excuse me, when did Mayor
25    Loeffler tell you his first order of
                    Precise Court Reporting
         (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                        J. Nofi

 2      business when he became mayor was to fire

 3      the Pisettis?

 4           A.    I don't know.

 5           Q.    Was it before or after your last

 6      day of employment?

 7           A.    Before.

 8           Q.    Now, my question, I need to

 9      repeat because you didn't answer, sir, how

10      do you know, as you sit here today, that

11      Loeffler knew what you allege Sanchez told

12      you about you not having any rights?

13           A.    Because she had a conversation

14      with George and I'm sure George had a

15      conversation with him.

16           Q.    Oh, you're sure that George had a

17      conversation with him?

18           A.    I was told, we went back that

19      before, but Carter said that that's what he

20      said.

21           Q.    Did Carter tell you that Hesse

22      had a conversation with Loeffler?

23           A.    No, just said he had a

24      conversation with Sanchez.

25           Q.    My question, sir, is --
```

```
 1                        J. Nofi
 2        A.   And I told you.
 3        Q.   -- how do you know that Loeffler
 4   had any idea as to what Sanchez told you and
 5   the two other officers during that meeting?
 6        A.   Well, if you told me something
 7   and I told him, you would know, same way.
 8        Q.   You want to stand by your answer?
 9        A.   I would say so.
10        Q.   That's fine, that works for me.
11             Let's go to page 33, paragraph
12   138.  It is alleged that defendants Hesse,
13   OBPD and the Ocean Beach's stigmatizing
14   conduct has marred plaintiffs reputation.
15   Do you see that?
16        A.   Uh-huh.
17        Q.   What stigmatizing conduct is
18   being referred to as it relates to you?
19        A.   Well, the name calling that he's
20   done over the years.
21        Q.   Who?
22        A.   George Hesse.
23        Q.   When you say over the years, what
24   do you mean?
25        A.   Well, it all started stemming
                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570
```

```
 1                     J. Nofi
 2     when they started hiring.  It all started
 3     when they started the uncertified officers.
 4     That's where it all started from.  That's
 5     where it started from once they came in,
 6     they were uncertified.  They were all
 7     buddies with them, I would imagine,
 8     whatever, and since they started working
 9     there, we started complaining that they were
10     uncertified.  That's when the abuse started,
11     shut the fuck up, you're an asshole, you're
12     retarded, you don't know what you're talking
13     about, you're just a retard, just like I
14     said on the blog, I'm a retard, you are a
15     fucking asshole, all that kind of stuff.
16          Q.    What about you?
17          A.    That's what he said to me.
18     That's what I'm saying.  It's on the blog.
19     It's on the blog that he said it.  My wife
20     and son printed it out.  I'm not very good
21     on the computer but they printed it out, it
22     was all over the blog.
23          Q.    So I'm just trying to figure
24     out --
25          A.    And everyone knew about it on the
```

```
 1                        J. Nofi

 2     job because people look at the blogs,

 3     everybody is on computers.

 4     MO          MR. NOVIKOFF:   Move to strike.

 5          Q.     The question I have for you, sir,

 6     is on April 2, 2006 what stigmatizing

 7     conduct, if anything, did Mr. Hesse

 8     perpetrate concerning you?

 9                 MR. GOODSTADT:   Objection.

10          A.     Say that again?

11          Q.     On April 2, 2006 what

12     stigmatizing conduct did Mr. Hesse undertake

13     as it concerns you specifically on that

14     date?

15          A.     On that date?

16          Q.     Yes, on that date.

17          A.     Just, you know, the day we went

18     to the civil service department?

19          Q.     No, April 2nd, sir.

20          A.     The day -- oh, okay, I'm sorry,

21     okay, got you.  When we went there, I got a

22     letter stating --

23          Q.     No, no, April 2nd was the day

24     that you allege --

25          A.     That's what I'm telling you.
```

```
 1                         J. Nofi
 2          Q.    I don't need a recitation of what
 3     happened.
 4                You allege in the complaint on
 5     April 2nd you were advised that you were no
 6     longer working at Ocean Beach, correct?
 7          A.    Yes.
 8          Q.    On April 2nd, without telling me
 9     the entire story, what stigmatizing conduct
10     concerning you personally did Mr. Hesse
11     engage in?
12                MR. GOODSTADT:    Objection.
13                THE WITNESS:    Does he mean bad
14          things he said about me?
15                MR. GOODSTADT:    Ask him, if you
16          don't understand what he means.
17          Q.    Well, you wrote stigmatizing
18     conduct, sir, what did you mean by
19     stigmatizing conduct?
20                MR. GOODSTADT:    Objection.
21          A.    That day, April 2nd, I was at the
22     ferry terminal going across to the ferry and
23     one of the guys said that George Hesse was
24     at a thing in the city for St. Patrick's Day
25     drunk out of his mind, saying he's going to
```

1                    J. Nofi

2     get rid of the assholes.  That's what he

3     told me.

4                    So then when I got there, I didn't

5     even know what was going on.  We got a

6     letter stating that we were getting new

7     uniforms, new ID and new shields.  So I went

8     there thinking oh, wow, this is great.  So

9     when I got there, I didn't even know what

10    was going on.  It's line up and when I went

11    in there he sat me down and said, you know,

12    I'm letting you go for budget cuts but I

13    want you to know you're a good father, good

14    husband and a good police officer and I'm

15    not putting you in the category of the other

16    three assholes that I'm getting rid of.  So

17    I said why are you getting rid of me for and

18    he said because of budget cuts.  I said can

19    you at least keep me one day a week, I need

20    the money, he said, no, I can't.

21                   So he didn't really say nothing

22    bad that day but as I was leaving the

23    humiliation was so bad in front of everybody,

24    it was horrible because they already knew

25    what was happening.

```
 1                         J. Nofi

 2          Q.    So now I understand that

 3     Mr. Hesse didn't say anything bad about you

 4     that day?

 5          A.    Not that he did, but it was the

 6     humiliation of being there in front of

 7     everyone and being told you weren't going to

 8     be employed any more.

 9                MR. GOODSTADT:   Objection.

10          A.    It's the way he did it.

11          Q.    What?

12          A.    The way he did it.  He already

13     knew the fact what was going on, he had it

14     set up.  The reason why it was set up, there

15     was a water taxi waiting for us, which he

16     called for, so it was set up because this

17     was a lie.  We had a letter stating we were

18     getting raises and money and uniforms and

19     all that stuff and it was totally opposite

20     of what it was when we went there that day.

21     So he totally lied and humiliated us,

22     especially me after what he said.

23          Q.    After what he said what?

24          A.    About all of that stuff, and when

25     I went out, they were just like laughing at
```
                    Precise Court Reporting
           (516) 747-9393  (718) 343-7227  (212) 581-2570

1                      J. Nofi

2      me, all the people on line, because they

3      knew what was going to happen before.  They

4      knew ahead of time, like they conspirated

5      before I got there.  They knew all the stuff

6      was taking place before.

7          Q.    Who conspirated?

8          A.    George knew that he was going to

9      fire us before I even got there.  On the

10     letter it said differently.

11         Q.    Okay, I got that.  Yo got a

12     letter before April 2nd saying come over,

13     you are going to get new shields and

14     whatever, correct?

15         A.    Right.

16         Q.    You came over by ferry on April

17     2nd and George Hesse said, and tell me if

18     I'm mischaracterizing it, I'm letting you go

19     for budget cuts, I'm not putting you in the

20     same category as the other three assholes?

21         A.    Yes.

22         Q.    He also said during that you were

23     being a good father, a good husband and a

24     good police officer, right?

25         A.    Yes.

Precise Court Reporting
(516) 747-9393  (718) 343-7227  (212) 581-2570

```
 1                        J. Nofi
 2          Q.    And he didn't say anything bad to
 3     you during that conversation?
 4          A.    Not in that moment.
 5          Q.    Just follow me, during that
 6     conversation he didn't say anything bad to
 7     you?
 8          A.    No.
 9          Q.    Was there anyone present during
10     that conversation when Hesse told you that
11     you were a good father, good husband and you
12     were a good police officer?
13          A.    It's possible one other person
14     could have been there but I can't tell.
15          Q.    And then subsequent, after Hesse
16     made these comments about you being a good
17     father and whatnot, there was a water taxi
18     waiting for you?
19          A.    I didn't even know there was
20     a water taxi.
21          Q.    But there was a water taxi
22     waiting for you?
23          A.    Yes.
24          Q.    You walked outside?
25          A.    Yes.
```

```
 1                         J. Nofi

 2         Q.   And you went to the water taxi?

 3         A.   I ran to the water taxi.  He was

 4    going to take off.  I ran, I didn't even

 5    know there was a water taxi to take me away.

 6         Q.   Were you the only person who went

 7    in the water taxi?

 8         A.   No, Carter and Kevin and Frank

 9    were on the water taxi.

10         Q.   Did Hesse tell you to go on the

11    water taxi?

12         A.   No.

13         Q.   Did Hesse tell you there was a

14    water taxi waiting for you?

15         A.   No.  I didn't even know how I was

16    going to get home.  I seen a water taxi with

17    those guys by it and I ran up to them going

18    I didn't even know they were fired, because

19    I didn't know what was going on.  He told me

20    that but I still didn't realize that they

21    were really fired and I got in the water

22    taxi and they said they were all fired too.

23    So what he said to me didn't mean really

24    much because I didn't believe him.  When I

25    went out there because he was actually, I
```

```
 1                          J. Nofi

 2      thought he was Carter's friend for years.

 3           Q.    So how do you know Hesse arranged

 4      for the water taxi?

 5           A.    Because he sent one of the police

 6      officers to get the water taxi to come over

 7      or told him to call.

 8           Q.    Who told you that?

 9           A.    I think Frank told me that.

10           Q.    As you don't know, it's based on

11      what Frank may have told you, right?

12                 MR. GOODSTADT:    Objection.

13           Q.    Is that yes?

14           A.    Yes.

15           Q.    And who is laughing at you

16      between the time you left where Hesse had

17      this conversation with you and the time you

18      gone onto the water taxi?

19           A.    His cronies.

20           Q.    Who was his cronies?

21           A.    Walter Moller, Pisettis, just the

22      people that he associated with, the ones

23      that were all the uncertified officers were.

24      That's who it was.

25           Q.    They were all uncertified as of
```

```
 1                    J. Nofi

 2    April 2, 2006?

 3         A.    That I don't know, but they were

 4    for a long time.

 5         Q.    Well, who was laughing at you,

 6    without characterizing who they were, give

 7    me the names.

 8         A.    Well, the one guy said to me --

 9         Q.    I don't want to know who said,

10    who was laughing at you?

11         A.    Didn't laugh, he said a remark to

12    me.

13         Q.    Who said a remark to you?

14         A.    Before we even got over there.

15         Q.    Before you got over there?

16         A.    Yeah, we have to take a ferry

17    from Bay Shore.

18         Q.    Okay.

19         A.    Before we were on the ferry, I

20    was sitting on the dock waiting for the

21    ferry.

22         Q.    Sir, I'm only interested in who

23    was laughing at you.

24         A.    I'm telling you, I can't think of

25    his name.
```

```
 1                      J. Nofi

 2        Q.    After Hesse told you that you

 3   weren't going to be working after --

 4        A.    Afterwards.

 5        Q.    Between that time and the time

 6   you got on the water ferry --

 7              MR. GOODSTADT:  Objection.

 8        Q.    -- name the people who were

 9   laughing at you.

10              MR. GOODSTADT:  Objection.

11        A.    It wasn't laughing, it was

12   mocking.

13        Q.    Fine, mocking, who was mocking?

14        A.    I just told you.

15        Q.    Give me the names.

16        A.    I would say Walter Moller,

17   Pisetti, that guy I can't think of his name,

18   the one that was in the Newsday.  I never

19   met him, only met him once.  The guy that

20   supposedly got in trouble with the Gilbert

21   thing, I can't think of his name.

22        Q.    But you know Moller, you know the

23   Pisettis, anybody else?

24        A.    Yeah, I can't think of the guy's

25   name, I only met him once.
```

```
 1                         J. Nofi

 2          Q.    How did Moller mock you, what did

 3     he do that you believed that he was mocking

 4     you?

 5          A.    You know, a little snide remark

 6     like bye.

 7          Q.    He said bye?

 8          A.    Not just said bye looking at you,

 9     you know, when someone's looking at you

10     saying bye.  You can tell if I'm looking at

11     you, nasty, you know.

12          Q.    How about the Pisettis, what did

13     they say?

14          A.    They never said nothing.  They

15     just looked at me.  They were actually

16     mocking more Kevin Lamm more than me.

17          Q.    Like I said, no disrespect to the

18     other four plaintiffs but I don't care about

19     them today, I care about you.

20                So, the Pisettis didn't say

21     anything to you?

22          A.    Just looks, like good-bye.

23          Q.    Their look?

24          A.    Yes.

25          Q.    And this guy Moller just said
```

```
 1                         J. Nofi

 2    bye-bye in a way that you believe he was

 3    mocking you?

 4         A.    Absolutely.

 5         Q.    Okay, I got you.

 6         A.    Embry, that's his name.

 7         Q.    Well, what did Embry do?

 8         A.    Before I got over there. Nothing

 9    afterwards, it was before.

10         Q.    On April 2, 2000 -- well, let's

11    go to the remaining part of 138.

12              Let's look at page 34. You say,

13    not you, it's alleged that by stigmatizing

14    plaintiffs as dishonest men, rats and rouge

15    law enforcement officers, do you see that?

16         A.    What page?

17         Q.    34, paragraph 138, starting at

18    the top.

19         A.    Oh, okay.

20         Q.    Do you see that?

21         A.    Yes.

22         Q.    Who, if anyone, called you a

23    dishonest man?

24         A.    On the blog.

25         Q.    This is on the blog?
```

```
 1                         J. Nofi

 2         A.    Yes.

 3         Q.    Okay, and what was said on the

 4    blog that you believe said that you were a

 5    dishonest man?

 6         A.    They called us rats.

 7         Q.    No, dishonest man.

 8         A.    That's what I'm saying, they

 9    called us all different kinds of stuff.

10    Saying that we were liars, we didn't know

11    what we were talking about.

12         Q.    So someone on the blog made

13    certain comments that you believe showed you

14    to be a dishonest man?

15         A.    Yes.

16         Q.    Did someone, when you make

17    reference to, it's made reference in this

18    paragraph to rats, do you see that?

19         A.    Yes.

20         Q.    Who, if anyone, on April 2, 2006

21    called you a rat?

22         A.    Before or after?

23         Q.    No, on April 2, 2006.

24         A.    Oh, April.

25         Q.    2nd.
```

```
 1                       J. Nofi

 2          A.    2nd, I mean, we just went over

 3    there and got told we were going and we left

 4    but this is, I'm talking about the blog now.

 5          Q.    So everything, at least according

 6    to your knowledge, in 138 that I just read

 7    refers to what's on the blog?

 8          A.    Oh, okay, I know what you're

 9    saying.  You want to know if any of this

10    stuff was stated that day.

11          Q.    Right.

12          A.    Okay, I'm with you.

13          Q.    Did Hesse call you a dishonest

14    man on April 2, 2006?

15          A.    I wasn't there.  After we left

16    they were still all over there, those

17    people.  You know, the ones that were all

18    there, George and all them and this is just

19    from hearsay, people telling me that when we

20    left they were saying that kind of stuff at

21    the meeting, when we left.

22          Q.    Who's they?

23          A.    Whoever was at that meeting.

24          Q.    So it was in addition to Hesse,

25    there were other people?

                   Precise Court Reporting
        (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                    J. Nofi

 2          A.    Yes, whoever was there.  I don't

 3     know who but that's just from hearsay, I'm

 4     telling you, that a lot of bad things were

 5     said about us during that.

 6          Q.    So to the extent any of what I

 7     just read at 138, dishonest men, rats, rogue

 8     law enforcement officers, was said on April

 9     2nd, it was based upon what you were told by

10     someone else took place after you left the

11     island?

12          A.    Yes, and also on the blog, a lot

13     of that stuff was said too.

14          Q.    We have what was said when you

15     left on April 2nd and on the blog after

16     April 2nd?

17          A.    Uh-huh.

18          Q.    Okay, let's look at page 36,

19     paragraph 148.  The defendants Hesse,

20     Loeffler, OBPD, Ocean Beach, Sanchez and

21     Suffolk County civil service subjected

22     plaintiffs to arbitrary and irrational

23     discrimination by selectively terminating

24     plaintiffs employment with a malicious or

25     bad faith, endemic intent to injure
```

```
 1                          J. Nofi
 2      plaintiffs.  Do you see where I read from?
 3           A.    Uh-huh.
 4           Q.    Who do you believe was similarly
 5      situated to you that should have been fired
 6      but wasn't?
 7                 MR. GOODSTADT:   Objection.
 8           A.    Well --
 9           Q.    According to your allegation?
10           A.    I would say quite a few because I
11      did my job there, where other people didn't
12      do their job, besides the ones that weren't
13      certified, and I went through the police
14      academy for six months and two weeks, I got
15      certified.
16           Q.    Give me some names.
17           A.    Oh, names?
18           Q.    Yes, as of April 2, 2006.
19           A.    Oh, afterwards?
20           Q.    No, on April 2, 2006 you allege
21      that you were terminated, correct?
22           A.    Yes, I'm sorry.
23           Q.    So, on April 2, 2006 who was
24      still an employee of the Ocean Beach Police
25      Department that you believe should have been
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

```
 1                      J. Nofi

 2      fired along with you?

 3               MR. GOODSTADT:   Objection, along

 4           with him or instead of him?

 5      Q.      Instead of you, I'm sorry.

 6      A.      The uncertified officers.

 7      Q.      Okay.

 8      A.      Walter Moller.

 9      Q.      Okay.

10      A.      For a lot of acts that he did.

11               Hardman, which was an uncertified

12      officer, and I'm not sure of the other guys

13      that were uncertified.  Oh, umm, Ty Bacon

14      because I was told, hearsay, but you can

15      probably look that up, that he failed the

16      polygraph in Suffolk County.  I don't know

17      how he was hired by Ocean Beach, because

18      once you fail the polygraph in Suffolk

19      County you cannot be hired ever again in the

20      county, and he did fail the Riverhead PD

21      polygraph.  So George still took him on, I

22      don't know how that works but.

23      Q.      Are you done?

24      A.      I guess so.

25 MO            MR. NOVIKOFF:   Move to strike
```

```
 1                    J. Nofi

 2          that aspect after Ty Bacon's name was

 3      identified.

 4          Q.    So we have uncertified officers,

 5      Moller, who is also uncertified?

 6          A.    No, he's certified.  I went

 7      through the academy with him.

 8          Q.    Okay, so we have Moller, the

 9      uncertified officers, Hardman and Bacon,

10      right?

11          A.    Oh, the guy Joe, I don't know his

12      last name.  The other guy Joe that he hired

13      like just recently, before we got let go, I

14      don't know his last name though.

15          Q.    This guy Joe, why should he have

16      been fired instead of you on April 2, 2006?

17          A.    He wasn't doing things that he

18      should have been doing.

19          Q.    Like what?

20          A.    Hanging out, partying, going out,

21      doing things, you know, while working and

22      not working.  You know, he told us, when I

23      first met him he still wasn't a police

24      officer, he was saying that, you know, I

25      don't know what's going on, what's taking so
```

```
 1                    J. Nofi
 2    long.  I should be hired as a police officer
 3    and, you know, he was just doing not the
 4    right thing that he should have been doing,
 5    conducting business the way it should have
 6    been done as a police officer.
 7         Q.    In your opinion?
 8         A.    In upholding the law, in
 9    everybody's opinion.
10         Q.    No, in your opinion though, I'm
11    not interested in anyone else's.
12         A.    Yes, in my opinion, yes.
13         Q.    And you are a police officer
14    since when?
15         A.    1999, got out of the academy '99,
16    2000.
17         Q.    And, Hardman, what did he do that
18    you believe he should have been fired for on
19    April 2nd as opposed to you?
20         A.    One time I called a 10-1, which
21    is an immediate response, that a police
22    officer could be killed or beat up or
23    whatever.  You're in the worst situation
24    there is, which is a 10-13 in New York City
25    totally different code, and he didn't
```

```
 1                    J. Nofi

 2    respond, not only because he was out of the

 3    town, where he was working another part of

 4    town or village, I should say, he didn't

 5    respond because he didn't know the codes,

 6    because he was uncertified. He didn't know

 7    the Suffolk County codes, which are totally

 8    different from New York City, a 10-13, an

 9    officer needs help, to a 10-1 versus us

10    here, he didn't respond. I was in a

11    confrontation with like three guys that were

12    ready to jump me and beat me up, and I

13    reported this to George Hesse and told him

14    that, I think it was the following day that

15    I reported to him, and he just laughed at me

16    with Hardman and brushed it off like it was

17    a joke and I could have been killed.

18         Q.    And when did this incident take

19    place.

20         A.    It was at the ferry terminal.

21         Q.    No, when did this incident take

22    place date, month, year?

23         A.    I would have to say, I don't know

24    when Hardman got hired, probably the first

25    year he got hired, which I don't know what
```

```
 1                     J. Nofi

 2     year that would be.  He got hired, like the

 3     first year when he was hired.

 4         Q.    Before or after the Halloween

 5     incident?

 6         A.    Oh, it was before the Halloween

 7     incident, yes, and I did report that to

 8     George and he mocked me right in front of

 9     him.

10         Q.    Other than this incident, this

11     one incident that you just testified to, is

12     there any other reason why you believe

13     Hardman should have been fired on April 2nd?

14         A.    Well, put it this way, if your

15     life was in danger and you could get killed,

16     you think you'd be kind of pissed off at

17     somebody for not responding.

18     MO         MR. NOVIKOFF:  Sir, motion to

19          strike.

20         A.    I'm answering.

21         Q.    Other than the example you just

22     gave about Hardman not responding to some

23     call that you made when you were almost

24     beaten up, was there another reason why you

25     believed on April 2, 2006 that Hardman
                    Precise Court Reporting
             (516) 747-9393  (718) 343-7227  (212) 581-2570
```

```
 1                      J. Nofi

 2     should have been fired?

 3          A.    He was uncertified.

 4          Q.    Okay, other than that?

 5          A.    Yes, he never did his job.

 6          Q.    What do you mean he never did his

 7     job?

 8          A.    Well, he was supposed to be in

 9     the Incorporated Village of Ocean Beach, but

10     he was always on the outer banks of Ocean

11     Beach, and he wouldn't show up, and you

12     would call him on the radio with the

13     Pisettis, and not once but 50 times to

14     report and they wouldn't report.  Then all

15     of sudden even George was getting mad and

16     screaming and yelling.  Then they would come

17     and they would laugh about it when they

18     finally got there because would wait,

19     wasting out time and getting paid for it to

20     drive them off the beach.  Meanwhile they

21     were off duty since 12 o'clock midnight but

22     they were partying from 12 o'clock midnight

23     to 8 o'clock in the morning the following

24     day and we couldn't find them and I always

25     had to wait for them off the beach but
```

                    Precise Court Reporting
        (516) 747-9393 (718) 343-7227 (212) 581-2570

1              J. Nofi

2     meanwhile they were MIA because nobody knew

3     where the hell they were because they were

4     so trashed or they weren't even in the

5     village, they were in the other part, like

6     Ocean Bay Park or wherever they were.

7          Q.    I asked you about Hardman, you

8     are saying "they," who's they?

9          A.    The uncertified officers,

10    Pisettis, Hardman.

11         Q.    So all the uncertified officers

12    got trashed and you had to drive them off

13    the island, is that your testimony.

14         A.    Oh, absolutely, yes.

15         Q.    Okay.

16         A.    Numerous times.  In fact I was

17    ordered to drive Walter Moller off with his

18    girlfriend, with his dog, which I couldn't

19    believe.  The dog was filthy gross dirty.

20    They were both trashed.  I drove them to the

21    check point and then he called me up again

22    and ordered me to drive them back, I don't

23    know why, and then drive them back again.

24    Meanwhile the village was being unmanned,

25    people could have been raped, robbed, who

                Precise Court Reporting
      (516) 747-9393 (718) 343-7227 (212) 581-2570