# In The Matter Of:

## EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM, v. INCORPORATED VILLAGE OF OCEAN BEACH

### THOMAS SNYDER
### September 24, 2008

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, NY 11501*
*(516) 747-9393*

Original File 49603.TXT, 494 Pages
Min-U-Script® File ID: 3435937667

**Word Index included with this Min-U-Script®**

EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
JOSEPH NOFI, and THOMAS SNYDER v.
INCORPORATED VILLAGE OF OCEAN BEACH

Case 2:07-cv-01215-SJF-ETB   Document 145-109   Filed 01/15/10   Page 2 of 9 PageID #: 4882

THOMAS SNYDER
September 24, 2008

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
[3] ------------------------------------X
    EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
[4] JOSEPH NOFI, and THOMAS SNYDER,
              Plaintiffs,
[5]       -against-   Case No. 07-Civ-1215
                       (SJF)(ETB)
[6] INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
    JOSEPH C. LOEFFLER, JR., individually and in
[7] his official capacity; former mayor NATALIE
    K. ROGERS, individually and in her official
[8] capacity; OCEAN BEACH POLICE DEPARTMENT;
    ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
[9] individually and in his official capacity;
    SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
[10] DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
     CIVIL SERVICE; and ALISON SANCHEZ,
[11] individually and in her official capacity,
              Defendants.
[12] ------------------------------------X
[13]           926 Reckson Plaza
[14]           Uniondale, New York
[15]
[16]           September 24, 2008
[17]           10:17 A.M.
[18]
[19]       VIDEOTAPE DEPOSITION of THOMAS
[20] SNYDER, taken pursuant to the Federal Rules
[21] of Civil Procedure, and Notice, held at the
[22] above-mentioned time and place before Edward
[23] Leto, a Notary Public of the State of New
[24] York.
[25]

Page 2

[1]
[2] APPEARANCES:
[3]     THOMPSON WIGDOR & GILLY LLP
            Attorneys for Plaintiffs
[4]     85 Fifth Avenue
            New York, New York 10003
[5] BY:  ANDREW S. GOODSTADT, ESQ.
[6]     RIVKIN RADLER LLP
            Attorneys for Defendants
[7]         Incorporated Village of Ocean
            Beach, Mayor Joseph C. Loeffler,
[8]         Jr., former Mayor Natalie K.
            Rogers, and Ocean Beach Police
[9]         Department
            926 Reckson Plaza
[10]        Uniondale, New York 11556
       BY:  KENNETH A. NOVIKOFF, ESQ.
[11]            -and-
            MICHAEL WELCH, ESQ.
[12]
       MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
[13]       Attorneys for Defendant Acting
           Deputy Police Chief George B.
[14]       Hesse
           530 Saw Mill River Road
[15]       Elmsford, New York 10523
       BY:  KEVIN W. CONNOLLY, ESQ.
[16]
       SUFFOLK COUNTY ATTORNEY'S OFFICE
[17]       Attorneys for Defendants Suffolk
           County, Suffolk County Police
[18]       Department, Suffolk County
           Department of Civil Service, and
[19]       Alison Sanchez
           100 Veterans Memorial Highway
[20]       Hauppauge, New York 11788
       BY:  CHRISTOPHER M. GATTO, ESQ.
[21]
       ALSO PRESENT
[22]    Albert Santana, Legal Video Specialist
[23]
[24]
[25]

Page 7

T. Snyder

[2] A: No, I have not.
[3] MR. NOVIKOFF: Let's mark the
[4] following document as Snyder-1.
[5] (Suffolk County Application For
[6] Employment was marked as Snyder
[7] Exhibit-1 for identification;
[8] 9/24/08, E.L.)
[9] Q: Sir, I'm showing you what's been
[10] marked as Snyder-1, and for the record, it's
[11] a four-page document. On the first page
[12] it's entitled "Suffolk County Application
[13] For Employment, Open-Competitive
[14] Examinations and Non-Competitive
[15] Appointments."
[16] MR. GOODSTADT: Just before you
[17] answer, do we have the Bates stamp
[18] numbers?
[19] MR. NOVIKOFF: The copy I have
[20] does not have a Bates stamp, but I
[21] believe it has been produced.
[22] MR. WELCH: Yes. I believe so.
[23] MR. NOVIKOFF: And we'll try to
[24] get you those Bates stamp numbers
[25] before the end of the day.

Page 8

T. Snyder

[2] Q: And the last page starts with on
[3] top saying "be sure to sign the declaration
[4] at the bottom of this page. Unsigned
[5] applications will be declared illegible."
[6] There is a date of 7/24/04 and a signature
[7] which appears to be that of Thomas A.
[8] Snyder. Do you maintain the document that
[9] I've just described in front of you right
[10] now as Snyder-1?
[11] A: Yes. That's my signature.
[12] Q: You anticipated my question. Is
[13] that your signature on the last page?
[14] A: Yes, it is.
[15] Q: And the 7/24/04 reflects the date
[16] upon which you signed this document?
[17] A: Yes, it does. If that's when I
[18] signed my signature, yes.
[19] Q: Do you recall — and for the
[20] record, it appears that this is Bates stamp
[21] number 009776 through 9779. And do you
[22] recall why you would have executed this
[23] application on or about July 24, 2004?
[24] A: No, I don't recall what this was
[25] for.

Page 9

T. Snyder

[2] Q: Okay. And do you see above your
[3] signature, it says "declaration"?
[4] A: Yes, I do.
[5] Q: And it starts "I declare subject
[6] to the penalties of perjury," do you see
[7] that?
[8] A: Yes, I do.
[9] Q: And do you understand what the
[10] penalties of perjury means, meant as it was
[11] stated in this document?
[12] A: Yes, I do.
[13] Q: What was your understanding?
[14] A: That if you — you lied, you
[15] know, signed this document and you lied,
[16] that you could be held liable for it.
[17] Q: Now, sir, at any point in time in
[18] your life, were you a member of the
[19] military?
[20] A: Yes, I was.
[21] Q: And for whom were you a member
[22] of?
[23] A: I served with the United States
[24] Navy.
[25] Q: And for how many years?

Page 10

T. Snyder

[2] A: I think it was maybe just a
[3] little less than four years actually.
[4] Q: And were you discharged?
[5] A: Yes, I was.
[6] Q: And were you discharged for bad
[7] conduct?
[8] A: That's correct.
[9] Q: And were you convicted by a
[10] general court marshal?
[11] A: In general court marshal. That's
[12] correct. Yes.
[13] Q: Okay. Now, sir, let's look back
[14] at Snyder-1. The first page, seven, "check
[15] appropriate box to the right of each
[16] question," do you see that?
[17] A: Yes, I do.
[18] Q: E, "did you ever receive a
[19] discharge from the armed forces of the
[20] United States which was other than honorable
[21] or which was issued under other than
[22] honorable circumstances," do you see that?
[23] A: Yes, I do.
[24] Q: And you checked "no," do you see
[25] that?

Page 15

T. Snyder

[2] make a motion to strike, based upon
[3] what we did the last depositions,
[4] you're reserving your rights to object
[5] to that motion.
[6]   Q: Sir, on this document, is there
[7] any reference to you stating that you were
[8] discharged for bad conduct?
[9]   MR. GOODSTADT: Objection. The
[10] documents speaks for itself.
[11]   Q: Is there anything on this
[12] document?
[13]   A: Not on this front page.
[14]   Q: Well, take a whole look at the
[15] document.
[16]   A: I don't see anywhere on — in any
[17] four of these documents anywhere where it
[18] says anything that's written about that.
[19]   Q: In the "comments" section, you
[20] don't make reference to the fact that you
[21] were convicted — and let me just get the
[22] right wording — you were convicted by a
[23] general court marshal, do you?
[24]   A: No, because they didn't ask that
[25] question.

Page 16

T. Snyder

[2]   Q: Sir, you wrote the comment,
[3] right?
[4]   A: That was the reason why I was
[5] discharged.
[6]   Q: Okay.
[7]   A: It was my understanding when I
[8] checked "yes," that I had to explain why I
[9] was discharged. That was the reason why I
[10] was discharged.
[11]   Q: Then you put a comment down, sir,
[12] "I was discharged from the United States
[13] Navy due to a hardship at home with family,"
[14] do you see that?
[15]   A: That's correct.
[16]   Q: Didn't say anything about being
[17] convicted at a general court marshal?
[18]   MR. GOODSTADT: Objection.
[19]   Q: Did you?
[20]   A: There's no question that asked me
[21] that, but I did explain it in the interview.
[22] I had to explain what happened in my
[23] discharge.
[24]   Q: On this document?
[25]   MR. GOODSTADT: Objection.

Page 17

T. Snyder

[2]   A: It's not stated anywhere on this
[3] document, sir, so no, I wouldn't write that
[4] there. But during the verbal interview with
[5] Chief Loeffler and Sergeant Paridiso, I did
[6] explain — in fact, gave them a copy of my
[7] discharge.
[8]   MO MR. NOVIKOFF: Motion to strike
[9] as nonresponsive.
[10]   Q: Sir, why were you convicted by
[11] general court marshal?
[12]   A: For what it says right here. I
[13] was AWOL because I had problems at home with
[14] my family and I was very young and immature
[15] and I could not deal with being in the navy
[16] and being away from my family at home.
[17]     I came home to help my mom is
[18] what I did, all right. My pay had gotten
[19] screwed up in the navy and it was taking
[20] months to get it straightened out. I was
[21] sending money home to help her and I
[22] couldn't do it, so 19 years old and being a
[23] little immature at that age, I made a very
[24] rash and unwise decision.
[25]   Q: Okay. Which you exacerbated by

Page 18

T. Snyder

[2] lying on an application?
[3]   DI MR. GOODSTADT: Objection.
[4]     Don't answer that. That's harassing.
[5]   Q: Sir, did you lie on any of the
[6] two applications I've shown you?
[7]   A: No, I didn't lie.
[8]   Q: Okay. And let's see. And did
[9] you have a trial by this court marshal?
[10]   A: I don't recall exactly. Yeah,
[11] there was a trial, but it was — it seemed
[12] very informal to me. It was only several
[13] people in the —
[14]   Q: Okay.
[15]   A: It was a general court marshal.
[16] That's what they called it.
[17]   Q: And were you represented by
[18] counsel at the time?
[19]   A: By the military. By a marine
[20] corps.
[21]   Q: So you had counsel at the time?
[22]   A: He was a marine corps attorney I
[23] would assume, yeah.
[24]   Q: Okay. And other than being
[25] discharged dishonorably, were there any

Page 23

T. Snyder

Q: Have you spoken with any of the other Plaintiffs within the last month concerning this lawsuit, outside the presence of your counsel?

A: I've spoken to Frank and Kevin. We're friends. We do talk.

Q: I'm sure you do talk. My question is more specific, about this lawsuit?

A: No, we have not.

Q: Okay. When is the last time you've spoken to Kevin about this lawsuit outside the presence of your attorney?

A: I have no idea. Probably several weeks ago.

Q: And what was the substance of that conversation?

A: Just how — when our depositions are going to be scheduled and who can make it and who can't.

Q: Okay. With regard to Mr. Fiorillo, have you discussed —

A: Same exact conversation was going on.

Page 24

T. Snyder

MR. GOODSTADT: Again, just let him finish the question.

THE WITNESS: Oh, I'm sorry.

MR. GOODSTADT: You don't know what he's actually asking until he ends.

MR. NOVIKOFF: I generally don't know what I'm asking until I end.

Q: With regard to Mr. Fiorillo, when was the — when was the last time that you have spoken with him concerning this litigation, outside the presence of your counsel?

A: Within the last several weeks when he told me about the deposition schedule and whether or not I was available.

Q: Okay. And prior — other than talking about deposition scheduling, when's the last time you had spoken with Mr. Lamm concerning the substance of this litigation?

A: I haven't.

MR. GOODSTADT: Again, with the same caveat, outside the presence of counsel?

Page 25

T. Snyder

MR. NOVIKOFF: Yes. Absolutely.

A: I haven't talken to him about it at all recently.

Q: When you say "recently," what do you mean?

A: Well, the last time I did talk about it was when we met with counsel.

Q: Okay. I'm talking outside the presence of your counsel —

A: I have not —

Q: — whether in person or over the phone?

A: I have not spoken to him about it.

Q: Over how long a period of time?

A: Probably several months. The last time, again, was when we — that was back in August.

MR. GOODSTADT: Don't. Don't.

Q: Same question with regard to Fiorillo?

A: Same thing. Exact same thing.

Q: And same question with regard to

Page 26

T. Snyder

Carter?

A: Same thing with Eddie and the same with Joe.

MR. NOVIKOFF: Okay. Let's mark the following document as Snyder-4.

(Document Bates stamped 009735 was marked as Snyder Exhibit-4 for identification; 9/24/08, E.L.)

Q: Do you recall when Snyder-4 was taken?

A: No, I do not.

Q: Do you know how long ago?

A: I have no idea, sir.

MR. GOODSTADT: For the record, I'll be willing to stipulate that he was bald in this picture.

MR. NOVIKOFF: You got it. We don't have to go through what we went through with Mr. Carter with the hair. That's fine.

Q: Before we get to the complaint, sir, you worked for Ocean Beach starting when?

Page 31

T. Snyder

[2] vote in this PBA.
[3] **Q:** So because you were told that you
[4] were — I just want to understand this. Is
[5] it your testimony that because you were told
[6] by someone that the village was going to
[7] layoff the part-time cops, you decided to
[8] quit?
[9] **A:** Well, they did layoff some of the
[10] part-time cops that I was working with
[11] there, so I was probably going to be next.
[12] **Q:** So before they laid you off, you
[13] decided to quit?
[14] **A:** I told them that I didn't — I
[15] enjoyed working for the village, I have a
[16] good rapport with the village administration
[17] and the people in the police department, and
[18] I didn't want to cause any problems, I
[19] didn't want to get laid off, so I would just
[20] resign my position.
[21] **Q:** Okay. And what precipitated you
[22] in asking to come back how many years later?
[23] **A:** Actually, I had a meeting with Ed
[24] Paridiso, the chief of police. He had saw
[25] me one day — actual — and he said to me,

Page 32

T. Snyder

[2] "Tom, you know, I'm looking for experienced
[3] police officers. I would like to rehire
[4] you. Are you willing to come back and work
[5] for me?"
[6] **Q:** And what did you say?
[7] **A:** I said, "Sure." And I asked him
[8] some questions about, you know, the pen and
[9] he — how the situation is over there with
[10] the PBA and all that.
[11] **Q:** And when did this take place?
[12] **A:** In May or — I think it was early
[13] June of 2001.
[14] **Q:** Okay. Now in the interim,
[15] whatever period of time that was when you
[16] weren't working for Ocean Beach, did you
[17] seek employment with any other law
[18] enforcement agency?
[19] **A:** No, I did not at that time.
[20] **Q:** Okay. Prior to you quitting,
[21] whenever that was in the '90s — I think we
[22] all agree it took place in the '90s —
[23] between your first day that you worked for
[24] Ocean Beach and your last day during your
[25] first go around with them, had you applied

Page 33

T. Snyder

[2] for any other law enforcement jobs?
[3] **A:** Yes, I did. I — the New York
[4] City Police Department.
[5] **Q:** When did you apply for the New
[6] York City Police Department?
[7] **A:** I want to say 1992 or '93.
[8] **Q:** And what did you have to do to
[9] apply for a position with the New York City
[10] Police Department?
[11] **A:** Basically the same requirements
[12] as if you applied for a position as a
[13] Suffolk County police officer or any police
[14] officer. You would have to take a test,
[15] pass it, and then go through all the — the
[16] background qualifications.
[17] **Q:** And did you take the test?
[18] **A:** Yes, I did.
[19] **Q:** Did you pass the test?
[20] **A:** Yes, I did.
[21] **Q:** And did you go through all the
[22] background tests that were required?
[23] **A:** I didn't did go through all of
[24] them. I went through half of them and then
[25] during the course of going through them, I

Page 34

T. Snyder

[2] changed my idea and decided I didn't want to
[3] go to New York City anymore. So I removed
[4] myself from consideration.
[5] **Q:** Okay. And had you failed any of
[6] the other tests —
[7] **A:** No, I had not.
[8] **Q:** — that you had taken?
[9] **A:** No, I had not.
[10] **MR. GOODSTADT:** Just let him
[11] finish the question.
[12] **Q:** Were you advised — other than
[13] the test that you say you passed, were you
[14] advised, up until the time you decided to
[15] pull your name from consideration, that you
[16] had either passed or failed any test?
[17] **A:** I had gone for my medical and
[18] they didn't tell me that I had failed it.
[19] **Q:** Did they tell you you had passed
[20] it?
[21] **A:** I don't recall.
[22] **Q:** Did you get the results back?
[23] **A:** Honestly, I don't recall
[24] honestly. It's been so long ago. I really
[25] don't recall.

Page 39

T. Snyder

Q: Sir, I'm showing you what's been marked as Snyder-6 and I — and I purport that this is a true and accurate copy of the complaint that was filed on your behalf in or about on March 21, 2007. Have you seen this document prior to today?

A: Oh, yes, I have.

Q: Did you review this document prior to its filing on March 21, 2007?

A: It was reviewed, yes.

Q: Did you review it?

A: I don't recall if I reviewed it or not prior to it being filed.

Q: So when you just testified that it was reviewed, who were you — what were you referring to?

A: I would assume my attorneys reviewed it before they filed it.

Q: Okay. But you don't recall if you reviewed it?

A: I don't recall if I reviewed just right prior to it being filed.

Q: I'm asking did you review any drafts of the complaint prior to it being

Page 40

T. Snyder

filed?

A: A draft of it, yes.

Q: That's what I'm saying.

A: Okay. Yes.

Q: Okay. And would you consider this document to be an important document?

A: Yes, I would.

Q: Would you agree with me that one of the reasons you wanted to review the document was to make sure that everything in there was accurate to the best of your recollection?

A: Yes.

Q: And was it important that everything in there be accurate to the best of your recollection?

A: Yes.

Q: And it would be important that if there was a mistake in there as to a fact that you were aware of, that you would not want that mistake to be filed?

A: Yes.

Q: And did you, when you reviewed the draft, notice any mistakes or

Page 41

T. Snyder

misrepresentations of the facts as you knew them to be?

MR. GOODSTADT: Objection. I'm going to instruct the witness not to answer the question. That's work product and attorney/client communication.

MR. NOVIKOFF: I'm just — Andrew, I'm just asking him if he noticed it. I'm not going to ask what he did with it, who he talked to about it. Just want — I think it's an appropriate question to ask.

MR. GOODSTADT: The question is whether he noticed any —

MR. NOVIKOFF: Whether in any draft that he looked at, did he see any mistake or misrepresentation of a fact that he was aware of.

MR. GOODSTADT: I'll let you answer yes or no on that or you don't recall.

A: I don't recall, to be honest with you.

Page 42

T. Snyder

Q: Okay. And as the facts as alleged pertaining to you specifically, everything that is set forth in this complaint is true and accurate, correct?

MR. GOODSTADT: And we're talking about the filed complaint?

MR. NOVIKOFF: The filed complaint.

A: Yes.

Q: Right. Let's look at paragraph 109. Actually, you know what, before we get to 109, this was filed March 21, 2007. Did you all have a press conference subsequent to filing this complaint?

A: I believe it was after the complaint was filed.

Q: After?

A: Yeah.

Q: And were you — did you participate in that press conference?

A: Yes, I did.

Q: And were there television cameras at that press conference?

A: Yes, there were.

Page 47

T. Snyder

A: Same with him as well.
Q: Same question with regard to Carter?
A: Eddie Carter was a little different. Eddie Carter, they I think reached out to him with regard to a separate incident in Ocean Beach where they mistakenly thought he was involved in.
Q: Well, my question was if Mr. Carter reached out to the DA's office unsolicited. Are you aware as to whether he did that?
A: I'm not aware of that, no.
Q: Okay. Now, so the DA called you up and left a message?
A: That's correct.
Q: And did you respond to that message?
A: Yes, I did.
Q: How did you respond?
A: I called them back and asked what they wanted to speak about and why they wanted me to come in.
Q: And who did you speak with?

Page 48

T. Snyder

A: Tom Iacopelli, the guy who left a message initially.
Q: And what did — what did this gentleman by the name Tom say to you when you called back?
A: He said to me that he had heard I was recently fired from Ocean Beach and that he wanted me to come in because he thought I had some information that could help them with regard to investigations that were occurring in Ocean Beach.
Q: What investigations?
A: He didn't name them specifically.
Q: Did you ask?
A: I didn't ask on the phone, no.
Q: And what — what transpired — well, did he say anything else about what they were investigating Ocean Beach about, other than what you've just testified to?
A: No, he didn't. We just set up when it was convenient for me to come in. We set up a date.
Q: And when did that take — that meeting take place?

Page 49

T. Snyder

A: Soon after that phone call. I'm not sure exactly when.
Q: Days? Weeks? Months?
A: I think it was days after. Maybe even a week.
Q: When — where did you meet?
A: In the Suffolk District Attorney's office.
Q: Who was present at this meeting?
A: The people I stated before. ADA Ray Tierney, Tom Iacopelli, Walter Warkenthien, John Burke, and there was several others, but I don't recall their names.
Q: Prior — and was this — would this meeting have taken place before you filed the Notice of Claim in this case?
A: Before — yes, it did. Yes. Because we filed this in 2007, yes.
Q: No. This is the complaint (indicating). You filed a Notice of Claim in 2006 and I believe it was sometime in the June, July time frame. If I gave you the June, July time frame as a point of

Page 50

T. Snyder

reference —
A: Right.
Q: Was your first face-to-face meeting with any member of the Suffolk County DA prior to you filing your Notice of Claim?
A: I'm not sure if it was prior to or right after, but it was very — both of them were very close together.
Q: Had you retained counsel, Mr. Goodstadt's office, prior to your first meeting with the Suffolk County District Attorney's office?
A: I don't recall if it was right before or right after.
Q: Okay. So you don't know as you sit here today, as to whether or not Mr. Goodstadt's law firm was representing you when you first met with the DA's office?
A: I don't recall exactly. No.
Q: Okay. So you had this meeting with ADA Tierney and a number of other individuals, correct?
A: That's correct.

Page 55

T. Snyder

[2] knowledge?
[3]    MR. GOODSTADT: Objection.
[4]    Q: Of what took place or didn't take
[5] place during that incident?
[6]    A: Not my — not my direct personal
[7] knowledge, but.
[8]    Q: That's all I'm asking about, your
[9] direct personal knowledge.
[10]    A: No. I wasn't present during that
[11] incident. I was not working that night.
[12]    Q: Okay. You weren't even on the
[13] beach that night?
[14]    A: No, I was not.
[15]    Q: Okay. And would it also be fair
[16] to say that anything you told the District
[17] Attorney regarding the Halloween incident
[18] that took place in the bar, was not based
[19] upon your direct personal knowledge, but
[20] based upon your investigation?
[21]    MR. GOODSTADT: Objection.
[22]    Q: Correct?
[23]    MR. GOODSTADT: Objection.
[24]    A: I would say that that was more my
[25] direct knowledge. I was working and I was

Page 56

T. Snyder

[2] called to the scene to investigate that.
[3]    Q: Right. But you weren't present
[4] when the alleged incident took place, were
[5] you?
[6]    A: I wasn't present when the alleged
[7] incident took place, no.
[8]    Q: Okay. All right. So we've
[9] now — we've now talked about this first
[10] meeting. Well, during this first meeting,
[11] did you — well, withdrawn. When was the
[12] next time that you spoke with any person
[13] associated with the Suffolk County DA's
[14] office concerning Ocean Beach?
[15]    A: Um, I think it was several weeks
[16] later. Two or three weeks later.
[17]    Q: And with whom did you have this
[18] conversation or meeting with?
[19]    A: With Tom Iacopelli.
[20]    Q: Over the phone or in person?
[21]    A: I had called him. I had called
[22] him over the phone and asked to come in to
[23] see him.
[24]    Q: Why did you call Mr. Iacopelli
[25] over the phone to ask to come in to see him?

Page 57

T. Snyder

[2]    A: I had found a letter that I
[3] received, a threatening letter I received in
[4] the mail prior to that that I felt that they
[5] needed to look at because it came from Ocean
[6] Beach.
[7]    Q: A threatening letter?
[8]    A: Yes.
[9]    Q: Was — did you receive this
[10] threatening letter before or after you had
[11] retained Mr. Goodstadt's law firm?
[12]    A: I received it before.
[13]    Q: Okay. So if you had received —
[14] did you receive this threatening letter
[15] before your first meeting with ADA Tierney
[16] and the others that we've just discussed?
[17]    A: Yes, I did.
[18]    Q: Did you bring this letter up to
[19] them during this meeting?
[20]    A: I may have. I don't recall if I
[21] did.
[22]    Q: Is there a reason why you didn't
[23] bring this letter to the first meeting that
[24] you had with ADA Tierney and the others?
[25]    A: I just stated that I just

Page 58

T. Snyder

[2] recently had found it after I had spoken to
[3] them and wanted to show this to them.
[4]    Q: When you say you had just
[5] recently found it, what does that mean?
[6]    A: Among my documents at home. I
[7] didn't — I was looking through it and I
[8] found the thing and I said oh, I want to
[9] bring this to them and let them know what
[10] happened here.
[11]    Q: When did you receive this letter?
[12]    A: Um, several months after the
[13] Halloween incident.
[14]    Q: Oh okay. So this was a letter
[15] that you had received prior to the — your
[16] last day of employment in March or —
[17]    A: Yes.
[18]    Q: — April of 2006?
[19]    A: Yes.
[20]    Q: Okay. And do you know if you've
[21] produced this letter in the course of
[22] discovery?
[23]    A: Yes, I did.
[24]    RQ MR. NOVIKOFF: Okay. Well, I
[25] don't know if we've — I don't believe