Page 63

T. Snyder

[2] part of the Suffolk County production,
[3] civil service production.
[4]     MR. NOVIKOFF: I don't know
[5] what this is yet, so that's why I'm
[6] asking the witness. So let's look
[7] at — let's mark this as Snyder-8.
[8] Snyder-7.
[9]     (Letter Dear Sir from Concerned
[10] Citizen of Ocean Beach was marked as
[11] Snyder Exhibit-7 for identification;
[12] 9/24/08, E.L.)
[13]     Q: Now I'm going to show you what is
[14] referred to or marked as Snyder-7. Please
[15] feel free to show it to your counsel and
[16] tell me when you're ready to answer my
[17] questions.
[18]     A: (Reviewing). Okay.
[19]     Q: Is this the letter that you were
[20] referring to?
[21]     A: Yes, this is it.
[22]     Q: Is there any handwriting on that
[23] letter?
[24]     A: Not handwriting on the letter,
[25] but on the envelope there was.

Page 64

T. Snyder

[2]     Q: Okay. So when you made reference
[3] to handwriting in response to my prior
[4] answer, you were referring to what was on —
[5]     A: Yes.
[6]     Q: On the envelope?
[7]     A: On the envelope of the letter.
[8] Yes.
[9]     Q: Okay. Fine. We don't need to go
[10] over that document anymore. Okay. So you
[11] told Mr. Hesse about this letter and he said
[12] he'd speak — he would speak to the
[13] individuals or he would investigate, what
[14] did Mr. Hesse say to you?
[15]     A: I don't recall exactly what he
[16] said, but it was along the lines of I felt
[17] it came from the individuals involved in the
[18] Halloween incident, it was soon after the
[19] incident, and they were concerned about how
[20] we investigated it. They thought that we
[21] were trying to jam them up as they put it.
[22]     MO MR. NOVIKOFF: Motion to strike
[23] as nonresponsive.
[24]     Q: You spoke to Mr. Hesse and said
[25] you believed that this letter came from the

Page 65

T. Snyder

[2] individuals involved in the alleged
[3] Halloween incident, right?
[4]     A: Yes, I did.
[5]     Q: And Mr. Hesse said he would look
[6] into it?
[7]     A: He did say he would look into it,
[8] yes.
[9]     Q: Okay. And then when did you
[10] speak to Mr. Paridiso about this letter?
[11]     A: Soon after I spoke to George
[12] Hesse about it.
[13]     Q: The next day?
[14]     A: It was within a day or two.
[15]     Q: Did Mr. Hesse attempt to prevent
[16] you from talking to Mr. Paridiso about this?
[17]     A: No, he did not.
[18]     Q: And how did you go about tracking
[19] down Mr. Paridiso to talk to him about this
[20] letter?
[21]     A: I saw him at work while I was —
[22] he was coming on duty and I was going off.
[23]     Q: Okay. Was it common for
[24] Mr. Paridiso to come on duty while you were
[25] going off duty?

Page 66

T. Snyder

[2]     A: It happened on a number of
[3] occasions, yeah.
[4]     Q: Okay. Well, how often?
[5]     A: Depending on if I worked the
[6] midnight to 8:00 tour and he was working
[7] 8:00 to 4:00. Sometimes we would see each
[8] other.
[9]     Q: Okay. And what did Mr. Paridiso
[10] say?
[11]     A: I had told him about the letter.
[12] He looked at it and he frowned and said that
[13] he would speak as well.
[14]     Q: And did Mr. Paridiso ever get
[15] back to you with regard to your inquiry with
[16] him concerning this letter?
[17]     A: He said that he would — we would
[18] have a meeting about it with the individuals
[19] that we suspected, and I said okay.
[20]     Q: Now did this take place — well,
[21] now I'm a little confused. You — you
[22] reached out to Ed Paridiso to show him the
[23] letter?
[24]     A: Um-hum.
[25]     Q: You say Mr. Paridiso frowned and

Page 71

[1]　　　　　　　T. Snyder
[2]　Q: Okay. Anything else you said to
[3] him in this phone conversation?
[4]　A: I don't recall. I think it was
[5] just specifically about that letter.
[6]　Q: And did he tell you to come on in
[7] and talk to him?
[8]　A: Actually, he came to my house.
[9] He drove to my house and picked the letter
[10] up.
[11]　Q: That day?
[12]　A: No. But it was a day or two
[13] after.
[14]　Q: And did you talk to him when he
[15] came to your house to pick it up?
[16]　A: Very briefly.
[17]　Q: What was the sum and substance of
[18] the conversation?
[19]　A: I showed him the envelope. I
[20] showed him the letter. He looked at it. He
[21] made me sign, initial, both of them, and he
[22] took it from me and that was it.
[23]　Q: Okay. And when was the next time
[24] you had any type of communication with the
[25] District Attorney's office?

Page 72

[1]　　　　　　　T. Snyder
[2]　A: I'm not sure when, but it was
[3] some — a long period after that.
[4]　Q: Months? Years?
[5]　A: I think it was months after that.
[6]　Q: And who initiated this
[7] communication?
[8]　A: I don't recall if it was them or
[9] me.
[10]　Q: And what was the sum and
[11] substance of this communication?
[12]　A: In this instance, I think it was
[13] more to — there was a new ADA on the case,
[14] Robert Biancavilla, and I think he wanted
[15] just to meet me because of the whole
[16] incident that they were investigating, so he
[17] had never saw me or talked to me, so.
[18]　Q: And did you in fact meet with
[19] this new ADA on the case?
[20]　A: Yes. Very briefly.
[21]　Q: By phone or in person?
[22]　A: No. In person.
[23]　Q: Where?
[24]　A: At the DA's office.
[25]　Q: And what was the sum and

Page 73

[1]　　　　　　　T. Snyder
[2] substance of the conversation?
[3]　A: He just asked how long I was
[4] working there, and you know, basically some
[5] of the same questions. He said, "I had
[6] never met you. I want to talk to you. I
[7] want to meet you."
[8]　Q: Okay. Same questions as were
[9] asked in your first meeting with the DAs?
[10]　A: Yes. Very similar.
[11]　Q: And how long did this meeting
[12] take place?
[13]　A: It didn't take long at all. It
[14] was maybe 20 minutes tops.
[15]　Q: Okay. And had you filed the
[16] complaint by this time in this matter?
[17]　A: Yes. I believe the complaint was
[18] filed by that time.
[19]　Q: And did he ask you any questions
[20] about any of your allegations in the
[21] complaint?
[22]　A: He asked me about the Halloween
[23] incident. He asked about how long I was
[24] working there. He stated to me that,
[25] "You're, you know, you're an old timer.

Page 74

[1]　　　　　　　T. Snyder
[2] You've been there a long time." He asked if
[3] I knew anything about beatings that had
[4] taken place. Some of the prior beatings
[5] that apparently were coming to light.
[6]　MR. NOVIKOFF: Okay. And —
[7] well, I'm actually going to move to
[8] strike that answer because my question
[9] was about did he ask you — no.
[10] Withdrawn. I'm not going to move to
[11] strike that answer.
[12]　Q: Was that the last conversation
[13] you had with anyone from Ocean — from the
[14] DA's office concerning Ocean Beach?
[15]　A: Yeah, I believe that's correct.
[16] I don't believe I've talked to them since.
[17]　Q: Have you ever testified before a
[18] grand jury?
[19]　A: I have —
[20]　MR. GOODSTADT: In connection
[21] with Ocean Beach?
[22]　Q: In connection with Ocean Beach?
[23]　A: No, I have not.
[24]　Q: Are you aware if any of the other
[25] Plaintiffs have testified before a grand

Page 79

T. Snyder

[2] Q: Okay. So if I — just so, if I
[3] understand, you would have learned this fact
[4] while your attorney was present during a
[5] conversation?
[6] MR. GOODSTADT: Objection.
[7] MR. NOVIKOFF: I just want to
[8] be clear. I'm not going to ask him who
[9] said what.
[10] MR. GOODSTADT: I understand,
[11] but just the fact that the topic was
[12] discussed I think is privilege. I
[13] think that you have the information you
[14] need on the question without going any
[15] further.
[16] MR. NOVIKOFF: I just want to
[17] be sure that it was he learned it
[18] during —
[19] MR. GOODSTADT: Well, if you
[20] asked if he learned it during the
[21] conversation, doesn't that encroach
[22] upon what we discussed or may have
[23] discussed? He told you he did not
[24] learn outside the presence of his
[25] attorney.

Page 80

T. Snyder

[2] MR. NOVIKOFF: Fair enough.
[3] Okay.
[4] Q: And did you ever learn that Lamm
[5] had tape recorded conversations?
[6] A: Again, it would be the same
[7] situation. It would be in the presence of
[8] my attorneys.
[9] MR. GOODSTADT: Again, don't —
[10] just — it's the same situation.
[11] Q: How about Fiorillo, did you ever
[12] become aware of the fact that Fiorillo had
[13] taped any conversation?
[14] A: I'm not aware —
[15] MR. GOODSTADT: Objection.
[16] That's assuming a fact.
[17] Q: Are you aware if Fiorillo has
[18] ever tape recorded a conversation?
[19] MR. GOODSTADT: That's a
[20] different question.
[21] A: I'm not aware if Frank ever
[22] recorded.
[23] Q: Are you aware if Nofi ever tape
[24] recorded a conversation?
[25] A: I'm not aware of — of Nofi ever

Page 81

T. Snyder

[2] recording.
[3] Q: How did it come — well, did you
[4] discuss suing Ocean Beach at any point in
[5] time prior to retaining — prior to meeting
[6] Mr. Goodstadt's law firm?
[7] MR. GOODSTADT: Objection.
[8] Q: Outside the presence of any other
[9] attorneys?
[10] MR. GOODSTADT: I just want
[11] to —
[12] MR. NOVIKOFF: I'll break it
[13] down. I'll break the question down.
[14] Q: Putting aside any communications
[15] you may have had in the presence of
[16] Mr. Goodstadt and his office and putting
[17] aside any communications you may have had
[18] with any other lawyer or law firm, did you
[19] have any communications with any of the
[20] other Plaintiffs concerning filing a lawsuit
[21] against Ocean Beach after April 2, 2006?
[22] A: Yes. One instance.
[23] Q: When was that instance?
[24] A: The day before I met my
[25] attorneys.

Page 82

T. Snyder

[2] Q: Okay. Who did you have a
[3] conversation with?
[4] A: With Ed Carter.
[5] Q: And what did you and Mr. Carter
[6] talk about?
[7] A: Eddie had called me. I was home
[8] sick in bed. He called me and said that —
[9] that the four of us were going to go meet
[10] with attorneys, and he thought it would be
[11] wise if I came along as well because I'm
[12] part of a lot of the events that are
[13] occurring there, and I just recently was
[14] fired as well, along with them.
[15] Q: How long after the date that you
[16] just say you were fired did Carter have this
[17] phone call with you?
[18] A: It was within a week.
[19] Q: So within the — just so I'm
[20] clear then, within a week of April 2,
[21] 2000 —
[22] A: Wait. I'm — I'm wrong. It
[23] wasn't within a week. It was actually — it
[24] was after that.
[25] Q: Well, it was certainly after you

Page 87

**T. Snyder**

[2] A: Yeah. I'm not sure. I don't
[3] recall their names.
[4] Q: Okay. And these women knew that
[5] you had applied to be promoted?
[6] A: They knew that we had taken a
[7] promotional exam and that it was recently
[8] scored and that we — myself and Eddie as
[9] well were up for a promotion.
[10] Q: Okay. And how would these women
[11] know that, according to your knowledge?
[12] A: Well, I would assume that the
[13] records from your promotional exam would
[14] come from civil service to the Town of Islip
[15] personnel department.
[16] Q: I'm asking you, how do you know
[17] that these women specifically knew that you
[18] had taken a test to be promoted?
[19] MR. GOODSTADT: He just
[20] testified to —
[21] Q: Without assuming, what is your
[22] knowledge, other than an assumption?
[23] A: That's — my knowledge is that
[24] that's how it would — they request the
[25] test, the town requests the tests through

Page 88

**T. Snyder**

[2] Suffolk County and Suffolk County posts, and
[3] you go take the test and then the results
[4] get brought back to the town.
[5] Q: The — some of the women that you
[6] referred to that you can't identify by name,
[7] did any of them tell you "I know that you
[8] just took a test" —
[9] A: No.
[10] Q: — "to be promoted"?
[11] A: Not directly. No.
[12] Q: Okay. Did anyone — did any of
[13] these "some of the women" that you testified
[14] to advise you that they were aware that you
[15] were up for a promotion?
[16] A: Um, they said that they knew
[17] people in the department were up. Not me
[18] specifically, no.
[19] Q: Okay. Fine. Now did any of
[20] these women that you can't name, advise you
[21] that they were told by George Hesse —
[22] A: No.
[23] Q: — that you were a rat?
[24] MR. GOODSTADT: Let him finish
[25] the question.

Page 89

**T. Snyder**

[2] A: No, they did not.
[3] Q: Did any of these women advise you
[4] that they had seen a piece of paper in which
[5] George Hesse had called you a rat?
[6] A: No, they did not.
[7] Q: Who are your superiors at the
[8] Town of Islip at this time?
[9] A: At this time, the assistant
[10] director to parks and recreation, George
[11] Schimpf. It's S-C-H-I-M-P-F.
[12] Q: Okay.
[13] A: He was the — well, he still is
[14] the assistant. He's running the department
[15] now. The director is — is no longer there.
[16] Q: At the time these women that you
[17] can't identify made whatever statements they
[18] made to you, who was your superior?
[19] A: Marty Raber. He was the
[20] executive assistant to the Town of Islip
[21] supervisor, Pete McGowan.
[22] Q: Did any of these women ever tell
[23] you that Mr. Raber had told them that George
[24] Hesse had said to Mr. Raber you were a rat?
[25] A: No, they did not.

Page 90

**T. Snyder**

[2] Q: Did any of these women that you
[3] can't identify ever advise you that George
[4] Hesse had advised George Schimpf that you
[5] were a rat?
[6] A: No, they did not.
[7] Q: Did Raber ever advise you that
[8] George Hesse had told you — that had told
[9] him that you were a rat?
[10] A: No, he did not, but he did
[11] know — he did know that we were fired from
[12] Ocean Beach and he knew the situation.
[13] MO MR. NOVIKOFF: Motion to strike
[14] as not responsive.
[15] Q: I'll ask the question again. Did
[16] Mr. Raber ever advise you that George Hesse
[17] had told him that you were a rat?
[18] A: No, he did not.
[19] Q: Did Mr. Schimpf ever advise you
[20] that George Hesse had told him that you were
[21] a rat?
[22] A: No, he did not.
[23] Q: Now when you make reference to "a
[24] reference" in paragraph 109, what
[25] specifically are you referring to?

Page 95

T. Snyder

[2] what do you mean?
[3] A: He heard the rumors from the
[4] officers down at the harbor master's office
[5] where George worked for the town part time.
[6] Q: Okay. How did Craig Cain —
[7] A: The same thing.
[8] Q: Hold on. You got to let me
[9] finish the question. Did Craig Cain ever
[10] advise you that he had spoken to George
[11] Hesse about you?
[12] A: No, he did not.
[13] Q: Okay. Did Tony Riccardi ever
[14] advise you that he had spoken to George
[15] Hesse about you?
[16] A: No, he had not.
[17] Q: Did any person that you worked
[18] with in your department as you use that
[19] phrase, ever advise you that they had spoken
[20] with George Hesse?
[21] A: No, they had not.
[22] Q: Okay. Let's talk about the
[23] harbor master department. Who works
[24] at the — who worked between April 2006 and
[25] today at the harbor master's department?

Page 96

T. Snyder

[2] A: I don't know the guy's name
[3] specifically. They have some new officers
[4] now, but I know Bobby Sgroi was one of the
[5] officers that George worked with. He's now
[6] running the department down there, and Alan
[7] Loeffler at the time was also down there.
[8] Q: Well, when — when did Alan
[9] Loeffler stop being down there?
[10] A: When he retired I want to say
[11] 2006. Sometime in 2006 he retired.
[12] Q: Did he retire before or after you
[13] were told you were no longer working there?
[14] A: He retired and then came back
[15] pending a waiver or something to that
[16] effect. I'm not sure, though.
[17] Q: Well, did you speak to Alan
[18] Loeffler concerning anything that George
[19] Hesse said to him, if anything?
[20] A: I spoke to him, but not directly
[21] about that. No.
[22] Q: Okay. Did Alan Loeffler ever
[23] advise you that George Hesse said anything
[24] to him concerning you?
[25] A: He never spoke — he never said

Page 97

T. Snyder

[2] to me directly, no.
[3] Q: Did Bobby Sgroi ever advise you
[4] that George Hesse had spoken to him about
[5] you after you say you were fired from Ocean
[6] Beach in 2006?
[7] A: He says he spoke to him, but he
[8] wanted to stay out of it.
[9] Q: Okay. So Sgroi said he talked to
[10] Hesse, but he didn't tell you what was said?
[11] A: Right. He wouldn't — he said he
[12] wanted to remain neutral because he liked me
[13] and he liked George and he didn't want to be
[14] involved in it.
[15] Q: So he didn't tell you anything
[16] about their conversation?
[17] A: No, he didn't. There's also —
[18] Q: Hold on. Hold on.
[19] MR. GOODSTADT: He was still
[20] answering the question.
[21] MR. NOVIKOFF: No. My question
[22] was specific did Bobby Sgroi. If the
[23] answer is going to be about what Bobby
[24] Sgroi said to you, then by all means
[25] continue. If it's not, then I don't

Page 98

T. Snyder

[2] need to hear it.
[3] MR. GOODSTADT: We'll put it in
[4] an affidavit then. That's fine.
[5] Q: Is your answer going to be what
[6] Bobby Sgroi said to you?
[7] A: No.
[8] Q: Okay. Then did anyone else who
[9] worked for the harbor master department
[10] between April 20, 2006 and the present day,
[11] tell you that they have spoken to George
[12] Hesse?
[13] A: Um, no, they have not. Not in
[14] reference to me.
[15] Q: Right. Who at the Town of Islip
[16] has advised you that they have spoken with
[17] George Hesse?
[18] A: Um, other than Bobby Sgroi and
[19] Alan, because he worked with Alan, I'm not
[20] sure. There may be other people. He did —
[21] he did work there.
[22] Q: That's not my question, sir, and
[23] I don't even know if you've told me that
[24] Alan Loeffler told you that he spoke to
[25] George Hesse about it, so I'll ask that

Page 103

[1] T. Snyder
[2] A: Yes, I did.
[3] Q: And —
[4] A: Their —
[5] Q: Hold on. Which supervisor or
[6] supervisors have you asked?
[7] A: Both Marty Raber and George
[8] Schimpf.
[9] Q: And when did you talk to
[10] Mr. Raber about why you were not promoted or
[11] have not been promoted?
[12] A: It would have to be prior to him
[13] leaving, so it would be after the results of
[14] the test came back, between September of '06
[15] and December of '06 when he left.
[16] Q: And when — and what did he say?
[17] A: He said, "I made my
[18] recommendations and that's it." He put his
[19] hand up. He didn't want to talk.
[20] Q: And did he say he made — did he
[21] say he recommended you?
[22] A: He just said, "I made my
[23] recommendations." He didn't want to talk.
[24] Q: How about Schimpf, have you ever
[25] spoke to Schimpf about the fact that you

Page 104

[1] T. Snyder
[2] have yet to be promoted to sergeant?
[3] A: Yes. And within the last year.
[4] Yeah.
[5] Q: Was that after you filed the
[6] lawsuit?
[7] A: Yes.
[8] Q: And was that after you had the
[9] press conference?
[10] A: Yes.
[11] Q: Was that after Newsday had run an
[12] article, at least one article concerning
[13] this?
[14] A: Yes.
[15] Q: Was that after News 12 had run at
[16] least one story about this?
[17] A: Yes. I believe so. Yes.
[18] Q: Was it after a number of other
[19] television stations and media outlets had
[20] run stories about this?
[21] A: I believe so. Yes.
[22] Q: And what did Mr. Schimpf say to
[23] you when you inquired with him as to why you
[24] had yet to be promoted?
[25] A: He said the same thing that Marty

Page 105

[1] T. Snyder
[2] Raber said, "I've made my recommendations,"
[3] and he didn't want to talk about it either.
[4] Q: Okay. Let's look at the next
[5] sentence of paragraph 109. Well, actually,
[6] the next sentence doesn't refer to you, does
[7] it?
[8] MR. GOODSTADT: Objection.
[9] A: No, it doesn't.
[10] Q: Do you have any knowledge one way
[11] or the other as to what — as to the basis
[12] of Mr. Carter's allegation?
[13] A: Not direct knowledge.
[14] Q: Just through what Mr. Carter told
[15] you?
[16] A: Yes.
[17] Q: Okay. Let's look at paragraph
[18] 110, "upon information and belief, Hesse
[19] circulated false and malicious negative
[20] references concerning Plaintiffs among
[21] officials working for the Town of Islip," do
[22] you see that?
[23] A: Yes, I do.
[24] Q: What do you mean by the word
[25] "circulated"?

Page 106

[1] T. Snyder
[2] A: Spread rumors. Discussed our
[3] employment and our firing with them.
[4] Q: Okay. So you understand
[5] "circulated" to being spreading rumors and
[6] discussing the reasons for your terminations
[7] with officials working for the Town of
[8] Islip?
[9] A: Yes.
[10] Q: Okay. What officials?
[11] A: The same ones we just talked
[12] about. This is —
[13] Q: Schimpf and —
[14] A: And Raber.
[15] Q: Okay.
[16] A: Um, among others.
[17] Q: Well, that's what I'm trying to
[18] find out.
[19] A: I would imagine Bobby Sgroi.
[20] Q: I don't want you to imagine. I
[21] want you to advise me when you made the
[22] allegation of "officials," what officials
[23] were you referring to. So you got Raber,
[24] you got Schimpf?
[25] A: Right.

Page 111

T. Snyder

Q: Have you ever looked at your civil service records?

MR. GOODSTADT: Objection.

A: I have never seen it, no. Not with civil service, no.

Q: Have you ever sought to look at your civil service records?

A: Um, well, I guess in a way I did when I called the state retirement system and asked them when was the last day I was registered as a police officer.

Q: When did you call them?

A: Soon after I was fired.

Q: Okay.

A: And they stated to me that they had me last working as a police officer in Ocean Beach on March 31, 2006.

Q: Okay. What were the false — well, then, sir, to your knowledge, what document has been inserted into your civil service records that contain a false and damaging and baseless allegation?

A: I would imagine when George Hesse talked to Alison Sanchez in civil service

Page 112

T. Snyder

and said that he was firing us, that that would be the false and malicious allegations.

Q: You imagine?

A: Well, he did — he did say that we were — that we were rats and we were being fired because of it.

MO MR. NOVIKOFF: Motion to strike, sir.

Q: You just said you imagine. Other than your imagination, can you tell me what specific document you are aware of that Mr. Hesse has sent to civil service that contains a false, damaging and baseless allegation?

MR. GOODSTADT: Objection.

A: He spoke to Alison Sanchez. I know he submitted documents upon our firing of why we were being fired. So I would assume in those documents that that's where it's written.

MO MR. NOVIKOFF: Motion to strike.

Q: Have you ever seen a document

Page 113

T. Snyder

that you claim went to civil service that contains a false, damaging and baseless allegation from Mr. Hesse?

A: I don't recall seeing one, no.

Q: Okay. And what is the basis for your belief or — withdrawn. What is the basis for your imagination that subsequent to April 20, 2006, Mr. Hesse spoke with Ms. Sanchez?

MR. GOODSTADT: Objection.

Q: Concerning you?

MR. GOODSTADT: Objection.

A: When I called the retirement system and found out that I was fired and I was fired prior to I was notified being fired.

Q: All right. Well, did that department that you spoke to say that Hesse spoke to Sanchez?

A: No. They said that they received documents from Ocean Beach and from Suffolk County Civil Service saying that I was no longer employed as a police officer.

Q: So my question to you, sir, what

Page 114

T. Snyder

evidence can you point to — well, withdrawn. My question then is, what is the basis for your belief that Sanchez and Hesse ever spoke about you after April 20, 2006?

A: It would be within those documents that — after April 20, 2006?

Q: Yes.

A: I'm not aware of them speaking after April 20, 2006.

Q: Okay. Then what is the basis for your belief that they had spoken about your termination after April 2, 2006?

A: I'm not aware they spoke before April 2. I assume they spoke before — prior to that, because apparently I was fired before I was notified I was fired.

Q: What makes you believe that Hesse notified Sanchez prior to April 2, 2006 that you in your words were being fired?

A: I believe in some of the documents in discovery we got from civil service department shows that they had regular communication.

Q: Concerning why you were fired?

Page 119

[1] T. Snyder
[2] Q: Okay. They didn't tell you that
[3] they had spoken to Hesse, did they?
[4] A: No. They wouldn't talk about it.
[5] They did — they did mention to me about the
[6] Ocean Beach incident, though. Or Ocean
[7] Beach. That I was a former employee there.
[8] Q: Well, did you disclose to them on
[9] the application that you were a former
[10] employer?
[11] A: On my —
[12] Q: That you were a former employee?
[13] A: On my resume, yes.
[14] Q: Okay. And who did you speak to
[15] there?
[16] A: Um, the director. I don't recall
[17] his name right now, but the director of that
[18] safety and security division. Bob. I'm not
[19] sure his last name right now.
[20] Q: And what is — was it Bob that
[21] spoke to you about Ocean Beach?
[22] A: Yes, he did.
[23] Q: And what did he say to you?
[24] A: He asked me — when he saw my
[25] resume, he asked me, "Are you one of those

Page 120

[1] T. Snyder
[2] guys that's involved in all the beatings
[3] over there?" I said, "No."
[4] Q: Okay. Did he say anything else
[5] about Ocean Beach?
[6] A: He asked why I was fired.
[7] Q: Okay. Anything else about Ocean
[8] Beach?
[9] A: That was it really.
[10] Q: Okay. So let me just — just so
[11] we're all clear and understand. Bob, the
[12] director of John T. Mather Memorial
[13] Hospital, during an interview for you — of
[14] you for a position that you applied for in
[15] or about June of '07, asked you if you were
[16] one of the officers involved in the beatings
[17] at Ocean Beach; is that correct?
[18] A: Yes.
[19] Q: And you answered him no?
[20] A: Right.
[21] Q: On that subject, did he ask you
[22] any other questions? "The subject" being
[23] what he labeled the beatings at Ocean Beach?
[24] A: He didn't ask any questions. He
[25] just — that was it. He just went on to the

Page 121

[1] T. Snyder
[2] next —
[3] Q: Right. He asked you a question
[4] if you were involved?
[5] A: Right.
[6] Q: And you said no?
[7] A: I said, "No, I was not." "I
[8] wasn't one of the bad cops," I said.
[9] Q: And on that issue, there was no
[10] further discussion?
[11] A: No.
[12] Q: And you made specific reference
[13] to bad cops in your answer?
[14] A: That was my answer to him. I
[15] said, "I was not — I'm not one of the bad
[16] cops over there, I'm one of the good cops."
[17] Q: Okay. And then the next issue
[18] that he asked you about in — concerning
[19] Ocean Beach was why you were fired?
[20] A: Yeah. We discussed it.
[21] Q: Well, what did he specifically
[22] ask you?
[23] A: He asked why I was fired.
[24] Q: And what did you say to him?
[25] A: I told him I was fired because

Page 122

[1] T. Snyder
[2] the — the sergeant at the time, George
[3] Hesse, my supervisor at the time, decided
[4] that I was a rat.
[5] Q: So you —
[6] A: So I said —
[7] Q: Hold on. Just so I'm clear, you
[8] said initially in response to his question
[9] about why you were fired, you said that
[10] George Hesse, who was your supervisor at the
[11] time?
[12] A: I said — yeah, my supervisor.
[13] Right.
[14] Q: Your supervisor at the time
[15] decided that you were a rat?
[16] A: He — that's what he said to me.
[17] I was a rat.
[18] Q: Okay. Fine. And did you say
[19] anything else to the director of security at
[20] the hospital before he asked you any
[21] follow-up questions about that?
[22] A: No. That's when I said, "I'm not
[23] one of the bad guys over there, I'm one of
[24] the good guys." That's — that's how I
[25] followed up. And he said, "Okay."

Page 127

[1] T. Snyder
[2] Sometime after. Shortly after that.
[3] Q: And then you met with him?
[4] A: Yes.
[5] Q: And he stated to you at the
[6] beginning of this meeting that they're not
[7] hiring?
[8] A: He — he took my resume. I told
[9] him who I was, and he looked at me, and he
[10] says, "Well, we're not hiring at this time."
[11] Q: Okay. And that was the extent of
[12] your conversation?
[13] A: That was the first time, yes.
[14] Q: And you said thank you very
[15] much —
[16] A: And I walked out.
[17] Q: — and you went on your way?
[18] A: Yes.
[19] Q: Okay. And then what caused you,
[20] if anything, to resubmit your application
[21] or — or seek employment again for the
[22] hospital?
[23] A: I just wanted to go back there
[24] and try it again.
[25] Q: Okay. And so how did you go

Page 128

[1] T. Snyder
[2] about that?
[3] A: I — I did the same thing again.
[4] I called up and made an appointment.
[5] Apparently, he — he must not have
[6] recognized that I was the same guy he talked
[7] to.
[8] Q: Okay. So he did meet with you
[9] this time?
[10] A: The second time, yeah.
[11] Q: The second time. Now in the
[12] first time in June, was the Gilbert case in
[13] the papers, to your knowledge?
[14] A: Oh, short — before that. It
[15] happened in August of '05.
[16] Q: Okay.
[17] A: Or September of '05.
[18] Q: But you just testified, though,
[19] that it was in the newspapers when you were
[20] interviewing?
[21] A: Well, it was prior to that.
[22] Q: Oh, okay.
[23] A: And then the whole scandal with
[24] the DA saying he's investigating Ocean Beach
[25] was in December of '05. There was a big

Page 129

[1] T. Snyder
[2] headline news.
[3] Q: Okay. So you went to the
[4] hospital. You got to see the director.
[5] Apparently he didn't recognize you from the
[6] last time?
[7] A: It didn't appear to me he did.
[8] Q: And you had a conversation with
[9] him? An interview with him, right?
[10] A: At that time, yes, I did.
[11] Q: And this is where he asked you if
[12] you were one of the cops involved in the
[13] beating —
[14] A: Right.
[15] Q: — that we talked about, and he
[16] also asked you why you were terminated and
[17] we talked about that, right?
[18] A: Yes.
[19] Q: Okay. Were you given — were you
[20] offered the job at that interview?
[21] A: Yes, I was, at the end of the
[22] interview.
[23] Q: Okay. How did he go about
[24] offering you the job?
[25] A: He said, "Well, this is what —

Page 130

[1] T. Snyder
[2] this is the opening I have. You know, can
[3] you do this?"
[4] Q: Okay.
[5] A: And I said, "I will fit it into
[6] my schedule. Yeah, I will do it. I need
[7] the job."
[8] Q: And how much do you earn?
[9] A: $13 and change an hour.
[10] Q: And how many hours do you work
[11] per week?
[12] A: Every other week, a total of
[13] seven and a half, so we're talking what, 15
[14] hours every other week.
[15] Q: Okay. So if I understand your
[16] testimony correctly, after you had discussed
[17] whether or not you were one of the cops
[18] involved in the beating at Ocean Beach, and
[19] after you had specifically told him that
[20] your supervisor had called you a rat, this
[21] director of security for the John T. Mather
[22] Memorial Hospital hired you?
[23] A: Yeah, he did.
[24] Q: Okay.
[25] A: I told him I wasn't one of the

Page 135

T. Snyder

[2] month —
[3]   MR. GOODSTADT: Objection.
[4]   Q: Well, when were these park
[5] rangers hired?
[6]   A: Within the last month it was —
[7] they just got hired.
[8]   Q: Okay. So other than the 10 that
[9] were hired within the last month, are you
[10] aware of any other park rangers that were
[11] hired between the date of your application
[12] and last month?
[13]   A: No, I'm not aware.
[14]   MR. NOVIKOFF: Okay. Let's
[15] mark the next document as Snyder-8.
[16]   (Application for Town of
[17] Brookhaven was marked as Snyder
[18] Exhibit-8 for identification;
[19] 9/24/08, E.L.)
[20]   A: (Reviewing).
[21]   Q: Sir, do you recognize Snyder-8?
[22]   A: Yes, I do.
[23]   Q: And what is Snyder-8?
[24]   A: This is the application I filled
[25] out for the — the position as a park

Page 136

T. Snyder

[2] ranger.
[3]   Q: And for the record, it's TOB0010
[4] to TOB0011, and you filled out this
[5] application on or about June 28, 2007?
[6]   A: Yes, I did.
[7]   Q: And you put down Ed Paridiso as
[8] your supervisor here?
[9]   A: Yes. Because Ed Paridiso still
[10] technically was chief at Ocean Beach.
[11]   Q: And was Ed Paridiso your
[12] supervisor while you worked at Ocean Beach?
[13]   A: When I worked with him on his
[14] tour, yes, I was. Yes, he was. Excuse me.
[15]   Q: Sir, what does that mean, when
[16] you worked with him on your tour? This —
[17] this question says "who is your supervisor,"
[18] you wrote "Ed Paridiso, chief." Was Ed
[19] Paridiso your supervisor throughout your
[20] tenure at Ocean Beach?
[21]   A: He was one of my supervisors.
[22] There was another one. George Hesse was the
[23] second supervisor. And on occasions, Walter
[24] Muller, police officer, was designated as
[25] the duty officer, and he was also my

Page 137

T. Snyder

[2] supervisor.
[3]   Q: Okay. So why didn't you put down
[4] Walter Muller?
[5]   A: Because Walter Muller is not
[6] going to give me a reference. He's not
[7] running the department. Chief Paridiso was.
[8]   Q: Why didn't you put Ed — why
[9] didn't you put — well, they weren't asking
[10] for a reference, were they? They were
[11] saying "state employment experience. Start
[12] with your present and last job, include
[13] military service and volunteer activities,"
[14] and then they write "employer" and you write
[15] what?
[16]   A: What — what line are you looking
[17] at? I'm sorry.
[18]   Q: Okay. I am looking at "employer
[19] name and address." You write "Incorporated
[20] Village of Ocean Beach," do you see that?
[21]   A: Okay. Yes, I see that.
[22]   Q: You then give a phone number.
[23] You then give how much you were making per
[24] hour?
[25]   A: Yes. That's correct.

Page 138

T. Snyder

[2]   Q: You then give your duties that
[3] you performed, right?
[4]   A: Yes.
[5]   Q: And then you write "supervisor,
[6] Ed Paridiso, chief," do you see that?
[7]   A: Yes.
[8]   Q: Why didn't you put Hesse down?
[9]   A: Because —
[10]   MR. GOODSTADT: Objection.
[11]   Q: Hesse was your supervisor, right?
[12]   A: He was the supervisor when I —
[13] when I worked underneath him in his tour,
[14] yes.
[15]   Q: Did you ever —
[16]   A: He was — at this point, he
[17] wasn't the chief, as far as I knew. The
[18] chief of police is the only one who can
[19] give — who could — they would want to
[20] speak to. They didn't want to speak to
[21] George Hesse.
[22]   Q: You got it. Okay. You didn't
[23] put down your military experience, did you?
[24]   A: No. I don't see anywhere on here
[25] where I had to fill it out.