Page 143

T. Snyder

[2] at the Brookhaven National Lab, any issues
[3] concerning your employment with Ocean Beach?
[4]  A: No. Again, I didn't get that far
[5] along in the process.
[6]  Q: Okay. So other than — well,
[7] let's — let's get specific now. You
[8] write — you allege you have been unable to
[9] secure new comparable employment in the law
[10] enforcement profession. What employers have
[11] you sent your resume to concerning securing
[12] new and comparable employment in the law
[13] enforcement profession since April 20, 2006?
[14]  A: Just those three. That's it.
[15]  Q: Okay.
[16]  A: Or, actually, I wouldn't even
[17] consider them — Mather comparable.
[18]  Q: Well, that's what I'm going to
[19] say. I mean, you didn't testify that all
[20] three of these are comparable. Are any
[21] three of these comparable to what you had at
[22] Ocean Beach, in your opinion?
[23]  A: Brookhaven National Lab I would
[24] say is comparable because they have a police
[25] force, and I would say the park ranger job

Page 144

T. Snyder

[2] would be comparable.
[3]  Q: Okay. And other than those two
[4] jobs, have you sent your resume or applied
[5] for any other comparable law enforcement
[6] profession — job?
[7]  A: No, I have not at this time.
[8]  Q: When — okay. Has any member of
[9] your family — has any member of your
[10] family been confronted concerning your Ocean
[11] Beach termination?
[12]  A: I wouldn't — I don't know if
[13] you want to say "confronted." People have
[14] brought it up to them, yeah.
[15]  Q: Well, let's just look at
[16] paragraph 114, the last sentence. You write
[17] "nevertheless, Plaintiffs and their families
[18] have been repeatedly confronted and
[19] castigated by strangers who have assumed
[20] that these baseless and malicious
[21] allegations against Plaintiffs are true," do
[22] you see that?
[23]  A: Yes, I do.
[24]  Q: Has your family been — has any
[25] family member been confronted and

Page 145

T. Snyder

[2] castigated?
[3]  A: Some members of my family have.
[4]  Q: Who?
[5]  A: My daughter. My daughter,
[6] Larissa, who works in Brookhaven town.
[7] People have mentioned to her about the blog.
[8] What's on the blog.
[9]  Q: About the blog?
[10]  A: Yup. As well as people coming up
[11] to me and mentioning about the blog, too.
[12]  Q: Okay. How about anyone else in
[13] your family?
[14]  A: No one — none — they haven't
[15] said anything to me about it, no.
[16]  Q: So you believe that the fact that
[17] some people in the Town of Islip have
[18] addressed with your daughter what may have
[19] appeared on the blog —
[20]  A: No, not with the Town of Islip.
[21]  Q: Okay. You believe because some
[22] people have addressed with your daughter the
[23] fact that your name has appeared on the
[24] blog, that has — that is what you consider
[25] to be castigated and confronted?

Page 146

T. Snyder

[2]  A: My name has been publicly smeared
[3] in the blog, yeah, as being a rat and being
[4] a bad cop.
[5]  MR. NOVIKOFF: Okay. We're
[6] going to go through the blog at the
[7] next break, after the next break. So
[8] why don't we take a break now and we'll
[9] come back.
[10]  THE VIDEOGRAPHER: This ends
[11] tape number two. The time is 12:28
[12] p.m. Going off the record.
[13]  (A break was taken.)
[14]  THE VIDEOGRAPHER: This begins
[15] tape number three. The time is 12:40
[16] p.m. Back on the record.
[17]  Q: Sir, you made reference to a blog
[18] before the break, and I believe when we
[19] spoke about your allegations in paragraph
[20] 113, you testified that part of Hesse's plan
[21] was that he allowed other officers to write
[22] in a blog, do you recall that?
[23]  A: Yes, I do.
[24]  Q: Okay. What blog are you
[25] referring to?

Page 151

T. Snyder

[1]
[2] saying "and let's not forget the two clowns
[3] from Islip, Ed and Tom. They too got canned
[4] for not doing their jobs. But do we need to
[5] bring up the Halloween incident. They are
[6] lucky that they didn't get charged with
[7] official misconduct and falsely reporting an
[8] incident," do you see that?
[9]    A: Yes, I do.
[10]   Q: And then — you then write, "this
[11] is the Tom referred to in this post," do you
[12] see that?
[13]   A: Yes, I do.
[14]   Q: Is that the only time you
[15] wrote — you wrote on this blog?
[16]   A: Yes, it is. Yes.
[17]   Q: How did you go about — this is
[18] something I think we all discussed at the
[19] break. How do you go about writing on a
[20] blog, because I have no clue? How do —
[21]   A: I don't understand. What do you
[22] mean how you go about —
[23]   MR. GOODSTADT: Just for the
[24] record, we didn't all discuss.
[25]   MR. NOVIKOFF: Well,

Page 152

T. Snyder

[1]
[2] Mr. Goodstadt wasn't part of this
[3] conversation. Nor was the court
[4] reporter or the videographer.
[5]   Q: Describe how you went about
[6] putting this blog on what's referred to as
[7] "The Schwartz Report"?
[8]   A: Okay. This was a public blog
[9] that was known prior to my firing by
[10] everybody not only in the police department,
[11] but in the Town of Islip. It's known to
[12] everybody, okay. 631 Politics and The
[13] Schwartz Report is where a lot of civil
[14] service employees go to blog. That's like
[15] sort of common public knowledge.
[16]   Q: Okay.
[17]   A: Okay? It was brought to my
[18] attention by numerous people I work with in
[19] the town, and also by some of my coworkers I
[20] got fired with at Ocean Beach who said, you
[21] know, there's stuff on the blog about you,
[22] and I went to see what was written.
[23]   Q: Okay. So you did. So how do go
[24] about — just describe for me the process.
[25] Do you type something? Do you send a letter

Page 153

T. Snyder

[1]
[2] to someone to put it on the blog?
[3]   A: Oh no. You type something in.
[4]   Q: Okay. So you go in. You give
[5] yourself a name?
[6]   A: Right. This is the name that I
[7] blogged under.
[8]   Q: You don't always have to use the
[9] same name, right? You can use any name you
[10] want?
[11]   A: I have no idea. I only did it
[12] once.
[13]   Q: Right.
[14]   A: So I don't know.
[15]   Q: Okay. And there's a section on
[16] the thing that said "name" and you put in —
[17]   A: This is the name that I decided
[18] to put in. Right.
[19]   MR. GOODSTADT: Just let him
[20] finish the question.
[21]   A: Okay.
[22]   Q: Why didn't you just say "Tom
[23] Snyder"? Why did you use the name
[24] "excaliber"?
[25]   A: Because I refer to myself right

Page 154

T. Snyder

[1]
[2] here.
[3]   Q: Okay.
[4]   A: And then it's — obviously
[5] it's — the people who are writing about me
[6] know who I am because they wrote where I
[7] work and what my name was and my coworker.
[8]   Q: And then you typed this out?
[9]   A: Yes.
[10]   Q: And you hit a send button?
[11]   A: You send it to their site I
[12] guess.
[13]   Q: Okay. Okay. And did Joe Nofi,
[14] to your knowledge, ever blog —
[15]   A: Not to my knowledge.
[16]   Q: — on The Schwartz Report?
[17]   MR. GOODSTADT: Let him finish
[18] the question.
[19]   A: Not to my knowledge.
[20]   Q: Did anyone ever tell you that Joe
[21] Nofi had put a blog on The Schwartz Report?
[22]   A: No, they did not.
[23]   Q: Okay. Did Ed Carter ever place a
[24] blog on The Schwartz Report?
[25]   A: Not to my knowledge.

Page 159

T. Snyder

[2] particular blog on The Schwartz Report that
[3] has been marked as Snyder Exhibit-9?
[4]   A: Can I identify? What do you mean
[5] can I identify?
[6]   Q: Can you look at any blog and tell
[7] me who wrote it specifically?
[8]   A: No, I cannot.
[9]   Q: Right. And can you identify for
[10] me any other blog that you believe was
[11] defamatory as it concerns you?
[12]   MR. GOODSTADT: Objection.
[13]   A: I would have to go through each
[14] and every page here and look and see if
[15] there's anything else in here about me.
[16] Because like I said, I didn't go on this all
[17] the time.
[18]   Q: Okay. Well, let's talk about up
[19] through April 19. I'm sorry, let's talk
[20] about up through April 13. Do you see that?
[21]   A: Yes.
[22]   Q: Prior to April 13, can you point
[23] to any blog that is part of the exhibit I
[24] gave you that you believe contained false
[25] and malicious information about you?

Page 160

T. Snyder

[2]   A: Well, this one here. The one I
[3] responded to (indicating).
[4]   Q: Right. Other than that one?
[5]   A: Here's something here
[6] (indicating).
[7]   Q: Just give me the number on the
[8] page.
[9]   A: Oh, page 16. Hesse 16.
[10]   Q: Okay.
[11]   A: That was definitely a concern of
[12] mine. That's why I posted —
[13]   Q: Just tell me which one.
[14]   A: The "ridiculous." "OB resident,"
[15] which is, again, reason why I suspected an
[16] OB resident was writing.
[17]   Q: "I heard that it was some "Town
[18] Employees" that got fired? Which causes me
[19] to wonder what the town officials would
[20] think if they found out that these people
[21] were fired from a police department?
[22] Hmmmm." No mention of you on this, is
[23] there?
[24]   A: No. But it was pretty obvious
[25] who the town employees were that were

Page 161

T. Snyder

[2] working at Ocean Beach and also working in
[3] the town. It was common knowledge.
[4]   Q: Well, is there a thread that's
[5] attached to this blog?
[6]   A: Well, when I received a letter
[7] stating —
[8]   Q: No. Is there a thread that
[9] appears on this blog that makes reference to
[10] any other blog?
[11]   A: Not to any other blog, no.
[12]   Q: Okay. Anything else prior to
[13] April 13, 2006 that you believe refers to
[14] you in a false and malicious manner?
[15]   A: This one right here (indicating).
[16]   Q: Just give me the number.
[17]   A: Page number 17.
[18]   Q: Okay.
[19]   A: It says "p.o. OBPD."
[20]   Q: "p.o." — okay.
[21]   A: It says "why don't you ladies
[22] grow a pair and sign your name. You write
[23] and hide under anonymity. Just like you
[24] hide under your shield. Lucky for you
[25] public floggings are considered barbaric. I

Page 162

T. Snyder

[2] personally know of 30 other police officers
[3] that are trustworthy and reliable who would
[4] love nothing more than to flog you publicly.
[5] Luckily for you you are here in the United
[6] States." I considered that against us.
[7]   Q: I'm talking about against you
[8] personally.
[9]   A: Okay. I considered that myself
[10] as against me. I was one of the guys fired,
[11] and they were assuming we were — we were
[12] blogging.
[13]   Q: And who is "they" assuming?
[14]   A: The police officers in the police
[15] department, because they were responding.
[16] Plus what George told me that they were
[17] responding.
[18]   Q: So this is dated April 8, 2006,
[19] right?
[20]   A: Right.
[21]   Q: And the other one you showed me
[22] on Hesse 16 is dated April 7, 2006, correct?
[23]   A: Right.
[24]   Q: You testified this morning that
[25] you didn't know you were fired until April

Page 167

T. Snyder

[2] department were blogging.
[3] **Q:** Okay?
[4] **A:** That's what he told me.
[5] **Q:** In any of your half a dozen
[6] reviews of the blog, did you discover any
[7] other blogs that you believed spread false
[8] and malicious information about you, other
[9] than what we were just looking at?
[10] **A:** There were several others I seen.
[11] I couldn't — I'd have to go through each
[12] and every page to find it.
[13] **Q:** Well, you know what, I think it's
[14] important enough that you should. So how do
[15] you want — we can do it now on the video.
[16] We can take it at lunch and come back and
[17] tell me. I'll do whatever you want to do.
[18] **MR. GOODSTADT:** I certainly
[19] think it should be done on the record.
[20] **MR. NOVIKOFF:** Well, the
[21] question I have is would you prefer us
[22] to take a break, him look at the blog
[23] over lunch, and then come back and
[24] testify as to what is — what he
[25] believes is malicious and defamatory,

Page 168

T. Snyder

[2] or do you want to stay on the record
[3] now in front of the video and your
[4] client can look at it right now? I'll
[5] do whatever you want to do.
[6] **MR. GOODSTADT:** I think we
[7] should stay on the record and him
[8] review it and we'll see how long we go.
[9] Maybe we'll break for lunch in between,
[10] unless you want to do it all in one
[11] shot. We can come back and he can
[12] review it after lunch.
[13] **MR. NOVIKOFF:** Well, then why
[14] don't we start it your way.
[15] **MR. GOODSTADT:** I think the
[16] review should be done as part of the
[17] record.
[18] **MR. NOVIKOFF:** Then let's start
[19] the review now.
[20] **A:** Okay. (Reviewing).
[21] **Q:** The only thing I would ask you,
[22] stop when you've come to one.
[23] **A:** Okay. I've come to one.
[24] **Q:** Okay. What page?
[25] **A:** 21.

Page 169

T. Snyder

[2] **Q:** Okay. Which one?
[3] **A:** "Still employed." It says
[4] "junior member."
[5] **Q:** Okay. What — what aspect of
[6] this do you believe represents a false
[7] and/or malicious rumor about you or
[8] information about you?
[9] **A:** The one about where it says "do
[10] you need more cops to rat on? Once a rat
[11] always a rat. You want to bring up the
[12] Halloween incident? Let's talk about it.
[13] The only cover up there was was how bad a
[14] job you did investigating it. Did you ever
[15] wonder why no one would talk to you guys
[16] during your shitty investigation? Everyone
[17] hates you. Everyone knew then you were a
[18] rat. Did you know that when the case was
[19] ran through the DA's office, they wanted to
[20] investigate you and your rat partners? Did
[21] you know that it was the sergeant who
[22] protected you from being investigated? How
[23] about the time you and your asshole partner
[24] beat up those three girls and one of them
[25] got away in handcuffs. That was really

Page 170

T. Snyder

[2] funny you moron. What a lawsuit that was
[3] going to be. But wait, it was the sergeant
[4] once again who protected your asses.
[5] Amazing. Truly amazing. This sergeant I
[6] talk of is currently the acting chief. Do
[7] you know why he's the acting chief? It's
[8] because he knows how to protect his men, the
[9] department and the village and cares enough
[10] to do so. The previous administration —
[11] chief in parentheses — doesn't care about
[12] you, the police department or the village.
[13] So suck up the fact that you were let go and
[14] get on with yourself. See you around. Oh,
[15] wait. No, I won't."
[16] **Q:** So now this is responding to
[17] someone called "the village idiot," right?
[18] **A:** It's obviously responding to
[19] us —
[20] **Q:** Sir, was this referring to
[21] someone called "the village idiot"?
[22] **A:** I am not sure. He could be
[23] referring to village idiot. He could be
[24] referring to some of the previous blogs.
[25] The way a blog works is sometimes people

Page 175

T. Snyder

[2] THE VIDEOGRAPHER: The time is
[3] 1:09 p.m. We're going off the record.
[4]   (A break was taken.)
[5]   THE VIDEOGRAPHER: The time is
[6] 2:04 p.m. Back the record.
[7]   MR. NOVIKOFF: Sir, as I just
[8] said while we were off the record, with
[9] regard to the last question that you
[10] haven't finished answering, what I'm
[11] going to do is move on to another
[12] subject and come back to this question,
[13] fully acknowledging that I have asked
[14] this question and I have given you the
[15] opportunity to go through every page of
[16] the blog. You haven't yet completed
[17] every page of the blog, and we'll
[18] probably pick that up towards the end
[19] of the deposition.
[20]   Q: Let's go to paragraph 115. You
[21] allege that you have suffered and continue
[22] to suffer severe mental anguish and
[23] emotional distress. Describe for me your
[24] mental anguish and emotional — withdrawn.
[25] Describe for me your severe mental anguish

Page 176

T. Snyder

[2] and emotional distress.
[3]   A: Well, I — I haven't been
[4] sleeping well at nights because of it. I've
[5] had a lot of stomach aches because of it.
[6] At the time that this was occurring, I was
[7] under doctor's care for a severe illness to
[8] begin with, and it just exacerbated that.
[9]   Q: You have a doctor that has
[10] rendered an opinion that this — this
[11] incident involving Ocean Beach has
[12] exacerbated your medical condition?
[13]   MR. GOODSTADT: Objection.
[14]   A: I don't have a doctor's opinion
[15] of that, but no. It did — it did make me
[16] feel a lot worse than what I was feeling
[17] when I was sick.
[18]   Q: What — what medical condition
[19] were you under doctor's care for?
[20]   A: I had hepatitis.
[21]   Q: Which hepatitis?
[22]   A: Hepatitis C.
[23]   Q: You still do, correct?
[24]   A: That's correct. Yeah. It's —
[25] it's under control right now. At the time

Page 177

T. Snyder

[2] it was — it was pretty severe. I was
[3] severely ill.
[4]   Q: When you say "severely ill,"
[5] describe for me what that means?
[6]   A: My liver enzymes were out of wack
[7] and I found out that when they did some —
[8] some CAT scans of my liver, they found out
[9] there was some damage to it.
[10]   Q: When were you first diagnosed
[11] with hepatitis C?
[12]   A: 2000 — December 2003 or four.
[13] I'm not sure exactly what year, but it was
[14] in that time frame.
[15]   Q: Okay. And have you sought the
[16] help of any medical professional with regard
[17] to your severe mental anguish and emotional
[18] distress?
[19]   A: No, I didn't.
[20]   Q: Okay.
[21]   A: Not at that time I hadn't.
[22]   Q: Well, have you today — well,
[23] I'll withdraw the question. Between the
[24] date that you were advised that you were
[25] terminated as you say it and today, have you

Page 178

T. Snyder

[2] sought the assistance of any medical
[3] professional with regard to what you claim
[4] to be severe mental anguish and emotional
[5] distress?
[6]   A: No, I haven't, because I
[7] currently work a civil service position, and
[8] I figured if I go to a doctor and state
[9] that, that they may say — if there's
[10] something psychologically wrong with me,
[11] they may psych me out of my — my full-time
[12] job as well. I was very concerned about
[13] that.
[14]   Q: And who has told you that if you
[15] went to seek the help of a medical
[16] professional, that you could lose your job?
[17]   A: It's happened to other police
[18] officers in the past.
[19]   Q: That's not my question, sir.
[20]   A: No one has told me specifically.
[21]   Q: And where can you point to that
[22] says if you go to a mental health
[23] professional, you can lose your job?
[24]   MR. GOODSTADT: Objection.
[25]   Q: Can you point to anything that

Page 183

T. Snyder

Q: Your boss was coming down hard on you about what?
A: About all of this. He didn't like me. He likes me now, but he didn't like me then. I think he realizes the situation.
Q: Who's your boss?
A: George Schimpf.
Q: And when did George Schimpf start coming down hard on you?
A: He started coming down hard on me soon after he got there.
Q: And when was that?
A: 2000 — late 2005, 2006. Something in that frame. In that time frame.
Q: So he started coming down hard on you as soon as he got there?
A: It was sometime right afterwards.
Q: Did he come down hard on you before you were terminated from Ocean Beach?
A: I don't think he might — I don't believe he was employed with the town then.

Page 184

T. Snyder

Q: Well, your last day of employment — you were — you had worked for the town in March of 2006, right?
A: Oh, that's correct. That's a mistake. He was, yeah. He was coming down on me before then, too.
Q: Why was he — how do you attribute what took place in April of 2006 to Mr. Schimpf coming down hard on you prior to that date?
A: Well, I think he just — he added on to it once he found out the knowledge of what was going on.
Q: You think?
A: I'm pretty confident that he was coming down on me like that.
Q: But he's coming down on you before you were fired from Ocean Beach, correct?
A: Yeah. But it got more severe afterwards.
Q: Well, why was he coming down on you before you got fired from Ocean Beach?
A: I think he — generally he was

Page 185

T. Snyder

coming down on everybody in the department.
Q: Okay. So you weren't singled out by Mr. Schimpf prior to your termination in terms of how hard he came down on you, did he — was he?
A: In some cases I was.
Q: Okay. Before you were terminated by Ocean Beach?
A: Yeah.
Q: Okay. So then why was Schimpf coming down harder on you before you were fired from Ocean Beach than others, in your opinion?
A: I felt that he knew that — what happened at Ocean Beach and he was listening to the rumors about us being, you know, bad cops and rats, and he wanted me out of there.
Q: What rumors were there before April 2, 2006?
A: The whole Halloween incident happened in 2004. That was well known around the town. Around the harbor master's, around the town and around Ocean

Page 186

T. Snyder

Beach.
Q: So you believe that Schimpf knew about the rumors, whatever they were, prior to your termination, and that's why he was coming down harder on you than others?
A: Yeah, I believe that.
Q: Okay. And did Hesse spread any rumors about the Halloween incident prior to April 2, 2006, to your knowledge?
A: Not specifically.
Q: Did anyone at Ocean Beach spread any of these rumors prior to April 2, 2006, to your knowledge?
A: It was well known around town that we were the officers that were working that night and that we were considered rats and we tried to jam up these guys.
Q: Who made it well known around town?
A: Every village resident. Every person that came there was — again, just like it said in the blog. "That's why no one talks to you and no one likes you. It's all known."

Page 191

T. Snyder

actually have to go home some days because I can't work." And he said, "Well, you can do better than this."

And I did. I started stepping it up quite a bit. Became one of the more active people in the department while I was on chemotherapy.

MO MR. NOVIKOFF: Motion to strike as nonresponsive.

Q: Sir, my question to you is, did Marty Raber, prior to April 2, 2006, tell you that you were a problem?

MR. GOODSTADT: Objection. He just told you what he said.

A: Yes, he did.

Q: Okay. Did Marty Raber, prior to April 2, 2006, tell you that he wanted to fire you?

A: No, he didn't.

Q: Okay. Now, April 2, 2006, let's use that date as the guide post. How long after April 2, 2006 was Marty Raber still your supervisor, if at all?

A: I believe he was — I believe he

Page 192

T. Snyder

left in December of 2006. I think that's when he left.

Q: Okay. And how long after April 2, 2006 was Schimpf still your supervisor?

A: He was the deputy at the time to Marty and he continued on. He's — he's still in the department.

Q: Okay. Now after April 2, 2006, did Mr. Schimpf tell you that he still had problems with you?

A: Yes, he did.

Q: What did he say to you and when was the first time — when was the first time he said he had problems with you after April 2, 2006?

A: Um, I — I don't recall specifically when, but it was sometime after that. Again, it was about my work production —

Q: Just I'm asking you when, sir.

A: I — I don't recall specifically.

Q: Was it weeks after? Months after?

A: I believe it was months after.

Page 193

T. Snyder

Q: Okay. And what did — what did Mr. Schimpf say to you in this conversation, this first conversation after April 2, 2006?

A: Um, I don't — I believe he said he didn't like the way I handled a specific call. This was several months after I believe.

Q: And what was the specific call?

A: It was for, um, it was a disturbance call for a suspicious male that was knocking on the door of a senior center or banging on the windows or something like that.

Q: And did he say anything to you in that conversation about Ocean Beach?

A: No, not in that conversation. No.

Q: Oh, okay. When was the next — did Mr. Schimpf advise you in that conversation that he wanted to fire you?

A: Um, he didn't advise me he wanted to fire me, but he had — he said that he had a problem with — with my work and that, you know, he was basically threatening

Page 194

T. Snyder

disciplinary action against me.

Q: What was he threatening you with?

A: To bring me up on charges for not properly doing my job or adhering to procedures or something to that effect.

Q: Okay. And did he ever bring you up on any charges?

A: No, he didn't, because it was explained to him that —

MO MR. NOVIKOFF: Motion to strike.

Q: Did he ever bring you up on charges, yes or no?

A: No, he didn't.

Q: Okay. When was the next time that Mr. Schimpf criticized you with regard to your work performance, if ever?

MR. GOODSTADT: Objection. You can answer.

Q: Well, I'll withdraw the question. Was there another time that after this conversation we were just talking about, that Schimpf criticized your work performance to you?

Page 199

T. Snyder

[2] your resume?
[3] A: Well —
[4] Q: No. What person stopped you from
[5] submitting your resume?
[6] A: No one stopped me from submitting
[7] it.
[8] Q: That's my — that's the answer
[9] then. Did you ever fill out an application
[10] for this Suffolk County job?
[11] A: No. I never got the opportunity
[12] to.
[13] Q: Who stopped you from submitting
[14] an application?
[15] A: Nobody physically stopped me.
[16] Q: Okay. Who at Suffolk County told
[17] you don't submit the application?
[18] A: Nobody spoke to me directly.
[19] Q: Okay. Did you ever put pen to
[20] paper in terms of looking for this job with
[21] Suffolk County?
[22] MR. GOODSTADT: Objection.
[23] A: I had my resume. I was all ready
[24] to submit it along with trying to get the
[25] recommendation from George, but no.

Page 200

T. Snyder

[2] Q: What do you mean trying to get
[3] the recommendation from George?
[4] A: I had requested a recommendation
[5] from him. I was going to take that along
[6] with my resume and submit it to the Suffolk
[7] County park police as soon as after I got
[8] fired by them.
[9] Q: And because George Hesse wouldn't
[10] give a recommendation as you requested on
[11] the day he told you you were fired, you
[12] didn't submit the application, is that your
[13] testimony?
[14] A: That was part of it, yes.
[15] Q: Well, is that part of the reason
[16] that you didn't submit your application?
[17] A: Yes — yes, it is.
[18] MR. GOODSTADT: He testified to
[19] that, didn't he?
[20] MR. NOVIKOFF: Excuse me. I'm
[21] asking the question.
[22] MR. GOODSTADT: I know, but
[23] you're asking the question again and
[24] you're putting words in his mouth he
[25] didn't say.

Page 201

T. Snyder

[2] MR. NOVIKOFF: Sir, you can
[3] object.
[4] MR. GOODSTADT: That's my
[5] objection.
[6] MR. NOVIKOFF: Fine. You don't
[7] have to speak your objection. You know
[8] that's inappropriate.
[9] MR. GOODSTADT: Well, it's also
[10] inappropriate for you to be badgering
[11] him and misstating his testimony. You
[12] know that's inappropriate as well.
[13] MR. NOVIKOFF: You can object,
[14] sir. You're entitled to object.
[15] MR. GOODSTADT: That's what I
[16] did, and you jumped on me.
[17] MR. NOVIKOFF: I don't want to
[18] hear your voice.
[19] MR. GOODSTADT: Guess what?
[20] MR. NOVIKOFF: Just say object.
[21] MR. GOODSTADT: Guess what?
[22] Guess what? Unfortunately for you, I'm
[23] defending and you're going to hear my
[24] voice.
[25] MR. NOVIKOFF: Sir, object.

Page 202

T. Snyder

[2] That's all. That's all you're entitled
[3] to. Object to the form.
[4] MR. GOODSTADT: I'm entitled to
[5] object to form? You can make whatever
[6] motions you want with my objection.
[7] Q: Sir, is it your testimony to the
[8] jury that's hearing this — that's going to
[9] watch this video, that you didn't submit an
[10] application because George Hesse didn't give
[11] you a reference?
[12] A: That's part of the reason, yes.
[13] Q: And what's the other part of the
[14] reason?
[15] A: The other part is that Ed Carter
[16] had spoken to — I don't recall the
[17] officer's name, but I guess the person that
[18] does the applicant hiring over at the
[19] Suffolk County park police, and said, "You
[20] guys, if you don't have a resume, then don't
[21] even bother — don't embarrass yourselves.
[22] If you can't get" — I'm sorry, not a
[23] resume — "if you can't get a recommendation
[24] from George stating why you were fired,
[25] don't embarrass yourselves."

Page 207

T. Snyder

A: Right. There was a slot open.
Q: Yes — yes or no?
A: Yes, I did.
MR. GOODSTADT: Objection.
Q: Was there a slot open in 2001 for a full-time police officer?
A: Yes, there was.
Q: And who got that?
A: At that time they didn't fill it. They didn't fill it until just recently. I think last year I believe they filled it.
Q: Okay. Who were the only full time police officers between 2001 and April 2, 2006, to your knowledge?
A: Ed Paridiso and George Hesse.
Q: And how many — to your knowledge, how many full-time police officers are there, to your knowledge, right now at Ocean Beach?
A: To my knowledge, I hear there's three or four right now. I think there's four. I think they hired two more full-timers.
Q: Okay. And who are they?

Page 208

T. Snyder

A: I don't know their names. I've never met the individuals.
Q: Okay. And how do you know that they've hired two more?
A: Because we see it in the newspapers.
Q: Okay. And it's your belief that you would have been thought of to have that full-time position?
A: Yes. It was a possibility.
Q: When you say it's a possibility, what do you mean?
A: Well, there was a possibility prior to that — prior to them filling those positions. Once that list expired, I was out of the running. Once they expire a civil service list, you're — that's it. You're done.
Q: When did your list expire?
A: I don't remember when, but it was sometime between 2001 and 2004 or five.
Q: Oh, so the list expired before you were terminated?
MR. GOODSTADT: Objection.

Page 209

T. Snyder

That's not what he testified to.
Q: Well, to your knowledge, did that list expire before you were terminated?
A: To my knowledge it did, yes.
Q: Okay. And to your knowledge and understanding of the Civil Service Laws, once that list expired, you would not have been eligible to be hired as a full-time police officer, correct?
A: Right. I would have to retake a test.
Q: Well, did you ever retake the test prior to your termination?
A: No. I couldn't take the test then.
Q: Before you were terminated you couldn't take the test?
A: No, I couldn't — yeah. I couldn't take the test. I had reached the age where I was aged out.
Q: Okay. So let me — let me just understand this, then. You took some exam which would have made you eligible for a full-time position with Ocean Beach prior to

Page 210

T. Snyder

you being terminated, correct?
A: Yes.
Q: Okay. And you — you had taken this test prior to 2001, correct?
A: Yeah. I think it was the year 2000.
Q: Okay. And in around 2001, you inquired with Hesse and Paridiso about the possibility of becoming a full-time police officer, right?
A: Yes, I did.
Q: And 2001 they didn't hire you as a full-time police officer, right?
A: No, they did not.
Q: 2002 they didn't?
A: No, they did not.
Q: 2003 they didn't?
A: No, they did not.
Q: 2004 they didn't?
A: No, they did not.
Q: When I say "they," I mean Ocean Beach, right?
A: Right.
Q: Okay. And then at some point in

Page 215

T. Snyder

Q: 2002?
A: No. I think it was after that.
Q: 2004?
A: Maybe 2004. Maybe 2003. Maybe somewhere in that area.
Q: Okay. So Muller was — you were coming on duty?
A: Well, I was —
Q: You were coming on duty?
A: Yeah. I was supposed to be working with him.
Q: Okay. And what shift are you referring to?
A: It would be the 4:00 to 12:00 shift.
Q: 4:00 to 12:00 shift. Okay. 4:00 in the afternoon to 12:00 midnight?
A: Yes.
Q: And you were scheduled to work with him?
A: Yes.
Q: Was Hesse there during that shift?
A: No, he wasn't because —

Page 216

T. Snyder

Q: No. Was Hesse there during that shift?
A: No, he wasn't.
Q: Was Paridiso there during that shift?
A: No, he wasn't.
Q: Had you been told that Muller was your superior for that shift by Hesse?
A: Not that day, no.
Q: Okay. So there were days when Hesse wasn't there that he didn't tell you that Muller was your supervisor, right?
A: Yes. That's correct.
Q: Okay. So my question to you is on those handful of occasions when you were told that Muller was your supervisor, what illegal or improper acts did he ask you to engage in?
MR. GOODSTADT: Objection.
Q: If any?
A: He didn't ask me to engage in any specifically.
Q: Okay. Give me an example when Muller, on those handful of occasions, was

Page 217

T. Snyder

your superior that he asked you to participate in an unlawful, tortious or otherwise wrongful conduct?
MR. GOODSTADT: Objection.
A: He didn't specifically ask me to engage in anything like that.
Q: Okay. When Muller was your superior on those handful of occasions, tell me when he asked you to cover up any unlawful, tortious or otherwise wrongful conduct and practices?
A: He didn't specifically ask me to.
Q: Okay. On those handful of occasions when Muller was your superior, please advise me as to what, if anything, he ever asked you to do that you believed was improper.
A: He didn't ask me anything specifically to do, something to do that's improper. Just the conduct that he was conducting himself with while he was working with me.
Q: Okay. We're not talking about while he was working with you. We're

Page 218

T. Snyder

talking about now when he was your superior on those handful of occasions. What can you point to that you claim was inappropriate conduct by Mr. Muller? Again, we're only talking about those handful of occasions when he was your superior.
A: Well, he was drinking on duty while I was working with him.
Q: Was he your superior?
A: I believed he was at that time, yes.
Q: Was this one of the occasions — handful of occasions that you're referring to?
A: Yes.
Q: Okay. This is one of the handful occasions when Hesse said "Muller is your superior"?
A: He had stated to us that when I'm not here, Muller would be the DO.
Q: I thought you had testified a few answers ago that there were occasions when Muller wasn't your DO when Hesse wasn't there?

Page 223

T. Snyder

Q: And you don't know for what purpose he went into the bar, correct?
A: At that time, no, I didn't.
Q: Well, at any time, do you know why he went into that bar on that specific occasion?
A: Sometimes he went in to drink. I mean, he came out drunk.
MO MR. NOVIKOFF: No. No. Sir, motion to strike.
Q: We're talking about that one instance.
A: No, not on that one instance.
Q: Have you ever discovered why he went into the bar on that one instance?
A: No, I haven't.
Q: Okay. Well, that's one example you've told me of when you were absolutely certain that Muller was your superior that he engaged in improper conduct. Give me another example, if you have one, when you were absolutely sure on those handful of occasions that Muller was your DO, that he engaged in any acts of impropriety, in your

Page 224

T. Snyder

opinion?
A: I can't recall any at the moment, no.
Q: Is there anything in your possession, custody or control that would refresh your recollection?
A: No, not that I'm aware of.
Q: Okay. Now to a prior question, you said something about Muller coming — you going off duty, Muller coming on duty and him signing in, do you recall that answer?
MR. GOODSTADT: Objection. That's not what he testified to.
Q: Or anything close to that answer?
A: Wait. Say that again.
Q: I believe you testified to an incident when you and Muller were coming on duty and he signed on, but he really wasn't on duty. Do you recall giving that answer?
A: Yes, I do.
Q: Can you describe what you meant by that?
A: He would be coming from, um, his

Page 225

T. Snyder

job, his full-time job in the courts in Hempstead, and he would be coming on duty at 4:00, but he wasn't getting there at 4:00. So he was getting there after 4:00, but he was signing himself in the log as working 4:00 to 12:00.
Q: And did you ever advise anyone of this?
A: The sergeant was aware of it.
Q: No. No. Did you ever advise anyone of this?
A: No, I didn't specifically.
Q: And did Muller do this on every occasion?
A: I don't know if he did on every occasion. I didn't see it all the time. I didn't see every occasion.
Q: How many times did you see Muller sign in at say starting at 4:00, but really not working at 4:00?
A: Only on a few occasions that — that we crossed paths like that.
Q: And on those few occasions, did you — did you approach Muller and ask him

Page 226

T. Snyder

what he was doing?
A: No, I did not.
Q: Did you complain to Hesse about this?
A: A —
Q: Again, just pertaining to Muller now?
A: No, I did not.
Q: Did you complain to Paridiso?
A: No, I did not.
Q: Did you complain to any trustee?
A: No. I never saw any trustees.
Q: Did you complain to the mayor?
A: No. I never saw the mayor either.
Q: The question isn't whether you saw them or not. Did you ever complain to the mayor?
A: No, I did not.
Q: Did you ever complain to the trustees about what Muller did?
A: No, I did not.
Q: And you never confronted Muller about it?