Page 231

[1] T. Snyder
[2] were sitting there.
[3] Q: Then how do you know that Muller
[4] wasn't similarly delayed by not get — not
[5] having a truck get to him on time?
[6] A: Because Muller was in the village
[7] drinking in the village with the Bosettis or
[8] whoever.
[9] Q: You're saying on those two
[10] occasions — on those few occasions that you
[11] saw Muller sign in — wait a minute.
[12] A: No, we're talking about
[13] different —
[14] Q: No, we're not talking about that.
[15] You said about Muller that there were times,
[16] a few times that he would come from his job
[17] in Hempstead late, but he would sign in as
[18] if he showed up on time, right?
[19] A: Right. That's correct.
[20] Q: Okay. We're not talking about
[21] him drinking. We're talking about him
[22] coming late to work, right?
[23] A: That's correct.
[24] Q: Right. Something you didn't
[25] complain to anyone about, right?

Page 232

[1] T. Snyder
[2] A: I think we talked about that.
[3] Yes.
[4] Q: Right. Right. How do you know
[5] that Muller wasn't at the checkpoint on time
[6] and also didn't have somebody get there on
[7] time to pick him up with the truck?
[8] A: Well, on some occasions —
[9] Q: How do you know?
[10] A: Honestly, I don't know.
[11] Q: Thank you. Let's go to paragraph
[12] 36 of the complaint. Oh, by the way, with
[13] regard to Muller and him coming in late and
[14] signing as if he came in on time, did you
[15] ever complain to George Hesse about that?
[16] A: George was aware of it.
[17] Q: Did you ever complain to George
[18] Hesse about it?
[19] A: No, not specifically.
[20] Q: Paragraph 36, you allege that
[21] "Plaintiffs each advised Hesse on numerous
[22] occasions that the department and village
[23] were left dangerously short of personnel
[24] when Plaintiffs were assigned to chauffeur
[25] intoxicated officers and their civilian

Page 233

[1] T. Snyder
[2] friends, and while — and while such
[3] uncertified officers were drinking in the
[4] local bars." To your knowledge, did there
[5] come ever a time when a certified officer
[6] drank while on duty in a bar?
[7] A: No, not to my knowledge.
[8] Q: So to your knowledge, the only
[9] people — the only officers that ever drank
[10] while on duty in an Ocean Beach bar were
[11] uncertified?
[12] A: Well, to my specific knowledge,
[13] yes.
[14] Q: Okay. Now you write — it's
[15] written that each advised Hesse on numerous
[16] occasions. Did you advise Hesse on numerous
[17] occasions that the department and the
[18] village were left dangerously short of
[19] personnel —
[20] A: I had mentioned it —
[21] Q: For the reasons that are set
[22] forth in paragraph 36?
[23] A: Yes, I did.
[24] Q: You did?
[25] A: Yes.

Page 234

[1] T. Snyder
[2] Q: When was the first time you
[3] mentioned it to Hesse?
[4] A: I think back in like 2002 or
[5] 2003.
[6] Q: Okay. And — and what did you
[7] say to Hesse?
[8] A: I had complained about us being
[9] left at the checkpoint on — on some
[10] occasions, on numerous occasions, and that
[11] we could not come in to go to duty because
[12] they were out cocktailing, and they were
[13] coming back — or we would get — there
[14] would be two trucks and we'd already be able
[15] to drive ourselves in, okay, and we'd have
[16] to drive them out. He said to take them out
[17] when they're done, and we would say, "We
[18] can't do that. We're going to leave the
[19] tour short."
[20] Q: And what did Hesse say?
[21] A: Well, they complained to him —
[22] we complained — they — let's put it this
[23] way, they wanted us to go to take them out.
[24] We said no. They started complaining to
[25] Hesse that we wouldn't take them out. He

Page 239

[1] T. Snyder
[2] coming off, it would be a problem.
[3]  Q: Prior to that change in policy?
[4]  A: They only started working there
[5] in 2002, so.
[6]  Q: No. I understand that. But I'm
[7] saying, you just testified that you made a
[8] couple of complaints and then — and then
[9] someone changed the policy with regard to
[10] the checkpoints, right?
[11]  MR. GOODSTADT: Objection.
[12]  A: Right.
[13]  Q: What did you mean by that?
[14]  A: Of changing the policy?
[15]  Q: Yeah.
[16]  A: That they — the relief now was
[17] going to be done — there was a directive
[18] posted on the board saying that the relief
[19] was going to be done in the village now
[20] rather than at the checkpoint, because the
[21] village is being left short of personnel.
[22]  Q: Did it say that in the directive?
[23]  A: I think it did. Yeah. I don't
[24] remember.
[25]  Q: You're not sure?

Page 240

[1] T. Snyder
[2]  A: It's going back several years
[3] now. I don't remember exactly what the
[4] words were, and I don't have a copy of that
[5] directive.
[6]  Q: But you know that the directive
[7] was changed with regard to the checkpoint?
[8]  A: Yes.
[9]  Q: That you were going to now be
[10] relieved at the village police office?
[11]  A: Right. They wanted us to come
[12] before the other tour went off.
[13]  Q: Okay. So when it's alleged that
[14] Hesse ignored Plaintiffs repeated — let's
[15] go to 36 again. The last sentence, "Hesse
[16] ignored Plaintiffs repeated complaints
[17] without regard for any resulting threat to
[18] public safety and Plaintiffs own safety,"
[19] that isn't necessarily true, because as it
[20] pertains to chauffeuring intoxicated
[21] officers, that did stop at some point in
[22] time, correct?
[23]  MR. GOODSTADT: Objection.
[24]  A: It stopped, but then started up
[25] again when —

Page 241

[1] T. Snyder
[2]  Q: When did it start up again?
[3]  A: Sometime back — not too long
[4] afterwards. Probably in 2003 it started up
[5] again, because they lost the second truck.
[6] They lost it in the ocean.
[7]  Q: Oh, so the directive came out in
[8] 2002, and then it was ignored in 2003?
[9]  MR. GOODSTADT: Objection.
[10]  A: Well, they were back down to one
[11] truck again.
[12]  Q: I'm not asking why it was
[13] ignored, I'm just asking, in your opinion,
[14] was this directive ignored in 2003 after
[15] being implemented in 2002?
[16]  MR. GOODSTADT: Objection.
[17]  A: Yeah, it was.
[18]  Q: What's that?
[19]  A: It was then.
[20]  Q: Okay. And in 2003, were you ever
[21] asked to chauffeur an intoxicated officer to
[22] the checkpoint?
[23]  A: It went back to the way it was.
[24]  Q: I'm asking you, sir, in 2003,
[25] were you ever asked to chauffeur an

Page 242

[1] T. Snyder
[2] intoxicated officer to the checkpoint?
[3]  A: There was some occasions where
[4] he — when he was working, he would ask us
[5] to do it, yes.
[6]  Q: Not "us," sir. You.
[7]  A: Okay. Not me specifically. No.
[8]  Q: That's all I'm asking.
[9]  A: Not me specifically.
[10]  Q: Did Hesse ever ask you
[11] specifically to chauffeur an intoxicated
[12] officer in 2003 to the checkpoint?
[13]  A: I don't recall if he did in 2003,
[14] no.
[15]  Q: Did Hesse ever ask you in 2004 to
[16] chauffeur an intoxicated officer to the
[17] checkpoint?
[18]  A: I don't recall if he did in 2004
[19] or not.
[20]  Q: Did Hesse ever, in 2005, ask you
[21] to chauffeur an intoxicated officer to the
[22] checkpoint?
[23]  A: I don't recall if they did or
[24] not.
[25]  Q: Not "they," Hesse?

Page 247

T. Snyder

[2] did you ever complain to Paridiso?
[3] A: No, I didn't. I complained to
[4] George.
[5] Q: My question is, did you ever
[6] complain to Paridiso?
[7] A: No, I did not.
[8] Q: Did you ever complain to the
[9] trustees?
[10] A: No, I did not.
[11] Q: Did you ever complain to the
[12] mayor?
[13] A: No, I did not.
[14] Q: Did you ever complain to Newsday?
[15] A: No, I did not.
[16] Q: Did you ever complain to News 12?
[17] A: No, I did not.
[18] Q: Did you ever complain to any
[19] media outlet?
[20] A: No, I did not.
[21] Q: So if I understand your testimony
[22] correctly, you know with certainty that at
[23] least through 2003, you made a few
[24] complaints to George Hesse about the
[25] chauffeuring issue and leaving the village

Page 248

T. Snyder

[2] short because of it, right?
[3] MR. GOODSTADT: Objection.
[4] A: Yes, I did.
[5] Q: And — but in 2004 and 2005, you
[6] have no recollection as to whether or not
[7] Hesse ever asked you to do it?
[8] A: We — I complained.
[9] Q: No, not complained. You have no
[10] recollection as to whether Hesse asked you,
[11] in 2004, 2005, to chauffeur either
[12] intoxicated officers or civilians?
[13] A: I don't recall at this time, no.
[14] Q: Right. And do you have any
[15] recollection in 2004, 2005 of personally
[16] complaining to Hesse about you chauffeuring
[17] anyone?
[18] A: I was trying to say I — over the
[19] course of 2002 through my termination, there
[20] was several occasions where he would ask me,
[21] yes, over the course of those years, and I
[22] would tell him the same story, "You're
[23] leaving the tour short."
[24] Q: But we've established that this
[25] took place in 2002 and 2003.

Page 249

T. Snyder

[2] A: Right.
[3] Q: But you don't have any
[4] recollection of it in 2004, 2005, right?
[5] A: Well, I was trying to say it was
[6] occurring over that period. That time
[7] period.
[8] Q: So you do now — so you now
[9] recall in 2004?
[10] A: Well, I was trying to say that
[11] before, but you wouldn't let me say that.
[12] Q: Sir, my question to you is very
[13] simple, sir. In 2004, did Hesse ask you to
[14] chauffeur a civilian to the checkpoint?
[15] A: Yeah, I'm sure he did. I just
[16] don't recall specifically when.
[17] Q: Okay. Same question with 2005?
[18] A: Yeah. I would say the same
[19] thing. Yes.
[20] Q: And did you complain to Hesse in
[21] 2004?
[22] A: Yeah. I used to say the same
[23] thing. "We're leaving the tour short. We
[24] can't do this."
[25] Q: And did you complain to Hesse in

Page 250

T. Snyder

[2] 2005?
[3] A: I'm sure I did, yes.
[4] Q: But you don't know with
[5] certainty?
[6] A: I just don't recall specifically
[7] the incident or when it happened.
[8] Q: But you know it happened?
[9] A: Yeah. It happened on a regular,
[10] you know, basis — excuse me. Occasionally
[11] throughout those time frames.
[12] Q: Okay. And in 2004, did you
[13] complain to Ed Paridiso?
[14] A: No, I did not.
[15] Q: In 2004, did you complain to any
[16] trustee?
[17] A: No, I did not.
[18] Q: In 2005 — I'm sorry, in 2004,
[19] did you complain to any mayor?
[20] A: No, I did not.
[21] Q: Did you complain to any newspaper
[22] or radio or television station?
[23] A: No, I did not.
[24] Q: About the public safety issue
[25] that you have complained about for three

Page 255

T. Snyder

[2] 12:00 to 4:00 shift — I'm sorry, during
[3] your 12:00 to 8:00 shifts, how many officers
[4] were on duty at the time?
[5]   A: It varied. Sometimes there could
[6] be three. Sometimes there could be two.
[7] Sometimes I could be working by myself.
[8] Sometimes it could be five.
[9]   Q: It varied?
[10]   A: Yes, it varied.
[11]   Q: So when — were there times when
[12] you were the only one that was on duty
[13] between 12:00 and 8:00?
[14]   A: Yeah, there were times. Yes.
[15]   Q: Well, how about during the summer
[16] months, how about between Memorial Day and
[17] Labor Day, were there any times when you
[18] were the only person on the 12:00 to 8:00
[19] shift?
[20]   A: I think there was very few
[21] occasions when that happened, yes.
[22]   Q: How about when there were only
[23] two people?
[24]   A: That happened more frequently.
[25]   Q: Okay. And did you work any other

Page 256

T. Snyder

[2] shifts? During the summer months now, not
[3] after Labor Day, but between Memorial Day
[4] and Labor Day?
[5]   A: Sometimes I worked a 9:00 at
[6] night to 5:00 in the morning or 8:00 at
[7] night to 4:00 in the morning.
[8]   Q: Okay. Let's talk about those two
[9] shifts, 9:00 to 5:00, 8:00 to 4:00. How
[10] many people — how many officers would
[11] normally be on duty during those shifts in
[12] the summer months?
[13]   A: Generally there would be usually
[14] three officers, two or three officers on the
[15] 4:00 to 12:00. Then I would sometimes come
[16] on at 8:00 by myself, sometimes I'd come on
[17] with another officer, or sometimes I would
[18] come on at 9:00 by myself or with another
[19] officer.
[20]   Q: So, again, at any given point
[21] during that shift, what was the average
[22] number of officers?
[23]   A: There could be anywhere between
[24] three and four officers.
[25]   Q: Okay. Let's go to paragraph 40.

Page 257

T. Snyder

[2] "Hesse also allowed the uncertified officers
[3] to drink beer while patrolling in police
[4] vehicles. In fact, when Plaintiffs would
[5] confiscate beer from people on the beach,
[6] Hesse and the uncertified officers would
[7] drink the confiscated beer and even would
[8] tell Plaintiffs what brand of beer to
[9] confiscate." Did Hesse ever tell you what
[10] brands of beer to confiscate?
[11]   A: No. He didn't say that to me.
[12] He said it to the other Plaintiffs in the
[13] lawsuit.
[14]   MO MR. NOVIKOFF: That's all.
[15]     Motion to strike.
[16]   Q: I'm just asking you, sir.
[17]   A: Yeah. No. He never —
[18]   Q: Let me ask you the question. Did
[19] Hesse ever tell you what brand of beer to
[20] confiscate?
[21]   A: No, he did not.
[22]   Q: Okay. "Plaintiffs each
[23] frequently complained to Hesse about this
[24] unlawful dangerous conduct," do you see
[25] that?

Page 258

T. Snyder

[2]   A: Yes, I do.
[3]   Q: And I believe the unlawful
[4] dangerous conduct is being referenced in the
[5] first two sentences of paragraph 40, do you
[6] see that?
[7]   A: Yes.
[8]   Q: Did you complain to Hesse
[9] personally?
[10]   A: Yes, I did.
[11]   Q: When did you first complain to
[12] Hesse about this?
[13]   A: Numerous occasions all throughout
[14] the entire — between 2002 and 2006 I'd say,
[15] or five.
[16]   Q: In 2002, how many times did you
[17] complain to Hesse?
[18]   A: Several times.
[19]   Q: What would you say to Hesse?
[20]   A: Tell him that these guys, again,
[21] were not relieving us properly on time, and
[22] when they were showing up, they were showing
[23] up drinking beers, driving the police
[24] vehicle, in civilian clothes sometimes,
[25] sometimes in uniform, or they were leaving

EDWARD CARTER, EVANS, ET AL. vs.
INCORPORATED VILLAGE OF OCEAN BEACH

Case 2:07-cv-01215-SJF-ETB   Document 145-112   Filed 01/15/10   Page 5 of 11 PageID #: 4915

THOMAS SNYDER
September 24, 2008

Page 263

T. Snyder

A: Well, at some point we did talk to the chief or I did talk to the chief about it.

Q: When did you talk to the chief about it?

A: In 2004.

Q: Really?

A: Yes.

Q: When?

A: Right after the Halloween incident.

Q: Okay. What did you say to the chief?

A: I told him that there was, you know, numerous instances of this situation with the Bosettis among other things I went through, and I told him about it, and he said then that he — he's — "George is responsible for his tour, I'm responsible for my tour. You have any issues or complaints, you got to bring them to George." And I said, "That's what we've been doing."

Q: So let me understand this, you

Page 264

T. Snyder

had already — this was right after the Halloween incident?

A: Yes, it was.

Q: Was this during the course of your investigation into the Halloween incident?

A: It was — no. This wasn't part of the investigation.

Q: No. But was this while you were investigating the Halloween incident?

A: No, it wasn't while.

Q: How long after you concluded your investigation did you complain to Paridiso about the Bosettis drinking?

A: My invest — I didn't — we didn't even get to really investigate. We just did a preliminary investigation.

Q: Then fine. Let's take that. How long after your preliminary investigation ended did you complain to Paridiso?

A: I think several days or a week or so. It was right within that time frame.

Q: And Paridiso said to you "not my problem, it's Hesse's problem"?

Page 265

T. Snyder

A: Said that —

Q: "Because Hesse is your superior during that shift"?

A: Yes, he did.

Q: Okay. Was that the only time you complained to Paridiso about the Bosettis and anybody else drinking beers while patrolling in police vehicles?

A: That was the only time I did specifically.

Q: That's all I'm asking you, is you.

A: Yes.

Q: Okay. 2005, did you complain to Paridiso?

A: No, I did not.

Q: At any point in time between 2002 and the end of 2005, did you complain to any trustee?

A: No, I did not.

Q: Did you complain to Loeffler?

A: No, I did not. Joel Loeffler wasn't —

Q: Did you complain to Joe Loeffler

Page 266

T. Snyder

at all?

A: No, I did not.

Q: Did you complain to Mayor Rogers?

A: No, I did not.

Q: Did — with regard to officers while on duty drinking beers while patrolling in police vehicles, did you, between 2002 and 2005, ever notify Newsday, News 12 or any other media outlet?

A: No, I did not.

Q: Did you ever put it on a blog?

A: No, I did not.

Q: Prior to the end of 2005?

A: No, I did not.

Q: So let me understand so far. Prior to the Halloween incident, you had raised complaints to Hesse about the Bosettis drinking while in patrol cars, as well as drinking in bars while on duty and not picking you up on time, right?

A: Right. Among other things as well.

Q: What other things prior to the Halloween incident did you complain to Hesse

Page 271

T. Snyder

[2] didn't know the code.
[3] A: Right.
[4] Q: So you would call them up. You
[5] don't know where they were, right?
[6] MR. GOODSTADT: Objection.
[7] Q: When you called them up, right?
[8] A: I have no idea where they were
[9] sometimes.
[10] Q: Well, no. No. When you called
[11] them up, did you know where they were
[12] physically?
[13] MR. GOODSTADT: Objection.
[14] Q: When you called them on their
[15] radio?
[16] A: No, sometimes I did not.
[17] Q: Well, how would you know where
[18] they were before you called them?
[19] A: Well, we knew what area of
[20] town —
[21] Q: I understand you knew what area
[22] of town.
[23] MR. GOODSTADT: Objection. Let
[24] him answer the question.
[25] Q: Did you ever know, when you

Page 272

T. Snyder

[2] called them on the phone, on the radio,
[3] where they were physically located?
[4] A: No.
[5] Q: Okay.
[6] A: Not all the times.
[7] Q: Well, any time?
[8] A: Sometimes when I was out on foot
[9] patrol, I could see where they were
[10] positioned on the other side of town or a
[11] few blocks away.
[12] Q: Well, when you were on foot
[13] patrol, were you calling them on the radio
[14] to send them out on a call?
[15] A: Yes. Sometimes we were. We used
[16] to have to all respond. To a 16, all
[17] officers go. I mean, this could be a big
[18] bar brawl, so. That was important.
[19] Q: I understand that, but when you
[20] were not the dispatcher —
[21] A: Right.
[22] Q: — would you call the Bosettis up
[23] and just tell them to go somewhere?
[24] A: I would tell them when they
[25] didn't respond when they were being told

Page 273

T. Snyder

[2] from the desk officer or they were being
[3] told by another officer it's a 16, you know,
[4] and it's a bar close to where they are, they
[5] didn't — "what's a 16," and I would chime
[6] in as I'm going over there, "it's a bar
[7] fight." You know.
[8] Q: Okay. I understand now. And
[9] they did this repeatedly before the
[10] Halloween incident, not know what the codes
[11] were, right?
[12] A: Yeah, they did that repeatedly.
[13] Yeah.
[14] Q: To your knowledge, of course.
[15] That's all I'm asking about.
[16] A: Yes.
[17] Q: And they also didn't respond to
[18] calls that you made on the radio, right? Is
[19] that your testimony?
[20] A: That's when I was — yes. When I
[21] was on the desk, yes.
[22] Q: And you complained to Hesse about
[23] this?
[24] A: Yes, I did.
[25] Q: Right. And you believed the

Page 274

T. Snyder

[2] Bosettis weren't acting in accordance with
[3] how police officers should act, right?
[4] A: Yes.
[5] Q: And this was all before the
[6] police incident?
[7] MR. GOODSTADT: Objection.
[8] Q: I mean the Halloween incident,
[9] right?
[10] A: This was before the Halloween
[11] incident, yes.
[12] Q: Right. And Kevin Lamm shared
[13] your views?
[14] MR. GOODSTADT: Objection. How
[15] would he know?
[16] MR. NOVIKOFF: Well, I'm asking
[17] him.
[18] Q: Do you know if Kevin Lamm shared
[19] your views?
[20] A: I think he did, yeah.
[21] Q: And did — and this is prior to
[22] the Halloween incident, right?
[23] A: Prior to the Halloween incident?
[24] Q: Right.
[25] A: Yeah.

EDWARD CARTER, et al. -v- FIORELLO, KEVIN LAMM, et al. | T. SNYDER
INCORPORATED VILLAGE OF OCEAN BEACH | September 24, 2008
Case 2:07-cv-01215-SJF-ETB Document 145-12 Filed 01/15/10 Page 7 of 11 PageID #: 4917

Page 279

[1] T. Snyder
[2] your radio calls as opposed to not knowing
[3] the codes?
[4] A: I'm not sure if it was 2002 or
[5] 2003.
[6] Q: Okay. But you complained at
[7] least in one of those years?
[8] A: Yes.
[9] Q: How many times in those years did
[10] you complain to Hesse?
[11] MR. GOODSTADT: About not
[12] returning —
[13] MR. NOVIKOFF: Not responding
[14] to the calls, yeah.
[15] A: I would say at least on one
[16] occasion I did.
[17] Q: How about 2004?
[18] A: 2004, no.
[19] Q: How about 2005?
[20] A: 2005, no.
[21] Q: Okay. In 2002 or three when you
[22] did complain, what was Hesse's response?
[23] A: The same as he always did. "I
[24] will talk to them about it."
[25] Q: How about leaving beer cans, did

Page 280

[1] T. Snyder
[2] you complain to Hesse in 2002?
[3] A: Yes, I did.
[4] Q: And how many times?
[5] A: At least one occasion.
[6] Q: Okay. And what was Hesse's —
[7] A: Maybe 2003. I may be wrong.
[8] Q: We're not there yet, 2003. I'm
[9] still on 2002.
[10] A: I'm not sure if it's 2002 or
[11] 2003.
[12] Q: Okay. So let's put 2002 and 2003
[13] together. How many times in those two years
[14] do you think — do you recall complaining —
[15] A: At least one occasion.
[16] Q: Do you recall complaining to
[17] Hesse about the beer cans?
[18] A: At least one occasion, yes.
[19] Q: What was Hesse's response?
[20] A: Always the same response.
[21] Q: How about 2004, did you complain
[22] about leaving the beer cans in the police
[23] vehicles?
[24] A: I don't recall if I did in 2004
[25] or not.

Page 281

[1] T. Snyder
[2] Q: How about 2005?
[3] A: I don't recall if I did in 2005
[4] or not.
[5] Q: Okay. On any occasion with
[6] regard to your complaints to Hesse — well,
[7] with regard to your — with regard to the
[8] Bosettis not knowing codes, did you ever
[9] complain to Paridiso?
[10] A: Um, I did complain to Paridiso,
[11] yes.
[12] Q: When?
[13] A: Actually, this was in 2004.
[14] Q: When?
[15] A: Again, after the Halloween
[16] incident.
[17] Q: And what was Paridiso's response?
[18] A: His response to me at that time
[19] was is that — that George is responsible
[20] for his tour, I'm responsible for my tour.
[21] Just — that was also part of the same
[22] conversation with the other thing we were
[23] talking about.
[24] Q: Okay. And did you complain to
[25] any trustee in 2004?

Page 282

[1] T. Snyder
[2] A: No, I did not.
[3] Q: About Bosettis not knowing the
[4] codes?
[5] A: No, I did not.
[6] Q: Did you complain to any mayor in
[7] 2004 about the Bosettis not knowing the
[8] codes?
[9] A: No, I did not.
[10] Q: Did you complain to Newsday, News
[11] 12 or any other media outlet?
[12] A: No, I did not.
[13] Q: Did you put it in a blog?
[14] A: No, I did not.
[15] Q: Okay. How about not responding
[16] to sales call — to radio calls, did you
[17] ever complain to Paridiso?
[18] A: Again, that was part of the same
[19] conversation.
[20] Q: We've been through that. How
[21] about did you complain to — ever complain
[22] to any trustee?
[23] A: No, I did not.
[24] Q: Did you ever complain to any
[25] mayor?

Page 287

T. Snyder

Q: No. To yourself.
A: (Reviewing). Okay.
Q: Do you have any personal knowledge as to what was alleged in paragraph 43?
A: Yes.
MR. GOODSTADT: Objection.
A: I was the desk officer on duty.
Q: Okay. So describe for me what occurred based upon your recollection.
A: These were on the occasions where I was working either 8:00 or 9:00 to 4:00 in the morning or 9:00 at night to 5:00 in the morning.
Q: All right. And when did this take place?
A: I believe in 2002, 2003. In that time frame.
Q: Did it ever take place in 2004?
A: No, it did not then.
Q: Did it ever take place in 2005?
A: No, it did not.
Q: Okay. And did you complain to Hesse in 2002?

Page 288

T. Snyder

A: I didn't then, no.
Q: Did you complain to Paridiso in 2002?
A: No, I did not.
Q: Did you complain to anybody in 2002?
A: No, I did not.
Q: About what is being referred to in 43?
A: Just my fellow police officers.
Q: And who were your fellow police officers?
A: The police officers that are in the department itself.
Q: Yeah. Who are they?
A: I don't have a roster. If I had a roster of the police officers of that year, I could tell you.
Q: Oh, so you complained to everybody?
A: Pretty much all of them knew about it. Yeah.
Q: Through you?
A: Yeah. They knew what happened.

Page 289

T. Snyder

I was working. I told them what happened.
Q: So if I understand correctly, and what officers are you referring to here?
A: The ones that were — which officers are you talking about now?
Q: The officers that are being referred to in paragraph 43.
A: The uncertified ones?
Q: Yes.
A: In particular, the two Bosetti brothers, Gary and Richie Bosetti.
Q: So in 2002, you complained to all of the officers at Ocean Beach concerning the Bosettis' conduct as it relates to paragraph 43?
MR. GOODSTADT: Objection.
Q: Yes or no?
A: I complained to a fair amount of them. Most of them I guess.
Q: Okay. 2003, did you complain to Hesse?
A: Um, I don't think I did. No.
Q: Did you complain to Paridiso?
MR. GOODSTADT: Just so we're

Page 290

T. Snyder

clear, about 43?
MR. NOVIKOFF: About 43, yeah. About 43.
A: At that time, no.
Q: At any time in 2003, did you complain to Hesse about what's being referred to in 43?
A: I had mentioned to him that I didn't want to work this tour anymore because I didn't feel safe working the tour with the officers I was working with.
Q: And who were the officers that you were working with that you're referring to?
A: Gary Bosetti, Richard Bosetti and Walter Muller. Those three in particular.
Q: Okay. And what did Hesse say to you in 2003 when you made this complaint?
A: He didn't really — he didn't say anything. He just — I just told him that I was now removing myself from the tour.
Q: So the fact when you say nothing took place in 2004 and 2005, to your

Page 295

T. Snyder

MR. NOVIKOFF: How much time do I have left?

THE VIDEOGRAPHER: A minute.

Q: You said you told Hesse in 2003 you didn't want to work with them anymore?

A: Right.

Q: But then you testified that on numerous occasions in 2004 and 2005, there was an overlap?

A: There was occasions where I was — I said I would work 9:00 at night to 5:00 in the morning or 8:00 to 4:00, but I had other officers working with me other than the Bosettis.

Q: Oh, so you didn't want to be the only person —

A: Right.

Q: Only officer that worked with the Bosettis and Muller?

A: That's correct. Right.

Q: And did Hesse, after you complained, ever put you in a shift where you were the only person that was working with the Bosettis and Muller?

Page 296

T. Snyder

A: I don't recall if he did at this time. No.

MR. NOVIKOFF: Okay.

THE VIDEOGRAPHER: This ends tape number four. The time is 3:41 p.m. Going off the record.

(A break was taken.)

THE VIDEOGRAPHER: This begins tape number five. The time is 3:49 p.m. Back on the record.

Q: Sir, let's turn — can you just turn your attention to paragraph 49. You allege in paragraph 49 the following: "Hesse also required Plaintiffs, during their tour of duty, to chauffeur him to and from different residences both inside and out of Ocean Beach so Hesse could engage in sexual escapades." When you refer to "out of Ocean Beach," what are you referring to?

A: This doesn't apply to me. This is to some of the other Plaintiffs in this lawsuit.

Q: Okay. So let's just be clear. Whatever's being referenced in 49 in this

Page 297

T. Snyder

complaint does not refer to you?

A: That's correct.

MR. GOODSTADT: Just read the whole paragraph to make sure of that before you answer that question. You're talking about the whole paragraph or just the first sentence?

MR. NOVIKOFF: The whole paragraph.

MR. GOODSTADT: Make sure you read the whole paragraph to make sure that's true before you answer.

A: This doesn't apply to me. I mean, he bragged about, you know, numerous women that he slept with, but I was never asked by him to chauffeur him specifically to a location.

Q: Okay. So that aspect of the allegation doesn't refer to you?

A: This one does not refer to me. It refers to the other Plaintiffs in the lawsuit.

Q: But Hesse did brag to you about his sexual escapades?

Page 298

T. Snyder

A: Yes, he did.

Q: Okay. And did he make the comment to you that's in quotes, "she just had the German sausage"?

A: He didn't make that to me, no.

Q: Okay. Did any other officer, while you were employed by Ocean Beach, ever brag about their sexual escapades?

A: Not to me, no.

Q: 51, you allege the following: "Clearly outraged by Plaintiffs' enforcement of the laws against his friends and acquaintances, Hesse instructed Plaintiffs and other officers under his command not to issue summonses to certain bars that Hesse and his clique of uncertified officers frequented both on and off duty, even though those bars regularly served alcohol to minors," do you see that?

A: Yes, I do.

Q: Did Hesse instruct you not to issue summonses to certain bars?

A: He told us not to —

Q: Not "us," sir. You.

Page 303

T. Snyder

Q: That's what I'm trying to figure out. If a 15 year old stabbed someone, that's a violation of the law, right?
A: Yeah.
Q: And you?
A: But this is not what we're talking about here.
Q: And you were authorized to arrest people who violated the law, right?
A: Um-hum.
Q: And there was no prohibition with regard to you arresting a minor who stabbed someone, right?
A: No. I wouldn't think so.
Q: Okay. Now a minor who is underage — who is drinking in a bar, that's also a violation of the law?
A: Yes. A lesser violation.
Q: But it's still a violation of the law?
MR. GOODSTADT: Objection.
A: Yeah.
Q: And you could arrest them, right?
A: Yeah, I could arrest them. Yeah.

Page 304

T. Snyder

Take them in custody.
Q: Okay. So my question to you is, putting aside the fact that you say Hesse instructed you not to issue summonses to the bar, what would have prevented you from putting that underaged drinker in custody?
A: He told us to stay away from the bars. To don't violate them. Don't go there. Don't — don't do what we told him we had to do.
Q: And this was an ongoing thing that Hesse told you from around 2002?
A: Yeah. He told us that in the beginning of 2002 and we didn't — we stayed away from those bars, even though we saw people. In fact, on occasion, I did go in and ID people. I didn't see them drinking, but they were underage in the bar as young as 14.
Q: Okay. So now let's go back to 2002. Did you complain to Hesse about his instructions to you in 2002?
A: Yeah. And he told us about Houser's, because Houser's had a very bad

Page 305

T. Snyder

problem with that.
Q: And in 2003, did Hesse instruct you to do the same thing or you just knew —
A: No. He didn't continually. He said it that one — one occasion. "I violated them myself. If you guys violate them, they may lose their liquor license." He didn't want — he didn't want that to happen apparently.
Q: So if I understand your testimony correctly, Hesse told you in or about 2002 with regard to certain bars, not to — not to issue summonses to them for underage drinking, right?
A: Yeah. That's correct.
Q: And he never told you after that to do that, correct?
A: No. I did walk through certain other bars and find underage people in them.
Q: I'm not suggesting — my question is not what you did after that. My question is focusing on Hesse now. Hesse told you in 2002 not to issue summonses to certain bars, CJ's and Houser's for underage

Page 306

T. Snyder

drinking?
A: I believe the Mermaid as well.
Q: Okay. For underage drinking, right?
A: Um-hum.
Q: And he didn't tell you after 2002 to do that, right?
A: No. I don't believe he did. No.
Q: You believe that his direction in 2002 carried forward in 2003, 2004 —
A: Well, there was —
Q: — and 2005, right?
MR. GOODSTADT: Let him finish the question.
A: There was an occasion where I went into the Mermaid Restaurant and the owner of the Mermaid happened to be a village board member, Scotty Hirsch, and he complained to George and the chief about it. That we were going in his bar walking around.
Q: Did Hesse — when this guy Scott Hirsch complained to Hesse and who else?
A: I believe he complained to the

Page 311

T. Snyder

A: Well, that's what he said to me. That they may be losing their liquor license because of it. He had said he had recently violated them himself.

Q: Did you, given your concern over the underage drinking problem on Ocean Beach, sir, did you complain to Paridiso?

A: I believe I did complain to Paridiso, yeah. I don't remember exactly when.

Q: Do you recall what you would have said to Paridiso?

A: No, I don't, actually. Probably the same thing, though.

Q: What?

A: That there was an underage drinking problem in that village, and you know, we have problems on our tour in particular.

Q: And did you complain to Joe Loeffler?

A: No. I didn't even know Joe Loeffler at that time. I don't think he was a village board member during some of those

Page 312

T. Snyder

periods of time.

Q: Did you complain to any trustee?

A: No, I did not.

Q: Did you complain to any mayor?

A: No, I did not.

Q: Given the significant problem of minors drinking in Ocean Beach, did you complain to Newsday, News 12 or any other media outlet?

A: No, I did not.

Q: Did you put it on a blog?

A: No, I did not.

Q: Did you send an anonymous letter to anyone?

A: No, I did not.

Q: Let's look at the last sentence.

MR. GOODSTADT: What paragraph are we on?

Q: 51. "Plaintiffs frequently complained to Hesse about his unlawful directives to selectively enforce the law by disregarding crimes and other violations of law committed by Hesse's friends," do you see that?

Page 313

T. Snyder

A: Yes, I do.

Q: Now we've talked about the bars.

A: Um-hum.

Q: Did Hesse ever advise you to disregard any other law concerning any of his other friends?

A: No. I don't recall if he did.

Q: Is there anything in your custody, possession or control that would refresh your recollection?

A: No, I don't believe there is.

Q: So to your knowledge, at least as you sit here today, the only times that Hesse would have told you to disregard the law concerning any of his friends, related to not issuing summonses to some of the bars in Ocean Beach?

A: Yes. That's correct.

Q: Okay. Let's look at 52. "In yet another incident in or around May 2004, Officer Snyder and Lamm were on a foot post at Bay and Ocean Breeze Walks when they witnessed a down pour of beer fall at their feet, as well as a laughing crowd on the

Page 314

T. Snyder

third floor balcony above," do you recall that incident?

A: Yes, I do.

Q: You then go on to allege that "Officer Snyder and Lamm contacted Hesse for assistance, and when he arrived, the trio proceeded to the apartment, where they observed a large group of underage youths drinking alcohol without any adult supervision, as well as an extensive collection of elicit drug paraphernalia," do you see that?

A: Yes, I do.

Q: Well, actually, let's go back to the alcohol issue in term — in paragraph 51. Do you have any friends in any other Suffolk County police department?

MR. GOODSTADT: Objection.

Q: Do you have any contacts? Do you know anyone in any other Suffolk County police department?

A: I know some people, yeah. In Suffolk County police?

Q: Yeah, Suffolk County police.