Page 407

**T. Snyder**

[2] the police liaison at the time.
[3]     **Q:** Right. Did you advise him that
[4] you have information to believe that Gary
[5] Bosetti was involved in this incident?
[6]     **A:** I didn't advise him that. He was
[7] listening to the whole conversation.
[8]     **Q:** My question to you, sir, is this,
[9] yes or no, and if you can't answer yes or
[10] no, then you can't answer it yes or no. Yes
[11] or no, did you advise Loeffler, when he came
[12] to the police station that night with the
[13] ambulance, that you have information to
[14] believe that Gary Bosetti was involved in
[15] the altercation?
[16]     **MR. GOODSTADT:** Objection.
[17] Answer the question the way you feel
[18] necessary to answer the question. He
[19] can make whatever motion or whatever he
[20] wants to do about it.
[21]     **Q:** Yes or no?
[22]     **A:** I can't answer it yes or no. I
[23] answered it the way I did before. He was
[24] listening to the conversations in the police
[25] department — in the interview.

Page 408

**T. Snyder**

[2]     **Q:** Sir, you, from your mouth to his
[3] ears, did you say to him, "Mr. Loeffler, I
[4] have information to believe that Gary
[5] Bosetti was involved in this altercation?
[6]     **A:** No, I didn't say that.
[7]     **Q:** Thank you. Well, did any of the
[8] victims say the name "Gary Bosetti" in the
[9] police station?
[10]     **A:** No, they did not.
[11]     **Q:** Okay. Did any of the girlfriends
[12] say in the police station "Gary Bosetti"?
[13]     **A:** No, they did not.
[14]     **Q:** Okay.
[15]     **A:** I don't believe they knew his
[16] name.
[17]     **Q:** Exactly. Did you inquire with
[18] Mayor Loeffler at the time as to whether he
[19] knew where Gary Bosetti lives in the police
[20] station that night?
[21]     **A:** Mayor Loeffler wasn't the mayor
[22] at the time. He —
[23]     **Q:** Fine. Thank you. I'll make
[24] it — I'll make it more precise. When
[25] Mr. Loeffler came into the police station

Page 409

**T. Snyder**

[2] that night, sir, did you ask him where Gary
[3] Bosetti lived?
[4]     **A:** No. I didn't — wouldn't believe
[5] he knew where he lived.
[6]     **Q:** What makes you think he wouldn't
[7] know? He was the police liaison. Maybe he
[8] had access to Gary's information. My
[9] question to you is, did you ask Mayor —
[10] Mr. Loeffler?
[11]     **MR. GOODSTADT:** Objection.
[12]     **A:** I did not ask him.
[13]     **Q:** So if I understand you correctly,
[14] you had information to believe that Gary
[15] Bosetti was involved in the vicious and —
[16] using your words — brutal assault on a —
[17] on a civilian that night, and you did
[18] absolutely nothing to ascertain his
[19] location?
[20]     **A:** Not at that moment we didn't, no.
[21]     **Q:** Well, that moment I'm including
[22] the entire night.
[23]     **A:** Well, it was only several hours
[24] later when the police chief came in and we
[25] handed it over to him.

Page 410

**T. Snyder**

[2]     **Q:** Okay. But I'm talking before the
[3] police chief came?
[4]     **A:** Not before the police chief came,
[5] because —
[6]     **Q:** You did — you did absolutely
[7] nothing to ascertain where Gary Bosetti
[8] lived?
[9]     **A:** We couldn't because we were
[10] treating the victims and that did take some
[11] time. And we also had to wait for the
[12] police boat to come, and that took some time
[13] as well.
[14]     **Q:** Okay. It took three of you to
[15] treat the victims?
[16]     **A:** They — we still had a crowd of
[17] people in the — in the police station, so
[18] we were standing around with them while
[19] rescue was with them.
[20]     **Q:** What crowd was there?
[21]     **A:** Well, we have the girls —
[22]     **Q:** We have the victims, we have the
[23] girlfriends and — and we have rescue,
[24] right?
[25]     **A:** Right.

Page 415

T. Snyder

want on the answering machine message?

A: I guess he wanted to talk to me about the Halloween incident.

Q: Okay. And did you speak to Paridiso that day about the Halloween incident?

A: Um, I spoke to him later on that — the day — the day after. Well, I guess it was Halloween then. Later on that day, yes.

Q: So you spoke to Paridiso, via phone or in person?

A: By phone.

Q: Okay. How long was the phone call?

A: I don't recall exactly how long.

Q: What did Paridiso ask you?

A: Um, he had —

Q: Or say to you?

A: He said to me that the victims had come back to file a complaint.

Q: Okay.

A: That they came back, and that while he was talking to them, they saw a

Page 416

T. Snyder

picture of Gary Bosetti on the wall of the police station, and they pointed to him and said, "That's the guy who did it."

Q: Okay. And what else did Paridiso say to you?

A: Paridiso said that he doesn't condone that type of action, that type of conduct from his police officers, and he promised them that he was going to fire Gary.

Q: Did Paridiso ask you anything during that phone conversation?

A: Um, well, he asked me what happened. I explained — I was explaining the situation to him on the phone.

Q: And what did you explain to him?

A: Just what I explained here about the Halloween incident. How we got the call. We went there. What happened. What we did afterwards.

Q: And what specific — just so I'm clear, what specific report did you file that evening?

A: A field report of the incident.

Page 417

T. Snyder

Q: Okay. Okay. And who did you submit it to?

A: I wrote the report and left it with — I said, with the package of the PCR, which is the medical reports that the rescue took of the victims, the pictures of Brian Vankoot, put it altogether and left it for the chief to look at. Left it on his desk.

Q: Okay. And then you spoke to the chief the day of Halloween by phone?

A: Yes. Later on that day.

Q: Okay. Did the chief say anything else, other than what you've just testified to?

A: He said that, um, he went to look for Gary in the village, but he couldn't find him, and he had developed information from somebody that Gary I think believed was taken off by boat from the village.

Q: Did he say anything else that you haven't testified about in that conversation on Halloween day?

A: He told me that he had — he was firing Gary and he expected Richie to

Page 418

T. Snyder

follow — to leave as well because those two are tied at the hip.

Q: He said he was firing Gary before he ever did any investigation?

A: He said he was in the process. That's what he said. "I don't condone that," and he said, "I promised the victims that I was going to fire Gary for what had happened."

Q: Okay. Did Paridiso say anything else in this conversation that you can recall, other than what you've testified to?

A: Not that I can recall. No.

Q: Did you say anything else to Paridiso in that telephone conversation, other than what you've just testified to?

A: I said to him, I said, "Chief, there's a lot of things that are occurring in this village that I can bring to your attention," and he said, "Tommy" — he didn't want to hear about it. He said, you know, that he's firing Gary and that's it.

Q: Didn't you testify earlier today that you told Paridiso in this conversation

Page 423

T. Snyder

A: He called me. I believe he called me.

Q: And what did he say?

A: He had asked me to write a 42 in regard to the incident.

Q: And what's a 42?

A: A 1042 is an internal correspondence. It's sort of like a letter.

Q: Okay. Did he explain to you why he wanted you to do this?

A: Um, he said that he and along with — he hired Pat Cherry or he had Pat Cherry as a special investigator, were going to investigate this Halloween thing.

Q: Okay. Now you said earlier it was your understanding that Paridiso was going to investigate this. What was that based upon?

A: That phone call when I spoke to him and he said he went out looking for Gary, I was under the assumption that the chief was investigating it then.

Q: Okay. And did you — in the period of time between that conversation and

Page 424

T. Snyder

when you spoke to Hesse, did anything else take place that led you to believe that Paridiso was investigating the incident?

A: I didn't speak to the chief or George in that time frame, so I have — I have no idea.

Q: Well, no. My question is between the time that you spoke to Paridiso Halloween day and the time you spoke to Hesse about a week later, other than what Paridiso said to you in the phone conversation, was there anything else that led you to believe that Paridiso was in fact investigating the incident?

A: No, there was not.

Q: Okay. Did anyone call you in that period of time as part of any investigation?

A: No. No one ever spoke to me about it.

Q: Okay. Paragraph 71, you allege — and this is on page 18, second sentence — "upon information and belief, the field report was then rewritten by or at

Page 425

T. Snyder

the direction of Hesse without Officer Fiorillo, Lamm and Snyder's knowledge or input, despite the fact that they were the only officers on duty in Ocean Beach at the time of the incident," do you see that?

A: Yes, I do.

Q: What information and belief are you relying upon?

A: Um, I believe — actually, if I'm not mistaken, George rewrote a field report of the incident and included it in the official investigation.

Q: And what's the basis for that belief? That's all I'm asking you.

A: I believe I saw that field report when he — with his folder with the investigation.

Q: Did he show it to you?

A: Um, he didn't show it to me specifically. I believe it was right there on his desk and we were looking through it.

Q: Who's "we"?

A: Myself and the other officers that were working. There was a number of us

Page 426

T. Snyder

working. I mean, it was right out in the open for everyone to see.

Q: Who were the other officers?

A: All — it was not just myself and the guys that were working midnight. It was all the other tours as well. Everybody was well aware of what was going on.

Q: No. I understand that. But you said there's a specific field report that you claim that — that Hesse rewrote, and the basis for that is you said that you looked at this report along with other officers because the report was out in the open on Hesse's desk, right?

A: Yeah. The file was at one point, yes.

Q: Did Hesse give you permission to go through the file?

A: He had told us that this is what he was doing and it was right there.

Q: Did Hesse give you permission to go through the file?

A: I don't remember if he said go through the file, but he left it open for us

Page 431

[1] T. Snyder
[2] not at this point.
[3] Q: Okay. Paragraph 73. "After
[4] demanding Bosetti's shield and side arm,
[5] Paridiso offered Bosetti the opportunity to
[6] submit a resignation letter," do you see
[7] that?
[8] A: Yes, I do.
[9] Q: Did Paridiso tell you that?
[10] A: No, he didn't say this to me.
[11] Q: Okay.
[12] A: Specifically.
[13] Q: Generally?
[14] A: No. He just — he didn't say
[15] this to me.
[16] Q: Okay.
[17] A: He said this to I believe other
[18] officers.
[19] Q: Okay. But not to you?
[20] A: Not to me.
[21] Q: Because that's really all I care
[22] about today.
[23] A: No, not to me.
[24] Q: Paragraph 74. "Within the same
[25] week, Hesse asked Officer Snyder, Fiorillo

Page 432

[1] T. Snyder
[2] and Lamm to submit a department internal
[3] correspondence 1042 regarding the Halloween
[4] incident and requested that each officer
[5] provide an individual statement concerning
[6] the incident," do you see that?
[7] A: Yes, I do.
[8] Q: Did that take place in that first
[9] phone conversation with Hesse that you were
[10] referring to?
[11] A: Yes, it did.
[12] Q: Okay. And did you provide a
[13] department internal correspondence 1042?
[14] A: Yes, I did.
[15] Q: And did you provide an individual
[16] statement concerning the incident?
[17] A: Well, that was my statement that
[18] I provided.
[19] Q: Okay.
[20] A: I wasn't due back in work. He
[21] had asked me, "When are you back at work,
[22] Tommy?" And I said, "Not until the end of
[23] the week." And he needed it right away he
[24] said. So I wrote the — typed it actually,
[25] the 42, at home.

Page 433

[1] T. Snyder
[2] Q: Okay.
[3] A: And he said, "When can you get it
[4] to me?"
[5] Q: So your 1042 was the same as the
[6] individual statement that's being referred
[7] to in —
[8] A: Yes.
[9] Q: In paragraph 74?
[10] A: Yes, it is.
[11] Q: Okay. 75, "Officer Snyder —
[12] after Officer Snyder complied with Hesse's
[13] directive to complete his statement, Hesse
[14] claimed that 'there's some discrepancies
[15] between what you and Officer Richard Bosetti
[16] say,'" and Officer Richard is in brackets,
[17] do you see that?
[18] A: Yes, I do.
[19] Q: When did Hesse tell you this?
[20] A: This was a follow-up phone call,
[21] um, when I faxed it to him, I then followed
[22] up with a phone call to see if he received
[23] it.
[24] Q: And what did Hesse specifically
[25] say to you with regard to anything in this

Page 434

[1] T. Snyder
[2] conversation?
[3] A: He said that he did — "Yes, I
[4] did get your 42," and that's exactly what he
[5] said. "Tommy, I'm going to tell you,
[6] there's some discrepancies between what you
[7] and Richie say."
[8] Q: And did Hesse tell you what the
[9] discrepancies were?
[10] A: He didn't go into it then, no.
[11] Q: Did you ask what the
[12] discrepancies were?
[13] A: I didn't ask him, no.
[14] Q: Okay. "Although Officer Snyder
[15] reaffirmed that his report was fully
[16] accurate, Hesse later insisted to Officer
[17] Carter that Snyder's report was 'a piece of
[18] shit,'" do you see that?
[19] A: Yes, I do.
[20] Q: When did Carter tell you that?
[21] A: Um, sometime after the incident.
[22] I'm not sure exactly when, but it was after
[23] the incident.
[24] Q: Did you ever approach Hesse and
[25] ask him why he told Carter that your report

Page 439

[1] T. Snyder
[2] A: I have no idea what his
[3] background would be.
[4] Q: Right. So you don't know if he
[5] had gotten hundreds of commendations while
[6] he was a Nassau County police officer, do
[7] you?
[8] A: I have no idea if he did or not.
[9] Q: All you know — all you claim is
[10] that he was somehow uncertified, correct?
[11] A: Well, he was uncertified.
[12] Q: Right. And that's based upon
[13] what? What knowledge?
[14] A: Based upon the knowledge that
[15] when he came to work originally as a police
[16] officer in the department, he didn't go
[17] through all the background requirements with
[18] Suffolk County.
[19] Q: And did he ever become certified,
[20] to your knowledge?
[21] A: To my knowledge, I don't know if
[22] he was or wasn't certified. When I was
[23] working there, he wasn't certified.
[24] Q: Okay. And you know that for a
[25] fact?

Page 440

[1] T. Snyder
[2] A: Yeah. Because there was an issue
[3] with civil service contacting the beach and
[4] letting them know that they had a group of
[5] people who were certified and a group of
[6] officers who were not certified, and they in
[7] fact had a list of that.
[8] Q: And you think because this
[9] retired police officer from Nassau County
[10] was allegedly uncertified, that meant that
[11] he was unqualified to perform an
[12] investigation?
[13] MR. GOODSTADT: Objection.
[14] Q: Is that your testimony?
[15] MR. GOODSTADT: Objection.
[16] A: He was unqualified then. He
[17] wasn't a certified police officer in Suffolk
[18] County.
[19] Q: So you're saying because he was
[20] uncertified, he could not conduct an
[21] investigation in the proper manner?
[22] A: Not as a police officer.
[23] Q: Okay. Now you then — you also
[24] allege that "he was not on duty and did not
[25] witness the fight," do you see that?

Page 441

[1] T. Snyder
[2] A: Yes.
[3] Q: You didn't witness the fight
[4] either, did you?
[5] A: No, I did not.
[6] Q: All right. "To investigate the
[7] incident." You didn't take any witness
[8] statement from anyone other than the
[9] victims, did you?
[10] A: I couldn't. No one would
[11] cooperate with me.
[12] Q: Not my question. You didn't take
[13] any —
[14] A: I think I testified to that
[15] already. That no, I didn't.
[16] Q: Right. Right. Okay. And would
[17] it be fair to say, sir, that as it pertained
[18] to the Bosettis, you had already complained
[19] on numerous occasions to Mr. Hesse about
[20] their conduct, right?
[21] A: Yes. Myself and other officers.
[22] Q: I'm just talking about you, sir.
[23] A: Yes.
[24] Q: And isn't it true that Fiorillo
[25] had also complained on multiple occasions to

Page 442

[1] T. Snyder
[2] George Hesse about the Bosettis?
[3] A: I — I know there was other
[4] occasions. I don't know how much multiple
[5] would be.
[6] Q: Then let's just stick to you.
[7] You had complained, prior to the Halloween
[8] incident, on multiple occasions going back
[9] to 2002 about the Bosettis, right?
[10] A: Yes.
[11] Q: You had complained about their
[12] conduct as police officers to George Hesse,
[13] right?
[14] A: Yes, I did.
[15] Q: You had complained to George
[16] Hesse about the fact that you believed that
[17] they were drunk on duty, correct?
[18] A: On — yes. Among other things,
[19] yes.
[20] Q: Among many other things, right?
[21] A: Yes.
[22] Q: Would you say that you were
[23] objective with regard to your views about
[24] the Bosettis?
[25] MR. GOODSTADT: Objection.

Case 2:07-cv-12145-JFB-ETB Document 145-14 Filed 01/15/10 Page 6 of 11 PageID #: 4938

EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM, THOMAS SNYDER
v.
INCORPORATED VILLAGE OF OCEAN BEACH
T. Snyder
September 24, 2008

Page 447

[1] T. Snyder
[2] near the incident, is that your testimony?
[3] MR. GOODSTADT: Objection.
[4] MR. NOVIKOFF: Okay.
[5] A: I'm not sure I'm following
[6] exactly what you're saying.
[7] Q: Well, you're alleging that Hesse
[8] was part of a conspiracy to cover up
[9] something on Halloween night, right?
[10] A: Yes.
[11] Q: And you — Hesse wasn't there
[12] Halloween night?
[13] A: No, he was not.
[14] Q: In fact, Hesse was on vacation
[15] Halloween night?
[16] A: He was off that night, yes.
[17] Q: So you believe the fact that some
[18] of the people who are witnesses that night
[19] who couldn't cooperate with you, were
[20] somehow being directed by Hesse not to
[21] cooperate with you?
[22] MR. GOODSTADT: Objection.
[23] A: From my understanding is when
[24] they talked to Cherry and Hesse, they said
[25] that we were lying and we were not telling

Page 448

[1] T. Snyder
[2] the truth.
[3] Q: Could it be that there were
[4] people in — in Ocean Beach that — who were
[5] present that night at Houser's Bar who
[6] didn't think much of you as a police
[7] officer?
[8] MR. GOODSTADT: Objection.
[9] A: I have no idea.
[10] Q: Didn't think much of Lamm as a
[11] police officer?
[12] MR. GOODSTADT: Objection.
[13] A: I wouldn't have any idea of that.
[14] Q: Didn't think much of Fiorillo as
[15] a police officer?
[16] MR. GOODSTADT: Objection.
[17] A: I wouldn't have any idea of that
[18] as well.
[19] Q: Didn't like you?
[20] MR. GOODSTADT: Objection.
[21] A: I wouldn't have any idea. No one
[22] ever said to me that they didn't like me.
[23] Q: Okay. You just think that it was
[24] surprising that no one spoke to you that
[25] night?

Page 449

[1] T. Snyder
[2] A: I found it very surprising when
[3] we were trying to talk to people, that they
[4] didn't see nothing, they didn't see nothing,
[5] they kept walking away. But they were
[6] willing to come forward afterwards.
[7] Q: That's what I'm asking you. How
[8] many people were willing to come forward
[9] afterwards?
[10] A: I'm not sure exactly how many. I
[11] know there were a number of witness
[12] statements that George said he had taken,
[13] that Cherry had taken.
[14] Q: Could it be because Pat Cherry
[15] was better at doing an investigation than
[16] you?
[17] MR. GOODSTADT: Objection.
[18] A: I wouldn't have any knowledge of
[19] that.
[20] Q: That's right. So for all you
[21] know, the witnesses who spoke to Cherry and
[22] gave statements to Cherry did so because
[23] Cherry was just better at it than you?
[24] MR. GOODSTADT: Objection.
[25] A: That's your opinion.

Page 450

[1] T. Snyder
[2] Q: No. I don't have an opinion one
[3] way or the other. I'm just saying, isn't
[4] that a possibility?
[5] MR. GOODSTADT: Objection.
[6] A: Not a possibility in my mind.
[7] Q: Okay. Of course not.
[8] A: I — I was not thinking of Pat
[9] Cherry as, again, he was not a certified
[10] police officer.
[11] Q: Oh. Okay. "Upon information and
[12] belief" — well, let's continue that
[13] allegation. "Cherry conducted a sham
[14] investigation." Well, why was it a sham
[15] investigation, sir? What aspect of the
[16] investigation would you consider to be a
[17] sham that Pat Cherry undertook?
[18] A: They never — Pat Cherry or
[19] George never interviewed us about the
[20] incident. Never involved us in the
[21] investigation.
[22] Q: He had your reports, though,
[23] right?
[24] A: He just had a 42 from us. He
[25] never spoke to us at all. In fact, no

Page 455

T. Snyder

information and belief, Cherry and Hesse ratified these false statements to cover up the Bosetti brothers' involvement in the Halloween incident and by attempting to shift blame to the victims." What is your information and belief as it's alleged here?

A: My information and belief would be that they turned the situation around, and in fact, Gary was making the arrest, and I couldn't understand how he could be making an arrest if he was fired.

Q: No. You're saying upon information and belief, Cherry and Hesse ratified these false statements for which you don't have any evidence of. My question to you is, what is your information and belief, and if don't have any information and belief, then that's fine, too.

MR. GOODSTADT: Objection.

Q: So what's your information and belief?

A: I don't have any information or belief.

Q: Okay.

Page 456

T. Snyder

MR. NOVIKOFF: How much time is left?

THE VIDEOGRAPHER: Two minutes.

MR. NOVIKOFF: Okay. Let's take a break.

THE VIDEOGRAPHER: This ends tape number six. The time is 5:59 p.m. We're going off the record.

(A break was taken.)

THE VIDEOGRAPHER: This begins tape number seven. The time is 6:08 p.m. Back on the record.

Q: Page 19, paragraph 80. It's alleged or you allege that "Hesse then showed Officer Snyder's statement to Officer Fiorillo, who noticed that his statement and Officer Snyder's agreed as to the events of October 31. Hesse then disparaged Officer Snyder's statement as well. Hesse then insisted that only Officer Cherry's report described what really happened." Did Fiorillo tell you that Hesse disparaged your statement in his presence?

A: Yes, he did.

Page 457

T. Snyder

Q: What did Snyder — what did Fiorillo say Hesse said that he believed was disparaging?

A: Similar to what he said to Eddie. That my report — my field report was a piece of shit and that I was — words along those lines. I'm not sure exactly what he said. I wasn't there.

Q: Now prior to you doing the 1042 by typing it that day, had you spoken to Fiorillo concerning what to put in the 1042?

A: No, I did not.

Q: Did you speak to Lamm about what to put in the 1042?

A: No, I did not.

Q: Did you talk to them at all between the night of the incident and the time you typed up the 1042 concerning the events that evening?

A: No, I did not.

Q: Okay. Paragraph 83. "In or around the week following the incident, Hesse rehired Gary Bosetti to work as an OBPD officer," do you see that?

Page 458

T. Snyder

A: Yes, I do.

Q: Do you have any personal knowledge as to this allegation?

A: Other than what I was told, I forget exactly who told me, but that he was rehired. I think Hesse actually told me. Said he was going to rehire Gary and he was going to be making the arrest.

Q: So your knowledge is based upon what Hesse told you?

A: I think that's what happened. Yes. I'm not — I'm not exactly sure.

Q: Okay. Did you discuss with Hesse in this conversation that perhaps took place, how he was going about hiring Gary Bosetti when Paridiso said he was going to fire Bosetti?

A: No. I don't recall saying that to him.

Q: Did you ever inquire with Paridiso as to why Bosetti is still working when he said he was going to fire him?

A: I never spoke to Eddie about that, no.

Page 463

T. Snyder

them up.

Q: Did you ever ask George Hesse why he said to Carter and Fiorillo that your 42 made him sick?

A: No. But — I didn't ask him that.

Q: Yes or no?

A: No, I didn't ask him that.

Q: You then continue to allege the following, "and indicated that he believed Officer Snyder 'had it in for Gary Bosetti' implying that Officer Snyder had willfully submitted a false report implicating the Bosettis," who told you this?

A: Eddie Carter said that to me when — during that same conversation.

Q: Did you approach George Hesse at any time to say to him that you did not have it in for Gary Bosetti?

A: Not at that time I didn't, no.

Q: At any time did you ever?

A: Long after that, yes.

Q: When did you tell George Hesse that you didn't have it in for Gary Bosetti?

Page 464

T. Snyder

A: When he — the day he fired me, and then at a meeting about I guess a month or so after.

Q: Well, the day he fired you was when? April 20?

A: April 20.

Q: Okay. And how did it come about that you would have told Hesse on that date that you didn't have it in for Gary Bosetti?

A: He said to me that — he told me that I was the civil service rat and that — that I was going to be fired because of it. That he was firing me because of it.

Q: No. Okay. My question to you is more specific.

A: I said — we were also talking about the incidents — the Halloween incident in particular we mentioned briefly, and I said, "I didn't do anything wrong. I just did what I was trained to do. I handled the incident the way I should have handled it and I didn't have it in for them."

Q: Were you ever trained to do

Page 465

T. Snyder

investigations?

A: I was trained to do preliminary investigations.

Q: What's a preliminary investigation?

A: Well, you start — as a police officer, you start an investigation when you respond to a call, okay, and then I put this thing together and left it for the chief to go look in further, because it was alleging that police officers were involved in this.

Q: As part of that investigation — training, were you ever taught how to secure a crime scene?

A: Yes, I was, but —

Q: Okay. As part of that —

MR. GOODSTADT: Objection.

Q: — training, were you ever instructed with regard to taking witness statements?

MR. GOODSTADT: Objection. I just ask you to let him finish the answer before you ask the next question.

Page 466

T. Snyder

MR. NOVIKOFF: My question is yes or no. If he can't answer it yes or no, then he can tell me he can't answer it yes or no. I am not going to permit him, on a yes or no question, to start speaking about anything he wants to speak.

MR. GOODSTADT: Well, if it has nothing to do with the question, you can make your motion to strike, you can do whatever you want to do. But he's entitled to answer the question the way he wants to answer the question.

MR. NOVIKOFF: You made it quite clear to him. Your instructions were perfect. You said when there's a yes or no question, to answer "yes," "no" or "I can't answer it yes or no," and I will accept "I can't answer it yes or no." That's legitimate.

MR. GOODSTADT: But if he can't answer it yes or no, he should be able to explain his answer to the question. And then you can move to strike and

Page 471

[1] **T. Snyder**
[2] **A:** Not myself specifically, no.
[3] **Q:** Okay. Then with regard to
[4] "Suffolk County Civil Service," do you see
[5] that?
[6] **A:** Yes, I do.
[7] **Q:** Who specifically did you complain
[8] to repeatedly as it's referred to in 117?
[9] **A:** I didn't.
[10] **MR. GOODSTADT:** Objection.
[11] **MR. NOVIKOFF:** I'll rephrase
[12] the question.
[13] **Q:** Who, if anyone, at Suffolk County
[14] Civil Service Department did you complain to
[15] concerning the endemic corruption and abuse
[16] of power?
[17] **A:** I didn't complain to anybody at
[18] the Suffolk County Civil Service Department.
[19] **Q:** Okay. Let's look at paragraph
[20] 135. There's reference to "defamatory
[21] statements," do you see that?
[22] **A:** Yes, I do.
[23] **Q:** What defamatory statement can you
[24] point to that George Hesse made —
[25] **MR. GOODSTADT:** Objection.

Page 472

[1] **T. Snyder**
[2] **Q:** — about you subsequent to April
[3] 2, 2006?
[4] **MR. GOODSTADT:** Objection.
[5] **A:** I would assume one of them would
[6] be the statement he made — he made to Frank
[7] and Kevin — Frank and Eddie about my 1042.
[8] **Q:** Well, that's before, sir.
[9] **A:** I'm sorry.
[10] **Q:** April 2, 2006. What defamatory
[11] statement did George Hesse make concerning
[12] you subsequent to April 2, 2006?
[13] **MR. GOODSTADT:** Objection.
[14] **A:** Subsequent to April 2 or on April
[15] 2?
[16] **Q:** Okay. Let's do on.
[17] **A:** I'm not sure what he said about
[18] me on April 2 at the — at the meeting. I
[19] don't know.
[20] **Q:** Okay. Then let's talk about
[21] after. What defamatory statement did George
[22] Hesse make about you after April 2, 2006?
[23] **MR. GOODSTADT:** Objection.
[24] **A:** When he was firing me, he called
[25] me a rat. He said, "You're — I — you're

Page 473

[1] **T. Snyder**
[2] the rat and that's the reason you're being
[3] fired."
[4] **Q:** Was there anyone present in this
[5] room when Mr. Hesse called you a rat?
[6] **A:** No. We weren't even in a room.
[7] We were in two vehicles side by side on a
[8] dock.
[9] **Q:** Okay. Other than this statement,
[10] what other defamatory statement do you
[11] contend in this lawsuit George Hesse made
[12] about you after April 2, 2006?
[13] **MR. GOODSTADT:** Objection.
[14] **A:** I can't recall one at the moment.
[15] **Q:** Okay. Do you understand what I
[16] mean by "defamatory"?
[17] **A:** Yes, I do.
[18] **Q:** And what is your understanding,
[19] so that we're all on the same page?
[20] **A:** Something that defames you. It
[21] discredits you. Impugns your integrity.
[22] **Q:** And is there anything in your
[23] possession, custody or control that would
[24] refresh your recollection?
[25] **A:** No, there is not.

Page 474

[1] **T. Snyder**
[2] **MR. NOVIKOFF:** All right. I'm
[3] going to leave a space in the
[4] transcript, and just as to this aspect
[5] of the deposition, I will leave it open
[6] when I conclude today, and I would ask
[7] you to advise me, subsequent to April
[8] 2, 2006, of any statements that you
[9] claim in this lawsuit to be defamatory
[10] that were made by George Hesse about
[11] you.
[12] **MR. GOODSTADT:** Objection.
[13] **MR. NOVIKOFF:** Okay.
[14] **INSERT:**
[15]
[16] **Q:** Paragraph 138, there's a
[17] reference to "stigmatizing conduct," do you
[18] see that?
[19] **A:** Yes, I do.
[20] **Q:** What has George Hesse done,
[21] subsequent to April 2, 2006, that you
[22] believe is stigmatizing conduct as it's used
[23] in paragraph 138?
[24] **A:** The fact that he will not write
[25] a — a reference for me, which is just

Page 479

T. Snyder

[2] Hesse to do so," do you see that?
[3] **A:** Yes, I do.
[4] **Q:** Mr. Loeffler was not mayor of the
[5] village while you were employed by the
[6] village, was he?
[7] **A:** I think he was for a small
[8] portion of when I was employed there.
[9] **Q:** Really? What time period was
[10] Mayor Loeffler the — was Joe Loeffler the
[11] mayor prior to April 2, 2006?
[12] **A:** I'm not sure exactly when, but I
[13] believe he was mayor just prior to that.
[14] **Q:** And if he wasn't, would that
[15] change your allegation in 176?
[16] **MR. GOODSTADT:** Objection.
[17] **A:** It wouldn't change the
[18] allegation, no. I mean, he — they did
[19] conspire to — to keep the uncertified
[20] officers and fire us.
[21] **Q:** What did Joe Loeffler do that you
[22] believe was part of this conspiracy?
[23] **A:** Well, I'm not sure specifically
[24] what he did.
[25] **Q:** That's what I'm asking you, sir.

Page 480

T. Snyder

[2] As you sit here today, what specifically did
[3] Joe Loeffler do as part of the conspiracy
[4] that you allege pertaining to the
[5] advancement of the careers of uncertified
[6] and unqualified personnel who served
[7] alongside you?
[8] **A:** I'm not — I'm not specific —
[9] I'm not sure at this time what exactly he
[10] did and did do.
[11] **Q:** Fine. Let's go to 177.
[12] "Defendant Loeffler had direct knowledge of
[13] the undue risk of harm to which Plaintiffs
[14] and the public were exposed to due to the
[15] retention of unfit village police officers,
[16] as Defendant Loeffler was present in the
[17] police station on the night of October 30,
[18] 2004, when the victims of Officer Gary
[19] Bosetti's assault arrived from Houser's Bar
[20] and identified Officer Gary Bosetti as their
[21] attacker," do you see that?
[22] **A:** Yes, I do.
[23] **Q:** What victim in the police station
[24] used the phrase "Gary Bosetti," because,
[25] sir, I believe you testified earlier that no

Page 481

T. Snyder

[2] one did?
[3] **A:** No. No one at that time had —
[4] had identified Gary Bosetti. No.
[5] **Q:** Okay. So this allegation that I
[6] just read that refers to the victim of
[7] Officer Gary Bosetti's assault identifying
[8] Gary Bosetti as their attacker did not take
[9] place in the police station, correct?
[10] **MR. GOODSTADT:** Objection.
[11] **A:** I'm sorry, repeat that.
[12] **Q:** Well, I'll rephrase the question.
[13] Based upon your testimony, the allegation
[14] that the victims in the police station in
[15] Joe Loeffler's presence identified Gary
[16] Bosetti as their attacker is not accurate,
[17] is it?
[18] **MR. GOODSTADT:** Objection.
[19] **A:** That's correct. That's not
[20] accurate.
[21] **Q:** It's not accurate?
[22] **A:** That's correct. That's not
[23] accurate.
[24] **Q:** Okay. When did the investigation
[25] into the Halloween incident end, to the best

Page 482

T. Snyder

[2] of your knowledge?
[3] **A:** Um, you know, I'm not sure.
[4] **Q:** Months after? Weeks after? By
[5] the end of 2004?
[6] **A:** I believe it was before the end
[7] of 2004, but I'm not sure exactly when.
[8] **Q:** Okay. Certainly Joe Loeffler was
[9] not mayor in 2004, was he?
[10] **A:** I don't recall if he was or not
[11] at that time.
[12] **Q:** Okay. If I told you that Joe
[13] Loeffler didn't become mayor until June of
[14] 2006, would that refresh your recollection?
[15] **A:** I wouldn't know that because I
[16] wasn't there in June of 2006.
[17] **MR. NOVIKOFF:** Okay. I'm just
[18] asking if it refreshed your
[19] recollection. Just give me two
[20] minutes. I may be done.
[21] **THE VIDEOGRAPHER:** Go off?
[22] **MR. NOVIKOFF:** No. Stay on for
[23] a minute. Let's not go off. You know
[24] what, I'm done. Subject to that
[25] limited — um, subject to that limited

Page 487

T. Snyder

[2] of the officers said anything to them.
[3] Q: I want to draw your attention to
[4] some testimony you gave earlier in the day
[5] regarding your discharge from the service.
[6] What was the specific conduct that the bad
[7] conduct discharge made reference to?
[8] A: As I testified earlier, it was
[9] for when I was AWOL. When I had the
[10] problems at home and I went home to help
[11] out.
[12] Q: Have you yourself personally ever
[13] made a complaint to Suffolk County Civil
[14] Service regarding uncertified officers?
[15] A: I have not personally made a
[16] complaint to them, no.
[17] Q: Earlier I believe you indicated
[18] that you and Ed Carter work together in the
[19] Town of Islip?
[20] A: Yes, we do.
[21] Q: Okay. What is the relationship,
[22] and by that I mean what is the working
[23] relationship between the two of you?
[24] A: We have a good working
[25] relationship. A good rapport.

Page 488

T. Snyder

[2] Q: Do you report to him?
[3] A: No, I don't. He works a separate
[4] tour than I do.
[5] Q: And you work what hours?
[6] A: I work 8:00 to 4:00.
[7] Q: And he works?
[8] A: And he works midnight to 8:00.
[9] Q: I'm going to draw your attention
[10] to the exhibit — I'm unsure of the number,
[11] but it was the complaint.
[12] A: Okay.
[13] Q: And paragraph 58.
[14] MR. GOODSTADT: Just for the
[15] record, it's Snyder-6.
[16] MR. CONNOLLY: Snyder-6. Thank
[17] you.
[18] MR. NOVIKOFF: 58?
[19] MR. CONNOLLY: 58.
[20] Q: What's the name of the alleged
[21] domestic violence victim?
[22] A: Just give me a few seconds to get
[23] there.
[24] Q: Sure.
[25] A: I believe her name was Lisa

Page 489

T. Snyder

[2] Campbell.
[3] Q: And did you learn the name of
[4] that woman that evening or had you known her
[5] before or something else?
[6] A: I had known previously. She's
[7] a — I believe she's a resident there.
[8] She's been there for a number of years while
[9] I worked there.
[10] MR. CONNOLLY: I have no
[11] further questions. Thank you.
[12] MR. GOODSTADT: I have nothing,
[13] but similar to the previous
[14] depositions, I just want to reserve the
[15] witness' right to review and sign.
[16] MR. NOVIKOFF: Absolutely. And
[17] we're off the record now.
[18] (Continued on next page for
[19] jurat.)

Page 490

[1] T. Snyder
[2] THE VIDEOGRAPHER: This
[3] completes today's deposition for Thomas
[4] Snyder on September 24, 2008. The time
[5] is 6:45 p.m. and we are off the record.

THOMAS SNYDER

Subscribed and sworn to
before me this _____ day
of _____ 2008.


NOTARY PUBLIC