## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
EDWARD CARTER, FRANK FIORILLO,  )
KEVIN LAMM, JOSEPH NOFI, and    )
THOMAS SNYDER,                  )
                                )
             Plaintiffs,        )
                                )
-against-                       )
                                ) Index No.
                                ) CV 07 1215
INCORPORATED VILLAGE OF OCEAN   )
BEACH; MAYOR JOSEPH C.          )
LOEFFLER, JR., individually     )
and in his Official capacity;   )
former mayor NATALIE K.ROGERS,  )
individually and in her         )
official capacity, OCEAN BEACH  )
POLICE DEPARTMENT; ACTING       )
DEPUTY POLICE CHIEF GEORGE B.   )
HESSE, individually and in his  )
official capacity; SUFFOLK      )
COUNTY; SUFFOLK COUNTY POLICE   )
DEPARTMENT OF CIVIL SERVICE;    )
and ALLISON SANCHEZ,            )
individually and in her         )
official capacity,              )
                                )
             Defendants.        )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

DEPOSITION OF GEORGE HESSE
Uniondale, New York
June 3, 2009

Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 23057

## Page 2

1
2              926 RexCorp Plaza
               Uniondale, New York
3
4              June 3, 2009
               10:00 A.M.
5
6
7
8
9
10
11
12
13        Deposition of GEORGE HESSE, held at
14   the offices of RIVKIN RADLER, LLP, 926
15   RexCorp Plaza, Uniondale, New York, pursuant
16   to Notice, before Judi Johnson, a Registered
17   Professional Reporter, a Certified Realtime
18   Reporter, a Certified LiveNote Reporter and
19   Notary Public of the State of New York.
20
21
22
23
24
25

## Page 3

1                   GEORGE HESSE
2   APPEARANCES:
3      THOMPSON WIGDOR & GILLY, LLP
4      Attorneys for the Plaintiffs
5      85 Fifth Avenue
6      New York, New York 10003
7
       BY: ANDREW S. GOODSTADT, ESQ.
8          ARIEL GRAFF, ESQ.
9
10     MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11     Attorneys for GEORGE B. HESSE
12     530 Saw Mill Road
13     Elmsford, New York 10523
14
       BY: KEVIN W. CONNOLLY, ESQ.
15
16
17
18     RIVKIN RADLER, LLP
19     Attorneys for INCORPORATED VILLAGE OF OCEAN BEACH,
20     JOSEPH LOEFFLER, NATALIE ROGERS AND OCEAN BEACH
21     POLICE DEPARTMENT
22     926 RexCorp Plaza
23     Uniondale, New York 11556-0926
24
       BY: KENNETH A. NOVIKOFF, ESQ.
25        MICHAEL WELCH, ESQ.

## Page 4

1                   GEORGE HESSE
2
3
4
5      BEE READY FISHBEIN HATTER & DONOVAN, LLP
6      Attorneys for SUFFOLK COUNTY
7      170 Old Country Road
8      Mineola, New York 11501
9
10     BY: KENNETH A. GRAY (A.M. SESSION ONLY)
11
12
13     SUFFOLK COUNTY DEPARTMENT OF LAW
14     Attorneys for the County
15     100 Veterans Memorial Highway
16     Hauppauge, New York 11788
17
       BY: BRIAN P. CALLAHAN, ESQ.
18
19     ALSO PRESENT:
20     STEVE SAN PIETRO - LEGAL VIDEO SPECIALIST
21     FRANK FIORILLO
22     KEVIN LAMM - AM SESSION ONLY
23     ED CARTER - AM SESSION ONLY
24     TOM SNYDER
25

1 (Pages 1 to 4)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 5

GEORGE HESSE

1        GEORGE HESSE
2        IT IS HEREBY STIPULATED AND AGREED by
3 and between the attorneys for the respective
4 parties herein, that filing and sealing and
5 the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7 that all objections, except as to the form
8 of the question, shall be reserved to the
9 time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11 that the within deposition may be sworn to
12 and signed before any officer authorized to
13 administer an oath, with the same force and
14 effect as if signed and sworn to before the
15 Court.
16
17      - oOo -
18
19
20
21
22
23
24
25

Page 6

GEORGE HESSE

1        GEORGE HESSE
2 GEORGE HESSE,
3      Called as a witness herein, having
4 first been duly sworn, was examined and
5 testified as follows:
6 BY THE REPORTER:
7    Q   Please state your name and address for
8 the record.
9    A   George Hesse, 623 Bay Walk, P.O. Box
10 425, Ocean Beach, New York 11770.
11    THE VIDEOGRAPHER:  This is the start  10:04:10AM
12 of the tape labeled Number 1 of the
13 videotaped deposition of George Hesse in the
14 matter of Carter Fiorello, et al versus the
15 Incorporated Village of Ocean Beach.  This
16 deposition is taking place at 926 RexCorp
17 Plaza, Uniondale, New York on Wednesday,
18 June the 3rd, 2009 at approximately
19 10:04 a.m.
20    My name is Steve San Pietro from TSG,  10:04:37AM
21 and I am the legal video specialist.  The
22 court reporter today is Judi Johnson in
23 association with TSG Reporting.
24    Will counsel please introduce  10:04:47AM
25 yourselves for the record.

Page 7

GEORGE HESSE

1        GEORGE HESSE
2    MR. GOODSTADT:  Andrew Goodstadt,  10:04:50AM
3 Thompson Wigdor & Gilly, on behalf of the
4 plaintiffs.  And with me is Ariel Graff,
5 G-R-A-F-F, from my office.
6    MR. CONNOLLY:  Kevin W. Connolly of  10:05:05AM
7 Marks, O'Neil, O'Brien & Courtney, counsel
8 for the defendant Hesse.
9    MR. NOVIKOFF:  Ken Novikoff, Rivkin  10:05:12AM
10 Radler, on behalf of all the village
11 defendants and Mayor Rogers, Mayor Loeffler
12 in their official and individual capacities.
13 With me is Michael Welch from my office.
14    MR. CALLAHAN:  Brian Callahan from the  10:05:23AM
15 office of Christine Malafi for the County of
16 Suffolk, Suffolk County PD and Allison
17 Sanchez.
18 EXAMINATION          10:05:30AM
19 BY MR. GOODSTADT:        10:05:36AM
20    Q   Good morning, Mr. Hesse.    10:05:41AM
21    A   Good morning.    10:05:42AM
22    Q   My name is Andrew Goodstadt Thompson.  10:05:43AM
23 I'm an attorney at the law firm of Thompson,
24 Wigdor & Gilly, and my firm represents the
25 plaintiffs in this matter, Frank Fiorillo, Ed

Page 8

GEORGE HESSE

1        GEORGE HESSE
2 Carter, Kevin Lamm, Tom Snyder and Joe Nofi.
3 And we're here today to ask you some questions
4 about the allegations in the complaint.
5    What is your current address?    10:06:00AM
6    A   My current address, my official  10:06:03AM
7 address is 315 Bay Walk, P.O. Box 371 Ocean
8 Beach, New York 11770.
9    Q   What do you mean by official address?  10:06:15AM
10    A   I also have a second residence of  10:06:17AM
11 191 The Helm, East Islip, New York 11730.
12    Q   And which address do you live at?    10:06:26AM
13    A   I mostly live at 191 The Helm, and I  10:06:29AM
14 do sleep at my apartment in Ocean Beach.
15    Q   How many days a year do you --    10:06:37AM
16 approximately, do you sleep at The Helm versus
17 your Ocean Beach residence?
18    A   I'd say the majority of the year.  10:06:43AM
19 Most of the summer, I stay in Ocean Beach.
20    Q   And when did you start living at Ocean  10:06:53AM
21 Beach during the summers?
22    A   About, I'd say, three years ago I  10:06:57AM
23 started staying weekends at the beach.
24    Q   Who else lives with you at that    10:07:08AM
25 address at the beach?

2  (Pages 5 to 8)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    It's a shared address.  It's the Ocean 10:07:11AM
3    Beach police barracks, and I have a room within
4    the barracks.
5    Q    Anyone else live there?        10:07:18AM
6    A    There are other police officers that  10:07:20AM
7    do stay overnight there, but I wouldn't say they
8    live there.
9    Q    Would you say that you live there?   10:07:26AM
10    A    No, but it's one of my official   10:07:28AM
11    addresses.
12    Q    Why do use that as an official address 10:07:32AM
13    if you don't live there?
14       MR. NOVIKOFF:  Objection.      10:07:36AM
15       MR. CONNOLLY:  Objection.      10:07:37AM
16       MR. NOVIKOFF:  Argumentative.  10:07:39AM
17    A    It's on my driver's license.  That's  10:07:40AM
18    where I live.  That's where I'm registered to
19    vote.  That's my legal address.
20    Q    Do you pay taxes out of there?      10:07:45AM
21    A    No.           10:07:47AM
22       MR. NOVIKOFF:  Objection.  Vague.   10:07:48AM
23    BY MR. GOODSTADT:          10:07:49AM
24    Q    What address do you pay taxes from?  10:07:51AM
25       MR. NOVIKOFF:  Objection.      10:07:54AM

GEORGE HESSE

1
2    A    I don't.          10:07:54AM
3    Q    You don't pay taxes?          10:07:54AM
4    A    Of course I pay taxes.         10:07:57AM
5       MR. CONNOLLY:  Andrew, what do you -- 10:08:00AM
6    BY MR. GOODSTADT:          10:08:02AM
7    Q    What address do you list on your tax  10:08:02AM
8    returns?
9       MR. NOVIKOFF:  Oh, okay.       10:08:05AM
10    A    In Ocean Beach.          10:08:07AM
11    Q    And who lives at the 191 The Helm    10:08:13AM
12    address?
13    A    My wife, my two children, my father  10:08:16AM
14    and his girlfriend.
15    Q    What's your wife's name?        10:08:25AM
16    A    Shannon.          10:08:26AM
17    Q    What are your children's ages?      10:08:28AM
18    A    My daughter Lauren is 12.  Megan is  10:08:30AM
19    eight.
20    Q    And your father's name is?      10:08:37AM
21    A    Dan.          10:08:39AM
22    Q    Same last name?          10:08:40AM
23    A    Yes.          10:08:42AM
24    Q    And his girlfriend's name?      10:08:42AM
25    A    Denise.          10:08:44AM

GEORGE HESSE

1
2    Q    Who owns that address?         10:08:48AM
3    A    My father.          10:08:50AM
4    Q    And what's Denise's last name?     10:09:01AM
5    A    Czarneki, C-Z-A-R-N-E-K-I.  Close   10:09:04AM
6    enough.
7    Q    How long has she lived there?      10:09:10AM
8    A    14 years.          10:09:12AM
9    Q    Did you use the Ocean Beach address  10:09:20AM
10    prior to three seasons ago when you started
11    staying overnight there?
12    A    Yes.          10:09:27AM
13       MR. NOVIKOFF:  Can we just have for   10:09:28AM
14    the record what season are you referring to,
15    2006, 2007, 2005?
16    BY MR. GOODSTADT:          10:09:36AM
17    Q    Well, what season did you start     10:09:36AM
18    staying there?
19    A    2006, I started staying there on a   10:09:40AM
20    regular basis on the weekends.
21       MR. NOVIKOFF:  Do you want to define 10:09:46AM
22    the season, Andrew?  It's been defined
23    before by other witnesses.
24    BY MR. GOODSTADT:          10:09:50AM
25    Q    When you use the word "season," why  10:09:51AM

GEORGE HESSE

1
2    don't you tell us what you mean so we're both of
3    the same page.
4    A    The summer season of 2006 would start, 10:09:55AM
5    say, May and end in September.
6    Q    Is that somewhere before Memorial Day  10:10:05AM
7    to somewhere just after Labor Day?
8    A    Yeah.  Two weeks before Memorial Day  10:10:10AM
9    to two weeks after Labor Day is an official
10    season, but I usually started staying around
11    Memorial Day right to Labor Day.
12    Q    And prior to 2006, were you using that 10:10:19AM
13    Ocean Beach address as your official address?
14    A    Yes.          10:10:24AM
15    Q    How come?          10:10:24AM
16    A    Well, I actually did live there back  10:10:26AM
17    in 2005 for about a year and a half, but not
18    directly at that address of 315 Bay Walk.
19    Q    What address did you live in?      10:10:38AM
20    A    The physical address was 146 Bungalow 10:10:40AM
21    Walk, and that's in Ocean Beach.
22    Q    Was that --          10:10:48AM
23    A    It's a house.          10:10:49AM
24    Q    Who owns that house?          10:10:50AM
25    A    Right now, someone named Joe     10:10:53AM

3 (Pages 9 to 12)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 13

GEORGE HESSE

1  Housworth.
2  Q   Who owned it when you lived there in   10:10:56AM
3  '05?
4  A   Oh, God.  Last name was Reusch.  I   10:11:00AM
5  think it was R-E-U-S-C-H.
6  Q   Did you rent it from Reusch?   10:11:08AM
7  A   Yes.   10:11:10AM
8  Q   Did you pay for that or did the beach   10:11:10AM
9  pay for it?
10  A   I paid for it.   10:11:14AM
11  Q   Who did you live with in '05 for a   10:11:14AM
12  year and a half there?
13  A   I lived with my wife; and then for a   10:11:18AM
14  short time, when my daughter was born, she lived
15  there with us.
16  Q   And prior to '05, had you ever used   10:11:27AM
17  the Ocean Beach address as your address or any
18  Ocean Beach address as your address?
19  MR. NOVIKOFF: Objection to form.   10:11:37AM
20  A   I don't know -- I'm thinking in 2004,   10:11:38AM
21  I may have established the address of 315 Bay
22  Walk.
23  Q   How about prior to 2004, did you ever   10:11:53AM
24  use an Ocean Beach address as your address?

Page 14

GEORGE HESSE

1  MR. NOVIKOFF: Objection to form.   10:11:57AM
2  A   No.   10:11:58AM
3  Q   So prior to 2004, you never lived at   10:12:02AM
4  Ocean Beach?
5  MR. NOVIKOFF: Same objection.   10:12:06AM
6  A   In -- I'm sorry, did I say 2004?  I   10:12:07AM
7  meant '94, 1994.  My first summer in Ocean Beach
8  was in '93, and I actually lived in the barracks
9  five days a week for my first season in Ocean
10  Beach.
11  Q   Were you a full-time officer or   10:12:30AM
12  part-time officer?
13  A   I was part-time or seasonal at that   10:12:32AM
14  time.
15  Q   And you lived in the barracks five   10:12:37AM
16  days a week?
17  A   Five days a week, correct.   10:12:39AM
18  Q   Did you pay any rent?   10:12:40AM
19  A   No.   10:12:42AM
20  Q   So why did you live there?   10:12:44AM
21  MR. NOVIKOFF: I'm going to object.   10:12:48AM
22  BY MR. GOODSTADT:   10:12:49AM
23  Q   Why did you live at Ocean Beach during   10:12:49AM
24  five days a week?

Page 15

GEORGE HESSE

1  A   I don't know.  I was 23 years old and   10:12:53AM
2  I just took this job in Ocean Beach, and they
3  offered us -- not just me, but several police
4  officers the opportunity to stay there.  I was
5  working late-night shifts; and to get a good
6  night's sleep, instead of going all the way home
7  and back, I stayed in the barracks.
8  Q   So just start.  So '94, you   10:13:12AM
9  established that as an official address?
10  A   That's correct, yes.   10:13:16AM
11  Q   What was the next official address   10:13:17AM
12  that you used after '94?
13  MR. NOVIKOFF: Objection to form.   10:13:21AM
14  A   I guess when I moved to 191 The Helm.   10:13:24AM
15  Q   When was that?   10:13:27AM
16  A   You gotta figure -- let's see.  I   10:13:30AM
17  think it was at the end of '97.
18  Q   And how long did you live at 191 The   10:13:45AM
19  Helm?
20  A   From '97 to present.   10:13:48AM
21  Q   Did you ever use 191 The Helm as your   10:13:53AM
22  official address?
23  MR. NOVIKOFF: Objection.   10:13:58AM
24  A   No.   10:13:58AM

Page 16

GEORGE HESSE

1  Q   So it was always Ocean Beach?   10:13:58AM
2  A   Correct.   10:14:01AM
3  Q   So how about from '97 until 2005, did   10:14:02AM
4  you live in Ocean Beach at any time during that
5  period at all?
6  MR. NOVIKOFF: Objection to form.   10:14:08AM
7  A   I would stay in Ocean Beach on   10:14:09AM
8  occasion.
9  Q   What do you mean by on occasion?   10:14:12AM
10  A   Well, back in the day, between -- I   10:14:13AM
11  got hired full-time in '95.  So '95 through
12  maybe 2000, we worked some really whacked-out
13  tours, in the winter especially.  We did two
14  days on with four days off, and I would stay
15  there my entire 48 hours.  And we were allowed
16  to sleep, eat and stay in our apartments, the
17  barracks, during my tour after my patrol
18  function was done.
19  Q   So how many days a week were you   10:14:49AM
20  living there between '97, when you moved out,
21  and 2005, when you said you lived there for a
22  year and a half?
23  A   You gotta figure it was 48-hour   10:14:57AM
24  shifts.  It was two days straight, four days

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 17

GEORGE HESSE

1
2   off. Sometimes I would stay an extra day;
3   sometimes I would go to 191 The Helm.
4       Q   And why were you using the Ocean Beach 10:15:11AM
5   address as your official address during that
6   period even though you were only staying there
7   two days a week?
8       MR. NOVIKOFF: Objection to form.   10:15:19AM
9       MR. CONNOLLY: Which period, again,   10:15:21AM
10   are we speaking of?
11       MR. GOODSTADT: That period between   10:15:25AM
12   '97, when he moved to 191 The Helm, and
13   2005, when he moved to 146 Bungalow Walk.
14       A   Will you repeat the question, please. 10:15:34AM
15       Q   Why did you use the Ocean Beach       10:15:36AM
16   address as your official address during that
17   period, when you were only staying there two
18   days a week?
19       MR. NOVIKOFF: Objection to form.   10:15:44AM
20       A   I always kept it because I always   10:15:45AM
21   thought I would officially move to Ocean Beach
22   on a permanent basis.
23       Q   So it was in anticipation of moving to 10:15:51AM
24   Ocean Beach?
25       A   Correct.       10:15:54AM

Page 18

GEORGE HESSE

1
2       Q   But you didn't actually live there on 10:15:54AM
3   a permanent basis, correct?
4       A   For almost two years, I did.   10:15:59AM
5       Q   But not during the period between '97 10:16:01AM
6   and '04, correct?
7       A   No.       10:16:05AM
8       Q   Was there a residency requirement to 10:16:05AM
9   be a full-time officer in Ocean Beach?
10       A   Yes.       10:16:09AM
11       Q   Is that why you use Ocean Beach as the 10:16:10AM
12   address?
13       A   At the time when I got hired, yes.   10:16:11AM
14       Q   And when did you become a full-time   10:16:14AM
15   officer?
16       A   '95. I believe it was November of   10:16:17AM
17   '95.
18       Q   So the period between '97 and '05 that 10:16:22AM
19   you didn't live there, you used the Ocean Beach
20   address because of the residency requirement?
21       A   No.       10:16:31AM
22       Q   You used it because you anticipated   10:16:32AM
23   that you'd eventually live there?
24       A   Correct.       10:16:35AM
25       Q   Even though you weren't at the time,   10:16:36AM

Page 19

GEORGE HESSE

1
2   for all those years?
3       A   Yes.       10:16:40AM
4       Q   I just want to go over some ground   10:16:48AM
5   rules before we get started.
6       MR. NOVIKOFF: I thought we just got   10:16:52AM
7   started.
8       MR. CONNOLLY: Continue.       10:16:56AM
9       MR. GOODSTADT: Was that an objection 10:16:57AM
10   or just an obnoxious comment?
11       MR. NOVIKOFF: It was a comment. You 10:17:01AM
12   said you were going to go over the ground
13   rules before we got started, but we've just
14   now spent 15 minutes on a residency issue.
15       MR. GOODSTADT: Now we're wasting time 10:17:08AM
16   on your inappropriate comments.
17       MR. NOVIKOFF: If you'd like to       10:17:12AM
18   continue the conversation, I'd be happy to.
19   BY MR. GOODSTADT:       10:17:16AM
20       Q   Do you understand that you're       10:17:16AM
21   testifying under oath today?
22       A   Yes.       10:17:19AM
23       Q   And that you're legally obligated to 10:17:19AM
24   tell the truth?
25       A   Yes.       10:17:22AM

Page 20

GEORGE HESSE

1
2       Q   And failure to do so is potentially   10:17:22AM
3   punishable as a criminal sanction?
4       A   Yes.       10:17:24AM
5       Q   Have you ever testified under oath   10:17:25AM
6   before --
7       A   Yes.       10:17:27AM
8       Q   Let me finish the question.       10:17:29AM
9       Have you ever testified under oath       10:17:30AM
10   before outside of your capacity as an arresting
11   officer?
12       A   No.       10:17:38AM
13       Q   So you never testified in a civil   10:17:39AM
14   action?
15       A   Yes.       10:17:42AM
16       Q   So since this is the first time you're 10:17:47AM
17   testifying under oath in a civil action, I just
18   want to make sure that --
19       MR. NOVIKOFF: Objection. He       10:17:54AM
20   testified, I believe, that he testified in a
21   civil action.
22       MR. GOODSTADT: I said he's never   10:18:00AM
23   testified in a civil action, and he said
24   yes.
25

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 21

GEORGE HESSE

1          GEORGE HESSE
2   BY MR. GOODSTADT:                    10:18:05AM
3      Q   Have you ever testified in a civil    10:18:06AM
4   action?
5      A   Yes.                          10:18:07AM
6      Q   How many times?              10:18:08AM
7      A   Four, maybe five.            10:18:17AM
8      Q   So why don't we start from today, not  10:18:22AM
9   including today, going in reverse chronological
10  order.  When was the most recent time you
11  testified under oath in a civil action?
12     A   The last time may have been around    10:18:38AM
13  1999.
14     Q   And were you a party to that civil    10:18:44AM
15  action?
16     A   You know, I don't remember if I was   10:18:49AM
17  particularly sued, but there was a police
18  officer within the department that was sued.
19     Q   And what was that matter -- strike    10:18:56AM
20  that.
21         Who was the plaintiff in that matter?  10:19:01AM
22     A   Christopher Cuneen, C-U-N-E-E-N.      10:19:03AM
23     Q   And who were the defendants?         10:19:10AM
24     A   I don't remember if I was a named    10:19:12AM
25  defendant, but Sergeant Bob Golopi and of course

Page 22

GEORGE HESSE

1          GEORGE HESSE
2   the Ocean Beach Police Department and the
3   Village of Ocean Beach.
4      Q   And what was Mr. Cuneen alleging in   10:19:21AM
5   his lawsuit?
6      A   That he was brutally beaten up, false  10:19:27AM
7   arrest, violation of civil rights.
8      Q   Who did he allege beat him up?       10:19:35AM
9      A   He may have alleged myself and       10:19:39AM
10  Sergeant Golopi.
11     Q   And you testified under oath in a    10:19:53AM
12  deposition or in some other form?
13     A   In a deposition.               10:19:57AM
14     Q   Who represented you in that matter?  10:19:59AM
15     A   I don't recall.              10:20:01AM
16     Q   Did you testify at a trial in that   10:20:04AM
17  matter?
18     A   No.                          10:20:06AM
19     Q   Did that matter get to a trial?      10:20:07AM
20     A   No.                          10:20:09AM
21     Q   Do you know how that case was        10:20:09AM
22  resolved?
23     A   I believe there was a settlement.    10:20:11AM
24     Q   Do you know what the settlement was   10:20:14AM
25  for?

Page 23

GEORGE HESSE

1          GEORGE HESSE
2      MR. NOVIKOFF:  Objection only to the  10:20:16AM
3   extent if you are aware if there was a
4   confidentiality agreement.  If you have no
5   knowledge one way or of the other, then
6   answer the question.
7      MR. GOODSTADT:  Don't you know a      10:20:26AM
8   confidentiality agreement doesn't trump his
9   obligation to testify under oath?
10     MR. NOVIKOFF:  I don't know what the  10:20:30AM
11  confidentiality agreement says.  I'm not
12  going to take your representation of what
13  the law is.
14     MR. GOODSTADT:  Well, that is the law.  10:20:37AM
15     MR. NOVIKOFF:  I'm asking the witness,  10:20:39AM
16  since I represent the village, that if he's
17  aware of whether or not there's a
18  confidentiality agreement, he should say so.
19  If he's not, he can answer the question.
20     MR. CONNOLLY:  You can answer the     10:20:48AM
21  question.
22     A   I'm not aware.                10:20:50AM
23     Q   You're not aware of what it settled  10:20:51AM
24  for?
25     A   I'm not aware, no.           10:20:54AM

Page 24

GEORGE HESSE

1          GEORGE HESSE
2      MR. GOODSTADT:  Ken, if you could just  10:21:28AM
3   put your microphone back on so all this
4   stuff is on the record.
5      MR. NOVIKOFF:  I think it is on the   10:21:31AM
6   record.  The stenographer and I believe the
7   videographer nodded with approval when I
8   took the mic off, indicating, at least to
9   me, that he could hear me.
10     MR. GOODSTADT:  Is it picking up?     10:21:41AM
11  Yeah, because I think we had one deposition
12  where it didn't.
13  BY MR. GOODSTADT:                     10:21:47AM
14     Q   Now, prior to the 1999 case with    10:21:47AM
15  Mr. Cuneen, when was the time before that that
16  you testified under oath in a civil matter?
17     A   I believe the one prior to that --   10:21:56AM
18  actually, you know what, I'm mistaken.  There
19  might have been one just prior to that -- before
20  that one, working our way back.  Bruce Mancada.
21     Q   Do you know how to spell Mancada?    10:22:11AM
22     A   It's M-A-N-C-A-D-A.           10:22:14AM
23     Q   And Mr. Mancada was a plaintiff in the  10:22:22AM
24  matter that you testified in?
25     A   Yes.                         10:22:25AM

6 (Pages 21 to 24)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 25

GEORGE HESSE

1
2    Q   Were you a defendant in that case?    10:22:26AM
3    A   Yes.                10:22:27AM
4    Q   Where was that case filed, do you    10:22:27AM
5  know?
6    A   I believe in Suffolk County.    10:22:29AM
7    Q   Where was the Cuneen case filed, do    10:22:34AM
8  you know?
9    A   Also, I believe, Suffolk County.    10:22:37AM
10    Q   And who were the defendants in    10:22:43AM
11  Mr. Mancada's case?
12    A   That would be me and a Billy Powell.  10:22:46AM
13    Q   And what were the allegations that    10:22:54AM
14  Mr. Mancada made against you and Mr. Powell?
15    A   Excessive force, violation of civil  10:22:59AM
16  rights.
17        MR. NOVIKOFF: I'm sorry, Andrew. Did 10:23:10AM
18  we establish this was before or after the
19  first case that he talked about?
20        MR. GOODSTADT: He believed it was    10:23:16AM
21  closer to today --
22        MR. NOVIKOFF: Okay. Got it.    10:23:19AM
23        MR. GOODSTADT: -- than the Cuneen    10:23:20AM
24  matter.
25        MR. CONNOLLY: At or about 1999.    10:23:23AM

Page 26

GEORGE HESSE

1
2        THE WITNESS: I believe it was 2000,  10:23:26AM
3  2001. I'm not really sure.
4  BY MR. GOODSTADT:            10:23:29AM
5    Q   And you testified under oath in a    10:23:30AM
6  deposition or was it some other form in that
7  matter?
8    A   A deposition.            10:23:35AM
9    Q   Did you testify at trial in that    10:23:35AM
10  matter?
11    A   No.            10:23:37AM
12    Q   Was there a trial in that matter?    10:23:37AM
13    A   No.            10:23:39AM
14    Q   Do you know how that case was    10:23:39AM
15  resolved?
16    A   No.            10:23:41AM
17    Q   You don't know if there was a    10:23:42AM
18  settlement?
19    A   No.            10:23:44AM
20    Q   Who represented you in that matter?  10:23:45AM
21    A   I don't recall.            10:23:47AM
22    Q   In connection with the Cuneen matter, 10:23:52AM
23  were there any criminal charges brought against
24  you?
25    A   No.            10:23:57AM

Page 27

GEORGE HESSE

1
2    Q   Were there any criminal charges    10:23:57AM
3  brought against Mr. Cuneen?
4    A   Yes.                10:24:01AM
5    Q   What were the charges brought against 10:24:02AM
6  Mr. Cuneen?
7    A   I wouldn't say criminal -- it was --  10:24:05AM
8  actually, there were two incidents with
9  Mr. Cuneen. One dealt with me, where he was
10  trespassing on private property, and he was
11  arrested for that. And then later he was
12  rearrested for harassment, maybe. I don't know
13  the particulars of the charges, but he was
14  rearrested later, when I wasn't present.
15    Q   Do you know whether he was convicted  10:24:35AM
16  on any of those arrests?
17    A   I don't know.            10:24:43AM
18    Q   And who arrested him for trespassing? 10:24:44AM
19    A   I was the arresting officer.    10:24:46AM
20    Q   And who was the arresting officer for 10:24:48AM
21  the harassment or other crime?
22    A   Bob Golopi, Sergeant Bob Golopi.    10:24:54AM
23    Q   And Bob Golopi was one of the    10:24:59AM
24  defendants in that matter?
25    A   Yes.                10:25:05AM

Page 28

GEORGE HESSE

1
2    Q   And he was alleged to have physically 10:25:05AM
3  beaten Mr. Cuneen?
4    A   He was alleged, yes.        10:25:09AM
5    Q   And now the Mancada matter. Were    10:25:11AM
6  there any criminal charges brought against you?
7    A   No.            10:25:17AM
8    Q   Were there any criminal charges    10:25:17AM
9  brought against Mr. Mancada?
10    A   Yes.                10:25:21AM
11    Q   What were the charges brought against 10:25:22AM
12  Mr. Mancada?
13    A   They were disorderly conduct and    10:25:25AM
14  resisting arrest.
15    Q   After being arrested -- after being  10:25:37AM
16  arrested for that, was he actually charged with
17  those --
18    A   Yes.                10:25:42AM
19    Q   -- with two allegations?        10:25:43AM
20        Was there a trial?        10:25:45AM
21    A   No.            10:25:46AM
22    Q   Did he plead?            10:25:48AM
23    A   I don't know.            10:25:49AM
24    Q   Who was the arresting officer of    10:25:50AM
25  Mr. Mancada?

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A   I was.                          10:25:53AM
3    Q   What did Mr. Mancada allege you to    10:25:58AM
4  have done?
5    A   I believe just an excessive use of    10:26:04AM
6  force and violated his civil rights.  I don't
7  really recall the whole complaint.
8    Q   Do you recall anything that he alleged 10:26:12AM
9  that you had done to him that he believed was
10  excessive force?
11    A   No.                          10:26:16AM
12    Q   So you don't know if he was convicted 10:26:22AM
13  for anything --
14    A   I don't recall.               10:26:25AM
15    Q   -- in connection with that matter?    10:26:25AM
16       How about -- and I think you testified 10:26:29AM
17  that -- did you testify that Golopi was a
18  sergeant at the time?
19    A   Yes, I did.                   10:26:38AM
20       MR. NOVIKOFF:  Objection.  Asked and 10:26:40AM
21  answered.
22    A   Yes.                         10:26:41AM
23    Q   He was?  You reported to him at that 10:26:41AM
24  time?
25    A   I reported to him?  Yes.     10:26:46AM

GEORGE HESSE

1
2    Q   Then how about the time before the   10:26:51AM
3  Cuneen testimony, when did that happen?
4       MR. NOVIKOFF:  Objection to form.    10:26:57AM
5  BY MR. GOODSTADT:                    10:26:58AM
6    Q   The time prior to the Cuneen matter, 10:26:58AM
7  when was the closest in time to that that you
8  testified under oath in a civil matter?
9       MR. NOVIKOFF:  Objection to form.    10:27:08AM
10       MR. CONNOLLY:  You can answer.     10:27:08AM
11    A   I really don't understand the      10:27:10AM
12  question.
13    Q   Right.  We're going in reverse      10:27:12AM
14  chronological on your civil testimony, correct?
15    A   Right.                        10:27:15AM
16    Q   So you have Mancada is the most     10:27:16AM
17  recent, other than for today.
18    A   Okay.                        10:27:20AM
19    Q   Then Cuneen?                  10:27:21AM
20    A   Correct.                      10:27:22AM
21    Q   Okay.  And now going in reverse     10:27:22AM
22  chronological order, when was the time before
23  that that you testified in a civil matter?
24    A   I believe -- I don't know the exact 10:27:28AM
25  date.  It could be in or around 95, '96.

GEORGE HESSE

1
2    Q   And who was the plaintiff in that    10:27:41AM
3  matter?
4    A   Kenneth Ryan.                 10:27:43AM
5    Q   Were you a defendant in that matter? 10:27:48AM
6    A   Yes.                         10:27:50AM
7    Q   Who were the other defendants?      10:27:51AM
8    A   I might have been the only one.  I'm 10:27:52AM
9  not sure.  I don't recall.
10    Q   What was the allegation that Mr. Ryan 10:27:57AM
11  made against you in that matter?
12    A   Excessive force, violation of civil 10:28:01AM
13  rights.
14    Q   Just so we're clear, the Cuneen     10:28:08AM
15  matter, Golopi was a defendant.  Was the beach
16  also a defendant in that matter?
17    A   Yes.                         10:28:18AM
18    Q   And the same thing with Mancada     10:28:19AM
19  matter.  It was you, Powell.  The beach also was
20  a defendant?
21    A   Correct.                      10:28:24AM
22    Q   Were any other individuals that were 10:28:24AM
23  defendants in that matter?
24    A   In which one?                 10:28:27AM
25    Q   Mancada.                      10:28:28AM

GEORGE HESSE

1
2    A   Not that I recall.            10:28:29AM
3    Q   How about in Cuneen?          10:28:30AM
4    A   Not that I recall.            10:28:32AM
5    Q   And Ryan, was the beach a defendant? 10:28:33AM
6    A   Yes.                         10:28:40AM
7    Q   Who represented you in the Ryan     10:28:40AM
8  matter?
9    A   I don't recall.               10:28:43AM
10    Q   When you testified, was it at a      10:28:43AM
11  deposition or some other forum?
12    A   Deposition.                   10:28:49AM
13    Q   And what were the allegations that   10:28:51AM
14  Mr. Ryan made that led him to claim that you
15  used excessive force and violated his civil
16  rights?
17    A   Repeat that.                  10:29:00AM
18    Q   Yes.                         10:29:01AM
19       What -- what conduct did Mr. Ryan    10:29:02AM
20  allege that you engaged in that amounted to
21  excessive force and a violation of his civil
22  rights?
23       MR. NOVIKOFF:  Alleged in the      10:29:12AM
24  complaint?
25       MR. GOODSTADT:  Correct.         10:29:14AM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    I think he alleged that I hit him in   10:29:14AM
3    the face with a baton and that I falsely
4    arrested him.
5        Q    Did that matter go to trial?        10:29:25AM
6    A    No.                    10:29:27AM
7        Q    Do you know how that matter was      10:29:28AM
8    disposed of or resolved?
9    A    No.                    10:29:31AM
10       Q    You don't know if there was a        10:29:32AM
11   settlement in that matter?
12   A    I don't know.
13       Q    Were any criminal charges brought    10:29:48AM
14   against you in connection with the Ryan matter?
15   A    No.                    10:29:54AM
16       Q    Were there any criminal -- well,     10:29:54AM
17   strike that.
18           Was he arrested at all in connection  10:29:54AM
19   with that matter?
20   A    Yes.                   10:29:57AM
21       Q    What was he arrested for?            10:29:57AM
22   A    Disorderly conduct and resisting     10:29:59AM
23   arrest.
24       Q    And who was the arresting officer in  10:30:05AM
25   that matter?

GEORGE HESSE

1
2    A    I was.                 10:30:08AM
3        Q    Was he actually charged with those   10:30:09AM
4    crimes after being arrested?
5    A    Yes.                   10:30:13AM
6        Q    Was there a trial?                   10:30:14AM
7    A    No.                    10:30:18AM
8        Q    Did he take a plea?                  10:30:19AM
9    A    Yes.                   10:30:21AM
10       Q    Do you know what he pled to?         10:30:21AM
11   A    He may have pled to the disorderly   10:30:24AM
12   conduct, and he allocuted.
13       Q    And how about the time before Kenneth  10:30:35AM
14   Ryan in which you testified in a civil matter,
15   when was that?
16   A    The next one.          10:30:44AM
17       Q    In reverse chronological order, the  10:30:46AM
18   time that you testified in a civil matter prior
19   to the Ryan matter.
20   A    It may have been '93 or '94.         10:30:52AM
21       Q    And who was the plaintiff in that    10:30:54AM
22   matter?
23   A    Michael Bloomberg.     10:30:56AM
24       MR. NOVIKOFF:  The mayor?               10:30:58AM
25       THE WITNESS:  No.       10:31:01AM

GEORGE HESSE

1
2    BY MR. GOODSTADT:                        10:31:02AM
3        Q    Were you a defendant?                10:31:02AM
4    A    Say that again.        10:31:04AM
5        Q    Were you a defendant?                10:31:04AM
6    A    Yes.                   10:31:06AM
7        Q    Who were the other defendants?       10:31:06AM
8    A    I would believe just the Village of  10:31:09AM
9    Ocean Beach.  I don't know if there were any
10   others.
11       Q    And what did Mr. Bloomberg allege in  10:31:16AM
12   his complaint?
13   A    Excessive use of force and violating  10:31:19AM
14   his civil rights.
15       Q    And what did -- what conduct did he  10:31:32AM
16   allege that you engaged in that amounted to
17   excessive force and a violation of his civil
18   rights?
19   A    What amount of conduct did I do?     10:31:41AM
20       Q    Well, what conduct did he allege that  10:31:44AM
21   you did that amounted to excessive force and a
22   violation of his civil rights?
23       MR. NOVIKOFF:  In the complaint?       10:31:51AM
24       MR. GOODSTADT:  What was he alleging   10:31:52AM
25   in the complaint.

GEORGE HESSE

1
2    A    I don't really recall exactly.       10:31:56AM
3        Q    Was there a trial in that matter?    10:31:59AM
4    A    No.                    10:32:01AM
5        Q    Do you know how that matter was      10:32:01AM
6    resolved or disposed of?
7    A    No.                    10:32:05AM
8        Q    You don't know if there was a        10:32:05AM
9    settlement?
10   A    No.                    10:32:08AM
11       Q    Who represented you in connection with  10:32:10AM
12   that matter?
13   A    I don't recall.        10:32:12AM
14       Q    Do you know where that matter was    10:32:12AM
15   filed?
16   A    Maybe Suffolk County.  10:32:14AM
17       Q    How about the Ryan matter, do you know  10:32:16AM
18   where that was filed?
19   A    Maybe Suffolk County also.           10:32:19AM
20       Q    Were there any times that you        10:32:23AM
21   testified in a civil matter other than for today
22   and the four that you just testified to?
23   A    Not that I recall.     10:32:30AM
24       Q    Well, we're doing a good job so far,  10:32:36AM
25   but it's important that you give verbal answers

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    so we can get a written record as well as a
3    videotaped transmission of this deposition; is
4    that okay?
5        A    I understand.            10:32:48AM
6        Q    If I ask a question that you don't    10:32:49AM
7    understand or you don't hear, just ask me to
8    repeat it or rephrase it, okay?
9        A    Okay.                    10:32:58AM
10       Q    If I use a term that you don't        10:32:58AM
11   understand or you don't hear, again, just ask me
12   to repeat it or rephrase it, okay?
13       A    Okay.                    10:33:05AM
14       Q    Because if you do answer a question,  10:33:07AM
15   I'm going to assume that you both understood it
16   and that you heard it.
17       A    Okay.                    10:33:12AM
18       MR. NOVIKOFF: Note my objection.        10:33:13AM
19   BY MR. GOODSTADT:                    10:33:14AM
20       Q    It's important that you let me finish 10:33:14AM
21   my question, just as it's important that I let
22   you finish your answer.  It's just again so we
23   have a clean record; is that okay?
24       A    Yes.                    10:33:19AM
25       Q    If there's any point in time that you 10:33:20AM

GEORGE HESSE

1
2    feel that you need to take a break or you want
3    to take a recess, just let me know.  I'll be
4    happy to accommodate that, okay?
5        A    Yes.                    10:33:28AM
6        Q    Are you presently taking any         10:33:28AM
7    medications?
8        A    No.                     10:33:32AM
9        Q    Is there anything that can think of   10:33:32AM
10   that would prevent you from testifying fully and
11   truthfully today?
12       A    No.                     10:33:38AM
13       Q    Are you sick at all today?          10:33:39AM
14       A    No.                     10:33:40AM
15       Q    Are you represented by an attorney in 10:33:44AM
16   connection with this matter?
17       A    Yes.                    10:33:48AM
18       Q    Who is that?                10:33:48AM
19       A    Kevin Connolly.             10:33:49AM
20       Q    And he's sitting right next to you,   10:33:50AM
21   correct?
22       A    Correct.                 10:33:53AM
23       Q    When did you first learn that the     10:33:53AM
24   plaintiffs were making allegations against Ocean
25   Beach and you in connection with this matter?

GEORGE HESSE

1
2        MR. NOVIKOFF: Objection.         10:34:01AM
3        Just allegations in the complaint or   10:34:02AM
4    just allegations at all?
5        MR. GOODSTADT: Allegations generally. 10:34:06AM
6        MR. NOVIKOFF: Okay. Objection to     10:34:09AM
7    form.
8        MR. CONNOLLY: Allegations that would 10:34:11AM
9    have been ultimately contained in the
10   complaint.
11       MR. NOVIKOFF: Yeah, I don't          10:34:15AM
12   understand the question.
13   BY MR. GOODSTADT:                    10:34:17AM
14       Q    Do you understand what I mean by      10:34:18AM
15   allegations?
16       A    Just repeat the question, please.     10:34:=
19AM
17       Q    When did you first learn that the     10:34:21AM
18   plaintiffs in this case were making allegations
19   against the beach and you?
20       MR. NOVIKOFF: Objection. Form.        10:34:27AM
21       A    I don't recall the date.          10:34:29AM
22       Q    Do you recall how you learned of it?  10:34:30AM
23       A    I believe I received a notice of claim 10:34:34AM
24   at some point.  I don't remember the date.
25       Q    How did you receive that notice of    10:34:41AM

GEORGE HESSE

1
2    claim?
3        A    I don't recall.            10:34:46AM
4        Q    You don't recall whether it was      10:34:48AM
5    delivered by mail, by hand, overnight, E-mail,
6    fax?
7        A    I don't recall.            10:34:54AM
8        Q    Do you recall where you were when you 10:34:55AM
9    received it?
10       A    I don't recall.            10:34:58AM
11       Q    Who did you speak with about the      10:35:03AM
12   notice of claim when you received it?
13       MR. NOVIKOFF: Objection.         10:35:08AM
14       A    I believe the first person I had      10:35:09AM
15   spoken to was Maryann Minerva.
16       Q    Who's she?                10:35:17AM
17       A    She's the village administrator.      10:35:18AM
18       Q    Did you reach out to her or did she   10:35:26AM
19   reach out to you in connection with that
20   discussion?
21       A    I don't know.             10:35:31AM
22       MR. NOVIKOFF: Objection. Form.        10:35:33AM
23       A    I don't recall.            10:35:34AM
24       Q    Was it on the phone or in person or   10:35:34AM
25   some other means?

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 41

GEORGE HESSE

2  MR. NOVIKOFF: Objection. Form.   10:35:37AM
3  A  I don't recall.   10:35:38AM
4  Q  What did you discuss with her?   10:35:41AM
5  A  We may have read the complaint   10:35:47AM
6  together and may have made some opinions about
7  it.
8  MR. CONNOLLY: Are we speaking of the   10:35:56AM
9  complaint or the notice of claim?
10  THE WITNESS: Notice of claim.   10:36:00AM
11  BY MR. GOODSTADT:   10:36:01AM
12  Q  And tell me the substance of the   10:36:01AM
13  conversation.
14  A  I really don't recall the substance.   10:36:04AM
15  Q  What opinions did you guys reach at   10:36:06AM
16  that time?
17  MR. NOVIKOFF: Objection. Form.   10:36:10AM
18  A  I was upset.   10:36:13AM
19  Q  How come?   10:36:16AM
20  A  Because I thought it was baseless.   10:36:18AM
21  Q  Did you discuss that with Ms. Minerva   10:36:22AM
22  at the time?
23  A  Yes.   10:36:25AM
24  Q  What did you tell her about your   10:36:25AM
25  belief that it was baseless?

Page 42

GEORGE HESSE

2  A  I figured that the entire complaint   10:36:30AM
3  was out of line and it was just based on lies.
4  Q  Did you tell her why you thought it   10:36:39AM
5  was based on lies?
6  A  I don't recall.   10:36:42AM
7  Q  What did she say to you in that   10:36:44AM
8  conversation?
9  MR. NOVIKOFF: Objection.   10:36:47AM
10  A  She agreed with me.   10:36:47AM
11  Q  Do you recall anything else that she   10:36:52AM
12  said other than for saying I agree with you?
13  A  No.   10:36:55AM
14  Q  Do you recall anything else that was   10:36:56AM
15  stated during that conversation other than what
16  you've testified to?
17  A  I don't recall at this time.   10:37:01AM
18  Q  Is there anything that you can think   10:37:02AM
19  of that would refresh your recollection?
20  A  No.   10:37:06AM
21  Q  Did you take any notes of the   10:37:07AM
22  conversation?
23  A  No.   10:37:08AM
24  Q  Was anyone else there?   10:37:08AM
25  A  No.   10:37:10AM

Page 43

GEORGE HESSE

2  Q  How long did the conversation last?   10:37:10AM
3  A  I don't recall.   10:37:12AM
4  Q  Did you speak to -- well, strike that.   10:37:16AM
5  Who else did you speak with about the   10:37:19AM
6  notice of claim?
7  MR. NOVIKOFF: Objection. Form.   10:37:23AM
8  A  I'm sure at some point I spoke to   10:37:25AM
9  Joseph Loeffler.
10  Q  Do you actually recall speaking with   10:37:33AM
11  him?
12  A  Not particularly, no.   10:37:36AM
13  Q  So you don't know whether you actually   10:37:38AM
14  spoke with him?
15  A  I don't recall.   10:37:43AM
16  Q  Can you think of anything that would   10:37:45AM
17  refresh your recollection?
18  A  No.   10:37:47AM
19  Q  What led you to believe that you   10:37:47AM
20  likely spoke with him?
21  A  Well, at the time, he was a trustee.   10:37:52AM
22  And I don't remember how we got into contact
23  with each other, but I'm sure at some point we
24  did speak about it.
25  Q  Did you speak with any other trustees   10:38:07AM

Page 44

GEORGE HESSE

2  other than for Mr. Loeffler about the notice of
3  claim?
4  A  No trustees, no.   10:38:11AM
5  Q  Why would you speak to Loeffler as   10:38:13AM
6  opposed to the other trustees?
7  A  I believe at that point, when he was a   10:38:20AM
8  trustee and Mayor Loeffler was -- Mayor Rogers
9  was in office, I don't want to say that he was a
10  liaison, but I think he understood the police
11  department's operation better than he would, so
12  I think he would just kind of interpret things
13  for her.
14  Q  Did he have a title of police liaison   10:38:41AM
15  at the time?
16  A  No.   10:38:45AM
17  Q  Does that title exist?   10:38:45AM
18  A  Not that I'm aware of, no.   10:38:47AM
19  Q  You don't recall any of the substance   10:38:54AM
20  of that conversation?
21  A  I don't recall, no.   10:38:57AM
22  Q  Did you speak with Mayor Rogers about   10:38:58AM
23  the notice of claim?
24  A  Yes.   10:39:01AM
25  Q  And when was that?   10:39:01AM

11 (Pages 41 to 44)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 45

GEORGE HESSE

1
2     A   Repeat that.                         10:39:03AM
3     Q   When was that conversation?         10:39:04AM
4     A   I don't recall the date.            10:39:05AM
5     Q   Was that in person or on the phone?  10:39:06AM
6     A   In person.                          10:39:09AM
7     Q   Just going back to the Loeffler     10:39:09AM
8   discussion, was that in person or on the phone?
9     A   In person.                          10:39:14AM
10    Q   Was anyone else there?              10:39:15AM
11    A   Not that I recall.                  10:39:17AM
12    Q   Did you ever refer to Loeffler as the  10:39:20AM
13  police liaison?
14    A   Nothing official that I can recall.  10:39:25AM
15    Q   How about unofficially, did you ever  10:39:29AM
16  refer to him as the police liaison?
17    A   Not that I recall.                  10:39:34AM
18    Q   So it's possible that you did?      10:39:34AM
19    A   Yeah.                               10:39:36AM
20        MR. NOVIKOFF:  Objection.           10:39:37AM
21  BY MR. GOODSTADT:                         10:39:38AM
22    Q   When did you speak with Rogers, was  10:39:41AM
23  that before or after speaking with Loeffler,
24  about the notice of claim?
25    A   I don't recall if it was before or  10:39:48AM

Page 46

GEORGE HESSE

1
2   after.
3     Q   What did you discuss with Mayor Rogers  10:39:53AM
4   about the notice of claim?
5     A   Just that, in my opinion, it was    10:39:57AM
6   baseless.
7     Q   And what did she say?               10:40:00AM
8     A   I don't remember her reaction.      10:40:03AM
9     Q   Do you remember anything she said to  10:40:04AM
10  you in that conversation?
11    A   Not in reference to the notice of   10:40:12AM
12  claim.
13        (Whereupon, the referred to portion  10:40:18AM
14    was read back by the court reporter:  Q, Do
15    you remember anything she said to you in
16    that conversation?  A, Not in reference to
17    the notice of claim.)
18  BY MR. GOODSTADT:                         10:40:27AM
19    Q   How about in reference to any of the  10:40:27AM
20  allegations in the notice of claim?
21        MR. NOVIKOFF:  Objection. Form.     10:40:31AM
22    A   Not that I recall.                  10:40:32AM
23    Q   Do you recall anything she said to you  10:40:33AM
24  during that conversation?
25    A   Yes.                                10:40:36AM

Page 47

GEORGE HESSE

1
2     Q   What did she say you to during the   10:40:36AM
3   conversation that you recall?
4     A   She had brought up Ed Paradiso.     10:40:40AM
5     Q   What did she say about Ed Paradiso?  10:40:43AM
6     A   That she was disappointed in him.   10:40:45AM
7     Q   Did she tell you she was disappointed  10:40:50AM
8   in Ed Paradiso?
9     A   Because he just kind of fell off the  10:40:55AM
10  face of the earth and really had no
11  participation in anything that was happening to
12  the police department, and that was it.
13    Q   Was Ed Paradiso on active duty at the  10:41:05AM
14  time?
15    A   At that point, no.                  10:41:11AM
16    Q   So she was referring to him not     10:41:14AM
17  participating in anything while he was not
18  active?
19        MR. NOVIKOFF:  Objection.           10:41:18AM
20    A   He was on medical leave, I guess.  I  10:41:20AM
21  don't know what the terminology is they
22  officially used, but he was out.
23    Q   But that's what she was saying, she   10:41:29AM
24  was disappointed that he wasn't participating in
25  anything at that time, while he was on the

Page 48

GEORGE HESSE

1
2   medical or whatever the term is?
3        MR. NOVIKOFF:  Objection to form.   10:41:38AM
4     A   That's correct.                     10:41:39AM
5     Q   Did she say anything else about Ed   10:41:40AM
6   Paradiso?
7     A   Not that I recall.                  10:41:42AM
8     Q   Did you respond to her disappointment  10:41:43AM
9   about Paradiso?
10    A   I agreed with her.                  10:41:46AM
11    Q   Did you expect Paradiso to participate  10:41:49AM
12  while he was out on medical leave?
13        MR. NOVIKOFF:  Objection.           10:41:54AM
14    A   I would -- yes, I expected him to   10:41:55AM
15  participate in something.
16    Q   What did you expect him to participate  10:41:58AM
17  in?
18    A   He was still the chief of the police  10:42:02AM
19  department.  He has some liabilities involved in
20  everything that we were doing.
21    Q   Do you recall anything else that you  10:42:14AM
22  discussed with Ms. Rogers during that
23  conversation?
24    A   No.                                 10:42:18AM
25    Q   And when she said that Ed Paradiso   10:42:21AM

12 (Pages 45 to 48)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  wasn't participating in anything, was she
3  talking about the stuff that was set forth in
4  the notice of claim or just generally wasn't
5  participating?
6      A   I think generally.          10:42:31AM
7      Q   Did you ever speak to Ed Paradiso    10:42:35AM
8  about the notice of claim?
9      A   Yes.                    10:42:39AM
10     Q   When was that?              10:42:40AM
11     A   I don't recall.         10:42:42AM
12     Q   Was that before or after you spoke   10:42:44AM
13  with Rogers?
14     A   I don't recall.         10:42:47AM
15     Q   Was it in person or on the phone?   10:42:49AM
16     A   On the phone.           10:42:51AM
17     Q   Did you call him or he called you?   10:42:52AM
18     A   He called me.           10:42:54AM
19     Q   Did he call you at home or at the   10:42:55AM
20  station or elsewhere?
21     A   At the station.         10:43:00AM
22     Q   Approximately how long after you   10:43:02AM
23  received the notice of claim did he call you to
24  discuss it?
25     A   I don't recall.         10:43:07AM

1          GEORGE HESSE
2      Q   And tell me everything you recall from   10:43:09AM
3  that conversation.
4      A   I expressed my disappointment in him   10:43:18AM
5  as the chief and that I believed that the
6  majority of what was going on with me in
7  reference to the job was his fault.
8      Q   What do you mean by that?        10:43:29AM
9      A   Just that I'm getting blamed for    10:43:32AM
10  absolutely everything, and he's chief of police.
11     Q   Do you recall what he said in response   10:43:42AM
12  to that?
13     A   Just a lot of, oh, I understand,    10:43:45AM
14  Georgie.
15     Q   Do you recall anything else you said   10:43:48AM
16  other than for the fact that you were getting
17  blamed for everything and he's the chief of
18  police?
19     A   Repeat that.            10:43:56AM
20     Q   Did you discuss anything else other   10:43:57AM
21  than for telling him that you're getting blamed
22  for everything even though he's the chief of
23  police?
24     A   No.                10:44:05AM
25     Q   Did you discuss the substance of the   10:44:05AM

1          GEORGE HESSE
2  claims in the notice of claim with him?
3      A   No.                10:44:09AM
4      Q   Have you ever discussed the substance   10:44:11AM
5  of the allegations in the notice of claim or the
6  complaint in this lawsuit with Ed Paradiso?
7          MR. NOVIKOFF: Objection to form.   10:44:20AM
8      A   No. I don't recall.         10:44:21AM
9      Q   What was the everything that you    10:44:29AM
10  thought you were getting blamed for?
11     A   Just the overall operation of the   10:44:34AM
12  police department. Everything was just falling
13  onto my lap. I was carrying the burden of
14  everything that happened to be going wrong.
15     Q   Was there anything going wrong other   10:44:44AM
16  than for receiving a notice of claim from the
17  plaintiff in this matter?
18         MR. NOVIKOFF: Objection to form.   10:44:51AM
19     A   We had some internal issues.    10:44:52AM
20     Q   What were those.            10:44:54AM
21         MR. NOVIKOFF: Well, were you done   10:44:56AM
22  with your answer?
23  BY MR. GOODSTADT:               10:44:59AM
24     Q   You can finish. I'm sorry. We have   10:44:59AM
25  that understanding that we're going to let each

1          GEORGE HESSE
2  other finish.
3      A   We were having some internal issues,   10:45:04AM
4  and I believe also the -- an incident that I was
5  involved with later.
6      Q   Anything other than for the notice of   10:45:21AM
7  claim, the internal issues and that incident
8  that you're referring to when you told Chief
9  Paradiso that you were getting blamed for
10  everything?
11         MR. NOVIKOFF: Note my objection to   10:45:30AM
12  the form.
13     A   I don't recall.         10:45:32AM
14     Q   What internal issues were you    10:45:33AM
15  referring to?
16     A   We had an incident back in 2004, and   10:45:37AM
17  we all know it here at this table, called the
18  Halloween incident. There was a lot of
19  animosity within the police department that
20  needed to be rectified that was never done.
21     Q   Animosity between who?          10:45:58AM
22     A   Employees.              10:46:00AM
23     Q   Who were the employees that there was   10:46:01AM
24  animosity between?
25     A   That would be Kevin Lamm, Frank    10:46:04AM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 53

GEORGE HESSE

1
2  Fiorillo, Tom Snyder, Gary Bosetti, Richard
3  Bosetti. There may have been some others that I
4  don't recall at this time.
5      Q   Do you recall anyone else that there  10:46:17AM
6  was animosity between that you're referring to?
7      A   Repeat that.                10:46:21AM
8      Q   Anyone else that there was animosity  10:46:22AM
9  between that you're referring when you say there
10  was animosity in the department?
11     A   I don't recall at this time.    10:46:26AM
12     Q   Ty Bacon?                  10:46:28AM
13     A   There may have been. I don't know.  10:46:31AM
14     Q   Patrick Cherry?              10:46:32AM
15     A   No.                    10:46:34AM
16     Q   John Dyer?                 10:46:37AM
17     A   No.                    10:46:39AM
18     Q   And when you say there was animosity,  10:46:43AM
19  it was between Lamm, Fiorillo and Snyder on one
20  side and the Bosettis on the other?
21         MR. NOVIKOFF: Objection to form.    10:46:52AM
22     A   Yes.                    10:46:53AM
23     Q   Was there animosity between you and   10:46:55AM
24  the Bosettis in connection with the Halloween
25  incident?

Page 54

GEORGE HESSE

1
2      A   No.                    10:47:00AM
3      Q   Was there animosity between you and   10:47:01AM
4  Fiorillo, Snyder and Lamm?
5      A   No.                    10:47:04AM
6      Q   When did that animosity start?     10:47:13AM
7      A   Probably right -- right away, in 2004,  10:47:18AM
8  October 31st.
9      Q   So before that, there was no animosity  10:47:23AM
10  between the Bosettis and those three plaintiffs
11  that you're referring to?
12     A   Not that I'm aware of.         10:47:30AM
13         MR. NOVIKOFF: Objection.        10:47:32AM
14  BY MR. GOODSTADT:
15     Q   Were any other -- and we'll discuss   10:47:35AM
16  Halloween a little bit later. But were there
17  any other internal issues that you're referring
18  to other than for the Halloween incident?
19     A   There was some regular insubordination  10:47:45AM
20  from some members of the police department and
21  myself.
22     Q   And who was that?            10:47:51AM
23     A   That would be Frank Fiorillo and Kevin  10:47:52AM
24  Lamm.
25     Q   Anyone else?               10:47:58AM

Page 55

GEORGE HESSE

1
2      A   Not that I recall.            10:48:00AM
3      Q   And what insubordination are you     10:48:03AM
4  referring to with respect to Fiorillo?
5      A   There are some particular times where  10:48:08AM
6  he was asked to do something and flat-out
7  refused.
8      Q   And what were those things he was     10:48:15AM
9  asked to do that he refused?
10     A   Well, there was one incident where I   10:48:19AM
11  asked him to just take a little Windex and
12  squirt one of the windows on the police car, and
13  I was told to go fuck myself, he wasn't gonna do
14  it.
15     Q   Did you write him up for that?       10:48:31AM
16     A   Yes, I did.                10:48:33AM
17     Q   Any other incidents that you're      10:48:39AM
18  referring to other than for squirting the Windex
19  on the police window?
20     A   Yeah. There was a time where he and   10:48:46AM
21  Kevin Lamm came to me and asked me if they
22  could -- when they're writing summons, if they
23  could take bail out on the street in a police
24  car, and I told them no, you cannot do that;
25  it's called station house bail for a reason.

Page 56

GEORGE HESSE

1
2         They went over my head. They went to  10:49:01AM
3  Judge Russell at the time. Judge Russell, not
4  being a criminal judge but a civil judge or
5  attorney, gave them wrong information,
6  misinformation, and told them that they can do
7  it.
8         They asked me again. I told them     10:49:17AM
9  again, no, you cannot do it, and I actually
10  caught them taking money from somebody they were
11  writing up in the police car just outside the
12  police department, and they tried to hide it
13  from me, because they hid the bail book in -- I
14  believe Kevin Lamm came in, grabbed the bail
15  book and went outside and tried to take bail.
16     Q   Were you upset that they went to Judge  10:49:41AM
17  Powell? Is that his name?
18     A   Russell.                 10:49:45AM
19     Q   Russell. Were you upset that they    10:49:46AM
20  went to Judge Russell?
21     A   No, I wasn't upset. It was just     10:49:50AM
22  incorrect procedure.
23     Q   It's a break in the chain of command?  10:49:55AM
24     A   You could say that.           10:49:57AM
25     Q   Would you say that?           10:49:58AM

14  (Pages 53 to 56)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 57

GEORGE HESSE

1
2    A    No.                          10:49:59AM
3    Q    You wouldn't say that's a break in the 10:49:59AM
4    chain of command?
5    A    No. Judge is not part of the chain of 10:50:02AM
6    command.
7    Q    So it would be breaking the chain of 10:50:05AM
8    command?
9        MR. NOVIKOFF: Objection. Form.      10:50:09AM
10   A    He's not part of the chain of command. 10:50:10AM
11   Q    So they went outside the chain of     10:50:13AM
12   command?
13   A    Yes.                        10:50:16AM
14   Q    Is that improper?               10:50:16AM
15   A    That's improper, yes.          10:50:17AM
16   Q    Did you write them up for that     10:50:21AM
17   incident?
18   A    No.                          10:50:24AM
19   Q    How come?                     10:50:25AM
20   A    I counseled them right on the spot.   10:50:26AM
21   Q    Did you memorialize that incident in  10:50:30AM
22   writing in any way?
23   A    No.                          10:50:34AM
24   Q    Any other incidents of insubordination 10:50:36AM
25   that you're referring to with respect to Lamm or

Page 58

GEORGE HESSE

1
2    Fiorillo?
3    A    With Lamm, he had a habit of putting  10:50:45AM
4    handcuffs on somebody urinating in public and
5    dragging them down through town and bringing
6    them to the police department, and he was told
7    not to do that. Just write the summons on the
8    spot.
9    Q    Did you write him up for that?       10:51:02AM
10   A    No.                          10:51:04AM
11   Q    Did he violate your direction of just  10:51:05AM
12   writing them up on the spot?
13   A    On a few occasions, yes.          10:51:11AM
14   Q    Even though he was allegedly         10:51:14AM
15   insubordinate on a few occasions, you didn't
16   write him up for it at all?
17   A    No. I counseled him.           10:51:21AM
18   Q    Did you memorialize it in writing in  10:51:22AM
19   any way?
20   A    No.                          10:51:25AM
21   Q    Did any of the -- strike that.       10:51:25AM
22       Any other incidents of insubordination 10:51:35AM
23   that you're referring to when you testified a
24   moment ago about insubordination with respect to
25   Fiorillo and Lamm?

Page 59

GEORGE HESSE

1
2        MR. NOVIKOFF: Objection. Form.      10:51:43AM
3    A    Right now, I don't recall.        10:51:44AM
4    Q    Any other internal issues other than  10:51:45AM
5    for the Halloween incident and the
6    insubordination by Fiorillo and Lamm?
7    A    As of right now, I don't recall.     10:51:53AM
8    Q    Anything that would refresh your     10:51:55AM
9    recollection?
10   A    I don't recall. I don't know.       10:51:57AM
11   Q    Do you have any notes anywhere --     10:51:58AM
12   A    I have no notes.               10:51:59AM
13   Q    -- in a file?                  10:52:00AM
14       And then you testified that you're     10:52:04AM
15   referring to an incident that you were involved
16   with later when you were talking about being
17   blamed for everything. What were referring to
18   when you said the incident that you were
19   involved in later?
20   A    Repeat that.                  10:52:17AM
21   Q    Yeah, I believe before you         10:52:19AM
22   testified -- when I asked you what was the
23   everything that you thought you were getting
24   blamed for, you said it was the notice of claim,
25   internal issues and the incident that you were

Page 60

GEORGE HESSE

1
2    involved in later. What was the incident that
3    you were involved in later that you were
4    referring to?
5    A    The Gilbert incident. Sam Gilbert.   10:52:31AM
6    Q    And what was that?              10:52:34AM
7    A    That was an arrest that was made.     10:52:35AM
8    Q    That you made?                10:52:45AM
9    A    I was an assist on the arrest, but    10:52:49AM
10   another police officer made the arrest.
11   Q    And what do you mean by "incident"?   10:52:57AM
12   Was it anything more than just an arrest?
13   A    No.                          10:53:01AM
14   Q    Did Mr. Gilbert sue you?           10:53:03AM
15   A    Yes.                        10:53:05AM
16   Q    For what?                     10:53:05AM
17   A    Excessive force -- he alleged that we  10:53:06AM
18   brutally beat him -- and false arrest, violating
19   his civil rights.
20   Q    And that matter is still pending,     10:53:19AM
21   correct?
22   A    The civil matter, yes.          10:53:21AM
23   Q    Who represents you in the civil      10:53:23AM
24   matter?
25   A    I believe his name is Mark Anesh.    10:53:25AM

TSG Reporting – Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 61

GEORGE HESSE

1
2    Q    Mr. Anesh is at Wilson, Elser,      10:53:34AM
3    Moskowitz, Edelman and Dicker?
4    A    It's possible. I don't recall.      10:53:39AM
5        And there is another attorney that is  10:53:40AM
6    on the case. I believe her last name is Slim,
7    S-L-I-M. I don't remember her first name. I've
8    only spoken to her once.
9    Q    Who are the other defendants in that  10:53:52AM
10   matter?
11       MR. NOVIKOFF: On the civil or on the  10:53:56AM
12   criminal?
13       MR. GOODSTADT: On the civil matter.  10:53:57AM
14   That's what we're talking about.
15   A    On the civil? I believe that would be  10:54:00AM
16   myself. There was Arnold Hardman, possibly --
17   well, the Village of Ocean Beach. To tell you
18   the truth, I don't recall who else is named on
19   the suit itself.
20   Q    And you were indicted for that?      10:54:22AM
21   A    That's correct.                      10:54:23AM
22   Q    And you were tried for that?         10:54:24AM
23   A    That's correct.                      10:54:25AM
24   Q    And you were acquitted, correct?     10:54:26AM
25   A    That's correct.                      10:54:29AM

Page 62

GEORGE HESSE

1
2    Q    Did you testify in the criminal trial? 10:54:29AM
3    A    No.                                  10:54:32AM
4    Q    And other than for this matter, the  10:54:39AM
5    Gilbert matter, the other matters that you
6    testified to that you testified in a deposition,
7    have you ever been sued civilly?
8        MR. CONNOLLY: Objection, Andrew, only 10:54:53AM
9    that I don't believe there's been any
10   testimony that he testified in the Gilbert
11   matter.
12       MR. GOODSTADT: Well, I'm asking now  10:54:59AM
13   has he been sued in any matter.
14   BY MR. GOODSTADT:                          10:55:02AM
15   Q    Other than for Gilbert, this incident 10:55:02AM
16   and perhaps the other four -- I know you don't
17   know if you were actually sued in the other
18   four. But putting those four aside, Gilbert and
19   this matter, have you ever been sued civilly?
20   A    Yes. I do have one other one.        10:55:11AM
21   Q    And what's the other one?            10:55:13AM
22   A    Jesse Prisco. Actually, I forgot     10:55:15AM
23   about that one.
24   Q    And what is Mr. Prisco suing you for? 10:55:23AM
25   A    Excessive force and maybe violating  10:55:25AM

Page 63

GEORGE HESSE

1
2    his civil rights. I don't recall what else.
3    Q    So let's go back to Gilbert quickly,  10:55:38AM
4    and we'll get into that in some more detail
5    later. In Gilbert, you testified already that
6    you were indicted on that matter and tried and
7    acquitted. Was Gilbert charged with any
8    criminal conduct with respect to that arrest?
9    A    Yes.                                 10:55:54AM
10   Q    And what was he charged with?        10:55:54AM
11   A    Resisting arrest and -- did I say -- I 10:55:56AM
12   said resisting arrest. Disorderly conduct,
13   resisting arrest, and he was also issued a
14   littering ticket.
15   Q    And who was the arresting officer?   10:56:11AM
16   A    Arnold Hardman.                      10:56:13AM
17   Q    And was he charged with those crimes  10:56:24AM
18   that he was arrested for?
19   A    Mr. Gilbert?                         10:56:29AM
20   Q    Yes.                                 10:56:30AM
21   A    Yes.                                 10:56:30AM
22   Q    And was there a trial in that matter? 10:56:31AM
23   A    No.                                  10:56:33AM
24   Q    Do you know how that -- those charges  10:56:34AM
25   were resolved, if at all?

Page 64

GEORGE HESSE

1
2    A    I believe he pled guilty to the      10:56:38AM
3    littering and they dismissed the other charges
4    in satisfaction.
5    Q    Okay. So there's no criminal charges  10:56:50AM
6    against him still pending, correct?
7    A    No.                                  10:56:55AM
8    Q    Let's go to Prisco. Who represents   10:56:55AM
9    you in the Prisco matter?
10   A    I don't recall his name.             10:57:00AM
11   Q    And who is Mr. Prisco suing other than 10:57:07AM
12   for you?
13   A    I'm sure the Village of Ocean Beach.  10:57:10AM
14   I don't recall who else is listed. I'm sure
15   there's a bunch of John Does, but I don't know.
16   Q    And what is Mr. Prisco suing you and  10:57:19AM
17   the beach for?
18   A    I believe I said that already.       10:57:24AM
19   Q    Excessive force?                     10:57:25AM
20   A    Excessive use of force and civil right 10:57:25AM
21   violation.
22   Q    You did say that. I apologize.       10:57:30AM
23       What did Mr. Prisco allege that you  10:57:32AM
24   did that amounted to excessive force and
25   violations of his civil rights?

16 (Pages 61 to 64)

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2      MR. NOVIKOFF:  In the complaint?     10:57:39AM
3      MR. GOODSTADT:  In the complaint.     10:57:41AM
4   A  He said that I dragged him down a     10:57:41AM
5   flight of stairs and that I beat him on the
6   street and falsely arrested him.
7      Q   And were any criminal charges brought  10:57:51AM
8   against Mr. Prisco with respect to that matter?
9   A  Yes.                    10:57:56AM
10     Q   What were those charges?        10:57:56AM
11  A  There was an assault second.  There    10:57:57AM
12  was disorderly conduct, resisting arrest.  I
13  believe there was some sort of a noise violation
14  under the village code.
15     Q   Was he charged with those crimes that  10:58:08AM
16  he was arrested for?
17  A  Yes.                    10:58:12AM
18     Q   And what was the outcome of those    10:58:12AM
19  charges?
20  A  I believe he pled to, I want to say   10:58:15AM
21  disorderly conduct, but I don't recall.
22     Q   Were there any criminal charges      10:58:27AM
23  brought against you or any other employees of
24  the village --
25  A  No.                     10:58:33AM

GEORGE HESSE

1
2      Q   -- with respect to that case?     10:58:34AM
3         Now, you didn't testify under oath at  10:58:36AM
4   all in the Prisco or the Gilbert matter, the
5   civil suits, right?
6   A  No.  Right.               10:58:43AM
7      Q   Now, just going back to what we      10:58:47AM
8   discussed before about your discussions with
9   people when you received the notice of claim.
10  Did you discuss the notice of claim at all with
11  Gary Bosetti?
12  A  I may have.                10:58:56AM
13     Q   And when did you discuss it with him?  10:58:58AM
14  A  I don't recall.             10:59:00AM
15     Q   Do you recall where you were when you  10:59:00AM
16  discussed it?
17  A  No.                     10:59:02AM
18     MR. NOVIKOFF:  Objection.       10:59:03AM
19  BY MR. GOODSTADT:                  10:59:04AM
20     Q   Do you recall the substance of the   10:59:07AM
21  discussion that you had with him with respect to
22  the notice of claim?
23     MR. NOVIKOFF:  Objection.       10:59:15AM
24     MR. CONNOLLY:  Objection.       10:59:16AM
25  A  No.                     10:59:17AM

GEORGE HESSE

1
2      Q   How about Richard Bosetti, did you    10:59:17AM
3   discuss the notice of claim with him?
4   A  I don't recall.             10:59:21AM
5      Q   Have you discussed the complaint in   10:59:21AM
6   this lawsuit or any of the allegations in the
7   complaint with Gary Bosetti?
8      MR. CONNOLLY:  Objection, Andrew, to  10:59:27AM
9      the extent that I don't know if we've gone
10     through whether Mr. Hesse had received a
11     copy of the complaint.
12  BY MR. GOODSTADT:                  10:59:34AM
13     Q   You were served with a copy of the   10:59:35AM
14  complaint in this lawsuit, correct?
15  A  I believe so.              10:59:38AM
16     Q   Have you read the complaint in this   10:59:39AM
17  lawsuit?
18  A  Yes.                    10:59:41AM
19     Q   Did you ever discuss the complaint or  10:59:42AM
20  any allegations in the complaint with Gary
21  Bosetti subsequent to you receiving it?
22  A  I don't recall.             10:59:49AM
23     Q   Did you ever discuss the complaint or  10:59:50AM
24  any allegations in the complaint with Richard
25  Bosetti subsequent to your receiving it?

GEORGE HESSE

1
2   A  I don't recall.             10:59:56AM
3      Q   Did you ever discuss the complaint or  10:59:56AM
4   any allegation in the complaint with yo Loeffler
5   subsequent to you receiving it?
6   A  Yes.                    11:00:03AM
7      Q   How many times?           11:00:04AM
8   A  I don't recall.             11:00:05AM
9      Q   Approximately how many times?      11:00:05AM
10  A  I really don't know.          11:00:07AM
11     Q   Do you recall the substance of any of  11:00:09AM
12  those conversations that you had with Joe
13  Loeffler about the complaint?
14  A  That we both felt that it was     11:00:14AM
15  baseless.
16     Q   Did you discuss why you felt it was   11:00:17AM
17  baseless with Joe Loeffler?
18  A  Just it's all lies.           11:00:21AM
19     Q   But did you discuss what you thought  11:00:23AM
20  were lies?
21  A  The whole thing.             11:00:25AM
22     Q   Every word in the complaint you think  11:00:31AM
23  is a lie?
24  A  Yes.                    11:00:33AM
25     Q   Do you recall anything that       11:00:36AM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 69

GEORGE HESSE

1
2  Mr. Loeffler said during those conversations?
3     A   I don't recall.                    11:00:41AM
4     Q   You don't recall anything he said?   11:00:42AM
5     A   I don't recall.                    11:00:45AM
6     Q   Do you have anything that would      11:00:46AM
7  refresh your recollection that you can think of?
8     A   At this time, no.                  11:00:51AM
9     Q   Do you have any notes?  Did you ever  11:00:51AM
10  have any written correspondence with him about
11  this matter?
12     A   Not that I'm aware of.            11:00:55AM
13     Q   Did you ever discuss Mitch Burns with  11:00:57AM
14  Joe Loeffler?
15     A   No.                              11:01:01AM
16        MR. NOVIKOFF: Objection only as to  11:01:01AM
17  time frame.
18        MR. GOODSTADT: Ever.              11:01:04AM
19     A   No.                              11:01:05AM
20     Q   Did you ever discuss the complaint or  11:01:09AM
21  any allegations in the complaint with Patrick
22  Cherry?
23     A   Yes.                             11:01:15AM
24     Q   And when I say Patrick Cherry, I'm   11:01:16AM
25  referring to Patrick Cherry, Sr.  Is that fair?

Page 70

GEORGE HESSE

1
2     A   Yes.                             11:01:21AM
3     Q   How many times did you discuss the   11:01:22AM
4  complaint or the allegations of the complaint
5  with Pat Cherry?
6        MR. NOVIKOFF: Objection again. Only  11:01:27AM
7  once he received the complaint?
8        MR. GOODSTADT: Subsequent to       11:01:30AM
9  receiving the complaint.
10     A   How many times?                   11:01:31AM
11     Q   Yes.                             11:01:31AM
12     A   I don't recall.                   11:01:32AM
13     Q   Approximately how many times?      11:01:32AM
14     A   I really don't recall.            11:01:34AM
15     Q   More than five?                   11:01:34AM
16     A   It's possible.                    11:01:35AM
17     Q   More than 10?                     11:01:36AM
18     A   I don't know.                     11:01:37AM
19     Q   When do you recall the first time  11:01:42AM
20  speaking with Cherry about the lawsuit?
21     A   I don't recall.                   11:01:45AM
22     Q   Was it within six months of receiving  11:01:46AM
23  it?
24     A   Safe to say, yes.                 11:01:53AM
25     Q   Do you recall the substance of any of  11:01:54AM

Page 71

GEORGE HESSE

1
2  your conversations with Cherry about the
3  complaint or any allegations of the complaint?
4     A   Just that it's baseless.          11:02:00AM
5     Q   Did you discuss what you thought was  11:02:01AM
6  baseless about it?
7     A   The whole thing.                  11:02:04AM
8     Q   Did you discuss specifically, other  11:02:05AM
9  than for saying the whole thing, any specific
10  allegations?
11        MR. NOVIKOFF: Objection as to form.  11:02:11AM
12     A   Just the basics.                  11:02:12AM
13     Q   Did you discuss the basis of why you  11:02:14AM
14  thought it was baseless with him?
15     A   Based on lies.                    11:02:15AM
16     Q   That's it?  You didn't discuss the  11:02:16AM
17  actual specific claims at all with him?
18     A   No.                              11:02:21AM
19     Q   Did you ever discuss the complaint or  11:02:25AM
20  any of the allegations in the complaint with
21  anyone from the Rivkin Radler law firm?
22     A   No.                              11:02:33AM
23     Q   Did you ever discuss the complaint or  11:02:37AM
24  the allegations in the complaint with Natalie
25  Rogers?

Page 72

GEORGE HESSE

1
2     A   Yes.  We went over that.          11:02:42AM
3     Q   No.  I think we went over the notice  11:02:45AM
4  of claim with Natalie Rogers.  Now I'm talking
5  about the complaint.
6        MR. NOVIKOFF: Your deposition, and  11:02:50AM
7  this doesn't count to your time, but I think
8  the witness should know that there's a
9  difference between a notice of claim and a
10  complaint, because maybe his prior answers,
11  there was some confusion.
12  BY MR. GOODSTADT:                        11:03:02AM
13     Q   Do you understand the difference   11:03:03AM
14  between the two?
15     A   Yes.                             11:03:05AM
16     Q   I mean, certainly you've received   11:03:06AM
17  complaints in the past.  You've now testified to
18  six or seven times you've been sued, correct?
19     A   Uh-huh.                          11:03:13AM
20     Q   And did you receive notices of claims  11:03:14AM
21  in those cases, as well?
22        MR. CONNOLLY: Objection.           11:03:14AM
23     A   Yes.                             11:03:14AM
24     Q   So you know the difference between the  11:03:15AM
25  two, correct?

18  (Pages 69 to 72)

053690b6-a7be-44d9-9835-90b3e21fffd8

## Page 73

GEORGE HESSE

2  A   Yes.                              11:03:18AM
3  Q   So now I'm just focused on the        11:03:19AM
4  complaint which was filed in federal court in
5  this lawsuit.
6      Did you ever discuss the complaint or  11:03:24AM
7  any of the allegations in the complaint with
8  Natalie Rogers?
9  A   I don't recall.                    11:03:33AM
10 Q   You don't recall one way or the other? 11:03:34AM
11 A   No, I don't.                       11:03:37AM
12 Q   Is there anything that you can think  11:03:40AM
13 of that would refresh your recollection as to
14 whether you spoke with her?
15 A   No.                                11:03:45AM
16 Q   Did you ever discuss the complaint or  11:03:45AM
17 any allegations in the complaint with Ty Bacon?
18 A   Yes.                               11:03:50AM
19 Q   How many times?                     11:03:50AM
20 A   I don't know.                      11:03:52AM
21 Q   Approximately how many times?        11:03:52AM
22 A   A couple times, maybe.             11:03:54AM
23 Q   More than five?                     11:03:56AM
24 A   I wouldn't say -- I'd say no.       11:03:57AM
25 Q   So somewhere between two and five?    11:04:00AM

## Page 74

GEORGE HESSE

2  A   It's possible, yes.                11:04:02AM
3  Q   Did you discuss it with him within the 11:04:04AM
4  first six months of receiving it?
5  A   I don't recall.                    11:04:08AM
6  Q   What did you discuss with Ty Bacon    11:04:12AM
7  about the complaint or the allegations in the
8  complaint?
9  A   It was baseless.                   11:04:16AM
10 Q   Did you discuss any of the specific   11:04:17AM
11 allegations?
12 A   I don't recall.                    11:04:20AM
13 Q   Did you tell him what you believe was  11:04:20AM
14 baseless in the complaint?
15 A   Specifically, I don't recall.      11:04:23AM
16 Q   Anything that would refresh your     11:04:26AM
17 recollection?
18 A   Not as of right now, no.           11:04:28AM
19 Q   What did he say about the complaint,  11:04:30AM
20 if anything?
21 A   He agreed with me. Thought it was     11:04:33AM
22 baseless.
23 Q   Do you know whether he read the      11:04:36AM
24 complaint?
25 A   You know, I don't know.            11:04:38AM

## Page 75

GEORGE HESSE

2  Q   Did you show him a copy of the       11:04:39AM
3  complaint?
4  A   No.                                11:04:40AM
5  Q   So do you know where he was concluding 11:04:41AM
6  it was baseless if you -- do you know how he
7  reached the conclusion that it was baseless if
8  you don't even know that he read the complaint?
9      MR. NOVIKOFF:  Objection to form.    11:05:01AM
10 A   Because of where it came from.       11:05:05AM
11 Q   What do you mean by that?            11:05:07AM
12 A   By the officers who filed it.       11:05:08AM
13 Q   So your understanding is that he     11:05:13AM
14 reached the conclusion it was baseless just
15 because it was filed by the five plaintiffs in
16 this case?
17 A   It's my opinion, yes.              11:05:21AM
18 Q   Did you ever ask him if he knew what  11:05:22AM
19 they were alleging?
20 A   No.                                11:05:24AM
21 Q   Did you ever tell him what they were  11:05:24AM
22 alleging?
23 A   I don't recall.                    11:05:27AM
24 Q   Did you ever show him a copy of the   11:05:27AM
25 complaint?

## Page 76

GEORGE HESSE

2      MR. NOVIKOFF:  Objection. Asked and  11:05:30AM
3  answered.
4  A   No.                                11:05:31AM
5  Q   Did you show any current or former   11:05:32AM
6  police officers in Ocean Beach a copy of the
7  complaint after you received it?
8  A   No.                                11:05:40AM
9  Q   What was your first law enforcement   11:05:47AM
10 job?
11 A   Ocean Beach Police Department.       11:05:51AM
12 Q   And when were you hired in the Ocean  11:05:52AM
13 Beach Police Department?
14 A   I was sworn in in December of 1992. I 11:05:56AM
15 attended the police academy through '93,
16 graduated in May of '93 and started working that
17 summer.
18 Q   Did you attend full-time academy?     11:06:09AM
19 A   No, the part-time seasonal police    11:06:12AM
20 academy of Suffolk County.
21 Q   How many months is that academy?     11:06:20AM
22 A   March, April, May, 5 months.        11:06:24AM
23 Q   What's the difference between a       11:06:27AM
24 part-time seasonal academy and a full-time
25 academy?

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

2   A   It's really the hours involved in the   11:06:32AM
3 training.
4   **Q   There's more hours with the full-time? 11:06:35AM**
5   A   Correct.     11:06:37AM
6   **Q   So it's more training?     11:06:38AM**
7   A   Yes.     11:06:39AM
8   **Q   When you were sworn in in December   11:06:46AM**
9 **'92, I assume you had already applied for the**
10 **job prior to then?**
11   A   Yes.     11:06:53AM
12   **Q   When did you apply for the job?   11:06:53AM**
13   A   I believe it was the end of the summer 11:06:55AM
14 of '92. My interview took place someplace in
15 the winter of '92 or '93.
16   **Q   How did you learn about the job?   11:07:07AM**
17   A   Through a friend -- a friend of my   11:07:10AM
18 father's who was a Suffolk County Marine Bureau
19 police officer.
20   **Q   And who was that? Who was the friend   11:07:18AM**
21 **of your father?**
22   A   His name was Freddy DeSantis.     11:07:21AM
23   **Q   Did you know anyone working in the   11:07:28AM**
24 **Ocean Beach Police Department prior to**
25 **submitting the application?**

GEORGE HESSE

2   A   No.     11:07:34AM
3   **Q   Who did you interview with?   11:07:36AM**
4   A   Bob Golopi.     11:07:39AM
5   **Q   Anyone else?     11:07:42AM**
6   A   I believe I met the chief, Ed     11:07:43AM
7 Paradiso, for a little -- a little while, but --
8   **Q   So at the time, Bop Golopi was a   11:07:50AM**
9 **sergeant and Paradiso was the chief?**
10   A   No, I think Bob was just a police   11:07:57AM
11 officer at the time.
12   **Q   What do you mean by just a police   11:07:59AM**
13 **officer?**
14   A   I don't think he was a sergeant at the 11:08:01AM
15 time when I first met him.
16   **Q   At some point, he was elevated to   11:08:06AM**
17 **sergeant?**
18   A   Yes.     11:08:09AM
19   **Q   Did he have to go through any tests to 11:08:09AM**
20 **be elevated to sergeant?**
21   MR. NOVIKOFF: Objection.     11:08:14AM
22   A   I don't know what he did at that time. 11:08:14AM
23   **Q   Do you know whether it was a   11:08:18AM**
24 **requirement to go through any tests at that time**
25 **to be elevated to sergeant?**

GEORGE HESSE

2   MR. NOVIKOFF: Objection.     11:08:23AM
3   A   At that time, I don't know.     11:08:24AM
4   **Q   Was there a sergeant at the time you   11:08:27AM**
5 **interviewed?**
6   A   That I was aware of at that time?     11:08:30AM
7   **Q   Yes.     11:08:33AM**
8   A   No.     11:08:33AM
9   **Q   So you interviewed with Golopi and   11:08:38AM**
10 **Paradiso. Did you interview with anyone else?**
11   A   No.     11:08:43AM
12   **Q   And who offered you the job?   11:08:43AM**
13   A   I believe I received a phone call from 11:08:46AM
14 Bob Golopi that said they were going to accept
15 my application and sponsor me to go to the
16 police academy.
17   **Q   Did you have any jobs prior to that,   11:08:57AM**
18 **outside of law enforcement?**
19   A   Yes.     11:09:02AM
20   **Q   What did you do just prior to starting 11:09:02AM**
21 **the academy?**
22   A   I worked in a delicatessen.     11:09:08AM
23   **Q   Did you apply for a certain position   11:09:11AM**
24 **at Ocean Beach?**
25   A   I believe it was just seasonal police 11:09:23AM

GEORGE HESSE

2 officer.
3   **Q   And were you hired for a seasonal   11:09:30AM**
4 **police officer position?**
5   A   Yes.     11:09:33AM
6   **Q   What's your understanding of what a   11:09:35AM**
7 **seasonal police officer is?**
8   A   The classification of a seasonal     11:09:39AM
9 police officer is a police officer that works
10 between the time frame of two weeks prior to
11 Memorial Day to two weeks after Labor Day.
12   **Q   And that's the job that you had when   11:09:50AM**
13 **you were first were hired there?**
14   A   That's what I was told, yes.     11:09:54AM
15   **Q   So you graduated the academy. Did you 11:09:55AM**
16 **have to take any other tests before you were**
17 **able to be certified as a police officer?**
18   A   Just what the academy provided.     11:10:03AM
19   **Q   And what were the tests in the   11:10:04AM**
20 **academy?**
21   A   At the time, I believe there was --   11:10:08AM
22 there's a battery of tests. You have a laws of
23 arrest test. You had a search and seizure test.
24 You have a deadly physical force test that you
25 have to pass. Then I believe at the time we

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 81

GEORGE HESSE

1
2 only had three comp tests that included just
3 everything to do with anything from penal law to
4 criminal procedure law, physical -- some
5 physical training. Just had to pass a battery
6 of tests.
7      Q    Did you have to pass any tests    11:10:40AM
8 administered by Suffolk County Civil Service?
9      A    Prior to going to the academy, yes.    11:10:46AM
10      Q    What did you have to pass prior to    11:10:49AM
11 going to the academy?
12      A    Physical agility, a medical and a    11:10:52AM
13 psychological.
14      Q    Did you have to take a polygraph?    11:10:59AM
15      A    At that time, no, it wasn't a    11:11:01AM
16 requirement.
17      Q    So which of those three tests did you    11:11:03AM
18 take first, the agility, medical or
19 psychological?
20      A    Oh, I don't recall.    11:11:09AM
21      Q    Did you pass the psychological?    11:11:11AM
22      A    Yes.    11:11:13AM
23      Q    First time you took it?    11:11:14AM
24      A    Yes.    11:11:15AM
25      Q    Did you pass the medical?    11:11:15AM

Page 82

GEORGE HESSE

1
2      A    Yes.    11:11:16AM
3      Q    First file you took it?    11:11:17AM
4      A    Yes.    11:11:18AM
5      Q    Did you pass the agility?    11:11:18AM
6      A    Yes.    11:11:20AM
7      Q    The first time you took it?    11:11:20AM
8      A    Yes.    11:11:22AM
9      Q    What's your understanding of the    11:11:33AM
10 purpose of having to take an agility test?
11      MR. NOVIKOFF: Objection.    11:11:40AM
12      A    Purpose? I don't understand the    11:11:41AM
13 question.
14      Q    Who requires you to take a physical    11:11:45AM
15 agility test prior to going to the academy?
16      MR. NOVIKOFF: Objection.    11:11:50AM
17      A    I believe it's Civil Service.    11:11:50AM
18      Q    Do you understand why you have to take 11:11:52AM
19 an agility test prior to going to the academy?
20      MR. CONNOLLY: Objection.    11:11:58AM
21      MR. NOVIKOFF: Objection.    11:11:58AM
22      A    No, I don't.    11:11:59AM
23      Q    Do you know the reason for it?    11:12:00AM
24      A    No.    11:12:01AM
25      MR. NOVIKOFF: Objection.    11:12:03AM

Page 83

GEORGE HESSE

1
2 BY MR. GOODSTADT:    11:12:03AM
3      Q    How about the medical test, do you    11:12:03AM
4 know the reason why you have to take a medical
5 test?
6      MR. NOVIKOFF: Objection.    11:12:07AM
7      A    I guess they want to know if you're    11:12:07AM
8 physically able to handle the physical training
9 part of being a police officer. That I can
10 understand.
11      Q    How about the psychological, do you    11:12:14AM
12 know why you need to take a psychological test
13 prior to going to the academy?
14      MR. NOVIKOFF: Objection.    11:12:21AM
15      MR. CONNOLLY: Objection.    11:12:21AM
16      A    Well, as a police officer, I'm sure    11:12:22AM
17 you're going to see a lot of bad things. They
18 want to make sure you can handle it, I guess.
19      Q    At the time, you didn't need a    11:12:29AM
20 polygraph; is that correct?
21      MR. NOVIKOFF: Objection.    11:12:29AM
22      A    That's correct.    11:12:30AM
23      Q    Did there come a point in time where a 11:12:29AM
24 polygraph was a requirement to be certified as a
25 police officer in Suffolk County?

Page 84

GEORGE HESSE

1
2      A    I believe there was.    11:12:34AM
3      MR. NOVIKOFF: Objection.    11:12:39AM
4      MR. CALLAHAN: Objection.    11:12:43AM
5      MR. CONNOLLY: Wait a second before    11:12:44AM
6 you answer. This way, if anyone is going to
7 object, we can get it on the record.
8 BY MR. GOODSTADT:    11:13:11AM
9      Q    At the time that you went to the    11:13:11AM
10 academy, there was no requirement from Suffolk
11 County Civil Service to take a polygraph,
12 correct?
13      MR. NOVIKOFF: Objection.    11:13:19AM
14      A    Correct.    11:13:20AM
15      Q    Did there come a point in time where    11:13:22AM
16 that requirement was put into place by Suffolk
17 County Civil Service?
18      MR. NOVIKOFF: Objection.    11:13:28AM
19      A    I believe so.    11:13:29AM
20      Q    Do you know when that happened?    11:13:30AM
21      A    No.    11:13:33AM
22      Q    Do you know approximately what year it 11:13:33AM
23 was?
24      A    No.    11:13:35AM
25      Q    Do you know the reason why a potential 11:13:36AM

21 (Pages 81 to 84)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 85

GEORGE HESSE

1
2  police officer needs to take a polygraph to be
3  certified in Suffolk County?
4      MR. CONNOLLY:  Objection.        11:13:47AM
5      MR. NOVIKOFF:  Objection.        11:13:48AM
6  A  I don't know why.              11:13:49AM
7  Q  Do you know whether those tests are   11:13:50AM
8  required by Civil Service law?
9      MR. NOVIKOFF:  Objection.        11:13:54AM
10  A  No.  I don't know if they're required. 11:13:56AM
11  Q  You don't know one way or the other?  11:13:57AM
12  A  No.                          11:14:00AM
13  Q  How about a background test, did you  11:14:01AM
14  have to go through a background check?
15  A  Yes.                         11:14:05AM
16  Q  Is that a Civil Service requirement?  11:14:06AM
17      MR. NOVIKOFF:  Objection.        11:14:08AM
18  A  You know, I don't know.          11:14:10AM
19  Q  How about now?  Do you know if a    11:14:12AM
20  background check is required to be certified as
21  a police officer in Suffolk County?
22      MR. NOVIKOFF:  Objection.        11:14:21AM
23      MR. CALLAHAN:  Objection.        11:14:22AM
24  A  I don't know.                 11:14:23AM
25  Q  Have you ever worked any other jobs   11:14:28AM

Page 86

GEORGE HESSE

1
2  during your employment at Ocean Beach?
3  A  Yes.                         11:14:31AM
4  Q  What other jobs have you worked while  11:14:32AM
5  employed as an Ocean Beach police officer?
6  A  I worked part-time for the Town of    11:14:36AM
7  Islip with their harbor police unit.
8  Q  When did you do that?           11:14:44AM
9  A  I may have started there in '94 or '95 11:14:49AM
10  at some point, and then I took a leave of
11  absence for a little while from that job and
12  then I went back.  I don't remember the exact
13  year I went back.  I'd have to look at some
14  records or something.
15  Q  Did you have any other jobs other than 11:15:13AM
16  for the part-time Town of Islip Harbor Police
17  job while you were employed by Ocean Beach?
18  A  I worked with a local carpenter for a  11:15:21AM
19  little while in Ocean Beach.
20  Q  Who was that?                11:15:25AM
21  A  His name was Tommy or Thomas Nolter,  11:15:26AM
22  N-O-L-T-E-R.
23  Q  What years did you do that?       11:15:32AM
24  A  I believe it was '95 through '97.    11:15:35AM
25  Q  Did he pay you to do that?        11:15:41AM

Page 87

GEORGE HESSE

1
2  A  Yes.                         11:15:43AM
3  Q  Did you pay taxes on that money?    11:15:44AM
4  A  No, I believe it was cash.        11:15:46AM
5  Q  I just want to -- just so I'm clear.  11:15:58AM
6  I know that it was cash, but did you declare it
7  on your tax returns that you made that cash?
8  A  No.                          11:16:07AM
9  Q  How come?                   11:16:07AM
10      MR. CONNOLLY:  Objection.        11:16:08AM
11      You can answer.              11:16:10AM
12  A  I don't recall why I didn't, but I   11:16:14AM
13  didn't.
14  Q  Have you ever been disciplined in your 11:16:22AM
15  employment at Ocean Beach?
16      MR. NOVIKOFF:  Objection.        11:16:26AM
17  A  No.                          11:16:27AM
18  Q  Ever been suspended?           11:16:30AM
19  A  No.                          11:16:32AM
20  Q  Do you know who F. Ethan Repp is?   11:16:33AM
21  A  Yes.                         11:16:39AM
22  Q  Who is that?                  11:16:39AM
23  A  He was, I think, a superintendent of  11:16:40AM
24  the village for a short period.
25  Q  Did you ever have any interaction with 11:17:13AM

Page 88

GEORGE HESSE

1
2  Mr. Repp?
3  A  Yes.                         11:17:15AM
4  Q  And what interaction did you have with 11:17:16AM
5  Mr. Repp?
6  A  He was in charge of the village.     11:17:19AM
7  Q  Do you recall Mr. Repp asked you for a 11:17:21AM
8  set of keys to the barracks?
9  A  Yes, I do now.                11:17:27AM
10  Q  What do you mean, you do now?      11:17:31AM
11  A  I do remember having a slight incident 11:17:33AM
12  with him.
13  Q  And what was the slight incident you  11:17:36AM
14  had?
15  A  He wanted a key to the barracks, and I 11:17:38AM
16  refused to give him one.
17  Q  Why?                       11:17:44AM
18  A  Because the chief wasn't there to     11:17:44AM
19  authorize me to give him a key.
20  Q  How many times did he request a key?  11:17:50AM
21  A  I don't recall.               11:17:52AM
22  Q  Do you know whether he wrote you up   11:17:56AM
23  for that?
24  A  Yes.                         11:18:01AM
25  Q  He did write you up?           11:18:02AM

22  (Pages 85 to 88)

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2     A    Yes, he did.                11:18:03AM
3     Q    So you -- do you consider that    11:18:04AM
4  discipline?
5     A    Yes.                        11:18:07AM
6     Q    So going back to my question before,  11:18:08AM
7  you actually have been disciplined, correct?
8     A    Yes.                        11:18:13AM
9     Q    Any other incidents of discipline  11:18:13AM
10 during your employment at Ocean Beach?
11    A    Not that I recall.          11:18:17AM
12        MR. NOVIKOFF: Case is over.   11:18:25AM
13        MR. GOODSTADT: What was that?   11:18:26AM
14        MR. NOVIKOFF: I'm just talking to  11:18:28AM
15  Mike.
16 BY MR. GOODSTADT:                   11:18:31AM
17    Q    You were hired for a seasonal police  11:18:33AM
18 officer position, correct?
19        MR. NOVIKOFF: Objection.     11:18:38AM
20    A    Originally, yes.            11:18:39AM
21    Q    So at any point in time, did that  11:18:40AM
22 title change?
23    A    Yes.                        11:18:45AM
24    Q    When did that title change for the  11:18:46AM
25 first time?

**GEORGE HESSE**

1
2     A    I believe it was November of '95.   11:18:48AM
3     Q    And what did your seasonal title  11:18:53AM
4  change to in November of '95?
5     A    Full-time police officer.   11:18:56AM
6     Q    So how many seasons did you work as a  11:19:02AM
7  seasonal police officer?
8     A    Two.                        11:19:07AM
9     Q    Did you work the off season during  11:19:07AM
10 those two years?
11    A    Yes.                        11:19:10AM
12    Q    So were you a part-time police officer  11:19:11AM
13 at any point between the seasonal position when
14 you were first hired and the change to full-time
15 in '95?
16        MR. NOVIKOFF: Objection to form.  11:19:19AM
17    A    Yes.                        11:19:20AM
18    Q    What did it change to, part-time?  11:19:21AM
19    A    At that time, I didn't know.  I just  11:19:25AM
20 continued service.
21    Q    Was there a lieutenant for the  11:19:37AM
22 department at all during your employment there?
23    A    No.                         11:19:43AM
24    Q    What paperwork did you fill out when  11:19:54AM
25 you first started working there in connection

**GEORGE HESSE**

1
2  with your employment, when you first started
3  working at Ocean Beach or just prior to it?
4     A    Paperwork?  I believe there was some  11:20:08AM
5  kind of questionnaire I had to fill out, an
6  application.
7     Q    Are you aware of something called the  11:20:13AM
8  Ocean Beach Police Department applicant
9  investigation section?
10    A    Yeah, that would be me.      11:20:18AM
11    Q    What is that?               11:20:20AM
12    A    That was just some title that I gave  11:20:21AM
13 myself because we had -- I was dealing with
14 Suffolk County at that point to process new
15 applicants that were coming in.
16    Q    When did you give yourself that title?  11:20:31AM
17    A    I don't know the date.       11:20:34AM
18    Q    Do you recall what year it was?  11:20:35AM
19    A    Maybe 2005.                 11:20:40AM
20    Q    Was there an applicant investigation  11:20:44AM
21 section in Ocean Beach prior to you giving
22 yourself that title?
23    A    No.                         11:20:50AM
24    Q    Did you have any training for that?  11:20:50AM
25    A    No.                         11:20:53AM

**GEORGE HESSE**

1
2     Q    Is that -- was that a Civil Service  11:20:55AM
3  title?
4     A    No.                         11:20:58AM
5     Q    Did you ever alert anybody that you  11:20:59AM
6  gave yourself that title?
7     A    No.                         11:21:03AM
8     Q    Did you -- did the Board of Trustees  11:21:06AM
9  in Ocean Beach pass any resolution awarding that
10 title?
11    A    No.                         11:21:12AM
12        MR. NOVIKOFF: Objection.     11:21:13AM
13 BY MR. GOODSTADT:                   11:21:13AM
14    Q    Why did you give yourself that title?  11:21:17AM
15    A    Because I was the new applicant  11:21:19AM
16 investigation unit for the Ocean Beach Police
17 Department.
18    Q    Well, who did the new applicant  11:21:24AM
19 investigations prior to you awarding yourself
20 that title?
21    A    Suffolk County PD.          11:21:30AM
22    Q    Did you alert the Suffolk County PD  11:21:32AM
23 that you now awarded yourself that title?
24    A    No.                         11:21:37AM
25    Q    What were you investigating as the  11:21:39AM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1           GEORGE HESSE
2    Ocean Beach Police Department applicant
3    investigation section?
4        A    Just new police officers.        11:21:47AM
5        Q    What did you do to investigate?    11:21:49AM
6        A    I had them fill out a questionnaire.   11:21:52AM
7    It required a ton of documentation. I reviewed
8    the documents. I sent out letters to previous
9    employers that they had for responses to see
10   what their work -- you know, if they were in
11   good standing with their previous jobs. I had
12   to send out a mental health release form to the
13   New York State Department of Health Services to
14   see if they had any previous mental health
15   issues that would stop them from becoming a
16   police officer. I'm sure there's a lot of other
17   assorted things, but I don't have an application
18   in front of me to go through.
19       Q    Where did you get the questionnaire    11:22:38AM
20   that you distributed to new applicants?
21       A    Some of it was from Suffolk County PD   11:22:43AM
22   and their applicant investigation unit. They
23   sent me a copy. I went online. I found other
24   applications from other police departments that
25   I thought would help out in having people fill

1           GEORGE HESSE
2    out these applications.
3        Q    Did anyone from the county approve the  11:22:59AM
4    packet that you put together?
5        A    No.                   11:23:03AM
6        Q    Did you create the questionnaire     11:23:03AM
7    packet?
8        A    Yes.                  11:23:06AM
9        Q    Was it only distributed to new      11:23:08AM
10   applicants?
11       A    Yes.                  11:23:12AM
12       Q    Did you do a criminal background     11:23:20AM
13   check?
14       A    Yes.                  11:23:22AM
15       Q    Anything else other than what you    11:23:24AM
16   testified to and now the criminal background
17   check that you did to investigate new
18   applicants?
19       A    I don't know.            11:23:32AM
20       Q    Did people who previously worked at   11:23:40AM
21   Ocean Beach have to go through the applicant
22   investigation section?
23       A    Current -- officers that were      11:23:47AM
24   currently employed?
25       Q    Yes.                  11:23:50AM

1           GEORGE HESSE
2        A    No.                   11:23:50AM
3        Q    Including full-time, part-time,     11:23:54AM
4    seasonal guys who had already been employed?
5        A    There was only one that had to redo   11:24:00AM
6    his application.
7        Q    Who was that?            11:24:04AM
8        A    Ty Bacon.               11:24:05AM
9        Q    Why did he have to redo the       11:24:05AM
10   application?
11       A    Because I believe Civil Service had   11:24:08AM
12   made a mistake with his certification to be a
13   police officer in Suffolk County, and they
14   required that he had to take the battery of
15   tests that are required before employment.
16       Q    Did Gary Bosetti have to fill it out? 11:24:27AM
17       A    Yes.                  11:24:29AM
18       Q    How come?               11:24:30AM
19       A    Technically, he was a new hire, and he 11:24:31AM
20   had to take the polygraph. The polygraph is
21   based on the application.
22       Q    What do you mean by technically he was 11:24:40AM
23   a new hire?
24       A    Because he was hired by the village,  11:24:42AM
25   and apparently there was some sort of confusion

1           GEORGE HESSE
2    with his status to become a police officer
3    within Suffolk County; and in order to get
4    through Suffolk County Civil Service's battery
5    of tests, he had to fill out this application.
6        Q    Do you know when that was?        11:25:01AM
7        A    It might have been 2005.       11:25:02AM
8        Q    But he had worked there prior to 2005, 11:25:03AM
9    right?
10       A    Yes.                  11:25:06AM
11       Q    So he had worked there prior to     11:25:06AM
12   passing the battery of tests?
13       A    Yes.                  11:25:10AM
14       Q    Anyone else fit that same category of 11:25:10AM
15   people who had worked there prior but still
16   needed to fill out your applicant investigation
17   section report?
18       A    Yes.                  11:25:19AM
19       Q    Who else what was that?         11:25:19AM
20       A    I believe there was Rich Bosetti,   11:25:21AM
21   Tommy Shaw. I already mentioned Ty Bacon. Who
22   else at that time? There was someone that --
23   oh, John Dyer. What was his name? There was a
24   gentleman that retired from New York City PD as
25   a lieutenant. I can't think of his name. Maybe

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 97

GEORGE HESSE

1   there was Pat Cherry also, but he chose not to
2   resume as a police officer with Ocean Beach.
3       **Q   Pat Cherry, Sr.?**              **11:26:09AM**
4       A   Correct.              11:26:11AM
5       **Q   There was one other you said?**      **11:26:11AM**
6       A   Yeah. I can't think of his name.   11:26:13AM
7       **Q   Is there anything that would help**   **11:26:14AM**
8   **refresh your recollection?**
9       A   I'm sure you have a list of every   11:26:18AM
10  police officer that worked in Ocean Beach. If
11  you give me the list, I'm sure I can find it.
12      **Q   We'll give you the list in a bit.**   **11:26:26AM**
13      A   Excuse me.              11:26:28AM
14      **Q   Does a police officer have to graduate** **11:26:34AM**
15  **the academy prior to being certified to be a**
16  **police officer?**
17          MR. NOVIKOFF: Objection.      11:26:40AM
18      A   To my recollection, there are some   11:26:43AM
19  technicalities with that.
20      **Q   What are the technicalities?**      **11:26:47AM**
21      A   I believe you could be hired as a   11:26:48AM
22  police officer, but within that calendar year at
23  some point you have to graduate a police
24  academy.

Page 98

GEORGE HESSE

1       **Q   Okay. Any other technicalities?**   **11:26:57AM**
2       A   Not that I'm aware of.         11:26:59AM
3       **Q   Does it have to be the Suffolk County** **11:27:00AM**
4   **police academy?**
5       A   No.                  11:27:03AM
6       **Q   So it can be New York City police**   **11:27:03AM**
7   **academy?**
8       A   Correct.              11:27:06AM
9       **Q   It could be Nassau County police**   **11:27:07AM**
10  **academy?**
11      A   Correct.              11:27:11AM
12      **Q   Are there different radio codes in New** **11:27:11AM**
13  **York City than Suffolk County?**
14          MR. CONNOLLY: What time frame?   11:27:17AM
15          MR. GOODSTADT: Any point in time.   11:27:18AM
16      A   Yes.                  11:27:19AM
17      **Q   So why don't we focus on 2002 to 2006.** **11:27:19AM**
18  **Were there different radio codes?**
19      A   I believe so.              11:27:23AM
20      **Q   Do the officers in Ocean Beach need to** **11:27:25AM**
21  **know the Suffolk County radio codes?**
22      A   They should be aware of them, yes.   11:27:29AM
23      **Q   It's important that they're aware of** **11:27:31AM**
24  **them?**

Page 99

GEORGE HESSE

1       A   Yeah, to a point.         11:27:33AM
2       **Q   Do you think it's important to the** **11:27:35AM**
3   **public safety that the police officers are aware**
4   **of the radio codes?**
5           MR. NOVIKOFF: Objection to the form. 11:27:40AM
6       I don't know what you mean by public safety.
7       Are you using it in the context of a 740
8       claim or just a general definition?
9           MR. GOODSTADT: Both.      11:27:49AM
10          MR. NOVIKOFF: Objection to form.   11:27:50AM
11      A   Repeat the question.      11:27:51AM
12          MR. NOVIKOFF: Calls for a legal   11:27:53AM
13      conclusion as well.
14  BY MR. GOODSTADT:             11:27:55AM
15      **Q   Do you think it's important to the** **11:27:55AM**
16  **public's safety that police officers in Ocean**
17  **Beach know the radio codes?**
18          MR. NOVIKOFF: Note my objection.   11:28:01AM
19      A   I think they should be familiarized   11:28:02AM
20  with them, yes.
21      **Q   Do you think it's important to public** **11:28:05AM**
22  **safety?**
23          MR. NOVIKOFF: Note my objection.   11:28:06AM
24      A   It's not detrimental, no.      11:28:07AM

Page 100

GEORGE HESSE

1       **Q   It's not detrimental to public safety** **11:28:09AM**
2   **for police officers --**
3       A   No.                  11:28:13AM
4       **Q   You don't think it's detrimental to** **11:28:13AM**
5   **the public's safety if police officers don't**
6   **know the radio codes that are being addressed to**
7   **them?**
8           MR. NOVIKOFF: Objection to the form   11:28:22AM
9       of the question.
10  BY MR. GOODSTADT:              11:28:23AM
11      **Q   Is that your testimony?**      **11:28:24AM**
12      A   There's more to it, but yeah.      11:28:25AM
13      **Q   What do you mean there's more to it?** **11:28:27AM**
14      A   Because since 2001, FEMA has      11:28:29AM
15  established the plain-talk doctrine since 2001.
16  You say the 10 code or any code, and then you
17  say what the actual call is.
18      **Q   And that's in place in Ocean Beach?** **11:28:46AM**
19      A   That's in place, correct.      11:28:48AM
20      **Q   What's the sense of having a radio** **11:28:55AM**
21  **code if you're doing the public talk now?**
22          MR. NOVIKOFF: Objection to the form   11:28:59AM
23      of the question.
24          MR. CONNOLLY: Objection. You can   11:29:02AM

25 (Pages 97 to 100)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 101

GEORGE HESSE

1  answer.
2      A    Repeat that.              11:29:05AM
3      Q    Yeah.  Why would you need a radio code 11:29:06AM
4  if you have a public-talk doctrine?
5          MR. NOVIKOFF:  Objection to the form. 11:29:13AM
6      A    To tell you the truth, at this point I 11:29:14AM
7  don't know why.
8      Q    At any point in time, did you know    11:29:17AM
9  why?
10         MR. NOVIKOFF:  Objection to form.      11:29:20AM
11     A    I have an opinion.         11:29:21AM
12     Q    What's your opinion?               11:29:22AM
13     A    My opinion was it's to shorten   11:29:23AM
14 communications on the radio.
15     Q    I'm saying if you have -- why would  11:29:26AM
16 you still need radio codes since 2001 if you're
17 required to also say public talk?
18         MR. NOVIKOFF:  Objection as to form. 11:29:37AM
19 Foundation.
20         MR. CONNOLLY:  Objection.       11:29:39AM
21     A    I don't know.             11:29:40AM
22         MR. GOODSTADT:  And when I say "public 11:29:42AM
23 talk," I mean plain talk.  I don't know if
24 that's the basis of the objection.  That's

Page 102

GEORGE HESSE

1
2  what I mean.
3  BY MR. GOODSTADT:                11:29:49AM
4      Q    I'm assuming you know understood what 11:29:49AM
5  I meant, correct?
6          MR. CONNOLLY:  Why don't we repeat the 11:29:52AM
7  question using plain talk.
8      A    I don't recall.           11:29:56AM
9      Q    Since 2001, there's a plain talk     11:29:57AM
10 doctrine, correct?
11     A    Yes.                      11:30:01AM
12     Q    So when a radio code is sent over the 11:30:01AM
13 radio, they say, you know, 10/1 officer in need
14 of -- you know, officer's life in danger.  Is
15 that what they say, something like that?
16         MR. NOVIKOFF:  Objection.       11:30:14AM
17 BY MR. GOODSTADT:                11:30:15AM
18     Q    Is that what you mean by public talk? 11:30:16AM
19         MR. NOVIKOFF:  Objection.       11:30:19AM
20     A    I think everybody knows what a 10/1 11:30:19AM
21 is.  I don't care where you come from.  But you
22 could tell from somebody's tone of voice on the
23 radio that they need assistance.
24     Q    What do you mean by everyone knows   11:30:31AM
25 what a 10/1 is?

Page 103

GEORGE HESSE

1
2      A    Everybody knows what a 10/1 is on this 11:30:34AM
3  job.
4      Q    Isn't it true that Arnold Hardman    11:30:38AM
5  failed to respond to a 10/1 by Nofi?
6          MR. NOVIKOFF:  Objection.  Leading.  11:30:46AM
7  Foundation.  Form.
8      A    No.                       11:30:50AM
9      Q    It's not true?                  11:30:51AM
10     A    I don't believe so.       11:30:53AM
11     Q    Nofi never complained to you that    11:30:57AM
12 Hardman didn't know what the code was, he
13 thought it was a threat to him?
14         MR. NOVIKOFF:  Objection.  Leading.  11:31:05AM
15 Form.
16     A    No.                       11:31:06AM
17     Q    Since 2001 in Ocean Beach, do all    11:31:12AM
18 radio codes that have been sent out over the
19 radio include the code and then the plain talk?
20         MR. NOVIKOFF:  Objection.  Form.    11:31:21AM
21 Foundation.
22     A    Repeat the question, please.    11:31:23AM
23     Q    Yeah.  Since 2001, when FEMA put in  11:31:25AM
24 their plain talk doctrine, do all radio codes
25 that are sent to the Ocean Beach police officers

Page 104

GEORGE HESSE

1
2  over the radio include both the code and the
3  plain talk?
4      A    Yes.                      11:31:37AM
5          MR. NOVIKOFF:  Objection.  Is the    11:31:38AM
6  question is that a requirement or does he
7  know if every single one that has been
8  transmitted even outside his presence had
9  that?
10 BY MR. GOODSTADT:                11:31:46AM
11     Q    Well, have you ever heard one that was 11:31:47AM
12 transmitted without the plain talk?
13     A    No.                       11:31:51AM
14     Q    Just going back.  You don't recall   11:31:55AM
15 Nofi complaining to you that Hardman didn't
16 respond to his 10/1?
17         MR. CONNOLLY:  Objection.       11:32:02AM
18     A    No.                       11:32:02AM
19         MR. NOVIKOFF:  Just note my objection 11:32:08AM
20 to that last question.
21 BY MR. GOODSTADT:                11:32:22AM
22     Q    We discussed before that there was a 11:32:23AM
23 battery of tests that you have to pass before
24 going to the police academy to be certified as a
25 police officer.

26 (Pages 101 to 104)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 105

GEORGE HESSE

1
2       Who in Ocean Beach since 2000 has been 11:32:30AM
3   charged with ensuring that the officers who are
4   hired have actually passed those tests?
5       MR. NOVIKOFF: Objection. Foundation. 11:32:39AM
6   Form.
7       MR. CONNOLLY: Time frame.      11:32:43AM
8   A   Since 2000?          11:32:45AM
9   Q   Since 2000, that's the time frame.   11:32:45AM
10  A   Since 2000 till the present?      11:32:48AM
11  Q   Yes.              11:32:50AM
12  A   From 2000 through 2006 would be Ed   11:32:51AM
13  Paradiso. From 2006 till present would be me.
14      MR. GOODSTADT: Okay, we can --     11:32:59AM
15      THE VIDEOGRAPHER: That is the end of 11:33:01AM
16  Tape Number 1.
17      The time is now 11:33 a.m. We are now 11:33:03AM
18  off the record.
19      (Whereupon, a discussion was held off 11:33:07AM
20  the record.)
21      THE VIDEOGRAPHER: This is the start  11:49:25AM
22  of Tape Number 2.
23      The time is now 11:49 a.m. We are now 11:49:27AM
24  back on the record.
25

Page 106

GEORGE HESSE

1
2   BY MR. GOODSTADT:           11:49:31AM
3   Q   Sir, before we went off the record,  11:49:31AM
4   I'd asked you a question about jobs that you had
5   while you were employed by Ocean Beach, and you
6   told me about a harbor job and you told me about
7   a job with a carpenter, correct?
8   A   Yes.            11:49:46AM
9   Q   Did you also work for Ian Levine at  11:49:47AM
10  Sky Cable?
11  A   Yes.            11:49:51AM
12  Q   And when did you work for Ian Levine 11:49:51AM
13  at Sky Cable?
14  A   I believe I worked for him from -- I'm 11:50:00AM
15  really going to be guessing, but maybe '97
16  through a little bit of 2000. I'm not real sure
17  exactly what the dates are.
18  Q   And did he pay you for that work?    11:50:18AM
19  A   Yes.            11:50:19AM
20  Q   Did you pay taxes on the pay that you 11:50:20AM
21  received from Mr. Levine?
22  A   No.             11:50:24AM
23  Q   So he paid you cash as well?     11:50:24AM
24  A   Yes.            11:50:26AM
25  Q   And you didn't declare that on your  11:50:26AM

Page 107

GEORGE HESSE

1
2   income tax returns?
3   A   No.                11:50:29AM
4   Q   How come?             11:50:30AM
5   A   Just didn't.          11:50:32AM
6       MR. NOVIKOFF: Objection.       11:50:35AM
7   BY MR. GOODSTADT:            11:50:36AM
8       Q   So other than for the Sky Cable job, 11:50:39AM
9   the carpenter job and the harbor job, did you
10  have any other jobs while you were employed by
11  Ocean Beach?
12  A   In the beginning, I worked for the   11:50:48AM
13  deli, I guess from '93 to -- from '93 to
14  somewhere in '95 maybe.
15  Q   That same deli you had worked at     11:50:59AM
16  beforehand?
17  A   I worked at a couple of different    11:51:02AM
18  delis, yes.
19  Q   Is Ian Levine a resident of Ocean    11:51:10AM
20  Beach?
21      MR. NOVIKOFF: Objection. Form.     11:51:13AM
22  Foundation.
23  A   Yes.              11:51:15AM
24  Q   Where is his home or property?     11:51:16AM
25  A   I'm trying to think of the exact     11:51:23AM

Page 108

GEORGE HESSE

1
2   address. He owns a home with his wife on Ocean
3   Breeze. I don't know the exact address.
4   Q   Have you ever been to his home?     11:51:33AM
5   A   Yes.              11:51:35AM
6   Q   Does he live there full time in Ocean 11:51:36AM
7   Beach?
8   A   He does, yes.          11:51:39AM
9   Q   How many times have you been to his  11:51:40AM
10  house?
11  A   Numerous times.          11:51:45AM
12  Q   Ever been there on non-police      11:51:47AM
13  business?
14  A   Yes.              11:51:50AM
15  Q   Social visits?         11:51:51AM
16  A   Once or twice, yes.       11:51:52AM
17  Q   Are you friends with Ian Levine?    11:51:54AM
18  A   We're acquaintances.       11:51:58AM
19  Q   Now, you testified before about your 11:52:01AM
20  harbor job. Who did you report to in your
21  harbor job?
22  A   Al Loeffler. He was the chief.     11:52:06AM
23  Q   He was the chief. What was the title 11:52:09AM
24  there?
25      MR. NOVIKOFF: His title or      11:52:12AM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 109

GEORGE HESSE

1    GEORGE HESSE
2        Mr. Loeffler's?
3    BY MR. GOODSTADT:                    11:52:15AM
4        Q    What was Mr. Loeffler's title there?  11:52:15AM
5        A    He was chief, but his exact Civil    11:52:18AM
6    Service title, I don't know.
7        Q    But you called him chief?          11:52:21AM
8        A    I called him chief on occasion, yes.  11:52:23AM
9        Q    You reported to him at that job?    11:52:29AM
10       A    Yes.                              11:52:32AM
11       Q    Did he work as a police officer on  11:52:32AM
12   Ocean Beach at any time?
13       A    Yes.                              11:52:36AM
14       Q    When did he work as an officer on   11:52:37AM
15   Ocean Beach?
16       A    From 1973 till maybe 2002 or '3 or '4.  11:52:40AM
17   I don't know.
18       Q    Did he report to you in his job as a  11:52:54AM
19   police officer in Ocean Beach?
20       A    At some point, yes.               11:52:59AM
21       Q    At the same time you had the harbor  11:53:01AM
22   job and you were reporting to him, was he also
23   reporting to you in the beach job?
24       A    There was a time, yes.           11:53:09AM
25       Q    Is he related to Mayor Joe Loeffler at  11:53:10AM

Page 110

GEORGE HESSE

1    GEORGE HESSE
2    all?
3        A    Yes.                              11:53:14AM
4        Q    What's the relationship?          11:53:15AM
5        A    Brothers.                         11:53:17AM
6        Q    And how long did you work the harbor  11:53:24AM
7    job? When did you stop working there?
8        A    I believe I started somewhere around  11:53:28AM
9    the end of '94, maybe somewhere in '95.  I
10   worked maybe two, three years, at the most.
11   Then I took a leave for some time, and then I
12   went back maybe 2002.  I'm not real sure.
13       Q    2002 until when?                  11:53:52AM
14       A    Until I got indicted.            11:53:53AM
15       Q    And what happened when you got     11:54:00AM
16   indicted?
17       A    March 27th, I got a phone call from  11:54:03AM
18   Bob Scroi, and I was told I was suspended.
19       Q    Who is Bob Scroi?                 11:54:10AM
20       A    He is now the current chief of the  11:54:12AM
21   Islip harbor police.
22       Q    When did Allen Loeffler stop being the  11:54:16AM
23   chief?
24       A    It's possible 2005.              11:54:20AM
25       Q    After he had left the Ocean Beach  11:54:24AM

Page 111

GEORGE HESSE

1    GEORGE HESSE
2    police force?
3        A    He may have stayed on for a short  11:54:28AM
4    period after he left the town job.  I really
5    don't know.
6        Q    Who is Bob Scroi?  Is that the name  11:54:39AM
7    you used?
8        A    Uh-huh.                           11:54:44AM
9        Q    Who is he?                        11:54:44AM
10       A    He's the chief of the Islip harbor  11:54:44AM
11   police now.
12       Q    And he told you that you were      11:54:47AM
13   suspended when you got indicted?
14       A    Yes.                              11:54:51AM
15       Q    Are you still currently suspended?  11:54:51AM
16       A    Yes.                              11:54:53AM
17       Q    Have you applied to get the job back  11:54:54AM
18   there at the harbor?
19       A    We've spoken about it, yes.       11:54:58AM
20       Q    You spoke to who about it?        11:55:01AM
21       A    Bob Scroi.                        11:55:03AM
22       Q    What was the substance of the      11:55:04AM
23   conversation?
24       A    He is -- he said he was looking into  11:55:06AM
25   it.  I believe public safety just got a new

Page 112

GEORGE HESSE

1    GEORGE HESSE
2    commissioner; and I met the commissioner, and we
3    just talked about possibly coming back.  Nothing
4    solid, but we talked about possibly coming back
5    to work.
6        Q    Has a decision been made one way or  11:55:23AM
7    the other?
8        MR. NOVIKOFF:  Objection.            11:55:28AM
9        A    Not that I'm aware of.            11:55:29AM
10       Q    Did you fill out any paperwork to get  11:55:30AM
11   the job back?
12       A    No.                               11:55:33AM
13       Q    I just want to go back to the FEMA  11:55:34AM
14   doctrine, because I was a little bit confused as
15   to what it was.  The FEMA doctrine, the plain --
16   what is it, the plain talk?
17       A    It's the plain-talk doctrine.     11:55:43AM
18       Q    The plain-talk doctrine?          11:55:45AM
19       A    Uh-huh.                           11:55:48AM
20       Q    Is that -- the plain-talk doctrine,  11:55:48AM
21   does that apply to interagency transmissions or
22   is that also within an agency that the
23   plain-talk doctrine applies to?
24       MR. NOVIKOFF:  Objection to form.     11:56:00AM
25       A    It's my understanding it applies to  11:56:00AM

28  (Pages 109 to 112)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 113

GEORGE HESSE

1 all jobs now.
2     Q    And when did it apply to all jobs?   11:56:03AM
3 When did that start?
4         MR. NOVIKOFF: Objection to form.   11:56:07AM
5     A   I don't know the exact date.   11:56:08AM
6     Q    Had it always applied to all jobs?   11:56:10AM
7         MR. NOVIKOFF: Objection.   11:56:13AM
8     A   Not that I'm aware of.   11:56:14AM
9     Q    Well, I guess I'm trying to just get a   11:56:18AM
10 timeline.
11         It was put in sometime after   11:56:21AM
12 September 11th, correct?
13     A   Correct.   11:56:25AM
14     Q    2001?   11:56:26AM
15     A   Correct.   11:56:26AM
16     Q    Then when it was first put in, did it   11:56:27AM
17 apply to all jobs or did it originally just
18 apply interagency?
19     A   I don't know.   11:56:36AM
20     Q    And when Suffolk County would relay a   11:56:39AM
21 code over the radio since 2001 to Ocean Beach
22 radios, they gave the code and plain talk or
23 just the code?
24         MR. NOVIKOFF: Objection. Form.   11:56:53AM

Page 114

GEORGE HESSE

1 Foundation.
2     A   They do now.   11:56:59AM
3     Q    When did that start?   11:57:00AM
4         MR. NOVIKOFF: Objection.   11:57:02AM
5     A   I don't recall.   11:57:03AM
6     Q    Was it within the last year?   11:57:04AM
7         MR. NOVIKOFF: Objection.   11:57:06AM
8     A   I don't recall.   11:57:09AM
9     Q    How about in '02, did they do it in   11:57:09AM
10 '02?
11         MR. NOVIKOFF: Objection.   11:57:13AM
12     A   I don't know.   11:57:13AM
13     Q    '03?   11:57:14AM
14     A   I don't know.   11:57:15AM
15     Q    '04?   11:57:16AM
16     A   I don't know.   11:57:18AM
17     Q    When you sent a code over the radio in   11:57:19AM
18 '02, did you do the radio code and the plain
19 talk or just the radio code?
20     A   As far back as I can remember in Ocean   11:57:30AM
21 Beach, we've always put a 10 code over and
22 pretty much said what it was afterwards, so --

Page 115

GEORGE HESSE

1     Q    What do you mean by "pretty much"?   11:57:40AM
2     A   It's pretty much been that way for a   11:57:42AM
3 long time for Ocean Beach.
4     Q    How long is a long time?   11:57:45AM
5     A   It could be from the beginning of when   11:57:49AM
6 I started working there.
7     Q    Okay. Have you ever transmitted a 10   11:57:53AM
8 code without plain talk?
9     A   Yeah. Sure.   11:58:00AM
10     Q    Since 2001?   11:58:01AM
11     A   Sure.   11:58:02AM
12     Q    Were you in violation of the FEMA   11:58:05AM
13 doctrine?
14     A   I may have been.   11:58:07AM
15     Q    But you don't know one way or of the   11:58:09AM
16 other?
17     A   No.   11:58:11AM
18     Q    And before, I think you defined what a   11:58:13AM
19 seasonal police officer was in Suffolk County.
20 Could you define what a part-time police officer
21 is in Suffolk County?
22         MR. CALLAHAN: Objection to form.   11:58:24AM
23         MR. NOVIKOFF: Objection.   11:58:26AM
24         MR. CONNOLLY: Objection.   11:58:26AM

Page 116

GEORGE HESSE

1     A   Can I answer?   11:58:29AM
2         MR. CONNOLLY: Yes.   11:58:30AM
3     A   Part-time status, it could be year   11:58:33AM
4 round. It could be -- you know, this is not my
5 definition, but it's the definition, I believe,
6 that Civil Service puts out. It's my
7 understanding that a part-time police officer
8 does not work more than 20 hours a week. It
9 could be year round or it could be from two
10 weeks after Labor Day to two weeks prior to
11 Memorial Day.
12     Q    Can a seasonal officer work after the   11:58:59AM
13 period two weeks after Labor Day through the
14 period of two weeks before Memorial Day, meaning
15 in the off season?
16     A   No.   11:59:09AM
17         MR. NOVIKOFF: Objection to the form   11:59:10AM
18 of that question.
19 BY MR. GOODSTADT:   11:59:12AM
20     Q    So was Ed Carter a part-time officer   11:59:12AM
21 or a seasonal officer?
22         MR. CONNOLLY: When?   11:59:16AM
23         MR. GOODSTADT: At any point in time   11:59:17AM
24 during his employment.

29 (Pages 113 to 116)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 117

GEORGE HESSE

1
2      MR. NOVIKOFF: Objection.          11:59:21AM
3    A  I don't know.                    11:59:21AM
4    Q  Well, did Ed ever work on the off      11:59:23AM
5  season --
6    A  Sure.                           11:59:27AM
7    Q  -- based on the definition we had?     11:59:27AM
8      So he couldn't have been a seasonal    11:59:29AM
9  officer, according to your definition and
10  understanding, correct?  So the fact that he
11  worked -- the fact that he worked during the off
12  season based on the definition that you've given
13  us, he couldn't have been a seasonal officer,
14  correct?  He had to have been part-time?
15      MR. NOVIKOFF: Objection to form.       11:59:49AM
16    A  His title is not controlled by me, so  11:59:49AM
17  I don't know what his title was.
18    Q  Well, his title is controlled by what?  11:59:54AM
19      MR. NOVIKOFF: Objection to form.       11:59:57AM
20  Calls for a legal conclusion.
21  BY MR. GOODSTADT:                     12:00:01PM
22    Q  What's your understanding of what his  12:00:01PM
23  title is controlled by?
24      MR. NOVIKOFF: Objection to form.       12:00:05PM
25    A  Well, my understanding is that the     12:00:06PM

Page 118

GEORGE HESSE

1
2  village, the village office, somebody within the
3  village office has to fill out some sort of
4  documentation changing his status or any
5  officer's status.
6    Q  Just for your understanding, if he was  12:00:23PM
7  working in the off season, then he couldn't have
8  been properly classified as a seasonal officer;
9  is that your understanding?
10      MR. NOVIKOFF: Objection.             12:00:35PM
11    A  His classification could have been     12:00:42PM
12  still seasonal.  I really don't know.
13    Q  But then he's working outside of       12:00:46PM
14  class, correct?
15      MR. NOVIKOFF: Objection.             12:00:50PM
16    A  Oh, yeah.  Yes.                      12:00:51PM
17    Q  So just so I'm clear.  I just want to  12:00:54PM
18  make sure I'm clear in my understanding.  So
19  either he was classified as part-time or he was
20  misclassified if he was classified as seasonal,
21  correct?
22      MR. NOVIKOFF: Objection to form.       12:01:05PM
23      MR. CALLAHAN: Objection to form.       12:01:07PM
24      MR. CONNOLLY: Objection.             12:01:08PM
25    A  Yes.                             12:01:08PM

Page 119

GEORGE HESSE

1
2    Q  Okay.  So there came a point in time   12:01:09PM
3  that you testified you became a full-time
4  officer, correct?
5    A  Yes.                             12:01:18PM
6    Q  Was there any kind of canvass letter   12:01:19PM
7  or list that you had to come off of to get that
8  position?
9    A  Yes.                             12:01:24PM
10    Q  And you were on the Ocean Beach list;  12:01:25PM
11  is that how it works?
12    A  It's a preferred list, yes.          12:01:29PM
13    Q  What do you mean by "preferred list"?  12:01:30PM
14    A  It's a residents list.              12:01:32PM
15    Q  So the residents of Ocean Beach get   12:01:38PM
16  preference over other people who may be
17  eligible?
18    A  Yes.                             12:01:44PM
19    Q  Is that one of the reasons why you use 12:01:45PM
20  the Ocean Beach residence as an address?
21      MR. NOVIKOFF: Objection.  Asked and   12:01:51PM
22  answered in the first 10 minutes of the
23  deposition.
24      MR. CONNOLLY: Objection.             12:01:54PM
25    A  Repeat the question.                12:01:56PM

Page 120

GEORGE HESSE

1
2    Q  Is one of the reasons why you used     12:01:57PM
3  Ocean Beach as your address to get onto that
4  preferred list?
5      MR. NOVIKOFF: Objection.             12:02:04PM
6    A  At the time, yes.                   12:02:05PM
7    Q  How long did you hold the title of     12:02:15PM
8  full-time police officer?
9    A  From November of '95 till present.    12:02:21PM
10    Q  So your title is police officer?      12:02:30PM
11    A  Correct.                          12:02:31PM
12    Q  That's the same title Ed Carter had    12:02:32PM
13  when he worked there?
14      MR. NOVIKOFF: Objection.             12:02:36PM
15    A  No.                              12:02:36PM
16    Q  He wasn't a police officer?          12:02:37PM
17    A  Yes.                             12:02:38PM
18    Q  Well, you're full-time, he's          12:02:40PM
19  part-time?
20    A  That's correct.                    12:02:43PM
21      MR. NOVIKOFF: Objection.             12:02:44PM
22  BY MR. GOODSTADT:                     12:02:44PM
23    Q  And you had the same title as the      12:02:45PM
24  other full-time police officers in Ocean Beach?
25    A  Yes.                             12:02:49PM

TSG Reporting – Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 121

GEORGE HESSE

1
2       Q    Did you ever get the title of          12:02:50PM
3  sergeant?
4       A    Yes.                    12:02:52PM
5       Q    When was that?              12:02:52PM
6       A    I believe in 2001.          12:02:53PM
7       Q    When did you first request the title  12:02:55PM
8  of sergeant?
9       A    Maybe in 1999.              12:03:04PM
10      Q    And how did you go about requesting   12:03:05PM
11  the title of sergeant?
12      A    I believe I wrote a memo to Ed       12:03:09PM
13  Paradiso.
14      Q    When was the last time you looked at  12:03:12PM
15  that memo?
16      A    I may have looked at it yesterday. I  12:03:19PM
17  didn't read it. I just kind of looked at it. I
18  just knew what it was.
19      Q    To prepare for today's deposition, you  12:03:24PM
20  looked at it?
21      A    Yes.                    12:03:27PM
22      Q    Where did you look at it?          12:03:27PM
23      A    In Mr. Connolly's office in       12:03:28PM
24  Westchester.
25          MR. GOODSTADT: Please mark that as   12:03:37PM

Page 122

GEORGE HESSE

1
2  Hesse 1.
3          (Whereupon, Bates document 3856 was   12:03:40PM
4  marked as Plaintiff's Exhibit 1 for
5  identification, as of this date.)
6          MR. NOVIKOFF: This is Hesse 1?       12:04:09PM
7          MR. GOODSTADT: It is.              12:04:10PM
8  I've placed in front of Mr. Hesse          12:04:15PM
9  what's now been marked as Hesse 1. It's a
10  one-page exhibit bearing Bates No. 3856.
11  (Handing.)
12  BY MR. GOODSTADT:                     12:04:22PM
13      Q    Mr. Hesse, is this the memo that    12:04:22PM
14  you're referring to that you wrote to Paradiso
15  in '99?
16      A    I believe so.              12:04:31PM
17      Q    Is that your signature on the bottom?  12:04:31PM
18      A    Yes.                    12:04:33PM
19      Q    And do you see on the bottom under   12:04:33PM
20  your typed signature line it says "PO103." what
21  does that stand for?
22      A    Police officer.             12:04:40PM
23      Q    Right.                   12:04:43PM
24      A    Then my shield number is 103.       12:04:43PM
25      Q    And what is the slash 8900?        12:04:45PM

Page 123

GEORGE HESSE

1
2      A    And that would be our command number.  12:04:48PM
3      Q    What do you mean by command number?  12:04:50PM
4      A    It's a number designating our police  12:04:52PM
5  department within the County of Suffolk.
6      Q    And you see the CC on the bottom,   12:04:58PM
7  Chief Paradiso correspondence file and original
8  to your personnel file.
9          Do you see that?             12:05:04PM
10      A    Yes.                    12:05:05PM
11      Q    Do you know who wrote that?        12:05:05PM
12      A    No.                    12:05:06PM
13      Q    That's not your handwriting?       12:05:07PM
14      A    No.                    12:05:08PM
15      Q    And then you see a stamp on the bottom 12:05:09PM
16  that says "Received February 18th, 1999."
17          Do you see that?             12:05:13PM
18      A    Yes.                    12:05:14PM
19      Q    Do you know who stamped that?       12:05:14PM
20      A    No.                    12:05:16PM
21      Q    How did you deliver this to the chief? 12:05:16PM
22      A    I may have just left it on his desk.  12:05:20PM
23      Q    Was this the letterhead of Ocean Beach 12:05:23PM
24  at the time?
25      A    At the time, yes.            12:05:27PM

Page 124

GEORGE HESSE

1
2      Q    Do you know who created the letterhead 12:05:28PM
3  for Ocean Beach?
4      A    No.                    12:05:31PM
5      Q    Okay. And now you asked for a      12:05:32PM
6  provisional appointment to sergeant.
7          Do you see that?             12:05:37PM
8      A    Yes.                    12:05:38PM
9      Q    What does that mean, a provisional   12:05:38PM
10  appointment?
11      A    I believe that you could be appointed  12:05:42PM
12  provisionally to a certain position pending the
13  taking of the next scheduled test.
14      Q    What's the basis of your belief on   12:05:49PM
15  that?
16      A    Somebody, I think, told me that.    12:05:53PM
17      Q    Do you know who told you that?      12:05:55PM
18      A    I don't recall.             12:05:56PM
19      Q    And so as of 1999, you had not taken  12:05:59PM
20  the sergeant's test?
21      A    I don't recall. I may have tried to  12:06:07PM
22  have taken the test at one time.
23      Q    At one time prior to '99?         12:06:11PM
24      A    It's possible. I don't know.       12:06:13PM
25      Q    How many times have you taken the   12:06:14PM

TSG Reporting – Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 125

GEORGE HESSE

1            GEORGE HESSE
2     sergeant's test?
3         A    I was assigned to take it four times.  12:06:17PM
4     I believe I took it three times.  I was a
5     no-show on one other.
6         Q    Did you pass it on any of the three   12:06:30PM
7     times you took it?
8         A    No.                12:06:33PM
9         Q    So you failed the sergeant's test   12:06:33PM
10    three times?
11        A    Yes.               12:06:36PM
12        Q    When was the first time you took it?  12:06:37PM
13        A    I don't recall.           12:06:38PM
14        Q    You don't recall what year it was?   12:06:39PM
15        A    No.                12:06:41PM
16        Q    When was the second time you took it?  12:06:42PM
17        A    I don't recall.           12:06:43PM
18        Q    Do you recall when the last time you  12:06:44PM
19    took it?
20        A    I took it in June of '07.      12:06:46PM
21        Q    Do you recall what your score was?   12:06:52PM
22        A    65.                12:06:53PM
23        Q    And what was the required score?   12:06:54PM
24        A    70.                12:06:55PM
25        Q    Do you recall what your scores were  12:06:58PM

Page 126

GEORGE HESSE

1            GEORGE HESSE
2     the other two times you took it?
3         A    No, I don't recall.         12:07:02PM
4         Q    Do you need to pass a sergeant's test  12:07:05PM
5     to be a sergeant?
6         MR. NOVIKOFF:  Objection.       12:07:10PM
7         MR. CONNOLLY:  Objection.       12:07:10PM
8         A    I believe so, yes.         12:07:11PM
9         Q    And what's your basis of that belief?  12:07:12PM
10        A    It's a promotional exam to sergeant.  12:07:14PM
11        Q    And then you write in your memo     12:07:19PM
12    here -- well, strike that, before the memo.
13            When were you a no-show to the test?  12:07:26PM
14        A    I don't recall.           12:07:29PM
15        Q    Do you recall what year it was?   12:07:31PM
16        A    Nope.              12:07:32PM
17        Q    Why didn't you show up?      12:07:34PM
18        A    I don't recall.           12:07:40PM
19        Q    Do you have to provide a reason why  12:07:44PM
20    you don't show up to the county?
21        A    No.                12:07:47PM
22        Q    You don't recall being out the night  12:07:53PM
23    before drinking that you didn't show up?
24        MR. NOVIKOFF:  Again, I didn't    12:07:57PM
25    understand the question.  You kind of

Page 127

GEORGE HESSE

1            GEORGE HESSE
2     mumbled and tailed off.
3     BY MR. GOODSTADT:            12:08:02PM
4         Q    I said, you don't recall being out   12:08:02PM
5     drinking the night before that you were a
6     no-show?
7         MR. NOVIKOFF:  Objection to form.   12:08:08PM
8         MR. CONNOLLY:  Objection.       12:08:09PM
9         A    No.                12:08:10PM
10        Q    Did you ever report to anybody at the  12:08:10PM
11    beach the fact that you had failed the
12    sergeant's test each time?
13        A    No.                12:08:16PM
14        Q    How were you alerted to the fact of  12:08:22PM
15    your score?  Was it posted somewhere?  Did you
16    get a letter or something?
17        MR. NOVIKOFF:  Objection.       12:08:28PM
18        A    I received a letter.        12:08:28PM
19        Q    Each time?             12:08:32PM
20        A    Yes.               12:08:33PM
21        Q    Did you keep copies of those letters?  12:08:46PM
22        A    No.                12:08:48PM
23        Q    Did you throw them out?      12:08:48PM
24        A    Yeah.              12:08:49PM
25        Q    As a police officer, as a full-time  12:08:55PM

Page 128

GEORGE HESSE

1            GEORGE HESSE
2     police officer, are there any restrictions on
3     supervisory powers that you're entitled to have?
4         MR. NOVIKOFF:  Objection to form.   12:09:05PM
5         A    Repeat the question.        12:09:15PM
6         Q    Yeah.              12:09:16PM
7             As a full-time police officer, as   12:09:16PM
8     opposed to any of the promotional roles,
9     sergeant, lieutenant, chief, is there any
10    restriction on the supervisory power that you're
11    entitled to have?
12        MR. CALLAHAN:  Objection to form.   12:09:29PM
13        MR. CONNOLLY:  Yeah, same objection.  12:09:30PM
14        MR. NOVIKOFF:  Objection.       12:09:32PM
15        A    No.                12:09:34PM
16        Q    So you're not aware of any      12:09:36PM
17    restrictions on powers that you can have in a
18    supervisor role?
19        MR. NOVIKOFF:  Note my objection.   12:09:42PM
20        A    No.                12:09:43PM
21        Q    And you see in the memo, if you look  12:09:47PM
22    down on the second line --
23        A    Uh-huh.              12:09:53PM
24        Q    -- the last word says -- that sentence  12:09:53PM
25    says, "The undersigned officer feels since I

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 129

GEORGE HESSE

1
2 already assumed the role of a supervisor, that
3 this appointment will help the police department
4 as a whole," et cetera.
5        Do you see that line?          12:10:05PM
6    A   Yes, I do.              12:10:06PM
7    Q   What were you referring to when you   12:10:07PM
8 said "since I already assumed the role of a
9 supervisor"?
10   A   I was a full-time police officer, I   12:10:13PM
11 was a senior officer, according to being
12 full-time, and Chief Paradiso already had
13 established that I was in charge of the shifts.
14   Q   In charge of which shifts?          12:10:25PM
15   A   The shifts that I was on, working.   12:10:27PM
16   Q   Did you have a set assigned shift in   12:10:30PM
17 or around '99?
18   A   I pretty much worked the standard   12:10:35PM
19 schedule, yes.
20   Q   What standard schedule?  What's the   12:10:38PM
21 hours of that shift?
22   A   For a long time, I worked Fridays and   12:10:42PM
23 Saturdays from 9 at night until 5 in the
24 morning, and then on Sundays I worked a 4 to 12,
25 and then on Mondays and Tuesdays I worked from

Page 130

GEORGE HESSE

1
2 8:00 a.m. till 4 p.m.
3    Q   Were there any other full-time        12:10:57PM
4 officers in '99 other than for you and
5 Paradiso --
6    A   No.                    12:11:02PM
7    Q   -- at Ocean Beach?          12:11:02PM
8    A   No.                    12:11:04PM
9    Q   And what were Paradiso's hours?       12:11:06PM
10   A   He pretty much worked straight day   12:11:09PM
11 tours.  He worked, I believe, from Wednesday
12 till Sunday, 8 till 4.
13   Q   Did that ever change, those regular   12:11:24PM
14 tours for Paradiso?
15   A   At some point, yes.          12:11:29PM
16   Q   When did it change?          12:11:30PM
17       And I don't mean once it went on leave   12:11:34PM
18 and he didn't have any more tours.  I'm talking
19 about until he went on leave.
20   A   I'm not sure of the date.  It might   12:11:41PM
21 have been 2001, 2002.
22   Q   And what did his tours change to?    12:11:45PM
23   A   He -- he was told to work the night   12:11:49PM
24 tours on Fridays and Saturdays and holiday
25 Sundays.

Page 131

GEORGE HESSE

1
2    Q   Who told him that?          12:12:04PM
3    A   The mayor.  Mayor Rogers, to be exact. 12:12:05PM
4    Q   Do you know why she told him that?   12:12:09PM
5    A   Yes.                   12:12:11PM
6    Q   And why did she tell him that?       12:12:11PM
7    A   It was a form of disciplinary action   12:12:15PM
8 against Ed Paradiso.
9    Q   And what was he being disciplined for? 12:12:19PM
10   A   I believe it was for double-dipping.   12:12:23PM
11   Q   And how did you learn that that was a   12:12:29PM
12 form of disciplinary action against Paradiso?
13   A   Because I knew a complaint was filed   12:12:33PM
14 against Paradiso by somebody in the village, and
15 I believe it was very slightly investigated and
16 he was switched to the night tours.
17   Q   Who filed a complaint?          12:12:50PM
18   A   I believe it was a Dale Wyckoff.   12:12:52PM
19   Q   Wyckoff?                12:12:58PM
20   A   W-Y-C-K-O-F-F.              12:13:01PM
21   Q   Is that a male or a female, Dale   12:13:06PM
22 Wyckoff?
23   A   Female.                12:13:09PM
24   Q   Any relation to Doug Wyckoff?       12:13:10PM
25   A   Yes.                   12:13:13PM

Page 132

GEORGE HESSE

1
2    Q   What's the relationship?          12:13:13PM
3    A   Well, there's Doug senior, who is her   12:13:14PM
4 ex-husband, and her son.
5    Q   Any relationship to a Marissa Wyckoff? 12:13:22PM
6    A   That would be her daughter.          12:13:24PM
7    Q   Marissa Wyckoff worked for you at some 12:13:25PM
8 point --
9    A   Yes.                   12:13:29PM
10   Q   -- in the police department?          12:13:29PM
11       There was a Doug Wyckoff at the        12:13:39PM
12 Halloween incident, correct?
13   A   Yes.                   12:13:43PM
14   Q   Was that senior or is that the son?   12:13:43PM
15   A   Senior.                12:13:46PM
16   Q   So -- and is Doug Wyckoff the father   12:13:52PM
17 of Marissa Wyckoff?
18   A   Doug senior, yes.          12:13:59PM
19   Q   How did you learn of the complaint   12:14:03PM
20 filed against Paradiso?
21   A   Dale Wyckoff told me.          12:14:10PM
22   Q   Did you ever see a copy of the       12:14:12PM
23 complaint?
24   A   No.                    12:14:15PM
25   Q   And who told that you he was being -- 12:14:15PM

33 (Pages 129 to 132)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 133

GEORGE HESSE

1
2    that Paradiso was being disciplined for the
3    double-dipping allegation?
4        A   I don't recall.            12:14:22PM
5        Q   Did you speak to Mayor Rogers about   12:14:23PM
6    it?
7        A   I don't recall.            12:14:26PM
8        Q   And who performed the slight        12:14:28PM
9    investigation -- I think you called it a slight
10   investigation.  Who performed the slight
11   investigation?
12       A   It was -- I believe it was Peter Bee   12:14:36PM
13   from Bee, Ready & Fishbein.
14       Q   And how do you know that Peter Bee    12:14:45PM
15   performed this investigation?
16       A   That's what I was told.        12:14:50PM
17       Q   By who?               12:14:51PM
18       A   I don't recall.            12:14:52PM
19       Q   Did Mayor Rogers tell you that?    12:14:52PM
20       A   I don't recall.            12:14:55PM
21       Q   Do you know what the results of the   12:14:55PM
22   investigation were?
23       A   I believe it was confirmed that he was 12:14:57PM
24   double-dipping.
25       Q   Do you know what led to that       12:15:05PM

Page 134

GEORGE HESSE

1
2    conclusion?
3        A   I believe it was his time sheets in   12:15:08PM
4    Ocean Beach and his time sheets in East Islip
5    School District.
6        Q   And so he was put onto your tours or   12:15:20PM
7    at least the Friday, Saturday tours that you
8    testified to before?
9        A   Yes.                  12:15:25PM
10       Q   And you were put on different tours?   12:15:26PM
11       A   Yes.                  12:15:29PM
12       Q   What tours were you put on when that   12:15:31PM
13   happened?
14       A   I was put on the day tour, which was   12:15:33PM
15   an 8 a.m. till 4 p.m.
16       Q   Did you ever discuss this change in   12:15:40PM
17   shift with Paradiso?
18       A   Yes.                  12:15:47PM
19       Q   When?                12:15:48PM
20       A   I'm sure right after it happened, but  12:15:51PM
21   I don't recall the date.
22       Q   Did you discuss the reasons for the   12:15:54PM
23   change in shift with Paradiso?
24       A   You know, I don't recall.       12:16:00PM
25       Q   Did you ever discuss with Paradiso the 12:16:02PM

Page 135

GEORGE HESSE

1
2    alleged time overlap or double-dipping I think
3    you called it?
4        A   I don't recall.            12:16:08PM
5        Q   You don't recall one way or the other? 12:16:09PM
6        A   No.                  12:16:11PM
7        Q   Again, just I know I asked the     12:16:14PM
8    question.  I just don't remember the question.
9            Who told you that the reason why the  12:16:18PM
10   tours were being shifted was a form of
11   discipline?
12       A   I don't recall.            12:16:23PM
13       Q   Do you have anything that would     12:16:25PM
14   refresh your recollection?
15       A   Not that I'm aware of.        12:16:27PM
16       Q   Did you ever discuss with Paradiso    12:16:28PM
17   that he was being disciplined?
18       A   I don't recall.            12:16:35PM
19       Q   Did you ever discuss with any other   12:16:35PM
20   current or former Ocean Beach police officers
21   that that shift in the tours was a form of
22   discipline for Paradiso?
23           MR. NOVIKOFF:  Objection to form.    12:16:45PM
24       A   I don't recall.            12:16:48PM
25       Q   Do you know if anything was put in his 12:16:50PM

Page 136

GEORGE HESSE

1
2    personnel file reflecting his being disciplined?
3        A   I never -- I have never seen anything. 12:16:55PM
4    I don't know.
5        Q   Who made the decision to discipline   12:16:58PM
6    him in this way?
7        A   I believe it was the mayor, but     12:17:02PM
8    that's -- I'm just guessing.
9        Q   What's the basis of that belief?    12:17:07PM
10       A   She was his boss.           12:17:09PM
11       Q   Do you know who Ms. Wyckoff complained 12:17:15PM
12   to?
13           MR. CONNOLLY:  You're referring to -- 12:17:23PM
14           MR. GOODSTADT:  Dale Wyckoff, yes.   12:17:27PM
15           MR. CONNOLLY:  Right.        12:17:28PM
16       A   I believe she took her written      12:17:29PM
17   complaint and filed it with the village office
18   or the Board of Trustees.  I just don't know.
19       Q   Do you know if the Board of Trustees  12:17:36PM
20   ever discussed it?
21       A   I don't know.             12:17:39PM
22       Q   Do you know whether the Board of     12:17:42PM
23   Trustees ever voted on the issue of whether or
24   not to discipline Paradiso in the way that
25   you've testified to?

34 (Pages 133 to 136)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 137

GEORGE HESSE

1
2      A   I don't know.                    12:17:55PM
3      Q   Have you ever been in a Board of    12:17:57PM
4    Trustees meeting?
5      A   Yes.                             12:18:00PM
6      Q   Are you required to go to Board of   12:18:01PM
7    Trustees meetings?
8         MR. NOVIKOFF:  Objection to form.   12:18:05PM
9      A   No.                              12:18:06PM
10     Q   So you sent this memo to Paradiso, and   12:18:14PM
11   the first sentence, it says, "As per our
12   conversation."
13        Do you see that?                  12:18:20PM
14     A   Yes.                             12:18:21PM
15     Q   What did you and Paradiso discuss in   12:18:21PM
16   that conversation?
17     A   I don't recall.                  12:18:26PM
18     Q   Do you recall anything that you    12:18:28PM
19   discussed?
20     A   No.                              12:18:29PM
21     Q   You don't recall whether you discussed   12:18:31PM
22   the actual test, the sergeant's test with
23   Paradiso by that time?
24     A   I don't recall.                  12:18:36PM
25     Q   Was anything decided with respect to   12:18:38PM

Page 138

GEORGE HESSE

1
2    this request for a provisional appointment in
3    '99?
4      A   I don't recall.                  12:18:46PM
5      Q   Did you actually make a proposal to    12:18:47PM
6    the village for this position?
7      A   I don't recall.                  12:18:52PM
8      Q   Do you have anything that would     12:18:54PM
9    refresh your recollection?
10     A   There might be.  I don't know.    12:18:56PM
11     Q   Anything that you can think of that    12:18:57PM
12   would refresh your recollection?
13     A   No.                              12:19:01PM
14     Q   Did you communicate this request with   12:19:04PM
15   any trustees in 1999?
16     A   I don't recall.                  12:19:11PM
17     Q   Anything that would refresh your   12:19:11PM
18   recollection?
19     A   I don't know.                    12:19:13PM
20     Q   Did you receive an appointment to the   12:19:18PM
21   provisional sergeant's position?
22        MR. CALLAHAN:  Objection to form.    12:19:23PM
23        MR. NOVIKOFF:  I join in it.       12:19:25PM
24        MR. GOODSTADT:  I'll strike that.   12:19:28PM
25

Page 139

GEORGE HESSE

1
2    BY MR. GOODSTADT:                       12:19:29PM
3      Q   Did you receive a provisional     12:19:30PM
4    appointment to sergeant in 1999?
5      A   No.                              12:19:34PM
6      Q   Was this request denied?          12:19:34PM
7      A   I believe so.                    12:19:37PM
8      Q   Who denied it?                    12:19:38PM
9      A   It may have been the chief.       12:19:40PM
10     Q   Do you know why he denied it?      12:19:44PM
11     A   No.                              12:19:45PM
12     Q   Did you ever speak to him about him    12:19:45PM
13   denying it?
14     A   I don't recall.                  12:19:48PM
15     Q   How did you learn that it was denied?   12:19:49PM
16     A   I believe was told.              12:19:51PM
17     Q   By who?                          12:19:52PM
18     A   By the chief.                    12:19:52PM
19     Q   Did he give you the reason as to why   12:19:53PM
20   he was denying it?
21     A   I don't recall.                  12:19:57PM
22     Q   You don't recall if he gave you the    12:19:57PM
23   reason or you don't recall what the reason was?
24     A   I don't know.  I'm thinking there was   12:20:02PM
25   something in writing that he may have given me,

Page 140

GEORGE HESSE

1
2    but I don't recall.
3      Q   Did you keep a copy of what he gave to   12:20:17PM
4    you in writing?
5      A   I don't recall.                  12:20:21PM
6      Q   Do you know if it was put in your    12:20:22PM
7    personnel file?
8      A   I don't know.                    12:20:24PM
9      Q   When was the last time you looked at   12:20:25PM
10   your personnel file?
11     A   Last time I looked in my personal   12:20:32PM
12   file?  You know, I don't recall.
13     Q   Last time you looked through it, do    12:20:39PM
14   you recall seeing anything in writing with
15   respect to a denial of your request in 1999?
16     A   No.                              12:20:46PM
17     Q   Did you ever make a follow-up request   12:20:48PM
18   for that same promotion?
19     A   I may have.                      12:20:54PM
20     Q   Do you recall actually doing it?   12:20:55PM
21     A   I don't recall.                  12:20:57PM
22        MR. GOODSTADT:  I apologize, that   12:21:23PM
23   corner's ripped.
24        (Whereupon, Bates document 3847 was   12:21:27PM
25   marked as Plaintiff's Exhibit 2 for

35 (Pages 137 to 140)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 141

GEORGE HESSE

1   GEORGE HESSE
2   identification, as of this date.)
3         MR. CONNOLLY:  Andrew, is this a        12:21:49PM
4   separate exhibit or is it part --
5         MR. GOODSTADT:  It is.  This is going    12:21:53PM
6   to be Hesse 2.  It's a separate exhibit.
7         I've placed in front of Mr. Hesse        12:22:14PM
8   what's now been marked as Hesse 2.  It is a
9   one-page document that is marked Bates
10  No. 3847.  (Handing.)
11  BY MR. GOODSTADT:                              12:22:25PM
12      Q   Mr. Hesse, have you ever seen this     12:22:26PM
13  document that's been marked as Hesse 2?
14      A   Yes.                                   12:22:30PM
15      Q   Is that your signature at the bottom   12:22:30PM
16  left corner?
17      A   Yes.                                   12:22:33PM
18      Q   And does this refresh your             12:22:35PM
19  recollection as to whether you made a subsequent
20  request for this provisional appointment
21  promotion?
22      A   Yes.                                   12:22:45PM
23      Q   And this is dated March 25th, 2001,    12:22:45PM
24  correct?
25      A   Correct.                               12:22:49PM

Page 142

GEORGE HESSE

1   GEORGE HESSE
2       Q   Do you recall how you submitted this   12:22:49PM
3   to the chief?
4       A   I may have just laid it on his desk.   12:22:54PM
5       Q   And in the second paragraph, you       12:23:02PM
6   reference, "The last time we spoke of this, you
7   stated 'look at what they did to Bob Golopi.'"
8           Do you see that?                       12:23:10PM
9       A   Yes.                                   12:23:11PM
10      Q   Do you recall the conversation that    12:23:12PM
11  you're referring to, the last time we spoke of
12  that, when that last conversation was?
13      A   I don't recall.                        12:23:19PM
14      Q   Was that the conversation in '99 that  12:23:19PM
15  you testified to already or is that some
16  subsequent conversation?
17      A   I don't recall.                        12:23:24PM
18      Q   Do you know what you're referring to   12:23:26PM
19  or what Paradiso was referring to when he said
20  "look at what they did to Bob Golopi"?
21      A   You know, I don't recall.              12:23:35PM
22      Q   The next sentence says, "Bob got what  12:23:37PM
23  he wanted and/or deserved."
24          Do you see that?                       12:23:41PM
25      A   Yes.                                   12:23:42PM

Page 143

GEORGE HESSE

1   GEORGE HESSE
2       Q   What were you referring to there?      12:23:43PM
3       A   I believe he -- well, he moved off the 12:23:46PM
4   beach and he got a vehicle.  And I'm
5   speculating.  But I really -- I really don't
6   recall.
7       Q   You don't recall what you're referring 12:23:57PM
8   to there?
9       A   No.  The "deserved" part, no.          12:24:00PM
10      Q   The next sentence says, "He always     12:24:02PM
11  made deals with the village without first
12  consulting you."
13          Do you see that?                       12:24:07PM
14      A   Yes.                                   12:24:08PM
15      Q   What are you referring to there?       12:24:08PM
16      A   Bob was always scamming, trying to     12:24:10PM
17  scam over the chief.  He wanted to be the chief.
18  He wanted to be in charge.  He was always
19  playing me and Paradiso and the mayor --
20  actually, the previous mayor, Natalie Rogers,
21  against each other.  And he was just -- I think
22  he was just ploying for leadership.
23      Q   What did he do to make you believe     12:24:35PM
24  that he was ploying for leadership?
25      A   He was always badmouthing Ed Paradiso  12:24:41PM

Page 144

GEORGE HESSE

1   GEORGE HESSE
2   and always trying to get him into trouble for
3   things that Ed may have done or not done.  I
4   don't know.  But he was always trying to be in
5   charge of everything.
6       Q   Was that inappropriate --             12:24:54PM
7           MR. NOVIKOFF:  Objection.              12:24:57PM
8   BY MR. GOODSTADT:                              12:24:58PM
9       Q   -- in your mind?                       12:24:59PM
10      A   Yes.                                   12:25:00PM
11      Q   Did he ever go outside the chain of    12:25:01PM
12  command and complain about Paradiso?
13          MR. NOVIKOFF:  Objection.              12:25:06PM
14  BY MR. GOODSTADT:
15      Q   Did Golopi ever go outside the chain   12:25:07PM
16  of command to complain about Paradiso?
17          MR. NOVIKOFF:  Objection.              12:25:13PM
18      A   I don't know.                          12:25:14PM
19      Q   Is going to the village and            12:25:16PM
20  complaining about him without first going to
21  Paradiso, is that going outside the chain of
22  command?
23      A   Well, if he felt there was an issue    12:25:24PM
24  with Paradiso, the next step would be the mayor,
25  who was our police commissioner.  So that is not

36 (Pages 141 to 144)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 145

GEORGE HESSE

```
1          GEORGE HESSE
2   going out of the chain of command.
3       Q   Is that what he did?  When you say   12:25:34PM
4   "deals with the village," you're referring to
5   the mayor?
6       A   Yes.                    12:25:43PM
7       Q   And the chain of the command, should   12:25:45PM
8   he first have gone to Paradiso --
9          MR. NOVIKOFF:  Objection to form.   12:25:50PM
10  BY MR. GOODSTADT:                  12:25:51PM
11      Q   -- with a complaint he had about   12:25:52PM
12  Paradiso?
13      A   Yes.                    12:25:54PM
14      Q   The next paragraph, the second   12:25:56PM
15  sentence says, "All I asked for is the title of
16  sergeant."
17         Do you see that?              12:26:04PM
18      A   Yes.                    12:26:04PM
19      Q   Is the sergeant, is that a competitive   12:26:04PM
20  position, where there needs to be a canvass
21  letter?
22         MR. NOVIKOFF:  Objection.       12:26:12PM
23         MR. CALLAHAN:  Objection.       12:26:13PM
24         MR. CONNOLLY:  Objection.       12:26:14PM
25      A   On most jobs, yes.            12:26:14PM
```

Page 146

GEORGE HESSE

```
1          GEORGE HESSE
2       Q   How about at Ocean Beach?       12:26:16PM
3       A   Well, if I'm the only one taking the   12:26:18PM
4   test, it's just a promotion.  It's not
5   comparative.
6       Q   What do you mean by "on most jobs,   12:26:24PM
7   yes"?
8       A   Say if it was Suffolk County PD and   12:26:27PM
9   you got 600 guys taking the sergeant's test
10  and there are four positions open, it's a
11  competitive promotion.
12      Q   So here there wouldn't have been a   12:26:37PM
13  canvass letter for that title, because you're
14  the only person going for it?
15         MR. NOVIKOFF:  Objection.       12:26:39PM
16      A   You know, I don't know.        12:26:40PM
17      Q   Then the last sentence of that   12:26:44PM
18  paragraph, "Even Mayor Rogers refers to me as
19  the sergeant when she speaks to me."
20         Do you see that?              12:26:51PM
21      A   Yes.                    12:26:51PM
22      Q   What did you mean by that?       12:26:51PM
23      A   She would call me Sergeant Hesse.   12:26:53PM
24      Q   Really?  For how long was she calling   12:26:56PM
25  you Sergeant Hesse?
```

Page 147

GEORGE HESSE

```
1          GEORGE HESSE
2       A   Probably for as long as she's been the   12:27:00PM
3   mayor.
4       Q   Did she ever call you Chief Hesse?   12:27:03PM
5       A   Yes.                    12:27:05PM
6       Q   When did that start?           12:27:06PM
7       A   When I was designated the deputy   12:27:07PM
8   chief.
9       Q   And then the first sentence of this   12:27:10PM
10  last paragraph says -- well, the next-to-last
11  paragraph, "I understand I did not do well
12  enough to pass the last exam."
13         Do you see that?              12:27:21PM
14      A   Yes.                    12:27:22PM
15      Q   So does that refresh your recollection   12:27:22PM
16  as to when you took the first test?
17      A   No.                     12:27:27PM
18      Q   But at least as of '01, you had taken   12:27:30PM
19  one and failed it, correct?
20      A   Correct.                  12:27:34PM
21      Q   And when you say "the last exam,"   12:27:36PM
22  you're referring to the sergeant's exam?
23      A   Yes.                    12:27:41PM
24      Q   Did you take it again after this 2001,   12:27:47PM
25  do you know, the test?
```

Page 148

GEORGE HESSE

```
1          GEORGE HESSE
2       A   Yes.                    12:27:50PM
3       Q   Two more times after that?       12:27:52PM
4       A   No.                     12:27:54PM
5       Q   One more time after '01 you took it?   12:27:55PM
6       A   Yes.                    12:27:57PM
7       Q   So you had taken it twice before you   12:27:58PM
8   wrote this letter and once after?
9       A   To the best of my recollection, yes.   12:28:02PM
10      Q   Okay.  So to the best of your   12:28:04PM
11  recollection, you took it in '07.  We discussed
12  that.
13         When did you take it prior to '07,   12:28:08PM
14  going in reverse chronological order?
15      A   I don't recall.              12:28:15PM
16      Q   You don't recall what year it was?   12:28:15PM
17      A   No.                     12:28:17PM
18      Q   And you don't recall the first time   12:28:18PM
19  you took it?
20      A   No.                     12:28:22PM
21      Q   But it's your belief that you had   12:28:23PM
22  taken it twice by '01, though, correct?
23      A   Yes.                    12:28:26PM
24      Q   Is there a limit on the amount of   12:28:27PM
25  times you can take a test for sergeant?
```

37 (Pages 145 to 148)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 149

GEORGE HESSE

1
2   MR. NOVIKOFF: Objection.    12:28:31PM
3   A   Not that I'm aware of.    12:28:32PM
4   Q   Now, you write in the next-to-last    12:28:43PM
5   sentence in that paragraph, "According to Civil
6   Service, you can stay in a provisional position
7   pending two exams."
8       Do you see that?    12:28:51PM
9   A   Yes.    12:28:51PM
10  Q   What's your basis for making that    12:28:51PM
11  statement?
12  A   I believe I was told that.    12:28:54PM
13  Q   By who?    12:28:56PM
14  A   I don't recall.    12:28:56PM
15  Q   And what did you mean by that? What's 12:29:00PM
16  your understanding of "you can stay in the
17  provisional position pending two exams"?
18  A   I believe my understanding was if you 12:29:07PM
19  took the test and failed it, you could remain in
20  that position until you take it again and
21  hopefully pass it.
22  Q   And what happens after the second time 12:29:15PM
23  you fail it, your understanding?
24  A   I don't know. I would assume they    12:29:19PM
25  remove you from the provisional appointment.

Page 150

GEORGE HESSE

1
2   Q   Then you said, "That gives me at least 12:29:26PM
3   four to five years to pass the test."
4       Do you see that?    12:29:30PM
5   A   Yes.    12:29:31PM
6   Q   How often was the test given, at least 12:29:32PM
7   at that time?
8   A   It's given in two-year increments.    12:29:36PM
9   Q   Every two years?    12:29:38PM
10  A   Every two years, yes.    12:29:39PM
11  Q   And then the last sentence says, "I    12:29:43PM
12  hope you reconsider your last decision, and I
13  thank you for your time in this matter."
14      Do you see that?    12:29:57PM
15  A   Yes.    12:29:57PM
16  Q   Did Paradiso ever reconsider his    12:29:57PM
17  decision the last time?
18  A   Yes.    12:30:01PM
19  Q   Okay. And what did he do this time in 12:30:02PM
20  response to this letter?
21  A   I believe he gave my proposal to the  12:30:09PM
22  village board, and it was approved.
23  Q   Were you at the -- strike that.    12:30:25PM
24      Was it approved at a board meeting?    12:30:27PM
25  A   To my understanding, it was approved  12:30:29PM

Page 151

GEORGE HESSE

1
2   in executive session at a board meeting.
3   Q   You weren't at the executive session? 12:30:36PM
4   A   No.    12:30:38PM
5   Q   So how did you learn that it was    12:30:39PM
6   approved at the executive session?
7   A   Paradiso had told me.    12:30:42PM
8   Q   Do you know when that was approved?   12:30:47PM
9   A   The date is -- the year was 2001. To  12:30:49PM
10  tell you the truth, I don't know the exact time
11  frame. It was definitely before the summer of
12  2001.
13  Q   And did that -- was the approval for  12:31:02PM
14  the provisional appointment or did they appoint
15  you sergeant?
16  A   It might have just been sergeant. I   12:31:09PM
17  don't know what the exact --
18  Q   Did you ever receive any -- a    12:31:14PM
19  confirmation of it in a letter saying
20  congratulations, you received X position?
21  A   No, I don't recall.    12:31:21PM
22  Q   Did you receive a raise when you got  12:31:22PM
23  the promotion?
24  A   I don't recall.    12:31:28PM
25  Q   Did you receive any additional    12:31:29PM

Page 152

GEORGE HESSE

1
2   authority when you got the position?
3   A   I was the sergeant, that -- sergeant. 12:31:35PM
4   Q   Did that -- did that grant you with   12:31:39PM
5   any additional authority that you didn't have
6   prior to being sergeant?
7       MR. NOVIKOFF: Objection. Form.    12:31:45PM
8   A   No.    12:31:46PM
9   Q   Did you have the authority to hire or 12:31:48PM
10  fire officers?
11  A   No.    12:31:51PM
12  Q   Did Paradiso have that authority?    12:31:55PM
13  A   Yes.    12:31:59PM
14  Q   Do you know whether he needed board   12:31:59PM
15  approval to hire or fire an officer?
16      MR. NOVIKOFF: Objection.    12:32:03PM
17  A   I don't believe so.    12:32:06PM
18  Q   Do you know whether he needed approval 12:32:09PM
19  from Civil Service to hire and fire an officer?
20      MR. NOVIKOFF: Objection. Form.    12:32:14PM
21  Foundation.
22  A   Yes.    12:32:16PM
23  Q   He needed approval from Civil Service? 12:32:18PM
24  A   Yes.    12:32:20PM
25  Q   Do you know whether he needed approval 12:32:25PM

38 (Pages 149 to 152)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 153

GEORGE HESSE

1
2   from anyone else other than for Civil Service
3   before he could hire or fire?
4      A   I'm not aware of any.          12:32:33PM
5      Q   What's the basis of your understanding 12:32:36PM
6   that he needed approval from Civil Service
7   before hiring or firing an officer?
8      A   Well, for the position, any person 12:32:41PM
9   within a municipality who is going to be hired,
10  you have to meet the minimum requirements that
11  Civil Service designates.
12     Q   And how about for terminations, did he 12:32:55PM
13  need approval from Civil Service before firing a
14  police officer?
15     MR. NOVIKOFF: Objection. Form.    12:33:05PM
16     MR. CALLAHAN: Objection.          12:33:07PM
17     A   I don't believe so.           12:33:07PM
18     Q   Did you actually appear before the  12:33:11PM
19  board to make a proposal for this position?
20     MR. NOVIKOFF: His position?       12:33:16PM
21  BY MR. GOODSTADT:                    12:33:17PM
22     Q   For the provisional appointment   12:33:17PM
23  position or just a sergeant position whichever
24  one you actually were promoted to.
25     MR. NOVIKOFF: As referred to in    12:33:24PM

Page 154

GEORGE HESSE

1
2   Hesse 2?
3      MR. GOODSTADT: This is the request. 12:33:27PM
4   He doesn't know exactly what the actual
5   promotion was. It was either sergeant or a
6   provisional appointment as sergeant.
7   BY MR. GOODSTADT:                    12:33:35PM
8      Q   Did you actually propose a promotion 12:33:35PM
9   to the board?
10     MR. CONNOLLY: Did he?            12:33:38PM
11  BY MR. GOODSTADT:                    12:33:39PM
12     Q   Yeah, did you physically go there and 12:33:39PM
13  make a proposal to them?
14     A   No.                 12:33:42PM
15     Q   Did you know that Paradiso had     12:33:45PM
16  forwarded your request on to the board?
17     A   I don't recall how it was done.   12:33:52PM
18     Q   Do you know whether he supported that 12:33:53PM
19  promotion at the time when he forwarded it on to
20  the board?
21     A   I don't know what his thoughts were. 12:34:00PM
22     Q   Did you ever see the letter that he 12:34:03PM
23  sent or the transmission that he sent with your
24  proposal to the board?
25     A   I may have. I don't recall.     12:34:10PM

Page 155

GEORGE HESSE

1
2      MR. GOODSTADT: Could you mark that as 12:34:16PM
3   Hesse 3.
4      (Whereupon, Bates document 3845-46 12:34:18PM
5   marked as Plaintiff's Exhibit 3 for
6   identification, as of this date.)
7      MR. CALLAHAN: How is this being    12:34:47PM
8   marked?
9      MR. GOODSTADT: Hesse 3.          12:34:49PM
10     I've placed in front of Mr. Hesse   12:34:53PM
11  what's been marked as Hesse 3. It is a
12  two-page document bearing Bates Nos. 3845
13  and 3846. (Handing.)
14  BY MR. GOODSTADT:                    12:35:02PM
15     Q   Mr. Hesse, have you ever seen the  12:35:03PM
16  exhibit that's been marked as Hesse 3?
17     A   Yes.                12:35:07PM
18     Q   Does this refresh your recollection as 12:35:08PM
19  to whether he forwarded on your document with
20  the recommendation?
21     A   Yes.                12:35:14PM
22     Q   Did you ever discuss with him that he 12:35:14PM
23  was going to recommend you for the position?
24     MR. NOVIKOFF: Objection. It was a  12:35:22PM
25  little confusing.

Page 156

GEORGE HESSE

1
2   BY MR. GOODSTADT:                    12:35:24PM
3      Q   At that time, before he sent this on, 12:35:25PM
4   did you ever discuss with him that he was going
5   to forward your request on with his
6   recommendation?
7      A   I don't recall.           12:35:34PM
8      Q   Did you discuss the test with him at 12:35:34PM
9   that point in time, the sergeant's test?
10     A   I don't recall.           12:35:38PM
11     Q   And it's your understanding the    12:35:43PM
12  board voted on it and approved it in executive
13  session?
14     MR. NOVIKOFF: Objection. Asked and 12:35:48PM
15  answered.
16  BY MR. GOODSTADT:                    12:35:49PM
17     Q   Is that correct?          12:35:49PM
18     A   Yes.                12:35:50PM
19     Q   Did you ever see any minutes that   12:35:51PM
20  reflect that?
21     A   No.                 12:35:56PM
22     Q   Did you ever speak to any of the    12:35:57PM
23  trustees about their approval of that
24  appointment?
25     A   Yes.                12:36:03PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 157

GEORGE HESSE

1
2     Q    Who did you speak with?          12:36:03PM
3     A    Andrew Miller.                   12:36:05PM
4     Q    Anyone else?                     12:36:06PM
5     A    Not that I recall.               12:36:08PM
6     Q    And what did Mr. Miller and you    12:36:12PM
7  discuss?
8     A    I don't recall.                  12:36:17PM
9     Q    Do you recall anything that you    12:36:18PM
10 discussed with him about the appointment?
11    A    I don't recall.                  12:36:23PM
12    Q    Did he tell you that it was      12:36:24PM
13 provisional as opposed to just sergeant?
14    A    I don't recall.                  12:36:30PM
15    Q    Do you know whether the promotion was  12:36:36PM
16 reported to Civil Service?
17    A    No, I don't.                     12:36:43PM
18    Q    Do you know if it was reported to the  12:36:45PM
19 State of New York?
20    A    No, I don't.                     12:36:48PM
21    Q    Did you ever attend any supervisory   12:36:57PM
22 schools administered by the Suffolk County
23 Police?
24        MR. NOVIKOFF: Objection to form.   12:37:03PM
25 Foundation.

Page 158

GEORGE HESSE

1
2        MR. CALLAHAN: Same objection.     12:37:05PM
3     A    No.                              12:37:07PM
4     Q    Is that a requirement to become a   12:37:08PM
5  sergeant to attend a supervisory school?
6        MR. NOVIKOFF: Objection. Form.     12:37:14PM
7        MR. CALLAHAN: Same.               12:37:18PM
8        MR. CONNOLLY: Same.               12:37:18PM
9     A    I don't know.                    12:37:20PM
10    Q    You don't know one way or the other?   12:37:20PM
11    A    No.                              12:37:20PM
12    Q    Do you know what I mean when I say   12:37:21PM
13 supervisory school administrated by the Suffolk
14 County Police?
15    A    Yes.                             12:37:27PM
16    Q    What is that, in your understanding.   12:37:28PM
17    A    I just know of a course that Suffolk   12:37:30PM
18 County offers as a supervisor school.
19    Q    And you never took that course?   12:37:38PM
20    A    No.                              12:37:40PM
21    Q    And you don't know one way or the   12:37:40PM
22 other whether it's required to be a sergeant to
23 take that course, correct?
24        MR. NOVIKOFF: Objection. Form.     12:37:47PM
25        MR. CALLAHAN: Same.               12:37:48PM

Page 159

GEORGE HESSE

1
2     A    I don't know.                    12:37:49PM
3     Q    Did you receive any training from   12:37:50PM
4  Suffolk County to be a sergeant?
5     A    No.                              12:37:56PM
6     Q    Did you go to any training -- other   12:37:58PM
7  than for it being on the job, did you go to any
8  formal training to be a sergeant?
9     A    No.                              12:38:07PM
10    Q    Did you have a business card at that   12:38:09PM
11 time?
12    A    I believe I did.                 12:38:12PM
13    Q    Did you change your business card to   12:38:13PM
14 reflect sergeant?
15    A    I'm sure I did.                  12:38:16PM
16    Q    Did it say provisional in there at   12:38:18PM
17 all?
18    A    Not that I'm aware of, no.       12:38:22PM
19    Q    Did you create your own business card   12:38:24PM
20 or did somebody -- or did someone at Ocean Beach
21 who was responsible for creating the business
22 cards?
23        MR. NOVIKOFF: Objection. Form.     12:38:32PM
24    A    I believe I created it.          12:38:33PM
25    Q    And you went out and got somebody to   12:38:35PM

Page 160

GEORGE HESSE

1
2  print them up?
3     A    No.                              12:38:39PM
4     Q    You printed them up yourself?    12:38:40PM
5     A    Yes.                             12:38:42PM
6     Q    Did you have a change in your uniform   12:38:45PM
7  to reflect the fact that you had been promoted
8  to sergeant?
9     A    Yes.                             12:38:52PM
10    Q    What did you have, the three chevron   12:38:52PM
11 patch or something that reflected your
12 promotion?
13    A    Yes.                             12:38:57PM
14    Q    Is that what you had, a three chevron   12:38:57PM
15 patch?
16    A    Yes.                             12:39:00PM
17    Q    And where did you get that patch from?  12:39:01PM
18    A    I believe it was ordered from the   12:39:04PM
19 uniform supply store.
20    Q    And you wore that on your sleeve?   12:39:10PM
21    A    Yes.                             12:39:13PM
22    Q    Was there any change to your shield   12:39:16PM
23 that reflects that you're a sergeant?
24    A    Yes.                             12:39:20PM
25    Q    What was the change on your shield   12:39:20PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 161

GEORGE HESSE

1          GEORGE HESSE
2    that reflected a sergeant?
3    A   I was issued a sergeant's shield.   12:39:23PM
4    Q   By who?                           12:39:25PM
5    A   Ed Paradiso.            12:39:26PM
6    Q   And when were you issued that shield?  12:39:31PM
7    A   I believe it had to be ordered, so I  12:39:37PM
8    don't really recall the exact date.
9    Q   Sometime in or around 2001?       12:39:41PM
10   A   Yes.                    12:39:44PM
11   Q   Did you hold yourself out to anybody  12:39:47PM
12   outside of the beach as a sergeant?
13        MR. CALLAHAN:  Objection to form.   12:39:54PM
14        MR. NOVIKOFF:  Yeah, objection.   12:39:55PM
15        MR. CONNOLLY:  Objection.   12:39:56PM
16   A   Yes.                    12:39:56PM
17   Q   Who did you hold yourself out to be --  12:39:57PM
18   who did you hold yourself out to as a sergeant
19   outside of Ocean Beach?
20   A   The world.              12:40:05PM
21   Q   So it wasn't your understanding that  12:40:06PM
22   this was some internal title, correct?
23        MR. NOVIKOFF:  Objection.     12:40:11PM
24        MR. CONNOLLY:  Objection.     12:40:12PM
25   A   I was the sergeant.  I was promoted  12:40:14PM

Page 162

GEORGE HESSE

1          GEORGE HESSE
2    internally, yes.
3    Q   So if I were to tell you that there   12:40:18PM
4    was some testimony by a village official that
5    this was just an internal title, would that be
6    news to you?
7    A   No.                      12:40:28PM
8    Q   It wouldn't?                 12:40:29PM
9    A   No.                      12:40:30PM
10   Q   So you've been told in the past that  12:40:30PM
11   this is an internal title?
12   A   Recently, yes.           12:40:34PM
13   Q   How recently -- how about at the time?  12:40:35PM
14   A   At the time, no.         12:40:37PM
15   Q   When were you told it was just an    12:40:38PM
16   internal title?
17   A   Probably within the last two years   12:40:42PM
18   now.
19   Q   Uh-huh.  Who told you that?       12:40:45PM
20   A   Mayor Joe Loeffler.       12:40:47PM
21   Q   When did he tell you that in the last  12:40:48PM
22   two years?
23   A   I don't recall.          12:40:51PM
24   Q   Do you recall what year it was?    12:40:51PM
25   A   It was within the last two years.  12:40:53PM

Page 163

GEORGE HESSE

1          GEORGE HESSE
2    Q   And were you sergeant at the time he  12:40:55PM
3    told you that or had you received another
4    promotion since then?
5    A   I received another promotion since   12:41:01PM
6    then.
7    Q   Did anyone ever tell you that the    12:41:04PM
8    sergeant title was just internal?
9    A   No.                     12:41:08PM
10   Q   So even Joe Loeffler didn't tell you  12:41:08PM
11   the sergeant title was internal?
12   A   Joe Loeffler wasn't a trustee at the  12:41:14PM
13   time.
14   Q   At what time?             12:41:17PM
15   A   At the time when I was given the     12:41:18PM
16   sergeant's.
17   Q   So at the time you held the sergeant  12:41:21PM
18   title and held yourself out to the world as a
19   sergeant, did anybody tell you that it was just
20   an internal title?
21   A   No.                     12:41:29PM
22        MR. CALLAHAN:  Objection to form.   12:41:31PM
23        MR. NOVIKOFF:  I join in.  I don't   12:41:33PM
24   like anyone to be alone.
25        MR. CALLAHAN:  Thank you.   12:41:43PM

Page 164

GEORGE HESSE

1          GEORGE HESSE
2    BY MR. GOODSTADT:               12:41:56PM
3    Q   So before, I asked you whether you had  12:41:57PM
4    the same title currently, your Civil Service was
5    a full-time police officer and you told me it
6    was.  And then I asked you was it the same title
7    as Ed Carter, and you told me it wasn't.  But do
8    you and Ed Carter hold the same police
9    certificate?
10        MR. NOVIKOFF:  Objection.   12:42:19PM
11        MR. CONNOLLY:  Objection.   12:42:19PM
12   A   Yes.                    12:42:20PM
13   Q   Same thing with Mr. Fiorillo,      12:42:21PM
14   Mr. Lamm, Mr. Snyder?
15        MR. NOVIKOFF:  Same objection.   12:42:26PM
16   A   Yes.                    12:42:27PM
17   Q   Mr. Nofi?                12:42:28PM
18        MR. NOVIKOFF:  Same objection.   12:42:30PM
19   A   Yes.                    12:42:30PM
20   Q   Yes?                    12:42:31PM
21   A   Yes.                    12:42:32PM
22   Q   Did there come a point in time that  12:42:32PM
23   you were promoted from the sergeant title?
24   A   Yes.                    12:42:37PM
25   Q   And when did that happen?        12:42:38PM

41 (Pages 161 to 164)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 165

**GEORGE HESSE**

1
2    A   I believe the date was January 18th,   12:42:41PM
3  2006.
4    Q   And what title did you receive a      12:42:48PM
5  promotion to in January of 2006?
6    A   Acting deputy chief.              12:42:58PM
7    Q   And is that something that you applied 12:43:10PM
8  for or put in a request for like you had done
9  for the sergeant position?
10   A   No.                          12:43:16PM
11   Q   Did you actually have to fill out any  12:43:17PM
12 work, any paperwork when you got the sergeant
13 position to reflect that change?
14   A   Not that I recall.               12:43:25PM
15   Q   Did you have to fill out any        12:43:26PM
16 application for that position other than for the
17 two letters that we've seen?
18   A   Not that I recall.               12:43:32PM
19   Q   Now, the -- so the deputy -- acting   12:43:35PM
20 deputy chief, is that what you said?
21   A   Correct.                       12:43:40PM
22   Q   How did you learn that you were up for 12:43:41PM
23 that position?
24   A   I was approached by Joe Loeffler, and 12:43:44PM
25 he said she was going to make that suggestion to

Page 166

GEORGE HESSE

1
2  the board.
3    Q   And is that a position that a canvass  12:43:54PM
4  letter would ordinarily go out to?
5      MR. CALLAHAN:  Objection to form.    12:43:59PM
6    A   I don't know.                    12:44:00PM
7    Q   You don't know one way or the other?  12:44:01PM
8    A   No.                          12:44:04PM
9    Q   When did Mr. Loeffler approach you to  12:44:04PM
10 tell you that he was going to make that proposal
11 to the board?
12   A   I don't recall any specific date.     12:44:09PM
13   Q   What was his title at the time?      12:44:10PM
14   A   A Trustee.                     12:44:12PM
15   Q   Do you recall what year it was that he 12:44:15PM
16 told you this?
17   A   It had to be in 2005 at some point.   12:44:17PM
18   Q   Do you recall what month it was?     12:44:23PM
19   A   No, I don't.                    12:44:25PM
20   Q   What did he tell you?              12:44:27PM
21   A   Well, at that point, Paradiso had     12:44:34PM
22 taken his leave, and he felt that the police
23 department still needs to move forward and
24 needed a certain sort of leadership and that he
25 was going to make the recommendation to the

Page 167

GEORGE HESSE

1
2  board for my new position.
3    Q   Do you know whether -- do you know    12:44:52PM
4  when the recommendation was made to the board?
5    A   I don't know.                    12:44:57PM
6    Q   Were you at the meeting at which it   12:44:58PM
7  was made?
8    A   No.                          12:45:00PM
9    Q   Do you know whether it was reported to 12:45:03PM
10 the public prior to the board proposal?
11   A   Not that I'm aware of.             12:45:07PM
12   Q   And how are you aware that he actually 12:45:12PM
13 was going to move forward and make that
14 proposal?
15   A   He told me.                    12:45:20PM
16   Q   And that was in '05?               12:45:22PM
17   A   Yes.                         12:45:23PM
18   Q   Did he tell you when he was going to   12:45:24PM
19 make that proposal?
20   A   Not exactly, no.                 12:45:27PM
21   Q   Did you take on the role prior to the  12:45:28PM
22 proposal being made, like, for example, he told
23 you in '05 he was going to make the proposal.
24 According to you it was done in 06 in January.
25 During the period from when he told you until

Page 168

**GEORGE HESSE**

1
2  the time that the proposal was made, had you
3  taken on the role of deputy chief of police
4  or -- deputy chief of police or acting deputy
5  chief of police.
6      MR. NOVIKOFF:  Objection to form.    12:45:56PM
7      MR. CONNOLLY:  Objection to form.    12:45:57PM
8      MR. CALLAHAN:  Objection.          12:45:59PM
9    A   I don't know if I assumed the role. I 12:46:00PM
10 did the job.
11   Q   And do you know whether the proposal  12:46:05PM
12 was actually made to the board?
13   A   No.                          12:46:10PM
14   Q   Did you ever see any documentation    12:46:11PM
15 that demonstrates that it was?
16   A   After I was approved, I did.        12:46:16PM
17   Q   And how did you learn that it was made 12:46:18PM
18 and approved?
19   A   Well, I was at the board meeting when  12:46:21PM
20 they made the appointment.
21   Q   So you were there when they proposed   12:46:25PM
22 it and voted on it?
23   A   Yes.  It was in a public forum.  Yes. 12:46:28PM
24   Q   Did you have to present anything to    12:46:32PM
25 the board in that meeting?

42 (Pages 165 to 168)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 169

GEORGE HESSE

1
2    A    No.                           12:46:35PM
3    Q    Did anyone speak on your behalf when  12:46:37PM
4    the proposal was made?
5    A    I believe Trustee Loeffler did.    12:46:41PM
6    Q    Do you recall what he said?       12:46:45PM
7    A    Not exactly, no.              12:46:47PM
8    Q    Who was the mayor at the time?    12:46:49PM
9    A    Natalie Rogers.               12:46:51PM
10   Q    Did you ever speak to Chief Paradiso   12:46:55PM
11   about the proposal that you'd be made deputy
12   chief or acting deputy chief of police?
13   A    No.                           12:47:06PM
14   Q    Did you ever learn of a conversation   12:47:08PM
15   that Paradiso had with Rogers about that
16   appointment?
17   A    I vaguely remember something, yes.   12:47:18PM
18   Q    What do you remember?            12:47:20PM
19   A    That he felt that I wasn't right for   12:47:21PM
20   the job.
21   Q    Do you know why he felt that?    12:47:24PM
22   A    I'm sure he was threatened.       12:47:26PM
23   Q    Did you ever discuss with him --    12:47:28PM
24   A    No.                           12:47:30PM
25   Q    -- his position on that?          12:47:30PM

Page 170

GEORGE HESSE

1
2    A    No.                           12:47:31PM
3         MR. NOVIKOFF:  I'm sorry, what was his  12:47:32PM
4    answer before that last question?
5         MR. GOODSTADT:  He thought he was    12:47:36PM
6    threatened.
7         MR. NOVIKOFF:  Paradiso thought he was  12:47:38PM
8    threatened?
9         MR. GOODSTADT:  Yes.          12:47:40PM
10   A    Not physically, but his job.     12:47:42PM
11   Q    That's just your speculation, right?   12:47:43PM
12   You never spoke to him about that?
13   A    No.                           12:47:47PM
14   Q    Did you ever speak to Rogers about    12:47:49PM
15   Paradiso's position with respect to your
16   promotion?
17   A    I don't recall.               12:47:56PM
18   Q    How did you learn of that conversation  12:47:57PM
19   that Paradiso had with Rogers?
20   A    I don't recall.               12:48:02PM
21   Q    Who was the police commissioner at the  12:48:04PM
22   time?
23        MR. NOVIKOFF:  Objection.         12:48:06PM
24   A    Natalie Rogers.               12:48:08PM
25   Q    Was there a police liaison at the    12:48:14PM

Page 171

GEORGE HESSE

1
2    time?
3         MR. NOVIKOFF:  Objection to the form   12:48:20PM
4    of the question.
5    A    Not that I'm aware of.          12:48:23PM
6    Q    Just you had it referred to Loeffler,  12:48:25PM
7    but you don't know if it was official or not?
8    A    That's correct.               12:48:29PM
9    Q    Who is the police commissioner today?  12:48:30PM
10   A    Joseph Loeffler.              12:48:32PM
11   Q    Was Paradiso still working at this   12:48:38PM
12   time?
13        MR. NOVIKOFF:  Objection.  Form.    12:48:42PM
14        MR. CONNOLLY:  Presumably you're    12:48:46PM
15   talking about the beach.
16        MR. GOODSTADT:  At the beach.  At the  12:48:49PM
17   beach.
18   A    No.                           12:48:50PM
19   Q    So he was already out on his leave or  12:48:50PM
20   whatever he was out on?
21        MR. NOVIKOFF:  Objection.         12:48:54PM
22   A    Yes.                          12:48:55PM
23   Q    Yes?                          12:48:55PM
24   A    Yes.                          12:48:56PM
25   Q    Did you ever see the resolution that  12:48:56PM

Page 172

GEORGE HESSE

1
2    approved your appointment?
3    A    I may have.                   12:49:02PM
4    Q    Was the appointment at the meeting in  12:49:06PM
5    January of '06, was that made to acting deputy
6    chief of police or deputy chief of police?
7    A    I think there's some terminology    12:49:15PM
8    problems there, but I've seen it as acting and
9    I've seen it as deputy chief.
10   Q    Well, which one was it?          12:49:22PM
11   A    To tell you the truth, I don't even   12:49:24PM
12   know.
13   Q    Is there a Civil Service test that's  12:49:26PM
14   required to get that promotion --
15        MR. NOVIKOFF:  Objection.         12:49:29PM
16   BY MR. GOODSTADT:                   12:49:31PM
17   Q    -- to deputy chief of police?     12:49:31PM
18        MR. CALLAHAN:  Same.          12:49:33PM
19   A    No.                           12:49:34PM
20   Q    Is there a Civil Service test to be   12:49:34PM
21   chief of police?
22        MR. NOVIKOFF:  Objection.         12:49:40PM
23        MR. CALLAHAN:  Same.          12:49:41PM
24   A    There is one.                 12:49:41PM
25   Q    Do you know whether you can be     12:49:42PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 173

GEORGE HESSE

1
2     promoted to chief or deputy chief without first
3     passing the sergeant's test --
4             MR. NOVIKOFF: Objection.        12:49:49PM
5     BY MR. GOODSTADT:                      12:49:50PM
6        Q    -- on your Civil Service level?   12:49:50PM
7             MR. NOVIKOFF: Objection.        12:49:52PM
8        A    I don't know.                   12:49:52PM
9        Q    You don't know one way or the other?  12:49:53PM
10       A    I don't know.                   12:49:56PM
11            MR. GOODSTADT: Mark this.       12:49:58PM
12            (Whereupon, Bates document 28 was   12:49:58PM
13      marked as Plaintiff's Exhibit 4 for
14      identification, as of this date.)
15            MR. GOODSTADT: I've placed in front   12:50:26PM
16      of Mr. Hesse what's now been marked as
17      Hesse 4. It's a one-page exhibit bearing
18      Bates No. 28. (Handing.)
19      BY MR. GOODSTADT:                     12:50:34PM
20       Q    Mr. Hesse, have you ever seen the   12:50:34PM
21      document that's been marked as Hesse 4?
22       A    Yes.                            12:50:38PM
23       Q    And this is the resolution that   12:50:38PM
24      demonstrates that you have been designated as
25      deputy chief of police.

Page 174

GEORGE HESSE

1
2            Do you see that?                 12:50:46PM
3        A    Yes.                            12:50:47PM
4        Q    So does this refresh your recollection  12:50:51PM
5     as to whether it was a designation to acting
6     versus deputy, just plain deputy chief of
7     police.
8             MR. NOVIKOFF: Objection to form.   12:50:59PM
9        A    It says deputy.                 12:51:00PM
10       Q    Is that a Civil Service title, deputy   12:51:01PM
11     chief of police?
12            MR. NOVIKOFF: Objection.        12:51:05PM
13       A    Yes.                            12:51:05PM
14       Q    Do you know whether this promotion was  12:51:10PM
15     reported to Civil Service?
16       A    Not that I'm aware of.          12:51:13PM
17       Q    Did you receive a pay increase with   12:51:15PM
18     this promotion?
19       A    I don't think so.              12:51:21PM
20       Q    Do you know whether this promotion was  12:51:23PM
21     approved by Civil Service?
22            MR. CALLAHAN: Objection to form.   12:51:28PM
23       A    I am unaware.                   12:51:29PM
24       Q    Is deputy chief of police, is that an   12:51:31PM
25     open competitive position?

Page 175

GEORGE HESSE

1
2             MR. NOVIKOFF: Objection.        12:51:35PM
3        A    It may be. I don't know.        12:51:36PM
4        Q    Do you know whether a canvass letter   12:51:38PM
5     was distributed to anybody?
6             MR. NOVIKOFF: Objection.        12:51:42PM
7        A    I am unaware.                   12:51:42PM
8        Q    And if you see on Hesse 4, do you see   12:51:45PM
9     where the arrow is that says "designation of
10    George Hesse"?
11       A    Uh-huh.                         12:51:54PM
12       Q    Do you see that?                12:51:53PM
13       A    Yes.                            12:51:55PM
14       Q    On the second line, it says, "Trustee   12:51:55PM
15    Loeffler made motion to designate George Hesse
16    as deputy chief of police with all power and
17    authority involved with that position."
18            Do you see that?                12:52:05PM
19       A    Yes.                            12:52:06PM
20       Q    Do you know what power and authority   12:52:06PM
21    is involved with that position?
22            MR. NOVIKOFF: Note my objection.   12:52:13PM
23            MR. CALLAHAN: Objection to form also.   12:52:14PM
24            MR. NOVIKOFF: Yeah.            12:52:17PM
25       A    I would assume that I am in charge of   12:52:17PM

Page 176

GEORGE HESSE

1     all aspects of the police department.
2        Q    And did your role change at all when   12:52:23PM
3     you received that promotion?
4        A    Slightly.                       12:52:28PM
5             MR. NOVIKOFF: Objection.        12:52:29PM
6     BY MR. GOODSTADT:                      12:52:29PM
7        Q    What do you mean by slightly?   12:52:29PM
8        A    I now had the powers to hire and   12:52:31PM
9     remove.
10       Q    Okay. Who did you report to in this   12:52:38PM
11    position?
12       A    The mayor and the mayor alone.   12:52:40PM
13       Q    Okay. So you got more power in terms   12:52:42PM
14    of the ability to hire and fire. Your reporting
15    relationship changed too, correct? You were
16    reporting to Paradiso, and now you're reporting
17    only to the mayor?
18       A    Yes.                            12:52:55PM
19       Q    Any other changes to your duties or   12:52:55PM
20    responsibilities with this promotion?
21       A    No.                             12:53:03PM
22       Q    This position is senior to the   12:53:05PM
23    position of sergeant, correct?
24       A    Yes.                            12:53:08PM

44 (Pages 173 to 176)

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 177

1          GEORGE HESSE
2     Q    Did any sergeant replace you?        12:53:08PM
3     A    No.                    12:53:14PM
4     Q    To this day, has anybody replaced you  12:53:14PM
5  in the sergeant role?  Is there a sergeant in
6  the Ocean Beach Police Department?
7     A    No.                    12:53:20PM
8     Q    Has there been one since          12:53:21PM
9  January 28th of 2006?
10    A    No.                    12:53:24PM
11    Q    Now that you have -- since January 20,  12:53:29PM
12 2006, you had the authority to hire and fire,
13 did you need board approval to do that?
14    A    No.                    12:53:37PM
15    Q    Did you need approval of anyone to    12:53:41PM
16 hire and fire?
17       MR. CONNOLLY:  Objection.       12:53:43PM
18       MR. NOVIKOFF:  Yeah, I'm going to    12:53:44PM
19 object to that one.
20    A    No.                    12:53:47PM
21    Q    When you became chief or deputy chief,  12:53:53PM
22 did your uniform change at all?
23    A    Yes.                   12:54:01PM
24    Q    How did your uniform change?       12:54:01PM
25    A    I removed the sergeant stripes and    12:54:03PM

Page 178

1          GEORGE HESSE
2  instead of a sergeant shield, I wore a chief
3  shield and stars on my collar.
4     Q    And when did you change your uniform?  12:54:18PM
5     A    Right after this designation.       12:54:24PM
6     Q    Do you know who an Officer Betenhauser  12:54:33PM
7  is?
8     A    Yes, I do.                12:54:36PM
9     Q    And what is Officer Betenhauser's     12:54:38PM
10 title?
11    A    Part-time seasonal police officer.    12:54:42PM
12    Q    Has that always been his title at     12:54:45PM
13 Ocean Beach?
14    A    No.                    12:54:47PM
15    Q    What other titles has Officer        12:54:47PM
16 Betenhauser held within Ocean Beach?
17    A    Betenhauser?              12:54:52PM
18    Q    Betenhauser, yes.            12:54:55PM
19    A    Actually, yes.  Thanks for reminding  12:54:57PM
20 me.  He was promoted to a sergeant for six
21 months.
22    Q    Who promoted him?            12:55:05PM
23    A    I believe it was at a trustee's       12:55:07PM
24 meeting, they took a vote on it, but it came
25 from Loeffler, Joe Loeffler.

Page 179

1          GEORGE HESSE
2     Q    Did he pass the sergeant's test,      12:55:17PM
3  Betenhauser?
4       MR. NOVIKOFF:  Objection.        12:55:22PM
5     A    There is.                12:55:22PM
6     Q    How come he only had the position for  12:55:23PM
7  six months?
8     A    Because that's all that, I think,     12:55:26PM
9  Civil Service would allow in a part-time
10 seasonal position.
11    Q    What's the basis of your understanding  12:55:31PM
12 of that?
13    A    That's what I was told.          12:55:34PM
14    Q    Did there come a point in time when    12:55:38PM
15 Civil Service questioned your role in a
16 supervisory capacity as being outside the title
17 of police officer?
18       MR. CALLAHAN:  Objection to form.    12:55:48PM
19       MR. NOVIKOFF:  Yeah, I join in.      12:55:50PM
20    A    I'm aware of some discrepancies, but I  12:55:54PM
21 don't know exactly what it was.
22    Q    When did you become aware of that?    12:56:01PM
23    A    I believe a lot of it happened after   12:56:04PM
24 March 27th of 2007.
25    Q    How did you become aware of it?      12:56:11PM

Page 180

1          GEORGE HESSE
2     A    I believe I was sitting in an office   12:56:14PM
3  with Mayor Loeffler and Maryann Minerva in her
4  office, and I believe that Mayor Loeffler had
5  told me about some problems with the titles and
6  title issuing.
7     Q    What did he tell you?            12:56:29PM
8     A    I really -- I really don't recall     12:56:36PM
9  other than the fact that there was -- there's a
10 problem with the titles, my supervisory role.
11    Q    What titles are you referring to?     12:56:45PM
12    A    Deputy chief.              12:56:47PM
13    Q    What problem did he tell you there     12:56:49PM
14 was?
15    A    That -- technically, that the village  12:56:52PM
16 couldn't do what they did.
17    Q    Okay.  Just deputy chief or that      12:57:00PM
18 included sergeant promotion as well?
19       MR. NOVIKOFF:  Objection.        12:57:04PM
20    A    That included that also.         12:57:05PM
21    Q    And he told you that?           12:57:06PM
22    A    I don't recall.              12:57:09PM
23    Q    Was anything done to rectify the      12:57:10PM
24 problem, the title problem?
25       MR. NOVIKOFF:  Objection.        12:57:14PM

45 (Pages 177 to 180)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 181

GEORGE HESSE

1      A    No.                    12:57:15PM
2      Q    Did he ever show you -- strike that.  12:57:21PM
3           Who had questioned or who had raised  12:57:24PM
4      the problem with the village with respect to the
5      titles?
6           MR. NOVIKOFF:  Who was Mr. Hesse     12:57:31PM
7      advised of as to raising the issue?
8           MR. GOODSTADT:  Yes.               12:57:37PM
9      BY MR. GOODSTADT:                        12:57:37PM
10     Q    Do you know how the village learned of  12:57:37PM
11     this alleged problem?
12     A    I believe Civil Service.            12:57:40PM
13     Q    And what's the basis of that belief?  12:57:42PM
14     A    I believe that the mayor and maybe   12:57:44PM
15     even Ken Gray himself went to a meeting with the
16     county attorney and Civil Service, members of
17     Civil Service.
18     Q    How did you learn of that meeting?    12:57:58PM
19     A    I was told.                         12:57:59PM
20     Q    By who?                             12:58:00PM
21     A    Joe Loeffler.                       12:58:01PM
22     Q    What were you told was discussed at   12:58:02PM
23     that meeting?
24     A    I don't recall, other than maybe my  12:58:05PM

Page 182

GEORGE HESSE

1      title issue.
2      Q    Do you know when the meeting was held?  12:58:11PM
3      A    I don't recall.                     12:58:13PM
4      Q    What was discussed with respect to    12:58:15PM
5      your title issue?  What did they tell you was
6      discussed?
7           MR. CALLAHAN:  Objection to form.     12:58:21PM
8      A    Yeah, I don't -- that there's just a  12:58:23PM
9      problem with the supervisory role that they had
10     put me in.
11     Q    Did they tell you it was out of title  12:58:35PM
12     to have the supervisory role?
13          MR. CALLAHAN:  Objection.            12:58:42PM
14          MR. NOVIKOFF:  Yeah, I just want to   12:58:44PM
15     caution you, Mr. Hesse, that any
16     conversations that you had with Mr. Gray in
17     his capacity as a village lawyer, I'm taking
18     the position as being confidential and
19     attorney-client privileged.
20          You can question him as to whether or  12:59:00PM
21     not it's appropriate, but --
22          MR. GOODSTADT:  I'm not sure -- it may  12:59:06PM
23     be privileged.  I'm not sure about
24     confidential.

Page 183

GEORGE HESSE

1           MR. NOVIKOFF:  Well, then, fine,     12:59:12PM
2      privilege.
3           MR. GOODSTADT:  There may be a certain  12:59:14PM
4      attorney-client privilege, which again I'm
5      not sure how appropriate it would be.
6      BY MR. GOODSTADT:                        12:59:17PM
7      Q    But just going back to the question --  12:59:17PM
8           MR. GOODSTADT:  Could you repeat the  12:59:19PM
9      question?
10          (Whereupon, the referred to portion   12:59:21PM
11     was read back by the court reporter:  Did
12     they tell you it was out of title to have
13     the supervisory role?)
14     A    Yes, that's the correct terminology.  12:59:34PM
15     Q    Who told you that?                   12:59:37PM
16     A    I believe Joe Loeffler.             12:59:38PM
17     Q    Did he tell you anything else about   12:59:42PM
18     the title problem other than for the fact that
19     your supervisory role was out of title?
20     A    That's all I recall.                12:59:52PM
21     Q    Did he show you the letter that came  12:59:53PM
22     or any letter that came from Civil Service with
23     respect to this issue?
24     A    No.                                 12:59:59PM

Page 184

GEORGE HESSE

1      Q    Do you recall -- you mentioned        12:59:59PM
2      March 27, 2007 this all came out.  Why is that
3      date relevant?
4      A    That's the date that I turned myself  1:00:08PM
5      in to the Suffolk County D.A.'s office for my
6      indictment.
7      Q    When did you learn you were indicted?  1:00:13PM
8      A    I believe within the week preceding   1:00:19PM
9      March 27th I had received a phone call from my
10     attorney.
11     Q    Okay.  And do you believe that the    1:00:26PM
12     issue with respect to the supervisory role being
13     out of title was connected with your indictment?
14          MR. CALLAHAN:  Objection to form.     1:00:36PM
15          MR. NOVIKOFF:  Objection.  Same.      1:00:37PM
16          MR. CONNOLLY:  Same.                 1:00:38PM
17     A    Yes.                                 1:00:39PM
18          MR. GOODSTADT:  Mark that, please.    1:00:41PM
19          (Whereupon, A letter dated January    1:00:42PM
20     2007 was marked as Plaintiff's Exhibit 5 for
21     identification, as of this date.)
22          MR. GOODSTADT:  I've placed in front   1:01:22PM
23     of Mr. Hesse what's been marked as Hesse 5.
24     It is a one-page letter from Allison Sanchez

46 (Pages 181 to 184)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 185

GEORGE HESSE

1
2     to Joseph Loeffler, Mayor, dated
3     January 4th, 2007.  I don't believe it
4     contains a Bates number.  (Handing.)
5  BY MR. GOODSTADT:                          1:01:42PM
6     Q   Mr. Hesse, have you ever seen the    1:01:43PM
7  letter marked as Hesse 5?
8     A   No.                     1:01:49PM
9     Q   So in January of '07 -- well, strike  1:01:50PM
10 that.
11        Do you recall whether this issue     1:01:53PM
12 reflected in this letter, being that your
13 supervisory capacity is outside of title, being
14 raised with you in January of '07?
15    A   I don't recall.                   1:02:06PM
16    Q   So seeing the fact that this letter   1:02:07PM
17 came in January of '07, does that change your
18 belief that your indictment had something to do
19 with it?
20    A   Well, according to the date, correct.  1:02:17PM
21    Q   Did you ever speak with -- strike    1:02:19PM
22 that.
23        Do you know who Allison Sanchez is?   1:02:22PM
24    A   Yes, I do.                    1:02:24PM
25    Q   Who was that?                   1:02:25PM

Page 186

GEORGE HESSE

1
2     A   She was the, I guess, account manager  1:02:25PM
3  in Civil Service that handled Ocean Beach.
4     Q   Did you deal with her regularly with  1:02:31PM
5  respect to Civil Service matters in connection
6  with Ocean Beach?
7        MR. NOVIKOFF:  Objection to form.     1:02:39PM
8        MR. CALLAHAN:  Same.              1:02:41PM
9        MR. CONNOLLY:  Same.              1:02:41PM
10    A   Yes.                      1:02:42PM
11    Q   How frequently did you speak or      1:02:42PM
12 communicate with her starting in 2005 -- strike
13 that -- starting in January 2006, when you
14 received the deputy chief position?
15       MR. CALLAHAN:  Objection to form.     1:02:57PM
16    A   Actually, I was dealing with Allison   1:02:58PM
17 earlier than 2006.
18    Q   Okay.  When did you start dealing with  1:03:03PM
19 Allison Sanchez?
20    A   I believe I started dealing with her   1:03:06PM
21 sometime in 2005.
22    Q   With respect to what?              1:03:11PM
23    A   The hiring and also correction of some  1:03:13PM
24 of the discrepancies with some of the police
25 officers that were working for us.

Page 187

GEORGE HESSE

1
2     Q   Okay.  And we'll discuss those       1:03:24PM
3  discrepancies going forward.
4        But did you ever discuss this issue in  1:03:28PM
5  this letter, the supervisory capacity being
6  outside of title with Allison Sanchez?
7     A   I don't recall.                  1:03:36PM
8     Q   Now, as of January 4, 2007, your title  1:03:38PM
9  within the village or at least the one that you
10 had been appointed to, was it still deputy chief
11 or had you been promoted again at some point
12 after that?
13    A   No.  I think it was just always deputy  1:03:53PM
14 chief.
15    Q   How about today, what's your title?   1:03:57PM
16    A   It's still, I would assume, deputy    1:03:59PM
17 chief.
18    Q   Have you ever been promoted to chief?  1:04:02PM
19    A   Not officially, no.               1:04:04PM
20    Q   Have you ever held yourself out to be  1:04:05PM
21 chief of police?
22    A   Yes.                      1:04:08PM
23    Q   To the public?                 1:04:08PM
24    A   Yes.                      1:04:09PM
25    Q   People outside of Ocean Beach?       1:04:10PM

Page 188

GEORGE HESSE

1
2     A   Yes.                      1:04:12PM
3     Q   To the State of New York, to        1:04:12PM
4  registries?
5     A   Yes.                      1:04:14PM
6     Q   Why would you hold yourself out to the  1:04:19PM
7  State of New York registries as chief of police
8  when that's not your title?
9        MR. CONNOLLY:  Objection to the form.  1:04:25PM
10       You can answer.                1:04:27PM
11    A   The village gave me the designation as  1:04:30PM
12 deputy chief, therefore I'm a chief.
13    Q   There's no difference between deputy   1:04:36PM
14 chief and chief of police?
15       MR. NOVIKOFF:  Objection to form.     1:04:41PM
16       MR. CALLAHAN:  Objection to form also.  1:04:43PM
17       MR. CONNOLLY:  Join.              1:04:44PM
18    A   There is a difference.             1:04:45PM
19    Q   So why would you hold yourself out as  1:04:46PM
20 chief of police if the village designated you as
21 deputy chief?
22    A   There's nobody to be the deputy to, so  1:04:49PM
23 therefore I am the chief.
24    Q   So you appointed yourself chief       1:04:54PM
25 because nobody is the chief; is that correct?

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 189

GEORGE HESSE

1
2     MR. NOVIKOFF: Objection to form.     1:04:58PM
3     MR. CONNOLLY: Join.     1:05:00PM
4   A   Everybody calls me the chief.     1:05:01PM
5   Q   So just going back to my question   1:05:04PM
6   before. Have you ever spoken with Allison
7   Sanchez about this issue?
8     MR. CALLAHAN: Objection to form.   1:05:11PM
9     MR. CONNOLLY: We're referring to the   1:05:12PM
10   out-of-title issue?
11     MR. GOODSTADT: Yeah, the out-of-title   1:05:14PM
12   issue that's reflected in Hesse 5.
13   A   I don't recall.     1:05:17PM
14   Q   Have you ever had any communication   1:05:18PM
15   with her about the out-of-title issue?
16     MR. CALLAHAN: As in 5?     1:05:24PM
17     MR. GOODSTADT: As in 5, yeah.     1:05:25PM
18   A   With me? Pertaining to --     1:05:27PM
19   Q   With respect to your supervisory   1:05:29PM
20   capacity being outside of your title?
21   A   I don't recall.     1:05:34PM
22   Q   Do you still have your supervisory   1:05:35PM
23   capacity?
24   A   Yes.     1:05:38PM
25   Q   So has anything ever been done to   1:05:39PM

Page 190

GEORGE HESSE

1
2   correct the problem that they're raising in
3   Hesse 5?
4     MR. CALLAHAN: Objection to form.     1:05:45PM
5     MR. NOVIKOFF: Objection to form.     1:05:47PM
6     MR. CONNOLLY: Objection.     1:05:48PM
7   A   As of right now, no.     1:05:49PM
8   Q   Is anything scheduled to happen?   1:05:50PM
9     MR. CALLAHAN: Objection to form.     1:05:53PM
10   A   I hope so.     1:05:54PM
11   Q   What's scheduled to happen?   1:05:55PM
12   A   Next -- what is it? June 14th is   1:05:56PM
13   the next sergeant's test.
14   Q   Is there a chief's test?   1:06:00PM
15   A   There is.     1:06:02PM
16   Q   Are you scheduled to take that as   1:06:05PM
17   well?
18   A   That just passed. No.     1:06:07PM
19   Q   So you're in the chief role -- I just   1:06:12PM
20   want to be clear for the record. You're in the
21   chief role at Ocean Beach without ever passing
22   the sergeant's test and without ever passing the
23   chief's test, correct?
24     MR. CALLAHAN: Objection to form.     1:06:24PM
25   A   Yes.     1:06:25PM

Page 191

GEORGE HESSE

1
2   Q   Do you know whether Civil Service has   1:06:26PM
3   approved the continuation of your supervisory
4   capacity being outside of title?
5     MR. CALLAHAN: Objection to form.     1:06:39PM
6   A   Unaware.     1:06:40PM
7   Q   You don't know one way or the other?   1:06:40PM
8   A   No.     1:06:40PM
9   Q   Have you ever spoken to anyone in   1:06:41PM
10   Civil Service about that issue?
11   A   No.     1:06:45PM
12   Q   Just to be clear. It's your   1:06:55PM
13   understanding that subsequent to January 2006,
14   when you were designated deputy chief of police,
15   that you haven't been designated in any other
16   title by the board; is that correct?
17   A   My employment status had changed as of   1:07:08PM
18   March 27th, 2007.
19   Q   What did that change to?   1:07:15PM
20   A   I was put on modified duty.     1:07:16PM
21   Q   By who?   1:07:19PM
22   A   I believe I received a letter from the   1:07:22PM
23   village, the village board, maybe Mayor Loeffler
24   himself.
25   Q   And what did the modified duty change   1:07:31PM

Page 192

GEORGE HESSE

1
2   with respect to your position at Ocean Beach?
3   A   Technically nothing.     1:07:42PM
4   Q   What do you mean by technically   1:07:45PM
5   nothing?
6   A   I was still in charge of the police   1:07:49PM
7   department. The only function I did not
8   regularly do was go on patrol. I was not to
9   wear a uniform. I turned in my weapon. And I
10   basically have done all the administrative work
11   in the department.
12   Q   Did you ever put on your uniform   1:08:05PM
13   during the time that you were on modified duty?
14   A   Yes.     1:08:12PM
15   Q   How many times?   1:08:13PM
16   A   Twice.     1:08:15PM
17   Q   How come?   1:08:15PM
18   A   One was for a graduation ceremony for   1:08:17PM
19   three part-time seasonal police officers I was
20   hiring at the time.
21   Q   Was that Mills, Clemmons and Zois?   1:08:26PM
22   A   No. It was Mills, Zois and I believe   1:08:31PM
23   Richard Tomanelli.
24   Q   And what was the other time?   1:08:37PM
25   A   The day that I hired or they got sworn   1:08:40PM

48   (Pages 189 to 192)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 193

GEORGE HESSE

1
2    in, Mills, Clemmons, and Zois was promoted to
3    full-time.
4        Q    And other than for those two          1:08:51PM
5    occasions, did you put your uniform on at all
6    during the modified duty period?
7        A    I don't recall if I did for any other  1:08:57PM
8    reason.
9        Q    Did your title change during that      1:09:00PM
10   period?
11       A    No.                        1:09:03PM
12       Q    Did Loeffler take over any of your     1:09:05PM
13   duties?
14       A    No.                        1:09:10PM
15       Q    Do you still hold yourself out as      1:09:35PM
16   chief of police during the modified duty period?
17       A    Yes.                       1:09:41PM
18       Q    And the village of Ocean Beach Police  1:09:43PM
19   Department, the letterhead, that identifies you
20   as chief of police?
21       A    No. It just says police department   1:09:55PM
22   now under my name.
23       Q    Did it ever identify you as chief of   1:09:57PM
24   police?
25       A    Yes.                       1:10:00PM

Page 194

GEORGE HESSE

1
2        Q    And who created that letterhead?       1:10:00PM
3        A    I did.                     1:10:02PM
4        Q    Did anyone approve it?                 1:10:02PM
5        A    No.                        1:10:04PM
6        Q    And you sent letters out on that       1:10:04PM
7    letterhead outside of Ocean Beach?
8        A    Yes.                       1:10:08PM
9        Q    And why is it changed now to police    1:10:09PM
10   department as opposed to chief of police?
11       A    Well, I was advised by Mayor Loeffler  1:10:15PM
12   that maybe I should take that off.
13       Q    Did he tell you why you should take    1:10:19PM
14   that off?
15       A    Because I'm working out of class.      1:10:22PM
16       Q    When did he tell you that?             1:10:27PM
17       A    I don't recall.                1:10:28PM
18       Q    When did you change the letterhead?    1:10:29PM
19       A    I don't recall.                1:10:32PM
20       Q    Is there anything that would refresh   1:10:35PM
21   your recollection? Do you have a date on your
22   computer that you actually changed it?
23       A    No.                        1:10:42PM
24       Q    Did you physically make the change?    1:10:43PM
25       A    Yes.                       1:10:45PM

Page 195

GEORGE HESSE

1
2        Q    And what computer did you make the     1:10:46PM
3    change on?
4        A    I don't know.                  1:10:50PM
5        Q    Was it in your office?                 1:10:51PM
6        A    Well, it's a shared office.            1:10:53PM
7        Q    But it wasn't a computer at home, it   1:10:55PM
8    was one within the police department?
9        A    Correct.                       1:11:00PM
10       Q    How many computers are in the office?  1:11:01PM
11       A    Three.                     1:11:02PM
12       Q    Do you have one on your desk?          1:11:03PM
13       A    Yes.                       1:11:04PM
14       Q    Where are the other two located?       1:11:05PM
15       A    One is at the front desk and one is on  1:11:07PM
16   the back desk.
17       Q    Do other officers have authority or    1:11:15PM
18   permission to use your computer?
19           MR. NOVIKOFF: Objection.               1:11:20PM
20   BY MR. GOODSTADT:                            1:11:21PM
21       Q    The one that's on your desk?           1:11:21PM
22           MR. NOVIKOFF: Compound.                 1:11:24PM
23       A    Sometimes.                     1:11:24PM
24       Q    Do they have to ask you first?         1:11:25PM
25       A    Yes.                       1:11:27PM

Page 196

GEORGE HESSE

1
2        Q    Did you ever search that computer for  1:11:34PM
3    documents that may be relevant to this
4    litigation?
5           MR. NOVIKOFF: Objection to the form.    1:11:43PM
6           MR. CONNOLLY: Same objection.           1:11:44PM
7           MR. NOVIKOFF: Are you asking him to     1:11:46PM
8    form a legal conclusion as to what may be
9    relevant?
10   BY MR. GOODSTADT:                            1:11:51PM
11       Q    Did you ever search the computer in    1:11:51PM
12   connection with this case?
13       A    I may have.                    1:11:55PM
14       Q    You don't recall one way or the other?  1:11:57PM
15       A    No.                        1:11:59PM
16       Q    Do you know whether anybody searched   1:11:59PM
17   your computer to see if there were documents
18   that were relevant to this matter?
19       A    No.                        1:12:04PM
20           MR. NOVIKOFF: Objection.               1:12:05PM
21       A    No.                        1:12:06PM
22       Q    Did anyone ever ask you to search your  1:12:07PM
23   computer?
24           MR. NOVIKOFF: In connection with this  1:12:10PM
25   lawsuit?

49 (Pages 193 to 196)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 197

GEORGE HESSE

1
2      MR. GOODSTADT:  In connection with      1:12:13PM
3  this matter, yeah.
4      MR. NOVIKOFF:  Sure.              1:12:15PM
5   A   No.                        1:12:16PM
6   Q   Did you ever search your E-mail in      1:12:28PM
7  connection with this matter?
8   A   I don't believe so.            1:12:34PM
9   Q   Anyone ever ask you to search your      1:12:34PM
10  E-mail in connection with this matter?
11   A   No.                        1:12:38PM
12      MR. CONNOLLY:  We're talking about his  1:12:39PM
13  work E-mail, correct?
14  BY MR. GOODSTADT:                   1:12:41PM
15   Q   Well, what's your work E-mail address?  1:12:42PM
16   A   OBPD@villageofOceanBeach.org.      1:12:47PM
17   Q   How long did you have that E-mail      1:12:53PM
18  address?
19   A   You know, I don't know.  I don't      1:12:56PM
20  recall.
21   Q   Did you have an E-mail address for      1:13:00PM
22  work prior to OBPD@villageofOceanBeach.org?
23   A   I had one that I used, yes.        1:13:10PM
24   Q   What was that E-mail address?      1:13:10PM
25   A   That was OBPD103@aol.com.          1:13:11PM

Page 198

GEORGE HESSE

1
2   Q   And when did you have that E-mail      1:13:17PM
3  address?  What was the file period?
4   A   Probably from -- it's possible from    1:13:21PM
5  '95, when I got promoted.  That's was shield
6  number, 103.  Until the present.
7   Q   Oh, so you still use that?          1:13:33PM
8   A   Yes.                        1:13:34PM
9   Q   And you use the other one, too,      1:13:34PM
10  OBPD@villageofOceanBeach.org?
11   A   Yes.                        1:13:43PM
12   Q   Did you search the OBPD103@aol      1:13:43PM
13  account --
14   A   No.                        1:13:45PM
15   Q   -- in connection with this case?      1:13:45PM
16   A   No.                        1:13:47PM
17   Q   Did you search the                1:13:47PM
18  OBPD@villageofOceanBeach.org E-mail in
19  connection with this matter?
20   A   I don't believe so.            1:13:52PM
21   Q   Do you know if anyone did?          1:13:52PM
22   A   No, I don't know.              1:13:54PM
23   Q   Do you use either of those          1:13:56PM
24  passwords from a home computer -- strike that.
25      Do you use either of those E-mail      1:14:00PM

Page 199

GEORGE HESSE

1
2  addresses from a home computer?
3   A   Just the OBPD103.  It's a personal      1:14:02PM
4  account.
5   Q   Did you ever use any other personal    1:14:11PM
6  E-mail addresses?
7   A   Sure.                      1:14:15PM
8   Q   Which ones?                  1:14:15PM
9   A   I have one that it's            1:14:17PM
10  BeachCop03.aol.com.
11   Q   Any others?                  1:14:28PM
12   A   I have BeachCop03@yahoo.com.        1:14:30PM
13   Q   Any others?                  1:14:40PM
14   A   Yeah.  I had something for an        1:14:42PM
15  investigation.  It's ILUVFI159@yahoo.com.
16   Q   Does that stand for I love Fire      1:15:03PM
17  Island?
18   A   Yes.                      1:15:07PM
19   Q   And what is the 159?            1:15:08PM
20   A   I don't know.  I just made up a      1:15:09PM
21  number.
22   Q   Does anyone have a shield 159 at Ocean  1:15:11PM
23  Beach?
24   A   No.                        1:15:15PM
25   Q   Any other E-mail addresses that you've  1:15:15PM

Page 200

GEORGE HESSE

1
2  used in the last 10 years, personal E-mail
3  addresses?
4   A   I don't recall.                1:15:21PM
5   Q   Did you search the BeachCop03@aol      1:15:21PM
6  E-mail address in connection with this case?
7   A   No.                        1:15:28PM
8   Q   Did you search the                1:15:28PM
9  BeachCop03@yahoo.com in connection with this
10  matter?
11   A   No.                        1:15:34PM
12   Q   Did you search the ILUVFI159@yahoo.com  1:15:34PM
13  E-mail address in connection with this matter?
14   A   No.                        1:15:43PM
15   Q   Did anyone ask you to search those    1:15:43PM
16  three E-mail accounts?
17   A   No.                        1:15:47PM
18      MR. GOODSTADT:  It's a good time to    1:16:01PM
19  take a break.
20      THE VIDEOGRAPHER:  That is the end of  1:16:04PM
21  Tape No. 2.  The time is now 1:16 p.m.
22      We are now off the record.        1:16:08PM
23      (Whereupon, a discussion was held off  1:16:09PM
24  the record.)
25      THE VIDEOGRAPHER:  This is the start  2:04:42PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 201

GEORGE HESSE

1
2   ever Tape No. 3.
3        The time is now 2:06 p.m.  We are now    2:05:50PM
4   back on the record.
5   BY MR. GOODSTADT:                           2:05:54PM
6      Q   Mr. Hesse, prior to us breaking for   2:05:55PM
7   lunch, we discussed a Sergeant Betenhause.
8        Do you remember that?                   2:06:02PM
9   A   Betenhauser, yes.          2:06:04PM
10     Q   Betenhauser.                          2:06:05PM
11       And you indicated that he passed the    2:06:05PM
12  sergeant's test; is that correct?
13  A   Yes.                       2:06:10PM
14     Q   Did he pass the Suffolk County        2:06:10PM
15  sergeant's test or New York City sergeant's
16  test?
17       MR. NOVIKOFF:  Objection.    2:06:16PM
18  A   New York City.             2:06:16PM
19     Q   Do you know whether that satisfies the 2:06:17PM
20  requirement to pass the test to be a sergeant in
21  Suffolk County?
22       MR. CALLAHAN:  Objection to form.    2:06:21PM
23       MR. NOVIKOFF:  Objection.    2:06:22PM
24  A   I don't know.              2:06:23PM
25     Q   So you don't know one way or the      2:06:24PM

Page 202

GEORGE HESSE

1
2   other?
3   A   No.                        2:06:26PM
4      Q   I believe you testified that your     2:06:34PM
5   wife's name is Sharon, did you say?
6   A   Shannon.                   2:06:38PM
7      Q   I apologize for that.  Shannon.       2:06:38PM
8        How long have you been married?        2:06:40PM
9   A   A little over 13 years.       2:06:41PM
10     Q   Is she your first wife?               2:06:45PM
11  A   Yes.                       2:06:46PM
12     Q   Have you ever cheated on her?         2:06:49PM
13       MR. CONNOLLY:  Objection.    2:06:52PM
14       MR. NOVIKOFF:  Whoa.  Whoa.    2:06:53PM
15       MR. GOODSTADT:  It's part of the    2:06:56PM
16  allegations in the case.  You know it is.
17       MR. NOVIKOFF:  Well, just because you   2:06:58PM
18  allege it in the case doesn't make it
19  relevant.  But he's not my witness, so I
20  can't tell him not to answer or not.
21       MR. CONNOLLY:  Objection.  Do you want  2:07:05PM
22  to -- objection.
23       MR. GOODSTADT:  You can mark it as    2:07:08PM
24  confidential, you can do what you want, but
25  it's certainly relevant.

Page 203

GEORGE HESSE

1
2       MR. NOVIKOFF:  Well, like I said, it's   2:07:14PM
3   not my witness.  I can't say anything.
4       MR. CONNOLLY:  In terms of the    2:07:18PM
5   complaint?
6       MR. GOODSTADT:  In terms of the    2:07:21PM
7   complaint.
8       MR. CONNOLLY:  On duty?      2:07:22PM
9       MR. GOODSTADT:  There are several    2:07:25PM
10  allegations with respect to that, yes.
11       MR. CONNOLLY:  As to -- why don't you   2:07:29PM
12  ask him the allegation, you know, as
13  contained in the complaint.
14       MR. GOODSTADT:  Well, because I'm    2:07:38PM
15  going to work my way to that.  As
16  Mr. Novikoff likes to do, set a foundation.
17  Then I'll have an objection on foundation
18  grounds now.
19       MR. NOVIKOFF:  Well, you could ask    2:07:51PM
20  him -- well, first of all, I'm staying out
21  of this.
22       You're not my witness.  I would never   2:07:55PM
23  let you answer it, but it's not for me to
24  make that decision.
25       MR. CONNOLLY:  Why don't we do it this  2:08:03PM

Page 204

GEORGE HESSE

1
2   way.  I'm going to object.  It's something
3   we can bring up to the judge when we bring
4   up other items.  Why don't we continue.
5   He's coming back.  You'll have an
6   opportunity.
7       MR. NOVIKOFF:  And we do have an    2:08:17PM
8   appearance now on June 11th.
9       MR. GOODSTADT:  Right.  I saw that.  I  2:08:21PM
10  saw that.
11       So you're instructing him not to    2:08:23PM
12  answer pending a --
13       MR. CONNOLLY:  Guidance from the    2:08:26PM
14  court.
15       MR. GOODSTADT:  Guidance from the    2:08:28PM
16  court?
17       MR. CONNOLLY:  I mean, we do have a    2:08:29PM
18  lot of get through here.
19       MR. GOODSTADT:  I understand.  I    2:08:38PM
20  certainly understand that.  I'm just trying
21  to figure out if we want to get on the phone
22  with the court right now.  I think it's
23  relevant to this whole next line of
24  questioning.
25       MR. CONNOLLY:  And again, this next    2:08:47PM

51 (Pages 201 to 204)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 205

GEORGE HESSE

1    GEORGE HESSE
2    line of questioning, I'm sure, is a portion
3    of a much further line of questioning that
4    we could segregate and address at a later
5    time if need be.
6        MR. GOODSTADT:  Let me just ask him    2:09:01PM
7    questions, and then we'll figure out if I
8    need to get back to that question.
9        MR. NOVIKOFF:  Okay.  Okay.    2:09:06PM
10   BY MR. GOODSTADT:    2:09:13PM
11   **Q    Mr. Hesse, have you ever posted on any    2:09:14PM**
12   **social networking sites?**
13   A    Yes.    2:09:19PM
14   **Q    Okay.  Which ones?    2:09:20PM**
15   A    Adult Friend Finder.  Ashley    2:09:23PM
16   Madison.com.  And I don't recall, there may have
17   been others.  You know what, there is one more.
18   Loveinuniform.com.
19   **Q    L-O-V-E-I-N-U-N-I-F-O-R-M?    2:09:53PM**
20   A    Spell it again.    2:09:59PM
21   **Q    L-O-V-E-I-N-U-N-I-F-O-R-M.com?    2:10:00PM**
22   A    That sounds right.    2:10:06PM
23   **Q    Any others?    2:10:07PM**
24       MR. CONNOLLY:  Just note my continuing    2:10:08PM
25   objection to this line of questioning.

Page 206

1    GEORGE HESSE
2        MR. GOODSTADT:  Sure.    2:10:11PM
3    A    Not that I recall.  I don't know.    2:10:11PM
4    **Q    Did you post on a site called -- I    2:10:13PM**
5    **don't know how to pronounce it.  It's spelled**
6    **M-I-G-E-N-T-E.com?**
7    A    What is it?    2:10:20PM
8    **Q    Migente, M-I-G-E-N-T-E.com?    2:10:23PM**
9    A    Yes, actually I did for a short period    2:10:26PM
10   of time.
11   **Q    How about on a website called    2:10:31PM**
12   **Fubar.com, F-U-B-A-R?**
13   A    Yes.    2:10:36PM
14   **Q    How about on any Yahoo age-restricted    2:10:39PM**
15   **groups?**
16       MR. CONNOLLY:  Objection.    2:10:47PM
17       MR. NOVIKOFF:  Yeah, I don't know what    2:10:48PM
18   that means.
19   BY MR. GOODSTADT:    2:10:50PM
20   **Q    A Solena_party Yahoo group, do you    2:10:50PM**
21   **recall posting on that?  S-O-L-E-N-A_party.**
22   A    It's not a post.  It's a group.    2:11:03PM
23   **Q    Have you ever posted on that site?    2:11:05PM**
24   A    No.    2:11:07PM
25   **Q    Sure about that?    2:11:08PM**

Page 207

1        **GEORGE HESSE**
2    A    I never posted anything that I recall    2:11:11PM
3    other than joining the group.
4    **Q    You don't recall posting any messages    2:11:18PM**
5    **on that site?**
6    A    I don't recall.    2:11:21PM
7    **Q    Okay.  How about any AOL social groups    2:11:21PM**
8    **or networking groups?**
9    A    I don't know if AOL has any social    2:11:30PM
10   networking groups.  It's a -- it's just a user
11   site.  They have chat rooms and stuff like that.
12   **Q    What was the user name you used on    2:11:40PM**
13   **Adult Friend Finder?**
14   A    You know, I don't recall.    2:11:45PM
15   **Q    What E-mail address did you use?    2:11:48PM**
16   A    BeachCop03.    2:11:51PM
17       MR. NOVIKOFF:  BeachCop what?    2:11:55PM
18       THE WITNESS:  BeachCop03.    2:11:57PM
19   BY MR. GOODSTADT:    2:11:59PM
20   **Q    @aol.com?    2:11:59PM**
21   A    Yes.    2:12:01PM
22   **Q    What name did you use on    2:12:02PM**
23   **AshleySabrina.com?**
24   A    It wasn't Ashley Sabrina.    2:12:09PM
25   **Q    Oh, it wasn't?  Ashley Madison.  I    2:12:12PM**

Page 208

1        **GEORGE HESSE**
2    **apologize for that.**
3        **What user name did you use on that?    2:12:19PM**
4    A    It might be Copper103.    2:12:24PM
5    **Q    C-O-P-P-E-R 103?    2:12:28PM**
6    A    Yes.    2:12:30PM
7    **Q    And what E-mail address did you use?    2:12:31PM**
8    A    BeachCop103.    2:12:33PM
9    **Q    What user name did you use on    2:12:36PM**
10   **loveinuniform.com?**
11   A    That is, I believe BeachCopp with two    2:12:43PM
12   Ps at the end.
13   **Q    What E-mail address did you use?    2:12:48PM**
14   A    BeachCop03@aol.com.    2:12:50PM
15       MR. CONNOLLY:  Andrew, I'm going to    2:12:58PM
16   cut this off at this point.
17       MR. GOODSTADT:  How come?    2:13:01PM
18       MR. CONNOLLY:  Where are you going    2:13:03PM
19   with it?  There are allegations contained in
20   the complaint regarding chauffeuring my
21   client around.
22       MR. GOODSTADT:  Yeah, to different    2:13:12PM
23   sexual escapades, right.  I'm setting a
24   foundation that he's engaged in sexual
25   escapades.  It certainly leads a lot of

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 209

GEORGE HESSE

1
2   credibility toward the allegations, correct?
3   You have to --
4           MR. CONNOLLY:  Why don't you ask him   2:13:28PM
5   questions limited to the complaint; and if
6   you need to, we'll bring this before the
7   court.
8           MR. GOODSTADT:  Well, let me just go   2:13:36PM
9   back.
10          MR. NOVIKOFF:  My only comment would   2:13:39PM
11  be that to the extent it's even relevant,
12  it's certainly not relevant after the date
13  that these officers were either not rehired
14  or fired, however we term that date to be.
15  But like I said, that's my only comment.
16  BY MR. GOODSTADT:                        2:13:56PM
17      Q   Well, did you ever post on any of   2:13:57PM
18  these social network sites from the police
19  station computers?
20      A   I've checked E-mails.              2:14:03PM
21      Q   Did you ever post any pictures of   2:14:07PM
22  yourself on these sites?
23      A   Yes.                              2:14:10PM
24      Q   In uniform?                       2:14:10PM
25      A   Yes.                              2:14:11PM

Page 210

GEORGE HESSE

1
2       Q   In the Ocean Beach police uniform?   2:14:11PM
3       A   Yes.                              2:14:13PM
4       Q   Did you notify anybody in the beach   2:14:20PM
5   that you were posting pictures of yourself on
6   these social websites in uniform?
7           MR. NOVIKOFF:  Note my objection to   2:14:27PM
8   that question.
9           MR. CONNOLLY:  Objection also.       2:14:28PM
10      A   Did I -- I don't understand the   2:14:31PM
11  question.
12      Q   Did you notify anyone at the beach,   2:14:32PM
13  the mayor, the board, Chief Paradiso when he was
14  there?
15      A   No.                               2:14:38PM
16      Q   Do you know if there are any rules   2:14:41PM
17  regarding pictures of yourself in a uniform
18  anywhere or posing in a uniform for anything?
19      A   Are there rules?                   2:14:52PM
20      Q   Are there any rules?              2:14:54PM
21      A   Not that I'm aware of.             2:14:55PM
22      Q   Did you ever send or respond to any   2:14:57PM
23  E-mails that you checked from the Ocean Beach
24  police computer?
25      A   Yes.                              2:15:23PM

Page 211

GEORGE HESSE

1
2       Q   How many times?                   2:15:24PM
3       A   Oh, I don't know.                 2:15:26PM
4       Q   What years?                       2:15:26PM
5       A   I don't know.                     2:15:28PM
6       Q   Do you know when it started that you   2:15:29PM
7   first started checking E-mails at the police
8   station on any of these social network websites?
9       A   When it started, no.              2:15:36PM
10      Q   You don't recall what year?        2:15:38PM
11      A   No.                               2:15:40PM
12      Q   Do you still check E-mails from any of   2:15:42PM
13  these websites?
14      A   Yes.                              2:15:45PM
15      Q   Which ones?                       2:15:45PM
16      A   Ashley Madison and the loveinuniform   2:15:48PM
17  and Fubar.
18          MR. CONNOLLY:  Objection to any     2:16:01PM
19  questioning since April 2nd, 2006 in this
20  regard.
21          MR. GOODSTADT:  The objection, I don't   2:16:08PM
22  think it's a -- relevance is not a basis to
23  instruct the witness not to answer, you
24  know.  We're more than willing to have your
25  objection on the record.  We can bring it up

Page 212

GEORGE HESSE

1
2   to the court when we raise all these other
3   issues.
4           MR. CONNOLLY:  It will be brought up   2:16:24PM
5   to the court.
6           MR. GOODSTADT:  Right.  Okay.        2:16:26PM
7   Now I'll suspended the questioning on   2:16:53PM
8   this.  I just want to ask him what E-mail
9   addresses he used, and then I'll suspend
10  other questions on this pending our
11  discussion with the court.  I just want on
12  the record what E-mail address were used, if
13  that's all right with you.
14          MR. CONNOLLY:  Why don't we just refer   2:17:09PM
15  the questions to the court and move on.
16  We're coming back on the 16th.  It's not
17  your only shot at the apple.
18          MR. GOODSTADT:  I know.  Why don't you   2:17:27PM
19  just give me a minute off the record just to
20  think about it and see how it plays into the
21  next set of questions.
22          THE VIDEOGRAPHER:  The time is       2:17:39PM
23  2:17 p.m.  We are now off the record.
24          (Whereupon, a discussion was held off   2:17:43PM
25  the record.)

53 (Pages 209 to 212)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 213

GEORGE HESSE

1
2      THE VIDEOGRAPHER:  The time is now      2:28:13PM
3    2:28 p.m.  We are now back on the record.
4      MR. GOODSTADT:  Okay.  Before we took   2:28:18PM
5    that break, Mr. Connolly and I conferred off
6    the record and decided that on this subject
7    I was going to ask just a limited number of
8    questions that we've agreed to, and it's
9    going to be certain topics that will be
10   subject to further discussion with the
11   court.
12      Is that acceptable, Mr. Connolly?      2:28:36PM
13      MR. CONNOLLY:  That's acceptable.      2:28:38PM
14   BY MR. GOODSTADT:                         2:28:39PM
15   **Q    Now, Mr. Hesse, have you ever met any**  2:28:39PM
16   **of the people that you've posted with or**
17   **E-mailed with on any social network site in**
18   **person?**
19   A    Yes.                                 2:28:51PM
20      MR. NOVIKOFF:  Objection.              2:28:52PM
21      MR. CONNOLLY:  Continuing objection.   2:28:53PM
22   BY MR. GOODSTADT:                         2:28:54PM
23   **Q    And did you ever meet with any of**  2:28:55PM
24   **those people that you've E-mailed with or posted**
25   **with on these social network sites on Fire**

Page 214

GEORGE HESSE

1
2    **Island?**
3    A    No.                                  2:29:06PM
4    **Q    So it was off of Fire Island?**      **2:29:14PM**
5    A    Yes.                                 2:29:16PM
6      MR. NOVIKOFF:  Objection.              2:29:17PM
7      MR. CONNOLLY:  Objection.              2:29:18PM
8      MR. NOVIKOFF:  If it's not on.         2:29:20PM
9      MR. GOODSTADT:  I just want to make    2:29:21PM
10   sure.
11   BY MR. GOODSTADT:                         2:29:24PM
12   **Q    And the pictures that you posted on**  **2:29:27PM**
13   **these sites, did you ever post them from the**
14   **police station computer?  I just want to know**
15   **physically where you uploaded them from.**
16      MR. CONNOLLY:  Objection.              2:29:37PM
17   A    I may have.                          2:29:39PM
18   **Q    Okay.**                              **2:29:40PM**
19      MR. GOODSTADT:  And again, the rest of  2:29:43PM
20   the questions will just be subject to motion
21   or discussion with the court.
22   BY MR. GOODSTADT:                         2:29:52PM
23   **Q    Have you ever posted on Facebook?**   **2:29:53PM**
24   A    Yes.  Yes.                           2:29:55PM
25   **Q    Did you ever change any of your**     **2:29:55PM**

Page 215

GEORGE HESSE

1
2    **privacy settings in Facebook in your posting?**
3    A    Yes.                                 2:30:00PM
4    **Q    What did you change your privacy**     **2:30:00PM**
5    **settings to?**
6    A    From public to private.             2:30:03PM
7    **Q    And did you ever post on My Space?**   **2:30:14PM**
8    A    Yes.                                 2:30:16PM
9    **Q    Did you ever change your privacy**     **2:30:17PM**
10   **settings on myspace.com?**
11   A    I don't know if they had a way that  2:30:23PM
12   you can do that.  I'm not sure.
13   **Q    What did you do, if anything, to**     **2:30:42PM**
14   **prepare for today's deposition?**
15   A    I met with my attorney on Monday and  2:30:47PM
16   Tuesday.
17   **Q    When you say your attorney, who are**   **2:30:50PM**
18   **you referring to?**
19   A    Mr. Connolly.                        2:30:57PM
20   **Q    And where did you meet with him?**     **2:30:58PM**
21   A    In Westchester, at his office.       2:31:00PM
22   **Q    Who was present at the meeting?**      **2:31:03PM**
23   A    Just he and I.                       2:31:05PM
24   **Q    How long did you meet with him?**      **2:31:08PM**
25   **Without telling me anything that you said to him**

Page 216

GEORGE HESSE

1
2    or he said to you, how long did you meet with
3    him on each of those days?
4      MR. CONNOLLY:  Exclusive of lunch,     2:31:17PM
5    breaks?
6      MR. GOODSTADT:  Yeah.  Just meeting    2:31:21PM
7    time.  Either inclusive or exclusive.
8    A    On Monday, I arrived at 9:30, and at  2:31:26PM
9    some point we took lunch, and I believe I left
10   somewhere around 5:00.
11   **Q    How about Tuesday?**                  **2:31:36PM**
12   A    Tuesday I arrived at 9:30, and I     2:31:37PM
13   believe I left at 4:00.
14   **Q    Were you on the clock at the beach at**  **2:31:48PM**
15   **the time?**
16   A    Yes.                                 2:31:50PM
17   **Q    So you got paid for that -- those two**  **2:31:51PM**
18   **days?**
19   A    Yes.                                 2:31:53PM
20   **Q    Are you on the clock today for the**    **2:31:54PM**
21   **beach?**
22   A    Yes.                                 2:31:56PM
23   **Q    So you're getting paid for today as**   **2:31:56PM**
24   **well?**
25   A    Yes.                                 2:31:58PM

54 (Pages 213 to 216)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 217

GEORGE HESSE

1
2     Q   And again, don't tell me anything that  2:32:04PM
3   you said to your attorney or your attorney said
4   to you.  But did you review any documents in
5   preparation for today's deposition?
6     A   Yes.                         2:32:13PM
7     Q   Did any of those documents refresh    2:32:14PM
8   your recollection as to any of the facts or
9   events that happened or that are alleged to have
10  happened in this case?
11    A   No.                          2:32:27PM
12    Q   Did you speak with -- well, strike   2:32:36PM
13  that.
14        Have you ever -- other than for today,  2:32:39PM
15  sitting in this room, have you ever spoken to
16  any lawyers from Rivkin Radler in connection
17  with this matter?
18    MR. NOVIKOFF:  Objection.  Asked and   2:32:48PM
19  answered.
20    A   No.                          2:32:49PM
21    Q   Did you speak with anybody -- any    2:32:52PM
22  current or former Ocean Beach employees in
23  preparation for today's deposition?
24    A   No.                          2:33:00PM
25    Q   Did you tell anybody at the beach that  2:33:03PM

Page 218

GEORGE HESSE

1
2   you were coming today for the deposition?
3     A   Yes.                         2:33:06PM
4     Q   Who did you tell?                2:33:07PM
5     A   Ty Bacon, John -- Pat Cherry, Pat   2:33:10PM
6   Cherry, Jr., Joe Dediminico, Billy Bambrick,
7   Hank Clemmons, Michael Mills, John Zois.  It's
8   possible a few other.
9     Q   Did you tell Joe Loeffler?         2:33:43PM
10    A   I told him I was scheduled for today,  2:33:47PM
11  yes.
12    Q   Did you discuss anything else with him  2:33:55PM
13  about this case in that conversation --
14    A   No.                          2:33:59PM
15    Q   -- other than the fact that you were  2:33:59PM
16  scheduled to come for a deposition?
17    A   No.                          2:34:03PM
18    Q   How did you tell the other people,   2:34:04PM
19  Bacon, Cherry, Cherry junior, Dediminico, et
20  cetera?  Did you tell them verbally or did you
21  send out an E-mail or a letter or memo or some
22  other way?
23    A   Verbal.                       2:34:16PM
24    Q   Did you tell them all together or    2:34:16PM
25  separately?

Page 219

GEORGE HESSE

1
2     A   Separately.                    2:34:19PM
3     Q   What did Bacon say when you told him  2:34:20PM
4   you were coming in for the deposition?
5     A   Good luck.                     2:34:25PM
6     Q   Did you discuss the substance of the   2:34:26PM
7   claims at all with Bacon?
8     A   No.                          2:34:29PM
9     Q   Did you ever discuss with Bacon     2:34:29PM
10  anything about his deposition that was taken in
11  this case?
12    A   Just the fact that he had come and was  2:34:=
34PM
13  deposed.
14    Q   Do you recall what he said about that?  2:34:37PM
15    A   No.                          2:34:41PM
16    Q   So you don't recall anything        2:34:46PM
17  substantive about what he said other than for
18  the fact that he was deposed?
19    A   No substance.                  2:34:52PM
20    Q   Did you ever review his transcript or  2:34:53PM
21  any excerpts of his transcript from this
22  deposition?
23    A   No.                          2:34:59PM
24    Q   And when you told Pat Cherry that you  2:34:59PM
25  were coming in today, what did he say in that

Page 220

GEORGE HESSE

1
2   conversation?
3     A   Good luck.                     2:35:04PM
4     Q   Anything else?                  2:35:05PM
5     A   No.                          2:35:06PM
6     Q   Did you discuss the substance of the  2:35:06PM
7   claims or allegations in this case with him?
8     A   No.                          2:35:11PM
9     Q   Did you ever discuss with Pat Cherry  2:35:11PM
10  anything about his deposition that was taken in
11  this case?
12    A   No.                          2:35:17PM
13    Q   Did he tell you that he was coming for  2:35:19PM
14  a deposition?
15    A   Yes.                         2:35:21PM
16    Q   Did you speak to him after his      2:35:22PM
17  deposition?
18    A   Yes.                         2:35:24PM
19    Q   About the deposition?             2:35:24PM
20    A   Yes.                         2:35:25PM
21    Q   And what did he say about it?        2:35:25PM
22    A   He said it went all right.          2:35:27PM
23    Q   Anything else?                  2:35:29PM
24    A   No.                          2:35:29PM
25    Q   Did you discuss the substance at all,  2:35:30PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 221

GEORGE HESSE

1
2  any of the questions that were asked?
3     A   No.                           2:35:34PM
4     Q   Did you ever review his transcript or  2:35:35PM
5  any excerpts from his transcript from the
6  deposition in this case?
7     A   Yes.                          2:35:41PM
8     Q   When did you do that?          2:35:42PM
9     A   I don't know the exact date, but I had  2:35:44PM
10 requested since I wasn't going to be present for
11 the depositions, if Mr. Connolly could send me a
12 copy so I could just look at them.
13    Q   Of just Cherry's or everybody's?   2:35:55PM
14    A   Of everybody's.                2:35:58PM
15    Q   So you reviewed everybody's deposition  2:35:59PM
16 transcripts in this case?
17    A   No.                           2:36:02PM
18    Q   Which ones have you reviewed?   2:36:03PM
19    A   I have read Mr. Snyder's. I've read  2:36:04PM
20 Kevin Lamm's. I read Joe Nofi's. I read Eddie
21 Carter's. I read Maryann Minerva's. I read I
22 think the first half of Natalie Rogers. That
23 may be it.
24    Q   Did you read Joe Loeffler's?   2:36:41PM
25    A   No.                           2:36:44PM

Page 222

GEORGE HESSE

1
2     Q   Did you read Allison Sanchez?   2:36:44PM
3     A   No.                           2:36:46PM
4     Q   Did you speak with Minerva about her  2:36:47PM
5  deposition?
6        MR. NOVIKOFF: Before or after?  2:36:51PM
7        MR. GOODSTADT: Either.          2:36:52PM
8        MR. NOVIKOFF: Okay.            2:36:54PM
9        MR. GOODSTADT: I'm trying to truncate  2:36:55PM
10 some of the questions.
11    A   Yes.                          2:36:57PM
12    Q   Before or after?               2:36:58PM
13    A   Before and after.              2:36:59PM
14    Q   What did you discuss with her before  2:36:59PM
15 her deposition?
16    A   Just the fact that she was coming.  2:37:02PM
17    Q   Have you ever discussed -- before her  2:37:04PM
18 deposition, did you ever discuss the substance
19 of any of the allegations made in the complaint?
20    A   Just like I said previous, that it was  2:37:11PM
21 baseless.
22    Q   But nothing specific about any of the  2:37:13PM
23 specific allegations?
24    A   Nothing specific, no.          2:37:17PM
25    Q   Okay. And did you speak with her  2:37:18PM

Page 223

GEORGE HESSE

1
2  after the deposition --
3     A   Yes.                          2:37:23PM
4     Q   -- as well?                    2:37:23PM
5        And when did you speak with her after  2:37:24PM
6  her deposition?
7     A   Maybe a day or two after.      2:37:27PM
8     Q   And what did she say in that    2:37:29PM
9  conversation?
10    A   Other than she had to go to the city,  2:37:34PM
11 she had a headache and that she felt slightly
12 intimidated by Mr. Fiorillo, that was it.
13    Q   Did she tell you anything       2:37:45PM
14 substantively about her deposition?
15    A   No.                           2:37:48PM
16    Q   How about Natalie Rogers, did you ever  2:37:52PM
17 speak to her about her deposition?
18    A   No.                           2:37:57PM
19    Q   Did you ever speak with Joe Loeffler  2:37:59PM
20 about his deposition?
21    A   No, other than the fact that he came  2:38:03PM
22 and took -- and gave his deposition.
23    Q   You didn't speak anything       2:38:07PM
24 substantive -- you didn't speak anything with
25 him about the substance of his deposition?

Page 224

GEORGE HESSE

1
2     A   No.                           2:38:13PM
3     Q   Did you speak with -- strike that.  2:38:15PM
4        Did you read the transcript of Gary  2:38:18PM
5  Bosetti's deposition?
6     A   No.                           2:38:21PM
7     Q   How about Richard Bosetti's     2:38:22PM
8  deposition?
9     A   No. I haven't received them.   2:38:24PM
10    Q   Have you spoken with either of them  2:38:25PM
11 about their depositions?
12    A   Just Gary, as far as him just coming  2:38:28PM
13 to give his deposition. And Richie also. I'm
14 sorry, yes.
15    Q   Before they took their depositions or  2:38:36PM
16 after?
17    A   I believe they -- Gary had called me  2:38:38PM
18 just to advise me that he was coming in and Gary
19 himself called me again to tell me that Richie
20 was going in, and then he called me to tell me
21 that either he was done or his brother was done.
22    Q   Did he tell you anything substantively  2:38:53PM
23 about their depositions?
24    A   No.                           2:38:57PM
25    Q   Did you see the Bosettis in the  2:38:57PM

56 (Pages 221 to 224)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 225

GEORGE HESSE

1        GEORGE HESSE
2  hospital after Rich Bosetti was in a motorcycle
3  accident?
4     A  Yes, I did.          2:39:04PM
5     Q  Did you discuss anything at all about  2:39:05PM
6  this case with them at that time?
7     A  No.            2:39:09PM
8     Q  Did you discuss anything about their  2:39:10PM
9  depositions with them at that time?
10    A  No.            2:39:12PM
11    Q  Did you ever read Allison Sanchez's  2:39:16PM
12  transcript?
13    A  I don't believe I received hers   2:39:21PM
14  either.
15    Q  Have you spoken with Ms. Sanchez at  2:39:22PM
16  all about her deposition?
17    A  Very briefly, yes.      2:39:26PM
18    Q  When did you speak to her?   2:39:27PM
19    A  I ran into her in Riverhead court one  2:39:29PM
20  day. I don't remember the specific day. And
21  she just said that he had come to the
22  deposition, and that was it. I introduced her
23  to my wife, and we just chatted for a little
24  bit.
25    Q  Did you tell her -- strike that.   2:39:43PM

Page 226

1        GEORGE HESSE
2    Did she tell you anything substantive  2:39:45PM
3  about her deposition?
4    A  The only thing that she did mention  2:39:48PM
5  was the part about sexual relations between me
6  and her, and she said she threw up in her mouth
7  and she laughed.
8     MR. NOVIKOFF: She actually did throw  2:39:58PM
9  up.
10    A  She thought it was a joke.   2:40:01PM
11    Q  Did she say anything else about her  2:40:05PM
12  deposition?
13    A  No. Our conversation was actually   2:40:08PM
14  pretty brief. She had a -- she's a parole
15  officer now. So she had to move on and do her
16  job, I guess. I don't know.
17    Q  After you received the complaint in   2:40:20PM
18  this case, did you ever discuss the substantive
19  allegations with Allison Sanchez?
20    A  I believe that we did discuss the   2:40:27PM
21  allegation of us having a sexual relationship.
22  That would be it.
23    Q  When did you have that discussion?   2:40:33PM
24    A  I don't recall.       2:40:34PM
25    Q  What was the substance of that   2:40:39PM

Page 227

1        GEORGE HESSE
2  discussion?
3    A  How funny it was that somebody would  2:40:42PM
4  make an allegation like that.
5    Q  Anything else that you discussed about  2:40:49PM
6  that allegation?
7    A  Yeah. She said that she couldn't   2:40:56PM
8  believe that the allegation was made by these
9  individuals, especially since they were in her
10  office and they saw pictures of her partner on
11  the wall, that these guys must not be very good
12  investigators.
13    Q  What do you mean by that, saw pictures  2:41:12PM
14  of her on the wall?
15     MR. NOVIKOFF: What does he mean by   2:41:18PM
16  that?
17  BY MR. GOODSTADT:        2:41:20PM
18    Q  Do you know what she meant by that?  2:41:20PM
19     MR. CALLAHAN: Objection to form.   2:41:23PM
20    A  By the fact that they were in her   2:41:24PM
21  office and she had pictures of her partner all
22  over the place.
23    Q  And how did she reach the conclusion,  2:41:31PM
24  if you know, that they weren't very good
25  investigators?

Page 228

1        GEORGE HESSE
2     MR. CALLAHAN: Objection to form.   2:41:42PM
3     MR. NOVIKOFF: Yeah, I join in.   2:41:43PM
4    A  She flat out said that she didn't   2:41:44PM
5  think they were smart cops.
6    Q  And her conclusion was based on the   2:41:48PM
7  fact that --
8     MR. CALLAHAN: Objection to form.   2:41:52PM
9     MR. GOODSTADT: We're objecting now   2:41:54PM
10  before questions are even asked?
11     MR. CALLAHAN: I thought you were   2:42:11PM
12  done.
13     MR. GOODSTADT: No, I wasn't.   2:42:12PM
14     MR. NOVIKOFF: Just note my objection  2:42:15PM
15  to all the questions.
16     MR. GOODSTADT: Welch can step in.   2:42:21PM
17  BY MR. GOODSTADT:        2:42:28PM
18    Q  Do you know what her conclusion was  2:42:28PM
19  based on?
20     MR. CALLAHAN: Objection to form.   2:42:31PM
21     MR. NOVIKOFF: I join.     2:42:33PM
22    A  I would say it was based on the fact  2:42:34PM
23  that they made this allegation that I had sexual
24  relations with her, when she was, in fact, a
25  lesbian.

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 229

GEORGE HESSE

1
2     Q     Does the fact that she's a lesbian    2:42:44PM
3   preclude that allegation from being true?
4         MR. CALLAHAN:  Objection to form.    2:42:45PM
5         MR. NOVIKOFF:  Physically?    2:42:46PM
6         MR. GOODSTADT:  Yeah.    2:42:48PM
7         MR. NOVIKOFF:  I think the record    2:42:48PM
8   could reflect that we can all stipulate that
9   lesbians can have sex with men.
10        MR. GOODSTADT:  Okay.    2:42:55PM
11  BY MR. GOODSTADT:    2:42:55PM
12    Q     You testified when you were a    2:43:00PM
13  sergeant, that your tours were on Friday,
14  Saturday nights; is that correct?
15    A     Correct.    2:43:09PM
16    Q     And you were the most senior officer    2:43:10PM
17  on that tour?
18    A     Yes.    2:43:13PM
19    Q     Now, if an officer on your tour had a    2:43:16PM
20  problem or a complaint in the chain of the
21  command, would they come to you with that
22  problem or complaint?
23    A     If they were working a tour with me    2:43:26PM
24  they would probably come right to me first.
25    Q     That's the way the chain of command    2:43:31PM

Page 230

GEORGE HESSE

1
2   works?
3     A     Sure.    2:43:33PM
4     Q     And did you ever hear Paradiso tell    2:43:37PM
5   the officers in Ocean Beach or any officer in
6   Ocean Beach that what happens on my tour, I'm
7   handling; what happens on officer Hesse's tour
8   he handles?
9     A     I never heard that.    2:43:51PM
10    Q     You never heard that.    2:43:53PM
11        Was there a set -- let's go to 2003.    2:44:03PM
12  Was there a set group of guys that were on your
13  tour?
14    A     I would say yes, but it fluctuated    2:44:13PM
15  from day to day.
16    Q     Who generally would be on your tour,    2:44:16PM
17  the core group?
18    A     2003, I'd have to look at the    2:44:19PM
19  schedule.  I don't know.
20    Q     Was Ed Carter on your tour a lot in    2:44:24PM
21  '03?
22    A     Sometimes.    2:44:29PM
23    Q     How about Tom Snyder?    2:44:29PM
24    A     Sometimes.    2:44:31PM
25    Q     Joe Nofi?    2:44:33PM

Page 231

GEORGE HESSE

1
2     A     Sometimes.    2:44:34PM
3     Q     Kevin Lamm?    2:44:35PM
4     A     Sometimes.    2:44:36PM
5     Q     How about Frank Fiorillo?    2:44:38PM
6     A     And sometimes, yeah.    2:44:39PM
7     Q     How about in '04, was Carter on your    2:44:42PM
8   tour a lot?
9         MR. NOVIKOFF:  Objection.    2:44:46PM
10        What do you mean by a lot?    2:44:48PM
11        MR. GOODSTADT:  Well, I think I asked    2:44:50PM
12  if there was a set group of guys, and he
13  said generally there were, but it
14  fluctuated.
15  BY MR. GOODSTADT:    2:44:56PM
16    Q     So would Carter be one of the general    2:44:56PM
17  group of guys that were on your tour in '04?
18    A     Sometimes.    2:45:03PM
19    Q     How about Snyder?    2:45:03PM
20    A     Sometimes.    2:45:04PM
21    Q     Nofi?    2:45:05PM
22    A     Sometimes.    2:45:05PM
23    Q     Lamm?    2:45:06PM
24    A     Sometimes.    2:45:07PM
25    Q     Fiorillo?    2:45:08PM

Page 232

GEORGE HESSE

1
2     A     Sometimes.    2:45:08PM
3     Q     How about in '03, would Gary Bosetti?    2:45:09PM
4     A     Very rarely, but sometimes, yeah.    2:45:12PM
5     Q     How about Rich Bosetti?    2:45:14PM
6     A     Same thing, sometimes.    2:45:16PM
7     Q     What tour did they generally work in    2:45:17PM
8   '03?
9     A     They always worked -- they pretty much    2:45:21PM
10  always worked 4 to 12s.
11    Q     And was your tour in '03 generally on    2:45:27PM
12  Fridays and Saturdays?
13    A     Friday and Saturday, 9 at night until    2:45:31PM
14  5 in the morning.
15    Q     So your tours would overlap --    2:45:34PM
16    A     Sometimes.    2:45:34PM
17    Q     -- generally?    2:45:34PM
18        What was Carter's tour generally in    2:45:35PM
19  '03?
20    A     Most of the time, I believe he worked    2:45:38PM
21  midnights from -- sorry.  From midnight till
22  eight in the morning.
23    Q     So, again, you'd overlap with him?    2:45:46PM
24    A     Sure.    2:45:48PM
25    Q     Snyder, do you know what his tour    2:45:49PM

58  (Pages 229 to 232)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 233

GEORGE HESSE

1
2    generally was in '03?
3        A    Generally it was midnights.    2:45:52PM
4        Q    How about Nofi?                2:45:53PM
5        A    Nofi fluctuated around a little bit.    2:45:56PM
6    Sometimes it was nine at night till five in the
7    morning.  Sometimes it was four to 12.
8    Sometimes it was midnights.
9        Q    So sometimes he had the same tour as    2:46:06PM
10   you and sometimes he overlapped?
11       A    Sometimes.                    2:46:12PM
12       Q    How about Lamm?              2:46:13PM
13       A    Lamm also worked a majority of    2:46:14PM
14   midnights, midnight to eight in the morning.
15   Sometimes he worked at nine at night till five
16   in the morning.
17       Q    And Fiorillo?                 2:46:23PM
18       A    Fiorillo worked some doubles, I    2:46:25PM
19   believe.  He did some maybe some 4 to 12s.  He
20   did some day tours.  He did night tours.  He was
21   on the schedule quite often.
22       MR. NOVIKOFF:  And we're talking about  2:46:39PM
23   in season now.
24       MR. GOODSTADT:  In season, yeah.    2:46:41PM
25

Page 234

GEORGE HESSE

1
2    BY MR. GOODSTADT:                        2:46:42PM
3        Q    How about in '04, did that change at    2:46:43PM
4    all?
5        A    No.                          2:46:45PM
6        Q    Same thing with Gary and Rich Bosetti,  2:46:46PM
7    generally they worked the 4-to-12 tour?
8        A    Yeah.                        2:46:49PM
9        Q    How about '05, did that change at all?  2:46:49PM
10       A    No.                          2:46:52PM
11       Q    In '03, '04 and '05, you generally did  2:46:52PM
12   the 9 to 5?
13       A    On Fridays and Saturdays.     2:46:57PM
14       Q    Fridays and Saturdays?        2:46:59PM
15       A    Yes.                         2:47:01PM
16       Q    When was the change?  That was in '02?  2:47:02PM
17       A    Which change?                 2:47:04PM
18       Q    I think you testified before that    2:47:06PM
19   Paradiso was flipped to your tours, you were
20   flipped to his tours due to some discipline of
21   his?
22       A    Yeah, it might have been 2002.  I'd    2:47:16PM
23   have to go through the records and the schedules
24   to see exactly what the dates were.  I don't
25   know.

Page 235

GEORGE HESSE

1
2        Q    You never heard that that switch was    2:47:24PM
3    done to discipline you?
4        A    Absolutely not.               2:47:28PM
5        MR. NOVIKOFF:  Andrew, I think -- your  2:47:39PM
6    question was did he ever hear that switch --
7        MR. GOODSTADT:  Did anyone tell him.    2:47:42PM
8        MR. NOVIKOFF:  -- or was, in his     2:47:43PM
9    opinion, the switch?
10       MR. GOODSTADT:  Well, did anyone ever  2:47:45PM
11   tell him that the switch was due to
12   discipline.
13       MR. NOVIKOFF:  And I think the witness  2:47:47PM
14   answered my latter question as opposed to
15   the first question.
16       MR. GOODSTADT:  Okay.            2:47:51PM
17   BY MR. GOODSTADT:                        2:47:52PM
18       Q    Did you ever hear -- did anyone ever    2:47:52PM
19   tell you that the switch was done to discipline
20   you as opposed to disciplining Paradiso?
21       A    No.                          2:48:02PM
22       Q    Have you ever heard that allegation    2:48:03PM
23   made?
24       A    No.                          2:48:05PM
25       Q    And I assume that means that your    2:48:10PM

Page 236

GEORGE HESSE

1
2    opinion was the reason that you testified
3    before, that it was to discipline Paradiso,
4    correct?
5        A    Correct.                     2:48:15PM
6        Q    Now, let's go back to Allison Sanchez.  2:48:22PM
7    She was also called Allison Chester at one
8    point, right?
9        A    Yes.                         2:48:27PM
10       Q    Okay.  So when I say Allison Sanchez,  2:48:26PM
11   I'm referring to the same person regardless of
12   what her last name is; is that fair?
13       A    Understood.                   2:48:31PM
14       Q    Did you generally deal with her over    2:48:32PM
15   the phone, in person, E-mail, letters, or which
16   way is it generally?
17       MR. NOVIKOFF:  Objection to form.    2:48:40PM
18       MR. CALLAHAN:  Objection to form.    2:48:42PM
19       A    On the phone.                 2:48:44PM
20       Q    How many times did you interact with    2:48:46PM
21   her in person?
22       A    Three, four times.            2:48:58PM
23       Q    Why don't we just start with the first  2:49:04PM
24   time.  Where was it?
25       A    At her office.                2:49:08PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 237

GEORGE HESSE

1
2    Q    Do you recall when that was, what    2:49:12PM
3    year?
4    A    It was probably in 2005.    2:49:16PM
5    Q    Had you ever met her prior to that    2:49:23PM
6    time?
7    A    No.    2:49:26PM
8    Q    Had you ever spoken to her prior to    2:49:27PM
9    that meeting in the office in '05?
10   A    I believe by then we had a    2:49:31PM
11   professional rapport on the phone.
12   Q    And had you ever seen her prior to    2:49:37PM
13   that?  I know you may not have met her, but had
14   you ever seen her around or in passing?
15   A    No.    2:49:45PM
16   Q    So you didn't recognize her when you    2:49:45PM
17   first saw her in '05 in her office?
18   MR. NOVIKOFF: Objection.    2:49:50PM
19   MR. GOODSTADT: Yeah, I shouldn't say    2:49:51PM
20   when you first saw her.
21   MR. NOVIKOFF: I mean, I would presume    2:49:54PM
22   that if he met her in her office, she has a
23   name plate saying Allison Sanchez.
24   MR. GOODSTADT: I'm talking about    2:49:59PM
25   recognizing the face.

Page 238

GEORGE HESSE

1
2    BY MR. GOODSTADT:    2:50:00PM
3    Q    Did you recognize the face when you    2:50:01PM
4    went into her office in 2005 as someone that you
5    may have seen around?
6    A    No.    2:50:06PM
7    Q    And what were you dealing with her    2:50:11PM
8    when you met in her office in '05?
9    A    I believe I had to go there to drop    2:50:14PM
10   off some paperwork, have some paperwork signed.
11   Q    With respect to what?    2:50:20PM
12   A    There are forms that have to be signed    2:50:21PM
13   by the -- I forget what the actual name of the
14   form is, but it's a form that gets sent to the
15   New York State registry for police officers.
16   The police officer signs it that's getting
17   hired.  The supervisor of the police department
18   signs it.  A representative from Civil Service
19   signs it.  And I believe the oath of office,
20   which I believe at that time was Maryann Minerva
21   would have to sign that form.
22   Q    And you signed that form that you    2:50:52PM
23   dropped off?
24   A    Yes.    2:50:54PM
25   Q    Did you sign it as chief of police?    2:50:54PM

Page 239

GEORGE HESSE

1
2    A    At that time, no.    2:50:57PM
3    Q    Deputy chief of police?    2:50:57PM
4    A    No.    2:50:59PM
5    Q    Sergeant?    2:50:59PM
6    A    Sergeant.    2:51:00PM
7    Q    Why did you sign as opposed to    2:51:01PM
8    Paradiso?
9    A    Because he told me to take care of the    2:51:06PM
10   paperwork, so that's what I did.
11   Q    So at least as of 2005, Allison    2:51:13PM
12   Sanchez was on notice that you had the title
13   sergeant; is that correct?
14   MR. CALLAHAN: Objection to form.    2:51:21PM
15   MR. NOVIKOFF: Objection.    2:51:22PM
16   MR. CONNOLLY: Objection.    2:51:23PM
17   A    Am I aware if she was aware?    2:51:25PM
18   Q    You had the paperwork that you showed    2:51:27PM
19   her, correct?
20   A    Yeah.    2:51:29PM
21   Q    You had signed off as sergeant,    2:51:30PM
22   correct?
23   A    Correct.    2:51:32PM
24   Q    Had you sent any other paperwork to    2:51:32PM
25   her prior to that signing off as sergeant?

Page 240

GEORGE HESSE

1
2    A    I don't know if I sent anything    2:51:38PM
3    through the mail to her.
4    Q    Had you ever sent her any memos or    2:51:45PM
5    E-mails where you signed off as sergeant,
6    whether it's through the mail or not?
7    A    I may have.  I don't recall.    2:51:53PM
8    Q    Did you ever send her any paperwork    2:51:55PM
9    that had you signed off as chief, whether it be
10   on the letterhead or your signature block?
11   A    I don't know.  That might have been --    2:52:03PM
12   I might have been appointed after she was gone.
13   I don't know.
14   Q    When was the second time you met with    2:52:09PM
15   her in person?
16   A    I believe she came to the village one    2:52:13PM
17   day.
18   Q    When was that?  What year?    2:52:15PM
19   A    It might have been in 2005.    2:52:17PM
20   Q    And did she come to see you or did she    2:52:25PM
21   just happen to be there?
22   MR. CALLAHAN: Objection to form.    2:52:29PM
23   A    She did not come to see me, no.    2:52:30PM
24   Q    She just was visiting Ocean Beach?    2:52:32PM
25   MR. CALLAHAN: Objection to form.    2:52:35PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 241

GEORGE HESSE

1  
2   A   She was there on business.        2:52:36PM  
3   Q   On business?                **2:52:37PM**  
4   A   Yes.                   2:52:38PM  
5   Q   And you met with her when she was      **2:52:38PM**  
6   there on business?  
7   A   I ran into her.             2:52:42PM  
8   Q   Did you have any conversation with     **2:52:43PM**  
9   her?  
10  A   Just there was probably -- I remember  2:52:44PM  
11  there was a brief hello.  
12  Q   Do you recall the substance of that    **2:52:48PM**  
13  conversation at all?  
14  A   Hello.                 2:52:50PM  
15  Q   Other than for hello?          **2:52:50PM**  
16  A   No.                   2:52:51PM  
17  Q   That was it?  Where did you run into   **2:52:52PM**  
18  her?  
19  A   In the village office.          2:52:54PM  
20  Q   Do you know what she was doing on the  2:52:57PM  
21  beach, what business she was there for?  
22  A   I believe she was there for some other  2:53:02PM  
23  Civil Service issues that required her  
24  attention, and she was meeting with Mary Ann  
25  Minerva.

Page 242

GEORGE HESSE

1  
2   Q   Do you know what the issues were?     **2:53:14PM**  
3   A   No.                   2:53:15PM  
4   Q   So how did you know she was meeting    **2:53:18PM**  
5   with Maryann Minerva to discuss Civil Service  
6   issues?  
7   A   She was an employee of Civil Service,  2:53:25PM  
8   she was there on business and Maryann Minerva is  
9   the superintendent of the village.  
10  Q   Did you ask Maryann what the issues    **2:53:31PM**  
11  were that she was there for?  
12  A   I don't recall.             2:53:31PM  
13  Q   Do you recall what month in '05 this   **2:53:34PM**  
14  was?  
15  A   I don't.                2:53:36PM  
16  Q   Did you ask Sanchez what she was doing  2:53:37PM  
17  there?  
18  A   I don't recall.             2:53:41PM  
19  Q   And sitting here today, you don't know  2:53:43PM  
20  what they were discussing?  
21      MR. NOVIKOFF:  Objection.        2:53:47PM  
22  A   No.                   2:53:47PM  
23  Q   What was the third time you dealt with  2:53:49PM  
24  her face to face?  
25  A   I ran into her one day.         2:53:53PM

Page 243

GEORGE HESSE

1  
2   Q   Where was that?            **2:53:56PM**  
3   A   It was in Cherry Grove, Fire Island.   2:53:57PM  
4   Q   Was she there on business?         **2:54:04PM**  
5   A   No.                   2:54:06PM  
6   Q   She was there for pleasure?        **2:54:06PM**  
7   A   Yes.                   2:54:07PM  
8   Q   And did you speak with her at all when  **2:54:08PM**  
9   you ran into her?  
10  A   Yes.                   2:54:12PM  
11  Q   What was the substance of that       **2:54:12PM**  
12  conversation?  
13  A   I don't recall.             2:54:16PM  
14  Q   When was the conversation?         **2:54:17PM**  
15  A   It was -- I don't have the exact date.  2:54:19PM  
16  Q   What year was it?            **2:54:24PM**  
17  A   It was in August of 2005, the first   2:54:27PM  
18  Wednesday in August of 2005.  
19  Q   And what was the substance of the     **2:54:51PM**  
20  conversation you had with her?  
21  A   It was purely social.          2:54:54PM  
22  Q   Do you recall what you discussed?     **2:54:56PM**  
23  A   No.                   2:54:57PM  
24  Q   Do you recall anything you discussed?  **2:54:58PM**  
25  A   No.                   2:54:59PM

Page 244

GEORGE HESSE

1  
2   Q   How long was the conversation?       **2:54:59PM**  
3   A   Half hour, 45 minutes.          2:55:04PM  
4   Q   Where was it?  I know it was in Cherry  2:55:10PM  
5   Grove, but where in Cherry Grove?  
6   A   It was at a bar, Ice Palace.        2:55:14PM  
7   Q   Were you on duty?            **2:55:24PM**  
8   A   No.                   2:55:25PM  
9   Q   Did you have any alcoholic beverages   **2:55:30PM**  
10  while you were there?  
11  A   Yes.                   2:55:33PM  
12  Q   How many?                **2:55:34PM**  
13  A   I don't know.  Four.          2:55:36PM  
14  Q   Did she have any alcoholic beverages?  **2:55:38PM**  
15  A   Yes.                   2:55:40PM  
16  Q   How many?                **2:55:40PM**  
17  A   I don't know.              2:55:41PM  
18  Q   More than one?              **2:55:43PM**  
19  A   It's possible.             2:55:46PM  
20  Q   More than two?              **2:55:47PM**  
21  A   It's possible.             2:55:48PM  
22  Q   More than three?            **2:55:48PM**  
23  A   It's possible.             2:55:49PM  
24  Q   More than four?             **2:55:50PM**  
25  A   Maybe.                 2:55:52PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 245

GEORGE HESSE

1
2   Q   You don't know?                2:55:53PM
3   A   I don't know.              2:55:54PM
4   Q   Were you with anyone else?     2:55:56PM
5   A   Yes.                    2:55:58PM
6       MR. CALLAHAN: Objection to form.   2:56:00PM
7   BY MR. GOODSTADT:               2:56:00PM
8   Q   Who were you with?           2:56:01PM
9   A   I was with Walter Muller. I was with   2:56:02PM
10  a Carl Muller. I don't know if anybody else
11  came with us. I think that was it.
12  Q   Is Carl Muller and Walter Muller   2:56:16PM
13  related?
14  A   No.                   2:56:20PM
15  Q   And was she with anybody else?   2:56:21PM
16  A   Yes.                   2:56:23PM
17  Q   Who was she with?            2:56:23PM
18  A   Her partner.              2:56:24PM
19  Q   Anyone else?               2:56:28PM
20  A   Not that I know of.          2:56:29PM
21  Q   Did you eat any food while you were   2:56:30PM
22  there?
23  A   Yes.                   2:56:33PM
24  Q   And what was it, a meal?       2:56:34PM
25  A   Lunch.                  2:56:37PM

Page 246

GEORGE HESSE

1
2   Q   Lunch. Who paid for that meal?   2:56:38PM
3   A   I believe the three gentlemen, all of   2:56:41PM
4   us together, we split it.
5   Q   So Allison Sanchez and her partner   2:56:48PM
6   didn't pay anything?
7   A   She didn't have lunch with us.   2:56:52PM
8   Q   They didn't eat with you?       2:56:55PM
9   A   No.                    2:56:57PM
10  Q   And when was the fourth time that you   2:56:57PM
11  had a face-to-face interaction with her?
12  A   I believe I had to get some more   2:57:02PM
13  papers signed at her office, and we went to
14  lunch.
15  Q   When was that?              2:57:18PM
16  A   It was probably later in 2005. I   2:57:19PM
17  don't know the exact date.
18  Q   How long did that interaction last?   2:57:25PM
19  A   Hour and a half.            2:57:27PM
20  Q   What paperwork were you bringing?   2:57:32PM
21  A   More of those forms I stated earlier.   2:57:34PM
22  Q   Was anyone else there?         2:57:50PM
23  A   No.                    2:57:51PM
24  Q   Have you ever discussed any of the   2:57:54PM
25  plaintiffs with Allison Sanchez --

Page 247

GEORGE HESSE

1
2   A   Yes.                   2:57:59PM
3   Q   -- or anything about the plaintiffs?   2:57:59PM
4       When was the first time you discussed   2:58:01PM
5   anything about the plaintiffs with Allison
6   Sanchez?
7   A   March of 2006.             2:58:10PM
8   Q   Was it in person or on the phone?   2:58:19PM
9   A   Phone.                  2:58:22PM
10  Q   Do you recall when in March?     2:58:22PM
11  A   No.                    2:58:24PM
12  Q   Did you call her or did she call you?   2:58:24PM
13  A   Called her.               2:58:27PM
14  Q   Just to discuss the plaintiffs or to   2:58:29PM
15  discuss other things as well?
16      MR. CALLAHAN: Objection to form.   2:58:34PM
17  A   I don't recall.             2:58:35PM
18  Q   And tell me everything you recall from   2:58:37PM
19  that phone conversation with respect to the
20  plaintiffs.
21  A   I called her to ask advice in   2:58:41PM
22  reference to -- regarding employment with some
23  of the part-time seasonal officers, what their
24  rights were, what my rights -- what the
25  department's rights were and what the village's

Page 248

GEORGE HESSE

1
2   rights were if I were to decide to let someone
3   go.
4   Q   Did you tell her who you were deciding   2:59:05PM
5   to let go?
6   A   No.                    2:59:08PM
7   Q   What did she tell you?         2:59:09PM
8   A   She said that she would find out. She   2:59:10PM
9   would ask her boss, and she'd get back to me.
10  Q   Did you discuss anything else with her   2:59:20PM
11  on that call about the plaintiffs?
12  A   No.                    2:59:24PM
13  Q   How long did that call last?     2:59:27PM
14  A   I don't recall.             2:59:29PM
15  Q   Did you discuss anything else other   2:59:30PM
16  than what you testified to with her on that
17  call?
18  A   I don't recall.             2:59:34PM
19  Q   Did she ever get back to you?    2:59:34PM
20  A   Yes.                   2:59:36PM
21  Q   She called you?             2:59:37PM
22  A   Yes.                   2:59:38PM
23  Q   And when was that? How long after the   2:59:38PM
24  first call?
25  A   I don't recall.             2:59:44PM

62 (Pages 245 to 248)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 249

GEORGE HESSE

1
2    Q   And what did she tell you?        2:59:44PM
3    A   She -- I believe she said she spoke to 2:59:47PM
4  Stan Pelk, but she explained to me that
5  part-time and seasonal employees, employees,
6  police officers are at-will employees and that
7  we could release them at any time without cause.
8    Q   Did she tell you what she was relying  3:00:12PM
9  on?
10   A   Just from what she was told by her     3:00:15PM
11  boss.
12   Q   Did she cite to you any provisions of  3:00:17PM
13  the Civil Service law that provided that?
14   A   No.                          3:00:22PM
15   Q   Did you discuss anything else with her  3:00:24PM
16  on that call?
17   A   I don't recall.                 3:00:27PM
18   Q   Did you discuss that issue about what   3:00:32PM
19  your rights were with anyone other than for
20  Allison Sanchez in March 2006?
21   A   As far as the rights, no.          3:00:40PM
22   Q   So I guess that covers the first two   3:00:44PM
23  times you spoke to her about the plaintiffs.
24       Did you speak with her about the       3:00:48PM
25  plaintiffs at any time subsequent to that?

Page 250

GEORGE HESSE

1
2    A   Yes.                          3:00:52PM
3    Q   When?                         3:00:53PM
4    A   I believe it was April 4th or 5th.    3:00:56PM
5  I'm not exactly sure on the date. She had
6  called me to say specifically that Frank
7  Fiorillo and, I believe it was Joe Nofi and
8  Kevin Lamm had come to her office to file a
9  complaint against the Village of Ocean Beach and
10  me for, you know, terminating them, and I
11  believe they wanted to know what their rights
12  were.
13   Q   Did she tell you what they're alleging  3:01:28PM
14  or the underlying allegation of the complaint?
15   A   Basically she told me that they wanted  3:01:38PM
16  to know what their rights were as police
17  officers and did I have a right to do what I
18  did; and I believe when she told them that they
19  didn't have any rights, I think Frank might have
20  gotten a little ornery with her, and he started
21  spouting off other stuff about, you know,
22  uncertified, unqualified police officers working
23  in Ocean Beach. And I believe she told him,
24  don't worry about what they're doing, you don't
25  have a leg to stand on.

Page 251

GEORGE HESSE

1
2    Q   She told you that she said that?      3:02:21PM
3    A   Yes.                          3:02:22PM
4    Q   And it was your understanding that she  3:02:32PM
5  was referring to -- when she said you don't have
6  a leg to stand on, it was your understanding
7  that she was referring to what his rights were?
8       MR. CALLAHAN: Objection to form.       3:02:41PM
9       MR. NOVIKOFF: Yeah, objection.         3:02:42PM
10       MR. CONNOLLY: Objection.             3:02:43PM
11   A   Yeah, that's what I believe.         3:02:43PM
12   Q   That was your understanding?         3:02:44PM
13   A   Yeah.                         3:02:46PM
14   Q   Did she tell you anything else about    3:02:46PM
15  that conversation?
16   A   I don't recall.                 3:02:49PM
17   Q   What did you say to her during that     3:02:51PM
18  conversation?
19   A   I don't recall, other than -- that's   3:03:00PM
20  it. I don't recall anything else.
21   Q   Were you in the -- were you in the     3:03:09PM
22  police station during this call?
23   A   I believe so.                  3:03:12PM
24   Q   Was anyone else on the line at your    3:03:18PM
25  end?

Page 252

GEORGE HESSE

1
2    A   No, not that I'm aware of.          3:03:22PM
3    Q   Did you tell anybody, any current or   3:03:24PM
4  former employees of Ocean Beach, about Snyder,
5  Lamm -- strike that.
6       About Nofi, Lamm and Fiorillo's        3:03:31PM
7  decision to go file a complaint against you and
8  the beach?
9    A   Subsequent to that?              3:03:40PM
10   Q   Yeah.                         3:03:41PM
11   A   You know, I don't recall.          3:03:42PM
12   Q   Did you ever discuss that with Joe     3:03:44PM
13  Loeffler, the fact that Sanchez alerted you to
14  their decision to come file a complaint against
15  you and the beach?
16       MR. CALLAHAN: Objection to form.       3:03:55PM
17   A   I don't recall.                 3:03:56PM
18   Q   Is there anything that would refresh    3:03:57PM
19  your recollection as to whether you did or not?
20   A   Unless you have something, no.       3:04:01PM
21   Q   When was the next time you spoke with   3:04:06PM
22  Allison Sanchez about the plaintiffs, about any
23  of the plaintiffs?
24       Again, when I say "speak," I mean      3:04:18PM
25  communicate with her, whether it's verbally, in

63 (Pages 249 to 252)

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2  writing.
3      A   Uh-huh.                          3:04:26PM
4          I don't recall.  I mean, I know I've  3:04:29PM
5  spoken to her after that.  I just don't know in
6  regards to what.
7      Q   Do you recall the substance of any of  3:04:35PM
8  those conversations?
9      A   I think later on, when there was an  3:04:41PM
10 allegation made that I was having sexual
11 relations with her, that we talked about that a
12 little bit, and I think she laughed at the fact
13 that somebody would make that allegation.
14     Q   Well, did you ever tell Ed Carter that  3:04:59PM
15 you took her out to lunch?
16     A   Not that I recall.              3:05:03PM
17     Q   Did you ever tell Ed Carter that you  3:05:04PM
18 slept with her?
19     A   Definitely not.                3:05:07PM
20     Q   Did you tell Joe Nofi that you banged  3:05:08PM
21 her?
22     A   Definitely not.                3:05:11PM
23     Q   Did you ever see her other than for  3:05:12PM
24 the -- well, strike that.
25         Have you ever seen her in Ocean Beach  3:05:17PM

**GEORGE HESSE**

1
2  other than for the one time that she was meeting
3  with Minerva?
4      A   No.                            3:05:22PM
5          MR. CALLAHAN:  I'm going to object to  3:05:29PM
6  the form.  You have testimony that's not
7  supported -- your question is not supported
8  by the testimony.
9          MR. GOODSTADT:  Okay.  I'm not sure  3:05:43PM
10 what that means, but okay.
11 BY MR. GOODSTADT:                        3:05:47PM
12     Q   Now, we touched upon before an issue  3:05:47PM
13 about uncertified police officers working at the
14 beach.
15         Do you recall that?            3:05:56PM
16     A   Yes.                           3:05:57PM
17     Q   Now, were there officers working at  3:06:02PM
18 the beach that hadn't passed the battery of
19 tests that you and I discussed early this
20 morning?
21     A   Yes.                           3:06:09PM
22     Q   And who was that?  Who are those  3:06:10PM
23 officers?
24     A   There was a Bill Walsh, Gary and  3:06:13PM
25 Richie Bosetti, Tommy Shaw, John Dyer, Pat

**GEORGE HESSE**

1
2  Cherry.  That officer, I can't think of his
3  name.  There may be some others.
4      Q   You said John Dyer?            3:06:47PM
5      A   Uh-huh.                        3:06:49PM
6      Q   Arnie Hardman?                 3:06:57PM
7      A   Yes, Arnie Hardman.  And there was  3:06:58PM
8  another one.
9      Q   John Bullis?                   3:07:11PM
10     A   Yes.                           3:07:15PM
11     Q   Is that who you were thinking of?  3:07:16PM
12     A   No.                            3:07:19PM
13     Q   Daniel Shook?                  3:07:24PM
14     A   That's him, Daniel Shook.      3:07:26PM
15     Q   And is it your understanding that if  3:07:38PM
16 you don't pass those battery of tests, that you
17 can't be a police officer in Suffolk County?
18         MR. NOVIKOFF:  Objection.      3:07:44PM
19     A   Correct.                       3:07:45PM
20     Q   So if you don't pass those tests,  3:07:46PM
21 you're a civilian, correct?
22         MR. NOVIKOFF:  Objection.  I don't  3:07:50PM
23     know what you mean by "civilian."
24         MR. CONNOLLY:  Objection.      3:07:52PM
25         MR. CALLAHAN:  Objection.      3:07:53PM

**GEORGE HESSE**

1
2  BY MR. GOODSTADT:                        3:07:54PM
3      Q   Do you know what I mean when I say  3:07:54PM
4  "civilian"?  You've heard that word?
5      A   Yes.                           3:07:57PM
6      Q   Do you know what I mean?        3:07:58PM
7      A   Yeah, I know what you mean.     3:08:00PM
8      Q   So I'll reask the question.     3:08:02PM
9          Is it your understanding that if you  3:08:03PM
10 don't pass those tests, then you are a civilian?
11         MR. NOVIKOFF:  Objection.      3:08:09PM
12         MR. CALLAHAN:  Objection to form.  3:08:11PM
13     A   It's a technicality, but yes.  3:08:13PM
14     Q   So those list of people we just went  3:08:17PM
15 over, during the time period that they were
16 working and being paid as police officers in
17 Ocean Beach, they were actually civilians,
18 correct?
19         MR. NOVIKOFF:  Objection.      3:08:29PM
20         MR. CALLAHAN:  Objection to form.  3:08:30PM
21         MR. CONNOLLY:  Objection.      3:08:31PM
22     A   No.                            3:08:31PM
23     Q   They weren't civilians?        3:08:32PM
24     A   No.                            3:08:33PM
25     Q   So which ones weren't civilians?  3:08:33PM

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 257

**GEORGE HESSE**

1
2      A    All of them were sworn in as police     3:08:37PM
3   officers.
4      Q    So it's your understanding that if     3:08:39PM
5   you're sworn in, that you're certified to be a
6   police officer?
7          MR. NOVIKOFF: Objection. It's not     3:08:45PM
8   his testimony.
9          MR. CALLAHAN: Objection.         3:08:49PM
10         MR. CONNOLLY: Objection.         3:08:51PM
11  BY MR. GOODSTADT:                 3:08:51PM
12     Q    Is that your understanding?         3:08:51PM
13     A    They were all retired police officers. 3:08:53PM
14     Q    Any of them retired from Suffolk     3:08:57PM
15  County police department?
16     A    None of them, no.             3:08:59PM
17     Q    So in terms of being in Suffolk     3:09:02PM
18  County, were they all civilians?
19         MR. NOVIKOFF: Objection. Asked and 3:09:07PM
20  answered.
21     A    It's a technicality, but, you know,     3:09:09PM
22  I'll agree with you, yes.
23     Q    Yes, they were?                 3:09:13PM
24         When did you first learn of an issue     3:09:15PM
25  with respect to this group of guys' lack of

Page 258

**GEORGE HESSE**

1
2   certification?
3      A    I don't recall a specific date.     3:09:27PM
4      Q    Do you recall what year it was?     3:09:30PM
5      A    It was probably the end of 2004,     3:09:34PM
6   maybe.
7      Q    How did you learn about it?         3:09:44PM
8      A    I don't remember.             3:09:47PM
9      Q    So when you heard about it at the end 3:09:54PM
10  of 2004 -- I believe I asked this question a
11  while ago; I'll just put it in a time frame --
12  ed Paradiso was the person in Ocean Beach
13  responsible for making sure that everybody that
14  was being paid as a police officer was
15  certified?
16         MR. NOVIKOFF: Objection.         3:10:11PM
17     A    You know, I don't know if it was     3:10:13PM
18  really his job to make sure, but he was sure in
19  charge of hiring.
20     Q    But when before I asked you who was in 3:10:21PM
21  charge for making sure that the people who are
22  hired are certified, you said up until January
23  of '06, it was Paradiso, and after that it was
24  you.
25         MR. NOVIKOFF: Objection. I don't     3:10:34PM

Page 259

**GEORGE HESSE**

1
2   know if that was your question. But if you
3   had asked the question already, then it's in
4   the record. So why are we fighting with
5   him?
6          MR. GOODSTADT: I just want to make     3:10:41PM
7   sure that I understood his testimony.
8          MR. NOVIKOFF: Well, ask him again.     3:10:45PM
9   I'll object, but he'll still answer.
10  BY MR. GOODSTADT:                 3:10:48PM
11     Q    Is the way I characterized it your     3:10:49PM
12  understanding?
13         MR. NOVIKOFF: Objection.         3:10:52PM
14     A    I understand where you're coming from. 3:10:53PM
15  But I believe it's the Village of Ocean Beach,
16  Maryann Minerva who fills out the Civil Service
17  paperwork to make sure that it's accurate.
18     Q    Okay. So it's your understanding that 3:11:07PM
19  Miss Minerva was the person responsible for
20  making sure that the people who are hired and
21  paid as police officers were certified to be in
22  that position?
23         MR. NOVIKOFF: Objection to the form,     3:11:18PM
24  more particularly to the word "responsible."
25  You're assuming that anyone was responsible

Page 260

**GEORGE HESSE**

1
2   in that period of time.
3          MR. CONNOLLY: Objection.         3:11:30PM
4   You can answer.                 3:11:30PM
5      A    You're going to have to repeat the     3:11:31PM
6   question. I'm sorry.
7          MR. GOODSTADT: Yeah, why don't you     3:11:38PM
8   read it back. That would be great.
9          (Whereupon, the requested portion was 3:11:41PM
10  read back by the court reporter: Okay. So
11  it's your understanding that Miss Minerva
12  was the person responsible for making sure
13  that the people who are hired and paid as
14  police officers were certified to be in that
15  position?)
16         MR. NOVIKOFF: Can we take a five     3:11:59PM
17  minute break?
18         MR. GOODSTADT: So you objected to a     3:12:06PM
19  word that wasn't even in the question.
20         MR. CONNOLLY: I thought he said     3:12:06PM
21  "responsible."
22         MR. GOODSTADT: Responsible for making 3:12:06PM
23  sure.
24         MR. NOVIKOFF: I have a problem with     3:12:09PM
25  the word "responsible" only because we

65 (Pages 257 to 260)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 261

GEORGE HESSE

```
1              GEORGE HESSE
2     haven't established that anyone was
3     responsible, because clearly there was a
4     problem.
5          But note my objection. You can --    3:12:16PM
6     A   That is my belief.           3:12:19PM
7     Q   What's the basis of that belief?     3:12:21PM
8     A   Because all applications and paperwork  3:12:23PM
9  is submitted to her for her approval; and
10 because it's a municipality, they have to report
11 to Civil Service and they have to report those
12 names to Civil Service.
13     Q   Does the chief of police have any    3:12:36PM
14 obligation with respect to that reporting
15 requirement?
16          MR. NOVIKOFF:  Objection.      3:12:42PM
17 A   I believe he has some responsibility.  3:12:43PM
18     Q   What is that responsibility?    3:12:46PM
19 A   To make sure that these men, these    3:12:48PM
20 officers are certified.
21          MR. NOVIKOFF:  Could we take that    3:12:54PM
22 break?
23          MR. GOODSTADT:  Yep.          3:12:56PM
24          THE VIDEOGRAPHER:  The time is now  3:12:57PM
25 3:13 p.m.  We are now off the record.
```

Page 262

```
1              GEORGE HESSE
2          (Whereupon, a discussion was held off  3:13:01PM
3     the record.)
4          THE VIDEOGRAPHER:  The time is now    3:29:04PM
5     3:29 p.m.  We are now back on the record.
6     BY MR. GOODSTADT:               3:29:07PM
7     Q   Now, just to go back to the issue with  3:29:10PM
8     the uncertified officers working in Ocean Beach.
9     How did you learn about the fact that there was
10 this problem?
11 A   I don't remember -- I think I stated I  3:29:23PM
12 don't remember how I found out.
13     Q   Did you ever speak with Ms. Minerva   3:29:30PM
14 about the issue?
15 A   Yes.                    3:29:34PM
16     Q   When was the first time you spoke with  3:29:35PM
17 her about this issue?
18 A   I don't recall.           3:29:37PM
19     Q   Do you recall what year it was?    3:29:39PM
20 A   It may have been the end of 2004 into  3:29:41PM
21 2005. I don't know.
22     Q   And when were the Bosettis hired?    3:29:49PM
23 A   I believe they came on in -- this is    3:29:52PM
24 off the top of my head, 2003.
25     Q   Is it possible it was 2002?      3:29:57PM
```

Page 263

```
1              GEORGE HESSE
2     A   It's possible, yes.          3:30:00PM
3     Q   Were you at the -- were you at the    3:30:06PM
4     preseason meeting?  When I say that, do you know
5     what that mean when I say a preseason meeting?
6     A   Yes.                    3:30:13PM
7     Q   Of the department?            3:30:13PM
8     A   Yes.                    3:30:14PM
9     Q   Were you at the preseason meeting the  3:30:15PM
10 first year the Bosettis were hired?
11 A   I would say yes.           3:30:18PM
12     Q   And did you tell the Bosettis in front  3:30:20PM
13 of the group that they would have to take their
14 tests?
15 A   I don't recall.           3:30:28PM
16     Q   Did you ever speak with Catherine    3:30:38PM
17 Spies?  Do you know who that is, Catherine
18 Spies?
19 A   Yes.                    3:30:43PM
20     Q   Who is she?              3:30:43PM
21 A   She was the deputy clerk. She's not    3:30:45PM
22 there anymore.
23     Q   Did you ever speak with her about this  3:30:49PM
24 issue?
25 A   Yes.                    3:30:51PM
```

Page 264

```
1              GEORGE HESSE
2     Q   When was the first time you spoke with  3:30:52PM
3     her about the issue?
4          MR. NOVIKOFF:  About the issue, the  3:30:54PM
5     certification?
6          MR. GOODSTADT:  About the          3:30:57PM
7     certification issue, yes.
8     A   I don't recall.           3:30:58PM
9     Q   Did you ever speak with Joe Loeffler   3:31:04PM
10 about the certification issue?
11 A   Yes.                    3:31:07PM
12     Q   When was the first time you spoke with  3:31:09PM
13 him?
14 A   I don't recall.           3:31:11PM
15     Q   Who did you speak with first out of    3:31:13PM
16 those three people, Minerva, Loeffler, Spias,
17 about the issue?
18 A   I don't recall.           3:31:23PM
19     Q   You're sure you didn't speak with    3:31:30PM
20 Minerva in December of '03 about this
21 certification issue?
22 A   Yeah.                    3:31:37PM
23          MR. NOVIKOFF:  Objection to the form.  3:31:38PM
24 A   It could've been.          3:31:39PM
25     Q   So it's possible that you knew about  3:31:40PM
```

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 265

GEORGE HESSE

1  GEORGE HESSE
2  the fact that there were uncertified officers
3  working as early as December of '03?
4       MR. NOVIKOFF:  Objection to the form   3:31:48PM
5  of the question.
6    A    Possible.                3:31:50PM
7    Q    Did you ever speak with Paradiso about   3:31:54PM
8  the issue?
9    A    Yes.                3:31:56PM
10   Q    When is the first time you spoke with   3:31:57PM
11 him about the issue?
12   A    I don't recall.           3:32:01PM
13   Q    Did you ever speak with any other   3:32:07PM
14 trustees other than for Loeffler about the
15 issue?
16      MR. NOVIKOFF:  Objection.  He didn't   3:32:13PM
17 say he talked to Loeffler.
18 BY MR. GOODSTADT:                3:32:15PM
19   Q    Did you ever speak to any trustees   3:32:16PM
20 about the issue?
21      MR. CONNOLLY:  When they were   3:32:20PM
22 trustees?
23      MR. GOODSTADT:  When they were   3:32:21PM
24 trustees, yeah.
25   A    Just Trustee Loeffler, I believe.  I   3:32:23PM

Page 266

1  GEORGE HESSE
2  don't recall if I would've talked to anybody
3  else.
4    Q    Did you ever speak to Natalie Rogers   3:32:28PM
5  about the issue?
6    A    You know, I don't recall.      3:32:31PM
7    Q    You don't recall one way or the other?   3:32:32PM
8    A    No.                3:32:35PM
9    Q    Was there a plan put in place to fix   3:32:35PM
10 the problem when you first learned of it?
11      MR. NOVIKOFF:  Objection.     3:32:42PM
12      MR. GOODSTADT:  Strike that.  Strike   3:32:43PM
13 that.
14 BY MR. GOODSTADT:                3:32:44PM
15   Q    Was there a plan put in place to fix   3:32:44PM
16 the problem?
17      MR. NOVIKOFF:  Same objection.   3:32:48PM
18   A    I wouldn't say there was a plan.  I   3:32:49PM
19 would say there was a suggestion to fix the
20 problem.
21   Q    Who made the suggestion?      3:32:53PM
22   A    I don't know where it came from, but   3:32:58PM
23 it filtered to me.
24   Q    How did it filter to you?      3:33:05PM
25   A    Paradiso asked me to look into the   3:33:07PM

Page 267

1  GEORGE HESSE
2  matter and see what I could do to correct it.
3    Q    Do you know when that conversation   3:33:15PM
4  occurred?
5    A    I don't recall.           3:33:17PM
6    Q    And did you do anything to correct the   3:33:20PM
7  matter?
8    A    Yes.                3:33:25PM
9    Q    How long after Paradiso told you that   3:33:26PM
10 did you do something to correct the matter?
11   A    I'm sure I started working on it right   3:33:30PM
12 away.
13   Q    And at that point in time, when   3:33:33PM
14 Paradiso told you to correct the matter, had you
15 known there was a problem or was that the first
16 time you learned there was a problem?
17   A    I don't recall.           3:33:41PM
18   Q    What did you do to fix the problem?   3:33:42PM
19   A    I believe I contacted Civil Service   3:33:46PM
20 and had to find out what these officers had to
21 do.
22   Q    Who at Civil Service did you speak   3:33:53PM
23 with -- strike that.
24      Did you contact Civil Service?   3:33:57PM
25   A    I may have.            3:33:58PM

Page 268

1  GEORGE HESSE
2    Q    Do you recall actually contacting   3:33:59PM
3  Civil Service?
4    A    I don't recall.           3:34:02PM
5    Q    Do you recall speaking to anyone at   3:34:02PM
6  Civil Service about what they had to do to
7  correct the problem?
8    A    At some point, I was in touch with   3:34:08PM
9  Allison Chester or Sanchez to correct the
10 problem.
11   Q    Do you recall when that was?      3:34:16PM
12   A    I don't recall.           3:34:17PM
13   Q    Do you recall how long after Paradiso   3:34:19PM
14 suggested that you fix the problem, the time gap
15 between that and the time you spoke with Sanchez
16 about it?
17   A    I'm not positive, no.        3:34:31PM
18   Q    Was it days, weeks, months years?   3:34:34PM
19   A    I don't recall.           3:34:37PM
20   Q    Other than for you, who else was   3:34:39PM
21 involved with the plan to fix the problem?
22   A    Maryann Minerva.          3:34:43PM
23   Q    Anyone else in the village involved   3:34:49PM
24 with the plan to fix it?
25      MR. NOVIKOFF:  Objection.     3:34:54PM

67 (Pages 265 to 268)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 269

GEORGE HESSE

1
2    A    Kathy Spies was part of it.        3:34:55PM
3    Q    Anyone else?                       3:35:06PM
4        MR. NOVIKOFF:  Note my objection.    3:35:10PM
5    A    I don't know when Kara a McKenna    3:35:14PM
6   started, but she also involved with the Civil
7   Service stuff, so --
8    Q    What was Minerva's role in the plan to  3:35:23PM
9   fix it?
10       MR. NOVIKOFF:  Objection to the form.  3:35:27PM
11   A    I don't know what her role was.    3:35:28PM
12   Q    Do you know anything that she did to  3:35:29PM
13  help fix the problem?
14   A    I don't know what she did, no.    3:35:35PM
15   Q    What was Spies's role?             3:35:37PM
16       MR. NOVIKOFF:  Objection.          3:35:39PM
17   A    I know she was in contact with Civil  3:35:40PM
18  Service.  I know there were some forms that
19  needed to be filled out.
20   Q    How do you know she was contact with  3:35:45PM
21  Civil Service?
22   A    She told me.                       3:35:49PM
23   Q    Do you recall when she told you, what  3:35:55PM
24  year it was?
25   A    I don't recall.                    3:35:57PM

Page 270

GEORGE HESSE

1
2    Q    Did she fill out the forms?       3:35:59PM
3        MR. NOVIKOFF:  Objection.          3:36:04PM
4    A    I believe she typed and hand writ some  3:36:04PM
5   of them.  I don't know if she signs off on them
6   or Maryann Minerva signs off on them.
7    Q    How long did the process take from the  3:36:20PM
8   time that you learned of the problem to the time
9   that -- well, strike that.
10       Was the problem ever rectified?    3:36:25PM
11   A    Yes.                               3:36:27PM
12   Q    How was it rectified?  What was done?  3:36:28PM
13   A    All our officers are now certified by  3:36:31PM
14  Civil Service.
15   Q    And the ones who weren't certified  3:36:35PM
16  stepped down or were fired or --
17   A    Yes.                               3:36:39PM
18   Q    -- took different positions; is that  3:36:40PM
19  what happened?
20   A    Yes.                               3:36:42PM
21   Q    Okay.  How long between the time that  3:36:42PM
22  you learned of the problem until rectifying the
23  problem?
24   A    It may have taken a year and a half,  3:36:52PM
25  almost two years to correct.

Page 271

GEORGE HESSE

1
2    Q    And during that period of a year and a  3:37:04PM
3   half to two years, these people who were not
4   certified were still being paid as police
5   officers or did you suspend them for that
6   period?
7        MR. NOVIKOFF:  Objection again to the  3:37:16PM
8   form.
9        When you say "you," are you saying    3:37:17PM
10  Hesse or the village?
11       MR. GOODSTADT:  Good question.     3:37:21PM
12       MR. NOVIKOFF:  Because Hesse has said  3:37:22PM
13  at the time that he had no authority to hire
14  or fire.
15  BY MR. GOODSTADT:                        3:37:27PM
16   Q    Were these people employed by the  3:37:28PM
17  village as police officers and paid by the
18  village as police officers during that period?
19   A    Yes.                               3:37:32PM
20   Q    Do you know whether anyone alerted  3:37:35PM
21  Civil Service to that fact?
22       MR. NOVIKOFF:  Objection.          3:37:44PM
23   A    I don't know.                      3:37:45PM
24   Q    When was Arnold Hardman certified?  3:37:55PM
25   A    He never completed certification.  3:37:58PM

Page 272

GEORGE HESSE

1
2    Q    And when was he employed up until as a  3:38:09PM
3   police officer?
4    A    I don't know the exact date when he  3:38:18PM
5   was no longer employed.  I don't know the exact
6   date.
7    Q    Do you know what year it was?      3:38:24PM
8    A    It may -- I'm just guessing, but --  3:38:26PM
9   no, I don't recall.  I don't recall.
10   Q    Did he work at all in the season of  3:38:31PM
11  2006?
12   A    Yes.                               3:38:35PM
13   Q    Okay.  So he was still working at the  3:38:36PM
14  beach as an uncertified police officer after the
15  plaintiffs in this case were let go?
16   A    Yes.                               3:38:45PM
17   Q    And at that point in time, did you  3:38:47PM
18  know that he was not certified?
19   A    Yes.                               3:38:51PM
20   Q    So the problem actually wasn't fully  3:38:58PM
21  rectified in the year and a half to two years,
22  correct?
23       MR. NOVIKOFF:  Objection to form.  3:39:03PM
24       MR. CALLAHAN:  Objection to the form.  3:39:06PM
25   A    It depends on when we started it.  3:39:07PM

68  (Pages 269 to 272)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 273

GEORGE HESSE

1
2     MR. NOVIKOFF:  Exactly.          3:39:09PM
3     A    But I don't know exactly what the    3:39:10PM
4  start date was, but I think it took somewhere in
5  the range of a year and a half to two years to
6  rectify it.
7     Q    Why did you let Arnold Hardman go if  3:39:19PM
8  he wasn't certified --
9     MR. NOVIKOFF:  Prior objection.      3:39:25PM
10 BY MR. GOODSTADT:                    3:39:26PM
11    Q    -- prior to the season of 2006?     3:39:26PM
12    MR. NOVIKOFF:  Now objection to      3:39:30PM
13 foundation because he testified that he had
14 no hiring or firing authority until he was
15 appointed deputy chief.
16    MR. GOODSTADT:  Which was January of  3:39:36PM
17 '06.  Now I'm talking about April '06.
18    MR. NOVIKOFF:  No.  I think you      3:39:39PM
19 mentioned before the season.
20    MR. GOODSTADT:  Yeah.            3:39:44PM
21    MR. NOVIKOFF:  Okay, I understand.    3:39:44PM
22 Okay, you're right.
23    MR. GOODSTADT:  The decision was made  3:39:45PM
24 after he was deputy chief.
25    MR. NOVIKOFF:  You're right.  You're  3:39:47PM

Page 274

GEORGE HESSE

1
2  right.
3     MR. CONNOLLY:  I'm just going to ask   3:39:48PM
4  that we read the question back now.
5     MR. GOODSTADT:  Okay.            3:39:51PM
6     MR. CONNOLLY:  Or you can repeat it.   3:39:51PM
7     MR. GOODSTADT:  It's been so long ago,  3:39:51PM
8  I'm not even sure what the question was.
9  BY MR. GOODSTADT:                    3:40:04PM
10    Q    So why didn't you let Arnold Hardman  3:40:05PM
11 go at the same time that you let the plaintiffs
12 go if you knew that he was not certified?
13    MR. NOVIKOFF:  Objection, only to the  3:40:14PM
14 extent that we have the same stipulation.
15    MR. GOODSTADT:  We do.           3:40:18PM
16    MR. NOVIKOFF:  You say let go, we say  3:40:19PM
17 not rehired.
18    MR. GOODSTADT:  It's also the word    3:40:23PM
19 that he used in the memo.
20    MR. NOVIKOFF:  That's different,     3:40:26PM
21 Andrew.
22    A    Ready?                3:40:28PM
23    Q    Yes.                 3:40:29PM
24    A    He was in the process of completing   3:40:30PM
25 his battery of tests.  He had one test to go,

Page 275

GEORGE HESSE

1
2  which would be the polygraph; and for unknown
3  circumstances, polygraph would not let him take
4  the test.
5     Q    What do you mean by that?       3:40:46PM
6     A    We feel there was some interference  3:40:50PM
7  from the D.A.'s office, and they didn't permit
8  him to take the polygraph test.
9     Q    When did he apply to take the     3:41:02PM
10 polygraph test, if you know?
11    A    I don't know the exact date, but we   3:41:08PM
12 had three tentative dates set up.  We went to
13 two of them and we were turned away.
14    Q    What's the basis of your belief that  3:41:22PM
15 the D.A. interfered?
16    A    They wouldn't give us a reason why   3:41:25PM
17 they wouldn't let him take the test, and we were
18 under investigation at that point.
19    Q    So what leads you to the conclusion   3:41:31PM
20 that the D.A. actually interfered with the
21 ability of Mr. Hardman to take the test?
22    A    Because that's my feeling.       3:41:38PM
23    Q    Do you recall when he was scheduled,   3:41:41PM
24 what year it was he was scheduled to go take the
25 test?

Page 276

GEORGE HESSE

1
2     A    I don't know the exact dates.  No.   3:41:46PM
3     Q    Do you recall what year it was?    3:41:52PM
4     A    2006.                 3:41:53PM
5     Q    2006?                 3:41:54PM
6     A    Yeah.                 3:41:54PM
7     Q    Did he apply to take the test -- well,  3:42:01PM
8  strike that.
9         When was he hired?            3:42:04PM
10    A    2003, 2004 possibly.          3:42:06PM
11    Q    And when in 2006, was it before the   3:42:15PM
12 season or after the season that he applied?
13    A    Actually, I'm mistaken on the dates.   3:42:19PM
14 There was -- there was an opportunity for him to
15 take it in 2005; but then I think he couldn't
16 make that date, so I rescheduled someone else to
17 take it on that date.  And he may have been
18 rescheduled at a later date.  I don't know the
19 exact date.
20    Q    So he failed to appear in '05?     3:42:37PM
21    A    I wouldn't say he failed to appear.   3:42:40PM
22 It was a reschedule.
23    Q    And what date in '06 was he       3:42:47PM
24 rescheduled for?  Was it before the season or
25 after the season?

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 277

GEORGE HESSE

1
2     A    It was in the heart of the season.  I  3:42:53PM
3  believe it might have been in the latter of
4  July, you know, one of the scheduled dates.
5  That might have been one of the last time that
6  we even tried.
7     Q    How often does the county administer  3:43:06PM
8  polygraph tests?
9        MR. NOVIKOFF:  Objection.        3:43:11PM
10  BY MR. GOODSTADT:                      3:43:11PM
11     Q    Back then, in '05.        3:43:12PM
12        MR. NOVIKOFF:  Same objection.  3:43:13PM
13     A    It's by appointment.        3:43:14PM
14     Q    Do they administer it all year round?  3:43:16PM
15        MR. NOVIKOFF:  Objection.      3:43:19PM
16     A    Yes.                3:43:20PM
17     Q    So you can call and get on the    3:43:20PM
18  schedule any time of the year?
19        MR. NOVIKOFF:  Objection.      3:43:24PM
20  BY MR. GOODSTADT:                      3:43:25PM
21     Q    Or fill out a form and schedule any  3:43:27PM
22  time of the year?
23        MR. NOVIKOFF:  Objection.      3:43:31PM
24     A    I'm sure they could perform the test  3:43:32PM
25  at any time of the year.  It depends on their

Page 278

GEORGE HESSE

1
2  availability.
3     Q    Did you -- when you say that you --  3:43:39PM
4  strike that.
5        Did you actually call and reschedule  3:43:42PM
6  someone in for Hardman's spot that he couldn't
7  make?
8     A    Yes.                3:43:49PM
9     Q    Did you at that time ask to have him  3:43:49PM
10  rescheduled?
11     A    I don't know if I did or not.    3:43:53PM
12     Q    Do you know when the first time    3:43:54PM
13  somebody reached out to the county to reschedule
14  him after he didn't appear in the '05 test?
15     A    Repeat that.          3:44:02PM
16        MR. GOODSTADT:  Could you read that  3:44:04PM
17  back.
18        (Whereupon, the requested portion was  3:44:05PM
19        read back by the court reporter:  Do you
20        know when the first time somebody reached
21        out to the county to reschedule him after he
22        didn't appear in the '05 test?)
23     A    Read that one more time, I'm sorry.  3:44:19PM
24     Q    I'll reask it.        3:44:21PM
25        Do you know when the first time either  3:44:22PM

Page 279

GEORGE HESSE

1
2  he or someone on his behalf reached out to the
3  county to reschedule the test after he didn't
4  appear in '05?
5     A    I don't know.  I would've been the    3:44:31PM
6  only one that would have rescheduled his test,
7  so I don't recall.
8     Q    Do you have anything that would      3:44:38PM
9  refresh your recollection?  Take any notes of
10  these calls?
11     A    Not that I recall.        3:44:42PM
12     Q    How did you alert the officers when    3:44:43PM
13  their scheduled dates were coming up?
14     A    Just by cell phone -- by telephone.  3:44:48PM
15     Q    So you would call them?        3:44:50PM
16     A    Yeah.              3:44:52PM
17     Q    Did you ever do anything in writing,  3:44:52PM
18  either by E-mail or a memo or a letter?
19     A    Sometimes I would write it right on  3:44:55PM
20  the front of their application pack.  Maybe I'd
21  just write it down on a note.
22     Q    Do you know whether you wrote anything  3:45:02PM
23  down with respect to Hardman?
24     A    I may have wrote something on the face  3:45:05PM
25  of his application, but I did that sometimes.  I

Page 280

GEORGE HESSE

1
2  didn't do it all the time.  I don't know.
3     Q    When you say "application," that was  3:45:13PM
4  the applicant investigation section that you
5  were running at the time?
6     A    Yes.                3:45:17PM
7     Q    Okay.  Who replaced Hardman in the '05  3:45:18PM
8  spot?
9     A    I believe it was Greg Keghlian.    3:45:24PM
10  K-E-G-H-L-I-A-N, Keghlian.
11     Q    Was Keghlian a new hire in '05 or had  3:45:33PM
12  he been a person who had been working there not
13  certified?
14     A    He wasn't a new hire in '05.  He    3:45:43PM
15  started in, I believe, '06.  But I might have
16  given his spot to Keghlian or it might have been
17  Bill Embry.  It might have even been Joe
18  Dediminico.  I'm not real sure.
19     Q    Other than for -- well, strike that.  3:46:05PM
20        Which people who served as police    3:46:09PM
21  officers that were uncertified eventually did
22  not pass the test to become certified?  You
23  testified Hardman.  I think you testified Cherry
24  decided that he would drop down because he
25  didn't want to take the test.  Who else

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 281

GEORGE HESSE

1
2    eventually did not become certified?
3        A    Danny Shook, John Dyer.  Bill Walsh,   3:46:28PM
4    he was never scheduled to do anything.  He just
5    went on to work at the D.A.'s office in Nassau.
6        I said John Dyer?  Did I say him?   3:46:46PM
7        Q    You did.                       3:46:49PM
8        A    Bullis decided not to take the battery   3:46:51PM
9    of tests.  He stepped down.  I'm not sure who
10   else.
11       Q    What happened to Dyer?  Did he step   3:47:00PM
12   down or was he fired?
13       A    I let him go.                   3:47:03PM
14       Q    When did that happen?          3:47:04PM
15       A    In 2006.                       3:47:12PM
16       Q    When did you let him go in 2006?   3:47:15PM
17       A    Because he failed the polygraph.   3:47:17PM
18       Q    When did you let him go?       3:47:19PM
19       A    Well, he didn't work the whole winter   3:47:23PM
20   of '05 in through '06.  So I think officially
21   might have been April 4th by memo to the village
22   office.
23       Q    If he failed the polygraph, would he   3:47:44PM
24   have the opportunity to take it again?
25       A    Yes.                           3:47:49PM

Page 282

GEORGE HESSE

1
2        Q    And he elected not to or you       3:47:49PM
3    terminated him just because he failed it?
4        A    He pretty much elected not to do it   3:47:52PM
5    again.
6        Q    How about Dan Shook, did he step down,   3:47:55PM
7    did you let him go or did something else happen
8    with him?
9        A    He -- he moved -- well, he took a   3:48:03PM
10   different position within the police department.
11       Q    What position did he take?       3:48:07PM
12       A    Dispatcher.                     3:48:08PM
13       Q    How about Walsh?  Was he the one who   3:48:08PM
14   moved to the D.A.?
15       A    Yes.                           3:48:12PM
16       Q    How about Bullis?              3:48:12PM
17       A    Dispatcher.                    3:48:14PM
18       Q    Did you get a copy of the         3:48:27PM
19   pre-polygraph questionnaire for your officers
20   prior to them taking the polygraph?
21       A    The pre-polygraph questionnaire is   3:48:34PM
22   part of the original packet.
23       Q    It's part of the packet?  How did you   3:48:38PM
24   get the pre-polygraph questionnaire?
25       A    That was part of -- when I was   3:48:43PM

Page 283

GEORGE HESSE

1
2    arranging this application, I found it online
3    for another job.  I don't remember what the
4    other job was.
5        Q    Eddie Carter didn't get you a copy of   3:48:50PM
6    that from somebody in Quogue?
7        A    That?  You know what, I don't know.  I   3:48:55PM
8    think I got it online.
9        Q    Did you ever allow any of the     3:49:03PM
10   uncertified officers to review the polygraph
11   questionnaire from Frank Fiorillo's personnel
12   jacket?
13       A    No.                            3:49:13PM
14       Q    Are the police officer personnel   3:49:16PM
15   jackets kept in the station?
16       A    Yes.                           3:49:20PM
17       Q    Where in the station?          3:49:20PM
18       A    Now they're kept in a locked filing   3:49:21PM
19   cabinet.
20       Q    How about in '05?              3:49:24PM
21       A    In '05, they were kept in a filing   3:49:26PM
22   cabinet.
23       Q    Unlocked?                      3:49:29PM
24       A    Unlocked.                      3:49:29PM
25       Q    Did Allen Loeffler pass all tests that   3:49:41PM

Page 284

GEORGE HESSE

1
2    are required to be a police officer?
3        A    He's been a cop since 1973.  I would   3:49:45PM
4    assume so.
5        Q    Do you know whether he took the basic   3:49:49PM
6    course for police officers?
7        A    Yes, he did.                   3:49:52PM
8        Q    Do you know whether anyone looked in   3:50:03PM
9    Frank's jacket to look at the polygraph
10   questions?
11       A    Not that I recall.              3:50:09PM
12       (Whereupon, Bates document 5773 was   3:50:16PM
13   marked as Plaintiff's Exhibit 6 for
14   identification, as of this date.)
15       MR. NOVIKOFF:  Hesse 6?              3:50:46PM
16       MR. GOODSTADT:  Hesse 6.             3:50:48PM
17   I've placed in front of Mr. Hesse   3:50:56PM
18   what's been marked as Hesse 6.  It's a
19   one-page document bearing Bates No. 5773.
20   (Handing.)
21   BY MR. GOODSTADT:                       3:51:05PM
22       Q    Mr. Hesse, have you ever seen this   3:51:05PM
23   document?
24       A    I may have.                    3:51:07PM
25       Q    You see in the second paragraph -- and   3:51:08PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 285

GEORGE HESSE

1
2       this is a letter from the State of New York,
3       Division of Criminal Justice Services. Second
4       paragraph, it says, "We've conducted a search of
5       our registry" records -- "registry and training
6       records, finding that Police Officer Allen
7       Loeffler, who is registered as a police officer
8       with the Ocean Beach Village Police Department,
9       has not successfully completed the basic course
10      for police officers."
11          Do you see that?            3:51:32PM
12      A   Yes.               3:51:33PM
13      Q   Do you know what that refers to?    3:51:34PM
14      A   It's stating that they say that he    3:51:35PM
15      never completed the police academy.
16      Q   Do you know whether this was ever     3:51:42PM
17      resolved one way or the other?
18          MR. NOVIKOFF: Objection. You haven't 3:51:46PM
19      asked him yet whether or not he was ever
20      aware of this since it was sent. It went to
21      Paradiso.
22      BY MR. GOODSTADT:               3:51:51PM
23      Q   Well, have you ever heard of that     3:51:52PM
24      issue?
25      A   Yes.               3:51:53PM

Page 286

GEORGE HESSE

1
2          MR. NOVIKOFF: Okay.          3:51:54PM
3       BY MR. GOODSTADT:               3:51:55PM
4       Q   When did you hear of it?          3:51:55PM
5       A   I don't recall.             3:51:56PM
6       Q   It was not in connection with this  3:51:58PM
7       case, right?
8          MR. NOVIKOFF: Objection. Form.    3:52:01PM
9       A   No.               3:52:02PM
10      Q   So you learned about it before this  3:52:03PM
11      case?
12      A   Yes.               3:52:05PM
13      Q   Okay. Do you know whether this issue 3:52:05PM
14      was ever resolved one way or the other?
15      A   I believe there was an attempt to   3:52:10PM
16      resolve it; but in my recollection, it has never
17      been resolved.
18      Q   Do you know whether -- well, strike  3:52:21PM
19      that.
20          When did Loeffler stop working for the 3:52:24PM
21      beach?
22      A   Off the top of my head, I don't know  3:52:26PM
23      what year.
24      Q   He stop working because of this issue? 3:52:30PM
25          MR. NOVIKOFF: Objection.        3:52:32PM

Page 287

GEORGE HESSE

1
2       A   I'm not sure.            3:52:32PM
3       Q   What was the attempt that was made to 3:52:41PM
4       resolve the issue?
5          MR. NOVIKOFF: Objection. Foundation. 3:52:44PM
6          Go ahead.             3:52:45PM
7          MR. CONNOLLY: Objection.        3:52:47PM
8          You can answer.             3:52:48PM
9       A   Okay. I actually called the police  3:52:49PM
10      academy -- academy to see if they could pull
11      some records from back then, 1973; and out of
12      all the class files, they could not the class
13      that he was in.
14      Q   Uh-huh. So to this day, do you know  3:53:07PM
15      whether there's ever been any confirmation,
16      official confirmation that he graduated the
17      academy?
18      A   None that I've received.         3:53:17PM
19      Q   Did you ever discuss with Allen     3:53:41PM
20      Loeffler why he stopped working as a police
21      officer in Ocean Beach?
22      A   I don't recall.            3:53:49PM
23      Q   How many years did he work on the    3:53:51PM
24      Ocean Beach force?
25      A   I'd like to say on and off since 1970. 3:53:59PM

Page 288

GEORGE HESSE

1
2       Q   If he did not pass the academy or     3:54:02PM
3       graduate the academy, do you know whether that
4       would be a violation of New York State Civil
5       Service law?
6          MR. NOVIKOFF: Objection.        3:54:17PM
7          MR. CALLAHAN: Objection.        3:54:18PM
8          MR. CONNOLLY: Objection.        3:54:19PM
9       A   I have no idea.             3:54:19PM
10          MR. GOODSTADT: Please mark that.    3:54:26PM
11          (Whereupon, Bates document 5769 was  3:54:27PM
12      marked as Plaintiff's Exhibit 7 for
13      identification, as of this date.)
14          MR. GOODSTADT: I've placed in front  3:54:52PM
15      of Mr. Hesse what's been marked as Hesse 7.
16      It's a one-page exhibit bearing Bates
17      No. 5769. (Handing.)
18      BY MR. GOODSTADT:               3:55:00PM
19      Q   Mr. Hesse, have you ever seen this   3:55:01PM
20      letter from the Suffolk County Department of
21      Civil Service?
22      A   I may have.             3:55:09PM
23      Q   And do you see on the second paragraph 3:55:16PM
24      where it says, "Unless we receive notification
25      that Mr. Loeffler has satisfied the criteria for

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 289

GEORGE HESSE

1
2       police officer certification, our records would
3       indicate that his appointment was disapproved.
4       Continued employment would be a violation of New
5       York State Civil Service law."
6             Do you see that?              3:55:34PM
7       A   Yes.                    3:55:36PM
8             MR. NOVIKOFF:  Are you going to read   3:55:37PM
9       the next sentence?
10      BY MR. GOODSTADT:                3:55:39PM
11      Q   "It is our understanding that    3:55:39PM
12      Mr. Loeffler is no longer employed by the
13      village, but that his termination has not been
14      reported to us."
15            MR. NOVIKOFF:  Okay.  Thank you.   3:55:46PM
16      BY MR. GOODSTADT:                3:55:47PM
17      Q   The question is:  Does this refresh   3:55:48PM
18      your recollection as to whether it would be a
19      Civil Service violation if he had worked there
20      without passing or without graduating the
21      academy?
22            MR. NOVIKOFF:  I'm going to object to   3:55:57PM
23      the question as to form, and the basis for
24      my objection is he didn't say he doesn't
25      recall.  He says I have no clue.  So I'm

Page 290

GEORGE HESSE

1
2       objecting to the form of the question.
3             MR. CONNOLLY:  Similar objection.   3:56:07PM
4       Please answer the question.       3:56:10PM
5       A   I wouldn't know.             3:56:11PM
6       Q   Do you know how this certification   3:56:29PM
7       issue was brought to the Civil Service
8       attention?
9             MR. NOVIKOFF:  Objection to form.  No   3:56:36PM
10      foundation.
11            MR. CALLAHAN:  Same.         3:56:39PM
12      A   On Allen Loeffler specifically?   3:56:41PM
13      Q   No, just generally, that there were   3:56:44PM
14      people at Ocean Beach working as police officers
15      who were not certified.
16            MR. NOVIKOFF:  Same objection.   3:56:50PM
17      A   I have an idea, yes.          3:56:51PM
18      Q   And what's your idea?         3:56:52PM
19      A   There was an issue with -- we picked   3:56:55PM
20      up a couple of police officers that once worked
21      for the state park police as part-time seasonal
22      police officers.  It should be seasonal.  They
23      were strictly seasonal.  And the New York State
24      park police decided to do away with their
25      part-time seasonal program, and a bunch of those

Page 291

GEORGE HESSE

1
2       seasonal part-time, whatever you want to call
3       them, were let go.  They all were seeking other
4       part-time seasonal police jobs.  And I believe
5       we hired two of them.  And from what I recall
6       was that because Ocean Beach just employed them
7       and put them on, that other villages that came
8       in contact with these officers had made a gripe
9       that we, Ocean Beach, just employed these guys
10      without having to go through a battery of Civil
11      Service tests, and they protested it.  So I
12      believe someone contacted Civil Service and
13      said, well, if Ocean Beach doesn't do it, why do
14      we have to do it.
15      Q   So you believe it was another village   3:58:15PM
16      police department?
17      A   I believe so, yes.           3:58:19PM
18      Q   Did you ever hear anyone allege that   3:58:20PM
19      it was Tommy Snyder who tipped off Civil Service
20      to that problem?
21      A   I've heard allegations of such, but   3:58:27PM
22      not about Tom Snyder.
23      Q   Who did you hear allegations about   3:58:31PM
24      that tipped off Civil Service?
25      A   Eddie Carter.                3:58:35PM

Page 292

GEORGE HESSE

1
2       Q   Who told you that Ed Carter tipped off   3:58:44PM
3       Civil Service?
4       A   I don't recall.              3:58:47PM
5       Q   You don't recall who -- strike that.   3:58:48PM
6             Where were you when you learned about   3:58:51PM
7       that?
8       A   I don't recall.              3:58:53PM
9       Q   Was it people on the department who   3:58:54PM
10      mentioned that to you?
11      A   It may have been, yes.       3:58:57PM
12      Q   Did you ever discuss that issue with   3:59:00PM
13      the Bosettis?
14            MR. NOVIKOFF:  What issue?   3:59:02PM
15            MR. GOODSTADT:  That Ed Carter tipped   3:59:03PM
16      off Civil Service, the claim that Ed Carter
17      tipped off the Civil Service to the fact
18      that there were uncertified officers working
19      there.
20            MR. NOVIKOFF:  I object to the form.   3:59:14PM
21      A   There were protests made by other   3:59:15PM
22      part-time seasonal police officers to that fact,
23      but I let it be known where I actually heard it
24      from.
25      Q   Who issued or lodged these protests?   3:59:22PM

73 (Pages 289 to 292)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 293

GEORGE HESSE

1
2     A   Gary Bosetti, Ty Bacon.  I don't     3:59:28PM
3  recall if anybody else ever really protested it.
4     Q   Did you ever hear either Bosetti or     3:59:37PM
5  Bacon refer to Ed Carter as a rat?
6     A   I don't recall.                    3:59:44PM
7     Q   Did you ever hear them refer to Ed     3:59:45PM
8  Carter as a Civil Service rat?
9     A   I don't recall.                    3:59:49PM
10    Q   Did you ever hear them, either of     3:59:50PM
11 them, refer to any of the plaintiffs as a rat?
12    A   I don't recall.                    3:59:54PM
13    Q   Did you ever hear them refer to any of  3:59:55PM
14 the plaintiffs as a Civil Service rat?
15    A   I really don't recall.             4:00:01PM
16    Q   Did you ever hear anyone refer to the  4:00:03PM
17 plaintiffs or any of the plaintiffs as a rat?
18    A   I don't recall.                    4:00:07PM
19    Q   Did you ever hear anyone refer to any  4:00:07PM
20 of the plaintiffs as a Civil Service rat?
21    A   I don't recall.                    4:00:12PM
22    Q   Do you have anything that would     4:00:12PM
23 refresh your recollection?
24    A   No.                                4:00:15PM
25    Q   Did you ever refer to any of the     4:00:15PM

Page 294

GEORGE HESSE

1
2  plaintiffs as a rat?
3     A   Yes.                               4:00:22PM
4     Q   Which plaintiffs did you refer to as a  4:00:22PM
5  rat?
6     A   Frank Fiorillo.                    4:00:25PM
7     Q   When did you refer to him as a rat?   4:00:28PM
8     A   I believe it was on a blog.        4:00:30PM
9     Q   So you posted on the blog referring to  4:00:38PM
10 Frank Fiorillo as a rat?
11    A   Yes.                               4:00:41PM
12    Q   Which blog?                        4:00:42PM
13    A   The Schwartz report,               4:00:43PM
14 LongIslandpolitics.com.
15    Q   What name did you post under?       4:00:49PM
16    A   For that entry, I don't know.      4:00:54PM
17    Q   How many times did you post on the   4:00:56PM
18 Schwartz report?
19    A   Oh God, 25, 30 times, maybe.       4:01:01PM
20    Q   Under what names have you posted    4:01:05PM
21 under?
22    A   Still Employed was one.  Maybe Still  4:01:15PM
23 Employed 2.  Dirty, Dirty 1, with the number
24 one, and maybe some other variations of that.
25 Others, I don't recall.

Page 295

GEORGE HESSE

1
2     Q   Do you have a list anywhere of names   4:01:34PM
3  that you posted under?
4     A   I don't currently have a list, no.   4:01:38PM
5     Q   Did you ever have a list?           4:01:40PM
6     A   Just what was on the blog.          4:01:41PM
7     Q   And what -- where did you post these   4:01:43PM
8  25 to 30 -- I know you posted them on the
9  Schwartz report.  But where physically were you
10 when you were posting these 25 to 30 posts?
11    A   From my house.                     4:01:53PM
12    Q   Did you ever post from the Ocean Beach  4:01:54PM
13 Police Department?
14    A   A couple.                          4:01:57PM
15    Q   How many times did you post from the   4:02:02PM
16 police department?
17    A   I don't recall.                    4:02:05PM
18    Q   Which house did you post from?      4:02:06PM
19    A   191 The Helm.                      4:02:08PM
20    Q   Are you aware of any other current or  4:02:17PM
21 former Ocean Beach police officers who post on
22 the blog?
23    A   Nobody that's openly admitted to me,  4:02:25PM
24 no.
25    Q   Did you ever see anyone post on the   4:02:29PM

Page 296

GEORGE HESSE

1
2  blog in the police station, other than for
3  yourself?
4     A   No.                                4:02:34PM
5        MR. GOODSTADT:  Tape's over.        4:02:37PM
6        THE VIDEOGRAPHER:  Yeah.  The time is  4:02:39PM
7  now 4:02 p.m.  We are now off the record.
8        (Whereupon, a discussion was held off  4:02:59PM
9  the record.)
10       MR. GOODSTADT:  Back on the record.   4:04:20PM
11       Well, due to a scheduling problem,     4:04:25PM
12 we've decided to break for the day, but
13 Mr. Connolly has agreed to bring his client
14 back for an additional day, not a full day,
15 on another occasion to complete the
16 deposition.  I still have two hours and 35
17 minutes under the federal rules.  We plan to
18 make a motion to the court, unless we can
19 agree to some additional time prior to that.
20       MR. CONNOLLY:  That is my            4:04:49PM
21 understanding.
22       MR. GOODSTADT:  I also want to put on  4:04:50PM
23 the record, to the extent that Mr. Hesse has
24 not reviewed his E-mail accounts, which I
25 think he was required to do under the

74  (Pages 293 to 296)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 297

```
 1            GEORGE HESSE
 2   discovery in his personal and professional
 3   capacities, just to make sure nothing gets
 4   destroyed, everything is preserved from here
 5   on in his E-mails.
 6        MR. CONNOLLY:  That will be taken      4:05:12PM
 7   under advisement.  I'll look into that.
 8        MR. GOODSTADT:  Great.                 4:05:15PM
 9        MR. NOVIKOFF:  And so we're clear with 4:05:17PM
10   regard to Mr. Hesse, we are coming back on
11   the 16th to complete his deposition, at
12   least complete the deposition of plaintiffs
13   of Mr. Hesse up to seven hours, unless
14   before that date the court grants more time
15   or there's an agreement.  And in addition,
16   certainly the village will have its
17   opportunity on the 16th or a date
18   thereafter to continue, and I presume the
19   county as well.
20        MR. GOODSTADT:  And his own lawyer,    4:05:49PM
21   for that matter.
22        (Continued on the next page to include 4:05:53PM
23   jurat.)
24
25
```

Page 298

```
 1            GEORGE HESSE
 2        MR. NOVIKOFF:  And his own lawyer, for 4:05:53PM
 3   that matter.
 4        MR. GOODSTADT:  I have no objections    4:05:53PM
 5   to any of that.
 6        (Time noted 4:05 p.m.)           4:05:55PM
 7        _____
 8            GEORGE HESSE
 9
     Subscribed and sworn to before me
10   this       day of        , 2009
11   _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 299

```
 1            PROCEEDINGS
 2          C E R T I F I C A T E
 3
 4        I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Publi
 5   and for the State of New York, do hereby certify:
 6        THAT the witness whose testimony is hereinbefo
 7   set forth, was duly sworn by me; and
 8        THAT the within transcript is a true record
 9   of the testimony given by said witness.  I further
10   certify that I am not related, either by blood or
11   marriage, to any of the parties to this action; and
12        THAT I am in no way interested in the outcome
13   this matter.
14        IN WITNESS WHEREOF, I have hereunto set
15   my hand this 8th day of June, 2009.
16
17        _____
18          JUDI JOHNSON, RPR, CRR, CLR
19
20
21
22
23
24
25
```

Page 300

```
 1            PROCEEDINGS
 2              INDEX
 3   ATTORNEY                        PAGE
 4      By Mr. Goodstadt              7
 5
 6
 7
 8
 9
10
11
12       INDEX OF HESSE EXHIBITS
13   I.D.        DESCRIPTION        PAGE
14   Exhibit 1  Bates document 3856      122
15   Exhibit 2  Bates document 3847      140
16   Exhibit 3  Bates document 3845-46   155
17   Exhibit 4  Bates document 28        173
18   Exhibit 5  A letter dated January 2007   184
19   Exhibit 6  Bates document 5773      284
20   Exhibit 7  Bates document 5769      288
21
22
23
24
25
```

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 301

```
 1              ERRATA SHEET
 2  NAME OF CASE:  CARTER V. OCEAN BEACH
 3  DATE OF DEPOSITION: June 3, 2009
 4  NAME OF WITNESS:  GEORGE HESSE
 5
 6  Reason codes:
 7     1. To clarify the record.
 8     2. To conform to the facts
 9     3. To correct the transcription
10        errors.
11  Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
20  From _____ to _____
21  Page _____ Line _____ Reason _____
22  From _____ to _____
23
24  _____
    GEORGE HESSE
25
```

TSG Reporting – Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 302

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
EDWARD CARTER, FRANK FIORILO,   )
KEVIN LAMM, JOSEPH NOFI, and    )
THOMAS SNYDER,                  )
                                )
             Plaintiffs,        )
                                )
-against-                       )
                                ) Index No.
                                ) CV 07 1215
INCORPORATED VILLAGE OF OCEAN   )
BEACH; MAYOR JOSEPH C.          )
LOEFFLER, JR., individually     )
and in his Official capacity;   )
former mayor NATALIE K.ROGERS,  )
individually and in her         )
official capacity, OCEAN BEACH  )
POLICE DEPARTMENT; ACTING       )
DEPUTY POLICE CHIEF GEORGE B.   )
HESSE, individually and in his  )
official capacity; SUFFOLK      )
COUNTY; SUFFOLK COUNTY POLICE   )
DEPARTMENT OF CIVIL SERVICE;    )
and ALLISON SANCHEZ,            )
individually and in her         )
official capacity,              )
                                )
             Defendants.        )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
            ***VOLUME II***
    CONTINUED DEPOSITION OF GEORGE HESSE
            Uniondale, New York
              June 16, 2009


Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 23331
```

Page 303

```
 1
 2              926 RexCorp Plaza
                Uniondale, New York
 3
 4              June 16, 2009
                10:00 A.M.
 5
 6
 7
 8
 9
10
11
12
13      Deposition of GEORGE HESSE, held at
14  the offices of RIVKIN RADLER, LLP, 926
15  RexCorp Plaza, Uniondale, New York, pursuant
16  to Notice, before Judi Johnson, a Registered
17  Professional Reporter, a Certified Realtime
18  Reporter, a Certified LiveNote Reporter and
19  Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 304

```
 1              GEORGE HESSE
 2  APPEARANCES:
 3      THOMPSON WIGDOR & GILLY, LLP
 4      Attorneys for the Plaintiffs
 5      85 Fifth Avenue
 6      New York, New York 10003
 7
        BY: ANDREW S. GOODSTADT, ESQ.
 8
 9      MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
10      Attorneys for GEORGE B. HESSE
11      530 Saw Mill Road
12      Elmsford, New York 10523
13
        BY: KEVIN W. CONNOLLY, ESQ.
14
15
16      RIVKIN RADLER, LLP
17
18      Attorneys for INCORPORATED VILLAGE OF OCEAN BEACH,
19      JOSEPH LOEFFLER, NATALIE ROGERS AND OCEAN BEACH
20      POLICE DEPARTMENT
21      926 RexCorp Plaza
22      Uniondale, New York 11556-0926
23
        BY: KENNETH A. NOVIKOFF, ESQ.
24        MICHAEL SCHNEPPER, ESQ. (A.M. SESSION ONLY)
25
```

Page 305

```
 1              GEORGE HESSE
 2
 3      BEE READY FISHBEIN HATTER & DONOVAN, LLP
 4
 5      Attorneys for SUFFOLK COUNTY
 6      170 Old Country Road
 7      Mineola, New York 11501
 8
        BY: (NOT PRESENT)
 9
10
11      SUFFOLK COUNTY DEPARTMENT OF LAW
12
13      Attorneys for the County
14      100 Veterans Memorial Highway
15      Hauppauge, New York 11788
16
        BY: CHRIS TERMINI, ESQ.
17
18      ALSO PRESENT:
19      JORDAN MUMMERT - LEGAL VIDEO SPECIALIST
20      FRANK FIORILLO
21      KEVIN LAMM
22      JOE NOFI - A.M. SESSION ONLY
23
24
25
```

1 (Pages 302 to 305)

b929ea01-2563-408a-a7fc-adb794430749

Page 306

GEORGE HESSE

1
2      IT IS HEREBY STIPULATED AND AGREED by
3  and between the attorneys for the respective
4  parties herein, that filing and sealing and
5  the same are hereby waived.
6      IT IS FURTHER STIPULATED AND AGREED
7  that all objections, except as to the form
8  of the question, shall be reserved to the
9  time of the trial.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to
12  and signed before any officer authorized to
13  administer an oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16
17      - o0o -
18
19
20
21
22
23
24
25

Page 307

GEORGE HESSE

1
2  GEORGE HESSE,
3      Called as a witness herein, having
4  first been duly sworn, was examined and
5  testified as follows:
6  BY THE REPORTER:
7  **Q   Please state your name and address for**
8  **the record.**
9      A   George Hesse, 623 Bay Walk, P.O. Box
10  425, Ocean Beach, New York 11770.
11      THE VIDEOGRAPHER:  This is the start   10:27:46AM
12  of the tape labeled Number 1 of the       10:27:47AM
13  continuation of the videotaped deposition of 10:27:49AM
14  George Hesse in the matter Carter, Fiorillo 10:27:52AM
15  versus Incorporated Village of Ocean Beach. 10:27:56AM
16  This deposition is being held at 92006     10:28:00AM
17  RexCorp Plaza in Uniondale, New York on    10:28:06AM
18  June 16th, 2009, at approximately         10:28:11AM
19  10:30 a.m.                                10:28:12AM
20      My name is Jordan Mummert from TSG     10:28:13AM
21  Reporting, Inc. I'm the legal video       10:28:16AM
22  specialist.  The court reporter is Judi    10:28:18AM
23  Johnson, in association with TGS Reporting. 10:28:19AM
24      Would counsel please introduce        10:28:20AM
25  yourself.                                 10:28:20AM

Page 308

GEORGE HESSE

1
2      MR. GOODSTADT:  Andrew Goodstadt,      10:28:20AM
3  Thompson, Wigdor & Gilly, on behalf of the 10:28:25AM
4  plaintiffs.                               10:28:28AM
5      MR. CONNOLLY:  Kevin W. Connolly of    10:28:28AM
6  Marks, O'Neill, O'Brien & Courtney, on     10:28:29AM
7  behalf of the Defendant Hesse.            10:28:31AM
8      MR. NOVIKOFF:  On behalf of the        10:28:33AM
9  village defendants, Ken Novikoff, and with 10:28:33AM
10  me is Michael Schnepper, Rivkin Radler.    10:28:35AM
11      MR. TERMINI:  And for Suffolk County  10:28:39AM
12  and the Suffolk County defendants, Assistant 10:28:40AM
13  County Attorney Chris P. Termini.         10:28:41AM
14      MR. NOVIKOFF:  Andrew, same stips as   10:28:55AM
15  in every other deposition?               10:28:57AM
16      MR. GOODSTADT:  Yes.                  10:28:59AM
17      MR. NOVIKOFF:  And same agreement with 10:29:01AM
18  regard to the phrase of rehire versus     10:29:02AM
19  termination in your questioning and my    10:29:04AM
20  questioning?                             10:29:06AM
21      MR. GOODSTADT:  Until we establish    10:29:08AM
22  something different possibly.            10:29:09AM
23      MR. NOVIKOFF:  Yes.                  10:29:10AM
24      MR. CONNOLLY:  And objection by one   10:29:13AM
25  counsel is an objection by all?          10:29:15AM

Page 309

GEORGE HESSE

1
2      MR. NOVIKOFF:  Sure.  I'm fine with    10:29:18AM
3  that.                                    10:29:19AM
4      Are you fine with that?              10:29:20AM
5      MR. GOODSTADT:  Yeah, I'm fine with    10:29:21AM
6  that.  All objections other than as to form 10:29:22AM
7  are preserved.                           10:29:26AM
8  EXAMINATION                              10:29:27AM
9  BY MR. GOODSTADT:                        10:29:28AM
10  **Q   Good morning, Mr. Hesse.**          10:29:29AM
11      A   Good morning.                    10:29:30AM
12  **Q   Thank you for returning.**          10:29:31AM
13      **I just want to remind you that you are** 10:29:32AM
14  **under oath and that you're sworn to tell the** 10:29:33AM
15  **truth, and failure to do so can result in some** 10:29:34AM
16  **criminal sanctions.**                   10:29:36AM
17      **Do you understand that?**           10:29:36AM
18      A   I do.                           10:29:37AM
19  **Q   Between the first day of your**     10:29:38AM
20  **deposition on June 3rd and today, did you review** 10:29:41AM
21  **the transcript of your first deposition?** 10:29:44AM
22      A   No.                            10:29:47AM
23  **Q   Did you review any excerpts of your** 10:29:47AM
24  **transcript --**                        10:29:48AM
25      A   No.                            10:29:50AM

2 (Pages 306 to 309)

b929ea01-2563-408a-a7fc-adb794430749

Page 310

GEORGE HESSE

1
2   Q   -- of your first deposition?          10:29:50AM
3       I just want to remind you to let me   10:29:52AM
4   finish my question before you answers, and I'll 10:29:54AM
5   let you finish your answer.  Okay?        10:29:56AM
6   A   Yes.                                  10:29:56AM
7   Q   Did you do anything to prepare for    10:29:57AM
8   today's deposition?                       10:29:58AM
9   A   Yes.                                  10:30:00AM
10  Q   What did you do to prepare for today's 10:30:00AM
11  deposition?                               10:30:03AM
12  A   I met with my attorney, Kevin         10:30:03AM
13  Connolly, yesterday.                      10:30:05AM
14  Q   For how long?                         10:30:07AM
15  A   Maybe four hours.                     10:30:09AM
16  Q   Where did you meet with him?          10:30:10AM
17  A   In Westchester -- Elmsford, at his    10:30:12AM
18  office.                                   10:30:14AM
19  Q   And who was present during that       10:30:15AM
20  meeting?                                  10:30:17AM
21  A   Just he and I.                        10:30:17AM
22  Q   Did you review any documents during   10:30:18AM
23  that meeting?                             10:30:21AM
24  A   Yes.                                  10:30:23AM
25  Q   How many documents did you review?    10:30:24AM

Page 311

GEORGE HESSE

1
2   A   Maybe five.                           10:30:28AM
3   Q   Which ones?                           10:30:29AM
4   A   They pertained to an incident that    10:30:31AM
5   took place October 31st of 2004 that dealt 10:30:33AM
6   with -- we all call the Halloween incident. 10:30:37AM
7   There may have been a couple of statements, a 10:30:43AM
8   few statements.                           10:30:46AM
9   Q   Any other documents other than for the 10:30:47AM
10  statements from the Halloween incident that you 10:30:50AM
11  reviewed in preparation for today's deposition? 10:30:53AM
12  A   No.                                   10:30:54AM
13  Q   Did you take the sergeant's test on   10:30:55AM
14  June 14th?                                10:30:57AM
15  A   Yes, I did.                           10:30:58AM
16  Q   And when do you find out what your    10:30:59AM
17  score is, whether you passed or failed?   10:31:01AM
18  A   I'm not really sure.  Maybe November. 10:31:04AM
19  Q   So you don't know as of today whether 10:31:07AM
20  you passed or failed?                     10:31:08AM
21  A   No.                                   10:31:10AM
22  Q   During your employment at Ocean Beach, 10:31:10AM
23  have you received any written performance 10:31:12AM
24  evaluations?                              10:31:14AM
25  A   Have I received any?                  10:31:16AM

Page 312

GEORGE HESSE

1
2   A   Yes.                                  10:31:17AM
3       MR. NOVIKOFF:  Objection.             10:31:18AM
4       Has he seen them or is he aware that  10:31:19AM
5   he's gotten any?                          10:31:21AM
6   BY MR. GOODSTADT:                         10:31:23AM
7   Q   Well, why don't we start with have you 10:31:23AM
8   seen any written performance evaluations. 10:31:25AM
9   A   For myself, no.                       10:31:28AM
10  Q   Have you ever -- are you aware any of  10:31:30AM
11  performance evaluations that have ever been 10:31:34AM
12  prepared for you?                         10:31:36AM
13  A   No.                                   10:31:37AM
14      MR. GOODSTADT:  Just mark this.       10:31:41AM
15      (Whereupon, Bates document 4547-488   10:31:43AM
16  was marked as Plaintiff's Exhibit 8 for   10:31:43AM
17  identification, as of this date.)         10:31:43AM
18      MR. GOODSTADT:  I've placed in front  10:32:19AM
19  of Mr. Hesse what's been marked as Hesse 8. 10:32:21AM
20  It is a two-page exhibit bearing Bates    10:32:24AM
21  numbers 4547 and 4548.                    10:32:26AM
22      MR. GOODSTADT:                        10:32:29AM
23  Q   Mr. Hesse, have you ever seen this    10:32:30AM
24  document that's been marked as Hesse 8?   10:32:32AM
25  A   I've seen the document, but not this  10:32:35AM

Page 313

GEORGE HESSE

1
2   particular document.                      10:32:37AM
3   Q   You've seen the form?                  10:32:37AM
4   A   I've seen the form, correct.          10:32:39AM
5   Q   What's is this form?                  10:32:40AM
6   A   It's a yearly performance report.     10:32:41AM
7   Q   Is this something that you've         10:32:43AM
8   completed for other officers at Ocean Beach? 10:32:45AM
9   A   Yes.                                  10:32:46AM
10  Q   What year did you start completing    10:32:47AM
11  these for other officers in Ocean Beach?  10:32:49AM
12  A   I started in 2007.                    10:32:51AM
13  Q   And prior to 2007, do you know whether 10:32:53AM
14  there were any written performance evaluations 10:32:56AM
15  provided to any officers in Ocean Beach?  10:33:00AM
16  A   I am unaware of any forms.            10:33:02AM
17  Q   Who made the decision to start        10:33:06AM
18  providing officers with yearly performance 10:33:09AM
19  evaluations?                              10:33:11AM
20      MR. NOVIKOFF:  Objection to form.     10:33:13AM
21  A   I did.                                10:33:14AM
22  Q   And why did you make that decision?   10:33:15AM
23  A   Well, in light of recent events, I    10:33:17AM
24  thought it would be good to have some sort of a 10:33:20AM
25  documentation of officers' yearly performance. 10:33:24AM

3 (Pages 310 to 313)

b929ea01-2563-408a-a7fc-adb794430749

Page 314

```
1              GEORGE HESSE
2      Q    What do you mean in light of recent   10:33:29AM
3    events?                        10:33:30AM
4      A    Of this lawsuit.             10:33:32AM
5      Q    Does Ocean Beach have a policy with   10:33:36AM
6    respect to written performance evaluations?   10:33:38AM
7        MR. NOVIKOFF: Objection.       10:33:42AM
8      A    You know, I believe something just   10:33:45AM
9    came up recently about doing yearly performance  10:33:47AM
10   reports for every employee in the village. I   10:33:53AM
11   just received a copy of a new form that the   10:33:56AM
12   village would like to use.          10:33:59AM
13     Q    When did you receive that?     10:34:01AM
14     A    I believe last week.          10:34:02AM
15     Q    Who did you receive it from?    10:34:05AM
16     A    Maryanne Minerva.            10:34:06AM
17     Q    Other than for the form that you   10:34:11AM
18   received, do you know whether there's any   10:34:12AM
19   policy -- strike that.              10:34:14AM
20         Between 2000 and 2006, do you know   10:34:16AM
21   whether there was any policy in Ocean Beach with  10:34:19AM
22   respect to written performance evaluations?   10:34:21AM
23       MR. NOVIKOFF: Objection.       10:34:25AM
24     A    None that I'm aware of.        10:34:26AM
25     Q    Do you know whether Hesse 8, which   10:34:28AM
```

Page 315

```
1              GEORGE HESSE
2    appears to be a yearly performance report for   10:34:30AM
3    you, do you know whether that was ever   10:34:33AM
4    completed?                     10:34:35AM
5      A    I don't think so, no.          10:34:36AM
6      Q    Do you know who created this Hesse 8   10:34:37AM
7    that has your name and the year 2007 on there?   10:34:40AM
8      A    Yes.                     10:34:42AM
9      Q    Who created that?            10:34:43AM
10     A    Paul Trosco.                 10:34:44AM
11     Q    Did he create them for all the   10:34:49AM
12   officers for '07?                 10:34:51AM
13       MR. NOVIKOFF: Objection.       10:34:53AM
14     A    Yes.                     10:34:53AM
15       MR. CONNOLLY: By "create," do you   10:35:01AM
16   mean fill in the officers' names?      10:35:01AM
17       MR. GOODSTADT: The names, exactly.   10:35:04AM
18   BY MR. GOODSTADT:                 10:35:06AM
19     Q    Who actually created this form, if you  10:35:06AM
20   know?                         10:35:10AM
21     A    Paul Trosco.                 10:35:10AM
22     Q    Was that your suggestion, that he   10:35:13AM
23   create a form?                   10:35:14AM
24     A    Yes.                     10:35:15AM
25     Q    And who actually filled out the   10:35:21AM
```

Page 316

```
1              GEORGE HESSE
2    evaluations for each of the officers in '07?   10:35:24AM
3      A    I did.                    10:35:27AM
4      Q    Did anyone else have any input?   10:35:28AM
5      A    No.                      10:35:31AM
6        MR. GOODSTADT: Can you mark this.   10:36:04AM
7        (Whereupon, Bates document 8189 and   10:36:06AM
8    5326 was marked as Plaintiff's Exhibit 9 for  10:36:06AM
9    identification, as of this date.)      10:36:06AM
10       MR. GOODSTADT: I've placed in front   10:36:46AM
11   of Mr. Hesse what's now been marked as   10:36:46AM
12   Hesse 9. It is a two-page exhibit, bearing   10:36:49AM
13   Bates numbers 8189 and 5326. And I   10:36:53AM
14   represent these are not consecutively   10:36:57AM
15   paginated, and they appear to be two   10:37:00AM
16   separate performance evaluations, but I've   10:37:02AM
17   marked as a single exhibit.          10:37:04AM
18       MR. NOVIKOFF: One is G. Bosetti and   10:37:06AM
19   the other one is Kevin Nowaski?        10:37:08AM
20       MR. GOODSTADT: Yes.            10:37:14AM
21   BY MR. GOODSTADT:                 10:37:16AM
22     Q    Mr. Hesse, do you recognize the   10:37:16AM
23   documents that have been marked as Hesse 9?   10:37:18AM
24     A    Yes.                     10:37:21AM
25     Q    And what are these documents?    10:37:21AM
```

Page 317

```
1              GEORGE HESSE
2      A    Yearly performance reports for Gary   10:37:23AM
3    Bosetti and Kevin Nowaski.           10:37:27AM
4      Q    If you look at the first page of   10:37:32AM
5    Hesse 9, 8189.                   10:37:32AM
6      A    Yes.                     10:37:35AM
7      Q    Is this your handwriting on the   10:37:36AM
8    document?                      10:37:38AM
9      A    Yes.                     10:37:38AM
10     Q    Is there anybody else's handwriting on  10:37:38AM
11   the document or is it all yours?       10:37:41AM
12     A    It is all mine.              10:37:43AM
13     Q    And if you look at the bottom, it says  10:37:43AM
14   "supervisor's signature." Is that your   10:37:46AM
15   signature?                     10:37:48AM
16     A    That is correct.             10:37:49AM
17     Q    And it's dated 1-31-08.        10:37:49AM
18         Do you see that?             10:37:52AM
19     A    Yes.                     10:37:53AM
20     Q    Is that the date that you completed   10:37:53AM
21   this?                         10:37:54AM
22     A    Okay.                    10:37:55AM
23     Q    What was your title at that time?   10:37:55AM
24       MR. NOVIKOFF: Objection.       10:37:57AM
25     A    Deputy chief of police.        10:38:01AM
```

4  (Pages 314 to 317)

b929ea01-2563-408a-a7fc-adb794430749

Page 318

1          GEORGE HESSE
2     Q    And again, just so the record is    10:38:06AM
3    clear, by that time, you had not passed your    10:38:08AM
4    sergeant's test or your chief's test?    10:38:11AM
5         MR. NOVIKOFF: Objection.    10:38:15AM
6    A    That's correct.    10:38:16AM
7     Q    If you look up at the top, it's Gary    10:38:16AM
8    Bosetti.    10:38:19AM
9         Do you see that?    10:38:19AM
10   A    Yes, sir.    10:38:20AM
11    Q    And what was Mr. Bosetti's position in    10:38:20AM
12   the department at that time?    10:38:21AM
13   A    Part-time seasonal police officer.    10:38:23AM
14    Q    And if you look under the -- on the    10:38:26AM
15   first set of lines that has your handwriting on    10:38:30AM
16   it, the second line says, "Needs to write more    10:38:32AM
17   summons."    10:38:36AM
18        Do you see that?    10:38:37AM
19   A    Yes.    10:38:37AM
20    Q    What did you mean by that?    10:38:38AM
21   A    I think he only wrote two for the    10:38:39AM
22   year, and I thought -- I expect him to write    10:38:42AM
23   more.    10:38:44AM
24    Q    Did you ever tell -- other than for    10:38:45AM
25   this written evaluation, did you ever tell the    10:38:46AM

Page 319

1          GEORGE HESSE
2    officers in Ocean Beach that they need to write    10:38:49AM
3    more summons?    10:38:52AM
4         MR. NOVIKOFF: Objection to form.    10:38:54AM
5    A    Yes.    10:38:55AM
6     Q    Do you know whether Chief Paradiso    10:38:55AM
7    ever told the officers at any time between 2000    10:38:58AM
8    and 2006 that they need to write more summons?    10:39:01AM
9    A    I don't know.    10:39:04AM
10    Q    You never heard him say that?    10:39:04AM
11   A    I don't recall.    10:39:06AM
12    Q    Do you recall ever being in a meeting    10:39:08AM
13   where the chief put up on a board the number of    10:39:09AM
14   summons that people wrote?    10:39:12AM
15   A    I don't recall that.    10:39:15AM
16    Q    If you look at the second page of this    10:39:27AM
17   exhibit, 5226.    10:39:29AM
18        Do you see that?    10:39:32AM
19   A    Yes.    10:39:32AM
20    Q    Is this your handwriting again on this    10:39:33AM
21   document?    10:39:34AM
22   A    Yes.    10:39:35AM
23    Q    And that's your signature under    10:39:35AM
24   "supervisor's signature"?    10:39:36AM
25   A    Yes.    10:39:38AM

Page 320

1          GEORGE HESSE
2     Q    And again, you're telling Mr. Nowaski    10:39:38AM
3    that he needs to write more summons as well,    10:39:42AM
4    correct?    10:39:45AM
5    A    Yes.    10:39:45AM
6     Q    Was that a problem in the department,    10:39:46AM
7    that officers weren't writing enough summonses?    10:39:47AM
8         MR. NOVIKOFF: Objection. Form.    10:39:50AM
9    A    I wouldn't say it was a problem, but I    10:39:51AM
10   thought guys needed to step up some of their    10:39:54AM
11   work.    10:39:56AM
12    Q    And what was Mr. Nowaski's position in    10:39:57AM
13   2007?    10:40:01AM
14   A    Part-time seasonal police officer.    10:40:01AM
15    Q    Did you actually deliver these reports    10:40:03AM
16   to the different officers -- strike that.    10:40:06AM
17        Did you actually deliver Gary    10:40:09AM
18   Bosetti's report to him?    10:40:11AM
19   A    I don't -- what do you mean by    10:40:16AM
20   "deliver"?    10:40:18AM
21    Q    Actually sit down, go over it him, let    10:40:18AM
22   him see a copy of it, discuss it with him.    10:40:22AM
23   A    No.    10:40:25AM
24    Q    Did he actually ever see a copy    10:40:25AM
25   of this?    10:40:27AM

Page 321

1          GEORGE HESSE
2    A    I don't know.    10:40:27AM
3     Q    So you never showed him a copy of it?    10:40:28AM
4    A    I really -- I don't recall if I did.    10:40:30AM
5     Q    What did you do with this after you    10:40:32AM
6    filled it out?    10:40:34AM
7    A    It went right into their employee    10:40:35AM
8    packets, their folders.    10:40:37AM
9     Q    Personnel files?    10:40:40AM
10   A    Yes.    10:40:40AM
11    Q    How about Mr. Nowaski, did you deliver    10:40:42AM
12   a copy of this to Mr. Nowaski?    10:40:44AM
13   A    No.    10:40:46AM
14    Q    Did you deliver a copy of the annual    10:40:47AM
15   reports to any of the officers in '07?    10:40:49AM
16   A    I don't recall if I did.    10:40:53AM
17    Q    Did you ever receive an employee    10:40:57AM
18   handbook at Ocean Beach?    10:40:59AM
19   A    I did, yes.    10:41:01AM
20    Q    When did you receive it?    10:41:03AM
21        MR. NOVIKOFF: Objection. Form.    10:41:05AM
22   A    Officially, in -- I'd like to say    10:41:14AM
23   '97ish.    10:41:22AM
24    Q    What do you mean by officially?    10:41:24AM
25   A    I believe it was a document that was    10:41:28AM

5  (Pages 318 to 321)

b929ea01-2563-408a-a7fc-adb794430749

Page 322

GEORGE HESSE

1
2  formulated by someone in the village and it was   10:41:28AM
3  floating around for a while.  It was never   10:41:28AM
4  officially approved.  And then one day it just   10:41:32AM
5  kind of showed up.  I still don't know if it was   10:41:35AM
6  approved.  And to tell you, to this date, I   10:41:38AM
7  don't think it was approved until somewhere in   10:41:40AM
8  early 2000, 2001, '2.   10:41:43AM
9      Q    Approved by who?   10:41:46AM
10     A    By the village board.   10:41:47AM
11     Q    The board actually voted on it,   10:41:49AM
12  approved it somewhere in 2000, 2002?   10:41:51AM
13     A    I'm guessing.  I don't recall.   10:41:53AM
14         MR. GOODSTADT:  Let's mark this.   10:41:58AM
15         (Whereupon, Bates document 1-25 was   10:41:59AM
16  marked as Plaintiff's Exhibit 10 for   10:41:59AM
17  identification, as of this date.)   10:41:59AM
18         MR. GOODSTADT:  I've placed in front   10:42:34AM
19  of Mr. Hesse what's been marked as Hesse 10.   10:42:35AM
20  It is a multiple-page exhibit bearing Bates   10:42:37AM
21  Numbers 1 through 25. (Handing.)   10:42:41AM
22  BY MR. GOODSTADT:   10:42:45AM
23     Q    Mr. Hesse, do you recognize this   10:42:46AM
24  document?   10:42:51AM
25     A    Yes.   10:42:51AM

Page 323

GEORGE HESSE

1
2      Q    And is this the handbook that you   10:42:52AM
3  testified that you received?   10:42:53AM
4      A    It appears to be.   10:42:54AM
5      Q    Do you know whether this handbook was   10:42:56AM
6  distributed to all officers in Ocean Beach?   10:42:58AM
7          MR. NOVIKOFF:  Objection.   10:43:01AM
8      A    I don't believe so.   10:43:05AM
9      Q    Do you know if it was distributed to   10:43:05AM
10  any officers in Ocean Beach?   10:43:06AM
11         MR. NOVIKOFF:  Objection.   10:43:08AM
12     A    I believe it was only distributed to   10:43:09AM
13  full-time persons of the village.   10:43:10AM
14     Q    So it's your understanding that it was   10:43:15AM
15  not distributed to any of the part-time   10:43:17AM
16  officers?   10:43:19AM
17     A    To the best of my recollection, no.   10:43:20AM
18     Q    Or any of the seasonal officers?   10:43:22AM
19     A    No.   10:43:23AM
20     Q    How come?   10:43:24AM
21         MR. CONNOLLY:  Objection.   10:43:25AM
22         MR. NOVIKOFF:  Objection.   10:43:26AM
23     A    I don't know.   10:43:27AM
24     Q    Who distributed it to the full-time   10:43:31AM
25  officers?   10:43:32AM

Page 324

GEORGE HESSE

1
2      A    The -- I believe Maryanne Minerva.   10:43:33AM
3      Q    Do you know whether the policies in   10:43:37AM
4  this handbook covered part-time or seasonal   10:43:38AM
5  employees?   10:43:41AM
6      A    I think very vaguely.  I'd have to   10:43:41AM
7  read through it.   10:43:43AM
8      Q    You don't know one way or the other,   10:43:44AM
9  sitting here?   10:43:45AM
10         MR. NOVIKOFF:  Objection.  Asked and   10:43:48AM
11  answered.   10:43:50AM
12     A    Right now, no.   10:43:50AM
13     Q    If you turn to Page 5 -- it's Page 5   10:43:55AM
14  of the book, but it's Bates numbered 9.   10:43:59AM
15     A    (Witness complies.) Uh-huh.   10:44:02AM
16         Okay.   10:44:04AM
17     Q    Do you have that page?   10:44:08AM
18     A    Yes.   10:44:09AM
19     Q    Do you see up top where it says   10:44:10AM
20  "unacceptable job performance/disciplinary   10:44:11AM
21  action"?   10:44:15AM
22     A    Yes, I do.   10:44:16AM
23         MR. NOVIKOFF:  Are we on Page 5?   10:44:16AM
24         MR. GOODSTADT:  Bates stamped 9, but   10:44:19AM
25  it's Page 5 of the book.   10:44:20AM

Page 325

GEORGE HESSE

1
2          MR. NOVIKOFF:  Bates stamped 9, but   10:44:23AM
3  Page 5 of the book?  Okay.  I got it.   10:44:28AM
4  BY MR. GOODSTADT:   10:44:30AM
5      Q    Now, do you see the second paragraph   10:44:30AM
6  down, it goes through a progressive disciplinary   10:44:31AM
7  system?   10:44:36AM
8      A    Yes.   10:44:38AM
9      Q    Says, "It upholds and maintains a   10:44:38AM
10  progressive disciplinary system which may   10:44:43AM
11  include all or part of the following steps   10:44:43AM
12  unless otherwise covered by law."   10:44:46AM
13         Do you see that?   10:44:49AM
14     A    Yes.   10:44:50AM
15     Q    Did you implement this disciplinary   10:44:50AM
16  system?   10:44:52AM
17         MR. NOVIKOFF:  Objection.   10:44:53AM
18     A    No.   10:44:53AM
19     Q    Do you know whether anyone in the   10:44:54AM
20  police department ever implemented this   10:44:56AM
21  disciplinary system?   10:45:00AM
22     A    I am unaware.   10:45:01AM
23     Q    So you don't know one way or the   10:45:02AM
24  other?   10:45:03AM
25     A    No.   10:45:05AM

TSG Reporting - Worldwide   (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 326

GEORGE HESSE

1       GEORGE HESSE
2   Q   If you look at Page 6 of the book,   10:45:05AM
3  Bates stamp 10, do you see the employee   10:45:08AM
4  performance appraisals paragraph?  It's like   10:45:12AM
5  halfway down the page.   10:45:15AM
6      Do you see that?   10:45:16AM
7  A   Yes.   10:45:19AM
8   Q   Okay.  It says, "Newly hired employees   10:45:20AM
9  may receive performance appraisals after 30   10:45:22AM
10  days."   10:45:26AM
11      Do you see that?   10:45:26AM
12  A   Yes.   10:45:27AM
13   Q   Did you ever administer performance   10:45:27AM
14  appraisals to any of your newly hired officers   10:45:30AM
15  after 30 days?   10:45:33AM
16      MR. NOVIKOFF:  Objection.  Foundation.   10:45:35AM
17  A   No.   10:45:37AM
18      MR. NOVIKOFF:  Form.   10:45:38AM
19  BY MR. GOODSTADT:   10:45:38AM
20   Q   Do you know whether any performance   10:45:39AM
21  appraisals were ever given to newly hired   10:45:41AM
22  officers after 30 days?   10:45:44AM
23      MR. NOVIKOFF:  Form.   10:45:46AM
24  A   No.   10:45:46AM
25   Q   And it says "and a more formal   10:45:47AM

Page 327

GEORGE HESSE

1       GEORGE HESSE
2  evaluation at the end of six months."   10:45:49AM
3      Do you see that?   10:45:52AM
4  A   Yes.   10:45:52AM
5   Q   Did you ever give a performance   10:45:53AM
6  appraisal to any of the officers at the end of   10:45:55AM
7  six months?   10:45:58AM
8      MR. NOVIKOFF:  Objection.  Foundation.   10:46:00AM
9  A   No.   10:46:01AM
10   Q   Do you know whether any officers were   10:46:01AM
11  ever any performance appraisals at the end of   10:46:02AM
12  six months?   10:46:06AM
13      MR. NOVIKOFF:  Objection.  Foundation.   10:46:07AM
14  A   No.   10:46:08AM
15   Q   The last sentence says, "Thereafter,   10:46:09AM
16  all employees may receive a performance   10:46:11AM
17  appraisal annually."   10:46:13AM
18      Do you see that?   10:46:15AM
19  A   Yes.   10:46:16AM
20   Q   And to your knowledge, that had not   10:46:17AM
21  been implemented until -- in the police   10:46:20AM
22  department until 2007; is that correct?   10:46:22AM
23      MR. NOVIKOFF:  Objection.  Form.   10:46:26AM
24  Foundation.   10:46:27AM
25  A   Correct.   10:46:28AM

Page 328

GEORGE HESSE

1       GEORGE HESSE
2   Q   If you look at -- strike that.   10:46:33AM
3      Before you look at the next section   10:46:36AM
4  I'll ask you to look at.   10:46:37AM
5      Did Ocean Beach Police Department or   10:46:39AM
6  the village have a policy with respect to   10:46:41AM
7  officers drinking on duty?   10:46:45AM
8      MR. NOVIKOFF:  Form.  Foundation.   10:46:47AM
9  A   Repeat that question.   10:46:48AM
10   Q   Yeah.  Did the Ocean Beach Police   10:46:50AM
11  Department or the village have any policy with   10:46:51AM
12  respect to officers drinking while on duty?   10:46:55AM
13      MR. NOVIKOFF:  Objection.  Same.   10:46:58AM
14  A   No policy.   10:46:59AM
15   Q   No policy?   10:47:00AM
16  A   Nothing writing -- in writing.   10:47:01AM
17   Q   Do you know whether the police   10:47:05AM
18  department had any policy -- the police   10:47:06AM
19  department or the village had any policy with   10:47:08AM
20  respect to off-duty police officers drinking in   10:47:11AM
21  Ocean Beach?   10:47:16AM
22      MR. NOVIKOFF:  Objection.   10:47:16AM
23  A   Nothing formal.   10:47:17AM
24   Q   So you don't recall any directives   10:47:19AM
25  ever being posted with respect to officers who   10:47:20AM

Page 329

GEORGE HESSE

1       GEORGE HESSE
2  were off duty drinking in Ocean Beach?   10:47:24AM
3  A   I don't recall.   10:47:27AM
4   Q   Do you know whether the beach had or   10:47:32AM
5  the department had any policy with respect to   10:47:34AM
6  officers who show up to work under the influence   10:47:40AM
7  of alcohol?   10:47:42AM
8  A   There was no written policies.   10:47:44AM
9   Q   Okay.  Do you know whether there was   10:47:45AM
10  ever any verbal policies with respect to   10:47:49AM
11  officers drinking on duty?   10:47:51AM
12      MR. NOVIKOFF:  Note my objection.   10:47:53AM
13  A   Well, I'm sure it would be frowned   10:47:56AM
14  upon if somebody showed up intoxicated.  I don't   10:47:59AM
15  think that was ever an issue.  I believe   10:48:03AM
16  Paradiso, Chief Paradiso might have put out   10:48:06AM
17  there that he referred -- preferred that guys   10:48:08AM
18  didn't drink in the village off duty.   10:48:14AM
19   Q   When did he put that out there?   10:48:16AM
20  A   I don't recall.  You know, that was   10:48:17AM
21  like a give-and-take type thing over the many   10:48:19AM
22  years I've been there.   10:48:21AM
23   Q   When do you recall him actually   10:48:23AM
24  putting it out there, though, what years?   10:48:25AM
25  A   I don't recall which years.   10:48:28AM

7 (Pages 326 to 329)

b929ea01-2563-408a-a7fc-adb794430749

Page 330

GEORGE HESSE

1
2    Q    When you say give and take, what did    10:48:29AM
3    you mean by that?                            10:48:30AM
4    A    When I first started there, there was   10:48:34AM
5    a policy that we were not supposed to be     10:48:36AM
6    drinking in the bars after we got off duty; but  10:48:38AM
7    then, I guess Ed Paradiso had lightened up on    10:48:45AM
8    that, and that was that.                     10:48:49AM
9    Q    What do you mean by Ed Paradiso         10:48:52AM
10   lightened up on that?                        10:48:53AM
11   A    You know, because guys would go out     10:48:54AM
12   for drinks after work.  You know, we were a  10:48:56AM
13   little more mature, a little more adult than 10:48:59AM
14   police officers that they had there in the past  10:49:00AM
15   that worked there that couldn't control      10:49:01AM
16   themselves.  And, you know, he would join us 10:49:03AM
17   sometimes, so...                             10:49:07AM
18   Q    When did he lighten up on it?           10:49:09AM
19   A    Probably around '95.                    10:49:12AM
20   Q    Did he ever get harder on that policy  10:49:16AM
21   and reinstate it?                            10:49:21AM
22   A    Not that I recall.                      10:49:23AM
23   Q    So from '95 until his last day of       10:49:25AM
24   employment at the beach, you don't recall him    10:49:28AM
25   ever verbally telling police officers that he    10:49:30AM

Page 331

GEORGE HESSE

1
2    preferred that they not go out and drink in the  10:49:35AM
3    bars off duty?                               10:49:38AM
4    MR. NOVIKOFF: Objection.  Form.              10:49:39AM
5    A    I don't recall any.                     10:49:40AM
6    Q    Do you recall Paradiso ever expressing 10:49:41AM
7    that preference or policy when the Bosettis were 10:49:47AM
8    working?                                     10:49:50AM
9    MR. NOVIKOFF: Objection.                     10:49:52AM
10   A    I don't recall that.                    10:49:53AM
11   Q    Did you ever hear him tell the          10:49:54AM
12   Bosettis that they shouldn't be going drinking   10:49:56AM
13   in bars in Ocean Beach when they're off duty?    10:49:59AM
14   A    I've never heard him tell them that.    10:50:02AM
15   Q    Did you ever tell the Bosettis that?    10:50:04AM
16   A    I don't recall if I did.               10:50:06AM
17   Q    Did you ever have a policy with         10:50:07AM
18   respect to -- a verbal policy with respect to    10:50:08AM
19   officers drinking in Ocean Beach while they're   10:50:12AM
20   off duty?                                    10:50:15AM
21   A    I never had a policy, no.               10:50:16AM
22   Q    Did you ever have a policy with         10:50:18AM
23   respect to officers drinking while they're on    10:50:20AM
24   duty, a verbal policy?                       10:50:23AM
25   MR. NOVIKOFF: Objection.                     10:50:25AM

Page 332

GEORGE HESSE

1
2    A    I would've liked to think that they     10:50:31AM
3    wouldn't do that.  I don't know of any policy    10:50:33AM
4    that was out there.                          10:50:36AM
5    Q    Did you ever speak to anybody or        10:50:37AM
6    discuss that issue with anybody, any officers?   10:50:39AM
7    A    About drinking on duty?                 10:50:41AM
8    Q    Yes.                                    10:50:43AM
9    A    I don't recall any conversation of     10:50:43AM
10   such.                                        10:50:45AM
11   Q    Do you ever recall any directives       10:50:49AM
12   being posted regarding drinking at the bars,     10:50:51AM
13   whether on duty or off duty?                 10:50:54AM
14   A    I don't recall any policies that were   10:50:56AM
15   posted.                                      10:50:58AM
16   Q    I asked for directive.  Are you using   10:51:01AM
17   the term "policy" interchange- --            10:51:03AM
18   A    Policy or directive.  I understand      10:51:06AM
19   what you're saying.  No, not that I recall any   10:51:06AM
20   being posted.                                10:51:08AM
21   Q    But just to be clear, those two terms   10:51:09AM
22   are interchangeable, a directive and a policy?   10:51:09AM
23   MR. NOVIKOFF:  Objection.                    10:51:12AM
24   BY MR. GOODSTADT:                            10:51:12AM
25   Q    So if I use policy, that's going to     10:51:13AM

Page 333

GEORGE HESSE

1
2    cover directive?  If I use directly, it will 10:51:15AM
3    cover policy?                                10:51:15AM
4    MR. NOVIKOFF:  Objection.                    10:51:16AM
5    A    Actually, they can mean two different   10:51:17AM
6    things.                                      10:51:19AM
7    Q    Did you ever have any alcoholic         10:51:27AM
8    beverages while on duty?                     10:51:28AM
9    A    No.                                     10:51:30AM
10   Q    Did you ever have any alcoholic         10:51:31AM
11   beverages while in uniform?                  10:51:33AM
12   A    Yes.                                    10:51:35AM
13   Q    How many times?                         10:51:35AM
14   A    I'd say in the range of six times.      10:51:44AM
15   Q    Where were you during those six times?  10:51:47AM
16   A    At least three times in the parade in   10:51:51AM
17   New York City for St. Patty's Day, and I think   10:51:54AM
18   the other three were funerals.               10:51:59AM
19   Q    Did you ever have an alcoholic          10:52:05AM
20   beverage in the station?                     10:52:07AM
21   A    Yes.                                    10:52:08AM
22   Q    While in uniform?                       10:52:08AM
23   A    No.                                     10:52:10AM
24   Q    While on duty?                          10:52:11AM
25   A    No.                                     10:52:12AM

8  (Pages 330 to 333)

b929ea01-2563-408a-a7fc-adb794430749

Page 334

GEORGE HESSE

1
2    Q    What alcoholic beverages have you had    10:52:14AM
3    in the station?                                10:52:16AM
4    A    I've had a beer, and I had something    10:52:17AM
5    called a rocket fuel once or twice.           10:52:22AM
6    Q    Any other alcoholic beverages that you  10:52:29AM
7    drank in the station?                         10:52:32AM
8    A    No, not that I recall.                   10:52:33AM
9    Q    Were you in uniform those times in the  10:52:34AM
10   station?                                      10:52:36AM
11        MR. NOVIKOFF:  Objection.  Asked and    10:52:36AM
12   answered.                                     10:52:37AM
13   A    No.                                      10:52:38AM
14   Q    When did you have the rocket fuels in   10:52:39AM
15   the station?  What years were they?          10:52:41AM
16   A    2005, 2004.  Maybe 2003.                 10:52:47AM
17   Q    Where did you get the rocket fuels      10:52:55AM
18   from?                                         10:52:57AM
19   A    A bar called CJ's.                       10:52:57AM
20   Q    Did they deliver them? Someone picked   10:53:03AM
21   them up? How did they get to the station?    10:53:05AM
22   A    On occasion, sometimes they would just  10:53:09AM
23   deliver them at the end of -- the close of the  10:53:11AM
24   bar.                                          10:53:13AM
25   Q    Who would deliver them?                  10:53:15AM

Page 335

GEORGE HESSE

1
2    A    One of the barbacks.                     10:53:16AM
3    Q    What was the name?                       10:53:18AM
4    A    I believe one of the kids was Brian,    10:53:21AM
5    and another one -- another kid had the name of  10:53:24AM
6    Paul.                                         10:53:30AM
7    Q    Paul Conway?                             10:53:31AM
8    A    If that's his last name.  I don't       10:53:33AM
9    know.                                         10:53:34AM
10   Q    Do you know Brian's last name?          10:53:36AM
11   A    Esop.                                    10:53:38AM
12   Q    Did they charge you for the rocket      10:53:43AM
13   fuels?                                        10:53:45AM
14   A    Sometimes.                              10:53:45AM
15   Q    But sometimes they didn't?              10:53:46AM
16   A    Right.                                   10:53:48AM
17   Q    Who else drank rocket fuels with you    10:53:49AM
18   in the police station?                        10:53:51AM
19   A    Let's see.  I guess when we were        10:53:54AM
20   getting off duty, Dave Gurden.  Who else?  You  10:53:56AM
21   know, I don't recall anybody else because it   10:54:05AM
22   wasn't a very popular drink.                   10:54:08AM
23   Q    Do you recall Gary Bosetti drinking     10:54:13AM
24   rocket fuel at the station?                    10:54:15AM
25   A    No, I don't recall any.                  10:54:16AM

Page 336

GEORGE HESSE

1
2    Q    How about Rich Bosetti?                  10:54:17AM
3    A    I don't recall.                          10:54:19AM
4    Q    Ty Bacon?                                10:54:20AM
5    A    No.                                      10:54:21AM
6    Q    No, you don't recall or you definitely  10:54:23AM
7    did not see him?                               10:54:25AM
8    A    I've never seen him drink.               10:54:26AM
9    Q    At any point, you've never seen him     10:54:28AM
10   drink?                                        10:54:30AM
11   A    Yeah, you know what, yeah, you're       10:54:30AM
12   right.  At a party, I've seen him have a beer or  10:54:32AM
13   something, but not in the station house, no.   10:54:35AM
14   Q    How about Walter Moeller, did you ever  10:54:37AM
15   see him drink a rocket fuel in the station?   10:54:40AM
16   A    No.                                      10:54:42AM
17   Q    Did you ever see him drink in the       10:54:43AM
18   station?                                      10:54:44AM
19   A    No.                                      10:54:44AM
20   Q    Did you ever see him drink on duty?     10:54:45AM
21   A    No.                                      10:54:47AM
22   Q    Do you know whether he's ever drank on  10:54:50AM
23   duty?                                         10:54:52AM
24   A    I don't know.                            10:54:53AM
25   Q    Did there ever come a time where        10:54:56AM

Page 337

GEORGE HESSE

1
2    Moeller got into a car accident right after   10:54:59AM
3    leaving the beach?                             10:55:03AM
4    A    Yes.                                     10:55:04AM
5    Q    Do you recall what year that was?       10:55:05AM
6    A    Was it 2004?  No, it couldn't have      10:55:13AM
7    been 2004.  Maybe 2006.                        10:55:17AM
8    Q    How long after his tour was the         10:55:27AM
9    accident?                                     10:55:30AM
10   A    Maybe a half hour.                       10:55:32AM
11   Q    And you were called to the scene?       10:55:37AM
12   A    I got a phone call, yes.                 10:55:39AM
13   Q    Who called you?                          10:55:41AM
14   A    It might have been Walter Moeller       10:55:44AM
15   himself.                                      10:55:46AM
16   Q    Do you know why he called you?          10:55:47AM
17   A    He said he was just in a car accident   10:55:49AM
18   And he couldn't find his shield; and he had his  10:55:51AM
19   weapon on him, and he was going to the hospital.  10:55:58AM
20   So he wanted me to come down and secure it.    10:56:01AM
21   Q    So you went -- did you go to the scene  10:56:04AM
22   of the accident?                              10:56:05AM
23   A    I went right to the scene, yes.         10:56:05AM
24   Q    Where was the accident?                 10:56:07AM
25   A    It was at the corner of, I believe,    10:56:09AM

9  (Pages 334 to 337)

b929ea01-2563-408a-a7fc-adb794430749

Page 338

GEORGE HESSE

1         GEORGE HESSE
2  Fifth Avenue and Montauk Highway, in front of  10:56:11AM
3  St. Pat's church.      10:56:15AM
4    **Q**  Was anyone injured in the accident?  10:56:16AM
5    A  Just him.      10:56:18AM
6    **Q**  And did you take his weapon from him?  10:56:19AM
7    A  Yes, I did.      10:56:21AM
8    **Q**  Did you ever find his shield?  10:56:22AM
9    A  Yes, I did.      10:56:24AM
10    **Q**  Was Walter Moeller drinking prior to  10:56:26AM
11  **that accident?**      10:56:29AM
12    A  No, not that I know of.  10:56:30AM
13    **Q**  Did you ever see the PCR -- do you  10:56:32AM
14  **know what a PCR is?**    10:56:34AM
15    A  Yes.      10:56:37AM
16    **Q**  What is a PCR?    10:56:37AM
17    A  A pre-hospital care report.  10:56:40AM
18    **Q**  Did you ever see the PCR with respect  10:56:41AM
19  **to that accident?**      10:56:41AM
20    A  No.      10:56:42AM
21    **Q**  So you don't know one way or the other  10:56:41AM
22  **whether the PCR indicated that he had alcohol on**  10:56:42AM
23  **his breath?**      10:56:44AM
24    A  I have no idea.    10:56:45AM
25    **Q**  Have you ever seen any officers in  10:57:01AM

Page 339

GEORGE HESSE

1         GEORGE HESSE
2  **Ocean Beach drink while they're on duty?**  10:57:03AM
3    A  No.      10:57:05AM
4    **Q**  Has anybody ever complained to you  10:57:10AM
5  **that other officers were drinking while they**  10:57:12AM
6  **were on duty?**      10:57:14AM
7    A  Never.      10:57:15AM
8    **Q**  Is it true that Ed Carter complained  10:57:20AM
9  **to you that he had to get the cell phone from**  10:57:22AM
10  **the Bosettis in CJ's?**    10:57:26AM
11    A  Never.      10:57:28AM
12    **Q**  Did you ever see Arnold Hardman drink  10:57:31AM
13  **the rocket fuel?**      10:57:34AM
14    MR. NOVIKOFF: Objection. Asked and  10:57:36AM
15  answered.      10:57:37AM
16    A  Arnold Hardman? Not that I recall,  10:57:38AM
17  no.      10:57:40AM
18    **Q**  Did you ever see Hardman drink while  10:57:42AM
19  **he was on duty?**      10:57:44AM
20    A  Never.      10:57:45AM
21    **Q**  Would you agree that if officers were  10:57:50AM
22  **drinking on duty, it would pose a public safety**  10:57:53AM
23  **threat?**      10:57:56AM
24    MR. NOVIKOFF: Objection.  10:57:57AM
25    MR. CONNOLLY: Objection.  10:57:57AM

Page 340

GEORGE HESSE

1         GEORGE HESSE
2    A  I do, in my opinion, yes.  10:57:58AM
3    **Q**  What public safety threat would it  10:58:03AM
4  **pose?**      10:58:05AM
5    MR. NOVIKOFF: Objection.  10:58:05AM
6    A  It would severely hinder your  10:58:09AM
7  judgment, I think, to many respects on the job.  10:58:12AM
8    **Q**  It would be a public safety threat if  10:58:16AM
9  **officers were drinking on duty and they were**  10:58:19AM
10  **carrying a weapon?**    10:58:21AM
11    MR. NOVIKOFF: Objection.  10:58:22AM
12    A  Yes.      10:58:23AM
13    **Q**  Would it pose a public safety threat  10:58:27AM
14  **if officers on duty were in the bars instead of**  10:58:30AM
15  **patrolling the neighborhood?**  10:58:33AM
16    MR. NOVIKOFF: Objection. How about  10:58:35AM
17  if they were in the bars performing --  10:58:41AM
18    MR. GOODSTADT: In the bars drinking.  10:58:43AM
19    MR. NOVIKOFF: You didn't ask that.  10:58:45AM
20  In the bars drinking off duty?  10:58:46AM
21    MR. GOODSTADT: No, on duty.  10:58:49AM
22    MR. NOVIKOFF: Oh, okay.  10:58:51AM
23    A  You might as well repeat the entire  10:58:52AM
24  question.      10:58:55AM
25    **Q**  The question is: Do you agree with me  10:58:55AM

Page 341

GEORGE HESSE

1         GEORGE HESSE
2  **that it would be a public safety threat if**  10:58:57AM
3  **officers were drinking in the bars while on duty**  10:59:01AM
4  **instead of patrolling the village?**  10:59:02AM
5    MR. NOVIKOFF: Objection.  10:59:03AM
6    A  In my opinion, yes.  10:59:03AM
7    **Q**  Do you think it would -- strike that.  10:59:10AM
8  **Do you think it undermines police**  10:59:12AM
9  **officers' authority to be drinking off duty in**  10:59:15AM
10  **the bars in Ocean Beach?**    10:59:19AM
11    MR. NOVIKOFF: Objection.  10:59:20AM
12    A  Undermines your authority? I don't  10:59:25AM
13  think so, no.      10:59:26AM
14    **Q**  You don't think there's a public  10:59:27AM
15  **perception problem if officers off duty are**  10:59:29AM
16  **drinking in the bars that they are required to**  10:59:34AM
17  **patrol on duty?**      10:59:39AM
18    MR. NOVIKOFF: Objection.  10:59:41AM
19    MR. CONNOLLY: Objection.  10:59:41AM
20    A  You're asking me to --  10:59:42AM
21    **Q**  I'm asking your opinion on that.  10:59:44AM
22    A  Yeah, I don't know.  10:59:46AM
23    MR. NOVIKOFF: Which is pantingly  10:59:49AM
24  irrelevant.      10:59:52AM
25    What was your answer?  10:59:55AM

10 (Pages 338 to 341)

b929ea01-2563-408a-a7fc-adb794430749

Page 342

GEORGE HESSE

1
2     THE WITNESS: I have no idea if it      10:59:56AM
3  would.                                    10:59:57AM
4     MR. NOVIKOFF: Me either.               10:59:58AM
5     MR. GOODSTADT: Luckily you're not the  11:00:01AM
6  witness today.                            11:00:02AM
7  BY MR. GOODSTADT:                         11:00:03AM
8     Q   Isn't it true that Tommy Snyder    11:00:03AM
9  complained to you that the Bosettis took the  11:00:06AM
10 cell phone from him and went to the bars while  11:00:08AM
11 they were on duty?                        11:00:10AM
12    MR. NOVIKOFF: Objection. Leading.      11:00:13AM
13 A  He never complained to me.             11:00:14AM
14    Q   He never complained to you about   11:00:16AM
15 anything or just about that issue?        11:00:19AM
16 A  Never.                                 11:00:20AM
17    MR. NOVIKOFF: Your question was any    11:00:21AM
18 issue --                                  11:00:22AM
19    MR. GOODSTADT: I was going to ask him  11:00:22AM
20 if he meant just about that issue or any  11:00:22AM
21 issue.                                    11:00:22AM
22    MR. CONNOLLY: Well, it wasn't          11:00:23AM
23 responsive to your question.              11:00:24AM
24    MR. GOODSTADT: And that's why I was    11:00:25AM
25 asking him to clarify.                    11:00:26AM

Page 343

GEORGE HESSE

1
2  A  Repeat the question.                   11:00:28AM
3     Q   Sure.                              11:00:29AM
4  You said he never complained to me.       11:00:31AM
5  My question -- my follow-up question was he  11:00:33AM
6  never complained to you about that issue or he  11:00:34AM
7  never complained to you about anything?   11:00:36AM
8  A  I gotta say, he's never complained to  11:00:38AM
9  me about anything. Specifically that issue.  11:00:40AM
10    Q   Would you agree with me that if    11:00:50AM
11 officers took the police cell phone into a bar  11:00:52AM
12 and were not answering the cell phone, that it  11:00:56AM
13 would pose a public safety threat?        11:00:59AM
14    MR. NOVIKOFF: Objection.               11:01:02AM
15 A  I could speculate, yeah, it would be   11:01:02AM
16 an issue.                                 11:01:04AM
17    Q   Is it your testimony that Snyder   11:01:10AM
18 complained to you that there were messages that  11:01:14AM
19 went unanswered on the cell phone when the  11:01:17AM
20 Bosettis returned the cell phone back to him?  11:01:20AM
21    MR. CONNOLLY: Objection.               11:01:23AM
22    MR. NOVIKOFF: Objection. You didn't    11:01:23AM
23 answer ask him that question, so how could  11:01:25AM
24 it be his testimony.                      11:01:27AM
25    MR. GOODSTADT: He said he never        11:01:28AM

Page 344

GEORGE HESSE

1
2  complained to him.                        11:01:30AM
3     MR. NOVIKOFF: Well, then that would    11:01:31AM
4  cover everything. Objection to the form.  11:01:31AM
5  A  I don't recall anything of that nature  11:01:33AM
6  at all.                                   11:01:35AM
7     Q   Is it true that Frank Fiorillo     11:01:42AM
8  complained to you that he had to relieve the  11:01:44AM
9  Bosettis on the next tour in the bar?     11:01:46AM
10    MR. NOVIKOFF: Objection. Form.         11:01:49AM
11 Leading.                                  11:01:50AM
12 A  No.                                    11:01:51AM
13    Q   Isn't it true that Ed Carter       11:01:54AM
14 complained about that as well?            11:01:55AM
15    MR. NOVIKOFF: Objection. Form.         11:01:57AM
16 A  No.                                    11:01:58AM
17    Q   Did any of the plaintiffs in this case  11:02:01AM
18 ever complain to you about officers drinking in  11:02:03AM
19 the bars in Ocean Beach?                  11:02:05AM
20    MR. NOVIKOFF: Objection. Asked and     11:02:07AM
21 answered.                                 11:02:07AM
22 A  No.                                    11:02:09AM
23    Q   Did Ed Carter ever complain to you  11:02:22AM
24 about officers bringing alcohol into the  11:02:24AM
25 station?                                  11:02:26AM

Page 345

GEORGE HESSE

1
2  A  No.                                    11:02:27AM
3     Q   Did Ed Carter ever complain about  11:02:30AM
4  officers drinking rocket fuel in the station?  11:02:32AM
5  A  No.                                    11:02:34AM
6     Q   Did Ed Carter ever complain that he  11:02:34AM
7  was required to clean up after officers who were  11:02:36AM
8  drinking rocket fuels in the station?     11:02:39AM
9  A  Never.                                 11:02:41AM
10    Q   Did anyone ever complain to you that  11:02:49AM
11 officers left dock masters in the station to  11:02:51AM
12 cover their shifts while they went out to the  11:02:54AM
13 bars?                                     11:02:57AM
14 A  Never.                                 11:02:57AM
15    Q   Did Joe Nofi complain to you that dock  11:03:09AM
16 masters were covering for officers?       11:03:13AM
17 A  Never.                                 11:03:15AM
18    Q   Would you agree with me that it would  11:03:17AM
19 be inappropriate for dock masters to be covering  11:03:18AM
20 police officers' shifts?                  11:03:22AM
21    MR. NOVIKOFF: Objection. Form.         11:03:24AM
22    MR. CONNOLLY: What do you mean?        11:03:26AM
23 Define "shift."                           11:03:28AM
24    MR. NOVIKOFF: Define "appropriate."    11:03:30AM
25

11 (Pages 342 to 345)

b929ea01-2563-408a-a7fc-adb794430749

Page 346

GEORGE HESSE

1          GEORGE HESSE
2  BY MR. GOODSTADT:                    11:03:31AM
3     Q   To cover for them while they were --  11:03:32AM
4  you know, while they were supposed to be on   11:03:34AM
5  duty?                           11:03:36AM
6     MR. NOVIKOFF: Objection.           11:03:37AM
7     A   To what respect? You know, a dock   11:03:38AM
8  master is not a police officer. He can't cover  11:03:41AM
9  the shift.                       11:03:44AM
10    Q   So it would be inappropriate for a   11:03:45AM
11  dock master to cover a police shift, right?   11:03:46AM
12    A   Yeah.                     11:03:49AM
13    MR. NOVIKOFF: Objection.           11:03:50AM
14  BY MR. GOODSTADT:                    11:03:50AM
15    Q   Is it appropriate to dispatch as a   11:04:03AM
16  dock master?                    11:04:09AM
17    A   Was it appropriate?            11:04:11AM
18    Q   Yes.                     11:04:12AM
19    MR. NOVIKOFF: Objection.           11:04:13AM
20    A   It was only used in extreme        11:04:15AM
21  situations.                     11:04:17AM
22    Q   How about in -- well, what do you mean 11:04:18AM
23  by in extreme situations?            11:04:20AM
24    A   Whereas if we were shorthanded or   11:04:23AM
25  something on the street and we had a police   11:04:24AM

Page 347

GEORGE HESSE

1  officer sitting on the desk and something, an   11:04:27AM
2  incident occurred in the street that required   11:04:29AM
3  some extra assistance, we would call the dock   11:04:30AM
4  master in to answer the phones.         11:04:33AM
5     Q   How about outside of that extreme   11:04:35AM
6  situation, would it be appropriate for a dock  11:04:37AM
7  master to dispatch?               11:04:39AM
8     MR. NOVIKOFF: Objection.           11:04:41AM
9     A   It was used on occasion just so it   11:04:43AM
10  could free up a police officer.         11:04:45AM
11    Q   In case of an emergency?         11:04:47AM
12    A   Most of the time, yes.           11:04:49AM
13    Q   How about outside of an emergency?  11:04:51AM
14    A   Not that I recall any.           11:04:53AM
15    Q   But I'm asking whether it would be  11:04:54AM
16  appropriate --                  11:04:56AM
17    MR. NOVIKOFF: Objection.           11:04:56AM
18  BY MR. GOODSTADT:                    11:04:57AM
19    Q   -- to have a dock master dispatch   11:04:57AM
20  outside of an emergency.            11:04:59AM
21    MR. NOVIKOFF: Objection.           11:05:02AM
22    A   It's tough answering the phones. It  11:05:03AM
23  really didn't matter.               11:05:05AM
24    Q   What do you mean?             11:05:06AM

Page 348

GEORGE HESSE

1          GEORGE HESSE
2     A   Just somebody answering the phones.  11:05:08AM
3     Q   A dock master is trained to dispatch? 11:05:10AM
4     A   No.                      11:05:14AM
5     Q   A dock master is certified by Civil  11:05:15AM
6  Service to be on a dispatch position?      11:05:18AM
7     A   I don't think there's really a      11:05:22AM
8  certification for it, but no.          11:05:23AM
9     Q   Did Carter complain to you Labor Day 11:05:31AM
10  weekend 2005 that officers were drinking in the 11:05:34AM
11  bar?                         11:05:37AM
12    A   Did he complain? I don't recall any  11:05:39AM
13  complaint, no.                   11:05:41AM
14    MR. NOVIKOFF: I'm sorry, what        11:05:42AM
15  weekend?                       11:05:43AM
16    MR. GOODSTADT: Labor Day 2005.       11:05:44AM
17    MR. NOVIKOFF: Okay.              11:05:47AM
18  BY MR. GOODSTADT:                    11:05:47AM
19    Q   Did Kevin Lamm ever complain to you 11:05:52AM
20  that officers were drinking in the bar?     11:05:54AM
21    MR. NOVIKOFF: Objection. Asked and   11:05:57AM
22  answered.                      11:05:58AM
23    MR. CONNOLLY: Objection.           11:05:58AM
24    A   No.                      11:05:59AM
25    Q   Did Lamm ever complain to you about  11:05:59AM

Page 349

GEORGE HESSE

1          GEORGE HESSE
2  officers drinking whether it was in the bars or 11:06:01AM
3  the station or anywhere else?          11:06:04AM
4     A   He never complained to me about that 11:06:05AM
5  stuff, no.                     11:06:07AM
6     Q   Did any officers ever drink while off 11:06:11AM
7  duty prior to going on shift?          11:06:15AM
8     MR. NOVIKOFF: Objection. Foundation. 11:06:18AM
9     A   I don't know.                11:06:20AM
10    Q   So you're not aware of any officers  11:06:21AM
11  drinking in the bar and then going on the eight 11:06:22AM
12  to four?                       11:06:24AM
13    MR. NOVIKOFF: Note my objection.     11:06:25AM
14    A   No.                      11:06:26AM
15    MR. NOVIKOFF: Unless he's present or  11:06:28AM
16  was told, I don't know how he would answer   11:06:29AM
17  that question.                  11:06:31AM
18    MR. GOODSTADT: Maybe he was answered 11:06:32AM
19  or told.                       11:06:35AM
20    MR. NOVIKOFF: Ask that question.     11:06:37AM
21  That's my objection.               11:06:37AM
22    MR. GOODSTADT: If he's aware of it,   11:06:37AM
23  that would be a way he's aware of it. Maybe  11:06:37AM
24  he's aware of it some other way. I want to   11:06:37AM
25  know if he's aware of it.            11:06:40AM

12 (Pages 346 to 349)

b929ea01-2563-408a-a7fc-adb794430749

Page 350

```
1          GEORGE HESSE
2   BY MR. GOODSTADT:              11:06:42AM
3      Q   Did anyone ever complain to you about  11:06:42AM
4   officers drinking in bars and then going on the  11:06:44AM
5   eight-to-four shift?              11:06:48AM
6      A   Never.                   11:06:49AM
7          MR. NOVIKOFF: Eight to four would  11:06:51AM
8   just be eight at night to four in the   11:06:52AM
9   morning, right?                 11:06:55AM
10         MR. GOODSTADT: Eight in the   11:06:56AM
11  morning till -- who were drinking at night,  11:06:56AM
12  getting on the eight in the morning shift  11:06:58AM
13  and getting on tour.            11:07:00AM
14         MR. NOVIKOFF: Got it. Okay. I just  11:07:01AM
15  wanted to clarify.              11:07:01AM
16         MR. CONNOLLY: Why don't we reask the  11:07:01AM
17  question.                       11:07:03AM
18  BY MR. GOODSTADT:              11:07:03AM
19     Q   Did anyone ever complain to you that  11:07:04AM
20  officers were going out and drinking and then  11:07:07AM
21  working the 8 a.m. to 4 p.m. shift?   11:07:08AM
22     A   No.                      11:07:11AM
23     Q   What was done with beer that was   11:07:16AM
24  confiscated at Ocean Beach?        11:07:19AM
25     A   What was done with it? Most of the  11:07:22AM
```

Page 351

```
1          GEORGE HESSE
2   time it would just sit -- it depended on how  11:07:25AM
3   much was taken, I guess, but most of the time it  11:07:28AM
4   would just sit in the station house.  11:07:31AM
5      Q   Was there a process by which the beer  11:07:33AM
6   would have to be either, you know, memorialized  11:07:36AM
7   that beer had been taken or any evidence or  11:07:44AM
8   anything else that would have to be done with  11:07:47AM
9   the beer?                       11:07:49AM
10         MR. NOVIKOFF: Object to the form.  11:07:50AM
11         MR. CONNOLLY: Objection to form.  11:07:52AM
12     A   I don't think there was anything in  11:07:53AM
13  place that really said what we had to do with  11:07:55AM
14  it.                             11:07:58AM
15     Q   Was it appropriate for officers to  11:08:00AM
16  drink beer that was confiscated?   11:08:01AM
17     A   Sometimes we did.          11:08:04AM
18     Q   So you've drank beer that was   11:08:06AM
19  confiscated?                    11:08:08AM
20     A   Stuff that was in the refrigerator, I  11:08:09AM
21  didn't know if it was confiscated or not.  11:08:11AM
22     Q   If it was confiscated, would it be  11:08:14AM
23  appropriate to drink that beer?    11:08:17AM
24         MR. NOVIKOFF: Objection to form.  11:08:19AM
25     A   It was disposed of.        11:08:19AM
```

Page 352

```
1          GEORGE HESSE
2      Q   That wasn't the question, sir. The  11:08:21AM
3   question was whether it was appropriate to drink  11:08:23AM
4   beer that was confiscated.         11:08:25AM
5          MR. NOVIKOFF: Objection to form.  11:08:28AM
6      A   I don't know if it was appropriate.  11:08:29AM
7      Q   So as the chief of police, you don't  11:08:32AM
8   have an opinion one way or the other?  11:08:34AM
9      A   At that time?            11:08:38AM
10     Q   Or as sergeant. As a sergeant of the  11:08:38AM
11  Ocean Beach Police Department, you have no   11:08:40AM
12  opinion or had no opinion one way or the other  11:08:42AM
13  whether it was appropriate to drink beer that  11:08:47AM
14  was confiscated?                 11:08:49AM
15         MR. NOVIKOFF: Objection.   11:08:50AM
16     A   I don't think -- no.       11:08:51AM
17     Q   It was not appropriate or it was   11:08:52AM
18  appropriate?                    11:08:54AM
19         MR. NOVIKOFF: You asked if he had an  11:08:55AM
20  opinion, and he said no.         11:08:56AM
21  BY MR. GOODSTADT:              11:08:57AM
22     Q   So you don't have an opinion one way  11:08:58AM
23  or the other?                   11:09:00AM
24     A   I really don't, no.        11:09:01AM
25     Q   Did you ever drink beer that you knew  11:09:02AM
```

Page 353

```
1          GEORGE HESSE
2   was confiscated?                 11:09:04AM
3      A   I believe I did, yeah.     11:09:06AM
4      Q   Did you ever tell any of the   11:09:07AM
5   plaintiffs what brands of beer to confiscate?  11:09:08AM
6      A   No.                      11:09:11AM
7      Q   Do you know whether any officers told  11:09:11AM
8   the plaintiffs what brands of beer to   11:09:13AM
9   confiscate?                     11:09:15AM
10     A   No.                      11:09:16AM
11     Q   Have you ever disciplined or   11:09:24AM
12  reprimanded any officers for drinking on duty?  11:09:26AM
13         MR. NOVIKOFF: Objection.   11:09:30AM
14     A   No.                      11:09:31AM
15     Q   Have you ever disciplined or   11:09:31AM
16  reprimanded any officers for drinking off duty  11:09:33AM
17  in Ocean Beach?                  11:09:36AM
18         MR. NOVIKOFF: Objection.   11:09:38AM
19     A   Not that I recall any, no.  11:09:38AM
20     Q   Did you ever tell officers that it was  11:09:44AM
21  inappropriate to drink in the bars while off  11:09:47AM
22  duty?                           11:09:50AM
23         MR. NOVIKOFF: Objection. Form.  11:09:51AM
24  Foundation.                     11:09:52AM
25     A   I don't recall. I may have. I don't  11:09:53AM
```

13  (Pages 350 to 353)

b929ea01-2563-408a-a7fc-adb794430749

Page 354

```
1              GEORGE HESSE
2    know.                    11:09:55AM
3       Q    What's in a rocket fuel?      11:10:06AM
4       A    It's a souped-up pina colada. I    11:10:09AM
5    believe it has -- it has some rum in it.  It has 11:10:17AM
6    151 rum in it, and I believe it's topped    11:10:20AM
7    off with, I believe, amaretto.  I'm not really  11:10:22AM
8    sure.                      11:10:26AM
9       Q    Did you ever collect money from other 11:10:27AM
10   officers to pay for the rocket fuels?    11:10:29AM
11      A    Not that I recall.          11:10:31AM
12      Q    Is there any policy in Ocean Beach or 11:10:36AM
13   in the police department with respect to    11:10:39AM
14   drinking alcohol in the police truck?     11:10:41AM
15      MR. NOVIKOFF:  Objection.        11:10:44AM
16      A    No.                  11:10:46AM
17      Q    So it was okay for officers to drink 11:10:48AM
18   in the police truck?            11:10:50AM
19      MR. NOVIKOFF:  Objection.  Is that a 11:10:52AM
20   question or a statement?         11:10:54AM
21      MR. GOODSTADT:  I asked was it okay -- 11:10:56AM
22      MR. NOVIKOFF:  Well, objection to   11:10:58AM
23   form.                     11:10:59AM
24      MR. GOODSTADT:  -- for officers to   11:10:59AM
25   drink in the police truck.        11:11:01AM
```

Page 355

```
1              GEORGE HESSE
2      MR. NOVIKOFF:  Okay.           11:11:03AM
3      A    No.                  11:11:03AM
4      Q    How about if they're off duty on their 11:11:04AM
5    way to the lighthouse, would it be appropriate 11:11:07AM
6    for an officer to have a drink in the police  11:11:09AM
7    truck?                    11:11:12AM
8      MR. NOVIKOFF:  Objection.        11:11:13AM
9      A    No, not really.           11:11:13AM
10     Q    Did you ever speak to any officers    11:11:14AM
11   about that?                11:11:16AM
12     A    No.                  11:11:16AM
13     Q    Any of the plaintiffs ever complain to 11:11:17AM
14   you that officers were drinking in the    11:11:18AM
15   truck?                    11:11:21AM
16     A    No.                  11:11:21AM
17     Q    Any of the plaintiffs ever complain to 11:11:22AM
18   you that they had to clean up the police truck 11:11:24AM
19   with beer bottles, caps and other refuse from 11:11:27AM
20   alcoholic beverages?            11:11:32AM
21     A    Never.                11:11:34AM
22     Q    Was it appropriate for police officers 11:11:37AM
23   to drink in the barracks?         11:11:40AM
24     MR. NOVIKOFF:  Objection.        11:11:42AM
25     A    Yes.                 11:11:44AM
```

Page 356

```
1              GEORGE HESSE
2      Q    It was appropriate?          11:11:45AM
3      A    Sure.                11:11:46AM
4      Q    Is there any policy with respect to  11:11:48AM
5    drinking in the barracks?         11:11:50AM
6      MR. NOVIKOFF:  Objection.        11:11:52AM
7      A    No.                  11:11:52AM
8      MR. CONNOLLY:  Again, are we making a 11:11:53AM
9    distinction between off duty and on duty?  11:11:55AM
10   BY MR. GOODSTADT:              11:11:58AM
11     Q    Well, on duty, was it appropriate to  11:11:58AM
12   drink in the barracks?           11:12:00AM
13     A    No.                  11:12:01AM
14     Q    How about before your tour, was it    11:12:01AM
15   appropriate to drink in the barracks?    11:12:04AM
16     MR. NOVIKOFF:  Objection.        11:12:06AM
17     A    I'd say no.             11:12:07AM
18     MR. NOVIKOFF:  When you say before    11:12:09AM
19   tour, you mean within a few hours.      11:12:10AM
20     MR. GOODSTADT:  Yeah, within a few    11:12:12AM
21   hours of your tour.             11:12:14AM
22   BY MR. GOODSTADT:              11:12:15AM
23     Q    Was it appropriate to have any    11:12:15AM
24   alcoholic beverages within a few hours of your 11:12:17AM
25   tour?                     11:12:19AM
```

Page 357

```
1              GEORGE HESSE
2      MR. NOVIKOFF:  Objection.        11:12:20AM
3      A    My opinion is no.          11:12:20AM
4      Q    Were there any policies with respect 11:12:23AM
5    to drinking before coming on duty?      11:12:25AM
6      MR. NOVIKOFF:  Note my objection.   11:12:29AM
7      A    There were no policies.       11:12:30AM
8      Q    If you turn to Hesse 10, Page 7 of the 11:12:31AM
9    book, Bates Number 11.           11:12:40AM
10     MR. NOVIKOFF:  Okay.           11:12:42AM
11   BY MR. GOODSTADT:              11:12:48AM
12     Q    Do you see under "substance abuse"?  11:12:49AM
13     A    Yes, I do.             11:12:51AM
14     Q    It says, "Incorporated Village of    11:12:52AM
15   Ocean Beach will not tolerate any substance  11:12:52AM
16   abuse on its premises.  Any employee reporting 11:12:56AM
17   for work under the influence of alcohol or   11:13:00AM
18   controlled drugs will be asked to leave    11:13:03AM
19   immediately."                11:13:06AM
20     Do you see that?             11:13:06AM
21     A    Yes.                 11:13:07AM
22     Q    Did you ever ask any officers who    11:13:07AM
23   reported under the influence of alcohol to   11:13:09AM
24   leave?                    11:13:11AM
25     MR. NOVIKOFF:  Objection.  Foundation. 11:13:12AM
```

TSG Reporting – Worldwide    (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 358

GEORGE HESSE

1
2    I don't think that he's testified that there 11:13:13AM
3    were ever officers that reported under the 11:13:15AM
4    influence.                        11:13:16AM
5    A   Yeah, I believe I was asked that 11:13:18AM
6    question, and no.                 11:13:20AM
7        MR. GOODSTADT: Could I just see that 11:13:35AM
8    question back.                    11:13:36AM
9    BY MR. GOODSTADT:                 11:13:46AM
10   Q   Did Tom Snyder ever complain to you 11:13:47AM
11   that officers were coming out to the checkpoint 11:13:48AM
12   late when he had to come in for his shift? 11:13:53AM
13   A   No.                          11:13:57AM
14   Q   Were firearms kept in the barracks? 11:14:05AM
15   A   I believe sometimes, yes.     11:14:08AM
16   Q   Okay. So even though firearms were 11:14:11AM
17   kept in the barracks, you thought it was 11:14:13AM
18   appropriate for officers to drink in the 11:14:15AM
19   barracks?                        11:14:17AM
20       MR. NOVIKOFF: Objection to the form 11:14:18AM
21   of the question.                  11:14:18AM
22   A   Sure.                        11:14:19AM
23   Q   Did any of the plaintiffs ever    11:14:31AM
24   complain to you that the barracks were unsecure? 11:14:33AM
25   A   Unsecure in what manner?      11:14:39AM

Page 359

GEORGE HESSE

1
2    Q   Door unlocked?                11:14:44AM
3    A   Yeah, I believe I had one complaint. 11:14:47AM
4    Q   Who complained about that?    11:14:50AM
5    A   I think it was Nofi, Joe Nofi, Tom 11:14:52AM
6    Snyder. I believe there was a dock master up 11:14:56AM
7    there that left the door unlocked once. 11:14:58AM
8    Q   When was that?               11:15:01AM
9    A   I don't recall the year or time frame. 11:15:01AM
10   Q   And it was Nofi and Snyder who   11:15:03AM
11   complained?                      11:15:05AM
12   A   Yeah. I believe so, yeah.    11:15:06AM
13   Q   What did they state in their    11:15:08AM
14   complaint?                       11:15:09AM
15   A   I believe that they said Dock Master 11:15:09AM
16   Hirsch, if I'm remembering his name correctly, 11:15:13AM
17   may have left the door open or unlocked. 11:15:17AM
18   Q   Did you do anything to discipline 11:15:22AM
19   Hirsch in response to that complaint? 11:15:26AM
20       MR. NOVIKOFF: Objection to form. 11:15:28AM
21   A   I don't recall a conversation I had 11:15:30AM
22   with him, but dock masters were banned from the 11:15:31AM
23   barracks after that point.        11:15:34AM
24   Q   So prior to that point, they weren't 11:15:36AM
25   banned; after that point, they were banned? 11:15:39AM

Page 360

GEORGE HESSE

1
2    A   That's correct.               11:15:41AM
3    Q   And banning them, was that in response 11:15:42AM
4    to the complaint by Snyder and Nofi? 11:15:44AM
5    A   Yes.                         11:15:46AM
6    Q   Did Carter ever complain to you about 11:15:46AM
7    the barracks being unsecured?     11:15:48AM
8    A   Not that I'm aware of, no.    11:15:50AM
9    Q   Nofi and Snyder's complaint, was that 11:15:52AM
10   in writing or verbal?            11:15:55AM
11   A   I believe it was in writing.  11:15:57AM
12   Q   And it's your testimony that Carter 11:15:59AM
13   never complained about that?      11:16:00AM
14   A   Not that I'm aware of, that I recall. 11:16:01AM
15       MR. GOODSTADT: Let's mark this, 11:16:13AM
16   please.                          11:16:14AM
17       (Whereupon, Bates document 2750 was 11:16:15AM
18   marked as Plaintiff's Exhibit 11 for 11:16:15AM
19   identification, as of this date.) 11:16:15AM
20       MR. GOODSTADT: I've placed in front 11:16:48AM
21   of Mr. Hesse what's been marked as Hesse 11. 11:16:49AM
22   It is a one-page document bearing Bates 11:16:52AM
23   Number 2750. (Handing.)          11:16:54AM
24   BY MR. GOODSTADT:                11:16:57AM
25   Q   Mr. Hesse, do you recognize this 11:16:57AM

Page 361

GEORGE HESSE

1
2    document marked as Hesse 11?      11:16:59AM
3    A   Actually, I don't -- I recognize it, 11:17:01AM
4    but I don't recall it.            11:17:02AM
5    Q   What do you recognize this as? 11:17:05AM
6    A   As an Ocean Beach Police Department 11:17:07AM
7    internal correspondence, a 2042.  11:17:10AM
8    Q   And this doesn't refresh your    11:17:14AM
9    recollection as to whether Carter complained to 11:17:16AM
10   you about the barracks being unsecure? 11:17:19AM
11       MR. CONNOLLY: Objection.      11:17:22AM
12       MR. NOVIKOFF: Yeah.          11:17:24AM
13   A   Yeah, I don't recall this document. 11:17:25AM
14       MR. CONNOLLY: Also, this appears to 11:17:31AM
15   be a field report of some sort, not a 11:17:32AM
16   complaint.                       11:17:34AM
17       MR. GOODSTADT: Okay.         11:17:36AM
18       MR. NOVIKOFF: Well, I guess the 11:17:37AM
19   definition of complaint is what we're going 11:17:38AM
20   to be debating in the summary judgment 11:17:39AM
21   motion.                          11:17:41AM
22       THE WITNESS: And it's not signed 11:17:42AM
23   either. So I don't know where it came from. 11:17:44AM
24       MR. NOVIKOFF: This establishes that 11:17:51AM
25   they knew how to write complaints. 11:17:53AM

15  (Pages 358 to 361)

b929ea01-2563-408a-a7fc-adb794430749

Page 362

GEORGE HESSE

1        GEORGE HESSE
2   BY MR. GOODSTADT:                    11:18:05AM
3       Q   Did you ever direct any of the      11:18:11AM
4   plaintiffs to drive you on social visits in the  11:18:12AM
5   village while you were on duty?          11:18:19AM
6       A   No.                11:18:21AM
7       Q   Did you ever direct plaintiffs to     11:18:22AM
8   drive any off-duty officers while they were in  11:18:23AM
9   the village?                11:18:27AM
10      MR. NOVIKOFF:  Objection to form.     11:18:32AM
11      A   What?                11:18:32AM
12      Q   Did you ever direct plaintiffs to     11:18:33AM
13  drive any off-duty officers to the checkpoint?  11:18:35AM
14      A   Yes.                11:18:38AM
15      MR. NOVIKOFF:  Objection to form.     11:18:39AM
16      The answer was yes?          11:18:40AM
17      THE WITNESS:  Yes.          11:18:42AM
18  BY MR. GOODSTADT:                    11:18:43AM
19      Q   While they were on duty, the       11:18:44AM
20  plaintiffs?                 11:18:45AM
21      MR. NOVIKOFF:  Is the question did he  11:18:46AM
22  ever direct plaintiffs while on duty to       11:18:48AM
23  drive off-duty police officers to the       11:18:48AM
24  checkpoint?                11:18:51AM
25      MR. GOODSTADT:  Yes.          11:18:51AM

Page 363

GEORGE HESSE

1        GEORGE HESSE
2       MR. NOVIKOFF:  Objection to form.     11:18:53AM
3       A   I may have, yes.          11:18:53AM
4       Q   Did you ever direct them to drive     11:18:55AM
5   off-duty officers after they came out of the    11:18:56AM
6   bars drinking to the checkpoint while the       11:19:00AM
7   plaintiffs were on duty?          11:19:04AM
8       MR. NOVIKOFF:  Objection to form and  11:19:06AM
9   foundation.                11:19:06AM
10      A   I may have.            11:19:07AM
11      Q   You don't recall one way or the other? 11:19:08AM
12      A   Specifically, no.          11:19:10AM
13      Q   Did plaintiffs ever complain to you   11:19:11AM
14  about having to do that?          11:19:13AM
15      A   No.                11:19:14AM
16      Q   Plaintiffs ever complain to you that   11:19:14AM
17  they were leaving the village short on officers  11:19:16AM
18  when they had to drive out to the checkpoint to  11:19:18AM
19  drive off-duty officers who had been drinking to 11:19:21AM
20  the checkpoint?                11:19:23AM
21      A   Never.                11:19:25AM
22      Q   Did you ever direct Joe Nofi to take   11:19:30AM
23  Walter Moeller, Walter Moeller's girlfriend and  11:19:33AM
24  their dog to the checkpoint after they'd been   11:19:38AM
25  drinking?                  11:19:41AM

Page 364

GEORGE HESSE

1        GEORGE HESSE
2       A   I don't recall that.          11:19:42AM
3       MR. NOVIKOFF:  Is the dog the problem? 11:19:47AM
4       MR. GOODSTADT:  No, it's leaving the  11:19:48AM
5   village unsecure is the problem.          11:19:49AM
6       MR. NOVIKOFF:  Oh, okay.         11:19:52AM
7   BY MR. GOODSTADT:                    11:19:59AM
8       Q   Did Ed Carter ever complain to you the 11:20:00AM
9   village was left short of personnel when he was  11:20:02AM
10  required to chauffeur intoxicated off-duty       11:20:05AM
11  officers?                  11:20:09AM
12      MR. NOVIKOFF:  Objection -- no, no   11:20:10AM
13  objection.                 11:20:12AM
14      A   He's never complained, no.       11:20:13AM
15      Q   Did you ever require off-duty officers 11:20:16AM
16  to wait until 5 a.m. to be taken to the       11:20:23AM
17  checkpoint?                11:20:28AM
18      A   I have done that, yes.        11:20:28AM
19      Q   When was -- strike that.       11:20:30AM
20      Was that a policy that you instituted 11:20:32AM
21  at some point?                11:20:34AM
22      A   No.                11:20:35AM
23      Q   And why did you require people to wait 11:20:36AM
24  until 5 a.m. to be taken to the checkpoint?    11:20:39AM
25      A   It may have been a busy night and    11:20:43AM

Page 365

GEORGE HESSE

1   instead of taking one of my police officers and  11:20:45AM
2   sending them on a -- you know, out of the       11:20:48AM
3   village for a little while, I would let them    11:20:51AM
4   wait until we were making our relief, and they  11:20:53AM
5   could wait until our relief time.          11:20:56AM
6       Q   What do you mean by "our relief time"? 11:20:58AM
7       A   When guys were going off duty, they   11:21:01AM
8   could wait for the officers who were driving off 11:21:03AM
9   to go off duty.                11:21:07AM
10      Q   And the request to require the police  11:21:11AM
11  officers to wait until 5 a.m. to be driven off,  11:21:16AM
12  it's your testimony that was in response to     11:21:20AM
13  Carter complaining about having to drive       11:21:22AM
14  intoxicated officers off duty --          11:21:26AM
15      A   No.                11:21:29AM
16      Q   -- off the island?          11:21:29AM
17      A   No.                11:21:32AM
18      Q   It's your testimony that Carter on the 11:21:44AM
19  July 4th weekend 2005 didn't complain to you    11:21:46AM
20  about being required to chauffeur civilians    11:21:50AM
21  around while he was on duty?          11:21:53AM
22      MR. NOVIKOFF:  I don't know.  I don't  11:21:55AM
23  think he's testified to that around yet.       11:21:56AM
24      Objection to form.          11:21:58AM

16 (Pages 362 to 365)

b929ea01-2563-408a-a7fc-adb794430749

Page 366

GEORGE HESSE

1
2    A    Chauffeur civilians around? I don't  11:22:01AM
3    know what you're talking about. I don't recall  11:22:04AM
4    that.                            11:22:05AM
5    Q    Did Carter ever complain to you that  11:22:05AM
6    he was required to chauffeur civilians around  11:22:07AM
7    and it left the village shorthanded?    11:22:07AM
8         MR. NOVIKOFF: Objection. Form.    11:22:10AM
9    A    No.                          11:22:11AM
10   Q    Did you ever put Carter on the back  11:22:12AM
11   streets to patrol?                   11:22:14AM
12   A    I'm sure he's done that, yes.      11:22:16AM
13   Q    Is being put on the back streets a  11:22:18AM
14   form of discipline?                  11:22:21AM
15   A    No.                          11:22:22AM
16   Q    How do you determine who patrols the  11:22:27AM
17   back streets?                      11:22:30AM
18   A    Sometimes I would ask for volunteers.  11:22:32AM
19   Q    How else?                     11:22:35AM
20   A    Sometimes I would just post you there.  11:22:37AM
21   Q    Was the back streets a less desirable  11:22:39AM
22   post than the other areas of the village?  11:22:41AM
23        MR. CONNOLLY: Objection.        11:22:44AM
24   A    In my opinion, yeah.             11:22:45AM
25   Q    Did you ever require Frank Fiorillo  11:22:50AM

Page 367

GEORGE HESSE

1
2    while he was on duty to drive you to Mitch  11:22:52AM
3    Burns' house?                      11:22:54AM
4    A    Not that I recall.              11:22:55AM
5    Q    Who's Mitch Burns?              11:22:56AM
6    A    Just a homeowner in the village.    11:22:58AM
7    Q    You're friends with Mr. Burns?      11:23:00AM
8    A    I'm an acquaintance.             11:23:02AM
9    Q    Have you ever been over his house?   11:23:03AM
10   A    Yeah.                        11:23:05AM
11   Q    In the village?                11:23:06AM
12   A    Yeah.                        11:23:07AM
13   Q    Where's his house located in the    11:23:08AM
14   village?                         11:23:10AM
15   A    It's on Evergreen Walk.          11:23:10AM
16   Q    How many times have you been to his  11:23:13AM
17   house?                          11:23:15AM
18   A    A handful of times.             11:23:16AM
19   Q    How many is a handful?           11:23:17AM
20   A    Five, six times. I don't know.      11:23:19AM
21   Q    Were any of those five or six times on  11:23:21AM
22   police business?                   11:23:23AM
23   A    Yeah.                        11:23:24AM
24   Q    What did you go to his house on police  11:23:26AM
25   business for?                      11:23:28AM

Page 368

GEORGE HESSE

1
2    A    I've been to his house for a noise  11:23:29AM
3    complaint or two.                  11:23:31AM
4    Q    Did you ever issue him a summons?   11:23:32AM
5    A    No.                          11:23:34AM
6    Q    Did you ever issue a noise complaint  11:23:38AM
7    summons to anyone in the village?    11:23:40AM
8    A    Oh, sure.                     11:23:43AM
9    Q    And why didn't you issue a summons to  11:23:44AM
10   Mitch Burns for the couple times that you were  11:23:47AM
11   called to his house for a noise violation?  11:23:49AM
12   A    I don't think it required a summons.  11:23:52AM
13   Q    What do you mean by that?         11:23:53AM
14   A    It wasn't as loud as it would normally  11:23:55AM
15   be to require a summons.             11:24:00AM
16   Q    Is there a certain decibel level or  11:24:02AM
17   something that requires a summons?    11:24:06AM
18   A    You could judge it by that, but no.  11:24:08AM
19   Q    Did you judge it that way?         11:24:10AM
20   A    It's a matter of discretion. No, I  11:24:12AM
21   didn't judge it by decibel levels.    11:24:15AM
22   Q    Have you ever been at his house on  11:24:24AM
23   non-police business?                 11:24:26AM
24   A    Yes.                         11:24:28AM
25   Q    How many times?                11:24:29AM

Page 369

GEORGE HESSE

1
2    A    Couple times.                 11:24:31AM
3    Q    How many is a couple?            11:24:32AM
4    A    Two, three times maybe.          11:24:34AM
5    Q    And what were you at his house for on  11:24:37AM
6    non-police business?                 11:24:39AM
7    A    My wife and I was invited over for a  11:24:41AM
8    barbecue.                         11:24:44AM
9    Q    Two or three times?              11:24:45AM
10   A    Yeah.                        11:24:46AM
11   Q    How about other than for a barbecue,  11:24:51AM
12   have you ever been over his house on non-police  11:24:53AM
13   business?                         11:24:55AM
14   A    Not that I recall.              11:24:56AM
15   Q    Have you ever been to his apartment in  11:24:58AM
16   Manhattan?                        11:25:02AM
17   A    Yes.                         11:25:03AM
18   Q    How many times?                11:25:04AM
19   A    Once.                        11:25:05AM
20   Q    On police business or non-police    11:25:06AM
21   business?                         11:25:08AM
22   A    Non-police business.             11:25:08AM
23   Q    Where's his apartment in Manhattan  11:25:09AM
24   that you've been to?                 11:25:12AM
25   A    I don't know the exact address.     11:25:13AM

17 (Pages 366 to 369)

b929ea01-2563-408a-a7fc-adb794430749

Page 370

GEORGE HESSE

1
2     Q     Was it on the Upper East Side?     11:25:15AM
3     A     It may have been. I don't know.     11:25:17AM
4     Q     When were you at his apartment on     11:25:20AM
5  non-police business?     11:25:22AM
6     A     It was around Christmastime, God, I     11:25:24AM
7  don't know, maybe 2003ish.     11:25:28AM
8     Q     What were you at his apartment for?     11:25:31AM
9     A     We were meeting he and his wife to go     11:25:33AM
10  to a show and then to get drinks afterwards.     11:25:37AM
11        MR. CONNOLLY: Who's "we"?     11:25:41AM
12        THE WITNESS: My wife and I and he and     11:25:42AM
13  his wife.     11:25:45AM
14  BY MR. GOODSTADT:     11:25:46AM
15     Q     Was anybody else there?     11:25:46AM
16     A     No.     11:25:48AM
17     Q     What year was that?     11:25:49AM
18     A     I don't really recall.     11:25:50AM
19     Q     Did you go to a show with him and his     11:25:52AM
20  wife?     11:25:54AM
21     A     Yes.     11:25:55AM
22     Q     Did you guys go out drinking     11:25:55AM
23  afterwards?     11:25:57AM
24     A     Yeah.     11:25:59AM
25     Q     Did you ever tell Frank Fiorillo with     11:26:02AM

Page 371

GEORGE HESSE

1
2  respect to Mitch Burns' place in Ocean Beach     11:26:05AM
3  that whatever happens here between the drugs and     11:26:08AM
4  the girls, we look the other way?     11:26:12AM
5     A     Never.     11:26:15AM
6     Q     Is it true that you told officers that     11:26:19AM
7  you slept with Elyse Miller in Mitch Burns' hot     11:26:22AM
8  tub?     11:26:26AM
9        MR. NOVIKOFF: Objection.     11:26:28AM
10     A     Never.     11:26:28AM
11     Q     Did you ever sleep with Elyse Miller     11:26:29AM
12  in Mitch Burns' hot tub?     11:26:30AM
13     A     Never.     11:26:33AM
14     Q     Have you ever been over Mitch Burns'     11:26:33AM
15  house while Elyse Miller was there as well?     11:26:34AM
16     A     Yes.     11:26:41AM
17     Q     How many times?     11:26:42AM
18     A     One time.     11:26:43AM
19     Q     When was that?     11:26:43AM
20     A     I don't recall.     11:26:44AM
21     Q     How did you get home from there the     11:26:47AM
22  day that Elyse Miller was there?     11:26:49AM
23     A     I don't know. I believe my wife and I     11:26:50AM
24  walked down Evergreen northbound to Bay Walk,     11:26:52AM
25  made a left and got on the ferry and went home.     11:26:57AM

Page 372

GEORGE HESSE

1
2     Q     Did you ever have Frank Fiorillo pick     11:27:01AM
3  you up from Mitch Burns' house?     11:27:03AM
4     A     Never.     11:27:06AM
5     Q     Did you ever sleep over his apartment     11:27:14AM
6  in New York City?     11:27:16AM
7     A     Never.     11:27:17AM
8     Q     Do you know whether he's ever sold any     11:27:23AM
9  narcotics?     11:27:25AM
10     A     I don't know.     11:27:26AM
11     Q     Did you ever hear that he was selling     11:27:27AM
12  narcotics?     11:27:29AM
13     A     No.     11:27:30AM
14     Q     Did you ever hear he was selling     11:27:30AM
15  Fentanyl lollipops?     11:27:32AM
16     A     No. I don't even know what that is.     11:27:34AM
17     Q     Do you know what Fentanyl is?     11:27:36AM
18     A     No.     11:27:39AM
19     Q     Who is Andrea Nimburger?     11:27:40AM
20     A     That's a woman who owns a house in the     11:27:42AM
21  village.     11:27:45AM
22     Q     Where is her house in the village?     11:27:46AM
23     A     I believe it's on Wilmot Walk,     11:27:48AM
24  W-I-L-M-O-T.     11:27:51AM
25     Q     Have you ever been over her house?     11:28:00AM

Page 373

GEORGE HESSE

1
2     A     Yes.     11:28:02AM
3     Q     How many times?     11:28:02AM
4     A     A handful of times.     11:28:03AM
5     Q     Have you ever been over there on     11:28:05AM
6  non-police business?     11:28:07AM
7     A     Yes.     11:28:10AM
8     Q     How many times?     11:28:11AM
9     A     Handful of times.     11:28:13AM
10     Q     How many is a handful?     11:28:14AM
11     A     Five or six.     11:28:16AM
12     Q     What years did you go to her house on     11:28:18AM
13  non-police business?     11:28:21AM
14     A     God, over 16 years, you know, I don't     11:28:23AM
15  know.     11:28:26AM
16     Q     You don't know?     11:28:28AM
17     A     Could be more than five or six times.     11:28:28AM
18     Q     Did you ever require Frank Fiorillo to     11:28:31AM
19  take her -- take you to her house for non-police     11:28:32AM
20  business?     11:28:36AM
21     A     Not that I recall, no.     11:28:37AM
22     Q     Do you know her son, Andrea     11:28:41AM
23  Nimburger's son?     11:28:43AM
24     A     Yeah.     11:28:45AM
25     Q     Did you ever have a sexual     11:28:45AM

18  (Pages 370 to 373)

b929ea01-2563-408a-a7fc-adb794430749

Page 374

GEORGE HESSE

1
2  relationship with Andrea Nimburger?        11:28:47AM
3        MR. CONNOLLY:  Objection.        11:28:49AM
4  A   No.                        11:28:50AM
5  Q   Isn't it true that you told Frank    11:28:51AM
6  Fiorillo that you did?            11:28:52AM
7        MR. CONNOLLY:  Objection.        11:28:53AM
8  A   No.                        11:28:54AM
9  Q   It's not true?            11:28:54AM
10  A   It's not true.                11:28:55AM
11  Q   Is it true that Fiorillo complained to 11:28:58AM
12  you that the village was being left short when 11:29:00AM
13  he had to chauffeur you over there?        11:29:03AM
14  A   Never.                    11:29:05AM
15  Q   Did you ever tell Ed Carter that you  11:29:19AM
16  gave someone the, quote, German sausage?    11:29:21AM
17        MR. CONNOLLY:  Objection.        11:29:25AM
18  A   Never.                    11:29:25AM
19  Q   Did you ever use that phrase, German  11:29:26AM
20  sausage?                    11:29:28AM
21  A   Yes.                    11:29:29AM
22        MR. NOVIKOFF:  You mean from a deli?  11:29:30AM
23  A   Yes, I have.                11:29:31AM
24  Q   What did you mean by German sausage?  11:29:32AM
25  A   I don't know.  I read it in the    11:29:33AM

Page 375

GEORGE HESSE

1
2  newspaper in the Post, and so now I use it on a 11:29:36AM
3  regular basis.                    11:29:37AM
4  Q   You use it on a regular basis?    11:29:38AM
5  A   Yeah, as a joke.                11:29:41AM
6  Q   Referring to what?            11:29:41AM
7  A   As the German sausage.            11:29:41AM
8  Q   What are you referring to as a German 11:29:43AM
9  sausage?                    11:29:44AM
10  A   I guess my penis.                11:29:44AM
11        MR. NOVIKOFF:  I was thinking a    11:29:47AM
12  sandwich.  Could be.                11:29:49AM
13        MR. GOODSTADT:  I don't want to think 11:29:51AM
14  of anything.                    11:29:51AM
15  BY MR. GOODSTADT:                11:30:10AM
16  Q   Did you ever refer to Kevin Lamm as   11:30:11AM
17  being gay or homosexual?            11:30:15AM
18  A   I have not, no.                11:30:18AM
19  Q   Did you ever refer to Kevin Lamm as   11:30:27AM
20  Kevina, either in writing or verbally?    11:30:29AM
21  A   Not that I recall, no.            11:30:35AM
22  Q   Did you ever refer to Kevin Lamm as   11:30:36AM
23  his last name Lambo --            11:30:38AM
24  A   Oh, sure.                    11:30:42AM
25  Q   -- either in writing or verbally?    11:30:43AM

Page 376

GEORGE HESSE

1
2  A   Verbal, yeah.            11:30:45AM
3  Q   Is that his nickname, Lambo?        11:30:46AM
4  A   Yeah.  Lambo Rambo, yeah.        11:30:49AM
5  Q   Did you ever give him a business card 11:30:51AM
6  that said Kevin Lambo?            11:30:57AM
7  A   No.                    11:30:59AM
8        (Whereupon, Bates document P 925 was  11:31:10AM
9  marked as Plaintiff's Exhibit 12 for    11:31:10AM
10  identification, as of this date.)        11:31:10AM
11  BY MR. GOODSTADT:                11:31:34AM
12  Q   I've placed in front of Hesse what's  11:31:41AM
13  been marked as Hesse 12.  It's a one-page  11:31:42AM
14  exhibit Bates numbered P 925.  (Handing.)   11:31:45AM
15        Mr. Hesse, have you ever seen what's  11:31:50AM
16  now been marked as Hesse 12?        11:31:52AM
17  A   Yes.                    11:31:54AM
18  Q   Where did you see this?        11:31:55AM
19  A   Actually, yesterday.  One of the    11:31:56AM
20  documents I forgot that I reviewed with my  11:31:59AM
21  attorney, Mr. Connolly.            11:32:01AM
22  Q   Did you create this --            11:32:03AM
23  A   No.                    11:32:05AM
24  Q   -- business card?            11:32:05AM
25        Did you ever create business cards on 11:32:06AM

Page 377

GEORGE HESSE

1
2  the police computer?                11:32:08AM
3  A   Yes.                    11:32:09AM
4  Q   For other officers?            11:32:10AM
5  A   Everyone had access to it to make    11:32:12AM
6  whatever they wanted.                11:32:15AM
7  Q   My question is, did you ever make them 11:32:17AM
8  for other officers?                11:32:19AM
9  A   I may have.                11:32:20AM
10  Q   You don't recall one way or the other? 11:32:20AM
11  A   I don't recall, no.                11:32:23AM
12  Q   Which computer do you make the    11:32:25AM
13  business cards on?                11:32:28AM
14  A   They were made on one of the station  11:32:30AM
15  house computers way back then on a program.  I 11:32:31AM
16  think it was Microsoft Publisher at the time.  11:32:34AM
17  Q   Who created the template for the Ocean 11:32:39AM
18  Beach business card?            11:32:43AM
19  A   I may have.                11:32:44AM
20  Q   Is this the template for the Ocean    11:32:45AM
21  Beach business card?  The top half of this, is 11:32:46AM
22  that the template?                11:32:49AM
23  A   It could've been back in the day.    11:32:51AM
24  This is old.                    11:32:53AM
25  Q   So you don't recall one way or the    11:32:54AM

19 (Pages 374 to 377)

b929ea01-2563-408a-a7fc-adb794430749

Page 378

GEORGE HESSE

1
2    other whether that was the template?        11:32:56AM
3        A   It may have been.                    11:32:58AM
4        Q   And is that the phone number of the  11:32:59AM
5    station house?                               11:33:02AM
6        A   No.                                  11:33:03AM
7        MR. CONNOLLY:  When?                     11:33:03AM
8        Q   Is that the address of the station   11:33:05AM
9    house?                                       11:33:08AM
10       A   Yes.                                 11:33:08AM
11       Q   Is that the fax number or was the fax 11:33:09AM
12   number of the station house?                 11:33:09AM
13       A   It was, I guess, when 516 was the area 11:33:11AM
14   code.  This is really old.                   11:33:14AM
15       Q   And was that the telephone number?   11:33:16AM
16       A   Back in the day, yeah.               11:33:18AM
17       Q   Isn't it true that you handed this   11:33:21AM
18   card to Kevin Lamm?                          11:33:22AM
19       MR. NOVIKOFF:  Objection.                11:33:24AM
20       A   I didn't hand this to Kevin Lamm, no. 11:33:24AM
21       Q   Do you believe that Kevin Lamm is    11:33:35AM
22   homosexual?                                  11:33:37AM
23       MR. NOVIKOFF:  Objection.                11:33:38AM
24       MR. CONNOLLY:  Objection.                11:33:39AM
25       MR. NOVIKOFF:  Objection.                11:33:40AM

Page 379

GEORGE HESSE

1
2        MR. CONNOLLY:  What's the relevance?     11:33:40AM
3        MR. GOODSTADT:  Well, the relevance      11:33:42AM
4    is, you know --                              11:33:43AM
5        MR. NOVIKOFF:  Are you making a claim     11:33:44AM
6    of discrimination based on sexual            11:33:45AM
7    orientation?                                 11:33:47AM
8        MR. GOODSTADT:  No.  We're making a      11:33:49AM
9    claim of defamation.  We're making a claim   11:33:50AM
10   of slander.  And if we have to amend the     11:33:52AM
11   complaint, we will.                          11:33:55AM
12       MR. NOVIKOFF:  I look forward to you     11:33:57AM
13   amending the complaint, obviously.           11:33:58AM
14   It's your witness.                           11:34:01AM
15       MR. CONNOLLY:  I agree, but you can      11:34:03AM
16   answer.                                      11:34:04AM
17       MR. GOODSTADT:  And your objections,     11:34:05AM
18   as we've gone over thousands of times,       11:34:06AM
19   patently irrelevant, are reserved.           11:34:08AM
20       MR. NOVIKOFF:  Sometimes yes,            11:34:12AM
21   sometimes no.                                11:34:12AM
22       MR. CONNOLLY:  If you have an opinion.    11:34:14AM
23       A   I don't believe he is, but I don't   11:34:18AM
24   have an opinion, really.                     11:34:19AM
25       Q   Did you ever call Kevin Lamm a rat?  11:34:25AM

Page 380

GEORGE HESSE

1
2        A   I may have.                          11:34:28AM
3        Q   How many times?                      11:34:31AM
4        A   I don't know.                        11:34:32AM
5        Q   What's your understanding of what a  11:34:35AM
6    rat is in police terminology?               11:34:36AM
7        MR. NOVIKOFF:  Objection.                11:34:39AM
8        MR. CONNOLLY:  In police terminology?    11:34:42AM
9        MR. GOODSTADT:  Yeah.                    11:34:44AM
10   BY MR. GOODSTADT:                            11:34:44AM
11       Q   You know, when you call another police 11:34:44AM
12   officer a rat, what does that mean?          11:34:46AM
13       MR. NOVIKOFF:  Objection.                11:34:48AM
14       MR. CONNOLLY:  Objection.                11:34:49AM
15       A   It could be a tattletale.  It could be 11:34:50AM
16   vermin, low, dirty down.  You know.          11:34:53AM
17       Q   How about a mutt, did you ever use   11:34:57AM
18   that term?                                   11:34:59AM
19       A   Yes.                                 11:35:00AM
20       Q   What does a mutt mean?               11:35:00AM
21       MR. NOVIKOFF:  In police parlance?       11:35:04AM
22       MR. GOODSTADT:  Yeah, in police          11:35:06AM
23   parlance.                                    11:35:07AM
24       MR. NOVIKOFF:  Objection.                11:35:08AM
25       A   Dirtbag.                             11:35:09AM

Page 381

GEORGE HESSE

1
2        Q   Is it different than a rat?          11:35:09AM
3        MR. NOVIKOFF:  In police parlance?       11:35:12AM
4        MR. GOODSTADT:  Yes.                     11:35:14AM
5        MR. NOVIKOFF:  Objection.                11:35:15AM
6        A   I guess you could use it different   11:35:16AM
7    ways, but yes.  They're a little different.  11:35:17AM
8        Q   In police parlance, what's the       11:35:20AM
9    difference between a rat and a mutt?         11:35:22AM
10       MR. NOVIKOFF:  Objection.                11:35:26AM
11       A   To differentiate the difference, a rat 11:35:26AM
12   could be a tattletale.                       11:35:27AM
13       Q   Right.                               11:35:29AM
14       A   A rat could be just vermin.  And a   11:35:30AM
15   mutt could just be a dirtbag.  I don't know.  11:35:34AM
16       Q   When you say you could've called Kevin 11:35:47AM
17   Lamm a rat, is there any incident that you're 11:35:49AM
18   referring to?                                11:35:52AM
19       A   I may have written something on the  11:35:52AM
20   blog or something like that.                 11:35:54AM
21       Q   What did you write on the blog?      11:35:56AM
22       A   I don't know.  I'd have to go through 11:35:58AM
23   the blog.                                    11:35:59AM
24       Q   Did you ever verbally call Kevin Lamm 11:36:05AM
25   a rat?                                       11:36:07AM

20  (Pages 378 to 381)

b929ea01-2563-408a-a7fc-adb794430749

Page 382

GEORGE HESSE

1
2     A    Not that I recall, um.          11:36:08AM
3     Q    Do you recall what your posting name   11:36:19AM
4  was on the blog when you called Kevin Lamm a   11:36:21AM
5  rat?                                           11:36:24AM
6     A    Specifically, no.                      11:36:24AM
7     Q    The last time you testified to four    11:36:25AM
8  names that thought that you used, Still        11:36:27AM
9  Employed, Still Employed 2, Dirty and Dirty 1.  11:36:29AM
10    A    Uh-huh.                                 11:36:32AM
11    Q    Any other names that you can think of   11:36:33AM
12  that you used on the blog?                     11:36:35AM
13    A    There are others, but I don't recall   11:36:36AM
14  them at this time.                             11:36:38AM
15    Q    Did you ever use Rat Hater?            11:36:48AM
16    A    I don't think so.                       11:36:50AM
17    MR. NOVIKOFF: On the blog?             11:36:52AM
18    MR. GOODSTADT: On the blog.            11:36:53AM
19  BY MR. GOODSTADT:                              11:36:55AM
20    Q    Did you ever use Forever Employed?     11:36:55AM
21    A    I don't know.  I'd have to look at the  11:36:57AM
22  post.                                          11:36:59AM
23    Q    Did you ever use Guest with 15 ones    11:36:59AM
24  after it?                                      11:37:03AM
25    A    No, I don't think so.                   11:37:04AM

Page 383

GEORGE HESSE

1
2     Q    Or just the handle just 15 ones?       11:37:04AM
3     A    No, I don't think so.                   11:37:07AM
4     Q    Did you ever use Guest 11770 or just   11:37:08AM
5  the number 11770?                              11:37:12AM
6     A    No.                                     11:37:16AM
7     Q    Did you use Free the Four?             11:37:16AM
8     A    I may have.                             11:37:18AM
9     MR. NOVIKOFF: Is it Free T-H-E        11:37:24AM
10  F-O-U-R?                                       11:37:25AM
11    MR. GOODSTADT: Yes.                    11:37:29AM
12  BY MR. GOODSTADT:                              11:37:31AM
13    Q    Did you ever use Just the Facts Ma'am?  11:37:32AM
14    A    I don't think so.                       11:37:34AM
15    Q    Did you ever use Your Turn Boys?       11:37:36AM
16    A    I don't think so.                       11:37:38AM
17    Q    Did you ever use Misconduct?           11:37:39AM
18    A    No.                                     11:37:41AM
19    Q    Did you ever use Frank the Fag?        11:37:42AM
20    A    No.                                     11:37:44AM
21    Q    Did you ever use Miss You Guys?        11:37:44AM
22    A    No.                                     11:37:47AM
23    Q    Did you ever use Hate the Five?        11:37:48AM
24    A    I don't think so, no.                   11:37:50AM
25    Q    Did you ever use On the Level?         11:37:52AM

Page 384

GEORGE HESSE

1
2     A    No.                                     11:37:54AM
3     Q    Did you ever use Man Up Jerk-offs?     11:37:55AM
4     A    No.                                     11:37:58AM
5     Q    Did you ever post --                    11:37:58AM
6     MR. NOVIKOFF: On the blog?             11:38:00AM
7     MR. GOODSTADT: On the blog.            11:38:01AM
8  BY MR. GOODSTADT:                              11:38:03AM
9     Q    Did you ever use no name and just post  11:38:03AM
10  without putting in a name?                     11:38:07AM
11    A    I don't think it lets you do that, but  11:38:08AM
12  no. I don't think so, no.                      11:38:10AM
13    Q    Have you ever seen Joe Nofi, Frank     11:38:17AM
14  Fiorillo or Kevin Lamm come into contact with  11:38:20AM
15  somebody who they did not beat up?             11:38:24AM
16    A    What?                                   11:38:27AM
17    MR. NOVIKOFF: Wait, wait. Hold on.     11:38:28AM
18    MR. CONNOLLY: Objection.               11:38:30AM
19    MR. NOVIKOFF: You know, that may not   11:38:30AM
20  be objectionable to form. I just want to       11:38:32AM
21  hear the question.                             11:38:34AM
22    If you can repeat that back for me.          11:38:35AM
23    (Whereupon, the referred to portion          11:38:45AM
24  was read back by the court reporter: Have      11:38:45AM
25  you ever seen Joe Nofi, Frank Fiorillo or      11:38:45AM

Page 385

GEORGE HESSE

1
2  Kevin Lamm come into contact with somebody     11:38:45AM
3  who they did not beat up?)                     11:38:45AM
4     MR. NOVIKOFF: You mean other than the   11:38:46AM
5  people at this table?                          11:38:47AM
6     MR. GOODSTADT: While they were police   11:38:52AM
7  officers.                                       11:38:53AM
8     MR. CONNOLLY: That's a simple yes or   11:38:57AM
9  no.                                             11:38:59AM
10    THE WITNESS: Yeah, I know. I'm just    11:38:59AM
11  trying to figure that one out.                 11:39:01AM
12    A    Yeah, I guess.                          11:39:03AM
13    Q    So a statement that the three of them   11:39:05AM
14  beat up everyone they came into contact with   11:39:08AM
15  would be false, correct?                       11:39:11AM
16    A    Yeah.                                   11:39:14AM
17    Q    Did you ever state or insinuate on the  11:39:18AM
18  blog that any of the plaintiffs were gay or    11:39:20AM
19  homosexual?                                     11:39:23AM
20    A    I may have.                             11:39:25AM
21    Q    Do you recall which plaintiff you      11:39:27AM
22  stated that about on the blog?                 11:39:29AM
23    A    I don't recall.                         11:39:31AM
24    Q    Was it Kevin Lamm?                     11:39:33AM
25    A    I might have.                           11:39:34AM

b929ea01-2563-408a-a7fc-adb794430749

Page 386

GEORGE HESSE

1
2  Q   Frank Fiorillo?                        11:39:35AM
3  A   I might have.                          11:39:36AM
4  Q   Do you believe Frank Fiorillo to be    11:39:38AM
5  gay or homosexual?                         11:39:40AM
6  A   Nah.                                   11:39:42AM
7  Q   Any other plaintiffs you insinuated    11:39:46AM
8  were gay or homosexual other than Mr. Fiorillo   11:39:49AM
9  or Mr. Lamm?                               11:39:52AM
10  A   I'm sure all five of the plaintiffs at   11:39:54AM
11  some point.                               11:39:56AM
12  Q   Do you believe that any of the five    11:39:57AM
13  plaintiffs are gay or homosexual?         11:39:58AM
14  A   No, I don't.                          11:40:00AM
15  Q   Did you ever call any of the          11:40:14AM
16  plaintiffs a mutt?                        11:40:15AM
17  MR. NOVIKOFF: On the blog?                11:40:16AM
18  MR. GOODSTADT: At any point. On the       11:40:18AM
19  blog, off the blog, verbally, in writing.   11:40:20AM
20  A   Yeah.                                 11:40:23AM
21  Q   When?                                 11:40:24AM
22  A   I don't recall.                       11:40:25AM
23  MR. GOODSTADT: Mark that.                 11:40:54AM
24  (Whereupon, picture of writing on the     11:40:56AM
25  wall was marked as Plaintiff's Exhibit 13   11:40:56AM

Page 387

GEORGE HESSE

1
2  for identification, as of this date.)      11:40:56AM
3  MR. GOODSTADT: I've placed in front        11:41:48AM
4  of Mr. Hesse what's now been marked as     11:41:49AM
5  Hesse 13. It is a two-page exhibit. I      11:41:51AM
6  don't believe it bears any Bates numbers.   11:41:55AM
7  BY MR. GOODSTADT:                          11:41:57AM
8  Q   Mr. Hesse, have you ever seen the      11:41:58AM
9  first page of what's been marked as Hesse 13?   11:42:00AM
10  A   Yes.                                  11:42:03AM
11  Q   Okay. And what is this depicting?     11:42:03AM
12  A   I believe it was in our bathroom stall   11:42:05AM
13  in the police station on a wood wall that you   11:42:08AM
14  would face. If you were a man standing up and   11:42:13AM
15  urinating into the toilet, you could see   11:42:17AM
16  straight in front of you what was written on the   11:42:19AM
17  wall.                                     11:42:23AM
18  Q   Do you know who wrote this?           11:42:23AM
19  A   I have no idea.                       11:42:24AM
20  Q   Did Snyder ever complain to you about   11:42:25AM
21  the first page of Hesse 13?               11:42:27AM
22  A   It was never complained, no.          11:42:29AM
23  Q   And were you the author of what's on   11:42:34AM
24  Hesse 13?                                 11:42:37AM
25  A   Absolutely not.                       11:42:38AM

Page 388

GEORGE HESSE

1
2  Q   How about Page 2 of Hesse 13, did you   11:42:38AM
3  ever see this?                            11:42:41AM
4  A   Yes.                                  11:42:42AM
5  Q   And was this -- where was this --     11:42:43AM
6  strike that.                              11:42:46AM
7  What is Page 2 of Hesse 13?               11:42:47AM
8  A   Basically just what I described, same   11:42:51AM
9  exact thing in the same area, writing on the   11:42:53AM
10  wall in the bathroom.                     11:42:56AM
11  Q   Were you the author of what's depicted   11:42:58AM
12  on the second page of Hesse 13?           11:42:59AM
13  A   Absolutely not, no.                   11:43:01AM
14  Q   Do you know who wrote what was on the   11:43:02AM
15  second page of Hesse 13?                  11:43:04AM
16  A   No, I don't.                         11:43:05AM
17  Q   Did you ever speak to any of the      11:43:07AM
18  officers about marking up the walls in the   11:43:09AM
19  bathroom?                                 11:43:11AM
20  A   At some point, I believe I wrote on   11:43:15AM
21  the wall and said "stop writing on the wall,"   11:43:17AM
22  and I told everybody to stop writing on the   11:43:19AM
23  wall.                                     11:43:22AM
24  Q   What do you mean, you wrote "stop     11:43:22AM
25  writing on the wall"? Was it a directive you   11:43:22AM

Page 389

GEORGE HESSE

1
2  posted or you actually wrote it --        11:43:23AM
3  A   No. I wrote it right underneath all   11:43:25AM
4  this stuff. I said, "Stop writing on the wall,   11:43:27AM
5  103."                                     11:43:31AM
6  Q   And who did you tell to stop writing   11:43:32AM
7  on the wall?                              11:43:32AM
8  A   I believe I made a general statement   11:43:33AM
9  to everybody that was working in the department.   11:43:35AM
10  Q   Do you recall when that was?          11:43:37AM
11  A   I don't, no.                         11:43:39AM
12  Q   And when was the two pictures that are   11:43:39AM
13  depicted in Hesse 13, when were those things   11:43:43AM
14  written on the wall?                      11:43:46AM
15  A   You know, I don't know. I know -- I   11:43:47AM
16  believe Laminated and Snyderized was up for   11:43:50AM
17  quite a while.                            11:43:56AM
18  Q   Did you ever take any steps to have it   11:43:58AM
19  removed?                                  11:44:01AM
20  A   Oh, I've removed it but, you know, not   11:44:01AM
21  then.                                     11:44:05AM
22  Q   I'm talking about then. Did you ever   11:44:06AM
23  take any steps to have it removed? You said it   11:44:08AM
24  was there quite a while.                  11:44:10AM
25  A   Yeah. No.                            11:44:12AM

Page 390

GEORGE HESSE

1
2      MR. NOVIKOFF: Objection. That wasn't 11:44:13AM
3   what you asked him when he responded "quite 11:44:14AM
4   a while." Objection to form, but --      11:44:17AM
5   BY MR. GOODSTADT:                11:44:19AM
6      Q   How long is quite a while?      11:44:19AM
7      MR. NOVIKOFF: He said he saw it quite 11:44:22AM
8   a while ago, I believe.            11:44:23AM
9      MR. GOODSTADT: Can you go back to the 11:44:26AM
10  answer "quite a while."            11:44:27AM
11     MR. CONNOLLY: Ask him.          11:44:29AM
12     MR. GOODSTADT: I want to see what he 11:44:30AM
13  said.                      11:44:31AM
14  BY MR. GOODSTADT:                11:45:01AM
15     Q   You testified that it was up for quite 11:45:01AM
16  a while.                     11:45:03AM
17     A   Uh-huh.                 11:45:04AM
18     MR. NOVIKOFF: I don't recall it that 11:45:05AM
19  way, but it is what it is.           11:45:05AM
20     MR. GOODSTADT: I have the transcript. 11:45:08AM
21  You can play the video, if you want.     11:45:08AM
22     MR. NOVIKOFF: I don't see a        11:45:15AM
23  transcript. It's on the video.         11:45:15AM
24     My objection stands.            11:45:15AM
25

Page 391

GEORGE HESSE

1
2   BY MR. GOODSTADT:                11:45:17AM
3      Q   So during the -- strike that.      11:45:17AM
4      What did you mean by quite a while,   11:45:19AM
5   how long?                     11:45:22AM
6      A   I believe it was years. I believe    11:45:22AM
7   that this stuff was on the wall for years.  11:45:24AM
8      Q   And during those years, did you ever 11:45:27AM
9   do anything to take it down other than for write 11:45:28AM
10  "stop writing on the walls, 103"?       11:45:32AM
11     A   No.                    11:45:33AM
12     Q   Did Kevin Lamm ever complain to you 11:45:36AM
13  about Page 2 of Hesse 13?           11:45:37AM
14     A   No.                    11:45:42AM
15     MR. GOODSTADT: I want to take a     11:45:55AM
16  five-minute break here.            11:45:56AM
17     MR. NOVIKOFF: You got it.         11:45:58AM
18     THE VIDEOGRAPHER: The time is 11:47. 11:45:59AM
19  We're off the record.             11:46:00AM
20     (Whereupon, a discussion was held off 11:46:03AM
21  the record.)                  11:46:03AM
22     THE VIDEOGRAPHER: The time is 12:04. 12:02:16PM
23  We're on the record.              12:02:17PM
24  BY MR. GOODSTADT:                12:02:20PM
25     Q   Mr. Hesse, do you know who Frank     12:02:21PM

Page 392

GEORGE HESSE

1
2   Tutone is?                    12:02:24PM
3      A   Yes.                   12:02:25PM
4      Q   Who is Frank Tutone?          12:02:25PM
5      A   He's a local resident of Ocean Beach. 12:02:27PM
6      Q   Have you ever been to Mr. Tutone's   12:02:34PM
7   residence?                    12:02:37PM
8      MR. CONNOLLY: In what capacity?     12:02:38PM
9      MR. GOODSTADT: At any time.        12:02:40PM
10     A   Yes.                   12:02:40PM
11     Q   How many times have you been to his  12:02:42PM
12  residence?                    12:02:44PM
13     A   Maybe four times.            12:02:47PM
14     Q   Have you ever been there on non-police 12:02:49PM
15  business?                    12:02:51PM
16     A   Never.                  12:02:52PM
17     Q   So all four times was on police     12:02:54PM
18  business?                    12:02:56PM
19     A   Yes.                   12:02:56PM
20     Q   And what was the police business at  12:02:57PM
21  Mr. Tutone's residence that you were there for? 12:02:59PM
22     A   To arrest him.             12:03:02PM
23     Q   All four times?             12:03:03PM
24     A   I believe so, yes.           12:03:04PM
25     Q   What was he arrested for?        12:03:05PM

Page 393

GEORGE HESSE

1
2      A   Hmm, God, so many things. Aggravated 12:03:08PM
3   harassment on several occasions. Domestic   12:03:11PM
4   violence type stuff.              12:03:18PM
5      Q   And domestic violence against whom?  12:03:27PM
6      A   That would be his on-and-off       12:03:29PM
7   girlfriend, Lisa Campbell.           12:03:32PM
8      Q   Are you aware of a time where      12:03:38PM
9   Ms. Campbell was in the station and Richard   12:03:42PM
10  Bosetti was giving her wine to drink?     12:03:45PM
11     MR. NOVIKOFF: Objection to form.    12:03:53PM
12     A   You know, I don't know. I've heard   12:03:55PM
13  the rumor, but I don't know for sure if that was 12:03:57PM
14  true or not.                   12:04:00PM
15     Q   When did you hear that rumor?      12:04:01PM
16     A   You know what, it may have been when 12:04:05PM
17  this proceeding started.            12:04:08PM
18     Q   You hadn't heard the rumor prior to  12:04:09PM
19  the proceeding?                 12:04:11PM
20     A   No. Not that I'm aware of.       12:04:12PM
21     Q   And if Mr. Bosetti had given her wine 12:04:16PM
22  to drink while she was there to file a domestic 12:04:21PM
23  violence complaint, would that have been   12:04:25PM
24  appropriate?                   12:04:28PM
25     MR. NOVIKOFF: Objection.         12:04:28PM

23  (Pages 390 to 393)

b929ea01-2563-408a-a7fc-adb794430749

Page 394

GEORGE HESSE

1
2     A    In my opinion, it's inappropriate.    12:04:29PM
3     Q    **Inappropriate?**                    **12:04:31PM**
4     A    Yeah.                                 12:04:31PM
5     Q    **It's something that would result in    12:04:32PM**
6     **discipline?**                           **12:04:37PM**
7         MR. CONNOLLY:  Objection.             12:04:38PM
8         MR. NOVIKOFF:  Objection.  Calls for  12:04:39PM
9     speculation.                              12:04:39PM
10    A    No.  Not necessarily.                12:04:40PM
11    Q    **What do you mean by not necessarily?  12:04:43PM**
12    A    I would probably just advise him not  12:04:45PM
13    to do that again.                         12:04:47PM
14    Q    **Have you ever spoken to Richard       12:04:48PM**
15    **Bosetti about that incident?**          **12:04:50PM**
16        MR. NOVIKOFF:  Foundation.            12:04:53PM
17    A    I don't recall if I did or not.      12:04:54PM
18    Q    **You don't recall one way or the other? 12:04:55PM**
19    A    No.                                  12:04:56PM
20    Q    **Have you ever spoken with anybody,    12:04:57PM**
21    **either former or current police officers at  12:04:59PM**
22    **Ocean Beach, with respect to that incident?  12:05:02PM**
23    A    I don't recall if I did or not.      12:05:04PM
24    Q    **So you don't know one way or the     12:05:05PM**
25    **other?**                                **12:05:06PM**

Page 395

GEORGE HESSE

1
2     A    No.                                  12:05:08PM
3     Q    **Did you ever speak to Kenny Bockelman  12:05:09PM**
4     **about that incident?**                  **12:05:12PM**
5     A    You know, I don't recall.            12:05:14PM
6     Q    **Do you know who Kenny Bockelman is?   12:05:15PM**
7     A    Oh, sure.                            12:05:17PM
8     Q    **Who is that?**                       **12:05:18PM**
9     A    He's a current part-time seasonal    12:05:18PM
10    police officer.  B-O-C-K-E-L-M-A-N.       12:05:21PM
11    Q    **Have you ever disciplined Rich        12:05:49PM**
12    **Bosetti?**                               **12:05:51PM**
13    A    Yes.                                 12:05:51PM
14    Q    **What did you discipline Rich Bosetti  12:05:52PM**
15    **for?**                                   **12:05:55PM**
16    A    A couple of different things.  One   12:05:55PM
17    time I felt that he wasn't getting to his post  12:06:01PM
18    in time, and we had a little bit of an argument.  12:06:04PM
19    So he was disciplined for that and sent home for  12:06:09PM
20    his tour of duty.  I believe there was another  12:06:13PM
21    time where he was caught sleeping by the mayor.  12:06:15PM
22    He was disciplined by the mayor and then me, and  12:06:20PM
23    then he was sent home for the tour of duty.  And  12:06:26PM
24    then he was pretty much not asked back for  12:06:29PM
25    employment proceeding that.               12:06:32PM

Page 396

GEORGE HESSE

1
2     Q    **What was the incident about what you  12:06:37PM**
3     **guys had the argument over Bosetti not being at  12:06:40PM**
4     **his post on time?**                      **12:06:43PM**
5     A    That night, early morning we had a   12:06:45PM
6     huge fire.  A building burnt to the ground.  And  12:06:48PM
7     that morning I had to call extra personnel in to  12:06:52PM
8     relieve some of the officers that were on all  12:06:55PM
9     night long.  They were soaking wet.  They had  12:06:58PM
10    debris all over them.  And I wanted him to get  12:07:02PM
11    to his post to relief one of those officers  12:07:05PM
12    to -- so they can go home, rest, change, shower,  12:07:09PM
13    whatever it is.  And I left the scene to go to  12:07:14PM
14    the police station for something, paperwork or  12:07:18PM
15    something.  And Rich Bosetti was sitting there  12:07:21PM
16    enjoying a cup of coffee and eating a bagel, and  12:07:24PM
17    I found that to be inappropriate under the  12:07:27PM
18    circumstances.                            12:07:30PM
19    Q    **When was that incident?**            **12:07:31PM**
20    A    I don't recall the exact date.  I'm  12:07:36PM
21    sure you could show me something that will help  12:07:38PM
22    me recollect.                             12:07:42PM
23    Q    **Do you know what year it was?**      **12:07:43PM**
24    A    I believe it was 2007.  It may have  12:07:44PM
25    been in June.  June or July.  I'm not real  12:07:48PM

Page 397

GEORGE HESSE

1
2     positive.                                 12:07:51PM
3     Q    **And what was the incident where the  12:07:51PM**
4     **mayor caught him sleeping?**             **12:07:53PM**
5     A    I don't recall the exact date, but I  12:07:57PM
6     came into work about, I don't know, 9:30ish, and  12:08:01PM
7     I believe I asked the dispatcher where everybody  12:08:07PM
8     was.  Everybody was on patrol.  And all of a  12:08:10PM
9     sudden, I guess Rich Bosetti just comes  12:08:13PM
10    strolling into the police station.  And then I  12:08:16PM
11    get a phone call from the mayor that he wants to  12:08:18PM
12    see Rich Bosetti and myself in his office at  12:08:21PM
13    whatever time he designated, and we reported to  12:08:26PM
14    his office.                               12:08:30PM
15    Q    **Okay.  When was that?**              **12:08:30PM**
16    A    I don't remember the exact date of  12:08:32PM
17    that either.  I believe it's written down in his  12:08:33PM
18    personnel file somewhere.                 12:08:37PM
19    Q    **And I believe you testified that he  12:08:38PM**
20    **was sent home on that tour?**            **12:08:40PM**
21    A    Yes, eventually he was sent home for  12:08:42PM
22    tour of duty.                             12:08:45PM
23    Q    **Who made the decision to send him    12:08:46PM**
24    **home?**                                  **12:08:48PM**
25    A    I did.                               12:08:49PM

24 (Pages 394 to 397)

b929ea01-2563-408a-a7fc-adb794430749

Page 398

```
                  GEORGE HESSE
 1
 2                        12:08:49PM
 3       Q   And then was his employment terminated 12:08:59PM
 4   after that?                          12:09:01PM
 5       A   Yeah. There were no hours available  12:09:02PM
 6   for him. It was the end of the season.    12:09:04PM
 7       Q   What do you mean, yeah, but there were 12:09:07PM
 8   no hours available for him?              12:09:09PM
 9       A   I chose not to give him any more     12:09:11PM
10   hours.                                   12:09:13PM
11       Q   Who made that decision to end his    12:09:13PM
12   employment?                              12:09:15PM
13       A   I did.                           12:09:16PM
14       Q   Did you have any -- did you have to  12:09:16PM
15   get any approval to end his employment?   12:09:19PM
16       A   No.                              12:09:22PM
17       Q   Did you seek anyone's approval to end 12:09:23PM
18   his employment?                          12:09:25PM
19       A   I don't recall if I did.         12:09:26PM
20       Q   Did you speak to anybody about that  12:09:27PM
21   decision prior to implementing it?        12:09:29PM
22       A   I don't recall if I did.         12:09:31PM
23       Q   Do you recall, did you speak with Joe 12:09:32PM
24   Loeffler about it?                       12:09:35PM
25       A   I may have. I don't recall.      12:09:36PM
```

Page 399

```
                  GEORGE HESSE
 1
 2       Q   Did you speak to anyone in Civil     12:09:39PM
 3   Service about it?                        12:09:41PM
 4       A   No.                              12:09:44PM
 5       Q   At that time, did you have the       12:09:45PM
 6   authority to terminate his employment?    12:09:46PM
 7       MR. NOVIKOFF: Objection. Form.          12:09:48PM
 8       A   I believe I did.                 12:09:50PM
 9       Q   And what's the basis of that belief? 12:09:54PM
10       A   By my title and position.        12:09:56PM
11       Q   Your title was at that time?         12:09:59PM
12       A   Deputy acting -- acting -- who knows. 12:10:01PM
13       MR. CONNOLLY: Deputy acting chief.       12:10:06PM
14       A   Deputy acting chief of police.   12:10:08PM
15       Q   But you testified last time that you 12:10:10PM
16   held yourself out to be chief, correct?   12:10:13PM
17       A   Yes.                             12:10:15PM
18       MR. NOVIKOFF: Objection.                 12:10:16PM
19   BY MR. GOODSTADT:                          12:10:17PM
20       Q   So during that period time?          12:10:17PM
21       A   2007, no. Paradiso was still employed 12:10:19PM
22   by the village, so I would be the deputy chief. 12:10:21PM
23       Q   When did the change happen between   12:10:25PM
24   deputy chief and chief?                   12:10:27PM
25       A   I believe he retired officially July 12:10:29PM
```

Page 400

```
                  GEORGE HESSE
 1
 2   of 2008.                        12:10:34PM
 3       Q   Did you need Paradiso's approval to   12:10:39PM
 4   terminate Mr. Bosetti's employment at that time? 12:10:42PM
 5       A   No.                              12:10:46PM
 6       Q   Did you get his approval to terminate 12:10:46PM
 7   Mr. Bosetti's employment at that time?    12:10:49PM
 8       MR. NOVIKOFF: Objection to form.         12:10:51PM
 9       A   No.                              12:10:52PM
10       Q   Did you discuss the decision with    12:10:52PM
11   Paradiso either before implementing it or after? 12:10:54PM
12       MR. NOVIKOFF: Objection to form.         12:10:57PM
13       A   No.                              12:10:58PM
14       Q   Sitting here today, you never         12:10:59PM
15   discussed that incident or decision to terminate 12:11:01PM
16   Rich Bosetti's employment with Chief Paradiso? 12:11:04PM
17       MR. NOVIKOFF: Objection to form.         12:11:08PM
18       A   No.                              12:11:09PM
19       Q   Now, there came a point in time where 12:11:35PM
20   there was a -- I believe you called it a    12:11:39PM
21   Halloween incident; is that correct?      12:11:40PM
22       A   Yes.                             12:11:41PM
23       Q   And that was -- just so we're clear,  12:11:42PM
24   that was the night of October 30th into the 12:11:44PM
25   morning of October 31, 2004?              12:11:47PM
```

Page 401

```
                  GEORGE HESSE
 1
 2       A   Yes.                             12:11:50PM
 3       Q   Where did the Halloween incident take 12:11:51PM
 4   place?                                   12:11:53PM
 5       A   At a bar called Houser's.        12:11:53PM
 6       Q   Where is Houser's located?           12:11:56PM
 7       A   It's on Bay Walk, and it's between    12:11:57PM
 8   Ocean Breeze walk and Evergreen Walk.     12:12:02PM
 9       Q   Had you ever been in Houser's prior to 12:12:07PM
10   the Halloween incident?                   12:12:09PM
11       A   Yes.                             12:12:10PM
12       Q   Had you ever been in there on        12:12:11PM
13   non-police business prior to the Halloween 12:12:14PM
14   incident?                                12:12:17PM
15       A   Yes.                             12:12:17PM
16       Q   Had you ever drank at Houser's prior  12:12:18PM
17   to the Halloween incident?                12:12:20PM
18       MR. NOVIKOFF: Objection to form.         12:12:23PM
19       On police business or not on police    12:12:24PM
20   business?                                12:12:26PM
21   BY MR. GOODSTADT:                          12:12:27PM
22       Q   Did you ever drink on police business 12:12:27PM
23   or while you were on duty at Houser's prior to 12:12:28PM
24   October 31st, 2004?                       12:12:29PM
25       A   Never.                           12:12:31PM
```

25 (Pages 398 to 401)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    Q   How about subsequent to October 31st,  12:12:32PM
3    2004?                                    12:12:33PM
4    A   Never.                    12:12:36PM
5    Q   Did you ever drink off duty in      12:12:36PM
6    Houser's prior to October 31, 2004?      12:12:38PM
7    A   Yes.                      12:12:40PM
8    Q   Did you ever drink off duty subsequent 12:12:42PM
9    to October 31, 2004?                    12:12:45PM
10   A   Yes.                      12:12:46PM
11   Q   Who was the owner of Houser's at the  12:12:47PM
12   time of the Halloween incident?          12:12:50PM
13   A   I believe there's partners involved in 12:12:51PM
14   the bar.  I think the major principals are Brian 12:12:53PM
15   O'Hanley and Alan Stillman.           12:12:58PM
16   Q   Did you know Mr. O'Hanley prior to   12:13:09PM
17   October 31, 2004?                        12:13:13PM
18   A   Yes.                      12:13:14PM
19   Q   Were you friendly with him?         12:13:16PM
20   A   Not really.               12:13:18PM
21   Q   Did you ever issue any summonses to  12:13:19PM
22   Houser's at any point in time?           12:13:21PM
23   A   Yes.                      12:13:23PM
24   Q   How many times?                     12:13:23PM
25   A   Maybe three times.        12:13:27PM

GEORGE HESSE

1
2    Q   Were they prior to Halloween '04 or  12:13:29PM
3    after?                                   12:13:31PM
4    A   Prior.                    12:13:31PM
5    Q   Are you friends with Mr. Stillman?  12:13:34PM
6    A   No.                       12:13:36PM
7    Q   Did you know him prior to Halloween  12:13:37PM
8    2004?                                    12:13:38PM
9    A   Yes.                      12:13:39PM
10   Q   Did you ever socialize with either of 12:13:42PM
11   them?                                    12:13:44PM
12   A   No.                       12:13:45PM
13   Q   Okay.  Where were you the night of the 12:13:45PM
14   Halloween incident?                      12:13:51PM
15   A   I was at a wedding.  I was in a      12:13:52PM
16   wedding party for a friend of mine.      12:13:54PM
17   Q   Where was that wedding?             12:13:58PM
18   A   Good question.  I believe the church 12:14:02PM
19   might have been in -- let me see, Bayport.  And 12:14:04PM
20   then the reception was Port Jeff somewhere.   12:14:10PM
21   Q   So you were in Suffolk County at the  12:14:18PM
22   time?                                    12:14:19PM
23   A   Yes.                      12:14:19PM
24   Q   Were you in Ocean Beach at all that  12:14:22PM
25   day or night, October 30th?             12:14:24PM

GEORGE HESSE

1
2    A   No.                       12:14:26PM
3    Q   And what was your title at that time? 12:14:33PM
4    A   Sergeant.                 12:14:37PM
5    Q   How did you first learn that there was 12:14:49PM
6    an incident on Halloween of 2004?        12:14:50PM
7    A   The early evening of Sunday, I       12:14:55PM
8    believe, the 31st, I received a call from Ed  12:14:58PM
9    Paradiso telling me that he had fired Gary   12:15:01PM
10   Bosetti for an incident that had taken place at 12:15:06PM
11   the bar, that Gary had gone berserk with a pool 12:15:09PM
12   cue and was hitting patrons of the bar.  12:15:14PM
13   Q   Do you recall anything else that was  12:15:18PM
14   discussed during that phone call?        12:15:19PM
15   A   I asked him what makes him think that 12:15:21PM
16   Gary went nuts and why, and he didn't know why. 12:15:23PM
17   Q   Did he tell you what made him think  12:15:30PM
18   that Gary went nuts?                     12:15:33PM
19   A   No.  He just said that he was involved 12:15:34PM
20   in a fight, that he believes he was involved in 12:15:36PM
21   a fight, and that he picked up a pool stick and 12:15:39PM
22   just started hitting people with it.     12:15:42PM
23   Q   Was anything else discussed during   12:15:45PM
24   that phone call?                         12:15:46PM
25   A   Yes.  He said that when I get in on  12:15:47PM

GEORGE HESSE

1
2    Monday morning, he wants me to investigate what 12:15:50PM
3    was going on.                  12:15:54PM
4    Q   Anything else that was discussed     12:16:01PM
5    during that call?                        12:16:02PM
6    A   Not that I recall.        12:16:04PM
7    Q   Did you speak with anybody else about 12:16:09PM
8    the Halloween incident prior to going in on that 12:16:11PM
9    Monday morning?                          12:16:15PM
10   A   Yes.                      12:16:16PM
11   Q   Who did you speak with?             12:16:16PM
12   A   Frank Fiorillo and Kevin Lamm.       12:16:17PM
13   Q   Okay.  When did you speak with --    12:16:20PM
14   well, strike that.                       12:16:23PM
15       Who did you speak with first, Frank  12:16:24PM
16   Fiorillo or Kevin Lamm?                  12:16:26PM
17   A   Kevin Lamm, I believe.    12:16:27PM
18   Q   And when did you speak with him?     12:16:28PM
19   A   I'm sure it was shortly after I spoke 12:16:30PM
20   to Ed Paradiso.  I was standing in Home Depot  12:16:32PM
21   parking lot in Bay Shore when I made contact   12:16:37PM
22   with Kevin.                    12:16:40PM
23   Q   It was on the phone you made contact  12:16:41PM
24   with him?                                12:16:44PM
25   A   Yeah.                     12:16:44PM

TSG Reporting - Worldwide   (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 406

GEORGE HESSE

1
2    Q    Did you reach out to him or did he    12:16:45PM
3    reach out to you?                            12:16:45PM
4    A    I called him.                    12:16:46PM
5    Q    Where was he located?            12:16:46PM
6    A    I have no idea.                   12:16:46PM
7    Q    Did you call him on his cell phone,    12:16:47PM
8    his house phone, station phone?            12:16:49PM
9    A    I believe it was his cell phone.    12:16:52PM
10    Q    Tell me everything you recall being    12:16:55PM
11    discussed in that conversation.            12:16:57PM
12    A    I basically remember asking him what    12:16:58PM
13    had happened and, you know, what made him think    12:17:00PM
14    that Gary went berserk with the pool stick, and    12:17:05PM
15    he kept saying he didn't know why.  He kept    12:17:08PM
16    saying, I don't know.                  12:17:12PM
17    Q    Well, did he tell you that Gary went    12:17:14PM
18    berserk with a pool stick or is that something    12:17:17PM
19    that Paradiso said?                       12:17:20PM
20    A    I might be conflicting on the two, but    12:17:22PM
21    he did say that Gary struck these individuals.    12:17:24PM
22    I don't know if he named them specifically, but    12:17:28PM
23    he hit somebody with the pool stick.      12:17:30PM
24    Q    When you say didn't know the name of    12:17:32PM
25    the individuals, the people who were struck or    12:17:35PM

Page 407

GEORGE HESSE

1
2    did he name Gary?                      12:17:38PM
3    A    The people that were struck.       12:17:40PM
4    Q    And what else did he say during that    12:17:42PM
5    call?                                  12:17:44PM
6    A    He just kept saying he didn't know    12:17:45PM
7    what had happened.                     12:17:46PM
8    Q    Did he give you any other details    12:17:49PM
9    about what had happened other than just telling    12:17:51PM
10    you that he had struck some people with a pool    12:18:03PM
11    cue?                                   12:18:06PM
12    A    That's it.  And he said the rest he    12:18:07PM
13    didn't know.                           12:18:09PM
14    Q    And what did you say during that    12:18:13PM
15    conversation?                          12:18:14PM
16    A    Okay.                            12:18:16PM
17    Q    How long did the conversation last?    12:18:17PM
18    A    A few minutes.  Not long.          12:18:19PM
19    Q    Did you take any notes of that    12:18:22PM
20    conversation?                          12:18:23PM
21    A    No.                              12:18:23PM
22    Q    Now, I believe you testified that you    12:18:27PM
23    spoke with Frank Fiorillo as well prior to    12:18:29PM
24    coming in that Monday?                  12:18:31PM
25    A    Yes.                             12:18:33PM

Page 408

GEORGE HESSE

1
2    Q    How long after the Lamm call was the    12:18:33PM
3    Fiorillo discussion?                   12:18:35PM
4    A    Within minutes.                   12:18:37PM
5    Q    Did you reach out to Fiorillo or did    12:18:38PM
6    he reach out to you?                   12:18:40PM
7    A    I believe I called him.           12:18:41PM
8    Q    Uh-huh.  What phone did you call him    12:18:43PM
9    on?                                    12:18:45PM
10    A    You know, I don't recall.         12:18:46PM
11    Q    Do you know where he was at the time?    12:18:49PM
12    A    No.                              12:18:51PM
13    Q    Was he on duty at the time?        12:18:52PM
14    A    When I called him, I don't believe so.    12:18:54PM
15    Q    Was Lamm on duty when you spoke with    12:18:56PM
16    him?                                   12:18:57PM
17    A    I don't believe so.               12:18:58PM
18    Q    Okay.  Tell me everything you recall    12:18:59PM
19    in your discussion with Fiorillo.        12:19:01PM
20    A    The phone conversation was pretty much    12:19:04PM
21    the same.  They just -- Fiorillo said that he    12:19:06PM
22    just didn't know what had happened.       12:19:10PM
23    Q    Did he give you any details?       12:19:17PM
24    A    Not that I recall specifically other    12:19:20PM
25    than he didn't know what had happened.    12:19:21PM

Page 409

GEORGE HESSE

1
2    Q    What did you say other than for what    12:19:23PM
3    happened?                              12:19:25PM
4    A    I really didn't say anything else.  I    12:19:27PM
5    just asked him what had happened.         12:19:29PM
6    Q    He said he didn't know?            12:19:32PM
7    A    Right.                           12:19:33PM
8    Q    Anything else discussed in that phone    12:19:33PM
9    call?                                  12:19:35PM
10    A    Not that I recall, no.            12:19:35PM
11    Q    Did you take any notes of that call?    12:19:37PM
12    A    No.                              12:19:38PM
13    Q    How long did that call last?       12:19:40PM
14    A    Few minutes.                     12:19:42PM
15    Q    So during those few minutes, you don't    12:19:46PM
16    recall anything other than for you saying what    12:19:48PM
17    happened and him saying I don't know what    12:19:50PM
18    happened?                              12:19:52PM
19        MR. CONNOLLY:  Objection to the form.    12:19:52PM
20    A    Pretty much.                     12:19:54PM
21    Q    Did you take any notes of that call?    12:19:57PM
22        MR. NOVIKOFF:  Objection.  Asked and    12:19:59PM
23    answered.                              12:20:00PM
24    A    No.                              12:20:00PM
25    Q    Did you speak with anybody else about    12:20:04PM

27 (Pages 406 to 409)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2     the Halloween incident prior to coming in on     12:20:05PM
3     Monday morning?                              12:20:09PM
4        A    No.                        12:20:10PM
5        Q    Did you have any other follow-up calls 12:20:11PM
6     with Paradiso prior to coming in Monday morning? 12:20:12PM
7        A    No.                        12:20:15PM
8        Q    Did you speak with Pat Cherry prior to 12:20:16PM
9     coming in Monday morning?                  12:20:19PM
10       A    I don't believe so, no.          12:20:20PM
11       Q    Did you speak with Gary Bosetti prior 12:20:21PM
12    to coming in Monday morning?                12:20:23PM
13       A    No.                        12:20:25PM
14       Q    Did you speak with Rich Bosetti prior 12:20:26PM
15    to coming in Monday morning?                12:20:27PM
16       A    No.                        12:20:29PM
17       Q    Did you have any communications or   12:20:39PM
18    correspondence with anybody about the Halloween 12:20:41PM
19    incident other than what you've testified to   12:20:43PM
20    prior to coming in that Monday morning?        12:20:45PM
21       A    Not that I recall, no.          12:20:47PM
22       Q    And then you came to work Monday? 12:20:53PM
23       A    Correct.                    12:20:55PM
24       Q    Okay.  What was the first thing you   12:20:55PM
25    did with respect to the Halloween incident when 12:20:57PM

GEORGE HESSE

1
2     you got to work that Monday?                 12:20:59PM
3        A    I read over the statements that were 12:21:01PM
4     taken by Officer Fiorillo, Lamm and Snyder and 12:21:04PM
5     the field report that was generated by Snyder. 12:21:07PM
6        Q    Okay.  Did you have a reaction to   12:21:15PM
7     statements in the field report?              12:21:17PM
8            MR. NOVIKOFF:  Objection.          12:21:20PM
9        A    A reaction?  No, I wouldn't say I had 12:21:21PM
10    a reaction.                           12:21:27PM
11       Q    What did you do after reviewing the   12:21:28PM
12    statements in the field report with respect to 12:21:30PM
13    the Halloween incident?                     12:21:32PM
14       A    I basically just sat there for a   12:21:33PM
15    little while, mulling them over, scratching my 12:21:35PM
16    head, reading them over and over again.  Just 12:21:38PM
17    waiting for something to pop.              12:21:41PM
18       Q    Did you speak with anybody else at   12:21:44PM
19    that time?                             12:21:47PM
20       A    That morning?  I received a call from 12:21:47PM
21    Chief Paradiso that morning.              12:21:51PM
22       Q    Do you know what time?             12:21:53PM
23       A    I'd like to say 8:30ish.         12:21:55PM
24       Q    What time did you get there?       12:21:58PM
25       A    I was there by 8.               12:21:59PM

GEORGE HESSE

1
2        Q    Okay.  So between 8 and 8:30, had you 12:22:01PM
3     already read the statements in the field report? 12:22:03PM
4        A    Yes.                        12:22:06PM
5        Q    And you were waiting for something to 12:22:07PM
6     pop during that period?                    12:22:09PM
7        A    Yeah.                      12:22:11PM
8        Q    Between 8 and 8:30, did you speak with 12:22:11PM
9     anybody prior to this call from Paradiso coming 12:22:14PM
10    in about the Halloween incident?            12:22:18PM
11       A    No.                        12:22:20PM
12       Q    What do you recall -- tell me the   12:22:24PM
13    details of your call with Paradiso that morning. 12:22:26PM
14       A    Well, he called me, and I basically 12:22:29PM
15    said to him that there's not really much to go 12:22:33PM
16    on yet, you know.  The field report really   12:22:36PM
17    didn't contain many names other than the three 12:22:38PM
18    individuals that were claiming they were hit   12:22:42PM
19    with a pool stick.                      12:22:45PM
20       Q    Anything else that was discussed   12:22:48PM
21    between you and Paradiso during that call?    12:22:50PM
22       A    Not that I recall.             12:22:52PM
23       Q    How long did that call last?       12:22:53PM
24       A    A few minutes.                12:22:55PM
25       Q    Do you recall anything he said during 12:22:58PM

GEORGE HESSE

1
2     that call?                             12:22:59PM
3        A    I don't recall exactly what he said, 12:23:00PM
4     no.                                 12:23:02PM
5        Q    How about generally, sum and       12:23:02PM
6     substance?                             12:23:04PM
7        A    He just said investigate it and see 12:23:05PM
8     what you can come up with.                 12:23:06PM
9        Q    Okay.  What was the next thing you did 12:23:08PM
10    with respect to the Halloween incident after   12:23:13PM
11    that 8:30 call with Paradiso?               12:23:15PM
12       A    I took a walk down to Houser's to see 12:23:17PM
13    if anybody was around.                   12:23:21PM
14       Q    Did you go with anybody?           12:23:23PM
15       A    No.                        12:23:25PM
16       Q    Who was on duty that morning?       12:23:28PM
17       A    I was alone.                 12:23:30PM
18       Q    And you took a walk down to Houser's. 12:23:40PM
19    What was the next thing you did?            12:23:42PM
20       A    I peered in the windows, looked around 12:23:44PM
21    to see if anybody was there.  Nobody was around, 12:23:46PM
22    and I just basically went back to the police   12:23:49PM
23    station.                              12:23:52PM
24       Q    Okay.  What was the next thing you did 12:23:56PM
25    with respect to Halloween?                 12:23:58PM

b929ea01-2563-408a-a7fc-adb794430749

Page 414

GEORGE HESSE

1
2    A    I sat in the station, and I think I    12:24:02PM
3    read the statements and everything again.  And    12:24:04PM
4    shortly thereafter, I believe it was around    12:24:08PM
5    9:30, I had received a fax from a gentlemen    12:24:11PM
6    named Bud Yager.    12:24:16PM
7    Q    Had you known Bud Yager prior to    12:24:24PM
8    receiving that fax?    12:24:28PM
9    A    Yeah.  Yes.    12:24:29PM
10   Q    Who was he?    12:24:29PM
11   A    He was a local resident that -- he    12:24:30PM
12   worked in the -- I think he and his wife ran the    12:24:33PM
13   movie theater.  He was a projectionist for the    12:24:37PM
14   movie theater.    12:24:41PM
15   Q    Had you spoken to Bud Yager about    12:24:43PM
16   Halloween prior to receiving the fax?    12:24:46PM
17   A    No.    12:24:48PM
18   Q    Had you known that Bud Yager was even    12:24:48PM
19   in the bar prior to receiving that fax?    12:24:50PM
20   A    No.    12:24:53PM
21   Q    And the fax came to the police    12:24:59PM
22   station?    12:25:00PM
23   A    Yes.    12:25:01PM
24   Q    And what was the sum and substance of    12:25:01PM
25   that fax?    12:25:03PM

Page 415

GEORGE HESSE

1
2    A    I guess he had heard that Gary Bosetti    12:25:03PM
3    was fired for the incident, and he felt that the    12:25:06PM
4    decision to fire Gary was incorrect.  He felt    12:25:11PM
5    that Gary Bosetti was a hero for saving his wife    12:25:13PM
6    from injury or possible injury from a man that    12:25:18PM
7    had attacked his wife.    12:25:22PM
8    Q    Prior to getting that fax, did you    12:25:24PM
9    know that his wife was at the bar?    12:25:26PM
10   A    No, I didn't.  No.    12:25:29PM
11   Q    What did you do with that fax other    12:25:41PM
12   than for reading it?  Did you disseminate it to    12:25:42PM
13   anybody else?    12:25:45PM
14   A    No.  I believe I called him --    12:25:46PM
15   actually, I tried to call him.  Turns out he's a    12:25:48PM
16   New York City fireman, and I tried to call him    12:25:52PM
17   at the number that was listed on the fax.  I got    12:25:55PM
18   no response.  And what I did is took a piece of    12:25:58PM
19   paper and I wrote, you know, Bud, it's George    12:26:01PM
20   from the police department.  I just received    12:26:04PM
21   your fax or something like that.  Call me at    12:26:06PM
22   this number.  And I faxed it to the number that    12:26:09PM
23   the fax came from.    12:26:12PM
24   Q    Did the fax go through?    12:26:15PM
25   A    Yeah, I think so.    12:26:17PM

Page 416

GEORGE HESSE

1
2    Q    Did you keep a copy of that responding    12:26:18PM
3    fax that you sent?    12:26:21PM
4    A    No, I don't think I did.    12:26:23PM
5    Q    What did you do with it?    12:26:24PM
6    A    I don't remember.    12:26:26PM
7    Q    What was the next thing that you did    12:26:32PM
8    with respect to Halloween after sending the fax    12:26:34PM
9    back to Bud Yager?    12:26:36PM
10   A    I believe I got a call back within 5    12:26:39PM
11   or 10 minutes from Bud Yager, and we just talked    12:26:43PM
12   about what he had sent me.    12:26:50PM
13   Q    Okay.  What did Bud Yager tell you in    12:26:51PM
14   that call?    12:26:53PM
15   A    Basically, he reiterated what was in    12:26:54PM
16   his letter to the police department; and I asked    12:26:57PM
17   if I could speak to his wife, if she would call    12:27:01PM
18   me.    12:27:04PM
19   Q    Did you take any notes of that call    12:27:09PM
20   with Bud Yager?    12:27:11PM
21   A    No.    12:27:12PM
22   Q    Why not?    12:27:12PM
23   A    I didn't.    12:27:14PM
24   Q    How come?    12:27:15PM
25        MR. CONNOLLY:  Objection.    12:27:21PM

Page 417

GEORGE HESSE

1
2    You can answer.    12:27:22PM
3    A    I didn't think it was necessary to    12:27:23PM
4    take notes.  I had his letter in front of me.    12:27:24PM
5    Q    Did you consider that call as part of    12:27:28PM
6    your investigation?    12:27:31PM
7    A    Yeah.    12:27:32PM
8    Q    Do you recall anything else that was    12:27:36PM
9    discussed in that phone call?    12:27:38PM
10   A    I wanted to speak to his wife.    12:27:41PM
11   Q    Did you know his wife?    12:27:44PM
12   A    Just vaguely.    12:27:46PM
13   Q    How did you know her?    12:27:48PM
14   A    Like I said, he and his wife ran the    12:27:50PM
15   movie theater, and I just knew them in passing.    12:27:53PM
16   Q    Did you ask Bud Yager whether he had    12:28:10PM
17   been drinking that night?    12:28:14PM
18   A    I don't recall.  I don't think so.    12:28:17PM
19   Q    Would that be important to know,    12:28:19PM
20   whether somebody who sent you a facsimile    12:28:20PM
21   reiterating a story that happened was drinking?    12:28:24PM
22        MR. NOVIKOFF:  Was what?    12:28:27PM
23        MR. GOODSTADT:  Whether it was    12:28:28PM
24   important to know whether a person who faxed    12:28:29PM
25   you a story reiterating what happened,    12:28:32PM

29  (Pages 414 to 417)

b929ea01-2563-408a-a7fc-adb794430749

Page 418

GEORGE HESSE

1
2    whether that person was drinking or not.   12:28:34PM
3         MR. NOVIKOFF:  Objection to form.    12:28:37PM
4         MR. CONNOLLY:  I'm assuming drinking   12:28:38PM
5    alcoholic beverages.                12:28:40PM
6         MR. GOODSTADT:  Yeah.            12:28:42PM
7         MR. CONNOLLY:  To the point of      12:28:43PM
8    intoxication.                       12:28:44PM
9         MR. GOODSTADT:  Just drinking at all.  12:28:44PM
10   A    It may have been important.       12:28:45PM
11   Q    Why didn't you ask him?          12:28:47PM
12   A    I don't know why I didn't ask him.   12:28:49PM
13   Q    In fact, if he had been drinking to   12:28:51PM
14   the point of intoxication, it could've affected  12:28:52PM
15   his ability to recollect facts, correct?    12:28:55PM
16        MR. NOVIKOFF:  Objection.        12:28:58PM
17   A    It may have.                     12:28:59PM
18   Q    Did you know Bud Yager mention anything about   12:29:01PM
19   Gary Bosetti using a pool cue?          12:29:05PM
20   A    No.  I don't recall.            12:29:09PM
21   Q    Did Bud Yager indicate that he      12:29:12PM
22   actually saw the altercation?           12:29:14PM
23   A    I believe he said that he did not see   12:29:16PM
24   the actual altercation in the beginning or the   12:29:18PM
25   beginning part of the altercation.       12:29:22PM

Page 419

GEORGE HESSE

1
2    Q    When you say the beginning part, what   12:29:24PM
3    part are you referring to?            12:29:26PM
4    A    The part where his wife was choked.   12:29:27PM
5    Q    Did you ask him where he got the      12:29:35PM
6    information from that his wife was being choked?  12:29:37PM
7         MR. NOVIKOFF:  Objection to form.    12:29:40PM
8    You mean to the extent it wasn't         12:29:41PM
9    contained in the statement?           12:29:42PM
10        MR. GOODSTADT:  He didn't personally   12:29:44PM
11   see it, so I want to know --          12:29:46PM
12        MR. NOVIKOFF:  Well, I'm saying to the   12:29:46PM
13   extent that that answer was not contained   12:29:47PM
14   within the statement.               12:29:49PM
15        MR. GOODSTADT:  Whether it is or     12:29:50PM
16   isn't, did you ask him the question.     12:29:51PM
17        MR. NOVIKOFF:  Fair enough.       12:29:54PM
18   A    He said his wife had told him what had   12:29:55PM
19   happened.                          12:29:57PM
20   Q    Did you ask whether his wife was      12:30:01PM
21   drinking?                          12:30:03PM
22   A    No, I don't think so.            12:30:05PM
23   Q    Sitting here today, do you know      12:30:07PM
24   whether Bud Yager was drinking that night?   12:30:08PM
25   A    I don't know.                   12:30:11PM

Page 420

GEORGE HESSE

1
2    Q    Do you know whether Jeanne Yager was   12:30:11PM
3    drinking that night?                12:30:14PM
4    A    I don't know.                   12:30:15PM
5    Q    Did he tell you he witnessed any part   12:30:15PM
6    of the altercation or the Halloween incident?   12:30:18PM
7    A    I don't recall.                 12:30:22PM
8    Q    Did you ask him whether he witnessed   12:30:25PM
9    any of it?                         12:30:27PM
10   A    I believe I did.                 12:30:28PM
11   Q    And you don't recall what his answer   12:30:29PM
12   was?                              12:30:31PM
13   A    No, I don't.                    12:30:31PM
14   Q    How many investigations had you      12:30:32PM
15   performed prior to investigating the Halloween   12:30:34PM
16   incident?                          12:30:37PM
17   A    I don't know.                   12:30:38PM
18   Q    Had you performed any investigations   12:30:40PM
19   prior to the Halloween incident?        12:30:42PM
20   A    Sure, I had.                    12:30:43PM
21   Q    Did you ever investigate any incident   12:30:44PM
22   dealing with an off-duty police officer?    12:30:47PM
23   A    I don't think so, no.            12:30:51PM
24   Q    Had you ever investigated a fight?    12:30:52PM
25   A    Yes.                           12:30:57PM

Page 421

GEORGE HESSE

1
2    Q    How many times?                  12:30:58PM
3    A    Hundreds.                       12:30:59PM
4    Q    Hundreds of times?               12:31:00PM
5    A    Hundreds of fights.             12:31:02PM
6    Q    Did you ever investigate any fights   12:31:04PM
7    not at the scene but afterwards?        12:31:07PM
8         MR. NOVIKOFF:  Objection to form.  I   12:31:10PM
9    have no idea what that question means.    12:31:11PM
10   BY MR. GOODSTADT:                     12:31:13PM
11   Q    Well, your investigation didn't happen  12:31:14PM
12   at the scene, right?                12:31:16PM
13   A    Yes.                           12:31:18PM
14   Q    It happened afterwards?          12:31:18PM
15   A    Right.                         12:31:18PM
16   Q    Do you understand the question I was   12:31:20PM
17   asking?                            12:31:21PM
18   A    I understand.                   12:31:21PM
19        MR. NOVIKOFF:  Well, I think that an   12:31:22PM
20   investigation can only take place after the   12:31:23PM
21   event occurred.                     12:31:26PM
22        MR. GOODSTADT:  Or at the scene.    12:31:28PM
23        MR. NOVIKOFF:  After the event      12:31:30PM
24   occurred.                          12:31:31PM
25        MR. GOODSTADT:  Right.           12:31:31PM

30  (Pages 418 to 421)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    MR. NOVIKOFF: Right. Okay.        12:31:31PM
3    A   Repeat your question.          12:31:31PM
4    Q   How many of those investigations     12:31:34PM
5    happened not at the scene but afterwards?  12:31:36PM
6    MR. NOVIKOFF: Objection.           12:31:40PM
7    A   I'd say a majority.            12:31:40PM
8    Q   A majority?                    12:31:42PM
9    A   Yeah.                          12:31:43PM
10   Q   Does Ocean Beach have an internal    12:31:43PM
11   affairs?                          12:31:45PM
12   A   No.                            12:31:48PM
13   Q   Does --                        12:31:49PM
14   MR. CONNOLLY: Department, I assume.   12:31:50PM
15   MR. GOODSTADT: Department, yeah.      12:31:51PM
16   Bureau or whatever it is.          12:31:52PM
17   BY MR. GOODSTADT:                  12:31:53PM
18   Q   Is there any -- does Suffolk County   12:31:54PM
19   internal affairs oversee Ocean Beach?  12:31:59PM
20   A   No.  Not that I'm aware of, no.   12:32:06PM
21   Q   Do you know whether there's ever been  12:32:09PM
22   an internal affairs investigation with respect  12:32:10PM
23   to any current or former officer in Ocean Beach?  12:32:12PM
24   A   With the internal affairs unit of   12:32:17PM
25   Suffolk County PD?  No.            12:32:20PM

GEORGE HESSE

1
2    Q   Or any internal affairs unit.     12:32:21PM
3    A   Not that I'm aware of.         12:32:24PM
4    Q   Did you call anybody at Suffolk County  12:32:26PM
5    Police with respect to the Halloween incident?  12:32:28PM
6    MR. NOVIKOFF: Objection to form.     12:32:32PM
7    A   No.                            12:32:33PM
8    Q   Did you involve Suffolk County Police  12:32:34PM
9    at all with respect to Halloween incident?  12:32:35PM
10   MR. NOVIKOFF: Objection. Foundation.  12:32:38PM
11   A   No.                            12:32:39PM
12   Q   Did you involve the D.A., County     12:32:40PM
13   District Attorney, with respect to the Halloween  12:32:43PM
14   incident?                         12:32:45PM
15   MR. NOVIKOFF: Objection.           12:32:46PM
16   A   Yes.                           12:32:46PM
17   Q   In what capacity?              12:32:47PM
18   A   At the completion of the        12:32:48PM
19   investigation, I turned all documents over to   12:32:49PM
20   the D.A.'s office, the prosecutor that's   12:32:51PM
21   assigned to the village for review.   12:32:54PM
22   Q   Who was the prosecutor assigned to the  12:32:56PM
23   village at the time?              12:32:59PM
24   A   It may -- you know, I think it was --  12:33:02PM
25   it's coming to me. Natalie -- no. Any other   12:33:09PM

GEORGE HESSE

1
2    day I can remember her name.  Mallory Sullivan.  12:33:15PM
3    Q   She was an investigator or is she an   12:33:29PM
4    assistant District Attorney?       12:33:30PM
5    A   She's an ADA. ADA.            12:33:32PM
6    You know what, I'm sorry. It may have  12:33:37PM
7    been Beth Grasso. Because they kind of work   12:33:39PM
8    back to back, but I think it was Beth Grasso.  12:33:45PM
9    Q   Were there any District Attorney     12:33:48PM
10   investigators involved in the Halloween  12:33:51PM
11   incident?                         12:33:53PM
12   MR. NOVIKOFF: Objection.           12:33:54PM
13   A   Not that I'm aware of.         12:33:55PM
14   MR. CONNOLLY: Andrew, after you      12:34:11PM
15   complete this line of questioning, it's   12:34:12PM
16   12:30.                            12:34:14PM
17   MR. NOVIKOFF: I don't think he's      12:34:17PM
18   completing this line of questioning for a   12:34:18PM
19   couple of hours.                   12:34:20PM
20   MR. GOODSTADT: Yeah. Let me just     12:34:21PM
21   finish on Mr. Yager, and then we'll take our   12:34:23PM
22   break, call the court and do what we have to   12:34:26PM
23   do.                               12:34:30PM
24   BY MR. GOODSTADT:                  12:34:38PM
25   Q   What was the next thing that happened  12:34:38PM

GEORGE HESSE

1
2    with respect to the Halloween incident after you  12:34:39PM
3    told Bud Yager that you'd like to speak with his  12:34:42PM
4    wife?                             12:34:46PM
5    A   I believe his wife had called me.   12:34:46PM
6    Q   Okay. And when was that?       12:34:48PM
7    A   That same day. The time frame,   12:34:50PM
8    though, from when I was talking to him until she  12:34:52PM
9    called may have been within an hour.   12:34:56PM
10   Q   Okay.                         12:34:58PM
11   MR. GOODSTADT: Mark this, please.    12:35:01PM
12   (Whereupon, Bates document 3180 was   12:35:03PM
13   marked as Plaintiff's Exhibit 14 for   12:35:03PM
14   identification, as of this date.)    12:35:03PM
15   MR. GOODSTADT: I've placed in front   12:35:54PM
16   of Mr. Hesse what's been marked as Hesse 14.  12:35:55PM
17   It's a one-page exhibit bearing Bates 3180.   12:35:57PM
18   (Handing.)                        12:36:01PM
19   BY MR. GOODSTADT:                  12:36:02PM
20   Q   Mr. Hesse, is this the fax that you   12:36:03PM
21   received or a copy of the fax that you received  12:36:04PM
22   from Bud Yager?                    12:36:06PM
23   A   It looks like it, yes.         12:36:08PM
24   Q   And this is the document you testified  12:36:09PM
25   to before that you had reviewed before calling  12:36:12PM

b929ea01-2563-408a-a7fc-adb794430749

Page 426

GEORGE HESSE

1
2    him?                                    12:36:15PM
3        A    Yes.                           12:36:15PM
4        Q    Or before faxing it over -- before    12:36:16PM
5    faxing a request for him to call you?    12:36:17PM
6        A    Yes.                           12:36:20PM
7        Q    And the -- if you look at the whole -- 12:36:21PM
8    just the first paragraph up until the last four  12:36:25PM
9    lines, do you see that?  Did you read that?    12:36:31PM
10       A    Which part?                    12:36:35PM
11       Q    The part that starts -- you know, on    12:36:36PM
12   the first line that says "on Saturday night,"    12:36:38PM
13   all the way through to four lines up from the    12:36:40PM
14   end of that first paragraph.            12:36:43PM
15       MR. CONNOLLY:  You mean second      12:36:46PM
16   sentence?                              12:36:47PM
17       MR. GOODSTADT:  All of the sentences, 12:36:48PM
18   starting on the second sentences.       12:36:50PM
19       A    That entire paragraph you're talking  12:36:54PM
20   about?                                 12:36:55PM
21       Q    Yeah, yeah.  Up until the sentence    12:36:56PM
22   that ends with the parenthetical that says "to    12:36:56PM
23   go to the ladies' room."                12:36:59PM
24       A    "Then she knocked on the door."  Okay. 12:37:04PM
25       Q    Okay.  You read that whole paragraph  12:37:07PM

Page 427

GEORGE HESSE

1
2    up until that line?                     12:37:11PM
3        A    You're talking about from "on     12:37:13PM
4    Saturday" to "she knocked on the door"?  Or you  12:37:14PM
5    want me to read the entire paragraph?   12:37:18PM
6        Q    Yeah, keep going.              12:37:20PM
7        A    Okay.                         12:37:37PM
8        Q    Now, up until that sentence that ends  12:37:38PM
9    "to go to the ladies' room" -- do you see that?  12:37:40PM
10   Bud Yager told you he did not witness any of    12:37:44PM
11   that, correct?                         12:37:46PM
12       MR. NOVIKOFF:  Objection.           12:37:48PM
13       A    Yeah, I believe that's what he said to  12:37:50PM
14   me.                                    12:37:51PM
15       Q    And then the next sentence that says,  12:37:52PM
16   "With that, this man lunged at my wife with his  12:37:53PM
17   hands on my wife's throat.  Jeanne was knocked  12:37:55PM
18   into the men's room door."               12:37:57PM
19       Do you see that?                    12:37:59PM
20       A    Yes.                          12:37:59PM
21       Q    Again, he did not -- he told you he    12:38:00PM
22   did not witness that, correct?          12:38:02PM
23       A    Right.                        12:38:03PM
24       Q    Then next sentence says, "Ocean Beach  12:38:04PM
25   Police Officer Gary Bosetti saw the situation    12:38:05PM

Page 428

GEORGE HESSE

1
2    and immediately took action."           12:38:12PM
3        Do you see that?                    12:38:13PM
4        A    Uh-huh.  Yes.                  12:38:14PM
5        Q    Did he tell you that he actually     12:38:14PM
6    saw -- did Bud Yager tell you he actually saw    12:38:14PM
7    Gary Bosetti take action?               12:38:17PM
8        A    No.                           12:38:18PM
9        Q    Did he tell you he didn't see Gary    12:38:18PM
10   Bosetti take action?                    12:38:21PM
11       A    I believe he said he didn't see the    12:38:22PM
12   incident.                              12:38:24PM
13       Q    And the next sentence says, "He       12:38:25PM
14   subdued this drunken individual."       12:38:27PM
15       Do you see that?                    12:38:29PM
16       A    Yes.                          12:38:29PM
17       Q    Did he tell you that he saw Gary      12:38:29PM
18   Bosetti subdue the drunken individual?  12:38:30PM
19       A    I believe he didn't.           12:38:33PM
20       Q    He told you that he did not see him?  12:38:33PM
21       A    He did not.                    12:38:36PM
22       Q    So is there any -- any facts that he's 12:38:37PM
23   stating about what happened the night before did 12:38:43PM
24   he actually see?                       12:38:48PM
25       A    I believe no.                  12:38:50PM

Page 429

GEORGE HESSE

1
2        MR. CONNOLLY:  Based upon what he told 12:38:51PM
3    you?                                   12:38:53PM
4        THE WITNESS:  Correct.              12:38:53PM
5    BY MR. GOODSTADT:                       12:38:55PM
6        Q    Did you ask him whether he saw Gary   12:38:55PM
7    Bosetti use a pool cue at any point?    12:38:59PM
8        A    I don't recall if I did or not.  12:39:01PM
9        Q    Did he mention anything about a pool  12:39:03PM
10   cue in your discussions?               12:39:04PM
11       A    I don't recall if he did or not.  12:39:06PM
12       Q    Did you ask Bud Yager why he hadn't   12:39:12PM
13   spoken to any of the police officers who showed  12:39:17PM
14   up that night?                         12:39:19PM
15       MR. NOVIKOFF:  Objection to form.    12:39:20PM
16   BY MR. GOODSTADT:                       12:39:21PM
17       Q    The on-duty police officers?      12:39:21PM
18       MR. NOVIKOFF:  Objection to form.    12:39:24PM
19       A    I don't recall if I asked him that or  12:39:25PM
20   not.                                   12:39:27PM
21       Q    Did you ask him why he didn't give a  12:39:27PM
22   statement that night to the police?     12:39:29PM
23       MR. NOVIKOFF:  Objection to form.    12:39:32PM
24       A    I don't recall if I did or not.  12:39:33PM
25       Q    Do you know whether he gave a       12:39:35PM

b929ea01-2563-408a-a7fc-adb794430749

Page 430

```
1              GEORGE HESSE
2    statement that night to the police?      12:39:37PM
3       A   I'm assuming no, because there's    12:39:39PM
4    though statement.                        12:39:41PM
5       Q   Now, I see that this memo is addressed 12:39:45PM
6    to Chief Paradiso.                        12:39:47PM
7          Do you see that?                   12:39:48PM
8       A   Yes.                  12:39:49PM
9       Q   Did you inform Chief Paradiso that    12:39:50PM
10   this memo came in?                        12:39:51PM
11      A   Yes.                  12:39:53PM
12      Q   When?                12:39:54PM
13      A   I don't recall when.            12:39:54PM
14      Q   Was it on that day?          12:39:55PM
15      A   Yes.                  12:39:56PM
16      Q   Was it before you faxed back to Bud   12:39:56PM
17   Yager, please call me?                   12:40:00PM
18      A   I think it was after.            12:40:02PM
19      Q   Do you recall Paradiso's response when 12:40:04PM
20   you told him this fax came in?            12:40:06PM
21      A   I don't remember his response.        12:40:08PM
22      Q   Did you tell Paradiso about it before 12:40:10PM
23   or after you actually spoke with Bud Yager?    12:40:12PM
24      A   It may have been after I spoke to Bud. 12:40:16PM
25      Q   Did you ask him how he heard that Rich 12:40:21PM
```

Page 431

```
1              GEORGE HESSE
2    Bosetti lost his job -- strike that.         12:40:23PM
3          Did you ask him how he learned that   12:40:26PM
4    Gary Bosetti lost his job?                12:40:29PM
5          MR. NOVIKOFF:  You're talking about   12:40:32PM
6    Bud Yager now?                          12:40:33PM
7          MR. GOODSTADT:  Bud Yeager.          12:40:34PM
8          MR. NOVIKOFF:  Okay.               12:40:35PM
9       A   Now, I don't recall if I did.       12:40:35PM
10      Q   Did you tell you how he learned that? 12:40:36PM
11      A   I don't recall.             12:40:40PM
12      Q   Do you know whether anyone asked him  12:40:41PM
13   to send in a statement?                  12:40:43PM
14      A   No.                  12:40:46PM
15      Q   Did you take any notes of your phone  12:40:47PM
16   call with Yager?                        12:40:49PM
17         MR. CONNOLLY:  Objection. Asked and  12:40:50PM
18   answered.                              12:40:51PM
19         MR. NOVIKOFF:  Objection. Asked and  12:40:52PM
20   answered.                              12:40:53PM
21      A   No.                  12:40:54PM
22      Q   You didn't?              12:40:54PM
23         How long did that call last?       12:40:56PM
24         MR. CONNOLLY:  Objection. Asked and  12:40:57PM
25   answered.                              12:40:58PM
```

Page 432

```
1              GEORGE HESSE
2    But you can answer.                12:40:58PM
3       A   It was several minutes.  I don't    12:41:00PM
4    really recall how long it was.            12:41:01PM
5       Q   Did you ask him what he did after   12:41:15PM
6    leaving Houser's that night?             12:41:18PM
7       A   You know, I don't recall if I did or  12:41:20PM
8    not.                  12:41:22PM
9       Q   Did he tell you what he did after he  12:41:22PM
10   left Houser's?                        12:41:25PM
11      A   I don't recall.             12:41:26PM
12      Q   Did you credit his statement as part  12:41:32PM
13   of your investigation?                  12:41:34PM
14      A   Did I credit?             12:41:36PM
15      Q   Yeah.  Did you believe the statement? 12:41:38PM
16      A   I believed it, yes.           12:41:41PM
17      Q   Did you give it any weight in terms of 12:41:43PM
18   reaching a conclusion to your investigation?   12:41:45PM
19         MR. NOVIKOFF:  Objection to form.    12:41:48PM
20      A   It gave me a way to go.          12:41:49PM
21      Q   What do you mean by that?      12:41:51PM
22      A   It gave me a lead on what may have    12:41:52PM
23   transpired that night to precipitate what    12:41:55PM
24   everybody was claiming about Gary Bosetti.     12:42:00PM
25      Q   And other than for that one phone    12:42:05PM
```

Page 433

```
1              GEORGE HESSE
2    call, did you ever speak with Bud Yager on any  12:42:06PM
3    other occasion about Halloween?           12:42:09PM
4          MR. NOVIKOFF:  About the Halloween   12:42:11PM
5    incident.                              12:42:12PM
6          MR. GOODSTADT:  Yeah.             12:42:13PM
7          MR. NOVIKOFF:  Okay.               12:42:16PM
8       A   You know, I don't believe I spoke to  12:42:17PM
9    him again after that day.                12:42:18PM
10      Q   About anything?             12:42:23PM
11      A   Yeah, I don't believe so.         12:42:25PM
12      Q   As the investigator -- strike that.  12:42:27PM
13         Were you the only investigator at this 12:42:30PM
14   time on the case?                       12:42:31PM
15      A   At this point, yes.          12:42:32PM
16      Q   Okay.  As the sole investigator, how  12:42:33PM
17   come you didn't take any notes with respect to  12:42:36PM
18   your interaction with Mr. Yager?          12:42:38PM
19         MR. NOVIKOFF:  Objection to form.  I  12:42:41PM
20   think it's asked and answered, but form as   12:42:42PM
21   well.                  12:42:44PM
22      A   Yeah, like I said, I didn't think it  12:42:45PM
23   was necessary because all I would've been doing 12:42:46PM
24   was rewriting basically what he had already sent 12:42:49PM
25   me.                  12:42:53PM
```

33  (Pages 430 to 433)

b929ea01-2563-408a-a7fc-adb794430749

Page 434

GEORGE HESSE

1
2   MR. GOODSTADT: This would be a good   12:42:53PM
3   time to take that break.   12:42:54PM
4   MR. CONNOLLY: Sure.   12:42:55PM
5   MR. NOVIKOFF: Okay.   12:42:56PM
6   THE VIDEOGRAPHER: The time is 12:44.   12:42:57PM
7   We're off the record.   12:42:59PM
8   (Whereupon, a lunch break was taken.)   12:43:00PM
9   THE VIDEOGRAPHER: The time is 1:47.   1:45:52PM
10   We're on the record.   1:45:52PM
11   BY MR. GOODSTADT:   1:45:55PM
12   Q   Mr. Hesse, before our break, you had   1:45:56PM
13   mentioned that on the Sunday before going back   1:45:59PM
14   to the beach on Monday after Halloween, that you   1:46:02PM
15   reached out to Fiorillo, you spoke with him, and   1:46:07PM
16   you reached out to Lamm and spoke with him,   1:46:09PM
17   correct?   1:46:13PM
18   A   Correct.   1:46:13PM
19   Q   Okay. Did you reach out to Snyder?   1:46:13PM
20   A   I believe I tried. I was unable to   1:46:15PM
21   get into contact with him.   1:46:20PM
22   Q   So did you speak with him at all   1:46:21PM
23   before coming back to the beach that Monday?   1:46:23PM
24   A   I don't recall.   1:46:26PM
25   Q   You don't recall one way or the other?   1:46:26PM

Page 435

GEORGE HESSE

1
2   A   No.   1:46:28PM
3   Q   Okay. And I just point you back to   1:46:29PM
4   Hesse 14. Do you see that there's an indicated   1:46:32PM
5   copy to Natalie Rogers?   1:46:36PM
6      Do you see that?   1:46:37PM
7   A   Yes, I do.   1:46:38PM
8   Q   Do you know whether she ever received   1:46:39PM
9   a copy of this memo?   1:46:41PM
10   A   I do not.   1:46:43PM
11   Q   Did you ever speak to her about this   1:46:43PM
12   memo?   1:46:45PM
13   A   I don't think, no.   1:46:46PM
14   Q   Did you ever speak with Natalie Rogers   1:46:47PM
15   at all about the Halloween incident?   1:46:49PM
16   A   I don't recall.   1:46:52PM
17   Q   So you don't recall one way or the   1:46:53PM
18   other?   1:46:54PM
19   A   No.   1:46:55PM
20   Q   Did you ever speak with Joe Loeffler   1:46:55PM
21   about the Halloween incident?   1:46:57PM
22   A   Yes.   1:46:59PM
23   Q   When did you speak with him about   1:47:01PM
24   Halloween?   1:47:02PM
25   A   I think it was a week after.   1:47:05PM

Page 436

GEORGE HESSE

1
2   Q   Was that on the phone or in person?   1:47:09PM
3   A   I believe it was in person.   1:47:11PM
4   Q   Where were you located?   1:47:13PM
5   A   In the police station.   1:47:15PM
6   Q   Was he there specifically to speak   1:47:19PM
7   about the Halloween incident or was he there on   1:47:21PM
8   some other business?   1:47:24PM
9      MR. NOVIKOFF: Objection.   1:47:26PM
10   A   I don't recall.   1:47:27PM
11   Q   Tell me everything you recall   1:47:29PM
12   discussing with Joe Loeffler during that   1:47:30PM
13   conversation.   1:47:33PM
14   A   I think I just pretty much told him   1:47:33PM
15   the story of what was going on with the incident   1:47:36PM
16   and basically what I had found out, and that was   1:47:40PM
17   pretty much it. He just said good job, pretty   1:47:46PM
18   much, and walked out.   1:47:49PM
19   Q   Did he tell you that he was at the   1:47:50PM
20   police station that night?   1:47:52PM
21   A   You know, I don't recall if he did.   1:47:54PM
22   Q   Did you ever discuss with him the fact   1:47:56PM
23   that he was at the police station that night?   1:47:58PM
24   A   Yes.   1:48:00PM
25   Q   When did you discuss that with him?   1:48:01PM

Page 437

GEORGE HESSE

1
2   A   Probably -- it was within the last two   1:48:08PM
3   years at some point. I don't know specifically   1:48:09PM
4   with the dates.   1:48:11PM
5   Q   After you were served with the   1:48:12PM
6   complaint in this lawsuit or before?   1:48:14PM
7   A   I think so, yes.   1:48:16PM
8   Q   What did he say about that?   1:48:17PM
9   A   He said that he was in the police   1:48:19PM
10   station. I guess he was running rescue that   1:48:20PM
11   night and he was the ambulance driver, and he   1:48:23PM
12   was inside the police station at some point.   1:48:25PM
13   Q   Did he tell you anything he witnessed   1:48:28PM
14   inside the police station or anything that was   1:48:29PM
15   said?   1:48:31PM
16   A   Not that I recall, no.   1:48:32PM
17   Q   What did he say to you about his   1:48:33PM
18   experience being at the police station that   1:48:35PM
19   night?   1:48:36PM
20   A   He basically just said he walked in   1:48:37PM
21   and dropped off some bags, and he went back out   1:48:39PM
22   into the rig to watch the rig, just to watch the   1:48:42PM
23   ambulance. He's the driver, so...   1:48:47PM
24   Q   Did he discuss with you at all the   1:48:49PM
25   injuries that were sustained by anybody who was   1:48:51PM

34 (Pages 434 to 437)

b929ea01-2563-408a-a7fc-adb794430749

Page 438

GEORGE HESSE

1
2  in the altercation?                          1:48:53PM
3      MR. NOVIKOFF: Objection. Form.           1:48:55PM
4      A  Not that I recall.                     1:48:56PM
5      Q  During the break that we just took,    1:49:04PM
6  did you speak with Ken Novikoff at all?      1:49:06PM
7      A  I think so, yeah.                       1:49:10PM
8      Q  What was discussed between you and     1:49:11PM
9  Mr. Novikoff.                                1:49:13PM
10     A  I don't recall, to tell you the truth. 1:49:15PM
11  Small talk.                                  1:49:17PM
12     Q  You don't recall anything that was     1:49:18PM
13  discussed in small talk?                     1:49:20PM
14     A  No.                                     1:49:21PM
15     Q  So you don't recall a conversation     1:49:22PM
16  that happened between 10 and 40 minutes ago?  1:49:23PM
17     A  No. I think we were just talking        1:49:28PM
18  about allowing you more time and calling the 1:49:30PM
19  judge. Most of the conversation was between  1:49:33PM
20  counsel.                                      1:49:34PM
21     Q  Anything else you recall of a          1:49:37PM
22  discussion between you and Mr. Novikoff?      1:49:39PM
23     A  No.                                     1:49:43PM
24     Q  So after you spoke with Bud Yager, you 1:49:47PM
25  testified that his wife called back an hour  1:49:52PM

Page 439

GEORGE HESSE

1
2  later, approximately; is that correct?       1:49:55PM
3      A  I think it was within an hour.         1:49:56PM
4      Q  Okay. Did you do anything with         1:49:58PM
5  respect to the Halloween incident between the  1:49:59PM
6  time you hung up with Bud Yager and the time  1:50:01PM
7  that Jeanne Yager called?                     1:50:04PM
8      A  I believe I said I had walked down      1:50:05PM
9  to -- no, no, that was before Bud's fax. No. I 1:50:07PM
10  think I just -- I was waiting for her phone   1:50:10PM
11  call.                                         1:50:15PM
12     Q  Did you reach out to Snyder at all     1:50:19PM
13  during that period?                           1:50:21PM
14     A  No.                                     1:50:22PM
15     Q  When was the first time that another   1:50:24PM
16  officer came on duty that morning?            1:50:26PM
17     A  I don't believe one did.                1:50:28PM
18     Q  And then at some point Jeanne Yager    1:50:36PM
19  called you?                                   1:50:39PM
20     A  Yes.                                    1:50:39PM
21     Q  Tell me everything you recall during   1:50:40PM
22  that phone conversation.                      1:50:41PM
23     A  I basically just told her to tell me   1:50:43PM
24  what her story was, what happened. She        1:50:46PM
25  explained to me what had occurred, and I asked 1:50:50PM

Page 440

GEORGE HESSE

1
2  her to put that down in writing and fax it to me 1:50:54PM
3  if she could.                                 1:50:56PM
4      Q  Did you take any notes of what she     1:51:01PM
5  explained to you occurred?                     1:51:04PM
6      A  No.                                    1:51:05PM
7      Q  How long was the call?                 1:51:05PM
8      A  It was over the course of several      1:51:07PM
9  minutes.                                      1:51:09PM
10     Q  Just so I'm clear, you're the sole     1:51:11PM
11  investigator on the case, you have a phone   1:51:14PM
12  conversation with an alleged victim of a      1:51:17PM
13  choking, and you didn't take any notes; is that 1:51:20PM
14  correct?                                      1:51:22PM
15     A  That's correct.                         1:51:23PM
16     MR. CONNOLLY: Objection.                  1:51:24PM
17  BY MR. GOODSTADT:                            1:51:25PM
18     Q  What did she tell you on that call?    1:51:25PM
19     A  She basically said that she was        1:51:29PM
20  standing first in line for the women's bathroom. 1:51:30PM
21  That she was waiting for a long time, several 1:51:35PM
22  minutes, maybe 15 minutes. She kept knocking on 1:51:37PM
23  the door with no response. A line had developed 1:51:41PM
24  behind her of other women waiting to go to the 1:51:44PM
25  bathroom. Eventually, the door flew open. A  1:51:47PM

Page 441

GEORGE HESSE

1
2  young lady came out and said something about  1:51:52PM
3  killing you, you old bitch or something like  1:51:54PM
4  that, to that effect, or you should die,      1:51:57PM
5  something like that. And then apparently a    1:52:01PM
6  boyfriend, a friend of this young female, had 1:52:05PM
7  come out of the bathroom and didn't say       1:52:08PM
8  anything, was holding onto the door, I believe, 1:52:12PM
9  and then lunged at Jeanne, grabbed her by the 1:52:14PM
10  throat and threw her into the wall or door of 1:52:18PM
11  the men's room and was banging her off the wall. 1:52:21PM
12     Then she said that Gary Bosetti came      1:52:25PM
13  over, grabbed the person off of her, put him  1:52:27PM
14  down on the floor and stopped him from choking 1:52:31PM
15  her.                                          1:52:34PM
16     Q  Did she actually see Gary Bosetti put  1:52:35PM
17  him down on the floor?                         1:52:37PM
18     MR. NOVIKOFF: Objection.                  1:52:39PM
19     A  I don't know. I'd have to read her     1:52:40PM
20  statement again.                              1:52:42PM
21     Q  Well, sitting here, do you recall one  1:52:42PM
22  way or the other whether she told you that?   1:52:44PM
23     A  No, I don't recall.                     1:52:46PM
24     Q  Did you ask her whether she was        1:52:47PM
25  drinking that night?                           1:52:49PM

35 (Pages 438 to 441)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    A    No, I don't recall if I did or not.    1:52:50PM
3    Q    Why wouldn't you ask her that?    1:52:52PM
4    A    I didn't think it was relevant.    1:52:55PM
5    Q    You don't think it was relevant that    1:52:57PM
6    somebody is giving you an eyewitness statement,    1:52:59PM
7    you don't think it was relevant whether that    1:53:01PM
8    person had been drinking during the incident    1:53:03PM
9    that they were giving you an eyewitness    1:53:05PM
10   statement about?    1:53:07PM
11          MR. CONNOLLY:  Objection.  Asked and    1:53:07PM
12   answered.    1:53:08PM
13   A    I didn't ask her that.    1:53:09PM
14   Q    I just want to be -- make sure I'm    1:53:10PM
15   clear that's your answer there?    1:53:10PM
16          MR. NOVIKOFF:  Oh, I think he's been    1:53:12PM
17   crystal clear three times already.    1:53:12PM
18          MR. CONNOLLY:  Objection.    1:53:14PM
19   BY MR. GOODSTADT:    1:53:14PM
20   Q    You didn't think it was relevant; is    1:53:14PM
21   that correct?    1:53:16PM
22   A    I did not ask her.    1:53:16PM
23          MR. CONNOLLY:  Objection.    1:53:17PM
24          MR. NOVIKOFF:  Objection.    1:53:17PM
25

GEORGE HESSE

1
2    BY MR. GOODSTADT:    1:53:17PM
3    Q    You didn't think it was relevant?  You    1:53:18PM
4    can answer.    1:53:18PM
5          MR. NOVIKOFF:  Objection.    1:53:18PM
6          You can answer.    1:53:18PM
7    A    I didn't think it was relevant, I    1:53:19PM
8    guess.    1:53:20PM
9    Q    And similar to the question I asked    1:53:22PM
10   you about her husband, do you think it could've    1:53:24PM
11   been -- that could have affected -- whether she    1:53:28PM
12   was drinking alcohol or not may have affected    1:53:29PM
13   her ability to recall events?    1:53:32PM
14          MR. CONNOLLY:  Objection to form.    1:53:34PM
15          You can answer.    1:53:34PM
16   A    It may have.    1:53:35PM
17   Q    Did she eventually fax something to    1:53:41PM
18   you?    1:53:43PM
19   A    Yes.    1:53:44PM
20   Q    How long after you spoke with her did    1:53:45PM
21   she fax something to you?    1:53:47PM
22   A    I don't recall.    1:53:48PM
23   Q    Was it handwritten or typed, what she    1:53:49PM
24   faxed to you?    1:53:52PM
25   A    Handwritten.    1:53:53PM

GEORGE HESSE

1
2    Q    Was it addressed to you, the fax?    1:53:54PM
3    A    You know, I don't recall if it was or    1:53:55PM
4    not.    1:53:57PM
5    Q    Do you recall anything else that was    1:54:03PM
6    discussed in the phone conversation that you had    1:54:04PM
7    with Jeanne Yager that you testified to before?    1:54:08PM
8    A    I don't recall at this time.    1:54:11PM
9    Q    Is there anything you can think of    1:54:13PM
10   that would refresh your recollection?    1:54:15PM
11   A    No.    1:54:16PM
12          (Whereupon, Bates document 3181-3182    1:54:29PM
13   was marked as Plaintiff's Exhibit 15 for    1:54:29PM
14   identification, as of this date.)    1:54:29PM
15   BY MR. GOODSTADT:    1:54:48PM
16   Q    Did Jeanne Yager tell you whether she    1:54:51PM
17   was in the bar when the on-duty officers    1:54:54PM
18   arrived?    1:54:56PM
19   A    I don't recall.  I'd have to read her    1:55:00PM
20   statement.    1:55:03PM
21   Q    Did you ask her whether she was at the    1:55:03PM
22   bar when the on-duty officers arrived?    1:55:05PM
23   A    You know, I believe I did.    1:55:10PM
24   Q    Do you recall what she said?    1:55:12PM
25   A    I believe -- I remember her saying    1:55:15PM

GEORGE HESSE

1
2    that she was standing by the bathrooms when the    1:55:17PM
3    police officers walked through the bar with one    1:55:20PM
4    of the individuals in the altercation, but    1:55:23PM
5    that's all I recall about that.    1:55:27PM
6    Q    Did you ask her why she didn't give a    1:55:29PM
7    statement to the police officers that night?    1:55:31PM
8          MR. NOVIKOFF:  Objection.  Form.    1:55:34PM
9    A    Yeah, later on.  I believe she    1:55:35PM
10   attempted to walk to the police station; but    1:55:37PM
11   there was ambulance there, and she didn't want    1:55:39PM
12   to interfere.  She felt that she didn't want to    1:55:41PM
13   bother anybody.    1:55:45PM
14   Q    She told you that?    1:55:47PM
15   A    That's -- yeah, that's what I recall.    1:55:48PM
16   Q    When did she tell you that?    1:55:51PM
17   A    I don't recall when, but I remember    1:55:52PM
18   her saying something to that effect.    1:55:54PM
19   Q    Was it during that phone conversation?    1:55:55PM
20   A    No.  No, it was after.    1:55:57PM
21   Q    How many times after that first phone    1:55:59PM
22   conversation did you speak with Jeanne Yager    1:56:01PM
23   about the Halloween incident?    1:56:03PM
24   A    Over the course of four and a half    1:56:05PM
25   years, I don't know, 20 times.    1:56:08PM

b929ea01-2563-408a-a7fc-adb794430749

Page 446

GEORGE HESSE

1
2     Q    And when was the first time she told    1:56:14PM
3     you that she didn't want to bother anybody?    1:56:16PM
4     A    It may have been at her house when    1:56:19PM
5     John Cherry and myself went there.    1:56:21PM
6     Q    Did she tell you who she tried to go    1:56:36PM
7     to the police station with, if anyone?    1:56:38PM
8     A    Yeah, I believe Rich Bosetti.    1:56:41PM
9     Q    She tried to go with Rich Bosetti?    1:56:43PM
10    A    Yes.    1:56:45PM
11    Q    Did she tell you where she went when    1:56:46PM
12    she didn't want to bother anyone and stop into    1:56:49PM
13    the police station?    1:56:51PM
14    A    Well, I think her and her husband had    1:56:52PM
15    walked down to CJ's.  And Richie, I believe,    1:56:54PM
16    approached them and said, you know, you should    1:56:57PM
17    really go tell the officers what had happened.    1:57:00PM
18    And they attempted to do so, and then they saw    1:57:02PM
19    the ambulance; and I think they just said, well,    1:57:06PM
20    we'll do it later or something.  I'm    1:57:08PM
21    speculating, but --    1:57:10PM
22        MR. CONNOLLY:  Don't speculate.    1:57:11PM
23        THE WITNESS:  Sorry.    1:57:13PM
24        MR. CONNOLLY:  Just testify upon your    1:57:13PM
25    knowledge.    1:57:14PM

Page 447

GEORGE HESSE

1
2     A    Yeah, they just turned around.    1:57:15PM
3     Q    Did she tell you how long after the    1:57:16PM
4     alleged choke that she tried to go to the police    1:57:19PM
5     station?    1:57:22PM
6     A    No, I don't recall.    1:57:22PM
7     Q    Did you ask her whether she had any    1:57:23PM
8     drinks in CJ's?    1:57:25PM
9     A    No, I don't recall.    1:57:28PM
10    Q    Did you ask her why she didn't try to    1:57:43PM
11    give a statement to the officers when she was in    1:57:46PM
12    the bar and the on-duty officers walked through    1:57:48PM
13    the bar?    1:57:51PM
14    A    Yeah.  At some point, Rich Bosetti had    1:57:53PM
15    gone outside to make contact with the three    1:57:55PM
16    police officers that were on duty, Fiorillo,    1:57:58PM
17    Lamm and Snyder, to address them and say that    1:58:01PM
18    Jean Yager was choked inside the bar, that they    1:58:03PM
19    may want to talk to them.  And I believe the    1:58:07PM
20    response was no one was choked.  I could never    1:58:09PM
21    ascertain who said it.  Tom Snyder denied it,    1:58:15PM
22    and Chris -- they said that Christopher    1:58:18PM
23    Shallick, who was one of the individuals    1:58:23PM
24    involved in this incident, said it.    1:58:25PM
25    Q    Said what?    1:58:27PM

Page 448

GEORGE HESSE

1
2     A    That no one was choked.    1:58:28PM
3     Q    Okay.    1:58:30PM
4     A    But I was told that Snyder said it.    1:58:30PM
5     Q    But just -- I guess I didn't get what    1:58:32PM
6     you meant.  Richard Bosetti went out and tried    1:58:35PM
7     to make contact with the on-duty officers?  How    1:58:40PM
8     do you know that?    1:58:43PM
9     A    Because that's what I was told.    1:58:44PM
10    Q    By who?    1:58:46PM
11    A    By the three of them at some point and    1:58:47PM
12    by Rich Bosetti.    1:58:49PM
13    Q    Do you know if Rich Bosetti was    1:58:51PM
14    drinking that night?    1:58:53PM
15    A    I don't know for sure.    1:58:53PM
16    Q    Did you ask him?    1:58:55PM
17    A    I don't recall.    1:58:56PM
18    Q    Okay.  And so Rich Bosetti tried to    1:58:56PM
19    make contact with them.  Did he make contact, to    1:58:59PM
20    your understanding?    1:59:02PM
21    A    Yes.    1:59:03PM
22    Q    How did you know he made contact?    1:59:03PM
23    A    I was told.    1:59:05PM
24    Q    By who?    1:59:06PM
25    A    By Officer Fiorillo and Gary Bos- --    1:59:07PM

Page 449

GEORGE HESSE

1
2     Rich Bosetti.    1:59:09PM
3     Q    Okay.  And what was the conversation    1:59:10PM
4     that was had outside the bar?    1:59:12PM
5     A    I believe Frank had said that we're    1:59:14PM
6     handling it, we'll take care of it.  And then    1:59:19PM
7     Richie had spoke to Snyder and tried to explain    1:59:23PM
8     to him that someone was choked.  I don't know if    1:59:26PM
9     he specifically used her name or not.  And the    1:59:30PM
10    term -- and, you know, someone blurted out, no    1:59:33PM
11    one was choked.  Now, Rich Bosetti says it was    1:59:37PM
12    Snyder that said it; and Snyder denies it, and    1:59:40PM
13    Snyder thinks that Christopher Shallick may have    1:59:43PM
14    said it.    1:59:47PM
15    Q    And what's the basis of your belief    1:59:47PM
16    that Snyder denied it and said Christopher    1:59:49PM
17    Shallick said it?    1:59:52PM
18    A    That's what they had told me.    1:59:53PM
19    Q    Who told you that?    1:59:56PM
20    A    I believe Snyder told me that.    1:59:57PM
21    Q    Did Snyder tell you that Rich    1:59:58PM
22    Bosetti -- that Snyder asked Rich Bosetti who    1:59:59PM
23    was choked?    2:00:00PM
24    A    I don't remember specifically.    2:00:01PM
25    Q    Did Rich Bosetti tell you that he    2:00:02PM

b929ea01-2563-408a-a7fc-adb794430749

Page 450

GEORGE HESSE                              2:00:05PM

1        GEORGE HESSE
2    identified who was choked?              2:00:05PM
3      A   I don't remember specifically.    2:00:07PM
4      Q   Now, if you look at Hesse 15, is this  2:00:12PM
5    the facsimile that came in?             2:00:15PM
6      A   Yes.                    2:00:19PM
7      Q   If you look at the top corner, it says 2:00:19PM
8    10-29-04.                    2:00:22PM
9        Do you see that?              2:00:23PM
10     A   Right.                  2:00:24PM
11     Q   That date is not accurate, is it?     2:00:25PM
12     A   No, that can't be.            2:00:28PM
13     Q   That's before the incident actually   2:00:29PM
14   happened, right?                2:00:30PM
15     A   Yes.                    2:00:31PM
16     Q   Do you recall what time it actually   2:00:32PM
17   came in?                     2:00:33PM
18     A   I don't recall, no.           2:00:34PM
19       MR. NOVIKOFF:  Well, there is that   2:00:34PM
20   underlining line that appears --        2:00:36PM
21       THE WITNESS:  Oh, there is, yes.    2:00:38PM
22       MR. NOVIKOFF: -- it says 10/3. Can't 2:00:38PM
23   really make out the next space.         2:00:40PM
24     A   2964 and a 1951.              2:00:44PM
25       MR. GOODSTADT:  Either way, it doesn't 2:00:47PM

Page 451

1        GEORGE HESSE
2    make sense, because that Monday was after 2:00:48PM
3    10-30 or 31.                  2:00:50PM
4        MR. NOVIKOFF:  Maybe the machine was 2:00:52PM
5    broken.                     2:00:53PM
6    BY MR. GOODSTADT:                2:00:55PM
7      Q   Do you know why she wrote it to Ed   2:00:55PM
8    Paradiso instead of you?            2:01:00PM
9      A   I don't know.              2:01:02PM
10     Q   Did you ever ask her?          2:01:02PM
11     A   No.                    2:01:03PM
12     Q   So this fax was in response to your   2:01:07PM
13   asking her to fax something in?         2:01:09PM
14     A   Yes.                    2:01:11PM
15     Q   Did she mention who else she was with 2:01:19PM
16   on that line?                  2:01:21PM
17     A   I believe she did, but she didn't know 2:01:26PM
18   who they were by name.             2:01:27PM
19     Q   So when you spoke to her, she told you 2:01:31PM
20   she didn't know who she was with by name? 2:01:33PM
21     A   She wasn't with anybody in particular, 2:01:36PM
22   just other women waiting on line.       2:01:38PM
23     Q   Okay. That's what she told you?    2:01:40PM
24     A   That's what I recall.          2:01:44PM
25     Q   Do you know whether she sought medical 2:01:50PM

Page 452

1        GEORGE HESSE
2    attention that night?              2:01:53PM
3      A   Repeat that.               2:01:56PM
4      Q   Did she -- did she indicate whether  2:01:58PM
5    she sought medical attention that night?  2:02:00PM
6      A   She did not.               2:02:02PM
7      Q   She did not.               2:02:03PM
8        Did you ask Richie Bosetti why he   2:02:04PM
9    didn't bring her into the station that night? 2:02:08PM
10     A   I believe I was told that they were  2:02:11PM
11   going to wait until the ambulance had left, but 2:02:17PM
12   then I don't think -- it never happened anyway, 2:02:20PM
13   so I don't know.                2:02:22PM
14     Q   So when the ambulance left, they    2:02:24PM
15   didn't go back; is that your testimony?   2:02:25PM
16     A   Right.                  2:02:27PM
17     Q   Okay. Do you know why they didn't go 2:02:28PM
18   back?                      2:02:30PM
19     A   I don't -- I don't know.        2:02:30PM
20     Q   Did you ask Rich Bosetti why?      2:02:32PM
21     A   I don't recall if I did.        2:02:33PM
22     Q   Did you ask Jean Yager why?       2:02:34PM
23     A   I don't recall if I did or not.     2:02:38PM
24     Q   Did you ask Bud Yager why?       2:02:40PM
25     A   I don't recall if I did or not.     2:02:43PM

Page 453

1        GEORGE HESSE
2      Q   Did you ask Rich Bosetti why he didn't 2:02:52PM
3    bring Jeanne Yager over to the on-duty officers 2:02:54PM
4    at Houser's?                   2:02:58PM
5      A   I don't recall if I did or not.     2:02:59PM
6      Q   So you don't know one way or the    2:03:02PM
7    other?                      2:03:03PM
8      A   No, I don't.               2:03:05PM
9      Q   Did he tell you why he didn't bring   2:03:06PM
10   her over to them at Houser's?          2:03:08PM
11     A   No.                    2:03:10PM
12       MR. CONNOLLY:  "Them" being the    2:03:10PM
13   officers at the scene?             2:03:11PM
14   BY MR. GOODSTADT:                2:03:12PM
15     Q   Rich Bosetti didn't bring Jean Yager  2:03:12PM
16   over to the on-duty officers at the scene.  2:03:15PM
17     A   Yeah, I don't recall.          2:03:18PM
18     Q   Did you ask him?             2:03:18PM
19     A   I don't recall if I did or not.     2:03:20PM
20       MR. GOODSTADT:  Why don't we take a  2:03:32PM
21   break here and try to get in touch with the 2:03:33PM
22   judge.                      2:03:35PM
23       THE VIDEOGRAPHER:  The time is 2:05. 2:03:36PM
24   We're off the record.              2:03:37PM
25       (Whereupon, a discussion was held off 2:03:40PM

38  (Pages 450 to 453)

b929ea01-2563-408a-a7fc-adb794430749

Page 454

GEORGE HESSE

1
2  the record.)                                  2:03:40PM
3        THE VIDEOGRAPHER: The time is 2:09.  2:07:43PM
4  We're on the record.                         2:07:44PM
5  BY MR. GOODSTADT:                            2:07:49PM
6     Q    Now, when this fax came in from Jeanne  2:07:49PM
7  Yager, did you discuss it with anybody on that  2:07:52PM
8  day, other than for what you already testified  2:07:55PM
9  to with your conversation with her?           2:07:58PM
10    A    I don't recall.                       2:08:01PM
11    Q    Did you speak to her after she faxed  2:08:02PM
12 it in on that day?                            2:08:05PM
13    A    I don't recall.                       2:08:07PM
14    Q    And at the time this fax came in, had  2:08:09PM
15 you put anybody else on the investigation with  2:08:13PM
16 you or were you still the sole investigator?  2:08:15PM
17    A    I was still alone.                    2:08:18PM
18    Q    And after this fax came in, what was  2:08:20PM
19 the next -- well, strike that.               2:08:24PM
20        How long was it between you got off  2:08:26PM
21 the phone with her and the fax came in?       2:08:29PM
22    A    I don't recall.                       2:08:31PM
23    Q    Did you do anything with respect to  2:08:31PM
24 the investigation between getting off the phone  2:08:32PM
25 with Jeanne Yager and Hesse 15 being faxed in?  2:08:35PM

Page 455

GEORGE HESSE

1
2     A    I don't remember.                    2:08:41PM
3     Q    So what was the next thing you recall  2:08:42PM
4  doing with respect to the Halloween incident  2:08:45PM
5  after receiving this fax?                    2:08:47PM
6     A    You know what, I really don't recall  2:09:02PM
7  what I did right after.                       2:09:04PM
8     Q    Do you recall anything else you did on  2:09:05PM
9  that day?                                     2:09:07PM
10    A    I believe -- I think I called either  2:09:09PM
11 Bud or Jeanne back at some point, and I asked if  2:09:12PM
12 they remember if anybody else was at the bar and  2:09:17PM
13 who it was, who was bartending.               2:09:20PM
14    Q    You don't recall which person you  2:09:25PM
15 called back and asked that to?                2:09:27PM
16    A    It was probably Jeanne, because I  2:09:29PM
17 couldn't get in touch with Bud from the       2:09:30PM
18 beginning, so...                             2:09:33PM
19    Q    And what did she say in response to  2:09:36PM
20 that question?                                2:09:38PM
21    A    She gave me some names.              2:09:39PM
22    Q    What name did she give you?          2:09:42PM
23    A    I believe Dan McKenna was the       2:09:43PM
24 bartender. She said Ian Levine was there. She  2:09:46PM
25 said Cara McKenna was there. I don't recall too  2:09:56PM

Page 456

GEORGE HESSE

1
2  many other names. She said she didn't know a  2:09:59PM
3  lot of people there.                          2:10:03PM
4     Q    And had you known Don McKenna before  2:10:04PM
5  that time?                                    2:10:08PM
6     A    Dan.                                  2:10:09PM
7     Q    Dan McKenna? I apologize.            2:10:10PM
8     A    Yeah, I knew Dan.                    2:10:11PM
9     Q    From being a bartender there or were  2:10:12PM
10 you personal friends?                         2:10:15PM
11        MR. NOVIKOFF: Objection.              2:10:16PM
12        MR. CONNOLLY: Objection, or something  2:10:17PM
13 else.                                         2:10:19PM
14    A    I'm not personal friends with Dan    2:10:19PM
15 McKenna. He's a member of the fire service over  2:10:19PM
16 there, ambulance corps.                      2:10:23PM
17    Q    Had you known Cara McKenna prior to  2:10:24PM
18 then?                                         2:10:27PM
19    A    Yes.                                  2:10:28PM
20    Q    How did you know her?               2:10:29PM
21    A    She is a long-time resident. She's  2:10:30PM
22 been born there. I know her parents. She also  2:10:32PM
23 works in the village office. She's also a     2:10:35PM
24 member of the fire service and ambulance corps.  2:10:38PM
25    Q    What did she do in the village office?  2:10:40PM

Page 457

GEORGE HESSE

1
2     A    Secretarial.                        2:10:43PM
3     Q    And Ian Levine you knew before then,  2:10:48PM
4  correct?                                      2:10:51PM
5     A    Yes.                                  2:10:51PM
6     Q    He's the same Ian Levine that you  2:10:52PM
7  worked for at Sky Cable?                     2:10:54PM
8     A    Yes.                                  2:10:56PM
9     Q    Did she tell you anything else during  2:10:56PM
10 that phone conversation other than for those  2:10:57PM
11 couple names?                                 2:11:00PM
12    A    Not that I recall, no.              2:11:01PM
13    Q    Do you recall anything else that was  2:11:03PM
14 discussed between the two of you during that  2:11:04PM
15 phone conversation?                           2:11:06PM
16    A    I don't recall.                       2:11:07PM
17    Q    Did you take any notes of that phone  2:11:07PM
18 conversation?                                 2:11:09PM
19        MR. NOVIKOFF: The second conversation  2:11:12PM
20 with Jeanne Yager?                            2:11:13PM
21        MR. GOODSTADT: When he called her  2:11:15PM
22 back.                                         2:11:17PM
23        MR. NOVIKOFF: Got it.                2:11:18PM
24        MR. GOODSTADT: We already went      2:11:18PM
25 through the first, was no notes.              2:11:18PM

39 (Pages 454 to 457)

b929ea01-2563-408a-a7fc-adb794430749

Page 458

GEORGE HESSE

1
2     A   Yeah, I don't recall if I took notes.   2:11:18PM
3     Q   If you took some notes, where would   2:11:20PM
4  they be kept?                    2:11:22PM
5     A   They should be in the file.  If I took   2:11:24PM
6  any notes, they would be in the file.   2:11:26PM
7     Q   Did you keep like a notebook in   2:11:28PM
8  connection with this investigation?   2:11:30PM
9     A   No.                    2:11:31PM
10     Q   So what would you have taken notes on?  2:11:33PM
11     A   Maybe just a piece of scrap paper or   2:11:35PM
12  something.                    2:11:38PM
13     Q   Sitting here today, you don't recall   2:11:42PM
14  one way or the other whether there were notes of  2:11:43PM
15  that conversation?                2:11:45PM
16     A   No, I don't recall.            2:11:46PM
17     Q   What was the next thing you did after   2:11:50PM
18  speaking with Jeanne Yager that day with respect  2:11:52PM
19  to Halloween incident?            2:11:54PM
20     A   Repeat that question.  I'm sorry.   2:11:58PM
21     Q   Yeah, after you spoke with Jeanne   2:12:00PM
22  Yager for the second time, what was the next   2:12:02PM
23  thing you did that day with respect to the   2:12:05PM
24  Halloween investigation?            2:12:08PM
25     A   I believe I reached out to Ian Levine   2:12:10PM

Page 459

GEORGE HESSE

1
2  to find out if he had seen anything.   2:12:12PM
3     Q   Did you get in touch with him?   2:12:19PM
4     A   Yes.                    2:12:20PM
5     Q   You called him or you went the to him   2:12:22PM
6  in person?                    2:12:25PM
7     A   I called him.                2:12:25PM
8     Q   Okay.  Tell me everything you recall   2:12:26PM
9  on that phone conversation.            2:12:27PM
10     A   I asked him about the night, if he had  2:12:30PM
11  seen anything.  He said that he remembers that   2:12:32PM
12  one of the Bosetti brothers -- a lot of people   2:12:40PM
13  had a hard time telling between the two Bosetti   2:12:43PM
14  brothers.  But he said one of the Bosetti   2:12:46PM
15  brothers was in a fight.  He called the police   2:12:46PM
16  department's direct number to get somebody down   2:12:48PM
17  there quick to help out either Richie or Gary.   2:12:50PM
18  And he said the fight was getting broken up   2:12:53PM
19  after he hung up the phone.  He said   2:12:58PM
20  approximately, I think, 10 minutes had gone by   2:13:01PM
21  before the police had arrived.  And that's all I  2:13:03PM
22  recall at this time.  I know he gave a   2:13:06PM
23  statement.                    2:13:08PM
24     Q   Did he tell you that he witnessed any  2:13:09PM
25  part of the fight?                2:13:10PM

Page 460

GEORGE HESSE

1
2     A   Just the end part.  He didn't see the  2:13:11PM
3  beginning.                    2:13:15PM
4     Q   What end part did he tell you he   2:13:15PM
5  witnessed?                    2:13:18PM
6     A   That Bosetti was over -- either   2:13:19PM
7  standing over or squatting over.  I'd have to   2:13:24PM
8  read his statement to recall.  He remembers   2:13:26PM
9  seeing his shield out, and that's all I recall   2:13:28PM
10  at this time.                    2:13:30PM
11     Q   Did he tell you that he saw one of the  2:13:31PM
12  Bosettis use a pool cue?            2:13:34PM
13     A   Not that I recall.            2:13:36PM
14     Q   Did you ask him whether he was   2:13:44PM
15  drinking that night?                2:13:45PM
16     A   No.                    2:13:46PM
17     Q   How come?                2:13:47PM
18     A   I don't recall why.            2:13:48PM
19     Q   Do you think it would be relevant if   2:13:50PM
20  an eyewitness who was giving you a statement was  2:13:51PM
21  drinking that night?                2:13:53PM
22        MR. NOVIKOFF:  Objection.        2:13:55PM
23     A   It could have been.            2:13:55PM
24     Q   Did you take any notes of the phone   2:13:57PM
25  call you had with Mr. Levine?            2:13:58PM

Page 461

GEORGE HESSE

1
2     A   I don't believe I did.            2:14:00PM
3     Q   How come?                2:14:01PM
4     A   Because I knew he was going to come in  2:14:01PM
5  and give a statement, and it was just I didn't   2:14:03PM
6  need to take notes.                2:14:05PM
7     Q   Tell me everything else you recall   2:14:14PM
8  about the conversation you had with Mr. Levine   2:14:15PM
9  on the phone that day.            2:14:17PM
10     A   I believe I asked him if he knew of   2:14:19PM
11  anybody else that was there that he remembers.  I  2:14:21PM
12  think he gave me a couple more names.   2:14:26PM
13     Q   What names did he give you?        2:14:29PM
14     A   I believe he gave me Sean O'Rourke,   2:14:31PM
15  Doug Wyckoff.  I think he also -- because I   2:14:34PM
16  asked who was -- if there were any other   2:14:37PM
17  bartenders besides Dan.  I don't recall offhand   2:14:38PM
18  if he told me anybody else's names.        2:14:44PM
19     Q   Did you ask him why he didn't give a   2:14:48PM
20  statement to the police that night?        2:14:50PM
21     A   I don't recall.                2:14:55PM
22     Q   Was he at the bar when the on-duty   2:14:56PM
23  police officers arrived?            2:14:58PM
24     A   Yes.                    2:15:02PM
25        MR. NOVIKOFF:  Was he told that by   2:15:04PM

40  (Pages 458 to 461)

b929ea01-2563-408a-a7fc-adb794430749

Page 462

GEORGE HESSE

```
1              GEORGE HESSE
2       Mr. Levine if he was at the bar.          2:15:06PM
3           MR. GOODSTADT:  Yeah.                  2:15:09PM
4    BY MR. GOODSTADT:                             2:15:09PM
5       Q    Did he tell you that he was there when  2:15:09PM
6    the on-duty police officers arrived?         2:15:11PM
7       A    Yes.                                  2:15:12PM
8       Q    Do you know whether he spoke with the  2:15:13PM
9    on-duty police officers?                      2:15:14PM
10      A    I don't recall.                       2:15:15PM
11      Q    Did you ask whether he spoke with the  2:15:15PM
12   on-duty police officers?                      2:15:17PM
13      A    I don't recall.                       2:15:19PM
14      Q    Just so I'm clear, to your           2:15:22PM
15   understanding or knowledge, he never reached out  2:15:24PM
16   to give a witness statement; you're the one that  2:15:29PM
17   reached out to him, correct?                  2:15:31PM
18      A    That's correct, yes.                  2:15:33PM
19      Q    Do you recall anything else that was  2:15:39PM
20   discussed during that phone conversation?     2:15:40PM
21      A    I don't recall.                       2:15:46PM
22      Q    How did you know he was going to come  2:15:48PM
23   in and give a statement?                      2:15:49PM
24      A    Because I asked him to.               2:15:51PM
25      Q    Did he ever come in and give a        2:15:53PM
```

Page 463

GEORGE HESSE

```
1              GEORGE HESSE
2    statement?                                    2:15:55PM
3       A    Yes.                                  2:15:55PM
4       Q    When?                                 2:15:55PM
5       A    I don't know the exact date.  It may  2:15:56PM
6    have been the next day.                       2:15:58PM
7       Q    That Tuesday?                         2:16:00PM
8       A    It may have been.  I don't know.  I   2:16:01PM
9    know you have the statements, so...           2:16:02PM
10      Q    It's your recollection it was that    2:16:05PM
11   Tuesday?                                      2:16:07PM
12      A    No.  I don't recall.                  2:16:07PM
13      Q    Did you ask him whether he saw Gary   2:16:13PM
14   Bosetti use a pool cue?                       2:16:16PM
15      A    I didn't -- I didn't take his         2:16:18PM
16   statement, so I don't recall, no.             2:16:21PM
17      Q    During the phone conversation you had.  2:16:22PM
18      A    You know, I don't recall.             2:16:25PM
19      Q    So after the phone conversation you   2:16:34PM
20   had with Ian Levine, what was the next thing  2:16:35PM
21   that you did in connection with the           2:16:38PM
22   investigation?                                2:16:40PM
23      A    Now that I knew Doug Wyckoff was      2:16:41PM
24   there, I think I tried to locate him.         2:16:44PM
25      Q    Okay.  And this is Doug Wyckoff, the  2:16:47PM
```

Page 464

GEORGE HESSE

```
1              GEORGE HESSE
2    husband of Dale Wyckoff, the former husband of  2:16:50PM
3    Dale Wyckoff, father of Marissa Wyckoff, who   2:16:54PM
4    worked in the police department; is that      2:16:58PM
5    correct?                                      2:16:59PM
6       A    Yes.                                  2:17:00PM
7       Q    And did you reach out to Mr. Wyckoff?  2:17:01PM
8       A    I don't remember how I got in touch   2:17:07PM
9    with him.  I think I ran into him.            2:17:08PM
10      Q    You ran into him?                      2:17:11PM
11      A    Yeah.                                  2:17:13PM
12      Q    Where?                                 2:17:13PM
13      A    Outside the police station.           2:17:14PM
14      Q    So the next thing you did, you're     2:17:17PM
15   going to reach out to Doug Wyckoff and you just  2:17:19PM
16   happen to run into him?                        2:17:22PM
17      A    It's a small village.  Yeah.          2:17:25PM
18      Q    Did you go outside looking for him?   2:17:26PM
19      A    You know, I don't recall.             2:17:29PM
20      Q    Was anyone else with you when you ran  2:17:32PM
21   into Doug Wyckoff?                            2:17:33PM
22      A    I don't believe so, no.               2:17:35PM
23      Q    Was anyone else with him when you ran  2:17:36PM
24   into Doug Wyckoff?                            2:17:38PM
25      A    I don't know.  I don't recall.        2:17:40PM
```

Page 465

GEORGE HESSE

```
1              GEORGE HESSE
2       Q    And did you speak with Doug Wyckoff   2:17:40PM
3    when you ran into him?                         2:17:42PM
4       A    Yes.                                  2:17:44PM
5       Q    Tell me everything you recall that was  2:17:44PM
6    stated during that discussion.               2:17:46PM
7       A    I asked him if he witnessed any of the  2:17:49PM
8    events of that night.  He said yes, that he   2:17:51PM
9    actually got involved.  And I asked if he would  2:17:54PM
10   be willing to give a statement, and he said yes.  2:17:59PM
11   And he came in and gave a statement.          2:18:01PM
12      Q    Did he tell you any of the events     2:18:03PM
13   during the conversation outside that he       2:18:07PM
14   witnessed?                                    2:18:09PM
15      A    I don't recall if he told me          2:18:11PM
16   specifics.                                    2:18:14PM
17      Q    And had he come forward with a        2:18:17PM
18   statement prior to you seeing him that        2:18:20PM
19   morning -- strike that.                       2:18:22PM
20           What time of day was it?             2:18:23PM
21      A    I don't recall what time.             2:18:25PM
22      Q    But it was still that same Monday?    2:18:26PM
23      A    I believe so, yeah.                   2:18:28PM
24      Q    And prior to you running into him, had  2:18:29PM
25   he reached out to the police department at all,  2:18:31PM
```

b929ea01-2563-408a-a7fc-adb794430749

**GEORGE HESSE**

1
2    do you know, to give a statement?          2:18:34PM
3       A    Not that I know of.          2:18:36PM
4       Q    And had he given a statement prior to  2:18:37PM
5    that?          2:18:39PM
6       A    Not that I know of.          2:18:39PM
7       Q    Did you ask him whether he was in the  2:18:45PM
8    bar at the time the on-duty officers got there?  2:18:46PM
9       A    I don't recall if I asked him that  2:18:51PM
10   specific question.          2:18:53PM
11      Q    Did you ask him why he didn't give a  2:18:53PM
12   statement that night?          2:18:56PM
13      A    You know what, I think I did, and he  2:18:58PM
14   said that no one asked him what happened.          2:19:00PM
15      Q    Did you ask him why he didn't go to  2:19:02PM
16   the police station?          2:19:04PM
17      A    I don't recall if I did or not.          2:19:06PM
18          MR. GOODSTADT: Let's go off the  2:19:18PM
19   record for one second.          2:19:18PM
20          THE VIDEOGRAPHER: The time is 2:21.  2:19:20PM
21   We're off the record.          2:19:21PM
22          (Whereupon, a discussion was held off  2:22:14PM
23   the record.)          2:22:14PM
24          THE VIDEOGRAPHER: The time is 2:24.  2:22:16PM
25   We're on the record.          2:22:17PM

GEORGE HESSE

1
2    BY MR. GOODSTADT:          2:22:21PM
3       Q    Do you recall anything else that was  2:22:21PM
4    discussed between you and Mr. Wyckoff in that  2:22:22PM
5    conversation outside?          2:22:25PM
6       A    Specifically, no.          2:22:26PM
7       Q    Did you take any notes of that  2:22:28PM
8    conversation?          2:22:30PM
9       A    No.          2:22:30PM
10      Q    Why not?          2:22:30PM
11      A    I think I took his statement.          2:22:32PM
12      Q    You took his statement outside?          2:22:33PM
13      A    No.  I think we walked right into the  2:22:35PM
14   police station.          2:22:37PM
15      Q    Okay.  So you took his statement on  2:22:38PM
16   that day?          2:22:40PM
17      A    You know, I don't recall if it was  2:22:40PM
18   that day, to tell you the truth.          2:22:42PM
19      Q    So your statement that we just walked  2:22:43PM
20   back to the police station and took his  2:22:43PM
21   statement may not be true?          2:22:43PM
22          MR. NOVIKOFF: Objection.          2:22:48PM
23          MR. CONNOLLY: Objection.          2:22:48PM
24      A    I don't recall four and a half years  2:22:50PM
25   ago.          2:22:52PM

GEORGE HESSE

1
2       Q    You don't recall what day it was?          2:22:59PM
3       A    No.          2:23:01PM
4       Q    Did he definitely come into the police  2:23:07PM
5    station on the day that you saw him outside?          2:23:09PM
6       A    You know, I don't recall.  I'm not  2:23:12PM
7    going to guess.          2:23:15PM
8       Q    Did you ask whether he was drinking?          2:23:18PM
9       A    I don't recall.          2:23:22PM
10      Q    You don't recall one way or the other?  2:23:23PM
11      A    No.          2:23:25PM
12      Q    Do you think that would be an  2:23:27PM
13   important fact to know, whether Mr. Wyckoff was  2:23:28PM
14   drinking that night?          2:23:31PM
15          MR. NOVIKOFF: Objection.          2:23:32PM
16      A    Could be.          2:23:33PM
17      Q    What do you mean, it could be?          2:23:35PM
18      A    It could be relevant.          2:23:37PM
19      Q    Why would it be relevant?          2:23:40PM
20          MR. NOVIKOFF: Objection.          2:23:42PM
21      A    May impair his judgment or his  2:23:43PM
22   recollection.          2:23:50PM
23      Q    So don't you think it of would have  2:23:54PM
24   been important to ask him that question?          2:23:56PM
25          MR. NOVIKOFF: Objection.          2:23:58PM

GEORGE HESSE

1
2          MR. CONNOLLY: Objection.          2:23:59PM
3       A    It could've been.          2:23:59PM
4          MR. GOODSTADT: Just mark that.          2:24:02PM
5          (Whereupon, Bates document 3165-3166  2:24:03PM
6    was marked as Plaintiff's Exhibit 16 for  2:24:03PM
7    identification, as of this date.)          2:24:03PM
8          MR. GOODSTADT: I've placed in front  2:24:26PM
9    of Mr. Hesse what's now been marked as  2:24:27PM
10   Hesse 16.  It is a two-page exhibit bearing  2:24:30PM
11   Bates 3165 and 3166.  (Handing.)          2:24:35PM
12   BY MR. GOODSTADT:          2:24:38PM
13      Q    Mr. Hesse, is this the witness  2:24:39PM
14   statement that you took of Mr. Wyckoff?          2:24:40PM
15      A    Yes.          2:24:42PM
16      Q    Do you see on the bottom left it has  2:24:45PM
17   "name of preparing officer"?          2:24:46PM
18          Do you see that?          2:24:48PM
19      A    Yes.          2:24:48PM
20      Q    Is that your handwriting and  2:24:50PM
21   signature?          2:24:51PM
22      A    Yes.          2:24:52PM
23      Q    And you were sergeant at the time?          2:24:55PM
24      A    Yes.          2:24:57PM
25      Q    Okay.  And the -- on the bottom right,  2:24:57PM

b929ea01-2563-408a-a7fc-adb794430749

Page 470

```
1              GEORGE HESSE
2   you see he signed it 11-2-04.          2:25:01PM
3       Do you see that?                   2:25:04PM
4   A   Yes.                   2:25:05PM
5   Q   Is that the date that you actually  2:25:05PM
6   took the statement?                    2:25:07PM
7   A   Yes.                   2:25:08PM
8   Q   Does that refresh your recollection as  2:25:09PM
9   to whether that was the Monday?        2:25:12PM
10  A   That would have to be Tuesday, then.   2:25:14PM
11  Q   Tuesday. Okay.                     2:25:17PM
12      So just so I get a time line correct  2:25:17PM
13  here, did you have the conversation with him  2:25:19PM
14  outside the police station on Monday or Tuesday?  2:25:21PM
15  A   I don't recall.          2:25:24PM
16  Q   Okay.                             2:25:25PM
17      MR. NOVIKOFF: I'm sorry, is two    2:25:26PM
18  minutes up?                 2:25:29PM
19      THE REPORTER: Yeah.               2:25:31PM
20      MR. NOVIKOFF: I want to put on the  2:25:33PM
21  record that I believe Mr. Goodstadt's seven  2:25:33PM
22  hours has ended, but then again, I leave  2:25:34PM
23  that to Mr. Connolly to decide what to do  2:25:37PM
24  going forward.             2:25:41PM
25      MR. CONNOLLY: Mr. Goodstadt, you can  2:25:42PM
```

Page 471

```
1              GEORGE HESSE
2   finish questioning regarding this exhibit.  2:25:44PM
3       MR. GOODSTADT: Okay. Four and a half  2:25:47PM
4   hours on this exhibit, are you okay with  2:25:50PM
5   that?                     2:25:52PM
6       MR. NOVIKOFF: All right then.      2:25:55PM
7       MR. CONNOLLY: Yes, four and a half  2:25:56PM
8   hours limited to this exhibit.         2:25:58PM
9   BY MR. GOODSTADT:            2:26:00PM
10  Q   So it's possible that there was a gap  2:26:01PM
11  of a day between your conversation outside and  2:26:03PM
12  the day you took his statement, correct?  2:26:05PM
13  A   Sure.                  2:26:08PM
14  Q   Okay. Did you ask Mr. Wyckoff why he  2:26:08PM
15  didn't give a statement at the bar that night?  2:26:13PM
16      MR. NOVIKOFF: Objection. Asked and  2:26:15PM
17  answered.                   2:26:16PM
18  A   I believe he said to me that no one  2:26:20PM
19  approached him or asked him what happened.  2:26:22PM
20  Q   Did you ask him whether he saw the  2:26:24PM
21  on-duty officers there that night?     2:26:26PM
22  A   I don't recall.          2:26:28PM
23  Q   Did you ask him whether any of the  2:26:29PM
24  officers went back into the bar and asked a  2:26:31PM
25  general question to everyone in the bar, did  2:26:33PM
```

Page 472

```
1              GEORGE HESSE
2   anyone see what happened this evening?  2:26:36PM
3   A   Repeat that.           2:26:38PM
4   Q   Did you ask him whether about of the  2:26:39PM
5   on-duty officers went back into the bar that  2:26:40PM
6   evening and asked generally to everyone that was  2:26:44PM
7   there, did anyone see what happened?   2:26:46PM
8   A   I don't recall anything like that, no.  2:26:49PM
9   Q   Did you ever hear that Tom Snyder went  2:26:50PM
10  back in the bar and asked that question?  2:26:53PM
11  A   No.                    2:26:56PM
12  Q   Snyder never told you that?        2:26:58PM
13  A   No.                    2:26:59PM
14  Q   If you look down -- well, strike that.  2:27:00PM
15      Is this the -- this is the witness   2:27:03PM
16  statement that he gave you?            2:27:04PM
17  A   Yes.                   2:27:05PM
18  Q   And is this your handwriting? I know  2:27:06PM
19  that may be his signature on the bottom right.  2:27:06PM
20  But other than that, is this your handwriting?  2:27:08PM
21  A   Yes.                   2:27:12PM
22  Q   Second page also, other than for his  2:27:12PM
23  signature, is that your handwriting?   2:27:14PM
24  A   Yes.                   2:27:16PM
25  Q   Was anyone else there when you took  2:27:16PM
```

Page 473

```
1              GEORGE HESSE
2   his statement?              2:27:18PM
3   A   I don't recall either way.  2:27:19PM
4   Q   Do you recall what time on the 2nd he  2:27:20PM
5   gave you this statement?              2:27:23PM
6   A   No, I don't recall.      2:27:23PM
7   Q   Do you recall what other statements  2:27:24PM
8   you had prior to Wyckoff giving you this  2:27:26PM
9   statement?                  2:27:28PM
10  A   Say that again.          2:27:28PM
11  Q   Do you recall what other -- which   2:27:29PM
12  other witness statements you had prior to taking  2:27:30PM
13  Wyckoff's?                  2:27:32PM
14  A   At this time, I don't recall, no.  2:27:33PM
15  Q   Is there anything that you can think  2:27:35PM
16  of that would refresh your recollection?  2:27:36PM
17  A   The entire Halloween file.  2:27:38PM
18  Q   Anything else?                    2:27:41PM
19  A   No.                    2:27:42PM
20  Q   Then if you look down the fourth line  2:27:45PM
21  down in the text there on Page 1 of Hesse 16, it  2:27:48PM
22  says, "I observed a large male, built like a  2:27:54PM
23  fireplug, now known to me as Christopher  2:27:57PM
24  Shallick."                  2:28:00PM
25      Do you see that?          2:28:00PM
```

43 (Pages 470 to 473)

b929ea01-2563-408a-a7fc-adb794430749

Page 474

```
      GEORGE HESSE
1
2    A   Yes.              2:28:01PM
3    Q   "Of 63 Maple Place Huntington, New   2:28:02PM
4  York."                  2:28:07PM
5    Do you see that?        2:28:07PM
6    A   Yes.              2:28:07PM
7    Q   How did he learn that that was    2:28:09PM
8  Christopher Shallick of 63 Maple Place,   2:28:09PM
9  Huntington, New York?       2:28:09PM
10   A   I laid out a couple of licenses that   2:28:10PM
11 these officers had photo-- I think   2:28:13PM
12 photocopied, and he said that was the guy right   2:28:15PM
13 there.                 2:28:18PM
14   Q   Okay. So the fact that you laid out   2:28:18PM
15 licenses and had like sort of a license   2:28:22PM
16 lineup --                2:28:25PM
17   A   Pretty much.          2:28:26PM
18   Q   -- that's not reflected anywhere in   2:28:27PM
19 here, is it?              2:28:29PM
20   A   No.                2:28:30PM
21   Q   In the statement?        2:28:30PM
22   A   No.                2:28:30PM
23   Q   How come?            2:28:31PM
24   A   I don't know.          2:28:33PM
25   Q   It says on this Page 2 of Exhibit   2:28:44PM
```

Page 475

```
      GEORGE HESSE
1
2  Hesse 16, the one, two, three, four, fifth line   2:28:53PM
3  down, it says, "The doorman, Sean O'Rourke."   2:28:56PM
4    Do you see that?        2:28:58PM
5    A   Yes.              2:28:59PM
6    Q   "Doorman, Sean O'Rourke, came over to   2:28:59PM
7  help keep Christopher out of the bar."   2:29:03PM
8    Do you see that?        2:29:05PM
9    A   Yes.              2:29:06PM
10   Q   It says, "Sean phoned the police."   2:29:07PM
11   Do you see that?        2:29:09PM
12   A   Yes.              2:29:10PM
13   Q   Is it your understanding that Sean   2:29:11PM
14 O'Rourke called the police that night?   2:29:13PM
15   A   Yes.              2:29:15PM
16   Q   And that's a separate call than Ian   2:29:16PM
17 Levine's?              2:29:19PM
18   A   Yes.              2:29:21PM
19   Q   And then the last sentence that says,   2:29:21PM
20 "They never asked me or anyone if I could see   2:29:23PM
21 any questions about what happened."    2:29:26PM
22   Do you see that?        2:29:29PM
23   A   Yeah.              2:29:30PM
24   Q   Is that the statement that you   2:29:31PM
25 testified to before, that no one had asked him   2:29:32PM
```

Page 476

```
      GEORGE HESSE
1
2  what happened?           2:29:34PM
3    MR. NOVIKOFF:   Objection.   2:29:35PM
4    A   That's what I recall. That's what he   2:29:36PM
5  told me.               2:29:37PM
6    Q   And then in response to that, you did   2:29:38PM
7  or did not ask him why he didn't proactively   2:29:41PM
8  seek to give a statement to the on-duty   2:29:44PM
9  officers?              2:29:46PM
10   MR. CONNOLLY:   Objection to form.   2:29:47PM
11   MR. NOVIKOFF:   Objection.   2:29:49PM
12   A   I don't recall.        2:29:49PM
13   Q   You don't recall whether you did?   2:29:49PM
14   A   No.               2:29:51PM
15   MR. GOODSTADT:   I think I'm done with   2:30:07PM
16 this exhibit for now.        2:30:08PM
17   MR. CONNOLLY:   Okay. Why don't we   2:30:09PM
18 take a two-minute break and figure out what   2:30:10PM
19 we're going to do.          2:30:12PM
20   THE VIDEOGRAPHER:   The time is 2:32.   2:30:15PM
21 We're off the record.        2:30:16PM
22   (Whereupon, a discussion was held off   2:30:18PM
23 the record.)            2:30:18PM
24   (Whereupon, Magistrate Boyle was   2:30:18PM
25 called.)                2:30:18PM
```

Page 477

```
      GEORGE HESSE
1
2    MR. GOODSTADT:   We are -- as you   3:03:01PM
3  recall, we had made a motion to extend the   3:03:03PM
4  time to take Defendant George Hesse's   3:03:07PM
5  deposition beyond the seven hours.    3:03:09PM
6    THE COURT:   Yes.        3:03:11PM
7    MR. GOODSTADT:   And you had denied   3:03:12PM
8  that without prejudice with the right to   3:03:13PM
9  renew when we reached the seven-hour point.   3:03:16PM
10 And we've now reached the seven-hour point,   3:03:18PM
11 and we'd like to renew our request for an   3:03:21PM
12 additional four and a half hours.    3:03:24PM
13   THE COURT:   These are really elaborate   3:03:26PM
14 motions because you really have to justify   3:03:26PM
15 your -- what you have to cover and why you   3:03:30PM
16 didn't cover it in the time allotted. And   3:03:34PM
17 I've done opinions on this, and, you know,   3:03:38PM
18 that's why I tried to set up a conference   3:03:42PM
19 call last week to urge you to do some kind   3:03:45PM
20 of a conference just to eliminate the   3:03:49PM
21 paperwork. But if you can't agree on it,   3:03:53PM
22 make your motion. But do your research on   3:03:55PM
23 it. These are simple issues that you made   3:03:57PM
24 in your motion; and if you use your same old   3:04:02PM
25 motion, it would be denied.      3:04:04PM
```

44 (Pages 474 to 477)

b929ea01-2563-408a-a7fc-adb794430749

Page 478

GEORGE HESSE

1

2      MR. GOODSTADT: Okay. So we'll be      3:04:07PM
3  happy to submit a brief on the issue.      3:04:10PM
4      THE COURT: Read the case. Are the      3:04:15PM
5  defendants there?      3:04:16PM
6      MR. CONNOLLY: Yes, we are, Your      3:04:17PM
7  Honor.      3:04:17PM
8      THE COURT: Is there any way you'll      3:04:18PM
9  consent to like an extension of two hours or  3:04:20PM
10  something? The defense should speak up to      3:04:22PM
11  that.      3:04:22PM
12      MR. CONNOLLY: Your Honor, we had      3:04:25PM
13  offered earlier an extension of 90 minutes.  3:04:26PM
14  We're already 20 minutes beyond the seven      3:04:29PM
15  hours, and my understanding is we've already  3:04:31PM
16  gotten 475 pages of deposition transcript.      3:04:31PM
17      THE COURT: So you did your seven      3:04:37PM
18  hours, did you?      3:04:40PM
19      MR. CONNOLLY: And seven hours and 20  3:04:41PM
20  minutes.      3:04:42PM
21      THE COURT: My suggestion would be to  3:04:45PM
22  see how you can work it out. Do you have      3:04:46PM
23  any offer at all or do you want to go      3:04:49PM
24  through a motion? Because you're probably      3:04:53PM
25  going to end up submitting your second      3:04:54PM

Page 479

GEORGE HESSE

1

2  deposition.      3:04:58PM
3      MR. CONNOLLY: Your Honor, we did      3:04:58PM
4  offer --      3:04:58PM
5      THE COURT: The issue being -- you      3:04:58PM
6  know, being the length of time.      3:04:59PM
7      MR. CONNOLLY: Your Honor, the      3:05:01PM
8  defendant did offer an additional      3:05:02PM
9  90 minutes.      3:05:04PM
10      THE COURT: Is that anything you're      3:05:08PM
11  interested in?      3:05:09PM
12      MR. GOODSTADT: Well, Your Honor, any  3:05:10PM
13  extra time certainly helps, but this is, as  3:05:12PM
14  we wrote in our letter, certainly the most  3:05:14PM
15  important witness in the entire case, who is  3:05:16PM
16  involved with almost each and every      3:05:19PM
17  allegation in the 193-paragraph complaint.  3:05:21PM
18  There's thousands of pages of documents,      3:05:24PM
19  most of which relate to this witness. I      3:05:26PM
20  believe I've been, you know, pretty good      3:05:29PM
21  about getting through a lot of the topics.  3:05:33PM
22  I don't think that I've delayed or      3:05:35PM
23  procrastinated or spent much time on      3:05:37PM
24  anything that would be irrelevant, and      3:05:40PM
25  there's just a lot of to go through. I      3:05:41PM

Page 480

GEORGE HESSE

1

2  mean, even Mr. Novikoff's letter to the      3:05:44PM
3  Court from weeks ago requesting extension of  3:05:46PM
4  the discovery schedule demonstrated that      3:05:48PM
5  this is a very important witness who -- you  3:05:51PM
6  know, who defendants plan to spend several  3:05:53PM
7  hours with as well questioning.      3:05:56PM
8      MR. NOVIKOFF: Your Honor, this is      3:05:58PM
9  Mr. Novikoff.      3:05:59PM
10      I was going to hopefully remain quiet  3:06:00PM
11  for once in my life because Mr. Hesse is not  3:06:03PM
12  my client. But since I've been brought into  3:06:05PM
13  this, the only thing I will say is I've      3:06:08PM
14  taken each of the plaintiffs' depositions on  3:06:10PM
15  the same allegations in under seven hours,  3:06:12PM
16  and I have not asked for one extension of      3:06:14PM
17  time for any of the plaintiffs. And also in  3:06:16PM
18  my respectful opinion, Mr. Goodstadt has      3:06:19PM
19  spent a considerable amount of time on      3:06:22PM
20  either irrelevant issues or issues that      3:06:25PM
21  really were not in dispute in terms of what  3:06:27PM
22  he believes are relevant facts in this case.  3:06:31PM
23  But it's Mr. Connolly's client, so other      3:06:34PM
24  than just saying that, I'm out of it.      3:06:37PM
25      THE COURT: Mr. Connolly, do you want  3:06:41PM

Page 481

GEORGE HESSE

1

2  to say something?      3:06:42PM
3      MR. CONNOLLY: Yes, Your Honor. I      3:06:43PM
4  feel what we've offered to do is more than  3:06:44PM
5  fair. And, you know, there's been no claim  3:06:47PM
6  that the questioning was impeded in any      3:06:49PM
7  manner, and I feel that if it was structured  3:06:51PM
8  in a different way, we could've been done      3:06:54PM
9  under the seven.      3:06:56PM
10      THE COURT: All right. My only      3:06:58PM
11  suggestion to you -- and I'm just saying      3:07:00PM
12  the obvious, so it's not going to be any      3:07:01PM
13  surprise. The plaintiff is looking for      3:07:04PM
14  another four and a half. You're offering      3:07:07PM
15  90 minutes. Why don't you split it down to  3:07:09PM
16  the middle and do two and a quarter hours,  3:07:12PM
17  and you can save yourselves a lot of      3:07:14PM
18  paperwork and indefiniteness and you can      3:07:17PM
19  wind this up today.      3:07:21PM
20      MR. CONNOLLY: Well, Your Honor, while  3:07:22PM
21  I appreciate the Court's suggestion, I feel  3:07:24PM
22  beyond 90 minutes --      3:07:30PM
23      THE COURT: You don't even have to      3:07:33PM
24  comment, okay. I can't do anything else      3:07:34PM
25  right now. So go ahead and make your motion  3:07:36PM

45 (Pages 478 to 481)

b929ea01-2563-408a-a7fc-adb794430749

Page 482

GEORGE HESSE

1
2    if you can't resolve it.                3:07:39PM
3        MR. GOODSTADT:  Thank you, Your Honor.  3:07:41PM
4        MR. CONNOLLY:  Thank you.          3:07:42PM
5        MR. NOVIKOFF:  Thank you.          3:07:44PM
6        (Whereupon, a discussion was held off  3:07:44PM
7    the record.)                           3:07:44PM
8        MR. GOODSTADT:  After the conference   3:25:41PM
9    call we had with the Court where the Court   3:25:43PM
10   suggest we try to work something out without  3:25:46PM
11   having the need to submit written motions,   3:25:49PM
12   we have not been able to work out an    3:25:52PM
13   agreeable extension for Mr. Hesse's     3:25:56PM
14   deposition.  So we plan to make a motion to  3:25:58PM
15   the Court for additional time pursuant to   3:26:00PM
16   the Judge's directive.  And I guess based on  3:26:02PM
17   what the court rules, we'll determine when   3:26:06PM
18   and for how long we reconvene.          3:26:09PM
19       MR. NOVIKOFF:  Just so it's clear, you  3:26:13PM
20   are keeping the deposition open.        3:26:14PM
21       MR. GOODSTADT:  Yes.               3:26:16PM
22       MR. NOVIKOFF:  You're not ending it,   3:26:16PM
23   and it's open subject to your application to  3:26:18PM
24   Judge Boyle for additional time.  And   3:26:20PM
25   therefore, on behalf of the village     3:26:23PM

Page 483

GEORGE HESSE

1
2    defendants, I reserve my right to question   3:26:25PM
3    Mr. Hesse until such time as the deposition   3:26:28PM
4    is officially closed either by Mr. Goodstadt  3:26:31PM
5    indicating such or the Court indicating that  3:26:35PM
6    Mr. Goodstadt has no additional time.   3:26:36PM
7        MR. CONNOLLY:  And so the record is   3:26:39PM
8    clear, at this juncture, we have gone on for  3:26:41PM
9    seven hours and 20 minutes.             3:26:44PM
10       MR. GOODSTADT:  The record will      3:26:46PM
11   reflect how long we've gone on for.     3:26:47PM
12       MR. TERMINI:  I would just simply    3:26:51PM
13   reserve any rights when it finally becomes   3:26:52PM
14   the County of Suffolk's turn.           3:26:55PM
15       (Time noted 3:26 p.m.)             3:26:59PM
16                                          3:26:59PM
17           GEORGE HESSE                   3:26:59PM
18                                          3:26:59PM
     Subscribed and sworn to before me      3:26:59PM
19   this      day of      , 2009           3:26:59PM
                                            3:26:59PM
20   _____        3:26:59PM
21                                          3:26:59PM
22
23
24
25

Page 484

1         PROCEEDINGS
2       C E R T I F I C A T E
3
4        I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Public in
5    and for the State of New York, do hereby certify:
6        THAT the witness whose testimony is hereinbefore
7    set forth, was duly sworn by me; and
8        THAT the within transcript is a true record
9    of the testimony given by said witness.  I further
10   certify that I am not related, either by blood or
11   marriage, to any of the parties to this action; and
12       THAT I am in no way interested in the outcome of
13   this matter.
14       IN WITNESS WHEREOF, I have hereunto set
15   my hand this 26th day of June, 2009.
16
17       _____
18          JUDI JOHNSON, RPR, CRR, CLR
19
20
21
22
23
24
25

Page 485

1         PROCEEDINGS
2           INDEX
3    ATTORNEY                        PAGE
4        By Mr. Goodstadt            309
5
6
7
8
9        INDEX OF HESSE EXHIBITS
10   I.D.          DESCRIPTION          PAGE
11   Exhibit 8  Bates document 4547-488      312
12   Exhibit 9  Bates document 8189 and 5326   316
13   Exhibit 10  Bates document 1-25         322
14   Exhibit 11  Bates document 2750         360
15   Exhibit 12  Bates document P 925        376
16   Exhibit 13  Picture of writing on the wall   386
17   Exhibit 14  Bates Document 3180         425
18   Exhibit 15  Bates document 3181-3182       444
19   Exhibit 16  Bates document 3165-3166      469
20
21
22
23
24
25

46 (Pages 482 to 485)

TSG Reporting - Worldwide    (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 486

```
 1              ERRATA SHEET
 2   NAME OF CASE:  CARTER V. OCEAN BEACH
 3   DATE OF DEPOSITION: JUNE 16, 2009
 4   NAME OF WITNESS:  GEORGE HESSE
 5
 6   Reason codes:
 7       1.  To clarify the record.
 8       2.  To conform to the facts
 9       3.  To correct the transcription
10          errors.
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
     GEORGE HESSE
25
```

TSG Reporting – Worldwide   (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 487

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI and    )
THOMAS SNYDER,                 )
                               )
              Plaintiffs,      )
                               )
         vs.                   ) CV 07 1215
                               )
INCORPORATED VILLAGE OF OCEAN  )
BEACH; MAYOR JOSEPH C. LOEFFLER)
JR., individually and in his   )
Official capacity; former Mayor)
NATALIE K. ROGERS, individually)
and in her official capacity,  )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF     )
GEORGE B. HESSE, individually  )
And in his official capacity;  )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK     )
COUNTY DEPARTMENT OF CIVIL     )
SERVICE; and ALLISON SANCHEZ,  )
Individually and in her        )
Official capacity,             )
                               )
              Defendants.      )
-------------------------------)

         CONTINUED VIDEOTAPED DEPOSITION OF
                    GEORGE HESSE
                  Uniondale, New York
                 Thursday, August 6, 2009

Reported by:
Philip Rizzuti
JOB NO. 24143
```

Page 488

```
 1
 2
 3
 4              August 6, 2009
 5                9:07 a.m.
 6
 7         Continued videotaped deposition
 8    of GEORGE HESSE, held at the offices
 9    of Rivkin Radler, 926 Rexcorp Plaza,
10    Uniondale, New York, pursuant to
11    subpoena, before Philip Rizzuti, a
12    Notary Public of the State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 489

```
 1
 2   A P P E A R A N C E S:
 3
 4      THOMPSON WIGDOR & GILLY, LLP
 5      Attorneys for Plaintiffs
 6         85 Fifth Avenue
 7         New York, New York 10003
 8      BY:  ANDREW S. GOODSTADT, ESQ.
 9
10      MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11      Attorneys for George B. Hesse
12         530 Saw Mill Road
13         Elmsford, New York 10523
14      BY:  KEVIN W. CONNOLLY, ESQ.
15
16      RIVKIN RADLER, LLP
17      Attorneys for Incorporated Village of
18      Ocean Beach, Joseph Loeffler, Natalie
19      Rogers and Ocean Beach Police Department
20         926 RexCorp Plaza
21         Uniondale, New York 11556
22      BY:  KENNETH A. NOVIKOFF, ESQ.
23
24
25
```

Page 490

```
 1
 2   A P P E A R A N C E S:
 3
 4      RUDOLPH M. BAPTISTE, ESQ.
 5      Assistant County Attorney
 6      Suffolk County, State of New York
 7         H. Lee Dennison Building, 6th Floor
 8         100 Veterans Memorial Highway - P.O. Box 6100
 9         Hauppauge, New York 11788-0099
10
11   ALSO PRESENT:
12      FRANK FIORILLO
13      KEVIN LAMM
14      THOMAS SNYDER
15      JORDAN MUMMERT, Videographer
16
17
18
19
20
21
22
23
24
25
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 491

1            Hesse
2            THE VIDEOGRAPHER:  This is the
3      start of the tape labeled number 1 of the
4      continuation of the videotape deposition
5      of George Hesse in the matter of Carter    09:07:56
6      and Fiorillo versus Incorporated Village
7      of Ocean Beach.  The date is August 6,
8      2009, the time is approximately 9:09 a.m.
9      We are on the record.
10     G E O R G E   H E S S E, called as a      09:08:12
11     witness, having been previously duly
12     sworn by a Notary Public, was examined
13     and testified as follows:
14     EXAMINATION BY
15     MR. GOODSTADT:                             09:08:14
16         Q.  Good morning, Mr. Hesse.
17         A.  Good morning.
18         Q.  Thank you for coming back.  I want
19     to remind you that you are still under oath
20     from last time and that you are still sworn to  09:08:21
21     tell the truth.  Do you understand that?
22         A.  Yes.
23         Q.  The last time we were here you had
24     testified briefly about drinking Rocket Fuels
25     in the police station, do you recall that?    09:08:32

Page 492

1            Hesse
2         A.  Uh-hum.
3         Q.  You testified that there were
4      times where people who worked in the bar, I
5      believe you identified Brian Easop and Paul    09:08:39
6      Conway as having delivered it to the police
7      station; is that correct?
8            MR. NOVIKOFF:  Objection to the
9      form.
10         A.  Yes.                               09:08:48
11         Q.  They worked at CJ's?
12         A.  Yes.
13         Q.  Did CJ's have a license to serve
14     alcohol outside their premises?
15         A.  They had a license to sell outside  09:08:57
16     of the premise, yes, they had like an all
17     premise sale license.
18         Q.  So they were entitled to sell
19     alcohol or deliver alcohol to the police
20     station without violating their license?     09:09:09
21            MR. NOVIKOFF:  Objection to the
22     form.
23         A.  I am not so sure about that, but
24     they were able to sell closed containers off
25     premises.                                   09:09:20

Page 493

1            Hesse
2         Q.  Well did the Rocket Fuels come in
3      a closed container?
4         A.  They did, yes.
5         Q.  When you say you are not so sure    09:09:23
6      about that, what are you not sure about?
7         A.  Well, like selling
8      over-the-counter, taking an open container
9      outside the bar, that is illegal to drink
10     outside of the -- in public, that is what I am  09:09:35
11     thinking along those lines.  But they could
12     sell alcohol over-the-counter and by the case,
13     by the bottle for off premises consumption.
14         Q.  How about a mixed drink?
15            MR. NOVIKOFF:  Objection.         09:09:51
16         A.  That is alcohol.
17         Q.  They could sell that off premises?
18         A.  I believe so.
19         Q.  What is the basis of your belief?
20         A.  I believe once I looked up their  09:09:58
21     license a while back, I don't recall what year
22     or when or why, but they do -- they had at
23     that time off premise sale license.
24         Q.  When did you look up their
25     license?                                   09:10:10

Page 494

1            Hesse
2            MR. NOVIKOFF:  Objection.
3         Q.  Do you recall what year it was?
4         A.  I don't remember.
5         Q.  Last time -- strike that.         09:10:14
6            Just so I am clear you never wrote
7      CJ's or Mr. Easop or Mr. Conway a ticket for
8      delivering the alcohol, did you?
9            MR. NOVIKOFF:  Objection.
10            MR. CONNOLLY:  Objection.        09:10:32
11     (Record read.)
12         A.  No.
13         Q.  That is correct?
14         A.  That is correct.
15         Q.  The last time when we were here we  09:10:46
16     were discussing the Halloween incident, do you
17     recall that?
18         A.  Yes.
19         Q.  I believe that you testified, the
20     last thing you testified to was a statement, a  09:11:00
21     witness statement that you had taken from Doug
22     Wyckoff, do you recall that?
23            MR. NOVIKOFF:  Objection to the
24     form.
25         A.  Yes.                               09:11:08

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 495

Hesse

1
2  Q.  Do you recall testifying that that
3  was on that next Tuesday morning?
4      MR. NOVIKOFF:  Objection to the
5   form.  His testimony is what it is.      09:11:28
6   A.  Yes, I believe it was the Tuesday
7  after the incident.
8  Q.  What do you recall doing in
9  connection with your investigation of the
10  Halloween incident after taking that witness   09:11:38
11  statement?
12     MR. CONNOLLY:  The next step?
13     MR. GOODSTADT:  Yes.  I believe he
14   walked us through his memory of the next
15   step.  So I want to know what the next   09:11:49
16   step is.
17   A.  I don't recall exactly what I did,
18  but I think I looked for more witnesses.
19  Q.  How did you go about doing that?
20   A.  I asked Doug Wyckoff who   09:11:57
21  may have been there that he recalls.
22  Q.  Do you recall who if anybody he
23  told you may have been there?
24   A.  Off the top of my head, no.
25  Q.  Do you recall what you did after   09:12:10

Page 496

Hesse

1
2  asking him that question who may have been
3  there?
4   A.  I don't recall.
5  Q.  Did there come a point in time   09:12:16
6  where you asked Pat Cherry to assist in the
7  investigation?
8   A.  Yes.
9  Q.  When was that?
10   A.  I don't know exactly.   09:12:30
11  Q.  Was it before or after the Tuesday
12  morning in which you spoke with Mr. Wyckoff?
13   A.  I don't recall.
14  Q.  How did you go about asking him;
15  ask you see him, call him, E-mail him, some   09:12:43
16  other form?
17   A.  I believe I called him.
18  Q.  Why did you call him?
19   A.  Because I thought he was a good
20  candidate to help me out.   09:12:51
21  Q.  You made the decision to appoint
22  him to the investigation?
23   A.  I believe I called Chief Paradiso
24  and asked him if it would be all right.
25  Q.  When did you call Chief Paradiso   09:12:59

Page 497

Hesse

1
2  to ask if it would be all right?
3   A.  I don't recall.
4  Q.  What was Chief Paradiso's
5  response?   09:13:07
6   A.  I think he thought it was a good
7  idea.
8  Q.  Do you recall what he said?
9   A.  No.
10  Q.  Was Pat Cherry scheduled to have a   09:13:13
11  tour on the days or times that he helped with
12  the investigation or did he come in
13  specifically to assist with the investigation?
14     MR. CONNOLLY:  Objection.
15     MR. NOVIKOFF:  Objection.   09:13:30
16   A.  I don't recall.
17  Q.  Was he paid for his time taking
18  part in the investigation?
19   A.  Yes.
20  Q.  Cherry was not on duty Halloween   09:13:35
21  night; is that correct?
22   A.  Correct.
23  Q.  Did the board have to approve
24  Cherry's involvement in the investigation?
25     MR. CONNOLLY:  Objection to the   09:13:48

Page 498

Hesse

1
2  form.
3   A.  No.
4  Q.  Did the board approve his
5  assistance in the investigation?   09:13:53
6     MR. CONNOLLY:  Objection to the
7   form.
8   A.  I don't know.
9  Q.  Did you speak to anybody on the
10  board prior to asking Mr. Cherry to   09:14:01
11  investigate?
12   A.  No.
13     MR. NOVIKOFF:  Objection to the
14   form.
15  Q.  At that point in time Mr. Cherry   09:14:08
16  had not passed all the civil service tests; is
17  that correct?
18   A.  Correct.
19  Q.  Did you alert anybody at civil
20  service with respect to Cherry's -- strike   09:14:31
21  that.
22      Did you alert anybody at civil
23  service about your decision to ask Mr. Cherry
24  to assist in the investigation?
25     MR. NOVIKOFF:  Objection to the   09:14:42

Page 499

Hesse

1           Hesse
2    form.
3           MR. BAPTISTE: Objection.
4       A.  No.
5       Q.  By that point in time, that      09:14:47
6    Tuesday morning, had you spoken with anybody
7    on the board of trustees of Ocean Beach about
8    the Halloween incident?
9       A.  Not that I recall.
10      Q.  Did you speak with the mayor prior  09:14:56
11   to that Tuesday morning about the Halloween
12   incident?
13          MR. NOVIKOFF: Objection to the
14   form.
15      A.  No.  Not that I recall.        09:15:04
16      Q.  Who was the mayor at the time?
17      A.  Natalie Rogers.
18      Q.  Did you draft a plan for an
19   investigation prior to commencing your
20   investigation?                    09:15:16
21      A.  No.
22      Q.  Did you take any notes in
23   preparation for your investigation?
24      A.  No.  Not that I recall.
25      Q.  Do you recall what day -- strike  09:15:26

Page 500

1           Hesse
2    that.
3           Did Pat Cherry ever come to the
4    island in connection with his assistance in
5    the investigation?                 09:15:38
6       A.  Yes.
7       Q.  Do you recall what day or days he
8    came to the island to assist in the
9    investigation?
10      A.  I don't recall, no.          09:15:44
11      Q.  Did you provide any documents to
12   Mr. Cherry before he commenced his role in the
13   investigation?
14      A.  I believe he reviewed all the
15   documents that we already had.        09:15:55
16      Q.  What documents were those?
17      A.  I believe it was, there were at
18   least three statements that were taken by the
19   officers that were on duty that night.  There
20   was a field report that was drafted that night  09:16:09
21   by Officer Snyder.  And I don't know if I had
22   any documents that I had drafted up.  Any
23   statements that I took he may have read one or
24   two that maybe that I took at that time.  And
25   I believe there was the letter from Budd  09:16:25

Page 501

1           Hesse
2    Jaeger, the fax, and some notes that were
3    faxed to me by his wife.
4       Q.  Any other documentation that you
5    provided to Mr. Cherry prior to him commencing  09:16:41
6    his role in the investigation?
7       A.  Not that I recall.
8       Q.  What did you explain to Mr. Cherry
9    about the assignment?
10      A.  I don't recall exactly how I      09:16:53
11   explained it to him.
12      Q.  Do you recall anything that you
13   explained to him?
14      A.  No.
15      Q.  Were you ever told that one of the  09:17:02
16   people who were involved in the altercation
17   with Mr. Bosetti had claimed that he was
18   afraid there was going to be a cover up, had
19   you ever heard that?
20          MR. NOVIKOFF: Objection.        09:17:32
21          MR. CONNOLLY: At any time?
22      Q.  At any time?
23      A.  I don't specifically recall, no.
24      Q.  And did Cherry take any -- did Pat
25   Cherry take any witness statements as part of  09:17:47

Page 502

1           Hesse
2    his role in the investigation?
3       A.  Yes.
4       Q.  How many witness statements did he
5    take?                           09:17:55
6       A.  Possibly three.
7       Q.  Do you know whose witness
8    statements Mr. Cherry took?
9       A.  He did Jeannie Jaeger, the victim.
10   He did Sean O'Rourke, and I believe he      09:18:11
11   interviewed Elyse Miller over the phone.
12      Q.  Where did the interview with
13   Jeannie Jaeger take place?
14      A.  At her house in Smithtown.
15      Q.  Do you know when that interview   09:18:35
16   took place?
17      A.  The statement is dated, so it
18   would be on the date that is on the statement
19   itself.  I don't recall the actual date.
20      Q.  Did you attend the interview?    09:18:49
21      A.  Yes, I did.
22      Q.  Did you ask any questions during
23   the interview?
24      A.  I don't recall if I did.
25      Q.  Did Mr. Cherry ask any questions  09:18:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 503

**Hesse**

1
2  during the interview?
3      A.   Specifically I don't really think
4  so.
5      Q.   Do you recall anything that you      09:19:11
6  said during that interview?
7      A.   No, I don't recall.
8      Q.   Do you recall anything that
9  Mr. Cherry said during that interview?
10     A.   Yes.  In his own words I think he    09:19:18
11  asked her to say in her own words what
12  happened.
13     Q.   Did he say anything else during
14  that interview?
15     A.   Not that I recall specifically,      09:19:27
16  no.
17     Q.   So you don't recall if he had
18  asked her any questions?
19     A.   Not specifically, no.
20     Q.   What was Ed Paradiso's role in the   09:19:39
21  investigation?
22     A.   I don't think he had a role.
23     Q.   He was not involved at all?
24     A.   I think in the early, early stages
25  his involvement dealt with -- you know, to    09:19:55

Page 504

Hesse

1
2  tell you the truth I don't know.  I mean he --
3  I know he spoke to Elyse Miller, he attempted
4  to talk to Gary Bosetti and Rich Bosetti.
5  Other than that he called me Sunday evening    09:20:13
6  and said investigate this.
7      Q.   What exactly did he say when he --
8  what exactly did he say when he called you
9  Sunday evening and told you that he wanted you
10  to investigate it?                            09:20:29
11     A.   He basically, you know, he told me
12  what he was told I guess what had happened
13  that night and said that when I come in Monday
14  morning he is going to put some documents for
15  me to read and try to figure out what          09:20:44
16  happened.
17     Q.   What did he tell you about what
18  had happened that night?
19         MR. CONNOLLY:  Read back the
20     question.                                  09:21:02
21         (Record read.)
22         MR. CONNOLLY:  Objection.  But you
23     can answer.
24     A.   He said something about Gary
25  Bosetti possibly went crazy in a bar and       09:21:09

Page 505

Hesse

1
2  started hitting people with a pool stick, and
3  that he had fired him, and that when I come in
4  Monday morning just figure out what happened.
5      Q.   Did he tell you where he learned     09:21:25
6  those facts from?
7          MR. NOVIKOFF:  Objection to the
8      form.
9      A.   I don't remember specifically if
10  he did.                                        09:21:34
11     Q.   He told you that he fired Gary
12  Bosetti?
13     A.   He told me he fired Gary Bosetti.
14     Q.   Did he tell you why he fired Gary
15  Bosetti?                                       09:21:45
16     A.   I don't recall specifically why.
17     Q.   Did you have any role in the
18  decision to fire Gary Bosetti?
19     A.   No.
20     Q.   Did you know about it prior to it    09:21:50
21  happening?
22     A.   No.
23     Q.   When Mr. Cherry came in as part of
24  the investigation did you tell him that Gary
25  Bosetti had been fired?                        09:22:05

Page 506

**Hesse**

1
2      A.   I don't recall specifically if I
3  told him when he came in.
4      Q.   How long did the investigation
5  take?                                          09:22:15
6          MR. NOVIKOFF:  Before they -- take
7      before what?
8          MR. CONNOLLY:  Objection.
9      Q.   How long did your investigation
10  take?                                          09:22:25
11         MR. NOVIKOFF:  Objection.
12     A.   Well, to get to the bottom of
13  things maybe five days, but from start to
14  finish to prosecution, it took a couple of
15  months.                                        09:22:42
16     Q.   What do you mean by to get to the
17  bottom of things?
18     A.   To kind of figure out what really
19  happened.
20     Q.   So you were able to reach a         09:22:49
21  conclusion as to what really happened within
22  five days?
23     A.   I believe it was about five days,
24  yes.
25         MR. CONNOLLY:  Objection.            09:22:56

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 507

Hesse

1
2     Q.   During those five days did you
3  speak with Kevin Lamm at all about his
4  involvement in the incident, or his
5  involvement in investigating that incident?      09:23:12
6          MR. NOVIKOFF:  Objection to the
7     form.  Foundation.
8     A.   Yes.
9     Q.   When did you speak with Lamm?
10    A.   Like I stated a few weeks ago,      09:23:20
11 when I got the phone call from Ed Paradiso
12 that he had fired Gary and that this incident
13 had happened, I called Kevin Lamm on his cell
14 phone and asked him what happened.
15    Q.   Did you speak to him at any time      09:23:38
16 after that call that you testified to already?
17    A.   Yes.  I believe I spoke to him one
18 other time.
19    Q.   When was that?
20    A.   I don't know the exact date.      09:23:47
21    Q.   Was it in person or on the phone?
22    A.   On the phone I believe.
23    Q.   Tell me everything that you recall
24 that was discussed between you and Mr. Lamm
25 during that telephone conference?      09:23:57

Page 508

Hesse

1
2     A.   I don't specifically remember the
3  contents of the phone call, but I asked him to
4  put a 42 together, a statement regarding what
5  he believes took place.      09:24:07
6     Q.   Do you recall anything else that
7  was discussed during that call?
8     A.   Not specifically, no.
9     Q.   Do you know whether Cherry ever
10 spoke with Lamm as part of his role in the      09:24:17
11 investigation?
12    A.   I don't know.
13    Q.   How many times did you speak with
14 Mr. Fiorillo in connection with the
15 investigation?      09:24:29
16    A.   Over the course of a couple of
17 years?
18    Q.   No, within the five day period
19 until you reached the conclusion?
20    A.   Like I stated with Kevin Lamm, I      09:24:39
21 also called Frank that Sunday, that Sunday
22 evening, early evening.  I asked him basically
23 the same thing that I asked Kevin, what had
24 happened, what he thought what had happened.
25    I don't specifically recall what      09:24:56

Page 509

Hesse

1
2  he said and I asked him to just put a
3  statement together, a 42, just to tell me what
4  happened.
5     Q.   Do you recall anything that was      09:25:05
6  discussed, any of the details of what was
7  discussed?
8     A.   No, I don't recall the details
9  exactly, no.
10    Q.   Did you speak with Mr. Fiorillo at  09:25:13
11 any other time during the five day period in
12 which it took you to investigate and reach a
13 conclusion?
14         MR. CONNOLLY:  Objection.
15    A.   I believe one other time, yes.      09:25:26
16    Q.   When was that?
17    A.   I think I saw him in person at
18 the -- at the lighthouse parking lot where we
19 make our relief.  I believe he handed me a
20 handwritten 42.      09:25:37
21    Q.   Do you recall anything that was
22 stated by either you or Mr. Fiorillo during
23 that -- during that incident in which you met
24 with him at the lighthouse?
25    A.   I don't recall specifically      09:25:56

Page 510

Hesse

1
2  anything.
3     Q.   How about generally, do you recall
4  anything generally that was discussed?
5     A.   No, not really.      09:26:01
6     Q.   How about Mr. Snyder, how many
7  times did you speak with him during the five
8  day period in which you investigated and
9  reached a conclusion?
10         MR. CONNOLLY:  Objection.      09:26:12
11    A.   You know what, I don't think I
12 spoke to him at all that I can recall.
13    Q.   Did you try to speak to him?
14    A.   I believe I did, but I am not
15 sure, I can't speculate.      09:26:23
16    Q.   So you don't recall any efforts
17 that you made to speak to Mr. Snyder?
18    A.   I don't recall.
19    Q.   Do you know whether Mr. Cherry
20 spoke with Mr. Fiorillo at all?      09:26:31
21    A.   I don't know.
22    Q.   Do you know whether Mr. Cherry
23 spoke with Mr. Snyder at all?
24    A.   I don't know.
25    Q.   Do you think it would have been      09:26:37

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 511

Hesse

1
2 important for him to speak with either Mr.
3 Fiorillo, Mr. Lamm or Mr. Snyder in connection
4 with his role in the investigation?
5        MR. CONNOLLY:  Objection.        09:26:50
6        MR. NOVIKOFF:  Objection.
7    A.   No.
8    Q.   Why not?
9    A.   We already had statements that
10 were taken by these individuals and I asked    09:26:54
11 them already to write me up a 42 what they
12 thought happened, so there was no need to
13 speak to them further.
14    Q.   Did you speak to anybody from
15 Ocean Beach Rescue who was on duty that night  09:27:07
16 of the Halloween incident during your five day
17 period of investigating?
18        MR. CONNOLLY:  Objection.
19    A.   I don't recall.
20    Q.   Did you speak with Joe Loeffler   09:27:15
21 during that period; when I say Joe Loeffler I
22 mean Joe Loeffler Jr.?
23    A.   I don't recall specifically
24 speaking to him.
25    Q.   Did you speak with any of the    09:27:28

Page 512

Hesse

1
2 three people who provided a witness statement
3 to the on duty officers that night?
4    A.   At any time?
5    Q.   During the five day period in    09:27:39
6 which you reached a conclusion as to what
7 happened?
8        MR. CONNOLLY:  Objection.
9    A.   No.
10    Q.   Did you try to speak with any of  09:27:44
11 the three of them?
12    A.   No.
13    Q.   Why not?
14    A.   I had their statements.
15    Q.   You didn't have any follow up    09:27:53
16 questions from those statements?
17    A.   No.
18    Q.   So their statements were complete
19 in your mind?
20    A.   Yes.                09:28:01
21    Q.   Just so I am clear you didn't deem
22 it necessary to speak with the other side, the
23 other individuals that were involved in the
24 fight?
25        MR. NOVIKOFF:  Objection.        09:28:14

Page 513

Hesse

1
2        MR. CONNOLLY:  Objection.
3    A.   They were already spoken to.
4    Q.   You didn't think it was necessary
5 or important to speak with them yourself?    09:28:20
6        MR. NOVIKOFF:  Objection.
7        MR. CONNOLLY:  Objection.
8    A.   No.
9    Q.   Do you believe that the on duty
10 officers did a sufficient job in taking their  09:28:28
11 statements?
12        MR. NOVIKOFF:  Objection to the
13 form.
14    A.   No.
15    Q.   Why not?                09:28:34
16    A.   They were somewhat incoherent.
17 They were purely written.
18    Q.   Did they provide any other
19 statements other than the ones that they gave
20 to the three on duty officers?        09:28:59
21    A.   I believe they made some verbal
22 comments the next day to Paradiso.
23    Q.   How did you learn of those verbal
24 comments?
25    A.   I believe when I was called that   09:29:11

Page 514

Hesse

1
2 night by Ed Paradiso, now thinking about it,
3 he did tell me that they came back early that
4 Sunday morning to file a complaint I guess
5 against Officer Bosetti.            09:29:24
6    Q.   Do you know whether they actually
7 filed a complaint against Officer Bosetti?
8    A.   I think it was all done verbally.
9    Q.   What was the basis of that belief?
10    A.   I was told that by Ed Paradiso.    09:29:37
11    Q.   Do you recall what Ed Paradiso
12 told you that they stated to him that Sunday
13 morning?
14    A.   I believe he told them that he had
15 already fired Officer Bosetti and an        09:29:47
16 investigation would be conducted.
17    Q.   Did he tell you anything that they
18 stated happened at the Halloween incident?
19    A.   I don't recall.
20    Q.   So I believe that you testified    09:29:59
21 that you thought that their statements were
22 complete, is that correct, is what you
23 testified to?
24        MR. CONNOLLY:  Objection.
25    A.   Yes.                09:30:08

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 515

```
 1            Hesse
 2      Q.  You testified that the statements
 3  that you read were incoherent and purely
 4  written; correct?
 5      A.  Yes.                    09:30:15
 6      Q.  So how do you reconcile those two?
 7      A.  I don't understand the question.
 8      Q.  What was incoherent about the
 9  statements?
10      A.  They just were just belligerent   09:30:21
11  lies from an intox person?
12      Q.  And did you know that as soon as
13  you read those statements that they were
14  belligerent lies from an intox person?
15      A.  You could tell just by reading   09:30:38
16  them.
17      Q.  So you didn't think it was
18  important for you to further question them
19  after you believed what they had given as a
20  statement were lies?              09:30:47
21      A.  No.
22      Q.  Why not?
23      A.  Because a victim came forward,
24  told me what really had happened.  And the
25  fact that the statements reflected the fact   09:30:59
```

Page 516

```
 1            Hesse
 2  that Gary Bosetti identified himself as a
 3  police officer led me to believe that there
 4  was no further questions I needed to ask these
 5  individuals because they already knew what   09:31:12
 6  they had done.
 7      Q.  What does the fact that Gary
 8  Bosetti identified himself as a police officer
 9  lead you to that conclusion?
10      A.  One of the statements stated that   09:31:21
11  Gary Bosetti who identified himself as a
12  police officer at least ten times, I think
13  that is what the statement says.
14      Q.  What did that lead you to believe
15  that -- why did that lead you to believe that   09:31:34
16  you didn't need to speak with them any
17  further?
18      A.  Because flat out they admitted
19  what they had done.
20      Q.  So it is your conclusion that   09:31:46
21  their witness statements is an admission as to
22  what they had done; is that your testimony?
23          MR. CONNOLLY:  Objection.
24          MR. NOVIKOFF:  Objection.
25      A.  Yeah.                  09:31:55
```

Page 517

```
 1            Hesse
 2      Q.  Did you run a background check on
 3  any of the three of them?
 4      A.  I may have, I don't recall
 5  specifically.                   09:32:07
 6      Q.  Did you run a background check on
 7  anybody other than for the three of them in
 8  connection with the investigation of the
 9  Halloween incident?
10          MR. CONNOLLY:  Objection.   09:32:15
11      A.  I don't specifically recall.
12      Q.  Why would you run a background
13  check on the three of them?
14      A.  Because they were suspects.
15      Q.  When did they become suspects?   09:32:23
16      A.  Probably after I had spoken to
17  Budd Jaeger and Jeannie Jaeger.
18      Q.  So they became suspects based on
19  the statements of Budd Jaeger and Jeannie
20  Jaeger?                       09:32:43
21      A.  Yes.
22      Q.  Was Gary Bosetti considered a
23  suspect in your mind?
24          MR. NOVIKOFF:  Objection as to
25  timeframe.                    09:32:51
```

Page 518

```
 1            Hesse
 2      Q.  While you were investigating?
 3          MR. CONNOLLY:  Same objection.
 4          MR. NOVIKOFF:  Objection.
 5      A.  In the early stages I was not   09:32:56
 6  sure.  It was possible, yes.
 7      Q.  Did you attempt to speak with him
 8  during the five days that you were
 9  investigating?
10      A.  Speak with who?           09:33:06
11      Q.  Start with Gary Bosetti, did you
12  attempt to speak with Gary Bosetti during the
13  five days of your investigation?
14      A.  No.
15          MR. CONNOLLY:  Objection.   09:33:15
16      Q.  Did you attempt to speak with Rich
17  Bosetti during the five days of your
18  investigation?
19      A.  No.
20          MR. CONNOLLY:  Objection.   09:33:23
21      Q.  Did you speak with either of them
22  during those five days?
23          MR. CONNOLLY:  Objection.
24      A.  No.
25      Q.  Why didn't you attempt to speak   09:33:29
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 519

**Hesse**

1  **Hesse**
2  with them?
3      A.  Because they too in the early
4  stages were suspect to possibly some
5  wrongdoing.                       09:33:38
6      Q.   Was it your policy not to speak to
7  anybody who was suspect of doing wrongdoing?
8      A.  Well I wanted to find some
9  independent witnesses to find out what had
10 happened.                         09:33:52
11     Q.   You didn't answer the question.
12 The question was whether it was a policy at
13 any time not to speak to anybody who was a
14 suspect of doing wrongdoing?
15         MR. CONNOLLY:  Objection.       09:34:01
16         MR. NOVIKOFF:  Objection.
17     A.  I found it not necessary to speak
18 to anybody at that time.
19     Q.   Do you know what the three people
20 who gave witness statements that night were   09:34:10
21 drinking?
22         MR. CONNOLLY:  You are talking
23     about the three --
24     Q.   Schalik, Van Koot and Tesori.  The
25 question was do you know what they were        09:34:29

Page 520

1      **Hesse**
2  drinking?
3         MR. CONNOLLY:  Got it?
4      A.  I don't specifically recall, no.
5      Q.   Do you know how many drinks they   09:34:35
6  had?
7      A.  No.
8      Q.   What was the basis of your belief
9  that they were intoxicated?
10     A.  I was told by the three officers   09:34:43
11 that were there.
12     Q.   Which are the three officers told
13 you?
14     A.  Fiorillo, Snyder and Lamm.
15     Q.   The fact that they were           09:34:51
16 intoxicated, did that have any role in your
17 assessment of their credibility?
18     A.  No.
19     Q.   Why did you testify before -- you
20 testified before that they were belligerent   09:35:06
21 lies by intox; is that correct?
22     A.  Uh-hum.
23     Q.   What does the fact that they were
24 intoxicated have to do with anything about the
25 belligerent lies, if anything?                 09:35:16

Page 521

1         **Hesse**
2      A.  Poor judgment maybe.  I don't
3  know.
4      Q.   Was Jeannie Jaeger drinking that
5  night?                            09:35:21
6      A.  I don't recall.
7      Q.   Do you know whether Cherry asked
8  her that as part of her interview?
9      A.  I don't recall.
10     Q.   Did you ask her that when you      09:35:28
11 spoke with her?
12     A.  I don't believe I did.
13     Q.   Do you think that that was a
14 question that should have been asked as part
15 of the investigation?                   09:35:40
16         MR. NOVIKOFF:  Objection.
17     A.  Not specifically, no.
18     Q.   Do you think that if she was drunk
19 it could have affected her judgment?
20     A.  Being a victim, no.              09:35:49
21     Q.   Could it have affected her ability
22 to recall facts?
23         MR. NOVIKOFF:  Objection.
24     A.  I don't know.
25     Q.   You don't think if she is         09:36:00

Page 522

1         **Hesse**
2  intoxicated it may have affected her ability
3  to recall facts?
4         MR. NOVIKOFF:  Objection.
5      A.  It is speculating.  It is         09:36:10
6  possible.
7      Q.   Well as a police officer for a
8  long time, in your experience as a police
9  officer do you believe that intoxicated
10 people -- strike that.                  09:36:26
11         Do you believe that intoxication
12 can affect a witness' ability to recall facts?
13         MR. CONNOLLY:  Objection.
14         MR. NOVIKOFF:  Objection.
15     A.  I believe so, yes.              09:36:34
16     Q.   But yet you still didn't ask her
17 if she was drinking?
18         MR. CONNOLLY:  Objection.
19     A.  I don't specifically recall.
20         MR. NOVIKOFF:  Before you ask the   09:36:46
21     next question, just to make clear on the
22     record, an objection by one party is an
23     objection for all?
24         MR. GOODSTADT:  Yes.
25         MR. NOVIKOFF:  Right.           09:36:59

9  (Pages 519 to 522)

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 523

Hesse

1
2    **Q.   Are you aware of the injuries to**
3    **Brian Van Koot from that night?**
4        A.   Partially, yes.
5        **Q.   What do you mean by partially?**    **09:37:05**
6        A.   I partially recall.
7        **Q.   You partially recall now or you**
8    **were partially aware at the time; I am not**
9    **sure what you mean by partially?**
10           MR. CONNOLLY:  Objection. Re-ask   09:37:19
11       the question.
12       **Q.   At the time during those five days**
13   **were you aware of the injuries to Brian Van**
14   **Koot?**
15           MR. CONNOLLY:  Objection. If you   09:37:32
16       understand the question.
17       A.   I know why he went to the
18   hospital, but I don't believe there were any
19   injuries sustained from what I recall.
20       **Q.   Did you see any pictures of Brian**   **09:37:41**
21   **Van Koot from that night?**
22           MR. CONNOLLY:  At any juncture?
23       **Q.   At any juncture?**
24       A.   Yes.
25       **Q.   When did you see those?**          **09:37:52**

Page 524

Hesse

1
2        A.   I may have saw them the day I came
3    in. I don't specifically recall.
4        **Q.   You testified that you don't**
5    **believe there were any injuries sustained by**   **09:38:10**
6    **Mr. Van Koot.  What did you mean by that?**
7        A.   He came in the next morning and I
8    believe he was okay.
9           MR. GOODSTADT:  Would you mark
10      this as Hesse Exhibit 17, photocopy of    09:38:28
11      photographs.
12          (Hesse Exhibit 17, photocopy of
13      photographs, marked for
14      identification, as of this date.)
15      **Q.   I placed in front of Mr. Hesse**    **09:38:41**
16   **what has now been marked as Hesse 17,**
17   **three-page exhibit bearing Bates numbers 3187**
18   **through 3188, 3189.**
19      **Mr. Hesse, are these the pictures**
20   **that you saw the next morning?**         **09:39:14**
21          MR. CONNOLLY:  Objection.
22      A.   Yes, I have seen these pictures,
23   yes.
24      **Q.   Did you hear that at that time**
25   **that Mr. Van Koot had suffered an unaligned**   **09:39:27**

Page 525

Hesse

1
2    **trachea, or disaligned trachea as a result of**
3    **the Halloween incident?**
4           MR. NOVIKOFF:  Objection to the
5       form.                            09:39:44
6       A.   Yes, I did hear that he had a
7    either deviated trachea or something, what the
8    EMT suspected, yes.
9       **Q.   What do you mean by what the EMT**
10   **suspected?**                            **09:40:00**
11      A.   If he had a deviated trachea I
12   doubt he would have been out of the hospital
13   within a couple of hours.  It was a
14   precautionary measure.
15      **Q.   So do you know whether he actually**   **09:40:10**
16   **suffered that injury?**
17      A.   I don't believe he did.
18      **Q.   That was on the basis of your**
19   **understanding that he was out of the hospital**
20   **and came to the police station the next**     **09:40:19**
21   **morning?**
22          MR. NOVIKOFF:  Objection to the
23      form.
24      A.   Yes.
25      **Q.   Did you ever check to see whether**   **09:40:22**

Page 526

Hesse

1
2    he had actually suffered those injuries?
3           MR. NOVIKOFF:  Objection.
4       Foundation.
5       A.   I don't recall.                09:40:30
6       **Q.   Did you ever speak -- strike that.**
7           **How did you know that the EMT**
8    **suspected that?**
9       A.   I think I read it on the PCR.
10      **Q.   Did you ever speak with anyone who**   **09:40:44**
11   **was on EMT that night about those injuries?**
12      A.   I don't recall if I did.
13      **Q.   When was the first time that you**
14   **spoke with Joe Loeffler Jr. about the**
15   **Halloween incident?**                   **09:40:57**
16      A.   I don't recall when.
17      **Q.   Do you recall how long after those**
18   **five days it was?**
19      A.   I don't.
20      **Q.   Joe Loeffler was part of the EMT**   **09:41:04**
21   **that night; is that correct?**
22      A.   I believe he was, yes.
23      **Q.   Did you ever hear the fact that he**
24   **stated that it was an assault second with a**
25   **dangerous instrument at the police station**   **09:41:15**

Page 527

1          **Hesse**
2  **that night?**
3          MR. CONNOLLY:  Objection.
4          MR. NOVIKOFF:  Objection.
5      A.  I heard a rumor about that, yes.   09:41:19
6      **Q.   Who did you hear the rumor from?**
7      A.  I don't recall.
8      **Q.   Did you ever speak with**
9  **Mr. Loeffler about that statement?**
10     A.  I don't recall.            09:41:26
11     **Q.   Did you ever speak with any of the**
12 **on duty officers that night about that**
13 **statement?**
14         MR. NOVIKOFF:  Objection.
15     **Q.   The three on duty officers that    09:41:36**
16 **were on duty that night --**
17         MR. CONNOLLY:  The three officers
18     that went to the scene?
19         MR. NOVIKOFF:  Objection to the
20     form.                09:41:45
21     **Q.   Yes.**
22     A.  I don't recall if I did
23 specifically.
24     **Q.   Do you recall specifically**
25 **speaking to anybody about that statement being  09:41:51**

Page 528

1          **Hesse**
2  **made?**
3          MR. NOVIKOFF:  Objection to the
4      form.
5      A.  Specifically no.            09:41:54
6      **Q.   Did you review the on duty**
7  **officers field report from that evening?**
8      A.  Yes.
9      **Q.   When did you review that for the**
10 **first time?                09:42:12**
11     A.  I believe it was that Monday
12 morning.
13     **Q.   And what was your reaction to**
14 **reading that report?**
15     A.  I don't know if I really had a    09:42:22
16 reaction.  I don't really recall what I had
17 thought.
18     **Q.   Did you read that at the same time**
19 **that you read the witness statements that had**
20 **been taken the night of the Halloween        09:42:39**
21 **incident?**
22     A.  Yes, I read them as a packet.
23     **Q.   And the photos that have been**
24 **marked as Hesse Exhibit 17, they were part of**
25 **that packet?                09:42:52**

Page 529

1          **Hesse**
2      A.  You know I don't recall if they
3  were or not.  I do remember seeing them.  I
4  don't remember when I first saw them though.
5      **Q.   Were there any handwritten notes    09:43:01**
6  **or notes or documents prepared by Ed Paradiso**
7  **in that packet that you received?**
8      A.  I don't recall if there was.
9          MR. GOODSTADT:  Would you mark
10 this document as Hesse Exhibit 18,        09:43:17
11 incident report.
12         (Hesse Exhibit 18, incident
13 report, marked for identification, as
14 of this date.)
15         MR. GOODSTADT:  Off the record for  09:43:40
16 one minute.
17         THE VIDEOGRAPHER:  The time is
18 9:45, we are off the record.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  The time is        09:51:48
21 9:53, we are on the record.
22     **Q.   Mr. Hesse, I want to go back to**
23 **your discussions with Jeannie Jaeger both on**
24 **the phone and when you went to her house with**
25 **Mr. Cherry.  Did you ever ask her why she        09:52:06**

Page 530

1          **Hesse**
2  **didn't provide a statement that night to the**
3  **on duty police officers?**
4      A.  Yes, she felt that because she saw
5  an ambulance in front of the police station,    09:52:21
6  that she felt that they were busy and she
7  didn't want to bother anybody.
8      **Q.   Do you know where she went after**
9  **Hauser's that night?**
10     A.  I don't recall where she went.    09:52:38
11     **Q.   You never heard that she went to**
12 **CJ's after Hauser's?**
13     A.  I don't recall.  She might have.
14     **Q.   Do you have to pass the police**
15 **station to get from Hauser's to CJ's?        09:52:49**
16     A.  Yes.
17     **Q.   Do you have to pass the police**
18 **station to get from CJ's back from their**
19 **residence?**
20     A.  No.                09:52:57
21     **Q.   How far is CJ's from the police**
22 **station?**
23     A.  Maybe 50 steps.
24     **Q.   50 steps?**
25     A.  Maybe.            09:53:03

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 531

Hesse

2 Q. Did you ask her whether the --
3 strike that.
4 You never spoke to her about
5 whether she was at CJ's that night after    09:53:08
6 Hauser's?
7 MR. CONNOLLY: Objection.
8 A. I don't recall.
9 Q. Did you ask her why she didn't
10 give a statement to the on duty officers at    09:53:16
11 Hauser's?
12 MR. CONNOLLY: Objection.
13 MR. NOVIKOFF: Objection.
14 A. I don't recall.
15 Q. Do you know whether -- strike    09:53:24
16 that.
17 Did she tell you that she didn't
18 want to bother anybody when she saw the
19 ambulance, did she tell you that during the
20 phone call or did she tell you that during the    09:53:35
21 visit to her house?
22 A. I don't recall.
23 Q. Do you know whether it was
24 incorporated into her witness statement?
25 A. I don't recall if it was or not.    09:53:44

Page 532

Hesse

2 Q. Do you think that is an important
3 fact that should be incorporated into a
4 witness statement?
5 MR. NOVIKOFF: Objection.    09:53:55
6 A. May have.
7 Q. It may have been important to
8 incorporate in a witness statement?
9 A. May have.
10 Q. What do you mean by that?    09:54:02
11 A. We just told her to tell us what
12 happened. You know, it is funny, I don't
13 recall whether or not she told me within those
14 first five days or when we took the statement
15 or after. I must have seen her a hundred    09:54:18
16 times since then, so I don't recall.
17 Q. So it is possible that you didn't
18 even ask her that during the five days?
19 A. I don't recall.
20 Q. The witness statements that were    09:54:28
21 prepared by, written by you and Mr. Cherry,
22 are those considered police property?
23 MR. NOVIKOFF: Objection to the
24 form.
25 A. I would say yes.    09:54:42

Page 533

Hesse

2 Q. Would they be confidential?
3 A. To a point.
4 Q. What do you mean by to a point?
5 A. They are not for the general    09:54:49
6 public to look at.
7 Q. Were they for other officers to
8 look at other than for you and Mr. Cherry?
9 A. I don't think I would have hid
10 them from anybody.    09:55:02
11 Q. Did you leave them out for anybody
12 to look at?
13 A. Not specifically that I recall.
14 Q. Did you ever show them to Gary
15 Bosetti?    09:55:11
16 A. Yes.
17 Q. When did you show them to Gary
18 Bosetti?
19 A. I don't recall when.
20 Q. Did you show them before or after    09:55:16
21 he provided his statement?
22 A. It might have been after.
23 Q. You don't recall showing them to
24 him before?
25 A. No.    09:55:24

Page 534

Hesse

2 Q. Would it have been improper for
3 him to review the other witness' statements
4 before giving his own witness statement?
5 MR. CONNOLLY: Objection.    09:55:33
6 MR. NOVIKOFF: Objection.
7 A. I don't believe so.
8 Q. So you think it would have been
9 proper for him to review everybody else's
10 witness statement prior to his statement being    09:55:39
11 taken?
12 MR. NOVIKOFF: Objection.
13 A. You know at that point I don't
14 think it really would have mattered.
15 Q. Why not?    09:55:50
16 A. Because we felt that his actions
17 were correct.
18 Q. So why did you ask him for a
19 statement?
20 A. Because we actually wanted to see    09:55:57
21 what he had to say.
22 Q. So again prior to actually seeing
23 what he had to say do you think it would have
24 been proper to show him all the other eye
25 witness statements that had been taken?    09:56:10

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2      MR. CONNOLLY:  Objection.
3      A.   Yeah, I don't recall whether or
4  not he did.  To tell you the truth I don't
5  believe he did until afterwards.          09:56:19
6      **Q.   I am not asking whether he did or**
7  **didn't, I am asking whether it would have been**
8  **proper to have provided him with the other**
9  **witness statements prior to finding out what**
10 **he had to say?**                         **09:56:28**
11     MR. NOVIKOFF:  Note my objection.
12     MR. CONNOLLY:  Objection.
13     A.   I don't think it would have been
14 proper, but like I said I don't recall whether
15 he did or not.  I don't think he did.      09:56:40
16     **Q.   Would it have been proper for him**
17 **to just make photocopies of the statements and**
18 **take them home with him?**
19     A.   I don't --
20     MR. NOVIKOFF:  Objection.        09:56:53
21     A.   I don't believe he did.
22     **Q.   The question wasn't whether he did**
23 **or didn't.  The question was whether it would**
24 **have been proper for him to do so?**
25     MR. NOVIKOFF:  Objection.        09:56:59

Hesse

1
2      A.   If he asked permission I don't
3  think it would have been improper.
4      **Q.   How about if he didn't ask**
5  **permission?**                            **09:57:05**
6      A.   I think that would be improper.
7      **Q.   Would it be grounds for**
8  **termination?**
9      A.   Not specifically.
10     **Q.   Why not?**                      **09:57:12**
11     A.   Why should he be; I don't know.
12     **Q.   Did you terminate David Gerbin**
13 **(phonetic) for making photocopies of police**
14 **documents?**
15     A.   He did more than that.          09:57:28
16     **Q.   Was that one of the reasons that**
17 **you terminated him?**
18     A.   Yes.
19     **Q.   What were the other reasons that**
20 **you terminated Gerbin?**                 **09:57:35**
21     A.   He was in my desk going through my
22 personal documents, not just a file that was
23 left on a desk.
24     **Q.   Anything else that Gerbin did that**
25 **you terminated him for?**                **09:57:46**

Hesse

1
2      A.   He went through people's personnel
3  files and took copies of that stuff too, I
4  don't find that to be proper.
5      **Q.   Anything else that you fired**     **09:57:54**
6  **Gerbin for?**
7      A.   I believe that was it.
8      **Q.   And that was -- you saw that on**
9  **the videotape, Gerbin taking the stuff?**
10     A.   Yes.                            09:58:17
11     **Q.   Did you keep a copy of that tape?**
12     A.   Yes.
13     **Q.   I believe you testified that**
14 **Mr. Paradiso had spoken to Elyse Miller; is**
15 **that correct?**                          **09:58:30**
16     MR. NOVIKOFF:  Objection.
17     A.   Yes.
18     **Q.   How did you learn that he spoke**
19 **with Elyse Miller?**
20     A.   I believe he had stated to me that  09:58:43
21 he did and Elyse Miller had said that he came
22 up to the house.
23     **Q.   What house is that?**
24     A.   I don't specifically remember.
25     **Q.   You don't know -- so she told you**  **09:58:49**

Hesse

1
2  **that she spoke with Ed Paradiso when he came**
3  **up to the house?**
4      A.   Yes, where she was staying that
5  night.                                    09:59:01
6      **Q.   Did she tell you which house it**
7  **was?**
8      A.   If I recall correctly I think it
9  was Michael Miller's house on Barberry Walk.
10     **Q.   Was Gary Bosetti staying there**     **09:59:11**
11 **that night?**
12     A.   I don't recall.
13     **Q.   Did you ever ask him?**
14     A.   I don't recall if I did or not.
15     **Q.   Do you know whether Richard**        **09:59:18**
16 **Bosetti was staying there that night?**
17     A.   I don't recall.
18     **Q.   Did you ever ask him?**
19     A.   Actually he made a statement that
20 he stayed in the barracks.               09:59:29
21     **Q.   Do you know whether he was**
22 **planning to stay at Michael Miller's house**
23 **that evening?**
24     A.   I don't know.
25     **Q.   Did Ms. Miller provide -- strike**   **09:59:40**

Page 539

Hesse

1    Hesse
2  that.
3    What else did Mr. Paradiso tell
4  you if anything about his discussion with
5  Ms. Miller?                          09:59:49
6    A.   I don't recall.
7    Q.   Do you recall anything he told you
8  about his discussion with Ms. Miller other
9  than the fact that he spoke with her?
10   A.   No, I don't recall.        09:59:58
11   Q.   When was the first time that you
12 spoke with Elyse Miller about Halloween?
13   A.   I don't remember the exact date,
14 but I believe it was over the telephone.
15   Q.   Was it prior to or after your    10:00:10
16 discussion on that Monday or on that Tuesday
17 with Doug Wyckoff?
18   A.   Well, I know Officer Cherry was
19 present when I spoke to her on the phone
20 because he was listening in.  Actually I was  10:00:28
21 listening in to him.  So it had to be a couple
22 of days after.
23   Q.   So your discussion with Ms. Miller
24 was a couple of days after that Tuesday?
25   A.   A day or two possibly, I don't    10:00:41

Page 540

1    Hesse
2  know.
3    Q.   So your recollection it was either
4  Wednesday or Thursday?
5    A.   It is possible, I don't know.     10:00:48
6    Q.   Did you call her or did she call
7  you?
8    A.   I don't remember.
9    Q.   Tell me everything that you recall
10 that she said about what happened on Halloween  10:01:01
11 during that phone call?
12       MR. CONNOLLY:  That phone call
13 being?
14   Q.   The one that you testified to the
15 first time that you spoke with her?        10:01:09
16   A.   I think we just basically asked
17 her what she observed, and she said she was
18 waiting on line for the bathroom.  She
19 remembers being on line for quite a while,
20 possibly fifteen minutes or more.  She was   10:01:20
21 standing behind who she now knows as Jeannie
22 Jaeger who was the first one on line.  I guess
23 they were having a discussion about how long
24 they were waiting on line.
25       They kept knocking on the door.  I  10:01:34

Page 541

1    Hesse
2  remember her saying that then a male and a
3  female came out of the bathroom.  Next thing
4  you know a fight broke out and her and Jeannie
5  somehow got themselves into the bathroom to   10:01:51
6  stay away from the fight.  That is basically
7  what I recall.  I don't remember specifics.
8    Q.   And who was -- who was on that
9  call?
10   A.   I believe it was myself and John  10:02:04
11 Cherry, Pat Cherry.
12   Q.   Did you ask -- strike that.
13       Do you know whether Ms. Miller was
14 drinking that evening?
15   A.   I don't recall.              10:02:13
16   Q.   Did you ask her?
17   A.   I don't recall.
18   Q.   Do you think that would have been
19 an important question to ask Ms. Miller?
20       MR. NOVIKOFF:  Objection.      10:02:22
21   A.   May have.
22   Q.   What do you mean by may have?
23   A.   It just may have.  I think it was
24 irrelevant, but I don't recall her if we asked
25 her or not.                        10:02:32

Page 542

1    Hesse
2    Q.   Why would it be irrelevant about
3  whether an alleged eyewitness was drinking?
4    A.   Because what she told us is what
5  we believed happened, so.  And she was not   10:02:42
6  intoxicated when we were asking her those
7  questions.
8    Q.   But if she was intoxicated at the
9  time it could have affected her judgment?
10   A.   It is possible.            10:02:55
11   Q.   Could it have affected her ability
12 to recall facts?
13       MR. NOVIKOFF:  Objection.
14   A.   It is possible.
15   Q.   Could it have affected her       10:03:06
16 perception?
17       MR. NOVIKOFF:  Objection.
18   A.   Sure.
19   Q.   Yet you still think it is
20 irrelevant?                       10:03:15
21   A.   Yes.
22   Q.   Did she ever provide a witness
23 statement in writing?
24   A.   Yes.
25   Q.   Before we get to that, did you    10:03:22

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 543

**Hesse**
1
2  take any notes of that phone conversation?
3      A.   I don't believe we did.
4      **Q.   How come?**
5      A.   I think we just asked her to write   10:03:31
6  down her recollection of what happened and
7  send it to us.
8      **Q.   But she had already given you a**
9  **verbal recollection; is that correct?**
10     A.   Yes.                         10:03:40
11     **Q.   You didn't take any notes of what**
12 **she said verbally?**
13         MR. CONNOLLY:  Objection.
14     A.   I specifically didn't.  I am
15 unaware if John Cherry did, or Patrick Cherry   10:03:47
16 he is known as.
17     **Q.   Don't you think it would have been**
18 **important to write down what she said to you**
19 **in case her written statement contradicted it?**
20     A.   No.                    10:04:00
21         MR. GOODSTADT:  Would you mark
22     this document as Hesse Exhibit 19,
23     handwritten statement dated November 1,
24     2004.
25         (Hesse Exhibit 19, handwritten   10:04:09

Page 544

Hesse
1
2      statement dated November 1, 2004,
3  marked for identification, as of this
4  date.)
5      **Q.   I placed in front of Mr. Hesse   10:04:40**
6  **what has been marked as Hesse Exhibit 19.  It**
7  **is a multiple page exhibit bearing Bates**
8  **numbers 3169 through 3175.**
9          **Mr. Hesse, do you recall ever**
10 **reading or seeing the document that has been   10:05:02**
11 **marked as Hesse Exhibit 19?**
12     A.   Yes.
13     **Q.   This is -- what is this document?**
14     A.   This is Elyse Miller's
15 recollection of what happened that night.   10:05:16
16     **Q.   Do you see on the first page dated**
17 **November 1, 2004, do you see that?**
18     A.   Yes.
19     **Q.   That was actually Monday; is that**
20 **correct?**                    10:05:24
21     A.   Yes.
22     **Q.   Does this refresh your**
23 **recollection as to who when you spoke with**
24 **Ms. Miller?**
25     A.   No.                    10:05:30

Page 545

**Hesse**
1
2      **Q.   Any reason to believe that it was**
3  **not provided to you on that Monday?**
4      A.   Say that again.
5      **Q.   Any reason to believe that this   10:05:44**
6  **was not provided to you on that Monday?**
7      A.   No.
8      **Q.   Was Pat Cherry assisting you by**
9  **that Monday?**
10     A.   You know, I don't recall if he   10:05:52
11 came in Monday, Tuesday or Wednesday.
12     **Q.   How did this statement come into**
13 **the station?**
14     A.   I believe originally it may have
15 been faxed first and then we asked her to take   10:06:05
16 it to a notary, have it notarized and send us
17 the original.
18     **Q.   It came to the fax machine in the**
19 **police station?**
20         MR. CONNOLLY:  Objection.   10:06:24
21     A.   I believe so.
22     **Q.   Did you -- strike that.**
23         **Did she ever mention to you**
24 **anything about Gary Bosetti using a pool cue**
25 **to strike somebody?**            10:06:40

Page 546

**Hesse**
1
2      A.   I don't recall if she did or not,
3  I would have to read this whole thing again.
4      **Q.   I represent to you that there is**
5  **nothing in this statement that mentioned   10:06:49**
6  **anything about a pool cue.**
7      A.   Okay.
8      **Q.   Did you think that that would be**
9  **strange that an eyewitness who allegedly saw**
10 **the whole incident would leave out the fact   10:06:58**
11 **that Gary Bosetti used a pool cue to strike**
12 **somebody?**
13         MR. CONNOLLY:  Objection.
14         MR. NOVIKOFF:  Objection.
15     A.   I never said that she saw the   10:07:04
16 whole incident, and we asked her in her best
17 recollection to give us a statement on what
18 she observed.
19     **Q.   Out of all the witness statements**
20 **that you took do you recall any of the alleged   10:07:19**
21 **eyewitnesses mentioning that Gary Bosetti used**
22 **a pool cue to strike somebody?**
23     A.   You know I don't think anybody
24 ever mentioned a pool cue.
25     **Q.   Did you think that that was   10:07:32**

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 547

**Hesse**

1
2  strange that nobody mentioned a pool cue?
3      MR. CONNOLLY:  Objection.
4      MR. NOVIKOFF:  Objection.
5      A.   Yes.                    10:07:36
6      Q.   It is an important fact that was
7  omitted by all the eyewitness statements that
8  you had taken?
9      MR. NOVIKOFF:  Objection.
10     A.   Everything was done in their    10:07:45
11 words, I am not going to put words in their
12 mouth.
13     Q.   Did you weigh -- strike that.
14         Did you use the fact that nobody
15 mentioned Gary Bosetti using a pool cue as   10:07:55
16 part of your credibility analysis?
17     A.   Credibility of who?
18     MR. NOVIKOFF:  Objection.
19     Q.   Of the eyewitnesses?
20     MR. NOVIKOFF:  Objection.    10:08:07
21     A.   Their statements are their
22 statements.
23     Q.   But you had to make a credibility
24 assessment as to whose statements were
25 accurate and whose were not; is that correct?  10:08:15

Page 548

**Hesse**

1
2      A.   Their statements were this
3  statements.
4      Q.   Well did you make a credibility
5  assessment as part of your investigation?   10:08:21
6      A.   Not that I specifically recall.
7      Q.   Well, you already testified that
8  you thought that the three people who were
9  involved with the fight that gave statements
10 that night had blatant lies in their    10:08:37
11 statements; correct?
12     MR. CONNOLLY:  Objection.
13     A.   That is what I felt.
14     Q.   So that was making a credibility
15 determination about the three of them;   10:08:44
16 correct?
17     MR. NOVIKOFF:  Objection.
18     A.   In your opinion, yes.
19     Q.   How about your opinion?
20     A.   I thought they were lying.    10:08:52
21     Q.   And you didn't believe their
22 statements; right?
23     A.   Yes.
24     Q.   You did not believe they were
25 credible; is that correct?           10:09:00

Page 549

**Hesse**

1
2      MR. CONNOLLY:  Objection.
3      A.   Correct.
4      Q.   So I will go back to the same
5  question.  So you did make a credibility   10:09:04
6  assessment as to the three people who gave
7  statements the night of the incident; correct?
8      A.   If you say so, yes.
9      Q.   I am not asking about what I say,
10 I am asking about you?           10:09:16
11     A.   I believe that they were lies.
12     Q.   Did you believe that any other
13 witnesses provided any lies in their
14 statements?
15     A.   Not that I recall, no.       10:09:32
16     Q.   So you view them as credible?
17     A.   Yes.
18     Q.   So I will go back to the question
19 again.  You did make a credibility assessment
20 as part of your investigation; is that    10:09:44
21 correct?
22     MR. NOVIKOFF:  Objection.
23     A.   At that time I don't recall.
24     Q.   And were you friends with Elyse
25 Miller at the time?            10:09:59

Page 550

**Hesse**

1
2      A.   We were acquaintances.
3      Q.   Was she ever a friend of yours on
4  Face Book?
5      A.   Yes, at one time.        10:10:06
6      Q.   What do you mean by at one time?
7      A.   I deleted her as a friend.
8      Q.   How come?
9      A.   Because we are not friends.
10     Q.   Were you friends during the period  10:10:16
11 that she was a friend on Face Book?
12     A.   No.
13     Q.   So why did you delete her --
14 strike that.
15         The reason that you deleted her is  10:10:25
16 because you are not friends?
17     A.   Correct.
18     Q.   So why didn't you delete her --
19 strike that?
20         How long was she a friend of yours  10:10:32
21 on Face Book?
22     A.   I barely had been on Face Book for
23 a year.  I just didn't find it necessary for
24 her to be a friend of mine on Face Book.
25     Q.   Anything else happen between the   10:10:44

Page 551

Hesse

1
2  two of you that caused you to delete her as a
3  friend in Face Book?
4      MR. BAPTISTE:  This is a surreal
5      line of questioning, but I am not        10:10:54
6      objecting.
7      A.  No.
8      Q.  Was she a friend of yours on your
9  My Space account?
10     A.  You know I don't think so.        10:11:02
11     Q.  Was she a friend of yours or an
12 acquaintance or whatever they call it on any
13 other social networking Internet site?
14     A.  No.
15     Q.  Did you ask her why she didn't     10:11:21
16 give a statement the night of the incident?
17     A.  I don't recall.
18     Q.  Did she tell you why she didn't
19 give a statement the night of the incident?
20     A.  I don't recall.        10:11:30
21     Q.  Did you ask her why she didn't go
22 to the police station that evening?
23     A.  I don't recall if we did or not.
24     Q.  Is it your testimony that you
25 don't know whether Gary Bosetti stayed at the  10:11:42

Page 552

Hesse

1
2  same house as Elyse Miller that night?
3      A.  I don't know.
4      Q.  If he did do you believe that that
5  would factor on her credibility at all?    10:11:53
6      A.  No.
7      Q.  Were they friends?
8      A.  I believe they are friends.
9      Q.  Did they have a sexual
10 relationship?        10:12:02
11     MR. NOVIKOFF:  Objection.
12     A.  I don't know.
13     MR. NOVIKOFF:  If you are going to
14     ask him did he personally witness or did
15     Gary tell him, that is fine.    10:12:10
16     Q.  Did you ever hear that they had a
17 sexual relationship?
18     A.  No.
19     Q.  Do you know whether -- well strike
20 that.        10:12:19
21     Did you ever take a witness
22 statement from Ian Levine about that evening?
23     A.  Yes.
24     Q.  You took his statement?
25     A.  I think I did.        10:12:28

Page 553

Hesse

1
2      Q.  Who else was there at the time of
3  the statement?
4      A.  I don't recall.
5      Q.  What day did you take his    10:12:36
6  statement?
7      A.  I don't recall.
8      Q.  Do you recall, do you know whether
9  Mr. Levine was drinking that evening?
10     A.  I don't know.        10:12:49
11     Q.  Did you ask him?
12     A.  I don't recall.
13     Q.  Is this the same Ian Levine that
14 you had worked for installing cable?
15     A.  Yes.        10:12:58
16     Q.  You testified I think the first
17 day of your deposition that he paid you in
18 cash; is that correct?
19     A.  Correct.
20     Q.  That you didn't pay taxes on that  10:13:09
21 money; right?
22     A.  Right.
23     MR. GOODSTADT:  Would you mark
24     this document as Hesse Exhibit 20,
25     handwritten statement dated November 2,  10:13:24

Page 554

Hesse

1
2  2004.
3      (Hesse Exhibit 20, handwritten
4      statement dated November 2, 2004,
5      marked for identification, as of this    10:13:25
6      date.)
7      Q.  I place in front of Mr. Hesse what
8  is marked as Hesse Exhibit 20.  It is a
9  two-page exhibit bearing Bates 3176 and 3177.
10     Mr. Hesse, do you recognize the     10:13:58
11 document marked as Hesse Exhibit 20?
12     A.  Yes.
13     Q.  What is this document?
14     A.  This is a statement by Ian Levine
15 that was taken by John Cherry.    10:14:04
16     Q.  Does this refresh your
17 recollection as to whether you took his
18 statement?
19     A.  Yes.
20     Q.  Were you with Mr. Cherry and     10:14:12
21 Mr. Levine at the time that this statement was
22 provided?
23     A.  No.
24     Q.  So your recollection before about
25 taking a witness statement from Mr. Levine is  10:14:19

Page 555

```
1              Hesse
2  incorrect, or did you take a separate
3  statement?
4      A.  You are correct, I was mistaken.
5      Q.  Did you review this witness      10:14:30
6  statement as part of your investigation?
7      A.  Yes, at some point I did read it.
8      Q.  And again you don't know if he was
9  drinking that evening?
10     A.  I don't know.              10:14:39
11     Q.  Did you take a statement of one
12 Mr. Sean O'Rourke as part of your
13 investigation?
14     A.  We did, but I did not do it
15 personally.                      10:14:57
16     Q.  Who took that statement?
17     A.  John Cherry, Pat Cherry.
18     Q.  Is Mr. O'Rourke -- who is Sean
19 O'Rourke?
20     A.  Just a local resident.       10:15:14
21     Q.  Does he work anywhere in the
22 village?
23     MR. CONNOLLY:  Now?
24     Q.  At the time?
25     A.  At the time, yes, he did a lot of 10:15:20
```

Page 556

```
1              Hesse
2  different things.
3      Q.  Was he working the night of the
4  Halloween incident?
5      A.  I believe he was the doorman.   10:15:26
6      Q.  The doorman of where?
7      A.  Hauser's.
8      Q.  Did you review his witness
9  statement as part of your investigation?
10     A.  I believe I did.           10:15:36
11     Q.  Was Mr. O'Rourke arrested for
12 cocaine possession?
13     A.  At some point, yes.
14     Q.  Was he prosecuted?
15     A.  Yes, he was.              10:15:45
16     Q.  Was he found guilty?
17     A.  Yes, he was.
18     Q.  Was it just for possession or was
19 there any other crimes?
20     A.  It was intent to sell and     10:15:51
21 possession.
22     Q.  Intent to sell was based on the
23 quantity or based on the fact that he had some
24 paraphernalia for selling or what was the
25 basis?                         10:16:02
```

Page 557

```
1              Hesse
2      A.  It was based on a lot of things.
3  It was based on the packaging, the amount and
4  the paraphernalia.
5      Q.  When was that arrest?        10:16:11
6      A.  Good question.  It was in the
7  month of January, I don't know, 2004, 2005.
8      Q.  Was it before or after you took
9  his statement?
10     A.  I don't know.  You know what, it  10:16:26
11 was definitely before the statement.
12     Q.  So at the time the statement was
13 taken you had known that he was a convicted
14 drug dealer; is that correct?
15     A.  Yes.                    10:16:40
16     Q.  What was he actually convicted
17 for?
18     MR. CONNOLLY:  Objection to the
19 extent that we know that he was arrested
20 before.  I don't know if it was      10:16:45
21 established that he was convicted.
22     Q.  Do you know when the conviction
23 was?
24     A.  I don't remember exactly what the
25 date was.                      10:16:53
```

Page 558

```
1              Hesse
2      Q.  Was it before or after the
3  Halloween statement that he gave to you?
4      A.  The conviction was possibly before
5  this also.                     10:16:58
6      Q.  What was he convicted for?
7      A.  You know, I don't remember the
8  exact plea deal, what he was convicted on.  I
9  don't remember exactly.
10     Q.  But it was a drug related       10:17:09
11 conviction?
12     A.  Yes.
13     Q.  So at the time he gave you this
14 witness statement you knew he had been
15 convicted of a drug related crime?    10:17:17
16     A.  Yes.
17     Q.  Did you -- did his statement play
18 any role in your conclusion that you reached
19 within those five days?
20     A.  Did it play a role; to what     10:17:32
21 extent; I don't recall.
22     Q.  Well did you believe his statement
23 to be credible?
24     A.  Sure.
25     Q.  Do you know whether Mr. O'Rourke  10:17:44
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 559

Hesse

1
2  was drinking that night?
3     A.   I don't recall.
4     Q.   Did you ask him?
5     A.   I don't recall.          10:17:49
6     Q.   Do you know whether Mr. O'Rourke
7  was doing drugs that night?
8     A.   I don't know, I didn't interview
9  him, so I don't know.
10    Q.   Do you know whether Mr. Cherry     10:17:56
11 asked him whether he was doing drugs that
12 night?
13    A.   I don't know.
14    Q.   Do you know whether Mr. Cherry
15 asked him if he was drinking that night?    10:18:02
16    A.   I don't know.
17    Q.   Do you think it would have been
18 important to find out whether or not a
19 eyewitness was doing drugs on the night of the
20 alleged incident?                  10:18:10
21    MR. NOVIKOFF:  Objection.
22    A.   Sure, I guess we could have asked.
23    Q.   Particularly after he has already
24 been convicted of a drug crime?
25    MR. NOVIKOFF:  Objection.        10:18:19

Page 560

Hesse

1
2     A.   I didn't interview him.
3     Q.   I am asking you whether you think
4  it was important to ask that question?
5     MR. NOVIKOFF:  Objection.        10:18:25
6     A.   It may have been.
7     Q.   You think it would have been
8  important to ask him whether he was drinking
9  that night?
10    MR. NOVIKOFF:  Objection.        10:18:30
11    A.   It could have been, yes.
12    Q.   I believe you testified before
13 that you got a statement from Gary Bosetti; is
14 that correct?
15    A.   At some point, yes.          10:18:39
16    Q.   When was that?
17    A.   I don't remember the exact date.
18    Q.   Was it before or after you had
19 gotten the statement from Sean O'Rourke?
20    A.   I believe it was after.        10:18:50
21    Q.   At some point was Gary rehired?
22    A.   Yes.
23    Q.   Who rehired him?
24    A.   Ed Paradiso.
25    Q.   Do you recall when that took     10:18:59

Page 561

Hesse

1
2  place?
3     A.   Specifically no.
4     Q.   Were you there when it happened?
5     A.   Yes.                  10:19:09
6     Q.   Where was it?
7     A.   Police station.
8     Q.   Who was there?
9     A.   John Cherry was there, but he was
10 sitting at the front desk, myself, Gary     10:19:16
11 Bosetti, Richie Bosetti and Ed Paradiso was in
12 the squad room.
13    Q.   I believe you testified that you
14 got his statement because you wanted to hear
15 what he had to say; is that correct?       10:19:34
16    A.   Yes.
17    Q.   How come you did -- strike that.
18       Do you recall taking it during the
19 first five days in which you reached your
20 conclusions?                   10:19:45
21    A.   I don't recall whether I did or
22 not.
23    MR. GOODSTADT:  Would you mark
24 this document as Hesse Exhibit 21,
25 internal correspondence, November 12,    10:20:09

Page 562

Hesse

1
2  2004.
3       (Hesse Exhibit 21, internal
4    correspondence, November 12, 2004,
5    marked for identification, as of this    10:20:10
6    date.)
7     Q.   I placed in front of Mr. Hesse
8  what is marked as Exhibit 21, Bates number
9  3158.  Mr. Hesse, do you recognize this
10 document?                     10:20:45
11    A.   Yes.
12    Q.   What is this document?
13    A.   Typed statement given by Gary
14 Bosetti.
15    Q.   You see it is dated November 12,   10:20:51
16 2004, do you see that?
17    A.   Yes.
18    Q.   Do you know whether he provided
19 a -- strike that.
20       How did you receive this        10:21:01
21 statement?
22    A.   I believe he did this in the
23 police station.  I think we had him come to
24 the station house.
25    Q.   He typed it up in the police     10:21:11

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 563

1      **Hesse**
2  station?
3      A.   I don't recall if I typed it as he
4  said it or if he typed it himself.
5      Q.   But to your recollection there was  10:21:19
6  no handwritten version of this from you or him
7  or somebody else?
8      A.   No.
9      Q.   You see it is dated November 12,
10 2004?                         10:21:31
11     A.   Yes.
12     Q.   That is now just about two weeks
13 after the incident?
14     A.   Yes.
15     Q.   Why did you wait about two weeks  10:21:36
16 to get his statement?
17     A.   I don't know why.
18     Q.   Did you ask him why he didn't give
19 a statement the night of the incident?
20     A.   I think he was -- I believe I did  10:21:47
21 ask him why he didn't approach one of the
22 three officers and, you know, I remember him
23 saying that he was dazed from the fight
24 itself.  That Richie attempted to -- Rich
25 Bosetti, his brother, attempted to talk to the  10:22:03

Page 564

1      Hesse
2  three and none of them wanted to talk to him.
3      Q.   Did you ask him why he didn't come
4  to the police station the next day to give a
5  statement?                     10:22:15
6      A.   Well, in his opinion I think he
7  felt he was being railroaded --
8      MR. CONNOLLY:  That is not the
9  question.
10     A.   So he didn't want to talk to      10:22:25
11 anybody, he left.
12     Q.   He left.  What do you mean by he
13 left?
14     A.   I think he left the beach.
15     Q.   As a retired 20 year veteran of   10:22:34
16 the New York City Police Department who was
17 involved in an altercation, was it appropriate
18 that he left the beach without giving a
19 statement?
20     MR. CONNOLLY:  Objection.      10:22:48
21     MR. NOVIKOFF:  Objection.
22     A.   He felt it was, yes.
23     Q.   I am not asking what he felt.  I
24 am asking you whether you felt that a 20 year
25 New York City veteran police officer at the   10:22:55

Page 565

1      **Hesse**
2  time a current police officer in the Village
3  of Ocean Beach, do you think it was
4  appropriate for him to leave the island
5  without giving a statement?           10:23:08
6      MR. NOVIKOFF:  Objection.
7      A.   I felt it was inappropriate, and I
8  felt he should have come to either myself or
9  the chief.
10     Q.   Did you ever write him up for not  10:23:13
11 doing?
12     MR. NOVIKOFF:  Objection.
13     A.   No.
14     Q.   Did you ever discipline him for
15 not doing that?                   10:23:20
16     MR. NOVIKOFF:  Objection.
17     A.   I did talk to him about it.
18     Q.   When did you speak to him about
19 it?
20     A.   I don't remember exactly.        10:23:25
21     Q.   Was it before or after November
22 12, 2004?
23     A.   I don't remember exactly, no.
24     Q.   Did you memorialize the fact that
25 you spoke to him about that?          10:23:37

Page 566

1      **Hesse**
2      A.   No.
3      Q.   What was your reaction when you
4  heard that he had left the island without
5  giving a statement?                10:23:47
6      A.   I don't know if I had a reaction.
7  I don't recall.
8      Q.   Do you know whether he was
9  drinking that night?
10     A.   I don't know.              10:23:58
11     Q.   Did you ever ask him?
12     A.   I may have, I don't know.
13     Q.   And he took police action that
14 night?
15     MR. NOVIKOFF:  Objection.       10:24:07
16     MR. CONNOLLY:  Objection.
17     Q.   Do you believe he took police
18 action that night?
19     A.   In my opinion, yes.
20     Q.   Was he the first officer at the   10:24:11
21 scene?
22     MR. NOVIKOFF:  Objection.
23     A.   He was already there.
24     Q.   So how come he didn't make an
25 arrest that night; did you ever ask him?      10:24:23

Page 567

**Hesse**

1      **Hesse**
2      A.   I may have asked him, I don't
3  recall specifically.
4      **Q.   Do you recall what his response**
5  **was?**                              **10:24:31**
6      A.   Not specifically, no.
7      **Q.   Did it surprise you that he didn't**
8  **make an arrest after what you now believe to**
9  **be the truth?**
10         MR. NOVIKOFF:  Objection.       10:24:45
11     A.   Was I surprised; I wouldn't say I
12  was surprised.
13     **Q.   Did you ever ask him why he left**
14  **the ocean without giving a statement?**
15         MR. BAPTISTE:  Why he left the   10:25:07
16     bar or why he left --
17     **Q.   The beach without giving a**
18  **statement?**
19     A.   I don't specifically remember.
20     **Q.   Did you ever ask him why he left   10:25:13**
21  **the bar without giving a statement?**
22         MR. NOVIKOFF:  Objection. Asked
23     and answered.
24     A.   I believe he was inside the bar
25  and Rich Bosetti went out to talk to the three  10:25:23

Page 568

1         Hesse
2  police officers, and they said they will take
3  care of it, they will do whatever,
4  specifically I don't recall.
5         Frank -- I believe it was Frank   10:25:33
6  Fiorillo had said to Rich specifically we are
7  handling it.  So Richie went back into the
8  bar.  So I don't know why they specifically
9  didn't talk to them.
10     **Q.   And by November 12th you had       10:25:44**
11  **already reached a conclusion as to what**
12  **happened; correct?**
13     A.   Yes.
14     **Q.   By that point in time had any**
15  **other witness mentioned to you that Gary   10:25:56**
16  **Bosetti used a pool cue?**
17         MR. CONNOLLY:  Objection.
18         MR. NOVIKOFF:  Objection to the
19     form.
20     A.   I don't believe any witness came   10:26:03
21  forward and said anything about a pool cue.
22     **Q.   Did you ever take a statement from**
23  **Richard Bosetti?**
24     A.   Yes.
25     **Q.   When did you take that statement?  10:26:14**

Page 569

1      **Hesse**
2      A.   I don't specifically remember.
3      **Q.   Was it before or after Gary's?**
4      A.   I don't know.
5      **Q.   Did you ask him to provide a     10:26:23**
6  **statement or did he come forward voluntarily**
7  **to do it?**
8      A.   I believe I asked him to write
9  something up.
10     **Q.   When did you ask him that?       10:26:29**
11     A.   I don't specifically remember.
12     **Q.   Do you recall approximately when**
13  **it was?**
14     A.   No.  I don't.
15     **Q.   Do you recall what month it was?   10:26:36**
16     A.   It was probably in November.
17     **Q.   Why would you think that?**
18     A.   Well, the incident took place on
19  the 31st, preceding month is November.
20         MR. GOODSTADT:  Would you mark     10:27:00
21     this document, internal correspondence,
22     December 10, 2004, as Hesse Exhibit 22,
23         (Hesse Exhibit 22, internal
24     correspondence, December 10, 2004,
25     marked for identification, as of this     10:27:02

Page 570

1         Hesse
2     date.)
3      **Q.   I placed in front of Mr. Hesse**
4  **what has been marked as Hesse Exhibit 22, it**
5  **is a multiple page exhibit bearing Bates      10:27:38**
6  **numbers 3200 through 3204.**
7         **Do you recognize the exhibit that**
8  **has been marked as Hesse Exhibit 22?**
9      A.   Yes.
10     **Q.   What is this?                   10:27:54**
11     A.   Statement that I took from Rich
12  Bosetti.
13     **Q.   And the last three pages are, is**
14  **that your handwriting?**
15     A.   Yes, that is my handwriting.    10:28:03
16     **Q.   How come Rich Bosetti didn't sign**
17  **the statement, the last three page written**
18  **statement?**
19     A.   I don't recall.
20     **Q.   Do you usually have a witness sign  10:28:11**
21  **a statement that they give?**
22     A.   Always, yes.
23     **Q.   Do you know whether he actually**
24  **signed the handwritten statement at any point?**
25     A.   According to this no, I don't     10:28:22

Page 571

1          Hesse
2  recall.
3     Q.   Who typed the first two pages?
4     A.   I think I went back and I typed it
5  up after I wrote it.          10:28:32
6     Q.   Why would you type it up?
7     A.   Just so it was easier to read, no
8  other reason.
9     Q.   You see the date, December 10,
10 2004?                    10:28:42
11    A.   Yes.
12    Q.   Does that now refresh your
13 recollection as to when you took Rich
14 Bosetti's statement?
15    A.   Not specifically, no.       10:28:46
16    Q.   Any reason to believe it was not
17 December 10, 2004?
18    A.   No.
19    Q.   Why would you wait six weeks to
20 take a statement?              10:28:55
21    MR. NOVIKOFF:  Almost six weeks.
22    Q.   Approximately six weeks.
23    MR. CONNOLLY:  Objection to the
24 form.  You can answer.
25    A.   I don't specifically recall why.   10:29:03

Page 572

1          Hesse
2     Q.   Do you think that six week time
3  lapse could affect his ability to recall the
4  events that night?
5     A.   It could have.          10:29:14
6     Q.   Did you ask him whether he was
7  drinking that night?
8     A.   Not specifically, I don't
9  remember.
10    Q.   Do you know whether he was       10:29:20
11 drinking that night?
12    A.   I don't know.
13    Q.   Do you think it would have been
14 important to ask him?
15    MR. CONNOLLY:  Objection.       10:29:26
16    A.   Sure.
17    Q.   Did you ask Rich Bosetti if he
18 tried to get any statements from any
19 eyewitnesses that night?
20    A.   I don't recall if I did.       10:29:48
21    Q.   Do you know how Rich Bosetti got
22 off the island that next morning?
23    A.   I don't recall.
24    Q.   Do you know how Gary Bosetti got
25 off the island on the morning of the 31st?   10:30:02

Page 573

1          Hesse
2     A.   I don't recall.
3     Q.   I believe you testified before
4  about asking the on duty officers that evening
5  to put together 42's; is that correct?       10:30:17
6     MR. CONNOLLY:  Objection.  Do you
7  mean the officers who were on the scene?
8     Q.   Who were on duty that night?
9     MR. CONNOLLY:  We have not
10 established there were any other officers   10:30:28
11 on duty.  I know you are making reference
12 to the three officers that went to the
13 scene.
14    MR. GOODSTADT:  I will rephrase.
15    MR. NOVIKOFF:  I believe this       10:30:35
16 witness testified today that he asked
17 Mr. Lamm and Mr. Fiorillo for 42's.  I
18 don't believe he made any reference to a
19 42 for Mr. Snyder.
20    Q.   So did you ask Mr. Fiorillo to       10:30:48
21 provide a 42?
22    A.   Yes.
23    Q.   A 42 is what?
24    A.   Just a memo.
25    Q.   Did you ask Lamm to provide a 42?   10:30:54

Page 574

1          Hesse
2     A.   Yes.
3     Q.   Did you ask Snyder to provide a
4  42?
5     A.   At some point I did.       10:31:01
6     Q.   Do you recall when you asked
7  Snyder to provide a 42?
8     A.   I don't recall.
9     Q.   Is it possible that it was October
10 31st that you asked him to provide a 42?       10:31:09
11    MR. NOVIKOFF:  Objection.
12    A.   I don't think so.
13    Q.   When was the first time that you
14 recall speaking to Snyder about the Halloween
15 incident?                    10:31:25
16    A.   I don't recall.
17    Q.   Do you recall approximately how
18 many days after the event?
19    A.   No, I don't.
20    Q.   Do you recall when Snyder provided  10:31:25
21 his 42?
22    A.   I don't.
23    Q.   Do you recall how Snyder provided
24 his 42?
25    A.   I think he put it in writing.       10:31:37

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 575

Hesse

1
2     Q.   Do you recall how you received it?
3     A.   I don't know.  I don't know if it
4  was by E-mail or if he faxed it.
5     Q.   Do you recall whether -- was it    10:31:47
6  handwritten or typed?
7     A.   My best recollection is it was
8  typed.
9     Q.   Did you ever receive the 42 from
10 Lamm?                              10:31:58
11    A.   Yes.
12    Q.   Do you recall when that was
13 received?
14    A.   I don't recall, no.
15    Q.   Did you ever receive a 42 from Mr.  10:32:02
16 Fiorillo?
17    A.   Yes.
18    Q.   Do you recall how that was
19 received by you?
20    A.   Like I stated earlier I believe he  10:32:10
21 handed me a handwritten 42.
22    Q.   Why did you ask them for 42's?
23    A.   I just wanted to see what their
24 recollection of the night was.
25    Q.   I believe you testified that prior  10:32:31

Page 576

Hesse

1
2  to asking for the 42 you discussed the
3  incident with Mr. Fiorillo and Mr. Lamm on the
4  telephone; is that correct?
5     A.   Yes.                           10:32:43
6     Q.   Do you recall whether you spoke
7  with Mr. Snyder at all about Halloween before
8  getting his 42?
9     A.   I must have if I asked for his 42.
10 I don't specifically -- specifically I don't    10:32:57
11 recall.
12    Q.   Did he tell you that Richard
13 Bosetti refused to answer questions that
14 evening?
15    A.   I don't recall.                 10:33:06
16    Q.   Did he tell you that the people
17 who came to the station that night, Schalik,
18 Tesori or Van Koot claimed that they thought
19 the incident was going to be covered up?
20       MR. NOVIKOFF:  Objection.         10:33:28
21       MR. CONNOLLY:  Objection as to
22 timeframe.
23    Q.   At any point in time?
24       MR. NOVIKOFF:  My objection went
25 beyond that.                          10:33:34

Page 577

Hesse

1
2     A.   I don't recall specifically, but
3  that came up a couple of times.  I don't know
4  when specifically though.
5     Q.   Who brought it up?              10:33:39
6     A.   I don't remember specifically.
7     Q.   Do you remember when you learned
8  of that allegation?
9     A.   No, I think it was a rumor that
10 was just circulating.                 10:33:49
11    Q.   Did you learn that rumor during
12 the five days in which you reached your
13 conclusion?
14       MR. CONNOLLY:  Objection.
15    A.   I don't recall.               10:33:57
16       MR. GOODSTADT:  Would you mark
17 this document as Hesse Exhibit 23,
18 typewritten document dated 11/5/04 to
19 George Hesse.
20       (Hesse Exhibit 23, typewritten    10:34:24
21    document dated 11/5/04 to George Hesse,
22 marked for identification, as of this
23 date.)
24    Q.   I place in front of Mr. Hesse what
25 has been marked as Hesse Exhibit 23, a  10:35:01

Page 578

Hesse

1
2  three-page exhibit bearing Bates numbers
3  3196, 3197 and 3198.
4       Mr. Hesse, do you recognize the
5  document marked as Hesse Exhibit 23?     10:35:13
6     A.   Yes.
7     Q.   What is this document?
8     A.   This is the statement or 42 from
9  Thomas Snyder to me.
10    Q.   Dated 11/5/04?                 10:35:26
11    A.   Yes.
12    Q.   Do you recall if you actually
13 received it on 11/5/04?
14    A.   The fax is showing it is
15 11/6/2004.                          10:35:42
16    Q.   Do you recall if that is the date
17 that you received it?
18    A.   I don't recall, no.
19    Q.   Does this -- did you speak with
20 Snyder before he provided the 42?        10:35:50
21    A.   I don't recall specifically.  I
22 believe I did though.
23    Q.   You had asked him to provide it,
24 right?
25    A.   Yes.  I already stated that.     10:36:01

Page 579

Hesse

1
2       MR. NOVIKOFF:  Objection.  Without
3    telling him what to testify to, I would
4    presume that he has testified that he
5    asked for a 42 of Snyder, that he had to   10:36:08
6    have at least had a conversation as to
7    that.
8       MR. CONNOLLY:  I believe he
9    actually testified to that.
10      MR. GOODSTADT:  I believe he also   10:36:16
11   testified that he didn't speak to Snyder
12   during the five days.  I wanted to
13   refresh his recollection.  I want to get
14   a time line.
15      Q.   Does this refresh your        10:36:24
16   recollection as to whether you spoke with Mr.
17   Snyder during the five day interval in which
18   you reached your conclusions?
19      A.   No.
20      MR. NOVIKOFF:  Also let the record  10:36:35
21   reflect that I think his testimony wasn't
22   five days, I think he believes it was
23   around five days.
24      Q.   Does this refresh your
25   recollection -- strike that.           10:36:47

Page 580

Hesse

1
2       Sitting here now do you recall
3    anything that was discussed between you and
4    Mr. Snyder other than for asking him to
5    provide a 42?                          10:36:57
6       A.   I don't recall.
7       Q.   Do you recall telling him that Joe
8    Loeffler wanted you to turn around the
9    investigation?
10      A.   No.                           10:37:05
11      Q.   Do you recall telling Tom Snyder
12   that you were going to wrap up the
13   investigation on the day that he faxed in his
14   42?
15      MR. NOVIKOFF:  Objection.          10:37:17
16      A.   I don't recall.
17      Q.   What was your reaction when you
18   received Mr. Snyder's statement?
19      MR. CONNOLLY:  Objection.
20      MR. NOVIKOFF:  If any.             10:37:34
21      Q.   If any?
22      A.   I don't recall having any
23   reaction.
24      Q.   Did you think his statements was
25   accurate?                             10:37:43

Page 581

Hesse

1
2       MR. NOVIKOFF:  Objection.
3       MR. CONNOLLY:  Objection.
4       A.   I had no reason to believe it was
5    not.                                  10:37:49
6       Q.   Did you believe that Mr. Snyder
7    was not telling the truth in his statement?
8       MR. CONNOLLY:  Objection.
9       MR. NOVIKOFF:  Objection.
10      A.   No.                           10:37:59
11      Q.   Did you believe that Mr. Snyder
12   was corrupt based on this statement?
13      A.   No.
14      Q.   Did you speak to him at all about
15   his statement?                         10:38:07
16      A.   I don't specifically recall.
17      Q.   Do you recall telling Mr. Snyder
18   that there were discrepancies between what he
19   and Richard Bosetti had stated?
20      A.   I don't specifically recall.   10:38:16
21      Q.   So you don't recall one way or the
22   other?
23      A.   No.
24      MR. NOVIKOFF:  When did Bosetti
25   provide this statement; object to that   10:38:34

Page 582

Hesse

1
2    last question because I think Bosetti
3    provided it after this.  Foundation
4    objection.
5       Q.   Do you ever recall telling Mr.   10:38:37
6    Snyder that there were discrepancies between
7    what his statement said and what Mr. Bosetti
8    claimed?
9       MR. CONNOLLY:  At any time?
10      Q.   Yes.                          10:38:47
11      A.   I specifically don't recall.
12      Q.   You don't recall one way or the
13   other?
14      A.   No.
15      Q.   Do you recall speaking to Ed      10:38:51
16   Carter about Tommy Snyder's statement?
17      A.   No.
18      Q.   You don't recall one way or the
19   other?
20      A.   No.                           10:38:59
21      Q.   You don't recall telling
22   Mr. Carter that Tommy Snyder needed to protect
23   the Bosetti's rather than the victims?
24      A.   No.
25      Q.   You don't recall telling Mr. Frank  10:39:11

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2 **Fiorillo that Tommy Snyder needed to protect**
3 **the Bosetti's rather than the victims?**
4     MR. NOVIKOFF: Objection.
5     A.   No.                    10:39:27
6     Q.   Isn't it true that you told
7 **Mr. Carter that Snyder's report made you sick?**
8     A.   No.
9     Q.   Isn't it true that -- strike that.
10 **Did Frank Fiorillo -- how did Frank Fiorillo   10:39:39**
11 **provide his statement to you?**
12     A.   For the third time he handed it to
13 me.
14     Q.   **Where was that?**
15     A.   It was at the checkpoint at the   10:39:48
16 lighthouse.
17     Q.   **Isn't it true that when he handed**
18 **it to you that you told Mr. Fiorillo that**
19 **Tommy Snyder's report made you sick?**
20     A.   No.                    10:40:00
21     Q.   Isn't it true that you told him
22 **that Tommy Snyder's 42 was a piece of shit?**
23     A.   No.
24     MR. NOVIKOFF: Objection.
25     Q.   **Isn't it true that you told them   10:40:07**

**Hesse**

1
2 that -- that you told Mr. Carter and Mr.
3 **Snyder that you thought that Tommy Snyder had**
4 **it in for the Bosetti's?**
5     MR. CONNOLLY: Objection. Them   10:40:20
6 being Mr. Carter?
7     Q.   **Yes.  That Mr. Hesse told**
8 **Mr. Carter and Mr. Snyder -- strike that.**
9         **Isn't it true that you told Mr.**
10 **Fiorillo and Mr. Carter that Tommy Snyder had   10:40:32**
11 **it in for the Bosetti's?**
12     A.   No.
13     Q.   **Did you believe that Tommy Snyder**
14 **had it in for the Bosetti's?**
15     A.   No.                    10:40:42
16     Q.   **Did the Bosetti's and Mr. Snyder**
17 **get along prior to the Halloween incident?**
18     MR. CONNOLLY: Objection.
19     A.   I don't think specifically, no,
20 they didn't get along.           10:40:55
21     Q.   **Had you heard a rumor prior to the**
22 **Halloween incident that Tommy Snyder is the**
23 **one who alerted Civil Service the summer**
24 **before to the fact that there were uncertified**
25 **officers at Ocean Beach?           10:41:07**

**Hesse**

1
2     MR. BAPTISTE: Objection.
3     MR. CONNOLLY: Objection.
4     MR. NOVIKOFF: Just read back the
5 question.  I want to see if I have a   10:41:20
6 basis to object.
7     (Record read.)
8     MR. NOVIKOFF: Actually that is
9 one of your few good questions, I have no
10 objection.                    10:41:47
11     A.   No.
12     Q.   **Do you know whether Tom Snyder**
13 **ever spoke with anyone at the District**
14 **Attorney's office about the Halloween**
15 **incident?                    10:41:59**
16     MR. CONNOLLY: At any time?
17     Q.   **At any time?**
18     MR. CONNOLLY: Does he know?
19     Q.   **Do you know whether Tom Snyder**
20 **ever spoke to anybody at the District   10:42:05**
21 **Attorney's office about the Halloween**
22 **incident?**
23     MR. CONNOLLY: Does he have
24 personal knowledge?
25     MR. GOODSTADT: Did he ever learn   10:42:13

Hesse

1
2 from anyone --
3     MR. CONNOLLY: Different question.
4     MR. BAPTISTE: Objection.
5     A.   Ask the question again.       10:42:19
6     Q.   **Had you ever heard that Tom Snyder**
7 **spoke to anyone at the District Attorney's**
8 **office about the Halloween incident?**
9     A.   I don't think I specifically
10 heard, I think I read it somewhere.       10:42:30
11     Q.   **Where did you read it?**
12     A.   In one of their depositions.
13     Q.   **What did you think of Tommy**
14 **Snyder's statement?**
15     A.   Which statement?          10:42:56
16     Q.   **The 42.**
17     A.   I don't know if I really thought
18 anything of it other than this is his
19 recollection of what happened that night.
20     Q.   **Did you think it was a complete 42  10:43:10**
21 **or a complete statement of what happened that**
22 **night?**
23     MR. NOVIKOFF: Objection.
24     MR. CONNOLLY: Objection.
25     A.   In his opinion.          10:43:17

Page 587

```
 1          Hesse
 2     Q.  How about in your opinion, did you
 3  think that was a complete 42?
 4          MR. CONNOLLY:  His opinion when?
 5     Q.  His opinion when you read it?    10:43:25
 6     A.  I think it was complete to the
 7  best of Mr. Snyder's knowledge of what
 8  happened that night.
 9     Q.  Did you doubt any of the
10  credibility of any of the statements in the 42  10:43:39
11  that Snyder provided?
12          MR. NOVIKOFF:  Objection.
13          MR. CONNOLLY:  Again you are
14  talking when he first read it?
15          MR. GOODSTADT:  Yes.       10:43:48
16     A.  I don't specifically remember.
17     Q.  How about sitting here today do
18  you doubt the credibility of any of the
19  statements made in the statement?
20     A.  I would have to read it entirely   10:43:59
21  again.
22          MR. CONNOLLY:  Objection.  You
23  want him to do so?
24          MR. GOODSTADT:  Maybe later.
25     Q.  I believe you testified that      10:44:12
```

Page 588

```
 1          Hesse
 2  Fiorillo handed you a statement, correct, a
 3  42?
 4     A.  From what I recall, yes.
 5     Q.  Do you recall what date that was?  10:44:21
 6     A.  No.
 7          MR. GOODSTADT:  Would you mark
 8  this document as Hesse Exhibit 24,
 9  internal correspondence, November 7,
10  2004.                   10:44:35
11          (Hesse Exhibit 24, internal
12  correspondence, November 7, 2004,
13  marked for identification, as of this
14  date.)
15          THE VIDEOGRAPHER:  The time is    10:44:56
16  10:46, we are off the record.
17          (Recess taken.)
18          THE VIDEOGRAPHER:  The time is
19  11:08, we are on the record.
20     Q.  Mr. Hesse, I placed in front of   11:06:25
21  you what is marked Exhibit 24, a multiple page
22  exhibit bearing Bates 3194 and 3195.  Do you
23  recognize the document marked as Hesse Exhibit
24  24?
25     A.  Yes.              11:06:38
```

Page 589

```
 1          Hesse
 2     Q.  What is this?
 3     A.  This is Frank Fiorillo's
 4  statement.
 5     Q.  The handwritten statement on page  11:06:44
 6  3195, is that the statement that he handed to
 7  you at the checkpoint?
 8     A.  I believe it is.
 9     Q.  Who typed up the first page of
10  this exhibit?            11:06:55
11     A.  I did.
12     Q.  How come?
13     A.  Because the piece of paper that he
14  had written it on, it was like crammed on, so
15  I thought to be able to read it a little    11:07:03
16  better I would read it and type it out in case
17  I had to refer to it for anything.
18     Q.  Did you ever speak to Mr. Fiorillo
19  about his statement?
20     A.  Specifically I don't recall.    11:07:12
21          MR. NOVIKOFF:  You mean after --
22     Q.  After he gave it to him.
23          MR. NOVIKOFF:  Right.
24     Q.  Isn't it true that you told him
25  that he needed to file a new statement to   11:07:28
```

Page 590

```
 1          Hesse
 2  protect the Bosetti's?
 3     A.  Absolutely not.
 4          MR. CONNOLLY:  Objection.
 5          I withdraw the objection.    11:07:36
 6     A.  Absolutely not.
 7     Q.  And you don't recall one way or
 8  the other whether you actually ever spoke to
 9  Mr. Fiorillo about his statement; is that
10  correct?                 11:07:49
11     A.  Correct.
12     Q.  So had you spoken to him, if you
13  had spoken to him you wouldn't recall anything
14  that was stated during that conversation; is
15  that correct?            11:07:56
16          MR. CONNOLLY:  Objection.
17          MR. NOVIKOFF:  Objection.
18     A.  You asked me a specific question
19  of the statement I possibly made, and there is
20  no way I asked him to rewrite this.     11:08:01
21     Q.  That wasn't my question now.  The
22  question now was had you last spoken with
23  him, sitting here today you don't recall
24  anything that was discussed between the two of
25  you?                     11:08:13
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2     A.   I don't recall specifically when,
3  where, why or what.  I remember receiving this
4  and reading it.
5     Q.   I am not talking about you          11:08:22
6  receiving this and reading it.  I am talking
7  about any conversations you had with Mr.
8  Fiorillo about his statement after you read it
9  and received it?
10    A.   Specifically no.              11:08:29
11    Q.   Did you ever show Mr. Fiorillo's
12  statement to Mr. Snyder?
13    A.   I don't recall if I did.
14    Q.   You don't recall one way or the
15  other?                        11:08:42
16    A.   No.
17    Q.   Do you recall telling Mr. Snyder
18  that it was similar to the piece of shit that
19  he had filed?
20       MR. NOVIKOFF:  Objection to the   11:08:50
21  form.
22    A.   No.
23       MR. NOVIKOFF:  Is the question
24  does he recall stating that or did he say
25  that?                          11:08:57

1              Hesse
2     Q.   The question is do you recall
3  stating that?
4     A.   No.
5       MR. NOVIKOFF:  Objection to form   11:08:59
6  of the question.
7     Q.   Did you state that to him?
8     A.   No.
9     Q.   Do you recall ever speaking with
10  Mr. Snyder about Mr. Fiorillo's statement?   11:09:03
11    A.   I don't recall.
12    Q.   You don't recall one way or the
13  other?
14    A.   No.
15    Q.   And sitting here today if that   11:09:11
16  conversation actually occurred you don't
17  recall any of the details of what was said;
18  correct?
19       MR. NOVIKOFF:  Objection.
20       MR. CONNOLLY:  Objection.       11:09:18
21    A.   Specifically no.
22    Q.   Or generally?
23       MR. NOVIKOFF:  Objection.
24    A.   Specifically no.
25    Q.   Generally you don't recall either; 11:09:21

1              Hesse
2  correct?
3     A.   I don't recall having a
4  conversation with Mr. Snyder, no.
5     Q.   Did you tell Mr. Fiorillo that   11:09:26
6  Cherry's investigation actually described what
7  happened that night?
8     A.   Specifically no.
9     Q.   Did you tell Mr. Snyder that
10  Cherry's investigation actually described what 11:09:44
11  happened that night?
12    A.   Specifically no.
13    Q.   Specifically you don't recall or
14  specifically you didn't say that?
15    A.   I don't specifically remember   11:09:51
16  saying it that way.
17    Q.   Do you recall saying it generally
18  in sum and substance that way?
19    A.   At some point I sat each one of
20  them down and had a conversation about the   11:10:04
21  investigation, yes.
22    Q.   When did you have that sit down
23  with Mr. Fiorillo?
24    A.   I believe it was after Mr. Schalik
25  and Mr. Van Koot had already been prosecuted.  11:10:13

1              Hesse
2     Q.   What was the substance of that
3  conversation?
4     A.   I told him that I thought it was a
5  good idea that he reviewed the entire   11:10:23
6  investigation package from start to finish to
7  show him what had happened.
8     Q.   And do you recall anything else
9  that was stated in that conversation?
10    A.   Not specifically.          11:10:37
11    Q.   How about generally?
12    A.   I believe Mr. Fiorillo sat down
13  and actually enjoyed reading the entire
14  arrest.
15    Q.   What made you believe that?   11:10:48
16    A.   He sat there and he read the whole
17  thing and he was shaking his head, yes, yes,
18  yes, yes, and finished it and said that it was
19  good.
20    Q.   Where was that conversation?   11:11:00
21    A.   In the police station.
22    Q.   When?
23    A.   I don't remember the date.
24    Q.   Who else was there?
25    A.   I think Mr. Cherry was there.   11:11:07

Page 595

Hesse

1
2      Q.   Do you recall how long after the
3   plea was done in connection with Mr. Schalik
4   or Mr. Van Koot's arrest?
5      A.   It might have been the following      11:11:23
6   summer or season.
7      Q.   So you think it was the summer of
8   '05?
9      A.   Possible, yes.
10     Q.   Did you have a sit down with          11:11:32
11  Mr. Lamm?
12     A.   Yes.
13     Q.   When did you have that sit down?
14     A.   Probably around the same time.
15     Q.   What was the sum and substance of    11:11:39
16  that conversation you had with Mr. Lamm?
17     A.   He chose not to read it.
18     Q.   Do you recall what you said to him
19  in sum and substance?
20     A.   I told him this is what the          11:11:46
21  investigation produced, that he should read
22  it.
23     Q.   Anything else that you recall in
24  that conversation?
25     A.   Not specifically.                    11:11:54

Page 596

Hesse

1
2      Q.   How about generally?
3      A.   No.  He just seemed very angry.
4      Q.   What do you mean by that?
5      A.   He just seemed like it was a joke.  11:12:00
6      Q.   What did he do that led you to
7   believe that he was angry?
8      A.   He took it and he looked at it
9   briefly and he said I am not reading that.
10     Q.   Did you respond to him when he       11:12:13
11  said that?
12     A.   Specifically I don't remember what
13  I said.
14     Q.   How about generally?
15     A.   Even generally I don't remember     11:12:20
16  anything else.
17     Q.   What made you believe or led you
18  to believe that he thought it was a joke?
19     A.   That is exactly what he said.
20     Q.   He said it is a joke?                11:12:28
21     A.   Yes, he said it is a joke.
22     Q.   What did you understand him to
23  mean when he said this was a joke?
24         MR. CONNOLLY:  Objection.
25     A.   I specifically remember him saying  11:12:42

Page 597

Hesse

1
2   that we are going to sweep this one under the
3   rug too.
4      Q.   When did he say that?
5      A.   During this little conversation     11:12:51
6   that we had when I asked him to read through
7   the investigative pack.
8      Q.   Do you know what he meant by that
9   when he said we are going to sweep this one
10  under the rug too?                           11:12:49
11     A.   I think he felt that there was a
12  cover up.
13     Q.   So he was claiming that there was
14  a cover up at that time?
15         MR. CONNOLLY:  Objection.            11:13:08
16     A.   There were rumors that that is --
17  that he especially suspected.
18     Q.   I am not talking about rumors, I
19  am talking about what he said to you right
20  now?                                         11:13:15
21     A.   Well he said that we were going to
22  sweep this under the rug.
23     Q.   That led you to believe that he
24  was claiming that it was being covered up?
25     A.   Yes.                                 11:13:22

Page 598

Hesse

1
2      Q.   How about Mr. Snyder, did you ever
3   have a sit down with Mr. Snyder?
4      A.   At some point I did, yes.
5      Q.   When was that?                       11:13:29
6      A.   I don't remember the specific
7   date.
8      Q.   When was the sit down with Lamm?
9      A.   It was around the same time I did
10  with Mr. Fiorillo.  I think it was early in  11:13:37
11  the season of 2005.
12     Q.   Now, when was the sit down with
13  Mr. Snyder?
14     A.   It was later, much later.  I don't
15  remember the date specifically.  But I thought 11:13:53
16  it would be a good idea that he come in with
17  both Bosetti brothers and have a sit down and
18  try to hash out some of this.
19     Q.   Was that after Mr. Snyder was let
20  go?                                          11:14:20
21     A.   I think it was just before.
22     Q.   Just before he was let go?
23     A.   Yes.
24         MR. NOVIKOFF:  When you say let
25  go, we have the same agreement --           11:14:38

28  (Pages 595 to 598)

Page 599

Hesse

1
2      MR. GOODSTADT:  We have the same
3  agreement.  Hopefully we will have time
4  to go through when Mr. Hesse said --
5      MR. NOVIKOFF:  Yes.        11:14:53
6      MR. GOODSTADT:  Would you mark
7  this document as Hesse Exhibit 25, Ocean
8  Beach Police Department, document dated
9  11/5/2004.
10     (Hesse Exhibit 25, Ocean Beach     11:15:02
11  Police Department, document dated
12  11/5/2004, marked for identification,
13  as of this date.)
14     Q.   Do you recall when you received
15  Mr. Lamm's 42?                  11:15:41
16     A.   I don't.
17     Q.   Why did you ask him to put this on
18  a 42?
19     A.   I just wanted him to write it down
20  and just give me an idea of what they thought  11:15:48
21  happened.
22     Q.   Is it standard to have a report of
23  an investigation done on a 42?
24     A.   They could have wrote it on a 42,
25  they could have wrote it on a blank piece of  11:16:04

Page 600

Hesse

1
2  paper.  I just wanted to know what they
3  thought happened.
4      Q.   Do you recall when you received
5  Mr. Lamm's statement?              11:16:11
6      A.   I don't.
7      Q.   Was it before or after you
8  received Fiorillo's?
9      A.   I don't recall.
10     Q.   How about was it before or after  11:16:15
11  you received Snyder's?
12     A.   I don't recall.
13     Q.   Do you recall how you received it?
14     A.   It might have been through E-mail
15  or fax, I am not sure.            11:16:23
16     Q.   I place in front of Mr. Hesse what
17  was marked as Hesse Exhibit 25, it is a
18  two-page exhibit bearing Bates 3192 and 3193.
19         Do you recognize the document
20  marked as Hesse Exhibit 25?        11:16:39
21     A.   Yes.
22     Q.   What is this?
23     A.   This is Mr. Lamm's statement.
24     Q.   It came in by E-mail?
25     A.   Yes.                    11:16:52

Page 601

Hesse

1
2      Q.   That beach cop 03, that is your
3  E-mail address?
4      A.   Yes.
5      Q.   Do you recall it coming in around  11:16:56
6  November 5, 2004?
7      A.   I guess that is the date that I
8  received it, or he sent it, I am not sure.
9      Q.   What was your reaction when you
10  read Mr. Lamm's statement, if any?    11:17:09
11     A.   I don't remember having a
12  reaction.
13     Q.   Did you ever speak with Mr. Lamm
14  about his statement after you received it?
15     A.   I don't specifically remember.    11:17:18
16     Q.   You don't recall one way or the
17  other?
18     A.   No.
19     Q.   So if you had that conversation
20  with him, sitting here today you don't recall  11:17:26
21  anything that was stated?
22     A.   Not specifically about his
23  statement, no.
24     Q.   How about generally?
25     A.   I don't know.            11:17:32

Page 602

Hesse

1
2      Q.   What did you think of Mr. Lamm's
3  statement when you received it?
4      MR. CONNOLLY:  In what regard?
5      Q.   In any regard?              11:17:51
6      A.   Repeat that.
7      Q.   What did you think of his
8  statement when you received it?
9      MR. NOVIKOFF:  Objection.
10     A.   I took it for what it was worth.    11:17:58
11  I read it and added it to the pile of papers
12  that was part of the investigation.
13     Q.   What do you mean for what it was
14  worth?
15     A.   This is what his account was of    11:18:10
16  what happened that night.
17     Q.   Did you think it was worth
18  anything?
19     A.   I don't recall.  I would have to
20  read it again.                  11:18:16
21     Q.   Sitting here today you don't
22  recall whether at that time you thought it was
23  worth anything?
24     A.   I specifically don't remember.
25     Q.   I believe you testified that at    11:18:23

Page 603

Hesse

1
2  some point around five days of investigating
3  you reached a conclusion as to what happened;
4  is that correct?
5      MR. CONNOLLY:  Objection.        11:18:32
6      A.  I had an idea of what was going
7  on.
8      Q.  Did you prepare any report?
9      A.  At some point I think I did
10  another field report.            11:18:42
11      Q.  When did you do that?
12      A.  I don't specifically remember the
13  date.
14      Q.  Was it after you reached your
15  conclusion?                11:18:54
16      A.  I don't recall.
17      Q.  Why would you do another field
18  report?
19      A.  Just to add to the investigation.
20      Q.  Just so we are clear, the    11:19:01
21  additional field report that you did is
22  something different than what has been marked
23  as -- what number was the field report?
24      A.  The original one?
25      Q.  Yes, the one that we marked today.  11:19:19

Page 604

Hesse

1
2      A.  It was number 18.
3      Q.  Just so it is clear for the
4  record, you did a field report that was
5  different than the one that has been marked as  11:19:35
6  Hesse Exhibit 18?
7      A.  Yes, it was a separate field
8  report.
9      Q.  Do you know where that field
10  report is kept?                11:19:53
11      A.  What do you mean where it is kept?
12      Q.  Where it is stored?
13      A.  It is stored as an electronic
14  document in the computer.
15      MR. GOODSTADT:  Would you mark as  11:20:14
16  Hesse Exhibit 26, incident report,
17  12/11/2004.
18      (Hesse Exhibit 26, incident
19      report, 12/11/2004, marked for
20      identification, as of this date.)    11:20:46
21      Q.  I placed in front of Mr. Hesse
22  what is marked as Hesse Exhibit 26, one-page
23  exhibit bearing Bates 3150.  Mr. Hesse, is
24  this the field report that you are referring
25  to?                    11:20:58

Page 605

Hesse

1
2      A.  Yes.
3      Q.  So other than for the -- well,
4  strike that.
5      This field report doesn't reflect  11:21:04
6  the conclusions of your investigation, does
7  it?
8      A.  You mean our findings?
9      Q.  Yes.
10      A.  No.                11:21:17
11      Q.  So when I ask you if you prepared
12  a report, I was referring to -- maybe you
13  misunderstood or I didn't ask the question
14  clearly.  Did you prepare a report that set
15  forth your findings or your conclusions?    11:21:29
16      A.  No.
17      Q.  How come?
18      A.  I don't specifically know why we
19  had to do that.
20      Q.  I am asking why you didn't?    11:21:39
21      MR. CONNOLLY:  Objection.
22      A.  I don't think it was what we
23  normally did.
24      Q.  Again just so I am clear for the
25  record, when you said another field report,    11:21:52

Page 606

Hesse

1
2  you are referring to Hesse Exhibit 26 and not
3  some other document?
4      A.  That is correct.
5      Q.  Now, other than for the witness    11:21:57
6  statements, the 42's that we went over, the
7  photos, the statements that were taken that
8  night from Schalik, to Tesori and Van Koot,
9  was there anything else that was placed into
10  the Halloween file?            11:22:17
11      MR. CONNOLLY:  Objection.
12      A.  Not that I specifically know.
13      Q.  Isn't it true that you told Lamm
14  that what was in his statement wasn't what
15  happened?                11:22:40
16      MR. CONNOLLY:  Objection.
17      A.  I don't recall that.
18      Q.  Isn't it true that you asked
19  Mr. Lamm to amend his statement?
20      A.  No.                11:22:49
21      Q.  It is not true or you don't
22  recall?
23      A.  It is not true.
24      Q.  There came a point in time where
25  you -- strike that.            11:23:05

Page 607

Hesse

1
2        There came a point in time where
3    the five plaintiffs in this matter were
4    terminated from Ocean Beach; is that correct?
5        A.   Yes.                    11:23:16
6        Q.   When was that?
7        A.   I believe they -- April 2nd for
8    four of them and it was later for Mr. Snyder.
9        Q.   Do you recall when Mr. Snyder was
10   terminated?              11:23:31
11       A.   Specifically I don't know the
12   date, no.
13       Q.   Do you recall how many -- was it
14   weeks, days, months after April 2nd that Mr.
15   Snyder was terminated?          11:23:42
16       A.   It may have been a couple of
17   weeks, I am not specifically sure.
18       Q.   Who made the decision to terminate
19   their employment?
20       A.   I did.               11:23:55
21       Q.   Did you consult with anybody in
22   making that decision?
23       A.   I don't think so.
24       Q.   When did you make the decision to
25   terminate their employment?          11:24:04

Page 608

Hesse

1
2        A.   Sometime in I guess January of
3    '06.
4        Q.   When did you first alert somebody
5    about the decision to terminate their      11:24:22
6    employment that you made in January of '06?
7        A.   I believe what I did is, I didn't
8    know how to go about it, so I called Civil
9    Service and I asked them for a little
10   direction.              11:24:37
11       Q.   Who in Civil Service did you call?
12       A.   I believe it was Allison Chester
13   at the time.
14       Q.   And she was the person in Civil
15   Service assigned to the Ocean Beach account?   11:24:54
16       A.   Yes.
17       Q.   You dealt with her in the past on
18   Civil Service issues?
19       A.   In the past, yes.
20       Q.   When was that call?        11:25:00
21       A.   I don't specifically know the
22   date.
23       Q.   Do you recall what month it was?
24       A.   It could have been January,
25   February, even March, I am not positive.    11:25:12

Page 609

Hesse

1
2        Q.   Is there anything that you can
3    think of that would refresh your recollection?
4        A.   No.
5        Q.   Did you take any notes of the      11:25:20
6    call?
7        A.   No.
8        Q.   Did you put it on any calendar or
9    diary?
10       A.   No.                    11:25:25
11       Q.   Tell me what you recall about that
12   call?
13       A.   I believe I stated it on the first
14   day of testimony that I called her.  I asked
15   her what their rights were as seasonal police   11:25:35
16   officers.  I asked her what the Village's
17   rights were and what my rights would be.
18       Q.   What did she respond?
19       A.   She said that she would have to
20   speak to her supervisor and find out some      11:25:50
21   details and that she would get back to me.
22       Q.   Did she ever get back to you?
23       A.   Yes.
24       Q.   Do you recall who the supervisor
25   was that she had to get in touch with?      11:25:59

Page 610

Hesse

1
2        A.   I don't know.
3        Q.   What did she tell you when she got
4    back to you?
5        A.   She told me that all part-time      11:26:06
6    seasonal officers are at will employees, and
7    that you could terminate or not rehire or just
8    not ask them back for any reason without
9    cause.
10       Q.   Did she tell you that there are    11:26:23
11   any reasons that couldn't form the basis of
12   the decision to terminate their employment?
13       A.   No.
14       Q.   Just so I am clear at that point
15   in time what was your title?          11:26:43
16       A.   At that time I was the -- I was
17   appointed Acting Deputy Chief.
18       MR. CONNOLLY:  We are talking
19   about when you are saying at that point
20   in --                    11:26:53
21       MR. GOODSTADT:  When he had this
22   conversation.
23       MR. CONNOLLY:  Yes.
24       Q.   Just so I am clear for the record
25   at no point were you the mayor of Ocean Beach;  11:26:59

Page 611

Hesse

1
2 correct?
3    A.   No.
4    Q.   At no point were you the acting
5 mayor?                              11:27:03
6       MR. NOVIKOFF:  We can stipulate to
7    that.
8    A.   No.
9       MR. GOODSTADT:  We have some
10    testimony from Civil Service as to who    11:27:10
11    can make these decisions.
12       MR. NOVIKOFF:  But we can
13    stipulate that he was never the mayor,
14    acting mayor, trustee, acting trustee
15    member or clerk.                    11:27:18
16    Q.   Were you ever the clerk of the
17 Village of Ocean Beach?
18    A.   No.
19    Q.   Acting clerk of the Village of
20 Ocean Beach?                        11:27:24
21    A.   No.
22    Q.   Do you recall anything else in
23 that conversation that you had with
24 Ms. Chester, the second conversation?
25    A.   No.                          11:27:33

Page 612

Hesse

1
2    Q.   When was the first time that you
3 alerted anybody who was either an employee of
4 the Village of Ocean Beach or a member of
5 the Board of Trustees of Ocean Beach about your    11:27:46
6 decision to terminate the five plaintiffs?
7    A.   I believe I wrote a memo to the
8 Village Clerk and to I think I cc'd it to the
9 mayor and Trustee Loeffler.
10    Q.   Do you recall when that was?      11:28:03
11    A.   The specific date that I wrote it,
12 April 4th, somewhere in there.
13    Q.   It was after you had already
14 notified four of the five plaintiffs that they
15 were terminated?                    11:28:16
16    A.   Yes.
17       MR. GOODSTADT:  Would you mark
18    this document as Hesse Exhibit 27, letter
19    dated March 11, 2006.
20       (Hesse Exhibit 27, letter dated    11:28:20
21    March 11, 2006, marked for
22    identification, as of this date.)
23    Q.   I place in front of Mr. Hesse what
24 has been marked as Hesse Exhibit 27, a
25 one-page exhibit bearing Bates 2662.      11:28:55

Page 613

Hesse

1
2       Mr. Hesse, do you recognize the
3 document that has been marked as Hesse Exhibit
4 27?
5    A.   Yes.                          11:29:07
6    Q.   What is this document?
7    A.   This was a memo sent out to all
8 officers of the department to come for a
9 meeting.
10    Q.   Did you send this to the five     11:29:18
11 plaintiffs?
12    A.   Yes.
13    Q.   Why did you send it to the five
14 plaintiffs if you made the decision to
15 terminate their employment?            11:29:23
16    A.   Because I wanted them to come to
17 the meeting with all their equipment.
18    Q.   You see in the fourth line down in
19 this memo it says new ID will be issued to
20 all?                                11:29:37
21    A.   Yes.
22    Q.   Why did you send that to the
23 plaintiffs saying that new ID would be issued
24 to all?
25    A.   It was a generic letter that I     11:29:44

Page 614

Hesse

1
2 sent to all members of the department.
3    Q.   So you didn't mean that new ID
4 would be issued to all of the people who were
5 invited to the meeting; is that correct?    11:29:54
6    A.   Yes.  You are correct.
7    Q.   Did you speak with any other --
8 strike that.
9       Did you alert any other police
10 officers at Ocean Beach that the plaintiffs    11:30:07
11 were going to be terminated prior to April 2,
12 2006?
13    A.   Yes.
14    Q.   Who did you speak with?
15    A.   Only one, Paul Trosko, who was my   11:30:14
16 full-time police officer.
17    Q.   What did you tell Paul Trosko?
18    A.   I told him what I was going to do.
19    Q.   Did you tell him why you were
20 going to do it?                      11:30:26
21    A.   I don't remember specifically.
22    Q.   This April 2006, that is the first
23 year, the first season in which you were the
24 Deputy Chief?
25       MR. NOVIKOFF:  Objection to the     11:30:37

Page 615

Hesse

1
2   form only to the extent that the question
3   implies that April 2nd is part of the
4   season.
5       Q.   That is a good point.          11:30:47
6           The meeting on April 2nd, that was
7   the first preseason meeting that you presided
8   over as Deputy Chief or Acting Deputy Chief?
9       A.   Yes.
10      Q.   In all the other prior seasons Ed   11:30:59
11  Paradiso was still actively working as the
12  chief?
13      A.   Yes.
14      Q.   And as you understand it this was
15  the first year, 2006, in which you had the     11:31:13
16  authority to hire and fire?
17      A.   That is what I believed, yes.
18      Q.   Did you notify Ed Paradiso that
19  you had terminated the five plaintiffs
20  employment prior to telling them on April 2nd? 11:31:31
21      MR. CONNOLLY:  Objection to the
22  form.
23      A.   I don't think I did.
24      Q.   Why not?
25      A.   Well we were really not on      11:31:39

Page 616

Hesse

1
2   speaking terms at that point.
3       Q.   What do you mean by that?
4       A.   We just didn't see eye-to-eye on
5   certain things, and I was told that I was put   11:31:57
6   in charge of the Police Department because he
7   was not expected to come back and I was in
8   charge.  I didn't have to check in with him.
9       Q.   Who told you that he was not
10  expected to come back?                 11:32:06
11      A.   It was everybody's belief, the
12  village board, the mayors, everybody.
13      Q.   You said that you were told that
14  you were in charge of the police station, he
15  wasn't expected back.  Who told you that?     11:32:14
16      A.   It might have been Trustee
17  Loeffler.
18      Q.   When you say Trustee Loeffler,
19  Joseph Loeffler, Jr.?
20      A.   Yes.                      11:32:21
21      Q.   Did he tell you that you didn't
22  need to check in with Ed Paradiso on decisions
23  affecting the police station?
24      MR. CONNOLLY:  Objection.
25      A.   Specifically no.          11:32:34

Page 617

Hesse

1
2       Q.   Did you invite Ed Paradiso to the
3   meeting?
4       A.   No.
5       Q.   How come?                 11:32:40
6       A.   I don't know.
7       Q.   Why did you terminate Frank
8   Fiorillo?
9       A.   Because of his regular
10  insubordination and I felt that now that I was  11:32:56
11  the chief that he would continue with his
12  insubordination.
13      Q.   Any other reasons?
14      A.   No.
15      Q.   What incidents of insubordination   11:33:10
16  led you to terminate him?
17      A.   Like I stated on the first day,
18  specifically one incident that sticks out is
19  we were driving in to work, it was myself,
20  John Dwyer, Paul Corolla and Mr. Fiorillo in    11:33:27
21  the car.  I had given an order to John Dwyer
22  who was a paramedic at the time to please go
23  over all the medical gear in the station house
24  to make sure that we have all our equipment
25  up-to-date, and I turned around and I asked     11:33:47

Page 618

Hesse

1
2   Mr. Fiorillo if he could please wash the
3   windows, the front windshield of the car when
4   we got back to the station house, and he flat
5   out told me no.                     11:34:00
6           I turned around, I said what do
7   you mean no.  His phrase to me is I am not
8   fucking doing it.  Get somebody else to do it.
9   I do enough around here.  I stopped the
10  vehicle and I said if he chose not to do it he  11:34:17
11  can go home.  He shut up and we drove the rest
12  of the way into work and then I told him not
13  to do it and I put him on a post.
14      Q.   Was Frank Fiorillo on duty when
15  you told him to wash the windows?          11:34:33
16      A.   Yes.
17      MR. NOVIKOFF:  Was he on duty when
18  he made the request in the car, or was he
19  on duty when he was asked to actually
20  wash the car?                    11:34:46
21      Q.   Was he on duty when you made the
22  request in the car?
23      A.   Yes.
24      Q.   Was he on duty at the time that
25  you wanted him to actually perform the washing  11:34:52

33 (Pages 615 to 618)

Page 619

**Hesse**

1  of the window?
2
3     A.   He would have been on duty, yes.
4     **Q.   Was he getting paid for that time?**
5     A.   Yes.                        11:35:00
6        MR. NOVIKOFF:  Objection.
7        MR. CONNOLLY:  Which time?
8     **Q.   Was he getting paid for the time**
9  **that you wanted him to wash the window?**
10    A.   Yes.                        11:35:10
11    **Q.   Was he getting paid at the time**
12 **that you had directed him not to wash the**
13 **window?**
14    A.   Yes.
15    **Q.   Are you sure about that?      11:35:16**
16    A.   We were in the police car.
17    **Q.   Did you write Mr. Fiorillo up for**
18 **that?**
19    A.   Yes, I did.
20    **Q.   Did you put it in his personnel   11:35:27**
21 **file?**
22    A.   Yes.
23 RQ   Q.   I would like to mark the record to
24 request the production of the alleged
25 write-up, I don't think we have it.      11:35:42

Page 620

Hesse

1        Hesse
2        MR. CONNOLLY:  I am sure it was
3  requested.
4        THE WITNESS:  It was.
5     **Q.   Did you report Mr. Fiorillo to Ed  11:35:50**
6  **Paradiso?**
7     A.   Yes.
8     **Q.   Do you know whether Mr. Fiorillo**
9  **reported the incident to Ed Paradiso?**
10    A.   Yes, he did.                 11:36:01
11    **Q.   Did Ed Paradiso tell you that**
12 **Fiorillo had complained to him about the**
13 **incident?**
14    A.   Yes, he did.
15    **Q.   Is it true that you placed Mr.     11:36:12**
16 **Fiorillo in the same post for three straight**
17 **tours and told him he couldn't move in**
18 **response to his complaint to Mr. Paradiso?**
19    A.   No, I did not.
20       MR. NOVIKOFF:  Your question was   11:36:27
21 kind of compound.  I didn't object, I
22 will take his answer, but you may want to
23 clarify.
24    **Q.   Did you ever place Mr. Fiorillo at**
25 **the same post for three straight tours and   11:36:35**

Page 621

**Hesse**

1
2  direct him not to move?
3        MR. CONNOLLY:  At any time?
4     **Q.   At any time?**
5     A.   Pretty much the same compound     11:36:42
6  question, but he was put on a post for three
7  days, but he can move around.
8     **Q.   What post?**
9     A.   The corner of Denhoff and Bay
10 Walk.                              11:36:55
11    **Q.   Was that in response to his**
12 **complaint to Mr. Paradiso?**
13    A.   No.
14    **Q.   Was it at or about the same time**
15 **or shortly after his complaint to Mr.     11:37:04**
16 **Paradiso?**
17    A.   No.
18    **Q.   Was it before or after the**
19 **complaint to Mr. Paradiso that he was placed**
20 **on that corner?                    11:37:12**
21    A.   It was before.
22    **Q.   Was it before or after he was told**
23 **to wash the windows?**
24    A.   It was after.
25    **Q.   So you put him at that post on     11:37:22**

Page 622

**Hesse**

1
2  Denhoff in response to his refusal to wash the
3  windows?
4     A.   Yes.
5     **Q.   Did you tell him that?        11:37:31**
6     A.   Yes.
7     **Q.   Is that reflected in your write-up**
8  **of him?**
9     A.   I don't specifically remember.
10    **Q.   Did you tell anybody that you were 11:37:39**
11 placing him, other than Mr. Fiorillo, did you
12 tell anyone else that you were placing him at
13 that corner for refusing to wash the windows?
14    A.   I don't recall.
15    **Q.   What was the reason that you told  11:37:51**
16 **Mr. Fiorillo that he was being terminated?**
17    A.   Mr. Fiorillo's regular patrol duty
18 was the use of a G.E.M. car and residential
19 patrol, that was like his favorite thing to
20 do, and so I took it away from him and I put   11:38:09
21 him on a foot post.
22       MR. CONNOLLY:  Different question.
23    **Q.   My question is what reason did you**
24 **tell Mr. Fiorillo on April 2, 2006 was the**
25 **reason for his termination?           11:38:22**

34  (Pages 619 to 622)

Page 623

Hesse

1
2       MR. NOVIKOFF:  Objection to the
3   form.
4       Q.  At some point on April 2, 2006 you
5   told Mr. Fiorillo -- at some point on April 2,   11:38:31
6   2006 you told Mr. Fiorillo that he was being
7   terminated; correct?
8       A.  Yes, I told him he was not coming
9   back to work.
10      Q.  What reason did you give him for   11:38:41
11  making that decision to terminate his
12  employment?
13      A.  I flat out told him because of his
14  insubordination on a regular basis is why I
15  felt it necessary that he did not any longer   11:38:55
16  work for us or me.
17      Q.  You didn't tell him that it was
18  due to budget cuts?
19      A.  Absolutely not.
20      Q.  And other than for the one       11:39:06
21  incident that you testified to what other
22  incidents of insubordination led you to
23  terminate his employment?
24      A.  There were other incidents that
25  were not written up because I felt it        11:39:15

Page 624

Hesse

1
2   justified enough to speak to the individual
3   officer.  But one that -- there was one night
4   in particular, I don't remember the date, it
5   was probably in 2004, we had a possible rape   11:39:27
6   investigation going on, we were backed up on
7   paperwork and I asked him stop writing
8   summonses, you are backing up the log, you are
9   tying up the radio.
10      I had to take him off his post,   11:39:42
11  take a post in front of the police station,
12  and he subsequently started to write more
13  summonses.  He just -- that was a regular type
14  of situation that would go on with Mr.
15  Fiorillo.                          11:39:58
16      Q.  When was that incident?
17      A.  It might have been in 2004.
18      Q.  And did you ever speak to Chief
19  Paradiso about that?
20      A.  About that specifically, no.      11:40:04
21      Q.  How come?
22      A.  Because I didn't find it
23  necessary.
24      Q.  But that was one of the reasons
25  that you terminated his employed?        11:40:11

Page 625

Hesse

1
2       MR. NOVIKOFF:  Objection.
3       A.  Why I didn't ask him back, yes.
4       Q.  I think you said you didn't write
5   him up; correct?                    11:40:19
6       A.  That is correct.
7       Q.  Any other alleged incidents of
8   insubordination that led you to terminate his
9   employment?
10      A.  There were others, but        11:40:24
11  specifically I can't recall.
12      Q.  So the only two that you can
13  recall are the two that you testified to?
14      A.  Right now, yes.
15      Q.  Did you tell him that those two   11:40:35
16  specific instances led to his termination?
17      A.  I don't know if I said those two
18  incidents specifically, but I told him about
19  his insubordination.  I told him that it was
20  best that he just move on with his life.   11:40:47
21      Q.  Anything else discussed during
22  that conversation that you had with Mr.
23  Fiorillo on April 2nd?
24      A.  Yes, he proceeded to state that he
25  would do whatever I asked him to do, and I   11:40:56

Page 626

Hesse

1
2   told him I didn't believe him, and that he
3   should just move on and we shook hands and
4   parted ways.
5       Q.  Anything else discussed during   11:41:08
6   that meeting?
7       A.  No.
8       Q.  Where was that meeting held?
9       A.  That was a one-on-one conversation
10  that he and I had in the what is called the   11:41:14
11  boat house in Ocean Beach.
12      Q.  So there was nobody else during
13  that conversation?
14      A.  Not inside the room, no.
15      Q.  What did you tell Mr. Carter the   11:41:28
16  reason for his layoff?
17      A.  Well, Mr. Carter did want a leave
18  of absence which he took on his own and, you
19  know, I explained to him that his -- he would
20  sleep on duty regularly and he would brag   11:41:53
21  about it.  And I explained to him, you just
22  had twins, you have a full-time job, then you
23  come into Ocean Beach to sleep.  It is not
24  fair to me and the other officers, that he
25  would brag about it and everything else.   11:42:10

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 627

Hesse

1
2         I just told him, I said maybe it
3  is best that you just concentrate on your
4  family life, concentrate on your job and just
5  move on.                    11:42:19
6     **Q.   Did you ever witness him sleeping**
7  **on the job?**
8     A.   Yes.
9     **Q.   How many times?**
10    A.   Over 16 years of working with him, 11:42:24
11  I don't know, a handful.
12    **Q.   Did you ever write him up for it?**
13    A.   No.
14    **Q.   How come?**
15    A.   Because I didn't find it necessary  11:42:33
16  to write him up for it.
17    **Q.   Did you ever speak with Ed**
18  **Paradiso about Mr. Carter's sleeping on the**
19  **job?**
20    A.   I don't specifically recall.       11:42:45
21    **Q.   Did you ever speak with any of the**
22  **prior chiefs that you worked under -- did you**
23  **work under any other prior chiefs?**
24    A.   No.
25    **Q.   So you don't recall ever speaking  11:42:53**

Page 628

Hesse

1
2  with Mr. Paradiso about your allegation that
3  Mr. Carter slept?
4     A.   No.
5     **Q.   Did you ever counsel him about his  11:43:01**
6  **sleeping.**
7     A.   I spoke to him about it.
8     **Q.   How many times?**
9     A.   I don't recall.
10    **Q.   Was anybody present during these  11:43:09**
11  **alleged conversations?**
12    A.   No.
13    **Q.   Is that the reason why you**
14  **terminated Ed Carter?**
15    A.   That is the reason why I let him   11:43:20
16  go, yes.
17    **Q.   Isn't it true that you told him**
18  **that he was being terminated because of**
19  **directives?**
20       MR. CONNOLLY:  Objection.       11:43:31
21    A.   Well the directives being sleeping
22  on duty, yes.
23    **Q.   You explained to him that that was**
24  **the directive that he was being terminated**
25  **for?**                       11:43:40

Page 629

Hesse

1
2     A.   Specifically yes, he should not be
3  sleeping on duty.
4     **Q.   I am asking is that what you told**
5  **him specifically?**                11:43:49
6       MR. CONNOLLY:  Using that specific
7       word.
8     A.   I may have used the word
9  directive, failed to follow directive of not
10  to sleep on duty.  I may have said that, yes.  11:43:56
11    **Q.   I just want to be clear, you told**
12  **him that his sleeping was the reason why you**
13  **were terminating him?**
14    A.   Yes.
15    **Q.   Was anybody else there when you   11:44:06**
16  **told him that?**
17    A.   No, that was a one-on-one
18  conversation.
19    **Q.   Did you tell Paul Trosko that that**
20  **was the reason that you were terminating Ed   11:44:16**
21  **Carter?**
22    A.   Yes.
23    **Q.   Did you tell Paul Trosko that that**
24  **was the reason why you were terminating Mr.**
25  **Fiorillo?**                    11:44:29

Page 630

Hesse

1
2     A.   Yes.
3     **Q.   Did you tell anyone on the Board**
4  **of Trustees to whom you sent the memo to that**
5  **the reason that you fired Ed Carter was      11:44:35**
6  **because he was sleeping?**
7     A.   I don't know if I specifically.
8     **Q.   Did you tell anyone on the Board**
9  **of Trustees that the reason why you fired**
10  **Frank Fiorillo was due to his insubordination?  11:44:45**
11       MR. CONNOLLY:  Again making
12       reference to the memo?
13    **Q.   The people that you sent the memo**
14  **to?**
15    A.   Specifically I didn't write it in  11:44:52
16  the memo, no.
17    **Q.   How about in any other way did you**
18  **communicate to the trustees to whom you wrote**
19  **that memo to that the reason that you fired**
20  **Fiorillo was due to his alleged            11:45:05**
21  **insubordination?**
22       MR. CONNOLLY:  Again at any time?
23    A.   I believe I did.
24    **Q.   Who did you tell that to?**
25    A.   Trustee Loeffler and Mayor Rogers, 11:45:13

Page 631

Hesse

1  and I believe in conversation I had said
2  something to Maryann Minerva, the Village
3  Clerk.
4      Q.   As to the reason why?        11:45:28
5      A.   Yes.
6      Q.   When was that?
7      A.   I don't recall the dates.
8      Q.   Was it before or after you told
9  them that you were terminating him?     11:45:35
10     A.   I believe it was after.
11     Q.   How long after?
12     A.   I don't know.
13     Q.   Was it days, weeks, months, years?
14     A.   It could have been.          11:45:40
15     Q.   Which one?
16     A.   It could have been all of them
17 over the course, time after time of talking
18 about this.  I don't know.
19     Q.   When was the first time that you   11:45:49
20 informed Maryann Minerva of the reasons that
21 you terminated the five plaintiffs?
22     A.   Probably after I wrote the memo
23 and sent the memo on to them.
24     Q.   How long after?        11:46:04

Page 632

Hesse

1      A.   I don't recall.
2      Q.   Why did you terminate Kevin Lamm?
3      A.   You know, Kevin is -- that is a
4  unique situation.  This guy left on his own,   11:46:14
5  never put anything in writing, took a
6  full-time job somewhere else.  I kind of heard
7  that he got a full-time job.  He didn't work
8  for six or eight months.  You know, he is an
9  angry individual.  He abuses the people that   11:46:31
10 he deals with, that he came in contact with.
11         He was another one that could be
12 insubordinate every once in a while.  I just
13 thought that it was best that he moved on with
14 his career and stayed at his full-time job.    11:46:46
15     Q.   Did you ever report to Ed Paradiso
16 that Kevin Lamm allegedly abused people who he
17 came in contact with?
18     A.   Specifically no, I don't remember.
19     Q.   Do you think that would have been   11:46:57
20 important to tell the Chief of Police that one
21 of his police officers was abusing people?
22     A.   Yes, we had conversations, we had
23 these conversations.  But Ed Paradiso kind of
24 liked these guys and had a soft spot for them.  11:47:11

Page 633

Hesse

1  So I guess he thought it wasn't a big deal, I
2  don't know.
3      Q.   When was the first time that Kevin
4  Lamm abused somebody?          11:47:21
5      A.   I don't know.  I don't recall.
6      Q.   How come you didn't ask for his
7  termination at that point in time?
8      A.   I worked with Kevin when I was
9  just a PO, it was not my job.        11:47:33
10     Q.   How about when you became a
11 supervisor?
12     A.   We had some conversations.
13     Q.   How come you didn't ask for his
14 termination at that time?           11:47:41
15     A.   Because I didn't find it necessary
16 and it was not my job to terminate him.
17     Q.   Has Kevin ever been sued for any
18 alleged abuse?
19     A.   I don't know.            11:47:50
20     Q.   What was the reason that you told
21 Kevin Lamm that you were terminating him?
22     A.   Just exactly how I explained it to
23 you.  He left, he didn't put anything in
24 writing.  He took a full-time job and I      11:48:03

Page 634

Hesse

1  thought it was best that he just move on.
2      Q.   Is it true that you told him that
3  it was due to budget cuts?
4      A.   No.                11:48:13
5      Q.   Were there budget cuts that year?
6      A.   No.
7      Q.   Had you ever spoken to Ed Paradiso
8  that you wanted to terminate Kevin Lamm?
9      A.   You know specifically I don't     11:48:30
10 remember.
11     Q.   Why did you terminate Tom Snyder?
12     A.   You know, Tommy at the end, at the
13 end of his employment he wasn't showing up to
14 work, he was giving other guys his tours      11:48:44
15 without calling in.  I think he had some
16 personal issues going on and, you know, it is
17 funny because I never had a specific
18 conversation with Tommy about saying that I
19 was letting him go or anything.  He just kind   11:49:00
20 of faded away, and I had no hours available
21 for him, and I just didn't put him back on the
22 schedule.  So we never had an official
23 conversation.
24     Q.   Did you ever write Kevin Lamm up   11:49:14

Page 635

Hesse

1
2  for his alleged abuse?
3      A.  I don't recall specifically.  I
4  don't think so.
5      Q.  Did you ever write him up for      11:49:22
6  insubordination?
7      A.  I don't think so.
8      Q.  Did you ever write him up for
9  being angry?
10     A.  I don't think so, no.           11:49:29
11     Q.  When did you tell Mr. Snyder that
12  he was being terminated?
13     A.  I think I just stated, I don't
14  think I ever actually told him that.
15     Q.  Did you meet with him on the dock  11:49:55
16  one night and asked for his shield and weapon?
17     A.  Yeah, we actually met up when I
18  was working for the harbor police and he was
19  working for the town.  I actually met him at
20  the Maple Avenue dock.  I needed -- I actually  11:50:11
21  needed my weapon back so I could get somebody
22  else qualified on the Glock, because I was
23  short weapons.  But I don't know if he
24  specifically turned in his shield that day
25  either.                           11:50:29

Page 636

Hesse

1
2      Q.  Did you schedule to meet him
3  there?
4      A.  I think it was like a chance
5  thing, that he was working, I was working and  11:50:35
6  we met up.
7      Q.  Did you run into each other?
8      A.  No, I think we communicated
9  somehow, because I might have asked him that I
10  needed the weapon back and he knew that I was  11:50:45
11  working this particular day, so we met up and
12  he handed over his weapon.
13     Q.  Why did you tell him that you were
14  terminating him?
15     A.  Well for the third time I don't    11:50:57
16  think I ever told him that he was being
17  terminated.
18     Q.  Isn't it true that you told him
19  that it was because he was the guy who ratted
20  to Civil Service about the uncertified      11:51:06
21  officers?
22     A.  Absolutely not.
23     Q.  Did he hand over his shield that
24  day?
25     A.  I don't remember.           11:51:22

Page 637

Hesse

1
2      Q.  Why did you terminate Joe Nofi?
3      A.  Joe Nofi, he was a unique person.
4  He just could never concentrate on one thing.
5  His summonses were poor, his appearance was  11:51:38
6  poor.  It was always a scheduling conflict
7  with him.  You know, he would be scheduled to
8  work, he wouldn't show up, he would have
9  somebody else take his tour.  I just didn't
10  want to tolerate it any more, so I asked him  11:51:55
11  to move on also.
12     Q.  What were the reasons that you
13  told him that he was being terminated?
14     A.  I just explained that, I gave him
15  the same jargon that I just give you.  That  11:52:05
16  his appearance was poor, his work was poor,
17  his attitude was poor.  His interaction with
18  people was really poor.
19     Q.  Did you ever write him up for his
20  poor summonses?                11:52:23
21     A.  No.
22     Q.  Did you ever write him up for a
23  poor appearance?
24     A.  No.
25     Q.  Did you ever write him up for    11:52:29

Page 638

Hesse

1
2  scheduling conflicts?
3      A.  He has been written up for that.
4  I wouldn't say written up, but advised not to
5  do that.                         11:52:37
6      Q.  In writing?
7      A.  Yes.
8  RQ   Q.  I would like to mark the record to
9  request production of any alleged written
10  warning or writings that --          11:52:45
11     A.  It has been produced.
12     Q.  Did you ever write him up for his
13  poor interaction with people?
14     A.  No.
15     Q.  Did you ever discuss any of those  11:52:55
16  issues with Ed Paradiso?
17     A.  Yes.
18     Q.  Which ones?
19     A.  All of them.
20     Q.  What was Ed Paradiso's response?  11:53:03
21     A.  You know, I don't really recall.
22     Q.  Isn't it true that you told Joe
23  Nofi that he was being terminated due to
24  budget cuts?
25     A.  No.                       11:53:19

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 639

Hesse

1
2     Q.   Isn't it true that you told him on
3  that day that he is not like the other four
4  assholes that you were terminating?
5     A.   No way.                    11:53:30
6     Q.   You told him he was a good man and
7  a good father?
8     A.   No.
9     Q.   Was anyone else present when you
10  told Joe Nofi the reasons for his termination?  11:53:37
11     A.   No.
12        MR. NOVIKOFF:  I don't think you
13     asked that question with regard to the
14     other plaintiffs.
15     Q.   Was anyone else present when you   11:53:43
16  informed Mr. Lamm that he was terminated?
17     A.   No.
18     Q.   Was anyone else present when you
19  told Mr. Fiorillo that he was terminated?
20     A.   No.                     11:53:57
21     Q.   Was anyone else present on the
22  docks the night that you spoke to Mr. Snyder
23  about returning his weapon and shield?
24     A.   It was a day shift, but no.
25     Q.   Was anyone else present at the    11:54:07

Page 640

Hesse

1
2  time that you told Carter the reasons for his
3  termination?
4     A.   No.
5     Q.   Why did you wait for them to come   11:54:12
6  to the meeting on April 2nd to tell them that
7  you were terminating their employment?
8     A.   I thought it was the best way to
9  just get all the equipment back and be able to
10  just have a sit down with them and tell them   11:54:29
11  what was going on.
12     Q.   Did you think that it would be
13  humiliating in front of the other officers who
14  were assembled for the meeting?
15     A.   At the time, no.             11:54:39
16     Q.   How about now, do you think it was
17  humiliating?
18     A.   In retrospect I should have done
19  it a better way.
20     Q.   When did you decide to terminate   11:54:47
21  Snyder?
22     A.   You know, I always liked Tommy, he
23  is a good guy.  I always thought he was a hard
24  worker.  But I thought at the end he just had
25  some personal issues that were affecting his   11:55:06

Page 641

Hesse

1
2  job performance.  He seemed to be angry with
3  some of the other employees, and I thought it
4  was just best that he move on at that time.
5     Q.   Which other employees was he angry   11:55:16
6  with?
7     A.   Oh God.  Ty Bacon, the Bosetti
8  brothers, Arnie Hardman.  Anybody that came on
9  from the City job that came on to our job for
10  some reason he had some kind of disdain toward  11:55:32
11  City cops, and it was just becoming an issue.
12     Q.   Is that one of the reasons that
13  you terminated him?
14     A.   It was one of the reasons why,
15  yes.                        11:55:43
16     Q.   Did he tell you why he didn't like
17  the Bosetti's or Bacon or Hardman?
18     A.   Well there were comments being
19  made by him and Carter about City cops because
20  I think their boss on their job was a retired   11:55:54
21  City cop that just got in trouble on their
22  job, and for some reason they just hated City
23  cops.
24     Q.   They told you that?
25     A.   Who is they?             11:56:09

Page 642

Hesse

1
2     Q.   Mr. Snyder and I guess Ed Carter?
3     A.   Yes, they had told me that.
4     Q.   And they told you that they didn't
5  like the Bosetti's because of that reason?     11:56:19
6     A.   I don't know if it was entirely
7  specifically that reason, but that was
8  definitely part of it.
9     Q.   Did you ever speak to the
10  Bosetti's about their feelings for Snyder?     11:56:27
11        MR. NOVIKOFF:  Objection.
12     Foundation.
13     A.   I think it was known.
14     Q.   What was known?
15     A.   That they did not get along.  They   11:56:36
16  didn't like each other.
17     Q.   Why didn't the Bosetti's like
18  Snyder?
19        MR. CONNOLLY:  Objection.
20        MR. NOVIKOFF:  Objection.       11:56:44
21     A.   I think the Bosetti's felt that
22  Tommy Snyder and -- Tommy Snyder specifically
23  with the Halloween incident, they thought it
24  was a set up on them to get them into trouble.
25     Q.   Did you think it was a set up on   11:56:58

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 643

**Hesse**

1
2  them?
3      A.   No.
4      Q.   When did the Bosetti's let you
5  know that they thought it was a set up?    11:57:03
6      A.   I think when I finally started to
7  talk to them about the Halloween incident,
8  they kept feeling that they were being set up.
9      Q.   Do you recall when the first time
10  that they told you that?              11:57:22
11     A.   Specifically no.  I brushed it
12  off.
13     Q.   Did there come a point in time
14  where you announced to the department the
15  termination of the five plaintiffs?     11:57:40
16     A.   No.
17     Q.   Did you tell them that day that
18  the five plaintiffs were being terminated?
19         MR. CONNOLLY:  They being those
20     present at the meeting.           11:57:48
21         MR. GOODSTADT:  Yes.  Right.
22         MR. NOVIKOFF  Well actually your
23     question I think he testified that he had
24     not made the decision about Snyder prior
25     to April 2nd.                    11:57:58

Page 644

**Hesse**

1
2      Q.   Did you announce to the officers
3  who were at the meeting that you had
4  terminated some of the plaintiffs?
5      A.   I don't know --          11:58:09
6      Q.   Or all of the plaintiffs?
7      A.   I don't think I made an
8  announcement.
9      Q.   Did you tell them, did you tell
10  anybody there that day that any of the    11:58:17
11  plaintiffs had been terminated?
12     A.   I think I was specifically asked
13  and I said that they are going to move on with
14  their lives.
15     Q.   Did you tell them why?       11:58:26
16     A.   No.
17     Q.   Isn't it true that you told the
18  assembled officers that you terminated Carter
19  and Snyder because you thought they were going
20  to wear a wire for the DA?           11:58:36
21     A.   No.
22     Q.   Do you recall what Gary Bosetti's
23  reaction was when you told him that the
24  plaintiffs were terminated?
25     A.   What his specific reaction was,   11:58:49

Page 645

**Hesse**

1
2  no.
3      Q.   What Richard Bosetti's reaction
4  was?
5      A.   I don't know.          11:58:51
6      Q.   Isn't it true that they said its
7  about time that you got rid of those assholes?
8      A.   No.
9      Q.   Isn't it true that you told Gary
10  Bosetti that he owed you hours for making that  11:59:00
11  decision?
12     A.   I don't understand what you mean
13  by that.
14     Q.   That he owed you hours to work,
15  extra tours for terminating the plaintiffs?    11:59:11
16     A.   That he, Gary, owes me hours?
17     Q.   Yes.
18     A.   I don't know what you mean by
19  that, no.
20     Q.   Were other part-time officers     11:59:21
21  hired, newly hired for that summer?
22     A.   Yes.
23     Q.   How many?
24     A.   Three I believe.
25     Q.   Was Chris Moran at the meeting of   11:59:29

Page 646

**Hesse**

1
2  the remaining department?
3      A.   I think so.
4      Q.   Were any full-time officers hired
5  that year?                        11:59:44
6      A.   Yes.
7      Q.   How many?
8      A.   I think just one.
9      Q.   Who was hired that year?
10     A.   I think that was Paul Trosko.     11:59:50
11     Q.   When was he hired?
12     A.   I don't remember the exact date.
13     Q.   Do you recall when he started
14  working?
15     A.   I would have to look back in the    12:00:04
16  records, no.
17         MR. GOODSTADT:  Off the record.
18         MR. CONNOLLY:  The calendar year
19     2006, when you said that year?
20         MR. GOODSTADT:  Yes, I mean that    12:00:18
21     year, 2006.  Off the record for two
22     seconds.
23         THE VIDEOGRAPHER:  The time is
24     12:02, we are off the record.
25         (Recess taken.)               12:00:28

Page 647

Hesse

1
2     THE VIDEOGRAPHER:  The time is
3   12:15, we are on the record.
4       Q.   Is there something that you wanted
5   to add?                            12:13:45
6       A.   You had asked about hiring
7   full-time police officers?
8       Q.   Right.
9       A.   Trosko was one, but we hired
10  another officer, Frank Foti, he might have   12:13:53
11  been at the end of 2006 or 2007.
12      Q.   Sir, isn't it true that after you
13  terminated the plaintiffs that you threatened
14  that Kevin Lamm, Frank Fiorillo and Joe Nofi's
15  law enforcement careers are over?        12:14:17
16      MR. NOVIKOFF:  That day or
17  subsequent?
18      Q.   At any point?
19      MR. NOVIKOFF:  Objection to the
20  form of the question.               12:14:25
21      MR. CONNOLLY:  Objection.
22      A.   Yes, I did say that.
23      Q.   When did you say that?
24      A.   I believe I said it to Eddie
25  Carter on the phone.                12:14:34

Page 648

Hesse

1
2       Q.   When was that?
3       A.   I don't remember the date.
4       Q.   Why did you tell him that?
5       A.   I was just angry at their actions.  12:14:40
6       Q.   What actions?
7       A.   Going to Civil Service, trying to
8   get me in trouble.  You know, when is enough
9   enough.
10      Q.   I want to play the audio just to    12:14:54
11  identify that that is what you are referring
12  to.  This has been previously produced in this
13  case.
14      (Audio played).
15      Do you recognize the voices in     12:15:24
16  that conversation?
17      A.   Yes.
18      Q.   Who are those voices?
19      A.   That would be Eddie Carter and
20  myself.                            12:15:33
21      Q.   Did you ever call Mr. Fiorillo,
22  Mr. Nofi and Mr. Snyder mutts?
23      A.   Yes.  I think in my second day of
24  testimony I might have said that.
25      Q.   Why did you call them mutts?     12:15:52

Page 649

Hesse

1
2       A.   Because I didn't like them very
3   much at that point.
4       Q.   Who did you call them mutts to?
5       A.   I don't recall.  I don't know.    12:16:02
6       Q.   I am going to play an audio again,
7   previously produced, I want to identify the
8   voices on the audio.
9       (Audio played.)
10      Q.   Do you recognize the voices on   12:16:38
11  that audio recording?
12      A.   Was that me, it didn't really
13  sound like me.
14      MR. CONNOLLY:  Can you play that
15  again?                             12:16:47
16      A.   You got to turn that up a little
17  bit.
18      Q.   Sure.
19      (Audio played.)
20      Q.   Do you recognize the voices in     12:17:15
21  that audio?
22      A.   Yes, it was Eddie Carter.
23      Q.   And who else?
24      A.   I believe it was me.
25      Q.   Any reason to believe it is not    12:17:30

Page 650

Hesse

1
2   you?
3       A.   No.
4       Q.   Did you ever provide any
5   references, good or bad, for any of the     12:17:34
6   plaintiffs in the case subsequent to their
7   employment at Ocean Beach?
8       MR. NOVIKOFF:  Or neutral?
9       Q.   Or neutral?
10      MR. CONNOLLY:  Or did he respond    12:17:49
11  to any request for references?
12      Q.   Yes, or actively provide any
13  references.
14      MR. CONNOLLY:  Objection to the
15  form either way.                    12:17:59
16      A.   Boy that is confusing.
17      Yes, I believe all my responses
18  were neutral.
19      Q.   How many responses did you provide
20  on behalf of Frank Fiorillo?         12:18:06
21      A.   Specifically maybe two.
22      Q.   Do you recall what jobs they were
23  for?
24      A.   Southhampton either village or
25  town.  Maybe Riverhead.  I don't specifically  12:18:22

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 651

Hesse

1  remember.
2      Q.   Who did you speak with in
3  Southampton with respect to Mr. Fiorillo?
4      A.   I believe there was a sergeant    12:18:32
5  that I spoke to.
6      Q.   Do you remember his name?
7      A.   No.
8      Q.   Was it Scott Foster, does that
9  ring a bell?                           12:18:38
10     A.   No.
11     Q.   What did you state to the sergeant
12  in Southampton about Mr. Fiorillo?
13     A.   I didn't state anything.  He had
14  asked me about him and I said that I cannot    12:18:45
15  give him any information.  I will only confirm
16  dates of employment.  And he asked me I think
17  to put that in writing which I did, and I sent
18  that out to Southampton.
19     Q.   Did you tell him that Mr. Fiorillo  12:19:01
20  was terminated?
21     A.   I don't think I did, no.
22     Q.   Did you tell him that Mr. Fiorillo
23  was suing you?
24     A.   No.                           12:19:11

Page 652

Hesse

1      Q.   Do you recall anything else that
2  you discussed with the sergeant from
3  Southampton?
4      A.   No.                           12:19:19
5      Q.   Do you recall when that
6  conversation happened?
7      A.   No, I don't.
8      Q.   Do you recall whether it was days,
9  weeks, months, years after you terminated Mr.  12:19:28
10  Fiorillo?
11     A.   Definitely was not years.  It
12  could have been a few weeks maybe.  I don't
13  know.  I don't recall.
14     Q.   Who at the Riverhead Police        12:19:39
15  Department did you speak with with respect to
16  Mr. Fiorillo?
17     A.   Like I said specifically Riverhead
18  I wasn't real positive about.  For some reason
19  I feel that I had a message from the Chief of  12:19:54
20  the Riverhead Police Department that I
21  responded back to.  I don't think I spoke to
22  him, it might have been a sergeant or a
23  lieutenant, I don't remember specifically.
24     Q.   Do you recall what you stated in   12:20:07

Page 653

Hesse

1  that conversation to the sergeant or
2  lieutenant who you spoke with?
3      A.   The conversations were very brief
4  and I stated dates of employment only, that is  12:20:16
5  it.  I don't believe I put anything in writing
6  for them.
7      Q.   Did you tell them that Mr.
8  Fiorillo was terminated?
9      A.   No.                           12:20:28
10     Q.   Did you explain to him why you
11  couldn't provide any additional information?
12     A.   No.
13     Q.   Did you explain to the person at
14  Southampton that you spoke with why you        12:20:35
15  wouldn't provide any additional information?
16     A.   I don't believe I ever did.
17     Q.   Did you ever speak to anyone or
18  communicate with anyone in the Northport Bay
19  Police Department with respect to Mr.          12:20:48
20  Fiorillo?
21     A.   Northport, no.
22     Q.   How about Huntington Bay Police
23  Department?
24     A.   Mr. Fiorillo, no.              12:20:54

Page 654

Hesse

1      Q.   How about Quogue Village Police
2  Department?
3      A.   No.  Quogue, no.
4      Q.   How about anyone with respect to   12:21:04
5  the Village of Babylon?
6      A.   No.
7      Q.   Code Enforcement Officer?
8      A.   No.
9      Q.   Did you ever speak with anyone at  12:21:11
10  the Town of Brookhaven with respect to Mr.
11  Fiorillo?
12     A.   No.
13     Q.   Did you ever provide any
14  references or respond to any request for       12:21:24
15  references on behalf of Mr. Snyder?
16     A.   I don't believe I got any from Mr.
17  Snyder.
18     Q.   How about with respect to the John
19  T. Mather Memorial Hospital?                   12:21:41
20     A.   I never got anything from them.
21     Q.   How about the Town of Brookhaven?
22     A.   I don't believe I got anything
23  from them either.
24     Q.   I am not asking whether you got    12:21:54

42  (Pages 651 to 654)

Page 655

**Hesse**

1
2 **anything.  I am asking whether you ever**
3 **communicated with anyone over there with**
4 **respect to Mr. Snyder?**
5          MR. NOVIKOFF:  Objection to the      12:22:00
6      form.
7      Q.   With respect to a potential
8 **employment opportunity for Mr. Snyder?**
9          MR. NOVIKOFF:  Foundation.
10      Objection.                          12:22:05
11      A.   I understand what you are asking,
12 but when I say I have not gotten anything, I
13 don't think I received a phone call or any
14 documentation that said that he was applying
15 for the job.                             12:22:15
16      Q.   How about the Suffolk County Park
17 **Rangers?**
18      A.   Suffolk County Park Rangers; no.
19      Q.   Did you ever provide any reference
20 **or respond to any request for a reference on**     12:22:26
21 **of Ed Carter?**
22      A.   I believe there was only one thing
23 that came up with Mr. Carter.
24      Q.   What came up with Mr. Carter?
25      A.   He called me to ask me if I would   12:22:37

Page 656

1          Hesse
2 give him a reference, it had something to do
3 with the town and Chief Greg Decanio from the
4 Islip Airport Police was going to call me in
5 reference to something to do with Eddie       12:22:57
6 Carter, and I told Eddie that I would only
7 tell them the truth of why he was let go.
8      Q.   Did you speak to Decanio?
9      A.   At some point I did, yes.
10          MR. NOVIKOFF:  Can you spell that?  12:23:14
11      THE WITNESS:  I have no idea.
12      MR. NOVIKOFF:  D-E-C-A-N-I-O.
13      Q.   Did you speak with Decanio before
14 **or after you spoke to Carter about Decanio?**
15      A.   After.                          12:23:35
16      Q.   So Ed didn't call you before and
17 **say you need to speak with Decanio?**
18      A.   I don't think so.  He called me
19 first and said that Greg would be calling me
20 or to have me call Greg, and I talked to Greg  12:23:44
21 Decanio after I spoke to Ed Carter.
22      Q.   What did you tell Greg Decanio?
23      A.   I told Greg that Eddie Carter is a
24 good guy, that the reason why I had let him go
25 was because of his sleeping on duty.  I said  12:24:00

Page 657

1          Hesse
2 that once again just like I reiterated before,
3 that he had just had twins, I think he over
4 exerted himself.  I think he was doing too
5 much.  That the best thing was to just move   12:24:13
6 on.
7      Q.   How come you told Decanio details
8 **of why you terminated Carter, but didn't tell**
9 **for example the Southampton Police Department**
10 **details of your termination of Fiorillo?**      12:24:26
11      A.   I know Greg, I am not going to
12 sugar coat it with Greg.  Greg I know a long
13 time.  We have done some training together,
14 and upon Eddie Carter's request I called him.
15      Q.   You called Decanio or he called    12:24:41
16 **you?**
17      A.   I believe I reached out to him.  I
18 don't believe Greg ever called me.
19      Q.   Did you ever submit anything in
20 **writing to Decanio?**                        12:24:52
21      A.   No.
22      Q.   Did you ever submit anything in
23 **writing with respect to Ed Carter at all in**
24 **connection with a reference or in response to**
25 **a reference to anyone?**                     12:25:05

Page 658

1          **Hesse**
2      A.   No.
3      Q.   Did you ever provide any
4 **references or respond to any reference**
5 **requests with respect to Kevin Lamm?**          12:25:10
6      A.   None.
7      Q.   Never spoke with anyone or
8 **communicated with anyone at the Lloyd Harbor**
9 **Police Department?**
10      A.   I did get a phone call from the    12:25:19
11 Chief in Lloyd Harbor.
12      Q.   So when you said none it is not
13 **correct?**
14      A.   It is correct.
15      Q.   You never spoke with the chief?    12:25:26
16      A.   I spoke to the chief.
17      Q.   Tell me about your call, tell me
18 **everything you recall in that discussion with**
19 **the chief from Lloyd Harbor?**
20      A.   I think he was served with a       12:25:36
21 subpoena in reference to this case, and he
22 wanted some details about what was going on,
23 he didn't understand why.  I said that I was
24 being sued for some wrongful termination.  And
25 I said these were the names that were involved  12:25:53

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 659

Hesse

1  with the suit, and he recognized I believe
2  Kevin Lamm's name because I think Kevin was on
3  their list for a full-time position.  And they
4  gave it to somebody else, but that was          12:26:07
5  previous to me speaking to them.
6     Q.   Had you spoken to anyone at Lloyd
7  Harbor prior to them calling you about the
8  subpoena?
9     A.   No.                         12:26:20
10    Q.   Did you tell them the reasons why
11 you were being sued other than for generically
12 wrongful termination?
13          MR. NOVIKOFF:  Objection to the
14    form.                          12:26:27
15    A.   No.
16    Q.   What else did you discuss with the
17 Lloyd Harbor Chief at that time?
18    A.   I forget what his name is, but it
19 turns out that he had his start in Ocean Beach  12:26:34
20 when he was a seasonal police officer.  So we
21 talked about the good old days with Joe
22 Loeffler as chief and the things that went on
23 back in the day.
24    Q.   Anything else?                 12:26:58

Page 660

Hesse

1     A.   No.
2     Q.   Did you speak to anyone at
3  Huntington Bay Police Department about Kevin
4  Lamm?                           12:27:08
5     A.   No.
6     Q.   Did you speak to anyone in the
7  Ashroken Village Police Department?
8     A.   No.
9     Q.   How about Suffolk County Police     12:27:15
10 Department with respect to Kevin Lamm?
11    A.   I believe his investigator had
12 called me and wanted me to put something in
13 writing on why he no longer worked for the
14 department, and I told her the only thing that  12:27:29
15 I would do is confirm dates of employment.
16    Q.   Did you do that in writing?
17    A.   I don't believe I ever did, no.
18    Q.   How come?
19    A.   I don't think that is what she     12:27:38
20 wanted, so I would up not doing it.
21    Q.   Did you ever submit anything in
22 writing to Suffolk County Police Department
23 with respect to Kevin Lamm?
24    A.   No.                         12:27:51

Page 661

Hesse

1     Q.   How about the Southampton Village
2  Police Department, did you ever communicate
3  with them with respect to Kevin Lamm?
4     A.   No.                         12:28:02
5     Q.   How about the Northport Village
6  Police Department, did you ever communicate
7  with them or anyone there with respect to
8  Kevin Lamm?
9     A.   No.                         12:28:06
10    Q.   Did you ever communicate with
11 anyone at the Town of Islip Airport security
12 guard group with respect to Kevin Lamm?
13    A.   No.
14    Q.   How about Joe Nofi, did you ever    12:28:19
15 communicate with anyone with respect to a
16 reference or respond to a request for a
17 reference for Joe Nofi?
18    A.   Yes.
19    Q.   Who did you respond to or speak     12:28:28
20 with?
21    A.   I believe I spoke to an
22 investigator from the Collier County Sheriff's
23 Department in Florida.
24    Q.   Who did you speak with there?       12:28:42

Page 662

Hesse

1     A.   I don't recall his name.
2     Q.   How long was the conversation?
3     A.   A couple of minutes.
4     Q.   Tell me everything that you recall  12:28:51
5  that you spoke to him about?
6     A.   Well I was faxed a request to fill
7  out some kind of form for reference, and all I
8  did was confirm dates of employment and faxed
9  it back.                          12:29:12
10    Q.   Did you fill in any other
11 sections?
12    A.   Specifically I don't recall if I
13 filled out anything else other than that.
14    Q.   Did you cross out any of the       12:29:23
15 sections?
16    A.   No.
17    Q.   Did you ever speak with anyone
18 from Collier County?
19    A.   After I responded back by fax      12:30:03
20 there was an investigator who did call me.
21    Q.   Do you recall that investigators
22 name?
23    A.   No.
24    Q.   What did you discuss with the      12:30:10

Page 663

Hesse

1
2 investigator?
3     A.   He had asked me if there was any
4 other information that I could provide.  I
5 told him no, but I did advise him about the     12:30:17
6 lawsuit against me.
7     Q.   Why did you advise him about the
8 lawsuit against you?
9     A.   Because I thought it was pertinent
10 to advise him.                   12:30:29
11     Q.   Why?
12     A.   Because it is public information
13 that I am being sued by this individual.
14     Q.   So is it your understanding that
15 at the time you spoke with the investigator     12:30:40
16 that it was public information that you were
17 being sued?
18     A.   Yes, it was.
19     Q.   You actually had been served with
20 a copy of the lawsuit?             12:30:51
21     A.   Yes.
22     Q.   Positive about that?
23     A.   I am pretty sure, yes.
24         MR. GOODSTADT:  Would you mark
25     this document as Hesse Exhibit 28,     12:31:03

Page 664

Hesse

1
2     Employment, Collier County Sheriff's
3     Office, Employment Reference Prior
4     Experience.
5         (Hesse Exhibit 28, Employment,     12:31:04
6     Collier County Sheriff's Office,
7     Employment Reference Prior Experience,
8     marked for identification, as of this
9     date.)
10     Q.   I placed in front of Mr. Hesse     12:31:39
11 what has been marked as Exhibit 28, a
12 four-page exhibit bearing Bates CCSO 147
13 through 150.  I ask you to look at pages 149
14 and 150?
15     A.   Okay.               12:32:02
16     Q.   Do you recall, turn to page 150,
17 do you see a signature there?
18     A.   A signature.
19     Q.   On the bottom left, do you see
20 that, it says Denado or Donohoe, do you see     12:32:14
21 that signature?
22     A.   Yes, I do.
23     Q.   Does that refresh your
24 recollection as to the name of the person that
25 you spoke with?             12:32:29

Page 665

Hesse

1
2     A.   Yes.
3     Q.   Was it Donohoe?
4     A.   Yes.
5     Q.   He has a date of 9/15/2006, do you     12:32:31
6 see that?
7     A.   Yes.
8         MR. NOVIKOFF:  Where is that?
9         MR. GOODSTADT:  On the right side
10     next to Donohoe's signature; I am talking     12:32:42
11     about 150.
12         MR. NOVIKOFF:  I don't see a copy
13     on 150.
14         MR. GOODSTADT:  Let me see your
15     copy.               12:32:54
16         MR. NOVIKOFF:  I see the comment,
17     I don't see the signature.  Okay, you got
18     it.
19     Q.   You see it is dated 9/15/2006, do
20 you see that?               12:33:09
21     A.   Yes.
22     Q.   Any reason to believe that that
23 was not the date that you spoke with him?
24     A.   I don't know.
25     Q.   In fact 9/15/2006 was six months     12:33:15

Page 666

Hesse

1
2 before you were actually sued; is that
3 correct?
4         MR. NOVIKOFF:  Objection to the
5     form of the question.  To what you mean     12:33:25
6     by actually sued.
7     Q.   Sued by Mr. Nofi?
8         MR. CONNOLLY:  Same objection.
9     A.   Sued or served with a notice of
10 claim, I put them together.               12:33:36
11     Q.   Did you testify two times, two
12 sessions ago that you know the difference
13 between a lawsuit and a notice of claim?
14     A.   I might have put them together as
15 far as being served a notice of claim as being     12:33:47
16 sued.
17     Q.   Is a notice of claim publicly
18 available information?
19     A.   I don't know.
20     Q.   So what did you mean before when     12:33:53
21 you said I thought it was relevant because it
22 was publicly available information?
23     A.   Everybody was knowing about it,
24 everybody knew about it at that point.
25     Q.   Who is everybody?               12:34:02

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 667

1              **Hesse**
2     A.   I don't know, it was on the news,
3  it was everywhere.
4     **Q.   It is your testimony that it was**
5  **on the news that by the time that you spoke**    12:34:10
6  **with Mr. Donohoe that you were being sued by**
7  **Joe Nofi; is that your testimony?**
8     A.   I knew it was coming at least.
9     **Q.   The question, sir, is at the time**
10 **that you spoke with Mr. Donohoe was it on the**   12:34:23
11 **news that you were being sued by Joe Nofi?**
12    A.   You know what, I just don't
13 recall.
14    **Q.   And here you testified -- here you**
15 **wrote or told him at least that you had**         12:34:34
16 **dismissed Mr. Nofi; is that correct?**
17          MR. CONNOLLY:  Objection.
18          MR. NOVIKOFF:  Objection.
19    A.   No.
20    **Q.   If you look on page 149, he checks**   12:34:41
21 **off dismissed?**
22          MR. NOVIKOFF:  Okay, 149.
23          MR. GOODSTADT:  Yes.
24          MR. NOVIKOFF:  I will stipulate
25     that on 149 there is a check mark that    12:34:54

Page 668

1              Hesse
2  says dismissed.
3     **Q.   Do you recall telling him that you**
4  **dismissed Joe Nofi?**
5     A.   No.                          12:35:00
6     **Q.    Then the explanation you see he**
7  **writes, dismissed, applicant presently suing**
8  **the Police Department for wrongful**
9  **termination.  Do you see that?**
10    A.   I do see that, yes.          12:35:08
11    **Q.   Do you recall telling him that you**
12 **dismissed Mr. Nofi and that he is presently**
13 **suing the Police Department for wrongful**
14 **termination?**
15          MR. NOVIKOFF:  Objection.     12:35:20
16 Compound.
17          MR. CONNOLLY:  Objection.
18    A.   That is not what I recall telling
19 him.
20    **Q.    What do you recall telling him?**   12:35:24
21    A.   I told him that he no longer works
22 for the department, and I will confirm dates
23 of employment, and that he is suing the
24 department for wrongful termination.  But that
25 is not the reason why he was terminated, that   12:35:35

Page 669

1              Hesse
2  is not what I told him.
3          MR. NOVIKOFF:  You can add one
4  more minute based upon what I am about to
5  say.  But I would think it would be        12:35:45
6  logical that if one is no longer working
7  at the department and one is suing for
8  wrongful termination, that that person
9  has been dismissed or otherwise
10 constructively discharged.               12:35:58
11    You can have one more minute based
12 on the colloquy.
13          MR. GOODSTADT:  I don't know why
14 you added the colloquy.
15          MR. NOVIKOFF:  I couldn't help    12:36:07
16 myself.
17    **Q.   Did you ever speak with Nofi about**
18 **your discussion with Donohoe or anyone at the**
19 **Collier County Sheriff's office?**
20    A.   No.                          12:36:20
21    **Q.    Did you ever let Nofi know that**
22 **someone had reached out to you to request a**
23 **reference on his before?**
24          MR. NOVIKOFF:  Objection.
25    A.   No.                          12:36:32

Page 670

1              Hesse
2     **Q.   Did you ever submit anything in**
3  **writing to Collier County with respect to**
4  **Mr. Nofi?**
5     A.   I was sent a one-page reference,   12:36:45
6  questionnaire, and I think I only put on there
7  that I confirmed dates of employment.
8     **Q.   Did you ever speak with**
9  **Mr. Donohoe other than for that one telephone**
10 **conference that you already testified to?**   12:37:12
11    A.   No.  I believe that was the only
12 time.
13    **Q.   Did you ever speak to anyone else**
14 **from Collier County on behalf of Mr. Nofi?**
15    A.   No.                          12:37:23
16    **Q.   Did you ever speak to anyone in**
17 **the Suffolk County Department of Health with**
18 **respect to Joe Nofi?**
19    A.   Yes.
20    **Q.   When?**                     12:37:29
21    A.   I don't know when.
22    **Q.   After his termination?**
23    A.   Yes.
24    **Q.   What did you speak to -- strike**
25 **that.**                            12:37:38

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 671

Hesse

1
2     **Do you know what year it was that**
3 **you spoke with that person?**
4     A.   No.
5     **Q.   Who was it that you spoke with?**   12:37:41
6     A.   It was a female, I believe -- I
7 don't know if they were in actual health
8 services or cigarette and tobacco section.
9 They wanted me to give a reference over the
10 phone which I didn't do, and I asked them if   12:38:03
11 they want a reference they would have to put
12 something on department letterhead and mail it
13 to me, and that was the extent of the
14 conversation.
15     **Q.   Have you ever given a reference**   12:38:17
16 **for any officers other than for the five**
17 **plaintiffs?**
18     A.   I may have over the years.
19     **Q.   Have you ever given any other**
20 **information other than for dates of**   12:38:25
21 **employment?**
22     A.   I may have.
23     **Q.   Did you provide Paul Trosko with a**
24 **reference?**
25     A.   I may have.   12:38:33

Page 672

Hesse

1
2     **Q.   Substantive reference other than**
3 **for dates of employment?**
4     A.   I may have.
5     **Q.   Was it a positive reference?**   12:38:38
6     A.   I would think so, yes.
7     **Q.   Did you ever have any**
8 **communications with anyone in the Suffolk**
9 **County Police Department with respect to Joe**
10 **Nofi?**   12:38:49
11     A.   In the Suffolk County Police
12 Department?
13     **Q.   Yes.**
14     MR. NOVIKOFF:  Independent of a
15     reference --   12:38:54
16     MR. GOODSTADT:  No, in connection
17     with a reference.
18     A.   No.
19     **Q.   How about anyone in the**
20 **Easthampton Bay Constable Police Department?**   12:39:02
21     A.   No.
22     **Q.   How about the Easthampton Marine**
23 **Patrol?**
24     A.   No.
25     **Q.   How about the Suffolk County SPCA?** 12:39:11

Page 673

Hesse

1
2     A.   I think somebody called in from
3 there too, but no reference was given.
4     **Q.   Tell me everything you recall on**
5 **the conversation you had with the Suffolk**   12:39:27
6 **County SPCA with respect to Nofi?**
7     A.   I just vaguely remember something
8 about him applying for the -- whatever it is,
9 SPCA.  But you know what, to tell you the
10 truth I don't think anybody called me directly 12:39:42
11 in reference to a reference.
12     **Q.   Did you ever provide a reference?**
13     A.   No.
14     **Q.   How about the Riverhead Police**
15 **Department, did you ever speak with anyone**   12:39:57
16 **there with respect to Joe Nofi?**
17     A.   I think somebody did call in.
18     **Q.   Tell me everything that you recall**
19 **about that conversation?**
20     A.   Just the fact that there was a   12:40:09
21 call.  I think it was the same time with Frank
22 Fiorillo, and no reference was given.
23     **Q.   What did you tell the person?**
24     A.   You know, I believe there was a
25 message left for me to call the chief back and 12:40:20

Page 674

Hesse

1
2 when I -- I called back, I didn't get the
3 chief and I never got a call back.  So I don't
4 think anything was ever said or done.
5     **Q.   So you never spoke with anyone?**   12:40:31
6     A.   No.
7     MR. CONNOLLY:  Who is this?
8     **Q.   Riverhead Police Department.**
9     A.   I don't really recall any
10 conversations that took place with them.   12:40:41
11     **Q.   Now about the Northport Police**
12 **Department with respect to Joe Nofi?**
13     A.   No.
14     **Q.   How about the Smithtown Bay**
15 **Constable with respect to Joe Nofi?**   12:40:53
16     A.   No.  Never.
17     **Q.   How about with the Shelter Island**
18 **Police with respect to Joe Nofi?**
19     A.   No.
20     **Q.   How about the Amtrak Police with**   12:41:00
21 **respect to Joe Nofi?**
22     A.   No, nothing.
23     **Q.   How about the Quogue Police with**
24 **respect to Joe Nofi?**
25     A.   Nothing.   12:41:11

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 675

Hesse

1
2     Q.   How about the North Hempstead Bay
3  Constable with respect to Joe Nofi?
4     A.   Nothing.
5     Q.   How about the Babylon Bay          12:41:21
6  Constable?
7     A.   Nothing.
8     Q.   Any others that you can recall and
9  any other potential employers that you can
10 recall discussing Joe Nofi with?          12:41:30
11    A.   No.
12    Q.   How about Frank Fiorillo, do you
13 recall anybody else other than for the ones
14 that I asked you about?
15    A.   No.                    12:41:40
16    Q.   How about with respect to Ed
17 Carter, do you recall anybody else other than
18 for Decanio?
19    A.   No.
20    Q.   How about Kevin Lamm, do you       12:41:48
21 recall speaking with anybody on behalf of
22 Kevin Lamm's application for a job?
23    A.   Other than Suffolk County Police
24 Department, no.
25    Q.   How about Tommy Snyder?           12:42:00

Page 676

Hesse

1
2     A.   Never.
3     Q.   I think we touched upon last time
4  your post on the blog. Do you know what I
5  mean when I say the blog?                 12:42:21
6     A.   Yes.
7     Q.   Subsequently you provided
8  information in response to interrogatories
9  identifying this post that you made; is that
10 correct?                      12:42:30
11    A.   Yes.
12    Q.   Is that all the posts that you
13 made, the ones that were in response to the
14 interrogatories?
15    A.   Yes.                   12:42:36
16    MR. NOVIKOFF:  How much time is
17 left.
18    THE VIDEOGRAPHER:  Eight minutes.
19    MR. NOVIKOFF:  Have you hit the
20 250 yet.                      12:42:53
21    MR. GOODSTADT:  I don't know.
22    MR. NOVIKOFF:  Off the record.
23    THE VIDEOGRAPHER:  The time is
24 12:44, we are off the record.
25    (Recess taken.)               12:43:09

Page 677

Hesse

1
2     THE VIDEOGRAPHER:  The time is
3  12:45, we are on the record.
4     Q.   Mr. Hesse, you have posted on the
5  blog from your home computer; is that correct?  12:43:36
6     A.   Yes.
7     Q.   Do you know if anyone else has
8  posted on the blog from your home computer
9  other than for you?
10    A.   Not that I am aware of.        12:43:44
11    Q.   And the same thing about the Ocean
12 Beach Police Department computer, you posted
13 there on the blog?
14    A.   I may have, yes.
15    Q.   Are you aware of anybody else       12:43:53
16 posting on the blog from the Ocean Beach
17 Police Department computer other than for
18 yourself?
19    A.   Not yet.
20    Q.   What do you mean by not yet?       12:44:02
21    A.   I am assuming I will find out.
22    MR. GOODSTADT:  I have nothing
23 further at this time.
24    MR. CONNOLLY:  You can ask one
25 more, his responses are based upon his   12:44:13

Page 678

Hesse

1
2  recollection of blog entries.
3     MR. GOODSTADT:  Okay.
4     MR. NOVIKOFF:  Its up to Andrew if
5  he wants to ask that question.        12:44:26
6     MR. GOODSTADT:  I am going to
7  leave his responses where they are and go
8  through what I need to on redirect if
9  necessary.
10    THE VIDEOGRAPHER:  The time is      12:44:38
11 12:46, we are off the record.
12    (Time noted 12:46 p.m.)
13    (Lunch recess taken.)
14
15
16
17
18
19
20
21
22
23
24
25

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 679

Hesse

1
2    A F T E R N O O N   S E S S I O N
3    (Time noted: 1:38 p.m.)
4    G E O R G E   H E S S E,   resumed and
5    testified as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. NOVIKOFF:
8    THE VIDEOGRAPHER: The time is
9    1:38, we are on the record.
10   Q.   Good afternoon, Mr. Hesse, how are  13:36:34
11   you?
12   A.   Good.
13   Q.   As you probably are aware I
14   represent all the Village defendants besides
15   you. As you are probably aware I represent  13:36:43
16   all the Village defendants except you, you are
17   aware of that?
18   A.   Yes.
19   Q.   Have you and I ever had
20   discussions about the substance or the merits  13:37:00
21   or lack thereof of the action that brings us
22   here today?
23   A.   No.
24   Q.   Have we ever exchanged written
25   communications?                              13:37:08

Page 680

Hesse

1
2    A.   No.
3    Q.   I am going to ask you a series of
4    questions, I want to start off with asking you
5    some questions about the blog, but since Mr.  13:37:19
6    Goodstadt didn't ask you about any specific
7    blog entries, I am not going to. But let me
8    just ask you a few questions about the blog.
9    To the extent that you entered,
10   you made blog entries subsequent to the April  13:37:37
11   2nd meeting, and you understand what I am
12   talking about by the April 2nd meeting?
13   A.   Yes.
14   Q.   April 2, 2006?
15   A.   Yes.                 13:37:51
16   Q.   Let me rephrase the question.
17   To the extent that you made blog
18   entries in the Schwartz Report subsequent to
19   April 2, 2006, were you doing that as part of
20   your official duties as Acting Chief of  13:38:03
21   Police?
22   A.   No.
23   Q.   With regard to any entries in the
24   Schwartz Report or any other blog concerning
25   Ocean Beach subsequent to April 2, 2006 were  13:38:14

Page 681

Hesse

1
2    you doing it in any capacity associated with
3    your position as Acting Chief of Police?
4    MR. GOODSTADT: Objection.
5    A.   No.                 13:38:25
6    Q.   Did you advise Mayor Rogers while
7    she was still mayor but subsequent to April 2,
8    2006 that you were entering blog entries?
9    A.   No.
10   Q.   Did you advise Trustee Loeffler  13:38:37
11   subsequent to April 2nd and while he was still
12   a trustee member that you were entering blog
13   entries on the Schwartz Report concerning
14   Ocean Beach issues?
15   A.   No.                 13:38:55
16   Q.   To your knowledge was anyone, to
17   your knowledge was any trustee ever aware
18   between April 2nd and the time that Mayor
19   Loeffler was -- withdrawn.
20   Between April 2nd and the time  13:39:12
21   that Mayor Loeffler was started as mayor in
22   the summer of 2006 are you aware of any
23   trustee that was aware that you were blogging
24   on the Schwartz Report concerning Ocean Beach?
25   MR. GOODSTADT: Objection.     13:39:28

Page 682

Hesse

1
2    A.   I was not aware of anybody that
3    would know, no.
4    Q.   You certainly didn't tell anyone,
5    did you?                 13:39:33
6    A.   No.
7    Q.   Well, since there is an objection
8    let me rephrase the question.
9    Did you tell any trustee between
10   April 2nd and the date that Mayor Loeffler  13:39:40
11   started as mayor that you were blogging on the
12   Schwartz Report concerning Ocean Beach?
13   A.   No.
14   Q.   Prior to receiving the -- prior to
15   being served with the complaint, the Federal  13:39:57
16   court complaint in this matter did you ever
17   advise mayor -- former Mayor Rogers that you
18   were blogging on the Schwartz Report
19   concerning Ocean Beach?
20   A.   No.                 13:40:10
21   Q.   Did you ever advise Mayor Loeffler
22   prior to serving -- getting served with the
23   summons and complaint in the action that you
24   were blogging on the Schwartz Report
25   concerning Ocean Beach?           13:40:26

49 (Pages 679 to 682)

Page 683

Hesse

1       A.   No.
2       Q.   Did you advise any trustee member
3    prior to the time that you were served with
4    the summons and complaint that you were       13:40:31
5    blogging on the Schwartz Report concerning
6    Ocean Beach?
7       A.   No.
8       Q.   Let's look at the exhibit that Mr.
9    Goodstadt showed you, Exhibit 28, Deposition   13:41:09
10   Exhibit 28, CCSO 147 through CCSO 150.
11   Specifically let's look at 149 and 150?
12      A.   Yes.
13      Q.   Did you draft this document?
14      A.   No.                                    13:41:34
15      Q.   Prior to today have you seen this
16   document?
17      A.   No.
18      Q.   So let's be more specific, the
19   line: Rate the applicant in the following      13:41:44
20   areas.  You didn't draw that line; right?
21      A.   No.
22      Q.   Now, Mr. Goodstadt asked you a
23   question as to when you did this, when you
24   spoke -- when you spoke to the investigator,   13:42:02

Page 684

Hesse

1    when you filled out whatever form you
2    indicated that you filled out.  Do you recall
3    those questions?
4       A.   Yes.                                   13:42:09
5       Q.   Now, the date of this document,
6    150, is 9/15/2006.  Would you agree with me
7    that given the fact that the Federal lawsuit
8    was not filed until March 2007, that you had
9    your conversation with Collier County prior to 13:42:30
10   the filing of the Federal lawsuit?
11      A.   Yes.
12      Q.   And if I represented to you that
13   the date of the notice of claim was on or
14   about June 30, 2006, would you agree with me   13:42:43
15   that based upon that representation you would
16   have had a conversation with Collier County
17   after becoming aware of the notice of claim?
18      A.   Yes.
19      Q.   In fact the notice of claim was in  13:42:56
20   part a claim that the five plaintiffs were
21   unlawfully terminated; correct?
22          MR. GOODSTADT:  Objection.
23      A.   Yes.
24      Q.   What was your -- what is your       13:43:04

Page 685

Hesse

1    knowledge as you sit here today as to what
2    claims if any any of the plaintiffs were
3    making in their respective notice of claims?
4       A.   It was my belief that it was for   13:43:14
5    some kind of illegal termination of sorts, and
6    then many other accusations that just didn't
7    make sense.
8       Q.   A notice of claim is filed with
9    the village; correct?                         13:43:36
10      A.   Yes.
11      Q.   And a notice of claim is filed
12   specifically with the clerk of the village; is
13   that correct?
14          MR. GOODSTADT:  Objection.          13:43:43
15      A.   Yes.
16      Q.   To your knowledge is a notice of
17   claim a document that an individual could file
18   a FOIA request to ascertain?
19          MR. GOODSTADT:  Objection.          13:43:56
20          MR. CONNOLLY:  Objection.
21      A.   You know, I believe they can.
22      Q.   Are you aware of any law that
23   requires a notice of claim be kept
24   confidential and hidden from the public?      13:44:08

Page 686

Hesse

1       A.   Not that I am aware of.
2           MR. GOODSTADT:  Objection.
3       Q.   Now, let's look at page 150?
4       A.   Uh-hum.                             13:44:40
5       Q.   Whoever wrote this document states
6    under the line:  Please provide any additional
7    information that you feel is important.
8           And they write as follows:  Deputy
9    Chief Hesse states quote, his Police           13:44:52
10   Department is being sued by the applicant for
11   quote wrongful (job) termination close quote.
12          Do you see that?
13      A.   Yes.
14      Q.   Did you state to whomever you       13:45:07
15   spoke to at Collier County that the Police
16   Department was being sued?
17      A.   Yes.
18      Q.   Did you state to the investigator
19   or whomever you spoke to at Collier County     13:45:17
20   that Mr. Nofi was suing the department for
21   wrongful termination?
22      A.   Yes.
23      Q.   Whoever wrote this document then
24   goes on to say:  Chief Hesse states that he    13:45:28

**Hesse**

1  **Hesse**
2  cannot comment on the applicant's reason he
3  was let go or his job history at the PD due to
4  the ongoing lawsuit.
5      Do you see that?                    13:45:40
6      A.   Yes.
7      Q.   Now, did you tell whomever you
8  spoke to at Collier County that you can't
9  comment on the applicant's reasons as to why
10  he was let go?                          13:45:51
11      A.   Yes.
12      Q.   Did you tell whomever you spoke to
13  at Collier County that you can't comment on
14  the applicant's job history at the Police
15  Department?                             13:46:00
16      A.   Yes.
17      Q.   And did you tell whomever you
18  spoke to at Collier County that you could not
19  discuss the reasons Mr. Nofi was let go or his
20  job history due to the ongoing lawsuit?  13:46:12
21      A.   Yes.
22      Q.   Now, did you speak with any lawyer
23  prior to giving this information to Collier
24  County as to what you could say with regard to
25  a reference request?                    13:46:28

1      **Hesse**
2      A.   No.
3      Q.   Did you speak with Mayor Loeffler?
4      A.   No.
5      Q.   Did you speak with former Mayor    13:46:33
6  Rogers?
7      A.   No.
8      Q.   Did you speak with any trustee?
9      A.   No.
10      Q.   Now, you indicated in response to   13:46:38
11  Mr. Goodstadt's question that in your opinion
12  you gave neutral references; is that correct?
13      A.   Uh-hum.
14      MR. GOODSTADT:  Objection.  His
15      testimony is what it is.             13:46:50
16      MR. NOVIKOFF:  Okay.
17      Q.   Let me state this.  In your
18  opinion the references that you gave with
19  regard -- putting aside Mr. Carter for the
20  time being, the references that you gave with   13:46:59
21  regard to the other four plaintiffs, to the
22  extent that you gave any references -- you
23  know, withdrawn, reference is a bad word.
24      To the extent that you had any
25  communications with regard to any prospective   13:47:11

1      **Hesse**
2  employers of the plaintiffs with the exception
3  of Mr. Carter, would you characterize your
4  comments as being neutral?
5      MR. GOODSTADT:  Objection.          13:47:22
6      A.   Yes.
7      Q.   Sir, if in fact you wanted to give
8  a negative reference with regard to for
9  example to Frank Fiorillo, what would you have
10  said to a prospective employer?         13:47:31
11      MR. GOODSTADT:  Objection.
12      A.   I would have said that he was
13  insubordinate and I would have gave him -- I
14  probably would have given him an example or
15  two.                                    13:47:44
16      Q.   The same thing with regard to Mr.
17  Nofi, if you were to give a negative reference
18  with regard to Mr. Nofi what would you have
19  said?
20      MR. GOODSTADT:  Objection.          13:47:55
21      A.   I would have said that, like I
22  stated earlier, he had poor work performance,
23  poor appearance and so on, along those lines.
24      Q.   Let's stay with Mr. Nofi for a
25  minute.  To the extent and I don't recall your   13:48:09

1      **Hesse**
2  testimony, I am not going to try to repeat it
3  here, to the extent that you gave any
4  references at all with regard to Mr. Nofi
5  subsequent to April 2, 2006, did you give that   13:48:19
6  type of a negative reference?
7      A.   No.
8      MR. CONNOLLY:  Objection.
9      Q.   Did you give any type of negative
10  reference?                              13:48:31
11      A.   No.
12      Q.   Same question with regard to Mr.
13  Fiorillo?
14      MR. GOODSTADT:  Objection.
15      A.   No.                            13:48:37
16      Q.   With regard to Mr. Snyder, to the
17  extent that you gave any, made any
18  communications with any prospective employers
19  of Mr. Snyder after April 2, 2006, if you were
20  going to give a negative reference what would   13:48:51
21  you have said?
22      MR. GOODSTADT:  Objection.
23      A.   I would have said that he had
24  somewhat of a poor attitude.  His work
25  performance was slipping.  That tours that he   13:49:01

Page 691

Hesse

1
2  was scheduled for he was not showing up for.
3     Q.   Did you give that type of -- did
4  you communicate those opinions to any
5  prospective employer to the best of your        13:49:13
6  recollection?
7     A.   No.
8     Q.   How about with regard to Mr. Lamm,
9  to the extent that you had any communications
10 with a prospective employer after April 2,     13:49:21
11 2006 and you were inclined to give a negative
12 reference, what would that negative have been?
13    MR. GOODSTADT:  Objection.
14    A.   I would have said that he had a
15 poor attitude, shows no discretion, generally   13:49:36
16 angry, and insubordinate.
17    Q.   Did you make -- did you
18 communicate those opinions to any prospective
19 employer that you were aware of?
20    A.   No.                                     13:49:54
21    Q.   So let's go back to what Mr.
22 Goodstadt brought out from you during his
23 testimony.  You acknowledged, and correct me
24 if I am wrong, that at least that on those
25 tapes -- withdrawn.                             13:50:06

Page 692

Hesse

1
2     You acknowledged on those tapes
3  that Mr. Goodstadt played for you, for us in
4  the morning, that you did make statements
5  concerning Lamm, Fiorillo and Nofi's law       13:50:17
6  enforcement careers; correct?
7     A.   Yes.
8     Q.   And in fact in sum or substance
9  you had said to whoever you were speaking to
10 that those -- that their law enforcement        13:50:31
11 careers were over; is that correct?
12    A.   Yes.
13    Q.   What did you mean by that as you
14 heard it on the tape?
15    MR. GOODSTADT:  Objection.              13:50:40
16    A.   I was angry.
17    MR. CONNOLLY:  Objection.
18    Q.   I understand.
19    A.   I was angry at the things, at the
20 acquisitions that they were making.  But as     13:50:47
21 far as their law enforcement careers are over,
22 they are just going to remain where they are
23 and that is what I hoped.  And really that was
24 it.  There was no threats made.  I didn't do
25 anything that would hurt them.  I never said    13:51:00

Page 693

Hesse

1
2  anything about them to any prospective
3  employer.  So, you know, I was just angry at
4  that moment.
5     MR. GOODSTADT:  Do we have an         13:51:12
6  agreement that I don't have to move to
7  strike anything?
8     MR. NOVIKOFF:  Yes, until such
9  time as you need to.
10    MR. GOODSTADT:  Well it is          13:51:21
11 preserved.  I don't have to do it today.
12    MR. NOVIKOFF:  Yes.
13    Q.   To the extent Mr. Goodstadt
14 believes that you were threatening to do
15 something in those tapes with regard to their   13:51:31
16 law enforcement careers, did you take any
17 action in furtherance of that?
18    MR. CONNOLLY:  Objection.
19    MR. GOODSTADT:  Objection.
20    A.   No.                                     13:51:43
21    Q.   Was it your intent on those tapes
22 to communicate that you were going to
23 affirmatively take any action to harm their
24 careers?
25    A.   No.                                     13:51:55

Page 694

Hesse

1
2     Q.   Now, Mr. Goodstadt inquired with
3  you with regard to various eyewitness
4  statements that had been filed with the
5  village concerning the Halloween incident, do  13:52:42
6  you recall that?
7     A.   Yes.
8     Q.   I think he said, he asked you did
9  you think it was strange that no one who put
10 in an eyewitness statement made reference to a  13:52:53
11 pool cue; correct?
12    A.   Yes.
13    Q.   I don't recall what your answer is
14 and frankly for purposes of my question I
15 don't care what your answer was.  Let's look    13:53:03
16 at the Exhibit 14?
17    MR. GOODSTADT:  Which is Exhibit
18 14?
19    Q.   This is the memo from Steve Jaeger
20 to Ed Paradiso?                                 13:53:34
21    MR. CONNOLLY:  You are going to
22 have to give him a copy.
23    MR. NOVIKOFF:  I thought the
24 reporter would have brought it.  So we
25 are continuing.                                 13:53:54

52 (Pages 691 to 694)

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 695

Hesse

1
2      MR. GOODSTADT:  I don't know.
3      MR. NOVIKOFF:  Do you have a clean
4  copy?
5      MR. CONNOLLY:  It has my          13:54:02
6  handwriting on it.
7      MR. NOVIKOFF:  It says Exhibit 14.
8  Can you show Mr. Goodstadt, I just --
9      MR. GOODSTADT:  That is fine.
10     Q.   I am going to show you what I      13:54:17
11  represent to be marked as Exhibit 14, I will
12  note for the record that Mr. -- your counsel's
13  handwriting is on the bottom of that page
14  indicating that it is Exhibit 14.
15     Now, would you characterize this      13:54:29
16  as an eyewitness statement, or would you
17  characterize this as a complaint to the chief
18  concerning an action taken against Gary
19  Bosetti by the chief?
20     A.   I took it as a complaint filed to   13:54:43
21  the chief about the actions that the chief
22  took against Gary Bosetti.
23     Q.   Does Mr. Jaeger in this letter
24  indicate at all that he was a witness to the
25  entirety of the altercation involving those    13:54:56

Page 696

Hesse

1
2  three individuals and Mr. Gary Bosetti?
3      MR. GOODSTADT:  Objection.
4      A.   No.
5      Q.   Does he indicate anywhere in this   13:55:04
6  letter that he was an eyewitness to anything
7  involving Gary Bosetti fighting these -- any
8  individual?
9      MR. GOODSTADT:  Objection.
10     A.   No.                    13:55:15
11     Q.   Now let's look at Exhibit 16?
12     MR. CONNOLLY:  Which we are going
13  to have the same problem.
14     MR. NOVIKOFF:  Yes.
15     Q.   It is the Doug Wyckoff, 3165 and    13:55:35
16  3166.
17     MR. GOODSTADT:  Looks good to me.
18     Q.   I am going to ask you to read,
19  same representation that what I am showing you
20  is 3165 and 3166.  I represent that it was     13:56:04
21  marked as Exhibit 16 at your deposition
22  earlier and your counsel is handing you a copy
23  of his.
24     MR. CONNOLLY:  Which again notes
25     that it is Exhibit 16 in my handwriting?   13:56:15

Page 697

Hesse

1
2      Q.   Now I am just going to ask you to
3  read Mr. Wyckoff's statement to yourself, on
4  the front and then it continues on the back.
5  Then I am going to ask you a series of       13:56:24
6  questions about that.
7      A.   Okay.
8      Q.   Did Mr. Wyckoff indicate in his
9  statement that he was a witness from the
10  entire altercation involving Gary Bosetti from 13:57:22
11  the moment it started to the moment it ended?
12     MR. GOODSTADT:  Objection.
13     A.   With Gary himself -- not entirely,
14  no.
15     Q.   In fact am I correct in my reading  13:57:34
16  of this that at some point in time Mr. Wyckoff
17  said that being that he was a bouncer for many
18  years he went and grabbed one of the alleged
19  victims and forced him out the front door;
20  yes?                       13:57:52
21     A.   Yes.
22     Q.   So I am correct in reading, that
23  is what I read?
24     A.   Yes.
25     MR. GOODSTADT:  Objection.        13:57:59

Page 698

Hesse

1
2      Q.   Would you agree then that had he
3  been taking one of the individuals out the
4  front door while the altercation was still
5  going on involving Gary Bosetti that he might  13:58:07
6  not have seen Mr. Bosetti using a pool cue?
7      MR. GOODSTADT:  Objection.
8      A.   Yes.
9      Q.   Did Mr. Bosetti ever deny ever
10  using a pool cue?                13:58:21
11     A.   No.
12     Q.   And in fact if I recall correctly
13  in his witness statement he acknowledged
14  specifically that he hit Mr. Schalik, or he
15  hit somebody with a pool cue; right?        13:58:28
16     A.   Yes.
17     Q.   Now, let's look at Exhibit 15, and
18  if Mr. Connolly doesn't mind I would like to
19  have him show to the extent that there is no
20  extraneous handwriting other than the exhibit  13:58:44
21  number.
22     Again I represent that Exhibit 15,
23  what I am handing you is document 3181 through
24  3182?
25     A.   Correct.                13:59:04

Page 699

Hesse

1
2       Q.   And it was marked as Exhibit 15 by
3   Mr. Goodstadt when he was questioning you.  I
4   am going to ask you to read this one and then
5   tell me when you are done?              13:59:15
6       A.   Okay.
7            MR. CONNOLLY:  Just let me see it
8   for a second.  Okay.
9       Q.   Now, I have showed you Exhibit 15,
10  and whose signature -- whose eyewitness      14:01:20
11  statement is that; that is Jeannie Jaeger; is
12  that correct?
13      A.   Yes.
14      Q.   Does Ms. Jaeger in this eyewitness
15  statement or this statement indicate that at    14:01:29
16  some point in time she went into the woman's
17  bathroom after the altercation began?
18           MR. GOODSTADT:  Objection.
19      A.   Yes.
20      Q.   Why don't you tell the court what   14:01:41
21  Ms. Jaeger is saying with regard to when she
22  went back into the bathroom?
23      A.   You want me to read it?
24      Q.   Yes, please.
25           MR. GOODSTADT:  Objection.       14:01:50

Page 700

Hesse

1
2       A.   "The man then lunged towards Gary
3   and fell into the corner with the parking
4   meter, taking the girl dressed as a cop with
5   him.  They were both down and not moving when   14:02:08
6   I grabbed Elyse and ducked into the ladies
7   room."
8       Q.   Would you agree with me that if
9   Ms. Jaeger was in the ladies room at the time
10  that Mr. Bosetti had used the pool cue and the   14:02:23
11  bathroom door was closed, she could not have
12  seen Mr. Bosetti use the pool cue?
13           MR. GOODSTADT:  Objection.
14      A.   Yes.
15      Q.   Would you agree with me that if     14:02:33
16  she put in this statement that she put, that
17  she saw Mr. Bosetti use a pool cue when in
18  fact she didn't, she would be committing a
19  perjurious act?
20      A.   Yes, she would be lying, yes.      14:02:45
21           MR. GOODSTADT:  Objection.
22      Q.   Does it seem strange to you that
23  based upon the fact that Ms. Jaeger went into
24  the ladies room at some point in time during
25  the altercation and she didn't put down in her   14:03:01

Page 701

Hesse

1
2   statement that she saw Mr. Bosetti use a pool
3   cue?
4       A.   No, I don't find it strange.
5       Q.   The same thing with Mr. Wyckoff,    14:03:12
6   given the fact that Mr. Wyckoff indicated that
7   at some point in time in the statement he took
8   one of the alleged victims and forced him out
9   of the bar, does it seem strange to you that
10  Mr. Wyckoff didn't see Mr. Bosetti use a pool   14:03:27
11  cue?
12      A.   No, I don't find it strange.
13      Q.   In fact if Mr. Wyckoff said he saw
14  Mr. Bosetti use a pool cue when in fact he
15  didn't, Mr. Wyckoff would be committing a       14:03:39
16  perjurious act; is that correct?
17      A.   Yes, he would be lying.
18      Q.   Let's look at Mr. Steven Jaeger.
19  Now if Mr. Steve Jaeger indicated in his
20  letter of complaint to Chief Paradiso that he   14:03:51
21  knew that Gary Bosetti used a pool cue when in
22  fact he never was an eyewitness to that, he
23  would be lying as well?
24      A.   Correct.
25      Q.   So to the extent that Mr.          14:04:06

Page 702

Hesse

1
2   Goodstadt showed you this letter of complaint
3   as a purported eyewitness statement, does it
4   seem strange to you now -- does it seem
5   strange to you that Mr. Budd Jaeger made no    14:04:18
6   reference to Gary Bosetti using a pool cue?
7            MR. GOODSTADT:  Objection.
8       A.   No.  At this time, no.
9       Q.   Let's look at Exhibit 19, and this
10  one I think he showed you today?              14:04:41
11      A.   Yes, it is somewhere in here.
12      Q.   Now, Exhibit 19 is a statement of
13  Elyse Miller; is that correct?
14      A.   Yes.
15      Q.   At least it purports to be a       14:04:57
16  statement of Elyse Miller?
17      A.   Yes.
18      Q.   Mr. Goodstadt asked you a series
19  of questions about that, do you recall?
20      A.   Yes.                          14:05:03
21      Q.   Let's go to the third page of this
22  document, 3171?
23      A.   Okay.
24      Q.   Actually it starts, the part I
25  want to focus on starts on 3170?             14:05:17

Page 703

Hesse

2      A.   Yes.
3      Q.   I am going to read it into the
4   record: "At that point the guy in the orange
5   jump suit reached for Jean's throat, he was      14:05:28
6   going to choke her.  Jean was trapped.  The
7   wall to the men's room was behind her and
8   there was no place to move in that little
9   bathroom waiting area.  I started to grab for
10  his wrist trying to get him off, but          14:05:45
11  thankfully Gary appeared and pushed him to the
12  ground and away from Jean.  The guy fell down
13  bringing Gary and the girl with him.  Suddenly
14  another guy appeared, I believe he had on a
15  gray shirt.  Gary told the guy that he was a    14:06:01
16  cop, telling him to step back, get out of the
17  way and to stay out of it.  But the guy said
18  he didn't care who Gary was and he went to
19  kick Gary in the head.  Gary blocked the kick
20  and Jean and I were pushed further back in the  14:06:16
21  tight space now trapped.  Jean pulled me into
22  the ladies room for safety."
23      Do you see that?
24      A.   Yes.
25      Q.   Let's assume, I wasn't there, you  14:06:26

Page 704

Hesse

2   were not there, no one in this room was there.
3   The only people -- well, actually none of the
4   police officers were there.
5      Let's assume for the purpose of     14:06:35
6   this question that Gary Bosetti used the pool
7   cue while Elyse Miller was in the bathroom,
8   and let's assume that the door was closed.
9   Could Elyse Miller have seen Gary Bosetti use
10  the pool cue while she was in the bathroom     14:06:52
11  with the door closed?
12      MR. GOODSTADT:  Objection.
13      A.   No.
14      Q.   Let's assume for the purpose of my
15  question that in fact Gary Bosetti used the    14:06:59
16  pool cue while Elyse Miller was in the
17  bathroom with the door closed.  Would it be
18  strange to you that Elyse Miller didn't put
19  down in her statement that Gary Bosetti had
20  used a pool cue?                    14:07:13
21      A.   No.
22      Q.   In fact if Gary Bosetti had used
23  a pool cue -- I'm sorry, and in fact had Elyse
24  Miller put down in her statement that Gary
25  Bosetti had used a pool cue, when in fact she  14:07:22

Page 705

Hesse

2   didn't see him use a pool cue, that would have
3   been a perjurious statement; correct?
4      A.   Yes.  She would have been lying.
5      MR. GOODSTADT:  You don't want to  14:07:34
6   discuss the part when she opens the door
7   and discusses the rest of it?
8      MR. NOVIKOFF:  No.  You may.
9      Q.   Now let's look at Exhibit 20,
10  because you know these things happen in the    14:07:51
11  blink of an eye.
12      MR. GOODSTADT:  Recollections are
13  sketchy, right, they become snapshots.
14      MR. NOVIKOFF:  They do, especially
15  if there is alcohol involved.        14:08:02
16      MR. GOODSTADT:  Read the statement
17  yourself.
18      Q.   You know what, before we get to
19  that, you are looking at an exhibit with one
20  of the alleged victims that Mr. Goodstadt     14:08:12
21  showed you; right?
22      A.   Yes.
23      Q.   What exhibit number was that?
24      A.   17.
25      Q.   Is there a picture there with a    14:08:17

Page 706

Hesse

2   neck brace on?
3      A.   Yes.
4      Q.   Is that standard procedure for a
5   victim that you believe have injuries when you  14:08:23
6   want to move them to put them in a neck brace?
7      MR. GOODSTADT:  Objection.
8      A.   No.
9      Q.   Do you think he went to the bar
10  with a neck brace?                  14:08:33
11      A.   No.
12      Q.   So at some point in time after he
13  left the bar that night somebody put him in a
14  neck brace?
15      A.   At some point, yes.          14:08:40
16      Q.   Do you know who did?
17      A.   I believe one of the EMTs did.
18      Q.   Let's go back to Exhibit 20, Ian
19  Levine, and read Mr. Levine's statement to
20  yourself and then tell me when you are done?  14:08:52
21      A.   I need a magnifying glass.
22      Okay.
23      Q.   Now, Mr. Levine makes no mention
24  of the fact that Gary Bosetti used a pool cue
25  at any time?                    14:10:46

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 707

**Hesse**

1      **Hesse**
2      A.   No, he did not.
3      Q.   Did Mr. Levine indicate in this
4   thing that he saw the entirety of the
5   altercation involving Mr. Gary Bosetti?      14:10:52
6          MR. GOODSTADT:  Objection.
7      A.   No.
8      Q.   In fact isn't it true that at
9   least in this statement Mr. Levine said at
10  some point in time after the altercation      14:11:06
11  started he used his cell phone to make a call
12  to the police?
13         MR. GOODSTADT:  Objection.
14     A.   Yes, he did.
15         MR. NOVIKOFF:  Leading?      14:11:15
16         MR. GOODSTADT:  The document
17  speaks for itself.
18         MR. CONNOLLY:  And going forward
19  so we don't have any talk overs and drive
20  the reporter crazy, wait a second or two   14:11:22
21  to allow for any objections.
22     Q.   So now hypothetically, sir, if Mr.
23  Levine took his eyes away from the altercation
24  while he went to get his cell phone, dial the
25  number for the police, talked to whomever he   14:11:37

Page 708

1      **Hesse**
2   talked to on the police, hang up the cell
3   phone and put the cell phone back wherever it
4   was, had he taken his eyes off the altercation
5   he may not have seen Mr. Bosetti use a pool      14:11:58
6   cue; correct?
7      A.   That is correct.
8          MR. GOODSTADT:  Objection.
9      Q.   Hypothetically?
10     A.   Yes.      14:11:58
11     Q.   And you would agree with me then
12  that if Mr. Levine, had he not seen Gary
13  Bosetti use a pool cue, put in the statement
14  that he in fact did use a pool cue, that would
15  have been a perjurious statement?      14:12:10
16     A.   Yes.
17     Q.   Now based upon your review of Mr.
18  Levine's statement and the fact that he used a
19  cell phone to call the police at some point in
20  time after the altercation started, does it      14:12:21
21  seem strange that he didn't see Gary Bosetti
22  use a pool cue?
23     A.   No.
24     Q.   Now, a whole lot of questions
25  about a cover up involving the Halloween      14:12:36

Page 709

1      **Hesse**
2   incident.  Do you recall questions about that?
3      A.   Yes.
4      Q.   Have you read the complaint in
5   this matter?      14:12:42
6      A.   Yes.
7      Q.   There is a whole lot of -- in fact
8   there is about 26 allegations I think about
9   you covering up or the Ocean Beach Police
10  Department covering up something with regard   14:12:53
11  to the Halloween incident; correct?
12     A.   Yes.
13     Q.   And you had rumors that some of
14  the plaintiffs here thought that there was a
15  cover up; correct?      14:13:01
16     A.   Yes.
17     Q.   Let me ask you these questions,
18  did you cover up anything involving the
19  Halloween incident?
20     A.   Absolutely not.      14:13:06
21     Q.   Did Chief Paradiso cover up
22  anything?
23     A.   Absolutely not.
24     Q.   To your knowledge did Mr. Cherry
25  cover up anything?      14:13:13

Page 710

1      **Hesse**
2      A.   Absolutely not.
3      Q.   To your knowledge did any trustee
4   member instruct you to cover up anything?
5      A.   No.      14:13:19
6      Q.   To your knowledge did Mayor Rogers
7   instruct you to cover up anything involving
8   the Halloween incident?
9      A.   No.
10     Q.   To your knowledge was the issue of  14:13:25
11  covering up anything involving the Halloween
12  incident ever mentioned between you and any
13  person higher in authority than you?
14     A.   No.
15         MR. GOODSTADT:  Objection.      14:13:44
16     Q.   Did the issue of -- withdrawn.
17         At some point in time there were
18  arrests made with regard to the Halloween
19  incident; is that correct?
20     A.   Yes.      14:13:57
21     Q.   Was Gary Bosetti arrested?
22     A.   No.
23     Q.   Who was arrested?
24     A.   Brian Van Koot and Christopher
25  Schalik.      14:14:05

Page 711

Hesse

1
2     Q.    And what was Brian Van Koot
3  arrested for?
4     A.    Harassment on Jean Jaeger for
5  choking her, and assault third on Gary      14:14:11
6  Bosetti.
7     Q.    What was the -- who was the other
8  individual?
9     A.    Christopher Schalik.
10    Q.    So we have Van Koot and Schalik?    14:14:18
11    A.    Yes.
12    Q.    What was Mr. Schalik arrested for?
13    A.    Assault on Gary Bosetti.
14    Q.    Now, an arrest is a serious
15  matter; correct?                            14:14:35
16       MR. GOODSTADT:  Objection.
17    A.    Yes.
18    Q.    Just could you tell I guess the
19  jury may one day, hopefully not, but maybe one
20  day see this videotape with your deposition,    14:14:43
21  could you tell the jury what takes place after
22  someone is arrested?
23       MR. CONNOLLY:  Objection.
24       MR. GOODSTADT:  Objection.
25    Q.    In terms of the process and the    14:14:58

Page 712

Hesse

1
2  procedure?
3     A.    There is a process.
4     Q.    Okay.
5     A.    Information that we have to get    14:15:01
6  from the defendant, pedigree information, past
7  arrest information.  There are fingerprints
8  taken, pictures taken, and then subsequently
9  charges are drawn up and then therefore they
10  are arraigned on those charges.             14:15:16
11    Q.    Who draws up the charges?
12    A.    We do.
13    Q.    When you say they are arraigned,
14  what do you mean?
15    A.    They go before the judge and plead  14:15:25
16  guilty or not guilty.
17    Q.    Does the Village of Ocean Beach
18  have their own type of District Attorney's
19  office?
20    A.    We have our own village court.      14:15:37
21    Q.    Okay.
22    A.    And we have district attorneys
23  appointed by the District Attorney's office of
24  Suffolk County to prosecute.
25    Q.    Now is it up to the -- based upon   14:15:46

Page 713

Hesse

1
2  your experience at Ocean Beach -- is it up to
3  the Suffolk County District Attorney
4  Prosecutor's office to decide ultimately
5  whether or not to prosecute someone who is    14:15:58
6  arrested?
7     A.    Yes.
8     Q.    So if I understand correctly,
9  merely because Van Koot and Schalik were
10  arrested didn't automatically mean that they  14:16:07
11  were going to be prosecuted by the District
12  Attorney's office?
13    A.    Well, we could back up a little
14  bit if I may.
15    Q.    Okay.  Answer that question --     14:16:16
16  answer the way you want.  If Mr. Goodstadt
17  objects or makes a motion to strike later on
18  we will don't with it.
19    A.    They were not arrested until I had
20  the approval of the District Attorney's        14:16:30
21  office.
22    Q.    That is interesting.  I never knew
23  that, so let me then ask you this question.
24       Prior to arresting Van Koot and
25  Schalik did you seek the approval from any law  14:16:42

Page 714

Hesse

1
2  enforcement entity or District Attorney's
3  office?
4     A.    Yes.
5       MR. BAPTISTE:  Objection.  General  14:16:51
6  objection.
7       MR. NOVIKOFF:  To form?
8       MR. BAPTISTE:  Yes.
9     Q.    Let me try to narrow it down a
10  little bit.  Prior to arresting Van Koot and   14:17:06
11  Schalik did you have any communications with
12  the Suffolk County District Attorney's office
13  concerning arresting either of these two
14  individuals?
15    A.    Yes.                                14:17:20
16    Q.    Can you describe for the jury and
17  the court what communications you had
18  concerning arresting Van Koot and Schalik
19  prior to actually arresting them?
20    A.    I told them what I had.  I said I   14:17:32
21  had a lot of documents I would like to fax
22  over for review to make sure that this is
23  going correctly.  I faxed them over.  I spoke
24  to -- it was not Beth Grosso who was appointed
25  to us -- Mallory Sullivan was the prosecutor I  14:17:52

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2  believe in this case, and I faxed everything
3  to her, she read it over.  She said she needed
4  to speak to her bureau chief which in turn she
5  did.  She got back to me and she said that the  14:18:08
6  charges look good.  And then I filed the
7  charges with the court.
8      Q.   How long was the process between
9  your first communication with Ms. Sullivan and
10  then her advising you as you just testified    14:18:21
11  that the charges looked good?
12     A.   Couple of days maybe.
13     Q.   You only had two conversations
14  with Mallory prior to arresting?
15     A.   That was it, yeah.          14:18:33
16     Q.   What did you fax over to her?
17     A.   The entire package.  It was all of
18  the plaintiff's statements.  Their reports, my
19  reports.  The charges that I was going to
20  draft up, the assault and harassment.  I       14:18:47
21  believe Officer Bosetti's statement, Rich
22  Bosetti's statements.  Basically every kit and
23  caboodle that you see her in front, all these
24  statements, I sent everything.
25     Q.   Did Ms. Sullivan ever advise you   14:19:05

Hesse

1
2  that she thought any of the witness statements
3  were strange?
4      A.   No.
5      Q.   Did she ever question you as to    14:19:12
6  why no witness statement other than perhaps
7  the Bosetti's, Mr. Gary Bosetti's indicated --
8  didn't indicate a pool cue being used?
9      A.   Never asked.
10     Q.   Did she ever indicate to you that  14:19:30
11  she thought the charges were suspect?
12     A.   Not at all.
13     Q.   Did she ever indicate to you by
14  any words that she used that you all were
15  engaging in a cover up to protect Gary Bosetti 14:19:42
16  or Richie Bosetti?
17     A.   Absolutely not.
18     Q.   Has any district attorney involved
19  in the arrest and prosecution of Van Koot and
20  Schalik ever advised you that they thought     14:19:57
21  that there was a cover up?
22     A.   Never.
23     Q.   Now, this was October of 2004;
24  right?
25     A.   Yes.              14:20:07

Hesse

1
2      Q.   And we are now August of 2009, so
3  almost five years removed.  To your knowledge
4  have you ever been brought up on charges
5  concerning a cover up of the Halloween         14:20:17
6  incident?
7      A.   No.
8      Q.   Has anyone been brought up on
9  charges concerning the Halloween incident?
10     A.   No.               14:20:26
11     Q.   To your knowledge has the village
12  been sued by Van Koot or Schalik concerning
13  the events surrounding that evening?
14     A.   No, they did not.
15     Q.   Are you aware if the District      14:20:34
16  Attorney is investigating you or the Ocean
17  Beach Police Department with regard to a cover
18  up of the Halloween incident?
19     A.   Am I aware of an investigation?
20     Q.   Yes.              14:20:43
21     A.   I believe there is an
22  investigation done.
23     Q.   You believe that that
24  investigation has concluded?
25         MR. GOODSTADT:  Objection.        14:20:49

Hesse

1
2      A.   I don't know.
3      Q.   But this is now five years ago;
4  correct?
5      A.   This was five years ago, yes.      14:20:55
6      Q.   What is the basis for your belief
7  that the Suffolk County District Attorney's
8  office was investigating an alleged cover up?
9      A.   Just from the plaintiff's comments
10  in their depositions, that they turned all     14:21:06
11  their stuff over to file a complaint that
12  there was a cover up.
13     Q.   So other than what you saw in the
14  depositions and what you read in the
15  depositions are you aware from any other       14:21:18
16  source that the District Attorney is
17  investigating the alleged cover up of anything
18  involving the Halloween incident?
19     A.   No.
20     Q.   So what happened after            14:21:33
21  Ms. Sullivan gave you the green light to
22  arrest Schalik and Van Koot?
23     A.   I took all the paperwork, I filed
24  it with the court.  The three -- I think it
25  was three court informations.  One harassment, 14:21:47

Page 719

Hesse

1
2 one assault for Van Koot, one assault for
3 Schalik.  I filed it with the court clerk.
4 She subsequently issued criminal summonses for
5 their appearance signed by the judge, and they    14:22:00
6 turned themselves in.
7     Q.   So if I understand your testimony
8 correctly, the judge had to sign off on the
9 criminal summonses; right?
10    A.   Yes.                14:22:13
11    Q.   And presumably if the judge didn't
12 think that there was enough good cause he or
13 she would not have signed the summonses?
14        MR. GOODSTADT:  Objection.
15    A.   I would suspect, yeah.        14:22:20
16    Q.   You would suspect yes?
17    A.   Yes.
18    Q.   So now we have before the arrest
19 were made and correct me if I am wrong, the
20 DA -- you had done your investigation?        14:22:31
21    A.   Yes.
22    Q.   The DA had looked at whatever you
23 sent them?
24    A.   Yes.
25    Q.   And they gave you the green light?  14:22:39

Page 720

Hesse

1
2    A.   Yes.
3    Q.   And the judge gave you the green
4 light?
5    A.   Yes.                14:22:43
6    Q.   What happened after the judge gave
7 you the green light?
8    A.   They came into court I believe in
9 December sometime, and they were arraigned and
10 they showed with an attorney.  And from that   14:22:54
11 point on they plea bargained and end of story.
12 They pled guilty, they allocuted and --
13    Q.   Let's break it down.
14        Did you arrest them after the
15 judge gave you the green light?        14:23:15
16    A.   No.  After -- when they turned
17 themselves in and they were arraigned they
18 were remanded to police custody for pedigree
19 information, arrest paperwork and
20 fingerprints, pictures.            14:23:29
21    Q.   So if I understand the sequence of
22 events, after the judge gave you a green light
23 there was some type of communication made with
24 them that they were in fact charged with
25 certain crimes and they were offered an   14:23:40

Page 721

Hesse

1
2 opportunity to come present themselves to the
3 court, and they did?
4    A.   Which they did, yes.
5    Q.   So no officer went to their house   14:23:50
6 to arrest them?
7    A.   No.
8    Q.   No one put them in handcuffs and
9 took them in a boat back to Ocean Beach;
10 right?                14:23:59
11    A.   No.
12    Q.   And so they came into court, they
13 were arraigned.  How were they arraigned, were
14 you there?
15    A.   Yes.                14:24:07
16    Q.   Describe for the court what took
17 place?
18    A.   Its funny because that year for
19 whatever reason the courtroom was shut down,
20 we had to use the village office which was    14:24:17
21 close to do the public except for court
22 purposes.  We set up a table, the judge sat
23 behind the table.  They stood before the judge
24 and they pled not guilty.
25    Q.   So the charges were read against   14:24:32

Page 722

Hesse

1
2 them?
3    A.   Yes.
4    Q.   Who read the charges against them?
5    A.   The judge.                14:24:37
6    Q.   And they were represented by
7 counsel?
8    A.   By counsel, yes.
9    Q.   By one or two counsel?
10    A.   I believe at that time it was two.  14:24:43
11    Q.   So each one of them had their own
12 counsel?
13    A.   Yes.
14    Q.   The charges were read against them
15 and they pled not guilty?            14:24:50
16    A.   Correct.
17    Q.   When did that take place?
18    A.   I believe in December.  I don't
19 know the exact date.
20    Q.   You indicated in a prior answer     14:24:58
21 that they took a plea at some point in time
22 thereafter?
23    A.   Yes.
24    Q.   When did they take the plea?
25    A.   I don't know.                14:25:08

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 723

Hesse

1        Hesse
2        Q.   Weeks later, months later?
3        A.   It was probably a month or two.
4   It could have been longer.
5        Q.   Had you had any communication with  14:25:17
6   the District Attorney's office between the
7   time of the arraignment and the time of the
8   plea?
9        A.   No.
10       Q.   Were you aware at all that there    14:25:24
11  were plea discussions going on?
12       A.   I was aware, but I didn't know
13  what they were.
14       Q.   How were you aware?
15       A.   I know because they had to make     14:25:31
16  motions for discovery and everything else.  So
17  I know they were communicating back and forth,
18  but other than an actual plea deal, I don't
19  know if I knew so until towards the end.
20       Q.   To your knowledge the defendant's   14:25:44
21  counsel made motions to get discovery?
22       A.   Sure.
23       Q.   What was your involvement?
24       A.   At this point?
25       Q.   How did you learn that they made    14:25:52

Page 724

Hesse

1        Hesse
2   motions for discovery?
3        A.   I was in court when they made the
4   motions.  They were speaking to the judge and
5   working out what they needed to do.        14:26:01
6        Q.   Pursuant to that motion did the
7   village -- or did the District Attorney to
8   your knowledge produce any discovery?
9        A.   Yes.
10       Q.   Do you know what the District       14:26:09
11  Attorney produced?
12       A.   I believe all these documents that
13  are sitting in front of us too.
14       Q.   So at least to your knowledge now
15  the District Attorney had an opportunity to    14:26:17
16  look at the witness statements and everything
17  else that was in the file, and Van Koot and
18  Schalik's attorneys had the opportunity to
19  look at those same documents; right?
20       A.   Yes.                     14:26:30
21       Q.   Were you notified before the plea
22  was taken that there was going to be a plea?
23       A.   I don't recall whether I was
24  notified or not.
25       Q.   How did you learn that there was a  14:26:44

Page 725

Hesse

1        Hesse
2   plea taken?
3        A.   I remember sitting in court and
4   listening to the plea and the allocution?
5        Q.   What did Van Koot to the best of    14:26:54
6   your recollection plea to?
7        A.   You know what, I don't know.
8   Disorderly conduct maybe.
9        Q.   Do you know what he allocuted to?
10       A.   He did admit to choking Jean        14:27:08
11  Jaeger.  He did admit to holding Gary Bosetti
12  while Chris Schalik kicked him in the face.
13       Q.   And what did Chris Schalik plea to
14  to the best of your recollection?
15       A.   Probably the same type of          14:27:26
16  disorderly conduct.
17       Q.   What did to the best of your
18  recollection Chris Schalik allocute to?
19       A.   He stated that he did kick Police
20  Officer Gary Bosetti, or attempted to kick him  14:27:37
21  in the face.
22       Q.   Now did these witnesses to your
23  recollection advise Officer Lamm that evening
24  that Schalik had in fact kicked Bosetti in the
25  face while Van Koot had him on the ground?     14:27:56

Page 726

Hesse

1        Hesse
2        A.   Did Christopher Schalik advise him
3   that he did --
4        Q.   According to any statement that
5   Lamm provided you did he ever indicate in that  14:28:05
6   statement that Schalik admitted to kicking
7   Bosetti in the face while Van Koot had him on
8   the ground?
9        A.   No.
10       Q.   In any statement that you saw Lamm  14:28:17
11  provide you during the course of the
12  investigation or even from that evening did he
13  ever advise in that statement that Van Koot
14  admitted to holding Bosetti down while Schalik  14:28:30
15  kicked him in the face?
16       A.   No.
17       Q.   How about with regard to Snyder,
18  in any statement that Snyder presented to you
19  with regard to the Halloween incident did he
20  ever make reference in there to Van Koot       14:28:39
21  acknowledging that he held Bosetti down while
22  Schalik kicked him?
23       A.   No.
24       Q.   Did he ever acknowledge in that
25  statement that Schalik admitted to kicking      14:28:48

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2  Bosetti while Van Koot held him down?
3       A.   No.
4       Q.   Same question with regard to Nofi.
5  In any statement that Nofi ever -- Snyder,     14:28:58
6  excuse me.
7       A.   Nofi was not there.
8       Q.   With regard to Snyder -- excuse
9  me, Fiorillo.  With regard to Fiorillo, in any
10 statement that Fiorillo provided you did he     14:29:12
11 ever state in there that Van Koot acknowledged
12 that he held Bosetti down while Schalik kicked
13 him?
14      A.   No.
15      Q.   Same question now, did Fiorillo     14:29:27
16 ever acknowledge -- did Fiorillo ever state in
17 any statement that he gave you or any report
18 that he gave you that Schalik admitted to
19 kicking Gary Bosetti while he was being held
20 down by Van Koot?                          14:29:42
21      A.   No.
22      Q.   So would you agree with me that
23 assuming that Van Koot and Schalik truthfully
24 allocuted to the events that took place that
25 evening, that they had lied to the officers     14:29:56

Hesse

1
2  that evening?
3       MR. GOODSTADT:  Objection.
4       A.   Yes.
5       Q.   How would you describe, I am going  14:30:07
6  to go officer by officer now, and I am only
7  referring specifically to the hours
8  immediately after the incident took place.  So
9  from the time that the officers were called to
10 go to Hauser's to the time that Chief Paradiso  14:30:28
11 came into the station that morning, how would
12 you describe Fiorillo's investigation of the
13 events that took place?
14      MR. GOODSTADT:  Objection.
15      MR. CONNOLLY:  Objection.     14:30:43
16      Q.   You can answer.
17      A.   I just believe it was poorly done.
18      Q.   With regard to Fiorillo now why do
19 you believe it was poorly done?
20      A.   I just -- I don't believe that he  14:30:56
21 was aggressive enough to talk to the people he
22 thought were the complainant.  I don't think
23 that he was aggressive enough to go into the
24 bar and just get names and phone numbers.  You
25 know, where is the pool cue; nobody gathered  14:31:24

Hesse

1
2  evidence.  No names, no phone numbers, they
3  didn't secure the premise, they could have
4  shut the doors, turn the lights on, turn the
5  music on.  I think there was just a lot of bad  14:31:35
6  decisions made throughout the course of the
7  entire incident.
8       Q.   Now, how about Snyder -- well,
9  when I asked you about Fiorillo, do you
10 include Snyder and Lamm into that description  14:31:46
11 as well, or I could just ask you the questions
12 one by one if you want?
13      A.   Yes, I do.
14      Q.   So when you say you thought that
15 there were bad decisions made you are     14:31:55
16 referring to Fiorillo, Lamm and Snyder?
17      A.   Yes.
18      Q.   I'm going to try to do this
19 without boring everyone to death and going
20 line by line through the complaint for the     14:32:36
21 sake of expediency.  Did any of the plaintiffs
22 ever complain to you about having to drive you
23 to anyplace in Ocean Beach for something
24 unrelated to official duties?
25      A.   No.                          14:33:00

Hesse

1
2       MR. CONNOLLY:  Objection.
3       Q.   Did the plaintiffs ever drive you
4  anywhere in Ocean Beach for duties unrelated
5  to you being a police officer?     14:33:06
6       A.   No.
7       Q.   Did any of the plaintiffs ever
8  drive you to anyplace off the beach for
9  reasons unrelated to official police duty?
10      A.   No.                      14:33:22
11      MR. GOODSTADT:  When you say off
12 the beach you are referring to outside of
13 Ocean Beach or off of Fire Island?
14      MR. NOVIKOFF:  No, outside of
15 Ocean Beach which would include outside  14:33:28
16 of Fire Island as well, but it would also
17 include other towns on Fire Island.
18      A.   Never.
19      Q.   Did any of the plaintiffs ever
20 complain to you that any decision you made  14:33:39
21 created a public safety issue?
22      MR. GOODSTADT:  Objection.
23      A.   Never.
24      Q.   Okay.  Did any of the plaintiffs
25 ever complain to you that they witnessed any  14:33:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2   officers drinking in bars while in uniform?
3      A.   No.
4      Q.   Did any of the plaintiffs ever
5   complain to you with regard to their            14:34:11
6   eyewitnessing any officers drinking in the
7   bars when off duty?
8      A.   Not a complaint, but I knew.
9      Q.   All I care about is what the
10  plaintiffs said to you?                         14:34:27
11     A.   There was never a complaint.
12     Q.   That is what I am asking.  So
13  let's break it down a little bit and go back
14  so the record is clear.  Did any of the
15  plaintiffs ever complain to you about any       14:34:35
16  officers while off duty drinking in bars in
17  Ocean Beach?
18     A.   No complaints.
19     Q.   Did any of the plaintiffs ever
20  complain to you about the subject of you        14:34:57
21  selectively enforcing the laws?
22     A.   No.
23     Q.   Did any of the plaintiffs ever
24  complain to you about treating them
25  differently than any other police officer?      14:35:14

**Hesse**

1
2      A.   No.
3      Q.   Do you recall any complaints that
4   Mr. Fiorillo ever made to you concerning
5   anything involving the conduct of any police    14:35:33
6   officer including him at Ocean Beach other
7   than him complaining to you about washing the
8   windows?
9      A.   No.
10     Q.   Were there any other examples of       14:35:39
11  insubordination that you can think of with
12  regard to Frank Fiorillo other than what you
13  have testified to?
14     A.   Yes, there was you know at lunch I
15  started thinking about it a little bit and      14:35:50
16  there was one other incident that he and Kevin
17  Lamm both came to me and asked for whatever
18  reason if they could take bail, station house
19  bail outside the station house, and I told
20  them no.  That is why it is called station      14:36:13
21  house bail.  You bring somebody in, you are
22  going to bail them.  You do it inside the
23  confines of the station house.  You fill out a
24  receipt, you put it on the summons, you attach
25  both with the cash and you drop it in the lock  14:36:29

**Hesse**

1
2   box.
3           For whatever reason they disagreed
4   with me and they went to our judge at the
5   time, Joe Russell, who sat as a criminal judge  14:36:37
6   in our court, but was a civil attorney.  I
7   guess they asked him the same question, and he
8   was like sure, you can do that.  So they went
9   over my head to somebody else that is not part
10  of the Police Department to ask them            14:36:55
11  permission to do it, and subsequently they
12  started doing it.
13          One evening I caught them outside
14  the Police Department in the police car behind
15  closed doors taking cash off of somebody for    14:37:07
16  bail.  Now the money was accounted for, so
17  there was no suspect that they were stealing
18  or anything.  But as far as my previous wish
19  that they do not do it, they were told not to
20  do it, they did it anyway.  And I have caught   14:37:25
21  them since doing it.
22          So they were reprimanded,
23  counseled in personal by me.
24     Q.   Did Lamm ever complain to you
25  about anything going on concerning the Ocean    14:37:42

**Hesse**

1
2   Beach Police Department?
3          MR. GOODSTADT:  Objection.
4      A.   That is a little broad, but no, no
5   complaints.                                     14:37:53
6      Q.   I tried to make it as broad as I
7   can make it.  Did Lamm ever complain to you
8   about the Bosetti's?
9      A.   No.
10     Q.   Did Fiorillo ever complain to you   14:38:04
11  about the Bosetti's?
12     A.   No.
13     Q.   Did Snyder ever complain to you
14  about anything involving the conduct of any
15  person affiliated with the Ocean Beach Police  14:38:19
16  Department?
17     A.   No.
18     Q.   Same question with regard to
19  Carter?
20     A.   No.                      14:38:24
21     Q.   Same question with regard to Nofi?
22     A.   No.
23     Q.   Did any of the plaintiffs ever
24  advise you that they were aware that there was
25  an individual in town selling -- carrying      14:38:38

Page 735

Hesse

1
2  lollipops that were laced with drugs?
3      A.  No, I never heard of that before.
4      Q.  Did the plaintiffs ever complain
5  to you that the bars in Ocean Beach were    14:38:55
6  permitting under age individuals drinking?
7      A.  Not specifically, no.
8      Q.  What about generally?
9      A.  We knew that it goes on, it is
10  just a matter of catching them.            14:39:11
11     Q.  What if anything did the Ocean
12  Beach Police Department do prior to April 2,
13  2006 to enforce the laws concerning under age
14  drinking in the bars on Ocean Beach?
15     A.  Specifically nothing.  It was a    14:39:23
16  case-by-case.  If you caught them, you did.
17  If you didn't, you didn't.  It was one of
18  those things.
19     Q.  If you saw what you believed --
20  not you, but police officers were instructed   14:39:35
21  that if they saw what they believed to be
22  under age drinking going on either in or out
23  of the bars they were to enforce the laws?
24     A.  Absolutely.
25     Q.  Did any of the plaintiffs ever    14:39:49

Page 736

Hesse

1
2  complain to you that the Bosetti's weren't
3  enforcing the laws with regard to under age
4  drinking?
5      A.  No.                                14:39:54
6      Q.  Let me rephrase the question.
7           Did any of the plaintiffs ever
8  complain you to that the Bosetti's were not
9  enforcing the laws as it pertained to under
10  age drinking?                             14:40:10
11     A.  No.
12     Q.  How about with -- did the
13  plaintiffs ever complain to you that any other
14  police officer wasn't enforcing the laws as to
15  under age drinking?                       14:40:20
16     A.  No.
17     Q.  Did they ever complain to you that
18  you were not enforcing the laws as to under
19  age drinking?
20     A.  No.                                14:40:29
21     Q.  Did you ever instruct any of the
22  plaintiffs not to issue a summons to any bar
23  owner because he or she was a friend of yours?
24     A.  No.
25     Q.  Well let me actually make it a    14:40:38

Page 737

Hesse

1
2  little bit more broader than that.  Did you
3  ever instruct the plaintiffs not to issue any
4  summonses to any bars on Ocean Beach?
5      A.  No.                                14:40:44
6      Q.  Did you ever instruct any of the
7  plaintiffs to stay away from any particular
8  entity and not issue summonses to them?
9      A.  No.
10     Q.  Did you ever instruct the        14:40:55
11  plaintiffs not to -- any of the plaintiffs not
12  to issue summonses to friends of yours?
13     A.  No.
14     Q.  Did you ever call Mr. Lamm a loser
15  in front of any citizen at Ocean Beach?      14:41:07
16     A.  No.
17     Q.  Did you ever insult any of the
18  plaintiffs in front of any citizens of Ocean
19  Beach?
20     A.  No.                                14:41:16
21         MR. GOODSTADT:  Objection.
22     Q.  Same question, did you ever insult
23  any of the plaintiffs in front of any visitors
24  to Ocean Beach?
25     A.  No.                                14:41:25

Page 738

Hesse

1
2         MR. GOODSTADT:  Objection.
3      Q.  I will try to make it even
4  clearer.  Did there ever come a time that you
5  insulted, denigrated, cursed or embarrassed    14:41:38
6  any of the plaintiffs in front of anybody
7  other than police officers -- you know what,
8  take a step back.
9           Did he ever embarrass, denigrate,
10  insult or ridicule any of the plaintiffs in    14:41:54
11  front of anybody while they were police
12  officers at Ocean Beach?
13     A.  No.
14     Q.  In the complaint the plaintiffs
15  allege certain things regarding the Bosetti's   14:42:15
16  throwing a file cabinet into the bay.  Do you
17  recall reading that.  Do you recall reading
18  that in the complaint?
19     A.  Yes.
20     Q.  Do you have knowledge, any        14:42:31
21  knowledge as to what the plaintiffs were
22  referring to when they made those allegations?
23     A.  Yes.
24     Q.  Can you describe for the court
25  what your knowledge is with regard to those    14:42:39

63  (Pages 735 to 738)

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 739

**Hesse**

1
2   allegations?
3       A.   I was told the story by Ed
4   Paradiso.
5       **Q.   That is what I want to know.**   14:42:46
6       A.   Basically it was an empty filing
7   cabinet, two or three tears, you know like
8   just a short filing cabinet, and it was thrown
9   into the marina, the middle marina by I
10  believe Rich Bosetti.                        14:43:05
11      **Q.   What else did Ed Paradiso tell**
12  **you?**
13      A.   I remember that it was a
14  lifeguard, Johnny Bucksbaum, that was asked to
15  go in and retrieve it.  They retrieved it,   14:43:16
16  they opened it, it was empty.  I think there
17  was some blank fingerprint cards in it.
18      **Q.   This is what Ed Paradiso told you?**
19      A.   Yes, he did.
20      **Q.   And were you in the village the**   14:43:30
21  **night or -- were you in the village at the**
22  **time that the Bosetti's through the file**
23  **cabinet in?**
24      A.   No.
25      **Q.   What involvement if any do you**   14:43:37

Page 740

**Hesse**

1
2   **have with regard to anything involving the**
3   **incident involving the file cabinet being**
4   **thrown in the bay?**
5           MR. GOODSTADT:  Objection.   14:43:49
6       A.   Absolutely none.
7       **Q.   Did you ever speak to Mr. Fiorillo**
8   **about that incident?**
9       A.   No.
10      **Q.   Ever speak with Lamm?**   14:43:53
11      A.   No.
12      **Q.   Nofi?**
13      A.   No.
14      **Q.   Lamm?**
15      A.   No.                          14:43:57
16      **Q.   Carter?**
17      A.   No.
18      **Q.   Snyder?**
19      A.   No.
20      **Q.   Let's go to the incident -- not**   14:44:02
21  **the incident, let's go to the allegation**
22  **concerning you putting Fiorillo on the same**
23  **shift for three straight days, same tour three**
24  **straight days and he couldn't move a muscle.**
25  **Do you recall those allegations?**   14:44:58

Page 741

**Hesse**

1
2       A.   Yes.
3       **Q.   Are those allegations true or**
4   **false?**
5       A.   False.                   14:45:02
6       **Q.   I think you admitted though you**
7   **did put Mr. Fiorillo on the same tour for**
8   **three state days?**
9       A.   That was his scheduled tour by Ed
10  Paradiso.                           14:45:15
11      **Q.   I am sorry, the same place?**
12      A.   Yes, it was the general area.
13      **Q.   So Mr. Paradiso had put Mr.**
14  **Fiorillo on the corner of Denhoff and Bay**
15  **Walk?**                             14:45:25
16      A.   No, you misunderstand.  He
17  scheduled the shifts, but I put him on that
18  post.
19      **Q.   The post, thank you, and the post**
20  **was Denhoff and Bay Walk?**   14:45:33
21      A.   Yes.
22      **Q.   What were the responsibilities of**
23  **the police officers who were assigned to this**
24  **post?**
25          MR. GOODSTADT:  Objection.   14:45:43

Page 742

Hesse

1
2       A.   It is basically a west end post,
3   it is just not Denhoff and Bay Walk.  We just
4   called it that.  But you had everything from
5   the police station west of that area that   14:45:53
6   encompassed about four or five blocks.
7       **Q.   So what was a police officer that**
8   **you assigned to that post supposed to do as**
9   **part of his duties and responsibilities**
10  **associated with that post?**   14:46:05
11      A.   Generally a regular patrol.
12      **Q.   I am not a police officer, so --**
13      A.   Basically he walked the area.
14  There is about one, two, three, four, five
15  bars in that area and one, two, three -- about   14:46:18
16  ten storefronts in that area, and that was his
17  post.
18      **Q.   And you categorically deny that**
19  **you told Mr. Fiorillo that he had to stand**
20  **under that light post for three straight days**   14:46:37
21  **without moving a muscle?**
22      A.   Yes, that wasn't true.
23          MR. GOODSTADT:  We have a classic
24      material issue effect.
25          MR. NOVIKOFF:  Yes, but it is not   14:46:58

Page 743

Hesse

1  relevant.
2        MR. GOODSTADT:  That is why we
3  asked questions.
4        MR. NOVIKOFF:  You put it in your   14:47:09
5  complaint.
6    Q.   So Mr. Hesse, let me ask you this,
7  I think the jury would want to know.  Why did
8  you do that?
9        MR. GOODSTADT:  Objection.        14:47:17
10    A.   Like I stated --
11        MR. NOVIKOFF:  What?
12        MR. GOODSTADT:  Do what?
13    Q.   I thought it was clear we were
14  referring back to the prior question.  I will   14:47:25
15  make the question clear.
16        Why did you assign Mr. Fiorillo to
17  that post for three straight tours?
18    A.   His regular duty performance was
19  to operate a golf cart.  He liked it.  That is   14:47:40
20  what he liked to do.  It is called a G.E.M.
21  car, and he would go on residential patrol.
22  That is what he liked to do.  So I would
23  assign him that regular post because like I
24  said that is what he liked to do.        14:48:00

Page 744

Hesse

1        Because of his actions that day of
2  insubordination I felt that a suitable
3  punishment would be to take him out of the
4  G.E.M. car and put him on a foot post.        14:48:12
5    Q.   You did that for three straight
6  tours?
7    A.   I don't know if it was three
8  tours.  They say it was three tours.  It might
9  have been a tour and a half or two tours        14:48:24
10  maybe.  I am a little bit of a lenient guy, I
11  don't know.
12    Q.   The plaintiffs make a number of
13  allegations about driving officers to
14  checkpoints?        14:48:36
15    A.   Yes.
16    Q.   Either these officers being drunk
17  or some of them not being drunk.  Do you
18  remember those allegations?
19    A.   Yes.        14:48:47
20    Q.   Let's talk about that for a little
21  bit.  Do you have an understanding as to what
22  the plaintiffs are talking about when they
23  make allegations about you directing them to
24  drive other police officers to the        14:48:59

Page 745

Hesse

1  checkpoints?
2        MR. GOODSTADT:  Objection.
3    A.   I know what they mean.
4    Q.   What do they mean?        14:49:05
5    A.   Our checkpoint, the checkpoint --
6    Q.   Break it down.  Have you ever
7  instructed officers to drive other officers to
8  checkpoints?
9    A.   Yes.        14:49:18
10    Q.   Tell the jury why you would do
11  that?
12    A.   End of tour, if a guy did overtime
13  and he had to get out of there we would
14  normally drive them out, and that was our        14:49:28
15  relief point, that is what we did every day
16  three, four to five times a day.  That is what
17  we did.
18    Q.   When you say that was your relief
19  point, for the people who don't know what that   14:49:39
20  means, what do you mean?
21    A.   That would be where we would pick
22  up the police car and we would relief guys
23  going on deputy and off duty, and that is
24  where we make the exchange.        14:49:47

Page 746

Hesse

1    Q.   Would the relief point be where
2  officers would drive their owns cars to start
3  their shifts?
4    A.   Yes.        14:49:58
5    Q.   Unless they took a boat over?
6    A.   Yes.
7    Q.   Were the plaintiffs the only
8  officers that you ever instructed to drive
9  other officers to the relief point?        14:50:10
10    A.   No.
11    Q.   Did you ever instruct any of the
12  plaintiffs to drive a drunken police officer
13  who had just finished his tour to the
14  checkpoint?        14:50:22
15    A.   No.
16        MR. GOODSTADT:  Objection.
17    Q.   Did any of the plaintiffs ever
18  object to you directing them to drive any
19  police officer to a checkpoint?        14:50:37
20    A.   No.
21    Q.   Did the plaintiffs ever complain
22  to you that you left the village shorthanded
23  by instructing them to drive any other off
24  duty police officer to the checkpoint?        14:50:53

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 747

**Hesse**

1
2     A.   No.
3     Q.   In your opinion did you leave the
4   village shorthanded when you directed one
5   officer to drive an off duty police officer to   14:51:01
6   the checkpoint?
7     A.   No.
8     Q.   Let's talk about the termination a
9   little bit, but more specifically because I
10   think Mr. Goodstadt covered it with you this   14:51:32
11   morning.  Let's address specifically April 2,
12   2004.  What time did the meeting start?
13     A.   You mean 2006.
14     Q.   2006, sorry.  What time did the
15   meeting start?                            14:51:48
16     A.   11ish maybe.
17     Q.   What time did it end?
18     A.   I don't recall.  It could have
19   gone a couple of hours.
20     Q.   When in relation to 11 o'clock did   14:51:58
21   you begin the process of informing the
22   plaintiffs privately that they were not going
23   to be rehired?
24     A.   That was my first order of
25   business.                                14:52:08

Page 748

Hesse

1
2     Q.   And after you told them that they
3   were not rehired and you said whatever you
4   said and they said whatever they said you
5   direct them to leave the island, the village?   14:52:14
6     A.   Yes.  I set up a water taxi to be
7   there so they didn't have to stand around and
8   be gawked at and, you know, I paid for the
9   water taxi and everything.
10     Q.   Now to your knowledge did they go   14:52:30
11   on the water taxi or did they stay and linger
12   in the village?
13     A.   They got on the water taxi.
14     Q.   So approximately if the meeting
15   started at 11 and that was the first order of   14:52:41
16   business, at what point in time do you recall
17   them being on the water taxi and going off the
18   island?
19     A.   By the time we settled in and I
20   started talking to them it could have been an   14:52:53
21   hour at most.
22     Q.   Then what did you do after you
23   spoke to the four plaintiffs that you spoke to
24   that morning?
25     A.   They left and the general meeting   14:53:01

Page 749

Hesse

1   started.
2
3     Q.   Where did the general meeting take
4   place?
5     A.   It was in the boat house in Ocean   14:53:08
6   Beach, or known as the boat house.
7     Q.   How long did that meeting go on
8   for?
9     A.   A few hours maybe.
10     Q.   Were you at a podium and was       14:53:15
11   everybody else sitting, or were you in seats
12   or in a circle?
13     A.   No, they all sat facing me and I
14   stood or sat behind the table.
15     Q.   Did you make any comments during   14:53:31
16   this meeting that you just described regarding
17   any of those four plaintiffs?
18     A.   No.
19     Q.   Did you make any derogatory
20   comments about those four plaintiffs?        14:53:45
21     A.   No.
22     Q.   Did you call them anything; did
23   you make reference to them at all in this
24   meeting?
25     A.   I was asked what happened.       14:53:52

Page 750

Hesse

1
2     Q.   Who asked you?
3     A.   Some of the other police officers.
4     Q.   Okay.  Do you recall who?
5     A.   Well, what had happened was I     14:54:01
6   started calling in officers one at a time
7   because I was doing a one-on-one with some
8   other guys, and I think a lot of people had
9   feared that they were going too.  So I was
10   asked what had happened and I basically      14:54:17
11   explained that they won't be returning this
12   year, and we just proceeded with our meeting
13   and I tried to stay off of it.
14     Q.   So other than in those one-on-ones
15   did you ever in front of the entire group make   14:54:29
16   any reference to the plaintiffs?
17     A.   No.
18     Q.   Direct or indirect?
19     A.   No.
20     MR. NOVIKOFF:  Off the record.     14:54:48
21     THE VIDEOGRAPHER:  The time is
22   2:56, we are off the record.
23     (Recess taken.)
24     THE VIDEOGRAPHER:  The time is
25   3:06, we are on the record.           15:04:38

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 751

```
              Hesse
 1
 2     Q.   Now, Mr. Hesse, let's go to
 3  Exhibit 27.
 4     A.   Okay.
 5     Q.   This document was dated March 11,   15:05:10
 6  2006; correct?
 7     A.   Yes.
 8     Q.   Did the 2006 season start as of
 9  March 11, 2006?
10     A.   No.                        15:05:25
11     Q.   The meeting was held on April 2,
12  2006, had the season started as of April 2,
13  2006?
14     A.   No.
15     Q.   When did the season start in 2006?  15:05:34
16     A.   The season usually starts two
17  weeks before Memorial Day.
18     Q.   May 31st or around that time?
19     A.   28th, early, late, it depends.
20     Q.   Once you made the decisions as to   15:05:47
21  whom you were going to -- let me take a step
22  back.  You answered some questions by Mr.
23  Goodstadt concerning your communications with
24  Allison Chester concerning what your rights
25  were and what the plaintiff's rights were?   15:06:02
```

Page 752

```
              Hesse
 1
 2     A.   Yes.
 3     Q.   Let's break it down.  Why did you
 4  call Ms. Chester prior to March -- I'm sorry,
 5  prior to April 2, 2006 with regard to what the  15:06:12
 6  plaintiffs' rights were?
 7     A.   I wanted to make sure that, you
 8  know, that I did the right thing.
 9     Q.   In terms of what?
10     A.   I didn't want to do anything that   15:06:24
11  was illegal.
12     Q.   What was the reason why you asked
13  Ms. Chester what your rights were?
14     A.   I wanted to make sure that once
15  again I didn't do anything illegal.        15:06:43
16     Q.   When you say anything illegal, you
17  mean with regard to your decision to not
18  rehire the plaintiffs for the season; is that
19  correct?
20     A.   Right, based on Civil Service law.  15:06:55
21     Q.   When were you appointed Acting
22  Deputy Chief?
23     A.   I think it was January either 8th
24  or 18th or 6th.  Somewhere in January of 2006.
25     Q.   Between the time that Chief       15:07:13
```

Page 753

```
              Hesse
 1
 2  Paradiso went out for good in September of
 3  2005.
 4     A.   Right.
 5     Q.   And the time that you were         15:07:19
 6  appointed by board resolution to be acting
 7  chief, who was responsible for scheduling
 8  tours?
 9     A.   I was.
10     Q.   Now, did the season -- the 2005    15:07:30
11  season ended sometime in October?
12     A.   September it really ends, two
13  weeks after Labor Day.
14     Q.   So middle of September?
15     A.   Yes.                       15:07:48
16     Q.   Between the middle of September
17  and January did you have to schedule officers
18  to work part-time?
19     A.   Yes.
20     Q.   There is a difference between      15:07:59
21  being -- at least to your understanding for
22  Ocean Beach was there a difference between
23  being a seasonal officer and being an off
24  season part-time officer?
25     A.   Yes, it is a title thing.         15:08:11
```

Page 754

```
              Hesse
 1
 2     Q.   So with regard now only to the off
 3  season in 2005 between mid September and the
 4  end of December 2005 did you schedule to your
 5  knowledge any of the plaintiffs to do         15:08:28
 6  part-time shifts?
 7     A.   Yes.
 8     Q.   Who did you schedule?
 9     A.   Tom Snyder, Eddie Carter.  I
10  believe Nofi did maybe one or two tours.  And  15:08:41
11  Frank Fiorillo did either one or two tours.
12     Q.   During that period of time had you
13  had any reason to consider whether or not --
14  well, withdrawn.
15         During that period of time were    15:08:56
16  you aware that you were going to be given the
17  responsibilities as Acting Deputy Chief in
18  2006?
19     A.   No.
20     Q.   When did you first learn that you  15:09:06
21  were going to be considered to be the Acting
22  Deputy Chief?
23     A.   I think in late December.
24     Q.   And when were you advised that you
25  were going to actually be voted upon to be the  15:09:18
```

Page 755

**Hesse**

1
2 **Acting Deputy Chief?**
3    A.   Maybe a week before.
4    **Q.   At what point in time did you**
5 **begin to formulate an opinion as to whether or**   15:09:28
6 **not you were going to rehire any of the five**
7 **plaintiffs for the 2006 season?**
8    A.   When the job became mine in
9 January through February and March I started
10 thinking about what I wanted to do and how I   15:09:49
11 wanted the department to go forward and I made
12 a decision.
13    **Q.   Let's talk about that.  How did**
14 **you want the department to go forward once you**
15 **learned that you were going to be the Acting**   15:10:00
16 **Deputy Chief?**
17    A.   I wanted the department to be a
18 little more respectful, a little more
19 understanding of the needs of the village.  We
20 are a very community service oriented Police   15:10:15
21 Department.  We handle everything from a
22 splinter in a baby, to a dog fighting, noise,
23 bar fights, to possibly rape, or being stab or
24 short of murder.  So I mean I wanted the
25 department to move in a different direction.   15:10:36

Page 756

Hesse

1
2    **Q.   Did Mr. Fiorillo fit within the**
3 **type of Police Department that you wanted**
4 **Ocean Beach to become upon your appointment to**
5 **Acting Chief?**   15:10:49
6    A.   In my opinion, no.
7    **Q.   Why not?**
8    A.   I think he was a little too abrupt
9 with the community and the people who
10 vacationed there.  I tried to instill in a lot   15:10:58
11 of these guys that people come there to have
12 fun, and we are there to make sure that they
13 do it safely and within the scope of the law.
14    **Q.   When you say too abrupt, can you**
15 **give me some examples?**   15:11:13
16    A.   Yeah, we have one of these silly
17 laws where you can't bike ride during the
18 summer season, and let's say Officer Fiorillo
19 would pull over this woman for riding her
20 bike, and because she failed to have   15:11:27
21 identification on her he would berate her and
22 yell at her, and that is not what we are
23 doing, that is not what we are there for.
24    **Q.   When you say berate and yell what**
25 **do you mean?**   15:11:43

Page 757

**Hesse**

1
2    A.   Where is your fucking ID, how come
3 you don't have your ID, this is illegal.
4    **Q.   Hold on, you got to go slowly.**
5 **What else?**   15:11:43
6    A.   You should know better.  You
7 should always have your ID on you.  But I mean
8 yelling at these people.
9    **Q.   How did you learn of this, this**
10 **specific example?**   15:12:02
11    A.   This specific example, I was
12 called to the scene.
13    **Q.   By whom?**
14    A.   By another police officer.
15    **Q.   Did the woman complain to you**   15:12:11
16 **about how she was spoken to?**
17    A.   Yes.
18    **Q.   What was Mr. Fiorillo's response**
19 **if any?**
20    A.   That she was a bitch and that, you   15:12:19
21 know, she disrespected him.
22    **Q.   Did Mr. Fiorillo indicate how she**
23 **disrespected him?**
24    A.   Just by talking back.
25    **Q.   Did Mr. Fiorillo explain to you**   15:12:30

Page 758

**Hesse**

1
2 **why he considered her to be a bitch?**
3    A.   He felt that she had an attitude,
4 a certain attitude.
5    **Q.   What if anything did you do with**   15:12:38
6 **regard to Mr. Fiorillo upon receipt of this**
7 **complaint by this woman?**
8    A.   Well, I let him continue to write
9 the summons.  I told him not to say another
10 word, that was between me and him, I didn't do   15:12:54
11 it in front of her, I pulled him aside a
12 little bit.  I said just calm down, it is a
13 bike riding ticket, write the ticket and let
14 her go, and that is it.
15    **Q.   Any other examples that you can**   15:13:06
16 **think of as you sit here today?**
17    A.   Similar complaints.  We had one
18 kid whose father came to talk to me who
19 happens to be a corrections officer, Tom
20 Foley, his son was stopped for riding his bike   15:13:22
21 at night.  The kid, maybe he mouth off a
22 little bit to him, but Frank threatened to
23 shoot him in the head.  The father came down
24 and complained with his son that Frank stated
25 he was going to shoot him in the head.   15:13:39

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 759

Hesse

1
2    Q.   Shoot him in the head or shoot him
3  in the face?
4    A.   I think it was shoot him in the
5  head.                              15:13:46
6    Q.   Did you speak to Mr. Fiorillo
7  concerning this?
8    A.   Yes.
9    Q.   What was Mr. Fiorillo's response
10  to you if any?                     15:13:52
11    A.   He said that the kid was irate, he
12  was throwing his bike around, and I told him,
13  I said Frank, you know what, I don't care, you
14  just don't talk to people like that.  I talked
15  to other witnesses that were there and they    15:14:07
16  said that is not what happened.  Frank just
17  went off on one of his regular tears and
18  started to yell and berate this guy in the
19  street.
20    Q.   When you say regular tears, what    15:14:19
21  do you mean?
22    A.   This was a usual thing with Frank.
23  You know, he carried the badge and he carried
24  a chip on his shoulder.  It was just a regular
25  occurrence.                        15:14:28

Page 760

Hesse

1
2    Q.   Let me ask you a question.  I am
3  sure Mr. Goodstadt will ask you this question
4  if he has not already.  How come you didn't
5  advice Mr. Paradiso that in your opinion    15:14:37
6  Fiorillo should not be rehired?
7    A.   He knew.  He knew.  He dealt with
8  him.  But you know what, Ed Paradiso had a
9  different outlook on things than I did.  He
10  enjoyed the misery of sending these guys out    15:14:54
11  there to do this kind of thing.  He was happy
12  they didn't have discretion, because we have
13  such silly laws that in our village code book,
14  eating on the beach, drinking on the beach,
15  not alcohol, but regular beverages on the    15:15:12
16  beach.  You can't eat or drink past a certain
17  point on a certain street.  The bike riding
18  laws.  You name it.  Ball playing on the
19  beach.  He is out there writing a father for
20  throwing a tennis ball to his son.    15:15:30
21        These are the kind of things that
22  went on on a regular basis.  He took this poor
23  86 year old woman who didn't have ID eating
24  peanuts on the beach and because she didn't
25  have ID he would escort her all the way to the    15:15:42

Page 761

Hesse

1
2  police station to verify who she was.  I mean
3  is that really a crime; what does it take.
4  How much does the village have to take.
5    Q.   Let me just clarify this.  There    15:15:53
6  was an occasion where an 86 year old woman was
7  on a bike, she --
8    A.   No, she was eating peanuts on the
9  beach.
10    Q.   She didn't have ID and Mr.    15:16:04
11  Fiorillo escorted this woman back to the
12  police station to verify that she was in fact
13  who she was?
14    A.   Yes.
15    Q.   You said that Paradiso knew all    15:16:13
16  this.  Now I am only concerned about Mr.
17  Fiorillo for the time being.  What do you mean
18  that Paradiso knew all about this?
19    A.   Frank worked split tours.  He
20  would partially for me and he would work    15:16:29
21  partially for Ed Paradiso, and Ed Paradiso
22  would encourage him to go out there and do
23  these types of summonses.
24    Q.   Did you ever discuss with Paradiso
25  why he was encouraging Fiorillo to do these    15:16:42

Page 762

Hesse

1
2  types of summonses?
3    A.   No, not really.
4    Q.   Did you -- I am trying to
5  understand.  Why didn't you ever tell Paradiso    15:16:53
6  hey, Fiorillo is just, you know, in my opinion
7  he should not be rehired?
8    A.   You know, it is such a small
9  village and in conversation I don't want to
10  say I never said it, I may have said it.  But,    15:17:07
11  you know, I don't know for sure if we talked
12  about it.  We talked about a lot of -- like I
13  said earlier I never saw eye to eye with Ed
14  Paradiso on a lot of things.  I would come in
15  for my tour he would already be done.  He    15:17:27
16  would come in late.
17        It was hard to talk to him.  I
18  mean towards the end of his rein it just --
19  the department was falling apart, and I blame
20  it on him and I blame it on type of    15:17:38
21  enforcement that was going on.  So...
22    Q.   So you thought for want of a
23  better term it would have been a futile act to
24  ask Ed not to rehire Fiorillo?
25    A.   Absolutely it was a futile act.    15:17:53

69  (Pages 759 to 762)

Page 763

Hesse

1   Absolutely.
2       Q.   **Because Paradiso knew what**
3   **Fiorillo was doing?**
4       A.   Yes.  Paradiso would go to these   15:17:57
5   board meetings and sit there, and people would
6   yell about certain things, noise, this, that
7   the other thing.  And he used Frank as a tool
8   of the Police Department to just go out there
9   and just hammer these people into submission,   15:18:11
10  and that is not what we are supposed to.
11      Q.   **In your opinion Mr. Fiorillo would**
12  **not have reflected the type of Police**
13  **Department that you wanted?**
14      A.   That is correct.            15:18:23
15      Q.   **So when you became in control of**
16  **who was to be rehired and who was not, you**
17  **made the decision not to hire Mr. Fiorillo?**
18      A.   That is correct.
19      Q.   **Now you talked about some silly**   15:18:32
20  **laws that were on the books.  Between the**
21  **season of 2006 when you first were the Acting**
22  **Chief and this season, 2009, has the**
23  **enforcement of those silly laws as you put it**
24  **increased or decreased?**            15:18:48

Page 764

Hesse

1       A.   Well I made a lot of changes.  It
2   was hard to establish a, you know, a statistic
3   because I changed all the paperwork.
4   Midstream through 2006 I changed the summons   15:19:02
5   format.  So I had to retrain and re-educate my
6   guys on how to write the summonses correctly.
7   There was a lot of issues.
8           Now I mean that we are in to 2009
9   it is up.  I mean we enforce, we still enforce   15:19:16
10  those silly laws, but we do it with respect.
11      Q.   **So when you say you had to retrain**
12  **your officers, what do you mean?**
13      A.   Basically a lot of the paperwork
14  changed.  So I had to sit down as a group and   15:19:34
15  explain what I expected on the summons, how to
16  issue the summons.  We even changed because it
17  is a four-page document which document you
18  give to the defendant.
19      Q.   **Let me ask you this, I am not**   15:19:46
20  **trying to be argumentative, I am trying to**
21  **understand.  How did the change in the summons**
22  **affect the amount of summonses up or down that**
23  **were issued with regard to these silly laws?**
24      A.   I think some of the guys were   15:20:03

Page 765

Hesse

1   afraid to write them because they didn't
2   really -- you know, there were getting the
3   idea how to write them, but I think they were
4   just cautious on how many they were writing   15:20:13
5   just to get the feel of it.
6       Q.   **Let's talk about Mr. Lamm.  Was**
7   **Mr. Lamm in your opinion the type of officer**
8   **that you wanted in the department as you saw**
9   **the department should be once you became the**   15:20:36
10  **Acting Chief?**
11      A.   No.
12      Q.   **He why not?**
13      A.   He was a lot like Fiorillo.
14  Showed no discretion.  You know, from time to   15:20:44
15  time he would have to be counseled, talked to
16  about certain actions that he took.
17  Specifically -- it started to get to the point
18  where under our village code he started
19  handcuffing individuals and bringing them to   15:21:05
20  the Police Department to issue summonses for a
21  Village violation where he should be doing it
22  out on his post where he was to begin with.
23      Q.   **I don't understand, what do you**
24  **mean?**                        15:21:19

Page 766

Hesse

1       A.   So he would be walking down the
2   street where he would see some suspect pissing
3   in public.  He would throw the guy in
4   handcuffs, toss him, do an illegal search and   15:21:27
5   seizure because what the heck are you looking
6   for, number one you have no probable cause.
7   Bring the guy to the police station and issue
8   him a summons and then unhandcuff him and let
9   him go.                        15:21:43
10      Q.   **What should he have done?**
11      A.   Wrote the summons right there.
12  Show me some ID, check it out, make sure it is
13  a valid ID, write the summons and send the guy
14  on his way.                      15:21:51
15      Q.   **Did Paradiso instruct him to put**
16  **these people in handcuffs and take them to the**
17  **police station?**
18      A.   No.
19      Q.   **Did you ever instruct Kevin to**   15:22:00
20  **stop putting people in handcuffs for pissing**
21  **in public type violations?**
22      A.   Yes, I did.
23      Q.   **Did he listen to you?**
24      A.   No, he did not.            15:22:16

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 767

Hesse

1
2      Q.   Was that an act of
3   insubordination?
4      A.   Yes, it was.
5      Q.   Did that have any impact on your   15:22:19
6   decision as to whether or not Mr. Lamm was the
7   type of officer that you wanted on your police
8   force going forward in light of the changes
9   that you wanted to make?
10     A.   Right, I didn't want him any      15:22:26
11  longer with the department.
12     Q.   Are there any other examples that
13  you can think of where you instructed Mr. Lamm
14  while he was working on your shift to do
15  something as it related to summonses that he    15:22:36
16  didn't do?
17     A.   To summonses that he didn't do;
18  not that I can think of.
19     Q.   How about generally, do you recall
20  any other examples where he just disregarded    15:22:47
21  one of your directions or instructions?
22     A.   Yes, there was one other time that
23  I can think of, this is really towards the end
24  of his employ.  We just got this big guy off
25  the water taxi, the guy was probably 6 foot 2,  15:23:03

Page 768

Hesse

1
2   240 and huge.  And I was able to calm this
3   individual down, I was able to get him off the
4   water taxi.  I forget what the disturbance was
5   on the taxi, whether he was not listening to    15:23:18
6   the captain's command to sit down, stop
7   drinking, smoking or whatever it was, and we
8   had about five officers in a line because this
9   guy was so big and we were worried that maybe
10  he may act inappropriate, attack us, punch      15:23:38
11  somebody, who knows, he was irate.
12          And I am talking to the guy and I
13  am walking him down the street and Kevin out
14  of nowhere says you fucking asshole, I will
15  kick your ass and the guy steps at us, and I    15:23:56
16  actually had to reprimand Kevin right there on
17  the spot, tell him to shut up, and step
18  between him and the guy and get this guy to
19  turn around and keep walking.  This is not a
20  police officer that we needed working in the    15:24:09
21  department.
22     Q.   While we are on that subject, you
23  talked about Mr. Fiorillo's demeanor with the
24  public.  What was Mr. Lamm's demeanor in the
25  public like; in your opinion based upon either  15:24:19

Page 769

Hesse

1
2   your observations or what you were told?
3      A.   His demeanor was abrupt also.  You
4   know every time you stop somebody and write
5   them a summons they are going to question your  15:24:33
6   authority, they are going to do something.
7   You know you take it as for what it is worth.
8   But Kevin Lamm, he would step right into you,
9   almost provoke the guy into a fight.  That is
10  not the demeanor that we need in this Police     15:24:46
11  Department.
12     Q.   What about Joe Nofi, in your
13  opinion was he the type of officer that you
14  wanted to be in your department given the
15  changes that you wanted to make?               15:25:04
16     A.   No.
17     Q.   Why not?
18     A.   Simply put Joe Nofi was a goof
19  ball.  You know, he was a nice guy, but he was
20  just a goof ball.  I mean paperwork was shoddy  15:25:16
21  at best.  Summonses were horrible, illegible,
22  illiterate.  And then if somebody was walking
23  in front of him and he was not wearing a
24  shirt, which is another one of our silly laws
25  in town, he wouldn't walk up to the guy and     15:25:37

Page 770

Hesse

1
2   just say excuse me, sir, you can't walk around
3   without a shirt on.  He would say hey asshole,
4   come here.  That is what he would do.
5          I would have to tell him, counsel  15:25:46
6   him, Joe, don't talk to people like that.  Go
7   over, excuse me, sir, this is what you need to
8   do.  Same thing when it pertained to anything,
9   he would act the same way all the time.  I did
10  not want it to continue under my command.        15:26:02
11     Q.   Let me ask you, you said something
12  about Joe Nofi's -- was it Joe Nofi's
13  summonses were illiterate or that Joe Nofi was
14  illiterate?
15     A.   The summonses.                    15:26:12
16     Q.   Then let me ask you this.  Did you
17  ever advise Paradiso, hey, you know what, I
18  don't think Nofi should be rehired for the
19  next season because of how he treated the
20  public in your opinion?                    15:26:31
21     A.   Specifically no.  Every year we
22  were shorthanded, so we had to work with what
23  we had.
24     Q.   Same question with regard to Lamm,
25  did you ever speak to Paradiso about perhaps    15:26:41

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 771

Hesse

1
2   Paradiso not rehiring Lamm for the season?
3       A.   Not specifically, no.
4       Q.   For the same reason as Nofi?
5       A.   Yes.  We just of went season to        15:26:53
6   season with what we had.
7       Q.   Did Paradiso ever ask you your
8   opinion as to -- take a step back.
9            With regard to rehiring anyone for
10  any particular season did Paradiso ever ask     15:27:05
11  you what your opinion was with regard to a
12  particular officer?
13      A.   Not that I recall, no.
14      Q.   Let's talk about Carter.  Was
15  Carter the type of officer that you would have  15:27:16
16  been comfortable with on your department given
17  the changes that you were going to make?
18      A.   No.
19      Q.   Why not?
20      A.   You know, he was kind of hidy         15:27:26
21  tidy, talks out of both side of his mouth
22  between cops.  You know, he just kind of
23  rubbed me the wrong way sometimes, and I just,
24  you know, the thing with the sleeping on duty,
25  bragging about it.  I would relieve him in the  15:27:43

Page 772

Hesse

1
2   morning, his hair is standing straight up.
3   Yeah, as soon as I got in I went upstairs, I
4   went to sleep.
5            You know, enough, I just didn't       15:27:52
6   want to deal with it any more.  I felt moving
7   forward he just wasn't a good candidate to
8   keep on.
9       Q.   How about Snyder, was he the type
10  of officer that you would have been            15:28:02
11  comfortable with in your department given the
12  changes that you wanted to make?
13      A.   You know Snyder was a difficult
14  decision for me.  Personally I always liked
15  Tommy.  We always got along, I thought we      15:28:15
16  worked pretty well together.  But he had -- he
17  had some issues.  He had some personal issues
18  which he rarely ever discussed with me, or
19  maybe he discussed it with other members of
20  the department, but he seemed towards the end  15:28:30
21  to start being angry a lot.  Whether it was
22  with himself or his other job or members of
23  our department.  So I thought moving forward
24  maybe it was best that he just moved on and
25  stayed at his full-time job.                   15:28:49

Page 773

Hesse

1
2       Q.   What were those personal issues?
3       A.   I think he was sick for a while.
4   He had maybe some issues with his kids,
5   ex-wives, I don't know if he has one or two.   15:28:59
6   Money issues.  Everybody has issues in their
7   personal lives, you know.
8       Q.   Let me ask you this.  We now -- in
9   January at some point in time you were
10  actually appointed.  At some point in time     15:29:18
11  prior to the actual appointment you knew you
12  were going to be Acting Chief?
13      A.   Uh-hum.
14      Q.   At that point in time when you
15  knew that you were going to become Acting      15:29:29
16  Chief did you schedule Lamm for any part-time
17  shifts?
18      A.   You know, Lamm was working for the
19  Town of Islip Airport security, police,
20  whatever, I don't know what they call          15:29:45
21  themselves right now, law enforcement.  I was
22  really unaware of what his plans were, what he
23  wanted to do.  There was never any
24  communication between me and him.  I called
25  him once for his weapon because I needed to    15:29:59

Page 774

Hesse

1
2   issue it to somebody else so he can get
3   qualified because I was short weapons.  And
4   you think he would have said something to me
5   then about his other job.                      15:30:10
6            But he didn't work for us for I
7   think it was eight or nine months.  So I
8   wasn't sure if he was going to plan on coming
9   back or what.  But then I just decided that
10  maybe it was best that he just moved on anyway 15:30:28
11  with all the other issues.
12      Q.   What do you mean he had not worked
13  for you for eight or nine months?
14      A.   I guess he must have said
15  something to Ed Paradiso about getting this     15:30:33
16  full-time job because there was an academy
17  involved, there was training and there was a
18  full-time job that he had received.
19      Q.   Okay.
20      A.   So he was not scheduled for          15:30:42
21  anything for us.
22      Q.   To your knowledge was he scheduled
23  to work at all in August or September of 2005?
24      A.   I don't recall.  I would have to
25  look at a schedule from back then.              15:30:51

Page 775

Hesse

1  Q.  How about Fiorillo, from the time
2  that you became aware of the fact that you
3  were going to become the Acting Chief did you
4  schedule Fiorillo for any part-time shifts?   15:31:05
5     A.  I think he worked two tours
6  because I was strapped for guys, I didn't have
7  anybody available to work.  But they might
8  have been like either Christmas or Christmas
9  Eve and New Years or New Year's Eve.  But I   15:31:21
10  don't think subsequent to that there was any.
11     Q.  Why didn't you schedule him?
12     A.  Because I really didn't prefer him
13  to be on shift.
14     Q.  How about Nofi, same question?   15:31:30
15     A.  He may have worked one tour that
16  entire winter.  But, you know, I was inclined
17  to give the tours to the guys that could work
18  alone and seniority.
19     Q.  What do you mean that could work   15:31:48
20  alone?
21     A.  At that time of year there is one
22  cop on per shift.
23     Q.  What was your concern about Nofi
24  working alone?   15:31:55

Page 776

1                    Hesse
2        MR. GOODSTADT:  Objection.
3     Q.  What concerns did you have if any
4  with regard to assigning Nofi a shift during
5  the winter when he would be working alone?   15:32:03
6     A.  Well if something happened you got
7  to know who to call, where to call, what radio
8  to use, what channel.  There is a lot of
9  variables.  So you know I really never thought
10  that he was capable of being alone.   15:32:16
11     Q.  You said you rather give it to
12  people with seniority?
13     A.  Seniority.
14     Q.  You mean seniority with Ocean
15  Beach or seniority in terms of police force   15:32:25
16  experience?
17     A.  Seniority with Ocean Beach.
18     Q.  So who did you give the majority
19  of the shifts to between the time that you
20  became or you learned that you were going to   15:32:34
21  be Acting Chief and the beginning of the
22  season; when I say shifts, I mean part-time
23  shifts?
24     A.  That is funny, I would have to
25  look at a schedule.  But I was in the process,  15:32:49

Page 777

1                    Hesse
2  but I may have hired Paul Trosko full-time.
3  So he was working full-time.  I was working
4  full-time.  I know Walter Muller was on the
5  schedule.  I am trying to think who else I   15:33:03
6  had.
7        You know, Carter could work by
8  himself.  Tommy Snyder was on by himself on
9  the midnights.  Specifically, you know, I
10  don't recall right now anybody else, I would   15:33:24
11  have to really look at a schedule.
12     Q.  As you can tell from the complaint
13  there is a lot of allegations about the
14  Bosetti's?
15     A.  Yes.   15:33:36
16     Q.  So I feel obligated to ask you
17  about them.  Describe for me your opinion of
18  the Bosetti's -- of Gary Bosetti, let's start
19  with him, as a police officer for Ocean Beach,
20  independent of whatever he did for the city?   15:33:52
21     A.  Okay.  Police officer for Ocean
22  Beach, and I said this for a long time about
23  Gary and Richie both, that when they came on
24  that they changed, they started to help change
25  the persona of the Police Department.  Kinder,  15:34:09

Page 778

1                    Hesse
2  friendlier, approachable.  They were easily
3  approachable.  Anybody can talk to them about
4  any issue that they had, and they would relay
5  that information on to either myself or Ed   15:34:23
6  Paradiso.
7        As far as their work, their
8  performance, you know, they were not summons
9  writers by any means.  They wrote one, two,
10  three when they actually had to.  But there   15:34:39
11  were times where because of them we solved a
12  burglary or two or three because people would
13  trust them and be able to come up to them and
14  give them the information that the Police
15  Department needed to make an arrest, or, you   15:34:54
16  know...
17     Q.  What is the basis for your opinion
18  that the people of Ocean Beach trusted Gary
19  and Richie Bosetti?
20     A.  Everybody would come up to me and   15:35:06
21  say they are so nice, they are great officers.
22  It is nice to have somebody that we can talk
23  to if there is an issue.  I mean the community
24  just loved them.
25     Q.  Did people come up and tell you   15:35:18

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 779

Hesse

1
2 how much they loved Kevin Lamm?
3     A.   No.
4     Q.   Did people come up to you and tell
5 you how much they liked or loved Frank     15:35:27
6 Fiorillo?
7     A.   No.
8     Q.   Joe Nofi?
9     A.   No.
10     Q.   Ed Carter?               15:35:33
11     A.   No.
12     Q.   Tom Snyder?
13     A.   No.
14     Q.   Correct me if I am wrong, none of
15 the five plaintiffs here have ever been a     15:35:41
16 full-time police officer?
17         MR. CONNOLLY:  Objection.
18         MR. GOODSTADT:  Objection.
19     Q.   Let me ask you.  To your knowledge
20 was Frank Fiorillo ever a full-time police     15:35:50
21 officer for any jurisdiction other than Ocean
22 Beach?
23     A.   No.
24     Q.   To your knowledge was Joe Nofi
25 ever a full-time police officer for any     15:36:00

Page 780

Hesse

1
2 jurisdiction other than Ocean Beach?
3     A.   No.
4     Q.   And same question with regard to
5 Snyder?                          15:36:08
6     A.   No.
7     Q.   Lamm?
8     A.   No.
9     Q.   Carter?
10     A.   No.                   15:36:15
11     Q.   And they were not -- none of the
12 plaintiffs were full-time for Ocean Beach
13 either; correct?
14     A.   Correct.
15     Q.   They were just either part-time     15:36:21
16 when it was off season?
17     A.   Correct.
18     Q.   Or seasonal?
19     A.   Yes.
20     Q.   And how many hours did a typical     15:36:26
21 police officer work on a weekly basis during
22 the season?
23         MR. GOODSTADT:  Objection.
24     A.   During the season?
25     Q.   Yes.                   15:36:36

Page 781

Hesse

1
2     A.   They could work one shift a week,
3 to 40 hours plus a week.
4     Q.   So it varied?
5     A.   It varied.               15:36:42
6     Q.   Depending on the schedules of the
7 particular officers?
8     A.   Correct.
9     Q.   Now to your knowledge how many
10 years experience did Gary Bosetti have?     15:37:00
11     A.   At the time he came to Ocean
12 Beach?
13     Q.   Yes.
14     A.   At least a minimum of 20.
15     Q.   Mr. Goodstadt asked you a lot of     15:37:08
16 questions about them not being certified by
17 Suffolk County.
18     A.   Correct.
19     Q.   Given their experience with the
20 New York City -- let's talk about Gary     15:37:19
21 Bosetti.  Given Gary Bosetti's experience with
22 the New York City Police Department were you
23 ever concerned that the public safety was at
24 risk because they were not certified by
25 Suffolk County?               15:37:30

Page 782

Hesse

1
2     A.   No.
3     Q.   Same question about Richie?
4     A.   No.
5     Q.   Same question about -- was Ty     15:37:35
6 Bacon certified?
7     A.   He was.  There was a mix up with
8 his paperwork.
9     Q.   Did you have any concern with
10 regard to any officer that was not certified     15:37:49
11 with regard to the public safety of Ocean
12 Beach?
13     A.   No.
14     Q.   Let's talk about Ty Bacon.  What
15 type of police officer was he?          15:37:59
16     A.   A good man, an honorable man,
17 takes a lot of pride in his job.  Good with
18 the community.  Good with the police.
19     Q.   As between the Bosetti's and the
20 five plaintiffs, who had -- who would you say     15:38:14
21 was the better police officer?
22         MR. GOODSTADT:  Objection.
23     A.   In my opinion the Bosetti brothers
24 were better police officers.
25     Q.   And were the Bosetti's the type of     15:38:27

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 783

Hesse

1
2 officers that you wanted to have in your
3 kinder and gentler Police Department?
4     A.   Yes.
5     Q.   How about Ty Bacon?          15:38:38
6     A.   Yes.
7     Q.   Let's go back to the Halloween
8 incident, I am just going through my notes
9 from this morning to see.  Now Mr. Goodstadt
10 asked you some questions about your      15:39:00
11 communications with Frank Fiorillo, and
12 Fiorillo I think you indicated was angry when
13 you -- was angry when you gave him the results
14 of your investigation?
15    A.   No.                    15:39:13
16    Q.   Who was that?
17    A.   Kevin Lamm.
18    Q.   Kevin Lamm was angry.  Now was it
19 Kevin Lamm who said are we going to sweep this
20 under the rug as well?           15:39:22
21    A.   Yes.
22    Q.   Did Lamm ask, advise you as to
23 what he meant by as well with regard to
24 sweeping something under the rug?
25    A.   No.                    15:39:32

Page 784

Hesse

1
2     Q.   Are you aware of anything that you
3 swept under the rug?
4     A.   No.
5     MR. GOODSTADT:  Objection.       15:39:36
6     Q.   To your knowledge did Lamm go to
7 Chief Paradiso with his concerns that I guess
8 the Halloween incident was being swept under
9 the rug?
10    A.   I don't know.            15:39:51
11    Q.   Did Chief Paradiso ever advise you
12 that he thought it was being swept under the
13 rug?
14    A.   No.  Never.
15    Q.   When did Lamm start working for   15:40:02
16 Ocean Beach?
17    A.   Late 90s.
18    Q.   Now, Mr. Goodstadt asked you some
19 questions about Gary Bosetti leaving the scene
20 of Hauser's Bar at some point in time after   15:40:18
21 the altercation.  Do you recall those
22 questions
23    A.   Yes.
24    Q.   And I believe you said that Richie
25 Bosetti told you that his brother was dazed?   15:40:32

Page 785

Hesse

1
2     A.   Yes.
3     Q.   Now in your opinion, I think Mr.
4 Goodstadt asked you this question, if he
5 didn't he will object, do you find it strange   15:40:39
6 that someone -- even an off duty police
7 officer who was involved in a physical
8 altercation when he was attacked by no less
9 than two individuals and who was dazed and
10 hurt, would have left the scene; do you find   15:40:53
11 that strange?
12    MR. CONNOLLY:  Objection.
13    MR. GOODSTADT:  Objection.
14    A.   No, I don't find that strange, no.
15    Q.   Why don't you find that strange?   15:41:00
16    A.   I think he wanted to go lay down.
17 I believe Richie had told me that he advised
18 him to go and go lay down.
19    Q.   So if I understand you correctly,
20 at least according to Richie, Richie told you   15:41:13
21 that he told his brother to leave and go lay
22 down?
23    A.   Correct.
24    Q.   Now, Mr. Goodstadt asked you some
25 questions about whether or not you disciplined   15:41:46

Page 786

Hesse

1
2 Gary Bosetti for leaving the scene or doing
3 anything as it related to the Halloween
4 incident when he was off duty, do you recall
5 that?                     15:42:03
6     A.   Yes.
7     Q.   Could you have disciplined Gary
8 Bosetti for something that he did while he was
9 off duty?
10    A.   Yes.                 15:42:09
11    Q.   Is there a policy at Ocean Beach
12 that talks about disciplining off duty police
13 officers?
14    MR. GOODSTADT:  Objection.
15    A.   At that time?           15:42:18
16    Q.   Yes.
17    A.   I don't believe we had any
18 policies.
19    Q.   Now Mr. Goodstadt asked you a
20 number of questions about your opinion of the   15:42:32
21 Lamm, Snyder, Fiorillo accounts of what went
22 on, do you recall that?
23    A.   Yes.
24    Q.   And those accounts were based upon
25 solely the accounts of the alleged victims; am   15:42:45

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 787

**Hesse**

1
2  I correct?
3      A.   Correct.
4          MR. GOODSTADT:  Objection.
5      Q.   And you said you believed that the   15:42:54
6  victims, the alleged victims' statements to
7  the three officers that night were lies, do
8  you recall that?
9      A.   Yes.
10      Q.   Did you initially believe that      15:43:02
11  they were lies when you first read them?
12      A.   No.
13      Q.   At what point in time did you come
14  to the conclusion that what Van Koot, Schalik
15  and I think Tesori stated to Lamm, Snyder      15:43:13
16  and/or Fiorillo that evening were lies?
17      A.   When I spoke to Budd Jaeger and
18  Jean Jaeger.
19      Q.   And why did what Jean and/or Budd
20  Jaeger say to you cause you to now believe      15:43:26
21  that what Schalik, Tesori and Van Koot said
22  were lies?
23      A.   Put a whole different perspective
24  on what we believed happened.
25      Q.   What was the different      15:43:39

Page 788

**Hesse**

1
2  perspective?
3      A.   Instead of Gary Bosetti just going
4  berserk in a bar in a drunken rage hitting
5  people in the bar with a pool stick, there      15:43:49
6  were other elements leading up to Mr. Gary
7  Bosetti defending himself and a third person
8  with the pool stick.
9      Q.   Was your opinion that the initial
10  three statements -- was it your opinion that   15:44:03
11  the accounts given by Tesori, Schalik and Van
12  Koot were lies, was that reinforced when you
13  received subsequent statements from other
14  witnesses?
15      A.   Yes.                    15:44:20
16      Q.   I know I'm flipping back, so I
17  apologize.  Let's go back to the April 2006
18  time period.  You had various police officers,
19  you asked them to come to the beach?
20      A.   Yes.                    15:44:52
21      Q.   You advised four of the plaintiffs
22  that they were not going to be rehired.  The
23  rest presumably if I am correct were going to
24  be rehired; right?
25      A.   Yes.                    15:45:00

Page 789

**Hesse**

1
2      Q.   Other than Mr. Snyder?
3      A.   Yes.
4      Q.   Did you notify the village at any
5  point in time after April 2nd as to those      15:45:08
6  officers that were going to be hired for the
7  2006 season, or did they just show up when the
8  season started and say here I am?
9      A.   There was no notification made
10  that they were going to be rehired.  They      15:45:23
11  basically got scheduled and started to work.
12      Q.   How did the village know to pay
13  them?
14      A.   I believe that twice, there is two
15  times a year that Civil Service sends out a    15:45:32
16  form that needs to be filled out by the
17  village that states which officers will be
18  working, and it gets verified by me, sent back
19  to the village office and sent on.
20      Q.   So at some point in time there is  15:45:45
21  a communication between you and the Village
22  Clerk's office as to which officers were being
23  hired for the 2006 season?
24      A.   Yes.
25      Q.   Did Mayor Rogers ever advise you  15:45:57

Page 790

**Hesse**

1
2  that she needed to approve which officers for
3  the 2006 season were going to be rehired?
4      A.   No.
5      Q.   Did Trustee Loeffler ever advise   15:46:06
6  you that he needed to approve of who you
7  rehired for the 2006 season?
8      A.   No.
9      Q.   Were you aware that you needed to
10  run the names by either Mayor Rogers or        15:46:18
11  Loeffler?
12      A.   I was never told that I had to do
13  that.
14      Q.   Or any trustee?
15      A.   No.                     15:46:24
16      Q.   To your knowledge did Paradiso
17  when he made the decision have to run the
18  names of the people that were being hired for
19  the particular season by either the mayor or
20  the trustees?                    15:46:36
21      A.   I was unaware.
22      Q.   Did Mayor Rogers ever advise you
23  that you acted improperly by not clearing the
24  seasonal police officer staff with her first?
25      A.   No.                     15:46:49

Page 791

Hesse

1
2      Q.   How about any trustee?
3      A.   No.
4      Q.   Now, you discussed with Mr.
5   Goodstadt on the first day of your testimony   15:47:58
6   with regard to certain comments that Mayor
7   Rogers said with regard to Mr. Paradiso.  Do
8   you recall being asked certain of those
9   questions?
10     A.   Vaguely.                              15:48:11
11     Q.   Do you recall being advised that
12  Ms. Rogers believed that there was some
13  liabilities with regard to Chief Paradiso?
14     A.   Vaguely.
15     Q.   What did you mean by liabilities;   15:48:21
16  you would have to know what the question was?
17     A.   Yes, I would need to hear it.
18     Q.   Okay.
19          Well let me be more specific.  I
20  believe you testified and correct me if I am   15:48:34
21  wrong that Mayor Rogers expressed some
22  disappointment with the chief when you spoke
23  to her concerning the notice of claim?
24          MR. GOODSTADT:  Objection.
25     Q.   Did you ever speak to Mayor Rogers  15:48:45

Page 792

Hesse

1
2   about the notice of claim?
3      A.   Yes.
4      Q.   And in that conversation did you
5   have -- did you discuss Chief Paradiso?   15:48:53
6      A.   Yes.
7      Q.   What did Mayor Rogers say to you
8   concerning Chief Paradiso at that time?
9      A.   I just remember her being unhappy
10  with the way he ran things.              15:49:04
11     Q.   Do you recall specifically what
12  Mayor Rogers said?
13     A.   Off the top of my head right now,
14  no.
15     Q.   Radio codes, again Mr. Goodstadt   15:49:12
16  asked you and you rolled your eyes, Mr.
17  Goodstadt asked you some questions about radio
18  codes?
19     A.   Yes.
20     Q.   Did Mr. Nofi ever advise you that   15:49:42
21  he had issued a 10-1 and that any police
22  officer failed to respond to the 10-1?
23     A.   He never complained, no.
24     Q.   Did he ever say anything to you,
25  even if it was not a complaint, that he had   15:49:58

Page 793

Hesse

1
2   issued a 10-1 and no one came to assist him?
3      A.   No.
4      Q.   Did you ever hear a rumor prior to
5   seeing this lawsuit that Joe Nofi had issued a  15:50:07
6   10-1 and no one came to help him?
7      A.   No.
8      Q.   Did you ever receive a
9   communication, I am not even talking about a
10  complaint now, did you ever receive a          15:50:25
11  communication from any police officer that
12  another police officer didn't know a radio
13  code?
14          MR. GOODSTADT:  Objection.
15     A.   No.                                    15:50:38
16     Q.   Did you ever receive a
17  communication from any resident of Ocean Beach
18  that the police didn't respond to something
19  involving that particular resident because a
20  particular officer did not know the right      15:50:54
21  radio code?
22          MR. GOODSTADT:  Objection.
23     A.   No.
24     Q.   Let me ask you something.  Was it
25  appropriate for a police officer at Ocean      15:51:07

Page 794

Hesse

1
2   Beach while in uniform to go into a private
3   residence, sit down and drink a beer?
4      A.   Would it be inappropriate?
5      Q.   Yes.                                   15:51:22
6      A.   In my opinion yes.
7      Q.   While they were on duty in
8   uniform?
9      A.   Absolutely, yes.
10     Q.   How about if they went into a        15:51:28
11  resident's house, had a woman sit on his lap,
12  drink a beer and have a picture taken?
13     A.   It is inappropriate.
14          MR. GOODSTADT:  I think we are --
15  you have no foundation that they even   15:51:49
16  drank a beer.  No foundation.
17          MR. NOVIKOFF:  Okay.  You could
18  have objected to form.
19          MR. GOODSTADT:  You are asking
20  hypotheticals.                          15:51:59
21          MR. NOVIKOFF:  That is true.
22          MR. GOODSTADT:  If you mentioned
23  one of my clients then maybe I would have
24  said objection.  But you are speaking
25  hypothetically.                         15:52:07

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 795

```
 1            Hesse
 2        MR. NOVIKOFF:  Well it is what it
 3    is.
 4        Q.   In response to I think Mr.
 5    Goodstadt's question again on the radio codes,  15:52:22
 6    I think you said that the officers always
 7    spoke the codes as well as plain talk, do you
 8    recall that?
 9        A.   Yes.
10        Q.   What does plain talk mean?       15:52:33
11        A.   Basically what we are doing now.
12    Just talking to each other.  Just give him the
13    type of call it was, you know, for what it
14    was.
15        Q.   Give me an example?       15:52:42
16        A.   Like we get a complaint of noise
17    somewhere.  So the dispatcher would pick up
18    the radio, he would assign it to an officer.
19    The officer would respond and he would say, we
20    have a 10-17, noise complaint at 668 Ocean   15:52:53
21    Breeze.
22        Q.   Okay.  Flipping back a little bit,
23    sorry, I don't think I asked you this
24    question.
25        Did Lamm or any other officer ever  15:53:04
```

Page 796

```
 1            Hesse
 2    advise you that people dumped beer near them
 3    when they were walking on the beach?
 4        A.   We had an incident.
 5        Q.   What is that incident?       15:53:18
 6        A.   We had an incident that Kevin Lamm
 7    and Tommy Snyder were standing on a foot post
 8    and Ocean Breeze and Bay Walk, and some punk
 9    took a beer, poured it down the ledge of the
10    building and it dripped on to Tom Snyder.   15:53:35
11        Q.   Now there is an allegation in the
12    complaint about beer being thrown from a
13    second or third floor story near Mr. Lamm.  Do
14    you recall seeing that?
15        A.   The complaint?       15:53:50
16        Q.   Yes.
17        A.   Yes.
18        Q.   To your understanding is that the
19    incident that you are discussing?
20        A.   That is the only one that I know   15:53:57
21    of.
22        Q.   Was the allegations in the
23    complaint about that incident accurate?
24        MR. GOODSTADT:  Objection.
25        A.   It was exaggerated.       15:54:06
```

Page 797

```
 1            Hesse
 2        Q.   How was it exaggerated?
 3        A.   I need you to read it to me so I
 4    can --
 5        Q.   Let me go find it.  You know what,  15:54:15
 6    let me mark the following complaint because I
 7    just want to make sure that we covered the
 8    allegations.  I apologize, I tried to do it a
 9    little expeditiously and I don't want to mess
10    it up.                    15:54:59
11        MR. CONNOLLY:  While this is being
12    marked let's go off the record.
13        THE VIDEOGRAPHER:  The time is
14    3:56, we are off the record.
15        (Recess taken.)       15:55:08
16        THE VIDEOGRAPHER:  The time is
17    4:05, we are on the record.
18        MR. NOVIKOFF:  We are going to
19    stop the deposition today after all
20    counsel have had a discussion off the   16:03:28
21    record.  We are going to continue with
22    the deposition of Mr. Hesse and hopefully
23    complete it on August 17th.
24        We are confirmed for Mr. Carollo
25    at this office here at 2 o'clock next   16:03:43
```

Page 798

```
 1
 2    Tuesday, and counsel will discuss the
 3    briefing schedule either tomorrow or
 4    early next week.
 5        MR. GOODSTADT:  No objection.   16:03:53
 6        MR. CONNOLLY:  With the request
 7    being that if he pushed back one week
 8    subject to court consent.
 9        MR. NOVIKOFF:  Okay.
10        THE VIDEOGRAPHER:  The time is   16:04:03
11    4:05.  We are off the record.
12        (Time noted:  4:05 p.m.)
13        _____
14        GEORGE HESSE
15
16    Subscribed and sworn to before me
17    this ___ day of _____, 2009
18
19    _____
20
21
22
23
24
25
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 799

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                    : ss.
 5   COUNTY OF NEW YORK  )
 6
 7        I, Philip Rizzuti, a Notary
 8   Public within and for the State of New
 9   York, do hereby certify:
10        That GEORGE HESSE, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by the witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I am
18   in no way interested in the outcome of this
19   matter.
20        IN WITNESS WHEREOF, I have
21   hereunto set my hand this 18th day of
22   August, 2009.
23        _____
24             PHILIP RIZZUTI
25
```

Page 800

```
 1
 2   ----------------- I N D E X ----------------
 3   WITNESS          EXAMINATION BY       PAGE
 4   GEORGE HESSE    Mr. Goodstadt      491
 5        Mr. Novikoff      679
 6
 7   ------------ INFORMATION REQUESTS -----------
 8   DIRECTIONS:     None
 9   RULINGS:        None
10   TO BE FURNISHED:  None
11   REQUESTS:       619, 638
12   MOTIONS:        None
13
14   ----------------- EXHIBITS -----------------
15    Hesse Exhibit 17, photocopy of    524
16    photographs,
17    Hesse Exhibit 18, incident        529
18    report,
19    Hesse Exhibit 19, handwritten     543
20    statement, November 1, 2004,
21    Hesse Exhibit 20, handwritten     554
22    statement, November 2, 2004,
23    Hesse Exhibit 21, internal        562
24    correspondence, November 12,
25    2004,
```

Page 801

```
 1
 2    Hesse Exhibit 22, internal        569
 3    correspondence, December 10,
 4    2004,
 5    Hesse Exhibit 23, typewritten     577
 6    document dated 11/5/04 to George
 7    Hesse,
 8    Hesse Exhibit 24, internal        588
 9    correspondence, November 7,
10    2004,
11    Hesse Exhibit 25, Ocean Beach     599
12    Police Department, document
13    dated 11/5/2004,
14    Hesse Exhibit 26, incident        604
15    report, 12/11/2004,
16    Hesse Exhibit 27, letter dated    612
17    March 11, 2006,
18    Hesse Exhibit 28, Employment,     664
19    Collier County Sheriff's Office,
20    Employment Reference Prior
21    Experience,
22
23
24
25
```

Page 802

```
 1
 2         *** ERRATA SHEET ***
 3   NAME OF CASE: CARTER VS. OCEAN BEACH
     DATE OF DEPOSITION:  August 6, 2009
 4   NAME OF WITNESS:   GEORGE HESSE
     PAGE  LINE    FROM     TO
 5   ____|____|_____|_____
 6   ____|____|_____|_____
 7   ____|____|_____|_____
 8   ____|____|_____|_____
 9   ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19
20        _____
21             GEORGE HESSE
22   Subscribed and sworn to before me
23   this _____ day of _____, 2009.
24   _____  _____
25   (Notary Public)     My Commission Expires:
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 803

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI and    )
THOMAS SNYDER,                 )
                               )
          Plaintiffs,          )
                               )
      vs.                      ) CV 07 1215
                               )
INCORPORATED VILLAGE OF OCEAN  )
BEACH; MAYOR JOSEPH C. LOEFFLER)
JR., individually and in his   )
Official capacity; former Mayor)
NATALIE K. ROGERS, individually)
and in her official capacity,  )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF     )
GEORGE B. HESSE, individually  )
And in his official capacity;  )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK     )
COUNTY DEPARTMENT OF CIVIL     )
SERVICE; and ALLISON SANCHEZ,  )
Individually and in her        )
Official capacity,             )
                               )
          Defendants.          )
------------------------------)

CONTINUED VIDEOTAPED DEPOSITION OF
GEORGE HESSE
Uniondale, New York
Monday, August 17, 2009

Reported by:
Philip Rizzuti
JOB NO. 24185

---

Page 804

                August 17, 2009
                10:22 a.m.

          Continued videotaped deposition
      of GEORGE HESSE, held at the offices
      of Rivkin Radler, 926 Rexcorp Plaza,
      Uniondale, New York, pursuant to
      subpoena, before Philip Rizzuti, a
      Notary Public of the State of New York

---

Page 805

1
2   A P P E A R A N C E S :
3
4       THOMPSON WIGDOR & GILLY, LLP
5       Attorneys for Plaintiffs
6           85 Fifth Avenue
7           New York, New York 10003
8       BY:  ANDREW S. GOODSTADT, ESQ.
9
10      MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11      Attorneys for George B. Hesse
12          530 Saw Mill Road
13          Elmsford, New York 10523
14      BY:  KEVIN W. CONNOLLY, ESQ.
15
16      RIVKIN RADLER, LLP
17      Attorneys for Incorporated Village of
18      Ocean Beach, Joseph Loeffler, Natalie
19      Rogers and Ocean Beach Police Department
20          926 RexCorp Plaza
21          Uniondale, New York 11556-0926
22      BY:  KENNETH A. NOVIKOFF, ESQ.
23
24
25

---

Page 806

1
2   A P P E A R A N C E S :
3
4       RUDOLPH M. BAPTISTE, ESQ.
5       Assistant County Attorney
6       Suffolk County, State of New York
7           100 Veterans Memorial Highway
8           P.O. Box 6100
9           Hauppauge, New York 11788-4311
10
11  ALSO PRESENT:
12      JORDAN MUMMERT, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1 (Pages 803 to 806)

Page 807

Hesse

1
2     MR. NOVIKOFF:  Would you mark as
3     Hesse Exhibit 29, complaint.
4         (Hesse Exhibit 29, complaint,
5     marked for identification, as of this      10:08:44
6     date.)
7         THE VIDEOGRAPHER:  This is the
8     start of the tape labelled number 1 of
9     the continuation of George Hesse in the
10    matter of Carter and Fiorillo versus      10:21:20
11    Incorporated Village of Ocean Beach.  The
12    date is August 17th.  The time is 10:22
13    a.m., we are on the record.
14  G E O R G E   H E S S E,  called as a
15    witness, having been duly sworn by a      10:21:33
16    Notary Public, was examined and
17    testified as follows:
18  EXAMINATION BY
19  MR. NOVIKOFF:
20    Q.   Good morning Mr. Hesse.      10:21:35
21    A.   Good morning.
22    Q.   How are you, welcome back for your
23    fourth day.  Hopefully we will be out of here
24    by noon.  Where I left off with you was we
25    were going to start going through some of the   10:21:42

Page 808

Hesse

1
2     allegations in the complaint.
3         In front of you is what has been
4     pre-marked as Exhibit 29.  I have left a copy
5     of Deposition Exhibit 29 for all counsel.  I   10:21:51
6     would ask you to turn your attention to page
7     9, paragraph 32.  In paragraph 32 plaintiffs
8     allege in part that you allowed your allies on
9     the force to spend their shifts drinking at
10    local bars while in uniform and officially on   10:22:28
11    duty.
12        Did you ever allow any officers to
13    drink in local bars while in uniform and
14    officially on duty?
15    A.   No.                    10:22:39
16    Q.   Plaintiffs then go on to allege in
17    paragraph 32 that you instructed other
18    officers under your command including the
19    plaintiffs to neglect their own duties in
20    order to chauffeur their intoxicated      10:22:56
21    colleagues both inside and out of Ocean Beach.
22        Did you ever order the plaintiffs
23    to chauffeur intoxicated police officers
24    around Ocean Beach?
25    A.   No.                    10:23:10

Page 809

Hesse

1
2     Q.   How about outside of Ocean Beach?
3     A.   No.
4     Q.   Paragraph 33 plaintiffs allege in
5     part that you encouraged and enabled on-duty   10:23:18
6     officers to drink alcohol in the police
7     station.
8         Sir, did you ever encourage or
9     enable any on-duty officers to drink alcohol
10    in the police station?              10:23:31
11    A.   No.
12    Q.   Plaintiffs allege that you would
13    collect money to have these on-duty police
14    officers have Rocket Fuel in the police
15    station.                    10:23:45
16        Sir, did you ever collect money so
17    that on-duty police officers could drink
18    Rocket Fuel in the police station?
19    A.   No.
20    Q.   Let's look at paragraph 35.      10:23:55
21    Plaintiffs allege in part that you hired
22    civilians as police dispatchers.
23        Did you, Mr. Hesse, hire civilians
24    to be civil dispatchers?
25    A.   I didn't hire anybody at that      10:24:17

Page 810

Hesse

1
2     time, no.
3     Q.   Paragraph 36.  Plaintiffs allege
4     that each one of them advised you on numerous
5     occasions that the department and the village   10:24:30
6     were left dangerously short of personnel while
7     plaintiffs were assigned to chauffeur
8     intoxicated officers and their civilian
9     friends.
10        Let me ask you this question,      10:24:42
11    putting aside the fact as to whether or not
12    you ordered anyone to chauffeur anyone, I
13    think you have spoken about that, did any of
14    the plaintiffs ever complain to you about the
15    subject of they having to chauffeur anyone      10:24:55
16    within or without of Ocean Beach?
17    A.   No.
18    Q.   Did they ever complain to you that
19    anything you did left the village dangerously
20    short of police personnel?          10:25:13
21    A.   Never.
22    Q.   Did they ever complain to you that
23    they personally witnessed on-duty police
24    officers drinking while in uniform in an Ocean
25    Beach bar?                    10:25:34

2 (Pages 807 to 810)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 811

**Hesse**

1  
2    A.   Never.
3    Q.   Let's look at the next page,
4  paragraph 39.  Plaintiffs allege in part that
5  you allowed uncertified officers to assign     10:25:49
6  dock masters to cover their shifts at the
7  Ocean Beach Police Department.
8        Did you ever allow uncertified
9  officers to assign dock masters to cover
10  shifts at the Ocean Beach Police Department?    10:26:07
11    A.   Never.
12    Q.   Did you ever allow any officer to
13  assign a dock master to cover shifts at the
14  Ocean Beach Police Department?
15    A.   No.                          10:26:19
16    Q.   Paragraph 40.  Plaintiffs allege
17  in part that you allowed uncertified officers
18  to drink beer while patrolling in police
19  vehicles.
20        Assuming that it really doesn't      10:26:33
21  matter whether someone is uncertified or
22  certified with regard to drinking in police
23  vehicles, let me ask you this question.  Did
24  you ever allow any officers to drink beer
25  while patrolling in police vehicles?          10:26:44

Page 812

**Hesse**

1  
2    A.   Never.
3    Q.   Did any of the plaintiffs ever
4  advise you that they were aware that any
5  officer was drinking a beer in a police        10:26:51
6  vehicle while on duty?
7    A.   Never.
8    Q.   Would you tell officers what types
9  of beer to confiscate?
10    A.   No.                          10:27:06
11    Q.   Did the plaintiffs ever complain
12  to you about you -- about the subject of you
13  confiscating beer improperly?
14    A.   No.
15    Q.   Did the plaintiffs ever complain    10:27:24
16  to you about any officers drinking the
17  confiscated beer?
18    A.   Never.
19    Q.   Paragraph 41.  Plaintiffs allege
20  that you instructed them to remove empty beer   10:27:43
21  cans and other refuge that uncertified
22  officers abandoned in their vehicles and left
23  strewn about the police station after a night
24  on duty.
25        Did you ever instruct plaintiffs    10:27:58

Page 813

**Hesse**

1  
2  to remove empty beer cans and other garbage
3  left by any other officer in the police
4  station?
5    A.   No.                          10:28:08
6    Q.   Did they ever complain to you that
7  they felt that they were required by you to
8  pick up beer cans and garbage left by other
9  officers in the police station?
10    A.   Never.                       10:28:17
11    Q.   Let's go to paragraph 43.  Did
12  Officer Snyder -- well, in 43 Officer Snyder's
13  complaint is alleging that on one or more
14  occasions other officers took away his police
15  radio phone.                        10:28:39
16        Did Snyder ever complain to you
17  that any other officer would take away his
18  emergency cell phone from him?
19        MR. GOODSTADT:  Objection.
20    A.   No.                          10:28:50
21    Q.   Did Snyder ever complain to you
22  that he felt that other officers were
23  mistreating him?
24    A.   No.
25        MR. GOODSTADT:  Just note my        10:29:04

Page 814

**Hesse**

1  
2  objection to that as well.
3        MR. NOVIKOFF:  That question?
4        MR. GOODSTADT:  Yes.
5        MR. NOVIKOFF:  Okay.            10:29:09
6    Q.   Let's look at paragraph 43.  Tell
7  me when you are done reading it to yourself?
8    A.   Okay.
9    Q.   Did Officer Snyder ever complain
10  to you about anything that is referenced      10:29:56
11  within paragraph 43?
12    A.   No.
13    Q.   Read paragraphs 44 and 45 to
14  yourself please and then tell me when you are
15  done?                             10:30:07
16    A.   Okay.
17    Q.   In now in paragraph 45 Mr.
18  Fiorillo is alleging that you chided him in
19  the presence of Lamm and Nofi with regard to
20  his involvement in an altercation involving an  10:31:04
21  intoxicated off-duty police officer.
22        Did you ever chide Mr. Fiorillo
23  with regard to his involvement in an incident,
24  a physical altercation involving an off-duty
25  police officer?                     10:31:23

3  (Pages 811 to 814)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 815

Hesse

1
2     MR. GOODSTADT: Objection.
3     Q.   As referenced in 44 and 45?
4     A.   As reference to this, no.
5     Q.   Do you recall what Mr. -- do you     10:31:27
6  have idea -- do you have an understanding as
7  to what Mr. Fiorillo is referencing in
8  paragraph 44 and 45?
9     A.   Yes.
10     Q.   Could you please tell me what he     10:31:35
11  is referencing?
12     A.   He is referencing an incident that
13  happened on the South Bay Water Taxi's.  We
14  got a call of a fight on the water taxi.  The
15  fight was between a Dr. Something Guida from     10:31:50
16  the Good Samaritan Hospital, he was punching
17  his girlfriend in the face, it was not Police
18  Officer Walter Muller who he is talking about
19  here.
20        Walter Muller identified himself     10:32:07
21  as a police officer, he was there with his
22  wife, they were out to dinner that night.  He
23  was not intoxicated.  He had taken police
24  action.  One of our civilian dock masters had
25  jumped on the boat and because of Officer     10:32:19

Page 816

Hesse

1
2  Fiorillo's actions that civilian also -- the
3  dock master had gotten hurt.
4        So when the incident was over we
5  arrested Dr. Guido for harassment on that     10:32:30
6  civilian dock master because the confrontation
7  that they had between them.  What happened
8  later was as a group I yelled at everybody,
9  especially the civilian dock master for
10  getting involved in police action.     10:32:48
11     Q.   Who was the civilian dock master?
12     A.   Kenny Lappena.
13     Q.   And when you said because of Mr.
14  Fiorillo's actions the dock master got hurt,
15  what was Mr. Fiorillo's actions that you are     10:32:57
16  referring to?
17     A.   What happened was because he put
18  Officer Muller in a head lock and prevented
19  him from restraining Dr. Guida, Dr. Guida was
20  aggressive toward the civilian dock master and 10:33:14
21  he got hurt.
22     Q.   So let me understand you
23  correctly.  Fiorillo put Muller in a head
24  lock?
25     A.   Yes, he did.     10:33:23

Page 817

Hesse

1
2     Q.   Did you ever question Fiorillo as
3  to why he did this?
4     A.   Yes.
5     Q.   And what did you ask him?     10:33:27
6     A.   He said he didn't recognize him.
7     Q.   But what did you ask him; before
8  you tell me what Fiorillo said what
9  specifically did you ask him if you can
10  recall?     10:33:37
11     A.   I don't remember a specific
12  question that I asked.  But I made a statement
13  that you better know your officers before you
14  take action like that.
15     Q.   Is it usual for one officer to put  10:33:47
16  another officer in a head lock?
17     A.   Of course not, and the other thing
18  is Lamm and Nofi were not even on that night
19  that I believe.  I don't remember them being
20  there.     10:33:57
21     Q.   Now where would there be a record
22  of what nights, what shifts Lamm and Nofi
23  worked in June of 2002?
24     A.   I am sure that the village has
25  provided all the schedules.     10:34:09

Page 818

Hesse

1
2     Q.   Where would I find it?
3     A.   On the schedules or maybe copies
4  of the blotters or something like that.
5     Q.   Where would there be a record of     10:34:15
6  the arrest of Dr. Guida?
7     A.   That was definitely turned over.
8  It is definitely in our files somewhere.
9     Q.   Let's look at paragraph 46 and 47
10  and 48.  Please read those and tell me when     10:34:34
11  you are done?
12     A.   Okay.
13     Q.   In 46 Mr. Fiorillo is alleging in
14  part that on one occasion you demanded of him
15  to transport you to a party at a private     10:35:14
16  residence in Ocean Beach.
17        Did you ever demand that Mr.
18  Fiorillo transport you to a private residence
19  in Ocean Beach for the purpose of attending a
20  party?     10:35:25
21     A.   No.
22     Q.   Did you ever ask him to transport
23  you to a party on a private residence in Ocean
24  Beach?
25     A.   Not that I recall.     10:35:32

4 (Pages 815 to 818)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 819

Hesse

1
2    Q.   Did you ever require Mr. Fiorillo
3  to pick you up from a party at a private
4  residence?
5    A.   No.                         10:35:45
6    Q.   On Ocean Beach?
7    A.   No.
8    Q.   Let me ask you this question
9  because I asked Mr. Paradiso a couple of
10 questions.  How long would it take to drive   10:35:56
11 one of your police vehicles from the north to
12 the south part of Ocean Beach?
13   A.   About two minutes.
14   Q.   How about from east and west
15 within Ocean Beach?              10:36:06
16   A.   Ten blocks, and they are not
17 regular blocks, there are maybe 200 feet
18 between each block.
19   Q.   So taking a police vehicle from
20 east to west, how long would it take to drive?  10:36:16
21   A.   A minute or two.
22   Q.   And north to south?
23   A.   The same.
24   Q.   In paragraph 47 Mr. Fiorillo makes
25 some allegations concerning a known drug   10:36:36

Page 820

Hesse

1
2  dealer, although he doesn't identify who the
3  known drug dealer is anywhere in the
4  complaint.
5         Mr. Hesse, did Mr. Fiorillo ever   10:36:45
6  inquire with you with regard to any
7  relationship you have with a drug dealer?
8    A.   No.
9    Q.   Did you ever advise Mr. Fiorillo
10 that you have as a close personal friend a    10:36:59
11 drug dealer who lives in Ocean Beach?
12   A.   No.
13   Q.   Did you ever forbid Mr. Fiorillo
14 from interfering with any drug dealer's
15 activity in Ocean Beach?           10:37:16
16   A.   Never.
17   Q.   To your knowledge -- withdrawn.
18         Let's go to paragraph 49.  Did you
19 ever require any of the plaintiffs to
20 chauffeur you to various residences within    10:37:38
21 Ocean Beach for non-police business?
22   A.   No.
23   Q.   How about outside of Ocean Beach?
24   A.   No.
25   Q.   Let's go to paragraph 50.  Read    10:37:49

Page 821

Hesse

1
2  paragraph 50 to yourself and advise me when
3  you are done reading it.
4    A.   Okay.
5    Q.   Now in paragraph 50 it appears    10:38:16
6  that Mr. Fiorillo is alleging in part that you
7  interfered in the issuance of a summons by him
8  to the son of a business owner in Ocean Beach.
9         Do you have any recollection as to
10 what Mr. Fiorillo is referring to in paragraph  10:38:35
11 50?
12   A.   I have no idea.
13   Q.   Did you ever tear up a summons
14 that Fiorillo issued to anybody in Ocean
15 Beach?                          10:38:44
16   A.   Never.
17   Q.   Let's please read 51 and tell me
18 when you are done.
19   A.   Okay.
20   Q.   Did you ever instruct any of the   10:39:13
21 plaintiffs not to issue summonses to any bar
22 in Ocean Beach?
23   A.   No.
24   Q.   Did you ever advise any of the
25 plaintiffs that certain bars should not be --  10:39:25

Page 822

Hesse

1
2  withdrawn.
3         Did any of the plaintiffs ever
4  complain to you about you selectively
5  enforcing the law?                 10:39:43
6    A.   No.
7         MR. GOODSTADT:  Objection.
8    Q.   Please read 52 and 53 and tell me
9  when you are done?
10   A.   Okay.                      10:40:00
11   Q.   Now in 52 plaintiffs are alleging
12 an incident involving Snyder and Lamm where
13 they witnessed a down pure of beer falling at
14 their feet.  Do you see where they are
15 referring to?                    10:40:56
16   A.   Yes.
17   Q.   Let's look at 53.  According to
18 the plaintiffs in 53 you, Mr. Hesse, directed
19 Officers Lamm and Snyder not to issue any
20 citations or make any arrest with regard to   10:41:12
21 these alleged under age individuals drinking
22 alcohol in that apartment building.
23         Did you ever direct Lamm and
24 Snyder not to issue any citations or make any
25 arrests to these youths who they say were    10:41:27

Page 823

Hesse

1  Hesse
2  breaking the law?
3      A.   No.
4      Q.   Did Lamm or Snyder ever relay the
5  incident to you where they believed that beer    10:41:35
6  was thrown at them?
7      A.   Yes.
8      Q.   What did they say to you?
9      A.   Tommy Snyder -- well I was called
10  to the scene. Tommy Snyder said that some       10:41:45
11  beer had dripped on him, I don't know if it
12  was a down pure of beer, but I think he got a
13  few drips on his head, because there was some
14  intox kid dumping beer down the, I guess the
15  slope of the roof and it dripped on to Officer   10:41:59
16  Snyder.
17        So when I received we went up
18  there, we identified the kid, he was 21. His
19  father happened to be a lieutenant in Nassau
20  County PD. I asked Snyder what do you want me    10:42:14
21  to do with this. He said let's just call the
22  father, which we did, to let the father know
23  what his son just did.
24        We went up to the residence where
25  the renter of the residence John was on the     10:42:29

Page 824

1       Hesse
2  scene, I forget his last name. We wrote him a
3  summons for noise. We did find a small pipe
4  for smoking marijuana. There was not
5  extensive drugs or drug paraphernalia there.    10:42:46
6  There was one pipe that was sitting on a
7  counter. There was some empty beer cans
8  sitting around.
9        I believe John had maybe his
10  sister, younger sister and some of her friends  10:43:01
11  there which none of them were seen drinking
12  any alcohol, because I believe the officers
13  had checked because I was dealing with John.
14  I confiscated the pipe, I went out to the
15  balcony so everybody could see and I threw the  10:43:19
16  pipe into the bay. And that was the end of
17  the story.
18      Q.   Now who was the police officer of
19  Nassau County?
20      A.   I don't remember his name.           10:43:26
21      Q.   What was his title?
22      A.   He was a lieutenant, I remember
23  him being a lieutenant.
24      Q.   Now you made reference to an
25  extensive collection of illicit drug           10:43:38

Page 825

1       Hesse
2  paraphernalia not being present in that
3  apartment. You are referring to the
4  allegation in paragraph 52 when the plaintiffs
5  alleged that there was an extensive collection  10:43:52
6  of such paraphernalia; correct?
7      A.   Yes.
8      Q.   It is your testimony that that
9  allegation is incorrect?
10      A.   Correct.                             10:43:59
11      Q.   And it is your position with
12  regard to the incidents being described in 52
13  and 53 that you asked Tommy Snyder what he
14  wanted to do, and Snyder's response was to
15  call the father?                              10:44:17
16      A.   That is it.
17      Q.   Okay. Go to paragraph 54, please
18  read it and tell me when you are done.
19      A.   Okay.
20      Q.   There has been some confusion       10:44:49
21  among some of the witnesses who looked at this
22  paragraph. Is 54 in your opinion still
23  referring to the same evening in the same
24  apartment that 52 and 53 are referring to?
25        MR. GOODSTADT:  Objection.             10:45:02

Page 826

1       Hesse
2        MR. CONNOLLY:  Objection.
3      A.   My opinion; it could be. I don't
4  know.
5      Q.   Now did you ever prohibit the       10:45:05
6  plaintiffs from investigating any crime that
7  took place in that apartment that evening or
8  any other evening?
9      A.   No.
10      Q.   Did you ever instruct any of the    10:45:16
11  plaintiffs to stay away from that apartment
12  and not investigate any alleged act of
13  criminality?
14      A.   Never.
15      Q.   That night or any night            10:45:27
16  afterwards?
17      A.   Never.
18      Q.   Now in the last sentence of
19  paragraph 54 the plaintiffs allege as follows
20  and I will quote this: Indeed on another      10:45:39
21  occasion plaintiffs even observed certain of
22  the uncertified officers on the apartment
23  balcony drinking and socializing with the same
24  group of minors. Close quote.
25        Did any of the plaintiffs ever        10:45:58

6  (Pages 823 to 826)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 827

Hesse

1
2  advise you that they ever saw any other
3  officer drinking and socializing with anyone
4  on the balcony of that apartment?
5      A.  Never.                    10:46:12
6      Q.  Let's go to paragraph 55, please
7  read it and tell me when you are done?
8      A.  Okay.
9      Q.  Did you ever encourage minors to
10 abuse alcohol?                    10:46:39
11     MR. GOODSTADT:  Objection.
12     A.  No.
13     MR. NOVIKOFF:  What is the
14 objection, it is your allegation; in yet
15 another instance of Hesse encouraging    10:46:46
16 minors to abuse alcohol, so I am asking
17 him.  So what is the objection?
18     MR. GOODSTADT:  The allegation is
19 encouraging.  I don't know if he has the
20 same definition that we would have.  So  10:46:54
21 object to the form.
22     MR. NOVIKOFF:  Because you don't
23 think he has the same definition of what
24 you have as encouraging?
25     MR. GOODSTADT:  Maybe.       10:47:05

Page 828

Hesse

1
2      MR. NOVIKOFF:  Okay, that is fine.
3      Q.  What is your definition of
4  encouraging, Mr. Hesse?
5      A.  It could be that I permitted them  10:47:10
6  or I actually handed them the beer and said
7  drink it, drink it.
8      Q.  Under any definition that you may
9  have as to the word encouraging did you ever
10 encourage minors to abuse alcohol?      10:47:23
11     A.  No.
12     Q.  Did you ever encourage minors to
13 drink alcohol?
14     A.  No.
15     Q.  Did you ever permit minors to    10:47:31
16 drink alcohol in your presence?
17     A.  No.
18     Q.  Did you ever condone minors of
19 drinking alcohol in your presence?
20     A.  No.                       10:47:40
21     Q.  Did you ever tell any of the
22 plaintiffs not to issue summonses to any
23 minors that they found to be drinking alcohol?
24     A.  No.
25     Q.  Did you ever intervene when      10:47:48

Page 829

Hesse

1
2  another officer issued a citation to any minor
3  carrying a case of beer?
4      A.  No.
5      Q.  Did you ever -- are you aware of   10:48:01
6  any incidents involving any officer issuing a
7  citation to a minor carrying a case of beer?
8      A.  I know the incident that they are
9  referring to.
10     Q.  In paragraph 55?             10:48:14
11     A.  Yes.
12     Q.  What is that incident?
13     A.  I believe we talked about it on
14 one of my other days.  There was a kid that
15 works for CJ's.  CJ's has an off premise     10:48:23
16 license, they have an off premise sale
17 license, and I believe he was delivering a
18 case of beer to -- of course it is to the
19 apartment where this other incident had taken
20 place.  But the kids were 21.  He was        10:48:45
21 delivering a case of beer.  I don't remember
22 if it was Lamm or Fiorillo who issued the
23 summons to him.  But I advised the kid bring
24 the receipt, bring the license, a copy of the
25 license, go to court, plead your case, he did,  10:49:02

Page 830

Hesse

1
2  and it was dismissed.
3      Q.  So when you say the kid was 21,
4  you are saying the kid who the beer was being
5  delivered to?                       10:49:10
6      A.  Correct.  The kid that purchased
7  the beer was 21.
8      Q.  Okay.  So let me understand what
9  happened.  Some kid purchased -- the kid who
10 was 21 purchased the case of beer from CJ's?  10:49:23
11     A.  Yes.  He ordered it.
12     Q.  He ordered it?
13     A.  Yes.
14     Q.  And it was delivered to him?
15     A.  It was in the process of being   10:49:33
16 delivered to him.
17     Q.  Who was delivering it to him?
18     A.  Some kid Paul, I can't think of
19 the last name, he has been mentioned a couple
20 of times.                           10:49:39
21     Q.  Was this kid Paul a minor?
22     A.  He was 20.
23     Q.  He was delivering the beer to your
24 knowledge on behalf of CJ's to the kid in the
25 apartment who was 21?                10:49:50

7  (Pages 827 to 830)

Page 831

**Hesse**

1
2     A.   Correct.
3     Q.   Okay, now, was the citation issued
4   to this Paul kid who was 20, or was the
5   citation issued to the 21 year old in the          10:49:57
6   apartment?
7     A.   It was issued to the kid Paul who
8   was making the delivery.
9     Q.   Okay, now, who issued the citation
10  to the kid making the delivery?                    10:50:16
11    A.   It was either Lamm or -- actually,
12  no. It might have been John Dwyer. It was
13  either John Dwyer, Kevin Lamm or Frank
14  Fiorillo. Offhand I am not sure.
15    Q.   Now what communication if any did   10:50:27
16  you have with regard to the kid Paul who was
17  making the delivery concerning the citation
18  that was issued to him?
19    A.   I believe I was already in the
20  station house at my desk and they brought the   10:50:38
21  kid Paul into the station house to issue the
22  summons. And he was complaining, you know, I
23  work for CJ's, I am making a delivery. Okay,
24  well, if that is the truth bring all your
25  documentation to court and prove your case. I  10:50:51

Page 832

**Hesse**

1
2   wasn't sure.
3     Q.   And that was the extent of your
4   communication with that kid Paul?
5     A.   Yes.                                         10:51:00
6     Q.   So the citation was issued?
7     A.   Yes.
8     Q.   And your advice to the kid was
9   just prove your case in court?
10    A.   Exactly.                                     10:51:07
11    Q.   Now the plaintiffs then allege in
12  55 that you returned the case of beer to the
13  under aged youth. Did you return the case of
14  beer to this kid Paul?
15    A.   No.                                          10:51:25
16    Q.   Did you take the case of beer to
17  the other kid who was 21 in the apartment?
18    A.   No.
19    Q.   Do you have an understanding as to
20  what plaintiffs mean when they say that you   10:51:32
21  returned the case of beer to the under aged
22  youth?
23    A.   The person who ordered it came and
24  took it. He came and picked it up.
25    Q.   And he was 21 to the best of your  10:51:39

Page 833

**Hesse**

1
2   knowledge.
3     A.   He was.
4     Q.   And how do you know that?
5     A.   We checked his ID.          10:51:43
6     Q.   The plaintiffs then allege in the
7   last sentence that Hesse later ordered that
8   Officer Lamm refrain from issuing citations on
9   enforcing the law against this youth.
10         Since we now have two youths that   10:52:03
11  are being referenced in the story by you, did
12  you ever order Officer Lamm to refrain from
13  issuing a citation or enforcing a law, any law
14  against this guy Paul?
15    A.   No.                          10:52:16
16    Q.   Same question with regard to the
17  21 year old that picked up the case of beer?
18    A.   No.
19    Q.   In paragraph 56, please read
20  paragraph 56 and then tell me when you are   10:52:29
21  done?
22    A.   Okay.
23    Q.   Now let's look at the first
24  sentence of paragraph 56. Here Snyder and
25  Lamm are alleging that you advised the youths  10:53:06

Page 834

**Hesse**

1
2   that were referenced in 54 and 55 -- I'm
3   sorry, in 55, that you advised these youths
4   that Officer Lamm was a loser.
5         Did you ever advise any youth that  10:53:23
6   Officer Lamm was a loser?
7     A.   No.
8     Q.   Did you ever advise any person
9   that was issued a citation that Officer Lamm
10  was a loser?                       10:53:34
11    A.   No.
12    Q.   Did you ever advise these youths
13  that no one likes Lamm as Lamm alleged in 56?
14    A.   No.
15    Q.   Did you ever advise any individual  10:53:43
16  that was issued a citation that no one likes
17  Lamm?
18    A.   No.
19    Q.   Did you ever advise any individual
20  who was issued a citation that no one listens  10:53:55
21  to Lamm and therefore they should not listen
22  to Lamm?
23    A.   No.
24    Q.   Did you ever advise anybody --
25  withdrawn.                         10:54:02

8 (Pages 831 to 834)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 835

Hesse

1
2       Did you ever advise any youth that
3   they should not listen to Officer Lamm's
4   lawful directives?
5       A.   No.                    10:54:13
6       Q.   Now please read 60 and 61 and tell
7   me when you are done?
8       A.   Okay.
9       Q.   Now, 60 is referring to an
10  incident, if I am correct, involving a file    10:55:14
11  cabinet being thrown in by one or both of the
12  Bosetti's into the bay?
13      A.   Right.
14      Q.   And I think you spoke about that
15  the last time, so I am not going to ask you    10:55:27
16  questions about that.
17          61 now if I understand it
18  correctly, tell me if your understanding is
19  differently, that in response to whatever
20  involvement Fiorillo was in this file cabinet    10:55:39
21  incident, you ordered him to spend three
22  consecutive shifts standing motionless beneath
23  a street like at the intersection of Denhoff
24  Walk and Bay Walk.
25          Do you have the same understanding  10:55:53

Page 836

Hesse

1
2   of 61 as I have?
3           MR. CONNOLLY:  Objection.
4       A.   He is trying to relate a couple of
5   different incidents into one.  That one thing    10:56:01
6   had nothing to do with the other.
7       Q.   So when you say that one thing had
8   nothing to do with the other, you are saying
9   that whether Fiorillo spent three shifts
10  standing motionless underneath a light had     10:56:17
11  nothing to do with what occurred with the file
12  cabinet with the Bosetti's?
13          MR. GOODSTADT:  Objection.
14          MR. CONNOLLY:  Objection.
15      A.   That is correct.                10:56:24
16      Q.   Let's stay on 61.  Did you ever
17  order Officer Fiorillo to spend three
18  consecutive shifts standing motionless beneath
19  a street light at the intersection of Denhoff
20  Walk and Bay Walk?                       10:56:35
21      A.   No.
22      Q.   I believe you did tell me at
23  least, I don't know if you told Mr. Goodstadt
24  in response to his questions, that you did
25  require Mr. Fiorillo to spend a number of    10:56:45

Page 837

Hesse

1
2   shifts in a row at the same location at
3   Denhoff Walk and Bay Walk.  Do you recall
4   that?
5       A.   Correct.                    10:56:55
6       Q.   Did that direction, putting
7   Fiorillo on the same shift for more than one
8   night in a row have anything to do with the
9   incident involving the Bosetti's throwing a
10  file cabinet in the water?              10:57:07
11      A.   Nothing.
12      Q.   Did you ever instruct Fiorillo on
13  any occasion that he was forbidden to move
14  from any assigned post during all of the times
15  that he worked on the same shift you worked?    10:57:21
16      A.   No.
17      Q.   Did you ever instruct any officer
18  during the time that you and Fiorillo worked
19  on the same shifts that that officer was not
20  permitted to speak with Fiorillo?          10:57:37
21      A.   No.
22      Q.   Paragraph 62 refers to an
23  instruction by you to Fiorillo to wash the
24  fleet of Ocean Beach Police Department
25  vehicles before the end of his shift.        10:57:51

Page 838

Hesse

1
2       Did you ever instruct Fiorillo to
3   wash the fleet of Ocean Beach Police
4   Department vehicles before the end of his
5   shift?                             10:58:00
6       A.   No.
7       Q.   How many vehicles are there in the
8   fleet of the Ocean Beach Police Department?
9       A.   Then or now?
10      Q.   How about before April 2006;        10:58:09
11  between the 2002 season and the 2005 season?
12      A.   We had two Expeditions, we had two
13  little golf card G.E.M. cars, and I think that
14  was it.
15      Q.   Did you ever instruct any of the    10:58:30
16  plaintiffs to ever wash the cars?
17      A.   I am sure I have over the years,
18  yes.
19      Q.   Have you ever instructed other
20  officers to wash the fleet of the Ocean Beach   10:58:39
21  Police Department?
22      A.   I have done it myself, yes.
23      Q.   And you have done it yourself?
24      A.   Absolutely.
25          MR. NOVIKOFF:  I have no further    10:59:03

9  (Pages 835 to 838)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 839

```
1            Hesse
2  questions, thank you.
3        MR. CONNOLLY:  I have no
4  questions.
5        MR. BAPTISTE:  Take a moment.    10:59:09
6        THE VIDEOGRAPHER:  The time is 11
7  o'clock.  We are off the record.
8        (Recess taken.)
9  EXAMINATION BY
10 MR. BAPTISTE:                11:03:46
11       THE VIDEOGRAPHER:  The time is
12 11:06, we are on the record.
13    Q.   Good morning, Mr. Hesse, I just
14 have a few questions.
15    A.   Good morning.           11:05:19
16    Q.   I believe earlier you testified
17 that -- actually do you know who Allison
18 Sanchez is?
19    A.   Yes.
20    Q.   Who do you know her to be?    11:05:29
21    A.   She was an employee of Suffolk
22 County Civil Service and I believe she was the
23 account manager for Ocean Beach, the
24 incorporated village of.
25    Q.   Could you describe any       11:05:45
```

Page 840

```
1            Hesse
2  relationship that you had with Ms. Sanchez?
3        MR. CONNOLLY:  Objection.
4     A.   It was strictly professional.
5        MR. GOODSTADT:  We have an      11:05:55
6  agreement, just one objection --
7        MR. NOVIKOFF:  Yes, one objection
8  is for all.
9     Q.   During the time of covering this
10 complaint have you ever met with Ms. Sanchez  11:06:07
11 in a personal capacity?
12    A.   Well, I went to drop off some
13 paperwork to her once and we went to lunch.
14 But I would consider that a professional
15 meeting.                      11:06:22
16    Q.   When you say you went to lunch,
17 you went to lunch in Suffolk County?
18    A.   Yes.
19    Q.   In Hauppauge?
20    A.   Yes.               11:06:28
21    Q.   Do you remember -- withdrawn.
22       Do you recall what was discussed
23 if anything during that lunch?
24    A.   Not really.  It was just a lot of
25 small talk.  Nothing about the job itself.    11:06:42
```

Page 841

```
1            Hesse
2     Q.   Previously you testified that you
3  dropped off paperwork.  Do you recall what
4  documents if any you did deliver?
5     A.   I believe -- I don't remember the  11:06:53
6  name of the document, but there were documents
7  that had to be filled out when a police
8  officer has passed his qualifying exams, the
9  four exams.  It has to be signed off on by
10 Civil Service so I can send to it the registry  11:07:09
11 of New York State.
12    Q.   At any time covered in this
13 complaint were you ever involved romantically
14 with Ms. Sanchez?
15    A.   Never.               11:07:24
16    Q.   How about outside the time of this
17 complaint?
18    A.   No.
19       MR. BAPTISTE:  No further
20 questions.                     11:07:32
21       MR. CONNOLLY:  I have no
22 questions.
23       MR. GOODSTADT:  I do.
24 EXAMINATION BY
25 MR. GOODSTADT:                11:07:44
```

Page 842

```
1            Hesse
2        MR. CONNOLLY:  You have had ten
3  hours, but that is fine.  Go ahead, and
4  if it becomes an issue I will deal with
5  it.                        11:08:07
6     Q.   Mr. Hesse, I just have some follow
7  up questions regarding some testimony that you
8  have given in response to questions asked by
9  the Ocean Beach defendant's attorney, as well
10 as the County's attorney.            11:08:19
11       You testified about your blogging
12 after April 2nd, do you recall your testimony
13 last time?
14       MR. CONNOLLY:  Objection.
15    A.   Just the fact that I made some    11:08:28
16 entries, yes.
17    Q.   You testified that you had not
18 spoken with any trustee about your blog; is
19 that correct?
20       MR. NOVIKOFF:  Objection.       11:08:38
21       MR. CONNOLLY:  Objection.  I don't
22 recall there being any question in that
23 regard, although admittedly there have
24 been thousands of questions.
25    A.   Yes.  I believe I was asked did I  11:08:51
```

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 843

Hesse

1       Hesse
2    discuss my blog entries with any trustee, no.
3       Q.   Sitting here today did you ever
4    discuss or have you spoken with any trustees
5    for the Village of Ocean Beach anything about   11:09:02
6    your blog entries?
7       A.   No.
8       Q.   Have you ever discussed or spoken
9    with any member of the board of trustees of
10   the Village of Ocean Beach just the fact that   11:09:12
11   you have blogged?
12      A.   No.
13      Q.   At the time that you blogged after
14   April 2, 2006 you were the top officer
15   actively working for the Village of Ocean      11:09:24
16   Beach; is that correct?
17      A.   Yes.
18      Q.   At that point in time you had the
19   authority to hire and fire?
20      A.   Yes.              11:09:33
21      Q.   At that point in time you had the
22   authority to make and administer policy with
23   respect to the Police Department?
24      A.   Yes.
25      MR. NOVIKOFF:  Note my objection    11:09:40

Page 844

1       Hesse
2    to that question.
3       Q.   Have you ever spoken with or
4    discussed your blog entries with Allison
5    Sanchez?                 11:09:50
6       A.   No.
7       Q.   Has Ms. Sanchez ever spoken with
8    you or discussed with you any blog entries
9    that she made?
10      A.   No.              11:09:57
11      Q.   Do you know whether Allison
12   Sanchez has ever entered any post on the
13   blogs?
14      MR. CONNOLLY:  Does he know
15   personally --                11:10:05
16      Q.   I am asking if he knows, not
17   necessarily actually witness her type it in,
18   but has anyone ever told you?
19      A.   I found out today that apparently
20   she may have made some blog entries.        11:10:16
21      Q.   So prior to today you didn't know
22   that?
23      A.   No.
24      Q.   And I don't want to impede upon
25   the attorney/client privilege, but did you    11:10:24

Page 845

1       Hesse
2    hear that from anybody other than for perhaps
3    your attorney or an attorney that represents
4    you?
5       A.   No.               11:10:33
6       MR. NOVIKOFF:  Just so the record
7    is clear, I believe we can stipulate that
8    within the last week we all have been
9    served by the Suffolk County supplemental
10   response to your interrogatory requests     11:10:47
11   concerning whether or not Ms. Sanchez
12   posted any blogs, and in fact she did
13   identify some blog entries.  Just so to
14   put this question into context of what we
15   received.              11:11:03
16      MR. GOODSTADT:  Right, I just
17   wanted to know if he had a conversation
18   with her --
19      MR. NOVIKOFF:  No, legitimate, I
20   understand that.             11:11:08
21      Q.   I want to go back to some
22   questions that Mr. Novikoff asked you about
23   the Halloween incident?
24      A.   Uh-hum.
25      Q.   Do you recall testifying in      11:11:19

Page 846

1       Hesse
2    response to Mr. Novikoff's questions about
3    Halloween?
4       A.   Yes.
5       Q.   And he went through a series of   11:11:26
6    the eyewitness statements that were taken in
7    connection with the Halloween incident, do you
8    recall that?
9       A.   Yes.
10      Q.   Then he went through select       11:11:32
11   portions of some eyewitness statements and had
12   asked you whether you knew if this person,
13   meaning the eyewitness, had actually
14   witnessed the part in which Mr. Bosetti used a
15   pool cue to strike someone, do you recall      11:11:49
16   that.
17      MR. CONNOLLY:  Objection to the
18   form.
19      A.   Yes.
20      Q.   Do you recall testifying that in   11:11:53
21   fact the witnesses that Mr. Novikoff asked you
22   about, that you were not sure whether they
23   witnessed the point -- the time period where
24   Mr. Bosetti used the pool cue, do you recall
25   that?                 11:12:10

Page 847

Hesse

1
2        MR. CONNOLLY: Objection.
3        MR. NOVIKOFF: Objection.
4     A.   Repeat that question.
5     Q.   Yes.                    11:12:16
6        Mr. Novikoff walked you through
7  certain witness statements, do you recall
8  that?
9     A.   Yes.
10     Q.   And there were the witness       11:12:23
11  statements that Mr. Novikoff walked you
12  through that did not contain any allegation
13  of, or contain any statement with respect to
14  Mr. Bosetti using a pool cue.  Do you recall
15  that?                         11:12:34
16     A.   Right.
17     Q.   Then he had asked you whether the
18  individuals that he walked you through,
19  whether they in fact told you that they even
20  eyewitnessed the incident in which Mr. Bosetti  11:12:42
21  used the pool cue, do you recall that?
22     A.   Yes.
23     Q.   In fact he even asked you if they
24  had not witnessed it and they said something
25  about it, and wrote something about it or gave  11:12:50

Page 848

Hesse

1
2  you the statement, that in fact it would be
3  perjurious, correct, do you recall that?
4        MR. CONNOLLY: Objection.
5     A.   Yes.                    11:12:57
6     Q.   And you said yes, it would be
7  perjurious?
8     A.   Yes.
9     Q.   Let me ask you, in the five days
10  that you took to reach a conclusion about what  11:13:01
11  happened at Halloween, did you speak to
12  anybody who witnessed the incident in which
13  Mr. Bosetti used a pool cue to strike
14  somebody?
15        MR. NOVIKOFF: Note my objection.  11:13:15
16        MR. CONNOLLY: Objection.
17     A.   I believe no.
18     Q.   And yet you still reached a
19  conclusion that Mr. Bosetti acted with
20  appropriate force; is that correct?      11:13:23
21     A.   Correct.
22     Q.   And yet the only statement that
23  you had in writing, verbally or otherwise
24  about the use of a pool cue was the statements
25  that the on-duty officers took; correct?   11:13:37

Page 849

Hesse

1
2     A.   No.
3     Q.   Well what other statements did you
4  have with respect to a pool cue by the time
5  you made your conclusions within five days of  11:13:43
6  investigating the incident?
7        MR. CONNOLLY: Objection.
8     A.   Well, the dates -- I understand
9  what you are saying, but Gary Bosetti himself
10  admitted to using a pool cue.            11:13:55
11     Q.   But sir you testified that you
12  didn't speak to Gary Bosetti during that five
13  day period?
14     A.   Correct.
15     Q.   So my question is during that five  11:14:00
16  day period the only witness statement that you
17  had from anybody with respect to the use of a
18  pool cue was from the statements that the
19  on-duty officers took that evening; is that
20  correct?                      11:14:15
21     A.   Correct.
22     Q.   And yet you still concluded that
23  Mr. Bosetti used proper force; correct?
24     A.   Correct.
25     Q.   Is it possible that all the other  11:14:24

Page 850

Hesse

1
2  statements that you got from all the other
3  eyewitnesses are correct, and yet Mr. Bosetti
4  still used excessive force with a pool cue?
5        MR. NOVIKOFF: Objection.       11:14:37
6        MR. CONNOLLY: Objection.
7     A.   I don't believe he used excessive
8  force.
9     Q.   I understand what your conclusion
10  is.  I understand what your conclusion is that  11:14:46
11  you don't believe that he used excessive
12  force.  My question to you is on the day that
13  you reached the conclusion five days after you
14  started the investigation, is it possible that
15  all the eyewitness statements that you        11:14:59
16  received from all the people who didn't
17  mention anything about a pool cue, is it
18  possible that even if that -- those statements
19  were correct and accurate, that Mr. Bosetti
20  still could have used excessive force with the  11:15:11
21  pool cue?
22        MR. NOVIKOFF: Objection to the
23     form because the eyewitness statements I
24     presume you are including are those of
25     the alleged victims.             11:15:23

12  (Pages 847 to 850)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 851

```
 1              Hesse
 2    Q.  Yes.
 3    A.  Yes.  They mentioned the pool cue.
 4  I never doubted that a pool cue was used.
 5    Q.  I understand that.  But how did   11:15:29
 6  you reach the conclusion that Mr. Bosetti had
 7  not used excessive force within the five days
 8  of starting the investigation when the only
 9  statement that you had about the use of a pool
10  cue came from the victims of the -- who were   11:15:44
11  struck by the pool cue in which they were
12  alleging excessive force?
13        MR. NOVIKOFF:  Objection.
14        MR. CONNOLLY:  Objection.
15    A.  Well there was three of them, and   11:15:52
16  the way I felt they were attacking the police
17  officer at that point.  So I do not believe it
18  to be excessive.
19    Q.  Is it possible that a police
20  officer could be attacked by a civilian and   11:16:03
21  the police officer still use excessive force?
22        MR. CONNOLLY:  Objection.
23        MR. NOVIKOFF:  Objection.  Maybe
24    if they were midgets.
25    A.  You are speculating about       11:16:14
```

Page 852

```
 1              Hesse
 2  something that may or may not happen somewhere
 3  in the world, I don't know, yes.
 4        MR. CONNOLLY:  So the answer to
 5    counsel's question regarding        11:16:25
 6    possibilities, is it possible.
 7    A.  Yes, why not.
 8    Q.  And is it possible that Gary
 9  Bosetti used excessive force, even taking all
10  the witness statements as true, at that point   11:16:31
11  in time is it possible in your mind that Gary
12  Bosetti used excessive force with that pool
13  cue?
14        MR. CONNOLLY:  Objection.
15        MR. NOVIKOFF:  Objection.       11:16:39
16    A.  That was the point of the
17  investigation, to get to the bottom of that.
18    Q.  And yet you didn't speak to a
19  single person and you didn't take a single
20  statement from anybody who actually witnessed   11:16:47
21  Mr. Bosetti use the pool cue; is that correct?
22        MR. NOVIKOFF:  Objection.
23        MR. CONNOLLY:  Objection.
24    A.  Their statements are their
25  statements.                          11:16:54
```

Page 853

```
 1              Hesse
 2    Q.  That is not the question.  The
 3  question was at the time that you reached your
 4  conclusion you had not taken a single
 5  statement from a witness who told you that   11:17:00
 6  they actually witnessed Mr. Bosetti use the
 7  pool cue?
 8        MR. NOVIKOFF:  Objection.
 9        MR. CONNOLLY:  Objection.
10    A.  I didn't have to take statements,   11:17:07
11  there were three of them there.
12        MR. CONNOLLY:  Simple yes or no
13    though.
14    A.  I did not, no.
15    Q.  Do you know whether Mr. Cherry   11:17:14
16  took any statements from any individual who
17  witnessed Mr. Bosetti use the pool cue?
18    A.  No.
19    Q.  You don't know or he didn't?
20    A.  I believe it is no.          11:17:23
21        MR. CONNOLLY:  Why don't you break
22    down the question.
23    Q.  Did Mr. Cherry --
24        MR. CONNOLLY:  And by the way I
25    believe he has been asked this.      11:17:34
```

Page 854

```
 1              Hesse
 2    Q.  Did Mr. Cherry take any statements
 3  from any eyewitness who actually saw Gary
 4  Bosetti use a pool cue to strike somebody?
 5        MR. NOVIKOFF:  Objection.      11:17:43
 6        MR. CONNOLLY:  Objection.
 7    A.  No.
 8    Q.  I believe you testified that you
 9  heard some rumors that the plaintiffs thought
10  that there was a cover-up.  Do you recall   11:18:12
11  testifying to that?
12    A.  Yes.
13    Q.  What rumors did you hear?
14    A.  That there was a cover-up.
15    Q.  Who did you hear the rumors from?  11:18:21
16    A.  I don't recall.
17    Q.  When did you hear the rumors?
18    A.  I don't recall that either.
19    Q.  Do you recall what year it was?
20    A.  It was probably in 2004.       11:18:29
21    Q.  Do you recall what the rumors
22  were?
23        MR. CONNOLLY:  Objection.
24    A.  Not specifically, no.
25    Q.  How about generally?          11:18:38
```

13 (Pages 851 to 854)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 855

Hesse

1
2       A.   Generally that we were covering up
3   to save Gary Bosetti.
4       Q.   And do you recall any of the
5   plaintiffs in which you heard the rumor that    11:18:51
6   were -- strike that.
7           As part of these rumors do you
8   recall any of the plaintiffs who were alleging
9   that you were covering up the Halloween
10  incident to save Gary Bosetti?              11:19:09
11          MR. NOVIKOFF:  Objection.
12          MR. CONNOLLY:  Objection.
13      A.   You are going to have to rephrase
14  that or something.
15      Q.   Which plaintiffs were the ones    11:19:16
16  that you heard rumors about that were alleging
17  there to be a cover-up?
18          MR. CONNOLLY:  Objection.
19          MR. NOVIKOFF:  Objection.
20          MR. CONNOLLY:  There has not been  11:19:27
21  any testimony in that regard.
22          MR. GOODSTADT:  I think I led off
23  the question by saying rumors --
24          MR. CONNOLLY:  I think you made a
25  generalization that there were rumors, I  11:19:35

Page 856

Hesse

1
2   don't think you specifically said --
3       Q.   Did you hear a rumor that the
4   plaintiffs were claiming that there was an
5   allegation of cover-up?              11:19:42
6       A.   I heard rumors, yes.  I don't
7   recall specifically coming from them, but you
8   know I could speculate and say yes, but I
9   don't know.
10      Q.   I am not saying that you actually  11:19:53
11  heard the rumors from them.  I am talking
12  about whether you heard rumors that it was the
13  plaintiffs who were the ones that were stating
14  that there was a cover-up?
15      A.   I believe so.          11:20:03
16      Q.   Which plaintiffs?
17      A.   I don't know.
18      Q.   Do you recall any of the
19  plaintiffs that you heard were claiming that
20  there was a cover-up to save Gary Bosetti?   11:20:10
21      A.   I believe I did state in one of
22  the other three days that I was here that
23  Kevin Lamm had mentioned something about
24  sweeping this under the carpet, or another
25  situation of sweeping this under the carpet.  11:20:21

Page 857

Hesse

1
2   And what he meant by that I don't know.
3       Q.   But that is something that he said
4   to you directly; correct?
5       A.   You know, yes.          11:20:28
6       Q.   I am talking now about the rumors,
7   I am not talking about someone made the
8   allegation to you directly.  You testified to
9   rumors.  I want to know what rumors you are
10  referring to?                  11:20:36
11          MR. NOVIKOFF:  Objection.
12          MR. CONNOLLY:  Objection.
13      A.   They were just rumors just like
14  any other rumor, how do they get around.  Word
15  of mouth.  I don't know.          11:20:43
16      Q.   Who did you hear the rumors from?
17      A.   I don't recall.
18          MR. CONNOLLY:  Objection.  He
19  indicated he doesn't know.
20      Q.   Did you respond to the rumors?   11:20:50
21      A.   Not that I recall.
22      Q.   Did you ever speak with any of the
23  plaintiffs about these rumors?
24      A.   Not specifically, no.
25      Q.   Did you ever speak with -- strike  11:20:59

Page 858

Hesse

1
2   that.
3           Did you ever speak to them
4   generally about the fact that there was an
5   allegation of a cover-up, other than for the   11:21:04
6   conversation you had with Lamm about sweeping
7   under the rug?
8           MR. NOVIKOFF:  Objection.
9       A.   No.
10      Q.   How come; why didn't you address   11:21:12
11  it with them when you heard these rumors?
12          MR. CONNOLLY:  Objection.
13          MR. NOVIKOFF:  Objection.
14      A.   Well because I heard the rumors I
15  did speak to them individually, but not about  11:21:21
16  the rumors.  Like I stated I think the last
17  time I was here that I sat down with each one
18  of them with the actual file for the whole
19  Halloween incident and I said read it, you
20  tell me what you see here.          11:21:35
21          Kevin Lamm like I said refused to
22  read it.  Fiorillo read through it and he
23  thought it was good at the time.  And Snyder
24  said that wow, I didn't know that, I didn't
25  know that, I didn't know that.  And he read   11:21:50

14  (Pages 855 to 858)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 859

Hesse

1
2   through it and he thought it was good.
3        MR. GOODSTADT:  I think we have an
4   agreement that I don't have to move to
5   strike at this time?            11:21:59
6        MR. NOVIKOFF:  No, not at all.
7   **Q.   I will re-ask the question.**
8        **The question is why didn't you**
9   **raise the rumors that you heard with the**
10  **plaintiffs?                    11:22:06**
11       A.   I didn't see there was a point.
12  **Q.   Did you ever speak with Gary**
13  **Bosetti about the rumors?**
14       A.   Not specifically, no.
15  **Q.   How about generally did you ever   11:22:15**
16  **speak with him about the rumors?**
17       A.   I think there was some complaints
18  on his behalf that he felt that, you know,
19  that these guys were bad mouthing him saying
20  that there were cover-ups.  And I did tell     11:22:29
21  Gary that, you know, I didn't believe his
22  allegation that they were trying to hurt him
23  or anything else.  I just investigated what I
24  had.  Took what I had.  Presented it to the DA
25  and that was it.                 11:22:42

Page 860

Hesse

1
2   **Q.   So Gary Bosetti made an allegation**
3   **that he thought that the plaintiffs were**
4   **trying to hurt him?**
5        A.   Yes.                   11:22:49
6   **Q.   Did you ever speak to Richie**
7   **Bosetti about the allegations of a cover-up or**
8   **the rumors of a cover-up?**
9        A.   No.
10       MR. NOVIKOFF:  Objection.   11:23:01
11  **Q.   When did Gary Bosetti claim to you**
12  **or complain to you that the plaintiffs were**
13  **trying to hurt him?**
14       A.   Specifically I don't remember.
15  **Q.   Do you recall what year it was?   11:23:16**
16       A.   It was probably at the end of 2004
17  at some point.
18  **Q.   Did you ever discuss the rumors of**
19  **a cover-up after you heard them with anybody?**
20       A.   I had spoken to Chief Paradiso     11:23:30
21  about the whole incident.
22  **Q.   Tell me when was that?**
23       A.   Specifically I don't have a date,
24  but it was right after I guess these rumors
25  had begun that I sat him down and had a little  11:23:50

Page 861

Hesse

1
2   chat with him about it.
3   **Q.   Tell me what you recall being**
4   **stated during that chat?**
5        A.   I told him what I guess both sides  11:24:01
6   were feeling, Gary and Richie, and then three
7   of the plaintiffs, Fiorillo, Lamm and Snyder
8   specifically.  And I thought it would be a
9   good idea that we get the group together and
10  we hash it out.  He refused to do so, he chose  11:24:16
11  not to do it.
12  **Q.   The chief chose not to do it?**
13       A.   Correct.
14  **Q.   Did he tell you why?**
15       A.   No.              11:24:25
16  **Q.   You testified about the District**
17  **Attorney's involvement in the Halloween**
18  **incident, do you recall that?**
19       A.   Yes.
20  **Q.   You testified that Mallory        11:24:38**
21  **Sullivan reviewed it, do you recall that?**
22       A.   Yes.
23  **Q.   Did anyone in the DA's office**
24  **conduct an independent investigation to your**
25  **knowledge?                     11:24:54**

Page 862

**Hesse**

1
2        MR. NOVIKOFF:  Objection.
3        MR. CONNOLLY:  Objection.
4        A.   To my knowledge no.  I don't know.
5   **Q.   And Mallory Sullivan is an        11:24:56**
6   **attorney in the DA's office?**
7        A.   Yes, she was a prosecutor.
8   **Q.   Do you know whether any of the**
9   **DA's investigators were involved in the**
10  **Halloween incident?                 11:25:07**
11       A.   Not that I am aware of.
12  **Q.   Did you ever speak with any DA**
13  **investigator with respect to the Halloween**
14  **incident?**
15       A.   I did not.            11:25:13
16  **Q.   Did you ever speak with any of the**
17  **DA's investigators with respect to your**
18  **investigation of the Halloween incident?**
19       A.   I did not.
20  **Q.   Then you testified that Van Koot   11:25:25**
21  **and Schalik's attorneys received discovery, do**
22  **you recall that?**
23       MR. NOVIKOFF:  Objection.
24       A.   Yes.
25  **Q.   What did they receive?          11:25:35**

15 (Pages 859 to 862)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 863

Hesse

1
2      MR. CONNOLLY: Objection.
3      A.  I wouldn't know.  I think the
4  court would have responded to that.
5      Q.  So you don't know?          11:25:44
6      A.  I don't know.
7      Q.  How do you know that they actually
8  received discovery?
9      A.  I think we had a discovery demand,
10  but specifically I don't know.          11:25:53
11      Q.  You were involved with responding
12  to the demand?
13      A.  You know I don't recall.
14      Q.  Then you testified that you were
15  upset that Fiorillo and Lamm went to Judge     11:26:13
16  Russell with respect to the station house bail
17  issue, do you recall that?
18      A.  Yes.
19      Q.  Why were you upset that they went
20  to Judge Russell?          11:26:23
21      A.  They went outside the confines of
22  the Police Department to get information about
23  Police Department procedures.
24      Q.  So outside of the chain of
25  command?          11:26:32

Page 864

Hesse

1
2      A.  Absolutely.
3      Q.  Do you recall when that incident
4  was?
5      A.  Specifically no.          11:26:34
6      Q.  Do you recall what year it was?
7      A.  May have been 2005.
8      Q.  Do you recall when in 2005?
9      A.  No.
10      Q.  Did you discipline them for going   11:26:48
11  outside the chain of command?
12      A.  I talked to them.
13      MR. CONNOLLY: Objection.
14      Q.  Did you memorialize your talk with
15  them or any other discipline?          11:26:58
16      A.  No.
17      Q.  You testified that they had done
18  it again after you spoke with them; is that
19  correct?
20      A.  Yes.          11:27:05
21      Q.  Did you discipline them for doing
22  that?
23      MR. CONNOLLY: Objection.
24      A.  I counseled them, I had a talk
25  with them.          11:27:10

Page 865

Hesse

1
2      Q.  Did you write them up at all?
3      A.  No.
4      Q.  Did you tell anybody else that
5  they had violated your instruction with     11:27:14
6  respect to the station house bail?
7      A.  I don't recall if I did.
8      Q.  Do you recall what year it was
9  that they allegedly disobeyed your order?
10      MR. CONNOLLY: Objection.          11:27:26
11      A.  I believe it was in a short
12  timeframe, so it would have been close to when
13  they did it the first time.
14      Q.  2005?
15      A.  Yes.          11:27:34
16      Q.  Was that during the season or
17  off-season?
18      A.  It would be during the season.
19      Q.  Did you ever speak with Judge
20  Russell about the station house bail issue?   11:27:42
21      A.  I don't believe so.
22      Q.  Did you ever speak with any member
23  of the board of trustees about the station
24  house bail issue?
25      A.  No.          11:27:52

Page 866

Hesse

1
2      Q.  Did you ever speak with the mayor
3  about the station house bail issue?
4      A.  No.
5      Q.  The mayor at the time was     11:27:56
6  Ms. Rogers?
7      A.  Yes.
8      Q.  You testified last time in
9  response to Mr. Novikoff's questions about
10  instructing officers to drive other off-duty   11:28:12
11  officers at the end of their shift, do you
12  recall that?
13      A.  Yes.
14      Q.  Did you ever instruct any officers
15  to drive off-duty officers out to the     11:28:23
16  checkpoint when it was not the end of their
17  shift?
18      MR. NOVIKOFF: Objection, form,
19      and I think we actually covered this
20      through your -- in your original direct   11:28:33
21      examination.
22      MR. GOODSTADT: Right, but I was
23      not sure what his response meant to your
24      question about yes, I instructed them to
25      do it at the end of their shift.     11:28:45

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 867

```
 1              Hesse
 2         MR. NOVIKOFF:  What is confusing
 3   about that response?
 4      Q.   Was it as their shift ended or was
 5   it at some point later than that in which you   11:28:53
 6   instructed the officers to drive the off-duty
 7   officers to the checkpoint?
 8         MR. NOVIKOFF:  Objection.
 9         MR. CONNOLLY:  A point later
10   meaning --                    11:29:06
11         MR. GOODSTADT:  A couple of hours
12   later.
13         MR. CONNOLLY:  When they were off
14   duty?
15         MR. GOODSTADT:  Yes.          11:29:13
16         MR. CONNOLLY:  So instructing
17   off-duty officers --
18         MR. GOODSTADT:  Instructing
19   on-duty officers to drive off-duty
20   officers to the checkpoint.      11:29:17
21         MR. CONNOLLY:  Meaning making
22   reference to several hours later after
23   the officers who were driven got off the
24   shift?
25         MR. GOODSTADT:  The off-duty    11:29:26
```

Page 868

```
 1              Hesse
 2   officers, yes, several hours after their
 3   becoming off duty.
 4         MR. CONNOLLY:  I understand the
 5   question now.                  11:29:34
 6      Q.   Because the testimony that I read
 7   and I understood from last time was that
 8   Mr. Hesse had instructed on-duty officers to
 9   drive off-duty officers to the checkpoint at
10   the end of their shift, do you recall that?   11:29:47
11      A.   Yes.
12      Q.   Did you ever instruct on-duty
13   officers to drive off-duty officers to the
14   checkpoint when it was not at the end of the
15   off-duty officer's shift?          11:29:56
16      A.   Sometimes, yes.
17      Q.   Was it -- did you ever instruct
18   any on-duty officers to drive off-duty
19   officers to the checkpoint after they got out
20   of the bars in Ocean Beach?        11:30:08
21         MR. NOVIKOFF:  Objection to the
22   form.
23         MR. CONNOLLY:  Objection.
24      A.   I may have.
25      Q.   Did any of the plaintiffs ever    11:30:13
```

Page 869

```
 1              Hesse
 2   complain to you about doing that?
 3      A.   Never.
 4      Q.   Do you believe it was appropriate
 5   for the on-duty officers to drive off-duty   11:30:21
 6   officers to the checkpoint after they got out
 7   of the bars?
 8         MR. NOVIKOFF:  Objection.
 9         MR. CONNOLLY:  Objection.
10      A.   Yes.                 11:30:28
11      Q.   How many officers were on duty
12   generally on the weekends between 2 in the
13   morning and 6 in the morning?
14         MR. CONNOLLY:  What years?
15      Q.   Between 2003 and 2005; the seasons   11:30:48
16   of '03 to '05?
17      A.   They would not change much between
18   the years.  There could be -- well, between 2
19   and 4 normally there would be close to eight
20   officers, and usually minimum staffing we      11:31:02
21   would have four to five officers between those
22   time frames.
23      Q.   How about between 4 and 6 in the
24   morning?
25      A.   4 and 6 in the morning, usually a   11:31:17
```

Page 870

```
 1              Hesse
 2   tour would end at 4 o'clock and two or three
 3   officers would go off duty.  And then from the
 4   midnight to 8 shift there would generally be
 5   three, sometimes four officers on duty.       11:31:28
 6      Q.   I believe you testified that you
 7   had learned that they intended to make you
 8   acting chief or acting deputy chief in late
 9   December of 2005, do you recall that?
10      A.   Yes, I believe so.        11:31:57
11      Q.   How did you learn of the board of
12   trustees intent?
13      A.   I believe Joe Loeffler came to
14   talk to me about it.
15      Q.   Do you recall what he stated?     11:32:07
16      A.   Specifically, no.
17      Q.   Do you recall generally what he
18   stated?
19      A.   He believed that because of the
20   absence of Ed Paradiso as the chief that the   11:32:15
21   Police Department needs to move forward and it
22   has to be somebody that can make the decisions
23   for the Police Department, so therefore they
24   were going to promote me to this deputy chief.
25      Q.   At that point in time do you know   11:32:30
```

Page 871

Hesse

1
2  whether Mr. Loeffler had known that you had
3  not passed your sergeant's test?
4          MR. CONNOLLY:  Objection.
5      A.   Yes.                    11:32:38
6      Q.   He knew that?
7      A.   Yes.
8      Q.   Did you speak to him about that at
9  that time?
10      A.   I don't remember specifically    11:32:43
11  about that time, but I have spoken to him
12  about it.
13      Q.   How about prior to the decision by
14  the board of trustees to promote you to deputy
15  chief or acting deputy chief, had you spoken   11:32:52
16  with Mr. Loeffler or anybody else on the board
17  of trustees about the fact that you had not
18  passed the sergeant's exam?
19          MR. CONNOLLY:  Objection.
20      A.   I may have talked to Joe Loeffler   11:33:02
21  about it previous.  I don't know about anybody
22  else on the board.
23      Q.   Do you recall the sum and
24  substance of any of those conversations?
25      A.   No, not specifically.  No.     11:33:12

Page 872

Hesse

1
2      Q.   How about generally?
3      A.   No, not really.
4      Q.   And you are sure that was late
5  December that you learned of the board's    11:33:24
6  intent to promote you that next January?
7          MR. CONNOLLY:  Objection.
8      A.   I believe so.
9      Q.   You testified about I think you
10  called it Officer Fiorillo's or Officer Lamm's  11:33:39
11  discretion in writing summonses, do you recall
12  that?
13      A.   Uh-hum.
14      Q.   And you mentioned something about,
15  I think your quote was silly laws regarding   11:33:49
16  bike riding in the village, do you recall
17  that?
18      A.   Yes.
19      Q.   Did you ever petition the board to
20  change the law with respect to bike riding?   11:33:57
21      A.   Actually I never petitioned it,
22  but they have changed the laws a little bit
23  here and there.  They augmented them.
24      Q.   When did they change the laws with
25  respect to bike riding?              11:34:06

Page 873

Hesse

1
2      A.   Specifically I don't remember the
3  year, but we used to go through the whole
4  summer with absolutely no bike riding any time
5  day or night.  Now they changed it to where   11:34:15
6  you can ride between certain times and certain
7  days.
8      Q.   Do you recall when they made that
9  change?
10      A.   Not specifically, no.       11:34:23
11      Q.   Was it before or after the
12  plaintiffs were terminated?
13          MR. CONNOLLY:  Objection.
14      A.   I believe it was before.
15          MR. NOVIKOFF:  Same agreement on   11:34:32
16  use of the word?
17          MR. GOODSTADT:  Yes.
18          MR. NOVIKOFF:  Got it.
19      Q.   I believe you testified last time
20  about Kevin Lamm conducting an illegal search  11:34:46
21  and seizure, do you recall that?
22          MR. CONNOLLY:  Objection.  Last
23  time when --
24      Q.   In response to Mr. Novikoff's
25  questions?                        11:35:01

Page 874

Hesse

1
2      A.   Specifically no, I don't recall.
3      Q.   Do you recall Kevin Lamm ever
4  conducting an illegal search and seizure?
5      A.   Yes.  Are we talking about when he  11:35:11
6  put some guys in handcuffs or are we talking
7  about when he went into CJ's; you got to give
8  me a little more specific.
9      Q.   Well I am asking do you believe
10  that Mr. Lamm ever conducted an illegal search  11:35:24
11  and seizure?
12      A.   Yes.
13      Q.   How many times?
14      A.   I don't know.  A couple of
15  incidents off the top of my head, maybe three  11:35:29
16  or four times that I know of.
17      Q.   Did you ever discipline him for
18  doing that?
19      A.   Yes.
20      Q.   How did you discipline him?       11:35:38
21      A.   Verbally.
22      Q.   Did you ever do anything in
23  writing?
24      A.   No.
25      Q.   How many times did you discipline  11:35:42

18 (Pages 871 to 874)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 875

Hesse

1   Hesse
2   him verbally?
3       A.   Off the top of my head maybe
4   twice.
5       Q.   What was his response?          11:35:49
6       A.   He said he will never do it again.
7       Q.   Did you ever investigate whether
8   he actually committed an illegal search and
9   seizure?
10          MR. NOVIKOFF:  Objection.         11:36:05
11      A.   One of them the complaint was
12  actually made by Tommy Snyder verbally to me,
13  and the other one I witnessed myself.
14      Q.   How come you never wrote him up
15  for the illegal search and seizure?          11:36:19
16          MR. NOVIKOFF:  Objection.
17      A.   He was counseled verbally.  I
18  didn't need to put it in writing.
19      Q.   Why not?
20          MR. CONNOLLY:  Objection.          11:36:30
21      A.   I didn't believe I had to.
22      Q.   Did you ever tell Chief Paradiso
23  that Kevin Lamm performed an illegal search
24  and seizure?
25      A.   I don't specifically remember if I  11:36:35

Page 876

Hesse

1   Hesse
2   did or not.
3       Q.   Did any civilian ever complain
4   that Mr. Lamm engaged in an illegal search and
5   seizure?                 11:36:43
6       A.   Yes.
7       Q.   In writing?
8       A.   He chose not to.
9       Q.   Who was that?
10      A.   His first name was Caleb.  I don't  11:36:46
11  know what his last name is.
12      Q.   So how did you learn that Caleb
13  was claiming that there was an illegal search
14  and seizure?
15      A.   After Tommy Snyder had told me      11:37:00
16  what was going on in reference to CJ's Bar, I
17  believe Caleb came to see me in the days
18  preceding Tommy telling me.  So I asked him
19  what happened, and he told me what happened.
20      Q.   Is Caleb an owner or an employee   11:37:17
21  of CJ's?
22      A.   He was a bartender for a year or
23  two.
24      Q.   Did you -- strike that.
25          Caleb came to see you about the     11:37:27

Page 877

Hesse

1   Hesse
2   issue?
3       A.   Yes.
4       Q.   At the police station?
5       A.   It might have been out front.    11:37:31
6       Q.   Did you make a blotter entry?
7       A.   No.
8       Q.   How come?
9       A.   I asked him if he wanted to put it
10  in writing and he chose not to.  So he just    11:37:40
11  wanted to let me know what was going on.
12      Q.   Does a complaint or an allegation
13  have to be in writing to make any -- for you
14  to put in a blotter entry?
15          MR. CONNOLLY:  Objection.          11:37:54
16          MR. NOVIKOFF:  Objection.
17      A.   I would prefer, yes.
18      Q.   That wasn't the question.  The
19  question was does a complaint or allegation
20  have to be in writing to lead you to the      11:38:00
21  decision to make a blotter entry?
22      A.   Back then we didn't make many
23  blotter when it came to stuff like that.  We
24  didn't make blotter entries for complainants
25  coming in to make a complaint against the      11:38:12

Page 878

Hesse

1   Hesse
2   Police Department or a police officer.
3       Q.   Have you ever discussed with
4   Paradiso your allegation that Mr. Lamm engaged
5   in an unlawful search or seizure?         11:38:21
6           MR. NOVIKOFF:  Objection.
7           MR. CONNOLLY:  Objection.
8       A.   I don't recall.
9       Q.   I think you testified about
10  Mr. Carter allegedly sleeping while on duty,   11:38:36
11  do you recall that?
12      A.   Yes.
13      Q.   Did you ever tell Chief Paradiso
14  that Ed Carter was sleeping on data?
15      A.   I don't recall if I did or not.    11:38:44
16      Q.   Did you ever anyone on the board
17  of trustees that Ed Carter was sleeping on
18  duty?
19          MR. NOVIKOFF:  Objection.
20      A.   No.                 11:38:52
21      Q.   Did you ever write him up for
22  sleeping on duty?
23      A.   No.
24      Q.   So let me understand.  Mr. Carter
25  was sleeping while he was being paid as a      11:38:59

19 (Pages 875 to 878)

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 879

Hesse

1    police officer; is that correct?
2
3        A.   That is correct.
4        Q.   Do you consider that stealing time
5    from the department or from the village?   11:39:06
6        MR. CONNOLLY:  Objection.
7        A.   You could look at it that way,
8    yes.
9        Q.   I am asking whether you looked at
10   it that way?                              11:39:13
11       A.   I didn't at the time, no.
12       Q.   You didn't look at it as he was
13   stealing time while he was sleeping?
14       A.   No.
15       Q.   Did you view it as he was stealing  11:39:20
16   money while being paid for sleeping?
17       MR. NOVIKOFF:  Objection.  Isn't
18   this beyond --
19       MR. GOODSTADT:  It is an
20   allegation as to why he was terminated.   11:39:34
21       MR. NOVIKOFF:  Putting aside the
22   fact that you had ten hours, and I can't
23   speak for Kevin, but I think this is
24   improper.  Isn't this beyond the scope of
25   any questions that I asked?               11:39:44

Page 880

Hesse

1
2        MR. GOODSTADT:  I don't think so.
3        MR. NOVIKOFF:  If I went into the
4    issue of why he was terminated --
5        MR. GOODSTADT:  Which you did.   11:39:52
6        MR. NOVIKOFF:  Okay, you can ask
7    him about those reasons.
8        MR. GOODSTADT:  I am.
9        MR. NOVIKOFF:  But now you are
10   going into questions about why he didn't   11:39:59
11   report certain things to certain people.
12       MR. GOODSTADT:  I didn't think --
13   I believe the reasons are not true, so I
14   can question him about it.
15       MR. NOVIKOFF:  Okay.              11:40:10
16       MR. GOODSTADT:  Just as I can
17   question him at trial about it if it is
18   raised.  Go back to the last question.
19       (Record read.)
20       MR. CONNOLLY:  Objection.         11:40:41
21       A.   I never looked at it that way, no.
22       Q.   Just to go back to the DA's
23   investigation of the Halloween incident, did
24   the DA -- strike that.
25       Before we get to the DA's           11:41:05

Page 881

Hesse

1    involvement in Halloween, you also mentioned
2    that the judge had to sign off on your
3    investigation before the arrests were made; is
4    that correct?                             11:41:19
5
6        MR. CONNOLLY:  Objection.
7        A.   I don't specifically think that
8    the judge has to sign off on an investigation.
9    No, I don't remember saying that.
10       Q.   Did the judge have to sign off     11:41:25
11   before an arrest is made?
12       A.   No.  I think you are
13   mis-understanding what the judge signed off
14   on.
15       Q.   What did the judge sign off on?    11:41:34
16       A.   The criminal summonses to be sent
17   to the alleged defendants.
18       Q.   And the judge signed off on the
19   criminal summonses that were sent to
20   Mr. Schalik and Mr. Van Koot?             11:41:49
21       A.   I believe so.  That is a court
22   document, it is done with the court.
23       Q.   Was that same process of the court
24   signing off on the summons performed in the
25   Sam Gilbert matter when he was arrested?   11:42:01

Page 882

Hesse

1
2        MR. CONNOLLY:  Objection.
3        A.   Correct, yes.
4        Q.   How about the DA's involvement
5    that you testified to with respect to the     11:42:12
6    Halloween incident, did the DA have a similar
7    involvement with respect to the Sam Gilbert
8    matter?
9        MR. CONNOLLY:  Objection.
10       A.   Yes.                              11:42:18
11       Q.   Has the judge ever -- strike that.
12       Has the judge in Ocean Beach ever
13   refused to sign a criminal summons that you
14   brought to the judge to sign?
15       A.   Not that I am aware of, no, never.  11:42:34
16       MR. CONNOLLY:  Objection.
17       Q.   I just want to go back again to a
18   statement that you made with respect to Mr.
19   Fiorillo's investigation of the Halloween
20   incident.  I believe in response to one of    11:42:53
21   Mr. Novikoff's questions you testified that it
22   was a poorly done investigation because he was
23   not aggressive enough to go back into the bar
24   to get statements, do you recall that?
25       A.   Not specifically, but yes.   11:43:07

20  (Pages 879 to 882)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 883

Hesse

1
2    Q.   But you believe that he was not
3  aggressive enough to go back into the bar to
4  get statements?
5    A.   I think that he could have been a   11:43:16
6  little more aggressive at speaking to people,
7  yes.
8    Q.   Do you believe that the on-duty
9  officers that didn't get statements from other
10  people because they were not aggressive      11:43:23
11  enough?
12    MR. CONNOLLY:  Objection.
13    A.   Yes.
14    MR. GOODSTADT:  Would you mark
15  this document, blog posting, Bates      11:43:43
16  numbers P 962 to P 1265, Hesse Exhibit
17  30.
18    (Hesse Exhibit 30, blog posting, P
19    962 to P 1265, marked for
20    identification, as of this date.)      11:44:40
21    Q.   I placed in front of Mr. Hesse
22  what has now been marked as Hesse Exhibit 30,
23  multiple page exhibit bearing Bates number P
24  962 to P 1265.
25    MR. CONNOLLY:  I have 64.      11:45:03

Page 884

Hesse

1
2    MR. GOODSTADT:  It goes to the
3  back of that page.
4    Q.   Could you turn to page P 970, post
5  number 22.  Are you there?      11:45:29
6    A.   Yes.
7    Q.   Why don't you take a second to
8  read that post?
9    MR. CONNOLLY:  I am objecting to
10  any questioning regarding the postings.   11:45:51
11  You need to explain as to how they were
12  delved into on questioning by the village
13  attorney or the county attorney.  It is
14  beyond the scope of redirect.
15    MR. GOODSTADT:  First of all with   11:46:07
16  respect to this post he has testified in
17  response to questions by the beach's
18  attorney that he believed that the
19  officers didn't go inside to get -- or
20  didn't appropriately go inside to get   11:46:21
21  witness statements because they were not
22  aggressive enough.
23    This post clearly indicates that
24  do you ever wonder why no one would talk
25  to you -- did you ever notice why no one   11:46:36

Page 885

Hesse

1
2  would talk to you guys during your shitty
3  investigation.  Everyone hates you.
4  Everyone knew that you were a rat.
5    I think that that is exactly in     11:46:46
6  response to, or at least contradicts what
7  he has testified to in response to
8  Mr. Novikoff.
9    MR. NOVIKOFF:  So obviously
10  Mr. Hesse has properly identified that he   11:47:00
11  was the author of the blog presumably
12  based upon the interrogatory.  His
13  testimony is what it is.  His blog says
14  what it says.  I am trying -- I am now
15  trying to figure out the purpose of going   11:47:12
16  through the blog.
17    MR. CONNOLLY:  It is duplicative.
18    MR. GOODSTADT:  It is not
19  duplicative.  It contradicts his
20  testimony.  That is exactly what redirect   11:47:27
21  is for.
22    MR. NOVIKOFF:  Me and Mr. Connolly
23  have different beliefs apparently as to
24  your ten hours and what it was for.  So I
25  can't tell Mr. Hesse not to answer the   11:47:40

Page 886

Hesse

1
2  question.
3    MR. CONNOLLY:  I think it is --
4    MR. GOODSTADT:  Also another basis
5  is that he testified that in response to   11:47:46
6  his threats that my clients would never
7  get another job in law enforcement, that
8  he never took any steps to prevent them
9  from getting another job in law
10  enforcement, and I think that statements   11:48:01
11  on a blog where a community in law
12  enforcement is reading it is a step.
13    MR. NOVIKOFF:  Well on that note,
14  Andrew, I think it would be, putting
15  aside the ten hours, we get past that      11:48:10
16  issue, I think the question would be
17  appropriate that you would ask him since
18  he has admitted writing certain things on
19  the blog, in sum and substance do you
20  agree with the proposition that writing   11:48:24
21  something on the blog that was not nice
22  to your clients would be harmful to their
23  getting jobs in the future; that is a
24  very general question which would be
25  responsive to that statement.      11:48:34

21 (Pages 883 to 886)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 887

Hesse

1
2     And I think there could be posed
3  other general questions that would be
4  responsive as opposed to going into
5  certain blogs and each and every blog and  11:48:41
6  going through it.  That is my position,
7  but it is Kevin's witness, so...
8        MR. GOODSTADT:  But in that case,
9  and I don't know what the answer to that
10  question --                    11:48:55
11       MR. NOVIKOFF:  The answer would be
12  what it is and you would go from there.
13       MR. GOODSTADT:  But assuming he
14  says that posting something negative or
15  calling a police officer a rat and  11:49:02
16  telling them that they did a shitty
17  investigation in a forum in which other
18  people in the police community would be
19  reading it may affect their ability to
20  get another job, and I want to be able to  11:49:15
21  ask which ones he thinks would affect
22  their ability to get another job.
23       MR. CONNOLLY:  I will allow
24  general questions, general questions.  We
25  are not going through the blogs piece by  11:49:41

Page 888

Hesse

1
2  piece.
3        MR. GOODSTADT:  I don't see why
4  not, I mean the door is open.
5        MR. CONNOLLY:  I disagree with    11:49:41
6  that.  I disagree that -- I still have
7  problems with the fact that you believe
8  the door was opened, I don't think it
9  was.
10       MR. GOODSTADT:  I want to ask    11:49:54
11  questions and see how open the door is.
12       MR. NOVIKOFF:  I don't know if a
13  codefendant asks the question of another
14  party, how that opens the door, presuming
15  that is even appropriate in a deposition,  11:50:10
16  to you asking questions of that witness.
17  I can see if Mr. Connolly asked Mr. Hesse
18  some questions that opened the door, but
19  merely because I asked questions, Hesse
20  is not my witness.            11:50:23
21       I object to the fact that anything
22  beyond ten hours is being used.  I think
23  the Judge Boyle was specific, he asked
24  ten hours.  If Mr. Goodstadt wants to
25  reserve some time to engage in redirect  11:50:35

Page 889

Hesse

1
2  examination he certainly could have.
3        MR. GOODSTADT:  That is just not
4  true.
5        MR. NOVIKOFF:  I am just        11:50:44
6  objecting.  I can't tell you not to do
7  anything.
8        MR. GOODSTADT:  We had these
9  discussions off the record about the
10  positions on that.  That is not true.    11:50:52
11       MR. NOVIKOFF:  Judge Boyle has
12  issued whatever he has issued in terms of
13  the amount of the deposition.  Mr.
14  Goodstadt has taken those ten hours.  My
15  position is that is all he was entitled  11:51:05
16  to.  But Mr. Hesse is not my witness so I
17  can't, other than killing trees with my
18  speech, I can't do anything about it.
19       So it is between Kevin and Mr.
20  Goodstadt to decide what they want to do  11:51:21
21  with this, and that will be the last that
22  I speak on this issue.
23       MR. GOODSTADT:  Certainly this
24  question about directly contradicting
25  testimony that he has already given, you  11:51:38

Page 890

Hesse

1
2  can let me ask with respect to that, and
3  then when we get to the other questions
4  we can narrow them down.
5        MR. CONNOLLY:  And it is your    11:51:52
6  position that it contradicts what?
7        MR. GOODSTADT:  His testimony that
8  the reason why they didn't get other
9  statements was because they were not
10  aggressive enough.  Here it says nobody    11:52:30
11  wants to speak to you because everybody
12  hates you.
13       MR. CONNOLLY:  I don't think that
14  was his testimony.  I thought or I
15  believe his testimony was something to    11:52:41
16  the effect that he believes they were not
17  aggressive as they could have been in
18  getting statements.  But I don't see what
19  is contained in the blog as a
20  contradiction to that statement.    11:53:01
21       MR. GOODSTADT:  Because it says do
22  you ever wonder why no one would talk to
23  you guys during your shitty
24  investigation.  The next sentence doesn't
25  say because you were not aggressive    11:53:13

Page 891

Hesse

1  enough, it says everybody hates you.
2  Everyone knew that you were a rat.
3       That is why I think it contradicts
4  it.                           11:53:23
5       MR. CONNOLLY:  I don't think it
6  contradicts it.  If you want to ask him
7  if he ever said something that he thought
8  contradicted their not being possibly
9  aggressive enough in obtaining        11:53:41
10 statements.
11      MR. GOODSTADT:  I am not sure I
12 understand what you are suggesting.
13      MR. CONNOLLY:  You can ask him if
14 he -- I am not seeing the contradiction.  11:53:55
15      MR. GOODSTADT:  I believe it is a
16 contradiction.  Definitely obviously
17 relates to the same issue that was asked.
18 Asked by Mr. Novikoff, it was not asked
19 by me originally.                 11:54:21
20      MR. CONNOLLY:  What was the item
21 asked?
22      MR. GOODSTADT:  The question was
23 about his viewpoint on their
24 investigation, and he said they did not  11:54:27

Page 892

Hesse

1  do a good investigation, and he thought
2  that Frank Fiorillo was not aggressive
3  enough in obtaining witness statements.
4       Here he is asking did you ever    11:54:36
5  wonder why no one would talk to you guys.
6  It has nothing to do with doing their
7  investigation.  His response isn't
8  because you were not aggressive enough,
9  his response is everyone hates you.    11:54:50
10 Everyone knew that you were a rat.
11      MR. CONNOLLY:  But they are not
12 contradictory and not mutually exclusive.
13 I am not following.
14      MR. GOODSTADT:  I want to know    11:55:01
15 what he meant by that.
16      MR. CONNOLLY:  Well if it is not a
17 contradiction I feel you are not entitled
18 to ask it.
19      MR. GOODSTADT:  Well even if it is  11:55:08
20 not a contradiction, it opens the door.
21      Let's go off the record now.
22      THE VIDEOGRAPHER:  The time is
23 11:36, we are off the record.
24      (Recess taken.)              11:55:22

Page 893

Hesse

1       THE VIDEOGRAPHER:  The time is
2  12:26, we are on the record.
3       Q.   Mr. Hesse, at the last date of
4  deposition you testified in response to one of  12:25:15
5  Mr. Novikoff's questions that you had not done
6  or taken any steps in furtherance of your
7  threat that plaintiffs law enforcement careers
8  would be over, do you recall that testimony?
9       A.   Yes.                      12:25:29
10      Q.   You also I believe testified to
11 and subsequently submitted some response to
12 interrogatories regarding some blog posts you
13 made, do you recall that?
14      A.   Yes.                      12:25:41
15      Q.   You would agree with me, would
16 not, that the blog post that you admitted to
17 posting contained some derogatory statements
18 about the plaintiffs in this case?
19      MR. CONNOLLY:  Objection.  You can  12:25:55
20 answer.
21      A.   Yes.
22      Q.   Would you agree with me that
23 posting the derogatory statements that you
24 made about the plaintiffs in this case on the  12:26:07

Page 894

Hesse

1  blog given the form that it is in would
2  negatively impact their careers in law
3  enforcement?
4       MR. CONNOLLY:  Objection.        12:26:20
5       MR. NOVIKOFF:  Objection.
6       A.   No.
7       Q.   Why not?
8       MR. CONNOLLY:  Objection.
9       A.   Because to tell you the truth to  12:26:24
10 me this is a fantasy blog.  I have been
11 in law enforcement 16 years, I have never seen
12 this blog until somebody told me somebody
13 wrote something about me.  So why would
14 anybody read this garbage.            12:26:40
15      Q.   Well why would you post it if you
16 didn't intend people to read it?
17      A.   Maybe I was venting some
18 frustration.
19      Q.   Have you ever spoken with anybody  12:26:49
20 outside of Ocean Beach about the blog?
21      A.   No.
22      MR. CONNOLLY:  Note my objection.
23      A.   Actually yes, I am sorry.
24      Q.   Who have you spoken with?    12:27:04

23 (Pages 891 to 894)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 895

**Hesse**

1
2    A.   Somebody from the Fire Island
3 Ferry Company advised me that this blog was
4 there, and that I should read it.
5    Q.   Who from the Fire Island Ferry      12:27:13
6 Company?
7    A.   George Haffele, he was the vice
8 president of the Ferry Company at the time.
9 H-A-F-F-E-L-E, something like that.
10   Q.   Mr. Haffele is the vice president   12:27:29
11 of the Ferry Company.  Is that the ferry that
12 takes the people back and forth to Fire
13 Island?
14   A.   Yes.
15   Q.   Have you spoken to anybody else     12:27:43
16 outside of Fire Island other than Mr. Haffele
17 about the blog?
18   A.   No.
19   Q.   What was your intention in posting
20 the negative statements about the plaintiffs   12:27:55
21 in this matter?
22        MR. NOVIKOFF:  Objection.
23        MR. CONNOLLY:  Objection.
24   A.   Well, these were posts directed at
25 other posts, maybe just to upset them a little   12:28:04

Page 896

Hesse

1
2 bit.
3    Q.   What do you mean by that, by
4 either one, posts directed at other posts,
5 what did you mean by that?           12:28:14
6    A.   Well most of these posts are
7 directed at posts that were previously made.
8    Q.   What did you mean to upset them?
9    A.   The plaintiffs.
10   Q.   Would you agree with me that if    12:28:22
11 another chief or a person of seniority in
12 another police department were to read the
13 negative statements that you made about my
14 clients that it could affect their decision on
15 whether to hire one of my clients?        12:28:42
16        MR. NOVIKOFF:  Objection.
17        MR. CONNOLLY:  Objection.
18   A.   To think of what somebody else
19 might think; I couldn't speculate.
20   Q.   So you have no opinion one way or   12:28:50
21 the other?
22        MR. CONNOLLY:  Objection.
23   A.   No.
24   Q.   Who within the department have you
25 spoken with about the blogs?           12:29:10

Page 897

**Hesse**

1
2    A.   Specifically John Cherry and I
3 recently have spoken about it.
4    Q.   Anybody else?
5    A.   No, not really.          12:29:25
6    Q.   You said that it was in response
7 to other posts, do you recall that?
8    A.   Yes.
9    Q.   Do you have any evidence or
10 information that any posts in the blog was      12:29:35
11 posted by any of the plaintiffs in this
12 matter?
13        MR. CONNOLLY:  Other than the
14    contents of the blog; I am not quite sure
15    I understand the question.        12:29:48
16   Q.   Well any contents of the blog?
17   A.   Do I have prove?
18   Q.   Any evidence, information, proof
19 or the like that any of the plaintiffs posted
20 on the blog?                12:29:59
21   A.   I have no proof.
22   Q.   I don't want to be narrowly
23 tailored just to the word proof because I
24 think that that has a sort of legal term.  I
25 want to know if you have any evidence or other   12:30:12

Page 898

**Hesse**

1
2 information that would lead you to conclude
3 that the plaintiffs posted -- any of the
4 plaintiffs posted on the blog?
5    A.   Well the only one that I know for   12:30:21
6 sure is the one that Tommy Snyder wrote
7 because he identified himself.  Other than
8 that no.
9    Q.   I want to go back to some of the
10 statements that you made -- strike that.      12:30:47
11        When said, I believe you
12 called it a fantasy, is that what you called
13 the blog?
14   A.   Yes.
15   Q.   Who did you understand would be    12:30:58
16 reading the blog?
17        MR. CONNOLLY:  Objection.
18        MR. NOVIKOFF:  Objection.
19   A.   I don't know.  I could probably
20 speculate that members of the Ocean Beach      12:31:05
21 Police Department and the plaintiffs.
22   Q.   Anybody else?
23   A.   I don't know.
24   Q.   It is publicly available the blog;
25 is that correct?              12:31:15

24 (Pages 895 to 898)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 899

**Hesse**

1
2     A.   Sure.
3     Q.   Did you ever discuss the blog with
4  any residents of Ocean Beach?
5     A.   No.                        12:31:20
6     Q.   I just want to go back again to
7  some of the statements that you made in
8  response to Mr. Novikoff's questions about the
9  reasons why you selected the plaintiffs for
10 termination.                     12:31:39
11        I believe you testified that you
12 selected Nofi in part because he approached
13 people inappropriately?
14    A.   That was part of it, yes.
15    Q.   Did you ever write him up for      12:31:51
16 that?
17    A.   No.
18    Q.   Did you ever speak with Chief
19 Paradiso about that?
20    A.   I don't recall.              12:31:56
21    Q.   Did you ever suggest to Chief
22 Paradiso that Joe Nofi should be terminated
23 for the way he approached people?
24    A.   You know I don't recall.
25    Q.   Is there anything that you could   12:32:05

Page 900

**Hesse**

1
2  think of that would refresh your recollection?
3     A.   No.
4     Q.   Did you ever discipline Nofi for
5  doing that, for inappropriately approaching   12:32:16
6  people?
7     A.   Verbally.
8     Q.   How many times?
9     A.   I don't know.
10    Q.   Was anyone else present?         12:32:24
11    A.   Not that I am aware of, no.
12    Q.   Why didn't you write him up for
13 it?
14        MR. CONNOLLY:  Objection.
15    A.   I didn't think he needed to be     12:32:30
16 written up.
17    Q.   You didn't think it was to a level
18 that needed to be written up.
19        MR. CONNOLLY:  Objection.
20    A.   No.                        12:32:37
21    Q.   I believe that you said one of the
22 reasons why you selected Mr. Carter for
23 termination was that he was hidy tidy, do you
24 recall using that phrase?
25    A.   Hidy tidy; no, I don't remember   12:32:47

Page 901

**Hesse**

1
2  using that phrase.
3     Q.   Do you know what that phrase
4  means, hidy tidy?
5     A.   I have no idea.               12:32:59
6     Q.   Did you ever personally witness Ed
7  Carter sleeping?
8     A.   Yes.
9     Q.   While he was not on break and
10 being paid?                        12:33:07
11    A.   Yes.
12    Q.   How many times?
13    A.   Repeat that, on break or --
14    Q.   Not on break and being paid?
15    A.   And being paid, yes.          12:33:14
16    Q.   How many times?
17    A.   I don't recall how many times.
18    Q.   Did you ever discuss it with the
19 chief, meaning Chief Paradiso?
20    A.   I don't recall if I did or not.   12:33:23
21    Q.   Is there anything that you can
22 think of that would refresh your recollection?
23    A.   No.
24    Q.   Did you ever discuss it or address
25 this issue with any members of the board of   12:33:30

Page 902

**Hesse**

1
2  trustees of Ocean Beach?
3     A.   No.
4     Q.   Did you ever discuss it with the
5  mayor, either the current mayor or any former   12:33:36
6  mayor of Ocean Beach the issue that you saw Ed
7  Carter sleeping?
8     A.   No.
9     Q.   Did you dock Mr. Carter pay for
10 the time that he was allegedly sleeping on    12:33:46
11 duty?
12    A.   No.
13    Q.   I believe you testified that the
14 reason why you selected Snyder for termination
15 was, you mentioned something about personal    12:34:03
16 issues and that he got sick and he had some
17 money issues, and at the end of his employment
18 he was angry.  Do you recall saying that?
19    A.   Yes.
20    Q.   What did you mean by that?       12:34:14
21    A.   He was not getting along with
22 members of the Police Department.  There were
23 problems between them.  And just the general
24 notion of the public, just dealings with them.
25 His attitude was just not right or conducive   12:34:29

25  (Pages 899 to 902)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 903

Hesse

1
2   to the community that we worked for.
3       Q.   Did you ever receive any
4   complaints from any members of the public
5   about Mr. Snyder?                    12:34:39
6       A.   Yes.
7       Q.   How many times?
8       A.   I don't know, I don't recall.
9       Q.   Did you receive it in writing?
10      A.   No.                    12:34:43
11      Q.   Verbally?
12      A.   Yes.
13      Q.   Anybody else there when you
14  received complaints about Mr. Snyder verbally?
15      A.   I don't know.            12:34:49
16      Q.   Who complained about Mr. Snyder?
17      A.   I don't remember names.
18      Q.   When did you receive those
19  complaints?
20      A.   I guess towards the end of 2005   12:34:54
21  specifically.
22      Q.   Do you recall when in 2005?
23      A.   Maybe in the month of August.
24      Q.   What were the complaints?
25      A.   Just, you know, one guy in   12:35:05

Page 904

Hesse

1
2   particular he came up to me and said that --
3   he didn't know the officer's names, but he
4   described Snyder and Fiorillo specifically,
5   and he said, you know, I am walking down the   12:35:19
6   street and it was late, it was dark, and I
7   came around a bush, the two cops were standing
8   there. He said they, in his words, they
9   attacked him because they thought that he was
10  urinating in a bush.               12:35:37
11       Meanwhile he was just walking
12  around the corner and that they rousted him,
13  they threw him in the bushes. I don't even
14  remember his name, but I asked him do you want
15  to put it in writing. He stated no, and that   12:35:51
16  was it. I didn't even bring it to their
17  attention at the time.
18      Q.   So just let me understand this. A
19  civilian claimed that he was roughed up,
20  attacked, thrown in the bushes by Mr. Snyder   12:36:05
21  and Mr. Fiorillo, and you didn't even address
22  it with them; is that correct?
23       MR. CONNOLLY: Objection.
24      A.   Yes. Correct.
25      Q.   Did you speak to Chief Paradiso   12:36:14

Page 905

Hesse

1
2   about it?
3       A.   I don't recall if I did or not.
4       Q.   Did you take any notes of your
5   conversation with the civilian who came in to   12:36:22
6   make the complaint?
7       A.   No, he didn't want to put it in
8   writing, he said no.
9       Q.   I am asking whether you put it in
10  writing?                        12:36:31
11      A.   No.
12      Q.   I assume you didn't address it
13  with Snyder and Fiorillo; you took no steps to
14  discipline them?
15      A.   No.                    12:36:38
16      Q.   Any other complaints about Snyder
17  from members of the public?
18      A.   Not that I specifically recall.
19      Q.   And is there anything that you
20  could think of that would refresh your   12:36:48
21  recollection?
22      A.   No, just my observations.
23      Q.   Did you ever receive anything in
24  writing from -- anything negative about Snyder
25  from anybody in the public?   12:36:59

Page 906

Hesse

1
2       A.   I don't recall. I don't know if
3   anything is in his file.
4       Q.   Which police officers was he not
5   getting along with?                12:37:04
6       A.   I believe there was -- well, let's
7   see. There would be Ty Bacon. There would be
8   Rich Bosetti, Gary Bosetti, Walter Muller. I
9   believe Paul Carollo had some issues with him.
10  I don't know about any others right now.   12:37:20
11      Q.   Do you know why they were not
12  getting along?
13       MR. CONNOLLY: Objection.
14      A.   Specifically no, not really.
15      Q.   Generally?                12:37:38
16      A.   Generally no.
17      Q.   Did it have anything to do with
18  the Halloween incident?
19      A.   It could.
20      Q.   You don't know one way or the   12:37:43
21  other?
22      A.   No.
23      Q.   Now going back to, I believe you
24  mentioned Walter Muller. Is Mr. Muller a
25  friend of yours?               12:37:59

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 907

**Hesse**

1
2    A.  Yes, we are friends.
3    **Q.  Did you ever travel with**
4  **Mr. Muller?**
5    A.  Sure.                                    12:38:03
6    **Q.  Did you ever go fishing together?**
7    A.  Yes.
8    **Q.  Did you ever go out socially with**
9  **the families?**
10   A.  Yes.                                     12:38:10
11   **Q.  And I want to go back to the**
12 **incident with Dr. Guida that you testified to**
13 **before.  You testified after the incident you**
14 **yelled at the group of officers; is that**
15 **correct?**                                   12:38:27
16   A.  Yes.
17   **Q.  Who was in that group?**
18   A.  Lappena which was a dock master.
19 Fiorillo.  I can't think of his name, Matt
20 O'Malley who happens to be a Suffolk County   12:38:40
21 police officer.  I don't remember who else was
22 there.
23   **Q.  Why did you yell at them?**
24   A.  I just didn't like the way the
25 call went and the actions that they took.  I   12:38:59

Page 908

                        Hesse

1
2  think they should have been a little more
3  aware of what was going on around them before
4  they just jumped into a melee.
5    **Q.  Do you recall what you said to**   12:39:09
6  **them about that?**
7    A.  Specifically no.
8    **Q.  Did you write anyone up for the**
9  **incident?**
10   A.  No.                                  12:39:15
11   **Q.  You didn't write up Kenny Lappena?**
12   A.  No.
13   **Q.  Did you ever ask Frank Fiorillo**
14 **why he put Muller in a head lock if it was**
15 **somebody else who punched their girlfriend?**   12:39:25
16   A.  You got to ask the question again.
17   **Q.  The question is did you ever ask**
18 **Frank Fiorillo why he would put Walter Muller**
19 **in a head lock if it was Dr. Guida who punched**
20 **his own girlfriend?**                       12:39:41
21   A.  I don't really recall.
22   **Q.  You don't recall asking him?**
23   A.  I just don't recall, no.
24   **Q.  Do you know why he did that?**
25       MR. CONNOLLY:  Objection.           12:39:50

Page 909

                        Hesse

1
2    A.  At this time right now I don't
3  remember.
4    **Q.  Fiorillo ever tell you that it was**
5  **Muller who struck somebody?**               12:39:54
6    A.  No.  Not until this.
7    **Q.  Did you write up Fiorillo for**
8  **putting Walter Muller in a head lock?**
9    A.  No.
10   **Q.  I believe you testified that**      12:40:07
11 **Muller was not intoxicated, did you testify to**
12 **that?**
13       MR. CONNOLLY:  Objection.
14   A.  I don't know either way if I did
15 or not.                                       12:40:16
16   **Q.  Do you whether he was intoxicated?**
17   A.  I don't believe he was.
18   **Q.  Did you take a breathalyzer?**
19   A.  No.
20   **Q.  Did you ask him if he was**         12:40:23
21 **intoxicated?**
22   A.  No.
23   **Q.  If Fiorillo actually witnessed**
24 **Muller punch his girlfriend or was told that**
25 **Muller had punched his girlfriend, would it be**  12:40:36

Page 910

                        Hesse

1
2  **improper for Fiorillo to put him in a head**
3  **lock to restrain him?**
4        MR. CONNOLLY:  Objection.
5    A.  Just based on somebody telling     12:40:43
6  him, no.
7    **Q.  How about if he witnessed it?**
8    A.  Not necessarily.
9    **Q.  Would it be necessarily improper**
10 **for him to do it?**                         12:40:53
11   A.  Well now you got to give me better
12 circumstances than just punching his
13 girlfriend.  Was there a previous punch, was
14 it after the fact, was it happening at that
15 time.  You are speculating on a lot of things  12:41:02
16 here, I don't know.
17   **Q.  I want to know if it -- if it**
18 **would ever be improper -- well strike that.**
19 **Would it ever be proper for Fiorillo to put**
20 **somebody in a head lock that he had seen punch**  12:41:15
21 **his girlfriend?**
22       MR. NOVIKOFF:  Objection.
23       MR. CONNOLLY:  Objection.
24   A.  If it was a way of restraining him
25 I guess it would be proper.                   12:41:25

TSG Reporting - Worldwide  (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 911

Hesse

1    Hesse
2    Q.   Does it matter whether Muller was
3    an officer or wasn't an officer if the level
4    of altercation required him to restrain the
5    person?                          12:41:37
6        A.   I don't think it would have
7    mattered, no.
8        Q.   Just so I am clear, it was not the
9    fact that Muller was an officer that you were
10   upset with Fiorillo, was it?        12:41:50
11       MR. CONNOLLY:  Objection.
12       A.   I never said I was upset with
13   Fiorillo.
14       Q.   You were upset with the way --
15       A.   It was a general with all of them  12:42:02
16   jumping into a melee that was going on the
17   boat.  And it really was directed at the
18   civilian employee, the dock master Kenny
19   Lappena, who happened to get hurt, and that is
20   why I yelled at them as a group.     12:42:15
21       Q.   So sitting here today do you know
22   why Fiorillo put Muller in a head lock?
23       MR. CONNOLLY:  Objection.
24       A.   I don't recall right now, no.
25       Q.   You testified in response to a   12:42:29

Page 912

Hesse

1    Hesse
2    question that Mr. Novikoff asked you about
3    whether Frank Fiorillo -- whether you ever
4    directed Frank Fiorillo to drive you to a
5    residence for a non-police business.  Do you  12:42:46
6    recall that?
7        A.   Yes.
8        Q.   You testified that you never
9    instructed him to do that; correct?
10       A.   No.                       12:42:55
11       Q.   Did he ever actually drive you to
12   a residence for a non-police business?
13       MR. CONNOLLY:  Objection.
14       A.   He may have.
15       Q.   Well the question before was he   12:43:02
16   never instructed him, the question is now
17   whether he actually drove him?
18       A.   He may have, I don't recall him
19   ever driving me anywhere.
20       Q.   Do you recall him ever picking you  12:43:12
21   up from a residence for non-police business?
22       A.   No.
23       Q.   You testified before about an
24   incident where you went up to the apartment
25   that there was the beer pouring incident, do   12:43:27

Page 913

Hesse

1    Hesse
2    you recall that?
3        A.   Yes.
4        Q.   You testified that you found a
5    pipe -- you found a pipe used for smoking    12:43:32
6    marijuana, do you recall that?
7        A.   Yes.
8        Q.   Do you know whose pipe it was?
9        A.   No.
10       Q.   Did you attempt to find out whose  12:43:41
11   pipe it was?
12       A.   I asked.
13       Q.   Did you check to see if there was
14   any marijuana in the pipe?
15       A.   Yes.                      12:43:51
16       Q.   Was there any marijuana in the
17   pipe?
18       A.   No.
19       Q.   Was there any remnants of
20   marijuana in the pipe?               12:43:54
21       A.   It looked like something was
22   smoked out of it -- no.
23       Q.   That give you probable cause to
24   search to see if there was drugs in the
25   apartment?                        12:44:07

Page 914

Hesse

1    Hesse
2        A.   I didn't feel there was enough.
3        Q.   Did you search to see if there was
4    any drugs in the apartment?
5        A.   No.                       12:44:12
6        Q.   Why would you throw a marijuana
7    pipe into the bay as opposed to taking it back
8    to the police station?
9        A.   Because if I took it back to the
10   police station it would be just sitting around  12:44:22
11   until I could dispose of it.  It was easier to
12   just show the kid that I took it and threw it
13   into the bay so he could no longer using.
14       Q.   What kid?
15       A.   I suspected it was this kid John   12:44:35
16   that I wrote a summons to.
17       Q.   Did you write him a summons for
18   possessing drug paraphernalia?
19       MR. NOVIKOFF:  Objection.
20       A.   No.                       12:44:50
21       Q.   Did you record the incident
22   anywhere in writing?
23       MR. NOVIKOFF:  Objection.  What
24   incident?
25       Q.   The fact that you found a        12:44:55

28  (Pages 911 to 914)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 915

**Hesse**

1
2    marijuana pipe and anything you may have done
3    with it?
4        A.   No, I don't believe so.
5        Q.   Why not?                    12:45:01
6        A.   I didn't think it was necessary.
7        MR. CONNOLLY:  Objection.
8        A.   You could buy those on any street
9    corner.
10       Q.   But this one wasn't a brand new   12:45:14
11   one bought on the street corner, you said
12   there was evidence that marijuana was smoked
13   in it; correct?
14       A.   I didn't say marijuana, I said
15   anything.                         12:45:23
16       Q.   Something?
17       A.   Yes.
18       Q.   Did you smell it?
19       A.   I smelled it.
20       Q.   What did it smell like?       12:45:27
21       A.   Burned ash.
22       Q.   Marijuana ash or cigarette ash?
23       A.   Not specifically that I remember.
24       Q.   Do you know what marijuana smells
25   like?                             12:45:35

Page 916

**Hesse**

1
2        A.   Oh yeah.
3        Q.   Did you ever keep any drugs or
4    drug paraphernalia in your drawer?
5        A.   Oh yeah.                    12:45:45
6        MR. CONNOLLY:  Objection.
7        Q.   Did you lock that drawer every
8    time -- was that drawer always locked?
9        MR. CONNOLLY:  Objection.
10       A.   No.                        12:45:53
11       Q.   Why would you leave drugs or drug
12   paraphernalia in your drawer?
13       A.   That is the only place that we had
14   to store it.
15       Q.   Did you have an evidence box that   12:46:01
16   was locked?
17       A.   We had a safe, 50/50 chance to get
18   in it.  It was already overwhelmed with drugs.
19       Q.   What do you mean by 50/50
20   channels?                         12:46:15
21       A.   The thing is probably from the
22   1940s and when you turned the dial it doesn't
23   always set right.
24       Q.   So you may not be able to get into
25   it?                               12:46:25

Page 917

**Hesse**

1
2        A.   Right.
3        Q.   Just so I am clear, you left drugs
4    or strike that -- you left drugs in your
5    drawer unsecured?                  12:46:33
6        MR. CONNOLLY:  Objection.
7        A.   It was in the confines of the
8    Police Department, yes.
9        Q.   But it was not locked?
10       A.   It was not locked.  We didn't have  12:46:38
11   locking cabinets at the time.
12       Q.   You left drug paraphernalia in the
13   drawer as well?
14       A.   Yes, it was all in an evidence bag
15   sealed in my drawer.              12:46:48
16       Q.   I want to go back to one other
17   question, well a couple of questions, with
18   respect to the incident where Paul Conway was
19   delivering the beer, do you recall that?
20       A.   Yes.                       12:47:04
21       Q.   Is there a certain age minimum to
22   deliver beer or to sell beer?
23       MR. NOVIKOFF:  Objection.
24       MR. CONNOLLY:  Objection.
25       Q.   I will break it down.        12:47:11

Page 918

**Hesse**

1
2        Is there an age minimum to deliver
3    beer?
4        MR. NOVIKOFF:  Objection.
5        A.   I don't believe there is an age   12:47:17
6    requirement for the delivery.  But to sell is
7    like a bartender or waiter or waitress I
8    believe you have to be 18.
9        Q.   And Paul Conway was 20?
10       A.   I believe he was 20 at the time,   12:47:31
11   yes.
12       Q.   And then there was some testimony
13   about the fact that you did not instruct any
14   of the plaintiffs not to issue citations to
15   minors, do you recall that?         12:47:48
16       A.   Yes.
17       Q.   If you were to instruct an officer
18   not to issue citation for minors, would you be
19   violating any laws?
20       MR. CONNOLLY:  Objection.        12:47:59
21       MR. NOVIKOFF:  Objection.
22       MR. CONNOLLY:  Hypothetical.
23       Q.   Yes.
24       A.   I don't think I would be violating
25   any laws.  I think it would be an immoral   12:48:07

29 (Pages 915 to 918)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 919

```
 1              Hesse
 2  order.
 3      Q.   Do you recall an incident in 2005
 4  when Ed Carter brought a minor into the police
 5  station who he wanted to issue a summons to    12:48:39
 6  who was served alcohol at CJ's?
 7      A.   No.
 8      Q.   Do you recall an incident where
 9  Carter wanted to issue CJ's a citation for
10  serving alcohol to a minor in the fall of      12:48:59
11  2005?
12      A.   No.
13      Q.   Who owns McGuire's?
14          MR. GOODSTADT:  At which juncture?
15      Q.   In 2005?                             12:49:14
16      A.   2005, I think there is a couple of
17  owners, Jimmy something.
18      Q.   Jimmy Betts?
19      A.   Yes.
20      Q.   Let's focus on Jimmy Betts --        12:49:23
21          MR. NOVIKOFF:  Can I ask one
22  question.  I don't recall ever talking to
23  him about McGuire's or anything involving
24  McGuire's.
25          MR. GOODSTADT:  Well you talked to  12:49:34
```

Page 920

```
 1              Hesse
 2  him about instructing officers not to
 3  issue summons when --
 4          MR. NOVIKOFF:  Fine.
 5  Notwithstanding my overall objection.       12:49:41
 6          MR. GOODSTADT:  Okay.
 7      Q.   Jimmy Betts was the owner of
 8  McGuire's in 2005?
 9      A.   I believe in 2005.
10      Q.   Do you recall an incident in the     12:49:53
11  summer of 2005 where Carter wanted to issue
12  Mr. Betts a summons for writing his bicycle
13  after hours without a light?
14      A.   Do I recall that?
15          MR. NOVIKOFF:  Objection.  That is  12:50:07
16  kind of what I am objecting to starting
17  the question off do you recall.  If he
18  answers no it can go both ways whether he
19  didn't recall it or it never happened.
20  So I object to the form of the question.  12:50:22
21      Q.   Would it be -- in the summer of
22  2005 I know you said there were some changes
23  in the rules with respect to the silly bicycle
24  riding rules.  In the summer of 2005 was there
25  an ordinance where if somebody was riding a  12:50:38
```

Page 921

```
 1              Hesse
 2  bicycle after hours they needed a light?
 3          MR. NOVIKOFF:  Objection.
 4      A.   Yes, when it was dark out.
 5          MR. CONNOLLY:  Assuming an          12:50:47
 6  operating light.
 7          MR. GOODSTADT:  Yes.
 8      A.   Flashlight.
 9      Q.   They could have a flashlight?
10      A.   It has to be in a holder.           12:50:54
11      Q.   Just going back to the question
12  that Mr. Novikoff objected to.  In response to
13  Mr. Novikoff's objection I just want to
14  rephrase a question.
15          Did there come a point in time in  12:51:42
16  the summer of 2005 where Ed Carter wanted to
17  issue a summons to Jimmy Betts for riding his
18  bicycle after hours without a light?
19          MR. CONNOLLY:  Objection.
20      A.   No.                                 12:51:57
21      Q.   It didn't happen?
22      A.   I don't think so.
23      Q.   Is it possible that it happened
24  and you don't recall it?
25          MR. CONNOLLY:  Objection.           12:52:03
```

Page 922

```
 1              Hesse
 2      A.   I don't think so.
 3      Q.   It is not possible?
 4      A.   No, it didn't happen.
 5      Q.   Did you ever accompany Ed Carter    12:52:14
 6  to an apartment on Bay Walk and Ocean Breeze,
 7  I believe those two streets cross each other?
 8      A.   Yes, they do, they intersect.
 9      Q.   Do you recall accompanying
10  Mr. Carter to an apartment on that corner     12:52:34
11  where there were under age drinkers?
12          MR. CONNOLLY:  Objection.
13      A.   No.
14      Q.   So you don't recall ever being in
15  that apartment with Mr. Carter?              12:52:46
16      A.   No.
17      Q.   Just go back to the incident with
18  the beer spilling, do you recall that
19  incident?
20      A.   Yes.                                12:53:10
21      Q.   Who did you say the leaseholder
22  was?
23      A.   I didn't.
24      Q.   Do you know who the leaseholder
25  was on the apartment?                        12:53:17
```

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 923

**Hesse**

1
2     A.   The leaseholder, no.
3     Q.   Do you know who the owner of the
4 apartment is?
5     A.   The owner of the building.      12:53:21
6     Q.   Yes.
7     A.   Billy Svingos.
8     Q.   He was the owner in 2003, 2004,
9 and 2005?
10    A.   Yes.                          12:53:30
11    Q.   I thought you mentioned a John who
12 was a leaseholder?
13         MR. CONNOLLY:  He didn't use the
14 phrase leaseholder.  I think the record
15 would correct me if I am mistaken,      12:53:37
16 renter.
17    Q.   Is it possible that there was a
18 renter named John up there?
19    A.   I believe he was one of the
20 renters.  I believe it was a group of them.  12:53:48
21    Q.   So it was like a share house?
22    A.   Something like that, yes.
23    Q.   So just so I understand, one
24 leaseholder and the leaseholder would sell out
25 shares to other renters; is that how it works?  12:53:56

Page 924

**Hesse**

1
2         MR. CONNOLLY:  Objection.
3     A.   Yes, kind of how it works.
4     Q.   This guy John, he was one of the
5 renters?                             12:54:04
6     A.   I believe he was, yes.
7     Q.   What summons did you write?
8     A.   I believe it was for noise.  Noise
9 violation.
10    Q.   So you didn't write any kind of    12:54:11
11 summons with respect to spilling alcohol on
12 the officers?
13    A.   No.
14         MR. CONNOLLY:  Objection.
15    Q.   You didn't write any kind of      12:54:23
16 summons with respect to the fact that there
17 was drug paraphernalia in the apartment?
18    A.   The pipe; no.
19    Q.   Who did you enter the apartment
20 with?                               12:54:50
21    A.   Tom Snyder and Kevin Lamm.
22    Q.   Anyone else?
23    A.   I don't recall if anybody else was
24 there.
25    Q.   Ever been in that apartment with    12:54:58

Page 925

**Hesse**

1
2 Paul Carollo?
3     A.   I don't recall if I was or not.
4     Q.   Who is Jason Maldonado?
5     A.   No idea.                      12:55:08
6     Q.   Do you know who Robert Steinhauser
7 is?
8     A.   No idea.
9     Q.   How about Brian Weinberg?
10    A.   No idea.                      12:55:14
11         MR. GOODSTADT:  Give me one minute
12 off the record just to review what I
13 have.
14         MR. NOVIKOFF:  Go off the record.
15         THE VIDEOGRAPHER:  The time is      12:55:32
16 12:57, we are off the record.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  The time is
19 12:58, we are on the record.
20         MR. GOODSTADT:  I have nothing      12:57:16
21 further at this time.
22 EXAMINATION BY
23 MR. NOVIKOFF:
24    Q.   Mr. Hesse, I think I have no less
25 than three minutes worth of questions, maybe   12:57:23

Page 926

**Hesse**

1
2 more than three questions.
3         You mentioned in response to Mr.
4 Goodstadt that Mr. Snyder communicated to you
5 about an illegal search and seizure by Lamm,   12:57:33
6 do you recall that?
7     A.   Yes.
8     Q.   What did Mr. Snyder specifically
9 say about that?
10    A.   He said that Kevin Lamm went up    12:57:37
11 the back alley of CJ's behind the bar, came in
12 the bar door and made a statement that he was
13 going to -- he doesn't give a shit who you
14 people are, he is going to get all of you.  In
15 reference to what I don't know, he went into   12:57:56
16 the kitchen, he was looking for something.  He
17 went into the bathroom looking for something.
18 And Tom Snyder said that he didn't agree with
19 it.  He even said something to Kevin about it.
20    Q.   So this was Snyder telling you    12:58:08
21 that Lamm said in words and effect I don't
22 give a shit who you are?
23    A.   Correct.
24    Q.   Now Mr. Goodstadt asked you a
25 question with regard to showing -- well, Mr.   12:58:19

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 927

Hesse

1  Hesse
2  Goodstadt asked you a question and you
3  responded with regard to you showing Lamm,
4  Snyder and Fiorillo at various times the file
5  of the investigation?              12:58:35
6     A.   Yes.
7     Q.   I think Mr. Goodstadt would be
8  objecting based upon your non-responsiveness,
9  so let me ask you this question.
10       Did you ever show Mr. Lamm a copy   12:58:44
11  of the investigative file of the Halloween
12  incident?
13    A.   Yes.
14    Q.   And Mr. Lamm didn't want to look
15  at it?                           12:58:51
16    A.   Correct.
17    Q.   At the time when you showed --
18  where did you show Lamm this?
19    A.   In the police station.
20    Q.   Did Lamm at the time that you   12:59:02
21  showed him make any reference to his belief
22  that you were covering up anything?
23    A.   I don't remember specifically.
24    Q.   With regard to you showing
25  Fiorillo the investigative file, let me ask   12:59:13

Page 928

1  Hesse
2  you this so there is no objection, did you
3  show Fiorillo the investigative file?
4     A.   Yes.
5     Q.   Where did you show it to him?   12:59:21
6     A.   In the same exact spot actually.
7     Q.   Was Mr. Fiorillo pleased or
8  displeased with regard to what he read?
9        MR. GOODSTADT:   Objection.
10    A.   He seemed to be very happy to read   12:59:32
11  it, and he said there was a lot of things that
12  they didn't know.
13    Q.   They being whom?
14    A.   The three officers.
15    Q.   Let me ask you this then.   What if   12:59:40
16  anything did Mr. Fiorillo say to you upon
17  subsequent to his reading of the investigative
18  file concerning the fact that he looked at the
19  file?
20       MR. GOODSTADT:   Objection.   12:59:49
21    A.   There was nothing derogatory other
22  than he made some statements that he didn't
23  know that certain things had transpired.
24    Q.   Certain things had transpired,
25  what he was referring to?   12:59:58

Page 929

1  Hesse
2     A.   Like the biggest part of Jeannie
3  Jaeger being attached by this individual.
4     Q.   Now the question I have is at this
5  time when you showed Fiorillo the   13:00:06
6  investigative file and he made those comments,
7  did he make any comments to you that it was
8  his belief that you were covering up
9  something?
10    A.   No.                     13:00:16
11    Q.   With regard to Snyder did you show
12  him the investigative file?
13    A.   Yes.
14    Q.   Did he review it?
15    A.   Yes.                    13:00:22
16    Q.   Where did you show it to him?
17    A.   In the police station.
18    Q.   Where did he review it?
19    A.   He was sitting at Chief Paradiso's
20  desk.                          13:00:30
21    Q.   What comment if any did he make to
22  you concerning his review of the investigative
23  file?
24    A.   I don't really recall to tell you
25  the truth.                      13:00:36

Page 930

1  Hesse
2     Q.   Did he make any reference to
3  his -- did he make any statement that led you
4  to believe that he believed that you were
5  covering up something?           13:00:42
6     A.   Absolutely not, no.
7        MR. GOODSTADT:   Objection.
8        MR. NOVIKOFF:   I have nothing
9  further.
10       MR. CONNOLLY:   I have one   13:00:57
11  question.
12       MR. NOVIKOFF:   Don't open the
13  door.
14  EXAMINATION BY
15  MR. CONNOLLY:                   13:01:00
16    Q.   Earlier Mr. Goodstadt had asked
17  you if you had any proof that plaintiffs or a
18  plaintiff may have made blog entries.   Do you
19  recall being asked that question?
20    A.   Yes.                    13:01:18
21    Q.   And what was your response?
22    A.   I had no proof.
23       MR. GOODSTADT:   Objection.
24    Q.   Did you ever form a belief based
25  upon the contents of blog entries that one or   13:01:31

Page 931

1          **Hesse**
2  **more plaintiffs may have made blog entries?**
3      A.   Yes.
4          MR. CONNOLLY:  Nothing further.
5          MR. GOODSTADT:  You expect me not   13:01:45
6  to ask him which entries; there is now a
7  new allegation that plaintiffs have made
8  entries.  I don't see how I can't ask him
9  the question.
10         MR. CONNOLLY:  Go off the record.   13:02:14
11         THE VIDEOGRAPHER:  The time is
12 1:03, we are going off the record.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  The time is
15 1:07, we are on the record.     13:06:28
16         MR. GOODSTADT:  In lieu of an
17 agreement that all parties have reached
18 in response to -- strike that.
19         In connection with the last
20 question that Mr. Connolly asked     13:06:39
21 Mr. Hesse about his belief as to whether
22 any of the plaintiffs posted on the blog,
23 we have agreed that plaintiffs will serve
24 interrogatories requesting the identity
25 of which blog posts Mr. Hesse believes   13:06:54

Page 932

1          Hesse
2  were posted by the plaintiffs, or
3  individually which plaintiff, and the
4  basis of his belief that it was the
5  plaintiff that he identifies who posted   13:07:06
6  the blog.
7          MR. NOVIKOFF:  Fine.
8          MR. CONNOLLY:  So agreed.
9          MR. GOODSTADT:  And Mr.
10 Novikoff is --          13:07:15
11         MR. NOVIKOFF:  Well if those are
12 the only two questions that you are going
13 to pose to him I don't feel -- I don't
14 think then I need to serve anything.
15         MR. CONNOLLY:  I take it we are   13:07:28
16 done.
17         MR. GOODSTADT:  We are.
18         THE VIDEOGRAPHER:  The time is
19         (Continued on next page.)
20
21
22
23
24
25

Page 933

1          Hesse
2  1:09.  We are off the record.
3          (Time noted:  1:10 p.m.)
4          _____
5          GEORGE HESSE
6
7  Subscribed and sworn to before me
8  this ___ day of _____, 2009
9
10 _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 934

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
4               : ss.
5  COUNTY OF NEW YORK  )
6
7          I, Philip Rizzuti, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10         That GEORGE HESSE, the witness
11 whose deposition is hereinbefore set forth,
12 was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15         I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of this
19 matter.
20         IN WITNESS WHEREOF, I have
21 hereunto set my hand this 27th day of
22 August, 2009.
23         _____
24         PHILIP RIZZUTI
25

33 (Pages 931 to 934)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 935

```
 1
 2    ---------------- I N D E X ----------------
 3    WITNESS          EXAMINATION BY       PAGE
 4    GEORGE HESSE    Mr. Novikoff     807, 925
 5               Mr. Baptiste       839
 6               Mr. Goodstadt      841
 7               Mr. Connolly       930
 8
 9    ------------ INFORMATION REQUESTS -----------
10    DIRECTIONS:      None
11    RULINGS:      None
12    TO BE FURNISHED:  None
13    REQUESTS:      None
14    MOTIONS:       None
15
16    ------------------ EXHIBITS ------------------
17     Hesse Exhibit 29, complaint,     807
18     Hesse Exhibit 30, blog posting,    883
19     P 962 to P 1265,
20
21
22
23
24
25
```

Page 936

```
 1
 2       *** ERRATA SHEET ***
 3    NAME OF CASE: CARTER VS. OCEAN BEACH
      DATE OF DEPOSITION:  August 17, 2009
 4    NAME OF WITNESS:   GEORGE HESSE
      PAGE  LINE    FROM      TO
 5    ____|_____|_____|_____
 6    ____|_____|_____|_____
 7    ____|_____|_____|_____
 8    ____|_____|_____|_____
 9    ____|_____|_____|_____
10    ____|_____|_____|_____
11    ____|_____|_____|_____
12    ____|_____|_____|_____
13    ____|_____|_____|_____
14    ____|_____|_____|_____
15    ____|_____|_____|_____
16    ____|_____|_____|_____
17    ____|_____|_____|_____
18    ____|_____|_____|_____
19
20       _____
21         GEORGE HESSE
22    Subscribed and sworn to before me
23    this ____ day of _____, 2009.
24    _____
25    (Notary Public)    My Commission Expires:
```

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d