Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
-------------------------------X
EDWARD CARTER, FRANK FIORILLO,
KEVIN LAMM, JOSEPH NOFI, and
THOMAS SNYDER,
              Plaintiffs,
         vs.              Case No. 07-1215
INCORPORATED VILLAGE OF
OCEAN BEACH; MAYOR JOSEPH C.
LOEFFLER, JR., individually,
and in his official capacity;
former mayor NATALIE K.
ROGERS, individually and in
her official capacity, OCEAN
BEACH POLICE DEPARTMENT;
ACTING DEPUTY POLICE CHIEF
GEORGE B. HESSE, individually
and in his official capacity;
SUFFOLK COUNTY; SUFFOLK COUNTY
POLICE DEPARTMENT; SUFFOLK COUNTY
DEPARTMENT OF CIVIL SERVICE; and
ALISON SANCHEZ, individually and
in her official capacity,

              Defendants.
-------------------------------X
         DEPOSITION OF NATALIE K. ROGERS
              Uniondale, New York
              November 14, 2008

Reported by:
Bonnie Pruszynski, RMR
JOB NO. 18811
```

Page 2

```
 1
 2          November 14, 2008
 3          10:15 a.m.
 4
 5
 6          VIDEOTAPED DEPOSITION OF NATALIE K.
 7   ROGERS, held at Rivkin Radler, LLP, RexCorp
 8   Plaza, Uniondale, New York, before
 9   Bonnie Pruszynski, Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified LiveNote Reporter, and a Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3   THOMPSON WIDGOR & GILLY, LLP
     Attorneys for Plaintiffs
 4       85 Fifth Avenue
         New York, New York 10003
 5   BY:   ARIEL Y. GRAFF, ESQ.
 6
 7   RIVKIN RADLER, LLP
     Attorneys for Defendants Incorporated Village of
 8   Ocean Beach, Mayor Joseph C. Loeffler, Jr., former
     mayor Natalie K. Rogers:
 9       926 RexCorp Plaza
         Uniondale, New York 11556
10   BY:   KENNETH A. NOVIKOFF, ESQ.
                  -and-
11   BEE READY FISHBEIN HATTER & DONOVAN, LLP
         170 Old Country Road
12       Mineola, New York 11501
     BY:   JOSHUA M. JEMAL, ESQ.
13
14   MARKS, ONEILL, O'BRIEN & COURTNEY, P.C.
     Attorneys for Acting Deputy Police Chief George B.
15   Hesse:
         530 Saw Mill River Road
16       Elmsford, New York 10523
     BY:   KEVIN W. CONNOLLY, ESQ.
17
18   SUFFOLK COUNTY DEPARTMENT OF LAW
     Attorneys for Suffolk County Defendants
19       H. Lee Dennison Building, 6th Floor
         100 Veterans Memorial Highway
20       Hauppauge, New York 11788
     BY:   SAMANTHA M. McEACHIN, ESQ.
21
22   ALSO PRESENT: Steve Sanpietro, Legal Video
         Specialist
23       Ryan Rudich, Law Clerk,
         Thompson, Wigdor & Gilly
24       Frank Fiorillo
         Kevin Lamm
25
```

Page 4

```
 1            N. Rogers
 2          THE VIDEOGRAPHER:  This is the start  09:55
 3   of the tape labeled number one of the
 4   videotape deposition of Natalie Rogers in
 5   the matter of Edward Carter, et al, versus
 6   Incorporated Village of Ocean Beach, et al,
 7   in the United States District Court, Eastern
 8   District of New York, Number CV 07-1215.
 9          This deposition is being held at    10:15
10   926 RexCorp Plaza, Uniondale, New York, on
11   Friday, November the 14th, 2008, at
12   approximately 10:15 a.m.
13          My name is Steve Sanpietro from TSG   10:16
14   Reporting, Inc., and I am the Legal Video
15   Specialist.
16          The court reporter today is Bonnie    10:16
17   Pruszynski, in association with TSG
18   Reporting.
19          Will counsel please introduce         10:16
20   yourselves for the record?
21          MR. GRAFF:  Ari Graff of the law firm 10:16
22   Thompson, Wigdor & Gilly, LLP, representing
23   plaintiffs.
24          With me here today is Ryan Rudich.    10:16
25   He's a paralegal with our firm.
```

1 (Pages 1 to 4)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 5

1        N. Rogers
2        Also present are two of our clients,  10:16
3   the plaintiffs in this action, Frank
4   Fiorillo and Kevin Lamm.
5        MR. NOVIKOFF:  On behalf of the      10:16
6   Village defendants, Mayor Loeffler, former
7   Mayor Rogers, Ken Novikoff of the law firm
8   of Rivkin Radler LLP.
9        With me today is Josh Jemal of the    10:16
10  law firm of Bee Ready representing the
11  Village as general counsel.
12       MR. CONNOLLY:  On behalf of defendant 10:17
13  Acting Deputy Police Chief George Hesse,
14  Kevin Connolly of Marks, O'Neill, O'Brien &
15  Courtney.
16       MS. McEACHIN:  On behalf of Suffolk    10:17
17  County Police Department, the Suffolk County
18  Department of Civil Service and the County
19  of Suffolk itself, Samantha McEachin,
20  Suffolk County Department of Law,
21  100 Veterans Memorial Highway, Hauppauge,
22  New York 11788.
23       THE VIDEOGRAPHER:  Will the court      10:17
24  reporter please swear in the witness?
25       (Witness sworn.)              10:17

Page 6

1        N. Rogers
2        MR. GRAFF:  This deposition will be   10:17
3   governed by the Federal Rules of Civil
4   Procedure and the local rules for the
5   Eastern District of New York.
6        MR. NOVIKOFF:  Well, if I am clear    10:17
7   then, the regular stips are applicable in
8   this deposition?
9        MR. GRAFF:  Are you referring to a    10:17
10  stip that is not consistent with the --
11       MR. NOVIKOFF:  Just the normal and    10:17
12  customary stips in federal court
13  depositions.  I just want to make sure, like
14  with Ms. Minerva's deposition, that they're
15  applicable in this one.
16       MR. GRAFF:  Are you concerned that    10:18
17  there is a stip that's not provided for?
18       MR. NOVIKOFF:  I just want to have a  10:18
19  confirmation with you.
20       MR. GRAFF:  It's difficult for me to  10:18
21  confirm when I'm not clear what you are
22  referring to.
23       MR. NOVIKOFF:  Do you understand what 10:18
24  the regular stips are in federal court
25  depositions?

Page 7

1        N. Rogers
2        MR. GRAFF:  I understand --       10:18
3        MR. NOVIKOFF:  All objections as to  10:18
4   relevancy are reserved until the time of
5   trial.  Objections to form need to be raised
6   at the time or they are waived.
7        Are you aware of those stipulations?  10:18
8   I just want to make sure we're all aware of
9   what stipulations we're covered today.
10       MR. GRAFF:  I am aware of the Federal 10:18
11  Rules, which do cover those items.
12       MR. NOVIKOFF:  Okay.           10:18
13  NATALIE ROGERS,                   10:18
14       called as a witness, having been first  10:18
15       duly sworn, was examined and testified  10:18
16       as follows:                10:18
17  EXAMINATION                     10:18
18  BY MR. GRAFF:                   13:39
19       Q    Ms. Rogers, my name is Ari Graff.  As 10:18
20  **you heard a moment ago, I'm a lawyer representing**
21  **the plaintiffs in this case, and I am going to be**
22  **asking you a series of questions today.**
23       **Before we start --          10:18**
24       MR. NOVIKOFF:  Actually, Counsel,    10:18
25  please don't make any speeches to my client.

Page 8

1        N. Rogers
2   Limit your communications with her to
3   questions.
4        So, why don't you proceed with your  10:18
5   first question?  She understands what she
6   needs to understand.
7        MR. GRAFF:  I would like to cover    10:19
8   some ground rules on the record.
9        MR. NOVIKOFF:  There are no ground   10:19
10  rules on the record.  You are here to ask my
11  client questions.  Whatever ground rules she
12  needs to know, she knows or she doesn't
13  know.
14       Please limit your communications to  10:19
15  my client with just questions.
16       MR. GRAFF:  I will note one item     10:19
17  respectfully, Mr. Novikoff.
18  BY MR. GRAFF:                    10:19
19       Q    To the extent that you need to take a 10:19
20  **break --**
21       MR. NOVIKOFF:  She understands that. 10:19
22  Please.
23       **Q    Ms. Rogers, just a question of      10:19**
24  **etiquette.**
25       **I understand that you were the Mayor 10:19**

2  (Pages 5 to 8)

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1
2 of Ocean Beach.  Is it customary for people to
3 address you as Mayor Rogers or Ms. Rogers?
4      A     Mayor Rogers.          10:20
5      Q     Thank you.          10:20
6           MR. NOVIKOFF:  Just to clarify, she   10:20
7 is not the Mayor of Ocean Beach.  She was.
8           MR. GRAFF:  I understand.      10:20
9           MR. NOVIKOFF:  Okay.      10:20
10 BY MR. GRAFF:              10:20
11      Q     Mayor Rogers, are you presently     10:20
12 taking any medications that could affect your
13 ability to testify truthfully today?
14      A     No.              10:20
15      Q     Are you presently taking any      10:20
16 medications that could affect your ability to
17 testify completely today?
18      A     No.              10:20
19      Q     Have you consumed any alcoholic     10:20
20 beverages in the last 24 hours?
21           MR. NOVIKOFF:  Objection.  Counsel,  10:20
22 if you want to ask her if she's drunk, ask
23 her.  If you want to ask her whether or not
24 any consumption of alcohol has impacted her
25 ability to testify truthfully, ask her.

N. Rogers

1
2           But just to ask her if she's consumed 10:20
3 alcoholic beverages is, quite frankly, a
4 ridiculous question.  So, if you want to
5 keep that question, then go ahead.
6      Q     Have you consumed any alcoholic     10:20
7 beverages in the last 24 hours, Mayor Rogers?
8           MR. NOVIKOFF:  Note my objection.   10:21
9           You can answer.          10:21
10      A     Yes.            10:21
11      Q     And when did you consume the most   10:21
12 recent alcoholic beverage?
13      A     About 6 o'clock last night.      10:21
14      Q     And in total yesterday, how many    10:21
15 alcoholic beverages did you consume?
16           MR. NOVIKOFF:  Note my objection.   10:21
17      A     One.            10:21
18      Q     Thank you.          10:21
19           Are you sick at all today?        10:21
20           MR. NOVIKOFF:  Objection.  Define   10:21
21 "sick."
22           THE WITNESS:  Am I supposed to answer 10:21
23 that?
24           MR. NOVIKOFF:  If you can understand  10:21
25 the question.

N. Rogers

1
2      A     No.              10:21
3      Q     Is there any reason you could think  10:21
4 of why you will not be able to answer my questions
5 truthfully and completely today?
6      A     No.              10:21
7      Q     Are you represented by an attorney in 10:21
8 connection with this deposition?
9      A     Would that --          10:21
10           MR. NOVIKOFF:  You can answer.      10:22
11      A     Yes.            10:22
12      Q     And would that be Mr. Novikoff who is 10:22
13 sitting next to you?
14      A     Yes.            10:22
15      Q     When did you first learn that the    10:22
16 plaintiffs in this case were making allegations
17 against Ocean Beach and others?
18           MR. NOVIKOFF:  Objection, only to the 10:22
19 phrase "allegations."  I don't know what
20 that means, whether it means in the context
21 of the formal complaint or allegations prior
22 to the complaint.
23           But you can answer.          10:22
24           Unless you want to rephrase your     10:22
25 question.

N. Rogers

1
2           MR. GRAFF:  Mr. Novikoff, I note you  10:22
3 have the right to object to the form of the
4 question.  I would ask that you limit your
5 objection and the description of the basis
6 for your objection unless I ask for further
7 clarification.
8           MR. NOVIKOFF:  Oh, is that how you    10:22
9 want to work it?  Unless you ask me for
10 clarification, you don't want me to try to
11 assist you in properly forming the question?
12           MR. GRAFF:  If you object --       10:22
13           MR. NOVIKOFF:  Because the question  10:22
14 you're asking is, when did you first learn
15 of the allegations that plaintiffs may have
16 made?  And I don't know what you mean by
17 "allegations."
18           But you're right.  I won't speak     10:22
19 unless you want me to help you clarify the
20 question.  Note my objection.
21           You can answer the question.        10:23
22      A     Sometime in the spring of 2006.     10:23
23 Probably, to my recollection, in April.
24      Q     And what allegations did you learn   10:23
25 that plaintiffs were making against Ocean Beach in

Page 13

N. Rogers

1
2     the spring of 2006, perhaps around April?
3         A     That certain police officers, who had 10:23
4     been -- who had worked for the Village prior to
5     that year, were not hired for the year 2006.
6         Q     And how did you learn of those      10:23
7     allegations?  Who communicated that to you?
8             MR. NOVIKOFF: Note my objection.    10:24
9             You can answer.            10:24
10        A     George Hesse.            10:24
11        Q     And was that a written, verbal or    10:24
12    spoken communication?
13        A     Yes.                 10:24
14        Q     Was that an in-person conversation?  10:24
15        A     Yes.                 10:24
16        Q     Where were you when you had that    10:24
17    conversation with George Hesse?
18        A     I was in front of my own home, which  10:24
19    is a condo.  Mr. Hesse passed by and saw me -- I
20    was out on the deck -- and stopped and talked to
21    me.
22            MR. NOVIKOFF: Let's go off the    10:24
23    record for three seconds.
24            THE VIDEOGRAPHER: The time is now   10:24
25    10:24 a.m.

Page 14

N. Rogers

1
2             We are now off the record.       10:24
3             (Discussion held off the record.)    10:24
4             MR. NOVIKOFF: Okay, we are back on.  10:24
5             THE VIDEOGRAPHER: One second.     10:24
6             The time is now 10:24 a.m.       10:24
7             We are now back on the record.     10:25
8     BY MR. GRAFF:
9         Q     Mayor Rogers, where is the home that  10:25
10    you referred to located?
11        A     It's Condo Number 7, on Dehnhoff    10:25
12    Walk, north of Bay Walk.
13        Q     And is that location within Ocean    10:25
14    Beach?
15        A     Yes, in Ocean Beach.         10:25
16        Q     When you say that George Hesse passed 10:25
17    by, was he driving in a car at that time?
18        A     No.                 10:25
19        Q     He was walking?           10:25
20        A     To my recollection, yes.       10:25
21        Q     And in substance, can you please tell 10:25
22    me what George Hesse communicated to you and what
23    you communicated to George Hesse in that
24    conversation.
25        A     In essence, he said that he didn't   10:25

Page 15

N. Rogers

1
2     know if I had heard, but he wanted to inform me
3     that some police officers who had worked for the
4     Village previously had not been hired for the year
5     2006.
6         Q     And what did you say to him when he   10:26
7     advised you of that?
8             MR. NOVIKOFF: Objection.        10:26
9             You can answer.          10:26
10        A     I asked him why.          10:26
11        Q     And what did Mr. Hesse say in     10:26
12    response to that question?
13            MR. NOVIKOFF: Objection.        10:26
14            You can answer.          10:26
15        A     He said that was his best judgment as 10:26
16    to their -- as to -- as to whether he felt it was
17    appropriate to hire them.
18        Q     Do you recall if he explained why it 10:27
19    was in his best judgment better not to rehire
20    them?
21        A     I don't believe he did explain fully, 10:27
22    no.
23        Q     Did you ask him to explain it?     10:27
24        A     I asked him only one question.    10:27
25        Q     And is that the question that you   10:27

Page 16

N. Rogers

1
2     already referred to?
3         A     No.                 10:27
4         Q     What question did you ask him?     10:27
5         A     I asked him if he had cleared this   10:27
6     with Civil Service, and if this had been -- his
7     action was consistent with the proper application
8     of Civil Service law.
9         Q     Was it George Hesse's responsibility 10:27
10    to insure that officers at the Ocean Beach Police
11    Department were handled in accordance with the
12    Civil Service obligations with respect to their
13    employment?
14            MR. NOVIKOFF: Objection.        10:28
15        A     I believe so.           10:28
16        Q     At that time, did George Hesse have  10:28
17    the authority to make decisions with respect to
18    hiring Ocean Beach police officers?
19        A     Yes.                 10:28
20        Q     At that time, did George Hesse have  10:28
21    responsibility with respect to terminating Ocean
22    Beach police officers?
23            MR. NOVIKOFF: Objection.        10:28
24            You can answer.          10:28
25        A     I believe so.           10:28

36cc7550-5e7e-4e1c-853f-09d9ba020092

1        N. Rogers
2        Q    Did George Hesse tell you that he had 10:28
3  terminated certain Ocean Beach police officers?
4        MR. NOVIKOFF:  Objection, asked and  10:28
5  answered.
6        You can answer.  You can answer.    10:28
7     A    No, he did not.             10:28
8        Q    Did he tell you who those officers  10:28
9  were?
10    A    I do not believe so, no.        10:28
11       MR. GRAFF:  Before we continue,    10:29
12  Mr. Novikoff, an issue that we had addressed
13  in past depositions is that there is some
14  conflicting terminology with respect to the
15  discontinuation of plaintiffs' employment.
16       We understand that your position has 10:29
17  been that they were not rehired.  Our
18  position has been that they were terminated.
19  As in the past depositions, would you agree
20  that for the purpose of this deposition
21  today, we can refer to their employment
22  ending and understand what --
23       MR. NOVIKOFF:  Yeah, I think -- I   10:29
24  will respond to your question, I think the
25  witness has definitely made a distinction

1        N. Rogers
2  between what George Hesse said with regard
3  to not rehiring and any communications that
4  George Hesse had in this conversation about
5  termination, so I think the witness has been
6  clear that she in her head has a distinction
7  between those two terms.
8        However, for the purpose of this       10:29
9  deposition, I think that if you ask the
10  questions with regard to the end of the
11  employment, I understand your position is
12  that they have been terminated, and you
13  understand our position is that they have
14  not been rehired.
15       MR. GRAFF:  Thank you.         10:30
16    Q    Mayor Rogers, did you also understand 10:30
17  what we were referring to --
18    A    Yes.              10:30
19    Q    -- with respect to that terminology? 10:30
20  Thank you.
21       What did George Hesse say in response 10:30
22  to your question about whether he had cleared the
23  decision to end certain officers' employment with
24  Civil Service?
25       MR. NOVIKOFF:  Objection to the form. 10:30

1        N. Rogers
2        You can answer.          10:30
3        THE WITNESS:  Sorry?         10:30
4        MR. NOVIKOFF:  You can answer.     10:30
5     A    He said yes, he had.         10:30
6        Q    Did he tell you with whom at Civil  10:30
7  Service he had communicated with respect to that
8  matter?
9     A    No, he did not.           10:30
10       Q    Do you know who at Civil Service   10:30
11  George Hesse communicated with in connection with
12  that matter?
13    A    No.              10:30
14       Q    Did George Hesse tell you         10:30
15  specifically who the officers were whose
16  employment had ended?
17       MR. NOVIKOFF:  Objection, asked and  10:30
18  answered.
19       You can answer.          10:30
20    A    No.              10:31
21       Q    Did you at some point find out    10:31
22  specifically who those officers were?
23       MR. NOVIKOFF:  Objection.       10:31
24       You can answer.          10:31
25    A    At some point, you asked?       10:31

1        N. Rogers
2        Q    During that conversation with George 10:31
3  Hesse, did Mr. Hesse indicate to you that he had
4  been named as a defendant in a lawsuit in
5  connection with the ending of those officers'
6  employment?
7        MR. NOVIKOFF:  Wait a minute, hold  10:31
8  on.  On this one I am going to have to
9  speak.
10       She is referring to a conversation,  10:31
11  and you have only asked her about a
12  conversation with George Hesse taking place
13  in April of 2006.  Your question now asks
14  her, in that conversation did George Hesse
15  tell you that he has been named as a
16  defendant in a lawsuit involving these
17  plaintiffs.
18       Do you want to clarify your question? 10:31
19  It makes no sense, because the lawsuit was
20  not filed in April of 2006.  Okay.  I mean,
21  that one I am just trying to help you on.
22  BY MR. GRAFF:               10:32
23    Q    Mayor Rogers, earlier I had asked you 10:32
24  what allegations George Hesse said had been
25  brought against Ocean Beach by the plaintiffs in

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1 N. Rogers
2 this lawsuit. What allegations did he tell you
3 that the officers were making in this conversation
4 that we have been discussing?
5     A    He did not.                    10:32
6           MR. NOVIKOFF: Objection. And again, 10:32
7     Counsel, I really don't want to speak, and
8     you can put this down as the time over your
9     seven hours that you are allotted to, and
10    that was the basis of my original objection
11    to the word "allegation," because it was
12    improperly formed.
13          Ms. Rogers answered your question as  10:32
14    to what allegations. What she understood
15    your word "allegations" to mean is what she
16    understood it to mean, and she has answered
17    your question, and then you spent ten
18    minutes talking about the April, 2006
19    conversation, which is completely
20    appropriate.
21          So, I go back to my original          10:33
22    objection, you know, to the word
23    "allegation."
24          You can answer the question. And I  10:33
25    won't speak again.

1           N. Rogers
2     A    Will you repeat the question now,    10:33
3     please, so I know what you are saying.
4     Q    Did George Hesse in this conversation 10:33
5     advise you that the officers whose employment had
6     ended were making any allegations against Ocean
7     Beach in connection with the fact that their
8     employment had ended?
9     A    No.                              10:33
10    Q    Other than what you have already     10:33
11    testified to, is there anything else that George
12    Hesse said to you that you can recall in that
13    conversation about the circumstances surrounding
14    the ending of those officers' employment?
15          MR. NOVIKOFF: Objection.           10:33
16          You can answer.                    10:33
17    A    No.                              10:33
18    Q    When is the last time that you spoke 10:34
19    with George Hesse?
20    A    About a month ago.                 10:34
21    Q    And in what context did you speak to 10:34
22    George Hesse about a month ago?
23    A    On or about Columbus Day, I was      10:34
24    closing up my unit, and I was on the deck, and
25    George Hesse walked past and stopped to say hello.

1           N. Rogers
2     Q    Other than saying hello, did you or  10:34
3     George Hesse communicate anything else to each
4     other at that time?
5           MR. NOVIKOFF: Objection.           10:34
6           THE WITNESS: Do I answer?          10:35
7           MR. NOVIKOFF: Yes. Unless I         10:35
8     instruct you not to answer, you are to
9     answer every question.
10    A    Yes. He expressed condolences on the 10:35
11    death of my husband, which had occurred in late
12    July.
13    Q    Is that late July, 2008?            10:35
14    A    2008.                            10:35
15    Q    I'm sorry to hear that, Mayor Rogers. 10:35
16          Other than the two conversations with 10:35
17    George Hesse that we have already discussed this
18    morning, have you had any other conversations with
19    George Hesse about this lawsuit, other than in the
20    presence of your attorneys?
21          MR. NOVIKOFF: Objection to the form. 10:35
22          You can answer the question.       10:35
23    A    No.                              10:35
24    Q    Have you spoken with current        10:35
25    Mayor Loeffler about this lawsuit, other than in

1           N. Rogers
2     the presence of attorneys?
3     A    Yes.                             10:36
4     Q    And on how many occasions did you    10:36
5     have such communications with Mayor Loeffler?
6     A    One that I can recall.             10:36
7     Q    And in substance, what was          10:36
8     communicated to you and what did you communicate
9     to Mayor Loeffler in that conversation?
10    A    He stopped by my condo in June of    10:36
11    this year, 2008, to advise me with regard to a
12    matter of the Fire Island Association.
13          At that time, he merely mentioned    10:37
14    that the lawsuit was progressing.
15    Q    Did you ask him what he meant by the 10:37
16    lawsuit was progressing?
17    A    No. I assumed I knew, so I didn't   10:37
18    ask him.
19    Q    And what did you assume that you knew 10:37
20    based on that comment from George --
21    Mayor Loeffler?
22    A    That it hadn't been resolved;       10:37
23    therefore, it was in progress someplace.
24    Q    And what matter regarding the Fire   10:37
25    Island Association did Mayor Loeffler advise you

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1
2  of during that conversation?
3      A    It had to do with being a          10:37
4  representative as an alternate to the Fire Island
5  Association.
6      Q    To clarify, was that with respect to  10:38
7  your being a representative as an alternate?
8      A    Yes.                    10:38
9      Q    Have you had any conversations, other  10:38
10 than in the presence of counsel, with Richard
11 Bessette regarding this lawsuit?
12     A    No.                    10:38
13     Q    Have you had any conversations, other  10:38
14 than in the presence of counsel, with Gary
15 Bessette regarding this lawsuit?
16     A    No.                    10:38
17     Q    Have you had any conversations, other  10:38
18 than in the presence of counsel, with Patrick
19 Cherry regarding this lawsuit?
20         MR. NOVIKOFF:  Objection.        10:38
21         You can answer.             10:38
22     A    No.                    10:38
23     Q    To clarify, do you know more than one  10:38
24 person named Patrick Cherry?
25         MR. NOVIKOFF:  Objection.  I don't  10:38

N. Rogers

1
2  think you have established that she knows
3  who Patrick Cherry is.
4      THE WITNESS:  Correct.  Counsel --  10:39
5      Q    You do not know anybody by the name  10:39
6  of Patrick Cherry?
7      A    Correct.                10:39
8      Q    Thank you.              10:39
9          Can you recall speaking with anyone  10:39
10 else, other than in the presence of counsel, about
11 this lawsuit?
12     A    Not that I can recall, no.      10:39
13     Q    In April, 2006, prior to that      10:39
14 conversation with George Hesse that we have
15 already discussed, did you know who Frank Fiorillo
16 was?
17     A    Yes.                   10:39
18     Q    And who did you know him to be?    10:39
19     A    A police officer.           10:39
20     Q    And that's a police officer at Ocean  10:39
21 Beach?
22     A    Correct.                10:39
23     Q    Had you had any direct communications  10:40
24 with Frank Fiorillo as of that time?
25     A    Yes.                   10:40

N. Rogers

1
2      Q    And in what context did you have your  10:40
3  most recent conversations as of that time with
4  Frank Fiorillo?
5          MR. NOVIKOFF:  Objection.        10:40
6          You can answer.             10:40
7      A    I believe that he assisted the mother  10:40
8  of one of the owners of a condo in our Bay View
9  Condos, which is where I live, at the time of the
10 Memorial Day celebration and parade.
11     Q    As of April, 2006, did you have any    10:40
12 information regarding Frank Fiorillo's performance
13 as a police officer with Ocean Beach?
14         MR. NOVIKOFF:  Objection to the form.  10:41
15     A    No.                    10:41
16     Q    Did you have any reason to think that  10:41
17 he was not a good police officer at Ocean Beach as
18 of that time?
19         MR. NOVIKOFF:  Objection to form.     10:41
20         You can answer.             10:41
21     A    No, I had no reason.          10:41
22     Q    As of April, 2006, prior to that      10:41
23 conversation with George Hesse, did you know who
24 Kevin Lamm was?
25     A    Yes.                   10:41

N. Rogers

1
2      Q    And who did you know Kevin Lamm to be  10:41
3  at that time?
4      A    A police officer in Ocean Beach.    10:41
5      Q    And did you have any knowledge        10:41
6  concerning Kevin Lamm's performance as a police
7  officer at Ocean Beach?
8          MR. NOVIKOFF:  Objection.        10:42
9          You can answer.             10:42
10     A    No, I did not.             10:42
11     Q    Had you had any direct communications  10:42
12 with Kevin Lamm as of that time?
13     A    Not to my recollection.        10:42
14     Q    Do you know how it is that you knew   10:42
15 that Kevin Lamm was an officer at Ocean Beach?
16     A    I saw all the officers on frequent    10:42
17 occasions walking the streets.
18     Q    As of that time, again, April, 2006,  10:42
19 before the conversation with George Hesse, did you
20 know who Edward Carter was?
21     A    Not specifically, no.         10:42
22     Q    Did you know anything about Ed Carter  10:42
23 as of that time?
24         MR. NOVIKOFF:  Objection.        10:42
25         You can answer.             10:42

7 (Pages 25 to 28)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 29

```
1              N. Rogers
2      A    No.              10:42
3      Q    As of that time, did you know who Tom 10:42
4  Snyder was?
5      A    No.              10:42
6      Q    How long have you lived at the Condo  10:43
7  Number 7 that you referred to earlier today?
8      A    Since 1987.        10:43
9      Q    And do you own that condo?      10:43
10        MR. NOVIKOFF:  Objection.  What could 10:43
11  possibly be the relevance of that,
12  Counselor?  I mean I will let her answer,
13  but what could be the relevance?
14        You can answer, Ms. Rogers.      10:43
15      A    The deed is in the name of my late   10:43
16  husband, Charles A. Rogers.
17      Q    Other than that condo, do you or did  10:43
18  your late husband own any other properties?
19        MR. NOVIKOFF:  Objection.  Do not    10:43
20  answer the question.
21        Not specifically because I am      10:43
22  concerned with the answer, Counselor.  What
23  does this have to do with this lawsuit?  And
24  if you explain it to me, I will let her
25  answer it.
```

Page 30

```
1              N. Rogers
2        I will take this to the judge,      10:44
3  because this is harassing and annoying.
4        MR. GRAFF:  This is not harassing and 10:44
5  annoying.  I do not in general want to
6  engage in colloquy with you, but I will
7  answer this question.
8        MR. NOVIKOFF:  Okay.         10:44
9        MR. GRAFF:  There was -- the date    10:44
10  escapes me.  There was a court conference in
11  connection with plaintiffs' first request
12  for production of documents from Ocean
13  Beach.
14        MR. NOVIKOFF:  Okay.          10:44
15        MR. GRAFF:  There were many matters  10:44
16  discussed at that conference --
17        MR. NOVIKOFF:  Okay.          10:44
18        MR. GRAFF:  -- which arose out of    10:44
19  plaintiffs' motion to compel --
20        MR. NOVIKOFF:  Okay.          10:44
21        MR. GRAFF:  -- discovery responses.  10:44
22  Among the items discussed was that Ocean
23  Beach would be providing a financial
24  statement with respect to the defendants in
25  this case.
```

Page 31

```
1              N. Rogers
2        MR. NOVIKOFF:  Okay.          10:44
3        MR. GRAFF:  No such statement has    10:44
4  been provided.  This question now goes to
5  assets.
6        MR. NOVIKOFF:  You mean each        10:44
7  particular person would provide a financial
8  statement.
9        MR. GRAFF:  Correct.  A financial    10:44
10  disclosure statement to the plaintiffs that
11  would identify their assets and worth.
12        MR. NOVIKOFF:  All right.  Well, I   10:45
13  would have thought that you would have sent
14  a letter to me at some point in time
15  indicating that those financial statements
16  had not been provided to you prior to these
17  depositions.  But you haven't.
18        But you can answer the question over  10:45
19  my objection then.
20        THE WITNESS:  May I ask a question?  10:45
21        MR. NOVIKOFF:  Not until you answer  10:45
22  that question, Mayor Rogers.
23      A    Yes.               10:45
24      Q    And what other properties are you   10:45
25  referring to?
```

Page 32

```
1              N. Rogers
2        THE WITNESS:  Now can I ask a        10:45
3  question?
4        MR. NOVIKOFF:  No.  You have to       10:45
5  answer that question, and then we will stop.
6        MR. GRAFF:  If your question relates  10:45
7  to whether or not your answer might violate
8  attorney-client privilege, I --
9        MR. NOVIKOFF:  That won't be the     10:45
10  reason.
11        MR. GRAFF:  Okay.            10:45
12      Q    Could you --              10:45
13      A    Are you referring to Ocean Beach    10:45
14  property or any property?
15      Q    Any properties that you or your      10:46
16  husband owned or own.
17      A    We own -- I own a condo, another    10:46
18  condo in the same unit -- in the same group of
19  condos.  Another unit.  Sorry.
20      Q    Are there any other properties that  10:46
21  either you or your late husband own?
22      A    I own a home in Queens, in Hollis,   10:46
23  New York.
24      Q    Are there any other properties?     10:46
25      A    A timeshare in Marco Island, Florida. 10:47
```

Page 33

N. Rogers

1
2  Q    Are there any other properties?    10:47
3  A    No.                        10:47
4      May I take a break, please?        10:47
5      MR. NOVIKOFF: Yes, you may.      10:47
6      THE VIDEOGRAPHER: The time is now   10:47
7  10:47 a.m.
8      We are now off the record.        10:47
9      (Recess taken.)              10:54
10     THE VIDEOGRAPHER: The time is now   10:54
11 10:54 a.m.
12     We are now back on the record.      10:54
13 BY MR. GRAFF:                  10:54
14     Q    Mayor Rogers, I would like to go back 10:54
15 to a question that I was asking shortly before we
16 took that break.
17     When I was asking you questions about 10:54
18 properties that you or your late husband own, to
19 clarify, are there other properties that you or
20 your husband are the part owners of or own a share
21 of less than total ownership?
22     MR. NOVIKOFF: Objection to the form. 10:55
23     You can answer.              10:55
24 A    Yes.                    10:55
25 Q    Could you please identify those    10:55

Page 34

N. Rogers

1
2  properties.
3  A    One is an office building at Five    10:55
4  Shore Lane in Bay Shore.  I think that is it.
5  That's it.
6  Q    And do you know what percentage of   10:55
7  that office building you own?
8      MR. NOVIKOFF: Objection.        10:56
9      You can answer.              10:56
10 A    My late husband owned 50 percent.  I 10:56
11 owned 33 and a third percent.
12 Q    And do you know who owned the      10:56
13 remaining fraction of that building?
14 A    Yes.                    10:56
15 Q    And who owns the remaining portion of 10:56
16 that building?
17 A    An estate in California.        10:56
18 Q    Do you know the name of that estate? 10:56
19 A    Yes. The name is Itkin.  I-T-K-I-N. 10:56
20     MR. NOVIKOFF: Just answer yes or no. 10:56
21     THE WITNESS: Pardon me?        10:56
22     MR. NOVIKOFF: Just answer yes or no. 10:56
23     MR. GRAFF:  Are you done?        10:56
24     MR. NOVIKOFF: For now.          10:56
25 BY MR. GRAFF:                  10:56

Page 35

N. Rogers

1
2  Q    I think I may have missed a question  10:56
3  earlier.  Going back to that conversation in
4  April, 2006, with George Hesse, do you recall what
5  George Hesse's title was at that time?
6  A    I believe it was deputy police chief. 10:57
7  Q    Are you finished with your answer?    10:57
8  A    Yes.                    10:57
9  Q    And as of April, 2006, did you know   10:57
10 who Joseph Nofi was?
11 A    No.                      10:57
12 Q    During that conversation that you had 10:57
13 with George Hesse in April, 2006, do you recall if
14 he was wearing his police uniform?
15 A    I don't believe so.            10:58
16 Q    Earlier you had referred to an        10:58
17 incident involving Frank Fiorillo providing
18 assistance to a woman who was ill.  Do you recall
19 what I am referring to?
20     MR. NOVIKOFF: Objection. Her        10:58
21     testimony is what it was.          10:58
22     You can answer.              10:58
23 A    Yes.                    10:58
24 Q    Do you recall the name of the        10:58
25 specific woman who Frank Fiorillo had assisted?

Page 36

N. Rogers

1
2  A    First name only.            10:58
3  Q    And what was that individual's first 10:58
4  name?
5  A    Peggy.                    10:58
6  Q    To your knowledge, is she or has she  10:58
7  ever been a resident of Ocean Beach?
8  A    She, no.  Her daughter, yes.      10:59
9  Q    And what is her --            10:59
10     MR. NOVIKOFF: Just answer the        10:59
11     question.
12     THE WITNESS: Sorry, excuse me.      10:59
13 BY MR. GRAFF:                  10:59
14 Q    What is her daughter's name?      10:59
15 A    Tru Hampton.              10:59
16     THE WITNESS: Sorry.            10:59
17 Q    And have you ever made any statements 10:59
18 to Frank Fiorillo concerning his performance as a
19 police officer at Ocean Beach?
20     MR. NOVIKOFF: Objection, asked and  10:59
21     answered.
22     You can answer.              10:59
23 A    Not that I recall.            10:59
24 Q    Has Ocean Beach ever provided you    11:00
25 with housing accommodations?

9 (Pages 33 to 36)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 37

```
1              N. Rogers
2         MR. NOVIKOFF:  You mean the land    11:00
3    known as Ocean Beach or --
4         MR. GRAFF:  The Village of Ocean    11:00
5    Beach.
6    A    No.                        11:00
7    Q    Has the Village of Ocean Beach ever  11:00
8    provided you with a housing allowance or funds
9    towards your housing?
10        MR. NOVIKOFF:  Objection.       11:00
11   A    No.                        11:00
12   Q    Have you ever been convicted of a   11:00
13   crime?
14   A    No.                        11:00
15   Q    Do you have any children?       11:00
16   A    Yes.                       11:00
17   Q    How many children do you have?    11:00
18        MR. NOVIKOFF:  Is that on the list?  11:01
19   I'm sorry.
20        You can answer.              11:01
21   A    Two.                       11:01
22   Q    And what are their ages, please?   11:01
23   A    Sixty and 62.                11:01
24   Q    Are either of your children employed?  11:01
25        MR. NOVIKOFF:  Objection.  Ask her if  11:01
```

Page 38

```
1              N. Rogers
2    either of her children are employed by the
3    Village of Ocean Beach or Suffolk County and
4    I will permit her to answer that question.
5    Q    Are either of your children employed  11:01
6    by any government or municipality?
7         MR. NOVIKOFF:  Objection.  Don't    11:01
8    answer.
9         Ask her if her children are employed  11:01
10   by Ocean Beach and/or Suffolk County and I
11   will allow her to answer that question.
12   Otherwise, there is absolutely no relevancy
13   to that question.
14        MR. GRAFF:  Mr. Novikoff --       11:02
15        MR. NOVIKOFF:  I understand your    11:02
16   position, Counselor.  This is becoming
17   harassing, abusive and annoying.
18        MR. GRAFF:  We will mark that for a   11:02
19   ruling.
20        MR. NOVIKOFF:  Okay.           11:02
21   Q    Mayor Rogers, are either of your    11:02
22   children employed by Suffolk County?
23   A    No.                        11:02
24   Q    Are either of your children employed  11:02
25   by Ocean Beach?
```

Page 39

```
1              N. Rogers
2    A    No.                11:02
3    Q    Have either of your children ever    11:02
4    been employed by Ocean Beach?
5    A    No.                        11:02
6    Q    Was your late husband ever employed  11:02
7    by Ocean Beach?
8    A    No.                        11:02
9    Q    Other than your late husband, have   11:02
10   you ever been married to anyone else?
11        MR. NOVIKOFF:  Not even a chance.   11:02
12   Don't answer that.                 11:02
13   I don't even know what her answer is,  11:02
14   but this is getting close to me making a
15   phone call to the judge.  Can you explain
16   any legitimate basis to ask that question?
17   Does it have anything to do with your
18   punitive damages claim as to her assets?
19   Does it have anything to do with any
20   allegation in this complaint, whether this
21   woman was previously married?  That is
22   abusive.
23        MR. GRAFF:  I disagree, and I believe  11:03
24   that your speaking objection here --
25        MR. NOVIKOFF:  Well, I think in this  11:03
```

Page 40

```
1              N. Rogers
2    regard it's appropriate.
3         How is that question remotely      11:03
4    relevant to anything involving this lawsuit?
5         MR. GRAFF:  Mr. Novikoff --        11:03
6         MR. NOVIKOFF:  Explain that to me,   11:03
7    because you are going to have to explain
8    that to the judge.
9         MR. GRAFF:  Mr. Novikoff, there is no  11:03
10   reason to raise your voice.
11        MR. NOVIKOFF:  I am angry at that    11:03
12   question, because you are an officer of the
13   Court, and you have wide latitude to ask
14   irrelevant questions, and I understand that.
15   And I understand I have to let this woman
16   answer those questions.
17        But there is -- I cannot understand   11:03
18   the remote relevancy of that question, and I
19   am waiting for you to explain it.
20        MR. GRAFF:  Mr. Novikoff, I will     11:03
21   explain it, but again, I note that your
22   shouting and pointing --
23        MR. NOVIKOFF:  I am.           11:03
24        MR. GRAFF:  -- and speaking objection  11:03
25   and this colloquy are improper.
```

N. Rogers

1
2       MR. NOVIKOFF:  Add it to the seven    11:03
3    hours then, respectfully.  What is the
4    relevancy of that question, whether she was
5    previously married?
6       MR. GRAFF:  If she was previously    11:04
7    married to somebody who's connected to any
8    of the individuals who are involved in this
9    case --
10       MR. NOVIKOFF:  Then why don't you ask 11:04
11    her how long she was married to her late
12    husband?  Because I can guarantee you if it
13    was more than 30 years, then your next
14    question is completely irrelevant.
15       MR. GRAFF:  Can we mark the dispute? 11:04
16    Q    How long were you married to your    11:04
17 late husband?
18    A    Four months less than 27 years.    11:04
19       MR. NOVIKOFF:  Still want to ask that 11:04
20    question?  Still want to mark it for a
21    ruling?
22       MR. GRAFF:  Counsel, the transcript    11:04
23    and the record is what it is.
24       MR. NOVIKOFF:  It is.    11:04
25       MR. GRAFF:  At this point I don't    11:04

N. Rogers

1
2    even think you are objecting.  I have not
3    asked a question.  You have made your
4    position clear at improper length.  I am
5    going to move on.
6       MR. NOVIKOFF:  Okay.    11:05
7 BY MR. GRAFF:    11:05
8    Q    Mayor Rogers, other than as Mayor of 11:05
9 Ocean Beach, have you ever been employed?
10    A    Yes.    11:05
11    Q    And what was your most recent    11:05
12 employer other than Ocean Beach?
13    A    Self.    11:05
14    Q    Other than self-employment, have you 11:05
15 ever been employed?
16       MR. NOVIKOFF:  Objection.    11:05
17    A    Yes.    11:05
18    Q    And in what business were you    11:05
19 self-employed?
20    A    Real estate.    11:05
21    Q    And did you have any employees in    11:06
22 connection with that real estate business?
23    A    Yes.    11:06
24    Q    Where was that real estate business 11:06
25 located?

N. Rogers

1
2       MS. McEACHIN:  Counsel, I'm sorry.    11:06
3    Can you just get a time frame?  When are we
4    talking about?  Is this recently or is this
5    20 years ago?
6       MR. NOVIKOFF:  Thank you, Counselor. 11:06
7    I was tired of hearing myself speak.
8 BY MR. GRAFF:    11:06
9    Q    I will ask you, please, could we    11:06
10 clarify, during what period of time were you
11 self-employed in the real estate business?
12       MR. NOVIKOFF:  It's not we clarify,    11:06
13    it's you clarify.
14       MR. GRAFF:  Was that an objection?    11:06
15       MR. NOVIKOFF:  No, it was a comment.  11:06
16       MR. GRAFF:  Okay.    11:06
17       MR. NOVIKOFF:  Don't speak to my    11:06
18    client, just ask her a question.
19       MR. GRAFF:  Mr. Novikoff, your    11:06
20    comments are not proper.
21       MR. NOVIKOFF:  Okay.    11:06
22    A    I have been a real estate broker    11:06
23 since 1963.
24    Q    Are you presently a real estate    11:07
25 broker?

N. Rogers

1
2    A    Yes.    11:07
3    Q    Does the real estate business at    11:07
4 which you are self-employed have a name?
5    A    Yes.    11:07
6    Q    What is it called, please?    11:07
7    A    Leon A. Katz Realty.  Leon A. Katz    11:07
8 Realty.
9    Q    Do you have any partners in that real 11:07
10 estate business?
11    A    No.    11:07
12    Q    Does that business have an office?    11:07
13    A    Yes.    11:07
14       MR. NOVIKOFF:  Just note my objection 11:07
15    to this entire line of questioning.  I
16    believe it is patently irrelevant.  I
17    believe counsel is engaging in a fishing
18    expedition with absolutely no good faith
19    basis to ask these questions.
20       But nevertheless, I will permit you    11:08
21    to answer these questions.
22 BY MR. GRAFF:    11:08
23    Q    Mayor Rogers, who is Leon A. Katz?    11:08
24    A    My first husband.    11:08
25    Q    And did Mr. Katz found that real    11:08

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 45

N. Rogers

1           N. Rogers
2  estate business?
3     A    Yes.              11:08
4     Q    Sorry, I am not sure I got your   11:08
5  answer to whether that real estate business has an
6  office.
7        MR. NOVIKOFF:  Is that a --     11:08
8     A    Yes.              11:08
9        MR. NOVIKOFF: -- question or is that 11:08
10  a statement?  That wasn't a question.  Is
11  there a question?
12    Q    Is that yes, it did have an office?  11:08
13        MR. NOVIKOFF:  There was no question. 11:08
14  You were making a statement about why --
15        MR. GRAFF:  I just asked --     11:09
16        MR. NOVIKOFF: -- you were sorry.   11:09
17        MR. GRAFF:  I just asked a question, 11:09
18  Mr. Novikoff.
19    Q    Is that yes, your real estate   11:09
20  office -- the real estate business did have an
21  office?
22     A    Yes.              11:09
23     Q    Does it currently have an office?   11:09
24     A    Yes.              11:09
25     Q    Where is that office located, please? 11:09

Page 46

N. Rogers

1           N. Rogers
2     A    In my home, in Queens.       11:09
3     Q    Other than yourself, does anybody   11:09
4  else work out of that office?
5     A    Yes.              11:09
6     Q    Who else works out of that office,   11:09
7  please?
8     A    One woman.           11:09
9     Q    Could you identify her name, please? 11:10
10     A    Isabel Torres.        11:10
11     Q    And do you know what the nature of  11:10
12  Ms. Torres' work is?
13     A    Clerical.        11:10
14     Q    Did Ms. Torres work for the Leon A.  11:10
15  Katz Realty business?
16     A    Yes.              11:10
17     Q    Other than in connection with the  11:10
18  Leon A. Katz Realty business, were you employed in
19  any other capacity during your employment as Mayor
20  of Ocean Beach?
21        MR. NOVIKOFF:  Objection.  Asked and 11:10
22  answered.
23        But you can answer.     11:10
24     A    No.              11:11
25     Q    Does the Leon A. Katz Realty business 11:11

Page 47

N. Rogers

1           N. Rogers
2  have a geographic area in which it conducts its
3  real estate business?
4        MR. NOVIKOFF:  Objection.    11:11
5     A    No.              11:11
6     Q    Does it deal in real estate    11:11
7  transactions beyond New York State?
8        MR. NOVIKOFF:  Objection.    11:11
9     A    No.              11:11
10    Q    Does it deal with real estate   11:11
11  transactions within Ocean Beach?
12        MR. NOVIKOFF:  Objection.    11:11
13     A    No.              11:11
14    Q    Does it deal in real estate    11:11
15  transactions within Suffolk County?
16        MR. NOVIKOFF:  Objection.    11:11
17     A    No.              11:11
18    Q    Could you describe the areas in which 11:11
19  Leon A. Katz Realty generally transacts real
20  estate business?
21        MR. NOVIKOFF:  Objection.    11:12
22     A    Limited management.     11:12
23     Q    I'm sorry, maybe I --    11:12
24     A    Limited property management.   11:12
25     Q    And where are the properties that it 11:12

Page 48

N. Rogers

1           N. Rogers
2  manages located?
3        MR. NOVIKOFF:  Objection.    11:12
4     A    Manhattan.         11:12
5     Q    And how many properties does it   11:12
6  manage in Manhattan?
7     A    One.              11:12
8     Q    And where is that property located?  11:12
9     A    889 Ninth Avenue.     11:12
10    Q    Other than the property at 889 Ninth 11:12
11  Avenue, and the properties that you have already
12  identified today, are there any other properties
13  that you or a business acting on your behalf
14  manages?
15        MR. NOVIKOFF:  Objection, compound.  11:13
16     A    No.              11:13
17    Q    Have you ever been a party in a   11:13
18  lawsuit, other than this lawsuit?
19     A    No.              11:13
20    Q    Have you ever been a defendant in a  11:13
21  lawsuit, other than this lawsuit?
22        MR. NOVIKOFF:  Ms. --      11:13
23     A    No.              11:13
24        MR. NOVIKOFF: -- Rogers individually 11:13
25  or Ms. Rogers in her official capacity as

TSG Reporting - Worldwide    (877) 702-9580

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 49

N. Rogers

1
2 either a trustee or Mayor of the Village?
3         MR. GRAFF: In either capacity.      11:13
4         MR. NOVIKOFF: Objection, compound.  11:14
5     A   Not that I know.        11:14
6     Q   **Other than this deposition today,   11:14**
7 **have you, on any other occasions, testified under**
8 **oath?**
9     A   Not that I can recall, no.      11:14
10    Q   **Has any grievance been filed against 11:14**
11 **you in connection with your employment or service**
12 **as Mayor of Ocean Beach?**
13        MR. NOVIKOFF: Objection, form.      11:14
14    A   One grievance that I can recall.    11:15
15    Q   **And did that grievance relate to an   11:15**
16 **employee at Ocean Beach?**
17    A   No.             11:15
18    Q   **Who did that -- what -- who did that 11:15**
19 **grievance relate to?**
20    A   A homeowner.         11:15
21    Q   **And in substance, what did that     11:15**
22 **homeowner allege as the basis for that grievance?**
23        MR. NOVIKOFF: Objection, form.      11:15
24    A   I can't recall the exact allegation. 11:16
25    Q   **Can you recall the general nature of 11:16**

Page 50

N. Rogers

1
2 the allegation?
3        MR. NOVIKOFF: Objection.        11:16
4     A   It had to do with the interpretation 11:16
5 of some zoning regulations that -- that's all I
6 can recall.
7     Q   **When was the most recent time that   11:17**
8 **you were employed in a capacity other than**
9 **self-employment?**
10    A   1983.            11:17
11    Q   **And who was your employer at that   11:17**
12 **time?**
13    A   The City of New York.         11:17
14    Q   **And what position did you hold at    11:17**
15 **that time?**
16    A   A member of the New York City Civil 11:17
17 Service Commission.
18    Q   **And was that the former -- the formal 11:17**
19 **title of that position?**
20        MR. NOVIKOFF: Objection, form.      11:17
21    A   Yes.             11:17
22    Q   **And what were your duties in your    11:17**
23 **capacity as a member of the New York Civil Service**
24 **Commission?**
25        MR. NOVIKOFF: Objection, form.      11:18

Page 51

N. Rogers

1
2     A   The commission was a hearing body.   11:18
3 New York City Civil Service Commission was a
4 hearing body.
5     Q   **Are you finished?          11:18**
6     A   Yes.             11:18
7     Q   **And what were your duties in        11:18**
8 **connection with your employment on the New York**
9 **City Civil Service Commission?**
10    A   To hear complaints against the City  11:18
11 and/or its departments.
12    Q   **Those complaints by Civil Service    11:18**
13 **employees of the City?**
14        MR. NOVIKOFF: Is that a question or 11:18
15 a statement? Objection.
16        MR. GRAFF: It was a question.      11:18
17        MR. NOVIKOFF: Form.          11:19
18    A   Yes.             11:19
19    Q   **And when you would hear complaints of 11:19**
20 **that nature, was it your role to make any sort of**
21 **determination with respect to those complaints?**
22    A   Yes.             11:19
23    Q   **During your employment as Mayor of   11:19**
24 **Ocean Beach -- first of all, when did you become**
25 **Mayor of Ocean Beach?**

Page 52

N. Rogers

1
2     A   In 1998.           11:19
3     Q   **And prior to becoming Mayor of Ocean 11:19**
4 **Beach, did you hold any other position with the**
5 **Village of Ocean Beach?**
6     A   Yes.             11:19
7     Q   **And what position did you hold       11:19**
8 **immediately prior to becoming Mayor?**
9     A   Trustee.           11:20
10    Q   **And during what period of time did   11:20**
11 **you serve as a trustee?**
12    A   For seven years prior to 1998,     11:20
13 starting in 1991.
14    Q   **And prior to beginning your service  11:20**
15 **as a trustee in 1991, did you hold any other**
16 **position with Ocean Beach?**
17    A   No.             11:20
18    Q   **Did you run in an election for the   11:20**
19 **position of trustee of Ocean Beach, when you first**
20 **obtained that position?**
21    A   Yes.             11:20
22    Q   **Do you know who was eligible or what 11:20**
23 **categories of people were eligible to vote in that**
24 **first election?**
25        MR. NOVIKOFF: Objection, calls for a 11:20

13 (Pages 49 to 52)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 53

N. Rogers

1        N. Rogers
2    legal conclusion.
3        You can answer.          11:20
4    A   Registered voters in Ocean Beach.   11:20
5    Q   Do you know how many registered   11:21
6    voters there were in Ocean Beach at that time?
7        MR. NOVIKOFF: What year are we   11:21
8    talking about?
9        MR. GRAFF: In connection with the   11:21
10   election to trustee that she began serving
11   in 1991.
12       MR. NOVIKOFF: The first time? Okay. 11:21
13       The first time you were elected.   11:21
14   A   Perhaps 500.          11:21
15       MR. NOVIKOFF: Don't guess.   11:21
16   A   I don't know the exact number.   11:21
17       MR. NOVIKOFF: Then that is your   11:21
18   answer.
19       THE WITNESS: Thank you.   11:21
20   Q   During your final term as Mayor, do   11:21
21   you know approximately how many registered voters
22   were in Ocean Beach?
23       MR. NOVIKOFF: Objection.   11:21
24   Q   Eligible to vote in Ocean Beach.   11:21
25       MR. NOVIKOFF: Objection to the form 11:21

Page 54

N. Rogers

1        N. Rogers
2    of the question.
3        You can answer.          11:21
4    A   Over 700.          11:21
5    Q   In 1991, when you ran for trustee of   11:22
6    Ocean Beach, did you run against an incumbent who
7    had held that position?
8        MR. NOVIKOFF: Objection, form.   11:22
9        You can answer.          11:22
10   A   Yes. I believe so, yes.   11:22
11   Q   And what incumbent was that?   11:22
12       THE WITNESS: I can't answer the   11:22
13   question in the form it was asked. I'm
14   sorry.
15       MR. NOVIKOFF: Then direct that to   11:22
16   Mr. Graff.
17   BY MR. GRAFF:          11:22
18   Q   Can you identify anybody who ran   11:22
19   against you or you ran against in your first
20   election to the position of trustee of Ocean
21   Beach?
22       MR. NOVIKOFF: Objection to the form. 11:22
23   A   I believe there was a gentleman named 11:23
24   John Moran.
25   Q   Do you recall if there were any other 11:23

Page 55

N. Rogers

1        N. Rogers
2    individuals who ran for that position other than
3    you and John Moran?
4        MR. NOVIKOFF: Objection, asked and   11:23
5    answered.
6        You can answer.          11:23
7    A   I believe Norma Daniels ran also.   11:23
8    Q   Do you recall if there was anyone   11:23
9    other than the people you have identified who ran
10   for that position at that time?
11       MR. NOVIKOFF: Objection.   11:23
12   A   There were others, but I don't recall 11:23
13   who.
14   Q   And did you serve more than one term   11:23
15   as trustee of Ocean Beach?
16   A   Yes.          11:23
17   Q   How many terms did you serve?   11:23
18   A   One and three-quarters.   11:24
19   Q   And as your first term was   11:24
20   concluding, did you run in an election to be
21   re-elected for another term as trustee of Ocean
22   Beach?
23   A   Yes.          11:24
24   Q   Did anyone run against you for that   11:24
25   position in that election?

Page 56

N. Rogers

1        N. Rogers
2    A   Yes.          11:24
3    Q   Can you identify anyone who ran   11:24
4    against you in that elects?
5    A   I do not recall the people who were   11:24
6    running.
7    Q   And why did you serve only   11:24
8    three-quarters of that second term?
9    A   Because I ran for Mayor before my   11:24
10   term was completed.
11   Q   And who, if anyone, did you run   11:24
12   against for Mayor at that time?
13   A   Paul Pugliese. P-U-G-L, I think it's 11:24
14   I-A-S-E.
15   Q   Other than you and Mr. Pugliese, do   11:25
16   you recall whether anyone else ran for Mayor of
17   Ocean Beach in that election?
18   A   Do I recall? Yes, I recall.   11:25
19   Q   Can you identify --          11:25
20   A   Nobody else ran.          11:25
21   Q   Other than you and Mr. Pugliese?   11:25
22       MR. NOVIKOFF: Objection.   11:25
23   A   Correct.          11:25
24   Q   Did you serve more than one term as   11:25
25   Mayor of Ocean Beach?

14   (Pages 53 to 56)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 57

```
 1            N. Rogers
 2    A   Yes.                11:25
 3    Q   How many terms did you serve?    11:25
 4    A   Two.                11:25
 5    Q   When you ran for re-election to a    11:25
 6  second term as Mayor of Ocean Beach, did anyone
 7  run against you?
 8    A   Yes.                11:26
 9    Q   Can you identify who ran against you  11:26
10  in that election?
11    A   Kathy Wikoff.          11:26
12    Q   Is Ms. Wikoff the only person who ran 11:26
13  against you in your campaign for re-election as
14  Mayor of Ocean Beach?
15    A   Yes.                11:26
16    Q   Did you -- strike that.       11:26
17        Were you affiliated with any      11:26
18  political party in connection with any of your
19  elections to positions at Ocean Beach?
20    A   Yes.                11:26
21    Q   Were you affiliated with more than   11:26
22  one political party for any -- for those
23  elections?
24    A   No.                 11:26
25    Q   And what party were you affiliated   11:26
```

Page 58

```
 1            N. Rogers
 2  with?
 3        MR. NOVIKOFF:  Objection.  I believe 11:26
 4  the witness has a First Amendment right not
 5  to answer what party she was affiliated with
 6  at any given time in her life.
 7        If the question is, did she run on a  11:27
 8  platform of a particular party, that is
 9  appropriate.  To ask the witness what party
10  she was affiliated with, no good.
11        THE WITNESS:  Am I to answer?     11:27
12        MR. NOVIKOFF:  No.          11:27
13        You can ask her if she ran on the    11:27
14  Republican ticket, Democratic ticket or any
15  other ticket.  But to ask her what party she
16  was affiliated with, no.
17        MR. GRAFF:  Mr. Novikoff, I do not   11:27
18  agree that your objection has merit.  And I
19  certainly believe that you are again, as the
20  record will reflect, speaking at greater
21  length than the facts that you intended to
22  communicated warranted.  That said --
23        MR. NOVIKOFF:  I just want the judge 11:27
24  to know when you make your motion that I am
25  objecting on the grounds that you are asking
```

Page 59

```
 1            N. Rogers
 2  this citizen of the United States what her
 3  political registration is, and that is an
 4  inappropriate question to ask.
 5        MR. GRAFF:  When you say        11:27
 6  "inappropriate" -- Mr. Novikoff, if we are
 7  going to have a colloquy on this issue, I
 8  would like to clarify, can we note that that
 9  time will not count towards the hour total?
10        MR. NOVIKOFF:  Yeah, on this one,    11:28
11  sure.
12        MR. GRAFF:  What is your basis for   11:28
13  stating that it is inappropriate?
14        MR. NOVIKOFF:  In my opinion, no     11:28
15  citizen of the United States has to under
16  oath testify as to what their political
17  affiliation is or registration, unless that
18  is an issue that is directly placed in this
19  lawsuit.  And I don't believe it is.
20        MR. GRAFF:  I understand that there  11:28
21  are certain testimonial privileges, such as
22  the Fifth Amendment right against
23  self-incrimination.
24        MR. NOVIKOFF:  Counsel, have you my  11:28
25  objection.  If you want to make -- mark it
```

Page 60

```
 1            N. Rogers
 2  for a ruling and make your motion at the end
 3  of the deposition, I will be more than happy
 4  to bring Ms. Rogers back to answer that
 5  question if the judge should so rule.
 6        MR. GRAFF:  Okay.  And to clarify,   11:28
 7  you had started your answer by stating it is
 8  your opinion.  Is that a matter of opinion,
 9  or do you believe that opinion is grounded
10  in law?
11        MR. NOVIKOFF:  I am not being        11:29
12  deposed.  You can go ask the question.
13        MR. GRAFF:  Okay.            11:29
14        MR. NOVIKOFF:  You got my -- the     11:29
15  court reporter is excellent.  She has taken
16  down every single word that I have spoken.
17  The videographer, I'm sure, is excellent and
18  I am sure the camera has taken down every
19  single word that I have spoken.
20        You have my objection.  You can ask  11:29
21  the witness a question.
22        MR. GRAFF:  Okay.  And if we can note 11:29
23  this time obviously will now be back on the
24  seven-hour clock.
25        MR. NOVIKOFF:  Yes.  You now have    11:29
```

15 (Pages 57 to 60)

36cc7550-5e7e-4e1c-853f-09d9ba020092

```
 1            N. Rogers
 2      seven hours and two minutes.
 3  BY MR. GRAFF:                    11:29
 4      Q    Mayor Rogers, did you run on a party 11:29
 5  platform in any of your elections at Ocean Beach?
 6      A    Yes.                   11:29
 7      Q    And what party?            11:29
 8      A    The Unity Party.        11:29
 9      Q    I'm actually not familiar with the   11:29
10  Unity Party.  Could you describe generally what
11  that party platform consists of.
12      A    It was a local affiliation of people  11:30
13  in Ocean Beach and only Ocean Beach for purposes
14  of running for office.
15      Q    And did -- were you a candidate on    11:30
16  the party platform of the Unity Party in
17  connection with all of your elections at Ocean
18  Beach?
19      A    Yes.                   11:30
20      Q    Does the Unity Party still exist     11:30
21  today?
22      A    I don't believe so.        11:30
23      Q    Do you know when it ceased to exist? 11:30
24      A    Not specifically, no.       11:30
25           MR. GRAFF:  Mr. Jemal, I'm going to  11:31
```

```
 1            N. Rogers
 2      note for the record that you have on
 3      multiple occasions, most recently in the
 4      last few sentences -- seconds, made sighs
 5      and given other indications that you are
 6      unsatisfied with the conduct of this
 7      deposition.  I believe that is disruptive
 8      and improper.  I would ask for you to
 9      refrain from doing that.
10           MR. NOVIKOFF:  I dispute your     11:31
11      characterization of Mr. Jemal's conduct at
12      this deposition.  Move on, Counselor.
13  BY MR. GRAFF:                    11:31
14      Q    Do you know approximately how many   11:31
15  members the Unity Party had at its peak of
16  membership?
17      A    No.                11:31
18      Q    Would you estimate that the Unity    11:32
19  Party ever had more than 50 members at one time?
20           MR. NOVIKOFF:  Objection, foundation. 11:32
21      You can answer.            11:32
22      And form.                11:32
23      A    I don't know that.         11:32
24      Q    During your terms as Mayor, were your 11:32
25  duties in connection with that position the same
```

```
 1            N. Rogers
 2  throughout the period of your service as Mayor?
 3           MR. NOVIKOFF:  Objection, form.      11:32
 4      A    They varied.           11:32
 5      Q    When you served as Mayor of Ocean    11:32
 6  Beach, did you at any point simultaneously hold
 7  the position of police commissioner at Ocean
 8  Beach?
 9           MR. NOVIKOFF:  Objection, form.      11:33
10      A    Yes.                   11:33
11      Q    And were you police commissioner at  11:33
12  Ocean Beach throughout the period that you served
13  as Mayor of Ocean Beach?
14      A    No.                    11:33
15      Q    When did you first become police     11:33
16  commissioner at Ocean Beach?
17      A    I believe it was 2002.      11:33
18      Q    And was that in the middle of one of 11:33
19  your terms as Mayor?
20      A    The start of one.          11:33
21      Q    Had there been a police commissioner 11:33
22  of Ocean Beach prior to the time that you had
23  began serving in that capacity?
24      A    Yes.                   11:34
25      Q    And who was the most recent police   11:34
```

```
 1            N. Rogers
 2  commissioner prior to yourself?
 3           MR. NOVIKOFF:  Objection.           11:34
 4      You can answer.            11:34
 5      A    Trustee Andrew Miller.      11:34
 6      Q    Other than yourself and Trustee      11:34
 7  Andrew Miller, did anybody else serve in the
 8  position as police commissioner of Ocean Beach at
 9  any point during your employment at Ocean Beach?
10           MR. NOVIKOFF:  Objection, form.      11:34
11      A    I don't believe so, no.     11:34
12      Q    Do you know who or what entity was    11:34
13  responsible for the decision to bring the position
14  of police commissioner within the position of
15  Mayor of Ocean Beach?
16           MR. NOVIKOFF:  Objection, form,      11:35
17      foundation.
18      A    The board of trustees.      11:35
19      Q    Do you know who spearhead -- strike  11:35
20  that.
21           Do you know who proposed that the    11:35
22  position of police commissioner of Ocean Beach
23  should become -- should be filled by the Mayor of
24  Ocean Beach?
25           MR. NOVIKOFF:  Objection, form.      11:35
```

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 65

N. Rogers

1  
2    A    I did.                           11:35
3    Q    And when did you make that proposal?  11:35
4    A    In 2002.                         11:35
5    Q    And why did you make that proposal at 11:35
6  that time?
7    A    Because Trustee Miller had been      11:36
8  defeated and was no longer a trustee.  Defeated in
9  an election and was no longer a trustee.
10   Q    Did anyone oppose or object to your  11:36
11  proposal to assume the position of police
12  commissioner of Ocean Beach in your capacity as
13  Mayor of Ocean Beach?
14       MR. NOVIKOFF:  Objection, form.     11:36
15   A    Not to my recollection.          11:36
16   Q    And can you explain why, when Trustee 11:36
17  Miller ceased being a trustee, you proposed that
18  his duties as police commissioner be assigned to
19  yourself in your capacity as Mayor?
20       MR. NOVIKOFF:  Objection, form.     11:36
21   A    I felt it was appropriate.       11:37
22   Q    Had you had any prior experience with 11:37
23  police or law enforcement service?
24   A    No.                              11:37
25   Q    At that time, this is when, in 2002,  11:37

Page 66

N. Rogers

1  
2  you became police commissioner, what were the
3  duties of that position?
4       MR. NOVIKOFF:  Objection, form.     11:37
5    A    General oversight.  General       11:37
6  oversight.
7    Q    Is that with respect to general     11:37
8  oversight over the Ocean Beach Police Department?
9    A    Yes.                             11:37
10   Q    And what was the nature of the work  11:38
11  that you performed when you became police
12  commissioner in 2002 with respect to general --
13  generally overseeing the department?
14       MR. NOVIKOFF:  Objection, form.     11:38
15   A    Regular informational meetings with  11:38
16  the chief of police.
17   Q    Did anyone else participate in those  11:38
18  regular informational meetings with the chief of
19  police?
20   A    Not to my recollection, no.      11:38
21   Q    And who was the chief of police at   11:38
22  that time?
23   A    Edward Paradiso.                 11:38
24   Q    At that time, was Edward Paradiso's  11:38
25  title as chief of police recognized as such by

Page 67

N. Rogers

1  
2  Suffolk County's Department of Civil Service?
3       MS. McEACHIN:  Objection.          11:39
4       MR. NOVIKOFF:  Objection, form.     11:39
5  You can answer.                        11:39
6       THE WITNESS:  I can answer?        11:39
7       MR. NOVIKOFF:  You can answer.      11:39
8    A    Repeat the question, please.     11:39
9    Q    Do you know whether in 2002, when   11:39
10  Edward Paradiso was chief of police, whether that
11  was also his position in connection with Suffolk
12  County Civil Service requirements?
13       MR. NOVIKOFF:  Objection.          11:39
14       MS. McEACHIN:  Objection.          11:39
15       MR. NOVIKOFF:  Form, calls for a    11:39
16  legal conclusion, among other problems.
17       You can answer.                   11:39
18       THE WITNESS:  I can answer?        11:39
19       MR. NOVIKOFF:  Until I tell you not  11:39
20  to, you can answer.
21   A    No.                              11:39
22       MR. JEMAL:  Can we step out for just  11:39
23  a minute?
24       MR. NOVIKOFF:  Sure.              11:39
25       THE VIDEOGRAPHER:  The time is now   11:39

Page 68

N. Rogers

1  
2  11:39 a.m.
3       We are now off the record.         11:40
4       (Recess taken.)                    11:40
5       THE VIDEOGRAPHER:  This is the start 11:50
6  of tape number two.  The time is now
7  11:50 a.m.
8       We are now back on the record.     11:50
9  BY MR. GRAFF:                          11:50
10   Q    How frequently would you have regular 11:51
11  informational meetings with Chief Paradiso when
12  you -- in the first year of your service as police
13  commissioner of Ocean Beach?
14       MR. NOVIKOFF:  Note my objection to  11:51
15  the form.
16       You may answer the question.       11:51
17   A    Approximately once a week during the  11:51
18  summer months, July and August.
19   Q    And who else, if anyone, would       11:51
20  participate in those regular informational
21  meetings?
22   A    No one.                          11:51
23   Q    Did you take any notes during those  11:51
24  meetings?
25   A    Generally not.                   11:51

17  (Pages 65 to 68)

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1    N. Rogers
2    **Q     Did you sometimes take notes during**   11:51
3    **those meetings?**
4    A    Not that I can recall, no.        11:51
5    **Q     Are there any documents that could**   11:52
6    **reflect your recollection as to whether you took**
7    **notes during those informational meetings?**
8         MR. NOVIKOFF:  Reflect her        11:52
9         recollection?
10        MR. GRAFF:  Refresh, excuse me.     11:52
11   A    I don't believe so, no.         11:52
12   **Q     And could you describe the types of**   11:52
13   **information that Chief Paradiso would communicate**
14   **to you in your capacity as police commissioner in**
15   **those meetings?**
16        MR. NOVIKOFF:  Objection, form.     11:52
17   A    Generally a discussion about what was 11:52
18   happening.  If there were any major problems.  If
19   everything was working well.  If we were on
20   budget.
21        They were not formal meetings, nor   11:52
22   was the format formal.
23   **Q     And did you continue to have regular**   11:53
24   **informational meetings of that nature throughout**
25   **the period of your service as police commissioner?**

1         N. Rogers
2         MR. NOVIKOFF:  Objection, form.     11:53
3    A    Only with Ed Paradiso during the time 11:53
4    that he remained in the capacity as police chief.
5    **Q     And at what time did he cease serving 11:53**
6    **in that capacity, and those meetings stop**
7    **happening?**
8         MR. NOVIKOFF:  Objection, form.     11:53
9    A    He had an injury to his -- I believe 11:53
10   it was his leg or his heel, which somewhat
11   incapacitated him, and he could not continue his
12   full-time activities as police commissioner.
13   **Q     And when did that occur?        11:54**
14   A    I do not recall the date.        11:54
15   **Q     Do you recall what year it was?     11:54**
16   A    To the best of my recollection, it    11:54
17   was in -- someplace in or around 2005.
18   **Q     When did you stop serving as Mayor of 11:54**
19   **Ocean Beach?**
20   A    My term ended on July 3rd, 2006.     11:54
21   **Q     From the time that Chief Paradiso    11:54**
22   **stopped serving in the capacity of chief through**
23   **July 3rd, 2006, did another individual assume his**
24   **role in those regular informational meetings that**
25   **you had been having until that point with**

1         N. Rogers
2    **Chief Paradiso?**
3         MR. NOVIKOFF:  Objection, form.     11:55
4         If you understand the question, you   11:55
5    can answer it.
6    A    No.                   11:55
7    **Q     And were you responding to my        11:55**
8    **question or to your counsel's statement?**
9    A    To your question.           11:55
10   **Q     Thank you.              11:55**
11        From the time that you became police  11:55
12   **commissioner in 2002, until the time that**
13   **Chief Paradiso stopped serving as chief in 2005,**
14   **did your duties as police commissioner involve**
15   **anything other than the regular informational**
16   **meetings that you have already referred to?**
17        MR. NOVIKOFF:  Objection, form.     11:55
18   A    I don't believe so.          11:56
19   **Q     From the time Chief Paradiso stopped  11:56**
20   **serving as chief in 2005, until July 3rd, 2006,**
21   **what, if anything, were your duties as police**
22   **commissioner?**
23        MR. NOVIKOFF:  Objection, form.     11:56
24   A    Just obtain general information as to 11:56
25   the operation of the police department.

1         N. Rogers
2    **Q     And was there a designated person at 11:57**
3    **the police department who was responsible for**
4    **communicating that general information to you?**
5    A    Yes.                  11:57
6    **Q     And who was that person?         11:57**
7    A    George Hesse.              11:57
8    **Q     And was anybody other than George    11:57**
9    **Hesse responsible for communicating that**
10   **information to you during that period?**
11        MR. NOVIKOFF:  Objection, form.     11:57
12   A    Not to my knowledge, no.        11:57
13   **Q     And what was George Hesse's title    11:57**
14   **during that period?**
15        MR. NOVIKOFF:  Objection, form.     11:57
16   A    Acting police commissioner.       11:57
17   **Q     I'm sorry, did you mean acting police 11:57**
18   **chief?**
19   A    Police chief, excuse me, yes.      11:57
20   **Q     Did the Village board of trustees    11:57**
21   **pass a resolution conferring the title of acting**
22   **police chief on George Hesse?**
23   A    I believe it was deputy police chief, 11:58
24   the resolution.  The answer is yes.
25   **Q     Do you recall who proposed that      11:58**

18 (Pages 69 to 72)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 73

```
 1            N. Rogers
 2  resolution?
 3      A    I did.                    11:58
 4      Q    And why did you propose that George  11:58
 5  Hesse assume the role of acting police chief?
 6      A    Because I felt it was appropriate to  11:58
 7  formalize his status.
 8      Q    And can you explain what you mean by  11:58
 9  "formalize his status"?
10          MR. NOVIKOFF:  It's a yes-or-no    11:58
11      question.  Can you explain?
12      A    Yes.                      11:58
13      Q    Please explain what you meant by   11:59
14  "formalize his status."
15      A    He was acting in the capacity of    11:59
16  police chief.  I felt it appropriate that it be
17  done by a board resolution.
18      Q    Do you recall when he began acting in 11:59
19  the capacity of acting police chief prior to that
20  role being formalized by that resolution?
21      A    No, I do not.  I do not recall the   11:59
22  date.
23      Q    Was he acting in that capacity prior  11:59
24  to the time that Edward Paradiso sustained an
25  injury and stopped serving actively as police
```

Page 74

```
 1            N. Rogers
 2  chief?
 3          MR. NOVIKOFF:  Objection, form.    11:59
 4      A    No.                        11:59
 5      Q    Do you know who, if anyone, was     12:00
 6  responsible for the decision, if one was made, for
 7  George Hesse to begin informally acting in the
 8  capacity of police chief?
 9          MR. NOVIKOFF:  Objection, form.    12:00
10      A    Yes.                      12:00
11      Q    Who was responsible for that      12:00
12  decision?
13      A    It was more than one person.    12:00
14      Q    Could you identify all of the     12:00
15  individuals who were responsible for that
16  decision?
17      A    Give me the time frame again, if you 12:00
18  will, Counselor, please.
19      Q    Sure.  After Edward Paradiso stopped 12:00
20  serving as police chief in approximately 2005,
21  through the time when George Hesse's role as
22  acting police chief was formalized by resolution.
23          MR. NOVIKOFF:  Objection, form.   12:01
24      A    The board of trustees as a group.   12:01
25      Q    As Mayor, were you the chairman of  12:01
```

Page 75

```
 1            N. Rogers
 2  the board of trustees?
 3          MR. NOVIKOFF:  Objection, form.    12:01
 4      A    Yes.                      12:01
 5      Q    Do you know who proposed initially to 12:01
 6  the board of trustees that George Hesse should
 7  assume the duties of acting police chief during
 8  that time?
 9          MR. NOVIKOFF:  Objection, form, asked 12:02
10      and answered.
11      A    No.                       12:02
12      Q    Do you know whether the board of    12:02
13  trustees -- strike that.
14          For what length of time was George   12:02
15  Hesse acting police chief prior to the resolution
16  formalizing that title?
17      A    I do not know.              12:02
18      Q    Was it more than a year?      12:02
19          MR. NOVIKOFF:  Objection.        12:02
20      A    I don't believe so, but I do not know 12:02
21  for certain.
22      Q    At the time that Edward Paradiso    12:03
23  communicated that he would not be able to continue
24  actively serving as police chief, did you
25  participate in any discussions regarding who would
```

Page 76

```
 1            N. Rogers
 2  assume his duties at the police department?
 3          MR. NOVIKOFF:  Objection, form.    12:03
 4      A    Yes.                      12:03
 5      Q    And who did you have those      12:03
 6  discussions with?
 7      A    Members of the board of trustees.   12:03
 8      Q    Who specifically, please?      12:03
 9      A    Trustee Jim Mallott and Trustee Joe 12:03
10  Loeffler.
11          MR. JEMAL:  Can we step out for a   12:04
12      second?
13          MR. GRAFF:  Note for the record that 12:04
14      Village attorney has requested a break.
15          MR. NOVIKOFF:  No.           12:04
16          THE VIDEOGRAPHER:  The time is now -- 12:04
17          MR. NOVIKOFF:  For the record,      12:04
18      defendants have requested a break.
19          THE VIDEOGRAPHER:  Time is now       12:04
20      12:04 p.m.
21          We are now off the record.       12:04
22          (Recess taken.)              12:04
23          THE VIDEOGRAPHER:  The time is now   12:05
24      12:05 p.m.
25          We are now back on the record.    12:05
```

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 77

1          N. Rogers
2          MR. GRAFF:  Could the court reporter  12:05
3    please read back my last question to Mayor
4    Rogers and her last response.
5          (Record read.)          12:06
6   BY MR. GRAFF:                   12:06
7      Q      Mayor Rogers, do you recall what    12:06
8   George Hesse's title was at the time that
9   Chief Paradiso stopped serving as police chief?
10         MR. NOVIKOFF:  Objection, form.    12:06
11     A    I believe it was sergeant.       12:06
12     Q      Do you recall whether the title of   12:06
13  sergeant was conferred on George Hesse by
14  resolution of the board of trustees?
15     A    It was not.          12:06
16     Q      Do you know when George Hesse      12:06
17  attained the title of sergeant?
18         MR. NOVIKOFF:  Objection, form.    12:06
19     A    No, I do not.          12:07
20     Q      Do you know whether George Hesse was  12:07
21  serving as police sergeant during any period of
22  time when Ed Paradiso was serving as police chief?
23         MR. NOVIKOFF:  Objection, form.    12:07
24     A    I do not know the time.       12:07
25     Q      Mayor Rogers, when you were a member  12:07

Page 78

1          N. Rogers
2   of the Civil Service Commission of New York City,
3   and you heard grievances by employees of New York
4   City, did any of those grievances involve members
5   of any police department?
6      A    No.              12:08
7          MS. McEACHIN:  Objection.       12:08
8          THE WITNESS:  Sorry.        12:08
9   BY MR. GRAFF:                   12:08
10     Q      Did you have conversations      12:08
11  individually with Trustee Mallott with respect to
12  the decision for George Hesse to serve as acting
13  police chief?
14         MR. NOVIKOFF:  Objection.  To the   12:08
15  extent any conversation individually was had
16  with Mr. Mallott during executive session, I
17  would instruct you not to answer the
18  question on the basis of privilege.
19         Other than in executive session, you  12:08
20  may proceed to answer.
21         MR. GRAFF:  I am going to need to     12:08
22  clarify, Mr. Novikoff, the nature of your
23  objection here.
24         MR. NOVIKOFF:  What exactly from my   12:08
25  statement didn't you understand, Counselor?

Page 79

1          N. Rogers
2          MR. GRAFF:  Well, are you instructing  12:08
3   the witness not to answer on the basis of a
4   privilege?
5          MR. NOVIKOFF:  Well, let's see.  I    12:08
6   said don't answer the question, and I said
7   privilege.  So, my question to you once
8   again is, Counselor, what didn't you
9   understand by my statement?
10         MR. GRAFF:  I do not understand what  12:09
11  privilege you are invoking in this context.
12         MR. NOVIKOFF:  Communications among  12:09
13  the trustees during executive sessions are
14  privileged.  I am instructing her not to
15  answer the question.
16         If it was a conversation outside of  12:09
17  executive session, she may answer the
18  question.
19         MR. GRAFF:  Is your objection --     12:09
20         MR. NOVIKOFF:  Counselor, ask the    12:09
21  question.  I have now told you twice the
22  basis for my objection.  Whether or not you
23  agree with it, I don't care.
24         MR. GRAFF:  I am looking for       12:09
25  clarification.

Page 80

1          N. Rogers
2          MR. NOVIKOFF:  There is no need for  12:09
3   clarification.
4          MR. GRAFF:  Counsel, there is.       12:09
5          MR. NOVIKOFF:  I couldn't have been  12:09
6   clearer.  I couldn't have been more clear.
7   I'm not being deposed here.  I have
8   objected.  I've told you what my objection
9   is.  It's in the record.  Proceed.
10         MR. GRAFF:  Your objection is       12:09
11  improper.  We can mark this for a ruling.
12         MR. NOVIKOFF:  I assumed you would   12:10
13  think it was improper.  Let's mark it for a
14  ruling.
15  BY MR. GRAFF:                   12:10
16     Q      Mayor Rogers, when the board of     12:10
17  trustees meets in executive session, does it ever
18  do so with more -- strike that.
19         Does it ever do so with fewer than   12:10
20  three members of the board of trustees?
21         MR. NOVIKOFF:  Objection to the form. 12:10
22     A    No.              12:10
23     Q      Did you ever have any conversations  12:10
24  with Trustee Mallott individually concerning the
25  decision for George Hesse to assume the role of

20  (Pages 77 to 80)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 81

```
1              N. Rogers
2   acting police chief?
3        MR. NOVIKOFF: Again, if the question 12:10
4   requires you to answer about something that
5   took place in executive session, I instruct
6   you not to answer.
7        If the conversation took place in any 12:11
8   other area outside of executive session, you
9   may answer the question.
10       MR. GRAFF: If we could mark the    12:11
11  record again.
12       MR. NOVIKOFF: It was the same      12:11
13  question that you asked five minutes ago.
14       MR. GRAFF: It's your objection     12:11
15  again.
16       MR. NOVIKOFF: I like to be         12:11
17  consistent.
18   A    Yes.                    12:11
19   Q    How many such conversations did you 12:11
20  have with Trustee Mallott?
21   A    I have no recollection.            12:11
22   Q    Do you recall what Trustee Mallott 12:11
23  said to you in those conversations?
24   A    General agreement. I do not recall 12:11
25  any specific words that we used.
```

Page 82

```
1              N. Rogers
2   Q    Agreement, general agreement with  12:12
3   what?
4   A    What was your question?            12:12
5   Q    You used the phrase "general       12:12
6   agreement" in your last response.
7   A    Right.                     12:12
8   Q    My question now is, what were you  12:12
9   referring to when you said "general agreement"?
10       MR. NOVIKOFF: I believe she said   12:12
11  your question.
12   A    Your question, yes.               12:12
13   Q    Thank you.                   12:12
14   Do you recall anything that you said 12:12
15  to Trustee Mallott in those conversations?
16   A    Not specifically, no.              12:12
17   Q    Did you have any conversations with 12:12
18  Joe Loeffler individually with respect to the
19  decision for George Hesse to assume the duties of
20  acting police chief?
21       MR. NOVIKOFF: Again, if the        12:12
22  conversation took place during executive
23  session, I instruct you not to answer. In
24  any other context, you may answer.
25   A    Yes.                      12:13
```

Page 83

```
1              N. Rogers
2        MR. GRAFF: Again, could we --      12:13
3        MR. NOVIKOFF: Yes. Mark for a      12:13
4   ruling.
5        MR. GRAFF: I wasn't asking you,    12:13
6   Mr. Novikoff. I was asking the court
7   reporter to please mark that.
8        MR. NOVIKOFF: Okay.              12:13
9   BY MR. GRAFF:                      12:13
10   Q    Do you recall how many such        12:13
11  conversations you had with Trustee Loeffler?
12   A    No, I do not.                    12:13
13   Q    Is the Trustee Loeffler who you are 12:13
14  referring to currently the Mayor of Ocean Beach?
15   A    Correct.                   12:13
16   Q    At the time -- as of the time that 12:13
17  Edward Paradiso stopped serving actively as police
18  chief, had you had any direct communications with
19  George Hesse with respect to the Ocean Beach
20  Police Department?
21       MR. NOVIKOFF: Objection, form.     12:14
22  You can answer.                    12:14
23   A    Not that I can recall, no.         12:14
24   Q    Did you have any knowledge at that 12:14
25  time concerning George Hesse's performance as an
```

Page 84

```
1              N. Rogers
2   Ocean Beach police officer?
3   A    Not specifically.                 12:14
4   Q    Do you recall what, if any,        12:14
5   information you did have with respect to his
6   performance as a police officer?
7        MR. NOVIKOFF: Objection, form.     12:14
8   You can answer.                    12:14
9   A    A satisfactory performance in       12:14
10  general.
11   Q    And what was the basis for your    12:14
12  knowledge of that information?
13   A    Information from Ed Paradiso.       12:14
14   Q    Did Ed Paradiso indicate to you at 12:14
15  the time that he stopped serving actively as
16  police chief that he believed that George Hesse
17  should assume his duties as acting police chief?
18   A    He did not.                   12:15
19   Q    Did you have any discussions with Ed 12:15
20  Paradiso regarding the decision for George Hesse
21  to assume the role of acting police chief?
22   A    Yes.                      12:15
23   Q    Do you recall how many such        12:15
24  conversations you had?
25   A    I only recall one.               12:15
```

21  (Pages 81 to 84)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 85

N. Rogers

1
2    Q    And, in substance, what do you recall 12:15
3    of that conversation?
4    A    Ed Paradiso did not feel that George 12:15
5    Hesse would be the right person as acting police
6    chief.
7    Q    Did he explain to you why he felt    12:16
8    that way?
9    A    No.                   12:16
10    Q    Did you ask him why he felt that way? 12:16
11    A    No.                   12:16
12    Q    Did you have any information at that 12:16
13    time concerning the basis for Ed Paradiso's
14    feeling that George Hesse would not be an
15    appropriate person to serve in the role of active
16    police chief?
17        MR. NOVIKOFF: Objection, form.    12:16
18    A    I don't believe so, no.   12:16
19    Q    Did you have any communications     12:17
20    individually with Trustee Mallott concerning Ed
21    Paradiso's feeling that it would not be
22    appropriate for George Hesse to serve as acting
23    police chief?
24        MR. NOVIKOFF: Again, same caution. 12:17
25    If it occurred in executive session, I

Page 86

N. Rogers

1
2    instruct you not to answer on the basis of
3    privilege.
4        If any conversation occurred outside 12:17
5    of it, you can answer.
6        MR. GRAFF: If we can please mark the 12:17
7    transcript.
8    A    No.                   12:17
9    Q    No, you did not communicate that fact 12:17
10    to Trustee Mallott?
11    A    You asked did we have any        12:17
12    conversations, and my answer is no.
13    Q    Okay. Did you communicate to     12:17
14    Trustee Mallott that Ed Paradiso had informed you
15    that he did not believe that it would be
16    appropriate for George Hesse to assume the role of
17    acting police chief?
18        MR. NOVIKOFF: Same caution and    12:17
19    instruction with regard to privilege.
20        MR. GRAFF: Mark the record, please. 12:17
21    A    I believe I spoke to him about it. I 12:18
22    have no recollection as to when.
23    Q    Do you recall anything of the     12:18
24    substance of what was discussed with
25    Trustee Mallott when you spoke to him about that

Page 87

N. Rogers

1
2    subject?
3    A    I was not comfortable with the    12:18
4    veracity of information I was getting from Ed
5    Paradiso.
6    Q    Why were you uncomfortable with the 12:18
7    veracity of that information?
8    A    There was a question about working  12:18
9    time on the part of Ed Paradiso. It had been
10    raised by others in the Village and the board of
11    trustees, and I had looked into the possibility of
12    him working another job on time that he was signed
13    in for having worked in the Village.
14    Q    And were you able to confirm whether 12:19
15    Ed Paradiso in fact was working at another job
16    during time that he indicated that he was working
17    at the Village?
18    A    I did. And I found some overlap of  12:19
19    time.
20    Q    What was the other position that he  12:19
21    was working at while he was working at -- while he
22    was on the clock at Ocean Beach?
23    A    Doing security in a -- I believe it's 12:20
24    a high school in East Islip on the mainland.
25    Q    And how much overlap did you find?   12:20

Page 88

N. Rogers

1
2        MR. NOVIKOFF: Note my objection to  12:20
3    the form.
4        You can answer.               12:20
5    A    I can't tell you how many hours. It 12:20
6    was a small number of hours, but there was some
7    overlap that I did find.
8    Q    Do you recall whether the number of  12:20
9    hours was fewer than 20 hours in total?
10    A    I do not recall the number of hours,  12:20
11    no.
12    Q    How did you verify that that overlap 12:20
13    existed?
14    A    I was given sign-ins for the school  12:20
15    and I obtained the time sheets from the Village
16    records for the periods in question.
17    Q    Did anyone else participate with you 12:21
18    in your investigation or attempt to verify whether
19    that overlap existed?
20        MR. NOVIKOFF: Objection, form.    12:21
21    A    When I completed my own review and  12:21
22    analysis, I sent the information --
23        THE WITNESS: Now, again, is this   12:21
24    privileged? I don't know.
25        MR. GRAFF: If you need to confer   12:21

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 89

N. Rogers

1  N. Rogers
2  with your counsel.
3       THE WITNESS:  I may have to.  Excuse  12:21
4  me.
5       MR. NOVIKOFF:  Let's.          12:21
6       THE VIDEOGRAPHER:  The time is now   12:21
7  12:21 p.m.
8       We are now off the record.      12:21
9       (Recess taken.)         12:21
10      THE VIDEOGRAPHER:  The time is now   12:23
11  12:23 p.m.
12      We are now back on the record.     12:23
13      MR. GRAFF:  Could the court reporter  12:24
14  please read back the last question and
15  response.
16      (Record read.)          12:24
17      MR. NOVIKOFF:  You can answer the   12:24
18  question.
19  BY MR. GRAFF:              12:24
20   Q    Can you finish answering the    12:24
21  question.
22   A    I sent the information to our Village 12:24
23  attorney, Peter Bee, and I asked him --
24      MR. NOVIKOFF:  Mmm, mmm.       12:24
25      THE WITNESS:  Sorry.        12:24

Page 90

N. Rogers

1       N. Rogers
2   A    I sent the information to Peter Bee.  12:24
3   Q    Did you confront Ed Paradiso with   12:24
4  your conclusion and the outcome of your
5  investigation?
6       MR. NOVIKOFF:  Objection to form.   12:24
7   A    No.             12:24
8   Q    Why not?        12:24
9       MR. NOVIKOFF:  If the answer requires 12:25
10  you to disclose attorney-client privilege,
11  then I will instruct you not to answer.  If
12  it doesn't, then you should answer.
13   A    I will only say that I wanted an    12:25
14  opinion from the Village attorney.
15   Q    Before discussing the issue with Ed  12:25
16  Paradiso?
17   A    Before anything.         12:25
18   Q    Did there ever come a point in time  12:25
19  when you did confront Ed Paradiso about the
20  conclusions of your investigation?
21      MR. NOVIKOFF:  Objection to the form. 12:25
22      You can answer.          12:25
23   A    No.             12:25
24   Q    Did you have any conversations    12:25
25  individually with Joe Loeffler concerning your

Page 91

N. Rogers

1       N. Rogers
2  investigation and its outcome?
3       MR. NOVIKOFF:  One, objection to    12:26
4  form.
5       Two, same instructions as before.  If 12:26
6  any conversation with Trustee Loeffler took
7  place in executive session, you shall not
8  answer the question on the basis of
9  privilege, and if it took place outside of
10  executive session, you are free to answer.
11      MR. GRAFF:  Please mark the      12:26
12  transcript.
13   A    I do not recall discussing this with 12:26
14  Trustee Loeffler.
15   Q    Did you have any discussions     12:26
16  individually with Trustee Loeffler concerning Ed
17  Paradiso's statement to you that he did not
18  believe that it would be appropriate for George
19  Hesse to assume the role of acting police chief?
20      MR. NOVIKOFF:  Same instructions   12:26
21  regarding the executive session privilege.
22      MR. GRAFF:  Please mark the      12:26
23  transcript.
24   A    I do not recall discussing that with 12:26
25  him, no.

Page 92

N. Rogers

1       N. Rogers
2   Q    So, when you had conversations    12:27
3  concerning the decision for George Hesse to assume
4  the role of acting police chief with Trustee
5  Mallott and Joe Loeffler and there was general
6  agreement that he should assume that role, did you
7  at any point in those discussions indicate that Ed
8  Paradiso did not agree with that, and did not
9  believe that he should assume that role?
10      MR. NOVIKOFF:  Note my objection.   12:27
11   A    All those discussions were in     12:27
12  executive session.
13   Q    Was counsel present for those     12:27
14  discussions?
15      MR. NOVIKOFF:  In executive session? 12:27
16      MR. GRAFF:  Yes.          12:27
17      MR. NOVIKOFF:  Okay.        12:27
18   A    I believe so.          12:27
19   Q    Was counsel present so that he could 12:27
20  provide legal advice to the board of trustees in
21  those executive sessions?
22      MR. NOVIKOFF:  Objection to form.   12:28
23      You can answer.          12:28
24   A    There was no legal advice requested.  12:28
25   Q    To your -- do you recall whether Joe 12:28

23  (Pages 89 to 92)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 93

N. Rogers

1
2    Loeffler ever indicated to you that he had any
3    doubts about the veracity of information
4    communicated to him by Ed Paradiso?
5              MR. NOVIKOFF:  Same executive session 12:29
6        privilege being asserted.
7              MR. GRAFF:  Please mark the        12:29
8        transcript.
9        A    No.                      12:29
10       Q    Did Trustee Mallott ever communicate 12:29
11   to you that he had any concerns concerning the
12   veracity of information provided to him by Ed
13   Paradiso?
14             MR. NOVIKOFF:  Same executive session 12:29
15       privilege.
16             MR. GRAFF:  Please mark the        12:29
17       transcript.
18       A    No.                      12:29
19       Q    Did you have any conversations with  12:29
20   George Hesse concerning your investigation into
21   the time overlap issue involving Ed Paradiso?
22       A    No.                      12:29
23       Q    Other than in the presence of        12:30
24   counsel, did you have any conversations with
25   anyone concerning your investigation into the time

Page 94

N. Rogers

1
2    overlap issue involving Ed Paradiso?
3        A    Not that I recall.            12:30
4        Q    Did you have any conversations with  12:30
5    George Hesse concerning Ed Paradiso's belief that
6    it would not be appropriate for George Hesse to
7    assume the role of acting police chief?
8        A    I don't believe so, no.        12:30
9        Q    When Ed Paradiso told you that he did 12:30
10   not believe it would be appropriate for George
11   Hesse to assume the role of acting police chief,
12   did you make any effort to corroborate the
13   veracity of his statement?
14             MR. NOVIKOFF:  Huh?  Objection to     12:31
15       form.
16       A    I think I answered that before.     12:31
17             MR. NOVIKOFF:  I don't even         12:31
18       understand it.
19       A    The answer is no.             12:31
20       Q    I may have been unclear.  When --   12:31
21       A    I gave you the answer.          12:31
22       Q    When Ed Paradiso told you that he did 12:31
23   not believe it would be appropriate for George
24   Hesse to serve as acting chief, did you consult
25   with anybody else to attempt to corroborate

Page 95

N. Rogers

1
2    whether there was any basis for Ed Paradiso's
3    belief?
4              MR. NOVIKOFF:  One, objection to     12:31
5        form.  Two, to the extent that you did
6        undertake any activity in the presence of
7        counsel, I instruct you not to answer.  But
8        other than that, you can answer.
9        A    Only in executive session.        12:31
10       Q    Was that in the presence of counsel? 12:31
11       A    Probably.  The reason I say that     12:32
12   is --
13             MR. NOVIKOFF:  No, no, no.  You      12:32
14       answered the question.  Probably.
15       A    Probably.                    12:32
16       Q    Does that mean you are not certain   12:32
17   whether counsel was present?
18             MR. NOVIKOFF:  Objection to form.   12:32
19       You can answer.                12:32
20       A    Yes.                     12:32
21       Q    Is it possible that counsel was not  12:32
22   present?
23             MR. NOVIKOFF:  Objection to the form. 12:32
24       A    It's possible.  Not likely.        12:32
25       Q    If counsel was present, do you recall 12:32

Page 96

N. Rogers

1
2    whether counsel's presence was for the purpose of
3    providing legal advice?
4              MR. NOVIKOFF:  Objection to form.    12:32
5        You can answer the question.        12:32
6        A    No.  No.                  12:33
7        Q    No, you do not recall, or no, that   12:33
8    was not his purpose?
9              MR. NOVIKOFF:  Objection to form.    12:33
10       A    No, not necessarily his purpose.    12:33
11       Q    Did counsel communicate legal advice 12:33
12   during that executive session?
13       A    Counsel -- counsel gave legal advice 12:33
14   when asked for it.  There were times when he did
15   not.
16       Q    Did counsel give legal advice during 12:34
17   an executive session with respect to the basis for
18   Ed Paradiso's belief that George Hesse should not
19   assume the role of acting police chief?
20             MR. NOVIKOFF:  Objection, one, to    12:34
21       form.  The question presumes that
22       conversations took place in executive
23       session concerning that very topic, which
24       would be privileged.  I don't believe there
25       has been any waiver of the privilege.

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1
2       So I am going to instruct you not to  12:34
3  answer that question on the grounds of
4  executive session privilege, as I have
5  stated before.  So don't answer the
6  question.
7       MR. GRAFF:  Is that a statutory       12:35
8  privilege?
9       MR. NOVIKOFF:  Just mark it for a      12:35
10  ruling, Counsel.  You see the problem is,
11  counsel is present during executive session.
12  Therefore, communications among the trustees
13  in the presence of counsel are privileged.
14  That is the basis.  Mark it for a ruling.
15       MR. GRAFF:  Even if those            12:35
16  communications were not for legal advice?
17       MR. NOVIKOFF:  You are a smart boy.   12:35
18  When did you graduate, 2006?  You know the
19  answer to that.
20       You can mark it for a ruling.        12:35
21       MR. GRAFF:  We are going to need      12:35
22  to --
23       MR. NOVIKOFF:  And I believe there is 12:35
24  also legislative immunity, but that's okay.
25  Mark it for a ruling.

N. Rogers

1
2       MR. GRAFF:  I would like to go off   12:35
3  the record so we can attempt to reach
4  Judge Boyle for a ruling.
5       MR. NOVIKOFF:  You got it.           12:35
6       THE VIDEOGRAPHER:  The time is       12:35
7  12:35 p.m.
8       We are now off the record.           12:35
9       (Recess taken.)                      12:35
10       THE VIDEOGRAPHER:  The time is now   12:54
11  12:54 p.m.
12       We are now back on the record.       12:54
13  BY MR. GRAFF:                             12:54
14       Q    Prior to your proposing to the board 12:55
15  that George Hesse's role as acting police chief
16  should be formalized by a resolution, did you have
17  any conversations individually with Trustee
18  Loeffler, with respect to Trustee Loeffler's
19  opinion as to George Hesse's suitability for that
20  position?
21       MR. NOVIKOFF:  Objection to form, and 12:55
22  to the extent it involves executive session
23  communications.
24       MR. GRAFF:  Please mark the          12:55
25  transcript.

N. Rogers

1
2       A    I believe we discussed this in       12:55
3  executive session.
4       Q    Did you have any conversations       12:55
5  involving only yourself and defendant Loeffler
6  with respect to that subject?
7       MR. NOVIKOFF:  Objection to form.      12:56
8       A    I don't think so, out of executive  12:56
9  session.
10       Q    I just want to make sure I understand 12:56
11  what you are referring to.
12       Are you referring to the possibility  12:56
13  that this was discussed in an executive session
14  that involved only you and defendant Loeffler?
15       MR. NOVIKOFF:  Objection to the form  12:56
16  of the question.
17       A    No.  You can't have a session with  12:56
18  less than three people.
19       Q    Okay.  So, you don't recall whether  12:56
20  you and Loeffler, only the two of you, ever
21  discussed whether George Hesse would be suitable
22  for the role of acting police chief?
23       MR. NOVIKOFF:  Objection, form.       12:56
24       A    I don't recall, no.              12:56
25       Q    What was -- was it your belief, when  12:57

N. Rogers

1
2  you proposed that George Hesse should assume the
3  role of acting police chief, that he would be
4  suitable in that role?
5       MR. NOVIKOFF:  Objection to form.      12:57
6       A    Yes.                             12:57
7       Q    What information, if any, was the  12:57
8  basis for your belief?
9       A    He had been doing it.  He had been  12:57
10  doing the job without formal resolution of the
11  board.
12       Q    And did you have any evidence or   12:57
13  information at that time to indicate that he had
14  been doing that job in a manner that was
15  appropriate?
16       MR. NOVIKOFF:  Objection to the form. 12:58
17       A    Yes, he appeared to be suitable.  12:58
18       Q    And in what way did he appear to be  12:58
19  suitable?
20       A    At all board meetings, the chief of  12:58
21  police was always requested to give a public
22  report of police activities.  And based upon these
23  reports and the information given out at the time,
24  it appeared to be suitable.
25       Q    And who was the individual who made  12:58

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 101

N. Rogers

1
2    these reports that you are referring to?
3        A    Whoever was the chief of police at -- 12:58
4    this was a standard procedure at all board
5    meetings of the board of directors of the Village.
6        Q    Okay.  The board of directors or the 12:59
7    board of trustees?
8        A    The board of trustees.  I'm sorry.   12:59
9    Excuse me on that.
10       Q    Did the Ocean Beach police chief make 12:59
11   reports to the effect that George Hesse was
12   suitable for the role of acting police chief?
13           MR. NOVIKOFF: I'm sorry, before you 12:59
14       answer, could you just read that question
15       back.  I just want to make sure my objection
16       is well founded.
17           (Record read.)              12:59
18       MR. NOVIKOFF: Yes, objection to     12:59
19       form.
20           If you understand the question.     12:59
21       A    It was never discussed.  The answer 13:00
22   is no.
23       Q    Okay.  Specifically, what evidence   13:00
24   did you have, if any, at the time that Ed Paradiso
25   stopped actively serving as police chief, that

Page 102

N. Rogers

1
2    would support your belief that George Hesse was
3    suitable to take on the role of acting police
4    chief?
5           MR. NOVIKOFF: Objection.  Objection 13:00
6       to form, foundation.
7       A    He had been performing the job.  To  13:00
8    the extent that it was not being performed by Ed
9    Paradiso, he had been performing this job and
10   performing it adequately.
11       Q    And to what extent was the job not   13:01
12   being performed by Edward Paradiso?
13       A    His in--              13:01
14           MR. NOVIKOFF: Objection.      13:01
15           THE WITNESS: I'm sorry?      13:01
16       A    His inability, because of a physical 13:01
17   problem with his foot, his inability to do the
18   entire job of police chief.
19       Q    And what is the basis for your belief 13:01
20   that he had been performing that role in a manner
21   that suggested to you that he would be appropriate
22   for the role of acting police chief?
23           MR. NOVIKOFF: Objection to form.    13:02
24       Asked and answered.
25       A    He who?  You said "he."       13:02

Page 103

N. Rogers

1
2        Q    That George Hesse would be suitable  13:02
3    for the role of acting police chief.
4           MR. NOVIKOFF: Objection.      13:02
5       A    I answered that before.  He had been 13:02
6    performing the duties to the extent that
7    Mr. Paradiso was not doing them.
8        Q    Okay.  How do you know that he,    13:02
9    George Hesse, had been performing those duties?
10           MR. NOVIKOFF: Objection, form.    13:02
11       A    Observation on the part of myself and 13:02
12   other trustees.
13       Q    What did you observe of George Hesse 13:02
14   fulfilling the role of acting police chief when Ed
15   Paradiso was still police chief?
16           MR. NOVIKOFF: Objection to the form. 13:02
17       It was the last part of that sentence that I
18       didn't understand.
19           But you can answer.       13:02
20       A    He was still designated as police    13:03
21   chief but had been -- his actual performance of
22   his duties had been diminishing because of a
23   health and physical inability situation.
24       Q    Okay.  I understand that.  How do you 13:03
25   know that George Hesse was taking on those duties

Page 104

N. Rogers

1
2    at that time?
3        A    Physical evidence, such as       13:03
4    scheduling, preparing budgetary information.
5        Q    In what way did physical evidence of 13:04
6    scheduling indicate to you that George Hesse had
7    been taking on the role or duties of police chief
8    or acting police chief while Ed Paradiso was
9    officially serving in that position?
10       A    Because Ed didn't prepare the     13:04
11   schedules but George did.
12       Q    How do you know that George did?   13:04
13       A    I guess we looked at -- some of the  13:04
14   trustees and myself saw schedules that were
15   prepared by George Hesse and not by Mr. Paradiso.
16       Q    At what point in time did you see   13:04
17   those schedules?
18       A    I have no recollection of the time   13:04
19   frame.  There was a sequence, there was a
20   transition.
21       Q    Who provided those schedules to you? 13:04
22       A    We requested them.  "We" meaning the 13:05
23   board of trustees requested them.
24       Q    Why did you request the schedules at 13:05
25   that time?

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 105

N. Rogers

1
2    A    We were trying to determine the --   13:05
3  the validity and the efficiency of the operation
4  of the Police Department.  We knew there was a
5  problem with the individual who was the chief of
6  police, and we wanted to see if the work was being
7  performed.
8    Q    And when you say you knew there was a 13:05
9  problem with Ed Paradiso as chief of police, what
10  specifically are you referring to?
11    A    He had a physical disability as a   13:06
12  result of an injury to, I believe it was the heel
13  on one, one leg, and as a result of it, his work
14  activity gradually became more limited and his
15  time ability to do some of the duties that he had
16  became more limited.
17    Q    Is that something that Ed Paradiso   13:06
18  informed you of?
19        MR. NOVIKOFF:  Objection.         13:06
20    A    No.  It was something that I observed 13:06
21  because I could see.
22    Q    What could you see?          13:06
23    A    I could see the injury.  I could see 13:06
24  the lack of ability of mobility.  I could see
25  inability to spend the time that was needed.

Page 106

N. Rogers

1
2  These are things that I could observe myself and
3  see, as could other trustees.
4    Q    And upon observing what you just    13:07
5  referred to, did you conclude that the functioning
6  of the Ocean Beach Police Department was adversely
7  affected?
8        MR. NOVIKOFF:  Objection to form.   13:07
9    A    Yes.                     13:07
10    Q    In what way was it adversely       13:07
11  affected?
12    A    I think I answered that.  The person 13:07
13  who was the chief of police was not doing or able
14  to do all of the duties that would be appropriate
15  and considered normal for the job and had been
16  normal for the job.
17    Q    And specifically what duties was he  13:08
18  not performing?
19    A    His mobility was limited, severely   13:08
20  limited.  He could not devote the time to all of
21  the activities that he should have been doing.
22    Q    And how did that adversely affect the 13:08
23  Police Department?
24        MR. NOVIKOFF:  Objection.         13:09
25    A    There were some things that weren't  13:09

Page 107

N. Rogers

1
2  being done.  If the job isn't being handled
3  correctly, then that's how it affected it.
4    Q    I may have misunderstood.  I am     13:09
5  asking again.  I understood from your earlier
6  testimony that as gradually Ed Paradiso's ability
7  to perform what you saw as the full spectrum of
8  duties as the Ocean Beach police chief declined,
9  that gradually George Hesse came to be performing
10  those duties in place of Ed Paradiso.  Is that
11  correct?
12    A    That is correct, because he was the  13:09
13  next in line to do those jobs.
14    Q    Okay.  So what was it that was not   13:10
15  being done at the Ocean Beach Police Department
16  that was adversely affecting the Police
17  Department?
18        MR. NOVIKOFF:  Objection, form, asked 13:10
19  and answered.
20    A    I think I did answer that.         13:10
21        MR. NOVIKOFF:  Got to do it again.   13:10
22  That would be the rule.
23    A    He physically could not get around as 13:10
24  much as he should and had been doing.  It affected
25  his ability to do the scheduling and to be where

Page 108

N. Rogers

1
2  he had to be all over the Village at different
3  times when he was supposed to be.
4    Q    How do you know that it affected his  13:10
5  ability to do the scheduling?
6        MR. NOVIKOFF:  Objection to form.    13:10
7    A    Because he didn't do all the        13:11
8  scheduling.
9    Q    Were the schedules -- was the       13:11
10  scheduling not being done?
11        MR. NOVIKOFF:  Objection, form.     13:11
12    A    I believe George Hesse was doing the 13:11
13  scheduling on an -- as he gradually assumed,
14  with -- without any objection, certain functions.
15    Q    How did you learn that he had assumed 13:11
16  the scheduling function at that time?
17    A    Observation and conversation.      13:11
18    Q    Conversations with whom?          13:11
19    A    I cannot be specific as to whom.    13:11
20    Q    Can you identify any person?        13:12
21    A    Ed Paradiso, George Hesse, trustees. 13:12
22    Q    Did Ed Paradiso indicate to you in  13:12
23  any conversation that George Hesse had been taking
24  over his responsibilities for scheduling?
25    A    He may have.  I cannot specifically  13:12

27 (Pages 105 to 108)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 109

1          N. Rogers
2  give you a time.
3      Q    Did he indicate to you, that is did   13:12
4  Ed Paradiso indicate to you that he believed that
5  George Hesse was effectively filling his duties
6  with respect to scheduling?
7          MR. NOVIKOFF:  Objection.        13:12
8      A    No.                   13:13
9      Q    What did you observe that led you to   13:13
10 conclude that George Hesse had been assuming Ed
11 Paradiso's scheduling duties?
12     A    The fact that he did it.         13:13
13     Q    And I believe I had asked you before, 13:13
14 how did you learn that George Hesse had been
15 filling Ed Paradiso's scheduling duties?  You said
16 observation and conversation.  What I am asking
17 now is, what did you observe that led you to
18 conclude that that's what George Hesse had been
19 doing?
20         MR. NOVIKOFF:  Objection to the     13:13
21     characterization of the prior testimony.
22     Objection to the form of the question.
23         You can answer.  I believe you     13:13
24     answered it, but you can answer again.
25     A    There had to be some conversation as  13:14

Page 110

1          N. Rogers
2  to, are the schedules worked out and is everything
3  covered, and the answer was yes.
4      Q    Do you recall any such conversation?  13:14
5      A    I cannot give you any details on the   13:14
6  conversation more than I have given you.
7      Q    Other than what you have already      13:14
8  testified to, did you have -- was there any other
9  information that you had that led you to believe
10 that George Hesse had been assuming Ed Paradiso's
11 duties with respect to scheduling?
12         MR. NOVIKOFF:  Objection to the form  13:14
13     of the question.
14         You can answer.              13:14
15     A    No.                    13:14
16         MR. NOVIKOFF:  All right.  It's 1:15. 13:14
17     Why don't we take a break now, and we will
18     be back at 2:15?
19         MR. GRAFF:  Yes.  Let's go off the    13:14
20     record, please.
21         THE VIDEOGRAPHER:  The time is now    13:14
22     1:14 p.m.
23         We are now off the record.        13:15
24         (Recess taken.)           13:15
25         THE VIDEOGRAPHER:  This is the start  14:12

Page 111

1          N. Rogers
2  of tape number three.  The time is now
3  2:11 p.m.
4          We are now back on the record.      14:12
5          MR. GRAFF:  Could the court reporter  14:12
6  please read back the last three or four
7  questions and answers before we took lunch.
8          (Record read.)               14:13
9  BY MR. GRAFF:                      14:13
10     Q    Mayor Rogers, what evidence did you   14:13
11 have that led you to conclude that as Ed
12 Paradiso's medical condition gradually resulted in
13 the diminution of the duties that he was
14 performing, what information did you have that led
15 you to believe that George Hesse had been taking
16 on his budgetary duties?
17         MR. NOVIKOFF:  Objection to form.    14:14
18     A    Ed Paradiso was spending less time in 14:14
19 the Village.  He was going to doctors.  His
20 mobility had decreased.  He just was not being
21 there, and not functioning.  I -- I can't say it
22 any clearer than that.
23         As far as George Hesse, as second in  14:14
24 command, he picked up the pieces and he did the
25 work that had to be done.

Page 112

1          N. Rogers
2      Q    My question is, what evidence did you  14:14
3  have that George Hesse had been picking up the
4  pieces and doing the work in connection with
5  budgetary duties?
6          MR. NOVIKOFF:  Objection to form.    14:14
7          You can answer again, Ms. Rogers.    14:14
8      A    Budgetary things had to do with      14:15
9  scheduling.  A budget gets passed once a year, and
10 you do have a format that you have to stay with as
11 far as a budget goes, but you schedule consistent
12 with what the approved budget is.
13     Q    Okay.  My question is, how did you    14:15
14 know that it was George Hesse who was fulfilling
15 those duties and not Ed Paradiso?
16         MR. NOVIKOFF:  Objection.  Asked and 14:15
17     answered.
18         You can answer.              14:15
19     A    Ed was not there to do it.  George   14:15
20 did it.
21     Q    How did you know that Ed was not      14:15
22 there to do those duties?
23         MR. NOVIKOFF:  Objection.         14:15
24     A    He was off the island.  He was       14:15
25 physically not there.  We knew it because we saw

28  (Pages 109 to 112)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 113

1        N. Rogers
2  that he was physically not there.
3      Q    When you say "not there" --        14:16
4      A    Not there in Ocean Beach.        14:16
5        MR. NOVIKOFF: Let him ask the        14:16
6  question.
7      A    Sorry, excuse me.        14:16
8      Q    Can you think of any occasions when  14:16
9  you tried to find him in Ocean Beach and
10 discovered that he was not there?
11     A    No.        14:16
12     Q    Did Ed Paradiso ever tell you that at  14:16
13 that time he was not able to attend to his duties
14 with respect to the budget?
15     A    The budget had been passed.  With  14:16
16 respect to scheduling and other things, if he was
17 not there and not doing it and somebody else was
18 doing it, it was a matter of observation.
19     Q    What evidence did you have that he  14:17
20 was not there and not doing it?
21       MR. NOVIKOFF: Objection.        14:17
22 You can answer again.        14:17
23     A    My eyes.        14:17
24     Q    Can you recall any occasion when you  14:17
25 observed that George Hesse was fulfilling those

Page 114

1        N. Rogers
2  duties in place of Ed Paradiso?
3        MR. NOVIKOFF: Objection to the form  14:17
4  of the question.
5        You can answer.        14:17
6      A    I can't think of a particular        14:17
7  incident, except for the fact that he did discuss
8  it with us as -- at board meetings, at a board of
9  trustees meeting, that he was doing the job of
10 scheduling.
11     Q    When you say "he," are you referring  14:18
12 to --
13     A    That Mr. Hesse.        14:18
14       MR. NOVIKOFF: Let him ask the        14:18
15 question.
16     Q    Was it Mr. Hesse who told you that  14:18
17 he, Mr. Hesse, was doing the duties of budget and
18 scheduling?
19       MR. NOVIKOFF: Objection, form.        14:18
20     A    He might have.        14:18
21     Q    Do you have any evidence that he did  14:18
22 tell you that?
23     A    No.        14:18
24     Q    Other than what you have already  14:18
25 testified to today, is there any other evidence

Page 115

1        N. Rogers
2  that you had that George Hesse was fulfilling Ed
3  Paradiso's responsibilities with respect to budget
4  and scheduling?
5        MR. NOVIKOFF: Are you done?        14:19
6  BY MR. GRAFF:        14:19
7      Q    At that time.        14:19
8        MR. NOVIKOFF: Objection.        14:19
9      A    Schedules were filed at the Village  14:19
10 office by him.
11     Q    By whom?        14:19
12     A    By Mr. Hesse.        14:19
13     Q    Did Mr. Hesse, himself, personally  14:19
14 bring schedules to file at the Village office?
15       MR. NOVIKOFF: Objection, form.        14:19
16     A    I don't know.        14:19
17     Q    How do you know that Mr. Hesse was  14:19
18 filing schedules at the Village office?
19       MR. NOVIKOFF: Objection, form.        14:19
20     A    These papers were filed.        14:19
21     Q    How do you know that they were not  14:19
22 filed by Ed Paradiso?
23     A    I didn't see the papers being filed.  14:19
24 I can't answer that.
25     Q    Okay.  I understand that you didn't  14:20

Page 116

1        N. Rogers
2  see the papers being filed.  Do you have any
3  knowledge or evidence to support your statement
4  that the papers were being filed by George Hesse
5  and not Ed Paradiso?
6        MR. NOVIKOFF: Objection, form.        14:20
7      A    Only having been told by the Village  14:20
8  office.
9      Q    Who in the Village office told you  14:20
10 that?
11     A    It might have been the administrator,  14:20
12 Marianne Minerva.
13     Q    Do you recall Marianne Minerva        14:20
14 telling you that information?
15       MR. NOVIKOFF: Objection.        14:20
16       You can answer.        14:20
17     A    Not specifically, no.        14:20
18     Q    When you say that it might have been  14:21
19 Marianne Minerva, what is the basis for your
20 suggesting that it might have been Marianne
21 Minerva?
22     A    Because that was the proper method of  14:21
23 doing it, of filing schedule papers or papers of
24 schedules for police officers.
25     Q    I am asking now why you believe that  14:21

29 (Pages 113 to 116)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 117

N. Rogers

1    **N. Rogers**
2    **Marianne Minerva might have told you that George**
3    **Hesse and not Ed Paradiso had been filing**
4    **schedules at the Village office.**
5         MR. NOVIKOFF: Counsel, you just      14:21
6    asked that question, she just answered it.
7    Objection. This is now becoming borderline
8    harassing.
9         MR. GRAFF: The answers have not been 14:22
10   responsive. I am not harassing the witness.
11        MR. NOVIKOFF: You just don't like    14:22
12   the answers you are getting.
13        Ms. Rogers, you can answer the       14:22
14   question again.
15        Actually, can you read it back. Just 14:22
16   read the question back so you have it,
17   please.
18        (Record read.)                14:22
19   A    Ed was not there to file them.      14:22
20   George Hesse filed them.
21   **Q    What evidence do you have that      14:22**
22   **indicates or indicated to you that George Hesse**
23   **was filing the schedules at that time?**
24        MR. NOVIKOFF: Objection to the form. 14:22
25   I think she just told you.

Page 118

N. Rogers

1         N. Rogers
2         But you can answer it again.       14:22
3    A    I do not recall.              14:23
4    **Q    Is it your testimony that you had    14:23**
5    **some such evidence that you cannot recall now?**
6         MR. NOVIKOFF: Her testimony is her  14:23
7    testimony, Counselor. Objection.
8         If you can answer the question,     14:23
9    Ms. Rogers, please do so.
10   A    There is no -- nothing that I can    14:23
11   recall that would qualify as to the word
12   "evidence."
13   **Q    Okay. What information did you have 14:23**
14   **that led you to conclude, as you have testified,**
15   **that George Hesse was filing the schedules at the**
16   **Village office instead of Ed Paradiso?**
17        MR. NOVIKOFF: Objection. She has    14:24
18   answered this now about three times.
19        But go ahead, do it again.         14:24
20   A    The same way. Ed wasn't there to    14:24
21   file them, George was there to file them. I was
22   told that he filed the papers and I believed it.
23   **Q    But you don't recall who told you    14:24**
24   **that?**
25   A    No.                   14:24

Page 119

N. Rogers

1         N. Rogers
2         MR. NOVIKOFF: Objection.           14:24
3    **Q    And do you recall how you knew that  14:24**
4    **Ed Paradiso was not there to be doing it himself?**
5         MR. NOVIKOFF: Objection, asked --   14:24
6    **Q    Specifically here to be filing the   14:24**
7    **schedules himself.**
8         MR. NOVIKOFF: Objection, asked and  14:24
9    answered for about the sixth time now.
10        MR. GRAFF: Counsel, the answers have 14:24
11   not been responsive to the question.
12        MR. NOVIKOFF: Then you make a       14:24
13   motion, you make the appropriate motion on
14   the record that they are nonresponsive.
15        They are responsive. You have asked 14:24
16   her now five different occasions how she
17   knows. She says through her own eyesight
18   and being told by someone at the Village
19   clerk. You then asked her to explain it and
20   she has.
21        MR. GRAFF: I have ruled out now that 14:24
22   she can recall who told her. I'm asking --
23        MR. NOVIKOFF: Ms. Rogers, answer the 14:25
24   question again.
25   A    Ed was not there to file the papers. 14:25

Page 120

N. Rogers

1         N. Rogers
2    George did file the schedules.
3         MR. GRAFF: Okay. Move to strike as  14:25
4    nonresponsive.
5         MR. NOVIKOFF: Okay.               14:25
6    BY MR. GRAFF:                   14:25
7    **Q    The question I want to know is, I    14:25**
8    **understand that you believe and have testified and**
9    **concluded --**
10        MR. NOVIKOFF: Counselor, no one at  14:25
11   this side of the table cares what you
12   understand or don't understand. Just ask
13   the question.
14        MR. GRAFF: Mr. Novikoff --         14:25
15        MR. NOVIKOFF: You are belaboring    14:25
16   this to the point of the cow being dead.
17   Just ask the question, please. Don't
18   preface your questions by saying what you
19   understand or what you don't understand or
20   that you are sorry or you are not sorry.
21        The point of a deposition, Counselor, 14:25
22   is to ask the questions of the witness, not
23   to explain to the witness what you
24   understand or not understand. So, please.
25   We are going to be here for a very long time

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 121

```
 1           N. Rogers
 2    today.  Just ask the witness the questions
 3    you want to ask.
 4           MR. GRAFF:  Mr. Novikoff, your      14:26
 5    extended commentary was not proper.  I would
 6    ask you to refrain from continuing to
 7    disrupt the deposition in this manner.
 8           MR. NOVIKOFF:  I don't think any    14:26
 9    other counsel here thinks I'm disrupting the
10    deposition, but please ask the question.
11    She will answer it again.
12           MR. GRAFF:  Could the court reporter, 14:26
13    please -- I'm sorry.  I believe you actually
14    interrupted the question.
15           MR. NOVIKOFF:  Okay.           14:26
16           MR. GRAFF:  I will start again.   14:26
17           MR. NOVIKOFF:  Sure.          14:26
18    BY MR. GRAFF:                      14:26
19       Q     Was there any information that served 14:26
20    as the basis for your determination that Ed
21    Paradiso was not there to file the schedules and
22    that George Hesse was filing the schedules?
23           MS. McEACHIN:  Objection.     14:26
24           MR. NOVIKOFF:  Objection, form.    14:26
25       A    I can only answer the same way I have 14:27
```

Page 122

```
 1           N. Rogers
 2    been answering.  Ed was not there.  He did not
 3    file the papers.
 4       Q     How do you know that?          14:27
 5       A    I am not --              14:27
 6           MR. NOVIKOFF:  Objection, form.    14:27
 7           Answer it again, Ms. Rogers.     14:27
 8       A    If he wasn't there, he wasn't there, 14:27
 9    I know that.  He wasn't there; therefore, the
10    papers were filed by the only other person who
11    could have filed schedules, papers.  I know that.
12       Q     So you inferred that George Hesse was 14:27
13    filing them instead of Ed Paradiso?
14       A    No, I knew.              14:27
15       Q     How did you know that to be the case? 14:27
16           MR. NOVIKOFF:  Objection, asked and  14:28
17    answered.
18           Answer it again.            14:28
19           It's your seven hours, Counselor.   14:28
20       A    I was told they had been filed by   14:28
21    George in the proper format.
22       Q     And to be clear, do you recall who  14:28
23    told you that?
24           MS. McEACHIN:  Objection, asked and  14:28
25    answered.
```

Page 123

```
 1           N. Rogers
 2           MR. NOVIKOFF:  Objection.      14:28
 3           You can answer, Ms. Rogers.     14:28
 4       A    I believe it was Marianne Minerva, to 14:28
 5    the best of my recollection.
 6       Q     Did you ask Ed Paradiso why George  14:28
 7    Hesse was filing the schedules that were Ed
 8    Paradiso's responsibility to file?
 9           MR. NOVIKOFF:  Objection to the form 14:29
10    and the foundation of that question.
11           You may answer, Ms. Rogers.     14:29
12       A    Did I ask, is the question; is that  14:29
13    correct?
14       Q     Yes.                 14:29
15       A    The answer is no.          14:29
16       Q     Did you speak with George Hesse to  14:29
17    confirm that he was, as you believed, filing the
18    schedules in place of Ed Paradiso?
19           MR. NOVIKOFF:  Objection.      14:29
20       A    I don't recall.            14:29
21       Q     As Ocean Beach police commissioner,  14:29
22    did you have the authority to hire Ocean Beach
23    police officers?
24           MR. NOVIKOFF:  Objection to the form 14:30
25    of the question.
```

Page 124

```
 1           N. Rogers
 2           You can answer.            14:30
 3       A    I don't know what the legal authority 14:30
 4    was.
 5       Q     As Ocean Beach police commissioner,  14:30
 6    did you participate in the hiring process for any
 7    Ocean Beach police officer?
 8           MR. NOVIKOFF:  You mean separate and  14:30
 9    apart from her role as Mayor at the same
10    time?  That's what I am trying to figure
11    out.  And other than a distinction
12    between --
13           MR. GRAFF:  No.  I am asking during  14:30
14    the time that she was police commissioner as
15    opposed to the time when she was Mayor prior
16    to that.  So in either capacity, either as
17    police commissioner --
18           MR. NOVIKOFF:  The question is, as  14:30
19    police commissioner and/or Mayor, did you
20    have the authority to --
21           MR. GRAFF:  Yes.          14:30
22           MR. NOVIKOFF:  Okay.        14:30
23           THE WITNESS:  I don't think he asked  14:30
24    about authority.  I think he asked did I
25    ever hire.
```

31 (Pages 121 to 124)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 125

N. Rogers

1
2     MR. NOVIKOFF:  Well, why don't we get   14:30
3     the question back, and then if the court
4     reporter could read the question, we can
5     hear the question.
6         MR. GRAFF:  To save time --      14:30
7         MR. NOVIKOFF:  Okay.         14:30
8         MR. GRAFF:  Actually, please, could   14:30
9     you read the question back.
10        (Record read.)           14:30
11    A    No.                14:31
12    Q    As Mayor, did you participate in the   14:31
13    hiring process for any Ocean Beach police officer?
14    A    No.                14:31
15    Q    Who, if anyone, in Ocean Beach was   14:31
16    responsible for hiring Ocean Beach police
17    officers?
18    A    The Ocean Beach chief of police.   14:31
19    Q    At some point in time, did Ed      14:31
20    Paradiso, who had been chief of police, stop
21    having the responsibility for hiring Ocean Beach
22    police officers?
23        MS. McEACHIN:  Objection.      14:32
24        MR. NOVIKOFF:  Objection to the form. 14:32
25    A    Yes.                14:32

Page 126

N. Rogers

1
2     Q    At what point in time did he cease to  14:32
3     have the authority to hire Ocean Beach police
4     officers?
5     A    When he stopped functioning and was   14:32
6     unable to function as police chief.
7     Q    Did that occur prior to the time when  14:32
8     the Village board of trustees voted to formalize
9     George Hesse's role as acting police chief?
10    A    Yes.                14:32
11    Q    How long prior to that time did Ed   14:32
12    Paradiso cease to have the authority to hire Ocean
13    Beach police officers?
14    A    I do not know.            14:33
15    Q    Do you know if it was more than one   14:33
16    year?
17    A    I don't believe so.          14:33
18    Q    Do you know if it was more than six   14:33
19    months?
20    A    I don't know.            14:33
21    Q    Other than Ed Paradiso and later    14:33
22    George Hesse, did anyone else at Ocean Beach have
23    the authority to hire Ocean Beach police officers
24    during the time that you served as Mayor of Ocean
25    Beach?

Page 127

N. Rogers

1
2         MR. NOVIKOFF:  Objection, form.    14:33
3         You can answer.          14:33
4     A    Not to my knowledge.        14:33
5     Q    Who, if anyone, at Ocean Beach had   14:33
6     the authority to terminate the employment of an
7     Ocean Beach police officer?
8     A    The question was who had the      14:34
9     authority?
10        MR. GRAFF:  Could the court reporter  14:34
11    please read back my last question.
12        (Record read.)           14:34
13    A    I believe it to be the police chief.  14:34
14    Q    As Mayor of Ocean Beach, Mayor and/or 14:34
15    police commissioner of Ocean Beach, did you have
16    the authority to hire any employees at Ocean
17    Beach?
18        MR. NOVIKOFF:  Objection.      14:34
19        You can answer.          14:34
20    A    I had the authority to and I did hire 14:34
21    some Ocean Beach personnel.
22    Q    What were the positions at Ocean    14:35
23    Beach that you had the authority to hire employees
24    to fill?
25    A    Upon the resignation of the then    14:35

Page 128

N. Rogers

1
2     administrator, I hired a new administrator.
3     Q    Did you hire employees for any other  14:35
4     positions at Ocean Beach during the period that
5     you served as Mayor and/or police commissioner?
6     A    The word is "hire." No.      14:35
7     Q    Did you ever effectuate the      14:35
8     termination of any employee at Ocean Beach during
9     the period that you served as Mayor and/or police
10    commissioner?
11    A    No.                14:36
12    Q    To your knowledge, did you have the   14:36
13    authority to terminate any employees at Ocean
14    Beach during the period that you served as Mayor
15    and/or police commissioner?
16    A    I might have had the authority.    14:36
17    Q    As you sit here today, do you know if 14:36
18    you did have that authority?
19    A    No, I do not know about the      14:36
20    authority.
21    Q    To your knowledge, were any police   14:37
22    officers at Ocean Beach terminated during the
23    period that you served as Mayor and/or police
24    commissioner?
25    A    To my knowledge, no.         14:37

TSG Reporting - Worldwide   (877) 702-9580

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 129

N. Rogers

1
2    Q    Do you have any information regarding 14:37
3    whether any Ocean Beach police officers were
4    terminated during the period that you served as
5    Mayor and/or police commissioner?
6         MR. NOVIKOFF:  Wait a minute.  I have 14:37
7    to stop on that one.  This one I have to
8    speak.
9         You asked her, to her knowledge, was 14:37
10   any police officers terminated, and she said
11   no.  Now you are asking if she has any
12   information with regard to the nonexistence
13   of a fact?
14        MR. GRAFF:  She said "not to my    14:38
15   knowledge," Counsel.  I just want to make
16   sure that that was not with an emphasis on
17   knowledge and some other information.
18        MR. NOVIKOFF:  You can answer the   14:38
19   question.
20        Object to form.          14:38
21   A    No.              14:38
22   Q    Did -- as Mayor and/or police    14:38
23   Commissioner of Ocean Beach, did you have an
24   office at Ocean Beach?
25        MS. McEACHIN:  Objection.  What do  14:38

Page 130

N. Rogers

1
2    you mean by office?  Office as a position or
3    office as a physical --
4         MR. GRAFF:  A physical office.    14:38
5    A    No.              14:38
6    Q    Did you have a desk where you worked 14:38
7    during your service as Mayor of Ocean Beach?
8    A    No.              14:38
9    Q    Did you ever receive correspondence, 14:39
10   letters, during the period that you worked as
11   Mayor and/or police commissioner of Ocean Beach?
12   And I am referring now to receive letters
13   addressed to you in your capacity as Mayor and/or
14   police commissioner.
15   A    Yes.              14:39
16   Q    What address would those letters be 14:39
17   addressed to?
18        MR. NOVIKOFF:  Objection.       14:39
19        You can answer.          14:39
20   A    The Village office.          14:39
21   Q    What is the address of the Village  14:39
22   office, please?
23   A    It's a post office address.      14:39
24   Q    How, to your knowledge, would those 14:39
25   letters get from the post office address to your

Page 131

N. Rogers

1
2    possession for you to read?
3    A    They were put in a mailbox that    14:39
4    myself and each one of the trustees had separate
5    mailboxes inside the Village office where we came
6    in and picked up our mail and other material
7    designated for us.
8    Q    And would the envelopes be opened   14:40
9    when those letters were put in your box or --
10   A    I believe so.           14:40
11   Q    Do you know who was responsible for  14:40
12   opening the envelopes and putting them in your
13   box?
14   A    No.              14:40
15   Q    Do you have any reason to believe   14:40
16   that letters that were addressed to you that were
17   opened were not put in your box?
18        MR. NOVIKOFF:  Objection.       14:40
19        You can answer it to the extent you  14:40
20   understand it.
21   A    No, I have no reason to believe such. 14:40
22   Q    Where would you keep letters that you 14:40
23   received in your capacity as Mayor and/or police
24   commissioner of Ocean Beach after you had read
25   them?

Page 132

N. Rogers

1
2         MR. NOVIKOFF:  Objection, form.    14:41
3         You can answer.          14:41
4    A    I had extensive files in my home.   14:41
5    Q    Do you still have those files in your 14:41
6    home?
7    A    No.              14:41
8    Q    Other than storing such letters in   14:41
9    the files in your home, would you keep copies of
10   those letters anywhere else?
11        MR. NOVIKOFF:  Objection, form.    14:41
12   A    Sometimes.           14:41
13   Q    Where else would you keep letters of 14:41
14   that nature?
15   A    In the appropriate file in the     14:41
16   Village office if I deemed them advisable to keep
17   copies.
18   Q    And would you personally put the    14:41
19   letters in the files at the Village office?
20   A    No.  I would hand them to a clerk to 14:41
21   file.
22        MR. NOVIKOFF:  Just answer the     14:42
23   question.
24   A    Sorry.  No.           14:42
25   Q    How would you determine whether such 14:42

33 (Pages 129 to 132)

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1
2  a letter would be filed in the Village office and
3  not solely in your personal files at home?
4          MS. McEACHIN:  Objection to the      14:42
5      question.  What letter?
6          MR. GRAFF:  Such a letter that is      14:42
7      letters that she received in her capacity as
8      Mayor and/or police commissioner of Ocean
9      Beach.
10         MS. McEACHIN:  That was over several  14:42
11     years; correct?
12         MR. GRAFF:  Yes.            14:42
13         MS. McEACHIN:  Okay, go ahead.      14:42
14     Q     And to clarify, at any point during  14:42
15  the period that you served as Mayor and/or police
16  commissioner, was there any procedure that you
17  followed for determining whether a letter should
18  be filed in the Village office?
19         MR. NOVIKOFF:  Objection to that     14:43
20     question.
21     A     Only my own evaluation.         14:43
22     Q     During the time that you served as  14:43
23  Mayor and/or police commissioner of Ocean Beach,
24  who other than the chief of police for the Ocean
25  Beach Police Department was responsible for

N. Rogers

1
2  enacting the budget for the Ocean Beach Police
3  Department?
4          MR. NOVIKOFF:  Objection.          14:43
5      Q     Or for creating the budget?        14:43
6          MR. NOVIKOFF:  Didn't fix it.        14:43
7      Objection.
8      A     To my knowledge, no one else.      14:44
9      Q     How would -- to your knowledge, how  14:44
10  would the chief of police of the Ocean Beach
11  Police Department know the amount of funds that
12  were available for the Ocean Beach Police
13  Department to be applied to the budget for the
14  Ocean Beach Police Department?
15         MR. NOVIKOFF:  Objection, form, calls  14:44
16     for speculation, of what's in someone else's
17     mind.
18         THE WITNESS:  Shall I answer that?   14:44
19         MR. NOVIKOFF:  If you can, yes.       14:44
20     A     He would be given, if he didn't have  14:44
21  it already, a copy of the prior year's budget and
22  told to submit a preliminary for the forthcoming
23  year.
24     Q     And the funds -- strike that.        14:45
25         Other than revenues provided to the  14:45

N. Rogers

1
2  Ocean Beach Police Department by the Village of
3  Ocean Beach, were there any other sources of
4  funding for the operations of the Ocean Beach
5  Police Department during the period of time that
6  you served as Mayor and/or police commissioner?
7          MR. NOVIKOFF:  Could you just read    14:45
8      that question back.
9          (Record read.)             14:45
10     A     Not to my knowledge.            14:46
11     Q     To your knowledge -- strike that.    14:46
12         Have you ever heard of an entity     14:46
13  called the Ocean Beach Police Benevolent
14  Association?
15     A     I may have.                14:46
16     Q     What, if anything, do you know about  14:46
17  the existence of the Ocean Beach Police Benevolent
18  Association?
19     A     Nothing specific.             14:46
20     Q     Do you recall who, if anyone, ever   14:46
21  spoke with you about the Ocean Beach Police
22  Benevolent Association?
23         MR. NOVIKOFF:  Objection, form.      14:47
24     A     No, I do not.              14:47
25     Q     During the time that you served as   14:47

N. Rogers

1
2  police commissioner, when budgeted funds would be
3  provided to the Ocean Beach Police Department, was
4  the Ocean Beach chief of police responsible for
5  maintaining records concerning the disbursement or
6  how those funds were spent by the Ocean Beach
7  Police Department?
8          MR. NOVIKOFF:  Objection to form.     14:47
9          You can answer.              14:47
10     A     I don't think that was the role of   14:47
11  the police chief, no.
12     Q     To your knowledge, during the time   14:47
13  that you served as Ocean Beach police
14  commissioner, was anyone in Ocean Beach
15  responsible for maintaining records of how the
16  Ocean Beach Police Department spent the funds in
17  its budget?
18     A     The Village clerk was responsible for  14:48
19  maintaining records of all expenditures.
20     Q     Do you recall whether you ever spoke  14:48
21  with the Village clerk specifically about anything
22  concerning the Ocean Beach Police Benevolent
23  Association?
24         MR. NOVIKOFF:  Objection, form.      14:48
25     A     No.                    14:48

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 137

1          N. Rogers
2        MR. GRAFF:  I'm going to ask the    14:48
3   court reporter to please mark as Exhibit
4   Rogers 1 a one-page document bearing Bates
5   Number 3931.
6        MR. NOVIKOFF:  And I would ask the    14:49
7   court reporter upon marking it to hand it to
8   me directly for my review.
9        MR. GRAFF:  I have a copy for you,    14:49
10   Mr. Novikoff.
11        MR. NOVIKOFF:  Thank you very much.   14:49
12        (Rogers Exhibit 1 marked for        14:49
13   identification.)
14        MR. GRAFF:  Where is the exhibit     14:49
15   that's been marked Exhibit 1?
16        MR. NOVIKOFF:  I'm holding it.       14:49
17        MR. GRAFF:  Mr. Novikoff, could you   14:49
18   please put the exhibit in front of the
19   witness?
20        MR. NOVIKOFF:  Is there a question    14:49
21   that you want to ask her concerning this
22   document?
23        MR. GRAFF:  Does it matter?          14:49
24        MR. NOVIKOFF:  Yes, because, sir, I   14:49
25   don't want to give you a lesson in evidence,

Page 138

1          N. Rogers
2   but all you have done is mark a document as
3   a deposition exhibit.  Until such time as
4   you are inquiring with this witness
5   concerning this document, it does not go in
6   front of her.
7        So if you are going to ask her a      14:50
8   question about the document, then I will be
9   very happy to hand it to her.
10        MR. GRAFF:  Mr. Novikoff, if you have  14:50
11   an objection to the document being placed in
12   front of the witness --
13        MR. NOVIKOFF:  No objection, sir.  If  14:50
14   there is a question concerning the document
15   that you've marked as an exhibit, I would be
16   more than happy to show it to her.  So if
17   there is a question, ask it.
18        MR. GRAFF:  Mr. Novikoff --          14:50
19        MR. NOVIKOFF:  I will not have this   14:50
20   witness have a document in front of her in
21   the absence of a question.  That is
22   completely inappropriate.
23        I don't feel the need to give you a   14:50
24   lesson in evidence.  You've just marked a
25   document.  It is meaningless until you ask

Page 139

1          N. Rogers
2   the witness a question.
3        MR. GRAFF:  Mr. Novikoff, your        14:50
4   objection to having the document in front of
5   the witness has been noted on the record and
6   will be preserved.
7        MR. NOVIKOFF:  That's right, so ask a  14:50
8   question, and let's go forward with it.
9   You're the one that is delaying this, sir,
10   because you are trying to engage me in a
11   conversation that is particularly
12   meaningless.
13        MR. GRAFF:  I do not want to engage   14:50
14   you in a conversation.  I'm asking you to
15   please put the document marked as --
16        MR. NOVIKOFF:  If there is a          14:51
17   question, I will give her the document.  If
18   there isn't a question, the document is not
19   going to be in front of her.
20        MR. GRAFF:  I will ask her a          14:51
21   question.
22        MR. NOVIKOFF:  Fine.  Now here is the  14:51
23   document, now ask her the question.
24   BY MR. GRAFF:                             14:51
25        Q    Mayor Rogers, could you please take a  14:51

Page 140

1          N. Rogers
2   moment to review the document that's been put in
3   front of you.
4        A    I have read it.                  14:51
5        Q    Mayor Rogers, have you seen this    14:51
6   document before?
7        A    I think I have.                  14:51
8        Q    Is this a document that you received,  14:52
9   as you described earlier, in a -- that had been
10   opened and put in a designated mail receptacle at
11   the Village office for you?
12        A    It would have been put in there if I  14:52
13   were to receive it, yes.
14        Q    Do you recall if you saw the document  14:52
15   upon receiving it in the Village office?
16        MR. NOVIKOFF:  Objection, form.       14:52
17        A    I do not recall where I looked at it.  14:52
18   No.
19        Q    The document is dated April 23, 2006.  14:52
20   Do you know what George Hesse's title was as of
21   that date?
22        MR. NOVIKOFF:  Note my objection to   14:53
23   the question.
24        You can answer.                       14:53
25        A    I believe it was deputy police chief.  14:53

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 141

1         Q      N. Rogers
2         Q     With respect to terminology, is there   14:53
3    a distinction between deputy police chief and
4    acting police chief that you know of?
5         A     Not really.          14:53
6         Q     When the Village board of trustees    14:53
7    passed a resolution to formalize George Hesse's
8    role as acting police chief, do you recall whether
9    that resolution assigned him the title acting
10   police chief?
11        A     Yes, I recall.         14:54
12        Q     Did it assign him that title?     14:54
13        A     I believe it was deputy.       14:54
14        Q     Okay.  If you could please look at   14:54
15   the letter, it's addressed to you, signed,
16   "Sincerely, Frank Fiorillo."  It states --
17        MR. NOVIKOFF:  What it states.  It    14:54
18   says what it says.  So, if you have a
19   question, then ask the question.
20        MR. GRAFF:  Okay.           14:54
21        Q     I'm going to read a part of the    14:54
22   letter.  If you believe that it would be helpful
23   for you to follow as I read --
24        MR. NOVIKOFF:  Don't worry, my client 14:54
25   is well aware of what her rights are with

Page 142

1         N. Rogers
2    regard to looking at a document.
3          If you want to read any part of this  14:54
4    letter, by all means do so.  If you have a
5    question regarding this document, by all
6    means ask it.
7          MR. GRAFF:  Okay.  And to be clear,  14:54
8    you're holding this document now.
9          MR. NOVIKOFF:  Yes, to be clear.    14:54
10   BY MR. GRAFF:               14:54
11        Q     "Dear Mayor Rogers" --     14:54
12        MR. GRAFF:  And to be clear, I object  14:54
13   to that conduct.
14        Q     "Dear Mayor Rogers:  I was employed  14:55
15   as a police officer in the incorporated Village of
16   Ocean Beach for the past four years."
17          Do you have any reason to believe    14:55
18   that that is not a true statement, any evidence
19   that indicates to you that that was not a true
20   statement?
21        MR. NOVIKOFF:  Objection, compound.  14:55
22        A     No.                14:55
23        Q     And just compound, I don't want the  14:55
24   question to be confusing.  Let me restate it
25   again.

Page 143

1              N. Rogers
2          MR. NOVIKOFF:  See, I am helpful.  Go 14:55
3    on.
4          MR. GRAFF:  I will go on.       14:55
5         Q     Do you have any evidence to indicate  14:55
6    that that is not a truthful statement?
7          MR. NOVIKOFF:  Objection.        14:55
8          You can answer.            14:55
9         A     No.                14:55
10        Q     The letter goes on:  "On Sunday,    14:55
11   April 2nd, 2006, at the annual police department
12   meeting, I was told by Deputy Chief George Hesse
13   that I was being let go due to budget
14   constraints."
15          In April, 2006, did you know what    14:56
16   "the annual police department meeting" referred
17   to, refers to?
18        A     No.                14:56
19        Q     Do you recall whether you ever     14:56
20   learned that Officer Fiorillo was told or stated
21   that he was told that he was being let go from the
22   Ocean Beach Police Department due to budget
23   constraints?
24        MS. McEACHIN:  Objection.  Have we   14:56
25   established whether or not former

Page 144

1              N. Rogers
2    Mayor Rogers even knew who Frank Fiorillo
3    was?
4          MR. GRAFF:  Yes.           14:56
5          MR. NOVIKOFF:  My question is,      14:56
6    separate and apart from reading it on this
7    document?
8          MR. GRAFF:  Either from this document 14:56
9    or another source.  I know the Mayor was not
10   certain whether she had read it.
11        MR. NOVIKOFF:  You can answer the     14:57
12   question.
13          Objection to form.          14:57
14        A     You will have to read that question  14:57
15   to me again, say it so I can understand it,
16   please.
17        MR. GRAFF:  Could the court reporter  14:57
18   please read back my last question to Mayor
19   Rogers.
20          (Record read.)            14:57
21        MR. NOVIKOFF:  My objection stands.  14:57
22        A     No.                14:57
23        Q     To your knowledge, were there budget  14:57
24   constraints that necessitated that the employment
25   of any Ocean Beach police officers end in April,

36 (Pages 141 to 144)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 145

N. Rogers

1
2    2006?
3              MR. NOVIKOFF: Objection.         14:57
4              You can answer.         14:57
5       A    To my knowledge, no.         14:57
6       Q    Do you recall whether you ever asked  14:57
7    George Hesse, in April or May, 2006, whether he
8    had ended the employment of Officer Fiorillo due
9    to budget constraints?
10             MR. NOVIKOFF: Objection, form.     14:58
11      A    No.         14:58
12      Q    Do you recall whether you ever asked  14:58
13   defendant Hesse whether in the year 2006, he
14   let -- he ended the employment of any Ocean Beach
15   police officer due to budget constraints?
16             MR. NOVIKOFF: Form objection.      14:58
17      A    No.         14:58
18      Q    The last sentence of this letter     14:58
19   states, "At this time" --
20             MR. GRAFF: Mr. Novikoff, do you    14:58
21   still have that letter?
22             MR. NOVIKOFF: It hasn't gone       14:58
23   anywhere.
24             MR. GRAFF: You have the marked     14:58
25   exhibit in front of you?

Page 146

1         N. Rogers
2              MR. NOVIKOFF: Yes, I do.          14:58
3    BY MR. GRAFF:                14:58
4       Q    The last sentence of the letter     14:58
5    states, "At this time I am requesting from you
6    personally a letter of recommendation which I can
7    use as a reference in future employment."
8              Do you recall being asked, whether in  14:59
9    writing or otherwise, by Frank Fiorillo for a
10   letter of recommendation in April, 2006?
11      A    I do not recall.         14:59
12      Q    Do you recall learning at any time  14:59
13   that Officer Fiorillo wanted you to provide him
14   with a letter of recommendation?
15      A    It's in the letter.         14:59
16      Q    Do you recall whether you learned at  14:59
17   any time in the year 2006, that Officer Fiorillo,
18   wanted you to provide him with a letter of
19   recommendation?
20             MR. NOVIKOFF: Objection.          14:59
21      A    It's in the letter.         14:59
22      Q    Do you recall that you read that in  14:59
23   the letter?
24      A    I believe I read this letter.        14:59
25      Q    Do you recall whether this was a     15:00

Page 147

1         N. Rogers
2    letter that you would have filed in the Village
3    office?
4       A    Yes, I would have filed it in the    15:00
5    Village office.
6       Q    And did you also file a copy of this  15:00
7    letter in your home?
8       A    Not to my recollection.         15:00
9       Q    Have you at any time since -- strike  15:00
10   that.
11             Did you ever search the files that   15:00
12   you maintain in your home to see if there were any
13   documents that related to the allegations in this
14   lawsuit?
15      A    No, because -- no.         15:00
16      Q    Do you know or do you recall why you  15:00
17   did not conduct such a search?
18      A    After I left office, I was cleaning   15:01
19   out all or most of the papers that related to
20   Ocean Beach and my job.
21      Q    And by "cleaning out," what do you    15:01
22   mean specifically?
23      A    Throwing out.         15:01
24      Q    What papers did you retain at that    15:01
25   time?

Page 148

1         N. Rogers
2       A    I retained a copy of the budget for a  15:01
3    while, and a few other documents totally unrelated
4    to this.
5       Q    Can you explain why you decided to    15:01
6    throw out documents relating to Ocean Beach at
7    that time?
8       A    I was no longer Mayor, and I had      15:01
9    volumes of paperwork.
10      Q    Did you need to create space in your  15:02
11   filing system at that time?
12      A    Yes.         15:02
13      Q    When you say "volumes of paperwork,"  15:02
14   could you estimate how many file drawers those
15   volumes filled?
16      A    Four to six, maybe.         15:02
17      Q    And at this time, what is filling, if  15:02
18   anything, those four to six file drawers?
19      A    Other things.         15:02
20      Q    Other documents?         15:02
21      A    Other things totally unrelated to     15:02
22   this.
23      Q    Were you ever instructed to preserve  15:02
24   any documents in connection with this lawsuit?
25             MR. NOVIKOFF: Objection. Any       15:02

37 (Pages 145 to 148)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 149

N. Rogers

1    N. Rogers
2    instructions --
3        A    Instructions --            15:03
4            MR. NOVIKOFF:  -- to preserve would   15:03
5        have had to, to the extent there were any,
6        come from counsel, so wouldn't you think
7        that that would be privileged?
8    BY MR. GRAFF:                       15:03
9        Q    Did you ever provide any documents   15:03
10   that you had been maintaining at home to your
11   counsel in connection with this lawsuit?
12       A    I do not believe so, no.    15:03
13       Q    In the course of disposing of the   15:03
14   documents that we have been discussing, did you
15   shred the documents?
16       A    No.                         15:03
17       Q    Over what period of time specifically 15:03
18   did you dispose of the documents that you had been
19   maintaining at your home in connection with Ocean
20   Beach?
21       A    Probably two years.        15:04
22       Q    Starting at what time?      15:04
23       A    After I no longer was Mayor.  I don't 15:04
24   know the date I started it.
25       Q    And you testified that your term as   15:04

Page 150

N. Rogers

1        N. Rogers
2    Mayor ended on July 3rd, 2006?
3        A    Correct.                   15:04
4        Q    So, were you continuing to dispose of 15:04
5    the documents relating to Ocean Beach all the way
6    up until July of this year?
7        A    Possibly.                  15:04
8        Q    Do you recall whether any of those   15:04
9    documents related to the Ocean Beach Police
10   Department?
11       A    No.  No, I do not recall.   15:04
12       Q    Thank you.                  15:04
13           MR. GRAFF:  If you could,     15:05
14       Mr. Novikoff, give the exhibit to the court
15       reporter, please.
16           MR. NOVIKOFF:  Sure.         15:05
17   BY MR. GRAFF:                        15:05
18       Q    Do you recall if you ever provided a  15:05
19   letter of recommendation for Officer Fiorillo?
20       A    I don't believe I did.      15:05
21       Q    Do you recall if there was any reason 15:05
22   why you did not provide a letter to
23   Officer Fiorillo?
24           MR. NOVIKOFF:  I'm going to object to 15:05
25       the form of that question.

Page 151

N. Rogers

1        N. Rogers
2        You can answer.                 15:05
3        A    I was aware that there was a lawsuit  15:05
4    and that I would do nothing with regard to it.
5        Q    Do you recall when this lawsuit was   15:05
6    filed?
7        A    No, I do not.               15:06
8        Q    In general, when you would receive   15:06
9    mail at the Village office, would you collect your
10   mail on a daily basis?
11       A    At least several times a week.   15:06
12           MR. GRAFF:  I'm going to ask the   15:06
13       court reporter to please mark as Exhibit
14       Rogers 3 a three-page document bearing Bates
15       Numbers 3845 to 3847.
16           MS. McEACHIN:  Excuse me, what   15:06
17       happened to Rogers 2?
18           MR. GRAFF:  I'm sorry, I mean Exhibit 15:06
19       Rogers 2.
20           (Rogers Exhibit 2 marked for     15:07
21       identification.)
22           MR. NOVIKOFF:  Okay.         15:07
23   BY MR. GRAFF:                        15:07
24       Q    Mayor Rogers, could you tell me,     15:07
25   please, if you have seen any page of this document

Page 152

N. Rogers

1        N. Rogers
2    marked as Rogers 2 before.
3            MR. NOVIKOFF:  Go through each page, 15:07
4        and the question is, do you recognize any of
5        the three pages of this exhibit.
6        A    I have to take a look at it and see.  15:07
7        Q    Please do.                  15:07
8        A    This is 3/30/01.            15:07
9            MS. McEACHIN:  Can I just ask why   15:09
10       this is being marked as one exhibit when
11       there is three separate documents that are
12       unrelated to one another?
13           MR. GRAFF:  They were consecutively  15:09
14       Bates numbered, and I will note, I cannot
15       confirm how many documents these originally
16       were, but I have put them together as one
17       exhibit because they will be used together
18       at the deposition.  But I am not
19       representing that these three pages at any
20       point necessarily were a single document.
21           MS. McEACHIN:  Okay.  Just note my   15:09
22       objection.
23       A    Okay, I have read it.       15:09
24       Q    I'm sorry, do you need a moment?    15:09
25       A    No, I have read it.         15:10

38  (Pages 149 to 152)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 153

1          N. Rogers
2     Q     Have you seen any of these three     15:10
3 pages before?
4     A     I do not recall seeing this.          15:10
5     Q     Okay.  If you could please turn to    15:10
6 the second page, marked Bates 3846.
7          The letter is addressed to Mr. Andrew 15:10
8 Miller, police commissioner, and it's stamped at
9 the top right-hand corner "Received March 30,
10 2001, incorporated Village of Ocean Beach."
11          Do you recall whether Mr. Andrew      15:10
12 Miller was the police commissioner in March 2001?
13          MR. NOVIKOFF:  Objection, asked and   15:10
14 answered.
15          You can answer.               15:10
16     A     Yes.                    15:10
17     Q     And I think you testified that       15:10
18 Mr. Miller ceased to serve as police commissioner
19 when he was no longer on the board of trustees.
20          MR. NOVIKOFF:  Objection.             15:11
21     Q     Is that correct?               15:11
22     A     Yes.                    15:11
23     Q     Did he run for re-election to the    15:11
24 board of trustees when his term expired in 2001 or
25 2002?

Page 154

1          N. Rogers
2     A     Yes, 2002.                 15:11
3     Q     Did you support his candidacy for    15:11
4 re-election at that time?
5     A     Yes.                    15:11
6     Q     The letter is signed by Chief Edward 15:11
7 T. Paradiso.  The text of the letter reads:  "Dear
8 Andy:  Please find enclosed a letter from
9 PO George Hesse requesting consideration for
10 provisional appointment to sergeant.  I feel that
11 Officer Hesse has grown as a police officer and
12 has carried on his supervisory duty
13 enthusiastically and professionally, and I add my
14 recommendation to his request and forward it to
15 you for backing and approval."
16          Mayor Rogers, do you know what, if    15:12
17 any, supervisory duties George Hesse had as of
18 March 30th, 2001?
19     A     Not specifically, no.          15:12
20     Q     Do you know the general nature --    15:12
21 strike that.
22          Do you know whether George Hesse had  15:12
23 any supervisory duties as of March 30th, 2001?
24     A     No.                    15:12
25     Q     Did Edward Paradiso ever explain to  15:12

Page 155

1          N. Rogers
2 you if there was any reason why he had written or
3 he had recommended George Hesse for professional
4 appointment to sergeant, but did not recommend him
5 for appointment as acting chief?
6          MR. NOVIKOFF:  Objection, form.       15:12
7     A     No.                    15:13
8     Q     To your knowledge, did anything      15:13
9 happen between George Hesse and Ed Paradiso
10 between March 30th, 2001, and the end of 2005,
11 that Ed Paradiso indicated to you had affected his
12 opinion of George Hesse?
13          MR. NOVIKOFF:  Objection, form.       15:13
14     A     To my knowledge, no.          15:13
15     Q     Between March 30th, 2001, and the end 15:13
16 of 2005, did Ed Paradiso ever explain to you or
17 state to you that any specific incident had
18 adversely impacted his impressions of George
19 Hesse's suitability for service as a police
20 officer?
21          MR. NOVIKOFF:  Objection, form.       15:14
22     A     To my knowledge, no.          15:14
23     Q     If you could please turn to the third 15:14
24 page of this document.
25          The document is dated March 25, 2001. 15:14

Page 156

1          N. Rogers
2 It states to Chief Edward T. Paradiso from George
3 B. Hesse, police officer.  Subject line:
4 "Provisional Appointment to Sergeant."
5          Mayor Rogers, do you recall if you    15:14
6 have seen this page of the document before?
7          MR. NOVIKOFF:  Objection, asked and   15:14
8 answered.  That was the first question
9 regarding this document.
10          But you can answer it again.         15:14
11     A     I don't recall seeing it.         15:14
12     Q     The last full paragraph of this      15:15
13 letter states:  "I understand I did not do well
14 enough to pass the last exam, but I believe that
15 there is a lot more to being a supervisor than
16 taking a test designed by the County police.
17          "I will be more prepared the next    15:15
18 time I take it so we can make it official, but for
19 the time being I would like the provisional
20 appointment.  According to Civil Service, you can
21 stay in a provisional position pending two exams.
22 That gives me at least four to five years to pass
23 the test."
24          To your knowledge, are the statements 15:15
25 in this letter concerning Civil Service standards

39 (Pages 153 to 156)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 157

N. Rogers

1
2  accurate?
3        MS. McEACHIN:  Objection.        15:15
4        MR. NOVIKOFF:  Objection, form, calls 15:15
5  for a legal conclusion, among other things.
6        You can answer, though.        15:15
7   A   To the extent that I am aware, yes.  15:16
8   Q   How long did you serve as a        15:16
9  commissioner on the New York City Civil Service
10  Commission?
11   A   Seven and a half years.        15:16
12   Q   Do you know what exam George Hesse is 15:16
13  referring to in this paragraph?
14   A   No.        15:16
15   Q   Did you ever discuss with George        15:16
16  Hesse whether he had passed a required exam in
17  connection with his position at the Ocean Beach
18  Police Department?
19   A   Did I discuss with him is your        15:16
20  question?
21   Q   Is that a subject that you ever        15:17
22  discussed with him, yes.
23   A   No.        15:17
24   Q   To your knowledge, did George        15:17
25  Hesse -- strike that.

Page 158

N. Rogers

1
2        To your knowledge, did George Hesse  15:17
3  fail to pass an exam that was required in
4  connection with his position at the Ocean Beach
5  Police Department, that is a Civil Service exam?
6        MS. McEACHIN:  Objection.        15:17
7        MR. CONNOLLY:  Objection.        15:17
8        MR. NOVIKOFF:  Okay, objection.        15:17
9   A   That's two questions.  Which one do  15:17
10  you want me to answer first?
11        MR. GRAFF:  Could you just read back  15:17
12  my last question.
13        (Record read.)        15:17
14  BY MR. GRAFF:
15   Q   I can see why it might have been        15:17
16  unclear.
17   A   Break it into two questions and I    15:17
18  will answer.
19   Q   To your knowledge, did George Hesse  15:18
20  fail to pass a Civil Service exam that was
21  required in his position at the Ocean Beach Police
22  Department?
23        MS. McEACHIN:  Still note my        15:18
24  objection.
25        MR. NOVIKOFF:  Mr. Connolly, are you  15:18

Page 159

N. Rogers

1
2  objecting?
3        MR. CONNOLLY:  Objection.        15:18
4        MR. NOVIKOFF:  I will object.        15:18
5        You can answer.        15:18
6   A   I can answer it up to a certain        15:18
7  point.  I cannot answer it in the way it's
8  phrased.  I'm sorry.
9        MR. NOVIKOFF:  You don't have to        15:18
10  apologize to me.
11   Q   Answer it up until the point that you 15:18
12  can answer it.
13   A   When you say to my knowledge, did he  15:18
14  fail to pass a Civil Service examination, if you
15  put a period after that, the answer would be yes.
16   Q   Okay.  What Civil Service examination 15:18
17  did George Hesse fail to pass?
18   A   To my knowledge, it was the        15:18
19  sergeant's exam.
20   Q   To your knowledge, did George Hesse   15:18
21  ever pass the Civil Service sergeant's exam that
22  you are referring to?
23   A   I don't know.        15:18
24   Q   To your knowledge, was George Hesse   15:18
25  required to pass the Civil Service sergeant's exam

Page 160

N. Rogers

1
2  to serve in the position of sergeant at the Ocean
3  Beach Police Department?
4        MS. McEACHIN:  Objection.        15:19
5        MR. NOVIKOFF:  Kevin?        15:19
6        MR. CONNOLLY:  Objection.        15:19
7        MR. NOVIKOFF:  Objection.        15:19
8   A   I don't know.        15:19
9   Q   Is that -- strike that.        15:19
10        Do you believe that George Hesse's    15:19
11  failure to pass the Civil Service sergeant exam
12  factored in, in any way, to your determination
13  that George Hesse was suitable to serve as acting
14  police chief?
15        MR. NOVIKOFF:  Wait a minute, hold   15:20
16  on.  Can you just read that question back.
17        (Record read.)        15:20
18        MR. NOVIKOFF:  Okay.  Objection.     15:20
19        You can answer.        15:20
20   A   I don't know.        15:20
21   Q   Is that something that you considered 15:20
22  at the time that you decided that George Hesse
23  should serve as acting police chief?
24        MR. NOVIKOFF:  Is what?        15:20
25   Q   His failure to pass the Civil Service 15:20

40 (Pages 157 to 160)

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1         N. Rogers
2    sergeant exam.
3         A    I don't believe so.          15:20
4         Q    During the period that you served as  15:21
5    a Commissioner on the New York City Civil Service
6    Commission, were you familiar with the New York
7    City, applicable New York City Civil Service
8    requirements for police officers?
9         MR. NOVIKOFF: Objection. I have no  15:21
10   idea what you mean by the word "familiar."
11        But you can answer.          15:21
12        Q    Did you have knowledge of those     15:21
13   requirements at that time?
14        A    No, because that was not within the  15:21
15   authority or purview of the activities of the
16   New York Civil Service Commission.
17        Q    And do you know what entity or agency 15:21
18   had purview over --
19        A    It was within --          15:22
20        MR. NOVIKOFF: Whoa, whoa.          15:22
21   Ms. Rogers, please let counsel finish the
22   question.
23        Were you done with the question?    15:22
24        MR. GRAFF: If Ms. -- excuse me,     15:22
25   Mayor Rogers wants to finish her

N. Rogers

1         N. Rogers
2    statement --
3         THE WITNESS: That's all right.     15:22
4         MR. NOVIKOFF: I just want to make     15:22
5    sure that you are finished so I can preserve
6    my objection, so if you are finished, I will
7    ask the court reporter to read the question
8    back. If you are not finished, then by all
9    means, finish your question.
10        MR. GRAFF: I will resume that     15:22
11   question.
12        Q    Do you know what entity had        15:22
13   jurisdiction or purview over NYPD Civil Service
14   requirements during the period that you served as
15   a commissioner on the New York City Civil Service
16   Commission?
17        MR. NOVIKOFF: Objection.          15:22
18        You can answer.          15:22
19        A    To my understanding and belief, it    15:22
20   was the New York City Police Department, not the
21   Civil Service Commission.
22        Q    At any time during the period that    15:23
23   you served as Mayor and/or police commissioner at
24   Ocean Beach, did you conduct any independent
25   research concerning the Civil Service requirements

N. Rogers

1         N. Rogers
2    applicable to employees at Ocean Beach?
3         MR. NOVIKOFF: Objection, form.     15:23
4         A    No.          15:23
5         Q    Did anyone ever tell you what those  15:23
6    requirements were during the period that you
7    served as police commissioner?
8         MR. NOVIKOFF: Other than perhaps    15:23
9    counsel? Because if your question includes
10   counsel --
11        MR. GRAFF: Other than counsel.     15:23
12        MR. NOVIKOFF: Okay. You can answer 15:23
13   the question.
14        A    When Marianne Minerva was hired as  15:23
15   administrator, one of her strengths was that she
16   was very knowledgeable about Civil Service matters
17   as it related to personnel.
18        When she came on, I instructed her to 15:24
19   do the research as to the appropriate steps that
20   should be recommended to the Village to take to
21   make us in greater compliance with Civil Service
22   requirements as they related to the Village.
23        Q    What is the basis for your statement  15:24
24   that Marianne Minerva, one of her strengths when
25   she came on was her knowledge of Civil Service

N. Rogers

1         N. Rogers
2    requirements?
3         A    That was part of her resume and     15:24
4    references.
5         Q    Do you recall what specifically was  15:24
6    stated on her resume that indicated --
7         A    No.          15:24
8         Q    Thanks.          15:24
9         And when you say that part of her     15:24
10   work was to bring Ocean Beach in greater
11   compliance with Civil Service requirements, is it
12   your understanding -- strike that.
13        Is it your understanding that Ocean  15:25
14   Beach was not in compliance with Civil Service
15   requirements at the time that Marianne Minerva
16   came on as Village administrator?
17        MS. McEACHIN: Objection.          15:25
18        MR. NOVIKOFF: Is it her          15:25
19   understanding now or was it her
20   understanding when Marianne Minerva came on
21   board?
22   BY MR. GRAFF:          15:25
23        Q    Let's break it down. When Marianne  15:25
24   Minerva came on board.
25        MR. NOVIKOFF: Fine. Objection to    15:25

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 165

```
 1              N. Rogers
 2    form.
 3              But you can answer.          15:25
 4       A    Yes, we were not in full compliance.  15:25
 5    That was my belief.
 6       Q    And in what ways were you not in full 15:25
 7    compliance?
 8       A    It was my understanding that every   15:25
 9    employee of the Village of Ocean Beach, whether it
10    be full-time or part-time, seasonal or not, had
11    certain requirements to make them consistent with
12    the -- with the Civil Service requirements of the
13    State.
14       Q    And do you know which requirements    15:26
15    Ocean Beach was not in compliance with at that
16    time?
17       A    Not specifically.            15:26
18       Q    Do you know whether the Ocean Beach  15:26
19    Police Department employees were in compliance
20    with Civil Service requirements at that time?
21       MR. NOVIKOFF: All of them, some of  15:26
22    them?
23       Q    Whether any -- yes.  Any were not in 15:26
24    compliance.
25       MR. NOVIKOFF: The question is, were  15:26
```

Page 166

```
 1              N. Rogers
 2    you aware at that time whether there were
 3    any police officers that were not in
 4    compliance with Civil Service; right?
 5       A    I was aware, yes.           15:26
 6       Q    Do you recall how many Ocean Beach  15:26
 7    police officers were not in compliance with those
 8    requirements at that time?
 9       MS. McEACHIN: Objection as to what  15:27
10    requirements, because is it duty statements?
11    Is it certification?  Is it the exam?  I
12    don't know what requirements you are
13    referring to.
14       MR. NOVIKOFF: I will join in that   15:27
15    objection.  Well stated.
16       MR. GRAFF: Okay, the objection is   15:27
17    noted.  I am asking whatever requirements
18    she was aware of that had to be complied
19    with, how many were not in compliance with
20    any aspect of that.
21       A    The question is how many; is that   15:27
22    correct?
23       Q    Yes.                    15:27
24       A    The answer is no.           15:27
25       Q    Is it your understanding that at some 15:27
```

Page 167

```
 1              N. Rogers
 2    point Ocean Beach police officers were all in
 3    compliance with all applicable Civil Service
 4    requirements?
 5       A    I don't believe that is my       15:28
 6    understanding, no.
 7       Q    So, is it your understanding that at 15:28
 8    any time -- strike that.
 9       Q    To your knowledge, at any time during 15:28
10    your service as Mayor/police commissioner of Ocean
11    Beach, was the Ocean Beach Police Department in
12    full compliance with applicable Civil Service
13    requirements?
14       A    No.                   15:28
15       Q    Do you know why the Ocean Beach     15:28
16    Police Department was not brought into compliance
17    with Civil Service requirements when Marianne
18    Minerva came on as Village administrator?
19       MR. NOVIKOFF: Objection to form.   15:28
20    Why don't we take this phone call?   15:28
21       THE VIDEOGRAPHER: The time is now   15:28
22    3:28 p.m.
23       We are now off the record.        15:28
24       (Telephone conference as follows:)   15:28
25       THE CLERK: Calling case 07 CV 1215,  15:30
```

Page 168

```
 1              N. Rogers
 2    Carter versus Incorporated Village of Ocean
 3    Beach.
 4       Counsel, please state your appearance 15:30
 5    for the record.
 6       MR. GRAFF: This is Ari Graff of the  15:30
 7    law firm Thompson Wigdor & Gilly LLP,
 8    representing plaintiffs at the deposition of
 9    Mayor Rogers.
10       MR. NOVIKOFF: Representing the      15:30
11    Village defendants, former mayor Natalie
12    Rogers and Mayor Joseph Loeffler, Kenneth
13    Novikoff from the law firm of Rivkin Radler
14    LLP.
15       Good afternoon, Your Honor.       15:31
16       THE COURT: You have a question for a 15:31
17    ruling?
18       MR. GRAFF: Yes, your Honor.  This is 15:31
19    Ari Graff, counsel for plaintiffs, speaking.
20    I had contacted chambers with respect to
21    Mr. Novikoff's instruction to the witness
22    not to answer questions on grounds of
23    executive session privilege.
24       My position is that that is not a    15:31
25    valid basis for instructing a witness not to
```

42 (Pages 165 to 168)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 169

N. Rogers

1       N. Rogers
2   answer a question at a deposition under the
3   Federal Rules of Civil Procedure and local
4   rules of the Eastern District of New York.
5       MR. NOVIKOFF:  Your Honor, this is   15:31
6   Mr. Novikoff.  The --
7       THE COURT:  Just one moment.  Do you  15:31
8   have a court reporter there?
9       MR. NOVIKOFF:  Yes, we do.      15:31
10      THE COURT:  You do.  Good.       15:31
11      I have a very, very bad connection,   15:31
12  just so you are aware of it.  So, if you
13  would speak slowly and as clearly as you
14  can.
15      Mr. Graff, as I understand it, the   15:31
16  basis for the objections are that the
17  question is frivolous?
18      MR. GRAFF:  No, sir.  That the     15:32
19  question is -- that the question does not
20  require a response on grounds of executive
21  session privilege.
22      THE COURT:  This is a very bad      15:32
23  connection.  How did you place this call?
24      MR. NOVIKOFF:  This is through our   15:32
25  phone in our conference room, Your Honor, on

Page 170

1       N. Rogers
2   speaker.
3       THE COURT:  Take it off speaker,    15:32
4   okay?
5       MR. NOVIKOFF:  Sure.         15:32
6       Your Honor, though, how -- the court  15:32
7   reporter just looked at me, not knowing how
8   she would be able to take down your
9   instructions.
10      Okay.  The Court is recording     15:32
11  everything.
12      (Telephone conference continued off  15:32
13  the record.)
14      MR. NOVIKOFF:  Let's go on the     15:36
15  record.
16      I will represent that Judge Boyle    15:36
17  ordered Ms. Rogers to answer all questions
18  concerning any communications that were
19  posed through questions of Mr. Graff
20  concerning comments made between her and any
21  trustee during executive session, that the
22  privileges that I have asserted do not
23  apply.
24      MR. GRAFF:  Did Judge Boyle indicate  15:37
25  that the presence of counsel at an executive

Page 171

1       N. Rogers
2   session would render the happenings at that
3   session subject to attorney-client
4   privilege?
5       MR. NOVIKOFF:  No, no.  Judge Boyle  15:37
6   was clear, and his transcript will bear the
7   basis of his ruling.  I'm not going to try
8   to characterize what he said.
9       But the questions that you posed were  15:37
10  not properly objected to on the basis of any
11  of the three privileges that I identified,
12  whether they were attorney-client privilege,
13  legislative immunity or executive session,
14  with or without counsel present.
15      MR. GRAFF:  Thank you.  Let's go off  15:38
16  the record, please.
17      (Recess taken.)         15:38
18      THE VIDEOGRAPHER:  This is the start  15:57
19  of tape number four.  The time is now
20  3:57 p.m.
21      We are now back on the record.     15:57
22  BY MR. GRAFF:         15:57
23      Q    Mayor Rogers, to your knowledge, is  15:57
24  an individual who maintains an official address at
25  a post office box at the Ocean Beach Post Office

Page 172

1       N. Rogers
2   eligible to vote in elections at Ocean Beach?
3       MR. NOVIKOFF:  Objection.       15:57
4       A    I don't know.  I don't remember.   15:57
5       Q    Is that something -- when you say  15:58
6   don't remember, is that something that you believe
7   you knew at one time and cannot recall as you sit
8   here today?
9       A    Yes.         15:58
10      Q    Do you know where the location    15:58
11  315 Bay Walk in Ocean Beach is?
12      A    Not offhand, no.       15:58
13      Q    Do you know the street address of the  15:58
14  Ocean Beach police barracks?
15      A    The street address, no.     15:58
16      Q    Have you ever heard of something    15:58
17  called the Ocean Beach Police Department Applicant
18  Investigation Section?
19      A    No.       15:58
20      Q    To your knowledge, has George Hesse  15:58
21  ever had a position on the Ocean Beach Police
22  Department Applicant Investigation Section?
23      MR. NOVIKOFF:  Objection to form.   15:59
24      A    No idea.       15:59
25      Q    Mayor Rogers, do you recall that   15:59

43 (Pages 169 to 172)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 173

```
 1              N. Rogers
 2   earlier today I asked you whether you had ever
 3   been named as a defendant in any lawsuit?
 4       A    Yes.                    15:59
 5       Q    Do you recall whether you have been  15:59
 6   named as a defendant in any lawsuit?
 7            MR. NOVIKOFF: Objection.         15:59
 8       Q    Other than the lawsuit we are here   15:59
 9   for today.
10            MR. NOVIKOFF: Asked and answered.  15:59
11            You can answer again.          15:59
12       A    To my knowledge, no.          15:59
13            MR. GRAFF: I will ask the court   15:59
14   reporter to please mark as exhibit Rogers 3
15   a multi-page document beginning on Bates
16   Number 9893, continuing through Bates number
17   9902.
18            (Rogers Exhibit 3 marked for      16:00
19   identification.)
20   BY MR. GRAFF:                  16:00
21       Q    Mayor Rogers, when you have had a   16:00
22   chance to look at the first page of this document,
23   could you tell me, please, if you recognize this
24   first page.
25       A    Oh, Peterson. Yes.          16:00
```

Page 174

```
 1              N. Rogers
 2       Q    Could you identify what this first   16:00
 3   page of the document is.
 4       A    It's a complaint apparently from    16:00
 5   Bridget M. Peterson, who was a police officer with
 6   the Village, against the department, against the
 7   chief Ed Paradiso and against me.
 8       Q    Have you seen this document before?  16:01
 9            MR. NOVIKOFF: Do you want her to   16:01
10   read the whole document in order to answer
11   that?
12       Q    With reference to the first page,    16:01
13   let's say.
14       A    Have I seen this?          16:01
15            MR. NOVIKOFF: Well, actually, if   16:01
16   you're going to ask if she has seen the
17   whole document --
18       Q    Have you seen the first page of this  16:01
19   document before?
20       A    I haven't seen it, but --      16:01
21            MR. NOVIKOFF: That was the question. 16:01
22            THE WITNESS: All right then.     16:01
23   BY MR. GRAFF:                  16:01
24       Q    Having looked at this document, does  16:01
25   it refresh your recollection at all as to whether
```

Page 175

```
 1              N. Rogers
 2   you have been named as a defendant in a lawsuit?
 3       A    Yes.                    16:01
 4            MR. NOVIKOFF: Looking at the first  16:01
 5   page.
 6       A    Yes. It does.            16:01
 7       Q    Do you now have an independent      16:01
 8   recollection, independent of this document, as to
 9   whether you have been named as a defendant?
10       A    Yes.                    16:01
11       Q    Do you recall whether you gave      16:01
12   testimony under oath in connection with this
13   lawsuit? And by "this lawsuit," I am referring to
14   the lawsuit referenced on this first page.
15       A    I don't recall testifying on this.  16:02
16       Q    To your knowledge, is this lawsuit   16:02
17   still active?
18       A    No, no.                 16:02
19       Q    Do you recall what allegations were  16:02
20   made against you in this lawsuit?
21            MR. NOVIKOFF: Objection.        16:02
22            You can answer.            16:02
23       A    Do I recall? No, I do not recall.   16:02
24       Q    To your knowledge, did this lawsuit  16:02
25   include allegations made against you?
```

Page 176

```
 1              N. Rogers
 2       A    To my knowledge, I assume they did,  16:02
 3   but I don't know what they are.
 4       Q    To your knowledge -- I have asked a  16:02
 5   similar question already. To your knowledge, has
 6   this lawsuit been resolved?
 7            MR. NOVIKOFF: Objection.         16:03
 8       A    Yes.                    16:03
 9       Q    Do you recall what the resolution of  16:03
10   this lawsuit involved?
11       A    I was told that the insurance company 16:03
12   settled this for -- at some level. I don't know
13   what.
14       Q    Do you know whether there was any    16:03
15   finding as to whether any of the defendants in
16   this lawsuit were liable for wrongful conduct?
17       A    No. I did not know.          16:03
18       Q    Do you know whether the resolution of 16:03
19   this lawsuit involved any admission that any of
20   the defendants in this lawsuit were liable for
21   wrongful conduct?
22       A    I do not know.            16:03
23       Q    When you say the insurance carrier   16:03
24   settled the lawsuit, what insurance carrier are
25   you referring to?
```

44 (Pages 173 to 176)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 177

1          N. Rogers
2      A    I don't know specifically. That was 16:03
3 what -- it was my understanding that an insurance
4 company settled. What insurance company, I don't
5 know.
6      Q    Other than any settlement funds that 16:04
7 the insurance company might have provided, to your
8 knowledge, did the Village of Ocean Beach
9 contribute any funds towards the settlement of
10 that lawsuit?
11     A    There may have been a deductible.    16:04
12     Q    Other than a deductible, to your    16:04
13 knowledge, did the Village of Ocean Beach
14 contribute any funds to the settlement of that
15 lawsuit?
16     A    To my knowledge, no.          16:04
17     Q    Mayor Rogers, do you know who a     16:05
18 person, an individual named Alan Loeffler is?
19     A    Say it again.         16:05
20     Q    Alan Loeffler?          16:05
21     A    I think that's Joe Loeffler's      16:05
22 brother.
23     Q    Do you know Alan Loeffler personally? 16:05
24     A    If it's the person I believe it to  16:05
25 be, I have met him a few times.

Page 178

1          N. Rogers
2      Q    Is the person you are referring to or 16:05
3 was the person you are referring to formerly a
4 police officer at Ocean Beach?
5      A    I don't know if he was in Ocean     16:05
6 Beach. I know he was a police officer.
7      Q    To your knowledge, have any relatives 16:06
8 of Mayor Loeffler been employed by Ocean Beach
9 during the period when you served as Mayor and/or
10 police commissioner?
11     A    Yes.             16:06
12     Q    Could you please list as many such   16:06
13 relatives as you can recall.
14     A    His mother was a clerk in the court. 16:06
15     Q    What was her name, please?       16:06
16     A    Winnie Loeffler. I guess it's      16:06
17 Winifred. I don't know.
18          And two daughters were in the      16:06
19 recreation department. One is there now. Jill is
20 there now, and she was there when I was Mayor.
21          And the other daughter is -- I     16:06
22 don't -- I don't -- I don't recall her first name.
23     Q    As Mayor of Ocean Beach, did you have 16:07
24 any supervisory responsibilities with respect to
25 the Ocean Beach Recreation Department?

Page 179

1          N. Rogers
2      A    Not directly, no.        16:07
3      Q    Did you have any indirect       16:07
4 responsibilities, supervisory responsibilities,
5 with respect to the Ocean Beach Recreation
6 Department?
7          MR. NOVIKOFF: Objection.        16:07
8          You can answer.          16:07
9      A    If I did, I didn't exercise them.   16:07
10     Q    Is it your testimony that you don't  16:07
11 know if you did?
12          MR. NOVIKOFF: Objection, her      16:07
13 testimony is her testimony.
14          You can answer.          16:07
15     A    I don't know if I did, yes, that's   16:07
16 correct. I don't know if I did.
17          MR. GRAFF: Could we go off the     16:08
18 record very briefly?
19          MR. NOVIKOFF: Sure.         16:08
20          THE VIDEOGRAPHER: The time is now   16:08
21 4:07 p.m.
22          We are now off the record.        16:08
23          (Discussion held off the record.)   16:08
24          THE VIDEOGRAPHER: The time is now   16:11
25 4:11 p.m.

Page 180

1          N. Rogers
2          We are now back on the record.     16:11
3          MR. GRAFF: Could the court reporter 16:11
4 please read back my last question to Mayor
5 Rogers and her last response.
6          (Record read.)          16:11
7 BY MR. GRAFF:                        16:11
8      Q    Mayor Rogers, if you wanted to     16:11
9 ascertain whether or not you had such supervisory
10 responsibilities with respect to the recreation
11 department, where could you obtain that
12 information?
13     A    NYCOM, which is the New York Council 16:12
14 of Mayors in Albany, has a lot of manuals on
15 village law, and I would look up and see just what
16 is provided for in all phases of village law as to
17 what the duties and responsibilities of the Mayor
18 are.
19     Q    During the time that you served as   16:12
20 Mayor and/or police commissioner, did you have
21 copies of the NYCOM documents that you are
22 referring to?
23          MR. NOVIKOFF: Objection.        16:12
24     A    I had some of them, yes.        16:12
25     Q    And were those maintained in your   16:12

45 (Pages 177 to 180)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 181

N. Rogers

1          N. Rogers
2  home?
3      A    Some were there, yes.  Not all.        16:12
4      Q    Which NYCOM documents of that nature  16:12
5  did you have?
6      A    There was a handbook for Village      16:13
7  officials, which gave the duties and
8  responsibilities of trustees and Mayor.  There was
9  a lot of election material.
10        THE REPORTER:  There was a lot of?   16:13
11     A    A lot of election material.          16:13
12        From time to time special pamphlets  16:13
13 were printed and I had some of them on specific
14 issues.
15     Q    Were there any such NYCOM documents  16:13
16 that addressed the duties and responsibilities of
17 any employee at Ocean Beach with respect to the
18 Ocean Beach Police Department?
19        MR. NOVIKOFF:  Objection.           16:14
20     A    Not that I recall.                 16:14
21     Q    If you had a question that could not  16:14
22 be answered by consulting the NYCOM documents that
23 you had, is there a way, or how would you have
24 sought to obtain further NYCOM documents that
25 might have resolved your question?

Page 182

N. Rogers

1          N. Rogers
2        MR. NOVIKOFF:  Objection.           16:14
3      A    There were a number of people in      16:14
4  Albany at the NYCOM offices, all of whom dealt
5  with different areas of village responsibilities
6  and activities, and I would call NYCOM and find
7  out who was responsible for the particular issue
8  or area that I was looking for and have a
9  conversation with that individual, if I could.
10     Q    If you were seeking to resolve a      16:15
11 question in the scope of your responsibilities as
12 Mayor and/or police commissioner, were there any
13 such questions that could have been resolved both
14 by the Civil Service Department and by the NYCOM
15 officials?  Was there any overlaps?
16        MR. NOVIKOFF:  Objection.           16:15
17        MS. McEACHIN:  Objection.           16:15
18     A    It's possible, but I don't know them. 16:15
19     Q    What did you understand the          16:15
20 distinction to be between issues that could be
21 resolved by NYCOM versus issues that could be
22 resolved by the Civil Service Department?
23        MR. NOVIKOFF:  Objection.           16:16
24     A    NYCOM dealt with state law           16:16
25 essentially and the interpretation of it as far as

Page 183

N. Rogers

1          N. Rogers
2  the villages were concerned.
3        Civil Service, to my knowledge, had  16:16
4  to do with the requirements for personnel.
5      Q    And during the time that you served  16:16
6  as Mayor and/or police commissioner, did you
7  understand that the Civil Service requirements
8  were requirements of law?
9        MS. McEACHIN:  Objection.           16:16
10        MR. NOVIKOFF:  Objection.           16:16
11        MR. CONNOLLY:  Objection.           16:16
12     A    Not specifically, no.             16:16
13     Q    Do you know what entity or individual  16:17
14 is responsible for promulgating or establishing
15 the Civil Service requirements with respect to
16 employees at Ocean Beach?
17        MR. NOVIKOFF:  Objection.           16:17
18     A    No, I do not.                     16:17
19     Q    To your knowledge, would any law or  16:17
20 regulation prohibit Ocean Beach from paying any
21 employees who were not employed in compliance with
22 Civil Service requirements?
23        MS. McEACHIN:  Objection.           16:17
24        MR. NOVIKOFF:  Objection.           16:17
25     A    To my knowledge, no.              16:17

Page 184

N. Rogers

1          N. Rogers
2      Q    Do you know somebody by the name of  16:18
3  Patricia Hoversen?
4      A    Spell the last name, please.        16:18
5      Q    Let me actually give you a document.  16:18
6        MR. GRAFF:  I'm going to ask the      16:18
7  court reporter to please mark as Exhibit
8  Minerva 4 --
9        MR. JEMAL:  Rogers.                 16:18
10        MR. GRAFF:  I'm sorry.  Rogers        16:18
11 Exhibit 4, a one-page document bearing Bates
12 Number 6476.
13        (Rogers Exhibit 4 marked for         16:18
14 identification.)
15 BY MR. GRAFF:                              16:18
16     Q    Ms. Rogers, when you have the        16:18
17 document in front of you, I would ask if you have
18 seen this document before.
19     A    1992?  Okay.                      16:19
20        This says "Dear Jack" and it's       16:20
21 addressed to Mr. Vernon Smith.  I don't quite
22 understand that.
23     Q    Have you seen this document, though?  16:20
24     A    No.                              16:20
25     Q    At the top left of the document,      16:20

46 (Pages 181 to 184)

36cc7550-5e7e-4e1c-853f-09d9ba020092

N. Rogers

1
2  under the caption "Board of Trustees," the name in
3  the middle of that list is Natalie Katz Roger,
4  R-O-G-E-R.  Does that refer to you?
5      A    Yes.                          16:20
6      Q    And what position did you hold at    16:20
7  Ocean Beach on January 15th, 1992?
8      A    I had just become a trustee.    16:20
9      Q    And the document is signed by --    16:20
10  there is the spelling of the name that I had asked
11  about before, Patricia H-O-V-E-R-S-E-N.
12      MR. NOVIKOFF: I'm sorry, Counsel,    16:21
13  the document has no signature on it.
14      Q    I'm sorry.  The typed name in the    16:21
15  signature block is Patricia H-O-V-E-R-S-E-N.  Do
16  you know any individual by that name?
17      A    No, sir.                      16:21
18      Q    The last paragraph of the document    16:21
19  states:  "Please be advised that you will not be
20  allowed to work or be paid for any work performed
21  while you are not approved by Civil Service.  You
22  cannot be approved by Civil Service until you have
23  taken and passed the medical and agility exams."
24           My question is, independent from what 16:21
25  is stated in this letter, does this letter refresh

N. Rogers

1
2  your recollection as to whether any regulation or
3  law would have prohibited Ocean Beach from paying
4  employees who were employed without complying with
5  Civil Service requirements?
6      MS. McEACHIN: Objection.           16:22
7      MR. NOVIKOFF: Objection, form.  I    16:22
8  don't believe that she said she didn't
9  recall, so therefore I think the question
10  about whether this refreshes her
11  recollection is improper.
12      But you can answer the question.    16:22
13      A    I do not recall ever seeing this    16:22
14  letter, and I did not know the contents of this
15  letter until you showed it to me now.
16      Q    During your employment as police    16:22
17  commissioner, if you had wanted to find an answer
18  to the question does any law or regulation
19  prohibit Ocean Beach from paying employees who are
20  not in compliance with Civil Service requirements,
21  what entity or individual would you contact to
22  obtain information of that nature?
23      MR. NOVIKOFF: Objection.           16:22
24      A    I can't answer that question.  It    16:22
25  presumes something.  It makes a presumption.  The

N. Rogers

1
2  first part of your question presumes something
3  which I don't understand.
4      Q    During your employment as Mayor    16:23
5  and/or police commissioner of Ocean Beach, did you
6  understand what the consequences of employing
7  individuals not in compliance with Civil Service
8  requirements were?
9      MR. NOVIKOFF: Objection.           16:23
10      You can answer.                    16:23
11      A    No.                          16:23
12      Q    Did you understand that there were    16:23
13  any consequences with respect to Ocean Beach's
14  employment of employees not in compliance with
15  Civil Service requirements?
16      MR. NOVIKOFF: Objection.           16:23
17      MS. McEACHIN: Objection.  Which    16:23
18  titles are you referring to?  Are you
19  referring to police officer title or some
20  other Civil Service title?
21      MR. GRAFF: Any employees.          16:24
22      MS. McEACHIN: That is too overbroad.  16:24
23      MR. NOVIKOFF: My objection stands.  16:24
24      A    No, that was not my function.    16:24
25      Q    Whose function was that?       16:24

N. Rogers

1
2      A    That was administrative.       16:24
3      Q    Who specifically?             16:24
4      A    The administrator, the         16:24
5  clerk/treasurer.  Certainly not myself.
6      Q    As between the administrator and the 16:24
7  clerk/treasurer -- well, first of all, is
8  clerk/treasurer one position?
9      A    At one point it was, yes.       16:24
10      Q    Okay.  As between administrator,    16:24
11  clerk/treasurer and/or clerk or treasurer, if
12  that, who was primarily responsible for
13  information of that nature during the period that
14  you were employed as Mayor and/or police
15  commissioner?
16      MR. NOVIKOFF: Objection.           16:25
17      A    It could have been any of several    16:25
18  people.  I can't answer you specifically.
19      Q    Okay.  As between Village       16:25
20  administrator and clerk/treasurer, which position
21  is more senior?
22      MR. NOVIKOFF: Objection.           16:25
23      A    They have different functions.    16:25
24      Q    At any point during your employment 16:25
25  as Mayor and/or police commissioner, did the

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 189

N. Rogers

1    N. Rogers
2    position of clerk/treasurer report to the
3    individual who held the position of Village
4    administrator?
5        A    No. They were different departments. 16:25
6    They did different work.
7        Q    Who did the Village administrator    16:26
8    report to during your employment as Mayor and/or
9    police commissioner?
10       A    The Mayor and the board.        16:26
11       Q    Did the Village administrator report 16:26
12   to you as -- in your capacity as Mayor during your
13   service in that position?
14       A    For certain functions, yes.       16:26
15       Q    What function, what functions     16:26
16   involving the Village administrator would the
17   Village administrator -- strike that. That's --
18            What were the functions of the    16:26
19   Village administrator with respect to which the
20   Village administrator reported to you during your
21   employment as Mayor and/or police commissioner?
22       MR. NOVIKOFF: Objection.      16:27
23       A    The general status of activities in  16:27
24   the Village of the capital improvements, the
25   operation of the various departments, the

Page 190

N. Rogers

1    N. Rogers
2    operation of the water department and the sewer
3    department, and street cleaning.
4        Q    Do you recall when, at what point in  16:27
5    time Marianne Minerva began serving in the
6    capacity of Village administrator?
7        A    They had been separated, the      16:28
8    clerk/treasurer and administrator. At one point
9    in time after the administrator that had
10   previously been there left, she was given that job
11   when the next person who took care of water and
12   sewer and capital improvements and street cleaning
13   and so on became -- had a different designation.
14   I am trying to remember what we gave that extra
15   designation.
16       Q    Maybe I can cut it -- make it a     16:28
17   little simpler. At what point in time did
18   Marianne Minerva begin serving as Village
19   administrator?
20       A    I can't tell you the date. I don't  16:28
21   remember.
22       Q    Do you remember the year?        16:28
23       A    It could be '04, '05. I do not     16:29
24   remember the year she came on, no.
25       Q    When Marianne Minerva began serving  16:29

Page 191

N. Rogers

1    N. Rogers
2    as Village administrator, did she at any point
3    report to you on the status of her efforts to
4    insure compliance with Civil Service requirements
5    by employees of Ocean Beach?
6        A    Yes, in a general way.         16:29
7        Q    Do you recall anything that she     16:29
8    reported to you on that subject?
9        A    No. That she was trying to get    16:29
10   everyone in the Village classified so that their
11   job would be properly classified as a Civil
12   Service job.
13       Q    Did you have -- do recall whether you 16:29
14   asked Marianne Minerva any questions about the
15   status of her efforts to achieve that objective?
16       A    I don't recall a specific question or 16:30
17   date, just a general question of how was the
18   compliance going, how were we doing on this.
19       Q    And do you recall how she responded  16:30
20   on any of those occasions?
21       A    We were making progress toward      16:30
22   getting every Village employee classified directly
23   within the Civil Service requirements.
24       Q    Did you understand that there would  16:30
25   be any penalty to Ocean Beach for failing to

Page 192

N. Rogers

1    N. Rogers
2    complete that process?
3        MR. NOVIKOFF: Objection.        16:31
4        MS. McEACHIN: Objection.        16:31
5        A    No.            16:31
6        Q    Do you know whether prior to       16:31
7    beginning her service as Village administrator,
8    Marianne Minerva had any previous experience with
9    respect to Civil Service requirements for
10   employees?
11       MR. NOVIKOFF: Objection, asked and  16:31
12   answered.
13            You can answer.         16:31
14       A    I think I said earlier that as part  16:31
15   of her resume and/or references at the time that
16   she was screened for the job in Ocean Beach, that
17   she had good experience working with Civil Service
18   requirements as it pertained to villages, as it
19   pertained to villages.
20       Q    Were you involved in the hiring     16:32
21   process of Marianne -- for Marianne Minerva?
22       A    Yes, I was.          16:32
23       Q    Based on the information that you    16:32
24   reviewed in connection with that hiring process,
25   did you conclude that Marianne Minerva had more

48 (Pages 189 to 192)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 193

1         N. Rogers
2  experience than you did with respect to insuring
3  compliance with Civil Service requirements for
4  employees?
5         MR. NOVIKOFF: Objection.        16:32
6         MR. GRAFF: Noted.        16:32
7     A   Yes, I did.        16:32
8     Q   Do you recall how many years of prior 16:32
9  work experience Marianne Minerva had with respect
10 to Civil Service issues?
11    A   No.        16:33
12    Q   Do you recall whether she had more   16:33
13 than seven years of experience with respect to
14 those issues?
15    A   No, I don't know.        16:33
16    Q   Do you recall whether she had more   16:33
17 than five years of experience?
18    A   I don't know.        16:33
19        MR. GRAFF: Ask the court reporter to 16:34
20 please mark as Exhibit Minerva 5 a one-page
21 document.  It's Bates numbered 267, but I
22 will note that the Bates number is stamped
23 within the text of the document.
24        MR. NOVIKOFF: Rogers.        16:34
25        MR. GRAFF: I am sorry, that is   16:34

Page 194

1         N. Rogers
2  correct, Exhibit Rogers 5.
3         (Rogers Exhibit 5 marked for     16:34
4  identification.)
5  BY MR. GRAFF:        16:34
6     Q   Mayor Rogers, if you could turn your 16:35
7  attention to the columns in the center of this
8  document.
9     A   Let me first see what it is.        16:35
10    Q   Please.  Is this a document that you 16:35
11 recognize?
12    A   No, I do not.        16:35
13    Q   I have some questions about the     16:35
14 information that is set out in this document.  I
15 understand you haven't seen it specifically, but
16 maybe you would still be able to answer the issues
17 I have here.
18        The first line of the document     16:35
19 reading across says Ed Paradiso, Social Security
20 number, and the title police sergeant.
21        MR. GRAFF: Mr. Novikoff, can you -- 16:35
22        MR. NOVIKOFF: Counsel, is there a   16:35
23 question? The document says what it says.
24        MR. GRAFF: I understand, but if she 16:35
25 could follow with me, my question will

Page 195

1         N. Rogers
2  relate to what is laid out on the document.
3         MR. NOVIKOFF: Fine.        16:35
4  BY MR. GRAFF:        16:35
5     Q   And it has next to this title police 16:36
6  sergeant, salary biweekly and an effective date
7  06/01/05.  Do you see the line I am referring to?
8     A   Yes.        16:36
9     Q   The bottom right-hand corner of the 16:36
10 document is signed.  Do you recognize that
11 signature?
12    A   Yes.        16:36
13        MR. NOVIKOFF: Objection.        16:36
14    Q   Whose signature is that?        16:36
15    A   Marianne Minerva.        16:36
16    Q   Okay.  On June 1st, 2005, what was  16:36
17 Edward Paradiso's position title?
18        MR. NOVIKOFF: Counsel, she didn't   16:36
19 need the document for that.
20        But go ahead, you can answer.        16:36
21    A   I think at that point he was still   16:36
22 police chief, but I am not certain of the dates.
23    Q   And the second line of the document, 16:36
24 I will just tell you what it says.  Your
25 counsel -- if you would like to see it, you can

Page 196

1         N. Rogers
2  ask him for the document.
3         George Hesse, Social Security number, 16:37
4  title police officer, a salary number, and again
5  an effective date 06/01/05.
6         On June 1st, 2005, what was George   16:37
7  Hesse's position in the Ocean Beach Police
8  Department?
9     A   I don't remember the date that he    16:37
10 assumed the role of acting police chief, so I
11 can't answer that.
12    Q   Immediately prior to assuming the    16:37
13 role or title of acting police chief, what title
14 did George Hesse have?
15        MR. NOVIKOFF: Objection.        16:37
16    A   He had the title of sergeant.        16:37
17    Q   During -- strike that.        16:37
18        Over the course of your employment in 16:38
19 any position with any government, have you ever
20 seen documents of this form before?
21        MR. NOVIKOFF: Objection.        16:38
22    A   No.        16:38
23    Q   Okay.  We can put that document      16:38
24 aside.
25        Mayor Rogers, did you do anything to 16:38

Page 197

```
 1            N. Rogers
 2    prepare for this deposition?
 3        A    No.  Well, I met, I met with my    16:39
 4    attorney and discussed something with him, yes.
 5        Q    Okay.  I just want to know -- I know  16:39
 6    that you understand the rules.  I want to be very
 7    clear, none of my questions are directed at
 8    anything that was communicated between you and
 9    your attorney.
10        A    Okay.                   16:39
11        Q    Did you at any point review any     16:39
12    documents to refresh your recollection in -- of
13    anything in anticipation of this deposition?
14            MR. NOVIKOFF:  Why don't we break it  16:39
15    down so it's clear?  Why don't we break it
16    down before she met with counsel, after she
17    met with counsel, and then leave the money
18    question as the third one, and we will see
19    if I object and instruct her not to answer.
20    Do you understand what I am asking?
21            MR. GRAFF:  Well, if the answer is no  16:39
22    to this question, I won't need to ask three
23    questions.
24            MR. NOVIKOFF:  No, no, because this   16:39
25    could encompass what she may or may not have
```

Page 198

```
 1            N. Rogers
 2    looked at while she was with me.  So if she
 3    did it outside of counsel, she should answer
 4    yes or no, either before or after she met
 5    with us, and then if you want to ask that
 6    last question about what she did while she
 7    was with me.
 8            Otherwise, I'm probably going to have  16:40
 9    to instruct her to, to not answer that
10    question because it's very broad.
11            MR. GRAFF:  Okay.  I know we both    16:40
12    know there is a dispute --
13            MR. NOVIKOFF:  Right.           16:40
14            MR. GRAFF:  -- as to the privilege   16:40
15    that pertains here that is pending before
16    the Court.
17            MR. NOVIKOFF:  Absolutely.       16:40
18            MR. GRAFF:  But I will proceed in the  16:40
19    manner which you have requested.
20            MR. NOVIKOFF:  Okay.  Great.     16:40
21    BY MR. GRAFF:              16:40
22        Q    Outside the presence of counsel, did  16:40
23    you review any documents to refresh your
24    recollection of anything in anticipation of this
25    deposition?
```

Page 199

```
 1            N. Rogers
 2        A    No.             16:40
 3        Q    Did you review any documents in the  16:40
 4    presence of counsel to refresh your recollection
 5    of anything in anticipation of this deposition?
 6            MR. NOVIKOFF:  Okay.  Don't answer   16:41
 7    that yet.
 8            In light of the fact that Ms. Rogers  16:41
 9    is going to have to come back a second time,
10    if I instruct her not to answer this
11    question and I am wrong on December 2nd,
12    that mean Ms. Rogers may have to come back a
13    third time.
14            So without waiving my objections on  16:41
15    the grounds of attorney-client privilege,
16    preserving it, I will allow Ms. Rogers to
17    answer this question.  Is that acceptable to
18    you?
19            MR. GRAFF:  You have noted that     16:41
20    position in the record.
21            MR. NOVIKOFF:  I don't believe your  16:41
22    question is appropriate.  I think your
23    question violates the attorney-client
24    privilege.
25            If I allow Ms. Rogers to answer this  16:41
```

Page 200

```
 1            N. Rogers
 2    question, I am not waiving, I want to be
 3    clear for the record, any other claim to
 4    attorney-client privilege that you may ask
 5    her, but in order to avoid the chance that
 6    she has to come back for a third time, I'm
 7    going to allow Ms. Rogers to answer this
 8    question.
 9            MR. GRAFF:  Okay.  You have noted    16:42
10    that for the record.  I will proceed like
11    that, but I do not agree that --
12            MR. NOVIKOFF:  I understand.  You   16:42
13    still take the position that it's an
14    appropriate question.
15            MR. GRAFF:  No.  I do not agree that  16:42
16    you are preserving the right to later assert
17    it by allowing her to answer question on the
18    record.
19            MR. NOVIKOFF:  Right.  So I just want  16:42
20    to make sure, you are saying if I allow her
21    to answer the question, that means if you
22    ask another question to her that may impact
23    upon attorney-client privilege, you are
24    going to use my permission for her to answer
25    this question as a waiver of any future
```

TSG Reporting - Worldwide   (877) 702-9580

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 201

```
 1           N. Rogers
 2  question?
 3           MR. GRAFF:  No.  I am saying that I  16:42
 4  am not making any agreement now with respect
 5  to what's waived or not.  You have noticed
 6  it on the record.
 7           MR. NOVIKOFF:  I'm sorry, Counsel.  16:42
 8  In the spirit of cooperation, I was trying
 9  to get this limited stipulation on the
10  record so that we can proceed and she can
11  answer a question that you want answered.
12           And I think that's a reasonable      16:43
13  request of mine in order to allow Ms. Rogers
14  to answer this question, but if you are not
15  going to take the position that my
16  permitting her to answer this question won't
17  be a waiver of any other assertions of
18  attorney-client privilege that may come down
19  the pike, I can't allow her to answer the
20  question.
21           Do you understand what I am saying?  16:43
22           MR. GRAFF:  Yes.  And if we could    16:43
23  just mark this off the clock for a minute, I
24  want to make sure I understand, because this
25  is important.
```

Page 202

```
 1           N. Rogers
 2           MR. NOVIKOFF:  Sure.            16:43
 3           MR. GRAFF:  I do not accept that if  16:43
 4  you let her answer these questions you can
 5  later assert an objection to the
 6  admissibility or -- strike that -- that you
 7  can later claim that the information that
 8  she communicates in her responses is somehow
 9  attorney-client privilege.
10           I am not looking to bootstrap this or 16:43
11  leverage it to get at other subjects, but my
12  position is that once she testifies as to
13  this matter, there is no further possibility
14  for you to claim that her response to those
15  questions is not part of the record or a
16  privileged subject.
17           MR. NOVIKOFF:  Are you sure you want 16:44
18  to take that position?  Because I think for
19  your sake, it's counterproductive.  Because
20  if you are going to be making a motion to
21  Judge Boyle, and he's going to see that I'm
22  going to allow this witness to answer that
23  question subject to me raising it further on
24  at trial, then that is your, that is your
25  place.
```

Page 203

```
 1           N. Rogers
 2           I mean, you tell me, Ari.  You       16:44
 3  graduated law school just like all of us in
 4  this room.
 5           I am going to try to allow her to    16:44
 6  answer this question so we can move on with
 7  this deposition so that it may not require
 8  you to make a letter motion on this issue
 9  and she doesn't have to come back for a
10  third time.
11           MR. GRAFF:  Okay.  I will tell you   16:44
12  what.  In the interest of trying to resolve
13  this, without having to subject Ms. Rogers,
14  Mayor Rogers to the possibility of a third
15  day of testimony that could be avoided --
16           MR. NOVIKOFF:  Right.              16:45
17           MR. GRAFF:  -- let's discuss this    16:45
18  between today and the second time she
19  testifies, and I will move on from this
20  question now.
21           MR. NOVIKOFF:  Great.  That works for 16:45
22  me.
23  BY MR. GRAFF:                           16:45
24      Q    Did you have -- did you discuss with 16:45
25  anyone other than counsel the fact that you would
```

Page 204

```
 1           N. Rogers
 2  be appearing here today for a deposition?
 3           MR. GRAFF:  And I am sorry, we are   16:45
 4  back on the clock.  Thank you.
 5      A    My daughter.                    16:45
 6      Q    And what did you discuss with your  16:45
 7  daughter with respect to your appearance for a
 8  deposition?
 9      A    Nothing.  Just that I was going to be 16:45
10  here.
11      Q    Did you tell her in connection with  16:45
12  what case you would be coming here for a
13  deposition?
14      A    Not specifically, no.            16:46
15      Q    Did she ask?                    16:46
16      A    She knew there were some issues of  16:46
17  the Village that were still open.
18      Q    Did she ask you in connection with  16:46
19  what case you would be coming for a deposition?
20      A    She just knew I was coming for a     16:46
21  deposition.
22      Q    Have you had any other discussions  16:46
23  with your daughter concerning this lawsuit?
24      A    No.                            16:46
25      Q    Do you know whether you have seen the 16:46
```

51 (Pages 201 to 204)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 205

1             N. Rogers
2  complaint that was filed in federal court in this
3  lawsuit?
4       A    I don't believe I have.        16:46
5       Q    Are you familiar, do you have     16:46
6  knowledge as to any of the specific allegations
7  that have been made by the plaintiffs in this
8  lawsuit?
9       A    No.                  16:47
10      Q    Do you know what claims have been    16:47
11 made against you in this lawsuit?
12      A    No.                  16:47
13      Q    Do you know whether the plaintiffs in 16:47
14 this lawsuit have alleged that you, Mayor Rogers,
15 engaged in any wrongful conduct against them?
16          MR. NOVIKOFF: Objection.       16:47
17      A    No.                  16:47
18      Q    To your knowledge, have you engaged  16:47
19 in any wrongful conduct with respect to the
20 plaintiffs in this lawsuit during the period when
21 you served as Mayor and/or police commissioner?
22      A    No.                  16:47
23      Q    Do you know who -- strike that.    16:48
24          Was a person by the name Susan Kafuko 16:48
25 an employee of Ocean Beach during the period when

Page 206

1             N. Rogers
2  you served as Mayor and/or police commissioner?
3       A    Yes.                 16:48
4       Q    Did you know Ms. Kafuko in connection 16:48
5  with --
6       A    Kafuko.               16:48
7       Q    Kafuko.  Personally?        16:48
8       A    Yes.                 16:48
9       Q    Does Miss Kafuko still work at Ocean 16:48
10 Beach, to your knowledge?
11      A    To my knowledge, yes.        16:48
12      Q    Do you know any person or have you   16:49
13 heard of an individual by the name of Shoshana
14 McCullum?
15          MR. NOVIKOFF: Objection.       16:49
16      A    Yes.                 16:49
17      Q    To your knowledge, has Shoshana    16:49
18 McCullum asserted that you engaged in any wrongful
19 conduct with respect to the employment of Susan
20 Kafuko during the period that you served as Mayor
21 and/or police commissioner?
22      A    You are asking me what I know about  16:49
23 what Shoshana McCullum thinks?
24      Q    No.  What she has alleged.     16:49
25          MR. NOVIKOFF: To whom?  To      16:49

Page 207

1             N. Rogers
2  Ms. Rogers or to --
3          MR. GRAFF:  Any allegations that    16:49
4  Mayor Rogers has knowledge of made by
5  Shoshana McCullum with respect to the
6  employment of Susan Kafuko.
7          MR. NOVIKOFF:  Are you specifically  16:49
8  asking about Ms. Rogers' knowledge about
9  what one individual may have alleged --
10         MR. GRAFF:  Yes.           16:50
11         MR. NOVIKOFF:  -- about her       16:50
12 involvement with another individual?
13         MR. GRAFF:  Yes.           16:50
14         MR. NOVIKOFF:  Okay.  You can answer. 16:50
15 Objection, but you can answer.
16      A    I have heard that she has made some  16:50
17 allegations.  I do not know what they are.
18      Q    To your knowledge, did Ms. McCullum  16:50
19 initiate any legal proceeding --
20      A    Did she what?            16:50
21      Q    Initiate a legal proceeding in     16:50
22 connection with the allegations that she made
23 concerning the employment of Susan Kafuko?
24      A    Did she initiate a legal proceeding  16:50
25 against whom?

Page 208

1             N. Rogers
2       Q    Against anyone, to the extent that   16:50
3  you know about.
4       A    To my knowledge, no.  I know nothing  16:50
5  about it.
6       Q    To your knowledge, did you engage in 16:51
7  any wrongful conduct with respect to the
8  employment of Susan Kafuko?
9       A    No.                  16:51
10         MR. NOVIKOFF:  Counsel, I'm just    16:51
11 going to ask, do you have a good faith basis
12 to ask that question?  Is there a complaint
13 that's been filed against Ms. Rogers or some
14 type of other filing?
15         I'm just asking if there is a good   16:51
16 faith basis to ask that question.
17         MR. GRAFF:  There --           16:51
18         MR. NOVIKOFF:  I mean, I'm just     16:51
19 asking you.
20         MR. GRAFF:  I have a good faith     16:51
21 basis.  I didn't pull these names out of a
22 hat.  I believe that there may have been.
23 That's why I am asking.
24         MR. NOVIKOFF:  Okay.  Go ahead.    16:51
25 BY MR. GRAFF:                  16:51

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 209

N. Rogers

1
2    Q    Do you know whether Ocean Beach's    16:51
3    insurance carrier has made any payment either to
4    Shoshana McCullum or to Susan Kafuko?
5    A    Do I know?  The answer is no, I do    16:52
6    not know.
7    Q    Do you know whether the Village of    16:52
8    Ocean Beach has made any settlement agreement with
9    either of those two individuals?
10   A    I do not know.    16:52
11   Q    Mayor Rogers, do you know of an    16:52
12   individual by the name of Christopher Schalik?
13   A    Please spell the last name.    16:53
14   Q    I believe it's spelled S-C-H-A-L-I-K.  16:53
15   A    I don't believe I do.    16:53
16   Q    Do you know an individual by the name  16:53
17   John Tesoro?  T-E-S-O-R-O.
18   A    No.    16:53
19   Q    Do you know of an individual by the    16:53
20   name of Brian VanKoot?
21   A    No.    16:53
22   Q    Do you know -- let me start that    16:53
23   again.
24         During your employment as police    16:53
25   commissioner of Ocean Beach, was there any policy

Page 210

N. Rogers

1
2    with respect to Ocean Beach police officers
3    drinking alcoholic beverages at bars within Ocean
4    Beach?
5         MR. NOVIKOFF:  Objection to form.    16:54
6         You can answer the question.    16:54
7    A    Was there any policy?    16:54
8    Q    Yes.  Were there any rules of Ocean    16:54
9    Beach that pertained to that subject?
10        MR. NOVIKOFF:  Objection.    16:54
11   A    I don't know about any rules.    16:54
12   Q    Okay.  Let me be more specific.    16:54
13   A    Yes.    16:54
14   Q    During the period of your employment  16:54
15   as police commissioner, were Ocean Beach police
16   officers permitted to drink in local bars when
17   they were off duty at any point during your
18   employment as police commissioner?
19        MR. NOVIKOFF:  Objection.    16:54
20        You can answer.    16:54
21   A    I don't know.    16:54
22   Q    Do you know whether they were    16:55
23   permitted to drink in local bars while they were
24   off duty but wearing their uniforms?
25        MR. NOVIKOFF:  Objection.    16:55

Page 211

N. Rogers

1
2    A    I don't know.    16:55
3    Q    Do you know whether they were    16:55
4    permitted to drink in local bars when they were on
5    duty?
6         MR. NOVIKOFF:  Objection.    16:55
7    A    Are you asking this as what's    16:55
8    appropriate or whether there is a regulation on
9    this?
10   Q    Whether there is any kind of rule at  16:55
11   Ocean Beach that they were expected to follow.
12   I'm not only talking about a formal regulation,
13   also a policy or a directive that you have
14   knowledge of that would have prohibited Ocean
15   Beach police officers from drinking at bars in
16   Ocean Beach while they were on duty.
17        MR. NOVIKOFF:  Note my objection.    16:55
18   A    It's totally inappropriate, but I    16:56
19   don't know if there is a regulation that says so.
20   I do not know that.
21   Q    Do you have any knowledge of Ocean    16:56
22   Beach police officers drinking in bars in Ocean
23   Beach while they were on duty at any time during
24   your employment as Mayor and/or police
25   commissioner of Ocean Beach?

Page 212

N. Rogers

1
2         MR. NOVIKOFF:  Objection.    16:56
3    A    No, I do not.    16:56
4    Q    If you had been informed --    16:56
5         MR. GRAFF:  It's a hypothetical    16:56
6    question, Counsel.  I understand from your
7    expression that you are going to object, but
8    I would like to pose it to the witness.
9         MR. NOVIKOFF:  My expression is    16:56
10   nothing.  You may proceed with your
11   question.
12        MR. GRAFF:  Thank you.    16:56
13   Q    If you had learned that an Ocean    16:56
14   Beach police officer was drinking at a bar in
15   Ocean Beach while on duty during the period of
16   your employment as police commissioner, what, if
17   any, action would you have taken?
18        MR. NOVIKOFF:  Objection.    16:57
19   A    The most appropriate disciplinary    16:57
20   action that I would legally be permitted to take.
21
22   Q    Can you identify that disciplinary    16:57
23   action?
24        MR. NOVIKOFF:  Objection.    16:57
25   A    Since I don't know what the extent of 16:57

53 (Pages 209 to 212)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 213

```
1              N. Rogers
2   it is, I can't identify it.
3       Q    As police commissioner, do you know   16:57
4   what the most serious disciplinary action that you
5   had the authority to take against an Ocean Beach
6   police officer was under any circumstances?
7              MR. NOVIKOFF: Objection to the form 16:57
8   of the question.
9              You can answer.                    16:57
10   A    No, I don't know.                        16:57
11       Q    As police commissioner, did you ever 16:57
12   discipline any Ocean Beach police officer?
13              MR. NOVIKOFF: Objection.           16:58
14   A    No.                                      16:58
15       Q    Do you have any personal knowledge   16:58
16   with respect to the discipline of any police
17   officer at Ocean Beach during the period of your
18   employment as police commissioner?
19              MR. NOVIKOFF: Objection, only to the 16:58
20   extent she was not employed as the police
21   commissioner.
22   A    I was not employed.                      16:58
23              MR. NOVIKOFF: She was not even     16:58
24   employed as Mayor.  She was Mayor.
25   A    I was elected as Mayor.                  16:58
```

Page 214

```
1              N. Rogers
2              MR. NOVIKOFF:  And she had         16:58
3   responsibilities as the police commissioner.
4   That is the only basis for my objection.
5              But you can answer the question.    16:58
6   Other than that, go ahead.
7   A    I'm sorry.  Repeat the question,          16:58
8   please.
9              MR. GRAFF:  Could the court reporter 16:58
10   just read back my last question to Mayor
11   Rogers.
12              (Record read.)                     16:59
13   A    No.                                       16:59
14       Q    Were you elected to the position of  16:59
15   police commissioner at any time?
16   A    It's not an elected position.            16:59
17       Q    Subsequent to your attaining the role 16:59
18   of police commissioner, did you ever run for
19   re-election as Mayor?
20   A    Yes.                                      16:59
21       Q    To your knowledge, did the ballots in 16:59
22   that election identify or state that you were
23   running for the position of Mayor and police
24   commissioner?
25   A    No.                                       17:00
```

Page 215

```
1              N. Rogers
2       Q    To your knowledge, did Mr. -- did the 17:00
3   individual who served as police commissioner
4   immediately prior to you, to your knowledge,
5   receive any compensation in connection with the
6   service in that position?
7   A    As police commissioner?              17:00
8       Q    Yes.                             17:00
9   A    No.                                  17:00
10       Q    Did you receive any compensation from 17:00
11   the Village of Ocean Beach in connection with your
12   service as police commissioner?
13   A    No.                                  17:00
14       Q    To your knowledge, do the        17:01
15   responsibilities of -- strike that.
16              To your knowledge, do the NYCOM   17:01
17   documents that you referenced earlier in your
18   testimony identify any responsibilities of police
19   commissioner?
20              MR. NOVIKOFF: Objection.        17:01
21   A    I don't know.                        17:01
22       Q    Do you recall whether you ever     17:01
23   investigated whether there was a NYCOM document
24   that set forth your responsibilities as police
25   commissioner?
```

Page 216

```
1              N. Rogers
2   A    I do not recall.                     17:01
3       Q    Do you recall whether the position of 17:01
4   police commissioner is addressed by any Civil
5   Service regulations by the Department of Civil
6   Service?
7              MR. NOVIKOFF: Objection.        17:01
8              MS. McEACHIN: Objection. With    17:01
9   regard to the Village or --
10              MR. GRAFF:  Yes, police commissioner 17:01
11   of Ocean Beach.
12              MR. NOVIKOFF:  So the question is, is 17:01
13   there a specific regulation within the Civil
14   Service laws that refers to the police
15   commissioner of Ocean Beach?
16              MR. GRAFF:  Does she have knowledge   17:02
17   as to the existence of any such regulation,
18   yes.
19              MR. NOVIKOFF:  Over my objection, you 17:02
20   can answer.
21   A    No.                                  17:02
22       Q    Do you recall whether you ever     17:02
23   discussed that issue with Marianne Minerva?
24              MR. NOVIKOFF: Objection.  What    17:02
25   issue?
```

TSG Reporting - Worldwide   (877) 702-9580

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 217

N. Rogers

2      MR. GRAFF:  Let me rephrase that      17:02
3  question.
4     Q    Do you recall whether you ever had    17:02
5  any discussions with Marianne Minerva concerning
6  the existence of any Civil Service requirements
7  with respect to the position of police
8  commissioner of Ocean Beach?
9      MR. NOVIKOFF:  Objection, form.      17:02
10     A    I do not believe I had        17:02
11  conversation with Marianne Minerva on this.
12     Q    Do you know who Richard Bessette is?  17:02
13     A    I think I have heard the name as a    17:02
14  police officer.
15     Q    To your knowledge, is Richard      17:02
16  Bessette currently a police officer at Ocean
17  Beach?
18     A    I don't know.          17:03
19     Q    Do you know -- strike that?      17:03
20        Prior to the resolution of the      17:03
21  Village board of trustees that formalized George
22  Hesse's position as acting police chief, did
23  George Hesse ever overrule a decision that had
24  been made by Ed Paradiso that you have any
25  knowledge of?

Page 218

N. Rogers

2     A    I don't know.  I have no knowledge of  17:03
3  that.
4     Q    Do you know whether George Hesse      17:03
5  would have had the authority to overrule any
6  decision of Edward Paradiso up until the point
7  when the resolution formalizing his role as acting
8  police chief was enacted?
9      MR. NOVIKOFF:  Objection.        17:04
10     A    Do I know?  No, I do not know.    17:04
11     Q    And to be clear, did you know at the  17:04
12  time?
13     A    No.            17:04
14     Q    To your knowledge, was any        17:04
15  investigation ever conducted within the Ocean
16  Beach Police Department with respect to the
17  conduct of Richard Bessette during his employment
18  as a police officer?
19      MR. NOVIKOFF:  Objection, form.      17:04
20  Assuming facts not in evidence.
21  You can answer.          17:04
22     A    I do not know.          17:05
23      MR. GRAFF:  I would ask the        17:05
24  videographer how much time we have left on
25  this tape.

Page 219

N. Rogers

2      THE VIDEOGRAPHER:  We have        17:05
3  24 minutes.
4      MR. NOVIKOFF:  How much time do we    17:05
5  have in the deposition, left in the
6  seven-hour deposition?  Better yet, when are
7  we up to the five-hour mark?
8      VIDEOGRAPHER:  About ten minutes.      17:05
9      MR. NOVIKOFF:  Can you go ten more    17:05
10  minutes?
11      MR. GRAFF:  I think this is a good    17:05
12  place for me to stop, if that's acceptable.
13      MR. NOVIKOFF:  I would prefer us to    17:05
14  get as much as we can do today up to that
15  two hours that you wanted to keep.
16      MR. GRAFF:  That's fine.        17:05
17  I will ask the court reporter to      17:05
18  please mark as Exhibit Rogers 6 a copy of
19  the complaint that the plaintiffs have filed
20  in this action.
21      (Rogers Exhibit 6 marked for        17:06
22  identification.)
23  BY MR. GRAFF:            17:06
24     Q    Mayor Rogers, did you earn a salary  17:06
25  in connection with your service as Mayor of Ocean

Page 220

N. Rogers

2  Beach?
3     A    Yes.            17:06
4     Q    Do you recall what that salary was in  17:06
5  your final year of employment as Mayor of Ocean
6  Beach?
7     A    $1,500 a year.        17:06
8     Q    If you could tell me, after you have  17:06
9  looked at the first page of this document, whether
10  you have ever seen the first page of this document
11  before.
12     A    I did not see this, to my knowledge.  17:07
13     Q    Okay.  Then we can put that document  17:07
14  aside.
15        Do you have any knowledge as to the    17:07
16  existence of any allegation by the plaintiffs in
17  this action concerning a coverup orchestrated by
18  George Hesse?
19      MR. NOVIKOFF:  Objection to the form.  17:07
20  You can answer the question.        17:07
21     A    Do I have any knowledge?  No.      17:07
22     Q    I'm asking now any knowledge as to    17:08
23  allegations that the plaintiffs may have made on
24  that subject.
25      MR. NOVIKOFF:  Objection.        17:08

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 221

```
1                N. Rogers
2          You can answer.              17:08
3     A   I don't have knowledge of that.    17:08
4     Q   Okay.  And to be clear, do you know   17:08
5 if it is the case that these plaintiffs have
6 alleged that George Hesse orchestrated an unlawful
7 coverup?
8          MR. NOVIKOFF: Objection to the form  17:08
9     of that question.
10          MR. CONNOLLY: Can you repeat the     17:08
11    question.
12    A   I don't know what their allegations   17:08
13 are.
14          MR. CONNOLLY: Counsel, can we have   17:08
15    the question repeated.
16          MR. GRAFF: Please.             17:08
17          (Record read.)                17:08
18 BY MR. GRAFF:
19    Q   Did you ever ask George Hesse whether 17:09
20 he had engaged in improper conduct in connection
21 with his employment at the Ocean Beach Police
22 Department?
23          MR. NOVIKOFF: Objection to the form  17:09
24    of the question.
25          You can answer.              17:09
```

Page 222

```
1                N. Rogers
2     A   As to the question, no.         17:09
3     Q   Other than in -- from conversations  17:09
4 with counsel, do you have any knowledge as to any
5 improper conduct by George Hesse in connection
6 with his employment at Ocean Beach?
7          MR. NOVIKOFF: Objection to the form  17:10
8     of the question.
9          You can answer.              17:10
10    A   No, I do not have any knowledge.    17:10
11    Q   Do you have any knowledge as to any  17:10
12 unlawful conduct committed by George Hesse in
13 connection with his employment at Ocean Beach?
14          MR. NOVIKOFF: Objection, form.   17:10
15          You can answer.              17:10
16    A   No, I do not have any knowledge.    17:10
17    Q   If George Hesse had been soliciting  17:10
18 contributions, funds from the public for use by
19 the Ocean Beach Police Department, would he have
20 been required to report on that to the Village
21 administrator?
22          MR. NOVIKOFF: Objection, form.   17:11
23    A   I have no idea.                17:11
24          MR. CONNOLLY: Same objection.    17:11
25          MR. GRAFF: Okay.  Ask the court   17:11
```

Page 223

```
1                N. Rogers
2 reporter to please mark as Exhibit Rogers 7
3 a one-page document Bates marked P926.
4          (Rogers Exhibit 7 marked for     17:11
5     identification.)
6 BY MR. GRAFF:                      17:11
7     Q   Mayor Rogers, when you have had a   17:11
8 chance to look at the document, can you tell me
9 whether you have seen the document before.
10          MR. JEMAL: Counsel, just a moment.   17:12
11    Do you have an extra copy of Exhibit 3?  I
12    didn't get that one.
13          MR. GRAFF: Let's address this off   17:12
14    the record.
15    A   I have read this.             17:13
16    Q   Have you read this prior to this    17:13
17 deposition?
18    A   I don't believe so.  Just now I have  17:13
19 read it.
20    Q   Okay.  You can put that document     17:13
21 aside.  Thank you.
22          To your knowledge, is there a video  17:13
23 camera, security camera within the Ocean Beach
24 Police Department?
25    A   Yes.                      17:13
```

Page 224

```
1                N. Rogers
2     Q   To your knowledge, is there a video  17:13
3 security camera within George Hesse's office?  Let
4 me rephrase then.
5          To your knowledge, has there at any  17:13
6 point during your service as police commissioner
7 been a video camera, security camera in George
8 Hesse's office at the Ocean Beach Police
9 Department?
10    A   I believe so.               17:14
11    Q   During what period of time was that   17:14
12 camera in George Hesse's office?
13    A   I don't know.               17:14
14    Q   Do you have any knowledge as to any   17:14
15 video that was recorded by that camera, that is
16 the contents of any video recordings?
17    A   No.  I have never seen any.      17:14
18    Q   Has anyone ever described any such    17:14
19 video recordings to you?
20    A   No.                      17:14
21          MR. NOVIKOFF: Are we up to the     17:14
22    five-hour mark?  Okay, let's do a few more
23    minutes.
24    Q   To your knowledge, has any Ocean     17:14
25 Beach police officer -- this is during the period
```

56 (Pages 221 to 224)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 225

N. Rogers

1
2  of your employment as police commissioner or
3  Mayor -- discharged their firearm in the line of
4  duty?
5      A    To my knowledge, no, I know of no      17:15
6  such thing.
7      Q    To your knowledge, has any Ocean       17:15
8  Beach police officer engaged in a physical
9  altercation with any member of the public in the
10 performance of their duties as police officers?
11          MR. NOVIKOFF:  Objection to the form   17:15
12     of the question.
13          You can answer.                         17:15
14     A    I have heard about such.  I have not    17:15
15 seen it.
16     Q    To your knowledge, has any member of    17:15
17 the public been hospitalized as a result of any
18 physical altercation with a member of the Ocean
19 Beach Police Department?
20          MR. NOVIKOFF:  Objection to the form    17:15
21     of the question.
22          You can answer.                          17:15
23     A    To my knowledge, yes, I have heard      17:15
24 about it.
25     Q    What specifically have you heard        17:16

Page 226

N. Rogers

1
2  about?
3          MR. NOVIKOFF:  I'm going to object.      17:16
4          You can answer.                           17:16
5      A    That an individual got into an          17:16
6  altercation with one or more members of the Police
7  Department whom I do not know, and resulting in an
8  injury and a subsequent hospitalization.
9      Q    Is that the only such incident that     17:16
10 you have knowledge of?
11     A    Of this kind of thing, yes.             17:16
12     Q    When did the incident that you are      17:16
13 referring to take place?
14     A    I don't know the date of it.            17:16
15     Q    Do you know the year of it?             17:16
16     A    I'm not sure if it's '05 or '6.  I      17:17
17 don't know.
18     Q    Is it either '05 or '06?                17:17
19     A    Could be.                               17:17
20     Q    Upon being informed of this incident,   17:17
21 did you ask anybody for further information about
22 what was involved in the incident?
23          MR. NOVIKOFF:  Objection to the         17:17
24     extent it calls for your communications with
25     counsel.  Other than that, you can answer

Page 227

N. Rogers

1
2  the question.
3      A    Did I ask anyone about it?  Is that     17:17
4  the question?
5      Q    Yes.                                    17:17
6      A    The answer is yes.                      17:17
7      Q    Who did you ask about the incident?     17:17
8      A    George Hesse.                           17:17
9      Q    What did you ask George Hesse?          17:17
10     A    I said, "Explain what happened in       17:17
11 this situation."
12     Q    And what did George Hesse say in        17:17
13 response to that, if anything?
14     A    He told me that the individual was      17:17
15 exceedingly intoxicated, and that he was brought
16 into the police station, that an accident happened
17 with a clock on the wall, that the individual
18 was -- had left and was trying to get back in and
19 that he was somehow injured.
20          He gave me a, a story about the         17:18
21 situation with this individual where an injury did
22 occur.
23     Q    And when you refer to the individual    17:18
24 who was highly intoxicated, to your knowledge --
25 or strike that.

Page 228

N. Rogers

1
2          Did George Hesse indicate to you that   17:18
3  any Ocean Beach police officer who was present at
4  that time was also intoxicated?
5      A    No, he did not.                         17:18
6      Q    What else, if anything, did George      17:19
7  Hesse tell you about that incident?
8      A    He said there were many witnesses to    17:19
9  the degree of intoxication of this individual from
10 the bar diagonally across the street from the
11 police station, where apparently the drinking had
12 occurred.
13     Q    Do you know the name of that bar?       17:19
14     A    CJ's.                                   17:19
15     Q    Do you know who owns the particular     17:19
16 bar?
17     A    No.                                     17:19
18     Q    Other than that conversation that you   17:19
19 have just been describing with George Hesse, did
20 you have any other conversations with George Hesse
21 concerning this incident?
22     A    No.  I had more than one conversation   17:19
23 regarding the same situation.
24     Q    Other than what you have already        17:19
25 testified to, what, if anything, did George Hesse

57 (Pages 225 to 228)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 229

N. Rogers

1 N. Rogers
2 tell you about the situation?
3         MR. NOVIKOFF:  Objection.          17:19
4         You can answer.              17:19
5     A    That the individual's behavior was   17:20
6 the cause of the incident.
7     Q    Did George Hesse tell you that the   17:20
8 police officers involved had behaved properly in
9 connection with this incident?
10         MR. NOVIKOFF:  Objection to the form  17:20
11 of the question.
12         You can answer.              17:20
13         THE WITNESS:  Hmm?          17:20
14         MR. NOVIKOFF:  You can answer.    17:20
15     A    Yes.                    17:20
16     Q    Did George Hesse indicate to you that  17:20
17 he had any concerns with respect to the question
18 of whether the Ocean Beach police officers
19 involved in this incident had behaved
20 appropriately?
21     A    Did he have concerns is the question?  17:20
22 I don't think he ever gave me any -- I didn't ask
23 him.  There was no response on that level.
24     Q    Other than what you have already   17:21
25 testified to, have you had any other

Page 230

N. Rogers

1 N. Rogers
2 communications with George Hesse concerning that
3 incident?
4         MR. NOVIKOFF:  Objection to the form.  17:21
5         You can answer.              17:21
6     A    No, because there was a subsequent   17:21
7 lawsuit, and once something gets into that level,
8 I don't discuss it with anybody.
9     Q    Do you know who is named as a      17:21
10 defendant -- or who are named as defendants in
11 that lawsuit?
12     A    No, I do not.              17:21
13     Q    Do you know whether you are named as  17:21
14 a defendant in that lawsuit?
15     A    I do not.                17:21
16     Q    Do you know whether that is a civil   17:21
17 lawsuit?
18     A    I don't know.              17:21
19     Q    Do you know whether that is a      17:21
20 criminal lawsuit?
21         MR. NOVIKOFF:  Objection.         17:21
22     A    I don't know.              17:21
23     Q    Other than the conversations that you  17:21
24 have testified to with George Hesse, have you
25 spoken with anyone other than counsel about this

Page 231

N. Rogers

1 N. Rogers
2 incident?
3     A    No.  Because once it became a      17:22
4 lawsuit, it was not advisable to discuss it.
5     Q    Prior to the time when it became a   17:22
6 lawsuit, did you have any conversations with
7 anyone other than George Hesse or counsel
8 concerning the incident?
9     A    I may have talked to either one of   17:22
10 two trustees.
11     Q    And which trustees might you have   17:22
12 talked to?
13     A    Trustee Jim Mallott and Trustee Joe  17:22
14 Loeffler.
15     Q    Do you recall what, if anything,    17:22
16 Trustee Joe Loeffler said to you about this
17 incident?
18     A    No, I don't.              17:22
19     Q    Do you recall what, if anything,    17:22
20 Trustee Mallott said to you about this incident?
21     A    No, I don't.              17:23
22     Q    As police commissioner, did you have  17:23
23 a responsibility to conduct any investigation
24 yourself concerning this incident?
25         MR. NOVIKOFF:  Objection.         17:23

Page 232

N. Rogers

1 N. Rogers
2         You can answer.              17:23
3     A    I might have had a responsibility,   17:23
4 but I was advised that the District Attorney was
5 involved and therefore it was inappropriate for me
6 to do anything.
7     Q    How much time had elapsed from when  17:23
8 you learned of this incident until you learned
9 that the District Attorney was involved in this
10 incident?
11     A    I don't know.              17:23
12     Q    Would you say it was months?       17:23
13     A    I don't know.              17:23
14     Q    Could it have been several months?   17:23
15     A    Again, I don't know.  I believe it   17:23
16 was shorter than several months, but I don't know.
17     Q    Did Trustee Loeffler indicate that he  17:24
18 would conduct any sort of investigation concerning
19 this incident?
20     A    I don't --                17:24
21         MR. NOVIKOFF:  Object to the form of  17:24
22 the question.
23         You can answer.              17:24
24     A    I don't recall.             17:24
25     Q    Did Trustee Mallott tell you that he  17:24

58  (Pages 229 to 232)

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 233

```
 1              N. Rogers
 2  was going to conduct any sort of investigation
 3  concerning this incident?
 4          MR. NOVIKOFF:  Objection to the form   17:24
 5  of the question.
 6      A    I do not recall.              17:24
 7          MR. NOVIKOFF:  We are past the      17:24
 8  five-hour mark.  Since this is a line of
 9  questioning that probably hasn't ended, it's
10  up to you whether you want to keep going.
11          MR. GRAFF:  We will pick up when we  17:24
12  resume.
13          MR. NOVIKOFF:  Okay.         17:24
14          MR. GRAFF:  Unless Mayor Rogers, do  17:24
15  you still want to not complete the seven
16  hours today?
17          (Continued on next page.)       17:24
18
19
20
21
22
23
24
25
```

Page 234

```
 1              N. Rogers
 2          THE WITNESS:  It depends on -- I'm  17:24
 3  not going to complete seven hours tonight,
 4  no.
 5          MR. GRAFF:  Okay.  So this is a good  17:24
 6  time to stop.
 7          THE VIDEOGRAPHER:  That concludes the  17:24
 8  video record for today.  The time is now
 9  5:24 p.m.
10          We are now off the record.
11              oOo
12      I, NATALIE K. ROGERS, the witness
13  herein, do hereby certify that the foregoing
14  testimony of the pages of this deposition to be a
15  true and correct transcript, subject to the
16  corrections, if any, shown on the attached page.
17          _____
18          NATALIE K. ROGERS
19  Subscribed and sworn to before me this
20  _____day of _____,_____.
21  _____
22          NOTARY PUBLIC
23
24
25
```

Page 235

```
 1
 2  STATE OF NEW YORK   )   Pg.   of Pgs.
 3  COUNTY OF NEW YORK  )
 4      I wish to make the following changes
 5  for the following reasons:
 6  PAGE  LINE
 7  ____  ____  CHANGE:_____
 8          REASON:_____
 9  ____  ____  CHANGE:_____
10          REASON:_____
11  ____  ____  CHANGE:_____
12          REASON:_____
13  ____  ____  CHANGE:_____
14          REASON:_____
15  ____  ____  CHANGE:_____
16          REASON:_____
17  ____  ____  CHANGE:_____
18          REASON:_____
19  ____  ____  CHANGE:_____
20          REASON:_____
21  ____  ____  CHANGE:_____
22          REASON:_____
23  ____  ____  CHANGE:_____
24          REASON:_____
25
              NATALIE K. ROGERS
```

Page 236

```
 1
 2          C E R T I F I C A T E
 3  STATE OF NEW YORK    )
 4                  : SS.
 5  COUNTY OF NEW YORK   )
 6
 7      I, BONNIE PRUSZYNSKI, a Notary
 8  Public with and for the State of New York,
 9  do hereby certify:
10      That NATALIE K. ROGERS, the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such deposition
13  is a true record of the testimony given by
14  the witness.
15      I further certify that I am not related
16  to any of the parties to this action by
17  blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 26th of November, 2008.
21
22          _____
23          Bonnie Pruszynski
24
25
```

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 237

```
1
2
3              I N D E X
4    WITNESS                    PAGE
5    NATALIE K. ROGERS
6    BY MR. GRAFF                  7
7
8
9
10             E X H I B I T S
11   Rogers Exhibit 1, Letter, 003931     137
12   Rogers Exhibit 2, Document, 003845-3847  151
13   Rogers Exhibit 3, Complaint        173
14   Rogers Exhibit 4, Letter, 006476       184
15   Rogers Exhibit 5, Report of Personnel  194
16        Changes
17   Rogers Exhibit 6, Complaint and Jury   219
18        Demand
19   Rogers Exhibit 7, Document, P 926      223
20
21
22
23
24
25
```

Page 238

```
1
2         QUESTIONS WITH REQUESTS TO MARK
3           PAGE    LINE
4            37     24
             39      9
5            57     25
             78      9
6            80     23
             82     17
7            85     19
             86     13
8            90     24
             91     15
9            92     25
             93     10
10           96     16
             98     13
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide   (877) 702-9580

36cc7550-5e7e-4e1c-853f-09d9ba020092

Page 239

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI, and  )
THOMAS SNYDER,                )
                              )
          Plaintiffs,         )
                              )
          vs.                 ) CV 07 1215
                              )
INCORPORATED VILLAGE OF OCEAN )
BEACH; MAYOR JOSEPH C. LOEFFLER)
JR., individually and in his  )
Official capacity; former mayor)
NATALIE K. ROGERS, individually)
and in her official capacity, )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF    )
GEORGE B. HESSE, individually )
And in his official capacity; )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK    )
COUNTY DEPARTMENT OF CIVIL    )
SERVICE; and ALLISON SANCHEZ, )
Individually and in her       )
Official capacity,            )
                              )
          Defendants.         )
------------------------------)

        CONTINUED VIDEOTAPED DEPOSITION OF
                  NATALIE ROGERS
                Uniondale, New York
              Monday, December 15, 2008

Reported by:
Philip Rizzuti
JOB NO. 20200A
```

Page 240

```
 1
 2
 3
 4              December 15, 2008
 5                 8:21 a.m.
 6
 7      Continued videotaped deposition of
 8    NATALIE ROGERS, held at the offices of
 9    Rivkin Radler, 926 Rexcorp Plaza,
10    Uniondale, New York, pursuant to
11    subpoena, before Philip Rizzuti, a
12    Notary Public of the State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 241

```
 1
 2   A P P E A R A N C E S:
 3
 4       THOMPSON WIGDOR & GILLY, LLP
 5       Attorneys for Plaintiffs
 6          85 Fifth Avenue
 7          New York, New York 10003
 8       BY:  ARIEL Y. GRAFF, ESQ.
 9
10       MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11       Attorneys for George B. Hesse
12          530 Saw Mill Road
13          Elmsford, New York 10523
14       BY:  KEVIN W. CONNOLLY, ESQ.
15
16       RIVKIN RADLER, LLP
17       Attorneys for Incorporated Village of
18       Ocean Beach, Joseph Loeffler, Natalie
19       Rogers and Ocean Beach Police Department
20          926 RexCorp Plaza
21          Uniondale, New York 11556-0926
22       BY:  KENNETH A. NOVIKOFF, ESQ.
23          MICHAEL P. WELCH, ESQ.
24
25
```

Page 242

```
 1
 2   A P P E A R A N C E S:
 3
 4       BEE READY FISHBEIN HATTER & DONOVAN, LLP
 5       Attorneys for Suffolk County
 6          170 Old Country Road
 7          Mineola, New York 11501
 8       BY:  JOSHUA M. JEMAL, ESQ.
 9
10   ALSO PRESENT:
11       EDWARD CARTER
12       FRANK FIORILLO
13       KEVIN LAMM
14       JOSEPH NOFI
15       THOMAS SNYDER
16       STEVEN SANPIETRO, Videographer
17
18
19
20
21
22
23
24
25
```

1 (Pages 239 to 242)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 243

Rogers

1       Rogers
2       THE VIDEOGRAPHER:  This is the
3   start tape labeled number 1 of the
4   continuing videotape deposition of
5   Natalie Rogers in the matter of Edward      08:21:38
6   Carter et al., versus the Incorporated
7   Village of Ocean Beach, et al.
8       This deposition is being held at
9   926 Rexcorp Plaza, Uniondale, New York,
10   on Monday, December 15, 2008 at         08:21:54
11   approximately 8:21 a.m.
12       My name is Steve Sanpietro from
13   TSG Reporting Inc., and I am the legal
14   video specialist.  The court reporter
15   today is Phil Rizzuti in association with  08:22:06
16   TSG Reporting.
17       Will counsel please introduce
18   yourselves for the record.
19       MR. GRAFF:  My name is Ari Graff
20   from the law firm of Thompson Wigdor &     08:22:17
21   Gilly, LLP, LLP, representing the
22   plaintiffs who are each here with me
23   today, Frank Fiorillo, Edward Carter,
24    Kevin Lamm, Joseph Nofi and Thomas
25    Snyder.                     08:22:30

Page 244

Rogers

1       Rogers
2       MR. WELCH:  For the Incorporated
3   Village of Ocean Beach, Ocean Beach
4   Police Department, former Mayor Natalie
5   Rogers and Mayor Joseph Loeffler, Rivkin  08:22:36
6   Radler by Michael Welch.  And also note
7   for the record that all other counsel
8   were noticed for the deposition today at
9   8:15, they have not yet arrived.  We are
10   going to be starting regardless.  That    08:22:49
11   would be the Suffolk County defendants
12   and also counsel for George Hesse.
13   N A T A L I E   R O G E R S,  called as a
14     witness, having been previously duly
15     sworn by a Notary Public, was examined
16     and testified as follows:
17   EXAMINATION BY
18   MR. GRAFF:
19       Q.   Good morning, I know we have been
20   through this before, I wanted to remind you if  08:23:04
21   at any point I ask a question that you don't
22   understand or use a word that doesn't make
23   sense or that you don't understand, just let
24   me know and I will have an obligation to
25   rephrase or reword.                 08:23:17

Page 245

Rogers

1       Rogers
2       MR. WELCH:  Usual stips, Ari,
3   objections to form.
4       MR. GRAFF:  This deposition will
5   be governed by the Federal Rules of Civil  08:23:24
6   Procedure, local rules for the Eastern
7   District of New York.  All objections
8   except as to form of the question are
9   reserved.
10       Q.   Now, Ms. Rogers, have you ever     08:23:34
11   heard of something called Shore Lane
12   Properties at Ocean Beach?
13       A.   Yes.
14       Q.   Do you -- what is Shore Lane
15   Properties?                  08:23:51
16       A.   It is a partnership.
17       Q.   Are you a part of that
18   partnership?
19       A.   Yes.
20       Q.   What is the nature of that       08:23:58
21   partnership?
22       A.   It owns a piece of property in Bay
23   Shore.
24       Q.   And how many partners are there in
25   that partnership?              08:24:10

Page 246

Rogers

1       Rogers
2       A.   Three.
3       Q.   Where is the property in Bay Shore
4   located?
5       A.   At 5 Shore Lane in Bay Shore.      08:24:17
6       Q.   Are all three partners equal
7   partners with respect to their ownership of
8   that property?
9       A.   No.
10       Q.   Who are the other partners?       08:24:26
11       A.   The estate of my late husband,
12   Charles Rogers, and a trust, the Itkin
13   Irrevocable Trust (phonetic) in California.
14       Q.   When you were here the last time
15   and we were talking about properties that you  08:24:49
16   owned did you identify Shore Lane Properties?
17       MR. WELCH:  Objection.  You can
18   answer.
19       A.   I don't remember.
20       Q.   Do you recall when Maryann Minerva  08:24:59
21   began working at Ocean Beach?
22       A.   Not the exact date, no.
23       Q.   But at a certain point she did
24   begin working at Ocean Beach; is that correct?
25       A.   Yes.                  08:25:16

2  (Pages 243 to 246)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 247

Rogers

1
2    Q.   What position did Maryann Minerva
3  hold at that time when she first began?
4    A.   Clerk treasurer.
5    Q.   And as clerk treasurer did Maryann   08:25:27
6  Minerva have responsibility with respect to
7  civil service compliance issues for employees
8  at Ocean Beach?
9    A.   Yes.
10   Q.   And what was the nature of her      08:25:36
11 responsibility over that issue?
12   A.   To ascertain from civil service
13 what requirements the village had, and to look
14 into all of the village personnel and see if
15 village personnel complied with civil service  08:26:03
16 requirements.
17   Q.   To the extent that village
18 personnel did not comply with civil service
19 requirements did Maryann Minerva have any
20 further responsibilities?                 08:26:15
21   A.   Not that I recall.
22   Q.   Who was Maryann Minerva's direct
23 supervisor when she began working at Ocean
24 Beach?
25      MR. WELCH:  Objection.  You can    08:26:37

Page 248

Rogers

1
2  answer.
3    A.   There was no one on staff who was
4  her direct supervisor.
5    Q.   Was anybody responsible for        08:26:49
6  supervising Maryann Minerva's work at Ocean
7  Beach?
8    A.   Only myself to the extent that
9  there was supervision.
10   Q.   Was that the case throughout the   08:27:01
11 period when you were serving as mayor and/or
12 Police Commissioner of Ocean Beach?
13      MR. WELCH:  Objection.  You can
14 answer.
15   A.   Yes.                              08:27:15
16   Q.   Did you ever direct Maryann
17 Minerva to take any action with respect to
18 ensuring that employees at Ocean Beach would
19 be employed in compliance with any applicable
20 civil service requirements?               08:27:25
21   A.   I don't understand the question.
22   Q.   Did you ever tell Maryann Minerva
23 to do anything to make sure that employees at
24 Ocean Beach were in compliance with civil
25 service requirements?                     08:27:40

Page 249

Rogers

1
2    A.   To do anything?
3    Q.   Yes.
4    A.   No.
5      MR. WELCH:  You want to put his     08:27:46
6  appearance on the record.
7      MR. JEMAL:  Joshua Jemal from
8  the village attorney's office.
9      MR. GRAFF:  Mr. Jemal just entered
10 the room.                                 08:27:59
11      MR. JEMAL:  Yes.
12      MR. GRAFF:  It looks like
13 Mr. Connolly, counsel for defendant
14 Hesse, has also arrived.
15   Q.   Did you believe that Maryann       08:28:07
16 Minerva was taking any action to ensure that
17 employees at Ocean Beach would be employed in
18 compliance with civil service requirements?
19      MR. WELCH:  Objection.  You can
20 answer.                                   08:28:20
21   A.   Yes.
22   Q.   Was Maryann Minerva required to
23 take any sort of action to ensure that
24 employees at Ocean Beach would be employed in
25 compliance with civil service requirements?  08:28:32

Page 250

Rogers

1
2    A.   I don't understand the word
3  action.
4    Q.   Well, to the extent that she
5  discovered that employees were not in         08:28:42
6  compliance did she have any responsibility to
7  resolve that non-compliance?
8      MR. WELCH:  Objection.  You can
9  answer.
10   A.   If she could.  There were some      08:28:50
11 things that she could do and some things that
12 she could not do.
13   Q.   Could you describe what sort of
14 things to your understanding she could not do
15 with respect to ensuring that employees were  08:29:10
16 in compliance with civil service requirements?
17   A.   If a person did not have the
18 required educational background, experience
19 background, or any other kind of background
20 that civil service required for a particular
21 job classification, she could not make them
22 get it or make them have it.
23      THE VIDEOGRAPHER:  The time is
24 8:29 a.m. and we are off the record.
25      (Recess taken.)                       08:30:32

3  (Pages 247 to 250)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 251

Rogers

1
2      THE VIDEOGRAPHER:  The time is now
3   8:30 a.m., we are now back on the record.
4      Q.   If Maryann Minerva were to
5   determine that an employee at Ocean Beach did   08:31:00
6   not have, did not satisfy certain basic
7   requirements for employment in any capacity at
8   Ocean Beach and she could not resolve that
9   situation was anybody at Ocean Beach required
10  to take any further action?          08:31:18
11      MR. WELCH:  Objection to the form.
12   You can answer.
13      A.   Only that I can recall if directed
14   by the contact she had with civil service.
15      Q.   Was Maryann Minerva required to    08:31:37
16   bring it to the attention of civil service if
17   she discovered that any employee was not in
18   compliance with applicable civil service
19   requirements?
20      MR. WELCH:  Objection to form.      08:31:50
21   You can answer.
22      A.   I am not sure that she was
23   required to.
24      Q.   To your knowledge was anybody at
25   Ocean Beach required to bring that to the     08:31:57

Page 252

Rogers

1
2   attention of civil service?
3      A.   To my knowledge she was the only
4   one who had the contact at civil service.
5      Q.   To your knowledge if you know how   08:32:06
6   would the civil service department come to
7   identify that an employee at Ocean Beach was
8   not in compliance with applicable
9   requirements?
10      A.   Only if someone in Ocean Beach     08:32:26
11   told them.
12      Q.   Were any of the civil service
13   requirements that we have been referring to to
14   your knowledge legal requirements for
15   continued employment at Ocean Beach?       08:32:41
16      MR. WELCH:  Objection to the form.
17      A.   Repeat the question, please.
18      Q.   Were any of the civil service
19   requirements with respect to which Maryann
20   Minerva would be investigating the employment   08:33:01
21   of employees to ensure compliance, were any of
22   those requirements legal requirements for
23   continued employment at Ocean Beach?
24      MR. WELCH:  Objection.  You can
25   answer.                     08:33:15

Page 253

Rogers

1
2      A.   Maybe continued employment in the
3   same job classification.
4      Q.   Could you explain what you mean by
5   your last response?            08:33:26
6      A.   Not necessarily continued
7   employment.
8      Q.   And would that mean that they
9   could continue employment in another job
10  capacity with respect to which they were in    08:33:37
11  compliance with civil service requirements?
12      A.   Perhaps, yes.
13      Q.   Could it also mean that they could
14  continue employment in a capacity in which
15  they were not in compliance with civil service  08:33:47
16  requirements?
17      MR. WELCH:  Objection to form.
18   You can answer.
19      A.   To my limited knowledge on this,
20   and I did not deal directly with civil       08:33:57
21   service, to my limited knowledge unless civil
22   service directed someone, directed Maryann to
23   terminate someone's employment, that
24   individual might have stayed on.
25      Q.   Did you ever have any          08:34:21

Page 254

Rogers

1
2   conversations that you can recall with Maryann
3   Minerva with respect to that issue?
4      A.   Only in regard to one individual,
5   not police, in another totally different     08:34:36
6   capacity.
7      Q.   What individual are you referring
8   to?
9      A.   Shoshana MacCallum (phonetic).
10      Q.   What position did Shoshana       08:34:49
11   MacCallum hold at that time?
12      A.   I think she was called archivist.
13      Q.   What was the nature of the
14   non-compliance with respect to Shoshana
15   MacCallum's employment as an archivist?     08:35:05
16      MR. WELCH:  Objection.  You can
17   answer.
18      A.   Educational and experience
19   background.
20      Q.   How was that non-compliance issue  08:35:15
21   resolved?
22      MR. WELCH:  Objection.  You can
23   answer.
24      A.   Civil service told Maryann, at
25   least this is what I have been told by her,   08:35:27

4  (Pages 251 to 254)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 255

```
 1          Rogers
 2  civil service told Maryann that we could not
 3  retain her in that capacity as an employee in
 4  Ocean Beach.
 5      Q.  Do you recall discussing that      08:35:39
 6  issue with Maryann Minerva?
 7      A.  Yes.
 8      Q.  What did Maryann Minerva say to
 9  you about that issue?
10      A.  It was determined that we would --  08:35:48
11  she would advise Ms. MacCallum of the civil
12  service position and offer her another
13  position in Ocean Beach to which she would not
14  have any requirement problems.
15      Q.  And did you agree to that          08:36:20
16  proposal?
17          MR. WELCH:  Objection.
18      A.  Yes.
19          MR. WELCH:  You can answer.
20      A.  Yes.                               08:36:29
21      Q.  Do you know who Maryann Minerva's
22  contact was at civil service?
23      A.  No.
24      Q.  Would it be fair to say that to
25  your understanding the continued employment of  08:36:41
```

Page 256

```
 1          Rogers
 2  employees who were not in compliance with
 3  civil service requirements was okay unless
 4  they got caught by the Department of Civil
 5  Service?                                   08:36:52
 6          MR. WELCH:  Objection.  Form.  You
 7      can answer.
 8      A.  The words got caught, I am not
 9  sure I -- scrap that.  Yes.
10      Q.  Did you ever discuss with Maryann  08:37:15
11  Minerva whether that was in fact the law with
12  respect to civil service requirements of
13  employees at Ocean Beach?
14          MR. WELCH:  Objection.  You can
15      answer.                                08:37:34
16      A.  No.
17      Q.  Did you believe that that was
18  lawful with respect to civil service
19  requirements for employees at Ocean Beach?
20          MR. WELCH:  Objection.  You can    08:37:46
21      answer.
22      A.  I believe that she was doing her
23  job appropriately.
24      Q.  Other than yourself was there
25  anybody else at Ocean Beach who had any     08:37:54
```

Page 257

```
 1          Rogers
 2  responsibility with respect to determining
 3  that Maryann Minerva was performing her job as
 4  required?
 5          MR. WELCH:  Objection.  You can    08:38:05
 6      answer.
 7      A.  The trustees may or may not have
 8  had opinions on it, I don't know, because they
 9  were all in contact with her.
10      Q.  Which trustees are you referring   08:38:21
11  to?
12      A.  There are four trustees plus
13  myself that comprise the board.
14      Q.  I would like to ask the court
15  reporter to please mark as, Rogers Exhibit 8,  08:38:43
16  a one-page document bearing Bates number
17  005769.
18          (Rogers Exhibit 8, one-page
19          document bearing Bates number 005769,
20          marked for identification, as of this  08:38:58
21          date.)
22      Q.  If you could please review the
23  document and when you have had a chance to
24  look at it -- I will note that Mr. Welch is
25  reviewing the document.                    08:39:49
```

Page 258

```
 1          Rogers
 2          MR. WELCH:  Would you like her to
 3  read it?
 4          MR. GRAFF:  No, I would like her
 5  to review it silently and let me know      08:39:56
 6  once she had a chance to review the
 7  document.
 8          MR. WELCH:  Read each paragraph.
 9      A.  I looked at this.
10      Q.  Mayor Rogers, do you recognize    08:40:46
11  that document?
12      A.  I may have seen it, but I really
13  don't recall it.
14      Q.  At the bottom left corner of the
15  document the document says cc in handwriting,  08:40:56
16  Natalie K. Rogers, Mayor.  Maryann Minerva,
17  Administrator.
18          Do you have any idea who would
19  have written that on this document?
20      A.  I don't know.                      08:41:11
21      Q.  If you look at the first paragraph
22  of the text the second or third sentence says:
23  Although we previously approved the
24  appointment of Mr. Loeffler, the Police
25  Officer Training Certificate is a legal    08:41:27
```

5  (Pages 255 to 258)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 259

Rogers

1       Rogers
2   requirement for continued employment.
3       Mayor Rogers, do you know what is
4   being referred to here, the Police Officer
5   Training Certificate?                    08:41:37
6       A.  No.
7       Q.  To your knowledge is something
8   called the Police Officer Training Certificate
9   a legal requirement for employment as a police
10  officer at Ocean Beach?                   08:41:50
11      MR. WELCH:  Objection.  You can
12  answer.
13      A.  I don't know.
14      Q.  If you look down to the second
15  paragraph, the second sentence states:    08:41:57
16  Continued employment would be a violation of
17  New York State Civil Service Law, or NYS Civil
18  Service Law.
19      When you read this document did
20  you understand that the employment of Ocean   08:42:14
21  Beach police officers without compliance with
22  this training certificate requirement would be
23  a violation of New York State Civil Service
24  Law?
25      MR. WELCH:  Objection.  You mean   08:42:28

Page 260

Rogers

1       Rogers
2   today or if she ever did?
3       Q.  Do you recall having reviewed it
4   before today, my question goes to when you
5   last reviewed it?                         08:42:39
6       MR. WELCH:  You can answer.
7       A.  I was not in charge of employing
8   anyone within the Police Department.
9       Q.  But you were the mayor of Ocean
10  Beach?                                    08:42:59
11      A.  Correct.
12      Q.  And you were in charge of Maryann
13  Minerva?
14      MR. WELCH:  Objection.  You can
15  answer.                                   08:43:03
16      A.  Yes.
17      Q.  Do you recall whether after seeing
18  this letter if you saw it during your service
19  as Mayor or Police Commissioner whether you
20  had any conversations with anyone concerning   08:43:24
21  the substance of this letter?
22      A.  I do not recall.
23      Q.  And to clarify the letter is
24  referring to an Alan Loeffler.  I asked you
25  when you were last here if you know who Alan   08:43:35

Page 261

Rogers

1       Rogers
2   Loeffler is.  Do you know who Alan Loeffler
3   is?
4       A.  I believe it to be the brother of
5   the present mayor of Ocean Beach, Joe     08:43:48
6   Loeffler.
7       Q.  As of the date of this letter
8   October 6, 2005 what position if any did Joe
9   Loeffler have at Ocean Beach?
10      A.  I believe he was a trustee.    08:44:01
11      Q.  To your knowledge did the -- we
12  can put aside the exhibit, Rogers Exhibit 8,
13  thank you.
14      To your knowledge did the
15  Department of Civil Service have to certify   08:44:17
16  the payroll for employees at Ocean Beach?
17      A.  I don't know.
18      Q.  During your service as mayor of
19  Ocean Beach did you ever have to sign off on
20  or certify the payroll for employees at Ocean   08:44:37
21  Beach?
22      A.  I did not.
23      Q.  To your knowledge who if anyone at
24  Ocean Beach was responsible for signing off or
25  certifying the payroll?                   08:44:50

Page 262

Rogers

1       Rogers
2       MR. WELCH:  Objection.  You can
3   answer.
4       A.  I believe most payroll was
5   certified by Maryann Minerva.             08:44:58
6       Q.  Did the Village Board of Trustees
7   have any role in approving the hiring of
8   individuals as employees at Ocean Beach?
9       A.  Only the top management personnel.
10      Q.  And could you identify the top   08:45:31
11  management personnel that you are referring
12  to?
13      A.  It would be the clerk treasurer,
14  it would be the administrator, it would be the
15  police chief.                             08:45:48
16      Q.  Is that all?
17      A.  I am trying to think if there was
18  one more.  I think we approved the head
19  lifeguard, or the head of the lifeguard
20  department.                               08:46:40
21      MR. GRAFF:  I will note that in
22  the last two questions or so Mr. Novikoff
23  entered the room and are you now
24  defending the deposition?
25      MR. NOVIKOFF:  I am here.         08:46:49

6  (Pages 259 to 262)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 263

Rogers

1
2       MR. GRAFF:  Good morning
3   Mr. Novikoff.
4       Q.   To your knowledge were there any
5   other positions at Ocean Beach with respect to  08:47:10
6   which a training certificate was a legal
7   requirement for continued employment?
8       MR. NOVIKOFF:  Objection.  You can
9   answer.
10      A.   Not to my knowledge.          08:47:22
11      Q.   To your knowledge was the role of
12  the Board of Trustees with respect to
13  approving of the hiring of the personnel that
14  you referred to a moment ago codified or
15  memorialized in writing anywhere?        08:47:38
16      A.   Not to my knowledge.
17      Q.   To your knowledge did the Village
18  Board of Trustees have any role with respect
19  to determining the salaries for employees at
20  Ocean Beach?                    08:47:49
21      MR. NOVIKOFF:  Objection.
22  Timeframe?
23      Q.   During your service as mayor of
24  Ocean Beach?
25      A.   Yes.                    08:47:58

Page 264

Rogers

1
2       Q.   With respect to what positions did
3   the Village Board of Trustees exercise that
4   responsibility?
5       A.   Ultimately all employees of the   08:48:11
6   village since the board approved a budget of
7   which salaries were a part of that budget.
8       Q.   To your knowledge did the Suffolk
9   County Department of Civil Service -- strike
10  that.                          08:48:45
11          To your knowledge was the village
12  budget that set forth the salaries that you
13  just referred to ever provided to the Suffolk
14  County Department of Civil Service?
15      A.   I don't know.               08:48:55
16      Q.   I am going to ask the court
17  reporter to please mark as Rogers Exhibit 9, a
18  one-page document bearing Bates number 28.  I
19  will note for the record that this document
20  appears to have been part of a multipage      08:49:16
21  document, but I am asking the court reporter
22  to mark the only page of that document that
23  was apparently produced.
24          (Rogers Exhibit 9, one-page
25          document bearing Bates number 28, marked  08:49:08

Page 265

Rogers

1
2   for identification, as of this date.)
3       Q.   Mayor Rogers, if you could take a
4   look at this document marked as Rogers Exhibit
5   9 and let me know once you have finished     08:50:03
6   reviewing it.
7       A.   I have read it.
8       Q.   Mr. Novikoff is holding the
9   document, okay.
10          Mayor Rogers, can you identify the  08:50:53
11  document marked as Rogers Exhibit 9?
12      A.   Yes.
13      Q.   What is that document?
14      A.   Part of the minutes of a meeting.
15      Q.   Is that a meeting of the Board of  08:51:02
16  Trustees held on January 28, 2006?
17      A.   That is what it says, yes.
18      Q.   Do you recall whether you have
19  ever reviewed this page of the minutes before?
20      A.   Yes.  I did.               08:51:13
21      MR. NOVIKOFF:  Let the record
22  reflect that there is an arrow --
23      A.   Only as to the arrow, yes.
24      MR. NOVIKOFF:  There is an arrow
25  on this exhibit.  So is the question    08:51:26

Page 266

Rogers

1
2   counsel did she ever see a copy of this
3   document with the arrow on it or without
4   the arrow?
5       MR. GRAFF:  I will clarify that.   08:51:35
6   I will note that we didn't place the
7   arrow.
8       MR. NOVIKOFF:  I am not suggesting
9   that you did.
10      Q.   Mayor Rogers, did you ever see a   08:51:42
11  copy of this document without the arrow on it?
12      A.   Yes.
13      Q.   Did you ever see a copy of this
14  document before today with the arrow on it?
15      A.   No.                     08:51:52
16      Q.   Did you see this document
17  within -- strike that.
18          Do you recall approximately when
19  you saw this document for the first time?
20      A.   Minutes of all meetings were   08:52:09
21  prepared after the meeting.  If it took --
22  whatever time it took to translate the work of
23  a meeting into a written set of minutes, as
24  soon as I got a copy I saw it.  It was not
25  always the same amount of time after each   08:52:34

7  (Pages 263 to 266)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 267

Rogers

1    meeting.
2        Q.   Who was responsible for compiling
3    the minutes of Board of Trustees meetings?
4        MR. NOVIKOFF:  Objection.        08:52:48
5        A.   Can I answer?
6        MR. NOVIKOFF:  Yes.
7        A.   Maryann Minerva if she were at the
8    meeting.
9        Q.   And if Maryann Minerva were not at  08:52:58
10   the meeting was there a specific person who
11   would take on that responsibility?
12       A.   Whoever was at the meeting and was
13   recording the minutes.  All minutes were
14   recorded.                            08:53:14
15       Q.   Do you recall whether you were
16   present at the January 28, 2006 meeting
17   reflected in these minutes?
18       A.   I believe I was.  May I?
19       MR. NOVIKOFF:  Yes, you may.        08:53:34
20       Q.   Do you recall --
21       MR. NOVIKOFF:  Do you need to look
22   at it to further answer your question?
23       THE WITNESS:  I just want to get
24   the date.                            08:53:42

Page 268

Rogers

1        A.   Yes, I believe I was.
2        Q.   Do you recall independent from
3    this document whether there was any discussion
4    at that Board of Trustees meeting concerning  08:53:57
5    designation of George Hesse as Deputy Chief of
6    Police?
7        A.   I don't recall that there was any.
8        Q.   Do you recall that at some point
9    there was a motion before the Village Board of  08:54:16
10   Trustees to designate George Hesse as Deputy
11   Chief of Police?
12       MR. NOVIKOFF:  Objection.  You can
13   answer.
14       A.   Yes.                        08:54:26
15       Q.   Do you recall who proposed that
16   motion?
17       MR. NOVIKOFF:  Without looking at
18   the document.
19       A.   Without looking at the document I  08:54:33
20   do not recall who proposed it.
21       Q.   If I could ask you to please take
22   a moment to look over the paragraph of the
23   document marked with an arrow to the extent
24   that it might refresh your recollection.        08:54:52

Page 269

Rogers

1        MR. NOVIKOFF:  So now the question
2    is reading the document, the paragraph
3    with the arrow, does this refresh your
4    recollection independent as to what is    08:55:04
5    said in this paragraph as to who made the
6    motion.  That is the only question?
7        THE WITNESS:  It does refresh it,
8    yes.
9        Q.   Who made that motion?        08:55:13
10       A.   Joe Loeffler.  Trustee Joe
11   Loeffler.
12       Q.   Do you recall if Trustee Mallott
13   seconded this motion?
14       A.   Independent of this?        08:55:28
15       Q.   After looking at this do you have
16   an independent recollection?
17       A.   Yes.
18       Q.   Do you recall whether anyone
19   present at that meeting did not support that  08:55:41
20   motion?
21       A.   I believe it was voted
22   unanimously.
23       Q.   Do you recall whether there was
24   any discussion of the motion aside from it    08:55:52

Page 270

Rogers

1    being made and it being voted upon?
2        MR. NOVIKOFF:  Objection.  You can
3    answer.
4        A.   Not at the time of the motion.    08:55:58
5        Q.   Do you recall whether there were
6    any discussions about the Village Board of
7    Trustees with respect to the designation of
8    George Hesse as Deputy Chief of Police prior
9    to this meeting?                    08:56:14
10       MR. NOVIKOFF:  Objection.  You can
11   answer.
12       A.   Yes.
13       Q.   Do you recall whether there was
14   more than such conversation?        08:56:22
15       A.   I don't recall that.
16       Q.   In substance what do you recall of
17   the conversation among the Village Board of
18   Trustees concerning designation of George
19   Hesse as Deputy Chief of Police?        08:56:35
20       A.   All trustees after discussion
21   seemed to agree that this would be an
22   appropriate designation.
23       Q.   Was there any discussion with
24   respect to appointing anyone other than George  08:56:59

8 (Pages 267 to 270)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 271

```
Rogers
1
2    Hesse to be Acting Police Chief at that time?
3        A.   Not that I recall.
4        Q.   Do you recall whether you said
5    anything in conversations with other trustees    08:57:12
6    with respect to the proposed designation of
7    George Hesse as Deputy Chief of Police?
8            MR. NOVIKOFF:  Outside the
9        presence of counsel, unless pursuant to
10       Judge Boyle's instruction the          08:57:28
11       conversation took place in executive
12       session, which we will still object to
13       and may appeal, but you have to answer
14       that.  So do you understand the
15       parameters?                           08:57:34
16           THE WITNESS:  Yes.
17           MR. NOVIKOFF:  Okay.
18       A.   The answer -- now the question is
19   did I; you are asking for my opinion on this?
20       Q.   Yes, whether you expressed any     08:57:46
21   view on that?
22       A.   Yes, I did.
23       Q.   What view did you express?
24       A.   I agreed with the -- with the
25   concept.                                  08:57:58
```

Page 272

```
Rogers
1
2        Q.   When you were last here we had
3    some discussion about Ed Paradiso's views on
4    that topic.  Do you recall what Ed Paradiso's
5    view was if any with respect to the proposed    08:58:09
6    designation of George Hesse as Deputy Chief of
7    Police?
8            MR. NOVIKOFF:  Objection to the
9        extent that it was already asked and
10       answered.  You can answer.           08:58:18
11       A.   Yes.
12       Q.   And I know we did cover this the
13   last time, but just so we are clear on the
14   series of questions that is to come, what was
15   Ed Paradiso's opinion with respect to the     08:58:39
16   designation of George Hesse as Deputy Chief of
17   Police?
18           MR. NOVIKOFF:  Objection, asked
19       and answered.  Counsel, I will take ten
20       seconds.  You prefaced the question by    08:58:47
21       saying that you already covered this.  So
22       her answer is in the transcript, so I
23       don't know why you are asking her again.
24       But you can answer the question.
25       A.   I believe Ed Paradiso was not     08:58:58
```

Page 273

```
Rogers
1
2    favorably inclined.
3        Q.   Did Ed Paradiso express that to
4    you in an oral communication?
5        A.   Yes.                             08:59:15
6        Q.   Do you recall whether he gave any
7    reasons for his belief?
8        A.   I do not.
9        Q.   Do you recall whether you asked
10   him if there were any reasons for his belief?  08:59:29
11       A.   I do not.
12       Q.   Do you recall anything else of
13   your conversation with Ed Paradiso in which he
14   expressed that belief?
15       A.   No.                              08:59:42
16       Q.   At the January 28, 2006 meeting of
17   the Village Board of Trustees when it was
18   proposed that George Hesse be designated as
19   Deputy Chief of Police was there any
20   discussion concerning Ed Paradiso's opinion    09:00:00
21   that George Hesse should not be appointed to
22   that position?
23           MR. NOVIKOFF:  Objection.  You can
24       answer.
25       A.   No.                              09:00:11
```

Page 274

```
Rogers
1
2        Q.   Did you ever relay Ed Paradiso's
3    opinion to any members of the Village Board of
4    Trustees?
5        A.   I don't recall.                  09:00:27
6        Q.   Do you recall whether any members
7    of the Village Board of Trustees ever
8    indicated to you in any way that they were
9    aware of Ed Paradiso's opinion with respect to
10   the designation of George Hesse as Deputy or   09:00:44
11   Acting Chief of Police?
12       A.   No.
13       Q.   Do you recall whether you spoke
14   with anyone other than Ed Paradiso about Ed
15   Paradiso's belief that George Hesse should not  09:01:05
16   be appointed Deputy Chief of Police?
17           MR. NOVIKOFF:  Objection.  You may
18       answer.
19       A.   I may have spoken to one or more
20   trustees, but I don't recall it.          09:01:18
21       Q.   Do you recall why you might have
22   spoken to a member of the Board of Trustees
23   about that issue?
24       A.   Because I talk to the trustees
25   about a lot of things.                    09:01:34
```

9 (Pages 271 to 274)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 275

```
 1              Rogers
 2      Q.  Did you consider Ed Paradiso's
 3  opinion on the subject to be relevant to the
 4  Board of Trustees' determination as to whether
 5  Hesse should be appointed?        09:01:47
 6      MR. NOVIKOFF:  Objection.  You can
 7  answer.
 8      A.  No.
 9      Q.  For what reason did you not
10  consider that to be relevant?     09:01:58
11      MR. NOVIKOFF:  Objection only to
12  the term relevant, but you can answer.
13      A.  I had some other concerns about
14  the veracity of Ed Paradiso.
15      Q.  Does that relate to that time     09:02:10
16  overlap that we discussed the last time that
17  you were here?
18      A.  Yes.
19      Q.  Did you ever discuss that time
20  overlap that you discovered with any members     09:02:16
21  of the Village Board of Trustees?
22      A.  I think so.
23      Q.  Do you recall which trustees you
24  discussed that with?
25      A.  I may have discussed it with     09:02:37
```

Page 276

```
 1              Rogers
 2  Trustee Mallott.
 3      Q.  In substance do you recall
 4  anything of that discussion with Trustee
 5  Mallott?              09:02:50
 6      MR. NOVIKOFF:  Objection.  You can
 7  answer.
 8      A.  There was no resolution.
 9      Q.  Do you recall whether Trustee
10  Mallott agreed with your conclusions with     09:03:01
11  respect to your investigation of that time
12  overlap issue?
13      MR. NOVIKOFF:  Objection.
14      A.  I do not recall.
15      Q.  To your knowledge did anyone at     09:03:11
16  Ocean Beach ever have any discussion directly
17  with Ed Paradiso concerning your investigation
18  of the time overlap issue?
19      MR. NOVIKOFF:  Objection.
20      A.  Did anyone in Ocean Beach; I don't 09:03:31
21  know.
22      MR. NOVIKOFF:  Counselor, my
23  objections are to the questions starting
24  with to your knowledge.  You mean
25  personal knowledge or based on multiple     09:03:42
```

Page 277

```
 1              Rogers
 2  hearsay sources.  So that is the basis
 3  for my objection to the questions.
 4      MR. GRAFF:  Okay.
 5      Q.  To clarify, do you have any     09:03:51
 6  information that would lead you to believe
 7  that anyone at Ocean Beach ever spoke with Ed
 8  Paradiso about your investigation of the time
 9  overlap issue?
10      A.  Ever spoke with Ed Paradiso is the  09:04:03
11  question?
12      Q.  Yes.
13      A.  I don't know.
14      Q.  Do you have any information that
15  would lead you to believe that anyone at Ocean  09:04:10
16  Beach ever communicated with Ed Paradiso with
17  respect to the time overlap issue?
18      A.  Someone may have, but I don't know
19  if there was communication.
20      Q.  Turning back to the Exhibit Rogers  09:04:26
21  9 with the arrow pointing to the paragraph, it
22  states that:  Due to circumstances that are
23  taking place within the Ocean Beach Police
24  Department with the chief out on medical leave
25  for past four months.            09:04:50
```

Page 278

```
 1              Rogers
 2      Do you know what that is referring
 3  to?
 4      A.  He had an injured foot which
 5  created a medical disability situation where     09:04:57
 6  he could not perform all of the duties of the
 7  Chief of Police.
 8      Q.  Was he still serving as of January
 9  28, 2006, was Ed Paradiso still serving with
10  respect to any of the duties of Chief of     09:05:17
11  Police?
12      MR. NOVIKOFF:  Objection.  You can
13  answer.
14      A.  He may have been doing some of
15  them.  He did not do all of them.     09:05:25
16      Q.  Do you recall whether on January
17  28, 2006 there were any discussions among the
18  Village Board of Trustees with respect to the
19  specific duties that Ed Paradiso was or was
20  not fulfilling at that time?     09:05:44
21      A.  No, I do not recall.
22      Q.  Thank you.
23      Going on in the paragraph Trustee
24  Loeffler made motion to designate George Hesse
25  as Deputy Chief of Police with all power and     09:05:57
```

10  (Pages 275 to 278)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 279

```
 1          Rogers
 2  authority involved with that position.
 3       Do you understand what this
 4  document refers to by the statement with all
 5  power and authority involved with that      09:06:07
 6  position?
 7       MR. NOVIKOFF: Objection.
 8    A.  Do I understand?
 9    Q.  Yes.
10    A.  Yes.                               09:06:15
11    Q.  And what is that referring to?
12       MR. NOVIKOFF: Objection. You can
13  answer.
14    A.  Scheduling, hiring, budget
15  compliance, monitoring the police office.  09:06:28
16  Giving out summonses and any and all other
17  things that the Police Department did.
18    Q.  Would that include power and
19  authority to terminate police officers at
20  Ocean Beach?                             09:07:01
21       MR. NOVIKOFF: Objection. You can
22  answer.
23    A.  As of that date?
24    Q.  Yes.
25    A.  There was nobody to terminate. We 09:07:11
```

Page 280

```
 1          Rogers
 2  only had two full-time police officers.
 3    Q.  And is that because this was the
 4  off season, the winter?
 5    A.  Yes.                               09:07:25
 6    Q.  In that paragraph when it says
 7  that the chief had been out on medical leave
 8  for the past four months, to your knowledge is
 9  that an accurate statement?
10       MR. NOVIKOFF: Objection.          09:07:39
11    A.  The word out which could be --
12  which could mean did nothing may be too
13  severe. I think he did limited activity with
14  regard to the job of police chief.
15    Q.  Earlier a moment ago I had        09:08:06
16  referred to the off season at Ocean Beach.
17  Did you understand what I was referring to?
18       MR. NOVIKOFF: Objection.
19    A.  Yes.
20    Q.  And could you explain what your   09:08:16
21  understanding of the off season at Ocean Beach
22  is?
23       MR. NOVIKOFF: Objection. Asked
24  and answered. But you can answer.
25    A.  Most police officers since it is a 09:08:29
```

Page 281

```
 1          Rogers
 2  summer community were hired in the spring for
 3  a seasonal job, and at the end of the season
 4  in the fall, I can't give you dates
 5  specifically because I did not do the hiring,  09:08:48
 6  their job was concluded because it was a
 7  limited hiring.
 8    Q.  Did Ed Paradiso sustain his injury
 9  that necessitated his absence from Ocean Beach
10  in some capacity during the summer of 2005?    09:09:18
11       MR. NOVIKOFF: Objection.
12    A.  I don't know when he sustained it.
13    Q.  Do you have any reason to believe
14  that he sustained his injury more than four
15  months prior to January 28, 2006?         09:09:31
16       MR. NOVIKOFF: Objection.
17    A.  I don't know.
18    Q.  If I could ask the court reporter
19  to please mark as Rogers Exhibit 10, a
20  two-page document bearing Bates numbers 3879   09:09:50
21  and 3880.
22       (Rogers Exhibit 10, two-page
23       document bearing Bates numbers 3879 and
24       3880, marked for identification, as of
25       this date.)                        09:10:28
```

Page 282

```
 1          Rogers
 2       MR. NOVIKOFF: Objection. I will
 3  note -- he didn't ask you to do anything
 4  with this.
 5       MR. GRAFF: No.                    09:10:32
 6       MR. NOVIKOFF: I will note for the
 7  record that on this two-page document
 8  which is Rogers Exhibit 10 it appears to
 9  be an incomplete part of an entire
10  minutes of the Board of Trustees meeting,  09:10:44
11  and it is only page 6 and 7. I also note
12  on the first page that there is a, what
13  appears to be a handwritten star on the
14  document.
15       MR. GRAFF: I will note that it    09:10:54
16  was produced to us in this manner.
17       MR. NOVIKOFF: That is fine.
18    Q.  Mayor Rogers, when the Village
19  Board of Trustees meets in executive session
20  are there any minutes taken with respect to    09:11:05
21  executive session?
22    A.  No.
23    Q.  Are there any -- strike that.
24       Does Maryann Minerva attend
25  executive sessions of the Village Board of    09:11:22
```

11 (Pages 279 to 282)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 283

```
 1        Rogers
 2 Trustees?
 3        MR. NOVIKOFF:  While she was
 4 mayor?
 5        MR. GRAFF:  Yes.        09:11:28
 6   A.  Yes.
 7   Q.  Do you recall whether Maryann
 8 Minerva ever took notes during executive
 9 session?
10   A.  I do not recall.        09:11:34
11   Q.  Do you recall whether anyone took
12 notes during executive session?
13   A.  Sometimes I did, but not all the
14 time.
15   Q.  Do you recall whether you ever    09:11:50
16 took notes during an executive session with
17 respect to discussions concerning the Ocean
18 Beach Police Department?
19   A.  No.
20   Q.  Do you recall whether notes from  09:12:13
21 executive session were ever preserved at Ocean
22 Beach?
23        MR. NOVIKOFF:  Are you done with
24 the question?
25        MR. GRAFF:  Yes.        09:12:29
```

Page 284

```
 1        Rogers
 2        MR. NOVIKOFF:  Objection.
 3   A.  To my knowledge, no.
 4   Q.  To your knowledge was there any
 5 reason why formal minutes were not taken    09:12:35
 6 during executive sessions?
 7        MR. NOVIKOFF:  Objection.
 8   A.  To my knowledge there was no
 9 requirement for it.
10   Q.  To your knowledge was there a    09:12:44
11 requirement that minutes be maintained with
12 respect to regular sessions?
13        MR. NOVIKOFF:  Objection.
14   A.  I believe they were required, yes.
15   Q.  Where would that requirement be    09:12:58
16 written down if anywhere as far as you know?
17        MR. NOVIKOFF:  Note my objection.
18   A.  Probably in --
19        MR. NOVIKOFF:  Don't say probably.
20 If you know you know, if you don't you    09:13:23
21 don't.
22        MR. GRAFF:  Mr. Novikoff --
23        MR. NOVIKOFF:  I am just
24 instructing my witness how to answer the
25 question.  There is no guessing.    09:13:31
```

Page 285

```
 1        Rogers
 2        MR. GRAFF:  I believe that your
 3 instruction is bordering on coaching.
 4        MR. NOVIKOFF:  Not even close to
 5 coaching.        09:13:39
 6   A.  To my knowledge --
 7        MR. NOVIKOFF:  Yes, to your
 8 knowledge.
 9   A.  To my knowledge it would be in the
10 guidelines for village officials on the    09:13:48
11 conduct of meetings in the village.
12   Q.  And are those guidelines set forth
13 in the NYCOM documents that you referred to
14 when we were last here?
15   A.  They would be.        09:14:02
16   Q.  Do you recall whether you had any
17 conversations with Trustee Loeffler with
18 respect to Ed Paradiso's opinion that George
19 Hesse should not be appointed Deputy Police
20 Chief?        09:14:21
21        MR. NOVIKOFF:  Objection.  Asked
22 and answered.
23   A.  I do not recall.
24   Q.  Other than what you have testified
25 to so far do you recall anything else that was  09:14:30
```

Page 286

```
 1        Rogers
 2 discussed among the Village Board of Trustees
 3 with respect to the designation of George
 4 Hesse as Acting Police Chief in January of
 5 2006?        09:14:48
 6        MR. NOVIKOFF:  Objection.
 7 Ms. Rogers, do you recall exactly what
 8 you testified to during the course of
 9 this deposition on that subject?
10        THE WITNESS:  Not word for word,    09:15:00
11 no.
12        MR. NOVIKOFF:  Then I object to
13 the foundation of the question.  You can
14 answer the question.
15   A.  No, not to my recollection.        09:15:05
16   Q.  Mayor Rogers, did you review any
17 transcript or portion of a transcript of your
18 first day of deposition testimony?
19   A.  I never saw it, no.
20   Q.  Now, there has been a period of    09:15:22
21 time between the first time you were here and
22 today.  During that interval did you think of
23 any testimony that you may have given on your
24 first day that was in any way inaccurate?
25        MR. NOVIKOFF:  Objection.  You can  09:15:43
```

TSG Reporting – Worldwide    877-702-9580

52454300-d00b-489d-a580-7c861cc4cc2d

Page 287

```
1            Rogers
2    answer.
3        A.  I don't recall all the things I
4    said exactly.
5        MR. GRAFF:  Mr. Novikoff, if you    09:15:57
6    can please give Mayor Rogers the document
7    marked as Exhibit 10.
8        MR. NOVIKOFF:  If there is a
9    question that requires her to look at
10   Exhibit 10 I will be more than happy to   09:16:09
11   give it to her.
12       MR. GRAFF:  There is.
13       MR. NOVIKOFF:  So ask the
14   question.
15       Q.  Towards the middle of the document  09:16:17
16   there is a column of numbers, there is some
17   words next to some of those numbers.  Those
18   words include increased settlement.  My
19   question is in the context of this document
20   what does that refer to?            09:16:32
21       MR. NOVIKOFF:  Read the document.
22   Read both pages and if you believe that
23   based upon reading both pages you can
24   accurately answer that question without
25   referring to pages 1 through 5, than by   09:16:46
```

Page 288

```
1            Rogers
2    all means answer the question.
3        Take your time and read it
4    thoroughly to the extent that you need
5    to.                              09:17:06
6        A.  What is the question with regard
7    to this memo; I read it.
8        Q.  Mr. Novikoff, do you mind if I
9    point the witness to the language that I am
10   referring to?                    09:19:04
11       MR. NOVIKOFF:  Sure, go ahead.
12       Q.  This increased settlement over
13   there, do you see that spot?
14       A.  This; yes.
15       MR. NOVIKOFF:  Which one, there is  09:19:10
16   increased settlement to 7,500, the one --
17       MR. GRAFF:  I am asking about the
18   first one.
19       MR. NOVIKOFF:  The one that is
20   7,500?                           09:19:24
21       MR. GRAFF:  Yes.
22       MR. NOVIKOFF:  Okay.
23       A.  Yes.
24       Q.  Do you understand what that refers
25   to?                              09:19:32
```

Page 289

```
1            Rogers
2        A.  Yes, I understand.
3        Q.  Can you explain what that refers
4    to?
5        A.  Exactly what it says.  I was a    09:19:35
6    trustee at that point, I was not mayor.
7        Q.  To your understanding does
8    increased settlement mean something different
9    from increased salary in the context of this
10   document?                        09:19:56
11       A.  In this context --
12       MR. NOVIKOFF:  Objection.
13       A.  In this context I believe it to be
14   the same.
15       Q.  Do you recall any discussion     09:20:06
16   concerning the salary adjustment for Police
17   Officer George Hesse at the April 11, 1998
18   meeting?
19       A.  No, I don't recall.
20       Q.  At the very top of the document,   09:20:30
21   counsel, at the very top of the document
22   underlined it says NYPIRG request to solicit.
23       Do you know what NYPIRG refers to
24   in the context of this document?
25       MR. NOVIKOFF:  Read whatever you    09:20:55
```

Page 290

```
1            Rogers
2    need to to answer the question.
3        A.  No, I do not.
4        Q.  Underneath that subheading it
5    says:  Following discussion Trustee Miller    09:21:12
6    moved as follows:  Whereas the NYPIRG has
7    requested that it be permitted to solicit
8    funds door to door in the Incorporated Village
9    of Ocean Beach, and whereas the Village code
10   in the best interest of the Village requires   09:21:33
11   denial of said request, and now therefore it
12   is hereby resolved that the request of NYPIRG
13   is hereby denied.  Trustee Rogers seconded
14   this motion.  Upon call all present voted aye.
15       Do you recall the motion that is    09:21:54
16   referred to in the text that I just read?
17       A.  No.
18       Q.  To your knowledge was there a
19   requirement of obtaining approval of the
20   Village Board of Trustees to solicit funds
21   door to door in Ocean Beach?
22       MR. NOVIKOFF:  Objection.  You can
23   answer.
24       A.  To my knowledge no.
25       THE VIDEOGRAPHER:  The time is now
```

13 (Pages 287 to 290)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 291

```
 1          Rogers
 2      9:22 a.m. and we are now off the record.
 3          (Recess taken.)
 4          THE VIDEOGRAPHER:  This is the
 5      start of tape number 2, the time is now    09:35:03
 6      9:35 a.m., we are back on the record.
 7          MR. NOVIKOFF:  Let the record
 8      reflect that Ms. Rogers was back and
 9      prepared to proceed at 9:29.
10      Q.   Mayor Rogers, to your knowledge    09:35:19
11   was there any requirement of obtaining
12   approval from the Village Board of Trustees to
13   solicit funds in Ocean Beach?
14          MR. NOVIKOFF:  Objection.
15      A.   To my knowledge, no.           09:35:31
16      Q.   And after having looked at the
17   document and discussing this for a few minutes
18   do you have any recollection of this motion
19   that is referred to here that you seconded?
20          MR. NOVIKOFF:  What document, what  09:35:49
21      motion, what did you discuss for the last
22      few minutes?
23      Q.   The document, Rogers 10?
24          MR. NOVIKOFF:  What is the
25      question?                        09:36:01
```

Page 292

```
 1          Rogers
 2      Q.   Whether as she sits here this
 3   morning Mayor Rogers has any recollection of
 4   the motion that is referred to in the top of
 5   this document on the request to solicit?    09:36:07
 6      A.   No.
 7      Q.   Turning to the second page of the
 8   document?
 9          MR. NOVIKOFF:  Of the exhibit; the
10      document is incomplete.          09:36:22
11      MR. GRAFF:  Yes.
12      Q.   Turning to the second page there
13   is a subheading, Inspectors of Election, do
14   you see what I am referring to?
15      A.   When I get it.  I don't see it.   09:36:33
16      MR. NOVIKOFF:  Right there.
17      A.   Yes.
18      Q.   Trustee Mallott moved -- I am
19   going to read that, beginning of the record:
20   Trustee Mallott moved as follows:  Be it    09:36:44
21   resolved by the Board of Trustees of the
22   Village of Ocean Beach pursuant to Election
23   Law Section 15-116, Sub 1 that the following
24   are appointed Inspectors of Election.
25          Do you understand what Inspectors  09:37:04
```

Page 293

```
 1          Rogers
 2   of Election refers to in the context of this?
 3          MR. NOVIKOFF:  Objection to the
 4      extent that there is a lot more that
 5      Trustee Mallott stated according to this  09:37:14
 6      exhibit, and you have only read the first
 7      two sentences of it.  So what is the
 8      question?
 9      Q.   The question is if she understands
10   what Inspectors of Election refers to in the   09:37:24
11   context of the text that I just read?
12      A.   The answer is yes.
13      Q.   Can you explain what Inspectors of
14   Election refers to?
15      A.   We have regular elections in Ocean  09:37:35
16   Beach, and pursuant to state law we have to
17   have inspectors who have people who are
18   registered come in, sign in, vote.  There is a
19   whole procedure for voting.  And the Village
20   Board of Trustees appoints election inspectors  09:37:57
21   each time there is a village election.
22      Q.   Thank you.  The individuals
23   indicated after the text that I read who were
24   appointed Inspectors of Election include
25   Winifred Loeffler, Susan Cafuoco, Sallie    09:38:14
```

Page 294

```
 1          Rogers
 2   Potterton and Harvey Levine.
 3          Mayor Rogers, do you know who
 4   Winifred Loeffler is?
 5      A.   Yes.                         09:38:26
 6      Q.   And who is she?
 7      A.   She is the mother of Joe Loeffler.
 8   Alan Loeffler, the wife of the former Police
 9   Chief Loeffler.
10      Q.   Do you know who Susan Cafuoco is?  09:38:42
11      A.   She is a resident of Ocean Beach,
12   wife of a contractor, who later became an
13   office clerk in Ocean Beach.
14      Q.   You are referring to her husband
15   being a contractor?                  09:39:20
16      A.   Yes.
17      Q.   Was he a contractor in Ocean
18   Beach?
19      A.   There and some places on the
20   mainland, but I don't know where.     09:39:30
21      Q.   Do you know whether Ms. Cafuoco's
22   husband the contractor maintains office on
23   Ocean Beach?
24          MR. NOVIKOFF:  Presently or in
25      1998?                          09:39:45
```

14 (Pages 291 to 294)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 295

Rogers

1
2    Q.   At the time?
3    A.   In 1998?
4    Q.   Yes.
5    A.   I don't know if he did.          09:39:47
6    Q.   Do you know if at any time her
7 husband the contractor maintained office at
8 Ocean Beach?
9    A.   Yes.
10   Q.   Do you know what the name of his  09:39:55
11 business was?
12   A.   It was called Brothers
13 Construction.
14   Q.   Ms. Cafuoco's husband's name, do
15 you recall what it was?          09:40:05
16      MR. NOVIKOFF:  As opposed to Mr.
17 Cafuoco.
18      MR. GRAFF:  Yes, maybe it was not
19 Cafuoco.
20      MR. NOVIKOFF:  Okay.          09:40:16
21   A.   Don Cafuoco.
22   Q.   Sallie Potterton, do you know who
23 that individual is?
24   A.   Yes.
25   Q.   Who is Sallie Potterton?          09:40:24

Page 296

Rogers

1
2    A.   A long time resident of Ocean
3 Beach and an artist.
4    Q.   And Harvey Levine?
5    A.   A resident of Ocean Beach and     09:40:31
6 owner of a bed and breakfast.
7    Q.   Further down after some other text
8 going to the substance of the motion it says
9 Trustee Rogers seconded this motion.  Do you
10 recall that you seconded this motion?     09:40:50
11      MR. NOVIKOFF:  Just without
12 looking at the document.
13   Q.   If you think it would refresh your
14 recollection --
15      MR. NOVIKOFF:  You asked her a     09:41:01
16 direct question, does she recall.  If the
17 answer is no, then the next question
18 should be would looking at that document
19 refresh your recollection.  So answer the
20 first question, do you recall seconding  09:41:12
21 the motion?
22   A.   No.
23   Q.   Would looking at the document
24 refresh your recollection?
25   A.   Yes.          09:41:18

Page 297

Rogers

1
2      MR. NOVIKOFF:  Look at whatever
3 you need.
4    A.   Yes.
5    Q.   Having looked at the document do   09:41:31
6 you recall that you seconded this motion?
7    A.   Yes.
8    Q.   Do you recall why you seconded the
9 motion?
10      MR. NOVIKOFF:  Objection.          09:41:42
11   A.   Because they all had been doing
12 this before, at least some of them had been
13 doing it before and they had experience, they
14 were all qualified for the job.
15      MR. NOVIKOFF:  I would also     09:41:55
16 advise -- not advise, just note that
17 there was more to this motion than just
18 the designation of four individuals as
19 Inspectors of Election.
20      MR. GRAFF:  I understand, in fact  09:42:07
21 I referred to there being more and this
22 is the second time that you made the same
23 reference.
24      MR. NOVIKOFF:  Thank you.
25   Q.   The very last line of the document  09:42:15

Page 298

Rogers

1
2 indicates that Acting Mayor Wingate voted
3 against the motion.  Do you recall whether
4 Acting Mayor Wingate voted against the motion?
5    A.   No.          09:42:27
6    Q.   Would it refresh your recollection
7 to look at the document?
8    A.   Yes.
9    Q.   If you could please take a look at
10 that document?          09:42:33
11   A.   Yes.
12   Q.   Having looked at the document do
13 you recall whether Acting Mayor Wingate voted
14 against the motion?
15      MR. NOVIKOFF:  The question is     09:42:40
16 without looking at this document do you
17 recall?
18      THE WITNESS:  I answered that no
19 already.
20      MR. NOVIKOFF:  But now without     09:42:46
21 looking at this document do you have an
22 independent recollection?
23   Q.   Having just looked at the
24 document?
25      MR. NOVIKOFF:  Does that refresh  09:42:54

15 (Pages 295 to 298)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 299

```
               Rogers
 1
 2    your recollection --
 3         THE WITNESS:  Yes, it does.
 4         MR. NOVIKOFF:  Got it.
 5    A.   The answer is yes.           09:43:00
 6    Q.   Do you recall why Acting Mayor
 7  Wingate voted against the motion?
 8    A.   Yes.
 9    Q.   Why did Acting Mayor Wingate vote
10  against the motion?               09:43:16
11    A.   He was opposed to one or more of
12  the people.
13    Q.   Do you recall whether he was
14  opposed to -- strike that.
15         Do you recall which people he was  09:43:42
16  opposed to?
17    A.   No.
18    Q.   Do you recall any one person who
19  he was opposed to?
20    A.   No.                         09:43:56
21    Q.   Do you recall whether Acting Mayor
22  Wingate expressed any reason for his
23  opposition to one or more people?
24    A.   No.
25    Q.   I believe when you were last here  09:44:24
```

Page 300

```
               Rogers
 1
 2  you indicated that you were a candidate for
 3  the Unitary Party when you ran for election of
 4  in Ocean Beach.
 5         MR. NOVIKOFF:  Hold on.  He asked  09:44:37
 6    the question.  As the question is formed
 7    I am going to object as asked and
 8    answered.  You can answer the question.
 9    A.   I can only answer the question by
10  telling you the name of the party is Unity  09:44:50
11  Party.
12         MR. NOVIKOFF:  Fine.
13    Q.   Thank you for that clarification.
14    A.   U-N-I-T-Y.
15    Q.   Were you a candidate for the Unity  09:44:59
16  Party in connection with all of your campaigns
17  for election at Ocean Beach?
18    A.   Yes.
19    Q.   Do you know when the Unity Party
20  was founded?                       09:45:11
21    A.   Approximately -- I won't say
22  approximately.
23         MR. NOVIKOFF:  The question is do
24    you know.
25    A.   Yes.  I know approximately.     09:45:30
```

Page 301

```
               Rogers
 1
 2    Q.   Approximately when was it founded?
 3         MR. NOVIKOFF:  Objection.
 4    A.   Approximately 1990.
 5    Q.   Do you know who founded the Unity  09:45:38
 6  Party?
 7    A.   No one person.
 8    Q.   Do you recall whether there was
 9  any sort of nomination process in connection
10  with your candidacy on the slate of the Unity  09:46:01
11  Party?
12    A.   Yes.
13    Q.   Can you explain what that process
14  involved?
15    A.   You had to get nominating        09:46:13
16  petitions signed, I believe the certain
17  minimum -- I know a certain minimum number was
18  required.  Signatures of registered voters in
19  the Incorporated Village of Ocean Beach.
20    Q.   Do you recall whether there was    09:46:32
21  any leader, head of the Unity Party at the
22  time that you ran as the candidate for the
23  Unity Party in connection with any of your
24  elections to office for Ocean Beach?
25         MR. NOVIKOFF:  Objection.         09:46:47
```

Page 302

```
               Rogers
 1
 2    A.   Yes.
 3    Q.   Who was the head of the Unity
 4  Party?
 5    A.   A person named Alan Kahn, K-A-H-N.  09:47:04
 6    Q.   Do you recall whether current
 7  Mayor Loeffler was ever a candidate for the
 8  Unity Party?
 9         MR. NOVIKOFF:  Objection.
10    Q.   Running on the slate of the Unity  09:47:19
11  Party or on the platform of the Unity Party?
12         MR. NOVIKOFF:  Objection.
13    A.   Do I recall; yes, I do recall.
14    Q.   Was he or did he?
15    A.   No.                          09:47:28
16    Q.   Do you recall whether Trustee
17  Miller ever ran on the platform or slate of
18  the Unity Party?
19         MR. NOVIKOFF:  Objection.
20    A.   Yes.                         09:47:37
21    Q.   Yes, he did?
22    A.   Yes, he did.
23    Q.   Do you recall who defeated Trustee
24  Miller in his final campaign for election to
25  the position of trustee?           09:47:49
```

16 (Pages 299 to 302)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 303

Rogers

1          Rogers
2      A.   Trustee Steven Einig, E-I-N-I-G.
3      Q.   In your first campaign for
4  election for the position of mayor of Ocean
5  Beach do you recall who if anyone else was a   09:48:12
6  candidate on the platform of the Unity Party?
7          MR. NOVIKOFF:  Objection to the
8      form.  You can answer.
9      A.   Yes.
10     Q.   Can you identify those persons?   09:48:25
11     A.   Trustee James Mallott, Trustee
12  Andrew Miller, and myself.
13     Q.   And in your second campaign for
14  this time reelection to mayor do you recall
15  who if anyone was a candidate on the platform   09:49:01
16  of the Unity Party?
17         MR. NOVIKOFF:  Objection.
18     A.   Yes, I recall.
19     Q.   Can you identify that person or
20  those persons?                09:49:09
21     A.   Trustee Mallott, Trustee Miller,
22  and myself for mayor.
23     Q.   Other than yourself and Trustee
24  Miller was there anybody else who served in
25  the capacity of Police Commissioner of Ocean   09:49:23

Page 304

Rogers

1          Rogers
2  Beach during your service as a trustee or
3  mayor of Ocean Beach?
4          MR. NOVIKOFF:  Objection to the
5      form.                  09:49:37
6      A.   During the time that I was a
7  trustee; not to my recollection.
8      Q.   To your recollection was Trustee
9  Miller a Police Commissioner at the time that
10  you were first elected as trustee of Ocean   09:49:51
11  Beach?
12         MR. NOVIKOFF:  Objection.
13     A.   Yes, he was.
14     Q.   Do you recall or do you have any
15  information concerning how Trustee Miller came   09:50:02
16  to serve in the position as Police
17  Commissioner of Ocean Beach?
18     A.   Yes, I do.
19     Q.   Could you explain what information
20  you have on that topic?           09:50:17
21     A.   When I became mayor I appointed
22  him as the Police Commissioner.
23     Q.   Why did you select Trustee Miller
24  as Police Commissioner when you became mayor?
25     A.   He had very good background and   09:50:28

Page 305

Rogers

1          Rogers
2  credentials.
3      Q.   Did you at that time consider
4  anyone else for appointment to the position of
5  Police Commissioner?           09:50:39
6      A.   No, I did not.
7      Q.   To your knowledge does current
8  Mayor Loeffler have any prior law or any law
9  enforcement experience?
10         MR. NOVIKOFF:  Note my objection   09:50:56
11     to the beginning of the question.  You
12     can answer.
13     Q.   Let me rephrase that again.
14         Do you have any information
15  concerning whether Trustee Loeffler has any   09:51:03
16  law enforcement experience; excuse me, current
17  Mayor Loeffler?
18     A.   Yes.
19     Q.   What information do you have with
20  respect to that issue?           09:51:15
21     A.   I believe -- scrap the I believe.
22         He was in Suffolk County, in
23  Suffolk County law enforcement as a detective.
24     Q.   Is there any other law enforcement
25  experience that you are aware of?      09:51:31

Page 306

Rogers

1          Rogers
2      A.   I don't know.
3      Q.   What was the law enforcement
4  experience if any that Trustee Miller had at
5  the time that you appointed him?      09:51:41
6          MR. NOVIKOFF:  Objection.  To the
7      extent that you know or have information.
8      A.   I don't recall.
9      Q.   Do you recall whether he had any
10  law enforcement experience at that time?   09:51:55
11     A.   He was not a police officer.
12     Q.   What specifically did you consider
13  to be relevant qualifications that Trustee
14  Miller possessed at the time that you
15  appointed him as Police Commissioner?   09:52:21
16     A.   Oversight.
17     Q.   Oversight with respect to what?
18     A.   Police matters.
19     Q.   Did he have prior experience with
20  oversight with respect to police matters?   09:52:32
21     A.   I believe so.
22     Q.   Could you expand on that at all?
23     A.   No, I don't recall the details.
24     Q.   When Trustee Miller was defeated
25  in his campaign for reelection to the position 09:52:51

TSG Reporting - Worldwide     877-702-9580

52454300-d00b-489d-a580-7c861cc4cc2d

Page 307

```
 1           Rogers
 2  of trustee at Ocean Beach were you the next
 3  person to serve as Police Commissioner of
 4  Ocean Beach?
 5      A.  Yes.                    09:53:00
 6      Q.  How were you selected to serve as
 7  Police Commissioner of Ocean Beach?
 8      A.  I made a determination myself.
 9      Q.  Did anybody else need to approve
10  your selection to serve in that position?  09:53:16
11          MR. NOVIKOFF:  Objection.  You can
12  answer.
13      A.  The board approved it.
14      Q.  Was that by motion?
15      A.  I don't recall.           09:53:30
16      Q.  Did you have -- strike that.
17          I believe that when you were last
18  here you testified that at the time that you
19  appointed yourself as Police Commissioner you
20  had no prior law enforcement experience; is    09:53:44
21  that correct?
22          MR. NOVIKOFF:  Objection to the
23      form of the question.  On its face it was
24      asked and answered.  You can answer the
25      question.                   09:53:52
```

Page 308

```
 1           Rogers
 2      A.  Except having been on the board as
 3  a trustee and a prior mayor.
 4      Q.  Was Mayor Loeffler a trustee at
 5  the time that you appointed yourself as Police  09:54:10
 6  Commissioner?
 7      A.  Yes.
 8      Q.  Other than Mayor Loeffler did any
 9  of the other trustees at that time have prior
10  law enforcement experience that you are aware  09:54:22
11  of?
12      A.  I was aware of none.
13      Q.  Did you consider appointing
14  Trustee Loeffler to the position of Police
15  Commissioner at that time?           09:54:32
16      A.  I did.
17      Q.  Why did you decide ultimately not
18  to appoint him to that position?
19      A.  He indicated to me that he did not
20  want the position.               09:54:42
21      Q.  Did he explain why he didn't want
22  that position to you?
23      A.  He said he didn't want it.
24      Q.  Did you ask him why he didn't want
25  it?                         09:54:55
```

Page 309

```
 1           Rogers
 2      A.  I don't know.
 3      Q.  I am sorry, did you say that you
 4  don't know or no is the answer?
 5      A.  The answer is no.        09:55:01
 6      Q.  Did you believe that you
 7  understood why he didn't want the position?
 8          MR. NOVIKOFF:  Objection.
 9      A.  Yes, I understood it.
10      Q.  What did you believe the basis for  09:55:16
11  his not wanting the position was at that time?
12      A.  I thought he might be concerned
13  about a possible conflict which he did not
14  want.
15      Q.  What conflict, possible conflict   09:55:30
16  are you referring to?
17      A.  I don't know.  That was my
18  perception.
19      Q.  Do you have any information
20  concerning the possible conflict that you just  09:55:46
21  referred to?
22      A.  No.
23      Q.  Can you identify any basis at all
24  for believing that he was concerned about a
25  possible conflict?               09:55:57
```

Page 310

```
 1           Rogers
 2      A.  He told me he didn't want it.
 3  Everything else was my understanding.
 4      Q.  To your understanding other than
 5  possible conflict was there any more to your   09:56:12
 6  understanding of that issue?
 7      A.  No.
 8          MR. NOVIKOFF:  Objection to the
 9      form.  You can answer.
10      A.  Not that I know of.        09:56:21
11      Q.  Did you discuss with Trustee
12  Loeffler whether it would be appropriate for
13  you to designate yourself as Police
14  Commissioner?
15      A.  Yes.                    09:56:29
16      Q.  Did he express any opinion on that
17  issue?
18      A.  He agreed.
19      Q.  He agreed that --
20      A.  That it would be appropriate.   09:56:43
21      Q.  Did he explain why he thought it
22  would be appropriate?
23          MR. NOVIKOFF:  Yes or no.
24      A.  Yes.
25      Q.  What did he explain?       09:56:55
```

18 (Pages 307 to 310)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 311

**Rogers**

1        A.  I have been mayor for the last
2   four years.  I have been a trustee for seven
3   years prior to that.  I had Ocean Beach
4   background that was extensive.        09:57:04
5        **Q.   At the time that you offered**
6   **Trustee Loeffler the position of Police**
7   **Commissioner did you indicate to him that you**
8   **were also considering yourself for that**
9   **position?**                      09:57:24
10          MR. NOVIKOFF:  Objection to the
11      form.  I don't know if she ever said she
12      offered him the position, but you can
13      answer.
14       A.   No.                    09:57:32
15       **Q.   Was it only after Trustee Loeffler**
16   **indicated to you that he did not want the**
17   **position that you first raised the possibility**
18   **with him of appointing yourself to that**
19   **position?**                      09:57:43
20       A.   To the best of my recollection,
21   yes.
22       **Q.   Do you recall whether any of the**
23   **other trustees expressed any opinion as to**
24   **whether it would be appropriate for you to**   09:57:54

Page 312

**Rogers**

1   **appoint yourself to the position of Police**
2   **Commissioner at that time?**
3          MR. NOVIKOFF:  At what time?
4          MR. GRAFF:  The time that she       09:58:01
5      appointed herself to the --
6          MR. NOVIKOFF:  There is two time
7      periods.  One when the board voted and
8      approved it, and then the time when you
9      said she has a conversation with Loeffler  09:58:12
10     about it.  So I object to form.  Are you
11     referring to during the meeting when they
12     approved it or at any point in time?
13       **Q.   At any point in time?**
14          MR. NOVIKOFF:  Objection to the    09:58:21
15     form.  You can answer the question.
16       A.   The question was did anybody else
17     have any interest in being -- in taking that
18     position, is that the question?
19       **Q.   That actually wasn't.  But let me**  09:58:40
20   **ask that question.**
21       A.   Rephrase it, please.
22       **Q.   Did anybody else express an**
23   **interest in succeeding Trustee Miller as**
24   **Police Commissioner of Ocean Beach?**    09:58:51

Page 313

**Rogers**

1        A.  I believe so.
2        **Q.   Who else expressed an interest?**
3        A.  Trustee Einig.
4        **Q.   Were you aware of any prior law**    09:59:14
5   **enforcement experience that Trustee Einig**
6   **possessed at that time?**
7        A.  No.  No, I was not aware.
8        **Q.   Did you have any discussions with**
9   **Trustee Einig concerning his interest in being** 09:59:34
10  **appointed as Police Commissioner at that time?**
11       A.  No.
12       **Q.   Did you have any discussions with**
13  **anyone concerning Trustee Einig's interest in**
14  **being appointed as Police Commissioner at that** 09:59:46
15  **time?**
16       A.  No.
17       **Q.   Does that mean you had no**
18  **conversations with Trustee Loeffler?**
19          MR. NOVIKOFF:  Is that a question   10:00:06
20      or statement; you asked the question, she
21      said no.  So what is the question?
22       **Q.   Did you have any conversations**
23  **with Trustee Loeffler concerning Trustee**
24  **Einig's interest in serving as Police**        10:00:19

Page 314

**Rogers**

1   **Commissioner?**
2        A.  Yes.
3        **Q.   A moment ago --**
4        A.  I said yes.                10:00:33
5        **Q.   A moment ago when I asked if you**
6   **had any conversations with anyone concerning**
7   **Trustee Einig's interest in serving as Police**
8   **Commissioner you responded no.**
9          MR. NOVIKOFF:  Objection to the    10:00:46
10      form, the testimony is what it is.  Do
11      you have a question?
12       A.  Go ahead.
13       **Q.   Are you correcting that testimony?**
14          MR. NOVIKOFF:  Hold on.  Is that   10:00:58
15      the question, are you correcting that
16      testimony?
17          MR. GRAFF:  No, if you would let
18      me ask the question.
19       **Q.   Are you correcting that testimony** 10:01:05
20  **with respect to your indication that you did**
21  **have conversations with Trustee Loeffler?**
22          MR. NOVIKOFF:  Objection to the
23      form.  Her testimony is what her
24      testimony is.  She is also entitled under  10:01:14

19  (Pages 311 to 314)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 315

```
1          Rogers
2    the Federal rules after the deposition to
3    review her transcript and make any
4    corrections.  Subject to those objections
5    you can answer the question.        10:01:24
6       A.  Yes.
7       Q.  What conversations did you have
8    with Trustee Loeffler concerning that issue?
9       A.  Very brief.  Neither one of us
10   felt that it was the proper and appropriate   10:01:45
11   designation.
12      Q.  Do you recall why you believed
13   that it was not the appropriate designation?
14          MR. NOVIKOFF:  Why specifically
15   Ms. Rogers believed?              10:02:04
16          MR. GRAFF:  Yes.
17          MR. NOVIKOFF:  You can answer.
18      A.  Trustee Einig has a fairly
19   volatile temperament that was not deemed to be
20   in accordance with what I considered        10:02:22
21   appropriate.
22      Q.  Other than Trustee Einig's
23   temperament were there any other reasons why
24   you thought it would not be appropriate to
25   appoint him as Police Commissioner at that    10:02:37
```

Page 316

```
1          Rogers
2    time?
3       A.  Not that I recall.
4       Q.  Do you recall whether Trustee
5    Loeffler expressed any explanation for why he  10:02:43
6    did not believe that Trustee Einig should be
7    appointed as Police Commissioner at that time?
8       A.  My only recollection is that he
9    agreed with me.
10      Q.  Would it be fair to characterize   10:02:58
11   Trustee Einig as a political opponent of yours
12   during your service as mayor of Ocean Beach?
13          MR. NOVIKOFF:  Objection.  You can
14   answer.
15      A.  Yes.                  10:03:10
16      Q.  Other than Trustee Einig's
17   temperament were there any other factors that
18   bear on your characterization of him as a
19   political opponent?
20          MR. NOVIKOFF:  Objection to the    10:03:28
21   form of the question.
22          Wait a minute, the question is
23   other than his temperament was there
24   anything that bore on her
25   characterization of him being a political  10:03:37
```

Page 317

```
1          Rogers
2    own component.  Counsel, his testimony
3    has nothing to do with her
4    characterization.
5       Your question was would it be fair  10:03:46
6    to characterize Trustee Einig as a
7    political opponent?
8          THE WITNESS:  I said yes.
9          MR. NOVIKOFF:  There was nothing
10   about his temperament that bore on the    10:03:56
11   question of being a political opponent.
12   So I object to the form of the question.
13   If you can possibly answer it go ahead.
14          MR. GRAFF:  Let me strike that.
15          MR. NOVIKOFF:  Okay.        10:04:05
16      Q.  Why would you agree that it is
17   fair to characterize Trustee Einig as a
18   political opponent of yours during your
19   service as mayor of Ocean Beach?
20      A.  His opinion on many issues was     10:04:19
21   very different and in some cases contrary to
22   mine.
23      Q.  Do you recall whether any of the
24   issues that you referring to related to the
25   Ocean Beach Police Department?          10:04:31
```

Page 318

```
1          Rogers
2       A.  No, I do not.
3       Q.  Do you recall whether any of the
4    issues you are referring to related to
5    employees at Ocean Beach?              10:04:42
6          MR. NOVIKOFF:  Outside of the
7    Police Department?
8          MR. GRAFF:  Yes.
9          MR. NOVIKOFF:  Okay, you can
10   answer.                    10:04:48
11      A.  No, I do not.
12      Q.  Do you recall any of the specific
13   issues that you are referring to?
14          MR. NOVIKOFF:  I think you are
15   bordering on harassing because this issue  10:04:56
16   is irrelevant, but you can answer the
17   question.
18      A.  Zoning, building, street cleaning,
19   noise, ferry schedules, to name a few.
20          MR. NOVIKOFF:  Would you like to   10:05:24
21   leave a space in the transcript and if
22   there are more issues that Ms. Rogers can
23   recall?
24       I guess not.
25          MR. GRAFF:  Sure.  Leave a space   10:05:38
```

20 (Pages 315 to 318)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 319

```
1              Rogers
2     in the transcript if you would like to
3     fill in some other issues.
4  TO BE FURNISHED _____.
5  _____  10:05:44
6     Q.  Do you recall whether Trustee
7  Einig ever expressed any views with respect to
8  the operation of the Ocean Beach Police
9  Department?
10         MR. NOVIKOFF:  While Mayor Rogers  10:05:51
11    was mayor?
12         MR. GRAFF:  I am asking ever that
13    she can recall.
14         MR. NOVIKOFF:  Go ahead.
15    Objection to the form.  You can answer  10:06:01
16    the question.
17    A.  Yes.
18    Q.  What views do you recall Trustee
19  Einig expressing on that issue?
20    A.  Enforcement.  Enforcement of laws.  10:06:15
21    Q.  What aspect of enforcement of laws
22  did he express a view on?
23    A.  Noise, bicycle riding, eating on
24  the streets.
25    Q.  What view did he express with  10:06:48
```

Page 320

```
1              Rogers
2   respect to enforcement of laws in those areas?
3          MR. NOVIKOFF:  Objection to the
4     form.  If you want to break it down then
5     I won't object.  But Mayor Rogers refers  10:07:02
6     to a number of different topics, so I
7     object to the form of the question.  You
8     can answer.
9     A.  In general I believe he was
10   looking for stricter enforcement.  10:07:11
11    Q.  And did you share his view with
12  respect to that issue?
13         MR. NOVIKOFF:  Objection.
14    A.  Not in the form it was given.
15    Q.  In what form was his view on those  10:07:27
16  issues given?
17         MR. NOVIKOFF:  Objection to the
18    form.  You can answer if you can.
19    A.  I can't answer that.
20    Q.  Did Trustee Einig express his  10:07:51
21  views on those issues prior to your
22  appointment as Police Commissioner?
23    A.  I don't believe so.
24    Q.  Did he express those views during
25  your service as Police Commissioner?  10:08:08
```

Page 321

```
1              Rogers
2     A.  Yes.
3     Q.  Do you believe that there was any
4  merit to Trustee Einig's view that stricter
5  enforcement in those areas would be  10:08:28
6  appropriate or beneficial?
7          MR. NOVIKOFF:  Any merit, even
8     like a scintilla of merit; okay, I am
9     going to object.  That is a pretty broad
10    question.  10:08:43
11    A.  A scintilla of merit.
12    Q.  Did you believe that enforcement
13  with respect to those issues was being
14  conducted appropriately during your service as
15  Police Commissioner?  10:08:57
16         MR. NOVIKOFF:  Objection to the
17    form.  You can answer.
18    A.  Not a hundred percent, no.
19    Q.  How would you characterize the
20  scintilla or the basis for the scintilla of  10:09:18
21  merit that you saw in Trustee Einig's views
22  with respect to those issues during your
23  service as Police Commissioner?
24         MR. NOVIKOFF:  That is an
25    unrelated compound question.  I object to  10:09:39
```

Page 322

```
1              Rogers
2     form.  You can answer if you can.
3     A.  These are not black and white
4  issues.  It is all a matter of degree.  Very
5  difficult to say that there is never some  10:09:52
6  merit to an opposing view.  There was some
7  merit, very small in my judgment, to some of
8  his concerns.
9     Q.  During your service as Police
10 Commissioner did you discuss Trustee Einig's  10:10:14
11 concerns with respect to the strictness of
12 enforcement with Trustee Loeffler?
13    A.  Yes.
14    Q.  In substance what do you recall of
15 those conversations with Trustee Loeffler?  10:10:35
16    A.  They were generally in executive
17 session where other people were there.
18    Q.  Do you recall in substance what
19 Trustee Loeffler expressed with respect to the
20 issue of Trustee Einig's concerns?  10:10:57
21         MR. NOVIKOFF:  In executive
22    session?
23         MR. GRAFF:  Yes.
24         MR. NOVIKOFF:  Just again note my
25    objection.  I believe it does invade  10:11:07
```

21  (Pages 319 to 322)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 323

```
 1           Rogers
 2     attorney/client privilege, but in light
 3     of Judge Boyle's ruling you have to
 4     answer the question.
 5        A.  No. I do not recall.        10:11:20
 6        Q.  Do you recall anything that was
 7     discussed in executive session concerning
 8     Trustee Einig's views with respect to the
 9     strictness of the enforcement of laws on Ocean
10     Beach?                          10:11:35
11           MR. NOVIKOFF:  Same objection.
12        A.  No, I don't recall.
13        Q.  Do you recall that when you were
14     last here we spoke about an incident involving
15     an injury to a person who was drunk and    10:12:00
16     arrested by Ocean Beach police officers?
17           MR. NOVIKOFF:  Don't answer yet.
18     Objection.  If you have something in the
19     transcript that you want to refer her to,
20     please do so.  Otherwise it has been    10:12:20
21     asked and answered.  You may answer the
22     question.
23        A.  Yes, I recall.
24        Q.  Other than that incident are you
25     aware of any other incidents wherein any    10:12:29
```

Page 324

```
 1           Rogers
 2     person sustained injuries at the hands of
 3     Ocean Beach police officers?
 4           MR. NOVIKOFF:  Objection.  You can
 5     answer the question.        10:12:43
 6        A.  Not that I recall.
 7        Q.  How did you come to learn of the
 8     incident that you do recall?
 9        A.  I believe I told you and still
10     tell you, I heard it on the street.    10:12:58
11        Q.  Do you recall who told you on the
12     street?
13        A.  No.
14        Q.  Do you recall whether you heard it
15     on the street when it was daylight?    10:13:08
16           MR. NOVIKOFF:  Objection.  Asked
17     and answered.  This is apparently in her
18     transcript already from at least my
19     review of it, but you can answer the
20     question again.        10:13:19
21        A.  I believe it was daylight.
22        Q.  Did you hear about it from George
23     Hesse?
24           MR. NOVIKOFF:  Objection.  Asked
25     and answered.  You can answer again.    10:13:31
```

Page 325

```
 1           Rogers
 2        Q.  That is did you first hear about
 3     it from George Hesse?
 4        A.  No.
 5           MR. NOVIKOFF:  Objection.  Asked    10:13:37
 6     and answered.
 7        Q.  Upon hearing about it from someone
 8     else did you inquire about the incident of
 9     George Hesse?
10           MR. NOVIKOFF:  To the extent it is 10:13:47
11     already in her testimony, asked and
12     answered.
13        A.  Yes.
14        Q.  What did George Hesse say to you
15     about that incident?        10:13:55
16           MR. NOVIKOFF:  Asked and answered.
17     You can answer again.
18        A.  He told me that the individual who
19     was injured had been in a bar, I believe it
20     was CJ's, had too much to drink, was    10:14:14
21     exceedingly intoxicated.  And I don't know if
22     I remember how he got into the police station,
23     I don't believe I remember that at all.  And
24     then certain matters occurred whereby he ended
25     up falling down, a clock fell on him.    10:14:39
```

Page 326

```
 1           Rogers
 2           He left the police station, banged
 3     on the door and got back in, and was
 4     subsequently restrained.  That is about it.
 5        Q.  Did you have more than one such    10:15:05
 6     conversation with George Hesse about that
 7     incident?
 8        A.  I don't remember.
 9        Q.  Do you recall what information you
10     had about that incident at the time that you   10:15:15
11     spoke with George Hesse about the incident;
12     that is information independent of what George
13     Hesse said to you?
14           MR. NOVIKOFF:  Objection.  Asked
15     and answered.  You can answer.        10:15:26
16        A.  Other people told me that that was
17     essentially correct and that there were a
18     number of people in the bar who had observed
19     the behavior of the person who was injured.
20        Q.  Did they observe his behavior --    10:15:50
21     did they advise you that they had observed his
22     behavior prior to the time that the individual
23     sustained his injuries?
24        A.  I don't know, I didn't question
25     the people.        10:16:07
```

22 (Pages 323 to 326)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 327

```
              Rogers
 1
 2     Q.   Did you have any information
 3  before your conversation with George Hesse
 4  concerning the nature of the injuries
 5  sustained by that individual?          10:16:18
 6     A.   No.
 7     Q.   In your conversation with George
 8  Hesse did you discuss anything with respect to
 9  the nature of the injuries sustained by that
10  individual?                            10:16:34
11     A.   I don't believe I was aware of the
12  nature of the injuries at the time that I
13  talked to George Hesse.
14     Q.   Other than in conversations with
15  counsel did you at some point learn of the   10:16:45
16  nature of the injuries sustained by that
17  individual?
18     A.   Yes.
19     Q.   And what did you learn of the
20  nature of those injuries?               10:16:58
21     A.   That there was a ruptured --
22  allegedly a ruptured spleen.
23     Q.   How did you learn of the
24  allegation of a ruptured spleen?
25     A.   I think I read it in the paper.   10:17:15
```

Page 328

```
              Rogers
 1
 2     Q.   After reading that in the
 3  paragraph did you have any further
 4  conversations with George Hesse with respect
 5  to that incident?                      10:17:39
 6     A.   No.
 7     Q.   Outside of the presence of counsel
 8  did you have any conversations with anyone
 9  with respect to that incident after learning
10  of the nature of the injuries in the paper?   10:17:56
11     A.   On advice of counsel --
12        MR. NOVIKOFF:  Outside the
13     presence of counsel.
14     A.   Of counsel, no.
15     Q.   Was the extent of the injuries   10:18:08
16  that you read in the paper consistent in your
17  mind with the statements about the incident
18  that George Hesse had previously made to you?
19        MR. CONNOLLY:  Objection.
20        MR. NOVIKOFF:  I join in.  I think 10:18:27
21     you have a foundation problem with the
22     question.  But you can answer the
23     question.
24     A.   Consistent; I really didn't
25  evaluate it, or try to.                10:18:44
```

Page 329

```
              Rogers
 1
 2     Q.   When George Hesse told you
 3  something about a clock falling down in
 4  connection with this incident was it your
 5  understanding that the individual sustained   10:18:55
 6  his injuries as a result of being struck by
 7  the falling clock?
 8        MR. NOVIKOFF:  Objection.
 9     A.   Not directly.
10     Q.   What if anything was your         10:19:04
11  understanding of how that individual came to
12  sustain his injuries?
13     A.   I didn't know.
14     Q.   Did you ask George Hesse when you
15  spoke with him about this issue how the       10:19:20
16  individual in question came to sustain his
17  injuries?
18        MR. NOVIKOFF:  Objection.
19     Foundation.
20     A.   No, because --             10:19:27
21        MR. NOVIKOFF:  The answer is no.
22     Q.   Why didn't you ask George Hesse
23  about that at that time?
24        MR. NOVIKOFF:  Objection.  I don't
25     think you established any foundation that 10:19:34
```

Page 330

```
              Rogers
 1
 2  George Hesse was aware of what actual
 3  injuries took place.  That is my
 4  objection, you can answer.
 5     A.   That is my answer, because I      10:19:43
 6  didn't know at that time.
 7     Q.   Why did you speak with George
 8  Hesse about that issue at that time; that is
 9  about the incident at that time?
10        MR. NOVIKOFF:  Is the question why  10:19:52
11     she didn't talk to George Hesse about it?
12        MR. GRAFF:  No, why did she.
13        MR. NOVIKOFF:  Go ahead.
14     A.   Because I heard about it on the
15  street and I inquired about it.           10:20:00
16     Q.   Why did you inquire of George
17  Hesse about that incident?
18     A.   He was Deputy Police Chief.
19     Q.   Did you inquire of anybody else
20  about that incident?                   10:20:15
21        MR. NOVIKOFF:  You can answer.
22     A.   No.
23     Q.   As you sit here today do you know
24  whether that individual in fact sustained a
25  ruptured spleen?                       10:20:33
```

23 (Pages 327 to 330)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 331

```
1            Rogers
2         MR. NOVIKOFF:  Other than from
3   what she read in newspaper; she testified
4   that she read in Newsday that the
5   individual suffered a ruptured spleen.   10:20:41
6   So is the question other than what she
7   read is she aware --
8         MR. GRAFF:  I believe she
9   testified that there was an allegation in
10  the paper.  I am asking now whether she   10:20:50
11  ever obtained further information.
12        MR. NOVIKOFF:  That is fine.
13  Okay.  Other than from counsel.
14     A.   Other than in the presence of
15  counsel?                  10:21:02
16        MR. NOVIKOFF:  Right.
17     A.   No.
18     Q.   Did you ever read a press release
19  issued by the district attorney in connection
20  with its investigation of this incident?   10:21:30
21     A.   I read several articles in the
22  newspaper.  I don't know if that was a result
23  of a press release by the district attorney.
24        MR. NOVIKOFF:  I am going to voice
25  an objection.  I am not going to instruct   10:21:48
```

Page 332

```
1            Rogers
2   you not to answer.  I believe you are now
3   litigating another case other than this,
4   and at the appropriate time I will move
5   for costs.  But rather than fight that   10:21:58
6   battle now I want Ms. Rogers to complete
7   her deposition.  So I am just going to
8   note that and you can answer the question
9   Ms. Rogers.
10     Q.   Based on the information conveyed   10:22:12
11  to you in your conversation with George Hesse
12  and anything else that you may have learned
13  about the incident from the newspaper, did you
14  at any point come to form a personal belief as
15  to the veracity of George Hesse's description   10:22:32
16  of the incident?
17        MR. NOVIKOFF:  Not my objection,
18  you can answer.
19        MR. CONNOLLY:  Objection.
20     A.   I had an opinion, yes.      10:22:45
21     Q.   What opinion did you have?
22        MR. NOVIKOFF:  Note my objection,
23  you can answer.
24     A.   I felt that his description was
25  reasonably valid.               10:23:05
```

Page 333

```
1            Rogers
2     Q.   And when you say reasonably valid,
3   does that mean something different than valid?
4         MR. NOVIKOFF:  Objection.
5     A.   That means I had no opinion on     10:23:20
6   every item of conversation on this, on every
7   particular detail.  I had no way of knowing,
8   therefore I had some modest concern.
9     Q.   Could you explain the nature of
10  the modest concern that you just referred to?   10:23:50
11     A.   No more than I just told you.
12     Q.   Did you form a personal opinion as
13  to whether George Hesse's statements about the
14  incident were inaccurate in any respect?
15        MR. NOVIKOFF:  Objection to the     10:24:08
16  form.  You can answer.
17        MR. CONNOLLY:  Objection.
18        MR. NOVIKOFF:  I think it is asked
19  and answered, but go ahead.
20     A.   I just told you, that I felt that   10:24:15
21  he was reasonably valid, that there was
22  possibly some opinion that he gave me that
23  could be questionable, but I wasn't there, so
24  I couldn't balance it against anything that I
25  knew.                         10:24:35
```

Page 334

```
1            Rogers
2     Q.   How long have you known George
3   Hesse?
4     A.   Since I was on the board as a
5   trustee, I don't know at what point he became   10:24:52
6   a member of the Police Department.  But
7   certainly since 1998.  I don't know.
8     Q.   Earlier you had referred to there
9   being two full-time police officers during the
10  off season at Ocean Beach; is that correct?     10:25:30
11     A.   Yes.
12        MR. NOVIKOFF:  Objection.  Her
13  testimony is her testimony.  You can
14  answer the question.
15     A.   Yes.                    10:25:37
16     Q.   Were those two full-time officers
17  the only police officers working at Ocean
18  Beach during the officer season?
19        MR. NOVIKOFF:  Which off season;
20  any off season?                10:25:50
21        MR. GRAFF:  That is a fair point.
22     Q.   Mayor Rogers, when you referred to
23  two full-time police officers who worked
24  during the off season, was it the case that
25  there were only two full-time police officers   10:26:05
```

24 (Pages 331 to 334)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 335

```
1            Rogers
2  throughout your service as Mayor or Police
3  Commissioner?
4       A.  Yes.
5       Q.  Were those two police officers the  10:26:14
6  only two police officers on duty in Ocean
7  Beach during the off season?
8       A.  I believe so.
9       Q.  To your knowledge were there also
10  part-time police officers who were employed by  10:26:28
11  Ocean Beach during the off season?
12       A.  Not to my knowledge.
13       Q.  Who were the two full-time police
14  officers that you referred to?
15       A.  Ed Paradiso and George Hesse.  10:26:44
16       Q.  To your knowledge was George Hesse
17  a resident of Ocean Beach at any time during
18  your service as Mayor or Police Commissioner?
19       A.  To my knowledge no.
20       Q.  To your knowledge was Ed Paradiso  10:27:03
21  a resident of Ocean Beach at any time during
22  your service as Police Commissioner?
23       A.  Yes.
24       Q.  To your knowledge was full-time
25  residency in Ocean Beach a requirement for  10:27:12
```

Page 336

```
1            Rogers
2  full-time employment as a police officer at
3  Ocean Beach at any time during your service as
4  Mayor?
5       MR. NOVIKOFF:  Objection.  You can 10:27:21
6    answer.
7       A.  I do not know.
8       Q.  To your knowledge during your
9  service as Mayor of Ocean Beach did the
10  Village Board of Trustees settle any lawsuits  10:27:49
11  that had named the Ocean Beach Police
12  Department as defendants?
13       MR. NOVIKOFF:  Objection.  You can
14    answer.
15       A.  I know of one specific one.  I  10:27:59
16  don't know of -- to my knowledge I don't know
17  of any others.
18       Q.  What is the specific lawsuit that
19  you are referring to?
20       A.  Bridget Peterson I think is the  10:28:12
21  last name.
22       Q.  Does the name David Gerdon, is the
23  name David Gerdon familiar to you?
24       A.  No.
25       Q.  Is the name Catherine Spies  10:28:35
```

Page 337

```
1            Rogers
2  familiar to you?
3       A.  Say again.
4       Q.  Catherine Spies or Spies
5  S-P-I-E-S?                      10:28:53
6       A.  I don't recall the name.
7       Q.  If you could take a look at the
8  document marked as Exhibit Rogers 9, at the
9  bottom of the document?
10       MR. NOVIKOFF:  Okay.  Where  10:29:15
11    specifically.
12       Q.  Under the signature line?
13       A.  Yes, she was deputy clerk.  I am
14  sorry, I didn't get the last name.
15       MR. NOVIKOFF:  Okay.  10:29:28
16       Q.  Am I pronouncing the name
17  correctly, Spies?
18       A.  Yes.  I didn't pay attention to
19  the last name.  Yes, you are pronouncing it
20  right.                          10:29:42
21       Q.  Was Ms. Spies the deputy village
22  clerk during your service as mayor?
23       MR. NOVIKOFF:  During the entire
24    service?
25       Q.  At any point?              10:29:50
```

Page 338

```
1            Rogers
2       A.  At any point, yes.
3       Q.  Was she deputy clerk throughout
4  your service as mayor?
5       A.  She left at some point, but I  10:30:00
6  don't remember the date.
7       Q.  As deputy clerk -- strike that.
8       Was Ms. Spies deputy clerk during
9  any portion of the period when Ms. Minerva was
10  village administrator?              10:30:18
11       A.  Yes.
12       Q.  As deputy village clerk was
13  Ms. Spies subordinate to Maryann Minerva?
14       A.  Yes.
15       Q.  Was it your understanding that  10:30:31
16  Maryann Minerva was Ms. Spies direct
17  supervisor?
18       A.  Yes.
19       Q.  Other than Maryann Minerva was
20  anybody else responsible for supervising  10:30:46
21  Ms. Spies?
22       MR. NOVIKOFF:  Directly or
23    indirectly?
24       MR. GRAFF:  To any extent.
25       MR. NOVIKOFF:  Object to the form, 10:30:58
```

25 (Pages 335 to 338)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 339

```
1            Rogers
2    you can answer.
3       A.   Not to my knowledge.
4       Q.   Did you participate in the hiring
5    process for Ms. Spies?          10:31:03
6       MR. NOVIKOFF:  Objection.  You can
7    answer.
8       A.   No.
9       Q.   Was Ms. Spies employed at Ocean
10   Beach at the time that you were first elected   10:31:11
11   to serve as trustee?
12      A.   It was 1991, I don't know.
13      Q.   To your knowledge did anyone at
14   Ocean Beach conduct performance reviews with
15   respect to Maryann Minerva's employment at   10:31:49
16   Ocean Beach?
17      MR. NOVIKOFF:  Objection.
18      A.   Not formal reviews, no.
19      Q.   Do you have any information or
20   reason to believe that informal reviews were   10:32:04
21   conducted with respect to Maryann Minerva's
22   performance in her capacity as an employee at
23   Ocean Beach?
24      A.   There were no specific formal
25   methodology of conducting performance reviews.  10:32:25
```

Page 340

```
1            Rogers
2    Informally, you know, it is a small village.
3    People say to one another how is he doing and
4    you say okay.  I don't consider that a formal
5    review.                       10:32:46
6       Q.   Did anyone ever express to you a
7    belief that Maryann Minerva was not performing
8    adequately during her employment as village
9    administrator?
10      A.   No one talked to me about it.     10:32:59
11      Q.   Do you have any information
12   concerning any discussions wherein it was
13   expressed that Maryann Minerva was not
14   performing in a satisfactory manner as village
15   administrator at Ocean Beach?        10:33:26
16      MR. NOVIKOFF:  Hold on, so the
17   question you are asking so I am clear,
18   does she have any information that other
19   people had had conversations concerning
20   the efficiency or the competency of    10:33:36
21   Maryann Minerva in her role as an
22   employee?
23      MR. GRAFF:  Yes.
24      MR. NOVIKOFF:  Okay.
25      A.   Not specifically, no.       10:33:43
```

Page 341

```
1            Rogers
2       Q.   If I asked the question, do you
3    generally have knowledge of that issue would
4    your response be the same?
5       MR. NOVIKOFF:  Objection to the    10:34:00
6    form.
7       A.   Yes, it would be the same.
8       Q.   To your knowledge did anyone --
9    strike that.
10      To your knowledge did anyone      10:34:07
11   conduct performance reviews with respect to the
12   performance of Catherine Spies in the
13   capacity of Deputy Village Clerk?
14      MR. NOVIKOFF:  Objection to the
15   form.  You can answer the question.     10:34:19
16      A.   Only Maryann Minerva.
17      Q.   To your knowledge did Ms. Minerva
18   conduct such reviews?
19      A.   No formal review was conducted.  I
20   think I answered that before.        10:34:34
21      Q.   Did Ms. Minerva express any view
22   to you with respect to her evaluation of
23   Catherine Spies performance as deputy clerk?
24      MR. NOVIKOFF:  Answer the question
25   and then I will make a comment.      10:34:53
```

Page 342

```
1            Rogers
2       A.   Nothing negative.
3       MR. NOVIKOFF:  Once again I think
4    this line of questioning about Ms. Spies,
5    unless there is some connection to the    10:35:02
6    issues in this lawsuit is completely
7    irrelevant and I will move for costs at
8    the appropriate time.
9       MR. GRAFF:  Fortunately that was
10   my last question on Ms. Spies.       10:35:10
11      MR. NOVIKOFF:  So I guess there is
12   no connection.  Go ahead.
13      MR. GRAFF:  I didn't say that, but
14   I have exhausted the line of questioning
15   to the point that I wanted to.       10:35:22
16      MR. NOVIKOFF:  Yes, you have
17   exhausted it.
18      MR. GRAFF:  Mr. Novikoff,
19   commentary is not appropriate during the
20   deposition.                     10:35:34
21      MR. NOVIKOFF:  Thanks for the
22   lessen.
23      Q.   Did you have any conversations
24   with Trustee Loeffler concerning the incident
25   involving an injury of the individual who we   10:35:56
```

26  (Pages 339 to 342)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 343

```
              Rogers
 1
 2    had been speaking about before who was injured
 3    at the Ocean Beach Police Department?
 4        A.   Not to my recollection.
 5        Q.   Did you have any conversations   10:36:07
 6    with Trustee Mallott concerning that issue?
 7           MR. NOVIKOFF:  What issue?
 8        Q.   The incident involving injuries to
 9    an individual that we had been previously
10    discussed?                            10:36:23
11           MR. NOVIKOFF:  Can you identify
12    name of the person you are referring to.
13        Q.   Mayor Rogers, do you know the name
14    of the individual who was injured at the Ocean
15    Beach Police Department?              10:36:31
16           MR. NOVIKOFF:  Allegedly.
17        A.   The last name begins with a G I
18    think, but I don't know.
19        Q.   If I told that you the name was
20    Gilbread would that refresh your recollection? 10:36:38
21        A.   Yes.
22        Q.   Did you have any conversations
23    with Ed Paradiso concerning that incident?
24           MR. NOVIKOFF:  Objection.  Asked
25    and answered.                         10:36:58
```

Page 344

```
              Rogers
 1
 2        A.   No.
 3        Q.   Did you have any conversations
 4    with Trustee Mallott; I am not sure if I got
 5    your answer?                          10:37:06
 6           MR. NOVIKOFF:  Objection.  Asked
 7    and answered.
 8        A.   I don't recall it, no.
 9        Q.   When was the last time that you
10    spoke with Ed Paradiso?               10:37:21
11        A.   After my husband passed away in
12    July, late in July Ed Paradiso came to the
13    funeral chapel, I saw him briefly for a few
14    minutes.
15        Q.   Prior to the time that Ed Paradiso 10:37:50
16    sustained an injury in connection with which
17    he ultimately went on disability did you have
18    any reason to question his performance as a
19    police chief at Ocean Beach?
20           MR. NOVIKOFF:  Objection.  You can 10:38:10
21    answer the question.
22        A.   Only what I previously discussed
23    with you.
24        Q.   That would be the time overlap
25    issue?                                10:38:25
```

Page 345

```
              Rogers
 1
 2        A.   Yes.  The working time overlap.
 3        Q.   Do you recall approximately how
 4    long before Ed Paradiso sustained his injury
 5    you learned or investigated that time overlap 10:38:35
 6    issue?
 7        A.   No, I don't recall.
 8        Q.   Do you believe that it was more
 9    than a year before?
10           MR. NOVIKOFF:  Objection.       10:38:47
11        A.   I don't know.
12        Q.   Other than that time overlap issue
13    did you ever have any reason to question Ed
14    Paradiso's integrity?
15           MR. NOVIKOFF:  Objection.       10:39:04
16        A.   No.
17        Q.   Did you ever have any reason -- up
18    until the time of that time overlap issue did
19    you ever have any reason to believe that Ed
20    Paradiso was not truthful?            10:39:16
21           MR. NOVIKOFF:  Objection.
22        A.   Only in general people have a
23    tendency to exaggerate sometimes.  Very vague,
24    no yes or no on that.
25        Q.   Did you have any reason to believe 10:39:45
```

Page 346

```
              Rogers
 1
 2    that Ed Paradiso was more prone to
 3    exaggeration than any person?
 4           MR. NOVIKOFF:  Objection.
 5        A.   To the specific question, no.    10:40:01
 6        Q.   How did you first learn of a
 7    potential question about time overlap with
 8    respect to Ed Paradiso's employment at Ocean
 9    Beach and another employer?
10           MR. NOVIKOFF:  How did she first  10:40:19
11    learn?
12           MR. GRAFF:  Yes.
13           MR. NOVIKOFF:  You can answer.
14    Once again I think this line of
15    questioning is irrelevant and I will move 10:40:26
16    for cost, but you can answer the
17    question.
18        A.   It was called to my attention by
19    the person who was the Post Mistress of Ocean
20    Beach.                                10:40:39
21        Q.   Who was that person?
22        A.   Dale Wycoff.
23        Q.   What did Ms. Wycoff say to you
24    that alerted you to that possible issue?
25        A.   That she had records from the   10:41:11
```

27  (Pages 343 to 346)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 347

```
 1           Rogers
 2  school where Ed Paradiso was a security person
 3  as far as time worked.
 4      Q.   Did she tell you how she came to
 5  obtain those records?          10:41:44
 6      A.   Not specifically, no.
 7      Q.   Did she share any information with
 8  you as to how she obtained those records?
 9      A.   She told me she was concerned and
10  she got the records.  I don't know the basis   10:41:58
11  for her concern originally.
12      Q.   To your knowledge did anybody ever
13  communicate directly with Ed Paradiso any
14  concern with respect to possible time overlap?
15      MR. NOVIKOFF:  Objection to the   10:42:15
16  beginning of the question as previously
17  indicated.  You can answer.
18      A.   I don't know if anybody did, no.
19      Q.   Do you have any information that
20  would provide a basis to believe that somebody   10:42:31
21  may have communicated directly with Ed
22  Paradiso in connection with that issue?
23      MR. NOVIKOFF:  Form objection.
24      A.   I don't know if Dale spoke
25  directly to him or not.  I don't believe she   10:42:46
```

Page 348

```
 1           Rogers
 2  told me.
 3      Q.   To your knowledge did Gale Wycoff
 4  ever serve in any capacity as the Ocean Beach
 5  Police Department?              10:43:01
 6      MR. NOVIKOFF:  Objection.
 7  Beginning of the sentence.  You can
 8  answer.
 9      A.   To my knowledge, no.
10      Q.   Just to be clear, are we talking   10:43:07
11  about Gale with a G?
12      A.   Dale, D-A-L-E.
13      Q.   Thank you.
14      To your knowledge did Dale Wycoff
15  have any family members who ever served in any   10:43:19
16  capacity at Ocean Beach?
17      MR. NOVIKOFF:  Objection.
18      A.   I don't know.  I really don't
19  know.
20      Q.   Do you know who Marisa Wycoff is?   10:43:31
21      A.   Who?
22      Q.   Marisa Wycoff?
23      A.   No.
24      MR. NOVIKOFF:  Note my objection.
25  I think these questions are also patently   10:43:47
```

Page 349

```
 1           Rogers
 2  irrelevant and I will be moving for cost
 3  at the appropriate time, but you can
 4  answer the question.
 5      A.   I don't.            10:44:00
 6      MR. GRAFF:  I don't agree that
 7  they are patently irrelevant.
 8      Q.   Was the answer no, you don't know
 9  who?
10      A.   Yes.               10:44:11
11      MR. GRAFF:  I would like to take a
12  brief break, I believe we have
13  approximately 40 minutes remaining.
14      MR. NOVIKOFF:  I don't know, let's
15  find out from the videographer.   10:44:20
16      THE VIDEOGRAPHER:  The time is
17  10:44.  We are now off the record.
18      (Recess taken.)
19      THE VIDEOGRAPHER:  This is the
20  start of tape number 3.  The time is   10:57:26
21  10:57 a.m., we are now back on the
22  record.
23      Q.   Mayor Rogers, do you know whether
24  George Hesse was a resident of Ocean Beach at
25  time that he was appointed Acting Police   10:57:39
```

Page 350

```
 1           Rogers
 2  Chief?
 3      A.   I don't know.
 4      Q.   During your service as Mayor
 5  and/or Police Commissioner did Ocean Beach   10:57:46
 6  have any formal written rules pertaining to
 7  the conduct of the Ocean Beach Police
 8  Department?
 9      MR. NOVIKOFF:  Objection.  You can
10  answer.                10:57:58
11      A.   I don't know.
12      Q.   Have you ever -- strike that.
13      Do you know who Mitch Burns is?
14      A.   No.
15      Q.   Have you ever heard that name   10:58:10
16  prior to my saying it just a moment ago?
17      A.   Mitch Burns?
18      Q.   Burns, yes.
19      A.   Not that I can recall.
20      Q.   Do you know who Doug Wycoff is?   10:58:20
21      A.   Yes.
22      Q.   Who is Doug Wycoff?
23      A.   I think that is Dale's husband.
24      Q.   Have you met him before?
25      A.   Yes, I have seen him.  I say   10:58:32
```

28  (Pages 347 to 350)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 351

1            Rogers
2  hello.
3      Q.   To your knowledge was he employed
4  in Ocean Beach during your service as Mayor
5  and Police Commissioner?              10:58:40
6      A.   I don't know.
7      Q.   Do you know whether he ever worked
8  as a bouncer at Ocean Beach at a bar?
9      A.   I don't know.
10     Q.   Do you know who Doug Wycoff, Jr.   10:58:52
11 is?
12     A.   I have heard the name, I couldn't
13 identify him.
14     Q.   Do you know anything at all
15 concerning Doug Wycoff, Jr.?          10:59:10
16     MR. NOVIKOFF:  Objection.
17     A.   I may be mistaken, but he -- is
18 that the son -- she had one son who died.  I
19 don't know if this is him or not.
20     Q.   You are referring to Dale Wycoff?  10:59:31
21     A.   Yes.
22     Q.   Do you know anything concerning
23 the circumstances surrounding the death of
24 Dale Wycoff's son who passed away?
25     MR. NOVIKOFF:  You are kidding me;  10:59:47

Page 352

1            Rogers
2  right?
3      MR. GRAFF:  No.
4      MR. NOVIKOFF:  You can answer the
5  question.                    10:59:50
6      A.   I may have heard that it had to do
7  with drugs.
8      Q.   Did Dale Wycoff ever express any
9  opinion to you that you understood as an
10 indication that she blamed Ed Paradiso in some  11:00:10
11 way for the death of her son?
12     A.   No.
13     Q.   Do you know who Mike Loeffler is?
14     A.   No.
15     Q.   To your knowledge does current    11:00:24
16 Mayor Joe Loeffler have any children?
17     A.   Yes, he has several.
18     Q.   To your knowledge are any of Mayor
19 Loeffler's children employed at Ocean Beach?
20     A.   Yes.              11:01:22
21     MR. NOVIKOFF:  Once again I think
22 this entire line of questioning is
23 patently irrelevant, I will move for
24 cost, but you can answer the question.
25     A.   Yes.              11:01:39

Page 353

1            Rogers
2      Q.   Mayor Rogers, did you review any
3  documents concerning Ocean Beach prior to your
4  deposition today?
5      MR. NOVIKOFF:  Between the time of  11:01:49
6  her last deposition and this?
7      MR. GRAFF:  Yes.
8      MR. NOVIKOFF:  So the question is
9  prior to your last deposition, the
10 conclusion of that and today did you      11:01:58
11 review any documents concerning Ocean
12 Beach?
13     A.   No.
14     Q.   In the weeks prior to your first
15 day of deposition testimony did you review any  11:02:07
16 documents concerning Ocean Beach?
17     MR. NOVIKOFF:  Objection.  Asked
18 and answered.  You can answer again.
19     A.   I didn't review any.  I threw some
20 out.  I didn't look at them.          11:02:22
21     MR. NOVIKOFF:  In the weeks prior?
22     THE WITNESS:  I was throwing out
23 papers, I have been doing that for a
24 while.
25     Q.   Did any of the documents that you  11:02:31

Page 354

1            Rogers
2  threw out refresh your recollection of
3  anything concerning Ocean Beach?
4      MR. NOVIKOFF:  Objection to the
5  form.  I think you are lacking      11:02:49
6  foundation, but you can answer the
7  question.
8      A.   No.
9      Q.   Do you know whether you threw out
10 any documents concerning the Ocean Beach      11:03:00
11 Police Department in the weeks prior to your
12 deposition?
13     A.   I don't know.
14     Q.   Other than yourself did anybody
15 else independently throw out any documents    11:03:11
16 that you had been maintaining in your home in
17 Queens?
18     MR. NOVIKOFF:  Objection to the
19 form.
20     A.   Yes.  Did anyone else other than  11:03:22
21 myself?
22     Q.   Throw away any documents
23 concerning Ocean Beach that you had been
24 maintaining there?
25     A.   Not that I know of.        11:03:31

29  (Pages 351 to 354)

TSG Reporting – Worldwide      877-702-9580

52454300-d00b-489d-a580-7c861cc4cc2d

Page 355

1           Rogers
2     Q.  Do you know whether anyone
3  searched through the documents that you
4  maintained in Queens to identify whether any
5  of those documents related to this lawsuit?    11:03:48
6     A.  Anyone?
7        MR. NOVIKOFF:  Other than
8  Ms. Rogers?
9        MR. GRAFF:  Yes.
10    A.  No.  Nobody went through any of my  11:03:59
11 papers.
12    Q.  Did you go through any of your
13 papers to identify whether any of those
14 documents pertained to the Ocean Beach Police
15 Department?                        11:04:10
16    A.  No.
17    Q.  Did you go through any of your
18 papers to determine whether any of those
19 papers related to this lawsuit?
20    A.  No.                    11:04:20
21    Q.  Other than the Unity Party are
22 there any political parties that you are aware
23 of that exist solely with respect to elections
24 in Ocean Beach?
25        MR. NOVIKOFF:  Objection.        11:04:42

Page 356

1           Rogers
2     A.  As of when?
3     Q.  At any point during your service
4  as Mayor or Police Commissioner?
5        MR. NOVIKOFF:  Objection.      11:04:49
6     A.  When I first ran the Unity Party
7  there was a party called the Better Way Party
8  I think.  Then there is something called the
9  Community Party, I don't even know who is
10 involved in it.                11:05:06
11    Q.  To your knowledge did Trustee
12 Einig run as a candidate on the slate on any
13 of either of those two parties?
14        MR. NOVIKOFF:  Objection to the
15 form.                        11:05:30
16    A.  When you run in Ocean Beach you
17 have to designate a party name.  What he
18 called the party name that he ran on I do not
19 know.
20    Q.  Do you know whether the Unity    11:05:43
21 Party ever raised funds for candidates for
22 office in Ocean Beach?
23    A.  Yes.  We did raise some funds.
24    Q.  And did the Unity Party raise
25 funds for your campaigns for office in Ocean  11:06:02

Page 357

1           Rogers
2  Beach?
3     A.  Not specifically for me, for the
4  election that was on at that time.
5     Q.  And is that the case with respect  11:06:14
6  to all of your elections for Ocean Beach?
7     A.  Yes.
8        MR. NOVIKOFF:  Note my objection
9  to this line of questioning as being
10 patently irrelevant.  But you did answer.  11:06:32
11    A.  I did answer yes.
12    Q.  Do you know whether your second
13 campaign for Mayor of Ocean Beach who was
14 responsible for allocation or disbursements of
15 the funds raised by the Unity Party?        11:06:44
16        MR. NOVIKOFF:  Same comment.
17    A.  I believe -- strike the word I
18 believe.
19        James Mallott had the checkbook.
20    Q.  Do you recall approximately the    11:07:05
21 total amount of funds that were raised by the
22 Unity Party at the time or in connection with
23 the second election that you ran for Mayor in
24 Ocean Beach?
25        MR. NOVIKOFF:  Same comment.        11:07:20

Page 358

1           Rogers
2     A.  I do not recall the amount, no.
3     Q.  Do you know whether there was ever
4  an investigation within Ocean Beach concerning
5  potential voting irregularities in connection  11:07:48
6  with any of the elections in which you were a
7  candidate for office?
8        MR. NOVIKOFF:  Same comment.
9     A.  Do I know if there was an
10 investigation, is that your question?        11:08:00
11    Q.
12        MR. NOVIKOFF:  Also object to the
13 form.  But you can answer the question.
14    A.  The answer to your question is no.
15    Q.  Do you know whether there was ever  11:08:10
16 an investigation conducted by an entity
17 outside of Ocean Beach concerning potential
18 voting irregularities in connection with
19 voters registered in Ocean Beach?
20        MR. NOVIKOFF:  Same comment.        11:08:21
21    A.  Not to my knowledge.
22        MR. NOVIKOFF:  Do you have a good
23 faith basis, counselor, other than your
24 client passing you a note that there was
25 some investigation by some entity other  11:08:34

30  (Pages 355 to 358)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 359

Rogers

1        Rogers
2   than Ocean Beach?
3        MR. GRAFF:  Mr. Novikoff, I am
4   taking a deposition.
5        MR. NOVIKOFF:  I am asking you, do  11:08:42
6   you have a good faith basis to ask that
7   question because that is the foundation
8   of all questions.
9        MR. GRAFF:  I don't believe that I
10  am required to represent that to you, but  11:08:50
11  I will indicate that yes I do have a good
12  faith basis for asking this line of
13  questioning.
14       MR. NOVIKOFF:  Okay, got you.
15       Q.   Mayor Rogers, during your      11:09:00
16  employment as Mayor and/or Police Commissioner
17  did you have any personal responsibilities
18  with respect to determining the salaries of
19  any employees at Ocean Beach?
20       A.   Yes.                          11:09:10
21       Q.   And what was the nature of your
22  responsibility in that area?
23       A.   I set the approximate increase
24  across the board for salaries at approximately
25  3 and a half percent, and I reviewed any    11:09:39

Page 360

1        Rogers
2   possible special considerations.
3        Q.   Do you recall whether you reviewed
4   any special considerations with respect to a
5   higher than 3 percent increase for any      11:10:01
6   specific employees?
7        MR. NOVIKOFF:  Objection to the
8   form.
9        A.   Yes.
10       Q.   Do you recall any of the specific  11:10:13
11  employees who that applies to?
12       A.   Kevin Schilling was in charge of
13  all construction.  I think Richard Schilling.
14  There is somebody else in the water department
15  but I can't recall his name right offhand.    11:10:49
16  Susan Cafuoco, Maryann Minerva.  That is what
17  I recall.
18       Q.   Do you recall when you had
19  occasion to review a higher than 3 percent
20  salary increase for Maryann Minerva?        11:11:25
21       A.   I don't know the date, but it was
22  at the time that she took on the job of
23  Administrator and Village Clerk combined.  A
24  prior administrator had left or was leaving.
25       MR. NOVIKOFF:  I repeat my prior    11:11:47

Page 361

1        Rogers
2   comment about the patently irrelevancy of
3   these questions, but you can answer.
4        Q.   Was that the only such occasion
5   when you reviewed a higher than 3 percent    11:11:57
6   salary increase for Maryann Minerva?
7        MR. NOVIKOFF:  Same comment.
8        A.   Yes.
9        Q.   And do you recall what percentage
10  salary increase you reviewed for Maryann     11:12:12
11  Minerva at that time?
12       MR. NOVIKOFF:  Same comment.
13       A.   It was a flat increase, not a
14  percentage as I recall.
15       Q.   Do you recall the amount of that  11:12:23
16  flat increase?
17       A.   No.
18       Q.   What about with respect to Susan
19  Cafuoco, when did you have an occasion to
20  review a higher than 3 percent salary increase  11:12:34
21  for Susan Cafuoco?
22       MR. NOVIKOFF:  Same comment.
23       A.   When she took on the duties of --
24  after Cathy Spies left when she took on some
25  of the duties of Deputy Clerk without the    11:12:51

Page 362

1        Rogers
2   designation, but some of the duties, and
3   purchasing.
4        Q.   What was Susan Cafuoco's position
5   up until that time?                         11:13:13
6        MR. NOVIKOFF:  Same comment.
7        A.   She was a clerk.  I don't know the
8   exact title.
9        Q.   And to the extent that she was
10  fulfilling duties of Deputy Clerk was her    11:13:29
11  supervisor in that capacity Maryann Minerva?
12       MR. NOVIKOFF:  Asked and answered.
13  Same comment.
14       A.   Yes.
15       Q.   And what percent salary increase  11:13:40
16  did you review for Susan Cafuoco at that time?
17       MR. NOVIKOFF:  Same comment.
18       A.   I don't remember the percentage,
19  but it was small.
20       Q.   Did you approve that percentage    11:14:03
21  increase of whatever amount in excess of 3
22  percent for Susan Cafuoco?
23       MR. NOVIKOFF:  Same comment.
24       A.   Yes.
25       Q.   Do you recall whether that       11:14:13

31 (Pages 359 to 362)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 363

Rogers

1
2 increase that you approved was ever rescinded?
3     A.   Yes.
4         MR. NOVIKOFF:  Same comment.
5     Q.   When was it rescinded?          11:14:27
6     A.   At a meeting.
7     Q.   Do you recall why it came to be
8 rescinded?
9         MR. NOVIKOFF:  Same comment.
10     A.   Because I didn't have the votes to  11:14:37
11 hold it.
12     Q.   And what meeting are you referring
13 to?
14         MR. NOVIKOFF:  Same comment.
15     A.   A meeting of the Board of       11:14:45
16 Trustees, I cannot give you the date, I don't
17 know it.
18     Q.   Do you recall why certain members
19 of the Board of Trustees were opposed to that
20 salary increase?                        11:14:57
21         MR. NOVIKOFF:  Same comment.
22     A.   It was in the budget, but they had
23 not read the budget.
24     Q.   When they came to learn that that
25 salary increase was contained in the budget   11:15:15

Page 364

Rogers

1
2 was there any reason that you recall them
3 expressing as to why they did not want that
4 increase to go through?
5         MR. NOVIKOFF:  Same comment.   11:15:25
6     A.   They didn't want it.
7     Q.   Do you recall --
8     A.   They didn't want it.
9     Q.   Do you recall anybody explaining
10 at that meeting why they didn't want it?   11:15:32
11         MR. NOVIKOFF:  Same comment.
12     A.   They didn't want it.
13     Q.   Do you recall whether any legal
14 proceedings were ever initiated with respect
15 to that salary increase for Susan Cafuoco?   11:15:45
16         MR. NOVIKOFF:  Same comment.
17     A.   I don't believe so.
18     Q.   Mayor Rogers, have you ever made
19 any statements to any of the plaintiffs in
20 this lawsuit or in this room concerning their  11:15:59
21 performance as police officers?
22     A.   I think you asked me that last
23 time.
24         MR. NOVIKOFF:  I think you did,
25 asked and answered.              11:16:09

Page 365

Rogers

1
2     A.   Yes.
3     Q.   Which of the officers, all five of
4 whom are present today, they were not all last
5 time, which of the five --          11:16:18
6         MR. CONNOLLY:  I think there is
7 only four present.  Sorry.
8     Q.   Which of the five did you make
9 comments of that nature to?
10         MR. NOVIKOFF:  Objection.  Asked   11:16:30
11 and answered.  I move for costs, go
12 ahead.
13     A.   I think I commented regarding
14 Frank.
15     Q.   Other than Frank Fiorillo, did you  11:16:37
16 make any comments concerning the performance
17 of any of the other plaintiffs in this
18 lawsuit?
19         MR. NOVIKOFF:  Objection, asked
20 and answered, moving for costs.          11:16:45
21     A.   I don't recall.
22     Q.   Mayor Rogers, did there ever come
23 a time when you directed anyone at the --
24 strike that.
25         Did there ever come a time when    11:17:04

Page 366

Rogers

1
2 you communicated to anyone at the Ocean Beach
3 Police Department that any laws in Ocean Beach
4 should be enforced more strictly?
5     A.   Yes.                      11:17:17
6     Q.   And on how many occasions did you
7 express that view or communicate that view?
8     A.   I can't tell you the number, but
9 it was more than once.
10     Q.   To whom did you communicate that   11:17:36
11 view?
12     A.   Ed Paradiso.
13     Q.   Did you communicate that view to
14 anyone other than Ed Paradiso?
15     A.   I don't believe so, no.       11:17:45
16     Q.   Did you communicate that view to
17 Ed Paradiso prior to the time that you began
18 serving as Police Commissioner?
19     A.   No.
20     Q.   Do you recall when approximately   11:17:59
21 the first time was that you communicated that
22 view to Ed Paradiso?
23     A.   No.
24     Q.   Do you recall what you
25 communicated to Ed Paradiso on any of those   11:18:11

32  (Pages 363 to 366)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 367

Rogers

1
2 occasions with respect to this issue?
3     A.  I asked for specific information
4 as to how many summonses had been written and
5 what the nature of the complaint was, and I   11:18:28
6 asked him for a report on it.
7     Q.  Did Ed Paradiso report to you on
8 that issue?
9     A.  Yes, he did.
10     Q.  Did he report to you on that issue 11:18:39
11 more than once?
12     MR. NOVIKOFF:  Objection to the
13   form.  You can answer the question.
14     A.  Yes.
15     Q.  Do you recall how many times he   11:18:52
16 reported to you on that issue?
17     A.  No, I do not.
18     Q.  Do you recall whether any of Ed
19 Paradiso's reports to you on that issue were
20 written?                 11:19:02
21     A.  I believe so, yes.
22     Q.  To be clear, did Ed Paradiso
23 produce to you documents from the Ocean Beach
24 Police Department or did he issue a written
25 report concerning that issue?       11:19:34

Page 368

Rogers

1
2     MR. NOVIKOFF:  Objection.  I don't
3   know what the difference is, but you can
4   answer if you can.
5     A.  Documents meaning copy of     11:19:40
6 summonses?
7     Q.  Yes, any documents that were
8 existing in the course of business at the
9 Police Department?
10     MR. NOVIKOFF:  Objection.  Calls   11:19:49
11   for a legal conclusion.  You can answer.
12     A.  I don't know the documents used in
13 the course of business.  He gave me a summary.
14     Q.  Did he give you a written summary
15 more than once?             11:20:01
16     MR. NOVIKOFF:  Objection.
17     A.  I don't recall.
18     Q.  Did Ed Paradiso also report to you
19 with respect to this issue orally?
20     A.  Yes, we discussed it weekly.   11:20:14
21     Q.  And was this issue, again this is
22 the issue that you communicated to Ed
23 Paradiso, that certain laws should be
24 communicated more strictly, was this ever
25 discussed at a Village Board of Trustees   11:20:33

Page 369

Rogers

1
2 meeting?
3     MR. NOVIKOFF:  Objection to the
4   characterization of the testimony, you
5   can answer.           11:20:38
6     A.  At an open meeting I don't recall
7 it.
8     Q.  Was it ever discussed at an
9 executive session of the village board during
10 the time that you served as Police     11:20:50
11 Commissioner or Mayor?
12     A.  It may have been.
13     Q.  To the extent that it was
14 discussed in executive session do you recall
15 anything of such a conversation?     11:20:59
16     A.  No.
17     MR. NOVIKOFF:  Note my objection
18   based on attorney/client privilege, but
19   according to Judge Boyle's ruling you
20   have to answer.         11:21:11
21     A.  No.
22     Q.  On the first such occasion when Ed
23 Paradiso reported to you do you recall
24 anything of the substance of what he reported?
25     A.  No.           11:21:20

Page 370

Rogers

1
2     Q.  When Ed Paradiso reported to you
3 on this issue did you direct him to more
4 strictly enforce any laws at Ocean Beach?
5     MR. NOVIKOFF:  Any laws -- well,   11:21:32
6   objection.  You can answer.
7     A.  The word direct I don't
8 understand.  The word direct, the answer is
9 no, we had discussions about it.
10     Q.  In those discussions did you     11:21:56
11 communicate to Ed Paradiso that in your view
12 any laws at Ocean Beach should be enforced
13 more strictly?
14     A.  Yes.
15     Q.  Do you recall what specific laws   11:22:08
16 you communicated should be enforced more
17 strictly?
18     A.  The only things that I can recall
19 is the discussion about noise, about bicycle
20 riding on weekends, about supervision or     11:22:26
21 control of the 1 o'clock, 1 a.m. ferry on
22 Saturday night, Sunday morning.  That is all I
23 can recall.
24     Q.  And did you communicate to Ed
25 Paradiso more than once that those laws should 11:22:50

52454300-d00b-489d-a580-7c861cc4cc2d

Page 371

```
1              Rogers
2  be enforced more strictly?
3        MR. NOVIKOFF: Objection. Asked
4  and answered. You can answer again.
5     A. To my recollection there was more   11:22:58
6  than one discussion.
7     Q. Was it your belief that Ed
8  Paradiso was in fact following through and
9  enforcing those laws more strictly as you
10 communicated to him he should?          11:23:17
11       MR. NOVIKOFF: Objection, don't
12 know the time period, but go ahead.
13    A. I thought so.
14    Q. Did you ever communicate to Ed
15 Paradiso that you believed more summonses    11:23:29
16 should be issued by the Ocean Beach Police
17 Department?
18       MR. NOVIKOFF: Objection. Asked
19 and answered.
20    A. It was all part of enforcement.    11:23:38
21    Q. Were there any specific laws that
22 you can recall that Trustee Einig believed
23 should be enforced more strictly, but that you
24 did not believe should be enforced more
25 strictly?                         11:24:00
```

Page 372

```
1              Rogers
2        MR. NOVIKOFF: Objection. I am
3  going to move for cost. You can answer.
4  Patently irrelevant.
5     A. No.                      11:24:06
6     Q. During the time that you served as
7  Police Commissioner do you recall whether it
8  was ever discussed at a Board of Trustees
9  meeting whether somebody else should take over
10 that role?                      11:24:35
11    A. At a Board of Trustees meeting,
12 no.
13    Q. Do you recall any conversations
14 after you assumed the position of Police
15 Commissioner, do you recall any conversations  11:24:47
16 wherein it was expressed that somebody else
17 should take on that role?
18    A. Yes.
19    Q. And who expressed such a view?
20    A. Trustee Einig.           11:25:03
21    Q. Did Trustee Einig express that
22 view on more than one occasion?
23    A. I only recall one occasion.
24    Q. Do you recall when that occasion
25 was?                         11:25:17
```

Page 373

```
1              Rogers
2     A. No. Not the date, no.
3     Q. Do you recall what the context of
4  that conversation was?
5        MR. NOVIKOFF: What the context   11:25:29
6  was or what the substance of it was?
7        MR. GRAFF: Where it occurred, how
8  it was communicated.
9        MR. NOVIKOFF: Okay.
10    A. In executive session.          11:25:36
11    Q. What do you recall of the
12 substance of what Trustee Einig communicated
13 in executive session with respect to this
14 issue?
15       MR. NOVIKOFF: Note my objection   11:25:47
16 based on the prior comment, you have to
17 answer that.
18    A. He wanted to become Police
19 Commissioner.
20    Q. Do you recall if he expressed any  11:25:55
21 reason why he should become Police
22 Commissioner?
23       MR. NOVIKOFF: Same objection.
24    A. I couldn't possibly quote his
25 language.                      11:26:05
```

Page 374

```
1              Rogers
2     Q. Without asking for you to quote
3  his language, in substance do you recall any
4  reasons that he communicated to support his
5  interest in becoming Police Commissioner in   11:26:15
6  your place?
7        MR. NOVIKOFF: Same objection.
8     A. That he would try and become more
9  civil.
10    Q. And what did you -- when you say  11:26:51
11 that he in substance communicated that he
12 would try to become more civil, in what way
13 would he try to become more civil?
14       MR. NOVIKOFF: Based upon his
15 comments or based upon her perception?  11:27:07
16       MR. GRAFF: Based upon what she
17 understood from his comments.
18       MR. NOVIKOFF: Okay. Same
19 objection.
20    A. His behavior on occasion was     11:27:17
21 somewhat abusive.
22    Q. Other than trying to become more
23 civil did he express any other reasons to
24 support his desire to become Police
25 Commissioner in your place?         11:27:41
```

34 (Pages 371 to 374)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 375

**Rogers**

1
2      A.   Just that he wanted it.
3      Q.   In substance do you recall whether
4    he communicated any reasons why he would be a
5    better Police Commissioner than he believed    11:27:57
6    you were?
7          MR. NOVIKOFF:  Objection to form.
8    I don't think you established a
9    foundation, but you can answer the
10   question.                        11:28:06
11     A.   No, I do not.
12     Q.   Did Trustee Einig communicate any
13   opinion with respect to your performance as
14   Police Commissioner?
15         MR. NOVIKOFF:  Now you are laying   11:28:18
16   a foundation.  You can answer, but just
17   note my prior objection.
18     A.   It was negative.
19     Q.   And did he express that opinion on
20   more than one occasion?              11:28:43
21         MR. NOVIKOFF:  Note my prior
22   objection with regard to executive
23   session.
24     A.   I believe it was more than one
25   objection, yes.                     11:28:48

Page 376

1          Rogers
2      Q.   Did any of those occasions occur
3    outside of an executive session?
4      A.   I don't recall.
5      Q.   Do you recall whether Trustee    11:29:02
6    Einig communicated any reasons why he believed
7    that your performance as Police Commissioner
8    was negative?
9          MR. NOVIKOFF:  Same objection as
10   to executive session.               11:29:15
11     Q.   Why he had a negative -- why his
12   perception of your performance was that your
13   performance was negative?
14         MR. NOVIKOFF:  Same objection.
15     A.   I have no recall of what he said.  11:29:24
16     Q.   Other than Trustee Einig do you
17   recall whether anyone at Ocean Beach ever
18   communicated dissatisfaction to you with
19   respect to your performance as Ocean Beach
20   Police Commissioner?                 11:29:42
21     A.   No one that I know did.
22     Q.   Did Trustee Einig criticize your
23   performance as Police Commissioner?
24         MR. NOVIKOFF:  Objection.  In
25   executive session, in a newspaper, in the  11:30:01

Page 377

1          Rogers
2    streets?
3          MR. GRAFF:  Ever.
4          MR. NOVIKOFF:  Ever.  Objection to
5    the form.  Note my prior objection.     11:30:08
6      A.   He might have.
7      Q.   Can you recall in substance the
8    basis for any criticism of your performance as
9    Police Commissioner that Trustee Einig may
10   have expressed?                     11:30:27
11     A.   No, I cannot.
12     Q.   Did you at any time believe that
13   there was any merit to Trustee Einig's
14   criticism of your performance as Police
15   Commissioner?                        11:30:43
16     A.   No, I did not.
17     Q.   As you sit here today how would
18   you evaluate your own performance as Police
19   Department?
20         MR. NOVIKOFF:  Move for costs, you  11:31:00
21   can answer, this is patently irrelevant,
22   go ahead.
23     A.   I thought I did a fairly good job,
24   perhaps not as thorough as I might have.
25   Thoroughly, sorry.                  11:31:24

Page 378

1          Rogers
2      Q.   Are there any specific areas that
3    you can identify with respect to which you
4    believe you should have been more thorough
5    during your performance as Police     11:31:33
6    Commissioner?
7          MR. NOVIKOFF:  Same comment.
8      A.   No.
9      Q.   Did you ever have any -- strike
10   that.                            11:31:44
11         Did you ever communicate to George
12   Hesse that any laws in Ocean Beach should be
13   enforced more strictly?
14         MR. NOVIKOFF:  Objection.  Asked
15   and answered.                      11:31:53
16     A.   Not that I recall.
17     Q.   To your knowledge when a summons
18   is issued in Ocean Beach that results in the
19   imposition of a fine where do the funds
20   comprising those fines -- where does that  11:32:17
21   money go?
22         MR. NOVIKOFF:  Move for costs,
23   completely irrelevant.  You can answer.
24     A.   I don't know.
25     Q.   As you sit here today do you     11:32:28

35  (Pages 375 to 378)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 379

```
          Rogers
 1
 2  believe that the decision to end the
 3  employment of the plaintiffs as police
 4  officers at Ocean Beach was justified?
 5      MR. NOVIKOFF: Objection. You can  11:32:53
 6  answer.
 7      A.   You got one word there that I
 8  don't understand.
 9      Q.   Please.
10      A.   That the decision to -- what was  11:33:00
11  the word?
12      Q.   To end the employment?
13      A.   End?
14      Q.   Yes. Maybe I can make that more
15  clear.                       11:33:16
16      A.   You have to because seasonal
17  people started at the beginning of the season
18  and their employment ended by the nature of
19  the way they were employed at the end of the
20  season.                      11:33:28
21      Q.   To your knowledge during the off
22  season or between seasons were any of these
23  plaintiffs employed as police officers?
24      MR. NOVIKOFF: Objection. Asked
25  and answered.                11:33:42
```

Page 380

```
          Rogers
 1
 2      A.   I don't know.
 3      Q.   To your knowledge was the decision
 4  not to continue the employment of any of these
 5  plaintiffs as police officers justified?  11:33:56
 6      MR. NOVIKOFF: Objection. Asked
 7  and answered. Foundation. You can
 8  answer.
 9      A.   I have no basis for an opinion on
10  that. The answer is I don't know.  11:34:06
11      Q.   Did you ever, other than in the
12  presence of counsel, did you ever inquire of
13  anyone as to the reasons why these plaintiffs'
14  employment as police officers at Ocean Beach
15  did not continue?             11:34:22
16      MR. NOVIKOFF: Objection. When;
17  prior to the end of her term as mayor or
18  subsequent to the end of her term as
19  mayor?
20      Q.   At any time?         11:34:35
21      MR. NOVIKOFF: Objection to the
22  form of the question. You can answer.
23      A.   At the time that I was advised
24  about it I asked the one question of George
25  Hesse, whether or not this was in compliance  11:34:45
```

Page 381

```
          Rogers
 1
 2  with civil service regulations.
 3      Q.   And how did George Hesse in
 4  substance respond to that question?
 5      MR. NOVIKOFF: Objection. Asked  11:34:59
 6  and answered. You can answer again.
 7      A.   He said yes, it was.
 8      Q.   Did you ever inquire of George
 9  Hesse why he made that decision to discontinue
10  the employment of these police officers?  11:35:08
11      MR. NOVIKOFF: Objection. Asked
12  and answered. You can answer it.
13      A.   No, I did not.
14      Q.   Did you at any point other than in
15  the presence of counsel learn any information  11:35:24
16  concerning why the employment of these
17  plaintiffs did not continue as police
18  officers?
19      A.   Only that George Hesse told me
20  that he felt it was not in the best interest  11:35:40
21  of the village.
22      Q.   Are those his exact words as best
23  you can recall?
24      MR. NOVIKOFF: Objection.
25      A.   No. My recollection of the  11:35:49
```

Page 382

```
          Rogers
 1
 2  general context. There was no specific answer
 3  that I can recall.
 4      MR. GRAFF: Counsel, I have five
 5  minutes, if I could take a two minute  11:36:07
 6  break to wrap it up.
 7      THE VIDEOGRAPHER: The time is
 8  11:36 a.m., we are off the record.
 9      (Recess taken.)
10      THE VIDEOGRAPHER: The time is now  11:37:57
11  11:38 a.m., we are now back on the
12  record.
13      Q.   Mayor Rogers, to your knowledge
14  was there ever a point in time when Ed
15  Paradiso worked on the day shift and George  11:38:30
16  Hesse worked on the night shift?
17      MR. NOVIKOFF: As a general matter
18  or as an exception?
19      Q.   As their regular shift during her
20  employment as Mayor and Police Commissioner?  11:38:43
21      MR. NOVIKOFF: Okay, you can
22  answer.
23      A.   There was a point in time I
24  believe, yes.
25      Q.   To your knowledge did they ever  11:38:49
```

36 (Pages 379 to 382)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 383

Rogers

1   come to switch such that Hesse worked day
2   shifts and Paradiso worked the night shift?
3
4        A.   I believe so.
5        Q.   To your knowledge did the Board of   11:39:00
6   Trustees play any role in connection with that
7   shift?
8        A.   Informally, yes.
9        Q.   In what sense did the Village
10  Board of Trustees play an informal role in   11:39:14
11  connection with that transition?
12       A.   There was some discussion that it
13  was important for Ed to be seen on the night
14  shift because that is where evening problems
15  occurred, most of the problems in the village   11:39:30
16  that had to do with police matters occurred.
17       Q.   What was your understanding of why
18  it was expressed that it would be important
19  for Ed Paradiso rather than Hesse to be seen
20  on the night shift?                      11:39:50
21       A.   Because when Ed Paradiso was the
22  police chief, he was the chief, and the
23  village -- the homeowners in the village
24  wanted to see the chief working at night.
25       Q.   Do you recall whether the home   11:40:04

Page 384

Rogers

1
2   owners in the village or anyone else expressed
3   any dissatisfaction with Hesse's performance
4   on the night shift?
5        MR. NOVIKOFF:  Prior to the   11:40:15
6   switch?
7        Q.   In connection with the switch,
8   leading up to the switch?
9        MR. NOVIKOFF:  Okay, prior to the
10  switch.                                11:40:16
11       A.   Nothing that I heard.  I have
12  heard nothing.
13       Q.   Do you recall whether in any
14  Village Board of Trustees meeting anyone ever
15  expressed dissatisfaction with Hesse's   11:40:39
16  performances as a police officer.
17       MR. NOVIKOFF:  As a trustee or as
18  an individual?
19       MR. GRAFF:  As either.
20       MR. NOVIKOFF:  Break it down,   11:40:47
21  because then I object to the form.
22       MR. GRAFF:  Okay, object to the
23  form.
24       MR. NOVIKOFF:  Okay, you can
25  answer the question.                   11:40:54

Page 385

Rogers

1
2        A.   In a Board of Trustee meetings is
3   what you asked?
4        Q.   Yes.
5        A.   The answer is no.             11:40:58
6        Q.   Do you recall whether anyone ever
7   expressed to you dissatisfaction with Hesse's
8   performance as a police officer during the
9   time that you worked as a -- served as Mayor
10  or Police Commissioner?                 11:41:12
11       MR. NOVIKOFF:  Outside of presence
12  of counsel?
13       MR. GRAFF:  Yes.  Like all
14  questions, outside the presence of
15  counsel.                               11:41:21
16       MR. NOVIKOFF:  Okay.
17       A.   No, I have no specific
18  recollection of that.
19       Q.   Once Hesse switched to days and
20  Paradiso switched to nights did they continue   11:41:43
21  serving on those shifts for the duration of
22  your service as Mayor or Police Commissioner?
23       A.   I have no idea because at one
24  point Ed Paradiso ceased to function as a
25  full-time Police Commissioner, and I cannot   11:42:00

Page 386

Rogers

1
2   place the date on that.
3        Q.   Do you recall any specific
4   homeowners who expressed or communicated that
5   they wanted to see the chief on the night   11:42:10
6   shift?
7        A.   No.
8        Q.   To your knowledge did anyone ever
9   conduct formal reviews of the performance of
10  any police officers at the Ocean Beach Police   11:42:35
11  Department during the time that you served as
12  Police Commissioner?
13       MR. NOVIKOFF:  Objection.  Asked
14  and answered.  You can answer.
15       A.   To my knowledge no.           11:42:41
16       Q.   Do you recall whether Trustee
17  Loeffler communicated any opinion in
18  connection with the switch between Ed Paradiso
19  and George Hesse on the night shift and the
20  day shift?                             11:43:00
21       MR. NOVIKOFF:  Objection.
22       A.   I do not recall, no.
23       MR. NOVIKOFF:  We are at the 44
24  minute mark, do you have a few more
25  questions?                             11:43:09

37 (Pages 383 to 386)

52454300-d00b-489d-a580-7c861cc4cc2d

Page 387

```
 1          Rogers
 2          MR. GRAFF:  We can stop at this
 3      point.
 4          MR. NOVIKOFF:  I am asking you, do
 5      you have a few more questions, or do you   11:43:14
 6      want to stop, because if you stop, then
 7      you are stopped?
 8      Q.   Mayor Rogers, between the last day
 9  of your -- the first day of your deposition
10  testimony and today did you have any        11:43:27
11  communications with anyone other than counsel
12  with respect to your first day or anticipated
13  second day of deposition?
14      A.   No.
15      Q.   Do you currently have any          11:43:47
16  documents pertaining to Ocean Beach in your
17  possession or control whether at your property
18  in Queens or elsewhere?
19      A.   I think I have some old copies of
20  Mayor's Corner that I have not thrown out yet, 11:44:07
21  that was a newsletter that I sent out from
22  time to time.
23      Q.   The minutes of Board of Trustees
24  meetings, are those public records?
25          MR. NOVIKOFF:  Objection.           11:44:23
```

Page 388

```
 1          Rogers
 2      A.   Everything I have is public
 3  records.  I am sorry.
 4          MR. NOVIKOFF:  Objection to the
 5      form.  You can answer the question.      11:44:28
 6      Q.   Did you have correspondence that
 7  was addressed to you in your capacity as Mayor
 8  of Ocean Beach at your property in Queens?
 9      A.   Mostly not.  I didn't keep those
10  type of documents.                          11:44:45
11      Q.   Do you have any reason to believe
12  that you had some of those types of documents
13  at your files in Queens?
14      A.   I may have had some papers, but
15  they were all thrown out.  Anything that I had 11:45:01
16  was same copies that are in the village
17  office.
18          MR. NOVIKOFF:  Perfect, one more
19      question.
20          MR. GRAFF:  Thank you for your      11:45:11
21      time.
22          MR. NOVIKOFF:  So you are done;
23      are you concluded with your deposition,
24      again you reserve your right to do
25      whatever you want, but are you done for  11:45:21
```

Page 389

```
 1          Rogers
 2      today?
 3          MR. GRAFF:  I am done for today.
 4          MR. NOVIKOFF:  Okay.  Well, I
 5      believe the plaintiff's counsel has taken 11:45:27
 6      the time allotted by the court, so I
 7      would object to any further time.  But
 8      obviously that is up to plaintiff's
 9      counsel.
10          Mr. Connolly, do you have any       11:45:40
11      questions.
12          MR. CONNOLLY:  No.
13          MR. NOVIKOFF:  I do not have any
14      questions.  Thank you very much,
15      Ms. Rogers.                             11:45:47
16          THE WITNESS:  Thank you, sir.
17          THE VIDEOGRAPHER:  That concludes
18      the video record for today.  The time is
19          (Continued on next page.)
20                      11:45:51
21
22
23
24
25
```

Page 390

```
 1          Rogers
 2      now 11:45 a.m., we are now off the
 3      record.
 4          (Time noted:  11:45 a.m.)
 5      _____
 6          NATALIE ROGERS
 7
 8  Subscribed and sworn to before me
 9  this ___ day of _____, 2008
10
11  _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide      877-702-9580

52454300-d00b-489d-a580-7c861cc4cc2d

Page 391

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6
 7          I, Philip Rizzuti, a Notary Public
 8   within and for the State of New York, do
 9   hereby certify:
10          That NATALIE ROGERS, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   the witness.
15          I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19          IN WITNESS WHEREOF, I have
20   hereunto set my hand this 26th day of
21   December, 2008.
22          _____
23          PHILIP RIZZUTI
24
25
```

Page 393

```
 1
 2              *** ERRATA SHEET ***
 3   NAME OF CASE: CARTER VS. OCEAN BEACH
     DATE OF DEPOSITION:  December 15, 2008
 4   NAME OF WITNESS:  NATALIE ROGERS
     PAGE   LINE     FROM      TO
 5   _____|_____|_____|_____
 6   _____|_____|_____|_____
 7   _____|_____|_____|_____
 8   _____|_____|_____|_____
 9   _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19
20          _____
21               NATALIE ROGERS
22   Subscribed and sworn to before me
23   this ____ day of _____, 2008.
24   _____   _____
25   (Notary Public)    My Commission Expires:
```

Page 392

```
 1
 2   ----------------- I N D E X ----------------
 3   WITNESS          EXAMINATION BY        PAGE
 4   NATALIE ROGERS   Mr. Graff             244
 5
 6   ------------ INFORMATION REQUESTS -----------
 7   None
 8
 9   ----------------- EXHIBITS ------------------
10   Rogers Exhibit 8, one-page       257
11   document bearing Bates number
12   005769,
13   Rogers Exhibit 9, one-page       264
14   document bearing Bates number
15   28,
16   Rogers Exhibit 10, two-page       281
17   document bearing Bates numbers
18   3879 and 3880,
19
20
21
22
23
24
25
```

52454300-d00b-489d-a580-7c861cc4cc2d