UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
EDWARD CARTER, FRANK FIORILLO, KEVIN
LAMM, JOSEPH NOFI, and THOMAS SNYDER,

                                 Plaintiffs,           Case No. 07-Civ-1215 (SJF)(ETB)

        -against-

INCORPORATED VILLAGE OF OCEAN BEACH;
MAYOR JOSEPH C. LOEFFLER, JR., individually and in
his official capacity; former mayor NATALIE K.
ROGERS, individually and in her official capacity,
OCEAN BEACH POLICE DEPARTMENT; ACTING
DEPUTY POLICE CHIEF GEORGE B. HESSE,
individually and in his official capacity; SUFFOLK
COUNTY; SUFFOLK COUNTY POLICE
DEPARTMENT; SUFFOLK COUNTY DEPARTMENT:
OF CIVIL SERVICE; and ALISON SANCHEZ,
individually and in her official capacity,

                                 Defendants.

-----------------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW OF THE INCORPORATED VILLAGE OF OCEAN
BEACH, MAYOR JOSEPH C. LOEFFLER, JR., INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY, FORMER MAYOR NATALIE K. ROGERS, INDIVIDUALLY
AND IN HER OFFICIAL CAPACITY, AND THE OCEAN BEACH POLICE
DEPARTMENT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

POINT I
PLAINTIFFS HAVE NOT RAISED ANY MATERIAL
ISSUE OF FACT PREVENTING DISMISSAL OF THEIR
FIRST AMENDMENT CLAIMS ......................................................................................................1

1.   The Undisputed Facts Concerning Alleged Improper
Conduct Do Not Support Plaintiffs' First Amendment Claims....................................................2

   A.   The Halloween Incident ......................................................................................2

   B.   Violation Of Suffolk County Civil Service Law ...............................................................5

   C.   Officers Drinking While On-Duty...................................................................................8

   D.   Failure To Properly Secure OBPD Firearms.................................................13

   E.   Failure To Discipline OBPD Officers For Destruction Of OBPD Property .................13

   F. Lack Of Knowledge Of Radio Codes ...........................................................14

   G. Selective Enforcement Of Laws.................................................................15

2.   No Complaint Went Beyond The Chain Of Command.......................................16

POINT II
PLAINTIFFS HAVE RAISED NO MATERIAL ISSUE OF FACT
PRECLUDING JUDGMENT SUMMARILY DISMISSING THE
INDIVIDUAL CLAIMS AGAINST LOEFFLER AND ROGERS.............................................23

POINT III
PLAINTIFFS HAVE RAISED NO MATERIAL ISSUE OF FACT
PRECLUDING SUMMARY DISMISSAL OF PLAINTIFFS' RESPECTIVE
DUE PROCESS CLAIMS.............................................................................................................24

CONCLUSION ...........................................................................................................................25

## **TABLE OF AUTHORITIES**

### **CASES**

*Brady v. County of Suffolk,*
  2009 U.S. Dist. LEXIS 85691 (E.D.N.Y. Sept. 19, 2009) .................................................2, 3, 8

*D'Allessandro v. City of Albany,*
  2008 U.S. Dist. LEXIS 14467 (N.D.N.Y. Feb. 26, 2008).........................................................25

*Hawkins v. Steingut,*
  829 F.2d 317 (2d Cir. 1987) .....................................................................................................24

*Igneri v. Town of Brookhaven,*
  232 A.D.2d 638, 648 N.Y.S.2d 473 (2d Dept., 1996)..............................................................25

*Ponterio v. Kaye,*
  2009 U.S. App. LEXIS 7923 (2d Cir., April 16, 2009)............................................................24

*Schwartz v. Mayor's Committee On Judiciary,*
  816 F.2d 54 (2d Cir. 1987) .......................................................................................................24

*Segal v. City of New York,*
  459 F.3d 207 (2d Cir. 2006) .....................................................................................................25

*Sprang v. Katonah-Lewisboro Union Fr. School District,*
  626 F. Supp. 2d 389 (S.D.N.Y., 2009) .....................................................................................25

*Walsh v. Suffolk County Police Department,*
  2008 U.S. Dist. LEXIS 36465 (E.D.N.Y. May 5, 2008), *aff'd*, 2009 U.S. App.
  LEXIS 14292 (2d Cir. July 1, 2009) .........................................................................................25

## POINT I

## PLAINTIFFS HAVE NOT RAISED ANY MATERIAL ISSUE OF FACT PREVENTING DISMISSAL OF THEIR FIRST AMENDMENT CLAIMS

Plaintiffs boldly proclaim at the beginning of their Complaint that they are:

> five police officers who had the courage to overcome the 'blue wall of silence' and fulfill their duty to protect the public by speaking out in opposition to the regime of endemic corruption within the Ocean Beach Police Department [    ]. Plaintiffs' repeated and tireless efforts to champion integrity and the highest values of public service have been met with abject failure [.]

*See, Complaint, at ¶ 1.* However, when challenged during discovery, (as well as in opposition to the Village Defendants' instant motion), to back up this provocative statement with facts showing that any of them "spoke out," each plaintiff miserably failed. Succinctly, plaintiffs have not pointed to a single piece of evidence that supports their seminal burden, *to wit*, that their purported speech is protected by the First Amendment.

To the contrary, plaintiffs' respective deposition testimony unequivocally demonstrates that: (1) in the four years prior to April 2, 2006, no plaintiff complained in writing, to anybody, about any issue concerning the public's health or safety; (2) no plaintiff ever went beyond the "Chain of Command" within the Ocean Beach Police Department, ("OBPD"), with any complaint, despite allegedly being ignored, cursed at and ridiculed when making such complaints to George Hesse, the very person they accuse of being solely and completely responsible for the "regime of endemic corruption," and; (3) no plaintiff ever made a complaint while off-duty, outside of the Village or in any context other than in the course of their OBPD jobs.

Indeed, the Village Defendants respectfully submit that plaintiffs' testimony does not paint a picture of courageous individuals who put their jobs in jeopardy to protect the public. Instead, the landscape that has been created by plaintiffs' testimony is that of five police officers

who, despite their litigation-driven proclamation to the contrary, moved for four years "without any urgency, formality or inclination to warn the citizenry of any impending harm," *Brady v. County of Suffolk, 2009 U.S. Dist. LEXIS 85691, at * 34 – 35 (E.D.N.Y. Sept. 19, 2009). (Emphasis added)*. Indeed, rather than being shown to be righteous advocates for the public's safety and well-being, plaintiffs' testimony illuminates their conscious disregard of the public's safety, making them each unworthy of ever wearing the uniform again. Thus, based upon the undisputed facts, this Court must rule as a matter of law that no plaintiff spoke as a "public citizen"[1] and, consequently, summarily dismiss plaintiffs' claims.

**1.      The Undisputed Facts Concerning Alleged Improper Conduct Do Not Support Plaintiffs' First Amendment Claims**

**A.      The Halloween Incident**

Plaintiffs have devoted significant attention to what they refer to as "the unlawful cover-up of an incident of police brutality orchestrated by Defendant Hesse," *see, Pls. Mem. Of Law, at p. 16*, devoting twenty-four allegations, (¶¶ *63 – 86*), in their Complaint and sixty-four paragraphs, (¶¶ *96 – 159*), in the "Additional Material Facts In Dispute" section of their Rule 56.1 Counter-Statement, to what they refer to as the "Halloween Incident." Given this focus, it is readily apparent that plaintiffs make Hesse's involvement in the investigation of the "Halloween Incident" the cornerstone of their respective First Amendment claims. This cornerstone, however, has material and uncorrectable defects.

First, and of seminal import, plaintiffs' counsel has failed to clearly acknowledge to this Court that Mr. Schalik and Mr. Van Koot, whom plaintiffs claim to be the alleged victims of the "police brutality" purportedly covered-up by Hesse, *see, Complaint, at ¶ 84*, were independently

---

[1] While the Village Defendants will focus herein on the "public citizen" prong of this Court's threshold analysis, they also continue to maintain that, as a matter of law, plaintiffs did not engage in speech concerning matters of "public concern."

prosecuted by the Suffolk County District's Attorney's office and pled guilty to criminal charges concerning their respective attacks on Gary Bosetti and Jeanne Jaeger. [2]   *See, Village Justice Court Disposition Records, attached to Robinson affidavit as Ex. "1" and "2".*  In this regard, on May 21, 2005, Mr. Schalik, before pleading guilty, allocuted before the Honorable William Wexler, Village Justice for Ocean Beach, as follows:

> THE COURT:  On October 31, 2004, at 3:30 a.m., ***did you kick Officer Gary Bosetti,*** an act which served no legitimate purpose[.]?
> THE DEFENDANT: ***Yes***, your Honor.

*Id., at Ex. "2", Schalik Dep. at p. 3, ln. 17 – 20; p. 3, ln. 4 – p. 4, ln. 1.  (Emphasis added).*

Moreover, Judge Wexler was apparently so appalled by Mr. Schalik's attack on Mr. Bosetti that he felt compelled to advise Mr. Schalik that had there been no plea, he would have thrown him in jail.  *Id., at p. 4, ln. 16 – 19.*

Shortly thereafter, on June 18, 2005, Mr. Van Koot, before pleading guilty, also allocuted before Judge Wexler:

> MS. GROSSO: And at that time and place, did you with intent to cause public inconvenience, annoyance or alarm act in a disorderly manner with no legitimate purpose by ***grabbing Officer Gary Bosetti by the legs and holding him while another individual, Christopher Schalik, kicked him?  Is this true***?
>
> ...
>
> THE DEFENDANT: ***Yes***.
>
> ...
>
> MR. FUCHS: Sir, ***did you engage in that conduct*** [grabbing Mrs. Jaeger around the throat and choking her][3] ***with a lady you now know to be Janine Jaeger on that date***, at that time and place as described by Ms. Grosso.
> THE DEFENDANT: ***Yes.***

---

[2]  According to uncontroverted testimony by Hesse, Van Koot and Schalik were not arrested by the OBPD until the Suffolk County District Attorney's office reviewed his complete investigative file and approved the respective arrests.  *See, Hesse Dep., attached to Novikoff Supp. Dec. as Ex. "AA", at p. 712, ln. 25 – p. 715, ln. 24.*

[3]  Bracketed language added reflecting conduct described in prior question.

*Id., at Ex. "1", Van Koot Disposition Tr., at p. 4, ln. 19 – p. 5, ln. 5; p. 5, ln. 20 – 24.*

(*Emphasis added*). Judge Wexler similarly admonished Van Koot. *Id., at p. 7, ln. 5 – 20.*

Accordingly, plaintiffs' reliance on their speculative belief of a cover-up is absurd in light of the attackers' allocutions and their consequent "guilty" pleas. The ridiculousness of plaintiffs' reliance on the Halloween Incident for their claims is even more pronounced when this Court considers the following undisputed facts:

- Ms. Jaeger, the victim of Van Koot's attack, swore out a formal complaint against Mr. Van Koot *(see, Ex. "1," Violation Information)*;
- Six witnesses, none of whom were police officers or employees of the Village, provided statements concerning the attack on Mr. Bosetti and Ms. Jaeger *(see, Ex. "AA", at p. 494, ln. 21 – 25; p. 502, ln. 7 – 11; p. 517, ln. 18 – 21; p. 552, ln. 21 – 23),* and;
- The Suffolk County District Attorney has not, in almost 5 ½ years since the incident, charged Ms. Jaeger, the witnesses, Hesse, Cherry or Gary Bosetti with any crime concerning the "Halloween Incident" or its investigation.

Second, plaintiffs' counsel has attempted to obfuscate the undeniable fact that only three plaintiffs, Snyder, Lamm and Fiorillo were on-duty the night of the Halloween Incident. Plaintiffs Carter and Nofi were not present in Ocean Beach that evening, and admittedly had no involvement in the Halloween Incident. *See, Nofi Dep., attached to Novikoff Dec. as Ex. "E", at p. 107, ln. 7 – 18; see, also, Carter Dep., attached to Novikoff Dec. as Ex. "B", at p. 356, ln. 3 – 25; p. 57, ln. 2 – 13.* Therefore, Carter and Nofi cannot rely on this incident in any manner to support their respective First Amendment claims.

Third, Lamm, Snyder and Fiorillo, have each failed to show this Court that they made any complaint, to anybody, (other than perhaps to each other), before their last day of employment, concerning their speculative contention that there had been a cover-up involving the Halloween Incident. *See, e.g., Fiorillo Dep., attached to Novikoff Dec. as Ex. "C", at p. 161,*

*ln. 17 – p. 164, ln. 8 - p. 258, ln. 7 – p. 260, ln. 10.* In fact, these three plaintiffs could not even refer this Court to one piece of documentary evidence or deposition testimony indicating that any of them ever told Hesse of their respective belief that he was engaging in a cover-up, despite being questioned extensively during their depositions about their communications with Hesse concerning the investigation of the Halloween Incident.[4]

## B.    Violation Of Suffolk County Civil Service Law

Plaintiffs argue, as a basis for their respective First Amendment claims, that they were each retaliated against because of their complaints concerning the hiring by Hesse of what they claim to be "uncertified"[5] and, consequently, unqualified[6] officers, in violation of the Suffolk County Civil Service Law. Notwithstanding the undisputed facts that then Chief Paradiso, and not Hesse, initially hired these "uncertified" officers in 2002, and continued to re-hire these officers in 2003, 2004 and 2005, and that the Village was never found by any administrative or judicial body to be in violation of any Civil Service law, rule or regulation concerning these

---

[4]    *See, e.g., **Lamm Dep.**, attached to Novikoff Dec. as Ex. "D", at p. 340, ln. 16 – p. 349, ln. 5; **Snyder Dep.,** attached to Novikoff Dep. as Ex. "F", at p. 374, ln. 25 – p. 376, ln. 10; p. 450, ln. 11 – p. 451, ln. 3; p. 453, ln. 2 – 14; p. 458, ln. 3 – 9; p. 463, ln. 3 – 9; p. 463, ln. 18 – p. 464, ln. 4; p. 468, ln. 5 – p. 469, ln. 24; **Fiorillo Dep.,** Ex. "C," at p. 212, ln. 21 – p. 217, ln. 18; p. 219, ln. 23 – p. 221, ln. 17; p. 256, ln. 16 – p. 257, ln. 25; p. 412, ln. 2 – p. 415, ln. 12.*

[5] Plaintiffs incorrectly refer to these officers as "uncertified," since there is no such designation in Civil Service Law. *See, Sanchez Dep., attached to Novikoff Supp. Dec. as Ex. "BB", at p. 323, ln. 17-24.*

[6] Plaintiffs focus primarily on Gary Bosetti, Richard Bosetti and Patrick Cherry, Sr. Their suggestion that these officers were unqualified because of any lack of "certification," and, thus, posed a risk to the health and safety to people in Ocean Beach is simply incredible, when considering the fact that:

- Richard Bosetti, immediately prior to being employed by the Village, had been a police officer for twenty (20) years with the New York City Police Department ("NYPD"), *see, R. Bosetti Dep., attached to Novikoff Dec. as Ex. "CC," at p. 92, ln. 9-15,* and an officer in the Emergency Services Unit ("ESU"), also known as the S.W.A.T. team, for fifteen (15) years. *Id., at p. 467, ln. 3-13; p. 470, ln. 13-17.*

- Gary Bosetti, immediately prior to being employed by the Village, had been a police officer for twenty (20) years with the NYPD, s*ee, G. Bosetti Dep., at Ex. "DD," p. 49, ln. 20-25,* and an officer in ESU for fifteen (15) years. *Id., at p. 55, ln. 4-5.*

- Pat Cherry, Sr., immediately prior to his employment with the Village, was a police officer with the Nassau County Police Department for approximately six (6) years, and a Detective in the Narcotics Bureau for twenty-five (25) years. *See, Cherry Dep., at Ex. "EE," at p. 116, ln. 24 - p.117, ln. 23.*

Succinctly, the experience and qualifications of plaintiffs, each of whom had no "police" experience other than their part-time tours with Ocean Beach, simply pales in comparison.

hires, plaintiffs' counsel's argument with regard to this issue fails for another simple reason – none of the plaintiffs have produced any evidence that they "spoke out" to anybody, including Hesse, about the claimed violation of the Suffolk County Civil Service regulation.

First, as to plaintiffs' speculative and unsupported assertion as to Hesse's role in the hiring and retention of these officers in 2003, 2004 and 2005 Seasons,[7] the uncontroverted non-party testimony of former Chief Paradiso destroys their position, inasmuch as Paradiso testified that he, and not Hesse, hired the Bosettis and all other OBPD officers from 2002 through 2005, and that it was his, (and not Hesse's), decision in those years as to whether to hire or fire any particular individual. *See, Paradiso Dep., attached to Novikoff Supp. Dec. as Ex. "FF", at p. 408, ln. 17 – p. 410, ln. 2.*

Second, contrary to plaintiffs' conjecture, there was no "unlawful" activity undertaken by the Village with regard to these hires.  In this regard, the Village Administrator, Mary Anne Minerva, first became aware in or around December 2003, that Village employees, including police officers, had been hired by various Village departments without first meeting certain Civil Service requirements. *See, Minerva Dep., attached to Novikoff Supp. Dec. as Ex. "GG", at p. 130, ln. 2-6.* Subsequently, Ms. Minerva, in conjunction with defendant Sanchez, Village Deputy Clerk Kathryn Spies and Hesse, commence the process to bring all affected Village employees in compliance with Civil Service guidelines. *Id., at p. 130, ln. 22 – p. 131, ln. 19; See also, Ex. "BB", at p. 110, ln. 15 – p. 112, ln. 5.*[8]

---

[7] Notably, plaintiffs' claim that Hesse had hiring authority with regard to these officers undercuts their entire First Amendment claim – if Hesse made the hiring and firing decisions for the OBPD in 2003, 2004 and 2005, then there could be no viable retaliation claim for anything done in 2006, since each plaintiff testified that beginning in 2002, they began complaining to Hesse about his role in the "endemic corruption" within the OBPD.
[8] Incredibly, Carter testified that in 2005, "I actually wound up helping George Hesse trying to get the guys certified[!]". *See, Ex. "B", at p. 362, ln. 11-13.*

Notably, according to Paradiso, the Suffolk County Civil Service gave the Village time to comply with its guidelines. *See, Ex. "FF", at p. 429, ln. 16 - 25.* Ms. Minerva testified that it took approximately one (1) year to bring the Village into compliance. *See, Ex. "GG", at p. 131, ln. 7 - 19.* Moreover, Sanchez, a personnel analyst for Civil Service, s*ee, Ex. "BB", at p., 24, ln. 11 - 17,* testified that, in accordance with Civil Service guidelines, employees not in compliance would not be disqualified by Civil Service from working during the time it took the Village to comply. *Id., at p. 124, ln. 12 - 19.* Moreover, according to Sanchez, the Village's failure to correct any reporting problems, once known, would not result in any consequences, although the Village would be expected to work toward compliance or its payroll would not be certified. *Id., at p. 122, ln. 25 - p. 123, ln. 9; see also, DiStephano Dep., attached to Novikoff Supp. Dec. as Ex. "HH," at p. 184, ln. 23 – p. 186, ln. 14.* Furthermore, Ms. Sanchez testified that, aside from a Village Archivist who had not met the minimum qualifications for that job title, Civil Service never notified the Village that "the employment of any employee could not continue based on failure to comply with Civil Service specifications." *See, Ex. "BB", at p. 155, ln. 25 – p. 156, ln. 10.*

Third, plaintiffs have presented no evidence that they ever complained to anybody concerning the actual decisions to hire and subsequently re-hire what they label as "uncertified" officers. To the contrary, Fiorillo acknowledged that he never complained to Suffolk County Civil Service, the Suffolk County District Attorney's office, the Village Board, Loeffler or any media outlet "with regard to the issue concerning uncertified, unqualified officers working" for the OBPD. *See, Ex. "C", at p. 396, ln. 19 – p. 397, ln. 24.* Fiorillo explained why he saw no need to complain concerning this issue: "I didn't have to complain. Ocean Beach knew about it. It was well known." *Id., at p. 396, ln. 24 – 25.*

7

## C.   **Officers Drinking While On-Duty**

Plaintiffs testified to making multiple complaints to Hesse, over the span of four years, about officers drinking alcohol on duty in bars, in the police station and in police vehicles.[9] Plaintiffs' respective deposition testimony unequivocally demonstrates that plaintiffs' self-styled "complaints" "contain[ed] no sense of urgency, nor formality, nor inclination to warn the citizenry of some impending harm." *Brady v. County of Suffolk, 2009 U.S. Dist. LEXIS 85691, at * 34 – 35 (E.D.N.Y. Sept. 19, 2009).*[10]

### *1)   Carter*

Carter testified that he began complaining to Hesse about Officer Ty Bacon drinking in 2003, *see, Ex. "B", at p. 35, ln. 12-20,* and that he complained to Hesse every time he saw Officer Bacon drink. *Id., at 37, ln. 9-13.* According to Carter, Hesse responded to these complaints, as well as his other officer/alcohol related complaints in 2003, by either telling him to "shut up," *id., at p. 37, ln. 23,* "cut the shit," *id., at p. 40, ln. 10,* "cut the bullshit," *id., at p. 41, ln. 7,* or simply laughing and walking away, *id., at p. 40, ln. 9-10.* Critically, despite these purported responses by Hesse and their obvious implications, Carter did not complain to anyone other than Hesse. *Id., at p. 41, ln. 16 – p. 44, ln. 18; p. 328, ln. 13 – p. 329, ln. 10; p. 334, ln. 12 – p. 335, ln. 7.*

---

[9] Both Hesse and Paradiso deny ever receiving complaints from any of the plaintiffs. *See, Ex. "G", at p. 474, ln. 3 – 497, ln. 22; see also, OB 56.1 ¶¶ 70, 71.*

[10] Before addressing each plaintiff's testimony on this issue, the Village Defendants posit that the veracity of Carter's, Nofi's and Fiorillo's claims on this particular issue must be called into serious question by their own acts. Critically, Carter admitted to drinking alcohol with "on-duty" police officers in 2005. *See, Ex. "B", at p. 59, ln. 10-11.* Indeed, when asked to explain why he would engage in the same conduct he had allegedly complained of to Hesse for three years, he simply stated:

*The shot was there, I wanted it and I drank it.*

*Id. (Emphasis added).* With regard to Nofi and Fiorillo, they both acknowledged the accuracy of a photograph, which depicts them in uniform, on-duty, in an Ocean Beach residence, sitting around a table with beers in front of them and a woman sitting on Fiorillo's lap. *See, Novikoff Supp. Dec. at Ex. "II".*

Carter also made officer/alcohol related complaints to Hesse in 2004. According to Carter, Hesse's reaction in 2004 was not much different than in 2003 – Hesse "looked at me and walked away," *id., at p. 46, ln. 7-18,* "just chuckled and ignored me," *id., at p. 50, ln. 8,* and "shrugged it off," *id., at p. 321, ln. 21-22.* Despite raising the same complaints to and receiving similar reactions by Hesse in 2004, Carter's complaints again went no further than Hesse in 2004, *id., at p. 47, ln. 2-17; p. 50, ln. 9 – p. 51, ln. 3; p. 329, ln., 22 – p. 331, ln. 17; p. 322, ln. 22 – p. 334, ln. 11.* Carter's inaction is astonishing, given his acknowledgment that by 2004, "[t]here was, again, the complaints were there, they weren't being answered, so at that point, you know, you wind up talking to deaf ears." *Id., at p. 321, ln. 25 – p. 322, ln. 4.*

In 2005, Carter believed that the officer/alcohol situation "was the worst" and "[t]hat's when it was really bad." *Id., at p. 332, ln. 19-21.* Despite this belief, and despite testifying that he was punished by Hesse, ("he banished me"), *id., at p. 329, ln. 12,* for certain alcohol/officer related complaints, Carter, once again, spoke to no one other than Hesse. *Id., at p. 68, ln. 23 – p. 69, ln. 21; p. 330, ln. 20 – p. 331, ln. 17; p. 332, ln. 22 – p. 333, ln. 14.* [11]

### 2) *Snyder*

Snyder testified that he began complaining to Hesse in 2002 concerning officer/alcohol related issues. *See, Ex. "F", at p. 234, ln. 2 – 5; p. 260, ln. 5 – 12.* Indeed, Snyder said that he "continually complained to Hesse" concerning this issue. *Id., at p. 261, ln. 18 – 19.*

Moreover, Snyder was of the opinion that through 2004 "nothing had changed," *Id., at p. 253, ln. 18 – 22,* with regard to the alcohol/officer issue and that Hesse had simply "ignored" his

---

[11] Indeed, it is clear that Carter's "complaints" had nothing to do with protecting the public and everything to do with the inconvenience the alleged drinking caused him in his work environment. *See, e.g., id., at p. 37, ln. 19 – 23* ("George, this is bullshit. I got to clean up all your guys' beers, rocket fuel, empty cups with Bacon, you and other guys drinking"); *id., at p. 38, ln. 14 – 17* ("George, this is bullshit. You guys are drinking in the station and leaving a mess. Beer cans, rocket fuels, cups, and why do I have to clean it up"); *id., at p. 51, ln. 18 – 21* ("I had to take off to go have one drink and you guys are getting paid to have a drink").

9

complaints in 2002 and 2003. Snyder agreed with the allegation in ¶ 42 of the Complaint that the officer/alcohol issue "became even more expansive during the summer of 2004," *id., at p. 284, ln. 18 – p. 285, ln. 8,* as it became an "every night occurrence." *Id., at p. 285, ln. 9 – 15.* Yet, despite Hesse's apparent three-year disregard of his complaints on this issue, Snyder, through the end of 2004 Summer Season spoke to no one other than Hesse. *Id., at p. 246, ln. 22 – p. 247, ln. 20; p. 250, ln. 12 – p. 251, ln. 24; p. 265, ln. 15 – p. 266, ln. 15.*[12] When asked to explain why he continued to complain to Hesse in 2004, Snyder stated: "I wanted to continually complain to him to point out to him what was going on there. Letting him know."[13] *Id., at p. 262, ln. 22 – 24.*

Snyder testified that the alcohol/officer issue remained the same in 2005. *Id., at p. 285, ln. 16 – 19.* Remarkably, despite being ignored by Hesse for four years, and told by Paradiso that it was not his problem, Snyder did not complain to anyone other than Hesse in 2005. *Id., at p. 265, ln. 15 – p. 266, ln. 15.*

### 3) Nofi

Nofi testified that part of the "endemic corruption" within the OBPD that he reported to his superiors, *see, Ex. "E", at p. 193, ln. 13 – 17; p. 195, ln. 25 – p. 196, ln. 23,* as alleged in ¶ 117 of the Complaint, included "cops drinking in bars" *id., at 195, ln. 25 – p. 196, ln. 5,* and "cops driving drunk," *id., at p. 196, ln. 21 – 197, ln. 12.* While he testified that he complained to

---

[12] Snyder testified that on only one occasion, *id., at p. 265, ln. 6-14,* after the Halloween Incident," *id., at p. 263, ln. 5-12,* did he "complain" to Paradiso:

> **Q:** What did you say to the chief?
> **A:** I told him that there was, you know, numerous instances of this situation with the Bosettis among other things I went through, and told him about it, and he said then that he – he's – "George is responsible for his tour, I'm responsible for my tour. You have any issues or complaints, you got to bring them to George." And I said, "that's what we've been doing."

*Id., at p. 263, ln. 13-24.*

[13] This answer is nonsensical in light of plaintiffs' allegations accusing Hesse of perpetrating and/or condoning all of the "endemic corruption," including knowingly permitting these officer/alcohol related issues to commence, continue and increase. *Id., at p. 259, ln. 12-24.*

10

Paradiso only once or twice, *id., at p. 203, ln. 22 – p. 204, ln. 9*, Nofi said he complained to Hesse more than 20 times about "endemic corruption," *id., at p. 214, ln. 3-9*, and that his first alcohol/officer complaint to Hesse occurred in April, 2003. *Id., at 299, ln. 9 – 23*.

Nofi testified that his complaints to Hesse went nowhere. *Id., at p. 204, ln. 23 – p. 205, ln. 2*. Notwithstanding Hesse's failure to address Nofi's complaints, he has submitted no competent evidence showing that he made complaints to anybody else about the officer/alcohol issue. *Id., at p. 208, ln. 25 – p. 211, ln. 13*.

### 4)    *Lamm*

Lamm recalls seeing an officer drink while on-duty twice in 2002, twice in 2003 and three times in 2004. *See, Ex. "D", at p. 191, ln. 13 – p. 192, ln. 9*. Lamm recalls seeing an officer drinking in a local bar two or three times in 2002, three times in 2003 and four times in 2004. *Id., at p. 192, ln. 14 – ln. 8*. Lamm testified that he was present in a police vehicle on two occasions in 2003 when Richard Bosetti was drinking and driving. *Id., at p. 197, ln. 7 – p. 198, ln. 19*.

For the fours years prior to his last day of employment with Village, Lamm merely complained to his tour supervisor, who except for two occasions, *id., at p. 196, ln. 22 – 25*, was Hesse. *Id., at p. 195, ln. 4 – p. 196, ln. 25; p. 200, ln. 14 – 21; p. 204, ln. 6 – p. 206, ln. 21*. Indeed, notwithstanding Lamm's, (as well as all of the other plaintiffs), argument that Hesse knowingly permitted and condoned officers drinking on-duty, as well as participating in this behavior as well, the following testimony by Lamm highlights the abject disregard he had for protecting the public from what he claims is part of the "endemic corruption" within the OBPD:

> **Q:** [     ] with regard to seeing a police officer drive intoxicated, what, other than talking to Mr. Hesse, *what did you do to protect the public?*
> **A:** It was brought to George Hesse's attention, who was the supervising officer, chain of command.

**Q:** Other than talking to Mr. Hesse, what did you do?

**A:** That's what I did.

**Q:** Okay. When you saw police officers drinking on duty and posing a risk to the health and safety of the public in doing so, other than Mr. Hesse, other than talking to Mr. Hesse, *what did you do to protect the public?*

**A:** That's what was done. Spoke to George Hesse. Chain of Command.

*Id., at p. 228, ln. 21 – p. 229, ln. 14. (Emphasis added).*

**Q:** Did you ever, before the last day of your employment with Ocean Beach, notify the Suffolk County District Attorney's Office, *in your duty to protect the public and speak out,* that there were police officers, while on duty, drinking alcoholic beverages.

**A.** No.

*Id., at p. 234, ln. 15-25. (Emphasis added).*

**Q:** And *in your duty to protect the public and speak out against the endemic corruption that you alleged*, did you ever advise Chief Paradiso of your concern that on duty police officers were drinking in local bars?

**A:** No. It was spoken to Hesse. Immediate supervisor, chain of command.

*Id., at p. 257, ln. 12-19. (Emphasis added).* [14]

### 5) *Fiorillo*

In 2002, Fiorillo said that he formed the belief that the drinking by Gary and Richard Bosetti created a public safety issue. *See, Ex. "C", at p. 108, ln. 5 – p. 109, ln. 4.* Notwithstanding this belief, Fiorillo did not advise Hesse, Paradiso or anybody else of this belief in 2002. *Id., at p. 108, ln. 24 – p. 115, ln. 16.* Moreover, even though his belief as to the public safety issue concerning the Bosettis drinking "strengthened ... as the years went by," *id., at p. 108, ln. 5 – 23; p. 120, ln. 21 – p. 121, ln. 16*, and he was of the opinion that "Hesse didn't do anything about it and Paradiso didn't do anything about it," *id., at p. 120, ln. 9 – 20*, his

---

[14] Similar answers were given by Lamm with regard to advising Mayor Rogers, Trustee Loeffler, "any other trustee" and "any media outlet." *Id,. at p. 257, ln. 12 – 258, ln. 14.*

complaints through 2004[15] about the Bosetti's drinking were limited primarily to Paradiso, (as opposed to Hesse), and did not go beyond the Chain of Command. *Id., at p. 116, ln. 23 – p. 124, ln. 3*.[16] Notably, in 2005, Fiorillo did not make any complaint to Hesse about the Bosettis drinking or any other alcohol/officer related issue. *Id., at p. 124, ln. 21-25.*

**D.    Failure To Properly Secure OBPD Firearms**

Plaintiffs have submitted no evidence that any plaintiff, other than Lamm, allegedly complained about a violation concerning the supervision of police weapons. Notably, although not being able to identify the specific policy being violated, *see, Ex. "D," at p. 208, ln. 2 – p. 209, ln. 18*, Lamm nevertheless acknowledged that he believed it was violated only one time, in 2004, and that he made only one complaint to Hesse in 2004. *Id.*

**E.    Failure To Discipline OBPD Officers For Destruction Of OBPD Property**

The only example cited by plaintiffs' counsel is the alleged conduct of Gary and Richard Bosetti throwing a file cabinet into the bay. *See, Pl. Counter 56.1, at ¶ 71.* Critically, it cannot be disputed that the only plaintiff having any connection to this incident was Fiorillo. *See, Ex. "C," at p. 201, ln. 16 – 2, p. 207, ln. 5.* Fiorillo made no mention in his deposition testimony of any other plaintiff being with him. Moreover, and of seminal import, by Fiorillo's own admission, Hesse had no involvement in this matter, as Fiorillo only spoke to Chief Paradiso. *Id.*

---

[15] Fiorillo's alleged communication on the evening of the Halloween Incident with Loeffler and one other occasion in 2005 will be addressed at *pp. 17 – 18, infra.*

[16] Although Fiorillo testified that he complained to Hesse, Fiorillo acknowledged that if he needed to complain about an incident occurring on his tour, he would complain to the supervisor of his tour. *Id., at p. 401, ln.. 22 – p. 402, ln. 13 – 16.* In this regard, Fiorillo noted that "[f]or the most part, the chief [Paradiso] was my supervisor because I worked his tour. *Id., at p. 405, ln. 11-12.* Moreover, Fiorillo's testified that his complaints in 2004 were primarily to Paradiso:

- "because George Hesse did not – he let these guys do whatever they wanted to do. He did not - what's the word? Supervise them, in my opinion, accordingly[.]" *Id,. at p. 194, ln. 22 – p. 195, ln. 5;*
- "[h]e [Hesse] wouldn't do anything about it anyway. He would be drinking with them." *Id., at p. 198, ln. 14 – 15;*
- "[b]ecause at that time, that was when the chief was trying to enforce the rules in the Village, and Hesse wasn't doing anything to enforce them himself." *Id., at p. 341, ln. 4 – 9.*

**F.**   **Lack Of Knowledge Of Radio Codes**

Plaintiffs rely on Hesse's purported failure to ensure that "uncertified" officers knew the Suffolk County Police Department radio codes as a basis for their respective First Amendment claims. Again, not every plaintiff allegedly complained to Hesse concerning this issue, and for those that did, the complaints were few and isolated. For example, neither Fiorillo, Lamm nor Carter has submitted any evidence showing that they ever complained to Hesse about any officer not knowing the radio codes.

With regard to Snyder, he alleges that he complained on only one occasion to Hesse in 2002 about the "Bosettis" not knowing the radio codes. *See, Ex. "F," at p. 277, ln. 6-16.* Hesse told Snyder that he "would speak to them about it." *Id.* Snyder then testified that he complained to Hesse as well in 2003 and 2004, at which time Hesse responded in the same manner as in 2002. Snyder testified that he "probably" complained to Hesse in 2005. *Id., at p. 278, ln. 4-23.* Given the fact that this issue arose in 2002, and continued on through 2005, as well as the fact that Snyder admittedly did not complain outside of the chain of command, his actions with regard to the sporadic and isolated issues concerning the radio codes show he had absolutely no desire to warn anybody of any potential danger.

With regard to Nofi, he could only identify one instance where he complained to Hesse. *See, Ex. "E," at p. 246, ln. 17 – p. 248, ln. 3.* However, not only was this alleged complaint in 2003,[17] but Nofi's testimony illustrates that it was complete speculation on his part that Police Officer Arnold Hardman did not know the radio codes:

> A:  One time I called a 10-1, which is an immediate response, that a police officer could be killed or beat up or whatever. You're in the worst situation there is, which is a 10-13 in New York City totally different code, ***and he didn't respond***, not only because he

---

[17] Nofi testified that his complaint occurred the first year that "Hardman" was hired. *Id., at p. 247, ln. 21 – p. 248, ln. 3.* Arnold Hardman was first hired in 2003. *See, Novikoff Sup. Dec. at Ex. "JJ".*

14

was out of the town, where he was working another part of town or village, I should say, he didn't respond because he didn't know the codes, because he was uncertified [     ].

*Id., at p. 246, ln. 20 – p. 247 ln. 17.* [18]   *(Emphasis added).*  Nofi has not presented any competent evidence as to why Hardman did not respond.

**G.     Selective Enforcement Of Laws**

Plaintiffs argue that Hesse directed them to selectively enforce certain laws and that their respective complaints concerning these directions support their First Amendment retaliation claim. However, plaintiffs' counsel only cites to Carter as an example. *See, Pls. Counter 56.1 at ¶ 169.*  Notably, however, an analysis of Carter's deposition testimony demonstrates that Carter's comments cannot be characterized as complaints reflecting a concern for the safety of the public citizens.

According to Carter, Hesse advised him twice in 2005 not to issue summonses to two bars on Ocean Beach concerning underage drinking. *See, Ex. "B," at p. 366, ln. 4 – p. 338, ln. 4.*  Carter testified that the only thing he said to Hesse on the first occasion was "George, you know, what do you want me to do?" *Id., at p. 338, ln. 20-21.* On the second occasion, Carter similarly said to Hesse, in reference to the summons Hesse told him not to write: "What do you

---

[18] Indeed, former Chief Paradiso, who was not named as a defendant in this action, completely eviscerates plaintiffs' claims concerning officers not knowing the radio codes. In response to plaintiffs' counsel's questioning, Paradiso testified as follows:

[w]hen the officers are hired, they are given a copy of the ten code. They are to keep it with them. Some of them would keep it inside their field appearance ticket booklets. …, but everybody that was out on patrol had a copy of the card and was expected to know and knew the ten codes that we used frequently.

*See, Ex. "FF", at p. 592, ln. 20 – p. 593, ln. 6.*

[n]o, they got the card when they started working. The majority of the guys had training it it. The guys from the city were told what the new codes were. They are not idiots. You know, you are doing the job every day, you use the same codes over and over and over again, so, you know, these guys would have enough time to be able to assimilate new responses to radio codes.

*Id., at p. 595, ln.6-14.*

15

want me to do with this?" *Id., at p. 339, ln. 25 – p. 340, ln. 3.* Notwithstanding the fact that Carter testified that Hesse was knowingly permitting under-age drinking, Carter's so-called complaints did not go beyond Hesse. *Id., at p. 340, ln. 4-25.*

## 2.   No Complaint Went Beyond The Chain Of Command

Each plaintiff concedes that, prior to their last days of employment with the Village, they never raised any complaint concerning Hesse's alleged misconduct with the Village's Board of Trustees, the Suffolk County Legislature, or any newspaper, radio or television station. Obviously realizing that admitting that they never went outside the Chain of Command would, based upon prevailing legal authority, effectively end their respective First Amendment claims, plaintiffs' counsel, in an attempt to extricate plaintiffs from this predicament, falsely argues that all of the plaintiffs proactively complained to Trustee Einig, Trustee Loeffler, Mayor Rogers and the Suffolk County District Attorney's office concerning Hesse's alleged misconduct. *See, Pls. Mem. Of Law, at p. 16.*

Plaintiffs' respective deposition testimony, however, tells a completely different story, belies their counsels' argument and exposes the utter frivolity of their claim that they are "are five police officers who had the courage to overcome the blue wall of silence and fulfill their duty to protect the public by speaking out in opposition to the regime if endemic corruption within the Ocean Police Department." Moreover, and of critical import, even if this Court accepts any part of their specious argument as to whom they "spoke out" to, plaintiffs have nevertheless failed to show that the substance of any alleged complaints to these three individuals and the District Attorney's office were ever communicated to Hesse, such that Hesse could not have conceivably used said communications as a basis to retaliate against them.

### A. Trustee Einig

Plaintiffs Carter, Snyder, Lamm and Fiorillo each admit that they did not raise any complaint with Trustee Einig, consistently answering no when asked if they made a complaint to "any trustee." *See, e.g., Ex. "B", at. p. 332, ln. 22 – p. 333, ln. 25; Ex. "C," at p. 122, ln. 4 – 11" Ex. "D'" at p. 206, ln. 7 – 11; Ex. "F", at p. 250, ln. 15 – 16.* The only plaintiff that even mentioned speaking with Trustee Einig was Nofi, who testified that he never complained to him about anything involving Hesse and that Einig did all the speaking when they spoke. *See, Ex. "E", at p. 272, ln. 22 – p. 273, ln. 23.*

### B. Trustee Loeffler

Plaintiffs Carter, Snyder and Lamm each admit that they did not raise any complaint with Trustee Loeffler, consistently answering no when asked if they made a complaint to "any trustee." *See, e.g., Ex. "B'", at p. 327, ln. 13 – p. 328, ln. 22; Ex. "D'", at p. 205, ln. 15 – 19; Ex. "F", at p. 283, ln. 10 – 11.* Nofi admittedly had no recollection of complaining to Loeffler, stating that "it's possible I did one time in the street," *see, Ex. "E", at p. 209, ln. 4 – 5.* With regard to the specifics of that "possible" complaint, Nofi was incapable of articulating the subject matter of the complaint:

> [t]hings that were going on, people in bars. *I don't remember*, but I know I had conversations with him. *I don't know what it could have been about.*

*Id., at p. 209, ln. 13 – 17. (Emphasis added).*

While Fiorillo says that he complained to Trustee Loeffler, an examination of his purported comments, and the context in which they were presented, show that they were nothing more than informal, personal gripes on two occasions about Gary and Richard Bosetti:

- In 2005, as Trustee Loeffler was riding his bike on the street in Ocean Beach while Fiorillo was on duty, Fiorillo discussed with Loeffler his plan to run for Mayor, at which time Fiorillo opined

17

that the Bosettis are "running amuck in Village", "are poisoning the Village," "are really taking the Village down" and are "constantly drinking." *See, Ex. "C", at p. 89, ln. 19 – p. 90, ln. 2.*

- On the evening of the Halloween Incident, when Trustee Loeffler was present at the station because he was the driver of the ambulance, Fiorillo opined that "this is a result of the Bosettis' drinking." *Id., at p. 101, ln. 6 – 7.*

These were the only communications by Fiorillo to Loeffler about drinking in the Village, *see, id., at p. 103, ln. 25 – p. 104, ln. 3,* or concerning any other incidents forming the basis for Fiorillo's retaliation claim. *See, id., at p. 105, ln. 22 – p. 107, ln. 17.* Putting aside the fact that the substance of these communications cannot form the basis of a First Amendment retaliation claim as they are nothing more than generalized grievances about another employee, Fiorillo has presented no evidence that these specific "complaints" were ever communicated by Loeffler to Hesse, thus negating any linkage between these alleged communications and Hesse's purported retaliatory action.

### C.    Mayor Rogers

Plaintiffs Carter, Snyder, Lamm and Fiorillo each admit that they raised no complaints with Mayor Rogers concerning any of the alleged misconduct perpetrated or condoned by Hesse. *See, e.g., Ex. "C", at p. 87, ln. 22 – 24; Ex. "F", p. 265, ln. 18 – p. 269, ln. 5; Ex. "B", p. 332, ln. 22 – p. 333, ln. 4; Ex. "D", at p. 206, ln. 12 – 22.* Likewise, Nofi admitted that he raised no complaints with Mayor Rogers about "endemic corruption and abuse of power," *see, Ex. "E," at p. 203, ln. 7 – p. 208, ln. 9,* although subsequently modifying that admission by testifying that "I may have made a complaint to … Mayor Rogers." *Id., at p. 281, ln. 18 – 19.* Not surprisingly, when asked to articulate the substance of his complaint, Nofi could only say ". . . I can't remember, it was just a complaint about something, just something that was going wrong." *Id., at p. 282, ln. 7 – 10.*

18

**D.      The Suffolk County District Attorney's Office**

An examination of the plaintiffs' respective deposition testimony reflects the undisputed

fact that before being advised that they would not be re-hired for the 2006 Summer Season, none

of them either proactively initiated a complaint with the Suffolk County District Attorney's

office, or in any manner complained to the DA about the "endemic corruption" involving Hesse

and the OBPD.

*1)      Edward Carter*

Carter raised no complaint concerning the OBPD with the DA prior to April 2, 2006:

> **Q:**     [        ] you write "Plaintiffs are five police officers who had the
> courage to overcome the blue wall of silence and fulfill their duty to
> protect the public by speaking out in opposition to the regime if endemic
> corruption within the Ocean Police Department." Do you see that?
> **A:**     Yes.
> . . .
> **Q:**     And prior to April 2, 2006, to whom did you speak out?
> **A:**     George Hesse.
> **Q:**     Anybody else?
> **A:**     No. George Hesse?

*See, Ex. "B", at p. 271, ln. 8 – p. 272, ln. 13.* Indeed, according to Carter, the only time that he

spoke to the DA prior to April 2, 2006, was in the fall of 2005, when the District Attorney's

office on two occasions approached him concerning whether he was working a particular

evening that summer when there was an incident involving members of the OBPD and a Mr.

Samuel Gilbert.[19] *Id., at p. 280, ln. 2 – p. 287, ln. 22.* Carter simply advised the DA that he was

not working that evening. *Id., at p. 280, ln. 10 – 14.*

---

[19] This incident of alleged police brutality is irrelevant to plaintiffs' claim because they each admittedly were not on
duty that particular night, see, e.g., Ex. "C," at p. 153, ln. 14 – 17; Ex. "B," at p. 279, ln. 13 - 15; Ex. "E," p. 103, ln.
23 - p. 104, ln. 3; Ex. "F," at p. 54, ln. 14 - 22.  In any event, plaintiffs cannot dispute that Hesse was acquitted of all
criminal charges relating to this incident.

### 2) **Snyder**

Snyder admitted at his deposition that he never spoke with the DA until after he was advised that he was not re-hired for the 2006 summer. *See, Ex. "F", at p. 45, ln. 4 – 14*.

### 3) **Nofi**

Nofi only had one communication with the District Attorney's office prior to April 2, 2006. This communication was initiated by the DA and only had to do, according to Nofi, with the Gilbert Incident, an issue not relevant to this claim:

> **Q:** When did the DA approach you concerning anything involving Ocean Beach?
> **A:** They came to my house, asked me questions about the Gilbert beating.

*See, Ex. "E", at p. 103, ln. 10 – 11*.

> ...
> **Q:** So how many communications did you have prior to your last day of employment with Ocean Beach?
> **A:** Before I was let go?
> **Q:** Before your last day of employment, yes.
> **A:** Just that one time.

*Id., at p. 104, ln. 13 – 19*.

### 4) **Lamm**

Lamm never complained to the Suffolk County District Attorney's Office:

> **Q:** In your duty to protect the public and speak out against – in opposition to the regime of endemic corruption, did you, before the last day of employment with Ocean Beach, speak with the Suffolk County District Attorney's office concerning the belief you held that there was a cover-up involving the Halloween incident?
> **A:** **No.**
> **Q:** [ ] Did you ever, before the last day of your employment with Ocean Beach, notify the Suffolk County District Attorney's office, in your duty to protect the public and speak out, that there were police officers, while on duty, drinking alcoholic beverages?
> **A:** **No.**
> **Q:** In your duty to speak out and protect the public good, did you ever advise the Suffolk County District Attorney's office that

there were police officers driving while intoxicated on Ocean
Beach?
**A:** **No.** [  ]

*See, Ex. "D", at p. 233, ln. 17 – p. 235, ln. 7. (Emphasis added).*

### 5) *Fiorillo*

Fiorillo never initiated a complaint with the Suffolk County District Attorney's office:

> **Q:** [    ] You've alleged in paragraph 101 that you believed
> you were retaliated against because of complaints that you made
> concerning various instances of obstruction of justice, abuse of
> power and other unlawful conduct?
> **A:** Absolutely.
> …
> **Q:** And this is from 2002 through April 2, 2006, correct?
> **A:** (Indicating).
> …
> **Q:** Did you ever complain to the Suffolk County District
> Attorney's office?
> **A:** No.

*See, Ex. "C", at p. 136, ln. 15 – p. 137, ln. 24.* Indeed, when specifically asked about whether he

complained in 2002 to the District Attorney's office concerning the Bosettis drinking while on

duty, and the public safety issue he believed it was created, Fiorillo testified as follows: *[w]hy*

***would I complain to the DA?*** *Id., at p. 108, ln. 24 – 109, ln. 16. (Emphasis added).*

Realizing that these blanket admissions about making no complaints to the District

Attorney's office would be fatal to his claim, Fiorillo subsequently attempted to characterize one

communication that he had with the District Attorney's office, after they contacted him after the

incident involving Mr. Gilbert, *id., at p. 142, ln. 11-17,* as a complaint by him concerning the

Halloween Incident. *Id., at p. 138, ln. 14 - 23.* However, by his own admission, Fiorillo never

told Hesse prior to April 2, 2006 that he communicated his belief to the DA as to Hesse's role in

a cover-up concerning the Halloween Incident. *Id. at p. 143, ln. 17 – 144, ln. 11; p. 168, ln. 2 –*

*171, ln. 5.* Indeed, Fiorillo was provided a final opportunity at his deposition to add something

21

to his testimony that would have shown that he advised Hesse that he told the DA of his opinion as to a cover-up, but he did not:

> **Q:**   Okay. Did you ever advise George Hesse of – as to anything that you specifically said to the DA concerning either the Halloween incident, the Gilbert incident or the Prisco incident, ***other than what you testified to?***
>
> **A:**   No.

*Id., at p. 171, ln. 6 – 12.  (Emphasis added).*

Therefore, as has been shown, while plaintiffs apparently believe themselves to have been courageous and tireless advocates for the public welfare, the reality is strikingly different. The Village Defendants have convincingly demonstrated, through the use of Plaintiffs' own words that, over a span of four years, they did absolutely nothing to protect the public against the alleged perceived endemic corruption and abuse of power within the OBPD, other than to complain to the very supervisor who they now claim created, perpetrated and condoned such purported corruption and abuse of power.

While plaintiffs seek no less than $225,000,000 to compensate them for what they claim to be their enormous sacrifice on behalf of the general public living in or visiting Ocean Beach, nothing better exemplifies their respective and collective delusion as to their self-proclaimed "courage" as Lamm's testimony concerning his allegation that Hesse told him "not to touch" a drug dealer who "handed out" drug laced lollipops. *See, Ex. "D", at p. 210, ln. 5 – p. 211, ln. 11*. Acknowledging that lollipops are something that children like to eat, *id., at p. 215, ln. 20 – p. 216, ln. 4,* Lamm gave the following testimony:

> **Q:**   Other than complaining to George Hesse as you claim in 159, you did nothing with regard to advising any other human being in a position of authority that there was a drug dealer on Ocean Beach possessing an illegal narcotic in the form of a lollipop, true?
> **A:**   **No. I did nothing.**

22

*Id., at p. 214, ln. 23 – p. 215, ln. 6. (Emphasis added).* Even more troubling, and certainly more

shocking, was the following answer Lamm provided:

> **Q:** [    ] Wasn't it a concern of you that there was a person, according to Mr. Hesse, on Ocean Beach, that had an illegal narcotic that looked like a lollipop, that God forbid a child would have found on the street and started eating, wasn't that a concern of yours as a police officer?
>
> . . .
>
> **A:     Lots of things could have – could have happened I'm sure.**

*Id., at p. 216, ln. 5-15. (Emphasis added).* Rather than advocating for the public's health and

welfare, Lamm exhibited nothing less than criminally conscious disregard[20] for the safety of

children and the general populace.

## POINT II

### PLAINTIFFS HAVE RAISED NO MATERIAL ISSUE OF FACT PRECLUDING JUDGMENT SUMMARILY DISMISSING THE INDIVIDUAL CLAIMS AGAINST LOEFFLER AND ROGERS

As it pertains to plaintiffs' respective § 1983 claims, the alleged unlawful conduct at

issue is the decision by Hesse not to hire plaintiffs for the 2006 Summer Season.  Critically,

however, while plaintiffs' counsel strains greatly and perverts testimony in order to articulate

commissions and omissions attributable to then Mayor Rogers and then Trustee Loeffler as it

relates to Hesse and the OBPD, they all pre-date Hesse's decision concerning the employment of

plaintiffs.  Notably absent in plaintiffs' submission is any evidence challenging Loeffler's and

---

[20] Similar disregard was shown, for example, by: (1) Fiorillo in failing to not only stop what he believed was a sale of cocaine occurring less than five feet from him, *see, Ex. "C", at p. 327, ln. 4 – p. 329, ln. 22,* but in failing to "speak out" to anybody in authority about Hesse's direction to allow such dangerous criminal activity, *id., at p. 333, ln. 42 – p. 335, ln. 23;* (2) Nofi in failing to inform anybody in authority about Hesse's condonation of an OBPD officer beating up a woman; *see, Ex. "E", at p. 200, ln. 18 – p. 201, ln. 15,* (3) Snyder who, notwithstanding his belief that the Bosettis and another officer created such an unsafe environment within the Village that he refused to work with them, complained to nobody; *see, Ex. "F", at p. 290 ln. 6 – p. 291, ln. 23,* and; (4) Carter, in speaking to no one other than Hesse about Hesse's protection of those who knowingly provided alcohol to teenagers. *See, Ex. "B," at p. 366, ln. 4 – p. 340, ln. 25.*

23

Rogers' respective contentions that they had any involvement in the decision by Hesse not to hire plaintiffs for the 2006 Summer season.  Without such connection, plaintiffs' claims agains them individually must be summarily dismissed.

## POINT III

### PLAINTIFFS HAVE RAISED NO MATERIAL IUSSE OF FACT PRECLUDING SUMMARY DISMISSAL OF PLAINTIFFS' RESPECTIVE DUE PROCESS CLAIMS[21]

As predicted, plaintiffs argue that they each had a protectable property interest in their jobs as "seasonal" police officers simply because they had been hired as "seasonal" police officers for a number of consecutive seasons prior to 2006. *See, Pls. Mem. Of Law, at p. 3 – 4,* Notwithstanding that plaintiffs' argument has been flatly rejected by the Second Circuit Court of Appeals, *see, e.g., Schwartz v. Mayor's Committee On Judiciary, 816 F.2d 54 (2d Cir. 1987); Hawkins v. Steingut, 829 F.2d 317, 322 (2d Cir. 1987); Ponterio v. Kaye, 2009 U.S. App. LEXIS 7923 (2d Cir., April 16, 2009),* plaintiffs' reliance on some alleged implicit understanding or policy fails because, as they acknowledged, the 2006 Summer season "was the first summer season that [Hesse] had the authority to do [sic] fire police officers. *Pls. Mem. Of Law, at p. 21.*

Accordingly, now possessed with the responsibility for selecting the members of the Village's summer police force, any alleged prior policy or understanding necessarily terminated. To hold otherwise, the Village Defendants respectfully submit would effectively provide each plaintiff employment as a "seasonal" police officer in perpetuity, regardless of the number to times the leadership of the OBPD changed.  There simply is no doctrinal support for the tenure rights that plaintiffs seek.

Last, plaintiffs' arguments regarding the adequacy of an Article 78 proceeding to provide post-deprivation relief are unavailing.  First, plaintiffs have not cited any authority that stands

---

[21] While plaintiffs argue that their "substantive due process" rights were violated, *see, Pls. Mem. Of Law, at p. 14,* no such claim for relief was delineated in their Complaint.  Regardless, this claim has no merit.

for the proposition that Hesse, as a "Department Head," is a "high ranking official."[22] *But see, D'Allessandro v. City of Albany, 2008 U.S. Dist. LEXIS 14467 (N.D.N.Y. Feb. 26, 2008)* (District Court dismissed due process claims because of availability of Article 78 proceeding where state actor accused of publishing defamatory statements was Chief of Police for the Albany Police Department). Second, Hesse's status is of no moment -- since plaintiffs were nothing more than at-will employees with no Civil Service Law § 75 rights, *see, e.g., Igneri v. Town of Brookhaven, 232 A.D.2d 638, 639, 648 N.Y.S.2d 473 (2d Dept., 1996)*, "the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim … [.]" *Segal v. City of New York, 459 F.3d 207, 214 (2d Cir. 2006); see also, Walsh v. Suffolk County Police Dept., 2008 U.S. Dist. LEXIS 36465, \*45 -46 (E.D.N.Y. May 5, 2008). aff'd 2009 U.S. App. LEXIS 14292 (2d Cir. July 1, 2009).* "New York provides for such a name clearing hearing pursuant to CPLR Article 78[.]" *Walsh, id., at \* 46; see also, Sprang v. Katonah-Lewisboro Union Fr. Sch. Dist., 626 F. Supp. 2d 389, 396 - 97 (S.D.N.Y., 2009)* (rejecting same "high ranking" official argument as being advanced by plaintiffs herein).

## CONCLUSION

For the reasons stated above, Plaintiffs' federal and state law claims against the Village should be summarily dismissed.

---

[22] To accept plaintiffs' argument would subject every municipality in New York State to § 1983 procedural due process claims for every hiring decision made by a Department Head. There is no doctrinal support for the expansive interpretation of "high ranking official" advanced by plaintiffs.

Dated: Uniondale, New York
January 15, 2010

Respectfully submitted,

RIVKIN RADLER LLP

By:    /s/
       Kenneth A. Novikoff (KAN-0350)
       Michael P. Welch (MPW-7559)
       926 RexCorp Plaza
       Uniondale, New York 11556-0926
       Telephone: (516) 357-3000
       Facsimile: (516) 357-3333

       COUNSEL FOR *INCORPORATED VILLAGE OF*
       *OCEAN    BEACH;    MAYOR    JOSEPH    C.*
       *LOEFFLER, JR. individually and in his official*
       *capacity, former mayor NATALIE K ROGERS,*
       *individually and in her official capacity, OCEAN*
       *BEACH POLICE DEPARTMENT*

TO:    Andrew S. Goodstadt, Esq.
       Thompson, Widgor & Gilly, LLP
       *Counsel for Plaintiff*
       85 Fifth Avenue
       New York, NY 10003
       Agoodstadt@TWGlaw.com

       Arlene Zwilling, Esq.
       Suffolk County Attorney's Office
       H. Lee Dennison Building
       100 Veterans Memorial Highway
       Hauppauge, New York 11788
       Arlene.Zwilling@SuffolkCountyNY.gov

       James M. Skelly, Esq.
       Marks, O'Neill, O'Brien & Courtney, P.C.
       Attorneys for Defendant George Hesse
       530 Saw Mill River Road
       Elmsford, New York 10523

2325548 v1

26