1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

   EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,

4  JOSEPH NOFI, and THOMAS SNYDER,
                           Plaintiffs,

5             -against-    Case No. 07-Civ-1215
                                     (SJF)(ETB)

6  INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
   JOSEPH C. LOEFFLER, JR., individually and in

7  his official capacity; former mayor NATALIE
   K. ROGERS, individually and in her official

8  capacity; OCEAN BEACH POLICE DEPARTMENT;
   ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,

9  individually and in his official capacity;
   SUFFOLK COUNTY; SUFFOLK COUNTY POLICE

10 DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
   CIVIL SERVICE; and ALISON SANCHEZ,

11 individually and in her official capacity,
                           Defendants.

12 - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

13                   926 Reckson Plaza

14                   Uniondale, New York

15

16                   September 16, 2008

17                   9:52 A.M.

18

19         VIDEOTAPE DEPOSITION of EDWARD

20 CARTER, taken pursuant to the Federal Rules

21 of Civil Procedure, and Notice, held at the

22 above-mentioned time and place before Edward

23 Leto, a Notary Public of the State of New

24 York.

25



```
1

2    A P P E A R A N C E S:

3        THOMPSON WIGDOR & GILLY LLP
                 Attorneys for Plaintiffs
4                85 Fifth Avenue
                 New York, New York 10003
5        BY:     ANDREW S. GOODSTADT, ESQ.

6        RIVKIN RADLER LLP
                 Attorneys for Defendants
7                Incorporated Village of Ocean
                 Beach, Mayor Joseph C. Loeffler,
8                Jr., former Mayor Natalie K.
                 Rogers, and Ocean Beach Police
9                Department
                 926 Reckson Plaza
10               Uniondale, New York 11556
         BY:     KENNETH A. NOVIKOFF, ESQ.
11                    -and-
                 MICHAEL WELCH, ESQ.
12
         MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
13               Attorneys for Defendant Acting
                 Deputy Police Chief George B.
14               Hess
                 530 Saw Mill River Road
15               Elmsford, New York 10523
         BY:     KEVIN W. CONNOLLY, ESQ.
16
         SUFFOLK COUNTY ATTORNEY'S OFFICE
17               Attorneys for Defendants Suffolk
                 County, Suffolk County Police
18               Department, Suffolk County
                 Department of Civil Service, and
19               Alison Sanchez
                 100 Veterans Memorial Highway
20               Hauppauge, New York 11788
         BY:     ARLENE ZWILLING, ESQ.
21
     ALSO PRESENT
22       Albert Santana, Legal Video Specialist

23

24

25
```

1

2          IT IS HEREBY STIPULATED AND

3    AGREED by and among counsel for the

4    respective parties hereto, that the filing,

5    sealing and certification of the within

6    deposition shall be and the same are hereby

7    waived;

8          IT IS FURTHER STIPULATED AND

9    AGREED that all objections, except to the

10   form of the question, shall be reserved to

11   the time of the trial;

12         IT IS FURTHER STIPULATED AND

13   AGREED that the within deposition may be

14   signed before any Notary Public with the

15   same force and effect as if signed and sworn

16   to by the Court.

17

18

19

20

21

22

23

24

25

```
 1                    E. Carter
 2         THE VIDEOGRAPHER:    This is tape
 3    number one of the videotape deposition
 4    of Edward Carter in the matter of
 5    Edward Carter, et al., Plaintiffs,
 6    versus Incorporated Village of Ocean
 7    Beach, et al., Defendants, in the
 8    United States District Court, Eastern
 9    District of New York, case number
10    07-civ-1215(SJF)(ETB), on September 16,
11    2008 at approximately 9:52 a.m.
12         My name is Albert Santana from
13    the firm of Precise Court Reporting and
14    I'm the legal video specialist.  The
15    court reporter is Ed Leto in
16    association with Precise Court
17    Reporting.  For the record, will
18    counsel please introduce themselves.
19         MR. GOODSTADT:    Andrew
20    Goodstadt, Thompson Wigdor & Gilly, on
21    behalf of the Plaintiffs.
22         MR. NOVIKOFF:    Ken Novikoff and
23    Michael Welch, Rivkin Radler, on behalf
24    of all Village Defendants and the
25    individual Defendants, Loeffler and
```

1                        E. Carter

2          Rogers.

3                    MS. ZWILLING:      Arlene Zwilling

4          for Christine Malafi, Suffolk County

5          Attorney, representing the Suffolk

6          County Defendants.

7                    MR. NOVIKOFF:      And just for the

8          record, counsel for Mr. Hesse is not

9          here yet.  He's indicated that he is

10         going to be delayed.  We noticed this

11         up for 9:30, so we're going to proceed

12         with the deposition now, which is

13         approximately five to 10:00, right.

14                   THE VIDEOGRAPHER:      Now will the

15         court reporter please swear the

16         witness.

17   E D W A R D    C A R T E R, having first

18   been duly sworn by a Notary Public of the

19   State of New York, was examined and

20   testified as follows:

21                   THE COURT REPORTER:      Please

22         state your name for the record.

23                   THE WITNESS:      Edward Carter.

24                   THE COURT REPORTER:      Please

25         state your address.

```
 1                    E. Carter
 2          THE WITNESS:      55 Kansas
 3     Avenue, Bay Shore, New York 11706.
 4          MR. NOVIKOFF:     Mr. Goodstadt,
 5     regular stipulations?
 6          MR. GOODSTADT:     Yes.  Federal
 7     rules govern, local rules govern.  He's
 8     just going to reserve his right to
 9     review and sign.
10          MR. NOVIKOFF:     Just like the
11     last deposition.
12          MR. GOODSTADT:     Yes.
13  EXAMINATION BY
14  MR. NOVIKOFF:
15          MR. NOVIKOFF:     Good morning,
16     sir.  I am Ken Novikoff and I'm going
17     to be asking you a series of questions
18     today, and if you don't understand my
19     questions, then I would invite you to
20     tell me and I will try to rephrase them
21     in such a way that you better
22     understand them.
23          You are free to talk to your
24     counsel at any time as many times as
25     you'd like.  The only thing I would
```

```
 1                    E. Carter
 2          request is that while a question is
 3          pending, you answer the question before
 4          you speak with your counsel.
 5          Obviously, if your counsel instructs
 6          you not to answer a question, then you
 7          do what you need to do.
 8          Q.     Have you spoken with Mr. Nofi --
 9   well, withdrawn.  Are you aware that
10   Mr. Nofi has been deposed in this case?
11          A.     Yes.
12          Q.     Did you speak with Mr. Nofi after
13   his deposition?
14          A.     No.
15          Q.     Did you speak with Mr. Nofi
16   before his deposition specifically
17   concerning his deposition?
18          A.     No.
19          Q.     Have you spoken to the -- to any
20   of the other Plaintiffs in this case
21   subsequent to Mr. Nofi's deposition?
22          A.     With my attorney, yes.
23                 MR. NOVIKOFF:    Yes.  Again,
24          let's also -- if I ask you questions
25          concerning communications you may have
```

```
 1                      E. Carter

 2        had with the other Plaintiffs that were

 3        in the presence of your counsel, then

 4        just advise me of that and I'm sure

 5        your counsel will tell you not to

 6        answer.  Likewise, if any of my

 7        questions seek information concerning

 8        what you and your counsel said, I'm

 9        sure your counsel will object.

10        Q.     Outside the presence of your

11   counsel, have you spoken with any of the

12   Plaintiffs subsequent to the Nofi

13   deposition?

14        A.     When we first filed the lawsuit,

15   yes.

16        Q.     Let me rephrase.  Nofi was

17   deposed last week.

18        A.     Yes.

19        Q.     You're aware of that.  After,

20   between that date of his deposition and

21   today, have you spoken with any of the other

22   Plaintiffs?

23        A.     Yes.

24        Q.     Whom -- with whom have you

25   spoken?
```

```
 1                      E. Carter
 2        A.      With Kevin Lamm.
 3        Q.      And when did you speak with Kevin
 4   Lamm?
 5        A.      Prior to -- it would be Sunday.
 6                (Mr. Connolly entered the room.)
 7        Q.      And was that in the presence of
 8   your attorney?
 9        A.      No.
10        Q.      Was it by phone?
11        A.      Yes.
12        Q.      What was the sum and substance of
13   the conversation?
14        A.      I told him I was going for a
15   deposition on Tuesday and that we were
16   notified that several depositions were
17   canceled next week and the following weeks,
18   which we had taken days off for.
19        Q.      Okay.  Well, what deposition --
20   what days off did you take?
21        A.      I was going to take off  -- well,
22   I didn't -- I took off for tomorrow which is
23   Wednesday, and I was going to put in for a
24   couple days next week.
25        Q.      Why did you decide to take off
```

1                         E. Carter

2    for tomorrow?

3          A.      There was a deposition scheduled

4    for tomorrow.

5          Q.      Of whom?

6          A.      With Mr. Paridiso.

7          Q.      And why did you think it was

8    important for you to be at Mr. Paridiso's

9    deposition?

10         A.      With my case being as important

11   as it is to me, I think it's important for

12   me to make as many depositions as I can.

13         Q.      Fair enough.  And what did

14   Mr. Lamm say to you, if anything, on Sunday

15   after you told him you were going to be

16   deposed and that some of the depositions had

17   been canceled?

18         A.      He asked me if I knew where the

19   place was, which I was a little unsure of,

20   and I told him that -- I asked him if he was

21   going to go on Wednesday, and he said he

22   wasn't sure if he could get off from work or

23   not.

24         Q.      Was that the extent of your

25   conversation with Mr. Lamm?

1                    E. Carter

2         A.     Basically, yes.  From what I

3    recall at this time, yes.

4         Q.     Did you talk about any of the

5    substantive allegations in the complaint

6    with Mr. Lamm on Sunday?

7         A.     No.

8         Q.     Prior to Mr. Nofi's deposition

9    last week, did you speak with any of the

10   other Plaintiffs concerning Nofi's

11   deposition?

12        A.     Just the other told -- we were

13   told we were going for depositions.  Just

14   the dates.

15        Q.     Okay.  You didn't speak with the

16   other Plaintiffs concerning --

17             MR. GOODSTADT:    Just -- just so

18        when you say you were told that you

19        were going for dates, don't disclose

20        any communications that came from us.

21        He's talking about only between you and

22        the other Plaintiffs.

23        Q.     Other than -- putting aside what

24   you may or may not have spoken to counsel

25   about concerning your deposition, have you

```
 1                    E. Carter
 2   spoken to anybody else concerning the fact
 3   that you were being deposed today?
 4        A.    No.
 5        Q.    With whom are you presently
 6   employed, if anybody?
 7        A.    Township of Islip.
 8        Q.    And what job do you presently
 9   hold with the Township of Islip?
10        A.    Civil service job as a park
11   ranger two, which is a sergeant's position.
12        Q.    Are you presently employed by any
13   other entity or individual?
14        A.    No.
15        Q.    In year 2008, have you sought any
16   employment from any entity or individual?
17        A.    No.
18        Q.    In 2007, did you seek employment
19   with any entity or individual?
20        A.    No.  I couldn't for my reason for
21   termination.
22   MO          MR. NOVIKOFF:    Motion to strike
23        as nonresponsive.
24        Q.    My question was a yes or no.
25        A.    No.
```

```
 1                    E. Carter
 2       Q.    So let me rephrase the question.
 3             MR. GOODSTADT:    Just so I don't
 4       have to address your motion to strike
 5       each time, we --
 6             MR. NOVIKOFF:   I would --
 7             MR. GOODSTADT:    -- oppose any
 8       motion to strike.
 9             MR. NOVIKOFF:    I would
10       stipulate that any time I make a motion
11       to strike, you are going to oppose it
12       and we'll take that up with the court
13       at the appropriate time.
14             MR. GOODSTADT:    Great.
15             MR. NOVIKOFF:    Okay.
16       Q.    Sir, in 2007, did you seek any
17   employment with any entity or individual?
18       A.    No.
19       Q.    Sir, in 2006, did you seek
20   employment with any entity or individual?
21       A.    Yes.  I tried to seek employment
22   with the Suffolk County Park Police.
23   Seasonally.
24       Q.    When in 2006 did you seek
25   employment with the Suffolk County Park
```

1                    E. Carter

2    Police?

3         A.     The phone call was made May,

4    early May of 2006 to the Smith Haven

5    barracks in I believe it's Mastic or

6    Shirley.

7         Q.     I'm sorry, what was the end?

8         A.     Mastic or Shirley.  The location

9    of it.

10        Q.     Okay.  Other than the Suffolk

11   County Park Police, did you seek any other

12   employment in 2006?

13        A.     Yes.  My park ranger three

14   position with the Town of Islip, which is a

15   civil service test, promotional test.  I

16   applied for it January of 2006.  Took the

17   test.  The test results came out September

18   2006.

19        Q.     So the test results came out

20   after you were advised that you were no

21   longer working for Ocean Beach?

22        A.     Yes.

23        Q.     Okay.  And that would have been

24   instead of seeking new employment, you were

25   seeking a promotion; is that fair?

1                     E. Carter

2         A.     Furthering my career with more

3    money.  Yes.

4         Q.     It would be a promotion as

5    opposed to a new job for a new employer?

6         A.     It is a new job with the same

7    employer, yes.

8         Q.     Okay.  So other than the test

9    that you took for this new job with the same

10   employer and other than the Suffolk County

11   Park Police application, did you try to find

12   a job with any other entity or employer in

13   2006?

14        A.     I researched stuff and I saw

15   there were several polygraphs that I

16   couldn't apply for them, so no.

17        Q.     When you say there were

18   "several" -- I'm not asking why you couldn't

19   apply for them, I'm only now asking you

20   about your comment about there were several

21   polygraphs.  So my question is, what did you

22   mean by your answer that "there were several

23   polygraphs"?

24        A.     I went on websites for armed

25   security guard, armed carriers and I saw the

1                    E. Carter

2    requirements, and it came up with a

3    polygraph.  I looked into doing stock at

4    Toys R Us, I had to take a polygraph.

5          Q.     Now why was taking a polygraph a

6    problem?

7          A.     The problem was when George Hesse

8    fired me, terminated me from Ocean Beach, he

9    originally told me I was let go for

10   directives that he posted in the fall.

11         Q.     Okay.

12         A.     He further went on later on at a

13   meeting on April 2, when I was let go, that

14   I was going to wear a wire for the District

15   Attorney's office in reference to a Gilbert

16   incident, a businessman that was beat up

17   while at Ocean Beach.

18         Q.     Okay.

19         A.     Subsequent phone call to Hesse

20   later on winds up being he tells me -- there

21   was a blog, the Long Island Politics, that I

22   did official misconduct, falsified paperwork

23   for a Halloween incident.  Arnold Hardman

24   calls me, reconfirms saying, "Carter" --

25   right after I was let go -- "you got scooped

1                    E. Carter

2    up.  I think you got scooped up in the

3    Halloween incident," which I wasn't working

4    then.  So there were three reasons at that

5    point why he let me go.  The fourth reason

6    he gave me is I was sleeping.  There was no

7    way I could answer a polygraph why I was let

8    go.

9         Q.    But, sir, a polygraph -- to your

10    knowledge, isn't it true that a polygraph is

11    a device wherein it is asking you questions

12    to see if your responses were less than

13    truthful?

14              MR. GOODSTADT:    Objection.

15         A.    Yes.

16         Q.    You have that understanding as to

17    what a polygraph is, correct?

18         A.    Yes.  Also, the question why were

19    you terminated or fired from Ocean Beach I

20    couldn't answer.

21         Q.    Well, that doesn't mean that you

22    would be lying, would it?

23              MR. GOODSTADT:    Objection.

24         Q.    Were you lying in response to

25    when -- the last answer that you gave with

1                        E. Carter

2     regard to the four reasons that you say that

3     Mr. Hesse says that he gave you for being

4     fired, were you lying?

5          A.     No.

6          Q.     Okay.  So if someone asked you on

7     a polygraph question exam "why were you

8     fired" and you answered "I don't know,"

9     would that be a truthful response?

10                MR. GOODSTADT:     Objection.

11         Q.     As you sit here today?  You can

12    answer.

13         A.     I'm sorry.

14                MR. GOODSTADT:     You can answer.

15         Q.     You can answer the question.

16         A.     It would be truthful.

17         Q.     And if someone asked you during a

18    polygraph exam what were the reasons that

19    Mr. Hesse gave you for being fired as you

20    say you were on April 2, you would have

21    given the same answers you just gave me,

22    correct?

23                MR. GOODSTADT:     Objection.

24         A.     No.  They have yes and no

25    questions and they would -- just the

                           E. Carter

1    hearing, again, why I was let go, my blood

2    pressure would be raised, which would give

3    off on the polygraph, and I would -- I would

4    definitely not pass a polygraph, and Hesse

5    was aware of that and I made him aware of

6    that.

7        Q.    When did you make Mr. Hesse aware

8    that your blood pressure would be raised

9    during a polygraph exam?

10       A.    I made him aware -- I didn't make

11   him aware of that.

12       Q.    Okay.  When did you make

13   Mr. Hesse aware that you would fail a

14   polygraph test because of the events that

15   took place on April 2, 2006?

16              MR. GOODSTADT:    Objection.

17       A.    I called -- I called him May.

18       Q.    Just answer me when.

19       A.    In May.

20       Q.    Okay.  How?

21       A.    By phone.

22       Q.    And what did you say to Mr. Hesse

23   concerning your concerns that you would

24   be -- you would fail a polygraph test?

1                     E. Carter

2          A.     I told him I would have to take a

3     polygraph for the Suffolk County Park Police

4     and a background, and I needed to know why I

5     was let go.

6          Q.     Okay.  Sir, in that conversation,

7     did you tell Mr. Hesse that you would fail a

8     polygraph test because of the events

9     concerning April 2, 2006?

10              MR. GOODSTADT:     Objection.

11         Q.     Yes or no?

12         A.     I'm sure I expressed it in the

13    way I asked him, yes.

14         Q.     I don't understand what that

15    means, sir.  What do you mean you expressed

16    it in a way you asked him?  My question is

17    simple, did you advise Mr. Hesse

18    specifically "I will fail a polygraph test

19    because of the events surrounding April 2,

20    2006"?

21              MR. GOODSTADT:     Objection.

22         A.     No.

23         Q.     Now since you brought it up, I'm

24    going to ask you this.  What reasons did

25    George Hesse give you at any point in time

```
 1                    E. Carter
 2   for why you were no longer going to be
 3   working for Ocean Beach?  I don't want to
 4   know the circumstances surrounding the
 5   conversation, I just want to know the
 6   specific reasons that George Hesse
 7   communicated to you directly.
 8        A.    The original one at April 2 was
 9   he had to let someone go for the directives
10   he hung up in the fall and he chose me.
11        Q.    Okay.  Next one?
12        A.    Later on, during a phone call and
13   an email, May of 2006, he told me for
14   sleeping.
15        Q.    Okay.  So he communicated to you
16   two reasons why he let you go.  One was for
17   what you labeled directives, and two is
18   because you were sleeping?
19        A.    Yes.
20        Q.    Any other reasons that he
21   communicated directly to you concerning why
22   he made the decision not to rehire you for
23   the 2006 summer season?
24             MR. GOODSTADT:    Objection.
25             MR. NOVIKOFF:    Well, I'll
```

1                    E. Carter

2        withdraw the question.

3        Q.    Other than the two reasons you

4   just gave me, are there any other reasons

5   that Mr. Hesse communicated to you directly

6   with regard to why you were no longer

7   working for Ocean Beach after April 2, 2006?

8        A.    No.

9              MR. NOVIKOFF:    I'm going to ask

10             the court reporter to mark the

11             following documents as Carter-1.

12             (Notice of Claim was marked as

13              Carter Exhibit-1 for identification;

14              9/16/08, E.L.)

15       Q.    Sir, I'm going to show you what's

16   been marked as Carter-1 and ask you to

17   review it, and please advise me when you're

18   done reviewing it.

19       A.    (Reviewing).  I'm done, sir.

20       Q.    And do you recognize this

21   document?

22       A.    Yes, sir.

23       Q.    And what is this document?

24       A.    It's a Notice of Claim.

25       Q.    And are you aware what a Notice

1                     E. Carter

2    of Claim is?

3         A.     I'm a little familiar with it,

4    sir.

5         Q.     What's your understanding what a

6    Notice of Claim is?

7         A.     My understanding is a Notice of

8    Claim must be filed within a specific period

9    of time after a wrong doing is done for

10   court or legal proceedings to proceed.

11        Q.     And let's turn to the third page.

12   It says -- there's a signature, do you see

13   that?

14        A.     Yes.

15        Q.     And it's "respectfully yours,

16   Thompson Wigdor & Gilly, LLP," do you see

17   that?

18        A.     Yes.

19        Q.     Was that your lawyer -- well, was

20   that the law firm representing you at the

21   date that the Notice of Claim was filed?

22        A.     Yes.

23        Q.     And you see the date "June 30,

24   2006"?

25        A.     Yes.

1                          E. Carter

2          Q.      Did you review the Notice of

3    Claim before you  -- well, did you authorize

4    your lawyers to file the Notice of Claim on

5    your behalf?

6          A.      Yes.

7          Q.      And did you review the Notice of

8    Claim prior to it being filed by your

9    lawyers?

10         A.      Yes.

11         Q.      On how many occasions did you

12   review the Notice of Claim prior to it being

13   filed?

14         A.      One time.

15         Q.      And did you review the Notice of

16   Claim for purposes of accuracy?

17         A.      Yes.

18         Q.      And would it be correct to say

19   that if you found that there was anything

20   that was inaccurate in there, you would have

21   notified your lawyers about that?

22              MR. GOODSTADT:     Objection.

23         A.      Yes.

24   RL    Q.      And prior to authorizing your

25   lawyers to file the Notice of Claim, did you

PRECISE COURT REPORTING
(516) 747-9393   (718) 343-7227   (212) 581-2570

```
 1                    E. Carter
 2  advise them that there was anything
 3  inaccurate?
 4  DI          MR. GOODSTADT:    Objection.  I'm
 5       going to instruct the witness not to
 6       respond to the question as it violates
 7       attorney/client communication.
 8               MR. NOVIKOFF:    I don't think it
 9       does, but let's mark that for a ruling.
10               MR. GOODSTADT:    Okay.
11       Q.    When you read this Notice of
12  Claim, was there anything inaccurate that
13  you saw?
14       A.    No.
15       Q.    And when I say "this Notice of
16  Claim," I'm talking about what's been marked
17  as Carter-1?
18       A.    No.
19       Q.    Okay.  Let's look at the "nature
20  of the claim" section.  Four lines from the
21  bottom, five lines from the bottom, in the
22  middle it says "and otherwise," do you see
23  it?
24       A.    Yes.
25       Q.    And just for the record, there is
```

```
 1                    E. Carter
 2  underlining on the Notice of Claim.  I don't
 3  know who put that there, but you --
 4  withdrawn.  I didn't put that there, so.
 5  "And otherwise wrongful conduct and
 6  practices engaged in by numerous senior
 7  ranking officers, including but not limited
 8  to Sergeant George Hesse," do you see that?
 9        A.    Yes.
10        Q.    Who are the other senior ranking
11  officers that you refer to in this Notice of
12  Claim?
13        A.    The officers that had more time
14  than me, which would be Ken Bockelman, Tyree
15  Bacon.
16        Q.    Anybody else?
17        A.    Those are the examples I recall
18  at this time.
19        Q.    So your understanding of senior
20  ranking officers means that they have more
21  experience than you?
22        A.    Yes.
23        Q.    At Ocean Beach?
24        A.    Yes.
25        Q.    How do you know Ty Bacon has more
```

```
 1                    E. Carter
 2  experience than you?
 3        A.     He started there prior to my
 4  starting in 1991.
 5        Q.     And was he working there
 6  continuously, to your knowledge?
 7        A.     To my knowledge, no.
 8        Q.     Do you know how many days he
 9  worked since 1991?
10        A.     No.
11        Q.     So how do you know that he worked
12  more days from the commencement of his
13  employment with Ocean Beach that you
14  worked -- than you worked?
15               MR. GOODSTADT:    Objection.
16        A.     He was --
17        Q.     I just want to know --
18        A.     He was there more than a year or
19  two prior to me.
20        Q.     But he was seasonal, correct?
21        A.     Yes.
22        Q.     You're seasonal?
23        A.     Yes.
24        Q.     That means you're not working
25  five days a week, correct?
```

```
 1                        E. Carter
 2             MR. GOODSTADT:     Objection.
 3             MR. NOVIKOFF:     Well, withdrawn.
 4        Q.     What's your understanding of the
 5   word "seasonal"?
 6        A.     Seasonal is from May to
 7   September.
 8        Q.     Right.  And you're working
 9   shifts, correct?
10        A.     Yes.
11        Q.     Less than 40 hours a week on
12   average?
13        A.     Myself, yes.
14        Q.     Yes.  How about Ty Bacon?
15        A.     He worked quite a few hours more.
16        Q.     How do you know?
17        A.     Because the schedules.
18        Q.     You saw the schedules since 1991
19   of when Ty Bacon worked?
20        A.     He was on the same schedule as
21   me, yes.
22        Q.     My question is, you've looked --
23   you know as you sit here today how many
24   days -- how many shifts Ty Bacon worked
25   since 1991?
```

1                         E. Carter

2          A.     No.

3                 MR. GOODSTADT:     Objection.

4          That wasn't the question.

5          Q.     Sir, would you agree with me that

6     you're just speculating as to whether or not

7     Mr. Bacon worked more hours at Ocean Beach

8     than you in your respective employment

9     histories?

10                MR. GOODSTADT:     Objection.

11         A.     It's my belief he did.

12         Q.     And it's your belief based upon

13    what?

14         A.     Based upon the number of times I

15    seen him there.

16         Q.     Did he work nights?

17         A.     Yes.

18         Q.     Did he work the same nights you

19    worked?

20         A.     Not always.

21         Q.     And if you weren't at Ocean Beach

22    during a particular night, you don't know

23    whether he was working there that night,

24    correct?

25                MR. GOODSTADT:     Objection.

```
 1                        E. Carter
 2          A.      Without looking back through the
 3   blotter book, no.
 4          Q.      Who's the other guy?
 5          A.      Kenneth Bockelman.
 6          Q.      Okay.  And how do you know he was
 7   more senior than you in terms of experience
 8   at Ocean Beach?
 9          A.      He worked 40 hours a week, and in
10   the off season, for many more hours than I
11   did.
12          Q.      How do you know?
13          A.      Because of the schedule.
14          Q.      And when did he start working for
15   Ocean Beach?
16          A.      I don't recall the exact date.
17          Q.      You started working for Ocean
18   Beach in 1991, correct?
19          A.      Yes.
20          Q.      And then there was a period of
21   time that you stopped, right?
22          A.      Yes.
23          Q.      Was Mr. Bockelman there in 1991?
24          A.      No.
25          Q.      Was Mr. Bockelman there on the
```

```
1                    E. Carter
2    last day of your employment during your
3    first tenure with Ocean Beach?
4         A.    No.
5         Q.    When did you recommence your
6    employment with Ocean Beach after your first
7    go around?
8         A.    2001.
9         Q.    Was Mr. Bockelman there in 2001?
10        A.    Yes.
11        Q.    Do you know how long prior to
12   2001 Mr. Bockelman first showed up?
13        A.    Only from what he said.  He
14   graduated the academy couple years earlier.
15        Q.    But that doesn't necessarily mean
16   he was working for Ocean Beach, correct?
17        A.    He went right to Ocean Beach.
18        Q.    Oh, he went right to Ocean Beach.
19   And did he work nights as well?
20        A.    Yes.
21        Q.    What unlawful conduct did
22   Mr. Bacon engage in, as you refer to in
23   here?
24        A.    Drinking on duty.
25        Q.    Okay.  And what tortious conduct
```

```
 1                    E. Carter
 2    did Mr. Bacon engage in as you refer to in
 3    here?
 4              MR. GOODSTADT:    Objection.
 5              MR. NOVIKOFF:     I'm just asking
 6        him.
 7              MR. GOODSTADT:    Calls for a
 8        legal conclusion.
 9              MR. NOVIKOFF:    Okay.  But this
10        is his document, so.
11        Q.    What tortious conduct did
12    Mr. Bacon engage in?
13              MR. GOODSTADT:    Same objection.
14        Q.    You can answer.
15        A.    At this time, I don't recall any.
16        Q.    What wrongful conduct and
17    practices did Mr. Bacon engage in as you
18    refer to in here?
19              MR. GOODSTADT:    Objection.
20        A.    The drinking on duty.
21        Q.    Okay.  Anything else?
22        A.    That I'm aware at this time, no.
23        Q.    So are you alleging here that you
24    were unlawfully terminated because you did
25    not participate with Mr. Bacon in drinking
```

1                          E. Carter

2       off duty?

3            A.       Drinking with Mr. Bacon and the

4       other officers, yes.

5            Q.       And Mr. Bacon fired you?

6            A.       Mr. Hesse fired me.

7            Q.       Okay.  So Mr. Bacon didn't have

8       anything to do with you being fired,

9       correct?

10           A.       Directly that I know of, no.

11           Q.       He had no authority to hire

12      you -- to fire you, to the best of your

13      knowledge, correct?

14           A.       Correct.

15           Q.       He was the same rank as you?

16           A.       Correct.

17           Q.       Okay.  And Bachman, what unlawful

18      conduct did Bachman participate in as you

19      allege here?

20           A.       He also drinking on duty.

21                 MR. GOODSTADT:    Just so the

22                 record is clear, I think it's

23                 "Bockelman."

24                 MR. NOVIKOFF:    "Bockelman,"

25                 okay.

```
 1                    E. Carter
 2        Q.    And what about tortious conduct,
 3   what tortious conduct did Mr. Bockelman
 4   engage in?
 5             MR. GOODSTADT:    Objection.
 6        Q.    Okay.  You can answer.
 7        A.    None that I know of at this time.
 8        Q.    Is there anything in your
 9   possession, custody or control that would
10   refresh your recollection?
11        A.    No.
12        Q.    What wrongful conduct and
13   practices did Bockelman engage in as you
14   refer to here?
15             MR. GOODSTADT:    Objection.
16        A.    The drinking on duty.
17        Q.    Okay.  Anything else?
18        A.    With myself, no.
19        Q.    Right.  And my questions, unless
20   I ask you differently, are just as it
21   relates to you.  Was Bockelman the same rank
22   as you?
23        A.    Yes.
24        Q.    He didn't have any authority to
25   fire you, to your knowledge, did he?
```

1                      E. Carter

2          A.      Not that I know of, no.

3          Q.      Did he -- to your knowledge, did

4   he have anything to do directly with you

5   being fired?

6          A.      Not that I know of.

7          Q.      Any other officers that you can

8   refer  -- that you can advise us of that you

9   consider to be senior ranking officers as

10  you used that term in this Notice of Claim?

11         A.      No, sir.

12         Q.      Okay.  And when did you first

13  find out -- well, when did you first learn

14  that Bacon was drinking off duty?

15                 MR. GOODSTADT:      Objection.

16         A.      Off duty?

17                 MR. NOVIKOFF:      Well, withdrawn.

18         Q.      Drinking on duty as you say was

19  an unlawful conduct?

20         A.      I saw it in 2003.

21         Q.      And did you complain to anybody

22  about Mr. Bacon now specifically?

23         A.      Mr. Bacon, yes.

24         Q.      Who did you complain to?

25         A.      George Hesse.

```
 1                    E. Carter
 2         Q.    Anybody else in 2003 now?
 3         A.    There were other officers
 4  drinking in the station along with
 5  Mr. Bacon, yes.
 6         Q.    I'm only concerned now about
 7  Mr. Bacon.
 8         A.    No.
 9         Q.    Did you complain to anyone else
10  in 2003, other than Mr. Hesse?
11         A.    No.
12         Q.    Did you complain to Mr. Hesse
13  about Mr. Bacon drinking on duty in 2004?
14         A.    Yes.
15         Q.    How many times in 2003 did you
16  complain to Mr. Hesse about Mr. Bacon
17  drinking on duty?
18         A.    Mr. Bacon would have been
19  approximately three times.
20         Q.    Do you recall when in 2003?
21         A.    Summer of 2003.
22         Q.    Three times during the summer of
23  2003; is that correct?
24         A.    That I witnessed, yes.
25         Q.    And how about  -- no, not that
```

```
 1                    E. Carter
 2   you witnessed.  That you complained to
 3   Mr. Hesse about.
 4         A.    Yes.
 5         Q.    Three times?
 6         A.    (Indicating).
 7         Q.    So would it be -- yes?
 8         A.    Yes.
 9         Q.    So would it be fair based upon
10   your testimony -- I'm sorry, would it be a
11   fair characterization of your testimony that
12   every time that you saw Mr. Bacon drink in
13   2003 while on duty, you complained to
14   Mr. Hesse about it?
15         A.    Yes.
16         Q.    Okay.  And the first time that
17   you complained, what did you say to
18   Mr. Hesse?
19         A.    I said, "George, this is
20   bullshit.  I got to clean up all your guys'
21   beers, rocket fuel, empty cups with Bacon,
22   you and the other guys drinking."  And
23   George just said, "Shut up and do it."
24         Q.    He said shut up and what?
25         A.    Do it.
```

1                    E. Carter

2        Q.     So you weren't necessarily

3   complaining about Mr. Bacon drinking, you

4   were complaining about the fact that you had

5   to clean up his mess and other people's

6   mess, correct?

7              MR. GOODSTADT:    Objection.

8        A.     No.  I was complaining that the

9   officers were drinking in the station and

10  leaving the mess.

11       Q.     But what specifically did you say

12  to Mr. Hesse when you say you complained to

13  him that first time?

14       A.     "George, this is bullshit.  You

15  guys are drinking in the station and leaving

16  a mess.  Beer cans, rocket fuels, cups, and

17  why do I have to clean it up?"

18       Q.     Okay.  So would it be fair to say

19  that part of your complaint was the fact

20  that you had to clean up the other officers

21  that you claim were drinking while on duty

22  in the station?

23       A.     Part of my claim, yes.

24       Q.     Okay.  Part of your complaint?

25       A.     Yes.

```
1                         E. Carter
2          Q.      Okay.  The second time in 2003
3    that you complained, what did you say to
4    Mr. Hesse?
5          A.      Basically the same thing.
6    "George, what's going on?"  "You know, why
7    do I have to clean up this stuff again?"
8          Q.      Okay.  Third time in 2003, what
9    was the sum and substance of your complaint
10   to Mr. Hesse?
11         A.      That the rocket fuels were
12   dropped at the front desk where I was.
13         Q.      And that you had to clean it up?
14         A.      No.  That the guys were coming in
15   picking them up and I was in the middle of
16   doing stuff.  Paperwork and stuff.
17         Q.      So what was your complaint?
18         A.      My complaint was the alcohol was
19   brought in the station.  It shouldn't have
20   been there.
21         Q.      Okay.  So it really had nothing
22   to do with the fact that you were doing
23   paperwork at the desk?
24         A.      It interfered with myself doing
25   the paperwork, yes.
```

1                          E. Carter

2          Q.      Got it.  And the second time that

3     you complained to Mr. Hesse, what was

4     Mr. Hesse's response?

5          A.      Again, just laughed it off and

6     walked away.

7          Q.      Third time, what was Mr. Hesse's

8     response?

9          A.      He gave me a look and said, "Just

10    cut the shit," and walked out.

11         Q.      He said to you "cut the shit"?

12         A.      Yup.

13         Q.      Now was Mr. Hesse the chief of

14    police at the time in 2003, to your

15    knowledge?

16         A.      No.

17         Q.      Who was?

18         A.      Chief Ed Paridiso.

19         Q.      Did you -- when -- well, how

20    would you characterize Mr. Hesse's response

21    to your first complaint in 2003?

22         A.      Normal George Hesse response.

23         Q.      Well, did he --

24                 MR. CONNOLLY:     Objection.

25                 MR. NOVIKOFF:     What's that?

```
 1                    E. Carter
 2           MR. CONNOLLY:    Objection.
 3           MR. NOVIKOFF:     You objected.
 4      Q.    Did you -- again, what did
 5  Mr. Hesse say to you when you complained to
 6  him the first time in 2003?
 7      A.    "Cut the bullshit."
 8      Q.    Now would you agree with me that
 9  a fair interpretation of Mr. Hesse's
10  response was that he was not going to do
11  anything about your complaint?
12           MR. GOODSTADT:    Objection.
13      Q.    Your first complaint?
14           MR. GOODSTADT:    Objection.
15      A.    Yes.
16      Q.    Okay.  Did you take -- did you
17  take your first complaint to Mr. Paridiso?
18      A.    No.
19      Q.    Did you take your complaint to
20  Mayor Rogers at the time?
21      A.    No.
22      Q.    Did you take -- the first time
23  that you complained to Mr. Hesse and he did
24  not give you a favorable response, did you
25  take your complaint to any trustee?
```

```
 1                        E. Carter
 2          A.      No.
 3          Q.      Second time in 2003, what did
 4   Mr. Hesse say to you when you complained?
 5          A.      He said, "Just clean it up."
 6          Q.      Okay.  Would you agree with me
 7   that that wasn't a favorable response on
 8   Mr. Hesse's part to your complaint?
 9                  MR. GOODSTADT:     Objection.
10          A.      Yes.
11          Q.      Did you take that second
12   complaint to Mr. Paridiso?
13          A.      No.
14          Q.      Did you take that second
15   complaint to Mayor Rogers?
16          A.      No.
17          Q.      Did you take that second
18   complaint to any trustee of the village?
19          A.      No.
20          Q.      Third time that Mr.  -- that you
21   complained to Mr. Hesse I believe you said
22   that he said "cut the bullshit," right?
23          A.      Yes.
24          Q.      Again, would you agree with me
25   that that was not a favorable response to
```

```
 1                    E. Carter
 2   your complaint?
 3              MR. GOODSTADT:    Objection.
 4        A.    Yes.
 5        Q.    Did you take that complaint to
 6   Mr. Paridiso?
 7        A.    No.
 8        Q.    Did you take that complaint to
 9   Mayor Rogers?
10        A.    No.
11        Q.    Did you take that complaint to
12   any trustee member?
13        A.    No.
14        Q.    At any point in time in 2003, did
15   you complain to Ed Paridiso about the fact
16   that there were officers, to your
17   recollection, to your belief, drinking off
18   duty in the police station?
19              MR. GOODSTADT:    Objection.
20              MR. NOVIKOFF:    I'm sorry.  I'm
21        sorry.  Withdraw the question.
22        Q.    At any point in time in 2003, did
23   you complain to Ed Paridiso that there were
24   officers on duty drinking?
25        A.    No.
```

```
 1                    E. Carter
 2        Q.    Same question with regard to
 3   Mayor Rogers?
 4        A.    No.
 5        Q.    Same question with regard to any
 6   trustee at the time?
 7        A.    No.
 8        Q.    In 2003, did you communicate with
 9   Ed Paridiso in any manner, shape or form
10   that there were officers drinking on duty?
11        A.    No.
12        Q.    Same question as to Mayor Rogers?
13        A.    No.
14        Q.    Same question as to the trustees?
15        A.    No.
16        Q.    Same question as to specifically
17   Mayor Loeffler -- I mean Mr. Loeffler?
18        A.    No.
19        Q.    Okay.  2004 now --
20             MR. GOODSTADT:    Just so we're
21        clear, you're talking about Joe
22        Loeffler?
23             MR. NOVIKOFF:    The Defendant in
24        this case, yes.  And unless I otherwise
25        indicate, if I say "Mr. Loeffler," I'm
```

```
 1                    E. Carter
 2          referring to the present mayor and the
 3          person who's now a Defendant in this
 4          lawsuit.
 5          Q.     How many times did you complain
 6   to George Hesse in 2004 about officers
 7   drinking while on duty?
 8          A.     Approximately three.
 9          Q.     Okay.  And when was your first in
10   2004?
11          A.     It was the summer of 2004 when I
12   had to leave two officers with a cell phone
13   and a police radio at CJ's Bar.
14   MO             MR. NOVIKOFF:   Okay.  I'm going
15          to move to strike that part of the
16          answer after the time period that
17          Mr. Carter indicated in his answer.
18          Q.     So you first complained in
19   2000 -- in the summer of 2004.  When was
20   your second and third complaint?
21          A.     Also the summer of 2004.
22          Q.     Okay.  Let's talk about your
23   first complaint to Mr. Hesse.  What did you
24   specifically say to him?
25          A.     I said, "George, I'm coming in.
```

```
 1                    E. Carter
 2   There's no one -- there's a dock master at
 3   the station."  I said, "I got to walk into
 4   CJ's Bar and get the radio and the cell
 5   phone from Rich and Gary Bosetti, and I
 6   think it's bullshit."
 7        Q.     And Rich and Gary Bosetti were
 8   officers of Ocean Beach?
 9        A.     Yes.
10        Q.     And when you went in on that
11   occasion to get the cell phone from them,
12   they were on duty, to the best of your
13   knowledge?
14        A.     Yes.
15        Q.     And what did Mr. Hesse say to
16   you, if anything, in response to your --
17        A.     He -- he just looked at me and
18   walked away.
19        Q.     Okay.  And how long after you had
20   to get the cell phone from the Bosettis did
21   you make the complaint to George Hesse?
22        A.     The next time I saw him.
23        Q.     Okay.  Was that the same night?
24   The next night?  Next week?
25        A.     It was within the week.
```

```
 1                    E. Carter
 2        Q.     Okay.  And would you
 3   characterize -- well, with regard to the
 4   complaint about getting the cell phone from
 5   the Bosettis in 2004 that you raised with
 6   Mr. Hesse, did you raise this complaint with
 7   Mayor Rogers?
 8        A.     No.
 9        Q.     Did you raise this complaint with
10   Ed Paridiso?
11        A.     No.
12        Q.     Did you raise this complaint with
13   Mr. Loeffler?
14        A.     No.
15        Q.     Did you raise this complaint with
16   any member of the  -- any trustee?
17        A.     No.
18        Q.     Okay.  Second time, what was your
19   complaint to Mr. Hesse about concerning
20   officers drinking on duty?
21        A.     Same thing.  Relieving the
22   officers in the bar.
23        Q.     "Same thing" meaning you had to
24   go get the cell phone?
25        A.     I had to go get the cell phone
```

```
 1                    E. Carter
 2    and police radio from in the bar.
 3         Q.    And the bar was CJ's?
 4         A.    Yes.
 5         Q.    And what did Mr. Hesse say to you
 6    in response to your second complaint on this
 7    subject in 2004?
 8         A.    That he would take care of it.
 9         Q.    Okay.  And did Mr. Hesse advise
10    you as to how he would take care of it?
11         A.    No.
12         Q.    Did you inquire with Mr. Hesse as
13    to how he would take care of it?
14         A.    I found out the next time I
15    relieved.
16         Q.    Did you inquire with Mr. Hesse
17    during the second complaint as to how he
18    would take care of it?
19         A.    No.
20         Q.    Okay.  Did, to your knowledge --
21    withdrawn.  To your knowledge, did Mr. Hesse
22    take care of it?
23         A.    Yes.
24         Q.    What did he do?
25         A.    He then -- I then wound up
```

1                    E. Carter

2    relieving -- walking into the station.  A

3    dock master had the cell phone, the police

4    cell phone and the radio.

5         Q.    So what exactly did Mr. Hesse do

6    to take care of it, to the best of your

7    recollection?

8         A.    To the best of my knowledge, he

9    told them stop going out to the bars with

10   the police radio and the cell phone.

11        Q.    Okay.  And did the Bosettis stop

12   doing that after your second complaint in

13   2004?

14        A.    Yes.

15        Q.    Okay.  What was your third

16   complaint concerning officers drinking on

17   duty to Mr. Hesse in 2004?

18        A.    I'm sorry, officers drinking on

19   duty?

20        Q.    Yes.  Well, that was the only

21   thing I think you mentioned, so.

22        A.    Yes.  That was also the rocket

23   fuels being brought into the police station.

24        Q.    Okay.  And that was -- the third

25   complaint that you made to Mr. Hesse was

1                    E. Carter

2    about the rocket fuels being brought into

3    the station?

4         A.    Yes.

5         Q.    What did Mr. Hesse say to you, if

6    anything, in response to your complaint on

7    this subject matter?

8         A.    Just chuckled and ignored me.

9         Q.    Okay.  And did you speak with

10   Mr. Paridiso about your third complaint

11   concerning the rocket fuel?

12        A.    No.

13        Q.    Did you speak with mayor -- did

14   you complain to Mayor Rogers?

15        A.    No.

16        Q.    Did you complain to Mr. Loeffler

17   about this third complaint?

18        A.    No.

19        Q.    Did you complain to any trustee

20   member?

21        A.    No.

22        Q.    Did you communicate, in 2004,

23   with anyone, other than Mr. Hesse,

24   concerning your complaints about officers

25   drinking on duty that you've just testified

```
 1                    E. Carter

 2   to?

 3        A.    No.

 4        Q.    2005, did you complain to

 5   Mr. Hesse about officers drinking on duty?

 6        A.    Yes.

 7        Q.    How many times?

 8        A.    One that sticks with me at this

 9   time that I recall.

10        Q.    And when was that?

11        A.    It was Labor Day weekend.

12        Q.    Labor Day, so that would have

13   been early September 2005?

14        A.    Yes.

15        Q.    And what did you say to

16   Mr. Hesse?

17        A.    I told him down at a bar,

18   Maguire's, I said, "What's going on?"  I

19   said, "I had to take off to go have one

20   drink and you guys are getting paid to have

21   a drink?"  And he just looked at me and

22   said, "Shut up."

23        Q.    What do you mean when you said

24   you had to take off to have one drink?

25        A.    I wound up -- one of the guys was
```

                     E. Carter

going over to Iraq, Hank Clemens.  We had

nine guys, approximately nine guys on the

midnight tour.  I asked George if I could

work half a tour from 8:00 at night to 12:00

and go out for two beers with Hank prior to

him leaving, deploying for Iraq, and George

says, "I have plenty of coverage.  Yes, you

could go."

    Q.    So Mr. Hesse said that you could

take a half a shift and celebrate with the

person going to Iraq, correct?

    A.    Yes.

    Q.    So what was your complaint?

    A.    Later, later in the morning,

approximately 3:30, 4:00 in the morning, I

walked down to Maguire's Bar, several of the

officers were inside drinking shots of

liquor while on duty.

    Q.    So your complaint was you had to

go off duty to drink, but the other people

were on duty and drinking?

    MR. GOODSTADT:    Objection.

    Q.    Was that your -- was that your

complaint to Mr. Hesse?

1                    E. Carter

2         A.     No.   My complaint is you're

3    drinking again in uniform and why did I have

4    to take off, you know.

5         Q.     Yes.   That's what I'm trying to

6    understand, sir.   Were you upset that you

7    had to take off in order to have a drink

8    with your -- with your friend who was going

9    to Iraq?

10        A.     No.

11        Q.     And the other officers could

12   drink on duty?

13        A.     I wasn't upset that I had to take

14   off, no.

15        Q.     Then what was the purpose of your

16   telling George Hesse that you had to take

17   off to drink and the others didn't?

18        A.     It just was part of what I said

19   to him.   But my complaint was they were

20   drinking while on duty.

21        Q.     So that was your complaint?

22        A.     Yes.

23        Q.     So let me go back to this

24   incident, this night.   You asked Mr. Hesse

25   to just work 8:00 to 12:00, correct?

```
 1                    E. Carter
 2        A.     Yes.
 3        Q.     So you could have a couple of
 4   drinks with your -- with your friend?
 5        A.     Yes.
 6        Q.     Who was an officer?
 7        A.     Yes.
 8        Q.     And you stopped working at 12:00
 9   that night?
10        A.     Yes, I did.
11        Q.     And then at 4:00 in the morning,
12   you saw two on duty officers drinking?
13             MR. GOODSTADT:    Objection.
14        Q.     Is that your testimony?
15        A.     No.
16        Q.     What was your testimony?
17        A.     Approximately 3:00, 3:30 in the
18   morning, down at Maguire's, there were
19   several officers.
20        Q.     Okay.  And where did you have
21   your drink with your friend?
22        A.     Down at Ocean Beach.
23        Q.     And is it your testimony that you
24   had two drinks in three hours?
25        A.     Yes.
```