1                          E. Carter

2          Q.      And the rest of the evening was

3    just pleasant conversation?

4                  MR. GOODSTADT:      Objection.

5          A.      I had one other drink later on.

6          Q.      So you had three drinks?

7          A.      Down with the officers later on,

8    yes.

9          Q.      What officers?

10         A.      George Hesse.  The ones -- Jimmy

11   Albanese.  The ones that were at Maguire's.

12         Q.      Oh.  Okay.  So the officers that

13   you were talking about that were at Jimmy

14   Maguire's that were drinking on duty, you

15   joined them for a drink?

16         A.      I didn't join them for a drink.

17   I walked in on them, and when I said that to

18   George, George told me, "Shut up," and then

19   handed me a shot.

20         Q.      And you drank it?

21         A.      He said, "Drink."  Yeah.  I was

22   off.  Yes.

23         Q.      Let me understand this now.

24   You're at one bar at Ocean Beach and you

25   have a couple drinks in a three-hour period

1                        E. Carter

2    of time with a fellow officer who's going

3    off to Iraq, right?

4         A.    Yes.

5         Q.    You then go to another bar,

6    right?

7         A.    Um-hum (indicating).

8         Q.    Why were you going to the other

9    bar?

10        A.    I was looking for the officers to

11   make sure when they got off at 4:00, that I

12   could get a ride out to my vehicle so I

13   could drive home.

14        Q.    And how did you know other

15   officers were going to be at Maguire's?

16        A.    I didn't.  It was at the other

17   side of the village, and that's when I was

18   walking around looking for everybody.

19        Q.    And you then show up at Maguire's

20   and you say what to George?

21             MR. GOODSTADT:    Objection.

22        A.    I first couldn't -- I didn't see

23   George there at first.  He was in the front

24   part up against the bar.

25        Q.    You didn't see George when you

```
 1                        E. Carter
 2    walked into the bar?
 3          A.     At first, no.
 4          Q.     How many people were in the bar
 5    at 3:00 in the morning?
 6          A.     Several.  It was Labor Day
 7    weekend.  There was -- my estimate, to the
 8    best of my knowledge at this time, would be
 9    approximately 50 or better.
10          Q.     Okay.  So you didn't see George
11    when you walked in, but at some point in
12    time you said something to George, right?
13          A.     Yes.
14          Q.     What did you say to George?
15                 MR. GOODSTADT:    Objection.
16          A.     I told him, I said, "You know,
17    this is bullshit."
18          Q.     And he told you to shut up?
19          A.     Yes.
20          Q.     And then he hands you a shot?
21          A.     Couple seconds, minute later,
22    yes.
23          Q.     And you drank it?
24          A.     Yes.
25          Q.     Why?  A man just told you to shut
```

```
 1                    E. Carter
 2   up after you made a complaint.  He hands you
 3   a shot.  This is the man that has laughed at
 4   you, ignored you for two and a half years
 5   concerning the issue of officers drinking on
 6   duty.  Why did you drink with him that night
 7   when he said "here's a shot"?
 8             MR. GOODSTADT:    Objection.
 9        A.    I wound up drinking a shot, yes.
10        Q.    My question is why, sir?  Why did
11   you drink the shot that George Hesse gave
12   you after two and a half years of him
13   ignoring your complaints concerning officers
14   drinking on duty?
15        A.    You have to understand, when you
16   make a complaint with George and you go
17   against him, he becomes very hostile, very
18   retaliatory, and he'll -- he would basically
19   explode on you in his own words.
20        Q.    So you had a shot because you
21   were afraid that George Hesse was going to
22   yell at you?
23        A.    I had a shot because I only had
24   two prior and I wasn't  -- had a limit that
25   I would be drunk to drive home, so yes, I
```

                              E. Carter

1                              E. Carter

2      had one.

3           Q.     Sir, I'm not questioning your

4      inebriation or lack thereof when you had the

5      shot with Mr. Hesse.  I'm asking you -- the

6      question is based upon what you've just

7      said, did you drink that shot because you

8      were afraid that Mr. Hesse would verbally

9      explode on you?

10          A.     Drink that shot for that reason,

11     no.

12          Q.     Did you drink that shot because

13     you thought that Mr. Hesse would somehow

14     retaliate against you if you didn't?

15          A.     No.

16          Q.     So I go back to my prior

17     question, sir.  You walk into that bar that

18     night.  The man that you have complained to

19     for two and a half years concerning officers

20     on duty drinking tells you to shut up.  He

21     hands you a shot of alcohol and you drink

22     it.  Why?

23          A.     The shot was there.  I wanted it

24     and I drank it.

25          Q.     Okay.  And Mr. Hesse was on duty?

```
 1                        E. Carter
 2          A.     Yes.
 3          Q.     So you engaged in drinking with
 4     an on duty police officer?
 5                 MR. GOODSTADT:    Objection.
 6          Q.     Is that your testimony?
 7                 MR. GOODSTADT:    Objection.
 8          A.     I drank it and George Hesse had
 9     one, yes.
10          Q.     You participated in drinking with
11     an on duty police officer?
12                 MR. GOODSTADT:    Objection.
13          A.     Yes.
14          Q.     The conduct that you complained
15     of for two and a half years, you
16     participated in while you were off duty,
17     correct?
18          A.     Yes.  I didn't tell him to drink
19     it, though.
20          Q.     I know.  But you participated in
21     the very conduct that you were complaining
22     about, correct?
23          A.     Yes.
24          Q.     Now in the first page of your
25     complaint, sir, you write "Plaintiffs are
```

1                    E. Carter
2    five police officers who had the courage to
3    overcome the blue wall of silence," do you
4    recall that in your complaint?
5                    MR. GOODSTADT:    Objection.
6         A.    Yes.
7         Q.    You didn't show much courage that
8    night when Mr. Hesse gave you the shot, did
9    you?
10                   MR. GOODSTADT:    Objection.
11        A.    Again, I was off duty.  Yes.
12        Q.    You believe you showed courage?
13        A.    I didn't believe I had to show
14   courage.  I was in a legal establishment, a
15   legal drink.
16        Q.    Yeah, but Mr. Hesse was on duty,
17   right?
18        A.    Yes.
19        Q.    And that was the conduct you
20   complained of, correct?
21        A.    Yes.
22        Q.    You found it offensive that
23   police officers were drinking on duty,
24   correct?
25        A.    Yes.

1                              E. Carter

2          Q.      You believed that it violated the

3    public trust, correct?

4          A.      Yes.

5          Q.      You believed it put citizens in

6    jeopardy, correct?

7          A.      Yes.

8          Q.      So you still believe that you

9    didn't need to exercise courage and to say

10   to Mr. Hesse, "no, I'm not going to

11   participate in what I deem to be a breach of

12   the public trust"?

13                 MR. GOODSTADT:      Objection.

14         Q.      Is that your testimony, sir?

15                 MR. GOODSTADT:      Objection.

16         A.      No.

17         Q.      Okay.  In 2006, sir, I think

18   you've only  -- well, I want you to take

19   some time.  Think about any other complaint

20   in 2006 that you raised with Mr. Hesse

21   concerning on duty police officers drinking.

22         A.      2006 I didn't work many hours.

23         Q.      Regardless of how many hours you

24   worked, you just said you can recall one

25   incident during the Labor Day weekend.

```
 1                        E. Carter
 2         A.      That was 2005.
 3         Q.      Oh, my question to you, sir, was
 4    2006 I believe.  Oh, it was 2005.  You're
 5    right.  I apologize.  In 2005, sir, other
 6    than this one incident on Labor Day weekend
 7    that you can recall, can you recall any
 8    others?  Complaints to George Hesse
 9    concerning officers drinking on duty?
10         A.      No.
11         Q.      Okay.  If I gave you five minutes
12    to think about it, do you think that would
13    refresh your recollection?
14              MR. GOODSTADT:     Objection.
15         A.      Yes.  Well, 2005, Paul Conway was
16    still bringing the rocket fuels inside,
17    but --
18         Q.      My question, sir, is regardless
19    of your witnessing of certain events, I'm
20    asking you other than the complaint that you
21    raised with Mr. Hesse in McGuire's during
22    Labor Day weekend, can you recall any other
23    complaints that you raised to Mr. Hesse in
24    2005 concerning officers drinking on duty?
25         A.      Cleaning out of the beer cans in
```

```
 1                    E. Carter
 2    the cars.  The officers pulling up to the
 3    check point with beers in their hand.
 4         Q.    And you made -- and you made
 5    these complaints to George Hesse?
 6         A.    George Hesse was driving the one
 7    night, yes.
 8         Q.    No.  My question is not what
 9    Mr. Hesse was doing, not what you witnessed.
10    We've gone through 2003, 2004, and 2005
11    concerning direct complaints that you raised
12    with Mr. Hesse, you would agree with me?
13         A.    Yes.
14         Q.    And you answered those questions
15    truthfully, correct?
16         A.    Yes.
17         Q.    And I believe in 2003 you made
18    three complaints, and in 2004 you said three
19    complaints, right?
20         A.    Yes.
21         Q.    And in 2005 you've told me of one
22    complaint Labor Day weekend.  So my question
23    is, are there any other complaints that you
24    can recall that you made directly to George
25    Hesse concerning the subject matter of
```

1                         E. Carter

2    officers drinking on duty in 2005?

3         A.      Not that I recall at this time.

4         Q.      And, again, if I gave you an

5    opportunity to think about it, do you think

6    that would refresh your recollection?

7         A.      Yes.

8         Q.      Do you want take a couple

9    minutes?

10        A.      Yes.

11        Q.      Please do.  Oh, you wanted to go

12   off the record and do that?

13        A.      Oh, I'm sorry.

14        Q.      No.  It's up to you.  However

15   you --

16        A.      I was going to use the bathroom.

17   I'm sorry.

18        Q.      You know what, then why don't we

19   do this.  Let's take a break.  You go to the

20   bathroom, you think about that, and come

21   back and tell me if it refresh yours

22   recollection.

23               THE VIDEOGRAPHER:    This ends

24        tape number one.  The time is 10:45

25        a.m.  We're going off the record.

```
 1                    E. Carter
 2              (A break was taken.)
 3              THE VIDEOGRAPHER:    This begins
 4         tape number two.  The time is 10:55
 5         a.m.  Back on the record.
 6         Q.    Mr. Carter, was that the only
 7    time you ever drank with Mr. Hesse on Ocean
 8    Beach?
 9         A.    Yes.
10         Q.    Ever?
11         A.    Yes.
12         Q.    That's the only time you ever
13    drank with Mr. Hesse on Fire Island?
14         A.    Yes.
15         Q.    Ever?
16         A.    Yes.
17         Q.    Was that the first time you ever
18    drank alcohol with any other -- putting
19    aside the night -- putting aside what you
20    did between 12:00 and 3:00 that night, was
21    that the only time that you ever drank
22    alcohol with any other officer, whether on
23    duty or off duty, on Ocean Beach?
24         A.    No.
25         Q.    Did you ever drink -- prior to
```

1                    E. Carter

2    that time, did you ever drink with any

3    officers -- well, withdrawn.  Prior to that

4    night, did you ever drink with any on duty

5    officers on Ocean Beach?

6         A.    No.

7         Q.    So the only time you would have

8    had a drink with an officer would have been

9    when that particular officer was off duty?

10        A.    Yes.

11        Q.    How often, in 2005, did you drink

12   with an off duty police officer on Ocean

13   Beach?

14        A.    Once.

15        Q.    And that was just with Mr. Hesse?

16        A.    Mr. Hank Clemens.  Off duty with

17   Hank and then George.  The same instance.

18   Same night.

19        Q.    How about 2004?

20        A.    2004, none.

21        Q.    2003?

22        A.    2003, none.

23        Q.    2002?

24        A.    2002, none.

25        Q.    2001?

1                    E. Carter

2         A.      None.

3         Q.      So then the only time you would

4    have had a drink with any other officer,

5    whether on duty or off duty, was that night

6    during Labor Day weekend in 2005; is that

7    correct?

8         A.      No.

9         Q.      You know what, then tell me the

10   other times you would have had a drink of

11   alcohol with an off duty police officer

12   while on Ocean Beach?

13        A.      1991 we had a police party the

14   end of the year.

15        Q.      Okay.

16        A.      1992 we had a police party at the

17   end of the year.  1993, when I went out of

18   the village to Ocean Bay Park for dinner,

19   after work, I might have had a drink.

20        Q.      Okay.

21        A.      So there were a couple times in

22   '91 to '93.

23        Q.      Got it.  Let's continue on --

24   well, let's go back to 2005 for a second.

25   Did you complain to Chief Paridiso about

```
 1                    E. Carter
 2   what you complained to Mr. Hesse about on
 3   Labor Day weekend 2005 concerning drinking
 4   while on duty?
 5        A.    No.
 6        Q.    Same question with regard to
 7   mayor -- excuse me, Mr. Loeffler?
 8        A.    No.
 9        Q.    Same question with regard to
10   Mayor Rogers?
11        A.    No.
12        Q.    Same question with regard to
13   trustees?
14        A.    No.
15        Q.    Did you communicate with any
16   trustee or mayor of Ocean Beach in 2005
17   concerning your complaint to Mr. Hesse?
18        A.    No.
19        Q.    Same question with regard to
20   Mr. Paridiso?
21        A.    No.
22        Q.    2006, did you make any complaints
23   to George Hesse concerning on duty officers
24   drinking?
25        A.    No.
```

1                    E. Carter

2          Q.      Same question with regard to Ed

3     Paridiso?

4          A.      No.

5          Q.      Same question with regard to any

6     mayor or trustee at the time?

7          A.      No.

8          Q.      Let's now go to the second page

9     of your Notice of Claim.   "Items of damage

10    or injuries claimed," do you see that, after

11    number four, next to number four?

12         A.      Yes.

13         Q.      Let's go in the -- let's see what

14    you wrote.   "Claimant sustained damages and

15    injuries, including but not limited to,

16    monetary and/or economic damages, including

17    but not limited to, loss of past and future

18    income, compensation and benefits, legal

19    fees and costs, permanent damage to his

20    personal and professional reputation and

21    standing in the community, loss of comfort

22    and support, fear, extreme mental and

23    emotional harm and stress, impairment of

24    natural growth process, and other injuries

25    not yet fully ascertained."   How much have

```
 1                    E. Carter
 2    you paid in legal fees and costs?
 3    DI        MR. GOODSTADT:    Objection.
 4        Don't answer the question.
 5             MR. NOVIKOFF:    Mr. Goodstadt,
 6        it's part of his Notice of Claim that
 7        this is what he's incurred.  I think
 8        since you have raised it -- not you but
 9        since the Plaintiff has raised this in
10        the Notice of Claim as damages he's
11        seeking to recover, I'm completely
12        entitled to asking the question how
13        much, without going into any detail
14        behind that.
15             MR. GOODSTADT:    You can take it
16        up with the court.
17             MR. NOVIKOFF:    You're
18        instructing him not to answer?
19             MR. GOODSTADT:    I'm instructing
20        him not to answer.
21             MR. NOVIKOFF:    All right.  That
22        one I'm taking up with the court, and I
23        may move for appropriate sanctions on
24        that, because that's the first I heard
25        of this.
```

```
 1              E. Carter
 2         MR. GOODSTADT:    Every case that
 3    has statutory fee provisions, requests
 4    legal fees and costs, and if you can
 5    cite me to some authority where they
 6    were -- a defense lawyer was entitled
 7    to ask how much money was spent in
 8    legal fees up to the date of
 9    deposition --
10         MR. NOVIKOFF:    Oh, no.  No.
11    No.  That's not my question.  And I
12    agree with you entirely, Mr. Goodstadt.
13    That should you prevail in this case,
14    your client is entitled to statutory
15    fees and costs.  That's not my
16    question.
17         Your client, in his Notice of
18    Claim, said the items of damages or
19    injuries claimed are legal fees and
20    costs.  My question is, has he paid any
21    legal fees and costs to date.  Not what
22    his ultimate damages would be, or not
23    what you could recover if you prevail.
24    But --
25         MR. GOODSTADT:    That's what he
```

```
 1                    E. Carter
 2        was referring to there.
 3                MR. NOVIKOFF:    Then if that's
 4        what your answer  -- if that's what
 5        you're going to put on the record, then
 6        I'll move on.
 7                Let the record reflect that
 8        Mr. Goodstadt has indicated that when
 9        legal fees and costs are referred to,
10        it's being referred to the statutory
11        fees and costs that Plaintiff would be
12        entitled to in the event he prevails.
13                MR. GOODSTADT:    That's correct.
14                MR. NOVIKOFF:    Okay.
15        Q.    "Loss of comfort and support,"
16    what did you mean by that?
17        A.    My own comfort.  My sleep.  My
18    support.  Obviously my family supported me.
19    I lost friends which I use as support.
20        Q.    Okay.  You've -- let's break it
21    down.  Loss of comfort and support you say
22    you've lost your family's comfort and
23    support?
24        A.    No.
25        Q.    Okay.  I'm sorry.  Go ahead.  You
```

```
 1                      E. Carter
 2   can finish your answer.  My question to you
 3   is, have you lost -- when you're using the
 4   words "loss of comfort and support," have
 5   you lost your family's comfort and support?
 6        A.     No.
 7        Q.     Okay.  What friends have you lost
 8   when you are referring to "loss of comfort
 9   and support"?
10        A.     Several friends that I used to
11   work with at Ocean Beach that would support
12   you just by being around you when you worked
13   and stuff.
14        Q.     And who were they?
15        A.     Who were they.  John Oley, Alan
16   Loeffler, Arnie Hardman, Paul Corallo.  I
17   could go on.
18        Q.     Please, go on.
19        A.     Pat Cherry.  I call him
20   Mr. Cherry.  He's the older Cherry.  And
21   there were other residents and stuff which
22   no longer talk to me.
23        Q.     Well, what residents no longer
24   talk to you?
25        A.     One that I just ran into the
```

1                      E. Carter

2    other day was the owner of the OB Market.

3    Just looked -- kept staring at me at a

4    parking violations hearing.

5         Q.     Where?

6         A.     In Islip.

7         Q.     And he kept staring at you?

8         A.     Until I walked up to him and said

9    something.  He says, "I wasn't sure if you'd

10   talk to me."

11        Q.     I'm --

12        A.     "I wasn't sure if you'd talk to

13   me."

14        Q.     Did he talk to you?

15        A.     After a little while.

16        Q.     Okay.  So he talked to you?

17        A.     Not like he used to.

18   Differently.

19        Q.     Well, prior to that time, what --

20   actually, what is this gentleman's name?

21        A.     I don't know his first name.  He

22   owned the OB Market.

23        Q.     Okay.  So you're saying you lost

24   this friend's comfort and support, but you

25   don't know his name?

                           E. Carter

1

2        A.     No.  It was someone I saw over

3   there, and you know, I would see from day to

4   day when I was working and stuff.  "Hi."

5   "How you doing."  "What's up."  "How's

6   everything."

7        Q.     But you don't know his name?

8        A.     No.

9        Q.     What other friends that aren't on

10  the police officer -- that weren't police

11  officers at Ocean Beach -- well, withdrawn.

12  You mentioned residents.  You just mentioned

13  one.  Any other residents that you believe

14  you've lost as a result of the actions of

15  Ocean Beach?

16       A.     I believe I lost most of the

17  residents.  From what's been posted on the

18  blog and stuff, it said straight out, you

19  lost many friends.

20       Q.     Yeah.  I'm asking you, sir.  You

21  said that you lost the comfort and support

22  of friends.  You've identified one

23  individual for whom you don't know the name

24  of as a friend.  What other friend can you

25  identify for me that you've lost as a result

1                       E. Carter

2    of the actions of Ocean Beach, other than

3    those police officers that you've

4    identified?

5         A.      None that I recall at this time.

6         Q.      Now the police officers that

7    you've lost, can you describe what you mean

8    by the phrase "you've lost them"?

9              MR. GOODSTADT:      Objection.

10        Q.      You can answer.

11        A.      I can answer?  I'm sorry.  First

12   thing was after the Gilbert incident, Paul

13   Corallo, I used to relieve all the time.  He

14   would sit -- he would talk to me for a

15   little while.  He clammed right up.

16   Wouldn't talk to me when I was let go.  I

17   haven't heard from him since.

18        Q.      And when was the Gilbert

19   incident?

20        A.      Gilbert incident was August of

21   2005.

22        Q.      Okay.  And my question to you,

23   sir, is, what did you mean when you said you

24   lost the friendship of those police

25   officers?  Is that the only example that you

```
 1                    E. Carter
 2    can give me?
 3         A.    No.  Their support, you know,
 4    with the friendship.  A friendship.
 5    Support.  You know.
 6         Q.    What do you mean by "support"?
 7         A.    Just being there for you to get
 8    through this.
 9         Q.    Get through what?
10         A.    Get through the hard part of
11    being let go.  Terminated.  Why I was
12    terminated.  Mental anguish.
13         Q.    Have you reached out to any of
14    those officers for their support and comfort
15    that you've identified?
16         A.    Yes.
17         Q.    Subsequent to being let go as you
18    say?
19         A.    John Oley.
20         Q.    Okay.  When did you reach out to
21    John Oley?  And spell his last name for me?
22         A.    O-L-E-Y.
23         Q.    Okay.  When did you reach out to
24    him?
25         A.    I saw him approximately
```

```
 1                    E. Carter
 2  November -- it was late 2006 and he wouldn't
 3  even talk to me.
 4       Q.    Okay.  But, sir, you filed this
 5  Notice of Claim in June of 2006, at least
 6  it's dated.  So why don't we stick with
 7  prior to June 2006.  Who did you reach out
 8  to prior to filing the Notice of Claim that
 9  would not speak to you that was a police
10  officer at Ocean Beach for comfort and
11  support?
12            MR. GOODSTADT:    Objection.
13            MR. NOVIKOFF:    I'll withdraw
14       the question.  I'll rephrase it.
15       Q.    What police officer, between
16  April 2, 2006 and June 30 2006, of Ocean
17  Beach did you reach out for comfort and
18  support?  What officer?
19       A.    None.
20       Q.    None.  Okay.  Between 2000 --
21  June 30, 2006 and the date you filed the
22  complaint, which for the record is March 21,
23  2007, what police officer at Ocean Beach did
24  you reach out for comfort and support?
25       A.    John Oley.
```

```
1                      E. Carter
2        Q.     Okay.  And describe for me the
3    incident involving Mr. Oley.
4              MR. GOODSTADT:     Objection.
5        A.     I saw Mr. Oley at Bay Shore
6    Dunkin Donuts.  I walked in.  He looked at
7    me, and I could tell immediately he didn't
8    want me there.  I walked up to him.  I said,
9    "How you doing, John?"  I said, "Are you
10   going to say hi?"  And he just stared at me
11   for a minute.  And he goes, "Yeah, Eddie, I
12   was going to say hi."  And when we went
13   outside, you know, I said, "John, why don't
14   you ever call me?  What was up?  You know,
15   we were good friends I thought."  I said,
16   "You know, what's going on?  And why did
17   George keep you and let me go, Tom, Kevin,
18   Joe and Frank?"  And he just looked.  He
19   said, "well," he said, "I don't know.  Why
20   did he let you go?"  And that was it.
21   Pretty much he blew me off.
22       Q.     Why did you think John should
23   have been let go as well as -- withdrawn.
24   Why do you think John should have been let
25   go if you were let go?
```

```
1                        E. Carter

2        A.      Because there was no reason to

3    let me go.

4        Q.      Then what reason was there to let

5    John go?

6        A.      None.  Same reason.

7        Q.      And prior to meeting -- prior to

8    the -- withdrawn.  Prior to seeing him in

9    the Bay Shore Dunkin Donuts, did you reach

10   out to John Oley between the date of the

11   filing of the Notice of Claim and the date

12   of the filing of the complaint?

13       A.      No.

14       Q.      Other -- let's now talk about the

15   time period between March 21, 2007 and the

16   present.  What police officers at Ocean

17   Beach have you reached out for comfort and

18   support?

19       A.      Alan Loeffler.

20       Q.      Alan Loeffler?

21       A.      Yes.

22       Q.      Is Alan Loeffler related at all

23   to Defendant Joseph Loeffler?

24       A.      Yes.

25       Q.      And what is their relationship?
```

1                    E. Carter

2          A.      Brothers.

3          Q.      So you reached out to the brother

4    of the person that you were suing

5    individually for comfort and support, is

6    that your testimony?

7          A.      Yes.  Me and Alan Loeffler were

8    very good friends at one time.

9          Q.      When did you reach out to

10   Mr. Alan Loeffler for comfort and support?

11         A.      Originally I dropped my uniforms

12   off to him.  I work with Alan in the Town of

13   Islip to let you know, and I see him from

14   day to day at different times.

15                 At the time the lawsuit was

16   filed, he came around the corner and he

17   looked at me and he says, "I can't talk to

18   you."  And I said, "Al, what are you talking

19   about?  Cut the shit.  What's going on?"

20   And he says, "Well, you filed a lawsuit."  I

21   said, "Yeah."  I said, "So that means our

22   friendship's over?"  And he looked at me and

23   he walked -- you know, pretty much he talked

24   to me for a couple seconds.  Nothing -- very

25   vague that I remember and he walked away.

```
 1                        E. Carter
 2    That was it.  I haven't spoken to him since.
 3            Q.      Are you surprised that he didn't
 4    want to talk to you, given the fact that you
 5    sued his brother?
 6            A.      Yes.
 7            Q.      You are?
 8            A.      Yes.
 9            Q.      Do you have a brother?
10            A.      Yes.
11            Q.      If someone sued your brother,
12    would you want to speak to them?
13                    MR. GOODSTADT:      Objection.
14            A.      If they were a good friend of
15    mine, yes.
16            Q.      Okay.  That's interesting.
17                    MR. GOODSTADT:      Objection.
18            Q.      Okay.  So between the date of the
19    filing of the complaint and the present, you
20    reached out to Alan Loeffler.  Anybody else?
21    Any other police officer at Ocean Beach that
22    you reached out for comfort and support?
23            A.      No.
24            Q.      Okay.  So we have Mr. Loeffler
25    and we have Mr. Oley, is that it?
```

```
 1                    E. Carter
 2        A.     Yes.
 3        Q.     Okay.  Has your wife left you?
 4        A.     No.
 5        Q.     Have your children abandoned you?
 6        A.     No.
 7        Q.     Any other friends abandon you as
 8   a result of you not being let go -- you not
 9   being rehired on April 2, 2006 by Ocean
10   Beach?
11              MR. GOODSTADT:    Objection.
12        A.     No.
13        Q.     Okay.  You mention as part of
14   your loss of comfort, that you couldn't
15   sleep.  Did I fairly characterize your
16   testimony?
17        A.     Yes.
18        Q.     When did you -- when did you
19   start having difficulty sleeping in relation
20   to April 2, 2006?
21        A.     April 2, that night.
22        Q.     Okay.  And how long has it
23   continued, if at all?
24        A.      It continued originally for
25   approximately a week and a half, and every
```

```
 1                      E. Carter
 2    time I see one of these defamatory remarks
 3    or whatever on that blog or someone brings
 4    it up to me, I relive it.  I relive April 2.
 5         Q.    Okay.  And when's the last time
 6    you looked at the blog?
 7         A.    Approximately one week ago.
 8         Q.    Why?
 9         A.    Because someone told me there was
10    posted -- something posted about me on
11    there.
12         Q.    What was posted a week ago?
13         A.    That myself and another officer
14    were doing official misconduct again by
15    falsifying time cards basically.
16         Q.    Who posted it?
17         A.    I don't know.
18         Q.    Do you know, as you sit here
19    today, the identity of anyone who posted
20    anything on this blog that you're referring
21    to?
22         A.    Yes.
23         Q.    Who?
24         A.    Tom Snyder.
25         Q.    Oh.  So Mr. Snyder's a defendant?
```

```
 1                      E. Carter
 2              MR. GOODSTADT:     Objection.
 3         Q.     Is Mr. Snyder a Plaintiff in this
 4    lawsuit?
 5         A.     Yes.
 6         Q.     And it's your testimony that
 7    Mr. Snyder posted something on the blog?
 8         A.     In --
 9         Q.     No.  Just -- don't tell me when.
10         A.     Yes.
11         Q.     How do you know that Mr. Snyder
12    posted something on the blog?
13         A.     He told me, and I went on the
14    blog and I saw it posted there.
15         Q.     I'm sorry?
16         A.     I went on the blog and saw it
17    posted there.
18         Q.     When did Mr. Snyder tell you he
19    posted something on the block blog?
20         A.     April of 2006.
21         Q.     Shortly after April 2, 2006?
22         A.     Within that week, yes.
23         Q.     Within that week.  Did Mr. Snyder
24    advise you as to why he was posting anything
25    on this blog?
```

1                         E. Carter

2          A.      Yes.

3          Q.      Why?  What did he say to you?

4          A.      He said, "Ed, someone posted

5   something about me and you, mostly about you

6   working Halloween night, doing official

7   misconduct and falsifying paperwork.  I

8   posted something in response to it saying

9   that you were not working, that you did not

10  do any of that," and he ID'd himself in that

11  blog that, "whoever you are posting this,

12  you know who I am and where to get in touch

13  with me now.  My name's Tom."

14         Q.      Okay.  Is that the only time, to

15  your knowledge, that Mr. Snyder posted

16  something on the blog?

17         A.      Yes.

18         Q.      To your knowledge, has any

19  other -- has any other Plaintiff posted

20  anything on the blog?

21         A.      No.

22         Q.      Other than Mr. Snyder, do you

23  know -- do you have personal knowledge of

24  the identity of any person who posted

25  anything on the blog since April 2, 2006

1                        E. Carter

2     through the present?

3          A.     Yes.

4          Q.     Who?

5          A.     Tyree Bacon.

6          Q.     How do you know that Tyree Bacon

7     posted anything on the blog?

8          A.     Tom Snyder had a meeting with

9     George Hesse in May of 2006 complaining

10    about the -- one of the blogs was the "OB

11    resident" the name was.  He complained that

12    even residents are posting about us, the

13    officers that were let go, and George Hesse

14    told him, "Tom, it's not the residents.

15    It's us in the police department and Tyree

16    Bacon."

17         Q.     Okay.  So you don't have personal

18    knowledge that it's Tyree Bacon, the only

19    knowledge you have is that Mr. Snyder told

20    you that Mr. Hesse told him that it was

21    Tyree Bacon?

22         A.     Yes.

23         Q.     Okay.  Have you gone to a doctor

24    with regard to your lack of ability to sleep

25    on certain occasions since April 2, 2006?

1                        E. Carter

2         A.      No.

3         Q.      Have you taken any medication?

4         A.      No.

5         Q.      Has it interfered with your

6    full-time job?

7         A.      Yes.

8         Q.      How has it interfered with your

9    full-time job?

10        A.      I went to work a couple nights,

11   you know, with a fogged head.  I wasn't 100

12   percent.

13        Q.      When do you work for the Town of

14   Islip?  What are your normal hours?

15        A.      I don't have normal hours.  I

16   work different shifts.  Right now I work

17   midnight to 8:00.

18        Q.      Midnight to 8:00.  And a couple

19   of -- is it your testimony that a couple of

20   occasions you went to a job -- your job at

21   night with a fogged head?

22        A.      With stuff in my head about the

23   beach, yes.

24        Q.      And how did that interfere with

25   your job?  Did you commit any acts of

```
 1                    E. Carter
 2   negligence that day?
 3        A.     No.
 4        Q.     Were you reprimanded at all for
 5   conduct -- for anything that went on during
 6   that day that you went to work with a fogged
 7   head?
 8        A.     No.
 9        Q.     Did you lose any benefits as a
10   result of anything that took place on those
11   few occasions that you went to work with a
12   fogged head?
13        A.     No.
14        Q.     Did you get demoted at all?
15        A.     No.
16        Q.     Was there any adverse action
17   taken against you as a result of anything
18   you may have done on those few occasions
19   that you went to work with a fogged head?
20             MR. GOODSTADT:     Objection.
21        A.     No.
22        Q.     Have you sought any -- have you
23   been to a psychiatrist at all with regard to
24   any issues concerning your lack of sleep?
25        A.     No.  I couldn't.
```

```
 1                      E. Carter
 2          Q.      You couldn't?
 3          A.      No.
 4          Q.      Why couldn't you go see a
 5    psychiatrist?
 6          A.      Because of my professional
 7    full-time job, the minute you see a
 8    psychiatrist, a mental health report would
 9    have been forwarded there.
10          Q.      Let me understand this, if you
11    went to see a psychiatrist, you would have
12    to report that to your superior?
13          A.      To my employee assistant program,
14    yes.
15          Q.      And what is your understanding as
16    to why you would have to report that?
17          A.      As a peace officer in New York
18    State, it would go on my permanent record
19    and it would automatically be flagged and
20    sent over there.
21          Q.      And do you know what statute
22    requires you to notify anyone at your job
23    that you went to see a psychiatrist?
24                  MR. GOODSTADT:     Objection.
25          A.      Not at this time.
```

1                        E. Carter

2          Q.     Can you tell me where you get

3    this information from that you've just

4    testified to, that you're required to notify

5    your employer that you went to see a

6    psychiatrist?

7          A.     Well, my promotion pending, and

8    my belief -- my belief is that it would have

9    affected that, and I would have had to make

10   that personal knowledge, public knowledge --

11   personal knowledge at work.

12         Q.     And what is your belief based on?

13   That's really what I'm asking you.  What is

14   your belief based on that had you gone to

15   see a psychiatrist or a mental health

16   professional, you would have had to notify

17   your employer?

18         A.     Past interviews.

19         Q.     Past interviews with whom?

20         A.     With different agencies with

21   myself.

22         Q.     And what did these interviewers

23   say to you, if anything, that led you to

24   believe that were you to go to a

25   psychiatrist, you would have to notify them,

1                    E. Carter

2    notify an employer that you went to see a

3    psychiatrist?

4        A.    I had to fill out a disclosure

5    form for the Mental Health Department for

6    New York State.

7        Q.    And what was the disclosure form?

8        A.    It was a standard New York State

9    disclosure form asking about my past

10   psychological history.  If there was any

11   contact with a psychiatrist or whatever.

12       Q.    Do you have a copy of this form

13   in your custody, possession or control?

14       A.    No.

15       Q.    Who would have -- for whom did

16   you fill this form out?

17       A.    I've had to fill it out for the

18   Town of Islip and I've seen it at Ocean

19   Beach with the applicant investigation

20   packet.

21       Q.    All right.  I'll look for that

22   form.  You write "extreme mental and

23   emotional harm and stress."  What did you

24   mean by that?

25       A.    The emotional harm and stress of

                           E. Carter

1                          E. Carter

2    going back -- like I said, when you see

3    stuff on the blog and reliving April 2, the

4    termination, and I -- you know, it's very

5    disturbing to me to this day.

6          Q.    What physical reactions, if

7    any -- well, what physical manifestations,

8    if any, do you believe have resulted from

9    this extreme mental and emotional harm and

10   stress?

11         A.    My heart would race.  I would get

12   severe headache.  I would take -- I would

13   have to take Tylenol with codeine.

14         Q.    Is your heart racing now?

15         A.    No.

16         Q.    You're reliving April 2 today,

17   aren't you?

18         A.    At a different point, yes.  Where

19   I'm not seeing something put in the computer

20   or whatever or put in my face that I did

21   illegally that I didn't.

22         Q.    So if we -- is it your testimony

23   that if I showed you the blog, that would

24   cause your heart to race?

25               MR. GOODSTADT:    Objection.

```
 1                    E. Carter
 2        A.     If you showed me parts of
 3   postings, yes.
 4        Q.     And have you seen any doctor
 5   concerning your heart racing?
 6        A.     No.
 7        Q.     That's pretty serious, wouldn't
 8   you agree?
 9        A.     No.  Because it comes and it
10   goes.
11        Q.     Okay.  So you didn't think it was
12   serious enough to see a doctor?
13        A.     No.
14        Q.     Other than your heart racing, was
15   there any other physical manifestations of
16   this extreme mental and emotional harm and
17   stress that you allege?
18        A.     The anguish.  The -- I told you I
19   had to take Tylenol with codeine a couple
20   times.
21        Q.     With codeine?
22        A.     The ones you buy over the
23   counter.
24        Q.     Oh, okay.
25        A.     I think -- I believe that's what
```

1                          E. Carter

2      they have in them.

3              Q.      And have you seen any doctor

4      concerning the headaches?

5              A.      No.

6              Q.      How many times have you had

7      headaches resulting from seeing the blog

8      that resulted -- that caused you to take

9      Tylenol?

10             A.      I couldn't give you an exact

11     amount now.  Approximately, at least a dozen

12     times.

13             Q.      Over the two and a half year time

14     period?

15             A.      Yes.  But I don't look at the

16     blog all the time.

17             Q.      I understand that.  But it's

18     about two and a half years since April 2,

19     right?

20             A.      Yes.

21             Q.      "Other injuries not yet fully

22     ascertained," do you see that?

23             A.      Yes.

24             Q.      Well, this was filed -- well,

25     this is dated June 30, 2006.  We're now in

```
 1                      E.  Carter
 2   September  of  2008.   Have  you  ascertained  yet
 3   those  other  injuries?
 4             MR.  GOODSTADT:     Objection.
 5        A.     Not  that  I'm  aware  of.
 6        Q.     Okay.
 7        A.     Sir,  if  I  may.
 8        Q.     Sure.
 9        A.     This  paragraph  is  --  the
10   sentences  in  this  paragraph  are  contained
11   obviously  in  a  paragraph.   The  paragraph  as
12   a  whole  is  what  I  signed  the  notice  of
13   complaint.
14        Q.     I  understand  that.   And  you've
15   made  certain  allegations  in  this  paragraph
16   concerning  what  your  damages  are,  and  one  of
17   them  was  "other  injuries  not  yet  fully
18   ascertained,"  and  my  question  to  you,  sir,
19   if  you  need  to  respond  again  to  it,  was
20   between  June  30,  2006  and  today,  have  you
21   ascertained  yet  the  other  injuries?
22             MR.  GOODSTADT:     Objection.
23        A.     Not  to  my  knowledge,  no.
24        Q.     "Impairment  of  natural  growth
25   process,"  what  did  you  mean  by  that?
```

```
 1                      E. Carter

 2          A.      I've lost hair.

 3          Q.      You've what?

 4          A.      I've lost hair.

 5          Q.      How old are you?

 6          A.      I'm 43 now.

 7          Q.      When did you start losing hair?

 8          A.      I've lost clumps -- I started

 9   losing my hair 42.

10          Q.      So -- and how old are you now?

11          A.      43.

12          Q.      So is it your testimony that

13   within the last year, you went from a full

14   set of hair to what appears now to be a

15   significantly receding hair line?

16          A.      No.

17          Q.      No.  So you started losing hair

18   before the age of 42, correct?

19          A.      Not as much as after 42.

20          Q.      Did you start losing your hair

21   before the age of 42?

22          A.      Yes.

23          Q.      When did you start losing your

24   hair, sir?

25          A.      I don't know.  I don't recall.
```

1                        E. Carter

2              MR. NOVIKOFF:    Well, let's

3         look at what has been identified as

4         9270.  I don't have copies of it, but

5         it's a picture of Mr. Carter.  Let's

6         mark this as Exhibit-2.

7              (Document Bates stamped 9270

8          was marked as Carter Exhibit-2 for

9           identification; 9/16/08, E.L.)

10         Q.    I'm going to show you what's been

11    marked as Exhibit-2.  If you want to show it

12    to your attorney before I ask you questions,

13    by all means do so.  Is that a picture of

14    you, sir?

15         A.    Yes, sir.

16         Q.    Do you know when this picture was

17    taken?

18         A.    I believe it was taken in 2005.

19         Q.    Okay.  Do you know for what

20    purpose it was taken in 2005?

21         A.    Grand jury subpoena.

22         Q.    A grand jury subpoena?

23         A.    Yes.

24         Q.    What grand jury subpoena?

25         A.    That George Hesse had on his desk

1                      E. Carter

2    that the grand jury subpoenaed pictures of

3    the officers for Gilbert.

4          Q.     My question to you, sir, was when

5    was your picture taken?

6          A.     In 2005.

7          Q.     Where?

8          A.     In the police station.

9          Q.     Which police station?

10         A.     Ocean Beach.

11         Q.     Okay.  And the purpose of taking

12   that picture was related to a grand jury

13   subpoena?

14         A.     Yes.

15         Q.     Okay.  And would you describe for

16   me -- well, would it be fair to say that on

17   that picture, your hair line is

18   significantly receded?

19         A.     Yes.

20         Q.     Okay.  So would you agree with me

21   that at some point in time prior to 2005,

22   your hairline has significantly -- was

23   significantly receding?

24         A.     Yes.

25         Q.     Do you have any pictures of you

1                    E. Carter

2      prior to 2005 in your custody, possession or

3      control?

4           A.    Driver's license.

5           Q.    Do you have a driver's license on

6      you right now?

7           A.    Yes.

8           Q.    When was your driver's license

9      taken?

10          A.    I don't know at this time without

11     looking at it.

12          Q.    Can you please look at your

13     driver's license now?

14               MR. GOODSTADT:    Objection.

15               Objection.  You can make a document

16               request.  He's not taking a document

17               that's not related to this case out of

18               his pocket to look at now.

19     RQ          MR. NOVIKOFF:    All right.

20               We'll make a request for the driver's

21               license.

22          Q.    Do you have any other pictures in

23     your home of you, prior to 2005?

24          A.    I'm sure there are.

25     RQ          MR. NOVIKOFF:    Okay.  I'm going

1              E. Carter

2        to call for the production of copies of

3        all pictures in your custody,

4        possession or control that would show

5        what your hair looked like prior to

6        2005 going back to the time that you

7        were 21.

8              MR. GOODSTADT:    Note my

9        objection, and I'll take it under

10       advisement.

11       Q.    Have you seen a doctor concerning

12  the clumps of hair that you say that have

13  left your head?

14       A.    No, sir.

15       Q.    Do you agree with me that

16  clumps -- that clumps of hair falling out of

17  your head is pretty serious, correct?

18             MR. GOODSTADT:    Objection.

19       A.    I believe it was due to the

20  stress and that's what I know.

21       Q.    My question isn't what it's due

22  to.  Would you agree with me that losing

23  clumps of your hair is pretty serious?

24       A.    It's serious I guess.  Yes.

25       Q.    Cause you concern, correct?

```
 1                      E. Carter
 2    Right?
 3           A.      Little bit.
 4           Q.      Little bit?  Not a lot?
 5                   MR. GOODSTADT:      Objection.
 6           Q.      Have you had a history of
 7    clumping of hair falling out of your head?
 8           A.      No.
 9           Q.      Did you go to a doctor?
10           A.      No.
11           Q.      Did you seek any type of medical
12    advice concerning why clumps of your hair
13    were falling out?
14           A.      No.
15           Q.      Okay.  When did you retain
16    Mr. Goodstadt's law firm in connection with
17    this Notice of Claim or any aspect of the
18    April 2, 2006 incident?
19                   MR. GOODSTADT:      Objection.
20           Q.      You can answer.
21           A.      The summer of 2006.
22           Q.      Well, the summer starts in June,
23    correct?  What do you mean by "summer"?
24    What months would be contained?
25           A.      May or June of 2006.
```

1                        E. Carter

2          Q.     Okay.

3          A.     June.

4          Q.     In relation to June 30, 2006 --

5          A.     Yes.

6          Q.     When  -- how long prior to June

7    30, 2006 did you retain Mr. Goodstadt's law

8    firm?

9                 MR. GOODSTADT:    Objection.

10         A.     I don't recall at this time.

11         Q.     Weeks earlier?

12         A.     I don't recall without a document

13   in front of me showing.

14         Q.     Okay.  Would that be -- did you

15   sign a retainer agreement with

16   Mr. Goodstadt's law firm?

17         A.     Yes.

18         Q.     Okay.  Then I'm going to leave a

19   space in the transcript for you to -- well,

20   would that be a document that would refresh

21   your recollection?

22         A.     I believe so.  Yes.

23                MR. NOVIKOFF:    Then I'm going

24         to leave a space in the transcript and

25         ask you to look at that document, and

1                         E. Carter

2          to the extent that it refreshes your

3          recollection as to the question I just

4          posed, please fill in the answer.

5                 MR. GOODSTADT:    Objection.

6    INSERT:

7          Q.    How did you come about first

8    meeting Mr. Goodstadt?  Now my question is,

9    I don't want to know about anything you said

10   to Mr. Goodstadt.  I don't want to know if

11   Mr. Goodstadt called you or if you called

12   Mr. Goodstadt.  My question to you is, when

13   did you first learn of Mr. Goodstadt's law

14   firm?

15         A.    In the latter part of May, early

16   June of 2006.

17         Q.    How did you learn of

18   Mr. Goodstadt's law firm?

19                MR. GOODSTADT:    Objection.

20         Q.    To the extent it doesn't call for

21   you to advise me of communications between

22   you and Mr. Goodstadt's law firm or any

23   lawyers involved with his law firm.

24         A.    While doing a Google search for

25   lawyers, because I felt I had a claim and

```
 1                    E. Carter

 2   didn't want to use one on the Island, so

 3   wound up coming up with Thompson Wigdor &

 4   Gilly.

 5        Q.     Okay.  And to your knowledge,

 6   were any of the other Plaintiffs looking for

 7   lawyers at that time?

 8        A.     Frank Fiorillo.

 9        Q.     How do you know that Frank

10   Fiorillo was looking for a law firm at that

11   time?

12        A.     Frank Fiorillo got in touch with

13   me and we talked.

14        Q.     In relation to when you did the

15   Google search, when did Mr. Fiorillo get in

16   touch with you?

17        A.     Approximately a day or so.

18        Q.     Prior to the Google search?

19        A.     Yes.

20        Q.     What did Mr. Fiorillo say to you?

21        A.     Well, I actually spoke to --

22   Frank called me because I didn't have his

23   number.  I told him about what George had

24   told me and he had gone trying to get a

25   couple jobs trying to secure him, he
```