1                    E. Carter

2    couldn't, and I told him about the phone

3    call about the county park police and Kevin

4    Lamm wound up having problems with the

5    Suffolk County Police, and he said, "You

6    know, this has to end."  And that's when we

7    got together.

8         Q.    So sometime in May, Mr. Fiorillo

9    and you spoke.  Mr. Fiorillo said he had

10    tried to get a few jobs in Suffolk County

11    and he couldn't?

12              MR. GOODSTADT:    Objection.

13         Q.    Is that the sum and substance?

14         A.    He said he tried to get a few

15    jobs, yes.

16         Q.    Right.  And what jobs did he say

17    he tried to get?

18         A.    One was Southampton Town, and

19    another was a driver's job that I don't know

20    where it was.

21         Q.    And this was between April 2 and

22    the date in May that you and he spoke?

23              MR. GOODSTADT:    Objection.

24         A.    The latter part of May, yes.

25         Q.    And at that time, had you spoken

1                    E. Carter

2    with Mr. Lamm about his job searches?

3         A.    Kevin, yes.  Kevin wound up --

4         Q.    No.  Just the answer was yes or

5    no?

6         A.    Yes.

7         Q.    When did you speak to Mr. Lamm --

8    well, in relation to when you spoke with

9    Mr. Fiorillo in late May, when did you speak

10   to Mr. Lamm concerning his job search

11   efforts?

12        A.    I kept in constant touch with

13   Kevin.  Kevin was the only one I had the

14   phone number for or I would see.

15        Q.    Why did you keep in constant

16   touch with Kevin?

17        A.    Kevin was a friend, a good

18   friend.

19        Q.    So --

20        A.    He was a partner when I was at

21   the beach.

22        Q.    So since April 2 -- between April

23   2, 2006 and the end of May, you kept in

24   constant contact with Kevin Lamm?

25        A.    Yes.  Kevin works for the Town of

1                        E. Carter

2    Islip also.

3           Q.      Okay.   How about Mr. Snyder, did

4    you keep in constant contact with him during

5    that period of time?

6           A.      I work with Tom Snyder, yes.

7           Q.      So you would have kept in

8    constant contact with him?

9           A.      Yes.

10          Q.      So you work with Snyder, you work

11   with Lamm?

12          A.      Yes.

13          Q.      Did you keep in constant contact

14   with Nofi?

15          A.      No.

16          Q.      Did you keep in constant -- well,

17   okay.   That's about it then.   And did the

18   five of you meet to discuss hiring the

19   Goodstadt law firm before you ever

20   communicated with Mr. Goodstadt's law firm?

21               MR. GOODSTADT:    Or any other

22        law firm.

23               MR. NOVIKOFF:    Or any other law

24        firm, yes.   That's right.

25          A.      We discussed  -- I spoke to Tom

1                          E. Carter

2      and Kevin personally one on one.  I spoke to

3      Frank on the phone.  And through, you know,

4      good -- the website and stuff, we felt

5      Mr. Goodstadt's law firm was one that could

6      take -- could help us.

7            Q.     Did you ever speak with Nofi

8      prior to  -- to your knowledge, how did Nofi

9      know to contact Mr. Goodstadt's law firm?

10                 MR. GOODSTADT:     Objection.

11           A.     I could only say Frank Fiorillo

12     contacted Nofi.

13           Q.     Did you ever speak to Nofi about

14     going to meet with Mr. Goodstadt's law firm?

15           A.     Only the day we were going to

16     Mr. Goodstadt's law firm.

17           Q.     "Standing in the community" you

18     make reference to in paragraph four.  What

19     community are you referring to?

20           A.     I'm sorry, paragraph four?

21           Q.     Yes.

22           A.     Standing in the community would

23     be my position as a father and as a park

24     ranger.  I heard, you know, my reputation

25     was damaged.  It was defamed.

1                              E. Carter

2         Q.    Well, sir, my question to you is,

3    what community are you referring to when you

4    say "standing"?

5         A.    My personal community.

6         Q.    And what does that mean when you

7    say "personal"?

8         A.    My family.  My friends.  How they

9    look at me.  The people walking down the

10   street.

11        Q.    So is it your testimony that your

12   family looks upon you worse today than they

13   did on April 2?

14        A.    They originally questioned me,

15   yes, as to when this stuff was in the paper

16   about the Gilbert thing and stuff.

17        Q.    Who is "they"?

18        A.    My mother.

19        Q.    Your mother questioned you?

20        A.    Yes.

21        Q.    What did she say?

22        A.    She said, "What's going on?  You

23   were fired from the beach.  We just saw this

24   other stuff in the paper not too long ago.

25   You said you weren't involved.  What

                              E. Carter

1                              E. Carter
2    happened?"
3         Q.     So your -- do you think your
4    mother thinks less of you today than she did
5    on April 2?
6              MR. GOODSTADT:    Objection.
7         A.     I couldn't answer that.
8         Q.     Is there anything she's done to
9    indicate that she thinks less of you?
10        A.     No.
11        Q.     Is there anything that you could
12   point to that makes you believe that your
13   standing in your mother's eyes is less today
14   than it was on April 2, 2006?
15        A.     No.
16        Q.     How about your wife, anything
17   that you could point to today that makes you
18   think that your standing in her eyes is less
19   today than on April 2, 2006?
20        A.     Just the anguish and stuff we're
21   going through with day-to-day with like I
22   said, the blog postings and stuff.  She got
23   very, very upset and annoyed when she saw my
24   name where I worked and stuff was posted on
25   there.

1                        E. Carter

2    MO          MR. NOVIKOFF:     Motion to

3         strike.

4         Q.     Is there anything that you can

5    point to that you believe shows  -- well,

6    you know what, let me ask you this question,

7    in your opinion, has your standing with your

8    wife decreased since April 2, 2006?

9              MR. GOODSTADT:     Objection.

10        A.     A little bit, yes.

11        Q.     A little bit.  She thinks less of

12   you?

13        A.     I believe so.

14        Q.     Okay.  What about your children,

15   how old are they?

16        A.     My daughter's five and the boys

17   are two and a half.

18        Q.     Your friends, what friends have

19   you lost outside of perhaps police officers

20   as a result of you being told, on April 2,

21   2006, that you're not working at Ocean

22   Beach?

23        A.     None.

24        Q.     Has any friend of yours told you

25   that they think less of you as a result of

1                    E. Carter

2    you not being rehired on April 2, 2006?

3         A.     No.

4         Q.     Now let's go to your employment

5    with Ocean Beach for a while.  You were --

6    well, beginning in 2001, you were a

7    part-time worker, correct?

8         A.     Seasonal from May to September,

9    and then a part-time police officer from

10   September to May.

11        Q.     Okay.  So it's seasonal during

12   the summer months and then after Labor Day

13   it's part time?

14        A.     Yes.

15        Q.     Explain the difference.

16        A.     Difference is is between May and

17   September, per Civil Service Law, you can

18   work 40 hours or more a week.  I guess more

19   a week.  And after September, Labor Day or

20   sometime whatever stipulation is exactly in

21   the book to May, it would be 20 hours a

22   week.  Half of a full timer.

23        Q.     Okay.  My question to you is were

24   you a -- during the summer months, before --

25   between Memorial Day -- well, between April

1                          E.  Carter

2       and Labor Day, were you a full-time worker

3       or a seasonal worker?

4                    MR.  GOODSTADT:      Objection.

5            Q.      To the best of your knowledge?

6            A.      Seasonal.

7            Q.      Okay.  And what is your

8       understanding of what "seasonal" means?

9                    MR.  GOODSTADT:      Objection.

10           Q.      To the extent you know?

11           A.      Seasonal is I can work 16 hours a

12      week.

13           Q.      Okay.  You could work 16 hours a

14      week as a seasonal?

15           A.      Well, it's 20 -- I believe it

16      states 20.  Half of 40 is 20, but the way

17      the tours were, 16 hours a week.

18           Q.      I didn't get that last part.

19           A.      A full timer could work 40 hours

20      a week, so it would be half of what they

21      could do.

22           Q.      Okay.  So the most you could

23      work, to your knowledge --

24           A.      Is 20 hours.

25           Q.      Is 20 hours during the --

1                          E. Carter

2          A.      Off season.

3          Q.      During the off -- no.  No.  I'm

4    talking that's when you were a part-time

5    worker?

6          A.      Yes.

7          Q.      That's after Labor Day?  Yes?

8          A.      Yes.

9          Q.      My question, though, is between

10   April and Labor Day, what's your

11   understanding of what "seasonal" means?

12                 MR. GOODSTADT:     Objection.

13         A.      Seasonal was you worked

14   approximately -- you could work up to 40

15   hours a week or more.

16         Q.      Now you didn't have a contract

17   with Ocean Beach, did you?

18         A.      No.

19         Q.      And every year you had to be

20   rehired, correct, to be a seasonal worker,

21   correct?

22                 MR. GOODSTADT:     Objection.

23         Q.      To your knowledge?

24         A.      I didn't have to be rehired.

25         Q.      No?

                        E. Carter

1

2        A.      I handed a 42 -- 2042 in and gave

3   them the hours I could work, and the chief

4   or George, whoever it was, would put you on

5   the schedule.

6        Q.      What's a 2042?

7        A.      You have a copy of one right

8   there in front of you (indicating).

9        Q.      Okay.  Well, just tell me what it

10  is.

11       A.      It's an internal memo.

12  Correspondence.

13       Q.      So if I understand correctly,

14  before every season -- well, just so we're

15  all clear and we're all talking about the

16  same thing, what was the season, to your

17  knowledge?

18       A.      Memorial Day to Labor Day,

19  roughly.  April  -- it was the end of April,

20  so April to Labor Day.

21       Q.      Okay.  So if I understand your

22  testimony correctly, what you would do,

23  since 2001, was send someone over at Ocean

24  Beach a 2042 indicating when you could work,

25  and then they would just put you on the

1                    E. Carter

2    schedule?

3        A.     My hours of availability is what

4    it was basically.

5        Q.     Okay.  So you controlled, for the

6    most part, what hours you worked during the

7    season?

8        A.     The only -- I put in what tours I

9    was available for.  I didn't get them all.

10       Q.     Right.

11       A.     I got -- it was split up among

12   the men --

13       Q.     Right.

14       A.     -- by the supervising officer.

15       Q.     Now there were officers that

16   worked during the day, correct?

17       A.     Yes.

18       Q.     But you couldn't work during the

19   day because you had a full-time job,

20   correct?

21       A.     Yes.

22       Q.     So you would put in -- what tours

23   would you normally put in for?

24            MR. GOODSTADT:     Objection.

25       A.     For Ocean Beach?

1                    E. Carter

2         Q.      Yes.

3         A.      I put in -- I was off -- whatever

4    my days off were, I would put in for either

5    a 4:00 to 12:00 -- there was a 9:00  --

6    there was about 20 different tours just to

7    make you aware of it.

8         Q.      Okay.

9         A.      I would put in for 4:00 at night

10   to 12:00 at night, 6:00 at night to 2:00 in

11   the morning, 8:00 at night to 4:00 in the

12   morning.  There was a 9:00 at night to 5:00

13   in the morning, or a midnight to 8:00.

14        Q.      Okay.  So if I understand now,

15   and just tell me if I'm wrong, on your days

16   off, for your days off from your full-time

17   job, you would notify Ocean Beach, whoever

18   made the decisions, as to what tours you

19   wanted to work on, and then Ocean Beach,

20   whomever it was, would advise you as to what

21   tours you got based upon your availability?

22        A.      Basically, yes.

23             MR. NOVIKOFF:    Now let's look

24        at -- let's mark the following document

25        as Carter-3.

1                    E. Carter

2              (Internal correspondence dated

3           December 6, 2005 was marked as

4           Carter Exhibit-3 for identification;

5           9/16/08, E.L.)

6         Q.    Carter-3 appears to be a memo

7    from you to Sergeant Hesse dated December 6,

8    2005, do you see that?

9         A.    Yes, sir.

10        Q.    Do you recall sending this doc --

11   this internal correspondence to Sergeant

12   Hesse?

13        A.    Yes.

14        Q.    Okay.  You CC'd Chief Paridiso,

15   do you see that?

16        A.    Yes.

17        Q.    Now what was your knowledge as to

18   Mr. Paridiso's status at this time?

19              MR. GOODSTADT:    Objection.

20        Q.    On December 6, 2005?

21              MR. GOODSTADT:    Same objection.

22        A.    That he was still doing the   --

23   he was still overseeing  -- out of respect,

24   I did it for Chief Paridiso is what I did.

25        Q.    What do you mean "out of

1                           E. Carter

2     respect"?

3          A.     Being that -- my understanding

4     was he was still with the department.

5          Q.     Well, what would make you think

6     that he wasn't, if anything, prior to

7     December 6?

8          A.     He was on disability leave.

9          Q.     When did you first learn he was

10    on disability leave?

11         A.     That was the summer of 2005.  But

12    he was still doing the schedule.  And at

13    that point, I wasn't sure who was doing the

14    schedule.

15         Q.     You just said that "but he was

16    still doing the schedule, and at that point,

17    I wasn't sure who was doing the schedule"?

18         A.     Yes.

19         Q.     That seems to be an

20    inconsistency, sir.

21                MR. GOODSTADT:     Objection.

22         Q.     What did you mean?  What was your

23    knowledge as to who was doing the schedule

24    on December 6, 2005?

25         A.     I -- I'm not sure, to be honest

1          E. Carter

2     with you.

3          Q.     Okay.  What makes you think

4     Mr. Paridiso was still doing the schedule?

5          MR. GOODSTADT:     Objection.

6          A.     Because guys said he would come

7     in and hang it up prior to that.  But I

8     never -- being it was in the winter, I

9     didn't see many guys, so I don't know.

10         Q.     When did guys tell you Paridiso

11    was still coming in to do the schedule?

12         A.     The -- September of '05.

13         Q.     So you weren't CCing Mr. Paridiso

14    out of respect, you were CCing Mr. Paridiso

15    because you were not aware as to who was

16    doing the schedule, correct?

17         MR. GOODSTADT:     Objection.

18         A.     Yes.

19         Q.     Okay.  And this memo is you

20    telling Sergeant Hesse and Mr. Paridiso that

21    you were unavailable for the three tour on

22    January 15, 2006, do you see that?

23         A.     Yes.

24         Q.     What's the three tour?

25         A.     That would be the midnight tour.

1                          E. Carter

2        Q.      Okay.  And December 6, 2005 --

3    I'm sorry, January 15, 2006 was not part of

4    the season as you've defined that, is it?

5        A.      Correct.

6        Q.      And tell me if I'm wrong, but you

7    would advise Ocean Beach as to when you were

8    available off season and they would

9    determine whether or not they would schedule

10   you for that particular tour?

11              MR. GOODSTADT:     Objection.

12       A.      Approximately a year prior, yes.

13       Q.      A year prior?

14       A.      Back in April of 2005.

15       Q.      I don't understand your answer.

16       A.      In other words, April 2005 I put

17   in this -- an internal correspondence with

18   the tours I was available for.

19       Q.      Right.

20       A.      Not knowing that something would

21   come up January 15.  So I notified them a

22   month prior, more than a month prior that

23   I'd be unavailable for that tour.  To please

24   replace me.

25       Q.      So when you said you put in that

```
 1                    E. Carter
 2    2014, am I right?
 3         A.    2042.
 4         Q.    The 2042 prior to April of a
 5    given season, you were advising them of your
 6    availability after the season as well?
 7         A.    Yes.
 8         Q.    Okay.
 9         A.    Basically I had steady days off.
10    At this point, I believe, best of my
11    recollection, I worked Sunday night midnight
12    and Monday night midnight.
13              MR. NOVIKOFF:    And let's mark
14         the following document as Carter-4.
15              (Internal correspondence dated
16         January 23, 2006 was marked as
17         Carter Exhibit-4 for identification;
18         9/16/08, E.L.)
19         Q.    Do you recall -- well, Carter-4
20    for the record is a memo from you to
21    Sergeant Hesse with a CC to Chief Paridiso
22    dated January 23, 2006, do you see that?
23         A.    Yes.
24         Q.    And do you recall sending this
25    correspondence to Ocean Beach?
```

1                     E. Carter

2          A.     I actually left it on Sergeant

3     Hesse's desk.

4          Q.     Okay.  And you CC'd Mr. Paridiso

5     why?

6          A.     Because he could still come back

7     as the chief.  He wasn't out on full

8     workmen's comp yet.

9          Q.     How do you know that?

10         A.     Because I had seen it not too

11    long before that, and there was -- the talk

12    between George was he was still out on comp.

13         Q.     The talk as between?

14         A.     George said the chief was still

15    out on workmen's comp.

16         Q.     Oh, so you had seen George, you

17    hadn't seen Mr. Paridiso?

18         A.     I ran into Ed Paridiso at Costco,

19    yes.

20         Q.     Between your December Carter-3

21    and your January Carter-4, you saw Ed

22    Paridiso?

23         A.     To my best of my recollection,

24    yes.

25         Q.     Did you ask him if he was

1                    E. Carter

2     involved in the scheduling when you saw him?

3          A.    No, I didn't.

4          Q.    Did you -- did your knowledge of

5     whether or not Mr. Paridiso was involved in

6     the scheduling change between Carter-3 and

7     Carter-4?

8          A.    No.  I still put him in to CC

9     Chief Paridiso, so.

10         Q.    Okay.

11         A.    It was still my belief he was

12    still there.

13         Q.    Okay.  And according to Carter-4,

14    you're advising Ocean Beach that given the

15    birth of your twins, you wanted to be

16    removed from the duty roster between

17    February 12 and April 9, 2006, do you see

18    that?

19         A.    Correct.

20         Q.    Okay.  Would it be fair to say

21    that between those dates, you did not work

22    for Ocean Beach?

23         A.    I don't recall if I worked

24    February 14, one other day, because George

25    tried to talk me out of taking this family

                              E. Carter

1 

2  leave.  He said -- I explained to him that I

3  didn't want to get stuck at the beach

4  because the way the vehicles were breaking

5  down, that if my wife went into labor, I

6  didn't want to be stuck over here and being

7  the fact I had twins, I had my daughter who

8  was at that time three years old, and he

9  says, "Eddie," he goes, "Listen," he goes,

10  "I'll come over, pick you up and drive you."

11  So I don't recall if I worked -- my last day

12  of work was February 12 or February 14 of

13  2006.  I don't recall.

14      Q.    Did Mr. Hesse advise you as to

15  why he was going to go out of his way to

16  pick you up so that you could work during

17  that period of time?

18      A.    So my wife -- if the truck broke

19  down, I didn't get stuck at the beach.

20      Q.    Did you have a good relationship

21  with Mr. Hesse on or -- in or about January

22  23, 2006?

23      A.    I had a fair relationship with

24  him, yes.

25      Q.    Was he -- would you consider him

```
 1                      E. Carter
 2   a friend?
 3        A.      I thought he was.
 4        Q.      Okay.  Even though he told you to
 5   shut up on occasion and disregarded your
 6   complaints?
 7        A.      Yes.
 8        Q.      Okay.  Did you ever socialize
 9   with Mr. Hesse outside of -- well, did you
10   ever socialize with Mr. Hesse after your
11   work hours?
12        A.      No.
13        Q.      And did Mr. Hesse explain to you
14   why he tried to talk you out of taking this
15   family leave that you referred to?
16        A.      He just  -- no.  He said, "Why
17   don't you keep working."  You know,
18   "don't -- I need you to work, and keep
19   working."
20        Q.      Okay.  Let's go back to the
21   Notice of Claim.  I believe that's
22   Exhibit-1.  You write on page two, second
23   full sentence, "in further retaliation for
24   Claimant's opposition, both during
25   Claimant's employment and subsequent to the
```

1                    E. Carter

2    unlawful termination of his employment,

3    defamatory statements have been made about

4    Claimant, both verbally and in writing on

5    the internet, in other media and to others."

6    Okay.  Who, without telling me where or what

7    they said, who do you claim, in this

8    lawsuit, has made defamatory statements

9    about you?

10        A.    George Hesse.

11             MR. GOODSTADT:    Objection.

12        A.    George Hesse.

13        Q.    Anybody else that you claim to

14   have made a defamatory statement about you?

15             MR. GOODSTADT:    Objection.

16        A.    Tyree Bacon.

17        Q.    Okay.  Other than Tyree Bacon and

18   George Hesse, anybody else?

19             MR. GOODSTADT:    Objection.

20        A.    No.

21        Q.    Okay.  When did Tyree Bacon make

22   defamatory statements about you?

23        A.    On the blog April 6.

24        Q.    Okay.  April 6 of 2006?

25        A.    I believe it was April 6 of 2006,

1                        E. Carter

2    yes.

3           Q.     Was that the only occasion that

4    you can point to where Tyree Bacon has made

5    a defamatory statement about you that you're

6    aware of?

7           A.     That -- with the posting of the

8    blog, if you were to look at it, it falls

9    down to specific -- a form basically of

10   writing and it follows it straight through.

11          Q.     Well, my question to you, you've

12   identified, sir, April 6, 2006 as an

13   incident where Tyree Bacon defamed you?

14          A.     Yes.

15          Q.     On the blog?

16          A.     Um-hum.

17          Q.     How do you know on April 6, 2006

18   Tyree Bacon was the author of the alleged

19   defamatory statement that you've just

20   referenced?

21          A.     I believe in the statement that

22   George Hesse told Tom Snyder, that Tom

23   Snyder told me.

24          Q.     Okay.  So your knowledge of

25   Mr. Bacon's defamatory statement on April 6

131

```
 1                    E. Carter
 2   2006 is based on what Hesse told Snyder and
 3   what Snyder told you?
 4        A.    Yes.
 5        Q.    Okay.  So we now have the April
 6   6, 2006 defamation.  Actually, what was the
 7   defamatory comment that you attribute to --
 8   that you attribute to Mr. Bacon?
 9        A.    That I did official misconduct
10   and falsified paperwork in reference to a
11   Halloween incident.
12        Q.    Okay.  Now have you been fired
13   from any job as a result of Mr. Bacon's
14   alleged defamatory comment?
15        A.    No.
16        Q.    Has anyone advised you that you
17   did not get any employment as a result of
18   Mr. Bacon's alleged defamatory comment on
19   April 6, 2006?
20        A.    The guys in my work in the locker
21   room said, in reference to the blog with my
22   promotion, which was offered to me
23   provisionally prior to me taking the test,
24   that I wasn't going to get it until that
25   whole thing with Ocean Beach was taken care
```

1                       E. Carter

2    of.

3    MO          MR. NOVIKOFF:      Motion to

4    strike.

5         Q.     Sir, my question's very specific.

6    Has anyone advised you that you did not get

7    a promotion or an employment opportunity

8    directly resulting from what you claim to be

9    Mr. Bacon's alleged defamatory statement on

10   April 6, 2006?

11              MR. GOODSTADT:      Objection.  He

12        just testified to it.

13        Q.     Did anyone tell you specifically

14   that?

15              MR. GOODSTADT:      Objection.  He

16        just testified to it.

17              MR. NOVIKOFF:      I understand.

18        You can answer.

19        A.     No.

20        Q.     Okay.  Now let's put aside the

21   April 6, 2006 alleged defamation of

22   Mr. Bacon.  Subsequent to that date, can you

23   point to another date on the blog in which

24   Tyree Bacon allegedly defamed you?

25              MR. GOODSTADT:      Objection.

1                          E. Carter

2          A.     I can't be 100 percent sure it

3     was him or not.

4          Q.     Why can't you be 100 percent sure

5     that it was him or not?

6          A.     Because the blog is an anonymous

7     blog.  Except for Tom Snyder is the only one

8     I can go right back to.

9          Q.     Now let's talk about Mr. Hesse's

10    alleged defamatory statements.  How many

11    defamatory statements do you attribute to

12    Mr. Hesse?

13               MR. GOODSTADT:    Objection.

14         A.     The firing of me would be one.

15    Why he told me at the meeting for

16    directives, failing to follow directives he

17    posted.  Wearing a wire.  Sleeping.  So

18    three.

19               MR. NOVIKOFF:    Okay.  Let's

20          take a break.  We have one minute left

21          on the tape.  We'll come back and we'll

22          pick it up there.

23               THE VIDEOGRAPHER:    This ends

24          tape number two.  The time is 11:54

25          a.m.  Going off the record.

```
 1              E. Carter
 2         (A break was taken.)
 3         THE VIDEOGRAPHER:    This begins
 4    tape number three.  The time is 12:09
 5    p.m.  Back on the record.
 6    Q.    Mr. Carter, you identified before
 7  the ending of tape number two, three alleged
 8  defamatory comments from Mr. Hesse
 9  concerning you.  One involved directives,
10  one involved wearing a wire, and one
11  involved you sleeping on duty, do you recall
12  that?
13    A.    Yes.
14         MR. GOODSTADT:    Objection.
15    Q.    Have you had a chance -- is there
16  anything else that you can recall that
17  Mr. Hesse said that you believe was
18  defamatory, other than what you've just
19  identified?
20         MR. GOODSTADT:    Objection.
21    A.    Not that I recall at this time.
22    Q.    Okay.  Is there anything in your
23  possession, custody or control that would
24  refresh your recollection?
25    A.    Not at this time.
```

1                              E. Carter
2         Q.      Okay.  Let's talk about the
3    alleged defamatory statement concerning
4    directives.  What specifically -- and don't
5    tell me to whom and don't tell me what or
6    where -- but just tell me what specifically
7    did Mr. Hesse say concerning directives that
8    you believe was defamatory?
9                MR. GOODSTADT:    Objection.
10        A.      He -- he wouldn't talk to me
11   about them when he fired me.  I asked him.
12   I said, "What directives are you talking
13   about?"  And he wouldn't give me an answer.
14        Q.      Okay.  I guess my question -- not
15   I guess -- my question is, what specifically
16   did Mr. Hesse say regarding directives that
17   you believe was defamatory?
18                MR. GOODSTADT:    Objection.
19        A.      He fired me for something I
20   didn't do.  I followed those directives.
21        Q.      Okay.  So your belief is that
22   Mr. Hesse made a defamatory comment to you
23   when he fired you for directives?
24                MR. GOODSTADT:    Objection.
25        A.      Yes.

```
 1                      E. Carter
 2        Q.     Okay.  Now where did Mr. Hesse
 3   make this defamatory statement?
 4        A.     In the boathouse at Ocean Beach.
 5        Q.     When?
 6        A.     April 2, 2006.
 7        Q.     Was there anyone present when
 8   Mr. Hesse made this defamatory statement
 9   concerning directives?
10        A.     To me, no.
11        Q.     Okay.  So just so I understand,
12   when you say that Mr. Hesse made a
13   defamatory comment regarding directives,
14   you're referring to a statement that
15   Mr. Hesse made to you in the boathouse on
16   April 2, 2006 without any other witnesses?
17        A.     Yes.
18        Q.     Okay.  Let's talk about wearing a
19   wire.  Again, not where, when or how, just
20   what specifically did Mr. Hesse say
21   concerning wearing a wire that you believe
22   was defamatory?
23        A.     I wasn't going to wear a wire.  I
24   knew nothing about a wire.  I was never
25   approached.  I was never asked.
```

```
 1                    E. Carter
 2    MO        MR. NOVIKOFF:    I understand
 3        that, and I'm going to move to strike.
 4        Q.    But what specifically -- well,
 5    let me take a step back.  You've alleged
 6    that Mr. Hesse made a defamatory statement
 7    concerning you involving wearing a wire?
 8        A.    Yes.
 9        Q.    What specifically did Mr. Hesse
10    say concerning wearing a wire that you
11    believe was defamatory?
12            MR. GOODSTADT:    Objection.
13        A.    The fact that if I was to wear a
14    wire, meant I was a rat, and I'm not.
15        Q.    What, though, did Mr. Hesse say
16    to you when you referred to wearing a wire?
17            MR. GOODSTADT:    Objection.
18        A.    He didn't say it to me.  He said
19    it to the other officers at the meeting.
20        Q.    Okay then.  Now what did he say
21    to the other officers at this meeting that
22    you've just referred to?
23        A.    That -- it was the April 2
24    meeting of 2006.  That Arnold Hardman's
25    attorney said that somebody was going to
```

1                    E. Carter

2    wear a wire and it was going to be Ed and

3    Tom, and we were going to get the officers

4    to admit that they beat up the businessman,

5    Gilbert, for the District Attorney's office.

6         Q.    Okay.  So this meeting took place

7    where?

8         A.    The boathouse.

9         Q.    And you weren't present at this

10   meeting?

11        A.    I was fired already.  Terminated.

12   Left the Island.

13        Q.    You had -- you had gone from the

14   Island by this time?

15        A.    Yes.

16        Q.    And according to somebody at that

17   meeting, Mr. Hesse said that Arnold

18   Hardman's attorney said that you were going

19   to wear a wire?

20        A.    That somebody was going to wear a

21   wire, and George said it was me or Tom

22   Snyder.

23        Q.    Okay.  So I just want to

24   understand now what transpired.  Mr. Hesse

25   said to someone at this meeting that Arnold

1                    E. Carter

2    Hardman's attorney said that someone was

3    going to wear a wire, and then George added

4    that it was going to be you and Ed, is that

5    a fair characterization?

6           A.    No.

7           Q.    No.

8           A.    Ed and Tom.

9           Q.    Ed and Tom.

10          A.    Ed and Tom were going to wear the

11   wire.  And he said it to all the officers

12   that were present at the meeting, along with

13   the dispatchers and any dock masters that

14   were there.

15          Q.    So to your knowledge, did

16   Mr. Hesse say that you had worn a wire or

17   did Mr. Hesse say that you were going to

18   wear a wire?

19          A.    I was going to wear a wire.

20          Q.    Okay.  And who told you that

21   Mr. Hesse said this?

22          A.    Originally, Kevin Lamm told me

23   that Chris Moran said it, and I heard Chris

24   Moran later in June of 2006 say it.

25          Q.    Okay.  So you learned of this

                              E. Carter

1

2    alleged defamation in one instance from

3    Mr. Lamm, who told you that Mr. Moran said

4    that George Hesse said this?

5         A.     Yes.

6         Q.     And on the other instance you

7    learned about this alleged defamatory

8    statement, you heard it directly from

9    Mr. Lamm?

10        A.     Directly from Mr. Moran.

11        Q.     From Mr. Moran.

12        A.     Yes.

13        Q.     Was that in a face-to-face

14   conversation?

15        A.     No.

16        Q.     Was it on a telephone call?

17        A.     Kevin was on a telephone call.

18        Q.     With whom?

19        A.     On speaker with Chris Moran.

20        Q.     And you were present?

21        A.     Yes.

22        Q.     Did Mr. Lamm tape this

23   conversation?

24        A.     Yes.

25        Q.     Were you aware that Mr. Lamm was

1                          E. Carter

2      taping this conversation?

3            A.     Yes.

4            Q.     Where did you  -- where did

5      Mr. Lamm -- where was the speaker phone

6      present?

7            A.     It was a Nextel.  One of those

8      Nextels.

9            Q.     So you were right next to

10     Mr. Lamm when he was doing this?

11           A.     Yes.

12           Q.     And where were you and Mr. Lamm?

13           A.     In Ronkonkoma.

14           Q.     Where in Ronkonkoma?

15           A.     By the airport.

16           Q.     Why?

17                  MR. GOODSTADT:    Objection.

18           Q.     Why were you with Mr. Lamm on

19     this occasion in June?

20           A.     I stopped up at work.  It's part

21     of my patrol, the airport, and I met up with

22     Kevin, and he said he was about to call

23     Chris.

24           Q.     So you and Mr. Lamm were working

25     at that time?

1                          E. Carter

2          A.      I was, yes.

3          Q.      Was Mr. Lamm working?

4          A.      To the best of my knowledge, yes.

5          Q.      So you both were working for the

6    Town of Islip, and Mr. Lamm advised you that

7    he was going to call Mr. Moran?

8          A.      Yes.

9          Q.      Did Mr. Lamm tell you why he was

10   going to call Mr. Moran?

11         A.      That Chris had called him and he

12   was going to call him back, and he said, "Do

13   you want me to ask him why you were let go

14   again?"  And I said, "Sure."

15         Q.      And did Mr. Lamm tell you that he

16   was going to be recording Mr. Moran?

17         A.      No.

18         Q.      Did -- were you aware that

19   Mr. Lamm was recording Mr. Moran in his

20   conversation?

21         A.      At that point, I saw a tape

22   recorder.  I didn't know if it was on or

23   not.

24         Q.      So Mr. Lamm had his Nextel phone

25   in one hand and a tape recorder in another?

1                          E. Carter

2          A.      No.  The tape recorder was on a

3    center console of the vehicle.

4          Q.      Oh, you were in a car?

5          A.      Yes.

6          Q.      What type of tape recorder was

7    it?

8          A.      A thin one (indicating).  Silver

9    in color.

10         Q.      A little dictaphone?

11         A.      If that's what they're called,

12   yes.

13         Q.      And you saw it?

14         A.      Yes.

15         Q.      And you assumed that he was

16   taping it?

17         A.      I found out later on he was

18   taping it, yes.

19         Q.      Well, did you ask Mr. Lamm at

20   that time why there was a tape recorder on

21   the console?

22         A.      No.

23         Q.      Did you see that it was on or

24   not?

25         A.      No.

```
1                       E. Carter
2        Q.     Did you see Mr. Lamm go to turn
3   it on?
4        A.     No.
5        Q.     Did Mr. Lamm tell Mr. Moran that
6   he was being taped?
7        A.     No.  Not that I recall.
8        Q.     Was that the only occasion that
9   you're aware of that Mr. Lamm was taping
10  telephone conversations?
11       A.     No.
12       Q.     Was that the first time  -- well,
13  let's -- before I go there, when did you
14  learn that Mr. Lamm had tape recorded that
15  conversation with Mr. Moran?
16       A.     Afterwards.  Shortly afterwards.
17  I don't recall exactly when.
18       Q.     Seconds?  Minutes?  Weeks?
19  Months?
20       A.     I don't recall at this time.
21       Q.     How?  How did you learn?
22       A.     Because he had to get the
23  recording to a disc.
24       Q.     Yeah, but how did you learn
25  Mr. Lamm had recorded that conversation?
```

1                    E. Carter

2        A.     He told me he did after.  You

3    know, I don't know if it was exactly then or

4    if it was later on.

5        Q.     And prior to that conversation

6    with Mr. Moran, were you aware that Mr. Lamm

7    was telephone -- was recording telephone

8    conversations with other individuals?

9              MR. GOODSTADT:     Objection.

10       A.     No.

11       Q.     No?

12       A.     No.

13       Q.     When did you learn that Mr. Lamm

14   had tape recorded other conversations, other

15   than the one that you were involved in?

16       A.     June of '06.

17       Q.     What did Mr. Lamm say to you, if

18   anything?

19       A.     He needed to have the tape

20   recordings put on a disc, and I didn't -- I

21   couldn't do it.

22       Q.     Did Mr. Lamm tell you why he was

23   tape recording conversations?

24       A.     For the defamation.  We all felt

25   that defamation was the biggest thing was me

                        E. Carter

1

2    wearing a wire.  That when a park ranger

3    three position did come up for me, I wanted

4    to know why I was let go, so I could tell my

5    boss the true reason, rather that what I had

6    to tell him a couple of days after, that I

7    was let go for directives that were hanging

8    on the board that I didn't know what I was

9    fired for.

10        Q.    So you had asked Mr. Lamm to tape

11   record the conversations?

12             MR. GOODSTADT:    Objection.

13        A.    No.

14        Q.    So let me understand this

15   correctly -- let me ask you this question,

16   did Mr. Lamm advise you as to why he was

17   tape recording conversations?  Not why you

18   think it was being done.  Did Mr. Lamm tell

19   you why he was tape recording conversations?

20        A.    No.

21        Q.    Did you ask Mr. Lamm to tape

22   record conversations?

23        A.    No.

24        Q.    So when you answered just before

25   about wanting to know why you were fired,

1                    E. Carter

2       what did that have to do with why Mr. Lamm

3       was tape recording a conversation?

4              MR. GOODSTADT:      Objection.

5           A.      Later on, when we had talked --

6       again, I don't know if it was right then and

7       there or if I had to go -- he said, "See,

8       that's why you were let go, for wearing a

9       wire."  And I said, "Unbelievable."  I said,

10      you know, "reason number three now."

11          Q.      Okay.  So let me get this

12      straight.  Based upon a tape recorded

13      conversation between Mr. Lamm and Mr. Moran,

14      wherein Mr. Moran said that George Hesse

15      back in April said something about you

16      wearing a wire, you concluded that that was

17      why you were fired?

18             MR. GOODSTADT:      Objection.

19          A.      I felt that was a big reason why

20      I was fired, because originally, I was

21      misID'd as being part  -- as being on the

22      night of the Gilbert incident and that

23      caused a lot of problems.

24          Q.      When were you misID'd as being

25      part of the Gilbert incident?

```
 1                         E. Carter
 2        A.      Back sometime 2005.
 3        Q.      Where were you misID'd?
 4        A.      Someone told the District
 5   Attorney's office I was working that night.
 6        Q.      Who told the District Attorney's
 7   office?
 8        A.      George Hesse told me it was Dave
 9   Gerden.
10        Q.      So George Hesse told you that
11   this guy Dave told the District Attorney's
12   office that you were mis -- that you were
13   part of the Gilbert incident?
14                MR. GOODSTADT:    Objection.
15        Q.      Is that your testimony?
16        A.      That he gave a statement, yes, or
17   a verbal that I was -- yeah, I was there
18   that night.
19        Q.      And you believe that that
20   misidentification contributed to you being
21   fired, you not being rehired?
22                MR. GOODSTADT:    Objection.
23        A.      That caused -- yes.  Absolutely.
24        Q.      What -- what connection do you
25   see between the two?
```

1                        E. Carter

2         A.       It started in the fall of 2006,

3   District Attorney's office started

4   interviewing people with reference to the

5   Gilbert incident.  They came to me twice and

6   I had Gray -- the attorney for the beach,

7   Gray come to my house.  They called me at

8   my -- they came the first time.  Asked me a

9   bunch of questions, which I didn't

10  understand what they were asking me, and

11  they said they had information that I was

12  working that night.  I said I wasn't.  It

13  was my daughter's birthday.  I had a party

14  in the yard and I don't work Saturday

15  nights.

16              Little time later, short time

17  later, I don't recall if it was a couple

18  days, a week, they said they were going to

19  interview other people.  They -- the

20  investigator, Tom Iacopelli, called me at my

21  town job.  You got the secretary.  The boss

22  is there.  She looks at me, she goes,

23  "District Attorney's office is on the phone

24  for you."  I picked the phone up.  He says,

25  "Carter, I need to speak to you.  We're

1                    E. Carter

2    coming to your house tomorrow."  I said,

3    "No, you're not."  He said, "What do you

4    mean?"  I said, "There was a 2042, an

5    internal correspondence put out that the

6    village attorney has to be present for any

7    conversations with you.  And I don't want to

8    be fired.  I need the job.  I need the

9    money."

10                   So he says, "Well, you spoke to

11   us in the past.  Why don't you speak to us

12   now."  I said, "You spoke to us first."  I

13   said, "Listen, I don't need to lose my job."

14   I said, "I'm going to call."  So I

15   immediately called George Hesse, who set an

16   appointment up with the attorney for the

17   beach at the time.  I believe he was called

18   "Gray."  He showed up at my house the next

19   day.

20                   And that's when guys started

21   looking at me funny like I was talking to

22   the District Attorney's office.  I was rat.

23   Again, I'm labeled as a rat.  And I told

24   George, I said, "I had nothing -- you, know,

25   I wasn't there."  He said, "I know you

```
 1                    E. Carter
 2   weren't there, but what are you going to
 3   do."
 4            So the range comes around
 5   November of 2005.  We meet at Stop & Shop in
 6   East Islip.  There's approximately 10 guys.
 7   We're all going out to the range together.
 8   10 -- maybe it was even more, 15 of us.  I
 9   walk up and the guy Dave says to me, "Oh,
10   the District Attorney's office talk to ya?"
11   And I looked and I said, "Dave, I wasn't
12   working that day."  And at that time, the
13   other guys said, "Dave, he wasn't working
14   that day."  It was the first time that it
15   came out three months later, two months
16   later that I wasn't working that day.
17            And subsequently, the District
18   Attorney's office never spoke to me again,
19   but George Hesse, in between that time, said
20   to me, "I don't understand why they keep
21   talking to you.  I don't know why."  And the
22   guys started looking at me funny.
23        Q.    Well, no, you testified that the
24   guys were looking at you funny before
25   Mr. Hesse said that to you about why are you
```

1                    E. Carter

2    working, correct?

3         A.    That was between September --

4    between the Gilbert thing and then with the

5    District Attorney's office first came over.

6         Q.    Mr. Hesse didn't misidentify you,

7    did he?

8         A.    Him, no.

9         Q.    Right.  Mr. Hesse didn't advise

10   anyone prior to April 2, 2006 that you were

11   wearing a wire, did he?

12             MR. GOODSTADT:    Objection.

13        Q.    To your knowledge?

14        A.    To my knowledge, no.  Not that I

15   know of.

16        Q.    Mr. Hesse, prior to April 2,

17   2006, didn't tell anyone, to your knowledge,

18   that you were cooperating with the DA,

19   correct?

20        A.    To my knowledge, no.

21        Q.    In fact, to your knowledge --

22   withdrawn.  So what -- explain to me how you

23   attribute your termination -- I'm sorry,

24   withdrawn.  How do you attribute you not

25   being rehired on April 2, 2006 to this

1              E. Carter

2    misidentification of you that Mr. Hesse had

3    nothing to do with?

4              MR. GOODSTADT:    Objection.

5         A.    Mr. Hesse being the senior

6    officer at that scene that night, could have

7    very easily taken care of it and explained.

8    Showed the blotter, the records that I

9    wasn't there.

10        Q.    How do you know he didn't?

11        A.    He never said he did.

12        Q.    Did you ask him?

13        A.    I said to him, I said "George" --

14   my exact words to him was, "This is pretty

15   sad.  I can't prove that I wasn't working

16   that night."

17        Q.    What do you mean you can't prove?

18   Didn't the records show you weren't working

19   that night?

20        A.    The District Attorney's office

21   originally said, in my house, with Gray

22   sitting there, that I could falsify the

23   blotter or my time sheets.

24        Q.    Oh, so it was the DA that didn't

25   necessarily believe, in your opinion, what

```
 1                    E. Carter
 2   was put on the time sheets, correct?
 3        A.     I'm not  -- yes.
 4        Q.     Right.  My question to you is,
 5   what makes you think that George Hesse
 6   didn't tell the DA that you didn't work that
 7   night?
 8        A.     He never said he did.
 9        Q.     But did you ask him?
10        A.     No.
11        Q.     What makes you think that the DA
12   didn't believe that in fact you didn't work
13   that night?
14        A.     What makes me believe -- I'm
15   sorry, repeat the question.
16        Q.     What makes you believe -- I'll
17   withdraw the question.  I'm just trying to
18   figure out what did Mr. Hesse say concerning
19   this misidentification prior to April 2,
20   2006 that you believe resulted, in part, in
21   you not being rehired by Ocean Beach?
22        A.     I'm sorry, we're talking about
23   the wire, is what we were talking about.
24        Q.     No.  We were talking about -- you
25   said this misidentification of you being
```

1                    E. Carter

2    involved in the Gilbert incident was a

3    reason, in your opinion, why you weren't

4    rehired.  So my question to you is, what did

5    Mr. Hesse do with regard to this

6    misidentification that you believe resulted

7    in a decision concerning you not being

8    rehired on April 2, 2006?

9                    MR. GOODSTADT:    Objection.

10        Q.    You can answer.

11        A.    The wire's what started this, and

12   then I went to explain how it came about,

13   the wearing of the wire.  That somebody was

14   going to wear the wire.  I was supposedly

15   cooperating with the District Attorney's

16   office because he came to my house twice.

17   No one else apparently at that point was

18   seen twice.

19        Q.    So the misidentification had

20   nothing to do with you being terminated, is

21   that your testimony?

22                    MR. GOODSTADT:    Objection.

23        Q.    Let me ask you straight out then,

24   sir.  You say that you were misidentified by

25   somebody, not George Hesse, concerning the

1                    E. Carter

2      Gilbert incident, correct?

3              MR. GOODSTADT:    Objection.

4         A.    Yes.

5         Q.    At some point in time prior to

6      April 2, 2006, you believe that the DA

7      thought that you were part of the Gilbert

8      incident, correct?

9         A.    Yes.

10        Q.    What did  -- do you believe that

11     this misidentification by someone other than

12     George Hesse, was a reason for you not to be

13     rehired on April 2, 2006?

14             MR. GOODSTADT:    Objection.

15        A.    The Gilbert incident  --

16        Q.    Yes or no?

17        A.    Part of it, yes.

18        Q.    Okay.  What part of your

19     misidentification do you believe resulted in

20     you not being rehired on April 2, 2006?

21             MR. GOODSTADT:    Objection.  He

22             just testified for five minutes about

23             it.

24        A.    The Gilbert incident as a whole

25     was part of me being misidentified.  Then

1                      E. Carter

2  coming out about me wearing a wire for the

3  District Attorney's office to have these

4  guys admit that they beat up Gilbert during

5  an incident that happened in August of 2005.

6         Q.    Who is "they" that you're talking

7  about, they say you were wearing a wire?

8              MR. GOODSTADT:    Objection.   He

9         already testified who said it.

10        Q.    Who's "they"?

11        A.    George Hesse.  Arnold Hardman's

12 attorney and George Hesse.

13        Q.    But that was April 2, 2006,

14 correct?

15        A.    Yes.

16        Q.    What did Mr. Hesse say about you

17 wearing a wire, if anything, prior to April

18 2, 2006?

19        A.    To myself, nothing.

20        Q.    To anybody that you're aware of,

21 prior to April 2, 2006?

22        A.    Apparently he spoke to Arnie

23 Hardman about it, because it was said at the

24 meeting.

25        Q.    Not apparently.

1               E. Carter

2          MR. CONNOLLY:    Objection.

3     Q.    What information can you point to

4   from any source that indicates that George

5   Hesse said anything to anyone, prior to

6   April 2, 2006, about you wearing a wire?

7     A.    Nothing.

8          MR. NOVIKOFF:    Let's end it

9          now.  It's 12:30.  We'll pick it up at

10         1:15.

11         THE VIDEOGRAPHER:    The time is

12         12:29 p.m.  We're going off the record.

13              (A break was taken.)

14         THE VIDEOGRAPHER:    The time is

15         1:24 p.m.  Back on the record.

16    Q.    Mr. Carter, stay on the wire

17  issue.  You testified that you were told

18  that Mr. Hesse made a comment concerning you

19  wearing a wire on April 2, 2006.  Has anyone

20  told you that Mr. Hesse made a comment about

21  you wearing a wire at any time subsequent to

22  April 2, 2006?

23    A.    No.

24    Q.    The third alleged defamatory

25  statement that you claim or you testified

1                        E. Carter
2      that Mr. Hesse made concerning you was that
3      you were sleeping on the job; is that
4      correct?
5           A.      That I was sleeping, yes.
6           Q.      Sleeping where?
7           A.      He told me I was  -- he told
8      another boss in the Town of Islip that I was
9      cutting myself thin and sleeping while
10     coming to work.
11          Q.      Okay.  Did Mr. Hesse ever
12     communicate directly to you any defamatory
13     statement concerning you sleeping while
14     working at Ocean Beach?
15               MR. GOODSTADT:     Objection.
16               MR. NOVIKOFF:     Withdrawn.
17          Q.      Did Mr. Hesse ever advise you
18     that he believed that you -- withdrawn.
19     While you were working at Ocean Beach, did
20     Mr. Hesse ever advise you that he thought
21     you were sleeping while on the job?
22          A.      No.
23          Q.      On April 2, 2006, did Mr. Hesse
24     ever advise you that he believed that you
25     were sleeping while on the job at Ocean

1                          E. Carter

2     Beach?

3          A.      No.

4          Q.      Prior to April 2, 2006, did

5     anyone tell you that Mr. Hesse said that you

6     were sleeping on the job?

7          A.      No.

8          Q.      Did -- has anyone told you that

9     Mr. Hesse, on April 2, 2006, said that you

10    were sleeping on the job?

11         A.      No.

12         Q.      Now after April 2, 2006, other

13    than what you say Mr. Hesse said to one of

14    your supervisors, did  -- has anyone told

15    you that Mr. Hesse said that you were

16    sleeping on the job?

17         A.      George Hesse himself, both

18    verbally and through an email.

19         Q.      What did George Hesse say to you

20    verbally about you sleeping on the job?

21         A.      He said that I had called  -- he

22    said that I spoke to Greg DeCanio, who was

23    looking into my promotion, and I had to ask

24    him for a letter.  He said, "I didn't know

25    what letter you needed.  What you want in

```
 1                    E. Carter
 2   the letter exactly.  And I told Greg you
 3   were cutting yourself thin.  You just had
 4   twin boys.  You were coming to his job,
 5   going upstairs and basically sleeping the
 6   night away."
 7        Q.    Okay.  And he told you this when?
 8        A.    May 15.
 9        Q.    Okay.  And did he tell you this
10   face to face?
11        A.    On the phone.  No.  On the phone
12   and in an email.
13        Q.    Okay.  Let's talk about on the
14   phone.  Who called who?
15        A.    I called -- George had originally
16   called me.  Left a message.  I called him
17   back when I got done with the training
18   class, and he said -- I said -- he said,
19   "Eddie, did you get my email?"  I said, "No,
20   George.  Truthfully, I didn't get on the
21   computer."  And he said, "Oh, I sent you an
22   email explaining everything," and then he
23   explained it to me that he told Greg DeCanio
24   that I was cutting myself thin, I just had
25   the twin boys, and that I was sleeping while
```