UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
JOSEPH NOFI, and THOMAS SNYDER,
                         Plaintiffs,
         -against-   Case No. 07-Civ-1215
                                   (SJF)(ETB)
INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
JOSEPH C. LOEFFLER, JR., individually and in
his official capacity; former mayor NATALIE
K. ROGERS, individually and in her official
capacity; OCEAN BEACH POLICE DEPARTMENT;
ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
individually and in his official capacity;
SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
CIVIL SERVICE; and ALISON SANCHEZ,
individually and in her official capacity,
                         Defendants.
-------------------------------------------X

                    926 Reckson Plaza

                    Uniondale, New York


                    November 19, 2008

                    10:03 A.M.


            VIDEOTAPE DEPOSITION of KEVIN

LAMM, taken pursuant to the Federal Rules of

Civil Procedure, and Notice, held at the

above-mentioned time and place before Edward

Leto, a Notary Public of the State of New

York.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 2

```
 1
 2      A P P E A R A N C E S:
 3           THOMPSON WIGDOR & GILLY LLP
                  Attorneys for Plaintiffs
 4                85 Fifth Avenue
                  New York, New York 10003
 5           BY:  ANDREW S. GOODSTADT, ESQ.
 6           RIVKIN RADLER LLP
                  Attorneys for Defendants
 7                Incorporated Village of Ocean
                  Beach, Mayor Joseph C. Loeffler,
 8                Jr., former Mayor Natalie K.
                  Rogers, and Ocean Beach Police
 9                Department
                  926 Reckson Plaza
10                Uniondale, New York 11556
             BY:  KENNETH A. NOVIKOFF, ESQ.
11
             MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.
12                Attorneys for Defendant Acting
                  Deputy Police Chief George B.
13                Hesse
                  530 Saw Mill River Road
14                Elmsford, New York 10523
             BY:  KEVIN W. CONNOLLY, ESQ.
15
        ALSO PRESENT
16           Albert Santana, Legal Video Specialist
             Frank Fiorillo
17           Joseph Nofi
             Thomas Snyder
18
19
20
21
22
23
24
25
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

1

2          IT IS HEREBY STIPULATED AND

3    AGREED by and among counsel for the

4    respective parties hereto, that the filing,

5    sealing and certification of the within

6    deposition shall be and the same are hereby

7    waived;

8              IT IS FURTHER STIPULATED AND

9    AGREED that all objections, except to the

10   form of the question, shall be reserved to

11   the time of the trial;

12             IT IS FURTHER STIPULATED AND

13   AGREED that the within deposition may be

14   signed before any Notary Public with the

15   same force and effect as if signed and sworn

16   to by the Court.

17

18

19

20

21

22

23

24

25

1          K. Lamm

2          THE VIDEOGRAPHER:   This is tape

3    number one of the videotape deposition

4    of Kevin Lamm in the matter of Edward

5    Carter, et al., Plaintiffs, versus

6    Incorporated Village of Ocean Beach, et

7    al., Defendants, in the United States

8    District Court, Eastern District of New

9    York, case number

10   07-CIV-1215(SJF)(ETB), on November 19,

11   2008, at approximately 10:03 a.m.

12         My name is Albert Santana from

13   the firm of Precise Court Reporting and

14   I'm the legal video specialist.   The

15   court reporter is Ed Leto in

16   association with Precise Court

17   Reporting.   For the record, will

18   counsels please introduce themselves.

19         MR. NOVIKOFF:   On behalf of the,

20   um, Village Defendants, the Ocean Beach

21   Police Department, Mayor Rogers and

22   Mayor Loeffler, both in their

23   individual and official capacities, Ken

24   Novikoff from the law firm of Rivkin

25   Radler.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2           MR. CONNOLLY:    On behalf of

3      Defendant Acting Police Chief -- Active

4      Deputy Police Chief George B. Hesse,

5      Kevin Connolly of Mark, O'Neill,

6      O'Brien & Courtney.

7           MR. GOODSTADT:    Andrew

8      Goodstadt, Thompson, Wigdor & Gilly, on

9      behalf of the Plaintiffs.

10          MR. NOVIKOFF:    And just for the

11     record, I believe Mr. Nofi, Mr. Snyder

12     and Mr. Fiorillo are present with you

13     today, correct, Mr. Goodstadt?

14          MR. GOODSTADT:    That is

15     correct.

16          MR. NOVIKOFF:    Okay.  Are we

17     set?

18          THE VIDEOGRAPHER:    Now will the

19     court reporter please swear in the

20     witness.

21     K E V I N   L A M M, having first been duly

22     sworn by a Notary Public of the State of New

23     York, was examined and testified as follows:

24     EXAMINATION BY

25     MR. NOVIKOFF:

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1             K. Lamm

2        THE COURT REPORTER:   Please

3   state your name for the record.

4        THE WITNESS:   Kevin Lamm.

5        THE COURT REPORTER:   Please

6   state your address.

7        THE WITNESS:   1066 Cassel

8   Avenue, Bay Shore, New York.

9        THE COURT REPORTER:   Spell it,

10   please, the street.

11        THE WITNESS:   C-A-S-S-E-L,

12   Avenue.

13        THE COURT REPORTER:   Try to keep

14   your voice up, please.

15   Q.   Who, if anyone, resides with you

16  at your present address?

17   A.   My mother.

18   Q.   Were you in attendance at the

19  deposition taken by your counsel yesterday

20  of Mr. Pat Cherry?

21   A.   No, I was not.

22   Q.   Were you in attendance at any of

23  the depositions?

24   A.   Yes, I was.

25   Q.   Which depositions were you in

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2     attendance of?

3          A.     Maryanne Minerva.

4          Q.     Okay.

5          A.     And Natalie Rogers.

6          Q.     Did you take any notes during

7     Ms. Minerva's deposition?

8          A.     I wrote a few things down.

9          Q.     Do you -- are you still in

10    possession of those notes?

11         A.     No, I'm not.

12         Q.     Did you destroy them?

13         A.     Yes.

14         Q.     When did you destroy them?

15         A.     Right after the deposition was

16    over.

17         Q.     Why did you take the notes down?

18         MR. GOODSTADT:    Objection.

19    This is --

20         Q.     Why did you take the notes down?

21         MR. GOODSTADT:    Objection.

22    Don't -- don't answer.  This is a -- a

23    privilege question.  He took them at

24    our request for our use in preparation

25    for --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2              MR. NOVIKOFF:    Well, that's

3        what I thought until he said he

4        destroyed them at the end.  I don't

5        think it's privileged if your client

6        takes notes down during a deposition,

7        but --

8              MR. GOODSTADT:    If they're

9        not --

10             MR. NOVIKOFF:    Look, I

11       understand you're objecting on the

12       basis of privilege.

13             MR. GOODSTADT:    I am.

14             MR. NOVIKOFF:    Okay.  Fine.

15       Q.    Did you take any notes at

16  Ms. Rogers' deposition?

17       A.    No, I didn't.

18       Q.    Okay.  So the only notes you took

19  were during Ms. Minerva's deposition?

20       A.    Yes.

21       Q.    Okay.  Now I note that you're

22  wearing a tie today.  Did you wear a tie

23  when you were present at Ms. Minerva's

24  deposition?

25             MR. GOODSTADT:    Objection.

1              K. Lamm

2      A.    No, I didn't.

3      Q.    What's that?

4      A.    No, I didn't.

5      Q.    Did you wear a tie when you were

6    present at Ms. Rogers' deposition?

7            MR. GOODSTADT:    Objection.

8      A.    No, I didn't.

9      Q.    Okay.  And you were aware today

10   that you were going to be videotaped for

11   your deposition, correct?

12     A.    Yes.

13     Q.    Did you review the Complaint that

14   has been filed in this action prior to it

15   being filed?

16     A.    Yes.

17     Q.    For what purpose did you review

18   the Complaint?

19     A.    To read over what was in there,

20   what we stated.

21     Q.    And would it be fair to say, sir,

22   that you read over the Complaint to make

23   sure that to the extent you had knowledge of

24   the allegations, that they were accurate?

25     A.    Yes.

Page 10

K. Lamm

1     Q.    And would you agree with me that it would be important that you -- that allegations for which you had knowledge of were not misrepresented in the Complaint?

         MR. GOODSTADT:   Objection.

     A.    Correct.

     Q.    And would you agree with me that it would be important that with regard to information that you had knowledge of, that the information was truthful in the Complaint, correct?

         MR. GOODSTADT:   Objection.

     A.    Correct.

     Q.    Without giving me any substance of conversations between you and your counsel, did you authorize your attorney to file the Complaint on your behalf?

     A.    Yes.

     Q.    Would it be fair to say that everything that you reviewed in the Complaint, that at least you had knowledge of, was accurate, to the best of your recollection?

     A.    Yes.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 11

1                    K. Lamm
2          Q.    Okay.  Now do you recall alleging
3     a claim in this case of tortious
4     interference with a prospective business
5     relationship under New York law?
6          A.    I don't understand.  Can you  --
7          Q.    Do you -- do you -- are you aware
8     as you sit here today that you've made
9     certain claims against the Defendants in
10    this case, correct?
11         A.    Yes.
12         Q.    And you're aware that you've
13    claimed that your 14th Amendment due process
14    rights have been violated, do you -- do you
15    understand that?
16         A.    Yes.
17         Q.    Do you understand that you've
18    claimed that your 14th Amendment liberty
19    interest claims  -- rights had been
20    violated?
21         A.    Yes.
22         Q.    Do you understand that you've
23    claimed in this case that your 1st Amendment
24    rights have been violated?
25              MR. GOODSTADT:    Objection.

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 12

1              K. Lamm

2      A.    Yes.

3      Q.    Okay.  And you've made various

4  other claims in this case, would you agree

5  with me?

6      A.    Yes.

7      Q.    Okay.  Now one of the claims in

8  the Complaint says -- is labeled "tortious

9  interference with a prospective business

10  relationship under New York law."  My

11  question to you is, do you recall that that

12  is a claim in this case that you've alleged

13  against some or all of the Defendants?

14      A.    Can you define what you mean by

15  "business"?

16      Q.    No, sir, because this is your

17  allegation.  So my question to you is -- I'm

18  not asking you to define anything.  I'm

19  asking you, do you recall alleging that as a

20  claim in this case?  If you don't recall,

21  then you don't recall.  That's fine, too.

22      A.    I recall something to that

23  effect.

24      Q.    Okay.  What new employment were

25  you scheduled to commence shortly after you

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2   were not rehired by the Ocean Beach Police

3   Department in or about April of 2006?

4        A.    I was processing for the Suffolk

5   County Police Department.

6        Q.    Is that the only employment that

7   you were scheduled to commence shortly after

8   the April 2006 time period?

9        A.    No.  There were other town and

10  village police agencies that also sent out

11  canvas letters that I responded to.

12       Q.    What other town and municipal

13  agencies I believe you testified to did you

14  send out that you received canvas letters

15  from?

16       A.    Southampton Town Police,

17  Southampton Village Police, Huntington Bay

18  Police, Lloyd Harbor Police.

19       Q.    Anything else?

20       A.    I believe that is all.

21       Q.    Okay.  Let's start with the

22  Suffolk County Police Department.  You --

23  you just indicated I believe, and if I'm

24  wrong, please tell me, that you were in the

25  process of seeking employment with the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 14

1                    K. Lamm

2     Suffolk County Police Department; is that

3     correct?

4              MR. GOODSTADT:    Objection.

5          A.    Yes.

6          Q.    What did you mean by "process"?

7          A.    Going through the processing as

8     far as backgrounds, their agility, medical.

9          Q.    Did you have to take a test in

10    order to apply for the Suffolk County Police

11    Department?

12         A.    A written test.

13         Q.    Okay.  When did you take that

14    written test?

15         A.    I believe it was in the year of

16    2003.

17         Q.    Okay.  When in 2003?

18         A.    I believe it was either May or

19    June.

20         Q.    What type of written test did you

21    have to take in May or June of 2003?

22         A.    Police test.

23         Q.    Can you describe what that police

24    test is?

25         A.    Reading comprehension test.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 15

1              K. Lamm

2    Individualization.  Memorization.

3         Q.    Did you pass the test?

4         A.    Yes, I did.

5         Q.    Do you know what score you got?

6         A.    92.5.

7         Q.    Okay.  And do you know, was there

8    a list that you appeared on with regard to

9    eligible employees for the Suffolk County

10   Police Department?

11        A.    Yes, there was.

12        Q.    And can you describe what that

13   list is?

14        A.    It's your number of ranking.

15        Q.    And do you know who puts out that

16   list?

17        A.    Suffolk County Civil Service.

18        Q.    And did you receive a copy of

19   that list?

20        A.    Yes.

21        Q.    After you took the test and

22   passed it?

23        A.    Not the list.  Just what my list

24   number was.

25        Q.    Okay.  And what was your list

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2    number?

3           A.    I believe it was 303 or it was

4    313.  I believe 303.

5           Q.    Okay.  And when did you receive

6    that document that listed you as either 303

7    or 313?

8           A.    I believe somewhere close to

9    or -- the year 2004 or just before 2004 in

10   the wintertime.

11          Q.    Okay.  When you say just

12   before -- so the winter of 2003 you may have

13   received the list?

14          A.    Right.  Or it could have been

15   just when it turned 2004.

16          Q.    Okay.  And what understanding, if

17   any, did you have with regard to the

18   significance of either the 303 or the 313

19   listing?

20             MR. GOODSTADT:    Objection.

21          A.    Can you please repeat --

22          Q.    Yeah.  Sure.  I'll rephrase the

23   question.  Do you have an understanding as

24   to what 303 or 313 meant with regard to your

25   application?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        A.    That is your rank number.

3        Q.    And what does that mean in

4    regard -- with regard to your application?

5        A.    That I was 303 on the list of

6    band score.

7        Q.    Would I be correct then in

8    understanding your answer to mean that at

9    least according to your understanding, they

10   had to -- Suffolk County had to offer 302

11   people the job first before they got to you?

12       A.    That's not accurate.

13       Q.    Okay.  What aspect of my

14   statement was inaccurate?

15       A.    That the score was band scored,

16   meaning that anybody that got the same grade

17   as me, also received the same list number as

18   me.

19       Q.    Okay.  So there could have been

20   more than one person with 303?

21       A.    There could have been more than

22   one person with a 92 and a half or 303.

23       Q.    So, theoretically, there could

24   have been more than 302 individuals who had

25   to be offered the job before it got to you;

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 18

1              K. Lamm

2    is that correct?

3              MR. GOODSTADT:    Objection.

4         A.    It could have been, but by the

5    time you get through process of elimination,

6    it could be less.

7         Q.    Why could it be less?

8         A.    'Cause some people may not meet

9    the standards or fail out on another part of

10   it.

11        Q.    Okay.  Got it.  But if I

12   understand, at least at the time that you

13   first received this document, theoretically,

14   there could have been more than 302 people

15   who could have been asked to take the job

16   before you?

17             MR. GOODSTADT:    Objection.

18        A.    Could have been or it could have

19   been less.

20        Q.    Okay.  Got it.  Did your number

21   ever change, to your knowledge?

22        A.    Not that I'm aware of.

23        Q.    Okay.  Now in 2004, did the

24   Suffolk County Police Department ever

25   communicate with you concerning your

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 19

1              K. Lamm

2    application?

3         A.    The Suffolk  -- not the Suffolk

4    County Police Department.

5         Q.    That's my question.

6         A.    Right.

7         Q.    Did any other agency communicate

8    with you, in 2004, concerning your

9    application?

10        A.    Suffolk County Civil Service

11   communicated before any department.

12        Q.    Okay.  And now I'm only talking

13   about in 2004.  What communication did you

14   receive from the Suffolk County Civil

15   Service Department concerning the test that

16   you took in 2003?

17        A.    If I was interested in any other

18   police jobs working for any other villages

19   or -- or towns.

20        Q.    Okay.  Well, in this

21   communication 2004, did they specifically

22   ask you any questions concerning your

23   interest in the Suffolk County Police

24   Department job?

25        A.    No.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 20

1                     K. Lamm

2          Q.     Okay.  So my question is -- was

3     specific, sir.  In 2004, did the Suffolk

4     County Civil Service Department communicate

5     with you concerning your interest in the

6     Suffolk County Police Department job?

7          A.     No.

8          Q.     Okay.  Did any other agency, in

9     2004, communicate with you concerning your

10    interest in the Suffolk County Police

11    Department job?

12         A.     Other agencies did send letters,

13    but it doesn't refer to Suffolk County

14    Police.

15         Q.     That's what -- all I'm asking.

16    Then in 2005, did any entity or agency

17    contact you with regard to your interest in

18    the Suffolk County Police Department job?

19         A.     No.

20         Q.     Okay.  In 2006 now, and

21    specifically before April 2, 2006, did any

22    entity contact you with regard to your

23    interest in the Suffolk County Police

24    Department job?

25         A.     In 2006?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    Yes.  Prior to April 2, 2006?

3     A.    Yes.

4     Q.    Okay.  Just don't tell me what,

5 just tell me who, what entity contacted you

6 before April 2, 2006?

7     A.    Suffolk County Police Department.

8     Q.    And what did they communicate to

9 you concerning your interest in the Suffolk

10 County Police Department job?

11    A.    They wanted to know if I was

12 interested in a position.

13    Q.    Okay.  Was there any  -- was this

14 communication in writing or verbal?

15    A.    It was in writing.

16    Q.    Okay.  Was there anything else on

17 this written communication from the Suffolk

18 County Police Department, other than what

19 you've just testified to?

20    A.    I don't believe so.  Just how to

21 return the letter.

22    Q.    Okay.  And did you -- do you know

23 when this letter came to you?

24    A.    For certain I don't.

25    Q.    Do you know what month?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 22

1              K. Lamm

2    A.    Maybe the month of March.

3    Q.    Okay.  And did you return the

4 letter?

5    A.    Yes, I did.

6    Q.    Okay.  And up until April 2,

7 2006, the only test that you took with

8 regard to the Suffolk County Police

9 Department job that you desired was this

10 written test in 2003; is that correct?

11    A.    Define what you mean by "only

12 test."

13    Q.    Well, I asked you specifically,

14 sir, what test did you take with regard to

15 this  -- with regard to the Suffolk County

16 Police Department job, and you testified a

17 written test in 2003.

18    A.    That was their test they gave.

19    Q.    That's right.  Did you undertake

20 any other test, between the written test in

21 2003 and the March letter from Suffolk

22 County Police Department, concerning your

23 interest in the Suffolk County Police

24 Department job?

25              MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                     K. Lamm

2          A.     I took a Suffolk County Sheriff's

3    test.

4          Q.     Okay.  I'll withdraw the

5    question.  I was unclear.  Now I'm just

6    focusing on the Suffolk County Police

7    Department job.  Between the written test

8    that you took in 2003 and March 2006, did

9    you take any other test specifically for the

10   Suffolk County Police Department job?

11         A.     No.

12         Q.     Okay.  Subsequent to this March

13   2006 communication that you've just

14   addressed in response to one of my

15   questions, when was the next communication,

16   if any, that you received from the Suffolk

17   County Police Department concerning your

18   interest in a job with them?

19         A.     I believe the next step was I

20   got -- I got a letter to appear for an

21   agility test.

22         Q.     When did you get that letter?

23         A.     Towards the end of March I

24   believe.

25         Q.     Of 2006?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 24

1            K. Lamm

2        A.    That's correct.

3        Q.    Okay.

4        A.    Approximately.

5  RQ           MR. NOVIKOFF:    All right.  And

6        again, Andrew, to the extent that this

7        hasn't been produced, and I'm not

8        suggesting it hasn't been, we call for

9        the production of all communications

10       from the Suffolk County Police

11       Department concerning his application.

12            MR. GOODSTADT:    Take it under

13       advisement.  Send us a letter

14       afterwards.

15            MR. NOVIKOFF:    Absolutely.

16       Q.    Did the Suffolk County Police

17  Department ask you to respond in any manner

18  to this communication in March concerning an

19  agility test?

20       A.    Yes.  I had to appear for an

21  agility test.

22       Q.    Okay.  And did you schedule a --

23  a date for this agility test?

24       A.    They scheduled it.

25       Q.    Okay.  And when was this

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 25

1                    K. Lamm

2    scheduled for?

3         A.    April 7.

4         Q.    April 7.  And did you undertake

5    the agility test?

6         A.    Yes, I did.

7         Q.    Did you pass the agility test?

8         A.    Yes, I did.

9         Q.    Okay.  What was the next

10   communication, if any, that you received

11   from the Suffolk County Police Department

12   concerning your interest in a job with them

13   after the communication concerning you

14   taking an agility test?

15        A.    I believe it was for a

16   orientation.

17        Q.    When you say you believe it was

18   for an orientation, what do you mean by

19   "orientation"?

20        A.    Where we would have to go to the

21   police academy and they would explain to us

22   some specifics about the job and -- and

23   prepare for a background investigation.

24        Q.    Okay.  And when did you receive

25   this communication?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 26

                        K. Lamm

1

2       A.    It was I believe -- actually,

3   after we finished the agility test, we had

4   to, as we were leaving, we signed a piece of

5   paper as to what day or -- what day we were

6   to appear for orientation.

7       Q.    Okay.  And what day did you  --

8   well, did you appear for orientation?

9       A.    Yes, I did.

10      Q.    And what day was that?

11      A.    The exact day I -- I don't

12  remember.

13      Q.    What month and year?

14      A.    It was in 2006.  The month  --

15  I'm not certain of the month.

16      Q.    What season?

17      A.    I believe it was springtime.

18      Q.    Okay.

19      A.    Late spring.

20      Q.    Late spring.  So -- okay.  And

21  when did you receive word that you passed

22  the agility test?

23      A.    I knew right then and there.

24      Q.    They advised you right then and

25  there that you passed the agility test?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 27

1                    K. Lamm

2         A.    Yes.

3         Q.    Okay.  And how did they -- how

4    did the Suffolk County Police Department

5    advise you right then and there?

6         A.    After you completed a battery of

7    tests, you would just go on to the next one.

8         Q.    Okay.  Did anyone advise you

9    verbally on that day that you passed the

10   agility test?

11        A.    Yes.

12        Q.    That's what I'm asking.  Who?

13        A.    The academy instructors.

14        Q.    And do you know the academy

15   instructors' names?

16        A.    No.  I don't know who it was.

17        Q.    Okay.  So between the agility

18   test and the date that you appeared for the

19   orientation, did you receive any

20   communications from the Suffolk County

21   Police Department concerning your interest

22   in a job with them?

23        A.    Not at that time.

24        Q.    That's all I'm asking, was that

25   period of time.  How long was the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    orientation session?

3         A.    Few hours.

4         Q.    Okay.  And did you have to fill

5    out any forms during the -- the orientation

6    session?

7         A.    Yes, I did.

8         Q.    What forms did you have to fill

9    out?

10        A.    Name, date of birth.  Some basic

11   things like that.  They gave us paperwork.

12        Q.    Did you have to fill out any

13   paperwork concerning your prior employment

14   history with Ocean Beach?

15        A.    Yes.

16        Q.    And do you recall what questions

17   they asked you about your prior employment

18   history with Ocean Beach?

19        A.    I believe they asked for how long

20   I worked there.

21        Q.    Okay.  Do you recall anything

22   else that they asked concerning your -- your

23   employment history with Ocean Beach?

24        A.    If we -- they asked if we

25   currently still, you know, worked there.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 29

K. Lamm

1

2    Q.    And what answer did you give?

3    A.    No.

4    Q.    Okay.  Did they ask a reason?

5  Well, withdrawn.  Did they ask you to

6  explain the reason why you no longer worked

7  there?

8    A.    Yes.

9    Q.    And what was the reason that you

10 gave?

11   A.    'Cause I was fired for budget

12 cuts.

13   Q.    Did you say "fired"?  Did you use

14 the word "fired"?

15   A.    I -- I believe I did.

16   Q.    And did they ask you to give any

17 further detail, other than the explanation

18 that you were fired for budget reasons?

19   A.    No.

20   Q.    Okay.  Did they ask you for any

21 recommendations or -- I'm sorry.  Withdrawn.

22 Did they ask you for any references

23 concerning your job with the Ocean Beach

24 Police Department?

25   A.    No.

Page 30

K. Lamm

1

2    Q.    Did you provide any references to

3    them on the date of this orientation

4    concerning your employment with the Ocean

5    Beach Police Department?

6    A.    No.

7    Q.    Okay.  So we are now at the point

8    in time of the orientation.  When was the

9    next communication, if any, that you

10   received from Suffolk County Police

11   Department concerning your interest in a job

12   with them?

13   A.    After the paperwork was submitted

14   in, I think it was two weeks after that.

15   Q.    Okay.

16   A.    After -- the paperwork was due

17   two weeks after the date of orientation, and

18   maybe within another month I had to appear

19   for a medical.

20   Q.    Okay.  And did you appear for  --

21   did you in fact appear for the medical?

22   A.    Yes, I did.

23   Q.    Okay.  This communication about

24   you appearing for a medical, was that verbal

25   or was that written?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 31

1                K. Lamm

2        A.     That was written.

3        Q.     Was there anything else on that

4    document that -- anything on that document

5    other than that you had to appear for a

6    medical?

7                MR. GOODSTADT:    Objection.

8        A.     No.

9        Q.     Okay.  And when did you appear

10   for this medical?

11       A.     I guess towards the beginning of

12   the summer.

13       Q.     Of 2006?

14       A.     2006.

15       Q.     Did you ever -- were you ever

16   advised by the Suffolk County Police

17   Department that you passed whatever medical

18   test they gave you?

19       A.     Yes, I did pass.

20       Q.     And they advised you of this?

21       A.     Yes, they did.

22       Q.     When did they advise you of this?

23       A.     Maybe a week and a half after.

24       Q.     Okay.  And did they advise you of

25   this in writing?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 32

1              K. Lamm

2      A.     Yes, they did.

3      Q.     Okay.  Now between the

4  orientation -- withdrawn.  No.  Between the

5  orientation and the date that you were

6  advised that you passed the medical test,

7  did you receive any other communications

8  from the Suffolk County Police Department,

9  other than what you've just testified to?

10              MR. GOODSTADT:    Objection.

11      A.     Yes.

12      Q.     What did you receive?

13      A.     I had to appear for a

14  psychological.

15      Q.     Okay.  Well, I assume when you

16  said "medical," that was both physical

17  and --

18      A.     No.

19      Q.     -- and mental.  But that's fine.

20  What did they ask you with regard to you --

21  your requirement to appear for a

22  psychological test in this written

23  communication?

24      A.     I had to appear for a written

25  psychological.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 33

1                      K. Lamm

2        Q.    A written psychological test?

3        A.    Yes.

4        Q.    And did you appear for a written

5   psychological test?

6        A.    Yes, I did.

7        Q.    When did you do that?

8        A.    I believe it was sometime in the

9   month of June of 2006.

10       Q.    Okay.  And did you ever receive

11  word from the Suffolk County Police

12  Department that you passed the written

13  psychological test?

14       A.    There was two phases to that

15  test.

16       Q.    Okay.  Well -- well, describe the

17  two phases to the test, and then I'll be

18  able to ask you more pointed questions.

19            MR. GOODSTADT:    Objection.

20       A.    After the written test, you had

21  to be scheduled for an oral.

22       Q.    Okay.  So let's stick with the

23  written test.  When did you take the written

24  test?

25       A.    I believe it was sometime at the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    beginning of June 2006.

3          Q.    Now did you ever receive word

4    from the Suffolk County Police Department

5    that you passed the written psychological

6    test?

7          A.    They don't do it separated.  They

8    do it altogether.

9          Q.    Okay.  When did you take the oral

10   psychological test?

11         A.    I believe it was a week or two

12   weeks after the written.

13         Q.    Okay.  So we're still in either

14   the June 2006 or early July 2006 time

15   period, correct?

16         A.    It would -- I would say June.

17         Q.    Okay.  That's fine.  Did you ever

18   receive communication that -- from the

19   Suffolk County Police Department that you

20   failed either of those psychological tests

21   that you've just described?

22         A.    Yes, I did.

23         Q.    Okay.  What were you -- what was

24   communicated to you?

25         A.    A letter.

Page 35

1                    K. Lamm

2       Q.    When did you receive this letter?

3       A.    Approximately two days after I

4  appealed it, when I went in for an appeal.

5  MO   Q.    You just mentioned that you

6  appealed something.  My question to you,

7  sir, is -- I'm going to move as

8  nonresponsive.  You took a psychological

9  written test and oral psychological test,

10 correct?

11      A.    Correct.

12      Q.    And that was required by the

13 Suffolk County Police Department?

14      A.    That is correct.

15      Q.    And I believe you testified that

16 you took this in the June 2006 time period,

17 correct?

18      A.    That's correct.

19      Q.    Did there come a time that you

20 were advised by the Suffolk County Police

21 Department that you had failed either or

22 both of these tests?

23      A.    Yes, there was.

24      Q.    Okay.  Give me the date in which

25 you were advised by the Suffolk County

1            K. Lamm

2    Police Department of your failure.

3         A.    Suffolk County Police Department

4    didn't advise me.  It's Suffolk County Civil

5    Service that advises me.

6         Q.    Okay.  So then your answer to me

7    would have been no, the Suffolk County

8    Police Department never advised me.  So

9    that's fine.  Let stick with the Suffolk --

10        A.    I was just making it clear.

11        Q.    I appreciate that.  When did the

12   Suffolk County Civil Service Department

13   advise you that you had failed either or

14   both of the psychological tests that you've

15   just described?

16        A.    Approximately within two days

17   after.

18        Q.    Okay.  So we're still in either

19   the June 2006 time period or early July 2006

20   time period, correct?

21        A.    I would say June.

22        Q.    And how did the Suffolk County

23   Police Department advise you of your

24   failure?

25        A.    They didn't.

Page 37

1           K. Lamm

2      Q.    I'm sorry, withdrawn.  How did

3 the Suffolk County Civil Service Department

4 advise you of your failure?

5      A.    Letter.

6      Q.    Okay.  Do you have that letter

7 still in your possession?

8      A.    The letter is with the attorneys.

9 RQ        MR. NOVIKOFF:    Okay.  I call

10        for the production of this, and I'll

11        follow it up with a letter, of all

12        communications involving the Suffolk

13        County Police Department application,

14        to the extent it hasn't been produced,

15        and again, we'll search -- we'll search

16        to see if it has been.

17           MR. GOODSTADT:    It's our

18        position that we have produced every

19        document that's responsive to discovery

20        requests that have been served in this

21        case.  You said that you want to follow

22        up in writing, we'll be happy to take

23        it under advisement.

24           MR. NOVIKOFF:   You got it.

25      Q.    What tests or -- well, did you

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    fail both tests?

3         A.    It doesn't say.

4         Q.    It just says you failed?

5         A.    It just says not qualified.

6         Q.    Okay.  So the Suffolk County

7    Civil Service Department sent you a letter

8    within two weeks after your psychological

9    test indicating that you were not qualified;

10   is that correct?

11        A.    Which test?

12        Q.    The psychological test.

13        A.    Which one?

14        Q.    You said you took both.

15        A.    Which one are you referring to?

16        Q.    Sir, I'll withdraw the question

17   and I'll ask you this again.  The Suffolk

18   County Civil Service Department sent you a

19   communication after you took both the verbal

20   and the written psychological test, correct?

21        A.    Correct.

22        Q.    And that was within a couple of

23   weeks of you taking both of those tests,

24   correct?

25        A.    That's correct.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2      Q.    Okay.  You understand me now?

3      A.    Now I do.

4      Q.    Did you graduate college?

5      A.    No.

6            MR. GOODSTADT:    Objection.

7      Q.    How many -- how many years of

8   college did you have?

9      A.    Don't have any college.

10      Q.    You never spent a day in college?

11      A.    Never spent a day in college.

12      Q.    Did you graduate high school?

13      A.    Yes.

14      Q.    What high school did you

15   graduate?

16      A.    West Islip.

17      Q.    West Islip.  Okay.  Let's get

18   back to the Suffolk County Civil Service

19   Department communication to you.  In this

20   letter, did they say anything else, other

21   than you were not qualified?

22      A.    No.

23      Q.    Okay.  What did you do, if

24   anything, once you received this letter from

25   the Suffolk County Civil Service Department

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 40

1                    K. Lamm

2     indicating that you were not qualified?

3          A.    Well, as I told you, I did appeal

4     it and go for a re -- a re-test there.

5          Q.    Okay.  How did you know to appeal

6     it?

7          A.    Well, actually, on one of the

8     letters asked if I would be interested in an

9     appeal, so I did.

10         Q.    Okay.  And what did you have to

11    do in order to appeal?

12         A.    I had to just show up again.

13         Q.    Okay.  Did you contact  -- well,

14    where did you have to show up?

15         A.    Civil Service.

16         Q.    Okay.  Did you have to contact

17    the Civil Service Department in order to

18    schedule a time to appeal?

19         A.    I sent a letter in that I would

20    appeal and they sent me the date back.

21         Q.    Okay.  And when was the date that

22    they sent back?

23         A.    It was kind of quick.  Within  --

24    within maybe a week.

25         Q.    Okay.  And did you have to submit

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 41

1              K. Lamm

2   any type of documentation in order to

3   appeal?

4         A.    I didn't have to.

5         Q.    That's what -- that's what I'm

6   asking you.  Did you have to?

7         A.    I didn't have to.

8         Q.    Okay.  Did you?

9         A.    No.

10        Q.    Okay.  And who did you see, if

11  anyone, on the date that you appeared for

12  your appeal?

13              MR. GOODSTADT:    Objection.

14        A.    I'm not positive of the

15  examiner's name, but I would believe it was

16  a Mr. Stone, and there was another man there

17  from Civil Service named Stanley Pelc.

18        Q.    Okay.  Had you ever met Mr. Pelc

19  before?

20        A.    I've seen him before.  Not

21  personally met him.

22        Q.    Okay.  Where did you see Mr. Pelc

23  before?

24        A.    At other tests that I've taken

25  there.

Page 42

K. Lamm

1
2      Q.    Okay.  And Mr. Stone, had you
3   ever met Mr. Stone before?
4      A.    No.
5      Q.    Okay.  He was not the person
6   that -- that did the first test or tests of
7   you for your psychological, was he?
8            MR. GOODSTADT:   Objection.
9      A.    No, he wasn't.
10     Q.    Okay.  And when you say -- when
11   you met Mr. Pelc and Mr. Stone, what
12   occurred, if anything, during this meeting?
13           MR. GOODSTADT:   Objection.
14     A.    First thing I asked was that I
15   didn't realize I had to take another
16   psychological because I had already taken
17   one within a year's time.
18     Q.    Who said this?
19     A.    I did.  I asked that.
20     Q.    Okay.  What specifically did you
21   ask of these gentlemen?
22     A.    I asked them if -- if I did have
23   to take that psychological over because I
24   had one taken prior within a year's time.
25     Q.    When did you take the prior

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 43

1              K. Lamm

2    psychological?

3         A.    The end of June of 2005.

4         Q.    For what purpose?

5         A.    For a job where I currently am

6    now.

7         Q.    Which job was that?

8         A.    Airport security.

9         Q.    Okay.  Now did you, prior to you

10   meeting with these two gentlemen, ask anyone

11   at the Suffolk County Civil Service

12   Department as to why you were not qualified?

13        A.    They wouldn't -- they don't

14   give --

15        Q.    No.  No.  My question to you is,

16   did you ask?

17        A.    Yes, I did.

18        Q.    Okay.  Who did you ask, again,

19   between the time that you were advised that

20   you were not qualified and the time that you

21   met with these two gentlemen, Mr. Stone and

22   Mr. Pelc?

23             MR. GOODSTADT:    Objection.

24        A.    Repeat it again, please.

25        Q.    Sure.  Between the time that you

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 44

K. Lamm

1  were advised that you were not qualified by

2  the Civil Service Department and the time

3  that you met with Mr. Stone and Mr. Pelc,

4  who did you ask why you were not qualified?

5  MR. GOODSTADT:   Objection.

6  A.   They were -- they were both there

7  in the room.  I asked why I couldn't be

8  found  -- why I wasn't qualified.

9  Q.   Okay.  Now my question, sir, is

10  before you went to this meeting with these

11  two gentlemen, did you ask anybody else at

12  the Suffolk County Civil Service Department

13  why you were not qualified?

14  A.   No.

15  Q.   Did you ask anyone else at

16  Suffolk County Police Department why you

17  were not qualified?

18  A.   No, I did not.

19  Q.   Okay.  So when you fir -- when

20  you went into this room --

21  A.   Excuse me.

22  Q.   Sure.

23  A.   I just want to get a drink of

24  water.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 45

1                    K. Lamm

2        Q.    Sure.  Absolutely.

3        A.    Thank you.  Excuse me.

4        Q.    You -- did you ask these two

5   gentlemen when you met with them, why you

6   were found not to be qualified?

7        A.    Yes, I did ask.

8        Q.    Okay.  And when in -- in relation

9   to the beginning of this meeting did you ask

10   these two gentlemen that question?

11             MR. GOODSTADT:   Objection.

12        A.    Somewhere towards the beginning,

13   middle.

14        Q.    Okay.  And did they respond to

15   your question?

16        A.    They just said after, you know,

17   we review this, you'll get your answer.

18        Q.    When they said they review this,

19   do you -- do you know what they were

20   referring to?

21        A.    I believe it was after the

22   interview.

23        Q.    Okay.  So they didn't tell you

24   why you were initially found not to be

25   qualified when you asked them that question?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 46

1                K. Lamm

2        A.     No, they didn't.

3        Q.     Okay.  Now what, if anything,

4   did -- did -- well, did you have to take any

5   tests during this meeting with these two

6   gentlemen?

7        A.     They just asked me a few

8   questions, and they're basically the same

9   thing they did when I first went.

10       Q.     How long was this meeting with --

11  with these two gentlemen?

12       A.     Not very long.

13       Q.     10 minutes?

14       A.     Maybe 15.

15       Q.     Okay.  And -- and your first

16  psychological test, the written test, how

17  long was that?

18       A.     Several hours.

19       Q.     And the verbal part of the

20  psychological, how long was that?

21       A.     The first time?

22       Q.     Yeah.

23       A.     Maybe 20 minutes.

24       Q.     Now did you ask these two

25  gentlemen any other questions during this

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1  meeting, other than the question as to why

2  you were not qualified?

3

4          MR. GOODSTADT:    Objection.

5      He's already testified to another

6      question he asked as well.

7          MR. NOVIKOFF:    Okay.  Then

8      fine.

9      Q.   You -- I recall you saying that

10  you weren't -- you asked a question as to

11  why you were not qualified.  What other

12  questions did you ask of these gentlemen?

13          MR. GOODSTADT:    In addition to

14      what he's already testified to?

15          MR. NOVIKOFF:    I don't recall

16      what he testified to, so I don't want

17      to put words in his mouth or

18      mischaracterize his testimony.

19      Q.   So, therefore, I'm asking you --

20          MR. GOODSTADT:    That's a

21      change.  A change for the better now.

22          MR. NOVIKOFF:    Oh, thank you so

23      much.

24      Q.   I recall that you just testified

25  that you asked these gentlemen why you were

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 48

K. Lamm

1    not qualified.  What other questions did you

2    ask of these two gentlemen?

3         A.    I asked how can I not be found

4    qualified when I have already held a

5    position as police officer.

6         Q.    Okay.  Did they respond to that

7    question?

8         A.    Basically just with a shrug of

9    the shoulders.

10        Q.    Okay.  And any other questions --

11   well, withdrawn.  Did you ask them any other

12   questions, other than the two that you've

13   testified to this morning?

14             MR. GOODSTADT:    He's testified

15        to three now, but --

16             MR. NOVIKOFF:    Three questions?

17        Q.    Well, what was the third

18   question?  We have the one as to why you

19   were not qualified.  The next question that

20   I recall you testifying to was how could you

21   be found not to be qualified because you --

22   you passed a prior test.  What was the third

23   question that you asked them?

24        A.    I just said that I've already

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 49

1            K. Lamm

2  taken the test within the prior year.

3      Q.    Okay.  Other than what you've

4  testified to, can you recall any other

5  questions that you asked of these gentlemen?

6      A.    Not that I can recall at this

7  time.

8      Q.    Okay.  Well, is there anything in

9  your custody, possession or control that

10  would refresh your recollection?

11      A.    I don't think so.

12      Q.    Okay.  Did you ever -- well, what

13  was the next communication that you received

14  from the Suffolk County Civil Service

15  Department concerning your appeal, to the

16  extent you received any additional

17  communication?

18            MR. GOODSTADT:    Objection.

19      A.    Just a letter.

20      Q.    When did this letter come to you?

21      A.    Just saying that, you know, I was

22  found not qualified.

23      Q.    I'm not asking you what the

24  letter was.  When did the letter come to

25  you?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 50

1                   K. Lamm

2        A.     Maybe two days after.

3        Q.     Okay.  And it came from the

4   Suffolk County Civil Service Department?

5        A.     Yes, it did.

6        Q.     And what did this letter say?

7        A.     Not qualified.

8        Q.     Okay.  And did you ever inquire

9   as to why this determination was made as

10  reflected in this -- this most recent

11  communication?

12       A.     That was it.

13       Q.     Okay.  Have you had any

14  additional communication with the Suffolk

15  County Civil Service Department concerning

16  your interest in the Suffolk County Police

17  Department position after receipt of the

18  letter that you just testified to?

19       A.     Just that I had to appear for a

20  background investigation.

21       Q.     When did you receive

22  communication that you had to appear for a

23  background investigation?

24       A.     Somewhere around the same time as

25  the psychological, approximately.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2          Q.     Did you ever appear for a

3     background investigation?

4          A.     Yes, I did.

5          Q.     Did you appear for this

6     background investigation prior to the first

7     communication that -- wherein you were

8     advised that you were not qualified?

9          A.     I believe it was before that.

10    I -- I believe it was before that.

11         Q.     So you believe you -- you

12    appeared before -- for a background

13    investigation before you first learned that

14    you were not qualified?

15         A.     Yes.  I believe so.

16         Q.     Okay.  And did you receive any

17    communication from the Suffolk County Police

18    Department concerning the background

19    investigation that they undertook?

20         A.     No, I didn't.

21         Q.     Did you receive any communication

22    from the Suffolk County Civil Service with

23    regard to the background investigation that

24    they undertook?

25         A.     No, I didn't.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 52

1          K. Lamm

2      Q.    Okay.  Now my question is

3  specifically, sir, you've received now,

4  after your appeal, a communication from the

5  Suffolk County Civil Service Department

6  saying that, once again, you were not

7  qualified, correct?

8      A.    Correct.

9      Q.    After receipt of that document,

10  did you receive any other communication from

11  the Suffolk County Civil Service Department

12  concerning your interest in the Suffolk

13  County Police Department job?

14      A.    No.

15      Q.    After receipt of the Suffolk

16  County Civil Service Department letter

17  indicating for a second time that you were

18  not qualified, did you receive any

19  communication from the Suffolk County Police

20  Department concerning your interest in a

21  position with them?

22      A.    No.

23      Q.    After receipt of the second

24  letter, did you receive any communication

25  from any source concerning your interest in

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 53

1                        K. Lamm

2        the Suffolk County Police Department job?

3              A.    No.

4              Q.    Okay.  Were you represented by

5        counsel, Mr. Goodstadt's office, at the time

6        that you received the second communication

7        concerning the Civil Service Department's

8        determination that you were not qualified?

9                    MR. GOODSTADT:    Objection.

10             A.    Was I represented by?

11             Q.    Mr. Goodstadt's law firm.

12             A.    For the appeal?

13             Q.    No.  No.  No.  Had you retained

14       Mr. Goodstadt's law firm for any purpose,

15       and I don't want to know the purpose, but

16       for any purpose at the time that you

17       received word from the Suffolk County Civil

18       Service Department for the second time that

19       you were not qualified?

20             A.    No.

21             Q.    Okay.  Had you filed a Notice of

22       Claim against the village prior to the time

23       that you received communication from the

24       Suffolk County Civil Service Department that

25       you were not qualified for the second time?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 54

1                    K. Lamm

2          A.     No.

3          Q.     How did Mr. Hesse interfere with

4    your application with the Suffolk County

5    Police Department after April 2, 2006?

6          A.     I was told by Chris Moran that

7    George Hesse wrote up an unfavorable

8    recommendation about me to the Suffolk

9    County applicant investigation unit.

10         Q.     Okay.  And who is Chris Moran?

11         A.     He works at Ocean Beach.

12         Q.     And did Chris Moran advise you as

13   to how he learned of this?

14         A.     George Hesse told him.

15         Q.     And did Mr. Moran tell you this

16   in a phone conversation?

17         A.     Yes, he did.

18         Q.     Did Mr. Moran tell you this in a

19   phone conversation in which he was being

20   tape recorded by you?

21         A.     Yes, he did.

22         Q.     Did you advise Mr. Moran during

23   this telephone conversation that you were

24   recording him?

25         A.     No, I didn't.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 55

1          K. Lamm

2     Q.    Did you tape record phone

3 conversations with Mr. Moran after April 2,

4 2006, other than the one that you've just

5 testified to?

6     A.    Yes.

7     Q.    In any of these phone

8 conversations, did you ever advise Mr. Moran

9 that he was being tape recorded?

10     A.    No.

11     Q.    Did you engage in any other phone

12 conversations with any other individuals in

13 which you tape recorded the conversations?

14          MR. GOODSTADT:    Objection.

15     You're talking about ever?

16          MR. NOVIKOFF:    I'm sorry.

17     Subsequent to -- well, I may adopt your

18     question.  The answer may be

19     interesting.

20     Q.    Did -- after April 2, 2006, did

21 you ever tape record a phone conversation

22 with any person, other than Chris Moran?

23     A.    I believe there might have --

24 might have been just one.

25     Q.    And who would that be?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 56

1                     K. Lamm

2          A.     John Oley.

3          Q.     And who is John Oley?

4          A.     He works at Ocean Beach.

5          Q.     And when would -- if -- when

6     would you have had this conversation with

7     Mr. Oley?

8          A.     Specifically, I can't give you

9     specific time.

10         Q.     Okay.  And what time period would

11    you have had these conversations with --

12    well, withdrawn.  The conversation in which

13    you testified that Mr. Moran told you that

14    George Hesse had sent an unfavorable

15    reference to the Suffolk County Department,

16    when did this phone conversation take place?

17              MR. GOODSTADT:    Objection.

18         A.     Specifically, I don't know the

19    exact time.

20         Q.     Did -- other than Mr. Moran's

21    statement to you, do you have any other

22    knowledge from whatever source, that

23    Mr. Hesse intentionally and maliciously

24    interfered with your application for the

25    Suffolk County Police Department?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 57

1                      K. Lamm

2          A.     No.

3          Q.     Have you ever seen the alleged

4     unfavorable reference that Mr. Hesse,

5     according to Mr. Moran, submitted to the

6     Suffolk County Police Department?

7          A.     No.

8          Q.     Have you ever sought to look --

9     withdrawn.  Have you ever sought to look for

10    this document?

11         A.     No.

12         Q.     Have you ever filed a FOIL

13    request?

14              MR. GOODSTADT:    Objection.

15         Q.     Do you know what a FOIL request

16    is?

17         A.     Yes, I do.

18         Q.     What is your understanding of a

19    FOIL request?

20         A.     No, I did not.

21         Q.     What is your understanding of a

22    FOIL request, sir?

23         A.     Freedom of information.

24         Q.     Did you ever file a FOIL request?

25         A.     No.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 58

1                    K. Lamm

2        Q.    Are you aware of anybody acting

3   on your behalf who has communicated with the

4   Suffolk County Police Department looking

5   into finding this unfavorable recommendation

6   by George Hesse?

7             MR. GOODSTADT:    Objection.  To

8        the extent that --

9             MR. NOVIKOFF:    Other -- other

10       than counsel.  Exactly.  Other than

11       counsel.

12       A.    Not that I'm aware of.

13       Q.    Okay.  Did Mr. Moran ever tell

14   you what specifically George Hesse said in

15   this unfavorable recommendation?

16       A.    I don't believe so.

17       Q.    Did you ever inquire with

18   Mr. Moran as to what specifically Mr. Hesse

19   said to you  -- said about you in this

20   allegedly unfavorable reference?

21       A.    Yes, I did ask.

22       Q.    And what did Mr. Moran say to you

23   in response to your question to him?

24       A.    He doesn't know exactly what was

25   written.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 59

K. Lamm

1
2    Q.    Okay.  Did Mr. Moran ever advise
3  you that he saw this unfavorable reference?
4    A.    He didn't  -- he saw the letter
5  that was sent to the department to George
6  Hesse, but not what was written on it.
7    Q.    What letter did Mr. Moran see?
8    A.    A letter from the police
9  department about asking, you know, about me
10  about verifying that I worked there.
11    Q.    Did Mr. Moran describe for you
12  what was in this letter, other than what
13  you've just testified to?
14    A.    No.
15    Q.    Did Mr. Moran advise you that
16  George Hesse told him specifically what
17  unfavorable information he provided to the
18  Suffolk County Police Department in response
19  to this written request?
20        MR. CONNOLLY:    Objection.
21    A.    No, he didn't.
22        MR. GOODSTADT:    It was probably
23    the double hearsay.
24        MR. NOVIKOFF:    I'm sure it is.
25    That's what I'm trying to establish.

Case 2:07-cv-01215-SJF-ETB   Document 170   Filed 01/15/10   Page 60 of 366 PageID #: 11797

1             K. Lamm
2             MR. GOODSTADT:    It's not -- not
3        a basis to object at a deposition.
4             MR. NOVIKOFF:    We'll see.
5        Q.    Did you ever inquire with George
6    Hesse, after receipt of this communication
7    from Mr. Moran, as to what, if anything, he
8    told the Suffolk County Police Department?
9        A.    No.
10       Q.    Have you ever spoken with
11   Mr. Hesse after April 2, 2006?
12       A.    No.
13       Q.    Did you ever register a complaint
14   to the Ocean Beach Police Department
15   concerning what Mr. Moran allegedly told
16   you?
17       A.    No.
18       Q.    Did you ever register a complaint
19   to any board of trustee member concerning
20   what Mr. Moran allegedly told you?
21       A.    No.
22       Q.    Did you ever register a complaint
23   to any mayor of Ocean Beach concerning what
24   Mr. Moran told you?
25       A.    No.

Page 61

1                   K. Lamm

2          MR. GOODSTADT:    Just so we're

3     clear, you're talking about whether he

4     did?

5          MR. NOVIKOFF:    Whether he did,

6     yeah.

7          MR. GOODSTADT:    Or whether we

8     did?

9          MR. NOVIKOFF:    Whether he did.

10         MR. GOODSTADT:    Okay.

11    Q.    Well, then let me ask you the

12    question.  Are you aware of, other than what

13    is set forth perhaps in this Complaint --

14         MR. GOODSTADT:    Or the Notice

15    of Claim.

16         MR. NOVIKOFF:    Or the Notice of

17    Claim.

18         MR. GOODSTADT:    That's a

19    different story.

20    Q.    Right.  Other than a filing,

21    whether it was the Notice of Claim or the

22    federal Complaint, are you aware of anyone

23    on your behalf sending a communication to

24    either the mayor or the board of trustees or

25    the police department concerning what

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 62

1                K. Lamm
2    Mr. Moran said to you?
3        A.    Not to my knowledge.
4        Q.    Okay.  As you sit here today, do
5    you have any knowledge whatsoever as to why
6    the Suffolk County Civil Service Department
7    found you, on two occasions, to be
8    unqualified for the position with the
9    Suffolk County Police Department?
10       A.    No.
11       Q.    Okay.  Let's talk about the test
12   for the Suffolk County Sheriff's position
13   that I believe you said you took.
14       A.    Yes.
15       Q.    How many tests have you taken
16   with regard to your interest in working for
17   the Suffolk County Sheriff's Department?
18       A.    Overall?
19       Q.    Yes.
20       A.    I believe just two.
21       Q.    Okay.  And what are these two?
22       A.    Written tests for an entry
23   position.
24       Q.    Entry position for what?
25       A.    Sheriff.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 63

1              K. Lamm

2      Q.    Okay.  When did you take this

3  written test?

4      A.    Somewhere around shortly after

5  the Suffolk Police test.  Maybe 2004.

6      Q.    Okay.  Did you take any other

7  tests with regard to your interest in a

8  position with the Suffolk County Sheriff's

9  Department?

10     A.    No.

11     Q.    Okay.  So did you take one

12  written test or two written tests?

13     A.    Well, there were two written

14  tests, but there was another one many years

15  before that.

16     Q.    Okay.  Well, let's go back to the

17  one that was many years before that.  When

18  did you take your first test for a position

19  with the Suffolk County Sheriff's

20  Department?

21     A.    Maybe four years before that.

22     Q.    So we're talking about 2000?

23     A.    Approximately.

24     Q.    And for what position was this

25  test given to you for?

Page 64

K. Lamm

1

2     A.     Entry level deputy.

3     Q.     Deputy.  Okay.  And describe the

4  test for me that was given to you in 2000.

5     A.     It's the same as it was with the

6  Suffolk Police Department test that I

7  described previously.

8     Q.     Okay.  They gave you a series of

9  questions for you to answer?

10     A.     Yes.

11     Q.     Do you recall how many questions?

12     A.     No.

13     Q.     Okay.  Did you pass that written

14  test?

15     A.     I believe so.

16     Q.     And now, again, we're talking

17  about the test in 2000, you believe you

18  passed that written test?

19     A.     I believe so.

20     Q.     Upon your passing that written

21  test, what, if anything, did you do next

22  with regard to your interest in seeking a

23  position with the Suffolk County Sheriff's

24  Department?

25     A.     Nothing.

Page 65

1              K. Lamm

2       Q.    Why not?

3       A.    Because you got to wait for your

4  list number to come up.  It never came up.

5       Q.    When you say you had to wait for

6  your list number to come up, what do you

7  mean?

8       A.    They go by -- they give you a

9  list of ranking.

10      Q.    Okay.  And did you ever get a

11 ranking as a result of the test that you

12 took in 2000?

13      A.    Yes.  But I wasn't reachable.

14      Q.    When you say you weren't

15 reachable, what do you mean by "reachable"?

16      A.    'Cause they only hire allotted

17 few.

18      Q.    Okay.  Fine.  What was your test

19 ranking as a result of the 2000 test that

20 you took for the Suffolk County Sheriff's

21 Department?

22      A.    I don't recall.

23      Q.    Was it above 100?

24      A.    I don't believe it was.

25      Q.    Was it above 50?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 66

K. Lamm

1
2     A.     No.  I don't believe it was.

3     Q.     Was it above 10?

4     A.     If it was, then I would have
5     received a letter if I wanted the job.

6     Q.     I'm sorry, say that again?

7     A.     If it was above 10, I would have
8     received a letter if I was interested in the
9     job.

10    Q.     What do you mean by that?

11    A.     I wasn't reachable.

12    Q.     No.  I understand that.  Is it
13    your  -- and explain to me, because I'm --
14    I'm not familiar with this, if you're giving
15    a ranking of number one, did you have an
16    understanding that that meant that you were
17    the first person that they would call upon
18    to see if you --

19    A.     That's correct.

20           MR. GOODSTADT:    Let him just
21    finish the question.

22    Q.     To call upon to see if you still
23    wanted to take the job?

24    A.     Right.

25    Q.     That's correct.  So my question

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 67

1                    K. Lamm

2      to you -- okay.  I got it.  So it's your --

3      correct me if I'm wrong, it's your testimony

4      that your number was of such a nature that

5      you weren't reachable in terms of them

6      offering you a job?

7            A.     Right.

8            Q.     Okay.  And did this test expire

9      -- I'm sorry, did the ranking as a result of

10     this test expire at any particular point in

11     time, to your knowledge?

12           A.     Yes, it does.

13           Q.     When does it expire?

14           A.     After three or four years or

15     whenever they decide to give a test.

16           Q.     Okay.  And is that the reason why

17     you took the test a second time, that your

18     initial ranking expired?

19           A.     No.  I took it because I wanted

20     to take it.

21           Q.     Okay.  Did you pass the second

22     test?

23           A.     Yes.

24           Q.     And what was your ranking?

25           A.     I believe it was 800 something.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 68

1          K. Lamm

2     Q.    Okay.  That's a very high

3  ranking, to your knowledge?

4          MR. GOODSTADT:    Objection.

5     A.    Ranking is ranking.

6     Q.    Okay.  That's a fair answer.

7  Between the first test and the second test,

8  had you received any communications from the

9  Sheriff's Department with regard to your

10 interest in a job with them?

11    A.    Just that I had passed the test

12 and they gave me a ranking.

13    Q.    Okay.  Did you receive any

14 communication from the Suffolk County Civil

15 Service Department, between the first test

16 and the second test for the Sheriff's

17 Department, concerning your interest in the

18 job?

19         MR. GOODSTADT:    Objection.

20    A.    No.

21    Q.    Okay.  Did you receive any

22 communication from any other governmental

23 agency, between the first test and the

24 second test, concerning your interest in the

25 Suffolk County Sheriff's job?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 69

1                   K. Lamm

2          A.     No.

3          Q.     Okay.  So now let's look at the

4     2004 test.  How long after the 2004 test did

5     you receive your ranking?

6          A.     After six months I believe.

7          Q.     Okay.  And what was the next

8     communication, if any, that you received

9     from the Suffolk County  -- I'm sorry, the

10    Suffolk County Sheriff's Department

11    concerning your interest in a job with them

12    after the 2004 test?

13         A.     They just gave me my grade and my

14    list number.

15         Q.     What was your grade?

16         A.     88 percent.

17         Q.     Okay.  So you were 88 percent

18    with a ranking in the 800s; is that correct?

19         A.     That's correct.

20         Q.     Okay.  What communication, if

21    any, did you receive from the Suffolk County

22    Civil Service Department with regard to your

23    interest in the Sheriff's Department job

24    after your 2004 test?

25         A.     There wasn't any.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 70

1              K. Lamm

2         Q.    What communication, if any, did

3    you receive from any other governmental

4    entity after the 2004 test, concerning your

5    interest in a Suffolk County Sheriff's job?

6         A.    There wasn't any.

7         Q.    Okay.  Have you done anything to

8    follow up with the Suffolk -- with the

9    Suffolk County Sheriff's Department

10   concerning your interest in a position with

11   them?

12        A.    No.

13        Q.    Are you aware if your ranking has

14   expired?

15        A.    Yes.

16        Q.    When did your ranking with the --

17   with the Suffolk County Sheriff's Department

18   expire?

19        A.    When they gave the next test.

20        Q.    When was that?

21        A.    Couple months ago.

22        Q.    Did you take that test?

23        A.    No.

24        Q.    Did anyone from the Suffolk

25   County Sheriff's Department ever advise you

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2    that George Hesse had communicated with them

3    with regard to any of your applications for

4    employment with them?

5         A.    Did any -- say again.

6         Q.    Did anyone from the Suffolk

7    County Sheriff's Department ever advise you

8    that George Hesse had communicated with them

9    concerning any of your applications for

10   employment with them?

11        A.    No.

12        Q.    Did anyone from the Suffolk

13   County -- from the Suffolk County Civil

14   Service Department ever advise you that

15   George Hesse had communicated with the

16   Sheriff's Department concerning your

17   application with them?

18        A.    No.

19        Q.    Did Chris Moran ever tell you

20   that George Hesse sent an unfavorable

21   reference to the Suffolk County Sheriff's

22   Department concerning your application?

23        A.    No.

24        Q.    Did George Moran ever tell

25   you that -- I'm sorry.  Yes.  Withdrawn.

Page 72

K. Lamm

Did Chris Moran ever tell you that George

Hesse ever sent an unfavorable reference to

the Suffolk County Civil Service Department

concerning your interest in the Sheriff's

Department job?

     A.    No.

     MR. NOVIKOFF:   Okay.  The tape

is about to end.  So let's change the

tape and continue.

     THE VIDEOGRAPHER:   This ends

tape number one.  The time is 11:02

a.m.  Going off the record.

     (A break was taken.)

     THE VIDEOGRAPHER:    This begins

tape number two.  The time is 11:18

a.m.  Back on the record.

     Q.    Okay.  Sir, you also mentioned

that you applied for the -- a position with

Southampton Town Police; is that correct?

     A.    Yes.

     Q.    When did you first make an

application for a position with the

Southampton Town Police?

     A.    I believe somewhere maybe late

Page 73

1               K. Lamm

2      2004, 2005.

3           Q.    And how did you go about making

4      that application?

5           A.    I received a canvas letter.

6           Q.    Okay.  And who did you receive a

7      canvas letter from?

8           A.    It was from Civil Service.

9           Q.    Okay.  And -- and what

10     specifically did this canvas letter say?

11          A.    It had a -- place a checkmark if

12     you're interested in a position with

13     certain, you know, police departments that

14     were listed, and the ones that, you know, I

15     listed previously to you were on that list.

16          Q.    Okay.  So in this letter, you

17     checked off the Southampton Town Police

18     Department, the Southampton Village Police

19     Department, the Huntington Bay Police

20     Department --

21          A.    That was a separate letter.

22          Q.    Okay.

23          A.    The east end towns were one

24     letter.

25          Q.    Okay.  So let's -- let's stick

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 74

                        K. Lamm

1

2    with this letter then, the canvas letter

3    that you say you received.

4          A.    Yes.

5          Q.    You checked off the Southampton

6    Police Department, the Southampton Village

7    Police Department?

8          A.    Yes.

9          Q.    And what other east end police

10   departments did you check off in this

11   letter?

12         A.    That may have been it.  There

13   could have been another one, but I

14   believe -- I believe that was just the two.

15         Q.    Okay.  So let's stick now with

16   the Southampton Town Police department.

17   After you checked off that box in this

18   canvas letter, did you send it back to the

19   Civil Service Department?

20         A.    Yes, I did.

21         Q.    Okay.  And what was the next

22   communication, if any, that you received

23   from any entity concerning your interest in

24   a position with the Southampton Town Police

25   Department?

Page 75

1                     K. Lamm

2        A.      Southampton Village.  They

3    sent --

4        Q.      No.  No.  My question now -- I'm

5    breaking it down.  You've -- you've told me

6    that you checked off at least two boxes, one

7    for Southampton Town and one for Southampton

8    Village, correct?

9        A.      Yes.

10       Q.      So my question now is

11   specifically to the Southampton Town Police

12   Department.

13       A.      Okay.

14       Q.      After you checked off that box

15   and you sent this canvas letter back to the

16   Civil Service Department, what was the next

17   communication, if any, that you received

18   from the Southampton -- I'm sorry.  What

19   was -- withdrawn.  What was the next

20   communication, if any, that you received

21   from any governmental entity concerning your

22   interest in the Southampton Town Police

23   Department position?

24       A.      There was a letter sent back

25   stating the requirements of residency that

1                    K. Lamm

2     you would need.

3          Q.     Who sent you back this letter?

4          A.     It was Civil Service.

5          Q.     Suffolk County Civil Service?

6          A.     Yes.

7          Q.     And when you say a letter was

8     sent back concerning the requirements of

9     residency, what  -- what was stated in this

10    letter concerning that?

11         A.     Wanted to know if I lived there.

12         Q.     In -- in the town of Southampton?

13         A.     That's right.

14         Q.     And did you learn  -- did you

15    live in the town of Southampton at that

16    time?

17         A.     No.

18         Q.     Have you ever lived in the town

19    of Southampton?

20         A.     No.

21         Q.     And what was your understanding

22    as to why they were asking you this

23    question?

24         A.     Because they have a residency

25    list that they use first.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 77

K. Lamm

1

2     Q.    Okay.  So if I understand
3  correctly, Southampton Town Police
4  Department will -- will seek applicants
5  first from those who live in the town, and
6  then if they exhaust that list, they will go
7  outside the town?
8     A.    Correct.
9     Q.    Okay.  What was the next
10 communication, if any, that you received --
11 well, did you -- did you respond to this
12 letter from the Civil Service Department
13 concerning the residency issue?
14    A.    Yes.
15    Q.    And -- and you advised them that
16 you were not a resident?
17    A.    That's right.
18    Q.    And when did you receive this
19 letter from them?
20    A.    Shortly after  -- shortly after
21 they sent me a canvas.
22    Q.    Which is we're still in the 2004
23 time period?
24    A.    Maybe 2005.
25    Q.    Okay.  And what was the next

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 78

K. Lamm

1    communication, if any, that you received

2    from any governmental entity concerning your

3    interest in the Southampton Town Police

4    Department job?

5         A.    I believe that was it.

6         Q.    Okay.  To your knowledge, has

7    George Hesse sent any communication to the

8    Southampton Town Police Department regarding

9    you since your checking off the box as

10   interested in a position with them?

11        A.    I don't know if he did or not.

12        Q.    That's my question.  Do you have

13   any knowledge?

14        A.    Again, I don't know if  -- I

15   don't know.

16        Q.    Well, let me ask -- let me

17   rephrase the question, sir.  Do you have any

18   knowledge as to whether or not George Hesse

19   ever communicated with the Southampton Town

20   Police Department concerning your interest

21   in a job with that department?

22        A.    No, I don't.

23        Q.    Okay.  Now let's go to the

24   Southampton Village Police Department.

25

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 79

1            K. Lamm

2    Subsequent to your checking off the box

3    concerning your interest in the Southampton

4    Village Police Department, what was the next

5    communication, if any, that you received

6    from any governmental entity concerning your

7    interest in that position?

8         A.    I believe it was 2006 they sent

9    me a letter.

10        Q.    Okay.  When in 2006?

11        A.    Around the summer.

12        Q.    So this would have been after you

13   were not rehired for the position with the

14   Ocean Beach Police Department?

15            MR. GOODSTADT:    Objection.  Are

16        we going to agree to --

17            MR. NOVIKOFF:    Yes.

18            MR. GOODSTADT:    -- terms?

19            MR. NOVIKOFF:    Just so we're

20        all clear, we take the position that --

21        that Mr. Lamm and the other Plaintiffs

22        were not rehired.  The Plaintiffs,

23        through Mr. Goodstadt, take the

24        position that they were terminated.  To

25        the extent my question refers to

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 80

1                     K. Lamm

2       termination or not rehire, no answer

3       here is waiving the respective

4       positions of the parties.

5               MR. GOODSTADT:    Why don't we

6       stay with "the employment ended."

7               MR. NOVIKOFF:    Okay.  Fine.

8       Just read to me what my question was.

9               (The requested portion was read.)

10      Q.    So this would have been after the

11   time that your employment relationship ended

12   with Ocean Beach?

13      A.    Correct.

14      Q.    Okay.  What did the letter from

15   the Southampton Village Police Department

16   state, to the best of your recollection?

17      A.    It stated that they were looking,

18   you know, for appli -- applicants that were

19   interested in the position.

20      Q.    Okay.  And did you respond to

21   that letter?

22      A.    Yes, I did.

23      Q.    And how did you respond to that

24   letter?

25      A.    That I was interested.

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    Okay.  How did you advise them

3   that you were interested?

4        A.    Check off box.

5        Q.    Okay.  And you sent that -- that

6   document back to the Southampton Village

7   Police Department?

8        A.    Yes.

9        Q.    Indicating that you were

10  interested?

11       A.    Yes.

12       Q.    What was the next communication,

13  if any, that you had with the Southampton

14  Village Police Department concerning your

15  interest in a position with them?

16       A.    They sent me a package that I had

17  to fill out with papers, you know,

18  background, previous employment.

19       Q.    Okay.  And did you fill those

20  papers out?

21       A.    I started to.  And along with

22  those papers was an interview date.

23       Q.    My question is, did you fill out

24  all those documents?

25       A.    I started to fill out all those

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 82

K. Lamm

1  documents, but --

2  Q.    Then my question to you, sir, is

3  did you complete filling out all the

4  documents that the Southampton Village

5  Police Department sent you?

6  A.    No.

7  Q.    Okay.  What documents that you

8  received from the Southampton Village Police

9  Department did you not complete?

10 A.    I don't know exactly what I did

11 not complete.

12 Q.    Okay.  Did you send any of the

13 documents that you received from the

14 Southampton Village Police Department, as

15 you've just testified to, back to the

16 village?

17 A.    No.

18 Q.    What was the next communication,

19 if any, that you received from the

20 Southampton Village Police Department?

21 A.    I didn't receive any.

22 Q.    So the last -- if I understand,

23 the last communication that you received

24 from the Southampton Village Police

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 83

1          K. Lamm

2    Department was this package of materials

3    that they had asked you to fill out?

4         A.    Right.  But I couldn't show for

5    the interview, so I had to call and cancel.

6    MO        MR. NOVIKOFF:    Hold on.  Motion

7         to strike.

8         Q.    My question, sir, is the last

9    communication  -- well, was the last

10   communication that you had with the

11   Southampton Village Police Department, the

12   package of materials that they had sent to

13   you?

14        A.    Yes, it was.

15        Q.    Okay.

16        MR. GOODSTADT:    You're talking

17        about written communication or oral

18        communication?

19        MR. NOVIKOFF:    Any

20        communication.  And I'm going to

21        clarify his answer, because I think in

22        a prior answer he had mentioned that he

23        had called them, so.

24        Q.    I'm referring to written

25   communication.  Was the package of materials

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 84

1          K. Lamm

2    that you received from the Southampton

3    Village Police Department, the last written

4    communication that you received from them?

5          A.    Yes, it was.

6          Q.    Okay.  Now subsequent to the

7    receipt of these document -- of this

8    documentation, did you have any verbal

9    communication with anyone associated with

10   the Southampton Village Police Department?

11         A.    No.

12         Q.    Okay.  Did the Southampton

13   Village Police Department, in this package

14   of materials, request that you schedule an

15   interview?

16         A.    Yes.

17         Q.    Did you schedule an interview

18   with the Southampton Village Police

19   Department?

20         A.    The interview date and time was

21   already scheduled in the package.

22         Q.    Okay.  And what was the interview

23   date and time that was already scheduled in

24   the package?

25         A.    It was in July of 2006.

Page 85

1          K. Lamm

2     Q.    Okay.  And from -- I believe from

3 your testimony you did not appear on that

4 date, did you?

5     A.    That's correct.

6     Q.    And did you advise anyone at the

7 Southampton Village Police Department that

8 you were not going to appear on that date

9 and time for the scheduled interview?

10     A.    Yes.  I called --

11     Q.    No.  My question is just yes or

12 no, sir.

13     A.    Yes, I did.

14     Q.    And who did you  -- how did you

15 communicate the fact that you were not going

16 to appear on that date and time?

17     A.    Telephone.

18     Q.    Who did you call?

19     A.    Chief.

20     Q.    Chief who?

21     A.    I don't remember the name.

22     Q.    How do you know -- how did you

23 know to call the chief?

24     A.    There was a telephone number

25 there.

1               K. Lamm

2          Q.     Okay.  And did you speak with the

3     chief?

4          A.     No.

5          Q.     Did you leave a voicemail message

6     with the chief?

7          A.     Yes, I did.

8          Q.     What specifically did you say to

9     the chief in this voicemail message?

10          A.     That I would not be able to

11     appear for the interview date.

12          Q.     And did you give him a reason --

13     and I assume it's a him -- did you give him

14     a reason in this telephone voicemail message

15     that you left?

16          A.     Yes.

17          Q.     What was the reason that you gave

18     the chief?

19          A.     Because I had received a letter

20     from Suffolk County Civil Service stating

21     that I was not qualified after the

22     psychological, therefore, that eliminated me

23     from seeking out any future further

24     employment with any police agency.

25          Q.     And how did you know this to be

Page 87

1                    K. Lamm

2        the case?

3            A.    Because once when you are found

4        not qualified, you can't accept a police

5        position until you take another test and

6        time passes by.

7            Q.    Okay.  I -- I understand that

8        that's your understanding.  My question to

9        you is, where did you get this understanding

10       from?  Did you read it in a statute?  Did

11       you read it in a book?  Where did you get

12       this understanding that you just testified

13       to concerning your disqualification for any

14       other law enforcement job as a result of

15       your failure to be qualified according to

16       Civil Service?

17           A.    When I went for my interview.

18       The appeal.

19           Q.    Okay.

20           A.    That, you know, once I failed a

21       psychological, I can't accept any other

22       police job, because that list number is the

23       same list number that they use off the

24       police exam.

25           Q.    So you were told specifically

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 88

1                    K. Lamm

2    that you failed the psychological by the

3    Suffolk County Civil Service Department?

4          A.    No.

5          Q.    So how do you know that you

6    failed the -- the psychological?

7          A.    I received a letter that I

8    failed.

9          Q.    The psychological?

10         A.    Yes.

11         Q.    Okay.  See, I thought you had

12   just said you received a letter saying that

13   you were not qualified.  Did you receive --

14         A.    That's what it says, not

15   qualified, on the letter.

16         Q.    Did it say you were not qualified

17   because you failed the psychological?

18         A.    Yes.

19         Q.    Oh, okay.  So you did receive --

20   just so we're clear, you received a letter

21   from the Suffolk County Civil Service

22   Department that specifically said you are

23   not qualified because you failed the

24   psychological test; is that correct?

25         A.    The exact wording, but it's

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 89

1                    K. Lamm

2    pretty close.

3            Q.    Okay.  And in the second letter

4    that you received -- you received from the

5    Suffolk County Civil Service Department, did

6    it also say that you were not qualified

7    because you had failed a psychological test?

8            A.    In appeal.  Yes.

9            Q.    Okay.  And did you ever seek to

10   determine what parts of the psychological

11   test you failed?

12           A.    When I was there for the appeal,

13   I asked if I would be able to know what part

14   I had failed, and they said they don't tell

15   you.

16           Q.    Okay.  And did you ever do

17   anything to ascertain the truthfulness of

18   the statement that said they don't tell

19   people why they fail tests?

20           A.    No.

21           Q.    Okay.  Now let's go back to the

22   understanding that you had about what --

23   what disqualifications you had as a result

24   of failing the physical  -- I mean the

25   psychological and being told you were not

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 90

1          K. Lamm

2     qualified by the Suffolk County Civil

3     Service Department.  Who told you

4     specifically, of those two individuals in

5     that meeting, that because you were not

6     qualified as a result of failing your

7     psychological, you could not apply for any

8     other job, any other law enforcement job?

9          MR. GOODSTADT:    Objection.

10     A.    Stanley Pelc.

11     Q.    Okay.  What specifically did

12     Mr. Pelc say to you?

13     A.    Because you need over a year to

14     pass, time to pass in order to take another

15     psychological again.

16     Q.    Did Mr. Pelc advise you

17     specifically as a result of your failure,

18     you cannot apply or pursue any other law

19     enforcement job?

20     A.    No, he did not say that.

21     Q.    So my question to you, sir, is,

22     what is the basis for your understanding

23     that because you were determined to be not

24     qualified as a result of failing a

25     psychological, you could not go forward in

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 91

K. Lamm

1    your application with the Southampton
2    Village Police Department?
3    A.    Because I had just received a
4    letter within two weeks that I was not
5    qualified from the Civil Service exam for
6    the psychological.
7    Q.    So that's the basis of your --
8    your understanding?
9    A.    Yes.
10   Q.    Have you taken a psychological
11   test subsequent to your -- subsequent to the
12   Civil Service Department's determination
13   that you were not qualified?
14   A.    I have taken other Civil Service
15   tests psychological before that.
16   Q.    I'm not interested, sir, with
17   before.  We've established that you took a
18   psych -- you took psychological tests with
19   regard to your application for a Suffolk
20   County Police Department position, correct?
21   A.    Correct.
22   Q.    We've established that you were
23   told on two occasions that you failed the
24   psychological test, and therefore, were not

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

Page 92

1                     K. Lamm

2     qualified, correct?

3          A.     Correct.

4          Q.     You've testified, if I understand

5     you correctly, and tell me if I'm wrong,

6     that you were advised by Mr. Pelc that you

7     would have to wait one more year before you

8     could take another psychological test,

9     correct?

10              MR. GOODSTADT:     Objection.

11         A.     That's correct.

12         Q.     Is that what Mr. Pelc told you?

13         A.     That's correct.

14         Q.     Have you taken another

15    psychological test since being advised that

16    you failed the test with regard to the

17    Suffolk County Police Department position?

18         A.     No.

19         Q.     Okay.  To your knowledge, did

20    George Hesse send any documentation --

21    withdrawn.  To your knowledge, did George

22    Hesse ever communicate to the -- to the

23    Southampton Village Police Department

24    concerning you with regard to your

25    application for employment?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 93

1                    K. Lamm

2        A.    Not to my knowledge.

3        Q.    To your knowledge, did Mr. Hesse

4   know that you were applying, at any point in

5   time, for a position with the Southampton

6   Village Police Department?

7        A.    I don't know if he did.

8        Q.    Did you ever advise Mr. Hesse?

9        A.    No.

10        Q.    Did you ever advise Mr. Hesse

11   that you were applying, at any point in

12   time, for a position with the Southampton

13   Town Police Department?

14        A.    No.

15        Q.    Sir, why have you not taken an

16   exam  -- a subsequent psychological exam for

17   a law enforcement job after you were advised

18   by the Suffolk County Civil Service

19   Department that you were not qualified as a

20   result of failing the psychological test?

21             MR. GOODSTADT:    Objection.

22        A.    I had no reason to take another

23   one.

24        Q.    What do you mean you had no

25   reason to take another one?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 94

1                      K. Lamm

2        A.    After that test?

3        Q.    Yes.

4        A.    For what?

5        Q.    Were you still interested in

6   working in law enforcement?

7        A.    Yes, I was.

8        Q.    Okay.  And if I understand you

9   correctly, Mr. Pelc told you that before you

10  could apply for another law enforcement job,

11  you had to wait a year and then take the

12  psychological --

13       A.    Over a year.

14       Q.    You had to wait for over a year

15  to take the psychological test again,

16  correct?

17       A.    Correct.

18       Q.    When he said "over a year," do

19  you know what he meant by "over a year"?

20       A.    A year has to pass.

21       Q.    Okay.  And how often are these

22  psychological tests given, to your

23  knowledge?  Well, withdrawn.  Is there a set

24  period, a set day every year where

25  psychological tests are given?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 95

1        K. Lamm

2        MR. GOODSTADT:    Objection.

3    Q.    To your knowledge?

4    A.    I don't know.

5    Q.    Okay.  Well, we've established

6 now, sir, that you failed the psychological

7 tests -- test, you were advised of that, and

8 then you were advised that you had to wait

9 for over a year to take another one,

10 correct?

11   A.    Correct.

12   Q.    Okay.  And we've also established

13 that you are still interested in working in

14 the law enforcement field, correct?

15   A.    Correct.

16   Q.    So then my question, sir, is why

17 haven't you taken a test, another

18 psychological test for the purposes of a law

19 enforcement position?

20   A.    'Cause I haven't had any other

21 tests taken for other law enforcement jobs.

22   Q.    What do you mean by that?

23   A.    Because I have exceeded the age

24 limit now.

25   Q.    What is the age limit?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 96

1                    K. Lamm

2          A.     35.

3          Q.     Okay.  How old were you when you

4    were advised that you had failed the

5    psychological tests for the Suffolk County

6    Police Department?

7          A.     34.

8          Q.     Okay.  And when did you turn 35,

9    what date and year?

10         A.     November of 2000  -- of -- of

11   that year.

12         Q.     Of 2000 and?

13         A.     Six.

14         Q.     Six.  Did you know that  -- did

15   you know when you were told that you had

16   failed -- I'm sorry.  Withdrawn.  Did you

17   know when you were advised for the second

18   time that the Civil Service Department had

19   indicated that you were not qualified as a

20   result of failing the psychological, that

21   there was a 35 year age limit on law

22   enforcement positions?

23         A.     I knew that there was.

24         Q.     You knew that there was a 35 year

25   age --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 97

1           K. Lamm

2       A.    In order to take the test, you --

3  you wouldn't be able to take the test if you

4  were over 35.

5       Q.    Okay.  And you knew that at the

6  time that you were told you were not

7  qualified?

8       A.    Yes.

9       Q.    Did you commence any type of

10  lawsuit between the time that you were

11  advised that you were not qualified and the

12  date of your 35th birthday concerning the

13  determination by the Suffolk County Civil

14  Service Department that you were not

15  qualified?

16           MR. GOODSTADT:    Objection.

17  A.    No.

18           MR. NOVIKOFF:    What's the basis

19  of the objection, counselor?

20           MR. GOODSTADT:    Did he commence

21  a lawsuit?  I mean, he's commenced a

22  lawsuit here, right?

23           MR. NOVIKOFF:    Well, then I'll

24  rephrase the question.

25       Q.    Did you commence a lawsuit in a

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2  state court, challenging the Suffolk County

3  Civil Service Department's determination

4  that you were not qualified prior to turning

5  35?

6           A.    This is the lawsuit here.

7           Q.    Well, you commenced this prior to

8  the time you turned 35?

9           A.    Yes.

10          Q.    Well, let's see.  Lawsuit's filed

11  March 21, 2007.  How old were you on March

12  21, 2007?

13          A.    35.

14          Q.    Okay.  Because you had turned 35

15  in November of 2006, correct?

16          A.    Yes.

17          Q.    Okay.  So let me ask the question

18  again, sir.  Did you file a lawsuit in any

19  state court, challenging the Civil Service

20  Department's determination that you were not

21  qualified because you failed a psychological

22  test prior to you turning 35?

23          A.    No.

24          Q.    Let's talk about Huntington Bay.

25  How did it come about that you applied for a

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 99

1                    K. Lamm

2     job with Huntington Bay?

3          A.     They sent a canvas letter.

4          Q.     Who sent a canvas letter?

5          A.     Civil Service.

6          Q.     And when did Civil Service send

7     you a canvas letter?

8          A.     Maybe late 2004, early 2005.

9          Q.     Okay.  And what boxes, if any,

10    did you check off on that particular canvas

11    letter?

12               MR. GOODSTADT:   Objection.

13         Q.    Well, withdrawn.  Did you check

14    off any boxes?  Well, even -- I'll even go

15    back further, since I don't want to have

16    another objection.  What was on this canvas

17    letter?

18         A.     Interested in employment.

19         Q.     And do you recall what entities,

20    if any, were identified in the Civil Service

21    canvas letter that you're referring to?

22         A.     Yes, I do.

23         Q.     And what were they?

24         A.     Lloyd Harbor.

25         Q.     Okay.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2      A.    And Huntington Bay.

3      Q.    Huntington Bay Police Department?

4      A.    Yes.

5      Q.    Lloyd Harbor Police Department?

6      A.    Lloyd Harbor, yes.

7      Q.    Okay.  And did you check off

8  those two boxes?

9      A.    Yes.

10     Q.    And did you return that canvas

11  letter to the Civil Service Department?

12     A.    Yes, I did.

13     Q.    With regard to Huntington Bay,

14  what was the next communication, if any,

15  that you received from them concerning your

16  interest in a position with that police

17  department?

18          MR. GOODSTADT:   Objection.

19     A.    I spoke to the chief and I

20  dropped off paperwork there.

21     Q.    Who was the chief?

22     A.    Chief Hobbs.

23     Q.    When did you speak with the

24  chief?

25     A.    Somewhere around the time frame

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    of 2005, springtime I believe.

3         Q.    Springtime of 2005?

4         A.    Yes.

5         Q.    Okay.  And what paperwork did you

6    drop off?

7         A.    Dropped off my police

8    certificate.

9         Q.    Okay.

10        A.    Copy of my test grade from the

11   police exam.

12        Q.    Okay.

13        A.    And some of my other training

14   documents from Suffolk Police Academy.

15        Q.    How did you know to go to -- to

16   go to the Huntington Bay Village Police

17   Department to drop off these documents?

18        A.    I just went there.

19        Q.    Did you schedule  -- did you

20   have -- did you have a communication with

21   anyone scheduling the time that you were to

22   drop off these documents?

23        A.    No.  No scheduled time.

24        Q.    Did anyone tell you to drop these

25   documents off?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2      A.    No.  I did.

3      Q.    And did you have a conversation

4  with Chief Hobbs the day that you dropped

5  these documents off?

6      A.    I said to him I was --

7      Q.    No.  The question is, did you

8  have a communication with Chief Hobbs on the

9  day that you dropped these documents off?

10     A.    Brief.

11     Q.    Okay.  Was that the first time

12  you had spoken with Chief Hobbs about your

13  interest in the Huntington -- Huntington Bay

14  Police Department?

15     A.    Yes.

16     Q.    And when you say it was a brief

17  conversation, how long was it?

18     A.    Brief.  Maybe three minutes.

19     Q.    And do you recall the sum and

20  substance of the conversation?

21     A.    Some of it.

22     Q.    Want to enlighten us?

23          MR. GOODSTADT:    Objection.

24     A.    Sure.  I said I was interested in

25  a position with your department and here's

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1  some of my -- here's a copy of my

2  certificate from the police academy and the

3  municipal bureau of police from New York

4  State.  He said, "Okay.  If anything, we'll

5  be in touch."  I said, "Thank you."  That

6  was really it.

7

8      Q.    Did the name George Hesse come up

9  at all during this brief conversation?

10     A.    No, it didn't.

11     Q.    Did the name of Ocean Beach come

12 up during the course of this brief

13 conversation?

14     A.    I said, "I work at Ocean Beach."

15     Q.    How did you describe -- did you

16 describe what you meant by you work at Ocean

17 Beach?

18     A.    That I was a police officer.

19     Q.    Did you describe to him whether

20 you were a full time or police  -- or part

21 time?

22     A.    No.

23     Q.    Did you describe to him whether

24 you were seasonal or full time?

25     A.    No.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 104

1        K. Lamm

2        Q.    Don't you think that would have

3    been important for him to know?

4        MR. GOODSTADT:    Objection.

5        A.    No.

6        Q.    Okay.  Well, what communication,

7    if any, did you receive from the Huntington

8    Bay Police Department after this brief

9    communication with Chief Hobbs?

10        A.    None.

11        Q.    Did you, prior to the end of your

12    employment relationship with Ocean Beach,

13    make any inquiries with the Huntington Bay

14    Police Department concerning your interest

15    in a job with them?

16        A.    No.

17        Q.    To your knowledge, did George

18    Hesse ever communicate with the Huntington

19    Bay -- Huntington Bay Police Department

20    concerning your interest in the job with

21    them?

22        A.    Repeat that, please.

23        Q.    To your knowledge, did George

24    Hesse ever communicate with the Huntington

25    Bay Police Department concerning your

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2      interest in a position with them?

3          A.    Not to my knowledge.

4          Q.    Did you ever advise Chief Hesse

5      that you had submitted an application to the

6      Huntington Bay Police Department?

7          A.    I believe I said something to

8      him.

9          Q.    When did you say something to

10     him?

11         A.    Sometime that year in 2005.

12         Q.    And do you recall what

13     Mr. Hesse's reaction was, if any?

14         A.    No, I don't.

15         Q.    Okay.  When was  -- after you

16     checked off the box for Lloyd Harbor Police

17     Department  -- actually, let me take a step

18     back.  The Huntington Bay Police Department,

19     was that a full-time position that you were

20     applying for?

21         A.    Yes.

22         Q.    And how about with the two

23     Southampton police department applications,

24     was that -- was that full time?

25         A.    Yes.

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    Okay.  Let's then go to Lloyd

3   Harbor.  After checking off the box of the

4   canvas letter and sending the letter back to

5   the Civil Service Department, what, if

6   anything -- what -- what, if any,

7   communication did you receive from the Lloyd

8   Harbor Police Department concerning your

9   interest in the job with them?

10       A.    They sent a letter with residency

11  requirements.

12       Q.    And were you -- and when did they

13  send this letter to you?

14       A.    Within a few  -- within a few

15  weeks after I sent a letter back.

16       Q.    And did you advise them that you

17  were not a resident of Lloyd Harbor at that

18  time?

19       A.    You didn't have to be a resident.

20       Q.    Oh, okay.  So they were different

21  than Southampton Town?

22            MR. GOODSTADT:    Objection.

23       Q.    To your knowledge?

24       A.    Slightly.

25       Q.    When you say "slightly," what do

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    you mean?

3         A.    Because Lloyd Harbor has what's

4    called a loose residency.

5         Q.    What is your understanding as to

6    what that means?

7         A.    The way they defined it?

8         Q.    Yes.  That's all I'm asking.

9         A.    The way they defined it was that

10   if you lived either in the village of Lloyd

11   Harbor or within an approximate 15 mile

12   range, you would get to be -- you would have

13   preference over anybody else that lived

14   further out.

15        Q.    Did you live in Lloyd Harbor at

16   the time you received this letter?

17        A.    No.

18        Q.    Have you ever lived in Lloyd

19   Harbor since submitting an application for

20   employment?

21        A.    No.

22        Q.    Did you live within the 15 miles

23   of this village at the time you received

24   this letter?

25        A.    Yes.  They -- they stated I was

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

2   within the range.

3        Q.    Okay.  And where did you live at

4   this time?

5        A.    Bay Shore.

6        Q.    Okay.  And did you advise  --

7   they stated that you lived in the range in

8   this letter?

9        A.    Yes.  They said that was

10  acceptable.

11       Q.    So what else, if anything, did

12  this letter state to you concerning your

13  interest in a job with them?

14       A.    They wanted to know if I had

15  already completed a police academy within

16  Suffolk County.

17       Q.    And -- and had you?

18       A.    And if I had any police

19  experience.

20       Q.    Okay.  Let's talk about the first

21  one.  Had you completed a  -- how did you

22  phrase it?

23       A.    Police academy?

24       Q.    Yeah.

25       A.    Yes, I did.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2       Q.      And did you advise them of that?

3       A.      Yes, I did.

4       Q.      And did you advise them of your

5   police experience?

6       A.      Yes, I did.

7       Q.      And how did you go about advising

8   them of your police experience and of your

9   police academy experience?

10      A.      It was through telephone.

11      Q.      Who did you speak with?

12      A.      Don't know the name.  Whoever was

13  working the desk.

14      Q.      When did you speak to them in

15  relation to when you received this letter

16  seeking this information?

17      A.      Sometime in 2005.

18      Q.      Okay.  And what was the next

19  communication, if any, that you received

20  from the Harbor -- the Lloyd Harbor Police

21  Department concerning your interest in a job

22  with them?

23      A.      To send a copy of my police

24  certificates.

25      Q.      And did you?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2          A.    Yes, I did.

3          Q.    How long  -- when -- when did you

4    receive this communication from them

5    concerning your police certificates?

6          A.    After the telephone conversation.

7          Q.    Okay.  And do you know who you

8    spoke to with regard to the request for the

9    police certificates?

10         A.    I don't know who it was.

11         Q.    Okay.  And how long after this

12   communication did you send the police

13   certificates to them?

14         A.    Within the next day or two.

15         Q.    Still in 2005?

16         A.    Yes.

17         Q.    Are we in the fall of 2005, the

18   summer or the winter?

19              MR. GOODSTADT:    Objection.

20         Q.    Well, do you know what season you

21   were in when you had these communications?

22         A.    Springtime maybe.

23         Q.    Okay.  And after you sent the

24   police certificates to Lloyd Harbor, what

25   communications, if any, did you engage in

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2    after that with Lloyd Harbor?

3        A.    They -- I believe they said you

4    can call back and you can talk to one of the

5    lieutenants if you have to.

6        Q.    Okay.  And did you call back?

7        A.    Yes, I did.

8        Q.    Do you know if  -- well, did you

9    speak to a live human being when you called

10   back?

11       A.    Yes, I did.

12       Q.    Do you know who you spoke to?

13       A.    It was a man I believe.  Who it

14   was, I don't know who it was.

15       Q.    How shortly after you were

16   advised you should speak to one of the

17   sergeants did you in fact call over to the

18   Lloyd Harbor Police Department?

19            MR. GOODSTADT:   Objection.

20       A.    Say again, please.

21       Q.    How long after -- we've

22   established you were advised that you should

23   call over and speak to one of the sergeants,

24   correct?

25            MR. GOODSTADT:   Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                     K. Lamm

2          Q.    Was that correct?

3          A.    She said lieutenant.

4          Q.    Oh, okay.  How long after you

5     were advised that you should call over and

6     speak to one of the lieutenants did you in

7     fact call over to speak to one of the

8     lieutenants?

9          A.    May have been a week later.

10         Q.    Okay.  So we're still in the 2005

11    time period?

12         A.    Yes.

13         Q.    And did you speak with any

14    lieutenants?

15         A.    I believe it was.  The name I

16    can't be for certain.

17         Q.    And do you know the name?

18         A.    The name I can't be for certain.

19         Q.    Okay.  And how long was this

20    conversation?

21         A.    It wasn't very long.

22         Q.    Two minutes?  Five minutes?  10

23    minutes?

24         A.    Six minutes.

25         Q.    Do you recall the sum and

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1
2  substance of this conversation?

3        A.    I asked if they received my
4  papers.  My police certificates.

5        Q.    And what was the response, if
6  any?

7        A.    Yes, they did.

8        Q.    Do you recall was someone --
9  anything else that was discussed with this
10  individual in this brief conversation?

11        A.    Yes.  That they were looking to
12  hire two people.

13        Q.    Okay.  And anything else that was
14  discussed?

15        A.    Yes.

16        Q.    What?  What was discussed?

17        A.    That being that I had already
18  graduated from the Suffolk County Police
19  Department, that I may have first preference
20  over anybody else that didn't have academy
21  experience or graduate from an accredited
22  agency.

23        Q.    Okay.

24        A.    Mainly Suffolk County Police
25  Academy.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2          Q.    Got it.  Anything else that was

3     discussed that you can recall?

4          A.    Not that I can recall.

5          Q.    And how did the conversation end?

6          A.    "Good-bye."  Hung up the phone.

7          Q.    Okay.  Were you advised to call

8     back at any particular time?

9          A.    No.

10          Q.    What was the next communication

11     that you engaged in with someone from the

12     Lloyd Harbor Police Department concerning

13     your interest in a position with that

14     department?

15          A.    May have been maybe another month

16     after.

17          Q.    And what type of communication

18     was this?

19          A.    Telephone.

20          Q.    Who initiated it?

21          A.    I did.

22          Q.    Who did you call?

23          A.    Lloyd Harbor Police.

24          Q.    Anyone specifically?

25          A.    Whoever was working the desk.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1        K. Lamm

2        Q.    And what was the purpose of your

3    phone call, if any?

4        A.    To see if they were still going

5    to hire two full time people and if there

6    was a time frame.

7        Q.    And what response, if any, did

8    you get to your inquiry?

9        A.    They said that they were still

10    making a decision.

11        Q.    And how long was this

12    conversation?

13        A.    Three, four minutes.

14        Q.    Okay.  Anything else you recall

15    said between you and this person at the

16    police department?

17        A.    Not that I can recall.

18        Q.    What was the next communication,

19    if any, that you had between you and anyone

20    at the Lloyd Harbor Police Department

21    concerning your interest in a job with them?

22        A.    I don't believe there was one.

23        Q.    Did you -- did you attempt to

24    phone the Lloyd Harbor Police Department

25    after this last communication?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 116

K. Lamm

A.    No.  I just waited for a response.

Q.    So we're still in  -- we're still in 2005, correct?

A.    Correct.

Q.    And you made no further communications with them?

A.    Waited for a response.

Q.    Before the end of your employment relationship in April of 2006 with Ocean Beach, did you make any inquiry with -- with the Lloyd Harbor Police Department?

A.    No.

Q.    Prior to the end of your employment relationship with the Lloyd  -- with Ocean Beach, did you become aware of the fact one way or the other as to whether Lloyd Harbor had filled those two full-time positions?

A.    Don't know.

Q.    Did you ever inquire as to whether they did?

A.    No.

Q.    To this day do you know if they

1                    K. Lamm

2   did?

3         A.    I don't know.

4         Q.    Did you ever inquire between

5   April 2, 2006 and this date?

6         A.    No.

7         Q.    To your knowledge, did Mr. Hesse

8   know that you were applying for a position

9   with the Lloyd Harbor Police Department?

10        A.    I believe he did.

11        Q.    How -- what's the basis for that

12  belief?

13        A.    Because I was talking about it

14  inside the station.

15        Q.    Directly to Mr. Hesse?

16        A.    He was passing by.

17        Q.    So who were you talking to?

18        A.    I believe -- I believe it was

19  Walter Muller.

20        Q.    When?

21        A.    The exact day I don't know.

22        Q.    Month and year?

23        A.    Maybe somewhere around the time

24  frame when I received the letter and made a

25  phone call.  2005.  Month, day I cannot be

1                    K. Lamm

2     specific.

3          Q.    I think you -- you sufficiently

4     answered that question.

5               MR. GOODSTADT:    Objection.

6          Q.    Did Mr. Hesse stop as he was

7     passing by to engage you in a conversation

8     concerning this?

9          A.    In passing he said, "Oh, you're

10     applying to Lloyd Harbor?"  I said, "Yes."

11          Q.    Did he say anything else?

12          A.    No.

13          Q.    To your knowledge, did Mr. -- has

14     Mr. Hesse ever communicated with Lloyd

15     Harbor concerning your interest in a

16     position with them?

17          A.    Not to my knowledge.

18          Q.    Let's  -- do you recall alleging

19     or -- withdrawn.  Do you recall stating a

20     claim for relief in your lawsuit described

21     as civil conspiracy under state law?

22               MR. GOODSTADT:    Objection.

23          A.    I don't recall right now.

24          Q.    Okay.  How did Defendant Hesse

25     and Ms. Sanchez conspire to unlawfully

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 119

1           K. Lamm

2    destroy your career?

3           MR. GOODSTADT:    Objection.

4           MR. NOVIKOFF:    What's the basis

5       for the objection, counselor?

6           MR. GOODSTADT:    To the extent

7       that "conspire" has a legal

8       connotation, he's a fact witness and,

9       you know, shouldn't be held to knowing

10       the definition of a legal claim in his

11       Complaint.

12           MR. NOVIKOFF:    Sir, I'm just

13       asking him to give me the basis for the

14       allegation that he made, and I'll quote

15       from page 186, "as set forth above,

16       Defendants Hesse and Alison Sanchez

17       conspired to unlawfully destroy

18       Plaintiffs' careers."

19           MR. GOODSTADT:    There's a legal

20       connotation to the word "conspire."

21           MR. NOVIKOFF:    That's fine.

22       Q.   Sir, what did Defendant Hesse and

23    Alison Sanchez do that leads you to believe

24    that they "conspired to unlawfully destroy"

25    your career?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2         MR. GOODSTADT:    Same objection.

3         MR. NOVIKOFF:    Okay.

4    A.    According to the phone

5    conversation that Ed Carter had with George

6    Hesse about myself, Frank Fiorillo and

7    Joseph Nofi would never get any law

8    enforcement careers ever again in our life.

9    Q.    Motion -- okay.  Continue.  I

10   don't want to stop your answer.

11   A.    Thank you.  And with all the

12   knowledge that he has in Civil Service right

13   now, and he snickered.

14        THE COURT REPORTER:    He what?

15        THE WITNESS:    He snickered.

16   Q.    He snickered?

17   A.    Laughed.

18   Q.    Who snickered?

19   A.    George Hesse.

20   Q.    Oh, okay.  When you say all the

21   knowledge that he has in Civil Service, what

22   do you mean?

23   A.    Well, he was friends with Alison

24   Sanchez.

25   Q.    And you know this how?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2        A.     Because he said that he had a

3   close friend in Civil Service one time when

4   we were in the police department and showed

5   her business card.

6        Q.     Did he say this to you?

7        A.     Yes, he did.

8        Q.     And what business card did he

9   show you?

10       A.     Alison Sanchez.

11       Q.     Okay.  When did he show you this?

12       A.     Sometime within the year of 2005.

13       Q.     Okay.

14       A.     End of 2004, beginning 2005.

15       Q.     And what was the context in which

16  he was showing you this card and making the

17  statement that he had a close friend in the

18  Civil Service Department?

19       A.     Again, please.

20       Q.     What was the context that led him

21  to tell you that he had a close friend in

22  the Civil Service Department and showed you

23  the business card?

24       A.     Because at that time, he was

25  hiring people to work in the department.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2      Q.     Okay.  And what led him, to your

3  recollection, to state that he had a close

4  friend in the Civil Service Department?

5      A.     Because these people that he was

6  hiring were not going through any Civil

7  Service requirements.

8      Q.     Okay.  Now when you say he hired,

9  was this before Chief Paridiso left or after

10  Chief Paridiso left?

11      A.     Exactly when Chief Paridiso left,

12  I don't know the exact date when he left.

13      Q.     I'm not asking when Chief

14  Paridiso left, not the date.  My question

15  is, when you just testified that you said

16  that George Hesse was hiring, was Chief

17  Paridiso at that time still working for the

18  police department, to your knowledge?

19      A.     To my knowledge, yes, he was.

20      Q.     Okay.  Now when I asked you the

21  question about, you know, before you

22  answered that you had a conversation with Ed

23  Snyder; is that correct?

24          MR. GOODSTADT:    Objection.

25      Q.     Tom Snyder?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 123

K. Lamm

1

2    A.    I didn't say Tom Snyder.

3    Q.    Who did you say?

4    A.    Edward Carter.

5    Q.    Okay.  Other than what Mr. Carter

6    may have told you, what else, if anything,

7    is the basis for your allegation that

8    Mr. Hesse and Ms. Sanchez "conspired to

9    unlawfully destroy" your career?

10            MR. GOODSTADT:    Objection.

11   A.    That is what I heard.

12   Q.    Okay.  So other than what you

13   heard from another source concerning a

14   conversation between George Hesse and

15   Mr. Carter, you have no other basis to

16   support that conclusion, do you?

17            MR. GOODSTADT:    Objection.  He

18        testified to a different conversation

19        he had with George Hesse.

20            MR. NOVIKOFF:    Sir, excuse me.

21        You can object.

22            MR. GOODSTADT:    Because you're

23        misstating the testimony right now.

24            MR. NOVIKOFF:    Then you can

25        object.

1          K. Lamm

2          MR. GOODSTADT:    I just did.

3          MR. NOVIKOFF:    I don't need to

4     hear it unless I asked for it, which I

5     have and you've responded to it.

6          MR. GOODSTADT:    I'm not going

7     to let you mislead the witness.

8          MR. NOVIKOFF:    Then you can

9     object, sir.

10          MR. GOODSTADT:    I am.  And I'm

11     protecting the record as well.  I'm not

12     letting you mislead the witness.

13          Q.    Sir, you've testified that --

14     that you heard of a conversation between

15     Mr. Hesse and Mr. Carter, correct?

16          A.    Correct.

17          Q.    Who told you about that

18     conversation?

19          A.    Ed Carter told me and I heard  --

20          Q.    That's all I'm asking.  Who told

21     you?

22          A.    Ed Carter.

23          Q.    Okay.  Did you hear about that

24     conversation from any other source, other

25     than Mr. Carter?

1              K. Lamm

2      A.     No.

3      Q.     Okay.  And that conversation that

4  Mr. Carter told you about was between

5  Mr. Hesse and who?

6      A.     The conversation was between

7  George Hesse and Edward Carter.

8      Q.     Okay.  Now other than this

9  conversation with Mr. Carter, that

10 Mr. Carter told you about, is there any

11 other basis for your claim that Mr. Hesse

12 and Ms. Sanchez "conspired to unlawfully

13 destroy" your career?

14          MR. GOODSTADT:   Objection.

15      Both the form, has a legal conclusion

16      required in it, and it's been asked and

17      answered.

18          MR. NOVIKOFF:   Okay.

19      A.     No.

20      Q.     Okay.  What acts did Mr. Hesse

21 and Ms. Sanchez do together, if any, that

22 you believe destroyed your career?

23      A.     Exactly?

24      Q.     Yeah.

25      A.     What they did, I can't pinpoint

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2  exactly.  But from their closeness and, you

3  know, that they have had and the way George

4  Hesse says with all his Civil Service

5  knowledge, I don't know what he was capable

6  of doing.

7        Q.    Sir, my question, sir, is to you,

8  other than your speculation as to what

9  Mr. Hesse is capable of doing, is there any

10  basis for you to conclude that Ms. Sanchez

11  and Mr. Hesse did anything together to

12  destroy your career?

13              MR. GOODSTADT:    Objection.

14        A.    I couldn't -- I couldn't be

15  specific?

16        Q.    How about generally?

17        A.    No.

18        Q.    Generally what --

19        A.    That was my answer that I just

20  gave.

21        Q.    You got it.  Did, to your

22  knowledge, Mr. Hesse and Ms. Sanchez ever

23  meet to discuss destroying your career?

24        A.    They have met, but I don't know

25  in what their discussions were.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    MO          MR. NOVIKOFF:    Motion to strike

3         as nonresponsive.

4         Q.    Sir, do you have any knowledge as

5    to whether or not Mr. Hesse and Ms. Sanchez

6    ever met to discuss destroying your career?

7         A.    No.

8         Q.    The answer's no?

9         A.    No.

10         Q.    Okay.  To your knowledge, sir,

11   did Mr. Hesse and Ms. Sanchez ever enter

12   into an agreement to destroy your career?

13         A.    Not that I'm aware of.

14         Q.    Was it "not that I'm aware of,"

15   is that the answer?  Okay.  So when you

16   allege in paragraph 186 that Defendant Hesse

17   and Ms. Sanchez "shared a mutual agreement

18   and understanding regarding their objective

19   to do so," what was the basis of that

20   allegation?

21              MR. GOODSTADT:    Objection.

22         A.    Repeat the question again.

23         Q.    Sure.  You've alleged in

24   paragraph 186 that Mr. Hesse and Ms. Sanchez

25   conspired to unlawfully destroy your career,

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    and then you further allege that both

3    Mr. Hesse and Ms. Sanchez "shared a mutual

4    agreement and understanding regarding their

5    objective to do so."  So my question to you

6    is, what is the basis for the truthfulness

7    of the allegation that "Mr. Hesse" -- I'm

8    sorry, that Mr. Hesse and Ms. Sanchez

9    "shared a mutual agreement and understanding

10   regarding their objective" to destroy your

11   career?

12           MR. GOODSTADT:    Objection.

13           MR. NOVIKOFF:    Okay.

14       A.    After I was being stated as a

15   Civil Service rat, George Hesse stated that,

16   you know, we will never get law enforcement

17   jobs again, so.

18       Q.    I understand that.  But what

19   evidence do you have that Ms. Sanchez had a

20   mutual agreement with Mr. Hesse to destroy

21   your legal career -- your -- your law

22   enforcement career?

23           MR. GOODSTADT:    Objection.

24       A.    I don't.

25       Q.    What evidence can you point to

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                     K. Lamm

2    that Ms. Sanchez had a mutual understanding

3    with Mr. Hesse to destroy your law

4    enforcement career?

5         A.    I don't know.

6         Q.    You then allege in 186, sir, that

7    Mr. Hesse and Ms. Sanchez "committed

8    numerous overt acts" in furtherance of the

9    plan to destroy your law enforcement career,

10   do you recall that?

11        A.    Yes.

12        Q.    What  -- do you have an

13   understanding as to what "overt" means?

14        A.    Sure.

15        Q.    What's your understanding of the

16   word "overt"?

17        A.    That they conspired together to

18   come up with the plan and  --

19        Q.    Okay.  What act that you allege

20   was undertaken between Hesse and Sanchez to

21   destroy your law enforcement career?

22             MR. GOODSTADT:    Objection.

23        A.    It appeared as if that the way

24   they had this close relationship together,

25   and through discovery and emails that they

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1    had together, they were hiring people to

2    work there uncertified without going through

3    any processing.  Therefore, the conversation

4    that Ed Carter had with George Hesse and

5    Hesse stating that he has Civil Service

6    knowledge, and to the fact that us three

7    mutts and rats will never get another law

8    enforcement job again, believes me  -- let's

9    me believe that they had something to do

10   with something about it.

11              MR. NOVIKOFF:    Motion to

12        strike.

13        A.    And that's my answer.

14   MO        MR. NOVIKOFF:    Go ahead.

15        Motion to strike as not responsive,

16        sir.

17        Q.    You've alleged that Hesse and

18   Sanchez committed numerous overt acts in

19   furtherance of their mutual understanding to

20   destroy your law enforcement career.  Name

21   me one act that Ms. Sanchez engaged in with

22   Mr. Hesse that supports your position that

23   they engaged in these acts to destroy your

24   career?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 131

1          K. Lamm

2          MR. GOODSTADT:      Objection.

3     Q.    Do you understand my question?

4     A.    I understand your question.

5     Q.    Okay.

6     A.    I can't.

7     Q.    Do you recall claiming in this

8    lawsuit, sir -- I'm sorry.  Withdrawn.  Do

9    you recall alleging as a claim for relief in

10   this lawsuit, the "negligent retention of an

11   unfit employee under state law"?

12          MR. GOODSTADT:      Objection.

13    A.    I don't recall.

14    Q.    Okay.  I'm going to show you what

15   is the -- I purport to be the Complaint that

16   was filed in this action, and I'm going to

17   refer your attention to paragraph -- to page

18   41, and ask you to look at the bolded

19   language in the parenthetical under the

20   words "as and for a 12th cause of action."

21          MR. GOODSTADT:      Are you marking

22      this as an exhibit?

23          MR. NOVIKOFF:      No.  It's the

24      Complaint.  I don't need to mark it as

25      an exhibit.  I'm not going to be using

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2      it, other than to refresh his

3      recollection.

4           MR. GOODSTADT:    What paragraph

5      are you on?

6           MR. NOVIKOFF:    Page 41.

7           MR. GOODSTADT:    And what

8      paragraph are you looking at?

9           MR. NOVIKOFF:    Just underneath

10      the language "as and for a 12th cause

11      of action."

12           Q.    My question to your client is,

13      sir, please look at the language underneath

14      that which is in bold and which is in

15      parentheticals, which says "negligent

16      retention of an unfit employee under state

17      law," and once you read that, can you advise

18      me if reading that refreshes your

19      recollection as to whether or not you have

20      alleged a claim against my clients entitled

21      "negligent retention of an unfit employee

22      under state law"?

23           A.    "Unfit employee," which means to

24      me is that the people they were hiring were

25      not fit.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

MO          MR. NOVIKOFF:    Sir, I'm not
asking you what you think it means.  My
question is specific, and I'm going to
move to strike.

          Q.    Does reading that one line, and
that's all I've asked you to read, the line
that's in bold and in the parentheticals,
does that refresh your recollection that
you've alleged in this case, a cause of
action sounding in negligent retention of an
unfit employee under state law?

          MR. GOODSTADT:    Objection.
Objection.  For the record, every
single motion that Mr. Novikoff
purports to make during this deposition
are all opposed, and we reserve our
right to oppose them to the extent that
he actually raises them in some form
that this matters.

          MR. NOVIKOFF:    That -- that
goes without question, sir.

          MR. GOODSTADT:    I just want to
make the record clear.

          MR. NOVIKOFF:    Didn't need to.

Page 134

K. Lamm

Q.    So that's my question.  Does that
refresh your recollection, Mr. Lamm?

A.    No, it doesn't.

Q.    Okay.  We don't need that
anymore.

MR. GOODSTADT:    Can we just
take a two-minute break?

MR. NOVIKOFF:    Sure.
Absolutely.

THE VIDEOGRAPHER:    The time is
12:11 p.m.  Going off the record.

(A break was taken.)

THE VIDEOGRAPHER:    This begins
tape number three.  The time is 12:20
p.m.  Back on the record.

MR. NOVIKOFF:    Just read my
last question and answer.

(The requested portion was read.)

Q.    Sir, you've alleged in this
Complaint the following, and I quote,
"Defendant Hesse, Ocean Beach, OBPD and
Suffolk County Civil Service deliberately
retained and advanced the careers of
uncertified and unqualified personnel who

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2    served alongside Plaintiffs as police

3    officers."  My question to you, sir, is what

4    officers -- what officers are you referring

5    to when you claim that they were

6    uncertified, and I'm just looking for their

7    identities?

8          A.    Let me make sure I get this

9    straight.  The officers that were

10   uncertified you said identity?

11         Q.    Yes.  You've made allegations in

12   here that there were certain uncertified

13   officers, and I'm only interested now, for

14   the purpose of my question, is for you to

15   identify those officers that you're

16   referring to in this Complaint.  In this

17   allegation that I just read.

18         A.    Arnold Hardman.

19         Q.    Okay.

20         A.    William Walsh, Dan Shook, Gary

21   Bosetti, Richard Bosetti, Patrick Cherry,

22   John Patrick Cherry, however he goes by John

23   Cherry.  John Patrick Cherry.  Patrick John

24   Cherry.

25         Q.    Same guy?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

2   A.    Same guy.

3   Q.    Okay.  Anybody else?

4   A.    Senior.

5   Q.    I understand.

6   A.    John Dyer.  That's what -- that's

7  what comes to my knowledge right now at this

8  time.

9   Q.    Who hired Andrew Hardman?  I'm

10  sorry.  Withdrawn.  When was Andrew Hardman

11  hired, to your knowledge?

12        MR. GOODSTADT:    Objection.

13   A.    I don't know who Andrew Hardman

14  is.

15   Q.    Okay.  When you said "Hardman,"

16  who was the first name?

17   A.    Arnold Hardman.

18   Q.    Arnold.  Okay.  Fine.  To your

19  knowledge, when was Arnold Hardman hired by

20  Ocean Beach?

21   A.    2003.

22   Q.    To your knowledge, when was

23  Mr. Walsh hired by Ocean Beach?

24   A.    2003.

25   Q.    To your knowledge, when was Dan

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1        K. Lamm

2   Shook hired by Ocean Beach?

3        A.    Could have been 2003 or 2004.

4        Q.    To your knowledge, when was Gary

5   Bosetti hired?

6        A.    2002.  Excuse me, sir.  It's

7   2002.  I'd like to add to that list Thomas

8   Schor.

9        Q.    Okay.  When was Richard Bosetti

10  hired by Ocean Beach, to your knowledge?

11       A.    2002.

12       Q.    To your knowledge, when was John

13  Pat Cherry hired?

14       A.    2004.

15       Q.    To your knowledge, when was John

16  Dyer hired?

17       A.    2004.

18       Q.    To your knowledge, when was

19  Thomas Schor hired?

20       A.    Maybe 2003, approximately.

21       Q.    To your knowledge, who made the

22  final decision to hire Mr. Hardman?

23       A.    To my knowledge, it would be

24  George Hesse.

25       Q.    What was the basis of your

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2    knowledge?

3         A.    Because he hired them.

4         Q.    How do you know he hired them?

5         A.    Because he had a list of names of

6    people that he was looking to hire.

7         Q.    To your knowledge, did

8    Mr. Hardman's employment have to be approved

9    by Mr. Paridiso?

10        A.    Did you say "employment" or

11   "unemployment"?

12        Q.    His employment.  To your

13   knowledge, did Mr. Paridiso have to approve,

14   in any manner, the hiring of Mr. Hardman?

15        A.    I don't believe so.  George was

16   the sergeant and he was doing the hiring.

17        Q.    How do you know he was doing the

18   hiring?

19        A.    Because he had the list of names

20   on his desk saying that who he was going to

21   hire.

22        Q.    I understand that.  But my

23   question is to you, how do you know, as you

24   sit here today, that Mr. Hesse didn't have

25   to get approval by Mr. Paridiso?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2       A.     Maybe he did.  I --

3       Q.     That's what my question is, do

4   you know?

5       A.     That's why I said to my

6   knowledge, it was George Hesse that did the

7   hiring.

8       Q.     Then let me rephrase my question.

9   As you sit here today, do you know if

10  Mr. Hesse had to get approval by

11  Mr. Paridiso to hire Mr. Hardman?

12      A.     I don't know.

13      Q.     Same question with regard to

14  Mr. Walsh?

15      A.     I don't know.

16      Q.     Same question with regard to

17  Mr. Shook?

18      A.     I don't know.

19      Q.     Same question with regard to Gary

20  Bosetti?

21      A.     I don't know.

22      Q.     Same question with regard to

23  Richard Bosetti?

24      A.     I don't know.

25      Q.     Same question with regard to Pat

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2    Cherry?

3         A.    I don't know.

4         Q.    Same question with regard to John

5    Dyer?

6         A.    I don't know.

7         Q.    Same question with regard to

8    Thomas Schor?

9         A.    I don't know.

10        Q.    As of the date that your

11   employment relationship ended with Ocean

12   Beach, was Mr. Hardman, to your knowledge,

13   still an employee?

14        A.    Yes, he was.

15        Q.    Same question with regard to

16   Mr. Walsh?

17        A.    I don't believe he was.

18        Q.    Same question with regard to

19   Mr. Shook?

20        A.    Not for certain.  I don't know.

21        Q.    Same question with regard to Gary

22   Bosetti?

23        A.    Yes, he was still employed.

24        Q.    Same question with regard to

25   Richard Bosetti?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2          A.    Yes, he was.

3          Q.    Same question with regard to Pat

4    Cherry?

5          A.    Yes, he was.

6          Q.    As a police officer or in some

7    other capacity?

8          A.    At that time, I believe they made

9    him a dispatcher after he was hired as a

10   police officer.

11         Q.    I got that.  Okay.  Same question

12   as regard to Mr. Dyer?

13         A.    No.  He -- at that time, no, he

14   wasn't.

15         Q.    Same question as regard to

16   Mr. Schor?

17         A.    Yes, he was still employed.

18         Q.    As a police officer?

19         A.    Yes, he was.  Excuse me,

20   Mr. Novikoff, if you don't mind.  Something

21   just came to my head if I can -- about a

22   question previously.

23         Q.    Well, what was the question?

24         A.    About George Hesse and Alison

25   Sanchez.  About how they conspired.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2      Q.    I'll let your counsel ask you

3  that question then.  Well, you know what,

4  tell me.  Tell me what you want to say.

5      A.    Because at the time we went to

6  Civil Service to complain, her name was

7  Alison Chester.

8      Q.    Okay.

9      A.    And we wanted to know about our

10  termination and how it was going to affect

11  previous employment, and she -- she stated

12  that it wouldn't and this would remain

13  confidential.

14      Q.    Okay.

15      A.    That meeting that we had.  So

16  after we left, and we have on Edward

17  Carter's tape, that George Hesse stated that

18  there was a phone -- telephone conversation

19  between Alison Sanchez and George Hesse

20  together about our termination.

21      Q.    Okay.  Other than that -- well,

22  do you -- do you know -- were you a

23  participant in the phone conversation with

24  George Hesse and Alison Carter, Alison

25  Chester?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 143

1                    K. Lamm

2         MR. GOODSTADT:    Objection.

3      A.    No, I was not.

4      Q.    Do you know specifically what

5  they discussed in that phone conversation?

6      A.    No, I don't.

7      Q.    Do you know if Alison Chester  --

8  do you have knowledge as you sit here today

9  as to whether Alison Chester agreed with

10 George Hesse in that phone conversation to

11 destroy your career?

12        MR. GOODSTADT:    Objection.

13     A.    No, I don't.

14     Q.    Do you know if Alison Chester, in

15 that phone conversation with Mr. Hesse,

16 agreed to do anything with Mr. Hesse to

17 destroy your career?

18        MR. GOODSTADT:    Objection.

19     A.    No, I don't.

20     Q.    Okay.  So let's go back to the

21 names that we were talking about.  You

22 allege that these officers were uncertified.

23 You also allege that they were unqualified.

24 In your mind, is there a difference between

25 being uncertified and unqualified as you use

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    those terms in this Complaint?

3          A.    Uncertified through Civil Service

4    and unqualified meaning the requirements as

5    per the Suffolk County Police Department.

6          Q.    With regard to unqualified, is

7    that the -- is the failure to adhere to

8    certain requirements of the Suffolk County

9    Police Department the only basis for you to

10   believe that certain officers were

11   unqualified?

12         A.    Unqualified meaning that

13   according to the standards of the Suffolk

14   County Police Department, to work in that

15   department would be unqualified.

16         Q.    Okay.  So you have a distinction

17   between uncertified and unqualified?

18         A.    Yes.

19         Q.    Okay.  Perfect.

20         A.    As my distinction.

21         Q.    Yes.  That's all.  I'm only

22   asking about your distinction.

23         A.    Just making it clear.

24         Q.    You got it.  You then go on  --

25   well, there's an allegation that the careers

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    of these uncertified and unqualified

3    personnel were advanced, what do you mean by

4    "advanced"?

5         A.     They kept their jobs and we were

6    fired.

7         Q.     Okay.  Got it.  Then you allege

8    that "while Defendant Loeffler, Mayor of

9    Ocean Beach, negligently permitted Hesse to

10   do so," do you see that?

11        A.     See what?

12        Q.     I'm sorry.  Do you recall making

13   that allegation?

14        A.     You have to repeat that, sir.

15        Q.     Okay.  You've alleged in

16   paragraph 176 the following, "as set forth

17   above, Defendant Hesse, Ocean Beach, OBPD

18   and Suffolk County Civil Service

19   deliberately retained and advanced the

20   careers of uncertified and unqualified

21   personnel who served alongside Plaintiffs as

22   police officers" -- and this is the key part

23   of the allegation -- "while Defendants" --

24   I'm not asking you to refer to that, unless

25   you need it.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2          MR. GOODSTADT:    You just read a

3     long paragraph.

4          Q.   I understand.  "While Defendant

5     Loeffler, Mayor of Ocean Beach, negligently

6     permitted Hesse to do so."  Do you recall

7     making that allegation?

8          A.   You just read that from here?

9          Q.   Yeah.  176.

10         A.   Do you mind if I take the time to

11    read that?

12         Q.   Take the time to read that first

13    sentence of 176 and tell me when you're

14    done.

15         A.   Are you only asking me about the

16    first sentence or the whole entire thing?

17         Q.   That's -- just the first

18    sentence.  If I ask you about the second

19    sentence, you be more than happy to read it.

20         A.   Just making sure.

21         Q.   You got it.

22         A.   All right.  And what was your

23    question to that?

24         Q.   Well, the question was, do you

25    recall making that allegation?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 147

                      K. Lamm

1

2        A.     Right.  Because they kept their

3    jobs.

4        Q.     No.  No.  The question is just do

5    you recall making that allegation?

6        A.     Yes.

7        Q.     Okay.  So now let's focus

8    specifically on that part of the allegation

9    that refers to Defendant Loeffler, do you

10   see that?

11       A.     Yes.

12       Q.     Now on April 2, 2006, when you

13   say your relationship with the Ocean Beach

14   Police Department ended, was Mr. Loeffler

15   the mayor?

16       A.     No.  I believe Natalie Rogers

17   was.

18       Q.     And I believe you've alleged that

19   the -- the advancement of the careers that

20   you state in this paragraph refers to the

21   fact that you no longer were employed by

22   Ocean Beach, but other uncertified and

23   unqualified officers kept their jobs; is

24   that correct?

25       A.     Yes.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2          Q.    Okay.  What specifically can you

3    tell the jury that is going to be watching

4    this videotape, that Mr. Loeffler did prior

5    to April 2, 2006, that you allege permitted

6    Hesse to advance the careers of these

7    unqualified and uncertified officers?

8          A.    Loeffler was the police liaison

9    of the department, so anything that happened

10   in that department, he would have known.

11         Q.    How do you know that?

12         A.    Because --

13         Q.    Not that he was police liaison.

14   How do you know what the duties and

15   responsibilities are of the police liaison?

16         A.    The police liaison, as to what I

17   understand it to be, is the overseer of the

18   department.

19         Q.    How do you -- what is your

20   understanding based on?  Did you read

21   something?

22         A.    I didn't read anything.

23         Q.    So you haven't read anything that

24   described what the duties and

25   responsibilities of the police liaison were,

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2    were you?  Did you?

3          A.    No.

4          Q.    Did Mr. Loeffler ever tell you

5    what the duties and responsibilities of the

6    police liaison was?

7          A.    No.

8          Q.    How about Mayor Rogers, did she

9    ever tell you?

10         A.    No.

11         Q.    Did George Hesse ever tell you?

12         A.    No.

13         Q.    Did sergeant -- I'm sorry, did

14   Chief Paridiso ever tell you?

15         A.    No.

16         Q.    Did any board of trustee member

17   ever tell you?

18         A.    No.

19         Q.    Did any village official ever

20   tell you what the duties and

21   responsibilities of a police liaison were?

22         A.    No.

23         Q.    Did Mr. Nofi ever tell you?

24         A.    No.

25         Q.    How about Mr. Carter?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     A.    No.

3     Q.    How about Mr. Snyder?

4     A.    No.

5     Q.    How about Mr. Fiorillo?

6     A.    No.

7     Q.    Any police officer ever tell you

8  what the duties and responsibilities of the

9  police liaison was who worked for Ocean

10  Beach?

11     A.    No.

12     Q.    Did any human being ever tell you

13  what the duties and responsibilities were of

14  the police liaison for the Ocean Beach

15  Police Department prior to April 2, 2006?

16     A.    No.

17     Q.    Let's stick with you now,

18  Mr. Lamm.  What danger were you exposed to

19  by the negligent retention of what you claim

20  to be unfit employees?  Now my question is

21  not what damages have you suffered, my

22  question is, what dangers have you been

23  exposed to?

24     A.    The dangers are --

25     Q.    Or were you exposed to?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2      A.    Exposed to was that these

3 officers that were -- what did you say,

4 unfit?

5      Q.    Well, you said unfit, sir.

6      A.    Well, just now I'm saying what

7 you said.

8      Q.    Okay.

9      A.    Unfit, uncertified, unqualified.

10 You know, they were drinking on duty and

11 carrying a loaded fire arm.  That could have

12 put anybody in danger.  Also, for the fact

13 that being that they did not complete the

14 Suffolk County Police Academy, they did not

15 know the proper radio procedure as to call

16 in assistance or for back up or acknowledge

17 radio transmissions from any other officer.

18      Q.    But my question to you, sir, is

19 what danger were you specifically exposed

20 to?

21           MR. GOODSTADT:    Objection.  He

22      just testified to it.

23           MR. NOVIKOFF:    Okay.  I don't

24      think he did, but I'm asking the

25      question again.

1                      K. Lamm

2        A.    That was all possible dangers

3   that could have happened.

4        Q.    Okay.  Then let me ask you this,

5   Mr. Lamm.  What dangers in fact happened as

6   it pertains to you specifically that you

7   claim resulted from the negligent retention

8   of an unfit employee?

9              MR. GOODSTADT:   Objection.

10       A.    To me specifically, none.  But to

11  the public, it could have been.

12       Q.    Well, thank you for protecting

13  the public.

14       A.    You're welcome.

15  MO   Q.    But my question is to you, sir --

16  and I'm going to move to strike the

17  answer -- what dangers specifically occurred

18  to you as a result of what you claim to be

19  the negligent retention of an unfit

20  employee?

21             MR. GOODSTADT:   Objection.

22       A.    None to me.

23       Q.    Okay.  In paragraph 178 -- and

24  I'll read it, it's a short paragraph -- "as

25  a direct and proximate result of Defendants

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 153

1           K. Lamm

2    Hesse, OBPD, Loeffler and Ocean Beach's

3    breach of duty to supervise, Plaintiffs have

4    been injured and have incurred damages

5    thereby."  How have you, Mr. Lamm, been

6    injured as a result of Hesse, OBPD, Loeffler

7    and Ocean Beach's breach of a duty to

8    supervise?

9           MR. GOODSTADT:    Objection.

10       A.    I'm going -- what was that, 178?

11          MR. GOODSTADT:    That's 178.

12       A.    I'd like to look at that, if

13   that's okay.

14       Q.    You can certainly look at it.

15   Take as much time as you want.

16       A.    Thank you.  (Reviewing).

17       Q.    Would you like the question

18   repeated?

19       A.    Sure.

20          MR. NOVIKOFF:    If the court

21   reporter can read the question back.

22          (The requested portion was read.)

23       A.    Nothing that directly pertains to

24   me.

25       Q.    What damages have you incurred --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2   withdrawn.  What monetary damages have you

3   incurred as a result of what you claim to be

4   Defendants' Hesse, OBPD, Loeffler and Ocean

5   Beach's breach of duty to supervise?

6          MR. GOODSTADT:    Objection.

7      A.    None that I can think of at this

8   time.

9      Q.    What injuries have you suffered,

10  Mr. Lamm, as a result of what you claim to

11  be a negligent retention of unfit employees?

12          MR. GOODSTADT:    Objection.

13     A.    Damages that I have suffered

14  is --

15     Q.    No.  The injuries.  Not damages.

16  What injuries have you suffered.  We'll get

17  to damages in the next question.

18          MR. GOODSTADT:    Objection.

19     Q.    So I'll repeat the question.

20  What injuries, what physical injuries have

21  you suffered as a result of what you claim

22  to be a negligent retention of unfit

23  officers?

24          MR. GOODSTADT:    Objection.

25     Q.    By Ocean Beach, by the Mayor --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 155

1              K. Lamm

2  Mayor Loeffler, by Hesse and by any other

3  Defendant?

4          MR. GOODSTADT:    Objection.

5      A.    No -- no physical injury.

6      Q.    What mental injury have you

7  suffered as a result of what you claim to be

8  the negligent retention of an unfit police

9  officer by Ocean Beach?

10     A.    Just mentally I feel that after

11 all that I have been through to get that job

12 as a police officer and being certified,

13 it's disheartening to see that I no longer

14 work there and there are people that are

15 uncertified that still hold a police

16 position.

17         MR. GOODSTADT:    Guys, let me

18     just note my objection to that last

19     question as well.

20     Q.    What monetary damages do you

21 claim to have suffered as a result of what

22 you allege to be a negligent retention of an

23 unfit employee?

24         MR. GOODSTADT:    Objection.

25     A.    Furthering my career as a police

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1        K. Lamm

2   officer where I could have advanced, and

3   also, I could have been working full time

4   for the Ocean Beach Police Department if I

5   had received a canvas letter after passing

6   that police test.

7   MO        MR. NOVIKOFF:    Motion to strike

8        as nonresponsive.

9        Q.    Sir, you claim in this lawsuit

10  that while you were still employed by Ocean

11  Beach, they hired officers who were both

12  uncertified and unqualified, correct?

13       A.    Correct.

14       Q.    Okay.  Now, my question to you

15  is, prior to the last day of your employment

16  with Ocean Beach, what monetary damages did

17  you suffer as a result of the retention of

18  what you claim to be uncertified and

19  unqualified police officers while you were

20  still employed by Ocean Beach?

21            MR. GOODSTADT:    Objection.

22            MR. NOVIKOFF:    Okay.

23       A.    None that I can think of at this

24  time.

25       Q.    Let's go to paragraph 177, and

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

```
1              K. Lamm
2   there's a reference to an incident that
3   occurred on October 30, 2004, do you see
4   that?
5        A.    177?
6        Q.    Yeah, 177.
7        A.    Of the same page?
8        Q.    It starts on page 41 and goes on
9   to page 42.  So if you need to read the
10  whole paragraph, that's fine, too.
11            MR. GOODSTADT:    Why don't you
12       do that.
13       Q.    And then tell me when you're done
14  reading it.
15       A.    (Reviewing).  Okay.  I'm
16  completed.
17       Q.    You've completed reading that?
18       A.    Yes, sir.
19       Q.    Okay.  Now you see there's a
20  reference to an incident that took place on
21  October 30, 2004?
22       A.    Okay.
23       Q.    Would -- yes?
24       A.    Go ahead.
25       Q.    And would you agree with me that
```

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                          K. Lamm

2    you've described this incident in the

3    Complaint as the Halloween incident?

4              A.    Yes, sir.

5              Q.    Okay.  And we'll get into the

6    details of that after lunch, but would you

7    agree with me it involved allegations of a

8    fight involving a police officer and three

9    civilians?

10             A.    Yes.  Uncertified police officer.

11             Q.    Well,  thank you for adding that,

12   but police officers?

13             A.    Just want to make it correct.

14             Q.    Sure.

15             A.    Welcome.

16             Q.    Do you have any knowledge as to

17   whether or not any of these three civilians

18   who were involved in this alleged attack,

19   ever pled guilty to any crimes relating to

20   this incident?

21             A.    If they ever pled guilty?

22             Q.    Yeah.

23             A.    To that crime?

24             Q.    To any crimes involving the

25   events taken place on October 30, 2004 and

Page 159

1              K. Lamm

2    to October 31, 2004?

3         A.    I don't know.  I'm unaware.

4         Q.    You don't know if -- if

5    Mr. Vankoot ever allocuted to a charge as it

6    pertains to the events concerning the

7    Halloween incident?

8         A.    My personal knowledge of whatever

9    he said of it, no.  From --

10         Q.    My question to you is, are you

11    aware of whether you were in a courtroom on

12    a particular date, whether you read it in

13    the newspaper, whether someone told you or

14    whether a rock was thrown through your

15    window, are you aware as to whether

16    Mr. Vankoot ever allocuted to a charge?

17         A.    Yes.  Yes.

18         Q.    Okay.  Are you aware as to

19    whether or not any of the other two

20    civilians ever allocuted to a charge

21    concerning any of the events that took place

22    in what is referred to as the Halloween

23    incident?

24              MR. GOODSTADT:    Objection.

25         A.    Yes.

Page 160

K. Lamm

1    Q.    Okay.  What other civilian --

2    what other of the two civilians pled or

3    allocuted to a charge?

4    A.    Chris Shalick.  And I believe --

5    I believe it was John Tesoro, if that's

6    correct with the name.

7    Q.    So if I understand correctly, all

8    three of the civilians that were involved in

9    the Halloween incident, allocuted to certain

10   criminal charges concerning the events of

11   that evening?

12       MR. GOODSTADT:    Objection.

13       Just so we're clear, which three

14       civilians are you talking about,

15       because I think Gary Bosetti was a

16       civilian also that night and so was

17       Richie Bosetti?

18   Q.    We're talking about -- okay.  The

19   three you just mentioned, Tesoro, Shalick

20   and -- and Vankoot, those three civilians.

21   A.    I'm not accurate about Tesoro

22   about a charge or not, but Christopher

23   Shalick, yes.

24   Q.    Okay.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 161

K. Lamm

1

2     A.     And --

3     Q.     Vankoot?

4     A.     Vankoot, yes.

5     Q.     What charge are you aware of that

6  Vankoot allocuted to?

7     A.     I'm not specific if it was a

8  disorderly conduct or not, but I know that

9  there was something.

10     Q.     What charge did Shalick allocute

11  to, to your knowledge?

12     A.     Could have been a disorderly

13  conduct as well.

14     Q.     How long after the Halloween

15  incident, to your knowledge, did these two

16  individuals allocute to these charges?

17     A.     Several months after the incident

18  I believe.

19     Q.     So we're still in the 2004 time

20  period?

21     A.     No.  I believe it was after that.

22     Q.     You believe it was -- when you

23  say several months, if the incident was

24  October 30, 2004, what do you mean by

25  "several months"?  Where does -- where does

1                    K. Lamm

2    that take us in the calendar?

3         A.    Probably sometime around the

4    month of June.

5         Q.    June of 2005?

6         A.    Um-hum.

7         Q.    So you believe several months

8    is -- is eight months?

9         A.    From by the  -- I believe that's

10   when -- I didn't know anything about --

11   about this until June of 2005 as -- as to

12   know what exactly happened over it because

13   we were kept out of the loop of any type of

14   investigation.  So I can only tell you from

15   that time span as to what I have heard.

16   MO         MR. NOVIKOFF:   Motion to strike

17        as nonresponsive.

18        Q.    Is your definition of "several

19   months," eight months, sir?

20             MR. GOODSTADT:   Objection.

21        A.    Approximately seven months.

22        Q.    And is it your testimony, sir,

23   that after the incident, the Halloween

24   incident, you were unaware of what

25   transpired regarding any of the alleged

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 163

1            K. Lamm

2    victims until June of 2005?

3        A.    We were kept out of --

4        Q.    Is that your testimony, yes or

5    no, that between the October 30 incident and

6    June of 2005, you were unaware of what

7    transpired with regard to these victims?

8            MR. GOODSTADT:    Answer the

9        question the way you want to answer it.

10        Q.    Can you answer that yes or no?

11        A.    I don't know what fully happened.

12    How the termination was made.

13        Q.    Can you answer the question yes

14    or no?  If you can't, then you can't and

15    you'll tell me that.  So I'm going to ask

16    you the question again.  Is it your

17    testimony that after your involvement in

18    investigating the incident on the evening of

19    Halloween until June of 2005, you were

20    unaware of what transpired with regard to

21    the alleged victims?

22            MR. GOODSTADT:    Objection.

23        Q.    And if I'll ask --

24            MR. GOODSTADT:    The testimony

25        is his testimony.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 164

K. Lamm

1    Q.    I'm asking for a yes or no, sir,
2    and if you can't answer yes or no, then
3    please tell me and I'll choose whether or
4    not to ask you a follow-up question.
5              MR. GOODSTADT:    Objection.
6    A.    No.  I only know of what happened
7    after the time frame had passed.
8              MR. NOVIKOFF:    Got it.  Okay.
9    Let's take a lunch break.  It's now
10   12:51.
11             THE VIDEOGRAPHER:    The time is
12   12:51 p.m.  Going off the record.
13             (A break was taken.)
14             THE VIDEOGRAPHER:    The time is
15   1:38 p.m.  Back on the record.
16   Q.    Sir, do you recall in this
17   Complaint, asserting a cause of action
18   entitled "termination in violation of public
19   policy under state law"?
20   A.    I don't recall right -- right
21   now.
22   Q.    Well, I would ask you, since you
23   have the Complaint in front of you, to look
24   at page 40, and specifically, just the bold

1              K. Lamm

2    language in parentheticals under the "as and

3    for an 11th cause of action," and then once

4    you just look at that one sentence, tell me

5    if that refreshes your recollection.

6         A.    (Reviewing).

7         Q.    Sir, does reading that one

8    sentence refresh your recollection?

9         A.    No.

10        Q.    Okay.  Well, what public policy

11   of New York State do you claim in this

12   lawsuit that my clients have violated?

13             MR. GOODSTADT:    Objection.

14        Q.    Okay.  Now the answer won't be

15   there.  That's why I'm asking the question.

16   What public policy of New York State are you

17   claiming in this lawsuit that my clients

18   have violated?

19             MR. GOODSTADT:    Objection.

20        You can read the section if you want.

21        A.    I can?

22             MR. GOODSTADT:    Unless he

23        instructs you not to.

24        Q.    Yeah.  I don't think I need you

25   to read that to answer the question.  If you

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                    K. Lamm
1

2   don't know, you don't know.

3         A.     I don't know at this time.

4         Q.     Do you think reading the five

5   allegations set forth under the 11th cause

6   of action would help you answer that

7   question?

8                 MR. GOODSTADT:     Objection.

9         A.     It may.

10         Q.     Then why don't you go read

11   paragraphs 170 to 174, and tell me, after

12   you read that, if you can -- as to what

13   public policy of New York State you claim my

14   clients have violated?

15                 MR. GOODSTADT:     Objection.

16         A.     (Reviewing).  The exact public

17   policy I just -- I don't know.

18         Q.     And if I asked you the same

19   question with regard to any of the

20   Defendants, would your answer be the same?

21                 MR. GOODSTADT:     Objection.

22         A.     I can't speak for any of the

23   other Defendants.

24         Q.     Oh no.  My question is, what

25   public policy do you claim in this lawsuit

1              K. Lamm

2     that any of the Defendants violated as

3     alleged in your 11th cause of action?

4              MR. GOODSTADT:    Objection.

5         A.    At this time, I don't recall.

6         Q.    Is there anything in your

7     possession, custody or control that would

8     refresh your recollection?

9              MR. GOODSTADT:    Objection.

10        Q.    Do you understand my question,

11    sir?

12        A.    Why don't you try to rephrase it

13    a little better for me.

14        Q.    Oh no.  I think I phrased it

15    particularly well, so I'll ask the court

16    reporter to read the question back.

17             (The requested portion was read.)

18             MR. GOODSTADT:    Note my

19    objection again.

20        A.    I don't know.

21        Q.    Let's go to paragraph 171, sir.

22    You allege the following, in part, "as set

23    forth above, Defendants terminated

24    Plaintiffs' employment because Plaintiffs

25    complied with and/or refused to violate laws

1               K. Lamm

2    and regulations governing law enforcement

3    personnel in Ocean Beach, Suffolk County and

4    the State of New York," do you see that?

5         A.    Yes.

6         Q.    What law and regulations

7    governing law enforcement personnel in Ocean

8    Beach, Suffolk County and the State of New

9    York did you comply with as you refer to it

10   in this allegation?

11              MR. GOODSTADT:    Objection.

12        A.    I complied with being an ethical

13   police officer.

14        Q.    What law can you point to that

15   refers to being an ethical police officer?

16              MR. GOODSTADT:    Objection.

17        A.    I don't know.

18        Q.    What regulation that's referenced

19   in paragraph 71 can you identify that refers

20   to being an ethical police officer?

21              MR. GOODSTADT:    Objection.

22        A.    Code of conduct in Ocean Beach.

23        Q.    Okay.  Any -- anything else?

24              MR. GOODSTADT:    Objection.

25        A.    Nothing at this time.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2         Q.    Okay.  So you've testified that

3    you were terminated because you complied

4    with being an ethical police officer.  What

5    other law or regulation, other than being an

6    ethical police officer, did you comply with

7    as you refer to it in this paragraph of the

8    Complaint?

9              MR. GOODSTADT:    Objection.

10        A.    I'm not for sure.

11        Q.    Okay.  Take the flip of it now.

12   What law or regulation governing law

13   enforcement personnel in Ocean Beach,

14   Suffolk County and the State of New York did

15   you refuse to violate?

16             MR. GOODSTADT:    Objection.

17        Q.    As you refer to it in paragraph

18   171 of the Complaint?

19             MR. GOODSTADT:    Objection.

20        A.    Repeat that, please.

21             MR. NOVIKOFF:   Court reporter.

22             (The requested portion was read.)

23        A.    I don't know.

24        Q.    Did you know it when you read the

25   Complaint for truthfulness and accuracy?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                 K. Lamm

2           MR. GOODSTADT:     Objection.

3      A.     I may have.

4      Q.     But you don't know it now?

5           MR. GOODSTADT:     Objection.

6      Q.     Is that your testimony?

7      A.     My answer was my answer.

8      Q.     Okay.  Do you recall if you've

9  alleged as against Defendant Hesse and the

10  Ocean Beach Police Department, defamation

11  per se under state law in this Complaint?

12      A.     Do I  -- I don't think I

13  understand what you said there.

14      Q.     Do you recall if you've alleged

15  against Hesse and the Defendant Ocean Beach

16  Police Department, that they have engaged in

17  what you identify as defamation per se under

18  state law in this Complaint?

19           MR. GOODSTADT:     Objection.  You

20       just said he identified it in the

21       Complaint.

22      Q.     Do you recall doing that?

23      A.     Yes.

24      Q.     Did Mr. Loeffler defame you in

25  any manner?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2        A.    Not that I'm aware of.

3        Q.    Did Mayor Rogers defame you in

4    any manner?

5        A.    Not that I'm aware of.

6             MR. GOODSTADT:    Objection.

7        Over objection.

8        Q.    I'm sorry, as your counsel was

9    objecting, you were answering, so.

10       A.    Not that I'm aware of.

11            MR. GOODSTADT:    Just note my

12       objection to the question before it as

13       well.

14            MR. NOVIKOFF:    It's noted.

15       Q.    Let's look at 164A.  You allege

16   "Defendants Hesse and OBPD published

17   defamatory statements about Plaintiffs,

18   including without limitation assertions

19   that:  A. (Plaintiffs were dishonest men,

20   "rats" and rogue law enforcement officers)

21   April 2, 2006)."  What did you mean when you

22   referred to April 2, 2006?

23       A.    That was the day we were fired.

24       Q.    Does that day have anything to do

25   with subparagraph A?

1                    K. Lamm

2         A.    Because I was accused of being a

3    Civil Service rat.

4         Q.    Okay.  Who accused you of being a

5    Civil Service rat?

6         A.    George Hesse, Rich Bosetti and

7    Gary Bosetti.

8         Q.    Okay.  Well, did they do it

9    altogether?  Yes or no.  Were they together

10   at the same time when they accused you of

11   being a Civil Service rat?

12        A.    No.

13        Q.    Okay.  When on April 2, 2006 did

14   George Hesse call you a Civil Service rat?

15        A.    He didn't on April 2.

16        Q.    When did George Hesse at any time

17   call you a Civil Service rat?

18        A.    Approximately towards the summer

19   season of 2004.

20        Q.    Did Mr. Hesse call you a Civil

21   Service rat in your presence, yes or no?

22        A.    Not in my direct presence, but

23   within proximity.

24        Q.    Did you hear Mr. Hesse call you a

25   Civil Service rat when you were in close

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2    proximity of him in the summer season of

3    2004?

4            A.    Yes.

5            Q.    Who else, if anybody, was

6    present, to your recollection, when

7    Mr. Hesse called you a Civil Service rat in

8    2000  -- in the summer season of 2004?

9            A.    I don't recall.

10           Q.    Okay.  What specifically do you

11   recall hearing Mr. Hesse say with regard to

12   you being a Civil Service rat in the summer

13   season of 2004?

14           A.    He stated that he's one of the

15   Civil Service rats.

16           Q.    And did he use your name

17   specifically in this communication?

18           A.    Yes.

19           Q.    So what specifically did he say?

20           MR. GOODSTADT:    Objection.

21   Asked and answered.

22           Q.    In regard to him using your name?

23   You just testified that he said "he is one

24   of the Civil Service rats."  Did he mention

25   your name specifically in this defamatory

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    statement?

3         A.    The name came out of Richard

4    Bosetti.  My name.

5         Q.    I'm only talking about George

6    Hesse now, sir.  Did George Hesse

7    specifically refer to you, Kevin Lamm, by

8    name when he said the term "a Civil Service

9    rat"?

10        A.    No.  I don't believe so.

11        Q.    Did he point at you when he said

12   this?

13        A.    No.

14        Q.    Where did this communication take

15   place?

16        A.    That was inside the police

17   station.

18        Q.    Now did he call you a Civil

19   Service rat, using those exact words, at any

20   point in time after the summer season of

21   2004?

22        A.    That I don't recall.

23        Q.    Did Mr. Hesse refer to you

24   specifically as a dishonest man at any point

25   in time?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2      A.    No.

3      Q.    Did Mr. Hesse say anything in

4  your  -- well, withdrawn.  What, if

5  anything, did Mr. Hesse say that led you to

6  allege that he defamed you by asserting that

7  you were a dishonest man as you say in 164A?

8           MR. GOODSTADT:    Objection.

9      A.    Say the question again, please.

10          MR. NOVIKOFF:    The court

11     reporter can read it back.

12          (The requested portion was read.)

13     A.    I don't recall.

14     Q.    Is there anything in your

15  possession, custody or control that would

16  refresh your recollection?

17     A.    I don't think so.

18     Q.    Did Mr. Hesse, in your  -- well,

19  did Mr. Hesse ever call you "a rogue law

20  enforcement officer"?

21     A.    I don't believe so.

22     Q.    What, if anything, did George

23  Hesse say, that you are aware of, that led

24  you to allege in this Complaint that

25  Mr. Hesse asserted that you were a "rogue

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    law enforcement officer"?

3         A.    That one direct line may not

4    pertain to me.

5         Q.    Did Mr. Hesse ever call you a

6    rat, separate and apart from calling you a

7    Civil Service rat in the summer season of

8    2004?

9              MR. GOODSTADT:    Objection.

10        A.    Just so that I clarify this, are

11   you saying the word "rat" separate from

12   "Civil Service rat"?

13        Q.    Yeah.  You've -- you've testified

14   I believe that in the summer season of 2004,

15   Mr. Hesse referred to you as a Civil Service

16   rat; am I correct?

17        A.    Correct.

18        Q.    Putting aside that specific

19   communication, did Mr. Hesse ever call you a

20   rat, to your knowledge?

21        A.    Not to my knowledge.

22        Q.    Let's look at 164B.  Well,

23   actually, let's go back to Civil Service rat

24   in the summer season.  When -- when did

25   Mr. Richard Bosetti call you a Civil Service

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    rat?

3          A.    Around the same time frame.

4          Q.    Was it at the same time that

5    Mr. Hesse called you that?

6          A.    Around the same time frame.

7          Q.    Okay.  How about Mr. Gary

8    Bosetti?

9          A.    Around the same time frame as

10   well.

11         Q.    Was anyone present when Richard

12   Bosetti called you a Civil Service rat?

13         A.    Yes.

14         Q.    Were you present?

15         A.    Yes.

16         Q.    Who else was present?

17         A.    Outside the police station, Tom

18   Snyder.

19         Q.    Anybody else?

20         A.    There may have been others there,

21   but I don't recall.

22         Q.    Who else -- who was present when

23   Gary Bosetti called you a Civil Service rat?

24         A.    I don't recall.

25         Q.    Were you present?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2     A.     I'm not sure.

3     Q.     Did you respond to Richard

4  Bosetti when he called you a Civil Service

5  rat?

6     A.     Yes.  We spoke.

7     Q.     What did you say to him?

8     A.     He asked me a question if I did

9  go to Civil Service, and my answer was no.

10    Q.     Was Tom Snyder present when

11 Mr. Bosetti asked you this question?

12    A.     Tom Snyder was outside the police

13 station.  The conversation took place

14 inside.

15    Q.     Now did Mr. Bosetti's

16 communication regarding you being a Civil

17 Service rat take place inside or outside the

18 police station?

19    A.     When I walked into the police

20 station, it was out -- it was outside.

21    Q.     Now was that the extent of your

22 conversation with Mr. Bosetti, Richard

23 Bosetti, you asked him  -- he asked you if

24 spoke to the Civil Service Department and

25 you said no, is that the extent of it?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2        A.    No.  There was a little more to

3    it.

4        Q.    Tell us.

5        A.    Okay.  He wanted to know if I

6    went to Civil Service and said anything

7    about him not being certified to try to make

8    him go through the testing procedure, and I

9    said, "No, I did not do that."  He said,

10   "Then who did it?"  I said, "I don't know

11   anything about this."

12       Q.    Gary Bosetti, did you ever talk

13   to Gary Bosetti about him calling you a

14   Civil Service rat?

15       A.    No.

16       Q.    Ever talk to George Hesse about

17   him calling you a Civil Service rat?

18       A.    My only response was that I did

19   not go to Civil Service.

20       Q.    Okay.  So when Mr. Hesse called

21   you a Civil Service rat, what, if anything,

22   did you say at that point in time to

23   Mr. Hesse?

24       A.    Not at that time.  After I spoke

25   to Richard Bosetti and later on sometime

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2   that night I said to George Hesse that I'm

3   not the one that went to Civil Service.  I

4   don't know anything about it.  I spoke to

5   Richie.

6        Q.    Are you aware of anyone who went

7   to Civil Service on this issue?

8             MR. GOODSTADT:    Objection.

9        A.    I'm not aware of anyone that did.

10  But the only thing that led to the

11  understanding of it was that there were

12  officers from another department that were

13  seeking employment with other town, village

14  police departments, and when they found out

15  they had to go through requirements for

16  Civil Service, that's when it came about

17  that they stated that you don't need these

18  requirements to work in Ocean Beach.

19  MO        MR. NOVIKOFF:    Motion to strike

20       as nonresponsive.

21       Q.    Let's go to 164B.  You allege

22  that "Plaintiffs had conspired to inculpate

23  innocent police officers for acts of

24  brutality against innocent citizens (April

25  2, 2006)."  What did you mean when you used

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2    the word "inculpate" --

3                MR. GOODSTADT:    Objection.

4        Q.    -- in this allegation?

5                MR. GOODSTADT:    Objection.

6        A.    That may not specifically pertain

7    to me.

8        Q.    Okay.  So you don't think B

9    pertains to you?

10       A.    It may not.  There's five  --

11   there's five of us on this lawsuit.

12       Q.    Sir, I'm asking you.  This is

13   your deposition.  Does subparagraph B apply

14   to you, because if it doesn't, then I can

15   move on to C.

16               MR. GOODSTADT:    Objection.

17       A.    No.  Not me.

18       Q.    Okay.  Let's go to C, then.  You

19   allege that Hesse and the OBPD asserted that

20   "Plaintiffs had conspired to disqualify

21   fellow officers from continued employment

22   with the OBPD without cause (April 2,

23   2006)."  Does C apply to you?

24               MR. GOODSTADT:    Objection.

25       A.    Yes.

1          K. Lamm

2     Q.    Okay.  Then let me ask you a

3  question.  What did Mr. Hesse say that forms

4  the basis for your allegation that he

5  asserted that "Plaintiffs had conspired to

6  disqualify fellow officers from continued

7  employment with the OBPD without cause"?

8     A.    Because I couldn't continue my

9  employment there.  I -- I was seeking out a

10  full-time job there off that  -- off a list,

11  and I couldn't continue employment because I

12  was fired.

13  MO          MR. NOVIKOFF:    Well, motion to

14     strike.

15     Q.    I'm asking you, sir,

16  specifically, what did Mr. Hesse say which

17  you allege was published, that leads you to

18  form the allegation in C that "Plaintiffs

19  had conspired to disqualify fellow officers

20  from continuing employment with the OBPD

21  without cause"?

22     A.    I don't recall.

23     Q.    And is there anything in your

24  possession, custody or control that would

25  refresh your recollection?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 183

K. Lamm

1

2      A.     I don't believe so.

3      Q.     Okay.  Let's look at D.  When did

4 Mr. Hesse assert "Officer Lamm is a loser

5 and no one likes him"?

6      A.     He said that when he gave a case

7 of beer back to an underage minor, Paul

8 Conway, and to the friends of his outside

9 the police station.  I heard Hesse say it

10 when I was standing behind his back.

11 MO       MR. NOVIKOFF:   I'm going to

12      move to strike.

13      Q.     When, sir?  What -- what time

14 period?

15      A.     It was the springtime.  I believe

16 it was approximately 2004.

17      Q.     Okay.  When did Mr. Hesse assert,

18 as you allege, that your, Officer Lamm's

19 "lawful directives should be freely

20 ignored"?

21      A.     At that same time when he gave a

22 case of beer back to the individuals on the

23 date I just stated.

24      Q.     Okay.  Let's look at E.  What

25 specific employer did Mr. Hesse advise, with

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                 K. Lamm

2    regard to you, that you were terminated for

3    cause and that you, Mr. Lamm, was litigious?

4         A.    Did you say E?  We're looking at

5    E?

6         Q.    E, yeah.  164E.

7         A.    Okay.  Can we go over that again,

8    please?

9              MR. NOVIKOFF:    You know what,

10        we got about a half minute left of the

11        tape.  Why don't we change the tape,

12        stay here, and we'll get right back on

13        the record.

14             THE VIDEOGRAPHER:    This ends

15        tape number three.  The time is 2:05

16        p.m.  We're going off the record.

17             (A break was taken.)

18             THE VIDEOGRAPHER:    This begins

19        tape number four.  The time is 2:11

20        p.m.  Back on the record.

21        Q.    Sir, what -- let's go back to

22    164E.  You allege that "Defendant Hesse and

23    OBPD published defamatory statements about

24    Plaintiffs including without limitation

25    assertions that," now let's go to E.  "By

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2    repeatedly advising prospective employers

3    that he had terminated Plaintiffs for

4    cause," do you see that?

5        A.    Yes.

6        Q.    What employer did Mr. Hesse

7    advise -- withdrawn.  What prospective

8    employer did Mr. Hesse advise that you,

9    Mr. Lamm, was terminated for cause?

10        A.    That would be the unfavorable

11    recommendation that he wrote about on me

12    that I found out through Chris Moran to

13    Suffolk County application section.

14        Q.    What you testified to this

15    morning?

16        A.    Yes.

17        Q.    Okay.  What prospective employer

18    did Mr. Hesse advise that you, Mr. Lamm,

19    were "litigious"?

20        A.    I don't recall at this time.

21        Q.    Did Mr. Moran ever tell you that

22    Mr. Hesse told him that he had told the

23    Suffolk County Police Department that you

24    were "litigious"?

25        A.    I don't recall.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    What prospective employer did

3   Mr. Hesse advise that with regard to you,

4   Mr. Lamm, that he could not comment

5   favorably on your performance as a police

6   officer?

7        A.    That -- that one thing may not

8   pertain to me.

9        Q.    Okay.  Let's go to paragraph 168.

10  Without going through, again, what the

11  alleged defamatory comments were that you've

12  testified to, how have they caused you

13  "severe mental anguish and pain" as you

14  allege in 168?

15            MR. GOODSTADT:    Objection.

16       A.    The fact -- the fact that I'll

17  never be a police officer again.

18       Q.    No.  I understand that.  But my

19  question is -- well, okay.  I'll ask you

20  this question then.  Describe the severe

21  mental anguish and pain that you have

22  suffered as a result of the defamatory

23  communications that you've testified to

24  today.

25       A.    I'm sorry, can you repeat that?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2     I was focusing on the --

3                  (The requested portion was read.)

4          A.     It's just very disheartening that

5     I will never be a police officer again or

6     further myself in any type of law

7     enforcement capacity like that.  That's it.

8          Q.     Have you seen a mental health

9     professional concerning what you claim to be

10    the suffering of severe mental pain and

11    anguish?

12         A.     No, I haven't.

13         Q.     Have you seen any medical

14    professional concerning what you claim to be

15    the suffering of severe mental anguish and

16    pain?

17         A.     No, I haven't.

18         Q.     What financial obligations have

19    you been unable to meet as a result of the

20    defamatory conduct -- communications that

21    you allege to have taken place as you

22    testified to?

23                MR. GOODSTADT:    Objection.

24         A.     That one statement may not

25    pertain to me directly.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2      Q.    Well, may not or does not?

3      A.    Does not.

4      Q.    Okay.  Is it your claim in this

5  case that because of the alleged defamatory

6  communications testified to today, that you

7  have been prevented from enjoying life?

8      A.    Yes.  I enjoyed my life as a

9  police officer and I am no longer a police

10  officer.

11      Q.    So is it your claim in this case

12  that as of the date of the alleged

13  defamatory statements that you claim to have

14  been made, you stopped enjoying all aspects

15  of life?

16            MR. GOODSTADT:    Objection.

17      A.    I enjoyed my life as a police

18  officer.

19      Q.    My question to you, sir, is, have

20  you stopped enjoying all aspects of life as

21  a result of the alleged defamatory

22  statements you claim to be made by

23  Mr. Hesse?

24            MR. GOODSTADT:    Objection.

25      A.    I was forced to stop enjoying

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 189

1              K. Lamm

2    life as a police officer.

3         Q.    Okay.  So other than enjoying

4    life as a police officer, you continue to

5    enjoy life?

6              MR. GOODSTADT:    Objection.

7         A.    As -- as best as I can.

8         Q.    Okay.  What emotional injury have

9    you suffered as you allege it to have taken

10   place in 168?

11              MR. GOODSTADT:    Objection.

12         A.    The injury knowing that I will

13   never be a police officer or work in a law

14   enforcement capacity again.

15         Q.    Other than that, any other

16   emotional injury that you claim to have

17   been -- have suffered in this case as a

18   result of the defamatory statements by

19   Mr. Hesse?

20              MR. GOODSTADT:    Same objection.

21         A.    That is all.

22         Q.    Okay.  Let's look at  -- well, do

23   you recall alleging a claim for relief in

24   this Complaint, asserting a violation by the

25   Ocean Beach Police Department and the -- and

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2    the village of Ocean Beach under the New

3    York Labor Law, Section 740?

4         A.    I don't recall.

5         Q.    Turn to page 38.  Read the bolded

6    language in the parentheticals under "Ninth

7    Cause of Action" and tell me if that

8    refreshes your recollection?

9         A.    (Reviewing).  Which number was

10   that?

11        Q.    Page 38 of your Complaint.

12        MR. GOODSTADT:    He's talking

13   about these two bolded lines

14   (indicating).

15        A.    What about it?

16        Q.    Does reading that one line that

17   your counsel pointed to refresh your

18   recollection as to whether you have claimed

19   in this case that Defendants have violated

20   New York State Labor Law, Section 40?

21        A.    I don't recall.

22        Q.    Okay.  Let's look at 158, and

23   I'll read what you've alleged.  "While

24   employed by the OBPD and Ocean Beach,

25   Plaintiffs had repeated exposure to

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 191

K. Lamm

1   activities, policies and practices of OBPD,

2   Ocean Beach and Defendant Hesse, which

3   create a substantial and specific danger to

4   the public health and safety and which

5   violate applicable laws, rules and

6   regulations including," do you see that?

7   A.    Yes, I do.

8   Q.    Let's look at number one.

9   "Police officers drinking while on duty (in

10  the police station, in local bars and while

11  driving OBPD vehicles both inside and out of

12  Ocean Beach)."  How many times did you,

13  Mr. Lamm, personally witness police officers

14  drinking while on duty in the police

15  station?  I'm just looking for a number now.

16  A.    You're gonna get it.

17  Q.    Okay.

18  A.    Approximately seven times.

19  Q.    How many times in 2000?

20  A.    In 2000.  I don't recall in 2000.

21  Q.    How many times in 2001, if any?

22  A.    I don't recall in 2001.

23  Q.    How many times in 2001?

24  MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2         Asked and answered.

3         Q.    Did I ask you 2000 -- oh, yeah.

4    I'm sorry.  How many times in 2002?

5         A.    I believe twice.

6         Q.    How many times in 2003?

7         A.    I think twice.

8         Q.    How many times in 2004?

9         A.    Three times.

10        Q.    How many times in 2005?

11        A.    I don't recall 2005.

12        Q.    How many times in 2006?

13        A.    Didn't work there 2006.

14        Q.    How many times did you see police

15   officers drinking in local bars while you

16   were employed by Ocean Beach?

17        A.    For what year?

18        Q.    All years, and then we'll break

19   it down.  While on duty now.  This is all

20   I'm interested in.

21        A.    Approximately in the area of 10.

22        Q.    How many times in 2000 zero?  How

23   many times in 2000?

24        A.    I don't recall.

25        Q.    How many times in 2001?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2      A.    I don't recall.

3      Q.    How many times in 2002?

4      A.    Two or three times.

5      Q.    How many times in '03?

6      A.    Approximately four times.

7      Q.    How many times in '04?

8      A.    Approximately four.

9      Q.    How many times in '05?

10     A.    Don't recall 2005.

11     Q.    Now let's look at 159.  You
allege that "Plaintiffs repeatedly notified
Hesse, their superior and direct superior,
of these violations of laws, rules and
regulations," do you see that?

16           MR. GOODSTADT:   Objection.

17     A.    Yes.

18     Q.    That's a truthful and accurate
statement, sir?

20     A.    On behalf of myself, yes.

21     Q.    Yeah.  Again, all I'm asking you
is about you now.  Is that a truthful and
accurate statement?

24     A.    Yes.

25     Q.    And when you say -- you use the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    phrase "their superior and direct superior,"

3    you're just referring to George Hess, right?

4          MR. GOODSTADT:    It says "direct

5       supervisor."

6       Q.    Oh, I'm sorry.  When you use the

7    phrase "their superior and direct

8    supervisor," you're referring to Mr. Hesse?

9       A.    Mr. Hesse, and also, whoever he

10   may have directed to be supervisor that

11   night if he wasn't there.

12      Q.    Okay.  Well, with regard to --

13   Mr. Lamm, to you, Mr. Lamm, did you ever

14   repeatedly complain to anyone other than

15   Mr. Hesse with regard to 158, 1?

16      A.    Another officer.

17      Q.    Yes.

18      A.    Yes.

19      Q.    Who?

20      A.    Ken Bockelman.

21      Q.    Was Ken Bockelman a supervisor of

22   that night shift at that time you complained

23   to him?

24      A.    He was put in charge of that

25   night.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    By Mr. Hesse?

3        A.    Yes.

4        Q.    So other than Mr. Bockelman on

5    that one  -- was it only one occasion that

6    you complained to Mr. Bockelman?

7        A.    I believe it was twice.

8        Q.    Twice.  When?  What year did you

9    first complain to Mr. Bockelman?

10       A.    I think it was -- I believe it

11   was 2004.

12       Q.    And the second time you

13   complained to Bockelman?

14       A.    Of the same year.

15       Q.    Okay.  So if 159 is correct, you

16   complained to only Mr. Hesse in 2002,

17   correct, about 158, 1?

18       A.    Only to Hesse and --

19       Q.    No.  In -- in 2002 I'm talking

20   about.  I'll -- I'll rephrase the question.

21   If 159 is correct, in 2002, you only

22   complained to Mr. Hesse concerning on duty

23   officers drinking in the police station and

24   in local bars, correct?

25            MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2       He's the only superior or supervisor.

3              MR. NOVIKOFF:    I don't know

4       what you mean.  You got an objection,

5       that's fine.

6       Q.    Sir, the question is -- and I'll

7   repeat it -- if 159 is correct, then the

8   only person in 2002 that you complained to

9   was Mr. Hesse concerning police officers

10  drinking while on duty in the police station

11  and in local bars?

12             MR. GOODSTADT:    Objection.

13      A.    At that time for 2002, something

14  was said to Hesse.  Yes.

15      Q.    Right.  Only -- only asking about

16  you now.  And if 159 is correct, then in

17  2003 the only person that you complained to

18  with regard to police officers drinking

19  while on duty in the police station and in

20  local bars was Mr. Hesse, correct?

21      A.    Correct.

22      Q.    In 2004, you would have

23  complained to Mr. Hesse and on two occasions

24  Mr. Bockelman?

25      A.    Correct.

1           K. Lamm

2       Q.    Okay.  Do you have any -- well,

3   were you present in an OBPD vehicle while it

4   was in motion that a police officer, while

5   on duty, was drinking?

6       A.    Yes, I was.

7       Q.    Okay.  On how many occasions were

8   you present in a moving Ocean Beach Police

9   Department vehicle when a police officer who

10  was on duty was drinking?

11      A.    Twice.

12      Q.    What  -- when was the first time

13  that you were present?

14      A.    2003.

15      Q.    When was the second time?

16      A.    Later of that same year.

17      Q.    Okay.  When you say "later of

18  that same year," are you referring to --

19      A.    Later in the season.

20      Q.    Okay.  The first time in 2003,

21  when in the season did you -- were you

22  present?

23      A.    Towards the beginning of the

24  season.

25      Q.    Okay.  That would have been when?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2    When's -- when do you view the beginning of

3    the season to be?

4         A.    I'm going to go with the

5    beginning of the season somewhere around the

6    month of May, June.

7         Q.    Okay.  And who was driving the

8    vehicle?

9         A.    Rich Bosetti.

10        Q.    Was he driving the vehicle on

11   both occasions in 2003?

12        A.    Yes.

13        Q.    Was he drinking while he was

14   driving?

15        A.    Yes.

16        Q.    Okay.  Did he physically have a

17   container of alcohol in his hand while he

18   was driving?

19        A.    Yes.  Labeled "Budweiser."

20        Q.    Okay.  So he had a Budweiser.

21   Was he, in your opinion, inebriated while he

22   was driving on either of these two

23   occasions?

24        A.    Depending on how much he had, you

25   know.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    Sir, you're the police officer.

3  In your opinion, was Mr. Bosetti, on either

4  of these two occasions, inebriated while

5  driving the OBPD vehicle in which you were

6  present?

7     A.    Depending on what he had

8  beforehand, you know, I don't know how much

9  he drank beforehand, but --

10    Q.    Given your observation of him,

11 did you have an opinion as to whether or not

12 he was inebriated?

13    A.    The first time I would say no.

14    Q.    The second time?

15    A.    The second time I would have to

16 say yes.

17    Q.    Okay.  And this was in 2003,

18 correct?

19    A.    That's correct.

20    Q.    And who else, if anybody, was

21 present in the vehicle the first time?

22    A.    I don't recall.

23    Q.    Who else, if anybody, was present

24 in the vehicle the second time?

25    A.    I don't recall at this time.

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2         Q.      Where were you sitting?

3         A.      Back seat.

4         Q.      Both times?

5         A.      Yes.

6         Q.      Do you know if anyone was present

7    in the front seat?

8         A.      There was, but I don't recall who

9    it was.

10        Q.      Okay.  So now you know that

11   someone was present, but you don't know who

12   it was?

13        A.      Yes.

14        Q.      Okay.  With regard to the second

15   occasion -- well, would it -- would it be

16   fair, sir, that if 159 of your Complaint is

17   accurate, you complained only to George

18   Hesse on each of these occasions that

19   Mr. Bosetti was driving with a Budweiser can

20   in his hand?

21        A.      Yes.

22        Q.      Okay.  Now the second time when

23   Mr. Bosetti, in your opinion, was

24   inebriated, did you advise Mr. Hesse that he

25   was inebriated?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

2  A.    Yes.

3  Q.    Did you attempt to arrest

4  Mr. Richie Bosetti for driving under the

5  influence of alcohol?

6  A.    No.

7  Q.    Is driving with an open container

8  a violation of the law?

9  A.    The open container  --

10  Q.    Is driving with an open container

11  of alcohol --

12  A.    -- occurred outside the village

13  of Ocean Beach, which is outside our

14  jurisdiction.

15  Q.    Sir, is, to your knowledge,

16  driving in New York State with an open

17  container of alcohol a violation of the law?

18  A.    Yes, it is.

19  Q.    Okay.  Would you agree with me

20  that it's a violation of New York State law

21  to drive while inebriated?

22  A.    Yes.

23  Q.    Okay.  Now the first time that

24  Mr. Bosetti was driving in your presence,

25  where was the  -- where was the vehicle in

1                    K. Lamm

2    motion when you saw that Mr. Bosetti was

3    drinking a Budweiser?

4         A.    On the beach.

5         Q.    In Ocean Beach?

6         A.    It was outside of Ocean Beach.

7         Q.    Where did the vehicle start its

8    journey from, sir?

9         A.    Ocean Beach.

10        Q.    Did Mr. Bosetti wait until he

11   went outside the jurisdiction of Ocean Beach

12   before he opened up the can of Budweiser?

13        A.    Exactly when the can was opened I

14   don't know, but when I saw him drink it, it

15   was outside of Ocean Beach.

16        Q.    What jurisdiction was Mr. Bosetti

17   in in the car when he had the open container

18   of alcohol?

19        A.    National seashore.

20        Q.    National seashore?

21        A.    Yes.

22        Q.    Is that a village?

23        A.    No.  It's federal property.

24        Q.    Oh, so Mr. Bosetti was driving

25   with an open container of alcohol on federal

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2    property, is that your testimony?

3         A.    Yes.  And it's also Suffolk

4    County as well.

5         Q.    Okay.  Second time, where  --

6    when did Mr. Bosetti begin his journey in

7    this car, in this vehicle?

8         A.    Started in Ocean Beach.

9         Q.    Was he inebriated, in your

10   opinion, when he started the vehicle up in

11   Ocean Beach?

12        A.    I don't know.  That I don't know.

13        Q.    Where did the vehicle end up?

14        A.    The Fire Island Lighthouse.

15        Q.    Okay.  The second time when you

16   complained to Mr. Hesse about Mr. Bosetti

17   specifically being inebriated, what was

18   Mr. Hesse's reaction?

19        A.    He says, "I'll take care of it."

20        Q.    And did he?

21        A.    I don't know if he ever spoke to

22   him or not.

23        Q.    Okay.  Would you agree with me

24   that someone driving in a car under the

25   state of alcohol -- withdrawn.  Would you

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    agree with me that someone driving a vehicle

3    in an inebriated state poses a severe and

4    significant risk to the public?

5         A.    Yes.

6         Q.    Okay.  Did you complain to

7    sergeant -- to Chief Paridiso about this --

8    about the fact that Mr. Bosetti was driving

9    a village vehicle while drunk?

10        A.    No.  I spoke to George Hesse, my

11   supervisor.  The chain of command.

12        Q.    Did you complain to Mr. Paridiso,

13   sir?

14        A.    No.  I spoke to George Hesse, my

15   supervisor, chain of command.

16        Q.    Did you complain to Mayor Rogers,

17   sir?  I understand.

18             MR. GOODSTADT:    You got to let

19        him finish the answer.  You can make

20        your --

21             MR. NOVIKOFF:    He says he's

22        complained to Mr. Hesse.

23             MR. GOODSTADT:    You can make

24        your motion to strike if you want, but

25        you got to let the guy finish his

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2        answer.

3        Q.    My question, sir, yes or no, for

4    the jury, if you want to look at the jury --

5        A.    I've already answered it.

6        Q.    Did you complain to Chief

7    Paridiso about the fact that you witnessed

8    Richard Bosetti driving drunk in a Ocean

9    Beach vehicle?

10       A.    No.  I responded  -- spoke to

11   George Hesse, my immediate supervisor.  Went

12   through the chain of command.

13   MO        MR. NOVIKOFF:    Motion to strike

14       as nonresponsive after the word "no."

15       Q.    Sir, did you complain to any

16   trustee concerning the fact that you

17   witnessed Richard Bosetti driving drunk in a

18   village vehicle?

19       A.    No.

20       Q.    Did you complain to Mayor Rogers

21   concerning the fact that you witnessed

22   May -- Richard Bosetti driving drunk in a

23   village vehicle?

24       A.    No.

25       Q.    Would you agree with me, sir,

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 206

1          K. Lamm

2    that  -- well, is it your opinion, sir, that

3    a -- a police officer who is drinking while

4    on duty, in any setting, poses a risk to the

5    public health and safety?

6         A.    Yes.

7         Q.    Did you ever complain to any

8    trustee concerning your witnessing, on no

9    less than 17 occasions, the fact that police

10   officers were drinking while on duty?

11        A.    No.

12        Q.    Can you tell the jury, sir, who's

13   going to see this videotape, whether or not

14   you ever complained to either Trustee

15   Loeffler or Mayor Rogers concerning the fact

16   on no less than 17 occasions, you saw on

17   duty police officers drinking alcoholic

18   beverages?

19        A.    No.  I spoke to Sergeant Hesse,

20   who was my immediate supervisor, and he

21   stated he would take care of the situation.

22   Chain of command.

23   MO          MR. NOVIKOFF:    Motion to strike

24        as nonresponsive after the word "no."

25        Q.    But you know what, sir, Mr. Hesse

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    didn't take care of the situation in 2003,

3    did he?

4         A.    I don't know what he said to

5    them.

6         Q.    Well, sir, they -- according to

7    your testimony, you witnessed in 2004

8    incidents of police officers drinking while

9    on duty, correct?

10        A.    Yes.

11        Q.    Would that lead you to conclude

12   that Mr. Hesse didn't take care of the

13   situation after you complained to him in

14   2003?

15        A.    I don't know what he had said to

16   them.

17        Q.    Would you agree with me, sir,

18   that the fact that the drinking continued in

19   2004, would mean that Mr. Hesse didn't take

20   care of the situation in 2003?

21        A.    I don't know what he could have

22   said to them.  I don't know if there was any

23   -- any type of punishment given.  I don't

24   know.

25        Q.    Okay.  Would you agree with me,

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 208

1                    K. Lamm

2    sir -- withdrawn.  Let's look at 158, 2.

3    You allege that "failure to follow

4    department policy regarding proper

5    supervision of police weapons."  What policy

6    are you referring to?

7         A.    (Reviewing).  There would be

8    loaded weapons upstairs in the police

9    barracks with the lockers open.

10        Q.    Yes.  I'm aware of what you're

11   alleging.  But my question is, what policy

12   regarding proper supervision of police

13   weapons are you referring to?  What is the

14   specific policy?

15        A.    I can't recall at this time.

16        Q.    Okay.  Now was this policy that

17   you can't recall at this  -- well,

18   withdrawn.  Is there anything in your

19   custody, possession or control that would

20   refresh your recollection as to what the

21   specific policy was?

22        A.    Not that I'm aware of.

23        Q.    Well, was this policy that you

24   don't recall at this point in time, violated

25   in 2000?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2        A.    No.

3        Q.    2001?

4        A.    No.

5        Q.    2002?

6        A.    No.

7        Q.    2003?

8        A.    No.

9        Q.    2004?

10       A.    I believe that is somewhere

11   around the time frame.

12       Q.    2005?

13       A.    I don't recall.

14       Q.    How many times in 2004 was this

15   policy violated that you are aware of?

16       A.    I'm not sure the specific number.

17       Q.    Was it at least one?

18       A.    Yes.

19       Q.    If 159 of your Complaint is

20   accurate, did you complain to George Hesse?

21   I'm sorry, was George Hesse the only person

22   you complained to?

23       A.    Yes.

24       Q.    Okay.  When in 2004 did you

25   complain to Mr. Hesse for the first time?

1              K. Lamm

2          MR. GOODSTADT:    Objection.

3      A.    Approximately in the middle of

4  the summer season.

5      Q.    Okay.  Look at number three, sir.

6  You allege "directives from Hesse insisting

7  that police officers allow drug dealers and

8  other criminals to violate the law with

9  impunity in Ocean Beach," do you see that?

10     A.    Yes, I do.

11     Q.    When you use the word

12 "directive," is it a written directive or a

13 verbal directive?

14     A.    Verbal.

15     Q.    Okay.  Did Mr. Hesse give you

16 a -- well, withdrawn.  What drug dealer, if

17 any, are you referring to when you make this

18 allegation?

19     A.    Mitch Burns.

20     Q.    And Mitch Burns, is he -- has he

21 been convicted of anything, to your

22 knowledge?

23     A.    I don't recall.

24     Q.    So if you don't recall if he's

25 been convicted of anything, how do you claim

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2   that he was a known drug dealer?

3          A.    From Hesse.

4          Q.    What did he -- okay.  Go ahead.

5   I don't mean to interrupt.  From Hesse.

6   Continue.

7          A.    From Hesse, he said that he gets

8   his information from Mitch Burns because he

9   had these Fentanyl lollipops that he has

10  been handing out, and he was -- we were told

11  not to touch him.

12         Q.    Any other source, other than what

13  Mr. Hesse said, that leads you to believe

14  that Mitch Burns is a known drug dealer?

15         A.    I can't recall at this time.

16         Q.    What's a Fentanyl lollipop?

17         A.    To my understanding, it was some

18  type of relaxer that was a drug in the shape

19  of a lollipop on a stick.

20         Q.    Okay.  When you say -- when you

21  say "relaxer," what do you mean?

22         A.    That was my only understanding of

23  it.  Just made you seem relaxed.  I don't

24  know.  Don't know too much about it.

25         Q.    But if I understand your

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    testimony correctly, you are aware -- you

3    were aware in 2004 that there was someone on

4    Ocean Beach handing out lollipops that were

5    illegal narcotics; is that true?

6         A.    How many of them, I don't know.

7         Q.    I didn't ask you how many.  I

8    just said -- and I'll re-ask the question --

9    if I understand your testimony correctly,

10   you were aware, in 2004, that there was an

11   individual in Ocean Beach that was handing

12   out at least one lollipop that was really an

13   illegal narcotic; is this correct?

14        A.    I only knew that from George

15   Hesse.

16        Q.    Okay.  So you knew that from

17   George Hesse?

18        A.    Only from George Hesse.

19        Q.    You didn't think it would have

20   been appropriate to advise Chief Paridiso

21   that there was a known drug addict handing

22   out lollipops that were illegal narcotics?

23             MR. GOODSTADT:    Objection.

24        A.    I am sure George Hesse, being

25   that he's a supervisor, would take care of

Page 213

                    K. Lamm

1

2   that and make the proper memorandums.

3        Q.    Wait a minute.  Let me understand

4   your testimony.  On one hand, Mr. Hesse is

5   telling you to lay off a known drug dealer,

6   and on the other hand you're saying you were

7   sure that Mr. Hesse was going to go up the

8   chain of command with this information, is

9   that your testimony?

10       A.    My testimony was that we were

11  told to stay away from Mitch Burns, but at

12  the same fact, through George Hesse, he said

13  that he has what is called a Fentanyl

14  lollipop.

15       Q.    Okay.

16       A.    Okay?

17       Q.    I think I got your answer.  So,

18  again, is it your testimony that you knew,

19  you were aware through Mr. Hesse that there

20  was a known drug dealer handing out illegal

21  narcotics in the form of a lollipop and you

22  didn't advise Chief Paridiso?

23       A.    I don't know if he was handing

24  them out.  As I said, it was only

25  information from George Hesse.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2        Q.    Did you advise Chief Paridiso of

3   anything with regard to a known drug dealer

4   possessing an illegal narcotic in the form

5   of a lollipop?

6        A.    No.

7        Q.    And you didn't advise Mayor

8   Rogers, did you?

9        A.    No.

10        Q.    And you didn't advise any

11   internal affairs officer of the Suffolk

12   County Police Department, did you?

13        A.    No.

14        Q.    And you didn't advise anyone from

15   the Suffolk County Police Department, did

16   you?

17        A.    No.

18        Q.    In fact, other than complaining

19   to George Hesse as you allege, you did

20   nothing, correct?

21        A.    I listened to what George Hesse

22   said.

23        Q.    Other than complaining to George

24   Hesse as you claim in 159, you did nothing

25   with regard to advising any other human

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    being in a position of authority that there

3    was a drug dealer on Ocean Beach possessing

4    an illegal narcotic in the form of a

5    lollipop, true?

6         A.    No.  I did nothing.

7         Q.    And in fact, this is a lollipop,

8    sir, correct, that you were referring to,

9    right?

10        A.    Again --

11        Q.    Right?  It was a lollipop?

12        A.    Again, I don't know the specifics

13   of it.

14        Q.    Well, Mr. Hesse said he had a

15   lollipop, right?  Mr. Hesse said that

16   Mr. Burns had an illegal narcotic in the

17   shape of a lollipop, correct?

18        A.    Whether it was on him or not, I

19   don't know.

20        Q.    Lollipops, in your experience,

21   are things that children like to eat and

22   suck on, correct?

23        A.    Not all children, but maybe.

24        Q.    Not all, but some children, you'd

25   agree with me, right?  When you were a

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2  child, did you suck on a lollipop?

3               MR. GOODSTADT:   Objection.

4       A.    Maybe I have.

5       Q.    Okay.  Wasn't it a concern of

6  yours that there was a person, according to

7  Mr. Hesse, on Ocean Beach, that had an

8  illegal narcotic that looked like a

9  lollipop, that God forbid a child would have

10 found on the street and started eating,

11 wasn't that a concern of yours as a police

12 officer?

13              MR. GOODSTADT:   Objection.

14      A.    Lots of things could have --

15 could have happened I'm sure.

16      Q.    I'll take that as a yes.

17              MR. GOODSTADT:   Objection.

18      Q.    Let's look at 160.  I'm sorry,

19 162.  What promotional opportunities were

20 you denied of as a direct and proximate

21 result of what you alleged in 158, 159, 160

22 and 161?

23      A.     Promotional opportunities could

24 have been my full-time position with Ocean

25 Beach.

Page 217

1              K. Lamm

2      Q.    Were you ever offered a full-time

3  position at Ocean Beach?

4      A.    No.

5      Q.    Did a full-time position ever

6  open up at Ocean Beach while you were

7  employed by Ocean Beach?

8      A.    After I was fired.

9      Q.    Okay.  My question to you, sir,

10 is before the time that you -- that your

11 employment relationship with Ocean Beach

12 ended, did a full-time position open up at

13 Ocean Beach?

14     A.    There was a full-time position

15 open because before I was fired, George

16 Hesse made mention that the village was

17 looking to hire somebody full time.

18     Q.    And how long before the end of

19 your employment relationship did George

20 Hesse make this comment?

21     A.    Approximately four months.

22     Q.    And was that position filled

23 before the date that your employment

24 relationship ended?

25     A.    Not that I'm aware of.  I

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 218

K. Lamm

wouldn't know.

Q.    Okay.  Well, did you learn, prior
to the last day of your employment, that
that full-time position had been filled?

A.    Not that I'm aware of.

Q.    And do you really believe that
you had the requisite skill set to be given
a full-time position with the Ocean Beach
Police Department?

A.    Sure.

Q.    Okay.  You were a part-time cop,
weren't you?

A.    Yes.

Q.    Never had a full-time position as
a police officer, did you?

A.    Depends how you specify full
time.

Q.    Were you ever a consistent 40
hour per week police officer for an entire
year?

A.    No.

Q.    In fact, you were just a summer
cop, right?

MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

A.    A cop is a cop.

Q.    That's your position, a cop is a cop?

A.    That's correct.  My certificate says so, which the uncertified officers didn't have.

Q.    Suffolk County never hired you, did you -- did they?

A.    I went to their academy and was trained by them.  The ones that are working there, they don't have the certificate, I do.

Q.    Suffolk County never hired you, did you -- did they?

A.    I completed their academy after seven months.

Q.    Did they ever hire you, sir?

A.    For the academy I was.

Q.    Did they ever hire you as a police officer?

A.    No, they didn't.

Q.    Nassau County ever hire you as a police officer?

A.    Never applied there.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    New York City ever hire you as a

3  police officer?

4     A.    Never applied there.

5          MR. GOODSTADT:    Why don't we go

6     through every jurisdiction in the

7     country.

8          MR. NOVIKOFF:    I may.

9          MR. GOODSTADT:    Okay.

10    A.    Cool.

11    Q.    Westchester County ever hire you?

12    A.    Never applied there.

13    Q.    Any other police officer in the

14  entire land ever hire you as a police

15  officer before you became 35?

16    A.    No.

17    Q.    Haven't you been referred to as a

18  glorified security guard while you were

19  working for Ocean Beach?

20    A.    By who?

21    Q.    By anybody?

22    A.    I don't recall.

23    Q.    You don't recall?  You mean it's

24  a possibility?

25    A.    I don't recall.

Precise Court Reporting

(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2        Q.    In your presence, isn't it true

3   that you were referred to as a glorified

4   security guard while you were working for

5   Ocean Beach?

6        A.    I don't recall.

7        Q.    Okay.  Let's look at your eighth

8   cause of action.  Do you recall alleging a

9   violation of the New York Civil Service Law,

10  Section 75-B in this lawsuit?

11       A.    I don't recall.

12       Q.    Page 37 of your Complaint.  Just

13  read the bold language in the parentheticals

14  and tell me if you recall.

15       A.    (Reviewing).  The bold letters,

16  no, I don't recall.

17       Q.    Okay.  155, you allege the

18  following, "Defendants' termination of

19  Plaintiffs' employment was a -- was an

20  "adverse personnel action" taken in

21  violation of New York Civil Service Law 75-B

22  on the sole basis that Plaintiffs each

23  disclosed what they reasonably believed to

24  be "improper governmental action" as that

25  term is defined in New York Civil Service

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 222

1                          K. Lamm

2      Law, Section 75-B," do you see that?

3              A.     I see it.

4              Q.     Who did you, Mr. Lamm, disclose

5      the "improper governmental action" to?

6                      MR. GOODSTADT:    Objection.

7              A.     I don't recall at this time.

8              Q.     Do you recall is there anything

9      in your custody, possession or control that

10     would refresh your recollection?

11             A.     Not that I'm aware of.

12             Q.     Do you have an understanding as

13     to what the phrase "improper governmental

14     action" means as you use it in paragraph

15     155?

16             A.     Yes.

17                     MR. GOODSTADT:    Objection.

18             Q.     What is your understanding?

19             A.     Not done correctly.

20             Q.     What was not done correctly?

21             A.     What it states here.

22             Q.     It doesn't state anything in

23     paragraph 155, other than the fact that you

24     disclosed what you reasonably believed to be

25     "improper governmental action."  So I ask

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 223

1              K. Lamm

2    the question again, sir, when you use the

3    words "improper governmental action," what

4    do you mean?

5              MR. GOODSTADT:    Objection.

6         A.    Not ethical.

7         Q.    Is that it, not ethical?

8         A.    That's it.

9         Q.    Let's look at -- on page 36,

10   paragraph 148.  You allege, in part,

11   "Defendants Hesse, Loeffler, OBPD, Ocean

12   Beach, Sanchez and Suffolk County Civil

13   Service subjected Plaintiffs to arbitrary

14   and irrational discrimination by selectively

15   terminating Plaintiffs' employment with a

16   malicious or bad faith intent to injure

17   Plaintiffs," do you see that?

18        A.    Yes.

19        Q.    Simple question, sir, how did

20   Loeffler subject you, Mr. Lamm, to arbitrary

21   and irrational discrimination by selectively

22   terminating you in April of 2 -- on April 2,

23   2006 as you've alleged?

24             MR. GOODSTADT:    Objection.

25        A.    Don't know for sure.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    What evidence do you have that

3  Mr. Loeffler acted in bad faith as you sit

4  here today, other than the fact that you say

5  you were terminated on April 2 of 2006?

6     A.    I don't know.

7     Q.    Other than the fact that you were

8  terminated as you say on April 2, 2006, what

9  evidence do you have that Mr. Loeffler acted

10  maliciously with regard to anything

11  involving you?

12          MR. GOODSTADT:    Objection.

13     A.    I don't know.

14          MR. GOODSTADT:    Whenever is a

15     good time, Ken, can we just take a

16     break?

17          MR. NOVIKOFF:    One more

18     question.

19          MR. GOODSTADT:    Yup.  Yup.

20     That's why I said whenever's a good

21     time.

22          MR. NOVIKOFF:    149.  Actually,

23     you know what, I don't need to go over

24     149.  Let's take a five-minute break.

25          MR. GOODSTADT:    That's fine.

1         K. Lamm

2         MR. NOVIKOFF:    How much time is

3     left on the -- on the tape?

4         THE VIDEOGRAPHER:    16 minutes.

5         MR. NOVIKOFF:    Okay.

6         THE VIDEOGRAPHER:    The time is

7     2:56 p.m.  Going off the record.

8             (A break was taken.)

9             (Mr. Gray, general counsel for

10    Ocean Beach, entered the deposition.)

11        THE VIDEOGRAPHER:    This begins

12    tape number five.  The time is 3:16

13    p.m.  Back on the record.

14        Q.    Sir, who do you presently work

15    for?

16        A.    Town of Islip.

17        Q.    Any particular department within

18    the Town of Islip?

19        A.    Airport.

20        Q.    Are you a security guard?

21        A.    Yes.

22        Q.    When did you first start working

23    for Town of Islip?

24        A.    2005.

25        Q.    At MacArthur Airport?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        A.     Yes.

3        Q.     As a security guard?

4        A.     Yes.

5        Q.     So you've been a security guard

6    throughout your tenure at -- at the Town of

7    Islip?

8        A.     Yes.

9        Q.     Okay.  Let's go to the Complaint,

10   sir.  Actually, before we go to the

11   Complaint, have you been up for any

12   promotions at the Town of Islip?

13       A.     No.

14       Q.     Have you been denied any

15   promotional opportunities as a result of

16   anything Mr. Hesse did, to your knowledge --

17       A.     No.

18       Q.     -- at the Town of Islip?  No?

19       A.     No.

20       Q.     Let's look at the first page.

21   You write -- you allege under the

22   preliminary statement, "Plaintiffs are five

23   police officers who had the courage to

24   overcome the "blue wall of silence" and

25   fulfill their duty to protect the public by

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 227

K. Lamm

1 speaking out in opposition to the regime of
2 endemic corruption within the Police --
3 Ocean Beach Police Department ("OBPD" or the
4 "department")."  Do you see that?
5
6       A.    Yes.
7       Q.    What did you mean by "blue wall
8 of silence"?
9       A.    Because if we were to talk about
10 anything, well, this is what happened.  We
11 lost our jobs.
12       Q.    No.  I understand that.  When you
13 say "blue wall of silence," what are you
14 referring to?
15       A.    That everybody else there in the
16 department was just quiet and wouldn't, you
17 know, raise the fact of issues of what was
18 happening, so we did.
19       Q.    Well, you refer to a duty to
20 protect the public by speaking out in
21 opposition, do you see that?
22       A.    Yes.
23       Q.    Other than talking to Mr. Hesse,
24 you didn't do anything with regard to your
25 knowledge that there was a known drug dealer

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    who had lollipops that contained illegal

3    narcotics, did you?

4         A.    Well --

5         Q.    Did you?

6         A.    We have made mention to Mr. Hesse

7    that we should bring the narcotics team

8    over.

9         Q.    Well, thank you.  You spoke to

10   Mr. Hesse.  So my question to you, sir, is

11   in your duty to protect the public from this

12   known drug dealer who had lollipops in the

13   form of an illegal narcotic, you didn't do

14   anything, other than talk to Mr. Hesse, did

15   you?

16        A.    He was the chain of command.

17        Q.    I understand that.  You didn't do

18   anything, other than talk to Mr. Hesse, did

19   you?

20        A.    He was the chain of command.

21        Q.    Okay.  Tell the jury, sir, with

22   regard to seeing a police officer drive

23   intoxicated, what, other than talking to

24   Mr. Hesse, did you do to protect the public?

25        A.    It was brought to George Hesse's

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2      attention, who was the supervising officer,

3      chain of command.

4           Q.    Other than talking to Mr. Hesse,

5      what did you do?

6           A.    That's what I did.

7           Q.    Okay.  When you saw police

8      officers drinking on duty and posing a risk

9      to the health and safety of the public in

10     doing so, other than Mr. Hesse, other than

11     talking to Mr. Hesse, what did you do to

12     protect the public?

13          A.    That's what was done.  Spoke to

14     George Hesse.  Chain of command.

15          Q.    Other than -- well, other than --

16     well, withdrawn.  When you believed that

17     there was a cover up involving the Halloween

18     incident, you didn't notify Sergeant  --

19     Chief Paridiso of your belief that there was

20     a cover up, did you?

21          A.    We were kept out of the loop of

22     all the investigation for several months.

23     MO          MR. NOVIKOFF:    Motion to

24          strike, sir.

25          Q.    You formed a belief at some point

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 230

1           K. Lamm

2    in time that there was a cover up involving

3    certain police officers concerning the

4    Halloween incident, correct?  You formed a

5    belief, correct?

6         A.    We were kept out of the loop of

7    the investigation.

8    MO         MR. NOVIKOFF:    Motion to

9         strike.

10              MR. GOODSTADT:    Let -- let him

11        answer the question.  Then make your

12        motion to strike.

13        Q.    Sir, yes or no, did you form an

14   opinion at some point in time that there was

15   a cover up involving the Halloween incident?

16        A.    Yes.

17        Q.    And, sir, in your duty to protect

18   the public from this cover up, did you

19   notify Chief Paridiso of your opinion that

20   there was a cover up, yes or no?  And if you

21   can't answer yes or no, that's fine.  Just

22   tell me.

23        A.    No.  Because we were unsure as to

24   what was going on because the investigation

25   that was taking place, we were kept out of

1              K. Lamm

2     the loop.

3     MO        MR. NOVIKOFF:    Motion to strike

4          everything after "no."

5          Q.    Sir, in your duty to protect the

6     public, when you came to believe that there

7     was a cover up involving the Halloween

8     incident, you didn't notify Mayor Rogers,

9     did you, yes or no?  And if you can't answer

10    yes or no, tell me.

11         A.    No.  She wasn't part of the chain

12    of command.

13    MO        MR. NOVIKOFF:    Okay.  Motion to

14         strike everything after "no."

15         Q.    In your duty to protect the

16    public, after you formed the opinion that

17    there was a cover up involving the Halloween

18    incident, you didn't notify Trustee

19    Loeffler, did you?

20         A.    Loeffler was there during the

21    Halloween incident.

22         Q.    My question, sir, is --

23    MO        MR. NOVIKOFF:    Motion to

24         strike.

25         Q.    When you formed the opinion that

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

1                   K. Lamm
2  there was a cover up -- withdrawn.  After
3  you formed the opinion that there was a
4  cover up, in your duty to protect the
5  public, did you notify Trustee Loeffler that
6  you believed that there was a cover up, yes
7  or no, and if you can't answer yes or no,
8  then tell me?
9       A.   No.  Because I believe he became
10 part of that because it was kept away from
11 us for several months and we were not part
12 of the investigation.
13 MO          MR. NOVIKOFF:    Motion to strike
14      everything after "no."
15      Q.   Sir, in your duty to protect the
16 public and speaking out in opposition to the
17 regime of endemic corruption, after you
18 believed that there was a cover up involving
19 the Halloween incident, did you contact
20 Newsday?
21      A.   Immediately after it happened?
22      Q.   Yeah.
23      A.   Not immediately after it
24 happened, because we didn't know everything
25 that had taken place.  We were kept out of

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2    the investigation.

3    MO         MR. NOVIKOFF:    Motion to strike

4         everything after "not immediately

5         thereafter."

6         Q.    Sir, prior to your last day of

7    employment with Ocean Beach, did you ever

8    advise Newsday that you believed that there

9    was a cover up involving the Halloween

10   incident in your duty to protect the public

11   and speak out in opposition?

12        A.    No.  We were kept out of the loop

13   of the investigation.  It was kept away from

14   us.

15   MO         MR. NOVIKOFF:    Motion to strike

16        everything after "no."

17        Q.    In your duty to protect the

18   public and speak out against the regime of

19   endemic corruption, before your last day of

20   employment with Ocean Beach, did you advise

21   any media source that you believed that

22   there was a cover up involving the Halloween

23   incident?

24        A.    No, I did not, because we were

25   kept out of the investigation of all that

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1  time and everything that was going on.

2  MO      MR. NOVIKOFF:    Motion to strike

3      everything after the word "no."

4      Q.    In your duty to protect the

5  public and speak out against -- in

6  opposition to the regime of endemic

7  corruption, did you, before the last day of

8  your employment with Ocean Beach, speak with

9  the Suffolk County District Attorney's

10  office concerning the belief that you held

11  that there was a cover up involving the

12  Halloween incident?

13      A.    No.

14      Q.    Did you ever speak, before your

15  last day of employment with Ocean Beach, in

16  your duty to protect the public and speak

17  out in opposition -- withdrawn.  Did you

18  ever, before the last day of your employment

19  with Ocean Beach, notify the Suffolk County

20  District Attorney's office, in your duty to

21  protect the public and speak out, that there

22  were police officers, while on duty,

23  drinking alcoholic beverages?

24      A.    No.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    In your duty to speak out and

3  protect the public good, did you ever advise

4  the Suffolk County District Attorney's

5  office that there were police officers

6  driving while intoxicated on Ocean Beach?

7     A.    No.  It was brought to George

8  Hesse's attention.  He was the immediate

9  supervisor.  Went through the chain of

10 command.

11 MO        MR. NOVIKOFF:    Motion to strike

12    everything after the word "no."

13    Q.    Did you, in your duty to protect

14 the public and speak out in opposition, did

15 you ever advise the Suffolk County District

16 Attorney's office, before the last day of

17 your employment with Ocean Beach, that there

18 was a known drug dealer on Ocean Beach who

19 had illegal narcotics in the form of a

20 lollipop?

21    A.    No.  It was words given by George

22 Hesse who later he was told that the

23 narcotics team should be brought in to the

24 village.

25 MO        MR. NOVIKOFF:    Motion to strike

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 236

1          K. Lamm

2      everything after the word "no."

3      Q.    Let's go to paragraph 13.  You

4  allege in paragraph 13 the following,

5  "Defendant George B. Hesse was and is

6  employed by Ocean Beach and the OBPD, with

7  his principle place of business at Bay and

8  Bayberry Walks, Ocean Beach, New York.  Upon

9  information and belief, Hesse resides in

10 Suffolk County, New York.  At all times

11 hereinafter mentioned, Defendant Hesse was

12 and is the official responsible for the

13 management and supervision of the OBPD,

14 including its maintenance and operation, as

15 well as the hiring, promotion and discipline

16 of employees and all other

17 employment-related issues," do you see that?

18     A.    Okay.

19     Q.    Did -- have you done anything to

20 confirm the accuracy of what I've just read

21 prior to authorizing your attorney to file

22 this Complaint?

23     A.    No.

24     Q.    When you allege in the second

25 sentence of paragraph 13 that "at all times

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                  K. Lamm

2    herein mentioned, Defendant Hesse was and is

3    the official responsible for" -- and now I'm

4    going to go a little bit further -- "the

5    hiring, promotion and discipline of

6    employees and all other employment-related

7    issues," what did you mean by that?

8                  MR. GOODSTADT:    Objection.

9         A.    Well, which part are we talking

10   about here, again, please?

11        Q.    Let's look at the second

12   sentence.  You see --

13                MR. GOODSTADT:    It's actually

14        the third sentence.

15        Q.    Paragraph 13.  The second

16   sentence.  Do you see you start off by

17   saying "at all times hereinafter mentioned,"

18   do you see that?

19        A.    Go ahead.

20        Q.    Okay.  You write "Defendant

21   Hesse," do you see that?

22        A.    I see it.

23        Q.    "Was and is the official

24   responsible," do you see that?

25        A.    Go ahead.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    What do you mean by "was and is

3    the official responsible"?

4              MR. GOODSTADT:    Objection.

5        Q.    What is your understanding of

6    what that phrase means?

7              MR. GOODSTADT:    Objection.

8        A.    'Cause he was the supervising

9    officer of the night shift and that is what

10   we worked.

11       Q.    Okay.  And then you write -- you

12   make some other allegations, you write "for

13   the management and supervision of the OBPD,"

14   do you see that?

15       A.    Yes.

16       Q.    I don't -- I'm not going to ask

17   you about that.  Then you write "including

18   its maintenance and operation," do you see

19   that?

20       A.    Yes.

21       Q.    I'm not going to ask you about

22   that.  This is what I'm going to ask you

23   about, "as well as the hiring, promotion and

24   discipline of employees and all other

25   employment-related issues."  Do you see

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 239

```
1                  K. Lamm
2    that?
3         A.    Yes.
4         Q.    What did you mean by the language
5    that I just read to you?
6              MR. GOODSTADT:    Objection.
7         A.    "As well as hiring."
8         Q.    Yeah.  What do you mean by that?
9         A.    He made himself the applicant
10   investigation section unit and began to hire
11   individuals that were uncertified.
12        Q.    How about in terms -- you use "as
13   well as the hiring, promotion and discipline
14   of employees," do you see that?
15        A.    Yes.
16        Q.    You then go on to say "and all
17   other employment-related issues," do you see
18   that?
19        A.    Yes.
20        Q.    Is termination an
21   employment-related issue that you are
22   referring to?
23        A.    Yes.
24        Q.    Okay.  Non-hiring an
25   employment-related issue that you are
```

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

2  referring to?

3      A.    That George Hesse was in charge

4  in -- of?

5      Q.    Yes.

6      A.    Yes.

7      Q.    Okay.  So if I understand what

8  you're saying, in 2003, George Hesse was the

9  person responsible for deciding whether or

10  not you, Mr. Lamm, was either going to be

11  rehired or terminated from the Ocean Beach

12  police department, correct?

13          MR. GOODSTADT:    Objection.

14      Q.    Is that what you mean when you

15  use this --

16      A.    He -- he was the one doing the

17  hiring in 2003, so that very well could

18  have -- could have been the answer.

19      Q.    No.  I'm asking you, you know,

20  based upon your testimony, sir, in your

21  opinion, was Mr. Hesse the person that

22  was the -- had the authority to decide in

23  2003 whether or not you would be terminated

24  from your position as a police officer for

25  Ocean Beach?

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2      A.    He may have been because he was

3   hiring in 2003.  So I would assume that he

4   is in charge of hiring and -- and could have

5   been firing in 2003.

6      Q.    Same thing for 2004, correct?

7      A.    Could have been.

8      Q.    How about 2005?

9      A.    May have been.

10     Q.    Okay.  Now with regard to the

11  Ocean -- the Halloween incident, that

12  occurred in October of 2004, correct?

13     A.    Yes.

14     Q.    And by that time, you had made

15  numerous complaints to Mr. Hesse about

16  various misconduct of other police officers,

17  correct?

18     A.    Yes.

19     Q.    Okay.  And you had criticized in

20  these complaints, Mr. Hesse's supervision of

21  these other police officers, correct?

22     A.    Yes.

23     Q.    Okay.  And you complained -- did

24  you ever complain to Mr. Hesse about what

25  you believed to be a cover up involving the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1             K. Lamm

2    Halloween incident?

3         A.    Yes, I did.

4         Q.    When?

5         A.    In June of 2005.

6         Q.    Did Mr. Hesse fire you in June of

7    2005?

8         A.    No, he didn't.

9         Q.    Did he fire you in July of 2005?

10        A.    No, he didn't.

11        Q.    Did he fire you in August of

12   2005?

13        A.    No, he didn't.

14        Q.    Did he fire you in September of

15   2005?

16        A.    No, he didn't.

17        Q.    Did he fire you in October of

18   2005?

19        A.    No.  But when I brought it to his

20   attention  --

21        Q.    I don't think there's a question,

22   sir.

23        A.    Well, I'm putting it on the

24   record anyway.

25        Q.    You go right ahead.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2         A.     That he tells me that the

3    incidents that occurred here in my statement

4    were not true about the Halloween incident,

5    and I said, "Well, how do you know?  You

6    weren't there."

7         Q.     Are you done with your statement

8    on the record?

9         A.     I am finished for now.

10   MO          MR. NOVIKOFF:    Move to strike

11        because there was no question pending.

12        Q.     Anything else you want to state?

13        A.     No.  Not yet.

14        Q.     Okay.  Paragraph 26.  Did you

15   read paragraph 26 before you authorized your

16   attorney to file this on your behalf?

17        A.     I believe so.

18        Q.     Okay.  Is 26 accurate?

19        A.     I believe it to be.

20        Q.     So is it your testimony that no

21   member of the public ever complained about

22   you in your role as a police officer for

23   Ocean Beach, to your knowledge?

24        A.     Not that I'm aware of.

25             MR. NOVIKOFF:    Let's mark the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     following document as Lamm-1.

3          (Allegations of Official

4      Misconduct was marked as Lamm Exhibit-1

5      for identification; 11/19/08, E.L.)

6     Q.    Sir, I'm going to show you what's

7  been marked as Lamm-1, and I'm not going to

8  ask you to read the document.  I'm just

9  going to ask you to read the first

10  paragraph, to yourself now, of the

11  allegation under the heading "allegations of

12  official misconduct" and tell me when you're

13  done reading those two sentences.

14     A.    (Reviewing).  Okay.

15     Q.    As you sit here today, are you

16  familiar with a person named Jolly-Johanna

17  L. Northrop?

18     A.    I'm not sure.

19     Q.    You're not sure if you are

20  familiar with that name?  I'm asking you, as

21  you sit here today, do you recognize the

22  name Jolly-Johanna L. Northrop?

23     A.    I don't recall it.

24     Q.    Okay.  Do you recall ever being

25  accused of abusing the public trust

1                    K. Lamm

2    involving an incident concerning Brody

3    Santoro?

4         A.    I don't recall it.

5         Q.    So it's possible, but as you sit

6    here today, you don't recall it?

7         A.    I'm not familiar with this.

8         Q.    Okay.  Let's move on then.  Let's

9    go to paragraph 32, sir.  Did Mr. Hesse ever

10   instruct you to chauffeur intoxicated

11   colleagues both inside and out of Ocean

12   Beach?

13        A.    He has asked me to take --

14        Q.    My question is just a yes or no.

15        A.    Yes, he has.

16        Q.    On how many occasions did

17   Mr. Hesse instruct you to chauffeur

18   intoxicated police officers both inside and

19   out of Ocean Beach?

20        A.    Just one time for me.

21        Q.    When?

22        A.    Somewhere around the season of

23   2003.

24        Q.    And who was the intoxicated

25   colleague that Mr. Hesse directed you to

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    chauffeur?

3         A.    Gary Bosetti and Rich Bosetti.

4         Q.    Oh, so there was two.  Okay.

5    Where did Mr. Hesse ask you to chauffeur

6    them to?

7         A.    He wanted me to bring them back

8    to the lighthouse.

9         Q.    Okay.  Were they on duty at the

10   time, Gary and Richie Bosetti?

11        A.    No.  That time they were off

12   duty.

13        Q.    What time of the day did

14   Mr. Hesse ask you to chauffeur the Bosetti

15   brothers in their inebriated state?

16        A.    Approximately 3:00 in the

17   morning.

18        Q.    Did you witness them getting into

19   a vehicle after you chauffeured them to the

20   lighthouse?

21        A.    No, I did not.

22        Q.    Do you know why they were being

23   chauffeured to the lighthouse?

24        A.    No.  He just told me to take them

25   to the lighthouse and I did.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1    Q.    Did you inquire with Mr. Hesse as
3  to why you were taking them to the
4  lighthouse?
5    A.    No, I didn't.
6    Q.    Did the Bosettis, in their
7  inebriated state, tell you why you were
8  taking them to the lighthouse?
9    A.    No.  They said they wanted to get
10  to the lighthouse.
11    Q.    Do you -- did you witness them
12  doing anything once you dropped them off at
13  the lighthouse?
14    A.    No, I didn't.
15    Q.    Did you stay around to make sure
16  that they didn't do any harm to themselves
17  in their inebriated state?
18    A.    No, I didn't.
19    Q.    Were you on  -- were you on duty
20  at the time?
21    A.    Yes, I was.
22    Q.    Are automobiles parked at the
23  lighthouse?
24    A.    Excuse me?
25    Q.    Are automobiles parked at the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    lighthouse?

3         A.    Yes.

4         Q.    Was it your belief that you were

5    chauffeuring the Bosetti brothers to their

6    automobiles to take off the island?

7         A.    Either that or they were going to

8    walk to the next town, Kismet.

9         Q.    And how far away is Kismet?

10        A.    Just several --

11             MR. GOODSTADT:    Objection.

12        Q.    What's that?

13        A.    Just several 100 feet down the

14   road.

15        Q.    Okay.  Could you have driven to

16   Kismet?

17        A.    Yes.

18        Q.    Okay.  Did you stay around to

19   make sure that the Bosettis didn't get into

20   their respective automobiles and drive under

21   the state of intoxication?

22        A.    No.

23        Q.    Wouldn't you agree, sir, that as

24   a police officer, it would have been

25   important for the safety of the public that

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

the Bosettis, in their inebriated state, did
not get into their automobiles and drive
away?

MR. GOODSTADT:    Objection.

Q.    Yes or no, or if you can't answer
yes or no, that's fine, too.

A.    I can't answer that.  They --
they could have just sat there and talked.

Q.    Oh, no.  I understand that.  But
my question, sir, is, would you agree with
me that it would be important for the public
health and safety, to make sure that the
Bosettis were not going to get into their
cars in an inebriated state that night?

A.    Yes, it would be.

Q.    Okay.  Did you undertake any
activity to ensure that the Bosettis did not
get into their car after you dropped them
off?

A.    I don't recall.

Q.    Okay.  When Mr. Hesse asked you
to do this, did you complain to him?

A.    Yes.  I -- I told him that being
that, you know, we're short staffed in the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2   village, I don't think that we should be

3   leaving the village with one less officer.

4        Q.    When you say you were short

5   staffed, what do you mean?

6        A.    'Cause at nighttime, we didn't

7   have that many officers at times that were

8   working.

9        Q.    So there were sometimes that you

10   have sufficient officers in the village at

11   night and there are times when you're short

12   staffed?

13        A.    Depending on who's scheduled and

14   depending on the crowd that is there that

15   night.

16        Q.    So it was your opinion that by

17   you taking the Bosettis to the lighthouse,

18   that left the village short staffed,

19   correct?

20        A.    Yes.

21        Q.    Mr. Hesse had a contrary opinion,

22   correct?

23        A.    Maybe he did.

24        Q.    Well, did he respond to you when

25   you said that you believed that you were

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    leaving the village short staffed?

3          A.    He said yeah, but nothing

4    happened.

5          Q.    So he had a contrary opinion  --

6    oh, no.  So he agreed with you that it was

7    short staffed?

8          A.    Yes.

9          Q.    Okay.  And you felt by leaving

10   the village short staffed, that was

11   compromising the public health and safety of

12   the village -- of the people on Ocean Beach?

13         A.    Yes.

14         Q.    Did you advise Chief Paridiso

15   that Mr. Hesse's direction, in your opinion,

16   compromised the public health and safety of

17   the people on Ocean Beach?  Yes or no or you

18   can't answer yes or no?

19         A.    I spoken to him about  -- about

20   it, saying that I -- I just don't feel that

21   it's right to drive them off if we're short

22   staffed during the summer season.

23         Q.    So you spoke to Chief Paridiso?

24         A.    Just that one time.

25         Q.    When did you speak to Chief

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 252

1                    K. Lamm

2    Paridiso?

3          A.    That was a few weeks after it.

4          Q.    And did Chief Paridiso say

5    anything to you in response to your

6    communication to him?

7          A.    I don't recall what he said.

8          Q.    Okay.  To your knowledge, after

9    you were asked to chauffeur the Bosettis,

10   were any of the other Plaintiffs in this

11   lawsuit asked to chauffeur any other

12   inebriated police officers anywhere within

13   or without Ocean Beach?

14         A.    I can't answer for -- for someone

15   else.

16         Q.    I'm just asking if you are aware,

17   not whether you can answer or not.  Are you

18   aware that after you complained to Chief

19   Paridiso, did Hesse ever order any other of

20   the Plaintiffs in this lawsuit to chauffeur

21   intoxicated police officers within or

22   without of Ocean Beach?

23         A.    I'm not for certain, but there --

24   it was stated to Hesse that we aren't going

25   to drive anybody out to the lighthouse or

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2   anything if they're here off duty, and then

3   there was a memo saying that if you have to

4   leave the village, use a water taxi.

5   MO          MR. NOVIKOFF:    Move to strike

6       as nonresponsive.

7       Q.    My question is simple, Mr. Lamm,

8   and if you don't know, then you don't know

9   and that's fine.  That's -- that's a fine

10  answer.  After you complained to

11  Mr. Paridiso, are you aware of any time that

12  one of the Plaintiffs in this action, at the

13  direction of Mr. Hesse, chauffeured an

14  intoxicated police officer anywhere within

15  or without Ocean Beach?

16      A.    I'm not for certain.

17      Q.    Great.  Let's look at paragraph

18  33.  Did you ever -- were you ever asked by

19  Mr. Hesse to give money for rocket fuel?

20      A.    No.

21      Q.    Are you aware if any of the

22  Plaintiffs in this action were ever -- were

23  ever asked by Hesse to give money for rocket

24  fuel?

25      A.    I don't believe so.  Not that I

1                    K. Lamm

2    know of.

3         Q.    Okay.  Did you personally ever

4    witness Hesse asking any police officer for

5    money so he can purchase rocket fuel?

6         A.    No.

7         Q.    Okay.  Let's look at paragraph

8    34.  In the last sentence of paragraph 34,

9    you allege, Mr. Lamm, "these newly hired

10   uncertified officers soon aligned themselves

11   with Hesse and his friends on the force,

12   further marginalizing the influence of

13   Plaintiffs and other dedicated and properly

14   certified OBPD officers."  In May 2002, what

15   influence did you have as a part-time

16   seasonal police officer for Ocean Beach?

17              MR. GOODSTADT:    Objection.

18        A.    I don't understand the question.

19        Q.    Well, I don't understand the

20   allegation, so that's why I'm asking you the

21   question.  You allege here that by virtue of

22   Mr. Hesse hiring uncertified officers who

23   then aligned themselves with Hesse and his

24   friends, your influence was further

25   marginalized, do you see that?

1               K. Lamm

2       A.      Um-hum.

3       Q.      My question to you is, what

4   influence did you have in May of 2002 as you

5   refer to it in paragraph 34?

6       A.      They were Hesse's -- they were

7   Hesse's buddies, and you know, we were just

8   distanced.

9       Q.      I understand that.  What

10  influence did you have, though, that's what

11  I'm asking?

12      A.      I personally may have had no

13  influence.

14      Q.      Okay.  Paragraph 36, "Plaintiffs

15  each advised Hesse on numerous occasions

16  that the department and village were left

17  dangerous -- dangerously short of personnel

18  when Plaintiffs were assigned to chauffeur

19  intoxicated officers and their civilian

20  friends and while such uncertified officers

21  were drinking in local bars," do you see

22  that?

23      A.      Yes.

24      Q.      Were you ever asked to chauffeur

25  a civilian friend of any intoxicated

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    officer?

3         A.    No.

4         Q.    How many communications did you

5    have with Mr. Hesse concerning your con  --

6    your belief that the village was short

7    staffed because officers were drinking in

8    local bars?

9         A.    How many what?

10        Q.    Communications did you have?  Let

11   me break it down.  We know you spoke with

12   Mr. Hesse about your opinion that the

13   village was left short staffed when you had

14   to chauffeur the Bosettis that one time in

15   2003, correct?

16        A.    Correct.

17        Q.    How many communications did you

18   have with Hesse about your opinion that the

19   village was left short staffed because

20   officers were drinking in the local bars?

21        A.    May have been two occasions.

22        Q.    When was the first one?

23        A.    2003.

24        Q.    When was the second one?

25        A.    2004.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2      Q.     Okay.

3      A.     End of 2003 and the beginning

4  season of 2004.

5      Q.     Okay.  And would you agree with

6  me, sir, that if there were police officers

7  while on duty drinking in local bars, and

8  that left, in your opinion, the village

9  short staffed, that that posed a risk to

10  people on Ocean Beach?

11      A.     Yes, it could.

12      Q.     And in your duty to protect the

13  public and speak out against the endemic

14  corruption that you alleged, did you ever

15  advise Chief Paridiso of your concern that

16  on duty police officers were drinking in

17  local bars?

18      A.     No.  It was spoken to Hesse.

19  Immediate supervisor, chain of command.

20  MO          MR. NOVIKOFF:    Motion to strike

21      everything after "no."

22      Q.     Same question with regard to

23  Mayor Rogers?

24      A.     She wasn't part of the chain of

25  command.

Page 258

K. Lamm

1

2     Q.    So the answer would be no?

3     A.    She wasn't part of the chain of
4  command.

5     Q.    Okay.  Same question with regard
6  to Trustee Loeffler?

7     A.    No.

8     Q.    Same question with regard to any
9  other trustee?

10    A.    No.  They weren't part of chain
11 of command.

12    Q.    Same question with regard to any
13 media outlet?

14    A.    No.

15    Q.    Now when you witnessed police
16 officers while on duty drinking in local
17 bars, were they eating a meal at the time?

18    A.    I don't believe so.

19    Q.    Okay.  So they were either at the
20 bar or they were -- they were at a table
21 drinking?

22    A.    At the bar, yes.

23    Q.    Okay.  Let's look at paragraph
24 39.  You allege "in addition, Hesse allowed
25 the uncertified officers to assign dock

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 259

1                    K. Lamm

2  masters to "cover" their shifts at the OBPD

3  blithely entrusting law enforcement power

4  and responsibility to untrained and

5  unsupervised civilians," do you see that?

6        A.    Yes, I do.

7        Q.    What did you mean "blithely"?

8              MR. GOODSTADT:    Objection.

9        A.    Don't exactly know.

10       Q.    When you read this for accuracy

11  and truthfulness, did you know?

12       A.    That they put -- that they put

13  their trust in it.

14       Q.    Okay.  What uncertified officers

15  were assigned to dock masters?  I'm sorry.

16  Who are you referring to in 39 when you

17  write "uncertified officers"?  I'm looking

18  for the identity of the officers that you're

19  referring to in 39.

20       A.    Rich Bosetti and Gary Bosetti.

21       Q.    Do you have personal knowledge

22  that Hesse allowed the Bosetti brothers to

23  assign dock masters to cover their shifts?

24       A.    If Hesse wasn't there that day or

25  if he had already left, those two officers

Page 260

1              K. Lamm

2  are in charge.  Therefore, if there -- if

3  there's a dock master there, which there

4  was, was assigned to take over the desk, and

5  they had left the village without a police

6  officer down there.

7  MO          MR. NOVIKOFF:   Motion to strike

8       as nonresponsive, sir.

9       Q.    Did you personally witness Hesse

10  directing the Bosettis to assign dock

11  masters to cover their shifts?

12          MR. GOODSTADT:   Objection.

13      A.    No, I did not.

14      Q.    Did you ever partner with any

15  dock master while you were working for Ocean

16  Beach?

17      A.    No.

18      Q.    During any shifts that you had

19  while at Ocean Beach, was there a dock

20  master that was acting as a police officer

21  during that same shift, to your knowledge?

22      A.    As far as acting as a police

23  officer, they were left alone in the

24  village, there would be nobody there, so

25  they would have to act by answering the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2  phone.

3  MO       MR. NOVIKOFF:   Motion to strike

4     as nonresponsive, sir.

5     Q.   Sir, while you were working for

6  Ocean Beach, did you ever become aware that

7  there was a dock master working as a police

8  officer during your shift?

9     A.   No.

10     Q.   Okay.  40, "Hesse also allowed

11  the uncertified officers to drink beer while

12  patrolling in police vehicles."  Were you

13  ever in a police vehicle, other than the one

14  instance that you testify  -- the two

15  instances that you testified to, wherein an

16  uncertified officer was drinking beer?

17     A.   Other than from what I stated.

18     Q.   Right.  So the answer would be

19  no, other -- no, correct?

20     A.   Not that I can recall.

21     Q.   Okay.  Did Hesse ever tell you,

22  Mr. Lamm, what types of beer to confiscate?

23     A.   No, he did not.  But I have heard

24  Rich Bosetti say it when Frank Fiorillo was

25  patrolling the beach, if he can get certain

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 262

1                    K. Lamm

2    kinds of beer.

3         Q.    You happy you got that out?

4         A.    If he confiscated anything.

5         Q.    You done with what you want to

6    say?

7         A.    He made a request.

8              MR. GOODSTADT:    Objection.

9  MO           MR. NOVIKOFF:    Motion to strike

10       as nonresponsive everything other than

11       after "no."

12        Q.    Did Hesse ever instruct you, as

13   you allege in paragraph 41, to remove empty

14   beer cans and other refuse from the

15   uncertified officers' abandoned vehicles?

16             MR. GOODSTADT:    Objection.

17             MR. NOVIKOFF:    Fine.  I'll

18       withdraw the question.

19        Q.    Let's look at 41.  "Rather than

20   address Plaintiffs' num -- numerous

21   complaints about these violations of law and

22   department policy, Hesse instructed

23   Plaintiffs to remove empty beer cans and

24   other refuse that the uncertified officers

25   abandoned in their vehicles and left strewn

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2    about the police station after a night on

3    duty."  Did Hesse ever instruct you,

4    Mr. Lamm, to do that which is being alleged

5    in paragraph 41?

6         A.    No, he didn't.

7         Q.    Let's look at paragraph 45.  Read

8    paragraph 45 to yourself and tell me when

9    you're done.

10        A.    (Reviewing).  Okay.

11        Q.    Is this an accurate allegation,

12   to the best of your recollection?

13             MR. GOODSTADT:    Objection.

14        A.    Yes.  Frank was ridiculed and

15   called a fucking moron and to let Walter

16   Muller do whatever he wanted because that's

17   his close friend.

18   MO        MR. NOVIKOFF:    Motion to strike

19        everything after the word "yes."

20        Q.    In your presence, how did Hesse

21   chide Officer Fiorillo?

22        A.    He belittled him.

23        Q.    What did he say?

24        A.    He called him a moron.  Said he

25   was stupid.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2        Q.    Okay.  Did Mr. Hesse say anything

3    else in your presence?

4        A.    He said that "that's a close

5    personal friend of mine and he can do what

6    he wants here."

7        Q.    Okay.  And did you think that

8    Mr. Hesse  -- and when did this take place,

9    sir?

10       A.    I believe it was approximately

11   2002.

12       Q.    Okay.  And this involved a fight,

13   correct?

14       A.    I believe it was a fight, yes.

15       Q.    Between who and whom?

16       A.    Walter Muller and I believe

17   either it was another party involved which I

18   didn't see.  I only came to the police

19   station to see the ending effects of it.

20       Q.    And was this person who came into

21   the police station a police officer or a

22   civilian?

23       A.    The fight didn't occur in the

24   police station.

25       Q.    But the person that you saw that

1              K. Lamm

2    came into the police station, was it a

3    civilian or was it a police officer who you

4    say you saw the effects of the altercation?

5         A.    The one that involved -- that was

6    involved was Walter Muller, who was a police

7    officer dressed in regular clothes.  At the

8    time I believe he was off duty.

9         Q.    I understand that.  But did he

10   get into a fight with another police officer

11   or with a civilian, to the best of your

12   knowledge?

13        A.    From what I understand and I

14   believe, it was another civilian.

15        Q.    So Mr. Hesse, instruct --

16   according to your allegation and testimony,

17   was basically saying it's okay for Muller to

18   beat up a civilian because he's a close

19   personal friend of mine; is that correct?

20        A.    I don't know what happened prior

21   to me getting there, but I was there for the

22   remarks he made to Frank Fiorillo.

23        Q.    Right.  And what did you

24   understand the remarks  -- did you

25   understand his remarks to mean that -- that

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2      Mr. Muller can beat up a civilian because

3      Mr. Muller is a close personal friend of

4      his?

5           A.    I believe the remarks were just

6      made to belittle Frank and embarrass him,

7      and -- and Hesse show that Walter Muller is

8      his friend and just to leave him be.

9           Q.    I understand that.  But you write

10     in the last sentence, Mr. -- you allege in

11     the last sentence, Mr. Lamm, that "rather

12     than disciplining this officer, Hesse

13     insisted that his friends in the OBPD be

14     afforded the freedom to violate the law with

15     impunity," do you see that?

16          A.    I see that.

17          Q.    So would you agree with me that

18     Hesse was instructing you and Fiorillo in

19     2002 that Mr. Muller, a police officer,

20     should be allowed to beat up civilians

21     because he's a close personal friend of his?

22               MR. GOODSTADT:    Objection.

23          Q.    Isn't that what you understood

24     Mr. Hesse to be saying?

25               MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     A.    I wouldn't say it to that extent.

3 The only person that knows what he said is

4 George Hesse himself.

5     Q.    But you graduated high school,

6 sir.  What did you understand Mr. Hesse to

7 mean when he insisted, according to your

8 allegation, that his friends in the OBPD be

9 afforded the freedom to violate the law with

10 impunity?

11          MR. GOODSTADT:    Objection.  I

12     don't know what his graduating high

13     school has to do with anything, but to

14     the extent that you're trying to harass

15     the witness, I'm going to instruct him

16     not to answer the next time that you

17     refer to high school education.

18          MR. NOVIKOFF:    Go ahead.

19          MR. GOODSTADT:    Unless you can

20     tell me what the relevance is.

21          MR. NOVIKOFF:    You can answer

22     the question.

23          MR. GOODSTADT:    I didn't think

24     so.

25     A.    My answer was my answer that I

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2   stated before.

3        Q.    Okay.  Did you ever advise Chief

4   Paridiso that it was your belief that Hesse

5   was permitting an officer, in 2002, to

6   violate the law with impunity?

7        A.    No.  I didn't speak to Chief

8   Paridiso.

9        Q.    Don't you believe that in your

10  duty to protect the public and speak out

11  against endemic corruption, that it would be

12  important for Chief Paridiso to know that

13  Sergeant Hesse was advising various police

14  officers to allow another police officer to

15  violate the law with impunity?

16       A.    I wasn't there for the incident.

17       Q.    Oh, okay.  Did you ever advise

18  Mayor Rogers or Trustee Loeffler, in 2002,

19  that you had heard directly from Mr. Hesse

20  that his buddies on the police force were

21  free to violate the law with impunity?

22       A.    No, I did not.

23       Q.    Now I guess is that another

24  example where you didn't protect the public

25  and speak out against corruption?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2          MR. GOODSTADT:    Objection.

3     A.    I didn't witness the incident,

4  so, therefore, I don't know exactly what

5  happened.  Like I said in my statement

6  before, I was only there for whatever

7  happened at the end inside the police

8  station with the ridicule against Frank

9  Fiorillo.

10  MO       MR. NOVIKOFF:    Motion to strike

11     as nonresponsive.

12     Q.    Let's look at paragraph 46.  Read

13  it and tell me when you're done reading it.

14     A.    (Reviewing).  Okay.

15     Q.    Do you have any personal

16  knowledge of the allegations in paragraph

17  46?

18     A.    No personal knowledge.

19     Q.    Let's look at paragraph 48.  Did

20  Mr. Hesse ever admit to you, Mr. Lamm, that

21  he regularly spent the night at a known drug

22  dealer's residence in Ocean Beach and

23  Manhattan?

24     A.    Yes, he did.

25     Q.    Who was the known drug dealer?

1          K. Lamm

2      A.    Mitch Burns.

3      Q.    Okay.  When did Mr. Hesse advise

4  you that he regularly spent the evenings in

5  Manhattan and Ocean Beach with Mitch --

6  Mitch -- the drug dealer's residence?

7      A.    After he came back one early

8  morning from being at Mitch Burns' house in

9  Ocean Beach and he bragged about having sex

10  with Elyse Miller with no condom in the hot

11  tub.

12 MO          MR. NOVIKOFF:    Elyse Miller,

13      okay.  I'm going to move to strike the

14      answer.

15      Q.    Sir, when did you -- when did

16  Mr. Hesse first advise you that he slept in

17  a known drug dealer's residence in Ocean

18  Beach or Manhattan?

19          MR. GOODSTADT:    He just told

20      you when.  When he came back --

21          MR. NOVIKOFF:    Thank you.

22      You're not testifying, Mr. Goodstadt.

23          MR. GOODSTADT:    You're asking

24      the same question that you just moved

25      to strike.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2           MR. NOVIKOFF:    So move to

3      strike.  Just because you don't like

4      the answers you're getting --

5           MR. GOODSTADT:    I actually like

6      that one.

7           MR. NOVIKOFF:    No, sir.

8           MR. GOODSTADT:    You moved to

9      strike it.  Now you're asking the same

10     question.

11          Q.    What month, what year, sir?

12          A.    I believe it -- summertime of --

13     summer of 2002.

14          Q.    Did you think it was appropriate

15     in the summertime of 2002 that the sergeant

16     of the Ocean Beach Police Department was

17     residing, on a regular basis, in a known

18     drug dealer's residence?

19          A.    It may not have been proper.

20          Q.    Is that your answer, "it may not

21     have been proper"?

22          A.    It may not have been proper, but

23     that's what he chose to do.  I can't speak

24     for his actions.

25          Q.    I'm not asking you to speak for

1          K. Lamm

2     him.  I'm only asking about your actions,

3     though.  Did you ever tell Chief Paridiso?

4          MR. GOODSTADT:    Objection.

5     A.    I don't recall if I did.

6     Q.    Did you ever tell Mayor Rogers or

7     Trustee Loeffler that Sergeant Hesse was

8     residing regularly in a known drug dealer's

9     residence?

10    A.    No, I didn't.

11    Q.    Did you ever chauffeur Mr. Hesse

12    to engage in a sexual escapade?

13    A.    Not that I can recall.

14    Q.    Did Mr. Hesse ever instruct you

15    not to issue summonses to his friends?

16    A.    Yes.  CJ's Bar.

17    Q.    Is that the only occasion in

18    which you recall that Mr. Hesse instructed

19    you not to issue a summons to CJ's Bar?

20    A.    Also, to the corner house on

21    Ocean Breeze and Bay Walk.  Not to go in

22    there as well.

23    Q.    Well, I'm not talking about

24    going.  I'm talking about issuing summonses

25    now.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2         A.      Same goes for that, too.

3         Q.      Same goes.  So we have two

4    occasions.   One CJ's Bar?

5         A.      Yes.

6         Q.      And one the corner house that you

7    referred to?

8         A.      Yes.

9         Q.      Any other examples of when

10   Mr. Hesse advised you not to issues

11   summonses to his friends?

12        A.      That's all that I can recall

13   right now.

14        Q.      When did Mr. Hesse advise you not

15   to issue a summons to CJ's Bar?

16        A.      In 2000 -- end of 2004.

17        Q.      And did you believe that this

18   was, at that time, a proper directive from

19   the sergeant of the Ocean Beach Police

20   Department?

21        A.      No.  I don't believe so.

22        Q.      Did you advise Chief Paridiso

23   that you believed that Sergeant Hesse was

24   giving you unlawful directives?

25        A.      No, I did not.  But George Hesse

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2   was my immediate supervisor, and I had to

3   listen to what he said.

4   MO          MR. NOVIKOFF:   Motion to strike

5        as nonresponsive after the word "no."

6        Q.    Did you advise Trustee Loeffler

7   or Mayor Rogers, after Hesse directed you

8   not to issue summonses to CJ's, that you

9   believed he was issuing unlawful directives?

10       A.    No, I did not.

11       Q.    When did Mr. Hesse tell you not

12  to issue summonses to that corner house that

13  you testified to?

14       A.    After the incident when they --

15       Q.    When in terms --

16       A.    -- poured beer down the top --

17  the roof of the establishment in 2004 in the

18  month of May.

19  MO          MR. NOVIKOFF:   May when?

20       Motion to strike.

21       Q.    What date, what month and year

22  did Mr. Hesse instruct you not to issue

23  summonses to this house?

24            MR. GOODSTADT:   Objection.  He

25       just answered the question.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2              MR. NOVIKOFF:    Good.  Thank

3        you.

4              MR. GOODSTADT:    He said May

5        2004.

6        Q.    What date, what month and year?

7              MR. GOODSTADT:    Objection.

8        A.    It was the month of May, 2004.

9        Q.    Did you believe that this was a

10       lawful directive from Mr. Hesse?

11       A.    No, I did not.

12       Q.    Did you advise Chief Paridiso

13       that you were receiving unlawful directives

14       from the sergeant?

15       A.    No.  George Hesse was the

16       immediate supervisor at nighttime and he was

17       my boss.

18  MO         MR. NOVIKOFF:    Motion to strike

19       as nonresponsive after the word "no."

20       Q.    Did you advise Mayor Rogers or

21       Trustee Loeffler that, in your belief, Chief

22       Hesse was issuing to you an unlawful

23       directive concerning this corner house?

24       A.    No, I did not.  You mind if I

25       stretch my legs?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2       MR. NOVIKOFF:    We got five

3    minutes to go on the tape.  Can we just

4    go for three more minutes?

5       THE WITNESS:    That's fine.

6       Q.    Paragraph 58.  Did you witness

7    the incident that's alleged in paragraph 58,

8    Mr. Lamm?

9       A.    Can I take the time to read it,

10   please?

11      Q.    Absolutely.

12      A.    (Reviewing).  No, I did not.

13      Q.    Look at paragraph 60 and read it,

14   if you can, to yourself, and then tell me if

15   you personally witnessed the events alleged

16   in paragraph 60.

17      A.    (Reviewing).  No, I wasn't.

18      MR. NOVIKOFF:    Okay.  Why don't

19   we take a break while the tape is being

20   changed.  Can we limit it to about five

21   minutes?

22      MR. GOODSTADT:    Sure.

23      MR. NOVIKOFF:    Thanks.

24      THE VIDEOGRAPHER:    This ends

25   tape number five.  The time is 4:14

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2        p.m.  going off the record.

3                (A break was taken.)

4                (Mr. Gray left the deposition.)

5                THE VIDEOGRAPHER:    This begins

6        tape number six.  The time is 4:29 p.m.

7        Back on the record.

8        Q.    Mr. Lamm, did you receive a call

9   on October 30, 2004 concerning a fight at

10   Houser's?

11        A.    Yes.

12        Q.    Did you personally receive the

13   call or did one of your partners receive the

14   call?

15        A.    First call that was received was

16   somebody said -- that said "come to

17   Houser's" and they hung up.

18        Q.    Okay.  And did you -- did you

19   personally receive that call?

20        A.    Yes, I did.

21        Q.    Did that call come from the

22   dispatcher?

23        A.    There is no dispatcher.

24        Q.    Okay.  So do you know who made

25   that call?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                    K. Lamm

1

2       A.      No, I don't.

3       Q.      Did you receive that call on your

4  cell phone?

5       A.      It was on the police phone.

6       Q.      On the what?

7       A.      On the police department phone.

8       Q.      And where were you when you

9  received this call?

10       A.      In the village.  Patrolling.

11       Q.      You were patrolling?

12       A.      Yes.

13       Q.      And did you have a phone with you

14  at the time of your -- of your patrol?

15       A.      Yes.

16       Q.      Okay.  And is that what you meant

17  when you said the police department phone?

18       A.      Yes.

19       Q.      Okay.  And can civilians call

20  directly to the police department phone that

21  you carry with you?

22       A.      Yes.

23       Q.      Okay.  Did you receive another

24  call?

25       A.      I didn't receive it.  Tom Snyder

1                   K. Lamm

2    received it.

3         Q.    Okay.  When you first received

4    the call -- well, was Tom Snyder with you

5    when he received that  -- a call?

6         A.    Yes.

7         Q.    All right.  And did he receive it

8    on the police department phone as well?

9         A.    Yes.

10        Q.    Did you have different numbers?

11             MR. GOODSTADT:    Objection.

12        Q.    Well, did your phone -- did your

13    respective police department phones have

14    different phone numbers?

15             MR. GOODSTADT:    Objection.

16        A.    It was forwarded, the phone.

17        Q.    It was what?

18        A.    The phone is forwarded to ring on

19    the cell phone.

20        Q.    From where?

21        A.    From the police phone in the --

22    in the station house.

23        Q.    Okay.  And is it forwarded

24    automatically or does a human being have to

25    forward the call?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2    A.    You would have to set it up that

3    way.  The person.

4    Q.    Well, the night of October 30,

5    2004, did a human being forward, to your

6    knowledge, the call that you received or was

7    it automatic?

8    A.    The phone was already forwarded.

9    Q.    Okay.  How much time elapsed

10   between the time that you got your phone

11   call and the time that Mr. Snyder got his

12   phone call?

13   A.    Maybe less than a minute.

14   Q.    Where were you and Mr.  -- well,

15   were you with Mr. Snyder at the time that

16   you got your phone call?

17   A.    Yes.

18   Q.    Were you in a car?

19   A.    I was in a vehicle.  SUV.

20   Q.    You were in an SUV.  Where -- and

21   was Mr. Snyder with you?

22   A.    Yes, he was.

23   Q.    Was anyone else with you?

24   A.    Yes.

25   Q.    Who?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2      A.    Frank Fiorillo.

3      Q.    Is it common that three police

4  officers patrol Ocean Beach at night?

5      A.    Yes.

6      Q.    Together?

7      A.    Yes.

8      Q.    Okay.  And where were you located

9  when you got your phone call?

10      A.    By the school.

11      Q.    At the school?

12      A.    Yeah.

13      Q.    Where is the school in relation

14  to Houser's?

15      A.    It's -- it's on the border.  It's

16  on the border.

17      Q.    Border of what?

18      A.    On the border of Corneil is where

19  the school is.  It is just -- what is that?

20  Trying to remember over there.  It's west of

21  Houser's.

22      Q.    I understand that.  You said

23  border.  Border of what?

24      A.    The border.  It's on the

25  borderline before  -- you would have to pass

1            K. Lamm

2   the school before you would go into another

3   town, but we were by the school.

4        Q.    Right.  So what were you at the

5   border of?  It was Ocean Beach --

6        A.    Ocean Beach and Corneil.

7        Q.    Okay.  And how long of a drive is

8   it from where you received the phone call to

9   Houser's?

10        A.    It's several blocks down.

11        Q.    So how long does it -- would it

12   normally take for you to drive from when you

13   received -- from where you were to Houser's?

14        A.    It all depends how many people

15   were out on the street.

16        Q.    Let's assume no one was out on

17   the street.

18        A.    It wouldn't take very long.

19        Q.    Well, tell me.

20        A.    Not long.

21        Q.    Well, what's "not long"?  10

22   seconds?  30 seconds?  Five minutes?  "Not

23   long" is a relative phrase.

24        A.    Well, considering that it was

25   dark and -- and there was parties going on,

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2     you'd have to use caution.  So maybe you can

3     get there in about, I don't know, two

4     minutes.

5          Q.    Okay.  How long did it take you

6     to get to Houser's once you got the phone

7     call?

8          A.    Just about that time.

9          Q.    Were you at Houser's by the time

10    that Snyder got his phone call?

11         A.    No.  At the time when he was

12    getting the phone call, I was turning the

13    vehicle around because that's a dead end

14    street.

15         Q.    So once you got the phone call,

16    you had to turn the vehicle around, is that

17    your testimony?

18         A.    Yes.

19         Q.    Okay.  Did Snyder, before you got

20    to Houser's, advise you as to what was said

21    to him on the phone call?

22         A.    He  -- he said that the Bosettis

23    are in a fight.

24         Q.    Did Snyder tell you who called

25    him?

1                 K. Lamm

2       A.    I don't recall.

3       Q.    Okay.  Did Snyder put the

4   phone -- when Snyder got the phone call, did

5   he put it on speaker so that everyone could

6   hear it?

7       A.    No.  Not that I can recall.  I

8   don't believe he did.

9       Q.    You don't believe he did?

10      A.    No.

11      Q.    Okay.  Now when you got to

12  Snyder's  -- when you got to Houser's,

13  describe what was going on outside of

14  Houser's when you -- when you got there.

15      A.    There was people out in the

16  street.

17      Q.    Okay.

18      A.    And people, as we got there,

19  people were exiting the establishment.

20      Q.    Okay.  Did you attempt  -- did

21  you personally, Mr. Lamm, attempt to stop

22  anyone from leaving before you entered

23  Houser's?

24      A.    No.  I saw Rich Bosetti outside

25  and --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.    No.  The question is yes or no,

3    did you attempt to stop anyone from leaving

4    once you got to Houser's?

5        A.    No.

6        Q.    Okay.  You exited the vehicle; is

7    that true?

8        A.    Yes.

9        Q.    And Mr. Snyder and Mr. Fiorillo

10   exited the vehicle?

11       A.    Yes.

12       Q.    Did the three of you walk

13   together to the entrance of Houser's?

14       A.    No.  We walked over towards Rich

15   Bosetti.

16       Q.    Now where was Rich Bosetti in

17   relation to the car when you exited the

18   vehicle?

19       A.    He was to the left of the

20   vehicle.

21       Q.    How far away from the vehicle to

22   the left was he?

23       A.    To give an exact answer, I

24   couldn't tell you exactly how many feet

25   exactly.

K. Lamm

1

2    Q.    Can you approximate?

3    A.    Or make an approximated guess.

4    Q.    You couldn't do either one of the

5    two?

6    A.    I could, but it may not be

7    accurate.

8    Q.    That's fine.  I'll accept your

9    answer with that -- with that caution.

10   A.    Maybe about -- I don't know.

11   Could be 40 feet maybe.  Maybe.

12   Q.    Okay.  How many people did --

13   were outside of Houser's as you rolled up?

14   A.    For an exact count, I'm not sure.

15   Q.    More than 10?

16   A.    Yes.  More than 10.

17   Q.    More than 20?

18   A.    Maybe -- maybe close -- close to

19   25 maybe.

20   Q.    Okay.  And were you in the car

21   when you spotted Richard Bosetti?

22   A.    When I got out of the vehicle is

23   when I saw Rich Bosetti.

24   Q.    Did Richard Bosetti wave you down

25   or did you spot Mr. Bosetti independently of

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    anything that Mr. Bosetti did?

3          A.    Spotted --

4          MR. GOODSTADT:    Objection.

5          Q.    What's that?

6          A.    Spotted him on my own.

7          Q.    Okay.  And did you approach

8    Mr. Bosetti or did Mr. Bosetti approach you

9    once you spotted him?

10         A.    Myself and Tom Snyder approached

11   Rich Bosetti.

12         Q.    Okay.  And was Mr. Bosetti

13   inebriated, in your opinion?

14         A.    He  -- he had what appeared to be

15   an alcoholic drink.  Smelled the alcohol on

16   him.

17         Q.    Okay.  And did you have a

18   conversation with Mr. Bosetti when you

19   approached him outside of Houser's when you

20   first rolled up?

21         A.    I asked him what happened.

22         Q.    And what did Mr. Bosetti say to

23   you?

24         A.    He said there was someone being

25   choked.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1                     

2      Q.    What was that?

3      A.    He said someone was being choked.

4      Q.    Choked, is that all he said?

5      A.    And I said, "Who was being

6  choked?"

7      Q.    And what was his response?

8      A.    He didn't answer.  Then the

9  person that is now known to me as Chris

10  Shalick, he said, "My friend was the one

11  being choked."

12      Q.    Okay.  So Chris Shalick was

13  standing next to Richard Bosetti while you

14  and Mr. Snyder were talking to him?

15      A.    Again, please.

16      Q.    Was -- was Mr. Shalick standing

17  next to Mr. Bosetti, Richard Bosetti when

18  you and Snyder were talking to him?

19      A.    Yes.

20      Q.    Okay.  Had he always been there

21  or did he come up while you were speaking

22  with Mr. Bosetti?

23      A.    Both of them were there together

24  upon the approach.

25      Q.    Okay.  Were they involved in an

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    altercation at that time, to the best of

3    your recollection?

4         A.    That's what we were asking.

5         Q.    No.  No.  When you saw

6    Mr. Bosetti and you approached him and

7    Mr. Shalick was there with him, was him and

8    Mr. Shalick engaged in any type of

9    altercation?

10        A.    I don't know if it was an

11   altercation.  They seemed to be in close

12   together, but I don't know if it was an

13   altercation.

14        Q.    And this was outside of Houser's?

15        A.    Yes.

16        Q.    Did you see either one of them

17   throw a fist?

18        A.    No, I did not.

19        Q.    Did you see either one of them

20   have their hands on the other?

21        A.    No, I did not.

22        Q.    Did either one of them appear to

23   you to be yelling at the other?

24        A.    I don't believe they were.

25        Q.    Did either one of them have their

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    finger in the other's face?

3         A.    Not that I -- not that I can

4    recall.

5         Q.    Okay.  So now you went up and you

6    approached Mr. Bosetti.  Did you ask who the

7    other individual was before you started

8    talking to Mr. Bosetti?

9         A.    Which?  The one that was there

10   with Rich Bosetti?

11        Q.    Yes.  You said it was Chris

12   Shalick, so --

13        A.    Who I understand to be known now.

14        Q.    Yeah.  Did you -- before you

15   started talking to Mr. Bosetti, did you

16   inquire with this other individual who he

17   was?

18        A.    Right.  Well, after we asked, you

19   know, what happened, the individual, Chris

20   Shalick, said, "It was my friend being

21   choked."  Tommy asked Rich Bosetti  -- Tom

22   Snyder asked Rich Bosetti, "Rich, what's

23   going on here?"  And Rich walked away.

24   MO            MR. NOVIKOFF:   Motion to strike

25        as nonresponsive.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2        Q.    As you walked up to Mr. Bosetti

3   and before you spoke to Mr. Bosetti, did you

4   ask who this individual was that was

5   standing in close proximity to Mr. Bosetti,

6   yes or no?

7        A.    Yes.

8        Q.    Okay.  And did he -- before you

9   spoke to Mr. Bosetti, did this individual

10  identify himself?

11       A.    I asked him what his name was.

12  He said, "Chris."

13       Q.    And did you ask him his last

14  name?

15       A.    I don't know if I asked him his

16  last name at that time.

17       Q.    Okay.  And you asked  -- what

18  was -- what was the first question that you

19  asked Mr. Richard Bosetti?

20            MR. GOODSTADT:    Objection.

21       A.    I said, "What's going on here?"

22       Q.    And did he answer you?

23       A.    Yes.

24       Q.    Okay.  And I think you advised us

25  of his answer.  Then what was the second

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    question?

3                    MR. GOODSTADT:     Objection.

4        A.    I said, "Who is this person?"

5        Q.    You asked Mr. Bosetti who is this

6    person?

7        A.    Um-hum.

8        Q.    But you had known this person

9    because you had asked him before you spoke

10   to Mr. Bosetti who he was and he said Chris,

11   correct?

12                   MR. GOODSTADT:     Objection.

13       That distorts the testimony.

14       A.    My understanding of the question

15   you just asked.

16       Q.    I'm just trying to understand

17   what you said to the respective individuals.

18   Before you spoke to Mr. Richard Bosetti, did

19   you inquire with this individual what his

20   name was?

21       A.    No.

22       Q.    Oh.  Okay.  Fine.

23       A.    Because I figured Rich would tell

24   me because he worked for the department.

25   MO         MR. NOVIKOFF:     Motion to

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     strike.

3          A.     And tell me what happened.

4  MO          MR. NOVIKOFF:    Motion to strike

5     as nonresponsive after "no."

6          MR. GOODSTADT:    Just objection.

7     Just to be clear, when you say "this

8     person," are you referring to -- I'm

9     not sure who you're referring to.  I

10    think you're both referring to two

11    different people.

12         Q.    Well, let's see.  He testified --

13 correct me if I'm wrong -- that when he

14 approached Mr. Richard Bosetti, there was a

15 gentleman standing in close proximity to

16 him, correct?

17         A.     Correct.

18         Q.    And that's a person that you now

19 know to be Chris Shalick, correct?

20         A.     That is correct.

21         Q.    Was there another person standing

22 next to Mr. -- Mr. Bosetti?

23         A.     No.  Other than myself and Thomas

24 Snyder.

25         Q.    That's right.  Now before you

1                    K. Lamm

2    spoke to Mr. Bosetti, did you inquire with

3    this individual standing next to him who he

4    was?

5         A.    No.  I asked Richard Bosetti

6    first.

7         Q.    Okay.  Well, so you asked

8    Mr. Bosetti who this individual was?

9         A.    No.  I had asked Rich Bosetti as

10   to what had happened first.

11        Q.    That's right.  And -- and he --

12   did he answer you?

13        A.    Yes.

14        Q.    Okay.  And then the next question

15   to Mr. Bosetti was what?

16        A.    Who was the person --

17        Q.    Standing next to him?

18        A.    That was being --

19        Q.    No?  Okay.  What was the

20   question?

21        A.    Let me finish.

22             MR. GOODSTADT:    That's where

23        the confusion came before.

24        A.    Who was this person that was

25   being choked.

1              K. Lamm

2        Q.    And what did he say, if anything?

3        A.    That's when Chris Shalick jumped

4   in and said, "It was my friend being

5   choked."

6        Q.    Okay.  Did you ask Mr. Bosetti a

7   question after Mr. Shalick spoke?

8        A.    I'm sorry.  Say that again.

9        Q.    Did you ask Mr. Bosetti a

10  question after Mr. Shalick spoke?

11       A.    I asked him, "Well, Rich, what's

12  the story?"  And he did not answer.

13       Q.    Did you ask him again?

14       A.    That's when Chris Shalick spoke

15  up and said, "My friend was in a choke --

16  was in a choke hold and I went to go pull

17  him out."

18       Q.    Okay.  So Mr. Shalick had said

19  two things to you then.  One, who he was,

20  and two, that his friend was being choked;

21  is that correct?

22       A.    That's right.

23       Q.    Okay.  Did you ask Mr. Bosetti

24  any other questions?

25       A.    No.  He had walked away.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2        Q.    Did you advise Mr. Bosetti to

3   stay there so that you can further

4   investigate the incident before he left

5   away?

6        A.    I figured that being that he

7   worked for the department, he would have

8   stayed there and helped us out.

9   MO        MR. NOVIKOFF:    Motion to strike

10       as nonresponsive.

11       Q.    Did you ask Mr. Bosetti to stay

12  there so that you can continue your

13  investigation before he walked away?

14       A.    No.  Figured that he worked for

15  the department, he would stay there and help

16  us out.

17  MO        MR. NOVIKOFF:    Motion to strike

18       as nonresponsive after the word "no."

19       Q.    Okay.  When Mr. Bosetti walked

20  away, did you continue in your conversation

21  with Chris Shalick?

22       A.    Yes, I did.

23       Q.    Okay.  During any of your

24  conversation with Mr. Bosetti, did you form

25  an opinion as to whether he was intoxicated

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2      or not?

3             A.      That who was intoxicated?

4             Q.      Mr. Bosetti.

5             A.      As I've said before, he appeared

6      to have an alcoholic beverage in his hand

7      and he smelled of alcohol.

8             Q.      How about from his speech, did

9      you form an opinion from his speech whether

10     or not he was intoxicated?

11            A.      No, I couldn't, because it was

12     too short of an answer for him to continue

13     speaking.

14            Q.      Did you look into his eyes and

15     determine or form an opinion as to whether

16     or not he was intoxicated?

17            A.      I don't recall that.

18            Q.      Did any aspect of his physical --

19     of his physicality indicate to you, in your

20     experience as a police officer, whether or

21     not he was intoxicated?

22            MR. GOODSTADT:      Objection.

23            A.      That I don't recall.

24            Q.      How about Mr. Shalick, was he, in

25     your opinion, intoxicated?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2       A.    They had all been drinking, so.

3       Q.    Well, sir, we know that you

4   weren't in the bar at the time of this

5   incident, correct?

6       A.    Correct.

7       Q.    So hear my question.  When you

8   were speaking to Mr. Shalick, did you

9   have -- form an opinion as to whether or not

10  he was intoxicated?

11      A.    He smelled of alcohol.

12      Q.    Mr. Shalick did?

13      A.    Yes.

14      Q.    Did he have a drink in his hand?

15      A.    No, he didn't.

16      Q.    Okay.  How long did you speak

17  with Mr. Shalick outside of Houser's?

18      A.    Just a short while.  Then we

19  asked, myself and Tom Snyder, if he can

20  identify the person.

21      Q.    All right.  How long was the

22  conversation?  I know you say it's a short

23  while, but that doesn't help me or

24  Mr. Goodstadt.  How long was the

25  conversation?

                    K. Lamm

1                MR. GOODSTADT:    Objection.

2                MR. NOVIKOFF:    Okay.

3      A.      Maybe three minutes.

4      Q.      Okay.  What else did Mr. Shalick

5  say to you, other than what you've testified

6  to so far?

7      A.      That he was hit with a pool cue.

8      Q.      That Shalick was hit with a pool

9  cue?

10      A.      Yeah.  In attempt to pull his

11  friend out of a choke hold.

12      Q.      Did Shalick indicate to you if

13  the pool cue broke or not?

14      A.      I believe they said it broke.

15      Q.      Okay.  During your conversation

16  with him outside of Houser's?

17      A.      From what I can recall.

18      Q.      That's -- that's all I'm asking

19  you to do.  Now in this three-minute

20  conversation with Mr. Shalick, do you recall

21  him saying anything else to you that you

22  haven't already testified to?

23      A.      I believe he stated that one of

24  the individuals was a cop.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2      Q.    Okay.  Do you recall anything

3  else?  Well, did you ask him what is the

4  basis for his belief that one of the

5  individuals was a cop?  Now, again, this is

6  just outside of Houser's.

7      A.    That's right.  I asked him, "How

8  did you know that?"  And he said the

9  individual stated it and he had a shield

10 around his neck.

11     Q.    Okay.  And by -- did you form an

12 opinion by speaking with Mr. Shalick,

13 whether or not he was intoxicated at the

14 time that you were speaking with him?

15     A.    I didn't form any opinion at that

16 time.

17     Q.    Did you inquire with Mr. Shalick

18 as to how many drinks he had had that night

19 while you were speaking to him outside?

20     A.    Not at that moment I didn't.

21     Q.    That's all I'm asking you.  About

22 that moment.  Did you ask him?

23     A.    I don't believe I did at that

24 moment.

25     Q.    Okay.  Anything else you can

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    recall Shalick saying to you during this

3    three-minute conversation outside of

4    Houser's?

5          A.    No.  I don't recall.

6          Q.    What did you personally do next,

7    Mr. Lamm, after you ended your conversation

8    with Mr. Shalick, if anything?

9          A.    Another person walked over and he

10   said  -- that was a person John Tesoro --

11   and he said that he was hit as well.  And I

12   said, "Can you identify who it was if you go

13   back in the bar?"  He said yes.

14         Q.    How long was your conversation

15   with Mr. Tesoro?

16         A.    Maybe a little over a minute.

17         Q.    In your opinion, was Mr. Tesoro

18   inebriated at the time you were speaking

19   with him?

20         A.    He didn't appear to be very

21   inebriated, but --

22         Q.    Well --

23         A.    I -- they have all been drinking,

24   so.

25         Q.    Well, again, you weren't there at

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                    K. Lamm

1   the time of the incident, so you don't know

2   firsthand whether or not they were drinking,

3   correct?

4        A.    No.  But just the -- the smell of

5   alcohol.

6        Q.    Well, inebriation is like

7   pregnancy, sir, you either are inebriated or

8   you're not.  So my question is whether or

9   not he was a little inebriated or a lot

10  inebriated, was he inebriated, in your

11  opinion, when you were speaking with him?

12            MR. GOODSTADT:    Objection.

13       A.    Yes.

14       Q.    Okay.  Did you ask Mr. Tesoro at

15  that time how many drinks he had consumed

16  that night?

17       A.    No.  I don't believe so.

18       Q.    Okay.  So did Mr. Tesoro say

19  anything to you, other than what you've just

20  testified to, in this conversation outside

21  of Houser's?

22       A.    Not that I can recall.

23       Q.    Okay.  And what did you do next,

24  you personally, Mr. Lamm?

K. Lamm

1
2     A.    Went behind the two individuals.
3 Thomas Snyder took the lead. You had the
4 two individuals and then myself and
5 proceeded to go into Houser's Bar.
6     Q.    Did you speak to anybody, other
7 than these two individuals, before you went
8 into Houser's Bar?
9        MR. GOODSTADT:   And Gary -- and
10    Richie Bosetti.
11        MR. NOVIKOFF:   Yes. And
12    Richard.
13     A.    No.
14     Q.    Did any civilians approach you
15 before you walked into Houser's Bar?
16     A.    Not that --
17        MR. GOODSTADT:   Other than the
18    three people?
19        MR. NOVIKOFF:   Yes.
20     A.    Not that I can recall.
21     Q.    Did you attempt to talk to any
22 of -- any civilians, other than the three
23 people we've been talking about, before you
24 went into the bar?
25     A.    No.

1          K. Lamm

2      Q.     Okay.  You went into the bar.

3  Did any bouncer stop you from going into the

4  bar?

5      A.     The bouncer stopped Thomas

6  Snyder.

7      Q.     Okay.  So before you and

8  Mr. Snyder went in the first time, a bouncer

9  stopped you?

10     A.     Not me.  Thomas Snyder.

11     Q.     Okay.  Where were you when this

12  bouncer stopped Mr. Snyder?

13     A.     As I said before, it was Thomas

14  Snyder, the two individuals and myself in

15  behind.

16     Q.     Okay.  And did you witness the

17  bouncer stopping Mr. Snyder?

18     A.     Yes.  I saw that.

19     Q.     Did you hear what the bouncer had

20  said to Mr. Snyder, if anything?

21     A.     I don't know what the bouncer

22  said to -- to Thomas Snyder.

23     Q.     Do you know what Mr. Snyder said

24  to the bouncer, if anything?

25     A.     Yes, I do.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                  K. Lamm

2        Q.    And you heard this?

3        A.    Yes.

4        Q.    What did you hear?

5        A.    He says, "You can step aside or

6    you -- or you can be arrested for impeding a

7    police investigation."

8        Q.    And did the bouncer step aside?

9        A.    Yes, he did.

10       Q.    So how long did it take between

11   the time that Mr. Snyder approached the

12   entrance to Houser's and the time that

13   Mr. Snyder went into Houser's?

14       A.    To give an exact figure on it, I

15   couldn't tell you.  I wasn't time clocking

16   it.

17       Q.    I understand you weren't time

18   clocking it, but was it five seconds?

19       A.    No.  Maybe a little longer than

20   that.

21       Q.    10 seconds?

22       A.    That the doorman was preventing

23   Thomas Snyder from getting in?

24       Q.    Yeah.  So it was about 10

25   seconds?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2    A.    I would use that for now.  10

3  seconds.

4    Q.    I don't want you to agree with me

5  just for the sake of agreeing with me, sir.

6  I mean, I think it's clear you testified

7  that Snyder --

8    A.    I may recall later that it might

9  have been a different time, but for now, 10

10  seconds seems to be pretty somewhat fair.

11    Q.    Okay.  Great.  What did you

12  personally do next once the bouncer

13  permitted you, Snyder, Tesoro and Shalick to

14  go in the bar?

15        MR. GOODSTADT:    Objection.

16    A.    We told them to look around.

17    Q.    You told who to look around?

18    A.    Chris Shalick.

19    Q.    Okay.

20    A.    John Tesoro.

21    Q.    Did you tell them -- what did you

22  tell them to look for, if anything?

23    A.    If they can identify the

24  individual.

25    Q.    Okay.  And what did you do after

1          K. Lamm

2    you told them to  -- and did you tell them

3    to look around or did Snyder tell them to

4    look around?

5         A.    We both did.

6         Q.    Same time?

7         A.    Yeah.  Well --

8         Q.    In stereo?  At the same time you

9    told them both to look around?

10        A.    As we got in there -- Tom --

11   Thomas Snyder said, you know, "Look around.

12   See if you can identify anyone."  And we

13   walked to the back of the  -- of the

14   establishment out onto the back deck, and

15   that's when I said, "If you can -- if you

16   can identify anyone, let us know."

17        Q.    So Shalick and Tesoro walked with

18   you through the bar to the back deck?

19        A.    They did.

20        Q.    Okay.  Now you had known that the

21   Bosettis -- withdrawn.  By virtue of the

22   call to Snyder, you were aware that someone

23   had alleged that the Bosettis were involved

24   in a fight, correct?

25        A.    It may have only been one.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1       K. Lamm

2       Q.    Sir, let's go back to what --

3  let's go back to what you testified to.  You

4  said Snyder got a call, right?

5       A.    Yes.

6       Q.    And you said that Snyder told you

7  that the Bosettis were in a fight, correct?

8       A.    Correct.

9       Q.    So at least as of the time that

10  you rolled up to Houser's and spoke to

11  Richard Bosetti, you had no idea as to

12  whether it was either Richard or Gary

13  Bosetti in the fight, all you knew is that

14  someone had said the Bosettis were in a

15  fight, correct?

16       A.    Correct.

17       Q.    And given the knowledge that you

18  knew, according to the phone call, that the

19  Bosettis were in a fight, you permitted

20  Richard Bosetti to leave a potential crime

21  scene, correct?

22            MR. GOODSTADT:    Objection.

23       A.    I didn't give him any potential

24  to leave.  He worked for the department.

25       Q.    Was he a civilian at the time or

1          K. Lamm

2    was he on duty at the time?

3          A.    He was a civilian at the time.

4    He was a civilian then, too, because he was

5    never certified to be a police officer.

6          Q.    Yeah.  I get that, sir.  But he

7    wasn't on duty at the time, was he?

8          A.    No, he wasn't.  But if he worked

9    for the department, you figured he would

10   have helped us out.

11   MO          MR. NOVIKOFF:    Motion to

12        strike.

13         Q.    Was he on duty at the time, sir?

14         A.    No, he wasn't.

15         Q.    Okay.  And you know of no

16   impediment, no law that says you can't

17   arrest an off duty police officer who may be

18   involved in a physical altercation, do you?

19         A.    Not that I'm aware of.

20         Q.    Are you aware of any law in the

21   State of New York that says you can't detain

22   an off duty police officer who you have

23   become aware of may be involved in a crime?

24         A.    Not that I'm aware of.

25         Q.    Right.  Okay.  So now you're in

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2     the bar and you have knowledge that the

3     Bosettis have been in a fight, correct, at

4     least according to the phone call to Snyder,

5     right?

6          A.    Yes.

7          Q.    You knew what Gary Bosetti looked

8     like -- looked like, correct?

9          A.    Yes.

10         Q.    There was no doubt as to what

11    Gary Bosetti looked like, in your opinion,

12    right?

13         A.    That's right.

14         Q.    So can you explain for the jury

15    if you were aware as to who may have been

16    involved in the fight, why you needed the

17    civilians to see if Gary Bosetti was in the

18    bar?

19         A.    Because they were there for the

20    incident and they had to identify the person

21    that was in this altercation with them.

22         Q.    Did you look by yourself --

23    withdrawn.  Did you look for Gary Bosetti

24    while you were in the bar?

25         A.    Myself and Thomas Snyder

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    approached Rich Bosetti and asked, "Where's

3    your brother?"

4         Q.    I'm not talking about what took

5    place outside.  When you were in the bar,

6    did you look for Gary Bosetti?  You

7    personally?

8         A.    When I was inside the bar --

9         Q.    Yes.  That's what I'm asking.

10        A.    I -- I'm giving you the answer.

11        Q.    Okay.

12        A.    I asked Rich Bosetti, "Where is

13   your brother?"

14        Q.    You said Rich Bosetti walked

15   away?

16        A.    He went back into the bar.

17        Q.    Oh, so while you were talking

18   with Shalick, Bosetti walked away and went

19   back into the bar, is that your testimony?

20        A.    Yes.

21        Q.    Okay.  So when you were in the

22   bar, you approached Richard Bosetti?

23        A.    Yes.

24        Q.    And what did you ask him?

25        A.    "Where's your brother?"

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        Q.     And what did he say?

3        A.     He didn't answer.

4        Q.     Did you ask him anything else?

5        A.     Thomas Snyder.

6        Q.     No.  You.  Did you ask him

7   anything else?

8        A.     I said, "What happened in here?"

9   And he still didn't answer.

10       Q.     But you had already asked him

11  that outside, right?

12       A.     Yes.

13       Q.     Did you -- why didn't you ask him

14  outside where his brother was, since you had

15  known by that time that the Bosettis were

16  involved in a fight?

17       A.     Because we didn't have all the

18  facts yet.

19       Q.     You didn't have any more facts

20  when you walked in, did you?

21       A.     That's why they had to go inside

22  and identify.

23       Q.     But, sir, you were told on the

24  phone call that the Bosettis were in a

25  fight, right?

Page 313

1                    K. Lamm

2         A.    I was not told that.

3         Q.    You heard that from Snyder?

4         A.    Yes.

5         Q.    You knew what Snyder had told you

6    when you first approached Bosetti outside,

7    right?

8         A.    Yes.

9         Q.    But you didn't ask Richard

10   Bosetti when you were outside where his

11   brother was, did you?

12        A.    No.

13        Q.    Okay.  So let's go back inside.

14   You asked Bosetti where his brother was and

15   he didn't answer you, right?

16        A.    Right.

17        Q.    You asked Richard Bosetti what

18   went on and he didn't answer you?

19        A.    Right.

20        Q.    Did you believe he was being

21   uncooperative in the investigation?

22        A.    Yes.

23        Q.    Okay.  So if I understand this

24   correctly, you are aware from a phone call

25   that Mr. Richard Bosetti was potentially

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1         K. Lamm

2    involved in hitting someone with a pool cue,

3    he was being uncooperative in an

4    investigation, and you allowed him to leave

5    the bar; is that correct?

6         A.    We didn't know if Rich Bosetti

7    hit anyone with a pool cue.

8         Q.    That wasn't my question, sir.

9    Sir, you were advised by Mr. Snyder that

10   someone had called up and said the Bosettis

11   were in a fight, right?

12        A.    Yes.

13        Q.    You were told by Shalick and

14   Tesoro that someone had swung and hit them

15   with a pool cue, right?

16        A.    Yes.

17        Q.    Okay.  Bosetti was in the bar,

18   right?

19             MR. GOODSTADT:    Objection.

20        Q.    Correct?

21             MR. GOODSTADT:    Which Bosetti?

22        A.    At what time?

23        Q.    Rich Bosetti, when you first

24   walked in the bar, right?

25        A.    He went back into the bar, and

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2     when we walked in there, he was in there.

3          Q.    And you asked him two questions

4     which he didn't answer?

5          A.    Right.

6          Q.    At some point in time, did Rich

7     Bosetti leave the bar?

8          A.    I'm sure he did, after we left.

9          Q.    So while you were still there,

10    Richard Bosetti was there?

11         A.    Yes.

12         Q.    Is that your testimony?

13         A.    Yes.

14         Q.    Okay.  So let's stay there.  Did

15    you ask Richard Bosetti any other questions

16    concerning the incident while you were in

17    Houser's for the first time?

18         A.    I believe -- I -- just from what

19    I remember, I asked him, "What happened in

20    here and where's your brother?"

21         Q.    Okay.  So those are the only two

22    questions you recall asking him?

23         A.    From what I can recall, yes.

24         Q.    Did Mr. Snyder, in your presence,

25    ask Mr. Richard Bosetti any questions?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                   K. Lamm

2        A.    Yes.

3        Q.    What did Mr. Snyder ask him?

4        A.    From what I can recall, I

5   remember him asking basically the same

6   thing.  "Where's your brother?"

7        Q.    Okay.  And was Mr. Richard

8   Bosetti as uncooperative with regard to

9   Snyder's questions as he was with yours?

10       A.    Yes.

11       Q.    Okay.  Did Mr. Fiorillo, in your

12   presence, ask Mr. Richard Bosetti any

13   questions while you were in the bar?

14       A.    Mr. Fiorillo was not inside the

15   bar.

16       Q.    Okay.  Was Mr. Fiorillo ever

17   inside the bar while you and Mr. Snyder were

18   in the bar?

19       A.    I don't believe so.

20       Q.    Okay.  That's -- that's fine.  So

21   Richard Bosetti was uncooperative in

22   response to your two questions.  What, if

23   anything, did you do next?  Well, let me ask

24   you a question.  Did you talk to Richard

25   Bosetti as soon as you got into the bar?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2       A.    No.  As soon as we got into the

3  bar, we went to the back deck for them to

4  make an ID.

5       Q.    And did they make an ID?

6       A.    They said, "He's not in here."

7  But they pointed to Rich Bosetti and they

8  said, "He was with this guy and he looked

9  like this guy."

10      Q.    Okay.  Did you -- well, what did

11 you do next after  -- well, who said "he

12 looked like this guy"?

13      A.    Chris Shalick.

14      Q.    After Chris Shalick made this

15 statement to you, what, if anything, did you

16 do next?

17      A.    I went over by the bar itself and

18 there was somebody there by the name of Dan

19 McKenna, and I asked him what he seen in

20 here tonight.

21      Q.    And what did he say?

22      A.    "I didn't see anything.  I'm

23 going home."

24      Q.    Okay.  And what, if anything, did

25 you do next?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                        K. Lamm

1

2        A.    We had them continue looking

3   around by the bathrooms.

4        Q.    Okay.

5        A.    And they said, "He's not in

6   here."

7        Q.    And what, if anything, did you

8   personally do next?

9        A.    They said that they had injuries,

10  and I asked out loud if anybody seen

11  anything happen in here tonight.

12       Q.    And what, if anything, came back

13  to you in response?

14       A.    There was no response.

15       Q.    Okay.  How many people were in

16  the bar at that time?

17       A.    At that time, maybe 10 or less

18  than 10 at that time.

19       Q.    Did you take the names down of

20  the people that were in the bar at that

21  time?

22       A.    No.

23       Q.    Did you inquire with Mr. Tesoro

24  or Mr. Shalick as to whether Richard Bosetti

25  was involved in the physical altercation?

1                     K. Lamm

2          A.    I don't remember at that time if

3    I did or not.

4          Q.    Specifically you now, did you ask

5    Mr. Tesoro what happened  -- while you were

6    in the bar now, did you ask Mr. Tesoro his

7    version of the events?

8          A.    He said that --

9          Q.    My question is, did you ask

10   Mr. Tesoro to describe for you his version

11   of the events that happened?

12         A.    I asked him to tell me, but

13   exactly where I asked him, whether I was

14   inside the bar at that time or just had

15   left, I don't remember where I asked him.

16         Q.    Okay.  Next -- same question with

17   regard to Mr. Shalick?

18         A.    Same thing.

19         Q.    Okay.  How long were you in the

20   bar for?  You personally now.  I'm not

21   asking you about Snyder.

22         A.    Maybe close to 10 minutes.

23         Q.    Okay.  Had any further

24   conversations with Mr. Richard Bosetti while

25   you were in the bar for these 10 minutes

1                      K. Lamm

2    maybe?

3          A.    No.

4          Q.    Okay.  Did you instruct

5    Mr. Bosetti to come with you to the police

6    station to give a statement prior to you

7    leaving the bar?

8          A.    I don't remember exactly, but at

9    that time, we needed to aid the  -- aid the

10   victims.  Get them first aid.

11   MO   Q.    My question to you, sir, is --

12   and motion to strike -- did you ask

13   Mr. Bosetti, Richard Bosetti to accompany

14   you to the police station to give his

15   version of the events?

16         A.    I don't recall.

17         Q.    Okay.  Did you look for the pool

18   cue that Mr. Shalick had said was broken in

19   half?

20         A.    Yes, we did.

21         Q.    Did you find it?

22         A.    No.

23         Q.    How long did you look for it?

24         A.    For as long as we were in there.

25         Q.    You looked under every table?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        A.    From what I can remember, there

3    were small tables up against the wall.  The

4    floor was opened.

5        Q.    What did -- did you look under

6    the pool table?

7        A.    Yes.

8        Q.    Okay.

9        A.    And on the pool rack.

10       Q.    Okay.  What did you -- so you saw

11   no evidence of a broken pool cue, correct?

12       A.    No.

13       Q.    What did you personally do next

14   upon your leaving Houser's?

15       A.    Escorted the two individuals back

16   to the police station.

17       Q.    Did you ever go back to Houser's

18   the morning of the 31st to further

19   investigate the incident?

20       A.    No.

21       Q.    Are you aware if Mr. Snyder ever

22   went to -- back to Houser's the morning of

23   the 31st to further investigate the

24   incident?

25       A.    I'm not aware if he did.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2      Q.    How about Mr. Fiorillo?

3      A.    I'm not aware if he did.

4      Q.    Okay.  Now did any patron state,

5  in your presence in Houser's Bar, that they

6  were afraid that there was going to be a

7  cover up when you were in the bar?

8      A.    Chris Shalick said something that

9  this -- this is going to be covered up.

10 Exactly where and when he stated that, I'm

11 not sure if it was inside the bar, outside

12 the bar, but he said it inside the police

13 station.

14     Q.    Other than Mr. Shalick, in the

15 bar itself, did any other individual say

16 that they believed that there was going to

17 be a cover up?

18     A.    I don't recall.

19     Q.    Before you walked into Houser's,

20 did you hear anybody say that there was

21 going to be a cover up?

22     A.    I don't remember at this time.

23     Q.    As -- when you left Houser's and

24 before you got to the police station, did

25 anyone state, in your presence, that there

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1  was going to be a cover up?

3      A.    I believe going back to the

4  police station, that's when Chris Shalick

5  said that this is going to be a cover up.

6      Q.    Sir, my question to you is, other

7  than Mr. Shalick, between the time that you

8  left Houser's Bar and the time you got to

9  the police station, did anybody say to you

10 that they believed it was -- there was going

11 to be a cover up?

12     A.    Not that I can recall.

13     Q.    Okay.  Did you have Gary

14 Bosetti's cell phone number?

15     A.    Not personally on me.

16     Q.    Could you have acquired that cell

17 phone number?

18     A.    Yes, I could have.

19     Q.    How could you have?

20     A.    I would have to go through the

21 police Rolodex.

22     Q.    And that was in the police

23 station?

24     A.    Yes.

25     Q.    Did you attempt to reach Gary

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1            K. Lamm

2     Bosetti via cell phone the morning of

3     October 31, 2004?

4          A.     No, I did not.

5          Q.     Did you call Sergeant Hesse at

6     any point in time during the morning of

7     October 31, 2004?  You personally now, I'm

8     not asking you about anybody else.

9          A.     No, I did not call Sergeant

10    Hesse.

11         Q.     Did you call Chief Paridiso at

12    any time during the morning of October 31,

13    2004?

14         A.     No, I did not.

15         Q.     Okay.  Did you call Mayor Rogers?

16         A.     No.

17         Q.     Okay.  Now what -- when you got

18    to the police station, what time was it?

19         A.     Close -- close to 3:00 a.m.

20         Q.     Okay.  What, if anything, did you

21    do next at 3:00 a.m. when you went to the

22    police station with Shalick and Tesoro?  You

23    personally now, not anybody else.

24         A.     I asked about his -- about his

25    injury and he was holding his arm.  And I

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    gave him an ice pack at that time.

3          Q.    Did you ask him -- and who is

4    this again?

5          A.    Shalick.

6          Q.    Did you ask Shalick to -- to

7    describe for you his version of the events

8    when he was in the police station?

9          A.    Yes.  That's -- we took out

10   statement forms.

11         Q.    Okay.  And did you take notes

12   down as he was writing before you put --

13   well, who wrote the statement, you or

14   Shal -- you or Shalick?

15         A.    Chris Shalick wrote the statement

16   I believe.

17         Q.    Okay.  Did you take any notes of

18   anything that Mr. Shalick said?

19         A.    I may have.  I don't recall that.

20         Q.    Okay.  Did you take any  -- did

21   you have any communication with Vankoot that

22   evening?

23         A.    Yes, I did.  When we got back to

24   the station, Frank, shortly after, brought

25   another  -- a third individual back who was

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    Brian Vankoot, who had injuries to his face

3    and -- and his throat.

4         Q.    And what communications, if any,

5    did you have with Vankoot?

6         A.    He said that he was in a choke --

7    choke hold.

8         Q.    Did you ask him -- I mean, what

9    precipitated him telling you this

10   specifically?

11        A.    I don't remember exactly.

12        Q.    Is that the only communication

13   that you had with Vankoot -- Vankoot while

14   he was in the police station?

15        A.    There may have been more, but I

16   don't remember.

17        Q.    Okay.  Did you have any

18   communications with Tesoro when he was in

19   the police station?

20        A.    Yes, I did.

21        Q.    Describe for me the

22   communications that you had with Tesoro.

23        A.    He said that he was hit with a

24   fist or a foot about the head.

25        Q.    What precipitated Mr. Tesoro

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

telling you this?

A.    I asked him about what had happened.

Q.    Was it your responsibility that night to take Mr. Tesoro's statement?

A.    Yes.  He was there.  I took his statement.

Q.    You took -- as opposed to Snyder or Fiorillo, you took Mr. Tes -- Mr. Tesoro's statement?

A.    I believe I took his statement.

Q.    And as opposed to Snyder and Fiorillo, you took Shalick's statement?

A.    I took Shalick's statement, yes.

Q.    Did you take Vankoot's statement?

A.    I think one of the other officers took Vankoot's statement.

Q.    And did you take any  -- any notes with regard to what Tesoro said to you?

A.    I don't recall.  I took -- I had taken photos of the injuries and rescue was called.

Q.    Okay.  Where did Tesoro write out

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2  his statement?

3      A.    I believe it was -- it was in the

4  police station.

5      Q.    Was Richard Bosetti in the police

6  station at any point in time between the

7  time that you arrived at the police station

8  with Tesoro and Shalick and the time that

9  rescue came?

10     A.    Yes.  Rich Bosetti did come in

11 the police station.

12     Q.    And did you attempt to question

13 him?

14     A.    When he came in there, he said he

15 was going to use the bathroom, and that's

16 when Chris Shalick pointed and said, "This

17 is going to be a cover up," and we asked

18 Rich to leave because he was disrupting

19 the -- the victims.

20     Q.    Well, what was he doing that was

21 disruptive?

22     A.    Because when he came in there,

23 they seemed to get a little rambunctious,

24 and we asked Rich to leave.

25     Q.    What do you mean by rambunk --

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                K. Lamm

2  "rambunctious"?

3         A.    Because they were say -- Chris

4  Shalick was saying that this is going to be

5  a cover up, and he seemed to get agitated,

6  so that's when we asked Rich to leave.

7         Q.    Did Vankoot get agitated?

8         A.    No.

9         Q.    Did Vankoot say there was going

10 to be a cover up?

11        A.    I don't recall.

12        Q.    Did Tesoro get agitated?

13        A.    I don't recall.

14        Q.    Did Tesoro get -- did Tesoro say

15 there was going to be a cover up?

16        A.    I don't recall.

17        Q.    So how long did you personally

18 see Richard Bosetti in the  -- in the police

19 station?

20        A.    Maybe two minutes.

21        Q.    Okay.  And how long  -- was there

22 any other civilians in the police station

23 when Vankoot, Shalick and Tesoro were in the

24 police station?

25        A.    I think later one of the friends,

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2   a girlfriend came by the station when he was

3   in there.  Vankoot.

4        Q.    And did you take the statement of

5   the girlfriend?

6        A.    I myself didn't.

7        Q.    Did you ask the girlfriend what

8   happened?

9        A.    Not me myself, no.

10       Q.    Okay.  Other than the girlfriend

11   and the three individuals that we're talking

12   about and Richard Bosetti, were there any

13   other civilians in the police station?

14       A.    If you want to consider the EMTs

15   civilians.

16       Q.    How long after you arrived did

17   the EMT people come?

18       A.    Well, when they were called, they

19   came to the station.

20       Q.    Yeah.  How long was it?

21       A.    Were they there at the station

22   or --

23       Q.    You arrived at 3:00.  When did

24   they arrive?

25       A.    Quickly.  Maybe within  -- maybe

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    within four minutes.

3          Q.    And how long did they stay?

4          A.    They stayed for quite a while,

5    because we had to call a Suffolk County

6    police boat to come transport the aided off

7    the island.

8          Q.    When did  -- when did -- when did

9    the three gentlemen that were alleged

10   victims leave the police station?

11         A.    Well, I believe my -- I believe

12   one of them, which is Bri -- Vankoot, he was

13   taken off by police boat.  And exact time,

14   I -- I don't know an exact time.  But he

15   was -- EMTs said that he had an unaligned

16   trachea.

17   MO          MR. NOVIKOFF:    Okay.  Motion to

18        strike as nonresponsive.

19         Q.    When -- how did the other two

20   alleged victims leave the police station?

21         A.    I believe they walked out, from

22   what I can remember.

23         Q.    How long after -- well, did they

24   leave -- did they walk out before or after

25   Vankoot was taken out of the police station?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1               K. Lamm

2        A.    I think after Vankoot left on the

3    boat is when they left.

4        Q.    How long after Vankoot left on

5    the boat did the individuals leave, the

6    other two individuals leave?

7        A.    It was around the same time

8    frame.

9        Q.    And after Tesoro gave his

10   statement, did you have any further

11   communications with him while he was in the

12   police station?

13       A.    If I did, I don't recall it.

14       Q.    After -- I'm sorry, let me ask

15   the question again.  After Tesoro wrote out

16   his statement, did you have any further

17   communications with him in the police

18   station?

19       A.    I may have, but I -- I don't

20   recall.  Rescue came in there and was

21   administering treatment.

22   MO        MR. NOVIKOFF:   Motion to strike

23       everything after "I don't recall."

24       Q.    After Shalick wrote out his

25   statement, did you have any further

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm
2    communications with him while he was in the
3    police station?
4         A.    Yes.
5         Q.    And what did  -- what was the sum
6    and substance of this communication?
7         A.    He stated that his friend was in
8    a choke hold and he went to pull his friend
9    out of the choke hold, and that's when he
10   got hit with the pool cue.
11        Q.    All right.  Did he say anything
12   else about what led up to the incident?
13   Actually, let me rephrase the question.  Did
14   Shalick ever discuss with you, outside of
15   his written statement, what he perceived to
16   have happened that led up to the alleged
17   physical altercation with Gary Bosetti?
18        A.    I don't recall that.
19        Q.    Did you ask him that?
20        A.    I may have.
21        Q.    Do you recall as you sit here
22   today doing it?
23        A.    At this time, I don't.
24        Q.    With Tesoro, did you ever ask
25   Tesoro, independent of his written

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    statement, what he perceived took place that

3    led up to the physical altercation with Gary

4    Bosetti?

5         A.    I believe he went in to  -- to

6    help his friend, from what he had stated,

7    and that's when he was hit as well.

8    MO          MR. NOVIKOFF:    Motion to strike

9         as nonresponsive.

10        Q.    My question to you is, did you

11   ask Tesoro what his version of the events

12   were that led up to the physical

13   altercation, independent of -- of what he

14   may have written in his written statement?

15        A.    I may have, but I don't recall

16   that.

17        Q.    Fine.  What forms did you fill

18   out  -- well, when did you leave  -- when

19   did your shift end that night?

20        A.    Mine ended at 5:00 a.m.

21        Q.    5:00 a.m. on October 31?

22        A.    Yes.

23        Q.    You came into the police station

24   at 3:00 with the alleged victims, correct?

25        A.    Approximately.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                          K. Lamm

2          Q.      How soon prior to the end of your

3    5:00 shift did every alleged victim leave

4    the police station?

5                  MR. GOODSTADT:     Objection.

6                  MR. NOVIKOFF:     Yeah, I know.

7          It was ugly form, but it's late.

8          A.      To give an exact timing, I

9    couldn't.

10         Q.      Approximate?

11         A.      But maybe we'll say 4:30.

12         Q.      Okay.  What forms did you

13   personally fill out, if any, before the end

14   of your shift on October 31, 2004?

15         A.      It was just one of the statement

16   forms I -- that they had wrote on.  I had to

17   sign it.

18         Q.      Okay.  And whose did you sign?

19         A.      Chris Shalick's.

20         Q.      Okay.  You didn't sign Tesoro's?

21         A.      I'm not sure if I did.

22         Q.      Okay.  Why did you have to sign

23   Shalick's form?

24         A.      I was the officer there that he

25   was giving the statement to.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

Q.    Okay.  Other than you signing off
on Shalick's form and maybe Tesoro's form,
what other forms, if any, did you personally
write out before the end of your shift on
October 31, 2004?

A.    I don't believe I personally
wrote out any other forms.

Q.    That's -- that's fine.  Did you
write out any forms after October 31, 2004
concerning the Halloween incident?

A.    I was asked to write a statement.

Q.    My question isn't what you were
asked.  Did you write out any official
police forms, after October 31, 2004,
concerning the Halloween incident?

A.    Handwritten as you say "write
out"?

Q.    Yeah.

A.    No.

Q.    Did you type out?

A.    Yes.

Q.    What did you type out?

A.    I was asked to give a statement
as to what the events were of that incident.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    Who asked you?

3     A.    George Hesse.

4     Q.    When did George Hesse ask you

5  this?

6     A.    A few days after.  Maybe four

7  days, five days after.

8     Q.    Now this was off season, correct?

9     A.    Yes.

10    Q.    Did George Hesse ask you -- I

11  mean, did he ask you this over the phone?

12    A.    I don't know if it was in phone

13  or it was the next day when I was working.

14  But he did -- he did ask me.

15    Q.    It could have been -- could have

16  been the evening of October  -- of November

17  1?

18    A.    It could have been.  It could

19  have been the next day I was working.

20    Q.    What did Mr. Hesse ask you?

21    A.    For me to write out a statement

22  as to what had happened.

23    Q.    Did Mr. Hesse ask you why he

24  wanted you to write out a statement?

25          MR. GOODSTADT:    Objection.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2       A.    I don't recall.  But it was an

3  uncommon practice.

4       Q.    Well, I was going to get to that.

5  But my question to you is, did Mr. --

6  Mr. Hesse -- no.  I'm sorry.  Did Mr. Hesse

7  advise you as to why he was asking you --

8  advising you -- did Mr. Hess advise you as

9  to why he was asking you to write out the

10 statement, type out the statement?

11      A.    He just said he wanted to know

12 what had happened.

13      Q.    And did you make -- did you

14 respond to him in any way?

15      A.    I said yes, okay, and I typed

16 something out.

17      Q.    And did -- who did you give it

18 to?

19      A.    It was sent to George Hesse.

20      Q.    How did you send it to George

21 Hesse?

22      A.    Through an email.

23      Q.    What was your next communication

24 with George -- oh, through an email?

25      A.    Yes.

1                    K. Lamm

2       Q.      Okay.

3       A.      Again, uncommon practice.

4    MO           MR. NOVIKOFF:      I got that.

5       Motion to strike.

6       Q.     How long was this statement?

7       A.     I believe two pages.

8       Q.     Okay.  And what was the next

9    communication -- well, did you have any

10   communication with Chief Paridiso concerning

11   the Halloween incident?

12            MR. GOODSTADT:     At any time or

13       in that time frame?

14            MR. NOVIKOFF:    In the time

15       frame between the Halloween incident

16       and the end of the year.

17       A.    I don't  -- I don't believe I

18   did.  I may have, but I'm not for certain.

19       Q.    Before  -- between the end  --

20   between the new year and June, the end of

21   June 2005, did you have any communication

22   with Chief Paridiso concerning the Halloween

23   incident?

24       A.    Other than the fact that John

25   Cherry, Patrick Cherry was the one doing an

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                        K. Lamm

1  investigation on it.  That was it.

2        Q.    Well, when did you have a

3  communication with Chief Paridiso concerning

4  Pat Cherry doing the investigation?

5        A.    I received that communication

6  from actually George Hesse about Cherry

7  doing the investigation on the Halloween

8  incident.

9        Q.    Okay.  So my question to you is,

10 what communications did you have with Chief

11 Paridiso before the end of June '05

12 concerning the Halloween incident?

13       A.    I don't believe -- if I did have

14 any, I don't recall it.

15       Q.    That's fine.  After you emailed

16 your statement to Chief  -- to Mr. Hesse,

17 when was your next communication, if any,

18 with Mr. Hesse concerning the Halloween

19 incident?

20       A.    The next time I saw him when

21 working, I asked him what's going on with

22 the -- with the incident.

23       Q.    And what did he say to you, if

24 anything?

1        K. Lamm

2        A.    He said -- he said it's under

3    investigation.

4        Q.    And what did you say to him, if

5    anything?

6        A.    I said, "Okay.  Well, let me know

7    if you need anything."

8        Q.    And what did he say?

9        A.    "Okay."

10       Q.    What was your next communication

11   with Mr. Hesse after that communication

12   concerning the Halloween incident?

13       A.    I asked him one more time.  It

14   was approximately -- maybe another month or

15   so, five weeks after, and I said, "Anything

16   happen with the investigation of the

17   Halloween incident?"  He says, "It's still

18   under investigation."

19       Q.    Was that your last communication

20   with Mr. Hesse concerning the Halloween

21   incident before the end of the year?

22       A.    End of the year as in what year?

23       Q.    2004?

24       A.    No.  I said at first I had a

25   communication with him after I wrote the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     statement, so maybe it was just the

3     beginning of the -- the new year.

4          Q.    Oh, okay.

5          A.    Two communications.

6          Q.    Between -- and other than those

7     two communications that you've just

8     testified to, when was the next time, if

9     any, that you had a communication with

10    Mr. Hesse concerning the Halloween incident?

11         A.    The next time he spoke to me was

12    in June of 2005.

13         Q.    And what, if anything, did he

14    say?

15         A.    He said, "I just wanted to tell

16    you that the Halloween investigation is

17    over."

18         Q.    And what did you say in response,

19    if anything?

20         A.    I said, "How come we weren't

21    asked to appear in court or -- or asked our

22    side of the story?"

23         Q.    And what, if anything, did he

24    respond?

25         A.    He said, "You weren't needed."

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2         Q.    And what, if anything, did you

3    respond?

4         A.    I said, "How were we not needed?

5    We were there for it."

6         Q.    And what, if anything, did Hesse

7    respond?

8         A.    He said, "The statement you wrote

9    was no good and that's not what happened."

10         Q.    And what -- okay.  I'm sorry.

11    Did --

12         A.    Yes, you interrupted me.  It's

13    okay.  I said, "How do you know what

14    happened?  You weren't there.  I was."

15         Q.    And what, if anything, did Hesse

16    say to you?

17         A.    He says, "What you wrote wasn't

18    any good," and he pointed to himself, and he

19    says, "I know what happened," and he held up

20    a folder, and he said, "This is what

21    happened."

22         Q.    And what, if anything, did you

23    say in response to Hesse?

24         A.    I said, "The statement that I

25    wrote is what happened."

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2     Q.    And what, if anything, did Hesse

3  say to you?

4     A.    He goes, "I want you to take a

5  look at this and -- and see what we have."

6          MR. NOVIKOFF:    Okay.  Let --

7     we're going to continue with this.  We

8     have to change the tape.  Can we just

9     stay in the room instead --

10          MR. GOODSTADT:    I have to use

11     the restroom.  I won't --

12          MR. NOVIKOFF:    Yeah.  Let's not

13     take long because I don't think I have

14     all that much, and I'd just as soon get

15     done in the next 10 or 15 minutes

16     instead of waiting 10 or 15 minutes.

17          MR. GOODSTADT:    Yeah.

18     That's --

19          THE VIDEOGRAPHER:    This ends

20     tape number six.  The time is 5:29 p.m.

21     We're going off the record.

22          (A break was taken.)

23          THE VIDEOGRAPHER:    This begins

24     tape number seven.  The time is 5:37

25     p.m.  Back on the record.

K. Lamm

1

2      Q.    Now, Mr. Lamm, we were talking

3  about your conversation with Mr. Hesse in

4  June of 2005, do you recall that?

5      A.    Yes.

6      Q.    What else was said in this

7  conversation, other than what you've already

8  testified to?

9      A.    When Hesse said that this is what

10 happened, he pointed to himself and said, "I

11 know what happened.  This is what happened,

12 and I want you to read it."  And I said,

13 "That's not what happened."  And then I told

14 him what had happened.  And I also told him

15 that Joe Loeffler was there at the -- at the

16 police station that stated it was an assault

17 second.

18     Q.    Now you told him what happened

19 based upon what the alleged victims told you

20 what happened, correct?

21     A.    Correct.  And --

22     Q.    Yes or no, correct?

23     A.    Yes.

24     Q.    Okay.

25     A.    And what Joe Loeffler said about

Precise Court Reporting
(516) 747-9393 (718) 343-7227 (212) 581-2570

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                 K. Lamm

2     it being an assault second.

3     MO          MR. NOVIKOFF:    Okay.  Did you

4         tell -- well, I'm going to move to

5         strike everything other than the word

6         "yes."

7                 MR. GOODSTADT:    Okay.

8         Q.    And other than  -- after you told

9     Mr. Hesse what Mr. Loeffler said, what, if

10    anything, did Hesse say to you?

11        A.    He said, "I want you to read this

12    folder."

13        Q.    And what, if anything, did you

14    say to Hesse in response?

15        A.    So I looked at it, and as I was

16    looking at it, I said, "These are just

17    statements written from your friends."

18        Q.    What did Mr. Hesse say in

19    response to that?

20        A.    He said --

21        Q.    If anything?

22        A.    He said, "Well, that's what

23    happened.  Those were the witnesses."

24        Q.    And what, if anything, did you

25    say to Hesse?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2         A.    I said, "How come they didn't

3    give us any statements?"

4         Q.    How come who didn't give you any

5    statements?

6         A.    The ones that were there that

7    gave statements.  How come they didn't

8    cooperate with us.  And also, I said, "How

9    come we don't have the Bosettis in here to

10   discuss this?"

11        Q.    And what, if anything, did Hesse

12   say to you in response?

13        A.    He said, "Gary Bosetti was wrong

14   for leaving the scene."

15        Q.    And what, if anything, did you

16   say?

17        A.    I said, "Well, how come we

18   weren't asked to appear in court for any of

19   this?  And how come we weren't asked all

20   these months that have passed by to be part

21   of this investigation?"

22        Q.    And what, if anything, did Hesse

23   say?

24        A.    He said, "You weren't needed."

25        Q.    I think we established that.  So

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1          K. Lamm

2    is there anything else that you said to

3    Hesse, other than what you've already

4    testified to?

5        A.   No.  I said, "that's not" -- I

6    said, "The way you're -- you're saying it,

7    that's not what happened."

8        Q.   Okay.  And you've said that.  Now

9    is there anything else that you recall

10   saying to Hesse or Hesse saying to you,

11   other than what you've just testified to?

12       A.   Hesse told me that after the

13   incident occurred, that Matt the plumber

14   took Gary Bosetti off the Island and drove

15   him to the Fire Island Lighthouse so he

16   could leave.

17       Q.   Great.

18       A.   In his own personal vehicle.

19       Q.   What else, if anything, do you

20   recall being said between you and Hesse,

21   other than what you just testified to?

22       A.   I believe that's all for now.

23       Q.   How long was this phone

24   conversation with Hesse?

25       A.   I was -- it was in person in the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

```
                      K. Lamm
 1
 2   police station.
 3          Q.    How long was this in person
 4   conversation?
 5          A.    About 15 minutes.
 6          Q.    Was anyone else present with you?
 7          A.    Not with me.  But John Cherry was
 8   there.
 9          Q.    Okay.  Anyone else, besides
10   Cherry, Chief -- well, Sergeant Hesse and
11   you?
12          A.    That was it.  That I'm aware of.
13          Q.    Well, you would have been aware
14   of who was in the room, right?
15          A.    I would have, yes.
16          Q.    Okay.
17          A.    But there could have been, you
18   know, somebody in the back room by the cells
19   that I didn't know was there.
20          Q.    Okay.  But in the room that you
21   were in, those were the only two people that
22   were present?
23          A.    From what I seen.
24          Q.    Okay.  Did you have any other
25   communications with Mr. Hesse concerning the
```

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1              K. Lamm

2    Halloween incident after this June 2005

3    conversation?

4         A.    I don't believe so.

5         Q.    After this June 2005

6    conversation, did you ever have a

7    conversation with Chief Paridiso before

8    you -- before your last day of employment

9    concerning the Halloween incident?

10        A.    I don't believe so.

11        Q.    Did you ever advise May -- Mayor

12   Rogers of your concerns regarding the

13   investigation after this June 2005

14   conversation with Hesse?

15        A.    No.

16        Q.    Did you ever advise Trustee

17   Loeffler of your concerns concerning this

18   2000  -- this investigation after your June

19   2005 conversation with Hesse?

20        A.    No.  He was there.  He drove the

21   ambulance and saw it and stated it was an

22   assault second.

23   MO        MR. NOVIKOFF:    Yeah.  Thanks.

24        You already said that.  Motion to

25        strike after the word "no."

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

K. Lamm

1

2    Q.    Have you spoken to Chief

3  Paridiso, you personally, concerning this

4  lawsuit?

5    A.    No.

6    Q.    Have you spoken to Chief Paridiso

7  concerning the fact that you say you were

8  terminated from employment?

9    A.    No.

10    Q.    Have you had any communications

11  with Chief Paridiso after April 2, 2006?

12    A.    Yes, I have.

13    Q.    What communications did you have

14  with him?

15    A.    He needed a parking pass to park

16  his vehicle when he went away.

17    Q.    Parking pass from whom?

18    A.    For the airport to park.

19    Q.    And did you provide it for him?

20    A.    As a courtesy, the department

21  does that for people.

22    Q.    I'm just asking you if you

23  provided it for him?

24    A.    Yes.  Not -- I didn't personally

25  hand it to him or anything, but, you know,

1                     K. Lamm

2      he was given his pass so he could park his

3      vehicle.

4           Q.    Other than that interchange, did

5      you have any other communication with Chief

6      Paridiso after April 2, 2006?

7           A.    Not that I can recall.

8           Q.    And during this discussion

9      concerning the parking pass, did you discuss

10     any issues concerning this lawsuit?

11          A.    No.

12          Q.    Did you discuss any issues

13     concerning your termination?

14          A.    No.

15          Q.    Did you discuss any issues

16     concerning George Hesse?

17          A.    No.

18          Q.    Okay.  And how long was this

19     conversation with Chief Paridiso?

20          A.    It was short.  Two, three

21     minutes.

22          Q.    Okay.  Did you ever post any

23     blogs on any site concerning Ocean Beach

24     after you were  -- after your last day of

25     employment with Ocean Beach?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2          A.    No, I did not.

3          Q.    Have you ever posted a blog where

4    the issue concerning Ocean Beach was

5    discussed?

6          A.    No.

7          Q.    You understand when I say

8    "posting a blog"?

9          A.    Yes, I understand when you say

10   posting a blog.  I know things have been

11   posted of me.

12         Q.    On what blog?

13         A.    On Long Island Politics Blog, the

14   Schwartz Report.

15         Q.    Okay.  So my question is, have

16   you ever posted on The Schwartz Report, a

17   blog?

18         A.    No, I have not.  But from my

19   understanding, it was told to Tom Snyder

20   that members of the department and Tyree

21   Bacon were posting things about me on that

22   blog about my character.

23         Q.    You happy?  You done with your

24   answer?

25         A.    That's my answer.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    MO           MR. NOVIKOFF:    Motion to strike

3         as nonresponsive.  After the fact --

4         after the testimony where he says he

5         didn't post any blogs.  I'm done.  No.

6         No.  Mr. Connolly.

7    EXAMINATION BY

8    MR. CONNOLLY:

9         Q.    Mr. Lamm, I want to bring your

10   attention back to 2006.  When you went for

11   the psychological evaluation in order to

12   gain employment with what was it, the

13   Suffolk County Police Department?

14        A.    Yes.

15        Q.    Had you had the background check

16   before either the written or oral

17   evaluation?

18        A.    The background check pertaining

19   to that specific job?

20        Q.    Yes.

21        A.    No.  It was just kind of

22   commencing at the same time.

23        Q.    Okay.  So did you get the results

24   of the psychological evaluation before you

25   submitted any paperwork regarding the

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 355

1              K. Lamm

2    background evaluation?

3              MR. GOODSTADT:    Objection.

4         A.    No.  I think I may have submitted

5    the background paperwork first.

6         Q.    And then you never got a response

7    in connection with the background check

8    because you had gotten a response in

9    connection with the evaluation?

10        A.    Correct.

11        Q.    Earlier I believe in connection

12   with your testimony regarding Mitch Burns,

13   you indicated that George Hesse had been

14   told to bring in the narcotics team, would

15   that be correct?

16        A.    Yes.

17        Q.    Who told George Hesse?

18        A.    Myself and other members of the

19   department suggested that we should have a

20   narcotics team come into the village.

21        Q.    Okay.  And where would that

22   narcotics team come from?

23        A.    Suffolk County.

24        Q.    And when did this conversation --

25   withdrawn.  On how many occasions did you

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                      K. Lamm

2     make that suggestion to George Hesse?

3          A.    Maybe twice, three times maybe.

4          Q.    And when did these two or three

5     occasions occur?

6          A.    2001, 2002.

7          Q.    And did these conversations occur

8     while you were on duty?

9          A.    Yes.

10         Q.    Would it have been in the station

11    house?

12         A.    Station house or sometimes

13    outside.

14         Q.    Was anybody else with you when

15    you had these particular conversations?

16         A.    Not -- not for all of them.

17         Q.    For any of them?

18         A.    There may have been other

19    officers there.  I can't recall who they

20    were.

21         Q.    Okay.  I believe you indicated

22    that other officers had made that similar

23    suggestion to Mr.  --- to George Hesse?

24         A.    Yes.

25         Q.    Okay.  Who were those other

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2    officers?

3         A.    Edward Carter.  Tom Snyder.  John

4    Oley.

5         Q.    Okay.  And how do you know this?

6         A.    Because one -- one time speaking

7    to John -- John Oley, he told me he

8    suggested it to George, and talking with Tom

9    and Eddie, they had told me that they

10   suggested it as well.

11        Q.    Okay.  And when did Tom Snyder

12   tell you this?

13        A.    Exactly the time frame, I don't

14   know the exact time frame.

15        Q.    Can you tell me the year?

16        A.    Around probably 2002.

17        Q.    And how about Ed Carter, when did

18   he tell you?

19        A.    Same time frame.

20        Q.    And John Oley?

21        A.    Somewhere in that same time

22   frame.  Summer season 2002.

23        Q.    And this -- did this suggestion

24   or suggestions to George Hesse, were they

25   verbal?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2      A.     Yes.

3      Q.     Okay.  Did you ever memorialize

4  them in writing?

5      A.     No.

6      Q.     In regard to the Houser's

7  incident, did you ever see Brian Van -- an

8  individual you later learned to be Brian

9  Vankoot at Houser's when you first arrived

10  at the scene?

11      A.     Did I see him there?

12      Q.     Yes.

13      A.     When I first arrive at the scene?

14      Q.     Yes.

15      A.     No, I -- I don't believe I did.

16  No.

17      Q.     When was the first time that

18  morning you saw Brian Vankoot?

19      A.     From -- from what I can recall,

20  is when Frank brought him into the police

21  station.

22      Q.     Did you ever learn where

23  Mr. Vankoot was between the time of the

24  incident and the time Officer Fiorillo

25  brought him into the station?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2        A.    That's something you'd have to

3    ask Frank Fiorillo as to exactly where he --

4    he got him.

5        Q.    Did you ever ask Officer Fiorillo

6    as to where he located Mr. Vankoot?

7        A.    Yes.  I'm sorry.  I believe he

8    found him at his house.

9        Q.    And when did you first learn

10   that?

11       A.    Sometime later that night I

12   believe.  After the incident was -- after

13   they were getting treatment.  I -- I believe

14   that's when I found out.

15       Q.    Do you mean later that morning?

16       A.    Yes.

17       Q.    From the point in time you and

18   the other officers received a call to go to

19   Houser's to the point in time you got to

20   Houser's, was there any conversation in the

21   vehicle?

22       A.    I don't recall if there was

23   specific.

24       Q.    And did you recognize -- you took

25   the first call, would that be correct?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1                    K. Lamm

2          A.     Yes.

3          Q.     Did you recognize the voice on

4    the call?

5          A.     No.

6          Q.     Was it a male or -- male voice?

7          A.     From what it appeared to sound

8    like, it -- it could have been a male voice.

9          Q.     And back in 2004, how did the

10   phone system work?  Earlier you indicated

11   that calls would bounce out from the station

12   house if it was set to do so, would that be

13   correct?

14         A.     Yes.  It's  --

15         Q.     Was there an order of preference

16   on which -- withdrawn.  Did each individual

17   officer back at this time have a cell phone

18   for business purposes?

19         A.     No.  It was just one cell phone.

20   It was the department's phone.

21         Q.     Why did  -- did you have the cell

22   phone for the first call?

23         A.     It wasn't on my person.  It was

24   in the middle of the vehicle and I answered

25   it.

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1           K. Lamm

2       Q.    Since April 2 of 2006, have you

3   applied for any other employment, other than

4   what you've testified to today?

5       A.    No, I --

6       Q.    And that would include non-law

7   enforcement fields?

8       A.    No, I haven't.

9       Q.    During your employment with the

10  Ocean Beach Police Department, how did you

11  get to work?

12      A.    I'm sorry?

13      Q.    How did you get to work?

14      A.    To Ocean Beach?

15      Q.    To Ocean Beach.

16      A.    I drove to the lighthouse, and

17  from the lighthouse, we would take a police

18  vehicle and drive to Ocean Beach or a water

19  taxi.

20      Q.    And when -- on those occasions

21  when you took a police vehicle, was there a

22  vehicle for use when you arrived at the

23  lighthouse?

24      A.    Not all the time.

25      Q.    Would you make a call?

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

                        K. Lamm

1

2      A.     Well, the shift coming out

3  driving out, we would get the vehicle.

4  Sometimes we would have to make the call

5  because the vehicle wasn't there and --

6      Q.     Thank you.  During -- during your

7  employment at Ocean Beach, were there any

8  occasions that on duty officers drove you to

9  the lighthouse?

10     A.     So if they were already working a

11 mid shift, they would come and pick me up

12 and they would drop me off at the

13 lighthouse.  But as far as coming on duty, I

14 don't believe there was.

15            MR. CONNOLLY:    Thank you.  I

16     have no further questions.

17            MR. GOODSTADT:    I have no

18     questions.  I just want to reserve

19     Mr. Lamm's right to review and correct

20     the transcript.

21            (Continued on next page for

22     jurat.)

23

24

25

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 363

K. Lamm

1

2      THE VIDEOGRAPHER:    This

3  completes today's deposition for Kevin

4  Lamm on November 19, 2008.  The time is

5  5:55 p.m. and we are off the record.

6      (TIME NOTED:   5:55 P.M.)

7

8      _____

9          KEVIN LAMM

10

11  Subscribed and sworn to

12  before me this _____ day

13  of _____ 2008.

14

15  _____

16      NOTARY PUBLIC

17

18

19

20

21

22

23

24

25

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

1

2                    INDEX TO EXHIBITS

3    LAMM EXHIBIT                              PAGE

4    1     Allegations of Official Misconduct. 244

5

6                    I N D E X            PAGE

7    RQ(s)

8    Production of all communications from

9         the Suffolk County Police Department

10        concerning Mr. Lamm's application.   24

11   Production of letter from Civil Service

12        advising Mr. Lamm of his failure.    37

13

14   MO (Pages) 35, 83, 127, 130, 133, 152, 156,

15   162, 180, 182, 183, 205, 206, 229, 230, 231,

16   232, 233, 234, 235, 243, 253, 257, 260, 261,

17   262, 263, 269, 270, 274, 275, 290, 293, 296,

18   309, 320, 331, 332, 334, 339, 346, 350, 354

19

20   EXAMINATION BY

21        MR. NOVIKOFF:        5

22        MR. CONNOLLY:      354

23

24

25

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 365

1

2                         CERTIFICATION

3

4

5          I, Edward Leto, a Notary Public

6    in and for the State of New York, do hereby

7    certify:

8              THAT the witness(es) whose

9    testimony is herein before set forth, was

10   duly sworn by me; and

11             THAT the within transcript is a

12   true and accurate record of the testimony

13   given by said witness(es).

14             I further certify that I am not

15   related either by blood or marriage, to any

16   of the parties to this action; and

17             THAT I am in no way interested in

18   the outcome of this matter.

19             IN WITNESS WHEREOF, I have

20   hereunto set my hand this 7th day of

21   December, 2008.

22

23

24        ---------------------------

25             EDWARD LETO

f49d21c7-3da6-4d80-aa95-28a7dd54ae00

Page 366

1

2                          ERRATA SHEET

3            I wish to make the following changes,

4       for the following reasons:

5       PAGE LINE

6       _____ ____CHANGE:_____

7                  REASON:_____

8       _____ ____CHANGE:_____

9                  REASON:_____

10      _____ ____CHANGE:_____

11                 REASON:_____

12      _____ ____CHANGE:_____

13                 REASON:_____

14      _____ ____CHANGE:_____

15                 REASON:_____

16      _____ ____CHANGE:_____

17                 REASON:_____

18      _____ ____CHANGE:_____

19                 REASON:_____

20      _____ ____CHANGE:_____

21                 REASON:_____

22      _____ ____CHANGE:_____

23                 REASON:_____

24      _____ ____CHANGE:_____

25                 REASON:_____