UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILO, KEVIN LAMM, JOSEPH NOFI, and THOMAS SNYDER,

Plaintiffs,

-against-

Index No. CV 07 1215

INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR JOSEPH C. LOEFFLER, JR., individually and in his Official capacity; former mayor NATALIE K.ROGERS, individually and in her official capacity, OCEAN BEACH POLICE DEPARTMENT; ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE, individually and in his official capacity; SUFFOLK COUNTY; SUFFOLK COUNTY POLICE DEPARTMENT OF CIVIL SERVICE; and ALLISON SANCHEZ, individually and in her official capacity,

Defendants.

***VOLUME I***
DEPOSITION OF TYREE BACON
New York, New York
February 12, 2009

Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 20819

85 Fifth Avenue
New York, New York

February 12, 2009
10:00 A.M.

Deposition of TYREE BACON, held at the offices of THOMPSON WIGDOR & GILLY, LLP, 85 Fifth Avenue, New York, New York, pursuant to Notice, before Judi Johnson, a Registered Professional Reporter, a Certified Realtime Reporter, a Certified LiveNote Reporter and Notary Public of the State of New York.

TYREE BACON

APPEARANCES:

THOMPSON WIGDOR & GILLY, LLP
Attorneys for the Plaintiffs
85 Fifth Avenue
New York, New York 10003

BY: ANDREW S. GOODSTADT, ESQ.

MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
Attorneys for GEORGE B. HESSE
530 Saw Mill Road
Elmsford, New York 10523

BY: KEVIN W. CONNOLLY, ESQ.

RIVKIN RADLER, LLP

Attorneys for INCORPORATED VILLAGE OF OCEAN BEACH, JOSEPH LOEFFLER, NATALIE ROGERS AND OCEAN BEACH POLICE DEPARTMENT
926 RexCorp Plaza
Uniondale, New York 11556-0926

BY: KENNETH A. NOVIKOFF, ESQ.

TYREE BACON

BEE READY FISHBEIN HATTER & DONOVAN, LLP

Attorneys for SUFFOLK COUNTY
170 Old Country Road
Mineola, New York 11501

BY: KENNETH A. GRAY, ESQ.

ALSO PRESENT:
FRANK FIORILLO
KEVIN LAMM
THOMAS SNYDER
JOSEPH NOFI
EDWARD CARTER
JOSH LIPSON - LEGAL VIDEO SPECIALIST

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

TYREE BACON

TYREE BACON,

Called as a witness herein, having first been duly sworn, was examined and testified as follows:

BY THE REPORTER:

**Q Please state your name and address for the record.**

A Tyree Bacon, 54 47th Street, Islip, New York 11751.

THE VIDEOGRAPHER: This is the start 10:07:31AM of Tape Number 1 of the videotaped deposition of Tyree Bacon in the matter of Carter, et al versus Incorporated Village of Ocean Beach, et al. Today's date is February 12th, 2009, at approximately 10:08 a.m.

Will the court reporter please swear 10:07:49AM in the witness.

EXAMINATION 10:07:52AM

BY MR. GOODSTADT: 10:08:00AM

**Q Good morning, Mr. Bacon. 10:08:02AM**

A Good morning. 10:08:03AM

**Q My name is Andrew Goodstadt. I'm an 10:08:04AM attorney at the law firm of Thompson, Wigdor &**

TYREE BACON

**Gilly, and our firm represents the plaintiffs in this case, Frank Fiorillo, Ed Carter, Joe Nofi, Tom Snyder and Kevin Lamm, in connection with the case they brought against Ocean Beach and a bunch of other entities or people.**

**Do you understand you're testifying 10:08:25AM under oath today?**

A Yes, I understand. 10:08:27AM

**Q And you've sworn to tell the truth. 10:08:28AM Do you understand that? 10:08:29AM**

A Yes, I do. 10:08:30AM

**Q And your failure to tell the truth 10:08:32AM could result in criminal penalties.**

**Do you understand that? 10:08:34AM**

A Yes. 10:08:35AM

**Q Have you ever testified under oath 10:08:35AM before?**

A I have. 10:08:37AM

**Q How many times? 10:08:37AM**

A Probably about 20. 10:08:39AM

**Q How about outside the scope of your 10:08:45AM duties as a police officer, how many times have you testified under oath?**

A Four or five. 10:08:53AM

TYREE BACON

**Q Okay. Why don't we start with the 10:08:54AM most recent one from today, going backwards. When was that?**

A Deposition sometime before Christmas 10:09:01AM regarding an aided case that I handled in Queens Supreme Court, probably about three years ago.

**Q And what were the allegations in that 10:09:14AM case?**

A Woman fell getting out of the jury 10:09:17AM box. There was poor lighting. She had a suit against the city, who owned the building, New York State courts, and the TV show, Law and Order, because they were filming in the building and there were problems with the lights going on and off.

**Q Were you a party to that action? 10:09:34AM**

A No, I was what they call an 10:09:36AM uninterested witness.

**Q And prior to that time, when did you 10:09:39AM testify under oath?**

A For a deposition when the Town of 10:09:46AM Islip was being sued for an arrest that was made by myself at MacArthur Airport.

**Q Just before we get to that one, in 10:10:00AM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**your deposition before Christmas that you took in connection with the slip and fall --**

A Uh-huh. 10:10:08AM

**Q -- in the jury box, were you 10:10:08AM represented by counsel in that matter?**

A Yes. 10:10:11AM

**Q Who represented you? 10:10:12AM**

A Corporation counsel for City of New 10:10:13AM York.

**Q Now let's go back to the issue with 10:10:15AM respect to the Town of Islip.**

A Uh-huh. 10:10:19AM

**Q Who was the plaintiff in that case? 10:10:20AM**

A Maureen Walsh. 10:10:23AM

**Q When was that deposition? 10:10:26AM**

A 2000. 10:10:32AM

**Q 2000? 10:10:33AM**

A Yeah, somewhere in that area. 10:10:34AM

**Q And what was she alleging in that 10:10:35AM case?**

A Excessive force, unjustified arrest. 10:10:40AM

**Q And what was the actual arrest? 10:10:46AM**

A Resisting arrest. It was a summons 10:10:55AM that escalated on her part.

TYREE BACON

**Q When was that? When was that -- 10:10:59AM**

A That was January of '99. 10:11:02AM

**Q Were you represented by counsel in 10:11:06AM connection with your deposition in that matter?**

A I was. 10:11:10AM

**Q Were you a party to that case? 10:11:10AM**

A I don't recall. The attorney who 10:11:12AM represented me at the time was Stuart Walsh. I don't recall which --

**Q Stuart Schwartz or Stuart Walsh? 10:11:30AM**

A Schwartz. 10:11:33AM

**Q From Oshman, Helfenstein & Matza? 10:11:33AM**

A I don't recall. 10:11:42AM

**Q That's who represented you in that 10:11:44AM case?**

A Yes. 10:11:46AM

**Q Did you pay for that representation or 10:11:46AM did the town pay for it?**

A I did not. 10:11:49AM

**Q And what were the allegations 10:11:51AM underlying the claim of excessive force?**

A Excessive force in general. That she 10:11:59AM shouldn't have been taken into custody. That she had been compliant, when she wasn't. She

TYREE BACON

claimed that I had beaten her.

**Q She was claiming that you had beaten 10:12:18AM her or you and other officers had beaten her?**

A Myself. 10:12:25AM

**Q What was your position at Long Island 10:12:26AM MacArthur Airport at the time of that arrest?**

A Airport security guard. 10:12:31AM

**Q So she claimed you were the only 10:12:33AM person that beat her?**

A Yes. 10:12:36AM

**Q What did she claim that you did to 10:12:36AM her?**

A I don't particularly remember all the 10:12:39AM details, but that I had grabbed her by the throat, thrown her on the desk, refused to let her use the restroom.

**Q Any other allegations? 10:12:55AM**

A That's what I remember. There may 10:12:56AM have been more. You've got the complaint.

**Q Right. 10:13:01AM**

A Please elaborate. 10:13:02AM

MR. NOVIKOFF: Just answer the 10:13:04AM question.

TYREE BACON

BY MR. GOODSTADT: 10:13:09AM

**Q And did that case go to trial? 10:13:10AM**

A No, it did not. 10:13:12AM

**Q How did that case resolve? 10:13:13AM**

MR. NOVIKOFF: Objection. 10:13:15AM

A I believe -- 10:13:16AM

MR. NOVIKOFF: Are you done? 10:13:18AM

MR. GOODSTADT: Yes. 10:13:19AM

BY MR. GOODSTADT: 10:13:20AM

**Q How was that case resolved? 10:13:20AM**

MR. NOVIKOFF: Objection. 10:13:22AM

BY MR. GOODSTADT: 10:13:22AM

**Q You can answer. 10:13:22AM**

A Okay. I believe they settled. I'm 10:13:23AM not certain.

**Q What leads you to believe that they 10:13:25AM settled?**

A I never got called for trial. 10:13:27AM

**Q You were never told that it actually 10:13:34AM settled?**

A No. 10:13:36AM

**Q You were never told that it settled 10:13:39AM for $130,000?**

A That sounds like something I may have 10:13:43AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

heard, but I don't recall specifically.

**Q Did you have to contribute any money 10:13:46AM toward that settlement?**

A No. 10:13:49AM

**Q Were you prosecuted for that conduct? 10:13:52AM**

A No, I was not. 10:13:55AM

**Q And there was no adjudication of her 10:14:01AM claim; it was settled before there was a trial. Is that your understanding?**

MR. NOVIKOFF: What was the question? 10:14:09AM

BY MR. GOODSTADT: 10:14:10AM

**Q There was no adjudication of her 10:14:10AM claim; it was settled before trial. Is that your understanding?**

A Yes. 10:14:16AM

**Q Other than for that incident, have you 10:14:23AM ever -- has anyone ever alleged excessive force against you?**

A No. 10:14:29AM

**Q Prior to the Walsh case -- strike 10:14:31AM that.**

**I see that another plaintiff in the 10:14:36AM case is David Walsh as the parent and natural guardian of William O. Walsh, an infant over the**

**TYREE BACON**

**age of 14.**

**Were there any claims by a William O. 10:14:50AM Walsh in that case?**

A There -- I believe there were claims 10:14:54AM by him and his sister when I was attempting to arrest --

MR. NOVIKOFF: No, just answer the 10:14:59AM question.

A Yes. 10:15:01AM

**Q What were those claims by him and his 10:15:01AM sister?**

A That they got caught up in the 10:15:04AM incident. In fact, they were the ones who had jumped me while I was trying to take Maureen Walsh into custody.

**Q I'm asking you what their claims were. 10:15:15AM**

A I have no idea what their claims -- I 10:15:18AM don't recall what their claims were specifically. It was all the same case.

**Q Did either William Walsh or his sister 10:15:25AM claim that you struck either one of them?**

MR. NOVIKOFF: Objection. 10:15:32AM

A I don't recall. 10:15:33AM

**Q Did you actually arrest Maureen Walsh 10:15:40AM**

**TYREE BACON**

**in that matter?**

A Yes. 10:15:44AM

**Q Did you have the powers of arrest as a 10:15:44AM security guard?**

A Excuse me? 10:15:48AM

**Q Did you have the powers of arrest as a 10:15:48AM security guard in --**

A Yes, we had peace officer powers at 10:15:52AM MacArthur Airport.

**Q And that includes the power to arrest? 10:15:56AM**

A Yes. 10:15:58AM

**Q Did you carry a firearm then? 10:16:00AM**

A I did. 10:16:02AM

**Q Was it your own personal firearm or 10:16:04AM was it one issued by the town?**

A It was my own personal issued firearm. 10:16:08AM

**Q Did you have a permit for that? 10:16:11AM**

A I did. 10:16:13AM

**Q What type of permit did you have? 10:16:13AM**

A Business permit. 10:16:15AM

**Q When did you get that business permit? 10:16:17AM**

A I don't recall. 10:16:18AM

**Q Has that permit expired? 10:16:21AM**

A Currently? 10:16:24AM

TYREE BACON

**Q Yes. 10:16:25AM**

A I don't have it. I carry on my now 10:16:27AM shield as a police officer.

**Q Are you currently employed by the 10:16:32AM Ocean Beach Police Department?**

A Yes. 10:16:36AM

**Q Are you a police officer in any other 10:16:37AM jurisdiction?**

A I am not. 10:16:40AM

**Q Do you consider yourself to be a real 10:16:41AM police officer in Ocean Beach?**

MR. NOVIKOFF: Objection. 10:16:44AM

You can answer. 10:16:45AM

Just so you know, unless I instruct 10:16:46AM you not to answer, even if I object, you have to answer the question.

A Yes. I have statutory powers of 10:16:51AM arrest throughout New York State, the same as a New York State Trooper or a New York City police officer.

**Q And you believe your duties are just 10:16:58AM as important as a New York State Trooper or New York City police officer?**

A Yes, when working in my geographic 10:17:04AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

area of employment.

**Q What do you mean by that? 10:17:09AM**

A When I'm working for the Village of 10:17:10AM Ocean Beach, that's my geographic area of employment.

**Q And you have statutory authority to 10:17:15AM arrest outside of your geographic area of employment?**

A Yes, for felonies and misdemeanors. 10:17:22AM

**Q Do you have authority to issue 10:17:25AM summonses outside your geographic area of employment?**

A No, only within the geographic area of 10:17:30AM employment.

**Q Do you have the authority to pull over 10:17:33AM a car outside your geographic area of employment?**

A No, I do not. 10:17:38AM

**Q Okay. Now, prior to the Maureen Walsh 10:17:42AM deposition, what was the time before that that you testified under oath outside of your -- the scope of your duties as a police officer?**

MR. NOVIKOFF: I'm going to object 10:17:55AM only because -- are you referring to police

TYREE BACON

officer as Ocean Beach? I don't know that he was an officer for any other jurisdiction?

BY MR. GOODSTADT: 10:18:04AM

**Q I'm talking about outside your duties 10:18:04AM of testifying as an arresting officer in any jurisdiction.**

MR. NOVIKOFF: All right. 10:18:13AM

A No, I think that may have been it. 10:18:14AM There were a couple of different depositions regarding the Maureen Walsh case..

**Q So you were deposed more than once in 10:18:19AM that case?**

A Yes. 10:18:22AM

**Q How many times were you deposed in 10:18:23AM that case?**

A I want to say two or three. I can't 10:18:25AM be certain.

**Q And other than for that case, have you 10:18:30AM ever been a party to a lawsuit?**

A Yes. 10:18:34AM

**Q How many times? 10:18:35AM**

A Once. 10:18:36AM

**Q What other lawsuit were you a party 10:18:36AM**

**TYREE BACON**

**to?**

A An automobile accident in Brooklyn. 10:18:39AM

**Q And were you the plaintiff or a 10:18:48AM defendant in that case?**

A Defendant. 10:18:50AM

**Q When was that? 10:18:51AM**

A 1986. 10:18:56AM

**Q Were you ever -- did you ever work at 10:19:02AM the -- well, strike that.**

**Do you know who Ronald Horn is? 10:19:11AM**

A No idea. 10:19:13AM

**Q You don't recall being named in a 10:19:14AM lawsuit in 2001 -- well, strike that.**

**As a court officer, do you have a 10:19:21AM shield?**

A Yes. 10:19:23AM

**Q What was your shield number? 10:19:24AM**

A Well, right now I'm a sergeant. It's 10:19:25AM 477.

**Q How about prior to becoming a 10:19:29AM sergeant? In 2001, what was your shield number?**

A I was a senior court officer, and it 10:19:32AM was -- actually, I don't remember what my --

**Q Were you ever shield Number 6229? 10:19:40AM**

**TYREE BACON**

A Yes. 10:19:43AM

**Q Do you recall being sued by a Ronald 10:19:43AM Horn in or around 2001?**

A No. 10:19:48AM

**Q I believe you testified that you were 10:20:02AM never a party other than for the automobile accident in Brooklyn and Maureen Walsh; is that correct?**

MR. NOVIKOFF: Objection. He didn't 10:20:13AM testify that he was a party to Maureen Walsh. He said he didn't recall if he was or not, and you haven't done anything to refresh his recollection.

MR. GOODSTADT: Okay. 10:20:24AM

BY MR. GOODSTADT: 10:20:25AM

**Q So other than the automobile accident 10:20:26AM in Brooklyn that you know you were a party to and the Maureen Walsh case, which you may have been a party to, do you recall being a party to any other lawsuit?**

A No, I do not. 10:20:38AM

**Q Were you ever a party in a lawsuit for 10:20:40AM divorce?**

A Yes. 10:20:45AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q How many times? 10:20:46AM**

A Once. 10:20:47AM

**Q When was that? 10:20:47AM**

A 1996 -- no, no, I'm sorry. '98. 10:20:49AM

**Q Were you the plaintiff in that matter 10:20:56AM or the defendant?**

A Defendant. 10:20:59AM

**Q Who was the plaintiff? 10:21:01AM**

A Jennifer Monroe. 10:21:03AM

**Q And she sued you for divorce? 10:21:07AM**

A Yes. 10:21:09AM

**Q Who represented you in that matter? 10:21:11AM**

A Dennis. I don't remember his last 10:21:14AM name.

**Q Where was that lawsuit filed? 10:21:19AM**

A Suffolk County. 10:21:21AM

**Q Did that case go to a hearing? 10:21:28AM**

A No. 10:21:30AM

**Q It was settled? 10:21:31AM**

A Yes. 10:21:32AM

**Q When was it settled? 10:21:36AM**

MR. NOVIKOFF: Hold on one second. 10:21:37AM I just want to make sure that nothing 10:21:39AM part of the settlement was confidential or

TYREE BACON

sealed or anything.

THE WITNESS: No. 10:21:44AM

MR. NOVIKOFF: It's all open? 10:21:44AM

THE WITNESS: Yeah, it was an amicable 10:21:45AM divorce.

MR. NOVIKOFF: Okay. Go ahead. 10:21:48AM

A She filed for divorce and we, you 10:21:50AM know, agreed to separate and divorce.

**Q When was that settled? 10:21:53AM**

A In '99. I'm not even certain. 10:21:56AM

**Q Did you have to testify in connection 10:22:08AM with that matter?**

A No.. 10:22:11AM

**Q So other than what you've testified to 10:22:12AM thus far, do you recall testifying under oath in any other proceeding, other than for as your role as a police officer?**

MR. NOVIKOFF: Objection. 10:22:22AM

You can answer.. 10:22:23AM

A Not that I recall. 10:22:25AM

**Q I know you've been through it in the 10:22:28AM past, but I just want to go over some ground rules today just so everyone is on the same page.**

**TYREE BACON**

**It's important -- and you're doing a 10:22:35AM good job so far -- that you give verbal answers as opposed to a nod of the head or --**

A Understood.. 10:22:40AM

**Q Understood? We're getting a record. 10:22:41AM Do you understand that? 10:22:43AM**

A Understood. 10:22:44AM

**Q And if you don't hear a question that 10:22:44AM I ask, just ask me to repeat it. I'll be happy to do so, okay?**

A Okay. 10:22:50AM

**Q If you don't understand a question I 10:22:50AM ask, ask me to rephrase it or repeat it. Again, I'll be happy to do so, okay?**

A Okay. 10:22:55AM

**Q If you don't understand or hear a word 10:22:56AM or phrase that I use, again, just let me know. I'll be happy to repeat it or rephrase it, okay?**

A Sure. 10:23:01AM

**Q Because if you answer the question, 10:23:01AM I'm going to assume that you both heard and understood the question and heard and understood every part of the question, okay?**

MR. NOVIKOFF: Objection. 10:23:09AM

TYREE BACON

You can answer. 10:23:10AM

A Okay. 10:23:11AM

**Q Did you ever sue the Town of Islip? 10:23:18AM**

A No. 10:23:21AM

**Q Just to go back to sort of the ground 10:23:26AM rules. It's important you let me finish my question before you finish, just as though I'm going to let you finish your answer before I ask the next question, again so we get a clear record.**

**Is that okay? 10:23:38AM**

A Yes. You probably have to remind me 10:23:39AM of that from time to time.

**Q Okay. If at any point in time you 10:23:42AM feel like you need a break or you need a recess, just let me know. I'll be happy to accommodate that request, okay?**

A Sure. 10:23:49AM

**Q The only thing I ask is that if 10:23:50AM there's a question pending, that you answer the question, then we take the break, okay?**

A Yes. 10:23:54AM

**Q Are you presently taking any 10:23:56AM medications that would affect your ability to**

TYREE BACON

**testify today?**
A No. 10:24:01AM
**Q Are you currently sick? 10:24:01AM**
A No. 10:24:03AM
**Q Are you under the care of a doctor for 10:24:03AM anything that would affect your ability to testify today?**
A No. 10:24:08AM
**Q Is there anything that you can think 10:24:08AM of that would affect your ability to testify today?**
A No. 10:24:13AM
**Q Have you ever used any illegal 10:24:13AM narcotics?**
A Yes. 10:24:17AM
**Q How many times? 10:24:18AM**
A Half dozen times. 10:24:21AM
**Q And what narcotics have you used? 10:24:22AM**
A Smoked marijuana back in high school. 10:24:25AM
**Q Anything else? 10:24:31AM**
A Tried cocaine once back in high school 10:24:32AM or shortly after high school.
**Q One time you tried it? 10:24:41AM**
A Yes. 10:24:43AM

TYREE BACON

**Q And have you used cocaine since then? 10:24:45AM**
A No. 10:24:48AM
**Q Have you smoked marijuana since then? 10:24:49AM**
A Nope. 10:24:51AM
**Q Have you used any other illegal drug 10:24:52AM since shortly after high school?**
A Nope. 10:24:56AM
**Q At the time that you used those 10:25:01AM narcotics, did you know they were illegal?**
A Yes. 10:25:05AM
MR. NOVIKOFF: I guess that makes him 10:25:11AM like the President.
THE WITNESS: Better than Clinton.. I 10:25:15AM did smoke.
BY MR. GOODSTADT: 10:25:21AM
**Q Are you represented by an attorney in 10:25:22AM connection with this deposition?**
A I am. 10:25:25AM
**Q And who is that? 10:25:25AM**
A (Indicating). What was your name 10:25:27AM again? I'm sorry.
MR. NOVIKOFF: Mr. Novikoff. 10:25:30AM
THE WITNESS: Mr. Novikoff. 10:25:32AM

TYREE BACON

BY MR. GOODSTADT: 10:25:33AM
**Q Mr. Novikoff is sitting right next to 10:25:34AM you, correct?**
A Yes, he is. 10:25:37AM
**Q When did you first learn that the 10:25:38AM plaintiffs in this case were making allegations against Ocean Beach?**
MR. NOVIKOFF: Objection. And my only 10:25:42AM objection is allegations within the complaint or just allegations in general? That's my objection to form.
BY MR. GOODSTADT: 10:25:51AM
**Q Allegations -- well, strike that. 10:25:52AM**
**Have you ever read a copy of the 10:25:54AM Complaint?**
A I have not. 10:25:56AM
**Q Do you know what the plaintiffs in 10:25:57AM this case are alleging?**
A Yes. 10:26:00AM
**Q What's your understanding of what the 10:26:00AM plaintiffs in this case are alleging?**
A That it's a bunch of nonsense. 10:26:06AM
MR. NOVIKOFF: No, that wasn't the 10:26:08AM question. Listen to the question.

TYREE BACON

Do you want to repeat it? 10:26:10AM
MR. GOODSTADT: Yeah. 10:26:10AM
BY MR. GOODSTADT: 10:26:10AM
**Q What's your understanding of what the 10:26:10AM plaintiffs in this case are alleging?**
A My understanding is that they were not 10:26:14AM invited back. They're alleging that they were fired because they've witnessed misconduct. In my opinion, it's all nonsense. There's no basis in truth to any of this.
**Q What misconduct is your understanding 10:26:36AM that they claim they've witnessed?**
A Drinking, sex, excessive force. 10:26:41AM
**Q Anything else? 10:26:51AM**
A No. I think that about covers it. 10:26:53AM
**Q What excessive force is your 10:26:55AM understanding of what these plaintiffs claim that they witnessed?**
A I'm not sure. I wasn't there and I 10:27:01AM didn't read the complaint, so I'm not certain.
**Q So your understandings is that they 10:27:06AM claim they witnessed excessive force, but you have no idea to what excessive force they claim?**
A Exactly. 10:27:14AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q What allegations of sex is it your 10:27:14AM understanding that the plaintiffs are claiming they witnessed in this case?**

A Once again, I'm not sure. 10:27:20AM

**Q So just generally, they just claimed 10:27:23AM they witnessed sex is your understanding?**

A Generally -- yeah, those three items 10:27:29AM were general complaints. I didn't read the complaint. I'm not certain of any specifics.

**Q And what's your understanding of what 10:27:38AM drinking the plaintiffs allege they witnessed in this case?**

A Once again, nothing specific. 10:27:44AM

**Q Do you know who they alleged to have 10:27:46AM witnessed drinking?**

A No, I don't. 10:27:49AM

**Q Do you know who they alleged they 10:27:49AM witnessed having sex?**

A No, I don't. 10:27:52AM

**Q Do you know who they alleged having to 10:27:53AM have witnessed exercising excessive force?**

A No, I don't. 10:27:58AM

**Q What's the basis of your understanding 10:28:00AM that that's what they're alleging?**

**TYREE BACON**

A From the complaint, from the rumor 10:28:05AM mill, from being here.

**Q So let's take those in order.. First 10:28:14AM one you said is you learned from the complaint. Didn't you testify you never saw a copy of the complaint?**

A Correct. You're telling me about the 10:28:27AM complaint. I met with a lawyer.

**Q I don't want to know any of the 10:28:32AM substance of the discussion that you may have had with your lawyer. But you said that the complaint is your basis, not your lawyer. You said the complaint.**

MR. NOVIKOFF: He said the complaint. 10:28:39AM He didn't specify the written complaint.

MR. GOODSTADT: Okay. 10:28:43AM

BY MR. GOODSTADT: 10:28:44AM

**Q So what complaint are you -- 10:28:44AM**

MR. NOVIKOFF: And then the witness 10:28:46AM did say he talked to his lawyers about that, and you appropriately told him that you don't want to go through anything he said with the lawyers. But I'm sorry.. That's my objection.

TYREE BACON

You can answer. 10:28:56AM

A Okay. I got a phone call from 10:28:58AM Mr. Michael Welch saying he wanted to speak to me in regards to a complaint that was filed on behalf of five complainants. I came to his office. He went over my background --

MR. NOVIKOFF: Don't go over. 10:29:12AM

THE WITNESS: I'm sorry. 10:29:14AM

MR. NOVIKOFF: And you met with 10:29:15AM Mr. Welch.

THE WITNESS: I met with Mr. Welch. 10:29:18AM

MR. NOVIKOFF: Leave it right there. 10:29:19AM

BY MR. GOODSTADT: 10:29:20AM

**Q And you met with Mr. Welch in 10:29:21AM preparation for today's deposition?**

A Yes. 10:29:24AM

**Q When did you meet with Mr. Welch? 10:29:24AM**

A Two days ago. 10:29:26AM

**Q You met with him at his office? 10:29:28AM**

A Yes. 10:29:29AM

**Q How long was that meeting? 10:29:30AM**

A Two hours. 10:29:32AM

**Q Did you review any documents during 10:29:34AM that meeting?**

**TYREE BACON**

A My personnel jacket. 10:29:36AM

**Q Did your personnel jacket refresh your 10:29:39AM recollection about any facts or issues?**

A He took the paperwork out and asked me 10:29:45AM questions based on, you know, the time frame I was employed by Ocean Beach --

MR. NOVIKOFF: No, no. Don't go 10:29:52AM through any specific. You can answer that he took out some paper; he showed it to you.

THE WITNESS: He didn't show me any 10:30:00AM documents. He took them out, and he asked questions based on those documents.

MR. NOVIKOFF: Got it. Okay. 10:30:05AM

BY MR. GOODSTADT: 10:30:05AM

**Q But before I asked you the question 10:30:05AM whether you reviewed any documents during that meeting with Mr. Welch. You said that you reviewed your personnel jacket; is that correct?**

MR. NOVIKOFF: Objection. 10:30:15AM

You can answer. 10:30:15AM

A Yes, he had it. He took piece of 10:30:16AM paper out by piece of paper, asked questions. Did I read anything in my personnel jacket? No, I did not.

TYREE BACON

**Q Did you actually read any documents during that meeting? 10:30:24AM**

A No, I did not. 10:30:27AM

**Q So I'll just go back to, again, you said that -- when I asked you your basis of your understanding of what was alleged, you said a complaint. What complaint were you referring to? 10:30:29AM**

A The complaint that brought me here to do this deposition. 10:30:41AM

**Q But you never saw that complaint? 10:30:44AM**

A I did not. 10:30:46AM

**Q Now, you said the rumor mill was another basis of your understanding of the allegations, correct? 10:30:47AM**

A Correct. 10:30:53AM

**Q What did you mean by the rumor mill? 10:30:54AM**

A Go to work, guys say that there's been a complaint filed, nothing specific. 10:30:56AM

**Q Who said there was a complaint filed? 10:31:05AM**

A I can't remember anybody specific. 10:31:07AM

**Q Just guys generally? 10:31:12AM**

A In general, correct. 10:31:13AM

**Q How many guys? 10:31:15AM**

**TYREE BACON**

A I don't know. Could've been two or three. It could've been five or six. I don't remember any specifics. 10:31:19AM

**Q When did rumor mill start? 10:31:24AM**

A Last summer. 10:31:27AM

**Q So the summer of '07 or the summer of '08? 10:31:29AM**

A The summer of '08, upon my arrival back from Iraq. 10:31:32AM

**Q That's when you heard from the rumor mill that there was -- 10:31:36AM**

A Yes. 10:31:39AM

**Q -- a complaint that was filed? 10:31:39AM**

A Yes. 10:31:40AM

**Q What was stated about the complaint that was filed? 10:31:42AM**

A Nothing specific. That the five guys who were not working for the village anymore filed a complaint and they're suing the village. 10:31:45AM

**Q Did anyone tell you what they were suing the village for? 10:31:55AM**

A No. 10:31:58AM

**Q At that point in time, the summer of '08, when you first heard of the rumor mill, did 10:31:59AM**

**TYREE BACON**

**you know what the five plaintiffs were suing over in this case?**

A No. 10:32:06AM

**Q When did you first learn what the five -- or at least your understanding of what the five plaintiffs in this case were suing over? 10:32:07AM**

A That would've been Wednesday, when I went with Mr. Welch. 10:32:15AM

**Q So is it your testimony, sir, that prior to this Wednesday, you didn't know any of the allegations in the complaint? 10:32:20AM**

MR. NOVIKOFF: Objection. 10:32:29AM

You can answer. 10:32:30AM

BY MR. GOODSTADT: 10:32:31AM

**Q Is that your testimony? 10:32:32AM**

A No, I didn't. 10:32:33AM

**Q You never spoke to Richard Bosetti about it? 10:32:33AM**

A No. 10:32:36AM

**Q How long did the rumor mill go on for? 10:32:39AM**

A I'd hear at the beginning of the shift. I'd go out on patrol, do my thing. I may have heard it once or twice. 10:32:45AM

**Q And once or twice during the summer -- 10:32:52AM**

**TYREE BACON**

**during the season of '08?**

A Yes. 10:32:56AM

**Q Did you ever discuss your viewpoint, I believe you called it -- I don't remember what you called it, but something to the effect that it was nonsense. Did you ever discuss that viewpoint with anybody? 10:32:59AM**

MR. NOVIKOFF: Objection. 10:33:11AM

A I'm sure I turned around and said it was probably nonsense. I may have even used words like bullshit. 10:33:12AM

**Q Okay. At the time you heard the rumor mill, you used the words like bullshit? 10:33:19AM**

A I may have. 10:33:23AM

**Q But how would you say it's bullshit if you had no idea of what was being alleged at that time, until last Wednesday? 10:33:24AM**

MR. NOVIKOFF: Objection. Argumentative. 10:33:28AM

You can answer. 10:33:29AM

A I don't know. 10:33:33AM

MR. NOVIKOFF: Also form. 10:33:33AM

But you can answer. 10:33:33AM

A I didn't know the whole facts behind 10:33:35AM

TYREE BACON

it. They were not invited back for a reason, and now they're making allegations to justify why they're not back; and from things that I've observed when working, I thought it was nonsense.

**Q But what did you think was nonsense if 10:33:49AM you didn't know what the allegations were until Wednesday?**

A I didn't -- 10:33:54AM

MR. NOVIKOFF: Wait. You've got to 10:33:55AM let him finish.

Andrew, did you finish the question? 10:33:57AM

MR. GOODSTADT: I did. 10:33:59AM

MR. NOVIKOFF: Do you want to just 10:34:00AM read it back so we're clear, please.

(Whereupon, the requested portion was 10:34:02AM read back by the court reporter: But what did you think was nonsense if you didn't know what the allegations were until Wednesday?)

MR. NOVIKOFF: Note my objection. 10:34:13AM

A Generally speaking, because I didn't 10:34:14AM know any specifics of it, I generally thought it was nonsense..

TYREE BACON

**Q Okay. But you didn't know any of the 10:34:21AM specifics of it, but did you know any generalities of it, other than the fact there was a complaint filed?**

MR. NOVIKOFF: Objection. 10:34:31AM

A I knew that they were alleging 10:34:32AM misconduct and that they weren't invited back because of that.

**Q And how did you know that they were 10:34:41AM alleging misconduct and that they weren't invited back because of that?**

A Just through the rumor mill. 10:34:48AM

**Q Okay. So the rumor mill was more than 10:34:50AM just the fact that a complaint was filed. It was that a complaint was filed alleging misconduct, and they weren't invited back because of it. Was that the rumor mill?**

MR. NOVIKOFF: Objection. 10:35:01AM

A I think that was probably what I had 10:35:01AM assumed from it.

**Q What was the basis of that assumption? 10:35:04AM**

A We're going in circles here. You've 10:35:07AM asked questions, I've answered them.. You know, I don't understand what else you'd like me to

TYREE BACON

say.

**Q Well, you just told me about an 10:35:16AM assumption that you made.**

A Right. 10:35:19AM

**Q And I want to know what lead you to 10:35:19AM that assumption.**

MR. NOVIKOFF: And you is asked that 10:35:22AM when you said what was the basis of your assumption that was nonsense, and he answered that. I'm going to object.

But you have to answer again. 10:35:29AM

A Okay. 10:35:31AM

MR. GOODSTADT: No, no, no. 10:35:32AM

BY MR. GOODSTADT: 10:35:33AM

**Q The question, the basis of nonsense, 10:35:33AM is different than what was the basis of your assumption that they were alleging misconduct and they were fired for that misconduct.**

A That assumption -- 10:35:43AM

MR. NOVIKOFF: And you've already 10:35:44AM asked that question also. Objection to form.

But you -- please answer the question. 10:35:46AM

A That assumption led me to believe it 10:35:46AM

TYREE BACON

was nonsense.

**Q I'm not asking how you reached the 10:35:51AM assumption that it was nonsense. I'm asking how you reached the assumption that they were alleging misconduct and they were fired because of that.**

A Through the rumor mill. 10:36:01AM

**Q So you heard that's what they were 10:36:02AM alleging?**

MR.. NOVIKOFF: Objection. 10:36:04AM

A Through the rumor mill, yes. 10:36:05AM

**Q And who alerted you to the fact that 10:36:07AM they were alleging misconduct and that they were fired because of that?**

A Once again, through the rumor mill. 10:36:14AM Nobody specific.

**Q The rumor mill at the Ocean Beach 10:36:17AM Police Department?**

A Yes. 10:36:20AM

**Q Was there anyone outside of the Ocean 10:36:20AM Beach Police Department that was part of the rumor mill?**

A Not that I recall. 10:36:25AM

**Q Then you testified that the third 10:36:27AM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**basis of your knowledge that those allegations of drinking, sex and excessive force in this case was being here. What did you mean by that?**

MR. NOVIKOFF: Objection. 10:36:39AM

You can answer. 10:36:41AM

A That's what I was informed by 10:36:42AM Mr. Welch, was the general content of the allegations that were made by them.

**Q Okay. So it was nothing you 10:36:50AM learned -- nothing you learned being here; it's something that you learned prior to being here?**

A Yes. 10:36:55AM

MR. NOVIKOFF: I just have to caution 10:36:57AM you. You can speak about meeting with Mr. Welch, meeting with me. You can speak about how long the meetings went on. You can speak about what documents you needed to review to refresh your recollection, if any. But you can't really talk about what Mr. Welch said to you and what you said to Mr. Welch.

BY MR. GOODSTADT: 10:37:28AM

**Q Have you ever spoken with George Hesse 10:37:31AM about any allegations in this lawsuit?**

TYREE BACON

A No, I have not. 10:37:35AM

**Q Have you ever spoken to Mayor Loeffler 10:37:37AM about any allegations in this lawsuit?**

A No, I have not. 10:37:41AM

**Q Have you ever spoken to Gary Bosetti 10:37:42AM about any allegations in this lawsuit?**

A No, I have not. 10:37:47AM

**Q Have you ever spoken to Richard 10:37:47AM Bosetti about any allegations in this lawsuit?**

A No, I have not. 10:37:49AM

**Q Have you have spoken to Natalie Rogers 10:37:50AM about any allegations in this lawsuit?**

A No, I have not. 10:37:55AM

**Q Have you ever spoken to Patrick Cherry 10:37:56AM about any allegations in this lawsuit?**

A No, I have not. 10:37:58AM

**Q Have you spoken with Mary Ann Minerva 10:37:58AM about any of the allegations in this lawsuit?**

A No. 10:38:00AM

**Q Have you spoken with any of the 10:38:00AM plaintiffs about the allegations in this lawsuit?**

A No. 10:38:04AM

**Q And other than for your assumption 10:38:05AM**

TYREE BACON

**that it was bullshit, have you spoken with any other current or former employees at Ocean Beach about the allegations in this lawsuit?**

MR. NOVIKOFF: Motion -- I'm sorry. 10:38:18AM Objection to form.

You can answer the question. 10:38:21AM

A No, I have not. 10:38:22AM

**Q Have you ever spoken to any of the 10:38:24AM individuals that I just listed about the fact that a lawsuit had been filed?**

A No, I have not. 10:38:30AM

**Q And other than for Mr. Welch, have you 10:38:35AM spoken with anybody else in this world about either the fact that a lawsuit had been filed or any allegations in the lawsuit?**

A My wife. 10:38:46AM

**Q Other than for your wife and 10:38:47AM Mr. Welch, have you spoken to anybody else about the fact that there's a lawsuit brought or any allegations in the lawsuit?**

A My attorney (indicating). 10:38:55AM

**Q Anyone else? 10:38:58AM**

A Nope. 10:39:00AM

**Q When did you start working at Ocean 10:39:04AM**

TYREE BACON

**Beach as a police officer?**

A Summer of 1990. 10:39:11AM

**Q Did you ever drink while on duty at 10:39:17AM Ocean Beach?**

A Not on duty. 10:39:20AM

**Q Did you ever drink during your tour? 10:39:28AM**

A Actually, let me correct that. Yes, 10:39:30AM on duty.

**Q How many times did you drink on duty? 10:39:34AM**

A Once. 10:39:36AM

**Q When was that? 10:39:36AM**

A Prior to the defendants here being 10:39:42AM terminated or let go or not invited back.

**Q And how long prior to that? 10:39:51AM**

A Probably the summer of '99. 10:39:59AM

**Q And were you in uniform at the time? 10:40:07AM**

A I was. 10:40:08AM

**Q And where were you drinking? 10:40:09AM**

A In the police station. 10:40:11AM

**Q What were you drinking? 10:40:15AM**

A It was a rum and Coke. 10:40:17AM

**Q Why were you drinking on duty in 10:40:23AM uniform?**

A It was towards the end of the shift, 10:40:27AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

we had gotten a pizza, and Ed Carter went across the street to CJ's to get what I thought was a pitcher of Coke; and when I poured a glass, it turned out to be a pitcher of rum and Coke.

**Q So Ed Carter brought back a pitcher of 10:40:42AM rum and Coke --**

A Yes, he did. 10:40:46AM

**Q -- to the station? 10:40:46AM**

A Yes, he did. 10:40:47AM

MR. NOVIKOFF: You've got to let him 10:40:47AM finish.

THE WITNESS: I understand. 10:40:49AM

BY MR. GOODSTADT: 10:40:50AM

**Q And at the time that he brought that 10:40:50AM back and you tasted it and realized that it was rum and Coke, did you continue to drink it?**

A No, I dumped it. 10:40:53AM

**Q So you only had one sip? 10:40:54AM**

A Correct. 10:40:56AM

**Q Have you ever witnessed any other 10:41:16AM police officers in Ocean Beach drinking while on duty?**

A No. 10:41:22AM

**Q Have you ever witnessed any Ocean 10:41:24AM**

**TYREE BACON**

**Beach --**

A Let me correct that. 10:41:26AM

That night, the other guys who were on 10:41:27AM shift also experienced the same thing.

**Q Who were the guys that were on shift? 10:41:33AM**

A I don't recall who was working that 10:41:35AM particular tour.

**Q Do you recall any of the people at all 10:41:37AM who were working that tour?**

A No, I don't. 10:41:40AM

**Q Was Ed Carter on duty at the time? 10:41:41AM**

A Yes, he was. 10:41:44AM

**Q Anyone else other than for you and Ed 10:41:45AM Carter?**

A It was in the summertime, it was in 10:41:48AM July, so there were probably six or seven other officers.

**Q Have you ever witnessed anybody drink 10:42:03AM before their shift?**

A No. 10:42:07AM

**Q Do you think it would be appropriate 10:42:10AM for an officer to have a beer before going on tour?**

A No, I don't think it would be 10:42:14AM

TYREE BACON

appropriate.

**Q Do you know if there's any rules or 10:42:17AM policies against it at Ocean Beach?**

A I'm sure there are. 10:42:21AM

**Q So if you were to learn that an 10:42:23AM officer would eat lunch, have a beer at lunch and then go on duty thereafter, you'd consider that to be improper?**

A Depending on how much time. If the 10:42:37AM guy's working a 4 to 12 and he had it at lunch and he was fit for duty, no, I wouldn't see that as being improper.

**Q How about if somebody had a beer 10:42:45AM during their shift on the lunch break?**

A I would think that that would be 10:42:50AM improper.

**Q Even if it's only one beer, you think 10:42:54AM that's improper?**

A Yes. 10:42:58AM

**Q And why do you believe that's 10:42:58AM improper?**

A Because you're on duty. 10:43:01AM

**Q Do you know if there's any policy 10:43:04AM against drinking while on duty?**

**TYREE BACON**

A I'm sure there is. I can't cite it 10:43:08AM specifically.

**Q Did you ever have a drink in the 10:43:14AM barracks prior to going on duty?**

A No. 10:43:18AM

**Q Did you ever hear that -- 10:43:25AM**

MR. NOVIKOFF: Hold on one second. 10:43:27AM

THE WITNESS: No, I'm done. I just 10:43:29AM wanted to make sure it wasn't anything pressing.

BY MR. GOODSTADT: 10:43:34AM

**Q Did you ever hear of anybody 10:43:34AM complaining about you drinking while on duty?**

A No. 10:43:39AM

**Q Did you ever drink at a bar in Ocean 10:43:42AM Beach?**

A Yes. 10:43:46AM

**Q How many times? 10:43:48AM**

A A handful of times. 10:43:50AM

**Q How many is a handful? 10:43:52AM**

A Half a dozen, a dozen. 10:43:54AM

**Q Was that on days that you worked? 10:43:58AM**

A No. 10:44:01AM

**Q So it was on days where you didn't 10:44:05AM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

**TYREE BACON**

**have any tours?**
A Correct. 10:44:08AM
**Q So you came into Ocean Beach to go to 10:44:09AM the bars, it wasn't after a tour?**
A It may have -- 10:44:12AM
MR. NOVIKOFF: Objection. 10:44:14AM
You can answer. 10:44:14AM
A It may have been after a tour or it 10:44:15AM may have been on my day off.
**Q How many times did you go out drinking 10:44:20AM after your tour in Ocean Beach?**
A Two or three times. 10:44:25AM
**Q Did you ever get drunk in the bars in 10:44:27AM Ocean Beach?**
A No. 10:44:31AM
**Q How many drinks does it take you to 10:44:31AM get drunk?**
A Me? Three. 10:44:34AM
**Q So you never had three drinks at a bar 10:44:36AM in Ocean Beach?**
A No. 10:44:40AM
**Q Would you consider it dangerous to 10:44:46AM have a beer during your shift and then carry a loaded firearm around?**

**TYREE BACON**

MR. NOVIKOFF: Objection. 10:44:52AM
You can answer. 10:44:53AM
A Yes. 10:44:54AM
**Q Did you ever have to be relieved from 10:45:03AM your tour in a bar?**
A No. 10:45:07AM
**Q Did you ever go to a bar in Ocean 10:45:13AM Beach with either of the Bosetti brothers?**
A No. 10:45:18AM
**Q How about with Arnold Hardman? 10:45:19AM**
A No. 10:45:22AM
**Q Walter Moeller? 10:45:23AM**
A Yes. 10:45:24AM
**Q How many times with Moeller? 10:45:24AM**
A Once or twice. 10:45:26AM
**Q How about Patrick Cherry? 10:45:28AM**
A None. 10:45:30AM
**Q George Hesse? 10:45:30AM**
A Yes. 10:45:31AM
**Q How many times? 10:45:32AM**
A Once or twice. 10:45:33AM
**Q When were the one or two times that 10:45:36AM you went to a bar in Ocean Beach with George Hesse?**

**TYREE BACON**

A I can't remember anything specific. 10:45:43AM
**Q Do you recall what year it was? 10:45:45AM**
A It would've been after '99. 10:45:48AM
MR. NOVIKOFF: Just before your next 10:45:52AM question, regular stips?
MR. GOODSTADT: Regular stips. 10:45:54AM
A It was after '99. 10:45:58AM
**Q Do you recall what year after '99? 10:45:59AM**
A No. 10:46:01AM
**Q What makes you believe that it was 10:46:05AM after '99?**
A Because it was after I came back. 10:46:07AM George wasn't there when I was there the first time.
**Q Okay. Which bar or bars did you go to 10:46:12AM with Mr. Hesse?**
A Bacci Beach would've been one of them, 10:46:21AM CJ's would've been one, and McGuire's.
**Q Any other bars that you've been to 10:46:34AM with Mr.. Hesse in Ocean Beach?**
A No. 10:46:37AM
**Q Have you ever been to a bar with 10:46:38AM Mr. Hesse outside of Ocean Beach?**
A Yes. 10:46:41AM

TYREE BACON

**Q How many times? 10:46:42AM**
A Three or four. 10:46:47AM
**Q George Hesse a friend of yours? 10:46:49AM**
A Professionally, yes. 10:46:51AM
**Q Do you guys socialize outside of work 10:46:53AM ever?**
A The Christmas party, the end-of-summer 10:46:55AM party. That's pretty much it.
**Q Any other occasions that you 10:47:04AM socialized with Mr. Hesse outside of work?**
A No, that's pretty much it. 10:47:07AM
**Q How many times did you go to Bacci 10:47:10AM Beach with Mr. Hesse?**
A Once. 10:47:14AM
**Q Was that when you were off duty? 10:47:14AM**
A Yes. 10:47:18AM
**Q Was Mr. Hesse off duty? 10:47:18AM**
A I believe so. 10:47:20AM
**Q Who else was there? 10:47:21AM**
MR. NOVIKOFF: You mean in his group? 10:47:24AM
BY MR. GOODSTADT: 10:47:25AM
**Q In your group. 10:47:25AM**
A Paul Carola was there. 10:47:27AM
**Q Anyone else? 10:47:31AM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A That's all that I remember. 10:47:34AM

**Q Did you guys eat a meal there? 10:47:35AM**

A Yes. 10:47:37AM

**Q Did you have any drinks? 10:47:38AM**

A I think I had a beer. 10:47:40AM

**Q Do you know whether Hesse had any drinks? 10:47:42AM**

A I don't recall. 10:47:44AM

**Q Who paid for that meal? 10:47:44AM**

A We all paid for it. 10:47:46AM

**Q Individually? 10:47:47AM**

A Yes. 10:47:48AM

**Q When did you go to CJ's with Mr. Hesse? 10:47:49AM**

A Same thing, it was for a meal. 10:47:53AM

**Q When was it? 10:47:55AM**

A I don't remember specifically. 10:47:56AM

**Q You don't recall what year it was? 10:47:58AM**

A No. After '99. 10:48:00AM

**Q You don't recall what year between 1999 and today it was? 10:48:04AM**

A Nothing specific. 10:48:08AM

**Q Was it closer to today or closer to 1999? 10:48:11AM**

TYREE BACON

A Closer to '99. 10:48:14AM

**Q Who else was at that meal at CJ's? 10:48:17AM**

A I think Walter Moeller was there for that. 10:48:20AM

**Q Anyone else? 10:48:24AM**

A Not that I remember. 10:48:25AM

**Q Did you have any drinks at that meal? 10:48:26AM**

A I think, once again, I had a beer with my burger. 10:48:28AM

**Q Do you know if Mr. Hesse had any drinks at that meal? 10:48:32AM**

A I don't recall. 10:48:35AM

**Q Were you on duty at the time? 10:48:36AM**

A No, I was not. 10:48:37AM

**Q Was Hesse on duty? 10:48:38AM**

A I don't know. 10:48:39AM

**Q Was Moeller on duty? 10:48:40AM**

A I don't know. 10:48:42AM

**Q Were you wearing a uniform? 10:48:42AM**

A No. None of the guys were in uniforms. 10:48:44AM

**Q You said none of the guys, referring to Hesse and Moeller and yourself? 10:48:48AM**

A Correct. 10:48:52AM

TYREE BACON

**Q Who paid for that meal? 10:48:52AM**

A We divvied it up among the three of us. 10:48:55AM

**Q When did you go to McGuire's with Hesse? 10:48:58AM**

A Once again, after '99. I don't remember when specifically. 10:49:02AM

**Q Was it closer to '99 or closer to today? 10:49:12AM**

A Closer to '99. 10:49:14AM

**Q Who else was there with you? 10:49:16AM**

MR. NOVIKOFF: If anybody. 10:49:23AM

A I don't remember. There was a crowd there. 10:49:25AM

MR. GOODSTADT: You mean in his group? 10:49:29AM

BY MR. GOODSTADT: 10:49:30AM

**Q I was going to say with you. 10:49:30AM**

A With us, nothing. 10:49:31AM

**Q So it was you and Hesse? 10:49:33AM**

A Me and George, yes. 10:49:35AM

**Q Were you off duty at the time? 10:49:36AM**

A Yes. 10:49:38AM

**Q Was Hesse off duty? 10:49:38AM**

A I don't know. 10:49:40AM

TYREE BACON

**Q Were either of you in uniforms? 10:49:42AM**

A I was not. 10:49:44AM

**Q Was he? 10:49:44AM**

A No, he wasn't. 10:49:46AM

**Q Did you have any alcohol at that meeting? 10:49:47AM**

A It wasn't a meeting. It was -- 10:49:49AM

**Q Would you go there to have a meal? Did you have a meal there that day? 10:49:52AM**

A No. That time we didn't have a meal, no. 10:49:55AM

**Q So that time you were there to drink? 10:49:58AM**

A Just to be social. 10:50:00AM

**Q Okay. Did you have any drinks that night? 10:50:01AM**

A Yes. 10:50:05AM

**Q What time were you at McGuire's? 10:50:06AM**

A It was after they were done with the restaurant, so I'm going to say 10 or 11:00. 10:50:12AM

**Q Do you recall what month it was? 10:50:18AM**

A It was in the off season, so it had to be after Labor Day. 10:50:22AM

**Q Did you have any alcohol? 10:50:30AM**

A Yes. 10:50:31AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q What did you drink that night? 10:50:32AM**

A I don't remember. 10:50:33AM

**Q How many drinks did you have? 10:50:34AM**

A Maybe one, two tops. 10:50:37AM

**Q Did Hesse have any alcohol that night? 10:50:38AM**

A I don't recall what he drank. 10:50:41AM

**Q Who paid for your drinks? 10:50:42AM**

A I paid for one, and I think I bought a 10:50:44AM round and he bought a round.

**Q When you say "a round," do you know 10:50:49AM what it means to pay a round?**

A You know, I bought my drink and his 10:50:51AM the first time, and he bought, you know, his and mine the second time.

**Q So he did have alcohol that night? 10:50:58AM**

MR. NOVIKOFF: Objection. 10:51:00AM

A It may have been a soda. I don't 10:51:01AM recall what he drank. But I put money on the bar; they took money from me. Then he put money on the bar; they took money from him.

**Q Was John Oley there with you? 10:51:11AM**

A No. 10:51:16AM

**Q Was John Oley at CJ's with you? 10:51:16AM**

A No. 10:51:19AM

TYREE BACON

**Q Was he at Bacci Beach with you? 10:51:20AM**

A No. 10:51:22AM

**Q Did you ever see Patrick Cherry drink 10:51:33AM at Ocean Beach?**

A No. 10:51:36AM

**Q How about the Bosettis, did you ever 10:51:36AM see them drink at Ocean Beach?**

A Yeah, all the time. 10:51:40AM

**Q What do you mean by "all the time"? 10:51:41AM**

A Off duty. I worked midnights, they 10:51:42AM worked 4 to 12s. When they got off duty, I'd see them in town.

**Q Did you ever see them drunk in Ocean 10:51:50AM Beach?**

A I may have once or twice. 10:51:54AM

**Q What years? 10:51:57AM**

A I have no idea. It was after '99. 10:51:57AM

**Q Did you ever see them drinking in the 10:52:03AM barracks?**

A Yes. 10:52:05AM

**Q How many times? 10:52:05AM**

A A couple of times. 10:52:07AM

**Q How many is a couple? 10:52:08AM**

A Two or three. 10:52:10AM

TYREE BACON

**Q What were they drinking in the 10:52:12AM barracks?**

A Beer. 10:52:14AM

**Q Did you ever see them drink in the 10:52:16AM police station?**

A No. 10:52:19AM

**Q Did you ever see Arnold Hardman 10:52:27AM drinking in Ocean Beach?**

A I never saw Arnie drink at all. 10:52:31AM

**Q And other than for the times that you 10:52:33AM testified about thus far, have you ever seen George Hesse drink in Ocean Beach?**

MR. NOVIKOFF: Okay, other than -- 10:52:44AM

BY MR. GOODSTADT: 10:52:45AM

**Q Other than what you testified to thus 10:52:45AM far.**

A Yes. 10:52:48AM

**Q How many times? 10:52:48AM**

A A handful of times, and that would be 10:52:50AM two, three, four, five. I'm not certain.

**Q What places have you seen George Hesse 10:52:58AM drink in Ocean Beach?**

A CJ's, the Albatross, McGuire's. 10:53:02AM

**Q Anywhere else? 10:53:15AM**

**TYREE BACON**

A I think that's about it. 10:53:16AM

**Q Was he on duty on any of those 10:53:20AM occasions?**

A I don't believe so. 10:53:22AM

**Q Was he in uniform on any of those 10:53:23AM occasions?**

A No. 10:53:25AM

**Q Did you ever see George Hesse drunk in 10:53:27AM Ocean Beach?**

A No. 10:53:30AM

**Q Is there any policy regarding drinking 10:53:34AM in the bars when you're off duty in Ocean Beach?**

MR. NOVIKOFF: Presently? 10:53:40AM

BY MR. GOODSTADT: 10:53:40AM

**Q At any point in time that you worked 10:53:41AM there.**

A No, I don't believe there was. 10:53:43AM

**Q You don't recall Joe Loeffler, Sr. 10:53:44AM having a policy that off-duty officers couldn't drink in the bars at Ocean Beach?**

A That was back in the early '90s, there 10:53:52AM was. But under Eddie Paradiso, I don't -- Eddie changed some of the policies and procedures, and we never all got copies of them.

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Did he change that policy? 10:54:04AM**
A I have no idea. 10:54:06AM
**Q So you don't know one way or the other 10:54:07AM whether it was still --**
A No. 10:54:11AM
**Q -- in effect? 10:54:11AM**
A No, I do not. 10:54:12AM
**Q Did you ever confiscate any beer in 10:54:15AM Ocean Beach?**
A No, I didn't. 10:54:18AM
**Q Was there a policy as to what would 10:54:20AM happen to beer that would be confiscated in Ocean Beach?**
MR. NOVIKOFF: Objection. 10:54:27AM
A None that I'm aware of. 10:54:29AM
**Q So had you had the occasion to 10:54:31AM confiscate beer, you wouldn't know what to do with it?**
MR. NOVIKOFF: Objection. 10:54:36AM
If you can answer. 10:54:39AM
A No, I don't. 10:54:40AM
**Q Do you know whether police officers, 10:54:46AM whether on duty or off, were permitted to drink beer that was confiscated?**

**TYREE BACON**

MR. NOVIKOFF: Objection. 10:54:56AM
A Repeat that. 10:54:57AM
**Q Do you know whether police officers in 10:54:58AM Ocean Beach, whether they be on duty or off duty, were entitled or permitted to drink beer that was confiscated?**
MR. NOVIKOFF: Objection. 10:55:09AM
A I don't know if that was permitted or 10:55:10AM not, no.
**Q Do you know whether that happened or 10:55:13AM not?**
A Yes, it happened all the time. 10:55:14AM
**Q And who drank beer that was 10:55:16AM confiscated?**
A Everybody. 10:55:20AM
**Q Tell me who. 10:55:21AM**
A Well, we can start with one, two, 10:55:24AM three of the defendants.
**Q Which ones? 10:55:30AM**
A Or complainants, whatever -- 10:55:30AM
MR. NOVIKOFF: Plaintiffs. 10:55:32AM
THE WITNESS: Plaintiffs, thank you. 10:55:33AM
A Myself, the Bosettis, Walter Moeller, 10:55:35AM Chief Hesse, Chief Paradiso. Just about

TYREE BACON

everybody who was on the roster at one point or another had taken a beer out of the refrigerator which had been confiscated previously, whether it was that tour, a week before, and would take one for the ride home.
**Q What do you mean, would take one for 10:56:05AM the ride home?**
A Weed take it. When we got to the 10:56:09AM checkpoint, we'd have a cold one before we left.
**Q Did you ever drink the beer in the 10:56:14AM vehicle on the way to the checkpoint?**
A No, I did not. 10:56:19AM
**Q Did you ever witnesses anybody drink a 10:56:20AM beer in the police vehicle on the way to the station -- on the way to the checkpoint?**
A No. 10:56:29AM
**Q Did you ever go in a vehicle with 10:56:29AM either of the Bosetti brothers to the checkpoint?**
A No. 10:56:37AM
**Q Did you ever go in a -- 10:56:37AM**
A Let me -- there were times when we 10:56:37AM brought them out. If I worked midnights and they worked 4 to 12s, and they chose to stay

TYREE BACON

around to go frequent any of the establishments, after 4:00, 5:00 in the morning, when the place closed up, we may take them to the checkpoint. That's happened, yes.
**Q Why would you or any other officers 10:56:56AM take them to the checkpoint?**
A So they can get their cars and go home 10:57:01AM so they didn't have to wait for the ferry in the morning.
**Q So you did that while you were on 10:57:05AM duty?**
A Yes. 10:57:08AM
**Q Did anybody instruct you to do that? 10:57:08AM**
A Nobody instructed me to do it. We did 10:57:12AM not just for them. We did it for almost anybody who chose to stick around after their shift and they needed a ride out. It was after the water taxis had shut down.
**Q When you say almost anyone, you mean 10:57:21AM almost any of the police officers?**
A Yes. 10:57:25AM
**Q Who else have you driven off, other 10:57:25AM than the Bosettis, during your shift?**
A During my shift? Anybody who's on the 10:57:29AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

roster. Anybody who was a member of the department between 1999 and now has been driven back to the checkpoint at one point or another.

**Q So my question was: Who have you driven back to the check point while you were on tour?** 10:57:40AM

A I've driven the Bosettis. I've driven Chief Hesse. Who else? John Oley, Gordon Barra, Brian Butler. And those are some of the names. I'm sure there's at least 10 others that escape me. 10:57:46AM

**Q Have you ever driven any of the plaintiffs to the checkpoint while you were on tour?** 10:58:12AM

A Not that I recall. 10:58:17AM

**Q Each time you drove any of those officers that you testified to, it was because they stayed around after their tour, going to the bars?** 10:58:19AM

A Or -- yes. 10:58:28AM

**Q Did you ever sleep in the barracks?** 10:58:29AM

A A few times. 10:58:30AM

**Q Overnight?** 10:58:32AM

A No. 10:58:33AM

TYREE BACON

**Q Did you ever sleep in the barracks during a tour?** 10:58:35AM

A Yes. 10:58:38AM

**Q How many times?** 10:58:38AM

A A couple of times. 10:58:40AM

**Q Did anyone know about that?** 10:58:43AM

A Sure. When you take your meal break, you go up to the barracks and try to catch a couple of winks. 10:58:45AM

**Q That was an accepted practice?** 10:58:52AM

A I was on my meal break. 10:58:54AM

**Q But is that an accepted practice --** 10:58:55AM

A Yes. 10:58:59AM

**Q -- on your meal practice break to go catch a couple of winks up in the barracks?** 10:58:59AM

A Yes. 10:59:04AM

**Q What time would you take your meal breaks during the midnight to 8 tour?** 10:59:04AM

A Five. After 5. 10:59:11AM

**Q After the bars shut down and the town got quiet?** 10:59:12AM

A Yes. 10:59:15AM

**Q I believe you testified that three of the plaintiffs drank beer that was confiscated.** 10:59:19AM

TYREE BACON

**Which plaintiffs were you referring to?**

A Mr. Carter, Mr. Snyder and Mr. Nofi. 10:59:26AM

MR. NOVIKOFF: I'm sorry. Carter, Snyder and Nofi? 10:59:35AM

BY MR. GOODSTADT: 10:59:38AM

**Q How many times did you see Carter drink beer that was confiscated?** 10:59:38AM

A A bunch. 10:59:41AM

**Q How many?** 10:59:41AM

A Half dozen. 10:59:42AM

**Q You actually witnessed him drinking the beer?** 10:59:43AM

A Yes. 10:59:46AM

**Q Where did he drink those beers?** 10:59:46AM

A Station house, barracks. 10:59:48AM

**Q Did you ever drink any of the beer in the station house?** 10:59:50AM

A No. 10:59:53AM

**Q Did you ever drink any of the beer that you took from the refrigerator in the barracks?** 10:59:54AM

A Yes. 10:59:59AM

**Q So other than the barracks and the checkpoint, where else would you drink beer that** 11:00:00AM

TYREE BACON

**you had taken from the refrigerator?**

A That was it. 11:00:08AM

**Q How many times did you see Snyder drink beer that was confiscated?** 11:00:08AM

A Once or twice. 11:00:12AM

**Q When would you see Snyder do that?** 11:00:13AM

A I don't remember anything specific. When he was still working there. 11:00:15AM

**Q Do you recall what year?** 11:00:19AM

A After '99. 11:00:20AM

**Q Do you recall what year after '99?** 11:00:21AM

A No. 11:00:22AM

**Q Was it closer to '99 or closer to today?** 11:00:24AM

A Closer to '99. 11:00:27AM

**Q How about Nofi, how many times did you see him drink a beer that was confiscated?** 11:00:30AM

A Once or twice. 11:00:35AM

**Q Where did you see him drink the beer?** 11:00:36AM

A In the station house. 11:00:37AM

**Q When was that?** 11:00:38AM

A Same time frame. 11:00:39AM

**Q After '99?** 11:00:40AM

A Yes. 11:00:41AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q But you don't know what year? 11:00:42AM**

A No. 11:00:43AM

**Q Who else was there when Nofi drank in 11:00:43AM the station house?**

A I don't recall. 11:00:47AM

**Q Who else was there when Snyder drank 11:00:47AM in the station house?**

A I don't recall. 11:00:50AM

**Q Who else was there when Carter drank 11:00:50AM in the station house?**

A I don't recall. 11:00:53AM

**Q You don't recall a single person that 11:00:53AM was there?**

A No. 11:00:56AM

**Q Did you ever see Frank Fiorillo drink 11:00:59AM a beer that was confiscated?**

A No. 11:01:03AM

**Q And you never saw Kevin Lamm drink a 11:01:03AM beer that was confiscated?**

A No. 11:01:13AM

**Q Do you know what rocket fuel is? 11:01:26AM**

A Yes. 11:01:27AM

**Q What's rocket fuel? 11:01:28AM**

A It's a drink that they make over at 11:01:29AM

TYREE BACON

CJ's.

**Q What's in it? 11:01:31AM**

A I'm not sure. 11:01:34AM

**Q Did you ever have a rocket fuel? 11:01:35AM**

A Yes. 11:01:36AM

**Q How many times? 11:01:37AM**

A Once. 11:01:37AM

**Q Where did you have that rocket fuel? 11:01:38AM**

A Back at the checkpoint. 11:01:40AM

**Q How did you get that rocket fuel? 11:01:41AM**

A CJ's was closing. It was the end of 11:01:44AM the shift. I had a rocket fuel, and we went back to the checkpoint and had it in the parking lot.

**Q Did you go to pick it up at CJ's or 11:01:53AM was it brought to the station?**

A It was brought to the station. 11:01:58AM

**Q Who brought it to the station? 11:02:00AM**

A I don't recall. 11:02:01AM

**Q Did one of the officers bring it to 11:02:02AM the station or did someone who worked at CJ's bring it?**

A Actually, it was somebody who worked 11:02:07AM at CJ's.

TYREE BACON

**Q They delivered the rocket fuels to the 11:02:10AM station?**

A Yes. 11:02:12AM

**Q Did you pay for the rocket fuel? 11:02:13AM**

A No, he brought it in and gave it to us 11:02:15AM for free, unless somebody else had paid for it.

**Q Did you ever see anyone drink rocket 11:02:26AM fuels in the station?**

A No. 11:02:30AM

**Q Did you ever hear that the plaintiffs 11:02:32AM in this case complained that they were required to clean up cups and debris from alcoholic beverages in the station?**

MR. NOVIKOFF: Can you just read that 11:02:42AM question. I didn't quite get it.

(Whereupon, the requested portion was 11:02:53AM read back by the court reporter: Did you ever hear that the plaintiffs in this case complained that they were required to clean up cups and debris from alcoholic beverages in the station?)

A No. 11:02:54AM

**Q Did you ever hear that they were 11:02:57AM required to clean up cups and debris from**

**TYREE BACON**

**alcoholic beverages in the station?**

A No. 11:03:03AM

**Q Did you ever have to clean up cups ask 11:03:03AM debris from alcoholic beverages in the station?**

A No. Can I elaborate on that a little? 11:03:07AM We all had to clean up the station. You know, if there was trash and it was overflowing, you would take the trash out, you know. And there were times that there were pizza boxes or lunch wrappers and stuff like that. But as far as alcoholic beverages, no.

**Q Do you know why Joe Loeffler, Sr. had 11:03:36AM a policy against off-duty police officers drinking in the bars on Ocean Beach?**

MR. NOVIKOFF: Objection. 11:03:44AM

A Probably public perception is what I 11:03:44AM would imagine.

**Q What do you mean by that? 11:03:48AM**

A If you're working a 4 to 12 and you're 11:03:49AM out there in uniform with the public and then you're frequenting the establishments, it doesn't look good for the public.

MR. NOVIKOFF: The question was do you 11:03:58AM know.

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

THE WITNESS: Do I know? 11:04:01AM

MR. NOVIKOFF: No guessing. You answered the question. But just for the future, the question -- 11:04:02AM

A No, I don't know, then. 11:04:05AM

**Q But that was your understanding of why? 11:04:07AM**

A Yes. 11:04:09AM

**Q You thought it would compromise or undermine you as a police officer if you were drinking and socializing with the people in the village at the bars? 11:04:09AM**

MR. NOVIKOFF: Objection. 11:04:19AM

A It could. 11:04:21AM

**Q Did George Hesse ever -- well, strike that. 11:04:26AM**

**I realize that you've called George Hesse Chief Hesse a bunch of times. 11:04:30AM**

A Yes. 11:04:35AM

**Q Okay. Do you refer to him as Chief Hesse? 11:04:35AM**

A Yes. 11:04:38AM

**Q Do you still refer to him as Chief Hesse? 11:04:38AM**

**TYREE BACON**

A Yes. 11:04:41AM

**Q Do you know if any other people refer to him still as Chief Hesse? 11:04:42AM**

A Everybody that works in the department. 11:04:46AM

**Q Is he currently the chief? 11:04:47AM**

A I believe he's the deputy chief or acting deputy chief. 11:04:49AM

**Q Who is the chief? 11:04:54AM**

A There is none right now. 11:04:55AM

**Q So currently George Hesse is the highest ranking officer in the department? 11:04:57AM**

MR. NOVIKOFF: Objection. 11:05:01AM

A Yes. 11:05:02AM

**Q Do you know if anyone outside -- have you ever heard of anyone outside the village refer to George Hesse as Chief Hesse? 11:05:05AM**

MR. NOVIKOFF: Objection. 11:05:13AM

A Yes. 11:05:14AM

**Q Who? 11:05:17AM**

A People in town. 11:05:19AM

**Q In the Town of Islip? 11:05:21AM**

A Village of Ocean Beach. No, the townspeople in the Village of Ocean Beach. 11:05:23AM

TYREE BACON

**Q How about outside the village? 11:05:28AM**

MR. NOVIKOFF: Wait a minute. 11:05:30AM

Have you ever heard people who are not residents of Ocean Beach in Ocean Beach refer to Chief Hesse or anyone outside of the village, regardless of whether they are residents, refer to him as chief? 11:05:31AM

MR. GOODSTADT: Correct. The latter. 11:05:41AM

MR. NOVIKOFF: The latter. Okay. Objection. 11:05:43AM

You can answer. 11:05:46AM

A Yes. 11:05:47AM

**Q Have you ever heard non-residents -- 11:05:48AM**

A Yes. 11:05:50AM

**Q -- and non-police officers refer to George Hesse as Chief Hesse outside the village? 11:05:51AM**

A Non-residents, but those were police officers. 11:05:57AM

**Q Police officers in Ocean Beach or police officers in other areas? 11:06:01AM**

A Police officers from Suffolk County. 11:06:04AM

**Q Does George Hesse currently carry a firearm? 11:06:13AM**

A No, he does not. 11:06:17AM

TYREE BACON

**Q Does he wear a uniform? 11:06:18AM**

A No, he does not. 11:06:20AM

**Q What does he wear to work every day? 11:06:21AM**

A Civilian clothes. 11:06:24AM

**Q What do you mean by that? 11:06:25AM**

A Civilian clothes. 11:06:26AM

**Q Jeans, T-shirt? 11:06:27AM**

A Suit and tie, jeans and a T-shirt, dress slacks and a collared shirt. 11:06:29AM

**Q When was the last time you recall seeing George Hesse wearing a uniform? 11:06:37AM**

A Prior to his indictment. 11:06:43AM

**Q Do you know when his indictment was? 11:06:47AM**

A March or April of 2006 -- no, 2007. 11:06:49AM

**Q What's your understanding of what George Hesse was indicted for? 11:07:01AM**

MR. NOVIKOFF: Objection. 11:07:05AM

MR. CONNOLLY: Objection. 11:07:07AM

A He was indicted for a crime. 11:07:07AM

**Q What crime? 11:07:09AM**

A Gang assault. 11:07:12AM

**Q Do you know who the alleged victim is? 11:07:16AM**

A The name I've heard was Gilbert or Gil Bard. 11:07:20AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

Page 77

TYREE BACON

**Q Do you know where the alleged crime occurred?** 11:07:25AM

A Yes. 11:07:28AM

**Q Where?** 11:07:28AM

A In the police station. 11:07:29AM

**Q How did you learn that that's where the alleged crime occurred?** 11:07:31AM

A I was at the arraignment. 11:07:34AM

**Q Have you ever read the indictment?** 11:07:38AM

A No, I did not. 11:07:40AM

**Q Have you ever discussed with George Hesse any allegations related to Mr. Gilbert?** 11:07:41AM

A No. 11:07:48AM

**Q Were you on duty that night?** 11:07:48AM

A I was not. 11:07:50AM

**Q When was the incident alleged to have occurred?** 11:07:51AM

A I'm not even certain. I wasn't there. 11:07:54AM

**Q Do you know who was there?** 11:07:57AM

MR. NOVIKOFF: Objection. He wasn't there, so how could he know? He could've heard from another source. If that's the question, that's fine. 11:07:59AM

MR. GOODSTADT: That's -- 11:08:09AM

Page 78

TYREE BACON

MR. NOVIKOFF: Okay. 11:08:10AM

A Yeah, the officers that were named in the indictment. 11:08:11AM

**Q Which are who?** 11:08:14AM

A Chief Hesse, Arnie Hardman, Paul Corolla. And who was the other one? Bill Embry. 11:08:16AM

**Q Did you ever discuss with Arnold Hardman any allegations with respect to the Gilbert matter?** 11:08:40AM

A I have not. 11:08:46AM

**Q Have you ever discussed with Paul Corolla any allegations with respect to the Gilbert matter?** 11:08:46AM

A I have not. 11:08:50AM

**Q Have you ever spoken to William Embry with respect to the allegations in the Gilbert matter?** 11:08:51AM

A I have not. 11:08:57AM

MR. NOVIKOFF: Hold on one second.. Let's take a two-minutes break. 11:09:04AM

MR. GOODSTADT: Sure. 11:09:09AM

THE VIDEOGRAPHER: The time is 11:10. We're going off the record. 11:09:10AM

Page 79

TYREE BACON

(Whereupon, a discussion was held off the record.) 11:09:13AM

THE VIDEOGRAPHER: The time is 11:27. We are back on the record. 11:26:51AM

BY MR. GOODSTADT: 11:26:57AM

**Q Sir, have you ever spoken to any of George Hesse's lawyers about the Gilbert incident?** 11:26:59AM

A No, I have not. 11:27:06AM

**Q Have you spoken to Mr. Embry's lawyer about the Gilbert incident?** 11:27:07AM

A No. 11:27:13AM

**Q Have you spoken to Mr. Hardman's lawyer about the Gilbert incident?** 11:27:13AM

A No, I have not. 11:27:18AM

**Q Have you ever spoken with Mr. Corolla's lawyer about the Gilbert incident?** 11:27:19AM

A No, I have not. 11:27:22AM

**Q Do you know who Gary Sisler is? Sisker?** 11:27:23AM

A Yes. 11:27:26AM

**Q Who is Gary Sisker?** 11:27:26AM

A He was the attorney that I had retained when I was suspended from MacArthur 11:27:28AM

Page 80

TYREE BACON

Airport.

**Q What were you suspended for?** 11:27:35AM

A For the Maureen Walsh incident. 11:27:38AM

**Q How long were you suspended for?** 11:27:41AM

A I'm still suspended to this day, from January 21st, 1999 until today, pending an investigation. 11:27:43AM

**Q Did you ever challenge that suspension?** 11:27:53AM

A That's what -- Gary sent a couple of letters to the town attorney, and he never responded. 11:27:56AM

**Q Did you ever file notice of claim against the town?** 11:28:02AM

A No. 11:28:05AM

**Q Do you know what the official reason for your suspension is?** 11:28:09AM

A Pending an investigation, that's what I was notified. 11:28:14AM

**Q What was the official --** 11:28:17AM

A There was -- 11:28:19AM

MR. NOVIKOFF: Hold on. 11:28:20AM

BY MR. GOODSTADT: 11:28:21AM

**Q What was the official reason given for** 11:28:22AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**your suspension?**

MR. NOVIKOFF: Objection to form and 11:28:24AM foundation. There's no establishment that there has been an official reason given.

You can answer. 11:28:31AM

A There was never an official reason. 11:28:31AM It was pending an investigation.

**Q And the Maureen Walsh incident, you 11:28:35AM said you were issuing a summons, that's how it started?**

A Yes. 11:28:53AM

**Q What year was that? 11:28:53AM**

A 1999. 11:28:54AM

**Q 1999 -- well, strike that.. 11:28:55AM**

**What was the summons for? 11:28:56AM**

A Dog in the airport on a leash. The 11:28:57AM dog needed to be in a crate. She was bringing the dog into the building. It needed to be in a kennel cage.

**Q And you were security? 11:29:08AM**

A Yes. 11:29:09AM

**Q What was your actual title there at 11:29:09AM the time?**

A Airport security guard. 11:29:11AM

TYREE BACON

**Q As an airport security guard in 1999, 11:29:13AM did you have the authority to issue a summons for a dog on a leash?**

A Yes. 11:29:21AM

**Q And where is that authority from? 11:29:21AM**

MR. NOVIKOFF: Objection. You can 11:29:23AM answer.

A Islip town -- actually, town law. 11:29:25AM

**Q Town law? 11:29:28AM**

A Yep. 11:29:29AM

**Q Did you have the authority to arrest 11:29:37AM in 1999?**

A Yes. 11:29:39AM

**Q And under what law did you have the 11:29:39AM authority to arrest?**

A Under the -- 11:29:42AM

MR. NOVIKOFF: Objection. 11:29:42AM

You can answer. 11:29:43AM

A Under the criminal procedure law. 11:29:44AM

**Q So it's your testimony, sir, that in 11:29:48AM 1999, under the criminal procedure law, you, as an Islip airport security guard, had the authority to arrest?**

MR. NOVIKOFF: Objection. 11:30:00AM

TYREE BACON

A Yes. 11:30:00AM

**Q We touched on this a bit before, but 11:30:08AM I'm not sure what we got through all of it.**

**Were you ever sleeping while you were 11:30:15AM on duty and being paid?**

MR. NOVIKOFF: Objection. Asked and 11:30:18AM answered.

You can answer. 11:30:19AM

A Yes. During meal. 11:30:20AM

**Q That was during a break? 11:30:22AM**

A Yes. 11:30:23AM

**Q Have you ever been sleeping during 11:30:24AM your tour when you were not on break?**

A No. 11:30:29AM

**Q You never fell asleep behind the 11:30:31AM school on a basketball court in Corneil?**

A No. 11:30:39AM

**Q Were you on bike patrol ever at Ocean 11:30:41AM Beach?**

A Yes. 11:30:44AM

**Q Was that a title that you had? 11:30:45AM**

A It was just a duty I had. I did 11:30:47AM bicycle patrol rather than foot patrol or vehicle patrol.

TYREE BACON

**Q Were there other people that did bike, 11:30:54AM as well, during your tour?**

A Yes. 11:30:58AM

**Q Who else were on bike patrol? 11:30:58AM**

A Ken Boggleman. 11:31:00AM

**Q So Ken Boggleman and yourself were the 11:31:01AM bike patrol officers?**

A Yes. 11:31:06AM

**Q Is it your testimony, sir, that when 11:31:07AM you were on bike patrol, you never fell asleep behind the school on Corneil on the basketball court?**

MR. NOVIKOFF: Objection. Form. 11:31:17AM Asked and answered.

And is the question while he was 11:31:18AM riding his bike, did he ever fall asleep?

MR. GOODSTADT: No, while he was on 11:31:23AM bike patrol.

MR. NOVIKOFF: Well, same objections. 11:31:26AM

You can answer. 11:31:26AM

A No. 11:31:27AM

**Q It's not your testimony? 11:31:28AM**

MR. NOVIKOFF: Objection. 11:31:29AM

A That is my testimony. I did not fall 11:31:30AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

asleep.

**Q I believe you testified your 11:31:35AM understanding of one of the allegations in the complaint is that the plaintiffs witnessed sex; is that correct?**

MR. NOVIKOFF: Objection. 11:31:45AM

You can answer. 11:31:45AM

A Yes. 11:31:46AM

**Q You testified to that. 11:31:47AM**

**Did you ever have sex while you were 11:31:47AM on duty in Ocean Beach?**

A No. 11:31:50AM

MR. NOVIKOFF: Do you have a 11:31:56AM good-faith basis to ask that question? Because I think that question kind of crossed the line unless you do have a good faith basis.

MR. GOODSTADT: Well, you produced his 11:32:08AM polygraph test where he said while employed by the Ocean Beach Police Department the applicant stated he had sex while on duty. Do you think that's a good-faith basis?

BY MR. GOODSTADT: 11:32:20AM

**Q Sir, isn't it true that you told the 11:32:20AM**

**TYREE BACON**

**person who administered the polygraph to you in 2005 that while employed by the Ocean Beach Police Department, that you stated you had sex while on duty?**

A That's not what I told them, but 11:32:32AM that's what you got in front of you, apparently.

**Q Did you testify at all about sex in 11:32:37AM connection with your -- strike that.**

**Did you tell the polygraph 11:32:41AM administrator anything at all about sex and Ocean Beach?**

A Yes. That was one of the 11:32:47AM questions that -- questions that were asked. They asked five questions. Did you ever sleep on the job, drink on the job, have sex on the job, party to any brutality and lie in any criminal proceedings. I think those were the questions that they asked --

**Q Uh-huh. 11:33:04AM**

A -- repeatedly. 11:33:04AM

**Q And it's your testimony that you never 11:33:06AM told them that you had sex while on duty?**

A Yes, that's my testimony. I had sex 11:33:11AM in Ocean Beach. I wasn't on duty.

TYREE BACON

**Q Did you ever have sex in the barracks 11:33:18AM in Ocean Beach?**

A No. 11:33:21AM

**Q Who did you have sex with in Ocean 11:33:22AM Beach?**

A My girlfriend at the time. 11:33:24AM

**Q What is her name? 11:33:25AM**

A Danielle. 11:33:27AM

**Q Sir, did you ever use the services of 11:33:38AM a prostitute?**

A Yes. 11:33:40AM

**Q How many times? 11:33:41AM**

A Once. 11:33:42AM

**Q Where was that? 11:33:44AM**

A In Germany. 11:33:45AM

**Q Sir, isn't it true -- 11:33:47AM**

MR. NOVIKOFF: Did you say in Germany? 11:33:49AM

THE WITNESS: In Germany. 11:33:50AM

MR. NOVIKOFF: Okay. 11:33:52AM

BY MR. GOODSTADT: 11:33:52AM

**Q Sir, isn't it true that you told the 11:33:52AM person that administered the polygraph that you had sex -- that you used the services of a prostitute on approximately six occasions?**

**TYREE BACON**

MR. NOVIKOFF: Objection. You can 11:34:02AM answer.

A I don't recall that. 11:34:04AM

**Q Is it true that you used the services 11:34:05AM of prostitute on approximately six occasions?**

A It was six different girls, one place 11:34:14AM in one instance.

**Q Oh. So when you responded once, it 11:34:19AM was one time with six different girls?**

A Yes. 11:34:27AM

**Q And that was -- 11:34:28AM**

MR. NOVIKOFF: In Germany? 11:34:29AM

THE WITNESS: In Germany. 11:34:30AM

MR. NOVIKOFF: If you want to keep 11:34:31AM going with this, go ahead.

BY MR. GOODSTADT: 11:34:43AM

**Q Do you know whether George Hesse has 11:35:01AM ever had sex on duty?**

MR. CONNOLLY: Objection. 11:35:05AM

A That, I don't know. 11:35:06AM

MR. NOVIKOFF: Just so we're clear, 11:35:08AM when you say does he know, has he ever witnessed it or has he ever heard?

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

BY MR. GOODSTADT: 11:35:13AM

**Q Have you ever witnessed it? 11:35:14AM**

A No. 11:35:16AM

**Q Did you ever heard that George Hesse 11:35:16AM had sex while on duty?**

A No. 11:35:20AM

**Q Did you ever hear him brag about 11:35:20AM having sex with Elyse Miller?**

A No. 11:35:24AM

**Q Did you ever hear him brag about 11:35:25AM having sex with Allison Sanchez?**

A No. 11:35:30AM

**Q Did you ever work for the New York 11:35:36AM City EMS?**

A I did. 11:35:41AM

**Q And when did you do that? 11:35:41AM**

A From 1984 through 1987. 11:35:44AM

**Q What was your title there? 11:35:48AM**

A Emergency medical specialist level 11:35:50AM one.

**Q What does that mean? 11:35:54AM**

A I was an EMT. 11:35:55AM

**Q Did you travel in an ambulance? 11:35:59AM**

A Yes. 11:36:01AM

TYREE BACON

**Q Did you work out of a certain 11:36:06AM precinct?**

A We had ambulance stations. 11:36:08AM

**Q Did the ambulance stations correlate 11:36:12AM to certain precincts?**

A We had sectors similar to precincts. 11:36:18AM They were areas. They didn't particularly correlate to specific precincts.

**Q What areas were you headquartered? 11:36:25AM**

A I worked out of Woodhull Hospital, 11:36:29AM which was the K7, which was Brooklyn north. Prior to that, I was in communications. And after Woodhull, I worked out of Elmhurst, which was northern Queens.

**Q Did you know either Gary or Richie 11:36:48AM Bosetti when you worked in the city?**

A No. 11:36:54AM

**Q Did you know either Gary or Richie 11:36:55AM Bosetti prior to them working at Ocean Beach?**

A No. 11:36:59AM

**Q Were you ever disciplined when you 11:36:59AM were an employee at the New York City EMS?**

A Yes. 11:37:06AM

**Q How many times? 11:37:06AM**

**TYREE BACON**

A Once -- twice. 11:37:07AM

**Q What were you disciplined for? 11:37:09AM**

A Had a motor vehicle accident and was 11:37:11AM retrained EVOC.

**Q What does EVOC mean? 11:37:20AM**

A Emergency vehicle operator's course. 11:37:23AM

**Q What was the other time? 11:37:26AM**

A Making long-distance phone calls. 11:37:27AM

**Q What do you mean by that? 11:37:31AM**

A When I transitioned from 212 to the 11:37:32AM 212/718 area code, my girlfriend was going to school upstate, and I called her from the phone and had phone sex with her.

**Q From the phone issued by the New York 11:37:45AM City EMS?**

A Yes. 11:37:49AM

**Q And the city paid for that bill? 11:37:51AM**

A No. I ended up ultimately paying for 11:37:52AM it.

**Q After you were caught making those 11:37:57AM calls?**

A Yes. 11:37:59AM

**Q Was that against policy, to make 11:38:00AM long-distance calls on the EMS phone?**

**TYREE BACON**

A It wasn't then, because you weren't 11:38:05AM able to until they transitioned. But as a result of that, they had a policy that you couldn't.

**Q It was just one time that you made a 11:38:12AM long-distance call?**

A No, it was a couple of times. 11:38:15AM

**Q Each time it was to have phone sex 11:38:18AM with your girlfriend?**

A Or talk to her. That was one of the 11:38:20AM things. Just talk in general. That was one of the things that happened while we were on the phone.

**Q Did you ever steal from the New York 11:38:26AM City EMS?**

A No.. 11:38:29AM

**Q You never stole medical surprise? 11:38:31AM**

A We would stock our bag up. My dad was 11:38:33AM a soccer coach. I would take extra stuff for his bag as a soccer coach.

**Q You didn't consider that stealing? 11:38:42AM**

A No, actually, it probably is. 11:38:43AM

**Q You didn't steal your helmet and 11:38:48AM oxygen regulator?**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A No. I just didn't turn that in when I 11:38:52AM left.
**Q So it was property of EMS? 11:38:55AM**
A It was. 11:38:57AM
**Q That was issued to you as an employee 11:38:57AM of EMS?**
A Yes. 11:39:00AM
**Q And then when you left the employment 11:39:00AM of EMS, you didn't return it?**
A Right. 11:39:05AM
**Q Do you still maintain those? 11:39:05AM**
A No, actually, I don't. 11:39:07AM
**Q What did you do with that equipment? 11:39:09AM**
A They were ultimately turned back in to 11:39:11AM EMS.
**Q When was that? 11:39:14AM**
A It was a while after I had left. 11:39:15AM
**Q How long after? 11:39:16AM**
A I don't recall. 11:39:17AM
**Q So you stopped in '87. 11:39:19AM**
A Right. 11:39:21AM
**Q Right? Was it within five years? 11:39:21AM**
A Yeah. 11:39:25AM
**Q Why did you return them? 11:39:30AM**

TYREE BACON

A They were collecting dust. It was 11:39:32AM either that or I was gonna throw them out.
**Q Did they ask for them back or did you 11:39:36AM voluntarily return them?**
A I gave them to a friend of mine to 11:39:38AM turn in to the quartermaster.
**Q What's "quartermaster"? 11:39:42AM**
A Their supply people. 11:39:43AM
**Q Does Ocean Beach have a quartermaster? 11:39:45AM**
A No. 11:39:48AM
**Q Why did you take the helmet and oxygen 11:39:54AM regulator when you left?**
MR. NOVIKOFF: Objection to the 11:39:58AM characterization.
You can answer. 11:40:00AM
A Okay. It just didn't get turned in 11:40:03AM when I left.
**Q How come? 11:40:06AM**
A It was in the basement somewhere. And 11:40:07AM then when it was found a year or so later, I don't need this and tossed it, you know -- I didn't toss it. Gave it back to my buddy and returned it to the quartermaster.
**Q So is it your testimony that you 11:40:21AM**

TYREE BACON

**didn't know that you had possession of that?**
A No, I had it. I just didn't go 11:40:24AM looking for it. They didn't make a big deal about not getting it.
**Q Were you fired from NYC EMS? 11:40:32AM**
A No. 11:40:35AM
**Q You left voluntarily? 11:40:36AM**
A Yes. 11:40:37AM
**Q Why did you leave? 11:40:38AM**
A For a job working for the state. Less 11:40:39AM hours and more money.
**Q What job did you have with the state? 11:40:42AM**
A Airport firefighter. 11:40:44AM
**Q What airport were you located at? 11:40:46AM**
A Gabreski Airport. 11:40:47AM
**Q How long did you hold that job? 11:40:50AM**
A Twelve years. 11:40:52AM
**Q Was that a full-time job? 11:40:52AM**
A Yes. 11:40:54AM
**Q Where is Gabreski Airport located? 11:40:55AM**
A In Westhampton Beach. 11:40:58AM
**Q Were you ever disciplined there? 11:41:02AM**
A Yes. 11:41:04AM
**Q What for? 11:41:04AM**

TYREE BACON

A Sick time abuse. 11:41:05AM
**Q Anything else? 11:41:09AM**
A No. 11:41:10AM
**Q Were you fired from your position at 11:41:13AM Gabreski Airport?**
A No. 11:41:16AM
**Q You left voluntarily? 11:41:16AM**
A Yes. 11:41:18AM
**Q Why did you leave there? 11:41:18AM**
A For the job with the courts. 11:41:19AM
**Q When did you leave there? 11:41:21AM**
A In September of '99. 11:41:22AM
**Q You testified that you worked at 11:41:32AM MacArthur Airport as a security guard, correct?**
A Yes. 11:41:39AM
**Q What years did you work there? 11:41:40AM**
A It was -- well, I'm still considered 11:41:45AM working there, but the suspension was effective, I think January 27th or 21st of 1999. I don't remember the start date. I was there for over a year.
**Q Some point in '97 or so? 11:42:01AM**
A '97 or '98. 11:42:04AM
**Q Was that a civil service position? 11:42:10AM**

A I was a civil service, but it's a 11:42:12AM
part-time position.

**Q Did you have to take any civil service 11:42:17AM tests for that position?**

A No. 11:42:19AM

**Q Did you have to get on the civil 11:42:21AM service list to get that position?**

MR. NOVIKOFF: Objection. 11:42:28AM

A No. 11:42:28AM

**Q Who hired you over there? 11:42:29AM**

A Chief Collazo. 11:42:32AM

**Q Were any other Ocean Beach police 11:42:37AM officers working there at the time that you worked there?**

A No. 11:42:42AM

**Q Did you require any certification to 11:42:47AM work there?**

A Yes. 11:42:49AM

**Q What certifications did you need? 11:42:50AM**

A You had to have been through the 11:42:51AM Suffolk County civil service process, which was the physical agility, psychological, medical, and they required a BMP certificate for either peace or police officer.

**Q Did you have to take a polygraph? 11:43:13AM**

A No. 11:43:15AM

**Q Prior to working at Ocean Beach, did 11:43:22AM you apply for any jobs in Suffolk County which you needed to take a polygraph for?**

A Yes. 11:43:29AM

**Q How many jobs? 11:43:29AM**

A Riverhead PD.. 11:43:31AM

**Q When did you apply to Riverhead PD? 11:43:33AM**

A I worked for them as a part-timer from 11:43:35AM '93 to '94 or '95.

**Q Did you take a polygraph prior to 11:43:44AM getting that position?**

A No. 11:43:47AM

**Q Did you take a polygraph at some point 11:43:48AM while you were working there?**

A Yes. 11:43:53AM

**Q Did you pass that polygraph? 11:43:54AM**

A No. 11:43:56AM

**Q You failed it? 11:43:56AM**

A Yes. 11:43:57AM

**Q What did you fail on the polygraph? 11:43:57AM Did you learn that?**

A I believe they said it showed 11:44:01AM

deception during the drug questions.

**Q Did you ever disclose to anyone at 11:44:08AM Ocean Beach that you had failed a prior Suffolk County polygraph?**

MR. NOVIKOFF: Objection. Foundation. 11:44:14AM

You can answer. 11:44:18AM

A I may have. 11:44:19AM

**Q You don't know one way or the other? 11:44:20AM**

A I don't recall specifically, no. 11:44:23AM

**Q Is it your testimony, sir, that you're 11:44:34AM still currently on the payroll at MacArthur Islip?**

A To the best of my knowledge, yes. 11:44:41AM

**Q Are you getting paid at all -- 11:44:42AM**

A No.. 11:44:44AM

**Q -- or does it say unpaid suspension? 11:44:44AM**

A It's unpaid suspension. 11:44:47AM

**Q Do you anticipate ever going to work 11:44:49AM there again?**

A No. 11:44:51AM

**Q Do you know whether the investigation 11:44:53AM is active?**

A I have no idea. 11:44:54AM

**Q Were you ever interviewed as part of 11:44:55AM**

**the investigation?**

A Not from them. 11:44:58AM

**Q From anyone? 11:44:59AM**

A Yes. 11:45:00AM

**Q Who were you interviewed by? 11:45:00AM**

A Suffolk County PD internal affairs and 11:45:02AM the District Attorney's Office.

**Q Did you ever learn the results of -- 11:45:11AM**

A Yes, I was cleared by both. 11:45:13AM

**Q Let me ask the question before you 11:45:15AM answer.**

**Did you ever learn the results of the 11:45:18AM investigation by the D.A.'s office or internal affairs?**

A Yes. 11:45:22AM

**Q What were the results? 11:45:23AM**

A I was cleared by both. My actions 11:45:25AM were proper.

**Q Did you ever get anything in writing 11:45:28AM that your actions were proper?**

A No. 11:45:30AM

**Q Did they determine your actions were 11:45:30AM proper before or after the town settled with Ms. Walsh for $130,000?**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

MR. NOVIKOFF: Objection to form. 11:45:39AM
You can answer. 11:45:39AM
A I believe that would've been prior to 11:45:40AM that.
**Q Just so I'm clear, is it your 11:45:42AM testimony that you were -- it was determined by the Suffolk County Police Department internal affairs and Suffolk County District Attorney's Office that your actions were proper and then the town settled for $130,000?**
MR. NOVIKOFF: Objection. Asked and 11:45:58AM answered. Form.
A To the best of my knowledge, yes. 11:46:00AM
**Q What was the process by which internal 11:46:09AM affairs investigated?**
A Spoke to an officer from internal 11:46:13AM affairs.
**Q That was it? That was your only 11:46:16AM involvement?**
A That was my only involvement. 11:46:18AM
**Q Does Ocean Beach have an internal 11:46:20AM affairs department?**
A No. 11:46:23AM
**Q Was Ms. Walsh prosecuted on the arrest 11:46:26AM**

TYREE BACON

**that you made?**
A Yes. 11:46:32AM
**Q And what was the result of that 11:46:32AM prosecution?**
A She took an ACD. 11:46:35AM
**Q What is that? 11:46:37AM**
A Adjournment in contemplation of 11:46:39AM dismissal.
**Q Did she take that plea before she 11:46:47AM sued?**
A I'm not certain. 11:46:51AM
**Q How did you learn of what her plea 11:46:53AM was?**
A The D.A. called and asked if I had a 11:46:56AM problem if she took an ACD. I said I could care less.
**Q Were you at the courthouse when she 11:47:02AM took that plea?**
A No. 11:47:08AM
**Q Have you ever been arrested? 11:47:19AM**
A Yes. 11:47:21AM
**Q How many times? 11:47:21AM**
A Twice -- no, three times. 11:47:22AM
**Q Okay. When was the first time you 11:47:27AM**

TYREE BACON

**were arrested?**
A It was in 1985. 11:47:31AM
**Q What were you arrested for? 11:47:33AM**
A Third-degree assault. 11:47:34AM
**Q And who was the complaining witness in 11:47:39AM that case?**
A My girlfriend at the time, Christine 11:47:42AM Gemmer. G-E-M-M-E-R.
**Q What did Mr. Gemmer allege against 11:47:49AM you?**
A Miss Gemmer. 11:47:53AM
**Q Miss Gemmer allege against you. 11:47:57AM**
A That I slapped her with an open hand. 11:47:57AM That was after I got -- we had an argument and I got kneed in the groin.
**Q Were you indicted for that offense? 11:48:04AM**
A No. Misdemeanor. 11:48:06AM
**Q How was that resolved, if at all? 11:48:08AM**
A I pled guilty to harassment. 11:48:11AM
**Q What court did you plead guilty in? 11:48:18AM**
A Suffolk County. 11:48:20AM
**Q Do you believe that you were guilty of 11:48:23AM harassment?**
MR. NOVIKOFF: Objection. 11:48:26AM

TYREE BACON

A I did hit her. 11:48:26AM
**Q Do you believe you were guilty of 11:48:31AM harassment?**
MR. NOVIKOFF: Objection. 11:48:33AM
If you understand the question. 11:48:37AM
A Yeah, I pled guilty. 11:48:38AM
**Q What was the second time you were 11:48:43AM arrested?**
A Correct.. 11:48:46AM
**Q I said when was the second time you 11:48:46AM were arrested.**
A Well, and in between that there was 11:48:49AM the warrant of failure to pay, so that's what I'm classifying as the second arrest..
**Q What do you mean by a warrant for 11:49:00AM failure to pay?**
A I had to pay by whatever the 11:49:01AM prescribed date was, $125 fine. I didn't pay it. I was going to pay it that Monday, and I got picked up actually that Saturday.
**Q So you had -- just so I understand, 11:49:15AM you had a specific period in which to pay the fine?**
A Correct. 11:49:21AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q And once that period expired, you hadn't paid? 11:49:21AM**

A Correct. 11:49:24AM

**Q And they came and picked you up? 11:49:24AM**

A Correct. 11:49:26AM

**Q And arrested you? 11:49:26AM**

A They took me into custody, brought me into the police station. I posted bail, which was the amount of the fine, and that was it. 11:49:27AM

**Q When was the third time you were arrested? 11:49:38AM**

A 1986. 11:49:42AM

MR. NOVIKOFF: It's your deposition. Can we just get a year for the second arrest so that I don't have to ask it? 11:49:46AM

BY MR. GOODSTADT: 11:49:50AM

**Q For the record, what was the year? You said it was during the 120 days after. 11:49:50AM**

A I'm going to say it was probably the end of '85, the beginning of '86. 11:49:53AM

**Q What were you arrested for in 1986? 11:50:01AM**

A Originally, it was second-degree assault. 11:50:08AM

**Q Who was the complainant in that matter? 11:50:12AM**

**TYREE BACON**

A A hospital police officer. I don't recall her name. 11:50:15AM

**Q What hospital? 11:50:19AM**

A Woodhull. 11:50:21AM

**Q Was that while you were employed by the New York City EMS? 11:50:24AM**

A Correct. 11:50:27AM

**Q What was the allegation that was made in that case? 11:50:28AM**

A That there was a chain going across the entrance to the parking lot. I took my car and I drove through the chain. The pole that was it a attached to hit her in the back, causing serious physical injury. 11:50:30AM

**Q You were arrested for that? 11:50:45AM**

A I was. 11:50:46AM

**Q Was that a misdemeanor or a felony? 11:50:47AM**

A I was originally charged as a felony but downgraded to third-degree assault, which was a misdemeanor. 11:50:50AM

**Q Were you arraigned on the felony? 11:50:58AM**

A No. 11:51:00AM

**Q How was that case resolved? 11:51:05AM**

**TYREE BACON**

A I took an ACD on that and ultimately dismissed. 11:51:07AM

**Q Other than for those three occasions, have you been arrested on any other occasions? 11:51:16AM**

A Nope. 11:51:22AM

**Q Have you ever been charged with any other crimes? 11:51:23AM**

A Nope. 11:51:25AM

**Q You don't recall being charged with invalid use of a credit card with intent to fraud? 11:51:26AM**

A No, that's never happened. 11:51:34AM

**Q Do you recall ever being charged with obstruction of government administration in the second degree? 11:51:35AM**

A That may have been part of the '86 case. 11:51:42AM

**Q Have you ever been registered as a sex offender? 11:51:58AM**

A No. 11:52:02AM

MR. NOVIKOFF: Again, I assume you have a good-faith basis for that question. 11:52:09AM

THE WITNESS: I was just going to ask you. 11:52:13AM

TYREE BACON

MR. GOODSTADT: Document bearing Bates No. 7422 says Tyree G. Bacon, III in a wanted missing person system search result. It says sexual offender registry information. The subject identified in the filing record with NIC something or other is registered as a convicted sexual offender. 11:52:15AM

MR. NOVIKOFF: That's all I ask. That's all I'm asking. It doesn't make it right. 11:52:36AM

MR. GOODSTADT: I just wanted to proffer a basis. 11:52:41AM

MR. NOVIKOFF: Yeah. What's the document? 11:52:44AM

MR. GOODSTADT: 7422. 11:52:48AM

BY MR. GOODSTADT: 11:52:53AM

**Q Do you know who Darrell Root is? 11:52:54AM**

A Never heard of him. 11:52:56AM

**Q Ever hear of J. Root? 11:52:57AM**

A No. 11:52:59AM

**Q David Bakken, B-A-K-K-E-N? 11:53:00AM**

A No. 11:53:04AM

**Q Darrell Rhodes? 11:53:04AM**

A No. 11:53:04AM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Kevin Jacob Rhodes? 11:53:04AM**

A No. 11:53:07AM

**Q Never heard of them? 11:53:07AM**

A No. 11:53:09AM

**Q Now, when did you start your job with the courts? 11:53:09AM**

A September of '99. 11:53:21AM

**Q You still have that job at the courts? 11:53:24AM**

A Yes. 11:53:26AM

**Q Have you ever been disciplined from that job? 11:53:26AM**

A Nope. 11:53:28AM

**Q And you've been promoted to sergeant? 11:53:30AM**

A I've received two promotions since I'm on that job. 11:53:32AM

**Q What was your original position there? 11:53:35AM**

A Uniformed court officer. 11:53:37AM

**Q What court is that in? 11:53:40AM**

A I was originally assigned to the academy. As a uniformed court officer, I was at Queens criminal court. 11:53:41AM

**Q When did you get your first promotion? 11:53:50AM**

A I took a provisional appointment in 2001 to senior court officer, and I think in 11:53:54AM

TYREE BACON

2003 I became permanent off the civil service list.

**Q What do you mean by that? 11:54:05AM**

A Originally, it was a provisional appointment. They hadn't given the test in some time. Then they gave the civil service exam and got promoted subsequent to the establishment of the civil service list. 11:54:07AM

**Q You took the test? 11:54:17AM**

A Yes. 11:54:18AM

**Q And passed it? 11:54:19AM**

A Yes. 11:54:20AM

**Q And then you testified there was a subsequent promotion to sergeant? 11:54:21AM**

A Correct. 11:54:25AM

**Q When was that? 11:54:26AM**

A I got promoted in the end of November of '07. 11:54:26AM

**Q And did you have to take a civil service test for that? 11:54:36AM**

A I did. 11:54:39AM

**Q Did you pass that test? 11:54:39AM**

A I did. 11:54:41AM

**Q Did you have to take any other tests 11:54:41AM**

**TYREE BACON**

**to be certified as a court officer other than the civil service test that you testified to?**

A Well, part of the entry process was the civil service exam. Upon passing that, you took your medical, psychological, you did your background check, physical agility. And I think that was the process. 11:54:48AM

THE WITNESS: Can I just take a break to use the restroom? 11:55:03AM

MR. GOODSTADT: Let me just ask one question. 11:55:06AM

THE WITNESS: Sure. 11:55:08AM

BY MR. GOODSTADT: 11:55:08AM

**Q Did you have to take a polygraph in connection with the -- 11:55:08AM**

A No. 11:55:11AM

**Q -- court position? 11:55:11AM**

A Sorry. 11:55:11AM

No, I did not. 11:55:12AM

THE WITNESS: Just a few seconds break. 11:55:12AM

THE VIDEOGRAPHER: The time is 11:56. We are off the record. 11:55:15AM

(Whereupon, a discussion was held off 11:55:43AM

TYREE BACON

the record.)

THE VIDEOGRAPHER: The time is 12:04, and we are back on the record. 12:03:39PM

BY MR. GOODSTADT: 12:03:42PM

**Q Mr. Bacon, did you graduate any police academies? 12:03:45PM**

A Yes. 12:03:51PM

**Q Which academy did you graduate? 12:03:51PM**

A Suffolk County Police Academy. 12:03:53PM

**Q And what year did you graduate the Suffolk County Police Academy? 12:03:55PM**

A 1989. 12:03:58PM

**Q And what was the first police job that you applied for? 12:04:07PM**

A Westhampton Beach. That's who sponsored me through the academy. 12:04:11PM

**Q Did you work there as a police officer? 12:04:16PM**

A I did. 12:04:18PM

**Q For how long? 12:04:18PM**

A That first season. 12:04:20PM

**Q What do you mean by that first season? 12:04:25PM**

A I just worked there the one summer graduating the police academy. 12:04:26PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q So the summer of '89? 12:04:31PM**

A Correct. 12:04:32PM

**Q What was your title there? 12:04:32PM**

A Part-time police officer. 12:04:34PM

**Q That was your civil service title? 12:04:40PM**

MR. NOVIKOFF: Objection. 12:04:41PM

A I believe so. 12:04:42PM

**Q Did you have to take any tests other 12:04:44PM than passing the academy to be certified for that position?**

A Yes. 12:04:51PM

**Q What tests did you have to take? What 12:04:52PM tests did you have to take?**

A We had to take the physical agility, 12:04:59PM the medical, the psychological. There was no written exam. That was a resume only position.

**Q Did you have to get a background check 12:05:14PM done?**

A Yes. 12:05:16PM

**Q Did you have to take a polygraph? 12:05:17PM**

A No. Back then, we did not. 12:05:20PM

**Q Were you ever disciplined in that 12:05:23PM position in Westhampton Beach?**

A No. 12:05:27PM

TYREE BACON

**Q Why did you stop working there? 12:05:28PM**

A Because I left to go to Ocean Beach. 12:05:29PM

**Q Did you apply to any other police 12:05:37PM officer positions -- well, strike that.**

**The next police officer position you 12:05:42PM applied for was Ocean Beach?**

A Right. 12:05:46PM

**Q And when did you apply for that 12:05:46PM position?**

A It was after the summer of '89, in 12:05:48PM 1990.

**Q How did you go a about applying for 12:05:54PM that position?**

A I went and I submitted a resume. 12:05:58PM

**Q Who did you submit a resume to? 12:06:01PM**

A At the time, he was a sergeant. Ed 12:06:03PM Paradiso.

**Q And how did you know there was an open 12:06:09PM position there?**

A A bunch of guys that I went to the 12:06:12PM academy with worked for Ocean Beach PD.

**Q Who was that? 12:06:17PM**

A Bob Galoppi, Tom Wassima, Ray Trypuc, 12:06:19PM Jeff, I want to say Goldman. I can't remember

TYREE BACON

Jeff's last name. And Mike Rosato also worked for them.

**Q And Paradiso at the time was a 12:06:36PM sergeant?**

A Yes. 12:06:39PM

**Q Who was the chief at the time? 12:06:40PM**

A Chief Joe Loeffler, Sr. 12:06:41PM

MR. NOVIKOFF: Can we just make it 12:06:45PM clear, I mean, that there's a distinction --

MR. GOODSTADT: I'm going to ask him 12:06:49PM right now.

MR. NOVIKOFF: Okay. 12:06:51PM

MR. GOODSTADT: I'm going to ask him 12:06:51PM right now.

BY MR. GOODSTADT: 12:06:51PM

**Q Does Chief Joe Loeffler senior have a 12:06:52PM relationship to Joe Loeffler, Jr., the current mayor of Ocean Beach?**

A Yes. 12:07:03PM

**Q And what was the relationship? 12:07:03PM**

A He was his father. 12:07:04PM

**Q And senior has since passed away? 12:07:05PM**

A He has. 12:07:08PM

**Q Who did you interview with for that 12:07:08PM**

**TYREE BACON**

**position?**

A I interviewed with Sergeant Paradiso. 12:07:12PM

**Q Anyone else? 12:07:14PM**

A I met the chief, he came in, walked 12:07:15PM out, and Eddie did the interview.

**Q And who offered you the job? 12:07:24PM**

A Eddie. 12:07:27PM

**Q At the interview? 12:07:28PM**

A Yes. 12:07:32PM

**Q On the spot? 12:07:32PM**

A Yes. 12:07:33PM

**Q Did the chief have any role in 12:07:33PM offering you the job?**

A He gave it his blessing. 12:07:39PM

**Q What do you mean by he gave it his 12:07:41PM blessing?**

A Chief was out that day doing other 12:07:43PM things in the village. I don't recall what it was. But Eddie did the interview, consulted with the chief and, you know.

**Q Did Paradiso at that time, as a 12:07:51PM sergeant, have authority to make a hiring without getting the blessing of the chief?**

A I have no idea. 12:08:00PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q What position were you hired for? 12:08:02PM**

A Part-time or seasonal police 12:08:04PM officer -- actually, it was part-time.

**Q Part-time? 12:08:08PM**

A Yeah. 12:08:08PM

**Q What's the difference between 12:08:09PM part-time and seasonal?**

A Part-time you can work no more than 12:08:12PM 20 hours for the entire year -- you know, 20 hours a week for the entire year. Seasonal is pretty much unlimited hours from a couple of weeks before Memorial Day to a couple of weeks after Labor Day.

**Q And that's the season, a couple of 12:08:30PM weeks before Memorial Day to a couple weeks after Labor Day?**

A Yes. 12:08:36PM

**Q So you were hired originally as a 12:08:39PM part-timer?**

A It may have been seasonal. I'm not 12:08:41PM certain what they classified me as.

**Q Do you recall what your starting 12:08:46PM salary was there?**

A It was like $7 or 7.50 an hour. 12:08:50PM

TYREE BACON

**Q Did you have to take any tests to be 12:08:52PM certified to work as a police officer in Ocean Beach?**

A No. 12:08:59PM

MR. NOVIKOFF: Originally? 12:09:00PM

MR. GOODSTADT: In 1990. 12:09:02PM

A No. It was considered a lateral 12:09:03PM transfer from one department to another.

**Q Did you take any additional tests? 12:09:09PM**

A No. 12:09:11PM

**Q And then you worked starting the 12:09:16PM season of '90? Was that your first season there at Ocean Beach?**

A Yeah. It was -- I want to say it was 12:09:24PM like April of -- I'm not certain. It was before Memorial Day weekend.

**Q And have you worked there continuously 12:09:33PM from that day until this one?**

A No. 12:09:38PM

**Q So there was a break in your service? 12:09:39PM**

A There was. 12:09:40PM

**Q What was the break in your service? 12:09:41PM**

A I left in '93 and then returned back 12:09:43PM to Ocean Beach in '99.

TYREE BACON

**Q So between '90 and '93, when you 12:09:51PM worked there as either seasonal or part-time, were any of the plaintiffs working at Ocean Beach at the time?**

A I believe Carter and Snyder at one 12:10:00PM point were working there.

**Q Did you ever work with Carter and 12:10:07PM Snyder during your first stint at the Ocean Beach Police Department?**

A Yes. 12:10:11PM

**Q Did you work with them frequently? 12:10:12PM**

A No. Occasionally. 12:10:14PM

**Q What tours did you work during your 12:10:15PM first time at Ocean Beach Police Department?**

A I worked predominantly 4 to 12s. 12:10:21PM

**Q Did that change at all during that 12:10:26PM first time from '90 to '93?**

A It always changed. Predominantly, I 12:10:35PM worked 4 to 12s then.

**Q Were you disciplined at all between 12:10:39PM '90 and '93, while you were employed at the Ocean Beach Police Department?**

A No, I was not. 12:10:45PM

**Q When you took a break in service from 12:10:46PM**

**TYREE BACON**

**the Ocean Beach Police Department, did your BMP-TC certificate expire?**

A It did not. 12:10:57PM

**Q How come? 12:10:58PM**

MR. NOVIKOFF: Objection. Go ahead. 12:10:58PM

A Because I left there and I worked for 12:11:00PM Islip Town Park Rangers as a seasonal park ranger. I worked a slew of jobs in between that.

**Q And your first job was Islip park 12:11:09PM ranger?**

A Right. 12:11:15PM

**Q That was a part-time position or 12:11:16PM seasonal?**

A That was seasonal. 12:11:18PM

**Q And how long did you work that job 12:11:19PM for?**

A A couple of months. 12:11:21PM

**Q That was in '93? 12:11:23PM**

A I believe so. 12:11:25PM

**Q Why did you stop working there? 12:11:26PM**

A Because I left for Riverhead PD as a 12:11:28PM part-time police officer.

**Q Were you ever disciplined in the Islip 12:11:37PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**park ranger position?**
A No. 12:11:40PM
**Q Did you leave there voluntarily? 12:11:41PM**
A Yes. 12:11:42PM
**Q And your next job was Riverhead Police 12:11:43PM Department as part-time police officer?**
A Yes. 12:11:47PM
**Q And when did you have that position? 12:11:47PM**
A From '93 through -- I don't recall if 12:11:49PM it was '94 or '95.
**Q Did you have to take any additional 12:11:56PM tests to be certified to work in that police department?**
A I did not. 12:12:02PM
**Q You didn't have to take a polygraph? 12:12:02PM**
A No. 12:12:04PM
**Q When did you fail the polygraph in 12:12:05PM Riverhead?**
MR. NOVIKOFF: Objection. Form. 12:12:08PM
When were you advised that you failed 12:12:09PM the polygraph?
A That was back when I was processing 12:12:12PM for a full-time position with them.
**Q What year was that? 12:12:17PM**

TYREE BACON

A '93 or '94. 12:12:19PM
**Q Okay. So you worked as a part-timer 12:12:21PM at Riverhead from '93 to '94 or '95ish?**
A Correct. 12:12:27PM
**Q And then you were processing to become 12:12:28PM a full-time officer there?**
A Yes. 12:12:33PM
**Q What do you mean processing to become 12:12:34PM a full-time officer?**
A They had a full-time slot, and there 12:12:36PM was like five or six people that they were interviewing to fill the slot that came off of the Suffolk County Police list.
**Q And you were one of the interviewees? 12:12:45PM**
A Yes. 12:12:48PM
**Q Did you have to take any tests to get 12:12:48PM on that list? Was there another civil service test administered?**
A You took the Suffolk County Police 12:12:54PM civil service exam.
**Q Did you pass that test? 12:12:57PM**
A Yes. 12:12:58PM
**Q That was a written test? 12:12:59PM**
A Yes. 12:13:00PM

TYREE BACON

**Q When did you pass that? 12:13:01PM**
A In that time frame. I don't recall. 12:13:02PM
**Q So just so I understand, you took the 12:13:03PM test, you make the list, a slot opens up and you're one of five people that were interviewed for that position?**
A Five or six, yes. 12:13:16PM
**Q Now, I believe you testified that you 12:13:18PM took a polygraph in connection with that processing; is that correct?**
A I did. 12:13:25PM
**Q Why did you take a polygraph at that 12:13:25PM time?**
MR. NOVIKOFF: Objection. 12:13:28PM
You can answer. 12:13:28PM
A You have to do the whole process over 12:13:28PM for the full-time position.
**Q What do you mean by the whole process? 12:13:31PM**
A Medical, background, psychological, 12:13:33PM physical agility, from part-time to full-time you had to do that.
**Q And the polygraph, right? 12:13:47PM**
A Correct. 12:13:48PM
**Q How did you learn you needed to take a 12:13:50PM**

TYREE BACON

**polygraph for that position?**
A Got a notice from civil service. 12:13:54PM
**Q Where did you take that polygraph? 12:13:59PM**
A Suffolk County Police Headquarters. 12:14:01PM
**Q Did you need to take a polygraph for a 12:14:13PM part-time position at that time if you had come in new?**
A At that time, no. 12:14:18PM
**Q Did there come a point in time where 12:14:19PM the part-time position required a polygraph for a police officer position?**
A I believe it does now, yes. 12:14:26PM
**Q When did that come in? 12:14:28PM**
MR. NOVIKOFF: Objection. 12:14:29PM
A I don't know. 12:14:30PM
**Q So it's your understanding that at 12:14:30PM that point in time, in '94 or '95, that only full-time police officers needed to take a polygraph?**
MR. NOVIKOFF: Objection. 12:14:39PM
A Yes. 12:14:39PM
**Q Do you know why Suffolk County 12:14:40PM requires a polygraph?**
MR. NOVIKOFF: Objection. 12:14:42PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

A No idea. 12:14:43PM

**Q Do you have any belief as to why? 12:14:45PM**

A No idea. 12:14:47PM

**Q So you take the polygraph -- well, 12:14:52PM strike that.**

**Did you pass all the other tests? 12:14:54PM**

A Yes. 12:14:56PM

**Q The medical, the background, the 12:14:56PM physical agility and psychological?**

A Yes. 12:15:01PM

**Q And the polygraph you took last? 12:15:02PM**

A No, I took the polygraph somewhere in 12:15:04PM between all of that. I don't remember the exact order.

**Q Did you take any other tests after you 12:15:09PM learned you failed the polygraph?**

A Yes. 12:15:13PM

**Q Why would you take the other tests 12:15:14PM after you failed the polygraph?**

A Because I could've appealed it. 12:15:18PM

**Q Did you appeal it? 12:15:20PM**

A No, I did not. 12:15:21PM

**Q Why not? 12:15:22PM**

A Because I left. I left working for 12:15:23PM

them voluntarily.

**Q When was that? 12:15:26PM**

A That same time period. 12:15:27PM

**Q '94 or '95? 12:15:29PM**

A Yes. 12:15:30PM

**Q Okay. What was your next job after 12:15:33PM that?**

A Islip town harbor police. 12:15:38PM

**Q What was your title there? 12:15:42PM**

A I don't recall if it was bay constable 12:15:45PM or harbormaster.

**Q Did you have to take any civil service 12:15:49PM tests for that position?**

A No. 12:15:52PM

**Q Did you have to go through the battery 12:15:53PM of tests again?**

A No. 12:15:56PM

**Q Was that a police position? 12:15:57PM**

A It's a peace offer position. 12:15:59PM

**Q Peace officer. What's the difference 12:16:01PM between peace officer and police officer?**

MR. NOVIKOFF: Objection. 12:16:06PM

You can answer. 12:16:06PM

A Yeah. Pretty much your statutory 12:16:07PM

arrest powers regarding pursuing somebody outside of state.

**Q That's the only difference? 12:16:15PM**

A And arrest -- executing search 12:16:16PM warrants.

**Q So your understanding of the 12:16:20PM difference is pursuing somebody out of New York State as well as executing search warrants?**

MR. NOVIKOFF: Objection. 12:16:29PM

A Correct. 12:16:30PM

**Q Is your understanding there are any 12:16:31PM other differences between a police officer and a peace offer?**

A There may be a couple of others, but 12:16:36PM none that I can recall.

**Q How did you go about getting the job 12:16:41PM at Islip town harbor?**

A I submitted a resume to the chief at 12:16:46PM Islip harbor police and also filled out an application and dropped that off at the town personnel office.

**Q Who was the chief at Islip harbor 12:17:03PM police at the time?**

A Alan Loeffler. 12:17:08PM

**Q Does Alan Loeffler have any 12:17:11PM relationship to Joe Loeffler Sr., the chief, and Joe Loeffler, Jr., the mayor?**

MR. NOVIKOFF: Objection. 12:17:21PM

To your knowledge. 12:17:21PM

A Yes. 12:17:22PM

**Q What's your understanding of the 12:17:23PM relationship?**

A He is the son of Joe Loeffler, Sr., 12:17:24PM the brother of Joe Loeffler, Jr.

**Q Did Alan Loeffler work at all at Ocean 12:17:31PM Beach with you?**

A He worked there for a while. I never 12:17:34PM worked with Alan. He worked shifts opposite of mine.

**Q What position -- he was a police 12:17:41PM officer there?**

A He was a part-time or seasonal police 12:17:43PM officer.

**Q And your job at Islip town harbor, did 12:17:50PM you report to Alan Loeffler?**

A I did. 12:17:55PM

**Q Were you ever disciplined there? 12:17:56PM**

A No. 12:17:57PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Were you friends with Alan Loeffler? 12:17:59PM**

A Professionally. 12:18:01PM

**Q Did you ever socialize with him 12:18:02PM outside of work?**

A I invited him to my wedding when I got 12:18:05PM married in '96.

**Q Did you invite any other Loefflers to 12:18:09PM your wedding?**

A No. 12:18:13PM

**Q Other than for your wedding, did you 12:18:14PM ever socialize with Alan Loeffler outside of --**

A No. 12:18:20PM

**Q Did he attend your wedding? 12:18:20PM**

A Yes, he did, him and his wife. 12:18:22PM

**Q And that was in '96? 12:18:26PM**

A Yes. 12:18:27PM

**Q So you were working at Islip town 12:18:28PM harbor at the time?**

A Yes. 12:18:31PM

**Q Did you work with Alan Loeffler in 12:18:31PM Ocean Beach before the harbor job or was it when you went back?**

A It was before the time frame that he 12:18:41PM worked.

TYREE BACON

**Q So you had known Alan Loeffler prior 12:18:44PM to the harbor job?**

A Yes. 12:18:48PM

**Q He was a police officer in Ocean 12:18:48PM Beach, you just never worked the same tours?**

A Correct. 12:18:52PM

**Q How long did you work at Islip town 12:18:58PM harbor?**

A I think I worked there about a year. 12:19:01PM

**Q Why did you leave there? 12:19:03PM**

A Because then I went and I worked at 12:19:05PM MacArthur Airport.

**Q Did you leave there voluntarily from 12:19:12PM the harbor job?**

A I did. 12:19:17PM

**Q Did your BMP-TC certificate expire at 12:19:17PM any time between leaving Ocean Beach and leaving the harbor job?**

A It did not. 12:19:27PM

**Q And then you got the job at MacArthur 12:19:28PM Airport that you testified to already, correct?**

A Correct. 12:19:34PM

**Q And that was -- what year did you 12:19:34PM start there?**

**TYREE BACON**

A '96 or '97. I don't recall. 12:19:38PM

**Q And that was until January of '99, 12:19:40PM when you were put on suspension?**

A Correct. 12:19:44PM

**Q And other than for what you've 12:19:46PM testified to, were you ever disciplined at MacArthur Airport?**

A No. 12:19:53PM

**Q What was your next job after MacArthur 12:19:53PM Airport?**

A I left MacArthur, and then that's when 12:19:58PM I came back to Ocean Beach in July of '99.

**Q Did you have any jobs between January 12:20:08PM of '99 and July of '99, other than for being on suspension at MacArthur Airport?**

A I had my full-time job working at the 12:20:15PM air base as an airport firefighter.

**Q Did your BMP-TC certificate expire 12:20:22PM during that break between the MacArthur Airport and going back to Ocean Beach?**

A No, it did not. 12:20:32PM

**Q Why not? 12:20:33PM**

MR. NOVIKOFF: Objection. 12:20:34PM

A Because I went from one agency to 12:20:35PM

TYREE BACON

another. It was less than a one-year break.

**Q So your understanding is your BMP-TC 12:20:42PM certificate remains active for a period -- any period up to a one-year break?**

A Correct. 12:20:51PM

**Q What is the basis of that 12:20:51PM understanding?**

A From what I understand through the 12:20:55PM various jobs I've worked, including my position as a state court officer.

**Q When you went back to Ocean Beach, 12:21:06PM that was 1999?**

A Correct. 12:21:10PM

**Q How did you go about applying for that 12:21:13PM job?**

A I called up to see if they had any 12:21:16PM open slots. I don't recall who I spoke with. They said submit a resume and do the civil service application form. I did that, I submitted it and started working shortly thereafter.

**Q Okay. During your first stint with 12:21:36PM the Ocean Beach Police Department, was George Hesse employed there?**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A He was not. 12:21:43PM

**Q How about when you got back in '99, 12:21:44PM was he employed there?**

A He was. 12:21:47PM

**Q What was his title? 12:21:48PM**

A He was a sergeant. 12:21:49PM

**Q Do you know whether George Hesse ever 12:21:53PM passed a sergeant's test?**

A I have no idea. 12:21:57PM

**Q Did you ever ask him? 12:21:58PM**

A No. 12:21:59PM

**Q Did you ever hear that he did not pass 12:21:59PM the test?**

A No, I did not. 12:22:02PM

**Q Do you know whether George Hesse ever 12:22:05PM took the sergeant's test?**

A I have no idea. 12:22:08PM

**Q Do you know if George Hesse ever took 12:22:10PM the chief's test?**

A I have no idea. 12:22:13PM

**Q You don't know whether he passed it? 12:22:14PM**

MR. NOVIKOFF: Objection. If he 12:22:16PM doesn't know whether he took the test, he doesn't know whether he passed it.

TYREE BACON

You can answer. 12:22:21PM

A If I don't know that he took it, then 12:22:21PM there's no way I would know if he passed it.

**Q Did you ever hear that he didn't pass 12:22:27PM it?**

A No. 12:22:29PM

**Q So just to time frame now. When in 12:22:30PM 1999 did you make that call over to the Ocean Beach Police Department?**

A Sometime prior to me working for them. 12:22:41PM I started working -- I was there for Fourth of July weekend, so it was sometime before that that I called them and that I, you know, did the paperwork with them.

**Q You worked the Fourth of July weekend 12:22:54PM in '99?**

A I believe I did. 12:22:57PM

**Q Are you sure about that? 12:23:01PM**

A No, I'm not sure. 12:23:02PM

**Q Who did you interview with for that 12:23:10PM position?**

A Ed Paradiso. 12:23:13PM

**Q What was Ed Paradiso's title at the 12:23:15PM time?**

TYREE BACON

A Chief. 12:23:17PM

**Q Did you interview with anyone else? 12:23:19PM**

A No. 12:23:22PM

**Q And Paradiso was the sergeant your 12:23:23PM first time around?**

A Correct. 12:23:26PM

**Q Did you remain in contact with 12:23:26PM Paradiso during your six-year break?**

A No, I did not. 12:23:30PM

**Q Are you friends with Ed Paradiso? 12:23:32PM**

A No. 12:23:34PM

**Q Do you ever socialize with him outside 12:23:34PM of work?**

A I was at a party for somebody that he 12:23:37PM happened to be at. We sat at the same table, we had a couple of drinks, exchanged niceties, shared a meal.

**Q But you didn't plan to meet him there, 12:23:49PM did you?**

A No. 12:23:51PM

**Q Did you ever E-mail with Ed Paradiso? 12:23:54PM**

A I did. 12:23:56PM

**Q How many times? 12:23:57PM**

A While I was working there, almost 12:23:59PM

TYREE BACON

weekly. That's how I gave him my availability schedule.

**Q How about when you weren't working 12:24:06PM there, did you ever E-mail him?**

A No. 12:24:09PM

**Q How about since he's left on 12:24:10PM disability?**

A I haven't had any contact with him. I 12:24:12PM saw him once in passing.

**Q What's your E-mail address? 12:24:19PM**

A Tyree3rd@aol.com. 12:24:21PM

MR. NOVIKOFF: I would hope that that 12:24:27PM information does not get disclosed without some notice. When I say disclosed, I mean filed.

MR. GOODSTADT: You can designate that 12:24:36PM part of the transcript confidential.

MR. NOVIKOFF: Okay. So I'm going to 12:24:39PM designate that part of the transcript confidential.

BY MR. GOODSTADT: 12:24:44PM

**Q Do you know what Paradiso's E-mail 12:24:44PM address is?**

A No, I don't. 12:24:47PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q How about George Hesse, do you E-mail with him? 12:24:48PM**

A Yes. 12:24:52PM

**Q How frequently do you E-mail with George Hesse? 12:24:52PM**

A Same thing, my schedule for availability. 12:24:55PM

**Q Do you ever E-mail George Hesse outside of your schedule for availability? 12:24:58PM**

A No. 12:25:01PM

**Q Do you ever E-mail any jokes with George Hesse? 12:25:01PM**

A No. 12:25:04PM

**Q Do you E-mail George Hesse from your home computer or from the police station computer or both? 12:25:09PM**

A I've done it from my home computer and also the police station computer. 12:25:15PM

**Q How many computers are in the police station? 12:25:19PM**

A Three. Three that I'm aware of. 12:25:22PM

**Q Have there always been three since 2006? 12:25:24PM**

A I don't recall. 12:25:30PM

TYREE BACON

**Q When you sign on to the police department computers, do you need a password? 12:25:34PM**

A No. 12:25:42PM

**Q So nothing would identify a specific individual as the user? 12:25:43PM**

A Not to get into the general computer. To get into some of the programs, like the arrest processing program, the report-writing program, you need to have a log-on. What else is there? To run motor vehicle checks, warrant checks, you need to have a log-on. 12:25:48PM

**Q Is a log-on specific to the individual or is there a general Ocean Beach Police Department log-on and password? 12:26:08PM**

MR. NOVIKOFF: Presently or at any time? 12:26:14PM

MR. GOODSTADT: Between '06 and now. 12:26:16PM

MR. NOVIKOFF: Okay. 12:26:19PM

A For the arrest paperwork, the program that does the field reports and that, yes, it's an individual log-on. For the warrant checks, I'm not certain, because I don't have the password privilege for that. 12:26:20PM

**Q How about to use the Internet? 12:26:34PM**

**TYREE BACON**

A No, that was open. There was no log-on for anybody to -- you know, you just get right into the computer. 12:26:36PM

**Q From '06 to the present, that's the case? 12:26:45PM**

A I haven't worked there in a while, so I couldn't tell you about the present. But that's how it was prior to '06. 12:26:48PM

**Q So from '06 to the last time you were there? And I know you had a tour in Iraq in between that. 12:26:56PM**

A Yeah. I couldn't tell you today; but prior to that, I don't recall. 12:27:03PM

**Q Did you ever log on to the Internet from the computer at the police station? 12:27:09PM**

A I have. 12:27:13PM

**Q Let's go back to when you came back in '99. Did you have to take any tests to be certified as a police officer at the time? 12:27:14PM**

A Not at '99, but later on I did. 12:27:22PM

**Q What do you mean by that? 12:27:25PM**

A There was a time when I got a notification from civil service to report for a physical agility exam. 12:27:27PM

TYREE BACON

**Q When was that? 12:27:33PM**

A 2004. 12:27:35PM

**Q How did you get that notice? 12:27:38PM**

A I got a letter in the mail. 12:27:39PM

**Q Was it from civil service or was it from someone at Ocean Beach? 12:27:41PM**

A No, it was from civil service. 12:27:45PM

**Q And it was for a physical agility? 12:27:47PM**

A Yes. 12:27:49PM

**Q Do you know why you needed to take a physical agility test in 2004? 12:27:50PM**

A There was apparently a problem with Chief Paradiso never notified civil service that I was back to working for them; and then when they were notified, they said that I was uncertified at that point from civil service and I had to reestablish that. So I started the civil service process. 12:27:54PM

**Q That was in 2004? 12:28:17PM**

A Yes. 12:28:19PM

**Q When in 2004 was that? 12:28:19PM**

A I think it was like April, beginning of the year. 12:28:22PM

**Q Were you working another job at that 12:28:26PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**time?**
A I was working for the courts. 12:28:29PM
**Q And the court, is that a police 12:28:32PM officer position?**
A Peace officer position. 12:28:35PM
**Q Peace officer. 12:28:36PM**
**You weren't working any other police 12:28:44PM jobs, were you?**
A No. 12:28:47PM
**Q So it's your understanding -- I 12:28:47PM believe you testified to this -- that civil service deemed you to be uncertified at that time?**
A Well, there was a question as to there 12:28:55PM being a lapse in service since the chief did not notify them that I was working from '99 on.
**Q How did you learn that that was the 12:29:08PM reason why you had to take these tests?**
A Because I called civil service to find 12:29:12PM out what this was all about.
**Q Who did you speak with in civil 12:29:16PM service?**
A At one point, I spoke with Allison. I 12:29:18PM believe I spoke -- I don't recall if it was Stan

TYREE BACON

Pelk or Alan Schneider also.
**Q What's Allison's last name? 12:29:31PM**
A I have no idea. 12:29:33PM
**Q Is it Allison Chester or Allison 12:29:34PM Sanchez?**
A I think at the time it was Allison 12:29:40PM Chester.
**Q What was her role in all of this? 12:29:42PM**
MR. NOVIKOFF: Objection. Objection. 12:29:44PM Only what -- no foundation that he knows what her role is other than his interaction with her.
BY MR. GOODSTADT: 12:29:54PM
**Q What is your understanding of what her 12:29:54PM role was?**
A I called her. She forwarded my 12:29:56PM question to whoever -- I don't recall who it was, whether it was Stan or Al Schneider.
**Q Why did you call her as opposed to any 12:30:04PM of the number of hundreds of other people who work in civil service?**
A I dialed the number at civil service 12:30:10PM that was on my paper, and that's the person that answered the phone.

TYREE BACON

**Q Did she sign a letter that was sent to 12:30:15PM you?**
A I don't recall. 12:30:18PM
**Q And prior to that phone call in '04 -- 12:30:21PM did you call her in '04?**
A Yeah. It was right after I got the 12:30:28PM notification.
**Q Prior to that time, had you ever had 12:30:31PM any interaction with Allison Chester?**
A No. 12:30:36PM
**Q Who's Stan Pelk? 12:30:37PM**
A He's director or assistant director. 12:30:40PM I'm not sure.
**Q Have you ever had any interaction with 12:30:44PM Mr. Pelk?**
A Spoke to him on the phone at one 12:30:48PM point.
**Q About what? 12:30:50PM**
A Something to do with civil service, 12:30:51PM you know, regarding this.
**Q What did you speak to him about? 12:30:55PM**
A Why I was taking this exam when I was 12:30:58PM previously qualified and certified. And like I said, I'm not sure if it was Stan or Alan

TYREE BACON

Schneider. But I spoke to her, and the call got forked to somebody.
**Q Who is Alan Schneider? 12:31:17PM**
A He was the director of civil service. 12:31:19PM
**Q When did you speak with either 12:31:23PM Mr. Pelk or Mr. Schneider?**
A Moments after I spoke to Allison. She 12:31:27PM transferred the phone call.
**Q That was in '04, as well? 12:31:31PM**
A Yes. 12:31:33PM
**Q Had you spoken to either of them 12:31:35PM previous to that phone call?**
A I spoke with Stan Pelk when I was 12:31:39PM suspended from Islip airport..
**Q Other than for your suspension from 12:31:44PM Islip airport, did you speak with Mr. Pelk at any other time?**
A No. 12:31:51PM
**Q Did you ever speak to Schneider, if he 12:31:51PM was the one you spoke to, at any other time other than that phone call?**
A I may have spoken to him also in that 12:31:54PM same time frame with Islip airport.
**Q What was his response when you asked 12:32:00PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**him why do I have to take this test when I've previous been certified, authorized, et cetera?**

A The sum and substance of the 12:32:07PM conversation was basically that Chief Paradiso dropped the ball in not getting the payroll certified and not notifying civil service of their current employment rosters.

**Q So was it just you that had to take 12:32:28PM the test over or was it everybody that wasn't certified?**

MR. NOVIKOFF: Objection. 12:32:35PM

To the extent you know. 12:32:35PM

A To the extent that I know, there was 12:32:37PM like six of us, seven of us that showed up to take the physical agility. Prior to that, I didn't know who did and who didn't.

**Q Who took it at the same time as you? 12:32:49PM**

A Myself, the Bosettis, Arnie Hardman, 12:32:53PM Tommy Shaw, Pat Cherry. There's another individual, used to be a city cop, worked for the state parks. I can't remember his name. And there may have been one or two other people. It was like six or seven people total.

**Q Was Paradiso there? 12:33:17PM**

TYREE BACON

A Yes, when we went to take our 12:33:19PM physical. The other individual's time was John Dyer.

**Q Why did Paradiso join you? 12:33:26PM**

MR. NOVIKOFF: Objection. 12:33:28PM

A He didn't join us to take the exam. 12:33:29PM He just came. He showed up. I have no idea why.

**Q Did you, prior to arriving for your 12:33:36PM physical agility test -- when did you take the physical agility test? When was this?**

A I think that was April of '04, maybe 12:33:44PM May of '04.

**Q And prior to going to take that 12:33:49PM physical agility test, had you spoken to anyone in the police department about the fact that you had to do that?**

A I think I may have spoken with Eddie. 12:33:58PM I can't be certain. He said, well, that's what civil service is requiring. You know, typical run -- you know, didn't get a firm answer. That's what civil service wants, that's what you're gonna do.

**Q Just so we're clear, when you say 12:34:13PM**

TYREE BACON

**Eddie, you mean Ed Paradiso?**

A Ed Paradiso. 12:34:17PM

**Q Not Ed Carter? 12:34:18PM**

A Correct. 12:34:19PM

**Q Did you speak with the Bosettis that 12:34:20PM you had to take this test?**

A No. 12:34:22PM

**Q Did you speak with Hardman? 12:34:23PM**

A No. 12:34:24PM

**Q How about Shaw? 12:34:25PM**

A No. 12:34:26PM

**Q Pat Cherry -- you said Pat Cherry. 12:34:26PM You're referring to senior?**

A Senior. 12:34:29PM

**Q Did you speak with him about that? 12:34:30PM**

A Nope. 12:34:31PM

**Q Did you speak with Dyer about having 12:34:32PM to take this test?**

A Nope. 12:34:36PM

**Q At the time you learned you had to 12:34:36PM take the physical agility test, did you learn you to had to take the full battery of tests or was it just the physical agility?**

A I had no idea what I had to do. 12:34:45PM

TYREE BACON

Apparently, that was the first step in many that I needed to do.

**Q When you called Sanchez or Chester -- 12:34:51PM**

MR. NOVIKOFF: Allison. 12:34:55PM

MR. GOODSTADT: Allison. 12:34:56PM

BY MR. GOODSTADT: 12:34:57PM

**Q When you called Allison, did she 12:34:57PM inform you you had to take all the tests?**

A She said that we had to do the test. 12:35:02PM She wasn't sure if it was gonna be the complete battery of tests.

**Q And how about Pelk or Schneider, did 12:35:09PM either of them tell you you had to take the full battery?**

A They just said that we had to take the 12:35:15PM test, and they weren't specific.

**Q What -- do you know what alerted civil 12:35:18PM service to the fact that you hadn't -- or at least that they believed that you hadn't been certified?**

A No, I don't. 12:35:26PM

**Q Did you speak to anybody about what -- 12:35:28PM the catalyst of that event?**

MR. NOVIKOFF: Other than Allison, 12:35:35PM

TYREE BACON

Stan and --

MR. GOODSTADT: Anybody. 12:35:39PM

A Allison, Stan and Al Schneider. I got 12:35:39PM a letter and there was a number on the paper, and I wasn't quite sure what it was about.. Attempted to get clarification, and there was no clarification. You had to take it.

**Q And you also talked to Ed Paradiso 12:35:53PM about it, and he said --**

A Right. Right. Exactly. 12:35:55PM

**Q Did you ever speak to anybody else 12:35:57PM about it?**

A No. 12:36:01PM

**Q Did you ever hear that one of the 12:36:02PM plaintiffs in this case called civil service to let them know?**

A No. 12:36:09PM

**Q You never heard anyone say that? 12:36:10PM**

A No. 12:36:12PM

**Q Never called anyone in civil service 12:36:12PM rat?**

MR. NOVIKOFF: Wait, wait, wait. 12:36:15PM Read that question back. 12:36:15PM I just want to make sure if I object, 12:36:17PM

TYREE BACON

it's appropriate.

MR. GOODSTADT: I asked if he ever 12:36:19PM called anyone at civil service a rat.

MR. NOVIKOFF: Let me have the court 12:36:23PM reporter read it back.

(Whereupon, the requested portion was 12:36:26PM read back by the court reporter: Never called anyone in civil service rat?)

MR. GOODSTADT: Let me repeat the 12:36:41PM question, because not whether you called anyone in civil service a rat.

BY MR. GOODSTADT: 12:36:47PM

**Q Have you ever called anyone a civil 12:36:48PM service rat?**

A No. 12:36:50PM

**Q Was there an answer? 12:36:54PM**

A I said no. 12:36:56PM

**Q Did you ever hear anybody call any of 12:36:56PM the plaintiffs in this case a civil service rat?**

A No. 12:37:01PM

**Q Have you ever heard that term, civil 12:37:02PM service rat?**

A No. 12:37:04PM

**Q Have you ever heard the term "rat" as 12:37:04PM**

TYREE BACON

**it relates to police department?**

A Yes. 12:37:08PM

**Q What is a rat? 12:37:09PM**

MR. NOVIKOFF: Objection. 12:37:11PM

MR. GOODSTADT: As it relates to a 12:37:13PM police department.

MR. NOVIKOFF: What is your 12:37:15PM understanding of what the word "rat" means as it pertains to the police department?

A Somebody who runs their mouth. 12:37:18PM

**Q What do you mean by that? 12:37:20PM**

A Somebody who goes outside the chain of 12:37:23PM command.

**Q What's your understanding of chain of 12:37:28PM command? What does that mean?**

A Chain of command. You have a chain of 12:37:31PM command. If you have a problem, you address it through the chain of command. If you have a sergeant, you take it to the sergeant. If you don't get redress, you take it to the chief in this particular case. If you don't get redress from the chief, you take it to a village board member or the mayor. If you don't get redress, then you take it further. You can take it to

TYREE BACON

civil service or another body, perhaps the District Attorney's Office.

**Q So it's your understanding that if you 12:37:57PM go through that process and you take it to the District Attorney's Office, that's not going outside your chain of command?**

A Correct. As long as you follow your 12:38:06PM chain of command..

**Q You never heard anyone say that they 12:38:14PM thought that Tom Snyder had alerted civil service to the fact that there were officers who were not certified at Ocean Beach?**

MR. NOVIKOFF: Don't answer that yet. 12:38:25PM Was the question -- did it start with 12:38:27PM did you ever hear?

MR. GOODSTADT: Have you ever heard. 12:38:30PM

MR. NOVIKOFF: Have you ever heard. 12:38:31PM Okay.

A No. 12:38:33PM

**Q Have you ever heard anyone state a 12:38:36PM belief that Ed Carter had alerted civil service to the fact that there were certain officers in Ocean Beach who were not certified by Suffolk County?**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A No. 12:38:48PM

**Q Have you ever heard that Joe Nofi lettered civil service to the fact that there were officers in Ocean Beach who were not certified? 12:38:50PM**

A No. 12:38:59PM

**Q Do you know how to spell Nofi? 12:39:00PM**

A No. 12:39:02PM

**Q Do you know how to spell Fiorillo? 12:39:02PM**

A I mean, no. I could turn around -- it's probably misspelled. But I imagine if I wrote it out, it's probably incorrect. 12:39:05PM

**Q How do you believe Mr. Fiorillo spells his name? 12:39:14PM**

MR. NOVIKOFF: Objection. 12:39:17PM

A F-I-O-R-E-L-L-O. I don't know. I'm guessing. 12:39:18PM

**Q How do you believe Mr. Nofi spells his name? 12:39:23PM**

A N-O-F-F-I. 12:39:26PM

**Q So you showed up in April of '04 to take the physical agility test. Did you actually take it -- 12:39:29PM**

A Yes. 12:39:48PM

TYREE BACON

**Q -- on that day? 12:39:48PM**

**Did the other six or seven guys take it? 12:39:49PM**

A Yes. 12:39:52PM

**Q Did you pass it? 12:39:52PM**

A No. I had to go back and retake it again. 12:39:53PM

**Q So you failed the first time. Did you have to appeal it or do you automatically get another shot? 12:39:56PM**

A No, you just go right back. You know, they schedule a date at least 30 days later. 12:39:59PM

**Q So failing the physical agility test doesn't disqualify you from being a police officer -- 12:40:03PM**

MR. NOVIKOFF: Objection. 12:40:12PM

BY MR. GOODSTADT: 12:40:13PM

**Q -- as long as you take it again? 12:40:13PM**

MR. NOVIKOFF: Objection. 12:40:15PM

A I mean, if you didn't qualify and you took it the second time and qualified, then you move on to the next step in the process.. 12:40:17PM

**Q But you had the ability to retake it 30 days later? 12:40:24PM**

TYREE BACON

A Yes. 12:40:28PM

**Q And what about the physical agility test did you fail the first time? 12:40:28PM**

A I didn't make the sit-ups in the allotted time. 12:40:32PM

**Q And the second time, you did that? 12:40:36PM**

A Yes. 12:40:37PM

**Q When was the second time that you went back for it? 12:40:38PM**

A It was a month later. 12:40:40PM

**Q So somewhere around May of '04? 12:40:42PM**

A Correct. 12:40:44PM

**Q Did you take any other civil service tests? 12:40:44PM**

A Yes. I did the medical. 12:40:47PM

MR. NOVIKOFF: In '94. 12:40:48PM

MR. GOODSTADT: In '04. 12:40:50PM

MR. NOVIKOFF: In '04. I'm sorry. Correct. 12:40:51PM

MR. GOODSTADT: Well, I don't know if it was '04 or '05. 12:40:53PM

MR. NOVIKOFF: In that time period. 12:40:53PM

BY MR. GOODSTADT: 12:40:55PM

**Q After you learned that you were 12:40:57PM**

TYREE BACON

**considered not to be certified by civil service, did you take any other tests?**

A Yes. 12:41:03PM

**Q Okay. What was the second test you took? 12:41:04PM**

A I took the medical. 12:41:06PM

**Q And when did you take that test? 12:41:11PM**

A After I took the physical agility and passed it. 12:41:16PM

**Q How did you learn that you needed to take the medical test? 12:41:19PM**

A Civil service sent me notification to report to this location on this date to take the medical exam. 12:41:23PM

**Q Did you call anyone at civil service to question why you needed to take it? 12:41:28PM**

A No. 12:41:31PM

**Q Did you speak to anyone in the Ocean Beach Police Department about your need to take the medical? 12:41:32PM**

A No. 12:41:38PM

**Q Do you recall what month that was -- 12:41:40PM**

A No. 12:41:42PM

**Q -- that you got that notice? 12:41:43PM**

TYREE BACON

A It was after I took the physical 12:41:44PM agility.

**Q So was it in '04? 12:41:47PM**

A Yes. 12:41:48PM

**Q Was it during the season? 12:41:49PM**

A I don't remember. 12:41:51PM

**Q And did you pass the medical? 12:41:56PM**

A Yes. 12:41:57PM

**Q Did you take any other tests -- 12:42:02PM**

A Yes. 12:42:04PM

**Q -- at or about that time in connection 12:42:04PM with being certified as a police officer in Ocean Beach?**

A Yes. 12:42:10PM

**Q What was the next test that you took? 12:42:10PM**

A Polygraph. 12:42:12PM

**Q When did you take the polygraph? 12:42:18PM**

A I think it was towards the end of '04. 12:42:20PM

**Q How many times did you take the 12:42:25PM polygraph?**

A Once for Ocean Beach and once back for 12:42:28PM Riverhead.

**Q How many times did you take it for 12:42:31PM Ocean Beach?**

TYREE BACON

A Only once. 12:42:34PM

**Q And it's your recollection that you 12:42:35PM took the polygraph in '04?**

A Yeah. I could be mistaken. It may 12:42:43PM have been '05. I don't know for certain.

**Q Have you ever seen a copy of your 12:42:49PM polygraph examination report?**

A No. 12:42:53PM

**Q At the time that -- strike that. 12:43:02PM**

**How did you learn that you had to take 12:43:05PM the polygraph?**

A I got notation from civil service that 12:43:08PM I had to take the polygraph.

**Q At the time you got that notice, did 12:43:11PM you call anyone at civil service to find out why you had to do that?**

A No. 12:43:14PM

**Q Did you speak to anybody in Ocean 12:43:16PM Beach about having to take the polygraph prior -- well, strike that.**

**Did you speak to anybody at Ocean 12:43:22PM Beach about the fact that you had to take the polygraph at or about the time you received the notice from civil service?**

TYREE BACON

A I think when I got that, I also was 12:43:31PM notified from Chief -- Sergeant Hesse to pick up the pre-poly questionnaire, because you have to fill out a questionnaire prior to filling out the polygraph.

**Q And you picked that up from Hesse? 12:43:45PM**

A From Ocean Beach. 12:43:48PM

**Q From George Hesse, you got it? 12:43:49PM**

A I didn't get it from George directly. 12:43:51PM I think it was at the station, and I picked it up there. It was in an envelope for me.

**Q Had you filled out a pre-polygraph 12:44:00PM questionnaire when you took the Riverhead polygraph?**

A Yes. 12:44:07PM

**Q Was it the same questionnaire? 12:44:07PM**

A Pretty much. 12:44:09PM

**Q Was the questionnaire administered by 12:44:09PM Suffolk County civil service or was it administered by the beach?**

MR. NOVIKOFF: Which one? The one for 12:44:16PM Ocean Beach.

MR. GOODSTADT: In '04. 12:44:19PM

A Yes. It was administered by Suffolk 12:44:20PM

TYREE BACON

County Police in Suffolk County Police Headquarters.

**Q So where did you fill it out -- strike 12:44:25PM that.**

**Did you fill out the pre-polygraph 12:44:28PM questionnaire?**

A Yes. 12:44:31PM

**Q Where did you fill it out? 12:44:31PM**

A At home. 12:44:33PM

**Q And where did you submit that? 12:44:40PM**

A I think it had to go back to the 12:44:44PM village for them to review it, and then it got forwarded to Suffolk County. But I'm not certain of the procedure.

While you're looking through those 12:45:01PM documents, do you mind if I --

MR. NOVIKOFF: Well, it's 12:45 p.m. 12:45:06PM

MR. GOODSTADT: We'll take a lunch 12:45:07PM break.

MR. NOVIKOFF: I mean, again, the 12:45:07PM witness has advised me, for child care issues, he has to leave at 4:30. I have questions, so...

MR. GOODSTADT: I mean, that I think 12:45:16PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

we should take a lunch break and see how long we go. If we have to bring him back --

MR. NOVIKOFF: We'll bring him back. 12:45:21PM

MR. GOODSTADT: And we'll go even 12:45:21PM further into March.

THE VIDEOGRAPHER: The time is 12:46. 12:45:27PM We are going off the record.

(Whereupon, a discussion was held off 12:45:31PM the record.)

THE VIDEOGRAPHER: The time is 1:49. 1:48:25PM We are back on the record.

BY MR. GOODSTADT: 1:48:28PM

**Q Mr. Bacon, I just want to go back to 1:48:32PM something that you testified to before. You testified that on certain occasions you drove the Bosettis and others to the checkpoint; is that correct?**

A Yes. 1:48:44PM

**Q And that was after they stayed in the 1:48:44PM village and were drinking?**

MR. NOVIKOFF: Objection. 1:48:47PM

A They stayed. They could've been out 1:48:50PM eating, drinking, partying. I'm not certain what they did.

TYREE BACON

**Q Did you ever know them to be drinking 1:48:55PM when you brought them back to the checkpoint?**

A They weren't drinking -- 1:48:59PM

MR. NOVIKOFF: Objection. 1:48:59PM

BY MR. GOODSTADT: 1:49:00PM

**Q Had you ever known them to have been 1:49:00PM drinking in the village on nights that you brought them back to the checkpoint?**

MR. NOVIKOFF: Objection. 1:49:07PM

A Yes. 1:49:08PM

**Q And you drove them back to their car? 1:49:09PM**

A Yes. 1:49:12PM

**Q And you saw them get into their cars? 1:49:12PM**

A Uh-huh. Yes. 1:49:16PM

**Q You saw them drive away? 1:49:17PM**

A Yes. 1:49:19PM

**Q After they'd been drinking, you did 1:49:19PM that?**

MR. NOVIKOFF: Objection. 1:49:22PM

A I'm assuming they drank. I didn't see 1:49:23PM them drink. They weren't drinking in the vehicle, so I'm assuming they may have had one or two drinks when they were out..

**Q What's that assumption based on? 1:49:32PM**

**TYREE BACON**

A Because they were there till 4:00 a.m. 1:49:34PM

**Q It's possible they had four or five 1:49:37PM drinks while they were out?**

MR. NOVIKOFF: Objection. 1:49:41PM

A Anything's possible. 1:49:42PM

**Q You didn't have any concerns of them 1:49:45PM getting into the cars after being out at the bars until 4:00 or 5:00 in the morning?**

MR. NOVIKOFF: Objection. Foundation. 1:49:52PM Form.

You can answer. 1:49:53PM

A They seemed to be quite coherent. 1:49:55PM They didn't appear to be under the influence. I didn't see a problem. If there was, then I wouldn't have taken them to their cars.

**Q Had you ever asked them if they were 1:50:05PM drinking?**

A No. 1:50:08PM

**Q Have you ever used any of the Ocean 1:50:10PM Beach police-issued equipment outside of Ocean Beach?**

A Not that I recall. 1:50:18PM

**Q You don't recall an incident where you 1:50:19PM deployed Ocean Beach issued Mace in a bar**

**TYREE BACON**

**outside of Ocean Beach?**

A That wasn't Ocean Beach issued Mace, 1:50:26PM so no.

**Q Did you ever deploy Mace in a bar 1:50:30PM outside of Ocean Beach?**

A No. 1:50:37PM

**Q Did you ever deploy Mace outside of a 1:50:38PM bar outside of Ocean Beach?**

A No. 1:50:43PM

**Q The incident that you testified to in 1:50:43PM which you were arrested for allegedly striking your girlfriend at the time, do you recall that?**

A Yes. 1:50:50PM

**Q Did you deploy Mace during that 1:50:51PM incident?**

A No. 1:50:55PM

**Q Do you recall ever deploying Mace 1:51:00PM while you were on duty in Ocean Beach?**

A Yes. 1:51:03PM

MR. NOVIKOFF: I'm sorry, I didn't 1:51:04PM hear the question because of the noise. What was the question?

(Whereupon, the referred to portion 1:51:08PM was read back by the court reporter: Do you

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

recall ever deploying Mace while you were on duty in Ocean Beach?)

MR. NOVIKOFF: Yes. Okay. 1:51:14PM

BY MR. GOODSTADT: 1:51:15PM

**Q The answer is yes? 1:51:15PM**

A Yes. 1:51:16PM

**Q How many times? 1:51:18PM**

A Twice. 1:51:20PM

**Q And where was the first time you deployed the Mace? 1:51:21PM**

A I believe that was in McGuire's. 1:51:27PM

**Q When was that incident? 1:51:29PM**

A 2003, 2004. 1:51:34PM

**Q Why did you deploy Mace in McGuire's? 1:51:39PM**

A There was a bar fight. 1:51:43PM

**Q How many people did you hit with the Mace? 1:51:44PM**

A The two people who were fighting and myself. 1:51:48PM

**Q Was one of the people that were fighting an off-duty third precinct officer? 1:51:51PM**

A I don't recall. 1:51:57PM

**Q So you don't recall deploying Mace on an off-duty Third Precinct officer at McGuire's? 1:51:57PM**

**TYREE BACON**

MR. NOVIKOFF: Objection. 1:52:05PM

A No. I don't believe anyone of the people fighting were police officers from any jurisdiction. 1:52:05PM

**Q Did you file a field report with respect to that incident? 1:52:10PM**

A No, I did not. The responding officers filed the field report, because I was getting my eyes washed out from the ambulance. 1:52:13PM

**Q Were you on duty at the time? 1:52:22PM**

A Yes. 1:52:23PM

**Q Did you fill out a use of force report? 1:52:24PM**

A At that time, we didn't have use of force reports. 1:52:27PM

**Q So your testimony is in '03 and '04, there were no use of force reports? 1:52:29PM**

MR. NOVIKOFF: Objection. I don't know if you established a timeframe. 1:52:34PM

MR. GOODSTADT: Well, he said it was in 2003, 2004. 1:52:37PM

MR. NOVIKOFF: Did he? 1:52:39PM

MR. GOODSTADT: He did. 1:52:40PM

MR. NOVIKOFF: Okay. 1:52:41PM

TYREE BACON

A I'm assuming it was that time frame. I don't -- I don't recall for certain, but we didn't the have use of force paperwork for that at that time. 1:52:41PM

**Q But it was during the time period after you came back in '99, right? 1:52:53PM**

A Yes, it was after '99. 1:52:56PM

**Q And before you took all the battery of tests to become certified? 1:52:57PM**

A I don't recall. 1:53:02PM

**Q You testified before about the paperwork that you filed or filled out in connection with coming back in '99, correct? 1:53:08PM**

MR. NOVIKOFF: Objection. 1:53:17PM

A Correct. 1:53:18PM

**Q Did you fill out any paperwork for Suffolk County in connection with coming back in '99? 1:53:18PM**

MR. NOVIKOFF: Objection. 1:53:23PM

A I submitted a resume, and I filled out the standard Suffolk County civil service application at the village office. 1:53:25PM

**Q And who did you submit that to? 1:53:32PM**

A The village office. 1:53:33PM

TYREE BACON

**Q Do you recall who in the village office? 1:53:36PM**

A No. 1:53:37PM

**Q Let's go back to the time frame in which you were going through the battery of tests. 1:53:40PM**

**I believe you testified that you filled out some pre-polygraph paperwork; is that correct? 1:53:48PM**

A Yes. 1:53:53PM

MR. NOVIKOFF: We're talking about in the 2004, 2005 period now? 1:53:53PM

MR. GOODSTADT: Yes. 1:53:57PM

MR. NOVIKOFF: Okay.. 1:53:58PM

BY MR. GOODSTADT: 1:53:59PM

**Q Do you recall filling out any other paperwork for a background check? 1:53:59PM**

A Yes. 1:54:04PM

**Q And what paperwork did you fill out for a background check? 1:54:06PM**

A There was a background investigation packet. 1:54:09PM

**Q Where did you get that from? 1:54:13PM**

A That was from the police department 1:54:15PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

also.

**Q From the Ocean Beach Police Department?** 1:54:17PM

A Yes. 1:54:19PM

**Q Okay. And who gave you that packet to fill out?** 1:54:20PM

A The polygraph paperwork and the application packet were in a big manila envelope with my name on it and the names of those that had to go through. I don't remember anyone specifically giving it to me. 1:54:27PM

**Q Who was performing the background check?** 1:54:40PM

A I believe the police department. 1:54:42PM

**Q The Ocean Beach Police Department --** 1:54:45PM

A Yes. 1:54:47PM

**Q -- or Suffolk County Police Department?** 1:54:47PM

A Ocean Beach. 1:54:49PM

**Q Do you know who at the beach was in charge of performing the background check?** 1:54:50PM

A I believe at the time, Chief Hesse -- Sergeant Hesse and Chief Paradiso were doing it. 1:54:54PM

**Q Have you ever heard of the Ocean Beach** 1:55:00PM

TYREE BACON

**Police Department applicant investigation section?**

A No. 1:55:05PM

MR. GOODSTADT: Mark this, please as Bacon 1. 1:55:08PM

(Whereupon, Bates document 7360-7381 was marked as Bacon Exhibit 1 for identification, as of this date.) 1:55:13PM

MR. NOVIKOFF: Don't do anything with it until he asks you. 1:55:41PM

BY MR. GOODSTADT: 1:55:43PM

**Q I've placed in front of Mr. Bacon what's been marked as Bacon 1. It is a multiple-page exhibit, bearing Bates 7360 through 7381. (Handing.)** 1:55:44PM

**Mr. Bacon, do you recognize the document that's been marked as Bacon 1?** 1:55:53PM

MR. NOVIKOFF: Now, if you need to review the document to answer the question, do so. If you don't, don't do so. 1:55:58PM

A May I thumb through it? 1:56:04PM

**Q Sure.** 1:56:09PM

A Okay, I remember it. 1:56:34PM

**Q If you look at the -- well, what is** 1:56:35PM

TYREE BACON

**this document?**

A This was the investigation packet that was handed. 1:56:38PM

**Q If you look at the first page, it says "police candidate application packet." Do you see that?** 1:56:40PM

A Yes. 1:56:44PM

**Q Were you a candidate for a police officer at that time?** 1:56:45PM

MR. NOVIKOFF: Objection. 1:56:47PM

A No. 1:56:48PM

**Q Do you know why you were filling out a candidate application packet?** 1:56:49PM

MR. NOVIKOFF: Objection. 1:56:52PM

A Because my original investigation packet wasn't around. 1:56:55PM

**Q When did you fill out your original investigation packet?** 1:57:04PM

A Back in 1990. 1:57:08PM

**Q And did you fill it out for the Ocean Beach Police Department or Suffolk County?** 1:57:09PM

A I believe it was an Ocean Beach packet even back then. 1:57:19PM

**Q Who was in charge of doing the** 1:57:22PM

TYREE BACON

**background back then?**

A Ed Paradiso. 1:57:25PM

**Q You recall that or are you speculating?** 1:57:25PM

A Well, it may have been the chief.. 1:57:28PM

**Q So you're speculating?** 1:57:30PM

A It was either of those two. 1:57:32PM

**Q But you definitely recall doing it through Ocean Beach and not through Suffolk County, the background check?** 1:57:33PM

A Yes. 1:57:38PM

**Q If you look at page 7361 -- strike that.** 1:57:38PM

**Before you look at 7361, do you recall when you received this packet?** 1:57:42PM

A No. Around the same time I'm assuming I did the polygraph paperwork. 1:57:46PM

**Q So if you look at 7361, which is the second page of Exhibit 1.** 1:57:52PM

A Okay. 1:57:56PM

**Q Do you see the -- halfway down, the signature box?** 1:57:57PM

A Yes. 1:58:00PM

**Q Is that your signature?** 1:58:01PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A It is. 1:58:02PM

**Q And it's dated 5-1-05. 1:58:03PM**

**Do you see that? 1:58:04PM**

A Yes. 1:58:06PM

**Q Any reason to believe you didn't sign 1:58:07PM it on 5-1-05?**

A Nope. 1:58:10PM

**Q Does that refresh your recollection as 1:58:11PM to when you got this information?**

MR. NOVIKOFF: You can answer. 1:58:14PM

A Maybe not when I got it, but that was 1:58:15PM when I signed it. And if you go further down, the 2nd of May is when it was notarized.

**Q So just so I understand, you signed it 1:58:22PM on May 1st and the notary signed it on May 2nd? Is that's what's indicated here?**

MR. NOVIKOFF: Objection. The 1:58:32PM document speaks for itself.

But you can answer. 1:58:33PM

A Yeah. 1:58:35PM

**Q So you didn't sign it in front of the 1:58:35PM notary?**

A No, I did. 1:58:38PM

**Q So you signed it in front of the 1:58:40PM**

TYREE BACON

**notary on May 1st and then the notary notarized it on May 2nd? Is that what happened?**

A No. I probably made a mistake and 1:58:47PM signed it the 1st on the 2nd.

**Q Okay. And are you speculating to that 1:58:51PM or do you recall that being a mistake?**

MR. NOVIKOFF: Objection. 1:58:55PM

A I don't recall. 1:58:56PM

**Q Now, if you see on this page, it says 1:58:59PM that you understand that failure to complete and return the questionnaire and documents I have been personally given today to the Ocean Beach Police Department applicant investigation section.**

**Do you see that? 1:59:13PM**

A Yes. 1:59:14PM

**Q Does that refresh your recollection of 1:59:15PM what the Ocean Beach Police Department applicant investigation section is?**

MR. NOVIKOFF: Objection. His 1:59:23PM testimony was he never heard of it, not that he doesn't recall.

But over my objection, you can answer 1:59:28PM the question.

TYREE BACON

A I remember having to have this in by 1:59:28PM the 15th.

**Q That wasn't the question. The 1:59:32PM question was whether that refreshes your recollection of an Ocean Beach Police Department applicant investigation section.**

MR. NOVIKOFF: Note my objection to 1:59:43PM the form of the question.

You can answer. 1:59:43PM

A I believe answer that. There is not 1:59:44PM an applicant investigation section, but they do their own investigations. So one of the officers or supervisors conducted the investigations.

**Q All right. Just so I'm clear, are you 1:59:54PM saying that this section that's referenced in this document does not exist?**

MR. NOVIKOFF: Objection. 2:00:01PM

You can answer. 2:00:06PM

A I'm saying it's an individual who does 2:00:06PM the work. Whether they call him the applicant investigation section, I couldn't tell you.

**Q And then it says if it's not submitted 2:00:14PM to that applicant investigation section no later**

TYREE BACON

**then 11:00 a.m. on 5-15-05, shall result in the removal of my name from the current certified list of police officer candidates.**

**Do you see that? 2:00:28PM**

A Yes. 2:00:29PM

**Q What list is that referring to? 2:00:29PM**

MR. NOVIKOFF: Objection. 2:00:31PM

A I'm guessing that's for the -- 2:00:33PM

MR. NOVIKOFF: Don't guess. 2:00:35PM

A Okay.. Then I don't know. 2:00:36PM

**Q So you were signing this and having it 2:00:38PM notarized, but you didn't know what section was being referenced and you didn't know what list was being referenced? Is that your testimony?**

MR.. NOVIKOFF: Objection. His 2:00:46PM testimony is what it is.

You can answer. 2:00:49PM

A This is the same packet that they use 2:00:50PM for full-time officers, okay? I'm a part-timer. They have to have it in, if they're coming off the Suffolk County list or village list. So there are things in here such as that verbiage that really doesn't apply to a part-timer.

**Q Right. 2:01:08PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A Like being removed from, you know, a list of police officer candidates. 2:01:08PM

**Q But you still swore to that statement even though it doesn't apply to you; is that your testimony? 2:01:13PM**

MR. NOVIKOFF: Objection. 2:01:19PM

You can answer if you want. If you can. 2:01:19PM

A What I swore to is that this would be in by this date and it would've been completed, to the best of my knowledge, in its entirety on that date. That's what I swore to. 2:01:22PM

**Q Well, what you swore to is written up here. That's what you swore to. 2:01:31PM**

MR. NOVIKOFF: Andrew, come on. 2:01:36PM

MR. GOODSTADT: The document speaks for itself. 2:01:37PM

MR. NOVIKOFF: It does speak for itself. You know that question is ridiculous. 2:01:39PM

But you can answer it again, if you want. 2:01:42PM

If that's the best you got. 2:01:42PM

MR. GOODSTADT: We've already gone 2:01:45PM

TYREE BACON

through a lot of the best we got.

MR. NOVIKOFF: I don't think so. 2:01:48PM

THE WITNESS: Now, now, play nice. 2:01:49PM

BY MR. GOODSTADT: 2:01:51PM

**Q Now, if you look at Page 7363. 2:01:51PM**

A (Witness complies.) Yes. 2:01:57PM

**Q Do you recall signing this document? 2:01:58PM**

A I do. 2:01:59PM

**Q And did you sign it on the 1st or did you by the accident sign the 1st -- as the 1st on the 2nd? 2:02:00PM**

MR. NOVIKOFF: Objection. 2:02:06PM

A I may have done it by accident. 2:02:07PM

**Q But sitting here today, you don't know one way or the other? 2:02:08PM**

A It may have been an accident. 2:02:19PM

**Q Sitting here today, you don't know one way or the other whether it was an accident? 2:02:20PM**

A I may have signed it on the 2nd, dating it the 1st is what may have happened. No, I don't know for sure. 2:02:21PM

**Q Who's Charles Edmond? 2:02:27PM**

A He's a notary public. 2:02:32PM

**Q Is he an employee of the beach? 2:02:33PM**

TYREE BACON

A No. 2:02:35PM

**Q Where did you get this notarized? 2:02:37PM**

A I don't recall. 2:02:39PM

**Q Did you get it notarized on Ocean Beach? 2:02:40PM**

A No. 2:02:43PM

**Q Did you fill this documentation out in Ocean Beach? 2:02:44PM**

A No, I did not. 2:02:46PM

**Q Where were you when you got this notarized? 2:02:47PM**

A I don't recall. It may have been at my bank. 2:02:51PM

**Q Did you fill this document out at your bank? 2:02:53PM**

A No, I filled it out at home. 2:02:56PM

**Q Did you sign the document at the bank? 2:02:58PM**

A Yes. 2:03:00PM

**Q If you look at the top of 7363, it says conditional offer of employment -- do you see that -- as a police officer with the Ocean Beach Police Department? 2:03:01PM**

A Yes. 2:03:09PM

**Q What did it mean for you to get a 2:03:10PM**

TYREE BACON

**conditional offer of employment?**

MR. NOVIKOFF: Objection. 2:03:14PM

You can answer. If you know. Don't guess. 2:03:14PM

A Once again, that was pertaining -- this is all geared to full-time police officers. It's the same packet -- 2:03:16PM

MR. NOVIKOFF: No, don't. If you don't know -- 2:03:23PM

A I don't know. 2:03:25PM

MR. NOVIKOFF: -- don't guess. 2:03:26PM

BY MR. GOODSTADT: 2:03:26PM

**Q The second paragraph, it says, "As part of the preemployment stage of the selection process, a background investigation of my character has been initiated." 2:03:27PM**

**Do you see that? 2:03:36PM**

A Yes. 2:03:37PM

**Q What was your understanding of the preemployment stage of the selection process? 2:03:37PM**

MR. NOVIKOFF: Objection. Form. 2:03:45PM

Assuming you had an understanding, but you can answer. 2:03:46PM

A I didn't have an understanding. 2:03:48PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q And then on the next paragraph it says 2:03:49PM on 5-1-05 commanding officer Sergeant George Hesse of the Ocean Beach Police Department applicant investigation section advised you of at this point in the selection process I'm being presented with a conditional offer of employment in accordance with Section 42 USC 12112 of the Americans with Disabilities Act.**

**Do you see that? 2:04:18PM**

A Yes. 2:04:19PM

**Q Did George Hesse advise you on 2:04:19PM May 1st, 2005 that you were being given a -- presented a conditional offer of employment?**

MR.. NOVIKOFF: Objection. 2:04:29PM

A I don't recall. 2:04:30PM

**Q Do you recall George Hesse being the 2:04:32PM commanding officer of the Ocean Beach Police Department applicant investigation section?**

A I don't recall. 2:04:38PM

**Q The next paragraph says you understand 2:04:47PM that the offer of employment is conditional upon taking and successfully passing a medical exam, psychological examination, polygraph examination and a physical fitness screening test**

TYREE BACON

**administered by Suffolk County Department of Civil Service.**

**Do you see that? 2:05:02PM**

A Yes. 2:05:03PM

MR. NOVIKOFF: And the last sentence. 2:05:05PM

BY MR. GOODSTADT: 2:05:05PM

**Q And that my ongoing background 2:05:05PM investigation reveals nothing of a derogatory nature.**

**Do you see that? 2:05:08PM**

A Yes. 2:05:09PM

**Q At this point in time, May of '05, had 2:05:10PM you taken those other tests that you testified to, the physical agility, medical? Those are two that you testified to.**

A Yes. 2:05:23PM

**Q So that had already been done? 2:05:24PM**

A I believe so. 2:05:29PM

**Q And other than for -- I believe you 2:05:52PM testified before that the only two police departments that you applied to were the Ocean Beach Police Department and the Riverhead Police Department; is that correct?**

MR. NOVIKOFF: Objection. 2:06:04PM

TYREE BACON

You can answer. 2:06:05PM

A No, that's not correct. Those were 2:06:06PM the departments that I had worked for and processed for.

**Q What departments have you applied for 2:06:12PM other than for those two?**

MR. NOVIKOFF: Police departments, 2:06:16PM right?

MR. GOODSTADT: Police departments. 2:06:17PM

A I've taken plenty of tests. Port 2:06:19PM Authority Police, Long Island Railroad, Metro-North railroad, prior to them merging to MTA. Suffolk County, I took their test. NYPD. I took other tests, the deputy sheriff, park ranger test. What else? The bay harbor -- harbormaster, bay constable. There may be others, but nothing that jumps out at me.

**Q Did you fail any tests in connection 2:06:59PM with any of those applications, other than for the Riverhead polygraph?**

MR. NOVIKOFF: Objection. 2:07:05PM

You can answer. 2:07:05PM

A No. 2:07:06PM

**Q You don't recall failing the medical 2:07:06PM**

TYREE BACON

**test for the New York Police Department job?**

A Actually, I was disqualified in 1984 2:07:12PM because I was six pounds underweight.

**Q That was failing the medical? 2:07:18PM**

A Yeah, it was their premedical. 2:07:19PM

**Q Have you ever been fired from any 2:07:39PM jobs?**

A Yes. 2:07:41PM

**Q How many? 2:07:42PM**

A One. 2:07:43PM

**Q What job were you fired from? 2:07:44PM**

A Arby's, back in 1981, 1982. 2:07:45PM

MR. NOVIKOFF: You don't want to know 2:07:53PM why? I think he stole some pickles.

MR. GOODSTADT: It's better than 2:07:57PM stealing stuff from the New York EMS.

MR. NOVIKOFF: So you think. Ooh. 2:08:01PM

THE WITNESS: Ooh. 2:08:03PM

BY MR. GOODSTADT: 2:08:05PM

**Q Why were you fired from Arby's? 2:08:06PM**

A I didn't show up to work. 2:08:08PM

**Q Just abandoned your job? 2:08:10PM**

A Yeah, it sucked. 2:08:12PM

**Q When did you take -- after the medical 2:08:27PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**test, what was the next test that you took to be certified as a police officer for Ocean Beach?**

A I think it was a polygraph. 2:08:34PM

**Q When did you take the polygraph test? 2:08:36PM**

A Not certain. 2:08:39PM

**Q Was it before or after you filled out 2:08:39PM the documentation that's been marked as Bacon 1?**

A I think it was after this. 2:08:46PM

**Q So it was sometime in '05 that you 2:08:48PM took the polygraph?**

A I'm not certain. 2:08:52PM

**Q And I don't recall the answer to this 2:08:58PM question.**

**When did you first learn -- what month 2:09:00PM was it in '04 that you first learned that you needed to take these tests?**

MR. NOVIKOFF: Objection. 2:09:07PM

You can answer. 2:09:07PM

A I don't remember. I got a letter from 2:09:08PM civil service.

**Q Well, you testified it was April '04 2:09:11PM that you took the physical agility test, correct?**

MR. NOVIKOFF: Objection. His 2:09:16PM

TYREE BACON

testimony is what it is.

You can answer. 2:09:17PM

A If that's what I testified to, sure. 2:09:18PM

**Q So you worked the '04 season knowing 2:09:20PM that you had to pass these tests?**

A Yes. 2:09:25PM

MR. NOVIKOFF: Objection. Form of the 2:09:26PM question.

BY MR. GOODSTADT: 2:09:28PM

**Q Without actually passing them; is that 2:09:29PM correct?**

MR. NOVIKOFF: Objection. 2:09:32PM

You can answer, if you can. 2:09:32PM

A Yes. 2:09:34PM

**Q Yes. And you worked at least part of 2:09:34PM the '05 season without passing all of these tests, correct?**

A Yes. 2:09:41PM

**Q Did you work -- had you passed the 2:09:41PM tests prior to the end of the '05 season?**

A I don't recall.. 2:09:47PM

**Q Did you ever speak to Maryann Minerva 2:09:55PM about the requirement to take these tests?**

A No. 2:10:01PM

TYREE BACON

**Q Did you ever speak to any of the 2:10:01PM administrators in Ocean Beach about requirements to take these tests?**

MR. NOVIKOFF: Objection. Asked and 2:10:08PM answered.

You can answer. 2:10:09PM

A No. 2:10:10PM

**Q Did you ever speak to -- who was the 2:10:10PM mayor at the time?**

A I think it was Natalie Rogers. 2:10:13PM

**Q Did you ever speak to her about it? 2:10:15PM**

A No. 2:10:17PM

**Q Did you ever speak to Joe Loeffler, 2:10:17PM when he was a trustee, about it?**

MR. NOVIKOFF: Objection. 2:10:21PM

A No. 2:10:21PM

**Q Was it your understanding that you 2:10:30PM were entitled to work during those two seasons, '04 and '05, even though you hadn't been certified?**

MR. NOVIKOFF: Objection to the form 2:10:40PM of the question.

You can answer. 2:10:42PM

A Yes. 2:10:42PM

TYREE BACON

**Q What was the basis of your belief of 2:10:43PM that?**

A Because there was a lapse in the 2:10:45PM village notifying civil service. It was no lapse in my employment status. It was a lapse in them notifying civil service.

**Q How about the other six or seven guys 2:10:57PM that you testified to, were they working prior to passing these tests?**

MR. NOVIKOFF: To the extent you know, 2:11:06PM you can answer.

A Some yes, some no, and I can't be 2:11:08PM specific who did and who didn't.

**Q Well, the Bosettis were there in April 2:11:12PM of '04 with you, right?**

A Yes. 2:11:17PM

**Q When did they start working in Ocean 2:11:17PM Beach?**

A I don't know. 2:11:21PM

**Q Hardman was there in April '04, 2:11:21PM correct?**

A Yes. 2:11:25PM

**Q When did he start working for the 2:11:26PM beach?**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A I don't know. 2:11:27PM

**Q How about Tommy Shaw, do you know when he started? 2:11:28PM**

A No. 2:11:31PM

**Q Pat Cherry, do you know when he started working for the beach? 2:11:31PM**

A No. 2:11:33PM

**Q And Tom Dyer, do you know when he started working for the beach? 2:11:33PM**

A No. 2:11:37PM

**Q Did you know these guys at the time you went for the civil service test, or were these just guys you were meeting for the first time? 2:11:38PM**

MR. NOVIKOFF: Objection. 2:11:44PM

You can answer. 2:11:44PM

A Yeah. 2:11:45PM

**Q How did you know the Bosettis prior to April of '04? 2:11:45PM**

A From working with them or changing shifts, you know, seeing them in passing. 2:11:50PM

**Q So they were working prior to taking these tests, correct? 2:11:54PM**

MR. NOVIKOFF: Objection. You've 2:11:57PM

TYREE BACON

already established that.

MR. GOODSTADT: He testified he didn't know. He testified he didn't know. 2:11:59PM

MR. NOVIKOFF: No, he told you he knew the Bosettis worked before. 2:12:01PM

You can answer over my objection. 2:12:05PM

A The Bosettis and those other individuals all worked prior to us being notified by civil service that we had to test. 2:12:07PM

**Q And do you know whether the other six or seven guys, the reason why they didn't take the test was because of some reporting mistake? 2:12:16PM**

A That, I don't know. 2:12:25PM

MR. NOVIKOFF: Objection. 2:12:26PM

BY MR. GOODSTADT: 2:12:31PM

**Q How did you learn that you needed to take a polygraph? 2:12:33PM**

A I got written notification from civil service. 2:12:36PM

**Q Did you speak to anyone at civil service after you got that notification to discuss the test? 2:12:39PM**

A No. 2:12:44PM

**Q Did you speak with anybody at Ocean 2:12:45PM**

TYREE BACON

**Beach about the test when you got notification?**

A Yes. 2:12:50PM

**Q Who did you speak with at Ocean Beach? 2:12:51PM**

A I don't recall. 2:12:54PM

**Q Do you recall anyone you spoke to at Ocean Beach about having to take the polygraph when you got notification of it? 2:12:55PM**

MR. NOVIKOFF: Are you talking about any employee of Ocean Beach, any resident of Ocean Beach? 2:13:01PM

MR. GOODSTADT: Talking about anybody at Ocean Beach, employee, resident, visitor. 2:13:05PM

A Spoke with Sergeant Hesse, and that's where I got my packet from. He said there was a packet here that I had to pick up and complete and get in by a certain date. 2:13:08PM

**Q When you say there was a packet, that included in the packet the document that's been marked as Bacon 1? 2:13:18PM**

A I don't recall if they were all the same a packet. I may have gotten one before the other. I'm not certain. 2:13:26PM

**Q So there was another packet that had pre-polygraph questions? 2:13:31PM**

TYREE BACON

MR. NOVIKOFF: Objection. 2:13:35PM

A I don't recall. 2:13:37PM

**Q Was there another set of documents that were pre-polygraph questions? 2:13:39PM**

A Yes. There was a pre polygraph questionnaire that was not part of this. 2:13:43PM

**Q Had you discussed that questionnaire at all with George Hesse? 2:13:47PM**

A Nope. 2:13:50PM

**Q Where did you fill out the pre-polygraph questionnaire? 2:13:51PM**

A At home. 2:13:54PM

**Q Did you have to get that document notarized? 2:13:56PM**

A I don't recall. 2:13:59PM

**Q When did you submit your pre-polygraph questionnaire? 2:14:09PM**

A I don't recall. 2:14:12PM

**Q Who did you submit it to? 2:14:13PM**

A I don't recall. 2:14:16PM

**Q Did you submit it to Ocean Beach? 2:14:17PM**

A Yes. 2:14:21PM

**Q So you didn't submit it to the county, you submitted it to somebody at the beach? 2:14:22PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

MR. NOVIKOFF: Objection. 2:14:26PM

A Yes. 2:14:27PM

**Q Did you submit it to somebody in the 2:14:28PM police department at Ocean Beach?**

A I don't remember how we got the packet 2:14:32PM in, who received it.

**Q Had you seen copies the 2:14:38PM pre-polygraph -- pre-polygraph questionnaire prior to actually picking up the packet?**

A No. 2:14:48PM

**Q You never looked in Frank Fiorillo's 2:14:53PM personnel jacket to see the pre-polygraph questions?**

MR. NOVIKOFF: Objection. Leading. 2:14:58PM

You can answer. 2:14:59PM

A No. 2:14:59PM

**Q What were the questions that were on 2:15:01PM the pre-polygraph questionnaire?**

A I don't recall. 2:15:06PM

**Q Do you recall any of them? 2:15:07PM**

MR. NOVIKOFF: Specifically or 2:15:08PM generally?

MR. GOODSTADT: I don't need to know 2:15:11PM the specific word for word.

TYREE BACON

MR. NOVIKOFF: That's what I mean. 2:15:14PM

MR. GOODSTADT: I want to know what 2:15:15PM the questions were asking in sum and substance.

A They asked you if you were truthful in 2:15:18PM your application packet. No, I don't remember anything specifically. It was all that -- in that nature.

**Q Did you keep a copy of the 2:15:31PM questionnaire?**

A No, I did not. 2:15:33PM

**Q Did you have to fill out any other 2:15:36PM paperwork for the polygraph other than for the pre-polygraph questionnaire?**

A I don't recall. 2:15:41PM

**Q Then there came a point in time when 2:15:42PM you actually went in to take the polygraph test?**

A Yes. 2:15:46PM

**Q And do you recall what month that was 2:15:47PM in?**

A No, I don't. 2:15:48PM

**Q But it was some point after May 1 of 2:15:49PM '05?**

A Don't recall. 2:15:53PM

TYREE BACON

**Q Where did you take the test? 2:15:54PM**

A Suffolk County Police headquarters. 2:15:56PM

**Q Where is that located? 2:15:58PM**

A In Yaphank. 2:16:00PM

**Q Did anyone tell you that if you didn't 2:16:06PM take and pass these tests, that you'd be terminated as a police officer in Ocean Beach?**

MR. NOVIKOFF: Objection. 2:16:14PM

A Nobody said anything in that nature. 2:16:14PM

**Q Uh-huh. So what was your 2:16:17PM understanding of why you were taking that test --**

MR. NOVIKOFF: Objection. Asked and 2:16:24PM answered.

BY MR. GOODSTADT: 2:16:25PM

**Q -- if you didn't need to them to 2:16:25PM maintain your position as a police officer?**

MR. NOVIKOFF: Objection. Form. 2:16:30PM Asked and answered.

You can answer. 2:16:31PM

A Because there was a lapse in paperwork 2:16:32PM or notification to civil service, and they were trying to fill in the spaces.

**Q Did you ever complain to anyone about 2:16:43PM**

TYREE BACON

**Ed Paradiso's lapse in paperwork to civil service?**

A Nope. 2:16:49PM

MR. NOVIKOFF: Objection. Foundation. 2:16:50PM

BY MR. GOODSTADT: 2:16:51PM

**Q Well, whose lapse was it? 2:16:52PM**

A Chief. 2:16:55PM

**Q Ed Paradiso? 2:16:55PM**

A Yes. 2:16:56PM

**Q Let me ask the question. Did you ever 2:16:59PM complain to anyone about the chief's lapse in paperwork?**

MR. NOVIKOFF: Objection. 2:17:04PM

A Not that I recall. 2:17:06PM

**Q Have you ever called anybody a rat? 2:17:14PM**

A No. 2:17:17PM

MR. NOVIKOFF: You've got to give me a 2:17:20PM chance to object.

THE WITNESS: Sorry. 2:17:23PM

MR. NOVIKOFF: Because he already 2:17:23PM asked you that twice.

BY MR. GOODSTADT: 2:17:27PM

**Q Prior to passing the battery of tests 2:17:29PM that were required by civil service, did you**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

**TYREE BACON**

**consider yourself to be a civilian?**

MR. NOVIKOFF: Hold on, in '04 and '05 2:17:39PM we're talking about?

MR. GOODSTADT: Anywhere from '99 to 2:17:42PM when he passed it in '04 and '05, when he held the title of police officer in Ocean Beach.

MR. NOVIKOFF: Objection to the form 2:17:51PM of the question.

You can answer.. 2:17:52PM

A No. 2:17:53PM

**Q You considered yourself to be a police 2:17:53PM officer?**

A Yes. 2:17:55PM

**Q Certified by the county? 2:17:55PM**

A And by the Bureau of Municipal Police 2:17:58PM Training Council, yes.

**Q So if you were already certified by 2:18:04PM the county, why did you need to take these tests?**

MR. NOVIKOFF: Objection. Form. 2:18:10PM Foundation.

You can answer. 2:18:13PM

A That was my question all along. I 2:18:14PM

TYREE BACON

have no idea.

**Q Is it possible that you weren't 2:18:18PM actually certified?**

MR. NOVIKOFF: Objection. Form. 2:18:20PM

You can answer. 2:18:21PM

A No, that wasn't the case. I was 2:18:22PM certified, because civil service, prior to completing the battery of tests, sent me a letter saying it was an error that they sent me through the process and that I was still certified and current all along.

MR. GOODSTADT: I'd like to mark the 2:18:41PM record to request production of a copy. I'll be happy to have it subpoenaed from Mr. Bacon, but if you're going to represent him, I trust --

MR. NOVIKOFF: I am representing him. 2:18:46PM

MR. GOODSTADT: -- we can serve him 2:18:48PM with a discovery request.

MR. NOVIKOFF: You don't need to 2:18:48PM subpoena him, because we are representing him. Your request is noted in the record. I'll take it under advisement.

TYREE BACON

BY MR. GOODSTADT: 2:18:56PM

**Q Do you still have a copy of that 2:18:57PM letter?**

A I do not.. 2:18:59PM

**Q What did you do with that letter? 2:19:00PM**

A Probably tossed it back in 2005, 2006. 2:19:02PM

**Q Who sent you that letter? 2:19:07PM**

A Suffolk County civil service. 2:19:10PM

**Q Do you recall who signed it? 2:19:11PM**

A I don't recall who signed it, but I do 2:19:13PM recall making a phone call to confirm it to Allison.

**Q And when did you receive that letter? 2:19:23PM**

A Sometime in 2005 or 2006. I don't 2:19:26PM recall.

**Q So it was after you passed all the 2:19:30PM battery of tests that you received it, or was it while you were undertaking the battery of tests?**

A While I was undertaking the battery of 2:19:38PM tests.

**Q Let me get this. Let me try to 2:19:40PM understand this now.**

**While you were in the middle of taking 2:19:43PM the tests, you received a letter that said this**

**TYREE BACON**

**is an error and you're certified and it's a mistake that we're putting you through this battery of tests?**

A No.. The letter stated that I was 2:19:53PM fully certified, and I called and spoke to Allison. It didn't say it was a mistake. I called and I spoke with Allison because I was questioning it. I said, you know, I still have to do the psychological. And she says no, we found the paperwork or whatever it was, it was a paperwork error between them and Ocean Beach, and I didn't have to go through any of this to begin with.

**Q Did you end up taking the 2:20:21PM psychological?**

A No, I did not. 2:20:23PM

**Q So did you receive that letter from 2:20:25PM Suffolk County civil service prior to taking your polygraph or after your polygraph?**

A It was after taking the polygraph. 2:20:31PM

**Q It was after the polygraph but prior 2:20:34PM to getting scheduled for psychological?**

A Actually, I had -- 2:20:38PM

MR. NOVIKOFF: Objection.. 2:20:39PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

You can answer. 2:20:40PM

A I had a date for the psychological, 2:20:41PM and that was why I called to confirm, should I still go or not, and she said absolutely not.

**Q Did you receive anything else in 2:20:48PM writing from civil service with respect to the tests, other than for what you've testified to thus far?**

MR. NOVIKOFF: Objection. 2:20:56PM

Like I said, unless I tell you not to 2:21:00PM answer, you may answer everything.

A Yeah, not that I recall. 2:21:02PM

**Q Do you know whether any of the other 2:21:05PM police officers in Ocean Beach received that letter saying that they were fully certified and didn't need to finish taking the tests?**

A No idea.. 2:21:14PM

**Q Who was your supervisor on the 12 to 8 2:21:22PM tour?**

MR. NOVIKOFF: Objection. Form. 2:21:25PM

What year? What time period? 2:21:28PM

BY MR. GOODSTADT: 2:21:31PM

**Q In any time period. If it changed, 2:21:32PM let me know when it changed.**

**TYREE BACON**

MR. NOVIKOFF: Still objection to 2:21:37PM form.

Go ahead. 2:21:38PM

A Sometimes it was then sergeant, now 2:21:38PM Deputy Chief Hesse. Sometimes we didn't have a supervisor. There were only two supervisors working for the village. One was Chief Paradiso, and for a while he was out with a line-of-duty injury, so it was just the one supervisor. So sometimes we worked without a supervisor.

**Q And in the chain of command example 2:21:59PM that you gave before, who would you report an incident to if you were working on a night when there was no supervisor?**

A To the senior officer on duty. 2:22:09PM

**Q And how is that defined? 2:22:11PM**

A The guy that's got the most time on. 2:22:13PM

**Q Did your time prior to your break 2:22:16PM count towards most time on?**

A Yes. 2:22:21PM

**Q Was Chief Paradiso ever in charge of 2:22:21PM your 12 to 8 tour as a supervising officer on the 12 to 8 tour?**

**TYREE BACON**

MR. NOVIKOFF: Objection. 2:22:29PM

You can answer. 2:22:30PM

A He was for a brief period. 2:22:30PM

**Q When was that? 2:22:32PM**

A I don't recall. 2:22:33PM

**Q Was it -- do you know why he took over 2:22:35PM that position for a brief period?**

MR. NOVIKOFF: Don't guess. Only if 2:22:40PM you know.

A No, I don't know. 2:22:42PM

**Q Who was the supervisor prior to him 2:22:43PM taking over for that brief period?**

A That was Sergeant Hesse. 2:22:47PM

**Q And then Paradiso took over the night, 2:22:49PM and where did Hesse go?**

A Days. 2:22:52PM

**Q And you don't know why that switch was 2:22:53PM made?**

A No. 2:22:55PM

**Q You don't recall what year it was in? 2:22:56PM**

A No. 2:22:58PM

**Q Have you ever attended any village 2:23:01PM board meetings?**

A No. 2:23:03PM

TYREE BACON

**Q How long was Paradiso on the night 2:23:06PM tours?**

A I don't recall. A couple -- 2:23:11PM

**Q Was it days, weeks, months? 2:23:13PM**

A I don't recall. It may have been a 2:23:15PM month, a couple of months. I'm not certain.

**Q Did you ever ask him why you're all of 2:23:21PM a sudden the supervisor on the night tour?**

MR. NOVIKOFF: Objection. 2:23:25PM

A No. 2:23:25PM

**Q Have you ever heard that it was 2:23:29PM discipline for Hesse?**

MR. NOVIKOFF: Objection. 2:23:34PM

A No, I didn't. 2:23:35PM

**Q You never heard it was in response to 2:23:37PM the complaints about his performance?**

MR. NOVIKOFF: Objection. 2:23:42PM

A No, I didn't. 2:23:43PM

**Q Have you ever seen Tom Snyder have a 2:24:07PM drink?**

A Not that I recall. 2:24:14PM

**Q And when I say "drink," I mean 2:24:15PM alcoholic drink.**

A Not that I recall. 2:24:17PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q And in fact, Tom Snyder had a liver 2:24:22PM problem, correct?**

MR. NOVIKOFF: Objection. Leading. 2:24:25PM

A I don't know. 2:24:26PM

**Q You don't recall Tom Snyder being sick 2:24:26PM at any point while you worked with him?**

A No. 2:24:31PM

**Q You don't recall him being on 2:24:31PM chemotherapy?**

A No, I don't. 2:24:34PM

**Q Who in Ocean Beach was responsible for 2:24:43PM making sure that officers passed the requisite tests?**

MR. NOVIKOFF: Objection. 2:24:51PM

A That would've been the chief. 2:24:55PM

**Q So it was Chief Paradiso up until the 2:24:57PM time that he went out and George Hesse became chief?**

A Correct. 2:25:02PM

**Q Other than for the two telephone calls 2:25:10PM you have now testified to that you had with Allison Chester, how many other times have you had correspondence or communication with her?**

A Prior to this or total? 2:25:22PM

TYREE BACON

**Q At any point in time from the day you 2:25:25PM were born until today.**

A Those were the two. There may have 2:25:28PM been another one that I can't be specific on, but both of them -- any of the calls related to me taking this battery of civil service tests.

**Q Have you ever met her -- 2:25:45PM**

A No, I have not. 2:25:46PM

**Q -- in person? 2:25:47PM**

**Have you ever used the Ocean Beach 2:25:54PM police barracks as your address?**

A Yes. 2:25:57PM

**Q How many times? 2:25:58PM**

A Once. 2:25:59PM

**Q What did you use the Ocean Beach 2:26:01PM police barracks for as your address?**

A Back in the '90s, in order to get an 2:26:06PM Islip town beach permit and a Fire Island national seashore permit to drive your vehicle back and forth to the village, you had to have an address, and that's what we did.

**Q When you say "we," who are you 2:26:21PM referring to?**

A The entire department who worked the 2:26:23PM

TYREE BACON

winter, you know, during that time frame.

**Q Other than for that time frame, have 2:26:30PM you ever used the Ocean Beach police barracks as your address?**

A No. 2:26:36PM

**Q Did you ever receive any performance 2:26:36PM evaluations when you worked at Ocean Beach?**

MR. NOVIKOFF: Objection. Form. 2:26:42PM

A None that I recall. 2:26:43PM

**Q Have you ever been told that you need 2:26:45PM to write more summonses?**

A No. 2:26:48PM

**Q Have you ever been told you write too 2:26:56PM many summonses?**

A No. 2:26:59PM

**Q Have you ever heard anyone else told 2:26:59PM that they write too many summonses?**

MR. NOVIKOFF: Objection. 2:27:04PM

BY MR. GOODSTADT: 2:27:04PM

**Q Anyone else in the Ocean Beach Police 2:27:04PM Department.**

A Yes. 2:27:05PM

**Q Who was told they write too many 2:27:06PM summonses?**

**TYREE BACON**

A Officer Fiorillo. 2:27:08PM

**Q When did you hear him told that? 2:27:09PM**

A Probably since he's been there. 2:27:13PM

**Q How many times? 2:27:15PM**

A Once. 2:27:18PM

**Q Who did you hear say that? 2:27:19PM**

A Chief Hesse, Sergeant Hesse, whatever 2:27:21PM his title was at the time.

**Q What exactly did he say, if you 2:27:30PM recall?**

A He was interested in quality, not 2:27:34PM quantity, that it took more than just numbers to justify good activity.

**Q What do you mean by quality, not 2:27:43PM quantity?**

MR. NOVIKOFF: Hold on. I'm going to 2:27:46PM object only because he's paraphrasing what Hesse said --

BY MR. GOODSTADT: 2:27:51PM

**Q Do you know what Hesse meant when he 2:27:52PM said quality, not quantity?**

MR. CONNOLLY: Objection. 2:27:58PM

A No. 2:27:59PM

**Q Did you know what Hesse meant when he 2:27:59PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**said it takes more than numbers to show good performance?**

A No. 2:28:04PM

**Q Did the chief ever -- Chief Paradiso 2:28:07PM ever speak to you about the number of summonses that you wrote?**

A No. 2:28:12PM

**Q You don't recall being in a meeting 2:28:14PM where the chief had on the board on two sides a list of people who wrote summonses and a list of people who wrote no summonses?**

A No. 2:28:24PM

**Q You don't recall saying if the 2:28:32PM Bosettis aren't gonna write summonses, I don't have to?**

A I probably said that somewhere along 2:28:38PM the line.

**Q What did you mean by that? 2:28:40PM**

A Just being a smart alec. 2:28:42PM

**Q Did the Bosettis have a reputation of 2:28:43PM not writing any summonses?**

A They had a reputation of being very 2:28:48PM laid back.

**Q What do you mean by that? 2:28:51PM**

TYREE BACON

A I think that speaks for itself. 2:28:53PM

**Q What about them led to the reputation 2:28:55PM of being very laid back?**

A They were two highly decorated 2:28:58PM emergency service police officers from New York City; and working in Ocean Beach, the environment was a whole lot different than some of the things that they had experienced, so they were laid back.

**Q What were the differences, if you 2:29:14PM know?**

A Well, as an emergency service officer, 2:29:16PM they would often be the first ones in the door facing a heavily armed suspect that was barricaded. Fortunately, in Ocean Beach, that's not what we deal with. We deal with a transient population, a lot of people there that vacation in the summertime.

**Q So what do they do that led to the 2:29:33PM reputation that they were laid back?**

A They were just very easy going.. 2:29:38PM

**Q Did they have a reputation of not 2:29:41PM issuing summonses?**

A That may have been part of it. 2:29:45PM

TYREE BACON

**Q Do you know how many summonses you 2:29:54PM issued in 2007?**

A No idea. 2:29:57PM

**Q Do you know approximately how many? 2:29:58PM**

A No. 2:29:59PM

MR. GOODSTADT: Let's mark this. 2:30:04PM

MR. NOVIKOFF: Bacon 2. 2:30:07PM

(Whereupon, Bates document 5335-37 was 2:30:08PM marked as Bacon Exhibit 2 for identification, as of this date.)

MR. GOODSTADT: I've placed in front 2:30:30PM of Mr. Bacon what's been marked as Bacon 2. It is a three-page exhibit bearing Bates numbers 5335 through 5337. (Handing.)

BY MR. GOODSTADT: 2:30:45PM

**Q Mr. Bacon, do you recognize the 2:30:44PM document that's been marked as Bacon 2?**

A No, never saw it. 2:30:48PM

**Q You never saw this document? 2:30:50PM**

A No. 2:30:52PM

**Q Did you ever speak to George Hesse 2:30:53PM about any yearly performance report?**

A No. 2:30:57PM

**Q It says in the middle of the probably 2:30:59PM**

TYREE BACON

**top third under "general enforcement against crime, quality of life and other violations" -- do you see that section?**

A Yes. 2:31:14PM

**Q The third line down, handwritten line 2:31:15PM down, it says "needs to write more summonses."**

**Do you see that? 2:31:20PM**

A Yes. 2:31:20PM

**Q Do you know what that means? 2:31:21PM**

MR. NOVIKOFF: Objection. 2:31:22PM

A Perhaps I needed to write more 2:31:24PM summonses.

MR. NOVIKOFF: No. If you know, you 2:31:26PM know. If you don't, you don't.

Are you asking him what he believes 2:31:30PM the author of this document meant or --

MR. GOODSTADT: I'm asking if he knows 2:31:35PM what it means.

MR. NOVIKOFF: Objection to the form. 2:31:37PM

You can answer the question. 2:31:38PM

A Sure. No, I'm not sure. 2:31:39PM

**Q Do you know who wrote this document? 2:31:42PM**

A Nope. 2:31:44PM

**Q You don't recognize the handwriting? 2:31:45PM**

**TYREE BACON**

A It says George Hesse, but I didn't see 2:31:47PM
him write it.

**Q Do you recognize this handwriting as 2:31:50PM**
**George Hesse's?**

A No, I don't recognize this handwriting 2:31:52PM
as George Hesse's.

**Q If you look down under the additional 2:31:55PM**
**supervisory comments, it says "needs to complete**
**assigned training."**

**Do you see what that means -- do you 2:32:00PM**
**see that?**

A Yes. 2:32:02PM

**Q Do you know what that means? 2:32:02PM**

A No. 2:32:03PM

**Q And it's your testimony that this was 2:32:06PM**
**never delivered to you, this document?**

MR. NOVIKOFF: Objection. 2:32:09PM

A Correct. 2:32:10PM

**Q Did you ever speak with Chief Paradiso 2:32:20PM**
**about the number of summonses that you issued?**

A No. 2:32:25PM

**Q Did you ever receive an employee 2:32:26PM**
**handbook when you worked for the beach?**

A No. 2:32:30PM

TYREE BACON

**Q Have you ever seen an employee 2:32:35PM**
**handbook for Ocean Beach?**

A Yes. 2:32:39PM

**Q When did you see an employee handbook 2:32:39PM**
**for Ocean Beach?**

A I think I've seen it in the station, 2:32:43PM
maybe posted on a bulletin board somewhere.

**Q Did you ever look at it? 2:32:48PM**

A No. 2:32:49PM

**Q No? I assume you never signed a copy 2:32:50PM**
**of it?**

A I may have. I don't recall. Show it 2:32:55PM
to me, refresh my recollection, and I can give
you a definitive answer.

(Whereupon, Bates document 1-25 was 2:33:05PM
marked as Bacon Exhibit 3 for
identification, as of this date.)

MR. GOODSTADT: I've placed in front 2:33:27PM
of Mr. Bacon what's been marked as Bacon 3.
It's a multiple-page exhibit bearing Bates 1
through 25. (Handing.)

BY MR. GOODSTADT: 2:33:38PM

**Q Mr. Bacon, have you ever seen the 2:33:38PM**
**document that's been marked as Bacon Exhibit 3?**

**TYREE BACON**

MR. NOVIKOFF: I want you to take as 2:33:44PM
little much or as much time as you need to
review the document, if at all, before you
answer the question.

While he's looking, did you mention 2:34:04PM
the Bates numbers?

MR. GOODSTADT: Yeah. 2:34:07PM

MR. NOVIKOFF: Okay. 2:34:07PM

A Yeah, I remember seeing this. Yes. 2:34:11PM

**Q Where did you see this? 2:34:13PM**

A In the police station. 2:34:15PM

**Q Is this the one that you testified to 2:34:16PM**
**a moment ago that was posted on the wall?**

MR. NOVIKOFF: Objection. 2:34:22PM

You can answer. 2:34:22PM

A There was one that was posted on the 2:34:24PM
wall, yes.

**Q That looked like this, or was it 2:34:26PM**
**something different?**

MR. NOVIKOFF: Objection. 2:34:29PM

A A little different than this, similar. 2:34:30PM

**Q What was different about the one on 2:34:33PM**
**the wall and the one that's been marked?**

A The typeset. 2:34:37PM

TYREE BACON

**Q What was different about the one on 2:34:38PM**
**the wall and the one marked as Bacon 3?**

MR. NOVIKOFF: Objection. 2:34:42PM

If you can answer. 2:34:42PM

A Yeah, I'm not quite sure. It just 2:34:44PM
looked a little different.

**Q Was it a different font? 2:34:48PM**

A The typeset on the cover looks a 2:34:50PM
little bit different, yes.

**Q Is it still in the Ocean Beach -- 2:34:55PM**
**strike that.**

**The last time you were at the Ocean 2:34:57PM**
**Beach police station, was it still hanging on**
**the bulletin board?**

A I don't recall. 2:35:02PM

**Q When was the last time you were at the 2:35:03PM**
**police station?**

A Six months ago or better. 2:35:09PM

**Q What was the last tour you worked? 2:35:12PM**

A Probably six months ago or better. 2:35:14PM

**Q Are you still employed by Ocean Beach? 2:35:16PM**

A Yes. 2:35:18PM

**Q And what's your current title? 2:35:19PM**

A Part-time police officer. 2:35:20PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON
**Q Have you worked any tours since Labor Day of '08?** 2:35:25PM
A I may have worked one or two. 2:35:30PM
**Q Are you collecting unemployment?** 2:35:33PM
A No. 2:35:35PM
**Q If you look at page that bears Bates No. 00004.** 2:35:37PM
A (Witness complies.) 2:35:44PM
**Q Do you see that page?** 2:35:54PM
A Yes. 2:35:55PM
**Q Do you recall whether you ever signed this page or a copy of this page?** 2:35:55PM
A I don't recall. 2:36:00PM
**Q And do you recall ever receiving an evaluation, written evaluation of your performance?** 2:36:03PM
A None that I've ever reviewed, no. 2:36:10PM
**Q Did you ever receive any verbal evaluations of your performance?** 2:36:11PM
MR. NOVIKOFF: Objection. Form. 2:36:16PM
A No.. 2:36:17PM
**Q If you look at the page that's been marked as 00010.** 2:36:38PM
A (Witness complies.) 2:36:45PM

TYREE BACON
**Q Under the employee performance appraisal.** 2:36:50PM
**Do you see that?** 2:36:53PM
A Yes. 2:36:57PM
**Q Okay. It says, "Newly hired employees may receive performance appraisals after 30 days."** 2:36:57PM
**Do you see that?** 2:37:03PM
A Yes. 2:37:04PM
**Q Did you receive any performance appraisal after 30 days of employment either on your first stint there or your second stint there?** 2:37:05PM
A None that I recall. 2:37:12PM
**Q And it says, "and a more formal evaluation at the end of six months."** 2:37:13PM
**Do you see that?** 2:37:17PM
A Yes. 2:37:17PM
**Q Did you receive a formal evaluation at the end of six months either in your first stint there or when you returned in '99?** 2:37:18PM
A None that I recall. 2:37:25PM
**Q It says, "Thereafter, all employees may receive a performance appraisal annually."** 2:37:25PM

**TYREE BACON**
**Do you see that?** 2:37:28PM
A Yes. 2:37:29PM
**Q Do you recall ever receiving an annual performance appraisal?** 2:37:29PM
A Nope. 2:37:33PM
**Q Did you receive raises each year that you worked at Ocean Beach?** 2:37:39PM
A Yes. 2:37:42PM
MR. GOODSTADT: Just mark that, please. 2:37:50PM
(Whereupon, Bates document 5600 was marked as Bacon Exhibit 4 for identification, as of this date.) 2:37:51PM
MR. GOODSTADT: I've placed in front of Bacon what's been marked as Bacon 4. It is a one-page exhibit bearing Bates 5600. (Handing.) 2:38:13PM
BY MR. GOODSTADT: 2:38:28PM
**Q Mr. Bacon, have you ever seen the document marked as Bacon 4?** 2:38:28PM
A No, I haven't. 2:38:29PM
**Q I represent to you that it's a document that was produced by counsel representing the beach in this matter. I just** 2:38:29PM

**TYREE BACON**
**want to look down. If you look down the dates -- do you see the dates column?**
A Yes. 2:38:44PM
**Q And then next to it is the position and classification.** 2:38:44PM
**Do you see that?** 2:38:47PM
A Yes. 2:38:48PM
**Q Is that position and classification accurate for those dates?** 2:38:48PM
MR.. NOVIKOFF: Objection. 2:38:51PM
A Rephrase that. 2:38:53PM
**Q Are those positions and classifications listed next to the dates accurate for the corresponding dates?** 2:38:54PM
MR. NOVIKOFF: Objection. 2:39:01PM
You can answer, if you can. 2:39:07PM
A Yeah. Yes and no. 2:39:09PM
**Q What's not accurate?** 2:39:11PM
A Well, leave of absence, I wasn't working for them at that time when they have it listed as leave of absence. I worked for various other agencies during that time frame, all within Suffolk County, you know. 2:39:12PM
**Q So you weren't on a leave of absence?** 2:39:25PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A No. 2:39:28PM

**Q Your employment actually ended in '93 2:39:28PM and then you became reemployed in '99?**

A With respect to the Village of Ocean 2:39:32PM Beach, yes..

**Q Right. That's what -- I'm just 2:39:35PM focusing on that right now.**

A Yes. 2:39:39PM

**Q Are the rates of pay -- well, strike 2:39:39PM that.**

**Other than for the use of the verbiage 2:39:42PM "leave of absence," is there anything else not accurate in the position and classification column?**

MR. NOVIKOFF: Note my objection. 2:39:51PM

You can answer. 2:39:52PM

A The salaries look about right. I'm 2:39:54PM not 100 percent certain.

**Q I was asking whether anything was not 2:40:01PM accurate about the position and classification column other than for the use of leave of absence?**

MR. NOVIKOFF: Note my objection. 2:40:09PM

You can answer. 2:40:11PM

TYREE BACON

BY MR. GOODSTADT: 2:40:11PM

**Q I'm just focused on the one column. 2:40:13PM**

A Yeah. Other than the leave of 2:40:15PM absence, because I wasn't working for them then.

**Q Okay. But is there anything else, 2:40:19PM other than for the leave of absence, that's not accurate?**

A No. Everything else, that I was 2:40:23PM employed by them as a police officer, is accurate.

**Q Now, the rates of pay, you testified 2:40:28PM they look about right, but you're not sure if they're accurate?**

A Correct. 2:40:33PM

**Q But there's nothing there that leads 2:40:33PM you to believe that that's not the accurate number, is there?**

MR. NOVIKOFF: Objection. 2:40:39PM

A No, there's nothing that would lead me 2:40:40PM to believe it's not accurate, correct.

**Q And do you see you were given a raise 2:40:45PM every single year that you worked there?**

A Yes. 2:40:49PM

**Q Now, that's accurate, you received a 2:40:49PM**

TYREE BACON

**raise every single year?**

A Yes. 2:40:53PM

**Q Was the raise that you received 2:40:54PM performance based or did everybody receive the same raise?**

MR. NOVIKOFF: Objection. 2:41:00PM

To the extent you know. 2:41:00PM

A I can't -- I can't, you know, explain 2:41:02PM for the other officers. I mean, myself, I received a raise every year, and I don't know if it was performance based or not.

**Q Do you know who was in charge of 2:41:12PM deciding that you should get a raise each of those years?**

MR. NOVIKOFF: Objection. 2:41:16PM

A No, I don't. 2:41:17PM

**Q Do you know the process behind the 2:41:18PM decision of whether or not to give you a raise each year?**

MR. NOVIKOFF: Objection. 2:41:24PM

A No, I don't. 2:41:25PM

**Q Do you know the process behind 2:41:26PM determining how much raise to give you each year?**

TYREE BACON

MR. NOVIKOFF: Objection. Form. 2:41:29PM

A I wasn't privy to any of that 2:41:30PM information.

**Q Who communicated to you that you were 2:41:32PM getting a raise?**

MR. NOVIKOFF: Objection. Form. 2:41:35PM

A We usually hear the beginning of July 2:41:37PM we were getting a raise from the chief, the sergeant, whoever it was; and on our next paycheck, there it was, we got a raise.

**Q When you say the beginning of the 2:41:48PM year, what are you referring to?**

A The beginning of the summer season. 2:41:51PM

**Q Was that the preseason meeting? 2:41:52PM**

A I don't recall. 2:41:54PM

**Q Do you know what I'm saying when I say 2:41:54PM a preseason meeting?**

A Yes. 2:41:58PM

**Q What's a preseason meeting? 2:41:58PM**

A It was a team meeting, where they get 2:42:00PM all the officers together to go over, make sure paperwork was right. Basically, it was a team meeting, just what the expectations were for the up and coming year.

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q What do you mean make sure paperwork was right?** 2:42:14PM

A Make sure people had updated, what is it, W-2s and W-4s, tax paperwork. If you have pay statements, whether you were claiming one or two dependents, stuff like that. 2:42:17PM

**Q Do you know whether anybody voted on the pay raises?** 2:42:32PM

MR. NOVIKOFF: Objection. 2:42:36PM

A Don't know. 2:42:37PM

**Q Did you ever collect unemployment in between seasons?** 2:42:39PM

A No, I did not. 2:42:42PM

**Q Did you ever apply for unemployment in between seasons?** 2:42:43PM

A No. 2:42:46PM

**Q That was because you had a full-time job?** 2:42:46PM

A Correct. 2:42:49PM

**Q Did you have to reapply for a position each season?** 2:42:54PM

A I did not. 2:42:57PM

**Q So did you remain employed throughout the year?** 2:43:01PM

TYREE BACON

MR. NOVIKOFF: Objection. 2:43:04PM

A Yes. My status was part-time police officer. 2:43:05PM

**Q So it's your understanding that your status was part-time police officer, meaning that you can work up to 20 hours during the whole year; is that your understanding?** 2:43:07PM

A Correct. 2:43:20PM

**Q And is it your understanding that if you were a part-time police officer, that you didn't have to do anything to be, quote-unquote, rehired each season?** 2:43:20PM

MR. NOVIKOFF: Objection. 2:43:29PM

BY MR. GOODSTADT: 2:43:29PM

**Q Is that correct?** 2:43:30PM

A I'm not sure how that all worked out. 2:43:30PM

**Q Well, did you fill out any paperwork to be rehired?** 2:43:33PM

A No, I didn't have to reapply for the position every year. No, I did not. 2:43:37PM

**Q Were you ever notified that we're rehiring you?** 2:43:41PM

A Yes. 2:43:44PM

**Q How were you notified that you were** 2:43:44PM

TYREE BACON

**being rehired?**

MR. NOVIKOFF: I'm sorry, what's the question? I didn't catch the first few words. 2:43:49PM

MR. GOODSTADT: Were you ever notified that you were rehired, and he said "yes." 2:43:54PM

BY MR. GOODSTADT: 2:43:54PM

**Q Other than for the rehiring in 1999, were you notified each year that you were rehired?** 2:43:57PM

A Prior to that and after that, yes, but there was a break in service where I wasn't invited back. 2:44:02PM

**Q I'm not asking about whether you were invited back. I'm talking about the years that you came back. Were you notified you were rehired?** 2:44:10PM

A No. We just -- you came to the preseason meeting. 2:44:16PM

**Q So just so I'm clear for the record. Each year you came to the preseason meeting, you didn't have to fill out any new paperwork for the season, you just had to make sure your tax forms were up to date; is that correct?** 2:44:24PM

TYREE BACON

A Correct. 2:44:35PM

**Q You didn't receive any notice that said, you know, anything in sum and substance, congratulations, you've been rehired by Ocean Beach for this season or you're being hired by Ocean Beach for this season?** 2:44:35PM

A No, I never received that. 2:44:45PM

**Q How about verbally? Did anybody ever tell you verbally tell you in sum or substance, congratulations, you're being rehired for the season or you're being hired for the season?** 2:44:47PM

A No. 2:44:54PM

**Q Other than for '99?** 2:44:54PM

A No. 2:44:57PM

MR. GOODSTADT: Why don't we take a break. 2:45:02PM

THE VIDEOGRAPHER: The time is 2:46. We are going off the record. 2:45:04PM

(Whereupon, a discussion was held off the record.) 2:49:36PM

THE VIDEOGRAPHER: The time is 2:54. We are back on the record. 2:53:22PM

BY MR. GOODSTADT: 2:53:26PM

**Q Mr. Bacon, just so I'm clear, other** 2:53:28PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**than for the polygraph that you failed in Riverhead and then the one that you subsequently passed in '05 for Ocean Beach, have you taken any other polygraphs for any other jobs that you applied for?**

MR. NOVIKOFF: Objection. 2:53:44PM

A I don't recall. 2:53:45PM

**Q Have you ever seen a job description 2:53:50PM or duty classification for a police officer in Ocean Beach?**

A No. 2:53:58PM

MR. GOODSTADT: Just mark this. 2:54:15PM

(Whereupon, Police Officer 2:54:17PM Part-Time/Seasonal was marked as Bacon Exhibit 5 for identification, as of this date.)

MR. GOODSTADT: I've placed in front 2:54:50PM of Mr. Bacon what's been marked as Bacon Exhibit 5. It is a two-page exhibit entitled "Police Officer Part-Time/Seasonal." (Handing.)

BY MR. GOODSTADT: 2:55:06PM

**Q Mr. Bacon, have you ever seen this 2:55:05PM document?**

TYREE BACON

A I don't recall. 2:55:08PM

**Q You don't recall one way or the other? 2:55:08PM**

A Correct. 2:55:11PM

**Q Did you ever go on Suffolk County 2:55:12PM civil service's website to look at the job description of a police officer part-time or a police officer seasonal?**

MR. NOVIKOFF: Objection. 2:55:20PM

A I have not. 2:55:21PM

**Q If you go back to Bacon 1. 2:55:32PM**

MR. NOVIKOFF: It's in that pile. 2:55:40PM

A (Witness complies.) 2:55:43PM

**Q If you look at Page 7367. 2:55:47PM**

A Don't have it in this package. 2:56:08PM

MR. NOVIKOFF: No, the bottom, 7367. 2:56:11PM

MR. GOODSTADT: Is it missing a page 2:56:13PM there?

MR. NOVIKOFF: Then it's 4, then 2:56:15PM it's 5.

THE WITNESS: 5, and then it jumps 2:56:17PM to 9.

MR. NOVIKOFF: I have it in mine. 2:56:19PM

MR.. CONNOLLY: Do you want to mark 2:56:29PM another one?

TYREE BACON

MR. NOVIKOFF: Yeah, let's mark 2:56:30PM another one.

MR. GOODSTADT: Are you okay with 2:56:34PM swapping it in?

MR. NOVIKOFF: I'd prefer to mark it. 2:56:36PM

MR. GOODSTADT: You'd prefer to mark 2:56:39PM it?

MR. NOVIKOFF: Yeah, mark it. 2:56:40PM

MR. GOODSTADT: I'd like to mark it 2:56:40PM Bacon 6.

MR. NOVIKOFF: I'll just make a note 2:56:43PM you'll get us a copy of Bacon 6?

MR. GOODSTADT: Okay. I think you 2:56:47PM have Bacon 6, right?

MR. NOVIKOFF: No. You're remarking a 2:56:49PM new document. Do you have enough copies for everybody?

MR. GOODSTADT: It's the exact same 2:56:52PM thing you have.

MR. CONNOLLY: With the cover page 2:56:55PM marked.

(Whereupon, Police Candidate 2:57:02PM Application Packet was marked as Bacon Exhibit 6 for identification, as of this

TYREE BACON

date.)

A Page number again? 2:57:29PM

**Q 7367. 2:57:32PM**

A Okay. 2:57:35PM

**Q Have you ever seen this description of 2:57:36PM an entry-level police officer?**

A Yes. 2:57:40PM

**Q Okay. When was the first time you saw 2:57:41PM this description?**

A Probably when I got my packet. 2:57:45PM

**Q Was it in the packet that you had 2:57:46PM testified to that you filled out the first time around?**

MR. NOVIKOFF: Objection. 2:57:50PM

A I don't recall. 2:57:51PM

**Q Okay. And is the -- as an Ocean Beach 2:57:52PM police officer, you had the authority to arrest; is that correct?**

A Yes.. 2:58:04PM

**Q And how far jurisdictionally did your 2:58:07PM authority to arrest extend?**

MR. NOVIKOFF: Objection. 2:58:12PM

You can answer. 2:58:13PM

A Throughout New York State. 2:58:14PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Is that for felonies and misdemeanors? 2:58:17PM**
A Correct. 2:58:21PM
**Q How about for violations? 2:58:22PM**
A That was within my geographic area of 2:58:23PM employment, which would've been the confines of Ocean Beach.
**Q So that the extent of your authority 2:58:31PM to issue a summons was within the borders of Ocean Beach?**
MR. NOVIKOFF: Objection. 2:58:42PM
BY MR. GOODSTADT: 2:58:45PM
**Q Is that correct? 2:58:45PM**
A Correct. 2:58:46PM
**Q Have you ever pulled over an 2:58:50PM automobile outside of Ocean Beach?**
A No. 2:58:56PM
**Q Do you recall ever stopping a vehicle 2:59:09PM in Islip?**
A Yes. 2:59:16PM
MR. GOODSTADT: Do you need to take a 2:59:22PM break?
MR. NOVIKOFF: No, that's fine. 2:59:24PM
BY MR. GOODSTADT: 2:59:25PM
**Q How did you -- when you pulled over 2:59:27PM**

**TYREE BACON**

**the vehicle in Islip, when was that?**
A A couple of years ago, after getting 2:59:33PM hit with a paintball.
**Q Do you recall what time of the day it 2:59:38PM was?**
A It was at night. I was on my way into 2:59:39PM work.
**Q Were you wearing your uniform? 2:59:42PM**
A I was. 2:59:44PM
**Q And how did you go about pulling over 2:59:44PM the vehicle?**
A Actually, they stopped at a 2:59:47PM stoplight -- excuse me, a stop sign, and I got out of my car and asked them what was going on, and that was it.
**Q Did you identify yourself as a police 2:59:55PM officer?**
A I may have. I was certainly in 2:59:57PM uniform.
**Q But did you say I'm a police officer? 3:00:00PM**
A No, I didn't say I'm a police officer. 3:00:02PM
**Q And what did you say to the person in 3:00:09PM the car or the people in the car?**
A You guys got a paintball gun? And 3:00:13PM

TYREE BACON

they got out the car, and no. The lights were on, I looked in, and that was it.
**Q Did you have your firearm on you at 3:00:20PM the time?**
A I did. 3:00:24PM
**Q Why did you look in their car? 3:00:25PM**
A I wanted to see if they had a 3:00:26PM paintball gun.
**Q Were you pulling them over in your 3:00:27PM capacity as a police officer?**
A No, I wasn't. 3:00:29PM
**Q So you were searching in their car in 3:00:30PM the capacity as a civilian while you were wearing a uniform and carrying a weapon; is that correct?**
MR. NOVIKOFF: Objection to the 3:00:39PM characterization.
You can answer the question. 3:00:40PM
A No. I was not searching their car. 3:00:41PM They had exited the vehicle. I never went into the vehicle. The interior light was on, and I was in a position to observe. I didn't go looking under the seats or in the glove compartment or the trunk.

TYREE BACON

**Q Did you ask them to exit the vehicle? 3:00:56PM**
MR. NOVIKOFF: What's that? 3:00:58PM
MR. GOODSTADT: Did you ask them to 3:00:59PM exit the vehicle.
A I don't recall. 3:01:01PM
**Q You don't recall one way or the other? 3:01:01PM**
A I don't remember. 3:01:04PM
**Q So you may have asked them to exit? 3:01:05PM**
MR. NOVIKOFF: Objection. 3:01:06PM
A I may have. 3:01:07PM
**Q Would that have been in your capacity 3:01:08PM as a police officer?**
MR. NOVIKOFF: Objection. 3:01:10PM
A Yes. 3:01:11PM
**Q Okay. Did you report the incident to 3:01:12PM anyone in Ocean Beach?**
A Yes. 3:01:20PM
**Q How come? 3:01:20PM**
A Just to cover myself. 3:01:23PM
**Q What do you mean by that? 3:01:25PM**
A I did take action, I was in uniform, 3:01:26PM so I felt it was appropriate to notify supervision.
**Q You took police action? 3:01:32PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

**TYREE BACON**

MR. NOVIKOFF: Objection. 3:01:34PM

A They exited the vehicle based on me being in the union, so that could be construed as taking police action, yes. 3:01:35PM

**Q Well, did you think you were taking police action? 3:01:42PM**

MR. NOVIKOFF: Objection. 3:01:45PM

A It could've been construed as such, yes. 3:01:47PM

**Q I'm asking whether you construed it. I don't care what other people may have construed it as. 3:01:50PM**

A Yes, I did construe that as that. 3:01:55PM

**Q Did you have the authority to take police action outside of Ocean Beach? 3:01:57PM**

A Yes. 3:02:01PM

**Q On what grounds? 3:02:04PM**

A Well, had there been a paintball gun in the car, I would've arrested them for possession of a firearm, since they did fire a paintball. And under the penal law, that fits the bill for a loaded weapon. 3:02:05PM

MR. GOODSTADT: Mark that, please. 3:02:17PM

(Whereupon, Bates document 6822 was 3:02:19PM

TYREE BACON

marked as Bacon Exhibit 7 for identification, as of this date.)

MR. GOODSTADT: I've placed in front of Mr. Bacon what's been marked as Bacon Exhibit 7. It's a one-page exhibit bearing Bates No. 6822. (Handing.) 3:02:37PM

BY MR. GOODSTADT: 3:02:49PM

**Q Is this the notification that you testified to to your supervisor? 3:02:49PM**

A Yes. 3:02:53PM

**Q Did you ever speak to Chief Hesse about this? 3:02:53PM**

MR. NOVIKOFF: Other than -- 3:02:58PM

MR. GOODSTADT: About this incident. 3:02:59PM

MR. NOVIKOFF: Other than this document? 3:03:01PM

MR. GOODSTADT: Yes. 3:03:03PM

BY MR.. GOODSTADT: 3:03:03PM

**Q Did you ever verbally speak to him about it? 3:03:04PM**

A I think after he received this, he asked me what happened and I informed him. 3:03:06PM

**Q Did you report it to Suffolk County? 3:03:11PM**

A I stopped by the firehouse, and it was 3:03:13PM

TYREE BACON

near tour change; and I notified the ongoing officer, but no report was taken.

**Q What do you mean you reported it to the ongoing officer? 3:03:21PM**

A In Suffolk County, they don't have precincts; they have relief points. The relief point was around the corner from where this happened. 3:03:26PM

So after that happened, I went to the relief point, where I knew they would be changing. We relieve at the lighthouse, okay? And I spoke to the officer there, let him know what's going on, and that was it. 3:03:31PM

**Q You didn't submit anything in writing? 3:03:44PM**

A No. 3:03:46PM

**Q Do you know if the officer took any notes of what you told him happened? 3:03:48PM**

A I don't recall. 3:03:51PM

**Q How come you left that part out of your memo? 3:03:52PM**

MR. NOVIKOFF: Objection. 3:03:56PM

A Didn't think it was relevant because no official report was drafted. 3:03:56PM

**Q Why didn't you call 911 when you got 3:04:00PM**

**TYREE BACON**

**hit by a paintball?**

MR. NOVIKOFF: Let him finish the question. Give me a chance to object, and you can answer that. 3:04:06PM

Is the question complete, Andrew? 3:04:14PM

MR. GOODSTADT: Yep. 3:04:16PM

MR. NOVIKOFF: Can you read the question back? 3:04:17PM

BY MR. GOODSTADT: 3:04:19PM

**Q Why didn't you call 911 when you got hit by a paintball? 3:04:20PM**

MR. NOVIKOFF: Objection to the form. I don't think he said he got hit by a paintball. 3:04:23PM

BY MR. GOODSTADT: 3:04:27PM

**Q Your car got hit by a paintball? 3:04:28PM**

MR. NOVIKOFF: Objection to the form of the question. 3:04:31PM

A Because I had eyes on the vehicle that I thought had done it. They turned, I followed them, they stopped at the light. I spoke to them and spoke to a police officer, which all of that was accomplished in less time than calling 911 and waiting for a sector car to arrive. 3:04:31PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Did you take down the plate of the vehicle? 3:04:51PM**
A I don't recall. 3:04:54PM
**Q Did you report the plate to anyone? 3:04:56PM**
A I'm sure if I did, I gave it to the Suffolk officer. 3:04:59PM
**Q Do you recall the officer's name who you spoke with? 3:05:07PM**
A No, I don't. 3:05:10PM
**Q What time was your tour that day? 3:05:14PM**
A Midnight. 3:05:19PM
**Q And what time did the incident happen? 3:05:19PM**
A Probably around 11:20. 3:05:25PM
**Q So is it your testimony that you got hit by a paintball, your car got hit by a paintball at 11:20, you pulled over this car, you exited the vehicle, you looked for a gun, a paintball gun, everyone got back in the car, then you went and reported it at the firehouse to the outgoing officer and still made it on time to your midnight tour? 3:05:26PM**
MR. NOVIKOFF: Objection. 3:05:50PM
You can answer. 3:05:50PM
A I may have been a few minutes late. I 3:05:51PM

TYREE BACON

think the whole interaction from the time I got hit to the time I left speaking to the officer was less than 10 minutes.
**Q So you don't recall whether you were late or not? 3:06:02PM**
A No, I don't. 3:06:05PM
(Whereupon, a discussion was held off the record.) 3:06:22PM
BY MR.. GOODSTADT: 3:06:28PM
**Q Before, we went over some of your arrests and the disposition of those arrests. 3:06:28PM**
**Do you recall doing that? 3:06:35PM**
MR. NOVIKOFF: Objection. 3:06:37PM
A Sorry? 3:06:38PM
**Q Do you recall going over your arrests and the disposition of those arrests before? 3:06:39PM**
A Yes. 3:06:43PM
MR. GOODSTADT: Let's mark that. 3:06:43PM
(Whereupon, Bates document 7410 was marked as Bacon Exhibit 8 for identification, as of this date.) 3:06:44PM
MR. GOODSTADT: I've placed in front of Mr. Bacon what's been marked as Bacon Exhibit 8. It's a one-page exhibit bearing 3:07:13PM

TYREE BACON

Bates No. 7410. (Handing.)
BY MR. GOODSTADT: 3:07:22PM
**Q Mr. Bacon, have you ever seen this document? 3:07:21PM**
A I have. 3:07:25PM
**Q Which incident is this document in relation to? 3:07:26PM**
A None of those that were mentioned. 3:07:30PM
**Q Was this a separate incident in which you were arrested? 3:07:33PM**
A No. This wasn't an arrest. 3:07:36PM
**Q What was this? 3:07:38PM**
A This was a summons. 3:07:39PM
**Q What was the summons for? 3:07:41PM**
A Being in the park after hours. 3:07:43PM
**Q Do you recall when you received that summons? 3:07:46PM**
A Sometime in 1984. 3:07:51PM
**Q Do you recall why you were in the park after hours? 3:07:53PM**
A Yeah. 3:07:56PM
**Q Why were you in the park after hours? 3:07:56PM**
A I was getting a blow job from my girlfriend. 3:07:58PM

TYREE BACON

**Q And you got a ticket? 3:08:01PM**
A Yes. 3:08:02PM
**Q Other than for this summons, did you ever receive any other summonses other than for traffic-related summons? 3:08:02PM**
A Traffic summonses. No, I don't recall getting any others. Parking, traffic. 3:08:11PM
MR. GOODSTADT: Mark that. 3:08:53PM
(Whereupon, Bates document 7418-7423 was marked as Bacon Exhibit 9 for identification, as of this date.) 3:08:54PM
MR. GOODSTADT: I've placed in front of Mr. Bacon what's been marked as Bacon Exhibit 9.. It's a multiple-page exhibit bearing Bates numbers 7418 through 7423. (Handing.) 3:09:16PM
BY MR. GOODSTADT: 3:09:28PM
**Q Mr. Bacon, I ask you to turn to 7419. 3:09:28PM**
A (Witness complies.) Yes. 3:09:32PM
**Q If you look in the arrest information -- 3:09:37PM**
A Uh-huh. 3:09:41PM
**Q -- section. 3:09:42PM**
A Yes. 3:09:43PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q You see the first one, which shows an 3:09:43PM arrest for assault with intent to cause physical injury.**

**Do you see that? 3:09:49PM**

A Correct, yes. 3:09:50PM

**Q What incident was that? Did you 3:09:51PM testify to the incident already?**

A Yes. That was the 1986 incident at 3:09:54PM Woodhull Hospital.

**Q Then the second is reckless 3:09:58PM endangerment second.**

**Do you see that? 3:10:00PM**

A Yes. That was all part of the same 3:10:03PM arrest.

**Q The next one is invalid use of a 3:10:04PM credit card with intent to fraud.**

**Do you see that? 3:10:08PM**

A Yeah. 3:10:09PM

**Q And I asked you about that before, and 3:10:09PM you said it never happened. Does this refresh your recollection as to --**

MR. NOVIKOFF: Objection to the 3:10:14PM characterization of the testimony.

You can answer. 3:10:17PM

TYREE BACON

A Yes. No, that never happened. There 3:10:18PM was -- I don't even know how that got there. The OGA below that, that was definitely part and parcel of the arrest.

**Q Of which arrest? 3:10:27PM**

A The 1986 on July the 8th. 3:10:28PM

**Q Arrest for what? 3:10:33PM**

A The assault, reckless endangerment, 3:10:34PM OGA, the parking incident at Woodhull Hospital.

**Q So three of these deal with the 3:10:43PM Woodhull Hospital?**

A Yes. 3:10:45PM

**Q And then the fourth one says invalid 3:10:45PM use of a credit card with intent to fraud. You don't know what that is referring to?**

A That has nothing to do with me, never 3:10:50PM did. Nope.

**Q Do you know what this document is? 3:10:53PM**

A I'm guessing this is an AISI printout. 3:10:55PM

**Q What do you mean by that? What AISI? 3:11:00PM**

A When you get your fingerprints run. 3:11:01PM

**Q Have you ever seen one of these in the 3:11:04PM past?**

A Yes. 3:11:07PM

TYREE BACON

MR. NOVIKOFF: You mean of his or in 3:11:08PM general?

MR. GOODSTADT: Just generally, and 3:11:10PM AISI printout.

A Yes. 3:11:12PM

**Q And where does one get to get a 3:11:12PM document that's marked as Bacon 9?**

A Well, you get fingerprinted, and they 3:11:18PM turn around and submit them to Albany, the FBI. This is the report that comes back when somebody is being investigated for a position or if it's an arrest.

**Q What do you mean, or if it's an 3:11:32PM arrest?**

A If somebody gets arrested and they get 3:11:35PM fingerprinted. And when their prints come back from Albany, you get the same kind of an AISI printout that gets attached to the criminal court complaint.

**Q Have you ever ran this report on 3:11:47PM anybody else?**

A No, I have not. 3:11:50PM

**Q Have you ever reviewed this report as 3:11:51PM part of any background investigation on anyone**

**TYREE BACON**

**else?**

A No. 3:11:55PM

**Q When have you seen these in the past? 3:11:57PM**

A Because I work as a court officer. 3:11:59PM It's attached to every single court case that comes into criminal court.

**Q So that's where you've seen them? 3:12:05PM**

A Yes. 3:12:07PM

**Q Are you currently married? 3:12:20PM**

A Yes. 3:12:21PM

**Q How long have you been married for to 3:12:21PM your current wife?**

A Since 2005. 3:12:25PM

**Q And what's your current wife's name? 3:12:27PM**

A Caroline. 3:12:30PM

**Q Do you have any children with 3:12:34PM Caroline?**

A I do. 3:12:36PM

**Q Just tell me the ages of your 3:12:36PM children.**

A Two. 3:12:39PM

**Q Is it a boy or girl? 3:12:41PM**

A Girl. 3:12:42PM

**Q And where is your wife employed? 3:12:49PM**

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

A City of New York Police Department. 3:12:51PM
**Q She's a police officer in New York City? 3:12:54PM**
A Yes.. 3:12:57PM
**Q What precinct? 3:12:57PM**
A Sixth precinct. 3:12:58PM
**Q Have you been married prior to your marriage to Caroline? 3:13:01PM**
A Yes. 3:13:05PM
**Q I believe you testified to a divorce before, correct? 3:13:05PM**
A Yes. 3:13:08PM
**Q How many times have you been married prior to Caroline? 3:13:09PM**
A Twice. 3:13:11PM
**Q And when was the first time you were married? 3:13:12PM**
A That was in 1996. 3:13:14PM
**Q And that ended -- and who was your wife at the time? 3:13:15PM**
A That was Jennifer Monroe. 3:13:18PM
**Q And did she sue you for divorce? 3:13:21PM**
A Yes. We already went through that. 3:13:25PM
**Q That was the one you testified to before? 3:13:28PM**

TYREE BACON

A Correct. 3:13:30PM
**Q The second wife, what was her name? 3:13:33PM**
A Susan Shields. 3:13:35PM
**Q And how did that marriage end? 3:13:37PM**
A In divorce. 3:13:39PM
**Q Did she sue you for divorce? 3:13:40PM**
A Yes. 3:13:42PM
**Q Was there any proceeding relating to that divorce? 3:13:42PM**
A No. 3:13:45PM
**Q Was that an amicable divorce? 3:13:46PM**
A Yes. 3:13:48PM
**Q Did you have any children with Jennifer? 3:13:49PM**
A No. 3:13:51PM
**Q Did you have any children with Susan? 3:13:51PM**
A No. 3:13:53PM
**Q And you served in the military, correct? 3:13:58PM**
A Yes. 3:14:01PM
**Q And you recently did a tour in Iraq? 3:14:01PM**
A Yes. 3:14:04PM
**Q What were the dates of that tour? 3:14:04PM**

TYREE BACON

A From January of '08 through -- I got back in May, but I was still on orders through June of '08. 3:14:06PM
**Q So January '08 through May or June of '08? 3:14:15PM**
A May, June of '08, correct. 3:14:19PM
**Q Have you gone to Iraq before that? 3:14:24PM**
A No. 3:14:26PM
**Q Had you had any active tour of duty prior to that? 3:14:26PM**
A Yes. 3:14:30PM
**Q Okay. Where were your other active tours of duty? 3:14:30PM**
A I got activated, and I was stationed at McGuire Air Force base for a year prior after 9-11. I did a couple of weeks in Kuwait. 3:14:33PM
**Q Let's just start with McGuire Air Force Base. What were the dates of McGuire Air Force Base? 3:14:44PM**
A October of '01 through October of '02. 3:14:50PM
**Q Okay. And then you went to Kuwait? 3:14:53PM**
A Yes. 3:14:57PM
**Q How long were you in Kuwait for? 3:14:58PM**
A Less than a month. 3:15:00PM

TYREE BACON

**Q And that was in October of '02, you were -- 3:15:01PM**
A No, no. Kuwait was 2000 something. It was the in the summer of 2000. 3:15:04PM
**Q So it was prior to McGuire Air Force Base? 3:15:09PM**
A Yes. 3:15:13PM
**Q So it was prior to September 11th? 3:15:13PM**
A Yes. 3:15:15PM
**Q And were you stationed anywhere other than for Iraq, McGuire Air Force base or Kuwait? 3:15:17PM**
A We did our two-week annual tour, and we were at various bases. I've been to the Rhein-Main Air Force Base in Germany. I've in Barksdale Air Force base in Louisiana. 3:15:24PM
**Q When were those tours? 3:15:39PM**
A I have no -- I don't even remember. 3:15:40PM
**Q What year? 3:15:42PM**
A Between 1987 and 2000. 3:15:44PM
**Q Okay. Were you stationed anywhere else? 3:15:49PM**
A A bunch of different places for two weeks of training here and there. I don't recall them all. 3:15:56PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

**Q Any -- other than for Iraq, were there 3:16:01PM any tours that you did after '02?**

A No -- annual training. And where were 3:16:09PM we for that? Kansas. Wichita Falls, Kansas, a couple of other places. I just don't recall.

**Q Where in Iraq were you? 3:16:25PM**

A Camp Cooke, up north. 3:16:27PM

**Q And what was your position there? 3:16:29PM**

A Assistant fire chief. 3:16:31PM

**Q What arm of the military were you in? 3:16:38PM**

A Air Force reserves. 3:16:41PM

**Q Did you have access to the Internet 3:16:47PM when you were over there?**

A Yes. 3:16:51PM

**Q Did you ever E-mail from over there? 3:16:54PM**

A Yes.. 3:16:56PM

**Q Did you ever E-mail anyone at Ocean 3:16:56PM Beach from over there, anyone who worked at Ocean Beach, employed by Ocean Beach?**

A No, I didn't. 3:17:03PM

**Q Did you ever E-mail any former 3:17:04PM employees of Ocean Beach from over there?**

A No. 3:17:08PM

**Q Did you ever read -- are you aware of 3:17:09PM**

**TYREE BACON**

**a blog with respect to the Ocean Beach Police Department?**

A Yes. 3:17:14PM

**Q Did you read the blog at all from over 3:17:17PM there?**

A No, I did not. 3:17:19PM

**Q You never logged on to the blog? 3:17:20PM**

A No. When we were over there, there 3:17:22PM was very, very restricted E-mail access. You had a government E-mail account. And I could send E-mail home to my wife, I could access my online bill pay, I could send E-mails to another DOD computer, but that was it. It was very, very limited, very restricted.

**Q Other than that limited or restricted 3:17:43PM E-mail access, did you have limited Internet access as well?**

A Yes. 3:17:46PM

**Q Were part of the limitations not 3:17:51PM allowing you to log on to the blog? Were you restricted from logging on to the blog?**

A There were websites you couldn't 3:17:55PM access at all.

**Q Was that one of the websites? 3:17:59PM**

**TYREE BACON**

MR. NOVIKOFF: Objection. 3:18:00PM

A I don't recall. There were more sites 3:18:01PM that you couldn't access than you could.

**Q What's the website of the blog that 3:18:06PM you're testifying about?**

A It was LI politics. 3:18:11PM

MR. NOVIKOFF: Are you sure or are you 3:18:14PM guessing?

THE WITNESS: No, I'm not certain. 3:18:16PM

MR. NOVIKOFF: Okay. 3:18:18PM

MR. GOODSTADT: Why don't we take a 3:18:19PM couple-minute break.

THE VIDEOGRAPHER: The time is 3:19. 3:18:31PM We're off the record.

(Whereupon, a discussion was held off 3:18:36PM the record.)

THE VIDEOGRAPHER: The time is 3:22. 3:21:13PM We are back on the record.

MR. GOODSTADT: It's now 3:22. In 3:21:17PM light of scheduling issues that have come up, it's become apparent that Mr. Bacon is not going to have his deposition completed today. All parties have agreed to resume and the witness has agreed to resume the

TYREE BACON

deposition at a later time to be agreed upon by counsel and the witness based on their schedules.

MR. NOVIKOFF: But you're going to 3:21:38PM continue.

MR. GOODSTADT: I'm going to continue 3:21:40PM mine and then you have your time.

MR. NOVIKOFF: Right. Right. As long 3:21:42PM as everyone is able to continue.. Fine. Great.

THE WITNESS: I just have one 3:21:47PM question? If you could get another subpoena, whatever, to him so I could bring it to work. They just need something for me to report on whatever days you guys --

MR. GOODSTADT: We'll send the same 3:21:59PM thing we did the other day.

THE WITNESS: Yeah, that's perfect, 3:22:02PM whatever the dates. They just need something.

MR. NOVIKOFF: Got it. 3:22:03PM

MR. GOODSTADT: We'll send the exact 3:22:04PM same thing we did today.

THE WITNESS: Thanks. 3:22:05PM

a5a0261c-43ec-45e0-be37-ef91a2c29f22

TYREE BACON

MR. CONNOLLY: So agreed. 3:22:06PM

THE VIDEOGRAPHER: The time is 3:23. 3:22:07PM

We are going off the record.

(Time noted 3:23 p.m..) 3:22:11PM

_________________ 3:22:11PM

TYREE BACON 3:22:11PM

3:22:11PM

Subscribed and sworn to before me 3:22:11PM

this day of , 2009 3:22:11PM

3:22:11PM

___________________________________ 3:22:11PM

3:22:11PM

PROCEEDINGS

C E R T I F I C A T E 3:22:11PM

3:22:11PM

I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Publi 3:22:11PM and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefo 3:22:11PM set forth, was duly sworn by me; and

THAT the within transcript is a true record 3:22:11PM of the testimony given by said witness. I further 3:22:11PM certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome 3:22:11PM this matter.

IN WITNESS WHEREOF, I have hereunto set 3:22:11PM my hand this 25th day of February, 2009. 3:22:11PM

3:22:11PM

____________________________ 3:22:11PM

JUDI JOHNSON, RPR, CRR, CLR 3:22:11PM

PROCEEDINGS

INDEX 3:22:11PM

ATTORNEY PAGE 3:22:11PM

By Mr. Goodstadt 6 3:22:11PM

3:22:11PM

3:22:11PM

3:22:11PM

3:22:11PM

3:22:11PM

INDEX OF BACON EXHIBITS 3:22:11PM

| I.D. | DESCRIPTION | PAGE | |
|---|---|---|---|
| Exhibit 1 | Bates document 7360-7381 | 170 | 3:22:11PM |
| Exhibit 2 | Bates document 5335-37 | 211 | 3:22:11PM |
| Exhibit 3 | Bates document 1-25 | 214 | 3:22:11PM |
| Exhibit 4 | Bates document 5600 | 219 | 3:22:11PM |
| Exhibit 5 | Police Officer Part-Time/Seasonal | 229 | 3:22:11PM |
| Exhibit 6 | Police Candidate Application Packet | 231 | 3:22:11PM |
| Exhibit 7 | Bates document 6822 | 237 | 3:22:11PM |
| Exhibit 8 | Bates document 7410 | 242 | 3:22:11PM |
| Exhibit 9 | Bates document 7418-7423 | 244 | 3:22:11PM |

3:22:11PM

ERRATA SHEET

NAME OF CASE: CARTER V. OCEAN BEACH 3:22:11PM

DATE OF DEPOSITION: February 12, 2009 3:22:11PM

NAME OF WITNESS: TYREE BACON 3:22:11PM

3:22:11PM

Reason codes: 3:22:11PM

1. To clarify the record. 3:22:11PM
2. To conform to the facts 3:22:11PM
3. To correct the transcription errors. 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

Page ______ Line _____ Reason _____ 3:22:11PM

From _____________ to _____________ 3:22:11PM

3:22:11PM

_________________________________________ 3:22:11PM

TYREE BACON 3:22:11PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM, JOSEPH NOFI, and THOMAS SNYDER,
Plaintiffs,
vs. Case No. 07-1215
INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR JOSEPH C. LOEFFLER, JR., individually, and in his official capacity; former mayor NATALIE K. ROGERS, individually and in her official capacity, OCEAN BEACH POLICE DEPARTMENT; ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE, individually and in his official capacity; SUFFOLK COUNTY; SUFFOLK COUNTY POLICE DEPARTMENT; SUFFOLK COUNTY DEPARTMENT OF CIVIL SERVICE; and ALISON SANCHEZ, individually and in her official capacity,

Defendants.
-------------------------------X
CONTINUED VIDEOTAPED DEPOSITION OF TYREE BACON
New York, New York
April 15, 2009

Reported by:
Bonnie Pruszynski, RMR
JOB NO. 22326

April 15, 2009
10:15 a.m.

Continued Videotaped Deposition OF TYREE BACON, held at THOMPSON, WIGDOR & GILLY, LLP, 85 Fifth Avenue, New York, New York, before Bonnie Pruszynski, Registered Professional Reporter, Registered Merit Reporter, Certified LiveNote Reporter, and a Notary Public of the State of New York.

A P P E A R A N C E S:

THOMPSON WIGDOR & GILLY, LLP
Attorneys for Plaintiffs
85 Fifth Avenue
New York, New York 10003
BY: ANDREW S. GOODSTADT, ESQ.

RIVKIN RADLER, LLP
Attorneys for Defendants Incorporated Village of Ocean Beach, Mayor Joseph C. Loeffler, Jr., former mayor Natalie K. Rogers:
926 RexCorp Plaza
Uniondale, New York 11556
BY: KENNETH A. NOVIKOFF, ESQ.

MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
Attorneys for Acting Deputy Police Chief George B. Hesse:
530 Saw Mill River Road
Elmsford, New York 10523
BY: KEVIN W. CONNOLLY, ESQ.

A P P E A R A N C E S (Continued)

SUFFOLK COUNTY DEPARTMENT OF LAW
Attorneys for Suffolk County Defendants
H. Lee Dennison Building, 6th Floor
100 Veterans Memorial Highway
Hauppauge, New York 11788
(Not present)

ALSO PRESENT: Carlos Lopez, Legal Video Specialist

Thomas Snyder

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

THE VIDEOGRAPHER: This the start of tape labeled number one of the videotape deposition of Tyree Bacon in the matter Carter Fiorillo versus Incorporated Village of Ocean Beach. 10:07

This deposition is being held at 85 Fifth Avenue, New York, New York, on April 5, 2009, at approximately 10:07 a.m. 10:07

My name is Carlo Lopez from TSG Reporting Inc. and I am the legal video specialist. 10:07

The court reporter is Bonnie Pruszynski, in association with TSG Reporting. 10:07

Will counsel please introduce yourself for the record? 10:07

MR. GOODSTADT: Andrew Goodstadt, Thompson, Wigdor and Gilly on behalf of the plaintiffs. 10:07

MR. NOVIKOFF: Ken Novikoff on behalf of the Village defendants. 10:07

MR. CONNOLLY: Kevin W. Connolly of Marks, O'Neill, O'Brien & Courtney on behalf of defendant, George Hesse. 10:08

T. Bacon

THE VIDEOGRAPHER: Will the court reporter please swear in the witness? 10:08

(Witness sworn.) 10:08

TYREE BACON, 10:08

called as a witness, having been first duly sworn, was examined and testified as follows: 10:08

EXAMINATION (Continued): 10:08

**Q Good morning. 10:08**

A Good morning. How are you, Counselor? 10:08

**Q Thank you for coming back. I appreciate it. 10:08**

**During the last deposition that you were here for in February, we went over a series of ground rules. 10:08**

**Do you remember that? 10:08**

A I do. 10:08

**Q And I just want to be sure that the same ground rules will be in effect today. Is that okay? 10:08**

A Absolutely. 10:08

MR. NOVIKOFF: And also the same stips? 10:08

T. Bacon

MR. GOODSTADT: Same stips. 10:08

MR. NOVIKOFF: And you will be giving me a copy in terms for him to review it? 10:08

MR. GOODSTADT: Same stips about terminating versus let go -- 10:08

MR. NOVIKOFF: You got it. 10:08

MR. GOODSTADT: Everything. 10:08

MR. NOVIKOFF: Good. 10:08

BY MR. GOODSTADT: 10:08

**Q And I just want to remind you. I reminded you last time, I just want to remind you that you are under oath today, and that you have sworn to tell the truth, and failure to do so could be punishable as a crime? 10:09**

MR. NOVIKOFF: Objection. 10:09

A Understood. 10:09

**Q What have you done, if anything, between the deposition in February and today to prepare for today? 10:09**

A Absolutely nothing. 10:09

**Q You haven't reviewed any documents? 10:09**

A I have not. 10:09

**Q You haven't had any meetings with anybody? 10:09**

**T. Bacon**

A Nope. 10:09

**Q Okay. And who did you speak with between the last time you were here and today about your deposition, if anyone? 10:09**

A Mike Welch. 10:09

**Q Anyone else? 10:09**

A My lieutenant and captain at work, when I brought in the subpoena yesterday. 10:09

**Q Anyone else? 10:09**

A No. 10:09

**Q Did you speak with anybody who is employed by the Village of Ocean Beach about your deposition from last time? 10:09**

A No. 10:09

**Q You didn't discuss it at all with George Hesse? 10:09**

A No. I did call in this morning to be put in the blotter, so I am getting paid. Other than that, you know, called in, said, "Sign me in the blotter. I am coming in for my deposition." And I will call them back upon completion so they sign me out. Other than that, nobody. 10:10

**Q Did you speak with George Hesse at all between February, when you were here last 10:10**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**time, and the call this morning? 10:10**

A I have. 10:10

**Q Anything at all to do with this case? 10:10**

A Nothing to do with this case whatsoever. 10:10 10:10

**Q And what -- have you worked any tours 10:10 between, at Ocean Beach, between your February 10:10 deposition and today? 10:10**

A I have not. 10:10

**Q So, between your deposition in 10:10 February and today, you haven't been paid at all 10:10 by Ocean Beach? 10:10**

A I have been paid. I had done a 10:10 training, which was offsite, and I had also gotten 10:10 paid for the deposition and the deposition prep. 10:10

**Q Okay. When you say "training," what 10:10 type of training? 10:10**

A I was out at Suffolk County Police 10:10 Academy doing EVOC training, Emergency Vehicle 10:10 Operator's Course. 10:11

**Q Other than that training, and being 10:11 paid for your time spent preparing for your 10:11 deposition and your time spent at this deposition, 10:11 were you paid at all by Ocean Beach between the 10:11**

T. Bacon

**February deposition and today? 10:11**

A No. There were no tours worked at 10:11 Ocean Beach between February and today. 10:11

**Q By you, you mean -- 10:11**

A By me in the Village, right. 10:11

**Q Have you reviewed a copy of the 10:11 complaint in this matter between the last 10:11 deposition, where you said you hadn't reviewed it, 10:11 and today? 10:11**

A No. 10:11

MR. NOVIKOFF: Objection to the form. 10:11 You can answer. 10:11

A No, I have not. 10:11

**Q Is there any reason that you can 10:11 think of that would prevent from testifying fully 10:11 and truthfully today? 10:11**

A None whatsoever. 10:11

**Q The last time you testified a bit 10:11 about some shifts that you had worked with Ed 10:11 Carter and Tom Snyder before you took your leave 10:11 of absence. 10:11**

**Do you recall that? 10:12**

MR. NOVIKOFF: Objection. 10:12 Andrew, the only reason I'm 10:12

T. Bacon

objecting, since it's been almost -- close 10:12 to two months since the last deposition, if 10:12 you start prefacing the questions with 10:12 testifying about what you testified to, what 10:12 you were asked two months ago, I'm going to 10:12 have to object. It's not a memory test as 10:12 to what he may have testified to or nor not 10:12 testified to; that would be my one 10:12 objection. 10:12

BY MR. GOODSTADT: 10:12

**Q I did ask him if he recalls that. 10:12**

A I recall testifying to that, yes. I 10:12 don't recall the sum and substance of the 10:12 testimony. 10:12

**Q Okay. So, other than for a few 10:12 shifts that you worked with Carter and Snyder 10:12 before you took your leave, had you worked with 10:12 any other plaintiffs before taking your leave? 10:12**

MR. NOVIKOFF: Objection. You can 10:12 answer. 10:12

A Taking my leave for what? 10:12

**Q Well, wasn't there a break in service 10:12 that you had at the Beach? 10:12**

MR. NOVIKOFF: Objection. Asked and 10:12

T. Bacon

answered. 10:12

A I was away on military leave. 10:12

**Q I am talking about you had a -- I 10:12 believe you testified last time that there was a 10:12 break in service at Ocean Beach between '93 and 10:12 '99. 10:13**

**Do you recall that? 10:13**

MR. NOVIKOFF: Objection. Objection 10:13 to what he may have testified earlier. 10:13 Asked and answered. 10:13

**Q Did you take -- was there a break in 10:13 service between '93 and '99 at the Beach? 10:13**

A Yes. 10:13

**Q And what I was getting at was last 10:13 time I believe you testified that before that 10:13 break in service, the years that you worked at 10:13 Ocean Beach before that break, you had worked some 10:13 shifts with Snyder and Carter? 10:13**

A Correct. 10:13

**Q Now, my question is: Other than for 10:13 those certain shifts that you worked with Snyder 10:13 and Carter before taking that break in service, 10:13 have you worked with any of the other plaintiffs? 10:13**

A No, I don't recall. 10:13

T. Bacon

**Q Had you known any of the other plaintiffs -- 10:13**

A No. 10:13

**Q -- prior to that? 10:13**

A No. 10:13

**Q Then when you came back in '99, had you known any of the other three plaintiffs prior to coming back in '99? 10:13**

A No. 10:13

**Q How did you meet Frank Fiorillo? 10:13**

A Working with him. 10:13

**Q Did you work with him a lot? 10:13**

A A fair amount of times, not a -- it wasn't a regular -- probably at least half the number of times, half the shifts I worked he was on the same shift. 10:14

**Q And that was the four to 12 shift? 10:14**

A No, I -- when I first came back, I was worked eight at night to four in the morning. I believe Frank worked midnights. He may have even worked eight at night to eight in the morning. I don't recall for certain. 10:14

**Q When you say about half your shifts were with Frank, what years were you referring to**

**T. Bacon**

**at that point? 10:14**

A Sometime after '99. I don't recall when he got out of the academy. I don't recall if he was there the first year I was back. 10:14

**Q Was it half the time from when he got out of the academy until the time that he was no longer employed there? 10:14**

A Yes. 10:14

**Q Approximately how many shifts a month would be half the time that you would work with Fiorillo? 10:15**

A I usually work one shift a month, maybe two shifts. So, I would say two shifts a month with him. 10:15

**Q And when you say one or two shifts a month, is that during the even season or off season? 10:15**

A During the season. 10:15

**Q Did you ever work with him off season? 10:15**

A No. 10:15

**Q About how many tours did you work per year in the off season? 10:15**

A A half dozen. 10:15

T. Bacon

**Q Half dozen total? 10:15**

A Yes. 10:15

**Q And how did you meet Joe Nofi? 10:15**

A Working in Ocean Beach. 10:15

**Q Did you work any tours with Nofi? 10:15**

A He worked four to 12's for a little while. Our shifts may have overlapped. I never really recall working with him. 10:15

**Q You don't recall being partnered up with him? 10:16**

A Maybe once or twice in the very beginning. 10:16

MR. NOVIKOFF: I just want, when you say "work with," are you saying partnered up with or just being in the Village at the same time as police officers on duty? 10:16

MR. GOODSTADT: That's what I meant. But then -- 10:16

MR. NOVIKOFF: Okay. 10:16

MR. GOODSTADT: -- the latter is what I asked for, then he said it would overlap, then I asked if he was ever partnered. 10:16

MR. NOVIKOFF: All right. 10:16

A He worked some of the same tours. 10:16

T. Bacon

There were a couple of tours that I was partnered up with him for field training purposes and stuff like that, maybe one or two. 10:16

**Q What do you mean by "for field training purposes"? 10:16**

A He was a new officer, and I had more experience, so they didn't want him out there by himself. 10:16

**Q So, did you train Nofi? 10:16**

A Not really. I mean, he went to the academy. I was trying to teach him how to write summonses, how to write field reports, enter stuff into the computer. 10:16

**Q Did anyone else help teach him that other than for you? 10:16**

A Probably just about everybody at work spent time with him. 10:16

**Q And when did you meet Kevin Lamm? 10:17**

A Upon my return in '99. 10:17

**Q Was he already employed? 10:17**

A I believe so. 10:17

**Q Did you work any shifts with Lamm? 10:17**

A Yes. 10:17

**Q Approximately how many a year would 10:17**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**you work with Lamm? 10:17**

A I don't know, ten, 12. 10:17

**Q Did he have the same tour as you or 10:17**
**did the staggered tours overlap? 10:17**

A Sometimes they overlapped; sometimes 10:17
they were the same tours. 10:17

**Q Were you ever partnered with Kevin 10:17**
**Lamm? 10:17**

A No. 10:17

**Q Did you have any role in hiring 10:17**
**Fiorillo? 10:17**

A No. 10:17

**Q Did you have any role in hiring Nofi? 10:17**

A No. 10:18

**Q Do you know who hired Fiorillo? 10:18**

A I believe back then it was all Eddie 10:18
Paradiso hired everybody. 10:18

**Q Do you know who hired Nofi? 10:18**

A Eddie Paradiso. 10:18

**Q Do you know whether George Hesse had 10:18**
**authority as the sergeant to hire? 10:18**

MR. NOVIKOFF: Objection. 10:18

A I don't know if he had -- 10:18

MR. NOVIKOFF: The question is yes, 10:18

T. Bacon

no or I don't know. 10:18

A I don't know. 10:18

**Q Do you know whether he hired anybody 10:18**
**when he was the sergeant? 10:18**

A I don't know. 10:18

**Q Now, there was an incident that we 10:18**
**have been referring to as the "Halloween incident" 10:18**
**that was in Houser's the night before Halloween in 10:18**
**2004. 10:18**

**Are you familiar with that 10:18**
**incident -- 10:18**

A Somewhat. 10:18

**Q -- when I say the "Halloween 10:18**
**incident"? 10:19**

**What is your understanding of what 10:19**
**happened there? 10:19**

MR. NOVIKOFF: Objection. My only 10:19
objection, really, is on personal knowledge. 10:19
I mean, I don't think you have laid a 10:19
foundation that he has personal knowledge; 10:19
and if he doesn't, then it's only -- then 10:19
everything he knows is based upon what 10:19
someone else may have told him or what he 10:19
may have looked at, which may be appropriate 10:19

T. Bacon

questions, but I think the foundation needs 10:19
to be laid, first. 10:19

MR. GOODSTADT: Let me lay the 10:19
foundation. 10:19

**Q Were you there the night of the 10:19**
**Halloween incident? 10:19**

A No, I was not. 10:19

**Q So, you didn't witness anything 10:19**
**happening at the Halloween incident? 10:19**

A I did not. 10:19

**Q I believe you testified, though, that 10:19**
**you are were somewhat familiar with what happened 10:19**
**there; is that correct? 10:19**

MR. NOVIKOFF: Objection. 10:19

A Yes. 10:19

**Q And what is the basis of your 10:19**
**familiarity? How did you learn about what 10:19**
**happened? 10:19**

A By knowing Jeanne and Bud Jaeger. 10:19

**Q What do you mean, "by knowing Jeanne 10:19**
**and Bud Jaeger"? 10:19**

A I have known Jeanne Jaeger and Bud 10:19
Jaeger for probably close to 20 years now from 10:20
working at the beach. 10:20

T. Bacon

**Q So, is the total amount of your 10:20**
**knowledge based on what you learned from Bud or 10:20**
**Jeanne Jaeger? 10:20**

A Yes. 10:20

**Q Have you ever spoken to Richie 10:20**
**Bosetti about what happened that night? 10:20**

A No. 10:20

**Q Have you ever spoken to Gary Bosetti 10:20**
**about what happened that night? 10:20**

A No. 10:20

**Q When did you first speak with Jeanne 10:20**
**Jaeger about what happened that night? 10:20**

A Actually, the first person I spoke to 10:20
was her husband, Bud. 10:20

**Q Okay. When did that conversation 10:20**
**happen then? 10:20**

A The May after the incident. I don't 10:20
-- I don't even -- when I came back that following 10:20
May, and I had seen them at the beach. 10:20

**Q Okay. Just so I am clear, the 10:20**
**incident happened, and I will represent that it 10:20**
**happened in October of 2004. 10:20**

A Then -- 10:20

**Q Then it was May of 2005? 10:20**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A Correct. 10:20

**Q So prior to -- well, strike that. 10:21**

**You said when you came back, what did 10:21 you mean by that? 10:21**

A Back when I was working during the 10:21 season of 2005. 10:21

**Q Did you work any tours off season 10:21 between '04 and '05? 10:21**

A I'm sure I did. I don't recall 10:21 specifically. 10:21

**Q You don't recall one way or the other 10:21 whether you worked any tours between Halloween '04 10:21 and May of '05? 10:21**

A I'm sure I did, but I don't 10:21 specifically recall. 10:21

**Q During those tours that you are sure 10:21 that you worked, you never had heard anything 10:21 about a Halloween incident? 10:21**

A No. 10:21

**Q So, the first -- your testimony is 10:21 the first that you heard of a Halloween incident 10:21 was in May of '05 from Bud Jaeger? 10:21**

A Correct. 10:21

**Q What medium did the conversation 10:21**

T. Bacon

**happen? Was it over the phone, in person, by 10:21 e-mail? 10:21**

A In person. 10:21

**Q That was in the Village of Ocean 10:21 Beach? 10:21**

A Yes. 10:21

**Q Who was part of that conversation? 10:22**

A Myself, Bud and his wife, Jeanne. 10:22

**Q So, the three of you? 10:22**

A Yes. 10:22

**Q Where were you located when that 10:22 happened, that conversation? 10:22**

A Up on the porch or balcony of their 10:22 apartment. 10:22

**Q Were you on duty? 10:22**

A Yes. 10:22

**Q Where is their apartment or where was 10:22 their apartment at the time? 10:22**

A Right across from the Community 10:22 Center or movie theater. 10:22

**Q What street that is located on? 10:22**

A Bay Walk. 10:22

**Q How many blocks from the police 10:22 station is that? 10:22**

T. Bacon

A Four. 10:22

**Q How many blocks from Houser's is 10:22 that? 10:22**

A Six. 10:22

**Q Do you have to pass the police -- 10:22**

A -- the police station to get to 10:22 Houser's from where their apartment was located. 10:22

**Q And how many blocks from CJ's is 10:22 their apartment? 10:22**

A Three. 10:23

**Q So, it goes their apartment, CJ's, 10:23 police station, and then Houser's -- 10:23**

A Correct. 10:23

**Q -- in terms of the walk? 10:23**

A Um-hum, yes. I'm sorry. 10:23

**Q Tell me everything that you recall 10:23 that Bud Jaeger stated to you during that 10:23 conversation. 10:23**

A I think -- well, I saw him. 10:23

I hadn't seen him since the end of 10:23 the previous season, Labor Day, somewhere about 10:23 there. 10:23

It was good to see him, his wife. 10:23 Just asking what had transpired over the winter 10:23

T. Bacon

months. You know, how life's been treating me, 10:23 how life's been treating him, stuff like that. 10:23

You know, he had asked if I worked 10:23 any during the winter. 10:23

I said I had. 10:23

He asked me if I knew anything about 10:23 what happened back on Halloween? 10:23

I said I didn't. And he proceeded to 10:23 tell me about what happened on Halloween. 10:23

**Q What did he tell you? 10:24**

A He said that while his wife was at 10:24 the bar, she went to go use the ladies room. The 10:24 door was locked. 10:24

She was banging on the door. She 10:24 waited a little while, nobody came out. She 10:24 knocked on the door again, waited another little 10:24 while, knocked on the door again, and a girl came 10:24 out, grabbed her by the throat, because she was 10:24 busy giving her boyfriend a blow job in the 10:24 bathroom; that apparently the Bosettis, one of the 10:24 Bosettis, I'm not certain who it was, tried to 10:24 intervene, break it up. 10:24

The girl's boyfriend came after him. 10:24 He identified himself as a cop, a struggle ensued, 10:24

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

something happened, one of them grabbed a pool cue 10:24
and struck the guy with it. 10:24

**Q What do you mean by "one of them"? 10:24**

A One of the Bosettis. I'm not sure if 10:24
it was Richie or Gary. 10:24

And, you know the cops came, and when 10:25
the police came, I believe Bud wanted to know who 10:25
the incompetent officers were that handled the 10:25
case, because the way it went down is not the way 10:25
it was written up, according to Bud. 10:25

MR. NOVIKOFF: Did you say 10:25
incompetent or competent? 10:25

THE WITNESS: Incompetent. 10:25

MR. NOVIKOFF: Okay. 10:25

BY MR. GOODSTADT: 10:25

**Q Do you recall anything else that he 10:25
told you, that he said to you about what happened 10:25
that night? 10:25**

A He was upset, because I guess shortly 10:25
after that the Bosettis were fired over the 10:25
incident, based on how it was originally 10:25
portrayed. 10:25

He wrote a letter to the chief, made 10:25
phone calls to the chief, maybe even the mayor or 10:25

T. Bacon

one of the Village board members, telling them 10:25
that is not how it happened, the whole beginning 10:25
part of the incident was left out, and the 10:26
Bosettis were rehired after that. 10:26

**Q And prior to that conversation, had 10:26
you learned that the Bosettis had been fired? 10:26**

A I didn't know what has transpired 10:26
during that season. 10:26

**Q So, this is the first time that you 10:26
learned anything about the Bosettis being fired? 10:26**

A Right. 10:26

**Q Do you recall anything else that he 10:26
said to you during the conversation? 10:26**

A Nothing specific. That was the sum 10:26
and substance of the conversation. 10:26

**Q Did you say anything to him during 10:26
the conversation? 10:26**

A I told him I really had no knowledge 10:26
of what went on. I wasn't there. 10:26

**Q But he specifically said to you that 10:26
one of the Bosettis hit somebody with a pool cue? 10:26**

A I believe he did. 10:26

**Q Did Jeanne Jaeger say anything? 10:26**

A She was -- she was pretty irate. She 10:26

T. Bacon

basically echoed the same sum and substance of 10:26
what happened. 10:26

**Q Did she mention that one of the 10:26
Bosettis had used a pool cue to hit somebody? 10:26**

A I could have been Bud, it could have 10:26
been Jeanne. I don't remember specifically who. 10:26

**Q Did one of them tell you that they 10:27
actually witnessed one of the Bosettis hit 10:27
somebody with a pool cue? 10:27**

A Like I said, I don't remember the 10:27
specifics, but that was all part of the 10:27
conversation. 10:27

**Q Did you have a response when he asked 10:27
who the incompetent officers who were on the scene 10:27
were? 10:27**

A No, because I didn't know who it was. 10:27

**Q Do you recall anything else that was 10:27
discussed during that conversation? 10:27**

A How things were going at his job, you 10:27
know. He became a captain in the City Fire 10:27
Department. He was in 117 truck. He loved it. 10:27

Jeanne was flying. You know, she was 10:27
a flight attendant for United, how things we're 10:27
going, just talked about almost everything under 10:27

T. Bacon

the sun, you know. 10:27

**Q How long did the conversation last? 10:27**

A Half hour. 10:27

**Q Were you partnered with somebody on 10:27
that tour? 10:28**

A No. 10:28

**Q Anything else you recall that either 10:28
you or either Bud Jaeger or Jeanne Jaeger said 10:28
during that conversation? 10:28**

A No. 10:28

**Q Did you discuss that conversation 10:28
with anyone? 10:28**

A No. 10:28

**Q How many other times did you speak 10:28
with Jeanne or Bud Jaeger about that Halloween 10:28
incident other than that one instance? 10:28**

A Probably just that. I saw Bud and 10:28
Jeanne almost every shift I worked. 10:28

**Q Did you discuss the Halloween 10:28
incident -- 10:28**

A No. 10:28

**Q -- with them after that? 10:28**

**So, only that one time? 10:28**

A To the best of my knowledge, yes. 10:28

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q Other than for that one half-hour conversation in which Halloween incident was discussed, have you spoken with anybody else at any other time about anything to do with the Halloween incident, other than for me today? 10:28**

A Not that I recall. 10:28

**Q You don't recall telling Rich Bosetti how upset you were with the way that the officers handled it? 10:29**

A No, I don't. 10:29

**Q You don't recall telling Rich Bosetti you were pissed off about it? 10:29**

A No, I don't recall that. 10:29

**Q Did you ever speak to the Bosettis about it? 10:29**

A Not that I recall. 10:29

**Q Did you ever speak to George Hesse about the Halloween incident? 10:29**

A No. 10:29

**Q Did you ever speak to Pat Cherry, Sr. about it? 10:29**

A No. 10:29

**Q Did you ever read any documents about the Halloween incident? 10:29**

**T. Bacon**

A I did not. 10:29

**Q Did you ever -- 10:29**

MR. NOVIKOFF: Hold on. You just have to let him finish the question. 10:29

BY MR. GOODSTADT: 10:29

**Q Did you ever read that letter that Bud Jaeger told that he sent to the chief? 10:29**

A No, I did not. 10:29

**Q Did you ever read any of the witness statements that were taken? 10:29**

A I did not. 10:29

**Q Did you ever read the field report that the on-duty officers filled out? 10:30**

A I did not. 10:30

**Q Did you ever review the statements that the on-duty officers took from the people who were involved in the fight that night? 10:30**

A I did not. 10:30

**Q Did you ever speak with any of the plaintiffs about the Halloween incident? 10:30**

A I may have said something to Tommy Snyder about it one night when we were working, asking what happened. I don't even think it was that summer. 10:30

T. Bacon

**Q What do you mean by "that summer," the summer of '05? 10:30**

A Just what happened. 10:30

**Q I don't mean what did you say. I mean, you don't think it was that summer of '05? 10:30**

A It may have been -- it could have been the summer of '05. It could have been the summer -- I don't recall. 10:30

**Q Where were you when you had that conversation with Tommy Snyder? 10:30**

A In front of the police station. 10:30

**Q Were you on duty? 10:30**

A Yes. 10:30

**Q Was he on duty? 10:30**

A Yes. 10:30

**Q Who else was there? 10:30**

A Just me and Tommy. 10:30

**Q What did you say to Tommy Snyder during that conversation? 10:31**

A We were sitting on a golf cart, and just talking about, you know, stuff, nothing that really comes to mind. 10:31

The Bosettis were walking back from the direction of the houses, and he was talking

T. Bacon

about how he didn't like the Bosettis, couldn't stand the Bosettis. They were nothing but trouble and stuff like that. 10:31

And I asked him -- and I believe he brought up the Halloween incident, and I asked what had happened, and he went off on a tirade talking about the Bosettis; that we were going to have to call a priest for an exorcism. 10:31

I mean, he was just screaming and cursing and everything else. 10:31

And that was pretty much it. 10:31

I said, "Well, I heard you had a hand in it," and then he really went off, you know over that. 10:32

**Q What did he say? 10:32**

A I don't remember specifically, but, you know, "I did my job," and, you know, "they fucked up. It's all them. It wasn't me. It wasn't the guys we were working with," you know, trying to defend his actions. 10:32

**Q Did Snyder say anything else that you recall during that conversation? 10:32**

A No. 10:32

**Q Do you recall what Snyder said about 10:32**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**the Bosettis, other than that you have to call a priest for an exorcism? 10:32**

A No, no. He didn't say that. 10:32

I said, "I thought I was going to have to call a priest for an exorcism because he was acting so irrationally." 10:32

**Q Tom Snyder was acting irrationally? 10:32**

A Yes. He went off on a tirade, a complete tirade about his hate and loathe for the Bosettis. 10:32

**Q You don't recall specifically anything he said about that? 10:32**

A No. 10:32

**Q Have you ever spoken to Tom Snyder prior to that about his feelings about the Bosettis? 10:32**

A I think there was one time Tom and I had -- not probably, definitely. We went to the hero shop and we were eating. 10:33

And my issue with the Bosettis was that during the wintertime, they were working all the hours, and it was easy for the chief just to schedule them for the entire week, rather than pick up the phone and try and divvy up hours 10:33

T. Bacon

amongst the rest of the guys. And that was the sum and substance of our conversation about the Bosettis. 10:33

**Q Any other conversation that you recall with Snyder about his feelings about the Bosettis? 10:33**

A Not that I recall. 10:33

**Q Did you ever speak with any other plaintiffs about the Bosettis? 10:33**

A Not that I recall. 10:33

MR. NOVIKOFF: Plaintiffs: Lamm, Carter -- 10:33

MR. GOODSTADT: Any other plaintiffs in this case. 10:33

MR. NOVIKOFF: Okay. 10:33

A Not that I recall. 10:33

**Q In the conversation you testified to, that you had with Snyder out in front of the station, where you thought you had to call a priest for an exorcism. 10:33**

**Do you recall anything that you said in that conversation? 10:34**

MR. NOVIKOFF: Objection. 10:34

A Just asking him what his issue was 10:34

T. Bacon

with the Bosettis. 10:34

**Q Did you tell Snyder about the conversation that you had with Bud Jaeger? 10:34**

A I think I had mentioned something about that; that sent him further over the edge. 10:34

**Q What did you tell him about your conversation with Bud Jaeger? 10:34**

A That, according to the original victim, which was Jeanne Jaeger and her husband, Bud, that is not how it went down, and that you guys fucked up the investigation. 10:34

**Q At that point time, did you know what they had done -- 10:34**

A No. 10:34

**Q -- with respect to the investigation? 10:34**

A No, I don't. 10:34

**Q Did you ask Bud or Jeanne Jaeger why they didn't give a statement to the police that night? 10:34**

A No. 10:34

MR. NOVIKOFF: Objection. 10:34

**Q Did you ask them why they didn't stay in the bar when the police got there? 10:34**

MR. NOVIKOFF: Objection. 10:34

T. Bacon

A I didn't know whether they left, I didn't know whether they stayed. I wasn't there. 10:34

MR. NOVIKOFF: You are asking questions that you haven't established a foundation that he knew of. I mean -- 10:34

BY MR. GOODSTADT: 10:35

**Q Did you ask them whether they gave a statement to police that night? 10:35**

A I did not. 10:35

**Q Do you know whether they gave a statement to the police that night? 10:35**

A I do not. 10:35

**Q As a police officer for almost 20 years now in Ocean Beach -- 10:35**

MR. NOVIKOFF: Part-time police officer. 10:35

MR. GOODSTADT: Part-time police officer, police officer nonetheless. 10:35

MR. NOVIKOFF: That's up for debate. 10:35

BY MR. GOODSTADT: 10:35

**Q Do you, do you believe that Jeanne Jaeger, after telling you about her being a victim, should have given a statement to the police that night? 10:35**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 297

T. Bacon

MR. NOVIKOFF: Objection. You can answer. 10:35

A Yes. I do believe she should have. 10:35

**Q And I know I asked this question, but before you told me you hadn't spoken to anybody else about Halloween, we have now established you did speak with somebody else, that was Snyder. 10:36**

A That was after speaking with Jaeger. 10:36

**Q When I ask a question about did you ever speak to anybody else about Halloween, I'm talking about from the day you were born until today. 10:36**

**Have you ever spoken to anybody else, other than for the conversation you testified to with Bud and Jeanne Jaeger, and the conversation you have already testified to with Snyder, have you spoken to anybody else about anything to do with the Halloween incident? 10:36**

A No. 10:36

MR. NOVIKOFF: Objection to the form as to the timeframe. 10:36

**Q From October of 2004 until today, same question? 10:36**

A No. 10:36

Page 298

T. Bacon

**Q And same question, just so we are clear on the timeframes, from October 2004 until today, have you ever seen the letter that Bud Jaeger told you that he sent? 10:36**

MR. NOVIKOFF: Objection. Asked and answered. You can answer. 10:36

A No. I have never seen any of the file pertaining to that case. 10:37

**Q Okay. So, you have never seen any of the witness statements, any of the letters -- 10:37**

MR. NOVIKOFF: Objection. 10:37

A Nothing in the file, not a field report, not a witness statement, nothing, not even the jacket folder. 10:37

**Q Do you believe that the officers on duty that night handled themselves appropriately? 10:37**

MR. NOVIKOFF: Objection. Again, foundation. 10:37

He's testified that he's seen no reports. He's testified that he hasn't talked to Hesse or Paradiso about it, and he has testified the only people that he has spoken to about the incidents are Jeanne and Bud Jaeger and I believe one of the 10:37

Page 299

T. Bacon

Bosettis. 10:37

So, Andrew, I mean, to ask at him that question, what is it based on? 10:37

MR. GOODSTADT: That's why I am asking the question. I want to find out the basis. 10:37

MR. NOVIKOFF: To the extent he even has a basis for it. 10:37

MR. GOODSTADT: If he doesn't have a belief, he can tell me he doesn't have a belief one way or the other. 10:38

MR. NOVIKOFF: That wasn't the question. 10:38

MR. GOODSTADT: That was the question. 10:38

MR. NOVIKOFF: You said, "do you believe." 10:38

MR. GOODSTADT: So, if he doesn't believe, that's what I am asking, same question. 10:38

MR. NOVIKOFF: Objection. You can answer. 10:38

MR. GOODSTADT: Why don't we read back the question, just so we have a clear 10:38

Page 300

T. Bacon

record. I don't remember what the question is. 10:38

MR. NOVIKOFF: The question should be: "Do you have a belief one way or the other," not "do you believe." 10:38

The question was also somewhat leading. 10:38

MR. GOODSTADT: I don't think that is appropriate at this stage, okay. 10:38

MR. NOVIKOFF: It's a form objection. 10:38

MR. GOODSTADT: Can we just read back that question? 10:38

(Record read.) 10:38

MR. NOVIKOFF: Note my objection for all the reasons previously stated. 10:38

A My answer is no, I do not believe that. 10:38

**Q What is the basis of your belief? 10:38**

A There was a crime committed or an attempted crime committed. Somebody was the victim. They never interviewed the victim, you know, and that would be Jeanne Jaeger, who was the victim. 10:39

There was something that precipitated 10:39

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon
one of the Bosettis or both of the Bosettis to 10:39
intervene, based on conversations with the -- the 10:39
Bosettis -- not Bosettis, excuse me, with the 10:39
Jaegers. 10:39
There was something that happened 10:39
that, from the way I see it, that there was an 10:39
agenda to tarnish the Bosettis and not fully 10:39
investigate the incident, and that's from knowing 10:39
after the fact. 10:39
I wasn't there. I didn't read any 10:39
paperwork. That is based on talking to Jeanne and 10:39
Bud Jaeger. 10:39
**Q Okay. So, the basis of your belief 10:39**
**that the officers didn't act appropriately that 10:39**
**night was the conversation with Bud and Jeanne 10:39**
**Jaeger? 10:39**
A Yes. 10:39
MR. NOVIKOFF: Objection. 10:39
**Q And, again, you didn't ask whether 10:39**
**they attempted to give a statement to police, or 10:40**
**whether they stuck around or anything to that 10:40**
**effect? 10:40**
MR. NOVIKOFF: Objection. Asked and 10:40
answered. 10:40

T. Bacon
A I did not. I didn't know whether 10:40
they did or did not give a statement. 10:40
**Q And what did you mean by "an agenda 10:40**
**to tarnish the reputation of the Bosettis"? 10:40**
MR. NOVIKOFF: What was that 10:40
question? 10:40
(Record read.) 10:40
MR. NOVIKOFF: Got it. 10:40
A Because of the hate that Tom Snyder 10:40
had for the Bosettis, I think that that may have 10:40
prevented him from doing a thorough investigation. 10:40
**Q And the basis of your belief of the 10:40**
**hate was just that one conversation that you had 10:40**
**with him or was there other -- 10:40**
A It was a pretty embarrassing tirade 10:40
to be standing in Bay Walk, in front of the police 10:40
station with him over there when he was going 10:40
through that tirade. 10:40
**Q Anybody else there during that 10:41**
**discussion? 10:41**
A Probably about 50 people that walked 10:41
past from one point to another. 10:41
**Q Nobody was actually part of your 10:41**
**discussion? 10:41**

**T. Bacon**
A No. 10:41
**Q Do you remember anybody who walked 10:41**
**by? 10:41**
A No. 10:41
**Q Did you ever speak to Ed Paradiso 10:41**
**about the Halloween incident? 10:41**
A No. 10:41
**Q And just so we are clear, when I say 10:41**
**"speak with," I intend that to mean in person, 10:41**
**over the phone, e-mail, any -- any form of 10:41**
**communication just, so we are clear? 10:41**
A Never. 10:41
**Q So, your answer doesn't change based 10:41**
**on that definition? 10:41**
A Correct. 10:41
**Q Did you ever speak to the Bosettis 10:41**
**about their termination? 10:41**
MR. NOVIKOFF: Objection to form. 10:41
I don't think you have laid a 10:41
foundation that they both were terminated, 10:41
but you can answer the question. 10:41
A I knew they were terminated or one of 10:41
them were terminated. I don't know which one or 10:41
both. 10:42

T. Bacon
**Q Did you ever speak to either of them 10:42**
**about the fact that one or both of them had been 10:42**
**terminated? 10:42**
MR. NOVIKOFF: As it relates to the 10:42
Halloween incident? 10:42
MR. GOODSTADT: Yes. In '04. 10:42
I'm not talking about any more recent 10:42
terminations. 10:42
MR. NOVIKOFF: Okay. Fine. 10:42
A No. 10:42
**Q Did you ever speak to George Hesse 10:42**
**about the fact that one or more of the Bosettis 10:42**
**had been terminated in '04? 10:42**
A No. 10:42
**Q Did you ever speak to Ed Paradiso 10:42**
**about that? 10:42**
A No. 10:42
**Q Do you know what the Ocean Beach 10:42**
**Police Department did, if anything, to investigate 10:42**
**the Halloween incident? 10:42**
A No idea. 10:42
**Q And I know you said you didn't read 10:42**
**any witness statements or anything else in the 10:42**
**file, but are you aware of any witnesses who gave 10:42**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon
**any statements? 10:42**
A I am not. 10:42
**Q Do you know who Doug Wyckoff is? 10:42**
A Yes. 10:43
**Q Who is Doug Wyckoff? 10:43**
A He's a member of the fire department. 10:43
**Q Which fire department? 10:43**
A Ocean Beach. 10:43
**Q Are you friends with Doug Wyckoff? 10:43**
A I know him in passing. 10:43
**Q Does he work as a bouncer at any of the bars in Ocean Beach? 10:43**
A He also works at CJ's as a bouncer and I believe he's a school teacher. 10:43
**Q In Ocean Beach School District? 10:43**
A I'm not sure where he teaches. 10:43
MR. NOVIKOFF: There is actually a school district of Ocean Beach? 10:43
THE WITNESS: Yes. 10:43
MR. GOODSTADT: I think there is a school district. 10:43
**Q Who is Sean O'Rourke? 10:43**
A Sean O'Rourke, he's a bouncer in Ocean Beach, also. 10:43

T. Bacon
**Q What bars does he bounce at? 10:43**
A Actually, I think he's at Houser's. 10:43 Also a member of the fire department. 10:43
**Q Do you know whether he's ever been arrested in Ocean Beach? 10:44**
A No idea. 10:44
**Q Are you friends with Sean O'Rourke? 10:44 Are you friends with sean O'Rourke? 10:44**
A Other than, "Hi, how are you," while on patrol, no. 10:44
**Q Have ever spoke with Sean O'Rourke about the Halloween incident? 10:44**
A No. 10:44
**Q Who is Elise Miller? 10:44**
A I don't know her. 10:44
**Q Do you know who Mike Miller is? 10:44**
A No. 10:44
**Q Do you know who Ian Levine is? 10:44**
A Yes. 10:44
**Q Who is Ian Levine? 10:44**
A Someone, who is also a member of the fire department. 10:44
**Q The Ocean Beach Fire Department? 10:44**
A Yes. 10:44

T. Bacon
**Q Are you friends with Ian Levine? 10:44**
A Once again, nothing more than "Hi, how are you," when I am working. 10:44
**Q Did you ever speak with Ian Levine about the Halloween incident? 10:44**
A No. 10:44
MR. NOVIKOFF: Wouldn't those questions, again, be subsumed within the two or three questions that you asked did he speak to anybody else other than Jaeger and Bosetti? It just seems like he answered that. 10:45
MR. GOODSTADT: Yes. And then he remembered a conversation that he had with Tom Snyder. So, I just want to be sure that I am clear. 10:45
MR. NOVIKOFF: That's fine. 10:45
BY MR. GOODSTADT: 10:45
**Q Did you attend any of the court appearances of any of the people who were involved in the Halloween incident? 10:45**
A No. 10:45
**Q Did you ever speak to anyone in the District Attorney's office about the Halloween? 10:45**

**T. Bacon**
A No. 10:45
**Q Have you ever spoken with anyone in the District Attorney's office about anything to do with respect to your employment at Ocean Beach? 10:45**
A No. 10:45
MR. GOODSTADT: Just mark this please. 10:46
(Bacon Exhibit 10 marked for identification as of this date.) 10:46
**Q What was the -- strike that. 10:46**
**Was there an annual department meeting before the season? 10:46**
A Yes. 10:46
**Q Every year? 10:46**
A Yes, most years. 10:46
**Q Did you attend it every year in which you worked at Ocean Beach? 10:47**
A Most years, not every year. 10:47
**Q How did you learn about the date that that was going to occur each year? 10:47**
A They would send out a memo. 10:47
**Q When you say "they," who is they? 10:47**
A The police department, George or the Chief. 10:47

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 309

T. Bacon
Q And who would preside over the annual department preseason meeting? 10:47
A The Chief. 10:47
Q So, Ed Paradiso? 10:47
A Yes. 10:47
Q And did there come a point in time where George Hesse started presiding over it? 10:47
A Yes. 10:47
Q What was the first year that you recall George Hesse presiding over the meeting? 10:47
A The first year that Eddie was out on his line-of-duty injury. 10:47
Q Do you recall what year that was? 10:47
A No, I don't. 10:47
Q I place in front of, Mr. Bacon, what has now been marked as Bacon 10. 10:47
It's a one-page exhibit bearing Bates number 2662. 10:47
Mr. Bacon, do you recall receiving this memo that has now been marked as Bacon 10? 10:48
A Yes. 10:48
Q And how did you receive this? Was it something that was mailed to your home, or handed to you at the station, or some other way? 10:48

Page 310

T. Bacon
A Mailed to my home. 10:48
Q Did you work any tours in the '05 off season? 10:48
A I'm sure I did, but I don't recall specifically. 10:48
Q And prior to -- well, strike that. 10:48
Did you attend the April 2nd, 2006, meeting? 10:48
A I may have. I don't recall specifically. 10:48
Q Do you recall speaking with George Hesse at all about staffing issues prior to the '06 meeting? 10:48
MR. NOVIKOFF: Objection. You can answer. 10:48
A I don't recall. 10:48
Q Did you receive anything else from Ocean Beach announcing this meeting or is this the only document that you received? 10:49
A To the best of my recollection, I believe that was it. 10:49
Q And could you take a look at 10? 10:49
If you look down on the second line, toward the end of the second line, it starts "All 10:49

Page 311

T. Bacon
officers." Do you see that? 10:49
A The second line -- 10:49
MR. NOVIKOFF: Starting with "All officers are required"? 10:49
MR. GOODSTADT: Yes. 10:49
MR. NOVIKOFF: That is the third line -- second line, third sentence. 10:49
MR. GOODSTADT: End of the second line. 10:49
A Yes. 10:49
Q "All officers are required to bring all issued equipment with them for inspection." 10:49
Do you see that? 10:49
A Yes. 10:49
Q Was that an annual requirement? 10:49
MR. NOVIKOFF: Objection. 10:49
A I don't recall. 10:49
Q So, you don't recall whether each year you had to bring in your issued equipment for inspection? 10:49
A No, I don't recall. 10:49
Q Do you recall whether you brought all your equipment to this meeting? 10:49
A I don't recall if I even attended 10:49

Page 312

T. Bacon
this meeting. 10:49
Q Do you recall being in a meeting at which the plaintiffs, at least four of the plaintiffs in this case were terminated prior to when the meeting started? 10:50
A I wasn't there when it happened, no. 10:50
Q You weren't at the meeting -- 10:50
A No. 10:50
Q -- on the day that the four officers were told that they weren't going to be working for the upcoming season? 10:50
A Actually, I got there late. I did attend the meeting, but it was after that happened. 10:50
Q What do you mean, you got there late. 10:50
Did you get there after the meeting had started or after the discussions with the four officers? 10:50
A After the -- 10:50
MR. NOVIKOFF: Objection. You can answer. 10:50
A After the meeting started and after the discussion with the four plaintiffs. 10:50
Q Okay. So, now that you have -- if I 10:50

T. Bacon

**represent to you that it was April 2nd, 2006, that 10:50 the discussion with those officers happened, that 10:50 refreshes your recollection that you were actually 10:50 at the meeting in '06? 10:50**

A Yes. 10:50

**Q And now that you recall that you were 10:50 there, do you recall whether you actually brought 10:50 your issued equipment for inspection? 10:51**

A I believe I did. 10:51

**Q Was all your equipment inspected? 10:51**

A That I don't recall. 10:51

**Q Who generally inspected the equipment 10:51 for the Ocean Beach Police Department, if anyone? 10:51**

A George had inspected the equipment. 10:51 He wanted to insure that everybody had firearms 10:51 that were registered to them, the serial numbers 10:51 matched up and stuff like that. 10:51

Like I said, I got there late. I got 10:51 there almost when the meeting was over and they 10:51 pulled me aside. I wanted to make sure I had my 10:51 three magazines for my firearm. He had to replace 10:51 two of them, because they were the older style, 10:51 and that I did have the weapon that was registered 10:51 to me, serial number. 10:51

T. Bacon

**Q And the last time I believe you 10:51 testified that you used to carry your own personal 10:51 firearm, but then you started carrying an Ocean 10:51 Beach firearm; is that correct? 10:51**

MR. NOVIKOFF: Note my objection. 10:52

A Yes. 10:52

**Q In '06, were you carrying your own 10:52 firearm with respect to your position as a police 10:52 officer in Ocean Beach or at that point in time 10:52 you had a Beach-issued weapon? 10:52**

A From 1999 on, I have carried a 10:52 department-issued firearm. 10:52

**Q So, the answer was in '06, it was an 10:52 Ocean Beach firearm? 10:52**

A Correct. 10:52

**Q And it says in the fourth line, it 10:52 says, "new ID will be issued to all." 10:52**

**Do you see that? 10:52**

A Yes. 10:52

**Q Do you recall whether you actually 10:52 received a new ID that day? 10:52**

A We didn't receive it that day. They 10:52 took photographs. 10:52

**Q And did you subsequently receive a 10:52**

**T. Bacon**

**new ID? 10:52**

A Yes. 10:52

**Q Was that ID different than the ones 10:52 that you carried previously? 10:52**

A It had an updated photograph. 10:52

**Q That was it, but everything else was 10:52 the same. 10:52**

A And the expiration date, I think, 10:52 changed. 10:52

**Q The format of the ID, other than the 10:52 picture and the expiration date, was the same? 10:52**

A I don't recall. 10:53

**Q It says here that meeting was to 10:53 start at 1200 hours. 10:53**

**Do you see that? 10:53**

A Yes. 10:53

**Q What time did you arrive? 10:53**

A Probably closer to one or 1:30. 10:53

**Q Did you have to sign in for meeting? 10:53**

A No. Actually, I don't recall if we 10:53 did or we didn't. I can't answer for certain. 10:53

**Q Do you recall whether you signed in? 10:53**

A I don't remember. 10:53

**Q Were you paid for attending that 10:53**

**T. Bacon**

**meeting? 10:53**

A I don't remember. 10:53

**Q When did you first learn that the 10:53 plaintiffs in this case were no longer going to be 10:53 working at the beach? 10:53**

A When I got there. 10:53

**Q How did you find out? 10:53**

A The water taxi that brought me there, 10:53 they were all leaving. I came in on a water taxi 10:53 and they were leaving on that same water taxi. 10:54

**Q Did you speak to any of the 10:54 plaintiffs that day? 10:54**

A No. 10:54

**Q Did you say anything to the 10:54 plaintiffs that day? 10:54**

A No. 10:54

**Q How did you learn that they were not 10:54 going to be working there for the season? 10:54**

A I think I asked George when I got 10:54 there, "What happened?" 10:54

He said, "They weren't invited back," 10:54 something to that effect. 10:54

**Q Did he tell you why? 10:54**

A No. 10:54

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 317

T. Bacon
**Q Did you ever ask him why? 10:54**
A No. 10:54
**Q Sitting here today -- well, strike that. 10:54**
**Do you recall which of the plaintiffs were getting on the water taxi that you took over? 10:54**
A I remember seeing Carter -- Carter and Snyder, I believe, Lamm, and -- 10:54
MR. NOVIKOFF: Don't guess. If you know, you know. 10:54
A Yeah. I don't remember for certain if it was all five or it was just a couple of them. I don't know. 10:54
**Q Do you specifically recall seeing any of them sitting here today? 10:54**
A Somebody, somebody was. There was at least three of them. 10:55
**Q I understand that, but my question was: Sitting here today, do you specifically recall -- 10:55**
A Who it was, no? 10:55
**Q Do you recall any of the people that they were specifically? 10:55**
A No. 10:55

Page 318

T. Bacon
**Q So, it could have been any combination of the five? 10:55**
A Right. 10:55
**Q And when you got there, the meeting had already been going on; is that correct? 10:55**
A Yes. 10:55
**Q Where was the meeting being held? 10:55**
A In the rec center, right behind the police station. 10:55
**Q How many people were at the meeting? 10:55**
A Twenty. 10:55
**Q Was it just for police officers or were other positions in the department there as well? 10:55**
A I think we may have had dispatchers and, perhaps, dockmasters, but I am not certain. 10:55
Can we take a break for me to use the restroom? Just a quick -- 10:55
MR. GOODSTADT: Yeah. That is fine with me. 10:55
THE VIDEOGRAPHER: The time is 10:56 a.m. We are going off the record. 10:55
(Recess taken.) 11:04
THE VIDEOGRAPHER: The time is 11:04

Page 319

T. Bacon
11:05 a.m. 11:04
We are back on the record. 11:04
BY MR. GOODSTADT: 11:04
**Q So, I believe that you testified, before we took a break, that you learned that the plaintiffs were being let go from George Hesse; is that correct? 11:05**
A No. I learned that they were leaving when I was coming in. 11:05
**Q Right, but my question was when you learned that they were no longer going to be working -- 11:05**
A Yes. 11:05
**Q -- going forward; that was from George Hesse? 11:05**
A Yes. 11:05
**Q And how did he communicate to you? 11:05**
A I just asked what was -- "Where are they going," when I got there? 11:05
He said, "They are no longer with us," or "they are not working anymore," something to that effect. 11:05
**Q When you got to the meeting, you asked George Hesse that question? 11:05**

Page 320

**T. Bacon**
A Yes. 11:05
**Q Did you speak with anyone else about the guys that you saw leaving -- 11:05**
A No. 11:05
**Q -- prior to George Hesse? 11:05**
A No. 11:05
**Q How long after you got there did you ask George that question? 11:05**
A The meeting looked like it was pretty much over at that point, because I think the hero, you know, they had gotten a hero. We were going to be having lunch. 11:05
There was some paperwork that I had to fill out. I had to have my ID card photo taken. A short time afterward, within 15 minutes of me getting there. 11:06
**Q And what do you recall George telling you about the fact they had been let go? 11:06**
A "They are not going to be working with us this season." 11:06
**Q You didn't ask him why? 11:06**
A No. 11:06
**Q He didn't tell you why? 11:06**
MR. NOVIKOFF: Objection. Asked and 11:06

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 321

T. Bacon
answered. 11:06
A No. 11:06
**Q Sitting here today, do you know why 11:06 they were let go? 11:06**
MR. NOVIKOFF: Objection. 11:06 Foundation. 11:06
You can answer. 11:06
A Sure. Because they were incompetent. 11:06
**Q And how do you know that that is the 11:06 reason they were let go? 11:06**
A Because I worked with these guys. 11:06
**Q Did you know who made the decision to 11:06 let them go? 11:06**
A I have no idea. 11:06
**Q Did anyone ever tell you they were 11:06 let go because they were incompetent? 11:06**
A No. 11:06
**Q So, that is your -- 11:06**
A It's my opinion. 11:06
**Q -- your opinion? 11:06**
**I'm not asking you -- I know I have 11:06 asked you a lot about your opinion today, but this 11:06 question is not a question about your opinion. 11:06**
**I'm asking whether you know why they 11:06**

Page 322

**T. Bacon**
**were let go. 11:07**
A No, I do not. 11:07
MR. NOVIKOFF: Just note my same 11:07 objection to the prior, identical question. 11:07
BY MR. GOODSTADT: 11:07
**Q Have you spoken with any of the 11:07 plaintiffs since that April 2nd, 2006, date? 11:07**
A No. 11:07
**Q Who have you spoken with about the 11:07 fact that the plaintiffs have been let go, between 11:07 April 2nd and today? 11:07**
MR. NOVIKOFF: Other than counsel. 11:07
**Q Other than counsel. 11:07**
A My wife. 11:07
**Q Anyone else? 11:07**
A No. 11:07
**Q Just George Hesse and your wife? 11:07**
A Yes. 11:07
**Q And counsel? 11:07**
A Yes. 11:07
MR. CONNOLLY: Objection, Andrew. 11:07 Only in that -- you can read back the 11:07 question. I think it infers that the 11:07 witness spoke to George Hesse as to why they 11:07

Page 323

T. Bacon
were let go. 11:07
MR. GOODSTADT: No. 11:07
**Q The question was intended to be: Who 11:07 else have you spoken with about the fact that they 11:08 had been let go, other than for George Hesse, 11:08 which you already testified to that conversation; 11:08 counsel, which I don't care what you said to 11:08 counsel; and your wife, who also I don't care what 11:08 you said to your wife. 11:08**
A That's it. 11:08
**Q Thank you. 11:08**
**Have you ever spoken the Bosettis 11:08 about any of the plaintiffs since April 2nd, 2006? 11:08**
A Nope. 11:08
**Q Never mentioned any of their names to 11:08 the Bosettis? 11:08**
A No. 11:08
MR. NOVIKOFF: Just -- I'm sorry. 11:08 Just give me two seconds. I'm expecting one 11:08 call. 11:08
(Telephone interruption.) 11:08
THE VIDEOGRAPHER: The time is 11:08 11:08 a.m. 11:08
We are going off the record. 11:08

Page 324

T. Bacon
(Recess taken.) 11:09
THE VIDEOGRAPHER: The time is 11:09 11:09 a.m. We are back on the record. 11:09
BY MR. GOODSTADT: 11:09
**Q Just to go back to the last question, 11:09 could I see it? 11:10**
**Just so I am clear, I just don't want 11:10 the semantics to get in the way. You never 11:10 mentioned any of the plaintiffs' names to either 11:10 Gary or Richard Bosetti? 11:10**
A Not that I recall. 11:10
**Q Do you recall either Gary or Richard 11:10 Bosetti discussing anything at all about the 11:10 plaintiffs in the case with you since April 2nd, 11:10 2006? 11:10**
MR. NOVIKOFF: Note my objection. 11:10
A I do not. 11:10
**Q Did you ever hear that there were 11:10 budget cuts in the beginning of the season of 11:10 2006? 11:10**
A No, I did not. 11:10
**Q Do you know whether there were any 11:10 budget cuts in the Ocean Beach Police Department 11:10 in 2006? 11:10**

T. Bacon
MR. NOVIKOFF: Objection. 11:10
A I do not. 11:10
**Q I don't recall if I asked you this question. Let me ask it again, if I did. 11:10**
**Did you say anything to any of the officers who were getting on to the water taxi that you were getting off of? 11:11**
A No. 11:11
**Q Didn't even exchange pleasantries, nothing? 11:11**
A No. They seemed like they were pretty annoyed, irate. Just pretty much went storming by. 11:11
**Q Did you hear anything that they were discussing amongst themselves at all? 11:11**
A I did not. 11:11
**Q What made you believe that they were irate? 11:11**
A They just -- they stuck to themselves, were on their way. They just didn't seem happy. 11:11
**Q Did you get there for any of the meeting? 11:11**
A I'm sorry. 11:11

T. Bacon
**Q Did you get there for any of the meeting? 11:11**
A Like I said, I caught the very tail end and had to do the paperwork for the new ID card, have my weapon inspected, my new ID card photo. The meeting was pretty much over at that point in time. 11:12
**Q So, you weren't there when anybody was talking to the group? 11:12**
A No. 11:12
**Q Who is Chris Moran? 11:12**
A Chris Moran is a dockmaster. 11:12
**Q We he at that meeting? 11:12**
A I don't recall. 11:12
**Q Do you ever work at the same time as Chris Moran? 11:12**
A Yes. He used to be the dockmaster, now he's a dispatcher. 11:12
**Q Is Chris Moran a good dispatcher in your opinion? 11:12**
MR. NOVIKOFF: Objection. 11:12
BY MR. GOODSTADT: 11:12
**Q You can answer. 11:12**
A Okay. Yeah, he seems to be pretty

T. Bacon
good. 11:12
**Q Do you think he's an honest guy? 11:12**
MR. NOVIKOFF: Objection. 11:12
A Yes. 11:12
**Q Do you know whether any newly hired officers were at that meeting? 11:12**
A I don't recall. 11:12
**Q Do you know whether any new officers were hired for '06? 11:13**
A I don't recall. 11:13
**Q Did you hear or -- strike that. 11:13**
**Did you discuss the fact that some or all the plaintiffs were no longer going to be working there with anyone else on that day, other than for the conversation you have already testified to with George Hesse? 11:13**
MR. NOVIKOFF: Objection to the form. 11:13
A Not that I recall. 11:13
**Q Did you hear anybody else discussing it? 11:13**
A Not that I recall. 11:13
**Q So, sitting here today, did you ever hear anybody state the reasons why the plaintiffs were let go? 11:13**

T. Bacon
A Not that I recall. 11:14
**Q What's George Hesse's position today? 11:14**
MR. NOVIKOFF: Objection. Foundation. 11:14
A Deputy Chief. 11:14
**Q Do you know whether you have to take a test to become a Deputy Chief, a civil service test? 11:14**
MR. NOVIKOFF: Objection, foundation. 11:14
A I don't know for sure. 11:14
**Q Do you know what a blog is? 11:14**
A Um-hum. 11:14
**Q What is a blog? 11:14**
A It's a, I guess, a computer web page, people post things, usually full of nonsense, ranting. 11:14
**Q Have you ever read a blog with respect to Ocean Beach? 11:15**
A Yes. 11:15
**Q And what blog is that? 11:15**
A Ocean Beach Police Corruption. 11:15
**Q Did you ever post on that blog? 11:15**
A No, I did not. 11:15
**Q When was the first time you read the 11:15**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Ocean Beach Police Corruption blog? 11:15**
A A couple years ago. 11:15
**Q Do you recall what year it was? 11:15**
A No, I don't. 11:15
**Q What computer did you read it on? 11:15**
MR. NOVIKOFF: Objection. 11:15
**Q Strike that. 11:15**
**Did you read it on a computer or did 11:15 you read it on a hard copy? 11:15**
A I read on it a computer. 11:15
**Q What computer did you read it on? 11:15**
A I don't recall. 11:15
**Q Did you ever read the Ocean Beach 11:15 Police Corruption blog at the Ocean Beach Police 11:15 Station? 11:15**
A Yes. 11:15
**Q On the Ocean Beach Police Station 11:15 computer? 11:15**
A Yes. 11:15
**Q How many times? 11:15**
A Three or four. 11:15
**Q Do you know what the website is that 11:16 you go to? Is it just Ocean Beach Police 11:16 Corruption.com? 11:16**

T. Bacon

A No, I think it's Long Island 11:16 Politics. It's a pretty vast, covers the 11:16 volunteer fire service, the police department, 11:16 sheriffs. People post all sorts of nonsense on 11:16 there. 11:16
**Q Is that the one where you click on 11:16 the Schwartz report? Is that what it's called? 11:16**
A That I don't know. 11:16
**Q And other than for the three or four 11:16 times that you reviewed the blog at the police 11:16 station computer, have you reviewed the blog, the 11:16 Ocean Beach Police Corruption blog at any other 11:16 time? 11:16**
A Yes. 11:16
**Q And how many other times have you 11:16 reviewed that blog? 11:16**
A Maybe three or four times, other than 11:16 what we previously spoke about. 11:16
**Q So, in addition to the three or four 11:16 times, you have reviewed it three or four other 11:16 times? 11:16**
A Yeah. Maybe a half dozen to ten 11:17 times, tops. 11:17
**Q Where were you those other times that 11:17**

T. Bacon

**you reviewed that blog? 11:17**
A Home. 11:17
**Q Every time was at home? 11:17**
A A couple times at home, maybe when I 11:17 was traveling. 11:17
**Q What computer did you use to view it 11:17 when you were traveling? 11:17**
A My own personal computer. 11:17
**Q The laptop that you have? 11:17**
A Yes. 11:17
**Q Is that the same computer that you 11:17 viewed it at home? 11:17**
A Yes. 11:17
**Q Do you still have that laptop? 11:17**
A No, I don't. 11:17
**Q Where that is laptop? 11:17**
A It got destroyed. 11:17
**Q When did it get destroyed? 11:17**
A Coming back from Iraq. 11:17
**Q How did it get destroyed? 11:17**
A Sand and dust, and when it was in my 11:17 carry-on, it got bounced around, and the hard 11:17 drive crapped out. 11:18
**Q Did you throw out the computer? 11:18**

T. Bacon

A Yes. 11:18
**Q Did you recover any of the data from 11:18 the hard drive before throwing it out? 11:18**
A No. It was shot. 11:18
**Q Other than for that laptop, have you 11:18 reviewed the Ocean Beach Police Corruption blog on 11:18 any other computer that you own? 11:18**
A No. 11:18
**Q Do you have a new laptop? 11:18**
A No, I don't. 11:18
**Q Do you have a home computer, a PC? 11:18**
A No. 11:18
**Q So, you don't have any computer at 11:18 your home? 11:18**
A No, I use my -- little Palm. 11:18
**Q Your Palm device? 11:18**
A Um-hum. 11:18
**Q Have you reviewed the blog at all on 11:18 your Palm device? 11:18**
A No. 11:18
**Q Do you know anyone who has ever 11:18 posted on the Ocean Beach Police Corruption blog? 11:19**
A I do not. 11:19
**Q Did you ever hear that Pat Cherry, 11:19**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Sr. posted on the blog? 11:19**
A No idea. 11:19
**Q Did you ever ask him? 11:19**
A No. 11:19
**Q Did you ever ask any other employees 11:19 of the Ocean Beach or Ocean Beach Police 11:19 Department whether they have posted on the blog? 11:19**
A No. 11:19
**Q Did you ever tell George Hesse that 11:19 you posted on the blog? 11:19**
A Nope. 11:19
MR. GOODSTADT: Give me one second. 11:19 I have exhibits in my office that I need. 11:19
THE VIDEOGRAPHER: The time is 11:19 11:19 a.m. We are going off the record. 11:19
(Recess taken.) 11:19
THE VIDEOGRAPHER: The time is 11:20 11:20 a.m. 11:20
We are back on the record. 11:20
BY MR. GOODSTADT: 11:20
**Q Did you ever refer to Kevin Lamm as 11:20 being gay? 11:20**
A No. 11:20
**Q Did you ever refer to him as being 11:20**

T. Bacon

**queer? 11:21**
A No. 11:21
**Q Did you ever refer to him as being a 11:21 fag? 11:21**
A No. 11:21
**Q Did you ever hear anyone refer to 11:21 Kevin Lamm with any of those terms? 11:21**
A No. 11:21
MR. NOVIKOFF: Hear? Do you mean 11:21 hear, read? I mean, you gave a broad 11:21 definition of speak the last time. 11:21
MR. GOODSTADT: I want it as broad as 11:21 possible. 11:21
MR. NOVIKOFF: So, hear means -- 11:21
MR. GOODSTADT: Hear means read with 11:21 your ears, with your eyes. 11:21
MR. NOVIKOFF: Has he ever seen any 11:21 communication? 11:21
BY MR. GOODSTADT: 11:21
**Q That's a good way to put it. 11:21**
**Have you ever seen any communication 11:21 that refers to Kevin Lamm as gay, queer, fag or 11:21 the like? 11:21**
A Yes. 11:21

T. Bacon

**Q How many times you have seen such 11:21 communications? 11:21**
A A couple. 11:21
**Q And where you have seen those 11:21 communications? 11:21**
A It was posted on the blog. 11:21
**Q Have you seen a reference to Kevin 11:21 Lamm being gay or queer or a fag or anything of 11:21 that ilk anywhere else? 11:21**
A No. 11:21
**Q Did you ever hear anybody verbally 11:21 call Kevin Lamm gay or fag or queer? 11:21**
A No. 11:22
**Q How many blog entries do you recall 11:22 where that was referenced? 11:22**
A More than one. I don't recall for 11:22 certain. 11:22
**Q Do you know who posted those blog 11:22 entries? 11:22**
A No idea. 11:22
**Q Did you ever see it written anywhere 11:22 in the station? Not on the computer, I mean 11:22 physically in the station. 11:22**
A No. 11:22

T. Bacon

**Q Do you recall it ever being written 11:22 on a wall? 11:22**
A No, I do not. 11:22
**Q Do you recall any pictures ever being 11:22 posted that referenced that? 11:22**
A No. 11:22
**Q Have you ever seen anyone post on the 11:22 Ocean Beach Police Corruption blog? 11:22**
A No. 11:22
MR. NOVIKOFF: Wait, is the 11:22 question -- 11:22
**Q Did you ever see anyone actually 11:22 post? 11:22**
MR. NOVIKOFF: Okay. 11:22
**Q Type in a post? 11:22**
A No, that I have not. 11:22
**Q Other than for me and your counsel, 11:22 possibly, has anyone ever asked you whether you 11:22 have posted on the blog? 11:22**
A Yes. George had -- actually, George 11:22 had sent out a memo that was posted at the station 11:23 house for everyone to stay off the blog, period, 11:23 not even to review it. 11:23
**Q Do you recall when that was sent? 11:23**

T. Bacon

A That was posted at the station, it 11:23 wasn't sent, two years ago, a year ago. 11:23

**Q So, it was either in '07 or '08? 11:23**

A Yes, somewhere in that time frame. 11:23

**Q And that was posted where in the 11:23 station? 11:23**

A On the memo board. There is a board 11:23 with all memos, you know, on the bulletin board. 11:23

**Q How long did the memo stay up for? 11:23**

A It may still be there, because 11:23 they -- it's on a big clipboard with a big ring 11:23 and any new memos, you know, go on top of the old 11:23 ones. 11:23

MR. GOODSTADT: I would like to mark 11:23 the record to request a copy of that memo, 11:23 because I don't believe that it has been 11:23 produced. 11:24

MR. NOVIKOFF: Take it under 11:24 advisement. You will follow-up with a 11:24 letter; right? 11:24

MR. GOODSTADT: Sure. 11:24

**Q Now, just to go back to the question 11:24 that I asked that led to your answer about the 11:24 memo, did anyone ever ask you whether you posted 11:24**

T. Bacon

**on the blog, other than for me and counsel? 11:24**

A I think George may have asked if I 11:24 posted something on the blog at one point. 11:24

**Q When did he ask that? 11:24**

A Around the same time the memo came 11:24 out. 11:24

**Q So, at some point in '07 or '08? 11:24**

A Somewhere around there, yes. 11:24

**Q And it wasn't in '06? 11:24**

MR. NOVIKOFF: Objection. 11:24

A It may have been. I don't recall for 11:24 certain. 11:24

**Q And what, exactly, did he ask you? 11:24**

A If I posted anything on the blog and, 11:24 if I had, that it's to stop right then and there, 11:24 and he's instructing everybody in the department 11:24 the same. 11:24

**Q What was your response? 11:24**

A I didn't post anything on the blog. 11:24

**Q Was anyone else there during that 11:25 conversation? 11:25**

A Not that I recall. 11:25

**Q Where were you when he asked you that 11:25 question? 11:25**

T. Bacon

A I think I was in the police station 11:25 coming on duty. 11:25

**Q I believe the last time you testified 11:25 that there were three computers in the police 11:25 station; is that correct? 11:25**

A Yes. 11:25

**Q Have there always been three since 11:25 2006? 11:25**

A There were three in there, maybe one 11:25 was out for repair. They had a problem at one 11:25 point, they had a lightning strike at the building 11:25 and it blew them all out. We were working with 11:25 one computer for a period, but I don't remember if 11:25 that was in that time frame or not. 11:25

**Q How many of the computers were for 11:25 use by any officer who wanted to use them? 11:25**

MR. NOVIKOFF: Objection. 11:25

A I think you could access all three of 11:25 them. 11:25

**Q Physically, where were they located? 11:25**

A One was at the dispatcher's desk, one 11:25 was at George's desk and one was further back at 11:26 Eddie's desk. 11:26

**Q Have you used all three of them? 11:26**

T. Bacon

MR. NOVIKOFF: During the course of 11:26 the 20 years? 11:26

MR. GOODSTADT: Since 2006 until now. 11:26

A Since 2006? I may have. 11:26

**Q Which computer or computers did you 11:26 use to access the blog in the station? 11:26**

A The one at the dispatch desk. 11:26

**Q Did you ever use the one at George's 11:26 desk? 11:26**

A No. 11:26

**Q Did you ever use the one -- when you 11:26 say "Eddie," it's Eddie Paradiso? 11:26**

A Yes. 11:26

**Q Did you ever use the one at 11:26 Paradiso's desk to access the blog? 11:26**

A No. 11:26

**Q Was anybody else with you when you 11:26 accessed the blog at the police station? 11:26**

A I don't recall. 11:26

**Q Have you ever discussed the blog with 11:26 anyone, other than for the conversation you 11:26 testified to that you had with George Hesse? 11:26**

A Just that there was a lot of bullshit 11:26 posted on it. 11:26

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q Who did you discuss that with? 11:26**

A I think that has come up in conversation with probably just about everybody working there. 11:26

**Q Has anyone working there ever mentioned to you that they have posted on the blog? 11:27**

A No. 11:27

**Q Has anyone working there mentioned to you anyone that they have known who has posted on the blog? 11:27**

A Say that again. Did they -- 11:27

**Q Has anyone working there ever tell you, yeah, you know, my friend, Charlie, posted on the blog; or, yeah, you know, another guy who used to work here posted on the blog? 11:27**

A No. Nobody has ever said that they had posted anything on the blog. All the conversations with guys that were working were that they were reading the blog, and found it quite humerous or disgusting, depending upon what it was that was written, you know. 11:27

**Q And have you had conversations with everyone who works there about that? 11:27**

**T. Bacon**

A Pretty much, yeah. 11:27

**Q Sitting here today, do you know anybody who has ever posted on the Ocean Beach Police Corruption blog? 11:27**

A No. 11:28

**Q Has anyone ever told that you they have posted on the blog? 11:28**

A No. 11:28

MR. NOVIKOFF: Objection. Asked and answered. 11:28

(Bacon Exhibit 11 marked for identification as of this date.) 11:28

MR. NOVIKOFF: I'm just going to represent that I haven't, obviously, looked through each page to see if this is what is -- if these have been, if the numbers are in consecutive order. 11:29

I trust that they are, and I trust that this represents what you will say it purports to represent. 11:29

MR. GOODSTADT: Yes. 11:29

And I will indicate that for the record, but I will represent that the Bates stamped indicates it was produced from 11:29

T. Bacon

George Hesse. 11:29

MR. NOVIKOFF: Twelve through 206. 11:29

My point is, I haven't looked through every page to see if there is any page missing. 11:29

MR. CONNOLLY: I can represent that these were copied from the blog. 11:29

MR. GOODSTADT: Okay. 11:29

**Q I have placed in front of Mr. Bacon what has now been marked as Bacon 11. It's a copy of the blog entries. 11:29**

**On top it says "the Schwartz report" and it bears Bates numbers Hesse 12 through Hesse 206. 11:29**

**Mr. Bacon, have you ever referred to Kevin Lamm as Kevina? 11:29**

A Who? 11:29

**Q Kevina, K-E-V-I-N-A? 11:29**

A No. 11:29

**Q Did you ever hear him referred to by that name? 11:30**

A No. 11:30

**Q If you look at Hesse 16 -- 11:30**

A Okay. 11:30

T. Bacon

**Q -- the entry that is time stamped 10:55 p.m. 11:30**

**Do you see that? 11:30**

A Okay. 11:30

**Q On 4/6/06? 11:30**

MR. NOVIKOFF: 10:55 p.m. 11:30

MR. GOODSTADT: On 4/6/06. 11:30

MR. NOVIKOFF: And underneath that is "ridiculous"? 11:30

MR. GOODSTADT: Yes. 11:30

MR. NOVIKOFF: Okay. 11:30

BY MR. GOODSTADT: 11:30

**Q Have you ever reviewed that blog? 11:30**

**Have you seen that before, that entry? 11:30**

A I may have. I don't remember anything specific about it. 11:30

**Q Do you know who "OB Res." is? 11:30**

A No. 11:30

**Q Do you know whether you were working on April 6, 2006? 11:30**

A I have no idea. 11:30

**Q And do you see it says, "I heard that there was some 'town employees' that got fired." 11:30**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Do you see that? 11:31**

A Um-hum. 11:31

**Q Do you know what that "town employees" refers to? 11:31**

A I do not. 11:31

**Q Can you look at the next page, Hesse 17? 11:31**

A Okay. 11:31

**Q If you look at the entry at 11:02 p.m. on 4/7. 11:31**

A Okay. 11:31

**Q It says "Guest P.O." 11:31**

**Do you see that? 11:31**

A Um-hum. 11:31

**Q Do you know who "Guest P.O." is? 11:31**

A No idea. 11:31

**Q Do you recall ever reviewing this blog? 11:31**

A Not specifically. 11:31

**Q Is it your testimony that you didn't post this blog? 11:31**

A Yes. It's my testimony that I didn't post that blog. 11:31

**Q Your testimony is you don't know who 11:31**

T. Bacon

**posted that blog? 11:31**

A That's my testimony. 11:31

**Q Do you know whether you were working on April 7, 2006? 11:31**

A I could have been. 11:31

**Q You don't recall one way or the other? 11:31**

A No, I don't. 11:31

**Q If you look at the next page, Hesse 18. 11:32**

A Okay. 11:32

**Q Do you see 4/8/2006, at 6:16 a.m.? 11:32**

**Do you see that entry? That doesn't have a person's name. 11:32**

A Okay. 11:32

**Q Do you see that? Did you ever review this blog? 11:32**

A I don't recall. 11:32

**Q Do you know whether you were working April 8, 2006? 11:32**

A No. I don't. 11:32

**Q And where it says, "and let's not forgot the two clowns from Islip, Ed and Tom." 11:32**

**Do you see that? 11:32**

T. Bacon

A Um-hum. 11:32

**Q Do you know who "the two clowns from Islip, Ed and Tom," refer to? 11:32**

A I would assume they are probably talking about Ed Carter and Tom Snyder? 11:32

**Q Is it your testimony you didn't post this blog? 11:32**

A Yes. 11:32

**Q If you look at Hesse 24 -- 11:33**

A Okay. 11:33

**Q -- look at the entry, 4/18/06 at 9:22 p.m. 11:33**

**Do you see that? 11:33**

A Um-hum. 11:33

**Q Titled "Sick of the rats." 11:33**

**Do you see that? 11:33**

A Yes. 11:33

**Q Do you know who that is, "Sick of the rats"? 11:33**

A No idea. 11:33

**Q Did you ever review this blog? 11:33**

A I may have; but, once again, I don't specifically recall. 11:33

**Q Do you know who posted this blog? 11:33**

T. Bacon

A No, I don't. 11:33

**Q It's your testimony you didn't post it? 11:33**

A Yes. 11:33

MR. NOVIKOFF: Objection, Andrew. 11:33

He's testified that he posted no blog and you asked him that three times. So, are you going to ask him, you know, point to various blogs and ask him if he posted it, in light of those answers? 11:33 11:34

MR. GOODSTADT: Certain ones. 11:34

MR. NOVIKOFF: All right. 11:34

BY MR. GOODSTADT: 11:34

**Q Do you know whether you were working on April 18, 2006? 11:34**

A No. I don't recall. 11:34

**Q Turn to Hesse 63. 11:34**

A Okay. 11:34

**Q 6/17/06 at 5:28 a.m. 11:34**

**Do you see that? 11:34**

A Yes. 11:34

**Q Do you know if you were working on June 17, 2006? 11:34**

A I have no idea. 11:34

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q And you see the blog starts, "Hey Kevina." 11:34**

**Do you see that? 11:34**

A Yes. 11:34

**Q Do you recall reviewing this blog? 11:34**

A No, I don't. 11:35

**Q Do you know who posted this? 11:35**

A No idea. 11:35

**Q Do you know how to spell the word "pathetic"? 11:35**

A Hum? 11:35

**Q Do you know how to spell the word "pathetic"? 11:35**

A I'm sure I do. 11:35

**Q How is it spelled? 11:35**

MR. NOVIKOFF: Objection. 11:35

A With a P. 11:35

**Q What comes after it? 11:35**

A An A. 11:35

**Q After that? 11:35**

A T H. 11:35

What has that got to do -- I don't know if I were to do it on my word processor, I would check word spell -- word check. 11:35

T. Bacon

**Q Sitting here today, you don't know how to spell it? 11:35**

A Not off the top of my head, no. 11:35

**Q Did you ever refer to Frank Fiorillo as a "fag"? 11:36**

A No. 11:36

**Q Did you ever see him in any communication referred to as a fag? 11:36**

A Not that I recall specifically. 11:36

**Q If you look at Hesse 202. 11:36**

A Okay. 11:36

**Q If look at the 5/27/08, 9:20 p.m. entry. 11:36**

A Okay. 11:36

MR. CONNOLLY: Counsel, I'm sorry. Where are we? 11:37

MR. GOODSTADT: Hesse 202. 11:37

MR. NOVIKOFF: Hesse 202. 9:20? 11:37

MR. GOODSTADT: 9:20 p.m. 11:37

MR. NOVIKOFF: 5/27/2008, another clown caper. 11:37

**Q That is the one. 11:37**

**Do you see that entry? 11:37**

A Um-hum. Yes. Sorry. 11:37

T. Bacon

**Q Do you know who "Another clown caper" is? 11:37**

A No idea. 11:37

**Q Were you in Iraq in May of '08? 11:37**

A Yes. No -- I may have been traveling home then. 11:37

**Q What were the dates of your tour? 11:37**

A The dates of my tour? From January 2nd through June, I want to say, the 13th. 11:37

**Q Of '08? 11:37**

A Yes. 11:37

**Q Do you know what a police benevolent association is? 11:38**

A Yes. 11:38

**Q What is a police benevolent association? 11:38**

A It's one that provides support for its members. 11:38

**Q Do you know if Ocean Beach has a -- we will call it PBA for short? 11:38**

A Actually, it's the Ocean Beach Police Association. It's not a benevolent association to my knowledge it. 11:38

**Q It's called the Ocean Beach Police**

**T. Bacon**

**Association? 11:38**

A Yes. 11:38

**Q And what is the Ocean Beach Police Association? 11:38**

A Back when I first started, they solicited donations because they ran the ambulance, and the money that they got in donations paid for uniforms and equipment for the ambulance. 11:38

**Q Is that an association that is still in existence? 11:38**

A I believe it is. 11:39

**Q Do you know whether they still solicit donations? 11:39**

A I don't think they solicit donations, but I do believe they receive donations. 11:39

**Q Are you a member of the Ocean Beach Police Association? 11:39**

A No, I am not. 11:39

**Q Do you know who are the members of the Ocean Beach Police Association? 11:39**

A No, I do not. 11:39

**Q Have you ever been a member of the Ocean Beach Police Association? 11:39**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A No. 11:39

**Q Do you know anyone who has ever been a member of the Ocean Beach Police Association? 11:39**

A I'm assuming every member of the department is. I mean, I have never attended a meeting, paid dues, don't have an Ocean Beach Police Association card. 11:39

MR. NOVIKOFF: Don't assume. 11:39

A Then I do not know. 11:39

**Q Have you ever been to a Ocean Beach Police Association meeting? 11:39**

A No. 11:39

MR. NOVIKOFF: Objection. 11:39

**Q Have you ever seen any documents related to the Ocean Beach Police Association? 11:39**

A As I said, when I first started working there, if we went on an ambulance call, they would send out a letter soliciting a donation for the ambulance fund. 11:40

**Q And that's in 1990, when you say when you first started working there? 11:40**

A 1990 through '93, somewhere in that time frame. 11:40

**Q How about subsequent to '93 -- 11:40**

T. Bacon

A No. 11:40

**Q -- have you ever seen any documents related to the Ocean Beach Police Association? 11:40**

A I have not. 11:40

**Q Have you ever seen any documents referring to the Ocean Beach Police Benevolent Association? 11:40**

A I have not. 11:40

**Q Other than for uniforms for the ambulance corp, do you know what else the Ocean Beach Police Association donations were used for? 11:41**

A No. It wasn't uniforms for the ambulance corp. It was for supplies for the ambulance and uniforms for members of the police department. 11:41

**Q Is that who pays for the uniforms of the police department today? 11:41**

A I believe so, but I am not certain. 11:41

**Q Do you know whether that money from the Ocean Beach Police Association has ever been used for any personal reasons? 11:41**

A Not to my knowledge. 11:41

**Q Who controls the money? 11:41**

MR. NOVIKOFF: Objection. 11:41

T. Bacon

A I'm not sure. 11:41

**Q Does the police, Ocean Beach Police Association have any board, any officers? 11:41**

A I don't know. 11:41

MR. NOVIKOFF: Objection. 11:41

**Q Have you ever been to any department holiday parties? 11:42**

A Yes. 11:42

**Q What years? 11:42**

A I don't recall specifically. 11:42

**Q Did you ever have to pay for attending the parties? 11:42**

A Paid for our own drinks, yes. 11:42

**Q How about the food? 11:42**

A We all turned around when we got there. They had appetizers. We would all throw 20 or 40 bucks up on the bar every time I went to the Christmas party. 11:42

**Q For drinks or for food? 11:42**

A As far as I knew, it was for both, because we ordered appetizers and drinks. 11:42

**Q And each year you attended you had to pay? 11:42**

A I always threw something up on the 11:42

T. Bacon

bar, yes. 11:43

**Q Did anyone tell you how much you owed? 11:43**

A No. 11:43

**Q So, how did you know how much you had to pay? 11:43**

A I'm sure I paid more than I had to, because I would stay for one or two drinks and I leave. Usually throw anywhere from 40 to $50 up on the bar, and I think that was pretty much what the other guys did. 11:43

**Q How do you know that if you left early? 11:43**

MR. NOVIKOFF: Objection. 11:43

A Well, I watched everybody throw a couple of 20s and a couple of tens up on the bar. 11:43

**Q Do you know whether the police association money was ever used to pay for any of those parties? 11:43**

A I have no idea. 11:43

(Bacon Exhibit 12 marked for identification as of this date.) 11:44

**Q I have placed in front of you what has now been marked as Bacon 12. It's a two-page 11:44**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**exhibit bearing Bates number P 926 and P 927. 11:44**
**Mr. Bacon, have you ever seen the 11:44 document marked as Bacon 12? 11:44**
A No. 11:44
**Q I refer to you the -- the top of the 11:44 document, the letterhead. 11:44**
**It says Ocean Beach Police Benevolent 11:44 Association. 11:44**
**Do you see that? 11:44**
A Hum. 11:44
**Q Sitting here today, is that the first 11:44 time you have ever seen that entity? 11:44**
A Yes. 11:45
**Q Where is P.O. Box 25 in Ocean Beach, 11:45 New York, do you know? 11:45**
A I'm assuming -- I can't assume, so. 11:45
**Q You don't know? 11:45**
A No. 11:45
**Q Do you know what that phone number is 11:45 there? 11:45**
A No. 11:45
**Q You don't? 11:45**
A No, I do not. 11:45
**Q Does the barracks have a satellite 11:45**

T. Bacon

**dish for the TV? 11:45**
A It does not; not now. It may have at 11:45 one point. 11:45
**Q You don't know one way or the other 11:45 whether it did? 11:45**
A No. I don't. 11:45
**Q Did there come a point in time that 11:45 you learned that somebody had written a letter 11:45 about Tom Snyder's, the timing of his signing in? 11:46**
A No. No, I have not. 11:46
**Q Do you know whether there was ever 11:46 any issue with respect to the time that Tom Snyder 11:46 was signing in? 11:46**
MR. NOVIKOFF: Where? 11:46
MR. GOODSTADT: At any point in time. 11:46
MR. NOVIKOFF: No. Where? 11:46
MR. GOODSTADT: At Ocean Beach Police 11:46 Department when he was signing in for his 11:46 tour. 11:46
MR. NOVIKOFF: Objection. 11:46
A No. I know him and Carter were late 11:46 all the time. 11:46
**Q How do you know that? 11:46**
A Whenever I worked, if I was working 11:46

T. Bacon

eight at night to four in the morning, they would 11:46 get in late because they didn't get off of their 11:46 tour from Islip Town Parks until midnight, and 11:46 they need to report there at midnight. 11:46
When I worked the midnight shift, we 11:46 sat around waiting the extra half hour and didn't 11:47 go in until about 12:30, when they arrived. 11:47
**Q So, you waited a half for Snyder and 11:47 Carter to go in? 11:47**
A Yes. 11:47
**Q Did you ever hear of anybody writing 11:47 a letter with respect to that issue, them arriving 11:47 late? 11:47**
A No, I have not. 11:47
**Q Did you ever arrive late for your 11:47 tour? 11:47**
A Have I? 11:47
**Q Yes. 11:47**
A Yes. 11:47
**Q How many times? 11:47**
A Maybe once, maybe twice in almost 20 11:47 years. 11:47
**Q Did you get paid for the time that 11:47 you didn't work but you were supposed to be 11:47**

T. Bacon

**scheduled to be paid -- scheduled to work? 11:47**
MR. NOVIKOFF: Objection. 11:47
A I don't recall. 11:47
**Q So, is it your testimony that when we 11:47 review the video surveillance from the Marine 11:47 Bureau, up at the check point, it will show that 11:47 you arrived on time for your shift? 11:47**
MR. NOVIKOFF: Objection. 11:47
Is there an a video from the Marine 11:47 Bureau that has been produced for you that I 11:47 don't know? I mean, is there a video at 11:47 all, or is that speculation by counsel? Is 11:47 there a video at all? 11:48
MR. GOODSTADT: We have a subpoena 11:48 out there, you know about that. 11:48
MR. NOVIKOFF: No, I know about the 11:48 subpoena. I didn't know if something has 11:48 been produced. 11:48
THE WITNESS: If there is a video, 11:48 it's going to show me showing up at 11:30. 11:48 And if there is, in fact, a video, it will 11:48 show Mr. Snyder and Mr. Carter showing up at 11:48 about 12:30. So, please, I would love to 11:48 see the video. 11:48

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

(Bacon Exhibit 13 marked for identification as of this date.) 11:48

BY MR. GOODSTADT: 11:48

**Q I have placed in front of Mr. Bacon what has been mark as Bacon 13. It is a two-page exhibit bearing Bates P 916 and P 336. 11:49**

**Mr. Bacon, have you ever seen either of the pages that have been marked as part of Bacon 13? 11:49**

A No, I have not. 11:49

**Q Is this the first time you became aware of this letter? 11:49**

A Yes. It's the first time I have seen it. 11:49

**Q Do you know who Mitch Burns is? 11:49**

A No. I don't. I know of a Mitch in Ocean Beach, but I don't know a Mitch Burns. It may be the same individual. 11:49

**Q Is Mitch a resident of Ocean Beach? 11:49**

A I believe so. 11:49

**Q Where is his house or apartment? 11:49**

A I have no idea. 11:49

**Q Have you ever been to Mitch's house or apartment? 11:49**

**T. Bacon**

A No. 11:49

**Q What does Mitch look like, that you know of? 11:50**

A Maybe 5'10", skinny, olive skin, brown hair, kind of eccentric, always has good-looking girls hanging on him. 11:50

**Q Did you ever hear that the Mitch that you know of was dealing drugs? 11:50**

A Yes. 11:50

**Q And how did you hear of that? 11:50**

A From the plaintiffs. 11:50

**Q And when did you hear that from the plaintiffs? 11:50**

A They always stated that on a routine basis, that it was "Mitch, the drug dealer." 11:50

**Q Do you know what their basis was for making those statements? 11:50**

A Probably supposition on their part. 11:50

**Q You don't know what the basis was? 11:50**

MR. NOVIKOFF: You asked him does he know the basis and he just told you what his basis was. 11:50

MR. GOODSTADT: He told me probably what it was. 11:51

T. Bacon

MR. NOVIKOFF: Objection to form. 11:51

A It certainly isn't based on any probable cause, I'm sure. Because if he was, then they would have arrested him. 11:51

**Q So, the Mitch that you are testifying to you have heard the plaintiffs refer to as "Mitch, the drug dealer"? 11:51**

A Yes. 11:51

**Q Which plaintiffs referred to him as that? 11:51**

A Snyder, Lamm, Carter and Fiorillo. 11:51

**Q Did you ever hear Nofi refer to him as "Mitch, the drug dealer"? 11:51**

A No. 11:51

**Q Did you ever ask these guys why they call him "Mitch, the drug dealer"? 11:51**

A No. 11:51

**Q Were you friends with Mitch? 11:51**

A No. 11:51

**Q Do you know whether Hesse is friends with him? 11:51**

MR. NOVIKOFF: Is the question does he know if Hesse is friends with him at this time? 11:51

T. Bacon

MR. GOODSTADT: Yes. 11:51

A Not that I know of. 11:51

**Q Do you know whether or not the Bosettis are friends with him? 11:51**

MR. NOVIKOFF: Objection. 11:51

A Not that I know of. 11:51

**Q Other than for the four plaintiffs that you mentioned, did you ever hear anyone else mention that Mitch was dealing drugs? 11:52**

A Nope. 11:52

(Witness and counsel conferring.) 11:52

MR. NOVIKOFF: You don't have to go off. 11:52

BY MR. GOODSTADT: 11:52

**Q Do you know whether he owns property in Ocean Beach? 11:52**

MR. NOVIKOFF: Mitch? 11:52

MR. GOODSTADT: Mitch. 11:52

A I have no idea. 11:52

**Q Did you ever assign a dockmaster to cover for you at the police station? 11:52**

A No. 11:52

**Q Were you ever aware of any police officers assigning a dockmaster to cover for them? 11:52**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A Yes. 11:53

**Q Who, which police officers? 11:53**

A I can't tell you specifically who. I can tell you the circumstances. 11:53

**Q But you don't know who? 11:53**

A No. 11:53

**Q Is it appropriate to have a dockmaster assigned to the police station? 11:53**

MR. NOVIKOFF: Objection. 11:53

A Under the circumstances, yes. 11:53

**Q How many times did it happen, that are you aware of? 11:53**

A A handful. 11:53

**Q And what were the circumstances? 11:53**

A The circumstances were there was a big fight, a 10-16, or somebody called a 10-1, and they needed every available police officer. So, you couldn't leave the desk unmanned. It was almost routine practice, when that would happen, whoever was working the desk would instruct the dockmaster to take the radio while he ran out, you know, ran out the door to assist the other officers. 11:53

**Q 10-16 is a fight? 11:53**

T. Bacon

A 10-16 is a fight, yes. 11:53

**Q What is a 10-1? 11:53**

A Officer down, officer needs assistance. 11:53

**Q That is a serious radio code, right, 10-1? 11:53**

A Yes. 11:53

**Q And, in fact, it would cause somebody sitting behind the desk to have a dockmaster take their position and get out of there as quickly as possible; correct? 11:54**

MR. NOVIKOFF: Objection. 11:54

A To back up the officer in need, yes. 11:54

**Q Are there any more serious codes than a 10-1 in your opinion? 11:54**

MR. NOVIKOFF: Objection. 11:54

A I think a 10-1 is probably the most serious. But also, it depends, you have a 10-9, and it turns out to be a cardiac arrest and the officer is by himself, and you have an officer on the desk, I would turn around and I would call the dockmaster to take the desk so I could assist the officer, you know, doing CPR, treating the aided. 11:54

**Q 10-9 is an aid case? 11:54**

T. Bacon

A It's a serious aided case, a resuscitator case. 11:54

**Q Where did you learn the 10 codes from? 11:54**

A Suffolk County Police Academy. 11:54

**Q Do you think it's important to know the ten codes? 11:54**

MR. NOVIKOFF: Objection. 11:54

A Yes. 11:54

**Q Do you think it would be a safety risk if some of the officers didn't know the 10 codes? 11:55**

A It could be. 11:55

**Q Were you ever instructed not to issue summonses to certain businesses? 11:55**

A No. 11:55

**Q Were you ever instructed not to issue summonses to certain people? 11:55**

A No. 11:55

**Q The last time you testified about some conversations that you had with Alison over at civil service. 11:55**

**Do you recall testifying to that? 11:55**

A Yes. 11:55

T. Bacon

**Q Have you ever met her face to face? 11:55**

A No, I have not. 11:55

**Q Do you know what she looks like? 11:55**

A Couldn't tell you. She could be Alison for all I know. 11:55

**Q Did you ever hear George Hesse talk about her, mention her name? 11:55**

A Yes. 11:56

**Q How many times? 11:56**

A A handful. 11:56

**Q And what did he say about her? 11:56**

A Regarding the civil service status, if there were questions they were to be directed to her. 11:56

**Q And do you know why they were being directed to her? 11:56**

A As we said the last time we were here, going for the -- you know, the process and whatnot, if there were questions, that they had to be directed to her. 11:56

**Q But do you know why they would have to be directed to her? 11:56**

A Because she is from civil service and she is the one who is the expert in civil service 11:56

T. Bacon

policies. 11:56

**Q Okay. 11:56**

A While you are -- is it all right if I 11:56 take a break and use the mens room? 11:56

THE VIDEOGRAPHER: The time is 11:56 11:57 a.m. 11:56

We are going off the record. 11:56

(Recess taken.) 12:07

THE VIDEOGRAPHER: The time is 12:08 12:08 p.m. 12:08

We are back on the record. 12:08

(Bacon Exhibit 14 marked for 12:08 identification as of this date.) 12:08

BY MR. GOODSTADT: 12:09

**Q Mr. Bacon, at the April 2nd, 2006, 12:09 department meeting, I believe you testified you 12:09 had some paperwork you had to fill out; is that 12:09 correct? 12:09**

A Yes. 12:09

**Q What type of paperwork did you have 12:09 to fill out? 12:09**

A I don't recall specifically. 12:09

**Q Did you fill out paperwork every 12:09 year? 12:09**

T. Bacon

A I believe we did. 12:09

**Q Was there anything different about 12:09 the paperwork in '06 than other years? 12:09**

A Not that I recall. 12:09

**Q I placed in front of 12:09 Mr. Bacon Exhibit 14 -- 12:09**

MR. NOVIKOFF: What was 13? Okay, I 12:09 got it. I missed a number, thank you. 12:09 Bacon 14. 12:10

BY MR. GOODSTADT: 12:10

**Q I placed in front of Mr. Bacon what 12:10 has been marked as Bacon 14. It is a one-page 12:10 exhibit bearing Bates number 7354. 12:10**

**Mr. Bacon, do you recognize this 12:10 document that's been marked as Bacon 14? 12:10**

A I do. 12:10

**Q Is that your signature on the second 12:10 line up from the bottom? 12:10**

A Yes, it is. 12:10

**Q And what did you -- after that it 12:10 says your signature, "P.O." What does that stand 12:10 for? 12:10**

A Police officer. 12:10

**Q And then it says number? 12:10**

T. Bacon

A 420. 12:10

**Q What is that? 12:10**

A My shield. 12:10

**Q And then slash -- 12:10**

A 8900. That is my command. 12:10

**Q What does that mean? 12:10**

A It's your official police signature. 12:10 When you sign something as a police officer, you 12:10 sign your name, your rank, your shield and your 12:10 command. 12:10

**Q What does it mean by "your command"? 12:10**

A Who you work for. 12:10

**Q And 8900, that is -- 12:10**

A That is Ocean Beach's command number, 12:10 correct. 12:11

**Q Who issues the number for Ocean 12:11 Beach? 12:11**

A I'm not certain. 12:11

**Q Do you know it it's a County thing or 12:11 State thing? 12:11**

A It may be a County thing, it may be a 12:11 State thing. I'm not certain. 12:11

**Q Have you had to sign this agreement 12:11 for every year you worked there? 12:11**

T. Bacon

A No. I did sign something like that 12:11 when I first got hired. 12:11

**Q Okay. 12:11**

A And then this was one that was done 12:11 on April 2nd of '06. 12:11

**Q Do you know why it was being done on 12:11 April 2nd of '06? 12:11**

A I believe everybody was doing that. 12:11 He just wanted to keep track of firearms that 12:11 people were purchasing. 12:11

**Q Did you ever have any communications 12:11 with either of the Bosettis about the fact that 12:11 the plaintiffs had filed a lawsuit in this case? 12:11**

MR. NOVIKOFF: Objection. Asked and 12:11 answered. 12:11

A I remember, as I said, when we were 12:11 here back in February that -- that was what we 12:11 heard through the rumor mill. I don't remember 12:11 specifically who, but that there was a lawsuit 12:11 filed, it involved them, and that was the extent 12:11 of it. We don't know the -- did not know what the 12:12 specifics were. 12:12

**Q I don't believe that you testified 12:12 who was the rumor mill. I thought you testified 12:12**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**that it was guys in the department. 12:12**

MR. NOVIKOFF: No, no. Hold on. Are you done with your statement/question? 12:12

MR. GOODSTADT: No. I just wanted to explain why I am asking this question. 12:12

**Q Now, I am asking you whether you recall, after speaking with either of the Bosettis, about the fact that the plaintiffs had sued in this case. 12:12**

MR. NOVIKOFF: Objection. Asked and answered. 12:12

His testimony is what his testimony is in February. You can answer the question. 12:12

A Right. The rumor mill or the guys. Bosettis specifically? No. 12:12

**Q So, you don't recall specifically speaking with Gary Bosetti about anything do with the facts or allegations in this complaint? 12:12**

A Not that I recall. 12:12

**Q And you don't recall speaking with Rich Bosetti about anything to do with the fact that a lawsuit has been filed or any other allegations in the complaint? 12:12**

T. Bacon

A No. 12:13

**Q Is there anything that you can think of that would refresh your recollection? 12:13**

A I don't think so. If you have something then, please -- 12:13

MR. NOVIKOFF: Please what? 12:13

THE WITNESS: Provide it to refresh my recollection. 12:13

MR. NOVIKOFF: There you go. 12:13

THE WITNESS: I have nothing further at this time. 12:13

MR. NOVIKOFF: Okay. 12:13

EXAMINATION 12:13

BY MR. NOVIKOFF: 12:13

**Q Good morning, Mr. Bacon. How are you? 12:13**

A Good morning. 12:13

How are you? 12:13

**Q Fine. Thank you. 12:13**

**Back in February, I believe the subject came up of drinking in the Village of Ocean Beach, certain police officers drinking. 12:13**

A Yes. 12:13

**Q Did you ever witness any of the 12:13**

T. Bacon

**plaintiffs drinking alcohol while on duty? 12:13**

A Yes. 12:13

**Q And whom did you, personally, witness? 12:13**

A It was Ed Carter. 12:13

**Q And on how many occasions did you witness Ed Carter drink while on duty? 12:13**

A That was the one that I recall. 12:13

**Q And when was that? 12:13**

A As I previous stated, previously stated, it was the end of a tour, four or 5 o'clock in the morning, somebody went and got a pizza at one of the pizza parlors. 12:14

He went and got a pitcher, I thought was Coke, from CJ's, brought it over. I poured a glass. It turned out to be a pitcher of rum and Coke, and I dumped it, and I believe pretty much everybody else did, and he drank the remainder of pitcher. 12:14

**Q And what year was this, if you can recall? 12:14**

A I don't -- I don't remember. 12:14

**Q Okay. Now, are any of plaintiffs in the room today? 12:14**

T. Bacon

A Yes, Mr. Snyder is. 12:14

**Q Is Mr. Snyder the person sitting to trite of Mr. Goodstadt? 12:14**

A Yes. 12:14

**Q Okay. Now, did there ever come a time that you saw Mr. Snyder, while on duty, engaged in a sexual act? 12:14**

A Snyder? No. 12:14

**Q Did you ever recall seeing any of the plaintiffs, while on duty, engaged in a sexual act? 12:15**

A Yes. 12:15

**Q Without telling me the sexual act yet, who was that plaintiff? 12:15**

A Officer Frank Fiorillo. 12:15

**Q Okay. And what sexual act did you see Mr. Fiorillo engaging in? 12:15**

A He was getting a blow job. 12:15

**Q From a woman or a man? 12:15**

A I'm not sure. 12:15

**Q Okay. Where was he engaging in this sexual act? 12:15**

A Behind the school, over by the playground. 12:15

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q And how -- what is the basis for your opinion that Mr. Fiorillo was on duty at this point in time that he was receiving this sexual act? 12:15**

A He was in uniform and he was in a Gem cart. 12:15

**Q What is a Gem cart? 12:15**

A It's an electric powered, bigger than a golf cart, you know, smaller an automobile. 12:15

**Q So, he was engaged in this sexual act, with either a man or a woman, while in his police uniform and in a police vehicle? 12:16**

A Yes. 12:16

**Q Okay. And where were you when you witnessed this? 12:16**

A I was on my bicycle. 12:16

Plaintiffs attorney was asking if I was sleeping in the park. 12:16

**Q Um-hum. 12:16**

A And I was not -- that is how I observed him. I was riding my bike, and was riding around, and he pulled up, and as I pulled out, I saw a head with a ponytail bobbing in his lap. 12:16

T. Bacon

**Q And you have no doubt in your mind, as you are sitting here today, that the person that was receiving this sexual act was Mr. Fiorillo? 12:16**

A None whatsoever. 12:16

**Q And because I am sure Mr. Goodstadt will ask you this, I will ask it. 12:16**

**What, if anything, did you do upon witnessing this sexual act? 12:16**

A I kept on my way, usual patrol. 12:16

**Q And is there a reason why you didn't tell either Chief Paradiso or George Hesse about this? 12:17**

A No, sir. It wasn't my business. It didn't affect my performance, my duties. I continued to patrol. 12:17

**Q Now, did you ever witness any of the plaintiffs becoming physically abusive with a member of the public while in uniform in Ocean Beach? 12:17**

A Yes. 12:17

**Q And which plaintiff or plaintiffs did you, personally, witness engaging in or physically abusing, in your opinion, a member of the public 12:17**

**T. Bacon**

**while in uniform? 12:17**

A That was Kevin Lamm. 12:17

**Q Okay. And can you describe the circumstances for me forming the basis for your opinion that Kevin Lamm, on one occasion, at least on one occasion, was being physically abusive with a member of the public while in uniform? 12:17**

A Yes. George Hesse was writing a summons to a female at the ferry line. Her boyfriend was highly intoxicated. He tried to step in and intervene. There was a bunch of us at the ferry line. 12:18

I tried keeping him back and talking to him. He went to take a swing at George. I took him down to the ground. Kevin Lamm jumped on him, didn't attempt to put handcuffs on him, put him in a headlock and just started pummeling him. 12:18

It took myself and two or three officers to pull Kevin off of the individual. 12:18

**Q To your knowledge, did that individual that was being beaten up by Mr. Lamm file a complaint? 12:18**

A I have no idea. 12:18

**Q Do you know what, if anything, Mr.**

**T. Bacon**

**Hesse said to Mr. Lamm concerning that incident? 12:18**

A I'm assuming -- 12:18

**Q Don't assume. 12:18**

A No, no. 12:18

**Q Did Mr. Hesse ever advise you that he said something to Mr. Lamm concerning this incident? 12:19**

A I believe -- yes, he did say he was going to counsel him. 12:19

**Q And did you inquire of Mr. Hesse as to what he meant by "counsel"? 12:19**

A No. 12:19

**Q Did you ever learn as to what, if anything, Mr. Hesse said to Mr. Lamm concerning this incident? 12:19**

A No. 12:19

**Q Were there any other instances involving Mr. Lamm which would lead you to believe that he had an anger issue? 12:19**

MR. GOODSTADT: Objection. 12:19

A Yes. 12:19

MR. GOODSTADT: Objection to the form. 12:19

MR. NOVIKOFF: What is the basis? 12:19

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

MR. GOODSTADT: What do you mean by "an anger issue"? 12:19

BY MR. NOVIKOFF: 12:19

**Q Sir, do you have understanding as to what I mean by "an anger issue"? 12:19**

A Yes. 12:19

**Q What is your understanding as to what I mean when I use of the phrase "anger issue"? 12:19**

A That he harbored hostilities toward the public at large. 12:19

**Q Given your understanding of that -- given what you believe I meant by "anger issue," and I will adopt that definition for purposes of this question, I will repeat the question. 12:19**

**Were there any other incidents that you witnessed with Mr. Lamm, where you believe that he had an anger issue? 12:19**

A Yes. 12:20

**Q Can you please describe for the jury and for the judge, who may be watching this tape, the basis for your opinion? 12:20**

A Yes. Routinely he ended up on the east end, down by Houser's or by the phone company, and he used to go on his rants, his 12:20

T. Bacon

tirades, how he hated Jews, he hated fags, he hated the public. He was looking for an excuse to hit somebody with his baton. 12:20

We used to get complaints from civilians how he used to poke people with his baton. 12:20

**Q Now, did you ever talk to Mr. Lamm about these anger issues? 12:20**

A No. 12:20

**Q You mentioned Mr. Lamm making some antisemitic comments and homophobic comments. 12:20**

A Yes. 12:20

**Q Can you describe in more detail what you heard Mr. Lamm say with regard to, say, making comments that you believe to be antisemitic? 12:20**

A Just that he hated these fucking Jews. 12:21

**Q Is it you saying "fucking Jews" or is Mr. Lamm saying "fucking Jews"? 12:21**

A No, Mr. Lamm. 12:21

Referring to Ocean Beach as Ocean Berg. He, he just hated people, in general. 12:21

**Q And what about, with his comments about homosexuals. What, specifically, do you 12:21**

**T. Bacon**

**recall Mr. Lamm saying? 12:21**

A Just that Ocean Beach was overrun with fags and Jews. 12:21

**Q And did, in your presence, any of the other plaintiffs make similar comments? 12:21**

A Yes. 12:21

**Q Concerning the Jews? 12:21**

A Yes. Mr. Snyder and Mr. Carter used to routinely refer to Ocean Beach as Ocean Berg. 12:21

**Q What about with regard to homosexuals? 12:21**

A No. 12:21

**Q How about with regard to African Americans? 12:21**

A No. 12:21

**Q Okay. Did any of the other plaintiffs refer to Ocean Beach as Ocean Berg? 12:21**

A Not that I recall. 12:21

**Q Have you had -- were you, personally, involved -- withdrawn. 12:22**

**Did you, personally, witness any incidents involving Mr. Nofi's use of physical force? 12:22**

A Yes. 12:22

T. Bacon

**Q Can you describe for the judge and jury, who may be seeing this video, that incident? 12:22**

A Well, Joe Nofi always had a habit of when he approached somebody, he would whistle, and he would tell them, "Hey, you. Come over here. What the fuck are you thinking of?" 12:22

He was very, very crass, unprofessional. Telling people he ought to give them a smack. He was a very pushy, hands-on guy. 12:22

We had an incident where we had a fight at the alligator -- 12:22

**Q Who had a fight, you and Mr. Nofi? 12:22**

A No, no. There was a 10-16, a fight. I pulled up on my bicycle. Two people were fighting. Got them separated. 12:22

I was in the process of putting handcuffs on one of the individuals, who was compliant, and Joe Nofi came running up with a flying tackle, and tackled myself and the individual whom I was handcuffing. 12:23

**Q Were you injured? 12:23**

A Yes, I was. 12:23

**Q And did Mr. Nofi explain why did he that? 12:23**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A No. 12:23

**Q Do you have any basis, given your 12:23 history in law enforcement that you went over 12:23 extensively with Mr. Goodstadt, as to why Mr. Novi 12:23 would have done that? 12:23**

A Because he's incompetent. He's a 12:23 buffoon. 12:23

MR. GOODSTADT: Just note my 12:23 objection to the question. 12:23

**Q And I will get to this with regard to 12:23 the other plaintiffs, but what is your -- because 12:23 you testified to this this morning with regard to 12:23 Mr. Goodstadt's question. 12:23**

**What is your basis for giving the 12:23 opinion that Mr. Nofi is incompetent and a 12:23 buffoon? 12:23**

A Reading his reports, when I was on 12:23 the desk, if he turned in a field report or a 12:23 summons, it looked like a five-year old wrote it. 12:23 Not just his penmanship, but his verbiage. He 12:23 didn't have a good grasp of the English language, 12:24 reading it or writing it. 12:24

**Q Now, with regard to Mr. Nofi, 12:24 Mr. Goodstadt asked you this morning some 12:24**

T. Bacon

**questions and you responded that you had trained, 12:24 try to train him a little bit? 12:24**

A Right. 12:24

**Q Can you describe what you meant by 12:24 that? 12:24**

A Whenever somebody, who is new, they 12:24 spend a couple of shifts working with each of the 12:24 officers. Everybody has their own different 12:24 styles or whatever. 12:24

**Q Um-hum. 12:24**

A And I spent a couple of days with him 12:24 and he was a moron. He was pretty much 12:24 untrainable. 12:24

**Q I believe you testified that, I just 12:24 want to get my notes to make sure that I am saying 12:24 this right. 12:24**

**You said probably everyone at work 12:24 spent time with him. 12:24**

A Yes. 12:24

**Q What did you mean by that? 12:24**

A Like I said, everybody would spend a 12:24 couple of shifts working with new person. So, I'm 12:24 pretty sure almost every person in the department 12:24 has spent a day or two working with him -- 12:25

T. Bacon

**Q Um-hum. 12:25**

A -- in various tours. 12:25

**Q Okay. Now, did you ever observe Mr. 12:25 Hesse criticize Mr. Lamm for how he interacted 12:25 with the public while on duty? 12:25**

A Yes, sir. 12:25

**Q Can you describe those circumstances 12:25 in which you, personally, witnessed Mr. Hesse 12:25 criticizing Mr. Lamm? 12:25**

A Yes. Kevin Lamm had a habit of 12:25 dragging people into the station house in 12:25 handcuffs for a routine summons. 12:25

**Q What do you mean by a "routine 12:25 summons"? 12:25**

A Whenever we issue a summons, we are 12:25 supposed to get ID, run a warrant check, give them 12:25 the summons, and send them on their way. 12:25 Occasionally, you would get somebody who was 12:25 non-compliant, didn't want to produce ID, didn't 12:25 have ID or whatever. 12:25

We would bring them to the station, 12:25 usually not in handcuffs. But it seemed like 12:25 Kevin would have that happen three or four times a 12:25 shift, and George -- there was a memo, actually, 12:25

T. Bacon

posted that summonses were to be issued in the 12:26 field, you know, unless there was an issue. And 12:26 he continued to bring people in in handcuffs. 12:26

And when he got done this one last 12:26 time, George says, "Kevin, in my office." They 12:26 closed the door and he counseled him. 12:26

**Q How do you know that he counseled 12:26 him? 12:26**

A Well, he was kind of loud, and the 12:26 Chief was annoyed, and I could hear it from behind 12:26 the closed door, but he did it behind closed 12:26 doors. 12:26

**Q What did you hear Chief Hesse say 12:26 to -- well, was Mr. Hesse the Chief at this time? 12:26**

A He was the Acting Deputy Chief, 12:26 right. 12:26

**Q What did Acting Deputy Chief Hesse 12:26 say that you heard through the walls? 12:26**

A I don't remember specifics, but in 12:26 sum and substance it was, "What don't you 12:26 understand about issuing field appearance tickets 12:26 in the field? You know, there is a memo, you have 12:26 been instructed." That was pretty much the gist 12:26 of it. 12:26

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q All right. Now, you testified in response to Mr. Goodstadt's questions concerning your opinion that Mr. Snyder hated the Bosettis?** 12:26 12:27 12:27

A Yes. 12:27

**Q Could you, once again, tell the judge and jury what is the basis for that objection?** 12:27 12:27

MR. GOODSTADT: Objection. 12:27

A Because of the tirade that he had while we were in front of the police station, sitting on the back of the golf cart. He made it crystal clear that he did not like them, did not trust them, that they were a thorn in his side. 12:27 12:27 12:27 12:27 12:27

**Q And that occurred after the Halloween incident?** 12:27 12:27

A Yes. 12:27

**Q Now, Mr. Goodstadt asked you a question concerning or a number of questions concerning Mr. and Mrs. Jaeger.** 12:27 12:27 12:27

**Do you recall that earlier this morning?** 12:27 12:27

A Yes. 12:27

**Q Now, I believe one of questions he asked you was do you believe that Mrs. Jaeger should have given a statement to the police on the** 12:27 12:28 12:28



**T. Bacon**

**night of the Halloween incident.** 12:28

**Do you recall that question?** 12:28

A Yes, I do. 12:28

**Q My question is a little bit different.** 12:28 12:28

**Do you believe the police officer responding to the call should have demanded a statement from Ms. Jaeger during the night of the Halloween incident?** 12:28 12:28 12:28 12:28

A Yes. And I am sure, had they gone to her and spoke to her, she would have voluntarily given a statement. They wouldn't have had to demand. 12:28 12:28 12:28 12:28

**Q Okay. Well, then let me rephrase the question.** 12:28 12:28

**Do you think that it was incumbent upon the police officers that night to find Ms. Jaeger and find out what her statement was?** 12:28 12:28 12:28

A Absolutely. 12:28

**Q And why is that? What is the basis for your opinion?** 12:28 12:28

A Based on the conversation with her and that there was an underlying criminal act prior to the fight with the Bosettis. 12:28 12:28 12:28



T. Bacon

**Q Is that normal police conduct in terms of getting witness statements from alleged victims?** 12:28 12:29 12:29

A Yes. 12:29

**Q Now, we talked about your belief that Mr. Nofi is both stupid and incompetent. The question I have for you, and I believe you testified in response to one of Mr. Goodstadt's questions that, in addition to Mr. Nofi being stupid and incompetent, that the other plaintiffs were incompetent.** 12:29 12:29 12:29 12:29 12:29 12:29 12:29

**What is the basis for your belief that the other plaintiffs were incompetent police officers?** 12:29 12:29 12:29

A They weren't effective at doing their job. 12:29 12:29

**Q What makes you believe that they weren't effective in doing their job?** 12:29 12:29

A Personal observations. 12:29

**Q Okay.** 12:29

A Snyder and Carter were late all the time. Carter was always up in the barracks sleeping when he should have been working. Okay. 12:29 12:29 12:29

We had Fiorillo, who was abusive, and 12:29



T. Bacon

his goal in life was to issue the greatest number of summonses, and that is really not an effective way to police people by just beating people into submission and getting summonses written. 12:29 12:29 12:30 12:30

Sometimes -- first of all, you have discretion in issuing summonses. If you are not allowed to rollerblade in Ocean Beach, and you have to have a shirt on in the business district, and I am on patrol, and you come and you roll up on rollerblades with no shirt and ask me for directions, common sense would say I will give you the directions and say -- I would educate. "You need to have a shirt on and you can't have the rollerblades on." That would be common sends. 12:30 12:30 12:30 12:30 12:30 12:30 12:30 12:30 12:30 12:30

Mr. Fiorello lacked that. He would just sit there and issue the summons and the guy is clueless. 12:30 12:30 12:30

**Q I would suggest if I rolled up on rollerblades without a shirt on, I would deserve a summons.** 12:30 12:30 12:30

A Perhaps. 12:30

**Q How about Mr. Lamm? What is your opinion that Mr. Lamm was an incompetent police officer?** 12:30 12:30 12:30





a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A Finishing with Fiorillo -- 12:30

**Q Okay. 12:31**

A -- and I am going to talk about Lamm as well. 12:31

Failure to pay attention to detail, that goes for the both of them. 12:31

**Q What do you mean by that? 12:31**

A Not aware of their surroundings, not aware of what their duties as police officers were. 12:31

You know, Lamm and Fiorillo were being abusive towards the public, even Nofi for that matter. I mean, they were bullies with badges, they were thugs with guns. 12:31

**Q And you, personally, witnessed the bullying by Mr. Nofi -- 12:31**

A Yes. 12:31

**Q -- and Lamm and Fiorillo with the public? 12:31**

A Yes. 12:31

**Q Did you witness Snyder and Carter being bullies with the public? 12:31**

A No. I can't say Snyder and Carter were being bullies. 12:31

T. Bacon

**Q Your opinion of them being incompetent had to do with other things than being bullies? 12:31**

A Yes. 12:31

**Q And Lamm, anything else you can tell the judge and jury that informs your opinion that Mr. Lamm was an incompetent police officer? 12:31**

A Nothing that comes to mind. 12:31

**Q Now, Mr. Goodstadt asked you about Mitch, who you identified as hearing the plaintiffs saying "Mitch, the drug dealer," correct? 12:32**

**What plaintiffs -- 12:32**

**You have to say yes or no. 12:32**

A Yes, I apologize. 12:32

**Q Which plaintiffs did you hear refer to Mitch as "Mitch, the drug dealer"? 12:32**

A Kevin Lamm, Carter, Snyder. 12:32

**Q Now, did they ever -- well, withdrawn. 12:32**

**And what did they say with regard to "Mitch, the drug dealer," that you can recall? 12:32**

A Just referring to him as "Mitch, the drug dealer." 12:32

T. Bacon

**Q Okay. And did they ever give you the basis for their opinion that Mitch was a drug dealer? 12:32**

A No. 12:32

**Q Did they ever advise you that they saw Mitch selling drugs? 12:32**

A No. 12:32

**Q Did they ever advise you that they were ever told that Mitch was selling drugs? 12:32**

A No. If Mitch was, in fact, selling drugs and they had knowledge, my question is: Why didn't they arrest them? They are police officers. 12:33

**Q Now, you made reference to Alison Sanchez in response to, or Alison Chester, I don't recall exactly how much Mr. Goodstadt used her name, as an expert in civil service law. 12:33**

**What makes you believe that she was an expert? 12:33**

A Well, she works for the Department of Civil Service. She is the one -- and I don't believe I said "civil service law." If I did that, I don't know. 12:33

But she is a representative from 12:33

T. Bacon

civil service that we were instructed to contact with -- some of the correspondence I had gotten was from her, and she doesn't just deal with us as a police department, she works for Suffolk County Civil Service, and there is probably hundreds of various civil service titles within the County. 12:33

**Q Now, let me ask you this question: For what reason were you advised to call Ms. Chester or Ms. Sanchez, depending on what her name was at the time? 12:34**

A Because I had to go back and I had to reprocess through civil service because, apparently, Chief Paradiso never notified them that I was back to work with Village. 12:34

**Q When was this, back when -- 12:34**

A Well, when I first came back in '99, I don't believe I found out that I had to go back to civil service until 2003, maybe 2004. 12:34

**Q Was there a certification issue that you became aware of in the 2004 time period? 12:34**

A Yes. 12:34

**Q Can you just describe what your understanding was of the certification issue? 12:34**

A That I needed to go through the civil 12:34

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

service process to tie up loose ends. 12:34

**Q And who told you that there was a certification issue? 12:34**

A I had gotten a letter from civil service signed by Allison Sanchez. 12:34

**Q Did you ever speak to Mr. Hesse about the certification issues? 12:35**

A Yes. 12:35

**Q What was the sum and substance of the conversation with Mr. Hesse? 12:35**

A Eddie Paradiso dropped the ball, never notified them that I was back working for them, and that I had to reprocess, and any further questions were to be directed towards Alison. 12:35

**Q And did there come a point time that you had to retake certain tests? 12:35**

A I did. 12:35

**Q How many tests did you take? 12:35**

A I did the medical, the polygraph, the physical agility. I don't believe I did the psychological. 12:35

I completed everything but the psychological, and then I had gotten notification from civil service that I was, in fact, certified 12:35

T. Bacon

and it was an error on their part. 12:35

**Q So, the reason why you didn't take the psychological was because you were notified -- that you didn't because you were, in fact, certified? 12:35**

A Right. And that the other tests that I had taken were for naught. 12:35

**Q Again, I think Mr. Snyder is in the room; correct? 12:36**

A Yes. 12:36

**Q Did there come a time that Mr. Snyder spoke to you about his prior military experience? 12:36**

A Yes. 12:36

**Q And do you recall when he would have spoken you to about this? 12:36**

A That was back when he first came on with Ocean Beach, and I was new, I think I had been there about a year already. So, I am going to say it was in the early '90s. 12:36

**Q And what do you recall Mr. Snyder saying to you with regard to his prior military experience? 12:36**

A That he was in the Navy. That there was a problem with civil service, and I think he 12:36

T. Bacon

was in the process of applying for the park rangers at that point, or maybe he was on, but there was a problem because of his discharge. 12:36

**Q And did he tell you what type of discharge he had? 12:36**

A He did not. 12:36

**Q Did you ask? 12:36**

A No, I did not. 12:36

**Q Are you a member of the military? 12:36**

A I am or was, excuse me. 12:36

**Q For how long were you a member of the military? 12:37**

A Almost 22 years. 12:37

**Q In your capacity as a member of the military, what type of discharges are there? 12:37**

A There is honorable, there is general, and then there is dishonorable. 12:37

**Q In your experience, if someone was having a problem with civil service, would it be because they were honorably discharged? 12:37**

MR. GOODSTADT: Objection. 12:37

A Certainly not. 12:37

**Q How about, would they have a problem with civil service if they were dishonorably 12:37**

**T. Bacon**

**discharged? 12:37**

MR. GOODSTADT: Objection. 12:37

A Absolutely. 12:37

BY MR. NOVIKOFF: 12:37

**Q What is the basis for your opinion? 12:37**

A If you have anything other than an honorable discharge, you are going to have problems with civil service. Even with an honorable discharge, you have to have an RE-1 code or an RE-2 code. That is a reenlistment eligible code that allows you to reenlist in the military, which means you left under honorable conditions and the military would take you back. 12:37

**Q Did you ever submit a reference for Mr. Fiorillo with regard to the FBI? 12:37**

A Yes. 12:37

**Q When did that take place? 12:37**

A That was during his first season being there. 12:38

**Q Did he ask you to submit a reference? 12:38**

A No. 12:38

**Q What were the circumstances surrounding you submitting a reference to the FBI on behalf of Mr. Fiorillo? 12:38**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A I had gotten a phone call from his investigator. 12:38 12:38

Q What did the investigator ask you? 12:38

A How he was as a police officer, asked me questions regarding his character. 12:38 12:38

Q And, to your knowledge, did Mr. Fiorillo ever get the job with the FBI? 12:38 12:38

A To my knowledge, no, he did not. 12:38

Q Now, I am trying to go back in my mind to February, which is difficult. 12:38 12:38

I think Mr. Goodstadt asked you about an arrest that you had for -- I'm sorry, withdrawn. 12:38 12:38 12:38

Mr. Goodstadt asked you about you engaging in -- you engaging the services of a prostitute at one point in time in your life. 12:38 12:38 12:39

A Yes. 12:39

Q Do you recall that? 12:39

A I do. 12:39

Q And I believe you testified that you had numerous prostitutes on that same evening? 12:39 12:39

A Yes. 12:39

Q Where was this brothel that you were in? 12:39 12:39

T. Bacon

A It was the Marble Palace in Frankfurt, Germany. 12:39 12:39

Q When? 12:39

A Back in 1985. 12:39

Q So, that is over 20 years ago? 12:39

A Yes. 12:39

MR. GOODSTADT: Objection. 12:39

MR. NOVIKOFF: Did I miscalculate the math in any context? 12:39 12:39

MR. GOODSTADT: No. 12:39

BY MR. NOVIKOFF: 12:39

Q And, to your knowledge, was it illegal in that part of Germany at that period of time to be with a prostitute? 12:39 12:39 12:39

A No, it was legal. 12:39

Q It was legal? 12:39

A Yes. 12:39

Q Okay. So, we can move on from that. 12:39

Now, Mr. Goodstadt asked you, I think, a question about another arrest that you had concerning -- withdrawn. 12:39 12:39 12:39

You know what, the testimony is what it is. 12:39 12:40

Did you ever have to, in any capacity 12:40

T. Bacon

in the last 20 years, get a secret security clearance for your military job? 12:40 12:40

A Yes. 12:40

Q Okay. And can you describe for the -- well, you know what, let's go back and talk about what you have done with your life in the last 20 years before we get to that question. 12:40 12:40 12:40 12:40

Are you a volunteer fireman? 12:40

A I am. 12:40

Q For how many years have you been a volunteer fireman? 12:40 12:40

A Twenty-five. 12:40

Q Where are you a volunteer fire person? 12:40 12:40

A In Islip. 12:40

Q And on 9/11, were you employed? 12:40

A I was. 12:40

Q And where were you employed? 12:40

A I was employed as a Senior Court Officer at Supreme Court, Criminal Term, 100 Centre Street, here in New York. 12:40 12:40 12:40

Q Now, on September 11th, 2001, this country encountered the tragic events of terrorist attacks; correct? 12:40 12:41 12:41

T. Bacon

A It did. 12:41

Q Were you involved in any aspect of the terrorist attack or the aftermath of the terrorist attack on September 11? 12:41 12:41 12:41

A Yes. 12:41

Q Can you please describe for the jury and the judge, who may be listening to this, what your involvement was shortly after the planes hit the towers and the towers came down? 12:41 12:41 12:41 12:41

A I was part of the security detail at 100 Centre Street. I was the building's EMT or emergency medical technician. We mobilized about 12 officers. We had our major, a sergeant and ten other officers. 12:41 12:41 12:41 12:41 12:41

We took a jury bus down to the World Trade Center site. We were on Broadway and Vesey Street right over by, I guess it was, 7 World Trade Center. 12:41 12:41 12:41 12:41

We went down there. Prior to getting on the bus, we grabbed all sorts of medical equipment. Everybody who was mobilized were former military, medical background, and our intent was to assist New York City EMS treating the sick and injured, because we knew the system 12:41 12:41 12:42 12:42 12:42 12:42

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 405

T. Bacon

would be overwhelmed. 12:42

**Q How long, on 9/11 how long were you there for? 12:42**

A Almost the entire day. 12:42

**Q With you there on September 12? 12:42**

A Yes. 12:42

**Q September 13? 12:42**

A Yes. 12:42

**Q How many days or weeks were you at 9/11, at the tower site after 9/11? 12:42**

A I was down there for about a month, with the exception of two days that I had to report for military duty, which I was called back to New York for. 12:42

**Q And where was this military duty? 12:42**

A At McGuire Air Force Base in New Jersey. 12:42

**Q And did you rescue any person on 9/11? 12:42**

A I did. Actually, I was in the mall area, beneath tower two. Myself, Mitch Wallace, Harry Thompson, and Tommy Jergens had come upon six injured victims that weren't ambulatory. We did a quick triage. 12:43

Page 406

T. Bacon

The woman, who later was known to me as Doris Torres, had burns over approximately 60 percent of her body. We deemed her to be critical and I was to remove her. 12:43

In the process of removing her, tower two came down. We got caught in the collapse. It was just outside the collapse zone. 12:43

The three other officers had perished, as well as the other victims that they were treating. 12:43

I put over a mayday over the radio, because I was lost and disoriented, ended up finding my way back out and, ultimately, successfully removed Ms. Torres, with the assistance of an FBI agent, a Port Authority cop and a civilian to a triage center a couple of blocks away. 12:43

**Q So, I was mistaken earlier. 12:44**

**You didn't go to twin tower sites after the collapse, you went there while they were still on fire? 12:44**

A Yes. 12:44

**Q And the officers that you went with all perished? 12:44**

Page 407

**T. Bacon**

A Correct. 12:44

**Q As well as the five other individuals that you originally encountered? 12:44**

A Yes. 12:44

**Q And you were trapped in the collapse, you were caught in the collapse? 12:44**

A I was caught in the collapse; I was not trapped. I was disoriented, but not trapped. 12:44

**Q Did you receive any type of medal or other type of commendations for your efforts that day? 12:44**

A I did. 12:44

**Q Can you tell the jury and the judge, who may be seeing this video, what you received? 12:44**

A I received a Medal of Valor for New York State, received the Medal of Valor from my job, received a letter signed by both the President and the First Lady. 12:44

Also, with respect to the Air Force Reserves because -- 12:44

**Q Okay. Go ahead. 12:44**

A -- because I was a service member, and we were under attack, I received the William Pitsenbarger Award from the Air Force Reserve 12:45

Page 408

T. Bacon

Command. 12:45

I was later nominated and became the firefighter of the year for the Air Force Reserve command, the United States Air Force and the Department of Defense. 12:45

**Q And did Senator Clinton at any point in time mention your name for any purpose on the senate floor? 12:45**

A Yes. 12:45

MR. GOODSTADT: Objection. 12:45

A There was a proclamation by Senator Clinton, specifically acknowledging the efforts of the court officers who responded, as well as those who perished. 12:45

**Q Now, to your knowledge, did Mr. Snyder ever go down to the 9/11 site to assist? 12:45**

A No. 12:45

**Q To your knowledge, did Mr. Carter ever go down to the 9/11 site to assist? 12:45**

A No. 12:45

**Q How about Mr. Lamm? 12:45**

A No. 12:45

**Q Now, if I told that you Mr. Nofi was 12:45**

T. Bacon

**seeking some type of monetary benefit for his alleged involvement in 9/11, what would your opinion be of that?** 12:45 12:45 12:46

A I would say he's full of shit. 12:46

**Q To your knowledge, did Mr. Nofi ever go down to 9/11 to help out?** 12:46 12:46

A He may have, but not with Ocean Beach Police, it was -- I don't know. 12:46 12:46

**Q Did he ever speak of it?** 12:46

A No. 12:46

**Q Now --** 12:46

THE VIDEOGRAPHER: I'm sorry. I need to change the tape. 12:46 12:46

MR. NOVIKOFF: Yeah. Okay. Take a quick break. I probably have maybe 20 more minutes left. 12:46 12:46 12:46

THE WITNESS: Okay. 12:46

THE VIDEOGRAPHER: The time is 12:46 p.m. 12:46 12:46

We are going off the record. 12:46

(Recess taken.) 12:53

THE VIDEOGRAPHER: The time is 12:54 p.m. 12:53 12:53

We are back on the record with video 12:53

T. Bacon

number three. 12:53

BY MR. NOVIKOFF: 12:53

**Q Mr. Bacon, let's go over your military record.** 12:54 12:54

**When did you first join the military?** 12:54

A I enlisted back in 1987. 12:54

**Q As what?** 12:54

A As -- enlisted in the Air National Guard and I went in as an airman basic. 12:54 12:54

**Q What is a airman basic?** 12:54

A It's a no striper, entry level. 12:54

**Q Were you a reservist or full time?** 12:54

A I was in the National Guard. I was a reservist. 12:54 12:54

**Q For how long have you been a reservist?** 12:54 12:54

A My entire career. 12:54

**Q For how many years?** 12:54

A Almost 22. 12:54

**Q Now, I think you said you received a top security clearance through the United States Air Force.** 12:54 12:54 12:54

A Secret, not top secret, but secret. 12:54

**Q Just secret. So, you weren't the** 12:54

T. Bacon

**president, you were a step below.** 12:54

**Okay. So you received security -- secret security clearance through United States Air Force?** 12:54 12:54 12:54

A Correct. 12:55

**Q When did you receive that?** 12:55

A Back in 1987. 12:55

**Q And at any point in time, did you -- was that secret security clearance taken away?** 12:55 12:55

A Never. 12:55

**Q And to your knowledge, did you have to undergo a background check before you got such secret security clearance?** 12:55 12:55 12:55

A You have to get it before you get it and every ten years it's up for review, and you have to resubmit your package, where they conduct another background investigation, and you are printed again, and it's like you never had it, but it's just to keep it going. 12:55 12:55 12:55 12:55 12:55 12:55

**Q Did you ever have to take any lie detector test?** 12:55 12:55

A No, I did not. 12:55

**Q Do you recall what you had to submit to the United States Air Force to get a secret** 12:55 12:55

T. Bacon

**security clearance?** 12:55

A Everything that is in my Ocean Beach Police personnel file, as far as the investigation questionnaire and then some. 12:55 12:55 12:55

**Q Okay. When you say "and then some," what is it?** 12:55 12:55

A Extensive background check into your finances, political affiliations, extracurricular, you know, hobbies -- 12:56 12:56 12:56

**Q Um-hum.** 12:56

A -- any organizations that you may belong to. 12:56 12:56

**Q Right.** 12:56

**And were you ever discharged from the Air Force Reserves?** 12:56 12:56

A Yes. 12:56

**Q And what type of discharge did you receive?** 12:56 12:56

A Honorable. 12:56

**Q When did you receive that?** 12:56

A I have received a couple of various honorable discharges at the end of my enlistments and my service overseas. Currently, I am retired. 12:56 12:56 12:56

**Q How many honorable discharges did you** 12:56

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**receive -- have you received? 12:56**

A Four. 12:56

**Q And when was the first? 12:56**

A Upon completing basic training, back in 1987. 12:56

**Q Okay. And did you ever serve overseas in a war? 12:56**

A Yes. 12:56

**Q When was the first time that you served overseas in a war? 12:56**

A Back in 2000, we were in Kuwait, enforcing the No Fly Zone. 12:56

**Q Okay. And what was your position? What was your title at the time? 12:56**

MR. GOODSTADT: Just note my standing objection to all these questions. Although I find them extremely interesting and I am happy to hear all these accomplishments, I know it's preserved, but I do have a relevance objection to all these, this line of questions. 12:57

MR. NOVIKOFF: I presume -- 12:57

MR. GOODSTADT: It's preserved. 12:57

MS. MAC GREGOR: -- since you were 12:57

T. Bacon

trying to discredit him, that these would be relevant to that. 12:57

But that is okay. It's preserved. We understand. 12:57

MR. CONNOLLY: I'm sorry. What was the question? 12:57

THE WITNESS: About serving overseas. 12:57

MR. NOVIKOFF: Let's have it read back. 12:57

(Record read.) 12:57

A I held the rank of staff sergeant and I was a crew chief in the fire department. 12:57

**Q And for how long did you serve in Kuwait? 12:57**

A A little over a month. 12:57

**Q Did you see combat? 12:57**

A I did not. 12:57

**Q And was there another time that you were overseas as military reservist in a war zone? 12:57**

A Yes. 12:58

**Q When was that? 12:58**

A Last year. 12:58

**Q 2008? 12:58**

A Yes. 12:58

T. Bacon

**Q Where were you? 12:58**

A Kirkuk, Iraq. 12:58

**Q For how long were you there? 12:58**

A Six months. 12:58

**Q And what were doing there? 12:58**

A I was the Assistant Fire Chief. 12:58

**Q Did you have to go to Iraq? 12:58**

A I did not. 12:58

**Q And why didn't you have to go to Iraq? 12:58**

A I had my 20 years, and I could have retired at that point, but the unit was going and I wanted to go with my guys. 12:58

**Q And were there any newspaper articles written about you, in terms of you going to Iraq? 12:58**

A Yes. 12:58

**Q Where were these newspaper articles? 12:58**

A In probably local newspapers, but they were also in monthly periodicals, Fire Engineering, Firehose Magazine, Air Force Times. 12:58

**Q And, so, are you presently retired from the military? 12:59**

A I am. 12:59

**Q To your knowledge, did any of the 12:59**

T. Bacon

**plaintiffs volunteer to serve their country in any of the wars that you were in? 12:59**

A No. 12:59

MR. GOODSTADT: Objection. 12:59

MR. NOVIKOFF: What is the objection? 12:59

MR. GOODSTADT: The same standing objection I am going to have to this entire line of question. 12:59

MR. NOVIKOFF: Relevance? 12:59

MR. GOODSTADT: Relevance. 12:59

MR. NOVIKOFF: You don't have to say relevance. You know we preserved that for time of trial. 12:59

A Mr. Snyder served, but couldn't complete voluntary enlistment. 12:59

**Q Okay. What is voluntary enlistment? 12:59**

A He enlisted and couldn't complete his term of obligation. 12:59

**Q Now, have you received any awards or commendations for your work as a New York State Court Officer? 12:59**

A I have. 12:59

**Q Please tell the jury and judge, who may be seeing this, what commendations you 12:59**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 417

T. Bacon

**received? 12:59**

A The Medal of Valor, both from the 12:59 State and the job for 9/11, three lifesaving 12:59 awards, and the Medal of Excellence. 12:59

**Q What is a Medal of Excellence? 12:59**

A It's for performing above and 01:00 beyond -- actually, that was for an aided case and 01:00 reviving a cardiac arrest victim. 01:00

**Q Have you receive any meritorious -- 01:00 I'm sorry, withdrawn. 01:00**

**Have you received any medals or 01:00 commendations concerning your job at Ocean Beach? 01:00**

A Yes. 01:00

**Q And can you tell the jury and judge, 01:00 who may be seeing this, what commendations you 01:00 have received? 01:00**

A Yes. I received a Meritorious Police 01:00 Award, police service award. 01:00

**Q Okay. Now, you worked at Westhampton 01:00 Police Department? 01:00**

A Yes. 01:00

**Q When? 01:00**

A Back in 1989. 01:00

**Q And for how long? 01:00**

Page 418

T. Bacon

A A year, one season. 01:00

**Q And did you work in the Riverhead 01:00 Police Department? 01:00**

A I did. 01:00

**Q For how long? 01:00**

A About a year-and-a-half. 01:00

**Q When? 01:00**

A '93 to, maybe, '95, '94. 01:00

**Q Did you work at the Harbor Police 01:00 Department? 01:00**

A I did. 01:00

**Q How long? 01:00**

A From '94 through, maybe, '96. 01:00

**Q Did you work at the MacArthur Airport 01:01 Police Department? 01:01**

A Yes. 01:01

**Q For how long? 01:01**

A '96 through '99, somewhere in that 01:01 time frame. 01:01

**Q And were all these part-time jobs? 01:01**

A Yes. 01:01

**Q So, if I understand you correctly, 01:01 for the better part of the last 25 years, you are 01:01 a volunteer fireman? 01:01**

Page 419

T. Bacon

A Correct. 01:01

**Q A part-time police officer? 01:01**

A Yes. 01:01

**Q A full-time court officer? 01:01**

A Yes. 01:01

**Q And you served your country in two 01:01 wars and have been a military reservist? 01:01**

A Yes. 01:01

**Q Now, let's go back, briefly, to -- 01:01 are you proud of your service to your country? 01:01**

A Absolutely. 01:01

**Q Is there any reason why you would lie 01:01 in this lawsuit? 01:01**

A No. 01:01

MR. GOODSTADT: Objection. 01:01

A None whatsoever. 01:01

**Q Are you friends with George Hesse? 01:01**

A Yes. 01:01

**Q Do you socialize with George Hesse? 01:01**

A On occasion. 01:01

**Q Would you lie for George Hesse? 01:01**

A No. 01:01

**Q Would you lie for Mayor Laughlin? 01:01**

A No. 01:01

Page 420

T. Bacon

**Q Is there anything that you can think 01:01 of that would cause you to subject your integrity 01:01 to scrutiny with regard to your testimony in this 01:02 case? 01:02**

A None whatsoever. 01:02

**Q Is your integrity important to you? 01:02**

A Absolutely. 01:02

**Q Is your reputation important to you? 01:02**

A Yes. 01:02

**Q And are you proud of the 01:02 accomplishments and the accolades that you have 01:02 received? 01:02**

A Extremely. 01:02

**Q You wouldn't want anyone to suggest 01:02 that you were less than honorable, given the fact 01:02 that you received all these accolades? 01:02**

A Correct. 01:02

**Q Now, Mr. Goodstadt asked you about 01:02 George Hesse drinking while in Ocean Beach. He 01:02 didn't ask who was Mr. Hesse was drinking with; do 01:02 you recall that? 01:02**

A No, I don't. 01:02

**Q He asked you, do you recall 01:02 Mr. Goodstadt asking if you ever saw George Hesse 01:02**

T. Bacon

**drinking in a bar in Ocean Beach? 01:02**

A Oh, yes, yes. I remember the question. 01:02

**Q Do you recall Mr. Goodstadt ever asking who was Mr. Hesse was drinking with in a bar at Ocean Beach? 01:02**

A I believe it was his wife. 01:02

**Q Do you recall Mr. Goodstadt ever asking that you that question? 01:02**

A No, he did not. 01:02

**Q I'm going to ask you that question: Who was Mr. Hesse drinking with in the bar in Ocean Beach? 01:03**

A His wife. 01:03

**Q Do you know, was he having dinner or lunch at the time with his wife? 01:03**

A He was having dinner. 01:03

**Q What was the reputation of Mr. Snyder among the other police officers? Putting aside the plaintiffs for a moment, what was Mr. Snyder's reputation like among the other police officers at Ocean Beach while you and he worked there? 01:03**

MR. GOODSTADT: Objection. 01:03

A A lot of guys would choose not to 01:03

T. Bacon

work with him. 01:03

**Q And why is that? 01:03**

A Because they thought he was a loaded gun, waiting to go off. The hostilities that he harbored toward the Bosettis kept him from, I guess, functioning properly and performing his duties as expected. 01:04

**Q What was Mr. Carter's reputation among the police officers of Ocean Beach, other than the plaintiffs here? 01:04**

A When he was awake, he was a do nothing. 01:04

**Q What do you mean by that? 01:04**

A Because he was always up in the barracks sleeping. 01:04

**Q What was his reputation? Not what was your opinion of him, what was the reputation among the other police officers? 01:04**

A Lazy and useless. 01:04

**Q And you base your opinion of his reputation on what? 01:04**

A My own observations. 01:04

**Q How about any conversations with other police officers about Carter? 01:04**

T. Bacon

A Generally speaking, I mean I don't recall anything specific; that was just a general -- 01:04

**Q What about Mr. Lamm's reputation among the police officers, what was that like, other than the plaintiffs? 01:04**

A He was out there. He was dangerous. 01:04

**Q What about Mr. Nofi's reputation among the other Ocean Beach police officers? 01:04**

A He was a complete moron and had no business being a cop. 01:05

**Q What about Mr. Fiorillo's reputation among the other police officers? 01:05**

A Once again, somebody who was dangerous, not clear thinking. I don't think he was capable of making sound judgments. Not me, but I think that was, generally speaking, other officers. 01:05

MR. NOVIKOFF: I have nothing further. Thank you. 01:05

THE WITNESS: Thanks. I'm sure you have some redirect. 01:05

MR. NOVIKOFF: Hold on. Mr. Hesse's attorney has nothing? 01:05

T. Bacon

MR. CONNOLLY: I have no questions. 01:05

MR. GOODSTADT: Okay. I have some questions. 01:05

FURTHER EXAMINATION 01:05

BY MR. GOODSTADT: 01:05

**Q You testified from, in response to questions from your own lawyer, that Ed Carter drank the rest of a pitcher of rum and Coke; is that correct? 01:06**

A Yes. 01:06

**Q How many drinks was that? 01:06**

A I don't know. Whatever was in the pitcher. I didn't watch. I didn't count how many glasses he poured, but it was probably more than three or four. 01:06

**Q Was he drunk? 01:06**

A I have no idea. 01:06

**Q Did you report his drinking to anyone? 01:06**

A No, I did not. 01:06

**Q Why not? 01:06**

A Because Eddie was a buffoon, and everybody knew it, and that's it. 01:06

**Q So, let me get this straight. You 01:06**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 425

T. Bacon

**didn't report a fellow officer, who had at least three or four rum and Cokes while on duty, because he was a buffoon and everyone knew it; is that your testimony?** 01:06

A Yeah. Like I didn't report that Fiorillo was getting a blow job on duty, also. 01:06

**Q We will get to that after.** 01:06

A Okay. 01:06

**Q Who else was in the police station when Ed Carter allegedly drank three or four rum and Cokes?** 01:06

A I don't recall. There was probably three or four other officers. 01:06

**Q Can you name any of them?** 01:06

A Lonnie Ogenbaugh may have been one of them. 01:07

**Q Are you sure he was one of them or he may have been one of them?** 01:07

MR. NOVIKOFF: Let him answer the question. 01:07

A I don't know for sure. 01:07

MR. NOVIKOFF: Let him answer the question. 01:07

A I don't know for sure, I can't tell

Page 426

T. Bacon

you for sure. I'm thinking Lonnie may have been one of them. Perhaps John Oley. Maybe Gordon Bara, a couple others; but like I said, I can't be certain who they. 01:07

**Q And Carter was on duty that evening?** 01:07

A Yes, he was. 01:07

**Q Carrying a weapon?** 01:07

A Yes. 01:07

**Q Did you think it was dangerous for somebody to drink three or four rum and Cokes and carry a weapon?** 01:07

A I think it was dangerous for Carter to carry a weapon, period. 01:07

MR. NOVIKOFF: It was asked and answered. 01:07

BY MR. GOODSTADT: 01:07

**Q That wasn't the question.** 01:07

**Did you think it was dangerous for someone, for Mr. Carter, to drink three or four rum and Cokes and to carry a weapon?** 01:07

A I think it was dangerous for Mr. Carter to carry a weapon when he was on duty, whether he was sober or had a couple of drinks in him. That is my answer. 01:08

Page 427

T. Bacon

**Q There is no difference in your mind in the dangerousness between when he's sober and when he is drunk?** 01:08

A No. I'm not even sure he was drunk. 01:08

**Q After he had three or four rum and Cokes?** 01:08

A No. 01:08

**Q So, you think he was just as dangerous when he was sober as after he had three or four rum and Cokes?** 01:08

A Yes. 01:08

MR. NOVIKOFF: Note my objection. You can answer. 01:08

MR. GOODSTADT: What is the basis? 01:08

MR. NOVIKOFF: You asked it now three times. I think it's a bit harassing. 01:08

MR. GOODSTADT: I just want it to be clear for the record that that is his actual testimony. I'm surprised by it. 01:08

MR. NOVIKOFF: I think it's quite clear. Whether are you surprised or not is not all that important. 01:08

BY MR. GOODSTADT: 01:08

**Q Why was it dangerous for Ed Carter to**

Page 428

T. Bacon

**carry a weapon?** 01:08

A Because he was a nut. He was a knucklehead. 01:08

MR. NOVIKOFF: Let him finish. 01:08

A If he was awake, he was walking around in a stupor. 01:08

**Q Did he ever discharge his weapon?** 01:08

A No, he didn't. 01:08

**Q Did he ever draw his weapon?** 01:08

A Not that I saw. 01:08

**Q What about walking around in a stupor led you to believe that it was dangerous for Mr. Carter to carry a weapon?** 01:09

A Because he was always tired. Very rarely did we see him on patrol. He was usually in bed on duty. 01:09

**Q I'm talking about the fact that you said it was dangerous for him to carry a weapon. I assume it wasn't dangerous when he was in bed, that he had a weapon; right?** 01:09

A No. 01:09

**Q You are talking about the times when he was not in bed. What did he do that was a danger?** 01:09

T. Bacon

A He was just an idiot. 01:09
**Q That's what he did? Because he was an idiot, he was a danger? 01:09**
A Yeah, in general terms he was an idiot. 01:09
**Q Did you report this dangerous situation to anyone? 01:09**
A No. 01:09
**Q Did you ever ask anybody to remove Ed Carter's weapon from him? 01:09**
A No. 01:09
**Q Did you ever ask him to be dismissed as a police officer because of the dangerous situation he was created? 01:09**
A No, but did I wear a bulletproof vest every night I worked. I was one of the few people who wore a vest every night I worked, because I didn't have confidence in the officers that I worked with: Ed Carter, Tom Snyder, Frank Fiorillo -- I would say, who else was there? Kevin Lamm and Joe Nofi. 01:10
**Q Any other officers that you felt you needed to wear a bulletproof vest because of? 01:10**
A No. 01:10

T. Bacon

**Q Just the five of them? 01:10**
A Those five. 01:10
**Q Did you ever tell anyone that you wore a bulletproof vest because you didn't have confidence in the five of them? 01:10**
A That was common knowledge. 01:10
**Q Who did you tell? 01:10**
A Everybody. 01:10
**Q Name one person that you told. 01:10**
A It was just common knowledge. 01:10
**Q That wasn't the question, sir. 01:10**
A You know, I can't think of specifics -- 01:10
**Q Okay. 01:10**
A -- but I wore a vest, and everybody knew that I wore a vest, and they knew that I didn't have confidence in the officers that I worked with. 01:10
**Q But you don't know a single person that you told; okay? 01:10**
MR. NOVIKOFF: I am sorry. Is that a statement or a question? 01:10
MR. GOODSTADT: It was both. It was a combination of the two. 01:10

T. Bacon

MR. NOVIKOFF: Asked and answered. I object. 01:10
MR. GOODSTADT: I will move on. 01:10
**Q Other than for the night where you saw Mr. Carter allegedly drink three or four rum and Cokes, did you see him drink while on duty on any other occasion? 01:10**
A Not that I recall. 01:10
**Q Were on you duty that night? 01:11**
A Yes. 01:11
**Q Who else was on duty that night? 01:11**
A As I told you before, I don't recall. 01:11
**Q What year was it? 01:11**
A I do not recall. It was after I came back in '99. 01:11
**Q So, some point between May of 1999 and April of 2006? 01:11**
A Yes. 01:11
**Q Somewhere in those seven years? 01:11**
A Somewhere in there. 01:11
**Q You don't know what year though? 01:11**
MR. NOVIKOFF: Objection. 01:11
A No, I don't. I'm sorry. 01:11
**Q You testified that you witnessed or allegedly witnessed Fiorillo engaging in a sexual act; correct? 01:11**

**T. Bacon**

A Correct. 01:11
**Q And you didn't report that to anyone; correct? 01:11**
A I did not. 01:11
**Q Why not? 01:11**
A It wasn't my business. 01:11
**Q He was getting paid by the Village at that time? 01:11**
A Yes. 01:11
**Q Why didn't you report that he was stealing time? 01:11**
A I didn't view it that way. You know, whether he wants to get a blow job on duty, that is his business. It didn't affect me doing my patrol. 01:11
**Q Was he on a break? 01:11**
A I would say probably not. He was in uniform, in a police vehicle. So, I assume he wasn't. So, I would say no, he wasn't on break. 01:12
**Q So, he was being paid for being on duty? 01:12**
MR. NOVIKOFF: Objection. 01:12

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A I guess. 01:12

**Q And you didn't view that as stealing time? 01:12**

A No. 01:12

**Q Was that part of his duties? 01:12**

A Getting blow jobs on duty? No, I don't think so. 01:12

**Q So, why didn't you view that as stealing time? 01:12**

MR. NOVIKOFF: Objection. 01:12

A I'm not a supervisor. 01:12

**Q That wasn't the question, sir. 01:12**

A Okay. 01:12

**Q The question was: Why didn't you -- 01:12**

MR. NOVIKOFF: You asked him why he didn't and he answered. 01:12

MR. GOODSTADT: It's nonresponsive. 01:12

MR. NOVIKOFF: So, say it's nonresponsive and ask him again. 01:12

MR. GOODSTADT: I did. 01:12

MR. NOVIKOFF: Okay. So, what is the question? 01:12

BY MR. GOODSTADT: 01:12

**Q The question is: Why did you not view that as stealing time? 01:12**

A I'm not his supervisor. 01:12

**Q Did you ever see anyone else engage in a sexual act while on duty? 01:12**

A No, not police officers. I have seen plenty of people engaging in sexual acts, but no police officers, no. 01:12

**Q Was Mr. Fiorillo engaged in unlawful activity of having a sexual act in public? 01:13**

A It wouldn't have been in public except -- 01:13

MR. NOVIKOFF: Objection to the foundation. We don't know the age of the individual. Clearly, it wouldn't be illegal -- well, perhaps it is. I don't know, you tell me. 01:13

THE WITNESS: No, I didn't -- 01:13

MR. NOVIKOFF: Objection, foundation. You go ahead. 01:13

THE WITNESS: Okay. I don't know, was it? You are the attorney. 01:13

BY MR. GOODSTADT: 01:13

**Q You are the police officer. 01:13**

A Okay. 01:13

T. Bacon

**Q You should know the penal law; correct? 01:13**

A Yes. 01:13

**Q Do you know whether a public act, sexual act is unlawful? 01:13**

A He would have been hidden somewhere behind the school bus, but I was doing the PATROL and riding the bike through the playground. 01:13

**Q In your view, he wasn't violating any rules or ordinances? 01:13**

A No. People get -- having sex on their back deck, and I happen to be driving by and I have a view. 01:13

**Q On property that they own; correct? 01:13**

A It may have been that they owned, maybe they leased it; maybe they were hanging out with friends, I don't know. 01:13

**Q Fiorello didn't own or lease -- 01:13**

A No. 01:14

**Q -- the school; right? 01:14**

A Yes. 01:14

**Q It was public property? 01:14**

A Yes, that was public property. 01:14

**Q Did you ever address it with him? 01:14**

A No. 01:14

**Q Did you ever raise it with him? 01:14**

A No. 01:14

**Q Did you ever raise it with anyone? 01:14**

A Nope. 01:14

**Q Did you ever mention it to anyone? 01:14**

A No. 01:14

**Q What year was that? 01:14**

A After he started working there up until April of '06. 01:14

**Q So, at some point in his career you viewed this? 01:14**

A Yes. 01:14

**Q You don't remember which year? 01:14**

A Oh, no. You asked if I ever spoke with anybody about it. Actually, there was another officer, Officer John Oley, who also witnessed Fiorillo getting a blow job in the Gem cart, because him and I talked to about that. Neither of us went to anybody over it. 01:14

MR. NOVIKOFF: That is the second blow job? 01:14

THE WITNESS: Yes. It wasn't the same one that I watched. 01:14

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

MR. NOVIKOFF: I'm just want a clarification, if he was talking about the same blow job. 01:14

MR. GOODSTADT: You can redirect the witness that you represent; that is fine. 01:14

**Q What year was your discussions with Oley? 01:14**

A Probably sometime between '99 and '06. 01:14

**Q Some point in that seven-year period? 01:15**

A Yes. 01:15

**Q Was anyone else on patrol with you when you allegedly witnessed Fiorillo? 01:15**

A There was a lot of people on parole but I was -- 01:15

**Q With you, I said. 01:15**

A -- by myself on a bicycle patrol. 01:15

**Q Did you partner up with someone when you were on bike patrol? 01:15**

A No. 01:15

**Q You said it didn't affect your duties, but, in fact, what should Mr. Fiorillo have been doing at the time he was on duty getting paid? 01:15**

**T. Bacon**

A Patrolling. 01:15

**Q So, it actually left the Village with one less officer patrolling; correct? 01:15**

A True. 01:15

**Q Did that leave the Village unsafe in your mind? 01:15**

A I'm sorry. What was the question? 01:15

**Q Did that leave the Village unsafe in your mind? 01:15**

MR. NOVIKOFF: Objection. 01:15

A Perhaps. 01:15

**Q Did you believe it left the Village unsafe? 01:15**

A I didn't feel that at the time, no. 01:15

**Q Then you testified that Kevin Lamm was -- you saw him engaging in physical abuse on people in the public; correct? 01:16**

A Correct. 01:16

**Q Did you ever report it to anyone? 01:16**

A It was witnessed by the Chief, himself. 01:16

**Q That wasn't the question. The question was whether you ever reported it to anyone. 01:16**

**T. Bacon**

MR. NOVIKOFF: Objection. That was his answer. You can answer the question again. 01:16

A The Chief witnessed it himself. There was no need for me to report it. 01:16

**Q So, the answer is no, you didn't report to it anyone? 01:16**

MR. NOVIKOFF: Objection. The answer is what the answer is. 01:16

A The answer is the Chief witnessed it himself. The Chief addressed it after the incident. I did not report it. I did not need to report it. 01:16

**Q So, you answered no, you didn't report it. 01:16**

A It was witnessed by the chief. You are splitting hairs. 01:16

**Q I am not splitting hairs. 01:16**

A You are splitting hairs. It is what it is. 01:16

The Chief witnessed it. There is no reason for me to report it. If I turn around and punch him in the nose in front of my attorney here, do I need to report to it my attorney? No, 01:16

T. Bacon

he witnessed it. 01:17

**Q The question was whether you reported it ot not. 01:17**

MR. NOVIKOFF: Objection. 01:17

A No. I did not report it. It was witnessed by the Chief, himself. 01:17

**Q Which incident of physical abuse was witnessed by the Chief that you didn't report? 01:17**

A When he grabbed the guy in the headlock that I took down and started punching him. In fact, the Chief was one of those who helped pull him off the guy. 01:17

**Q Was Mr. Lamm arrested? 01:17**

A No, he was not. 01:17

**Q Was he indicted? 01:17**

A No, he was not. 01:17

**Q When you say "the Chief," who are you referring to? 01:17**

A George Hesse. 01:17

**Q What year did this happen? 01:17**

A Sometime between '99 and '06. 01:17

**Q Was Hesse the Chief from '99 to 06? 01:17**

MR. NOVIKOFF: Answer the question. 01:17

A What's that? 01:17

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q Was Hesse the Chief from '99 to '06? 01:17**
A Somewhere in that period he was. 01:17
MR. NOVIKOFF: Okay. 01:17
A I don't recall what point in time he became the Deputy Chief. 01:17 01:18
**Q Was he the Chief at the time of the Lamm incident? 01:18 01:18**
A I don't recall. He may have been a sergeant then. 01:18 01:18
**Q You also testified that Lamm went on a tirade with antisemitic and homophobic statements; correct? 01:18 01:18 01:18**
MR. NOVIKOFF: Objection. I don't know if he used the word tirade. 01:18 01:18
MR. GOODSTADT: No, he did. 01:18
THE WITNESS: I did use the word tirade. 01:18 01:18
MR. NOVIKOFF: I stand corrected. 01:18
BY MR. GOODSTADT: 01:18
**Q What year was that? 01:18**
A Once again, it was in that time frame, and that was more than once. 01:18 01:18
**Q Who else was present during this tirade? 01:18 01:18**

**T. Bacon**

A John Oley was one of them. Let's see, who else? 01:18 01:18
Oley was there for one of them. I can't recall for certain without having the roster in front of me. 01:18 01:18 01:18
**Q Did you ever report him for making these antisemitic or homophobic statements? 01:18 01:18**
A I did not. 01:18
**Q Did you ever use the phrase "Ocean Berg"? 01:18 01:19**
A No. 01:19
**Q How come you didn't report him? 01:19**
MR. NOVIKOFF: Objection. You can answer. 01:19 01:19
A How come I didn't report who? 01:19
**Q Kevin Lamm for using antisemitic and homophobic statements? 01:19 01:19**
A That was Kevin's thing, not mine. 01:19
**Q I understand. Why didn't you report him? 01:19 01:19**
A I didn't. No reason. It's none of my business. He's doing his thing, causing havoc as he always did on patrol. 01:19 01:19 01:19
**Q Did you ever report him for causing 01:19**

**T. Bacon**

**havoc on patrol? 01:19**
A No. 01:19
**Q I believe you testified that Snyder and Carter also used the term "Ocean Berg," correct? When was that? 01:19 01:19 01:19**
A Both before '99, before I came, when I was there the first time and even the second time, you know, the second time. 01:19 01:19 01:19
**Q Who else was present when Snyder made the comment? 01:19 01:19**
A Lonnie Ogenbaugh was one of them, even guys from Islip Harbor Police, Bob Scroy. I'm sure there were plenty of others. 01:19 01:19 01:20
**Q Did you report him for make in antisemitic comments? 01:20 01:20**
A I did not. 01:20
**Q How many times did he make the comment? 01:20 01:20**
A Dozens. 01:20
**Q Did he make any other antisemitic comments other Ocean Berg? 01:20 01:20**
A Nothing that I can remember. 01:20
**Q How about Carter, how many times did he make the comment Ocean Berg? 01:20 01:20**

**T. Bacon**

A Dozens. 01:20
**Q Did you ever report him? 01:20**
A No. 01:20
**Q Who else was present when he made the comment? 01:20 01:20**
A Lonny, actually the first time around, back in, prior to '99 when they were there and I was there the first time around, Mike Rosato was one of the guys. 01:20 01:20 01:20 01:20
I can't recall specifically. 01:20
**Q And did you ever report Carter? 01:20**
A No. 01:20
**Q How come? 01:20**
A I didn't. 01:20
**Q You testified that Nofi was crass. What led you to the conclusion that he was crass? 01:21 01:21 01:21**
A Instead of walking up to somebody who committed a violation in your presence and say, "Excuse me. Can I speak to you for a second?" 01:21 01:21 01:21
He would whistle at them and say, "Hey you, asshole. Come on over here. What the fuck are you thinking? I should give you a fuckin smack, ha." I deem that as crass. 01:21 01:21 01:21 01:21

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

Page 445

T. Bacon

**Q Did anyone ever file a complaint against him? 01:21**

A That I do not know. 01:21

**Q Did you ever report him? 01:21**

A Yes. 01:21

**Q Who did you report him to? 01:21**

A George Hesse. 01:21

**Q How many times? 01:21**

A Once. 01:21

**Q When? 01:21**

A The first time that it happened, I can't -- when -- I don't know, sometime between '99 and '02. 01:21

**Q Between 1999 and 2002 -- 01:21**

A Yes. 01:21

**Q -- did you ever make a report in writing? 01:21**

A No. 01:21

**Q Who else was there when you told George Hesse? 01:21**

A Nobody. 01:21

**Q Just the two of you? 01:21**

A Um-hum. 01:21

**Q Where were you? 01:21**

Page 446

**T. Bacon**

A In the station. 01:22

**Q What did you tell him? 01:22**

A I told him that "this guy is an idiot. He has no business being a cop. He doesn't know how to talk to people. He's ignorant and I am not going to work with him." 01:22

**Q Did you ever work with Nofi? 01:22**

A A couple of times. 01:22

**Q After that time? 01:22**

A No. 01:22

**Q So, after 2002 you never worked with Nofi? 01:22**

A Right. 01:22

**Q You said that he injured you -- 01:22**

A Yes. 01:22

**Q -- is that correct? 01:22**

**What injury did you have? 01:22**

A Bruised ribs. 01:22

**Q Did you get medical attention for it? 01:22**

A I did. 01:22

**Q That day? 01:22**

A Right after the incident. 01:22

**Q Do you know what led Nofi to jump on top of you? 01:22**

Page 447

**T. Bacon**

A His general incompetence and not knowing what's going on. 01:22

**Q Did ask you him why he jumped on top of you? 01:22**

A No. 01:22

**Q So, you don't know the reason that he did it; correct? 01:22**

A Other than he's an idiot, no. 01:22

**Q Did you ask him, "did you do it because are you an idiot"? 01:22**

A No, I think I called him a fuckin retard and I said, "What the fuck did you do that for?" 01:23

He said, "Well, it's your arrest." 01:23

I said, "No, it's not. It's your arrest. I'm going to the hospital." 01:23

**Q That was his response, you remember that specifically? 01:23**

A Yes. 01:23

**Q What year was that? 01:23**

MR. NOVIKOFF: Objection. 01:23

A I don't recall. 01:23

**Q Did you fill out any paperwork with respect to it? 01:23**

Page 448

**T. Bacon**

A Absolutely. Line of duty injury report. It's in the memo book, hospital paperwork, sure. It's in the blotter. 01:23

MR. GOODSTADT: I would like to mark the record to request the line of duty injury report, and the blotter, which I know there is a request for currently, and also the other document that has he just referred to. 01:23

MR. NOVIKOFF: Take it under advisement. 01:23

BY MR. GOODSTADT: 01:23

**Q Did you fill out a field report? 01:23**

A I didn't fill out a field report. He ended up having -- he got the whole ball because it became his arrest. 01:23

He had to do the field report, the arrest, the summons and everything else because I went to the hospital. 01:23

**Q Do you know whether anyone was approaching you from behind at the time that Joe Novi jumped on top of you? 01:24**

A There he was nobody approaching me from behind. 01:24

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

**Q How do you know that? 01:24**

A Because there were other officers that witnessed it and couldn't believe what they saw. 01:24

**Q Did you ask them if anyone was approaching from behind? 01:24**

A No. 01:24

**Q You don't have eyes in the back of your head so you can't see behind you; is that correct? 01:24**

MR. NOVIKOFF: I don't know. Do you have eyes in the back of your head? 01:24

THE WITNESS: I do not. 01:24

MR. NOVIKOFF: I think that answers the question. 01:24

THE WITNESS: Why didn't he grab the perp, instead of grabbing the both of us and tackling us both -- 01:24

MR. NOVIKOFF: Don't argue. Don't worry about it. 01:24

THE WITNESS: -- who was compliant. 01:24

BY MR. GOODSTADT: 01:24

**Q Do you know whether Kevin Lamm was ever written up for dragging summons people in in 01:24**

**T. Bacon**

**handcuffs? 01:24**

A I have no idea. 01:24

**Q When was the memo that was issued about issuing summons in the field, when was that posted? 01:24**

A I don't recall. 01:25

**Q Who posted it? 01:25**

A Hesse. 01:25

**Q Do you recall what year this was? 01:25**

A Sometime between '99 and '06. 01:25

MR. GOODSTADT: I would like to mark the record again to request a production of that memo. 01:25

MR. NOVIKOFF: Take it under advisement. 01:25

BY MR. GOODSTADT: 01:25

**Q You testified before about your belief that the officers on duty the night of the Halloween incident should have demanded that Jeanne Jaeger give them a statement that evening. 01:25**

**Do you recall testifying to that -- 01:25**

MR. NOVIKOFF: Objection. 01:25

**Q -- in sum and substance? 01:25**

MR. NOVIKOFF: That was not his 01:25

T. Bacon

testimony. I asked him about the word demanded and I think he said he wouldn't characterize it as demanded. 01:25

I'm objecting to that. You can answer if you can. 01:25

A I didn't state that they should have demanded. They should have done a complete, thorough investigation, and asked her for a statement, and gotten witness statements from anybody who witnessed what had happened. 01:26

**Q Do you know whether they tried to get those statements? 01:26**

A I have no idea. 01:26

**Q Do you know whether they even knew it was Jeanne Jaeger who was involved at that time? 01:26**

A I have no idea. 01:26

**Q Do you know whether they asked Rich Bosetti to get the woman who was allegedly being choked? 01:26**

A I have no idea. 01:26

**Q You testified that Fiorillo beat people into submission. 01:26**

**What did you mean by that? 01:26**

MR. NOVIKOFF: Objection to the 01:26

T. Bacon

characterization of his testimony. That was part of an entire answer, so it's taken out of context, but you can answer over my objection. 01:26

A Yeah, verbally abusive and verbally beat them into submission. He wasn't physical. He didn't physically abuse anybody. He was just verbally abusive. 01:26

**Q Did you ever report that to anyone? 01:26**

A No, I did not. 01:26

**Q You testified that Fiorillo issued too many summonses; correct? 01:26**

A Yes. 01:26

**Q Isn't it true that the Chief, when I say Chief, I mean, Paradiso, told the department that they needed to issue more summonses? 01:27**

A We always used to hear you need to issues summonses; that was a routine mantra. 01:27

**Q Were you ever told that you needed to issue more summonses? 01:27**

A Yes. 01:27

**Q You testified that Fiorillo was bullying with the public. Do you recall testifying to that? 01:27**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon
A Yes. 01:27
**Q What did you mean by that? 01:27**
A Once again, he was verbally abusive to the public. 01:27 01:27
**Q Again, you never reported that; correct? 01:27 01:27**
A No, I did not. 01:27
**Q Do you know whether anyone ever filed a complaint about his verbal abuse? 01:27 01:27**
A Yes, I do know. 01:27
**Q Who filed a complaint about his verbal use? 01:27 01:27**
A I have no idea who the civilian was, but I know, because Chief Paradiso asked me about it. 01:27 01:27 01:27
**Q When was this? 01:27**
A Sometime between 1999 and 2006. 01:27
**Q You don't recall what year? 01:27**
A No. 01:27
**Q I think you testified about a call that you received from an FBI investigator about Fiorillo? 01:27 01:28 01:28**
A Yes. 01:28
**Q Do you recall that? 01:28**

T. Bacon
**What did you to say the FBI investigator about Fiorello? 01:28 01:28**
A I gave him a favorable reference. It was within the first six months that Fiorillo was working with us. 01:28 01:28 01:28
**Q Do you recall what you said to the investigator about Fiorillo? 01:28 01:28**
A That he was trustworthy, dedicated, professional. It was before we knew who Fiorillo really was and it wasn't an accurate reference that I had given. 01:28 01:28 01:28 01:28
**Q Did you ever correct that reference? 01:28**
A No, I did not. 01:28
**Q You testified that you are a volunteer fire department -- or volunteer firefighter in the Islip Fire Department; is that correct? 01:28 01:28 01:28 01:28**
A Yes. 01:28
**Q Any other Ocean Beach police officers work there? 01:28 01:28**
A No. 01:28
**Q Any other Ocean Beach police officers work there during your tenure there? 01:29 01:29**
A No. 01:29

T. Bacon
**Q You testified that you voluntarily went on your last tour, even though you were retired and didn't have to go, but you wanted to go with your guys; is that correct? 01:29 01:29 01:29 01:29**
A I was eligible for retirement. I had not retired yet. 01:29 01:29
**Q But you voluntarily went because you wanted to go with your guys; is that correct? 01:29 01:29**
A Correct. 01:29
**Q Well, what did you mean by that? 01:29**
A They needed an assistant chief to go, someone in my rank. If I didn't go, somebody else was going to get stuck going. I could have turned around and retired, but I chose not to until after I came back so there wouldn't be either, A, shortfall, or somebody else wouldn't get stuck going. 01:29 01:29 01:29 01:29 01:29 01:29 01:29
**Q You went as a sense of loyalty to those guys? 01:29 01:29**
A I went as a sense of duty to my country. 01:29 01:29
**Q Again, I certainly appreciate your service to the country. Nobody is questioning that. 01:30 01:30 01:30**

T. Bacon
**And then you testified about a conversation that you had with Snyder about his time in the military? 01:30 01:30 01:30**
A Correct. 01:30
**Q When was that conversation? 01:30**
A In the early '90s. 01:30
**Q Do you know when Mr. Snyder left the military? 01:30 01:30**
A I do not. 01:30
**Q Do you know how old he was? 01:30**
A No idea. 01:30
**Q Do you know why he left the military? 01:30**
A Because he's a coward. 01:30
**Q And what is your basis for that? 01:30**
A Because he left and went AWOL. 01:30
**Q Do you know why, what the circumstances were? 01:30 01:30**
A No. I believe he said because of a girl. 01:30 01:30
**Q When did he tell you that? 01:30**
A Back in that time frame, back in the early '90s. 01:30 01:30
**Q What did he specifically tell you about a girl? 01:30 01:30**

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

A He said, "I got myself in trouble chasing after a gir." 01:30 01:30

**Q Who else was there during that conversation? 01:30 01:30**

A Just me and him. 01:30

**Q Do you know what kind of discharge he received? 01:30 01:30**

A No idea. 01:30

**Q You testified that guys chose not to work with Snyder; is that correct? 01:31 01:31**

A Um-hum. 01:31

**Q Who chose not to work with Snyder? 01:31**

A A bunch of guys. 01:31

**Q Who? 01:31**

A I don't know anybody specific. I know I was one of them. I didn't work with Snyder, Carter, Lamm, Fiorillo and Novi. If I was on the same shift, I was on bicycle patrol, and I would stay far from them. 01:31 01:31 01:31 01:31 01:31

**Q Who did you tell that you didn't want to work with Snyder? 01:31 01:31**

A Me? George. 01:31

**Q How many times did you tell him that? 01:31**

A Once. It wasn't just Snyder. I told 01:31

T. Bacon

him I didn't want to work with any one of those five knuckleheads. 01:31 01:31

**Q Do you know if anyone else told him that? 01:31 01:31**

A No. 01:31

**Q If anyone ever pulled themselves off of a tour because they didn't want to work with them? 01:31 01:31 01:31**

A No idea. 01:31

**Q Did you ever drop off a tour because you didn't want to work with one of those guys? 01:31 01:31**

A No. 01:32

MR. GOODSTADT: I have nothing further. 01:32 01:32

MR. NOVIKOFF: I'm good. 01:32

MR. CONNOLLY: I just have one question. 01:32 01:32

EXAMINATION 01:32

BY MR. CONNOLLY: 01:32

**Q You indicated that you became aware there was a civilian complaint against Frank Fiorillo; is that correct? 01:32 01:32 01:32**

A Yes. 01:32

**Q And I believe you testified you 01:32**

T. Bacon

**became aware of that particular complaint because you were informed by Chief Paradiso; is that correct? 01:32 01:32 01:32**

A Actually, I was there when the incident had occurred, and then Chief Paradiso, after seeing the individual making the complaint, that is how I knew the complaint was made, but I witnessed the actual issue at hand, personally. 01:32 01:32 01:32 01:32 01:32

**Q What was the actual issue at hand that you witnessed? 01:32 01:32**

A We were driving off, driving through Salt Air in the morning at the end of the tour, that there was a woman walking on the walkway, and she didn't yield to us, which she didn't have to because she is a pedestrian on the walkway. 01:32 01:32 01:33 01:33 01:33

And he got out of the car, started screaming and hollering, getting in her face, pointing at her and everything. 01:33 01:33 01:33

He got back into the car and I told him he was way out of line, don't ever do that again and embarrass me while I am with you. That was it. We went home. 01:33 01:33 01:33 01:33

The next shift I got a phone call from -- actually, later that day got a phone call 01:33 01:33

T. Bacon

from Ed Paradiso asking what had happened. 01:33

**Q And did you tell him what happened? 01:33**

A Yes. 01:33

**Q And was it the sum and substance of what you just said to us? 01:33 01:33**

A Yes. 01:33

**Q Do you know if Mr. Fiorello was counseled by Chief Paradiso? 01:33 01:33**

A That I have no idea. 01:33

MR. CONNOLLY: I have no further questions. 01:33 01:33

MR. GOODSTADT: I have one further question. 01:33 01:33

FURTHER EXAMINATION 01:33

BY MR. GOODSTADT: 01:33

**Q Isn't it true that you told Tom Snyder that you wore a vest because you were worried about the potential for violence in bar fights, including people carrying weapons or getting hit by glass? 01:33 01:33 01:33 01:34 01:34**

MR. NOVIKOFF: Objection, leading. 01:34

A No. 01:34

MR. GOODSTADT: That's it. 01:34

MR. CONNOLLY: Thank you. 01:34

a4a18d5c-ca6e-480a-b6b0-217d19a4c041

T. Bacon

THE VIDEOGRAPHER: The time is 1:34 p.m. 01:34 01:34

We are going off the record. 01:34

oOo

I, TYREE BACON, the witness herein, do hereby certify that the foregoing testimony of the pages of this deposition to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

_________________________

TYREE BACON

Subscribed and sworn to before me this ______day of ________________,______.

______________________________________

NOTARY PUBLIC

STATE OF NEW YORK ) Pg. of Pgs.
COUNTY OF NEW YORK )

I wish to make the following changes for the following reasons:

PAGE LINE
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
____ ____ CHANGE:__________________________
REASON:___________________________
__________________________

TYREE BACON

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.
COUNTY OF NEW YORK )

I, BONNIE PRUSZYNSKI, a Notary Public with and for the State of New York, do hereby certify:

That TYREE BACON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th of April, 2009.

__________________________

Bonnie Pruszynski

I N D E X

| WITNESS | PAGE |
| --- | --- |
| TYREE BACON | |
| BY MR. GOODSTADT | 266, 424, 460 |
| BY MR. NOVIKOFF | 374 |
| BY MR. CONNOLLY | 458 |

INFORMATION REQUESTED:

Page 377, Line 15
Page 448, Line 5
Page 450, Line 12

E X H I B I T S

| Exhibit | Page |
| --- | --- |
| Bacon Exhibit 10 2662 | 308 |
| Bacon Exhibit 11 Hesse 12-206 | 342 |
| Bacon Exhibit 12 P 926 - 927 | 356 |
| Bacon Exhibit 13 P 916, P 336 | 361 |
| Bacon Exhibit 14 007354 | 369 |

a4a18d5c-ca6e-480a-b6b0-217d19a4c041