Page 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO,  )
KEVIN LAMM, JOSEPH NOFI, and    )
THOMAS SNYDER,                  ) CV 07 1215
                                )
                Plaintiffs,     )
                                )
            vs.                 )
                                )
INCORPORATED VILLAGE OF OCEAN   )
BEACH; MAYOR JOSEPH C. LOEFFLER,)
JR., individually and in his    )
official capacity; former mayor )
NATALIE K. ROGERS, individually )
and in her official capacity,   )
OCEAN BEACH POLICE DEPARTMENT;  )
ACTING DEPUTY POLICE CHIEF      )
GEORGE B. HESSE, individually   )
and in his official capacity;   )
SUFFOLK COUNTY; SUFFOLK COUNTY  )
POLICE DEPARTMENT, SUFFOLK      )
COUNTY DEPARTMENT OF CIVIL      )
SERVICE; and ALISON SANCHEZ,    )
individually and in her         )
official capacity,              )
                                )
                Defendants.     )
------------------------------)

        VIDEOTAPED DEPOSITION OF
         JOSEPH C. LOEFFLER, JR.
           New York, New York
        Wednesday, February 25, 2009

Reported by:
KRISTIN KOCH, RPR, RMR, CRR, CLR
JOB NO. 20823
```

Page 2

```
 1
 2
 3
 4
 5              February 25, 2009
 6              10:04 a.m.
 7
 8
 9        Deposition of JOSEPH C. LOEFFLER,
10    JR., held at the offices of Rivkin Radler
11    LLP, 926 RexCorp Plaza, Uniondale,
12    New York, before Kristin Koch, a Registered
13    Professional Reporter, Registered Merit
14    Reporter, Certified Realtime Reporter,
15    Certified Livenote Reporter and Notary
16    Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S:
 3
 4        THOMPSON WIGDOR & GILLY LLP
 5        Attorneys for Plaintiffs
 6            85 Fifth Avenue
 7            New York, New York 10003
 8        BY:  ARIEL Y. GRAFF, ESQ.
 9
10        BEE READY FISHBEIN HATTER & DONOVAN, LLP
11        Attorneys for Incorporated Village of
12        Ocean Beach
13            170 Old Country Road
14            Mineola, New York 11501
15        BY:  JOSHUA JEMAL, ESQ.
16
17        RIVKIN RADLER LLP
18        Attorneys for Incorporated Village of
19        Ocean Beach, Joseph C. Loeffler Jr.,
20        Natalie K. Rogers and Ocean Beach Police
21        Department
22            926 RexCorp Plaza
23            Uniondale, New York 11556-0926
24        BY:  KENNETH A. NOVIKOFF, ESQ.
25            MICHAEL P. WELCH, ESQ.
```

Page 4

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3
 4
 5        MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
 6        Attorneys for George B. Hesse
 7            530 Saw Mill River Road
 8            Elmsford, New York 10523
 9        BY:  KEVIN W. CONNOLLY, ESQ.
10
11
12
13    ALSO PRESENT:
14
15        SILVIO FACCHIN, Legal Video Specialist
16        FRANK FIORILLO
17        THOMAS SNYDER
18        JOSEPH NOFI
19        KEVIN LAMM
20
21
22
23
24
25
```

1 (Pages 1 to 4)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 5

```
1
2         IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the
4    respective parties herein, that filing and
5    sealing and the same are hereby waived.
6         IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19        - oOo -
20
21
22
23
24
25
```

Page 6

```
1
2        (Loeffler Exhibit 1, Confidential    09:50:33
3    Wage/Salary History, marked for       09:50:33
4    identification.)                      09:57:23
5        (Loeffler Exhibit 2, Ocean Beach   09:57:23
6    Defendants' Response to Plaintiffs' First  09:57:23
7    Set of Interrogatories, marked for     09:57:23
8    identification.)                      09:57:24
9            *   *   *          10:03:38
10       THE VIDEOGRAPHER:  This is the tape   10:03:38
11   labeled number 1 of the videotaped       10:03:40
12   deposition of Mayor Joseph Loeffler in the  10:03:42
13   matter of Edward Carter, et al., versus   10:03:46
14   Incorporated Village of Ocean Beach, et al.  10:03:48
15       We are now going on the record.  The  10:03:51
16   time is 10:04 a.m.  Counsel will state   10:03:53
17   their appearances for the record.        10:03:56
18       MR. GRAFF:  Ari Graff from the law    10:03:58
19   firm of Thompson Wigdor & Gilly          10:03:59
20   representing the plaintiffs in this action,  10:04:01
21   three of whom are present with me here    10:04:03
22   today; Frank Fiorillo, Tom Snyder and Joe  10:04:05
23   Nofi.                        10:04:09
24       MR. NOVIKOFF:  And just for the      10:04:11
25   record, let the record reflect that       10:04:12
```

Page 7

```
1
2    Mr. Fiorillo is not wearing a suit.      10:04:14
3        For all of the Village defendants    10:04:16
4    except Mr. Hesse, Ken Novikoff and Michael  10:04:18
5    Welch from the law firm of Rivkin Radler  10:04:22
6    LLP, and Joshua Jemal, general counsel to  10:04:25
7    the Village from the law firm of --       10:04:28
8        MR. JEMAL:  Bee Ready Fishbein       10:04:28
9    Hatter & Donovan.               10:04:32
10       MR. CONNOLLY:  Kevin W. Connolly of   10:04:32
11   Marks, O'Neill, O'Brien & Courtney for the  10:04:34
12   defendant George Hesse.            10:04:36
13       THE VIDEOGRAPHER:  Will the court    10:04:37
14   reporter please swear in the witness.     10:04:38
15   J O S E P H  C.  L O E F F L E R ,  J R.,   10:04:46
16   called as a witness, having been duly sworn
17   by a Notary Public, was examined and
18   testified as follows:
19       MR. GRAFF:  This deposition will be  10:04:47
20   governed by the Federal Rules of Civil    10:04:50
21   Procedure and local civil rules for the   10:04:53
22   Eastern District of New York.          10:04:56
23       MR. NOVIKOFF:  Same stips as in      10:04:56
24   every other deposition that we have had?  10:04:58
25       MR. GRAFF:  Sure.          10:04:59
```

Page 8

```
1        Loeffler
2        MR. NOVIKOFF:  Okay.          10:05:00
3    EXAMINATION BY                 10:05:00
4    MR. GRAFF:                   10:05:00
5    Q.   Good morning, Mayor Loeffler.  As   10:05:00
6    you heard a moment ago, my name is Ari Graff, a  10:05:02
7    lawyer representing the plaintiffs.  I am going  10:05:05
8    to be asking you a series of questions today.  10:05:07
9        Do you understand that you are      10:05:11
10   testifying under oath in this deposition and  10:05:12
11   are legally obligated to tell the truth?   10:05:15
12       MR. NOVIKOFF:  You can move on.  The  10:05:17
13   witness is well aware what his obligations  10:05:19
14   are.  He just swore under oath.         10:05:21
15       MR. GRAFF:  Okay.  The witness can   10:05:22
16   indicate that in response to my question.   10:05:24
17       MR. NOVIKOFF:  Move on.  He is not   10:05:25
18   going to answer that question.          10:05:26
19       MR. GRAFF:  You are going to        10:05:27
20   instruct him not to answer?           10:05:28
21       MR. NOVIKOFF:  What's the point,     10:05:29
22   Ari?  He swore under oath.  Ask him does he  10:05:30
23   understand what the oath means.         10:05:33
24   Q.   Do you understand that the oath that  10:05:33
25   you took at the beginning of the deposition a  10:05:35
```

Page 9

Loeffler

1
2    moment ago indicated that you are obligated to    10:05:38
3    tell the truth during this deposition?           10:05:41
4        A.  Yes, I do.                    10:05:43
5        Q.  Thank you.  Have you ever testified    10:05:43
6    under oath before?                     10:05:45
7        A.  Yes, I have.                 10:05:47
8        Q.  And how many times have you        10:05:47
9    testified under oath before?           10:05:51
10       A.  Between 50 and 100 times.         10:05:53
11       Q.  In any of those cases when you      10:05:58
12   testified under oath, were you a party to the   10:06:01
13   proceeding?                            10:06:03
14       A.  Yes.                         10:06:03
15       Q.  And what was the most recent time   10:06:14
16   that you testified under oath prior to today?   10:06:18
17       A.  About four years ago.           10:06:20
18       Q.  And in what context did you give   10:06:23
19   sworn testimony four years ago?        10:06:24
20       A.  It was in a federal trial in Central   10:06:26
21   Islip.                          10:06:30
22       Q.  And what was the nature of your     10:06:30
23   testimony in that case?                10:06:34
24       A.  It was referencing a gun arrest that   10:06:35
25   I had made while I was employed by the Suffolk   10:06:38

Page 10

Loeffler

1
2    County Police Department that was being        10:06:41
3    prosecuted in the federal court.              10:06:42
4        Q.  Other than testimony that you have   10:06:44
5    given in the context of your official police    10:06:46
6    duties, have you ever testified under oath in   10:06:49
7    any other context?                     10:06:51
8        A.  Yes.                         10:06:52
9        Q.  And in what context would that be?   10:06:52
10       A.  I had an EBT in an automobile       10:06:55
11   accident.                          10:06:58
12       Q.  Other than the EBT, are there any   10:06:59
13   other times that you testified not in the      10:07:02
14   context of your official law enforcement       10:07:05
15   duties?                            10:07:09
16       A.  Yes, at my divorce proceedings.    10:07:09
17       Q.  Other than that, are there any      10:07:13
18   others?                            10:07:15
19       A.  No.                          10:07:15
20       Q.  Have you ever been a plaintiff in   10:07:16
21   any lawsuit?                           10:07:19
22       A.  No.                          10:07:22
23       Q.  Have you ever been a defendant in   10:07:24
24   any lawsuit other than this lawsuit?          10:07:25
25       A.  Yes.                         10:07:28

Page 11

Loeffler

1
2        Q.  And in what cases have you been a   10:07:31
3    defendant?                             10:07:33
4        MR. NOVIKOFF:  In his official         10:07:34
5    capacity or individual capacity?          10:07:36
6        MR. GRAFF:  In either.                10:07:37
7        MR. NOVIKOFF:  Why don't you break     10:07:38
8    it down, official and then individual.         10:07:39
9        Q.  We can break it down.  In what cases   10:07:40
10   have you testified as a named defendant in your   10:07:44
11   official capacity?                     10:07:46
12       A.  I testified in federal court on a    10:07:48
13   case that I handled.                   10:07:55
14       Q.  And what was the nature of that     10:07:57
15   case?                              10:07:58
16       A.  That case was an allegation by a    10:07:59
17   defendant reference treatment that he received   10:08:04
18   while in custody.                      10:08:08
19       Q.  And what was the official capacity   10:08:11
20   or position that you held at that time?        10:08:13
21       A.  I was a detective with the Suffolk   10:08:16
22   County Police Department.              10:08:18
23       Q.  And what was the nature of the      10:08:19
24   treatment that was the basis?          10:08:23
25       A.  We never got that far.  The case was   10:08:25

Page 12

Loeffler

1
2    dismissed.                         10:08:27
3        Q.  Other than that case, have there --   10:08:28
4    do you remember the name of the plaintiff in   10:08:30
5    that case?                             10:08:32
6        A.  No, I do not.                   10:08:32
7        Q.  Other than that case, have there    10:08:33
8    been any other cases where you have testified   10:08:35
9    in your official capacity as a named defendant?   10:08:37
10       A.  No.                          10:08:39
11       Q.  Other than this case, have there     10:08:39
12   been any cases in which you have testified in   10:08:41
13   your individual capacity as a named defendant?   10:08:43
14       A.  No.                          10:08:45
15       Q.  I know you have gone through this    10:08:46
16   many times before, but just to quickly go over   10:08:53
17   some of the protocols that we usually follow,    10:08:56
18   as you can see, there is a court reporter       10:08:58
19   here --                            10:09:00
20       MR. NOVIKOFF:  What makes you think    10:09:00
21   he has gone over this many times before?    10:09:01
22       MR. GRAFF:  He has given testimony    10:09:03
23   before in the context of --             10:09:04
24       MR. NOVIKOFF:  So what makes you       10:09:06
25   think he has gone over whatever protocols?   10:09:07

3 (Pages 9 to 12)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 13

```
1              Loeffler
2    Why don't you just ask questions.       10:09:07
3        MR. GRAFF:  Okay.              10:09:10
4      Q.  I will note that if you don't hear a  10:09:17
5  question or don't understand a question or a  10:09:20
6  word, please feel free to let me know and I'll  10:09:22
7  rephrase or repeat the question so that you can  10:09:24
8  understand it.                  10:09:26
9        Also, if you would like to take a   10:09:27
10  break at any time, please just let me know and   10:09:29
11  we can do that, but I would usually ask that if   10:09:31
12  there is a question pending, you first answer   10:09:34
13  the question before the break.          10:09:35
14        Are you presently taking any       10:09:39
15  medications that could affect your ability to   10:09:42
16  testify fully and completely today?       10:09:44
17    A.   No.                  10:09:47
18      Q.  Are you presently under a doctor's   10:09:48
19  care for any condition that could affect your   10:09:51
20  ability to testify fully and completely today?   10:09:53
21    A.   No.              10:09:55
22      Q.  Is there any reason you can think of   10:09:55
23  why you wouldn't be able to answer my questions   10:09:59
24  truthfully, fully and completely today?      10:10:01
25        MR. NOVIKOFF:  Objection.  I think   10:10:03
```

Page 14

```
1              Loeffler
2    you should ask the question about        10:10:05
3    truthfully, because if the question      10:10:07
4    encompasses "fully and completely," that  10:10:10
5    subsumes that your questions are clear, so  10:10:12
6    if you ask him if there is anything he can  10:10:13
7    think of that would prevent him from      10:10:16
8    answering honestly, that's a legitimate   10:10:18
9    question and he can answer that question.  10:10:20
10        MR. GRAFF:  Okay.          10:10:21
11      Q.  I will note again that to the extent  10:10:21
12  that you are unclear about a question I am    10:10:22
13  asking, please tell me and I can repeat or   10:10:26
14  rephrase the question.              10:10:28
15        MR. NOVIKOFF:  Counsel, I'm here to   10:10:29
16    object to the form of the question.  That's  10:10:32
17    my role.  Are you suggesting by that    10:10:34
18    instruction to the witness that he is    10:10:37
19    somehow waiving his rights under the     10:10:38
20    Federal Rules of Civil Procedure to review  10:10:41
21    his transcript at the conclusion and make  10:10:42
22    whatever changes he wants with any      10:10:45
23    explanation that he wants?          10:10:46
24        MR. GRAFF:  I am suggesting only    10:10:47
25    what I stated to the witness.  This     10:10:48
```

Page 15

```
1              Loeffler
2    deposition is governed by the Federal Rules  10:10:50
3    of Civil Procedure.              10:10:52
4        MR. NOVIKOFF:  I just want to make    10:10:52
5    that clear.                  10:10:55
6        MR. GRAFF:  Mr. Novikoff, are you    10:10:56
7    requesting the opportunity to review the   10:10:58
8    transcript?                  10:10:59
9        MR. NOVIKOFF:  I think -- if you    10:11:00
10    want to introduce it at trial, if this ever  10:11:01
11    gets to trial, you better show him the    10:11:03
12    transcript.                  10:11:05
13        MR. GRAFF:  Okay.  Pursuant to the  10:11:06
14    Federal Rules of Civil Procedure you have  10:11:08
15    the right to request that opportunity    10:11:09
16    before the completion of this deposition,  10:11:11
17    as you now have.              10:11:13
18      Q.  Is there any reason, Mayor Loeffler,  10:11:14
19  that you can think of why you wouldn't be able  10:11:16
20  to answer my questions truthfully today?     10:11:18
21    A.   No.              10:11:20
22      Q.  Is there any reason you can think of  10:11:21
23  why you wouldn't be able to answer my questions  10:11:23
24  fully and completely to the best of your     10:11:25
25  understanding and recollection?          10:11:27
```

Page 16

```
1              Loeffler
2    A.   No.              10:11:28
3      Q.  Who have you spoken with about this  10:11:29
4  lawsuit other than your counsel?        10:11:39
5    A.   My wife, my family, members of the   10:11:41
6  Village staff, news reporters, and some members  10:11:47
7  of the general public.              10:12:02
8      Q.  Are you finished with that answer?   10:12:08
9    A.   Yes, I am.              10:12:10
10      Q.  And what is your wife's name?      10:12:11
11    A.   Conde, C-O-N-D-E.          10:12:13
12      Q.  And how long have you been married  10:12:19
13  to Conde?                  10:12:20
14    A.   Eleven years.          10:12:21
15      Q.  And prior to your marriage to Conde,  10:12:29
16  have you been married to anyone else?      10:12:32
17    A.   Yes, I was.          10:12:33
18      Q.  And who else have you been married  10:12:34
19  to?                      10:12:36
20    A.   Donna.              10:12:36
21      Q.  And what have you discussed -- were  10:12:41
22  you referring to your current wife Conde as --  10:12:43
23    A.   Yes.              10:12:46
24      Q.  What have you discussed with Conde  10:12:46
25  about this lawsuit?              10:12:49
```

4  (Pages 13 to 16)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 17

Loeffler

1
2      MR. NOVIKOFF:  Objection.  Spousal      10:12:49
3   privilege.  You have to lay a much better      10:12:51
4   foundation to get him to answer about      10:12:54
5   communications he has with his wife about a  10:12:55
6   lawsuit in which he is named a party of.      10:12:59
7      MR. GRAFF:  We can come back to      10:13:01
8   that.                    10:13:02
9      Q.   Which family members did you intend   10:13:02
10  to refer to as having -- as people who you have   10:13:04
11  discussed this lawsuit with?              10:13:09
12     A.   My children, my brother.       10:13:10
13     Q.   And --                    10:13:16
14     A.   My mother.  That's about it.      10:13:17
15     Q.   Specifically which children?       10:13:21
16     A.   I have four children; Suzanne,      10:13:23
17  Christine, Michael and Jillian.        10:13:26
18     Q.   And have you spoken with all four of   10:13:30
19  your children about this lawsuit?           10:13:34
20     A.   Yes.                10:13:35
21     Q.   And what have you discussed in       10:13:36
22  substance with your children concerning this   10:13:39
23  lawsuit?                    10:13:41
24     A.   That I thought this --        10:13:41
25     MR. NOVIKOFF:  Go ahead.       10:13:43

Page 18

Loeffler

1
2      A.   That I thought this was a frivolous   10:13:44
3   lawsuit and a waste of my time and that I was   10:13:45
4   very annoyed that I had to respond to these   10:13:48
5   questions and that it was taking a lot of my   10:13:51
6   time away from my family, this lawsuit has, and   10:13:55
7   I'm annoyed at that.              10:13:59
8      Q.   Other than your annoyance at the   10:14:00
9   lawsuit, is there anything else that you can   10:14:04
10  recall that you have discussed in substance   10:14:05
11  with any of your children?          10:14:08
12     MR. NOVIKOFF:  Objection to the   10:14:08
13  characterization of his testimony.  I think  10:14:09
14  he said more than he was merely annoyed   10:14:11
15  with the lawsuit.              10:14:13
16     Q.   Other than what you referred to in   10:14:14
17  your last response, have you discussed anything   10:14:16
18  else?                    10:14:17
19     A.   That would be the sum and substance   10:14:17
20  of what I said.               10:14:19
21     Q.   And can you recall any specific       10:14:20
22  conversations with any of your children on that   10:14:21
23  subject?                    10:14:23
24     A.   No, I can't.            10:14:24
25     MR. NOVIKOFF:  What subject?  The   10:14:25

Page 19

Loeffler

1
2   lawsuit, his annoyance, the fact that it's   10:14:27
3   frivolous?  What?  You gotta be precise,      10:14:29
4   Ari.                    10:14:32
5      Q.   Precise -- what you had testified to   10:14:34
6   before, including your annoyance.          10:14:36
7      MR. NOVIKOFF:  Objection to the      10:14:38
8   form.                    10:14:38
9      A.   I'm confused.            10:14:39
10     MR. NOVIKOFF:  Yes, if you want to   10:14:40
11  break it down, break it down.          10:14:42
12     Q.   Can you recall when the last time   10:14:43
13  you discussed this lawsuit with Suzanne, your   10:14:44
14  daughter, was?               10:14:48
15     A.   Within the last month.  I discussed   10:14:48
16  it with all my children in the last month.   10:14:51
17     MR. NOVIKOFF:  Just answer the   10:14:53
18  question.                 10:14:53
19     Q.   What members of the Village staff   10:14:54
20  have you discussed this lawsuit with?          10:14:55
21     MR. NOVIKOFF:  So we are off his   10:14:58
22  children now?              10:14:59
23     MR. GRAFF:  I am asking about the   10:15:00
24  Village staff right now.          10:15:01
25     MR. NOVIKOFF:  Okay, good.       10:15:02

Page 20

Loeffler

1
2      A.   The members of the board.       10:15:04
3      Q.   And who are the members of the board   10:15:10
4   that you are referring to?          10:15:11
5      A.   It would be William Wingate, James   10:15:12
6   Mallott, Kenneth Klein and Steven Einig.      10:15:18
7      Q.   And what have you discussed with       10:15:32
8   William Wingate concerning this lawsuit?       10:15:34
9      MR. NOVIKOFF:  Now, if the witness   10:15:36
10  has addressed anything about this lawsuit  10:15:41
11  with a trustee member outside the presence   10:15:45
12  of counsel, I will permit him to answer.   10:15:48
13  If the witness has discussed with a trustee   10:15:50
14  in the presence of counsel, but not for the  10:15:53
15  purpose of seeking legal advice, I will   10:15:55
16  allow the witness to answer.  If he has in   10:15:58
17  a meeting with a trustee member with       10:16:01
18  counsel present seeking legal advice from   10:16:04
19  counsel, that I will object to and assert   10:16:07
20  privilege.                10:16:10
21     MR. GRAFF:  I understand.       10:16:10
22     MR. NOVIKOFF:  Okay.          10:16:11
23     A.   This matter has been discussed in --   10:16:11
24  at meetings, Village board meetings, and during   10:16:16
25  executive session with counsel present.   10:16:19

5  (Pages 17 to 20)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 21

Loeffler

1
2    MR. NOVIKOFF: See, now, if it's --    10:16:21
3    now, just for clarity, when you say board    10:16:23
4    meetings, it's open to the general public?    10:16:25
5    THE WITNESS: Yes.    10:16:26
6    MR. NOVIKOFF: Okay. So if it's    10:16:27
7    open to the general public, you have to    10:16:28
8    answer. If it was an executive session for    10:16:30
9    the purpose of seeking legal advice and    10:16:33
10   counsel, then I'm going to instruct you not    10:16:35
11   to answer. Do you understand at least my    10:16:38
12   distinction?    10:16:41
13   THE WITNESS: Yes, I do.    10:16:42
14   Q. Okay. And keeping Mr. Novikoff's    10:16:43
15   distinction in mind, what have you discussed    10:16:45
16   with William Wingate concerning this lawsuit?    10:16:48
17   A. All the discussions I've had with    10:16:49
18   the Board of Trustees has been during executive    10:16:51
19   session.    10:16:53
20   Q. So you have never had any    10:16:54
21   discussions with William Wingate individually    10:16:55
22   concerning this lawsuit?    10:16:58
23   A. No sum and substance about this    10:16:58
24   lawsuit. The only thing I have discussed is    10:17:00
25   the fact that I'd be responding to this EBT    10:17:02

Page 22

Loeffler

1
2    today.    10:17:06
3    Q. And prior to -- strike that.    10:17:07
4    How long have you known William    10:17:17
5    Wingate?    10:17:18
6    A. 25 years.    10:17:19
7    Q. And what is the nature of your    10:17:21
8    relationship with Mr. Wingate?    10:17:24
9    A. He is a friend.    10:17:27
10   Q. And in what context did you first    10:17:37
11   meet Mr. Wingate?    10:17:39
12   A. I bought a piece of property from    10:17:40
13   him, land.    10:17:45
14   Q. And is that land located in Ocean    10:17:48
15   Beach?    10:17:50
16   A. Yes, it is.    10:17:50
17   Q. And in what year did you purchase    10:17:51
18   that land?    10:17:53
19   A. 1985. 1984.    10:17:54
20   Q. Have you -- what is the address of    10:17:59
21   that property that you are referring to?    10:18:02
22   A. 68 Ocean Road, Ocean Beach.    10:18:04
23   Q. Other than that purchase of land    10:18:16
24   from Mr. Wingate, have you been involved in any    10:18:20
25   other real estate transactions in which he    10:18:22

Page 23

Loeffler

1
2    played a part that you are aware of?    10:18:24
3    A. No.    10:18:26
4    Q. Has Mr. Wingate ever loaned you any    10:18:27
5    money in connection with any real estate    10:18:29
6    transactions?    10:18:31
7    A. Yes.    10:18:32
8    Q. And on how many occasions has    10:18:34
9    Mr. Wingate loaned you money in connection with    10:18:37
10   a real estate transaction?    10:18:39
11   A. Two.    10:18:41
12   Q. And what was the more recent of    10:18:42
13   those two occasions? When did that take place?    10:18:47
14   A. Fifteen years ago.    10:18:49
15   Q. And how much money did he loan you    10:18:50
16   at that time?    10:18:52
17   A. I don't know. I don't remember    10:18:53
18   exactly how much.    10:18:54
19   Q. And what real estate was being    10:18:55
20   purchased at that time?    10:18:58
21   A. 29 Beachwold Walk in Seaview.    10:18:59
22   Q. And what was the other real estate    10:19:05
23   transaction in connection with which    10:19:13
24   Mr. Wingate loaned you money?    10:19:15
25   A. He had held a mortgage on the    10:19:16

Page 24

Loeffler

1
2    property that I bought at 68 Ocean Road.    10:19:19
3    Q. And how -- in what amount was the    10:19:21
4    mortgage?    10:19:27
5    A. I don't remember.    10:19:27
6    Q. If I suggested that it was a hundred    10:19:27
7    thousand dollars, would that refresh your    10:19:30
8    recollection?    10:19:31
9    A. It could have been.    10:19:32
10   Q. Have you ever been involved in any    10:19:32
11   purchase of real estate from Ocean Beach, that    10:19:40
12   is, the Village of Ocean Beach?    10:19:43
13   A. Yes.    10:19:47
14   Q. And on how many occasions have you    10:19:47
15   been involved in purchasing real estate from    10:19:49
16   the Village of Ocean Beach?    10:19:51
17   A. One.    10:19:53
18   Q. And when was that occasion?    10:19:53
19   A. Approximately three years ago.    10:19:55
20   Q. And what real estate did you    10:19:57
21   purchase at that time?    10:19:58
22   A. I purchased a 4 by 50 foot right of    10:19:59
23   way from the Village of Ocean Beach.    10:20:04
24   Q. And where is the -- that located,    10:20:06
25   the address?    10:20:09

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 25

```
 1              Loeffler
 2     A.  68 Ocean Road.              10:20:09
 3     Q.  And how much did you pay for that    10:20:11
 4  real estate?                     10:20:14
 5     A.  $1,500, I think.            10:20:14
 6     Q.  And do you know what the assessed    10:20:18
 7  value of the real estate was at the time that   10:20:21
 8  you purchased it?                 10:20:23
 9     A.  It didn't have an assessed value, I   10:20:24
10  don't think.                     10:20:28
11     Q.  Subsequent to your purchase of that   10:20:29
12  piece of real estate, has it been assessed, to   10:20:32
13  your knowledge?                  10:20:34
14     A.  No, it has not.             10:20:35
15     Q.  Do you know what the value of that    10:20:39
16  real estate is?                  10:20:41
17     A.  No, I don't.               10:20:41
18     Q.  When did you first meet Trustee     10:20:50
19  James Mallott?                   10:20:53
20     A.  Thirty years ago.           10:20:55
21     Q.  And what's the nature of your      10:20:56
22  relationship with Mr. Mallott?         10:20:58
23     A.  Friend.                   10:20:59
24     Q.  And is he a family friend?  Do your   10:21:04
25  families interact socially?           10:21:08
```

Page 26

```
 1              Loeffler
 2        MR. NOVIKOFF:  Objection.  Form.   10:21:10
 3     Q.  Do your families interact socially?   10:21:13
 4     A.  No.                      10:21:17
 5     Q.  And when did you meet Trustee      10:21:18
 6  Kenneth Klein?                   10:21:20
 7     A.  Five years ago.             10:21:23
 8     Q.  And in what context did you meet    10:21:28
 9  Mr. Klein?                     10:21:30
10     A.  He was a member of the Zoning Board   10:21:31
11  of Appeals in the Incorporated Village of Ocean   10:21:32
12  Beach.                        10:21:36
13     Q.  What's the nature of your         10:21:36
14  relationship with Mr. Klein?           10:21:37
15     A.  He is a friend.             10:21:38
16     Q.  And Trustee Steven Einig, when did   10:21:43
17  you first meet him?                10:21:46
18     A.  2003.                     10:21:48
19     Q.  In what context did you first meet   10:21:52
20  Mr. Einig?                     10:21:53
21     A.  He was a member of the sitting board   10:21:54
22  of the Village of Ocean Beach.         10:21:56
23     Q.  When you say "the city board," is    10:21:59
24  that --                        10:22:01
25     A.  Sitting board.             10:22:01
```

Page 27

```
 1              Loeffler
 2     Q.  Sitting board?               10:22:01
 3     A.  Sitting, S-I-T-T-I-N-G.        10:22:04
 4     Q.  What's the nature of your         10:22:07
 5  relationship with Mr. Einig?           10:22:09
 6     A.  He is a friend.             10:22:10
 7     Q.  Have any of your children ever been   10:22:11
 8  employed by Ocean Beach?            10:22:19
 9     A.  Yes.                      10:22:20
10     Q.  And which children have been        10:22:20
11  employed by Ocean Beach?            10:22:23
12     A.  All of them.               10:22:24
13     Q.  What positions has Suzanne Loeffler   10:22:25
14  held with Ocean Beach?              10:22:29
15     A.  She worked in the Village office and   10:22:30
16  she was the director of the recreation     10:22:32
17  department.                     10:22:34
18     Q.  And during what period of time did    10:22:34
19  she work in the Village office?         10:22:36
20     A.  I don't know the exact date.       10:22:37
21     Q.  Do you know the years?          10:22:44
22     A.  No, I don't.               10:22:45
23     Q.  And during what period of time, if   10:22:46
24  you know, did she work in the recreation    10:22:49
25  department?                     10:22:52
```

Page 28

```
 1              Loeffler
 2     A.  Up until two years ago she worked    10:22:52
 3  there -- three years ago she worked there.   10:22:55
 4     Q.  And do you know how long she held    10:22:57
 5  her position with that department?       10:22:59
 6     A.  No, I don't.               10:23:00
 7     Q.  And what positions has Jillian      10:23:01
 8  Loeffler held with the Village of Ocean Beach?   10:23:07
 9     A.  She is the seasonal director of the   10:23:10
10  recreation department.              10:23:13
11     Q.  And how long has she held that      10:23:13
12  position?                      10:23:15
13     A.  Two years.                 10:23:15
14     Q.  Did you have any role in her       10:23:16
15  obtaining that position?            10:23:18
16     A.  No, I did not.              10:23:19
17     Q.  And what positions has Mike Loeffler   10:23:20
18  held with Ocean Beach?              10:23:24
19     A.  He was a seasonal lifeguard.      10:23:25
20     Q.  During what period of time was he a   10:23:27
21  seasonal lifeguard?                10:23:30
22     A.  More than five years ago.        10:23:32
23     Q.  And what positions has Christine    10:23:39
24  Loeffler held with Ocean Beach?         10:23:41
25     A.  She worked for the -- this last     10:23:43
```

TSG Reporting – Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 29

Loeffler

1
2  summer for three months she worked at the          10:23:49
3  recreation department.                               10:23:52
4      Q.  And that was after Suzanne Loeffler    10:23:58
5  no longer worked there?                              10:24:02
6      A.  Correct.                            10:24:03
7      Q.  Thank you.  Are you related to       10:24:03
8  Winnie or Winifred Loeffler?                 10:24:09
9      A.  That's my mother.                  10:24:10
10     Q.  Has your mother, Mrs. Loeffler, held  10:24:13
11 any positions with Ocean Beach?             10:24:16
12     A.  Yes, she has.              10:24:17
13     Q.  What positions has she held?         10:24:19
14     A.  She was the court clerk.          10:24:21
15     Q.  During what period of time was she   10:24:22
16 court clerk?                                 10:24:25
17     A.  Approximately 30 years.           10:24:25
18     Q.  And do you know what the nature of   10:24:30
19 her duties were as Village clerk -- court    10:24:32
20 clerk?  Excuse me.                           10:24:35
21     A.  She worked in the court.         10:24:35
22     Q.  Other than the members of your       10:24:40
23 family who we have just been discussing, have  10:24:42
24 any other family members of yours ever been   10:24:45
25 employed by Ocean Beach?                     10:24:47

Page 30

Loeffler

1
2      A.  My father.                       10:24:48
3      Q.  And was your father the chief of     10:24:49
4  police at Ocean Beach?                       10:24:53
5      A.  Yes, he was.                  10:24:53
6      Q.  And do you know during what period   10:24:54
7  of time he was the police chief?             10:24:56
8      A.  From 1956 until 1993 maybe.       10:24:58
9      Q.  Have any other members of your       10:25:15
10 family been employed by Ocean Beach?         10:25:17
11     A.  My brother, Alan.             10:25:19
12     Q.  Alan Loeffler?                       10:25:20
13     A.  Yes, sir.                  10:25:21
14     Q.  What position has your brother held  10:25:22
15 with Ocean Beach?                            10:25:24
16     A.  He was a police officer in the     10:25:25
17 Village Police Department.                    10:25:26
18     Q.  And, to your knowledge, has Alan     10:25:30
19 Loeffler held any law enforcement positions   10:25:33
20 outside of Ocean Beach?                      10:25:35
21     A.  Yes, he has.              10:25:37
22     Q.  And what law enforcement positions   10:25:38
23 has he held?                                 10:25:41
24     A.  He worked for the U.S. Marshal    10:25:41
25 Service and he worked for the Town of Islip.   10:25:43

Page 31

Loeffler

1
2      Q.  Do you know what position he held in  10:25:50
3  the Town of Islip?                           10:25:51
4      A.  He was harbor master.          10:25:52
5      Q.  Is that a law enforcement position?  10:25:54
6      A.  Yes, it is.              10:25:57
7      Q.  Do you know during what period of    10:25:59
8  time he held the position of harbor master in  10:26:01
9  the Town of Islip?                           10:26:04
10     A.  Thirty years.  For thirty years.  He  10:26:05
11 just retired, so that would be from, let's see,  10:26:07
12 1975 to 2005, something like that.            10:26:10
13     Q.  And did your brother, Alan Loeffler,  10:26:19
14 communicate to you why he was retiring in 2005?  10:26:23
15     A.  Because he had thirty years in the   10:26:25
16 department.                                   10:26:27
17     Q.  Have you ever been convicted of a    10:26:34
18 crime?                                        10:26:36
19     A.  No.                      10:26:36
20         MR. NOVIKOFF:  You don't want to ask  10:26:40
21 what position he had with the U.S. Marshal?  10:26:42
22         MR. GRAFF:  I will ask the questions  10:26:47
23 that I'd like to ask.                         10:26:48
24         MR. NOVIKOFF:  All right.  I just     10:26:50
25 thought it was interesting that you only      10:26:51

Page 32

Loeffler

1
2  asked about the Town of Islip and not the     10:26:52
3  U.S. Marshal.                                10:26:54
4      Q.  Since your counsel has raised it,    10:26:55
5  what position did Alan Loeffler hold at the   10:26:57
6  U.S. Marshal?                                10:26:59
7      A.  He was a sky marshal during the     10:27:00
8  early '70s working at Kennedy Airport.        10:27:02
9      Q.  Have you had any conversations with  10:27:09
10 former Mayor Rogers concerning this lawsuit?  10:27:11
11     A.  No.                      10:27:14
12         MR. NOVIKOFF:  Okay.  You can        10:27:16
13 answer.  Right, you can answer.  He           10:27:18
14 wouldn't have been an employee at the time.   10:27:19
15     A.  Would you repeat the question,      10:27:22
16 please.                                       10:27:23
17     Q.  Have you had any conversations with  10:27:23
18 former Mayor Rogers concerning this lawsuit?  10:27:25
19         MR. NOVIKOFF:  Oh, actually, other   10:27:28
20 than in the presence of counsel.              10:27:29
21         MR. GRAFF:  Yes.                10:27:31
22     Q.  None of my questions today are       10:27:32
23 intended to get at anything that was          10:27:33
24 communicated by your counsel to you or by you  10:27:35
25 to your counsel or by anyone else in your     10:27:38

8 (Pages 29 to 32)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 33

                    Loeffler
1
2  presence in the presence of counsel for the      10:27:41
3  purpose of obtaining legal advice.                 10:27:43
4         With that in mind, have you had any    10:27:45
5  conversations with former Mayor Rogers         10:27:47
6  concerning this lawsuit?                             10:27:49
7     A.  Yes.                          10:27:51
8     Q.  On how many occasions have you      10:27:52
9  spoken with Mayor Rogers concerning this      10:27:54
10 lawsuit?                                   10:27:57
11    A.  Once.                          10:27:57
12    Q.  And when did that conversation take  10:27:57
13 place?                                      10:27:59
14    A.  About a year ago.                    10:28:00
15    Q.  And in substance, can you tell me    10:28:03
16 what was discussed between the two of you in  10:28:05
17 that conversation?                             10:28:08
18    MR. NOVIKOFF:  As long as it was      10:28:09
19    outside the presence of counsel.        10:28:11
20    A.  It was discussed that we were both   10:28:12
21 defendants in this lawsuit and that we were    10:28:14
22 going to pursue this lawsuit vigorously.       10:28:16
23    Q.  Have you had any conversations with  10:28:22
24 Mary Anne Minerva concerning this lawsuit?   10:28:25
25    A.  Yes.                          10:28:27

Page 34

                    Loeffler
1
2     Q.  And what's the most recent occasion  10:28:28
3  when you communicated with Ms. Minerva about  10:28:30
4  this lawsuit?                              10:28:33
5         MR. NOVIKOFF:  Now, I am only going  10:28:34
6    to direct the witness on two things.  One,  10:28:35
7    if your discussion with Ms. Minerva was in  10:28:37
8    the presence of counsel, you don't answer,  10:28:39
9    or if your discussion with Ms. Minerva was  10:28:42
10   at the request of counsel in order to      10:28:44
11   obtain information concerning this lawsuit,  10:28:48
12   then I would instruct you not to answer.    10:28:50
13   Other than that, go wild.               10:28:52
14    A.  I spoke to her last week informing    10:28:55
15 her that I would be at this EBT.          10:28:58
16    Q.  Other than that conversation and any  10:29:01
17 conversations, as your counsel noted, that were  10:29:04
18 in the presence of counsel or under the       10:29:08
19 direction of counsel in connection with        10:29:10
20 litigation of this case, have you had any other  10:29:13
21 communications with Ms. Minerva about this    10:29:15
22 lawsuit?                                   10:29:18
23    A.  Yes.                          10:29:18
24    Q.  And in substance what have you       10:29:18
25 discussed with Ms. Minerva about this lawsuit?  10:29:20

Page 35

                    Loeffler
1
2     A.  I thought it was a waste of my time  10:29:22
3  and a frivolous lawsuit brought by some       10:29:24
4  disgruntled employees.                       10:29:26
5     Q.  Did you have any conversations with  10:29:28
6  Ms. Minerva concerning her deposition in this  10:29:30
7  lawsuit?                                   10:29:32
8         MR. NOVIKOFF:  Concerning the fact  10:29:33
9    that she was going to be deposed or       10:29:34
10   concerning anything she said at her        10:29:36
11   deposition after the fact?               10:29:38
12   MR. GRAFF:  Either.                    10:29:39
13   MR. NOVIKOFF:  Then objection to       10:29:40
14   form.  Break it down.                    10:29:41
15    A.  Would you please repeat the         10:29:44
16 question.                                 10:29:45
17    Q.  Have you had any conversations with  10:29:45
18 Ms. Minerva concerning her deposition in this  10:29:47
19 lawsuit?                                   10:29:49
20    MR. NOVIKOFF:  Objection to form.      10:29:49
21    You can answer.                        10:29:50
22    A.  No, I have not.                    10:29:51
23    Q.  And have you had any conversations   10:29:52
24 with Mayor Rogers -- former Mayor Rogers about  10:29:56
25 her deposition in this lawsuit?             10:30:00

Page 36

                    Loeffler
1
2     MR. NOVIKOFF:  Objection to form.      10:30:01
3    A.  No, I have not.                    10:30:02
4     Q.  Do you know who Patrick Cherry is?   10:30:10
5     A.  Yes, I do.                        10:30:13
6     Q.  And who is Patrick Cherry?          10:30:14
7     A.  He is an employee of the           10:30:16
8  Incorporated Village of Ocean Beach.          10:30:18
9     Q.  And in what capacity is he employed?  10:30:19
10    A.  He is a dispatcher.                 10:30:21
11    Q.  Is that a police dispatcher?         10:30:23
12    A.  Yes, he is.                        10:30:24
13    Q.  Have you had any conversations with  10:30:25
14 Pat Cherry regarding this lawsuit?           10:30:27
15    (Kevin Lamm enters.)                  10:30:29
16    A.  No, I have not.                    10:30:29
17    Q.  Have you had any conversations with  10:30:31
18 George Hesse about this lawsuit?             10:30:48
19    A.  Yes, I have.                      10:30:50
20    MR. NOVIKOFF:  I'm sorry, could you    10:30:58
21    just read that question?  Only because I  10:30:59
22    believe another plaintiff came into the   10:31:00
23    room in the course of the question, Kevin  10:31:01
24    Lamm, so I just want to note that, and if  10:31:02
25    you could just read the question back.    10:31:04

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 37

Loeffler

1
2      (Record read.)                    10:31:11
3      Q.   And when is the most recent occasion  10:31:12
4  on which you had communication with George    10:31:14
5  Hesse about this lawsuit?            10:31:16
6      A.   About a week ago.              10:31:18
7      Q.   What did you discuss with George    10:31:23
8  Hesse in that conversation a week ago?    10:31:27
9      A.   That I would be attending this EBT.  10:31:28
10     Q.   Was anything else -- strike that.  10:31:31
11         Did he say anything to you in       10:31:33
12  response when you communicated that fact?  10:31:34
13     A.   He said "good luck."             10:31:35
14     Q.   Was anything else discussed between  10:31:37
15  the two of you in that conversation?     10:31:39
16     A.   No.                    10:31:40
17         MR. NOVIKOFF:  About this lawsuit?  10:31:40
18         MR. GRAFF:  No, in general.        10:31:41
19         MR. NOVIKOFF:  Oh, okay.          10:31:43
20     A.   I discussed how the weather was in  10:31:45
21  New York, I discussed how his family was, I  10:31:47
22  talked to him about his boat.  General     10:31:49
23  conversation that friends talk about, but not  10:31:53
24  about this lawsuit.                10:31:56
25     Q.   And does George Hesse own a boat?    10:31:59

Page 38

Loeffler

1
2      A.   Yes, he does.                 10:32:02
3      Q.   What kind of boat does he have?     10:32:03
4      A.   32-foot Sea Ray.              10:32:05
5      Q.   Do you own any boats?           10:32:09
6      A.   Yes, I do.                  10:32:10
7      Q.   Do you own more than one boat?     10:32:10
8      A.   No, I do not.                10:32:12
9      Q.   What kind of boat do you own?     10:32:14
10     A.   A 25-foot Contender.           10:32:15
11     Q.   Other than the conversation with   10:32:17
12  George Hesse that you have already referred to,  10:32:19
13  have you had any other communications with    10:32:21
14  Mr. Hesse concerning this lawsuit?      10:32:23
15     A.   No.                    10:32:25
16         MR. NOVIKOFF:  Concerning this     10:32:31
17  lawsuit after the Complaint was filed?    10:32:33
18         MR. GRAFF:  That's what initiated   10:32:37
19  the lawsuit, so yes.              10:32:39
20         MR. NOVIKOFF:  Well, your question  10:32:41
21  was a little bit vague, so I just wanted to  10:32:42
22  be clear that the witness is only        10:32:44
23  addressing conversations with Mr. Hesse    10:32:45
24  after the commencement of this lawsuit    10:32:47
25  concerning this lawsuit.            10:32:49

Page 39

Loeffler

1
2      The question is other than what you   10:32:53
3  have just testified to, have you spoken     10:32:55
4  with Mr. Hesse concerning this lawsuit     10:32:57
5  after this lawsuit was filed?           10:33:01
6      A.   Yes.  That's what I said, didn't I?  10:33:04
7      Q.   And what was communicated in        10:33:08
8  substance between you and Mr. Hesse in those  10:33:10
9  conversations?                  10:33:12
10     A.   Basically that I would be attending  10:33:13
11  a deposition, that the lawsuit was pending.   10:33:17
12  There were other discussions taking place about  10:33:23
13  other Village business, but not about this    10:33:27
14  lawsuit.                     10:33:30
15     Q.   Have you reviewed the Complaint that  10:33:30
16  was filed in federal court in this lawsuit?  10:33:32
17     A.   Yes, I have.                10:33:35
18     Q.   And did you discuss the Complaint   10:33:36
19  with George Hesse?               10:33:39
20     A.   Yes, I did.                 10:33:40
21     Q.   And were there any specific        10:33:48
22  allegations in the Complaint that you can    10:33:49
23  recall discussing with George Hesse?     10:33:51
24     A.   I only discussed with him the       10:33:54
25  portions of the Complaint that were reference  10:33:56

Page 40

Loeffler

1
2  to me.                       10:33:59
3         MR. NOVIKOFF:  So you didn't have a  10:34:02
4  long conversation, did you?           10:34:04
5         THE WITNESS:  No, sir.           10:34:05
6      Q.   And do you recall what was          10:34:06
7  communicated in substance between you and    10:34:10
8  Mr. Hesse about those portions of the      10:34:13
9  Complaint?                    10:34:14
10     A.   That they were baseless and untrue.  10:34:15
11     Q.   Did you discuss any of the         10:34:17
12  allegations in the Complaint with former Mayor  10:34:26
13  Rogers?                     10:34:30
14         MR. NOVIKOFF:  Outside the presence  10:34:30
15  of counsel.                   10:34:31
16     A.   No, I did not.               10:34:32
17     Q.   Have you had any communications with  10:34:33
18  any of the plaintiffs since this lawsuit was  10:34:37
19  filed?                      10:34:39
20     A.   No, I have not.               10:34:39
21     Q.   When did you first learn that the   10:34:44
22  plaintiffs were making allegations against    10:34:46
23  Ocean Beach concerning the subject matter of  10:34:48
24  this lawsuit?                  10:34:50
25     A.   With the filing of the lawsuit.     10:34:51

10 (Pages 37 to 40)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 41

```
 1          Loeffler
 2    Q.   And that's the federal lawsuit?      10:34:54
 3    A.   Yes.  I believe that was in April    10:34:56
 4  about.  I'm not sure of the exact date.     10:34:59
 5    Q.   Do you know who Richard Bosetti is?  10:35:02
 6    A.   Yes, I do.              10:35:08
 7    Q.   Who is Richard Bosetti?             10:35:09
 8    A.   He is a former police officer in the  10:35:11
 9  Incorporated Village of Ocean Beach.       10:35:13
10    Q.   And when did he stop serving as a    10:35:14
11  police officer, if you know?               10:35:18
12    A.   Sometime this year.  I don't know if 10:35:20
13  it was '08 or '09.  I'm not positive.      10:35:23
14    Q.   Did you ever have any communications 10:35:27
15  with Richard Bosetti concerning the subject of 10:35:29
16  this lawsuit?                              10:35:32
17    A.   No, I did not.            10:35:32
18    Q.   And do you know why Richard Bosetti  10:35:33
19  stopped working as a police officer with the 10:35:37
20  Incorporated Village of Ocean Beach?       10:35:39
21    A.   He resigned.             10:35:41
22    Q.   Do you know who Gary Bosetti is?     10:35:42
23    A.   Yes, I do.               10:35:49
24    Q.   Is that Richard Bosetti's brother?   10:35:49
25    A.   Yes, it is.              10:35:51
```

Page 42

```
 1          Loeffler
 2    Q.   And was he also a police officer at  10:35:52
 3  Ocean Beach?                               10:35:54
 4    A.   Yes, he was.             10:35:54
 5    Q.   And do you know during what period   10:35:55
 6  of time he was a police officer with Ocean 10:35:57
 7  Beach?                                     10:35:59
 8    A.   No, I do not.            10:35:59
 9    Q.   Do you know when his service as a    10:36:00
10  police officer ended?                      10:36:02
11    A.   '07, '08.               10:36:02
12    Q.   And do you know why Gary Bosetti's   10:36:09
13  service as a police officer ended at that time? 10:36:13
14    A.   He resigned.             10:36:14
15    Q.   Do you know anything about the       10:36:16
16  circumstances of his resignation?          10:36:18
17    A.   No, I don't.             10:36:20
18    Q.   And do you know anything about the   10:36:25
19  circumstances of Richard Bosetti's resignation? 10:36:28
20    A.   No, I do not.            10:36:31
21    Q.   Did you ever ask either Richard or   10:36:32
22  Gary Bosetti to resign?                    10:36:34
23    A.   I did not.              10:36:35
24    Q.   Did you ever direct anyone else to   10:36:36
25  ask either Richard or Gary Bosetti to resign? 10:36:40
```

Page 43

```
 1          Loeffler
 2    A.   I did not.              10:36:42
 3    Q.   Did you have any communications with 10:36:46
 4  either Richard or Gary Bosetti concerning   10:36:49
 5  either of their resignations?              10:36:53
 6    A.   I did not.              10:36:54
 7    Q.   Have you had any conversations with  10:36:55
 8  either -- strike that -- with Gary Bosetti   10:36:57
 9  concerning the subject of this lawsuit?     10:37:00
10    A.   I did not.              10:37:02
11    Q.   Do you know who Ty or Tyree Bacon    10:37:08
12  is?                                        10:37:10
13    A.   Yes, I do.              10:37:11
14    Q.   And who is Tyree Bacon?             10:37:12
15    A.   He is a police officer in the        10:37:14
16  Village of Ocean Beach.                    10:37:16
17    Q.   Have you had any conversations with  10:37:17
18  Tyree Bacon about this lawsuit?            10:37:19
19    A.   No, I have not.          10:37:22
20    Q.   Have you had any conversations with  10:37:23
21  Tyree Bacon about any of the allegations in the 10:37:25
22  Complaint?                                 10:37:27
23    A.   No, I have not.          10:37:27
24    Q.   Are you currently a resident of      10:37:28
25  Ocean Beach?                               10:37:40
```

Page 44

```
 1          Loeffler
 2    A.   Yes.                    10:37:41
 3    MR. NOVIKOFF:  Objection.      10:37:41
 4    You can answer.                10:37:42
 5    A.   Yes, I am.              10:37:44
 6    Q.   And do you reside at 68 or 68-69     10:37:45
 7  Ocean Road?                                10:37:48
 8    A.   Yes, I do.              10:37:49
 9    Q.   I have a few questions that just go  10:37:50
10  to your educational background.            10:37:56
11    Q.   Did you graduate high school?       10:37:59
12    A.   Yes, I did.             10:38:00
13    Q.   What high school did you attend?     10:38:01
14    A.   Bay Shore High School.  10:38:02
15    Q.   And what year did you graduate?      10:38:04
16    A.   1967.                   10:38:08
17    Q.   And did you attend any college or    10:38:09
18  university?                                10:38:12
19    A.   Yes, I did.             10:38:12
20    Q.   And what college or university did   10:38:13
21  you attend after high school?              10:38:19
22    A.   The State University College of      10:38:19
23  Potsdam.                                   10:38:21
24    Q.   And did you obtain a degree from the 10:38:23
25  State University College of Potsdam?       10:38:25
```

TSG Reporting – Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1    A.   No, I did not.                    10:38:28
2    Q.   How many years did you attend the    10:38:29
3 **State University College of Potsdam?**    10:38:33
4    A.   Two.  Two.               10:38:36
5    Q.   And other than those two years, have    10:38:38
6 **you had any other formal coursework at any**    10:38:43
7 **college or university?**           10:38:47
8    A.   Yes.               10:38:48
9    Q.   And could you identify that, please?  10:38:48
10    A.   Dowling College.            10:38:51
11    Q.   And what did you study at Dowling    10:38:53
12 **College?**              10:38:55
13    A.   Business administration.        10:38:55
14    Q.   And did you attain any degree at    10:38:57
15 **Dowling College?**           10:39:00
16    A.   Yes, I did.             10:39:01
17    Q.   What degree?            10:39:02
18    A.   Bachelor of business administration.  10:39:02
19    Q.   And in what year did you get that    10:39:05
20 **degree?**               10:39:06
21    A.   Sometime in the '80s.         10:39:07
22    Q.   Have you attended any other colleges  10:39:12
23 **or universities?**           10:39:15
24    A.   Farmingdale University.        10:39:16


1              Loeffler
2    A.   No, I did not.                    10:38:28
3    Q.   How many years did you attend the    10:38:29
4 **State University College of Potsdam?**    10:38:33
5    A.   Two.  Two.               10:38:36
6    Q.   And other than those two years, have    10:38:38
7 **you had any other formal coursework at any**    10:38:43
8 **college or university?**           10:38:47
9    A.   Yes.               10:38:48
10    Q.   And could you identify that, please?  10:38:48
11    A.   Dowling College.            10:38:51
12    Q.   And what did you study at Dowling    10:38:53
13 **College?**              10:38:55
14    A.   Business administration.        10:38:55
15    Q.   And did you attain any degree at    10:38:57
16 **Dowling College?**           10:39:00
17    A.   Yes, I did.             10:39:01
18    Q.   What degree?            10:39:02
19    A.   Bachelor of business administration.  10:39:02
20    Q.   And in what year did you get that    10:39:05
21 **degree?**               10:39:06
22    A.   Sometime in the '80s.         10:39:07
23    Q.   Have you attended any other colleges  10:39:12
24 **or universities?**           10:39:15
25    A.   Farmingdale University.        10:39:16

1              Loeffler
2    Q.   And what was the nature of your    10:39:19
3 **study at Farmingdale University?**    10:39:22
4    A.   Finance.             10:39:24
5    Q.   Did you attain any degree from    10:39:26
6 **Farmingdale University?**           10:39:29
7    A.   No, I did not.             10:39:30
8    Q.   How many years did you attend    10:39:31
9 **Farmingdale?**              10:39:33
10    A.   Two.               10:39:34
11    Q.   Have you attended any other colleges  10:39:34
12 **or universities other than what we have already**  10:39:37
13 **discussed?**              10:39:40
14    A.   No.               10:39:40
15    Q.   Why did you stop attending    10:39:40
16 **Farmingdale University after two years?**    10:39:42
17    A.   I only took some night courses    10:39:44
18 there.               10:39:46
19    Q.   And was that in pursuit of any    10:39:47
20 **certification or formal credential?**    10:39:50
21    A.   Yes, it was.            10:39:52
22    Q.   And did you attain any kind of    10:39:53
23 **certification or formal credential?**    10:39:56
24    A.   Yes, I did.             10:39:58
25    Q.   And in what?            10:39:59

1              Loeffler
2    A.   I got a bachelor of business    10:40:01
3 administration from Dowling College and I used   10:40:03
4 those credits that I obtained in Farmingdale    10:40:05
5 towards the pursuit of that degree.     10:40:07
6    Q.   Thank you.  Other than the colleges    10:40:09
7 **and universities that you have already**    10:40:14
8 **identified, have you attended any other**    10:40:15
9 **colleges or universities?**       10:40:17
10    A.   No, I have not.           10:40:18
11    Q.   Have you attained any other degrees   10:40:20
12 **or certifications?**           10:40:21
13    A.   Yes.  I received a certificate from    10:40:22
14 the Metropolitan Police Training Council as a   10:40:32
15 police officer of the Suffolk County Police   10:40:36
16 Department in 1973.            10:40:40
17    Q.   Have you attained any other    10:40:43
18 **certifications?**           10:40:46
19    A.   I attained -- I attended the FBI    10:40:47
20 Academy training as a hostage negotiator and   10:40:51
21 received a certificate for that.       10:40:57
22    Q.   And when did you receive that    10:40:58
23 **certificate?**              10:40:59
24    A.   In 1987.             10:40:59
25    Q.   Have you attained any other    10:41:03

1              Loeffler
2 **certifications?**             10:41:04
3    A.   No, I have not.           10:41:05
4    Q.   Other than this lawsuit, have you    10:41:10
5 **been involved in any other lawsuits in the**    10:41:22
6 **context of your service at Ocean Beach?**    10:41:26
7       MR. NOVIKOFF:  Objection to the form   10:41:29
8 of the question.  I would think that as    10:41:30
9 mayor or trustee any time the Village was   10:41:33
10 sued, this witness would be involved, so I   10:41:36
11 am objecting to the form.  I think I have   10:41:44
12 given you a way to clean it up.       10:41:45
13       MR. GRAFF:  I will come back to    10:42:00
14 that.               10:42:01
15    Q.   Have you ever sued or threatened to   10:42:01
16 **sue any employer of yours?**       10:42:03
17       MR. NOVIKOFF:  Wait a minute.    10:42:05
18 Can you read that question.        10:42:06
19 (Record read.)             10:42:11
20       MR. NOVIKOFF:  Any employer of --    10:42:12
21 okay.  I understand the question.       10:42:14
22 Objection to form.           10:42:15
23    A.   No, I have not.           10:42:17
24    Q.   Other than these plaintiffs, have    10:42:18
25 **any employees of Ocean Beach ever sued or**    10:42:24

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2  threatened to sue you personally?              10:42:27
3       MR. NOVIKOFF:  Objection to form.      10:42:29
4  That he is aware of?                          10:42:31
5       MR. GRAFF:  Yes.                        10:42:32
6       MR. NOVIKOFF:  Okay.  I am still        10:42:33
7  going to object to form, but that at least    10:42:34
8  clears up part of the objection.              10:42:37
9       A.  No.              10:42:38
10      Q.   Have any formal grievances ever been  10:42:38
11 filed against you personally during your      10:42:44
12 services at Ocean Beach?                      10:42:46
13      MR. NOVIKOFF:  Objection to the         10:42:48
14 phrase "formal grievances."  I don't know     10:42:50
15 what that means.                              10:42:51
16      Q.   Do you know what a grievance is?  Is  10:42:52
17 there a grievance in the context of Ocean     10:42:54
18 Beach?                                        10:42:55
19      MR. NOVIKOFF:  Is it now grievance      10:42:55
20 or is it now formal grievance?  Your          10:42:56
21 question was formal grievance.                10:42:58
22      Q.   Would you know what I am referring   10:42:59
23 to by the phrase "formal grievance,"          10:43:01
24 Mr. Loeffler?                                 10:43:04
25      A.   Not in the context you are asking   10:43:04

Loeffler

1
2  the question, no.                             10:43:06
3       Q.   Is there another context in which --  10:43:07
4       MR. NOVIKOFF:  There could be           10:43:10
5  multiple contexts.                            10:43:11
6       Q.   Have you ever been disciplined by   10:43:14
7  any employer?                                 10:43:17
8       A.   No, I have not.                     10:43:17
9       Q.   Have you ever been terminated from  10:43:18
10 any employment position?                      10:43:20
11      A.   No, I have not.                     10:43:22
12      Q.   Have you ever been asked to resign  10:43:23
13 from any position?                            10:43:24
14      A.   No, I have not.                     10:43:26
15      Q.   Have you ever been subject to any   10:43:27
16 discipline by any employer?                   10:43:29
17      A.   I believe you already asked that    10:43:30
18 question.  I have not.                        10:43:32
19      Q.   The answer is no.                   10:43:33
20      Other than any conversations with        10:43:36
21 counsel, what, if anything, did you do to     10:43:38
22 prepare for this deposition today?            10:43:40
23      MR. NOVIKOFF:  And other than           10:43:43
24 meeting with counsel, meeting and speaking    10:43:45
25 with counsel?                                 10:43:47

Loeffler

1
2       MR. GRAFF:  Yes.               10:43:47
3       MR. NOVIKOFF:  And anything that        10:43:50
4  took place within that meeting, like          10:43:51
5  looking at documents?  I mean, I think we     10:43:52
6  have already established you can ask him if    10:43:55
7  he looked at any documents to refresh his     10:43:57
8  recollection, but I don't think it's          10:44:00
9  appropriate for you to ask him if he looked   10:44:01
10 at any documents that I or Michael Welch or   10:44:03
11 Josh Jemal handed to him.  So that's why I    10:44:06
12 am just, you know, trying to figure out       10:44:09
13 exactly what you are asking.                  10:44:10
14      MR. GRAFF:  Okay.              10:44:11
15      Q.   With that distinction in mind, what,  10:44:12
16 if anything, have you done to prepare for this  10:44:15
17 deposition?                                   10:44:17
18      A.   Would you repeat that.  I don't     10:44:17
19 quite understand what you are asking.         10:44:19
20      Q.   Sure.  Other than anything that     10:44:20
21 happened in any meetings with counsel, what, if  10:44:21
22 anything, did you do to prepare for this      10:44:24
23 deposition?                                   10:44:26
24      A.   I took a shower this morning, had   10:44:26
25 breakfast.                    10:44:30

Loeffler

1
2       Q.   Have you reviewed any transcripts   10:44:31
3  from any other depositions in this case?      10:44:33
4       A.   No.                      10:44:35
5       MR. NOVIKOFF:  Outside the              10:44:35
6  presentation of counsel?                      10:44:36
7       MR. GRAFF:  No, in general.             10:44:37
8       MR. NOVIKOFF:  I don't know if --       10:44:40
9  and I think the answer is already given,      10:44:44
10 but if I showed him a transcript of a         10:44:47
11 witness, I don't know if that's              10:44:51
12 discoverable.  I think if he looked at a      10:44:55
13 transcript to refresh his recollection, at    10:44:57
14 least based upon what Judge Boyle has         10:45:00
15 already ruled, that would not be             10:45:02
16 objectionable.  So that's the distinction.    10:45:04
17      MR. GRAFF:  I understand the            10:45:06
18 distinction you are making.  I am asking if   10:45:07
19 he has reviewed any transcripts.             10:45:09
20      MR. NOVIKOFF:  Outside of the           10:45:10
21 presence --                   10:45:11
22      MR. GRAFF:  No.  I am asking if he      10:45:12
23 has reviewed any transcripts.               10:45:13
24      MR. NOVIKOFF:  He answered no.          10:45:17
25 I'm -- the answer is not waiving my right     10:45:20

13  (Pages 49 to 52)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 53

```
1              Loeffler
2    to object on the grounds of attorney/client  10:45:21
3    privilege, but since you already answered  10:45:25
4    "no," we might as well move on instead of  10:45:27
5    fighting for ten minutes.          10:45:29
6        MR. GRAFF:  Thank you.        10:45:30
7    Q.  And the answer to that was no?     10:45:31
8    A.  Yes.              10:45:33
9    Q.  Did you review any documents that   10:45:34
10   refreshed your recollection of anything in  10:45:36
11   connection with this deposition today?    10:45:41
12   A.  No, I have not.          10:45:42
13   Q.  Other than the law firm of Rivkin   10:45:43
14   Radler, have there been other law firms that  10:46:07
15   have represented you or the Village of Ocean  10:46:09
16   Beach in this lawsuit?          10:46:10
17       MR. NOVIKOFF:  And other than Josh  10:46:14
18   Jemal's law firm, which I think we can all  10:46:16
19   stipulate has been --          10:46:19
20       MR. GRAFF:  Yes.          10:46:19
21       MR. NOVIKOFF:  -- general counsel.   10:46:19
22   A.  I believe Mark Anash was        10:46:22
23   the first -- no, I don't -- no.       10:46:25
24       MR. NOVIKOFF:  If you can recall.    10:46:27
25   It's not a guessing game.        10:46:29
```

Page 54

```
1              Loeffler
2    A.  I don't recall.  No, I believe it's  10:46:30
3    been Rivkin Radler.          10:46:31
4    Q.  And just to be clear, is there    10:46:34
5    another law firm that the name you can't    10:46:36
6    remember now or you are --        10:46:38
7    A.  No.  In this lawsuit, Rivkin Radler.  10:46:39
8        MR. NOVIKOFF:  But, again, I mean,   10:46:41
9    this is a memory game, Ari, because I think  10:46:43
10   the record in the docket would reflect that  10:46:45
11   there was, in fact, another lawsuit that    10:46:48
12   appeared on behalf of Ocean Beach prior to  10:46:50
13   Rivkin Radler.            10:46:52
14       MR. GRAFF:  I am asking you.      10:46:52
15       MR. NOVIKOFF:  I know, I mean, you   10:46:53
16   are asking --            10:46:54
17   A.  I don't know who it was.  I don't   10:46:54
18   remember.              10:46:56
19       MR. GRAFF:  I asked the court    10:47:01
20   reporter to mark as Exhibit 1 a one-page   10:47:02
21   document produced by Ocean Beach without   10:47:05
22   Bates number.  I am going to pass that to   10:47:07
23   the witness.            10:47:09
24   I will note that Mr. Novikoff is    10:47:11
25   holding the document.          10:47:12
```

Page 55

```
1              Loeffler
2        MR. NOVIKOFF:  Because I would like   10:47:12
3    to look at it.            10:47:12
4        MR. GRAFF:  I do have a copy for    10:47:13
5    you, Mr. Novikoff.          10:47:15
6        MR. NOVIKOFF:  Thank you.  And I    10:47:16
7    would like to compare it to the copy that  10:47:16
8    you provided me.  Is there a question?  Or  10:47:20
9    would you like the witness to look at it?   10:47:25
10       MR. GRAFF:  I'd like the witness to   10:47:27
11   look at it first and to tell me if he    10:47:28
12   recognizes the document.        10:47:30
13       MR. NOVIKOFF:  Fair enough.      10:47:30
14   There you go (handing).        10:47:31
15   (Document review.)          10:47:45
16       MR. NOVIKOFF:  The only question is  10:47:54
17   do you recognize it.  Not the information  10:47:54
18   that's on it --            10:47:59
19       THE WITNESS:  Okay.        10:47:59
20       MR. NOVIKOFF:  -- just the document.  10:48:00
21   A.  I've never seen this before.     10:48:00
22   Q.  Okay.              10:48:02
23   A.  This is the first time I am seeing  10:48:03
24   this.              10:48:05
25   Q.  The document is headed Confidential  10:48:05
```

Page 56

```
1              Loeffler
2    Wage Salary/History, employee name is Joseph C.  10:48:09
3    Loeffler, Jr.            10:48:12
4        If you look towards the bottom of    10:48:13
5    the document, it indicates that you were mayor  10:48:15
6    from July 3rd, '06 and the end date it has here  10:48:16
7    is May 31st, '07.          10:48:19
8        MR. NOVIKOFF:  That's what the     10:48:21
9    document says, yes.          10:48:22
10   Q.  Is that the date that you began    10:48:23
11   serving as mayor?          10:48:25
12       MR. NOVIKOFF:  So the question is   10:48:26
13   did you start serving as mayor of Ocean    10:48:27
14   Beach on July 3rd, 2006?        10:48:29
15       MR. GRAFF:  Yes.          10:48:31
16   A.  Yes, I did.            10:48:32
17   Q.  And the document above mayor      10:48:33
18   indicates that you served as a trustee, it has  10:48:36
19   it on a number of lines, but the period of time  10:48:37
20   is from August 2002 through May 30 -- I'm    10:48:39
21   sorry, through July 2nd, 2006.       10:48:43
22       Is that the time that you served as  10:48:45
23   a trustee in Ocean Beach?        10:48:47
24   A.  Yes, that's correct.        10:48:49
25   Q.  And if it would be of assistance to  10:48:50
```

9e28f7aa-4e93-4641-9524-8529961356c8

Page 57

Loeffler

1
2  you in connection with these questions, I'm          10:48:52
3  sure Mr. Novikoff would be happy to let you see     10:48:54
4  the document.                                        10:48:56
5        MR. NOVIKOFF:  If Mr. Loeffler -- if  10:48:56
6  he needs to look at the document to refresh  10:48:58
7  his recollection, then he will so advise     10:48:59
8  me.                                          10:49:02
9     Q.   During the period that you were         10:49:02
10 trustee or mayor, did you hold any other         10:49:03
11 employment?                                      10:49:07
12       MR. NOVIKOFF:  With Ocean Beach?     10:49:08
13       MR. GRAFF:  With anyone.     10:49:09
14       MR. NOVIKOFF:  Okay.          10:49:11
15    A.   I was employed by the Suffolk County  10:49:11
16 Police Department.                         10:49:14
17    Q.   And what position did you hold at     10:49:15
18 the Suffolk County Police Department during     10:49:16
19 that period?                                 10:49:18
20    A.   I was a detective.          10:49:19
21    Q.   And who was your direct superior in     10:49:25
22 the Suffolk County Police Department during     10:49:29
23 that period?                                 10:49:30
24       MR. NOVIKOFF:  Objection to the     10:49:35
25 frame -- to the form.                 10:49:36

Page 58

Loeffler

1
2     A.   James -- Lieutenant James Maher.     10:49:38
3     Q.   Was he your supervisor during that     10:50:01
4  entire period?                                10:50:03
5     A.   What period is that?          10:50:04
6     Q.   The period when you were also         10:50:06
7  serving as trustee or mayor.                 10:50:08
8     A.   I believe so.          10:50:09
9     Q.   Have you held any other employment     10:50:16
10 other than a Suffolk County detective during     10:50:17
11 the period that you served as trustee or mayor?  10:50:22
12    A.   No.          10:50:25
13    Q.   Moving up on the document, it         10:50:25
14 indicates that you were a building inspector     10:50:30
15 from January 1st, 1980 through June 1st, 1980.     10:50:32
16 Do you recall that?                         10:50:38
17    A.   Yes, I do.          10:50:39
18    Q.   Between the time that you finished     10:50:39
19 serving as a building inspector until you     10:50:42
20 became a trustee, what, if any, employment did  10:50:44
21 you hold?                                    10:50:46
22       MR. NOVIKOFF:  With the Village?     10:50:47
23       MR. GRAFF:  With anyone.  What, if  10:50:49
24 any, employment.                         10:50:51
25    A.   I was employed by the Suffolk County  10:50:52

Page 59

Loeffler

1  Police Department.                         10:50:54
2     Q.   Any other employment?          10:50:54
3     A.   No.          10:50:56
4     Q.   What about during those years when     10:50:56
5  you were a building inspector in 1980, did you     10:51:00
6  hold any other employment?                 10:51:04
7     A.   No.          10:51:04
8     Q.   Were you also employed by the         10:51:05
9  Suffolk County Police Department?         10:51:07
10    A.   Yes, oh, yes.  I've been employed by  10:51:08
11 the Suffolk County Police Department from July  10:51:11
12 of 1973 through January of 2004.          10:51:13
13    Q.   And did you -- were you continuously  10:51:21
14 employed by the Suffolk County Police         10:51:22
15 Department during that entire period?         10:51:24
16    A.   Yes, I was.          10:51:25
17    Q.   Okay.  Moving up on the document, it  10:51:26
18 indicates that you served as a police officer  10:51:32
19 at Ocean Beach from September 5th, 1970 through  10:51:34
20 July 7th, 1973.  Is that accurate, to the best  10:51:40
21 of your recollection?                 10:51:44
22    A.   Yes.          10:51:45
23    Q.   Other than the positions that I have  10:51:46
24 referred to on Exhibit 1 and your position with  10:51:52

Page 60

Loeffler

1
2  the Suffolk County Police Department, have you  10:51:54
3  held any other employment during the period?     10:51:57
4     A.   Well, I think that I was a -- I     10:52:02
5  worked -- I picked up garbage.  I worked in  10:52:04
6  maintenance department for two summers while I  10:52:07
7  was in college.                         10:52:09
8     Q.   And that was at Ocean Beach?         10:52:09
9     A.   Yes, it was.          10:52:11
10    Q.   Other than the employment positions     10:52:11
11 that we have just been discussing, have you     10:52:14
12 held any other employment?                 10:52:16
13       MR. NOVIKOFF:  Objection.     10:52:18
14    A.   I was chief of the Fire Department.     10:52:18
15    Q.   Is that the Fire Department in --     10:52:22
16    A.   Ocean Beach Fire Department.     10:52:24
17    Q.   During what period were you chief of  10:52:25
18 the Ocean Beach Fire Department?         10:52:27
19    A.   Early '80s.  I'm not sure of the     10:52:29
20 dates.                                 10:52:36
21    Q.   Is there currently a chief of the     10:52:37
22 Ocean Beach Fire Department?                 10:52:40
23    A.   Yes, there is.          10:52:41
24    Q.   Who is that person?          10:52:41
25    A.   Robert Thornberg.          10:52:42

9e28f7aa-4e93-4641-9524-8529961356c8

Page 61

```
1              Loeffler
2      Q.   And when you became mayor of Ocean   10:52:50
3  Beach on July 3rd, 2006, did you also at that   10:52:55
4  time become police commissioner in Ocean Beach?   10:52:57
5      MR. NOVIKOFF: Objection. Form.   10:53:00
6      A.   I became the person in charge of the   10:53:05
7  Police Department, yes, I did.   10:53:06
8      Q.   And was there any formal title in   10:53:07
9  connection with your being the person in charge   10:53:10
10 of the Police Department?   10:53:11
11     MR. NOVIKOFF: Objection to form.   10:53:12
12     A.   Besides the title bestowed upon me   10:53:13
13 by Village law and general municipal law, no.   10:53:18
14     Q.   And what title are you referring to?   10:53:21
15     A.   Well, the mayor of the Village is   10:53:22
16 the chief operating officer of a Village   10:53:24
17 according to Village law and he is in charge of   10:53:26
18 all departments.   10:53:29
19     Q.   And at the time that you first   10:53:37
20 became mayor, other than yourself who was the   10:53:39
21 most senior official with responsibility for   10:53:43
22 the Ocean Beach Police Department?   10:53:46
23     MR. NOVIKOFF: Senior in terms of   10:53:47
24     age, senior in terms of years, senior in   10:53:48
25     terms of experience?   10:53:50
```

Page 62

```
1              Loeffler
2      MR. GRAFF: Organizational   10:53:51
3      hierarchy.   10:53:53
4      MR. NOVIKOFF: All right.   10:53:54
5      You can answer.   10:53:55
6      A.   Chief Edward Paradiso was the chief   10:53:56
7  of police.   10:53:58
8      Q.   And is Mr. Paradiso still the chief   10:53:59
9  of police?   10:54:01
10     A.   No, he is not.   10:54:01
11     Q.   When did he stop serving as chief of   10:54:02
12 police?   10:54:04
13     MR. NOVIKOFF: Objection to the   10:54:06
14     form.   10:54:07
15     You can answer the question.   10:54:08
16     A.   He retired in 2008, I think.   10:54:09
17     Q.   And was Chief Paradiso actively   10:54:16
18 serving in the capacity of chief of police   10:54:19
19 through his retirement in July 2008?   10:54:21
20     MR. NOVIKOFF: Objection to the form   10:54:22
21     of the question. I don't know what you   10:54:23
22     mean by "actively."   10:54:26
23     MR. GRAFF: On a day-to-day basis.   10:54:28
24     MR. NOVIKOFF: Still, form.   10:54:29
25     Q.   Are you able to answer the question   10:54:35
```

Page 63

```
1              Loeffler
2  as I have stated it?   10:54:36
3      A.   Restate the question for me, please.   10:54:38
4      Q.   Was Chief Paradiso actively serving   10:54:40
5  in the capacity of chief of police on a   10:54:43
6  day-to-day basis until his retirement in 2008?   10:54:46
7      MR. NOVIKOFF: Objection to the   10:54:49
8      form.   10:54:49
9      You can answer.   10:54:50
10     A.   No, he was not.   10:54:50
11     Q.   At what point in time did he stop   10:54:52
12 actively serving on a day-to-day basis?   10:54:54
13     A.   I'm not sure it was '06 or '07, he   10:54:56
14 became injured in the line of duty.   10:55:03
15     Q.   Do you recall what the nature of his   10:55:07
16 injury was?   10:55:09
17     A.   He had a torn Achilles tendon.   10:55:09
18     Q.   Do you know how he tore that   10:55:15
19 Achilles tendon?   10:55:16
20     A.   I am not positive of that.   10:55:17
21     Q.   Other than -- strike that.   10:55:18
22     Is there currently a chief of police   10:55:27
23 in Ocean Beach?   10:55:29
24     A.   No, there is not.   10:55:30
25     Q.   Other than yourself, who, if anyone,   10:55:31
```

Page 64

```
1              Loeffler
2  in the Village of Ocean Beach would be the next   10:55:36
3  highest-ranking official with oversight over   10:55:41
4  the Police Department?   10:55:43
5      MR. NOVIKOFF: Presently?   10:55:44
6      MR. GRAFF: Presently.   10:55:45
7      MR. NOVIKOFF: As Mr. Loeffler sits   10:55:46
8      here today. Okay.   10:55:49
9      A.   George Hesse.   10:55:50
10     Q.   And when you first became mayor, was   10:55:53
11 Chief Paradiso -- had he already sustained his   10:55:58
12 injury?   10:56:01
13     A.   No. I was a little quick to say   10:56:01
14 that. I'm not positive.   10:56:08
15     Q.   During the period when Chief   10:56:09
16 Paradiso was actively serving as chief of   10:56:16
17 police, in what capacity was George Hesse   10:56:20
18 employed at the Ocean Beach Police Department?   10:56:23
19     MR. NOVIKOFF: I am going to object   10:56:24
20     to the form of the question.   10:56:25
21     You can answer that.   10:56:26
22     A.   He was employed as a sergeant.   10:56:27
23     Q.   Is there currently anyone who is   10:56:37
24 employed as sergeant in the Ocean Beach Police   10:56:39
25 Department?   10:56:42
```

9e28f7aa-4e93-4641-9524-8529961356c8

Page 65

```
 1              Loeffler
 2      A.  No, there is not.          10:56:42
 3      Q.  Is George Hesse still a sergeant    10:56:43
 4  with the Ocean Beach Police Department?    10:56:50
 5      A.  No, he is not.             10:56:51
 6      Q.  At what point in time did George    10:56:52
 7  Hesse stop serving in the capacity of sergeant?  10:56:54
 8      A.  I don't recall.            10:56:57
 9      Q.  Do you recall -- strike that.  Did    10:57:08
10  you participate -- strike that.         10:57:12
11          MR. NOVIKOFF:  I eagerly await the    10:57:28
12  question.                     10:57:30
13      Q.  Did George Hesse, to your knowledge,  10:57:32
14  voluntarily decide to stop serving as sergeant  10:57:35
15  at that time?                  10:57:38
16          MR. NOVIKOFF:  Objection.        10:57:40
17      A.  No, he did not.            10:57:48
18      Q.  Did you direct that George Hesse    10:57:49
19  should stop serving as police sergeant at that  10:57:52
20  time?                       10:57:55
21          MR. NOVIKOFF:  Again, if the      10:57:55
22  conversations involve an attorney present  10:58:00
23  at the time you had any communications with  10:58:04
24  Mr. Hesse, then I am going to instruct you  10:58:06
25  not to answer the question.          10:58:09
```

Page 66

```
 1              Loeffler
 2      Q.  Other than in the presence of      10:58:12
 3  counsel, did you direct anyone in substance or  10:58:14
 4  to the effect that George Hesse should no    10:58:19
 5  longer continue to serve as police sergeant?  10:58:22
 6          MR. NOVIKOFF:  I am going to object  10:58:25
 7  to the form of the question.          10:58:27
 8      A.  George Hesse was placed, I don't    10:58:28
 9  remember the date, on what I determined to be a  10:58:30
10  modified duty assignment.            10:58:33
11      Q.  And why did you place him on a    10:58:37
12  modified duty assignment at that time?    10:58:39
13          MR. NOVIKOFF:  Objection.  To the    10:58:41
14  extent the reasons entail communications    10:58:42
15  with counsel, I am going to instruct you    10:58:46
16  not to answer the question.          10:58:47
17      A.  It was done under advice of counsel.  10:58:49
18      Q.  Do you know when George Hesse began  10:58:51
19  working in the Ocean Beach Police Department?  10:58:55
20      A.  No, I do not.             10:58:58
21      Q.  Was George Hesse already working in  10:58:59
22  the Ocean Beach Police Department when you    10:59:03
23  began serving as trustee?            10:59:05
24      A.  Yes.                  10:59:07
25      Q.  Was George Hesse ever promoted in    10:59:08
```

Page 67

```
 1              Loeffler
 2  connection with his employment at Ocean Beach  10:59:15
 3  subsequent to the time that you first became    10:59:18
 4  trustee?                     10:59:20
 5          MR. NOVIKOFF:  Objection to the    10:59:20
 6  form.  I don't know what the term        10:59:21
 7  "promoted" means.  I mean, did his        10:59:28
 8  responsibilities increase, that's fine.    10:59:31
 9  Did his title change, that's fine.  I'm not  10:59:32
10  sure what "promoted" means in the context  10:59:35
11  in which we are talking about.          10:59:37
12      Q.  Mayor Loeffler, did you        10:59:38
13  understand --                  10:59:39
14      A.  No, I do not.             10:59:40
15      Q.  Do you know what "promoted" means?    10:59:41
16      A.  Yes.                  10:59:43
17      Q.  Okay.  And what's your understanding  10:59:43
18  of "promoted," please?             10:59:46
19      A.  Elevated in rank.           10:59:47
20      Q.  And was George Hesse -- going with    10:59:49
21  that definition, was George Hesse promoted --  10:59:51
22      A.  George Hesse was given a different    10:59:54
23  rank, yes, he was.               10:59:56
24      Q.  And was it a higher rank than the    10:59:57
25  rank that he had held?             10:59:59
```

Page 68

```
 1              Loeffler
 2      A.  Yes.                  11:00:00
 3      Q.  And from what rank to what rank did    11:00:01
 4  he move?                     11:00:04
 5      A.  He went from being a sergeant to    11:00:04
 6  being the deputy chief of police.        11:00:07
 7      Q.  And were you responsible for that    11:00:09
 8  promotion?                    11:00:12
 9      A.  Partially, yes.            11:00:13
10      Q.  And what was your role in connection  11:00:14
11  with that promotion?              11:00:16
12      A.  I made a motion to elevate him to    11:00:17
13  that level.                   11:00:19
14      Q.  Why did you make that motion?      11:00:19
15      A.  Because he had taken on the duties    11:00:22
16  and responsibilities of the police chief while  11:00:23
17  he was on 207C.                11:00:27
18          THE COURT REPORTER:  I'm sorry,    11:00:32
19  "while he was on" --              11:00:32
20      A.  207C.  Injured in the line of duty.    11:00:32
21          MR. NOVIKOFF:  "He" being        11:00:35
22  Mr. Paradiso?                  11:00:37
23          THE WITNESS:  Yes.           11:00:37
24      Q.  Prior to George Hesse -- you making    11:00:41
25  that motion to promote George Hesse, did you  11:00:45
```

17 (Pages 65 to 68)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 69

Loeffler

1
2  have any conversations with anyone concerning    11:00:48
3  the possibility of giving him that promotion?    11:00:50
4       MR. NOVIKOFF:  Other than counsel,    11:00:52
5  right?                      11:00:55
6       A.  It was discussed during executive    11:00:56
7  session with counsel present.           11:00:58
8       MR. NOVIKOFF:  Well, here is the    11:01:02
9  delineation that Judge Boyle has made in    11:01:03
10  this case, and tell me if I am wrong.  If    11:01:05
11  the discussion was had among trustees but    11:01:08
12  the purpose of the discussion was not to    11:01:12
13  seek legal counsel, then you have to answer    11:01:14
14  it.  If the discussion was had for the    11:01:16
15  purpose of seeking legal counsel with    11:01:19
16  regard to any issue, I am going to    11:01:21
17  instruct you not to answer.         11:01:24
18       A.  I think it was discussed that since    11:01:27
19  he was taking on the responsibility, we would    11:01:30
20  give him the designation.            11:01:31
21       Q.  And who specifically on the Board of    11:01:33
22  Trustees was involved in that discussion?    11:01:35
23       A.  Everyone.              11:01:37
24       Q.  And was it discussed by the Board of    11:01:39
25  Trustees on more than one occasion?    11:01:41

Page 70

Loeffler

1
2       A.  Yes.                  11:01:43
3       Q.  On how many occasions was it    11:01:49
4  discussed by the Board of Trustees?    11:01:51
5       A.  Two that I remember.       11:01:54
6       Q.  And in substance, what was discussed    11:01:55
7  on the first occasion?           11:01:58
8       A.  The role that Chief Paradiso was    11:02:00
9  playing in the Police Department at that time,    11:02:06
10  that he wasn't available, and that George had    11:02:08
11  taken on the responsibilities of the Police    11:02:11
12  Department and that the thought was that we    11:02:18
13  would recognize those responsibilities through    11:02:23
14  elevating him to deputy chief of police, and at    11:02:26
15  the next meeting I believe we did that.    11:02:29
16       Q.  And who were the members of the    11:02:34
17  Board of Trustees during -- on the first    11:02:36
18  occasion?                   11:02:38
19       A.  The same ones that were there on the    11:02:38
20  second occasion.                11:02:41
21       Q.  And can you identify those members,    11:02:42
22  please?                     11:02:43
23       A.  It was myself, Jim Mallott, Steve    11:02:44
24  Einig, Bill Wingate and Mayor Rogers was the    11:02:50
25  composition of the board at that time when the    11:02:56

Page 71

Loeffler

1
2  decision was made.              11:02:58
3       Q.  And were any of those members of the    11:03:01
4  Board of Trustees that you just identified at    11:03:03
5  that time serving as police commissioner in    11:03:06
6  Ocean Beach?                 11:03:09
7       A.  No, they were not.        11:03:09
8       Q.  Did any of those members of the    11:03:11
9  Board of Trustees that you have identified have    11:03:13
10  any responsibility with respect to the Ocean    11:03:17
11  Beach Police Department?          11:03:19
12       MR. NOVIKOFF:  Objection to the form    11:03:23
13  of the question.               11:03:24
14       A.  I don't understand what you mean by    11:03:29
15  "responsibility."              11:03:30
16       Q.  Let me ask a slightly different    11:03:31
17  question.  Did any of the members of the Board    11:03:33
18  of Trustees have more responsibility than any    11:03:36
19  of the other members over the Ocean Beach    11:03:37
20  Police Department?              11:03:40
21       MR. NOVIKOFF:  Same objection.    11:03:41
22       You can answer, if you understand    11:03:43
23  it.                       11:03:44
24       A.  No, no one had any more    11:03:47
25  responsibility.               11:03:48

Page 72

Loeffler

1
2       Q.  So Trustee Mallott didn't have any    11:03:49
3  more responsibility than any of the other    11:03:51
4  trustees?                   11:03:53
5       A.  Correct.              11:03:53
6       Q.  And what, if any, was Mayor Rogers'    11:03:58
7  responsibility over the Police Department at    11:04:02
8  that time?                   11:04:04
9       MR. NOVIKOFF:  Objection to the    11:04:04
10  form.                      11:04:06
11       You can answer.            11:04:06
12       A.  As the chief operating officer of    11:04:07
13  the Village of Ocean Beach, Village law makes    11:04:10
14  her the ex facto head of all departments.    11:04:14
15       Q.  Are you aware of any investigation    11:04:28
16  conducted by any member of the Board of    11:04:31
17  Trustees concerning Edward Paradiso at or    11:04:34
18  around the time that George Hesse received that    11:04:38
19  promotion?                  11:04:40
20       MR. NOVIKOFF:  Objection to the form    11:04:41
21  of the question.  There is a lot of    11:04:42
22  problems with that question.       11:04:48
23       A.  You have to be a little more    11:04:55
24  specific about the time frame, I believe.  Do    11:04:57
25  you want to give me some dates?    11:04:59

18 (Pages 69 to 72)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 73

Loeffler

1
2  Q.  In the year prior to the promotion,   11:05:05
3  if that would help.                        11:05:08
4     A.  In the year prior to promotion --   11:05:10
5     Q.  Are you aware of any investigation   11:05:13
6  conducted by any member of the Board of    11:05:16
7  Trustees concerning Ed Paradiso?           11:05:19
8        MR. NOVIKOFF:  Objection to the form 11:05:21
9  of the question.                           11:05:22
10    A.  I am not aware.                      11:05:23
11    Q.  Are you aware of any investigation   11:05:25
12 conducted or overseen by Mayor Rogers with 11:05:28
13 respect to Chief Paradiso in the year leading 11:05:31
14 up to George Hesse's promotion?            11:05:34
15       MR. NOVIKOFF:  Objection.  Again,     11:05:36
16 I'm not trying to be difficult.  Are you   11:05:38
17 asking about an investigation done by Mayor 11:05:40
18 Rogers as an individual or Mayor Rogers as 11:05:43
19 the mayor on behalf of the trustees or the 11:05:45
20 Village?                                    11:05:48
21       MR. GRAFF:  Any investigation that    11:05:49
22 he is aware of by Mayor Rogers in her      11:05:50
23 individual or official capacities.          11:05:52
24       MR. NOVIKOFF:  I am going to object   11:05:54
25 to form.                                    11:05:55

Page 74

Loeffler

1
2     You can answer the question.            11:05:55
3     A.  Yes.                                 11:05:56
4     Q.  And what investigation were you      11:05:57
5  aware of?                                   11:05:59
6     A.  Mayor Rogers conducted an            11:05:59
7  investigation that was brought to her attention 11:06:01
8  about some outside employment that Chief    11:06:04
9  Paradiso was involved in while employed by the 11:06:07
10 Village of Ocean Beach.                     11:06:09
11    Q.  And is there any policy at Ocean     11:06:11
12 Beach that would prohibit an employee of Ocean 11:06:16
13 Beach from having contemporaneous employment 11:06:18
14 with another entity?                        11:06:21
15    A.  You have to give me a time frame.    11:06:23
16    Q.  At the time that we are discussing,  11:06:26
17 which is in the year leading up to --       11:06:29
18    A.  No, there was no prohibition.        11:06:31
19    Q.  Is there presently any prohibition?  11:06:36
20    A.  No prohibition, but there is -- now  11:06:39
21 there is a notification requirement.        11:06:41
22    Q.  And do you know who brought the      11:06:42
23 issue of George Hesse's dual employment to  11:06:50
24 Mayor Rogers' attention?                    11:06:54
25       MR. NOVIKOFF:  Unless it was through  11:06:56

Page 75

Loeffler

1
2  counsel's communication --                  11:06:59
3     A.  No, excuse me, George Hesse was not  11:07:00
4  under -- Mayor Rogers didn't investigate George 11:07:02
5  Hesse.                                      11:07:05
6     Q.  I'm sorry, I believe I misspoke.     11:07:05
7     A.  You did misspeak.                    11:07:07
8     Q.  Okay.  Do you know who brought the   11:07:09
9  issue of Ed Paradiso's dual employment to Mayor 11:07:10
10 Rogers's attention?                         11:07:14
11    A.  No.                                   11:07:14
12       MR. NOVIKOFF:  And the answer is yes  11:07:14
13 or no.                                      11:07:15
14    A.  I do not.                             11:07:16
15    Q.  And do you know what the nature of   11:07:17
16 the investigation was?                      11:07:22
17       MR. NOVIKOFF:  Again, yes or no.      11:07:25
18    A.  Yes.                                  11:07:26
19    Q.  And what was the nature of the       11:07:26
20 investigation?                              11:07:28
21       MR. NOVIKOFF:  Objection to the       11:07:30
22 form.                                       11:07:31
23       You can answer.                        11:07:31
24    A.  There was some question about his    11:07:31
25 hours of employment conflicting with the hours 11:07:34

Page 76

Loeffler

1
2  of employment at his second job.            11:07:36
3     Q.  When you say "conflicting," do you   11:07:38
4  mean that he was simultaneously working hours 11:07:40
5  in both places?                             11:07:43
6     A.  Is that what you are asking me?      11:07:44
7     Q.  Yes.                                 11:07:45
8        MR. NOVIKOFF:  Objection to his       11:07:45
9  knowledge of specifically what Mr. Paradiso 11:07:47
10 did or --                                   11:07:49
11       MR. GRAFF:  You know what, strike     11:07:50
12 that.                                       11:07:50
13    Q.  What is the nature of the            11:07:50
14 conflicting hours that you are referring to? 11:07:52
15       MR. NOVIKOFF:  Objection to the       11:07:53
16 extent you know specifically what the       11:07:54
17 conflicting hours were.                     11:07:56
18    A.  I don't.  I don't know what the      11:07:58
19 conflicting hours were.                     11:08:00
20    Q.  Do you know if there was any         11:08:02
21 conclusion on the basis of that investigation? 11:08:05
22       MR. NOVIKOFF:  Conclusion of what,    11:08:08
23 the investigation or anything else after    11:08:09
24 the investigation?                          11:08:11
25       MR. GRAFF:  Anything that was         11:08:11

19 (Pages 73 to 76)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 77

```
 1              Loeffler
 2    concluded based on what was discovered    11:08:13
 3    during the investigation.                 11:08:15
 4        MR. NOVIKOFF: I am going to object    11:08:17
 5    to the form. Ari, you know what's going   11:08:19
 6    on. I think the questions -- I mean, I am 11:08:21
 7    not objecting on the questions. I am just 11:08:23
 8    saying you kind of know what has proceeded 11:08:25
 9    between Mr. Paradiso and the Village, I    11:08:27
10    would hope you know, so you could ask the  11:08:29
11    questions a little bit more focussed and   11:08:31
12    get the answers. Objection to form.        11:08:33
13        You can answer.                        11:08:34
14    A.  I believe those were privileged        11:08:36
15    communications that transpired and I don't 11:08:39
16    think I am at liberty to speak about those. 11:08:41
17    Q.  So those are conversations that        11:08:44
18    happened in the presence of counsel for legal 11:08:45
19    advice?                                    11:08:47
20    A.  Absolutely.                            11:08:47
21    Q.  Okay. Do you know whether anyone on    11:08:48
22    the Board of Trustees had any direct       11:08:51
23    communication with Ed Paradiso concerning that 11:08:54
24    investigation?                             11:08:56
25    A.  I do not.                              11:08:57
```

Page 78

```
 1              Loeffler
 2    Q.  Do you know whether Ed Paradiso ever   11:08:59
 3    expressed any opinion as to the promotion of 11:09:07
 4    George Hesse to the position of sergeant at 11:09:12
 5    that time?                                 11:09:15
 6        MR. NOVIKOFF: Objection.               11:09:15
 7    A.  He never expressed an opinion to me.   11:09:18
 8    Q.  Did anyone ever communicate to you     11:09:21
 9    that Ed Paradiso had expressed to them an  11:09:24
10    opinion about George Hesse's promotion?    11:09:27
11        MR. NOVIKOFF: If you could follow      11:09:30
12    it, you could answer it.                   11:09:31
13    A.  Did anyone ever express to me that     11:09:33
14    they talked to somebody that talked to Ed  11:09:37
15    Paradiso that may have had an opinion about 11:09:39
16    whether he was promoted? Is that what you  11:09:40
17    asked me?                                  11:09:43
18    Q.  Let me ask it more specifically.       11:09:43
19    A.  Okay.                                  11:09:45
20    Q.  Did Mayor Rogers indicate to you       11:09:46
21    that she was aware of Ed Paradiso's opinion 11:09:47
22    with respect to George Hesse's promotion?  11:09:50
23    A.  She never communicated that with me.   11:09:52
24    Q.  At that time were you aware from any   11:09:54
25    source whether George -- whether Ed Paradiso 11:10:07
```

Page 79

```
 1              Loeffler
 2    had an opinion concerning George Hesse's   11:10:12
 3    promotion?                                 11:10:14
 4        MR. NOVIKOFF: Objection.               11:10:15
 5    A.  I think I already answered that. I     11:10:15
 6    have no --                                 11:10:18
 7    Q.  As you sit here today, do you know     11:10:18
 8    what Ed Paradiso's opinion was at that time? 11:10:20
 9        MR. NOVIKOFF: At what time? An         11:10:23
10    opinion about what?                        11:10:25
11        MR. GRAFF: At the time of the          11:10:26
12    promotion, his opinion --                  11:10:27
13        MR. GRAFF: About?                      11:10:27
14        MR. GRAFF: -- about the promotion.     11:10:28
15        MR. NOVIKOFF: So you are asking        11:10:29
16    does this witness -- you know what, form.  11:10:30
17    Objection.                                 11:10:33
18        You can answer.                        11:10:33
19    A.  I don't know.                          11:10:34
20        MR. GRAFF: Can I ask the               11:10:42
21    videographer how much time we have left on 11:10:43
22    this tape?                                 11:10:46
23        THE VIDEOGRAPHER: About 22 minutes.   11:10:46
24    Q.  I had asked the court reporter to      11:10:54
25    mark as Loeffler Exhibit 2 a document in this 11:10:55
```

Page 80

```
 1              Loeffler
 2    case that's headed Ocean Beach Defendants' 11:10:59
 3    Response to Plaintiffs' First Set of       11:11:04
 4    Interrogatories. If I could ask you to take a 11:11:06
 5    look at the document, Mayor Loeffler, and tell 11:11:08
 6    me, please, if this is a document that you have 11:11:11
 7    seen before.                               11:11:12
 8        MR. NOVIKOFF: Look at it as            11:11:19
 9    thoroughly as you need to in order to      11:11:21
10    answer the question (handing).             11:11:23
11        While you are looking at the           11:12:03
12    document, I am going to get a cup of        11:12:05
13    coffee.                                    11:12:08
14        (Document review.)                     11:12:58
15    A.  Okay, I have reviewed it.              11:13:55
16        MR. NOVIKOFF: And the question is      11:14:58
17    does he recognize the document?            11:14:59
18        MR. GRAFF: Yes.                        11:15:01
19    A.  As it's shown to me, yes, I            11:15:02
20    recognize it.                              11:15:05
21    Q.  When did you see this document         11:15:06
22    first?                                     11:15:07
23        MR. NOVIKOFF: Objection. He didn't     11:15:08
24    testify that he has seen it before today.  11:15:10
25    He just says he recognizes the document.   11:15:13
```

20 (Pages 77 to 80)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 81

Loeffler

1
2    Q.  Did you see the document before    11:15:15
3    today?                                11:15:16
4        A.  I don't remember seeing this    11:15:17
5    document.  I didn't sign it, so I don't know if  11:15:18
6    I reviewed -- I don't know.  I don't remember  11:15:24
7    seeing that document.  I do now recall now that  11:15:27
8    we had a different law firm.            11:15:27
9        THE COURT REPORTER:  I can't hear    11:15:27
10   you.  I'm sorry.                       11:15:27
11       A.  I do recall now after reading this  11:15:30
12   that we had a different law firm representing  11:15:32
13   us in the beginning.  Now I remember it was  11:15:34
14   Anthony Marino.                        11:15:37
15       Q.  Okay.  There are some numbered    11:15:39
16   statements in the document.  If I could turn  11:15:41
17   your attention to the statement numbered 9.  11:15:43
18       MR. NOVIKOFF:  Okay.  What's the    11:15:45
19   question?                             11:15:46
20       MR. GRAFF:  I'd like to ask Mayor    11:15:47
21   Loeffler to please read it.            11:15:49
22       MR. NOVIKOFF:  The document speaks    11:15:50
23   for itself, Ari.  We don't need to read it  11:15:51
24   into the record and burden the transcript.  11:15:53
25       Q.  "The persons involved with the    11:15:56

Page 82

Loeffler

1
2    decision to hire employees were the Suffolk  11:15:58
3    County Civil Service Commission and the Ocean  11:15:59
4    Beach Board of Trustees."              11:16:02
5        Mayor Loeffler, during your service  11:16:03
6    as trustee at Ocean Beach, was it the case that  11:16:05
7    the persons involved with this decision to hire  11:16:08
8    employees in Ocean Beach were the Suffolk  11:16:10
9    County Civil Service Commission and Ocean Beach  11:16:13
10   Board of Trustees?                     11:16:15
11       MR. NOVIKOFF:  Hold on.  I am going  11:16:16
12   to object to the form of the question and I  11:16:17
13   do think I need to explain why I am    11:16:19
14   objecting, because there is a number of  11:16:22
15   reasons and I don't know if this witness  11:16:24
16   could even answer the question in this  11:16:25
17   form.                                 11:16:26
18       One, you have read into the record  11:16:27
19   an answer, but the document doesn't have  11:16:28
20   the question on it, so I think it would be  11:16:30
21   important if you are going to read    11:16:33
22   something in as an answer, to show the  11:16:34
23   question.                             11:16:36
24       Secondly, talking about persons    11:16:37
25   involved with the decision to hire    11:16:40

Page 83

Loeffler

1
2    employees.  I don't know who employees    11:16:41
3    refer to.  If you are referring to some of  11:16:43
4    the plaintiffs in this action, I think, if  11:16:45
5    I understand the record correctly, some of  11:16:48
6    the plaintiffs were hired back in the early  11:16:50
7    1990s, so the question is whether this    11:16:53
8    witness even has an understanding as to    11:16:55
9    when at least some of these witnesses were  11:16:58
10   hired as to who was involved.          11:16:59
11       So that's the objection, but    11:17:01
12   proceed.                              11:17:03
13       Q.  Okay.  Well, since the document is  11:17:03
14   not in front of the witness, I am going to  11:17:04
15   represent that the question I am about to read  11:17:06
16   is the question to which the statement    11:17:08
17   responds.  Interrogatory No. 9.  I'm reading  11:17:10
18   from Plaintiffs' First Set of Interrogatories  11:17:14
19   to Defendants' Incorporated Village of Ocean  11:17:16
20   Beach, Mayor Joseph C. Loeffler, Jr., Former  11:17:19
21   Mayor Natalie K. Rogers, and Ocean Beach Police  11:17:22
22   Department dated July 11th, 2007.          11:17:25
23       Interrogatory No. 9 reads:          11:17:29
24   "Identify each and every person responsible for  11:17:31
25   hiring employees including but not limited to  11:17:34

Page 84

Loeffler

1
2    police officers, police dispatchers and dock  11:17:37
3    masters at Ocean Beach and/or OBPD from 2000 to  11:17:40
4    the present, including the role of each person  11:17:47
5    identified in your response."          11:17:49
6        MR. NOVIKOFF:  So now what's the    11:17:50
7    question?                             11:17:51
8        Q.  The question is, Mayor Loeffler, is  11:17:52
9    it a -- as you understand it, is it an accurate  11:17:55
10   response that the persons involved with the  11:18:00
11   decision to hire employees were the Suffolk  11:18:02
12   County Civil Service Commission and the Ocean  11:18:04
13   Beach Board of Trustees?              11:18:06
14       MR. NOVIKOFF:  You are asking this  11:18:07
15   witness to testify as to whether response  11:18:08
16   number 9 is accurate to the question that  11:18:14
17   you just presented?                    11:18:16
18       MR. GRAFF:  Yes.                   11:18:18
19       MR. NOVIKOFF:  I am going to object  11:18:19
20   to the form.                          11:18:20
21       You can answer, if you want.        11:18:21
22       A.  Yes, it is true, it's accurate.  11:18:23
23       THE COURT REPORTER:  I'm sorry?    11:18:23
24       A.  Yes, it is accurate.            11:18:33
25       Q.  Interrogatory No. 12 states:    11:18:33

9e28f7aa-4e93-4641-9524-8529961356c8

1                    **Loeffler**
2       **"Identify and describe any and all policies    11:18:36**
3       **concerning the consumption of alcoholic    11:18:39**
4       **beverages by on-duty or off-duty OBPD officers    11:18:42**
5       **in Ocean Beach from 2000 to the present."    11:18:46**
6             **The response states: "There is a    11:18:49**
7       **policy in place that prohibits the consumption    11:18:50**
8       **of alcoholic beverages by officers on duty."    11:18:52**
9             **Mayor Loeffler, are you familiar    11:18:56**
10      **with the policy in place in Ocean Beach that    11:18:58**
11      **prohibits the consumption of alcoholic    11:19:02**
12      **beverages by officers on duty?    11:19:03**
13      A.   Yes, I am.                      11:19:03
14      **Q.   And can you describe that policy?    11:19:06**
15      A.   It's the 2006 policy manual of the    11:19:07
16      Ocean Beach Police Department which prohibits    11:19:13
17      the consumption of alcoholic beverages on duty.   11:19:14
18      **Q.   And when did that policy manual take    11:19:17**
19      **effect?                          11:19:20**
20      A.   2006.                          11:19:20
21      **Q.   Okay.  Prior to the implementation    11:19:21**
22      **of that policy in 2006, was there any policy    11:19:27**
23      **that prohibited the consumption of alcoholic    11:19:30**
24      **beverages by on- or off-duty officers in Ocean    11:19:33**
25      **Beach?                          11:19:35**

1                    **Loeffler**
2             MR. NOVIKOFF:  I am going to object    11:19:35
3       to the form of the question.  Foundation.    11:19:36
4       You can answer.                      11:19:39
5       A.   I don't know if I have ever read the    11:19:40
6       prior policy manual.  I don't know if there was    11:19:44
7       one in existence, a policy manual for the Ocean    11:19:47
8       Beach Police Department.                11:19:49
9       **Q.   Are you aware of any informal policy    11:19:50**
10      **that would have been applicable at that time?    11:19:52**
11            MR. NOVIKOFF:  Objection to the form    11:19:54
12      of the question.                     11:19:55
13            You can answer.                11:19:57
14      A.   Informal policy?  I don't know what    11:19:57
15      exactly you mean.  Do --                11:20:05
16            MR. NOVIKOFF:  No, no, no.        11:20:09
17      **Q.   If you are unclear on the        11:20:10**
18      **question --                      11:20:13**
19      A.   I am unclear.                   11:20:13
20            MR. NOVIKOFF:  He just said he    11:20:13
21      doesn't --                          11:20:14
22      **Q.   Could you explain what part of the    11:20:14**
23      **question is unclear to you?           11:20:17**
24            MR. NOVIKOFF:  As opposed to the    11:20:18
25      entire question.                     11:20:20

1                    Loeffler
2       A.   I'm not familiar with the policy or    11:20:21
3       the policy manual that was in existence prior    11:20:24
4       to 2006.  That's what you are asking me to    11:20:28
5       testify about; is that correct?         11:20:30
6       Q.   Yes, let me go on.  Maybe I can be    11:20:31
7       more clear.                         11:20:33
8             Other than the policy manual that    11:20:34
9       you are referring to, is there any other    11:20:35
10      written policy applicable to the operations of    11:20:38
11      the Ocean Beach Police Department?       11:20:42
12            MR. NOVIKOFF:  Wait.  Now?        11:20:43
13            MR. GRAFF:  Now, yes.           11:20:46
14            MR. NOVIKOFF:  Are there any other    11:20:47
15      written policies applicable to the Ocean    11:20:48
16      Beach Police Department right now?       11:20:51
17            MR. GRAFF:  To the operations of the   11:20:51
18      Police Department other than the policy    11:20:53
19      manual, yes.                        11:20:54
20            MR. NOVIKOFF:  Okay.             11:20:55
21      A.   I have no knowledge of the sum and    11:20:57
22      substance of the policy manual prior to 2006.   11:21:02
23      Q.   Interrogatory No. 19, and if you    11:21:04
24      would like to follow it, the response also    11:21:07
25      number 19 in what's been marked as Loeffler 3,   11:21:11

1                    Loeffler
2       interrogatory 19 reads: "Describe the    11:21:14
3       qualifications" --                   11:21:16
4             MR. NOVIKOFF:  Wait.  Wait did you    11:21:18
5       just mark what you are reading as 3, as    11:21:19
6       Loeffler 3?  Because all you have given me    11:21:22
7       is Loeffler 2.                      11:21:24
8             MR. GRAFF:  I'm sorry, the response    11:21:25
9       is in Loeffler 2.                   11:21:26
10            MR. NOVIKOFF:  Okay.  So you are    11:21:27
11      reading from another document?          11:21:28
12            MR. GRAFF:  I am reading from    11:21:29
13      Plaintiffs' Interrogatories.            11:21:31
14      Q.   "Describe the qualifications, tests,    11:21:31
15      criteria, training, experience and    11:21:34
16      certifications including but not limited to    11:21:36
17      Civil Service certification necessary to become   11:21:38
18      and/or remain employed as a police officer at    11:21:42
19      OBPD."                          11:21:44
20            Mayor Loeffler, were you able to    11:21:46
21      follow the question that I just read?    11:21:47
22      A.   Yes.                          11:21:49
23            MR. NOVIKOFF:  You mean was he able    11:21:50
24      to listen to what you just said?         11:21:51
25            MR. GRAFF:  It was a long sentence.    11:21:53

TSG Reporting – Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 89

Loeffler

1
2     I wanted to make sure that it was clear     11:21:54
3     from beginning to end.                      11:21:56
4          MR. NOVIKOFF:  Okay.                   11:21:57
5     Q.   Response number 19 states:  "All       11:21:57
6     officers are hired pursuant to the rules and  11:21:59
7     qualifications of the Suffolk County Civil    11:22:01
8     Service Department."                        11:22:03
9          Mayor Loeffler, as of the date of      11:22:04
10    this response, November 9th, 2007, was that an  11:22:06
11    accurate statement?                         11:22:09
12         MR. NOVIKOFF:  Objection.              11:22:09
13    A.   Yes, it was.                           11:22:11
14    Q.   And would that statement be accurate   11:22:14
15    with respect to the entire period during which  11:22:16
16    you served as trustee or mayor?             11:22:20
17         MR. NOVIKOFF:  Note my objection.      11:22:22
18    A.   I don't know.                          11:22:23
19         MR. NOVIKOFF:  He is not an expert     11:22:27
20    on the Civil Service law.                   11:22:28
21         MR. GRAFF:  Okay.                      11:22:30
22    Q.   Interrogatory No. 22 states:           11:22:31
23    "Describe Defendant Loeffler's role and/or  11:22:35
24    responsibilities concerning the OBPD from 2000  11:22:37
25    to the present."                            11:22:40

Page 90

Loeffler

1
2          The response -- well, let me first     11:22:42
3     ask you what were -- what was your role or   11:22:47
4     responsibilities concerning the OBPD from 2000  11:22:51
5     to the present, if any?                     11:22:53
6          MR. NOVIKOFF:  If any.  Okay.  Note    11:22:55
7     my objection.                               11:22:56
8          You can answer.                        11:22:57
9     A.   I was a trustee with the Village       11:22:57
10    from 2002 to 2006 and I was mayor from 2006  11:22:59
11    until the present day.                      11:23:03
12    Q.   Okay.  So response number 22, Mayor    11:23:04
13    Joseph C. Loeffler, Jr. had no role in the  11:23:07
14    operations of the Police Department other than  11:23:09
15    as a member of the Board of Trustees and    11:23:11
16    currently as mayor of the Village."  Is that --  11:23:13
17         MR. NOVIKOFF:  Object --              11:23:16
18    A.   Currently as mayor of the Village I    11:23:16
19    have a role and responsibility in the Police  11:23:18
20    Department.                                 11:23:20
21    Q.   Okay.                                  11:23:21
22         MR. NOVIKOFF:  Was there a question?  11:23:23
23    Because I think you were about to ask a      11:23:26
24    question and then the witness started        11:23:28
25    answering.                                  11:23:29

Page 91

Loeffler

1
2          THE WITNESS:  Sorry.                   11:23:30
3          MR. NOVIKOFF:  So are you              11:23:30
4     done with -- have you completed your        11:23:31
5     question?                                   11:23:33
6          MR. GRAFF:  There is not a question   11:23:33
7     pending at the moment.                      11:23:34
8          MR. NOVIKOFF:  Okay, that's fine.      11:23:35
9          THE VIDEOGRAPHER:  Counselors, now    11:23:41
10    it's ten minutes until the end of tape.     11:23:43
11         MR. NOVIKOFF:  Oh, that is so cool.   11:23:45
12         MR. GRAFF:  Okay, so let's take a      11:23:46
13    break at this point.                        11:23:49
14         THE VIDEOGRAPHER:  We are now going   11:23:50
15    off the record.  The time is 11:24 a.m.     11:23:53
16         (Recess was taken from 11:24 to       11:23:57
17    11:34.)                                     11:23:57
18         (Loeffler Exhibit 3, Incorporated     11:33:52
19    Village of Ocean Beach Board of Trustees    11:33:52
20    Meeting Held January 28, 2006, Bates        11:33:52
21    stamped 000028, marked for identification.)  11:34:07
22         THE VIDEOGRAPHER:  We are back on      11:34:07
23    the record.  The time is 11:34 a.m.  This   11:34:13
24    is the beginning of the tape labeled         11:34:16
25    number 2.                                   11:34:18

Page 92

Loeffler

1
2     BY MR. GRAFF:                               11:34:20
3     Q.   During the break I asked the court     11:34:20
4     reporter to mark as Exhibit Loeffler 3 a    11:34:22
5     one-page document produced by Ocean Beach   11:34:24
6     bearing Bates number 28.                    11:34:25
7          Mayor Loeffler, I am going to pass     11:34:28
8     you the document and when you have had a chance  11:34:30
9     to review the document, if you could tell me,  11:34:32
10    please, whether you have seen this document   11:34:34
11    before.                                     11:34:36
12         MR. GRAFF:  Mr. Novikoff, are you      11:34:42
13    examining for accuracy?                     11:34:44
14         MR. NOVIKOFF:  I'm not the deponent   11:34:46
15    here.  I am doing what a lawyer does, sir.  11:34:48
16    I am looking at what you have marked versus  11:34:50
17    what you have handed me, and I do note for   11:34:53
18    the record that there appears to be an      11:34:55
19    arrow handwritten in on this document and I  11:34:56
20    do not know whether that arrow was on the   11:34:59
21    document when it was produced or not, but   11:35:01
22    that could be verified.                     11:35:03
23         MR. GRAFF:  I can represent the        11:35:04
24    arrow was there.  We didn't make that.      11:35:05
25         MR. NOVIKOFF:  Okay.  So the           11:35:07

TSG Reporting - Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 93

Loeffler

1
2  question is you want him to look at this   11:35:08
3  and see if he recognizes it?        11:35:10
4       MR. GRAFF:  If he has seen it     11:35:11
5  before, yes.              11:35:12
6       MR. NOVIKOFF:  Okay, go ahead     11:35:13
7  (handing).              11:35:14
8       (Document review.)          11:35:25
9  Q.   Mayor Loeffler, have you had a    11:35:25
10 chance to look at the document?       11:35:27
11 A.   Yes, I have.            11:35:28
12 Q.   Do you recognize it?        11:35:29
13      MR. NOVIKOFF:  Note for the record   11:35:30
14 it appears on the top of the document to be  11:35:31
15 page 8 of what apparently is minutes of a   11:35:33
16 Board of Trustee meeting held on January   11:35:36
17 28, 2006.              11:35:38
18      MR. GRAFF:  And I will note that the  11:35:39
19 first seven pages weren't produced.     11:35:40
20      MR. NOVIKOFF:  That's fine, just so   11:35:42
21 the record is clear what it is.       11:35:43
22 Q.   Mayor Loeffler, do you recognize   11:35:45
23 this document?            11:35:47
24 A.   Yes, I do.            11:35:47
25 Q.   And do you recognize it to be as   11:35:48

Page 94

Loeffler

1
2  characterized by your counsel, minutes from a  11:35:50
3  Board of Trustees meeting held on January 28th,  11:35:53
4  '06, the 8th page?          11:35:55
5       MR. NOVIKOFF:  That's not how I   11:35:57
6  characterized it.            11:35:58
7  Q.   Do you recognize it as I have    11:35:59
8  characterized it?          11:36:02
9  A.   It appears to be part of the minutes  11:36:02
10 from the board meeting of January 28th, 2006,  11:36:04
11 yes, it does.              11:36:07
12 Q.   Okay.  The section that's marked   11:36:08
13 with an arrow, the arrow is pointing to the   11:36:10
14 subheading designation of George Hesse as   11:36:14
15 deputy chief of police.        11:36:16
16      Do you recall whether George Hesse   11:36:17
17 was ever designated as deputy chief of police?  11:36:18
18      MR. NOVIKOFF:  Objection.      11:36:20
19 A.   Before this or by this document?    11:36:25
20 Q.   By this document or at this time.   11:36:27
21      MR. NOVIKOFF:  Doesn't the document  11:36:29
22 say designation of George Hesse as deputy   11:36:30
23 chief of police?            11:36:33
24 A.   That's what it says.        11:36:34
25 Q.   And was that -- is that consistent   11:36:35

Page 95

Loeffler

1
2  with what you recall happening?      11:36:38
3  A.   Yes.                11:36:42
4  Q.   When the document says "Trustee    11:36:43
5  Loeffler made motion to designate George Hesse  11:36:44
6  as deputy chief of police with all power and   11:36:46
7  authority involved with that position," what is  11:36:49
8  the power and authority involved with the   11:36:51
9  position of deputy chief of police?     11:36:52
10      MR. NOVIKOFF:  Objection.      11:36:55
11 You can answer.            11:36:55
12 A.   It would be bestowing him the same   11:36:56
13 powers as the chief of police.       11:36:59
14 Q.   Thank you.            11:37:01
15      Was there a written motion that you   11:37:05
16 proposed or was this an oral motion?     11:37:07
17      MR. NOVIKOFF:  Objection.  Written   11:37:09
18 motion like what lawyers do?  I don't know   11:37:11
19 what you mean by "written motion."     11:37:15
20 Q.   When it says "Trustee Loeffler made   11:37:16
21 motion," is that something that you would have  11:37:19
22 done orally?              11:37:21
23 A.   Orally.              11:37:21
24 Q.   Then skip down two subheadings, it   11:37:24
25 says Executive Session, 12 p.m., "Trustee   11:37:27

Page 96

Loeffler

1
2  Wingate moved to go into executive session for  11:37:29
3  purpose of discussing personnel and litigation  11:37:31
4  matters."              11:37:33
5       Do you recall what the personnel    11:37:35
6  matters that were discussed in that executive   11:37:36
7  session were?            11:37:38
8       MR. NOVIKOFF:  Again, if the     11:37:40
9  discussion was done for the purposes of    11:37:42
10 seeking legal advice with regard to any   11:37:46
11 issues, then I am going to have to instruct   11:37:46
12 him not to answer.  If they were just done   11:37:51
13 as overall discussions concerning Village   11:37:53
14 matters and merely -- and just the counsel   11:37:55
15 was present because the counsel is present,   11:37:57
16 then you can answer the question.      11:38:00
17 A.   I don't remember.          11:38:01
18 Q.   Okay.  We can put aside that     11:38:04
19 document.              11:38:07
20      Do you recall whether anyone     11:38:14
21 expressed any opposition on the Board of   11:38:15
22 Trustees to designating George Hesse as deputy  11:38:18
23 chief of police?            11:38:21
24 A.   Can I review that document?     11:38:23
25      MR. NOVIKOFF:  Sure.        11:38:25

24 (Pages 93 to 96)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 97

```
 1            Loeffler
 2     Q.   That would refresh your         11:38:26
 3   recollection?                          11:38:27
 4     A.   Well, I am trying to see if --  11:38:28
 5     Q.   Sure.                           11:38:29
 6     A.   It says "upon call, all voted aye,"  11:38:31
 7   so I guess that would indicate that there was  11:38:34
 8   no opposition.                         11:38:36
 9     Q.   And before the actual voting did  11:38:37
10   anyone verbalize any objections or reservations  11:38:39
11   about designating George Hesse as --   11:38:41
12     A.   Are you asking me to testify about  11:38:43
13   this or about the actions at the meeting?  11:38:45
14     Q.   The actions at the meeting.     11:38:47
15          MR. NOVIKOFF:  I am going to object  11:38:48
16   to the question.  Objections and       11:38:49
17   reservations have two different meanings,  11:38:50
18   so if you want to break it down, then go  11:38:53
19   ahead.  I mean, I think it's clear your  11:38:55
20   Exhibit 3 indicates that it was a majority  11:38:57
21   vote, but I understand what you are asking  11:38:59
22   next, I just think the form is improper.  11:39:01
23     Q.   Did anyone on the Board of Trustees  11:39:03
24   express any concerns about the designation of  11:39:14
25   George Hesse as deputy chief of police?  11:39:18
```

Page 98

```
 1            Loeffler
 2          MR. NOVIKOFF:  Objection to the  11:39:20
 3   form.                                  11:39:21
 4          You can answer.                 11:39:21
 5     A.   I don't recall.                 11:39:22
 6     Q.   Do you recall whether there was a  11:39:26
 7   discussion of your motion?             11:39:27
 8          MR. NOVIKOFF:  Objection.       11:39:31
 9   Discussion by whom?                    11:39:31
10     Q.   Discussion by the Board of Trustees  11:39:33
11   upon the making of the motion to designate  11:39:35
12   George Hesse.                          11:39:37
13          MR. NOVIKOFF:  Again, I don't want  11:39:38
14   to be difficult, but I would presume that a  11:39:40
15   vote is a discussion.  So I am objecting to  11:39:43
16   form.                                  11:39:48
17     A.   The motion was presented.  It was --  11:39:48
18   a roll call was taken, a vote was made, and a  11:39:52
19   motion passed.                         11:39:56
20     Q.   Okay.  Between the making of the  11:39:56
21   motion and the vote, did anybody say anything  11:39:59
22   with respect to the substance of the motion?  11:40:01
23     A.   I don't recall.                 11:40:04
24     Q.   Okay.  Thank you.              11:40:05
25          Have you ever heard of an entity  11:40:12
```

Page 99

```
 1            Loeffler
 2   called the Ocean Beach Police Benevolent  11:40:14
 3   Association?                           11:40:18
 4     A.   Yes, I have.                    11:40:18
 5     Q.   And what is that organization?  11:40:19
 6     A.   I'm not sure.                   11:40:20
 7     Q.   When did you hear of it?        11:40:23
 8     A.   I believe I -- some point in time I  11:40:25
 9   remember getting a solicitation for funds from  11:40:27
10   that organization.                     11:40:30
11     Q.   And were you a trustee at that time?  11:40:30
12     A.   I don't believe so.            11:40:33
13     Q.   Were you a mayor at that time?  11:40:37
14     A.   I don't believe so.            11:40:38
15     Q.   Other than receiving a solicitation,  11:40:39
16   have you in any other contexts encountered  11:40:43
17   something called Ocean Beach Police Benevolent  11:40:48
18   Association?                           11:40:52
19     A.   No.                            11:40:52
20          MR. NOVIKOFF:  Objection.  He never  11:40:52
21   said he encountered it.                11:40:53
22          MR. GRAFF:  He encountered it on the  11:40:55
23   solicitation document.                 11:40:57
24          MR. NOVIKOFF:  If that's what you  11:40:58
25   mean by "encounter."  Okay.  I am going to  11:40:59
```

Page 100

```
 1            Loeffler
 2   object to form.                        11:40:59
 3     A.   I have no knowledge of that     11:41:00
 4   organization, truthfully.              11:41:01
 5     Q.   Did you respond to that solicitation  11:41:02
 6   notice?                                11:41:05
 7     A.   I don't remember.              11:41:05
 8     Q.   To your knowledge, in your capacity  11:41:08
 9   as mayor currently, is there in existence  11:41:11
10   something called the Ocean Beach Police  11:41:15
11   Benevolent Association?                11:41:18
12     A.   I don't know.                  11:41:18
13     Q.   Do you know anybody by the name of  11:41:32
14   Sally Hess?                            11:41:34
15          MR. NOVIKOFF:  How do you spell the  11:41:36
16   last name?                             11:41:37
17          MR. GRAFF:  H-E-S-S.            11:41:38
18     A.   No, I don't.                   11:41:40
19     Q.   Do you know anybody by the name of  11:41:43
20   Tina Hess?                             11:41:45
21     A.   No, I don't.                   11:41:47
22     Q.   Do you know anybody by the name of  11:41:57
23   Ronnie Hess?                           11:42:01
24     A.   No, I don't.                   11:42:02
25     Q.   Mayor Loeffler, how long have you  11:42:04
```

25 (Pages 97 to 100)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 101

```
1              Loeffler
2  been a resident of Ocean Beach?        11:42:06
3         MR. NOVIKOFF: Note my objection.   11:42:11
4         You can answer.            11:42:12
5     A.   50 years, 55 years.          11:42:16
6         MR. NOVIKOFF: Is that 5-5?      11:42:18
7         THE WITNESS: 5-5.          11:42:19
8     A.   Most of my life.            11:42:20
9     Q.   And are you -- during those 55   11:42:21
10 years, have you been a year-round resident of   11:42:28
11 Ocean Beach?                 11:42:30
12    A.   Yes.              11:42:30
13    Q.   Continuously for 55 years?      11:42:30
14    A.   Uh-huh.              11:42:33
15        THE COURT REPORTER: You have to   11:42:33
16 answer verbally.              11:42:33
17    A.   Yes.              11:42:34
18    Q.   To your knowledge, has any Ocean   11:42:36
19 Beach police officer ever discharged their   11:42:43
20 firearm in a line of duty?        11:42:46
21        MR. NOVIKOFF: As an Ocean Beach   11:42:48
22 police officer?              11:42:50
23        MR. GRAFF: Yes.          11:42:51
24        MR. NOVIKOFF: Okay.        11:42:51
25        To your knowledge.          11:42:53
```

Page 102

```
1              Loeffler
2     A.   None. No, not to my knowledge.   11:42:54
3     Q.   Have you ever discharged your    11:42:57
4  firearm in the line of duty?        11:42:58
5         MR. NOVIKOFF: As an Ocean Beach   11:43:00
6  police officer?              11:43:01
7         MR. GRAFF: Ever.          11:43:01
8         MR. NOVIKOFF: Oh, okay.      11:43:01
9     A.   Yes.              11:43:03
10    Q.   On how many occasions has that   11:43:05
11 happened?                 11:43:07
12    A.   One.              11:43:08
13    Q.   And who were you shooting at on that   11:43:12
14 occasion?                11:43:14
15    A.   A perpetrator.            11:43:16
16    Q.   When did that take place?      11:43:17
17    A.   1975.              11:43:20
18    Q.   Have you ever shot anyone?      11:43:21
19        MR. NOVIKOFF: Objection. When you   11:43:32
20 mean shot at someone, you mean where the   11:43:34
21 bullet actually hit somebody --        11:43:37
22        MR. GRAFF: Yes.          11:43:38
23        MR. NOVIKOFF: -- or shot at      11:43:38
24 somebody?                11:43:38
25        MR. GRAFF: No, shot someone where   11:43:38
```

Page 103

```
1              Loeffler
2  the bullet hit them.            11:43:39
3         MR. NOVIKOFF: Okay.        11:43:40
4     A.   Yes.              11:43:41
5     Q.   Who have you shot?        11:43:42
6     A.   Perpetrator.            11:43:43
7     Q.   Other than that occasion in 1975,   11:43:45
8  have you shot anyone else?        11:43:48
9     A.   No.              11:43:49
10    Q.   And just to be clear, have you shot   11:43:49
11 anyone else inadvertently not intending to   11:44:02
12 shoot them?                11:44:05
13    A.   No.              11:44:06
14        MR. NOVIKOFF: Are you going to ask   11:44:16
15 about deer?                11:44:17
16    Q.   During the period of your service as   11:44:26
17 trustee at Ocean Beach, did you ever discipline   11:44:28
18 any employees of Ocean Beach?        11:44:31
19        MR. NOVIKOFF: Objection to the   11:44:33
20 form, "discipline." I don't know what it   11:44:35
21 means.                  11:44:36
22    A.   No.              11:44:38
23    Q.   What about during your service as   11:44:42
24 mayor, have you ever had occasion to discipline   11:44:44
25 any employee at Ocean Beach?        11:44:46
```

Page 104

```
1              Loeffler
2         MR. NOVIKOFF: Same objection.   11:44:48
3     A.   Yes.              11:44:49
4     Q.   On how many occasions have you   11:44:52
5  disciplined an employee at Ocean Beach?   11:44:55
6     A.   Two.              11:44:57
7     Q.   Starting with the first of those   11:45:01
8  occasions, could you describe the      11:45:04
9  circumstances.              11:45:07
10    A.   The first one was with -- both of   11:45:08
11 them were clerical staff in the Village office.   11:45:12
12    Q.   And what precipitated your      11:45:15
13 disciplining a member of the clerical staff on   11:45:21
14 the first occasion?            11:45:24
15    A.   I don't know the particulars of the   11:45:24
16 discipline, but they both received -- letters   11:45:26
17 of discipline were placed in their employee   11:45:28
18 jackets.                11:45:31
19    Q.   Do you remember the name of the   11:45:31
20 individual member of the clerical staff on the   11:45:35
21 first occasion?              11:45:38
22    A.   Susan Caffuco.            11:45:39
23    Q.   And on the second occasion, do you   11:45:45
24 remember the particular name of the clerical   11:45:54
25 staff?                  11:45:56
```

26 (Pages 101 to 104)

9e28f7aa-4e93-4641-9524-8529961356c8

## Page 105

Loeffler

2  A.  Arta Wejien.                     11:45:56
3     Q.  Do you know what precipitated your    11:46:04
4  discipline of Arta Wejien?              11:46:08
5     A.  I don't remember.             11:46:10
6     Q.  And you also don't remember       11:46:10
7  why Susan Caffuco was --                11:46:12
8     A.  I don't remember the sum and    11:46:12
9  substance, but I know that there were two  11:46:13
10  letters -- I have issued two letters of    11:46:14
11  discipline.                          11:46:16
12     Q.  Other than those two letters, have   11:46:18
13  you disciplined any other members of Ocean   11:46:20
14  Beach, any other employees of Ocean Beach?   11:46:22
15     MR. NOVIKOFF:  Objection.  Asked and  11:46:24
16  answered.                          11:46:25
17     A.  No, I have not.               11:46:25
18     Q.  Have you ever directed anyone else   11:46:27
19  to discipline anyone, any employees of Ocean   11:46:30
20  Beach?                            11:46:33
21     MR. NOVIKOFF:  Objection to the     11:46:33
22  form.                            11:46:34
23     A.  No, I have not.               11:46:34
24     Q.  Have you ever terminated the     11:46:38
25  employment of any employees at Ocean Beach?   11:46:42

## Page 106

Loeffler

2     MR. NOVIKOFF:  Okay.  I am going to   11:46:44
3  object only -- has this witness as mayor or   11:46:45
4  the trustee ever on his own accord said    11:46:51
5  "you're fired"?                      11:46:55
6     MR. GRAFF:  Effectuated the        11:46:56
7  termination, either yourself or by        11:46:57
8  directing someone else to.              11:47:00
9     MR. NOVIKOFF:  Okay, I am going to   11:47:01
10  object to the form, but you can answer.    11:47:02
11     A.  Define "termination" for me.      11:47:04
12     Q.  Do you understand what "termination"  11:47:10
13  means in the context of employment?       11:47:12
14     A.  No, I don't.                 11:47:13
15     Q.  To discontinue the employment of a   11:47:14
16  person, to prevent that person from continuing  11:47:23
17  to work at Ocean Beach.                11:47:28
18     MR. NOVIKOFF:  Those are the two     11:47:31
19  definitions of "terminate" that you are    11:47:32
20  asking this witness to answer on?        11:47:34
21     MR. GRAFF:  Yes.               11:47:36
22     MR. NOVIKOFF:  Okay.  Objection to   11:47:37
23  the form of the question.              11:47:39
24     A.  No.                      11:47:41
25     Q.  To your knowledge, has any Ocean   11:47:41

## Page 107

Loeffler

2  Beach police officer ever been terminated?   11:47:48
3     A.  No.                       11:47:50
4     Q.  To your knowledge, has any member of  11:47:53
5  the Ocean Beach Police Department ever been   11:48:12
6  subject to discipline?                 11:48:14
7     MR. NOVIKOFF:  Objection to the form   11:48:15
8  of the question.  I think "discipline" is a   11:48:18
9  very broad word.                    11:48:20
10     A.  And "anyone."  Is that over the last   11:48:22
11  60 years or what are you talking about?    11:48:26
12     Q.  Yes.                     11:48:27
13     MR. NOVIKOFF:  Over the last 60     11:48:28
14  years?                           11:48:29
15     MR. GRAFF:  That he is aware, yes.   11:48:29
16     A.  I have no --                11:48:31
17     MR. NOVIKOFF:  Objection.         11:48:31
18     A.  No, I have no knowledge.        11:48:33
19     MR. GRAFF:  I am going to ask the    11:48:52
20  court reporter to please mark as         11:48:53
21  Exhibit Loeffler 4 a one-page document     11:48:54
22  produced by Ocean Beach bearing Bates     11:48:56
23  number 001005.                     11:48:58
24     (Loeffler Exhibit 4, memo dated     11:49:15
25  April 4, 2006, Bates stamped 001005, marked  11:49:15

## Page 108

Loeffler

2  for identification.)                  11:49:15
3     MR. NOVIKOFF:  And you want him to   11:49:15
4  do what with this?                   11:49:15
5     Q.  To review the document and to let me   11:49:34
6  know if this is a document that you have seen   11:49:36
7  before, Mayor Loeffler.                11:49:38
8     (Document review.)               11:49:39
9     MR. NOVIKOFF:  So the question is    11:49:39
10  does he recognize this document?        11:49:54
11     MR. GRAFF:  Yes.               11:49:55
12     A.  I don't remember seeing that      11:49:56
13  document.                         11:49:58
14     Q.  Okay.  At the bottom of the      11:50:00
15  document, if you will note there is a CC and   11:50:05
16  there is two names who that document is CC'd   11:50:07
17  to.                             11:50:10
18     MR. NOVIKOFF:  Let the record      11:50:10
19  reflect that it's CC'd to Natalie K.     11:50:11
20  Rogers/Mayor/Police Commissioner and Joseph  11:50:13
21  Loeffler/Trustee.                   11:50:16
22     Q.  Mayor Loeffler, during the time that   11:50:18
23  you were a trustee at Ocean Beach, was Mayor   11:50:21
24  Rogers -- did Mayor Rogers ever serve as police   11:50:26
25  commissioner of Ocean Beach?            11:50:29

Page 109

1          **Loeffler**
2          MR. NOVIKOFF:  Objection to the form   11:50:30
3   of the question.                          11:50:30
4     A.   She by Village law would be the      11:50:31
5   department head for all departments.  So the   11:50:36
6   term "police commissioner" could broadly be   11:50:40
7   used for that position.                   11:50:42
8     **Q.   If you look at the top left of the   11:50:44**
9   **document --**                           11:50:46
10         MR. NOVIKOFF:  Okay.               11:50:49
11    **Q.   It says Natalie -- this is in the   11:50:50**
12   **header.**                               11:50:51
13         MR. NOVIKOFF:  It says Natalie C.   11:50:51
14   Rogers, Mayor/Police Commissioner.  Okay.   11:50:53
15    **Q.   Do you know why the designation with   11:50:56**
16   **the mayor/police commissioner specifically with   11:50:58**
17   **reference to the Police Department and not to   11:51:01**
18   **other departments in Ocean Beach?**      11:51:03
19         MR. NOVIKOFF:  Objection to the      11:51:04
20   form.  I don't know if you have established   11:51:05
21   that this letterhead is different than any   11:51:08
22   other letterhead, so I am going to object   11:51:10
23   to the form of the question.              11:51:13
24         If you can answer, if you can        11:51:15
25   answer.  If you need to look at the       11:51:17

Page 110

1          **Loeffler**
2   document --                              11:51:17
3     A.   It looks -- it appears that it's    11:51:18
4   police department stationery.  Other      11:51:19
5   departments have different stationery.  I don't   11:51:21
6   know.                                    11:51:24
7     **Q.   Have you ever seen stationery that   11:51:24**
8   **identified the mayor, whoever the mayor might   11:51:26**
9   **have been at that time, as mayor/fire   11:51:29**
10   **commissioner?**                          11:51:31
11    A.   Not that I recall.                  11:51:33
12    **Q.   Do you recall ever seeing a document   11:51:39**
13   **that identified the mayor as mayor/sanitation   11:51:41**
14   **commissioner.**                          11:51:44
15         MR. NOVIKOFF:  The answer is just   11:51:45
16   yes, you recall, or no, you recall.       11:51:46
17    A.   No.                                11:51:48
18    **Q.   Do you recall ever seeing a document   11:51:48**
19   **that identified the mayor as mayor slash any   11:51:51**
20   **department other than police followed by the   11:51:55**
21   **word "commissioner"?**                   11:51:58
22         MR. NOVIKOFF:  Again, it's just yes   11:51:59
23   if you recall --                         11:52:00
24    A.   No.                                11:52:01
25    **Q.   Do you recall if you have ever   11:52:07**

Page 111

1          **Loeffler**
2   **during the time that you served as a trustee   11:52:09**
3   **and Mayor Rogers was serving as mayor whether   11:52:12**
4   **you ever received correspondence that was   11:52:14**
5   **copied to Mayor Rogers and to yourself but to   11:52:17**
6   **no other members of the Board of Trustees?**   11:52:20
7     A.   I don't recall.                    11:52:22
8     **Q.   The document at the reference line   11:52:27**
9   **is headed Termination of Employment.  The text   11:52:30**
10   **reads:  "For your information, the following   11:52:33**
11   **officers were let go and will not be returning   11:52:35**
12   **to work for the 2006 summer season."  Then it   11:52:37**
13   **lists certain names.**                    11:52:40
14         **Mayor Loeffler, are you aware that   11:52:42**
15   **certain officers were let go and did not return   11:52:44**
16   **to work for the 2006 summer season as stated in   11:52:46**
17   **the document?**                          11:52:49
18         MR. NOVIKOFF:  Objection to the form   11:52:49
19   of the question.  I don't know what you   11:52:50
20   mean by "let go."                        11:52:51
21         MR. GRAFF:  As stated in the        11:52:52
22   document, to the extent that he can       11:52:53
23   understand it.                           11:52:55
24         MR. NOVIKOFF:  The document says   11:52:56
25   "let go."  I don't know if you have asked   11:52:57

Page 112

1          **Loeffler**
2   this witness what his understanding, if   11:52:58
3   any, of the frame -- word "let go" is as   11:53:00
4   used by Mr. Hesse.  So I am going to object   11:53:03
5   to the question.  I think you need to lay a   11:53:07
6   foundation, Ari.                         11:53:09
7         MR. GRAFF:  Okay.                  11:53:10
8     **Q.   Now if you could look at the   11:53:10**
9   **document, do you understand what the document   11:53:12**
10   **is referring to?**                        11:53:13
11    A.   Yes, I do.                         11:53:17
12    **Q.   And what is the document referring   11:53:18**
13   **to?**                                    11:53:20
14    A.   It's referring to the fact that    11:53:20
15   there are one, two, three, four, five, six --   11:53:22
16   seven names of individuals that were not   11:53:27
17   rehired.                                 11:53:29
18    **Q.   And other than based on this   11:53:30**
19   **document, do you recall that these seven or   11:53:33**
20   **eight officers were not rehired at that time?**   11:53:37
21    A.   Is it seven or is it eight?         11:53:40
22    **Q.   Seven.**                           11:53:42
23    A.   That's what I thought.             11:53:43
24         MR. NOVIKOFF:  So what's the        11:53:46
25   question?  Now that we have gotten the math   11:53:47

28  (Pages 109 to 112)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 113

```
 1          Loeffler
 2    right.                    11:53:47
 3      Q.   If you have a recollection of this    11:53:47
 4    happening independent of this document.       11:53:50
 5      A.  No, I don't.            11:53:51
 6      MR. NOVIKOFF:  Wait, wait, was    11:53:52
 7    the -- objection to form.  Was the question  11:53:53
 8    does he have knowledge independent of this   11:53:55
 9    document that seven officers were not     11:53:58
10    rehired in April 2006?            11:54:00
11      That's the question.  Taking this     11:54:05
12    document aside, do you have knowledge that   11:54:07
13    in April 2006 seven officers were not      11:54:12
14    rehired?  That's the question.        11:54:15
15      A.  Yes, I do.            11:54:18
16      Q.   And how did you first learn that     11:54:19
17    seven officers --             11:54:23
18      MR. GRAFF:  I'll note, Mr. Novikoff,   11:54:25
19    we have got the conflicting terminology.    11:54:26
20    If we refer to --            11:54:29
21      MR. NOVIKOFF:  Yes, we all       11:54:30
22    understand that your position is that they   11:54:31
23    were terminated, our position is that they   11:54:32
24    were not rehired.  I'm not going to suggest  11:54:35
25    at trial that your use of the word one way   11:54:38
```

Page 114

```
 1          Loeffler
 2    or the other changes your position and you   11:54:41
 3    are not going to use at the time of trial    11:54:43
 4    or in motion that my use of whatever phrase  11:54:45
 5    changes our position.            11:54:48
 6      MR. GRAFF:  Thank you.          11:54:49
 7      Q.   When did you first learn that seven  11:54:49
 8    officers were not rehired in 2006, Mayor    11:54:52
 9    Loeffler?                 11:54:55
10      A.  Sometime after April 4th of 2006.   11:54:56
11      Q.   And how did you come to learn of it  11:55:04
12    at that time?               11:55:06
13      A.  I believe Deputy Chief Hesse       11:55:06
14    informed the board that he would not be     11:55:12
15    rehiring these people.           11:55:13
16      Q.   And was that -- did he inform them  11:55:14
17    in person in a spoken communication?       11:55:18
18      A.  I don't recall.           11:55:20
19      Q.   Do you recall whether he informed   11:55:20
20    the board at any formal meeting of the board?  11:55:23
21      MR. NOVIKOFF:  I am going to object   11:55:28
22    to the form of the question.        11:55:29
23      You can answer, though.        11:55:30
24      A.  I don't recall.           11:55:31
25      Q.   Do you recall whether he provided   11:55:34
```

Page 115

```
 1          Loeffler
 2    any reason why those officers were not being  11:55:35
 3    rehired when he informed the board?       11:55:38
 4      A.  If I don't recall him doing that, I  11:55:40
 5    couldn't recall any reasons.        11:55:43
 6      Q.   Do you recall ever having any      11:55:45
 7    conversations directly with George Hesse about  11:55:46
 8    the fact that certain officers were not rehired  11:55:48
 9    to work for the 2006 season?        11:55:51
10      MR. NOVIKOFF:  At what period of     11:55:52
11    time?                   11:55:54
12      MR. GRAFF:  At any period of time.    11:55:55
13      A.  Well, obviously five of those      11:55:57
14    officers are part of this lawsuit, so I do have  11:55:58
15    some knowledge that they were not rehired as  11:56:01
16    part of the filing of the documents by the   11:56:04
17    plaintiffs.                11:56:07
18      Q.   Prior to the plaintiffs filing the   11:56:08
19    document in this lawsuit, did you have any    11:56:10
20    communications with George Hesse that you can  11:56:13
21    recall concerning officers not being rehired  11:56:16
22    for the 2006 season?            11:56:18
23      A.  No, I don't recall.         11:56:20
24      Q.   Do you know who William Powell is?  11:56:22
25      A.  No, I don't.           11:56:26
```

Page 116

```
 1          Loeffler
 2      Q.   Do you know who John Dyer is?      11:56:27
 3      A.  No, I don't.           11:56:28
 4      Q.   At the time that George Hesse      11:56:30
 5    informed you that officers were not being    11:56:34
 6    rehired --                11:56:37
 7      A.  No.                11:56:37
 8      Q.   Informed the board?  Is that what   11:56:40
 9    your hesitation was?            11:56:41
10      A.  Okay, yes.             11:56:42
11      Q.   Informed the board including       11:56:43
12    yourself that certain officers would not be   11:56:45
13    rehired for 2006, did you know who Edward    11:56:47
14    Carter was?                11:56:51
15      A.  Yeah.                11:56:52
16      MR. NOVIKOFF:  Did he know who he    11:56:52
17    was or was he aware that there was a person  11:56:54
18    affiliated with Ocean Beach named Edward    11:56:56
19    Carter?                  11:56:59
20      MR. GRAFF:  Either way.         11:57:04
21      MR. NOVIKOFF:  Okay.  Objection to   11:57:04
22    the form.                 11:57:06
23      A.  I know who Edward Carter is.      11:57:06
24      Q.   And who did you know Edward Carter  11:57:08
25    to be at that time?             11:57:10
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2     A.   A police officer.                    11:57:11
3     Q.   Had you ever had any communications  11:57:12
4  with Edward Carter directly?                 11:57:14
5     A.   Once.                   11:57:17
6     Q.   On what occasion did you --          11:57:18
7     A.   He showed up at a fire scene in the  11:57:20
8  wintertime.  He was working a midnight tour.  11:57:22
9  That's the only time I ever spoke to Edward   11:57:25
10 Carter.                    11:57:27
11    Q.   And in substance what did you -- or  11:57:27
12 what did you say to Ed Carter in that         11:57:29
13 conversation?                    11:57:31
14    A.   "Thanks for coming."         11:57:31
15    Q.   And where was the location of that   11:57:35
16 fire scene?                    11:57:37
17    A.   On Denhnoff Roadway in Ocean Beach.  11:57:39
18    Q.   And what structure, if any, was on   11:57:42
19 fire?                    11:57:45
20    A.   Four Seasons Hotel.          11:57:45
21    Q.   And do you know what Ed Carter did   11:57:53
22 when he arrived at that fire scene, what role 11:57:55
23 he played, if any?                    11:57:58
24    A.   No, I don't.             11:57:59
25    Q.   As of April 2006 did you know who    11:58:01

Loeffler

1
2  Kevin Lamm was?                    11:58:04
3     A.   Yes.                    11:58:05
4        MR. NOVIKOFF:  Objection.       11:58:05
5     Q.   And who did you know Kevin Lamm to   11:58:06
6  be?                    11:58:08
7     A.   A police officer within the Village  11:58:08
8  of Ocean Beach.                    11:58:10
9     Q.   Had you ever had any communications  11:58:10
10 with Mr. Lamm as of April of 2006?           11:58:12
11    A.   Yes, from time to time I would speak 11:58:14
12 with him.                    11:58:16
13    Q.   And can you recall anything of what  11:58:16
14 you discussed with Kevin Lamm as of April 2006? 11:58:19
15    A.   Small talk.  I would see him.  He    11:58:23
16 would meet the ferries a lot.  I guess that was 11:58:26
17 one of his jobs in the Police Department.  See 11:58:29
18 him on the street, just say "hi."       11:58:31
19    Q.   As of April 2006, did you have any   11:58:33
20 reason to believe that Kevin Lamm's performance 11:58:36
21 as a police officer was less than satisfactory? 11:58:39
22        MR. NOVIKOFF:  Objection.       11:58:41
23        You can answer.             11:58:42
24    A.   I had no knowledge of his        11:58:42
25 performance status.             11:58:47

Loeffler

1
2     Q.   And what about Ed Carter, as of      11:58:48
3  April 2006 did you have any knowledge of his   11:58:53
4  performance status?                    11:58:55
5        MR. NOVIKOFF:  Same objections.   11:58:56
6     A.   No.                    11:58:57
7        MR. NOVIKOFF:  Actually, I withdraw 11:59:01
8     the objection because the question was  11:59:03
9     changed.                    11:59:04
10    Q.   As of April 2006, did you know who   11:59:06
11 Joseph Nofi was?                    11:59:08
12        MR. NOVIKOFF:  Objection.       11:59:09
13    A.   Yes.                    11:59:10
14    Q.   And who did you know Joseph Nofi to  11:59:11
15 be?                    11:59:14
16    A.   A police officer with the Ocean     11:59:14
17 Beach Police Department.             11:59:15
18        MR. NOVIKOFF:  Ari, is your question 11:59:15
19    as of April 2006 or was it as of April 4th, 11:59:17
20    2006?  If your question is as of April   11:59:24
21    2006, that subsumes the entire month of  11:59:28
22    April, which I think this witness testified 11:59:31
23    that perhaps he and George Hesse --     11:59:32
24    Q.   With that clarification, prior to    11:59:34
25 the ending of his employment up to April 4th,  11:59:36

Loeffler

1
2  2006, who did you know Joseph Nofi to be?      11:59:39
3        MR. NOVIKOFF:  Objection.       11:59:42
4     A.   A police officer in the Ocean Beach  11:59:43
5  Police Department.             11:59:45
6     Q.   Had you ever had any communications  11:59:46
7  with Joseph Nofi as of that time?           11:59:47
8     A.   Prior to that date, is that what you 11:59:50
9  are talking about?                    11:59:52
10    Q.   Yes.                    11:59:52
11    A.   Yes.                    11:59:53
12    Q.   And can you recall the substance of  11:59:53
13 anything that was communicated in those        11:59:55
14 conversations?                    11:59:56
15    A.   No, I can't.  Mostly small talk.     11:59:57
16    Q.   Do you recall whether you ever       12:00:00
17 discussed any issues with respect to the Ocean 12:00:03
18 Beach Police Department with Joseph Nofi?       12:00:07
19        MR. NOVIKOFF:  Objection to the     12:00:10
20    form.                    12:00:10
21    A.   I'm not clear on what you are       12:00:13
22 asking.                    12:00:15
23    Q.   Well, did any of the small talk      12:00:15
24 include anything concerning the Ocean Beach    12:00:17
25 Police Department?                    12:00:20

Page 121

Loeffler

1
2       MR. NOVIKOFF:  Other than the fact    12:00:20
3   that Mr. Lamm was an officer at the time?    12:00:21
4       THE WITNESS:  No, we are talking    12:00:24
5   about Mr. Nofi, right?    12:00:25
6       MR. NOVIKOFF:  Mr. Nofi, I mean.    12:00:26
7       MR. GRAFF:  Right.    12:00:26
8       MR. NOVIKOFF:  Okay.  Objection to    12:00:27
9   the form.    12:00:28
10      A.   No.    12:00:29
11      Q.   Do you recall discussing any --    12:00:29
12  discussing with Joe Nofi any other officers at    12:00:31
13  the Ocean Beach Police Department?    12:00:33
14      A.   No.    12:00:34
15      Q.   Do you recall ever discussing with    12:00:35
16  Kevin Lamm any other officers at the Ocean    12:00:36
17  Beach Police Department?    12:00:39
18      A.   No.    12:00:39
19      Q.   As of April 4th, 2006, did you know    12:00:39
20  who Frank Fiorillo was?    12:00:44
21      A.   Yes.    12:00:45
22      Q.   Who did you know him to be?    12:00:45
23      A.   A police officer with the Ocean    12:00:47
24  Beach Police Department.    12:00:48
25      Q.   Had you ever had any communications    12:00:49

Page 122

Loeffler

1
2   with Frank Fiorillo as of that date?    12:00:50
3       A.   Yes.    12:00:52
4       Q.   How many times would you say you    12:00:52
5   communicated with Frank Fiorillo?    12:00:54
6       A.   I don't know.    12:00:56
7       Q.   Can you recall the substance of any    12:00:58
8   of those communications?    12:01:00
9       A.   Mostly small talk, "how are you    12:01:01
10  doing, how are things going."    12:01:03
11      Q.   Other than that small talk, can you    12:01:04
12  recall anything else that you communicated?    12:01:06
13      A.   No.    12:01:07
14      Q.   Did you have any knowledge of Frank    12:01:08
15  Fiorillo's performance as a police officer as    12:01:11
16  of April 4th, 2006?    12:01:14
17      A.   No.    12:01:15
18      Q.   Do you recall ever discussing any    12:01:15
19  other officers at the Ocean Beach Police    12:01:28
20  Department with Frank Fiorillo?    12:01:30
21      MR. NOVIKOFF:  Objection.  You have    12:01:31
22  been asking these questions "do you recall"    12:01:32
23  and I have objected and I haven't objected.    12:01:36
24  When you say "do you recall," are you    12:01:38
25  asking him affirmatively did you have any    12:01:40

Page 123

Loeffler

1
2   discussions with him?    12:01:42
3       MR. GRAFF:  Yes.    12:01:43
4       MR. NOVIKOFF:  Okay.  So when you    12:01:44
5   say going forward, and you may want to    12:01:45
6   change your questions, "do you recall,"    12:01:48
7   this witness should assume that that means    12:01:50
8   did you ever?  Because there is two -- two    12:01:53
9   different meanings to those questions.    12:01:57
10      MR. GRAFF:  I would not want to    12:01:58
11  confuse the witness or the testimony.    12:02:00
12      MR. NOVIKOFF:  Okay.  Ask him did    12:02:01
13  you have any conversations with --    12:02:02
14      Q.   Did you have any conversations with    12:02:02
15  Frank Fiorillo prior to April 4th, 2006?    12:02:04
16      A.   Yes.    12:02:07
17      Q.   Other than small talk, do you recall    12:02:08
18  anything specific that you discussed with Frank    12:02:12
19  Fiorillo?    12:02:14
20      A.   No.    12:02:14
21      Q.   Did you ever discuss any police    12:02:15
22  matters with Frank Fiorillo?    12:02:22
23      A.   No.    12:02:23
24      MR. NOVIKOFF:  Objection.    12:02:24
25      THE WITNESS:  Sorry.    12:02:26

Page 124

Loeffler

1
2       MR. NOVIKOFF:  No, you can answer,    12:02:27
3   that's fine.    12:02:28
4       A.   No.    12:02:29
5       Q.   As of April 4th, 2006, did you know    12:02:29
6   who Thomas Snyder was?    12:02:32
7       A.   Yes.    12:02:33
8       Q.   And who did you know him to be?    12:02:34
9       A.   A police officer of the Ocean Beach    12:02:35
10  Police Department.    12:02:37
11      Q.   Do you have any knowledge of his    12:02:37
12  performance as a police officer?    12:02:40
13      A.   No, I do not.    12:02:41
14      Q.   Did you ever have any communications    12:02:42
15  with Tom Snyder?    12:02:43
16      A.   I don't know if we ever actually --    12:02:45
17  very infrequent, if I did.  I don't remember.    12:02:56
18      Q.   Can you recall the substance of    12:02:58
19  anything communicated?    12:02:59
20      A.   No.  No.    12:02:59
21      Q.   Do you recall whether -- strike    12:03:03
22  that.    12:03:05
23      Did you ever discuss any other    12:03:05
24  officers at the Ocean Beach Police Department    12:03:09
25  with Tom Snyder?    12:03:11

31 (Pages 121 to 124)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 125

1          **Loeffler**
2      A.   No, I did not.              12:03:12
3      **Q.   Did you ever direct any of the five   12:03:14**
4  **plaintiffs in this lawsuit during their time   12:03:16**
5  **that they were police officers at Ocean Beach,   12:03:19**
6  **did you ever direct any of them to not issue a   12:03:21**
7  **citation to any particular person?      12:03:26**
8          MR. NOVIKOFF:  Objection to the   12:03:28
9      form.  You have a wholesale lack of   12:03:29
10     foundation on that question.  You are   12:03:32
11     presuming that it was the mayor's      12:03:42
12     responsibility or authority to direct   12:03:44
13     police officers to --              12:03:47
14         MR. GRAFF:  I'm not assuming   12:03:48
15     anything.  I am asking if he did direct   12:03:49
16     them.                           12:03:51
17         MR. NOVIKOFF:  Well, I am objecting   12:03:51
18     to the form.                     12:03:52
19     A.   Direct them -- repeat the question   12:03:55
20  for me, please.                     12:04:00
21     **Q.   I will ask it a slightly different   12:04:01**
22  **way.                           12:04:03**
23         **Did you ever ask any of the five   12:04:04**
24  **plaintiffs to not issue a citation or violation   12:04:05**
25  **to any particular person on any particular   12:04:09**

Page 126

1          Loeffler
2  occasion?                        12:04:11
3      A.   Not that I recall.           12:04:12
4      **Q.   Did you ever ask any of the five   12:04:14**
5  **plaintiffs in this case to not arrest any   12:04:18**
6  **particular person on any particular occasion?   12:04:21**
7      A.   No.                       12:04:23
8          MR. NOVIKOFF:  Do you have a good   12:04:27
9      faith basis to suggest that he did?   12:04:28
10         MR. GRAFF:  I do.           12:04:30
11         MR. NOVIKOFF:  Okay.  Can we hear   12:04:31
12     it?  Because I think what you just accused   12:04:33
13     the mayor of Ocean Beach of doing by virtue   12:04:37
14     of the question is that he did direct   12:04:40
15     someone not to arrest someone else and I   12:04:41
16     think that's a pretty serious accusation to   12:04:44
17     me.                             12:04:47
18         MR. GRAFF:  I will be more specific.   12:04:47
19         THE WITNESS:  Okay, that would be   12:04:49
20     great.                          12:04:49
21     **Q.   Did you ever direct any of the   12:04:49**
22  **officers not to arrest or issue a citation to   12:04:51**
23  **Michael Loeffler?                  12:04:54**
24     A.   Oh, absolutely.  Absolutely, I did.   12:04:55
25     **Q.   And when did that happen?   12:04:57**

Page 127

1          **Loeffler**
2      A.   When they attempted to issue him a   12:04:59
3  citation for a crime that he didn't commit.   12:05:01
4      **Q.   When did that take place?   12:05:05**
5      A.   I don't remember the date.      12:05:06
6      **Q.   Do you remember the year?   12:05:07**
7      A.   2005 maybe.  I'm not sure.   12:05:09
8      **Q.   And which officer specifically are   12:05:13**
9  **you referring to?              12:05:15**
10     A.   Officer Fiorillo, right here,   12:05:15
11  sitting right here.              12:05:17
12     **Q.   And can you describe the context of   12:05:19**
13  **what you are referring to?         12:05:22**
14     A.   Yes.  He wanted to issue my son a   12:05:22
15  summons for stealing a barbecue.      12:05:24
16         MR. NOVIKOFF:  Is there anything   12:05:31
17     more you want to add to that?      12:05:32
18         THE WITNESS:  Well, I have to more   12:05:33
19     answer to that, but that's...      12:05:34
20         MR. NOVIKOFF:  Okay.           12:05:35
21     **Q.   If you could elaborate on that,   12:05:35**
22  **please.                        12:05:37**
23     A.   Well, do you want --         12:05:37
24         MR. NOVIKOFF:  Do you want the   12:05:40
25     witness to --                   12:05:41

Page 128

1          Loeffler
2          MR. GRAFF:  Yes.           12:05:42
3          MR. NOVIKOFF:  Testify as to   12:05:42
4      whatever you want to testify about the   12:05:43
5      incident.                      12:05:45
6      A.   There was an incident that occurred   12:05:45
7  at 31 Ocean Road where my son removed a   12:05:47
8  barbecue from that residence and took it to   12:05:51
9  Ocean Bay Park and Officer Fiorillo, I believe,   12:05:53
10  wanted to issue him a summons for stealing that   12:05:55
11  barbecue, but I own that house.  That's my   12:05:57
12  barbecue.  So I don't know what Officer   12:06:01
13  Fiorillo was going to commit, but he would have   12:06:03
14  committed a false arrest.  I was attempting to   12:06:05
15  stop him from doing that and allow him not to,   12:06:08
16  but I owned that house.  That was my barbecue.   12:06:11
17  Okay.  So in attempting to assist Officer   12:06:13
18  Fiorillo in not getting involved in a false   12:06:18
19  arrest suit, I did make that suggestion that he   12:06:20
20  not do that, because there would not be a   12:06:23
21  complainant at that house.           12:06:25
22     **Q.   And was that house your residence?   12:06:26**
23     A.   No, it was one of my rental houses   12:06:29
24  at the time.                      12:06:31
25     **Q.   Was it occupied at the time?   12:06:32**

32 (Pages 125 to 128)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 129

```
1              Loeffler
2     A.  Sure, it was.              12:06:33
3     Q.  And did you recognize the specific   12:06:34
4  barbecue in question as being your property and   12:06:36
5  not something that the renting party had   12:06:38
6  brought?                         12:06:40
7     A.  Absolutely did.  It was my barbecue.  12:06:41
8     Q.  Other than that specific occasion,   12:06:43
9  did you ever direct any other Ocean Beach   12:06:45
10  police officers to refrain from arresting or   12:06:47
11  issuing a citation to Michael Loeffler?   12:06:51
12     A.  No.  I didn't advise him not to   12:06:54
13  arrest him.  He could have arrested him and   12:06:59
14  maybe he should have and then my son might have  12:07:01
15  a decent lawsuit against the police department   12:07:03
16  and Officer Fiorillo.  All I did was advise him   12:07:07
17  that that barbecue belonged to me.   12:07:09
18     Q.  And what, if anything, did Frank   12:07:11
19  Fiorillo do in response to that advice?   12:07:13
20     A.  I don't know.  Obviously he didn't   12:07:15
21  issue the summons.          12:07:17
22     Q.  Other than the officers who were not  12:07:32
23  rehired in the 2006 season, are you aware of   12:07:34
24  any other officers who were not rehired at any   12:07:37
25  other times during your service as mayor or   12:07:41
```

Page 130

```
1              Loeffler
2  trustee?                         12:07:44
3     A.  I don't recall.              12:07:50
4     Q.  Have you -- when was the last time   12:08:06
5  you spoke to Ed Paradiso?         12:08:08
6     A.  About a year ago, I guess.   12:08:14
7  Approximately a year.            12:08:22
8     Q.  Do you recall what you spoke with Ed  12:08:23
9  Paradiso about at that time?      12:08:26
10     A.  His father's funeral.        12:08:27
11     Q.  Have you ever had any conversations   12:08:29
12  with Ed Paradiso concerning this lawsuit?   12:08:31
13     A.  No, I have not.            12:08:33
14     Q.  Do you know whether there was any   12:08:34
15  Civil Service test that George Hesse was   12:08:44
16  required to take in order to attain the   12:08:46
17  position of police sergeant?      12:08:48
18        MR. NOVIKOFF:  Objection to the   12:08:50
19     form.  I don't know if this witness is an   12:08:51
20     expert in Civil Service law.   12:08:57
21        THE COURT REPORTER:  I can't hear   12:08:57
22     you.                         12:08:57
23        MR. NOVIKOFF:  I said i don't know   12:08:57
24     if this witness is -- and I know he is not   12:08:58
25     an expert on the Civil Service law, so you  12:08:59
```

Page 131

```
1              Loeffler
2  can answer.                      12:09:01
3     A.  Was -- a test that he was required   12:09:02
4  to take?                         12:09:06
5     Q.  Yes.                      12:09:06
6     A.  I don't know.              12:09:07
7     Q.  Do you know whether there was --   12:09:07
8  strike that.                     12:09:09
9        Do you know whether George Hesse   12:09:11
10  ever passed any Civil Service examination in   12:09:13
11  connection with the position of police   12:09:17
12  sergeant?                        12:09:19
13     A.  No, I do not.             12:09:19
14     Q.  Do you know whether George Hesse   12:09:20
15  passed any Civil Service exam in connection   12:09:22
16  with the position of deputy police chief?   12:09:25
17     A.  No, I do not.             12:09:28
18     Q.  Do you know what the Civil Service   12:09:29
19  requirements are with respect to the hiring of   12:09:38
20  police officers at Ocean Beach?   12:09:48
21        MR. NOVIKOFF:  All of the Civil   12:09:49
22     Service requirements?          12:09:50
23        MR. GRAFF:  Any.            12:09:51
24        MR. NOVIKOFF:  Objection to form.   12:09:52
25     A.  No, I do not.             12:09:53
```

Page 132

```
1              Loeffler
2     Q.  Is there any particular individual   12:09:55
3  or position at Ocean Beach that is responsible   12:10:01
4  for overseeing compliance with applicable Civil   12:10:04
5  Service requirements for employees?   12:10:08
6     A.  Yes.                      12:10:09
7     Q.  And who is that person?      12:10:09
8     A.  Mary Anne Minerva.          12:10:12
9     Q.  And what position does Mary Anne   12:10:15
10  Minerva hold?                    12:10:16
11     A.  She is the Village clerk.   12:10:16
12     Q.  And do you exercise any oversight   12:10:18
13  over Mary Anne Minerva's execution of those   12:10:20
14  responsibilities?                12:10:23
15        MR. NOVIKOFF:  Objection to the form  12:10:24
16     of the question.  Other than in his overall  12:10:25
17     capacity as mayor?             12:10:27
18        MR. GRAFF:  Well, does he in his   12:10:30
19     overall capacity as mayor or otherwise   12:10:31
20     exercise any oversight over Mary Anne   12:10:34
21     Minerva with respect to --     12:10:37
22        MR. NOVIKOFF:  I think the mayor   12:10:38
23     would, as already testified --   12:10:40
24     A.  She would have general oversight   12:10:41
25  over everybody.                  12:10:42
```

Page 133

```
 1            Loeffler
 2     Q.  Okay.  And in the context of your      12:10:44
 3  general oversight, have you ever done anything  12:10:45
 4  specific to oversee Mary Anne Minerva in        12:10:47
 5  connection with her execution or compliance    12:10:50
 6  with Civil Service requirements for employees?  12:10:57
 7        MR. NOVIKOFF:  Objection.        12:10:58
 8        You can answer.              12:11:00
 9     A.  That is within the realm of her        12:11:01
10  responsibility as Village clerk.        12:11:04
11     Q.  And do you have any information as      12:11:07
12  to whether Mary Anne Minerva has been effective  12:11:09
13  in fulfilling that responsibility?      12:11:14
14     A.  I believe she has.            12:11:17
15     Q.  And on what do you base that belief?   12:11:18
16     A.  I believe she has told me that the     12:11:22
17  payroll today is certified.              12:11:23
18     Q.  Do you know whether the payroll       12:11:27
19  for -- specifically with respect to payroll for  12:11:29
20  Ocean Beach police officers was certified      12:11:31
21  throughout the period that you have served as   12:11:34
22  mayor of Ocean Beach?            12:11:36
23     A.  I don't know.              12:11:37
24     Q.  Do you know whether the payroll was   12:11:40
25  certified at any point during the period that   12:11:42
```

Page 134

```
 1            Loeffler
 2  you served as a trustee of Ocean Beach?      12:11:46
 3        MR. NOVIKOFF:  Objection to the form  12:11:49
 4  of the question.                12:11:49
 5        You can answer.              12:11:50
 6     A.  I don't know.              12:11:51
 7     Q.  Other than Mary Anne Minerva, is      12:11:54
 8  there anyone else at Ocean Beach that you are   12:11:56
 9  aware of that has interactions with the Civil   12:11:59
10  Service Department?              12:12:04
11        MR. NOVIKOFF:  Wait a minute, anyone  12:12:04
12  at Ocean Beach that has interaction?      12:12:06
13     Wouldn't any police officer presumably have  12:12:08
14  interaction?                  12:12:11
15        MR. GRAFF:  Interaction with the    12:12:12
16  Civil Service Department with respect to      12:12:13
17  compliance with any applicable Civil      12:12:15
18  Service requirements for employees at Ocean   12:12:18
19  Beach.                    12:12:20
20        MR. NOVIKOFF:  I am going to object   12:12:20
21  to the form.  I will presume that every      12:12:21
22  employee at some point in time or another    12:12:23
23  should or had interaction with Civil      12:12:26
24  Service, so I am going to object to the      12:12:28
25  form of the question.  I think I know what   12:12:30
```

Page 135

```
 1            Loeffler
 2  you are asking, but you didn't get there.     12:12:32
 3     A.  I have met with the Civil Service     12:12:35
 4  Commission as my -- within the realm of my time  12:12:37
 5  as being mayor.                12:12:41
 6     Q.  And on how many occasions have you    12:12:42
 7  met with the Civil Service Commission?      12:12:44
 8     A.  Twice.                  12:12:46
 9     Q.  And who specifically did you meet     12:12:47
10  with?                      12:12:50
11     A.  Alan Schneider.              12:12:51
12     Q.  Did you meet with Alan Schneider on   12:12:54
13  both occasions?                12:12:57
14     A.  Yes, I did.                12:12:57
15     Q.  When was the first occasion that you  12:12:58
16  met with Alan Schneider?            12:13:01
17     A.  Sometime after 2006.            12:13:03
18     Q.  And who requested that meeting?      12:13:04
19     A.  I did.                  12:13:08
20     Q.  Why did you request a meeting with   12:13:09
21  Alan Schneider at that time?          12:13:11
22     A.  Well, we were attempting to hire     12:13:12
23  some full-time police officers off a new list   12:13:14
24  that had been established.            12:13:21
25     Q.  And did you meet with Alan Schneider  12:13:27
```

Page 136

```
 1            Loeffler
 2  at his office?                12:13:29
 3     A.  Yes.                  12:13:29
 4     Q.  How long did that meeting last?     12:13:30
 5     A.  An hour, two.  I don't remember.     12:13:31
 6     Q.  What was discussed during that hour?  12:13:33
 7     A.  Qualifications for us hiring        12:13:35
 8  full-time police officers.              12:13:38
 9     Q.  Prior to that meeting, were there     12:13:40
10  any individuals employed as full-time police   12:13:43
11  officers in Ocean Beach?            12:13:47
12     A.  Yes.                  12:13:49
13     Q.  And who was employed as a full-time  12:13:49
14  police officer at Ocean Beach as of that      12:13:52
15  meeting?                    12:13:54
16     A.  Edward Paradiso, George Hesse, Paul  12:13:54
17  Trosko.  I think that might be all.  I'm not --  12:14:08
18  I think that's it.                12:14:19
19     Q.  Why were you looking to hire more     12:14:20
20  full-time police officers specifically at that  12:14:23
21  point in time?                12:14:25
22     A.  Because it's my opinion that the     12:14:25
23  police department needs to move away from      12:14:29
24  seasonal and part-time police officers and hire  12:14:32
25  full-time police officers because they are more  12:14:34
```

34  (Pages 133 to 136)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 137

Loeffler

1
2  responsive and more reliable than the ones we    12:14:38
3  have been hiring.                                12:14:40
4      Q.   And can you identify any specific      12:14:41
5  deficiencies with respect to seasonal police    12:15:09
6  officers generally that would lead you to        12:15:12
7  believe that Ocean Beach would be better served  12:15:18
8  by full-time police officers?                    12:15:19
9      MR. NOVIKOFF:  Are you sure you want        12:15:22
10   to ask that question?                          12:15:23
11     A.   In my opinion, full-time police        12:15:25
12  officers serve the community better, are less   12:15:27
13  apt to take time off to fulfill their job       12:15:30
14  requirements, and they put the Village first,   12:15:33
15  where seasonal or part-time police officers who 12:15:35
16  have full-time jobs would put their jobs first  12:15:38
17  before the Village of Ocean Beach. So it is of  12:15:41
18  my opinion that the Village is better served by 12:15:43
19  hiring full-time police officers.               12:15:46
20     Q.   And in what ways would the seasonal    12:15:49
21  police officers not put Ocean Beach first?      12:15:52
22     A.   Well, if they had a conflict between   12:15:54
23  their full-time job and the seasonal job, I     12:15:57
24  would suspect that they would rely on taking    12:16:00
25  the seasonal -- the full-time job more          12:16:03

Page 138

Loeffler

1
2  importantly than the seasonal job.              12:16:05
3      Q.   And did you review any kind of         12:16:08
4  attendance records or other documentation?      12:16:09
5      A.   I just told you it was my opinion.     12:16:12
6      Q.   In connection with forming that        12:16:14
7  opinion.                                         12:16:15
8      A.   No, I did not.                          12:16:16
9      Q.   And on what do you base that           12:16:17
10  opinion?                                         12:16:19
11     A.   On other Police Departments.           12:16:20
12     Q.   Are you aware of any specific          12:16:24
13  officers who would -- any specific seasonal     12:16:26
14  officers who would not put Ocean Beach Police   12:16:32
15  Department first?                                12:16:35
16     A.   No, I am not.                           12:16:35
17     Q.   Did you have any discussions with      12:16:36
18  anybody else at Ocean Beach concerning your     12:16:40
19  opinion at that time?                            12:16:43
20     A.   No.                                     12:16:44
21     Q.   Did you have any discussions with      12:16:50
22  George Hesse about why you were seeking to hire 12:16:52
23  additional full-time police officers at that   12:16:55
24  time?                                            12:16:56
25     A.   I told him that was what I was going   12:16:56

Page 139

Loeffler

1
2  to do.                                          12:16:59
3      Q.   Did he ask you why?                     12:16:59
4      A.   Yes, and I told him exactly what I     12:17:00
5  told you.                                        12:17:03
6      Q.   And did he say anything in response?   12:17:03
7      A.   No, he did not.                         12:17:06
8      Q.   As far as you know, was George         12:17:10
9  Hesse's employment as a full-time police        12:17:12
10  officer in compliance with any applicable Civil 12:17:17
11  Service requirements at that time?              12:17:20
12     MR. NOVIKOFF:  Objection to the            12:17:21
13   form.                                          12:17:22
14     A.   I believe he was.                       12:17:23
15     Q.   Was that discussed at all at that      12:17:27
16  first meeting with Alan Schneider?             12:17:29
17     A.   Yes.                                    12:17:32
18     Q.   And in substance what was discussed   12:17:34
19  with respect to that issue?                      12:17:38
20     A.   Whether George Hesse could fulfill    12:17:39
21  the job category classification of supervisor.  12:17:43
22     Q.   And what, if anything, did            12:17:47
23  Mr. Schneider express on that topic?           12:17:52
24     A.   That he could not.                      12:17:54
25     Q.   Did Mr. Schneider indicate whether    12:18:01

Page 140

Loeffler

1
2  George Hesse could meet the requirements for    12:18:04
3  continued service as a full-time police         12:18:07
4  officer?                                         12:18:09
5      A.   No, just -- we just spoke about        12:18:09
6  supervision.                                     12:18:12
7      Q.   And did you -- other than what you     12:18:13
8  have already testified to, what, if anything,   12:18:19
9  do you recall of the substance of the           12:18:22
10  discussion with Alan Schneider at that first    12:18:23
11  meeting?                                         12:18:26
12     MR. NOVIKOFF:  Objection to asking         12:18:26
13   this witness to recall exactly what he has    12:18:27
14   testified to.                                  12:18:31
15     A.   Mr. Schneider allowed us to hire a    12:18:32
16  part-time -- seasonal police sergeant.          12:18:37
17     Q.   And who was hired as the seasonal     12:18:42
18  police sergeant?                                 12:18:52
19     A.   Richard -- I have to think of his     12:18:53
20  last name.  I can't think of it.  We hired     12:18:56
21  someone from the Police Department, from within 12:18:57
22  the Police Department that had been a           12:18:59
23  lieutenant with the New York City Police        12:19:01
24  Department and Civil Service allowed us to hire 12:19:04
25  him on a seasonal basis for the summer of 2007. 12:19:06

35 (Pages 137 to 140)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 141

Loeffler

1
2    Q.   And when did Paul Trosko become a    12:19:15
3    full-time police officer, if you know?    12:19:18
4    A.   I don't know.                         12:19:20
5    Q.   Was Mary Anne Minerva present at      12:19:20
6    that meeting with Alan Schneider?          12:19:23
7    A.   Yes, she was.                         12:19:25
8    Q.   What, if anything, did Mary Anne      12:19:26
9    Minerva say during that meeting?           12:19:27
10   A.   I don't think she said anything.      12:19:29
11   Q.   Who else was present for that         12:19:31
12   meeting?                                   12:19:34
13   A.   Peter Fishbein from the office of     12:19:35
14   Bee Ready Fishbein.                        12:19:38
15   Q.   Anyone else?                          12:19:41
16   A.   County attorney's office.  I don't    12:19:42
17   remember who he was.  A female county      12:19:45
18   attorney.                                  12:19:48
19   Q.   If I said the name Arlene Zwilling,   12:19:48
20   would that refresh your recollection as to that   12:19:52
21   person's name?                             12:19:53
22   A.   I don't remember.  It could.  I       12:19:54
23   don't -- I don't remember.  And there was  12:19:57
24   someone else from Civil Service, another   12:19:59
25   official.  Bettenhouse, Richard Bettenhouse.   12:20:06

Page 142

Loeffler

1
2    I'm sorry.                                 12:20:10
3    MR. NOVIKOFF:  That's the name of          12:20:11
4    the --                                     12:20:12
5    A.   That's the name of the officer we     12:20:12
6    appointed sergeant, temporary sergeant.    12:20:14
7    Q.   Do you know anybody at the Civil      12:20:19
8    Service -- Suffolk County Civil Service    12:20:23
9    Department by the name of Alison Sanchez?  12:20:25
10   A.   Yes.                                  12:20:27
11   Q.   And who do you know her to be?        12:20:28
12   MR. NOVIKOFF:  Based upon what?            12:20:29
13   Before the filing of the Complaint?        12:20:30
14   MR. GRAFF:  No, as he sits here            12:20:31
15   today.                                     12:20:32
16   MR. NOVIKOFF:  What's that?               12:20:33
17   MR. GRAFF:  As he sits here today.         12:20:33
18   MR. NOVIKOFF:  Yeah, but the               12:20:34
19   question is very broad.  Does he know --   12:20:34
20   you asked him, I think, essentially how    12:20:37
21   does he know her.  The question I think    12:20:39
22   should be did he know of her before the    12:20:40
23   filing of the Complaint or after the       12:20:42
24   filing.                                    12:20:44
25   MR. GRAFF:  I will clarify that.           12:20:44

Page 143

Loeffler

1
2    MR. NOVIKOFF:  Okay.                       12:20:46
3    Q.   Did you know who Alison Sanchez was   12:20:46
4    prior to the filing of the Complaint?      12:20:48
5    A.   No, I don't think so.                 12:20:50
6    Q.   And would you have known the same     12:20:57
7    individual by the name Alison Chester?     12:20:59
8    A.   No, it was Alison Sanchez.            12:21:01
9    Q.   Do you recall how you first heard     12:21:06
10   the name Alison Sanchez?                   12:21:07
11   A.   Yes.                                  12:21:10
12   Q.   And in what context did you first     12:21:11
13   hear her name?                             12:21:13
14   A.   I was introduced to her.  She was in  12:21:14
15   the Village office reviewing payroll documents.   12:21:16
16   Q.   When did that happen?                 12:21:19
17   A.   I don't remember.                     12:21:20
18   Q.   Who was she reviewing the payroll     12:21:21
19   documents with?                            12:21:25
20   A.   Mary Anne Minerva.                    12:21:25
21   Q.   Anyone else?                          12:21:26
22   A.   Not that I recall.                    12:21:27
23   Q.   How did you know what documents       12:21:28
24   Ms. Sanchez and Ms. Minerva were reviewing?   12:21:35
25   A.   They appeared to be payroll           12:21:38

Page 144

Loeffler

1
2    documents.                                 12:21:40
3    Q.   Did you have any conversations with   12:21:41
4    Mary Anne Minerva about her meeting on that   12:21:42
5    occasion with Alison Sanchez?              12:21:45
6    A.   No.                                   12:21:48
7    Q.   When was the second occasion that     12:21:49
8    you met with Mr. Schneider?                12:21:51
9    A.   Probably a year after, a year         12:21:56
10   following the appointment of Richard       12:22:01
11   Bettenhouse.                               12:22:03
12   Q.   And why did you meet with             12:22:04
13   Mr. Schneider on that occasion?            12:22:06
14   A.   Because we wished to continue that    12:22:07
15   position for another year.                 12:22:09
16   Q.   And was that an in-person meeting?    12:22:11
17   A.   Yes, it was.                          12:22:15
18   Q.   Was it also again at Mr. Schneider's  12:22:16
19   office?                                    12:22:19
20   A.   Yes, it was.                          12:22:19
21   Q.   Who else was present for the          12:22:20
22   meeting?                                   12:22:21
23   A.   The same people that were at the      12:22:21
24   first meeting.                             12:22:25
25   Q.   And how long did that meeting last?   12:22:27

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 145

Loeffler

1
2    A.   I don't recall.                       12:22:29
3    Q.   And in substance what was discussed   12:22:31
4    during that meeting?                        12:22:33
5    A.   The continuation of the position of    12:22:34
6    temporary sergeant for the Village of Ocean   12:22:36
7    Beach Police Department.                     12:22:39
8    Q.   Were any other topics discussed?       12:22:39
9    A.   No.                   12:22:41
10   Q.   And in substance what did             12:22:42
11   Mr. Schneider communicate with respect to that   12:22:45
12   issue during that meeting?                  12:22:47
13   A.   That they would allow it for one       12:22:48
14   more season, but they would not continue to   12:22:50
15   allow it.                  12:22:53
16   Q.   During either of your meetings with    12:22:59
17   Mr. Schneider did you take any notes during the   12:23:01
18   meeting?                   12:23:04
19   A.   No, I did not.            12:23:05
20   Q.   Do you know whether anyone took        12:23:06
21   notes during either of those meetings?      12:23:09
22   A.   I believe counsel did.    12:23:10
23   Q.   Would that be counsel for Ocean       12:23:11
24   Beach or counsel for the county?            12:23:15
25   A.   I believe both counsels did.   12:23:16

Page 146

Loeffler

1
2    Q.   As mayor of Ocean Beach do you have    12:23:18
3    the authority to terminate the employment of   12:23:36
4    police officers at Ocean Beach?             12:23:39
5    A.   I don't know.             12:23:40
6    Q.   Do you know who, if anyone, at Ocean   12:23:44
7    Beach has the authority to terminate police   12:23:46
8    officers currently?                        12:23:48
9    A.   I would imagine the Village board     12:23:49
10   would have that authority and probably the   12:23:59
11   department heads can terminate people under   12:24:06
12   their guise as long as they meet the        12:24:08
13   termination requirements of Civil Service.   12:24:12
14   Q.   And would a department head at Ocean   12:24:13
15   Beach need to obtain approval from anyone else   12:24:17
16   at Ocean Beach in order to terminate an      12:24:18
17   employee under their supervision?           12:24:21
18   A.   No.  We allow them to hire and fire.   12:24:23
19   Q.   What about when George Hesse was       12:24:25
20   acting deputy chief, did he have hire and fire   12:24:29
21   authority over the Ocean Beach Police       12:24:32
22   Department?                12:24:34
23   A.   Yes, he did.              12:24:34
24   MR. GRAFF:  I am going to ask the          12:24:51
25   court reporter to please mark as            12:24:53

Page 147

Loeffler

1
2    Exhibit Loeffler 5 a one-page document      12:24:54
3    produced to us by the county without Bates   12:24:56
4    number.                    12:24:59
5    (Loeffler Exhibit 5, letter dated          12:25:08
6    January 4, 2007, marked for                 12:25:08
7    identification.)                           12:25:26
8    MR. NOVIKOFF:  And is there a              12:25:26
9    question?  Do you want him to look at the   12:25:27
10   document?                  12:25:30
11   MR. GRAFF:  When you are done              12:25:30
12   reviewing it, Mr. Novikoff.   12:25:31
13   MR. NOVIKOFF:  I'm sorry.      12:25:31
14   Q.   If Mayor Loeffler could please look    12:25:32
15   at the document, and my first question is    12:25:34
16   whether you have seen the document before.   12:25:37
17   (Document review.)            12:25:53
18   A.   Yes, I have seen this document.   12:25:53
19   Q.   When did you first see the document?   12:25:55
20   A.   Sometime in January of '07.   12:25:57
21   Q.   Was the version of the document that   12:25:59
22   you saw signed?                12:26:00
23   A.   I don't recall.             12:26:02
24   Q.   Did you receive it in the mail?        12:26:06
25   A.   I receive everything in the mail.   12:26:08

Page 148

Loeffler

1
2    Q.   So you received this Exhibit 5 in      12:26:11
3    the mail?                  12:26:12
4    A.   I would think -- I don't know.  I      12:26:13
5    don't know how it got into my possession.   12:26:14
6    Q.   Do you recall where you were when      12:26:17
7    you saw the document?                      12:26:18
8    A.   I imagine I was in the Village        12:26:19
9    office.                  12:26:21
10   Q.   At that time did you know who Alison   12:26:21
11   Sanchez was?                12:26:23
12   A.   Yes.                  12:26:24
13   Q.   Had you ever received correspondence   12:26:26
14   from Alison Sanchez prior to this exhibit?   12:26:28
15   MR. NOVIKOFF:  That he is aware of.   12:26:30
16   MR. GRAFF:  That he is aware of.   12:26:31
17   A.   I don't recall.             12:26:34
18   Q.   Did you receive this document before   12:26:34
19   or after your first meeting with Alan       12:26:40
20   Schneider?                 12:26:42
21   MR. NOVIKOFF:  Do you need to look         12:26:45
22   at the document?                12:26:47
23   THE WITNESS:  Yes, let me see it.   12:26:47
24   MR. NOVIKOFF:  (Handing).       12:26:49
25   A.   I believe before.           12:26:57

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 149

```
 1              Loeffler
 2    Q.  Was this document -- strike that.    12:26:58
 3       When you received this document, did   12:27:09
 4  you have an understanding of what it was      12:27:10
 5  referring to with the first few sentences:    12:27:12
 6  "This department has become aware that Police   12:27:14
 7  Officer George Hesse has been working in a   12:27:16
 8  supervisory capacity.  Supervisory          12:27:18
 9  responsibility is a duty that is out of title   12:27:21
10  for a police officer"?                     12:27:23
11       MR. NOVIKOFF:  Objection to the      12:27:24
12    form.  I think you are asking him if he had  12:27:25
13    an understanding as to what Alison Sanchez   12:27:27
14    meant and that's, I think, palpably        12:27:29
15    objectionable.  I think the appropriate     12:27:33
16    question would be does he have an         12:27:34
17    understanding as to what this letter means.  12:27:36
18       MR. GRAFF:  That's what I attempted   12:27:40
19    to ask.                                  12:27:42
20       MR. NOVIKOFF:  Okay, because that's   12:27:42
21    not what you asked.                       12:27:43
22       So do you have an understanding?      12:27:44
23    A.  Is that the question?               12:27:46
24       MR. NOVIKOFF:  Yes.  Not as to what   12:27:46
25    Alison Sanchez meant, but do you have an   12:27:48
```

Page 150

```
 1              Loeffler
 2  understanding.                             12:27:50
 3    A.  Yes, I do.                           12:27:50
 4    Q.  And at the time that you first read   12:27:51
 5  this, did you have the same understanding?   12:27:53
 6       MR. NOVIKOFF:  I don't think you      12:27:56
 7    have established that his understandings is   12:27:58
 8    different.  He says he has an            12:28:00
 9    understanding.                          12:28:02
10    A.  That's my understanding of it, so...  12:28:03
11    Q.  And is your -- okay.                 12:28:04
12       And what is your understanding of     12:28:06
13  the second sentence, "supervisory           12:28:07
14  responsibility is a duty that is out of title   12:28:09
15  for a police officer"?                     12:28:11
16    A.  That a police officer is out of     12:28:12
17  title doing supervisory work.              12:28:15
18    Q.  And out of title, what does that     12:28:18
19  refer to in this context, as you understand it?  12:28:21
20    A.  Civil Service title.               12:28:23
21    Q.  And as of January 4, 2007, how long   12:28:25
22  had George Hesse been working in a supervisory   12:28:33
23  capacity at Ocean Beach?                   12:28:36
24       MR. NOVIKOFF:  Objection to the form   12:28:37
25    of the question.                         12:28:38
```

Page 151

```
 1              Loeffler
 2    A.  I don't know.                        12:28:39
 3    Q.  The second paragraph states:  "Once   12:28:46
 4  we have determined the proper position        12:28:47
 5  classification, you may then act to appoint   12:28:49
 6  Mr. Hesse to this title."  I'm sorry, I skipped   12:28:52
 7  a sentence.                               12:28:53
 8       The third sentence of the first       12:28:54
 9  paragraph:  "To remedy this, we will need you   12:28:55
10  to submit a new duties statement so that we may   12:28:58
11  review the position and determine the proper   12:29:00
12  title."                                   12:29:02
13       To your knowledge, was a new duty      12:29:02
14  statement for George Hesse ever submitted to   12:29:04
15  the Civil Service Department subsequent to your   12:29:07
16  receipt of this letter?                    12:29:09
17    A.  Not to my knowledge.                12:29:10
18    Q.  The first sentence of the second     12:29:11
19  paragraph:  "Once we have determined the proper   12:29:16
20  position classification, you may then act to   12:29:18
21  appoint Mr. Hesse to this title."          12:29:21
22       MR. NOVIKOFF:  Okay.                 12:29:26
23    Q.  To your knowledge, did the Civil     12:29:27
24  Service Department ever determine the proper   12:29:30
25  position classification for George Hesse?   12:29:31
```

Page 152

```
 1              Loeffler
 2       MR. NOVIKOFF:  You are asking him if   12:29:33
 3    the Civil Service Department did something?  12:29:34
 4       MR. GRAFF:  That he is aware of,      12:29:37
 5    yes.                                    12:29:38
 6       MR. NOVIKOFF:  I am going to object.   12:29:39
 7       You can answer.                      12:29:40
 8    A.  George Hesse was determined to be a   12:29:44
 9  police officer.                           12:29:46
10    Q.  Did George Hesse's position at the   12:29:57
11  Ocean Beach Police Department change subsequent   12:29:59
12  to your receipt of this letter?            12:30:02
13       MR. NOVIKOFF:  Objection.            12:30:05
14    Q.  And to clarify the time period a     12:30:08
15  little better, after your receipt of this    12:30:10
16  letter but before he was placed on modified   12:30:11
17  duty.                                     12:30:14
18       MR. NOVIKOFF:  I am still going to    12:30:14
19    object, but at least that clarified one of   12:30:16
20    the issues.                             12:30:20
21    A.  Yes, George Hesse's title as        12:30:20
22  sergeant was not utilized after the receipt of   12:30:25
23  this letter.                              12:30:31
24    Q.  And did his duties in the Ocean      12:30:32
25  Beach Police Department change in connection   12:30:35
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 153

Loeffler

1
2  with that title no longer being utilized?        12:30:37
3       A.   Yes.                          12:30:39
4       Q.   And what duties were changed in       12:30:40
5  connection with that title change?        12:30:44
6       A.   He was directed to no longer perform  12:30:46
7  supervisory responsibilities with reference to  12:30:50
8  the Ocean Beach Police Department.         12:30:53
9       Q.   And who directed George Hesse to no   12:30:54
10 longer perform supervisory responsibilities?   12:30:58
11      A.   I did.                        12:31:01
12      Q.   And, to your knowledge, did George   12:31:01
13 Hesse adhere to that direction?            12:31:04
14      A.   Yes, he has.                   12:31:06
15      Q.   And when did you direct George Hesse 12:31:07
16 to no longer exercise supervisory           12:31:11
17 responsibilities?                        12:31:14
18      A.   Sometime after the receipt of that   12:31:14
19 letter.                                 12:31:16
20      Q.   And that was prior to his being      12:31:16
21 placed on modified duty?                  12:31:18
22      A.   I'm not sure when the directive --   12:31:20
23 do you have a copy of the directive for      12:31:22
24 modified duty assignment, the policy?       12:31:24
25      Q.   We might get to that later.  I am    12:31:25

Page 154

Loeffler

1
2  just now --                             12:31:26
3       A.   Well, you know --              12:31:26
4       MR. NOVIKOFF:  The witness is asking  12:31:28
5  you to show him a document to help him      12:31:29
6  answer the question, so if you have it, you  12:31:32
7  should show it to him.  If not, I think      12:31:34
8  this line of questioning should end then.   12:31:35
9       MR. GRAFF:  I will ask a different     12:31:37
10 question now.                           12:31:39
11      Q.   After you directed George Hesse to   12:31:42
12 no longer exercise supervisory responsibility,  12:31:44
13 who, if anyone, exercised supervisory        12:31:48
14 responsibility with respect to the Ocean Beach  12:31:51
15 Police Department?                       12:31:53
16      A.   In the summer of '07 Richard       12:31:53
17 Bettenhouse did.                        12:31:55
18      Q.   And did Richard Bettenhouse's       12:31:56
19 employment end at the end of summer '07?     12:32:02
20      MR. NOVIKOFF:  Objection to the form   12:32:04
21 of the question.                        12:32:05
22      A.   Yes.                          12:32:11
23      Q.   And after the time that Richard     12:32:12
24 Bettenhouse's employment ended, who, if anyone,  12:32:14
25 exercised supervisory responsibility over the  12:32:16

Page 155

Loeffler

1
2  Ocean Beach Police Department?             12:32:18
3       A.   I did.                        12:32:19
4       Q.   Anyone else?                   12:32:20
5       A.   No.                           12:32:21
6       Q.   And in what ways did you exercise   12:32:22
7  that supervisory responsibility?           12:32:25
8       A.   I supervised the issuance of       12:32:28
9  directives, policy, and the certifying -- or  12:32:34
10 the issuance of orders within the Police     12:32:42
11 Department.                             12:32:46
12      Q.   And what directives did you         12:32:46
13 supervise the issuance of?                12:32:51
14      A.   I issued a bunch of directives.  I  12:32:53
15 don't know --                           12:32:55
16      Q.   Can you think of a single one?     12:32:56
17      A.   I can think of one directive that I  12:32:58
18 issued that when there are more than three   12:33:02
19 police officers working, one of them shall   12:33:05
20 be -- we set up station points and should be  12:33:07
21 responsible to patrol the residential area of  12:33:08
22 the Village.  That was one of the directives  12:33:12
23 that I wrote.                           12:33:14
24      Q.   Why did you issue that directive?   12:33:14
25      A.   Because I wanted to have a better   12:33:16

Page 156

Loeffler

1
2  police presence in the residential district  12:33:18
3  when there was at least three police officers  12:33:20
4  working.                                12:33:22
5       Q.   And what had been the practice until  12:33:22
6  the time that you --                     12:33:25
7       MR. NOVIKOFF:  Wait, what had         
8  been --                                 
9       THE COURT REPORTER:  One at a time.   
10      MR. NOVIKOFF:  What's the question?    
11      Q.   What had been the practice up until  12:33:25
12 the time that you issued that directive?     12:33:29
13      MR. NOVIKOFF:  You mean going back     12:33:30
14 the 55 years that the mayor was in the       12:33:31
15 Village?                                12:33:33
16      MR. GRAFF:  Going back to the         12:33:34
17 beginning of your service as mayor.         12:33:35
18      A.   There was no direction.          12:33:37
19      Q.   And can you think of any other      12:33:40
20 directives that you issued?               12:33:43
21      A.   I just -- no, I don't --          12:33:45
22      Q.   What policies did you supervise the  12:33:48
23 issuance of?                            12:33:52
24      A.   I think the adoption of the policy  12:33:53
25 manual, I supervised that when it went into  12:34:04

9e28f7aa-4e93-4641-9524-8529961356c8

Page 157

Loeffler

1
2  place in 2006.                          12:34:08
3     Q.   And what is that policy manual that  12:34:11
4  you are referring to?                   12:34:13
5     A.   It's the policy manual for the   12:34:14
6  Village Police Department.              12:34:16
7     Q.   Who drafted it, authored it?     12:34:17
8     A.   It's a combination of a lot of   12:34:20
9  Police Departments.                     12:34:23
10    Q.   And who compiled it?             12:34:23
11    A.   Paul Trosko had a lot to do with  12:34:25
12  compiling that before he left the employ of the  12:34:29
13  Police Department.                     12:34:31
14    Q.   And did you oversee Paul Trosko's  12:34:32
15  compilation of the policy manual?      12:34:38
16    A.   Yes.                            12:34:45
17    Q.   Did you give Paul Trosko any     12:34:46
18  instructions with respect to his compilation of  12:34:48
19  the policy manual?                     12:34:51
20    A.   Yes.                            12:34:52
21    Q.   What did you instruct Paul Trosko  12:34:52
22  with respect to that issue?            12:34:55
23    A.   "Do a good job."                12:34:56
24    Q.   And prior to the issuance of the  12:34:57
25  policy manual in 2006, what, if any, written  12:35:01

Page 158

Loeffler

1
2  policies internal to Ocean Beach governed the  12:35:08
3  conduct or operation of the Ocean Beach Police  12:35:11
4  Department?                            12:35:13
5     A.   I don't -- I'm unaware that there  12:35:13
6  was one.                               12:35:15
7     Q.   Why did you direct the compilation  12:35:16
8  of the policy manual in 2006? Why did you  12:35:22
9  decide to do that at that time?        12:35:24
10    A.   Because it hadn't been done.     12:35:25
11    Q.   And what was the purpose in doing it  12:35:27
12  if it hadn't been done until that point?  12:35:30
13       MR. NOVIKOFF:  Objection to the form  12:35:32
14  of the question.                       12:35:32
15    A.   I felt the Police Department needed  12:35:33
16  a policy manual that could be referred to in  12:35:37
17  any police situation which needed to be  12:35:39
18  addressed by any police officer in the Village  12:35:42
19  of Ocean Beach and we would use it as a  12:35:44
20  reference to how to handle situations and what  12:35:47
21  the policies, goals and expectations of the  12:35:49
22  Police Department were.                12:35:51
23    Q.   And is that based on your experience  12:35:52
24  as a police officer?                   12:35:55
25    A.   Absolutely.                     12:35:56

Page 159

Loeffler

1
2     Q.   Is it based on anything else?    12:35:56
3        MR. NOVIKOFF:  Other than his life  12:35:58
4  experience?                            12:36:00
5     A.   It's based on my life experience as  12:36:00
6  a police officer.                      12:36:02
7     Q.   And after that policy manual was  12:36:03
8  issued in 2006, was it distributed to all the  12:36:05
9  officers at the Ocean Beach Police Department?  12:36:08
10    A.   Yes, it was.                    12:36:09
11    Q.   And is it like a pocket guide or  12:36:10
12  something more weighty?                12:36:14
13    A.   It's approximately a thousand pages.  12:36:15
14       MR. NOVIKOFF:  I don't think it's a  12:36:18
15  pocket guide.                          12:36:19
16    Q.   Was any training provided to the  12:36:20
17  officers with respect to the policy manual?  12:36:21
18    A.   Yes.                            12:36:23
19    Q.   What training?                  12:36:24
20    A.   The training was that they all had  12:36:24
21  to read it and sign that they had read it.  12:36:26
22    Q.   All one thousand pages?          12:36:28
23    A.   Absolutely.                     12:36:30
24    Q.   Was there any quiz or test to     12:36:30
25  determine whether they had effectively  12:36:32

Page 160

Loeffler

1
2  assimilated the material after reading it?  12:36:34
3        MR. NOVIKOFF:  You mean did they put  12:36:36
4  them in a chair with chalk and they had to  12:36:37
5  write it out?                          12:36:39
6     A.   No, we just expected them to do  12:36:40
7  that.  I read it.                      12:36:43
8     Q.   Was the policy manual issued in 2006  12:36:54
9  subsequent to April 4th -- excuse me.  Strike  12:37:01
10  that.                                 12:37:06
11       Were any of the plaintiffs employed  12:37:12
12  as police officers at any time when the policy  12:37:14
13  manual was in effect?                  12:37:16
14    A.   No.                            12:37:19
15    Q.   Did you ever discuss the substance  12:37:20
16  of the policy manual with any police officers  12:37:24
17  at Ocean Beach other than Paul Trosko?  12:37:27
18       MR. NOVIKOFF:  Prior to its issuance  12:37:30
19  or subsequent to its issuance?         12:37:31
20       MR. GRAFF:  Subsequent to its       12:37:32
21  issuance.                             12:37:33
22    A.   George Hesse.                   12:37:34
23    Q.   And do you recall in substance what  12:37:38
24  you discussed with George Hesse?       12:37:41
25    A.   In making up the policy manual I  12:37:42

9e28f7aa-4e93-4641-9524-8529961356c8

Page 161

```
1              Loeffler
2   wanted his input in it.             12:37:46
3      Q.   And did he provide any input?      12:37:47
4      A.   Yes, he did.               12:37:49
5      Q.   And what was the nature of his     12:37:50
6   input?                    12:37:51
7      A.   He made many comments about input.   12:37:52
8      Q.   Can you remember anything?      12:37:55
9      A.   No, I can't.              12:37:56
10     Q.   Are you familiar with an Ocean Beach  12:37:57
11  employee handbook?             12:38:03
12     A.   Yes.       12:38:05
13        MR. GRAFF:  I don't want to make    12:38:08
14  this a memory game.  I am actually going to  12:38:09
15  mark the handbook so you can take a look.   12:38:12
16        If I could ask the court reporter to  12:38:26
17  please mark as Exhibit Loeffler 6 a      12:38:28
18  document with the title page Incorporated  12:38:31
19  Village of Ocean Beach Employee Handbook   12:38:34
20  produced by Ocean Beach Bates numbers 1    12:38:36
21  through 25.                12:38:38
22        (Loeffler Exhibit 6, The          12:38:42
23  Incorporated Village of Ocean Beach      12:38:42
24  Employee Handbook, Bates stamped 000001   12:38:42
25  through 000025, marked for identification.)  12:38:42
```

Page 162

```
1              Loeffler
2        MR. GRAFF:  I will note that      12:39:01
3   Mr. Novikoff is comparing the 25 pages.    12:39:19
4        MR. NOVIKOFF:  Hey, it's your       12:39:22
5   exhibit.  Are you suggesting for a moment   12:39:24
6   that as competent counsel I shouldn't make  12:39:26
7   sure that what you are handing the witness  12:39:27
8   isn't what you are handing me?        12:39:29
9        MR. GRAFF:  Certainly not, but, as  12:39:30
10  you know, this deposition is being      12:39:30
11  videotaped.  You are not on camera.  I     12:39:31
12  wanted to explain the delay for the record.  12:39:33
13        MR. NOVIKOFF:  I don't see why you  12:39:35
14  needed to.  Did I explain the delay when   12:39:37
15  you were trying to get your exhibits      12:39:38
16  together prior to reconvening for the      12:39:40
17  second session of this deposition, counsel?  12:39:42
18  I don't think so.             12:39:44
19        Here you go, Mayor (handing).      12:39:46
20     Q.   Mayor Loeffler, do you recognize   12:39:51
21  this document as the Ocean Beach employee   12:39:53
22  handbook?                  12:39:54
23     A.   I haven't had a chance to review it  12:39:55
24  yet.                    12:39:56
25     Q.   Please take as much time as you need  12:39:57
```

Page 163

```
1              Loeffler
2   to answer that question.          12:39:59
3        (Document review.)          12:40:00
4        MR. GRAFF:  While Mr. Loeffler is   12:41:31
5   reviewing the document, could I ask the     12:41:32
6   videographer how much time we have on the  12:41:32
7   tape?                   12:41:34
8        THE VIDEOGRAPHER:  We have 22     12:41:34
9   minutes.                 12:41:37
10        (Document review.)          12:42:39
11     Q.   Do you recognize this document as   12:43:02
12  the Ocean Beach Employee Handbook?       12:43:06
13     A.   At the time -- at this time, yes.   12:43:08
14     Q.   And you are referring to the page   12:43:11
15  marked --                  12:43:13
16     A.   No, I am referring to the date, in   12:43:13
17  2005 it was.               12:43:16
18     Q.   As marked on page 1 of the document?  12:43:17
19  It's stamped upside-down number 1.       12:43:21
20     A.   On page 1, yes.            12:43:23
21        MR. NOVIKOFF:  Cover page.       12:43:25
22     A.   Cover page.              12:43:30
23     Q.   If I could go back to something we   12:43:30
24  had been talking about earlier, at the time  12:43:32
25  that you purchased a piece of real estate from  12:43:34
```

Page 164

```
1              Loeffler
2   Ocean Beach, who specifically at Ocean Beach  12:43:35
3   did you deal with in connection with that   12:43:37
4   transaction?                12:43:39
5      A.   Bee Ready Fishbein are the attorneys  12:43:40
6   for the Village.  Every resident in the Village  12:43:45
7   was given an opportunity to buy that piece of  12:43:47
8   property.  I wasn't the only one who bought it.  12:43:49
9   600 other people did too.          12:43:52
10     Q.   Bought the same property?       12:43:54
11     A.   Yeah.       12:43:55
12     Q.   Can you explain how that worked.    12:43:56
13     A.   Yes.  The piece of properties were   12:43:58
14  declared excess by the Village.  Some pieces of  12:44:01
15  property were right of way, some pieces of  12:44:04
16  property were easements.  They were in the  12:44:06
17  front of the houses and behind the houses.  12:44:08
18  They were 4-by-50 sections of property that the  12:44:10
19  Village decided that were not of use to them  12:44:12
20  and they sold them to each individual      12:44:15
21  homeowner.  As a homeowner I was entitled to  12:44:16
22  buy that piece of property and I did, as did   12:44:18
23  approximately 400 other people in the Village.  12:44:21
24     Q.   Other than counsel for the Village,  12:44:24
25  who at Ocean Beach was responsible for     12:44:26
```

41 (Pages 161 to 164)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 165

Loeffler

1
2  administering or overseeing that purchase that     12:44:28
3  you have been describing?                          12:44:30
4      A.   Counsel did it, pretty much.  They        12:44:31
5  set up the deeds, the transfer documents,          12:44:33
6  insured the title reports.                         12:44:37
7      Q.   And who proposed this real estate         12:44:39
8  purchase system?                                   12:44:43
9      A.   I believe the -- it was before I was      12:44:44
10  on the Village board, so sometime before '02.     12:44:49
11     Q.   Do you know whether there was any         12:44:53
12  particular trustee who was overseeing this?       12:44:55
13     A.   No, I don't.                              12:44:57
14     Q.   If I could ask you to please turn to      12:44:59
15  what's stamped as page 4 of the handbook.         12:45:02
16         MR. NOVIKOFF:  Okay.  Is there             12:45:08
17     anything you would like the witness to do      12:45:09
18     with this?                                     12:45:10
19     Q.   Do you recognize this particular          12:45:11
20  page?                                             12:45:13
21         MR. NOVIKOFF:  Okay (handing).             12:45:13
22     A.   I recognize it as page 4 of the          12:45:16
23  handbook.                                         12:45:24
24     Q.   And it's headed acknowledgment --         12:45:25
25     A.   Is it page 4?  Bates statement --         12:45:29

Page 166

Loeffler

1
2  stamp 4.                                           12:45:31
3         MR. NOVIKOFF:  Just let the record          12:45:33
4     reflect, counselor --                           12:45:34
5      A.   It's an acknowledgment page.              12:45:35
6         MR. NOVIKOFF:  -- that you got a            12:45:37
7     table of contents that's page 2, page 3,        12:45:39
8     and then page 4, which is Bates stamped         12:45:42
9     does not have a number on it.                   12:45:46
10     Q.   Right.  I am referring to the Bates       12:45:47
11  stamp.                                            12:45:49
12         MR. NOVIKOFF:  Okay.                       12:45:50
13     Q.   To your knowledge, do employees at        12:45:50
14  Ocean Beach -- strike that.                       12:45:51
15         During the period that you served as       12:45:53
16  a trustee at Ocean Beach, did employees at        12:45:54
17  Ocean Beach, to your knowledge, sign and return   12:45:57
18  this page of the handbook?                         12:45:59
19     A.   I don't know.                             12:46:00
20     Q.   Is this handbook -- strike that.          12:46:01
21         When the policy manual was issued in       12:46:10
22  2006, did this handbook continue to apply to      12:46:12
23  the employment of Ocean Beach employees in the    12:46:15
24  Police Department?                                12:46:20
25         MR. NOVIKOFF:  Objection to the form       12:46:20

Page 167

Loeffler

1
2  of the question.                                   12:46:21
3      A.   It was a supplement to the policy         12:46:23
4  manual.                                            12:46:27
5      Q.   Thank you.  If I could ask you to         12:46:30
6  please turn to what's stamped as page 10 of the    12:46:31
7  handbook.                                          12:46:35
8         MR. NOVIKOFF:  Bates stamp 10?             12:46:36
9      Q.   Numbered page 6, Bates stamp 10.          12:46:37
10         MR. NOVIKOFF:  You got it.  Okay.          12:46:40
11     (Handing).  Any particular part of page 10?   12:46:42
12     Q.   If I could direct your attention to       12:46:45
13  the last subheading on the page, Employment of    12:46:47
14  Relatives, my question is are you familiar with   12:46:49
15  the policy that's set forth in that paragraph?    12:46:51
16     A.   Yes, I am.                                12:46:53
17         MR. NOVIKOFF:  Make sure.                  12:46:53
18     A.   I am.                                     12:46:53
19         MR. NOVIKOFF:  Okay.                       12:46:55
20     Q.   And at any point during your service      12:46:55
21  as trustee or mayor, did the employment of any    12:47:04
22  of your family members at Ocean Beach conflict    12:47:06
23  or violate this policy?                           12:47:09
24     A.   No.                                       12:47:10
25         MR. NOVIKOFF:  In this witness'            12:47:10

Page 168

Loeffler

1
2  opinion?                                           12:47:12
3         MR. GRAFF:  Sure.                           12:47:12
4      A.   In my opinion, no.                        12:47:13
5         MR. NOVIKOFF:  Is there an issue in         12:47:16
6     this lawsuit with regard to Mr. Loeffler's     12:47:17
7     family members being -- working for the        12:47:20
8     Village?                                        12:47:22
9         MR. GRAFF:  Mr. Novikoff, in this          12:47:24
10     deposition I ask the questions.                12:47:26
11         MR. NOVIKOFF:  No, no, I understand       12:47:27
12     and I am giving -- it's not my place to       12:47:28
13     give you any latitude or give you broad       12:47:30
14     latitude.  I am just saying that it seems     12:47:32
15     like that question went to an issue that is   12:47:35
16     so far removed from this case.  I am not      12:47:37
17     going to tell him not to answer it.           12:47:39
18         MR. GRAFF:  Well, he has answered it      12:47:40
19     and I have another question.                  12:47:42
20         MR. NOVIKOFF:  Okay.                       12:47:43
21     Q.   This is on what's Bates stamped 11,       12:47:43
22  page number 7 of the handbook.  The second to     12:47:45
23  last subheading is captioned Substance Abuse.     12:47:50
24         Mayor Loeffler, are you familiar           12:47:54
25  with the policy set forth underneath that         12:47:55

42  (Pages 165 to 168)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 169

Loeffler

1
2    caption?                              12:47:58
3        A.   As it's read -- as I read it, yes.   12:47:59
4        Q.   Now, I am looking for clarification   12:48:08
5    specifically on the last sentence of the   12:48:11
6    paragraph there:  "Any employee who repeatedly   12:48:13
7    reports to work under the influence of alcohol   12:48:15
8    or drugs may have his or her employment   12:48:17
9    terminated immediately."           12:48:20
10       Do you understand what "repeatedly"   12:48:22
11   means in this context?                12:48:24
12       A.   More than once.           12:48:25
13       MR. NOVIKOFF:  Are you going to ask   12:48:29
14   him what his understanding of the word   12:48:31
15   "may" means in this context?  Are you going   12:48:32
16   to ask him if he is aware if any police   12:48:38
17   officer violated this policy?          12:48:41
18       Q.   To your knowledge, has any employee   12:48:42
19   of Ocean Beach employed in the Ocean Beach   12:48:45
20   Police Department ever been terminated for   12:48:48
21   violation of this policy?              12:48:50
22       MR. NOVIKOFF:  Objection to the   12:48:51
23   form.  You haven't established that any   12:48:52
24   employee of the Village's behavior ever   12:48:54
25   came within this policy.            12:48:57

Page 170

Loeffler

1
2    You can answer.                      12:48:58
3        A.   I am not aware that anyone was.   12:49:02
4        Q.   Are you aware of any employee at   12:49:05
5    Ocean Beach generally who has ever been   12:49:07
6    terminated for violating this policy?   12:49:09
7        MR. NOVIKOFF:  Same objection.   12:49:11
8        A.   I am unaware of anyone.      12:49:12
9        Q.   If I could ask you to turn to the   12:49:14
10   very last page of the document Bates stamped   12:49:21
11   25, no page number.                12:49:25
12       MR. NOVIKOFF:  Okay.  Table of   12:49:27
13   Organization?                      12:49:28
14       MR. GRAFF:  Yes.               12:49:28
15       MR. NOVIKOFF:  Got it.  And is there   12:49:29
16   a question?                        12:49:31
17       Q.   I am asking -- I have some questions   12:49:32
18   to clarify the Table of Organization.   12:49:34
19       MR. NOVIKOFF:  So ask him.      12:49:37
20       Q.   The mayor and the Board of Trustees   12:49:38
21   I understand.  Superintendent of Public Works   12:49:40
22   and Village Administrator, is that one position   12:49:42
23   or two positions?                   12:49:44
24       A.   Two positions.             12:49:45
25       Q.   And during your employment as or   12:49:47

Page 171

Loeffler

1
2    service as a trustee, who was the        12:49:51
3    Superintendent of Public Works?          12:49:52
4        A.   Kevin Schielling.           12:49:54
5        Q.   And was he -- did he hold that   12:49:56
6    position continuously during your service as a   12:49:59
7    trustee?                           12:50:02
8        A.   Yes.                       12:50:02
9        Q.   Does he still hold that position?   12:50:02
10       A.   Yes, he does.               12:50:04
11       Q.   And who was the Village        12:50:05
12   administrator when you first became a trustee?   12:50:07
13       A.   Ethan -- what's Ethan's last name?   12:50:09
14   There was someone that was the Village   12:50:15
15   administrator.                      12:50:18
16       Q.   And was Ms. Minerva the next Village   12:50:19
17   administrator after Ethan?            12:50:21
18       A.   Yes.                       12:50:23
19       Q.   And the position that your mother   12:50:23
20   held, the court clerk, is that reflected   12:50:28
21   anywhere on this Table of Organization?   12:50:31
22       A.   No.                        12:50:33
23       Q.   Did your mother hold any other   12:50:43
24   positions other than clerk of the court?   12:50:45
25       A.   No.                        12:50:46

Page 172

Loeffler

1
2        Q.   The department heads that are   12:50:51
3    identified here, water, sewer maintenance,   12:50:53
4    beaches, recreation and fire and police   12:50:56
5    departments, do each of those departments have   12:50:59
6    a department head?                  12:51:00
7        A.   Yes.                       12:51:01
8        Q.   During your -- strike that.   12:51:02
9        MR. GRAFF:  That's all I have for   12:51:19
10   the handbook.  Counsel, would this be a   12:51:20
11   good time for you to break for lunch?   12:51:22
12       MR. NOVIKOFF:  No, actually, I would   12:51:24
13   prefer to go on for another 45 minutes and   12:51:25
14   then maybe break for lunch then.  I don't   12:51:27
15   think my witness is tired at all and I'm   12:51:28
16   certainly not tired.                 12:51:31
17       MR. GRAFF:  Okay.  Why don't we at   12:51:32
18   least finish up this tape then.         12:51:33
19       Q.   Mayor Loeffler, who lives with you   12:51:46
20   at your residence in Ocean Beach?        12:51:48
21       A.   My wife.                    12:51:49
22       Q.   Do any of your children live with   12:51:51
23   you?                               12:51:53
24       A.   My daughter Jillian.         12:51:53
25       Q.   And other than Jillian, have any of   12:51:56

43 (Pages 169 to 172)

9e28f7aa-4e93-4641-9524-8529961356c8

```
1              Loeffler
2    your other -- did any of your other children    12:51:57
3    live with you at any point during your service    12:51:59
4    as trustee or mayor?                  12:52:01
5         A.  Yes.            12:52:02
6         Q.  Which children?              12:52:03
7         A.  All of them.          12:52:04
8         MR. NOVIKOFF: Are you just trying    12:52:06
9    to fill up the time until the tape is over?  12:52:07
10        MR. GRAFF: No.          12:52:10
11        MR. NOVIKOFF: Okay.          12:52:12
12        Q.  During what period of time did Mike    12:52:12
13   Loeffler live with you?            12:52:14
14        A.  On and off, most of his life.    12:52:16
15        MR. GRAFF: I will ask the      12:52:32
16   court reporter to please mark as        12:52:32
17   Exhibit Loeffler 7 a one-page document      12:52:34
18   produced by Ocean Beach bearing Bates      12:52:36
19   number 3780.              12:52:38
20        (Loeffler Exhibit 7, handwritten    12:52:41
21   document, Bates stamped 003780, marked for  12:52:41
22   identification.)            12:53:01
23        MR. NOVIKOFF: Is there a question?  12:53:01
24        MR. GRAFF: Yes.          12:53:03
25        Q.  When you have a chance to look at    12:53:03
```

```
1              Loeffler
2    the document, can you identify it, please,    12:53:05
3    Mayor Loeffler.            12:53:08
4         (Document review.)          12:53:15
5         Q.  Can you identify the document?    12:53:42
6         A.  It's a change of duty assignment    12:53:43
7    that I penned on March 27th, 2007.        12:53:46
8         Q.  And was this document that you    12:53:50
9    penned originally only one page?        12:53:54
10        A.  Yes.            12:53:56
11        Q.  Why did you pen this document at    12:54:00
12   this time, at that time, March 27th, '07?    12:54:05
13        MR. NOVIKOFF: Other than what's    12:54:06
14   already set forth in this document?      12:54:08
15        MR. GRAFF: Yes.          12:54:09
16        MR. NOVIKOFF: Okay.          12:54:10
17        Q.  What prompted you to pen this    12:54:10
18   document?              12:54:12
19        A.  Advice of counsel.        12:54:12
20        Q.  And there is five numbered items    12:54:14
21   towards the bottom of the document.  Are those    12:54:18
22   items that you drafted on the advice of    12:54:19
23   counsel?              12:54:23
24        A.  Yes.            12:54:23
25        Q.  Did counsel speak to you on the    12:54:24
```

```
1              Loeffler
2    phone as you were drafting it?        12:54:27
3         MR. NOVIKOFF: Objection. Yeah, no,  12:54:28
4    no, that's -- no.        12:54:33
5         Q.  Number 5 --            12:54:38
6         MR. GRAFF: You are going to      12:54:40
7    instruct the witness not to answer?      12:54:40
8         MR. NOVIKOFF: On that one, yes.    12:54:41
9         MR. GRAFF: Okay.          12:54:41
10        Q.  Number 5: "The uniform of the day    12:54:42
11   will be proper casual attire."  What is proper    12:54:43
12   casual attire, as stated in this document that    12:54:46
13   you drafted?              12:54:48
14        A.  Non-uniform.          12:54:49
15        Q.  And number 3 says: "Turn in any key    12:54:50
16   in your possession to any Police Department    12:55:03
17   vehicles and facilities."  To your knowledge,    12:55:05
18   did --              12:55:07
19        MR. NOVIKOFF: Number 3, okay.      12:55:08
20        Q.  Did George Hesse ever turn in keys    12:55:09
21   as stated in this paragraph, in this number?    12:55:12
22        A.  Yes, he did.          12:55:14
23        Q.  And what keys did he have that he    12:55:15
24   turned in at that time?            12:55:18
25        MR. NOVIKOFF: You mean whether they    12:55:20
```

```
1              Loeffler
2    were metal or carbon or --          12:55:22
3         MR. GRAFF: What were they keys to?    12:55:24
4         MR. NOVIKOFF: Oh, okay.        12:55:25
5         A.  I believe he had copies of all the    12:55:25
6    keys for the Police Department and the      12:55:27
7    vehicles.              12:55:29
8         Q.  And was -- I take it the handwritten    12:55:29
9    version is not what was presented to George    12:55:36
10   Hesse?              12:55:38
11        MR. NOVIKOFF: Why do you take that?  12:55:38
12   Why don't you just ask him the question.    12:55:40
13        Q.  Was this handwritten version ever    12:55:41
14   presented to George Hesse?          12:55:43
15        A.  I believe it was. I believe it may    12:55:46
16   have been typed as well.          12:55:49
17        Q.  I, again, don't want to make this a    12:55:50
18   memory game.  I am going to ask --      12:55:52
19        A.  Then what are you playing around    12:55:54
20   here for?            12:55:56
21        MR. NOVIKOFF: I mean, if you have    12:55:56
22   the written memo, then show him the written    12:55:57
23   memo.              12:55:59
24        MR. GRAFF: Counsel, they could have    12:56:00
25   both been given to George Hesse.      12:56:01
```

9e28f7aa-4e93-4641-9524-8529961356c8

Page 177

1          Loeffler
2          MR. NOVIKOFF:  Then you should ask   12:56:03
3   that question instead of saying "I take   12:56:04
4   it."                               12:56:06
5          MR. GRAFF:  I'd like to ask the   12:56:08
6   court reporter to please mark as        12:56:10
7   Exhibit Loeffler 8 a one-page document   12:56:11
8   bearing Bates number 3778 produced by Ocean 12:56:13
9   Beach.                             12:56:16
10       (Loeffler Exhibit 8, memo dated   12:56:18
11  March 26, 2007, Bates stamped 003778,   12:56:18
12  marked for identification.)          12:56:18
13       Q.  Mayor Loeffler, when you have had a  12:56:39
14  chance to review the document marked Loeffler  12:56:41
15  8, can you tell me if you can identify the  12:56:44
16  document.                          12:56:47
17       MR. NOVIKOFF:  He is just giving you  12:56:47
18  that document.  If he wants you to compare  12:56:57
19  it, he will.                       12:56:59
20       (Document review.)             12:57:21
21       A.  I have read it.             12:57:21
22       Q.  Can you identify the document,     12:57:22
23  please?                            12:57:24
24       A.  It's a document that's dated March  12:57:24
25  26, 2007 from myself to George Hesse signed by  12:57:27

Page 178

1          Loeffler
2   me and it's signed by George Hesse, 3-28-07.  12:57:31
3       Q.  And who typed the document?        12:57:35
4       A.  I don't see the person's initials  12:57:37
5   that typed it, but I didn't type it.  One of  12:57:43
6   the clerical person in the office typed it.  12:57:45
7       Q.  If I could ask you to compare       12:57:47
8   Loeffler 7 to Loeffler 8 for a moment, Loeffler  12:57:50
9   7 ends at the bottom with bullet number 5.  12:57:52
10  Loeffler 8 continues through bullet 8.  Did you  12:57:56
11  ever handwrite bullets 6 through 8 that appear  12:58:00
12  on Loeffler 8?                     12:58:04
13      A.  I don't know.  I don't recall.   12:58:05
14      Q.  Do you know who was responsible for  12:58:07
15  introducing numbers 6 through 8 into         12:58:10
16  Loeffler 8?                        12:58:12
17      A.  I was.                      12:58:13
18      Q.  You were?                    12:58:13
19      A.  Sure.                       12:58:14
20      Q.  Was that also at the advice of      12:58:14
21  counsel?                           12:58:16
22      A.  Absolutely.                  12:58:16
23      THE VIDEOGRAPHER:  Counselors, now   12:58:20
24  it's five minutes to the end.           12:58:21
25      Q.  Number 6 on the typewritten version:  12:58:24

Page 179

1          Loeffler
2   "You shall refrain from any activities which  12:58:27
3   may cause you to interact with members of the  12:58:30
4   general public pertaining to police functions  12:58:32
5   or duties."                        12:58:34
6          Can you explain what you meant by   12:58:34
7   "pertaining to police functions or duties"?  12:58:40
8       A.  Taking police action.         12:58:42
9       Q.  Number 8 states:  "No verbal or    12:58:55
10  written communication shall be made with     12:58:58
11  reference to the police function of the      12:58:59
12  department or any other information pertaining  12:59:00
13  to the operation or policies of the Village of  12:59:02
14  Ocean Beach without first obtaining board    12:59:05
15  approval."                         12:59:07
16       To your knowledge, has George Hesse   12:59:08
17  ever obtained board approval to undertake     12:59:10
18  verbal or written communications as set forth  12:59:13
19  in this paragraph?                 12:59:15
20       MR. NOVIKOFF:  Objection.          12:59:16
21  Foundation.  You didn't establish that       12:59:17
22  George Hesse ever made the request to the    12:59:19
23  board for the board to give approval.        12:59:21
24  Objection.                         12:59:25
25       A.  I don't believe he ever applied for  12:59:26

Page 180

1          Loeffler
2   permission.                        12:59:30
3       Q.  To your knowledge, has George Hesse  12:59:31
4   adhered to all the terms of this modified duty  12:59:33
5   statement 1 through 8?             12:59:37
6       A.  Yes.                        12:59:38
7       Q.  Are the terms of this statement     12:59:39
8   still in effect?                   12:59:40
9       A.  Yes.                        12:59:41
10      Q.  In your handwritten version,       12:59:43
11  Loeffler 7, the memo is addressed to Deputy  12:59:44
12  Police Chief George Hesse.  The typewritten  12:59:47
13  version, Loeffler 8, is addressed to George  12:59:49
14  Hesse.                             12:59:52
15       Do you know why the typewritten      12:59:53
16  version is not identical to your handwritten  12:59:54
17  version in that respect?           12:59:56
18      MR. NOVIKOFF:  If it's on advice of  12:59:57
19  counsel, just say "advice of counsel."      12:59:59
20      A.  It's on advice of counsel.      13:00:01
21      Q.  Did you have any discussions with  13:00:04
22  Mary Anne Minerva concerning Loeffler 7 or  13:00:06
23  Loeffler 8?                        13:00:09
24      MR. NOVIKOFF:  Any issue pertaining  13:00:10
25  to it or the actual formation of it?        13:00:11

45  (Pages 177 to 180)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 181

```
1              Loeffler
2        MR. GRAFF:  The documents.  Either      13:00:14
3   of these specific texts.                     13:00:15
4        MR. NOVIKOFF:  So is the question to    13:00:18
5   the mayor did he ever have a communication   13:00:18
6   with Mary Anne Minerva concerning the        13:00:21
7   drafting of this document as opposed to the  13:00:23
8   issues that may have been presented in this  13:00:27
9   document.                                    13:00:29
10       MR. GRAFF:  If that would help the      13:00:29
11  witness, yes, concerning the drafting of     13:00:31
12  either of these two documents.               13:00:33
13  A.  I drafted the document.                  13:00:34
14       Q.  Did you have any communications with 13:00:35
15  Mary Anne Minerva in the course of drafting the 13:00:37
16  document?                                    13:00:39
17  A.  I did not.                               13:00:39
18       Q.  How did you communicate bullets 6   13:00:41
19  through 8 to whoever it is who typed the     13:00:43
20  document?                                    13:00:46
21  A.  I don't recall.                          13:00:46
22       Q.  On Loeffler 8 right underneath the  13:01:13
23  date it states:  "As of 0000 hour March 27,  13:01:15
24  2007 until further notice your assignment will 13:01:22
25  be changed from active to modified duty."    13:01:24
```

Page 182

```
1              Loeffler
2        MR. NOVIKOFF:  Yes.                     13:01:31
3        Q.  What, if anything, would prompt you 13:01:38
4   to provide further notice with respect to this 13:01:40
5   item to George Hesse?                        13:01:42
6        MR. NOVIKOFF:  Objection.  Form.        13:01:44
7   A.  Ask -- would you repeat the question     13:01:49
8   for me.  I'm not quite grasping it.          13:01:54
9        Q.  Why would you give further notice to 13:01:56
10  George Hesse that would alter his modified duty 13:01:58
11  statement?                                   13:02:02
12  A.  No, it says "and until further           13:02:02
13  notice."                                     13:02:04
14       Q.  Right.  Were you contemplating any  13:02:04
15  circumstances that would lead you to provide 13:02:06
16  further notice in the future?                13:02:08
17       MR. NOVIKOFF:  It's a yes-or-no         13:02:10
18  question.                                    13:02:11
19  A.  No.                                      13:02:12
20       THE VIDEOGRAPHER:  Counselors, we       13:02:16
21  are at the end of the tape.                  13:02:17
22       MR. GRAFF:  Okay, so let's go off       13:02:18
23  the record, please.                          13:02:20
24       THE VIDEOGRAPHER:  We are now going     13:02:21
25  off the record.  The time is 1:02 p.m.       13:02:22
```

Page 183

```
1              Loeffler
2        (Recess was taken from 1:02 to          13:02:25
3   1:13.)                                       13:02:25
4        THE VIDEOGRAPHER:  We are back on       13:11:26
5   the record.  The time is 1:13 p.m.  This is  13:12:57
6   the beginning of the tape labeled number 3.  13:13:00
7   BY MR. GRAFF:                                13:13:03
8        Q.  Mayor Loeffler, if I could ask you  13:13:04
9   to please turn your attention back to        13:13:05
10  Exhibit Loeffler 8, the very last paragraph, 13:13:08
11  "please sign the original of this            13:13:11
12  correspondence and return it to the Village  13:13:12
13  office within 48 hours after receipt."       13:13:14
14       Would you mind reading the very next    13:13:19
15  sentence.  I'm not sure if I can see all the 13:13:22
16  words.                                       13:13:24
17  A.  "You accept" -- "your acceptance of      13:13:24
18  these conditions of modified stature are     13:13:26
19  required to maintain your employment.  All   13:13:29
20  conditions are subject to change and review by 13:13:30
21  the Village, by the board of Trustees, and are 13:13:32
22  not to be viewed as an employment contract." 13:13:35
23       Q.  Okay.                               13:13:37
24       And have the conditions set forth in    13:13:41
25  this document been changed by the Board of   13:13:43
```

Page 184

```
1              Loeffler
2   Trustees since March 26, 2007?               13:13:46
3   A.  No.                                      13:13:48
4        Q.  And when it states that "your       13:13:49
5   acceptance of these conditions of modified   13:13:52
6   stature are required to maintain your        13:13:54
7   employment," does that mean to Mr. Hesse's   13:13:57
8   employment would end if he were to violate any 13:13:59
9   of these terms?                              13:14:02
10       MR. NOVIKOFF:  Objection.  Calls for    13:14:03
11  speculation.  Calls for possibly a legal     13:14:04
12  conclusion.                                  13:14:07
13       If you can answer it, you can answer    13:14:07
14  it.                                          13:14:09
15  A.  If -- I don't understand exactly.        13:14:10
16  What are you asking me?                      13:14:15
17       Q.  What would the consequences be, if  13:14:16
18  any, if George Hesse were to violate the terms 13:14:19
19  of this document?                            13:14:19
20       MR. NOVIKOFF:  Note my objection.       13:14:20
21  For example, are you asking if George Hesse  13:14:21
22  came one day with his police shirt on        13:14:23
23  instead of proper casual attire, what would  13:14:25
24  be the consequences?                         13:14:28
25       Q.  Let's ask about that specifically,  13:14:29
```

46 (Pages 181 to 184)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 185

```
1              Loeffler
2    sure.                        13:14:31
3         What if George Hesse failed to      13:14:32
4    comply with the uniform of the day proper   13:14:34
5    casual attire, what, if any, commences would   13:14:36
6    there be?                      13:14:38
7         MR. NOVIKOFF: Note my objection.   13:14:39
8    Calls for speculation.              13:14:40
9         You can answer.              13:14:41
10   A.   I'd send him home to change.       13:14:42
11        Q.   And what about number 6, what, if   13:14:46
12   any, consequences would there be if George   13:14:50
13   Hesse were to interact with members of the   13:14:52
14   general public pertaining to police functions   13:14:54
15   or duties?                     13:14:57
16        MR. NOVIKOFF: Note my objection.   13:14:57
17   A.   I would remind him to refrain from   13:14:58
18   that, since he has agreed to it.        13:15:00
19        Q.   What about number 8?        13:15:02
20        MR. NOVIKOFF: Calls for         13:15:05
21   speculation.                   13:15:06
22        Q.   Okay. "No verbal or written    13:15:07
23   communication shall be made with reference to   13:15:09
24   police function of the department or any other   13:15:11
25   information pertaining to the operations or   13:15:12
```

Page 186

```
1              Loeffler
2    policies of the Village of Ocean Beach."    13:15:14
3         MR. NOVIKOFF: Calls for         13:15:16
4    speculation.                   13:15:17
5         Q.   What, if any, consequences would   13:15:17
6    there be if George Hesse were to violate that?   13:15:19
7         MR. NOVIKOFF: Note my objection.   13:15:21
8    Calls for speculation. Calls for a legal   13:15:22
9    conclusion.                    13:15:24
10   A.   Until that happens I would have a   13:15:25
11   hard time telling you what would happen.   13:15:27
12        Q.   And as far as you know, George Hesse   13:15:28
13   has not violated any of these conditions 1   13:15:30
14   through 8?                     13:15:32
15        MR. NOVIKOFF: Asked and answered.   13:15:33
16        You can answer again.          13:15:33
17   A.   That's correct.              13:15:35
18        MR. GRAFF: I am going to ask the   13:15:53
19   court reporter to mark as             13:15:54
20   Exhibit Loeffler 9 a one-page document    13:15:55
21   produced by Ocean Beach bearing Bates    13:15:57
22   number 5875.                   13:15:59
23        (Loeffler Exhibit 9, Ratification   13:16:06
24   and Approval of Personnel, Bates stamped   13:16:06
25   005875, marked for identification.)      13:16:20
```

Page 187

```
1              Loeffler
2         Q.   Mayor Loeffler, when Mr. Novikoff   13:16:20
3    finishes examining and you have had a chance to   13:16:23
4    review the document, could you tell me, please,   13:16:25
5    if you can identify it.             13:16:27
6         MR. NOVIKOFF: Note for the record   13:16:28
7    that this is apparently a page 5 of a    13:16:29
8    document.                     13:16:32
9         You can answer the question as posed   13:16:34
10   now.                        13:16:36
11        MR. GRAFF: Before you get to that   13:16:40
12   question, I'd like to, just for clarity   13:16:41
13   sake, call for the production of any pages   13:16:44
14   of any of the meeting minutes that were   13:16:46
15   produced to us as single pages or without   13:16:48
16   all pages.                     13:16:52
17        MR. NOVIKOFF: I am not about to go   13:16:53
18   through our entire production to ascertain   13:16:54
19   what is complete or not complete. You tell   13:16:57
20   me what you want and I will take it under   13:16:59
21   advisement.                    13:17:01
22 RQ      MR. GRAFF: Sure. I want all the   13:17:02
23   pages of the document that's been marked as   13:17:04
24   Loeffler 9, all the pages of the document   13:17:06
25   that's been marked as Loeffler 3.        13:17:09
```

Page 188

```
1              Loeffler
2         MR. NOVIKOFF: Take it under       13:17:11
3    advisement.                    13:17:12
4         (Document review.)            13:17:48
5    A.   Yes.                      13:17:48
6         Q.   Can you identify this document,   13:17:49
7    please?                       13:17:50
8    A.   It purports to be page 5 of the    13:17:50
9    typed minutes of a Village board meeting.   13:17:55
10        Q.   Have you seen this document before?   13:17:57
11        MR. NOVIKOFF: This one particular   13:17:58
12   page?                        13:18:00
13        MR. GRAFF: Yes.              13:18:00
14        MR. NOVIKOFF: If you can answer it,   13:18:01
15   answer it.                     13:18:03
16   A.   I'm sure I have.             13:18:04
17        Q.   And when you saw it, did it have the   13:18:05
18   handwritten notations in the left-hand margin?   13:18:09
19   A.   I don't believe it did.          13:18:11
20        Q.   Can you identify the handwriting?   13:18:15
21   A.   No, I can't.               13:18:18
22        Q.   Can you make out any of the words   13:18:20
23   that are in the margin there?          13:18:23
24   A.   It says "Kara Arta" and then it says   13:18:25
25   "Arta." They are both employees of the Village   13:18:28
```

TSG Reporting – Worldwide   877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 189

```
 1              Loeffler
 2  of Ocean Beach.                    13:18:31
 3      Q.  Are those two different people?   13:18:31
 4      A.  Yes.                   13:18:33
 5      Q.  Kara and Arta?            13:18:33
 6      A.  Yes.                   13:18:34
 7      Q.  Who is Kara?              13:18:35
 8      A.  Kara is a clerk in the office.    13:18:35
 9      Q.  And what is Kara's full name?    13:18:39
10      A.  Kara McKenna.              13:18:41
11      Q.  And what is Arta's full name?    13:18:46
12      A.  Wejien.  It's W-E-J --I can get the  13:18:48
13  correct spelling for you.  W-E-J-E-N-I-N or   13:18:56
14  something, I guess.               13:19:00
15      Q.  And what is Arta's position, Arta  13:19:01
16  Wejien?                       13:19:04
17      A.  She is the deputy treasurer.  Deputy  13:19:05
18  treasurer.  Accounts payable clerk too.   13:19:10
19      Q.  At the very top of this page of the  13:19:24
20  document:  "Ratification approval of personnel,  13:19:26
21  Trustee Mallott moved as follows, whereas   13:19:29
22  Mary Anne Minerva, Village administrator, has  13:19:31
23  provided a report to the Board of Trustees   13:19:33
24  detailing and listing new hires, has requested  13:19:36
25  ratification and approval by the Board of   13:19:39
```

Page 190

```
 1              Loeffler
 2  Trustees for said new hires."         13:19:41
 3          Mayor Loeffler, do you know what the  13:19:43
 4  report provided by Mary Anne Minerva as   13:19:45
 5  referenced in this document is?       13:19:47
 6      A.  No, I don't.               13:19:49
 7      Q.  Do you recall Mary Anne Minerva   13:19:55
 8  delivering any kind of report with respect to  13:19:57
 9  this matter?                   13:20:00
10      A.  I don't recall, no.           13:20:01
11      Q.  The new hires that are identified   13:20:02
12  here, Trosko, Paul OBPD, F/T; underneath that,  13:20:08
13  Foti, Francis OBPD, F/T, are those the   13:20:13
14  full-time officers that were hired that were   13:20:18
15  discussed -- the hiring of which was discussed  13:20:20
16  at your first meeting with Mr. Schneider?   13:20:22
17      A.  No.  Let me correct myself.  It --  13:20:25
18  I'm not sure if they -- these gentlemen were   13:20:43
19  part-time employees who became full-time    13:20:48
20  employees.                    13:20:50
21      Q.  And did they become full-time    13:20:51
22  employees at or around the date of the    13:20:53
23  document, January 27th, '07?         13:20:57
24      A.  Yes, they did.              13:20:58
25      Q.  And do you know why they were made  13:20:59
```

Page 191

```
 1              Loeffler
 2  full-time employees at that time?       13:21:03
 3      A.  Because of the direction that I    13:21:05
 4  wanted the Police Department to go, to hire   13:21:13
 5  full-time employees instead of using part-time  13:21:15
 6  and seasonal employees.             13:21:17
 7      Q.  And did your meeting with      13:21:18
 8  Mr. Schneider take place before or after   13:21:20
 9  January 27th, 2007, the date of this document?  13:21:21
10      A.  Before.                  13:21:26
11      Q.  So was the hiring of these two    13:21:28
12  individuals as full-time officers in compliance  13:21:31
13  with whatever requirements were communicated to  13:21:34
14  you by Mr. Schneider?              13:21:36
15      A.  Yes, they were.              13:21:37
16      Q.  And as of the date of this document,  13:21:39
17  did you know who Paul Trosko was?       13:21:41
18      A.  Yes.                   13:21:44
19      Q.  In what context did you first meet   13:21:45
20  Paul Trosko?                   13:21:49
21      A.  He was a part-time police officer in  13:21:50
22  the Village of Ocean Beach.          13:21:52
23      Q.  And you met him during his      13:21:53
24  employment as a police officer?        13:21:55
25      A.  Yes.                   13:21:56
```

Page 192

```
 1              Loeffler
 2      Q.  What about Francis Foti?        13:21:56
 3      A.  The same.                13:21:58
 4      Q.  You also met him --           13:22:01
 5      A.  As a part-time police officer.     13:22:04
 6      Q.  Underneath that section, the very   13:22:05
 7  next section is adoption of Police Department   13:22:08
 8  rules and procedures.  It says:  "Mayor    13:22:09
 9  Loeffler moved as follows.  Whereas the Village  13:22:11
10  of Ocean Beach has determined that it is in the  13:22:14
11  best interests of the Village to have a written  13:22:16
12  set of rules and procedures for the Ocean Beach  13:22:17
13  Police Department and whereas the Village has   13:22:19
14  undertaken to prepare a set of rules and   13:22:21
15  procedures, now, therefor it is hereby resolved  13:22:23
16  that the Village hereby adopts these submitted   13:22:26
17  Ocean Beach department rules and procedures."   13:22:28
18          Mayor Loeffler, do you know what the  13:22:31
19  rules and procedures referenced in this section  13:22:32
20  are?                       13:22:34
21      A.  Yes, the Ocean Beach Police        13:22:35
22  Department rules and procedures.        13:22:37
23      Q.  And is that the police manual that   13:22:38
24  was issued in 2006?               13:22:40
25      A.  Yes.  Well, it was -- a draft was    13:22:40
```

Page 193

```
1           Loeffler
2    issued in 2006.  It was finalized as of this    13:22:45
3    date.                              13:22:48
4        Q.   And at what point in relation to    13:22:48
5    January 27, 2007 was it distributed to the    13:22:50
6    Ocean Beach Police Department officers?    13:22:53
7        A.   Upon its authorized issuance.    13:22:55
8        Q.   Was there any discussion among the    13:22:58
9    Board of Trustees upon your making of this    13:23:07
10   motion?                          13:23:10
11       MR. NOVIKOFF:  Objection to the    13:23:11
12   form.                          13:23:12
13       A.   There was discussion with the    13:23:15
14   trustees that was carried out in the executive    13:23:18
15   session with the advice of counsel, yes, with    13:23:20
16   reference to this policy manual.    13:23:24
17       Q.   Other than in conversations that    13:23:27
18   took place in the presence of counsel for the    13:23:29
19   purpose of obtaining legal advice, did you have    13:23:31
20   any conversations with any members of the Board    13:23:33
21   of Trustees concerning the adoption of the    13:23:36
22   Police Department manual?    13:23:40
23       A.   Yes.                    13:23:40
24       Q.   And which members of the Board of    13:23:41
25   Trustees did you discuss that with?    13:23:43
```

Page 194

```
1           Loeffler
2        A.   All of them.              13:23:44
3        Q.   Individually?            13:23:44
4        A.   Together.  At the board meeting.    13:23:45
5        Q.   And was that in executive session or    13:23:49
6    general session?                  13:23:51
7        A.   No, we discussed this in public.    13:23:52
8        Q.   And what was discussed in public?    13:23:53
9        A.   I expressed my -- the need that I    13:23:55
10   felt that the Police Department needed to have    13:23:58
11   a written policy manual in place and that this    13:24:01
12   had taken a year to develop it and it was now    13:24:04
13   in the final stages, it had been reviewed, it    13:24:07
14   had been put into draft form, it had been    13:24:10
15   rereviewed, it had been updated, and it was in    13:24:12
16   a final document presentation form and at this    13:24:15
17   time I presented it to the board to be    13:24:18
18   finalized.                      13:24:20
19       Q.   Does the substance of the Police    13:24:21
20   Department -- if I say "manual," do we know    13:24:34
21   what --                          13:24:36
22       A.   We know it was filed.    13:24:37
23       Q.   Okay.  Does the substance of the    13:24:38
24   Police Department manual relate in any way to    13:24:39
25   any requirements of the Civil Service    13:24:42
```

Page 195

```
1           Loeffler
2    Department with respect to the Ocean Beach    13:24:45
3    Police Department?                13:24:46
4        A.   No, it does not.          13:24:46
5        Q.   Is the manual -- when it was    13:24:47
6    distributed to Ocean Beach police officers, was    13:24:52
7    it bound?                        13:24:54
8        A.   Yes.                    13:24:55
9        Q.   So was it sent to a printer and    13:24:55
10   published in a bound book-like form?    13:25:00
11       MR. NOVIKOFF:  Objection to the form    13:25:03
12   of the question.                  13:25:05
13       A.   It's in a ring binder form.    13:25:05
14       Q.   Binder.                13:25:05
15 RQ       MR. GRAFF:  I'd also like to call    13:25:07
16   for the production of the complete manual.    13:25:09
17       MR. NOVIKOFF:  Take it under    13:25:11
18   advisement.                      13:25:11
19       Q.   Did you review any of the specific    13:25:16
20   policies set forth in the police manual with    13:25:19
21   any of the members of the Village board of    13:25:22
22   Trustees?                        13:25:26
23       A.   No.                    13:25:26
24       Q.   Other than yourself, were any    13:25:29
25   members of the Board of Trustees -- did any    13:25:32
```

Page 196

```
1           Loeffler
2    members of the Board of Trustees contribute to    13:25:36
3    the drafting or f authorship of the police    13:25:38
4    manual?                          13:25:41
5        MR. NOVIKOFF:  Objection to form.    13:25:41
6        A.   I believe members of the board    13:25:42
7    expressed concern and jubilance in the fact    13:25:50
8    that we were taking a huge step into bringing    13:25:54
9    the Police Department to a level that allowed    13:25:58
10   for some accountability in the actions of    13:26:00
11   police officers and that -- do you want me to    13:26:04
12   finish or do you want to interrupt me?    13:26:07
13       Q.   Please.                13:26:08
14       A.   And I believe they reviewed the    13:26:09
15   policy manual prior to its adoption and were    13:26:12
16   grateful for my efforts and the efforts of the    13:26:16
17   Police Department and the officers for    13:26:18
18   producing such a document.          13:26:19
19       Q.   Are you done?            13:26:21
20       A.   Yes, I'm done.            13:26:22
21       Q.   I may have misheard earlier on.  Did    13:26:23
22   you say concern and jubilance?    13:26:26
23       A.   Yes.  Concern that we hadn't done    13:26:29
24   this before.                    13:26:31
25       MR. GRAFF:  Okay.  You can put aside    13:26:47
```

49 (Pages 193 to 196)

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2      this document.  Thank you.          13:26:48
3          MR. NOVIKOFF:  It's already been put  13:26:51
4      aside.                              13:26:52
5          MR. GRAFF:  Excuse me?          13:26:52
6          MR. NOVIKOFF:  It's already been put  13:26:52
7      aside.                              13:26:52
8          MR. GRAFF:  I am going to ask the    13:26:57
9      court reporter to please mark as        13:26:59
10     Exhibit Loeffler 10 a one-page document   13:27:03
11     produced to us by Ocean Beach bearing Bates  13:27:06
12     number 9809.                        13:27:08
13         (Loeffler Exhibit 10, Accept the NYS  13:27:11
14     Department of State's Proposed Responses on  13:27:11
15     the Local Waterfront Revitalization   13:27:11
16     Program, Bates stamped 009809, marked for  13:27:11
17     identification.)                     13:27:11
18         MR. NOVIKOFF:  And do you want the    13:27:34
19     witness to look at this document?       13:27:36
20     **Q.  Yes.  As with all of the documents,**   13:27:37
21     **if you could take as much time to review it and**  13:27:40
22     **then let me know if you recognize it.**        13:27:42
23         MR. NOVIKOFF:  And while the witness   13:27:43
24     is looking at it, just let the record     13:27:44
25     reflect that this is purportedly a page 3   13:27:46

Loeffler

1
2      of a document.                      13:27:49
3   RQ     MR. GRAFF:  And we will call for the  13:27:51
4      production of any other pages of this    13:27:52
5      document that exist.                13:27:54
6          MR. NOVIKOFF:  Take it under       13:27:55
7      advisement.                         13:27:56
8      **Q.  Mayor Loeffler, can you identify the**  13:28:06
9      **document?**                           13:28:08
10     A.  It appears to be page 3 of a       13:28:09
11     production of the minutes of the Village board  13:28:15
12     meeting that occurred on June 23rd, 2007.   13:28:17
13     **Q.  If I could direct your attention to**   13:28:21
14     **the last subheading on the document, Adoption**  13:28:24
15     **of Police Department Rules and Procedures**   13:28:27
16     **Update, "Trustee Mallott moved as follows."**   13:28:28
17     **Do you recall anything of the events**   13:28:31
18     **that are described in the following paragraph**  13:28:35
19     **there?**                              13:28:37
20         MR. NOVIKOFF:  Oh, you want him to    13:28:37
21     read the events of what transpired after   13:28:39
22     Trustee Mallott moved as follows --     13:28:42
23         MR. GRAFF:  Yes.                 13:28:42
24         MR. NOVIKOFF:  -- and tell you if he  13:28:43
25     recalls any of it?                  13:28:44

Loeffler

1
2          MR. GRAFF:  That's exactly what I    13:28:44
3      asked.                              13:28:46
4          MR. NOVIKOFF:  Sure.             13:28:46
5      Go ahead.                           13:28:47
6      (Document review.)                  13:28:59
7      A.  Okay.                           13:28:59
8      **Q.  Do you recall any of the events that**  13:29:08
9      **are described here?**                  13:29:10
10     A.  Yes, I do.                      13:29:11
11     **Q.  One of things that's described here**  13:29:13
12     **is an update that had been prepared pertaining**  13:29:19
13     **to domestic incidents and domestic violence.**  13:29:22
14     **Do you recall what that refers to?**   13:29:25
15     A.  Yes, I do.                      13:29:26
16     **Q.  What does that refer to?**         13:29:27
17     A.  It refers to the handling of       13:29:27
18     domestic incident and domestic violence calls  13:29:28
19     which was updated in the policy manual.  The  13:29:31
20     policy manual is a living, breathing document  13:29:33
21     that is constantly updated as circumstances   13:29:35
22     require that to be.  If there was a shortfall  13:29:38
23     in the document and we notice it, we make a  13:29:41
24     modification to it.  The document then is   13:29:44
25     presented to the Village board as an addendum  13:29:46

Loeffler

1
2      or an amendment to the policy manual, it's   13:29:49
3      inserted, and then a copy of that addendum is  13:29:52
4      given to all the people that signed for it, all  13:29:55
5      the officers that signed for that document to  13:29:58
6      be inserted into their copy of the policy   13:29:59
7      manual.                             13:30:01
8      **Q.  And who prepared this update that's**  13:30:02
9      **referenced here?**                    13:30:04
10     A.  I believe it may have been -- I     13:30:06
11     don't know whether it was George Hesse or Paul  13:30:14
12     Trosko.                             13:30:16
13     **Q.  Did you direct either of those**   13:30:17
14     **people to prepare this update?**        13:30:19
15     A.  What I directed them to do was the   13:30:21
16     Ocean Beach Police Department is attempting to  13:30:23
17     become an accredited police agency.  It's a  13:30:25
18     defined term in the State of New York.  And in  13:30:29
19     doing so there are certain requirements that  13:30:32
20     need to be done.  One of them is to constantly  13:30:34
21     update and keep the policy manual in conformity  13:30:37
22     with state law and provisions of the law and  13:30:40
23     that's what they do.  From time to time this  13:30:43
24     has been -- this is not the only update, I   13:30:44
25     believe, that's been done to the manual.   13:30:46

9e28f7aa-4e93-4641-9524-8529961356c8

Page 201

```
 1            Loeffler
 2     Q.  And with respect to this particular   13:30:48
 3  update, was it updating an existing section   13:30:50
 4  pertaining to domestic incidents and domestic   13:30:53
 5  violence, or was that a new section?   13:30:56
 6     A.  I believe it was updating an   13:31:00
 7  existing.                13:31:03
 8     Q.  Was Trustee Mallott involved at all   13:31:04
 9  in this update to the department manual?   13:31:07
10     A.  No.            13:31:11
11     Q.  Do you know why Trustee Mallott made   13:31:11
12  the motion for this update?   13:31:13
13        MR. NOVIKOFF:  Other than wanting to   13:31:15
14  approve it?  I mean, objection to the form.   13:31:16
15     A.  I guess because it was his turn to   13:31:21
16  read.                13:31:23
17     Q.  Let's put aside Loeffler 10.   13:31:28
18        MR. NOVIKOFF:  With pleasure.   13:31:28
19     Q.  Do you recall who determined that   13:31:34
20  that section should be updated?   13:31:35
21     A.  No.            13:31:36
22     Q.  Did you have any discussions with   13:31:37
23  anyone other than Paul Trosko or George Hesse   13:31:42
24  or members of the Board of Trustees concerning   13:31:45
25  this update?            13:31:47
```

Page 202

```
 1            Loeffler
 2     A.  No.            13:31:47
 3     Q.  Did you have any discussion with   13:31:48
 4  members of the Board of Trustees concerning   13:31:50
 5  this update?            13:31:52
 6     A.  Probably not.        13:31:53
 7     Q.  Are you aware of any specific   13:31:57
 8  incidents of domestic abuse or violence that   13:32:03
 9  were handled by the Ocean Beach Police   13:32:07
10  Department during your service as trustee?   13:32:08
11     A.  No, I am not.        13:32:10
12     Q.  What about during your service as   13:32:11
13  mayor?                13:32:14
14     A.  The Ocean Beach Police Department   13:32:14
15  has responded to incidents of domestic violence   13:32:18
16  since I've been mayor from 2006 to the present.   13:32:22
17     Q.  Are you aware of any specific   13:32:24
18  instances?            13:32:26
19     A.  I am not aware of any specific   13:32:27
20  instance.            13:32:28
21        MR. GRAFF:  I am going to ask the   13:32:36
22  court reporter to please mark as   13:32:37
23  Exhibit Loeffler 11 a document produced to   13:32:39
24  us by Ocean Beach bearing Bates numbers   13:32:41
25  2652 through 2661.        13:32:44
```

Page 203

```
 1            Loeffler
 2        (Loeffler Exhibit 12, Section 1:   13:32:47
 3  Discipline/Charges and Specifications,   13:32:47
 4  Bates stamped 2652 through 2661, marked for   13:32:47
 5  identification.)            13:33:09
 6     Q.  Mayor Loeffler, when you have had a   13:33:09
 7  chance to review the document, I am not going   13:33:12
 8  to ask about any specific provisions.  My only   13:33:13
 9  question is if you can tell me what this   13:33:16
10  document is, where it comes from.   13:33:18
11        MR. NOVIKOFF:  So are you asking the   13:33:20
12  witness once I review it to review it   13:33:22
13  himself?                13:33:25
14        MR. GRAFF:  As much as he needs to   13:33:25
15  to tell me if he recognizes it and what it   13:33:27
16  is.                13:33:29
17        MR. NOVIKOFF:  Okay.  You got it.   13:33:29
18  Here you go (handing).  Read away.   13:33:30
19     Q.  Actually, if I could be more   13:33:38
20  specific, I am going to ask now just about the   13:33:40
21  first page of the document, 2652.   13:33:42
22        MR. NOVIKOFF:  So you don't want the   13:33:45
23  witness to review it to see if he   13:33:46
24  recognizes the document?   13:33:47
25     Q.  I am going to start with the first   13:33:48
```

Page 204

```
 1            Loeffler
 2  page of the document.  If you could review the   13:33:50
 3  very first page and tell me if you can -- if   13:33:51
 4  you recognize it.            13:33:53
 5        MR. NOVIKOFF:  Recognize the first   13:33:53
 6  page?                13:33:54
 7        MR. GRAFF:  The first page.   13:33:55
 8        MR. NOVIKOFF:  Independent of the   13:33:55
 9  other eight pages?        13:33:57
10        MR. GRAFF:  Yes.        13:33:58
11     A.  I don't think I can do that.  Right   13:33:59
12  from here I don't -- I would need to review the   13:34:01
13  whole document.            13:34:03
14     Q.  Okay, if you need to review the full   13:34:03
15  document, please do.        13:34:06
16     A.  It's only...        13:34:07
17        (Document review.)        13:34:16
18     Q.  Mayor Loeffler, can you tell me what   13:35:35
19  this document is?        13:35:37
20     A.  I'm not positive, no, I'm not.  Do   13:35:38
21  you want to tell me what it is?   13:35:41
22     Q.  I don't know.  That's why I am   13:35:43
23  asking you.            13:35:44
24     A.  Oh.  It may be --   13:35:45
25        MR. NOVIKOFF:  Don't guess.   13:35:46
```

51  (Pages 201 to 204)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 205

```
 1            Loeffler
 2     A.  I'm not positive without seeing this  13:35:47
 3  in its proper context.                       13:35:49
 4  RQ       MR. GRAFF:  It's like to call for   13:35:51
 5     the production of the balance of whatever 13:35:52
 6     this document came from.                  13:35:53
 7         THE WITNESS:  It's the policy         13:35:55
 8     manual.                                   13:35:56
 9     Q.  Is it possible that this is part of   13:35:56
10  the Police Department policy manual?         13:35:59
11     A.  Yes, it is.                           13:36:00
12         MR. NOVIKOFF:  Objection.             13:36:01
13         You can answer.  Is it possible?      13:36:01
14     A.  Yes, it is.                           13:36:02
15     Q.  Do you recognize any specific page    13:36:03
16  of it as part of the policy manual?          13:36:05
17         MR. NOVIKOFF:  I mean, the question   13:36:07
18  I have, Ari, is you have asked me on behalf  13:36:10
19  of my client to produce the entirety of     13:36:12
20  this document of which the mayor is not      13:36:14
21  absolutely sure what it is and certainly I   13:36:17
22  don't know what it is.  So I will endeavor   13:36:19
23  upon taking your request under advisement    13:36:22
24  to look for something that this may be       13:36:25
25  included in, but I can't tell you that I     13:36:30
```

Page 206

```
 1            Loeffler
 2  would know where to begin to look or my      13:36:32
 3  client would know where to begin to look.    13:36:35
 4         MR. GRAFF:  Okay.  I believe I noted  13:36:37
 5  for the record, but this document was one    13:36:40
 6  produced by Ocean Beach which is why --      13:36:42
 7         MR. NOVIKOFF:  No, I understand       13:36:44
 8  that.  I'm not -- I'm not questioning for a  13:36:45
 9  moment that we produced it, but I can't      13:36:49
10  tell you for certainty right now where this  13:36:52
11  came from, so, I mean, I am going to do      13:36:55
12  what I have to do as I am required under     13:36:58
13  the federal rules, but I think the request   13:37:00
14  is a little bit broad to ask me as counsel   13:37:02
15  to request that my client search for the     13:37:04
16  document in which this document is           13:37:09
17  contained in, but I'll take it under         13:37:11
18  advisement.                                  13:37:13
19     A.  It --                                 13:37:15
20         MR. NOVIKOFF:  Don't guess.  No       13:37:17
21  question pending.  Don't worry.              13:37:19
22     Q.  If you could please say what you had  13:37:19
23  started saying.                              13:37:22
24         MR. NOVIKOFF:  No.  There is no       13:37:22
25  question pending.                            13:37:24
```

Page 207

```
 1            Loeffler
 2         MR. GRAFF:  That's the question.      13:37:25
 3         MR. NOVIKOFF:  Say what you were      13:37:25
 4  going to say?                                13:37:26
 5         MR. GRAFF:  What you had started      13:37:27
 6  saying, yes.                                 13:37:28
 7         MR. NOVIKOFF:  How about if he was    13:37:28
 8  going to say he thought your questions were  13:37:30
 9  foolish, do you want him to say that?        13:37:32
10     Q.  Is that what you were going to say?   13:37:32
11     A.  No.                                   13:37:34
12     Q.  Could you please finish saying what   13:37:35
13  you had started saying?                      13:37:37
14     A.  I was under the impression that this  13:37:38
15  may be part of the policy manual, but I -- not 13:37:40
16  seeing it in this context and reading it, I  13:37:43
17  don't -- I can't be sure of that, but it may 13:37:46
18  be.                                          13:37:49
19     Q.  Okay.  Thank you, Mayor Loeffler.     13:37:49
20  We could put aside Loeffler 11.              13:37:51
21     A.  12.  I'm sorry.  It says 12 on it.    13:37:55
22         MR. GRAFF:  Loeffler 12.  Excuse me.  13:37:57
23         Where is the stamped copy of
24  Loeffler 11?
25         MR. NOVIKOFF:  I do not know.
```

Page 208

```
 1            Loeffler
 2         MR. JEMAL:  I think we skipped one.
 3         THE COURT REPORTER:  Can we go off
 4  the record for a second.
 5         MR. GRAFF:  Yes, please.
 6         THE VIDEOGRAPHER:  Going off the
 7  record.  The time is 1:38 p.m.
 8         (Discussion off the record.)           13:39:11
 9         THE VIDEOGRAPHER:  We are back on      13:39:11
10  the record.  The time is 1:39 p.m.           13:39:18
11         MR. GRAFF:  And to clarify for the    13:39:20
12  record, the last document that had been      13:39:22
13  presented to the witness I had indicated     13:39:24
14  that it should be marked as 11, but it's     13:39:25
15  actually marked Loeffler 12.  It bears       13:39:28
16  Bates numbers 2652 to 2661.                  13:39:30
17         And if I could now ask the court      13:39:34
18  reporter to please mark as Exhibit Loeffler  13:39:35
19  11 a one-page document produced by Ocean     13:39:36
20  Beach bearing Bates number 9810.             13:39:38
21         (Loeffler Exhibit 11, Resolution No.  13:40:02
22  2008-18, Bates stamped 009810, marked for    13:40:02
23  identification.)                             13:40:25
24     Q.  Mayor Loeffler, when you have had a   13:40:25
25  chance to look at the document, could you tell 13:40:26
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

**Loeffler**

1
2   me, please, what the document is?          13:40:28
3       A.   It's a copy of the board resolution    13:40:30
4   2008-18 dated March 8th of 2008 and attested to   13:40:33
5   by Mary Anne Minerva, Village administrator,    13:40:41
6   clerk and treasurer.                13:40:44
7       Q.   The document relates to additional    13:40:45
8   updates to the police manual; is that correct?   13:40:46
9       A.   That's what it -- yes.          13:40:49
10      Q.   Who prepared the updates that are    13:40:49
11  referenced in this document?           13:40:51
12      MR. NOVIKOFF:  Who typed them, who    13:40:53
13  drafted them?                 13:40:55
14      Q.   Who drafted those sections that are   13:40:56
15  updated?                   13:40:57
16      A.   I would imagine they came from --    13:40:58
17  they came from the Police Department.       13:41:07
18      Q.   Which Police Department?        13:41:08
19      A.   Ocean Beach Police Department.      13:41:10
20      Q.   Do you know who specifically at the   13:41:11
21  Ocean Beach Police Department?          13:41:14
22      A.   I don't recall.             13:41:15
23      Q.   Do you recall whether you reviewed   13:41:16
24  these sections before they were updated?     13:41:18
25      A.   Absolutely.              13:41:20

**Loeffler**

1
2       Q.   Do you recall what any of these    13:41:21
3   sections relate to?             13:41:23
4       MR. NOVIKOFF:  As he sits here      13:41:24
5   today?                    13:41:25
6       MR. GRAFF:  Yes.            13:41:25
7       A.   Absolutely not.             13:41:26
8       MR. GRAFF:  Okay, let's put aside    13:41:31
9   Loeffler 11.                 13:41:33
10      Can I ask the videographer what time   13:41:41
11  it is?                    13:41:43
12      THE VIDEOGRAPHER:  It is 1:42 p.m.   13:41:44
13      MR. NOVIKOFF:  Your call.  We can   13:41:47
14  stop now, if you want.            13:41:48
15      MR. GRAFF:  Could I ask the court   13:41:50
16  reporter --                 13:41:52
17      MR. NOVIKOFF:  I think she wanted to  13:41:52
18  stop about an hour ago.           13:41:54
19      MR. GRAFF:  Yes.  Why don't we break  13:41:56
20  for lunch at this point.  The time is 1:42.  13:41:57
21  Counsel, when would you like to resume?    13:42:00
22      MR. NOVIKOFF:  Between 2:30 and    13:42:02
23  2:45.                    13:42:04
24      MR. GRAFF:  Great.           13:42:04
25      THE VIDEOGRAPHER:  Going off the    13:42:05

**Loeffler**

1
2   record.  The time is 1:42 p.m.        13:42:05
3       (Mr. Novikoff exits.)          13:42:07
4       (Lunch recess was taken from 1:42 to   13:42:07
5   2:37.)                    13:42:08
6       THE VIDEOGRAPHER:  We are back on    14:36:05
7   the record.  The time is 2:37 p.m.      14:36:30
8   CONTINUED EXAMINATION BY           14:36:30
9   MR. GRAFF:                  14:36:34
10      Q.   Good afternoon, again, Mayor     14:36:35
11  Loeffler.                  14:36:37
12      A.   Good afternoon.            14:36:37
13      Q.   Prior to the time when Ed Paradiso   14:36:38
14  sustained the injury that led to him going out   14:36:44
15  on disability leave, did you have any knowledge  14:36:46
16  with respect to his performance as police chief  14:36:48
17  in Ocean Beach?              14:36:51
18      MR. WELCH:  Objection.  Form.      14:36:54
19      You can answer.             14:36:55
20      A.   I guess he was doing a pretty good   14:36:56
21  job.                     14:37:03
22      Q.   Did you ever -- as you sit here     14:37:04
23  today, do you have any knowledge with respect   14:37:11
24  to Gary Bosetti's performance as a police     14:37:13
25  officer in Ocean Beach?           14:37:15

**Loeffler**

1
2       A.   No, I don't.              14:37:16
3       Q.   As you sit here today, do you have   14:37:17
4   any knowledge with respect to Richard Bosetti's  14:37:18
5   performance as a police officer in Ocean Beach?  14:37:21
6       A.   No, I don't know.  I do not.       14:37:23
7       Q.   Do you know whether Richard Bosetti  14:37:24
8   was ever disciplined formally or informally for  14:37:26
9   sleeping on the job while on duty as a police   14:37:31
10  officer in Ocean Beach?           14:37:33
11      MR. WELCH:  Objection.  Form.      14:37:34
12      You can answer.             14:37:35
13      A.   Was it Richard or Gary?  One of them  14:37:36
14  was.                     14:37:42
15      Q.   And could you describe the context   14:37:42
16  in which one of them was disciplined for that?   14:37:46
17      MR. WELCH:  Objection.         14:37:49
18      You can answer.             14:37:51
19      A.   One morning I went into the fire    14:37:52
20  hall, which is near the police station, and I   14:37:56
21  thought it was Gary, maybe it was Richie, was   14:38:00
22  lying on the couch watching TV.  Apparently it   14:38:04
23  looked to me like he was sleeping, 9:00 in the   14:38:08
24  morning.  I startled him.  I got the ice out of  14:38:11
25  the ice machine, because I was going to go out   14:38:15

9e28f7aa-4e93-4641-9524-8529961356c8

Page 213

```
 1            Loeffler
 2  fishing, he got up.  Went back to the      14:38:19
 3  Village office.  I told George Hesse to come  14:38:22
 4  over with Officer Bosetti and I explained to  14:38:25
 5  him when he got there that his conduct was    14:38:30
 6  unacceptable and we were having enough problems  14:38:34
 7  in Ocean Beach without having police officers  14:38:36
 8  who were sleeping on the job, which I thought  14:38:37
 9  he was doing, and that if this conduct were to  14:38:41
10  continue, you know, there would be some       14:38:46
11  consequences to it and I told George Hesse at  14:38:49
12  the time that -- of the incident and what      14:38:54
13  happened and he said he would handle it.       14:38:58
14      Q.  And do you have any information with   14:39:00
15  respect to how or whether George Hesse handled  14:39:02
16  that situation after that conversation?        14:39:05
17      A.  I'm not sure what he did.             14:39:07
18      Q.  Do you know how long -- for what      14:39:09
19  period of time following that conversation the  14:39:16
20  Bosetti at issue continued to work as a police  14:39:20
21  officer in Ocean Beach?                        14:39:24
22      A.  No, I don't.  It wasn't a long        14:39:25
23  period of time after that.                     14:39:27
24      Q.  Did the Bosetti at issue indicate     14:39:28
25  why he might have been sleeping at 9 in the    14:39:34
```

Page 214

```
 1            Loeffler
 2  morning that day?                              14:39:36
 3      MR. WELCH:  Object to the form.           14:39:37
 4      You can answer.                            14:39:39
 5      A.  I believe he told me he was just      14:39:42
 6  catching up on the news on the television, he  14:39:45
 7  wasn't really sleeping.  I didn't -- the       14:39:47
 8  answer, to me, didn't portray that he was      14:39:50
 9  catching up on the news.  I thought he was     14:39:52
10  sleeping.                                      14:39:54
11      Q.  Do you know whether there was any     14:39:55
12  event or function involving the Ocean Beach    14:40:01
13  Police Department the day or the night prior to  14:40:03
14  the incident?                                  14:40:06
15      A.  I don't know.                          14:40:08
16      Q.  Do you know whether there was an      14:40:08
17  event in connection with fund-raising for a    14:40:12
18  legal defense fund involving the Ocean Beach   14:40:15
19  Police Department the night before?            14:40:18
20      A.  No, I don't.                           14:40:19
21      Q.  To your knowledge, has the Ocean      14:40:21
22  Beach Police Department ever participated in   14:40:23
23  any fund-raising activities for any legal      14:40:24
24  defense fund that you are aware of?            14:40:28
25      MR. WELCH:  Objection.  Do you have       14:40:30
```

Page 215

```
 1            Loeffler
 2  a time frame?                                  14:40:30
 3      Q.  During the period of your service as  14:40:31
 4  mayor of Ocean Beach.                          14:40:34
 5      A.  There is -- there is a legal defense  14:40:35
 6  fund that's not -- it's not associated with the  14:40:37
 7  Police Department, that was set up to raise    14:40:40
 8  money for the defense of certain police        14:40:42
 9  officers.                                      14:40:45
10      Q.  And was it set up to serve for the    14:40:45
11  defense of certain specific police officers?   14:40:48
12      A.  No.                                    14:40:50
13      Q.  Who administers that fund?             14:40:50
14      A.  I believe George Rehn, who is a CPA,  14:40:53
15  is the administer of that fund.  He has an     14:41:01
16  office in Ocean Beach.                         14:41:04
17      Q.  Do you know when that fund was        14:41:05
18  created?                                       14:41:07
19      A.  '07, I'd say.                          14:41:07
20      Q.  Have you ever contributed to that     14:41:12
21  fund?                                          14:41:14
22      A.  Yes, I have.                           14:41:15
23      Q.  How many different contributions      14:41:17
24  have you made to that fund?                    14:41:20
25      MR. WELCH:  Objection to form.            14:41:21
```

Page 216

```
 1            Loeffler
 2      You can answer.                            14:41:22
 3      A.  Two contributions.                     14:41:24
 4      Q.  And what was the amount of the first  14:41:25
 5  contribution?                                  14:41:27
 6      A.  I am trying to think.  I'd have to     14:41:27
 7  check my checkbook to make sure.               14:41:36
 8      Q.  Could you say whether it was more     14:41:38
 9  than a thousand dollars?                       14:41:40
10      A.  No, it was not more than a thousand   14:41:41
11  dollars.                                       14:41:42
12      Q.  What about the second contribution?   14:41:42
13      A.  Neither one were more than a          14:41:44
14  thousand dollars.                              14:41:45
15      Q.  And do you know who has received      14:41:46
16  funds from the legal defense fund for legal    14:41:48
17  defense?                                       14:41:51
18      A.  No, I don't.                           14:41:52
19      Q.  Do you know whether there is any      14:41:52
20  video surveillance system within the Ocean    14:42:01
21  Beach Police Department facility?              14:42:05
22      MR. WELCH:  Today?  Or at any time?      14:42:06
23      Q.  At any time during your service as    14:42:09
24  mayor.                                         14:42:11
25      MR. WELCH:  As mayor.                     14:42:12
```

54 (Pages 213 to 216)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 217

Loeffler

1
2   A.  Absolutely, yes.                    14:42:14
3       Q.  And what about during your service    14:42:15
4   as trustee?                             14:42:17
5       A.  I don't know.                   14:42:18
6       Q.  Have you ever seen any video       14:42:20
7   surveillance footage recorded by a camera in   14:42:22
8   the Ocean Beach Police Department?        14:42:25
9       A.  Yes, I have.                    14:42:26
10      Q.  And what area of the Police        14:42:27
11  Department was depicted in that video?    14:42:29
12      A.  The station house, the desk area,   14:42:32
13  the cell area and the squad room.         14:42:39
14      Q.  Were you able to determine how many   14:42:41
15  cameras were -- strike that.            14:42:44
16      Why did you review video from the     14:42:52
17  surveillance camera in the Ocean Beach Police   14:42:54
18  Department?                             14:42:57
19      A.  Because I had the Police Department   14:42:57
20  purchase it.                           14:42:59
21      Q.  And why did you have it purchased?   14:42:59
22      A.  Because the equipment that they had   14:43:02
23  prior to this I was told was not functioning   14:43:04
24  properly, so I had to -- I authorized the   14:43:08
25  Police Department to buy all new equipment.   14:43:10

Page 218

Loeffler

1
2       Q.  And when did they -- when did you    14:43:13
3   authorize that?                         14:43:14
4       A.  2006.                          14:43:15
5       Q.  And do you recall any specific      14:43:19
6   conduct that was depicted in the video that you   14:43:21
7   reviewed?                              14:43:25
8       A.  No, I just reviewed its set-up.    14:43:25
9       Q.  Did George Hesse ever show you any   14:43:33
10  video that had been recorded from the      14:43:36
11  surveillance cameras inside the --        14:43:38
12      A.  Yes.                           14:43:38
13      Q.  What video did George Hesse show     14:43:39
14  you?                                   14:43:41
15      A.  I saw some video of -- in one       14:43:41
16  Memorial Day someone stole the memorial wreaths   14:43:46
17  that were delivered to the Village to be put at   14:43:50
18  the memorial site and they had surveillance   14:43:52
19  cameras in the waiting area for the ferry   14:43:56
20  terminal now and those cameras depicted the   14:43:59
21  person stealing those items and I saw that   14:44:04
22  video.                                 14:44:06
23      Q.  Did George Hesse show you any other   14:44:09
24  videos?                                14:44:11
25      A.  No, I haven't seen any other videos.   14:44:11

Page 219

Loeffler

1
2       Q.  Do you have any information at all   14:44:23
3   concerning a video recording that depicts   14:44:24
4   George Hesse in a cell with a detainee?    14:44:27
5       MR. WELCH:  Objection.              14:44:30
6       A.  I've never seen any.            14:44:31
7       Q.  Have you heard anything like that   14:44:33
8   discussed?                             14:44:35
9       A.  I have not.                    14:44:35
10      Q.  Okay.  Do you know who -- strike     14:44:36
11  that.                                  14:44:42
12      A.  Could you speak up just a little   14:44:42
13  bit.                                   14:44:44
14      Q.  Sure.  Do you know a former police   14:44:44
15  officer at Ocean Beach by the name of Dave   14:44:46
16  Gerdon?                                14:44:48
17      A.  Yes.                          14:44:49
18      Q.  And when did you first hear the name   14:44:49
19  Dave Gerdon?                           14:44:53
20      A.  I have known Dave for twenty years.   14:44:54
21      Q.  And is he currently a police officer   14:44:56
22  at Ocean Beach?                        14:44:58
23      A.  No, he is not.                 14:44:59
24      Q.  Do you know when his employment     14:45:00
25  ended?                                 14:45:01

Page 220

Loeffler

1
2       A.  No, I'm not sure.               14:45:02
3       Q.  Do you know why it ended?         14:45:03
4       A.  I believe he was taking materials   14:45:04
5   from the police station, unauthorized materials   14:45:12
6   from the police station.               14:45:15
7       Q.  And what is the basis for that      14:45:16
8   belief?                                14:45:18
9       A.  I believe it was on video         14:45:18
10  surveillance tape.                     14:45:21
11      Q.  Did you ever see that video        14:45:22
12  surveillance tape?                     14:45:23
13      A.  No, I did not.                 14:45:23
14      Q.  Did anyone report to you that that   14:45:24
15  surveillance tape existed?             14:45:26
16      A.  Yes.                          14:45:27
17      Q.  Who reported that to you?         14:45:28
18      A.  George Hesse.                   14:45:28
19      Q.  Did George Hesse communicate to you   14:45:29
20  what the nature of the materials that      14:45:31
21  Mr. Gerdon had taken without authorization   14:45:33
22  were?                                  14:45:34
23      A.  No, he did not.                14:45:34
24      Q.  Did you ask?                    14:45:35
25      A.  No, I did not.                 14:45:35

55 (Pages 217 to 220)

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2    Q.  Do you know whether -- strike that.   14:45:37
3        Did you learn about this incident     14:45:38
4    prior to the ending of Mr. Gerdon's employment   14:45:45
5    as a police officer?               14:45:48
6    A.  Yes.                   14:45:49
7        MR. WELCH:  Objection to the form.   14:45:49
8    A.  Yes.                   14:45:50
9    Q.  Did you direct that any action      14:45:51
10   should be undertaken in response to that     14:45:53
11   incident?                    14:45:55
12   A.  Yes.                   14:45:55
13       MR. WELCH:  Objection to the form.   14:45:55
14   Q.  What action did you direct should be  14:45:57
15   undertaken?                  14:45:59
16   A.  All the videotapes were turned over  14:46:00
17   to the District Attorney's office for their   14:46:02
18   investigation.                  14:46:07
19   Q.  Do you know whether that          14:46:08
20   investigation ever reached any conclusions?   14:46:09
21       MR. WELCH:  Objection.  To your    14:46:11
22   knowledge.                   14:46:12
23   A.  No, I don't know.              14:46:13
24   Q.  Do you know whether any charges were  14:46:14
25   ever brought against Mr. Gerdon?          14:46:15

Loeffler

1
2    A.  I do not.                  14:46:17
3    Q.  Did anyone ever describe to you the   14:46:18
4    nature of the materials that Mr. Gerdon     14:46:20
5    purportedly had taken from the police office?  14:46:22
6    A.  No.                    14:46:24
7    Q.  Did you ever ask anyone?         14:46:25
8    A.  No.                    14:46:27
9    Q.  Did you ever discuss it with anyone?  14:46:27
10   A.  I was instructed not to.          14:46:29
11   Q.  And who instructed you not to?     14:46:30
12   A.  The District Attorney's office.      14:46:32
13   Q.  When did you get that instruction?   14:46:33
14   A.  When the District Attorney said that  14:46:35
15   they were going to conduct the investigation.  14:46:36
16   Q.  And who specifically in the District  14:46:38
17   Attorney's office?               14:46:40
18   A.  It came through our attorney's      14:46:41
19   office from ADA -- what's his name?       14:46:42
20       MR. WELCH:  If you don't recall, you  14:46:42
21   don't recall.                  14:46:49
22   Q.  Could it be ADA Spoda?          14:46:53
23   A.  No.  It was Bian --             14:46:56
24   Q.  Biancavilla?               14:47:10
25   A.  Biancavilla.                14:47:13

Loeffler

1
2    Q.  Earlier today you had indicated that  14:47:21
3    you had communications with members of the news  14:47:23
4    media concerning this lawsuit.  Do you recall  14:47:26
5    what I am referring to?             14:47:28
6        MR. WELCH:  Objection.           14:47:30
7        You can answer.              14:47:31
8    A.  Yes.                    14:47:32
9    Q.  On how many occasions did you speak  14:47:32
10   with the news media about this lawsuit?      14:47:34
11   A.  On one specific day I spoke to      14:47:35
12   two -- I spoke to Newsday and I spoke to the  14:47:44
13   AP.                       14:47:47
14   Q.  And did you speak to them         14:47:47
15   simultaneously?                 14:47:49
16   A.  No.                    14:47:49
17   Q.  Did a reporter from Newsday request  14:47:50
18   to speak to you?                14:47:56
19   A.  Yes.                    14:47:57
20   Q.  And did you have an in-person       14:47:57
21   conversation with the reporter for Newsday?   14:48:01
22   A.  Excuse me?                 14:48:03
23   Q.  Did you have an in-person          14:48:03
24   conversation?                  14:48:05
25   A.  No.                    14:48:05

Loeffler

1
2    Q.  What about the reporter from AP, did  14:48:06
3    that reporter request to speak with you?     14:48:08
4    A.  Yes.                    14:48:09
5    Q.  And did you have an in-person       14:48:10
6    conversation with that reporter?         14:48:12
7    A.  No.                    14:48:12
8    Q.  Do you remember who the reporter was  14:48:13
9    from the AP?                   14:48:14
10   A.  No.                    14:48:15
11   Q.  Do you remember who the reporter was  14:48:15
12   from Newsday?                  14:48:16
13   A.  Sandra Peddie.               14:48:18
14   Q.  In substance, do you recall what was  14:48:23
15   communicated between you and Sandra Peddie on  14:48:25
16   that occasion?                 14:48:28
17   A.  I think the conversation was that we  14:48:30
18   would have no comment on the ongoing litigation  14:48:33
19   and refer them to our attorneys.         14:48:35
20   Q.  Did you ever make any comments to    14:48:37
21   any reporter for Newsday to the effect that you  14:48:40
22   vowed to create a kinder and gentler Ocean    14:48:45
23   Beach police force?               14:48:50
24       MR. WELCH:  Objection to form.      14:48:51
25       You can answer.              14:48:54

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2     A.   I had made that announcement at a      14:48:54
3  board meeting that a Newsday reporter was        14:48:56
4  present at, but I didn't make that presentation  14:48:58
5  to the Newsday reporter.                          14:49:00
6     Q.   Okay.  And what was the substance of   14:49:01
7  that announcement?                               14:49:03
8     A.   It was that the crux of the -- or       14:49:04
9  the demeanor of the Police Department was going  14:49:09
10  to change to more of a service-oriented          14:49:11
11  Police Department as opposed to an               14:49:16
12  enforcement-oriented Police Department.          14:49:19
13     Q.   Did you have any conversations with    14:49:20
14  any members of the Village Board of Trustees     14:49:23
15  concerning the subject of that statement prior   14:49:25
16  to your making it at that meeting?               14:49:29
17     A.   Yes.                                     14:49:30
18     Q.   And who did you discuss it with?       14:49:31
19     A.   With the entire board before I made    14:49:33
20  the comment.                                     14:49:34
21     Q.   And did anyone on the board express    14:49:35
22  any opinions as to the appropriateness of that  14:49:38
23  comment?                                         14:49:40
24     A.   They thought it was appropriate.       14:49:41
25     Q.   Did every member of the board         14:49:42

Loeffler

1
2  express that they thought it was appropriate?    14:49:43
3     A.   Yes.                                      14:49:45
4     Q.   Do you recall whether Trustee Einig    14:49:45
5  has at any point during your service as mayor    14:49:47
6  or trustee expressed any views as to the         14:49:50
7  enforcement practices of the Ocean Beach Police  14:49:53
8  Department?                                       14:49:55
9        MR. WELCH:  Object to the form.            14:49:55
10        Do you understand the question?           14:49:57
11        THE WITNESS:  No, I don't.                14:49:58
12     Q.   Has Trustee Einig ever expressed any   14:49:59
13  views that you are aware of during your service  14:50:01
14  as mayor or trustee concerning the strictness   14:50:09
15  of the enforcement policies of the Ocean Beach  14:50:11
16  Police Department?                               14:50:14
17        MR. WELCH:  Object to the form.           14:50:14
18        You can answer, if you understand         14:50:16
19  it.                                              14:50:17
20     A.   Yes, he has.                             14:50:17
21     Q.   And what has he said about that       14:50:18
22  subject?                                         14:50:20
23     A.   Trustee Einig believes that we         14:50:20
24  should take a stronger position with reference   14:50:23
25  to enforcement than we do at the present time.   14:50:26

Loeffler

1
2     Q.   And has he expressed that view in     14:50:28
3  meetings at the Board of Trustees?               14:50:30
4     A.   Yes, he has.                             14:50:31
5     Q.   Have other members of the Board of    14:50:32
6  Trustees indicated that they share that view?   14:50:34
7        MR. WELCH:  To the extent that these     14:50:36
8  conversations were had in executive session      14:50:38
9  and were -- and counsel was present and          14:50:41
10  counsel was present for the purposes of          14:50:43
11  providing legal advice and legal advice was      14:50:47
12  sought during those conversations, then I        14:50:49
13  would direct you not to answer those             14:50:50
14  questions, but if they weren't, then you         14:50:52
15  can answer.                                       14:50:54
16     A.   He has made it known at public         14:50:55
17  meetings.                                         14:50:58
18     Q.   Have any other members of the Board   14:51:00
19  of Trustees indicated at those meetings that    14:51:02
20  they shared his view?                            14:51:04
21     A.   No.                                      14:51:06
22     Q.   Do you recall having any discussions  14:51:08
23  individually with Trustee Einig about his view  14:51:15
24  on the subject?                                  14:51:18
25     A.   Yes.                                     14:51:19

Loeffler

1
2     Q.   And do you recall in substance what   14:51:19
3  you discussed with Trustee Einig?               14:51:23
4     A.   No, not really.                         14:51:25
5     Q.   Did you share Trustee Einig's view    14:51:27
6  on the subject?                                  14:51:30
7        MR. WELCH:  I am going to object.         14:51:31
8  There is no foundation, and also it's a          14:51:35
9  totally irrelevant line of questioning, but      14:51:38
10  to the extent that you can answer that           14:51:40
11  question, feel free.                             14:51:42
12     A.   I don't share his feelings.            14:51:44
13     Q.   Did you explain ever to Trustee       14:51:46
14  Einig why you did not share his view on that    14:51:49
15  subject?                                         14:51:52
16     A.   Yes.                                     14:51:52
17     Q.   And what did you express?             14:51:52
18     A.   That I don't share his feelings.       14:51:54
19     Q.   Did you give any reasons why?         14:51:55
20     A.   No.                                      14:51:57
21     Q.   Does Trustee Einig still a member of  14:51:58
22  the Board of Trustees at the time that you made  14:52:04
23  the statement that was reported by Newsday at    14:52:06
24  the board meeting concerning a kinder and        14:52:09
25  gentler police force?                            14:52:11

9e28f7aa-4e93-4641-9524-8529961356c8

Page 229

Loeffler

1
2        MR. WELCH  I am going to object to   14:52:12
3    the form.  There has been absolutely no   14:52:14
4    evidence or foundation laid as to when this   14:52:15
5    time frame was, whether he was the mayor or   14:52:16
6    as the trustee.  Can you just establish   14:52:19
7    when the time frame was of this?          14:52:25
8        MR. GRAFF:  Sure.                     14:52:27
9    Q.   When did you make that statement   14:52:27
10   that was reported in Newsday?              14:52:28
11       A.   I don't remember.              14:52:29
12   Q.   What position did you hold at Ocean   14:52:30
13   Beach at the time?                         14:52:32
14       A.   I was the mayor.               14:52:32
15       MR. WELCH:  So this was after then   14:52:34
16   you became mayor?                          14:52:36
17       THE WITNESS:  Yes, after.           14:52:36
18       MR. WELCH:  After '07.              14:52:37
19       THE WITNESS:  '06.                  14:52:39
20   Q.   Was Trustee Einig then a member of   14:52:42
21   the Board of Trustees?                     14:52:44
22       A.   Yes, he was.                   14:52:45
23   Q.   Did he express support for the   14:52:46
24   statement that you made about the kinder and   14:52:53
25   gentler police force?                      14:52:55

Page 230

Loeffler

1
2        MR. WELCH:  Objection.  Asked and   14:52:57
3    answered.                                  14:52:57
4        You can answer it again.            14:52:57
5        A.   For that statement he did.  He may   14:52:59
6    not have totally agreed with my position, but   14:53:02
7    he believed that -- he did support me in that   14:53:05
8    statement.                                 14:53:08
9    Q.   Was George Hesse present at that   14:53:09
10   meeting?                                   14:53:11
11       A.   I don't believe so.           14:53:11
12   Q.   Do you recall whether there was a   14:53:14
13   point in time during your service as trustee   14:53:19
14   when George Hesse was transferred either to or   14:53:23
15   from the day shift to the night shift?   14:53:32
16       A.   No, I don't remember that.    14:53:35
17   Q.   On the occasion when you advised   14:53:37
18   Frank Fiorillo not to arrest or serve a   14:53:47
19   citation to Mike Loeffler, did you know how   14:53:50
20   Frank Fiorillo -- strike that.           14:53:58
21       Do you know if there was a report to   14:54:07
22   the Police Department that the barbecue in   14:54:08
23   question had been stolen?                  14:54:10
24       A.   I don't know.                  14:54:11
25   Q.   Did you ever have any conversation   14:54:12

Page 231

Loeffler

1
2    with Frank Fiorillo, whether or not others were   14:54:19
3    present, did you ever speak with Frank Fiorillo   14:54:22
4    about Richard Bosetti?                     14:54:25
5        MR. WELCH:  Objection.  Asked and   14:54:26
6    answered.                                  14:54:27
7        You can answer it again.            14:54:27
8        A.   No.                            14:54:28
9    Q.   Did you ever speak with Frank   14:54:29
10   Fiorillo about Gary Bosetti?               14:54:30
11       A.   No.                            14:54:31
12   Q.   Did you ever speak with any of the   14:54:32
13   plaintiffs in this lawsuit about either of   14:54:34
14   those individuals?                         14:54:36
15       A.   No.                            14:54:36
16   Q.   Other than your service as mayor and   14:54:37
17   police commissioner, have you ever served in   14:54:55
18   any other capacity in Ocean Beach, whether as a   14:54:57
19   volunteer or for pay?                      14:55:00
20       A.   No.                            14:55:01
21   Q.   Do you ever drive an Ocean Beach   14:55:02
22   rescue vehicle?                            14:55:06
23       A.   Absolutely.  You just said for pay,   14:55:07
24   didn't you?                                14:55:10
25   Q.   Whether or not for pay.           14:55:10

Page 232

Loeffler

1
2        A.   I didn't hear you say "whether or   14:55:11
3    not."  I'm sorry.  Yes, I'm a member of the   14:55:13
4    Fire Department.                           14:55:14
5        MR. WELCH:  Is that a volunteer   14:55:15
6    position?                                  14:55:17
7        THE WITNESS:  It's a volunteer   14:55:18
8    position.                                  14:55:19
9    Q.   Do you recall ever responding in the   14:55:19
10   Ocean Beach rescue vehicle to an incident   14:55:24
11   involving domestic violence wherein the male   14:55:27
12   and the female and a small baby were in the   14:55:33
13   Ocean Beach police station together?   14:55:36
14       MR. WELCH:  Object to the form.   14:55:38
15   Compound.                                  14:55:39
16       You can answer.                     14:55:39
17       A.   No, I don't recall.           14:55:40
18       MR. GRAFF:  I'd like to ask the   14:55:53
19   court reporter to please mark as          14:55:55
20   Exhibit Loeffler 13 a one-page document   14:55:59
21   produced to us by Ocean Beach bearing Bates   14:56:01
22   number 5419.                               14:56:03
23       (Loeffler Exhibit 13, letter dated   14:56:21
24   April 6, 2007, Bates stamped 005419, marked   14:56:21
25   for identification.)                       14:56:39

58  (Pages 229 to 232)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 233

Loeffler

1
2     Q.   After your counsel is finished        14:56:39
3   comparing your version and his version of the    14:56:41
4   document, if you could please take a look at    14:56:43
5   the document and tell me if this is something    14:56:45
6   you have seen before.                           14:56:47
7          MR. WELCH:  Have you seen this        14:56:48
8   before, yes or no?                  14:56:49
9          (Document review.)              14:56:54
10    A.   Yes, I have.              14:57:04
11    Q.   And when did you first see the        14:57:07
12  document?                      14:57:10
13    A.   I guess in April of '07.          14:57:11
14    Q.   The document is dated April 6, 2007?  14:57:18
15    A.   Yes.                      14:57:21
16    Q.   The document states:  "Dear Officer    14:57:22
17  Hardman, due to the impending litigation and    14:57:30
18  under advice of counsel, the Village cannot    14:57:32
19  rehire you for the 2007 summer season."      14:57:34
20        Do you know what the impending      14:57:36
21  litigation referenced in this document is?      14:57:39
22    A.   I wouldn't -- I don't know.  I don't  14:57:41
23  want to guess at it.              14:57:50
24    Q.   And would you be guessing between    14:57:52
25  multiple possibilities that you believe it      14:57:56

Page 234

Loeffler

1
2   could be, or is there only one that you think    14:57:57
3   it could?                        14:57:59
4          MR. WELCH:  Well, he said he is      14:58:00
5   going to be guessing.  He is not going to      14:58:01
6   guess at any possibility, so...          14:58:03
7     A.   I'm not gonna guess.  I don't know.  14:58:05
8     Q.   Okay.  I will continue reading.  "All  14:58:06
9   department equipment must be secured and turned  14:58:07
10  in by April 20th, 2006.  All contact must be    14:58:10
11  through officer Paul Trosko.  He will give you  14:58:12
12  a detailed receipt for all equipment.  I      14:58:15
13  apologize for any inconvenience this has caused  14:58:17
14  and if there is anything I can do, please call.  14:58:18
15  Keep the faith, respectfully, George B. Hesse."  14:58:20
16  CC Joseph Loeffler, Mayor/Police Commissioner,  14:58:24
17  Mary Anne Minerva, Kenneth Gray, Village      14:58:25
18  Attorney.                      14:58:27
19        Did you have any conversations with    14:58:28
20  George Hesse concerning what's set forth in    14:58:31
21  this document?                  14:58:33
22    A.   Yes, I did, but those conversations    14:58:34
23  were during executive session with the presence  14:58:39
24  of counsel that we used to advise us on the    14:58:42
25  issue.                        14:58:45

Page 235

Loeffler

1
2     Q.   Then I won't ask you to testify to    14:58:46
3   those matters.                  14:58:49
4          If you look up to the top right-hand  14:58:49
5   corner of the document in the header it says    14:58:51
6   George B. Hesse, Chief of Police.          14:58:54
7          Was George Hesse ever the chief of    14:58:55
8   police in Ocean Beach?              14:58:57
9     A.   No, he was not.              14:58:57
10    Q.   What was George Hesse's position in    14:59:02
11  the Ocean Beach Police Department on April 6,    14:59:04
12  2007?                        14:59:06
13    A.   I don't know if that was after that    14:59:06
14  letter I wrote or not.              14:59:06
15         THE COURT REPORTER:  I can't hear    14:59:06
16  you.                        14:59:06
17         THE WITNESS:  Oh, I'm sorry.      14:59:06
18    A.   I don't know if that was after the    14:59:27
19  order that I gave to him removing him from duty  14:59:29
20  or not.                      14:59:32
21    Q.   Are you referring to Loeffler 8?    14:59:33
22  Maybe if I could put that in front of you to --  14:59:35
23  is that the order you are referring to?      14:59:41
24    A.   Yes.                      14:59:43
25    Q.   And that order is dated March 26,    14:59:43

Page 236

Loeffler

1
2   2007?                        14:59:45
3     A.   Yes, it is.                  14:59:45
4     Q.   And April 6, 2007 is obviously      14:59:46
5   subsequent to March 26, 2007; correct?      14:59:49
6     A.   Yes, it is.                  14:59:51
7     Q.   Does George Hesse having written    14:59:52
8   this letter concerning Officer Hardman's      14:59:56
9   employment under the heading George B. Hesse,    14:59:58
10  Chief of Police, does that in any way violate    15:00:01
11  the terms of Loeffler 8, as you understand    15:00:03
12  them?                        15:00:06
13         MR. WELCH:  Objection to the extent  15:00:07
14  that it calls for a legal conclusion, and    15:00:09
15  also there is no foundation whatsoever and    15:00:12
16  that this witness didn't actually draft      15:00:15
17  this document and -- but to that extent you    15:00:18
18  can answer the question.              15:00:22
19    A.   I believe the document was drafted    15:00:25
20  by George at the direction of counsel and the    15:00:27
21  board.                        15:00:33
22    Q.   Do you recall whether George Hesse    15:00:31
23  obtained board approval before sending this    15:00:34
24  document?                      15:00:36
25    A.   It was done at the direction of the    15:00:37

TSG Reporting – Worldwide       877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 237

```
1              Loeffler
2   board, so I would assume that meant it must be    15:00:38
3   approved.                          15:00:41
4       Q.   Have any of the things that we have    15:00:54
5   been discussing in the last several minutes     15:00:56
6   refreshed your recollection as to the nature of  15:00:58
7   the impending litigation that's referenced in   15:01:00
8   Loeffler 13?                      15:01:01
9       MR. WELCH: Objection to the form.       15:01:02
10  And I don't know what you are referring to,     15:01:09
11  but if the witness was referring to, as far     15:01:10
12  as the last several minutes of your           15:01:12
13  conversation, you can answer the question.      15:01:14
14  If you don't, then you can ask him to          15:01:16
15  rephrase it.                       15:01:18
16      Is your recollection refreshed by          15:01:22
17  your prior conversation this past few           15:01:24
18  minutes?                         15:01:24
19      Q.   You know what, to avoid any         15:01:25
20  ambiguity, do you, as you sit here now, recall  15:01:27
21  what the nature of the impending litigation     15:01:30
22  referenced in Loeffler 13 is?               15:01:33
23      A.   It was the --                15:01:35
24      MR. WELCH: Objection. Asked and          15:01:36
25  answered.                        15:01:37
```

Page 238

```
1              Loeffler
2       You can answer it.                 15:01:37
3       A.   Probably -- I don't want "probably."  15:01:38
4   It was the arrest of certain police officers    15:01:47
5   within the Police Department.              15:01:50
6       Q.   Which police officers?            15:01:52
7       A.   Hardman and Hesse.              15:01:53
8       Q.   Were any other officers arrested as   15:01:56
9   part of that impending litigation?           15:01:59
10      A.   Emburey and Carollo.             15:02:00
11      MR. GRAFF: I am going to ask the        15:02:14
12  court reporter to please mark as            15:02:15
13  Exhibit Loeffler 14 a one-page document        15:02:17
14  produced by Ocean Beach bearing Bates         15:02:19
15  number 4431.                       15:02:21
16      (Loeffler Exhibit 14, letter dated      15:02:50
17  August 6, 2007, Bates stamped 004431,        15:02:50
18  marked for identification.)                15:02:59
19      Q.   Mayor Loeffler, when your counsel is  15:02:59
20  finished reviewing the document, if you could   15:03:01
21  please review the document yourself and let me  15:03:02
22  know if this is a document you have seen       15:03:04
23  before?                          15:03:06
24      MR. WELCH: Have you seen this          15:03:06
25  before?                          15:03:07
```

Page 239

```
1              Loeffler
2       (Document review.)               15:03:08
3       A.   Yes, sir.                  15:03:08
4       Q.   Is this a letter that you wrote?     15:03:22
5       A.   Yes, it is.                 15:03:24
6       Q.   Why did you write this letter?      15:03:25
7       MR. WELCH: To the extent that it       15:03:27
8   may call for privilege with counsel,          15:03:28
9   attorney/client privilege. If it doesn't,      15:03:32
10  you can answer. If it does, to the extent      15:03:35
11  that you drafted this as a result of          15:03:37
12  conversations with counsel, then I direct      15:03:38
13  you not to answer the question.             15:03:40
14      A.   This was done under advice of       15:03:41
15  counsel. This letter was written under the     15:03:43
16  advice of counsel.                   15:03:47
17      Q.   Was Paul Carollo arrested, to your   15:03:48
18  knowledge, at the same time as Officer Hardman?  15:03:52
19      A.   Yes.                     15:03:54
20      Q.   And, to your knowledge, was Paul     15:03:56
21  Carollo rehired in the 2007 season?          15:04:00
22      A.   I don't know.                15:04:04
23      Q.   When you write: "Dear Officer       15:04:08
24  Carollo, Civil Service rules and regulations    15:04:10
25  require you to work at least one tour during    15:04:13
```

Page 240

```
1              Loeffler
2   the calendar year," what is the source of your  15:04:15
3   knowledge about those civil service rules and   15:04:18
4   regulations?                       15:04:20
5       MR. WELCH: To the extent you did       15:04:21
6   not learn it -- to the extent you learned      15:04:22
7   that outside of conversations with counsel,     15:04:23
8   you can answer.                    15:04:24
9       Do you have an independent --          15:04:26
10      A.   I would think it came from counsel.   15:04:28
11  I would believe it came from counsel. I'm not   15:04:32
12  versed on Civil Service law.               15:04:33
13      Q.   When you wrote: "You may work one    15:04:35
14  tour for the Village under modified duty       15:04:40
15  assignment to fulfill the requirement and       15:04:42
16  maintain your status," what status were you     15:04:44
17  referring to?                      15:04:46
18      A.   Police officer.               15:04:47
19      Q.   And when you refer to modified duty   15:04:48
20  assignment, what was the nature of the modified  15:04:50
21  duty assignment?                    15:04:53
22      A.   It would be without your weapon, it   15:04:54
23  would be of a clerical nature, no weapon, no    15:04:57
24  badge, civilian clothes. The same restrictions  15:05:01
25  that were put onto Patrolman Hesse.          15:05:04
```

9e28f7aa-4e93-4641-9524-8529961356c8

Page 241

```
 1           Loeffler
 2      THE COURT REPORTER: "Put onto" --   15:05:04
 3      THE WITNESS: Police Officer Hesse.  15:05:09
 4    Q.  When you wrote: "Hopefully you will  15:05:09
 5  take advantage of this opportunity.  Upon the  15:05:11
 6  successful completion of court actions, we  15:05:13
 7  would like to reinstate you to your previous  15:05:14
 8  assignment," what were the court actions that  15:05:16
 9  you are referring to?            15:05:18
10    A.  The arrest.              15:05:19
11    Q.  Do you know what charges, if any,  15:05:25
12  were brought against Paul Carollo?     15:05:27
13    A.  Paul Carollo was arrested, but I  15:05:30
14  don't know what the charges were.       15:05:32
15    Q.  Do you know -- strike that.    15:05:33
16      Do you know why this letter to Paul  15:05:50
17  Carollo was from you rather than from George  15:05:52
18  Hesse?                    15:05:54
19      MR. WELCH: Objection. To the    15:05:55
20    extent it calls for conversations you may  15:05:55
21    have had with counsel or at the direction  15:05:57
22    of counsel or on advice of counsel, I   15:05:59
23    direct you not to answer, but to the extent  15:06:01
24    that it is outside of that, those caveats,  15:06:03
25    you can answer.             15:06:05
```

Page 242

```
 1           Loeffler
 2    A.  I would -- obviously I was directed  15:06:07
 3  by counsel to do this and that's what I did.  15:06:09
 4    Q.  Do you know whether Officer Carollo  15:06:14
 5  worked one tour under modified duty assignment  15:06:17
 6  subsequent to your drafting of this letter?  15:06:20
 7    A.  I don't know that.         15:06:22
 8    Q.  Did you ever have any conversations  15:06:24
 9  with Paul Carollo about this letter?    15:06:25
10    A.  No, sir.              15:06:27
11    Q.  Did you have any conversations with  15:06:27
12  Paul Carollo subsequent to August 6, 2007?  15:06:29
13    A.  No.                15:06:32
14    Q.  None at all?            15:06:32
15    A.  None at all.            15:06:33
16    Q.  What about Officer Hardman, did you  15:06:38
17  have any conversations with him subsequent to  15:06:40
18  April 6, 2007?              15:06:42
19    A.  No.                15:06:43
20    Q.  Did you have any conversations with  15:06:44
21  George Hesse about his arrest?       15:06:59
22    A.  Yes.                15:07:00
23    Q.  How many times have you spoken with  15:07:06
24  George Hesse about his arrest?        15:07:08
25    A.  I don't know.           15:07:12
```

Page 243

```
 1           Loeffler
 2    Q.  Can you recall anything that was  15:07:17
 3  discussed between the two of you about his  15:07:20
 4  arrest?                   15:07:21
 5      MR. WELCH: Just the arrest?  Is   15:07:23
 6    that all you are asking about?     15:07:24
 7      MR. GRAFF: The arrest and any    15:07:26
 8    charges that were brought against him.  15:07:28
 9    A.  The charges were false and he was  15:07:29
10  going to be exonerated. That's what he  15:07:31
11  believed.                 15:07:31
12      THE COURT REPORTER: I'm sorry?   15:07:31
13    A.  That the charges were false and he  15:07:34
14  would be fully exonerated. That was his  15:07:35
15  belief. That's what he expressed to me.  15:07:38
16    Q.  Did he communicate to you what those  15:07:40
17  charges were?              15:07:43
18    A.  No.                15:07:43
19    Q.  Do you have any understanding of  15:07:43
20  what those charges are, as you sit here today?  15:07:45
21      MR. WELCH: Objection.        15:07:49
22      You can answer.          15:07:50
23    A.  He was charged with an assault.   15:07:50
24    Q.  Did you have any conversations with  15:07:52
25  George Hesse concerning the incident that was  15:07:55
```

Page 244

```
 1           Loeffler
 2  charged as an assault?           15:07:57
 3    A.  No.                15:07:58
 4      MR. WELCH: Objection.        15:07:59
 5    A.  No, I did not.           15:08:00
 6    Q.  Did you ever learn from anyone other  15:08:07
 7  than your counsel any information about the  15:08:09
 8  events that were charged as an assault?   15:08:13
 9    A.  I don't understand the question.   15:08:15
10    Q.  Well, presumably something happened  15:08:18
11  and on the basis of that George Hesse was  15:08:23
12  charged with an assault. I'm asking now if you  15:08:25
13  are aware of what it was that happened that led  15:08:28
14  him to be charged with an assault.    15:08:30
15      MR. WELCH: Objection. Form.     15:08:32
16    Foundation. Why don't you just ask him if  15:08:34
17    he is aware of whatever incident was the  15:08:35
18    underlying result of the indictment of  15:08:37
19    George Hesse. Just ask him.      15:08:39
20    Q.  Are you aware?           15:08:41
21    A.  Yes.                15:08:41
22    Q.  What is the underlying incident?   15:08:42
23    A.  There is an allegation that there  15:08:43
24  was an assault that took place within the  15:08:45
25  police station and George Hesse was the  15:08:47
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 245

Loeffler

1
2  perpetrator of that assault.                 15:08:50
3      Q.   Did you ever discuss the purported   15:08:51
4  assault with George Hesse?               15:08:53
5      A.   No, I have not.         15:08:55
6      Q.   Did you ever discuss it with any     15:08:56
7  officers at the Ocean Beach Police Department?   15:08:57
8      A.   No, I have not.         15:08:57
9      Q.   Did you ever discuss it with any     15:08:58
10  employee of Ocean Beach?             15:09:00
11      A.   No, I have not.         15:09:01
12      Q.   Is that incident the first incident   15:09:13
13  that you are aware of wherein George Hesse has   15:09:14
14  been accused of assaulting a civilian in the   15:09:17
15  course of his duties as an employee of the   15:09:21
16  Ocean Beach Police Department?           15:09:24
17      MR. WELCH:  Objection to the form.   15:09:25
18      You can answer.             15:09:26
19  A.   No, it's not.         15:09:30
20      Q.   How many prior incidents are you     15:09:31
21  aware of?               15:09:33
22      A.   One.             15:09:33
23      Q.   And what incident are you referring   15:09:34
24  to?                   15:09:36
25      A.   Prisco V Ocean Beach, there is a     15:09:36

Page 246

Loeffler

1
2  pending lawsuit.                 15:09:40
3      Q.   Did you ever have any discussions     15:09:41
4  with George Hesse about that lawsuit?       15:09:43
5      A.   Nope.             15:09:44
6      Q.   Do you know what's alleged in that   15:09:44
7  lawsuit?               15:09:47
8      A.   I am trying to think if I read the   15:09:47
9  allegations.  No, I don't think I ever read   15:09:54
10  that one.               15:09:58
11      Q.   When George Hesse expressed to you   15:09:58
12  that the charges in the more recent lawsuit   15:10:02
13  were without merit and he would be exonerated,   15:10:05
14  do you believe that they are without merit and   15:10:12
15  will be -- and he will be exonerated?       15:10:14
16      MR. WELCH:  Objection.         15:10:17
17      MR. CONNOLLY:  Objection.       15:10:18
18      MR. WELCH:  Why don't you ask him if   15:10:18
19      he has any personal knowledge of the     15:10:19
20      incident.  That would be an appropriate   15:10:22
21      question.  Otherwise it's an entirely     15:10:23
22      irrelevant line of inquiry as to what he   15:10:24
23      believes as far as the legitimacy or merit   15:10:26
24      to the allegations as against Mr. Hesse.   15:10:27
25      MR. GRAFF:  Let me ask a different   15:10:29

Page 247

Loeffler

1
2  question.                   15:10:30
3      MR. WELCH:  Is that question       15:10:31
4      withdrawn?  Are you withdrawing that     15:10:32
5      question?               15:10:32
6      MR. GRAFF:  I am asking a different   15:10:32
7      question than that question.         15:10:33
8      MR. WELCH:  So then withdrawn.  You   15:10:34
9      can answer his next question.         15:10:36
10      MR. GRAFF:  Presumably you will want   15:10:37
11      to wait to hear it, but...         15:10:38
12      MR. WELCH:  We are all waiting.     15:10:41
13      Q.   Did you ever make any statements to   15:10:43
14  anyone else to the effect that the charges   15:10:49
15  against George Hesse were without merit and   15:10:51
16  that he would be exonerated?           15:10:53
17      MR. WELCH:  Objection.         15:10:55
18      You can answer.             15:10:56
19  A.   Yeah, I did.         15:10:58
20      Q.   And who did you make such       15:11:00
21  statements --               15:11:00
22      A.   Everybody I know.           15:11:01
23      Q.   Did you ever make such statements to   15:11:03
24  the press?               15:11:05
25      A.   I don't recall.         15:11:05

Page 248

Loeffler

1
2      Q.   When you made those statements, did   15:11:09
3  you believe them to be true?           15:11:11
4      A.   Yes, I did.         15:11:12
5      Q.   As you sit here today, do you     15:11:13
6  believe them to be true?           15:11:15
7      A.   Yes, I do.         15:11:16
8      MR. WELCH:  Objection.         15:11:17
9      You can answer.             15:11:17
10      Q.   Mayor Loeffler, just to go back very   15:11:36
11  quickly to something that we had touched on   15:11:38
12  earlier, did you ever accidentally shoot your   15:11:40
13  brother, Alan Loeffler?             15:11:43
14      MR. WELCH:  Objection.         15:11:44
15      You can answer.             15:11:45
16      A.   Yes.             15:11:45
17      Q.   So when I asked you earlier today if   15:11:46
18  you had ever shot anyone inadvertently, why   15:11:51
19  didn't you tell me that you had accidentally   15:11:54
20  shot your brother, Alan Loeffler?         15:11:56
21      A.   I was five years old.  I forgot   15:11:58
22  about that.               15:12:00
23      Q.   You were five years old at the time   15:12:01
24  of that shooting?             15:12:03
25      A.   Uh-huh.             15:12:03

TSG Reporting - Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 249

1          Loeffler
2       MR. WELCH:  Is that a yes?          15:12:04
3    A.  Yes, I was five years old.  Six.  He  15:12:05
4 was five.                       15:12:07
5    Q.  Do you know whether your brother,  15:12:08
6 Alan Loeffler, sustained any permanent   15:12:09
7 injuries from --                 15:12:14
8       MR. WELCH:  Objection.  Ari, what is  15:12:14
9 the relevance of this line of inquiry?   15:12:15
10 This is palpably improper and now you are  15:12:17
11 harassing Mr. Loeffler.           15:12:20
12      MR. GRAFF:  This is really my last  15:12:20
13 question on that --               15:12:22
14      MR. WELCH:  That's your only     15:12:22
15 question, because I am not going to allow  15:12:23
16 him to answer that question.       15:12:25
17      MR. GRAFF:  You are instructing him  15:12:25
18 not to --                       15:12:25
19      MR. WELCH:  I am instructing him not  15:12:25
20 to answer that question.  You can call the  15:12:26
21 court right now if you want to ask him when  15:12:28
22 he may have shot his brother accidentally  15:12:30
23 when his brother was five years old, when  15:12:30
24 he was five years old, which was what, how  15:12:32
25 many years, fifty years ago approximately?  15:12:32

Page 250

1          Loeffler
2    THE WITNESS:  Fifty-five years ago.  15:12:36
3    MR. WELCH:  Fifty-five years ago.  15:12:36
4    MR. GRAFF:  I can ask a more      15:12:37
5 specific question.                15:12:38
6    Q.  Do you know whether as a result of  15:12:39
7 being shot on that occasion there was any  15:12:40
8 impact on Alan Loeffler's ability to serve as a  15:12:42
9 police officer as an adult?        15:12:46
10   A.  No.                       15:12:49
11      MR. WELCH:  Objection to form.   15:12:49
12   A.  No.                       15:12:50
13   Q.  Are you aware that the Complaint in  15:12:58
14 this lawsuit includes certain allegations about  15:12:59
15 an incident that occurred at Houser's Bar on  15:13:02
16 Halloween 2004?                   15:13:04
17   A.  Yes.                      15:13:06
18      MR. WELCH:  Objection.          15:13:07
19      You can answer.              15:13:08
20   Q.  If I refer to the Halloween     15:13:09
21 incident, will you understand what I am  15:13:11
22 referring to?                    15:13:12
23   A.  Yes.                      15:13:13
24   Q.  When did you first learn any    15:13:14
25 information about any events involved in the  15:13:19

Page 251

1          Loeffler
2 Halloween incident?                15:13:22
3    A.  The night of the incident.     15:13:23
4    Q.  And how did you come to learn of the  15:13:28
5 incident on that night?            15:13:30
6    A.  I was driving the Ocean Beach   15:13:31
7 volunteer Fire Department ambulance.  We were  15:13:34
8 toned out by Yaphank fire central to respond to  15:13:37
9 the Ocean Beach police station referencing an  15:13:42
10 assault.  So I responded to the firehouse, I'm  15:13:49
11 a chauffeur for the ambulance, and I drove the  15:13:54
12 ambulance to the police station.   15:13:57
13   Q.  Did you get out of the ambulance?  15:13:58
14   A.  Yes.                      15:14:00
15   Q.  Did you go into the police station?  15:14:00
16   A.  Yes.                      15:14:02
17   Q.  Could you describe as much as you  15:14:02
18 remember of what happened from the time you  15:14:04
19 entered the police station until you exited it.  15:14:06
20   A.  I carried in -- I parked the vehicle  15:14:10
21 in front of the police station.  The paramedics  15:14:14
22 got out of the vehicle.  I carried in the jump  15:14:18
23 bag or the paramedic bag.  I was greeted at the  15:14:21
24 entrance to the squad room by Kevin Lamm.  15:14:25
25 Kevin Lamm said to me "we've got a guy here hit  15:14:29

Page 252

1          Loeffler
2 in the head with a pool cue."  I said to Kevin,  15:14:35
3 Officer Lamm, "sounds like you might have an  15:14:39
4 assault 2, you should call a third squad."  I  15:14:42
5 put the bag done and I went outside.  15:14:46
6    Q.  Do you recall where you were   15:14:49
7 standing when you made the comment to Officer  15:14:50
8 Lamm about assault 2?              15:14:52
9    A.  Right in the doorway.          15:14:53
10   Q.  Were you leaning on the doorway?  15:14:55
11   A.  No.  He was.                15:14:57
12   Q.  And what happened when you left the  15:15:03
13 police station?                   15:15:07
14   A.  I went out in the ambulance and sat  15:15:07
15 in the ambulance.                 15:15:09
16   Q.  And at a certain point did you do  15:15:10
17 something else?                   15:15:13
18      MR. WELCH:  Objection to the form.  15:15:14
19      You can answer.              15:15:16
20   A.  I wait -- I waited for the     15:15:16
21 paramedics to complete their assignment and  15:15:19
22 the -- they placed the subject on a police boat  15:15:27
23 for transportation to the mainland and we  15:15:29
24 packed up the rig and went home.   15:15:32
25   Q.  Other than the brief communication  15:15:34

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2    with Officer Lamm that you have already          15:15:37
3    testified to, did you speak with anybody else     15:15:39
4    that night?                                       15:15:41
5       A.  No.                      15:15:41
6       Q.  The next day did you speak to              15:15:42
7    anybody else -- to anybody at all about the       15:15:48
8    events of the night before?                       15:15:51
9       A.  No.                      15:15:52
10      Q.  When was the first time, if at all,        15:15:52
11   that you spoke to anybody about the events of     15:15:56
12   that night?                                       15:15:57
13      A.  Maybe Monday or Tuesday.        15:15:58
14      Q.  What day of the week was the               15:16:03
15   Halloween incident?                               15:16:04
16      A.  I believe it was a Saturday.       15:16:05
17      Q.  And who is the first person who you        15:16:08
18   spoke to about that incident?                     15:16:10
19      A.  Mary Anne Minerva.             15:16:11
20      Q.  What did you say to Mary Anne              15:16:12
21   Minerva?                                          15:16:14
22      A.  She told me that there was an     15:16:14
23   incident that took place at the Halloween -- at   15:16:16
24   Houser's Hotel and it involved the Bosetti        15:16:19
25   brothers.                      15:16:22

Loeffler

1
2       Q.  On the night of the incident, were        15:16:22
3    you aware that it involved the Bosetti            15:16:24
4    brothers?                                         15:16:27
5       A.  No.                      15:16:27
6       Q.  Did you have any information on the        15:16:27
7    night of the incident as to who was involved?     15:16:30
8       A.  No.                      15:16:33
9       Q.  Were you then serving as a member of      15:16:33
10   the Village Board of Trustees?                     15:16:39
11      A.  Yes.                     15:16:40
12      Q.  And the mayor at that time was Mayor       15:16:41
13   Rogers?                                           15:16:47
14      A.  Yes.                     15:16:47
15      Q.  Did you ever have any conversations       15:16:48
16   with Mayor Rogers about the Halloween incident?   15:16:49
17      A.  Not that I recall.          15:16:52
18      Q.  After your conversation with              15:16:58
19   Mary Anne Minerva, do you recall who you spoke    15:17:00
20   to next about the Halloween incident?             15:17:02
21      MR. WELCH:  If anyone.            15:17:04
22      A.  Yes.                     15:17:06
23      Q.  Who is the next person you spoke to?      15:17:11
24      A.  George Hesse.               15:17:13
25      Q.  And when did you have that               15:17:16

Loeffler

1
2    conversation with George Hesse?                   15:17:19
3       A.  A couple of days later.          15:17:20
4       Q.  In substance, what was discussed          15:17:22
5    between you and George Hesse?                      15:17:24
6       A.  I asked him what was going on and he  15:17:25
7    said that Chief Paradiso had instructed him to   15:17:28
8    conduct an investigation, that the               15:17:33
9    investigation that was done that night was       15:17:34
10   improper, and that Chief Paradiso had            15:17:36
11   instructed him to conduct an investigation to    15:17:38
12   find out exactly what happened, and that's what  15:17:41
13   he was going to do.                  15:17:43
14      Q.  Did you ask him in what way the           15:17:44
15   investigation conducted on the night of the      15:17:46
16   improper?                                         15:17:49
17      A.  No, I did not.               15:17:49
18      Q.  Did you think you understood what he      15:17:50
19   was talking about?                                15:17:51
20      MR. WELCH:  Objection.            15:17:52
21      You can answer.                 15:17:53
22      A.  No, I don't know what he was talking  15:17:54
23   about.                        15:17:55
24      Q.  Were you a detective with the            15:17:55
25   Suffolk County Police Department at that time?   15:17:57

Loeffler

1
2       A.  Yes, I was.                15:17:58
3       Q.  Other than what you have already         15:17:59
4    testified to about that conversation with        15:18:08
5    George Hesse, was anything else communicated     15:18:09
6    between the two of you in that conversation?     15:18:11
7       A.  No.                      15:18:13
8       Q.  Who, if anyone, did you speak to         15:18:13
9    about the Halloween incident following that      15:18:16
10   conversation with George Hesse?                   15:18:18
11      A.  I don't recall who I spoke to, if  15:18:23
12   anybody.                       15:18:30
13      Q.  Did you ever speak to anybody about      15:18:31
14   the Halloween incident for the purpose of        15:18:35
15   obtaining further information about what         15:18:37
16   happened that night?                              15:18:38
17      MR. WELCH:  Object to the form.      15:18:39
18      You can answer.                 15:18:40
19      A.  No.                      15:18:42
20      Q.  Between the conversation with George     15:18:43
21   Hesse that you testified to and today, have you  15:18:47
22   had any conversations that you can recall with   15:18:52
23   anybody about the Halloween incident other than  15:18:54
24   your counsel?                                     15:18:56
25      A.  Yes.                     15:18:57

TSG Reporting - Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 257

Loeffler

2    Q.   And who can you recall having        15:18:57
3    conversations with about that incident?        15:18:59
4    A.   The Suffolk County District        15:19:00
5    Attorney's office.        15:19:02
6    Q.   Who specifically?        15:19:02
7    A.   ADA Biancavilla.        15:19:03
8    Q.   And did you speak with that ADA on        15:19:08
9    more than one occasion?        15:19:12
10    A.   No, just once.        15:19:12
11    Q.   And did he initiate that        15:19:13
12    communication?        15:19:16
13    A.   Yes, he did.        15:19:16
14    Q.   Did he call you?        15:19:17
15    A.   He called my counsel.        15:19:18
16    Q.   And did you ever speak with him        15:19:20
17    directly?        15:19:22
18    A.   Yes.        15:19:23
19    Q.   Did you understand why he was        15:19:23
20    seeking to speak with you?        15:19:28
21    MR. WELCH:  Objection as to what his  15:19:29
22    understanding is, your knowledge of his        15:19:30
23    understanding of why he was speaking to        15:19:32
24    you, but if you know, you can answer.        15:19:34
25    A.   The reason for the conference was        15:19:36

Page 258

Loeffler

2    not that particular incident.        15:19:38
3    Q.   Was that incident discussed in that  15:19:42
4    conference?        15:19:44
5    A.   Yes, it was.        15:19:44
6    Q.   And in substance what was        15:19:45
7    discussed -- actually, strike that.  What        15:19:48
8    did --        15:19:50
9    MR. JEMAL:  I need to take a quick  15:19:52
10    break to speak with Mike.        15:19:54
11    MR. GRAFF:  Is this for privilege  15:19:56
12    purposes?        15:19:57
13    MR. JEMAL:  It is for privilege  15:19:57
14    purposes.        15:19:59
15    MR. WELCH:  It is to discuss  15:19:59
16    privilege.        15:19:59
17    MR. GRAFF:  Let's go off the record  15:19:59
18    THE VIDEOGRAPHER:  Going off the  15:20:01
19    record.  The time is 3:20 p.m.        15:20:02
20    (Recess was taken from 3:20 to        15:20:04
21    3:24.)        15:20:04
22    THE VIDEOGRAPHER:  We are back on  15:22:56
23    the record.  The time is 3:24 p.m.  This  15:23:38
24    is the beginning of the tape labeled  15:23:41
25    number 4.        15:23:43

Page 259

Loeffler

2    BY MR. GRAFF:        15:23:45
3    Q.   Mayor Loeffler, was the Halloween        15:23:45
4    incident discussed in that conference with ADA  15:23:48
5    Biancavilla?        15:23:51
6    A.   Yes, it was.        15:23:51
7    Q.   And what do you recall ADA        15:23:52
8    Biancavilla saying about the Halloween incident  15:23:54
9    in that conversation?        15:23:56
10    A.   He asked me what I knew about it.        15:23:56
11    Q.   And what did you say in response?        15:23:58
12    A.   The same sum and substance that I        15:24:00
13    told you already.        15:24:02
14    Q.   Was anything else about the        15:24:03
15    Halloween incident discussed in that        15:24:04
16    conversation?        15:24:06
17    A.   No, there was not.        15:24:06
18    Q.   Did he ask you any follow-up        15:24:07
19    questions?        15:24:08
20    A.   With reference to --        15:24:09
21    Q.   The Halloween incident.        15:24:10
22    A.   No.        15:24:12
23    Q.   What else, if anything, was        15:24:13
24    discussed in that conference?        15:24:14
25    A.   There were some questions -- he        15:24:17

Page 260

Loeffler

2    asked me questions about the Gilberd incident  15:24:22
3    and he asked me questions -- general questions  15:24:28
4    about Village government and how it was run.  15:24:34
5    Q.   Do you recall any of the specific        15:24:38
6    questions he asked you about how the Village        15:24:41
7    government is run?        15:24:43
8    A.   He just asked me, you know, when I  15:24:44
9    became mayor, when I was a trustee, what, in  15:24:46
10    fact, was my role with the Police Department.  15:24:51
11    That was about it.        15:24:54
12    Q.   And in substance what did you say in  15:24:55
13    response to those questions about the Village  15:24:57
14    government?        15:24:59
15    MR. WELCH:  Why don't we break it  15:24:59
16    down into which parts of the questions he  15:25:01
17    responded to.        15:25:03
18    Q.   About your role in the Police        15:25:04
19    Department, what did you say in response to his  15:25:06
20    question on that subject?        15:25:08
21    A.   That my role with the Police        15:25:09
22    Department only started when I became mayor in  15:25:10
23    2006.  Before that I had no -- limited        15:25:12
24    involvement with the Police Department.        15:25:16
25    Q.   Did ADA Biancavilla ask you        15:25:17

65 (Pages 257 to 260)

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2  questions about any other employees of Ocean     15:25:27
3  Beach in that conference?                        15:25:28
4      A.  No.                          15:25:30
5      Q.  And what, if anything, did ADA     15:25:32
6  Biancavilla ask you about the Gilberd incident   15:25:39
7  in that conference?                              15:25:41
8      A.  He asked me what I knew about it.     15:25:43
9      Q.  And what did you say in response to   15:25:47
10  that?                                  15:25:49
11      A.  I said I didn't know very much about  15:25:49
12  it.  That there was someone who was hurt in the  15:25:51
13  police station and that George Hesse was         15:25:55
14  arrested for that incident.               15:25:56
15      Q.  And I think the Gilberd incident      15:26:04
16  hadn't been identified yet in your testimony.    15:26:06
17          Just to be clear, there is the        15:26:08
18  Prisco incident that you referred to, the        15:26:10
19  Gilberd incident and the Halloween incident,     15:26:12
20  three separate incidents?                        15:26:14
21      A.  Yes.                         15:26:15
22      Q.  What else, if anything, was          15:26:16
23  discussed in that conference with ADA            15:26:19
24  Biancavilla?                            15:26:20
25      A.  That was all.                 15:26:21

Loeffler

1
2      Q.  Did you have any further discussions  15:26:22
3  with ADA Biancavilla after that?                 15:26:24
4      A.  No, I have not.               15:26:26
5      Q.  Have you had any further discussions  15:26:27
6  with anyone from the District Attorney's         15:26:29
7  office?                                 15:26:31
8      A.  No, I have not.               15:26:31
9      Q.  Prior to that conversation with ADA   15:26:32
10  Biancavilla had you had any conversations with   15:26:33
11  anyone from the District Attorney's office?      15:26:36
12      A.  No, I have not.               15:26:38
13      Q.  After that conference with ADA        15:26:39
14  Biancavilla, did you have any discussions with   15:26:46
15  anybody else about that conference?              15:26:49
16      A.  Yes.                        15:26:51
17      Q.  Who did you speak with about that     15:26:54
18  conference?                             15:26:55
19          MR. WELCH:  Aside from counsel.       15:26:56
20      A.  My attorneys, counsel.         15:26:57
21      Q.  Other than counsel, did you --       15:26:58
22      A.  Oh, no.                     15:26:58
23      Q.  -- discuss it with anyone else?      15:26:59
24      A.  No.                         15:27:00
25      Q.  After that conversation with ADA     15:27:00

Loeffler

1
2  Biancavilla, who else, if anyone, did you        15:27:09
3  thereafter speak with about the Halloween        15:27:13
4  incident?                               15:27:14
5          MR. WELCH:  Objection.  Asked and     15:27:14
6      answered.                        15:27:14
7          You can answer it again.         15:27:15
8      A.  No one.  I haven't spoken to anybody  15:27:16
9  about that.                             15:27:18
10      Q.  Did you ever review any statements   15:27:20
11  that were taken in the course of any             15:27:23
12  investigation into the Halloween incident?       15:27:24
13      A.  No, I have not.               15:27:26
14      Q.  Did you take any notes during that    15:27:29
15  conference with ADA Biancavilla?                 15:27:31
16      A.  No, I did not.               15:27:33
17      Q.  Other than what you have already      15:27:34
18  testified to today, is there any other           15:27:39
19  information that you can think of that you have   15:27:42
20  concerning the Halloween incident?               15:27:44
21          MR. WELCH:  Objection to the form.    15:27:46
22      You can answer to the extent you         15:27:48
23      haven't already.                 15:27:51
24      A.  What information are you talking      15:27:52
25  about?                                  15:27:55

Loeffler

1
2      Q.  Did you ever obtain from any other    15:27:55
3  source any further information about the         15:27:58
4  Halloween incident?                              15:27:59
5      A.  No.                         15:28:00
6      Q.  How did you first learn about the     15:28:02
7  Gilberd incident?                                15:28:04
8      A.  I believe it was a newspaper          15:28:05
9  article.                                15:28:12
10      Q.  Do you recall what that newspaper    15:28:13
11  was?                                    15:28:15
12      A.  It would either be Newsday or the    15:28:15
13  Daily News, because those are the two papers     15:28:20
14  that I read every day.                  15:28:22
15      Q.  Do you subscribe to those            15:28:23
16  newspapers?                             15:28:26
17      A.  No.                         15:28:26
18      Q.  Do you purchase them?             15:28:27
19      A.  Yes.                        15:28:28
20      Q.  Do you read them online ever?        15:28:28
21      A.  No.                         15:28:30
22      Q.  Do you use the Internet personally?   15:28:31
23      A.  Yes.                        15:28:34
24      Q.  Do you have an e-mail address in     15:28:34
25  your capacity as mayor of Ocean Beach?           15:28:35

9e28f7aa-4e93-4641-9524-8529961356c8

**Loeffler**

1
2    A.   Yes, I do.                    15:28:37
3    Q.   Is that an official e-mail address?   15:28:38
4    A.   Yes, it is.                   15:28:40
5    Q.   What is that address, please?    15:28:40
6    A.   J-L-O-E-F-F-L-E-R at Village of   15:28:42
7  Ocean Beach, all one word, dot-org.    15:28:46
8    Q.   Did you have an e-mail address at   15:28:50
9  the Village of Ocean Beach during any of the   15:28:52
10  time that you served as trustee at Ocean Beach?   15:28:54
11    A.   No.                          15:28:56
12    Q.   To your knowledge, does anybody else   15:28:57
13  have an e-mail address that ends in Village of   15:29:00
14  Ocean Beach dot-org?                15:29:03
15    A.   Yes.                         15:29:05
16    Q.   Who else?                    15:29:06
17    A.   There are numerous people in the   15:29:07
18  Village that have that.             15:29:09
19    Q.   Do you know when those e-mail   15:29:10
20  addresses were first created or assigned?   15:29:14
21        MR. WELCH:  Objection to the form.   15:29:17
22        You can answer.               15:29:20
23    A.   No, I don't know exactly when.   15:29:20
24    Q.   Do you know whether Ed Paradiso --   15:29:25
25  do you know approximately when, like if you   15:29:28

**Loeffler**

1
2  could approximate by year?          15:29:31
3    A.   It was after we developed our   15:29:33
4  website, so I don't know when that was.   15:29:34
5    Q.   Was that during your service as   15:29:37
6  trustee?                          15:29:39
7    A.   I'm not sure when the website was   15:29:40
8  developed.                        15:29:46
9    Q.   Do you know whether Ed Paradiso had   15:29:47
10  an official Ocean Beach e-mail address?   15:29:49
11    A.   No, I do not.                15:29:51
12    Q.   Do you know whether anyone at the   15:29:52
13  Ocean Beach Police Department had at any point   15:29:54
14  an official Ocean Beach e-mail address?   15:29:56
15    A.   No, I do not.                15:29:58
16    Q.   Do you know whether today anybody at   15:29:59
17  the Ocean Beach Police Department has an   15:30:00
18  official Ocean Beach e-mail address?   15:30:02
19    A.   No, I do not.                15:30:03
20    Q.   Do you know whether George Hesse   15:30:04
21  ever had an official Ocean Beach e-mail   15:30:06
22  address?                          15:30:08
23        MR. WELCH:  Objection.  Asked and   15:30:08
24  answered.                         15:30:09
25        You can answer again.          15:30:09

**Loeffler**

1
2    A.   No, I don't.                 15:30:09
3    Q.   Have you ever exchanged e-mail with   15:30:10
4  George Hesse?                      15:30:12
5    A.   No.                          15:30:12
6    Q.   Are there any policies that you are   15:30:12
7  aware of governing the use of official Ocean   15:30:22
8  Beach e-mail accounts?              15:30:29
9    A.   Yes.                         15:30:30
10    Q.   And what are the nature of those   15:30:30
11  policies?                         15:30:33
12        MR. WELCH:  Objection.         15:30:33
13        You can answer.               15:30:34
14    A.   There is a written directive that   15:30:34
15  all employees were given with reference to the   15:30:36
16  use of the internet and Village equipment.   15:30:38
17    Q.   Do you know whether there is any   15:30:43
18  rule or policy concerning the use of personal   15:30:46
19  e-mail addresses in connection with any   15:30:50
20  official business for Ocean Beach?   15:30:54
21        MR. WELCH:  Objection to the form.   15:30:57
22        You can answer.               15:30:58
23    A.   I don't have the -- I don't know if   15:30:59
24  you have a copy of the Village's Internet   15:31:01
25  policy.                           15:31:04

**Loeffler**

1
2    Q.   Unless was that in the handbook   15:31:04
3  perhaps?                          15:31:06
4    A.   No, there is a policy.  I'm not   15:31:06
5  familiar -- without reading it to you right   15:31:09
6  here, I couldn't answer that question.  I don't   15:31:11
7  know exactly what it says, but there is an   15:31:13
8  Internet policy that's in place in the Village   15:31:15
9  of Ocean Beach.                    15:31:18
10    Q.   After reading about the Gilberd   15:31:20
11  incident in the newspaper, who, if anyone, did   15:31:22
12  you speak to about that incident?   15:31:26
13    A.   George Hesse.                15:31:28
14    Q.   Was he the first person you spoke to   15:31:31
15  after reading about it in the newspaper?   15:31:34
16    A.   Uh-huh.                      15:31:37
17    Q.   How long after reading about it --   15:31:37
18        THE COURT REPORTER:  You have to   15:31:37
19  answer verbally.                   15:31:37
20        THE WITNESS:  Oh, I'm sorry.   15:31:37
21    A.   Yes.                         15:31:37
22    Q.   How long after reading about it did   15:31:37
23  you speak with George Hesse?        15:31:39
24    A.   A couple days after I read it, I   15:31:40
25  believe.                          15:31:43

9e28f7aa-4e93-4641-9524-8529961356c8

Page 269

Loeffler

1
2    Q.   Why did you wait a couple of days to    15:31:43
3    speak to him?                                15:31:46
4    A.   I don't believe --                      15:31:46
5    MR. WELCH:  Objection.                        15:31:46
6    You can answer.                               15:31:47
7    A.   I don't believe he was working.          15:31:47
8    Q.   Have you ever called George Hesse on    15:31:49
9    his cell phone?                              15:31:52
10   A.   Yes, I have.                             15:31:57
11   Q.   Have you ever called George Hesse on   15:32:00
12   his home phone?                             15:32:02
13   A.   No, I have not.                          15:32:02
14   Q.   What did you say to George Hesse       15:32:04
15   when you first communicated with him about the   15:32:08
16   Gilberd incident?                           15:32:11
17   A.   I asked him what happened.              15:32:12
18   Q.   Did he respond to that question?       15:32:15
19   A.   Yes.                                     15:32:17
20   Q.   What did he say?                        15:32:17
21   A.   He said a guy got hurt in the police   15:32:18
22   station.                                     15:32:20
23   Q.   Did he give any further detail than    15:32:21
24   what you just stated?                        15:32:23
25   A.   No.                                      15:32:24

Page 270

Loeffler

1
2    Q.   Did you ask him for any further        15:32:24
3    information?                                 15:32:26
4    A.   The only information I did say to        15:32:26
5    him was, you know, that "I think that you    15:32:28
6    should look to see if there is film for that."  15:32:32
7    Q.   And by "film," you mean video          15:32:38
8    surveillance footage?                        15:32:40
9    A.   Video surveillance footage.             15:32:41
10   Q.   And do you know whether there was      15:32:43
11   film from it?                                15:32:48
12   A.   There was not.                          15:32:49
13   Q.   Was that -- did the Gilberd incident   15:32:49
14   take place prior to the upgrade of the       15:32:52
15   department's electronic surveillance?        15:32:54
16   A.   Yes.                                     15:32:56
17   Q.   Do you know who is responsible for     15:32:58
18   maintaining video surveillance footage from the   15:33:00
19   Ocean Beach Police Department?               15:33:04
20   MR. WELCH:  Objection to the form.           15:33:05
21   You can answer.                              15:33:07
22   A.   Right now today?                         15:33:07
23   Q.   Let's start with today, please, yes.   15:33:09
24   A.   The officer on duty every day checks   15:33:12
25   the cameras to make sure that they are        15:33:14

Page 271

Loeffler

1
2    operational and logs that into a log, as he   15:33:16
3    does the phone record.  There is a phone     15:33:19
4    recorder also on the -- that's logged in every   15:33:21
5    day to make sure it's operational.  There is a   15:33:23
6    logbook for that as well.                    15:33:26
7    Q.   When did the phone -- when was         15:33:28
8    the -- excuse me.                            15:33:28
9    When was the phone recorder          15:33:28
10   installed?                                    15:33:32
11   A.   I'm not sure.                            15:33:33
12   Q.   Do you know whether there was a        15:33:36
13   phone recorder in place during your service as   15:33:39
14   trustee?                                      15:33:42
15   A.   I don't believe there was.              15:33:42
16   Q.   Have you ever heard any phone         15:33:44
17   recordings from that phone recorder?         15:33:46
18   A.   No, I have not.                          15:33:48
19   Q.   Do you know whether the video         15:33:50
20   surveillance footage is saved on those tapes   15:33:55
21   that it's recorded on or are they recorded over   15:34:01
22   again?                                        15:34:04
23   A.   It's not on tape.                        15:34:04
24   Q.   How -- and what medium are --          15:34:06
25   A.   Digital.                                 15:34:08

Page 272

Loeffler

1
2    MR. CONNOLLY:  Ari, just so we are           15:34:11
3    clear, we are talking about the system as    15:34:11
4    it exists today?                              15:34:11
5    THE WITNESS:  As exists today.               15:34:11
6    MR. GRAFF:  As exists today.                  15:34:12
7    Q.   Prior to the upgrade of the system,    15:34:15
8    do you know in what medium the surveillance   15:34:18
9    footage was stored?                          15:34:20
10   A.   VHS tapes.                               15:34:21
11   Q.   And were those VHS tapes kept in a     15:34:23
12   library or were they reused?                 15:34:26
13   A.   I don't know.                            15:34:28
14   Q.   Have you ever seen any video library   15:34:28
15   from those -- consisting of those VHS tapes?   15:34:31
16   A.   No, I have not.                          15:34:35
17   Q.   Do you know how many hours of video    15:34:38
18   footage can be stored on the DVR that's part of   15:34:43
19   the current system?                          15:34:46
20   MR. WELCH:  Objection to the form.           15:34:47
21   Is it a DVR system or is it something else?  15:34:49
22   A.   It's a DVR system.  Well, it's a        15:34:52
23   surveillance camera system.                  15:34:54
24   Q.   And by DVR, just so it's clear for     15:34:56
25   the record, I was referring to digital video   15:34:59

68  (Pages 269 to 272)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 273

```
             Loeffler
 1
 2   recording.                        15:35:00
 3      A.  Uh-huh.                     15:35:00
 4        THE COURT REPORTER:  You have to    15:35:00
 5   answer verbally.                   15:35:00
 6      A.  Yes.                        15:35:05
 7      Q.  Do you recall whether when you read   15:35:06
 8   about the Gilberd --               15:35:08
 9      A.  Do you want me to answer the   15:35:09
10   question?  You asked me a question.  I didn't   15:35:10
11   answer it.  You asked me how many days it was   15:35:11
12   stored there.                      15:35:12
13      Q.  Oh.  Do you know how many?    15:35:13
14      A.  Yes, I do.                  15:35:14
15      Q.  How many?                   15:35:15
16      A.  Ninety days.               15:35:15
17      Q.  Other than checking to make sure   15:35:19
18   that the system is working and logging that it   15:35:21
19   is, do you know whether anyone actually reviews   15:35:24
20   the recordings on a routine basis?   15:35:26
21      A.  No, I don't.                15:35:29
22      Q.  When you read about the Gilberd   15:35:32
23   incident for the first time in the newspaper,   15:35:46
24   could you describe for us now what you recall   15:35:50
25   of the description of that incident?   15:35:54
```

Page 274

```
             Loeffler
 1
 2        MR. WELCH:  You want him to describe   15:35:56
 3   now an article that he read about the   15:35:57
 4   incident?  Do you want him to describe to   15:35:59
 5   you an article that essentially involves a   15:36:02
 6   hearsay statement from what reporters,   15:36:05
 7   whomever is writing about this incident?   15:36:07
 8        MR. GRAFF:  Yes.              15:36:07
 9        MR. WELCH:  What he recalls about   15:36:09
10   that?                            15:36:10
11        MR. GRAFF:  About the information   15:36:10
12   that he read about in that article.   15:36:12
13        MR. WELCH:  Okay.  From whatever   15:36:13
14   sources they got it from, whatever he   15:36:14
15   recalls from that newspaper?          15:36:16
16        MR. GRAFF:  I am asking about what   15:36:17
17   he recalls from what he read in the   15:36:19
18   newspaper.                       15:36:20
19        MR. CONNOLLY:  Okay, that's fine.   15:36:21
20        Go ahead.  You can answer.     15:36:21
21        Can you recall reading from that   15:36:21
22   newspaper article?                 15:36:25
23      A.  No, I can't -- I don't recall the   15:36:27
24   sum and substance of what I read.  It's a   15:36:29
25   couple years ago.                  15:36:31
```

Page 275

```
             Loeffler
 1
 2      Q.  After that conversation with George   15:36:32
 3   Hesse about the Gilberd incident that you   15:36:41
 4   referred to -- well, first of all, was anything   15:36:43
 5   further communicated between the two of you in   15:36:45
 6   that conversation?                 15:36:49
 7      A.  No.                        15:36:49
 8      Q.  Did you ever follow up with George   15:36:49
 9   Hesse to find out whether there was video of   15:36:52
10   the incident?                     15:36:54
11      A.  Not with George Hesse, no.    15:36:56
12      Q.  Did you ever follow up with anyone   15:36:57
13   to find out?                      15:36:59
14      A.  Yes.                       15:37:00
15      Q.  Who did you follow up with?    15:37:00
16      A.  Chief Ed Paradiso.          15:37:02
17      Q.  And what did chief Ed Paradiso say   15:37:03
18   when you asked him about that?       15:37:05
19      A.  The system was malfunctioning.   15:37:05
20      Q.  Other than the conversation with   15:37:12
21   George -- well, strike that.  Excuse me.   15:37:13
22        Other than discussing the video   15:37:15
23   malfunction with Ed Paradiso, did you have any   15:37:18
24   other conversation with Ed Paradiso about the   15:37:20
25   Gilberd incident?                  15:37:23
```

Page 276

```
             Loeffler
 1
 2      A.  No.                        15:37:24
 3      Q.  Other than the conversation that you   15:37:25
 4   have already referred to with George Hesse, did   15:37:27
 5   you have any further conversations with George   15:37:29
 6   Hesse about the Gilberd incident?    15:37:31
 7      A.  No.                        15:37:33
 8        MR. WELCH:  Objection.  Asked and   15:37:33
 9   answered.                        15:37:34
10        MR. CONNOLLY:  Objection.      15:37:34
11      A.  No.                        15:37:35
12      Q.  Other than the fact that there was   15:37:35
13   an injury in the police station, as you sit   15:37:42
14   here today do you have any other information as   15:37:44
15   to the facts involved in the Gilberd incident?   15:37:46
16        MR. WELCH:  Objection.         15:37:48
17        You can answer.              15:37:49
18      A.  No, I don't.               15:37:49
19      Q.  Did George Hesse ever indicate to   15:37:51
20   you that the injury to Mr. Gilberd was   15:37:52
21   sustained when a clock hit him on the head?   15:37:54
22      A.  No.                        15:37:57
23      Q.  Do you know what the nature of the   15:37:58
24   injuries sustained by Mr. Gilberd were?   15:38:00
25        MR. WELCH:  Do you have personal   15:38:03
```

69 (Pages 273 to 276)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 277

Loeffler

1
2    knowledge of what the injuries to          15:38:09
3    Mr. Gilberd are?                   15:38:11
4        A.  I believe it was a lacerated        15:38:13
5    bladder, but I'm not positive.            15:38:15
6        Q.  Do you know what the nature of the   15:38:23
7    injuries sustained by Mr. Prisco were?      15:38:24
8        A.  No, I do not.                15:38:26
9        MR. WELCH:  Objection to the form of  15:38:30
10   that question.                    15:38:31
11       Q.  Do you know the names of any of the  15:38:32
12   civilians who were involved in the Halloween  15:38:36
13   incident are?                     15:38:38
14       A.  No, I do not.                15:38:39
15       Q.  Do you know the nature of the      15:38:41
16   injuries sustained by anyone in connection with  15:38:42
17   that incident?                    15:38:45
18       A.  No, I do not.                15:38:45
19       Q.  After the Halloween incident what is  15:38:50
20   the first time that you can recall having any  15:38:51
21   communication with either Gary or Richey     15:38:53
22   Bosetti?                        15:38:56
23       A.  I never spoke to them about that   15:38:58
24   incident.                       15:38:59
25       Q.  Did you ever learn that either of  15:39:00

Page 278

Loeffler

1
2    them were or were not involved in the incident  15:39:05
3    either way?                      15:39:08
4        A.  I believe I did -- I'm not -- I am  15:39:08
5    trying to think how I learned.  I did learn  15:39:25
6    that they were involved in the incident, but it  15:39:27
7    wasn't from George Hesse.  I am trying to    15:39:29
8    think.  I don't know.  I don't know.  I don't  15:39:34
9    recall.                         15:39:37
10       Q.  Do you recall if not who         15:39:37
11   communicated to you that you were involved, do  15:39:42
12   you recall what the nature of their involvement  15:39:45
13   was that was communicated?            15:39:47
14       A.  No, that they were involved.  That's  15:39:48
15   all I remember.                    15:39:50
16       Q.  And do you recall learning that     15:39:50
17   anyone else in particular was involved in the  15:39:51
18   incident?                       15:39:55
19       A.  No.                      15:39:56
20       Q.  Other than the conversations with Ed  15:39:56
21   Paradiso and George Hesse that you have already  15:40:00
22   referred to, can you recall any other      15:40:03
23   conversations that you had with anyone other  15:40:05
24   than counsel about the Halloween incident?   15:40:06
25       MR. WELCH:  Objection.  Asked and    15:40:08

Page 279

Loeffler

1
2    answered.                       15:40:09
3        You can answer it again.          15:40:09
4        A.  No.                      15:40:10
5        Q.  Did you discuss the Halloween      15:40:10
6    incident with any of your children?        15:40:12
7        A.  No.                      15:40:13
8        Q.  Did you ever make a statement to    15:40:14
9    George Hesse to the effect of "we have to turn  15:40:36
10   this around" with reference to the Halloween  15:40:38
11   incident?                       15:40:40
12       A.  No.                      15:40:42
13       Q.  Did you ever make a statement to    15:40:43
14   that effect to anyone with reference to the   15:40:44
15   Halloween incident?                 15:40:49
16       A.  No.                      15:40:50
17       Q.  Do you recall whether the events   15:41:07
18   that led to Officer Gerdon's termination were  15:41:10
19   captured by any video surveillance system?   15:41:14
20       A.  Yes, they were.               15:41:18
21       Q.  And did you ever review that video?  15:41:21
22       MR. WELCH:  Objection.  Asked and    15:41:23
23   answered.                       15:41:23
24       A.  No, I did not.               15:41:24
25       Q.  And I may have already asked the   15:41:25

Page 280

Loeffler

1
2    question --                      15:41:29
3        A.  You did.                   15:41:30
4        Q.  Yes.  At this point do you recall   15:41:31
5    anything of the specific conduct that led to   15:41:32
6    Officer Gerdon's termination?           15:41:35
7        MR. WELCH:  Objection.            15:41:39
8        A.  I already answered that.         15:41:40
9        MR. WELCH:  He answered that         15:41:40
10   question.                       15:41:45
11       Q.  Do you know an individual by the    15:41:45
12   name of Jean Jaeger is?              15:41:47
13       A.  Yes, I know who Jean Jaeger is.    15:41:56
14       Q.  Who is Jean Jaeger?            15:41:59
15       A.  She was married to Bud Jaeger, who  15:42:00
16   is deceased now, and they ran the movie      15:42:03
17   theater.                        15:42:07
18       Q.  Do you know Mr. Jean Jaeger was    15:42:07
19   involved in any way in the Halloween incident?  15:42:14
20       A.  No, I don't.                 15:42:15
21       Q.  Have you ever had any conversations  15:42:16
22   with Jean Jaeger concerning the Halloween    15:42:19
23   incident?                       15:42:22
24       A.  No.                      15:42:23
25       Q.  Other than running the movie      15:42:23

TSG Reporting - Worldwide      877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 281

Loeffler

1
2   theater, do you know if Bud Jaeger held any      15:42:26
3   other employment?                                 15:42:28
4       A.   He was a New York City fireman.         15:42:30
5       Q.   Do you know what position he held at    15:42:32
6   the New York City Fire Department?                15:42:34
7       A.   He was a lieutenant.                     15:42:36
8       Q.   Do you know whether he was ever a        15:42:37
9   captain?                                          15:42:39
10      A.   Oh, maybe he was.  I don't -- could      15:42:39
11  have been.                                        15:42:42
12      Q.   Is Bud Jaeger ever referred to as        15:42:42
13  Steven Jaeger?  Is that the same person?          15:42:46
14      A.   Yes.                                      15:42:48
15      Q.   What was the nature of your              15:42:49
16  relationship with Jean Jaeger?                    15:42:51
17          MR. WELCH:  Objection.                    15:42:53
18          To the extent you have one.               15:42:54
19      A.   She is Bud's wife.  No relationship.     15:42:57
20  They worked the movie theater.                    15:43:00
21      Q.   Were you ever -- were you friends        15:43:02
22  with Bud Jaeger when he was living?               15:43:05
23      A.   No.                                       15:43:06
24      Q.   Do you know an individual by the         15:43:07
25  name of Sean O'Rourke?                            15:43:09

Page 282

Loeffler

1
2       A.   Sean O'Rourke?  Yes.                     15:43:12
3       Q.   And who is Sean O'Rourke?                15:43:13
4       A.   He is resident of the Village.           15:43:16
5       Q.   Do you know where he works?              15:43:19
6       A.   In construction.  In construction.       15:43:21
7       Q.   And do you know whether his              15:43:26
8   construction work is based in Ocean Beach?        15:43:27
9       A.   Fire Island, yes.                        15:43:29
10      Q.   And what, if any, relationship do        15:43:31
11  you have with Sean O'Rourke?                      15:43:36
12      A.   He is a captain of the Fire              15:43:37
13  Department.  I saw him last night at a fire.      15:43:39
14      Q.   Do you know whether Sean O'Rourke        15:43:41
15  had any involvement in the Halloween incident?   15:43:42
16      A.   No, I don't.                             15:43:45
17      Q.   Did you ever discuss the Halloween       15:43:46
18  incident with Sean O'Rourke?                      15:43:48
19      A.   No.                                       15:43:50
20      Q.   Have you ever heard of an individual     15:43:51
21  named Ian Levine?                                 15:43:56
22      A.   Yes.                                      15:43:57
23      Q.   Who is Ian Levine?                       15:43:58
24      A.   Resident of the Village of Ocean        15:43:59
25  Beach.                                            15:44:01

Page 283

Loeffler

1
2       Q.   Do you know where Ian Levine works?     15:44:01
3       A.   He runs the community garden center     15:44:05
4   business in the Village of Ocean Beach.           15:44:10
5       Q.   And what, if any, relationship do       15:44:11
6   you have with Ian Levine?                         15:44:14
7       A.   I saw him last night at the fire        15:44:15
8   too.  He is a member of the Fire Department.     15:44:18
9       Q.   And when you are referring to seeing    15:44:20
10  people last night at the Fire Department, can    15:44:21
11  you explain what the context of that  was?       15:44:24
12      A.   We had a fire alarm last night and      15:44:25
13  they showed up.                                   15:44:28
14      Q.   Do you know whether Ian Levine had      15:44:29
15  any involvement in the Halloween incident?       15:44:31
16      A.   No, I do not.                           15:44:32
17      Q.   Did you ever discuss it with Ian        15:44:33
18  Levine?                                           15:44:34
19      A.   No, I have not.                         15:44:34
20      Q.   Do you know an individual by the        15:44:36
21  name of Elyse Miller?                            15:44:38
22          THE COURT REPORTER:  I'm sorry?          15:44:38
23          MR. GRAFF:  Elyse Miller.                15:44:40
24  E-L-Y-S-E.                                        15:44:42
25      A.   No, I don't know that name.             15:44:42

Page 284

Loeffler

1
2       Q.   Do you know an individual by the        15:44:44
3   name of Douglas Wykoff?                          15:44:51
4       A.   Yes.                                     15:44:53
5       Q.   Who is Douglas Wykoff?                   15:44:54
6       A.   A resident of the Village of Ocean      15:44:55
7   Beach.                                            15:44:58
8       Q.   How long have you known Doug Wykoff?    15:44:58
9       A.   Thirty years, forty year.  I don't      15:45:01
10  know how old Doug is.  Forty years.              15:45:05
11      Q.   And how would you describe your         15:45:06
12  relationship with Doug Wykoff?                    15:45:09
13      A.   He was my kid's kindergarten            15:45:11
14  teacher.                                          15:45:15
15      Q.   And were you friendly with Doug         15:45:15
16  Wykoff's family?                                  15:45:20
17      A.   Yes.                                      15:45:22
18      Q.   Does he live with his family in         15:45:23
19  Ocean Beach?                                      15:45:25
20      A.   Yes.                                      15:45:25
21      Q.   What is Doug Wykoff's wife's name?      15:45:25
22      A.   This is a question and answer.          15:45:31
23  Dale.  Dale Wykoff.                               15:45:33
24      Q.   With a D?                               15:45:34
25      A.   With a D, yes.                          15:45:36

71 (Pages 281 to 284)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 285

Loeffler

1
2    Q.   And what is Dale Wykoff's employment   15:45:37
3    in Ocean Beach, if any?                     15:45:42
4        A.   She is employed by the U.S. Postal   15:45:42
5    Service.                                    15:45:45
6        Q.   Do you know whether the Wykoffs have   15:45:45
7    any children?                               15:45:53
8        A.   Yes.                               15:45:54
9        Q.   How many children do they have?   15:45:55
10       A.   They had two.  One is living.  One   15:45:56
11   is deceased.                                15:46:03
12       Q.   What's the name of the child who is   15:46:04
13   living?                                     15:46:08
14       A.   Marissa.                           15:46:09
15       MR. WELCH:  I don't know if this is   15:46:10
16   relevant, Ari.                              15:46:12
17       A.   She is a New York City police      15:46:15
18   officer.                                    15:46:16
19       Q.   Do you recall that earlier today I   15:46:17
20   had asked you about any investigations or about   15:46:18
21   certain investigation concerning Ed Paradiso's   15:46:21
22   dual employment?                            15:46:25
23       A.   Yes.                               15:46:25
24       Q.   Do you know whether Dale Wykoff    15:46:26
25   played any role in that investigation?      15:46:30

Page 286

Loeffler

1
2        MR. WELCH:  Objection to the form.   15:46:32
3    Objection to the use of the term            15:46:34
4    "investigation."  That wasn't your question   15:46:35
5    earlier today.  Your earlier question       15:46:39
6    involved Mayor Rogers' investigation.       15:46:41
7        So to the extent that you can answer   15:46:43
8    the question, I am noting my objection, you   15:46:46
9    can.                                        15:46:48
10       A.   Ask the question again.            15:46:49
11       Q.   Do you know whether Dale Wykoff    15:46:52
12   played any role in the investigation by Mayor   15:46:54
13   Rogers involving Ed Paradiso's dual employment?   15:46:59
14       MR. WELCH:  Objection.  The question   15:47:01
15   is did you play a role in the               15:47:02
16   investigation.                              15:47:05
17       A.   No, I don't know that.             15:47:06
18       Q.   Do you know whether Dale Wykoff ever   15:47:07
19   conducted her own investigation into that   15:47:10
20   matter?                                     15:47:12
21       A.   No, I do not.                      15:47:12
22       Q.   How old is Marissa Wykoff?         15:47:14
23       A.   She has got to be in her thirties.   15:47:23
24       Q.   And what was the name of Wykoffs'   15:47:26
25   child that passed away?                     15:47:28

Page 287

Loeffler

1
2        MR. WELCH:  Objection.  Ari, this is   15:47:29
3    very irrelevant.                            15:47:31
4        A.   Douglas Junior.                    15:47:32
5        Q.   And how old was Douglas -- when did   15:47:34
6    Douglas Junior pass away?                   15:47:37
7        A.   Let's see.  He was 18.  My son is   15:47:39
8    25.  About seven, eight years ago maybe.  Maybe   15:47:54
9    eight years ago.                            15:47:57
10       Q.   Was Douglas Junior, to your        15:47:57
11   knowledge, friends with Mike Loeffler?      15:48:04
12       A.   Yes.  They were Boy Scouts together.   15:48:05
13       Q.   What, if anything, do you know about   15:48:18
14   the circumstances of Doug Wykoff Junior's   15:48:21
15   death?                                      15:48:23
16       MR. WELCH:  Objection.  Ari, what is   15:48:23
17   the relevance of this to any of the         15:48:25
18   allegations in this Complaint?  Unless you   15:48:26
19   can articulate that to me, I am going to    15:48:28
20   direct the witness not to answer that       15:48:30
21   question.  And you can take it up with the   15:48:32
22   judge, if you want.  You can call the judge   15:48:35
23   right now.  We have time.                   15:48:37
24       Q.   Do you know whether Michael Loeffler   15:48:43
25   was ever questioned at all by any member of the   15:48:53

Page 288

Loeffler

1
2    Ocean Beach Police Department in connection   15:48:58
3    with the circumstances of Doug Wykoff Junior's   15:49:00
4    death?                                      15:49:03
5        MR. WELCH:  Objection.  I am going   15:49:03
6    to direct the witness not to answer that   15:49:04
7    question.  Next question.                   15:49:05
8        Q.   Did you ever have any communications   15:49:06
9    with any of the plaintiffs in this lawsuit   15:49:08
10   concerning the circumstances of Doug Wykoff   15:49:10
11   Junior's death?                             15:49:12
12       A.   No.                                15:49:13
13       Q.   Did you have any conversations with   15:49:13
14   any Ocean Beach police officers concerning the   15:49:17
15   circumstances of Doug Wykoff Junior's death?   15:49:19
16       A.   No.                                15:49:21
17       Q.   Did you have any communications ever   15:49:22
18   with Mike Loeffler concerning the circumstances   15:49:25
19   of Doug Wykoff Junior's death?              15:49:26
20       MR. WELCH:  Objection.  I am going   15:49:28
21   to direct the witness not to answer the   15:49:29
22   question.                                   15:49:30
23       Q.   Do you know an individual by the   15:49:31
24   name of Mitch Burns?                        15:49:33
25       A.   No.                                15:49:33

TSG Reporting - Worldwide     877-702-9580

Page 289

Loeffler

1
2    Q.   Have you heard that name prior to    15:49:34
3  today?                                      15:49:36
4    A.   Yes.                                 15:49:37
5    Q.   When did you first hear that name?   15:49:38
6    A.   It was mentioned -- I believe it's   15:49:40
7  in the lawsuit.                             15:49:41
8    Q.   Other than any reference to it in    15:49:45
9  the lawsuit, do you recall ever hearing Mitch   15:49:48
10 Burns' name in another context?             15:49:53
11   A.   Never met the man.  Never met the    15:49:54
12 man.                                        15:49:56
13   Q.   Did you ever hear his name other     15:49:58
14 than in connection with this lawsuit?       15:50:00
15   A.   No.                                  15:50:01
16   Q.   And what reference is there to Mitch  15:50:02
17 Burns in this lawsuit?                      15:50:14
18       MR. WELCH:  Objection.  Ari, why      15:50:15
19   don't you show him the Complaint and ask  15:50:16
20   him if he recalls the specific allegation.  15:50:18
21   Q.   Do you recall any allegations        15:50:18
22 involving Mitch Burns?                      15:50:20
23   A.   No, I don't recall the allegation.   15:50:20
24 I just remember -- I remember the name.     15:50:24
25   Q.   And you remember the name from       15:50:25

Page 290

Loeffler

1
2  reviewing the Complaint in this lawsuit?    15:50:33
3    A.   Yeah, I think so.                    15:50:34
4    Q.   If I showed you the Complaint, do    15:50:43
5  you think you could find the spot?          15:50:45
6    A.   No, I probably couldn't.             15:50:46
7    Q.   Did you ever review the answer that  15:50:49
8  was filed to this Complaint in federal court,  15:50:53
9  that is, these Plaintiffs' Complaint?       15:50:56
10   A.   Is that the one you showed me today?  15:50:59
11   A.   No.  The Answer to the Complaint,    15:51:01
12 not to the Interrogatories.                 15:51:07
13   A.   Well, I'm not an attorney, so I      15:51:09
14 don't know exactly what you are asking me.  15:51:11
15   Q.   Do you have any information          15:51:21
16 concerning an incident involving one of the  15:51:22
17 Bosettis and an evidence locker on the Great  15:51:24
18 South Bay?                                  15:51:28
19   A.   No.                                  15:51:28
20   Q.   Do you recall reading an allegation  15:51:29
21 involving those three matters in the Complaint?  15:51:31
22       MR. WELCH:  Objection.  Did you say   15:51:34
23   "three matters"?  Maybe I misunderstood the  15:51:36
24   question.  Can you repeat the question.   15:51:40
25       (Record read.)                        15:51:54

Page 291

Loeffler

1
2       MR. WELCH:  So I am going to object    15:51:56
3  to the form.  It's compound.  If you could  15:51:58
4  just break down those three matters so we   15:52:00
5  can get a clear record, I'd appreciate it.  15:52:01
6    Q.   Do you recall any allegation in the  15:52:02
7  Complaint that involved all three of those  15:52:03
8  matters?                                    15:52:05
9    A.   What matters is that?                15:52:05
10   Q.   An evidence locker, a Bosetti, and   15:52:07
11 the Great South Bay.                        15:52:09
12   A.   No.                                  15:52:10
13   Q.   Would your answer be the same if I   15:52:11
14 changed evidence locker to file cabinet?    15:52:25
15       MR. WELCH:  Objection to the form.    15:52:29
16   His answer is his answer.  What he        15:52:31
17   testified to earlier --                   15:52:32
18   A.   I don't know what you are talking    15:52:33
19 about, so I'm sorry.                        15:52:34
20   Q.   When George Hesse communicated to    15:53:07
21 you that there was going to be a follow-up or  15:53:10
22 a second investigation of the Halloween     15:53:13
23 incident, do you recall what I am referring to?  15:53:16
24       MR. WELCH:  I am going to object to   15:53:18
25   the form of the question.  It's           15:53:19

Page 292

Loeffler

1
2  mischaracterizing the testimony.            15:53:21
3       If you can answer it, go ahead.        15:53:22
4    A.   Would you ask that again, please.    15:53:24
5    Q.   I believe you had earlier indicated  15:53:27
6  that George Hesse had communicated to you that  15:53:29
7  the investigation of the Halloween incident  15:53:31
8  conducted on the night of the incident was  15:53:33
9  improper and that another investigation would  15:53:35
10 be conducted.                               15:53:36
11   A.   He was instructed by Ed Paradiso to  15:53:37
12 do that, yes.                               15:53:40
13   Q.   Did you ever speak about that        15:53:41
14 subject with Ed Paradiso?                   15:53:43
15       MR. WELCH:  Objection.  Asked and     15:53:46
16   answered.                                 15:53:46
17       You can answer it again.              15:53:46
18   A.   No, I never did.                     15:53:47
19   Q.   And did you ever have any further    15:53:49
20 conversations with George Hesse about that  15:53:50
21 investigation that you referred to?         15:53:51
22       MR. WELCH:  Objection.  Asked and     15:53:53
23   answered.                                 15:53:54
24       You can answer it again.              15:53:54
25   A.   No.                                  15:53:55

73 (Pages 289 to 292)

9e28f7aa-4e93-4641-9524-8529961356c8

Loeffler

1
2     MR. GRAFF:  How much time, if I          15:53:55
3 could ask the videographer, is left on this  15:54:02
4 tape?                                         15:54:04
5     THE VIDEOGRAPHER:  59 minutes.           15:54:04
6     MR. GRAFF:  I'd like to take a brief     15:54:10
7 break.                                        15:54:12
8     MR. WELCH:  Five minutes?                15:54:14
9     MR. GRAFF:  Yes.                         15:54:15
10     THE VIDEOGRAPHER:  Going off the        15:54:16
11 record.  The time is 3:54 p.m.              15:54:17
12     (Recess was taken from 3:54 to          15:54:19
13 4:04.)                                       15:54:20
14     THE VIDEOGRAPHER:  We are back on       16:02:20
15 the record.  The time is 4:04 p.m.          16:03:53
16 BY MR. GRAFF:                               16:03:58
17     Q.  When I left earlier, I had asked you  16:03:58
18 if you knew who Mitch Burns is.              16:04:01
19     A.  Yes.                                16:04:03
20     Q.  And your answer was you do not know  16:04:04
21 who Mitch Burns is?                          16:04:05
22     A.  No, I don't.                        16:04:06
23     Q.  The Complaint makes reference to a   16:04:07
24 known drug dealer.  Is that the reference to  16:04:09
25 Mitch Burns that you were referring to earlier?  16:04:12

Loeffler

1
2     MR. WELCH:  Objection to the form.       16:04:14
3     You can answer.                          16:04:15
4     A.  I don't know.  I don't know who      16:04:17
5 Mitch -- I've heard the name, but I don't know  16:04:18
6 who he is.  I have never met the man.        16:04:20
7     Q.  Have you heard what his employment,  16:04:24
8 if any, is?                                   16:04:26
9     A.  No.  I don't know him.  I just said  16:04:27
10 I never met the man, never spoke to the man.  I  16:04:28
11 don't know who he is.                        16:04:31
12     Q.  Other than possibly reading his name  16:04:32
13 in the Complaint, do you have any idea where  16:04:33
14 else you would have heard the name?          16:04:35
15     A.  No.  No, I don't.                   16:04:38
16     Q.  Do you know if Ed Paradiso has ever  16:04:48
17 sued the Incorporated Village of Ocean Beach?  16:04:52
18     A.  Yes.  Yes, he has.                  16:04:54
19     Q.  And has he sued Ocean Beach on more  16:04:56
20 than one occasion?                           16:05:00
21     A.  One that I'm aware of.              16:05:01
22     Q.  And what was -- what were the nature  16:05:04
23 of the allegations against Ocean Beach that Ed  16:05:07
24 Paradiso made on that occasion that you are  16:05:09
25 aware of?                                     16:05:11

Loeffler

1
2     A.  It's ongoing litigation with         16:05:12
3 reference to a wage dispute.                 16:05:14
4     Q.  So that litigation has not been      16:05:17
5 resolved?                                     16:05:21
6     A.  No, it has not.                      16:05:22
7     Q.  And when did Ed Paradiso initiate    16:05:23
8 that litigation?                              16:05:25
9     A.  While he was out injured in the line  16:05:26
10 of duty.                                      16:05:28
11     Q.  And what is he alleging in           16:05:29
12 connection with the wage dispute?           16:05:32
13     MR. WELCH:  That you are aware of.       16:05:34
14 Objection to form, but you can answer.       16:05:36
15     A.  He is alleging that he is entitled  16:05:37
16 to certain benefits that we don't feel he is  16:05:39
17 entitled to.                                  16:05:43
18     Q.  And what benefits?                  16:05:43
19     A.  Monetary benefits.                  16:05:45
20     Q.  And how much money is at issue?     16:05:46
21     A.  I don't know.                       16:05:49
22     Q.  Do you know if you were named as an  16:05:52
23 individual defendant in that lawsuit?       16:05:54
24     A.  No, I was not.                      16:05:55
25     Q.  And who is representing the Village  16:05:57

Loeffler

1
2 in connection with that lawsuit?             16:06:00
3     A.  Bee Ready Fishbein Hatter Donovan.   16:06:01
4     Q.  Other than this lawsuit, is the law  16:06:04
5 firm -- has the law firm of Rivkin Radler    16:06:06
6 represented the Village of Ocean Beach in any  16:06:08
7 other case that you are aware of?            16:06:10
8     MR. WELCH:  I am going to object to      16:06:13
9 the form.                                     16:06:14
10     If you know.  Do you know?              16:06:16
11     A.  I'm not sure.  I'm not sure.        16:06:17
12 Because I think you guys might represent us in  16:06:23
13 another case.  You do.  That's -- the Gilberd  16:06:25
14 case.  I think you have that now.            16:06:29
15     MR. WELCH:  Do you know?  If you        16:06:31
16 don't know, you don't know.                 16:06:32
17     A.  Yes, you do.  Rivkin Radler does    16:06:33
18 represent us in another case.               16:06:37
19     MR. JEMAL:  Just by Village counsel,    16:06:39
20 that's something that was recently           16:06:41
21 transferred to this firm, representation of  16:06:42
22 the Village on the Samuel Gilberd case       16:06:44
23 against the Incorporated Village of Ocean    16:06:47
24 Beach.                                        16:06:50
25     Q.  And the Samuel Gilberd case against  16:06:50

9e28f7aa-4e93-4641-9524-8529961356c8

Page 297

Loeffler

1
2   the Incorporated Village of Ocean Beach, that's   16:06:53
3   a civil lawsuit?                                  16:06:53
4       A.   Yes, it is.                    16:06:54
5       Q.   Do you know -- have you reviewed the   16:06:55
6   Complaint that was filed in that lawsuit?        16:06:57
7       A.   Yes, I have, but I don't remember      16:06:58
8   when or where.  I have read it.            16:07:06
9       Q.   And can you describe as best you can   16:07:08
10  recall what Samuel Gilberd's allegations         16:07:11
11  against Ocean Beach are?                     16:07:13
12       MR. WELCH:  As he remembers from      16:07:14
13   reading the Complaint?                   16:07:16
14       MR. GRAFF:  From any source.          16:07:16
15       MR. WELCH:  Or any personal            16:07:17
16   knowledge of, which he has already          16:07:18
17   testified to?  Not any source.  I am asking  16:07:19
18   you to clarify the question, please.  He      16:07:21
19   has already testified to his knowledge of    16:07:24
20   the Gilberd incident, his personal           16:07:25
21   knowledge of it, which he didn't have.  So   16:07:27
22   now you are asking for knowledge that he     16:07:29
23   gained from reading somebody else's         16:07:30
24   Complaint?                        16:07:32
25       MR. GRAFF:  Yes.              16:07:32

Page 298

Loeffler

1
2       MR. WELCH:  Do you have any        16:07:32
3   knowledge about the incident from reading    16:07:33
4   about somebody else's Complaint?         16:07:35
5       A.   He -- to the best of my        16:07:37
6   recollection, he makes an allegation that he   16:07:40
7   was injured while in custody.  That's the sum   16:07:43
8   and substance of what I can remember the      16:07:48
9   Complaint to be.                    16:07:49
10       Q.   Do you know if you are an individual   16:07:50
11  defendant in that lawsuit?              16:07:51
12       A.   I don't believe I am.           16:07:52
13       Q.   Do you know whether you have been   16:07:56
14  named as an individual defendant in any      16:08:02
15  lawsuits other than this lawsuit in connection   16:08:04
16  with your service at Ocean Beach?         16:08:06
17       MR. WELCH:  Objection.  Asked and   16:08:08
18   answered about five hours ago, but you can   16:08:09
19   answer it again.                   16:08:11
20       A.   No.                    16:08:11
21       Q.   Do you know whether former Mayor   16:08:12
22  Rogers has been named as an individual      16:08:16
23  defendant in any other lawsuit other than this   16:08:17
24  lawsuit in connection with her service at Ocean   16:08:19
25  Beach?                         16:08:21

Page 299

Loeffler

1       A.   No, I do not.            16:08:21
2       Q.   Do you know whether Alan Loeffler   16:08:23
3   has been named as an individual defendant in   16:08:29
4   any lawsuit in connection with carrying out any   16:08:31
5   law enforcement duties that he has?      16:08:39
6       MR. WELCH:  Objection to the form,   16:08:41
7   and Alan Loeffler it's been established he   16:08:46
8   is not working for the Village anymore, so   16:08:48
9   he doesn't have any continuing duties.     16:08:50
10       MR. WELCH:  I said any law       16:08:52
11   enforcement duties that he has.        16:08:53
12       MR. WELCH:  That he has.  He doesn't   16:08:55
13   work for the Village anymore.  You are     16:08:56
14   saying if he is still employed in a law     16:08:57
15   enforcement capacity?              16:08:57
16       MR. GRAFF:  Yes.              16:08:59
17       MR. WELCH:  You need to establish   16:09:01
18   that foundation if he is still employed in   16:09:02
19   law enforcement.  I don't think you have.   16:09:04
20       MR. GRAFF:  Okay.  I am asking now   16:09:04
21   if Mayor Loeffler knows whether his       16:09:06
22   brother, Alan Loeffler, has been named as   16:09:08
23   an individual defendant in connection with   16:09:10
24   the execution of any law enforcement duties   16:09:12

Page 300

Loeffler

1
2   that he may have in his capacity as an     16:09:14
3   employee of any employer.           16:09:17
4       MR. WELCH:  Ever?  Or right now?  If   16:09:18
5   he is still employed is there a lawsuit     16:09:20
6   pending against him or is he a defendant in   16:09:22
7   a lawsuit?                       16:09:24
8       MR. GRAFF:  Has he ever been a     16:09:24
9   defendant in a lawsuit in connection with    16:09:25
10   his execution of law enforcement duties     16:09:27
11   that Mayor Loeffler is aware of.        16:09:30
12       MR. WELCH:  Ever.             16:09:32
13       MR. GRAFF:  Yes.             16:09:32
14       A.   Yes.                  16:09:33
15       Q.   Has he been involved in more than   16:09:33
16  one such lawsuit that you are aware of?     16:09:35
17       A.   I don't know.            16:09:37
18       Q.   And the one lawsuit that you are   16:09:39
19  aware of, is that still pending?         16:09:42
20       A.   Yes.                  16:09:44
21       Q.   And do you know who the plaintiff is   16:09:44
22  in that lawsuit?                  16:09:45
23       A.   No.                   16:09:46
24       Q.   And do you know what the nature of   16:09:46
25  the allegations against Alan Loeffler are in   16:09:48

75 (Pages 297 to 300)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 301

```
 1              Loeffler
 2   that lawsuit?                    16:09:49
 3      A.  No, I do not.             16:09:50
 4      Q.  Do you know whether it's alleged    16:09:51
 5   that Alan Loeffler --            16:09:53
 6      A.  I just said I didn't know.  So it    16:09:54
 7   doesn't matter.                  16:09:56
 8      Q.  You don't know any of the    16:09:56
 9   allegations?                     16:09:57
10      A.  No, I don't know any of the    16:09:57
11   allegations.                     16:09:57
12      Q.  Have you ever discussed it with Alan  16:09:58
13   Loeffler?                        16:09:59
14      A.  I know he has a pending lawsuit.    16:10:00
15   That's all I know.               16:10:01
16      Q.  Do you know when that lawsuit was    16:10:02
17   commenced?                       16:10:04
18      A.  No.                       16:10:04
19      Q.  Do you know whether that lawsuit was  16:10:05
20   commenced prior to Alan Loeffler's retirement?  16:10:12
21      A.  Retirement from where?      16:10:18
22      Q.  From Ocean Beach.         16:10:22
23      A.  No.  I don't -- he didn't -- I    16:10:26
24   don't -- no, I don't know that.   16:10:30
25      Q.  Did Alan Loeffler ever work at Ocean  16:10:31
```

Page 302

```
 1              Loeffler
 2   Beach?                           16:10:33
 3      A.  He absolutely did.         16:10:33
 4      Q.  As a police officer?       16:10:34
 5      A.  Absolutely did.           16:10:35
 6      Q.  Do you know when he retired from    16:10:36
 7   that position?                   16:10:37
 8      A.  He never retired from that position.  16:10:38
 9      Q.  Is he still working as a police    16:10:39
10   officer?                         16:10:43
11      A.  No.                       16:10:43
12      Q.  But his employment as a police    16:10:46
13   officer at Ocean Beach is not ongoing; is that  16:10:48
14   correct?                         16:10:50
15      A.  That's correct.           16:10:51
16      Q.  Okay.  Mayor Loeffler, are you aware  16:10:52
17   that plaintiffs' allegations in this case    16:11:03
18   include the claims against George Hesse for    16:11:05
19   defamation?                      16:11:12
20      A.  Yes.                      16:11:13
21      Q.  And do you know what plaintiffs    16:11:14
22   have -- in what way plaintiffs have alleged    16:11:17
23   that George Hesse defamed them?   16:11:19
24      A.  No, I don't.              16:11:21
25      Q.  Have you ever discussed those    16:11:21
```

Page 303

```
 1              Loeffler
 2   allegations with George Hesse?   16:11:23
 3      A.  No, I have not.            16:11:24
 4      Q.  Have you ever discussed those    16:11:25
 5   allegations with anyone other than your    16:11:26
 6   counsel?                         16:11:27
 7      A.  No, I have not.            16:11:27
 8          MR. GRAFF:  I am going to ask the    16:11:33
 9   court reporter to please mark as    16:11:35
10   Exhibit Loeffler 15 a three-page document  16:11:36
11   bearing Bates number 10182 through 10184.  16:11:48
12          (Loeffler Exhibit 15, Pending    16:11:59
13   Claims, Bates stamped 010182 through    16:11:59
14   010184, marked for identification.)    16:12:01
15      Q.  Mayor Loeffler, while your counsel    16:12:29
16   is looking at those documents, geographically,  16:12:30
17   what is the distance between the Town of Islip  16:12:37
18   and Ocean Beach?  That is, how would one --    16:12:44
19   strike that.                     16:12:48
20          How would one travel from the Town    16:12:49
21   of Islip to Ocean Beach?         16:12:51
22      A.  Ocean Beach is in the Town of Islip.  16:12:52
23      Q.  Okay.  And the Town of Islip Harbor  16:12:57
24   Police, do you know what their jurisdiction is?  16:13:02
25      A.  The Town of Islip.         16:13:04
```

Page 304

```
 1              Loeffler
 2      Q.  And does that include Ocean Beach?  16:13:05
 3      A.  The waters in front of -- yes, the    16:13:08
 4   waters in Ocean Beach, yes, it would.    16:13:11
 5      Q.  And just so I'm clear, does the Town  16:13:13
 6   of Islip have overlapping jurisdiction with    16:13:20
 7   Ocean Beach Police Department or are they    16:13:21
 8   separate?                        16:13:24
 9          MR. WELCH:  Objection to the form of  16:13:24
10   the question.  To the extent it also calls  16:13:25
11   for a legal conclusion.          16:13:27
12          You can answer the question.    16:13:28
13      A.  I don't know exactly what their    16:13:30
14   jurisdiction is.                 16:13:31
15      Q.  Do you know who the chief or head of  16:13:32
16   the Town of Islip Harbor Police Department is?  16:13:37
17      A.  Robert Sgroi.             16:13:42
18      Q.  And do you know who preceded him in    16:13:43
19   that position?                   16:13:45
20      A.  My brother, Alan Loeffler.   16:13:45
21      Q.  And what position does Alan Loeffler  16:13:48
22   currently hold with the Town of Islip Harbor    16:13:51
23   Police?                          16:13:54
24      A.  None.                     16:13:54
25      Q.  Is Alan Loeffler currently employed    16:13:56
```

TSG Reporting – Worldwide      877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 305

```
1              Loeffler
2   by any employer?                16:13:59
3     A.  No.              16:14:00
4     Q.  Do you know why he stopped serving   16:14:01
5   as chief of the Harbor -- Town of Islip Harbor   16:14:03
6   Police?                16:14:09
7     A.  Yes.              16:14:09
8     Q.  And why?                16:14:09
9     A.  Because he spent thirty years there   16:14:10
10  and he retired.              16:14:12
11     Q.  Mayor Loeffler, when you have had a   16:14:16
12  chance to review the document that's been   16:14:23
13  marked Loeffler 15, could you tell me, please,   16:14:25
14  if you have ever seen it before?       16:14:27
15     MR. WELCH:  The question is have you   16:14:29
16  seen this before.            16:14:30
17     (Document review.)          16:14:48
18     A.  I've never seen this document.     16:14:48
19     Q.  Let's put it aside.        16:14:50
20         Have you ever heard of a person   16:14:52
21  named Harriet Beizer before, B-E-I-Z-E-R?    16:14:54
22     A.  Yes.              16:14:57
23     Q.  And who is Harriet Beizer?       16:14:58
24     A.  She is a resident of the Village of   16:14:59
25  Ocean Beach.            16:15:01
```

Page 306

```
1              Loeffler
2     Q.  And when did you first meet Harriet   16:15:02
3   Beizer?              16:15:04
4     A.  I've never met Harriet Beizer.     16:15:05
5     Q.  How do you know who she is?       16:15:06
6     A.  She filed a lawsuit against the     16:15:08
7   Village.              16:15:09
8     Q.  And what is she alleging as a basis   16:15:10
9   for her lawsuit?            16:15:13
10     A.  I believe the lawsuit has been     16:15:13
11  settled and there is a confidentiality     16:15:16
12  agreement on that lawsuit, so I don't know if I   16:15:19
13  could pierce that.            16:15:21
14     MR. WELCH:  Do you need to step     16:15:23
15  outside and speak with counsel about it?    16:15:24
16     MR. GRAFF:  I would like to follow   16:15:26
17  up on that.  If you guys need to confer,   16:15:28
18  please do.              16:15:30
19     MR. WELCH:  Yes, we will take a     16:15:30
20  minute.              16:15:32
21     THE VIDEOGRAPHER:  Going off the   16:15:32
22  record.  The time is 4:16 p.m.         16:15:33
23     (Recess was taken from 4:16 to     16:15:35
24  4:29.)              16:15:36
25     THE VIDEOGRAPHER:  We are back on   16:23:00
```

Page 307

```
1              Loeffler
2   the record.  The time is 4:29 p.m.  This is   16:28:47
3   the beginning of the tape labeled number 5.   16:28:51
4     (Mr. Novikoff enters.)        16:28:51
5     MR. GRAFF:  If the court reporter     16:28:56
6   could please read back my last question     16:28:57
7   before the break.            16:28:59
8     (Record read.)          16:29:12
9     MR. NOVIKOFF:  Yeah, the position we   16:29:13
10  are going to take is that to Mr. -- Mayor   16:29:14
11  Loeffler's recollection and belief the     16:29:18
12  confidentiality provision prevents him from   16:29:21
13  testifying in this -- on this issue without   16:29:24
14  a court order, so if it's something you     16:29:27
15  want to take up with the judge at a later   16:29:29
16  date and the judge rules that it's     16:29:32
17  relevant, then Mr. Loeffler has to testify   16:29:34
18  or otherwise produce a copy of the     16:29:36
19  confidentiality agreement, then obviously   16:29:38
20  we will comply with any court order, but --   16:29:40
21     MR. GRAFF:  Okay, and without     16:29:43
22  reference to the confidentiality agreement,   16:29:44
23  is your position that he can't answer     16:29:46
24  questions about the allegations at all in   16:29:47
25  that case?              16:29:49
```

Page 308

```
1              Loeffler
2     MR. NOVIKOFF:  I think they are     16:29:49
3   palpably irrelevant and I don't know the   16:29:51
4   scope of the confidentiality agreement,   16:29:52
5   quite frankly, and I don't know how far it   16:29:54
6   goes.  I don't know if it says you can't   16:29:56
7   discuss anything about the lawsuit.  I     16:29:58
8   would think it would, because it's     16:30:00
9   presumably, I don't know, a settlement     16:30:02
10  agreement, and I think the safer approach   16:30:04
11  would be to mark it and take it up with the   16:30:08
12  judge and if the judge finds it, one,     16:30:11
13  relevant and, two, that he could testify   16:30:15
14  pursuant to the confidentiality agreement,   16:30:17
15  then we will do it.            16:30:19
16  RL     MR. GRAFF:  Let's just mark the   16:30:20
17  transcript for ease at this point.     16:30:21
18     MR. NOVIKOFF:  Yes.          16:30:21
19     MR. GRAFF:  I won't press on that   16:30:23
20  issue if you haven't seen the       16:30:25
21  confidentiality --          16:30:26
22     MR. NOVIKOFF:  Yeah, I haven't seen   16:30:27
23  it.  I would suggest perhaps in the future,   16:30:29
24  not in this case, in another case, if you   16:30:31
25  think you are going to go into a line of   16:30:34
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 309

```
 1              Loeffler
 2    questioning where there was a settlement    16:30:34
 3    agreement with a municipality, you give us   16:30:36
 4    some notice and we could then find a        16:30:38
 5    confidentiality agreement and maybe avoid   16:30:40
 6    this issue, but...                          16:30:42
 7        MR. GRAFF:  Counsel, I didn't know      16:30:44
 8    that the case had been settled until --     16:30:45
 9        MR. NOVIKOFF:  No, I understand.  I     16:30:47
10    understand.                                 16:30:48
11    BY MR. GRAFF:                               16:30:51
12        Q.   Mayor Loeffler, are you familiar   16:30:51
13    with a business in Ocean Beach called the   16:30:53
14    Island Mermaid Corporation?                 16:30:56
15        A.   Yes.              16:30:58
16        Q.   And what is the nature of that     16:30:59
17    business?                     16:31:00
18        A.   It's a bar/restaurant.            16:31:00
19        Q.   And, to your knowledge, has the    16:31:02
20    Island Mermaid Corporation brought any lawsuit  16:31:03
21    against Ocean Beach during your service as  16:31:05
22    trustee or mayor?                  16:31:07
23        A.   Yes.              16:31:08
24        Q.   And do you know what the nature of  16:31:08
25    the allegations in that lawsuit are?        16:31:10
```

Page 310

```
 1              Loeffler
 2        A.   No, I'm not familiar with it.      16:31:11
 3        Q.   Mayor Loeffler, how many properties  16:31:13
 4    do you own in the Village of Ocean Beach?   16:31:33
 5        A.   One.                   16:31:36
 6        Q.   And what address is that property   16:31:37
 7    located at?                     16:31:39
 8        A.   68 Ocean Road.             16:31:40
 9        Q.   And is there an address 69 Ocean   16:31:42
10    Road?                      16:31:44
11        A.   It's 68-69. It's two lots.        16:31:44
12        Q.   Other than that property, do you own  16:31:49
13    any other properties?               16:31:50
14        A.   Not in the Village of Ocean Beach,  16:31:51
15    no, I do not.                   16:31:53
16        Q.   What about outside the Village of   16:31:53
17    Ocean Beach?                   16:31:55
18        A.   Yes, I do.              16:31:55
19        Q.   And how many properties do you own  16:31:56
20    outside of the Village of Ocean Beach?      16:31:57
21        A.   One.                   16:31:59
22        Q.   And where is that property located?  16:31:59
23        A.   In Seaview.              16:32:02
24        Q.   And is that a rental property?     16:32:03
25        A.   Yes, it is.              16:32:07
```

Page 311

```
 1              Loeffler
 2        Q.   And where is that property located?  16:32:08
 3        A.   29 Beachwold Walk, Seaview.        16:32:11
 4        Q.   Do you own any properties in the   16:32:21
 5    state of Florida?                  16:32:23
 6        A.   Yes, I do.              16:32:24
 7        Q.   And how many properties do you own  16:32:25
 8    in Florida?                    16:32:28
 9        A.   I own one.              16:32:29
10        Q.   And where is that property located?  16:32:30
11        A.   2921 South Ocean Boulevard, Highland  16:32:32
12    Beach, Florida.                 16:32:37
13        Q.   And do you know what the assessed   16:32:38
14    value of that property is?             16:32:39
15        A.   No, I do not.              16:32:41
16        Q.   Do you know what the assessed value  16:32:41
17    of the property that you own in Ocean Beach is?  16:32:42
18        A.   No, I do not.              16:32:44
19        Q.   Do you know what the assessed value  16:32:45
20    of the property that you referenced outside of  16:32:46
21    Ocean Beach that you own?             16:32:51
22        A.   No, I don't.              16:32:52
23        Q.   Other than those three properties,   16:32:52
24    do you own any other properties?          16:32:54
25        A.   I own a piece of property, a lot, in  16:32:56
```

Page 312

```
 1              Loeffler
 2    Crystal River, Florida, a piece of vacant land.  16:33:01
 3        Q.   And when did you acquire that land?  16:33:07
 4        A.   25 years ago.             16:33:09
 5        Q.   Do you know what the current        16:33:12
 6    assessed value of that land is?          16:33:13
 7        A.   The taxes are $28, so I don't know  16:33:15
 8    what the assessment is.  It wasn't one of my  16:33:19
 9    best deals.                    16:33:26
10        Q.   And was that the property at 2921 --  16:33:30
11        A.   No.  No.  It's a lot in Crystal     16:33:33
12    River, Florida.  I don't even know what the  16:33:37
13    address is.                    16:33:39
14        Q.   Other than the properties that you  16:33:40
15    have already identified, do you own any other  16:33:48
16    properties?                    16:33:50
17        A.   No.                   16:33:50
18        Q.   Have you sold any properties that   16:33:51
19    you owned within the last five years?       16:33:58
20        A.   Yes.              16:34:01
21        Q.   And how many properties have you    16:34:02
22    sold?                      16:34:04
23        A.   One.                   16:34:04
24        Q.   Where is that property located?     16:34:04
25        A.   In the incorporated Village of Ocean  16:34:06
```

TSG Reporting — Worldwide      877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 313

```
 1              Loeffler
 2  Beach.                        16:34:08
 3      Q.  And what's the address?        16:34:08
 4      A.  31 Ocean Road.            16:34:09
 5      Q.  Are there any other properties that   16:34:15
 6  you own that you haven't identified today?   16:34:16
 7      A.  No.                    16:34:18
 8      Q.  Are there any other properties that   16:34:18
 9  you are a part owner of?            16:34:19
10      A.  No.                16:34:22
11      Q.  Are there any properties that your   16:34:23
12  wife owns in her name?            16:34:27
13      A.  Yes.                16:34:29
14      Q.  How many such properties?        16:34:31
15      A.  I don't know.            16:34:32
16      MR. NOVIKOFF:  I think I may stop   16:34:48
17  you talking about his wife's properties   16:34:49
18  unless they are jointly owned.        16:34:52
19      Q.  Other than the one boat that you    16:34:59
20  referenced earlier today, do you own any other   16:35:01
21  boats?                    16:35:03
22      A.  No.                16:35:03
23      Q.  Other than the property that you    16:35:04
24  referenced earlier today that the mortgage was   16:35:08
25  secured through Trustee Wingate, have you   16:35:11
```

Page 314

```
 1              Loeffler
 2  acquired any other properties through private   16:35:16
 3  lenders?                    16:35:20
 4      A.  No.                16:35:20
 5      Q.  Has the mortgage on the property    16:35:21
 6  where the mortgager was Trustee Wingate, has   16:35:30
 7  that mortgage been repaid?            16:35:32
 8      A.  Yes.                16:35:33
 9      Q.  When was that mortgage repaid?    16:35:34
10      A.  Around ten years ago.        16:35:36
11      Q.  Do you own any businesses?        16:36:00
12      A.  No.                16:36:02
13      MR. GRAFF:  If I could ask the court   16:36:07
14  reporter to please mark as Exhibit Loeffler   16:36:12
15  16 a copy of the Complaint in this case.   16:36:14
16      (Loeffler Exhibit 16, Complaint and   16:36:25
17  Jury Demand, marked for identification.)   16:36:25
18      MR. NOVIKOFF:  Okay.  Do you want    16:36:46
19  him to look at it and see if he recognizes   16:36:47
20  it?                    16:36:50
21      MR. GRAFF:  Yes.            16:36:50
22      Q.  If you could look at it as much as    16:36:50
23  you need to to tell me if this is the document   16:36:52
24  that you recognize as the federal Complaint in   16:36:54
25  this lawsuit that you reviewed.        16:36:56
```

Page 315

```
 1              Loeffler
 2      (Document review.)            16:37:02
 3      MR. NOVIKOFF:  We will stipulate    16:37:12
 4  that it's the Complaint.  I mean, do you   16:37:12
 5  want him to --                16:37:18
 6      A.  Do you want me to go through this   16:37:19
 7  page by page?                16:37:21
 8      MR. NOVIKOFF:  If you want to go    16:37:22
 9  page by page, he will.  I am trying to   16:37:22
10  short -- okay.  Go ahead.            16:37:23
11      Q.  And as you are flipping, Mayor    16:37:26
12  Loeffler, if you could please let me know if   16:37:28
13  you find the point in the Complaint where it    16:37:29
14  references Mitch Burns.            16:37:32
15      MR. NOVIKOFF:  Well, you know what,   16:37:33
16  this is not a hunt and peck process.  Why   16:37:34
17  don't you tell him what paragraph to look   16:37:37
18  at, because I gotta tell you, I'd probably   16:37:39
19  take five, ten minutes trying to find Mitch   16:37:41
20  Burns in there.  So, you know, again, if   16:37:45
21  there is a paragraph number you want to   16:37:48
22  refer him to, then by all means, do so.   16:37:50
23      MR. GRAFF:  There is not.        16:37:50
24      MR. NOVIKOFF:  There is not?  Does    16:37:52
25  the name Mitch Burns appear in there?    16:37:53
```

Page 316

```
 1              Loeffler
 2      MR. GRAFF:  Mayor Loeffler indicated   16:37:56
 3  that he heard the name.  He believed he saw   16:37:57
 4  it in the Complaint.            16:37:59
 5      MR. NOVIKOFF:  Okay, you know what,   16:38:00
 6  then look through and see if Mitch Burns   16:38:01
 7  appears in the Complaint.  He has got seven   16:38:03
 8  hours.                16:38:18
 9      (Document review.)            16:38:47
10      MR. NOVIKOFF:  Ari, I have no        16:38:47
11  problem while the mayor is looking page by   16:38:48
12  page for Mitch Burns' name, but if the end   16:38:50
13  result of this is that the mayor is going   16:38:53
14  to say he was mistaken, that Mitch Burns'   16:38:54
15  name does not appear in the Complaint,   16:38:56
16  where does that get you other than wasting   16:38:58
17  five minutes of time?  But it's your    16:39:00
18  deposition.  I just...            16:39:03
19      (Document review.)            16:39:22
20      Q.  Mayor Loeffler, rather than taking    16:39:27
21  the time now, why don't we mark the transcript   16:39:29
22  and if on your review of the transcript you do   16:39:31
23  remember where you saw the name Mitch Burns,   16:39:36
24  you can just fill it in there.        16:39:38
25      A.  So what does that mean?        16:39:40
```

79 (Pages 313 to 316)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 317

```
1           Loeffler
2    MR. NOVIKOFF: That means you don't   16:39:41
3    have to read any more of the Complaint.     16:39:43
4  TO BE FURNISHED:_____.  16:39:44
5    Q.  If I could turn, please, to      16:39:44
6  paragraph 60 of the Complaint.          16:39:46
7    MR. NOVIKOFF: Okay. Is there      16:39:58
8  anything you would like the mayor to do   16:39:59
9  with paragraph 60?               16:40:01
10    MR. GRAFF: If he could read it,   16:40:02
11  please.               16:40:03
12    MR. NOVIKOFF: Read the whole    16:40:03
13  paragraph to himself? Okay.         16:40:04
14    MR. GRAFF: Yes.            16:40:05
15    MR. NOVIKOFF: Sure.          16:40:06
16    (Document review.)         16:40:21
17  A.  Okay.               16:40:46
18    Q.  Did you discuss the allegations in   16:40:47
19  paragraph 60 of the Complaint with anyone other  16:40:50
20  than counsel?               16:40:52
21  A.  I don't remember that, reading that,  16:40:53
22  but --               16:40:56
23    MR. NOVIKOFF: So that's your     16:40:57
24  answer.               16:40:58
25    Q.  After reading that do you recall   16:40:59
```

Page 318

```
1           Loeffler
2  whether other than in the context of this   16:41:02
3  Complaint you have any information concerning   16:41:04
4  any of the allegations set forth in paragraph   16:41:06
5  60?               16:41:08
6    MR. NOVIKOFF: Whoa, counselor,      16:41:08
7  there is a lot going on in paragraph 60.   16:41:11
8  You got paragraph 60 saying that Fiorillo   16:41:13
9  was en route to the police station. So    16:41:16
10  that's one issue. And that Fiorillo     16:41:18
11  observed Bosetti drinking. That's another  16:41:20
12  issue. That then Bosetti approaching -- I   16:41:22
13  mean, you have 25 issues in paragraph 60   16:41:24
14  that you are asking this witness to opine   16:41:27
15  about.               16:41:29
16    Q.  Let me --            16:41:29
17    MR. NOVIKOFF: Be more specific.   16:41:31
18    Q.  Do you have any information     16:41:32
19  concerning the incident involving a cabinet   16:41:34
20  thrown into the Great South Bay that's alleged  16:41:38
21  in this paragraph?            16:41:40
22  A.  I do not have any information with   16:41:41
23  reference to this incident.         16:41:43
24    Q.  If you could turn, please, to page   16:41:44
25  16, paragraph 63.            16:41:49
```

Page 319

```
1           Loeffler
2    MR. NOVIKOFF: Would you like the   16:41:55
3  witness to read paragraph 63 to himself?   16:41:56
4    MR. GRAFF: Let me first ask the   16:41:59
5  question and then he can read as much as he  16:42:00
6  needs to to answer it.           16:42:02
7    MR. NOVIKOFF: Okay.          16:42:02
8    Q.  The allegations under the subheading  16:42:03
9  The Halloween Incident run from paragraph 63   16:42:05
10  and end before the next subheading in    16:42:08
11  paragraph 70.              16:42:10
12    MR. NOVIKOFF: I will stipulate to   16:42:11
13  that.               16:42:12
14    Q.  My question is whether, Mayor    16:42:13
15  Loeffler, you discussed any of the allegations  16:42:15
16  in these paragraphs with anyone other than   16:42:16
17  counsel?               16:42:18
18    MR. NOVIKOFF: You know -- okay.   16:42:18
19  You are talking -- you are asking the    16:42:22
20  witness without even reading --       16:42:24
21    MR. GRAFF: No.            16:42:24
22    MR. NOVIKOFF: -- the paragraph. So  16:42:26
23  you want him now to read 63 through 70 and   16:42:26
24  then ask the question whether or not he    16:42:29
25  read -- he had discussed any issues that   16:42:31
```

Page 320

```
1           Loeffler
2  could possibly have been referred to in    16:42:34
3  these eight, nine paragraphs with anyone    16:42:37
4  other than counsel? If that's what you    16:42:38
5  want him to do, I will provide -- fine.   16:42:41
6  Read 63 through 70 and then I will ask the   16:42:44
7  court reporter to repeat the question so    16:42:47
8  it's absolutely clear and in case I need to   16:42:48
9  make an objection.             16:42:52
10    THE WITNESS: Do you want me to read  16:42:52
11  it out loud?               16:42:52
12    MR. NOVIKOFF: No, to yourself.    16:43:09
13    (Document review.)         16:43:09
14    MR. NOVIKOFF: Once you have read    16:43:27
15  it, tell me when you are done.        16:43:28
16    (Document review.)         16:43:28
17    MR. NOVIKOFF: Okay. Stop. You    16:44:49
18  want him to just read up to paragraph 70;   16:44:50
19  right?               16:44:53
20    MR. GRAFF: Yes.            16:44:53
21    MR. NOVIKOFF: Okay, now, can the   16:44:53
22  court reporter please read the question    16:44:55
23  that Mr. Graff is asking the witness.    16:44:56
24    (Record read.)          16:45:09
25    MR. NOVIKOFF: I am going to object  16:45:11
```

80  (Pages 317 to 320)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 321

Loeffler

1
2    to the form, because there are a number of   16:45:12
3    allegations in all of these and I will go   16:45:16
4    sentence by sentence then.   16:45:19
5    Q.   Were there any sentences in these   16:45:21
6    paragraphs that you can recall specifically   16:45:23
7    discussing with anyone?   16:45:25
8    A.   Yes, one.   16:45:26
9    Q.   Which sentence?   16:45:28
10   A.   Paragraph 69, Defendant Loeffler,   16:45:29
11   then serving in his capacity as Village board   16:45:40
12   member, and I don't know what official police   16:45:43
13   liaison is, was present in the station house   16:45:44
14   and said that he believed the injuries to   16:45:47
15   Vankoot constituted assault in the second   16:45:52
16   degree with a dangerous instrument. I already   16:45:56
17   testified that that's exactly what I said.   16:45:59
18   Q.   And did you discuss that statement   16:46:00
19   with anyone other than your counsel?   16:46:02
20   A.   No. Well, I did with you.   16:46:03
21   Q.   Thank you. And have you ever heard   16:46:05
22   the term in any of your law enforcement   16:46:09
23   positions "official police liaison"?   16:46:11
24   A.   No.   16:46:14
25   Q.   Is the first time you encountered   16:46:14

Page 322

Loeffler

1
2    that term in this Complaint?   16:46:18
3    A.   Yes.   16:46:19
4    Q.   Mayor Loeffler, I know this is a   16:46:30
5    sensitive topic and I don't want to keep   16:46:32
6    returning to it, but very briefly, did Dale or   16:46:34
7    Doug Wykoff Senior ever indicate to you that   16:46:39
8    they blamed Ed Paradiso in any way for the   16:46:41
9    death of their son?   16:46:44
10   MR. NOVIKOFF: No. Ari, I mean,   16:46:45
11   what possible relevance -- and I don't even   16:46:51
12   know what the answer is, but what possible   16:46:54
13   relevance could that have to this lawsuit   16:46:56
14   about apparently Mr. Wykoff's son --   16:47:00
15   THE WITNESS: Committed suicide.   16:47:03
16   MR. NOVIKOFF: -- committed suicide?   16:47:03
17   MR. GRAFF: Could I perhaps just   16:47:05
18   speak to you off the record privately?   16:47:06
19   MR. NOVIKOFF: Sure, I would be   16:47:07
20   happy to.   16:47:08
21   THE VIDEOGRAPHER: Going off the   16:47:09
22   record. The time is 4:47 p.m.   16:47:10
23   (Recess was taken from 4:47 to   16:47:13
24   4:57.)   16:47:13
25   THE VIDEOGRAPHER: We are back on   16:56:39

Page 323

Loeffler

1
2    the record. The time is 4:57 p.m.   16:56:44
3    MR. GRAFF: Could the court reporter   16:56:50
4    please read back my last question to the   16:56:51
5    witness.   16:56:53
6    (Record read.)   16:57:18
7    A.   No.   16:57:20
8    Q.   Mayor Loeffler, do you know whether   16:57:35
9    Mike Loeffler was in the company of Doug Wykoff   16:57:36
10   Junior on the night that he passed away?   16:57:39
11   A.   I don't know that. I don't know   16:57:42
12   whether he was or not. They are cousins, you   16:57:49
13   know. He is related to me, Douglas.   16:57:51
14   Q.   I didn't know that. What's the   16:57:53
15   relation?   16:57:54
16   A.   It's kind of involved, but Dale's --   16:57:55
17   Dale's mother and Doug's -- Dale's mother   16:58:00
18   and -- Dale's mother was sister to my   16:58:08
19   brother-in-law's who married my -- it gets very   16:58:10
20   involved, but they are second cousins, Doug and   16:58:15
21   my son.   16:58:18
22   Q.   But you don't know if he was   16:58:21
23   specifically with his company in --   16:58:23
24   A.   I don't know that.   16:58:24
25   Q.   Do you know whether Mike Loeffler   16:58:25

Page 324

Loeffler

1
2    had consumed drugs or narcotics on the night of   16:58:36
3    Doug Junior's death?   16:58:41
4    A.   I don't know that.   16:58:42
5    Q.   Did you ever have any conversations   16:58:43
6    with anyone at Ocean Beach Police Department   16:58:49
7    concerning that subject?   16:58:51
8    A.   No, I did not. That investigation   16:58:53
9    was handled by the Suffolk County Homicide   16:58:57
10   Division, Doug's death.   16:58:59
11   Q.   And were you ever a part of that   16:59:02
12   division as the Suffolk County detective?   16:59:03
13   A.   Yes, I was.   16:59:07
14   Q.   Were you involved at all in that   16:59:07
15   investigation?   16:59:09
16   A.   No, I was not.   16:59:10
17   Q.   Mayor Loeffler, prior to your   16:59:36
18   election as mayor, did you ever state to anyone   16:59:37
19   in substance that you intended to terminate   16:59:42
20   either of the Bosettis' employment as police   16:59:46
21   officers in the event that you were elected   16:59:49
22   mayor?   16:59:50
23   A.   No, I did not.   16:59:50
24   Q.   Do you know whether the Suffolk   16:59:56
25   County Police Department has jurisdiction over   16:59:59

81  (Pages 321 to 324)

9e28f7aa-4e93-4641-9524-8529961356c8

Page 325

Loeffler

1
2    to enforce law in the Incorporated Village of    17:00:08
3    Ocean Beach?                                     17:00:10
4        A.   They have concurrent jurisdiction,      17:00:11
5    yes, they do.                                    17:00:13
6        Q.   And in practice do they ever carry      17:00:14
7    out law enforcement activities that you are      17:00:16
8    aware of in Ocean Beach?                         17:00:18
9        A.   Some investigative activities, but      17:00:19
10   not day-to-day law enforcement activities.       17:00:21
11       Q.   As a Suffolk County detective have      17:00:23
12   you ever carried out any of your duties within   17:00:25
13   the territory of the Incorporated Village --     17:00:28
14       A.   I was not -- I was not assigned to      17:00:31
15   the precinct that handles that jurisdiction.     17:00:32
16       Q.   What precinct were you assigned to?     17:00:35
17       A.   The first precinct.                     17:00:36
18       Q.   And have you been assigned to the       17:00:37
19   first precinct --                                17:00:39
20       A.   As a detective for 19 years.            17:00:41
21       Q.   And that would be throughout your       17:00:43
22   service as mayor and police commissioner?        17:00:45
23       A.   Yes.                                    17:00:47
24       MR. GRAFF:  Mayor Loeffler, thank            17:00:54
25   you very much for your time and answering        17:00:56

Page 326

Loeffler

1
2    my questions today.  I am concluded for          17:00:57
3    today, although I would note that we would       17:01:00
4    reserve our right to reopen, if necessary,       17:01:03
5    upon production of the financial                 17:01:07
6    statements.                                      17:01:10
7        MR. NOVIKOFF:  I don't know if I             17:01:11
8    necessarily agree with that, but you have        17:01:13
9    stated your position on the record.  Okay.       17:01:15
10       MR. GRAFF:  Does anyone have cross?          17:01:17
11       MR. NOVIKOFF:  No.  Kevin?                   17:01:20
12       MR. CONNOLLY:  No.                           17:01:20
13       MR. GRAFF:  Thank you.                       17:01:22
14       THE VIDEOGRAPHER:  We are now going          17:01:22
15   off the record.  The time is 5:01 p.m.           17:01:24
16   This is the end of the tape labeled              17:01:27
17   number 5 to this videotaped deposition.          17:01:28
18       (Time noted:  5:01 p.m.)               17:01:32
19                                                    17:01:32
20   --------------------
21       JOSEPH C. LOEFFLER, JR.
22
23   Subscribed and sworn to before me
24   this        day of           2009.
25   --------------------------------------

Page 327

1
2    C E R T I F I C A T E
3
4    STATE OF NEW YORK  )
5                       ) ss.:
6    COUNTY OF NASSAU   )
7
8        I, KRISTIN KOCH, a Notary Public within
9    and for the State of New York, do hereby
10   certify:
11       That JOSEPH C. LOEFFLER, JR., the
12   witness whose deposition is hereinbefore
13   set forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16       I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of this
20   matter.
21       IN WITNESS WHEREOF, I have hereunto
22   set my hand this 9th day of March, 2009.
23   -------------------------
24       KRISTIN KOCH, RPR, RMR, CRR, CLR
25

Page 328

1
2    -----------------I N D E X-----------------
3    WITNESS         EXAMINATION BY       PAGE
4
5    JOSEPH C. LOEFFLER, JR.    MR. GRAFF       7
6    RULING:  308
7    -------------EXHIBITS-----------------
8    LOEFFLER              PAGE LINE
9    Exhibit 1                   6  2
10   Confidential Wage/Salary History.....
11   Exhibit 2                   6  5
     Ocean Beach Defendants' Response to
12   Plaintiffs' First Set of
     Interrogatories.....................
13                              91  18
14   Exhibit 3
     Incorporated Village of Ocean Beach
15   Board of Trustees Meeting Held
     January 28, 2006, Bates stamped
16   000028...........................
                                107  24
17   Exhibit 4
     Memo dated April 4, 2006, Bates
18   stamped 001005......................
                                145  5
19   Exhibit 5
     Letter dated January 4, 2007.........
20                              161  22
     Exhibit 6
21   The Incorporated Village of Ocean
     Beach Employee Handbook, Bates
22   stamped 000001 through 000025........
                                173  20
23   Exhibit 7
     Handwritten document, Bates stamped
24   003780.............................
                                177  10
25   Exhibit 8
     Memo dated March 26, 2007, Bates
     stamped 003778......................

TSG Reporting – Worldwide     877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8

Page 329

```
1
2    ------------------EXHIBITS------------------
3
     LOEFFLER              PAGE LINE
4
                          186  23
5    Exhibit 9
     Ratification and Approval of
6    Personnel, Bates stamped 005875......
                          197  13
7    Exhibit 10
     Accept the NYS Department of
8    State's Proposed Responses on the
     Local Waterfront Revitalization
9    Program, Bates stamped 009809.......
                          203  2
10   Exhibit 12
     Section 1:  Discipline/Charges and
11   Specifications, Bates stamped 2652
     through 2661.........................
12                        208  21
     Exhibit 11
13   Resolution No. 2008-18, Bates
     stamped 009810.......................
14                        232  23
     Exhibit 13
15   Letter dated April 6, 2007, Bates
     stamped 005419.......................
16                        238  16
     Exhibit 14
17   Letter dated August 6, 2007, Bates
     stamped 004431.......................
18                        303  12
     Exhibit 15
19   Pending Claims, Bates stamped
     010182 through 010184................
20                        314  16
     Exhibit 16
21   Complaint and Jury Demand............
22
     ------------------DOCUMENT REQUESTS------------
23
24   PAGE 187   All pages of Loeffler 9 and all
               pages of Loeffler 3
25
```

Page 330

```
1
2    ------------------DOCUMENT REQUESTS------------
3
     PAGE 195   Complete manual
4
         198   All pages of Loeffler 10
5
         205   All pages of Loeffler 12
6
7    ------------INFORMATION TO BE FURNISHED--------
8
     PAGE  317  Location of Mitch Burns' name
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 331

```
1
2         ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:      Carter v. Ocean Beach
     Dep. Date:      February 25, 2009
4    Deponent:       Joseph C. Loeffler, Jr.
5            CORRECTIONS:
6    Pg. Ln.  Now Reads      Should Read    Reason
7    ____ ___  _____  _____  _____
8    ____ ___  _____  _____  _____
9    ____ ___  _____  _____  _____
10   ____ ___  _____  _____  _____
11   ____ ___  _____  _____  _____
12   ____ ___  _____  _____  _____
13   ____ ___  _____  _____  _____
14   ____ ___  _____  _____  _____
15   ____ ___  _____  _____  _____
16   ____ ___  _____  _____  _____
17   ____ ___  _____  _____  _____
18
19            _____
20            Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS____DAY OF_____, 2009.
23
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

TSG Reporting - Worldwide    877-702-9580

9e28f7aa-4e93-4641-9524-8529961356c8