```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

   EDWARD CARTER, FRANK FIORILLO, )
   KEVIN LAMM, JOSEPH NOFI, and   )
   THOMAS SNYDER,                 )
                                  )
                 Plaintiffs,      )
                                  )
                 vs.              ) CV 07 1215
                                  )
   INCORPORATED VILLAGE OF OCEAN  )
   BEACH; MAYOR JOSEPH C. LOEFFLER)
   JR., individually and in his   )
   Official capacity; former mayor)
   NATALIE K. ROGERS, individually)
   and in her official capacity,  )
   OCEAN BEACH POLICE DEPARTMENT; )
   ACTING DEPUTY POLICE CHIEF     )
   GEORGE B. HESSE, individually  )
   And in his official capacity;  )
   SUFFOLK COUNTY; SUFFOLK COUNTY )
   POLICE DEPARTMENT, SUFFOLK     )
   COUNTY DEPARTMENT OF CIVIL     )
   SERVICE; and ALLISON SANCHEZ,  )
   Individually and in her        )
   Official capacity,             )
                                  )
                 Defendants.      )
   ------------------------------)
```

VIDEOTAPED DEPOSITION OF PATRICK JOHN CHERRY

New York, New York

Tuesday, November 18, 2008

Reported by:
Philip Rizzuti
JOB NO. 18815

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 2

```
 1
 2
 3
 4                  November 18, 2008
 5                  9:37 a.m.
 6
 7          Videotaped deposition of PATRICK
 8     JOHN CHERRY, held at the offices of
 9     Thompson Wigdor & Gilly, 85 Fifth
10     Avenue, New York, New York, pursuant to
11     subpoena, before Philip Rizzuti, a
12     Notary Public of the State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2     A P P E A R A N C E S:
 3
 4     ALSO PRESENT:
 5          THOMAS SNYDER
 6          FRANK FIORILLO
 7          JOSH LIPSON, Videographer
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S:
 3
 4          THOMPSON WIGDOR & GILLY, LLP
 5          Attorneys for Plaintiffs
 6               85 Fifth Avenue
 7               New York, New York 10003
 8          BY:  ANDREW S. GOODSTADT, ESQ.
 9
10          MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11          Attorneys for George B. Hesse
12               530 Saw Mill Road
13               Elmsford, New York 10523
14          BY:  KEVIN W. CONNOLLY, ESQ.
15
16          RIVKIN RADLER, LLP
17          Attorneys for Incorporated Village of
18          Ocean Beach, Joseph Loeffler, Natalie
19          Rogers and Ocean Beach Police Department
20               926 RexCorp Plaza
21               Uniondale, New York 11556-0926
22          BY:  KENNETH A. NOVIKOFF, ESQ.
23
24
25
```

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3     by and between counsel for the respective
 4     parties hereto, that the filing, sealing and
 5     certification of the within deposition shall
 6     be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8     that all objections, except as to the form
 9     of the question, shall be reserved to the
10     time of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12     that the within deposition may be signed
13     before any Notary Public with the same force
14     and effect as if signed and sworn to before
15     the Court.
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 6

Cherry

1
2  THE VIDEOGRAPHER:  This is the the
3  start of tape number 1 of the videotape
4  deposition of Patrick Cherry in the
5  matter of Carter versus Incorporated
6  Village of Ocean Beach.  Today's date is
7  November 18, 2008 at approximately 9:37
8  a.m.
9      Will the court reporter please
10  swear in the witness.
11  P A T R I C K   J O H N   C H E R R Y,
12  called as a witness, having been duly
13  sworn by a Notary Public, was examined
14  and testified as follows:
15  EXAMINATION BY
16  MR. GOODSTADT:
17      MR. NOVIKOFF:  Same stips as in
18  the other depositions?
19      MR. GOODSTADT:  Yes.  Federal
20  rules and local civil rules govern.
21      MR. NOVIKOFF:  Yes.
22  Q.   Good morning, Mr. Cherry.
23  A.   Good morning.
24  Q.   My name is Andrew Goodstadt, I am
25  an attorney at the law firm of Thompson Wigdor

Page 7

Cherry

1
2  & Gilly, and my law firm represents the five
3  plaintiffs in this matter against the Village
4  of Ocean Beach and others.  Thank you for
5  coming this morning.
6      I ask if you could mark this
7  Cherry Exhibit 1, please, subpoena.
8      (Cherry Exhibit 1, subpoena,
9      marked for identification, as of this
10      date.)
11  Q.   I have placed in front of
12  Mr. Cherry what has now been marked as Cherry
13  1.  It is a two-page exhibit and it is a
14  subpoena that is signed by me dated August 14,
15  2008.
16      Mr. Cherry, do you recognize the
17  document that has been marked as Cherry
18  Exhibit 1?
19  A.   Yes, I do.
20  Q.   What is this document?
21  A.   It is a subpoena to appear here
22  for -- to give testimony.
23  Q.   Do you recall receiving the
24  subpoena in or around August of 2008?
25  A.   Yes.  It was delivered to my wife

Page 8

Cherry

1
2  who gave it to me later on in the evening.
3      MR. NOVIKOFF:  That is a yes or no
4  question.
5  Q.   If you look up in the top left
6  where it says to, you see that under the
7  caption?
8  A.   Yes, sir.
9  Q.   And it says to Patrick Cherry, 4
10  Grand Avenue, Bay Shore, New York, do you see
11  that?
12  A.   Yes, I do.
13  Q.   And is that your address?
14  A.   The address is incorrect.
15  Q.   Incorrect?
16  A.   It should be 4 Gerard Avenue.
17  Q.   I apologize for getting that
18  wrong, but nevertheless it was delivered to
19  your home?
20  A.   Yes.
21  Q.   And in or about August of 2008
22  when you received this subpoena for your
23  deposition were you working at Ocean Beach at
24  the time?
25  A.   Yes.

Page 9

Cherry

1
2  Q.   What was your title at that time?
3  A.   Dispatcher.
4  Q.   And in or around August of 2008
5  were you a -- was that your position
6  full-time?
7  A.   I was seasonal.
8  Q.   Seasonal?
9  A.   Yes.
10  Q.   What do you mean by seasonal?
11  A.   I worked from two weeks before
12  Memorial Day to two weeks after Labor Day.
13  Q.   So now that we are beyond two
14  weeks after Labor Day of 2008 are you
15  currently working at Ocean Beach?
16  A.   No.
17  Q.   So you are not employed by Ocean
18  Beach right now?
19  A.   I am employed -- I am still
20  employed, I am what they classified as on
21  call, that means if they call me I go into
22  work.
23  Q.   When you say they classify you,
24  who are you referring to?
25  A.   The Village.

3  (Pages 6 to 9)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 10

```
 1                Cherry
 2      Q.   The Village classifies as you on
 3  call?
 4      A.   Yes.
 5      Q.   Do you know whether that is a
 6  civil service title?
 7      A.   I believe it is.
 8      Q.   And what is that exact title?
 9      A.   On call status.
10      Q.   On call dispatcher or just on call
11  status?
12          MR. NOVIKOFF:  Objection.  You can
13      answer.  Just so you know unless I
14      instruct you not to answer a question you
15      are to answer every question regardless
16      of whether I object or not.
17      A.   Okay.  On call I believe is if
18  they call me in to go to work, I could go to
19  work.
20      Q.   And I believe the question was
21  whether the title is on call status or on call
22  dispatcher?
23      A.   On call dispatcher.
24      Q.   Just so I am clear, it is your
25  understanding that that is a civil service
```

Page 11

```
 1                Cherry
 2  title, on call dispatcher?
 3          MR. NOVIKOFF:  Objection.
 4      A.   I believe so.
 5      Q.   Since after two weeks -- since the
 6  period that ended the season in '08, which I
 7  believe you testified was two weeks after
 8  Labor Day; is that correct?
 9      A.   It may have been two and a half,
10  three weeks.
11      Q.   So now I am talking about the
12  period between the end of the season for '08
13  and today how many shifts have you worked?
14      A.   None.
15      Q.   So you have not been called at
16  all?
17      A.   No.
18      Q.   Have you been paid at all from
19  Ocean Beach between -- I am talking about the
20  period the end of the season '08 until today?
21      A.   No.
22      Q.   Are you receiving unemployment
23  insurance benefits currently?
24      A.   Yes.
25      Q.   Did you file forms to receive
```

Page 12

```
 1                Cherry
 2  that?
 3      A.   Yes.
 4      Q.   And in the section that asked why
 5  you are no longer employed or what the reason
 6  was that you left Ocean Beach in those forms,
 7  do you recall what box you checked off?
 8      A.   Lack of work.
 9      Q.   Did you alert the unemployment
10  insurance board that you were on on call
11  status?
12      A.   Yes, I did.
13      Q.   How long have you lived at 4
14  Gerard?
15      A.   Gerard.
16      Q.   How long have you lived at 4
17  Gerard Avenue?
18      A.   Since 1976.
19      Q.   Since 1976 have you used any other
20  address as your home address?
21      A.   No.
22      Q.   Have you ever used any address in
23  the Village of Ocean Beach as your home
24  address?
25      A.   No.
```

Page 13

```
 1                Cherry
 2      Q.   Have you ever testified under oath
 3  before?
 4      A.   Yes.
 5      Q.   Have you ever testified under oath
 6  in a civil proceeding?
 7      A.   No.
 8      Q.   So this is your first time?
 9      A.   Yes.
10      Q.   Never testified in a deposition
11  before?
12      A.   No.
13      Q.   Since this is your first time I
14  want to go over a few ground rules so we are
15  on the same page today, is that fair?
16      A.   Yes.
17      Q.   You understand that you are
18  testifying under oath, you are sworn to tell
19  the truth?
20      A.   Yes.
21      Q.   That if you fail to tell the truth
22  it potentially is punishable as a criminal
23  offense, do you understand that?
24          MR. NOVIKOFF:  Objection.
25      A.   Yes.
```

4 (Pages 10 to 13)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 14

Cherry

1
2      Q.   It is important that you give
3   verbal answers because as you can see there is
4   a court reporter sitting next to both of us
5   and he needs to take down a record and he
6   doesn't -- it is not good if he records your
7   answer as a nod of the head or shake of the
8   head.
9      A.   Yes.
10     Q.   Do you understand that?
11     A.   Yes.
12     Q.   If you don't hear or understand a
13  question that I ask just ask me to repeat or
14  rephrase it, I will be happy to do so, okay?
15     A.   Yes.
16     Q.   And if you don't hear or
17  understand a phrase or word that I use, again
18  let me know, I will be happy to repeat or
19  rephrase it?
20     A.   Yes.
21     Q.   When you answer a question I am
22  going to assume that you both heard the
23  question and that you understood it, okay?
24     A.   Yes.
25     Q.   If at any point in time you want

Page 15

Cherry

1
2   to correct an answer in this deposition feel
3   free to do so, okay?
4      A.   Yes.
5          MR. NOVIKOFF:  Note my objection.
6   We know what he is entitled to do at the
7   conclusion of the deposition.
8      Q.   Again the fact that there is a
9   court reporter here it is important that you
10  let me finish my questions, the same way that
11  it is important that I let you finish your
12  answer so we get a clear transcript, okay?
13     A.   Yes.
14     Q.   If at any point in time you need
15  to the take a break or recess, just let me
16  know, okay?
17     A.   Yes.
18     Q.   The only thing that I ask is if
19  there is a question pending, that unless there
20  is an issue between you and counsel with
21  respect to privilege, that you answer the
22  question and then we take our break, is that
23  fair?
24     A.   Yes.
25     Q.   Are you presently taking any

Page 16

Cherry

1
2   medications that you believe would impair your
3   ability to testify today?
4      A.   No.
5      Q.   Have you consumed any controlled
6   substance, drugs or narcotics in the last 72
7   hours?
8      A.   No.
9      Q.   Have you consumed any alcoholic
10  beverages in the last 72 hours?
11     A.   Yes, I had a small glass of sherry
12  last night.
13         MR. NOVIKOFF:  Yes or no.
14     Q.   Is there anything about your
15  consumption of that glass of sherry that would
16  impair your ability to testify today?
17     A.   No.
18     Q.   Great.  Is there any reason that
19  you can think of that would possibly impair
20  your ability to testify fully and truthfully
21  today?
22     A.   No.
23     Q.   And you are represented by an
24  attorney in connection with this deposition?
25     A.   Yes.

Page 17

Cherry

1
2      Q.   Who is that?
3      A.   Rivkin Radler, Mr. Novikoff.
4      Q.   And Mr. Novikoff is sitting right
5   next to you; correct?
6      A.   Yes.
7      Q.   When did you first learn that the
8   plaintiffs in this matter were making
9   allegations against Ocean Beach and others?
10         MR. NOVIKOFF:  Objection.
11     A.   I believe it was in the papers.
12     Q.   That was the first time that you
13  heard about the fact that the plaintiffs were
14  making some allegations in this case?
15     A.   Yes.
16         MR. NOVIKOFF:  Note my objection.
17     Q.   What is your understanding of the
18  allegations that are being made in this case?
19     A.   I believe that they were let go
20  unfairly, that they had certain allegations of
21  wrongdoing in Ocean Beach.
22     Q.   Anything else?
23     A.   That is as far as I know.
24     Q.   What is your understanding of the
25  allegations that are being made of wrongdoing?

5  (Pages 14 to 17)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

**Cherry**

1
2     A.    I believe it was drinking on duty.
3    Having sex on duty by certain members.  There
4    was allegation that there was a cover-up of a
5    brutality incident.
6     **Q.    Any others?**
7     A.    Uncertified officers working on
8    the beach, on Ocean Beach.
9     **Q.    Anything else?**
10     A.    That is I guess about it.  As far
11    as I know.
12     **Q.    We will get into some detail on**
13    **those allegations a little bit later.  What is**
14    **your understanding of the allegation that they**
15    **were let go unfairly?**
16     A.    I don't know what their rationale
17    was other than they felt that they were let go
18    unfairly.
19     **Q.    Have you read a copy of the**
20    **complaint in this matter?**
21     A.    Part of it, not all of it.
22     **Q.    When did you read that complaint?**
23     A.    Pardon me?
24     **Q.    When did you read those parts of**
25    **the complaint?**

**Cherry**

1
2     A.    When they got served I asked if I
3    could read the part -- I read the part that
4    pertains to me as far as the alleged cover-up
5    of the police brutality during the Halloween
6    incident.
7     **Q.    When you say they got served, who**
8    **are you referring to?**
9     A.    The Village of Ocean Beach.
10     **Q.    How did you learn that they were**
11    **served?**
12     A.    There was a lawsuit, I knew they
13    got served.  I asked when they get served
14    could I read the charges.
15     **Q.    Who did you ask?**
16     A.    Chief Hesse.
17     **Q.    You referred to Mr. Hesse as Chief**
18    **Hesse, first name is George; is that correct?**
19     A.    That is correct.
20     **Q.    How long have you referred to him**
21    **as Chief Hesse?**
22     A.    He was given the title of deputy
23    chief sometime I guess in -- probably around
24    2006.
25     **Q.    Was there a point where he was**

**Cherry**

1
2    **given a title of chief to your understanding?**
3     A.    No.  Chief is deputy chief I
4    believe, but we call deputy chief chiefs, that
5    is what we call them.
6     MR. NOVIKOFF:  Just answer the
7     question.
8     **Q.    Do you know whether Mr. Hesse or**
9    **Deputy Chief Hesse ever passed the civil**
10    **service test required to achieve the position**
11    **of deputy chief?**
12     A.    No.
13     **Q.    You don't know or he didn't pass?**
14     MR. NOVIKOFF:  The question was do
15     you know.  So the answer is no.
16     A.    That is correct.
17     **Q.    So you don't know one way or the**
18    **other?**
19     A.    No.
20     **Q.    Did you ever speak to Hesse about**
21    **whether he passed the tests necessary to**
22    **achieve the position of deputy chief?**
23     A.    Yes.  Well --
24     MR. NOVIKOFF:  Note my objection,
25     you can answer.

Cherry

1
2     A.    We talked about the -- I know he
3    was appointed deputy chief.  I am not aware
4    that he passed any test or took any tests to
5    be deputy chief.
6     **Q.    Did you ever ask him whether he**
7    **passed any tests or took any tests to become**
8    **deputy chief?**
9     MR. NOVIKOFF:  Objection.
10     A.    No.
11     MR. NOVIKOFF:  Mr. Cherry, you
12     need to let Mr. Goodstadt finish the
13     question and then you can answer.
14     **Q.    Do you know whether there is any**
15    **test or tests that are administered by Suffolk**
16    **County Civil Service that are required to be**
17    **passed before becoming deputy chief of a**
18    **police department?**
19     MR. NOVIKOFF:  Objection.
20     A.    I know there is a civil service
21    test for a chief for the village or town or
22    department.
23     **Q.    What was Mr. Hesse's title to your**
24    **understanding directly before he was appointed**
25    **deputy chief?**

6 (Pages 18 to 21)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 22

Cherry

1
2     MR. NOVIKOFF:  Objection.
3     A.   He was sergeant.
4     Q.   You referred to him as Sergeant
5  Hesse?
6     A.   Yes.
7     Q.   Was that a title that everybody in
8  the department referred to him as?
9     MR. NOVIKOFF:  Objection.
10    A.   Yes.
11    Q.   How about people outside the
12  department, do you know whether people outside
13  the department referred to him as Sergeant
14  Hesse?
15    MR. NOVIKOFF:  Objection.
16    A.   Yes.
17    Q.   They did?
18    A.   Yes.
19    Q.   How about outside the Village of
20  Ocean Beach, do you know whether anybody
21  referred to him as Sergeant Hesse?
22    MR. NOVIKOFF:  Objection.
23    A.   I don't know.
24    Q.   I believe that you testified that
25  you asked Sergeant Hesse or Chief Hesse for a

Page 23

Cherry

1
2  copy of the complaint when you learn that they
3  were served; is that correct?
4     A.   Yes.
5     Q.   He gave you a copy of the
6  complaint?
7     A.   I asked to see it when it came in,
8  see what -- when he got served I asked if I
9  could look at the allegations.
10    Q.   Did he give you a copy of the
11  complaint?
12    A.   He gave me a copy to read, I
13  didn't keep it.
14    Q.   But he, Chief Hesse is the one who
15  furnished you, actually handed you a copy of
16  it?
17    A.   Yes.
18    Q.   He handed you a hard copy of it?
19    A.   Paper, yes.
20    Q.   It was not E-mailed or faxed,
21  handed to you in a hard copy?
22    A.   Yes.
23    Q.   Where were you when he gave you
24  that?
25    A.   In the station house.

Page 24

Cherry

1
2     Q.   Do you recall when that was?
3     A.   No.  The exact date I don't
4  remember.
5     Q.   Do you know approximately?
6     A.   It was after they received it, I
7  am not sure exactly when, but it was after
8  they received a copy of the allegations.  The
9  affidavit.
10    Q.   Were you working on the day that
11  Mr. Hesse handed you a copy of the complaint?
12    A.   Yes.
13    Q.   So it was during the season that
14  you received it?
15    A.   Yes.
16    Q.   What was your reaction to the
17  parts of the complaint that you read?
18    A.   I was dumbfounded.
19    Q.   Why?
20    A.   They made allegation that we
21  conspired to give false testimony as regards
22  to their Halloween incident, and the
23  investigation that Chief Hesse conducted and I
24  assisted him on.
25    Q.   Just so I understand, Halloween

Page 25

Cherry

1
2  incident, Chief Hesse is the one who conducted
3  the investigation?
4     A.   That is correct.
5     Q.   And you were assisting him on it?
6     A.   Yes.
7     Q.   We will get to the investigation
8  later on.  But did you have any special title
9  with respect to your investigation?
10    A.   No.
11    Q.   You don't recall ever being
12  appointed as a special investigator?
13    A.   No.
14    Q.   Your investigation or your role in
15  the investigation, was that part of your
16  duties as a police officer in Ocean Beach?
17    A.   The sergeant asked me if I could
18  assist him and I said I would, and I assisted
19  him.
20    Q.   What was your title at the time of
21  the investigation into the Halloween incident?
22    A.   Police officer.
23    Q.   For the Village of Ocean Beach?
24    A.   That is correct.
25    Q.   At the time that you received and

7 (Pages 22 to 25)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 26

Cherry

1
2  read at least parts of the complaint did you
3  speak with George Hesse about the allegations
4  that were made therein?
5      A.   Other than saying, you know, gave
6  my opinion, I can understand -- that I
7  couldn't understand why they thought we
8  conducted a cover-up of the alleged brutality
9  by one of the other officers.
10     Q.   Do you recall exactly what you
11 said to him?
12     A.   Not the exact words, no.
13     Q.   So in sum and substance you recall
14 just telling him that you don't understand why
15 there is an allegation of a cover-up?
16     A.   That is correct.
17     Q.   Do you recall what his response to
18 that was?
19     A.   He said you are right, I don't
20 know why either.
21     Q.   Again we will get into that in a
22 little bit, more detail later on.
23         At the time that you received and
24 read at least portions of the complaint did
25 you speak with any other person who was

Page 27

Cherry

1
2  employed by the Village of Ocean Beach about
3  those allegations?
4      A.   I may have mentioned it to one or
5  two other officers, you know, expressed my
6  disbelief about it.
7      Q.   Which officers?
8      A.   I don't recall.  I am not sure.
9      Q.   Is there anything that you can
10 think of that would refresh your recollection
11 as to who you spoke with?
12     A.   No.
13     Q.   Did you ever speak with Joseph
14 Loeffler?
15     A.   No.
16     Q.   About the allegations?
17     A.   Yes, I did.
18         MR. NOVIKOFF:  You have to wait
19 until Mr. Goodstadt finishes the
20 question.
21     Q.   Was that about the time that you
22 received and read the complaint or some
23 subsequent time?
24     A.   Sometime after that.
25     Q.   When did you speak with Joe

Page 28

Cherry

1
2  Loeffler about the allegations that were made
3  in the complaint?
4      A.   I believe he came into the station
5  house and I mentioned it to him, again
6  expressing my disbelief in why they would
7  accuse us of doing something like that.
8      Q.   When was that conversation?
9      A.   It was sometime after receiving
10 the complaint, I don't know the exact date.
11 But it was during the season because I was
12 working.
13     Q.   Do you recall which season it was
14 during?
15     A.   I am not sure -- I guess -- I
16 don't know exactly when the complaint was
17 received so I am not quite sure that I can
18 give you a definite answer on when that was or
19 what season it was.
20     Q.   Was it this past season?
21     A.   I am not sure it was early this
22 season or the year before.
23     Q.   Was Joe Loeffler the mayor of the
24 Village of Ocean Beach at that time?
25     A.   When I spoke to him he was the

Page 29

Cherry

1
2  mayor.
3      Q.   Did he come to the station
4  specifically to discuss the complaint?
5          MR. NOVIKOFF:  Objection.
6      A.   No.
7          MR. NOVIKOFF:  Give me time to
8  object.
9      Q.   How long did your conversation
10 last with Mr. Loeffler regarding the
11 allegations in the complaint?
12     A.   No more than a few minutes.
13     Q.   Who else was present?
14     A.   I don't recall.
15     Q.   Were there other officers present?
16     A.   I don't believe so.
17     Q.   What was your title at the time?
18     A.   Dispatcher.
19     Q.   What was Mr. Loeffler's reaction
20 to your statement to him?
21         MR. NOVIKOFF:  Objection.
22     A.   He said that is their complaint,
23 they made the allegation.  He said I don't
24 believe it either.  I don't remember his exact
25 words, but he said I don't believe it either,

8  (Pages 26 to 29)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 30

Cherry

1
2  why they would make such a complaint.
3     Q.   Did you discuss anything else with
4  Mr. Loeffler during that conversation?
5     A.   No.
6     Q.   Did you take any notes of the
7  conversation?
8     A.   No.
9     Q.   Do you know whether took any notes
10 of the conversation?
11    A.   No.
12    Q.   Other than for that one
13 conversation in the police station with Mr.
14 Loeffler have you discussed with him on any
15 other occasion the allegations that were made
16 in the complaint?
17    A.   Not the allegations, no.
18    Q.   How about the fact that the
19 plaintiffs have filed a complaint?
20    A.   No.
21    Q.   Have you discussed anything else
22 with respect to the complaint with Mr.
23 Loeffler subsequent to that one conversation
24 that you testified to?
25    A.   Other than that we might be called

Page 31

Cherry

1
2  in for a deposition at some point, that was
3  the extent of the conversations.
4     Q.   When was that conversation?
5     A.   That was again after I -- after we
6  got the complaint and there is a process going
7  along, he advised us that we might be called
8  in for a deposition.
9     Q.   When you say he advised us --
10    A.   He advised me, myself.
11    Q.   Was there anybody else there when
12 he advised you?
13    A.   I don't know, I don't remember.
14    Q.   Do you have an approximate
15 timeframe of when that happened?
16    A.   Sometime after we got the
17 complaint, that is all I can say, before the
18 depositions began.
19    Q.   Before all the depositions began
20 in this case?
21    A.   Yes.
22    Q.   Other than for advising that you
23 may have to be called in for a deposition,
24 what else did Mr. Loeffler say to you during
25 that conversation?

Page 32

Cherry

1
2     A.   Nothing, just that we may be
3  called in to give a deposition, that was the
4  extent of it.  To make us aware that we may be
5  called in.
6     Q.   Again you used the word us, to
7  make us aware?
8     A.   Myself.
9     Q.   Where were you when this
10 conversation happened?
11    A.   At the station house.
12    Q.   Were you working at the time?
13    A.   Yes.
14    Q.   Did you have a response to Mr.
15 Loeffler when he told you that you may have to
16 be called in for a deposition?
17    A.   Other than saying okay, I will
18 give the information, but there was no other
19 response.
20    Q.   Was that discussion before or
21 after you received the subpoena that is marked
22 as Exhibit 1?
23    A.   Before.
24    Q.   You don't recall which season that
25 conversation happened in?

Page 33

Cherry

1
2     A.   No.
3     Q.   But it was during the season?
4     A.   Yes.
5     Q.   Did you work any shifts between
6  the end of the '07 season and the beginning of
7  the '08 season?
8     A.   No.
9     Q.   Have you ever spoken to Gary
10 Bossetti about the complaint or any of the
11 allegations raised in the complaint?
12    A.   Yes.
13    Q.   When did that conversation happen?
14    A.   Again I said, he said the
15 complaint was made that there was a cover-up,
16 I said again just expressing my disbelief or
17 my understanding of why the complaint was
18 made.
19        MR. NOVIKOFF:  The question was
20    when?
21        THE WITNESS:  When?
22        MR. NOVIKOFF:  Yes.
23    Q.   When was that conversation?
24    A.   Again after the complaint was
25 received.

9 (Pages 30 to 33)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 34

Cherry

1                    Cherry
2     **Q.   Do you recall how long after the**
3 **complaint was received that you had that**
4 **conversation?**
5     A.   It was probably wasn't too long
6 after, I don't know the exact timeframe.
7     **Q.   And who else was present during**
8 **that conversation?**
9     A.   I don't recall, probably just me
10 and Gary.
11     **Q.   Where were you located when that**
12 **conversation was happening?**
13     A.   At the station.
14     **Q.   That was a face-to-face**
15 **conversation?**
16     A.   Pardon me?
17     **Q.   A face-to-face conversation?**
18     A.   Yes.
19     **Q.   How long did that conversation**
20 **last?**
21     A.   Again a matter of minutes.
22     **Q.   Do you recall what he said about**
23 **the complaint or any of the allegations in the**
24 **complaint?**
25     A.   He expressed disbelief also, that

Page 35

Cherry

1                    Cherry
2 was about it.
3     **Q.   Did you discuss anything beyond**
4 **the cover-up?**
5     A.   What do you mean by cover-up?
6     **Q.   I believe you testified that --**
7     A.   The alleged cover-up.
8     **Q.   Yes, the alleged cover-up?**
9     A.   No.
10     **Q.   Did you discuss anything beyond**
11 **the alleged cover-up?**
12     A.   No.
13     **Q.   Did you discuss any of the**
14 **allegations of -- I believe you stated**
15 **wrongdoing, you listed a bunch of them.  Did**
16 **you discuss any of those allegations with Gary**
17 **Bossetti?**
18     MR. NOVIKOFF:  Objection.
19     A.   No.
20     **Q.   Have you had any other**
21 **conversations with Gary Bossetti about the**
22 **complaint or anything in the complaint other**
23 **than the one conversation you already**
24 **testified to?**
25     A.   No.

Page 36

Cherry

1                    Cherry
2     **Q.   Did you take any notes of that**
3 **conversation?**
4     A.   No.
5     **Q.   Did you ever discuss the complaint**
6 **or anything, or any allegations alleged in the**
7 **complaint with Richard Bossetti?**
8     A.   Again other than that -- again
9 expressing the -- my one questioning why they
10 would make such an allegation.  Basically the
11 same thing.
12     MR. NOVIKOFF:  Finish your answer.
13     A.   Basically the same thing, we
14 just -- I didn't understand why they were
15 making that allegation.  What they based it
16 on.
17     MR. NOVIKOFF:  Yes or no.
18     **Q.   When did that conversation with**
19 **Richard Bossetti take place?**
20     A.   Again after we received the
21 complaint.  I am not sure of the exact time.
22     **Q.   Was it days, weeks, months, years?**
23     A.   Within months probably.  We worked
24 at the same time so I probably ran into him.
25     **Q.   So it likely was the same season**

Page 37

Cherry

1                    Cherry
2 **that the complaint was filed and served?**
3     A.   Yes, after it was served.
4     **Q.   So if I represent to you that that**
5 **was the 2007 season, is it your testimony that**
6 **you didn't discuss the complaint or any**
7 **allegations in the complaint with either Gary**
8 **Bossetti or Richard Bossetti during the 2008**
9 **season?**
10     MR. NOVIKOFF:  Objection.  You can
11 answer.
12     A.   I am not sure it was the 2007
13 season.  I don't believe I had any other
14 further discussions.
15     **Q.   I am representing to you that the**
16 **complaint was filed and served, it would have**
17 **been the 2007 season?**
18     A.   Okay.
19     **Q.   Let's use that as an assumption?**
20     A.   Okay.
21     **Q.   Now you testified that it was**
22 **within weeks that you had these conversations.**
23 **So it was in the 2007 season; correct?**
24     A.   Uh-hum.
25     **Q.   My question to you is did you have**

TSG Reporting - Worldwide     877-702-9580

Cherry

1  any conversations with either Richard or Gary
2  Bossetti during the 2008 season with respect
3  to the complaint or any of the allegations in
4  the complaint?
5      A.   I don't have any recollection of
6  talking to them this past season.
7      Q.   Did you ever discuss with them
8  that you may be called in for a deposition?
9      A.   No.
10     Q.   What was -- what did Richard
11  Bossetti say during that conversation that you
12  testified to?
13     A.   Again the same thing, it was -- I
14  said I don't understand where they are
15  getting these -- you know, what is this based
16  on, what is the -- where do they come up with
17  this allegation, and he agreed there is no
18  basis for the allegations.
19     Q.   Did you recall anything else that
20  he may have said during that conversation?
21     A.   No.  As I said just basically
22  disbelief in the allegations that were made.
23     Q.   How long did that conversation
24  last?

Cherry

1      A.   Matter of a couple of minutes.
2  Two or three minutes maybe.
3      Q.   Did you take any notes of that
4  conversation?
5      A.   No.
6      Q.   Do you know whether he did?
7      A.   No, sir.
8      Q.   Have you ever spoken with Edward
9  Paradiso about the complaint or any of the
10  allegations in the complaint?
11     A.   No.
12     Q.   Have you ever spoken with Natalie
13  Rogers about the complaint or any of the
14  allegations that were made in the complaint?
15     A.   No.
16     Q.   Did you ever speak with Tyree
17  Bacon about the complaint or any allegations
18  made in the complaints?
19     A.   No.
20     Q.   Have you ever spoken with any of
21  the plaintiffs about the complaint or any of
22  the allegations made in the complaint?
23     A.   No.
24     Q.   Do you know who the plaintiffs are

Cherry

1  in the case?
2      A.   Yes.
3      Q.   Who are they?
4      A.   Frank Fiorilli, Tom Snyder, Ed
5  Carter, Mr. Nofi.
6      Q.   Joseph Nofi?
7      A.   Yes.  And there is one other, Ed
8  Carter.  Is that five; that is five.
9      Q.   I think you said Mr. Carter twice?
10     A.   I can't think of who the fifth
11  person is.  Mr. Lamm.
12     Q.   That is Kevin Lamm?
13     A.   Yes.
14     Q.   Have you discussed the allegations
15  made in the complaint or the complaint with
16  any residents of the Village of Ocean Beach?
17     A.   No.
18     Q.   Have you discussed the complaint
19  or any allegations of the complaint with
20  anybody else, other than for counsel and any
21  of the people that you have testified to thus
22  far?
23     A.   No.
24     Q.   Mr. Cherry, do you have a son who

Cherry

1  is either currently or was formerly employed
2  with the Village of Ocean Beach?
3      A.   Yes.
4      Q.   What was your son's name?
5      A.   Patrick Cherry, C-H-E-R-R-Y.
6      Q.   What position was he employed --
7  strike that.
8           What was his position when he was
9  employed by the Village of Ocean Beach?
10     A.   He was a dock master.
11     Q.   Was he ever a police officer?
12     A.   No.
13     Q.   Has he ever graduated the Police
14  Academy?
15     A.   Yes.  When you say --
16     Q.   A police officer within the
17  Village of Ocean Beach?
18     A.   No.
19     Q.   Has he ever been a police officer
20  anywhere?
21     A.   Yes.
22     Q.   Where was he a police officer?
23     A.   He is a police officer in the New
24  York City Police department.

11 (Pages 38 to 41)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 42

```
 1                    Cherry
 2       Q.   Currently?
 3       A.   Yes.
 4       Q.   Does he still work for the Village
 5  of Ocean Beach?
 6       A.   No.
 7       Q.   When did he stop working for the
 8  Village of Ocean Beach?
 9       A.   I am not sure of the exact date.
10       Q.   Do you know what year it was?
11       A.   No.
12       Q.   At the time that he was working
13  for the Village of Ocean Beach had he already
14  graduated the Police Academy?
15       A.   No.
16       Q.   So he stopped working at the
17  Village of Ocean Beach and then graduated the
18  Police Academy?
19       A.   Yes.
20       Q.   Was his title at all times at
21  Ocean Beach dock master?
22       A.   I believe so, yes.
23       Q.   Never held the title of police
24  officer at Ocean Beach?
25       A.   No.
```

Page 43

```
 1                    Cherry
 2       Q.   Never held the title of the
 3  dispatcher at Ocean Beach?
 4       A.   No.  Not to my knowledge.
 5       Q.   When your son was a dock master at
 6  Ocean Beach do you know who he reported to?
 7       A.   I believe Chief Paradiso and
 8  Sergeant Hesse.
 9       Q.   Did your son have a personal
10  relationship with Mr. Hesse outside of his
11  duties as a dock master for the Village of
12  Ocean Beach?
13            MR. NOVIKOFF:  Objection.
14            MR. CONNOLLY:  Objection.
15       A.   I believe they became friends
16  having worked together at Ocean Beach.
17       Q.   Did they ever travel together on
18  vacation?
19       A.   I don't know.
20       Q.   Do you know whether they
21  socialized outside of their duties at Ocean
22  Beach?
23            MR. NOVIKOFF:  Objection.
24       A.   I believe they did occasionally.
25       Q.   Did your son have a social
```

Page 44

```
 1                    Cherry
 2  relationship outside of his duties with the
 3  Village of Ocean Beach with Chief Paradiso?
 4       A.   No.
 5       Q.   Have you ever been convicted of a
 6  crime?
 7       A.   No, sir.
 8       Q.   I believe you testified that your
 9  wife received a subpoena, so I am assuming
10  that you are married; is that correct?
11       A.   Yes.
12       Q.   And how many children do you have?
13       A.   Three.
14       Q.   So there is Patrick -- just tell
15  me the names and ages of the other children?
16       A.   I have a daughter Nora, she is 30,
17  and a daughter Deidre, D-E-I-D-R-E, and she is
18  26.
19       Q.   Has Nora ever been employed by the
20  Village of Ocean Beach?
21       A.   No.
22       Q.   Has Nora ever been employed by
23  Suffolk County?
24       A.   No.
25       Q.   Has Deidre ever been employed by
```

Page 45

```
 1                    Cherry
 2  the Village of Ocean Beach?
 3       A.   No.
 4       Q.   Has Deidre ever been employed by
 5  Suffolk County?
 6       A.   No.
 7       Q.   Other than for your wife has
 8  anybody lived with you at any point in time
 9  between October of 2004 and the present?
10       A.   Yes.
11       Q.   Who is that?
12       A.   Well, other than my daughter.
13       Q.   Which daughter?
14       A.   Deidre.
15       Q.   What dates did she live with you
16  during that period?
17       A.   She has lived there all her life.
18            Did you say 2004 --
19       Q.   Well, since October 2004, which is
20  when the Halloween incident occurred I want to
21  know the people who are over 18 who have lived
22  with you other than your wife and your
23  daughter Deidre?
24       A.   My daughter Nora also lived with
25  us until last year, 2007.
```

Page 46

Cherry

1
2     Q.   When we refer to the Halloween
3  incident just so that everybody is clear what
4  are you referring to?
5     A.   That was a Halloween of 2004,
6  there was an incident at Houser's Bar.
7  Houser's Restaurant.  It is a restaurant and
8  bar.
9     Q.   You testified that there was an
10 incident happened at Houser's Bar, what was
11 that incident?
12    A.   I guess the officers who were
13 working that night received a call that Gary
14 Bossetti was trying to break up a fight from
15 what I understand, and received two calls, and
16 they responded, or I believe it was Officer
17 Fiorilli, Snyder and Lamm responded, and there
18 was an allegation that Gary Bossetti had
19 assaulted a number of the people with a pool
20 cue and his fist.
21    Q.   Just so we are clear, when we
22 refer to the Halloween incident, that is what
23 we are referring to?
24    A.   Yes.
25    Q.   Did you ever discuss the Halloween

Page 47

Cherry

1
2  incident with your daughter Deidre?
3     A.   Not directly, no.  My wife and I
4  discussed the lawsuit and my daughter may have
5  overheard it, but I never really discussed it
6  with her.
7     Q.   I am not asking you any
8  conversation you had with your wife.  I just
9  want to know conversation you had with your
10 daughter Deidre?
11    A.   My daughter Deidre was aware that
12 there was a lawsuit involved, but I never had
13 a conversation with her directly about the
14 lawsuit and or the allegations made in it.
15 But she is aware of what goes on in the house.
16    Q.   Did you ever discuss the merits of
17 the lawsuit with your daughter Deidre?
18    A.   No.
19       MR. NOVIKOFF:  Objection.
20    Q.   Did you ever discuss the Halloween
21 incident with your daughter Nora?
22    A.   Directly, no.
23    Q.   What do you mean by directly?
24    A.   Same thing.  She knew there was a
25 lawsuit involved, and it was about the -- my

Page 48

Cherry

1
2  part of it was about this Halloween incident.
3     Q.   Have you ever discussed the merits
4  of the lawsuit with your daughter Deidre?
5       MR. NOVIKOFF:  Objection.
6     A.   No.
7     Q.   Did you ever discuss the merits of
8  the lawsuit with your daughter Nora?
9       MR. NOVIKOFF:  Objection.
10    A.   No.
11    Q.   Have you ever discussed the
12 Halloween incident with your son Patrick?
13    A.   Yes.
14    Q.   When was that conversation --
15 strike that.
16       How many times have you discussed
17 the Halloween incident with your son Patrick?
18    A.   A number of times after the
19 allegations were made when I informed him I
20 got the subpoena to appear for -- to give a
21 deposition about it.
22    Q.   How about at the time that you
23 were assisting Mr. Hesse in the purported
24 investigation?
25    A.   I may have mentioned it, probably

Page 49

Cherry

1
2  mentioned that to him.  Yeah, you know, there
3  was an incident over there in conversation.
4     Q.   Was he employed by the Village of
5  Ocean Beach at that time?
6     A.   No.
7     Q.   At the time of the Halloween
8  incident?
9     A.   No, he was not.
10    Q.   Why did he leave the employ of the
11 Village of Ocean Beach?
12    A.   Probably went to another job, it
13 may have been the Police Department.  I am not
14 sure exactly when he left and when he joined
15 the Police Department, but he left there.  It
16 was a summer employment job, seasonal job,
17 probably left there to go to the Police
18 Department.
19    Q.   During the time that your son was
20 a seasonal dock master, was that his title?
21    A.   Yes.
22    Q.   At the time that he was a seasonal
23 dock master at Village of Ocean Beach did he
24 hold any other job either during the season or
25 after the season?

13  (Pages 46 to 49)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Cherry

1       A.   I don't believe so.
2       Q.   And let's go back to the
3  conversations that you had with your son at or
4  around the time of the purported investigation
5  into Halloween.  Do you recall when the first
6  time you spoke with him about the Halloween
7  incident was?
8       A.   It was probably shortly after
9  George asked me to assist him with looking
10 into it.
11      Q.   When did George ask you to assist
12 him, do you recall?
13      A.   I believe it was probably around
14 November 1st of 2004.
15      Q.   What did you discuss with your son
16 at that time during the first conversation
17 with respect to the Halloween incident?
18      A.   Basically that George -- that
19 there was an incident over at the Houser's Bar
20 and it was alleged that Gary assaulted -- Gary
21 Bossetti assaulted someone or a number of
22 people over there, and that George was going
23 to do an investigation and he asked me to
24 assist in the investigation.
25

Cherry

1       Q.   You say it was alleged that Gary
2  Bossetti had assaulted a number of people over
3  the head.  Who was alleging that?
4       A.   Apparently the officers who were
5  responding to the scene filed a report in
6  which they -- it stated that he assaulted
7  somebody.  It was assault third degree
8  investigation.
9       Q.   Was your understanding at that
10 time of the allegations against Mr. Bossetti,
11 were those based on the report that you just
12 testified to, or did you have that information
13 from some other source?
14      MR. NOVIKOFF:  Objection.
15      A.   The report.
16      Q.   Do you recall what your son said
17 in response to what you told him about the
18 Halloween incident at that time?
19      A.   I just told him about it.  He
20 was -- he had the same opinion that I did.
21 Gary was not the type of guy that would
22 assault somebody.  He said what happened, I
23 said I don't know, we have to look into it.
24      Q.   Do you recall anything else that
25

Cherry

1  either of you said during that conversation?
2       A.   That is to the best of the
3  recollection, just informing him what is going
4  on in Ocean Beach, and George asked me to
5  assist him.
6       Q.   Was that conversation in person,
7  over the phone or some other means?
8       A.   Probably in person.
9       Q.   Do you recall where you were?
10      A.   At home.
11      Q.   At your home?
12      A.   Yes.
13      Q.   Was Patrick Cherry living with you
14 at the time?
15      A.   No, but he would come over often.
16      Q.   Did he express other than telling
17 you that Richard Bossetti was not the type
18 that would go out and assault somebody with a
19 pool stick, did he express any other beliefs
20 about that incident at the time?
21      A.   No.  Gary Bossetti is the person
22 to which --
23      Q.   I see what you are saying, I
24 apologize.
25

Cherry

1       A.   No, just that this was about the
2  extent, disbelief that Gary would do something
3  like that with no reason.
4       Q.   Other than for that one
5  conversation did you have any other
6  conversations at or about the time you were
7  assisting in the purported investigation with
8  your son about the Halloween incident?
9       A.   Not that I know of.
10      Q.   What was the next time that you
11 recall speaking to your son about the
12 incident?
13      A.   Well, I don't know the exact
14 times, but he would come out and say how is it
15 going, what is going on with the
16 investigation, something like that, and I
17 would tell him what I knew at the time.
18      Q.   You would tell him -- strike that.
19      Those conversations, those
20 occurred while the investigation was going on?
21      A.   Well, my involvement only took
22 a -- probably a week or so.  After that it was
23 George had completed the investigation.  I
24 assisted him in the investigation about a week
25

Page 54

Cherry

1    and then George completed the investigation.
2    So it would have to be -- he just
3    asked me what is going on with that, what is
4    going on with the investigation.  I would tell
5    him what I knew at time.  He showed an
6    interest in what was going on.
7    **Q.   Just so I am clear now.  Those**
8    **conversations that happened during the week**
9    **that you were assisting on the investigation**
10   **or after that?**
11   A.   The first conversation took place
12   a day or two after I first started assisting.
13   As he came out, I don't recall the times he
14   came out, maybe once every couple of weeks he
15   would stop by, and I recall him inquiring
16   about what was going on over there, how is it
17   going.  I would tell him what I knew.
18   **Q.   So just so I am clear, sir, you**
19   **were disclosing what you learned from the**
20   **investigation to a person who was not employed**
21   **by the beach while the investigation was**
22   **pending; is that correct?**
23   MR. NOVIKOFF:  Objection.
24   A.   I would tell him I knew, yes.

Page 55

Cherry

1    **Q.   And do you recall how many times**
2    **during the investigation those conversations**
3    **occurred on?**
4    MR. NOVIKOFF:  Objection.
5    A.   I don't know the exact number of
6    times.
7    **Q.   More than two?**
8    A.   Yes, probably.  As I said he came
9    out, not every time, he would say what is new
10   at Ocean Beach and this is something -- if
11   something new developed I would mention it to
12   him.  He wanted to know.  As I say it was
13   casual conversation between father and son
14   having both worked over there, he would
15   inquire what was going on.  Sometimes I didn't
16   know anything or I didn't tell him because
17   there was nothing to tell.
18   **Q.   I am just focusing on the**
19   **Halloween incident, not what other things may**
20   **be happening at Ocean Beach?**
21   A.   Right.
22   **Q.   When was the time that you recall**
23   **speaking to him about the Halloween incident**
24   **after that first group of conversations that**

Page 56

Cherry

1    **you just testified to?**
2    A.   Probably the outcome, after
3    Mr. Van Koot was arrested.  What the outcome
4    of the investigation was.
5    **Q.   Prior to the outcome of Mr. Van**
6    **Koot being arrested had you expressed to your**
7    **son your belief as to what happened that**
8    **night?**
9    A.   Yes.
10   **Q.   What was the first time that you**
11   **expressed to him your belief as to what had**
12   **happened that night?**
13   A.   After we finished taking the
14   statements from a number of witnesses.
15   **Q.   When was that, the first time that**
16   **you recall telling your son about your belief**
17   **of what happened that night?**
18   A.   It was -- could you repeat the
19   question.
20   **Q.   When, approximately what date was**
21   **that?**
22   A.   I think I finished with my part of
23   assisting George around the 7th of November.
24   We had finished -- I had finished taking

Page 57

Cherry

1    statements from the witnesses and developed a
2    sense of what happened.  So sometime after
3    that I may have expressed it to my son.
4    **Q.   Do you recall what you told your**
5    **son about what happened?**
6    A.   I said I believe Gary acted in
7    defense of a third person.  Was attacked by
8    the person who was assaulting a woman in the
9    hallway and two of his friends came over and
10   joined in the fray and started kicking and
11   punching Gary.  I said I felt he acted in
12   defense of a third person and for self
13   defense.
14   **Q.   What was that conclusions based**
15   **on?**
16   A.   The statements that I had taken
17   from three witnesses and ones that George
18   Hesse had taken.
19   **Q.   We will get into detail of those**
20   **statements later, but which three witnesses**
21   **are you referring to?**
22   A.   Jeannie Jaegger, J-A-E-G-G-E-R, I
23   am not sure of the spelling, I have to check
24   the statements.  Ian Levine and Sean O'Rourke.

15  (Pages 54 to 57)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 58

Cherry

1
2    Q.   Which witness statements were you
3 referring to that Mr. Hesse had taken?
4    A.   I believe he took the statement
5 from Doug Wycoff, W-Y-C-O-F-F, I believe it
6 is.
7    Q.   Any other statements?
8    A.   That was all I knew of at the
9 time.
10    Q.   Had you taken into account the
11 witness statements that were taken the night
12 of the incident?
13    A.   Yes.
14    Q.   So those are additional statements
15 that you took into account?
16    A.   I knew about those statements, but
17 they didn't really give much information other
18 than that they were attacked by someone who
19 said he was a police officer.
20    Q.   But when you testified that you
21 spoke to your son about what happened that
22 night, you testified that you base that on the
23 three witnesses statements that you took plus
24 Mr. Wycoff; is that correct?
25        MR. NOVIKOFF:  Objection to the

Page 59

Cherry

1
2 form.  You can answer.
3    Q.   Is that correct?
4    A.   Yes.
5    Q.   So my question to you was your
6 conclusion or your belief about what happened,
7 was that based at all based on the statements
8 taken of the witnesses on Halloween night?
9        MR. NOVIKOFF:  Objection.  You can
10    answer.
11    A.   Other than I read the three
12 statements, they didn't indicate what had
13 happened prior to them being assaulted.  These
14 statements gave a bigger picture to show us
15 what happened prior to them being assaulted,
16 what they said -- what they claimed to be an
17 assault.
18    Q.   So did you believe those
19 statements of those witnesses that were taken
20 on the night of the Halloween incident to be
21 incomplete?
22    A.   Yes.
23    Q.   I just want to go back to the
24 conversation in which you disclosed to your
25 son what you believed what happened that

Page 60

Cherry

1
2 night.  Do you recall what his reaction was?
3    A.   Other than just listening to me he
4 didn't show any particular reaction.  I mean
5 he didn't react to what I told him, you know,
6 okay.  He just listened to me.
7    Q.   Had you spoken to any other
8 witnesses other than for the four that you
9 listed?
10    A.   No.
11        MR. NOVIKOFF:  Hold it.
12    Q.   At the time -- by the time that
13 you told your son what had happened?
14        MR. NOVIKOFF:  Objection to the
15    question.  I think he said he only took
16    three witnesses and read Hesse's only.
17    Q.   Have you spoken to any witnesses
18 other than for the three that you had taken?
19    A.   No.
20    Q.   Let me finish the question.
21        At the time that you disclosed to
22 your son what you believed happened that night
23 had you spoken to any other witnesses other
24 than Ms. Jaegger, Mr. Levine and Mr. O'Rourke?
25    A.   No.

Page 61

Cherry

1
2    Q.   Had you read any witness
3 statements other than for Mr. Wycoff and the
4 witness statements that were taken the night
5 of the Halloween incident?
6    A.   Any others?
7    Q.   Had you read any other witness
8 statements?
9    A.   No.
10    Q.   Was your belief as to what
11 happened that night based on anything else
12 other than for the seven statements that you
13 have discussed today; meaning the three that
14 you took, the one that Mr. Hesse took, and the
15 three witness statements that were taken the
16 night of the incident?
17    A.   Sorry, I lost the question.  Was
18 it based on anything else other than that?
19    Q.   Yes.
20    A.   No.
21    Q.   Was your belief of what happened
22 based on anything else other than for those
23 seven witness statements and/or whatever
24 conversations you had with the witnesses that
25 you took?

TSG Reporting - Worldwide      877-702-9580

Page 62

**Cherry**

1
2    A.   That is correct, there was no
3 other basis, no other statements that I read,
4 or no other basis for my conclusion at that
5 time.
6    Q.   **And do you recall when the next**
7 **time you spoke to your son about the Halloween**
8 **incident was subsequent to the discussion**
9 **where you disclosed to him what you believed**
10 **happened?**
11    A.   No.  Other than I think sometime I
12 probably told him that there had been an
13 arrest in the case, and that I believe Mr. Van
14 Koot had been arrested and one of the other
15 defendants, subjects had been arrested.  Other
16 than that it sort of ended the -- I didn't go
17 back to work until the following season, there
18 was not much conversation after that.
19    Q.   **And the Halloween incident, that**
20 **was after the season; is that correct?**
21    A.   That is correct.
22    Q.   **So at the time that you were asked**
23 **to assist Mr. Hesse you were not actively**
24 **working at the beach, were you?**
25    A.   That is correct.

Page 63

Cherry

1
2    Q.   **So you specifically came to work**
3 **at the beach to perform your duties assisting**
4 **Mr. Hesse; is that correct?**
5    A.   That is correct.
6    Q.   **Were you paid for those duties?**
7    A.   Yes.
8    Q.   **Were you paid your same rate that**
9 **you were paid for being a police officer?**
10    A.   Yes.
11    Q.   **Were you paid anything more than**
12 **what you were paid as a police officer?**
13    A.   No.
14    Q.   **How many hours did you log or did**
15 **you get paid for in connection with your**
16 **investigation?**
17    A.   I would say maybe 16.  16, 20
18 hours, I am not sure of the exact time.
19    Q.   **Were you actually placed on the**
20 **schedule during that period?**
21    A.   No, I was not.
22    Q.   **So how did you put in your request**
23 **to be paid for those hours?**
24    A.   I wasn't on the schedule.  We have
25 a time sheet that we fill out.  I filled out

Page 64

Cherry

1
2 the time sheet.
3    Q.   **So when you were working there**
4 **during those 16 to 20 hours there still was**
5 **the normal police shift; you didn't replace**
6 **any other police officers that were scheduled**
7 **to work those hours; is that correct?**
8       MR. NOVIKOFF:  Objection.
9    A.   No, sir.
10    Q.   **I want to quickly go through your**
11 **educational background.  What was the highest**
12 **level of education that you completed?**
13    A.   Probably about one year of
14 college, one year's credits of college.
15    Q.   **Where was that?**
16    A.   State University of New York
17 Farmingdale at the time.
18    Q.   **Did you receive any kind of degree**
19 **or diploma or certificate from that school?**
20    A.   No.
21    Q.   **Do you have any degrees,**
22 **certificates or diploma subsequent to that?**
23    A.   As far as educational
24 institutions?
25    Q.   **Yes.**

Page 65

**Cherry**

1
2    A.   No.
3    Q.   **How about as far as any other type**
4 **of institutions?**
5    A.   The Police Department.
6    Q.   **What certificate or diploma do you**
7 **have from the Police Department?**
8    A.   Well, upon completion of the
9 Police Academy are you given a municipal
10 Chiefs of Police training certificate.
11    Q.   **When did you receive that?**
12    A.   In January of 1971.
13    Q.   **Other than for the police training**
14 **certificate do you have any other**
15 **certificates, degrees or diplomas subsequent**
16 **to your attendance at SUNY Farmingdale?**
17    A.   I have police courses that I went
18 to, a number of certificates for training
19 purposes, usually one or two week school.
20    Q.   **Which certificates do you have?**
21    A.   The Drug Enforcement Agency, I
22 have two or three certificates from them for
23 training.  The FBI Firearms Instructors
24 School, that was in service training at the
25 Police Department.  A number of those that are

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

1                    Cherry
2  given every three or four years.
3              There is probably several more,
4  but I have to look up my files to see.  But
5  they were basically training schools for the
6  Police Department.  Oh, The International
7  Association of Drug Diversion Investigators
8  course.
9      Q.   Any others?
10     A.   Not that I can recall at this
11 time.
12     Q.   You say you have to check your
13 files.  What are you referring to?
14     A.   I have copies of the certificates
15 that I got.
16     Q.   Did you keep any file or files
17 with respect to your assistance in
18 investigating the Halloween incident?
19     A.   No.
20     Q.   Do you have any paperwork or
21 documents in your possession that related to
22 your assistance in the Halloween incident?
23     A.   I have copies of the statements
24 that I took.
25     Q.   Where do you keep those?

1                    Cherry
2      A.   They are in my file drawer in my
3  house.
4      Q.   When did you take a copy of that
5  to your file drawer in your house?
6      A.   I usually took them, I made a copy
7  of them after we took the statements.
8      Q.   So just so I understand, at some
9  point in early November of 2004 you made a
10 copy of the statements and took them home with
11 you?
12     A.   Yes.
13     Q.   You still maintain those today?
14     A.   Yes.
15     Q.   Do you have any other copies of
16 statements of the witnesses that you didn't
17 take?
18     A.   Yes.
19     Q.   So which copies of the statements
20 of the witnesses that you didn't take do you
21 have?
22     A.   I have got the three copies that
23 the officers took.  I have got the copy that
24 George took, Mr. Wycoff.
25     Q.   Any others?

1                    Cherry
2      A.   No.  That is I think all the
3  statements involved.
4      Q.   Why did you take those home to
5  your house?
6      A.   Well, I learned -- I took the
7  other copies when I learned there was a
8  lawsuit just to review them.
9      Q.   So again so we are clear, you took
10 the three statements that you took?
11     A.   Uh-hum.
12     Q.   Home with you in or around
13 November of 2004?
14     A.   Right.
15     Q.   And then you took copies of the
16 statements that the officers took that night,
17 and those are the witness statements that you
18 are referring to?
19     A.   Yes.
20     Q.   As well as a copy of the Wycoff
21 statement?
22     A.   Yes.
23     Q.   And that was in or around 2007
24 when the complaint was filed?
25     A.   I believe it was after we got the

1                    Cherry
2  complaint, that is when I took -- after we got
3  the complaint.  So we got the complaint, I
4  don't know when I actually read it, but it was
5  after I read the complaint I made some copies
6  just to review them.
7      Q.   Did you get permission from
8  somebody to make copies and take them home?
9      A.   I asked George whether I could
10 make copies and he said yes.
11     Q.   And take them home?
12     A.   Yes.
13     Q.   You got permission both in '04
14 when you did it, and after you learned of the
15 lawsuit, both times you got permission from
16 him?
17     A.   I don't think I asked him for
18 permission in '04, but I usually take copies
19 of the statements that I make.  You see there
20 was a case file in the office that the copies
21 were maintained, but I made a copy for my
22 personal possession.
23          MR. NOVIKOFF:  Hold on.
24          (Witness confers with counsel.)
25     Q.   Just so I am clear, the copies

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 70

Cherry

1
2    that you made for your personal possession,
3    were you authorized to take that from somebody
4    at Ocean Beach?
5         MR. NOVIKOFF:  Objection.  You can
6    answer.
7         A.   Not specifically, no.
8         Q.   And the copies that you took after
9    you learned that the lawsuit had been filed,
10   were you authorized from somebody at Ocean
11   Beach to take those copies home?
12        MR. NOVIKOFF:  Objection.
13        A.   I asked if I could make copies of
14   them and I was told that I could.
15        Q.   Just so I am clear, I am not
16   talking about making the copies, I am talking
17   about actually taking the copies off of Ocean
18   Beach to your home?
19        A.   Okay.
20        MR. NOVIKOFF:  Note my objection.
21        Q.   Were you authorized to do that?
22        MR. NOVIKOFF:  Note my objection.
23        A.   Not specifically authorized, but
24   there was no objection to it.
25        Q.   Well, did you alert anybody at

Page 71

Cherry

1
2    Ocean Beach that you were going to take copies
3    home with you?
4         A.   Well, I asked if I could have a
5    copy of them.  I assumed I was going to take
6    them home.
7         Q.   Who did you ask whether you could
8    have a copy?
9         A.   I asked George if I could --
10   George Hesse if I could make a copy.
11        Q.   And what was his response?
12        A.   He said yes.
13        Q.   Did you tell him why you were
14   making copies of them and taking them home?
15        A.   Yes.  So I could review them, I
16   know we were going to have a hearing on it.
17        Q.   Just so I am clear, this is at the
18   time that the complaint was filed you took
19   them because you knew there was going to be a
20   hearing on it?
21        A.   Well, they made a -- they made a
22   complaint involving me.  I felt that I had to
23   defend myself somewhere along the line or a
24   deposition like this, I should have some
25   references to look at.  So I asked if I could

Page 72

Cherry

1
2    make copies of the statements involved.
3         Q.   Did you make copies of any other
4    documents other than for the three witnesses
5    who you took, Wycoff, and the three witnesses
6    who were the on duty officers took on the
7    night of the incident?
8         A.   No.
9         Q.   You didn't take any statements
10   that were made that were produced by the
11   officers?
12        MR. NOVIKOFF:  Objection.
13        A.   No.
14        Q.   You didn't take any statement that
15   was provided by either Gary Bossetti or
16   Richard Bossetti?
17        A.   No.
18        Q.   You didn't take any statements
19   that were provided by any other witnesses?
20        A.   No, sir.
21        Q.   And where did you get the
22   documents from that you took the time that you
23   learned that the complaint was filed?
24        A.   Where did I get the documents
25   from?

Page 73

Cherry

1
2         Q.   Yes.
3         A.   There is a case jacket in the
4    office.
5         Q.   Where is that kept in the office?
6         A.   In a file.
7         Q.   Where is that file located?
8         A.   In the back in the office.  The
9    station house.
10        Q.   Whose office is that?
11        A.   It is -- I don't know if you are
12   familiar with the -- it is -- well, it is the
13   office.  There is a front desk and then there
14   is the office, everything is -- files are in
15   the office.
16        Q.   There are desks in the office?
17        A.   Yes.
18        Q.   Who has a desk in the office, or
19   who had a desk at the time?
20        A.   George has his desk there and then
21   there is about three other desks or -- one
22   other desk and then a row of -- a shelf where
23   the file drawer was under the shelf.  That is
24   where the guys do their work and stuff.  So it
25   is not an office per se, it is the whole

19  (Pages 70 to 73)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 74

Cherry

1  office. The station, just a very small
2  station.
3
4      Q.   Does Chief Paradiso have a desk
5  there?
6      A.   Yes, he did.
7      Q.   Does he currently have a desk
8  there?
9      A.   No, he is retired now.
10     Q.   Have you ever been a party to any
11 lawsuit?
12     A.   No. Other than this one, no.
13         MR. NOVIKOFF: Other --
14     A.   I'm sorry, no. I am thinking of
15 party, so...
16     Q.   Have there ever been any
17 grievances filed against you either in your
18 employment at Ocean Beach or in your
19 employment with Nassau County?
20     A.   No.
21     Q.   Have you ever been disciplined
22 either during your employment with Ocean Beach
23 or your employment with Nassau County?
24     A.   No.
25     Q.   Have you ever threatened to sue

Page 75

Cherry

1  any of your employers?
2      A.   No.
3      Q.   Have you ever threatened to sue
4  any union that may have represented you?
5      A.   No.
6      Q.   Have you ever been a member of a
7  union?
8      A.   Yes.
9      Q.   Which union?
10     A.   The Police Benevolent Association
11 of Nassau County, and the Detectives
12 Association Incorporated of Nassau County.
13     Q.   You said the Police Benevolent
14 Association of Nassau County, is that also
15 known as the PBA of Nassau County?
16     A.   That is correct.
17     Q.   Did Ocean Beach ever have a PBA?
18     A.   Not to my knowledge.
19     Q.   So you were never a member of any
20 police benevolent association or police
21 benefit association?
22     A.   Of Ocean Beach?
23     Q.   Of Ocean Beach?
24     A.   No.

Page 76

Cherry

1      Q.   What does a PBA do?
2          MR. NOVIKOFF: Objection.
3      A.   They are the bargaining agent for
4  the police officers in Nassau County, and a
5  benevolent association.
6      Q.   Other than representing you, let's
7  focus on the Nassau County PBA because that is
8  what you are familiar with, other than
9  representing you and the other officers who
10 were members in collective bargaining, what
11 else did the PBA do on your behalf?
12     A.   They provided attorneys if you
13 needed one. They have a Christmas party, you
14 know, members and benefit type things.
15     Q.   Do you know how the PBA raised its
16 funds from Nassau County?
17     A.   We pay dues.
18     Q.   Do they ever have any fundraisers?
19     A.   I don't believe so, no.
20     Q.   Do they ever solicit donations
21 from anybody?
22     A.   I don't think that Nassau did, to
23 my knowledge.
24     Q.   So you never took part in any kind

Page 77

Cherry

1  of drive or situation where the Nassau County
2  PBA was trying to solicit donations?
3          MR. NOVIKOFF: Objection.
4      A.   No, sir.
5      Q.   Did you ever take part in any
6  drive or other circumstances where the Ocean
7  Beach Police Department was soliciting
8  donations?
9      A.   No.
10     Q.   Does the Ocean Beach Police
11 Department actively solicit donations?
12     A.   I am not sure.
13     Q.   Are you aware of any time when the
14 Ocean Beach Police Department has actively
15 solicited donations?
16     A.   I am not personally aware of it,
17 no.
18     Q.   What have you done to prepare for
19 this deposition?
20     A.   I read over the statements that I
21 took, and that is about it.
22     Q.   Just so I am clear, you only read
23 over the ones that you took?
24     A.   The package pertaining to the

20  (Pages 74 to 77)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 78

```
 1              Cherry
 2   Halloween incident.
 3        Q.   So the statements that you took,
 4   you mean the statements that you took home
 5   with you?
 6        A.   The statements that I took and the
 7   statements that I took home with me.  The ones
 8   that I actually did take and the copies of the
 9   statements that I took home.
10        Q.   So the statements that you took,
11   that is incorporated in the statements that
12   you took home; correct?
13        A.   Yes.  That is correct.
14        Q.   Did you review any other documents
15   other than for the seven witness statements
16   that you testified that you took home?
17        A.   No.
18        Q.   Did you ever review a copy of the
19   complaint in preparation for this?
20        A.   I reread the complaint, I don't
21   have a copy of it.
22        Q.   I am talking about in preparation
23   for the deposition, did you read a copy of the
24   complaint?
25        A.   Recently?
```

Page 79

```
 1              Cherry
 2        Q.   To prepare for today's deposition?
 3        A.   No.
 4        Q.   Did you review any other documents
 5   to prepare for today's deposition other than
 6   for those seven witness statements?
 7        A.   No.
 8        Q.   Did you speak to anybody in
 9   preparation for today's deposition?
10        A.   No.
11        MR. NOVIKOFF:  Other than counsel.
12        A.   Other than counsel.
13        Q.   You spoke to counsel, I don't want
14   to know what you spoke about, but you spoke to
15   counsel?
16        A.   Yes.
17        Q.   How many times did you speak to
18   counsel to prepare for the deposition?
19        A.   Once.
20        Q.   How long did that meeting last?
21        MR. NOVIKOFF:  I am going to
22   object.
23        MR. GOODSTADT:  I don't want --
24        MR. NOVIKOFF:  I will object.  I
25   think the question is improper, but
```

Page 80

```
 1              Cherry
 2   subject to whatever objections I have on
 3   attorney/client privilege and based upon
 4   our prior discussion that by allowing the
 5   witness to answer that question I am not
 6   waiving the objection on the basis of
 7   privilege you can answer that.  Is that
 8   okay?
 9        MR. GOODSTADT:  Agreed.
10        A.   About two hours.
11        Q.   Can was anyone present other than
12   for attorneys and you?
13        A.   No.
14        Q.   When did that two hour meeting
15   last -- when did it occur?
16        A.   Yesterday.
17        Q.   Other than for the conversation
18   with counsel did you speak with anybody else
19   in preparation for today's deposition?
20        A.   No.
21        Q.   You didn't speak with anybody at
22   Ocean Beach to prepare for the deposition?
23        A.   No.
24        Q.   When was the last time that you
25   spoke with Joseph Loeffler?
```

Page 81

```
 1              Cherry
 2        A.   Probably early September after
 3   Labor Day.
 4        Q.   Was that during the season or
 5   after the season?
 6        A.   Just at the end of the season.
 7        Q.   Was that after the season or
 8   during the season?
 9        A.   It was during the season that I
10   worked.  I worked until I think the second or
11   third week in September, and I spoke to him
12   during that week, that last week.
13        Q.   Have you spoken to any, other than
14   for your son, have you spoken to any current
15   or former employee of Ocean Beach since the
16   end of the '08 season?
17        A.   I spoke to George Hesse.
18        Q.   When was the last time that you
19   spoke to George Hesse?
20        A.   Yesterday.
21        Q.   Did you discuss this case or
22   anything about this case with George Hesse
23   yesterday?
24        A.   I told him I met with the
25   attorneys and that I was going to go for the
```

21 (Pages 78 to 81)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 82

Cherry

1  deposition today.  We didn't discuss any -- we
2  didn't discuss anything else other than that I
3  was going to the deposition today.
4     Q.  How long did that discussion last?
5     A.  About two minutes.
6     Q.  The whole discussion lasted two
7  minutes or just about the deposition?
8     A.  Just about the whole discussion.
9     Q.  Other than for -- did you take any
10 notes of that discussion?
11    A.  No.
12    Q.  Was that over the phone or in
13 person?
14    A.  Over the phone.
15    Q.  Other than for that two minute
16 phone call have you had any discussions with
17 George Hesse subsequent to the end of the '08
18 season?
19    A.  Subsequent to the end -- after the
20 '08 season?
21    Q.  After it ended have you had any
22 other correspondence whether verbal or written
23 with George Hesse?
24    A.  Yes.  I spoke to him a couple of
25

Page 83

Cherry

1  times, we had coffee once.
2     Q.  How many times have you spoken to
3  him other than for the two minute discussion
4  yesterday?
5     A.  Probably twice on the phone and
6  once having coffee.
7     Q.  Let's work backwards
8  chronologically from yesterday.  When was the
9  time before yesterday that you spoke with Mr.
10 Hesse?
11    A.  I had coffee with him I believe it
12 was last week, I am not sure what day,
13 Wednesday or Thursday of last week.
14    Q.  Where did you have coffee with
15 him?
16    A.  Barnes & Noble in Bay Shore.
17    Q.  How long were the two of you
18 together?
19    A.  About a half hour.
20    Q.  Did you discuss this case or any
21 allegations of this case with him at that
22 time?
23    A.  No.
24    Q.  Did you tell him about
25

Page 84

Cherry

1  depositions?
2     A.  No.
3     Q.  Did you discuss the Gilbert matter
4  with him?
5     A.  No.
6     Q.  Did you discuss anything at all
7  about Ocean Beach with him during that
8  conversation?
9     A.  No, we try not to.
10    MR. NOVIKOFF:  Just answer the
11 question.
12    Q.  Did you take any notes of your
13 conversation with him?
14    A.  No.
15    Q.  Do you know whether he took any
16 notes?
17    A.  No, sir.
18    Q.  You don't know or --
19    A.  Not to my knowledge.
20    Q.  Prior to the coffee last Wednesday
21 or Thursday when was the time before that that
22 you spoke with Mr. Hesse?
23    A.  Probably talked to him on the
24 phone a week or two before that.
25

Page 85

Cherry

1     Q.  How long did that conversation
2  last?
3     A.  A couple of minutes.
4     Q.  Did you call him or did he call
5  you?
6     A.  I called him.
7     Q.  What was the purpose of the call?
8     A.  He had a court appearance and I
9  just asked him how it went.
10    Q.  Did you ask him how it went?
11    A.  Yes.
12    Q.  What was his response?
13    A.  He said he didn't have to appear,
14 his lawyer -- it was a conference and his
15 lawyer told him that he didn't have to appear.
16    MR. NOVIKOFF:  Read back the
17 question and answer.
18    (Record read.)
19    Q.  Did he tell you anything else
20 about that conference?
21    A.  No.
22    Q.  What else did you discuss with him
23 on that phone call?
24    A.  That was about it.

Page 86

Cherry

1
2     Q.    How long did that phone call last?
3     A.    A minute or two at most.
4     Q.    How did you know that he had a
5  conference that day?
6     A.    Its -- I keep track of that when
7  he has to go.  Sometimes I go to the hearing,
8  go to the court with him.
9     Q.    How do you keep track of the court
10 dates?
11    A.    It is listed on the Suffolk County
12 DA's web-site, it has a link to the court
13 calendar, and I check it occasionally.
14    Q.    Do you recall anything else that
15 was discussed during that conversation?
16    A.    Pardon me?
17    Q.    Was anything else discussed during
18 that conversation?
19    A.    No.
20    Q.    Prior to that conversation which
21 was probably about three weeks ago or so what
22 was the time before that when you spoke with
23 Mr. Hesse?
24    A.    It was probably during working,
25 when I was working.

Page 87

Cherry

1
2     Q.    So subsequent to the '08 season
3  ending do you recall speaking to him twice on
4  the phone and once in person at the coffee?
5     A.    Yes.
6     Q.    And during any of those
7  conversations other than what you already
8  testified to, yesterday's conversation, did
9  you discuss this case or anything about this
10 case with him?
11    A.    No.
12    Q.    Other than for Mr. Hesse and your
13 son, have you spoken with any current or
14 former employee of Ocean Beach between the
15 time the '08 season ended and today?
16    A.    I spoke to Hank Clemens
17 (phonetic), I called him --
18        MR. NOVIKOFF:  The question is who
19    did you speak with?
20    Q.    Who is Hank Clemens?
21    A.    Hank Clemens is a police officer
22 with the Ocean Beach Police Department.
23    Q.    Is he a full-time police officer?
24    A.    Yes.
25    Q.    He works throughout the year?

Page 88

Cherry

1
2     A.    Yes.
3     Q.    Did you speak with Mr. Clemens in
4  person or over the phone?
5     A.    Over the phone.
6     Q.    And did you call him or he called
7  you?
8     A.    I called him.
9     Q.    Where did you call him at?
10    A.    I called him at the Ocean Beach
11 police headquarters.
12    Q.    Why did you call him?
13    A.    To tell him that I was going to a
14 deposition.
15    Q.    Why did you call Mr. Clemens to
16 tell him that?
17    A.    Just to log it in just in case
18 there was an accident or something, I was on
19 department business.  I signed on with him to
20 let him know I was going to the deposition,
21 and it was official department business or
22 village business.
23    Q.    Are you being paid by the
24 department to testify today?
25    A.    Yes.

Page 89

Cherry

1
2     Q.    What rate are you being paid at?
3     A.    My basic rate.
4     Q.    Which is what?
5     A.    I believe it is $19.67.
6        MR. NOVIKOFF:  So if you want to
7    take the first seven hours.
8     Q.    Who told you that you would be
9  paid for today's time?
10    A.    George Hesse.
11    Q.    When did he tell you that?
12    A.    I guess when I spoke to him, when
13 I called him yesterday.
14    Q.    So that is something additional
15 that you recall?
16    A.    Yes.  Now that you mentioned it, I
17 mentioned should I sign on, he said yes, you
18 get paid for the day.
19    Q.    Was that the first time that you
20 knew that you were going to get paid?
21    A.    Yes.
22    Q.    So why did you call Hank Clemens a
23 couple of weeks ago then?
24        MR. NOVIKOFF:  Objection.
25    A.    No, I spoke to him yesterday.

Page 90

Cherry

1
2  **Q.  Your discussion with Hank Clemens**
3  **was yesterday?**
4     A.   Yes.
5     **Q.   I misunderstood you, I apologize.**
6  **So you spoke to Mr. Hank Clemens after you**
7  **spoke with Mr. Hesse?**
8     A.   No, I spoke to Hank Clemens in the
9  morning about roughly 9:30 before, just to let
10 him know I was going to the prep for the
11 deposition, and I called him when I finished
12 up a little after 12.  When we finished then I
13 called George later, about an hour later.
14    **Q.   Now that you recall this**
15 **additional substance that you discussed with**
16 **Mr. Hesse yesterday, is there anything else**
17 **that you now recall discussing with him?**
18       MR. NOVIKOFF:  Objection.
19    A.   No.
20    **Q.   Were you paid for the time that**
21 **you spent preparing yesterday?**
22    A.   No.
23    **Q.   Do you know why you get paid for**
24 **today and not for the time preparing?**
25    A.   Because I was subpoenaed to be

Page 91

Cherry

1
2  here today, and they paid me for the day, of
3  the deposition.  I don't know why.
4     **Q.   Do you know why they didn't pay**
5  **you for yesterday?**
6     A.   No.  I have no idea.
7     **Q.   And other than for logging in with**
8  **Mr. Clemens for the time that you are at the**
9  **deposition today what else did you discuss**
10 **with him yesterday?**
11    A.   That is it.
12    **Q.   So now other than for Mr. Hesse,**
13 **Mr. Clemens and your son have you had any**
14 **conversations with any current or former**
15 **employee of Ocean Beach subsequent to the end**
16 **of the '08 season?**
17    A.   No.
18       MR. GOODSTADT:  Let's take a
19 break.
20       THE VIDEOGRAPHER:  The time is
21 10:57, we are off the record.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  The time is
24 11:12, we are back on the record.
25    **Q.   Mr. Cherry, when did your son**

Page 92

Cherry

1
2  **graduate the academy?**
3     A.   I am not sure of the exact date,
4  he has been on the police force about eight
5  years.
6        MR. NOVIKOFF:  Eight years?
7        THE WITNESS:  Yes.
8     **Q.   So at some point in or around 2000**
9  **or so?**
10    A.   2000, yes.
11    **Q.   After he left Ocean Beach to go to**
12 **the academy did he work at all at Ocean Beach**
13 **at any time from that date until today?**
14    A.   No.
15       MR. NOVIKOFF:  Objection.
16    **Q.   And he is currently with the New**
17 **York City Police department; is that correct?**
18    A.   Yes.
19    **Q.   What is his title?**
20    A.   Detective.
21    **Q.   What precinct?**
22    A.   He works out of the Firearms
23 Investigation Division of the Organized Crime
24 Control Bureau.
25    **Q.   How long has he had that title?**

Page 93

Cherry

1
2     A.   He has been there a short time.
3  Probably about a month.
4     **Q.   Where was --**
5     A.   Title detective --
6     **Q.   Start with detective, how long has**
7  **he been a detective?**
8     A.   About two years, two and a half
9  years.
10    **Q.   How long has he been with the**
11 **Firearms Investigation Unit?**
12    A.   About a month.
13    **Q.   Where was he before that?**
14    A.   He was with Brooklyn North
15 Narcotics.
16    **Q.   How long was he there for?**
17    A.   He was there about three years.
18    **Q.   So he was there both prior to and**
19 **after he became a detective?**
20    A.   He became a -- yes, that is
21 correct.  He was a police officer, he was
22 promoted while he was in Brooklyn North and
23 stayed there until he went to the firearms
24 unit.
25    **Q.   Was there additional training that**

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 94

Cherry

1
2    you need to become a detective?
3        A.   Additional training after you make
4    detective, but it is based on merit and his
5    performance.
6        Q.   When he was in Brooklyn North
7    Narcotics, both as a police officer and
8    detective, where is his home precinct; I don't
9    know if I am using the right vernacular?
10       A.   His office -- I am not sure
11   exactly the location of his office, I have
12   never been there, but it is in Brooklyn North,
13   I am not sure what precinct, where the office
14   was.
15       Q.   He has been there, he started at
16   Brooklyn North somewhere around 2005?
17       A.   That would be about right, yes.
18       Q.   Where is he prior to being the
19   Brooklyn North?
20       A.   He was assigned to the 73rd
21   Precinct Anti-Crime Unit.
22       Q.   Where is the 73rd Precinct?
23       A.   In Brooklyn.
24       Q.   Do you know where in Brooklyn?
25       A.   No.

Page 95

Cherry

1
2        Q.   How long was he with the 73rd
3    Precinct?
4        A.   That is where he started his
5    career after graduating from the academy.
6        Q.   So somewhere in about 2000 or 2001
7    he started at the 73rd?
8        A.   Yes.
9        Q.   Do you know whether either of the
10   Bossetti's worked at the 73rd?
11       A.   I don't know.
12       Q.   Do you know whether your son ever
13   worked with the Bossetti's when they were New
14   York City police officers?
15       A.   No, they never did.
16       Q.   Do you know one way or the other?
17       A.   No, he didn't work with them.
18       Q.   Do you know whether he knew them?
19       A.   Prior to --
20       Q.   When they were both police
21   officers with the New York City Police
22   Department?
23       A.   No, I don't believe so.
24       Q.   Do you know when they met?
25       A.   I am not sure.

Page 96

Cherry

1
2        Q.   Is your son friendly with either
3    of the Bossetti's?
4            MR. NOVIKOFF:  Objection.
5        A.   No.  I mean they -- he knows them
6    to say hello, but they are not friends.  They
7    don't socialize or anything like that with
8    each other.
9        Q.   Have they ever worked together?
10       A.   I don't believe so.
11       Q.   So I believe you testified before
12   that your son said that Gary Bossetti is not
13   the type of guy that would go out and assault
14   somebody; is that correct?
15           MR. NOVIKOFF:  Objection.  You can
16   answer.
17       A.   I believe I said that.
18       Q.   You said that?
19       A.   Yes.
20       Q.   I thought you said your son said
21   that, I apologize.
22           Did your son opine on that subject
23   at all?
24       A.   No.
25       Q.   When did you start working as a

Page 97

Cherry

1
2    police officer in Nassau County?
3        A.   I was sworn in October 9, 1970, my
4    start date.
5        Q.   How long were you employed by the
6    Nassau County Police Department?
7        A.   31 years.
8        Q.   What was your last day of
9    employment there?
10       A.   I left there May 3, 2001.
11       Q.   Did you leave there voluntarily?
12       A.   Yes.
13       Q.   Did you retire?
14       A.   Yes, I did.
15       Q.   You collecting a full pension?
16       A.   Yes, sir.
17           MR. GOODSTADT:  Would you mark
18   this as Cherry Exhibit 2, request for
19   certification of basic police training.
20           (Cherry Exhibit 2, request for
21   certification of basic police training,
22   marked for identification, as of this
23   date.)
24       Q.   I placed in front of Mr. Cherry
25   what has now been marked as Cherry Exhibit 2,

25  (Pages 94 to 97)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Cherry

1
2  it is a one-page exhibit that has a Bates
3  number of 5462 at the bottom.
4       Mr. Cherry, do you recognize the
5  document that has been marked as Cherry
6  Exhibit 2?
7       A.   Yes.
8       Q.   What is this document?
9       A.   This is a document from the
10 training division certifying my basic police
11 training.
12      Q.   Do you recognize the handwriting
13 on this document?
14      A.   Yes.
15      Q.   Let me start with the top half
16 that is written, it looks like all caps up to
17 the line that says from the top down to the
18 line that says rank and date of employment?
19      A.   Okay.
20      Q.   Do you see that section?
21      A.   Yes.
22      Q.   Whose handwriting is that?
23      A.   That is my handwriting.
24      Q.   If you look at rank, what did you
25 write there?

Cherry

1
2       A.   Detective retired.
3       Q.   That was your rank upon retiring?
4       A.   Detective.
5       Q.   That is what you currently have
6  now as a rank, retired detective?
7       A.   Well, I am not in the Police
8  Department any more so I don't really have a
9  rank, but I indicated that I was detective who
10 was retired.
11      Q.   So you don't currently have a
12 rank, so you are currently a civilian?
13      A.   Civilian, yes.
14      Q.   Then date of employment, what does
15 that mean?
16      A.   That is the date that I was sworn
17 into the Police Department, first day on the
18 job.
19      Q.   That is done prior to going into
20 the academy?
21      A.   Yes.
22      Q.   Now if you look at the deputy
23 inspector, do you recognize that name?
24      A.   Yes.
25      Q.   Who is that?

Cherry

1
2       A.   John P. Hunter.
3       Q.   And who is Mr. Hunter?
4       A.   He was a deputy inspector in the
5  training bureau.
6       Q.   Why were you getting this
7  certification certificate?
8       A.   I believe this was given to me
9  when I was a seasonal police officer with the
10 New York State Park Police, they required this
11 as part of their investigation.
12      Q.   Is this something that you
13 submitted to them or was it something that
14 Nassau County sent to them?
15      MR. NOVIKOFF:  Objection.
16      A.   The State Park Police asked me to
17 get this.  Part of their requirements.
18      Q.   Now, if you look at the part on
19 the bottom, the typed part that starts
20 Detective Patrick J. Cherry, do you see that?
21      A.   Yes.
22      Q.   It says Detective Patrick J.
23 Cherry, serial 4823, do you see that?
24      A.   Yes.
25      Q.   What is 4823?

Cherry

1
2       A.   That is my serial number.
3       Q.   Is that also known as a shield
4  number?
5       A.   No, that is like my permanent
6  number at the Police Department.  Shield
7  number is different.
8       Q.   Did you have a shield number when
9  you worked for the Nassau County Police
10 Department?
11      A.   Yes, I did.
12      Q.   What was your shield number?
13      A.   My detective shield number was
14 222.
15      Q.   Did you have a shield number when
16 you worked as a police officer at Ocean Beach?
17      A.   Yes.
18      Q.   What shield number were you at
19 Ocean Beach?
20      A.   I believe it was 426 I believe.
21      Q.   Did you have a serial number at
22 Ocean Beach?
23      A.   Not that I know of.
24      Q.   It says here that you retired from
25 the Nassau County Police Department on May 3,

Page 102

Cherry

1
2 2001. Do you see that?
3   A.  Yes.
4   Q.  Is that accurate?
5   A.  Yes, it is.
6   Q.  Next sentence says he was
7 certified as a police officer on January 19,
8 1971. Do you see that?
9   A.  Yes.
10   Q.  What does that mean to be
11 certified as a police officer?
12   MR. NOVIKOFF:  Objection.  You can
13   answer.
14   A.  That means that I completed the
15 proper training as required by the Municipal
16 Police Chief's Counsel of the State of New
17 York.
18   Q.  Do you know what that training
19 consisted of?
20   A.  It was -- I completed the Nassau
21 County Police Academy and everything we did in
22 the Police Academy, I am not sure exactly, it
23 consisted of a lot of things.
24   Q.  Did it consist of anything outside
25 of the training at the Police Academy?

Page 103

Cherry

1
2   A.  No.
3   Q.  Were you required to take any
4 tests through civil service to become a police
5 officer?
6   A.  Yes.
7   Q.  In Nassau County?
8   A.  Yes, that was prior to being
9 appointed, yes.
10   Q.  So you couldn't be appointed
11 unless you passed the test for civil service?
12   A.  That is correct.
13   Q.  An d what were the tests that you
14 were required to take to be appointed in
15 Nassau County at the time that you were
16 appointed?
17   MR. NOVIKOFF:  Objection.  You may
18   answer.
19   A.  A written test, psychological
20 test, physical agility test, and a medical.
21   Q.  Were you required to take a
22 polygraph?
23   A.  No.
24   Q.  Once you were, you had passed
25 those tests -- strike that.

Page 104

Cherry

1
2   Who administered those tests?
3   A.  Nassau County Civil Service.
4   Q.  After you passed those tests
5 administered by Nassau County Civil Service
6 and you had graduated from the academy, then
7 you were certified to be a police officer in
8 Nassau County?
9   A.  I believe so, yes.
10   Q.  At that point in time once you
11 passed all the tests and you graduated the
12 Police Academy were you certified to be a
13 police officer in any other place other than
14 for Nassau County?
15   A.  I don't know.
16   Q.  For example could you have just
17 gone and worked for the Suffolk County Police
18 Department without taking any further tests,
19 without going to any further academy?
20   MR. NOVIKOFF:  Objection.  You can
21   answer.
22   A.  No, probably not.
23   Q.  Why not?
24   A.  I don't think they have a lateral
25 transfer.

Page 105

Cherry

1
2   Q.  So you would need to take
3 additional tests?
4   A.  Yes.
5   Q.  Would you have had to go to
6 another academy?
7   A.  I don't know what their
8 requirements would be on that.  Probably.
9   Q.  How about would you have been able
10 to go work for a town police department within
11 Nassau County?
12   MR. NOVIKOFF:  Objection.  You can
13   answer.
14   A.  I believe if you -- I believe they
15 took off -- the town's took off the same list.
16 I know people came from towns to Nassau.  I
17 never heard of a person going from Nassau to a
18 village.
19   Q.  Do you know whether the people
20 that went from town to Nassau had to take any
21 additional test?
22   MR. NOVIKOFF:  Objection.
23   A.  I know the village took over -- I
24 don't know for sure in civil service.  I know
25 that Nassau County Police took over a number

27 (Pages 102 to 105)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 106

Cherry

1  of villages and absorbed those officers into
2  the Police Department without any further
3  tests or qualifications.
4      **Q.   I am talking now about town police**
5  **departments as opposed to a village police**
6  **department in Nassau County, same thing?**
7          MR. NOVIKOFF:  Objection.  You can
8      answer.
9      A.   Town and village, yes, same thing.
10     **Q.   Is there a difference between a**
11 **town and a village to your knowledge in Nassau**
12 **County?**
13         MR. NOVIKOFF:  Objection.
14     A.   Yes.  But there is -- well, Nassau
15 is a little different, there is no town police
16 departments like -- I don't know if -- yes,
17 there is town police departments in Suffolk
18 County.  But there is no town police
19 departments in Nassau, there is just village
20 police departments or city police departments.
21     **Q.   So it is village, city, county?**
22     A.   Yes.
23     **Q.   To your knowledge could you have**
24 **worked for any of those three entities, either**

Page 107

Cherry

1      **a town police -- strike that -- either a city**
2  **police department, a village police department**
3  **or Nassau County Police Department once you**
4  **had passed the Nassau County Civil Service**
5  **test and graduated the academy?**
6          MR. NOVIKOFF:  Objection.
7      A.   Yes.  I mean I guess yes, you
8  could.
9          MR. NOVIKOFF:  Don't guess.
10     A.   Well, usually you pick where you
11 want to work before you went to the academy.
12 If you wanted to work for the village, the
13 town -- the village or the county.  But Nassau
14 had absorbed some of the villages and their
15 officers went on Nassau County Police
16 Department without taking any additional
17 tests.
18     **Q.   So it was your understanding that**
19 **that could have happened without passing a**
20 **test, but that you as a Nassau County Police**
21 **Officer couldn't have gone to work in Suffolk**
22 **County Police Department without taking**
23 **additional tests; is that correct?**
24         MR. NOVIKOFF:  Objection.

Page 108

Cherry

1      A.   I don't know.  I don't know of
2  anybody that ever went from a county to a
3  village.
4      **Q.   I am not talking about a county to**
5  **village.  I am talking about going from Nassau**
6  **County Police Department to Suffolk County**
7  **Police Department?**
8          MR. NOVIKOFF:  Objection.
9      A.   No.  I don't believe you can.
10     **Q.   That is because you have to take**
11 **additional tests; is that correct?**
12         MR. NOVIKOFF:  Objection.
13     A.   You have to take a test for the
14 Suffolk County Police Department.
15     **Q.   Now my question is do you know**
16 **whether you as a Nassau County Police Officer**
17 **could have gone to work at a village police**
18 **department within Suffolk County without**
19 **taking any additional tests?**
20         MR. NOVIKOFF:  Objection.
21     A.   I don't know.
22     **Q.   You didn't know at the time or you**
23 **don't know now?**
24     A.   Well I know now --

Page 109

Cherry

1          MR. NOVIKOFF:  Objection.  You can
2      answer.
3      A.   I know now, but I didn't know at
4  the time that I was hired by Ocean Beach.
5      **Q.   What is your knowledge now as to**
6  **whether that was permissible?**
7          MR. NOVIKOFF:  Objection.
8      A.   Now I know you have to go through
9  the civil service, Suffolk County Civil
10 Service and take their required tests.
11     **Q.   When did you learn that**
12 **requirement?**
13     A.   Probably 2005.
14     **Q.   How did you learn that**
15 **requirement?**
16     A.   Civil service came down --
17 apparently civil service came down and advised
18 the Village that they had to go -- police
19 officers had to go through the civil service
20 requirements.
21     **Q.   My question is a little bit**
22 **different.  My question is how did you learn**
23 **about it?**
24     A.   I guess I learned through the

TSG Reporting - Worldwide      877-702-9580

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 110

Cherry

1
2  Police Department, I am not sure, either the
3  chief or George said all the guys had to go
4  through the civil service requirements.
5      Q.   That was in 2005?
6      A.   Yes.
7      Q.   When did you start working at
8  Ocean Beach?
9      A.   May 2004.
10     Q.   So at no point during 2004 did you
11 learn of this requirement?
12     A.   I don't believe so, no.
13     Q.   What tests to your understanding
14 were required to be certified in Suffolk
15 County as a police officer?
16         MR. NOVIKOFF:  Objection.
17     A.   I believe you have to go take a
18 physical agility, psychological and a medical.
19     Q.   How about a polygraph, are you
20 aware of that requirement?
21     A.   Yes, I think there is a polygraph.
22     Q.   And you hadn't taken those tests
23 for Suffolk County; is that correct?
24     A.   No, sir.
25     Q.   Sitting here today have you taken

Page 111

Cherry

1
2  them at any time up to and including today,
3  have you taken these tests that are required
4  by Suffolk County at any time?
5      A.   No, I have not.
6      Q.   And if you had taken those tests
7  and passed them would you be certified to be
8  an officer in Suffolk County, or would you
9  need to attend the academy as well?
10         MR. NOVIKOFF:  Objection.
11     A.   I believe you don't have to attend
12 the Suffolk Academy.
13     Q.   So your understanding was that
14 your attendance at the Nassau Police Academy
15 would have satisfied the academy requirement,
16 but yet you still had to take the other civil
17 service tests?
18         MR. NOVIKOFF:  Objection.  You can
19 answer.
20     A.   That is what I believe now, yes.
21     Q.   And the basis of your belief is
22 what you learned in 2005?
23     A.   Yes, sir.
24     Q.   So without taking those tests you
25 were still a civilian like you testified you

Page 112

Cherry

1
2  were when you retired from Nassau; is that
3  correct?
4          MR. NOVIKOFF:  Objection.
5      A.   Correct.  I believe when I was
6  hired by -- no, I believe -- well, I was hired
7  by Ocean Beach as a police officer at the time
8  in 2004.
9      Q.   Were you certified to be a police
10 officer in Ocean Beach in 2004 when you were
11 hired?
12         MR. NOVIKOFF:  Objection.
13     A.   What do you mean by certified;
14 certified by Suffolk County?
15     Q.   Certified to work and be paid as a
16 police officer working at a village in Suffolk
17 County?
18         MR. NOVIKOFF:  Objection.
19     A.   I believe I was at that time
20 because I was hired.
21     Q.   What was your belief based on?
22         MR. NOVIKOFF:  Objection.
23     Q.   Just by the fact that you were
24 hired?
25     A.   Yes.

Page 113

Cherry

1
2      Q.   Sitting here today do you believe
3  that you were certified to be hired as a
4  police officer and be paid as a police officer
5  in 2004 in Suffolk County?
6          MR. NOVIKOFF:  Objection.
7      A.   I was qualified as a police
8  officer, however I -- you see I was under the
9  impression -- yes, I believe I was hired, I
10 was able to be hired at that time.  I was
11 under the impression that I was hired as a
12 police officer.
13     Q.   I understand what your impression
14 was at the time you were hired.  I am asking
15 you sitting here today with all the knowledge
16 that you have today do you believe at the time
17 that you were hired to be a police officer
18 that you were certified to be hired as a
19 police officer and paid as a police officer in
20 a village in Suffolk County?
21         MR. NOVIKOFF:  Note my objection.
22 You can answer.
23     A.   I don't know.  I am not sure if
24 they were -- if those qualifications were in
25 effect in 2004.  I was aware that this

29  (Pages 110 to 113)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 114

Cherry

1   decision was made either early 2005, I don't
2   know if it applied in 2004.
3       Q.   So you didn't know whether Suffolk
4   County had the requirements that you testified
5   to, the physical agility test, the
6   psychological, the medical and the polygraph
7   in 2004?
8           MR. NOVIKOFF: Objection. You can
9       answer.
10      A.   I don't know if that was in effect
11  to become a police officer in the Village at
12  that time. Personally I don't know that.
13      Q.   Let's assume that they were in
14  effect, take that assumption for this
15  question, assuming they were in effect, is it
16  your position still that you were certified to
17  be hired and paid as a police officer by the
18  Village of Ocean Beach in 2004?
19          MR. NOVIKOFF: Objection. You can
20      answer.
21      A.   Assuming what you said, no,
22  probably not.
23      Q.   So assuming what I said is true,
24  you were a civilian in 2004 when you were

Page 115

Cherry

1   working as a police officer in Ocean Beach; is
2   that correct?
3           MR. NOVIKOFF: Objection. You can
4       answer that.
5       A.   Assuming what you said, yes,
6   probably.
7       Q.   Well, what do you mean by
8   probably?
9       A.   Well, if I was not a police
10  officer what would I be?
11      Q.   So the answer is yes; not yes
12  probably?
13          MR. NOVIKOFF: Objection. His
14      answer is his answer.
15      Q.   I am asking you yes or no whether
16  assuming that the tests that you testified to
17  before were a requirement in 2004, at the time
18  that you were hired as a police officer and
19  paid as a police officer in 2004 you actually
20  were a civilian in Suffolk County; is that
21  correct?
22          MR. NOVIKOFF: Objection. You can
23      answer.
24      A.   Based on your assumption that

Page 116

Cherry

1   would be correct.
2       Q.   Did you have any pistol licenses
3   in 2004 when you were hired?
4       A.   Yes, I did.
5       Q.   What licenses did you have?
6       A.   I have a Suffolk County pistol
7   permit.
8       Q.   Any others?
9       A.   No.
10      Q.   When you were hired to be a police
11  officer in May of 2004 did you carry a weapon
12  when you were a police officer?
13      A.   Yes.
14      Q.   Was the weapon loaded?
15      A.   Yes.
16      Q.   You wore or carried a shield?
17      A.   Yes.
18      Q.   You held yourself out to be a
19  police officer?
20      A.   Yes.
21      Q.   You were a uniform?
22      A.   Yes.
23      Q.   I just want to go back now before
24  you worked in Ocean Beach when you were still

Page 117

Cherry

1   employed at Nassau County, why don't you walk
2   me through the titles that you had starting
3   when you started and ended in 1970?
4       A.   I was sworn in as a police
5   officer. I was -- just want the titles?
6       Q.   Your titles and precincts if that
7   applies?
8       A.   I was assigned to First Precinct.
9   While I was at the First Precinct I was
10  temporarily assigned to the Firearms Training
11  Bureau as an instructor, and that would be
12  when a class was in effect. When the class
13  was over I would go back to the precinct. I
14  went back and forth several times before in
15  1974 I was transferred from the First Precinct
16  to the Narcotics Bureau.
17          I was in the Narcotics Bureau for
18  two years assigned to the Strike Force which
19  was like a Narcotics Anti-Crime Unit. And in
20  197 -- May of '76 I was promoted to detective.
21  I stayed in the Narcotics Bureau until my
22  retirement in 2001 as a detective.
23      Q.   During your time that you were
24  employed either as a police officer or a

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 118

1          Cherry
2    detective or a firearms instructor with Nassau
3    County --
4         A.   The title was still police officer
5    assigned to the Firearms Training Bureau.
6         Q.   Just so we are clear, the titles
7    that you had in Nassau County were police
8    officer and detective; is that correct?
9         A.   Two titles, correct.
10        Q.   So at any time when you were a
11   police officer or a detective did you ever
12   work for Internal Affairs?
13        A.   No.
14        Q.   Does Nassau County have an
15   Internal Affairs Bureau or Department?
16        A.   Yes.
17        Q.   And what is Internal Affairs in
18   the Nassau County Police Department?
19        A.   They investigate allegations
20   against police officers of wrongdoing in the
21   department.
22        Q.   Were you ever trained in Internal
23   Affairs?
24        A.   No, sir.
25        Q.   Did you ever have any experience

Page 119

1          Cherry
2    during the times that you were a detective or
3    police officer in Nassau County investigating
4    allegations of misconduct by the police
5    officers?
6         A.   No.
7         Q.   Did you ever have any experience
8    investigating allegations of assault?
9         A.   Yes.
10        Q.   And what did that experience
11   involve?
12        A.   As a police officer I investigated
13   assaults that occurred in a precinct in my
14   area of patrol on assignment or coming across
15   it.  As a detective I was involved in not a
16   lot of investigations involving assaults, but
17   occasionally a police officer would be
18   assaulted as part of a narcotics
19   investigation, and I was involved in just
20   taking statements and investigating the
21   assault and resisting arrest or whatever was
22   involved.  And on several occasions I was
23   assigned to investigate assaults with local
24   precincts for the homicide squad.
25        Q.   While you were a detective or a

Page 120

1          Cherry
2    police officer?
3         A.   As a detective.
4         Q.   How many investigations of
5    assaults did you undertake when you were in
6    Nassau County?
7         A.   In total maybe about a dozen.
8         Q.   And did any of those
9    investigations of assault involve allegations
10   that a police officer assaulted somebody?
11        A.   No.
12        Q.   They were all either assaults
13   between civilians or an assault by a civilian
14   on a police officer; is that correct?
15        A.   That is correct.
16        Q.   So in your 31 years you
17   investigated approximately 12 assaults; is
18   that correct?
19        A.   Yes.
20           MR. NOVIKOFF:  Objection.
21        A.   Roughly.
22        Q.   When you were employed with Nassau
23   County that was a full-time position; is that
24   correct?
25        A.   Yes.

Page 121

1          Cherry
2         Q.   Did you work any other jobs while
3    you were employed as a Nassau County Police
4    Officer or detective?
5         A.   No.
6         Q.   Never worked security anywhere as
7    a bouncer or any other part-time jobs?
8         A.   No, sir.
9         Q.   When you were with the Nassau
10   County Police Department what tours did you
11   work?
12        A.   I worked -- as a uniform officer I
13   worked around the clock, 8 to 4 and 4 to 12
14   and midnight to 8 a.m.  As a detective I
15   primarily worked 8 to 4's and 4 to 12's.  On
16   special assignments you may work a midnight
17   tour depending on the needs of the unit.
18        Q.   I know that you testified that you
19   never had been disciplined while you were at
20   Nassau County, but had you ever been
21   investigated by Internal Affairs?
22        A.   Not to my knowledge.
23           MR. NOVIKOFF:  That's why its
24   Internal Affairs.
25        Q.   And you retired in what year from

31 (Pages 118 to 121)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 122

| | |
|---|---|
| 1 | Cherry |
| 2 | the Nassau County Police Department? |
| 3 | A.   2001. |
| 4 | Q.   And why did you retire? |
| 5 | A.   I just -- you know, I figured I |
| 6 | did 31 years, I was ready to retire and |
| 7 | voluntarily retired. |
| 8 | Q.   Subsequent to your retirement what |
| 9 | was the first place that you were employed? |
| 10 | A.   The New York State Park Police. |
| 11 | Q.   And what was your title with the |
| 12 | New York State Park Police? |
| 13 | A.   Police officer. |
| 14 | Q.   Was that a full-time position? |
| 15 | A.   No, seasonal position. |
| 16 | Q.   Where were you -- did you report |
| 17 | into a certain precinct or headquarters? |
| 18 | A.   I was assigned to the Jones Beach |
| 19 | Barracks. |
| 20 | Q.   I assume that is in Jones Beach? |
| 21 | A.   Yes, Jones Beach State Park. |
| 22 | Q.   That is in Nassau County; is that |
| 23 | correct? |
| 24 | A.   Yes.  But the region I was |
| 25 | assigned to encompassed Nassau and Suffolk. |

Page 123

| | |
|---|---|
| 1 | Cherry |
| 2 | Q.   When you say a seasonal officer |
| 3 | with the New York State Park Police, was the |
| 4 | seasonal defined in the same way as you |
| 5 | defined it before? |
| 6 | A.   Basically it was a summer season, |
| 7 | they went from April to mid September. |
| 8 | Q.   And how many hours a week were you |
| 9 | working the first year as a seasonal police |
| 10 | officer with the New York State Park Police? |
| 11 | A.   I would say I worked three tours, |
| 12 | about 24 hours the first year and probably 36 |
| 13 | hours the second year.  You can work as many |
| 14 | days as you wanted to. |
| 15 | Q.   What years did you work there as a |
| 16 | seasonal police officer? |
| 17 | A.   2002 and 2003. |
| 18 | Q.   Did you ever take any additional |
| 19 | tests to be a seasonal police officer with the |
| 20 | New York State Park Police? |
| 21 | A.   No. |
| 22 | MR. NOVIKOFF:  Objection. |
| 23 | Q.   So the tests that you testified to |
| 24 | that you passed in Nassau County and the |
| 25 | graduation in Nassau County Police Academy, |

Page 124

| | |
|---|---|
| 1 | Cherry |
| 2 | those were sufficient to be certified to work |
| 3 | as a seasonal police officer for the New York |
| 4 | State Park Police? |
| 5 | MR. NOVIKOFF:  Objection. |
| 6 | A.   That is correct. |
| 7 | Q.   Did you have any additional |
| 8 | training when you worked at the New York State |
| 9 | Park Police? |
| 10 | A.   Yes.  We had two weeks of |
| 11 | training. |
| 12 | Q.   What type of training was that? |
| 13 | A.   Going over Penal Law, firearms |
| 14 | training, first aid training.  Their basic |
| 15 | procedures and form training. |
| 16 | Q.   You worked there as a police |
| 17 | officer? |
| 18 | A.   Yes. |
| 19 | Q.   You were not a detective there; |
| 20 | correct? |
| 21 | A.   No, sir. |
| 22 | Q.   That is a position that you are |
| 23 | paid by the State? |
| 24 | A.   Correct. |
| 25 | Q.   What was the process that you |

Page 125

| | |
|---|---|
| 1 | Cherry |
| 2 | undertook to get that job? |
| 3 | A.   There was an application to fill |
| 4 | out, you had an interview, and you had to get |
| 5 | a medical form signed by your physician saying |
| 6 | you were capable of performing duties. |
| 7 | Q.   So you had it from your own |
| 8 | physician or you had -- |
| 9 | A.   No.  You had a form provided by |
| 10 | the State Park Police to take to your |
| 11 | physician to have signed. |
| 12 | Q.   How much -- did they pay you on an |
| 13 | hourly rate? |
| 14 | A.   Yes. |
| 15 | Q.   How much was the hourly rate? |
| 16 | A.   $16.67. |
| 17 | Q.   For both seasons, '02 and '03? |
| 18 | A.   I believe so, yes. |
| 19 | Q.   And while you were -- let's talk |
| 20 | about during the season, during '02 and '03, |
| 21 | did you work any other jobs during the season? |
| 22 | A.   No. |
| 23 | Q.   How about on the off season, using |
| 24 | the April to September timeframe defined as a |
| 25 | season in this context, did you work any jobs |

32  (Pages 122 to 125)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Cherry

1  **Cherry**
2  in the off season during those two years?
3      A.   No.
4      Q.   So during the period that you were
5  a seasonal police officer for the New York
6  State Park Police you didn't work at Ocean
7  Beach at all; correct?
8      A.   No.
9      Q.   Did you carry a weapon when you
10 were a seasonal police officer with the New
11 York State Park Police?
12     A.   Yes.
13     Q.   Did you have a shield?
14     A.   Yes.
15     Q.   Do you recall what your shield
16 number was?
17     A.   55.
18     Q.   During your time that you were
19 employed by the New York State Park Police
20 were you ever disciplined?
21     A.   No.
22     Q.   Were you ever investigated by
23 Internal Affairs?
24     A.   No.
25     Q.   Did you ever have any claim or

1      **Cherry**
2  allegations brought against you in your
3  position as a seasonal police officer?
4      MR. NOVIKOFF:  Objection.
5      A.   No.
6      Q.   Why did you leave your employment
7  with the State Park Police?
8      A.   The Park Police terminated their
9  seasonal program.
10     Q.   In the off season between '02 and
11 '03 did you collect unemployment?
12     A.   No, I don't believe so that year.
13     Q.   How about after the '03 season,
14 did you collect unemployment?
15     A.   Yes, I did.
16     Q.   Now, there came a point in time
17 that you were -- strike that.
18     What was the job that you had
19 subsequent to the end of the '03 season when
20 you were a seasonal police officer with the
21 State Park Police?
22     A.   I was a patrol officer.
23     Q.   Where were you a patrol officer?
24     A.   The Long Island region which
25 consists of Nassau and Suffolk Counties.

1      Cherry
2      Q.   Who employed you as a patrol
3  officer?
4      A.   The New York State Park Police.
5  You are talking about the State Park Police
6  now, correct, the 2002, 2003 season?
7      Q.   I was talking about the period
8  after that, but let's go back to what your
9  duties were with the New York State Park
10 Police.  What were your duties when you were a
11 seasonal officer with the New York State Park
12 Police?
13     A.   To patrol the parks, enforce the
14 laws of New York State, handle accident
15 scenes, medical emergencies, crowd control.
16 And investigate -- additional investigation on
17 incidents that occurred down there, crimes and
18 violations.
19     Q.   Anything else?
20     A.   That is basically the police
21 patrol function.
22     Q.   What do you mean by an additional
23 investigation of incidents?
24     A.   When you had a crime committed
25 down there or an accident investigation you do

1  Cherry
2  the preliminary investigation, take a
3  statement from the witnesses or the victim.
4  And if it required any further investigation
5  the detectives would follow up on it and you
6  would have to submit that at the end of the
7  tour and the sergeant has to review it.
8      Q.   So your role was just to take the
9  statements from the witnesses and/or the
10 victims?
11     A.   Yes.
12     Q.   And if there was any subsequent or
13 further investigation, that was out of your
14 hands, that was with the detective or the
15 sergeant?
16     A.   It would depend.  They only had a
17 limited number of detectives, I think three to
18 four.  When somebody had a robbery down there,
19 the detectives were not available, we ended up
20 taking statements from the victims and
21 witnesses involved, doing the background on
22 the subjects.  I believe there were four
23 subjects involved in the robbery.  So we did
24 the complete investigation, myself and several
25 other officers involving the robbery.

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 130

Cherry

1
2        I also had a case where a man
3  drowned his dog in the beach, it was a hot
4  Sunday afternoon, and I handled that
5  investigation also, taking statements from
6  multiple witnesses and doing back up witness
7  investigation and taking statements, arranging
8  for an autopsy on the crime scene on the dog.
9  So I got involved in that.
10       Q.   And other than those two
11  investigations did you do any other
12  investigation in your two years as a seasonal
13  police officer in the Park Police?
14       A.   Other than the initial
15  investigation that I stated, no.
16       Q.   Did you ever discharge your weapon
17  as a seasonal police officer in the State Park
18  Police?
19       A.   No.
20       Q.   Have you ever discharged your
21  weapon as a Nassau County Police Officer?
22       A.   No.
23       Q.   When you were a seasonal police
24  officer with the State Park Police did you
25  issue any summonses?

Page 131

Cherry

1
2       A.   Yes.
3       Q.   Did you make any arrests?
4       A.   Yes.
5       Q.   So you had authority to do those
6  two things?
7       A.   Yes.
8       Q.   Did you ever testify in connection
9  with any of those arrests?
10       A.   Yes.
11       Q.   And that was in the subsequent
12  proceeding with respect to the arrests?
13       A.   Correct.
14       Q.   Is that in court?
15       A.   Yes.  Grand Jury.
16       Q.   Grand Jury?
17       A.   Yes.
18       Q.   Did you ever testify during the
19  trial of any of those arrests?
20       A.   No.
21       Q.   Have you ever testified at a
22  trial?
23       A.   Yes.
24       Q.   How many times?
25       A.   I would say about four or five, at

Page 132

Cherry

1
2  trials.
3       Q.   At trials?
4       A.   Yes, four or five.
5       Q.   Which entity were you employed by
6  at the time that you testified at trial?
7       A.   Nassau County Police Department.
8       Q.   So you never testified at trial
9  with respect to your employment at the Park
10  Police or at Ocean Beach?
11       A.   No.
12       Q.   What was, we will go back to the
13  question that I asked before, what was the job
14  that you had after the State Park Police job
15  which ended at the end of the season '03?
16       A.   Yes.  The next job I had was at
17  Ocean Beach in the season of 2004.
18       Q.   Did you work any jobs between the
19  end of the season of '03 and the beginning of
20  the season of '04?
21       A.   No.
22       Q.   But you collected unemployment
23  during that period; is that correct?
24       A.   That period, yes.
25       Q.   When did you -- strike that.

Page 133

Cherry

1
2       How learn about the job at Ocean
3  Beach?
4       A.   When I first retired George asked
5  me, George Hesse asked me if I was interested
6  in working for Ocean Beach and I said no, I
7  wasn't planning on working, so I said no.
8  When I left the State Park Police he again
9  asked me if I was interested in working at
10  Ocean Beach, I said yes, I would give it a
11  shot.
12       Q.   How did you know Hesse at the time
13  that you retired from the Nassau County job?
14       A.   My son was working for Ocean
15  Beach, I met George, he stopped by the house
16  once or twice to either pick up my son or drop
17  him off, and I met George that way.  And when
18  I first retired he knew I was retiring from
19  what my son told him apparently, and he asked
20  me if I was interested in going to the Ocean
21  Beach Police Department.
22       Q.   So your son maintained contact
23  with George Hesse after he left Ocean Beach?
24       A.   Yes, occasionally.
25       Q.   So by the time you retired from

34  (Pages 130 to 133)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 134

Cherry

1    Cherry
2  Nassau County your son had already started
3  working in New York; is that correct?
4      A.   Yes.
5      Q.   And did George Hesse contact you
6  originally when you retired from Nassau
7  County?
8      A.   He was over the house dropping my
9  son off from work and he knew I was retired,
10 he said are you interested in coming to work
11 for Ocean Beach and at that point I said no.
12     Q.   So at the time that you retired in
13 '01 your son was working in Ocean Beach?
14     A.   No, he was not.
15     Q.   So then what was George Hesse
16 doing at your house?
17     A.   I guess he stopped by the house to
18 see Patrick.
19     Q.   And Patrick was living with you at
20 the time?
21     A.   Yes.
22     Q.   Do you recall what he said to you
23 in connection with possibly working at Ocean
24 Beach?
25     A.   As I said he knew I was retiring,

Page 135

Cherry

1    Cherry
2  he said would be interested in coming to work
3  at Ocean Beach.  At that time I said no, I
4  wasn't interested.
5      Q.   How come?
6      A.   I wasn't going to work.
7      Q.   Do you recall when that
8  conversation happened?
9      A.   It had to be shortly after --
10 either just before I retired or slightly after
11 in 2001, in May of 2001.
12     Q.   At any point in time between that
13 conversation and when you ended your work with
14 the State Park Police had you discussed with
15 George Hesse the possibility of working at
16 Ocean Beach?
17     A.   No.
18     Q.   Had you had any contact with
19 George Hesse during that period?
20     A.   I don't think I -- I may have once
21 or twice, but I don't recall -- I don't
22 believe I had a lot of contact with him.  I
23 may have saw him or talked to him once or
24 twice during that two year period.  My son
25 didn't work there any more, I had no reason to

Page 136

Cherry

1    Cherry
2  be over -- I had never been to Ocean Beach
3  before I went to work there, but I don't think
4  so.
5      Q.   Was George at your house at any
6  point in time other than that one incident
7  that you testified to before you left the
8  position with the Park Police?
9          MR. NOVIKOFF:  Objection.  You can
10 answer.
11     A.   I don't recall, he may have been,
12 but I don't recall any specific time.
13     Q.   You said there may have been those
14 couple of conversations that you had with him,
15 two or three, do you recall any details of any
16 conversations you actually had with him?
17         MR. NOVIKOFF:  Objection.
18     A.   No.
19     Q.   Other than for the one time that
20 you testified to when he was over your house
21 and asked you to come work at Ocean Beach, has
22 George ever been at your house on any other
23 occasion?
24     A.   Since then?
25     Q.   At any time either before then or

Page 137

Cherry

1    Cherry
2  after that?
3      A.   Yes, he has been to the house
4  several occasions.
5      Q.   Before then or after?
6      A.   After then.
7      Q.   Had he been to your house before
8  then?
9      A.   Before 2001?
10     Q.   Yes.
11     A.   Yes.  He may have been to see my
12 son.
13     Q.   How many times?
14     A.   That is when he dropped him off
15 occasionally from work, or picked him up going
16 to work.  So it was not often, it was just
17 occasionally he would stop by.  He has been to
18 the house a number of times.
19     Q.   Approximately how many?
20     A.   To pick up my son, I couldn't
21 venture a guess, he has been there.
22     Q.   More than ten?
23     A.   I wouldn't say -- maybe, maybe
24 not.  I don't know.
25     Q.   How about after 2001 how many

Page 138

```
1              Cherry
2  times has he been to your house?
3       A.   Since I was working there in 2004
4  he picked me up a couple of times to go to
5  work or dropped me off or he just stopped by,
6  you know, say hello.
7       Q.   So other than for picking you up
8  or dropping you off he would also stop by
9  socially?
10      A.   Yes, occasionally.  Maybe three or
11 four times all together.
12      Q.   And after the time in '01 where he
13 asked you to come work there when was the next
14 time you had any discussions with George Hesse
15 about the possibility of working at the beach?
16      A.   It was in the papers that they
17 were not going to bring us back for, the New
18 York State Park Police was not going to bring
19 us back for the 2004 season.  We had -- he
20 asked me if I was interested.  Sometime in
21 the early -- before -- it might have been
22 around -- he asked me if I was interested in,
23 since they were not going to have -- I wasn't
24 going to be going back with the New York State
25 Park Police, if I wanted to come and work for
```

Page 139

```
1              Cherry
2  Ocean Beach.
3       Q.   Do you recall when that was after
4  the paper reported that you were not coming
5  back?
6       A.   It was probably April or May.
7       Q.   Of 2004?
8       A.   Yes, I believe so to the best of
9  my recollection.
10      Q.   Have you ever been at George
11 Hesse's house?
12      A.   Yes.
13      Q.   How many times?
14      A.   I have been there four times.
15 Mostly for end of season parties.
16      Q.   At his house?
17      A.   Yes.
18      Q.   And what years were you there for
19 the end of season parties at his house?
20      A.   2004.  I believe it was 2004,
21 2005, usually have an end of the season party.
22 I am not sure because Chief Paradiso had one
23 at his house.  I would say I have been to
24 George's house about four times.
25      Q.   Have you ever been there other
```

Page 140

```
1              Cherry
2  than for an end of season party?
3       A.   No.
4       Q.   The end of season party, is that
5  something for the Police Department of Ocean
6  Beach?
7       A.   Yes.
8       Q.   Everyone who is employed by the
9  Police Department is invited to that?
10      A.   Yes.
11      Q.   How did you receive an invite to
12 that?
13      A.   Usually puts a notice up on the
14 bulletin board in the office.
15      Q.   Who paid for that?
16      A.   I don't know.
17           MR. NOVIKOFF:  Objection.
18      Q.   You don't know how that party was
19 funded?
20           MR. NOVIKOFF:  Objection.
21      A.   No.
22      Q.   You didn't pay anything for it,
23 did you?
24      A.   No.
25      Q.   Let's go back now to the time in
```

Page 141

```
1              Cherry
2  April or May of '04 when George Hesse --
3  George Hesse approached you about the
4  possibility of working in Ocean Beach?
5       A.   I believe so.  He didn't approach
6  me, he asked me would I be interested in going
7  over there, and I said yes.
8       Q.   Was that a phone conversation, in
9  person conversation, through some other means?
10      A.   I am not sure.
11      Q.   You don't recall one way or the
12 other?
13      A.   No.
14      Q.   So you don't recall how he
15 approached you about working there?
16           MR. NOVIKOFF:  Objection.
17      A.   I don't recall.
18      Q.   What did he say to you?
19      A.   Would you be interested in coming
20 over to Ocean Beach to work.
21      Q.   What was your response?
22      A.   I said yes, I would be.
23      Q.   And did you fill out any paperwork
24 to apply for that position?
25      A.   I believe I did, yes.
```

36 (Pages 138 to 141)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 142

Cherry

1
2    **Q.   What paperwork did you fill out to**
3    **apply?**
4        A.   I believe it was an application
5    form.
6    **Q.   You fill out an application?**
7        A.   I believe so, yes.
8    **Q.   Do you recall when you filled out**
9    **that application?**
10       A.   Probably in early 2004.  April or
11   May I am not sure of the exact date.
12   **Q.   Where were you when you filled out**
13   **the application?**
14       A.   I went to the station.
15   **Q.   In Ocean Beach?**
16       A.   Yes.
17   **Q.   Who did you submit the application**
18   **to?**
19       A.   Sergeant Hesse.
20   **Q.   He was a sergeant at the Ocean**
21   **Beach Police Department at that time?**
22       A.   Yes.
23   **Q.   How did you learn that he was a**
24   **sergeant?**
25       MR. NOVIKOFF:  Objection.

Page 143

Cherry

1
2        A.   That was his rank, you know, I
3    don't -- somebody told me, he was a sergeant,
4    I saw his uniform, he had three stripes on his
5    arm.
6    **Q.   Did you know that he was a**
7    **sergeant before you went there to fill out the**
8    **paper?**
9        A.   Yes, my son worked there and he
10   was a sergeant when my son worked there.
11   **Q.   Do you know, was the application**
12   **that you filled out, was that an Ocean Beach**
13   **document or was that a Suffolk County**
14   **document?**
15       MR. NOVIKOFF:  The application
16   that Hesse filled --
17       MR. GOODSTADT:  He testified --
18       MR. NOVIKOFF:  He said the
19   application that he filled out.  Maybe I
20   am wrong.
21   **Q.   The application that you testified**
22   **to that you filled out, was that a document**
23   **for Ocean Beach or was that a document for**
24   **Suffolk County?**
25       A.   I believe it was Ocean Beach.  To

Page 144

Cherry

1
2    the best of my recollection.
3    RQ   Q.   I would like to mark the record
4    here, I don't think we have been produced a
5    copy of a written application that Mr. Cherry
6    filled out.
7        MR. NOVIKOFF:  I know that we
8    produced 9,000 pages.  I cannot represent
9    to you that I know what the identity of
10   each of one of those are.  We will search
11   to see what was produced and if you
12   requested Mr. Cherry's application I am
13   sure it should have been provided as part
14   of his personnel file.
15       MR. GOODSTADT:  Maybe it was
16   produced, I have not seen it.
17       MR. NOVIKOFF:  I would ask you to
18   remind me after the deposition and we
19   will get it.
20       MR. GOODSTADT:  We will send you a
21   letter.
22       MR. NOVIKOFF:  Yes.
23   **Q.   Did you submit a resume?**
24       A.   Yes, I did.
25   **Q.   Did they ask you to submit a**

Page 145

**Cherry**

1
2    **resume or is that something that you did**
3    **voluntarily?**
4        A.   I just sent it along as part of
5    the application.
6    **Q.   What do you mean you sent it**
7    **along?**
8        A.   I provided it, a resume, give them
9    some idea of my police background.
10   **Q.   Did you give the resume to**
11   **Sergeant Hesse?**
12       A.   Yes.
13   **Q.   You did that on the same day that**
14   **you filled out the application?**
15       A.   I believe so.
16       MR. GOODSTADT:  Mark this document
17   as Cherry Exhibit 3, resume.
18       (Cherry Exhibit 3, resume, marked
19   for identification, as of this date.)
20       MR. GOODSTADT:  Let's take five
21   minutes.
22       THE VIDEOGRAPHER:  The time is
23   12:04, we are going off the record.
24       (Recess taken.)
25       THE VIDEOGRAPHER:  The time is

37 (Pages 142 to 145)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 146

Cherry

1
2    12:12.  We are back on the record.
3        Q.   Mr. Cherry, I placed in front of
4    you what has been marked as Cherry Exhibit 3,
5    a three-page document Bates numbered 4104
6    through 4106.  Do you recognize this document?
7        A.   Yes.
8        Q.   What is it?
9        A.   Its my resume.
10       Q.   Is this the resume that you
11   submitted to Sergeant Hesse in connection with
12   your application to the Village of Ocean
13   Beach?
14       A.   Yes.  It appears to be.
15       Q.   Other than for the application and
16   this resume did you submit any other paperwork
17   for the Village of Ocean Beach in connection
18   with your application for employment there?
19       A.   I think I gave him a copy of my
20   initial police training council certificate.
21       Q.   Anything else?
22       A.   I don't recall.  I -- whatever
23   they required I submitted.
24       Q.   Did you submit any documents that
25   were produced by civil service, either Suffolk

Page 147

Cherry

1
2    County or Nassau County?
3        A.   I may have -- I don't know if I
4    submitted this form or not, this form that we
5    had here.
6            MR. NOVIKOFF:  Let the record
7        reflect Cherry Exhibit 2.
8        A.   I don't know if I submitted a copy
9    of that or not, but I gave my municipal police
10   council certificate.
11       Q.   Did you have an interview for the
12   position?
13       A.   With Sergeant Hesse.
14       Q.   Anybody else?
15       A.   No.
16       Q.   How long did that interview last?
17       A.   The whole process between the
18   interview and the filling out the forms, maybe
19   an hour or two.
20       Q.   How long did the interview part
21   last?
22       A.   I would say maybe a half hour.
23       Q.   As part of that process did you
24   meet with any other employees from the Village
25   of Ocean Beach other than for George Hesse?

Page 148

Cherry

1
2        A.   I don't believe so, no.
3        Q.   It was only that one day that you
4    did all these tasks as part of the application
5    process or was --
6        A.   I would say it was just filling
7    out the application and what these forms with
8    me on that particular day, that was it.
9        Q.   And did there come a point in time
10   where you were actually offered a job as a
11   police officer?
12       A.   Yes.
13       Q.   When was that?
14       A.   Shortly after I filled out the
15   application I was asked to come down and get
16   sworn in.  I don't know the exact date.
17       Q.   Being asked to be sworn in, was
18   that the notification process that you had
19   been offered a job as a police officer?
20       A.   Yes.
21       Q.   How long after your forms that you
22   filled out and your interview did that happen?
23       A.   I am not sure.
24       Q.   Was it days, weeks?
25       A.   Weeks probably.

Page 149

Cherry

1
2        Q.   Hours?
3        A.   Probably weeks.  I am not sure of
4    the exact date that I was sworn in.
5        Q.   How were you asked to come and get
6    sworn in, meaning did somebody call you, did
7    you get a letter?
8        A.   I believe George, Sergeant Hesse
9    called me and asked me to come in.
10       Q.   Do you know if anybody else had
11   any role in the decision to offer you a job as
12   a police officer other than from Mr. Hesse?
13       A.   I believe Chief Paradiso had to
14   approve it.
15       Q.   What is your basis for that
16   belief?
17       A.   Because he is the chief of the
18   department, I have to go through him.
19       Q.   Do you know whether he actually
20   approved it?
21       A.   I don't know.
22       Q.   Do you know whether it was
23   actually a requirement that he had to approve
24   it?
25       A.   Was there a requirement?

38 (Pages 146 to 149)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 150

Cherry

1
2      Q.   Yes.
3           MR. NOVIKOFF:  Note my objection.
4      A.   I don't know if it was a
5  requirement, but he was the chief of the
6  department, I would assume that he had the
7  final say, or had something to do with it.
8      Q.   Prior to that time had you ever
9  met Chief Paradiso?
10     A.   No.
11     Q.   Had you ever spoken with him?
12     A.   Prior to that time, no.
13     Q.   Had you ever had any
14 correspondence with Chief Paradiso prior to
15 the time that you were offered a job at Ocean
16 Beach?
17     A.   No.
18     Q.   Other than for -- strike that,
19 your son wasn't working there at the time.
20 Did you know any other police officers in
21 Ocean Beach at that time?
22          MR. NOVIKOFF:  Objection.  You can
23 answer.
24     A.   I don't think so, no.
25     Q.   At that time in April or May of

Page 151

Cherry

1
2  2004 do you know whether your son had any
3  communications or correspondence with anyone
4  at Ocean Beach?
5      A.   No, I don't know.  I don't know.
6      Q.   Was he in communication with
7  George Hesse at that time?
8      A.   I don't know.
9      Q.   And what position were you asked
10 to come down and be sworn in for?
11     A.   Police officer.
12     Q.   Did you accept the offer?
13     A.   Yes.
14     Q.   On the spot, or did you have to
15 call him back and say yes, I accept?
16     A.   No, I told him I would come down.
17     Q.   What title was he actually
18 offering you a job as?
19     A.   Police officer.
20     Q.   Was it full-time police officer,
21 seasonal, part-time or some other title?
22     A.   Seasonal.
23     Q.   That was the civil service
24 classification of the job that was being
25 offered to you?

Page 152

Cherry

1
2      A.   I didn't know that at the time.  I
3  didn't know it was seasonal police officer,
4  was a classification.  I knew it was going to
5  be just for the summer season, he needed more
6  people, but I didn't know if I was a
7  classification, a civil service clarification.
8      Q.   What were your -- strike that.
9           Did there come a point in time
10 where you actually went down there and were
11 sworn in as a police officer?
12     A.   Yes.
13     Q.   When was that?
14     A.   I don't know the exact date.
15     Q.   Do you know what month it was?
16     A.   I am not sure.  It had to be
17 sometime before the season started, but I am
18 not sure when it started.
19     Q.   How far before the season started
20 was it, days, weeks, months?
21     A.   It could have been a month, it
22 could have been a couple of weeks, I am not
23 sure.
24     Q.   Is there anything that would
25 refresh your recollection?

Page 153

Cherry

1
2      A.   Yes.
3      Q.   What is that?
4      A.   Probably the -- you signed a book
5  at the Village office when you got sworn in.
6      Q.   Were any other police officers
7  sworn in at the same time as you or the same
8  day as you?
9      A.   I don't believe so.
10     Q.   Who swore you in as a seasonal
11 police officer at Ocean Beach?
12     A.   I believe it was Mary Minerva, the
13 Village Administrator.
14     Q.   How long did that process take?
15     A.   It took about five minutes.
16     Q.   You actually went down to Ocean
17 Beach to do that?
18     A.   Yes.
19     Q.   Where was the ceremony or the
20 swearing in, where did it take place?
21     A.   Village office.
22     Q.   Was anyone else there other than
23 you and Ms. Minerva?
24     A.   I believe Sergeant Hesse was
25 there.

39  (Pages 150 to 153)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 154

```
        Cherry
 1
 2      Q.   Anyone else?
 3      A.   Not that I know of.
 4      Q.   Had you known Ms. Minerva prior to
 5  that swearing in?
 6      A.   No.
 7      Q.   After the swearing in had you had
 8  any encounters or correspondence with Ms.
 9  Minerva?
10      A.   Nothing official, no.  I mean I
11  run into her, going to take -- going into the
12  Village hall and stop in to see her, but
13  nothing official or anything like that, say
14  hello.
15      Q.   You would say hello to her?
16      A.   Yes.
17      Q.   She would respond?
18      A.   Yes.
19      Q.   You knew who she was?
20      A.   Yes.  She was the Village
21  administrator in charge of every day
22  operations of the Village.
23      Q.   Did you ever have any
24  correspondence or encounters with Mayor
25  Rogers?
```

Page 155

```
        Cherry
 1
 2      A.   Other than to say that I met her
 3  also, and I was introduced to her, and just to
 4  say hello.  Nothing official.  She would come
 5  into the station house occasionally.
 6      Q.   When were you introduced to her?
 7      A.   Sometime after I got employed by
 8  the Village in 2004.
 9      Q.   Was it some kind of official
10  introduction?
11      A.   No.  I just met her on the street,
12  I was introduced by one of the other officers,
13  or she came into the station house and I was
14  introduced to her.  There was no formal
15  introduction.
16      Q.   How many encounters or
17  correspondence did you have with her?
18      A.   I had no correspondence.  She
19  would come into the station house occasionally
20  if there was something going on in the
21  Village, if we had a power outage she would
22  come in to find out what was going on.  Other
23  than that if I saw her in the street I would
24  acknowledge her and say hello.
25      Q.   About how many times did that
```

Page 156

```
        Cherry
 1
 2  happen?
 3      A.   Maybe a dozen times.  You see her
 4  walking down the street, good morning mayor,
 5  something like that.  There was no
 6  correspondence at all between me and her.
 7      Q.   When you were hired she was the
 8  current mayor at the time?
 9      A.   Yes, I believe so.
10      Q.   Do you know whether she held any
11  title with the Police Department?
12      A.   No.  I don't know one way or the
13  other.
14      Q.   Do you know whether the Village of
15  Ocean Beach had a police commissioner?
16      A.   Not to my knowledge.
17      Q.   Did you ever see any village
18  letterhead at the time that you worked there?
19      A.   Village letterhead.
20      Q.   Yes.  Not Police Department
21  letterhead, but Village of Ocean Beach
22  letterhead?
23      A.   I don't think so, no.
24      Q.   You don't recall seeing letterhead
25  that says Natalie Rogers, Mayor/Police
```

Page 157

```
        Cherry
 1
 2  Commissioner?
 3      A.   No.
 4      Q.   When did you first actually have
 5  your first tour as a police officer at the
 6  Village of Ocean Beach?
 7      A.   It had to be sometime in May of
 8  2004.
 9      Q.   Was there a departmental meeting
10  leading into the season in 2004?
11      A.   Yes, I believe there was.
12      Q.   When did that take place?
13      A.   I am not quite sure of the exact
14  date.
15      Q.   Do you recall what month it was
16  held in?
17      A.   It is usually in April.  I am not
18  sure if the 2004 was in April or what the date
19  on that was, but I remember being in a
20  meeting.
21      Q.   What is the purpose of the
22  departmental meeting?
23      A.   I guess --
24      MR. NOVIKOFF:  Objection.  You can
25  answer.
```

40  (Pages 154 to 157)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 158

Cherry

1
2      A.   I wasn't sure the first year, but
3  just the guys get together, check the
4  equipment, anything new in the Village that is
5  going on that we should know about.
6      Q.   In '04 who ran the departmental
7  meeting?
8      A.   I believe it was Chief Paradiso.
9      Q.   How about in '05 who ran the
10 departmental meeting?
11     A.   Again I believe it was Chief
12 Paradiso.  To the best of my recollection it
13 was Chief Paradiso.
14     Q.   You attended in '05 as well?
15     A.   Yes.
16     Q.   How about in '06?
17     A.   I think that was George Hesse.
18     Q.   You attended in '06?
19     A.   Yes.
20     Q.   How about in '07 who ran it?
21     A.   George Hesse.
22     Q.   Did you attend in '07?
23     A.   Yes.
24     Q.   How about in '08, who ran it?
25     A.   Chief Hesse.

Page 159

Cherry

1
2      Q.   And you attended as well in '08?
3      A.   Yes.
4      Q.   How did you learn that there was a
5  departmental meeting in '04?
6      A.   We were sent a letter.
7      Q.   Were you sent a letter each year?
8      A.   Yes.
9      Q.   For the departmental meeting?
10     A.   I am not sure about the first
11 year, but every year after that we got a
12 letter saying when the meeting was, usually a
13 month or so in advance, particular day,
14 usually a Sunday.
15     Q.   What were your duties as a
16 seasonal police officer in Ocean Beach?
17     A.   Basically patrol.  Issue summonses
18 when necessary.  Handle aided cases and
19 medical emergencies.  Crowd control.  Normal
20 patrol function.  Enforce ordinances, New York
21 State laws and Village ordinances.
22     Q.   Did you issue any summonses when
23 you were a seasonal police officer for Ocean
24 Beach?
25     A.   Yes.

Page 160

Cherry

1
2      Q.   You actually issued them or that
3  was part of your job?
4      A.   I actually issued them.
5      Q.   Do you remember how many you
6  issued in '04?
7      A.   Two.
8      Q.   How about '05?
9      A.   I wasn't a police officer in '05,
10 I was a dispatcher from season of 2005 to
11 current season 2008.
12     Q.   So you were a police officer for
13 only one season?
14     A.   That is correct.
15     Q.   And you testified that you issued
16 two summonses?
17     A.   Yes.  To the best of my
18 recollection.
19     Q.   Have you ever seen a job
20 description of seasonal police officer prior
21 to working there?
22     A.   I don't believe so.
23     Q.   While you were working there did
24 you ever see a job description of a seasonal
25 police officer?

Page 161

Cherry

1
2      A.   I don't believe so.
3          MR. GOODSTADT:  Would you mark
4  this document as Cherry Exhibit 4, Police
5  Officer Part-Time/Seasonal.
6          MR. NOVIKOFF:  This doesn't have a
7  Bates stamp number on.
8          MR. GOODSTADT:  I believe it was
9  produced by the County without a Bates
10 stamp on it, or it was referred to in one
11 of their responses, a web-site.
12         MR. NOVIKOFF:  That is fine.
13         MR. GOODSTADT:  Either I pulled it
14 off the web or they produced without a
15 number.
16         MR. NOVIKOFF:  So this is Cherry
17 Exhibit 4?
18         MR. CONNOLLY:  I believe at an
19 earlier deposition you indicated that it
20 was produced by the County without a
21 Bates number.
22         MR. NOVIKOFF:  So it is Cherry
23 Exhibit 4.
24         (Cherry Exhibit 4, Police Officer
25 Part-Time/Seasonal, marked for

TSG Reporting - Worldwide      877-702-9580

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 162

1              Cherry
2     identification, as of this date.)
3         Q.   I placed in front of Mr. Cherry
4   what is now marked as Cherry Exhibit 4, a
5   two-page Exhibit, not Bates stamped, but
6   entitled Police Officer Part-Time/Seasonal.
7   It has the number of 5001 at the top of both
8   pages.
9              Have you ever seen the document
10  that has been marked as Cherry Exhibit 4?
11        MR. NOVIKOFF:  If you need to read
12     the document to answer that question, go
13     ahead.
14     A.   Let me --
15     Q.   Go ahead, take your time.
16     A.   Okay.
17     Q.   Have you ever seen the document
18  marked as Cherry Exhibit 4?
19     A.   No.
20     Q.   I want to focus your attention on
21  the necessary special requirements section?
22     A.   Yes.
23     Q.   Sir, is it your testimony that at
24  the time that you were a police officer in the
25  Village of Ocean Beach that you didn't know

Page 163

1              Cherry
2   that number 4 listed under there was a
3   requirement?
4         MR. NOVIKOFF:  Objection.  Asked
5     and answered.  You can answer again.
6     A.   Can I ask a question?
7     Q.   Sure.
8     A.   When did this take effect?
9     Q.   The question is not when it took
10  effect or didn't, my question to you, at the
11  time that you worked as an Ocean Beach police
12  officer did you know of a requirement that is
13  set forth in point 4?
14        MR. NOVIKOFF:  Objection.  Asked
15     and answered.  You can answer.
16     A.   Okay, could you repeat the
17  question.
18        (Record read.)
19     A.   Point 4, I didn't know that was a
20  requirement when I took -- when I applied in
21  2004.
22     Q.   How about point 5, did you know if
23  that was a requirement at the time that you
24  were a police officer; not at the time that
25  you applied, but any time when you were a

Page 164

1              Cherry
2   police officer in Ocean Beach?
3         MR. NOVIKOFF:  Objection.
4     A.   It is difficult for me to answer.
5   I don't know if this was in effect when I
6   had -- in 2004.  If it was not in effect and I
7   didn't know if their was a requirement.  I
8   never saw this, I didn't know of any of these
9   requirements.
10     Q.   My question is -- I just note for
11  the record that it is dated April 5, 2004,
12  although I don't know if that is a
13  requirement --
14        MR. NOVIKOFF:  The document will
15     speak no itself.
16        MR. GOODSTADT:  It will.
17     Q.   My question was whether at any
18  time that you were a police officer were you
19  aware of a requirement as set forth in point,
20  I think we are up to 5?
21        MR. NOVIKOFF:  Objection.
22     A.   No.
23     Q.   Same question with point 6, any
24  time that you were a police officer with the
25  Village of Ocean Beach did you know of a

Page 165

1              Cherry
2   requirement set forth in point 6?
3         MR. NOVIKOFF:  Same objection.
4     A.   No.
5     Q.   How about point 9, at any point
6   when you were a police officer with the
7   Village of Ocean Beach did you know of a
8   requirement set forth in point 9 at the bottom
9   of the first page?
10        MR. NOVIKOFF:  Objection.
11     A.   No.
12     Q.   Sir, I believe you testified
13  before that you knew that you couldn't just go
14  from the Nassau County Police Department to
15  the Suffolk County Police Department; correct?
16        MR. NOVIKOFF:  Objection.  You can
17     answer.
18     A.   Correct.
19     Q.   Did you believe that you could
20  just go from the Nassau County Police
21  Department to a village police department in
22  Suffolk County?
23        MR. NOVIKOFF:  Objection.
24     A.   I didn't know.  I was hired so I
25  assumed that I was, similar to the State Park

42 (Pages 162 to 165)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 166

```
 1              Cherry
 2  Police, because I went from Nassau to the
 3  State Park Police, which covered Nassau and
 4  Suffolk, and I was under the impression, you
 5  know, the similar situation with Ocean Beach,
 6  I thought they hired me based on my
 7  qualifications as a police officer.  I didn't
 8  realize there was Suffolk County requirements
 9  prior to that.
10      Q.   Did you know that the Village of
11  Ocean Beach Police Department fell under the
12  jurisdiction of the Suffolk County Civil
13  Service Department?
14          MR. NOVIKOFF:  Objection.
15      A.   I didn't know at that time.  I
16  mean I didn't know if they could hire on their
17  own.
18      Q.   How about when you were an
19  employee there, did you know that the Ocean
20  Beach Police Department fell under the
21  jurisdiction of the Suffolk County Civil
22  Service?
23          MR. NOVIKOFF:  Objection, you can
24      answer.
25      A.   I found out later on when I was
```

Page 167

```
 1              Cherry
 2  employed that the civil service, when there
 3  was some question about whether we were going
 4  to get a waiver or not.  I said a waiver for
 5  what.  He said to be a police officer.
 6      Q.   When did that happen?
 7      A.   That was sometime after I was
 8  employed.
 9      Q.   When?
10      A.   The exact date, sometime in 2004,
11  the end of 2004.
12      Q.   At the end of the season 2004 or
13  the end of the calendar year 2004?
14      A.   Towards the end of the season
15  2004.
16      Q.   But prior to the end of the season
17  2004 and in fact when you were still with
18  Nassau County you knew that you couldn't just
19  go work for Suffolk County; correct?
20          MR. NOVIKOFF:  Objection.  You can
21      answer.
22      A.   The Suffolk County Police, I knew
23  that, that is correct.
24      Q.   Just so I am clear for the record,
25  your testimony is that you didn't know whether
```

Page 168

```
 1              Cherry
 2  you could go work for a village in Suffolk
 3  County Police Department or in a village in
 4  Suffolk County while you were at Nassau?
 5          MR. NOVIKOFF:  Objection.
 6      A.   While I was at Nassau?
 7      Q.   Yes?
 8      A.   A Suffolk County village?
 9      Q.   Yes.
10      A.   I didn't know.
11          MR. GOODSTADT:  Would you mark as
12      Cherry Exhibit 5, copy of summons.
13          (Cherry Exhibit 5, three-page
14      exhibit, Bates stamp numbers 11690, 11754
15      and 11628, marked for identification, as
16      of this date.)
17      Q.   I placed in front of Mr. Cherry
18  what has been marked as Cherry Exhibit 5, a
19  three-page exhibit, Bates stamp numbers are
20  11690, 11754 and 11628.
21          Mr. Cherry, I want you to focus on
22  the page that is Bates stamped 11690?
23      A.   Yes.
24      Q.   Do you see that?
25      A.   Yes.
```

Page 169

```
 1              Cherry
 2      Q.   If you look at the, two separate
 3  summonses here, do you see that?
 4      A.   Yes much.
 5      Q.   These are summonses?
 6      A.   Yes.
 7      Q.   The one on the list, if you look
 8  on the bottom you see a signature there over
 9  the word complainant?
10      A.   Yes.
11      Q.   Is that your signature?
12      A.   Yes.
13      Q.   And it is dated July 24, 2004?
14      A.   Yes.
15      Q.   Is this one of the summonses that
16  you testified to that you filled out?
17      A.   No, it is not one of the summonses
18  that I was talking about.  This was a summons
19  that was issued to David Butcher on an
20  appearance on a charge of petit larceny.
21      Q.   I just want to correct the record,
22  the date of the actual summons is 7/18, the
23  appearance date is July 24th, I misstated that
24  for the record.
25      A.   Okay.
```

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 170

Cherry

1
2     Q.   This is a different summons than
3  what you were testifying to before?
4        MR. NOVIKOFF: Objection.  You can
5     answer.
6     A.   Right.  It is a summons, but I
7  said two.  One was for I think riding a bike,
8  and the other one was for open alcohol.  This
9  one was for a petit larceny charge.  So that
10 would be additional summons that I wrote.  But
11 yes, I did write it.
12    Q.   If you look down at the bottom
13 next to your signature, it says PO/426?
14    A.   Yes.
15    Q.   What is that?
16    A.   That is my rank and my shield
17 number.
18    Q.   If you look at the bottom line it
19 says bail amount, a hundred.  Bail receipt
20 number 92890.  Do you see that?
21    A.   Yes.
22    Q.   What is that?
23    A.   That is a receipt issued when a
24 person gives bail, you give him a receipt for
25 the amount of money that he presented for

Page 171

Cherry

1
2  bail.
3     Q.   This person gave to you a hundred
4  dollars bail?
5     A.   Gave to the Police Department.  It
6  was attached to the summons and sent to court.
7     Q.   Did this guy actually give you a
8  hundred dollars?
9     A.   Yes.
10    Q.   He handed it to you?
11    A.   Yes.
12    Q.   Check or cash?
13    A.   Cash.
14    Q.   What did you do with that money?
15    A.   That money was attached to the
16 summons and forwarded to the court.
17    Q.   What do you mean by attached,
18 stapled or something like that?
19    A.   Clipped.
20    Q.   Paper clip?
21    A.   Yes.  Put in a secure box or a
22 box.
23    Q.   What secure box?
24    A.   Summons box.
25    Q.   Where was that summons box?

Page 172

Cherry

1
2     A.   At the front desk.
3     Q.   At the Police Department?
4     A.   Yes.
5     Q.   Was that box locked?
6     A.   Yes.
7     Q.   Do you know who had the key?
8     A.   I believe the chief had the key, I
9  can't say for sure it was locked.
10    Q.   So you don't know one way or the
11 other if it was locked?
12    A.   Yes.  Not sure.  I don't know for
13 sure.
14    Q.   Do you know whether there was a
15 lock on the box?
16    A.   There was a hasp on the box for a
17 lock.
18    Q.   Did you ever see the box locked?
19    A.   I am not sure.
20    Q.   Did you ever see the box unlocked?
21    A.   Closed and unlocked, yes.
22    Q.   Did you in fact place the hundred
23 dollars cash into the box?
24    A.   Yes.
25    Q.   You didn't lock it?

Page 173

Cherry

1
2     A.   Yes.
3     Q.   So it was unlocked when you did
4  it?
5     A.   I don't know if it was locked or
6  not, I don't remember.
7     Q.   Is there like a slot on the top
8  where you put it in?
9     A.   Yes.
10    Q.   So you don't have to actually open
11 the box to put it in?
12    A.   Correct.
13    Q.   Do you recall whether you opened
14 it to put it in, or did you drop it in the
15 slot.
16    A.   I put it in the slot, but I don't
17 recall specifically this summons, whether I --
18 I usually put it right in the slot.
19    Q.   When you say usually do it, how
20 many times have you put money in the slot?
21    A.   Summonses go in the slot, and if
22 there is bail attached to the summons it goes
23 with the summons.
24    Q.   So at most it happened three times
25 or I should say --

44  (Pages 170 to 173)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 174

**Cherry**

1
2    A.   I didn't necessarily put them in
3  the box.  I didn't -- the person who issued
4  the summons didn't actually put it in the
5  desk.  Usually a desk officer would certify
6  the summons and put the summons in the box.
7    Q.   **Is that what happened with the**
8  **summons on 11690?**
9    A.   I don't recall exactly what
10  happened.  But the bail was for the summons.
11    Q.   **If you turn to 11754?**
12    A.   Yes.
13    Q.   **The summons on the right?**
14    A.   Yes.
15    Q.   **Page 2 of the exhibit?**
16    A.   Okay.
17    Q.   **The summons on the right?**
18    A.   Yes.
19    Q.   **Is that one of the two summonses**
20  **that you testified to before?**
21    A.   Yes.
22    Q.   **If you look at the bottom above**
23  **the line that says complainant, is that your**
24  **signature?**
25    A.   That is correct.

Page 175

Cherry

1
2    Q.   **Did you ever generally sign your**
3  **name PJ Cherry like it is on 11754, or Patrick**
4  **J. Cherry like it is on 11690?**
5    A.   I signed both ways.
6    Q.   **What was the summons for?**
7    A.   The summons was for riding a bike
8  during the restricted hours.
9    Q.   **Was there any bail money attached**
10  **to this summons?**
11    A.   No.
12    Q.   **If you look at the third page of**
13  **this exhibit which is Bates number 11628, and**
14  **do you recognize this summons?**
15    Q.   **Is this the summons that you**
16  **filled out?**
17    A.   Yes, it is.
18    Q.   **Is this the other summons that you**
19  **testified to before?**
20    A.   Yes.
21    Q.   **If you look above the line that**
22  **says complainant, do you see the signature?**
23    A.   Yes.
24    Q.   **P. Cherry?**
25

Page 176

**Cherry**

1
2    A.   Yes.
3    Q.   **Is that another way that you sign**
4  **your name?**
5    A.   Yes.
6    Q.   **Again it is PO/426?**
7    A.   Yes.
8    Q.   **That was your shield number?**
9    A.   Yes.
10    Q.   **Was there bail money attached to**
11  **this summons?**
12    A.   No.
13    Q.   **What was this summons for?**
14    A.   Open alcohol.
15    Q.   **Other than for the three summonses**
16  **that were marked as Cherry Exhibit 5, did you**
17  **write any other summonses while you were**
18  **employed by the Village of Ocean Beach?**
19       MR. NOVIKOFF:  Objection.
20    A.   These were the only two or three
21  that I can recall.
22    Q.   **You issued them as a police**
23  **officer?**
24    A.   Yes.
25    Q.   **Did you make any arrests while you**

Page 177

**Cherry**

1
2  were employed by the Village of Ocean Beach?
3    A.   Yes, I believe the first summons
4  involved an arrest situation.  He was arrested
5  and issued a summons to appear in court.
6    Q.   **Did you make any other arrests**
7  **while you were a police officer of the Village**
8  **of Ocean Beach?**
9    A.   I don't believe so.
10    Q.   **I believe you said there came a**
11  **time where you were no longer employed as a**
12  **police officer; is that correct?**
13    A.   That is correct.
14    Q.   **When was that?**
15    A.   May 2005 to the present, to the
16  end of 2008.
17       MR. GOODSTADT:  Would you mark
18    this document as Cherry Exhibit 6,
19    Incorporated Village of Ocean Beach list.
20       (Cherry Exhibit 6, Incorporated
21    Village of Ocean Beach list, marked for
22    identification, as of this date.)
23    Q.   **I placed in front of Mr. Cherry**
24  **what has now been marked Exhibit 6, one-page**
25  **document that bears the Bates number 234.**

45 (Pages 174 to 177)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 178

```
 1              Cherry
 2  Mr. Cherry, have you ever seen the document
 3  that is Bates numbered 234?
 4      A.   No.
 5      Q.   Have you ever seen any document in
 6  this form?
 7      A.   No.
 8      Q.   Please look down next to your name
 9  on this list, you see where your name appears,
10  Cherry, Patrick?
11      A.   Yes, I do.
12      Q.   Do you know what the RS stands
13  for?
14      A.   No.
15      Q.   If you look across, that is a
16  Social Security number; is that correct?
17      A.   Yes.
18      Q.   The title is police officer, do
19  you see that?
20      A.   Yes.
21      Q.   Is that the wage that you were
22  paid in '04?
23      A.   I believe so, yes.
24      Q.   And the date there is 9/28/04, do
25  you see that?
```

Page 179

```
 1              Cherry
 2      A.   Yes.
 3      Q.   That was during the period that
 4  you were a police officer in Ocean Beach?
 5      A.   I may have ended -- it may have
 6  been after I left for that season, I am not
 7  sure exactly the date that I left in 2004 for
 8  the season.  But I believe it is after the
 9  date that I left.  I am not sure.  I don't
10  know what date was my last day.
11      Q.   So after the season ended did you
12  still hold your shield?
13      A.   Yes.
14      Q.   Did you still maintain your
15  weapon?
16      A.   Yes.
17      Q.   So were you still a police officer
18  with Ocean Beach at the time?
19      A.   Yes.
20      Q.   So as of 9/28/04 you were still
21  employed as a police officer?
22      A.   I was employed, but not working,
23  yes, that is correct.
24      Q.   You see next to that there is a
25  handwritten notation that says disapproved, do
```

Page 180

```
 1              Cherry
 2  you see that?
 3      A.   Yes.
 4      Q.   Do you know what that stands for?
 5      A.   No, I don't.
 6      Q.   Has anyone ever told you that you
 7  were disapproved for something at Ocean Beach?
 8      A.   No.
 9      Q.   You testified that there was a
10  point in time in 2005 that I believe you said
11  it was May, that you no longer were employed
12  as a police officer at Ocean Beach; is that
13  correct?
14          MR. NOVIKOFF:  Objection.
15      A.   Yes, I believe May 1st I resigned
16  as a police officer.
17      Q.   Why did you resign as a police
18  officer?
19      A.   I was advised I have to go through
20  the Suffolk County test, you know, the
21  physical agility and so on and so forth.  I
22  had a health issue in December of that year
23  and I decided not to stay on as a police
24  officer.
25      Q.   Who advised you that you have to
```

Page 181

```
 1              Cherry
 2  go through the Suffolk County tests?
 3      A.   I believe Chief Hesse did and I
 4  got letters for scheduling appointments to
 5  take the various tests.  And I decided I
 6  wasn't going to go back as a police officer.
 7      Q.   When was the first time that you
 8  were advised that you needed to go through the
 9  Suffolk County test?
10          MR. NOVIKOFF:  Objection.  Asked
11  and answered.  You can answer.
12      A.   I don't recall.
13      Q.   Do you recall what month it was?
14      A.   No.
15      Q.   Do you recall --
16      A.   Sometime after the season was over
17  he told me I have to.
18      Q.   At some point between the end of
19  the season '04 and May 1, '05?
20      A.   Yes.
21      Q.   Do you recall which calendar year
22  it was in; was it in '04 or '05?
23      A.   I believe the end of '04, the end
24  of the season.
25      Q.   So some point between September of
```

46 (Pages 178 to 181)

Page 182

Cherry

1 '04 and December of '04 is when?
2     A.   I believe so.  To the best of my
3 recollection.
4     **Q.   Did you first learn of it through**
5 **Chief Hesse or Deputy Chief Hesse or Sergeant**
6 **Hesse, or did you first learn of it through**
7 **those letters that you got?**
8     A.   I got some letters -- I am not
9 sure.  George may have told me first and then
10 I got the letters, or the letters may have
11 spurred a phone call, what is the story, what
12 is going on.  But there came a point where I
13 decided not to go back.
14    **Q.   What tests are you referring to?**
15    A.   The physical agility, that was the
16 first time I think I got the letter.  I don't
17 recall, there may have been a letter for a --
18 just physical agility.  I rescheduled and I
19 decided I was not going to do it and I let
20 civil service know.
21    **Q.   Did George Hesse inform you when**
22 **you first learned from him by phone or in**
23 **person?**
24    A.   Probably by phone, I am not sure

Page 183

Cherry

1 exactly how.  I may have called him to find
2 out what is going on, because he is over on
3 Ocean Beach, it is not easy to go over there,
4 so it is usually a phone conversation.
5    **Q.   Do you recall what he said during**
6 **the phone conversation?**
7    A.   I believe he said that civil
8 service is going to require that the police
9 officers who are working there, who were not
10 former -- who were former police officers have
11 to go through a whole Suffolk County Civil
12 Service process.
13    **Q.   Did he tell you this was a new**
14 **requirement?**
15       MR. NOVIKOFF:  Objection.
16    **Q.   From Suffolk County?**
17    A.   He didn't say it was a new
18 requirement, he just informed us that we have
19 to go through the civil service process, he
20 didn't say anything about it being a new or
21 not new.
22    **Q.   Did he indicate one way or the**
23 **other whether he knew about those requirements**
24 **prior to the time that he disclosed them to**

Page 184

Cherry

1 you?
2    A.   Not in the conversation -- not
3 during the conversation that we had, he didn't
4 give me any indication of that.
5       MR. GOODSTADT:  Let's take a
6    break.
7       THE VIDEOGRAPHER:  The time is
8    12:50.  Off the record.
9       (Lunch recess taken.)
10       (Time noted:  12:50 p.m.)

Page 185

Cherry

1    A F T E R N O O N   S E S S I O N
2       (Time noted:  1:38 p.m.)
3 P A T R I C K   J O H N   C H E R R Y,
4    resumed and testified as follows:
5 EXAMINATION BY (Cont'd.)
6 MR. GOODSTADT:
7       THE VIDEOGRAPHER:  The time is
8    1:38, we are back on the record.
9    **Q.   Before we broke for lunch**
10 **Mr. Cherry I believe that we were discussing**
11 **when you learned about the requirements for**
12 **Suffolk County Civil Service, do you recall**
13 **that?**
14    A.   Yes.
15    **Q.   I believe you testified before**
16 **about somebody asking whether you were going**
17 **to get a waiver; is that correct?**
18       MR. NOVIKOFF:  Objection.  Like I
19    said you can answer everything unless I
20    tell you not to.
21    A.   Okay.  Yes.
22    **Q.   What were you referring to when**
23 **you said that?**
24    A.   A waiver for us to work as police

Page 186

Cherry

1  officers.
2      Q.   Who was inquiring whether you were
4  going to get a waiver?
5      A.   Somebody mentioned it to me that
6  they were going to try to get a waiver.
7      Q.   Do you remember who that was?
8      A.   I believe it was Chief Hesse.
9      Q.   Do you know when he asked you
10 about that?
11     A.   No.  He didn't ask me, he sort of
12 mentioned that he was trying to get a waiver.
13     Q.   He mentioned that he was trying to
14 get a waiver for you?
15     A.   Yes.
16     Q.   Do you know what efforts he took
17 to get that waiver?
18     A.   No.
19     Q.   Do you know when he was taking
20 those efforts to try to get a waiver?
21     A.   No.
22     Q.   Do you know whether there is such
23 a thing as a waiver?
24     A.   I don't know.
25     Q.   Did there come a point in time

Page 187

Cherry

1
2  where -- strike that.
3          Do you know who Officer Dyer,
4  D-Y-E-R?
5      A.   Yes.
6      Q.   Who is Officer Dyer?
7      A.   John was an officer who came on, I
8  believe it was the same year that I did in
9  2004.
10     Q.   Did Officer Dyer, did he have the
11 same issues with respect to the certifications
12 and tests?
13     A.   I believe so.
14         MR. NOVIKOFF:  Objection.
15     Q.   Did you ever discuss the issue
16 with him?
17     A.   I don't believe so.
18     Q.   Did you ever hear him mention the
19 issue?
20     A.   No.
21     Q.   You never heard him talking about
22 it in the police station?
23         MR. NOVIKOFF:  Objection.
24     A.   I don't recall, no.
25     Q.   Whatever happened with the waiver

Page 188

Cherry

1
2  or the attempts of George Hesse getting you a
3  waiver?
4          MR. NOVIKOFF:  Objection.
5      A.   I never heard anything about it.
6      Q.   Did you ever follow up with him?
7      A.   No.
8      Q.   Did anyone ever tell you that you
9  could no longer work as a police officer
10 unless you got these tests or certifications
11 from Suffolk County Civil Service?
12     A.   Yes.  I think when he said we had
13 to pass all the tests to stay on the job.
14     Q.   When did you learn that, you had
15 to pass a test to stay on the job?
16     A.   When did I hear that; when I got
17 the letters from civil service I inquired and
18 they -- I wanted to cancel a physical, an
19 agility tests.  I said, I asked them, I said
20 what are the requirements.  He said you have
21 to pass every phase of the examinations.
22     Q.   How many letters did you get from
23 civil service?
24     A.   I think I got two or three about
25 civil service requirements, taking the exams,

Page 189

Cherry

1
2  scheduling of exams.
3      Q.   You don't recall when the first
4  one came?
5      A.   No, it was sometime the end of
6  the -- after the -- the end of the 2004
7  season.
8      Q.   So it was sometime between the end
9  of the season and the end of the calendar year
10 2004?
11     A.   Yes.
12     Q.   Did you keep copies of those
13 letters?
14     A.   No.
15     Q.   What did you do with them?
16     A.   I eventually threw them away.
17     Q.   Did you ever speak to anyone at
18 civil service about the letters or the
19 requirements?
20     A.   I called there to let them know I
21 wasn't going to make an exam.  Other than that
22 I didn't speak to anybody specifically about
23 the -- what you had to do.
24     Q.   So your exams were actually
25 schedule?

48  (Pages 186 to 189)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 190

**Cherry**

1
2       MR. NOVIKOFF:  Objection.
3       A.   Scheduled, yes.
4       **Q.   Which exam was scheduled?**
5       A.   The physical agility.
6       **Q.   The other exam was scheduled?**
7       A.   No, I think -- well, no.
8       **Q.   Did you try to schedule any other**
9   **exams?**
10      A.   No.
11      **Q.   Did they try to schedule them with**
12  **you?**
13      A.   No.
14      **Q.   And did you call them to schedule**
15  **the physical agility or did they send you the**
16  **days?**
17      A.   They sent me a date and they asked
18  if I wasn't going to take it, to give them
19  notice, which I did.
20      **Q.   Why did you decide not to take it?**
21      MR. NOVIKOFF:  Objection.
22      A.   I decided I was not going to
23  pursue it any more, I was going to resign.
24      **Q.   Why?**
25      MR. NOVIKOFF:  Objection.

Page 191

Cherry

1
2       A.   Well, I decided to resign.  I
3   didn't want to go through the process and like
4   I said before I had some health issues, I
5   didn't want to go further to be a police
6   officer in the Village.
7       **Q.   If you were not required to take a**
8   **test would you have stayed on as a police**
9   **officer in the Village?**
10      MR. NOVIKOFF:  Objection.
11      A.   Probably not.
12      **Q.   So you were going to resign**
13  **regardless of whether the civil service issue**
14  **came up?**
15      A.   Yes.
16      **Q.   Had you told anyone that?**
17      A.   No.
18      MR. GOODSTADT:  Would you mark
19  this document as Cherry Exhibit 7, memo
20  dated May 1, 2005.
21      (Cherry Exhibit 7, memo dated May
22  1, 2005, marked for identification, as of
23  this date.)
24      **Q.   I place in front of Mr. Cherry**
25  **what has now been marked as Cherry Exhibit 7,**

Page 192

**Cherry**

1
2   **a one-page document bearing Bates stamp 4113.**
3       **Mr. Cherry, do you recognize the**
4   **document that has been marked as Cherry**
5   **Exhibit 7?**
6       A.   Yes, sir.
7       **Q.   What is this document?**
8       A.   It is my resignation letter to
9   Chief Paradiso.
10      **Q.   Do you recall writing this letter?**
11      A.   Yes, I do.
12      **Q.   Did you actually type it?**
13      A.   Yes.
14      **Q.   Is that your signature on the**
15  **bottom of the letter?**
16      A.   Yes.
17      **Q.   You want to look down it says:  To**
18  **Chief Edward Paradiso.  Do you see that?**
19      A.   Yes.
20      **Q.   Why were you submitting it to**
21  **Chief Edward Paradiso?**
22      A.   Because he was the chief of the
23  department.
24      **Q.   Did you give a copy of this letter**
25  **to anyone else other than Chief Paradiso?**

Page 193

**Cherry**

1
2       A.   No.
3       **Q.   Had you spoken to anyone in the**
4   **department that you were going to resign prior**
5   **to submitting this?**
6       MR. NOVIKOFF:  Objection.
7       A.   Yes, I believe I advised Sergeant
8   Hesse that I was not going to stay on as a
9   police officer, I was going to resign.
10      **Q.   When did you advise him of that?**
11      A.   Sometime prior to May 1st when I
12  submitted the letter.
13      **Q.   How far prior to May 1st?**
14      A.   I don't know the exact date.
15      **Q.   Was it days, weeks, months?**
16      A.   Probably a month or two prior.
17      **Q.   So you think it was some point in**
18  **the first quarter of 2005 that you told him**
19  **that?**
20      A.   Yes, that sounds reasonable.
21      **Q.   You say on the top sentence:**
22  **Effective immediately I am reluctantly**
23  **tendering my resignation.  Do you see that?**
24      A.   Yes.
25      **Q.   Why were you reluctant to tender**

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 194

Cherry

1
2    your resignation?
3          MR. NOVIKOFF:  Objection.
4          A.   I would rather stay as a police
5    officer, but due to my health concerns and not
6    wanting to go through the process again I
7    decided not to.
8          Q.   Just so I understand, did you
9    tender your resignation because of the health
10   concerns, or did you tender your resignation
11   because you didn't want to go through the
12   process?
13         MR. NOVIKOFF:  Objection.
14         A.   Both.
15         Q.   Then the first sentence of the
16   second paragraph it says:  It has been a
17   pleasure to have worked for and with you,
18   Sergeant Hesse, and the other members of the
19   department.  Do you see that?
20         A.   Yes.
21         Q.   At the time George Hesse's title
22   was sergeant?
23         A.   Yes.
24         MR. NOVIKOFF:  Objection.
25         Q.   The last sentence of your letter

Page 195

Cherry

1
2    it says:  If I can assist the department in
3    another capacity on a part-time basis, please
4    let me know.  Do you see that?
5          A.   Yes.
6          Q.   Did they take you up on that
7    offer?
8          A.   Yes.
9          Q.   What job did they offer you?
10         A.   They asked me if I would stay on
11   as a dispatcher.
12         Q.   On a part-time basis?
13         A.   Yes.  Seasonal dispatcher.
14         Q.   Seasonal or part-time?
15         MR. NOVIKOFF:  Objection.
16         A.   Seasonal.
17         Q.   Just so I am clear, dispatcher was
18   the civil service title?
19         MR. NOVIKOFF:  Objection.
20         A.   Yes.
21         Q.   Was it just seasonal dispatcher or
22   emergency services dispatcher?
23         MR. NOVIKOFF:  Objection.
24         A.   Seasonal dispatcher.
25         Q.   Do you know what tests if any are

Page 196

Cherry

1
2    required to -- for you to pass to get the job
3    of seasonal dispatcher?
4          MR. NOVIKOFF:  Objection.
5          A.   I don't think there are any test
6    requirements.
7          Q.   What were your duties as a
8    dispatcher?
9          A.   Answer the telephone.  Take
10   complaints.  Dispatch the officers to answer
11   the complaints.  Make entries in the blotter.
12   Make entries in the computer log provided by
13   the officers on their field reports, put them
14   into the computer.
15         When summonses come in record them
16   in the blotter and file them to be forwarded
17   to court.  Information, you know, I get
18   information sent in.  Anything that comes
19   through the main desk.
20         Q.   Do you carry a weapon?
21         A.   No.
22         Q.   Do you have a shield as a
23   dispatcher?
24         A.   Yes.
25         Q.   Do you have a police uniform?

Page 197

Cherry

1
2          A.   You wear a uniform, it is
3    different from the police uniform.  Black
4    shirt and khaki pants.
5          Q.   Same shield?
6          A.   Similar shield, it says dispatcher
7    on it.
8          Q.   What is your shield number?
9          A.   552.
10         Q.   As dispatcher do you have the
11   authority to make arrests?
12         A.   No.
13         Q.   Do you have authority to issue
14   summonses?
15         MR. NOVIKOFF:  Objection.
16         A.   No.
17         Q.   At the time that you were a police
18   officer in Ocean Beach who was your
19   supervisor?
20         MR. NOVIKOFF:  Objection.
21         A.   Whoever was the senior officer
22   working, either Chief Paradiso or Sergeant
23   Hesse.
24         Q.   What tours did you work?
25         A.   The first year I worked primarily

50 (Pages 194 to 197)

Page 198

Cherry

1    nights, 4 to 12, that extended to 4 to 1 a.m.
2    on Saturdays.
3    
4        **Q.   When you say at first, you are**
5    **talking about 2004?**
6        A.   That is correct.
7        **Q.   Did you ever work any other tours**
8    **other than 4 to 12 and 4 to 1 while you were a**
9    **police officer in Ocean Beach?**
10       A.   I may have worked a day tour now
11   and then, but primarily 4 to 12's.
12       **Q.   Who was the senior officer or**
13   **superior officer on duty during that shift,**
14   **the 4 to 12 shift?**
15       A.   Who did I work for?
16       **Q.   Yes.**
17       A.   Whoever happened to be the
18   superior officer that night.  Either Chief
19   Hesse or -- Chief Paradiso or Sergeant Hesse.
20       **Q.   Who was the superior officer**
21   **generally on that tour, 4 to 12?**
22       A.   Sergeant Hesse.
23       **Q.   For the entire tour?**
24       A.   Yes.
25       **Q.   Was there any point that Chief**

Page 199

Cherry

1        **Paradiso was the superior officer on the 4 to**
2    **12 tour when you worked?**
3        MR. NOVIKOFF:  Objection.
4        A.   Occasionally.  If the chief wasn't
5    available or on vacation the chief may stay
6    and work later than that, but he was primarily
7    the daytime supervisor.
8        **Q.   While you were employed as a**
9    **police officer at Ocean Beach did Chief**
10   **Paradiso work the 4 to 12 shift other than to**
11   **go in when Hesse was on vacation?**
12       A.   Not normally, no.
13       **Q.   How about at all?**
14       A.   I would say occasionally he would
15   depending on if the supervisor was needed that
16   night or he stayed late.  He was the chief, he
17   could do whatever he wanted to do.
18       **Q.   So if there was an issue that you**
19   **wanted to raise with your superior officer**
20   **or -- strike that.**
21       **If there was an issue that you**
22   **wanted to raise with the department would you**
23   **raise it to your superior officer who was on**
24   **duty at that time?**

Page 200

Cherry

1        MR. NOVIKOFF:  Objection.
2        A.   If there was an issue during the
3    tour?
4        **Q.   Yes.**
5        A.   Yes, you would go to the officer
6    who was in charge if you had to seek advice
7    from a superior.
8        **Q.   That is a chain of command, you go**
9    **to the superior officer who is on duty?**
10       MR. NOVIKOFF:  Objection.
11       A.   Yes.
12       **Q.   That is what was told to you?**
13       MR. NOVIKOFF:  Objection.
14       A.   Yes.  That is what normal
15   procedure would be.
16       **Q.   Was it told to you that that was**
17   **the procedure there as well?**
18       A.   Yes.
19       **Q.   Who told you that?**
20       A.   I don't think anybody -- well, you
21   went to the -- if you had a problem I had to
22   go to a superior, you went to the superior
23   officer that is working.
24       MR. NOVIKOFF:  Listen to the

Page 201

Cherry

1    question.  He is asking specific
2    questions.
3        **Q.   You believe that was well known**
4    **throughout the department that that was the**
5    **process?**
6        MR. NOVIKOFF:  Objection.
7        A.   Yes.
8        **Q.   I believe you testified that**
9    **Officer John Dyer was hired as a police**
10   **officer the same year that you were; is that**
11   **correct?**
12       MR. NOVIKOFF:  Objection.
13       A.   I believe so, yes.
14       **Q.   Were there any other police**
15   **officers who were hired for the first season,**
16   **for the 2004 season other than for you and**
17   **Mr. Dyer?**
18       MR. NOVIKOFF:  Objection.  To the
19       extent that he knows you can answer.
20       A.   I don't know.
21       **Q.   How many police officers were**
22   **employed by the Village of Ocean Beach in the**
23   **'04 season?**
24       A.   I don't know the exact number.

TSG Reporting - Worldwide      877-702-9580

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 202

Cherry

1
2    **Q.  Approximately?**
3        MR. NOVIKOFF:  Objection.
4    A.  I would say approximately 30.
5    **Q.  How many of those police officers**
6    **generally worked the 4 to 12 tour?**
7        MR. NOVIKOFF:  Objection.
8    A.  It would depend on the night.
9    **Q.  Was there a certain group of**
10   **officers that generally worked the same shift**
11   **as you?**
12       MR. NOVIKOFF:  Objection.
13   A.  I worked three days, primarily
14   three days a week the first year I believe,
15   and depending on what days you worked it would
16   be different officers every night.  It may be
17   the same officer, but some of the same
18   officers may have worked, whoever was
19   available to work in a particular night would
20   be working.  It was not the same person -- it
21   was not the same crew every night.
22   **Q.  Did you generally work the same**
23   **days each week?**
24   A.  Yes.
25   **Q.  What days were those?**

Page 203

Cherry

1
2    A.  If I recall I worked Friday,
3    Saturday and Sunday to the best of my
4    recollection for the 2004 season.
5    **Q.  I want to go back, you said a**
6    **couple of times now during the first season,**
7    **you are referring to the 2004 season?**
8    A.  Yes.
9    **Q.  Were there any other seasons that**
10   **you worked as a police officer for Ocean**
11   **Beach?**
12   A.  No, but you are talking about
13   scheduling.
14   **Q.  I just wanted to be clear?**
15   A.  Yes, right.
16   **Q.  Of the Friday -- on the Friday**
17   **tour, the 4 to 12 tour that I am talking**
18   **about, who generally were the officers that**
19   **you worked with on that tour?**
20   A.  I couldn't say specifically
21   because it was different every night.  It was
22   depending on who was available to work, and
23   depending on what the person's schedule was,
24   it would be different people every night.  I
25   couldn't say any given date who was working.

Page 204

Cherry

1
2    **Q.  Generally George Hesse was the**
3    **superior officer on duty?**
4    A.  I would say --
5        MR. NOVIKOFF:  Objection.  Wait
6    until the question is over.
7    A.  I would say generally George Hesse
8    was the sergeant assigned.
9    **Q.  Did the Bossetti's work the Friday**
10   **4 to 12 frequently with you?**
11       MR. NOVIKOFF:  Objection.
12   A.  I remember them working
13   occasionally with me, yes.
14   **Q.  How about Officer Moeller?**
15       MR. NOVIKOFF:  Objection.
16   A.  I worked with -- anybody you named
17   I worked with, but I can't say exactly what
18   days they worked without having the schedule
19   in front of me.
20   **Q.  So there was no regular crew that**
21   **worked either the Friday, Saturday or Sunday**
22   **tour, 4 to 12, is that your testimony?**
23       MR. NOVIKOFF:  Objection.
24   A.  Not that I can recall, no.
25   **Q.  The only regular that was on duty**

Page 205

Cherry

1
2    **during those tours for you that you can recall**
3    **is George Hesse?**
4        MR. NOVIKOFF:  Objection.
5    A.  Yes.
6    **Q.  Did you ever socialize with any**
7    **officers outside of work during that 2004**
8    **season?**
9    A.  No.
10   **Q.  How about did you ever socialize**
11   **with any officers -- strike that.**
12       **Did you ever eat meals with those**
13   **officers during your tour, any officers during**
14   **your tour?**
15   A.  Yes.
16   **Q.  Did you ever go to the Bocce Beach**
17   **on Sunday night for dinner?**
18   A.  Yes.
19   **Q.  How often would you do that?**
20   A.  Just about every Sunday if we
21   were not -- if it was not busy, usually every
22   Sunday.
23       MR. NOVIKOFF:  Are you done with
24   your answer?
25       THE WITNESS:  Yes.

52 (Pages 202 to 205)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 206

Cherry

1
2    Q.   Who did you generally go with on
3  Sundays to the Bocce Beach for dinner?
4    A.   It was myself, George Hesse,
5  depending on who was working.  Sometimes the
6  Bossetti's, sometimes Officer Moeller.  That
7  is all I recall.  It was different people,
8  whoever happened to be working, who wanted to
9  join, go over there, they would go with us.
10   Q.   And did you eat dinner during your
11 tour?
12   A.   Yes.
13   Q.   Were you paid for the time that
14 you were eating dinner?
15   A.   I believe we had a half hour meal
16 period and yes, sometimes it went over a half
17 hour and we would bring the radio with us, but
18 it was during the tour, yes.
19   Q.   Who paid for those dinners?
20   A.   We did.
21   Q.   Individually?
22   A.   Yes, we got the bill and we gave
23 in our share.
24   Q.   Did you ever drink any alcohol
25 during those dinners?

Page 207

Cherry

1
2    A.   No.
3    Q.   Do you know if any other officers
4  ever drank any alcohol during those dinners?
5    A.   No.
6    Q.   You don't know or they didn't
7  drink?   MR. NOVIKOFF:  Objection.  You can
8
9  answer.
10   A.   No, we didn't drink alcohol.
11   Q.   I am not asking whether you did, I
12 am asking whether any other officers drank
13 alcohol?
14       MR. NOVIKOFF:  Objection.
15   A.   I didn't see anybody drink any
16 alcoholic beverages.
17   Q.   Sir, are the radio, the police
18 radio codes different in Suffolk County than
19 they are in Nassau County -- strike that.
20       MR. NOVIKOFF:  Objection.
21   Q.   Back in 2004 were the radio codes
22 in the Police Department in Suffolk County
23 different than they were for Nassau County?
24       MR. NOVIKOFF:  Objection.
25   A.   Yes.

Page 208

Cherry

1
2    Q.   How did you learn the radio codes
3  for Suffolk County when you were working in
4  the Village of Ocean Beach as a police
5  officer?
6        MR. NOVIKOFF:  Objection.
7    A.   There was a card that listed all
8  the radio numbers that was at the front desk
9  or I had a copy of it, and I looked at it.  If
10 you had to use a code that you didn't know,
11 you would look at the code and see what code
12 it was.
13   Q.   What if you were outside of the
14 station?
15   A.   I had one in my summons book also.
16   Q.   You carried a copy of the card
17 code?
18   A.   Yes.
19   Q.   Do you know who alerted civil
20 service to the fact that there were
21 uncertified officers working in Ocean Beach?
22       MR. NOVIKOFF:  Objection.
23   A.   No.
24   Q.   Did you ever hear anybody accuse
25 Tom Snyder of alerting civil service to the

Page 209

Cherry

1
2  fact that there were uncertified officers
3  working in Ocean Beach?
4        MR. NOVIKOFF:  Objection.
5    A.   No.
6    Q.   Did you ever hear anybody call Tom
7  Snyder a rat?
8    A.   No.
9        MR. NOVIKOFF:  Objection.
10   Q.   Did you ever hear anyone accuse
11 Frank Fiorillo of notifying civil service to
12 the issue that there were uncertified workers
13 in Ocean Beach?
14       MR. NOVIKOFF:  Objection.
15   A.   No.
16   Q.   Did you ever hear anyone call
17 Frank Fiorillo a rat?
18       MR. NOVIKOFF:  Objection.
19   A.   No.
20       MR. GOODSTADT:  What is the basis?
21       MR. NOVIKOFF:  I think it is form.
22       MR. GOODSTADT:  What is wrong with
23    the form?
24       MR. NOVIKOFF:  I think the form --
25       MR. GOODSTADT:  What about it?

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 210

Cherry

1
2      MR. NOVIKOFF: I believe you are
3  calling for hearsay. I am preserving my
4  objection, I am not speaking, Andrew.
5      Q.  Did you ever hear anyone accuse Ed
6  Carter of alerting civil service to the issue
7  that there were uncertified police officers
8  working in Ocean Beach?
9      MR. NOVIKOFF: Objection.
10     A.  No.
11     Q.  Did you hear anyone call Ed Carter
12  a rat?
13     A.  No.
14     Q.  Did you ever hear anyone accuse
15  Kevin Lamm of notifying civil service that
16  there were uncertified workers working as
17  police officers at Ocean Beach?
18     A.  No.
19     MR. NOVIKOFF: Objection.
20     Q.  Did you ever hear anyone call
21  Kevin Lamm a rat?
22     MR. NOVIKOFF: Objection.
23     A.  No.
24     Q.  Did you ever hear anyone accuse
25  Joe Nofi of alerting civil service to the fact

Page 211

Cherry

1
2  that there were uncertified police officers
3  working at Ocean Beach?
4      MR. NOVIKOFF: Objection.
5      A.  No.
6      Q.  Did you ever hear anyone call Joe
7  Nofi a rat?
8      MR. NOVIKOFF: Objection.
9      A.  No.
10     Q.  Do you know what the term rat
11  means in the terms of a police officer?
12     MR. NOVIKOFF: Objection.
13     A.  Yes.
14     Q.  What does it mean?
15     A.  A guy who accuses another officer
16  of doing something that is against the
17  department.
18     Q.  Have you ever called anyone a rat?
19     A.  No.
20     Q.  I believe you testified that
21  Officer Dyer had the same issues that you did
22  about being uncertified; is that correct?
23     MR. NOVIKOFF: Objection.
24     A.  Yes, I believe he did have the
25  same issues.

Page 212

Cherry

1
2      Q.  Were you aware of any other
3  officers who worked as police officers at
4  Ocean Beach who had the same issues about
5  being uncertified?
6      A.  I believe the Bossetti's, Richard
7  and Gary. I don't think there was anybody
8  else. Dyer, myself. I can't think of anybody
9  else right now that came over as a police
10  officer that was uncertified.
11     Q.  How did you know that John Dyer
12  had the same problem?
13     A.  Because he told me he had to take
14  the civil service required tests.
15     Q.  Do you know what Dyer did before
16  working at Ocean Beach?
17     A.  I believe he was a New York City
18  Police Officer.
19     Q.  Do you know whether he knew Hesse
20  prior to coming over to work at Ocean Beach?
21     A.  I don't know.
22     Q.  How did you learn that the
23  Bossetti's had the same problem about being
24  uncertified as you did?
25     A.  Because they had to take the

Page 213

Cherry

1
2  required civil service test also.
3      Q.  I understand they had to take it,
4  I want to know how you learned that they had
5  to take it?
6      MR. NOVIKOFF: Objection.
7      A.  They probably told me they had to
8  take it.
9      Q.  Do you recall them telling you?
10     A.  Yes. They were scheduled to take
11  one.
12     Q.  When did you learn that Gary
13  Bossetti was uncertified and had to take those
14  tests?
15     A.  Sometime after the 2004 season I
16  think everybody had to take the test, you
17  know, formal police officers who were working
18  there that didn't -- had to take the test.
19     Q.  How far after the end of the '04
20  season did you learn that?
21     A.  The same time that I found
22  basically, the end of the season, after the
23  end of the season before the 2005 season
24  started.
25     Q.  So did Gary Bossetti tell you that

54 (Pages 210 to 213)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 214

Cherry

1   **he had to take the test?**
2       A.   I believe it was mentioned that he
3   had to take the test.  I don't know if he told
4   me directly that he had to take the test.
5       **Q.   It was on the phone or in person**
6   **that he mentioned this to you?**
7       A.   As I said I don't know if he
8   personally told me or I just heard that he had
9   to take the test, or somebody mentioned it, I
10  don't recall.
11      **Q.   Did you speak to Gary Bossetti in**
12  **between the end of the '04 season and the '05**
13  **season?**
14      A.   About the tests?
15      **Q.   At all.**
16      A.   I probably spoke to him at a
17  Christmas party or something like that.  I
18  mean just to say hello.
19      **Q.   Was there a Christmas party in**
20  **'04?**
21      A.   I am not sure.
22      **Q.   Were there Christmas parties**
23  **generally at Ocean Beach?**
24      A.   Yes.  We usually got together

Page 215

Cherry

1   around Christmastime.  I can't say it was
2   every year.  We did do it last year, but I
3   can't say it was every year and I didn't
4   attend every party.
5       **Q.   Is this a party that is different**
6   **than the one that you testified to before that**
7   **happened at Hesse's house and Paradiso's**
8   **house?**
9       A.   Yes.
10      **Q.   Where would the Christmas parties**
11  **be held?**
12      A.   They were a restaurant in, that I
13  can recall, a restaurant in Sayville.
14      **Q.   Was it called the Portly Villager?**
15      A.   Yes.
16      **Q.   Do you know who owned that**
17  **restaurant?**
18      A.   Mrs. Keglein (phonetic).
19      **Q.   Is her husband an employee as a**
20  **police officer in Ocean Beach?**
21      A.   He was.
22      **Q.   What years was he employed as a --**
23      A.   He was only there -- to the best
24  of my recollection I think it was 2006, 2007.

Page 216

Cherry

1       **Q.   Who paid for the Christmas parties**
2   **that you attended?**
3       A.   I am not sure.
4       **Q.   Did you have to pay for any of**
5   **them?**
6       A.   Last year I think we chipped in 20
7   bucks a man, something like that, but I am not
8   sure of the prior years.
9       **Q.   You don't recall chipping in the**
10  **prior years?**
11          MR. NOVIKOFF:  Objection.
12      A.   No, I don't.
13      **Q.   Did you ever hear that the Ocean**
14  **Beach PBA paid for those parties?**
15      A.   I believe that they possibly did.
16          MR. NOVIKOFF:  Let's take a break.
17  One second.  I don't have to go off the
18  record.
19          THE VIDEOGRAPHER:  The time is
20  2:08.  We are off the record.
21          (Recess taken.)
22          THE VIDEOGRAPHER:  The time is
23  2:09.  We are back on the record.
24      **Q.   Sir, I think you just testified**

Page 217

Cherry

1   **that you believe that the Ocean Beach PBA may**
2   **have paid for the Christmas parties, but**
3   **before you testified that you never heard of**
4   **an Ocean Beach PBA?**
5           MR. NOVIKOFF:  Objection.  You can
6   answer.
7       A.   Yes.
8       **Q.   How do you reconcile that?**
9       A.   I was wrong.  I am -- as far as I
10  knew we didn't have a PBA.  I wasn't a member
11  of the Ocean Beach PBA.  I don't know what
12  fund paid for it, but it was -- somebody paid
13  for it.  I am not sure who.
14      **Q.   Why do you think it is possible**
15  **that the Ocean Beach PBA?**
16          MR. NOVIKOFF:  Objection.
17      A.   As I said I don't know if there
18  was a PBA fund.  As far as I know we didn't
19  have a PBA.  I wasn't a member of any Ocean
20  Beach PBA.  I was not a contributing member.
21  I didn't contribute to it.  I didn't pay any
22  dues to a PBA.  So I don't know if there is a
23  PBA.
24      **Q.   Do you know whether Sergeant**

Page 218

```
 1              Cherry
 2   and/or Chief Hesse ever solicited donations
 3   for the PBA?
 4          MR. NOVIKOFF:  Objection.
 5          MR. CONNOLLY:  Objection.
 6      A.   I have no personal knowledge of
 7   that.
 8      Q.   To your knowledge who at Ocean
 9   Beach was in charge of insuring compliance
10   with the civil service laws with respect to
11   police officers?
12          MR. NOVIKOFF:  Objection.
13      A.   I don't know.
14      Q.   While you were a police officer at
15   Ocean Beach did you ever receive a handbook,
16   an employee handbook?
17      A.   I don't believe so, no.
18      Q.   Did you ever receive any
19   performance evaluations?
20          MR. NOVIKOFF:  Objection.
21      A.   I don't believe so.
22      Q.   Did you ever discuss or have any
23   correspondence other than for Cherry 7 with
24   Chief Paradiso about the civil service
25   requirements?
```

Page 219

```
 1              Cherry
 2          MR. NOVIKOFF:  Objection.
 3      A.   No.
 4      Q.   Did you ever tell Chief Paradiso
 5   why you were resigning as a police officer in
 6   Ocean Beach?
 7          MR. NOVIKOFF:  Other than Cherry
 8   7?
 9          MR. GOODSTADT:  Well, Cherry 7
10   says reluctantly.
11          MR. NOVIKOFF:  Your question was
12   pretty broad.  I just wanted to clarify.
13      A.   Did I tell Chief Paradiso?
14      Q.   Why you were resigning?
15      A.   I never had a direct conversation
16   with him, no.
17      Q.   Did you ever any kind of indirect
18   conversation or communication with him?
19      A.   No.
20      Q.   I believe that you testified that
21   you worked as a dispatcher after that; is that
22   correct?
23          MR. NOVIKOFF:  Objection.
24      A.   Yes.
25      Q.   What was the first season that you
```

Page 220

```
 1              Cherry
 2   worked as a dispatcher at Ocean Beach?
 3      A.   2005.
 4      Q.   So there was no break in service
 5   in terms of seasons that you were employed at
 6   Ocean Beach, was there?
 7      A.   No.
 8      Q.   Was there any -- strike that.
 9          How did you go about applying for
10   the position as dispatcher?
11      A.   I think I -- I don't remember.
12      Q.   Did you fill out an application?
13      A.   I am not sure if I did or not for
14   the dispatcher position.
15      Q.   Do you know who made the decision
16   to hire you as a dispatcher?
17      A.   In 2005, no, I am not sure.
18      Q.   Did you interview for the
19   position?
20      A.   No.
21      Q.   Did you resubmit a resume?
22      A.   No.
23      Q.   Did you submit any paperwork in
24   connection with your application for the
25   position as a dispatcher?
```

Page 221

```
 1              Cherry
 2      A.   I don't recall doing any
 3   additional paperwork.
 4      Q.   Did you collect unemployment
 5   during the period between the end of the '04
 6   season and the start of the '05 season?
 7      A.   No.
 8      Q.   How come?
 9      A.   I didn't qualify for it.
10      Q.   Did you apply for it?
11      A.   Yes.
12      Q.   Why do you think you didn't
13   qualify for it?
14      A.   There is a certain criteria that
15   the unemployment, based on how many months you
16   work and how much you make, and I didn't fit
17   the criteria, that criteria to receive -- I
18   applied for it and then they sent me a letter
19   saying that I was not eligible that season.  I
20   was not eligible at this point.
21      Q.   Was it because you didn't work
22   enough hours?
23      A.   Yes.  A combination of hours and
24   salary.
25      Q.   When you moved from the position
```

Page 222

Cherry

1
2  of police officer to dispatcher was there a
3  change in salary?
4      A.  Yes.
5      Q.  Did it go up or down?
6      A.  Down.
7      Q.  Would you mark as Cherry Exhibit
8  8, Confidential Wage/Salary History.  March
9  23, 2004.
10         (Cherry Exhibit 8, Confidential
11      Wage/Salary History.  March 23, 2004,
12      marked for identification, as of this
13      date.)
14      Q.  I place in front of Mr. Cherry
15  what has now been marked as Cherry Exhibit 8,
16  it is a one-page exhibit bearing Bates stamp
17  5424.
18      Mr. Cherry, do you recognize this
19  document that is marked as Exhibit 8?
20      A.  This is first time I have seen it.
21      Q.  I just want you to look down, I
22  represent to you this is a document that was
23  produced to us by the Village of Ocean Beach.
24  If you look from the dates from 3/23/04 to
25  5/31/04, do you see that?

Page 223

Cherry

1
2      A.  Yes.
3      Q.  Does that refresh your
4  recollection as to when you first started
5  working as a police officer?
6      MR. NOVIKOFF:  Objection.
7      A.  That was probably -- 03/23 was
8  probably the day that I was sworn in.
9      MR. NOVIKOFF:  The question is
10     does reviewing this document now
11     independent from this document refresh
12     your recollection as to when you first
13     started working as a police officer; not
14     reading this, do you have now a
15     recollection as to when you first started
16     working as a police officer.
17     A.  Well, I didn't start working as a
18  police officer until the May of -- so working,
19  working as a police officer, until May of
20  2004.
21     Q.  So during the period from March
22  23, '04 through May 31, '04 were you working
23  as a police officer during that period?
24     A.  Probably the last two weeks in
25  May.  That is when I started working

Page 224

Cherry

1
2  physically as a police officer at the beach.
3      Q.  Is that your hourly rate of pay,
4  the $18.63 an hour?
5      A.  Yes.  To the best of my
6  recollection that is correct.
7      Q.  Then as of June 1, '04 through May
8  31, '05, was that your hourly rate of pay,
9  $19.28?
10      A.  Yes, I believe we got a raise.
11      Q.  I thought that Cherry 7 indicated
12  that effective immediately, meaning May 1, '05
13  you resigned as a police officer; is that
14  correct?
15      MR. NOVIKOFF:  Objection.
16      A.  Yes.
17      Q.  Did they accept that resignation
18  as of May 1, '04?
19      A.  As far as I know.
20      Q.  Do you know whether you were paid
21  at the rate of a police officer during the
22  month of May 2004?
23      A.  I don't believe so, no.
24      Q.  So it is your belief that this is
25  incorrect?

Page 225

Cherry

1
2      MR. NOVIKOFF:  Objection.
3      Q.  Cherry 8?
4      MR. NOVIKOFF:  Objection.
5      A.  I don't believe -- I was not
6  working as a police officer on the 31st, so I
7  don't believe that date is correct.
8      Q.  If you look at 6/1/05 to 5/31/06,
9  do you see that?
10      A.  Yes.
11      Q.  It says dispatcher?
12      A.  Yes.
13      Q.  $17.74, was that your rate of pay
14  during that year?
15      A.  I believe so.
16      Q.  The same thing for the '06, 6/1/06
17  to 5/31/07 you were a dispatcher?
18      A.  Yes, I was.
19      Q.  And was that your rate of pay,
20  $18.36 an hour?
21      A.  Yes.
22      Q.  Do you know what your rate of pay
23  was for the '07 season?
24      A.  I think it was $19 for the '07
25  season.

57 (Pages 222 to 225)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 226

Cherry

1
2     Q.   Were you ever paid overtime?
3     A.   No.
4     Q.   How about when you were a police
5   officer, were you ever paid overtime?
6     A.   I don't think I ever worked enough
7   hours to get paid overtime in a given pay
8   period.
9     Q.   During the period after the '05
10  season to the start of the '06 season did you
11  collect unemployment insurance?
12    A.   I believe so.  I would have to
13  check.  I would have to check with my records
14  to be sure, but I believe I did.
15    Q.   And in between seasons -- strike
16  that.
17         Prior to coming back to work in
18  the '05 season did you have to submit any
19  paperwork to apply for the position?
20         MR. NOVIKOFF:  Objection.
21    A.   Of dispatcher?
22    Q.   Well, did you start the '05 season
23  as dispatcher?
24    A.   Yes.
25    Q.   So did you have to submit any

Page 227

Cherry

1
2   application for the dispatcher position?
3         MR. NOVIKOFF:  Objection, asked
4   and answered.
5     A.   I don't believe so.
6     Q.   After the '05 season ended prior
7   to the '06 season did you have to reapply for
8   the position of dispatcher?
9     A.   No.
10    Q.   Did you have to go through any
11  process to be rehired as a dispatcher?
12    A.   No.
13    Q.   Did you stay as a dispatcher
14  throughout the year for Ocean Beach?
15    A.   '06?
16    Q.   Yes.
17    A.   Yes.
18    Q.   So on the off season you were
19  still employed as a dispatcher for Ocean
20  Beach?
21    A.   I was employed, but I didn't work
22  during the off season.
23    Q.   So you were employed but didn't
24  work?
25    A.   As far as I know.

Page 228

Cherry

1
2     Q.   I just want to know what your
3   understanding is?
4     A.   Yes.
5     Q.   So it is your understanding there
6   was no process to actually be rehired for the
7   next season?
8     A.   Not to my knowledge.
9     Q.   I want to focus on the point when
10  you were employed as a police officer in Ocean
11  Beach.  Did you ever have any alcoholic
12  beverages while you were on duty?
13    A.   No.
14    Q.   Did you ever have an alcoholic
15  beverage while you were in uniform?
16    A.   No.
17    Q.   Have you ever seen any police
18  officer working for Ocean Beach drinking while
19  on duty?
20    A.   I never saw anybody, no.
21    Q.   Did you ever see an Ocean Beach
22  police officer drinking in uniform?
23    A.   No, sir.
24    Q.   Did you ever see an Ocean Beach
25  police officer in a bar in uniform?

Page 229

Cherry

1
2     A.   While working?
3     Q.   Yes.
4     A.   Yes.
5     Q.   Was it business related?
6     A.   The ones I saw yes, they were
7   business related.
8     Q.   How many times did you see
9   officers in bars?
10    A.   When we got a call to a
11  disturbance in a bar and the officers went
12  inside.  So whenever we had a call for a
13  disturbance the officers responded and
14  necessitated going into the bar, they would go
15  into the bar.
16    Q.   Did you ever have any alcoholic
17  beverages in Ocean Beach while off duty?
18    A.   Yes.
19    Q.   How many times?
20    A.   I stayed after work probably two
21  or three times.  In a particular season you
22  are referring to or --
23    Q.   When you were employed as a police
24  officer?
25    A.   Probably about two or three times

Page 230

Cherry

1    I stayed after work and had a few drinks.
2        Q.   Do you know whether there is any
3    policy with the Ocean Beach Police Department
4    with respect to off duty police officers
5    drinking in bars in Ocean Beach?
6            MR. NOVIKOFF:  When; now or when
7        he was a police officer?
8        Q.   When you were a police officer.
9        A.   I didn't know of any policy that
10   said that.
11       Q.   How about now?
12       A.   I still don't know of any policy
13   that says that.
14       Q.   Did you ever ask anyone whether
15   there was a policy with respect for that?
16           MR. NOVIKOFF:  Objection.
17       A.   No.
18       Q.   Did you ever have any alcoholic
19   beverages inside the station, whether on or
20   off duty?
21       A.   No.
22       Q.   Did you ever see any officers
23   drinking any alcoholic beverages inside the
24   station?
25

Page 231

Cherry

1        A.   No.
2        Q.   Whether they were on or off duty?
3        A.   No.
4        Q.   Did you ever see any bartenders
5    deliver any alcoholic beverages to the police
6    station?
7        A.   No.
8        Q.   Do you know what Rocket Fuel is?
9        A.   Yes.
10       Q.   What is Rocket Fuel?
11       A.   It is a -- like a Pina Colada
12   drink, like a super Pina Colada type drink.
13       Q.   Is it your testimony, sir, that
14   you never saw anybody deliver Rocket Fuels to
15   the police station?
16           MR. NOVIKOFF:  Objection.
17       A.   Yes.
18           MR. NOVIKOFF:  Yes, that is your
19       testimony?
20           THE WITNESS:  Yes.
21       Q.   Did you ever see any police
22   officers drinking while they were driving to
23   the check point in the police vehicle?
24       A.   No.
25

Page 232

Cherry

1            MR. NOVIKOFF:  Drinking alcohol?
2        Q.   Drinking alcohol?
3        A.   No.
4        Q.   Did you ever see any alcoholic
5    containers, whether it be a beer can or beer
6    bottle, in the police vehicles?
7        A.   In the police vehicles, no.
8        Q.   I trust you were never required to
9    clean up any alcoholic containers in the
10   police vehicle?
11       A.   No.
12       Q.   Were you ever required to clean
13   any alcoholic beverage containers at the
14   station?
15       A.   No.
16       Q.   Did you ever hear that any of the
17   plaintiffs in this case complained about
18   officers drinking while on duty?
19       A.   Did I ever hear of any complaint?
20       Q.   Yes.
21       A.   I heard there were complaints
22   about it, yes.
23       Q.   When did you hear that?
24       A.   When you are working you hear
25

Page 233

Cherry

1    things, and I couldn't recall who said what or
2    when.
3        Q.   But you recall hearing complaints
4    by the plaintiffs that officers were drinking?
5        A.   From the plaintiffs -- from the
6    complainants, I never heard them complain
7    directly or indirectly to me or anybody else.
8        Q.   So what were you referring to when
9    you said that you heard that there were
10   complaints?
11           MR. NOVIKOFF:  Objection.
12       A.   I just heard that there were
13   complaints about drinking.
14       Q.   Who did you hear that from?
15       A.   I don't recall.
16       Q.   What did you hear about it?
17       A.   That there was somebody drinking,
18   they were drinking on duty.
19       Q.   Do you know who was alleged to
20   have been drinking on duty?
21       A.   No.  I didn't -- I minded my own
22   business, I didn't get involved in any of that
23   stuff.
24       Q.   How many times did you hear that
25

Page 234

Cherry

1
2  there were complaints about officers drinking
3  on duty?
4      A.  I can't say.
5      Q.  Approximately how many times?
6          MR. NOVIKOFF:  Objection.
7      A.  Once or twice.
8      Q.  Who did you hear discussing it?
9      A.  I don't recall.
10     Q.  Did you ever discuss it with
11  anyone?
12     A.  No.
13     Q.  How did you get from the Village
14  after your tour to the checkpoint?
15     A.  We drove out in the police car.
16     Q.  When you say we, who are referring
17  to?
18     A.  The people either coming on duty
19  or going off duty.
20     Q.  Did all the officers leave
21  together that were getting off duty?
22     A.  If they were leaving they were
23  going in the same truck.
24     Q.  What do you mean if they were
25  leaving?

Page 235

Cherry

1
2      A.  Some officers didn't leave, some
3  stayed.  If you were going to leave the truck
4  left and you went out with the truck.
5      Q.  What do you mean by they stayed?
6      A.  If you didn't want to go out with
7  the truck, the end of tour, you stayed -- you
8  didn't go in the truck.  Those who were going
9  off duty and wanted to go out to their cars to
10  leave went by truck.
11     Q.  Do you recall whether Gary
12  Bossetti used to go out in the bars at Ocean
13  Beach after getting off duty?
14     A.  Did Gary?
15     Q.  Yes.
16     A.  I believe he did.
17     Q.  Frequently?
18         MR. NOVIKOFF:  Objection.
19     A.  I don't know.  I know he went
20  occasionally, but I don't know the frequency
21  of it.
22     Q.  How many times to your knowledge?
23     A.  I have no idea.
24     Q.  Did Richard Bossetti ever go out
25  to the bars in Ocean Beach after getting off

Page 236

Cherry

1
2  duty?
3          MR. NOVIKOFF:  Objection.
4      A.  Yes.
5      Q.  How frequently?
6      A.  I couldn't say how frequently.
7      Q.  Did Arnold Harmon go out to the
8  bars in Ocean Beach after getting off duty?
9          MR. NOVIKOFF:  Objection.
10     A.  I don't recall him going out much
11  after work.
12     Q.  Did you work with Arnold Harmon on
13  a lot of tours?
14         MR. NOVIKOFF:  Objection.
15     A.  Occasionally.
16     Q.  Do you know whether he was one of
17  the officers who had the same certification
18  problem that you did?
19         MR. NOVIKOFF:  Objection.
20     A.  I believe he was.
21     Q.  How about Tyree Bacon, do you know
22  who that is?
23     A.  Yes.
24     Q.  Did Mr. Bacon go out to bars after
25  getting off tours?

Page 237

Cherry

1
2          MR. NOVIKOFF:  Objection.
3      A.  Not to my knowledge.
4      Q.  Do you know whether Mr. Bacon had
5  a certification problem like you?
6      A.  I don't believe so.
7      Q.  I believe you testified that there
8  were two to three times that you went out to
9  the bars after getting off duty?
10         MR. NOVIKOFF:  Objection.
11     A.  Yes.
12     Q.  On those two or three occasions
13  how did you get to the checkpoint?
14     A.  We drove out.
15     Q.  You drove out yourself?
16     A.  No.  Usually somebody -- when I
17  stayed, sometimes the truck wouldn't leave
18  right away, so I -- usually we got together
19  and say anybody going out, anybody wants to go
20  out, we are going to go out, the truck is
21  going to leave at let's say 2 o'clock.  So the
22  guys go out until 2 o'clock, have a drink, 2
23  o'clock they get in the truck and they drive
24  out with whoever is going out.
25     Q.  And who would drive the truck out

60  (Pages 234 to 237)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 238

Cherry

1  **Cherry**
2  **at 2 o'clock?**
3           MR. NOVIKOFF:  Objection.
4       A.   One of the officers.
5       **Q.   One of the officers that was on**
6  **duty or one of the officers that you were out**
7  **with?**
8       A.   It would depend on whether the
9  truck was going to come back in or not.  If
10  the guys were going off duty and were going to
11  leave the truck at the checkpoint by the
12  lighthouse in Fire Island, on the 4 to 8 tour,
13  the guys who were off duty would take the
14  truck out.  If the truck was going to come
15  back into the Village, then somebody who was
16  working would take the truck out.
17       **Q.   Was it part of the officers who**
18  **were on duty's responsibility to drive the**
19  **officers who had been off duty and out**
20  **drinking to the checkpoint?**
21           MR. NOVIKOFF:  Objection.
22       A.   It would be if the truck wasn't --
23  if the truck was supposed to come back into
24  the Village for it to take the people off for
25  a later tour, like a 5 o'clock tour, end of

Page 239

Cherry

1  the 5 o'clock tour.
2       **Q.   What was the tour after your 4 to**
3  **12 tour?**
4       A.   It was 4 to 12 on the Saturdays,
5  you had like a split tours.  You had 4 to 12,
6  some people stayed until 1.  Then you had the
7  like 9 at night to 5 in the morning tour.  So
8  there would be people -- there could be people
9  going out at 12 after the 1 o'clock or 1:30 or
10  so -- after the 1 o'clock, the end of the 1
11  o'clock tour you go out around 1:30.  Then
12  there was another tour, 9 to 5 tour go out at
13  5 o'clock.
14       **Q.   How many officers were on the 9 to**
15  **5 tour?**
16       A.   It would vary, I couldn't say for
17  sure.
18       **Q.   What would it vary between, what**
19  **was the lowest number?**
20           MR. NOVIKOFF:  Objection.
21       A.   I would say two would be the
22  lowest.
23       **Q.   What was the highest number?**
24       A.   Maybe four or five.

Page 240

Cherry

1       Cherry
2       **Q.   How long did it take to get from**
3  **the Village to the lighthouse?**
4       A.   I would say fifteen minutes.
5       **Q.   So a round trip is about a half**
6  **hour?**
7       A.   Roughly.
8       **Q.   Did you ever hear -- strike that.**
9       **Did any of the plaintiffs in this**
10  **case ever drive you to the checkpoint on a**
11  **night where you stayed after your tour to**
12  **drink in the bars?**
13       A.   I don't recall.
14       **Q.   Did you ever hear that the**
15  **plaintiffs complained about having to drive**
16  **officers to the checkpoint after they had**
17  **gotten off their tour and had been drinking in**
18  **the bars?**
19           MR. NOVIKOFF:  Objection.
20       A.   I never heard any complaints to
21  that effect.
22       **Q.   Prior to working in Ocean Beach**
23  **did you know any of the plaintiffs in this**
24  **case?**
25       A.   No.

Page 241

Cherry

1       Cherry
2       **Q.   Did you work while you were**
3  **employed as a police officer in Ocean Beach,**
4  **did you work with the plaintiffs in this case?**
5       A.   Yes.
6       **Q.   All five of them?**
7       A.   Yes.  At one time or another
8  during that course of the season I worked with
9  all five.
10       **Q.   Did any of the plaintiffs in this**
11  **case work that 4 to 12 tour with you, or is it**
12  **just part of that split tour that you**
13  **testified to?**
14       A.   It would be any of the tours.  I
15  worked 4 to 12, so I am sure that I worked
16  nights when they were working, you know, each
17  of the officers were working.
18       **Q.   Were you ever partnered with any**
19  **of the plaintiffs in this case?**
20       A.   I was partnered I think with Kevin
21  Lamm one night.  I don't know if Frank or
22  Tommy ever worked -- if we ever worked
23  together as partners.  Mostly worked alone
24  unless it was a Saturday night, and they team
25  up on Saturday night.

Page 242

```
 1              Cherry
 2      Q.   Did you have a specific officer
 3  who you would partner with more frequently
 4  than others?
 5          MR. NOVIKOFF:  Objection.
 6      A.   No.
 7      Q.   Do you believe that the plaintiffs
 8  in this case were good police officers?
 9          MR. NOVIKOFF:  Objection.
10      A.   It was not my duty -- I wouldn't
11  evaluate them as a fellow police officer to
12  say yes or no.
13      Q.   Well sitting here today how do you
14  evaluate their performance?
15          MR. NOVIKOFF:  Objection.
16      A.   As I said I wouldn't evaluate
17  them.  As a police officer we did our jobs.  I
18  did mine, they did their's.  I wouldn't be a
19  person who would rate them whether good, bad
20  or indifferent.
21      Q.   After 31 years as a Nassau County
22  Police Officer and one year as a police
23  officer in the Village of Ocean Beach you
24  couldn't rate their performance; is that your
25  testimony?
```

Page 243

```
 1              Cherry
 2          MR. NOVIKOFF:  Objection.  You can
 3      answer.
 4      A.   I just don't do that.  I wouldn't
 5  rate them on their job performance.  Not my
 6  responsibility and I wouldn't rate them.
 7      Q.   I am asking you, I know you
 8  wouldn't rate them, but I am asking you today
 9  as you sit here to rate them, do you believe
10  that they were good police officers?
11          MR. NOVIKOFF:  Objection.  Asked
12      and answered.  Foundation.  Go ahead, I
13      am not telling you not to answer.
14      A.   I don't know how to answer that
15  question.
16      Q.   Is there something that could help
17  you answer that question, should I rephrase
18  it.  I am not sure what you can't answer about
19  it?
20      A.   You are asking for my opinion,
21  personal opinion?
22      Q.   I am asking for your opinion as
23  someone who has 31 years of experience as a
24  decorated Nassau County Police Officer and
25  Detective, and someone who is employed in the
```

Page 244

```
 1              Cherry
 2  Village of Ocean Beach as a police officer
 3  whether you believe -- we can go individually.
 4          Frank Fiorillo, was he a good
 5  police officer?
 6          MR. NOVIKOFF:  Objection.  Asked
 7      and answered.  Foundation.  To the extent
 8      that you can answer, answer.
 9      A.   Was he a good police officer; in
10  what respect, I don't understand what respect
11  you are asking.
12      Q.   Performing the duties of a police
13  officer, you testified before to what they
14  were.  So in performing those duties do you
15  believe that Frank Fiorillo was a good police
16  officer?
17          MR. NOVIKOFF:  Objection.  Asked
18      and answered.  Foundation.  Go ahead,
19      sir.
20      A.   Frank answered -- from what I can
21  see -- you are talking when I was a police
22  officer or in general or over the course of
23  the years that I worked there?
24      Q.   Sitting here today what you have
25  seen of Frank Fiorillo as a police officer,
```

Page 245

```
 1              Cherry
 2  whether it was while you were a police
 3  officer, while you were a dispatcher, you were
 4  up in the police station as a dispatcher;
 5  correct?
 6      A.   Yes, that is correct.
 7      Q.   So based on that experience do you
 8  think that Frank Fiorillo was a good police
 9  officer?
10          MR. NOVIKOFF:  Just so I am clear
11      on the question, you are asking based on
12      his witnessing of Mr. Fiorilli's conduct
13      as a police officer, does he have an
14      opinion as to whether he is good or not?
15      Q.   Based on your witnessing it, based
16  on anything that you heard, based on your
17  opinion sitting here today.
18          MR. NOVIKOFF:  The way that
19      question is structured I object.  You can
20      answer.
21      A.   Frank answered his calls, he did
22  his job as far as responding to assignments.
23  His demeanor with the public was a little
24  rough I would say.  That's about it.
25      Q.   Other than from his demeanor with
```

Page 246

```
1              Cherry
2   the public being rough, was there anything
3   else that you believed that was not good about
4   Mr. Fiorilli's performance as a police
5   officer?
6          MR. NOVIKOFF: Objection.
7      A.  I would say no.
8      Q.   What did you mean by the demeanor
9   with the public was rough?
10     A.   He seems to be a little abrasive
11  with the public from what I can see.  He comes
12  on strong.
13     Q.   Are you aware of any complaints
14  made about Mr. Fiorilli by any member of the
15  public?
16     A.   Am I personally aware of any?
17     Q.   Whether personally or not
18  personally, I am not sure -- I am not asking
19  whether someone actually complained to you, I
20  am asking whether you are aware of any
21  complaints about Mr. Fiorilli when he was a
22  police officer at Ocean Beach?
23         MR. NOVIKOFF: Objection.  To the
24     extent that you have knowledge you can
25     answer.
```

Page 247

```
1              Cherry
2      A.   I am just not quite sure how to
3   answer that.  I think there were some
4   complaints that he was abrasive in the way he
5   came on to people when they were being stopped
6   by him for violations, Village ordinances,
7   like riding bikes and things like that.
8      Q.   Do you know of any specific
9   complaints that were raised about him?
10     A.   Not personally, no.
11     Q.   Do you know anybody who raised a
12  complaint about Mr. Fiorilli?
13     A.   No, not anybody by name who raised
14  a complaint.
15     Q.   When were these complaints raised?
16     A.   You know, I don't know specific
17  complaints that were made, just the feel I got
18  for Frank was that he was -- you asked me my
19  opinion, I gave you my opinion.  He was
20  somewhat abrasive or rough the way he handled
21  some of the people that he dealt with.
22     Q.   You heard that -- you testified
23  that there were some complaints?
24     A.   I heard there were complaints,
25  just what I said.  But I can't be specific on
```

Page 248

```
1              Cherry
2   who made the complaints or when or why.
3      Q.   How did you learn that there were
4   complaints that were made?
5      A.   You hear things, you see things
6   the way they happened.
7      Q.   Who did you hear it from?
8      A.   I don't recall.
9      Q.   Where did you see it?
10         MR. NOVIKOFF: Objection.
11         MR. CONNOLLY: Can we take a break
12     right now?
13         MR. GOODSTADT: Let me ask the
14     question.
15         MR. NOVIKOFF: Note my objection,
16     you can answer.
17     A.   What was the question?
18     Q.   Who did you see it from; let me
19  rephrase it.  What did you see?
20     A.   Sometimes when he confronted
21  people he would do it a lot more forcibly than
22  I would.  Just going by, you asked me for my
23  opinion and I am giving it to you.
24         MR. GOODSTADT: Let's take a
25     break.
```

Page 249

```
1              Cherry
2          THE VIDEOGRAPHER:  The time is
3   2:30.  We are going off the record.
4          (Recess taken.)
5          THE VIDEOGRAPHER:  The time is
6   2:48.  We are back on the record.
7      Q.   Before we broke Mr. Cherry you
8   testified that Mr. Fiorilli had done things
9   with a little more force than you would; is
10  that correct?
11         MR. NOVIKOFF: Objection.
12     A.   As far as coming on, being more
13  forceful with his demeanor with civilians
14  sometimes.
15     Q.   Were there any other officers in
16  Ocean Beach that had the same viewpoint about?
17     A.   I think Kevin Lamm would be the
18  same.
19     Q.   Anyone else?
20     A.   I can't think of anybody else.
21     Q.   Did you believe that George Hesse
22  came on more forcibly than you would to any
23  member of the public?
24         MR. NOVIKOFF: Objection.
25     Q.   In any dealings with the public?
```

63 (Pages 246 to 249)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 250

Cherry

1
2    A.   No.
3    Q.   Do you believe that Ed Carter was
4  a good police officer at Ocean Beach?
5        MR. NOVIKOFF:  Objection.
6    A.   I didn't work with Ed Carter very
7  much.  He usually worked midnights.  I really
8  can't form an opinion on Ed.
9    Q.   How many tours did you work with
10 Ed?
11   A.   I have no idea, it was not a lot
12 though.
13   Q.   You believe that -- strike that.
14       Do you have any -- do you know of
15 anything that would lead you to believe that
16 Ed Carter was not a good police officer?
17       MR. NOVIKOFF:  Objection.
18   A.   I have no direct knowledge on
19 that.
20   Q.   Did you ever hear anything from
21 anyone else that would lead you to believe
22 that Ed Carter was not a good police officer?
23       MR. NOVIKOFF:  Objection.
24   A.   No.
25   Q.   Do you believe that Kevin Lamm was

Page 251

Cherry

1
2  a good police officer?
3        MR. NOVIKOFF:  What was the
4  question?
5    Q.   Do you believe that Kevin Lamm was
6  a good police officer?
7        MR. NOVIKOFF:  Objection.
8  Foundation.  You can answer.
9    A.   As I think I mentioned just a
10 moment ago that Kevin Lamm did sometimes come
11 on more forcefully than a normal type of
12 individual -- you know, dealing with the
13 public.
14   Q.   Other than for coming on more
15 forcefully in his dealing with the public --
16   A.   I mean verbally more forcefully,
17 not physically forcefully.
18   Q.   Other than for coming on verbally
19 more forcefully with the public was there
20 anything else that would lead you to believe
21 that Kevin Lamm was not a good police officer?
22       MR. NOVIKOFF:  Objection.
23   A.   It seems that Kevin would bring
24 people into the station handcuffed for a minor
25 summons or violation, and when there was no

Page 252

Cherry

1
2  real -- if he had a problem in the street he
3  could have called for assistance to handle the
4  situation in the street, rather than putting a
5  person in handcuffs and bringing them to the
6  station for an alcohol violation for instance.
7    Q.   Is that separate and apart from
8  him coming on --
9    A.   Yes.
10   Q.   Anything else other than for those
11 two things that would lead you to believe that
12 Kevin Lamm was not a good police officer?
13   A.   No.
14   Q.   So to your understanding
15 everything else that Kevin Lamm did as a
16 police officer were good?
17       MR. NOVIKOFF:  Objection.
18   A.   What do you mean by good?
19   Q.   I mean was there anything that you
20 would in your experience as a police officer
21 with 31 years in Nassau County and at least
22 one season in the Village of Ocean Beach as a
23 police officer, and then working with police
24 officers as a dispatcher for the three seasons
25 after that or four seasons after that, is

Page 253

Cherry

1
2  there anything that you are aware of other
3  than from what you testified to in which you
4  believe that Kevin Lamm did not perform his
5  duties as a police officer in a -- other than
6  for a good manner?
7        MR. NOVIKOFF:  Objection.
8    A.   No, I don't think so.
9    Q.   Do you believe that Thomas Snyder
10 was a good police officer?
11       MR. NOVIKOFF:  Objection.
12 Foundation.  You can answer.
13   A.   Basically the same with Tom, I
14 didn't work many tours with Tom.  I couldn't
15 express an opinion about whether Tom was a
16 good police officer or not.  I didn't work
17 with him enough to form an opinion.
18   Q.   Are you aware of anything or any
19 incident that would lead you to believe that
20 Thomas Snyder was not a good police officer?
21   A.   No.
22       MR. NOVIKOFF:  Objection.
23   Q.   Do you believe that Joe Nofi was a
24 good police officer?
25       MR. NOVIKOFF:  Objection.

64 (Pages 250 to 253)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 254

Cherry

1
2     Foundation.
3         A.    In my opinion Joe needed some
4     guidance when he was working.  As a matter of
5     fact we used to -- he used to be assigned to
6     work with Frank to not help him out, but sort
7     of -- you know, partner up with him so if he
8     had any problem Frank could help him out with
9     it.
10        Q.    So did you understand that Frank
11    was assigned to help mentor Joe?
12        A.    To be with him, to assist Joe if
13    he had any problems.
14        Q.    What leads to believe that Joe
15    Nofi needed guidance?
16        A.    Just the way he performed his
17    duties, writing summonses and some of the
18    ways -- you know I saw as a dispatcher I get
19    all the summons and they were not written very
20    clearly.  You know, what happened.  Frank
21    would assist Joe with those.
22        Q.    Anything else other than the way
23    he wrote summonses that led you to believe
24    that he needed guidance?
25        A.    No.  I didn't work very many tours

Page 255

Cherry

1
2     with Joe, but enough to see that he needed
3     some guidance.
4         Q.    Did you ever tell Joe that his
5     summonses were not clear?
6             MR. NOVIKOFF:  Objection.
7         A.    Occasionally I couldn't read them.
8     I said Joe, I can't read this.  I would have
9     to put the contents of the summons into the
10    computer and I couldn't read them, or they
11    were broken sentences, what exactly do you
12    mean by this.
13        Q.    So it was not his penmanship you
14    are talking about, it was the actual words
15    that you didn't understand?
16        A.    Yes.  Both, it was both.
17        Q.    How many times did you tell him
18    that his summonses were not clear?
19        A.    A couple of times.
20        Q.    Were there any other officers at
21    Ocean Beach whose summonses were not clear?
22        A.    None that I can think of.
23        Q.    Other than for the fact that his
24    summonses at times were not clear was there
25    anything else that you are aware of that would

Page 256

Cherry

1
2     lead you to believe that Mr. Nofi was not a
3     good police officer?
4             MR. NOVIKOFF:  Objection.
5         A.    No.
6         Q.    I want to focus now on the
7     Halloween incident.
8         A.    Okay.
9         Q.    That you had testified to before.
10    That was the, just so we are clear, same page,
11    that was the alleged assault at Houser's Bar
12    on Halloween night of 2004?
13        A.    Okay.
14        Q.    Again just so we are clear, I
15    believe, correct me if I am wrong so we are
16    working on the same page, that it was the
17    night of October 30th into the morning of
18    October 31st; is that right?
19        A.    Yes.
20        Q.    How did you first learn that there
21    was an incident in Houser's?
22        A.    Sergeant Hesse called me at home
23    to tell me that Gary Bossetti had been fired
24    as a result of an incident that occurred at
25    Houser's Bar.

Page 257

Cherry

1
2         Q.    Did he tell you what the incident
3     was or did he say just say that there was an
4     incident?
5         A.    He said that it was alleged that
6     Gary had attacked a number of people with a
7     pool cue.
8         Q.    Did he tell you who that was
9     alleged by?
10        A.    He said the officers who responded
11    to the scene in their report.
12        Q.    What day was this?
13        A.    October 31st.
14        Q.    He called you --
15        A.    I am sorry, I believe he called me
16    on the 31st.  Let me correct that, it was
17    either the 31st or the 1st, I am not sure.
18        Q.    So he told you that the officers
19    who were at the scene had alleged that Gary
20    hit a number of people with a pool cue?
21        A.    Based on what they were told by
22    the people they interviewed.
23        Q.    So it was not the officers who
24    were making the allegation, it was the people
25    that they interviewed that were making the

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 258

Cherry

1       Cherry
2    allegation?
3       A.   Yes.
4       Q.   At that point in time did Hesse
5    tell you who the officers that were on duty
6    that night?
7       A.   I believe he did, yes.
8       Q.   Who was on duty that night?
9       A.   I believe it was Frank Fiorillo,
10   Thomas Snyder and Kevin Lamm.
11      Q.   What else did Officer Hesse tell
12   you during that night?
13      A.   He said the chief had fired Gary.
14      Q.   Did he tell you why the chief
15   fired him?
16      A.   Because of the incident.
17      Q.   Did he tell you what his thoughts
18   were on the chief's decision to fire Gary?
19      A.   Not at that time, no.  You are
20   talking about the original call?
21      Q.   Still now about the original call
22   on either the 31st or 1st?
23      A.   Right.
24      Q.   So he called you at your home?
25      A.   Yes.

Page 259

1       Cherry
2       Q.   Do you know what time of day it
3    was?
4       A.   I don't know.  I believe it was in
5    the morning, but I am not sure.
6       Q.   Was Officer Hesse at the station
7    when called you?
8       A.   I don't know.
9       Q.   You didn't ask him where he was?
10      A.   No.
11      Q.   Do you have caller ID at home?
12      A.   I do, but I don't recall what the
13   number -- what number it was that he was
14   calling from.
15      Q.   Did Hesse generally work morning
16   tours?
17      MR. NOVIKOFF:  Objection.
18      A.   No, not generally.
19      Q.   In 2004 he generally worked the
20   night tour, or the 4 to 12 tour?
21      A.   Yes.
22      Q.   So this call happened outside of
23   the 4 to 12 period?
24      A.   I believe so, yes.
25      Q.   What was your response when he

Page 260

1       Cherry
2    told you that Gary had been fired by the
3    chief?
4       A.   I was -- I said why, what
5    happened.  I said what happened.  Why did he
6    attack these people, that was my first
7    question.  And George said I don't know.  He
8    said these are the initial reports that we
9    got.  He said the chief had assigned him to
10   look into the matter.
11      Q.   He actually told you that the
12   chief assigned him to look into the matter?
13      A.   He said the chief said to look
14   into it and see what you can find what
15   happened.
16      Q.   Do you recall anything else that
17   was stated during that first call?
18      A.   Yes.  George asked me if I could
19   assist him.  I said to do what.  He said what
20   do you think we should do.  I said I think you
21   should go find some witnesses who were there
22   and find out what happened, take statements
23   from them.
24      Q.   Did he respond to that?
25      A.   Pardon me?

Page 261

1       Cherry
2       Q.   Did he respond to that suggestion?
3       A.   He said can you help me with this.
4    I said to do what.  He said can you help me
5    take the statements.  I said yes, okay, if you
6    want me to.
7       Q.   Did tell you that he would pay you
8    for that time?
9       MR. NOVIKOFF:  That George would
10   pay him or the Village --
11      Q.   That you would be paid for that
12   time?
13      A.   That didn't come up at that time.
14      Q.   This is after the season, right?
15      A.   Yes, that would be after the
16   season.
17      Q.   Had you worked any tours between
18   the end of '04 and this call from George
19   Hesse?
20      A.   No.
21      Q.   What else was discussed between
22   you and Mr. Hesse during that call?
23      A.   That was about it.  On the call
24   you are talking about.
25      Q.   Well, did you agree that you would

TSG Reporting - Worldwide      877-702-9580

Page 262

Cherry

1
2  help him and assist him?
3     A.   Yes, sort of reluctantly.  I was
4  finished for the season, I really didn't want
5  to go back to work, but since he asked me I
6  said I would help him.
7     Q.   Did you speak with the chief at
8  all about the Halloween incident?
9     A.   No.
10       MR. NOVIKOFF:  When you say
11  chief --
12       MR. GOODSTADT:  Paradiso.
13       MR. NOVIKOFF:  Okay.
14     A.   My cold is acting up.
15     Q.   So sitting here today have you
16  ever spoken with Chief Paradiso about the
17  Halloween incident?
18     A.   I don't believe I ever have.
19     Q.   Did you ever have any
20  correspondence with the chief, when I say
21  chief I mean Chief Paradiso about the
22  Halloween incident?
23     A.   Any correspondence --
24     Q.   Written or verbal, I just want to
25  make sure I am as broad as possible?

Page 263

Cherry

1
2     A.   Yeah, I don't think I had any
3  interaction with the chief concerning the
4  Halloween incident.
5     Q.   And you were not at Houser's the
6  night of the Halloween incident; correct?
7     A.   No, I was not.
8     Q.   Have you ever been at the Ocean
9  Beach Halloween party?
10     A.   No.
11     Q.   Are you aware of somebody
12  committing suicide at a Halloween party at
13  Ocean Beach, or after the Halloween party?
14       MR. NOVIKOFF:  Just again, I don't
15     mean to be interrupting.  Is he aware
16     that someone committed suicide, or is he
17     aware that someone told him that someone
18     committed suicide?
19       MR. GOODSTADT:  I don't care how
20     you are aware, whether you --
21       MR. NOVIKOFF:  Okay.
22     A.   I was not aware that anybody
23  committed suicide after a Halloween party.
24     Q.   Where were you the night of the
25  30th into the morning of the 31st?

Page 264

Cherry

1
2     A.   I was home, probably home to the
3  best of my recollection.
4     Q.   You were not at Ocean Beach at
5  all?
6     A.   No.
7     Q.   You didn't work any tours that day
8  or that night?
9     A.   No.
10     Q.   And at that point in time just so
11  I am clear you actually -- you had the title
12  of seasonal police officer, but you had not
13  been certified by Suffolk County; is that
14  correct?
15       MR. NOVIKOFF:  Objection.
16     A.   Yes, that is correct.
17     Q.   So again I think we went over this
18  before, but I just want to go over this time
19  line again.  So assuming that those
20  requirements that we went over before were in
21  effect as of that time, you were a civilian;
22  is that correct?
23       MR. NOVIKOFF:  Objection.
24     Q.   On that night?
25     A.   I didn't know that I was a

Page 265

Cherry

1
2  civilian at that point.  At some time shortly
3  after that I was aware that we had to take the
4  Suffolk County Civil Service required tests.
5  But at that point I was under the assumption
6  that I was a police officer.
7     Q.   I know what your assumption was,
8  but now I am asking that you have the
9  knowledge using my assumptions --
10     A.   On your assumptions that is
11  correct.
12       MR. NOVIKOFF:  Objection.
13     Q.   Where is Houser's actually located
14  in respect to the Police Department?
15     A.   It is on Bay Walk east of the
16  Police Department maybe about 150 yards, 200
17  yards away.  That is a rough estimate on my
18  part.
19     Q.   Had you ever been at Houser's
20  prior to the Halloween incident?
21     A.   No.
22     Q.   So you were never there on police
23  business or social reasons?
24     A.   No.
25     Q.   That means that you have never

67 (Pages 262 to 265)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 266

Cherry

1        Cherry
2    issued any summonses or tickets to Houser's?
3        A.   No.
4        Q.   Never issued any summonses or
5    tickets to the bartender at Houser's?
6        A.   No.  Excuse me, I don't know who
7    the bartender was.
8        Q.   I am talking about in connection
9    with their duties as a bartender?
10       A.   No.
11       Q.   You never issued any summons or
12   tickets or any patrons at Houser's in
13   connection with their patronizing Houser's?
14       A.   No.
15       Q.   How long did that initial phone
16   call last with Mr. Hesse that you testified to
17   on October 31st and November 1st?
18       A.   I would say maybe roughly three or
19   four or five minutes.
20       Q.   Did you take any notes of that
21   call?
22       A.   No.
23       Q.   Do you know whether he took any
24   notes of that call?
25       A.   Not that I am aware of.

Page 267

1        Cherry
2        Q.   When was the -- who was the next
3    person that you had any correspondence with
4    with respect to the Halloween incident after
5    that phone call?
6        A.   I believe on November 2nd I went
7    into the police station, I went to Ocean
8    Beach.
9        Q.   So between speaking with George
10   Hesse on that first call and going to the
11   police station on November 2nd did you speak
12   with anybody or have any correspondence with
13   anyone with respect to the Halloween incident?
14       A.   I don't believe so.
15       Q.   So there were no subsequent
16   discussions between you and Mr. Hesse prior to
17   going to the Ocean Beach Police Department on
18   the 2nd?
19       A.   No.
20       MR. NOVIKOFF:  Objection.
21       Q.   Did you tell him that you were
22   going to come in on the 2nd?
23       A.   Yes.  He said can you come in.  I
24   said I can't come in today.  I said I will
25   come in tomorrow, the 2nd.

Page 268

1        Cherry
2        Q.   Does that refresh your
3    recollection as to when the actual call
4    happened?
5        MR. NOVIKOFF:  Objection.  You can
6    answer.
7        A.   I went in on the 2nd, I am not
8    sure if the call was the day of the 31st or
9    the day of the 1st.  I am not sure what day it
10   was.
11       Q.   I believe you just testified that
12   you told Hesse that you could come in
13   tomorrow?
14       A.   I must have mis-spoke.
15       Q.   So you don't recall the time --
16       A.   I don't remember which day the
17   call came in, either the 31st or the 1st, one
18   of those two days, I am not sure which.  It
19   was four years ago, I don't remember.
20       Q.   Now I am actually a little bit
21   confused.  You are not sure on the day you
22   went in?
23       A.   No.  The day I went in was the
24   2nd.
25       Q.   Are you not sure that you told him

Page 269

1        Cherry
2    that you are coming in tomorrow?
3        A.   Correct.  I said I would come in
4    and I came in whatever day the 2nd was, that
5    was the day I went in.
6        Q.   So you told him you were going to
7    come in on the 2nd; did you guys have a plan
8    to meet there on the 2nd?
9        MR. NOVIKOFF:  Objection.
10       A.   I went in.  I don't recall exactly
11   what I said to him as far as when I was coming
12   in.  However I did go in -- but I was there on
13   November 2nd.
14       Q.   Did you bring anything with you?
15       A.   No.
16       Q.   When you went on the 2nd?
17       A.   No.
18       Q.   Were you in uniform?
19       A.   No.
20       Q.   Did you bring your shield?
21       A.   Yes.
22       Q.   Did you bring a weapon?
23       A.   My off duty weapon.
24       Q.   Was that a beach issued weapon?
25       A.   No.

68  (Pages 266 to 269)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 270

Cherry

1
2    Q.   Your own personal weapon?
3    A.   Yes.
4    Q.   When you went into the Ocean Beach
5 Police Department on November 2nd who was
6 there?
7    A.   Chief Paradiso was there and
8 Sergeant Hesse was there.
9    Q.   Did you have any communication
10 with Chief Paradiso that day?
11   A.   No.  Other than to say hello.
12   Q.   Other than Paradiso and Hesse was
13 anybody else there?
14   A.   Not to my recollection.
15   Q.   Was Paradiso, he was on duty at
16 that time?
17   A.   I don't believe so.
18   Q.   Was Hesse on duty at that time?
19   A.   Yes, he was.
20   Q.   What time on the 2nd did you go
21 in?
22   A.   I believe it was the morning, I
23 took a ferry over, but I couldn't tell you
24 what time exactly.
25   Q.   When you got there did you have a

Page 271

Cherry

1
2 conversation with Hesse?
3    A.   Yes.
4    Q.   How long did the initial
5 conversation last?
6    A.   Well, I was there for a couple of
7 hours.  So I had a conversation with Sergeant
8 Hesse, and he had a private conversation with
9 the chief, and then I believe the chief left,
10 he left and I -- George and I sat down and
11 talked about it.
12   Q.   What did you and George discuss in
13 the initial conversation prior to the private
14 conversation with the chief?
15   A.   He thanked me, he called.  He said
16 thanks for coming over, I can use some help on
17 this.  He had a conversation with the chief.
18 The chief left, and George and I discussed the
19 case.
20   Q.   Did you do anything to prepare for
21 your assistance that you would be providing
22 prior to going there on November 2nd?
23   A.   No.
24   Q.   Where did the conversation happen
25 with George Hesse that you had with him after

Page 272

Cherry

1
2 the private conversation you had with the
3 chief?
4    A.   We sat down.  George showed me the
5 reports.  I read the reports.  And he said
6 what should we do.  And as I said in the
7 telephone conversation, let's see if we can
8 find some witnesses who were there that night
9 who can give us some idea what happened.  That
10 way you have a foundation to go interview
11 other people.
12   Q.   What reports did he show you?
13   A.   He showed me the case report.  The
14 report prepared by I believe it was the
15 officers who were at the scene, and the
16 statements taken by them, and I believe there
17 were pictures that they had taken.
18   Q.   So you reviewed the pictures, the
19 field report?
20   A.   Right.
21   Q.   And the witness statements?
22   A.   That is correct.
23   Q.   Anything else that you reviewed?
24   A.   Whatever was there with the -- I
25 think that was it as far as what there was.

Page 273

Cherry

1
2 You know, what the reports that the officers
3 who were at the scene made.  Anything they had
4 in other words I looked at.
5    Q.   And prior to looking at the
6 reports what else did you and Mr. Hesse
7 discuss?
8    A.   As I said I suggested that we try
9 to find some witnesses who were there, and he
10 said he would try to find out who was there
11 that we could talk and interview them.  We
12 also had a memo sent by a Budd Jaegger
13 indicating that he had heard that Gary had
14 gotten fired, this was in the statement, and
15 that explained how Gary had came to the
16 defense of his wife who was attacked by a
17 person coming out of the lady's room, or
18 coming in the bathroom area of the Houser's
19 Bar.
20   Q.   Do you know whether Budd Jaegger
21 had a personal relationship with Hesse?
22   A.   I don't know what the relationship
23 was.  He was also the -- he ran the theater
24 over there at Ocean Beach.
25       MR. NOVIKOFF:  The what?

Page 274

Cherry

2    THE WITNESS:  The theater, the
3  movie theater.
4       A.   I don't know if they had a
5  relationship at that time.  I still don't know
6  what the relationship was at that time with
7  Budd Jaegger.
8       **Q.   You say you still don't know, is
9  that what you just said?**
10      A.   What the relationship was at that
11 time I don't know.  If I may, you have to
12 remember George was over there, the supervisor
13 of the policemen over there for fourteen years
14 and he knew a lot of people over there.  So I
15 guess he knew who Budd was.  I don't know if
16 there was any other relationship other than
17 that.
18      **Q.   Do you know what Officer Hesse's
19 relationship was with Jean Jaeger?**
20      A.   No.
21      **Q.   During your initial discussion
22 with George Hesse when you arrived there on
23 the 2nd, when I say initial discussion I am
24 talking about the discussion you had after the
25 private discussion with the chief, did you**

Page 275

Cherry

2  **guys discuss the goals of the investigation?**
3       MR. NOVIKOFF:  Objection.  You can
4  answer.
5       A.   The goals of the investigation;
6  finding out what happened.
7       **Q.   Did you discuss that?**
8       A.   Yes.
9       **Q.   Did you discuss as one of the
10 goals being trying to get Gary Bossetti's job
11 back?**
12      A.   No.  The object of the
13 investigation was to find out what happened.
14      **Q.   Officer Hesse didn't tell you that
15 one of his goals was to get Gary Bossetti's
16 job back?**
17      A.   No.
18      **Q.   When you decided amongst
19 yourselves that you would try to find
20 witnesses to take statements from, did you
21 prepare a list of witnesses?**
22      MR. NOVIKOFF:  Objection.
23      A.   No because I didn't know who was
24 witnesses at that time.  As it turned out
25 witnesses came forward.

Page 276

Cherry

2       **Q.   Well, you knew that Budd Jaegger
3  was a witness; correct?**
4       A.   Yes.
5       **Q.   So you knew at least one witness;
6  right?**
7       A.   Yes, at that point.
8       MR. NOVIKOFF:  Objection.
9       A.   Excuse me, he was not a witness to
10 what happened, he was relaying what his wife
11 had told him happened in his memo.
12      MR. NOVIKOFF:  That was the basis
13 for my objection to the question.
14      **Q.   Did you contact Budd Jaegger as
15 part of your investigation?**
16      A.   No, not Budd, I didn't contact
17 Budd.
18      **Q.   Do you know whether Mr. Hesse did?**
19      A.   I don't know for sure.  I don't
20 know if he had discussions with him or not
21 about the memo.
22      **Q.   The statement that you had from
23 Budd Jaegger, do you know whether that was
24 solicited or was it sent in on his own?**
25      A.   I believe it was sent in on his

Page 277

Cherry

2  own.
3       **Q.   At any point in the investigation
4  did you speak with any of the three officers
5  who were on duty that night?**
6       A.   No.
7       **Q.   At any point in the investigation
8  did you speak with Brian Van Koot?**
9       A.   No.
10      **Q.   Did you attempt to speak to Brian
11 Van Koot at any point during the
12 investigation?**
13      MR. NOVIKOFF:  Objection.
14      A.   No.
15      **Q.   Did you speak with Christopher
16 Schalik at any point during the investigation?**
17      A.   No.
18      **Q.   Did you attempt to speak with
19 Mr. Schalik at any point in time during the
20 investigation?**
21      A.   No.
22      **Q.   Did you speak with John Tesoro at
23 any point during your investigation?**
24      A.   No.
25      **Q.   Did you attempt to speak with**

70 (Pages 274 to 277)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 278

Cherry

1
2  Mr. Tesoro at any point during your
3  investigation?
4      A.   No.  If I may point out, you said
5  referring to my investigation, it was I was
6  assisting Sergeant Hesse in the investigation.
7      Q.   That is fair.  When I say your
8  investigation I am referring to the
9  investigation that was performed by you and
10  Mr. Hesse?
11      A.   Okay.
12      Q.   Do you know whether Mr. Hesse
13  spoke to Brian Van Koot as part of the
14  investigation?
15      A.   I don't know.
16      Q.   Do you know whether he attempted
17  to speak to Mr. Van Koot as part of the
18  investigation?
19      A.   I don't know.
20      Q.   Do you know whether Mr. Hesse
21  spoke with Chris Schalik as part of his
22  investigation?
23      A.   I don't know.
24      Q.   Do you know whether he attempt to
25  do speak with Mr. Schalik as part of the

Page 279

Cherry

1
2  investigation?
3      A.   I don't know.
4      Q.   Do you know whether Mr. Hesse
5  spoke to John Tesoro as part of the
6  investigation?
7      A.   I don't know.
8      Q.   Do you know whether he attempted
9  to speak to Mr. Tesoro as part of the
10  investigation?
11      A.   I don't know.
12      Q.   At that point in time you knew
13  that the three of them were witnesses; is that
14  correct?
15      A.   Yes.
16      Q.   Why wouldn't you speak with them?
17      A.   They were -- they had -- we had
18  their statements from the -- the officers took
19  statements from them.  My part of the
20  investigation was to find out what happened as
21  far as -- they never spoke to the officer they
22  went to assist.  We were trying to find out
23  what happened -- why did Gary if he assaulted
24  these people, what was -- if Gary had
25  assaulted these people, why he had assaulted

Page 280

Cherry

1
2  these people.
3          We were trying to get some
4  background information as to what happened
5  prior to the assault to see if there was any
6  reason why Gary would assault somebody.
7      Q.   I think you testified before that
8  these statements were incomplete; is that
9  correct?
10      A.   That is correct.
11      Q.   So why wouldn't you speak to the
12  three people who you know were witnesses about
13  what happened before the assault to complete
14  their statements?
15      A.   It was clear from the statements
16  that they took that they were accusing Gary
17  Bossetti of assaulting them.  We were trying
18  to find out by interviewing independent
19  witnesses what transpired to cause that
20  assault, if in fact an assault had taken
21  place.  We were trying to get some background
22  information by interviewing witnesses to see
23  if there was any reason why Gary would assault
24  somebody.
25      Q.   Don't you think it would be

Page 281

Cherry

1
2  important also for you to speak to the alleged
3  victims of the assault?
4          MR. NOVIKOFF:  Objection.  You can
5      answer.
6      A.   Not at that point.
7      Q.   At any point do you think it would
8  have been important for you to speak or for
9  Mr. Hesse to speak to the victims of the
10  assault as part of the investigation?
11          MR. NOVIKOFF:  Objection.  Only as
12      to Mr. Hesse.  Foundation.  You can
13      answer.
14      A.   It depends what transpired.  You
15  are talking about the point where we have not
16  interviewed anybody yet.  Maybe at a point --
17      Q.   I am talking about at any point
18  during the investigation that was undertaken
19  in connection with the Halloween incident,
20  don't you think it would have been important
21  for you to speak to, or Mr. Hesse to speak
22  with the alleged victims of the alleged
23  assault?
24          MR. NOVIKOFF:  Objection.
25      A.   Possibly.

Page 282

Cherry

1
2      **Q.   What do you mean by possibly?**
3      A.   It may or may not be, it depends
4   on the circumstances that happened prior to
5   them being assaulted.
6      **Q.   So you testified before that there
7   was nothing in these statements that addressed
8   what happened prior to the assaults; correct?**
9      MR. NOVIKOFF:  Objection.
10     A.   That is correct.
11     MR. NOVIKOFF:  Mr. Cherry, you got
12   to let Mr. Goodstadt ask the questions
13   and you got to give me a couple of
14   seconds to object and then you answer,
15   or else the court reporter is going to
16   shoot himself in the head.
17     (Record read.)
18     **Q.   And you were trying to figure out
19   what happened leading up to the assaults;
20   correct?**
21     A.   Correct.
22     **Q.   So don't you think it would be
23   important to speak to the alleged victims of
24   an assault to get their side of the story
25   about what happened leading to the assault?**

Page 283

Cherry

1
2      MR. NOVIKOFF:  Objection.  You can
3   answer.
4      A.   Well, the officers that responded
5   should have gotten that.
6      **Q.   But they didn't; correct?**
7      A.   Correct.
8      **Q.   So you were --**
9      MR. NOVIKOFF:  Objection to that.
10   You can answer the question.
11     A.   What was the question?
12     **Q.   But they didn't; correct?**
13     A.   Correct.
14     MR. NOVIKOFF:  Objection.
15     **Q.   You were brought in to assist in
16   an investigation of the incident?**
17     A.   Correct.
18     **Q.   Don't you think as part of your
19   investigation that you should have gotten that
20   information that you testified made the report
21   incomplete?**
22     MR. NOVIKOFF:  Objection.
23     A.   It would depend on what
24   information you elicited from other witnesses.
25   Depending on what happened, what the situation

Page 284

Cherry

1
2   was and what happened prior to them being
3   assaulted.  I will give you one -- it may or
4   may not have been important to speak to them.
5   If you develop enough evidence that they
6   committed a crime it may not be necessary to
7   speak to them.
8      **Q.   So you would rely on other
9   people's statements without speaking to the
10  alleged victims to have a complete picture of
11  what happened that night?**
12     A.   Yes.
13     **Q.   It is your testimony; right?**
14     A.   I am not saying that they should
15   not be interviewed, I am saying that we
16   didn't.  It may not be necessary depending on
17   what evidence came forward.
18     **Q.   Sitting here today knowing what
19   evidence came forward don't you think it was
20   important that you should have spoken with the
21   alleged victims?**
22     MR. NOVIKOFF:  Objection.
23     A.   No.
24     MR. NOVIKOFF:  You got to give me
25   a chance to object.

Page 285

Cherry

1
2      **Q.   Why not?**
3      A.   Because the person was convicted
4   of a crime.  He took a plea and he was
5   convicted.
6      **Q.   When was the person convicted?**
7      A.   He pled guilty in court.
8      **Q.   When?**
9      A.   Mr. Van Koot.
10     **Q.   When?**
11     A.   I don't know the exact date.
12     **Q.   Is it your testimony that if
13  you --**
14     MR. NOVIKOFF:  You asked him given
15   what you know now.  He answered the
16   question because he now knows that they
17   were convicted.  Another question you
18   could ask Andrew may be more appropriate,
19   but he did answer your question.
20     **Q.   So at any point prior to them
21  being convicted did you think it would be
22  important to speak to the alleged victims of
23  an assault?**
24     MR. NOVIKOFF:  Objection.  Asked
25   and answered.  But you can answer.

72 (Pages 282 to 285)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 286

Cherry

1    A.   It may not be, no.
2    Q.   So prior to December 12th, the
3  date that they took the plea, you don't
4  believe that it would have been important to
5  speak to the alleged victims of an assault --
6  of the assault during your investigation of
7  what happened during that assault?
8        MR. NOVIKOFF:  Objection.  Answer.
9    A.   The investigation showed that it
10 was not an assault, they were not assaulted.
11 That Gary acted in defense of a third person
12 and acted in self defense as far as our
13 investigation showed.  Therefore it wouldn't
14 be necessary to talk to them.
15   Q.   You say as far as our
16 investigation showed?
17   A.   Yes.
18   Q.   That is based on statements made
19 by people other than the victims; is that
20 correct?
21   A.   That is correct.
22   Q.   So you never got, other than from
23 reading the incomplete statements, you never
24 got the victims' side of the story?

Page 287

Cherry

1        MR. NOVIKOFF:  Objection to the
2  characterization.  You can answer.
3    A.   It turned out they were not
4  victims.
5    Q.   Now, would you mark this as Cherry
6  Exhibit 9, report.
7        (Cherry Exhibit 9, report, marked
8        for identification, as of this date.)
9    Q.   I placed in front of Mr. Cherry
10 what has been marked as Cherry Exhibit 9, a
11 one-page document bearing Bates number 3183.
12       Mr. Cherry, do you recognize the
13 document that has been marked as 3183?
14   A.   This is a statement --
15       MR. NOVIKOFF:  The question is do
16 you recognize it?
17   A.   Yes, I recognize it.
18   Q.   What is it?
19   A.   Pardon me.
20   Q.   What is that document?
21   A.   A statement taken by Frank
22 Fiorillo from Brian Van Koot.
23   Q.   Was this one of the statements
24 that is -- that was part of the documentation

Page 288

Cherry

1  that you had on the morning of November 2nd?
2    A.   Yes.
3    Q.   And is this one of the statements
4  that you characterized as incomplete?
5    A.   Yes.
6    Q.   What is incomplete about the
7  statement?
8    A.   It doesn't say what they were
9  doing prior to him being hit in the face, or
10 if there was any reason to be hit in the face,
11 what was it.  What was the -- my throat is
12 getting dry.
13       MR. NOVIKOFF:  Here is some water.
14   Q.   So sitting here today you don't
15 know what Mr. Van Koot's position is with
16 respect to what caused it; is that correct?
17   A.   Today I know.
18   Q.   You do know?
19   A.   Yes.
20   Q.   How do you know that?
21   A.   From the statements taken from the
22 other witnesses.
23   Q.   How do you know that, what Mr. Van
24 Koot's position was based on the statements

Page 289

Cherry

1  taken from other witnesses?
2    A.   What his position was, because
3  Jeannie Jaegger said that Mr. Van Koot was --
4  Mr. Van Koot had grabbed her throat and put
5  her up against the wall in the lady's room at
6  the Houser's Bar.
7    Q.   I am not talking about what his
8  physical position was in the bar, I am talking
9  about what his story is, what led up to the
10 assault?
11   A.   I mis-understood the question.
12 Could you repeat the question.
13   Q.   Sitting here today you don't know
14 what Mr. Van Koot's position is or story was
15 as to what led to the assault; correct?
16   A.   Other than what I learned from the
17 statements taken from Jeannie Jaegger and
18 Elyse Myller.
19   Q.   Explain to me how you know what
20 Mr. Van Koot's story is, or his position is
21 based on statements by other people?
22   A.   It appears that from the
23 statements that he was in the lady's room with
24 a female.  The people outside wanted to use

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 290

Cherry

1   the bathroom, and it appears that he got upset
2   because they were knocking on the door to go
3   in, and he came out of the bathroom and
4   grabbed Jeannie Jaegger by the throat and
5   pushed her up against the wall because he was
6   being interrupted from whatever he was doing
7   in the lady's room.
8       Q.   I understand that that is a
9   **conclusion that you reached based on Jeannie**
10  **Jaegger and Elyse Myller's statement.**
11      A.   Right.
12      Q.   **My question to you is you don't**
13  **know what Mr. Van Koot's story would be as to**
14  **what led up to the assault; correct?**
15      A.   Based on this?
16      Q.   **Based on anything?**
17      A.   I don't know what -- this is
18  evidence, the statements gave us some idea of
19  what transpired.
20      Q.   **I understand that you reached a**
21  **conclusion.**
22      A.   Right, based on the statements.
23          MR. NOVIKOFF:  Hold on, let him
24      ask the question, say what he wants to

Page 291

Cherry

1   say.
2       Q.   **I understand that it is your**
3   **position that you reached a conclusion of what**
4   **transpired based on witness statements.  My**
5   **question to you is not what conclusions you**
6   **reached, my question to you is sitting here**
7   **today you don't know what Mr. Van Koot's**
8   **explanation of the incidents that led to the**
9   **assault were; is that correct?**
10          MR. NOVIKOFF:  Objection.  Asked
11      and answered.  You can answer.
12          MR. GOODSTADT:  It was answered,
13      but the question wasn't answered.
14      A.   I don't understand the question as
15  far as --
16      Q.   **Let me give you a hypothetical.**
17      A.   -- as far as Mr. Van Koot's
18  reason --
19      Q.   **For example you don't know if**
20  **Mr. Van Koot agrees with the fact that**
21  **somebody knocked on the bathroom door, he was**
22  **interrupted and came out and straggled Jeannie**
23  **Jaegger; correct?**
24      A.   When he pled guilty he allocuted

Page 292

Cherry

1   to what he did.
2       Q.   **That he knocked on the door and**
3   **straggled Jeannie Jaegger?**
4          **(Record read.)**
5      A.   I believe, I don't have the
6   allocution in front of me, I don't know if you
7   have, but he admitted to grabbing her by the
8   throat and throwing her up against the wall.
9       Q.   **Were you there when he allocuted?**
10      A.   No.
11      Q.   **Do you know whether he was telling**
12  **that story as part of an allocution to accept**
13  **a plea, or is that what he actually believed**
14  **happened?**
15          MR. NOVIKOFF:  Objection.
16      A.   He testified under oath, so I
17  assume that is what happened.
18      Q.   **Just as you are testifying under**
19  **oath today; is that correct?**
20      A.   Yes, sir.
21      Q.   **Prior to him allocuting you didn't**
22  **know what his explanation of the events**
23  **leading up to the assault were; is that**
24  **correct?**

Page 293

Cherry

1       A.   That is correct.
2       Q.   **And you made no effort to find**
3   **out?**
4      A.   No.
5       Q.   **Correct?**
6      A.   Right.
7          MR. GOODSTADT:  Would you mark
8   this document as Cherry Exhibit 10,
9   report.
10          (Cherry Exhibit 10, report, marked
11      for identification, as of this date.)
12      Q.   **Now I placed in front of**
13  **Mr. Cherry what is marked as Cherry Exhibit**
14  **10, it is a one-page document exhibit Bates**
15  **number 3185.**
16          **Mr. Cherry, do you recognize the**
17  **document that has been marked as Cherry**
18  **Exhibit 10?**
19      A.   This is a statement taken by Kevin
20  Lamm from Christopher Schalik.
21      Q.   **Was this one of the documents that**
22  **were part of the packet of documentation that**
23  **you received the morning of the November 2nd**
24  **when you arrived at the police station?**

Page 294

Cherry

1
2    A.    That I looked at, yes.
3    Q.    Did you ever discuss with George
4    Hesse whether you should speak with the
5    alleged victims?
6    A.    I didn't.
7    Q.    Never had any discussions with him
8    whether you guys should as part of the
9    investigation speak with the alleged victims?
10   A.    My part of the investigation was
11   to locate witnesses who eventually came
12   forward and interview them. Once those
13   statements were taken, the last one being
14   November 7th, that was the end of my
15   involvement in the case.
16         So we had no discussions about
17   whether to speak to the three -- the original
18   complainants or not.
19   Q.    Would you mark this document as
20   Cherry Exhibit 11, report.
21         (Cherry Exhibit 11, report, marked
22   for identification, as of this date.)
23   Q.    I placed in front of Mr. Cherry
24   what has now been marked as Cherry Exhibit 11,
25   a one-page document bearing Bates number 3186.

Page 295

Cherry

1
2    Mr. Cherry, do you recognize this
3    document?
4    A.    Yes, this is a statement taken by
5    Thomas Snyder from John A. Tesoro.
6    Q.    You see that Mr. Tesoro alleges
7    that an unknown male grabbed a pool cue and
8    looked at him and then hit him in the head at
9    least twice and also in his right elbow. Do
10   you see that?
11   A.    Where is this; this is in the body
12   of the statement?
13   Q.    In the body of the statement?
14         MR. NOVIKOFF: What line?
15   Q.    It starts on the end of the third
16   line.
17         MR. NOVIKOFF: Got it, okay.
18   A.    Okay, I see that.
19   Q.    Was that the first time that you
20   learned -- reading these statements is that
21   the first time that you learned that there was
22   an allegation that someone had been hit by a
23   pool cue?
24   A.    Yes.
25   Q.    So during your conversations with

Page 296

Cherry

1
2    Hesse on the 31st or 1st he never mentioned
3    that there was an allegation that someone had
4    been hit with a pool cue?
5         MR. NOVIKOFF: Objection.
6    A.    Yes, I think he told me that. I
7    think I may have testified to that, that
8    someone accused Gary Bossetti of assaulting
9    someone with a pool cue.
10   Q.    So reading this documentation was
11   not the first time that you learned that there
12   was an allegation that someone was hit with a
13   pool cue?
14   A.    Right.
15   Q.    Look back at Cherry Exhibit 10, if
16   you look at the end of the fifth line in the
17   body of the statement it says that he picked
18   up a pool stick and hit me with the pool stick
19   on my left arm causing the pool stick to
20   break. Do you see that?
21   A.    Yes, I do.
22   Q.    Would you mark as Cherry Exhibit
23   12, incident report.
24         (Cherry Exhibit 12, incident
25   report, marked for identification, as of

Page 297

Cherry

1
2    this date.)
3    Q.    I now place in front of Mr. Cherry
4    what has been marked as Cherry Exhibit 12,
5    one-page exhibit Bates number 3184.
6         Mr. Cherry, do you recognize this
7    document that has been marked as Cherry
8    Exhibit 12?
9    A.    Yes, I do.
10   Q.    What is this document?
11   A.    It is a field report prepared by
12   Thomas Snyder and reference to the incident
13   that happened in Houser's Bar.
14   Q.    Was this part of the documentation
15   that was given to you the morning of November
16   2nd when you arrived at the police station?
17   A.    Yes.
18   Q.    Again this references that a pool
19   cue was used to hit two of the alleged
20   victims?
21         MR. NOVIKOFF: Objection. You can
22   answer.
23   A.    Yes.
24   Q.    And in the documentation that has
25   now been marked as Cherry 9, 10, 11 and 12, do

75 (Pages 294 to 297)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 298

```
 1              Cherry
 2  you see anywhere where it says that Gary
 3  Bossetti assaulted somebody with a pool cue?
 4      A.   No.
 5      Q.   So based on your reading of the
 6  statements that had come in that you got that
 7  morning, that is not where you learned that
 8  Gary Bossetti was alleged to have been the one
 9  to have been using the pool cue, that was some
10  other source?
11          MR. NOVIKOFF:  Objection.
12      A.   George told me that Gary had been
13  fired for assaulting the people with the pool
14  cue.
15      Q.   You learned that Gary Bossetti was
16  the person that was being charged, or who was
17  alleged to have hit somebody with a pool cue
18  through Hesse, not through the documentation;
19  is that correct?
20          MR. NOVIKOFF:  Objection.
21      A.   Yes.
22          MR. GOODSTADT:  Would you mark
23      this document as Cherry Exhibit 13,
24      photocopy of a photograph.
25          (Cherry Exhibit 13, photocopy of a
```

Page 299

```
 1              Cherry
 2  photograph, marked for identification, as
 3  of this date.)
 4      Q.   I place in front of Mr. Cherry
 5  what is marked as Cherry Exhibit 13, a
 6  three-page document bearing Bates numbers
 7  consecutively paginated 3187 to 3189.
 8          Mr. Cherry, do you recognize these
 9  documents that were marked as Exhibit 13?
10      A.   Yes.
11      Q.   What are these documents?
12      A.   I believe these are pictures of
13  Mr. Van Koot that were taken by the officers
14  the night of the incident.
15      Q.   Was this part of the documentation
16  that you received on November 2nd?
17      A.   Yes.
18          MR. NOVIKOFF:  Hold on one second,
19      I apologize.  We have been doing this for
20      about two hours now, did I miss the
21      changing of the tape to go to tape 4?
22          THE VIDEOGRAPHER:  The last break
23      we changed.
24          MR. NOVIKOFF:  Thanks.
25          (Record read.)
```

Page 300

```
 1              Cherry
 2      Q.   Let me ask you, how did the
 3  documents that have been marked in Cherry 9
 4  through Cherry 13, how did those documents or
 5  what role did those documents if any play in
 6  your investigation?
 7      A.   The documents you just showed me,
 8  they put the -- to be developed -- defendants
 9  at the scene of the crime saying they were
10  assaulted and I think one of them indicates
11  that the person that was being assaulted, I
12  have to read these over, said that the person
13  who assaulted them said that he was a police
14  officer or a policeman, I don't remember the
15  exact verbiage.
16      Q.   I think he is reviewing something
17  right now.
18      A.   Yes.  The male hitting me with the
19  pool cue said he was a cop.  That is from the
20  statement of Exhibit 11.
21      Q.   As part of your investigation did
22  you --
23      A.   Can I read the other two?
24      Q.   Go ahead and read it.
25      A.   Again the statement of Chris
```

Page 301

```
 1              Cherry
 2  Schalik, Exhibit number 10, also indicates
 3  that the person who was hitting him saying he
 4  was a cop approximately ten times.
 5      Q.   I believe the question is what
 6  role in your investigation did those
 7  statements play?
 8          MR. NOVIKOFF:  Are you done with
 9      the question?
10          MR. GOODSTADT:  That is the
11      question.
12          MR. NOVIKOFF:  Objection, you may
13      answer.
14      A.   What role the statements helped us
15  with this investigation; is that correct?
16      Q.   Yes.
17      A.   It indicated that the person who
18  allegedly assaulted the three people, two of
19  the statements as indicated alleged that the
20  person said he was a cop.  In the
21  investigation Gary never, you know, he
22  identified himself as a police officer to
23  these people.
24          It was my understanding reviewing
25  these statements that Gary -- what I
```

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 302

Cherry

1  determined from these statements that we took
2  from the other witnesses that Gary went to aid
3  Jeannie Jaegger, got into an alteration with
4  Van Koot. Van Koot's friends seeing the
5  altercation intervened instead of breaking up
6  the fight, they assaulted Gary Bossetti.
7          That was the outcome of my take on
8  the investigation, or what was showed me.
9      Q.   Did you discredit anything in
10 those witness statements that have been marked
11 as 9, 10 and 11?
12         MR. NOVIKOFF:  You can answer the
13 question.  If you need to read the
14 statements.
15         MR. GOODSTADT:  He just read them.
16 But he can read them again.
17     A.   No, they say they were assaulted.
18 The investigation in my opinion showed that
19 Gary Bossetti was defending himself against a
20 three person assault.
21     Q.   Did you believe that Gary Bossetti
22 choked Brian Van Koot?
23         MR. NOVIKOFF:  Objection.  You can
24 answer.
25

Page 303

Cherry

1      A.   I don't know.  I know he was
2  defending himself against an assault.  I don't
3  know what action he took to ward off the
4  assault, whether that is true or not.
5      Q.   So you didn't have an opinion as
6  part of your investigation one way or the
7  other as to whether Gary Bossetti choked Brian
8  Van Koot?
9      A.   In defending himself he may have,
10 I don't know.  I don't know.
11     Q.   Is there a level of force in your
12 mind that is acceptable for a police officer
13 to defend himself?
14         MR. NOVIKOFF:  Objection.  You can
15 answer.
16     A.   Yes.
17     Q.   Is there a level of force in your
18 mind that is unacceptable for a police officer
19 to defend himself?
20     A.   Yes.
21         MR. NOVIKOFF:  Objection.
22     Q.   Do you believe that Mr. Bossetti,
23 Gary Bossetti, hit John Tesoro with a pool cue
24 in the hit?
25

Page 304

Cherry

1      A.   I don't know.
2      Q.   So you didn't reach a conclusion
3  one way or the other?
4      A.   No.  In the part of the
5  investigation that I had I didn't interview
6  Officer Bossetti, I don't know what actions he
7  took to defend himself.
8      Q.   Did you speak to Officer Bossetti
9  at all as part of the investigation?
10     A.   I didn't, no.
11     Q.   Did you speak to his brother
12 Richard Bossetti at al as part of the
13 investigation?
14     A.   No.
15     Q.   Just so I am clear here, so you
16 didn't speak to any of the parties who were
17 actually involved in the alleged assault,
18 meaning that were part of the fight?
19     A.   That is correct.
20     Q.   And did you believe that
21 Christopher Schalik had been hit in the arm
22 with a pool cue that caused the pool cue to
23 break?
24     A.   I don't know.
25

Page 305

Cherry

1         MR. NOVIKOFF:  Objection.
2      A.   Same answer that I gave before, I
3  don't know.
4      Q.   So you didn't reach a conclusion
5  one way or the other?
6         MR. NOVIKOFF:  Objection.
7      A.   I don't know what actions Officer
8  Bossetti took to defend himself.
9      Q.   Did you ever speak with anybody
10 from Ocean Beach Rescue about the Halloween
11 incident?
12     A.   No.
13     Q.   Did you ever speak to Joe Loeffler
14 about the Halloween incident?
15     A.   No.  During the investigation
16 timeframe?
17     Q.   At any point in time?
18     A.   Other than when the suit came up,
19 they said there is an allegation that the --
20 we were covering up a brutality case to the
21 Halloween incident.  I said I couldn't
22 understand what -- what they could possibly
23 say that we covered up.
24     Q.   Did Joe Loeffler tell you that he

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 306

Cherry

1
2  was there the night of Halloween?
3        MR. NOVIKOFF:  Objection.
4        A.  I don't recall.
5        Q.   As you sit here today you don't
6  know that Joseph Loeffler actually drove the
7  ambulance on the night of the Halloween
8  incident?
9        MR. NOVIKOFF:  Objection.
10       A.   He told me or somebody told me
11 that he drove the ambulance.  I am not sure
12 who or when I was told that.  It was probably
13 sometime after the initial investigation.
14       Q.   So as part of the investigation
15 you didn't know that Joseph Loeffler drove the
16 ambulance?
17       MR. NOVIKOFF:  Objection.
18       A.   No.
19       Q.   Did you ever hear that Joe
20 Loeffler that night said that he believed what
21 happened to Mr. Van Koot to be an assault
22 second?
23       MR. NOVIKOFF:  Objection.
24       A.   I know -- I recall somebody saying
25 that, but I don't know when I learned that.

Page 307

Cherry

1
2        Q.   Do you recall who said it?
3        A.   No.
4        Q.   Do you recall when you learned it?
5        A.   No.
6        Q.   During your investigation were you
7  aware that one of the alleged victims, meaning
8  Schalik, Tesoro or Van Koot, pointed to
9  Richard Bossetti in the bar and said the
10 person who assaulted us looked like him?
11       MR. NOVIKOFF:  Objection.
12       A.   I may have read that in one of the
13 officers statements after the investigation,
14 but not prior to that.
15       Q.   And not during your investigation?
16       A.   No.
17       Q.   Who did you interview as part of
18 the investigation?
19       A.   I spoke to Jeannie Jaegger over
20 the telephone I believe on November 2nd, and I
21 interviewed her at her home on November 7th I
22 believe.  I interviewed Elyse Myller on the
23 phone.
24       Q.   What date was that?
25       A.   That was on November 2nd also to

Page 308

Cherry

1
2  the best of my recollection.  I took a
3  statement from Sean O'Rourke, I am not quite
4  sure on the date, I don't know if it was
5  November -- I am not sure of the date on Sean
6  O'Rourke.  I also interviewed Ian Levine, or
7  took statements from him.
8        Q.   Do you know what date that was?
9        A.   I am not quite sure of the date.
10 I believe it was sometime between the 2nd and
11 7th.
12       Q.   And other than for taking those
13 statements or receiving those statements and
14 making those phone calls what else did you do
15 on November 2nd in connection with your
16 investigation?
17       A.   I am not sure if I -- I may have
18 taken a statement from one of the -- either
19 the -- either Ian Levine or Sean O'Rourke on
20 that date, but I am not sure which one.
21       Q.   Did you do anything else as part
22 of the investigation on that day.
23       A.   I checked all three of the Van
24 Koot -- all three of the people involved for
25 warrants and prior records, and I think I made

Page 309

Cherry

1
2  a note on that.  I think one had a failure to
3  appear on an alcohol violation or something
4  like that, or an open alcohol violation.
5  Other than that there was no priors, no
6  arrests.
7        Q.   Why did you do that check?
8        A.   Just a routine to see who I was
9  dealing with.  Routine matter.
10       Q.   Did you do a check on priors for
11 the witnesses whose statements you were
12 taking?
13       A.   No.
14       Q.   So is it routine to take a
15 background check or a check of priors for
16 complainants?
17       A.   Well, I just checked to see if
18 they had any criminal background.  For
19 complainants, not normally no.
20       Q.   So why did you do it for the three
21 of them?
22       A.   I wanted to see what their
23 background was.
24       Q.   Why?
25       A.   That is what I do usually before I

TSG Reporting - Worldwide      877-702-9580

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 310

Cherry

1  interview a witness. Sometimes I will check
2  the background to see what -- if I don't know
3  them or if I don't have any dealings with them
4  before just to see what their backgrounds are.
5      Q.   Sir, you just testified that you
6  didn't interview the three of them?
7      A.   I didn't.
8          MR. NOVIKOFF: Objection.
9      Q.   What do you mean you do a
10 background check of a witness before you
11 interview them?
12     A.   I did a background check on them
13 to see what their priors were because I was
14 curious, I wanted to see if they had any
15 priors.
16     Q.   So now you are saying because you
17 were curious and --
18         MR. NOVIKOFF: Objection. You can
19 answer.
20     Q.   Now you are saying because you
21 were curious and you objected.
22         MR. NOVIKOFF: I apologize.
23     Q.   You told him he could answer it.
24         Before you said that you checked

Page 311

Cherry

1  the background, and I asked why. You said you
2  usually check the background of a witness
3  before you interview them; is that correct?
4      A.   I said that, yes.
5      Q.   Then I said you didn't interview
6  these guys?
7      A.   Right.
8      Q.   Correct?
9      A.   Correct.
10         MR. NOVIKOFF: Objection.
11     Q.   So why did you check their
12 backgrounds?
13     A.   I wanted to see if they had any
14 prior incidents.
15     Q.   The question is why?
16         MR. NOVIKOFF: Objection.
17     A.   I just did.
18     Q.   Did you check Sean O'Rourke's
19 background?
20     A.   No.
21     Q.   Did you check Jeannie Jaeger's
22 background?
23     A.   No.
24     Q.   Did you check Budd Jaegger's

Page 312

Cherry

1  background?
2      A.   No.
3      Q.   Did you check Elyse Myller's
4  background?
5      A.   No.
6      Q.   Why not?
7      A.   I just wanted to see the people we
8  were dealing with, the three other people who
9  were in the fight, had any priors. That is
10 just something that I did.
11     Q.   Did you check Richard Bossetti's
12 background?
13     A.   No. He is a police officer, why
14 would I check his background?
15     Q.   Was he a certified police officer
16 at the time?
17         MR. NOVIKOFF: Objection.
18     A.   I didn't check his background.
19     Q.   Did anyone tell you to check their
20 background or you did it on your own?
21     A.   My own.
22     Q.   How did you go about checking
23 their background?
24     A.   I am not sure now, I called the

Page 313

Cherry

1  Sheriff or the Suffolk County Records Bureau,
2  I am not sure which, and asked for a
3  background check for priors and warrants.
4      Q.   When you called over there did you
5  hold yourself out to be a police officer?
6      A.   Yes.
7      Q.   So myself who is not a police
8  officer can't just call up and get a
9  background check; is that correct?
10     A.   That is correct.
11         MR. GOODSTADT: Would you mark
12 this handwritten note, Cherry Exhibit 14,
13 handwritten note.
14         (Cherry Exhibit 14, handwritten
15 note, marked for identification, as of
16 this date.)
17     Q.   I placed in front of Mr. Cherry
18 what is now marked as Cherry Exhibit 14, a
19 one-page document exhibit with the Bates
20 number 3179.
21     A.   Yes.
22     Q.   Mr. Cherry, do you recognize this
23 document?
24     A.   Yes, sir.

Page 314

Cherry

1
2     Q.   What is this document?
3     A.   This is notes I took on the
4  warrant checks, prior checks for the three
5  subjects in this case.
6     Q.   Did you take these as you were on
7  the phone with the sheriff or whoever you
8  spoke with?
9     A.   Yes.  Suffolk County.
10    Q.   Did you do any background checks
11 of anybody else as part of your investigation
12 aside from these three people?
13    A.   No.
14    Q.   Were you aware that Sean O'Rourke
15 had been arrested for cocaine possession in
16 Ocean Beach?
17    A.   Yes, I was.
18    Q.   Are you aware whether he had ever
19 been arrested prior to that time?
20    A.   No.
21    Q.   Were you aware whether there were
22 any outstanding warrants?
23    A.   No.
24    Q.   I believe you also testified that
25 there was a statement in the documentation

Page 315

Cherry

1
2  that you received the morning of the 2nd from
3  Elyse Myller; is that right?
4     A.   That is correct.
5     Q.   Is that a handwritten statement or
6  was it typed?
7     A.   I believe it was a handwritten
8  statement.
9     Q.   When these documents were given to
10 you were they in some kind of a file, what
11 form were they given to you?
12    A.   In a file folder like that.
13    Q.   In a manila folder like this?
14    A.   Yes.
15       MR. GOODSTADT:  Would you mark
16    this as Cherry Exhibit 15, handwritten
17    document.
18       (Cherry Exhibit 15, handwritten
19    document, marked for identification, as
20    of this date.)
21    Q.   Mr. Cherry, do you know why -- do
22 you know how Mr. Hesse had possession of a
23 statement prior to the time that you got there
24 on the 2nd?
25    A.   No.

Page 316

Cherry

1
2     Q.   Do you know whether Ms. Myller
3  came forward on her own to provide a
4  statement?
5     A.   I am not sure.  I am not sure.
6     Q.   So you don't know whether somebody
7  requested that from her or whether she did it
8  on her own?
9     A.   I don't know.
10    Q.   Do you know whether George Hesse
11 had any relationship with Elyse Myller?
12    A.   Not to my knowledge.
13    Q.   Never heard that he had any sexual
14 relationship with her?
15    A.   No.
16    Q.   Do you know who Mitch Burns is?
17    A.   No.  I don't know -- last name?
18    Q.   Burns?
19    A.   No.
20    Q.   Never heard of Mitchell Burns?
21    A.   No.
22    Q.   I am going to ask you some
23 questions about it, you can read it if you
24 want?
25       MR. NOVIKOFF:  You need him to

Page 317

Cherry

1
2  read it?
3        MR. GOODSTADT:  Yes, I have a
4     bunch of questions.
5        MR. NOVIKOFF:  Why don't you just
6     say if you recognize this document.  If
7     you need to read it to recognize it, then
8     read it.
9     A.   I recognize it.
10    Q.   What is this document that has
11 been marked as Cherry Exhibit 15, it is --
12       MR. NOVIKOFF:  3169 through 3175.
13    A.   You want me to read the whole
14 thing?
15    Q.   Just for the record what is it?
16    A.   It is a statement addressed to
17 George from Elyse Myller dated November 1,
18 2004.
19    Q.   This is the handwritten statement
20 that you testified was part of the package of
21 information that you received on the 2nd?
22    A.   Yes.
23    Q.   Was this the only --
24       MR. NOVIKOFF:  The record reflects
25    that on the first page it says November

80  (Pages 314 to 317)

Page 318

Cherry

1 | 1, 2004.  On the last page it appears to
2 | be notarized by someone with a November
3 | 2nd date.  So go on.
4 | **Q.   Other than for the statements from**
5 | **the alleged victims of the assault, were there**
6 | **any statements in the file when you got there**
7 | **other than for Ms. Miller's statement?**
8 | A.   There was the memo from Jeannie
9 | Jaegger --
10 | **Q.   From Budd Jaegger?**
11 | A.   From Budd Jaegger, and I believe
12 | there was a fax copy of a statement from
13 | Jeannie Jaegger.
14 | **Q.   Why don't you take a couple of**
15 | **minutes to read this?**
16 | A.   Okay.
17 | MR. GOODSTADT:  Go off the record.
18 | THE VIDEOGRAPHER:  The time is 4
19 | o'clock.  We are going off the record.
20 | (Recess taken.)
21 | THE VIDEOGRAPHER:  The time is
22 | 4:30.  We are back on the record.
23 | **Q.   I don't know if I asked this**
24 | **already, but I will ask it again.  Do you**

Page 319

Cherry

1 | **recognize the document that has been marked as**
2 | **Cherry Exhibit 15?**
3 | A.   Yes, I do.
4 | **Q.   This was the statement that was**
5 | **provided by Elyse Myller that was in the**
6 | **package of documents that you received on**
7 | **November 2nd; is that correct?**
8 | A.   Yes.
9 | **Q.   If you look at the first sentence,**
10 | **or the salutation is George, do you know who**
11 | **that is referring to?**
12 | A.   I believe it is George Hesse.
13 | **Q.   First sentence says:  As per your**
14 | **request I am writing to recap the events as I**
15 | **remember them.**
16 | **Do you see that?**
17 | A.   Yes.
18 | **Q.   Do you know whether George**
19 | **actually requested that Elyse Myller provide a**
20 | **statement?**
21 | A.   Do I know that for a fact, no, I
22 | don't know.
23 | **Q.   So you don't know what she is**
24 | **referring to when she says per your request?**

Page 320

Cherry

1 | A.   No.
2 | **Q.   Did you ever discuss with George**
3 | **the fact that he may have requested Ms. Myller**
4 | **to put together a statement and provide it to**
5 | **him?**
6 | A.   No.
7 | **Q.   Do you know whether Ms. Myller was**
8 | **drinking that night?**
9 | A.   I do not know.
10 | **Q.   Never asked her?**
11 | A.   No.
12 | **Q.   Do you think that is important to**
13 | **know whether somebody who is giving a witness**
14 | **statement may have been intoxicated at the**
15 | **time of the events that they are giving a**
16 | **statement about?**
17 | MR. NOVIKOFF:  Objection.
18 | A.   It might be important.
19 | **Q.   What do you mean?**
20 | A.   It might be important depending on
21 | what kind of statement she gave.  It seems to
22 | be fairly complete.  I don't know if she was
23 | drinking or not.
24 | **Q.   So your -- you draw the line as to**

Page 321

Cherry

1 | **whether it is important if a person was**
2 | **drinking or not as to whether the statement is**
3 | **complete?**
4 | MR. NOVIKOFF:  Objection.
5 | A.   It would depend on how much she
6 | was drinking or whether she was intoxicated
7 | or -- a person who has a couple of drinks may
8 | be able to give a statement that is adequate
9 | for the investigation.  I don't know what her
10 | situation was that night.
11 | **Q.   You didn't attempt to find out;**
12 | **correct?**
13 | A.   Correct.
14 | **Q.   How come?**
15 | A.   I didn't speak to her originally.
16 | **Q.   Well, you spoke to her on November**
17 | **2nd?**
18 | A.   Yes.
19 | **Q.   How come you didn't ask her then,**
20 | **were you drinking Ms. Miller?**
21 | A.   It just didn't come to mind.
22 | **Q.   It didn't come to mind that**
23 | **somebody who was attending a Halloween party**
24 | **may have been drinking?**

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 322

Cherry

1
2     MR. NOVIKOFF:  Objection.
3     A.   Its a possibility, yes.
4     Q.   Was it something that you just
5  didn't deem to be relevant or just something
6  that didn't come to mind?
7     MR. NOVIKOFF:  Objection.
8     A.   It didn't come to mind.
9     Q.   Sitting here today do you think it
10  is relevant as to whether Ms. Myller was
11  drinking that night?
12     MR. NOVIKOFF:  Objection.
13     A.   Possibly.
14     Q.   What do you mean by possibly?
15     A.   It may be relevant, it may not be
16  relevant.
17     Q.   If she was intoxicated would that
18  be relevant?
19     MR. NOVIKOFF:  Objection.
20     A.   It may be.
21     Q.   Would that affect the weight that
22  you would put on her statement?
23     MR. NOVIKOFF:  Objection.
24     A.   Possibly.
25     Q.   Do you know how this statement was

Page 323

Cherry

1
2  delivered to Mr. Hesse?
3     A.   No.
4     Q.   Do you know when it was delivered
5  to Mr. Hesse?
6     A.   No.
7     Q.   Again your lawyer has already
8  pointed this out, but if you could turn to the
9  last page it appears to be notarized on
10  November 2, 2004, do you see that?
11     A.   Yes, I do.
12     Q.   So you don't know if this was
13  provided before or after the date it was
14  notarized?
15     A.   Yes, I do.  I spoke to Elyse
16  Myller, I believe there is another copy
17  without the notary stamp on it.  I asked her
18  if she had the original of the statement that
19  she wrote to George Hesse, and she said she
20  did.  I asked her to have it notarized and
21  send us the original.
22     Q.   So the copy that you had in front
23  of you at the time wasn't notarized?
24     A.   Yes.
25     Q.   Is it your testimony, sir, that

Page 324

Cherry

1
2  somebody notarized her signature at some point
3  after she signed?
4     MR. NOVIKOFF:  Objection.  I don't
5  know if that is his testimony.
6     A.   That wasn't my testimony.  I said
7  go to a notary, do what you have to do to be
8  valid, and notarize it and send it to us.  I
9  don't know what the notary would do to
10  validate her signature.
11     Q.   Was the version that you had that
12  didn't have the notary, did it have her
13  signature on it?
14     A.   Yes.
15     Q.   Do you know --
16     A.   To the best of my recollection.
17     Q.   Do you know what happened to that
18  copy that was not notarized?
19     A.   I don't know.
20 RQ     MR. GOODSTADT:  I would like to
21     mark the record here, to the extent it
22     has not been produced, again I represent
23     I have not seen it, we ask for
24     production of the original version that
25     was in the possession of Mr. Hesse and

Page 325

Cherry

1
2  Mr. Cherry.
3     MR. NOVIKOFF:  Like I said that
4     would seem to be a document that if we
5     have it, the Village has it it should
6     have been produced, and just remind me
7     after the deposition by letter and we
8     will try to ascertain it.
9     Q.   Prior to November 1, 2004 did you
10  know who Elyse Myller was?
11     A.   No.
12     Q.   Never met her before?
13     A.   Not to my knowledge.
14     Q.   Have you ever met her
15  face-to-face?
16     A.   Since then?
17     Q.   Yes.
18     A.   Yes.
19     Q.   So now that you have met her do
20  you have an opinion as to whether you knew her
21  before November 1st, or you knew who she was
22  before November 1st?
23     A.   I don't believe so.
24     Q.   When did you meet her
25  face-to-face?

82  (Pages 322 to 325)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 326

Cherry

1
2    A.   She is a -- she rents out there,
3  she rents a house out there, and I was
4  introduced to her I guess a year -- this is
5  2005, and I see her out there occasionally and
6  walking around, biking around.
7    Q.   Who were you introduced by?
8    A.   I don't know if it was George who
9  introduced me to her.
10    Q.   So it may have been George Hesse
11  who introduced her?
12    A.   It may have been somebody else, I
13  don't remember who introduced us.
14    Q.   If you look at her statement on
15  page 1, if you look down five lines up from
16  the bottom, it says I believe at this point,
17  you see that?
18    A.   Yes.
19    Q.   It says:  I believe at this point
20  others were now waiting behind us and a line
21  was now forming.
22        Do you see that?
23    A.   Yes.
24    Q.   Do you know who was standing
25  behind them?

Page 327

Cherry

1
2    A.   No.
3    Q.   Did you make any effort to find
4  out who was on that line that Jeannie Jaegger
5  allegedly was choked?
6    A.   No.
7    Q.   How come?
8    A.   I just didn't.
9    Q.   You think that was important,
10  maybe there would be other witnesses who saw
11  the alleged choking?
12        MR. NOVIKOFF:  Objection.
13    A.   It depends on what they saw, I
14  guess possibly.
15    Q.   But you didn't make an effort to
16  find out what they saw; is that correct?
17    A.   No.
18    Q.   Not correct or is correct?
19    A.   That is correct.  I wasn't at the
20  scene that night either.
21    Q.   If you look at the page 2,
22  thirteen lines down.
23    A.   Okay.
24    Q.   It says at that point, do you see
25  the sentence that starts at that point?

Page 328

Cherry

1
2    A.   Yes.
3        MR. NOVIKOFF:  Where are you --
4    yes, I see it.
5    Q.   At that point the guy in the
6  orange jump suit reached for Jean's throat.
7  He was going to choke her.  Do you see that?
8    A.   Yes, sir.
9    Q.   Did you ask Elyse Myller whether
10  the guy in the orange jump suit was going to
11  choke her, or whether he actually choked her?
12    A.   I believe further on in the
13  statement it says that the assault -- I think
14  it is on the page -- the answer is yes, he
15  said he had her by the throat up against the
16  wall.  I believe it says it somewhere --
17        MR. NOVIKOFF:  Note my objection
18    to the question.
19    A.   Page 6, the sentence above the
20  last paragraph:  Gary no doubtedly prevented
21  an attack on Jean, one that was already in
22  progress and very real.
23    Q.   How do you know that she was
24  referring to the choking when she says one
25  that was already in progress?

Page 329

Cherry

1
2        MR. NOVIKOFF:  Note my objection.
3    You can answer.
4    A.   Gary no doubtedly prevented an
5  attack on Jean, one that was already in
6  progress and very real.
7    Q.   How do you know that that refers
8  to a choking?
9    A.   This one says going to choke her,
10  reached for Jean's throat and he was going to
11  choke her.  I am sure I asked her, I can't
12  recall whether I -- whether I -- if I asked
13  her -- I can't recall asking, but I am sure I
14  said did he attempt to choke her or did he
15  choke her.
16        MR. NOVIKOFF:  I am just going to
17    note for the record that I am not going
18    to read page 2, but I think you read in
19    an incomplete part of the statement,
20    counselor, on page 2, but I am not going
21    to read into it, into the record anything
22    else.
23        MR. GOODSTADT:  I am not sure what
24    you are referring to, but it speaks for
25    itself.  The document speaks for itself.

83 (Pages 326 to 329)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 330

Cherry

1
2     MR. NOVIKOFF:  Right, that is why
3  I didn't feel a need to read into it.  It
4  does speaks for itself.
5     Q.   What makes you so sure that you
6  asked her was he choking her or was he about
7  to choke her?
8     A.   Because I think that would be an
9  important fact, whether he has his hand around
10  her neck or not.
11     Q.   Do you assume asking that or do
12  you recall asking that?
13     MR. NOVIKOFF:  Objection.
14     A.   I don't recall, but that would be
15  a key element to whether it was an assault or
16  an harassment, depending on how much physical
17  injury was sustained by the person who is
18  being choked or grabbed by the throat.  I
19  think I would have asked that.  I don't recall
20  asking that, but there is no doubt that I
21  would.
22     Q.   Did you take any notes of that
23  phone conversation?
24     A.   No, I did not.
25     Q.   Let me understand this.  You

Page 331

Cherry

1
2  called up the witness to this allege assault,
3  how long did you speak to her for?
4     MR. NOVIKOFF:  The assault we are
5  talking about is the assault on that
6  woman?
7     Q.   On the Halloween incident.
8     MR. NOVIKOFF:  Okay.
9     Q.   You spoke to a witness with
10  respect to the Halloween incident; is that
11  correct?
12     A.   Yes.
13     Q.   You called her; is that correct?
14     A.   Yes.
15     Q.   How long did you speak to her for?
16     A.   I would say ten minutes, fifteen
17  minutes maybe.
18     Q.   Did any of the substance of what
19  she told you on that telephone call play any
20  role into your investigation?
21     A.   Yes.
22     Q.   You didn't take any notes?
23     A.   No, I was going over the
24  statement.
25     Q.   But you were asking her questions

Page 332

Cherry

1
2  that were not clear on her statement; correct?
3     MR. NOVIKOFF:  Objection.
4     A.   To the best of my recollection,
5  you know, I assume I asked her questions, we
6  were going over it.  I just wasn't reading it
7  to her and saying what happened.  I was trying
8  to elicit some more information.  I don't have
9  any notes, I don't remember what she said, it
10  was four years ago.  But I would certainly say
11  did he reach for her, or did he actually have
12  his hands around her neck.
13     Q.   But you don't recall actually
14  asking that?
15     A.   No.
16     Q.   You don't recall her telling you
17  the answer to that question?
18     A.   No, I don't recall.
19     Q.   Why didn't you take any notes?
20     A.   I didn't think it was necessary.
21  I mean she is available to clarify her own
22  statement if it goes to trial.
23     Q.   That is fair if that is what you
24  are going to go with?
25     A.   It is a statement --

Page 333

Cherry

1
2     MR. NOVIKOFF:  There is no
3  question, just a gratuitous comment by
4  counsel trying to elicit a response.
5     Q.   If you look at the bottom of page
6  3?
7     A.   Okay.
8     MR. NOVIKOFF:  Start by now?
9     Q.   Yes:  By now several people were
10  involved, though oddly no on duty cops had
11  arrived.
12     Do you see that?
13     A.   Yes.
14     Q.   It says:  Richie was there and had
15  his wallet open, he was showing his badge.
16     Do you see that?
17     A.   Yes.
18     Q.   Did you try to verify whether
19  Richie came over to where the fight was and
20  show his badge?
21     A.   With Elyse?
22     Q.   Yes.
23     A.   I don't recall.
24     Q.   Did you try to verify that with
25  anybody?

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 334

Cherry

1
2     A.   I didn't, no.
3     Q.   So you did nothing to verify
4  whether that was true?
5          MR. NOVIKOFF:  Objection.
6     A.   No, I didn't interview Richie.
7     Q.   I didn't ask you that.
8          Did you do anything to verify that
9  that was true?
10         MR. NOVIKOFF:  Objection.
11    A.   I didn't, no.
12    Q.   Now, if you look on page 4, it
13  says on line -- five lines down, it says:
14  There were as I said a lot of people involved
15  by now, and my recollection of the events are
16  sketchy.
17         Do you see that?
18    A.   Yes, I do.
19    Q.   That raise any issues with you
20  that she is saying that her recollection of
21  the events are sketchy?
22    A.   No.  I mean it is part of her
23  statement.  Again if she was going to testify
24  that would be put up, somebody might ask her
25  about that, what she meant by sketchy.

Page 335

Cherry

1
2     Q.   Did you ask her what she meant by
3  sketchy?
4     A.   No.
5     Q.   Did the fact that she admitted
6  that her recollection was sketchy have any
7  weight in the conclusions that you reached?
8          MR. NOVIKOFF:  Objection.
9     A.   No.
10    Q.   Did you credit her statement in
11  the conclusions that you reached?
12         MR. NOVIKOFF:  Objection.
13    Q.   Did you credit her statement in
14  the conclusions that you reached?
15    A.   Did I credit her statement?
16    Q.   Yes.
17    A.   It was part of it, yes.
18    Q.   So you believed that her statement
19  was credible?
20    A.   Yes.
21    Q.   Now, if you look at paragraph 3 on
22  page 4?
23    A.   Okay.
24    Q.   You see where it says:  By now
25  everything was pretty calm, the party/fun was

Page 336

Cherry

1
2  obviously over.
3          The next sentence says:  The on
4  duty officers were busy talking to people and
5  collecting information both inside and
6  outside.
7          Do you see that?
8     A.   Yes.
9     Q.   Do you know whether that statement
10  that the officers on duty were busy collecting
11  information both inside and outside
12  contradicts any other witness statements in
13  the case?
14    A.   That is her opinion of what was
15  going on, I don't know if it contradicts what
16  other people said.  They had their view of the
17  version of the incident and she had hers.  She
18  doesn't know what they were talking to them
19  about.
20    Q.   I understand that, but the fact
21  that she is swearing under oath that the
22  officers, the on duty officers were busy
23  talking to people and collecting information
24  both inside and outside.
25    A.   Okay.

Page 337

Cherry

1
2          MR. NOVIKOFF:  Objection.
3     Q.   My question is whether that
4  contradicted any other witness statements that
5  you took or read in this matter?
6          MR. NOVIKOFF:  Objection.
7  Specifically to the characterization of
8  swearing under oath.
9          MR. GOODSTADT:  Well, it is
10  notarized, isn't it?
11         MR. NOVIKOFF:  I don't know what
12  that means.  All that means to my
13  knowledge is that the notary verified
14  that the person who signed it was the
15  person whose signature is on the
16  document.  That is my objection.
17    A.   As I said this was her statement.
18  Other people's statements were their
19  statements of what they saw and observed.
20  Some may contradict each other, some may not.
21    Q.   Did you review the statements to
22  see any contradictions, to determine if there
23  were any contradictions?
24    A.   Not specifically to look for
25  contradictions, no.

Page 338

Cherry

1
2     Q.   If you look at the page 5, the
3  middle paragraph it says:  Richie went to the
4  police station several times from what I
5  understand.
6          Do you see that?
7     A.   Yes.
8     Q.   Did you do anything to verify
9  whether Richie Bossetti went to the police
10 stations several times that night?
11         MR. NOVIKOFF:  Objection.
12    A.   I didn't.  I didn't personally,
13 no.
14    Q.   Do you know whether anyone did?
15    A.   I don't know.
16    Q.   Do you know where Gary Bossetti
17 stayed that night?
18    A.   According to this statement he
19 stayed at Jean's house, or a house that they
20 had permission to use.
21    Q.   Do you know how he got off the
22 island?
23    A.   How he got off the island?
24         MR. NOVIKOFF:  The question is do
25    you know how he got off the island?

Page 339

Cherry

1
2     A.   Do I know, no.
3     Q.   Did you ever make any inquiry as
4  to how he got off the island?
5     A.   I didn't, no.
6     Q.   So you testified that you called
7  her on the 2nd; is that correct?
8     A.   Yes.
9     Q.   That conversation lasted between
10 ten and fifteen minutes?
11    A.   Approximately.
12    Q.   Other than what you testified to
13 thus far what did she tell you during that
14 conversation?
15         MR. NOVIKOFF:  Objection.
16    A.   We basically went over the
17 statement, a copy of the statement that we
18 had, and as I said the end of the conversation
19 I asked her to have it notarized and send us
20 the original.  That was the extent of the
21 conversation as far as I recall.
22    Q.   And did you follow up with her at
23 any time after that?
24    A.   I didn't, no.
25    Q.   Anything that she told you during

Page 340

Cherry

1
2  the conversation contradict her written
3  statement?
4     A.   No.
5     Q.   She mention anything about a pool
6  cue being involved?
7     A.   I don't believe so.
8     Q.   Did you ask her?
9     A.   No.
10    Q.   Was there a pool cue involved?
11    A.   No.
12    Q.   Did that seem strange to you --
13         MR. NOVIKOFF:  He wasn't finished
14    with the answer.  He was starting to
15    answer.  So --
16    A.   I forgot what I was going to say.
17 Give me the question again.
18    Q.   Did she mention anything about a
19 pool cue being involved.  You said no, and I
20 started to say did that seem strange to you,
21 and your counsel wanted you to finish what you
22 were going to say after no.
23         MR. NOVIKOFF:  Were you going to
24    say anything?
25    A.   No.

Page 341

Cherry

1
2     Q.   Did it seem strange to you that an
3  eyewitness to an event wrote a seven-page
4  statement, talked to you for fifteen minutes,
5  doesn't mention anything about a pool cue
6  being involved?
7         MR. NOVIKOFF:  Objection.
8     A.   No.
9     Q.   Why not?
10    A.   I took her statement as it was
11 written.  This was the initial part of the
12 investigation.  You know, there was going to
13 be further investigation, not by me, but by
14 Sergeant Hesse.  So I -- we just were trying
15 to get the statements together, who saw what
16 she saw, and put those together to see what
17 happened.  I assumed there would be follow up
18 by someone else.
19    Q.   Why did you assume there would be
20 follow up by someone else?
21    A.   Well, these were the initial
22 statements that came in.  Now you have to talk
23 to the officers or some of the officers
24 involved and try to elicit what happened.
25    Q.   You didn't ask her -- finish.

86 (Pages 338 to 341)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 342

Cherry

1
2     A.   I didn't ask her about the pool
3  cue.
4     Q.   You didn't think it was --
5     A.   At that point no --
6        MR. NOVIKOFF:  Woe.  I know you
7  probably know what counsel is going to
8  ask, but let him ask the question.
9     Q.   You didn't think that it somehow
10  damaged her credibility that she didn't
11  mention anything about a pool cue being
12  involved?
13     A.   At that point, no.
14     Q.   At that point you knew that there
15  was a pool cue allegedly involved; is that
16  correct?
17     A.   Yes.
18     Q.   Do you know what her relationship
19  with the Bossetti's was at that time?
20     A.   No.
21     Q.   Did you ask her?
22     A.   No.
23     Q.   Why not?
24        MR. NOVIKOFF:  Objection.  Go
25  ahead.

Page 343

Cherry

1
2     A.   At that point in the initial part
3  of the investigation she was a witness to the
4  attack in the bathroom area.  I didn't think
5  to ask her what her relationship was with
6  Gary.
7     Q.   So as part of your investigation
8  you are not looking to see whether alleged
9  eyewitnesses may have a bias?
10     A.   As I said it was the initial part
11  of the investigation putting together
12  witnesses who were there at the scene.  If any
13  questions had to be asked further on that
14  would have been done by a person doing the
15  investigation.  I was there to get the
16  original, find out what transpired that night.
17     Q.   So let me get this straight.  You
18  were not doing the investigation?
19     A.   No.
20     Q.   You were assisting in the
21  investigation?
22     A.   I was assisting in the
23  investigation to ascertain what witnesses saw
24  what.
25     Q.   Right.  As part of that you didn't

Page 344

Cherry

1
2  ascertain what biases a potential witness
3  might have?
4        MR. NOVIKOFF:  Objection.  Asked
5  and answered.
6     A.   No.
7     Q.   In fact she writes in here that
8  she went to the same house as Gary Bossetti
9  that night; is that correct?
10     A.   That is correct.
11     Q.   That she was in touch with Richard
12  Bossetti; is that correct?
13     A.   Correct.
14     Q.   And that didn't play a role in
15  your determination of whether her statement
16  was credible?
17        MR. NOVIKOFF:  Objection.  You can
18  answer.
19     A.   No.
20     Q.   If you look at page 6, the first
21  paragraph counting up from the bottom six
22  lines up from the bottom?
23     A.   Okay.
24     Q.   It says:  Before the chief left I
25  told him for 100 percent certainty that there

Page 345

Cherry

1
2  was no gray area about whether or not Gary's
3  actions were justified.
4     Do you see that?
5     A.   Yes, I do.
6     Q.   Do you know whether she is
7  qualified to make a judgment as to whether
8  somebody's actions in connection with an
9  assault are justified?
10        MR. NOVIKOFF:  Objection.
11     A.   I don't know if she is qualified
12  or not.  She saw what she saw.
13     Q.   Did you ask her why she believed
14  the actions were justified 100 percent?
15     A.   No, I didn't ask her that.
16     Q.   And in fact you don't know if she
17  even saw Gary hit somebody with a pool cue; is
18  that correct?
19     A.   That is correct.
20     Q.   Do you know whether as part of the
21  investigation anybody else spoke to Ms.
22  Myller?
23     A.   I don't know.
24     Q.   She indicated in her statement
25  that the chief came to that house; is that

87  (Pages 342 to 345)

Page 346

Cherry

1
2  correct, in the morning?
3      A.   Yes.
4      Q.   Did you ever speak to the chief
5  about what she told him?
6      A.   No.
7      Q.   How come?
8      A.   I didn't have the opportunity to.
9      Q.   The chief wasn't around that week?
10     A.   He wasn't around and as I said I
11 didn't talk to him at all about this
12 investigation.
13     Q.   Do you have the chief's phone
14 number?
15     A.   I didn't have it at the time, I
16 probably could have gotten it if I wanted to
17 talk to him, but I wasn't conducting the
18 investigation after this initial statement.
19     Q.   You also testified that there was
20 a statement in the file from Budd Jaegger; is
21 that correct?
22     A.   Correct, or was a memo to the
23 chief.
24         MR. GOODSTADT:  Would you mark
25     this as Cherry Exhibit 16, memo dated

Page 347

Cherry

1
2  November 1, 2004.
3          (Cherry Exhibit 16, memo dated
4      November 1, 2004, marked for
5      identification, as of this date.)
6      Q.   I placed in front of Mr. Cherry
7  what has now been marked as Cherry Exhibit 16,
8  a one-page document Bates number 3180.
9          Mr. Cherry, have you ever seen the
10 document that is marked as Cherry Exhibit 16?
11     A.   Yes.
12     Q.   And what is this document?
13     A.   It is a memo from Steven Jaegger
14 to Edward Paradiso dated November 1, 2004, and
15 the subject was the Halloween party fight.
16     Q.   Is this the memorandum that you
17 testified to that was part of the documents
18 that were given to you on November 2nd?
19     A.   Yes.
20     Q.   Do you know how this document was
21 forwarded to Chief Paradiso and/or anyone in
22 the Ocean Beach Police Department?
23     A.   No, I don't.
24     Q.   Did you speak with George Hesse
25 about who Budd Jaegger was at any point during

Page 348

Cherry

1
2  the investigation?
3      A.   With Chief Hesse?
4      Q.   Yes.
5      A.   Budd Jaegger was -- Steven Jaegger
6  was the name on the memo, was the husband of
7  Jeannie Jaegger.
8      Q.   Did you know what relationship Mr.
9  Hesse had with Budd Jaegger?
10     A.   No.
11     Q.   If you look down on the first
12 paragraph, five lines up from the -- four
13 lines up from the first paragraph?
14     A.   Four lines up from the bottom?
15     Q.   Yes, where it says:  Ocean Beach
16 Police Officer Gary Bossetti saw the situation
17 and immediately took action.  He subdued this
18 drunken individual.
19         Do you see that?
20     A.   Yes, I do.
21     Q.   Now, again Budd Jaegger doesn't
22 mention anything about a pool cue either;
23 correct?
24     A.   No.
25         MR. NOVIKOFF:  Objection.

Page 349

Cherry

1
2      Q.   Do you know whether Budd Jaegger
3  actually saw the incident?
4      A.   I don't know.
5      Q.   Did you ever speak to Budd
6  Jaegger?
7      A.   I didn't, no.
8      Q.   Do you know whether anyone did as
9  part of the investigation?
10     A.   I believe Chief Hesse did, or
11 Sergeant Hesse at the time.
12     Q.   What is that belief based on?
13     A.   He got the memo from Ed Paradiso,
14 and I believe he spoke to him.  I don't know a
15 hundred percent sure whether he spoke to him
16 or not.
17     Q.   My question is what is your belief
18 based on that he spoke to him; not the fact
19 that he got a memo, I want to know what your
20 belief that he spoke to him is based on?
21     A.   Just a -- there is no basis for
22 the belief, but I assumed he would have spoken
23 to him.
24     Q.   Why would you assume that?
25     A.   Because he wrote the original

Page 350

Cherry

1        Cherry
2    memo.
3        Q.   So you assume that because you
4    should speak to somebody who provides a
5    statement?
6        MR. NOVIKOFF: Objection.
7        A.   I don't know if it is the Chief
8    Paradiso spoke to him or George spoke to him,
9    I don't know.
10       Q.   So maybe Chief Paradiso spoke to
11   him?
12       A.   Possibility, yes.
13       Q.   Did Chief Paradiso have any role
14   in this investigation?
15       MR. NOVIKOFF: Objection.
16       A.   A direct role, I don't know.  Not
17   when I was involved in it.
18       Q.   Did he have any indirect role
19   while you were involved?
20       A.   No.
21       Q.   Do you know where Budd Jaegger and
22   Jeannie Jaegger went after the incident that
23   night?
24       MR. NOVIKOFF: Objection.
25   Foundation.

Page 351

1        Cherry
2        A.   No, I don't know.
3        Q.   Do you know whether they went to
4    the police station?
5        A.   I don't know.
6        Q.   Do you know whether they gave a
7    statement to the officers who were on duty?
8        MR. NOVIKOFF: Objection.
9        A.   I don't know.
10       MR. NOVIKOFF: My objection is I
11       don't think you established that Budd
12       Jaegger was even there.  It could help
13       you or not.  That is the basis of my
14       objection.
15       MR. GOODSTADT: That is fine.  If
16       he was not there then you are relying on
17       a witness statement of somebody who was
18       not there.
19       MR. NOVIKOFF: It is what it is.
20       MR. GOODSTADT: Right.
21       Q.   So you don't know one way or the
22   other whether Budd Jaegger and Jeannie Jaegger
23   went to the police station that night to
24   provide a statement?
25       A.   I don't know.

Page 352

1        Cherry
2        Q.   Do you know whether Budd Jaegger
3    was in the bar when the on duty police
4    officers arrived?
5        A.   I don't know whether he was in the
6    bar at all that night.
7        Q.   Do you know whether Jeannie
8    Jaegger was at the bar when the on duty police
9    officers arrived?
10       A.   I believe she was in the bar, yes.
11       Let me change that.  I don't know
12   if she was in the bar, I am not quite sure.  I
13   have to review her statement to see if she was
14   in the bar at the time.
15       Q.   I don't want to get caught up with
16   inside the bar or outside the bar, was she
17   around the premises?
18       A.   I don't know.
19       Q.   Do you know whether she gave a
20   statement that night?
21       A.   Jeannie Jaegger?
22       Q.   Yes.
23       A.   Whether she gave a statement; I
24   don't know.
25       Q.   To the police that night?

Page 353

1        Cherry
2        A.   I don't think she was in the
3    station house that night.
4        Q.   Do you know whether she went to
5    CJ's after the incident?
6        A.   No, I don't know.
7        Q.   And to go from Houser's to CJ's do
8    you have to pass a police station?
9        A.   Yes.
10       Q.   Do you know whether Budd Jaegger
11   was drinking that night?
12       A.   I don't know.
13       Q.   Did you ask him?
14       A.   No.
15       Q.   I think I asked this, but do you
16   know what Budd Jaegger's relationship was with
17   George Hesse?
18       A.   No.
19       Q.   Sitting here today have you ever
20   spoken with Budd Jaegger about the Halloween
21   incident?
22       A.   No.
23       Q.   I believe you also testified that
24   you took a statement from Ian Levine; is that
25   correct?

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 354

**Cherry**

1   A.   Yes.
2   Q.   **When did you take that statement?**
3   A.   I am not sure of the exact date.
4        MR. GOODSTADT:  Would you mark as
5   Cherry Exhibit 17, handwritten document.
6        (Cherry Exhibit 17, handwritten
7   document, marked for identification, as
8   of this date.)
9   Q.   **I placed in front of Mr. Cherry**
10  **what is now marked as Cherry Exhibit 17, a**
11  **two-page document exhibit bearing Bates number**
12  **3176 to 3177.**
13       **Mr. Cherry, do you recognize the**
14  **document that has been marked as Cherry**
15  **Exhibit 17?**
16  A.   Yes.
17  Q.   **What is this document?**
18  A.   This is a statement of Ian Levine
19  taken November 2nd by me.
20  Q.   **Is this your handwriting on this**
21  **document?**
22  A.   Yes, it is.
23  Q.   **Look at the 2nd page above where**
24  **it is handwritten Ian Levine, is that**

Page 355

**Cherry**

1   Mr. Levine's signature?
2   A.   Yes.
3   Q.   **You witnessed him sign this?**
4   A.   Yes.
5   Q.   **You signed under it as Police**
6   **Officer John Cherry; is that correct?**
7   A.   Yes.
8   Q.   **What does the next thing say after**
9   **your name?**
10  A.   SH, shield, 426.
11  Q.   **And why did you take Mr. Levine's**
12  **statements as opposed to Hesse?**
13  A.   Chief Hesse asked me to take the
14  statement.
15  Q.   **So he told you to get the**
16  **statement of Ian Levine?**
17  A.   Yes.
18  Q.   **Did he give you a list of people**
19  **to take statements from?**
20  A.   No.
21  Q.   **When did he ask you to take a**
22  **statement from Mr. Levine?**
23  A.   Mr. Levine came into the station
24  and George asked me to take a statement.

Page 356

Cherry

1   Q.   **Do you know whether George called**
2   **him before and spoke to him before and asked**
3   **him to come in?**
4   A.   I don't know.
5   Q.   **Do you know whether anyone asked**
6   **him to come in to take a statement?**
7   A.   I don't know.
8   Q.   **And this statement is dated**
9   **November 2nd; is that correct?**
10  A.   Yes.
11  Q.   **So is that the date that you**
12  **actually took a statement on?**
13  A.   Yes.
14  Q.   **Was this statement taken, does he**
15  **give you a narrative or did you ask him**
16  **questions?**
17  A.   I asked him what happened and as
18  he told me what happened and I wrote it down.
19  Q.   **Did you ask him any other**
20  **questions other than what happened?**
21  A.   No.
22  Q.   **Do you know whether Ian Levine was**
23  **drinking that night?**
24  A.   No.

Page 357

Cherry

1   Q.   **Did you ask him?**
2   A.   No.
3   Q.   **Did you think it important to know**
4   **whether somebody giving a witness statement**
5   **like Mr. Levine was drinking that night?**
6        MR. NOVIKOFF:  Objection.
7   A.   It may or may not be, but I didn't
8   ask him if he was drinking.
9   Q.   **When you say may or may not, that**
10  **is based on the same answer that you gave**
11  **before?**
12  A.   Yes.
13  Q.   **We don't need to go through it**
14  **again.**
15  A.   Okay.
16  Q.   **Who else was there while you were**
17  **taking the statement from Mr. Levine?**
18  A.   The chief was there I believe.  He
19  was -- he was not in the room -- he didn't
20  witness the statement, so he wasn't actually
21  there when I took the statement.  He was
22  somewhere in the station house.
23  Q.   **Chief Paradiso?**
24  A.   I'm sorry, Sergeant Hesse.

90  (Pages 354 to 357)

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 358

Cherry

1
2    **Q.   So Hesse was a sergeant at the**
3    **time?**
4    A.   Yes.
5    **Q.   So after Hesse and Paradiso had**
6    **their private discussion?**
7    A.   Right.
8    **Q.   Paradiso left; is that correct?**
9    A.   Yes.
10   **Q.   Did he return at all that day**
11   **while you were there?**
12   A.   No.  I believe not, no.
13   **Q.   Did you have any communication**
14   **with him that day after he left?**
15   A.   No.
16   **Q.   Ian Levine, he is the gentleman**
17   **who called the police that night; is that**
18   **correct?**
19   A.   Yes, I believe so.
20   **Q.   Did you know Ian Levine prior to**
21   **taking the statement?**
22   A.   I knew who he was, he is a local
23   merchant in town.
24   **Q.   Is he a resident of Ocean Beach?**
25   A.   I believe so, yes.

Page 359

Cherry

1
2    **Q.   When you say a merchant, does he**
3    **own a business in Ocean Beach?**
4    A.   I believe him and his father own a
5    business in town.
6    **Q.   What business is that?**
7    A.   They have a landscaping business
8    and they run a hotel I believe.
9    **Q.   What is the name of the**
10   **landscaping business?**
11   A.   I don't know.
12   **Q.   What was it at the time?**
13   A.   I don't know what it was named at
14   the time.
15   **Q.   What was the name of the hotel**
16   **that they ran at the time?**
17   A.   I believe it is Season's Hotel.
18   **Q.   Is it still open, Season's?**
19   A.   Yes.
20   **Q.   Do they still run it?**
21   A.   Yes.
22   **Q.   Do you know what Mr. Levine's**
23   **relationship was with Mr. Hesse?**
24   A.   No.
25   **Q.   Do you know what it was with Gary**

Page 360

Cherry

1
2    **Bossetti?**
3    A.   No.
4    **Q.   Do you know what it was with**
5    **Richard Bossetti?**
6    A.   No.
7    **Q.   Do you know what Budd Jaegger's**
8    **relationship was with Gary Bossetti?**
9    A.   No.
10   **Q.   Do you know what Budd Jaegger's**
11   **relationship was with Richard Bossetti?**
12   A.   No.
13   **Q.   How long was Mr. Levine giving you**
14   **the statement for?**
15   A.   I guesses he was in there maybe 45
16   minutes to an hour maybe, or half hour or 45
17   minutes, somewhere along that line.
18   **Q.   Did you discuss anything else with**
19   **him other than the statement?**
20   A.   No.
21   **Q.   Did you discuss -- did he tell you**
22   **anything about Ocean Beach -- strike that.**
23   **Did he tell you anything to you**
24   **about the Halloween incident other than what**
25   **is reflected in your statement?**

Page 361

Cherry

1
2    A.   No.
3    **Q.   It took you 45 minutes to do a**
4    **page and a half statement?**
5    MR. NOVIKOFF:  Objection.
6    A.   Half hour to 45 minutes talking to
7    him, what happened, writing it down.  Then
8    what happened, write it down.  Continue on the
9    narrative.  As he told me what happened I
10   wrote it down.
11   **Q.   And other than for asking what**
12   **happened a number of times were there any**
13   **other questions that you asked him about the**
14   **Halloween incident?**
15   MR. NOVIKOFF:  Objection.
16   A.   No.
17   **Q.   I will note again and I will**
18   **represent for the record that Mr. Levine**
19   **doesn't mention anything about a pool cue in**
20   **here; is that correct?**
21   A.   I didn't read the statement --
22   MR. NOVIKOFF:  The document speaks
23   for itself.  You can answer the question.
24   A.   Yes.
25   **Q.   Do you recall him mentioning**

TSG Reporting - Worldwide     877-702-9580

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 362

Cherry

1
2    anything about a pool cue to you?
3         A.   No.
4         Q.   Do you recall whether he told you
5    that he actually saw the incident, the fight
6    being the incident?
7         A.   Again I would have to read what he
8    said in the statement.  He said he noticed
9    some people fighting in the back and
10   recognized Gary Bossetti.  As I said this is
11   his statement, it speaks to what he told me.
12        Q.   The fight was in the northeast
13   corner of the bar, do you see that, it is on
14   the sixth line down?
15        A.   The second paragraph.
16        Q.   Of the second paragraph, yes?
17        A.   I see that.
18        Q.   He says he was sitting at the bar,
19   do you see that?
20        A.   Yes.
21        Q.   How far is the bar to the
22   northeast corner of Houser's?
23        A.   I don't know.
24        Q.   Have you ever been in Houser's?
25        A.   Just one time.

Page 363

Cherry

1
2         Q.   When was that?
3         A.   On November 2nd.
4         Q.   As part of the investigation?
5         A.   Yes.
6         Q.   You didn't check -- strike that.
7              Was that before or after you took
8    the statement from Mr. Levine?
9         A.   Before.
10        Q.   So you didn't -- strike that.
11             Based on your visit there was it
12   your position that somebody could see the
13   northeast corner of the bar when they are
14   sitting at the bar?
15             MR. NOVIKOFF:  Objection.
16        A.   I don't know.
17        Q.   Did you ask him about whether he
18   saw a pool cue being used that night?
19        A.   No.
20        Q.   Did you think it was strange that
21   he didn't mention anything about a pool cue?
22             MR. NOVIKOFF:  Objection.
23        A.   It is his statement, I am not
24   going to put words in the man's mouth.  If he
25   didn't mention it I was not going to ask him

Page 364

Cherry

1
2    about it.  Tell me what you saw and tell me
3    what happened.
4         Q.   Did Mr. Levine give a statement to
5    the police that night?
6         A.   I don't know.
7         Q.   Do you know whether he was at the
8    bar when the on duty police officers showed
9    up?
10        A.   I don't know if he mentioned it in
11   the statement or not.
12             MR. NOVIKOFF:  Does he personally
13        know --
14        Q.   Whether you know by something that
15   you were told by Mr. Levine or somebody --
16   fair enough.
17        A.   What was the question again?
18        Q.   Whether you know whether Mr.
19   Levine was at the bar or on the bar's premise
20   at the time when the on duty police officers
21   showed up?
22        A.   Do I know personally, no.  But he
23   says he was in the statement.
24        Q.   Did you ask him why he didn't give
25   a statement at that point in time?

Page 365

Cherry

1
2         A.   No.
3         Q.   Did you think it was strange that
4    he didn't give a statement to the on duty
5    officers when they showed up?
6             MR. NOVIKOFF:  Objection.
7         A.   If I was one of the officers
8    responding and he was a person originally
9    called I would have sought him out to find out
10   what happened.  I don't know what transpired
11   at the bar that night, I wasn't there.  So I
12   don't know why he didn't give a statement to
13   the officers who responded.
14        Q.   So you don't know one way or the
15   other whether the officers who responded tried
16   to get a statement from Mr. Levine?
17        A.   I don't know.
18        Q.   Do you know what Mr. Levine's
19   relationship was with Elyse Myller?
20        A.   No.
21        Q.   But he mentions that he spoke to
22   Elyse Myller and got the information about
23   what happened to Jeannie Jaegger from her; is
24   that correct?
25             MR. NOVIKOFF:  Objection.  The

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 366

```
 1           Cherry
 2   document speaks for itself.  You can
 3   answer.
 4       A.  I didn't read that part.  Can you
 5   tell me what page.
 6       Q.  Second page, and it is the second
 7   paragraph down:  I later spoke to Elyse Myller
 8   who told me that Jeannie Jaegger was attacked
 9   by the man who Gary was trying to take out of
10   the bar.
11       A.  Okay.  Yes.
12       Q.  Did you ask him what his
13   relationship was with Elyse Myller?
14       A.  No.
15       Q.  Did you ask him why he didn't go
16   to the police station that night?
17       A.  No.
18       Q.  Did you credit his statement as
19   part of your investigation?
20       MR. NOVIKOFF:  Objection.
21       A.  Yes.
22       Q.  Do you know whether he saw Elyse
23   Myller's statement prior to giving you his
24   statement?
25       A.  Not to my knowledge.
```

Page 367

```
 1           Cherry
 2       Q.  So you don't know one way or the
 3   other?
 4       A.  No.
 5       MR. GOODSTADT:  I think we can
 6   break now.
 7       MR. NOVIKOFF:  Great.
 8       MR. GOODSTADT:  The deposition is
 9   not closed subject to the time remaining,
10   and we will find a convenient date to
11   bring Mr. Cherry back to complete the
12   deposition.
13       THE VIDEOGRAPHER:  The time is
14   5:13.  We are going off the record.
15       (Time noted: 5:13 a.m.)
16       _____
17       PATRICK JOHN CHERRY
18
19   Subscribed and sworn to before me
20   this ___ day of _____, 2008
21   _____
22   _____
23
24
25
```

Page 368

```
 1
 2           C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                 : ss.
 5   COUNTY OF NEW YORK  )
 6
 7       I, Philip Rizzuti, a Notary Public
 8   within and for the State of New York, do
 9   hereby certify:
10       That PATRICK JOHN CHERRY, the
11   witness whose deposition is hereinbefore set
12   forth, was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by the witness.
15       I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have
20   hereunto set my hand this 2nd day of
21   December, 2008.
22       _____
23       PHILIP RIZZUTI
24
25
```

Page 369

```
 1
 2   ------------------ I N D E X ----------------
 3   WITNESS        EXAMINATION BY        PAGE
 4   PATRICK JOHN CHERRY  Mr. Goodstadt    6
 5
 6   ------------ INFORMATION REQUESTS -----------
 7   REQUESTS: 144, 324
 8
 9   ------------------ EXHIBITS ------------------
10   Cherry Exhibit 1, subpoena,       7
11   Cherry Exhibit 2, request for    97
12   certification of basic training,
13   Cherry Exhibit 3, resume,       145
14   Cherry Exhibit 4, Police Officer  161
15   Part-Time/Seasonal,
16   Cherry Exhibit 5, three-page     168
17   exhibit, Bates stamp numbers
18   11690, 11754 and 11628,
19   Cherry Exhibit 6, Incorporated    177
20   Village of Ocean Beach list,
21   Cherry Exhibit 7, memo May 1,     191
22   2005,
23   Cherry Exhibit 8, Confidential    222
24   Wage/Salary History.  March 23,
25   2004,
```

Page 370

```
 1
 2    Cherry Exhibit 9, report,         287
 3    Cherry Exhibit 10, report,        293
 4    Cherry Exhibit 11, report,        294
 5    Cherry Exhibit 12, incident       296
 6    report,
 7    Cherry Exhibit 13, photocopy of   298
 8    a photograph,
 9    Cherry Exhibit 14, handwritten    313
10    note,
11    Cherry Exhibit 15, handwritten    315
12    document,
13    Cherry Exhibit 16, memo dated     347
14    November 1, 2004,
15    Cherry Exhibit 17, handwritten    354
16    document,
17
18
19
20
21
22
23
24
25
```

Page 371

```
 1
 2         *** ERRATA SHEET ***
 3    NAME OF CASE: CARTER VS. OCEAN BEACH
      DATE OF DEPOSITION:  November 18, 2008
 4    NAME OF WITNESS:  PATRICK JOHN CHERRY
      PAGE   LINE     FROM       TO
 5    ___|_____|_____|_____
 6    ___|_____|_____|_____
 7    ___|_____|_____|_____
 8    ___|_____|_____|_____
 9    ___|_____|_____|_____
10    ___|_____|_____|_____
11    ___|_____|_____|_____
12    ___|_____|_____|_____
13    ___|_____|_____|_____
14    ___|_____|_____|_____
15    ___|_____|_____|_____
16    ___|_____|_____|_____
17    ___|_____|_____|_____
18    ___|_____|_____|_____
19
20         _____
21         PATRICK JOHN CHERRY
22    Subscribed and sworn to before me
23    this _____ day of _____, 2008.
24    _____
25    (Notary Public)     My Commission Expires:
```

e4b4e7e5-3449-4dbe-a650-4f12d6f6ac0a

Page 372

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI, and   )
THOMAS SNYDER,                 )
                               )
            Plaintiffs,        )
                               )
            vs.                ) CV 07 1215
                               )
INCORPORATED VILLAGE OF OCEAN  )
BEACH; MAYOR JOSEPH C. LOEFFLER)
JR., individually and in his   )
Official capacity; former mayor)
NATALIE K. ROGERS, individually)
and in her official capacity,  )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF     )
GEORGE B. HESSE, individually  )
and in his official capacity;  )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK     )
COUNTY DEPARTMENT OF CIVIL     )
SERVICE; and ALLISON SANCHEZ,  )
Individually and in her        )
Official capacity,             )
                               )
            Defendants.        )
------------------------------)


CONTINUED VIDEOTAPED DEPOSITION OF

PATRICK CHERRY

New York, New York

Friday, February 6, 2009


Reported by:
Philip Rizzuti
JOB NO. 20816B

Page 373

```
 1
 2
 3
 4                    February 6, 2009
 5                    11:32 a.m.
 6
 7       Continued videotaped deposition of
 8    PATRICK CHERRY, held at the offices
 9    of Thompson Wigdor & Gilly, 85 Fifth
10    Avenue, New York, New York, pursuant to
11    subpoena, before Philip Rizzuti, a
12    Notary Public of the State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 375

```
 1
 2    A P P E A R A N C E S:
 3
 4       BEE READY FISHBEIN HATTER & DONOVAN, LLP
 5       Attorneys for Village of Ocean Beach
 6          170 Old Country Road
 7          Mineola, New York 11501
 8       BY:   KENNETH A. GRAY, ESQ.
 9
10    ALSO PRESENT:
11       MICHAEL PINEIRO, Videographer
12       KEVIN LAMM
13       FRANK FIORILLO
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 374

```
 1
 2    A P P E A R A N C E S:
 3
 4       THOMPSON WIGDOR & GILLY, LLP
 5       Attorneys for Plaintiffs
 6          85 Fifth Avenue
 7          New York, New York 10003
 8       BY:   ANDREW S. GOODSTADT, ESQ..
 9
10
11    MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
12       Attorneys for George B. Hesse
13          530 Saw Mill Road
14          Elmsford, New York 10523
15       BY:   KEVIN W. CONNOLLY, ESQ.
16
17    RIVKIN RADLER, LLP
18       Attorneys for Incorporated Village of
19    Ocean Beach, Joseph Loeffler, Natalie
20    Rogers and Ocean Beach Police Department
21          926 RexCorp Plaza
22          Uniondale, New York 11556-0926
23       BY:   MICHAEL P. WELCH, ESQ.
24
25
```

Page 376

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3    by and between counsel for the respective
 4    parties hereto, that the filing, sealing and
 5    certification of the within deposition shall
 6    be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8    that all objections, except as to the form
 9    of the question, shall be reserved to the
10    time of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be signed
13    before any Notary Public with the same force
14    and effect as if signed and sworn to before
15    the Court.
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 373 to 376)

fe328622-2839-421c-b95d-1a148c29491d

Page 377

Cherry

1
2      THE VIDEOGRAPHER:  This is the
3  start of the tape labeled number 1 of
4  the continuing videotape deposition of
5  Patrick Cherry in the matter of Carter    11:32:43
6  versus Incorporated Village of Ocean
7  Beach.  This deposition is being held at
8  85 Fifth Avenue, New York, New York on
9  February 6, 2009 at approximately 11:35
10  a.m.                         11:33:00
11      My name is Michael Pineiro from
12  TSG Reporting Inc., and I am the legal
13  video specialist.  The court reporter is
14  Phil Rizzuti in association with TSG
15  Reporting.  Will counsel please        11:33:10
16  introduce yourselves.
17      MR. GOODSTADT:  Andrew Goodstadt,
18  Thompson Wigdor & Gilly on behalf of the
19  plaintiffs.
20      MR. WELCH:  For the Incorporated    11:33:15
21  Village of Ocean Beach, Mayor Loeffler,
22  former Mayor Rogers and the Ocean Beach
23  Police Department, Rivkin Radler, 926
24  RexCorp Plaza, Uniondale, New York, by
25  Michael Welch.                  11:33:26

Page 378

Cherry

1
2      MR. CONNOLLY:  Kevin W. Connolly,
3  Marks, O'Neill, O'Brien & Courtney, for
4  defendant George B. Hesse.
5      MR. GRAY:  Kenneth Gray from the    11:33:34
6  law firm of Bee Ready Fishbein Hatter &
7  Donovan, 170 Old Country Road, Mineola,
8  New York, village attorney for the
9  Village of Ocean Beach.
10  P A T R I C K   C H E R R Y, called as a    11:33:48
11      witness, having been previously duly
12      sworn by a Notary Public, was examined
13      and testified as follows:
14  EXAMINATION BY
15  MR. GOODSTADT:                  11:33:51
16      MR. WELCH:  Usual stips?
17      MR. GOODSTADT:  Usual stips.
18      Q.   Good morning, Mr. Cherry.
19      A.   Good morning.
20      Q.   Thank you for coming back.  Before  11:33:57
21  we get started I just wanted to agree on the
22  same ground rules as last time apply.  Do you
23  recall what those were?
24      A.   Do you want to go over them
25  briefly?                     11:34:08

Page 379

Cherry

1
2      Q.   The most important one is that if
3  you don't understand or hear a question that I
4  ask just let me know and I will be happy to
5  repeat or rephrase it.  To the extent that you  11:34:16
6  answer the question I will assume that you
7  both heard my question and understood the
8  whole thing, okay?
9      A.   Yes, sir.
10      Q.   Have you done anything to prepare  11:34:25
11  for today's deposition between November 18,
12  2008, which was your first day of deposition
13  and today?
14      A.   No.
15      Q.   Have you reviewed a copy of the    11:34:33
16  transcript from your November 18th deposition?
17      A.   No, sir.
18      Q.   Have you reviewed any excerpts of
19  that transcript?
20      A.   No, sir.                11:34:44
21      Q.   Have you spoken with any current
22  or former employees of Ocean Beach or the
23  Ocean Beach Police Department about this case
24  since November 18, 2008?
25      A.   No, sir.                11:34:55

Page 380

Cherry

1
2      Q.   Have you spoken with George Hesse
3  at all since November 18, 2008 and today?
4      A.   Yes, sir.
5      Q.   How many times have you spoken    11:35:02
6  with him?
7      A.   Approximately eight times.
8      Q.   Eight times.  Have you discussed
9  anything to do with this case with him during
10  those eight discussions?              11:35:14
11      A.   No, sir.
12      Q.   When was the most recent time that
13  you spoke with him?
14      A.   This morning when I signed on duty
15  with the village.                 11:35:24
16      Q.   And you are working today?
17      A.   Yes, sir.
18      Q.   And you are being paid by the
19  Village of Ocean Beach for your time today?
20      A.   Yes, sir.                11:35:33
21      Q.   Did you discuss where you were
22  going today with Mr. Hesse?
23      A.   I told him that I was going to
24  finish my deposition.
25      Q.   With respect to this case?        11:35:43

3 (Pages 377 to 380)

fe328622-2839-421c-b95d-1a148c29491d

Page 381

Cherry

1
2    A.   Yes.
3    Q.   Did he say anything in response?
4    A.   No, sir.
5    Q.   Did you discuss any of the      11:35:46
6    plaintiffs in this case with him?
7    A.   No, sir.
8    Q.   Since November 18, 2008 until
9    today have you discussed anything at all about
10   the plaintiffs in this case with the George     11:35:57
11   Hesse?
12   A.   No.
13   Q.   Have you discussed anything at all
14   about this lawsuit with George Hesse between
15   November 18, 2008 and today?      11:36:04
16   A.   Other than coming today, I had to
17   go back, there was no other discussions.
18   Q.   Did you speak to him about your
19   first day of deposition at all?
20   A.   Other than I went to the      11:36:14
21   deposition, that is about it.
22   Q.   You didn't tell him how it went or
23   what any of the questions were?
24   A.   No, sir.
25   Q.   Nothing about the substance of the  11:36:20

Page 382

Cherry

1
2    deposition?
3    A.   No, sir.
4    Q.   I believe the last time you
5    testified that you have two daughters; that  11:36:25
6    correct?
7    A.   That is correct.
8    Q.   One's name is Deirdre?
9    A.   Correct.
10   Q.   The other one?      11:36:31
11   A.   Nora.
12   Q.   Is Deirdre friends with Mr. Hesse?
13   A.   She knows Mr. Hesse, but other
14   than say hello, I don't think I would consider
15   them friends.  They know each other.     11:36:50
16   Q.   What do you mean by saying hello,
17   have they seen each other over the last two
18   years?
19   A.   My daughter works over at Ocean
20   Beach and she will stop into the station to    11:37:03
21   tell me she is there, and if George is there
22   she will say hello to him, or if he stops by
23   the house she will say hello to him.  But
24   other than that there is no other
25   relationship.      11:37:16

Page 383

Cherry

1
2    Q.   Why did you tell -- strike that.
3         What position does she have at
4    Ocean Beach?
5    A.   She works for Klein's, it is a      11:37:22
6    general store over in Ocean Beach.
7    Q.   So she is not employed by Ocean
8    Beach, she is employed by a private business
9    at Ocean Beach?
10   A.   That is correct.      11:37:31
11   Q.   How long has she had that job?
12   A.   I guess since -- I would say over
13   ten years.
14   Q.   And why did you tell Mr. Hesse
15   that you were coming here today?      11:37:44
16   A.   He was.
17        MR. WELCH:  Objection.  You can
18   answer.
19   A.   I was -- I called him to sign on
20   duty.  He answered the phone.      11:37:53
21   Q.   Do you report to him?
22   A.   I don't understand in what way,
23   sir.
24   Q.   Is he your supervisor?
25   A.   Well, I do report to him, he is a  11:38:04

Page 384

Cherry

1
2    supervisor.  But today whoever answered the
3    phone I would have signed on duty with.  He
4    just happened to answer the question.
5    Q.   Is he still actively working at      11:38:17
6    Ocean Beach?
7    A.   I believe so, yes.
8    Q.   Do you know what his position is?
9    A.   He is a supervisor.  I don't know
10   exactly what his current position is, or his    11:38:24
11   current title I should say.
12   Q.   You don't know what his current
13   title is?
14   A.   No.
15   Q.   What do you refer to him as      11:38:30
16   currently?
17   A.   Chief.  I still call him chief.
18   Q.   You still call him chief?
19   A.   Yes, sir.
20   Q.   Do other people in the department  11:38:35
21   call him chief?
22   A.   I wouldn't know.
23   Q.   I believe the last time you
24   testified that you were an on call dispatcher
25   currently; is that correct?      11:38:43

4  (Pages 381 to 384)

Page 385

Cherry

2      A.   That is correct.
3      Q.   Is that an actual civil service
4   title?
5           MR. WELCH:  Objection.  Asked and   11:38:46
6   answered in the previous definition.  You
7   can answer again.
8      A.   I believe so, yes.
9      Q.   Did you have to take a test for
10  that title?                            11:38:52
11     A.   No.
12     Q.   Did you have to apply to receive
13  that position?
14          MR. WELCH:  Objection.  Asked and
15  answered.  You can answer.         11:38:58
16     A.   I applied for a job as dispatcher
17  with the village and was hired.  There was no
18  -- I filled out -- I don't know if I filled
19  out another application or not.  But yes, I
20  resigned as a police officer and applied as a  11:39:10
21  dispatcher when they asked me to.
22     Q.   But no further applications or
23  paperwork with respect to becoming an on call
24  dispatcher?
25     A.   No, sir.                      11:39:20

Page 386

1         Cherry
2      Q.   Now, the last time we finished off
3   we were in the middle of discussing your role
4   in the investigation into the Halloween
5   incident, do you recall that, sir?    11:39:30
6      A.   Yes, I do.
7      Q.   Do you know who Mr. Douglas Wycoff
8   it?
9      A.   Yes.
10     Q.   Who is Douglas Wycoff?         11:39:36
11     A.   He is a resident of Ocean Beach.
12  I believe he is a teacher over there at the
13  school, and I know him from the village.
14     Q.   Are you friends with him?
15     A.   I wouldn't say friends.  I know   11:39:51
16  him to say hello.
17     Q.   Does he live on the beach; is he a
18  permanent resident of the beach?
19     A.   I believe so, yes.
20     Q.   Do you know where, what address he  11:40:05
21  lives at?
22     A.   No.
23     Q.   Have you ever been to his house?
24     A.   No.
25          MR. GOODSTADT:  Would you mark   11:40:12

Page 387

1         Cherry
2   this document as Cherry Exhibit 18,
3   document numbered 003165 through 3166.
4         (Cherry Exhibit 18, document
5   numbered 003165 through 3166, marked for  11:40:23
6   identification, as of this date.)
7      Q.   I place in front of Mr. Cherry
8   what has been marked as Cherry Exhibit 18, two
9   page exhibit bearing Bates numbers 3165 to
10  3166.                              11:40:57
11          Have you ever seen the document
12  marked as Cherry Exhibit 18?
13     A.   I have seen this document, yes.
14     Q.   What it the document?
15     A.   It is a statement of Douglas    11:41:02
16  Wycoff.
17     Q.   Who took this statement?
18          MR. WELCH:  Objection.
19     A.   George Hesse did.
20     Q.   Were you present in the station on  11:41:12
21  November 2, 2004?
22     A.   I am not sure.
23     Q.   Were you present at this
24  investigation -- strike that.
25          Were you present at the site in   11:41:26

Page 388

1         Cherry
2   which Mr. Hesse took Mr. Wycoff's statement?
3          MR.. WELCH:  Objection.
4      A.   I don't believe so, no.
5      Q.   Have you ever spoken with Douglas  11:41:37
6   Wycoff about the incident on Halloween 2004 in
7   Ocean Beach?
8      A.   No.
9      Q.   Did you ever speak with anyone
10  about the statement that has been marked as   11:41:50
11  Cherry Exhibit 18?
12     A.   Could you repeat that?
13     Q.   Have you ever spoken to anybody
14  about the statement that has been marked as
15  Cherry Exhibit 18?                 11:42:00
16     A.   No.
17     Q.   When was the first time that you
18  reviewed this document?
19     A.   I don't know the first time, I
20  don't remember the first time that I looked at  11:42:08
21  it.
22     Q.   Did you review it in your role as
23  part of the investigation into the Halloween
24  incident?
25     A.   Sometime after that, after the --  11:42:14

5 (Pages 385 to 388)

fe328622-2839-421c-b95d-1a148c29491d

Page 389

Cherry

1
2  it was not -- it was probably when I got
3  back -- I don't know the exact time.  I did
4  read it sometime afterwards.
5      Q.   How long afterwards?          11:42:26
6      A.   Probably when I got back for the
7  next season.
8      Q.   So you don't think you reviewed
9  the statement until the '05 season?
10     A.   That is correct.              11:42:34
11     Q.   Do you know whether this statement
12 played any role in any conclusions that were
13 reached as part of that investigation?
14         MR. WELCH:  Objection.  You can
15     answer.                           11:42:47
16     A.   I don't know.
17     Q.   Did you ever speak to George Hesse
18 about this statement?
19     A.   No.
20     Q.   How did you come about getting a  11:42:52
21 copy of this?
22     A.   There was a file.
23     Q.   What do you mean there was a file?
24     A.   There was a case file on this
25 incident.  A file where they kept all the   11:43:02

Page 390

Cherry

1
2  paperwork.
3      Q.   How did you receive a copy of the
4  file when you came back in the '05 season?
5      A.   I didn't receive a copy of it, I   11:43:11
6  looked at the file.
7      Q.   Where was the file kept?
8      A.   In the office.
9      Q.   Whose office?
10     A.   The village, the Police Department  11:43:19
11 office.
12     Q.   So nobody handed it to you, you
13 just went into the file cabinet and looked at
14 the file?
15     A.   No.  I asked to read the -- look    11:43:29
16 at the file.
17     Q.   Who did you ask?
18     A.   Sergeant Hesse.
19     Q.   And he was the sergeant at the
20 time?                                  11:43:38
21     A.   Yes.
22     Q.   Did you have any reaction when you
23 read this statement from Douglas Wycoff?
24         MR. WELCH:  Objection.  You can
25     answer.                           11:43:47

Page 391

Cherry

1
2      A.   No.
3      Q.   Do you know whether the
4  investigation was concluded as of the
5  beginning of the '05 season?          11:43:53
6      A.   The investigation was concluded,
7  yes.
8      Q.   Do you know if any conclusions
9  were reached?
10     A.   As far as --                 11:44:00
11     Q.   Well, were there any conclusions
12 reached as a result of the investigation?
13     A.   Yes.
14     Q.   What were the conclusions that
15 were reached?                         11:44:09
16     A.   That Gary Bossetti apparently had
17 acted as his role as a police officer.  Gary
18 Bossetti had acted properly as his role as a
19 police officer.  Observed a female getting
20 attacked by someone, went in and intervened  11:44:32
21 and stopped the attack, and then was
22 assaulted by the -- I believe Mr. Van Koot and
23 two friends of his, and that he acted in
24 defending himself properly.
25     Q.   Who reached that conclusion?      11:44:54

Page 392

Cherry

1
2      A.   That was the conclusion that
3  apparently -- I reached that conclusion myself
4  on the investigation, and George and I believe
5  Chief Paradiso reached that conclusion also.   11:45:04
6      Q.   When did you reach that
7  conclusion?
8      A.   After the investigation was
9  finished.
10     Q.   When was that?                11:45:09
11     A.   Not finished, but after we took
12 the statements from the witnesses.
13     Q.   When was that?
14     A.   Well, after I completed my
15 statements it sort of put the picture together  11:45:22
16 and I guess -- I don't know exactly when the
17 chief and the sergeant drew the same
18 conclusion, it was sometime shortly
19 thereafter.
20     Q.   When did you reach the conclusion  11:45:33
21 of your role in the investigation?
22     A.   After I finished taking the
23 statements and read them that was my opinion.
24     Q.   When was that?
25     A.   Shortly after I took the          11:45:40

6 (Pages 389 to 392)

Page 393

Cherry

1    statements sometime in the beginning of
2    November.
3        Q.   So you reached the conclusion
4    before you saw Mr. Wycoff's statement; is that  11:45:47
5    correct?
6        A.   Probably yes.
7        Q.   Had you spoken to either Gary or
8    Richard Bossetti about the incident at the
9    time that you reached your conclusion?        11:45:56
10       A.   No.
11       Q.   Had you spoken to Mr. Van Koot
12   prior to reaching the conclusion?
13           MR. WELCH:  Objection.
14       A.   No.                 11:46:03
15       Q.   Had you spoken to Mr. Shallek
16   prior to reaching the conclusion that
17   Mr. Bossetti, Gary Bossetti had acted properly
18   in his role as police officer?
19       A.   No.                 11:46:18
20           MR. WELCH:  Objection.
21       Q.   What was the basis of your
22   conclusion?
23       A.   The sum and substance of the
24   statements that we took.             11:46:25
25

Page 394

Cherry

1        Q.   And again those statements did not
2    include either of the Bossetti's or any of the
3    other three individuals who were part of the
4    incident; is that correct?          11:46:35
5            MR. WELCH:  Objection.  You can
6        answer.
7        A.   Correct.
8        Q.   Did you report your conclusion to
9    anybody?                      11:46:48
10       A.   I told George what my feelings
11   were.
12       Q.   When did you tell George that?
13       A.   After we finished taking the
14   initial statements that I took.       11:46:57
15       Q.   What exactly did you tell George?
16       A.   That it appeared that Gary acted
17   properly.  That he came to the defense of a
18   third person and then continued to defend
19   himself.                      11:47:10
20       Q.   Did you put your conclusion in
21   writing in any way?
22       A.   No.
23       Q.   Do you know whether Mr. Hesse took
24   any notes of your conclusion?        11:47:20
25

Page 395

Cherry

1        A.   I don't know.
2        Q.   What was Mr. Hesse's response?
3        A.   He agreed.
4        Q.   At that time he agreed?        11:47:27
5        A.   Yes.
6        Q.   So this is somewhere in the very
7    beginning of November?
8        A.   Well, yes.  By the first
9    probably -- I don't know the date of the last  11:47:35
10   statement I took, but it was sometime probably
11   in the first week of November.
12       Q.   Had you --
13       A.   To the best of my recollection.
14       Q.   And when you reached that       11:47:44
15   conclusion had you spoken with Mr. Fiorello?
16       A.   No.
17           MR. WELCH:  Objection.
18       Q.   And at the time that you reached
19   that conclusion had you spoken with Mr. Lamm   11:47:53
20   about the incident?
21           MR. WELCH:  Objection.
22       A.   No.
23       Q.   At the time that you reached the
24   conclusion had you spoken with Mr. Snyder      11:47:59
25

Page 396

Cherry

1    about the incident?
2            MR. WELCH:  Objection.
3        A.   No.
4        Q.   Do you think it would have been   11:48:03
5    important to speak to the three of them prior
6    to reaching the conclusion?
7            MR. WELCH:  Objection.
8        A.   Well, it was not my -- I didn't
9    feel that I was the person to speak to them.   11:48:15
10       Q.   Why?
11       A.   I believe that was either the
12   sergeant or the chief's job to interview them.
13       Q.   Did anyone tell you that they were
14   going to interview them?             11:48:28
15       A.   No.
16       Q.   Do you know whether either of the
17   three of them were interviewed prior to
18   reaching your conclusion that Mr. Hesse
19   concurring with your conclusion?        11:48:35
20       A.   No.
21       Q.   You don't know one way or the
22   other?
23       A.   No.
24       Q..  Do you know whether any of the    11:48:44

7 (Pages 393 to 396)

fe328622-2839-421c-b95d-1a148c29491d

Page 397

Cherry

1  three -- well, actually more than three
2  civilians in the fight.  Whether Mr. Van Koot,
3  Mr. Shallek or Mr. Tesoro were interviewed by
4  Mr. Hesse or Mr. Paradiso prior to reaching    11:48:55
5  your conclusion?
6     A.  No.
7     Q.   Do you know whether they ever
8  interviewed any of the three of them?
9     A.  I don't know.                11:49:04
10    Q.   Did you ever interview any of the
11 three of them?
12    A.  No.
13       MR. WELCH:  Objection.
14    Q.   Do you think it would have been    11:49:08
15 important to interview the three of them
16 before reaching a conclusion as to what
17 happened?
18       MR. WELCH:  Objection.  Asked and
19    answered.  You can answer again.    11:49:21
20    A.   They had given their statements
21 already to these officers, and I felt based on
22 what the other witnesses said that Bossetti,
23 Gary Bossetti acted within his duties as a
24 police officer.  I didn't feel myself it was    11:49:41

Page 398

Cherry

1  necessary to speak to them.
2     Q.   Had you reviewed their statements
3  prior to reaching the conclusion?
4     A.  I read the statements.       11:49:48
5     Q.   Did you believe them to be
6  credible?
7     A.   I think they left out part of
8  their -- you know, what happened prior to them
9  getting involved in the fight.  So I don't    11:50:02
10 know -- we didn't know how the fight or
11 alleged fight actually started, and I think
12 that was important to find out what caused the
13 fight and who started it and what happened.
14 That is what we were looking into, how did    11:50:18
15 this whole thing start.
16    Q.   Right.  So you thought it was
17 important to learn that from them, but you
18 never asked them, correct?
19    A.  I thought it was important to find  11:50:28
20 out what happened, what actually happened by
21 interviewing other witnesses.  It appeared to
22 me that it was only half the story there.
23    Q.   Did you think it was important to
24 find out what happened before the fight from    11:50:38

Page 399

Cherry

1  everybody who was there?
2       MR. WELCH:  Objection.  You can
3    answer.
4     A.  Yes.                11:50:43
5     Q.   Did you believe Mr. Wycoff's
6  statement to be accurate and credible when you
7  read it in the beginning of the season of '05?
8     A.  Yes.
9     Q.   I note in here that he did not    11:51:04
10 mention anything about a pool cue again.  Do
11 you think that that was strange that he didn't
12 mention anything about the pool cue being
13 used?
14       MR. WELCH:  Objection.  Did you    11:51:14
15    review the document and know what it
16    says?
17    A.  I have not read it recently, but I
18 did read it.  Give me a moment and I will read
19 it again.                11:51:22
20       MR. WELCH:  Do you want him to
21    read it again?
22    Q.   I will represent that there is
23 nothing in there about a pool cue?
24       MR. WELCH:  Based on that    11:51:29

Page 400

Cherry

1  representation -- what was the question?
2     Q.   Do you think it is strange that he
3  didn't mention that a pool cue was used as
4  part of the fight?          11:51:37
5       MR. WELCH:  Objection.  You can
6    answer.
7     A.  I don't know what he saw and what
8  he didn't see.  This is his statement.
9     Q.   And did you ever read the    11:51:44
10 statements that were given by the three on
11 duty police officers that night?
12       MR. WELCH:  Objection.  You can
13    answer.
14    A.  I eventually read them, yes.    11:51:54
15    Q.   And when did you read those?
16    A.  Again in the early part of the '05
17 season.
18    Q.   So you didn't read them as part of
19 your -- in reaching your conclusion as to what  11:52:08
20 happened that night?
21    A.  No.
22    Q.   So what did you actually -- other
23 than the statements that you took what did you
24 review in reaching your conclusion?    11:52:20

8  (Pages 397 to 400)

fe328622-2839-421c-b95d-1a148c29491d

Page 401

**Cherry**

1
2    A.   The statements of Jeanne Jaeger,
3  Elyse Myller, Sean O'Rourke, and the other
4  person, I am trying to think of his name. Ian
5  Levine.                  11:52:44
6    Q.   Other than for those four people's
7  statements did you read anything else in
8  reaching your conclusion?
9    A.   The three statements that the
10  officers who responded that night took.      11:52:55
11    Q.   Those were Mr. Shallek, Mr. Tesoro
12  and Mr. Van Koot?
13    A.   Correct.
14    Q.   Did you read any other documents
15  in connection with reaching your conclusions   11:53:04
16  as to what happened that night?
17       MR. WELCH: Objection. You can
18  answer.
19    A.   I believe I read the field report
20  also.                      11:53:12
21    Q.   Anything else that you reviewed in
22  reaching that conclusion?
23    A.   Not that I can recall.
24    Q.   And other than for the people's
25  statements that you took did you speak with   11:53:21

Page 402

**Cherry**

1
2  anybody as part of your role in the
3  investigation about what happened that night?
4    A.   No. Nobody else other than the
5  people that we took statements from.      11:53:29
6    Q.   I believe you testified that you
7  relied on Sean O'Rourke's statement as part of
8  the analysis that went into your conclusion;
9  is that correct?
10    A.   Yes.              11:53:42
11    Q.   Who is Sean O'Rourke?
12    A.   Sean O'Rourke is a resident of
13  Ocean Beach.
14    Q.   And why did you take his
15  statement?                11:53:50
16    A.   I believe he was the -- one of the
17  persons who was working that night as a
18  doorman, and that he was one of the persons I
19  believe that called the Police Department.
20    Q.   He was one of the persons who    11:54:05
21  called the police, is that what you said?
22    A..   I believe so.
23    Q.   How did you learn that he was one
24  of the persons who called the police?
25    A.   I believe it might be in his   11:54:12

Page 403

**Cherry**

1
2  statement.
3    Q.   Would it surprise you if it was
4  not in the statement?
5       MR. WELCH: Objection.      11:54:22
6    A.   Would it surprise me if it was not
7  in his statement; it might if I thought he was
8  one of the persons that called. It might --
9  it would surprise because he was a person who
10  called -- I believe he was one of the persons   11:54:38
11  who called the Police Department.
12       MR. GOODSTADT: Please mark this
13  as Cherry Exhibit 19.
14       (Cherry Exhibit 19, two-page
15  document, Bates 3167 through 3168, marked   11:55:20
16  for identification, as of this date.)
17    Q.   I place in front of Mr. Cherry
18  what has been marked as Cherry Exhibit 19, it
19  is a two-page exhibit bearing Bates 3167
20  through 3168. Mr. Cherry, do you recognize   11:55:23
21  the document marked as Cherry Exhibit 19?
22    A.   Yes.
23    Q.   What is this document?
24    A.   It is a statement of Sean
25  O'Rourke.                11:55:32

Page 404

**Cherry**

1
2    Q.   When was the last time that you
3  reviewed this statement?
4    A.   Probably sometime early in the
5  year.                  11:55:38
6    Q.   Earlier this year?
7    A.   Yes.
8    Q.   When?
9    A.   When we found out that I was going
10  to be deposed.              11:55:44
11    Q.   So that was last year actually,
12  '08?
13    A.   Yes.
14    Q.   Why don't you take a minute to
15  review it?                11:55:50
16    A.   Okay.
17    Q.   Have you had a chance to review it
18  now?
19    A.   Yes, I have.
20    Q.   Is this a statement that you took   11:56:40
21  from Mr. O'Rourke?
22    A.   Yes, sir.
23    Q.   That was on or about November 5,
24  2004?
25    A.   Yes, sir.            11:56:47

9 (Pages 401 to 404)

Page 405

Cherry

1
2    Q.   The signature on the bottom left
3    of page 1 and the bottom left of page 2, is
4    that your signature?
5    A.   Yes.                    11:56:53
6    Q.   It says PO PJ Cherry, SH 426,
7    OBPD, do you see that?
8    A.   Yes.
9    Q.   What does PO stand for?
10   A.   Police officer.          11:57:06
11   Q.   So you signed this as a police
12   officer?
13   A.   Yes, sir.
14   Q.   Even though you were a civilian at
15   the time?              11:57:12
16   MR. WELCH:  Objection.
17   A.   I was still working as a police
18   officer at that time.
19   Q.   But you were not certified to work
20   as a police officer in Suffolk County at the   11:57:19
21   time; is that correct?
22   MR. WELCH:  Objection.  Asked and
23   answered.  You can answer again.
24   A.   I don't know if I was certified or
25   not.  I was hired as a police officer, I      11:57:26

Page 406

Cherry

1
2    thought I was a police officer.
3    Q.   What is SH 426, that is your
4    shield number?
5    A.   That is correct.        11:57:34
6    Q.   Are you aware that Mr. O'Rourke
7    had been arrested by George Hesse for cocaine
8    possession?
9    A.   Yes.
10   Q.   Were you aware at the time of this  11:57:43
11   statement that he had been arrested for
12   cocaine possession?
13   A.   Yes.
14   Q.   Did that play any role in your
15   credibility assessment of Mr. O'Rourke?   11:57:51
16   A.   No.
17   Q.   Did you ask Mr. O'Rourke whether
18   he was drinking that night?
19   A.   No.
20   Q.   Do you think that would have been   11:58:02
21   important to know whether he was drinking that
22   night?
23   MR. WELCH:  Objection.
24   A.   No.  It was important what he
25   remembered.                11:58:10

Page 407

Cherry

1
2    Q.   So you think that if he had been
3    drinking it could have affected his ability of
4    what he remembered?
5    A.   I don't know.            11:58:17
6    Q.   You don't know one way or the
7    other?
8    A.   No.
9    Q..   You are a trained detective and
10   don't know whether alcohol intake can affect   11:58:22
11   somebody's memory of certain events?
12   MR. WELCH:  Objection.
13   A.   Well, it would probably depend on
14   how much he had and whether he was drinking or
15   not.                      11:58:32
16   Q.   But you didn't ask him any of
17   those questions?
18   A.   Right.  So we don't know.
19   Q.   Where was the statement taken?
20   A.   In the Ocean Beach police station.  11:58:42
21   Q.   Did you call him to come in to
22   give a statement?
23   A.   No.
24   Q..   Do you know whether anyone called
25   him to come in to give a statement?         11:58:52

Page 408

Cherry

1
2    A.   I believe George Hesse called him.
3    Q.   Were you there when George Hesse
4    called him?
5    A.   No.  I may have been, I didn't --  11:58:56
6    he came in to give a statement, and he just
7    came in to give -- so I assume somebody called
8    him to come in because I was working that day.
9    Q.   How was it determined that you
10   would take his statement as opposed to Mr.     11:59:13
11   Hesse?
12   A.   Sergeant Hesse asked me to take
13   it.
14   Q.   What did he say to you?
15   A.   He said take the statement, could  11:59:21
16   you take Mr. O'Rourke's statement.
17   Q.   Was anybody else present when you
18   were taking the statement?
19   A.   I don't believe so, no.
20   Q.   So just you and Mr. O'Rourke in    11:59:31
21   the police station?
22   A.   Well, there might have been other
23   people in the police station, but I was taking
24   the statement from Mr. O'Rourke.  I mean
25   people are going in and out all the time.    11:59:40

10  (Pages 405 to 408)

fe328622-2839-421c-b95d-1a148c29491d

Page 409

Cherry

1
2    Q.   Had you spoken to Mr. O'Rourke
3    prior to taking a statement about the
4    Halloween incident?
5    A.   No.                        11:59:48
6    Q.   Did you ask him any specific
7    questions for the statement or he just gave
8    you a narrative?
9    A.   I asked him what happened, he gave
10   me a narrative, which is basically this.   11:59:55
11   Q.   So you didn't ask any other
12   questions other than for what happened?
13   A.   The only question I asked him, he
14   was telling me about the incident.  He said
15   one of the Bossetti's, he said I don't know   12:00:08
16   his first name, I don't know whether it is
17   Richie or Gary.  I said well can you tell the
18   difference between them, and he said yes.  I
19   said what do you know him, who do you think,
20   what name do you think -- who do you think it   12:00:22
21   was, Richie or Gary as far as the name goes;
22   and he said I think it was Richie.
23         I said -- then I said you sure you
24   can identify, tell them apart.  He said yes.
25   I said okay, if you think his name is Richie,   12:00:41

Page 410

Cherry

1
2    we will use Richie.  That is why his name is
3    Richie here, not Gary.
4    Q.   So he mis-identified who was in
5    the fight; right?                  12:00:44
6    A.   No.
7         MR. WELCH:  Objection.
8    A.   He wasn't sure what the first name
9    of the Bossetti that was involved in the fight
10   was.                           12:00:53
11   Q.   But he knew the difference between
12   the two; correct?
13   A.   Yes.  He knew the difference
14   facially, but he was not sure who was who, you
15   follow me?                       12:01:00
16   Q.   I don't follow.
17   A.   I had the same problem with the
18   Bossetti brothers --
19        MR. WELCH:  There is no question
20   pending.                        12:01:08
21   Q.   What did he tell you his problem
22   was with identifying the Bossetti's?
23        MR. WELCH:  Objection.
24   A.   Which -- it was not which
25   Bossetti, it was the name of the Bossetti that   12:01:22

Page 411

Cherry

1
2    was involved he wasn't sure of.  He wasn't
3    sure it was Richie or Gary.  He knew which
4    Bossetti was involved in it by facial
5    recognition, but he wasn't sure of what   12:01:33
6    brother that was.
7    Q.   How do you know that he knew which
8    Bossetti was involved; did you put pictures in
9    front of him?
10   A.   No.  I asked him if he knew the   12:01:43
11   difference between which two brothers.  They
12   are facially -- they are not identical
13   twins -- they are not -- they are not
14   identical.  You can tell them apart, they
15   don't look the same.              12:02:00
16   Q.   No, I understand that.  But when
17   he told you it was Rich Bossetti how did you
18   know that he actually saw Gary Bossetti, was
19   just getting his name wrong?
20   A.   Well, I said there was a problem   12:02:11
21   with this, could you identify him from a photo
22   pack or in person, he says yes.
23   Q.   Did he identify him?
24   A.   No.  I said if need be we would
25   show you a picture.               12:02:23

Page 412

Cherry

1
2    Q.   How come none of that is recorded
3    in your statement?
4         MR. WELCH:  Objection.
5    A.   I just didn't put it in.       12:02:29
6    Q.   How come?
7    A.   I didn't think it was necessary.
8    I am explaining it now.  If it had to be
9    explained, I would explain it.  As a matter of
10   fact I told Sergeant Hesse that he had a   12:02:44
11   problem with -- not with -- which, the name of
12   the Bossetti that was involved.  He knew which
13   Bossetti it was, he was not sure whether the
14   name was Gary or Richie.  I explained that to
15   the sergeant if in fact we needed to get   12:02:59
16   identification he could pick out the Bossetti
17   that was involved either from a photo pack or
18   in person.
19   Q.   How long has Sean O'Rourke worked
20   in Ocean Beach?                   12:03:12
21   A.   I don't know.  He lives there.  I
22   don't know how long he has worked there.
23   Q.   How many years have the Bossetti's
24   been working there?
25   A.   At that time I guess about two   12:03:19

11 (Pages 409 to 412)

fe328622-2839-421c-b95d-1a148c29491d

Page 413

```
1              Cherry
2   years or so.  Two or three.  I am not sure of
3   the number.
4       Q.   How come you didn't show him a
5   picture at the time to make sure that his    12:03:26
6   statement was accurate?
7           MR. WELCH:  Objection.
8       A.   We didn't have a photo pack
9   prepared, and rather than just show him one
10  picture or two pictures of the brothers I    12:03:38
11  decided to wait, and if we needed
12  identification we could do it the proper way.
13      Q.   Were there any pictures of the
14  Bossetti's available to you at the time?
15      A.   I mean -- not -- I didn't have any  12:03:53
16  pictures of them at the time I was
17  interviewing or taking the statement from
18  Mr. O'Rourke.
19      Q.   So is it your testimony that there
20  were no pictures of the Bossetti's available  12:04:02
21  at the police station that you could have
22  shown him?
23          MR. WELCH:  Objection.
24      A..   There probably was an ID photo in
25  the computer, but I didn't feel to show him   12:04:10
```

Page 414

```
1              Cherry
2   one picture would be the right thing to do.
3       Q.   Pictures of him on the wall?
4           MR. WELCH:  Objection.
5       A.   I don't know.                12:04:18
6       Q.   He references in the statement
7   about a bartender named Mr. McKenna, do you
8   see that; the first page, ninth line down?
9       A.   I am sorry, how far down -- I see.
10      Q.   The bartender, Don McKenna --    12:04:43
11      A.   Dan McKenna.
12      Q.   Dan McKenna, there was a problem
13  near the bathroom, do you see that?
14      A.   Yes.
15      Q.   Did you speak with Dan McKenna at  12:04:49
16  all as part of your investigation?
17      A.   No, I didn't.
18      Q.   Do you know whether anyone did?
19      A.   I don't think so..
20      Q.   Did you ask Mr. O'Rourke why he    12:04:57
21  didn't give a statement the night of the
22  incident?
23      A.   He said he tried to tell one of
24  the officers what he knew, but they wouldn't
25  talk to them.                         12:05:07
```

Page 415

```
1              Cherry
2       Q.   Which officer did he try to tell?
3       A.   He didn't say.  He said one of the
4   officers.
5       Q.   Did you ask him which officer?    12:05:12
6       A.   No.
7       Q.   How come?
8       A.   I didn't think it was important at
9   the time I was taking the statement.
10      Q.   Now looking through this could you  12:05:22
11  point to me where in the statement it said
12  that Sean O'Rourke called the police?
13      A.   In reading the statement it is not
14  in there.
15      Q.   It is not in there; right?       12:05:37
16      A.   That is correct.
17      Q.   So how do you know that Sean
18  O'Rourke called the police?
19      A.   I am not sure.  It might have been
20  in one of the other statements that I       12:05:48
21  recalled, or that is what was told to me at
22  the time to the best of my recollection, that
23  he was one of the people that called.  I
24  didn't receive the call so I don't know for
25  sure exactly.                         12:05:55
```

Page 416

```
1              Cherry
2       Q.   Did he tell you that he made the
3   call to the police?
4       A.   If he told me it probably would
5   have been in here at the time that he gave he  12:06:01
6   the statement.
7       Q.   Do you think it was an important
8   fact that he left out that he made the call to
9   the police?
10          MR. WELCH:  Objection.        12:06:08
11      A.   Well, I didn't respond to the
12  scene.  I imagine the officers that responded
13  to the scene would have talked to the people
14  who called to make the complaint.
15      Q.   My question to you is in asking    12:06:22
16  him what happened, the fact that he left out
17  that he had called the police, don't you think
18  that was an important fact to leave out of a
19  statement?
20          MR. WELCH:  Objection.  You can    12:06:33
21      answer.
22      A.   It probably would have been better
23  if it was in there, yes, I agree do that.  But
24  I took what he told me.
25      Q.   Did the fact that he left out the  12:06:45
```

Page 417

Cherry

1  fact that it should have been in there, did
2  that affect your view on his credibility?
3         MR. WELCH: Objection. You can
4  answer.                   12:06:52
5     A.   No, I don't think so.
6     Q.   Do you know whether he was friends
7  with George Hesse?
8     A.   Mr. O'Rourke?
9     Q.   Yes.                  12:07:01
10    A.   They are acquaintances. You know,
11 George has been there at the time for 14
12 years. He knows most of the people in the
13 village. To say friends, I don't think they
14 were friends.               12:07:13
15    Q.   Do you know whether Gary Bossetti
16 is friends with Sean O'Rourke?
17    A.   I don't believe so, no.
18    Q.   How about Richard Bossetti?
19    A..  I don't believe so.         12:07:21
20    Q.   Did you ask him why he didn't go
21 to the police station to give a statement that
22 night?
23    A.   No.
24    Q..  How long did this interview last?  12:07:30

Page 418

Cherry

1     A.   I would say twenty minutes to a
2  half hour.
3     Q.   Is there anything that he told you
4  other than this purported conversation about   12:07:47
5  the difference between Gary and Richard
6  Bossetti that is not in your statement?
7     A.   Not that I can recall, no.
8     Q.   Is there anything that would
9  refresh your recollection as to whether there   12:08:05
10 was anything else that he told you that was
11 not reflected in your statement?
12    A.   No.
13    Q.   Did you take any other notes for
14 this statement other than for this written    12:08:14
15 statement that you have?
16    A.   I don't believe so, no.
17    Q.   Did you write this statement down
18 as he was giving it to you or is it something
19 that you prepared after you finished the      12:08:24
20 interview?
21    A.   As he was giving it to me.
22    Q.   Did you speak with George Hesse
23 about this statement at all?
24    A.   Yes. I told him about the        12:08:30

Page 419

Cherry

1  discrepancy and exactly the name discrepancy.
2     Q.   Did you discuss anything else with
3  Mr. Hesse about the statement other than for
4  the name discrepancy?              12:08:41
5     A.   No.
6     Q.   I note in here that Mr. O'Rourke
7  doesn't mention anything about a pool cue.
8  Did you think that was strange that he left
9  that part out?                 12:08:52
10       MR. WELCH: Objection. The
11 document speaks for itself. You can
12 answer.
13    A.   That is exactly, that was his
14 statement, he didn't mention anything about a   12:08:56
15 pool cue.
16    Q.   The fact that he doesn't mention
17 anything about a pool cue, did that affect
18 your analysis of his credibility?
19    A.   No, because I don't know if he saw   12:09:04
20 the incident with the pool cue or not.
21    Q.   In any of your statements that you
22 took did anybody mention anything about a pool
23 cue being used?
24    A.   I don't believe so, no.          12:09:14

Page 420

Cherry

1     Q.   Did you know that a pool cue
2  allegedly had been used when you were taking
3  these statements?
4     A.   Yes. I believe it was in one of   12:09:23
5  the statements of the three witnesses that the
6  officers, the responding officers took.
7     Q.   The fact that none of these
8  witnesses whose statements that you took
9  mentioned a pool cue, did that affect your     12:09:36
10 analysis of their credibility at all?
11    A.   No.
12    Q.   Did you ask any of them about
13 whether they saw a pool cue being used?
14    A.   I don't believe so, no.       12:09:49
15    Q.   Why not?
16    A.   I wanted their statement, I didn't
17 want to put anything into their mouth, mention
18 anything that could be a leading question. I
19 wanted to know what their recollection was.    12:09:59
20    Q.   The fact that they didn't mention
21 anything about a pool cue, you didn't believe
22 that that could lead to the conclusion that
23 they were protecting Gary Bossetti?
24       MR. WELCH: Objection. You can    12:10:12

13 (Pages 417 to 420)

Page 421

Cherry

1    answer.
2        A.   No.
3        Q.   Have you spoken to Mr. O'Rourke
4    about the Halloween incident other than for    12:10:26
5    November 4th when he came in and you took his
6    statement?
7        A.   No.
8        Q..   I believe you testified that you
9    took Ms. Jaegger's statement as well; is that   12:10:36
10   correct?
11       A.   That is correct.
12       Q.   When did you take that statement?
13       A.   Where?
14       Q.   When?              12:10:41
15       A.   I don't recall the exact date.  I
16   think it may have been November 6th.  If you
17   have a copy of it I can tell you exactly.
18       Q.   Where did you take the statement?
19       A.   At her home.          12:10:52
20       Q.   So you went out to her house to
21   take the statement?
22       A.   Yes.
23       Q.   Did you do that on your own or
24   somebody asked you to do that?       12:10:58

Page 422

Cherry

1        A.   George Hesse and I went to her
2    house to take the statement.
3        Q.   Whose decision was it to go to her
4    house to take the statement?       12:11:07
5        A.   George's.
6        Q.   Do you know why he wanted to go to
7    her house to take a statement?
8        A.   Yes.  She was -- I don't believe
9    she was coming back to the island and she    12:11:16
10   lived locally, so we decided to go to her
11   house and take a statement.
12       Q.   Has she provided a statement other
13   than for the one that you took that you are
14   aware of?                12:11:27
15       A.   Yes.
16       Q.   Did you review that statement
17   prior to going to take her statement?
18       A.   Yes.
19       Q.   So if you already had her      12:11:32
20   statement why did you go and take another
21   statement from her?
22       A.   To put it in more deposition form.
23       Q.   What do you mean by that?
24       A.   Take it and put the caveat on the    12:11:41

Page 423

Cherry

1    end that any false statement made herein is
2    punishable as a class A misdemeanor under the
3    Penal Law section.
4        MR. GOODSTADT:  Would you mark    12:12:02
5    this document as Cherry Exhibit 20,
6    document number 003162 through 3164.
7        (Cherry Exhibit 20, document
8    number 003162 through 3164, marked for
9    identification, as of this date.)    12:12:42
10       Q.   I place in front of Mr. Cherry
11   what has been marked as Cherry Exhibit 20.  It
12   is a three-page exhibit bearing Bates numbers
13   3162 through 3164.
14       Mr. Cherry, have you ever seen the  12:12:59
15   document that is marked as Cherry Exhibit 20?
16       A.   Yes.
17       Q.   What is this document?
18       A.   This is the statement of Jeanne C.
19   Jaeger taken on November 7, 2004.       12:13:12
20       Q.   Who was present when you took this
21   statement?
22       A.   George Hesse and myself and
23   Mrs. Jaeger.
24       Q.   Was anyone else there?       12:13:20

Page 424

Cherry

1        A.   No.
2        Q.   Her husband was not there?
3        A.   No.
4        Q.   If you look at the bottom left    12:13:25
5    corner of pages 1, 2 and 3, is that your
6    signature?
7        A.   Yes, it is.
8        Q.   Under your signature there appears
9    to be a signature.  Whose signature is that?  12:13:34
10       A.   That is George Hesse's signature.
11       Q.   Again he is signing as sergeant
12   103/OBPD, do you see that?
13       A.   Yes..
14       Q.   That was his shield number, 103?  12:13:48
15       A.   Yes.
16       Q.   Other than for this statement did
17   he -- did the two of you take a statement
18   together from any other witnesses?
19       A.   He was at the station house when I  12:13:57
20   took some of the statements.  Unless he
21   actually signed it he was not there with me.
22       Q.   Now this is your handwriting?
23       A.   Yes.
24       Q.   How was it decided that you would  12:14:16

14 (Pages 421 to 424)

fe328622-2839-421c-b95d-1a148c29491d

Page 425

**Cherry**

1
2  write out the statement as opposed to Mr.
3  Hesse?
4      A.   Because I had more experience in
5  taking statements, and Sergeant Hesse asked me   12:14:25
6  to take it.
7      Q.   Now she Ms. Jaeger is one of the
8  original purported victims of that night; is
9  that correct?
10        MR. WELCH:  Objection.          12:14:35
11     A.   Apparently, yes.
12     Q.   Did you reach a conclusion that
13  she was a victim that night?
14     A.   Yes.
15     Q.   Did you ask her whether she was    12:14:42
16  drinking that night?
17     A.   I don't believe so.
18     Q.   Do you know whether she was
19  drinking that night?
20     A.   I don't know.             12:14:53
21     Q.   Do you think it would be important
22  to know whether she was drinking that night?
23        MR. WELCH:  Objection.  You can
24     answer.
25     A.   I don't think it would be that    12:14:58

Page 426

1        Cherry
2  important, no.
3      Q.   Well, you testified before that if
4  somebody drank a lot it could affect their
5  ability to recall events; is that correct?    12:15:06
6      A.   I would say it would depend on how
7  much they drank and if they drank at all, it
8  might.
9      Q.   So you don't think it would be
10  important to know at all whether she drank,    12:15:17
11  and if she did how much she drank?
12     A.   The important thing is what she
13  remembered.
14     Q.   But the amount that she drank
15  could affect her ability to recall; correct?   12:15:36
16        MR. WELCH:  Objection.  You can
17     answer.
18     A.   I don't know.
19     Q.   But in your experience 30 years as
20  a detective you don't know one way or the     12:15:44
21  other whether the amount that somebody drinks
22  can affect their ability to recall events?
23        MR. WELCH:  Objection.
24     Q.   Is that what you are telling us?
25     A.   It is a possibility I believe.    12:15:53

Page 427

**Cherry**

1
2      Q.   So why didn't you ask her?
3        MR. WELCH:  Objection.  Asked and
4     answered.  You can answer again.
5      A.   I didn't ask her.        12:16:01
6      Q.   This was done on November 7, 2004;
7  correct?
8      A.   Correct.
9      Q.   Why did you wait a week to go meet
10  with her?                  12:16:10
11     A.   Availability.  She was available.
12     Q.   Based on her availability?
13     A.   Yes.
14     Q.   Did you try to speak with her
15  prior to November 7, 2004?            12:16:16
16     A.   I believe I spoke to her on the
17  phone prior to that making arrangements to
18  come and talk to her about the -- telling her
19  me take the statement.
20     Q.   Was that at Mr. Hesse's suggestion  12:16:25
21  that you called her?
22     A.   I called her to see -- because she
23  had forwarded a statement, you know, a
24  statement to the Police Department.
25     Q.   My question is did you call her at  12:16:39

Page 428

1        **Cherry**
2  George Hesse's request or did you do it on
3  your own?
4      A.   No, I called her.
5      Q.   What was the location of the house   12:16:45
6  that you took the statement at?
7      A.   17 Wood Lane, Smithtown, New York.
8      Q.   So you traveled out to Smithtown
9  for this?
10     A.   Yes.                12:17:03
11     Q.   Were you on duty at the time?
12     A.   Yes.
13     Q.   Was Mr. Hesse on duty at the time?
14     A.   Yes.
15     Q.   Was this statement given based on   12:17:08
16  the narrative or did you ask her specific
17  questions?
18     A.   I had spoken to her on the phone
19  earlier and going over the narrative, I had
20  the narrative that she gave us originally    12:17:19
21  faxed to us, and she redid the narrative and I
22  wrote it down as she was giving it to us.
23     Q.   Did you know her prior to speaking
24  to her on this issue?
25     A.   No.                 12:17:34

15 (Pages 425 to 428)

fe328622-2839-421c-b95d-1a148c29491d

Page 429

Cherry

1
2    Q.   Do you know whether Mr. Hesse did?
3    A.   I believe he did, yes.
4    Q.   Do you know whether he was friends
5 with her?                    12:17:40
6    A.   I don't know.
7    Q.   Do you know whether he is friends
8 with her husband, her late husband?
9    A.   I don't know.
10    Q.   If you look at the second page of   12:17:46
11 this exhibit and the second paragraph down?
12    A.   Okay.
13    Q.   The second line of the second
14 paragraph says:  The man then lunged at me
15 grabbing me neck with both hands, banging me   12:18:03
16 into the men's room door.
17        Do you see that?
18    A.   Yes, I do.
19    Q.   Do you know whether she filed a
20 police report that night?            12:18:13
21    A.   Did she file one that night; no.
22    Q.   How come?
23    A.   From what -- I don't know.
24    Q.   Did you ask her why she didn't
25 file a police report after allegedly being   12:18:24

Page 430

Cherry

1
2 assaulted?
3    A.   Apparently she had gone to the
4 police station with Richie Bossetti, but they
5 had the three people involved in the station   12:18:32
6 house, and Richie went in to see if it was a
7 good time to come in and have her give a
8 statement.  They said no, they were too busy.
9    Q.   And how did you learn about that
10 she was with Richie Bossetti when they came   12:18:47
11 back to the station?
12    A.   I believe she told us.
13    Q.   As part of her statement she told
14 you that?
15    A.   No.                12:18:57
16    Q.   How come you didn't put that in
17 the statement?
18    A.   Because this was the actual
19 incident itself.
20    Q.   Well, don't you think that what   12:19:05
21 her actions were in an effort to allegedly
22 report the incident was part of the incident?
23        MR. WELCH:  Objection..  You can
24    answer.
25    A.   You got to remember we were trying   12:19:11

Page 431

Cherry

1
2 to -- this wasn't a criminal investigation, we
3 were trying to find out what happened, and
4 this is basically what happened as far as she
5 was concerned.  And this was the basis of I   12:19:25
6 guess what Gary did and what he saw.
7        So we didn't get into anything too
8 much after the initial incident itself.  The
9 statement ends after she was grabbed by the
10 neck and what happened after that, then it   12:19:41
11 stopped.  We didn't get anything after that,
12 after that incident occurred.
13    Q.   Why didn't you go into anything
14 after the incident occurred?
15    A.   Well I just stopped at that point.  12:19:52
16    Q.   Do you know that she went to the
17 hospital that night?
18    A.   No.
19    Q.   You don't know or --
20    A.   She didn't.            12:20:00
21    Q.   Did you ask her why she didn't
22 seek any medical treatment that night?
23    A.   No.
24    Q.   Are you aware that she actually
25 went down to CJ's after Houser's?       12:20:17

Page 432

Cherry

1
2        MR. WELCH:  Objection.  Asked and
3    answered.  You can answer again.
4    A.   Whether she went to CJ's after
5    that?                  12:20:27
6    Q.   Yes.
7    A.   No.
8    Q.   You don't know one way or the
9 other?
10    A.   I don't know.            12:20:30
11    Q.   When did you see her original
12 statement that she faxed in?
13    A.   I'm not sure.  Sometime I guess
14 around the November 1st or 2nd.
15    Q.   Did you see the statement that her   12:20:49
16 husband Budd Jaeger had sent in?
17    A.   Yes, I saw that.
18    Q.   That was prior to taking her
19 statement?
20    A.   Yes.                12:20:59
21    Q.   Why didn't you go get a deposition
22 like statement from Budd Jaeger?
23    A.   He was not at the scene.
24    Q.   Did you read a statement that came
25 in Elyse Myller?            12:21:08

16  (Pages 429 to 432)

fe328622-2839-421c-b95d-1a148c29491d

Page 433

Cherry

1      Cherry
2      A.   Yes.
3      Q.   How come you didn't take a
4  statement from her in a deposition form?
5      MR. WELCH: Objection.  You can   12:21:16
6  answer.
7      A.   I called her after we got, after I
8  read the thing and asked her if she could
9  send -- she had the original statement that
10  she wrote out and she faxed to us, she said   12:21:26
11  she did, I believe I testified that we asked
12  her to send a notarized copy of that or
13  notarized original to us so I have it for the
14  record.  It was a matter of logistics, she
15  lived in the city and very difficult to   12:21:46
16  interview her and she wasn't coming back out
17  to the Fire Island.
18      Q.   But other than for the statements
19  that we have looked at now as far as
20  depositions, did you take any other statements   12:22:05
21  in connection with your role in investigating
22  this incident?
23      A.   The ones that we looked at
24  already?
25      Q.   Right.   12:22:13

Page 434

1      Cherry
2      A.   No.
3      Q.   Were there any statements that you
4  tried to get that you couldn't?
5      A.   No.   12:22:16
6      Q.   Were there any witnesses that you
7  thought would be important to get that you
8  didn't take?
9      A.   No.
10      Q.   How come you didn't interview Gary   12:22:24
11  Bossetti as part of your role in the
12  investigation of the incident?
13      MR. WELCH: Objection.  Asked and
14  answered.  You can answer again.
15      A.   I didn't feel that was my   12:22:34
16  function.  It should be a supervisor
17  interviewing the police officer.
18      Q.   Do you know when he was
19  investigated as part of the investigation?
20      A.   No.   12:22:47
21      Q.   Do you know whether he was
22  drinking that night?
23      A.   I don't know.
24      Q.   Did you ever speak with Gary
25  Bossetti about Halloween?   12:22:51

Page 435

1      Cherry
2      A.   No.
3      Q.   Have you ever spoken to Richard
4  Bossetti about Halloween?
5      A.   No.   12:22:56
6      Q.   I believe you testified that you
7  reviewed their statements -- strike that.
8      Did you ever review their
9  statements that they gave in connection with
10  this case?   12:23:03
11      MR. WELCH: Objection.  Asked and
12  answered.  You can answer again.
13      A.   Yes.
14      Q.   That was the next season?
15      A.   Yes.   12:23:07
16      Q.   So I assume that their statements
17  had no effect on your conclusion that you
18  reached that Gary Bossetti had acted properly?
19      MR. WELCH: Objection to the form.
20  You can answer.   12:23:27
21      A.   No.
22      Q.   Do you know where the Bossetti's
23  slept that night?
24      A.   No.
25      Q.   Do you know what time Gary   12:23:35

Page 436

1      Cherry
2  Bossetti left the island that night?
3      A.   I don't know.  I wasn't there.
4      Q.   Do you know how Gary Bossetti got
5  off the island?   12:23:50
6      A.   No.
7      Q.   Have you ever seen the statements
8  that were provided by any of the on duty
9  officers that night?
10      A.   Yes.   12:24:05
11      Q.   When did you see those statements?
12      A.   Again early in the '05 season.
13      Q.   So you had not seen them at all in
14  2004?
15      A.   No.   12:24:14
16      Q.   And they didn't have any effect on
17  your conclusion that you reached?
18      A.   No.
19      Q.   Did you try to speak with any of
20  them as part of your investigation?   12:24:29
21      A.   No.
22      Q.   Do you think it would have been
23  important to speak with the three of them or
24  any of the three of them as part of your
25  investigation?   12:24:36

17 (Pages 433 to 436)

fe328622-2839-421c-b95d-1a148c29491d

Page 437

Cherry

1
2     MR. WELCH:  Objection.  You can
3  answer.
4     A.   No, that wasn't -- I don't believe
5  that was my job to do, I believe the          12:24:41
6  supervisor should be the person who
7  interviewed them.
8     Q.   Have you ever spoken with any of
9  the three officers that were on duty that
10  night about Halloween?                        12:24:57
11     A.   I believe we -- there was a
12  question as to whether there was a cover-up
13  involved, and I believe we asked them if they
14  wanted to look at the file, come in and look
15  at it and if they had any questions they could  12:25:10
16  ask us.  And I believe I was there when each
17  of them looked through the file and read the
18  statements.
19     Q.   Let's go back to what you said.
20  What was the first question of a cover-up?     12:25:22
21     A.   I heard someone, I believe George
22  Hesse mention that they were complaining that
23  we covered up a brutality case, and I said the
24  facts are there, I said show them the file,
25  let them read the file.  I didn't know if      12:25:39

Page 438

Cherry

1
2  anybody had showed them the file or they read
3  it or not.  I said let them read the file and
4  see what we discovered.
5     Q.   Did George Hesse actually tell you  12:25:50
6  that the three of them complained to him that
7  they believed there was a cover-up?
8     A.   No.
9     Q.   How did you find that out?
10     A.   George told me.  He said I heard     12:25:56
11  that they think this is a cover-up, that we
12  are trying to cover up something.
13     Q.   When was this?
14     A.   Sometime in the, I believe in the
15  '05 -- the '05 season.                         12:26:08
16     Q.   So at some point in the '05 season
17  you learned that the three on duty officers
18  that night believed that you guys were
19  covering up an incident of police brutality?
20     A.   Yes.                                  12:26:21
21     Q.   And George Hesse told you that?
22     MR. WELCH:  Objection..  You can
23  answer.
24     A.   I believe so.
25     Q.   Did you ever speak to George Hesse  12:26:28

Page 439

Cherry

1
2  about that allegation?
3     A.   Other than when he first told me,
4  I said there was no cover up, I said the facts
5  are all there.  You know, self-explanatory.  I  12:26:41
6  said let them read the file.  That was, you
7  know, I was kind of upset that they thought
8  that I would cover up something.
9     Q.   Do you know why they believed you
10  covered something up?                          12:26:57
11     A.   I don't know.
12     Q.   Did you ever speak to them about
13  it?
14     A.   No.
15     Q.   I go back to the question I asked   12:27:02
16  before.  Had you ever spoken to any of the
17  three officers that were on duty that night
18  about the Halloween incident?
19     MR. WELCH:  Objection.  Asked and
20  answered.  You can answer again.              12:27:10
21     A.   Just when we asked them to look at
22  the file I was there, if they had a question
23  they could ask me.
24     Q.   Did they ask you any questions?
25     A.   Not that I recall.                   12:27:19

Page 440

Cherry

1
2     Q.   Did you say anything to them?
3     A.   I said the file is here, read the
4  file.  They read the file and there was no
5  questions.  They didn't ask me what happened,  12:27:30
6  why did I feel this way about the case.  I
7  said this is what happened.
8     Q.   What do you recall if anything --
9  what's the substance if you recall of any
10  conversation that you ever had with Frank     12:27:51
11  Fiorillo about Halloween?
12     A.   I don't recall other than asking
13  him to review the file, having any
14  conversation with him about it.
15     Q.   You actually asked him to review   12:28:00
16  the file?
17     A.   I said the file is here, I asked
18  him to come in and read the file.
19     Q.   Did he come in by himself or with
20  other people?                                 12:28:10
21     A.   I don't know.  I think they each
22  came in individually to read it.  I don't
23  think they came together.
24     Q.   Who was in the room with
25  Mr. Fiorilli when he reviewed the file?       12:28:14

18  (Pages  437 to 440)

fe328622-2839-421c-b95d-1a148c29491d

Page 441

Cherry

1
2     A.   I don't recall.  I believe I was,
3   but I don't recall who was in the room.  It is
4   a small office, people are in and all out the
5   time.  So there may have been, there may not     12:28:31
6   have been other people.
7     Q.   You don't recall other than saying
8   here is the file anything else that was
9   discussed between the two of you?
10    A.   No.                    12:28:33
11    Q.   How about Mr. Lamm, what do you
12  recall speaking with him, the substance of
13  what you spoke with him about the Halloween
14  incident?
15    A.   Other than having them review the     12:28:40
16  file I don't recall any conversations that we
17  had about -- there was no questions, no
18  questions about -- they had an opportunity to
19  ask me if I was there or at any time ask me
20  questions about.  I never received any        12:28:58
21  questions.
22    Q.   Did you ever ask any of them why
23  they believed there was a cover-up?
24    A.   No.
25    Q.   Do you recall the substance of any  12:29:04

Page 442

Cherry

1
2   conversation you had with Tom Snyder about the
3   Halloween incident?
4     A.   No.
5     Q.   Did there come a point in time     12:29:11
6   that Gary Bossetti was terminated over the
7   Halloween incident?
8         MR. WELCH:  Objection.  You can
9   answer.
10    A.   I don't -- I don't know from      12:29:26
11  direct knowledge, but I understand the chief
12  had terminated him.
13    Q.   How did you learn that?
14    A.   George Hesse told me when he
15  called me, telephone.              12:29:38
16    Q.   So you had known that he had been
17  terminated prior to your taking the witness
18  statements?
19    A.   Yes.
20    Q.   Were you friends with Gary       12:29:45
21  Bossetti?
22    A.   We worked together, we were casual
23  friends.  We didn't socialize or anything,
24  just from working.
25    Q.   You never socialized with him     12:29:57

Page 443

Cherry

1
2   after a shift?
3     A.   I may have had a drink with him
4   once or twice, but other than that, no.
5     Q.   Did you ever go to any meals with  12:30:06
6   him either on or off duty?
7     A.   No.  On duty we sat down and had
8   dinner a couple of times.
9     Q.   What was your reaction when you
10  heard that Gary Bossetti had been terminated?  12:30:16
11        MR. WELCH:  Objection.  You can
12  answer.
13    A.   I was surprised.  I said why, I
14  asked George.  He said apparently he has been
15  accused of assaulting three people in a bar.   12:30:29
16    Q.   Did you have any response to that?
17    A.   I said that doesn't sound like
18  Gary.  I said why, what happened, George said
19  I don't know.  At that time he didn't know.
20    Q.   Was part of your goal in the      12:30:42
21  investigation to get Gary Bossetti's job back?
22    A.   No.
23    Q.   George Hesse didn't tell you we
24  need to get Gary's job back?
25    A.   No.                    12:30:55

Page 444

Cherry

1
2     Q.   Are you sure about that?
3     A.   Yes.
4         MR. WELCH:  Objection.  The
5   testimony speaks for itself.          12:30:59
6     Q.   There came a point in time where
7   Mr. Van Koot was arrested over the Halloween
8   incident; is that correct?
9     A.   Yes.
10    Q.   Do you know who arrested him?      12:31:11
11    A.   I believe Gary Bossetti was the
12  arresting officer.
13    Q.   So let me just get this straight.
14  There was an incident where he alleges that an
15  off duty police officer assaulted him, and the  12:31:21
16  same off duty police officer was sent out to
17  arrest him; is that correct?
18        MR. WELCH:  Objection.
19    A.   I don't believe he was sent out.
20  I believe they issued a summons, a notice to   12:31:33
21  appear and he surrendered with his attorney
22  and at that point he was arrested by I believe
23  Gary Bossetti.  I wasn't there at the time.
24    Q.   Did you attend the court
25  appearance?                    12:31:48

19  (Pages 441 to 444)

fe328622-2839-421c-b95d-1a148c29491d

Page 445

Cherry

1       **Cherry**
2    A.  No, sir.
3    **Q.  Have you ever spoken with anyone**
4 **at the District Attorney's office about the**
5 **Halloween incident?**          12:31:56
6    A.  No.
7    **Q.  Have you ever been contacted by**
8 **anyone at the District Attorney's office about**
9 **the Halloween incident?**
10    A.  No.          12:32:02
11    **Q.  Did you go into Houser's as part**
12 **of your investigation?**
13    A.  Yes.
14    **Q.  Why did you go there as part of**
15 **your investigation?**      12:32:26
16    A.  I had never been in Houser's, so I
17 wanted to in and see what it looked like.
18    **Q.  Did you speak with the bartender**
19 **as part of your investigation?**
20    A.  I didn't, no.     12:32:35
21    **Q.  Do you know if anyone did?**
22    A.  I believe George spoke to someone
23 there that day.  There was only one person in
24 the bar at the time cleaning up to close the
25 bar, I believe George spoke to him.    12:32:46

Page 446

Cherry

1       Cherry
2    **Q.  You testified last time about the**
3 **preseason meetings that the department would**
4 **have; is that correct?**
5    A.  Yes.          12:32:57
6    **Q.  How were you alerted to the**
7 **meetings?**
8    A.  A letter.
9    MR. GOODSTADT:  Would you mark
10  this document as Cherry Exhibit 21,    12:33:08
11  document numbered 002662.
12    (Cherry Exhibit 21, document
13  numbered 002662, marked for
14  identification, as of this date.)
15    **Q.  Did you take pictures at Houser's**  12:33:49
16 **Bar?**
17    A.  Yes.
18    **Q.  Why did you do that?**
19    A.  I think George took the pictures,
20 because there were pictures taken.    12:33:56
21    **Q.  How come you took pictures?**
22    A.  Just to have a record of what the
23 area looked like.  It is a very small area.
24    **Q.  Now, I focus your attention on**
25 **what has been marked as Cherry 21.**    12:34:11

Page 447

Cherry

1       Cherry
2    A.  Okay.
3    **Q.  One page exhibit bearing Bates**
4 **2662?**
5    A.  Okay.         12:34:19
6    **Q.  Have you ever seen the document**
7 **marked as Cherry 21?**
8    A.  I believe I have, yes.
9    **Q.  What is this document?**
10    A.  It is a letter advising members  12:34:25
11 about the annual department meeting to be held
12 in this case on April 2nd, at noon, 1200
13 hours.
14    Q..  Did you receive a copy of this
15 memo prior to the meeting?     12:34:43
16    A..  I believe so, yes.
17    **Q.  How did you get a copy of it?**
18    A.  By mail.
19    **Q.  Was it standard practice to send a**
20 **letter like this announcing the preseason**   12:34:52
21 **meeting?**
22    MR. WELCH:  Objection.  You can
23 answer.
24    A.  I believe so, yes.
25    **Q.  Prior to -- strike that.**     12:35:00

Page 448

Cherry

1       **Cherry**
2    **Did you actually attend the**
3 **meeting?**
4    A.  Yes.
5    **Q.  This is the one that you testified**  12:35:10
6 **to last time that George Hesse ran the**
7 **meeting?**
8    MR. WELCH:  Objection.  I don't
9  believe that was the testimony, but you
10  can answer.         12:35:18
11    MR. GOODSTADT:  I think he said
12  the meeting in 2006 was run by George
13  Hesse.  In fact I am pretty sure he did.
14    A.  I don't recall that, but I believe
15 he did run the meeting.       12:35:26
16    **Q.  Prior to the meeting did you speak**
17 **with George Hesse about what was going to**
18 **happen at the meeting?**
19    A.  No.
20    **Q.  Did you speak to George Hesse at**   12:35:34
21 **all about staffing issues prior to meeting?**
22    A.  No.
23    **Q.  Did you know that the five**
24 **plaintiffs in this case were going to be**
25 **terminated prior to that meeting?**    12:35:46

Page 449

Cherry

1          **Cherry**
2     A.   No.
3     Q.   When did you learn that the five
4  plaintiffs in this case were terminated at
5  Ocean Beach?              **12:35:55**
6     A.   We were waiting outside for the
7  meeting to start and they were called in
8  first, you know, go into the office and when
9  they came out they advised, advised us that
10 they were being terminated.        12:36:12
11    Q.   Who advised you?
12    A..  I don't recall who told me, but I
13 found out that they were being terminated.
14    Q.   You don't recall how you learned
15 that they were terminated?           **12:36:23**
16    A.   Somebody told me.
17    Q.   Did you learn before the meeting
18 started or did you learn while you were
19 standing out there waiting?
20    A.   Before the meeting started while   12:36:30
21 we were outside waiting.
22    Q.   Did George Hesse tell you that
23 they were being terminated?
24    A.   No.
25    Q.   Did you hear the reason as to why  **12:36:37**

Page 450

1          **Cherry**
2  they were being terminated?
3     A.   No.
4     Q.   Sitting here today do you know the
5  reason why they were told they were     **12:36:43**
6  terminated?
7     A.   I guess it was performance issues.
8     Q.   What is the basis of that?
9     A.   Just my, from what I can -- you
10 know, what I thought.            12:36:54
11    Q.   What was the basis of your
12 thinking that?
13    A.   I don't know what other reason
14 there could be?
15    Q.   Well, did you review any     **12:37:02**
16 performance issues?
17       MR. WELCH:  Objection.  Asked and
18 answered at the previous deposition.
19    A.   No.
20    Q.   Did anyone ever advise of you any  **12:37:12**
21 performance problems with any of the five
22 plaintiffs?
23    A.   Advised me?
24    Q.   Yes.
25    A.   No.                  12:37:21

Page 451

1          Cherry
2     Q.   Did anyone actually advise you
3  that performance was the reason that they were
4  let go?
5     A.   Not that I can recall.         12:37:26
6     Q.   So sitting here today your belief
7  that it was performance related was just
8  conjecture?
9     A.   Yes.
10    Q.   Did you ever discuss with George   **12:37:42**
11 Hesse why he let the five of them go?
12    A.   No.
13    Q..  Did you ever discuss with Chief
14 Paradiso why the five of them were let go?
15       MR. WELCH:  Objection to the form.  12:37:53
16    A.   No.
17    Q.   Now, this memo that is marked as
18 Cherry Exhibit 21 instructs you -- strike
19 that.  It says all officers are required to
20 bring all issued equipment with them for     **12:38:07**
21 inspect.  Do you see that?
22    A.   Yes, I do.
23    Q.   Does that refer to you as an
24 officer?
25    A.   I was not an officer at the time,  12:38:13

Page 452

1          Cherry
2  I was a dispatcher.
3     Q.   So you didn't bring any equipment
4  with you for inspection?
5     A.   I brought my shield and my ID     12:38:19
6  card.
7        MR. WELCH:  The seven hours is up
8  now.  How much time do you think in
9  addition to that you would need.
10       MR. GOODSTADT:  I should be done    12:38:35
11 in 15 or 20 minutes.  Not that much left.
12       MR. WELCH:  Okay.
13    Q.   It says here on line 4, it says
14 new ID will be issued to all.  Do you see
15 that?                     **12:38:49**
16    A.   Okay.
17    Q.   Was new ID issued to you at that
18 meeting?
19    A.   I don't recall.  Possibly, but I
20 don't recall.                12:39:16
21    Q.   What does your ID from Ocean Beach
22 say; does it have your title on it?
23    A.   Yes.
24    Q.   What does it say?
25    A.   Dispatcher.             12:39:23

21 (Pages 449 to 452)

Page 453

Cherry

1          Cherry
2     Q.   Did you ever an ID that said
3    police officer?
4     A.   Yes.
5     Q.   When did you turn that in?       12:39:27
6     A.   When I resigned.
7     Q.   Where was the actual meeting held?
8     A.   In the boat house which is next to
9    the ferry terminal.
10    Q.   Who attended the meeting?       12:39:39
11    A.   All the officers that were able to
12   attend. I don't know exactly how many that
13   showed up, but the officers that came attended
14   the meeting.
15    Q.   Do you know who Chris Moran is?   12:39:54
16    A.   Yes.
17    Q.   Was Mr. Moran at that meeting?
18    A.   I don't know for sure.
19    Q.   You don't recall one way or the
20   other?                     12:40:00
21    A.   No.
22    Q.   Did Mr.. Hesse address at that
23   meeting the fact that he had just terminated
24   some officers?
25    A.   I believe he mentioned it, yes.    12:40:08

Page 454

1          Cherry
2     Q.   What did he say about that?
3     A.   I don't recall the exact words.
4     Q.   Sum and substance what did he say?
5     A.   That some people were not coming   12:40:15
6    back.
7     Q.   What did he say about that; did he
8    give any explanation as to why?
9     A..   Not that I can recall.
10    Q.   Did he say who wasn't coming back?  12:40:23
11    A.   No, but by that time we had known
12   who was not coming back, the five officers
13   that were not coming back.
14    Q.   How did you know that?
15    A.   Because they gathered around --    12:40:34
16   they came out and told me they were not coming
17   back.
18    Q.   At that point in time did you know
19   that Tom Snyder was being let go?
20    A.   I found out the five people who    12:40:44
21   were being let go, yes.
22    Q.   So that day you found out that Tom
23   Snyder was being let go?
24    A.   To the best of my recollection.
25   As I said I don't recall who was there and who  12:40:54

Page 455

1          Cherry
2    wasn't.
3     Q.   Did Mr. Hesse tell you, strike
4    that.
5         Did Mr. Hesse discuss anything     12:41:02
6    other than his saying there were certain
7    people that were not coming back, did he say
8    anything else about the five police officers
9    who are plaintiffs in this case?
10    A.   Not that I can recall.       12:41:14
11    Q.   Did he mention the names of the
12   people that were not coming back?
13    A.   Not that I recall.
14    Q.   Isn't it true that he said that Ed
15   Carter and Tom Snyder were being fired because  12:41:25
16   they were going to wear a wire for the DA?
17         MR. WELCH: Objection to the form.
18    A.   I don't recall that.
19    Q.   Is there anything that would
20   refresh your recollection?          12:41:39
21    A.   No.
22    Q.   Do you recall Mr. Hesse saying
23   anything about the DA at that meeting?
24    A.   I don't remember.
25    Q.   You don't recall him saying        12:41:47

Page 456

1          Cherry
2    something about Arnold Hardman's (phonetic)
3    attorney telling him that Snyder and Carter
4    were going to wear a wire in connection with
5    the Gilbred incident?             12:41:58
6         MR. WELCH: Objection to the form.
7    You can answer.
8     A.   No, I don't.
9     Q.   Do you remember him saying
10   anything at all about Arnold Hardman's     12:42:04
11   attorney?
12    A.   No.
13    Q.   Did you ever speak with Arnold
14   Hardman about any of the five plaintiffs in
15   this case?                 12:42:11
16    A.   No.
17    Q.   Anyone ask any questions as to why
18   the five officers were let go that day?
19    A.   I don't believe so.
20    Q.   Did you speak with any other     12:42:25
21   officers that were there -- strike that.
22        Did you speak with any other
23   people who were there about the fact that some
24   officers had been terminated?
25    A.   Other than the surprise, no, that  12:42:37

22  (Pages 453 to 456)

Page 457

```
1              Cherry
2    they were let go. We may have discussed it
3    with somebody what happened, what is going on.
4    I don't recall a specific conversation I had
5    with anybody about it other than general      12:42:52
6    conversation that, you know, surprise that
7    this happened.
8        Q.   Do you recall the sum and
9    substance of any of that general conversation?
10       A.   As I said it was a surprise of      12:43:02
11   what was going on.
12       Q.   Who expressed surprise?
13       A.   I did myself, you know, everybody
14   was surprised or, you know, just became aware
15   of it and we we -- it was a surprise to us.  12:43:16
16       Q.   Why were you surprised?
17       A.   Because, you know, it happened.
18       Q.   You had no knowledge that it was
19   going to happen prior to that day?
20       A.   No, sir.                  12:43:29
21           MR. WELCH:  Objection.  Asked and
22   answered.  You can answer.
23       Q.   Were there any officers hired,
24   newly hired officers for that season?
25       A.   I don't recall.            12:43:38
```

Page 458

```
1              Cherry
2        Q.   Isn't it true that Hesse called at
3    least some of the plaintiffs in this case rats
4    at that meeting?
5           MR. WELCH:  Objection.  Form.   12:43:54
6    Foundation.  You can answer.
7        A.   I don't recall.
8        Q.   You don't recall one way or the
9    other?
10       A.   No.                    12:43:59
11       Q.   Was there any discussion of any
12   budget cuts occurring that year at that
13   meeting?
14       A.   Not that I know of.
15       Q.   Have you ever heard, sitting here  12:44:13
16   today have you ever heard that there were any
17   budget cuts for that season?
18       A.   Not that I recall, no.
19       Q.   This is the first year that Hesse
20   was the senior officer in the village; is that  12:44:33
21   correct?
22           MR. WELCH:  Objection to the form.
23   Foundation.  You can answer.
24       A.   I don't recall George's status.  I
25   know -- I am not sure when the exact date   12:44:57
```

Page 459

```
1              Cherry
2    Chief Paradiso went on sick leave.
3        Q.   But it was after Paradiso went on
4    sick leave that Mr. Hesse became the superior
5    officer in the village?            12:45:01
6        A.   Well, he was the sergeant, so if
7    the chief is on sick leave he was the only
8    other supervisor..
9        Q.   Paul Trosko, do you recall him
10   being hired as a full-time officer that year?  12:45:13
11       A.   I am not sure the exact date Paul
12   was hired as a full-time officer.
13       Q.   How about Francis Foti, do you
14   recall him being hired as a full-time officer
15   that year?                     12:45:23
16       A.   I am not sure of the exact date
17   that he was hired.
18       Q.   Is George Hesse currently on
19   modified duty?
20       A.   I believe so, yes.         12:45:32
21       Q.   Does he carry a weapon?
22       A.   I don't think so.
23       Q.   Does he wear a uniform?
24       A.   Yes.
25       Q.   Same police uniform he has always  12:45:41
```

Page 460

```
1              Cherry
2    worn?
3        A.   Not the same uniform.  He wears
4    Khaki pants and a blue shirt.
5        Q.   What does that signify?        12:45:55
6        A.   That is just what he wears.
7        Q.   When did he start wearing that
8    uniform?
9        A.   Last year.  Last season.
10       Q.   The blue shirt, that is an Ocean   12:46:07
11   Beach Police Department shirt?
12       A.   He wore a blue shirt with a shield
13   on it.  Then there came a point where he just
14   wore a blue shirt without the shield on it.
15       Q.   When did that happen?         12:46:28
16       A.   Sometime during the season last
17   year.
18       Q.   During the '08 season?
19       A.   Yes, to the best of my
20   recollection.  I don't remember exactly when   12:46:35
21   he switched.
22       Q.   When was the last time that you
23   saw George Hesse?
24       A.   Last time I saw him; probably in
25   October.  I mean at work or --          12:46:46
```

23  (Pages 457 to 460)

fe328622-2839-421c-b95d-1a148c29491d

Page 461

1                    Cherry
2        Q.    At any point in time?
3        A.   I saw him at the Christmas party.
4        Q.    Where was the Christmas party?
5        A.   At Portly Villager.          12:46:56
6        Q.    Who paid for that party?
7        A.   It was a cash bar.
8        Q.    No one paid -- no one from the
9    village paid for that party?
10       A.   Not to my knowledge, no.      12:47:14
11       Q.    Do you know if anyone else has
12   been placed on modified duty in the last two
13   years at Ocean Beach?
14           MR. WELCH:  Objection.  You can
15   answer.                             12:47:25
16       A.   Not to my knowledge.
17       Q.    Do you know who Mitch Burns is?
18           MR. WELCH:  Objection.  Asked and
19   answered.  You can answer again.
20       A.   No.                         12:47:34
21       Q.    Have you ever been to a Christmas
22   party for the Ocean Beach Police Department at
23   the Argyle Grill in Babylon?
24       A.   Yes.
25       Q.    What year did you go to that?    12:47:47

Page 462

1                    Cherry
2        A.   I believe that was the first year
3    that I was there, maybe the first two years
4    the Christmas party was there.  Then it
5    switched over to the Portly Villager.    12:47:58
6        Q.    Do you recall being at the '05
7    Christmas party?
8        A.   Yes.
9        Q.    Do you know who paid for that
10   party?                              12:48:10
11       A.   No.
12       Q.    Is it true that the PBA paid for
13   that party?
14           MR. WELCH:  Objection.
15       A.   I don't know for sure.       12:48:14
16       Q.    Did you have to pay for that
17   party?
18       A.   I don't recall if that was a cash
19   bar or not.
20       Q.    Have you ever reviewed any blogs   12:48:21
21   in connection with the Ocean Beach Police
22   Department?
23       A.   Yes, there was a blog that
24   contained an Ocean Beach Police Department
25   blog.                               12:48:43

Page 463

1                    Cherry
2        Q.    What was the web-site that blog
3    was on?
4        A.   I am trying to think of the name
5    of it.  The Schwartz Report or something like  12:48:50
6    that.
7        Q.    When did you first review that?
8        A.   It had been going on for I guess a
9    year or so, nothing recently, but I know the
10   last year or two there was a blog about that,  12:49:08
11   Ocean Beach.
12       Q.    When did you first review it?
13       A.   When it first came on, I don't
14   know the exact date.
15       Q.    Where did you review it?      12:49:18
16       A.   On the computer.
17       Q.    On which computer?
18       A.   My home computer.
19       Q.    Did you ever review it at the
20   computer at the police station at Ocean Beach?  12:49:27
21       A.   I may have once or twice, yes.
22       Q.    Have you ever posted on the blog?
23       A.   Yes.
24       Q.    How many times?
25       A.   I believe four.              12:49:37

Page 464

1                    Cherry
2        Q.    What name do you post on there?
3        A.   No particular name, I think it is
4    like 12345.
5        Q.    That is the name, 12345?      12:49:48
6        A.   Well, you just go on, you just put
7    something down to get on the blog.
8        Q.    What was the -- when did you post
9    on the blog?
10       A.   The exact -- I can give you the    12:49:59
11   exact dates if you want them.
12       Q.    Can I get the exact dates?
13           MR. WELCH:  You have it written
14   down; you want to leave a space?
15       A.   Yes.  I thought I had my book with  12:50:07
16   me, but I don't know.
17       Q.    Leave a space in the transcript
18   for that.
19   TO BE FURNISHED: _____
20   _____  12:50:13
21   _____
22       A.   I believe I posted four times..  I
23   don't have the exact dates and times.
24       Q.    Why did you post on the blog?
25       A.   Because I felt there was some -- a  12:50:21

24 (Pages 461 to 464)

fe328622-2839-421c-b95d-1a148c29491d

Page 465

```
      Cherry
1
2  lot of inaccuracies on the blog, and I made
3  some statements, some posts on the block to
4  try to set the record straight so to speak.
5     Q.  Where did you post from?        12:50:45
6     A.  My home.
7     Q.  Did you ever post from the
8  computer in the Ocean Beach Police Department?
9     A.  No.
10    Q..  Do you know whether any -- are you  12:50:51
11 aware of anyone else posting from the Ocean
12 Beach Police Department on that blog?
13    A.  Not to my knowledge.
14    Q.  Do you know whether Ti Bacon ever
15 posted on the blog?               12:51:04
16    A.  Not to my knowledge.
17    Q.  Did you ever tell George Hesse
18 that you posted on the blog?
19    A.  Yes.
20    Q.  What did you tell him?          12:51:12
21    A.  I told him when I had an
22 opportunity if I posted on the blog, that I
23 made a post.
24    Q..  Did he ever tell you whether
25 anyone else in the Police Department had   12:51:26
```

Page 466

```
      Cherry
1
2  posted on the blog?
3     A.  No.
4     Q.  Did he ever tell you whether he
5  had posted on the blog?            12:51:33
6     A.  No.
7     Q.  Sitting here today do you know
8  whether any other former or current members of
9  the Ocean Beach Police Department have ever
10 posted on the blog?              12:51:41
11    A.  Not to my knowledge.
12    Q.  Have you ever spoken to any other
13 current or former Ocean Beach police officers
14 about them posting anything on the blog?
15    A.  No.             12:51:53
16    Q.  Other than for George Hesse who
17 else at Ocean Beach have you told that you
18 posted on the blog?
19    A.  That is about it.
20    Q.  Tell me the sum and substance of   12:52:04
21 your disclosure to George Hesse that you
22 posted on the blog?
23    A.  I said I made a reply to a post, I
24 don't know if he read the blog, but there was
25 some really disgusting things on it and a lot   12:52:14
```

Page 467

```
      Cherry
1
2  inaccuracies on it, and I usually don't
3  respond to things like that, but I felt it
4  necessary to write need I think -- I felt that
5  I had to write something and I made about four  12:52:29
6  entries on the blog.
7     Q.  Did you ever speak to Chief
8  Paradiso about the blog?
9     A.  No.
10    Q..  Did you tell George Hesse the    12:52:41
11 substance of your blog postings?
12    A.  Yes.
13    Q.  Do you know whether he read your
14 blog postings?
15    A.  I believe he did.        12:52:52
16    Q.  Did he respond or tell you
17 anything about the substance of your postings?
18    A.  No.
19    Q.  How come you didn't post under
20 your own name?                12:53:16
21    A.  I didn't want to put my name, I
22 don't like to put my name on a computer.  So I
23 just put, you know, I put, usually put a
24 number, 45678 or 12345.
25    Q.  Did you ever hear George Hesse    12:53:36
```

Page 468

```
      Cherry
1
2  mention having any sexual encounters at Ocean
3  Beach?
4     A.  No.
5     Q.  George Hesse ever ask you to drive  12:53:45
6  him to any sexual escapades at Ocean Beach?
7        MR. WELCH:  Objection.
8     A.  No.
9     Q.  Did you ever hear him ask anybody
10 else to drive him to a sexual escapade on the   12:54:01
11 beach?
12    A.  No.
13       MR. WELCH:  Objection.
14    Q.  Did you ever hear Hesse state that
15 he had slept with Allison Sanchez?       12:54:10
16    A.  No.
17    Q.  Do you know who Allison Sanchez
18 is?
19    A.  No.
20    Q.  Do you know who Allison Chester   12:54:16
21 is?
22    A.  No.
23       MR. GOODSTADT:  Give me two
24 minutes.
25       THE VIDEOGRAPHER:  The time is    12:54:33
```

25 (Pages 465 to 468)

Page 469

Cherry

1
2   12:56, we are going off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  The time is
5   1:01, we are back on the record.        12:58:55
6        Q.   I believed you testified that you
7   called -- strike that.
8        You spoke to George Hesse this
9   morning to tell you were coming here; is
10  that correct?                  12:59:04
11       A.   That is correct.
12       Q.   Which phone number did you reach
13  him at?
14       A.   The 583-5866, that is the Ocean
15  Beach Police headquarters number.      12:59:11
16       Q.   Where is Mr. Hesse's office
17  currently?
18       A.   In the police station in Ocean
19  Beach.
20       Q.   Did he pick up the phone when you  12:59:20
21  called?
22       A.   Yes.
23       Q.   Do you recall what he said when he
24  picked up the phone?
25       A.   I told him I was --         12:59:29

Page 470

Cherry

1
2        Q.   I am asking not what you said, do
3   you recall what he said when he picked up the
4   phone, what was the first thing he said when
5   he picked up the phone?            12:59:38
6        A.   He said hello.
7        Q.   Did he identify himself?
8        A.   No.  I mean he knew it was me.
9        Q.   How did you know that he was?
10       A.   He was probably on the cell phone.  12:59:49
11  You forward the call to a cell phone when he
12  is not in the office itself.  I guess he saw
13  the identification, my number on the caller
14  ID.
15       Q.   Got you.              13:00:04
16       Now, just one other issue.  You
17  testified before that the investigation that
18  you were undertaking in November of '04 was
19  not a criminal investigation; is that correct?
20       A.   Correct.             13:00:18
21       Q.   Was it criminal activity that came
22  out as part of your investigation?
23       MR. WELCH:  Objection to the form.
24  You can answer.
25       A.   The investigation was to find out  13:00:29

Page 471

Cherry

1
2   what happened at the Halloween incident.
3   Since Gary Bossetti was never interviewed at
4   the time, we wanted to try to find out what
5   happened, and as I said the best way I thought  13:00:45
6   to do that was speak to the witnesses first.
7   That is why we spoke to the witnesses and got
8   their statements.  So it was an investigation
9   actually to find out what transpired that
10  night.                      13:01:04
11       Q.   And you testified that you thought
12  it was a supervisor's role to interview the
13  Bossetti's; is that correct?
14       A.   The police officers involved.
15       Q.   Why did you believe it was a      13:01:09
16  supervisor's role to do that?
17       A.   I felt it was an investigation
18  that a supervisor should take to do.  Being a
19  cop, investigating another cop, in the police
20  world this is not done, usually you have a     13:01:25
21  supervisor investigate when other officers are
22  involved.
23       Q.   Did you discuss that with Hesse or
24  Paradiso, that one of them were going to
25  interview the Bossetti brothers?         13:01:35

Page 472

Cherry

1
2        A.   Yes.
3        Q.   When did you discuss that with
4   them?
5        A.   I told George when he originally   13:01:41
6   called me that I think I would help him take
7   the statements of the witnesses, but any
8   statements or investigation that had to be
9   done involving the police officers, either the
10  officers that responded or Gary should be done  13:01:50
11  by a supervisor.
12       Q.   Do you know whether any
13  supervisors actually took statements from Gary
14  Bossetti or Richard Bossetti?
15       A.   I don't know.  Other than the      13:02:00
16  reports that they filed I don't know of any
17  other ones myself.
18       Q.   What do you mean by reports that
19  they filed?
20       A.   Well, when I read their reports, I  13:02:09
21  guess they submitted reports that I read in
22  early '05, the case jacket, they had submitted
23  written reports.
24       Q.   Just one more quick line of
25  questioning.  Who made the decision to rehire  13:02:27

26 (Pages 469 to 472)

fe328622-2839-421c-b95d-1a148c29491d

Page 473

```
 1              Cherry
 2  Gary Bossetti?
 3      A.  I don't know.
 4      Q.  How did you learn of the decision?
 5      A.  How did I learn of the decision?   13:02:34
 6      Q.  How did you learn of that
 7  decision?
 8      A.  I guess George told me, Sergeant
 9  Hesse told me that he was rehired.  I don't
10  know who made the decision, whether it was the  13:02:51
11  chief.  I imagine it would have to be the
12  chief, but I don't know for sure.
13      Q.  Why do you think it had to be the
14  chief?
15      A.  Because he is in charge of the     13:02:58
16  department.
17      Q.  You said the chief, is that Chief
18  Paradiso?
19      A.  Chief Paradiso, yes.
20      Q.  Do you know who fired Gary       13:03:03
21  Bossetti?
22      A.  I believe Chief Paradiso did.
23      Q.  Did how did you learn that?
24      A.  George told me.
25      Q.  When did he tell you that?        13:03:11
```

Page 474

```
 1              Cherry
 2      A.  When he called me to ask for -- to
 3  tell me what happened and asked me for
 4  assistance.
 5      Q.  Do you know what date Gary        13:03:16
 6  Bossetti was rehired?
 7      A.  No.
 8      Q.  When did you learn that he was
 9  rehired?
10      A.  I guess before the '05 season, I   13:03:21
11  guess the next season, '07.
12      Q.  Did you learn that he was going to
13  be rehired prior to someone actually telling
14  him that he was rehired?
15      A.  No.                   13:03:38
16      Q.  Do you know who communicated to
17  him that he was retired?
18      A.  No.
19          MR. GOODSTADT:  I have nothing
20          (Continued on next page.)      13:03:41
21
22
23
24
25
```

Page 475

```
 1
 2  further.
 3          MR. WELCH:  That is it.
 4          THE VIDEOGRAPHER:  The time is
 5  1:05.  This is the end of today's      13:03:47
 6  deposition.  We are going off the record.
 7          (Time noted:  1:05 p.m.)
 8          _____
 9              PATRICK CHERRY
10
11  Subscribed and sworn to before me
12  this ___ day of _____, 2009
13
14  _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 476

```
 1
 2          C E R T I F I C A T E
 3  STATE OF NEW YORK   )
 4                : ss.
 5  COUNTY OF NEW YORK  )
 6
 7      I, Philip Rizzuti, a Notary Public
 8  within and for the State of New York, do
 9  hereby certify:
10      That PATRICK CHERRY, the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such deposition
13  is a true record of the testimony given by
14  the witness.
15      I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 19th day of
21  February, 2009.
22          _____
23              PHILIP RIZZUTI
24
25
```

27 (Pages 473 to 476)

fe328622-2839-421c-b95d-1a148c29491d

```
                                    Page 477

 1
 2   ----------------- I N D E X ---------------
 3   WITNESS          EXAMINATION BY        PAGE
 4   PATRICK CHERRY    Mr. Goodstadt       378
 5
 6   ------------ INFORMATION REQUESTS -----------
 7   TO BE FURNISHED:   464
 8
 9   ------------------ EXHIBITS ------------------
10    Cherry Exhibit 18, document      387
11    numbered 003165 through 3166,
12    Cherry Exhibit 19, two-page      403
13    document, Bates 3167 through
14    3168,
15    Cherry Exhibit 20, document      423
16    number 003162 through 3164,
17    Cherry Exhibit 21, document      446
18    numbered 002662,
19
20
21
22
23
24
25
```

```
                                    Page 478

 1
 2       *** ERRATA SHEET ***
 3   NAME OF CASE: CARTER VS. OCEAN BEACH
     DATE OF DEPOSITION:  February 6, 2009
 4   NAME OF WITNESS:  PATRICK CHERRY
     PAGE  LINE    FROM       TO
 5   ____|_____|_____|_____
 6   ____|_____|_____|_____
 7   ____|_____|_____|_____
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19
20        _____
21         PATRICK CHERRY
22   Subscribed and sworn to before me
23   this _____ day of _____, 2009.
24   _____
25   (Notary Public)    My Commission Expires:
```

TSG Reporting – Worldwide     877-702-9580

fe328622-2839-421c-b95d-1a148c29491d