## In The Matter Of:

*EDWARD CARTER   v.*
*INCORPORATED VILLAGE OF OCEAN BEACH*

---

*FRANK FIORILLO*
*February 20, 2009*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, NY  11501*
*(516) 747-9393*

Original File 51060.TXT, 475 Pages
Min-U-Script® File ID: 2701167041

## Word Index included with this Min-U-Script®

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
[3] ---------------------------------X
    EDWARD CARTER, FRANK FIORILLO, KEVIN LAMM,
[4] JOSEPH NOFI, and THOMAS SNYDER,
                    Plaintiffs,
[5]      -against-  Case No. 07-Civ-1215
                         (SJF)(ETB)
[6] INCORPORATED VILLAGE OF OCEAN BEACH; MAYOR
    JOSEPH C. LOEFFLER, JR., individually and in
[7] his official capacity; former mayor NATALIE
    K. ROGERS, individually and in her official
[8] capacity; OCEAN BEACH POLICE DEPARTMENT;
    ACTING DEPUTY POLICE CHIEF GEORGE B. HESSE,
[9] individually and in his official capacity;
    SUFFOLK COUNTY; SUFFOLK COUNTY POLICE
[10] DEPARTMENT; SUFFOLK COUNTY DEPARTMENT: OF
    CIVIL SERVICE; and ALISON SANCHEZ,
[11] individually and in her official capacity,
                    Defendants.
[12] ---------------------------------X
[13]            85 Fifth Avenue
[14]            New York, New York
[15]
[16]            February 20, 2009
[17]            10:03 A.M.
[18]
[19]      VIDEOTAPE DEPOSITION of FRANK
[20] FIORILLO, taken pursuant to the Federal
[21] Rules of Civil Procedure, and Notice, held
[22] at the above-mentioned time and place before
[23] Edward Leto, a Notary Public of the State of
[24] New York.
[25]

Page 2

[1]
[2] APPEARANCES:

[3]    THOMPSON WIGDOR & GILLY LLP

           Attorneys for Plaintiffs

[4]        85 Fifth Avenue

           New York, New York 10003

[5]    BY:  ANDREW S. GOODSTADT, ESQ.

[6]    RIVKIN RADLER LLP

           Attorneys for Defendants

[7]        Incorporated Village of Ocean

           Beach, Mayor Joseph C. Loeffler,

[8]        Jr., former Mayor Natalie K.

           Rogers, and Ocean Beach Police

[9]        Department

           926 Reckson Plaza

[10]       Uniondale, New York 11556

       BY:  KENNETH A. NOVIKOFF, ESQ.

[11]

       MARK, O'NEILL, O'BRIEN & COURTNEY, P.C.

[12]       Attorneys for Defendant Acting

           Deputy Police Chief George B.

[13]       Hesse

           530 Saw Mill River Road

[14]       Elmsford, New York 10523

       BY:  KEVIN W. CONNOLLY, ESQ.

[15]

       SUFFOLK COUNTY ATTORNEY'S OFFICE

[16]       Attorneys for Defendants Suffolk

           County, Suffolk County Police

[17]       Department, Suffolk County

           Department of Civil Service, and

[18]       Alison Sanchez

           100 Veterans Memorial Highway

[19]       Hauppauge, New York 11788

       BY:  ARLENE ZWILLING, ESQ.

[20]

[21] ALSO PRESENT

       Kenneth Gray, General Counsel, Ocean

[22]       Beach Police Department

       Albert Santana, Legal Video Specialist

[23]

[24]

[25]

FRANK FIORILLO
February 20, 2009

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

---

Page 3

[1]
[2]      IT IS HEREBY STIPULATED AND
[3] AGREED by and among counsel for the
[4] respective parties hereto, that the filing,
[5] sealing and certification of the within
[6] deposition shall be and the same are hereby
[7] waived;
[8]      IT IS FURTHER STIPULATED AND
[9] AGREED that all objections, except to the
[10] form of the question, shall be reserved to
[11] the time of the trial;
[12]      IT IS FURTHER STIPULATED AND
[13] AGREED that the within deposition may be
[14] signed before any Notary Public with the
[15] same force and effect as if signed and sworn
[16] to by the Court.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 4

F. Fiorillo

[1]
[2]      THE VIDEOGRAPHER: This is tape
[3] number one in the videotape deposition
[4] of Frank Fiorillo in the matter of
[5] Edward Carter, et al, Plaintiffs,
[6] versus Incorporated Village of Ocean
[7] Beach, et al, Defendants, in the United
[8] States District Court, Eastern District
[9] of New York, case number
[10] 07-CIV-1215(SJF)(ETB), on February 20,
[11] 2009 at approximately 10:16 a.m.
[12]      I'm Albert Santana from the firm
[13] of Precise Court Reporting and I am the
[14] legal video specialist. The court
[15] reporter is Ed Leto in association with
[16] Precise Court Reporting.
[17]      For the record, will counsel
[18] please introduce themselves.
[19]      MR. GOODSTADT: Andrew
[20] Goodstadt, Thompson, Wigdor & Gilly, on
[21] behalf of the Plaintiffs.
[22]      MR. NOVIKOFF: On behalf of all
[23] the Village Defendants, except Sergeant
[24] Hesse, Ken Novikoff, Rivkin Radler.
[25]      MR. CONNOLLY: On behalf of

---

Page 5

F. Fiorillo

[1]
[2] Defendant George B. Hesse, Kevin W.
[3] Connolly of Mark, O'Neill, O'Brien &
[4] Courtney.
[5]      MR. GRAY: Kenneth Gray from
[6] the law firm Bee Ready Fishbein Hatter
[7] & Donovan, Village attorneys, Village
[8] of Ocean Beach.
[9]      MS. ZWILLING: For the County
[10] Defendants, Arlene Zwilling for
[11] Christine Malafi, Suffolk County
[12] Attorney.
[13]      THE VIDEOGRAPHER: Now will the
[14] court reporter please swear in the
[15] witness.
[16] FRANK FIORILLO, having first
[17] been duly sworn by a Notary Public of the
[18] State of New York, was examined and
[19] testified as follows:
[20]      THE REPORTER: Please state
[21] your name for the record.
[22]      THE WITNESS: Frank Fiorillo.
[23]      THE REPORTER: Please state
[24] your address.
[25]      THE WITNESS: 7 Wellwood

---

Page 6

F. Fiorillo

[1]
[2] Avenue, Farmingdale, New York 11735.
[3]      THE REPORTER: Thank you.
[4]      MR. NOVIKOFF: Andrew, regular
[5] stips?
[6]      MR. GOODSTADT: Yes.
[7]      MR. NOVIKOFF: Okay.
[8]                    EXAMINATION BY
[9]                    MR. NOVIKOFF:
[10]      Q: Mr. Fiorillo, at any point in
[11] time in the year 2005, did you receive
[12] unemployment benefits?
[13]      A: No. I think it was 2006.
[14]      Q: So the answer would be "no"?
[15]      A: The answer would be, to the best
[16] of my recollection, I was — I was
[17] working —
[18]      Q: I don't need — my answer was
[19] just yes or no or if you don't recall, you
[20] don't recall?
[21]      A: I don't recall 2005.
[22]      Q: How about 2004?
[23]      A: No. I was working then.
[24]      Q: How about 2003?
[25]      A: No.

---

Page 7

**F. Fiorillo**

[1]
[2] **Q:** How about 2006?
[3] **A:** I believe so.
[4] **Q:** When did you first apply for
[5] unemployment benefits?
[6] **A:** In I would say the spring of
[7] 2006.
[8] **Q:** Was it before or after you were
[9] advised by Ocean Beach that you would not be
[10] working for them for the 2006 season?
[11] **MR. GOODSTADT:** Just so we're
[12] on the same agreement —
[13] **MR. NOVIKOFF:** Same
[14] understanding. In fact, I even phrased
[15] the question so we wouldn't have to do
[16] that.
[17] **MR. GOODSTADT:** Right. Right.
[18] **A:** I'm not quite sure what month it
[19] started, but it was in the springtime of
[20] 2006 I believe.
[21] **Q:** No. My question is in what
[22] month, sir. It's in relation to when you
[23] were advised by Ocean Beach. So let me
[24] maybe back it up a little bit. Do you
[25] recall being advised by anyone at Ocean

Page 8

**F. Fiorillo**

[1]
[2] Beach that you would not be working for them
[3] for the 2006 season?
[4] **A:** Well, let's see. On April 2,
[5] 2006, that was the day I was fired.
[6] **MO MR. NOVIKOFF:** Well, that's
[7] nice. Motion to strike.
[8] **Q:** My answer is, do you recall —
[9] it's a yes or no question, sir — do you
[10] recall being advised by anyone at Ocean
[11] Beach that you were not going to work for
[12] them for the 2006 season, yes or no?
[13] **A:** At what time?
[14] **Q:** I'll rephrase the question. Were
[15] you advised at any point in time in 2006
[16] that you were not going to work for Ocean
[17] Beach for the 2006 season?
[18] **A:** Yes.
[19] **Q:** Were you advised by someone at
[20] Ocean Beach?
[21] **A:** Yes.
[22] **Q:** Who were you advised by?
[23] **A:** George Hesse.
[24] **Q:** Okay. What month were you
[25] advised by George Hesse?

Page 9

**F. Fiorillo**

[1]
[2] **A:** April.
[3] **Q:** What day in April?
[4] **A:** The second day.
[5] **Q:** Okay. Now with regard to
[6] unemployment benefits, did you apply for
[7] unemployment benefits before April 2, 2006?
[8] **A:** I might have. I'm not — I don't
[9] recall.
[10] **Q:** Okay. Were you working at any
[11] job in 2006 prior to April 2, 2006?
[12] **A:** Yes.
[13] **Q:** What were you working — what
[14] job were you working at?
[15] **A:** I was working as a driver. As a
[16] driver.
[17] **Q:** For whom?
[18] **A:** For LLC Maintenance.
[19] **Q:** Okay. And how much — were you
[20] an hourly employee or an annual salaried
[21] employee?
[22] **MR. GOODSTADT:** Objection.
[23] **A:** How did they base it. I — I
[24] guess it was based on, um, an annual salary.
[25] **Q:** What was your annual salary?

Page 10

**F. Fiorillo**

[1]
[2] **A:** I didn't work the whole year, so.
[3] **Q:** I understand, but when you first
[4] started, did they tell you what your annual
[5] salary would be?
[6] **A:** I think, approximately, the base
[7] salary was 60,000.
[8] **Q:** Okay. Now in 2006, prior to
[9] April 2, 2006, were you working for any
[10] other company or individual for which you
[11] were paid a salary?
[12] **A:** Yes.
[13] **Q:** For whom?
[14] **A:** In which year?
[15] **Q:** 2006, prior to April 2?
[16] **A:** Oh, in 2006? Ocean Beach.
[17] **Q:** Okay. And were you a seasonal
[18] employee in 2006 prior to April 2, 2006?
[19] **MR. GOODSTADT:** Objection.
[20] **A:** No.
[21] **Q:** Well, do you understand what I
[22] meant by the term "seasonal employee"?
[23] **A:** Absolutely.
[24] **Q:** What was your understanding?
[25] **A:** My understanding was if you

Page 11

*F. Fiorillo*

[1]
[2] worked two weeks — approximately two weeks
[3] before Memorial Day and approximately two
[4] weeks after Labor Day, you were considered
[5] seasonal.
[6]     **Q:** Okay. Were you a part — to your
[7] understanding, in 2006, prior to April 2,
[8] were you a part-time employee for Ocean
[9] Beach?
[10]     **A:** Yes.
[11]     **Q:** Okay. Other than for Ocean Beach
[12] and other than for a driver, were you — as
[13] a driver for that company, were you employed
[14] by any other entity or individual in 2006
[15] prior to April 2, 2006?
[16]     **A:** I don't believe so.
[17]     **Q:** Okay. After April 2, 2006 — and
[18] we're only now in the year 2006 — were you
[19] employed by anybody?
[20]     **A:** After April 2, 2006?
[21]     **Q:** Yes.
[22]     **A:** No.
[23]     **Q:** Okay. So if I — and tell me if
[24] I'm wrong — if I understood your testimony
[25] correctly, after April 2, 2006, for the

Page 12

*F. Fiorillo*

[1]
[2] remaining year 2006, you did not work for
[3] anybody for which you were paid?
[4]     **A:** I don't believe so.
[5]     **Q:** Okay. I notice you're wearing a
[6] suit today, sir. Have you been appearing at
[7] every deposition in this case?
[8]     **A:** No.
[9]     **MR. GOODSTADT:** Objection.
[10]     **Q:** Do you recall what deposition you
[11] didn't appear for?
[12]     **MR. GOODSTADT:** Objection.
[13]     **A:** I'm not sure.
[14]     **Q:** Okay. Were you at Mr. Richard
[15] Bosetti's deposition?
[16]     **A:** Yes.
[17]     **Q:** That was last week, correct?
[18]     **A:** Um, I don't recall the exact day.
[19]     **Q:** But do you recall it was last
[20] week?
[21]     **A:** I would — that would be fair to
[22] say.
[23]     **Q:** Were you at Ms. Sanchez's
[24] deposition yesterday?
[25]     **A:** No.

Page 13

*F. Fiorillo*

[1]
[2]     **Q:** You were not at Ms. Sanchez's
[3] deposition yesterday?
[4]     **A:** No, I was not.
[5]     **MS. ZWILLING:** Two days ago.
[6]     **Q:** I'm sorry, two days ago?
[7]     **A:** Yes.
[8]     **Q:** Okay. It seemed like yesterday.
[9] Were you wearing a suit in Ms. Sanchez's
[10] deposition?
[11]     **MR. GOODSTADT:** Objection.
[12]     **A:** I didn't know I was required to
[13] wear a suit.
[14]     **Q:** That wasn't my question, sir.
[15] Did you wear a suit at Ms. Sanchez's
[16] deposition?
[17]     **MR. GOODSTADT:** Objection.
[18]     **A:** No.
[19]     **Q:** Did you wear a suit at
[20] Mr. Bosetti's deposition?
[21]     **A:** I didn't know —
[22]     **MR. GOODSTADT:** Objection.
[23]     **A:** — I was required to.
[24]     **Q:** That's interesting, but my
[25] question to you, yes or no, did you wear a

Page 14

*F. Fiorillo*

[1]
[2] suit at Mr. Bosetti's deposition?
[3]     **MR. GOODSTADT:** Objection.
[4]     **A:** I didn't know I had to.
[5]     **Q:** Yes or no, sir?
[6]     **MR. GOODSTADT:** Objection.
[7]     **Q:** Did you wear a suit at
[8] Mr. Bosetti's deposition?
[9]     **A:** Nobody —
[10]     **MR. GOODSTADT:** Objection.
[11]     **A:** — told me I had to.
[12]     **Q:** Is that a "no, I did not wear a
[13] suit"?
[14]     **A:** I didn't wear one, but I wasn't
[15] advised to wear one. If I was advised to
[16] wear one, I would have.
[17]     **Q:** So my question as to whether or
[18] not — you know what, have you worn a suit
[19] at any other deposition?
[20]     **MR. GOODSTADT:** Objection.
[21]     **A:** As —
[22]     **MR. NOVIKOFF:** What's the basis
[23] of the objection?
[24]     **MR. GOODSTADT:** Well, first of
[25] all, any other deposition you mean with

EDWARD CARTER  v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

---

Page 15

F. Fiorillo

[1]
[2] respect to this case? And second of
[3] all, this is so patently irrelevant,
[4] that going —
[5] **MR. NOVIKOFF:** Sir, at this —
[6] **MR. GOODSTADT:** Let me finish.
[7] You asked for the basis.
[8] **MR. NOVIKOFF:** You told me. It
[9] was patently irrelevant. And I
[10] understand that. And you said form.
[11] I'm rephrasing the form.
[12] **MR. GOODSTADT:** And you've
[13] actually instructed your witnesses not
[14] to answer on patent irrelevancy.
[15] That's why we have to bring a witness
[16] back.
[17] **MR. NOVIKOFF:** You happy you
[18] got that in, Andrew?
[19] **MR. GOODSTADT:** I'm just
[20] explaining to you. You asked for the
[21] basis for it.
[22] **MR. NOVIKOFF:** And you told me
[23] form. Patent irrelevancy.
[24] **MR. GOODSTADT:** I'm not done
[25] yet. You asked a question, let me

---

Page 16

F. Fiorillo

[1]
[2] finish the question. I want to answer
[3] the question.
[4] **MR. NOVIKOFF:** Go finish what
[5] you want to say.
[6] **MR. GOODSTADT:** Otherwise don't
[7] ask me the question.
[8] **MR. NOVIKOFF:** So finish.
[9] **MR. GOODSTADT:** I'm not
[10] instructing him not to answer at this
[11] point, but there's absolutely no basis
[12] for these questions. It's patently
[13] irrelevant and form.
[14] **Q:** At any other deposition that
[15] you've appeared on this case, have you worn
[16] a suit?
[17] **MR. GOODSTADT:** Objection.
[18] **A:** No.
[19] **Q:** The answer is "no"?
[20] **A:** Correct.
[21] **Q:** Okay. Sir, do you recall filing
[22] a Complaint or having your attorneys file a
[23] Complaint on your behalf in this matter?
[24] **A:** Yes.
[25] **Q:** Okay. And do you recall having

---

Page 17

F. Fiorillo

[1]
[2] your attorneys file a Notice of Claim on
[3] your behalf?
[4] **A:** Yes.
[5] **Q:** With Ocean Beach?
[6] **A:** Yes.
[7] **Q:** Okay. And with regard to the
[8] Notice of Claim, was your attorney
[9] Mr. Goodstadt's law firm?
[10] **A:** Well, the firm, Mr. Goodstadt.
[11] **Q:** Mr. Goodstadt's law firm, was
[12] Mr. Goodstadt's law firm your attorney when
[13] you filed a Notice of Claim?
[14] **A:** Yes.
[15] **Q:** And was Mr. Goodstadt's law firm
[16] your attorney when the Complaint in this
[17] matter was filed?
[18] **A:** Yes.
[19] **Q:** And do you recall reviewing any
[20] drafts of the Complaint before they were
[21] filed?
[22] **A:** I don't recall.
[23] **Q:** Okay. You don't recall whether
[24] or not you've ever seen — well, prior to
[25] the filing in federal court of the

---

Page 18

F. Fiorillo

[1]
[2] Complaint, did you review it for accuracy?
[3] **A:** I'm not sure.
[4] **Q:** Is there anything in your
[5] possession, custody or control that would
[6] refresh your recollection?
[7] **A:** No.
[8] **Q:** Would you agree with me, sir,
[9] that filing a federal lawsuit in which you
[10] and the four other Plaintiffs are seeking in
[11] excess of $25,000,000, is an important
[12] matter in your life?
[13] **A:** Yes.
[14] **MR. GOODSTADT:** Objection.
[15] **Q:** And would you agree with me that
[16] the allegations in the Complaint are what
[17] you are accusing Ocean Beach and other
[18] Defendants of doing during the course of
[19] your employment with Ocean Beach?
[20] **A:** Yes.
[21] **Q:** And would you agree with me that
[22] it would be important to make sure that your
[23] allegations against the Defendants were
[24] accurate and truthful, to the best of your
[25] knowledge?

---

Page 19

**F. Fiorillo**

[1]
[2] **MR. GOODSTADT:** Objection.
[3] **A:** Yes.
[4] **Q:** Okay. And would you agree with
[5] me that you would want to ensure, by any way
[6] possible, that what was being filed in this
[7] action was truthful and accurate?
[8] **A:** Yes.
[9] **Q:** Okay. And do you have any reason
[10] to believe that what was filed by you in
[11] this Complaint was in fact truthful and
[12] accurate?
[13] **A:** It was truthful and accurate.
[14] Correct.
[15] **Q:** And how do you know that if you
[16] didn't read this?
[17] **MR. GOODSTADT:** Objection.
[18] **A:** No. You — I think you asked me
[19] before — like the day it was filed, did I
[20] review it then?
[21] **Q:** No.
[22] **A:** No?
[23] **Q:** My question was, prior to it was
[24] filed, did you review it for accuracy?
[25] **A:** Yes, because —

Page 20

**F. Fiorillo**

[1]
[2] **Q:** My question is just yes or no.
[3] **A:** Yes.
[4] **Q:** So I'll — so the record is
[5] clear. Did you review the Complaint prior
[6] to it being filed for accuracy?
[7] **A:** Yes.
[8] **Q:** And to your knowledge, was
[9] everything that was set forth in there
[10] truthful and accurate?
[11] **A:** Yes.
[12] **Q:** And with regard to the
[13] allegations that pertain to you, you had
[14] firsthand knowledge of those acc — those
[15] accusations?
[16] **A:** Yes.
[17] **Q:** And what's your understanding of
[18] "firsthand knowledge"?
[19] **A:** I was a direct witness.
[20] **Q:** You were a direct witness?
[21] **A:** (Indicating).
[22] **Q:** I'm going to show you what I
[23] purport to be a true and accurate copy of
[24] the Complaint that was filed by your
[25] attorneys on your behalf, as well as the

Page 21

**F. Fiorillo**

[1]
[2] other four Plaintiffs. And it was filed on
[3] March 21, 2007.
[4] **MR. GOODSTADT:** You want to
[5] mark this?
[6] **MR. NOVIKOFF:** Do we need to?
[7] I mean, I will — all right. Let's
[8] mark it number one. Fiorillo-1.
[9] (Complaint was marked as Fiorillo
[10] Exhibit-1 for identification; 2/20/09,
[11] E.L.)
[12] **Q:** Can you take Exhibit-1, and I'm
[13] going to be asking you a series of questions
[14] about that for the next couple hours. Can
[15] you show it to him?
[16] **MR. GOODSTADT:** Ask him a
[17] question.
[18] **MR. NOVIKOFF:** Okay. That's
[19] fine.
[20] **Q:** Please turn to page 44 of the
[21] Complaint. Actually, page 43 of the
[22] Complaint.
[23] **A:** Can I separate this (indicating)?
[24] **Q:** If that makes it easier for you,
[25] sure. Are you on page 44? I'm sorry, 43?

Page 22

**F. Fiorillo**

[1]
[2] **A:** 43.
[3] **Q:** Yeah. Let's go to paragraph 186.
[4] **A:** Yes.
[5] **Q:** You allege as follows "as set
[6] forth above, Defendants Hesse and Alison
[7] Sanchez conspired to unlawfully destroy
[8] Plaintiffs' careers and shared a mutual
[9] agreement and understanding regarding their
[10] objective to do so and the manner in which
[11] their common objective was to be achieved,
[12] and committed numerous overt acts in
[13] furtherance thereof," do you see that?
[14] **A:** Yes.
[15] **Q:** Did you personally — were you —
[16] withdrawn. Were you a direct witness to the
[17] overt acts between — engaged in by Hesse
[18] and Alison Sanchez that you claim to be the
[19] basis for conspiracy?
[20] **MR. GOODSTADT:** Objection.
[21] **Q:** Yes or no? If you can't answer
[22] yes or no, that's fine, too. Then you tell
[23] me that.
[24] **A:** I can't answer that question yes
[25] or no.

Page 23

**F. Fiorillo**

[1]
[2] **Q:** Okay. Why can't you answer that
[3] question yes or no?
[4] **A:** Because I have to explain the
[5] situation that precipitated this allegation.
[6] **Q:** Okay. Then let's break it down,
[7] sir. There's a reference to "numerous overt
[8] acts." Let's put Mr. Hesse aside. What
[9] were Alison Sanchez's overt acts as you
[10] allege them in 186?
[11] **MR. GOODSTADT:** Objection.
[12] **A:** Her overt acts are in reference
[13] to getting officers qualified in Ocean Beach
[14] that were allowed to work in Ocean Beach
[15] without being qualified. She did not take
[16] action on keeping or preventing the officers
[17] that were working who were not qualified to
[18] work in Ocean Beach. In other words, these
[19] officers were working in Ocean Beach without
[20] the qualifications set forth by Suffolk
[21] County Civil Service.
[22] **Q:** And how do you know that it was
[23] Mrs. Sanchez's responsibility to — well,
[24] actually, you know what, let me just see
[25] that question so I have — use your words

Page 24

**F. Fiorillo**

[1]
[2] correctly. (Reviewing). How did you know
[3] that it was — well, withdrawn. What is the
[4] basis of your opinion that it was
[5] Ms. Sanchez's responsibility to take action
[6] to ensure that only officers that were
[7] qualified under the Civil Service Law were
[8] allowed to work at Ocean Beach?
[9] **A:** Well, I happened to be there on
[10] several occasions when she called the
[11] station, and she — I asked her who was
[12] calling because she was calling for George
[13] Hesse. So I asked who was calling, and she
[14] was the — she responded that she was
[15] the — oh, the — she handled the account
[16] for Ocean Beach in Civil Service. "Just
[17] tell George Hesse it's Alison." He'll know
[18] who she is.
[19] **Q:** So what exactly did Alison
[20] Sanchez say to you on the phone that leads
[21] you to believe that she was the person
[22] responsible for making sure that only
[23] qualified officers worked at Ocean Beach?
[24] **A:** Because during the course of when
[25] they found out that the officers weren't

Page 25

**F. Fiorillo**

[1]
[2] qualified or certified, she was the one that
[3] was handling all the — the process,
[4] because in the department, all the cops were
[5] talking about what they had to go through,
[6] and she was the one that was setting up the
[7] stages that they had to go through.
[8] **MO MR. NOVIKOFF:** Move to strike.
[9] **Q:** My question to you, sir, is the
[10] following, and I'll repeat it, what did
[11] Alison Sanchez say to you when she called
[12] the station house and you picked up the
[13] phone, that led you to believe, as you've
[14] testified to, that she was the person
[15] responsible — responsible for ensuring that
[16] only qualified officers worked at Ocean
[17] Beach?
[18] **A:** She told me she was the account
[19] representative for Ocean Beach.
[20] **Q:** Did she say anything else to you?
[21] **A:** No.
[22] **Q:** Okay. And other — prior to
[23] April 2, other than one or two phone calls
[24] that you picked up at the station in which
[25] Alison Sanchez was on the other line, had

Page 26

**F. Fiorillo**

[1]
[2] you ever spoken to Ms. Sanchez?
[3] **MR. GOODSTADT:** Objection.
[4] **A:** I might have. I — I don't know.
[5] **Q:** Okay. And on how many occasions
[6] do you recall picking up the phone at the
[7] station house and hearing that it was Alison
[8] Sanchez on the other line?
[9] **A:** At least three times.
[10] **Q:** Okay. And do you recall the sum
[11] and substance of any of the other
[12] conversations that you had with Ms. Sanchez
[13] in those three times that you picked up the
[14] phone?
[15] **A:** No.
[16] **Q:** Okay. Now you mentioned the
[17] overt act of Ms. Sanchez's being responsible
[18] for ensuring the compliance of — of the
[19] officers with the qualifications of Civil
[20] Service. What law imposes the obligation of
[21] Ms. Sanchez to be responsible for ensuring
[22] compliance with the Civil Service Laws of
[23] the officers of Ocean Beach?
[24] **MR. GOODSTADT:** Objection.
[25] **A:** What law?

Page 27

**F. Fiorillo**

[1]
[2] **Q:** Yeah. Are you aware of any law?
[3] **MR. GOODSTADT:** Objection.
[4] **A:** I'm not aware of any law.
[5] **Q:** What law are you aware of that
[6] requires the Suffolk County Civil Service to
[7] be responsible for ensuring compliance with
[8] their laws with regard to police officers at
[9] Ocean Beach?
[10] **MR. GOODSTADT:** Objection.
[11] **A:** Well, I can tell you for a fact
[12] that I was one of them that had to go
[13] through the process — through the whole
[14] process to become a police officer in Ocean
[15] Beach.
[16] **Q:** I'm not asking you about what you
[17] had to do. Are you —
[18] **A:** Well, that's the basis — that's
[19] a little bit of the basis for the question.
[20] **Q:** No, sir. Trust me, it's not.
[21] My question to you —
[22] **MR. GOODSTADT:** Objection.
[23] **Q:** — to the extent that you know,
[24] what law can you point to that requires
[25] Civil Service to ensure that Ocean Beach is

Page 28

**F. Fiorillo**

[1]
[2] following the laws concerning the
[3] qualification of police officers?
[4] **MR. GOODSTADT:** Objection.
[5] **A:** I don't know.
[6] **Q:** Okay. Now you mentioned that —
[7] the qualification issue with regard to the
[8] overt acts, right?
[9] **A:** Yes.
[10] **Q:** Okay. And that occurred prior
[11] to — your conversations with Ms. Sanchez on
[12] this issue occurred prior to April 2, 2006,
[13] right?
[14] **MR. GOODSTADT:** Objection.
[15] **Q:** Well, I'll withdraw.
[16] **A:** That's not the — no.
[17] **Q:** I'll withdraw the question.
[18] There's an objection. How did
[19] Mrs. Sanchez's alleged failure to ensure
[20] compliance with Civil Service Laws destroy
[21] your career?
[22] **A:** Well, if the — if the officers
[23] that were working in Ocean Beach were
[24] prevented from working in Ocean Beach and
[25] stopped by Civil Service, then I probably

Page 29

**F. Fiorillo**

[1]
[2] would have — I still would have my job
[3] there.
[4] **Q:** Why do you say that?
[5] **A:** Why do I say that? Because —
[6] **Q:** Let me be specific. Why do you
[7] say specifically that you think you would
[8] still have your job there?
[9] **A:** Because I was — I had to go
[10] through the process. It takes — it takes
[11] a while to go through the process and become
[12] a police officer in Ocean Beach.
[13] **Q:** No. And I understand that.
[14] And —
[15] **A:** So in other words, in that time
[16] period, I would be making more money. I
[17] wouldn't be fired.
[18] **Q:** Well, that's my question, sir.
[19] Let's — you've now stated that one of the
[20] overt acts of Ms. Sanchez, as alleged in
[21] 186, was that she didn't do whatever her job
[22] was with regard to ensuring that the
[23] officers that work for Ocean Beach were
[24] qualified, correct?
[25] **A:** Correct.

Page 30

**F. Fiorillo**

[1]
[2] **Q:** And you allege also in 186 that
[3] in a conspiracy with Defendant Hesse,
[4] Ms. Sanchez engaged in this overt act to
[5] unlawfully destroy your career, do you see
[6] that?
[7] **A:** Yes.
[8] **Q:** And when I asked you the question
[9] as to how Ms. Sanchez's act, as you
[10] testified to, destroyed your career, you
[11] said, in part, that you would still probably
[12] be at Ocean Beach if she did her job, right?
[13] **A:** I would think so.
[14] **Q:** Okay. So here's my question to
[15] you, sir, why do you think you would still
[16] have your job at Ocean Beach if Ms. Sanchez
[17] had done her job, as you allege that she
[18] should have?
[19] **A:** Well, first of all, George Hesse
[20] wasn't a sergeant. From my understanding,
[21] you have to go through Civil Service and
[22] pass a test to become a sergeant.
[23] **Q:** Okay. All right. So how did the
[24] fact that George Hesse was not a sergeant
[25] play into the destruction of your career as

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 31

**F. Fiorillo**

[1]
[2] it relates to what Ms. Sanchez didn't do?
[3]     **A:** Because George Hesse ultimately
[4] became the — I don't know what title he
[5] had. It was either acting deputy chief,
[6] deputy chief, acting chief or chief. I
[7] don't know. But he ultimately became a
[8] person in charge that ultimately fired me.
[9]     **Q:** Okay. So I understand now. And
[10] tell me if I'm wrong, because I — I just
[11] want to make sure this is clear, and if I'm
[12] wrong in any regard, tell me. You believe
[13] that because Ms. Sanchez didn't do her job,
[14] George Hesse was allowed to become in a
[15] position at Ocean Beach in which he was then
[16] allowed to fire you for no reason?
[17]     **MR. GOODSTADT:** Objection.
[18]     **Q:** Is that accurate?
[19]     **A:** Pretty accurate.
[20]     **Q:** What — okay. Go on.
[21]     **A:** Because it could have been —
[22] okay. It could have been Alison Sanchez and
[23] maybe her superior —
[24]     **Q:** Okay. Continue.
[25]     **A:** That — that didn't, um, oversee

Page 32

**F. Fiorillo**

[1]
[2] what should have been, um, upheld by Civil
[3] Service.
[4]     **Q:** Okay.
[5]     **A:** That's my belief.
[6]     **Q:** And that's all I'm asking you
[7] about, your belief and the facts as you know
[8] them or you believe you know them. So just
[9] so we're clear, and based upon what you've
[10] just told me, you believe that the reason
[11] why your career was destroyed, as it relates
[12] to Alison Sanchez, is that if Alison Sanchez
[13] and perhaps her superiors had done the right
[14] job, Mr. Hesse would never have been in a
[15] position to be able to fire you?
[16]     **A:** I didn't say "never," but maybe
[17] highly unlikely.
[18]     **Q:** Okay. And that's because, in
[19] your opinion, Mr. Hesse was not qualified to
[20] be a sergeant because he didn't pass
[21] whatever Civil Service requirements there
[22] were?
[23]     **A:** From my understanding.
[24]     **Q:** That's all I'm asking. From your
[25] understanding, right? Correct?

Page 33

**F. Fiorillo**

[1]
[2]     **A:** Yes.
[3]     **Q:** And, therefore, had he — had
[4] the fact that his lack of qualifications
[5] been enforced by Civil Service, he would
[6] never have been put in a position to have
[7] the authority to make a decision whether or
[8] not to fire you as you say he did?
[9]     **A:** I would think so.
[10]     **Q:** Okay. Great. What other overt
[11] act, if any, did Alison Sanchez engage in,
[12] other than what you've just testified to,
[13] that you believe led to the destruction of
[14] your career?
[15]     **A:** I believe that Alison Sanchez,
[16] from what Alison Sanchez told me when I went
[17] to her office shortly thereafter when I was
[18] fired that week, the week of I believe it
[19] was April 5, Wednesday afternoon, when I
[20] went into her office, we spoke about me
[21] being fired, Kevin Lamm being fired, Joe
[22] Nofi being fired and Eddie Carter being
[23] fired at the time. Tommy Snyder was not
[24] fired at this time.
[25]     **Q:** Okay.

Page 34

**F. Fiorillo**

[1]
[2]     **A:** Okay? So I believe that from
[3] what she told me, she — she told me and
[4] Kevin and Joe that she had spoke to George
[5] Hesse and Maryanne Minerva, and she was
[6] expecting us. She said that she spoke to
[7] them prior to us getting fired, so,
[8] therefore, I believe that they came up with
[9] whatever they were going to do before April
[10] 2, and then April 2 we were blind-sided and
[11] fired.
[12]     **Q:** Okay. So, again, just so I'm
[13] clear, you believe that — and let's assume
[14] for the purposes of the question that
[15] Ms. Sanchez spoke with Mr. Hesse
[16] specifically about certain employment
[17] decisions relating to you and the other
[18] Plaintiffs prior to April 2. So we're —
[19]     **A:** Yes. I follow.
[20]     **Q:** We're going to make that
[21] assumption for the purpose of my questions.
[22] You believe that an overt act to destroy
[23] your career was the fact that Ms. Sanchez
[24] engaged in a conversation with at least
[25] Mr. Hesse concerning the fact that Mr. Hesse

Page 35

*F. Fiorillo*

[1]
[2] wanted to terminate you prior to April 2?
[3]    **A:** Well, it was painfully apparent.
[4]    **Q:** No. No. I'm just confirming,
[5] that's what you believe the overt act was?
[6]    **A:** Absolutely.
[7]    **Q:** That there was a conversation
[8] between Mr. Hesse and Ms. Sanchez prior to
[9] April 2?
[10]    **A:** At least those two.
[11]    **Q:** At least those two, exactly, at
[12] least those two, concerning Mr. Hesse's
[13] decision to fire you?
[14]    **A:** Yes.
[15]    **Q:** Okay.
[16]    **A:** Including Maryanne Minerva,
[17] because that's what I was told.
[18]    **Q:** According to you, by Ms. Sanchez?
[19]    **A:** Well, she told me that.
[20]    **Q:** I'm not challenging what you
[21] said. This is what you've said. I'm just
[22] trying to understand it. So you believe
[23] that certainly Sanchez had a conversation
[24] with Hesse prior to April 2, and based upon
[25] what you say Sanchez told you, she had a

Page 36

*F. Fiorillo*

[1]
[2] conversation with Minerva prior to April 2
[3] concerning Hesse's decision to terminate?
[4]    **A:** Well, I don't know if it was
[5] Hesse's decision.
[6]    **Q:** Okay.
[7]    **A:** But, ultimately, it was Hesse's
[8] decision because he's the one who fired us.
[9]    **Q:** Okay. Well, whose decision could
[10] it have been, in your opinion, if it wasn't
[11] Hesse?
[12]    **A:** I don't know who else was
[13] involved.
[14]    **Q:** Okay. But you believe, based
[15] upon what Sanchez told you, she had a
[16] conversation with —
[17]    **A:** She only told me Hesse and
[18] Minerva.
[19]    **MR. GOODSTADT:** Let him finish
[20] the question.
[21]    **Q:** At least based upon your
[22] testimony, Sanchez had a conversation with
[23] Hesse, prior to April 2, that concerned the
[24] possibility of you being, as you say, fired
[25] from Ocean Beach?

Page 37

*F. Fiorillo*

[1]
[2]    **A:** She told me both Hesse and
[3] Minerva.
[4]    **Q:** I understand. We're with Hesse
[5] now, right?
[6]    **A:** Okay.
[7]    **Q:** And you also believe that Sanchez
[8] had a conversation with Minerva?
[9]    **A:** Based on what Alison Sanchez told
[10] me.
[11]    **Q:** Right. So we're on the same
[12] page. Were you a party to the conversation
[13] between Hesse and Sanchez?
[14]    **A:** No.
[15]    **Q:** Were you a party to the
[16] conversation between Minerva and Sanchez?
[17]    **A:** No.
[18]    **Q:** Do you have any idea, based upon
[19] any document that you've seen, as to what
[20] the conversation between Hesse and Sanchez
[21] involved?
[22]    **A:** No.
[23]    **Q:** Okay. Do you have any idea,
[24] based upon any document that you've seen, as
[25] to what the sum and substance of the

Page 38

*F. Fiorillo*

[1]
[2] conversation was between Sanchez and
[3] Minerva?
[4]    **A:** No.
[5]    **Q:** Now were you — you were there
[6] yesterday when Ms. Sanchez testified about
[7] her conversation with Hesse concerning
[8] Hesse's thoughts about not rehiring certain
[9] police officers for the 2006 season,
[10] correct?
[11]    **MR. GOODSTADT:** Objection.
[12]    **Q:** I'm sorry, two days ago. Were
[13] you present at Ms. Sanchez's deposition?
[14]    **A:** Yes.
[15]    **Q:** Do you recall her testifying with
[16] regard to the sum and substance of her
[17] communications with Mr. Hesse prior to April
[18] 2, concerning the decision — the ultimate
[19] decision regarding you not being rehired for
[20] the 2006 season?
[21]    **MR. GOODSTADT:** Objection.
[22]    **A:** I don't know what specifically
[23] was said about me.
[24]    **Q:** Okay. Then I'll withdraw the
[25] question. Do you recall Ms. Sanchez

Page 39

**F. Fiorillo**

[1]
[2] testifying about a conversation she had with
[3] Mr. Hesse, prior to April 2, concerning what
[4] the rights and obligations were of certain
[5] officers under the Civil Service Law?
[6] **A:** To be honest with you, I don't
[7] recall exactly what she said.
[8] **Q:** Do you recall the conversation —
[9] **A:** I don't recall the conversation.
[10] I really don't.
[11] **Q:** Do you recall — do you recall
[12] Ms. Sanchez even testifying about that
[13] subject matter?
[14] **A:** I can't even remember, to tell
[15] you the truth.
[16] **Q:** Not a problem. Okay. So we have
[17] the fact that she had a conversation with
[18] Mr. Hesse and Mr. Minerva as —
[19] **A:** Ms. Minerva.
[20] **Q:** Ms. Minerva as an overt act. We
[21] have the fact, according to your testimony,
[22] that you believe that she didn't do her job
[23] with regard to the certification of certain
[24] officers at Ocean Beach. Any other overt
[25] act that you believe Ms. Sanchez engaged in

Page 40

**F. Fiorillo**

[1]
[2] that you claim led to the destruction of
[3] your career?
[4] **A:** Not to my knowledge.
[5] **Q:** Okay. You make reference in
[6] paragraph 180 — 186 to a mutual agreement
[7] and understanding regarding their objective
[8] to destroy your career, do you see that?
[9] **A:** Yes.
[10] **Q:** Okay. What evidence do you have
[11] that Ms. Sanchez had the intent to destroy
[12] your career?
[13] **MR. GOODSTADT:** Objection.
[14] **A:** What evidence?
[15] **Q:** Well, I'll rephrase the question.
[16] What forms the basis for your opinion that
[17] Ms. Sanchez formed the intent, prior to
[18] April 2, 2006, to destroy your career?
[19] **MR. GOODSTADT:** Objection.
[20] **A:** Well, my belief is that there was
[21] a conspiracy between at least Alison Sanchez
[22] and George Hesse to get rid of us five for
[23] sure.
[24] **Q:** Okay. Were there anybody else,
[25] other than the five Plaintiffs in this case,

Page 41

**F. Fiorillo**

[1]
[2] that were not rehired for the 2006 season,
[3] and, again, we have an understanding of the
[4] phrase that I just used?
[5] **A:** There were two other officers,
[6] but they didn't work there — Billy Powell,
[7] if he worked one day, I think he worked one
[8] day. Maybe, okay? But it wasn't — in
[9] other words, us five, we were part time. We
[10] worked all year round. Um, and we were more
[11] consistent on the work level.
[12] **MO MR. NOVIKOFF:** And I'm going to
[13] move to strike that part of the answer
[14] that was not responsive.
[15] **Q:** My question to you, sir, is were
[16] there any other officers, other than the
[17] five Plaintiffs in this action, that were
[18] not rehired for the 2006 season?
[19] **MR. GOODSTADT:** Objection.
[20] **Q:** Yes or no?
[21] **MR. GOODSTADT:** Objection.
[22] **Q:** To the best of your knowledge?
[23] **A:** Well, I only know up until April
[24] 2, so.
[25] **Q:** That's what I'm saying. Up

Page 42

**F. Fiorillo**

[1]
[2] through — other than the five Plaintiffs in
[3] this action, were there any other officers
[4] that were not rehired for the 2006 season,
[5] that you are aware of, yes or no?
[6] **MR. GOODSTADT:** Objection.
[7] **A:** Then I can't — I can say I don't
[8] know.
[9] **Q:** Okay. Fine. Now, so you believe
[10] that Ms. Sanchez engaged in a conspiracy
[11] with Hesse and that's the reason why she
[12] formed the intent to destroy your career.
[13] My question to you is, what evidence, if
[14] any, do you have as to when Ms. Sanchez
[15] formed the intent to destroy your career?
[16] **MR. GOODSTADT:** Objection.
[17] **A:** I don't have any evidence.
[18] **Q:** What evidence can you point to
[19] and that you can advise the jury that will
[20] be watching this videotape that you believe
[21] shows that Ms. Sanchez formed the intent to
[22] destroy your career, your police career
[23] prior to April 2, 2006?
[24] **MR. GOODSTADT:** Objection.
[25] **A:** What evidence?

Page 43

**F. Fiorillo**

[1]
[2] **Q:** Yeah, that you can point to?
[3] **A:** Well, I can point to it, but it's
[4] not — in other words, it could be
[5] produced.
[6] **Q:** Okay. Tell me. I'm giving you
[7] the opportunity to tell the jury —
[8] **A:** All right.
[9] **Q:** — what evidence do you think —
[10] **A:** I'm going to tell the jury right
[11] now —
[12] **Q:** Hold on. Excuse me. That you
[13] think — evidence you think exists to
[14] demonstrate that Alison Sanchez formed the
[15] intent, prior to April 2, 2006, to destroy
[16] your career?
[17] **MR. GOODSTADT:** Objection.
[18] **A:** I'm going to tell the jury right
[19] now that I believe that the Suffolk County
[20] Civil Service Department, through Suffolk —
[21] through the County of Suffolk, can produce
[22] phone records, prior to April 2, from
[23] conversations going from Ocean Beach to
[24] Civil Service and back and forth. That
[25] would be evidence.

Page 44

**F. Fiorillo**

[1]
[2] **Q:** Okay. Let's assume that you are
[3] 100 percent correct, that prior to April 2,
[4] there will be phone records that demonstrate
[5] that Civil Service and Ocean Beach had
[6] discussions over the phone. What evidence
[7] can you tell the jury that on these phone
[8] calls, Ms. Sanchez formed the intent to
[9] destroy your career prior to April 2, 2006?
[10] **MR. GOODSTADT:** Objection.
[11] **A:** Well, we might get that out of
[12] George Hesse.
[13] **Q:** I'm not asking about what we may
[14] get out of whom.
[15] **A:** Well, he's a party in the
[16] conversation.
[17] **Q:** Mr. Fiorillo, I'm asking you
[18] about Ms. Sanchez. What evidence can you
[19] tell the jury right now, and it's been
[20] almost two years since you filed this
[21] Complaint, that you could tell the jury
[22] shows that Alison Sanchez formed the intent,
[23] prior to April 2, 2006, to destroy your
[24] police career?
[25] **MR. GOODSTADT:** Objection. He

Page 45

**F. Fiorillo**

[1]
[2] already testified to a lot of it.
[3] **Q:** Okay. I'm asking you a question.
[4] **A:** Well, I just — I just said what
[5] I said about the phone records. That could
[6] be evidence.
[7] **Q:** Okay.
[8] **A:** I mean, it could — it could
[9] be — it could be discovered — it could be,
[10] um —
[11] **Q:** So other than what —
[12] **A:** Follow up —
[13] **Q:** Go ahead.
[14] **A:** It could be followed up and maybe
[15] something will come out of that. I don't
[16] know. But it could be. It's evidence.
[17] It's — it's a trail. A paper trail.
[18] **Q:** Okay. So I understand it now.
[19] Other than what may be — tell me if I'm
[20] wrong, other than what may be discovered in
[21] additional documents, and other than what
[22] Mr. Hesse may say, and other than what may
[23] be said by other witnesses that may come
[24] down the pike in this matter, you don't have
[25] any evidence that you can point to right

Page 46

**F. Fiorillo**

[1]
[2] now —
[3] **A:** No.
[4] **Q:** — to suggest that Ms. Sanchez
[5] formed the intent, prior to April 2, to
[6] destroy your career?
[7] **MR. GOODSTADT:** Objection.
[8] Other than what he already testified
[9] to?
[10] **Q:** I'm sorry, what was your answer?
[11] **A:** Well, I just said about the
[12] evidence that I stated prior to this
[13] question. But I don't have any other
[14] evidence.
[15] **Q:** Great. Okay. I'll accept that
[16] answer. Thank you. And what you've
[17] testified prior to the last question with
[18] regard to Ms. Sanchez was that she told you
[19] she had a conversation with Hesse and
[20] Minerva?
[21] **A:** Correct.
[22] **Q:** And that you don't believe she
[23] did her job correctly with regard to the
[24] qualifications of police officers at Ocean
[25] Beach?

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

---

Page 47

F. Fiorillo

[1]
[2] **A:** That's my belief.
[3] **Q:** That — that's fine. Great.
[4] When do you believe Mr. Hesse and
[5] Ms. Sanchez formed the common objective, as
[6] you've alleged in 186, to destroy your
[7] career?
[8] **MR. GOODSTADT:** Objection.
[9] **A:** Prior to April 2.
[10] **Q:** Okay. When prior to April 2?
[11] **A:** That I don't know, because —
[12] **Q:** Months prior to April 2? Years
[13] prior to April 2? Weeks?
[14] **A:** Well, I don't know, but I can
[15] explain further on — on the context of what
[16] happened prior to April 2 that would give
[17] you a partial answer to that question.
[18] **Q:** No. I'm only interested right
[19] now as to when you believe Hesse and Sanchez
[20] formed the common objective to destroy your
[21] career?
[22] **MR. GOODSTADT:** Objection.
[23] **A:** I would say between March 11 and
[24] April 2.
[25] **Q:** Okay. And March 11, what

---

Page 48

F. Fiorillo

[1]
[2] significance does March 11 have?
[3] **A:** Very significant.
[4] **Q:** I'm asking you, what significance
[5] does it have?
[6] **A:** I got a letter from the Ocean
[7] Beach Police Department from George Hesse
[8] that stated that we were going to have a
[9] departmental meeting on April 2, and that
[10] new ID would be issued to all. Now my
[11] understanding is I'm part of "all" in that
[12] — in that letter.
[13] **Q:** Okay.
[14] **A:** Okay?
[15] **Q:** Sure.
[16] **A:** So I was — I was upset. I was
[17] beside myself. I was — I was — I was
[18] traumatized, okay, that day when I was
[19] fired. Because that letter was not true,
[20] okay? It was — it was a ploy on the part
[21] of Hesse to fire us.
[22] MO **Q.** Okay. Well, that's my question,
[23] sir, and I'm going to move to strike that
[24] aspect of the answer that's not responsive.
[25] But you say there was a ploy on the part of

---

Page 49

F. Fiorillo

[1]
[2] Hesse, and I understand that that's one of
[3] your — your allegations in this Complaint.
[4] My question to you is more specifically,
[5] when do you think Ms. Sanchez joined in the
[6] ploy as you call it with Mr. Hesse to
[7] specifically destroy your career?
[8] **MR. GOODSTADT:** Objection.
[9] **A:** Prior to April 2, because she
[10] told me that.
[11] **Q:** That she told you that she joined
[12] in with Hesse to destroy your career?
[13] **A:** Well, "joining in" could mean
[14] that what she told me was she spoke to
[15] George Hesse and Maryanne Minerva. So I
[16] consider that to be, you know, they — they
[17] talked between themselves — amongst
[18] themselves.
[19] **Q:** Even though you don't know what
[20] they talked about specifically?
[21] **A:** I have no idea.
[22] **Q:** Okay. Let me ask you to turn to
[23] page 23. Do you see in the middle it says
[24] "Alison Sanchez conspires with Hesse to
[25] destroy Plaintiffs' careers"?

---

Page 50

F. Fiorillo

[1]
[2] **A:** Yes.
[3] **Q:** Okay. And paragraph 99 reflects
[4] the fact that you met with Nofi and Lamm
[5] with Ms. Sanchez a few days after April 2;
[6] is that correct?
[7] **A:** That's correct.
[8] **Q:** Okay. And you allege "upon
[9] information and belief, Sanchez was
[10] responsible for appointing and approving the
[11] hiring of the uncertified officers at the
[12] OBPD," do you see that?
[13] **A:** Yes.
[14] **Q:** What's the basis for your belief
[15] as to the accuracy of what I just read?
[16] **A:** Okay. Alison Sanchez was the
[17] account holder for Ocean Beach. She was
[18] responsible for getting actually civilians
[19] together to go forward to, um, their
[20] qualifying tests. So based on their passing
[21] those qualifying exams, she would then —
[22] it's her say to Ocean Beach that she
[23] would — she would tell them if they were
[24] qualified or certified, whichever word you
[25] want to use, same difference.

---

**FRANK FIORILLO**
**February 20, 2009**

**EDWARD CARTER v.**
**INCORPORATED VILLAGE OF OCEAN BEACH**

---

Page 51

*F. Fiorillo*

[1]
[2] **Q:** Right.
[3] **A:** That they can go forward and they
[4] would be appointed, and then Ocean Beach can
[5] either hire them or fire them or not hire
[6] them. I'm sorry.
[7] **Q:** Okay. Well, you allege in this
[8] that she was responsible for approving the
[9] hiring of the uncertified officers, do you
[10] see that?
[11] **A:** Yes.
[12] **Q:** What information can you advise
[13] the jury that you have or that you've seen
[14] to support the allegation that Ms. Sanchez
[15] had the responsibility to approve the
[16] hiring?
[17] **MR. GOODSTADT:** Objection.
[18] **A:** Well, I want to state that based
[19] on her approving the qualified candidates,
[20] then the hiring would take place. She would
[21] be ultimately in the process, I would think.
[22] **Q:** And if she indicated that the
[23] qualifications were not met, what authority
[24] did she have, if any, to your knowledge, to
[25] prevent Ocean Beach from filing — from

---

Page 52

*F. Fiorillo*

[1]
[2] hiring certain officers?
[3] **MR. GOODSTADT:** Objection.
[4] **A:** Well, I think that she would have
[5] to report to Ocean Beach that they wouldn't
[6] be certified to work there.
[7] **Q:** Right. So now my question to you
[8] is let's assume that she did that. To your
[9] knowledge, since you made this allegation,
[10] did she have the authority to stop Ocean
[11] Beach from hiring an unqualified officer?
[12] **MR. GOODSTADT:** Objection.
[13] **A:** I don't know that part.
[14] **Q:** Sir, you've alleged here "upon
[15] information and belief, Sanchez was
[16] responsible for appointing and approving the
[17] hiring." Okay.
[18] **A:** I think her responsibility
[19] probably entails all of that.
[20] **Q:** Do you know that for a fact?
[21] **A:** No.
[22] **Q:** Do you know specifically what
[23] Ms. Sanchez's responsibilities were with
[24] regard to the hiring and appointing of
[25] police officers at Ocean Beach?

---

Page 53

*F. Fiorillo*

[1]
[2] **A:** No.
[3] **MR. GOODSTADT:** Objection.
[4] **Q:** Do you know what authority she
[5] has to go to court and stop Ocean Beach from
[6] hiring unqualified officers?
[7] **MR. GOODSTADT:** Objection.
[8] **A:** I don't know.
[9] **Q:** Do you know anything about what
[10] Ms. Sanchez's specific responsibilities and
[11] authority was with regard to the hiring of
[12] officers at Ocean Beach?
[13] **MR. GOODSTADT:** Objection.
[14] **A:** I don't know.
[15] **Q:** You've approved, though, sir, the
[16] suing of Ms. Sanchez in her individual
[17] capacity; is that correct?
[18] **A:** Yes.
[19] **Q:** And you're seeking money damages
[20] from Ms. Sanchez, correct?
[21] **A:** Yes.
[22] **Q:** And if I understand you
[23] correctly, you have no idea what Ms. Sanchez
[24] ever said to Mr. Hesse on the phone call
[25] that she said she had, correct?

---

Page 54

*F. Fiorillo*

[1]
[2] **MR. GOODSTADT:** Objection.
[3] **A:** Correct.
[4] **Q:** And you have no idea what
[5] Ms. Sanchez's authority and responsibilities
[6] were with regard to the appointment and the
[7] hiring of officers at Ocean Beach, correct?
[8] **MR. GOODSTADT:** Objection.
[9] **A:** Correct.
[10] **Q:** And, in fact, you don't have any
[11] idea as to what her authority and
[12] responsibilities were with regard to
[13] issue at Ocean Beach; isn't that correct?
[14] **MR. GOODSTADT:** Objection.
[15] **A:** No.
[16] **Q:** No.
[17] **A:** That's not correct.
[18] **Q:** Okay. Let's go to paragraph 100.
[19] You allege the following, "Sanchez assured
[20] Officers Fiorillo, Nofi and Lamm that their
[21] conversation would remain confidential," do
[22] you see that?
[23] **A:** Yes.
[24] **Q:** Did she tell you, Mr. Fiorillo,
[25] that the conversation would be confidential?

---

EDWARD CARTER   v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 55

**F. Fiorillo**

[1]
[2] **A:** She told me specifically.
[3] **Q:** What did she specifically say to
[4] you?
[5] **A:** She said that this conversation
[6] amongst us would be confidential, because I
[7] explained to her when we first initially
[8] walked in, I said, "We all have livelihoods.
[9] We want this to remain confidential," and
[10] especially for Joe Nofi because he worked
[11] for the Suffolk County Health Department.
[12] **Q:** Now you were here yesterday when
[13] Ms. Sanchez test — I mean two days ago —
[14] withdrawn. You were at the County's office
[15] during Ms. Sanchez's deposition two days
[16] ago, right?
[17] **A:** Yes.
[18] **Q:** And you recall her specifically
[19] denying that she ever said that she told you
[20] that the conversation would be confidential,
[21] correct?
[22] **A:** Correct.
[23] **Q:** So would it be fair to say and
[24] you can tell the jury that with regard to
[25] this specific issue, Ms. Sanchez was lying?

Page 56

**F. Fiorillo**

[1]
[2] **A:** Absolutely she was lying.
[3] **Q:** Okay. Now did you ask
[4] Ms. Sanchez if she was a lawyer?
[5] **MR. GOODSTADT:** Objection.
[6] **A:** If she's a lawyer?
[7] **Q:** During that meeting?
[8] **A:** No.
[9] **Q:** Are you aware of any provision in
[10] the Civil Service Law that would require
[11] Ms. Sanchez to keep your conversations
[12] confidential?
[13] **MR. GOODSTADT:** Objection.
[14] **A:** Why would she say that she would
[15] if she —
[16] **Q:** I'm just asking — no, that's not
[17] my question, sir. Are you aware of any
[18] requirements in the Civil Service Law that
[19] would require Ms. Sanchez from keeping your
[20] conversations confidential?
[21] **A:** I don't know. I don't know
[22] anything about that requirement.
[23] **Q:** Okay. And had you known at the
[24] time that you met with her that — on
[25] April — a few days after April 2, that

Page 57

**F. Fiorillo**

[1]
[2] George Hesse had bragged about having a
[3] sexual relationship with Ms. Sanchez?
[4] **A:** George Hesse bragged about it.
[5] **Q:** Yes, sir. My question — please,
[6] listen to my question. Were you aware,
[7] prior to meeting Ms. Sanchez a few days
[8] after April 2, that George Hesse had bragged
[9] about having sex with Alison Sanchez?
[10] **A:** Yes.
[11] **Q:** Okay. Because you've alleged
[12] that in this Complaint, correct?
[13] **A:** Well, yes, because —
[14] **Q:** No. I'm just asking —
[15] **A:** Yes.
[16] **Q:** Yes. So notwithstanding — if I
[17] understand, notwithstanding the fact that
[18] you believed at the time of this meeting
[19] with Alison Sanchez that George Hesse had
[20] bragged about having sex with her, you
[21] trusted Ms. Sanchez to keep whatever you
[22] said confidential?
[23] **A:** What did — what did —
[24] **Q:** My —
[25] **A:** — one thing have to do with the

Page 58

**F. Fiorillo**

[1]
[2] other?
[3] **Q:** Well, that's my question to you,
[4] sir, and I'll rephrase it. Is it your
[5] contention that notwithstanding the fact
[6] that you knew that George Hesse had bragged
[7] about having sex with Alison Sanchez prior
[8] to the meeting that we're talking about, you
[9] nevertheless trusted her to keep what you
[10] said to her confidential?
[11] **A:** I didn't know what to do at the
[12] time. The only thing that I could possibly
[13] do was go to Civil Service, okay? I — I
[14] trusted that I was going to a person, a
[15] professional person that had to do with the
[16] hiring or — not the hiring, but the — the
[17] Civil Service process in — in getting a
[18] police officer appointed to a position of
[19] police officer based on their passing the
[20] qualifying exams, that at least I could talk
[21] to somebody in that regard because of what
[22] was going on in Ocean Beach.
[23] **Q:** Are you done?
[24] **A:** So that's what I felt. I felt
[25] that — I had no — I didn't know what to

Page 59

[1] **F. Fiorillo**
[2] do. I was fired. Do you know what it's
[3] like being fired as a police officer?
[4] **MR. GOODSTADT:** Frank, just
[5] answer the question.
[6] **THE WITNESS:** No. But I'm
[7] upset.
[8] **MR. GOODSTADT:** I understand.
[9] Just answer the question.
[10] **MO MR. NOVIKOFF:** Thank you
[11] because I'm going to move to strike. I
[12] don't think you answered the question.
[13] **Q:** Sir, you say you and your other
[14] two Plaintiffs who met with Ms. Sanchez that
[15] day asked to be — the conversation to be
[16] confidential, right?
[17] **A:** Yes.
[18] **Q:** And you're saying that
[19] Ms. Sanchez said yes, it would be
[20] confidential, right?
[21] **A:** Yes, she did.
[22] **Q:** And you knew prior to that
[23] conversation that Ms. Sanchez, according to
[24] George Hesse, had had sex with him, right?
[25] **A:** I knew that he had sex with her?

Page 60

[1] **F. Fiorillo**
[2] **Q:** According to George Hesse?
[3] **A:** According to what he said.
[4] **Q:** That's right. That's all I'm
[5] asking. I'm not saying that you witnessed
[6] it. I'm not saying whether it happened or
[7] not. But George Hesse had bragged,
[8] according to you, that he had had sex with
[9] Alison Sanchez?
[10] **A:** Yes.
[11] **Q:** So my question is, sir,
[12] notwithstanding your knowledge that George
[13] Hesse had bragged about having an intimate
[14] sexual relationship with Alison Chester, you
[15] nevertheless trusted her to keep whatever
[16] you said confidential?
[17] **MR. GOODSTADT:** Objection.
[18] He's already answered that question.
[19] **Q:** Yes or no, did you trust her?
[20] **MR. GOODSTADT:** Objection. You
[21] answered the question.
[22] **A:** Did I trust her?
[23] **Q:** Yes.
[24] **A:** Absolutely.
[25] **Q:** Okay. And you had no concern

Page 61

[1] **F. Fiorillo**
[2] whatsoever during this meeting that what you
[3] would have said to her, wasn't going to
[4] immediately go back to George Hesse?
[5] **A:** Not for one minute.
[6] **Q:** Not for — not for one second?
[7] **A:** Why would I think — I would
[8] think that she would be professional enough
[9] to keep her word and not — what's so funny?
[10] **Q:** I'm sorry. Can you answer my
[11] question? I don't think anyone's laughing,
[12] but go ahead.
[13] **MR. GOODSTADT:** Yes.
[14] Ms. Sanchez — Ms. Zwilling was
[15] laughing.
[16] **MS. ZWILLING:** No, I wasn't. I
[17] would have to disagree with you. I
[18] haven't spoken to your client, so I
[19] don't know why he has to —
[20] **MR. NOVIKOFF:** I didn't hear
[21] anything.
[22] **MR. GOODSTADT:** You don't have
[23] a microphone.
[24] **A:** Excuse me, sir. I need for you
[25] to repeat the question.

Page 62

[1] **F. Fiorillo**
[2] **Q:** It's okay. Now did Ms. Sanchez,
[3] in your opinion, breach that
[4] confidentiality?
[5] **A:** In my opinion?
[6] **Q:** Yeah.
[7] **A:** Yes.
[8] **Q:** Did she tell Mr. Hesse about the
[9] conversation that you had with her on a few
[10] days after April 2?
[11] **A:** Did she tell Mr. Hesse?
[12] **Q:** Yeah. That's what I'm asking
[13] you.
[14] **A:** As far as I know.
[15] **Q:** Okay. What's the basis for your
[16] knowledge?
[17] **A:** Um, it was — it was relayed to
[18] me through I want to say Tommy Snyder
[19] that — it was either Tommy Snyder or Eddie
[20] Carter, I'm not quite sure which one, but
[21] one of those two, it was relayed back to us
[22] that — because Eddie and Tommy talked to
[23] George Hesse after we were fired, and
[24] through one of them, he stated that Hesse
[25] stated that Alison Sanchez called him after

Page 63

**F. Fiorillo**

[1]
[2] Kevin, Joe and myself went to Civil Service.
[3]    **Q:** Okay. So if I understand your
[4] testimony correctly, you have no direct
[5] knowledge of whether or not Sanchez ever
[6] called Hesse to discuss the meeting that you
[7] had with him?
[8]    **MR. GOODSTADT:** Objection.
[9]    **A:** No.
[10]    **Q:** And, in fact, the only knowledge
[11] that you have is based upon the word of two
[12] other Plaintiffs — one or two of the other
[13] Plaintiffs in this action, correct?
[14]    **MR. GOODSTADT:** Objection.
[15]    **A:** Well, it could have been the word
[16] of three others.
[17]    **Q:** Okay.
[18]    **A:** Hesse was the third.
[19]    **Q:** But you didn't talk to Hesse
[20] about this?
[21]    **A:** No. But he talked to —
[22]    **Q:** My question to you is, who do
[23] you — what is the basis of your knowledge,
[24] correct? And you said it was either — it
[25] was either Snyder or Carter told me —

Page 64

**F. Fiorillo**

[1]
[2]    **A:** Who talked to Hesse.
[3]    **Q:** Who talked to Hesse?
[4]    **A:** Correct.
[5]    **Q:** You never talked to Hesse about
[6] this?
[7]    **A:** (Indicating).
[8]    **Q:** So the only knowledge that you
[9] can base the allegation that Sanchez
[10] breached the confidentiality, is based upon
[11] the word of either one or two of the
[12] Plaintiffs in this action, correct?
[13]    **MR. GOODSTADT:** Objection.
[14]    **A:** Yes.
[15]    **Q:** Okay. Now did Snyder tell you
[16] what Hesse said to — let's assume it's
[17] Snyder. Well, you know what, let's not
[18] assume it's Snyder. Did either Snyder or
[19] Carter tell you specifically what Sanchez
[20] said to Hesse about your meeting?
[21]    **A:** What — what Hesse said to
[22] either Snyder or Carter about the meeting?
[23]    **Q:** No.
[24]    **A:** About what Sanchez said to Hesse?
[25]    **Q:** Yes.

Page 65

**F. Fiorillo**

[1]
[2]    **A:** That we went to Civil Service
[3] and, um, he called us rats for going to
[4] Civil Service.
[5]    **MO MR. NOVIKOFF:** Okay. I'm going
[6] to move to strike.
[7]    **Q:** I'm not asking you about what
[8] Hesse said about what you guys did. My
[9] question is more specific. Did either
[10] Carter or Snyder tell you specifically what
[11] Hesse said Sanchez said to Hesse about what
[12] went on during that meeting?
[13]    **A:** No.
[14]    **Q:** Okay. So for all you know,
[15] Sanchez —
[16]    **A:** Other than the fact that she said
[17] that we went to Civil Service.
[18]    **Q:** Right. So all you know, the
[19] conversation between Sanchez and Hesse could
[20] have been that Sanchez said "by the way,
[21] three of the officers came to see me, but I
[22] can't tell you what they said because it's
[23] confidential."
[24]    **MR. GOODSTADT:** Objection.
[25]    **Q:** Right?

Page 66

**F. Fiorillo**

[1]
[2]    **A:** I don't know.
[3]    **Q:** Right. You don't — exactly.
[4] You don't know what Sanchez said, do you?
[5]    **A:** No. I wasn't there.
[6]    **Q:** In paragraph 100, you allege that
[7] you disclosed your decision to Sanchez to
[8] seek recourse for Hesse and the OBPD's
[9] unlawful termination, do you see that?
[10]    **A:** Yes.
[11]    **Q:** Okay. What specifically did you
[12] advise Sanchez in this meeting with regard
[13] to what I just read?
[14]    **A:** I don't understand this.
[15]    **MR. GOODSTADT:** I don't think
[16] that that refers to Fiorillo.
[17]    **MR. NOVIKOFF:** Well, if it
[18] doesn't, then like other witnesses, he
[19] can tell me if this aspect of the
[20] allegation doesn't refer to him.
[21]    **MR. GOODSTADT:** I think it
[22] says, if you read the whole paragraph,
[23] it says "particularly because Officer
[24] Nofi was a full-time employee of
[25] Suffolk County, disclosure of his

Page 67

F. Fiorillo

[1]
[2] decision to seek recourse."
[3]     MR. NOVIKOFF: Well, I didn't
[4] really understand the allegation.
[5]     A: That's why I didn't understand
[6] that.
[7]     Q: Then I'll ask you a more pointed
[8] question in regard to this. Did you ever
[9] advise — did you personally, Mr. Fiorillo,
[10] not Nofi and Lamm, did you ever advise
[11] Sanchez during this meeting that you had
[12] made a decision to seek recourse against
[13] Hesse and the Ocean Beach Police Department?
[14]     A: Well, I asked her what we
[15] could — what we could do through Civil
[16] Service is what I did.
[17]     Q: I'm not there yet. We'll get
[18] there after we change the tape. My question
[19] to you is, at any point in time in this
[20] meeting with Sanchez, did you tell Sanchez
[21] that you had already made a decision to seek
[22] recourse against Hesse and the Ocean Beach
[23] Police Department?
[24]     A: Well, I — I — what I said was
[25] that I wasn't happy with the — the decision

Page 68

F. Fiorillo

[1]
[2] that she was telling me and I'm going to
[3] pursue it further.
[4]     Q: Oh, okay. So you did tell her
[5] you were going to pursue it further?
[6]     A: Yes.
[7]     Q: Okay. And this was a few days
[8] after the — the meeting — I'm sorry,
[9] after the decision not to hire you, right?
[10]     A: Right.
[11]     Q: So I'm clear, a few days after
[12] the decision was made not to rehire you at
[13] Ocean Beach — and I know you say
[14] "terminate" — you had already decided that
[15] you were going to take it further?
[16]     A: Right.
[17]     Q: Okay. What was the next step
[18] that you engaged in to take it further after
[19] this meeting?
[20]     A: Well, I didn't immediately the
[21] next day —
[22]     Q: I'm not asking you —
[23]     A: — take any action.
[24]     Q: Hold on. I'm not asking you what
[25] you did the next day. I'm just asking you

Page 69

F. Fiorillo

[1]
[2] what was your next step? Could have been a
[3] day later, it could have been a week later,
[4] it could have been a month later. I don't
[5] care. What I'm asking you is, what was the
[6] next step that you engaged in to take it
[7] further?
[8]     MR. GOODSTADT: You mean after
[9] he left the meeting with Ms. Sanchez?
[10]     MR. NOVIKOFF: After he left
[11] the meeting, yeah.
[12]     A: Like I said, that — I didn't do
[13] anything that particular day.
[14]     Q: I understand.
[15]     A: Actually, I didn't know what the
[16] next step was going to be because I was
[17] never in a position like this before, so.
[18]     Q: Okay.
[19]     A: Time went by, because what I did
[20] was I applied with other police departments,
[21] okay? So maybe, um, April, May, June —
[22] maybe two months went by, not quite two
[23] months, and then I was getting exhausted
[24] because things were not going — were — I
[25] was applying to every police department that

Page 70

F. Fiorillo

[1]
[2] was — was hiring in Suffolk County, every
[3] village or, you know, town police
[4] department, and I wasn't get — getting a
[5] job or I don't know. It just seemed to me
[6] like something was wrong.
[7]     MO MR. NOVIKOFF: Okay. I'm
[8] going to move to strike because you
[9] didn't tell me what your next step was
[10] to take it further.
[11]     Q: My question to you is, what was
[12] the next step to take it further with regard
[13] to the decision to seek recourse against
[14] Hesse and Ocean Beach Police Department?
[15]     A: Okay. What I did was I tried to
[16] obtain employment as a police officer within
[17] the next I would say maybe two months after
[18] I was fired.
[19]     Q: Okay.
[20]     A: And then time was running out
[21] because they wouldn't hire maybe after a
[22] certain point for — to start in their
[23] department, um, you know, part time. In
[24] other words, if we had advanced notice that
[25] we were going to be fired on April 2, I

Page 71

*F. Fiorillo*

[1]
[2] could have at least applied earlier and got
[3] my name in the system to obtain a job as a
[4] police officer, instead of doing it this
[5] way.
[6]    **MO MR. NOVIKOFF:** I'm going to
[7] move to strike. You didn't answer my
[8] question, but we're going to change the
[9] tape and then I'm going to ask you it
[10] again.
[11]    **THE VIDEOGRAPHER:** This ends
[12] tape number one. The time is 11:18
[13] a.m. We're going off the record.
[14]    (A break was taken.)
[15]    **THE VIDEOGRAPHER:** This begins
[16] tape number two. The time is 11:24
[17] a.m. Back on the record.
[18]    **Q:** Sir, you've — you testified
[19] before the end of the first tape that you
[20] told Ms. Sanchez, because you weren't happy
[21] about what she was telling you, that you
[22] were going to take it to the next step,
[23] right?
[24]    **A:** Right.
[25]    **Q:** Okay. Now I'm not interested in

Page 72

*F. Fiorillo*

[1]
[2] what job searches you did, at least for the
[3] time being, and we'll get to that, just now
[4] with regard to the next step, what was that
[5] next step?
[6]    **A:** The next step would be something
[7] that I didn't know what the next step was
[8] going to be, because she basically told me I
[9] had no next step.
[10]    **Q:** I understand that, but you took a
[11] next step. At some point in time, we know
[12] you retained Mr. Goodstadt, right?
[13]    **A:** Yes.
[14]    **Q:** Okay.
[15]    **A:** But she told me that I didn't
[16] have a leg to stand on.
[17]    **Q:** Sir, sir, I understand that. But
[18] you retained Mr. Goodstadt, right?
[19]    **A:** Yes.
[20]    **Q:** Okay. So we have — we have the
[21] meeting with Ms. Sanchez on a few days after
[22] April 2, right, and then we know that you
[23] retained Mr. Goodstadt's law firm at some
[24] particular date, we don't know what that
[25] date is yet. So we got meeting, retain

Page 73

*F. Fiorillo*

[1]
[2] Goodstadt, right?
[3]    **A:** Right.
[4]    **Q:** After the meeting and before you
[5] retained Goodstadt, what was your next step,
[6] if any?
[7]    **A:** I basically didn't have a next
[8] step at that time because she said you
[9] didn't have a leg to stand on. So I didn't
[10] know what to do.
[11]    **Q:** But you took a next step?
[12]    **A:** Absolutely I took a next step.
[13]    **Q:** Was retaining Mr. Goodstadt the
[14] next step?
[15]    **A:** Yes. Yeah. Ultimately.
[16]    **Q:** No, not ultimately. We know that
[17] retaining Mr. Goodstadt was a step to
[18] seeking recourse because he filed a Notice
[19] of Claim on your behalf, right?
[20]    **A:** Yes.
[21]    **Q:** And you would agree with me that
[22] would be a step to taking recourse, right?
[23]    **A:** Absolutely.
[24]    **Q:** Okay. So we got that. Was
[25] retaining Mr. Goodstadt the next step in

Page 74

*F. Fiorillo*

[1]
[2] seeking recourse or was there a step before
[3] that that you took?
[4]    **A:** That was my next step.
[5]    **Q:** Fine. Did you meet with any
[6] other attorneys prior to your first meeting
[7] or communication with Mr. Goodstadt?
[8]    **A:** No.
[9]    **Q:** Okay. How did you learn of
[10] Mr. Goodstadt's law firm?
[11]    **A:** It came to a point in time when
[12] Eddie Carter and I were talking about what
[13] could — what would be our next step. What
[14] is — what can we do. It seems like we
[15] couldn't do anything. But then it's like it
[16] was unfair.
[17]    So Eddie was describing, um, a
[18] case that had to do with, um, I think it was
[19] a male subject or a male — some person who
[20] was working for Wal-Mart on Long Island. It
[21] was something that was done unfairly to —
[22] to this person. I don't know the whole
[23] case.
[24]    Anyway, Eddie was more familiar
[25] with it. So what — what he did was he

Page 75

[1]                    **F. Fiorillo**
[2] Googled I think the Wal-Mart case is what it
[3] was, something like to that effect, and he
[4] found the firm of Thompson Wigdor & Gilly.
[5] It wasn't Andrew Goodstadt.
[6]    **Q:** I understand that. I know. I
[7] understand.
[8]    **A:** So what I did was when Eddie told
[9] me, he said "I got — I got this firm." He
[10] said, "It's not on Long Island." I said,
[11] "Well, I don't think it's a good idea if we
[12] get a firm on Long Island," okay? Only
[13] because I just didn't — I felt very
[14] uncomfortable at this time with a lot of
[15] things, okay? As far as being fired on Long
[16] Island and other things that were going on.
[17] So what I did was I initially made the phone
[18] call.
[19]    **Q:** To — to the Thompson Wigdor law
[20] firm?
[21]    **A:** Yeah. But it wasn't here.
[22]    **Q:** Where was it?
[23]    **A:** It was in the Empire State
[24] Building.
[25]    **Q:** Okay. The same law firm, but a

Page 76

[1]                    **F. Fiorillo**
[2] different address?
[3]    **A:** Yes.
[4]    **Q:** Okay. And when did you make that
[5] phone call?
[6]    **MR. GOODSTADT:** Objection.
[7]    **MR. NOVIKOFF:** When?
[8]    **MR. GOODSTADT:** But when he
[9] engaged us, when he started receiving
[10] advice from us, I don't think that's
[11] relevant.
[12]    **MR. NOVIKOFF:** Oh, I think one
[13] it's completely relevant, and two, even
[14] if it's not relevant, it's not
[15] privileged, and you can't object and
[16] instruct the witness not to answer on
[17] the grounds of relevance. I'm not
[18] asking for any communications that he
[19] had with you. I'm asking him when he
[20] first met with you. Just like you
[21] asked my clients when they met with me.
[22]    **MR. GOODSTADT:** Well, that's
[23] different.
[24]    **MR. NOVIKOFF:** And they
[25] answered when. I'll call Judge Boyle

Page 77

[1]                    **F. Fiorillo**
[2] up. I don't think there's any issue
[3] with me asking your client, to the
[4] extent he can recall, when he met with
[5] you the first time, especially since
[6] you put it into play in your
[7] allegation.
[8]    **MR. GOODSTADT:** I don't think
[9] that's right.
[10]    **MR. NOVIKOFF:** You did. But he
[11] when he first met with you and who he
[12] met with. But even putting aside the
[13] second part of that, when he first met
[14] with you is not — is not privileged.
[15] And if you want to call Judge Boyle on
[16] it, we'll call Judge Boyle on that.
[17]    **MR. GOODSTADT:** I just instruct
[18] you not to disclose anything that was
[19] said —
[20]    **MR. NOVIKOFF:** Absolutely.
[21]    **MR. GOODSTADT:** — at any point
[22] in time between you and any other
[23] lawyers.
[24]    **Q:** And just so you know, my
[25] questions, unless I specifically ask you,

Page 78

[1]                    **F. Fiorillo**
[2] which I don't think I'm going to, I don't
[3] want to know what you may have spoken to
[4] about with any lawyers at this law firm or,
[5] for that matter, any lawyers at any other
[6] law firm. So I'm going to ask you the
[7] question. When did you first have a
[8] communication with somebody from the
[9] Thompson Wigdor law firm?
[10]    **MR. GOODSTADT:** I just want to
[11] instruct you that to the extent you can
[12] remember, only when is what he's asking
[13] you.
[14]    **Q:** Only when. Only when.
[15]    **A:** Okay. It was sometime after
[16] April 2 and before I would say the 4th of
[17] July.
[18]    **Q:** Okay. Well, if I told you you
[19] filed — if I told you the Notice of Claim
[20] was filed June 30, would you agree with me
[21] that it was sometime between April 2 and
[22] June 30?
[23]    **A:** Okay. Yes.
[24]    **Q:** Okay. And did you review the
[25] Notice of Claim before it was filed?

Page 79

**F. Fiorillo**

[1]
[2] A: I believe I reviewed it. I
[3] believe I reviewed it.
[4] Q: Okay. Between the time that you
[5] reviewed the Notice of Claim, how long prior
[6] to that time did you first have a
[7] communication with someone from the Thompson
[8] Wigdor law firm? And again, I don't want to
[9] know what that communication was, I'm just
[10] looking for a time period, whether it was
[11] days, weeks or months?
[12] A: I'm sorry, before —
[13] Q: Okay. You looked — the Notice
[14] of Claim was dated June 30?
[15] A: Okay.
[16] Q: You just testified that you
[17] believed you reviewed the Notice of Claim
[18] before it was filed with the Village, right?
[19] A: Correct.
[20] Q: Okay. How long prior to you
[21] reviewing the Notice of Claim before it was
[22] filed did you first have a communication
[23] with the Thompson Wigdor law firm?
[24] A: I don't remember.
[25] Q: Days?

Page 80

**F. Fiorillo**

[1]
[2] A: To be honest with you, I don't
[3] know at what point in time and then at what
[4] point in time the file — the claim was
[5] filed.
[6] Q: Well, the claim was filed June
[7] 30.
[8] A: No. I know that. But I don't
[9] know how long before it started.
[10] Q: Days? Weeks? Really, that's all
[11] I'm asking.
[12] A: I don't — I don't want to guess.
[13] Q: Then you don't. Um, did you
[14] have — after you had a phone communication
[15] with someone at this law firm, did there
[16] come a time that you personally met with
[17] anyone at the Thompson Wigdor law firm?
[18] And, again, I don't want to know anything
[19] that was discussed at the meeting.
[20] A: Yes.
[21] Q: Okay. Between the phone call and
[22] the meeting, what period of time elapsed?
[23] A: To be honest with you, I can't
[24] remember that timeline. I — I just don't
[25] recall exactly the — the sequence of

Page 81

**F. Fiorillo**

[1]
[2] events.
[3] Q: Was it the same day?
[4] A: I can't recall — what do you
[5] mean, the same day it was filed?
[6] Q: Well, no. You had a telephone
[7] conversation, right? Wait. Hold on.
[8] You — you phoned the law firm of Thompson
[9] Wigdor, right?
[10] A: Correct.
[11] Q: Okay. And you had a face-to-face
[12] meeting with someone at Thompson Wigdor,
[13] right?
[14] A: Yes.
[15] Q: Did you have that face-to-face
[16] meeting on the same day that you had the
[17] phone communication?
[18] A: No.
[19] Q: Okay. How many days or weeks
[20] transpired between the phone call and the
[21] meeting with Thompson Wigdor?
[22] A: I don't recall.
[23] Q: Okay. Did you have more than one
[24] face-to-face meeting with someone at
[25] Thompson Wigdor before June 30, 2004, which

Page 82

**F. Fiorillo**

[1]
[2] is the date of the Notice of Claim?
[3] DI MR. GOODSTADT: Objection. I'm
[4] going to instruct him not to answer
[5] that.
[6] MR. NOVIKOFF: Why?
[7] MR. GOODSTADT: Because the
[8] amount of times he met with lawyers,
[9] how long he met with lawyers, when he
[10] met with them, that's not relevant.
[11] MR. NOVIKOFF: Well, your —
[12] well, you can't stop him —
[13] MR. GOODSTADT: I think it's
[14] privileged. I think it's —
[15] MR. NOVIKOFF: Are you
[16] instructing your witness not to answer?
[17] MR. GOODSTADT: I just did.
[18] MR. NOVIKOFF: Because you have
[19] alleged that your client reasonably
[20] relied on the advice of Ms. Sanchez,
[21] and this goes directly to the
[22] reasonability of their reliance and any
[23] damages that flow from there. And —
[24] MS. ZWILLING: I would
[25] absolutely have to agree.

Page 83

[1]                    *F. Fiorillo*
[2]    **MR. GOODSTADT:** I didn't think
[3] you wouldn't agree, but I'm instructing
[4] him not to answer.
[5]    **MR. NOVIKOFF:** We will make the
[6] appropriate motion then.
[7]    **MR. GOODSTADT:** Make the
[8] appropriate motion.
[9]    **MR. NOVIKOFF:** That's fine.
[10]    **Q:** In your first meeting with
[11] Thompson Wigdor, who among the other
[12] Plaintiffs met with you, if any?
[13]    **DI MR. GOODSTADT:** Objection. I
[14] instruct you not to answer that
[15] question.
[16]    **MR. NOVIKOFF:** On what grounds?
[17]    **MR. GOODSTADT:** On the grounds
[18] that's privileged. It was at the
[19] meeting. You can ask him if there were
[20] any non-lawyers there who were not
[21] being represented, and the privilege
[22] is —
[23]    **MR. NOVIKOFF:** Mr. Goodstadt, I
[24] think you've already taken positions in
[25] motions in this case that are

Page 84

[1]                    *F. Fiorillo*
[2] fundamentally opposite to the position
[3] you're taking now. And that's fine.
[4]    **MR. GOODSTADT:** That's not
[5] correct.
[6]    **MR. NOVIKOFF:** I can't tell you
[7] what to do.
[8]    **MR. GOODSTADT:** The positions I
[9] take have to do with what somebody does
[10] to prepare for a deposition. That's
[11] the position. The Case Law is clear.
[12] You can ask those questions in terms of
[13] what somebody did to prepare and
[14] refresh their recollection for a
[15] deposition.
[16]    **MR. NOVIKOFF:** Okay. No
[17] problem. I just want to make it known
[18] you are instructing your client not to
[19] answer that question.
[20]    **MR. GOODSTADT:** I am.
[21]    **MR. NOVIKOFF:** I don't think
[22] there's a good faith basis to assert
[23] privilege, but I'll move on. We'll
[24] have another motion.
[25]    **MR. GOODSTADT:** Sure.

Page 85

[1]                    *F. Fiorillo*
[2]    **Q:** 101, you allege that "Officers
[3] Fiorillo, Nofi and Lamm then relayed the
[4] substance of their employment experience at
[5] the OBPD, including their termination
[6] without notice or cause in retaliation for
[7] complaints regarding repeated instances of
[8] obstruction of justice, abuse of power and
[9] other unlawful conduct committed by or at
[10] the direction of Hesse," do you see that?
[11]    **A:** Yes.
[12]    **Q:** Now I'm not going to ask you
[13] specifics yet. My question is a little bit
[14] more focused. With regard to the complaints
[15] that you allege in 101, did you make these
[16] Complaints to George Hesse?
[17]    **MR. GOODSTADT:** Objection.
[18]    **Q:** I'll rephrase the question. You
[19] see the word "complaints" in 101?
[20]    **A:** This is — this is to Alison
[21] Sanchez?
[22]    **Q:** Yes. You said —
[23]    **A:** Okay. Okay. I want to make that
[24] clear.
[25]    **Q:** In 101, you allege that you told

Page 86

[1]                    *F. Fiorillo*
[2] Ms. Sanchez that you were fired in
[3] retaliation for making certain complaints,
[4] do you see that?
[5]    **A:** Yes.
[6]    **Q:** Okay. I read that correctly,
[7] right?
[8]    **A:** Yes.
[9]    **Q:** Okay. Now with regard to the
[10] complaints that you spoke of with
[11] Ms. Sanchez, prior to that day, had you made
[12] those complaints to George Hesse?
[13]    **A:** About the uncertified officers?
[14]    **Q:** About whatever you're referring
[15] to in 101.
[16]    **A:** About what I complained to Alison
[17] Sanchez about?
[18]    **Q:** Yes.
[19]    **A:** Yeah.
[20]    **Q:** Let me take a step back.
[21]    **A:** Yes. The answer is yes.
[22]    **Q:** Well, 101 — I think you may be a
[23] little confused by my question. 101, you
[24] are making the allegation that you told
[25] Alison Sanchez that you were terminated

Page 87

F. Fiorillo

[1]
[2] without cause and in retaliation for making
[3] complaints regarding repeated instances of
[4] obstruction of justice, abuse of power and
[5] other unlawful conduct committed by or at
[6] the direction of Hesse, do you see that?
[7]     A: Yes.
[8]     Q: Now I don't want to know what the
[9] complaints are yet. We'll have plenty of
[10] time to go over that this afternoon. But
[11] with regard to the complaints that you were
[12] referring to when you spoke to Alison
[13] Sanchez and that are set forth in paragraph
[14] 101, had you raised those complaints with
[15] George Hesse prior to April 2, 2006?
[16]     A: Yes.
[17]     Q: Okay. Had you raised those
[18] complaints with Anthony Paridiso — I'm
[19] sorry, with Chief Paridiso prior to April 2,
[20] 2006?
[21]     A: Yes.
[22]     Q: Had you raised those complaints
[23] with Mayor Rogers?
[24]     A: No.
[25]     Q: Had you raised those complaints

Page 88

F. Fiorillo

[1]
[2] with Trustee Loeffler?
[3]     A: Yes.
[4]     Q: Okay. What specific complaint or
[5] complaints did you raise with Trustee
[6] Loeffler prior to April 2, 2006?
[7]     A: That the — the complaint was
[8] that — was specific to the — to Gary
[9] Bosetti and Richard Bosetti, first of all.
[10]     Q: I'm asking you —
[11]     A: That was my complaint
[12] specifically about them.
[13]     Q: Yeah. I'm asking you what this
[14] complaint was.
[15]     A: Okay. My complaint was —
[16]     Q: To Loeffler now.
[17]     A: To Joe Loeffler.
[18]     Q: Right.
[19]     A: Exactly. Joe Loeffler, Jr.
[20]     Q: Right.
[21]     A: The current mayor.
[22]     Q: Right.
[23]     A: I com — I spoke to him and
[24] complained about Gary Bosetti and Richard
[25] Bosetti running amuck in the Village,

Page 89

F. Fiorillo

[1]
[2] constantly drinking. And he knew that
[3] because we had a conversation.
[4]     Q: Sir, I'm just asking you about
[5] what your complaint was —
[6]     A: That was my complaint.
[7]     MO MR. NOVIKOFF: Okay. Motion to
[8] strike what you think Trustee Loeffler
[9] knew or not.
[10]     Q: Okay. When did you make this
[11] complaint to Joe Loeffler about the Bosettis
[12] running amuck, constantly drinking in the
[13] Village?
[14]     A: In I would say it was 2005.
[15]     Q: When in 2005?
[16]     A: Summertime.
[17]     Q: Where did you make this
[18] Complaint?
[19]     A: It was — he was riding his
[20] bike. He came — he was actually walking
[21] his bike to the corner of Cottage Walk and
[22] Bay Walk. He was on the — he was on
[23] the — let me see what the direction was.
[24] He was on the southeast corner by the hero
[25] shop across from the post office — the

Page 90

F. Fiorillo

[1]
[2] village offices.
[3]     Q: And was this during the daytime?
[4]     A: Yes.
[5]     Q: Were you on duty?
[6]     A: Yes.
[7]     Q: What month?
[8]     A: It was I would say — I would say
[9] July.
[10]     Q: Okay. And before or after July
[11] 4th?
[12]     A: Before or after July 4th. I'm
[13] trying to think. I think we had the parade
[14] already, so I would say the best of my
[15] recollection is after the 4th of July.
[16]     Q: And what specifically did you say
[17] to Joe Loeffler?
[18]     A: I said that "The Bosettis are
[19] poisoning this village."
[20]     Q: What else did you say, because I
[21] presume you didn't just end it at "poisoning
[22] the village"?
[23]     A: No. We were talking about Gary
[24] and Richard Bosetti.
[25]     Q: Who started the conversation?

Page 91

*F. Fiorillo*

[1]
[2] **A:** Um, he — well, it was like
[3] this; he was going to run for mayor.
[4] **Q:** No. I'm not interested —
[5] **A:** I'm telling how it started.
[6] **Q:** No. Did he start the
[7] conversation with you or did you start the
[8] conversation?
[9] **A:** Well, we greeted each other
[10] hello.
[11] **Q:** Who said the first words after
[12] "hello"?
[13] **A:** Um, I did.
[14] **Q:** Okay. What did you say to him
[15] after you both said hello?
[16] **A:** I said "Joe, I hear you're going
[17] to run for mayor."
[18] **Q:** Good. What did he say after
[19] that?
[20] **A:** He said he was going to run for
[21] mayor.
[22] **Q:** What did you say?
[23] **A:** And I said, "Well, when you
[24] became — when you become mayor, I hope you
[25] clean up the village."

Page 92

*F. Fiorillo*

[1]
[2] **Q:** And did you say anything else
[3] before he responded?
[4] **A:** Did I say anything else?
[5] **Q:** Right. Did you explain why you
[6] wanted him to clean up the village before he
[7] responded?
[8] **A:** Yeah. In the conversation,
[9] that's what I said.
[10] **Q:** Fine. You said you hope he
[11] cleans up the village, and what did Loeffler
[12] say in response to you —
[13] **A:** Joe said when he becomes mayor,
[14] he's going to clean up the village.
[15] **Q:** Okay. And did you say anything
[16] else after Joe — after Joe said that?
[17] **A:** Yes, I did.
[18] **Q:** What did you say?
[19] **A:** I said, "Well, I hope you — you
[20] know, you take action on what's going on in
[21] this village, because it's, you know,
[22] getting — it was getting pretty bad."
[23] **Q:** And what did he say to that?
[24] **A:** And I said — well, what I said
[25] was —

Page 93

*F. Fiorillo*

[1]
[2] **Q:** Yeah. Tell me.
[3] **A:** What I said was, "Gary Bosetti
[4] and Richard Bosetti are really taking this
[5] village down."
[6] **Q:** Okay.
[7] **A:** And what Joe Loeffler said was,
[8] "Well, when I become mayor, they're going to
[9] be the first two that I fire."
[10] **Q:** Okay. And did you tell Joe
[11] during that conversation why the Bosetti
[12] brothers were taking the village down as you
[13] say?
[14] **A:** No. Well, after I said that, he
[15] said, "I know because they're involved in
[16] everything here." That was his exact words.
[17] **Q:** They were involved in everything.
[18] Did you tell Joe Loeffler anything else
[19] about the Bosettis during that conversation
[20] that you said you complained about drinking
[21] in the village and running amuck? That's
[22] what you said. You said —
[23] **A:** That's exactly what I said.
[24] **Q:** That's what I've been asking you.
[25] When did you say that the Bosettis were

Page 94

*F. Fiorillo*

[1]
[2] running amuck?
[3] **A:** When did I say that? In the
[4] conversation.
[5] **Q:** Yeah. When in the conversation?
[6] **A:** During the course of the
[7] conversation.
[8] **Q:** We've just gone through it. When
[9] did — in response to what — in response
[10] to what did you say —
[11] **A:** He said he was going to clean up
[12] the village.
[13] **Q:** And then what did you say?
[14] **A:** And then I said — what happened
[15] was — I said that the Bosettis were taking
[16] this village down.
[17] **Q:** Right.
[18] **A:** I said they were — actually, I
[19] said they were poisoning the village.
[20] **Q:** Right. Okay.
[21] **A:** Okay? And what he said was when
[22] he became mayor, that those were going to be
[23] the first two guys that he was going to
[24] fire.
[25] **Q:** Okay. When did you tell Mayor

EDWARD CARTER  v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 95

F. Fiorillo

[1]
[2] Loeffler that they were constantly drinking
[3] in the village?
[4]    A: He said that he knew — he knew
[5] it, too. He — it wasn't something that he
[6] didn't know.
[7]    Q: Sir, I'm not asking you yet what
[8] Loeffler said to you. My question to you
[9] is, you testified earlier that you
[10] complained to Joe Loeffler about the
[11] Bosettis constantly drinking in the village.
[12] Were those your words? Did you say —
[13]    A: Yes.
[14]    Q: Did you say to Loeffler in this
[15] conversation outdoors while you were on duty
[16] in July, after the parade, after July 4th,
[17] that the Bosettis were constantly drinking
[18] in the village?
[19]    A: Yes.
[20]    Q: What were your exact words?
[21]    A: Those were my words.
[22]    Q: Okay. And what did he say in
[23] response to that?
[24]    A: When he becomes mayor —
[25]    Q: Okay.

Page 96

F. Fiorillo

[1]
[2]    A: Okay, that was going to be one of
[3] the first actions he takes.
[4]    Q: Okay.
[5]    A: That he told me. He said, "Those
[6] are going to be the first two guys I fire."
[7]    Q: Okay. Now let me ask you this.
[8] Was Mayor Loeffler the mayor on April 2,
[9] 2006?
[10]    A: On April 2, 2006? No.
[11]    Q: Um, had — do you know if Mayor
[12] Loeffler became mayor at any point in time
[13] in 2006?
[14]    A: Yes.
[15]    Q: All right. Do you know as of
[16] today if the Bosettis are still employed by
[17] Ocean Beach?
[18]    A: I don't know.
[19]    MR. GOODSTADT: Hold on. Let's
[20] take a break while Arlene's phone is
[21] ringing.
[22]    MS. ZWILLING: Sorry about
[23] that.
[24]    Q: You have no knowledge one way or
[25] the other as to whether Richard Bosetti is

Page 97

F. Fiorillo

[1]
[2] still employed by Ocean Beach?
[3]    MR. GOODSTADT: Objection.
[4]    A: I don't — I don't know how they
[5] do their employing. In other words, I don't
[6] know if they go back and — I don't know.
[7] I don't know.
[8]    Q: You never heard of Mr. Bosetti
[9] being fired by Ocean Beach after — after
[10] April 2, 2006?
[11]    A: I don't know what's going on in
[12] Ocean Beach right now.
[13]    Q: You have no idea about Gary
[14] Bosetti being fired by Ocean Beach?
[15]    A: I have no knowledge of that
[16] whatsoever.
[17]    Q: Have you ever heard that Gary
[18] Bosetti is no —
[19]    A: This is news to me.
[20]    Q: So you're testifying today under
[21] oath that February 20, 2008 is the first
[22] that you have learned that Gary Bosetti is
[23] no longer employed by Ocean Beach?
[24]    MR. GOODSTADT: Objection.
[25]    A: Yes.

Page 98

F. Fiorillo

[1]
[2]    Q: And were you here during the
[3] testimony of Richard Bosetti?
[4]    A: Yes.
[5]    Q: Do you recall Mr. Bosetti
[6] testifying that Joe Loeffler fired him after
[7] Loeffler caught him sleeping in the police
[8] station?
[9]    A: You asked me about Gary.
[10]    Q: I know. Now I'm asking you about
[11] Rich.
[12]    A: Richie —
[13]    Q: Are you — were you at the
[14] testimony of Richard Bosetti a week ago —
[15]    A: Okay.
[16]    Q: Wherein — yes or no, were you at
[17] the testimony of Richard Bosetti when he
[18] testified that Loeffler fired him after
[19] Loeffler saw him sleeping in the police
[20] station?
[21]    MR. GOODSTADT: Objection.
[22]    A: That's not true.
[23]    Q: Were you here when Bosetti said
[24] that?
[25]    MR. GOODSTADT: Objection.

---

Page 99

F. Fiorillo

[1]
[2] A: But he didn't say that.
[3] Q: What did he say?
[4] A: He said that he was sleeping in
[5] the fire hall.
[6] Q: Okay. I'm sorry. Were you here
[7] during Richard Bosetti's deposition when
[8] Richard Bosetti said that Loeffler caught
[9] him sleeping in the fire hall and fired him?
[10] A: Yes.
[11] Q: Okay. Is it your testimony that
[12] that was the first time you had ever learned
[13] that Richard Bosetti was no longer employed
[14] by the Village?
[15] A: That — that's not my testimony.
[16] Q: When did you first learn that
[17] Richard Bosetti was no longer employed by
[18] the Village?
[19] A: When Kevin Lamm got a call from
[20] John Oley at 6:00 in the morning from Ocean
[21] Beach and told Kevin — John Oley told
[22] Kevin that Richie Bosetti was fired the day
[23] after the — the George Hesse, Paul Corallo,
[24] Arnold Hardman indictment fundraiser, the
[25] next day he was fired.

Page 100

F. Fiorillo

[1]
[2] Q: Indictment fundraiser?
[3] A: Yeah. They had an indictment
[4] fundraiser.
[5] Q: Oh, for their legal fees?
[6] A: For their legal fees.
[7] Q: Oh, okay. And when was that?
[8] A: Um, I would say — I would say
[9] sometime in September of — let's see —
[10] 2007.
[11] Q: Okay. Now let's get back to your
[12] conversation with Joe Loeffler. So he said
[13] to you when he becomes mayor, he would get
[14] rid of — he would fire the Bosettis. Was
[15] that the only time that you complained to
[16] Joe Loeffler about drinking in the Village?
[17] A: No. I complained to Joe Loeffler
[18] when the Hal — there was a Halloween
[19] fight.
[20] Q: Right.
[21] A: And he was the ambulance driver.
[22] Q: Right.
[23] A: And he was at the station at the
[24] time.
[25] Q: Right.

Page 101

F. Fiorillo

[1]
[2] A: And we were going through the
[3] whole process of with the victims and the
[4] complainants and —
[5] Q: Right.
[6] A: And the whole scene. And I said,
[7] "This is a result of the Bosettis drinking."
[8] Q: Now the Bosettis were off duty at
[9] the time, right?
[10] A: What do you mean by "off duty"?
[11] Q: Well, the night of the Halloween
[12] incident, were the Bosettis on duty at the
[13] time of the fight?
[14] A: Well, at the time of the fight,
[15] they represented themselves as police
[16] officers.
[17] Q: Were they on duty?
[18] A: I don't know.
[19] Q: You don't know? You never found
[20] out? Mr. Fiorillo, you investigated the
[21] Halloween incident, correct?
[22] A: They claimed —
[23] Q: Sir, you —
[24] A: — they were off duty.
[25] Q: Sir, you investigated the

Page 102

F. Fiorillo

[1]
[2] Halloween incident, didn't you?
[3] A: Yes.
[4] Q: Did you ever inquire with regard
[5] to whether the Bosettis were on duty that
[6] night?
[7] A: In my opinion, they were off
[8] duty. They weren't working with us.
[9] Q: Fine. So when I asked you the
[10] question —
[11] A: But there's a reason why I
[12] answered that question that way.
[13] Q: I'm sure there is a reason,
[14] Mr. Fiorillo. And Mr. Loeffler wasn't just
[15] hanging out in the police station that
[16] night, right?
[17] A: Well, he —
[18] Q: Right? He wasn't just hanging
[19] out, he had a job that night, correct?
[20] A: Yeah. But he was —
[21] Q: He was with —
[22] A: — hanging out. He was waiting.
[23] Q: He was with the ambulance?
[24] A: Yeah. But he wasn't doing
[25] anything. He was basically hanging out.

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 103

F. Fiorillo

[1]
[2] Q: Sir —
[3] A: I mean, he was doing his job.
[4] Q: Sir, was Mr. Loeffler at the
[5] police station before the ambulance arrived?
[6] A: No.
[7] Q: Okay. And Mr. Loeffler was part
[8] of the ambulance crew that night, correct?
[9] A: He was the driver.
[10] Q: Right. And when the ambulance
[11] left, so did Mr. Loeffler, right?
[12] A: Correct.
[13] Q: Given that he was the driver.
[14] Okay. So you had told Mr. Loeffler the
[15] night of the Halloween incident that this is
[16] the result of the Bosettis drinking, right?
[17] You had this so called conversation with
[18] Mr. Loeffler in July of 2005 when you said
[19] the Bosettis are constantly drinking in the
[20] Village, correct?
[21] A: Which he knew.
[22] Q: Fine. You had that conversation,
[23] correct?
[24] A: Yes.
[25] Q: Okay. Were there any other times

Page 104

F. Fiorillo

[1]
[2] that you complained to Joe Loeffler about
[3] drinking in the Village?
[4] A: No.
[5] Q: Okay. Were there any other times
[6] that you made any complaints to Joe
[7] Loeffler, other than what you've just
[8] testified to, with regard to what you stated
[9] to Ms. Sanchez during that April meeting
[10] with her?
[11] A: I don't —
[12] MR. GOODSTADT: Just so we're
[13] clear, you're asking whether he
[14] complained to Loeffler about anything
[15] that he said?
[16] MR. NOVIKOFF: Right.
[17] Q: We started out this whole line of
[18] questioning with what you said to Sanchez in
[19] that meeting. You generally said to her
[20] that you were being fired for — in
[21] retaliation for making certain complaints,
[22] right, concerning —
[23] A: What I said —
[24] Q: Excuse me.
[25] A: Sure.

Page 105

F. Fiorillo

[1]
[2] Q: Concerning obstruction of
[3] justice, abuse of power and other unlawful
[4] conduct, right?
[5] A: Now you --- I was complaining to
[6] Alison Sanchez at this point.
[7] Q: Yes.
[8] A: Okay. Yes.
[9] Q: And then I asked you a series of
[10] questions, Mr. Fiorillo. I said with regard
[11] to what you believe was complaints that
[12] formed the basis of the retaliatory action,
[13] did you complain to George Hesse, and you —
[14] A: Yes.
[15] Q: — said yes. I asked you if you
[16] complained to Paridiso. You said yes.
[17] A: Yes.
[18] Q: Then I asked you if you
[19] complained to Loeffler, and you gave me two
[20] instances.
[21] A: Right.
[22] Q: With regard to any of the
[23] complaints that you repeatedly made that
[24] formed your belief that you were retaliated
[25] against, did you make any complaints to Joe

Page 106

F. Fiorillo

[1]
[2] Loeffler?
[3] A: Any other than the two mentioned?
[4] Q: Right.
[5] A: No.
[6] Q: Okay. And you're certain of
[7] that?
[8] A: Yeah. I don't believe I ever
[9] spoke to Joe Loeffler after that.
[10] Q: I'm talking about before. At any
[11] time. You started working there in 2002,
[12] right?
[13] A: Yeah, but it wasn't —
[14] Q: Sir —
[15] A: Yes. Yes.
[16] Q: In 2002, did you ever make a
[17] Complaint to Trustee Loeffler?
[18] A: No.
[19] Q: In 2003, did you ever make a
[20] Complaint to Trustee Loeffler?
[21] A: No.
[22] Q: In 2004, did you ever make a
[23] Complaint to Trustee Loeffler?
[24] MR. GOODSTADT: Other than the
[25] ones he already testified to?

Page 107

*F. Fiorillo*

[1]
[2] A: Yes. Yes. Yes.
[3] Q: Well, yes. Other than the
[4] Halloween incident.
[5] A: That's 2004.
[6] Q: Right. So other than the
[7] Halloween incident, did you make any other
[8] complaints to Trustee Loeffler?
[9] A: In 2004?
[10] Q: Right.
[11] A: No.
[12] Q: In 2005, other than this one time
[13] you spoke about in July, did you make any
[14] other complaints to Trustee Loeffler?
[15] A: No.
[16] Q: 2006, did you —
[17] A: No.
[18] Q: Okay. So you — is it your
[19] opinion that the Bosettis drinking in the
[20] Village created a public safety hazard?
[21] A: Absolutely.
[22] Q: And when did you first form this
[23] belief?
[24] A: Well, you can't — you can't keep
[25] on going out drinking when — after —

Page 108

*F. Fiorillo*

[1]
[2] Q: Sir —
[3] A: Well, I'm going to explain — I'm
[4] going to answer the question.
[5] Q: Sir, right now I don't care about
[6] why you think that. I'm asking you, you
[7] stated that you formed the belief that the
[8] Bosettis drinking in the Village created a
[9] public safety issue, right?
[10] A: Yes.
[11] Q: When did you first form that
[12] belief?
[13] A: It — it — well, let's see,
[14] after I started working there in 2002.
[15] Q: When in 2002 did you first form
[16] that belief?
[17] A: When I first started to get to
[18] know both Richie and Gary and their
[19] behavior.
[20] Q: So you formed this belief in
[21] 2002?
[22] A: Yes. And it strengthened then as
[23] the years went by.
[24] Q: And we're going to get to that
[25] right now. So in 2002, you formed the

Page 109

*F. Fiorillo*

[1]
[2] belief that the drinking by the Bosettis
[3] were creating a public safety issue, right?
[4] A: Yes.
[5] Q: And did you complain to Hesse in
[6] 2002?
[7] A: No, not in 2002.
[8] Q: Okay. Did you complain to
[9] Paridiso in 2002?
[10] A: Not in 2002.
[11] Q: Did you — did you write any
[12] letters to the Suffolk County DA?
[13] A: No.
[14] Q: Did you complain to the DA in
[15] 2002?
[16] A: Why would I complain to the DA?
[17] Q: Sir, my question is not why you
[18] would or why you wouldn't. In 2002, when
[19] you first formed the belief that the
[20] drinking by the Bosettis created a public
[21] safety issue, did you complain to the
[22] Suffolk County District Attorney's office?
[23] A: No.
[24] Q: Did you complain to any police
[25] department on Long Island?

Page 110

*F. Fiorillo*

[1]
[2] A: Well, indirectly.
[3] Q: No. Directly. You, making a
[4] complaint.
[5] A: When you say "any police
[6] department" —
[7] Q: Other than Ocean Beach — well,
[8] you didn't make a complaint to Hesse and you
[9] didn't make a complaint to Paridiso. So
[10] other than Ocean Beach, did you make a
[11] complaint to any other police department in
[12] Long Island concerning the Bosettis drinking
[13] in 2002 and your belief that their drinking
[14] created a public safety issue?
[15] A: Yes.
[16] Q: To whom?
[17] A: Suffolk County Police.
[18] Q: Which person?
[19] A: Mike Santarpia.
[20] Q: And who is Michael Santarpia?
[21] A: He's an academy instructor at the
[22] Suffolk County Police Academy.
[23] Q: And what did you say to Michael
[24] Santarpia?
[25] A: I said that, "I can't believe the

EDWARD CARTER  v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 111

**F. Fiorillo**

[1]
[2] department that I'm in and what's going on,
[3] because what you taught me is absolutely not
[4] what — what is happening in this police
[5] department."
[6] **Q:** And what was Mr. Santarpia's
[7] position at the time?
[8] **A:** He was an academy instructor.
[9] **Q:** Was he a captain in the police
[10] department, in any police department?
[11] **A:** He was the academy instructor for
[12] the Suffolk County Police.
[13] **Q:** Was he in charge of any type of
[14] precinct in Suffolk County?
[15] **A:** No.
[16] **Q:** Okay. And why did you complain
[17] to Mr. Santarpia?
[18] **A:** Because I had a rapport with
[19] Mr. Santarpia going through the academy.
[20] **Q:** And you complained to him that
[21] the Bosettis were drinking and creating a
[22] public safety issue?
[23] **A:** Yes.
[24] **Q:** Okay. And what did Mr. Santarpia
[25] say he was going to do? Anything?

Page 112

**F. Fiorillo**

[1]
[2] **A:** Um, he — he didn't say he was
[3] going to do anything in particular.
[4] **Q:** That's my question.
[5] **A:** No.
[6] **Q:** Did you ask him to do anything in
[7] particular?
[8] **A:** No. But he just —
[9] **Q:** My question to you, sir, is did
[10] you ask him to do anything in particular?
[11] **A:** No.
[12] **Q:** Other than to Mr. Santarpia, did
[13] you complain to any other police department
[14] in Long Island in 2002 about your belief
[15] that the Bosettis drinking created a public
[16] safety issue?
[17] **A:** Now when you say police
[18] department or police officer in another
[19] department —
[20] **Q:** Police department.
[21] **A:** Okay. No.
[22] **Q:** Okay. Who else did you complain
[23] to in 2002 that was part of the police — a
[24] police department on Long Island?
[25] **A:** Jane Harrigan.

Page 113

**F. Fiorillo**

[1]
[2] **Q:** Spell it, please.
[3] **A:** H-A-R-R-I-G-A-N.
[4] **Q:** And what did you say to
[5] Mr. Harrigan?
[6] **A:** Ms.
[7] **Q:** Ms. Harrigan?
[8] **A:** Jane. Jane.
[9] **Q:** What did you say to her?
[10] **A:** I explained to her that Ocean
[11] Beach hired retired city cops that just
[12] didn't conform with what we were taught in
[13] the academy.
[14] **Q:** Okay. And did you complain to
[15] any other police officer outside of Ocean
[16] Beach in 2002?
[17] **A:** Not that I can recall at this
[18] time.
[19] **Q:** Did you communicate with anyone
[20] from the Suffolk County District Attorney's
[21] office with regard to your belief in 2002
[22] that we've been discussing?
[23] **A:** No.
[24] **Q:** Did you communicate with anyone
[25] from Newsday in 2002 with regard to your

Page 114

**F. Fiorillo**

[1]
[2] belief that we've been discussing?
[3] **A:** No.
[4] **Q:** Did you communicate with any
[5] other — with any media outlet with regard
[6] to the belief that you formed in 2002 that
[7] we've been discussing?
[8] **A:** No.
[9] **Q:** And you understand what I mean by
[10] "media outlet," correct?
[11] **A:** Yes.
[12] **Q:** What do you — what's your
[13] understanding, just so we're clear?
[14] **A:** The press.
[15] **Q:** Correct. Radio? TV?
[16] **A:** Yeah.
[17] **Q:** Did you — did you create any
[18] blog in 2002?
[19] **A:** No.
[20] **Q:** Did you post any blog in 2002
[21] that reflected your belief that we've been
[22] talking about?
[23] **A:** No.
[24] **Q:** Okay. Did you attend any board
[25] meeting in 2000 — of the Village in 2002?

Page 115

*F. Fiorillo*

[1]
[2] A: No.
[3] Q: Did you attend any Suffolk County
[4] Legislative meeting in 2002?
[5] A: No.
[6] Q: Did you make any type of public
[7] statement in 2002 concerning your belief
[8] that we've been talking about?
[9] A: No.
[10] MR. GOODSTADT: Objection.
[11] What do you mean by "public statement"?
[12] He already testified to two people he's
[13] spoken to.
[14] Q: Other than the two people that
[15] you've spoken to?
[16] A: I don't believe so.
[17] Q: Okay. How about 2003, did you
[18] complain to George Hesse about the Bosettis
[19] drinking in 2003?
[20] A: Yes.
[21] Q: Did you complain to Paridiso in
[22] 2003 about the Bosettis drinking?
[23] A: It was an ongoing thing.
[24] Q: I'm asking —
[25] A: Yes.

Page 116

*F. Fiorillo*

[1]
[2] Q: What did Paridiso say?
[3] A: That he would address it.
[4] Q: Did he?
[5] A: He tried to.
[6] Q: Was he successful?
[7] A: No.
[8] Q: When you say "he tried to," what
[9] did he do?
[10] A: He posted a note saying that
[11] the — that officers were supposed to leave
[12] their — get out of Ocean Beach after their
[13] tours instead of frequenting the bars.
[14] Q: Okay. So when you were
[15] complaining about the Bosettis drinking, it
[16] would include the time that they were
[17] drinking while they were off duty, correct?
[18] A: Well —
[19] Q: It may — I'm not suggesting that
[20] it didn't also include when they were on
[21] duty.
[22] A: Yes.
[23] Q: I'm just saying, for the purpose
[24] of my question, when you started complaining
[25] about the Bosettis drinking in the village,

Page 117

*F. Fiorillo*

[1]
[2] it would include those occasions when they
[3] were off duty as well, right?
[4] A: Only because of —
[5] Q: I just need a —
[6] A: Well, yes. It encompassed that
[7] also.
[8] Q: Right. Okay. And in 2003, did
[9] you complain to Mayor Rogers?
[10] A: No.
[11] Q: And you still had the belief that
[12] the drinking of the Bosettis created a
[13] public safety hazard?
[14] A: Absolutely.
[15] Q: And did you complain to Trustee
[16] Loeffler?
[17] A: Not in 2003.
[18] Q: Did you complain to any media
[19] outlet?
[20] A: No.
[21] Q: Did you communicate with the
[22] Suffolk County District Attorney's office?
[23] A: No.
[24] Q: Did you speak about your opinion
[25] that we've been discussing in 2003 with any

Page 118

*F. Fiorillo*

[1]
[2] police department or police officer from any
[3] police department outside of Ocean Beach?
[4] A: No.
[5] Q: Did you attend any Village of
[6] Ocean Beach board meetings?
[7] A: No.
[8] Q: Did you attend any Suffolk County
[9] Legislative meetings?
[10] A: No.
[11] Q: Did you do anything beyond
[12] speaking to Hesse and Paridiso in 2003 with
[13] regard to your opinion that the Bosettis
[14] drinking created a public safety issue?
[15] A: Did I do anything?
[16] Q: Yeah. Other than what you said
[17] you did with Hesse and Paridiso?
[18] A: I didn't do anything.
[19] Q: Right. Let me make it clear.
[20] A: I mean, they —
[21] Q: Other than complaining to Hesse
[22] and Paridiso in 2003, did you do anything
[23] else with regard to advising anyone in the
[24] entire world that, in your belief, the
[25] Bosettis drinking created a public safety

EDWARD CARTER  v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 119

**F. Fiorillo**

[1]
[2] problem?
[3] **MR. GOODSTADT:** Including other
[4] police officers in Ocean Beach Police
[5] Department?
[6] **MR. NOVIKOFF:** Excluding that.
[7] **MR. GOODSTADT:** Okay.
[8] **A:** I didn't do anything.
[9] **Q:** Right. 2004, did you complain to
[10] Hesse about the Bosettis drinking?
[11] **A:** Yes.
[12] **Q:** And did you complain to Paridiso?
[13] **A:** Yes.
[14] **Q:** And what did Paridiso say to you?
[15] **A:** That he was going to address it.
[16] **Q:** Even though he tried to address
[17] it in 2003?
[18] **A:** Exactly.
[19] **Q:** What did he say specifically?
[20] **A:** That he was going to talk to them
[21] about — because it all — it revolved
[22] around the Halloween incident.
[23] **Q:** Okay. Did you complain to
[24] Paridiso before the Halloween incident about
[25] the Bosettis drinking?

Page 120

**F. Fiorillo**

[1]
[2] **A:** Yes.
[3] **Q:** And what did he say to you before
[4] the Halloween incident?
[5] **A:** He was going to talk to them
[6] about it then also.
[7] **Q:** Okay. And did he?
[8] **A:** I don't know. I wasn't there.
[9] **Q:** Okay. So would you agree with me
[10] that notwithstanding your complaints in
[11] 2002, 2003 and 2004, prior to the Halloween
[12] incident, there was nothing that was done
[13] to, in your opinion, lessen the public
[14] safety issue that revolved around the
[15] Bosettis drinking?
[16] **A:** In my opinion, Hesse didn't do
[17] anything about it and Paridiso didn't do
[18] anything about it.
[19] **Q:** Right.
[20] **A:** That's my opinion.
[21] **Q:** And in 2004, you believe the
[22] public safety issue with regard to the
[23] drinking by the Bosettis was stronger than
[24] it was in 2002, right?
[25] **A:** I believe so.

Page 121

**F. Fiorillo**

[1]
[2] **Q:** You believed it was getting
[3] worse?
[4] **A:** I definitely do. That's my
[5] opinion.
[6] **Q:** And that's all I'm asking you.
[7] And you believe that, in fact, between 2002
[8] and 2004, the public's safety was even more
[9] at risk?
[10] **A:** I believe so.
[11] **Q:** In 2004, right?
[12] **A:** Well, apparently —
[13] **Q:** Than it was in 2002?
[14] **A:** It was pretty apparent.
[15] **Q:** Yes or no?
[16] **A:** Yes.
[17] **Q:** Okay. And in 2004, did you
[18] complain to the board of trustees of the
[19] Village?
[20] **A:** In 2004?
[21] **Q:** Yeah.
[22] **MR. GOODSTADT:** Other than for
[23] Loeffler, who was a trustee at the
[24] time?
[25] **Q:** Other than — other than for what

Page 122

**F. Fiorillo**

[1]
[2] you said —
[3] **A:** I spoke to him.
[4] **Q:** Hold on. Other than for what you
[5] said — withdrawn. Other than for what you
[6] testified that you said to Loeffler the
[7] night of the Halloween incident, did you
[8] ever complain to any other trustee in 2004
[9] about the public safety issue that we've
[10] been discussing?
[11] **A:** I don't believe so.
[12] **Q:** Did you ever complain to Mayor
[13] Rogers —
[14] **A:** No.
[15] **Q:** — in 2004? Did you ever attend
[16] a Village board meeting?
[17] **A:** No.
[18] **Q:** Did you ever communicate with the
[19] Suffolk County District Attorney's office
[20] concerning your belief as to the public
[21] safety issue?
[22] **A:** No.
[23] **Q:** Did you ever communicate to any
[24] media outlet with regard to your opinion?
[25] **A:** No.

Page 123

[1]                          *F. Fiorillo*
[2]    **Q:** No?
[3]    **A:** No.
[4]    **MR. GOODSTADT:** You're still
[5] talking about '04?
[6]    **MR. NOVIKOFF:** '04. Only in
[7] '04.
[8]    **A:** No.
[9]    **Q:** Did you complain to any other
[10] police department in Long Island?
[11]    **A:** No.
[12]    **Q:** So, again, let me understand then
[13] your testimony correctly. Other than —
[14] well, withdrawn. In 2004, you — you
[15] believed that there was a public safety
[16] issue concerning the Bosettis drinking in
[17] the Village, correct?
[18]    **A:** I'm sorry.
[19]    **Q:** In 2004 —
[20]    **A:** In 2004, yes.
[21]    **Q:** And notwithstanding this belief,
[22] the only communications that you had on this
[23] matter were with Hesse, Paridiso and the one
[24] time with Loeffler on Halloween night?
[25]    **A:** In 2004.

Page 124

[1]                          *F. Fiorillo*
[2]    **Q:** Right.
[3]    **A:** Yes.
[4]    **Q:** Yes. Okay. Now —
[5]    **MR. GOODSTADT:** And you're
[6] excluding other officers in the Ocean
[7] Beach Police Department?
[8]    **MR. NOVIKOFF:** Yes. I'm
[9] excluding other officers.
[10]    **Q:** The only superiors you had at the
[11] Ocean Beach Police Department were Hesse and
[12] Paridiso, right?
[13]    **A:** Well, if they weren't working,
[14] then it would be the senior officer over me
[15] who had the most experience.
[16]    **Q:** But on — as for the full-time
[17] officers —
[18]    **A:** There was only two at the time.
[19]    **Q:** Hesse and Paridiso?
[20]    **A:** Correct.
[21]    **Q:** Okay. And how — let's go to
[22] 2005 with regard to the Bosettis drinking.
[23] Did you complain to Hesse about the Bosettis
[24] drinking in 2005?
[25]    **A:** Not in 2005.

Page 125

[1]                          *F. Fiorillo*
[2]    **Q:** No? Why not?
[3]    **A:** Because what was going on — the
[4] department was starting to fragment in I
[5] would say after — after the Halloween
[6] incident. So, um, to be honest with you, we
[7] were — we were — "we" meaning myself,
[8] Kevin Lamm, and Tommy Snyder — were being,
[9] um, let's see. We were being alienated
[10] so — so to speak.
[11]    **Q:** Okay. By whom were you being
[12] alienated?
[13]    **A:** Richard Bosetti, Gary Bosetti,
[14] George Hesse.
[15]    **Q:** How were the Bosettis alienating
[16] you?
[17]    **A:** And, also, there was another —
[18] Pat — Pat Cherry also.
[19]    **Q:** How were the Bosettis alienating
[20] you?
[21]    **A:** Well, when — if I came on duty
[22] and I was relieving one of them, they
[23] wouldn't talk to you. They wouldn't let you
[24] know what's going on in the Village. They
[25] would actually be in their car at the relief

Page 126

[1]                          *F. Fiorillo*
[2] point, and the radio and the phone would be
[3] in the police vehicle, and as soon as they'd
[4] seen me drive up, they would go.
[5]    **Q:** How was Cherry alienating you?
[6]    **A:** He wouldn't talk to me because of
[7] the Halloween incident.
[8]    **MO MR. NOVIKOFF:** Move to strike.
[9]    **Q:** I'm just asking you how did
[10] Cherry alienate you. I'm not asking why you
[11] think he was alienating you. I'm just
[12] asking how did he alienate you.
[13]    **MR. GOODSTADT:** He answered the
[14] question. You made your motion. Let's
[15] move on.
[16]    **Q:** How did — how did he alienate
[17] you?
[18]    **A:** Well, that was part of the
[19] alienation. I mean, he wouldn't speak to
[20] me.
[21]    **Q:** He wouldn't speak to you?
[22]    **A:** Yeah.
[23]    **Q:** Is that it?
[24]    **A:** Well, yeah.
[25]    **Q:** Okay. How did Hesse alienate you

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 127

[1]                   *F. Fiorillo*
[2] in 2005?
[3]     **A:** Hesse was very — he was keeping
[4] me out of the loop on — basically the
[5] Halloween incident was paramount at this
[6] time between the — between like Halloween
[7] of 2004 all the way through 2005, and until
[8] the day I was fired actually.
[9]     **MO MR. NOVIKOFF:** Okay. Move to
[10] strike.
[11]     **Q:** How did Hesse alienate you —
[12]     **A:** Didn't I answer the question?
[13]     **MR. GOODSTADT:** You did.
[14]     **Q:** How? How? Not why. Not why you
[15] think he did. How? How did Hesse alienate
[16] you in 2005?
[17]     **MR. GOODSTADT:** He just
[18] answered the question, but he can
[19] answer it again.
[20]     **Q:** That's fine. How did Hesse
[21] alienate you? What did he do or didn't do?
[22]     **A:** He kept me out of the loop of —
[23] okay. Let's say there was a Christmas
[24] party, okay?
[25]     **Q:** Right.

Page 128

[1]                   *F. Fiorillo*
[2]     **A:** In 2004.
[3]     **Q:** We're not talking about 2004.
[4] We're talking 2005 now.
[5]     **A:** No. You told me how — how he
[6] alienated me —
[7]     **Q:** In 2005.
[8]     **A:** Since Halloween.
[9]     **Q:** No, not since Halloween. You
[10] said that in 2005 —
[11]     **A:** Okay, so — okay.
[12]     **Q:** Four people started alienating
[13] you. You talked about the Bosettis —
[14]     **A:** Well, it started — it started —
[15]     **Q:** Oh, okay.
[16]     **A:** It started from — I'm going to
[17] tell you when it started. It started from
[18] the Halloween incident.
[19]     **Q:** Okay.
[20]     **A:** That's when it started.
[21]     **Q:** Okay.
[22]     **A:** That's when the department really
[23] started to fragment.
[24]     **Q:** Okay. How did Hesse alienate
[25] you?

Page 129

[1]                   *F. Fiorillo*
[2]     **A:** Okay. If I was in the station,
[3] okay, and I came in, he would close the
[4] door. The Bosettis, Hardman and whoever
[5] else was in the room — those people I know
[6] were in the room, but I don't know, there
[7] might have been other officers — closed the
[8] door. Slammed the door. So now I'm on the
[9] outside, they're on the inside.
[10]     **Q:** Okay.
[11]     **A:** Okay?
[12]     **Q:** Any other instances?
[13]     **A:** It happened numerous times.
[14]     **Q:** Any other examples, different
[15] from what you just said?
[16]     **MR. GOODSTADT:** In addition to
[17] keeping him out of the loop and the
[18] Christmas party?
[19]     **MR. NOVIKOFF:** I don't know
[20] about putting him out of the loop.
[21] That's what I'm asking.
[22]     **A:** What's that?
[23]     **Q:** You testified that an example
[24] which happened numerous occasions was Hesse
[25] would slam the door on you and he had

Page 130

[1]                   *F. Fiorillo*
[2] Hardman and other people in his office,
[3] right?
[4]     **A:** Gary Bosetti, Richard, Hardman.
[5]     **Q:** Any other examples of how Hesse
[6] alienated you in 2005?
[7]     **MR. GOODSTADT:** In addition to
[8] keeping him out of the loop and in
[9] addition to the Christmas party?
[10]     **MR. NOVIKOFF:** I don't know
[11] what the loop is, so.
[12]     **A:** I remember that there was a
[13] Christmas party in 2005. Um, it just so
[14] happened we weren't invited. All the other
[15] members —
[16]     **Q:** "We" being who?
[17]     **A:** Excuse me?
[18]     **Q:** "We" being who?
[19]     **A:** Okay. "We" being Tommy Snyder,
[20] Kevin Lamm, myself.
[21]     **Q:** Okay. Any other examples of how
[22] he alienated you, "he" being Hesse, in 2005?
[23]     **A:** Well, in 2005, it became — let's
[24] see. I'm trying to figure it. In 2005, at
[25] a certain point in time, he took over the

Page 131

*F. Fiorillo*

[1]
[2] scheduling, and what happened was I worked
[3] all year round on the schedule, and all of a
[4] sudden, there came a point in time, I don't
[5] know, maybe October of 2005 that I was off
[6] the schedule, because I normally worked
[7] Thanksgiving. I worked every Thanksgiving
[8] since I started there, and, um, I didn't
[9] work Thanksgiving. But I didn't work any
[10] tours at all.
[11]    **Q:** Oh, okay. So after —
[12]    **A:** Only, okay, from after —
[13] from — let's see. I didn't work any tour
[14] at a certain point in time in — I don't
[15] know — I want to say October. From after
[16] October, the only tour I worked was, to the
[17] best of my memory, is New Year's Eve and New
[18] Year's Day. So it would be like the end of
[19] 2005, the first day in 2006, and that was my
[20] last tour. I didn't get any tours all the
[21] way to April 2, 2006, the day where I was
[22] fired. So that, to me, I was being
[23] alienated.
[24]    **Q:** Okay. So if I understand you
[25] correctly, at some point in time in October

Page 132

*F. Fiorillo*

[1]
[2] of 2005, in your opinion, Hesse became in
[3] control of scheduling?
[4]    **A:** I don't — I don't know exactly
[5] if who became in — in control.
[6]    **Q:** Well, you said you believed Hesse
[7] did.
[8]    **A:** Yeah. But I don't know if it was
[9] him, you know — I think quite possibly it
[10] was him.
[11]    **Q:** Well, you just said Hesse was and
[12] then after that you didn't get many tours.
[13]    **A:** Right.
[14]    **Q:** Right.
[15]    **A:** I'm saying I believe it was him.
[16]    **Q:** Right. Okay. That's what I'm
[17] asking you.
[18]    **A:** Okay. I'm sorry.
[19]    **Q:** So in 2000 — after the season
[20] was over — well —
[21]    **A:** No. Don't go by the season,
[22] because I worked —
[23]    **Q:** Sir —
[24]    **MR. GOODSTADT:** Let him ask the
[25] question.

Page 133

*F. Fiorillo*

[1]
[2]    **Q:** October is after the season,
[3] right?
[4]    **A:** No. But I think I worked a tour
[5] in October. That's what I'm trying —
[6]    **Q:** I'm not —
[7]    **A:** Or late September.
[8]    **Q:** Sir, I'm not asking you that
[9] question. I just want to understand what
[10] your knowledge is. October is after the
[11] season, right?
[12]    **A:** For the seasonals.
[13]    **Q:** Right.
[14]    **A:** Yes.
[15]    **Q:** The season is two weeks before —
[16]    **A:** For the seasonals.
[17]    **Q:** Sir, the season is two weeks
[18] before Memorial Day to two weeks after Labor
[19] Day, right?
[20]    **A:** Correct.
[21]    **Q:** So we can all agree that October
[22] is after the "season," right?
[23]    **A:** For the seasonal police officers.
[24]    **Q:** Right.
[25]    **A:** Correct.

Page 134

*F. Fiorillo*

[1]
[2]    **Q:** So if I understand your
[3] testimony, at some point after the 2005
[4] season ended, Hesse began to assume control
[5] of the scheduling and your tours ended?
[6]    **A:** Yes.
[7]    **Q:** Fine. You were hired for the
[8] 2005 season, right?
[9]    **A:** I was hired —
[10]    **Q:** You were hired by the Village of
[11] Ocean Beach for the 2005 season, correct?
[12]    **MR. GOODSTADT:** Objection.
[13]    **A:** I kept on working.
[14]    **MR. GOODSTADT:** Before.
[15]    **A:** I was hired in 2002.
[16]    **MR. GOODSTADT:** Yeah.
[17]    **Q:** Did you work for the Village in
[18] the 2005 season?
[19]    **A:** Yes.
[20]    **Q:** Okay. And Mr. Hesse was there at
[21] the time, correct?
[22]    **A:** Yes.
[23]    **Q:** Okay. And that was after the
[24] Halloween incident?
[25]    **A:** Yes.

EDWARD CARTER  v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 135

F. Fiorillo

[1]
[2] **Q:** Any other examples of how Hesse
[3] alienated you in 2005?
[4] **A:** Um, I believe there was a party
[5] for Hank Clemens because he was coming home
[6] from I think it was Iraq, and his wife told
[7] Hesse to post the, um, date that Hank was
[8] going to come back because she was having a
[9] party for him, and Hesse took the, um, the
[10] invitation off the bulletin board so that
[11] Kevin, myself and Tommy, we never — what
[12] happened was Kevin saw Hank's wife later on
[13] after the party and said, "How come you
[14] didn't come?" And then he said, "Well, I
[15] didn't even know about it." And then she
[16] said that she gave George the invitation to
[17] put on the bulletin board, and that's —
[18] that's how I felt we were alienated. You
[19] know.
[20] **Q:** Any other examples? Listen, I'm
[21] not challenging how you feel.
[22] **A:** The Christmas party.
[23] **Q:** I'm just asking you to give me
[24] some examples.
[25] **A:** The Christmas party.

Page 136

F. Fiorillo

[1]
[2] **Q:** You told me that.
[3] **A:** No. In 2005.
[4] **Q:** Right. I think you've mentioned
[5] that.
[6] **A:** Okay.
[7] **Q:** Any other examples of alienation
[8] at the hands of George Hesse in 2005?
[9] **A:** I would say, to the best of my
[10] memory right now, those are — those that I
[11] gave you.
[12] **Q:** Okay. Now let's — let me ask
[13] you this, and maybe it could prevent me from
[14] having to ask you numerous questions.
[15] You've alleged in paragraph 101 that you
[16] believed you were retaliated against because
[17] of complaints that you made concerning
[18] various instances of obstruction of justice,
[19] abuse of power and other unlawful conduct?
[20] **A:** Absolutely.
[21] **Q:** Okay. Did you ever complain to
[22] Mayor Rogers about any of the examples of
[23] what you say you complained about?
[24] **A:** No.
[25] **Q:** Okay. Did you ever complain to

Page 137

F. Fiorillo

[1]
[2] Trustee Loeffler about any of the complaints
[3] that — any of the examples that you've
[4] complained about that's referenced in 101,
[5] other than what you've already testified to?
[6] **A:** No.
[7] **Q:** The answer's no?
[8] **A:** Right.
[9] **Q:** And we understand what you've
[10] already testified to, right?
[11] **A:** Yes. Yes. Yes.
[12] **Q:** Did you ever complain — same
[13] question now with regard to the board of
[14] trustees as a group, did you ever complain
[15] to them?
[16] **A:** No.
[17] **Q:** And this is from 2002 through
[18] April 2, 2006, correct?
[19] **A:** (Indicating).
[20] **Q:** You never complained to them?
[21] **A:** No.
[22] **Q:** Did you ever complain to the
[23] Suffolk County District Attorney's office?
[24] **A:** No.
[25] **Q:** Did you ever communicate with the

Page 138

F. Fiorillo

[1]
[2] Suffolk County District Attorney's office
[3] before April 2, 2006 about the complaints
[4] that you say you were fired for in
[5] retaliation for making the complaints? Do
[6] you want me to rephrase the question?
[7] **A:** Yes, please.
[8] **Q:** You got it. With regard to those
[9] complaints that you are referencing in
[10] paragraph 101, did you ever communicate with
[11] the Suffolk County District Attorney's
[12] office prior to April 2, 2006?
[13] **A:** Yes.
[14] **Q:** Okay. On what issue or issues
[15] did you complain to the Suffolk County
[16] District Attorney's office about prior to
[17] April 2, 2006?
[18] **A:** The Halloween fight.
[19] **Q:** Okay.
[20] **A:** The Jesse Prisco incident.
[21] **Q:** Okay.
[22] **A:** The Samuel Gilbert incident.
[23] **Q:** Okay.
[24] **A:** Those things.
[25] **Q:** Okay. Jesse Prisco, what was

Page 139

[1]                         *F. Fiorillo*
[2] that incident? What are you talking about
[3] when you say "Jesse Prisco"? I understand
[4] the Halloween. I think I know what the
[5] Gilbert incident is. Prisco I don't know.
[6]     **A:** Prisco was —
[7]     **MR. GOODSTADT:** That's because
[8] you didn't let him answer any questions
[9] about Prisco, otherwise you would know.
[10]     **MR. NOVIKOFF:** Okay.
[11]     **A:** Jesse Prisco was a, um, a —
[12] let's see, how can I put this? He was a
[13] renter in a house.
[14]     **Q:** Um-hum.
[15]     **A:** He was a lawyer.
[16]     **Q:** Right.
[17]     **A:** There was a — do you want me to
[18] explain the whole thing or how far, you
[19] know, like —
[20]     **Q:** I just need a description of what
[21] you're referring to. I mean —
[22]     **A:** All right. There was —
[23]     **Q:** Was it a police brutality? Was
[24] it an unlawful —
[25]     **A:** I'll shorten it up. I'll shorten

Page 140

[1]                         *F. Fiorillo*
[2] it up. It was a police brutality incident.
[3]     **Q:** When did it take place, at least
[4] in your opinion?
[5]     **A:** That took place I want to say
[6] in — I want to say that took place sometime
[7] in 2004.
[8]     **Q:** Okay. Now you say you
[9] communicated with the Suffolk County
[10] District Attorney's office. With regard to
[11] the Halloween incident that you just
[12] testified to, did you contact the Suffolk
[13] County DA's or did they contact you?
[14]     **A:** The Halloween incident, they
[15] contacted me.
[16]     **Q:** Okay. When did the Suffolk
[17] County DA's office contact you about the
[18] Halloween incident?
[19]     **A:** I don't recall. I don't know the
[20] timeline.
[21]     **Q:** Well, was it in 2004?
[22]     **A:** I think it was in 2005.
[23]     **Q:** And who contacted you at the DA's
[24] office?
[25]     **A:** Let's see. I believe it was —

Page 141

[1]                         *F. Fiorillo*
[2] it started with the Samuel Gilbert incident
[3] in 2005.
[4]     **Q:** Okay.
[5]     **A:** Okay? That was around the end of
[6] August 2005.
[7]     **Q:** Okay. So then let me just stop
[8] you, because I don't mean to interrupt your
[9] answer.
[10]     **A:** Because I'm trying to get the
[11] timeline.
[12]     **Q:** That's what I'm trying to focus
[13] on. So is it your testimony that the first
[14] time you would have communicated with the
[15] Suffolk County District Attorney's office
[16] concerning the Halloween incident was after
[17] the Gilbert incident in August of 2005?
[18]     **A:** I believe so.
[19]     **Q:** Okay. And when —
[20]     **A:** I didn't — they contacted me.
[21]     **Q:** Well, you've established —
[22] you've established that from the Halloween.
[23] I think we're going to be able to clear this
[24] up in a couple minutes. When the Suffolk
[25] County District Attorney's office first

Page 142

[1]                         *F. Fiorillo*
[2] communicated with you with regard to
[3] anything involving Ocean Beach, was it
[4] specifically with regard to the Halloween
[5] incident or was it with regard to the
[6] Gilbert incident as well?
[7]     **A:** Both.
[8]     **Q:** Okay. And —
[9]     **A:** Actually, actually, the three of
[10] them — all three.
[11]     **Q:** Okay. So with regard to Prisco,
[12] Gilbert and the Halloween incident, you
[13] would have not communicated with the DA's
[14] office until after the Gilbert incident; is
[15] that correct?
[16]     **A:** Yeah. Because they contacted me
[17] in —
[18]     **Q:** Right.
[19]     **A:** After the Gilbert incident.
[20]     **Q:** And who did you speak to?
[21]     **A:** Well, initially the, um,
[22] initially they came to my house.
[23]     **Q:** I'm just saying, who?
[24]     **A:** Well, many people.
[25]     **Q:** Who was the first one?

EDWARD CARTER v.
INCORPORATED VILLAGE OF OCEAN BEACH

FRANK FIORILLO
February 20, 2009

Page 143

**F. Fiorillo**

[1]
[2] **A:** Tom Iacopelli and an investigator
[3] Cori — Corallao. Something like — I'm not
[4] familiar with — with the name.
[5] **MR. NOVIKOFF:** Now — and I
[6] think the tape — how much time do I
[7] have left on the tape?
[8] **THE VIDEOGRAPHER:** Two minutes.
[9] **Q:** So — and we'll get more — in
[10] more detail with the DA's conversations with
[11] you. Did you ever advise — well, did you
[12] ever report to the Ocean Beach Police
[13] Department that the Suffolk County District
[14] Attorney's office communicated to you with
[15] regard to Gilbert, Prisco and the Halloween
[16] incident?
[17] **A:** I spoke to George Hesse.
[18] **Q:** What did you say to George Hesse?
[19] **A:** I said they contacted me.
[20] **Q:** And what did he say?
[21] **A:** He said, "It's not a big deal."
[22] He goes, "I'm not even worried about it."
[23] **Q:** Did he tell you to lie?
[24] **A:** Did he tell me to lie?
[25] **Q:** Yeah.

Page 144

**F. Fiorillo**

[1]
[2] **A:** No. We didn't discuss anything
[3] that was —
[4] **Q:** Did he tell you — did he
[5] threaten you when you reported this to him?
[6] **A:** No.
[7] **Q:** Did he do anything, in your
[8] opinion, that you believed indicated that he
[9] wanted you to be less than truthful with the
[10] Suffolk County District Attorney's office?
[11] **A:** Of course not.
[12] **MR. NOVIKOFF:** Okay. Let's
[13] switch the tape.
[14] **THE VIDEOGRAPHER:** This ends
[15] tape number two. The time is 12:25
[16] p.m. We're going off the record.
[17] (A break was taken.)
[18] **THE VIDEOGRAPHER:** This begins
[19] tape number three. The time is 1:16
[20] p.m. Back on the record.
[21] **Q:** Mr. Fiorillo, we left before the
[22] lunch break discussing generally the time —
[23] the initial time that the Suffolk County
[24] District Attorney contacted you, and I think
[25] you testified that it was at some point in

Page 145

**F. Fiorillo**

[1]
[2] time after the Gilbert incident in August of
[3] 2005; is that correct?
[4] **A:** Correct.
[5] **Q:** Okay. On how many occasions
[6] between 2005 — August 2005 and April 2 of
[7] 2006 did you and someone from the Suffolk
[8] County District Attorney's office
[9] communicate concerning Ocean Beach?
[10] **A:** I don't recall how many times
[11] specifically.
[12] **Q:** Between one and five?
[13] **A:** I would say.
[14] **Q:** More than five?
[15] **A:** I don't think so.
[16] **Q:** Okay. And I'll get back to
[17] that — to those conversations shortly.
[18] Once — well, between April 2, 2006 and the
[19] time that you retained the Thompson Wigdor
[20] law firm, had you spoken to the Suffolk
[21] County District Attorney's office?
[22] **A:** Yes.
[23] **Q:** Okay. Did you communicate with
[24] them or did they contact you?
[25] **MR. GOODSTADT:** Objection.

Page 146

**F. Fiorillo**

[1]
[2] **Q:** Well, withdrawn. Who — who
[3] reached out to whom between April 2, 2006
[4] and the time you retained the Goodstadt law
[5] firm?
[6] **MR. GOODSTADT:** The Thompson
[7] law firm? I'm fine with that.
[8] **Q:** The Thompson Wigdor law firm.
[9] Yes.
[10] **A:** I'm not sure if they called me
[11] first or if I called them first.
[12] **Q:** Well, let me ask you
[13] specifically. Did you — did you call the
[14] Suffolk County District Attorney's office to
[15] advise them that you were fired?
[16] **A:** I think, yes, there came a
[17] certain — a point in time that I did call
[18] them about that.
[19] **Q:** Okay. Was that before or after
[20] you first communicated with the Thompson
[21] Wigdor law firm?
[22] **A:** Well, I don't know. I don't
[23] know.
[24] **Q:** Who did you call — I'm sorry.
[25] Who did you communicate with with regard to

Page 147

**F. Fiorillo**

[1]
[2] advising them that you were fired by Ocean
[3] Beach as you say you were?
[4] A: I — I called the — the
[5] specific group that handles the government
[6] corruption in Suffolk County.
[7] Q: Okay.
[8] A: That's what I — that's who I
[9] looked up. And they transferred me to a
[10] person in that office.
[11] Q: And who was that person?
[12] A: There were two people at the
[13] time.
[14] Q: And who were they?
[15] A: There were Walter Warkenthien and
[16] Richard Burke, and thereafter, Robert
[17] Biancavilla.
[18] Q: Okay. Can you — do you know the
[19] spellings of any of those names? If you
[20] don't, that's fine. Just for the court
[21] reporter. Never mind. And what did you say
[22] on the first occasion — on the occasion
[23] that you called to advise the Suffolk County
[24] DA that you were fired, what did you say?
[25] A: I told them what had happened.

Page 148

**F. Fiorillo**

[1]
[2] Q: Okay. And what was that?
[3] A: That, initially, I was — I
[4] received a letter in the mail stating that I
[5] was to appear at a Ocean Beach Police
[6] Department meeting on April 2, 2006 at
[7] 12:00, and that the letter stated that we
[8] would all be issued new IDs. And then when
[9] I got there, George Hesse made an
[10] announcement that he wanted all the officers
[11] to line up in line at the boathouse, and
[12] what happened was the only officers that
[13] lined up at the boathouse was Eddie Carter,
[14] myself, Joe Nofi and Kevin Lamm. Everybody
[15] else was down by the police station. Like
[16] a — it's like a block away.
[17] Q: When did — when did Hesse —
[18] and I know I'm going off the line of
[19] questioning — when did Hesse tell all the
[20] officers to line up?
[21] A: When we got — when we got —
[22] when we were outside the boathouse —
[23] Q: Okay?
[24] A: — we were going to have a
[25] meeting in the boathouse.

Page 149

**F. Fiorillo**

[1]
[2] Q: Right.
[3] A: But he said before the meeting,
[4] he wants us all to line up. He was going to
[5] talk to us one at a time. But then when we
[6] lined up, it wasn't like the whole
[7] department lined up. It was only four of
[8] us.
[9] Q: Got it. Okay. Um, and what else
[10] did you say to the District Attorney's
[11] office in your first conversation with them
[12] about you being fired?
[13] A: I told — I told the District
[14] Attorney's office that I thought that there
[15] was, um — that it was unfair, and I didn't
[16] know what was going on over there, but I
[17] felt that George Hesse was retaliating
[18] against me because of the Halloween fight.
[19] Q: Okay. Did you tell them anything
[20] else with regard to you not being hired —
[21] rehired by the Ocean Beach — Village of
[22] Ocean Beach?
[23] MR. GOODSTADT: Objection.
[24] Q: In that first conversation?
[25] A: Well, I think in the first

Page 150

**F. Fiorillo**

[1]
[2] conversation, it — it — it went from me
[3] telling him about the — the firing, to him
[4] like questioning more — questioning me
[5] more about the Halloween fight.
[6] Q: That's — that's fine. I'm not
[7] questioning you what anyone said. I'm just
[8] trying to find out —
[9] A: No. That's how it went.
[10] Q: Okay.
[11] A: It wasn't — you know. It was
[12] yes, I told him about the firing, and then
[13] he went back to the Halloween fight, and he
[14] asked me if I — if he thought that I
[15] thought that had anything to do with it.
[16] Q: Okay.
[17] A: And I said yes.
[18] Q: Now did he give you any — did
[19] this Suffolk County District Attorney's
[20] office employee give you any advice on what
[21] you should do with regard to being — I'm
[22] sorry, with regard to your rights concerning
[23] being fired in this first conversation?
[24] A: Um, I'm trying to think if I —
[25] if I asked him — let me just think this

Page 151

F. Fiorillo

[1]
[2] out. I think it was his suggestion — his
[3] suggestion that, you know, I think you need
[4] a lawyer.
[5]     Q: Okay. And did you tell him
[6] during this first conversation that you had
[7] talked to a lawyer?
[8]     MR. GOODSTADT: Objection.
[9]     A: It was — it was right after we
[10] had gotten fired, so I didn't contact a
[11] lawyer at this time.
[12]     Q: Okay. Then —
[13]     A: It was like a short time later.
[14] Within a couple of weeks.
[15]     Q: Okay. So within a couple of
[16] weeks of you not being rehired by Ocean
[17] Beach, you contacted the Suffolk County
[18] District Attorney to tell them about what
[19] happened on April 2?
[20]     A: Yes.
[21]     MR. GOODSTADT: Objection.
[22]     MR. NOVIKOFF: Is the objection
[23] as to how I characterized the firing or
[24] not being rehired, because we have an
[25] agreement?

Page 152

F. Fiorillo

[1]
[2]     MR. GOODSTADT: I know we have
[3] an agreement. There were a couple of
[4] points.
[5]     MR. NOVIKOFF: Okay. That's
[6] fine. As long as it wasn't just that.
[7]     MR. GOODSTADT: It was that
[8] and —
[9]     MR. NOVIKOFF: Because we
[10] have — we have the agreement.
[11]     MR. GOODSTADT: Okay.
[12]     Q: What was — when was the next
[13] time that you spoke with someone from the
[14] District Attorney's office concerning the
[15] fact that you weren't hired — rehired on
[16] April 2, 2006, if there was one?
[17]     A: They didn't take that issue up so
[18] much as far as other issues —
[19]     Q: Okay.
[20]     A: — they were more concerned
[21] about. In other words, that was my — that
[22] was me personally. It had nothing to do
[23] with them or anything they were
[24] investigating as far as me being fired.
[25]     Q: Got it. So now let's go back to

Page 153

F. Fiorillo

[1]
[2] between the time period of August 2005 and
[3] April 2, 2006. You say you spoke to the
[4] District Attorney around no more than five
[5] times concerning —
[6]     A: I would say.
[7]     Q: — issues involving Ocean Beach,
[8] right?
[9]     A: Right. Well, up until which
[10] point in time?
[11]     Q: Between August 2005 and April 2,
[12] 2006.
[13]     A: Right.
[14]     Q: Okay. And you did not personally
[15] witness anything involving the Gilbert
[16] incident, did you?
[17]     A: Nothing whatsoever.
[18]     Q: And you didn't personally witness
[19] anything involving the Prisco incident, did
[20] you?
[21]     A: Yes.
[22]     Q: Oh, you did. What did you
[23] witness?
[24]     A: I was at the scene when Prisco
[25] was handcuffed and put into the police

Page 154

F. Fiorillo

[1]
[2] vehicle.
[3]     Q: Okay.
[4]     A: I also wrote summonses on the —
[5] at the scene.
[6]     Q: Did you witness any alleged
[7] brutality —
[8]     A: No.
[9]     Q: — involving Mr. Prisco?
[10]     A: No.
[11]     Q: Okay.
[12]     A: They asked me that also.
[13]     Q: Well, I would hope they would
[14] have. Have you given any grand jury
[15] testimony?
[16]     A: Not yet.
[17]     Q: Well, has anyone told you that
[18] you have to give — you're going to be
[19] giving grand jury testimony?
[20]     A: Yes.
[21]     Q: Who has told you that you're
[22] going to be giving grand jury testimony?
[23]     A: District Attorney's office.
[24]     Q: With regard to what issue?
[25]     A: The Halloween fight.

Page 155

*F. Fiorillo*

[2] **Q:** Okay. And when did the District
[3] Attorney say that you were going to be
[4] giving grand jury testimony regarding the
[5] Halloween fight?
[6] **A:** Um, about a month ago.
[7] **Q:** And when did they say you were
[8] going to give the testimony?
[9] **A:** Bob Biancavilla said he's going
[10] to call me back.
[11] **Q:** Did he say approximately what
[12] time period you would be giving this
[13] testimony?
[14] **A:** He didn't give me a time period,
[15] but he did say that the Gilbert case is the
[16] first case that they're going to deal with,
[17] and then they said they're going to proceed
[18] with the other cases. So that's — that's
[19] what I was told.
[20] **Q:** Okay. Have you given any sworn
[21] statements to the Suffolk County District
[22] Attorney's office prior to today?
[23] **A:** No.
[24] **Q:** Do you understand what I mean by
[25] "sworn statement"?

Page 156

*F. Fiorillo*

[2] **A:** Under oath or —
[3] **Q:** Right.
[4] **A:** Notarized?
[5] **Q:** Right. No?
[6] **A:** No.
[7] **MR. GOODSTADT:** Just so it's
[8] clear, when you say "prior to today,"
[9] he didn't give one today.
[10] **MR. NOVIKOFF:** I just used
[11] today —
[12] **MR. GOODSTADT:** It was a little
[13] loaded I guess.
[14] **MR. NOVIKOFF:** No. No. I'm
[15] just using today as a period of
[16] reference.
[17] **MR. GOODSTADT:** Understood.
[18] **Q:** And —
[19] **MR. GOODSTADT:** It could be
[20] inferred that you meant prior today.
[21] That he gave one today.
[22] **Q:** Have you provided the District
[23] Attorney's office any documentation with
[24] regard to any of their investigations?
[25] **A:** No documentation.

Page 157

*F. Fiorillo*

[2] **Q:** Have you provided the District
[3] Attorney with copies of any audio tapes
[4] prior to today concerning any of their
[5] investigations?
[6] **A:** No.
[7] **Q:** Have you provided the District
[8] Attorney with anything, other than your own
[9] statements, concerning any of the issues
[10] that they're investigating, prior to today?
[11] **A:** Have I provided anything other
[12] than my own statements?
[13] **Q:** Right.
[14] **A:** Yes.
[15] **Q:** What have you provided?
[16] **A:** Um, well, emails as far back
[17] and forth information. Instead of using the
[18] phone, email.
[19] **Q:** Emails —
[20] **A:** As far as when they need
[21] information pertaining to whatever they are
[22] asking me, I'll email them back.
[23] **Q:** Oh, okay. Well, beyond you
[24] either emailing them communications or
[25] talking to them over the phone or in person,

Page 158

*F. Fiorillo*

[2] have you provided them anything else with
[3] regard to the issues that they're
[4] investigating concerning Ocean Beach?
[5] **A:** I don't think I provided them
[6] with any paperwork, anything like that.
[7] **Q:** Okay. And are you aware if any
[8] of the other Plaintiffs have testified
[9] before a grand jury involving any of the
[10] issues that the Suffolk County District
[11] Attorney's investigating?
[12] **A:** Any of —
[13] **Q:** Are you aware of —
[14] **A:** Who else like?
[15] **Q:** If any of the other Plaintiffs in
[16] this case —
[17] **A:** This case.
[18] **Q:** — have testified in a grand jury
[19] concerning any investigation by the Suffolk
[20] County District Attorney concerning Ocean
[21] Beach?
[22] **A:** I don't know.
[23] **Q:** Okay. And — withdrawn. Okay.
[24] So now let's go back to complaints that you
[25] raised in 2005 with regard to — and I know

Page 159

F. Fiorillo

[1]
[2] it's been a while, so let's go back to
[3] paragraph 101. Now, again, with regard to
[4] the complaints that you spoke of with
[5] Ms. Sanchez in that April meeting with her
[6] that was attended by Nofi and Lamm, did you
[7] complain in 2005 to any media outlet with
[8] regard to those issues?
[9] **A:** No.
[10] **Q:** Okay. Did you complain to any
[11] other police officer outside of the Village
[12] of Ocean Beach in 2005?
[13] **A:** I don't believe so.
[14] **Q:** Did you attend any Suffolk County
[15] Legislative board meetings?
[16] **A:** No.
[17] **Q:** Any Village board meetings in
[18] 2005?
[19] **A:** No.
[20] **Q:** Same question for 2006,
[21] between — between January 1, 2006 and April
[22] 2, 2006, did you complain — did you
[23] communicate any complaints to the — to a
[24] media outlet?
[25] **A:** No. Oh, wait. In 2006?

Page 160

F. Fiorillo

[1]
[2] **Q:** Between January 1, 2006 and April
[3] 2, 2006, did you make any — did you
[4] communicate with any media outlet concerning
[5] any issues —
[6] **A:** No.
[7] **Q:** — pertaining to Ocean Beach?
[8] **A:** No. Nothing.
[9] **MR. GOODSTADT:** Let him finish
[10] the question.
[11] **A:** Oh.
[12] **Q:** Let's break it down. Between
[13] April 1, 2006 and — I'm sorry, between
[14] January 1, 2006 and April 2, 2006, did you
[15] raise any — did you communicate with any
[16] media outlet concerning any issues
[17] pertaining to Ocean Beach?
[18] **A:** No.
[19] **Q:** Okay. Did you communicate with
[20] the Suffolk County District Attorney's
[21] office — withdrawn. We talked about that.
[22] Did you attend any Suffolk County
[23] Legislative meetings?
[24] **A:** No.
[25] **Q:** Did you attend any Village board

Page 161

F. Fiorillo

[1]
[2] meetings in that time period?
[3] **A:** No.
[4] **Q:** Did you complain to Mayor
[5] Loeffler about anything in that time period
[6] in 2006?
[7] **A:** No.
[8] **Q:** Did you complain to any
[9] particular trustee of the Village?
[10] **A:** No.
[11] **Q:** Okay. Did you complain to
[12] Paridiso about anything in that time period?
[13] **A:** No.
[14] **Q:** Did you complain to Hesse about
[15] anything in that time period?
[16] **A:** No.
[17] **Q:** And I'm going to ask you similar
[18] questions, but I think it may alleviate
[19] another long line of questions. You've made
[20] a lot of allegations in this Complaint about
[21] conduct and behavior at Ocean Beach while
[22] you were a police officer there, right?
[23] **A:** Yes.
[24] **Q:** And they range anywhere from
[25] drinking to police brutality to cover ups,

Page 162

F. Fiorillo

[1]
[2] correct?
[3] **A:** Correct.
[4] **Q:** And you're familiar with all of
[5] the allegations that you've made in the
[6] complaint, correct?
[7] **MR. GOODSTADT:** Objection.
[8] **A:** Yes.
[9] **Q:** Okay. With regards to any
[10] complaint that you have referenced in your
[11] Complaint that you filed, did you ever
[12] complain to a media outlet prior to April 2,
[13] 2006?
[14] **A:** No.
[15] **Q:** Did you ever complain to Mayor
[16] Rogers?
[17] **A:** No.
[18] **Q:** Other than for the two instances
[19] that we've discussed with Mr. Loeffler, did
[20] you ever complain to Mr. Loeffler?
[21] **A:** No.
[22] **Q:** Did you ever attend a board
[23] meeting for the purpose of raising any issue
[24] that's referenced in this Complaint?
[25] **A:** Hold on. Let me get that again.