Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
EDWARD CARTER, FRANK FIORILLO,  )
KEVIN LAMM, JOSEPH NOFI, and    )
THOMAS SNYDER,                  )
                                )
          Plaintiffs,           )
                                )
-against-                       )
                                ) Index No.
                                ) CV 07 1215
INCORPORATED VILLAGE OF OCEAN   )
BEACH; MAYOR JOSEPH C.          )
LOEFFLER, JR., individually     )
and in his Official capacity;   )
former mayor NATALIE K.ROGERS,  )
individually and in her         )
official capacity, OCEAN BEACH  )
POLICE DEPARTMENT; ACTING       )
DEPUTY POLICE CHIEF GEORGE B.   )
HESSE, individually and in his  )
official capacity; SUFFOLK      )
COUNTY; SUFFOLK COUNTY POLICE   )
DEPARTMENT OF CIVIL SERVICE;    )
and ALLISON SANCHEZ,            )
individually and in her         )
official capacity,              )
                                )
          Defendants.           )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
          DEPOSITION OF GEORGE HESSE
               Uniondale, New York
                 June 3, 2009

Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 23057

---

Page 2

1
2            926 RexCorp Plaza
             Uniondale, New York
3
4            June 3, 2009
             10:00 A.M.
5
6
7
8
9
10
11
12
13        Deposition of GEORGE HESSE, held at
14   the offices of RIVKIN RADLER, LLP, 926
15   RexCorp Plaza, Uniondale, New York, pursuant
16   to Notice, before Judi Johnson, a Registered
17   Professional Reporter, a Certified Realtime
18   Reporter, a Certified LiveNote Reporter and
19   Notary Public of the State of New York.
20
21
22
23
24
25

---

Page 3

1                 GEORGE HESSE
2   APPEARANCES:
3      THOMPSON WIGDOR & GILLY, LLP
4      Attorneys for the Plaintiffs
5      85 Fifth Avenue
6      New York, New York 10003
7
       BY: ANDREW S. GOODSTADT, ESQ.
8          ARIEL GRAFF, ESQ.
9
10     MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11     Attorneys for GEORGE B. HESSE
12     530 Saw Mill Road
13     Elmsford, New York 10523
14
       BY: KEVIN W. CONNOLLY, ESQ.
15
16
17
18     RIVKIN RADLER, LLP
19     Attorneys for INCORPORATED VILLAGE OF OCEAN BEACH,
20     JOSEPH LOEFFLER, NATALIE ROGERS AND OCEAN BEACH
21     POLICE DEPARTMENT
22     926 RexCorp Plaza
23     Uniondale, New York 11556-0926
24
       BY: KENNETH A. NOVIKOFF, ESQ.
25          MICHAEL WELCH, ESQ.

---

Page 4

1                 GEORGE HESSE
2
3
4
5      BEE READY FISHBEIN HATTER & DONOVAN, LLP
6      Attorneys for SUFFOLK COUNTY
7      170 Old Country Road
8      Mineola, New York 11501
9
10     BY: KENNETH A. GRAY (A.M. SESSION ONLY)
11
12
13     SUFFOLK COUNTY DEPARTMENT OF LAW
14     Attorneys for the County
15     100 Veterans Memorial Highway
16     Hauppauge, New York 11788
17
       BY: BRIAN P. CALLAHAN, ESQ.
18
19     ALSO PRESENT:
20     STEVE SAN PIETRO - LEGAL VIDEO SPECIALIST
21     FRANK FIORILLO
22     KEVIN LAMM - AM SESSION ONLY
23     ED CARTER - AM SESSION ONLY
24     TOM SNYDER
25

1 (Pages 1 to 4)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 5

```
1              GEORGE HESSE
2          IT IS HEREBY STIPULATED AND AGREED by
3    and between the attorneys for the respective
4    parties herein, that filing and sealing and
5    the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10         IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17            - o0o -
18
19
20
21
22
23
24
25
```

Page 6

```
1              GEORGE HESSE
2    GEORGE HESSE,
3          Called as a witness herein, having
4    first been duly sworn, was examined and
5    testified as follows:
6    BY THE REPORTER:
7       Q    Please state your name and address for
8    the record.
9       A    George Hesse, 623 Bay Walk, P.O. Box
10   425, Ocean Beach, New York 11770.
11         THE VIDEOGRAPHER:  This is the start  10:04:10AM
12   of the tape labeled Number 1 of the
13   videotaped deposition of George Hesse in the
14   matter of Carter Fiorello, et al versus the
15   Incorporated Village of Ocean Beach.  This
16   deposition is taking place at 926 RexCorp
17   Plaza, Uniondale, New York on Wednesday,
18   June the 3rd, 2009 at approximately
19   10:04 a.m.
20         My name is Steve San Pietro from TSG,  10:04:37AM
21   and I am the legal video specialist.  The
22   court reporter today is Judi Johnson in
23   association with TSG Reporting.
24         Will counsel please introduce       10:04:47AM
25   yourselves for the record.
```

Page 7

```
1              GEORGE HESSE
2          MR. GOODSTADT:  Andrew Goodstadt,     10:04:50AM
3    Thompson Wigdor & Gilly, on behalf of the
4    plaintiffs.  And with me is Ariel Graff,
5    G-R-A-F-F, from my office.
6          MR. CONNOLLY:  Kevin W. Connolly of   10:05:05AM
7    Marks, O'Neil, O'Brien & Courtney, counsel
8    for the defendant Hesse.
9          MR. NOVIKOFF:  Ken Novikoff, Rivkin   10:05:12AM
10   Radler, on behalf of all the village
11   defendants and Mayor Rogers, Mayor Loeffler
12   in their official and individual capacities.
13   With me is Michael Welch from my office.
14         MR. CALLAHAN:  Brian Callahan from the 10:05:23AM
15   office of Christine Malafi for the County of
16   Suffolk, Suffolk County PD and Allison
17   Sanchez.
18   EXAMINATION                       10:05:30AM
19   BY MR. GOODSTADT:                 10:05:36AM
20      Q    Good morning, Mr. Hesse.          10:05:41AM
21      A    Good morning.         10:05:42AM
22      Q    My name is Andrew Goodstadt Thompson.  10:05:43AM
23   I'm an attorney at the law firm of Thompson,
24   Wigdor & Gilly, and my firm represents the
25   plaintiffs in this matter, Frank Fiorillo, Ed
```

Page 8

```
1              GEORGE HESSE
2    Carter, Kevin Lamm, Tom Snyder and Joe Nofi.
3    And we're here today to ask you some questions
4    about the allegations in the complaint.
5          What is your current address?        10:06:00AM
6       A    My current address, my official      10:06:03AM
7    address is 315 Bay Walk, P.O. Box 371 Ocean
8    Beach, New York 11770.
9       Q    What do you mean by official address?  10:06:15AM
10      A    I also have a second residence of     10:06:17AM
11   191 The Helm, East Islip, New York 11730.
12      Q    And which address do you live at?     10:06:26AM
13      A    I mostly live at 191 The Helm, and I  10:06:29AM
14   do sleep at my apartment in Ocean Beach.
15      Q    How many days a year do you --       10:06:37AM
16   approximately, do you sleep at The Helm versus
17   your Ocean Beach residence?
18      A    I'd say the majority of the year.    10:06:43AM
19   Most of the summer, I stay in Ocean Beach.
20      Q    And when did you start living at Ocean 10:06:53AM
21   Beach during the summers?
22      A    About, I'd say, three years ago I     10:06:57AM
23   started staying weekends at the beach.
24      Q    Who else lives with you at that       10:07:08AM
25   address at the beach?
```

2  (Pages 5 to 8)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

A    It's a shared address. It's the Ocean 10:07:11AM
Beach police barracks, and I have a room within
the barracks.

Q    Anyone else live there?        10:07:18AM

A    There are other police officers that 10:07:20AM
do stay overnight there, but I wouldn't say they
live there.

Q    Would you say that you live there?   10:07:26AM

A    No, but it's one of my official   10:07:28AM
addresses.

Q    Why do use that as an official address 10:07:32AM
if you don't live there?

MR. NOVIKOFF:  Objection.        10:07:36AM

MR. CONNOLLY:  Objection.        10:07:37AM

MR. NOVIKOFF:  Argumentative.    10:07:39AM

A    It's on my driver's license.  That's 10:07:40AM
where I vote.  That's where I'm registered to
vote.  That's my legal address.

Q    Do you pay taxes out of there?     10:07:45AM

A    No.                   10:07:47AM

MR. NOVIKOFF:  Objection.  Vague.   10:07:48AM

BY MR. GOODSTADT:                10:07:49AM

Q    What address do you pay taxes from? 10:07:51AM

MR. NOVIKOFF:  Objection.        10:07:54AM

GEORGE HESSE

A    I don't.              10:07:54AM

Q    You don't pay taxes?           10:07:54AM

A    Of course I pay taxes.          10:07:57AM

MR. CONNOLLY:  Andrew, what do you -- 10:08:00AM

BY MR. GOODSTADT:                10:08:02AM

Q    What address do you list on your tax 10:08:02AM
returns?

MR. NOVIKOFF:  Oh, okay.         10:08:05AM

A    In Ocean Beach.          10:08:07AM

Q    And who lives at the 191 The Helm   10:08:13AM
address?

A    My wife, my two children, my father 10:08:16AM
and his girlfriend.

Q    What's your wife's name?        10:08:25AM

A    Shannon.              10:08:26AM

Q    What are your children's ages?   10:08:28AM

A    My daughter Lauren is 12.  Megan is 10:08:30AM
eight.

Q    And your father's name is?      10:08:37AM

A    Dan.                  10:08:39AM

Q    Same last name?                10:08:40AM

A    Yes.                  10:08:42AM

Q    And his girlfriend's name?      10:08:42AM

A    Denise.               10:08:44AM

GEORGE HESSE

Q    Who owns that address?         10:08:48AM

A    My father.              10:08:50AM

Q    And what's Denise's last name?   10:09:01AM

A    Czarneki, C-Z-A-R-N-E-K-I.  Close  10:09:04AM
enough.

Q    How long has she lived there?   10:09:10AM

A    14 years.             10:09:12AM

Q    Did you use the Ocean Beach address 10:09:20AM
prior to three seasons ago when you started
staying overnight there?

A    Yes.                  10:09:27AM

MR. NOVIKOFF:  Can we just have for   10:09:28AM
the record what season are you referring to,
2006, 2007, 2005?

BY MR. GOODSTADT:                10:09:36AM

Q    Well, what season did you start   10:09:36AM
staying there?

A    2006, I started staying there on a   10:09:40AM
regular basis on the weekends.

MR. NOVIKOFF:  Do you want to define 10:09:46AM
the season, Andrew?  It's been defined
before by other witnesses.

BY MR. GOODSTADT:                10:09:50AM

Q    When you use the word "season," why 10:09:51AM

GEORGE HESSE

don't you tell us what you mean so we're both of
the same page.

A    The summer season of 2006 would start, 10:09:55AM
say, May and end in September.

Q    Is that somewhere before Memorial Day 10:10:05AM
to somewhere just after Labor Day?

A    Yeah.  Two weeks before Memorial Day 10:10:10AM
to two weeks after Labor Day is an official
season, but I usually started staying around
Memorial Day right to Labor Day.

Q    And prior to 2006, were you using that 10:10:19AM
Ocean Beach address as your official address?

A    Yes.                  10:10:24AM

Q    How come?                  10:10:24AM

A    Well, I actually did live there back   10:10:26AM
in 2005 for about a year and a half, but not
directly at that address of 315 Bay Walk.

Q    What address did you live in?    10:10:38AM

A    The physical address was 146 Bungalow 10:10:40AM
Walk, and that's in Ocean Beach.

Q    Was that --             10:10:48AM

A    It's a house.          10:10:49AM

Q    Who owns that house?           10:10:50AM

A    Right now, someone named Joe   10:10:53AM

053690b6-a7be-44d9-9835-90b3e21fffd8

1    GEORGE HESSE
2  Housworth.
3      Q   Who owned it when you lived there in   10:10:56AM
4  '05?
5      A   Oh, God.  Last name was Reusch.  I   10:11:00AM
6  think it was R-E-U-S-C-H.
7      Q   Did you rent it from Reusch?       10:11:08AM
8      A   Yes.                  10:11:10AM
9      Q   Did you pay for that or did the beach  10:11:10AM
10  pay for it?
11     A   I paid for it.           10:11:14AM
12     Q   Who do you live with in '05 for a   10:11:14AM
13  year and a half there?
14     A   I lived with my wife; and then for a  10:11:18AM
15  short time, when my daughter was born, she lived
16  there with us.
17     Q   And prior to '05, had you ever used  10:11:27AM
18  the Ocean Beach address as your address or any
19  Ocean Beach address as your address?
20     MR. NOVIKOFF: Objection to form.   10:11:37AM
21     A   I don't know -- I'm thinking in 2004,  10:11:38AM
22  I may have established the address of 315 Bay
23  Walk.
24     Q   How about prior to 2004, did you ever  10:11:53AM
25  use an Ocean Beach address as your address?

1    GEORGE HESSE
2     MR. NOVIKOFF: Objection to form.   10:11:57AM
3     A   No.                  10:11:58AM
4     Q   So prior to 2004, you never lived at  10:12:02AM
5  Ocean Beach?
6     MR. NOVIKOFF: Same objection.    10:12:06AM
7     A   In -- I'm sorry, did I say 2004?  I  10:12:07AM
8  meant '94, 1994.  My first summer in Ocean Beach
9  was in '93, and I actually lived in the barracks
10  five days a week for my first season in Ocean
11  Beach.
12     Q   Were you a full-time officer or    10:12:30AM
13  part-time officer?
14     A   I was part-time or seasonal at that  10:12:32AM
15  time.
16     Q   And you lived in the barracks five   10:12:37AM
17  days a week?
18     A   Five days a week, correct.     10:12:39AM
19     Q   Did you pay any rent?        10:12:40AM
20     A   No.                  10:12:42AM
21     Q   So why did you live there?      10:12:44AM
22     MR. NOVIKOFF: I'm going to object.   10:12:48AM
23  BY MR. GOODSTADT:              10:12:49AM
24     Q   Why did you live at Ocean Beach during  10:12:49AM
25  five days a week?

1    GEORGE HESSE
2     A   I don't know.  I was 23 years old and  10:12:53AM
3  I just took this job in Ocean Beach, and they
4  offered us -- not just me, but several police
5  officers the opportunity to stay there.  I was
6  working late-night shifts; and to get a good
7  night's sleep, instead of going all the way home
8  and back, I stayed in the barracks.
9     Q   So just start.  So '94, you       10:13:12AM
10  established that as an official address?
11     A   That's correct, yes.        10:13:16AM
12     Q   What was the next official address   10:13:17AM
13  that you used after '94?
14     MR. NOVIKOFF: Objection to form.   10:13:21AM
15     A   I guess when I moved to 191 The Helm.  10:13:24AM
16     Q   When was that?            10:13:27AM
17     A   You gotta figure -- let's see.  I   10:13:30AM
18  think it was at the end of '97.
19     Q   And how long did you live at 191 The  10:13:45AM
20  Helm?
21     A   From '97 to present.        10:13:48AM
22     Q   Did you ever use 191 The Helm as your  10:13:53AM
23  official address?
24     MR. NOVIKOFF: Objection.       10:13:58AM
25     A   No.                  10:13:58AM

1    GEORGE HESSE
2     Q   So it was always Ocean Beach?     10:13:58AM
3     A   Correct.              10:14:01AM
4     Q   So how about from '97 until 2005, did  10:14:02AM
5  you live in Ocean Beach at any time during that
6  period at all?
7     MR. NOVIKOFF: Objection to form.   10:14:08AM
8     A   I would stay in Ocean Beach on     10:14:09AM
9  occasion.
10     Q   What do you mean by on occasion?    10:14:12AM
11     A   Well, back in the day, between -- I  10:14:13AM
12  got hired full-time in '95.  So '95 through
13  maybe 2000, we worked some really whacked-out
14  tours, in the winter especially.  We did two
15  days on with four days off, and I would stay
16  there my entire 48 hours.  And we were allowed
17  to sleep, eat and stay in our apartments, the
18  barracks, during my tour after my patrol
19  function was done.
20     Q   So how many days a week were you    10:14:49AM
21  living there between '97, when you moved out,
22  and 2005, when you said you lived there for a
23  year and a half?
24     A   You gotta figure it was 48-hour    10:14:57AM
25  shifts.  It was two days straight, four days

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  off. Sometimes I would stay an extra day;
3  sometimes I would go to 191 The Helm.
4      Q   And why were you using the Ocean Beach 10:15:11AM
5  address as your official address during that
6  period even though you were only staying there
7  two days a week?
8      MR. NOVIKOFF: Objection to form.   10:15:19AM
9      MR. CONNOLLY: Which period, again,   10:15:21AM
10  are we speaking of?
11      MR. GOODSTADT: That period between   10:15:25AM
12  '97, when he moved to 191 The Helm, and
13  2005, when he moved to 146 Bungalow Walk.
14      A   Will you repeat the question, please.   10:15:34AM
15      Q   Why did you use the Ocean Beach   10:15:36AM
16  address as your official address during that
17  period, when you were only staying there two
18  days a week?
19      MR. NOVIKOFF: Objection to form.   10:15:44AM
20      A   I always kept it because I always   10:15:45AM
21  thought I would officially move to Ocean Beach
22  on a permanent basis.
23      Q   So it was in anticipation of moving to 10:15:51AM
24  Ocean Beach?
25      A   Correct.   10:15:54AM

GEORGE HESSE

1
2      Q   But you didn't actually live there on 10:15:54AM
3  a permanent basis, correct?
4      A   For almost two years, I did.   10:15:59AM
5      Q   But not during the period between '97 10:16:01AM
6  and '04, correct?
7      A   No.   10:16:05AM
8      Q   Was there a residency requirement to   10:16:05AM
9  be a full-time officer in Ocean Beach?
10      A   Yes.   10:16:09AM
11      Q   Is that why you use Ocean Beach as the 10:16:10AM
12  address?
13      A   At the time when I got hired, yes.   10:16:11AM
14      Q   And when did you become a full-time   10:16:14AM
15  officer?
16      A   '95. I believe it was November of   10:16:17AM
17  '95.
18      Q   So the period between '97 and '05 that 10:16:22AM
19  you didn't live there, you used the Ocean Beach
20  address because of the residency requirement?
21      A   No.   10:16:31AM
22      Q   You used it because you anticipated   10:16:32AM
23  that you'd eventually live there?
24      A   Correct.   10:16:35AM
25      Q   Even though you weren't at the time,   10:16:36AM

GEORGE HESSE

1
2  for all those years?
3      A   Yes.   10:16:40AM
4      Q   I just want to go over some ground   10:16:48AM
5  rules before we get started.
6      MR. NOVIKOFF: I thought we just got   10:16:52AM
7  started.
8      MR. CONNOLLY: Continue.   10:16:56AM
9      MR. GOODSTADT: Was that an objection 10:16:57AM
10  or just an obnoxious comment?
11      MR. NOVIKOFF: It was a comment. You   10:17:01AM
12  said you were going to go over the ground
13  rules before we got started, but we've just
14  now spent 15 minutes on a residency issue.
15      MR. GOODSTADT: Now we're wasting time 10:17:08AM
16  on your inappropriate comments.
17      MR. NOVIKOFF: If you'd like to   10:17:12AM
18  continue the conversation, I'd be happy to.
19  BY MR. GOODSTADT:   10:17:16AM
20      Q   Do you understand that you're   10:17:16AM
21  testifying under oath today?
22      A   Yes.   10:17:19AM
23      Q   And that you're legally obligated to  10:17:19AM
24  tell the truth?
25      A   Yes.   10:17:22AM

GEORGE HESSE

1
2      Q   And failure to do so is potentially   10:17:22AM
3  punishable as a criminal sanction?
4      A   Yes.   10:17:24AM
5      Q   Have you ever testified under oath   10:17:25AM
6  before --
7      A   Yes.   10:17:27AM
8      Q   Let me finish the question.   10:17:29AM
9      Have you ever testified under oath   10:17:30AM
10  before outside of your capacity as an arresting
11  officer?
12      A   No.   10:17:38AM
13      Q   So you never testified in a civil   10:17:39AM
14  action?
15      A   Yes.   10:17:42AM
16      Q   So since this is the first time you're 10:17:47AM
17  testifying under oath in a civil action, I just
18  want to make sure that --
19      MR. NOVIKOFF: Objection. He   10:17:54AM
20  testified, I believe, that he testified in a
21  civil action.
22      MR. GOODSTADT: I said he's never   10:18:00AM
23  testified in a civil action, and he said
24  yes.
25

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

1            GEORGE HESSE
2   BY MR. GOODSTADT:                    10:18:05AM
3       Q    Have you ever testified in a civil    10:18:06AM
4   action?
5       A    Yes.                        10:18:07AM
6       Q    How many times?                      10:18:08AM
7       A    Four, maybe five.          10:18:17AM
8       Q    So why don't we start from today, not  10:18:22AM
9   including today, going in reverse chronological
10  order.  When was the most recent time you
11  testified under oath in a civil action?
12      A    The last time may have been around    10:18:38AM
13  1999.
14      Q    And were you a party to that civil    10:18:44AM
15  action?
16      A    You know, I don't remember if I was   10:18:49AM
17  particularly sued, but there was a police
18  officer within the department that was sued.
19      Q    And what was that matter -- strike    10:18:56AM
20  that.
21           Who was the plaintiff in that matter?  10:19:01AM
22      A    Christopher Cuneen, C-U-N-E-E-N.      10:19:03AM
23      Q    And who were the defendants?         10:19:10AM
24      A    I don't remember if I was a named     10:19:12AM
25  defendant, but Sergeant Bob Golopi and of course

1            GEORGE HESSE
2   the Ocean Beach Police Department and the
3   Village of Ocean Beach.
4       Q    And what was Mr. Cuneen alleging in   10:19:21AM
5   his lawsuit?
6       A    That he was brutally beaten up, false  10:19:27AM
7   arrest, violation of civil rights.
8       Q    Who did he allege beat him up?        10:19:35AM
9       A    He may have alleged myself and        10:19:39AM
10  Sergeant Golopi.
11      Q    And you testified under oath in a     10:19:53AM
12  deposition or in some other form?
13      A    In a deposition.            10:19:57AM
14      Q    Who represented you in that matter?   10:19:59AM
15      A    I don't recall.            10:20:01AM
16      Q    Did you testify at a trial in that    10:20:04AM
17  matter?
18      A    No.                        10:20:06AM
19      Q    Did that matter get to a trial?       10:20:07AM
20      A    No.                        10:20:09AM
21      Q    Do you know how that case was         10:20:09AM
22  resolved?
23      A    I believe there was a settlement.    10:20:11AM
24      Q    Do you know what the settlement was   10:20:14AM
25  for?

1            GEORGE HESSE
2       MR. NOVIKOFF:  Objection only to the   10:20:16AM
3   extent if you are aware if there was a
4   confidentiality agreement.  If you have no
5   knowledge one way or of the other, then
6   answer the question.
7       MR. GOODSTADT:  Don't you know a        10:20:26AM
8   confidentiality agreement doesn't trump his
9   obligation to testify under oath?
10      MR. NOVIKOFF:  I don't know what the    10:20:30AM
11  confidentiality agreement says.  I'm not
12  going to take your representation of what
13  the law is.
14      MR. GOODSTADT:  Well, that is the law.  10:20:37AM
15      MR. NOVIKOFF:  I'm asking the witness,  10:20:39AM
16  since I represent the village, that if he's
17  aware of whether or not there's a
18  confidentiality agreement, he should say so.
19  If he's not, he can answer the question.
20      MR. CONNOLLY:  You can answer the       10:20:48AM
21  question.
22      A    I'm not aware.              10:20:50AM
23      Q    You're not aware of what it settled   10:20:51AM
24  for?
25      A    I'm not aware, no.          10:20:54AM

1            GEORGE HESSE
2       MR. GOODSTADT:  Ken, if you could just  10:21:28AM
3   put your microphone back on so all this
4   stuff is on the record.
5       MR. NOVIKOFF:  I think it is on the     10:21:31AM
6   record.  The stenographer and I believe the
7   videographer nodded with approval when I
8   took the mic off, indicating, at least to
9   me, that he could hear me.
10      MR. GOODSTADT:  Is it picking up?       10:21:41AM
11  Yeah, because I think we had one deposition
12  where it didn't.
13  BY MR. GOODSTADT:                    10:21:47AM
14      Q    Now, prior to the 1999 case with     10:21:47AM
15  Mr. Cuneen, when was the time before that that
16  you testified under oath in a civil matter?
17      A    I believe the one prior to that --   10:21:56AM
18  actually, you know what, I'm mistaken.  There
19  might have been one just prior to that -- before
20  that one, working our way back.  Bruce Mancada.
21      Q    Do you know how to spell Mancada?    10:22:11AM
22      A    It's M-A-N-C-A-D-A.          10:22:14AM
23      Q    And Mr. Mancada was a plaintiff in the  10:22:22AM
24  matter that you testified in?
25      A    Yes.                       10:22:25AM

Page 25

GEORGE HESSE

1
2   Q   Were you a defendant in that case?   10:22:26AM
3   A   Yes.                10:22:27AM
4   Q   Where was that case filed, do you   10:22:27AM
5   know?
6   A   I believe in Suffolk County.   10:22:29AM
7   Q   Where was the Cuneen case filed, do   10:22:34AM
8   you know?
9   A   Also, I believe, Suffolk County.   10:22:37AM
10   Q   And who were the defendants in   10:22:43AM
11   Mr. Mancada's case?
12   A   That would be me and a Billy Powell.   10:22:46AM
13   Q   And what were the allegations that   10:22:54AM
14   Mr. Mancada made against you and Mr. Powell?
15   A   Excessive force, violation of civil   10:22:59AM
16   rights.
17       MR. NOVIKOFF: I'm sorry, Andrew. Did   10:23:10AM
18   we establish this was before or after the
19   first case that he talked about?
20       MR. GOODSTADT: He believed it was   10:23:16AM
21   closer to today --
22       MR. NOVIKOFF: Okay. Got it.   10:23:19AM
23       MR. GOODSTADT: -- than the Cuneen   10:23:20AM
24   matter.
25       MR. CONNOLLY: At or about 1999.   10:23:23AM

Page 26

GEORGE HESSE

1
2       THE WITNESS: I believe it was 2000,   10:23:26AM
3   2001. I'm not really sure.
4   BY MR. GOODSTADT:                10:23:29AM
5   Q   And you testified under oath in a   10:23:30AM
6   deposition or was it some other form in that
7   matter?
8   A   A deposition.            10:23:35AM
9   Q   Did you testify at trial in that   10:23:35AM
10   matter?
11   A   No.                10:23:37AM
12   Q   Was there a trial in that matter?   10:23:37AM
13   A   No.                10:23:39AM
14   Q   Do you know how that case was   10:23:39AM
15   resolved?
16   A   No.                10:23:41AM
17   Q   You don't know if there was a   10:23:42AM
18   settlement?
19   A   No.                10:23:44AM
20   Q   Who represented you in that matter?   10:23:45AM
21   A   I don't recall.            10:23:52AM
22   Q   In connection with the Cuneen matter,   10:23:52AM
23   were there any criminal charges brought against
24   you?
25   A   No.                10:23:57AM

Page 27

GEORGE HESSE

1
2   Q   Were there any criminal charges   10:23:57AM
3   brought against Mr. Cuneen?
4   A   Yes.                10:24:01AM
5   Q   What were the charges brought against   10:24:02AM
6   Mr. Cuneen?
7   A   I wouldn't say criminal -- it was --   10:24:05AM
8   actually, there were two incidents with
9   Mr. Cuneen. One dealt with me, where he was
10   trespassing on private property, and he was
11   arrested for that. And then later he was
12   rearrested for harassment, maybe. I don't know
13   the particulars of the charges, but he was
14   rearrested later, when I wasn't present.
15   Q   Do you know whether he was convicted   10:24:35AM
16   on any of those arrests?
17   A   I don't know.            10:24:43AM
18   Q   And who arrested him for trespassing?   10:24:44AM
19   A   I was the arresting officer.   10:24:46AM
20   Q   And who was the arresting officer for   10:24:48AM
21   the harassment or other crime?
22   A   Bob Golopi, Sergeant Bob Golopi.   10:24:54AM
23   Q   And Bob Golopi was one of the   10:24:59AM
24   defendants in that matter?
25   A   Yes.                10:25:05AM

Page 28

GEORGE HESSE

1
2   Q   And he was alleged to have physically   10:25:05AM
3   beaten Mr. Cuneen?
4   A   He was alleged, yes.        10:25:09AM
5   Q   And now the Mancada matter. Were   10:25:11AM
6   there any criminal charges brought against you?
7   A   No.                10:25:17AM
8   Q   Were there any criminal charges   10:25:17AM
9   brought against Mr. Mancada?
10   A   Yes.                10:25:21AM
11   Q   What were the charges brought against   10:25:22AM
12   Mr. Mancada?
13   A   They were disorderly conduct and   10:25:25AM
14   resisting arrest.
15   Q   After being arrested -- after being   10:25:37AM
16   arrested for that, was he actually charged with
17   those --
18   A   Yes.                10:25:42AM
19   Q   -- with two allegations?        10:25:43AM
20       Was there a trial?            10:25:45AM
21   A   No.                10:25:46AM
22   Q   Did he plead?            10:25:48AM
23   A   I don't know.            10:25:49AM
24   Q   Who was the arresting officer of   10:25:50AM
25   Mr. Mancada?

7 (Pages 25 to 28)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 29

GEORGE HESSE

1
2     A   I was.                          10:25:53AM
3     Q   What did Mr. Mancada allege you to     10:25:58AM
4   have done?
5     A   I believe just an excessive use of     10:26:04AM
6   force and violated his civil rights.  I don't
7   really recall the whole complaint.
8     Q   Do you recall anything that he alleged   10:26:12AM
9   that you had done to him that he believed was
10   excessive force?
11    A   No.                             10:26:16AM
12    Q   So you don't know if he was convicted   10:26:22AM
13   for anything --
14    A   I don't recall.                  10:26:25AM
15    Q   -- in connection with that matter?    10:26:25AM
16        How about -- and I think you testified   10:26:29AM
17   that -- did you testify that Golopi was a
18   sergeant at the time?
19    A   Yes, I did.                      10:26:38AM
20        MR. NOVIKOFF:  Objection.  Asked and   10:26:40AM
21   answered.
22    A   Yes.                            10:26:41AM
23    Q   He was?  You reported to him at that   10:26:41AM
24   time?
25    A   I reported to him?  Yes.         10:26:46AM

Page 30

GEORGE HESSE

1
2     Q   Then how about the time before the    10:26:51AM
3   Cuneen testimony, when did that happen?
4        MR. NOVIKOFF:  Objection to form.    10:26:57AM
5   BY MR. GOODSTADT:                      10:26:58AM
6     Q   The time prior to the Cuneen matter,   10:26:58AM
7   when was the closest in time to that that you
8   testified under oath in a civil matter?
9        MR. NOVIKOFF:  Objection to form.    10:27:08AM
10        MR. CONNOLLY:  You can answer.     10:27:08AM
11    A   I really don't understand the       10:27:10AM
12   question.
13    Q   Right.  We're going in reverse      10:27:12AM
14   chronological on your civil testimony, correct?
15    A   Right.                          10:27:15AM
16    Q   So you have Mancada is the most     10:27:16AM
17   recent, other than for today.
18    A   Okay.                           10:27:20AM
19    Q   Then Cuneen?                     10:27:21AM
20    A   Correct.                        10:27:22AM
21    Q   Okay.  And now going in reverse     10:27:22AM
22   chronological order, when was the time before
23   that that you testified in a civil matter?
24    A   I believe -- I don't know the exact   10:27:28AM
25   date.  It could be in or around 95, '96.

Page 31

GEORGE HESSE

1
2     Q   And who was the plaintiff in that     10:27:41AM
3   matter?
4     A   Kenneth Ryan.                    10:27:43AM
5     Q   Were you a defendant in that matter?   10:27:48AM
6     A   Yes.                            10:27:50AM
7     Q   Who were the other defendants?      10:27:51AM
8     A   I might have been the only one.  I'm   10:27:52AM
9   not sure.  I don't recall.
10    Q   What was the allegation that Mr. Ryan   10:27:57AM
11   made against you in that matter?
12    A   Excessive force, violation of civil   10:28:01AM
13   rights.
14    Q   Just so we're clear, the Cuneen      10:28:08AM
15   matter, Golopi was a defendant.  Was the beach
16   also a defendant in that matter?
17    A   Yes.                            10:28:18AM
18    Q   And the same thing with Mancada      10:28:19AM
19   matter.  It was you, Powell.  The beach also was
20   a defendant?
21    A   Correct.                        10:28:24AM
22    Q   Were any other individuals that were   10:28:24AM
23   defendants in that matter?
24    A   In which one?                    10:28:27AM
25    Q   Mancada.                        10:28:28AM

Page 32

GEORGE HESSE

1
2     A   Not that I recall.               10:28:29AM
3     Q   How about in Cuneen?             10:28:30AM
4     A   Not that I recall.               10:28:32AM
5     Q   And Ryan, was the beach a defendant?   10:28:33AM
6     A   Yes.                            10:28:40AM
7     Q   Who represented you in the Ryan      10:28:40AM
8   matter?
9     A   I don't recall.                  10:28:43AM
10    Q   When you testified, was it at a      10:28:43AM
11   deposition or some other forum?
12    A   Deposition.                      10:28:49AM
13    Q   And what were the allegations that   10:28:51AM
14   Mr. Ryan made that led him to claim that you
15   used excessive force and violated his civil
16   rights?
17    A   Repeat that.                     10:29:00AM
18    Q   Yes.                            10:29:01AM
19        What -- what conduct did Mr. Ryan    10:29:02AM
20   allege that you engaged in that amounted to
21   excessive force and a violation of his civil
22   rights?
23        MR. NOVIKOFF:  Alleged in the       10:29:12AM
24   complaint?
25        MR. GOODSTADT:  Correct.          10:29:14AM

8 (Pages 29 to 32)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 33

GEORGE HESSE

1
2   A   I think he alleged that I hit him in   10:29:14AM
3   the face with a baton and that I falsely
4   arrested him.
5   Q   Did that matter go to trial?   10:29:25AM
6   A   No.   10:29:27AM
7   Q   Do you know how that matter was   10:29:28AM
8   disposed of or resolved?
9   A   No.   10:29:31AM
10   Q   You don't know if there was a   10:29:32AM
11   settlement in that matter?
12   A   I don't know.   10:29:35AM
13   Q   Were any criminal charges brought   10:29:48AM
14   against you in connection with the Ryan matter?
15   A   No.   10:29:54AM
16   Q   Were there any criminal -- well,   10:29:54AM
17   strike that.
18   Was he arrested at all in connection   10:29:54AM
19   with that matter?
20   A   Yes.   10:29:57AM
21   Q   What was he arrested for?   10:29:57AM
22   A   Disorderly conduct and resisting   10:29:59AM
23   arrest.
24   Q   And who was the arresting officer in   10:30:05AM
25   that matter?

Page 34

GEORGE HESSE

1
2   A   I was.   10:30:08AM
3   Q   Was he actually charged with those   10:30:09AM
4   crimes after being arrested?
5   A   Yes.   10:30:13AM
6   Q   Was there a trial?   10:30:14AM
7   A   No.   10:30:18AM
8   Q   Did he take a plea?   10:30:19AM
9   A   Yes.   10:30:21AM
10   Q   Do you know what he pled to?   10:30:21AM
11   A   He may have pled to the disorderly   10:30:24AM
12   conduct, and he allocuted.
13   Q   And how about the time before Kenneth   10:30:35AM
14   Ryan in which you testified in a civil matter,
15   when was that?
16   A   The next one.   10:30:44AM
17   Q   In reverse chronological order, the   10:30:46AM
18   time that you testified in a civil matter prior
19   to the Ryan matter.
20   A   It may have been '93 or '94.   10:30:52AM
21   Q   And who was the plaintiff in that   10:30:54AM
22   matter?
23   A   Michael Bloomberg.   10:30:56AM
24   MR. NOVIKOFF:  The mayor?   10:30:58AM
25   THE WITNESS:  No.   10:31:01AM

Page 35

GEORGE HESSE

1
2   BY MR. GOODSTADT:   10:31:02AM
3   Q   Were you a defendant?   10:31:02AM
4   A   Say that again.   10:31:04AM
5   Q   Were you a defendant?   10:31:04AM
6   A   Yes.   10:31:06AM
7   Q   Who were the other defendants?   10:31:06AM
8   A   I would believe just the Village of   10:31:09AM
9   Ocean Beach.  I don't know if there were any
10   others.
11   Q   And what did Mr. Bloomberg allege in   10:31:16AM
12   his complaint?
13   A   Excessive use of force and violating   10:31:19AM
14   his civil rights.
15   Q   And what did -- what conduct did he   10:31:32AM
16   allege that you engaged in that amounted to
17   excessive force and a violation of his civil
18   rights?
19   A   What amount of conduct did I do?   10:31:41AM
20   Q   Well, what conduct did he allege that   10:31:44AM
21   you did that amounted to excessive force and a
22   violation of his civil rights?
23   MR. NOVIKOFF:  In the complaint?   10:31:51AM
24   MR. GOODSTADT:  What was he alleging   10:31:52AM
25   in the complaint.

Page 36

GEORGE HESSE

1
2   A   I don't really recall exactly.   10:31:56AM
3   Q   Was there a trial in that matter?   10:31:59AM
4   A   No.   10:32:01AM
5   Q   Do you know how that matter was   10:32:01AM
6   resolved or disposed of?
7   A   No.   10:32:05AM
8   Q   You don't know if there was a   10:32:05AM
9   settlement?
10   A   No.   10:32:08AM
11   Q   Who represented you in connection with   10:32:10AM
12   that matter?
13   A   I don't recall.   10:32:12AM
14   Q   Do you know where that matter was   10:32:12AM
15   filed?
16   A   Maybe Suffolk County.   10:32:14AM
17   Q   How about the Ryan matter, do you know   10:32:16AM
18   where that was filed?
19   A   Maybe Suffolk County also.   10:32:19AM
20   Q   Were there any times that you   10:32:23AM
21   testified in a civil matter other than for today
22   and the four that you just testified to?
23   A   Not that I recall.   10:32:30AM
24   Q   Well, we're doing a good job so far,   10:32:36AM
25   but it's important that you give verbal answers

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  so we can get a written record as well as a
3  videotaped transmission of this deposition; is
4  that okay?
5      A   I understand.            10:32:48AM
6      Q   If I ask a question that you don't   10:32:49AM
7  understand or you don't hear, just ask me to
8  repeat it or rephrase it, okay?
9      A   Okay.                    10:32:58AM
10     Q   If I use a term that you don't      10:32:58AM
11 understand or you don't hear, again, just ask me
12 to repeat it or rephrase it, okay?
13     A   Okay.                    10:33:05AM
14     Q   Because if you do answer a question,   10:33:07AM
15 I'm going to assume that you both understood it
16 and that you heard it.
17     A   Okay.                    10:33:12AM
18     MR. NOVIKOFF:  Note my objection.     10:33:13AM
19 BY MR. GOODSTADT:                 10:33:14AM
20     Q   It's important that you let me finish   10:33:14AM
21 my question, just as it's important that I let
22 you finish your answer.  It's just again so we
23 have a clean record; is that okay?
24     A   Yes.                     10:33:19AM
25     Q   If there's any point in time that you   10:33:20AM

GEORGE HESSE

1
2  feel that you need to take a break or you want
3  to take a recess, just let me know.  I'll be
4  happy to accommodate that, okay?
5      A   Yes.                     10:33:28AM
6      Q   Are you presently taking any       10:33:28AM
7  medications?
8      A   No.                      10:33:32AM
9      Q   Is there anything that can think of   10:33:32AM
10 that would prevent you from testifying fully and
11 truthfully today?
12     A   No.                      10:33:38AM
13     Q   Are you sick at all today?         10:33:39AM
14     A   No.                      10:33:40AM
15     Q   Are you represented by an attorney in   10:33:44AM
16 connection with this matter?
17     A   Yes.                     10:33:48AM
18     Q   Who is that?               10:33:48AM
19     A   Kevin Connolly.            10:33:49AM
20     Q   And he's sitting right next to you,   10:33:50AM
21 correct?
22     A   Correct.                 10:33:53AM
23     Q   When did you first learn that the   10:33:53AM
24 plaintiffs were making allegations against Ocean
25 Beach and you in connection with this matter?

GEORGE HESSE

1
2      MR. NOVIKOFF:  Objection.          10:34:01AM
3      Just allegations in the complaint or   10:34:02AM
4  just allegations at all?
5      MR. GOODSTADT:  Allegations generally. 10:34:06AM
6      MR. NOVIKOFF:  Okay.  Objection to   10:34:09AM
7  form.
8      MR. CONNOLLY:  Allegations that would  10:34:11AM
9  have been ultimately contained in the
10 complaint.
11     MR. NOVIKOFF:  Yeah, I don't         10:34:15AM
12 understand the question.
13 BY MR. GOODSTADT:                 10:34:17AM
14     Q   Do you understand what I mean by    10:34:18AM
15 allegations?
16     A   Just repeat the question, please.    10:34:=19AM
17     Q   When did you first learn that the    10:34:21AM
18 plaintiffs in this case were making allegations
19 against the beach and you?
20     MR. NOVIKOFF:  Objection.  Form.      10:34:27AM
21     A   I don't recall the date.          10:34:29AM
22     Q   Do you recall how you learned of it?  10:34:30AM
23     A   I believe I received a notice of claim 10:34:34AM
24 at some point.  I don't remember the date.
25     Q   How did you receive that notice of   10:34:41AM

GEORGE HESSE

1
2  claim?
3      A   I don't recall.            10:34:46AM
4      Q   You don't recall whether it was     10:34:48AM
5  delivered by mail, by hand, overnight, E-mail,
6  fax?
7      A   I don't recall.            10:34:54AM
8      Q   Do you recall where you were when you  10:34:55AM
9  received it?
10     A   I don't recall.            10:34:58AM
11     Q   Who did you speak with about the    10:35:03AM
12 notice of claim when you received it?
13     MR. NOVIKOFF:  Objection.           10:35:08AM
14     A   I believe the first person I had    10:35:09AM
15 spoken to was Maryann Minerva.
16     Q   Who's she?                10:35:17AM
17     A   She's the village administrator.     10:35:18AM
18     Q   Did you reach out to her or did she   10:35:26AM
19 reach out to you in connection with that
20 discussion?
21     A   I don't know.              10:35:31AM
22     MR. NOVIKOFF:  Objection.  Form.      10:35:33AM
23     A   I don't recall.            10:35:34AM
24     Q   Was it on the phone or in person or   10:35:34AM
25 some other means?

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2      MR. NOVIKOFF: Objection. Form.   10:35:37AM
3    A   I don't recall.              10:35:38AM
4    Q   What did you discuss with her?   10:35:41AM
5    A   We may have read the complaint   10:35:47AM
6  together and may have made some opinions about
7  it.
8      MR. CONNOLLY: Are we speaking of the   10:35:56AM
9  complaint or the notice of claim?
10     THE WITNESS: Notice of claim.   10:36:00AM
11 BY MR. GOODSTADT:                10:36:01AM
12   Q   And tell me the substance of the   10:36:01AM
13 conversation.
14   A   I really don't recall the substance.   10:36:04AM
15   Q   What opinions did you guys reach at   10:36:06AM
16 that time?
17     MR. NOVIKOFF: Objection. Form.   10:36:10AM
18   A   I was upset.               10:36:13AM
19   Q   How come?                10:36:16AM
20   A   Because I thought it was baseless.   10:36:18AM
21   Q   Did you discuss that with Ms. Minerva   10:36:22AM
22 at the time?
23   A   Yes.                   10:36:25AM
24   Q   What did you tell her about your   10:36:25AM
25 belief that it was baseless?

GEORGE HESSE

1
2    A   I figured that the entire complaint   10:36:30AM
3  was out of line and it was just based on lies.
4    Q   Did you tell her why you thought it   10:36:39AM
5  was based on lies?
6    A   I don't recall.              10:36:42AM
7    Q   What did she say to you in that   10:36:44AM
8  conversation?
9      MR. NOVIKOFF: Objection.   10:36:47AM
10   A   She agreed with me.            10:36:47AM
11   Q   Do you recall anything else that she   10:36:52AM
12 said other than for saying I agree with you?
13   A   No.                   10:36:55AM
14   Q   Do you recall anything else that was   10:36:56AM
15 stated during that conversation other than what
16 you've testified to?
17   A   I don't recall at this time.     10:37:01AM
18   Q   Is there anything that you can think   10:37:02AM
19 of that would refresh your recollection?
20   A   No.                   10:37:06AM
21   Q   Did you take any notes of the   10:37:07AM
22 conversation?
23   A   No.                   10:37:08AM
24   Q   Was anyone else there?          10:37:08AM
25   A   No.                   10:37:10AM

GEORGE HESSE

1
2    Q   How long did the conversation last?   10:37:10AM
3    A   I don't recall.              10:37:12AM
4    Q   Did you speak to -- well, strike that.   10:37:16AM
5      Who else did you speak with about the   10:37:19AM
6  notice of claim?
7      MR. NOVIKOFF: Objection. Form.   10:37:23AM
8    A   I'm sure at some point I spoke to   10:37:25AM
9  Joseph Loeffler.
10   Q   Do you actually recall speaking with   10:37:33AM
11 him?
12   A   Not particularly, no.           10:37:36AM
13   Q   So you don't know whether you actually   10:37:38AM
14 spoke with him?
15   A   I don't recall.              10:37:43AM
16   Q   Can you think of anything that would   10:37:45AM
17 refresh your recollection?
18   A   No.                   10:37:47AM
19   Q   What led you to believe that you   10:37:47AM
20 likely spoke with him?
21   A   Well, at the time, he was a trustee.   10:37:52AM
22 And I don't remember how we got into contact
23 with each other, but I'm sure at some point we
24 did speak about it.
25   Q   Did you speak with any other trustees   10:38:07AM

GEORGE HESSE

1
2  other than for Mr. Loeffler about the notice of
3  claim?
4    A   No trustees, no.             10:38:11AM
5    Q   Why would you speak to Loeffler as   10:38:13AM
6  opposed to the other trustees?
7    A   I believe at that point, when he was a 10:38:20AM
8  trustee and Mayor Loeffler was -- Mayor Rogers
9  was in office, I don't want to say that he was a
10 liaison, but I think he understood the police
11 department's operation better than she would, so
12 I think he would just kind of interpret things
13 for her.
14   Q   Did he have a title of police liaison   10:38:41AM
15 at the time?
16   A   No.                   10:38:45AM
17   Q   Does that title exist?          10:38:45AM
18   A   Not that I'm aware of, no.        10:38:47AM
19   Q   You don't recall any of the substance   10:38:54AM
20 of that conversation?
21   A   I don't recall, no.           10:38:57AM
22   Q   Did you speak with Mayor Rogers about   10:38:58AM
23 the notice of claim?
24   A   Yes.                   10:39:01AM
25   Q   And when was that?            10:39:01AM

11 (Pages 41 to 44)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    Repeat that.                    10:39:03AM
3    Q    When was that conversation?            10:39:04AM
4    A    I don't recall the date.              10:39:05AM
5    Q    Was that in person or on the phone?   10:39:06AM
6    A    In person.                       10:39:09AM
7    Q    Just going back to the Loeffler        10:39:09AM
8    discussion, was that in person or on the phone?
9    A    In person.                       10:39:14AM
10   Q    Was anyone else there?             10:39:15AM
11   A    Not that I recall.                 10:39:17AM
12   Q    Did you ever refer to Loeffler as the  10:39:20AM
13   police liaison?
14   A    Nothing official that I can recall.    10:39:25AM
15   Q    How about unofficially, did you ever   10:39:29AM
16   refer to him as the police liaison?
17   A    Not that I recall.                 10:39:34AM
18   Q    So it's possible that you did?        10:39:34AM
19   A    Yeah.                           10:39:36AM
20        MR. NOVIKOFF:  Objection.         10:39:37AM
21   BY MR. GOODSTADT:                     10:39:38AM
22   Q    When did you speak with Rogers, was   10:39:41AM
23   that before or after speaking with Loeffler,
24   about the notice of claim?
25   A    I don't recall if it was before or    10:39:48AM

GEORGE HESSE

1
2    after.
3    Q    What did you discuss with Mayor Rogers 10:39:53AM
4    about the notice of claim?
5    A    Just that, in my opinion, it was      10:39:57AM
6    baseless.
7    Q    And what did she say?               10:40:00AM
8    A    I don't remember her reaction.        10:40:03AM
9    Q    Do you remember anything she said to   10:40:04AM
10   you in that conversation?
11   A    Not in reference to the notice of      10:40:12AM
12   claim.
13        (Whereupon, the referred to portion   10:40:18AM
14   was read back by the court reporter:  Q, Do
15   you remember anything she said to you in
16   that conversation?  A, Not in reference to
17   the notice of claim.)
18   BY MR. GOODSTADT:                     10:40:27AM
19   Q    How about in reference to any of the   10:40:27AM
20   allegations in the notice of claim?
21        MR. NOVIKOFF:  Objection.  Form.     10:40:31AM
22   A    Not that I recall.                 10:40:32AM
23   Q    Do you recall anything she said to you 10:40:33AM
24   during that conversation?
25   A    Yes.                           10:40:36AM

GEORGE HESSE

1
2    Q    What did she say you to during the    10:40:36AM
3    conversation that you recall?
4    A    She had brought up Ed Paradiso.       10:40:40AM
5    Q    What did she say about Ed Paradiso?   10:40:43AM
6    A    That she was disappointed in him.     10:40:45AM
7    Q    Did she tell you she was disappointed  10:40:50AM
8    in Ed Paradiso?
9    A    Because he just kind of fell off the   10:40:55AM
10   face of the earth and really had no
11   participation in anything that was happening to
12   the police department, and that was it.
13   Q    Was Ed Paradiso on active duty at the  10:41:05AM
14   time?
15   A    At that point, no.                 10:41:11AM
16   Q    So she was referring to him not        10:41:14AM
17   participating in anything while he was not
18   active?
19        MR. NOVIKOFF:  Objection.          10:41:18AM
20   A    He was on medical leave, I guess.  I   10:41:20AM
21   don't know what the terminology is they
22   officially used, but he was out.
23   Q    But that's what she was saying, she    10:41:29AM
24   was disappointed that he wasn't participating in
25   anything at that time, while he was on the

GEORGE HESSE

1
2    medical or whatever the term is?
3        MR. NOVIKOFF:  Objection to form.    10:41:38AM
4    A    That's correct.                   10:41:39AM
5    Q    Did she say anything else about Ed     10:41:40AM
6    Paradiso?
7    A    Not that I recall.                 10:41:42AM
8    Q    Did you respond to her disappointment  10:41:43AM
9    about Paradiso?
10   A    I agreed with her.                 10:41:46AM
11   Q    Did you expect Paradiso to participate 10:41:49AM
12   while he was out on medical leave?
13        MR. NOVIKOFF:  Objection.          10:41:54AM
14   A    I would -- yes, I expected him to      10:41:55AM
15   participate in something.
16   Q    What did you expect him to participate 10:41:58AM
17   in?
18   A    He was still the chief of the police   10:42:02AM
19   department.  He has some liabilities involved in
20   everything that we were doing.
21   Q    Do you recall anything else that you   10:42:14AM
22   discussed with Ms. Rogers during that
23   conversation?
24   A    No.                           10:42:18AM
25   Q    And when she said that Ed Paradiso     10:42:21AM

12 (Pages 45 to 48)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  wasn't participating in anything, was she
3  talking about the stuff that was set forth in
4  the notice of claim or just generally wasn't
5  participating?
6      A   I think generally.          10:42:31AM
7      Q   Did you ever speak to Ed Paradiso    10:42:35AM
8  about the notice of claim?
9      A   Yes.                  10:42:39AM
10     Q   When was that?              10:42:40AM
11     A   I don't recall.          10:42:42AM
12     Q   Was that before or after you spoke    10:42:44AM
13  with Rogers?
14     A   I don't recall.          10:42:47AM
15     Q   Was it in person or on the phone?    10:42:49AM
16     A   On the phone.            10:42:51AM
17     Q   Did you call him or he called you?    10:42:52AM
18     A   He called me.            10:42:54AM
19     Q   Did he call you at home or at the    10:42:55AM
20  station or elsewhere?
21     A   At the station.          10:43:00AM
22     Q   Approximately how long after you    10:43:02AM
23  received the notice of claim did he call you to
24  discuss it?
25     A   I don't recall.          10:43:07AM

1              GEORGE HESSE
2      Q   And tell me everything you recall from  10:43:09AM
3  that conversation.
4      A   I expressed my disappointment in him  10:43:18AM
5  as the chief and that I believed that the
6  majority of what was going on with me in
7  reference to the job was his fault.
8      Q   What do you mean by that?        10:43:29AM
9      A   Just that I'm getting blamed for    10:43:32AM
10  absolutely everything, and he's chief of police.
11     Q   Do you recall what he said in response  10:43:42AM
12  to that?
13     A   Just a lot of, oh, I understand,    10:43:45AM
14  Georgie.
15     Q   Do you recall anything else you said  10:43:48AM
16  other than for the fact that you were getting
17  blamed for everything and he's the chief of
18  police?
19     A   Repeat that.            10:43:56AM
20     Q   Did you discuss anything else other    10:43:57AM
21  than for telling him that you're getting blamed
22  for everything even though he's the chief of
23  police?
24     A   No.                10:44:05AM
25     Q   Did you discuss the substance of the  10:44:05AM

1              GEORGE HESSE
2  claims in the notice of claim with him?
3      A   No.                10:44:09AM
4      Q   Have you ever discussed the substance  10:44:11AM
5  of the allegations in the notice of claim or the
6  complaint in this lawsuit with Ed Paradiso?
7          MR. NOVIKOFF: Objection to form.    10:44:20AM
8      A   No. I don't recall.          10:44:21AM
9      Q   What was the everything that you    10:44:29AM
10  thought you were getting blamed for?
11     A   Just the overall operation of the    10:44:34AM
12  police department. Everything was just falling
13  onto my lap. I was carrying the burden of
14  everything that happened to be going wrong.
15     Q   Was there anything going wrong other  10:44:44AM
16  than for receiving a notice of claim from the
17  plaintiff in this matter?
18          MR. NOVIKOFF: Objection to form.    10:44:51AM
19     A   We had some internal issues.      10:44:52AM
20     Q   What were those.            10:44:54AM
21          MR. NOVIKOFF: Well, were you done    10:44:56AM
22  with your answer?
23  BY MR. GOODSTADT:              10:44:59AM
24     Q   You can finish. I'm sorry. We have    10:44:59AM
25  that understanding that we're going to let each

1              GEORGE HESSE
2  other finish.
3      A   We were having some internal issues,    10:45:04AM
4  and I believe also the -- an incident that I was
5  involved with later.
6      Q   Anything other than for the notice of  10:45:21AM
7  claim, the internal issues and that incident
8  that you're referring to when you told Chief
9  Paradiso that you were getting blamed for
10  everything?
11          MR. NOVIKOFF: Note my objection to    10:45:30AM
12  the form.
13     A   I don't recall.          10:45:32AM
14     Q   What internal issues were you      10:45:33AM
15  referring to?
16     A   We had an incident back in 2004, and  10:45:37AM
17  we all know it here at this table, called the
18  Halloween incident. There was a lot of
19  animosity within the police department that
20  needed to be rectified that was never done.
21     Q   Animosity between who?        10:45:58AM
22     A   Employees.              10:46:00AM
23     Q   Who were the employees that there was  10:46:01AM
24  animosity between?
25     A   That would be Kevin Lamm, Frank      10:46:04AM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1  GEORGE HESSE
2  Fiorillo, Tom Snyder, Gary Bosetti, Richard
3  Bosetti. There may have been some others that I
4  don't recall at this time.
5  Q   Do you recall anyone else that there   10:46:17AM
6  was animosity between that you're referring to?
7  A   Repeat that.          10:46:21AM
8  Q   Anyone else that there was animosity   10:46:22AM
9  between that you're referring when you say there
10  was animosity in the department?
11  A   I don't recall at this time.   10:46:26AM
12  Q   Ty Bacon?          10:46:28AM
13  A   There may have been. I don't know.   10:46:31AM
14  Q   Patrick Cherry?          10:46:32AM
15  A   No.          10:46:34AM
16  Q   John Dyer?          10:46:37AM
17  A   No.          10:46:39AM
18  Q   And when you say there was animosity,   10:46:43AM
19  it was between Lamm, Fiorillo and Snyder on one
20  side and the Bosettis on the other?
21      MR. NOVIKOFF: Objection to form.   10:46:52AM
22  A   Yes.          10:46:53AM
23  Q   Was there animosity between you and   10:46:55AM
24  the Bosettis in connection with the Halloween
25  incident?

GEORGE HESSE

1  GEORGE HESSE
2  A   No.          10:47:00AM
3  Q   Was there animosity between you and   10:47:01AM
4  Fiorillo, Snyder and Lamm?
5  A   No.          10:47:04AM
6  Q   When did that animosity start?   10:47:13AM
7  A   Probably right -- right away, in 2004,   10:47:18AM
8  October 31st.
9  Q   So before that, there was no animosity   10:47:23AM
10  between the Bosettis and those three plaintiffs
11  that you're referring to?
12  A   Not that I'm aware of.          10:47:30AM
13      MR. NOVIKOFF: Objection.   10:47:32AM
14  BY MR. GOODSTADT:
15  Q   Were any other -- and we'll discuss   10:47:35AM
16  Halloween a little bit later. But were there
17  any other internal issues that you're referring
18  to other than for the Halloween incident?
19  A   There was some regular insubordination   10:47:45AM
20  from some members of the police department and
21  myself.
22  Q   And who was that?          10:47:51AM
23  A   That would be Frank Fiorillo and Kevin   10:47:52AM
24  Lamm.
25  Q   Anyone else?          10:47:58AM

GEORGE HESSE

1  GEORGE HESSE
2  A   Not that I recall.          10:48:00AM
3  Q   And what insubordination are you   10:48:03AM
4  referring to with respect to Fiorillo?
5  A   There are some particular times where   10:48:08AM
6  he was asked to do something and flat-out
7  refused.
8  Q   And what were those things he was   10:48:15AM
9  asked to do that he refused?
10  A   Well, there was one incident where I   10:48:19AM
11  asked him to just take a little Windex and
12  squirt one of the windows on the police car, and
13  I was told to go fuck myself, he wasn't gonna do
14  it.
15  Q   Did you write him up for that?   10:48:31AM
16  A   Yes, I did.          10:48:33AM
17  Q   Any other incidents that you're   10:48:39AM
18  referring to other than for squirting the Windex
19  on the police window?
20  A   Yeah. There was a time where he and   10:48:46AM
21  Kevin Lamm came to me and asked me if they
22  could -- when they're writing summons, if they
23  could take bail out on the street in a police
24  car, and I told them no, you cannot do that;
25  it's called station house bail for a reason.

GEORGE HESSE

1  GEORGE HESSE
2  They went over my head. They went to   10:49:01AM
3  Judge Russell at the time. Judge Russell, not
4  being a criminal judge but a civil judge or
5  attorney, gave them wrong information,
6  misinformation, and told them that they can do
7  it.
8  They asked me again. I told them   10:49:17AM
9  again, no, you cannot do it, and I actually
10  caught them taking money from somebody they were
11  writing up in the police car just outside the
12  police department, and they tried to hide it
13  from me, because they hid the bail book in -- I
14  believe Kevin Lamm came in, grabbed the bail
15  book and went outside and tried to take bail.
16  Q   Were you upset that they went to Judge   10:49:41AM
17  Powell? Is that his name?
18  A   Russell.          10:49:45AM
19  Q   Russell. Were you upset that they   10:49:46AM
20  went to Judge Russell?
21  A   No, I wasn't upset. It was just   10:49:50AM
22  incorrect procedure.
23  Q   It's a break in the chain of command?   10:49:55AM
24  A   You could say that.          10:49:57AM
25  Q   Would you say that?          10:49:58AM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    No.                        10:49:59AM
3    Q    You wouldn't say that's a break in the   10:49:59AM
4    chain of command?
5    A    No. Judge is not part of the chain of   10:50:02AM
6    command.
7    Q    So it would be breaking the chain of   10:50:05AM
8    command?
9         MR. NOVIKOFF: Objection. Form.        10:50:09AM
10   A    He's not part of the chain of command.  10:50:10AM
11   Q    So they went outside the chain of       10:50:13AM
12   command?
13   A    Yes.                       10:50:16AM
14   Q    Is that improper?              10:50:16AM
15   A    That's improper, yes.           10:50:17AM
16   Q    Did you write them up for that       10:50:21AM
17   incident?
18   A    No.                        10:50:24AM
19   Q    How come?                   10:50:25AM
20   A    I counseled them right on the spot.  10:50:26AM
21   Q    Did you memorialize that incident in   10:50:30AM
22   writing in any way?
23   A    No.                        10:50:34AM
24   Q    Any other incidents of insubordination  10:50:36AM
25   that you're referring to with respect to Lamm or

GEORGE HESSE

1
2    Fiorillo?
3    A    With Lamm, he had a habit of putting   10:50:45AM
4    handcuffs on somebody urinating in public and
5    dragging them down through town and bringing
6    them to the police department, and he was told
7    not to do that. Just write the summons on the
8    spot.
9    Q    Did you write him up for that?       10:51:02AM
10   A    No.                        10:51:04AM
11   Q    Did he violate your direction of just   10:51:05AM
12   writing them up on the spot?
13   A    On a few occasions, yes.          10:51:11AM
14   Q    Even though he was allegedly        10:51:14AM
15   insubordinate on a few occasions, you didn't
16   write him up for it at all?
17   A    No. I counseled him.            10:51:21AM
18   Q    Did you memorialize it in writing in   10:51:22AM
19   any way?
20   A    No.                        10:51:25AM
21   Q    Did any of the -- strike that.      10:51:25AM
22        Any other incidents of insubordination  10:51:35AM
23   that you're referring to when you testified a
24   moment ago about insubordination with respect to
25   Fiorillo and Lamm?

GEORGE HESSE

1
2         MR. NOVIKOFF: Objection. Form.        10:51:43AM
3    A    Right now, I don't recall.         10:51:44AM
4    Q    Any other internal issues other than   10:51:45AM
5    for the Halloween incident and the
6    insubordination by Fiorillo and Lamm?
7    A    As of right now, I don't recall.    10:51:53AM
8    Q    Anything that would refresh your     10:51:55AM
9    recollection?
10   A    I don't recall. I don't know.       10:51:57AM
11   Q    Do you have any notes anywhere --     10:51:58AM
12   A    I have no notes.                10:51:59AM
13   Q    -- in a file?                  10:52:00AM
14        And then you testified that you're    10:52:04AM
15   referring to an incident that you were involved
16   with later when you were talking about being
17   blamed for everything. What were referring to
18   when you said the incident that you were
19   involved in later?
20   A    Repeat that.                 10:52:17AM
21   Q    Yeah, I believe before you         10:52:19AM
22   testified -- when I asked you what was the
23   everything that you thought you were getting
24   blamed for, you said it was the notice of claim,
25   internal issues and the incident that you were

GEORGE HESSE

1
2    involved in later. What was the incident that
3    you were involved in later that you were
4    referring to?
5    A    The Gilbert incident. Sam Gilbert.   10:52:31AM
6    Q    And what was that?             10:52:34AM
7    A    That was an arrest that was made.    10:52:35AM
8    Q    That you made?               10:52:45AM
9    A    I was an assist on the arrest, but   10:52:49AM
10   another police officer made the arrest.
11   Q    And what do you mean by "incident"?   10:52:57AM
12   Was it anything more than just an arrest?
13   A    No.                        10:53:01AM
14   Q    Did Mr. Gilbert sue you?          10:53:03AM
15   A    Yes.                       10:53:05AM
16   Q    For what?                   10:53:05AM
17   A    Excessive force -- he alleged that we  10:53:06AM
18   brutally beat him -- and false arrest, violating
19   his civil rights.
20   Q    And that matter is still pending,     10:53:19AM
21   correct?
22   A    The civil matter, yes.           10:53:21AM
23   Q    Who represents you in the civil      10:53:23AM
24   matter?
25   A    I believe his name is Mark Anesh.    10:53:25AM

053690b6-a7be-44d9-9835-90b3e21fffd8

1       GEORGE HESSE
2       Q   Mr. Anesh is at Wilson, Elser,      10:53:34AM
3   Moskowitz, Edelman and Dicker?
4       A   It's possible. I don't recall.      10:53:39AM
5       And there is another attorney that is   10:53:40AM
6   on the case. I believe her last name is Slim,
7   S-L-I-M. I don't remember her first name. I've
8   only spoken to her once.
9       Q   Who are the other defendants in that   10:53:52AM
10  matter?
11      MR. NOVIKOFF: On the civil or on the   10:53:56AM
12  criminal?
13      MR. GOODSTADT: On the civil matter.   10:53:57AM
14  That's what we're talking about.
15      A   On the civil? I believe that would be   10:54:00AM
16  myself. There was Arnold Hardman, possibly --
17  well, the Village of Ocean Beach. To tell you
18  the truth, I don't recall who else is named on
19  the suit itself.
20      Q   And you were indicted for that?      10:54:22AM
21      A   That's correct.      10:54:23AM
22      Q   And you were tried for that?      10:54:24AM
23      A   That's correct.      10:54:25AM
24      Q   And you were acquitted, correct?      10:54:26AM
25      A   That's correct.      10:54:29AM

1       GEORGE HESSE
2       Q   Did you testify in the criminal trial? 10:54:29AM
3       A   No.      10:54:32AM
4       Q   And other than for this matter, the   10:54:39AM
5   Gilbert matter, the other matters that you
6   testified to that you testified in a deposition,
7   have you ever been sued civilly?
8       MR. CONNOLLY: Objection, Andrew, only   10:54:53AM
9   that I don't believe there's been any
10  testimony that he testified in the Gilbert
11  matter.
12      MR. GOODSTADT: Well, I'm asking now   10:54:59AM
13  has he been sued in any matter.
14  BY MR. GOODSTADT:      10:55:02AM
15      Q   Other than for Gilbert, this incident   10:55:02AM
16  and perhaps the other four -- I know you don't
17  know if you were actually sued in the other
18  four. But putting those four aside, Gilbert and
19  this matter, have you ever been sued civilly?
20      A   Yes. I do have one other one.      10:55:11AM
21      Q   And what's the other one?      10:55:13AM
22      A   Jesse Prisco. Actually, I forgot   10:55:15AM
23  about that one.
24      Q   And what is Mr. Prisco suing you for?   10:55:23AM
25      A   Excessive force and maybe violating   10:55:25AM

1       GEORGE HESSE
2   his civil rights. I don't recall what else.
3       Q   So let's go back to Gilbert quickly,   10:55:38AM
4   and we'll get into that in some more detail
5   later. In Gilbert, you testified already that
6   you were indicted on that matter and tried and
7   acquitted. Was Gilbert charged with any
8   criminal conduct with respect to that arrest?
9       A   Yes.      10:55:54AM
10      Q   And what was he charged with?      10:55:54AM
11      A   Resisting arrest and -- did I say -- I   10:55:56AM
12  said resisting arrest. Disorderly conduct,
13  resisting arrest, and he was also issued a
14  littering ticket.
15      Q   And who was the arresting officer?      10:56:11AM
16      A   Arnold Hardman.      10:56:13AM
17      Q   And was he charged with those crimes   10:56:24AM
18  that he was arrested for?
19      A   Mr. Gilbert?      10:56:29AM
20      Q   Yes.      10:56:30AM
21      A   Yes.      10:56:30AM
22      Q   And was there a trial in that matter?   10:56:31AM
23      A   No.      10:56:33AM
24      Q   Do you know how that -- those charges   10:56:34AM
25  were resolved, if at all?

1       GEORGE HESSE
2       A   I believe he pled guilty to the      10:56:38AM
3   littering and they dismissed the other charges
4   in satisfaction.
5       Q   Okay. So there's no criminal charges   10:56:50AM
6   against him still pending, correct?
7       A   No.      10:56:55AM
8       Q   Let's go to Prisco. Who represents   10:56:55AM
9   you in the Prisco matter?
10      A   I don't recall his name.      10:57:00AM
11      Q   And who is Mr. Prisco suing other than   10:57:07AM
12  for you?
13      A   I'm sure the Village of Ocean Beach.   10:57:10AM
14  I don't recall who else is listed. I'm sure
15  there's a bunch of John Does, but I don't know.
16      Q   And what is Mr. Prisco suing you and   10:57:19AM
17  the beach for?
18      A   I believe I said that already.      10:57:24AM
19      Q   Excessive force?      10:57:25AM
20      A   Excessive use of force and civil right   10:57:25AM
21  violation.
22      Q   You did say that. I apologize.      10:57:30AM
23      What did Mr. Prisco allege that you   10:57:32AM
24  did that amounted to excessive force and
25  violations of his civil rights?

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2      MR. NOVIKOFF: In the complaint?      10:57:39AM
3      MR. GOODSTADT: In the complaint.      10:57:41AM
4    A   He said that I dragged him down a      10:57:41AM
5   flight of stairs and that I beat him on the
6   street and falsely arrested him.
7    Q   And were any criminal charges brought  10:57:51AM
8   against Mr. Prisco with respect to that matter?
9    A   Yes.            10:57:56AM
10   Q   What were those charges?      10:57:56AM
11   A   There was an assault second. There    10:57:57AM
12  was disorderly conduct, resisting arrest. I
13  believe there was some sort of a noise violation
14  under the village code.
15   Q   Was he charged with those crimes that  10:58:08AM
16  he was arrested for?
17   A   Yes.            10:58:12AM
18   Q   And what was the outcome of those    10:58:12AM
19  charges?
20   A   I believe he pled to, I want to say    10:58:15AM
21  disorderly conduct, but I don't recall.
22   Q   Were there any criminal charges      10:58:27AM
23  brought against you or any other employees of
24  the village --
25   A   No.            10:58:33AM

GEORGE HESSE

1
2    Q   -- with respect to that case?      10:58:34AM
3      Now, you didn't testify under oath at  10:58:36AM
4   all in the Prisco or the Gilbert matter, the
5   civil suits, right?
6    A   No. Right.        10:58:43AM
7    Q   Now, just going back to what we      10:58:47AM
8   discussed before about your discussions with
9   people when you received the notice of claim.
10  Did you discuss the notice of claim at all with
11  Gary Bosetti?
12   A   I may have.        10:58:56AM
13   Q   And when did you discuss it with him? 10:58:58AM
14   A   I don't recall.        10:59:00AM
15   Q   Do you recall where you were when you 10:59:00AM
16  discussed it?
17   A   No.            10:59:02AM
18      MR. NOVIKOFF: Objection.      10:59:03AM
19  BY MR. GOODSTADT:          10:59:04AM
20   Q   Do you recall the substance of the    10:59:07AM
21  discussion that you had with him with respect to
22  the notice of claim?
23      MR. NOVIKOFF: Objection.      10:59:15AM
24      MR. CONNOLLY: Objection.      10:59:16AM
25   A   No.            10:59:17AM

GEORGE HESSE

1
2    Q   How about Richard Bosetti, did you    10:59:17AM
3   discuss the notice of claim with him?
4    A   I don't recall.        10:59:21AM
5    Q   Have you discussed the complaint in    10:59:21AM
6   this lawsuit or any of the allegations in the
7   complaint with Gary Bosetti?
8      MR. CONNOLLY: Objection, Andrew, to  10:59:27AM
9   the extent that I don't know if we've gone
10  through whether Mr. Hesse had received a
11  copy of the complaint.
12  BY MR. GOODSTADT:          10:59:34AM
13   Q   You were served with a copy of the    10:59:35AM
14  complaint in this lawsuit, correct?
15   A   I believe so.        10:59:38AM
16   Q   Have you read the complaint in this    10:59:39AM
17  lawsuit?
18   A   Yes.            10:59:41AM
19   Q   Did you ever discuss the complaint or 10:59:42AM
20  any allegations in the complaint with Gary
21  Bosetti subsequent to you receiving it?
22   A   I don't recall.        10:59:49AM
23   Q   Did you ever discuss the complaint or 10:59:50AM
24  any allegations in the complaint with Richard
25  Bosetti subsequent to your receiving it?

**GEORGE HESSE**

1
2    A   I don't recall.        10:59:56AM
3    Q   Did you ever discuss the complaint or 10:59:56AM
4   any allegation in the complaint with yo Loeffler
5   subsequent to you receiving it?
6    A   Yes.            11:00:03AM
7    Q   How many times?        11:00:04AM
8    A   I don't recall.        11:00:05AM
9    Q   Approximately how many times?      11:00:05AM
10   A   I really don't know.      11:00:07AM
11   Q   Do you recall the substance of any of 11:00:09AM
12  those conversations that you had with Joe
13  Loeffler about the complaint?
14   A   That we both felt that it was      11:00:14AM
15  baseless.
16   Q   Did you discuss why you felt it was   11:00:17AM
17  baseless with Joe Loeffler?
18   A   Just it's all lies.        11:00:21AM
19   Q   But did you discuss what you thought  11:00:23AM
20  were lies?
21   A   The whole thing.        11:00:25AM
22   Q   Every word in the complaint you think 11:00:31AM
23  is a lie?
24   A   Yes.            11:00:33AM
25   Q   Do you recall anything that      11:00:36AM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1    GEORGE HESSE
2  Mr. Loeffler said during those conversations?
3    A   I don't recall.          11:00:41AM
4    Q   You don't recall anything he said?   11:00:42AM
5    A   I don't recall.          11:00:45AM
6    Q   Do you have anything that would       11:00:46AM
7  refresh your recollection that you can think of?
8    A   At this time, no.         11:00:51AM
9    Q   Do you have any notes?  Did you ever   11:00:51AM
10 have any written correspondence with him about
11 this matter?
12   A   Not that I'm aware of.     11:00:55AM
13   Q   Did you ever discuss Mitch Burns with   11:00:57AM
14 Joe Loeffler?
15   A   No.                       11:01:01AM
16      MR. NOVIKOFF: Objection only as to   11:01:01AM
17 time frame.
18      MR. GOODSTADT: Ever.        11:01:04AM
19   A   No.                       11:01:05AM
20   Q   Did you ever discuss the complaint or   11:01:09AM
21 any allegations in the complaint with Patrick
22 Cherry?
23   A   Yes.                      11:01:15AM
24   Q   And when I say Patrick Cherry, I'm     11:01:16AM
25 referring to Patrick Cherry, Sr.  Is that fair?

GEORGE HESSE

1    GEORGE HESSE
2    A   Yes.                      11:01:21AM
3    Q   How many times did you discuss the    11:01:22AM
4  complaint or the allegations of the complaint
5  with Pat Cherry?
6      MR. NOVIKOFF: Objection again.  Only   11:01:27AM
7  once he received the complaint?
8      MR. GOODSTADT: Subsequent to        11:01:30AM
9  receiving the complaint.
10   A   How many times?           11:01:31AM
11   Q   Yes.                      11:01:31AM
12   A   I don't recall.           11:01:32AM
13   Q   Approximately how many times?       11:01:32AM
14   A   I really don't recall.     11:01:34AM
15   Q   More than five?            11:01:34AM
16   A   It's possible.            11:01:35AM
17   Q   More than 10?             11:01:36AM
18   A   I don't know.             11:01:37AM
19   Q   When do you recall the first time   11:01:42AM
20 speaking with Cherry about the lawsuit?
21   A   I don't recall.           11:01:45AM
22   Q   Was it within six months of receiving   11:01:46AM
23 it?
24   A   Safe to say, yes.         11:01:53AM
25   Q   Do you recall the substance of any of   11:01:54AM

GEORGE HESSE

1    GEORGE HESSE
2  your conversations with Cherry about the
3  complaint or any allegations of the complaint?
4    A   Just that it's baseless.     11:02:00AM
5    Q   Did you discuss what you thought was   11:02:01AM
6  baseless about it?
7    A   The whole thing.          11:02:04AM
8    Q   Did you discuss specifically, other   11:02:05AM
9  than for saying the whole thing, any specific
10 allegations?
11      MR. NOVIKOFF: Objection as to form.  11:02:11AM
12   A   Just the basics.          11:02:12AM
13   Q   Did you discuss the basis of why you   11:02:14AM
14 thought it was baseless with him?
15   A   Based on lies.            11:02:15AM
16   Q   That's it?  You didn't discuss the    11:02:16AM
17 actual specific claims at all with him?
18   A   No.                       11:02:21AM
19   Q   Did you ever discuss the complaint or   11:02:25AM
20 any of the allegations in the complaint with
21 anyone from the Rivkin Radler law firm?
22   A   No.                       11:02:33AM
23   Q   Did you ever discuss the complaint or   11:02:37AM
24 the allegations in the complaint with Natalie
25 Rogers?

GEORGE HESSE

1    GEORGE HESSE
2    A   Yes.  We went over that.     11:02:42AM
3    Q   No.  I think we went over the notice   11:02:45AM
4  of claim with Natalie Rogers.  Now I'm talking
5  about the complaint.
6      MR. NOVIKOFF:  Your deposition, and   11:02:50AM
7   this doesn't count to your time, but I think
8   the witness should know that there's a
9   difference between a notice of claim and a
10  complaint, because maybe his prior answers,
11  there was some confusion.
12 BY MR. GOODSTADT:                11:03:02AM
13   Q   Do you understand the difference      11:03:03AM
14 between the two?
15   A   Yes.                      11:03:05AM
16   Q   I mean, certainly you've received     11:03:06AM
17 complaints in the past.  You've now testified to
18 six or seven times you've been sued, correct?
19   A   Uh-huh.                   11:03:13AM
20   Q   And did you receive notices of claims   11:03:14AM
21 in those cases, as well?
22      MR. CONNOLLY: Objection.     11:03:14AM
23   A   Yes.                      11:03:14AM
24   Q   So you know the difference between the   11:03:15AM
25 two, correct?

18 (Pages 69 to 72)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A   Yes.                          11:03:18AM
3    Q   So now I'm just focused on the        11:03:19AM
4    complaint which was filed in federal court in
5    this lawsuit.
6        Did you ever discuss the complaint or  11:03:24AM
7    any of the allegations in the complaint with
8    Natalie Rogers?
9    A   I don't recall.               11:03:33AM
10   Q   You don't recall one way or the other? 11:03:34AM
11   A   No, I don't.                  11:03:37AM
12   Q   Is there anything that you can think  11:03:40AM
13   of that would refresh your recollection as to
14   whether you spoke with her?
15   A   No.                          11:03:45AM
16   Q   Did you ever discuss the complaint or  11:03:45AM
17   any allegations in the complaint with Ty Bacon?
18   A   Yes.                          11:03:50AM
19   Q   How many times?                11:03:50AM
20   A   I don't know.                 11:03:52AM
21   Q   Approximately how many times?        11:03:52AM
22   A   A couple times, maybe.         11:03:54AM
23   Q   More than five?                11:03:56AM
24   A   I wouldn't say -- I'd say no.   11:03:57AM
25   Q   So somewhere between two and five?   11:04:00AM

GEORGE HESSE

1
2    A   It's possible, yes.           11:04:02AM
3    Q   Did you discuss it with him within the 11:04:04AM
4    first six months of receiving it?
5    A   I don't recall.               11:04:08AM
6    Q   What did you discuss with Ty Bacon    11:04:12AM
7    about the complaint or the allegations in the
8    complaint?
9    A   It was baseless.              11:04:16AM
10   Q   Did you discuss any of the specific   11:04:17AM
11   allegations?
12   A   I don't recall.               11:04:20AM
13   Q   Did you tell him what you believe was  11:04:20AM
14   baseless in the complaint?
15   A   Specifically, I don't recall.  11:04:23AM
16   Q   Anything that would refresh your      11:04:26AM
17   recollection?
18   A   Not as of right now, no.       11:04:28AM
19   Q   What did he say about the complaint,  11:04:30AM
20   if anything?
21   A   He agreed with me.  Thought it was    11:04:33AM
22   baseless.
23   Q   Do you know whether he read the       11:04:36AM
24   complaint?
25   A   You know, I don't know.        11:04:38AM

GEORGE HESSE

1
2    Q   Did you show him a copy of the        11:04:39AM
3    complaint?
4    A   No.                          11:04:40AM
5    Q   So do you know where he was concluding 11:04:41AM
6    it was baseless if you -- do you know how he
7    reached the conclusion that it was baseless if
8    you don't even know that he read the complaint?
9        MR. NOVIKOFF:  Objection to form.    11:05:01AM
10   A   Because of where it came from.  11:05:05AM
11   Q   What do you mean by that?             11:05:07AM
12   A   By the officers who filed it.   11:05:08AM
13   Q   So your understanding is that he      11:05:13AM
14   reached the conclusion it was baseless just
15   because it was filed by the five plaintiffs in
16   this case?
17   A   It's my opinion, yes.          11:05:21AM
18   Q   Did you ever ask him if he knew what  11:05:22AM
19   they were alleging?
20   A   No.                          11:05:24AM
21   Q   Did you ever tell him what they were  11:05:24AM
22   alleging?
23   A   I don't recall.               11:05:27AM
24   Q   Did you ever show him a copy of the   11:05:27AM
25   complaint?

GEORGE HESSE

1
2        MR. NOVIKOFF:  Objection.  Asked and  11:05:30AM
3    answered.
4    A   No.                          11:05:31AM
5    Q   Did you show any current or former    11:05:32AM
6    police officers in Ocean Beach a copy of the
7    complaint after you received it?
8    A   No.                          11:05:40AM
9    Q   What was your first law enforcement   11:05:47AM
10   job?
11   A   Ocean Beach Police Department.  11:05:51AM
12   Q   And when were you hired in the Ocean  11:05:52AM
13   Beach Police Department?
14   A   I was sworn in in December of 1992.  I 11:05:56AM
15   attended the police academy through '93,
16   graduated in May of '93 and started working that
17   summer.
18   Q   Did you attend full-time academy?     11:06:09AM
19   A   No, the part-time seasonal police    11:06:12AM
20   academy of Suffolk County.
21   Q   How many months is that academy?     11:06:20AM
22   A   March, April, May, 5 months.   11:06:24AM
23   Q   What's the difference between a       11:06:27AM
24   part-time seasonal academy and a full-time
25   academy?

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A   It's really the hours involved in the   11:06:32AM
3    training.
4    Q   There's more hours with the full-time?   11:06:35AM
5    A   Correct.   11:06:37AM
6    Q   So it's more training?   11:06:38AM
7    A   Yes.   11:06:39AM
8    Q   When you were sworn in in December   11:06:46AM
9    '92, I assume you had already applied for the
10   job prior to then?
11   A   Yes.   11:06:53AM
12   Q   When did you apply for the job?   11:06:53AM
13   A   I believe it was the end of the summer 11:06:55AM
14   of '92. My interview took place someplace in
15   the winter of '92 or the...
16   Q   How did you learn about the job?   11:07:07AM
17   A   Through a friend -- a friend of my   11:07:10AM
18   father's who was a Suffolk County Marine Bureau
19   police officer.
20   Q   And who was that? Who was the friend   11:07:18AM
21   of your father?
22   A   His name was Freddy DeSantis.   11:07:21AM
23   Q   Did you know anyone working in the   11:07:28AM
24   Ocean Beach Police Department prior to
25   submitting the application?

GEORGE HESSE

1
2    A   No.   11:07:34AM
3    Q   Who did you interview with?   11:07:36AM
4    A   Bob Golopi.   11:07:39AM
5    Q   Anyone else?   11:07:42AM
6    A   I believe I met the chief, Ed   11:07:43AM
7    Paradiso, for a little -- a little while, but --
8    Q   So at the time, Bop Golopi was a   11:07:50AM
9    sergeant and Paradiso was the chief?
10   A   No, I think Bob was just a police   11:07:57AM
11   officer at the time.
12   Q   What do you mean by just a police   11:07:59AM
13   officer?
14   A   I don't think he was a sergeant at the 11:08:01AM
15   time when I first met him.
16   Q   At some point, he was elevated to   11:08:06AM
17   sergeant?
18   A   Yes.   11:08:09AM
19   Q   Did he have to go through any tests to 11:08:09AM
20   be elevated to sergeant?
21   MR. NOVIKOFF: Objection.   11:08:14AM
22   A   I don't know what he did at that time. 11:08:14AM
23   Q   Do you know whether it was a   11:08:18AM
24   requirement to go through any tests at that time
25   to be elevated to sergeant?

GEORGE HESSE

1
2    MR. NOVIKOFF: Objection.   11:08:23AM
3    A   At that time, I don't know.   11:08:24AM
4    Q   Was there a sergeant at the time you   11:08:27AM
5    interviewed?
6    A   That I was aware of at that time?   11:08:30AM
7    Q   Yes.   11:08:33AM
8    A   No.   11:08:33AM
9    Q   So you interviewed with Golopi and   11:08:38AM
10   Paradiso. Did you interview with anyone else?
11   A   No.   11:08:43AM
12   Q   And who offered you the job?   11:08:43AM
13   A   I believe I received a phone call from 11:08:46AM
14   Bob Golopi that said they were going to accept
15   my application and sponsor me to go to the
16   police academy.
17   Q   Did you have any jobs prior to that,   11:08:57AM
18   outside of law enforcement?
19   A   Yes.   11:09:02AM
20   Q   What did you do just prior to starting 11:09:02AM
21   the academy?
22   A   I worked in a delicatessen.   11:09:08AM
23   Q   Did you apply for a certain position   11:09:11AM
24   at Ocean Beach?
25   A   I believe it was just seasonal police 11:09:23AM

GEORGE HESSE

1
2    officer.
3    Q   And were you hired for a seasonal   11:09:30AM
4    police officer position?
5    A   Yes.   11:09:33AM
6    Q   What's your understanding of what a   11:09:35AM
7    seasonal police officer is?
8    A   The classification of a seasonal   11:09:39AM
9    police officer is a police officer that works
10   between the time frame of two weeks prior to
11   Memorial Day to two weeks after Labor Day.
12   Q   And that's the job that you had when   11:09:50AM
13   you were first were hired there?
14   A   That's what I was told, yes.   11:09:54AM
15   Q   So you graduated the academy. Did you 11:09:55AM
16   have to take any other tests before you were
17   able to be certified as a police officer?
18   A   Just what the academy provided.   11:10:03AM
19   Q   And what were the tests in the   11:10:04AM
20   academy?
21   A   At the time, I believe there was --   11:10:08AM
22   there's a battery of tests. You have a laws of
23   arrest test. You had a search and seizure test.
24   You have a deadly physical force test that you
25   have to pass. Then I believe at the time we

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  only had three comp tests that included just
3  everything to do with anything from penal law to
4  criminal procedure law, physical -- some
5  physical training. Just had to pass a battery
6  of tests.
7      Q    Did you have to pass any tests        11:10:40AM
8  administered by Suffolk County Civil Service?
9      A    Prior to going to the academy, yes.   11:10:46AM
10     Q    What did you have to pass prior to     11:10:49AM
11 going to the academy?
12     A    Physical agility, a medical and a      11:10:52AM
13 psychological.
14     Q    Did you have to take a polygraph?      11:10:59AM
15     A    At that time, no, it wasn't a          11:11:01AM
16 requirement.
17     Q    So which of those three tests did you  11:11:03AM
18 take first, the agility, medical or
19 psychological?
20     A    Oh, I don't recall.                    11:11:09AM
21     Q    Did you pass the psychological?        11:11:11AM
22     A    Yes.                                   11:11:13AM
23     Q    First time you took it?                11:11:14AM
24     A    Yes.                                   11:11:15AM
25     Q    Did you pass the medical?              11:11:15AM

GEORGE HESSE

1
2      A    Yes.                                   11:11:16AM
3      Q    First file you took it?                11:11:17AM
4      A    Yes.                                   11:11:18AM
5      Q    Did you pass the agility?              11:11:18AM
6      A    Yes.                                   11:11:20AM
7      Q    The first time you took it?            11:11:20AM
8      A    Yes.                                   11:11:22AM
9      Q    What's your understanding of the       11:11:33AM
10 purpose of having to take an agility test?
11         MR. NOVIKOFF: Objection.               11:11:40AM
12     A    Purpose? I don't understand the        11:11:41AM
13 question.
14     Q    Who requires you to take a physical    11:11:45AM
15 agility test prior to going to the academy?
16         MR. NOVIKOFF: Objection.               11:11:50AM
17     A    I believe it's Civil Service.          11:11:50AM
18     Q    Do you understand why you have to take 11:11:52AM
19 an agility test prior to going to the academy?
20         MR. CONNOLLY: Objection.               11:11:58AM
21         MR. NOVIKOFF: Objection.               11:11:58AM
22     A    No, I don't.                           11:11:59AM
23     Q    Do you know the reason for it?         11:12:00AM
24     A    No.                                    11:12:01AM
25         MR. NOVIKOFF: Objection.               11:12:03AM

GEORGE HESSE

1
2  BY MR. GOODSTADT:                              11:12:03AM
3      Q    How about the medical test, do you     11:12:03AM
4  know the reason why you have to take a medical
5  test?
6          MR. NOVIKOFF: Objection.               11:12:07AM
7      A    I guess they want to know if you're    11:12:07AM
8  physically able to handle the physical training
9  part of being a police officer. That I can
10 understand.
11     Q    How about the psychological, do you    11:12:14AM
12 know why you need to take a psychological test
13 prior to going to the academy?
14         MR. NOVIKOFF: Objection.               11:12:21AM
15         MR. CONNOLLY: Objection.               11:12:21AM
16     A    Well, as a police officer, I'm sure    11:12:22AM
17 you're going to see a lot of bad things. They
18 want to make sure you can handle it, I guess.
19     Q    At the time, you didn't need a         11:12:29AM
20 polygraph; is that correct?
21         MR. NOVIKOFF: Objection.               11:12:29AM
22     A    That's correct.                        11:12:30AM
23     Q    Did there come a point in time where a 11:12:29AM
24 polygraph was a requirement to be certified as a
25 police officer in Suffolk County?

GEORGE HESSE

1
2      A    I believe there was.                   11:12:34AM
3          MR. NOVIKOFF: Objection.               11:12:39AM
4          MR. CALLAHAN: Objection.               11:12:43AM
5          MR. CONNOLLY: Wait a second before     11:12:44AM
6  you answer. This way, if anyone is going to
7  object, we can get it on the record.
8  BY MR. GOODSTADT:                              11:13:11AM
9      Q    At the time that you went to the       11:13:11AM
10 academy, there was no requirement from Suffolk
11 County Civil Service to take a polygraph,
12 correct?
13         MR. NOVIKOFF: Objection.               11:13:19AM
14     A    Correct.                               11:13:20AM
15     Q    Did there come a point in time where   11:13:22AM
16 that requirement was put into place by Suffolk
17 County Civil Service?
18         MR. NOVIKOFF: Objection.               11:13:28AM
19     A    I believe so.                          11:13:29AM
20     Q    Do you know when that happened?        11:13:30AM
21     A    No.                                    11:13:33AM
22     Q    Do you know approximately what year it 11:13:33AM
23 was?
24     A    No.                                    11:13:35AM
25     Q    Do you know the reason why a potential 11:13:36AM

21 (Pages 81 to 84)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 85

GEORGE HESSE

1     GEORGE HESSE
2  police officer needs to take a polygraph to be
3  certified in Suffolk County.
4        MR. CONNOLLY: Objection.        11:13:47AM
5        MR. NOVIKOFF: Objection.        11:13:48AM
6   A  I don't know why.              11:13:49AM
7   Q  Do you know whether those tests are   11:13:50AM
8  required by Civil Service law?
9        MR. NOVIKOFF: Objection.        11:13:54AM
10  A  No.  I don't know if they're required. 11:13:56AM
11  Q  You don't know one way or the other?  11:13:57AM
12  A  No.                            11:14:00AM
13  Q  How about a background test, did you   11:14:01AM
14  have to go through a background check?
15  A  Yes.                          11:14:05AM
16  Q  Is that a Civil Service requirement?  11:14:06AM
17        MR. NOVIKOFF: Objection.        11:14:08AM
18  A  You know, I don't know.          11:14:10AM
19  Q  How about now?  Do you know if a      11:14:12AM
20  background check is required to be certified as
21  a police officer in Suffolk County?
22        MR. NOVIKOFF: Objection.        11:14:21AM
23        MR. CALLAHAN: Objection.        11:14:22AM
24  A  I don't know.                  11:14:23AM
25  Q  Have you ever worked any other jobs   11:14:28AM

Page 86

1     GEORGE HESSE
2  during your employment at Ocean Beach?
3   A  Yes.                          11:14:31AM
4   Q  What other jobs have you worked while  11:14:32AM
5  employed as an Ocean Beach police officer?
6   A  I worked part-time for the Town of    11:14:36AM
7  Islip with their harbor police unit.
8   Q  When did you do that?          11:14:44AM
9   A  I may have started there in '94 or '95 11:14:49AM
10  at some point, and then I took a leave of
11  absence for a little while from that job and
12  then I went back.  I don't remember the exact
13  year I went back.  I'd have to look at some
14  records or something.
15  Q  Did you have any other jobs other than  11:15:13AM
16  for the part-time Town of Islip Harbor Police
17  job while you were employed by Ocean Beach?
18  A  I worked with a local carpenter for a  11:15:21AM
19  little while in Ocean Beach.
20  Q  Who was that?                  11:15:25AM
21  A  His name was Tommy or Thomas Nolter,  11:15:26AM
22  N-O-L-T-E-R.
23  Q  What years did you do that?      11:15:32AM
24  A  I believe it was '95 through '97.    11:15:35AM
25  Q  Did he pay you to do that?        11:15:41AM

Page 87

1     GEORGE HESSE
2   A  Yes.                          11:15:43AM
3   Q  Did you pay taxes on that money?    11:15:44AM
4   A  No, I believe it was cash.        11:15:46AM
5   Q  I just want to -- just so I'm clear.  11:15:58AM
6  I know that it was cash, but did you declare it
7  on your tax returns that you made that cash?
8   A  No.                          11:16:07AM
9   Q  How come?                    11:16:07AM
10        MR. CONNOLLY: Objection.        11:16:08AM
11        You can answer.              11:16:10AM
12  A  I don't recall why I didn't, but I    11:16:14AM
13  didn't.
14  Q  Have you ever been disciplined in your 11:16:22AM
15  employment at Ocean Beach?
16        MR. NOVIKOFF: Objection.        11:16:26AM
17  A  No.                          11:16:27AM
18  Q  Ever been suspended?          11:16:30AM
19  A  No.                          11:16:32AM
20  Q  Do you know who F. Ethan Repp is?    11:16:33AM
21  A  Yes.                          11:16:39AM
22  Q  Who is that?                  11:16:39AM
23  A  He was, I think, a superintendent of  11:16:40AM
24  the village for a short period.
25  Q  Did you ever have any interaction with 11:17:13AM

Page 88

1     GEORGE HESSE
2  Mr. Repp?
3   A  Yes.                          11:17:15AM
4   Q  And what interaction did you have with 11:17:16AM
5  Mr. Repp?
6   A  He was in charge of the village.      11:17:19AM
7   Q  Do you recall Mr. Repp asked you for a 11:17:21AM
8  set of keys to the barracks?
9   A  Yes, I do now.                11:17:27AM
10  Q  What do you mean, you do now?      11:17:31AM
11  A  I do remember having a slight incident 11:17:33AM
12  with him.
13  Q  And what was the slight incident you  11:17:36AM
14  had?
15  A  He wanted a key to the barracks, and I 11:17:38AM
16  refused to give him one.
17  Q  Why?                        11:17:44AM
18  A  Because the chief wasn't there to    11:17:44AM
19  authorize me to give him a key.
20  Q  How many times did he request a key?  11:17:50AM
21  A  I don't recall.                11:17:52AM
22  Q  Do you know whether he wrote you up   11:17:56AM
23  for that?
24  A  Yes.                          11:18:01AM
25  Q  He did write you up?          11:18:02AM

22 (Pages 85 to 88)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    Yes, he did.              11:18:03AM
3    Q    So you -- do you consider that        11:18:04AM
4    discipline?
5    A    Yes.                      11:18:07AM
6    Q    So going back to my question before,   11:18:08AM
7    you actually have been disciplined, correct?
8    A    Yes.                      11:18:13AM
9    Q    Any other incidents of discipline     11:18:13AM
10   during your employment at Ocean Beach?
11   A    Not that I recall.        11:18:17AM
12       MR. NOVIKOFF: Case is over.    11:18:25AM
13       MR. GOODSTADT: What was that?    11:18:26AM
14       MR. NOVIKOFF: I'm just talking to    11:18:28AM
15   Mike.
16   BY MR. GOODSTADT:              11:18:31AM
17   Q    You were hired for a seasonal police   11:18:33AM
18   officer position, correct?
19       MR. NOVIKOFF: Objection.    11:18:38AM
20   A    Originally, yes.          11:18:39AM
21   Q    So at any point in time, did that      11:18:40AM
22   title change?
23   A    Yes.                      11:18:45AM
24   Q    When did that title change for the     11:18:46AM
25   first time?

GEORGE HESSE

1
2    A    I believe it was November of '95.      11:18:48AM
3    Q    And what did your seasonal title       11:18:53AM
4    change to in November of '95?
5    A    Full-time police officer.      11:18:56AM
6    Q    So how many seasons did you work as a  11:19:02AM
7    seasonal police officer?
8    A    Two.                      11:19:07AM
9    Q    Did you work the off season during     11:19:07AM
10   those two years?
11   A    Yes.                      11:19:10AM
12   Q    So were you a part-time police officer 11:19:11AM
13   at any point between the seasonal position when
14   you were first hired and the change to full-time
15   in '95?
16       MR. NOVIKOFF: Objection to form.   11:19:19AM
17   A    Yes.                      11:19:20AM
18   Q    What did it change to, part-time?      11:19:21AM
19   A    At that time, I didn't know.  I just   11:19:25AM
20   continued service.
21   Q    Was there a lieutenant for the         11:19:37AM
22   department at all during your employment there?
23   A    No.                       11:19:43AM
24   Q    What paperwork did you fill out when   11:19:54AM
25   you first started working there in connection

GEORGE HESSE

1
2    with your employment, when you first started
3    working at Ocean Beach or just prior to it?
4    A    Paperwork? I believe there was some  11:20:08AM
5    kind of questionnaire I had to fill out, an
6    application.
7    Q    Are you aware of something called the  11:20:13AM
8    Ocean Beach Police Department applicant
9    investigation section?
10   A    Yeah, that would be me.        11:20:18AM
11   Q    What is that?             11:20:20AM
12   A    That was just some title that I gave   11:20:21AM
13   myself because we had -- I was dealing with
14   Suffolk County at that point to process new
15   applicants that were coming in.
16   Q    When did you give yourself that title? 11:20:31AM
17   A    I don't know the date.        11:20:34AM
18   Q    Do you recall what year it was?        11:20:35AM
19   A    Maybe 2005.               11:20:40AM
20   Q    Was there an applicant investigation   11:20:44AM
21   section in Ocean Beach prior to you giving
22   yourself that title?
23   A    No.                       11:20:50AM
24   Q    Did you have any training for that?    11:20:50AM
25   A    No.                       11:20:53AM

GEORGE HESSE

1
2    Q    Is that -- was that a Civil Service    11:20:55AM
3    title?
4    A    No.                       11:20:58AM
5    Q    Did you ever alert anybody that you    11:20:59AM
6    gave yourself that title?
7    A    No.                       11:21:03AM
8    Q    Did you -- did the Board of Trustees   11:21:06AM
9    in Ocean Beach pass any resolution awarding that
10   title?
11   A    No.                       11:21:12AM
12       MR. NOVIKOFF: Objection.    11:21:13AM
13   BY MR. GOODSTADT:              11:21:13AM
14   Q    Why did you give yourself that title?  11:21:17AM
15   A    Because I was the new applicant       11:21:19AM
16   investigation unit for the Ocean Beach Police
17   Department.
18   Q    Well, who did the new applicant        11:21:24AM
19   investigations prior to you awarding yourself
20   that title?
21   A    Suffolk County PD.        11:21:30AM
22   Q    Did you alert the Suffolk County PD    11:21:32AM
23   that you now awarded yourself that title?
24   A    No.                       11:21:37AM
25   Q    What were you investigating as the     11:21:39AM

TSG Reporting - Worldwide     (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  Ocean Beach Police Department applicant
3  investigation section?
4      A    Just new police officers.        11:21:47AM
5      Q    What did you do to investigate?    11:21:49AM
6      A    I had them fill out a questionnaire.   11:21:52AM
7  It required a ton of documentation. I reviewed
8  the documents. I sent out letters to previous
9  employers that they had for responses to see
10 what their work -- you know, if they were in
11 good standing with their previous jobs. I had
12 to send out a mental health release form to the
13 New York State Department of Health Services to
14 see if they had any previous mental health
15 issues that would stop them from becoming a
16 police officer. I'm sure there's a lot of other
17 assorted things, but I don't have an application
18 in front of me to go through.
19     Q    Where did you get the questionnaire   11:22:38AM
20 that you distributed to new applicants?
21     A    Some of it was from Suffolk County PD  11:22:43AM
22 and their applicant investigation unit. They
23 sent me a copy. I went online. I found other
24 applications from other police departments that
25 I thought would help out in having people fill

GEORGE HESSE

1
2  out these applications.
3      Q    Did anyone from the county approve the  11:22:59AM
4  packet that you put together?
5      A    No.                        11:23:03AM
6      Q    Did you create the questionnaire    11:23:03AM
7  packet?
8      A    Yes.                       11:23:06AM
9      Q    Was it only distributed to new      11:23:08AM
10 applicants?
11     A    Yes.                       11:23:12AM
12     Q    Did you do a criminal background     11:23:20AM
13 check?
14     A    Yes.                       11:23:22AM
15     Q    Anything else other than what you    11:23:24AM
16 testified to and now the criminal background
17 check that you did to investigate new
18 applicants?
19     A    I don't know.                 11:23:32AM
20     Q    Did people who previously worked at   11:23:40AM
21 Ocean Beach have to go through the applicant
22 investigation section?
23     A    Current -- officers that were      11:23:47AM
24 currently employed?
25     Q    Yes.                       11:23:50AM

GEORGE HESSE

1
2      A    No.                        11:23:50AM
3      Q    Including full-time, part-time,     11:23:54AM
4  seasonal guys who had already been employed?
5      A    There was only one that had to redo   11:24:00AM
6  his application.
7      Q    Who was that?                 11:24:04AM
8      A    Ty Bacon.                    11:24:05AM
9      Q    Why did he have to redo the        11:24:05AM
10 application?
11     A    Because I believe Civil Service had   11:24:08AM
12 made a mistake with his certification to be a
13 police officer in Suffolk County, and they
14 required that he had to take the battery of
15 tests that are required before employment.
16     Q    Did Gary Bosetti have to fill it out?  11:24:27AM
17     A    Yes.                       11:24:29AM
18     Q    How come?                    11:24:30AM
19     A    Technically, he was a new hire, and he  11:24:31AM
20 had to take the polygraph. The polygraph is
21 based on the application.
22     Q    What do you mean by technically he was  11:24:40AM
23 a new hire?
24     A    Because he was hired by the village,  11:24:42AM
25 and apparently there was some sort of confusion

GEORGE HESSE

1
2  with his status to become a police officer
3  within Suffolk County; and in order to get
4  through Suffolk County Civil Service's battery
5  of tests, he had to fill out this application.
6      Q    Do you know when that was?         11:25:01AM
7      A    It might have been 2005.           11:25:02AM
8      Q    But he had worked there prior to 2005, 11:25:03AM
9  right?
10     A    Yes.                       11:25:06AM
11     Q    So he had worked there prior to      11:25:06AM
12 passing the battery of tests?
13     A    Yes.                       11:25:10AM
14     Q    Anyone else fit that same category of  11:25:10AM
15 people who had worked there prior but still
16 needed to fill out your applicant investigation
17 section report?
18     A    Yes.                       11:25:19AM
19     Q    Who else what was that?           11:25:19AM
20     A    I believe there was Rich Bosetti,    11:25:21AM
21 Tommy Shaw. I already mentioned Ty Bacon. Who
22 else at that time? There was someone that --
23 oh, John Dyer. What was his name? There was a
24 gentleman that retired from New York City PD as
25 a lieutenant. I can't think of his name. Maybe

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1  
2   there was Pat Cherry also, but he chose not to
3   resume as a police officer with Ocean Beach.
4   **Q    Pat Cherry, Sr.?            11:26:09AM**
5   A   Correct.            11:26:11AM
6   **Q    There was one other you said?      11:26:11AM**
7   A   Yeah. I can't think of his name.   11:26:13AM
8   **Q    Is there anything that would help    11:26:14AM**
9   **refresh your recollection?**
10  A   I'm sure you have a list of every    11:26:18AM
11  police officer that worked in Ocean Beach.  If
12  you give me the list, I'm sure I can find it.
13  **Q    We'll give you the list in a bit.     11:26:26AM**
14  A   Excuse me.            11:26:28AM
15  **Q    Does a police officer have to graduate 11:26:34AM**
16  **the academy prior to being certified to be a**
17  **police officer?**
18     MR. NOVIKOFF: Objection.        11:26:40AM
19  A   To my recollection, there are some   11:26:43AM
20  technicalities with that.
21  **Q    What are the technicalities?      11:26:47AM**
22  A   I believe you could be hired as a    11:26:48AM
23  police officer, but within that calendar year at
24  some point you have to graduate a police
25  academy.

GEORGE HESSE

1  
2   **Q    Okay. Any other technicalities?     11:26:57AM**
3   A   Not that I'm aware of.        11:26:59AM
4   **Q    Does it have to be the Suffolk County  11:27:00AM**
5   **police academy?**
6   A   No.            11:27:03AM
7   **Q    So it can be New York City police    11:27:03AM**
8   **academy?**
9   A   Correct.            11:27:06AM
10  **Q    It could be Nassau County police    11:27:07AM**
11  **academy?**
12  A   Correct.            11:27:11AM
13  **Q    Are there different radio codes in New 11:27:11AM**
14  **York City than Suffolk County?**
15     MR. CONNOLLY: What time frame?      11:27:17AM
16     MR. GOODSTADT: Any point in time.   11:27:18AM
17  A   Yes.            11:27:19AM
18  **Q    So why don't we focus on 2002 to 2006. 11:27:19AM**
19  **Were there different radio codes?**
20  A   I believe so.            11:27:23AM
21  **Q    Do the officers in Ocean Beach need to 11:27:25AM**
22  **know the Suffolk County radio codes?**
23  A   They should be aware of them, yes.   11:27:29AM
24  **Q    It's important that they're aware of  11:27:31AM**
25  **them?**

GEORGE HESSE

1  
2   A   Yeah, to a point.        11:27:33AM
3   **Q    Do you think it's important to the    11:27:35AM**
4   **public safety that the police officers are aware**
5   **of the radio codes?**
6      MR. NOVIKOFF: Objection to the form. 11:27:40AM
7   I don't know what you mean by public safety.
8   Are you using it in the context of a 740
9   claim or just a general definition?
10     MR. GOODSTADT: Both.        11:27:49AM
11     MR. NOVIKOFF: Objection to form.    11:27:50AM
12  A   Repeat the question.        11:27:51AM
13     MR. NOVIKOFF: Calls for a legal    11:27:53AM
14  conclusion as well.
15  BY MR. GOODSTADT:            11:27:55AM
16  **Q    Do you think it's important to the    11:27:55AM**
17  **public's safety that police officers in Ocean**
18  **Beach know the radio codes?**
19     MR. NOVIKOFF: Note my objection.    11:28:01AM
20  A   I think they should be familiarized   11:28:02AM
21  with them, yes.
22  **Q    Do you think it's important to public 11:28:05AM**
23  **safety?**
24     MR. NOVIKOFF: Note my objection.    11:28:06AM
25  A   It's not detrimental, no.      11:28:07AM

GEORGE HESSE

1  
2   **Q    It's not detrimental to public safety 11:28:09AM**
3   **for police officers --**
4   A   No.            11:28:13AM
5   **Q    You don't think it's detrimental to   11:28:13AM**
6   **the public's safety if police officers don't**
7   **know the radio codes that are being addressed to**
8   **them?**
9      MR. NOVIKOFF: Objection to the form  11:28:22AM
10  of the question.
11  BY MR. GOODSTADT:            11:28:23AM
12  **Q    Is that your testimony?        11:28:24AM**
13  A   There's more to it, but yeah.     11:28:25AM
14  **Q    What do you mean there's more to it?  11:28:27AM**
15  A   Because since 2001, FEMA has      11:28:29AM
16  established the plain-talk doctrine since 2001.
17  You say the 10 code or any code, and then you
18  say what the actual call is.
19  **Q    And that's in place in Ocean Beach?   11:28:46AM**
20  A   That's in place, correct.      11:28:48AM
21  **Q    What's the sense of having a radio    11:28:55AM**
22  **code if you're doing the public talk now?**
23     MR. NOVIKOFF: Objection to the form  11:28:59AM
24  of the question.
25     MR. CONNOLLY: Objection. You can    11:29:02AM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 101

GEORGE HESSE

1    answer.
2    A    Repeat that.         11:29:05AM
3    Q    Yeah.  Why would you need a radio code 11:29:06AM
4  if you have a public-talk system?
5         MR. NOVIKOFF:  Objection to the form. 11:29:13AM
6    A    To tell you the truth, at this point I 11:29:14AM
7  don't know why.
8    Q    At any point in time, did you know    11:29:17AM
9  why?
10        MR. NOVIKOFF:  Objection to form.    11:29:20AM
11   A    I have an opinion.        11:29:21AM
12   Q    What's your opinion?           11:29:22AM
13   A    My opinion was it's to shorten    11:29:23AM
14  communications on the radio.
15   Q    I'm saying if you have -- why would   11:29:26AM
16  you still need radio codes since 2001 if you're
17  required to also say public talk?
18        MR. NOVIKOFF:  Objection as to form. 11:29:37AM
19  Foundation.
20        MR. CONNOLLY:  Objection.        11:29:39AM
21   A    I don't know.          11:29:40AM
22        MR. GOODSTADT:  And when I say "public 11:29:42AM
23  talk," I mean plain talk.  I don't know if
24  that's the basis of the objection.  That's

Page 102

GEORGE HESSE

1    what I mean.
2  BY MR. GOODSTADT:            11:29:49AM
3    Q    I'm assuming you know understood what 11:29:49AM
4  I meant, correct?
5         MR. CONNOLLY:  Why don't we repeat the 11:29:52AM
6    question using plain talk.
7    A    I don't recall.           11:29:56AM
8    Q    Since 2001, there's a plain talk     11:29:57AM
9  doctrine, correct?
10   A    Yes.                11:30:01AM
11   Q    So when a radio code is sent over the 11:30:01AM
12  radio, they say, you know, 10/1 officer in need
13  of -- you know, officer's life in danger.  Is
14  that what they say, something like that?
15        MR. NOVIKOFF:  Objection.        11:30:14AM
16  BY MR. GOODSTADT:            11:30:15AM
17   Q    Is that what you mean by public talk? 11:30:16AM
18        MR. NOVIKOFF:  Objection.        11:30:19AM
19   A    I think everybody knows what a 10/1   11:30:19AM
20  is.  I don't care where you come from.  But you
21  could tell from somebody's tone of voice on the
22  radio that they need assistance.
23   Q    What do you mean by everyone knows    11:30:31AM
24  what a 10/1 is?

Page 103

GEORGE HESSE

1    A    Everybody knows what a 10/1 is on this 11:30:34AM
2  job.
3    Q    Isn't it true that Arnold Hardman    11:30:38AM
4  failed to respond to a 10/1 by Nofi?
5         MR. NOVIKOFF:  Objection.  Leading.  11:30:46AM
6  Foundation.  Form.
7    A    No.                11:30:50AM
8    Q    It's not true?            11:30:51AM
9    A    I don't believe so.        11:30:53AM
10   Q    Nofi never complained to you that     11:30:57AM
11  Hardman didn't know what the code was, he
12  thought it was a threat to him?
13        MR. NOVIKOFF:  Objection.  Leading.  11:31:05AM
14  Form.
15   A    No.                11:31:06AM
16   Q    Since 2001 in Ocean Beach, do all    11:31:12AM
17  radio codes that have been sent out over the
18  radio include the code and then the plain talk?
19        MR. NOVIKOFF:  Objection.  Form.    11:31:21AM
20  Foundation.
21   A    Repeat the question, please.       11:31:23AM
22   Q    Yeah.  Since 2001, when FEMA put in   11:31:25AM
23  their plain talk doctrine, do all radio codes
24  that are sent to the Ocean Beach police officers

Page 104

GEORGE HESSE

1    over the radio include both the code and the
2  plain talk?
3    A    Yes.                11:31:37AM
4         MR. NOVIKOFF:  Objection.  Is the    11:31:38AM
5    question is that a requirement or does he
6    know if every single one that has been
7    transmitted even outside his presence had
8    that?
9  BY MR. GOODSTADT:            11:31:46AM
10   Q    Well, have you ever heard one that was 11:31:47AM
11  transmitted without the plain talk?
12   A    No.                11:31:51AM
13   Q    Just going back.  You don't recall    11:31:55AM
14  Nofi complaining to you that Hardman didn't
15  respond to his 10/1?
16        MR. CONNOLLY:  Objection.        11:32:02AM
17   A    No.                11:32:02AM
18        MR. NOVIKOFF:  Just note my objection 11:32:08AM
19  to that last question.
20  BY MR. GOODSTADT:            11:32:22AM
21   Q    We discussed before that there was a  11:32:23AM
22  battery of tests that you have to pass before
23  going to the police academy to be certified as a
24  police officer.

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    Who in Ocean Beach since 2000 has been    11:32:30AM
3 charged with ensuring that the officers who are
4 hired have actually passed those tests?
5        MR. NOVIKOFF: Objection. Foundation. 11:32:39AM
6 Form.
7        MR. CONNOLLY: Time frame.    11:32:43AM
8    A    Since 2000?        11:32:45AM
9    Q    Since 2000, that's the time frame.    11:32:45AM
10   A    Since 2000 till the present?        11:32:48AM
11   Q    Yes.        11:32:50AM
12   A    From 2000 through 2006 would be Ed   11:32:51AM
13 Paradiso. From 2006 till present would be me.
14       MR. GOODSTADT:  Okay, we can --    11:32:59AM
15       THE VIDEOGRAPHER: That is the end of 11:33:01AM
16 Tape Number 1.
17       The time is now 11:33 a.m. We are now 11:33:03AM
18 off the record.
19       (Whereupon, a discussion was held off 11:33:07AM
20 the record.)
21       THE VIDEOGRAPHER: This is the start   11:49:25AM
22 of Tape Number 2.
23       The time is now 11:49 a.m. We are now 11:49:27AM
24 back on the record.
25

GEORGE HESSE

1
2 BY MR. GOODSTADT:                11:49:31AM
3    Q    Sir, before we went off the record,   11:49:31AM
4 I'd asked you a question about jobs that you had
5 while you were employed by Ocean Beach, and you
6 told me about a harbor job and you told me about
7 a job with a carpenter, correct?
8    A    Yes.                11:49:46AM
9    Q    Did you also work for Ian Levine at   11:49:47AM
10 Sky Cable?
11   A    Yes.                11:49:51AM
12   Q    And when did you work for Ian Levine   11:49:51AM
13 at Sky Cable?
14   A    I believe I worked for him from -- I'm 11:50:00AM
15 really going to be guessing, but maybe '97
16 through a little bit of 2000. I'm not real sure
17 exactly what the dates are.
18   Q    And did he pay you for that work?    11:50:18AM
19   A    Yes.                11:50:19AM
20   Q    Did you pay taxes on the pay that you   11:50:20AM
21 received from Mr. Levine?
22   A    No.                11:50:24AM
23   Q    So he paid you cash as well?        11:50:24AM
24   A    Yes.                11:50:26AM
25   Q    And you didn't declare that on your   11:50:26AM

GEORGE HESSE

1
2 income tax returns?
3    A    No.                11:50:29AM
4    Q    How come?            11:50:30AM
5    A    Just didn't.            11:50:32AM
6        MR. NOVIKOFF: Objection.        11:50:35AM
7 BY MR. GOODSTADT:                11:50:36AM
8    Q    So other than for the Sky Cable job,   11:50:39AM
9 the carpenter job and the harbor job, did you
10 have any other jobs while you were employed by
11 Ocean Beach?
12   A    In the beginning, I worked for the   11:50:48AM
13 deli, I guess from '93 to -- from '93 to
14 somewhere in '95 maybe.
15   Q    That same deli you had worked at    11:50:59AM
16 beforehand?
17   A    I worked at a couple of different   11:51:02AM
18 delis, yes.
19   Q    Is Ian Levine a resident of Ocean   11:51:10AM
20 Beach?
21       MR. NOVIKOFF: Objection. Form.    11:51:13AM
22 Foundation.
23   A    Yes.                11:51:15AM
24   Q    Where is his home or property?    11:51:16AM
25   A    I'm trying to think of the exact   11:51:23AM

GEORGE HESSE

1
2 address. He owns a home with his wife on Ocean
3 Breeze. I don't know the exact address.
4    Q    Have you ever been to his home?    11:51:33AM
5    A    Yes.                11:51:35AM
6    Q    Does he live there full time in Ocean 11:51:36AM
7 Beach?
8    A    He does, yes.            11:51:39AM
9    Q    How many times have you been to his   11:51:40AM
10 house?
11   A    Numerous times.            11:51:45AM
12   Q    Ever been there on non-police        11:51:47AM
13 business?
14   A    Yes.                11:51:50AM
15   Q    Social visits?            11:51:51AM
16   A    Once or twice, yes.            11:51:52AM
17   Q    Are you friends with Ian Levine?    11:51:54AM
18   A    We're acquaintances.            11:51:58AM
19   Q    Now, you testified before about your   11:52:01AM
20 harbor job. Who did you report to in your
21 harbor job?
22   A    Al Loeffler. He was the chief.    11:52:06AM
23   Q    He was the chief. What was the title 11:52:09AM
24 there?
25       MR. NOVIKOFF: His title or    11:52:12AM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 109

```
1            GEORGE HESSE
2    Mr. Loeffler's?
3    BY MR. GOODSTADT:              11:52:15AM
4        Q   What was Mr. Loeffler's title there?  11:52:15AM
5        A   He was chief, but his exact Civil   11:52:18AM
6    Service title, I don't know.
7        Q   But you called him chief?       11:52:21AM
8        A   I called him chief on occasion, yes.  11:52:23AM
9        Q   You reported to him at that job?   11:52:29AM
10       A   Yes.                   11:52:32AM
11       Q   Did he work as a police officer on  11:52:32AM
12   Ocean Beach at any time?
13       A   Yes.                   11:52:36AM
14       Q   When did he work as an officer on  11:52:37AM
15   Ocean Beach?
16       A   From 1973 till maybe 2002 or '3 or '4.  11:52:40AM
17   I don't know.
18       Q   Did he report to you in his job as a  11:52:54AM
19   police officer in Ocean Beach?
20       A   At some point, yes.        11:52:59AM
21       Q   At the same time you had the harbor  11:53:01AM
22   job and you were reporting to him, was he also
23   reporting to you in the beach job?
24       A   There was a time, yes.      11:53:09AM
25       Q   Is he related to Mayor Joe Loeffler at 11:53:10AM
```

Page 110

```
1            GEORGE HESSE
2    all?
3        A   Yes.                   11:53:14AM
4        Q   What's the relationship?     11:53:15AM
5        A   Brothers.              11:53:17AM
6        Q   And how long did you work the harbor  11:53:24AM
7    job? When did you stop working there?
8        A   I believe I started somewhere around  11:53:28AM
9    the end of '94, maybe somewhere in '95.  I
10   worked maybe two, three years, at the most.
11   Then I took a leave for some time, and then I
12   went back maybe 2002.  I'm not real sure.
13       Q   2002 until when?           11:53:52AM
14       A   Until I got indicted.       11:53:53AM
15       Q   And what happened when you got     11:54:00AM
16   indicted?
17       A   March 27th, I got a phone call from  11:54:03AM
18   Bob Scroi, and I was told I was suspended.
19       Q   Who is Bob Scroi?          11:54:10AM
20       A   He is now the current chief of the   11:54:12AM
21   Islip harbor police.
22       Q   When did Allen Loeffler stop being the 11:54:16AM
23   chief?
24       A   It's possible 2005.         11:54:20AM
25       Q   After he had left the Ocean Beach   11:54:24AM
```

Page 111

```
1            GEORGE HESSE
2    police force?
3        A   He may have stayed on for a short   11:54:28AM
4    period after he left the town job.  I really
5    don't know.
6        Q   Who is Bob Scroi?  Is that the name  11:54:39AM
7    you used?
8        A   Uh-huh.                11:54:44AM
9        Q   Who is he?              11:54:44AM
10       A   He's the chief of the Islip harbor   11:54:44AM
11   police now.
12       Q   And he told you that you were       11:54:47AM
13   suspended when you got indicted?
14       A   Yes.                   11:54:51AM
15       Q   Are you still currently suspended?   11:54:51AM
16       A   Yes.                   11:54:53AM
17       Q   Have you applied to get the job back  11:54:54AM
18   there at the harbor?
19       A   We've spoken about it, yes.     11:54:58AM
20       Q   You spoke to who about it?       11:55:01AM
21       A   Bob Scroi.             11:55:03AM
22       Q   What was the substance of the      11:55:04AM
23   conversation?
24       A   He is -- he said he was looking into  11:55:06AM
25   it.  I believe public safety just got a new
```

Page 112

```
1            GEORGE HESSE
2    commissioner; and I met the commissioner, and we
3    just talked about possibly coming back.  Nothing
4    solid, but we talked about possibly coming back
5    to work.
6        Q   Has a decision been made one way or  11:55:23AM
7    the other?
8        MR. NOVIKOFF:  Objection.       11:55:28AM
9        A   Not that I'm aware of.      11:55:29AM
10       Q   Did you fill out any paperwork to get  11:55:30AM
11   the job back?
12       A   No.                   11:55:33AM
13       Q   I just want to go back to the FEMA   11:55:34AM
14   doctrine, because I was a little bit confused as
15   to what it was.  The FEMA doctrine, the plain --
16   what is it, the plain talk?
17       A   It's the plain-talk doctrine.    11:55:43AM
18       Q   The plain-talk doctrine?       11:55:45AM
19       A   Uh-huh.                11:55:48AM
20       Q   Is that -- the plain-talk doctrine,  11:55:48AM
21   does that apply to interagency transmissions or
22   is that also within an agency that the
23   plain-talk doctrine applies to?
24       MR. NOVIKOFF:  Objection to form.   11:56:00AM
25       A   It's my understanding it applies to   11:56:00AM
```

28  (Pages 109 to 112)

053690b6-a7be-44d9-9835-90b3e21fffd8

1        GEORGE HESSE
2   all jobs now.
3        Q   And when did it apply to all jobs?   11:56:03AM
4   When did that start?
5        MR. NOVIKOFF: Objection to form.   11:56:07AM
6        A   I don't know the exact date.   11:56:08AM
7        Q   Had it always applied to all jobs?   11:56:10AM
8        MR. NOVIKOFF: Objection.   11:56:13AM
9        A   Not that I'm aware of.   11:56:14AM
10       Q   Well, I guess I'm trying to just get a   11:56:18AM
11   timeline.
12        It was put in sometime after   11:56:21AM
13   September 11th, correct?
14        A   Correct.   11:56:25AM
15        Q   2001?   11:56:26AM
16        A   Correct.   11:56:26AM
17        Q   Then when it was first put in, did it   11:56:27AM
18   apply to all jobs or did it originally just
19   apply interagency?
20        A   I don't know.   11:56:36AM
21        Q   And when Suffolk County would relay a   11:56:39AM
22   code over the radio since 2001 to Ocean Beach
23   radios, they gave the code and plain talk or
24   just the code?
25        MR. NOVIKOFF: Objection. Form.   11:56:53AM

1        GEORGE HESSE
2   Foundation.
3        A   They do now.   11:56:59AM
4        Q   When did that start?   11:57:00AM
5        MR. NOVIKOFF: Objection.   11:57:02AM
6        A   I don't recall.   11:57:03AM
7        Q   Was it within the last year?   11:57:04AM
8        MR. NOVIKOFF: Objection.   11:57:06AM
9        A   I don't recall.   11:57:09AM
10       Q   How about in '02, did they do it in   11:57:09AM
11   '02?
12        MR. NOVIKOFF: Objection.   11:57:13AM
13        A   I don't know.   11:57:13AM
14        Q   '03?   11:57:14AM
15        A   I don't know.   11:57:15AM
16        A   I don't know.   11:57:16AM
17        Q   '04?   11:57:16AM
18        A   I don't know.   11:57:18AM
19        A   I don't know.   11:57:18AM
20        Q   When you sent a code over the radio in   11:57:19AM
21   '02, did you do the radio code and the plain
22   talk or just the radio code?
23        A   As far back as I can remember in Ocean   11:57:30AM
24   Beach, we've always put a 10 code over and
25   pretty much said what it was afterwards, so --

1        GEORGE HESSE
2        Q   What do you mean by "pretty much"?   11:57:40AM
3        A   It's pretty much been that way for a   11:57:42AM
4   long time for Ocean Beach.
5        Q   How long is a long time?   11:57:45AM
6        A   It could be from the beginning of when   11:57:49AM
7   I started working there.
8        Q   Okay. Have you ever transmitted a 10   11:57:53AM
9   code without plain talk?
10        A   Yeah. Sure.   11:58:00AM
11        Q   Since 2001?   11:58:01AM
12        A   Sure.   11:58:02AM
13        Q   Were you in violation of the FEMA   11:58:05AM
14   doctrine?
15        A   I may have been.   11:58:07AM
16        Q   But you don't know one way or of the   11:58:09AM
17   other?
18        A   No.   11:58:11AM
19        Q   And before, I think you defined what a   11:58:13AM
20   seasonal police officer was in Suffolk County.
21   Could you define what a part-time police officer
22   is in Suffolk County?
23        MR. CALLAHAN: Objection to form.   11:58:24AM
24        MR. NOVIKOFF: Objection.   11:58:26AM
25        MR. CONNOLLY: Objection.   11:58:26AM

1        GEORGE HESSE
2        A   Can I answer?   11:58:29AM
3        MR. CONNOLLY: Yes.   11:58:30AM
4        A   Part-time status, it could be year   11:58:33AM
5   round. It could be -- you know, this is not my
6   definition, but it's the definition, I believe,
7   that Civil Service puts out. It's my
8   understanding that a part-time police officer
9   does not work more than 20 hours a week. It
10   could be year round or it could be from two
11   weeks after Labor Day to two weeks prior to
12   Memorial Day.
13        Q   Can a seasonal officer work after the   11:58:59AM
14   period two weeks after Labor Day through the
15   period of two weeks before Memorial Day, meaning
16   in the off season?
17        A   No.   11:59:09AM
18        MR. NOVIKOFF: Objection to the form   11:59:10AM
19   of that question.
20   BY MR. GOODSTADT:   11:59:12AM
21        Q   So was Ed Carter a part-time officer   11:59:12AM
22   or a seasonal officer?
23        MR. CONNOLLY: When?   11:59:16AM
24        MR. GOODSTADT: At any point in time   11:59:17AM
25   during his employment.

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 117

GEORGE HESSE

1         GEORGE HESSE
2         MR. NOVIKOFF: Objection.        11:59:21AM
3    A   I don't know.                    11:59:21AM
4    Q   Well, did Ed ever work on the off   11:59:23AM
5  season --
6    A   Sure.                            11:59:27AM
7    Q   -- based on the definition we had?   11:59:27AM
8        So he couldn't have been a seasonal   11:59:29AM
9  officer, according to your definition and
10  understanding, correct?  So the fact that he
11  worked -- the fact that he worked during the off
12  season based on the definition that you've given
13  us, he couldn't have been a seasonal officer,
14  correct?  He had to have been part-time?
15       MR. NOVIKOFF: Objection to form.    11:59:49AM
16   A   His title is not controlled by me, so   11:59:49AM
17  I don't know what his title was.
18   Q   Well, his title is controlled by what?   11:59:54AM
19       MR. NOVIKOFF: Objection to form.    11:59:57AM
20  Calls for a legal conclusion.
21  BY MR. GOODSTADT:                     12:00:01PM
22   Q   What's your understanding of what his   12:00:01PM
23  title is controlled by?
24       MR. NOVIKOFF: Objection to form.    12:00:05PM
25   A   Well, my understanding is that the   12:00:06PM

Page 118

GEORGE HESSE

1         GEORGE HESSE
2  village, the village office, somebody within the
3  village office has to fill out some sort of
4  documentation changing his status or any
5  officer's status.
6    Q   Just for your understanding, if he was   12:00:23PM
7  working in the off season, then he couldn't have
8  been properly classified as a seasonal officer;
9  is that your understanding?
10       MR. NOVIKOFF: Objection.          12:00:35PM
11   A   His classification could have been   12:00:42PM
12  still seasonal.  I really don't know.
13   Q   But then he's working outside of   12:00:46PM
14  class, correct?
15       MR. NOVIKOFF: Objection.          12:00:50PM
16   A   Oh, yeah.  Yes.                   12:00:51PM
17   Q   So just so I'm clear.  I just want to   12:00:54PM
18  make sure I'm clear in my understanding.  So
19  either he was classified as part-time or he was
20  misclassified if he was classified as seasonal,
21  correct?
22       MR. NOVIKOFF: Objection to form.    12:01:05PM
23       MR. CALLAHAN: Objection to form.    12:01:07PM
24       MR. CONNOLLY: Objection.          12:01:08PM
25   A   Yes.                             12:01:08PM

Page 119

GEORGE HESSE

1         GEORGE HESSE
2    Q   Okay.  So there came a point in time   12:01:09PM
3  that you testified you became a full-time
4  officer, correct?
5    A   Yes.                             12:01:18PM
6    Q   Was there any kind of canvass letter   12:01:19PM
7  or list that you had to come off of to get that
8  position?
9    A   Yes.                             12:01:24PM
10   Q   And you were on the Ocean Beach list;   12:01:25PM
11  is that how it works?
12   A   It's a preferred list, yes.        12:01:29PM
13   Q   What do you mean by "preferred list"?   12:01:30PM
14   A   It's a residents list.             12:01:32PM
15   Q   So the residents of Ocean Beach get   12:01:38PM
16  preference over other people who may be
17  eligible?
18   A   Yes.                             12:01:44PM
19   Q   Is that one of the reasons why you use   12:01:45PM
20  the Ocean Beach residence as an address?
21       MR. NOVIKOFF: Objection.  Asked and   12:01:51PM
22  answered in the first 10 minutes of the
23  deposition.
24       MR. CONNOLLY: Objection.          12:01:54PM
25   A   Repeat the question.             12:01:56PM

Page 120

GEORGE HESSE

1         GEORGE HESSE
2    Q   Is one of the reasons why you used   12:01:57PM
3  Ocean Beach as your address to get onto that
4  preferred list?
5        MR. NOVIKOFF: Objection.          12:02:04PM
6    A   At the time, yes.                 12:02:05PM
7    Q   How long did you hold the title of   12:02:15PM
8  full-time police officer?
9    A   From November of '95 till present.   12:02:21PM
10   Q   So your title is police officer?   12:02:30PM
11   A   Correct.                         12:02:31PM
12   Q   That's the same title Ed Carter had   12:02:32PM
13  when he worked there?
14       MR. NOVIKOFF: Objection.          12:02:36PM
15   A   No.                              12:02:36PM
16   Q   He wasn't a police officer?        12:02:37PM
17   A   Yes.                             12:02:38PM
18   Q   Well, you're full-time, he's        12:02:40PM
19  part-time?
20   A   That's correct.                  12:02:43PM
21       MR. NOVIKOFF: Objection.          12:02:44PM
22  BY MR. GOODSTADT:                     12:02:44PM
23   Q   And you had the same title as the   12:02:45PM
24  other full-time police officers in Ocean Beach?
25   A   Yes.                             12:02:49PM

30 (Pages 117 to 120)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 121

GEORGE HESSE

1
2       Q    Did you ever get the title of        12:02:50PM
3    sergeant?
4       A    Yes.                        12:02:52PM
5       Q    When was that?                 12:02:52PM
6       A    I believe in 2001.             12:02:53PM
7       Q    When did you first request the title  12:02:55PM
8    of sergeant?
9       A    Maybe in 1999.                12:03:04PM
10      Q    And how did you go about requesting   12:03:05PM
11   the title of sergeant?
12      A    I believe I wrote a memo to Ed       12:03:09PM
13   Paradiso.
14      Q    When was the last time you looked at  12:03:12PM
15   that memo?
16      A    I may have looked at it yesterday. I  12:03:19PM
17   didn't read it. I just kind of looked at it. I
18   just knew what it was.
19      Q    To prepare for today's deposition, you  12:03:24PM
20   looked at it?
21      A    Yes.                        12:03:27PM
22      Q    Where did you look at it?           12:03:27PM
23      A    In Mr. Connolly's office in        12:03:28PM
24   Westchester.
25           MR. GOODSTADT: Please mark that as    12:03:37PM

Page 122

GEORGE HESSE

1
2    Hesse 1.
3           (Whereupon, Bates document 3856 was   12:03:40PM
4    marked as Plaintiff's Exhibit 1 for
5    identification, as of this date.)
6           MR. NOVIKOFF: This is Hesse 1?       12:04:09PM
7           MR. GOODSTADT: It is.             12:04:10PM
8       I've placed in front of Mr. Hesse       12:04:15PM
9    what's now been marked as Hesse 1. It's a
10   one-page exhibit bearing Bates No. 3856.
11       (Handing.)
12   BY MR. GOODSTADT:                     12:04:22PM
13      Q    Mr. Hesse, is this the memo that     12:04:22PM
14   you're referring to that you wrote to Paradiso
15   in '99?
16      A    I believe so.                 12:04:31PM
17      Q    Is that your signature on the bottom?  12:04:31PM
18      A    Yes.                        12:04:33PM
19      Q    And do you see on the bottom under    12:04:33PM
20   your typed signature line it says "PO103." what
21   does that stand for?
22      A    Police officer.                12:04:40PM
23      Q    Right.                      12:04:43PM
24      A    Then my shield number is 103.       12:04:43PM
25      Q    And what is the slash 8900?         12:04:45PM

Page 123

GEORGE HESSE

1
2       A    And that would be our command number.  12:04:48PM
3       Q    What do you mean by command number?   12:04:50PM
4       A    It's a number designating our police  12:04:52PM
5    department within the County of Suffolk.
6       Q    And you see the CC on the bottom,     12:04:58PM
7    Chief Paradiso correspondence file and original
8    to your personnel file.
9           Do you see that?                12:05:04PM
10      A    Yes.                        12:05:05PM
11      Q    Do you know who wrote that?         12:05:05PM
12      A    No.                         12:05:06PM
13      Q    That's not your handwriting?        12:05:07PM
14      A    No.                         12:05:08PM
15      Q    And then you see a stamp on the bottom  12:05:09PM
16   that says "Received February 18th, 1999."
17           Do you see that?               12:05:13PM
18      A    Yes.                        12:05:14PM
19      Q    Do you know who stamped that?        12:05:14PM
20      A    No.                         12:05:16PM
21      Q    How did you deliver this to the chief?  12:05:16PM
22      A    I may have just left it on his desk.  12:05:20PM
23      Q    Was this the letterhead of Ocean Beach  12:05:23PM
24   at the time?
25      A    At the time, yes.              12:05:27PM

Page 124

GEORGE HESSE

1
2       Q    Do you know who created the letterhead  12:05:28PM
3    for Ocean Beach?
4       A    No.                         12:05:31PM
5       Q    Okay. And now you asked for a       12:05:32PM
6    provisional appointment to sergeant.
7           Do you see that?                12:05:37PM
8       A    Yes.                        12:05:38PM
9       Q    What does that mean, a provisional    12:05:38PM
10   appointment?
11      A    I believe that you could be appointed  12:05:42PM
12   provisionally to a certain position pending the
13   taking of the next scheduled test.
14      Q    What's the basis of your belief on    12:05:49PM
15   that?
16      A    Somebody, I think, told me that.     12:05:53PM
17      Q    Do you know who told you that?       12:05:55PM
18      A    I don't recall.                12:05:56PM
19      Q    And so as of 1999, you had not taken   12:05:59PM
20   the sergeant's test?
21      A    I don't recall. I may have tried to   12:06:07PM
22   have taken the test at one time.
23      Q    At one time prior to '99?           12:06:11PM
24      A    It's possible. I don't know.         12:06:13PM
25      Q    How many times have you taken the     12:06:14PM

053690b6-a7be-44d9-9835-90b3e21fffd8

1           GEORGE HESSE
2    sergeant's test?
3        A   I was assigned to take it four times.  12:06:17PM
4    I believe I took it three times.  I was a
5    no-show on one other.
6        Q   Did you pass it on any of the three   12:06:30PM
7    times you took it?
8        A   No.                    12:06:33PM
9        Q   So you failed the sergeant's test   12:06:33PM
10   three times?
11       A   Yes.                   12:06:36PM
12       Q   When was the first time you took it?  12:06:37PM
13       A   I don't recall.            12:06:38PM
14       Q   You don't recall what year it was?   12:06:39PM
15       A   No.                    12:06:41PM
16       Q   When was the second time you took it?  12:06:42PM
17       A   I don't recall.            12:06:43PM
18       Q   Do you recall when the last time you   12:06:44PM
19   took it?
20       A   I took it in June of '07.      12:06:46PM
21       Q   Do you recall what your score was?   12:06:52PM
22       A   65.                    12:06:53PM
23       Q   And what was the required score?    12:06:54PM
24       A   70.                    12:06:55PM
25       Q   Do you recall what your scores were  12:06:58PM

1           GEORGE HESSE
2    the other two times you took it?
3        A   No, I don't recall.         12:07:02PM
4        Q   Do you need to pass a sergeant's test  12:07:05PM
5    to be a sergeant?
6        MR. NOVIKOFF:  Objection.        12:07:10PM
7        MR. CONNOLLY:  Objection.        12:07:10PM
8        A   I believe so, yes.          12:07:11PM
9        Q   And what's your basis of that belief?  12:07:12PM
10       A   It's a promotional exam to sergeant.  12:07:14PM
11       Q   And then you write in your memo      12:07:19PM
12   here -- well, strike that, before the memo.
13       When were you a no-show to the test?  12:07:26PM
14       A   I don't recall.            12:07:29PM
15       Q   Do you recall what year it was?     12:07:31PM
16       A   Nope.                  12:07:32PM
17       Q   Why didn't you show up?       12:07:34PM
18       A   I don't recall.            12:07:40PM
19       Q   Do you have to provide a reason why   12:07:44PM
20   you don't show up to the county?
21       A   No.                    12:07:47PM
22       Q   You don't recall being out the night  12:07:53PM
23   before drinking that you didn't show up?
24       MR. NOVIKOFF:  Again, I didn't    12:07:57PM
25   understand the question.  You kind of

1           GEORGE HESSE
2    mumbled and tailed off.
3    BY MR. GOODSTADT:              12:08:02PM
4        Q   I said, you don't recall being out   12:08:02PM
5    drinking the night before that you were a
6    no-show?
7        MR. NOVIKOFF:  Objection to form.  12:08:08PM
8        MR. CONNOLLY:  Objection.        12:08:09PM
9        A   No.                    12:08:10PM
10       Q   Did you ever report to anybody at the  12:08:10PM
11   beach the fact that you had failed the
12   sergeant's test each time?
13       A   No.                    12:08:16PM
14       Q   How were you alerted to the fact of   12:08:22PM
15   your score?  Was it posted somewhere?  Did you
16   get a letter or something?
17       MR. NOVIKOFF:  Objection.        12:08:28PM
18       A   I received a letter.         12:08:28PM
19       Q   Each time?                12:08:32PM
20       A   Yes.                   12:08:33PM
21       Q   Did you keep copies of those letters?  12:08:46PM
22       A   No.                    12:08:48PM
23       Q   Did you throw them out?        12:08:48PM
24       A   Yeah.                  12:08:49PM
25       Q   As a police officer, as a full-time   12:08:55PM

1           GEORGE HESSE
2    police officer, are there any restrictions on
3    supervisory powers that you're entitled to have?
4        MR. NOVIKOFF:  Objection to form.  12:09:05PM
5        A   Repeat the question.         12:09:15PM
6        Q   Yeah.                  12:09:16PM
7        As a full-time police officer, as   12:09:16PM
8    opposed to any of the promotional roles,
9    sergeant, lieutenant, chief, is there any
10   restriction on the supervisory power that you're
11   entitled to have?
12       MR. CALLAHAN:  Objection to form.  12:09:29PM
13       MR. CONNOLLY:  Yeah, same objection.  12:09:30PM
14       MR. NOVIKOFF:  Objection.        12:09:32PM
15       A   No.                    12:09:34PM
16       Q   So you're not aware of any       12:09:36PM
17   restrictions on powers that you can have in a
18   supervisor role?
19       MR. NOVIKOFF:  Note my objection.  12:09:42PM
20       A   No.                    12:09:43PM
21       Q   And you see in the memo, if you look  12:09:47PM
22   down on the second line --
23       A   Uh-huh.                 12:09:53PM
24       Q   -- the last word says -- that sentence  12:09:53PM
25   says, "The undersigned officer feels since I

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2  already assumed the role of a supervisor, that
3  this appointment will help the police department
4  as a whole," et cetera.
5      Do you see that line?          12:10:05PM
6  A  Yes, I do.               12:10:06PM
7  Q  What were you referring to when you   12:10:07PM
8  said "since I already assumed the role of a
9  supervisor"?
10  A  I was a full-time police officer, I   12:10:13PM
11  was a senior officer, according to being
12  full-time, and Chief Paradiso already had
13  established that I was in charge of the shifts.
14  Q  In charge of which shifts?          12:10:25PM
15  A  The shifts that I was on, working.   12:10:27PM
16  Q  Did you have a set assigned shift in   12:10:30PM
17  or around '99?
18  A  I pretty much worked the standard   12:10:35PM
19  schedule, yes.
20  Q  What standard schedule?  What's the   12:10:38PM
21  hours of that shift?
22  A  For a long time, I worked Fridays and   12:10:42PM
23  Saturdays from 9 at night until 5 in the
24  morning, and then on Sundays I worked a 4 to 12,
25  and then on Mondays and Tuesdays I worked from

GEORGE HESSE

1
2  8:00 a.m. till 4 p.m.
3  Q  Were there any other full-time   12:10:57PM
4  officers in '99 other than for you and
5  Paradiso --
6  A  No.               12:11:02PM
7  Q  -- at Ocean Beach?          12:11:02PM
8  A  No.               12:11:04PM
9  Q  And what were Paradiso's hours?   12:11:06PM
10  A  He pretty much worked straight day   12:11:09PM
11  tours. He worked, I believe, from Wednesday
12  till Sunday, 8 till 4.
13  Q  Did that ever change, those regular   12:11:24PM
14  tours for Paradiso?
15  A  At some point, yes.          12:11:29PM
16  Q  When did it change?          12:11:30PM
17      And I don't mean once when he went on leave   12:11:34PM
18  and he didn't have any more tours.  I'm talking
19  about until he went on leave.
20  A  I'm not sure of the date.  It might   12:11:41PM
21  have been 2001, 2002.
22  Q  And what did his tours change to?   12:11:45PM
23  A  He -- he was told to work the night   12:11:49PM
24  tours on Fridays and Saturdays and holiday
25  Sundays.

GEORGE HESSE

1
2  Q  Who told him that?          12:12:04PM
3  A  The mayor.  Mayor Rogers, to be exact. 12:12:05PM
4  Q  Do you know why she told him that?   12:12:09PM
5  A  Yes.               12:12:11PM
6  Q  And why did she tell him that?   12:12:11PM
7  A  It was a form of disciplinary action   12:12:15PM
8  against Ed Paradiso.
9  Q  And what was he being disciplined for? 12:12:19PM
10  A  I believe it was for double-dipping.   12:12:23PM
11  Q  And how did you learn that that was a   12:12:29PM
12  form of disciplinary action against Paradiso?
13  A  Because I knew a complaint was filed   12:12:33PM
14  against Paradiso by somebody in the village, and
15  I believe it was very slightly investigated and
16  he was switched to the night tours.
17  Q  Who filed a complaint?          12:12:50PM
18  A  I believe it was a Dale Wyckoff.   12:12:52PM
19  Q  Wyckoff?               12:12:58PM
20  A  W-Y-C-K-O-F-F.          12:13:01PM
21  Q  Is that a male or a female, Dale   12:13:06PM
22  Wyckoff?
23  A  Female.               12:13:09PM
24  Q  Any relation to Doug Wyckoff?   12:13:10PM
25  A  Yes.               12:13:13PM

GEORGE HESSE

1
2  Q  What's the relationship?          12:13:13PM
3  A  Well, there's Doug senior, who is her   12:13:14PM
4  ex-husband, and her son.
5  Q  Any relationship to a Marissa Wyckoff? 12:13:22PM
6  A  That would be her daughter.          12:13:24PM
7  Q  Marissa Wyckoff worked for you at some 12:13:25PM
8  point --
9  A  Yes.               12:13:29PM
10  Q  -- in the police department?          12:13:29PM
11      There was a Doug Wyckoff at the          12:13:39PM
12  Halloween incident, correct?
13  A  Yes.               12:13:43PM
14  Q  Was that senior or is that the son?   12:13:43PM
15  A  Senior.               12:13:46PM
16  Q  So -- and is Doug Wyckoff the father   12:13:52PM
17  of Marissa Wyckoff?
18  A  Doug senior, yes.          12:13:59PM
19  Q  How did you learn of the complaint   12:14:03PM
20  filed against Paradiso?
21  A  Dale Wyckoff told me.          12:14:10PM
22  Q  Did you ever see a copy of the   12:14:12PM
23  complaint?
24  A  No.               12:14:15PM
25  Q  And who told that you he was being -- 12:14:15PM

33 (Pages 129 to 132)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  that Paradiso was being disciplined for the
3  double-dipping allegation?
4      A   I don't recall.            12:14:22PM
5      Q   Did you speak to Mayor Rogers about   12:14:23PM
6  it?
7      A   I don't recall.            12:14:26PM
8      Q   And who performed the slight       12:14:28PM
9  investigation -- I think you called it a slight
10  investigation.  Who performed the slight
11  investigation?
12     A   It was -- I believe it was Peter Bee  12:14:36PM
13  from Bee, Ready & Fishbein.
14     Q   And how do you know that Peter Bee    12:14:45PM
15  performed this investigation?
16     A   That's what I was told.         12:14:50PM
17     Q   By who?                 12:14:51PM
18     A   I don't recall.            12:14:52PM
19     Q   Did Mayor Rogers tell you that?    12:14:52PM
20     A   I don't recall.            12:14:55PM
21     Q   Do you know what the results of the   12:14:55PM
22  investigation were?
23     A   I believe it was confirmed that he was 12:14:57PM
24  double-dipping.
25     Q   Do you know what led to that       12:15:05PM

GEORGE HESSE

1
2  conclusion?
3      A   I believe it was his time sheets in   12:15:08PM
4  Ocean Beach and his time sheets in East Islip
5  School District.
6      Q   And so he was put onto your tours or   12:15:20PM
7  at least the Friday, Saturday tours that you
8  testified to before?
9      A   Yes.                   12:15:25PM
10     Q   And you were put on different tours?   12:15:26PM
11     A   Yes.                   12:15:29PM
12     Q   What tours were you put on when that   12:15:31PM
13  happened?
14     A   I was put on the day tour, which was   12:15:33PM
15  an 8 a.m. till 4 p.m.
16     Q   Did you ever discuss this change in   12:15:40PM
17  shift with Paradiso?
18     A   Yes.                   12:15:47PM
19     Q   When?                  12:15:48PM
20     A   I'm sure right after it happened, but  12:15:51PM
21  I don't recall the date.
22     Q   Did you discuss the reasons for the   12:15:54PM
23  change in shift with Paradiso?
24     A   You know, I don't recall.      12:16:00PM
25     Q   Did you ever discuss with Paradiso the 12:16:02PM

GEORGE HESSE

1
2  alleged timer overlap or double-dipping I think
3  you called it?
4      A   I don't recall.            12:16:08PM
5      Q   You don't recall one way or the other? 12:16:09PM
6      A   No.                    12:16:11PM
7      Q   Again, just I know I asked the     12:16:14PM
8  question.  I just don't remember the question.
9           Who told you that the reason why the  12:16:18PM
10  tours were being shifted was a form of
11  discipline?
12     A   I don't recall.            12:16:23PM
13     Q   Do you have anything that would     12:16:25PM
14  refresh your recollection?
15     A   Not that I'm aware of.          12:16:27PM
16     Q   Did you ever discuss with Paradiso    12:16:28PM
17  that he was being disciplined?
18     A   I don't recall.            12:16:35PM
19     Q   Did you ever discuss with any other   12:16:35PM
20  current or former Ocean Beach police officers
21  that that shift in the tours was a form of
22  discipline for Paradiso?
23         MR. NOVIKOFF:  Objection to form.    12:16:45PM
24     A   I don't recall.            12:16:48PM
25     Q   Do you know if anything was put in his 12:16:50PM

GEORGE HESSE

1
2  personnel file reflecting his being disciplined?
3      A   I never -- I have never seen anything. 12:16:55PM
4  I don't know.
5      Q   Who made the decision to discipline   12:16:58PM
6  him in this way?
7      A   I believe it was the mayor, but     12:17:02PM
8  that's -- I'm just guessing.
9      Q   What's the basis of that belief?   12:17:07PM
10     A   She was his boss.           12:17:09PM
11     Q   Do you know who Ms. Wyckoff complained 12:17:15PM
12  to?
13         MR. CONNOLLY:  You're referring to -- 12:17:23PM
14         MR. GOODSTADT:  Dale Wyckoff, yes.  12:17:27PM
15         MR. CONNOLLY:  Right.      12:17:28PM
16     A   I believe she took her written      12:17:29PM
17  complaint and filed it with the village office
18  or the Board of Trustees.  I just don't know.
19     Q   Do you know if the Board of Trustees  12:17:36PM
20  ever discussed it?
21     A   I don't know.             12:17:39PM
22     Q   Do you know whether the Board of     12:17:42PM
23  Trustees ever voted on the issue of whether or
24  not to discipline Paradiso in the way that
25  you've testified to?

053690b6-a7be-44d9-9835-90b3e21fffd8

1              **GEORGE HESSE**
2     A   I don't know.              12:17:55PM
3     **Q   Have you ever been in a Board of    12:17:57PM**
4  **Trustees meeting?**
5     A   Yes.                       12:18:00PM
6     **Q   Are you required to go to Board of    12:18:01PM**
7  **Trustees meetings?**
8        MR. NOVIKOFF:  Objection to form.    12:18:05PM
9     A   No.                        12:18:06PM
10    **Q   So you sent this memo to Paradiso, and 12:18:14PM**
11 **the first sentence, it says, "As per our**
12 **conversation."**
13    **Do you see that?              12:18:20PM**
14    A   Yes.                       12:18:21PM
15    **Q   What did you and Paradiso discuss in  12:18:21PM**
16 **that conversation?**
17    A   I don't recall.            12:18:26PM
18    **Q   Do you recall anything that you     12:18:28PM**
19 **discussed?**
20    A   No.                        12:18:29PM
21    **Q   You don't recall whether you discussed 12:18:31PM**
22 **the actual test, the sergeant's test with**
23 **Paradiso by that time?**
24    A   I don't recall.            12:18:36PM
25    **Q   Was anything decided with respect to  12:18:38PM**

1              **GEORGE HESSE**
2  **this request for a provisional appointment in**
3  **'99?**
4     A   I don't recall.            12:18:46PM
5     **Q   Did you actually make a proposal to   12:18:47PM**
6  **the village for this position?**
7     A   I don't recall.            12:18:52PM
8     **Q   Do you have anything that would      12:18:54PM**
9  **refresh your recollection?**
10    A   There might be.  I don't know.    12:18:56PM
11    **Q   Anything that you can think of that   12:18:57PM**
12 **would refresh your recollection?**
13    A   No.                        12:19:01PM
14    **Q   Did you communicate this request with 12:19:04PM**
15 **any trustees in 1999?**
16    A   I don't recall.            12:19:11PM
17    **Q   Anything that would refresh your     12:19:11PM**
18 **recollection?**
19    A   I don't know.              12:19:13PM
20    **Q   Did you receive an appointment to the 12:19:18PM**
21 **provisional sergeant's position?**
22       MR. CALLAHAN:  Objection to form.    12:19:23PM
23       MR. NOVIKOFF:  I join in it.      12:19:25PM
24       MR. GOODSTADT:  I'll strike that.    12:19:28PM
25

1              GEORGE HESSE
2  BY MR. GOODSTADT:                  12:19:29PM
3     **Q   Did you receive a provisional       12:19:30PM**
4  **appointment to sergeant in 1999?**
5     A   No.                        12:19:34PM
6     **Q   Was this request denied?         12:19:34PM**
7     A   I believe so.              12:19:37PM
8     **Q   Who denied it?             12:19:38PM**
9     A   It may have been the chief.    12:19:40PM
10    **Q   Do you know why he denied it?     12:19:44PM**
11    A   No.                        12:19:45PM
12    **Q   Did you ever speak to him about him   12:19:45PM**
13 **denying it?**
14    A   I don't recall.            12:19:48PM
15    **Q   How did you learn that it was denied? 12:19:49PM**
16    A   I believe was told.        12:19:51PM
17    **Q   By who?                    12:19:52PM**
18    A   By the chief.              12:19:52PM
19    **Q   Did he give you the reason as to why  12:19:53PM**
20 **he was denying it?**
21    A   I don't recall.            12:19:57PM
22    **Q   You don't recall if he gave you the   12:19:57PM**
23 **reason or you don't recall what the reason was?**
24    A   I don't know.  I'm thinking there was  12:20:02PM
25 something in writing that he may have given me,

1              GEORGE HESSE
2  but I don't recall.
3     **Q   Did you keep a copy of what he gave to 12:20:17PM**
4  **you in writing?**
5     A   I don't recall.            12:20:21PM
6     **Q   Do you know if it was put in your    12:20:22PM**
7  **personnel file?**
8     A   I don't know.              12:20:24PM
9     **Q   When was the last time you looked at  12:20:25PM**
10 **your personnel file?**
11    A   Last time I looked in my personal    12:20:32PM
12 file?  You know, I don't recall.
13    **Q   Last time you looked through it, do   12:20:39PM**
14 **you recall seeing anything in writing with**
15 **respect to a denial of your request in 1999?**
16    A   No.                        12:20:46PM
17    **Q   Did you ever make a follow-up request 12:20:48PM**
18 **for that same promotion?**
19    A   I may have.                12:20:54PM
20    **Q   Do you recall actually doing it?     12:20:55PM**
21    A   I don't recall.            12:20:57PM
22       MR. GOODSTADT:  I apologize, that    12:21:23PM
23 corner's ripped.
24       (Whereupon, Bates document 3847 was   12:21:27PM
25 marked as Plaintiff's Exhibit 2 for

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 141

GEORGE HESSE

1    GEORGE HESSE
2    identification, as of this date.)
3        MR. CONNOLLY:  Andrew, is this a    12:21:49PM
4    separate exhibit or is it part --
5        MR. GOODSTADT:  It is.  This is going    12:21:53PM
6    to be Hesse 2.  It's a separate exhibit.
7        I've placed in front of Mr. Hesse    12:22:14PM
8    what's now been marked as Hesse 2.  It is a
9    one-page document that is marked Bates
10   No. 3847.  (Handing.)
11   BY MR. GOODSTADT:    12:22:25PM
12       Q    Mr. Hesse, have you ever seen this    12:22:26PM
13   document that's been marked as Hesse 2?
14       A    Yes.    12:22:30PM
15       Q    Is that your signature at the bottom    12:22:30PM
16   left corner?
17       A    Yes.    12:22:33PM
18       Q    And does this refresh your    12:22:35PM
19   recollection as to whether you made a subsequent
20   request for this provisional appointment
21   promotion?
22       A    Yes.    12:22:45PM
23       Q    And this is dated March 25th, 2001,    12:22:45PM
24   correct?
25       A    Correct.    12:22:49PM

Page 142

GEORGE HESSE

1    GEORGE HESSE
2        Q    Do you recall how you submitted this    12:22:49PM
3    to the chief?
4        A    I may have just laid it on his desk.    12:22:54PM
5        Q    And in the second paragraph, you    12:23:02PM
6    reference, "The last time we spoke of this, you
7    stated 'look at what they did to Bob Golopi.'"
8        Do you see that?    12:23:10PM
9        A    Yes.    12:23:11PM
10       Q    Do you recall the conversation that    12:23:12PM
11   you're referring to, the last time we spoke of
12   that, when that last conversation was?
13       A    I don't recall.    12:23:19PM
14       Q    Was that the conversation in '99 that    12:23:19PM
15   you testified to already or is that some
16   subsequent conversation?
17       A    I don't recall.    12:23:24PM
18       Q    Do you know what you're referring to    12:23:26PM
19   or what Paradiso was referring to when he said
20   "look at what they did to Bob Golopi"?
21       A    You know, I don't recall.    12:23:35PM
22       Q    The next sentence says, "Bob got what    12:23:37PM
23   he wanted and/or deserved."
24       Do you see that?    12:23:41PM
25       A    Yes.    12:23:42PM

Page 143

GEORGE HESSE

1    GEORGE HESSE
2        Q    What were you referring to there?    12:23:43PM
3        A    I believe he -- well, he moved off the    12:23:46PM
4    beach and he got a vehicle.  And I'm
5    speculating.  But I really -- I really don't
6    recall.
7        Q    You don't recall what you're referring    12:23:57PM
8    to there?
9        A    No.  The "deserved" part, no.    12:24:00PM
10       Q    The next sentence says, "He always    12:24:02PM
11   made deals with the village without first
12   consulting you."
13       Do you see that?    12:24:07PM
14       A    Yes.    12:24:08PM
15       Q    What are you referring to there?    12:24:08PM
16       A    Bob was always scamming, trying to    12:24:10PM
17   scam over the chief.  He wanted to be the chief.
18   He wanted to be in charge.  He was always
19   playing me and Paradiso and the mayor --
20   actually, the previous mayor, Natalie Rogers,
21   against each other.  And he was just -- I think
22   he was just ploying for leadership.
23       Q    What did he do to make you believe    12:24:35PM
24   that he was ploying for leadership?
25       A    He was always badmouthing Ed Paradiso    12:24:41PM

Page 144

GEORGE HESSE

1    GEORGE HESSE
2    and always trying to get him into trouble for
3    things that Ed may have done or not done.  I
4    don't know.  But he was always trying to be in
5    charge of everything.
6        Q    Was that inappropriate --    12:24:54PM
7        MR. NOVIKOFF:  Objection.    12:24:57PM
8    BY MR. GOODSTADT:    12:24:58PM
9        Q    -- in your mind?    12:24:59PM
10       A    Yes.    12:25:00PM
11       Q    Did he ever go outside the chain of    12:25:01PM
12   command and complain about Paradiso?
13       MR. NOVIKOFF:  Objection.    12:25:06PM
14   BY MR. GOODSTADT:
15       Q    Did Golopi ever go outside the chain    12:25:07PM
16   of command to complain about Paradiso?
17       MR. NOVIKOFF:  Objection.    12:25:13PM
18       A    I don't know.    12:25:14PM
19       Q    Is going to the village and    12:25:16PM
20   complaining about him without first going to
21   Paradiso, is that going outside the chain of
22   command?
23       A    Well, if he felt there was an issue    12:25:24PM
24   with Paradiso, the next step would be the mayor,
25   who was our police commissioner.  So that is not

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 145

GEORGE HESSE

1    GEORGE HESSE
2  going out of the chain of command.
3      Q   Is that what he did?  When you say   12:25:34PM
4  "deals with the village," you're referring to
5  the mayor?
6      A   Yes.                 12:25:43PM
7      Q   And the chain of the command, should   12:25:45PM
8  he first have gone to Paradiso --
9          MR. NOVIKOFF:  Objection to form.   12:25:50PM
10 BY MR. GOODSTADT:               12:25:51PM
11     Q   -- with a complaint he had about   12:25:52PM
12 Paradiso?
13     A   Yes.                 12:25:54PM
14     Q   The next paragraph, the second   12:25:56PM
15 sentence says, "All I asked for is the title of
16 sergeant."
17         Do you see that?           12:26:04PM
18     A   Yes.                 12:26:04PM
19     Q   Is the sergeant, is that a competitive   12:26:04PM
20 position, where there needs to be a canvass
21 letter?
22         MR. NOVIKOFF:  Objection.   12:26:12PM
23         MR. CALLAHAN:  Objection.   12:26:13PM
24         MR. CONNOLLY:  Objection.   12:26:14PM
25     A   On most jobs, yes.         12:26:14PM

Page 146

1    GEORGE HESSE
2      Q   How about at Ocean Beach?       12:26:16PM
3      A   Well, if I'm the only one taking the   12:26:18PM
4  test, it's just a promotion.  It's not
5  comparative.
6      Q   What do you mean by "on most jobs,   12:26:24PM
7  yes"?
8      A   Say if it was Suffolk County PD and   12:26:27PM
9  you got 600 guys taking the sergeant's test
10 and there are four positions open, it's a
11 competitive promotion.
12     Q   So here there wouldn't have been a   12:26:37PM
13 canvass letter for that title, because you're
14 the only person going for it?
15         MR. NOVIKOFF:  Objection.   12:26:39PM
16     A   You know, I don't know.      12:26:40PM
17     Q   Then the last sentence of that   12:26:44PM
18 paragraph, "Even Mayor Rogers refers to me as
19 the sergeant when she speaks to me."
20         Do you see that?           12:26:51PM
21     A   Yes.                 12:26:51PM
22     Q   What did you mean by that?     12:26:51PM
23     A   She would call me Sergeant Hesse.   12:26:53PM
24     Q   Really?  For how long was she calling   12:26:56PM
25 you Sergeant Hesse?

Page 147

1          GEORGE HESSE
2      A   Probably for as long as she's been the   12:27:00PM
3  mayor.
4      Q   Did she ever call you Chief Hesse?   12:27:03PM
5      A   Yes.                 12:27:05PM
6      Q   When did that start?         12:27:06PM
7      A   When I was designated the deputy   12:27:07PM
8  chief.
9      Q   And then the first sentence of this   12:27:10PM
10 last paragraph says -- well, the next-to-last
11 paragraph, "I understand I did not do well
12 enough to pass the last exam."
13         Do you see that?           12:27:21PM
14     A   Yes.                 12:27:22PM
15     Q   So does that refresh your recollection   12:27:22PM
16 as to when you took the first test?
17     A   No.                 12:27:27PM
18     Q   But at least as of '01, you had taken   12:27:30PM
19 one and failed it, correct?
20     A   Correct.               12:27:34PM
21     Q   And when you say "the last exam,"   12:27:36PM
22 you're referring to the sergeant's exam?
23     A   Yes.                 12:27:41PM
24     Q   Did you take it again after this 2001,   12:27:47PM
25 do you know, the test?

Page 148

1          GEORGE HESSE
2      A   Yes.                 12:27:50PM
3      Q   Two more times after that?       12:27:52PM
4      A   No.                 12:27:54PM
5      Q   One more time after '01 you took it?   12:27:55PM
6      A   Yes.                 12:27:57PM
7      Q   So you had taken it twice before you   12:27:58PM
8  wrote this letter and once after?
9      A   To the best of my recollection, yes.   12:28:02PM
10     Q   Okay.  So to the best of your   12:28:04PM
11 recollection, you took it in '07.  We discussed
12 that.
13         When did you take it prior to '07,   12:28:08PM
14 going in reverse chronological order?
15     A   I don't recall.           12:28:15PM
16     Q   You don't recall what year it was?   12:28:15PM
17     A   No.                 12:28:17PM
18     Q   And you don't recall the first time   12:28:18PM
19 you took it?
20     A   No.                 12:28:22PM
21     Q   But it's your belief that you had   12:28:23PM
22 taken it twice by '01, though, correct?
23     A   Yes.                 12:28:26PM
24     Q   Is there a limit on the amount of   12:28:27PM
25 times you can take a test for sergeant?

37 (Pages 145 to 148)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 149

GEORGE HESSE

1
2     MR. NOVIKOFF:  Objection.          12:28:31PM
3     A   Not that I'm aware of.           12:28:32PM
4     Q   Now, you write in the next-to-last    12:28:43PM
5  sentence in that paragraph, "According to Civil
6  Service, you can stay in a provisional position
7  pending two exams."
8        Do you see that?                12:28:51PM
9     A   Yes.                        12:28:51PM
10    Q   What's your basis for making that    12:28:51PM
11 statement?
12    A   I believe I was told that.        12:28:54PM
13    Q   By who?                     12:28:56PM
14    A   I don't recall.                 12:28:56PM
15    Q   And what did you mean by that?  What's 12:29:00PM
16 your understanding of "you can stay in the
17 provisional position pending two exams"?
18    A   I believe my understanding was if you 12:29:07PM
19 took the test and failed it, you could remain in
20 that position until you take it again and
21 hopefully pass it.
22    Q   And what happens after the second time 12:29:15PM
23 you fail it, your understanding?
24    A   I don't know.  I would assume they    12:29:19PM
25 remove you from the provisional appointment.

Page 150

GEORGE HESSE

1
2     Q   Then you said, "That gives me at least 12:29:26PM
3  four to five years to pass the test."
4        Do you see that?                12:29:30PM
5     A   Yes.                        12:29:31PM
6     Q   How often was the test given, at least 12:29:32PM
7  at that time?
8     A   It's given in two-year increments.    12:29:36PM
9     Q   Every two years?              12:29:38PM
10    A   Every two years, yes.           12:29:39PM
11    Q   And then the last sentence says, "I   12:29:43PM
12 hope you reconsider your last decision, and I
13 thank you for your time in this matter."
14       Do you see that?                12:29:57PM
15    A   Yes.                        12:29:57PM
16    Q   Did Paradiso ever reconsider his     12:29:57PM
17 decision the last time?
18    A   Yes.                        12:30:01PM
19    Q   Okay.  And what did he do this time in 12:30:02PM
20 response to this letter?
21    A   I believe he gave my proposal to the  12:30:09PM
22 village board, and it was approved.
23    Q   Were you at the -- strike that.     12:30:25PM
24       Was it approved at a board meeting?  12:30:27PM
25    A   To my understanding, it was approved  12:30:29PM

Page 151

GEORGE HESSE

1
2  in executive session at a board meeting.
3     Q   You weren't at the executive session? 12:30:36PM
4     A   No.                         12:30:38PM
5     Q   So how did you learn that it was     12:30:39PM
6  approved at the executive session?
7     A   Paradiso had told me.           12:30:42PM
8     Q   Do you know when that was approved?  12:30:47PM
9     A   The date is -- the year was 2001.  To 12:30:49PM
10 tell you the truth, I don't know the exact time
11 frame.  It was definitely before the summer of
12 2001.
13    Q   And did that -- was the approval for  12:31:02PM
14 the provisional appointment or did they appoint
15 you sergeant?
16    A   It might have just been sergeant.  I  12:31:09PM
17 don't know what the exact --
18    Q   Did you ever receive any -- a        12:31:14PM
19 confirmation of it in a letter saying
20 congratulations, you received X position?
21    A   No, I don't recall.             12:31:21PM
22    Q   Did you receive a raise when you got  12:31:22PM
23 the promotion?
24    A   I don't recall.                 12:31:28PM
25    Q   Did you receive any additional       12:31:29PM

Page 152

GEORGE HESSE

1
2  authority when you got the position?
3     A   I was the sergeant, that -- sergeant. 12:31:35PM
4     Q   Did that -- did that grant you with  12:31:39PM
5  any additional authority that you didn't have
6  prior to being sergeant?
7        MR. NOVIKOFF:  Objection.  Form.   12:31:45PM
8     A   No.                         12:31:46PM
9     Q   Did you have the authority to hire or 12:31:48PM
10 fire officers?
11    A   No.                         12:31:51PM
12    Q   Did Paradiso have that authority?    12:31:55PM
13    A   Yes.                        12:31:59PM
14    Q   Do you know whether he needed board   12:31:59PM
15 approval to hire or fire an officer?
16       MR. NOVIKOFF:  Objection.         12:32:03PM
17    A   I don't believe so.             12:32:06PM
18    Q   Do you know whether he needed approval 12:32:09PM
19 from Civil Service to hire and fire an officer?
20       MR. NOVIKOFF:  Objection.  Form.   12:32:14PM
21 Foundation.
22    A   Yes.                        12:32:16PM
23    Q   He needed approval from Civil Service? 12:32:18PM
24    A   Yes.                        12:32:20PM
25    Q   Do you know whether he needed approval 12:32:25PM

053690b6-a7be-44d9-9835-90b3e21fffd8

1        **GEORGE HESSE**
2    **from anyone else other than for Civil Service**
3    **before he could hire or fire?**
4        A    I'm not aware of any.        12:32:33PM
5        **Q    What's the basis of your understanding 12:32:36PM**
6    **that he needed approval from Civil Service**
7    **before hiring or firing an officer?**
8        A    Well, for the position, any person    12:32:41PM
9    within a municipality who is going to be hired,
10   you have to meet the minimum requirements that
11   Civil Service designates.
12       **Q    And how about for terminations, did he 12:32:55PM**
13   **need approval from Civil Service before firing a**
14   **police officer?**
15       MR. NOVIKOFF: Objection. Form.    12:33:05PM
16       MR. CALLAHAN: Objection.    12:33:07PM
17       A    I don't believe so.        12:33:07PM
18       **Q    Did you actually appear before the    12:33:11PM**
19   **board to make a proposal for this position?**
20       MR. NOVIKOFF: His position?    12:33:16PM
21   BY MR. GOODSTADT:    12:33:17PM
22       **Q    For the provisional appointment    12:33:17PM**
23   **position or just a sergeant position whichever**
24   **one actually were promoted to.**
25       MR. NOVIKOFF: As referred to in    12:33:24PM

1        GEORGE HESSE
2    Hesse 2?
3        MR. GOODSTADT: This is the request.  12:33:27PM
4    He doesn't know exactly what the actual
5    promotion was.  It was either sergeant or a
6    provisional appointment as sergeant.
7    BY MR. GOODSTADT:    12:33:35PM
8        **Q    Did you actually propose a promotion  12:33:35PM**
9    **to the board?**
10       MR. CONNOLLY: Did he?    12:33:38PM
11   BY MR. GOODSTADT:    12:33:39PM
12       **Q    Yeah, did you physically go there and  12:33:39PM**
13   **make a proposal to them?**
14       A    No.        12:33:42PM
15       **Q    Did you know that Paradiso had    12:33:45PM**
16   **forwarded your request on to the board?**
17       A    I don't recall how it was done.    12:33:52PM
18       **Q    Do you know whether he supported that 12:33:53PM**
19   **promotion at the time when he forwarded it on to**
20   **the board?**
21       A    I don't know what his thoughts were.  12:34:00PM
22       **Q    Did you ever see the letter that he   12:34:03PM**
23   **sent or the transmission that he sent with your**
24   **proposal to the board?**
25       A    I may have.  I don't recall.    12:34:10PM

1        GEORGE HESSE
2        MR. GOODSTADT: Could you mark that as 12:34:16PM
3    Hesse 3.
4        (Whereupon, Bates document 3845-46 12:34:18PM
5    marked as Plaintiff's Exhibit 3 for
6    identification, as of this date.)
7        MR. CALLAHAN: How is this being    12:34:47PM
8    marked?
9        MR. GOODSTADT: Hesse 3.        12:34:49PM
10       I've placed in front of Mr. Hesse    12:34:53PM
11   what's been marked as Hesse 3.  It is a
12   two-page document bearing Bates Nos. 3845
13   and 3846.  (Handing.)
14   BY MR. GOODSTADT:    12:35:02PM
15       **Q    Mr. Hesse, have you ever seen the    12:35:03PM**
16   **exhibit that's been marked as Hesse 3?**
17       A    Yes.        12:35:07PM
18       **Q    Does this refresh your recollection as 12:35:08PM**
19   **to whether he forwarded on your document with**
20   **the recommendation?**
21       A    Yes.        12:35:14PM
22       **Q    Did you ever discuss with him that he 12:35:14PM**
23   **was going to recommend you for the position?**
24       MR. NOVIKOFF: Objection. It was a  12:35:22PM
25   little confusing.

1        GEORGE HESSE
2    BY MR. GOODSTADT:    12:35:24PM
3        **Q    At that time, before he sent this on, 12:35:25PM**
4    **did you ever discuss with him that he was going**
5    **to forward your request on with his**
6    **recommendation?**
7        A    I don't recall.    12:35:34PM
8        **Q    Did you discuss the test with him at  12:35:34PM**
9    **that point in time, the sergeant's test?**
10       A    I don't recall.        12:35:38PM
11       **Q    And it's your understanding that the  12:35:43PM**
12   **board voted on it and approved it in executive**
13   **session?**
14       MR. NOVIKOFF: Objection. Asked and  12:35:48PM
15   answered.
16   BY MR. GOODSTADT:    12:35:49PM
17       **Q    Is that correct?        12:35:49PM**
18       A    Yes.        12:35:50PM
19       **Q    Did you ever see any minutes that    12:35:51PM**
20   **reflect that?**
21       A    No.        12:35:56PM
22       **Q    Did you ever speak to any of the    12:35:57PM**
23   **trustees about their approval of that**
24   **appointment?**
25       A    Yes.        12:36:03PM

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2   Q   Who did you speak with?        12:36:03PM
3   A   Andrew Miller.               12:36:05PM
4   Q   Anyone else?                  12:36:06PM
5   A   Not that I recall.           12:36:08PM
6   Q   And what did Mr. Miller and you    12:36:12PM
7   discuss?
8   A   I don't recall.              12:36:17PM
9   Q   Do you recall anything that you    12:36:18PM
10  discussed with him about the appointment?
11  A   I don't recall.              12:36:23PM
12  Q   Did he tell you that it was   12:36:24PM
13  provisional as opposed to just sergeant?
14  A   I don't recall.              12:36:30PM
15  Q   Do you know whether the promotion was  12:36:36PM
16  reported to Civil Service?
17  A   No, I don't.                 12:36:43PM
18  Q   Do you know if it was reported to the  12:36:45PM
19  State of New York?
20  A   No, I don't.                 12:36:48PM
21  Q   Did you ever attend any supervisory  12:36:57PM
22  schools administered by the Suffolk County
23  Police?
24      MR. NOVIKOFF:  Objection to form.    12:37:03PM
25  Foundation.

GEORGE HESSE

1
2       MR. CALLAHAN:  Same objection.     12:37:05PM
3   A   No.                          12:37:07PM
4   Q   Is that a requirement to become a   12:37:08PM
5   sergeant to attend a supervisory school?
6       MR. NOVIKOFF:  Objection. Form.    12:37:14PM
7       MR. CALLAHAN:  Same.            12:37:18PM
8       MR. CONNOLLY:  Same.            12:37:18PM
9   A   I don't know.                12:37:20PM
10  Q   You don't know one way or the other?  12:37:20PM
11  A   No.                          12:37:20PM
12  Q   Do you know what I mean when I say   12:37:21PM
13  supervisory school administrated by the Suffolk
14  County Police?
15  A   Yes.                         12:37:27PM
16  Q   What is that, in your understanding.  12:37:28PM
17  A   I just know of a course that Suffolk  12:37:30PM
18  County offers as a supervisor school.
19  Q   And you never took that course?    12:37:38PM
20  A   No.                          12:37:40PM
21  Q   And you don't know one way or the   12:37:40PM
22  other whether it's required to be a sergeant to
23  take that course, correct?
24      MR. NOVIKOFF:  Objection. Form.    12:37:47PM
25      MR. CALLAHAN:  Same.            12:37:48PM

GEORGE HESSE

1
2   A   I don't know.                12:37:49PM
3   Q   Did you receive any training from   12:37:50PM
4   Suffolk County to be a sergeant?
5   A   No.                          12:37:56PM
6   Q   Did you go to any training -- other  12:37:58PM
7   than for it being on the job, did you go to any
8   formal training to be a sergeant?
9   A   No.                          12:38:07PM
10  Q   Did you have a business card at that  12:38:09PM
11  time?
12  A   I believe I did.             12:38:12PM
13  Q   Did you change your business card to  12:38:13PM
14  reflect sergeant?
15  A   I'm sure I did.              12:38:16PM
16  Q   Did it say provisional in there at   12:38:18PM
17  all?
18  A   Not that I'm aware of, no.       12:38:22PM
19  Q   Did you create your own business card  12:38:24PM
20  or did somebody -- or did someone at Ocean Beach
21  who was responsible for creating the business
22  cards?
23      MR. NOVIKOFF:  Objection. Form.    12:38:32PM
24  A   I believe I created it.         12:38:33PM
25  Q   And you went out and got somebody to  12:38:35PM

GEORGE HESSE

1
2   print them up?
3   A   No.                          12:38:39PM
4   Q   You printed them up yourself?     12:38:40PM
5   A   Yes.                         12:38:42PM
6   Q   Did you have a change in your uniform  12:38:45PM
7   to reflect the fact that you had been promoted
8   to sergeant?
9   A   Yes.                         12:38:52PM
10  Q   What did you have, the three chevron  12:38:52PM
11  patch or something that reflected your
12  promotion?
13  A   Yes.                         12:38:57PM
14  Q   Is that what you had, a three chevron  12:38:57PM
15  patch?
16  A   Yes.                         12:39:00PM
17  Q   And where did you get that patch from?  12:39:01PM
18  A   I believe it was ordered from the   12:39:04PM
19  uniform supply store.
20  Q   And you wore that on your sleeve?   12:39:10PM
21  A   Yes.                         12:39:13PM
22  Q   Was there any change to your shield  12:39:16PM
23  that reflects that you're a sergeant?
24  A   Yes.                         12:39:20PM
25  Q   What was the change on your shield   12:39:20PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 161

GEORGE HESSE

1       that reflected a sergeant?
2
3       A   I was issued a sergeant's shield.   12:39:23PM
4       Q   By who?                        12:39:25PM
5       A   Ed Paradiso.                   12:39:26PM
6       Q   And when were you issued that shield?   12:39:31PM
7       A   I believe it had to be ordered, so I   12:39:37PM
8       don't really recall the exact date.
9       Q   Sometime in or around 2001?    12:39:41PM
10      A   Yes.                           12:39:44PM
11      Q   Did you hold yourself out to anybody   12:39:47PM
12      outside of the beach as a sergeant?
13          MR. CALLAHAN:  Objection to form.   12:39:54PM
14          MR. NOVIKOFF:  Yeah, objection.   12:39:55PM
15          MR. CONNOLLY:  Objection.      12:39:56PM
16      A   Yes.                           12:39:56PM
17      Q   Who did you hold yourself out to be --   12:39:57PM
18      who did you hold yourself out to as a sergeant
19      outside of Ocean Beach?
20      A   The world.                     12:40:05PM
21      Q   So it wasn't your understanding that   12:40:06PM
22      this was some internal title, correct?
23          MR. NOVIKOFF:  Objection.      12:40:11PM
24          MR. CONNOLLY:  Objection.      12:40:12PM
25      A   I was the sergeant.  I was promoted   12:40:14PM

Page 162

GEORGE HESSE

1
2       internally, yes.
3       Q   So if I were to tell you that there   12:40:18PM
4       was some testimony by a village official that
5       this was just an internal title, would that be
6       news to you?
7       A   No.                            12:40:28PM
8       Q   It wouldn't?                   12:40:29PM
9       A   No.                            12:40:30PM
10      Q   So you've been told in the past that   12:40:30PM
11      this is an internal title?
12      A   Recently, yes.                 12:40:34PM
13      Q   How recently -- how about at the time?   12:40:35PM
14      A   At the time, no.               12:40:35PM
15      Q   When were you told it was just an   12:40:38PM
16      internal title?
17      A   Probably within the last two years   12:40:42PM
18      now.
19      Q   Uh-huh.  Who told you that?    12:40:45PM
20      A   Mayor Joe Loeffler.            12:40:47PM
21      Q   When did he tell you that in the last   12:40:48PM
22      two years?
23      A   I don't recall.                12:40:51PM
24      Q   Do you recall what year it was?   12:40:51PM
25      A   It was within the last two years.   12:40:53PM

Page 163

GEORGE HESSE

1
2       Q   And were you sergeant at the time he   12:40:55PM
3       told you that or had you received another
4       promotion since then?
5       A   I received another promotion since   12:41:01PM
6       then.
7       Q   Did anyone ever tell you that the   12:41:04PM
8       sergeant title was just internal?
9       A   No.                            12:41:08PM
10      Q   So even Joe Loeffler didn't tell you   12:41:08PM
11      the sergeant title was internal?
12      A   Joe Loeffler wasn't a trustee at the   12:41:14PM
13      time.
14      Q   At what time?                  12:41:17PM
15      A   At the time when I was given the   12:41:18PM
16      sergeant's.
17      Q   So at the time you held the sergeant   12:41:21PM
18      title and held yourself out to the world as a
19      sergeant, did anybody tell you that it was just
20      an internal title?
21      A   No.                            12:41:29PM
22          MR. CALLAHAN:  Objection to form.   12:41:31PM
23          MR. NOVIKOFF:  I join in.  I don't   12:41:33PM
24      like anyone to be alone.
25          MR. CALLAHAN:  Thank you.      12:41:43PM

Page 164

GEORGE HESSE

1
2       BY MR. GOODSTADT:                  12:41:56PM
3       Q   So before, I asked you whether you had   12:41:57PM
4       the same title currently, your Civil Service was
5       a full-time police officer and you told me it
6       was.  And then I asked you was it the same title
7       as Ed Carter, and you told me it wasn't.  But do
8       you and Ed Carter hold the same police
9       certificate?
10          MR. NOVIKOFF:  Objection.      12:42:19PM
11          MR. CONNOLLY:  Objection.      12:42:19PM
12      A   Yes.                           12:42:20PM
13      Q   Same thing with Mr. Fiorillo,   12:42:21PM
14      Mr. Lamm, Mr. Snyder?
15          MR. NOVIKOFF:  Same objection.   12:42:26PM
16      A   Yes.                           12:42:27PM
17      Q   Mr. Nofi?                      12:42:28PM
18          MR. NOVIKOFF:  Same objection.   12:42:30PM
19      A   Yes.                           12:42:30PM
20      Q   Yes?                           12:42:31PM
21      A   Yes.                           12:42:32PM
22      Q   Did there come a point in time that   12:42:32PM
23      you were promoted from the sergeant title?
24      A   Yes.                           12:42:37PM
25      Q   And when did that happen?      12:42:38PM

41 (Pages 161 to 164)

053690b6-a7be-44d9-9835-90b3e21fffd8

1          **GEORGE HESSE**
2     A   I believe the date was January 18th,   12:42:41PM
3  2006.
4     **Q   And what title did you receive a       12:42:48PM**
5  **promotion to in January of 2006?**
6     A   Acting deputy chief.              12:42:58PM
7     **Q   And is that something that you applied 12:43:10PM**
8  **for or put in a request for like you had done**
9  **for the sergeant position?**
10    A   No.                          12:43:16PM
11    **Q   Did you actually have to fill out any  12:43:17PM**
12 **work, any paperwork when you got the sergeant**
13 **position to reflect that change?**
14    A   Not that I recall.              12:43:25PM
15    **Q   Did you have to fill out any         12:43:26PM**
16 **application for that position other than for the**
17 **two letters that we've seen?**
18    A   Not that I recall.              12:43:32PM
19    **Q   Now, the -- so the deputy -- acting    12:43:35PM**
20 **deputy chief, is that what you said?**
21    A   Correct.                      12:43:40PM
22    **Q   How did you learn that you were up for 12:43:41PM**
23 **that position?**
24    A   I was approached by Joe Loeffler, and  12:43:44PM
25 he said she was going to make that suggestion to

1          GEORGE HESSE
2  the board.
3     **Q   And is that a position that a canvass  12:43:54PM**
4  **letter would ordinarily go out to?**
5          MR. CALLAHAN:  Objection to form.      12:43:59PM
6     A   I don't know.                  12:44:00PM
7     **Q   You don't know one way or the other?   12:44:01PM**
8     A   No.                          12:44:04PM
9     **Q   When did Mr. Loeffler approach you to  12:44:04PM**
10 **tell you that he was going to make that proposal**
11 **to the board?**
12    A   I don't recall any specific date.      12:44:09PM
13    **Q   What was his title at the time?        12:44:10PM**
14    A   Trustee.                      12:44:12PM
15    **Q   Do you recall what year it was that he 12:44:15PM**
16 **told you this?**
17    A   It had to be in 2005 at some point.    12:44:17PM
18    **Q   Do you recall what month it was?       12:44:23PM**
19    A   No, I don't.                    12:44:25PM
20    **Q   What did he tell you?                12:44:27PM**
21    A   Well, at that point, Paradiso had     12:44:34PM
22 taken his leave, and he felt that the police
23 department still needs to move forward and
24 needed a certain sort of leadership and that he
25 was going to make the recommendation to the

1          GEORGE HESSE
2  board for my new position.
3     **Q   Do you know whether -- do you know    12:44:52PM**
4  **when the recommendation was made to the board?**
5     A   I don't know.                  12:44:57PM
6     **Q   Were you at the meeting at which      12:44:58PM**
7  **was made?**
8     A   No.                          12:45:00PM
9     **Q   Do you know whether it was reported to 12:45:03PM**
10 **the public prior to the board proposal?**
11    A   Not that I'm aware of.            12:45:07PM
12    **Q   And how are you aware that he actually 12:45:12PM**
13 **was going to move forward and make that**
14 **proposal?**
15    A   He told me.                    12:45:20PM
16    **Q   And that was in '05?              12:45:22PM**
17    A   Yes.                          12:45:23PM
18    **Q   Did he tell you when he was going to   12:45:24PM**
19 **make that proposal?**
20    A   Not exactly, no.                12:45:27PM
21    **Q   Did you take on the role prior to the  12:45:28PM**
22 **proposal being made, like, for example, he told**
23 **you in '05 he was going to make the proposal.**
24 **According to you it was done in 06 in January.**
25 **During the period from when he told you until**

1          **GEORGE HESSE**
2  **the time that the proposal was made, had you**
3  **taken on the role of deputy chief of police**
4  **or -- deputy chief of police or acting deputy**
5  **chief of police.**
6          MR. NOVIKOFF:  Objection to form.      12:45:56PM
7          MR. CONNOLLY:  Objection to form.      12:45:57PM
8          MR. CALLAHAN:  Objection.            12:45:59PM
9     A   I don't know if I assumed the role.  I 12:46:00PM
10 did the job.
11    **Q   And do you know whether the proposal   12:46:05PM**
12 **was actually made to the board?**
13    A   No.                          12:46:10PM
14    **Q   Did you ever see any documentation    12:46:11PM**
15 **that demonstrates that it was?**
16    A   After I was approved, I did.        12:46:16PM
17    **Q   And how did you learn that it was made 12:46:18PM**
18 **and approved?**
19    A   Well, I was at the board meeting when  12:46:21PM
20 they made the appointment.
21    **Q   So you were there when they proposed   12:46:25PM**
22 **it and voted on it?**
23    A   Yes.  It was in a public forum.  Yes. 12:46:28PM
24    **Q   Did you have to present anything to    12:46:32PM**
25 **the board in that meeting?**

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    No.                      12:46:35PM
3    Q    Did anyone speak on your behalf when   12:46:37PM
4    the proposal was made?
5    A    I believe Trustee Loeffler did.      12:46:41PM
6    Q    Do you recall what he said?          12:46:45PM
7    A    Not exactly, no.              12:46:47PM
8    Q    Who was the mayor at the time?       12:46:49PM
9    A    Natalie Rogers.              12:46:51PM
10   Q    Did you ever speak to Chief Paradiso   12:46:55PM
11   about the proposal that you'd be made deputy
12   chief or acting deputy chief of police?
13   A    No.                      12:47:06PM
14   Q    Did you ever learn of a conversation   12:47:08PM
15   that Paradiso had with Rogers about that
16   appointment?
17   A    I vaguely remember something, yes.    12:47:18PM
18   Q    What do you remember?         12:47:20PM
19   A    That he felt that I wasn't right for   12:47:21PM
20   the job.
21   Q    Do you know why he felt that?     12:47:24PM
22   A    I'm sure he was threatened.       12:47:26PM
23   Q    Did you ever discuss with him --     12:47:28PM
24   A    No.                      12:47:30PM
25   Q    -- his position on that?          12:47:30PM

GEORGE HESSE

1
2    A    No.                      12:47:31PM
3         MR. NOVIKOFF:  I'm sorry, what was his   12:47:32PM
4    answer before that last question?
5         MR. GOODSTADT:  He thought he was    12:47:36PM
6    threatened.
7         MR. NOVIKOFF:  Paradiso thought he was   12:47:38PM
8    threatened?
9         MR. GOODSTADT:  Yes.           12:47:40PM
10   A    Not physically, but his job.      12:47:42PM
11   Q    That's just speculation, right?   12:47:43PM
12   You never spoke to him about that?
13   A    No.                      12:47:47PM
14   Q    Did you ever speak to Rogers about    12:47:49PM
15   Paradiso's position with respect to your
16   promotion?
17   A    I don't recall.              12:47:56PM
18   Q    How did you learn of that conversation   12:47:57PM
19   that Paradiso had with Rogers?
20   A    I don't recall.              12:48:02PM
21   Q    Who was the police commissioner at the   12:48:04PM
22   time?
23        MR. NOVIKOFF:  Objection.        12:48:06PM
24   A    Natalie Rogers.              12:48:08PM
25   Q    Was there a police liaison at the    12:48:14PM

GEORGE HESSE

1
2    time?
3         MR. NOVIKOFF:  Objection to the form   12:48:20PM
4    of the question.
5    A    Not that I'm aware of.          12:48:23PM
6    Q    Just you had it referred to Loeffler,   12:48:25PM
7    but you don't know if it was official or not?
8    A    That's correct.              12:48:29PM
9    Q    Who is the police commissioner today?   12:48:30PM
10   A    Joseph Loeffler.              12:48:32PM
11   Q    Was Paradiso still working at this    12:48:38PM
12   time?
13        MR. NOVIKOFF:  Objection.  Form.      12:48:42PM
14        MR. CONNOLLY:  Presumably you're     12:48:46PM
15   talking about the beach.
16        MR. GOODSTADT:  At the beach.  At the   12:48:49PM
17   beach.
18   A    No.                      12:48:50PM
19   Q    So he was already out on his leave or   12:48:50PM
20   whatever he was out on?
21        MR. NOVIKOFF:  Objection.        12:48:54PM
22   A    Yes.                      12:48:55PM
23   Q    Yes?                      12:48:55PM
24   A    Yes.                      12:48:56PM
25   Q    Did you ever see the resolution that   12:48:56PM

GEORGE HESSE

1
2    approved your appointment?
3    A    I may have.                  12:49:02PM
4    Q    Was the appointment at the meeting in   12:49:06PM
5    January of '06, was that made to acting deputy
6    chief of police or deputy chief of police?
7    A    I think there's some terminology      12:49:15PM
8    problems there, but I've seen it as acting and
9    I've seen it as deputy chief.
10   Q    Well, which one was it?          12:49:22PM
11   A    To tell you the truth, I don't even   12:49:24PM
12   know.
13   Q    Is there a Civil Service test that's   12:49:26PM
14   required to get that promotion --
15        MR. NOVIKOFF:  Objection.        12:49:29PM
16   BY MR. GOODSTADT:                  12:49:31PM
17   Q    -- to deputy chief of police?     12:49:31PM
18        MR. CALLAHAN:  Same.           12:49:33PM
19   A    No.                      12:49:34PM
20   Q    Is there a Civil Service test to be   12:49:34PM
21   chief of police?
22        MR. NOVIKOFF:  Objection.        12:49:40PM
23        MR. CALLAHAN:  Same.           12:49:41PM
24   A    There is one.                12:49:41PM
25   Q    Do you know whether you can be     12:49:42PM

43  (Pages 169 to 172)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2 promoted to chief or deputy chief without first
3 passing the sergeant's test --
4       MR. NOVIKOFF: Objection.        12:49:49PM
5 BY MR. GOODSTADT:               12:49:50PM
6    Q    -- on your Civil Service level?   **12:49:50PM**
7       MR. NOVIKOFF: Objection.        12:49:52PM
8    A   I don't know.             12:49:52PM
9    Q    You don't know one way or the other?  **12:49:53PM**
10    A   I don't know.             12:49:56PM
11       MR. GOODSTADT: Mark this.       12:49:58PM
12       (Whereupon, Bates document 28 was   12:49:58PM
13 marked as Plaintiff's Exhibit 4 for
14 identification, as of this date.)
15       MR. GOODSTADT: I've placed in front  12:50:26PM
16 of Mr. Hesse what's now been marked as
17 Hesse 4. It's a one-page exhibit bearing
18 Bates No. 28. (Handing.)
19 BY MR. GOODSTADT:               12:50:34PM
20    Q    Mr. Hesse, have you ever seen the   **12:50:34PM**
21 document that's been marked as Hesse 4?
22    A   Yes.                12:50:38PM
23    Q    And this is the resolution that    **12:50:38PM**
24 demonstrates that you have been designated as
25 deputy chief of police.

GEORGE HESSE

1
2       Do you see that?            **12:50:46PM**
3    A   Yes.                12:50:47PM
4    Q    So does this refresh your recollection  12:50:51PM
5 as to whether it was a designation to acting
6 versus deputy, just plain deputy chief of
7 police.
8       MR. NOVIKOFF: Objection to form.    12:50:59PM
9    A   It says deputy.            12:51:00PM
10    Q    Is that a Civil Service title, deputy  **12:51:01PM**
11 chief of police?
12       MR. NOVIKOFF: Objection.        12:51:05PM
13    A   Yes.                12:51:05PM
14    Q    Do you know whether this promotion was  12:51:10PM
15 reported to Civil Service?
16    A   Not that I'm aware of.         12:51:13PM
17    Q    Did you receive a pay increase with   **12:51:15PM**
18 this promotion?
19    A   I don't think so.           12:51:21PM
20    Q    Do you know whether this promotion was  12:51:23PM
21 approved by Civil Service?
22       MR. CALLAHAN: Objection to form.    12:51:28PM
23    A   I am unaware.             12:51:29PM
24    Q    Is deputy chief of police, is that an  **12:51:31PM**
25 open competitive position?

GEORGE HESSE

1
2       MR. NOVIKOFF: Objection.        12:51:35PM
3    A   It may be. I don't know.        12:51:36PM
4    Q    Do you know whether a canvass letter  **12:51:38PM**
5 was distributed to anybody?
6       MR. NOVIKOFF: Objection.        12:51:42PM
7    A   I am unaware.             12:51:42PM
8    Q    And if you see on Hesse 4, do you see  **12:51:45PM**
9 where the arrow is that says "designation of
10 George Hesse"?
11    A   Uh-huh.              12:51:54PM
12    Q    Do you see that?           **12:51:53PM**
13    A   Yes.                12:51:55PM
14    Q    On the second line, it says, "Trustee  **12:51:55PM**
15 Loeffler made motion to designate George Hesse
16 as deputy chief of police with all power and
17 authority involved with that position."
18       Do you see that?            12:52:05PM
19    A   Yes.                12:52:06PM
20    Q    Do you know what power and authority   **12:52:06PM**
21 is involved with that position?
22       MR. NOVIKOFF: Note my objection.    12:52:13PM
23       MR. CALLAHAN: Objection to form also. 12:52:14PM
24       MR. NOVIKOFF: Yeah.          12:52:17PM
25    A   I would assume that I am in charge of  12:52:17PM

GEORGE HESSE

1
2 all aspects of the police department.
3    Q    And did your role change at all when   **12:52:23PM**
4 you received that promotion?
5    A   Slightly.               12:52:28PM
6       MR. NOVIKOFF: Objection.        12:52:29PM
7 BY MR. GOODSTADT:               12:52:29PM
8    Q    What do you mean by slightly?      **12:52:29PM**
9    A   I now had the powers to hire and    12:52:31PM
10 remove.
11    Q    Okay. Who did you report to in this  **12:52:38PM**
12 position?
13    A   The mayor and the mayor alone.      12:52:40PM
14    Q    Okay. So you got more power in terms  **12:52:42PM**
15 of the ability to hire and fire. Your reporting
16 relationship changed too, correct? You were
17 reporting to Paradiso, and now you're reporting
18 only to the mayor?
19    A   Yes.                12:52:55PM
20    Q    Any other changes to your duties or   **12:52:55PM**
21 responsibilities with this promotion?
22    A   No.                12:53:03PM
23    Q    This position is senior to the     **12:53:05PM**
24 position of sergeant, correct?
25    A   Yes.                12:53:08PM

TSG Reporting – Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

1          GEORGE HESSE
2      Q    Did any sergeant replace you?        12:53:08PM
3      A    No.              12:53:14PM
4      Q    To this day, has anybody replaced you  12:53:14PM
5   in the sergeant role?  Is there a sergeant in
6   the Ocean Beach Police Department?
7      A    No.              12:53:20PM
8      Q    Has there been one since          12:53:21PM
9   January 28th of 2006?
10     A    No.              12:53:24PM
11     Q    Now that you have -- since January 20,  12:53:29PM
12  2006, you had the authority to hire and fire,
13  did you need board approval to do that?
14     A    No.              12:53:37PM
15     Q    Did you need approval of anyone to     12:53:41PM
16  hire and fire?
17        MR. CONNOLLY:  Objection.       12:53:43PM
18        MR. NOVIKOFF:  Yeah, I'm going to      12:53:44PM
19  object to that one.
20     A    No.              12:53:47PM
21     Q    When you became chief or deputy chief,  12:53:53PM
22  did your uniform change at all?
23     A    Yes.             12:54:01PM
24     Q    How did your uniform change?       12:54:01PM
25     A    I removed the sergeant stripes and    12:54:03PM

1          GEORGE HESSE
2   instead of a sergeant shield, I wore a chief
3   shield and stars on my collar.
4      Q    And when did you change your uniform?  12:54:18PM
5      A    Right after this designation.       12:54:24PM
6      Q    Do you know who an Officer Betenhauser  12:54:33PM
7   is?
8      A    Yes, I do.            12:54:36PM
9      Q    And what is Officer Betenhauser's     12:54:38PM
10  title?
11     A    Part-time seasonal police officer.    12:54:42PM
12     Q    Has that always been his title at     12:54:45PM
13  Ocean Beach?
14     A    No.              12:54:47PM
15     Q    What other titles has Officer         12:54:47PM
16  Betenhauser held within Ocean Beach?
17     A    Betenhauser?          12:54:52PM
18     Q    Betenhauser, yes.             12:54:55PM
19     A    Actually, yes.  Thanks for reminding   12:54:57PM
20  me.  He was promoted to a sergeant for six
21  months.
22     Q    Who promoted him?             12:55:05PM
23     A    I believe it was at a trustee's       12:55:07PM
24  meeting, they took a vote on it, but it came
25  from Loeffler, Joe Loeffler.

1          GEORGE HESSE
2      Q    Did he pass the sergeant's test,      12:55:17PM
3   Betenhauser?
4        MR. NOVIKOFF:  Objection.        12:55:22PM
5      A    Yes.             12:55:22PM
6      Q    How come he only had the position for  12:55:23PM
7   six months?
8      A    Because that's all that, I think,     12:55:26PM
9   Civil Service would allow in a part-time
10  seasonal position.
11     Q    What's the basis of your understanding  12:55:31PM
12  of that?
13     A    That's what I was told.        12:55:34PM
14     Q    Did there come a point in time when   12:55:38PM
15  Civil Service questioned your role in a
16  supervisory capacity as being outside the title
17  of police officer?
18        MR. CALLAHAN:  Objection to form.    12:55:48PM
19        MR. NOVIKOFF:  Yeah, I join in.      12:55:50PM
20     A    I'm aware of some discrepancies, but I  12:55:54PM
21  don't know exactly what it was.
22     Q    When did you become aware of that?    12:56:01PM
23     A    I believe a lot of it happened after   12:56:04PM
24  March 27th of 2007.
25     Q    How did you become aware of it?       12:56:11PM

1          GEORGE HESSE
2      A    I believe I was sitting in an office   12:56:14PM
3   with Mayor Loeffler and Maryann Minerva in her
4   office, and I believe that Mayor Loeffler had
5   told me about some problems with the titles and
6   title issuing.
7      Q    What did he tell you?             12:56:29PM
8      A    I really -- I really don't recall     12:56:36PM
9   other than the fact that there was -- there's a
10  problem with the titles, my supervisory role.
11     Q    What titles are you referring to?     12:56:45PM
12     A    Deputy chief.          12:56:47PM
13     Q    What problem did he tell you there    12:56:49PM
14  was?
15     A    That -- technically, that the village  12:56:52PM
16  couldn't do what they did.
17     Q    Okay.  Just deputy chief or that      12:57:00PM
18  included sergeant promotion as well?
19        MR. NOVIKOFF:  Objection.        12:57:04PM
20     A    That included that also.       12:57:05PM
21     Q    And he told you that?             12:57:06PM
22     A    I don't recall.       12:57:09PM
23     Q    Was anything done to rectify the      12:57:10PM
24  problem, the title problem?
25        MR. NOVIKOFF:  Objection.        12:57:14PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 181

GEORGE HESSE

1   A   No.                        12:57:15PM
2   Q   Did he ever show you -- strike that.  12:57:21PM
3       Who had questioned or who had raised  12:57:24PM
4   the problem with the village with respect to the
5   titles?
6       MR. NOVIKOFF:  Who was Mr. Hesse   12:57:31PM
7   advised of as to raising the issue?
8       MR. GOODSTADT:  Yes.           12:57:37PM
9   BY MR. GOODSTADT:                    12:57:37PM
10  Q   Do you know how the village learned of  12:57:37PM
11  this alleged problem?
12  A   I believe Civil Service.        12:57:40PM
13  Q   And what's the basis of that belief?  12:57:42PM
14  A   I believe that the mayor and maybe   12:57:44PM
15  even Ken Gray himself went to a meeting with the
16  county attorney and Civil Service, members of
17  Civil Service.
18  Q   How did you learn of that meeting?   12:57:58PM
19  A   I was told.                    12:57:59PM
20  Q   By who?                       12:58:00PM
21  A   Joe Loeffler.                  12:58:01PM
22  Q   What were you told was discussed at   12:58:02PM
23  that meeting?
24  A   I don't recall, other than maybe my   12:58:05PM

Page 182

GEORGE HESSE

1   title issue.
2   Q   Do you know when the meeting was held?  12:58:11PM
3   A   I don't recall.                12:58:13PM
4   Q   What was discussed with respect to   12:58:15PM
5   your title issue?  What did they tell you was
6   discussed?
7       MR. CALLAHAN:  Objection to form.   12:58:21PM
8   A   Yeah, I don't -- that there's just a   12:58:23PM
9   problem with the supervisory role that they had
10  put me in.
11  Q   Did they tell you it was out of title  12:58:35PM
12  to have the supervisory role?
13      MR. CALLAHAN:  Objection.        12:58:42PM
14      MR. NOVIKOFF:  Yeah, I just want to   12:58:44PM
15  caution you, Mr. Hesse, that any
16  conversations that you had with Mr. Gray in
17  his capacity as a village lawyer, I'm taking
18  the position as being confidential and
19  attorney-client privileged.
20      You can question him as to whether or  12:59:00PM
21  not it's appropriate, but --
22      MR. GOODSTADT:  I'm not sure -- it may  12:59:06PM
23  be privileged.  I'm not sure about
24  confidential.

Page 183

GEORGE HESSE

1       MR. NOVIKOFF:  Well, then, fine,    12:59:12PM
2   privilege.
3       MR. GOODSTADT:  There may be a certain  12:59:14PM
4   attorney-client privilege, which again I'm
5   not sure how appropriate it would be.
6   BY MR. GOODSTADT:                    12:59:17PM
7   Q   But just going back to the question --  12:59:17PM
8       MR. GOODSTADT:  Could you repeat the   12:59:19PM
9   question?
10      (Whereupon, the referred to portion   12:59:21PM
11  was read back by the court reporter:  Did
12  they tell you it was out of title to have
13  the supervisory role?)
14  A   Yes, that's the correct terminology.  12:59:34PM
15  Q   Who told you that?             12:59:37PM
16  A   I believe Joe Loeffler.        12:59:38PM
17  Q   Did he tell you anything else about   12:59:42PM
18  the title problem other than for the fact that
19  your supervisory role was out of title?
20  A   That's all I recall.           12:59:52PM
21  Q   Did he show you the letter that came   12:59:53PM
22  or any letter that came from Civil Service with
23  respect to this issue?
24  A   No.                           12:59:59PM

Page 184

GEORGE HESSE

1   Q   Do you recall -- you mentioned       12:59:59PM
2   March 27, 2007 this all came out.  Why is that
3   date relevant?
4   A   That's the date that I turned myself   1:00:08PM
5   in to the Suffolk County D.A.'s office for my
6   indictment.
7   Q   When did you learn you were indicted?  1:00:13PM
8   A   I believe within the week preceding   1:00:19PM
9   March 27th I had received a phone call from my
10  attorney.
11  Q   Okay.  And do you believe that the    1:00:26PM
12  issue with respect to the supervisory role being
13  out of title was connected with your indictment?
14      MR. CALLAHAN:  Objection to form.   1:00:36PM
15      MR. NOVIKOFF:  Objection.  Same.    1:00:37PM
16      MR. CONNOLLY:  Same.             1:00:38PM
17  A   Yes.                          1:00:39PM
18      MR. GOODSTADT:  Mark that, please.   1:00:41PM
19      (Whereupon, A letter dated January   1:00:42PM
20  2007 was marked as Plaintiff's Exhibit 5 for
21  identification, as of this date.)
22      MR. GOODSTADT:  I've placed in front   1:01:22PM
23  of Mr. Hesse what's been marked as Hesse 5.
24  It is a one-page letter from Allison Sanchez

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2      to Joseph Loeffler, Mayor, dated
3      January 4th, 2007.  I don't believe it
4      contains a Bates number.  (Handing.)
5  BY MR. GOODSTADT:                          1:01:42PM
6      Q    Mr. Hesse, have you ever seen the   1:01:43PM
7  letter marked as Hesse 5?
8      A    No.                     1:01:49PM
9      Q    So in January of '07 -- well, strike   1:01:50PM
10  that.
11          Do you recall whether this issue      1:01:53PM
12  reflected in this letter, being that your
13  supervisory capacity is outside of title, being
14  raised with you in January of '07?
15      A    I don't recall.            1:02:06PM
16      Q    So seeing the fact that this letter   1:02:07PM
17  came in January of '07, does that change your
18  belief that your indictment had something to do
19  with it?
20      A    Well, according to the date, correct.  1:02:17PM
21      Q    Did you ever speak with -- strike    1:02:19PM
22  that.
23          Do you know who Allison Sanchez is?  1:02:22PM
24      A    Yes, I do.                1:02:24PM
25      Q    Who was that?              1:02:25PM

GEORGE HESSE

1
2      A    She was the, I guess, account manager  1:02:25PM
3  in Civil Service that handled Ocean Beach.
4      Q    Did you deal with her regularly with   1:02:31PM
5  respect to Civil Service matters in connection
6  with Ocean Beach?
7          MR. NOVIKOFF:  Objection to form.     1:02:39PM
8          MR. CALLAHAN:  Same.          1:02:41PM
9          MR. CONNOLLY:  Same.          1:02:41PM
10      A    Yes.                    1:02:42PM
11      Q    How frequently did you speak or     1:02:42PM
12  communicate with her starting in 2005 -- strike
13  that -- starting in January 2006, when you
14  received the deputy chief position?
15          MR. CALLAHAN:  Objection to form.     1:02:57PM
16      A    Actually, I was dealing with Allison   1:02:58PM
17  earlier than 2006.
18      Q    Okay.  When did you start dealing with  1:03:03PM
19  Allison Sanchez?
20      A    I believe I started dealing with her    1:03:06PM
21  sometime in 2005.
22      Q    With respect to what?          1:03:11PM
23      A    The hiring and also correction of some  1:03:13PM
24  of the discrepancies with some of the police
25  officers that were working for us.

GEORGE HESSE

1
2      Q    Okay.  And we'll discuss those      1:03:24PM
3  discrepancies going forward.
4          But did you ever discuss this issue in  1:03:28PM
5  this letter, the supervisory capacity being
6  outside of title with Allison Sanchez?
7      A    I don't recall.            1:03:36PM
8      Q    Now, as of January 4, 2007, your title  1:03:38PM
9  within the village or at least the one that you
10  had been appointed to, was it still deputy chief
11  or had you been promoted again at some point
12  after that?
13      A    No.  I think it was just always deputy  1:03:53PM
14  chief.
15      Q    How about today, what's your title?   1:03:57PM
16      A    It's still, I would assume, deputy    1:03:59PM
17  chief.
18      Q    Have you ever been promoted to chief?  1:04:02PM
19      A    Not officially, no.          1:04:04PM
20      Q    Have you ever held yourself out to be   1:04:05PM
21  chief of police?
22      A    Yes.                    1:04:08PM
23      Q    To the public?             1:04:08PM
24      A    Yes.                    1:04:09PM
25      Q    People outside of Ocean Beach?       1:04:10PM

GEORGE HESSE

1
2      A    Yes.                    1:04:12PM
3      Q    To the State of New York, to        1:04:12PM
4  registries?
5      A    Yes.                    1:04:14PM
6      Q    Why would you hold yourself out to the  1:04:19PM
7  State of New York registries as chief of police
8  when that's not your title?
9          MR. CONNOLLY:  Objection to the form.  1:04:25PM
10          You can answer.            1:04:27PM
11      A    The village gave me the designation as  1:04:30PM
12  deputy chief, therefore I'm a chief.
13      Q    There's no difference between deputy   1:04:36PM
14  chief and chief of police?
15          MR. NOVIKOFF:  Objection to form.     1:04:41PM
16          MR. CALLAHAN:  Objection to form also.  1:04:43PM
17          MR. CONNOLLY:  Join.          1:04:44PM
18      A    There is a difference.        1:04:45PM
19      Q    So why would you hold yourself out as   1:04:46PM
20  chief of police if the village designated you as
21  deputy chief?
22      A    There's nobody to be the deputy to, so  1:04:49PM
23  therefore I am the chief.
24      Q    So you appointed yourself chief       1:04:54PM
25  because nobody is the chief; is that correct?

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2       MR. NOVIKOFF: Objection to form.   1:04:58PM
3       MR. CONNOLLY: Join.          1:05:00PM
4    A   Everybody calls me the chief.      1:05:01PM
5    Q   So just going back to my question   1:05:04PM
6  before.  Have you ever spoken with Allison
7  Sanchez about this issue?
8       MR. CALLAHAN: Objection to form.   1:05:11PM
9       MR. CONNOLLY: We're referring to the  1:05:12PM
10 out-of-title issue?
11      MR. GOODSTADT: Yeah, the out-of-title  1:05:14PM
12 issue that's reflected in Hesse 5.
13   A   I don't recall.             1:05:17PM
14   Q   Have you ever had any communication   1:05:18PM
15 with her about the out-of-title issue?
16      MR. CALLAHAN: As in 5?        1:05:24PM
17      MR. GOODSTADT: As in 5, yeah.    1:05:25PM
18   A   With me?  Pertaining to --     1:05:27PM
19   Q   With respect to your supervisory   1:05:29PM
20 capacity being outside of your title?
21   A   I don't recall.             1:05:34PM
22   Q   Do you still have your supervisory   1:05:35PM
23 capacity?
24   A   Yes.                      1:05:38PM
25   Q   So has anything ever been done to   1:05:39PM

GEORGE HESSE

1
2  correct the problem that they're raising in
3  Hesse 5?
4       MR. CALLAHAN: Objection to form.    1:05:45PM
5       MR. NOVIKOFF: Objection to form.    1:05:47PM
6       MR. CONNOLLY: Objection.        1:05:48PM
7    A   As of right now, no.           1:05:49PM
8    Q   Is anything scheduled to happen?    1:05:50PM
9       MR. CALLAHAN: Objection to form.    1:05:53PM
10   A   I hope so.                  1:05:54PM
11   Q   What's scheduled to happen?      1:05:55PM
12   A   Next -- what is it?  June 14th is   1:05:56PM
13 the next sergeant's test.
14   Q   Is there a chief's test?        1:06:00PM
15   A   There is.                  1:06:02PM
16   Q   Are you scheduled to take that as   1:06:05PM
17 well?
18   A   That just passed.  No.         1:06:07PM
19   Q   So you're in the chief role -- I just   1:06:12PM
20 want to be clear for the record.  You're in the
21 chief role at Ocean Beach without ever passing
22 the sergeant's test and without ever passing the
23 chief's test, correct?
24      MR. CALLAHAN: Objection to form.    1:06:24PM
25   A   Yes.                      1:06:25PM

GEORGE HESSE

1
2    Q   Do you know whether Civil Service has   1:06:26PM
3  approved the continuation of your supervisory
4  capacity being outside of title?
5       MR. CALLAHAN: Objection to form.    1:06:39PM
6    A   Unaware.                   1:06:40PM
7    Q   You don't know one way or the other?   1:06:40PM
8    A   No.                       1:06:40PM
9    Q   Have you ever spoken to anyone in   1:06:41PM
10 Civil Service about that issue?
11   A   No.                       1:06:45PM
12   Q   Just to be clear.  It's your      1:06:55PM
13 understanding that subsequent to January 2006,
14 when you were designated deputy chief of police,
15 that you haven't been designated in any other
16 title by the board; is that correct?
17   A   My employment status had changed as of   1:07:08PM
18 March 27th, 2007.
19   Q   What did that change to?        1:07:15PM
20   A   I was put on modified duty.        1:07:16PM
21   Q   By who?                   1:07:19PM
22   A   I believe I received a letter from the   1:07:22PM
23 village, the village board, maybe Mayor Loeffler
24 himself.
25   Q   And what did the modified duty change   1:07:31PM

GEORGE HESSE

1
2  with respect to your position at Ocean Beach?
3    A   Technically nothing.          1:07:42PM
4    Q   What do you mean by technically   1:07:45PM
5  nothing?
6    A   I was still in charge of the police   1:07:49PM
7  department.  The only function I did not
8  regularly do was go on patrol.  I was not to
9  wear a uniform.  I turned in my weapon.  And I
10 basically have done all the administrative work
11 in the department.
12   Q   Did you ever put on your uniform   1:08:05PM
13 during the time that you were on modified duty?
14   A   Yes.                      1:08:12PM
15   Q   How many times?            1:08:13PM
16   A   Twice.                     1:08:15PM
17   Q   How come?                 1:08:15PM
18   A   One was for a graduation ceremony for   1:08:17PM
19 three part-time seasonal police officers I was
20 hiring at the time.
21   Q   Was that Mills, Clemmons and Zois?   1:08:26PM
22   A   No.  It was Mills, Zois and I believe   1:08:31PM
23 Richard Tomanelli.
24   Q   And what was the other time?     1:08:37PM
25   A   The day that I hired or they got sworn   1:08:40PM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  in, Mills, Clemmons, and Zois was promoted to
3  full-time.
4      Q    And other than for those two        1:08:51PM
5  occasions, did you put your uniform on at all
6  during the modified duty period?
7      A    I don't recall if I did for any other  1:08:57PM
8  reason.
9      Q    Did your title change during that     1:09:00PM
10 period?
11     A    No.                          1:09:03PM
12     Q    Did Loeffler take over any of your    1:09:05PM
13 duties?
14     A    No.                          1:09:10PM
15     Q    Do you still hold yourself out as     1:09:35PM
16 chief of police during the modified duty period?
17     A    Yes.                         1:09:41PM
18     Q    And the village of Ocean Beach Police  1:09:43PM
19 Department, the letterhead, that identifies you
20 as chief of police?
21     A    No.  It just says police department  1:09:55PM
22 now under my name.
23     Q    Did it ever identify you as chief of  1:09:57PM
24 police?
25     A    Yes.                         1:10:00PM

GEORGE HESSE

1
2      Q    And who created that letterhead?     1:10:00PM
3      A    I did.                       1:10:02PM
4      Q    Did anyone approve it?            1:10:02PM
5      A    No.                          1:10:04PM
6      Q    And you sent letters out on that     1:10:04PM
7  letterhead outside of Ocean Beach?
8      A    Yes.                         1:10:08PM
9      Q    And why is it changed now to police   1:10:09PM
10 department as opposed to chief of police?
11     A    Well, I was advised by Mayor Loeffler  1:10:15PM
12 that maybe I should take that off.
13     Q    Did he tell you why you should take   1:10:19PM
14 that off?
15     A    Because I'm working out of class.    1:10:22PM
16     Q    When did he tell you that?         1:10:27PM
17     A    I don't recall.                 1:10:28PM
18     Q    When did you change the letterhead?  1:10:29PM
19     A    I don't recall.                 1:10:32PM
20     Q    Is there anything that would refresh  1:10:35PM
21 your recollection?  Do you have a date on your
22 computer that you actually changed it?
23     A    No.                          1:10:42PM
24     Q    Did you physically make the change?  1:10:43PM
25     A    Yes.                         1:10:45PM

GEORGE HESSE

1
2      Q    And what computer did you make the   1:10:46PM
3  change on?
4      A    I don't know.                  1:10:50PM
5      Q    Was it in your office?           1:10:51PM
6      A    Well, it's a shared office.        1:10:53PM
7      Q    But it wasn't a computer at home, it  1:10:55PM
8  was one within the police department?
9      A    Correct.                     1:11:00PM
10     Q    How many computers are in the office?  1:11:01PM
11     A    Three.                       1:11:02PM
12     Q    Do you have one on your desk?       1:11:03PM
13     A    Yes.                         1:11:04PM
14     Q    Where are the other two located?     1:11:05PM
15     A    One is at the front desk and one is on  1:11:07PM
16 the back desk.
17     Q    Do other officers have authority or   1:11:15PM
18 permission to use your computer?
19         MR. NOVIKOFF:  Objection.        1:11:20PM
20 BY MR. GOODSTADT:                     1:11:21PM
21     Q    The one that's on your desk?       1:11:21PM
22         MR. NOVIKOFF:  Compound.         1:11:24PM
23     A    Sometimes.                   1:11:24PM
24     Q    Do they have to ask you first?      1:11:25PM
25     A    Yes.                         1:11:27PM

GEORGE HESSE

1
2      Q    Did you ever search that computer for  1:11:34PM
3  documents that may be relevant to this
4  litigation?
5         MR. NOVIKOFF:  Objection to the form.  1:11:43PM
6         MR. CONNOLLY:  Same objection.     1:11:44PM
7         MR. NOVIKOFF:  Are you asking him to  1:11:46PM
8  form a legal conclusion as to what may be
9  relevant?
10 BY MR. GOODSTADT:                     1:11:51PM
11     Q    Did you ever search the computer in   1:11:51PM
12 connection with this case?
13     A    I may have.                   1:11:55PM
14     Q    You don't recall one way or the other?  1:11:57PM
15     A    No.                          1:11:59PM
16     Q    Do you know whether anybody searched  1:11:59PM
17 your computer to see if there were documents
18 that were relevant to this matter?
19     A    No.                          1:12:04PM
20         MR. NOVIKOFF:  Objection.        1:12:05PM
21     A    No.                          1:12:06PM
22     Q    Did anyone ever ask you to search your  1:12:07PM
23 computer?
24         MR. NOVIKOFF:  In connection with this  1:12:10PM
25 lawsuit?

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 197

GEORGE HESSE

1
2 MR. GOODSTADT: In connection with 1:12:13PM
3 this matter, yeah.
4 MR. NOVIKOFF: Sure. 1:12:15PM
5 A No. 1:12:16PM
6 Q Did you ever search your E-mail in 1:12:28PM
7 connection with this matter?
8 A I don't believe so. 1:12:34PM
9 Q Anyone ever ask you to search your 1:12:34PM
10 E-mail in connection with this matter?
11 A No. 1:12:38PM
12 MR. CONNOLLY: We're talking about his 1:12:39PM
13 work E-mail, correct?
14 BY MR. GOODSTADT: 1:12:41PM
15 Q Well, what's your work E-mail address? 1:12:42PM
16 A OBPD@villageofOceanBeach.org. 1:12:47PM
17 Q How long did you have that E-mail 1:12:53PM
18 address?
19 A You know, I don't know. I don't 1:12:56PM
20 recall.
21 Q Did you have an E-mail address for 1:13:00PM
22 work prior to OBPD@villageofOceanBeach.org?
23 A I had one that I used, yes. 1:13:10PM
24 Q What was that E-mail address? 1:13:10PM
25 A That was OBPD103@aol.com. 1:13:11PM

Page 198

GEORGE HESSE

1
2 Q And when did you have that E-mail 1:13:17PM
3 address? What was the file period?
4 A Probably from -- it's possible from 1:13:21PM
5 '95, when I got promoted. That's was shield
6 number, 103. Until the present.
7 Q Oh, so you still use that? 1:13:33PM
8 A Yes. 1:13:34PM
9 Q And you use the other one, too, 1:13:34PM
10 OBPD@villageofOceanBeach.org?
11 A Yes. 1:13:43PM
12 Q Did you search the OBPD103@aol 1:13:43PM
13 account --
14 A No. 1:13:45PM
15 Q -- in connection with this case? 1:13:45PM
16 A No. 1:13:47PM
17 Q Did you search the 1:13:47PM
18 OBPD@villageofOceanBeach.org E-mail in
19 connection with this matter?
20 A I don't believe so. 1:13:52PM
21 Q Do you know if anyone did? 1:13:52PM
22 A No, I don't know. 1:13:54PM
23 Q Do you use either of those 1:13:56PM
24 passwords from a home computer -- strike that.
25 Do you use either of those E-mail 1:14:00PM

Page 199

GEORGE HESSE

1
2 addresses from a home computer?
3 A Just the OBPD103. It's a personal 1:14:02PM
4 account.
5 Q Did you ever use any other personal 1:14:11PM
6 E-mail addresses?
7 A Sure. 1:14:15PM
8 Q Which ones? 1:14:15PM
9 A I have one that's 1:14:17PM
10 BeachCop03@aol.com.
11 Q Any others? 1:14:28PM
12 A I have BeachCop03@yahoo.com. 1:14:30PM
13 Q Any others? 1:14:40PM
14 A Yeah. I had something for an 1:14:42PM
15 investigation. It's ILUVFI159@yahoo.com.
16 Q Does that stand for I love Fire 1:15:03PM
17 Island?
18 A Yes. 1:15:07PM
19 Q And what is the 159? 1:15:08PM
20 A I don't know. I just made up a 1:15:09PM
21 number.
22 Q Does anyone have a shield 159 at Ocean 1:15:11PM
23 Beach?
24 A No. 1:15:15PM
25 Q Any other E-mail addresses that you've 1:15:15PM

Page 200

GEORGE HESSE

1
2 used in the last 10 years, personal E-mail
3 addresses?
4 A I don't recall. 1:15:21PM
5 Q Did you search the BeachCop03@aol 1:15:21PM
6 E-mail address in connection with this case?
7 A No. 1:15:28PM
8 Q Did you search the 1:15:28PM
9 BeachCop03@yahoo.com in connection with this
10 matter?
11 A No. 1:15:34PM
12 Q Did you search the ILUVFI159@yahoo.com 1:15:34PM
13 E-mail address in connection with this matter?
14 A No. 1:15:43PM
15 Q Did anyone ask you to search those 1:15:43PM
16 three E-mail accounts?
17 A No. 1:15:47PM
18 MR. GOODSTADT: It's a good time to 1:16:01PM
19 take a break.
20 THE VIDEOGRAPHER: That is the end of 1:16:04PM
21 Tape No. 2. The time is now 1:16 p.m.
22 We are now off the record. 1:16:08PM
23 (Whereupon, a discussion was held off 1:16:09PM
24 the record.)
25 THE VIDEOGRAPHER: This is the start 2:04:42PM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2  ever Tape No. 3.
3      The time is now 2:06 p.m.  We are now   2:05:50PM
4  back on the record.
5  BY MR. GOODSTADT:                          2:05:54PM
6      Q   Mr. Hesse, prior to us breaking for   2:05:55PM
7  lunch, we discussed a Sergeant Betenhause.
8          Do you remember that?              2:06:02PM
9      A   Betenhauser, yes.        2:06:04PM
10     Q   Betenhauser.                       2:06:05PM
11         And you indicated that he passed the   2:06:05PM
12  sergeant's test; is that correct?
13     A   Yes.                     2:06:10PM
14     Q   Did he pass the Suffolk County        2:06:10PM
15  sergeant's test or New York City sergeant's
16  test?
17         MR. NOVIKOFF:  Objection.   2:06:16PM
18     A   New York City.           2:06:16PM
19     Q   Do you know whether that satisfies the   2:06:17PM
20  requirement to pass the test to be a sergeant in
21  Suffolk County?
22         MR. CALLAHAN:  Objection to form.    2:06:21PM
23         MR. NOVIKOFF:  Objection.   2:06:22PM
24     A   I don't know.            2:06:23PM
25     Q   So you don't know one way or the     2:06:24PM

GEORGE HESSE

1
2  other?
3      A   No.                      2:06:26PM
4      Q   I believe you testified that your     2:06:34PM
5  wife's name is Sharon, did you say?
6      A   Shannon.                 2:06:38PM
7      Q   I apologize for that.  Shannon.       2:06:38PM
8          How long have you been married?      2:06:40PM
9      A   A little over 13 years.        2:06:41PM
10     Q   Is she your first wife?           2:06:45PM
11     A   Yes.                     2:06:46PM
12     Q   Have you ever cheated on her?       2:06:49PM
13         MR. CONNOLLY:  Objection.   2:06:52PM
14         MR. NOVIKOFF:  Whoa.  Whoa.   2:06:53PM
15         MR. GOODSTADT:  It's part of the   2:06:56PM
16  allegations in the case.  You know it is.
17         MR. NOVIKOFF:  Well, just because you   2:06:58PM
18  allege it in the case doesn't make it
19  relevant.  But he's not my witness, so I
20  can't tell him not to answer or not.
21         MR. CONNOLLY:  Objection.  Do you want   2:07:05PM
22  to -- objection.
23         MR. GOODSTADT:  You can mark it as   2:07:08PM
24  confidential, you can do what you want, but
25  it's certainly relevant.

GEORGE HESSE

1
2          MR. NOVIKOFF:  Well, like I said, it's   2:07:14PM
3  not my witness.  I can't say anything.
4          MR. CONNOLLY:  In terms of the   2:07:18PM
5  complaint?
6          MR. GOODSTADT:  In terms of the   2:07:21PM
7  complaint.
8          MR. CONNOLLY:  On duty?     2:07:22PM
9          MR. GOODSTADT:  There are several   2:07:25PM
10  allegations with respect to that, yes.
11         MR. CONNOLLY:  As to -- why don't you   2:07:29PM
12  ask him the allegation, you know, as
13  contained in the complaint.
14         MR. GOODSTADT:  Well, because I'm   2:07:38PM
15  going to work my way to that.  As
16  Mr. Novikoff likes to do, set a foundation.
17  Then I'll have an objection on foundation
18  grounds now.
19         MR. NOVIKOFF:  Well, you could ask   2:07:51PM
20  him -- well, first of all, I'm staying out
21  of this.
22         You're not my witness.  I would never   2:07:55PM
23  let you answer it, but it's not for me to
24  make that decision.
25         MR. CONNOLLY:  Why don't we do it this   2:08:03PM

GEORGE HESSE

1
2  way.  I'm going to object.  It's something
3  we can bring up to the judge when we bring
4  up other items.  Why don't we continue.
5  He's coming back.  You'll have an
6  opportunity.
7          MR. NOVIKOFF:  And we do have an   2:08:17PM
8  appearance now on June 11th.
9          MR. GOODSTADT:  Right.  I saw that.  I   2:08:21PM
10  saw that.
11         So you're instructing him not to   2:08:23PM
12  answer pending a --
13         MR. CONNOLLY:  Guidance from the   2:08:26PM
14  court.
15         MR. GOODSTADT:  Guidance from the   2:08:28PM
16  court?
17         MR. CONNOLLY:  I mean, we do have a   2:08:29PM
18  lot of get through here.
19         MR. GOODSTADT:  I understand.  I   2:08:38PM
20  certainly understand that.  I'm just trying
21  to figure out if we want to get on the phone
22  with the court right now.  I think it's
23  relevant to this whole next line of
24  questioning.
25         MR. CONNOLLY:  And again, this next   2:08:47PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 205

GEORGE HESSE

1
2  line of questioning, I'm sure, is a portion
3  of a much further line of questioning that
4  we could segregate and address at a later
5  time if need be.
6      MR. GOODSTADT:  Let me just ask him   2:09:01PM
7  questions, and then we'll figure out if I
8  need to get back to that question.
9      MR. NOVIKOFF:  Okay.  Okay.   2:09:06PM
10 BY MR. GOODSTADT:   2:09:13PM
11     Q   Mr. Hesse, have you ever posted on any   2:09:14PM
12 social networking sites?
13     A   Yes.   2:09:19PM
14     Q   Okay.  Which ones?   2:09:20PM
15     A   Adult Friend Finder.  Ashley   2:09:23PM
16 Madison.com.  And I don't recall, there may have
17 been others.  You know what, there is one more.
18 Loveinuniform.com.
19     Q   L-O-V-E-I-N-U-N-I-F-O-R-M?   2:09:53PM
20     A   Spell it again.   2:09:59PM
21     Q   L-O-V-E-I-N-U-N-I-F-O-R-M.com?   2:10:00PM
22     A   That sounds right.   2:10:06PM
23     Q   Any others?   2:10:07PM
24     MR. CONNOLLY:  Just note my continuing   2:10:08PM
25 objection to this line of questioning.

Page 206

GEORGE HESSE

1
2      MR. GOODSTADT:  Sure.   2:10:11PM
3     A   Not that I recall.  I don't know.   2:10:11PM
4     Q   Did you post on a site called -- I   2:10:13PM
5  don't know how to pronounce it.  It's spelled
6  M-I-G-E-N-T-E.com?
7     A   What is it?   2:10:20PM
8     Q   Migente, M-I-G-E-N-T-E.com?   2:10:23PM
9     A   Yes, actually I did for a short period   2:10:26PM
10 of time.
11     Q   How about on a website called   2:10:31PM
12 Fubar.com, F-U-B-A-R?
13     A   Yes.   2:10:36PM
14     Q   How about on any Yahoo age-restricted   2:10:39PM
15 groups?
16     MR. CONNOLLY:  Objection.   2:10:47PM
17     MR. NOVIKOFF:  Yeah, I don't know what   2:10:48PM
18 that means.
19 BY MR. GOODSTADT:   2:10:50PM
20     Q   A Solena_party Yahoo group, do you   2:10:50PM
21 recall posting on that?  S-O-L-E-N-A_party.
22     A   It's not a post.  It's a group.   2:11:03PM
23     Q   Have you ever posted on that site?   2:11:05PM
24     A   No.   2:11:07PM
25     Q   Sure about that?   2:11:08PM

Page 207

GEORGE HESSE

1
2     A   I never posted anything that I recall   2:11:11PM
3  other than joining the group.
4     Q   You don't recall posting any messages   2:11:18PM
5  on that site?
6     A   I don't recall.   2:11:21PM
7     Q   Okay.  How about any AOL social groups   2:11:21PM
8  or networking groups?
9     A   I don't know if AOL has any social   2:11:30PM
10 networking groups.  It's a -- it's just a user
11 site.  They have chat rooms and stuff like that.
12     Q   What was the user name you used on   2:11:40PM
13 Adult Friend Finder?
14     A   You know, I don't recall.   2:11:45PM
15     Q   What E-mail address did you use?   2:11:48PM
16     A   BeachCop03.   2:11:51PM
17     MR. NOVIKOFF:  BeachCop what?   2:11:55PM
18     THE WITNESS:  BeachCop03.   2:11:57PM
19 BY MR. GOODSTADT:   2:11:59PM
20     Q   @aol.com?   2:11:59PM
21     A   Yes.   2:12:01PM
22     Q   What name did you use on   2:12:02PM
23 AshleySabrina.com?
24     A   It wasn't Ashley Sabrina.   2:12:09PM
25     Q   Oh, it wasn't?  Ashley Madison.  I   2:12:12PM

Page 208

GEORGE HESSE

1
2  apologize for that.
3      What user name did you use on that?   2:12:19PM
4     A   It might be Copper103.   2:12:24PM
5     Q   C-O-P-P-E-R 103?   2:12:28PM
6     A   Yes.   2:12:30PM
7     Q   And what E-mail address did you use?   2:12:31PM
8     A   BeachCop103.   2:12:33PM
9     Q   What user name did you use on   2:12:36PM
10 loveinuniform.com?
11     A   That is, I believe BeachCopp with two   2:12:43PM
12 Ps at the end.
13     Q   What E-mail address did you use?   2:12:48PM
14     A   BeachCop03@aol.com.   2:12:50PM
15     MR. CONNOLLY:  Andrew, I'm going to   2:12:58PM
16 cut this off at this point.
17     MR. GOODSTADT:  How come?   2:13:01PM
18     MR. CONNOLLY:  Where are you going   2:13:03PM
19 with it?  There are allegations contained in
20 the complaint regarding chauffeuring my
21 client around.
22     MR. GOODSTADT:  Yeah, to different   2:13:12PM
23 sexual escapades, right.  I'm setting a
24 foundation that he's engaged in sexual
25 escapades.  It certainly leads a lot of

053690b6-a7be-44d9-9835-90b3e21fffd8

1        GEORGE HESSE
2    credibility toward the allegations, correct?
3    You have to --
4        MR. CONNOLLY: Why don't you ask him   2:13:28PM
5    questions limited to the complaint; and if
6    you need to, we'll bring this before the
7    court.
8        MR. GOODSTADT: Well, let me just go   2:13:36PM
9    back.
10       MR. NOVIKOFF: My only comment would   2:13:39PM
11   be that to the extent it's even relevant,
12   it's certainly not relevant after the date
13   that these officers were either not rehired
14   or fired, however we term that date to be.
15   But like I said, that's my only comment.
16   BY MR. GOODSTADT:                2:13:56PM
17   Q    Well, did you ever post on any of   2:13:57PM
18   these social network sites from the police
19   station computers?
20   A    I've checked E-mails.        2:14:03PM
21   Q    Did you ever post any pictures of   2:14:07PM
22   yourself on these sites?
23   A    Yes.                       2:14:10PM
24   Q    In uniform?                 2:14:10PM
25   A    Yes.                       2:14:11PM

1        GEORGE HESSE
2    Q    In the Ocean Beach police uniform?   2:14:11PM
3    A    Yes.                       2:14:13PM
4    Q    Did you notify anybody in the beach   2:14:20PM
5    that you were posting pictures of yourself on
6    these social websites in uniform?
7        MR. NOVIKOFF: Note my objection to   2:14:27PM
8    that question.
9        MR. CONNOLLY: Objection also.       2:14:28PM
10   A    Did I -- I don't understand the   2:14:31PM
11   question.
12   Q    Did you notify anyone at the beach,   2:14:32PM
13   the mayor, the board, Chief Paradiso when he was
14   there?
15   A    No.                        2:14:38PM
16   Q    Do you know if there are any rules   2:14:41PM
17   regarding pictures of yourself in a uniform
18   anywhere or posing in a uniform for anything?
19   A    Are there rules?            2:14:52PM
20   Q    Are there any rules?         2:14:54PM
21   A    Not that I'm aware of.       2:14:55PM
22   Q    Did you ever send or respond to any   2:14:57PM
23   E-mails that you checked from the Ocean Beach
24   police computer?
25   A    Yes.                       2:15:23PM

1        GEORGE HESSE
2    Q    How many times?             2:15:24PM
3    A    Oh, I don't know.           2:15:26PM
4    Q    What years?                 2:15:26PM
5    A    I don't know.               2:15:28PM
6    Q    Do you know when it started that you   2:15:29PM
7    first started checking E-mails at the police
8    station on any of these social network websites?
9    A    When it started, no.        2:15:36PM
10   Q    You don't recall what year?     2:15:38PM
11   A    No.                        2:15:40PM
12   Q    Do you still check E-mails from any of   2:15:42PM
13   these websites?
14   A    Yes.                       2:15:45PM
15   Q    Which ones?                 2:15:45PM
16   A    Ashley Madison and the loveinuniform   2:15:48PM
17   and Fubar.
18       MR. CONNOLLY: Objection to any       2:16:01PM
19   questioning since April 2nd, 2006 in this
20   regard.
21       MR. GOODSTADT: The objection, I don't   2:16:08PM
22   think it's a -- relevance is not a basis to
23   instruct the witness not to answer, you
24   know.  We're more than willing to have your
25   objection on the record.  We can bring it up

1        GEORGE HESSE
2    to the court when we raise all these other
3    issues.
4        MR. CONNOLLY: It will be brought up   2:16:24PM
5    to the court.
6        MR. GOODSTADT: Right.  Okay.         2:16:26PM
7        Now I'll suspended the questioning on   2:16:53PM
8    this.  I just want to ask him what E-mail
9    addresses he used, and then I'll suspend
10   other questions on this pending our
11   discussion with the court.  I just want on
12   the record what E-mail address were used, if
13   that's all right with you.
14       MR. CONNOLLY: Why don't we just refer   2:17:09PM
15   the questions to the court and move on.
16   We're coming back on the 16th.  It's not
17   your only shot at the apple.
18       MR. GOODSTADT: I know.  Why don't you   2:17:27PM
19   just give me a minute off the record just to
20   think about it and see how it plays into the
21   next set of questions.
22       THE VIDEOGRAPHER: The time is         2:17:39PM
23   2:17 p.m.  We are now off the record.
24       (Whereupon, a discussion was held off   2:17:43PM
25   the record.)

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 213

GEORGE HESSE

1    GEORGE HESSE
2    THE VIDEOGRAPHER: The time is now    2:28:13PM
3    2:28 p.m. We are now back on the record.
4    MR. GOODSTADT: Okay. Before we took    2:28:18PM
5    that break, Mr. Connolly and I conferred off
6    the record and decided that on this subject
7    I was going to ask just a limited number of
8    questions that we've agreed to, and it's
9    going to be certain topics that will be
10   subject to further discussion with the
11   court.
12   Is that acceptable, Mr. Connolly?    2:28:36PM
13   MR. CONNOLLY: That's acceptable.    2:28:38PM
14   BY MR. GOODSTADT:    2:28:39PM
15   Q   Now, Mr. Hesse, have you ever met any    2:28:39PM
16   of the people that you've posted with or
17   E-mailed with on any social network site in
18   person?
19   A   Yes.    2:28:51PM
20   MR. NOVIKOFF: Objection.    2:28:52PM
21   MR. CONNOLLY: Continuing objection.    2:28:53PM
22   BY MR. GOODSTADT:    2:28:54PM
23   Q   And did you ever meet with any of    2:28:55PM
24   those people that you've E-mailed with or posted
25   with on these social network sites on Fire

Page 214

1    GEORGE HESSE
2    Island?
3    A   No.    2:29:06PM
4    Q   So it was off of Fire Island?    2:29:14PM
5    A   Yes.    2:29:16PM
6    MR. NOVIKOFF: Objection.    2:29:17PM
7    MR. CONNOLLY: Objection.    2:29:18PM
8    MR. NOVIKOFF: If it's not on.    2:29:20PM
9    MR. GOODSTADT: I just want to make    2:29:21PM
10   sure.
11   BY MR. GOODSTADT:    2:29:24PM
12   Q   And the pictures that you posted on    2:29:27PM
13   these sites, did you ever post them from the
14   police station computer? I just want to know
15   physically where you uploaded them from.
16   MR. CONNOLLY: Objection.    2:29:37PM
17   A   I may have.    2:29:39PM
18   Q   Okay.    2:29:40PM
19   MR. GOODSTADT: And again, the rest of    2:29:43PM
20   the questions will just be subject to motion
21   or discussion with the court.
22   BY MR. GOODSTADT:    2:29:52PM
23   Q   Have you ever posted on Facebook?    2:29:53PM
24   A   Yes. Yes.    2:29:55PM
25   Q   Did you ever change any of your    2:29:55PM

Page 215

1    GEORGE HESSE
2    privacy settings in Facebook in your posting?
3    A   Yes.    2:30:00PM
4    Q   What did you change your privacy    2:30:00PM
5    settings to?
6    A   From public to private.    2:30:03PM
7    Q   And did you ever post on My Space?    2:30:14PM
8    A   Yes.    2:30:16PM
9    Q   Did you ever change your privacy    2:30:17PM
10   settings on myspace.com?
11   A   I don't know if they had a way that    2:30:23PM
12   you can do that. I'm not sure.
13   Q   What did you do, if anything, to    2:30:42PM
14   prepare for today's deposition?
15   A   I met with my attorney on Monday and    2:30:47PM
16   Tuesday.
17   Q   When you say your attorney, who are    2:30:50PM
18   you referring to?
19   A   Mr. Connolly.    2:30:57PM
20   Q   And where did you meet with him?    2:30:58PM
21   A   In Westchester, at his office.    2:31:00PM
22   Q   Who was present at the meeting?    2:31:03PM
23   A   Just he and I.    2:31:05PM
24   Q   How long did you meet with him?    2:31:08PM
25   Without telling me anything that you said to him

Page 216

1    GEORGE HESSE
2    or he said to you, how long did you meet with
3    him on each of those days?
4    MR. CONNOLLY: Exclusive of lunch,    2:31:17PM
5    breaks?
6    MR. GOODSTADT: Yeah. Just meeting    2:31:21PM
7    time. Either inclusive or exclusive.
8    A   On Monday, I arrived at 9:30, and at    2:31:26PM
9    some point we took lunch, and I believe I left
10   somewhere around 5:00.
11   Q   How about Tuesday?    2:31:36PM
12   A   Tuesday I arrived at 9:30, and I    2:31:37PM
13   believe I left at 4:00.
14   Q   Were you on the clock at the beach at    2:31:48PM
15   the time?
16   A   Yes.    2:31:50PM
17   Q   So you got paid for that -- those two    2:31:51PM
18   days?
19   A   Yes.    2:31:53PM
20   Q   Are you on the clock today for the    2:31:54PM
21   beach?
22   A   Yes.    2:31:56PM
23   Q   So you're getting paid for today as    2:31:56PM
24   well?
25   A   Yes.    2:31:58PM

TSG Reporting – Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 217

GEORGE HESSE

1
2     Q   And again, don't tell me anything that  2:32:04PM
3  you said to your attorney or your attorney said
4  to you.  But did you review any documents in
5  preparation for today's deposition?
6     A   Yes.                          2:32:13PM
7     Q   Did any of those documents refresh    2:32:14PM
8  your recollection as to any of the facts or
9  events that happened or that are alleged to have
10  happened in this case?
11    A   No.                           2:32:27PM
12    Q   Did you speak with -- well, strike   2:32:36PM
13  that.
14        Have you ever -- other than for today,  2:32:39PM
15  sitting in this room, have you ever spoken to
16  any lawyers from Rivkin Radler in connection
17  with this matter?
18        MR. NOVIKOFF:  Objection.  Asked and  2:32:48PM
19  answered.
20    A   No.                           2:32:49PM
21    Q   Did you speak with anybody -- any    2:32:52PM
22  current or former Ocean Beach employees in
23  preparation for today's deposition?
24    A   No.                           2:33:00PM
25    Q   Did you tell anybody at the beach that  2:33:03PM

Page 218

GEORGE HESSE

1
2  you were coming today for the deposition?
3     A   Yes.                          2:33:06PM
4     Q   Who did you tell?                2:33:07PM
5     A   Ty Bacon, John -- Pat Cherry, Pat    2:33:10PM
6  Cherry, Jr., Joe Dediminico, Billy Bambrick,
7  Hank Clemmons, Michael Mills, John Zois.  It's
8  possible a few other.
9     Q   Did you tell Joe Loeffler?        2:33:43PM
10    A   I told him I was scheduled for today,  2:33:47PM
11  yes.
12    Q   Did you discuss anything else with him  2:33:55PM
13  about this case in that conversation --
14    A   No.                           2:33:59PM
15    Q   -- other than the fact that you were  2:33:59PM
16  scheduled to come for a deposition?
17    A   No.                           2:34:03PM
18    Q   How did you tell the other people,   2:34:04PM
19  Bacon, Cherry, Cherry junior, Dediminico, et
20  cetera?  Did you tell them verbally or did you
21  send out an E-mail or a letter or memo or some
22  other way?
23    A   Verbal.                       2:34:16PM
24    Q   Did you tell them all together or    2:34:16PM
25  separately?

Page 219

GEORGE HESSE

1
2     A   Separately.                    2:34:19PM
3     Q   What did Bacon say when you told him  2:34:20PM
4  you were coming in for the deposition?
5     A   Good luck.                     2:34:25PM
6     Q   Did you discuss the substance of the   2:34:26PM
7  claims at all with Bacon?
8     A   No.                           2:34:29PM
9     Q   Did you ever discuss with Bacon      2:34:29PM
10  anything about his deposition that was taken in
11  this case?
12    A   Just the fact that he had come and was  2:34:=
34PM
13  deposed.
14    Q   Do you recall what he said about that?  2:34:37PM
15    A   No.                           2:34:41PM
16    Q   So you don't recall anything        2:34:46PM
17  substantive about what he said other than for
18  the fact that he was deposed?
19    A   No substance.                  2:34:52PM
20    Q   Did you ever review his transcript or  2:34:53PM
21  any excerpts of his transcript from this
22  deposition?
23    A   No.                           2:34:59PM
24    Q   And when you told Pat Cherry that you  2:34:59PM
25  were coming in today, what did he say in that

Page 220

GEORGE HESSE

1
2  conversation?
3     A   Good luck.                     2:35:04PM
4     Q   Anything else?                  2:35:05PM
5     A   No.                           2:35:06PM
6     Q   Did you discuss the substance of the   2:35:06PM
7  claims or allegations in this case with him?
8     A   No.                           2:35:11PM
9     Q   Did you ever discuss with Pat Cherry  2:35:11PM
10  anything about his deposition that was taken in
11  this case?
12    A   No.                           2:35:17PM
13    Q   Did he tell you that he was coming for  2:35:19PM
14  a deposition?
15    A   Yes.                          2:35:21PM
16    Q   Did you speak to him after his        2:35:22PM
17  deposition?
18    A   Yes.                          2:35:24PM
19    Q   About the deposition?             2:35:24PM
20    A   Yes.                          2:35:25PM
21    Q   And what did he say about it?        2:35:25PM
22    A   He said it went all right.          2:35:27PM
23    Q   Anything else?                  2:35:29PM
24    A   No.                           2:35:29PM
25    Q   Did you discuss the substance at all,  2:35:30PM

55 (Pages 217 to 220)

053690b6-a7be-44d9-9835-90b3e21fffd8

1          **GEORGE HESSE**
2   any of the questions that were asked?
3      A    No.                    2:35:34PM
4      **Q    Did you ever review his transcript or  2:35:35PM**
5   **any excerpts from his transcript from the**
6   **deposition in this case?**
7      A    Yes.                   2:35:41PM
8      **Q    When did you do that?          2:35:42PM**
9      A    I don't know the exact date, but I had  2:35:44PM
10  requested since I wasn't going to be present for
11  the depositions, if Mr. Connolly could send me a
12  copy so I could just look at them.
13     **Q    Of just Cherry's or everybody's?     2:35:55PM**
14     A    Of everybody's.           2:35:58PM
15     **Q    So you reviewed everybody's deposition  2:35:59PM**
16  **transcripts in this case?**
17     A    No.                    2:36:02PM
18     **Q    Which ones have you reviewed?      2:36:03PM**
19     A    I have read Mr. Snyder's.  I've read  2:36:04PM
20  Kevin Lamm's.  I read Joe Nofi's.  I read Eddie
21  Carter's.  I read Maryann Minerva's.  I read I
22  think the first half of Natalie Rogers.  That
23  may be it.
24     **Q    Did you read Joe Loeffler's?       2:36:41PM**
25     A    No.                    2:36:44PM

1          GEORGE HESSE
2      **Q    Did you read Allison Sanchez?      2:36:44PM**
3      A    No.                    2:36:46PM
4      **Q    Did you speak with Minerva about her  2:36:47PM**
5   **deposition?**
6          MR. NOVIKOFF:  Before or after?   2:36:51PM
7          MR. GOODSTADT:  Either.        2:36:52PM
8          MR. NOVIKOFF:  Okay.          2:36:54PM
9          MR. GOODSTADT:  I'm trying to truncate  2:36:55PM
10  some of the questions.
11     A    Yes.                   2:36:57PM
12     **Q    Before or after?            2:36:58PM**
13     A    Before and after.          2:36:59PM
14     **Q    What did you discuss with her before  2:36:59PM**
15  **her deposition?**
16     A    Just the fact that she was coming.  2:37:02PM
17     **Q    Have you ever discussed -- before her  2:37:04PM**
18  **deposition, did you ever discuss the substance**
19  **of any of the allegations made in the complaint?**
20     A    Just like I said previous, that it was  2:37:11PM
21  baseless.
22     **Q    But nothing specific about any of the  2:37:13PM**
23  **specific allegations?**
24     A    Nothing specific, no.        2:37:17PM
25     **Q    Okay.  And did you speak with her    2:37:18PM**

1          **GEORGE HESSE**
2   **after the deposition --**
3      A    Yes.                   2:37:23PM
4      **Q    -- as well?                2:37:23PM**
5          And when did you speak with her after  2:37:24PM
6   her deposition?
7      A    Maybe a day or two after.     2:37:27PM
8      **Q    And what did she say in that      2:37:29PM**
9   **conversation?**
10     A    Other than she had to go to the city,  2:37:34PM
11  she had a headache and that she felt slightly
12  intimidated by Mr. Fiorillo, that was it.
13     **Q    Did she tell you anything        2:37:45PM**
14  **substantively about her deposition?**
15     A    No.                    2:37:48PM
16     **Q    How about Natalie Rogers, did you ever  2:37:52PM**
17  **speak to her about her deposition?**
18     A    No.                    2:37:57PM
19     **Q    Did you ever speak with Joe Loeffler  2:37:59PM**
20  **about his deposition?**
21     A    No, other than the fact that he came  2:38:03PM
22  and took -- and gave his deposition.
23     **Q    You didn't speak anything        2:38:07PM**
24  **substantive -- you didn't speak anything with**
25  **him about the substance of his deposition?**

1          **GEORGE HESSE**
2      A    No.                    2:38:13PM
3      **Q    Did you speak with -- strike that.   2:38:15PM**
4          Did you read the transcript of Gary  2:38:18PM
5   Bosetti's deposition?
6      A    No.                    2:38:21PM
7      **Q    How about Richard Bosetti's       2:38:22PM**
8   **deposition?**
9      A    No.  I haven't received them.   2:38:24PM
10     **Q    Have you spoken with either of them  2:38:25PM**
11  **about their depositions?**
12     A    Just Gary, as far as him just coming  2:38:28PM
13  to give his deposition.  And Richie also.  I'm
14  sorry, yes.
15     **Q    Before they took their depositions or  2:38:36PM**
16  **after?**
17     A    I believe they -- Gary had called me  2:38:38PM
18  just to advise me that he was coming in and Gary
19  himself called me again to tell me that Richie
20  was going in, and then he called me to tell me
21  that either he was done or his brother was done.
22     **Q    Did he tell you anything substantively  2:38:53PM**
23  **about their depositions?**
24     A    No.                    2:38:57PM
25     **Q    Did you see the Bosettis in the     2:38:57PM**

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 225

GEORGE HESSE

1   GEORGE HESSE
2   hospital after Rich Bosetti was in a motorcycle
3   accident?
4       A   Yes, I did.                    2:39:04PM
5       Q   Did you discuss anything at all about   2:39:05PM
6   this case with them at that time?
7       A   No.                           2:39:09PM
8       Q   Did you discuss anything about their   2:39:10PM
9   depositions with them at that time?
10      A   No.                           2:39:12PM
11      Q   Did you ever read Allison Sanchez's   2:39:16PM
12  transcript?
13      A   I don't believe I received hers   2:39:21PM
14  either.
15      Q   Have you spoken with Ms. Sanchez at   2:39:22PM
16  all about her deposition?
17      A   Very briefly, yes.             2:39:26PM
18      Q   When did you speak to her?       2:39:27PM
19      A   I ran into her in Riverhead court one   2:39:29PM
20  day. I don't remember the specific day. And
21  she just said that he had come to the
22  deposition, and that was it. I introduced her
23  to my wife, and we just chatted for a little
24  bit.
25      Q   Did you tell her -- strike that.   2:39:43PM

Page 226

GEORGE HESSE

1   GEORGE HESSE
2       Did she tell you anything substantive   2:39:45PM
3   about her deposition?
4       A   The only thing that she did mention   2:39:48PM
5   was the part about sexual relations between me
6   and her, and she said she threw up in her mouth
7   and she laughed.
8       MR. NOVIKOFF: She actually did throw   2:39:58PM
9   up.
10      A   She thought it was a joke.       2:40:01PM
11      Q   Did she say anything else about her   2:40:05PM
12  deposition?
13      A   No. Our conversation was actually   2:40:08PM
14  pretty brief. She had a -- she's a parole
15  officer now. So she had to move on and do her
16  job, I guess. I don't know.
17      Q   After you received the complaint in   2:40:20PM
18  this case, did you ever discuss the substantive
19  allegations with Allison Sanchez?
20      A   I believe that we did discuss the   2:40:27PM
21  allegation of us having a sexual relationship.
22  That would be it.
23      Q   When did you have that discussion?   2:40:33PM
24      A   I don't recall.                 2:40:34PM
25      Q   What was the substance of that   2:40:39PM

Page 227

GEORGE HESSE

1   GEORGE HESSE
2   discussion?
3       A   How funny it was that somebody would   2:40:42PM
4   make an allegation like that.
5       Q   Anything else that you discussed about   2:40:49PM
6   that allegation?
7       A   Yeah. She said that she couldn't   2:40:56PM
8   believe that the allegation was made by these
9   individuals, especially since they were in her
10  office and they saw pictures of her partner on
11  the wall, that these guys must not be very good
12  investigators.
13      Q   What do you mean by that, saw pictures   2:41:12PM
14  of her on the wall?
15      MR. NOVIKOFF: What does he mean by   2:41:18PM
16  that?
17  BY MR. GOODSTADT:                       2:41:20PM
18      Q   Do you know what she meant by that?   2:41:20PM
19      MR. CALLAHAN: Objection to form.   2:41:23PM
20      A   By the fact that they were in her   2:41:24PM
21  office and she had pictures of her partner all
22  over the place.
23      Q   And how did she reach the conclusion,   2:41:31PM
24  if you know, that they weren't very good
25  investigators?

Page 228

GEORGE HESSE

1   GEORGE HESSE
2       MR. CALLAHAN: Objection to form.   2:41:42PM
3       MR. NOVIKOFF: Yeah, I join in.   2:41:43PM
4       A   She flat out said that she didn't   2:41:44PM
5   think they were smart cops.
6       Q   And her conclusion was based on the   2:41:48PM
7   fact that --
8       MR. CALLAHAN: Objection to form.   2:41:52PM
9       MR. GOODSTADT: We're objecting now   2:41:54PM
10  before questions are even asked?
11      MR. CALLAHAN: I thought you were   2:42:11PM
12  done.
13      MR. GOODSTADT: No, I wasn't.   2:42:12PM
14      MR. NOVIKOFF: Just note my objection   2:42:15PM
15  to all the questions.
16      MR. GOODSTADT: Welch can step in.   2:42:21PM
17  BY MR. GOODSTADT:                       2:42:28PM
18      Q   Do you know what her conclusion was   2:42:28PM
19  based on?
20      MR. CALLAHAN: Objection to form.   2:42:31PM
21      MR. NOVIKOFF: I join.            2:42:33PM
22      A   I would say it was based on the fact   2:42:34PM
23  that they made this allegation that I had sexual
24  relations with her, when she was, in fact, a
25  lesbian.

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 229

GEORGE HESSE

1
2    Q   Does the fact that she's a lesbian   2:42:44PM
3    preclude that allegation from being true?
4        MR. CALLAHAN: Objection to form.   2:42:45PM
5        MR. NOVIKOFF:  Physically?   2:42:46PM
6        MR. GOODSTADT:  Yeah.   2:42:48PM
7        MR. NOVIKOFF:  I think the record   2:42:48PM
8    could reflect that we can all stipulate that
9    lesbians can have sex with men.
10       MR. GOODSTADT:  Okay.   2:42:55PM
11   BY MR. GOODSTADT:   2:42:55PM
12   Q   You testified when you were a   2:43:00PM
13   sergeant, that your tours were on Friday,
14   Saturday nights; is that correct?
15   A   Correct.   2:43:09PM
16   Q   And you were the most senior officer   2:43:10PM
17   on that tour?
18   A   Yes.   2:43:13PM
19   Q   Now, if an officer on your tour had a   2:43:16PM
20   problem or a complaint in the chain of the
21   command, would they come to you with that
22   problem or complaint?
23   A   If they were working a tour with me   2:43:26PM
24   they would probably come right to me first.
25   Q   That's the way the chain of command   2:43:31PM

Page 230

GEORGE HESSE

1
2    works?
3    A   Sure.   2:43:33PM
4    Q   And did you ever hear Paradiso tell   2:43:37PM
5    the officers in Ocean Beach or any officer in
6    Ocean Beach that what happens on my tour, I'm
7    handling; what happens on officer Hesse's tour
8    he handles?
9    A   I never heard that.   2:43:51PM
10   Q   You never heard that.   2:43:53PM
11   Was there a set -- let's go to 2003.   2:44:03PM
12   Was there a set group of guys that were on your
13   tour?
14   A   I would say yes, but it fluctuated   2:44:13PM
15   from day to day.
16   Q   Who generally would be on your tour,   2:44:16PM
17   the core group?
18   A   2003, I'd have to look at the   2:44:19PM
19   schedule.  I don't know.
20   Q   Was Ed Carter on your tour a lot in   2:44:24PM
21   '03?
22   A   Sometimes.   2:44:29PM
23   Q   How about Tom Snyder?   2:44:29PM
24   A   Sometimes.   2:44:31PM
25   Q   Joe Nofi?   2:44:33PM

Page 231

GEORGE HESSE

1
2    A   Sometimes.   2:44:34PM
3    Q   Kevin Lamm?   2:44:35PM
4    A   Sometimes.   2:44:36PM
5    Q   How about Frank Fiorillo?   2:44:38PM
6    A   And sometimes, yeah.   2:44:39PM
7    Q   How about in '04, was Carter on your   2:44:42PM
8    tour a lot?
9        MR. NOVIKOFF:  Objection.   2:44:46PM
10       What do you mean by a lot?   2:44:48PM
11       MR. GOODSTADT:  Well, I think I asked   2:44:50PM
12   if there was a set group of guys, and he
13   said generally there were, but it
14   fluctuated.
15   BY MR. GOODSTADT:   2:44:56PM
16   Q   So would Carter be one of the general   2:44:56PM
17   group of guys that were on your tour in '04?
18   A   Sometimes.   2:45:03PM
19   Q   How about Snyder?   2:45:03PM
20   A   Sometimes.   2:45:04PM
21   Q   Nofi?   2:45:05PM
22   A   Sometimes.   2:45:05PM
23   Q   Lamm?   2:45:06PM
24   A   Sometimes.   2:45:07PM
25   Q   Fiorillo?   2:45:08PM

Page 232

GEORGE HESSE

1
2    A   Sometimes.   2:45:08PM
3    Q   How about in '03, would Gary Bosetti?   2:45:09PM
4    A   Very rarely, but sometimes, yeah.   2:45:12PM
5    Q   How about Rich Bosetti?   2:45:14PM
6    A   Same thing, sometimes.   2:45:16PM
7    Q   What tour did they generally work in   2:45:17PM
8    '03?
9    A   They always worked -- they pretty much   2:45:21PM
10   always worked 4 to 12s.
11   Q   And was your tour in '03 generally on   2:45:27PM
12   Fridays and Saturdays?
13   A   Friday and Saturday, 9 at night until   2:45:31PM
14   5 in the morning.
15   Q   So your tours would overlap --   2:45:34PM
16   A   Sometimes.   2:45:34PM
17   Q   -- generally?   2:45:34PM
18       What was Carter's tour generally in   2:45:35PM
19   '03?
20   A   Most of the time, I believe he worked   2:45:38PM
21   midnights from -- sorry.  From midnight till
22   eight in the morning.
23   Q   So, again, you'd overlap with him?   2:45:46PM
24   A   Sure.   2:45:48PM
25   Q   Snyder, do you know what his tour   2:45:49PM

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1     GEORGE HESSE
2  generally was in '03?
3    A  Generally it was midnights.   2:45:52PM
4    **Q  How about Nofi?**      **2:45:53PM**
5    A  Nofi fluctuated around a little bit.  2:45:56PM
6  Sometimes it was nine at night till five in the
7  morning.  Sometimes it was four to 12.
8  Sometimes it was midnights.
9    **Q  So sometimes he had the same tour as  2:46:06PM**
10  **you and sometimes he overlapped?**
11    A  Sometimes.          2:46:12PM
12    **Q  How about Lamm?**     **2:46:13PM**
13    A  Lamm also worked a majority of    2:46:14PM
14  midnights, midnight to eight in the morning.
15  Sometimes he worked at nine at night till five
16  in the morning.
17    **Q  And Fiorillo?**      **2:46:23PM**
18    A  Fiorillo worked some doubles, I   2:46:25PM
19  believe.  He did some maybe some 4 to 12s.  He
20  did some day tours.  He did night tours.  He was
21  on the schedule quite often.
22    MR. NOVIKOFF:  And we're talking about  2:46:39PM
23  in season now.
24    MR. GOODSTADT:  In season, yeah.   2:46:41PM

1     GEORGE HESSE
2  BY MR. GOODSTADT:        2:46:42PM
3    **Q  How about in '04, did that change at  2:46:43PM**
4  **all?**
5    A  No.          2:46:45PM
6    **Q  Same thing with Gary and Rich Bosetti,  2:46:46PM**
7  **generally they worked the 4-to-12 tour?**
8    A  Yeah.        2:46:49PM
9    **Q  How about '05, did that change at all?  2:46:49PM**
10    A  No.          2:46:52PM
11    **Q  In '03, '04 and '05, you generally did  2:46:52PM**
12  **the 9 to 5?**
13    A  On Fridays and Saturdays.    2:46:57PM
14    **Q  Fridays and Saturdays?**  **2:46:59PM**
15    A  Yes.         2:47:01PM
16    **Q  When was the change?  That was in '02?  2:47:02PM**
17    A  Which change?      2:47:04PM
18    **Q  I think you testified before that   2:47:06PM**
19  **Paradiso was flipped to your tours, you were**
20  **flipped to his tours due to some discipline of**
21  **his?**
22    A  Yeah, it might have been 2002.  I'd  2:47:16PM
23  have to go through the records and the schedules
24  to see exactly what the dates were.  I don't
25  know.

1     GEORGE HESSE
2    **Q  You never heard that that switch was  2:47:24PM**
3  **done to discipline you?**
4    A  Absolutely not.     2:47:28PM
5    MR. NOVIKOFF:  Andrew, I think -- your  2:47:39PM
6  question was did he ever hear that switch --
7    MR. GOODSTADT:  Did anyone tell him.  2:47:42PM
8    MR. NOVIKOFF:  -- or was, in his   2:47:43PM
9  opinion, the switch?
10    MR. GOODSTADT:  Well, did anyone ever  2:47:45PM
11  tell him that the switch was due to
12  discipline.
13    MR. NOVIKOFF:  And I think the witness  2:47:47PM
14  answered my latter question as opposed to
15  the first question.
16    MR. GOODSTADT:  Okay.    2:47:51PM
17  BY MR. GOODSTADT:        2:47:52PM
18    **Q  Did you ever hear -- did anyone ever  2:47:52PM**
19  **tell you that the switch was done to discipline**
20  **you as opposed to disciplining Paradiso?**
21    A  No.          2:48:02PM
22    **Q  Have you ever heard that allegation  2:48:03PM**
23  **made?**
24    A  No.          2:48:05PM
25    **Q  And I assume that means that your   2:48:10PM**

1     **GEORGE HESSE**
2  **opinion was the reason that you testified**
3  **before, that it was to discipline Paradiso,**
4  **correct?**
5    A  Correct.       2:48:15PM
6    **Q  Now, let's go back to Allison Sanchez.  2:48:22PM**
7  **She was also called Allison Chester at one**
8  **point, right?**
9    A  Yes.         2:48:27PM
10    **Q  Okay.  So when I say Allison Sanchez,  2:48:26PM**
11  **I'm referring to the same person regardless of**
12  **what her last name is; is that fair?**
13    A  Understood.       2:48:31PM
14    **Q  Did you generally deal with her over  2:48:32PM**
15  **the phone, in person, E-mail, letters, or which**
16  **way is it generally?**
17    MR. NOVIKOFF:  Objection to form.  2:48:40PM
18    MR. CALLAHAN:  Objection to form.  2:48:42PM
19    A  On the phone.      2:48:44PM
20    **Q  How many times did you interact with  2:48:46PM**
21  **her in person?**
22    A  Three, four times.    2:48:58PM
23    **Q  Why don't we just start with the first  2:49:04PM**
24  **time.  Where was it?**
25    A  At her office.      2:49:08PM

GEORGE HESSE

1
2    Q    Do you recall when that was, what    2:49:12PM
3    year?
4    A    It was probably in 2005.    2:49:16PM
5    Q    Had you ever met her prior to that    2:49:23PM
6    time?
7    A    No.    2:49:26PM
8    Q    Had you ever spoken to her prior to    2:49:27PM
9    that meeting in the office in '05?
10   A    I believe by then we had a    2:49:31PM
11   professional rapport on the phone.
12   Q    And had you ever seen her prior to    2:49:37PM
13   that?  I know you may not have met her, but had
14   you ever seen her around or in passing?
15   A    No.    2:49:45PM
16   Q    So you didn't recognize her when you    2:49:45PM
17   first saw her in '05 in her office?
18        MR. NOVIKOFF:  Objection.    2:49:50PM
19        MR. GOODSTADT:  Yeah, I shouldn't say    2:49:51PM
20   when you first saw her.
21        MR. NOVIKOFF:  I mean, I would presume    2:49:54PM
22   that if he met her in her office, she has a
23   name plate saying Allison Sanchez.
24        MR. GOODSTADT:  I'm talking about    2:49:59PM
25   recognizing the face.

GEORGE HESSE

1
2    BY MR. GOODSTADT:    2:50:00PM
3    Q    Did you recognize the face when you    2:50:01PM
4    went into her office in 2005 as someone that you
5    may have seen around?
6    A    No.    2:50:06PM
7    Q    And what were you dealing with her    2:50:11PM
8    when you met in her office in '05?
9    A    I believe I had to go there to drop    2:50:14PM
10   off some paperwork, have some paperwork signed.
11   Q    With respect to what?    2:50:20PM
12   A    There are forms that have to be signed    2:50:21PM
13   by the -- I forget what the actual name of the
14   form is, but it's a form that gets sent to the
15   New York State registry for police officers.
16   The police officer signs it that's getting
17   hired.  The supervisor of the police department
18   signs it.  A representative from Civil Service
19   signs it.  And I believe the oath of office,
20   which I believe at that time was Maryann Minerva
21   would have to sign that form.
22   Q    And you signed that form that you    2:50:52PM
23   dropped off?
24   A    Yes.    2:50:54PM
25   Q    Did you sign it as chief of police?    2:50:54PM

GEORGE HESSE

1
2    A    At that time, no.    2:50:57PM
3    Q    Deputy chief of police?    2:50:57PM
4    A    No.    2:50:59PM
5    Q    Sergeant?    2:50:59PM
6    A    Sergeant.    2:51:00PM
7    Q    Why did you sign as opposed to    2:51:01PM
8    Paradiso?
9    A    Because he told me to take care of the    2:51:06PM
10   paperwork, so that's what I did.
11   Q    So at least as of 2005, Allison    2:51:13PM
12   Sanchez was on notice that you had the title
13   sergeant; is that correct?
14        MR. CALLAHAN:  Objection to form.    2:51:21PM
15        MR. NOVIKOFF:  Objection.    2:51:22PM
16        MR. CONNOLLY:  Objection.    2:51:23PM
17   A    Am I aware if she was aware?    2:51:25PM
18   Q    You had the paperwork that you showed    2:51:27PM
19   her, correct?
20   A    Yeah.    2:51:29PM
21   Q    You had signed off as sergeant,    2:51:30PM
22   correct?
23   A    Correct.    2:51:32PM
24   Q    Had you sent any other paperwork to    2:51:32PM
25   her prior to that signing off as sergeant?

GEORGE HESSE

1
2    A    I don't know if I sent anything    2:51:38PM
3    through the mail to her.
4    Q    Had you ever sent her any memos or    2:51:45PM
5    E-mails where you signed off as sergeant,
6    whether it's through the mail or not?
7    A    I may have.  I don't recall.    2:51:53PM
8    Q    Did you ever send her any paperwork    2:51:55PM
9    that had you signed off as chief, whether it be
10   on the letterhead or your signature block?
11   A    I don't know.  That might have been --    2:52:03PM
12   I might have been appointed after she was gone.
13   I don't know.
14   Q    When was the second time you met with    2:52:09PM
15   her in person?
16   A    I believe she came to the village one    2:52:13PM
17   day.
18   Q    When was that?  What year?    2:52:15PM
19   A    It might have been in 2005.    2:52:17PM
20   Q    And did she come to see you or did she    2:52:25PM
21   just happen to be there?
22        MR. CALLAHAN:  Objection to form.    2:52:29PM
23   A    She did not come to see me, no.    2:52:30PM
24   Q    She just was visiting Ocean Beach?    2:52:32PM
25        MR. CALLAHAN:  Objection to form.    2:52:35PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 241

GEORGE HESSE

1
2     A    She was there on business.        2:52:36PM
3     Q    On business?                      2:52:37PM
4     A    Yes.                              2:52:38PM
5     Q    And you met with her when she was  2:52:38PM
6  there on business?
7     A    I ran into her.                   2:52:42PM
8     Q    Did you have any conversation with  2:52:43PM
9  her?
10    A    Just there was probably -- I remember  2:52:44PM
11  there was a brief hello.
12    Q    Do you recall the substance of that  2:52:48PM
13  conversation at all?
14    A    Hello.                            2:52:50PM
15    Q    Other than for hello?             2:52:50PM
16    A    No.                               2:52:51PM
17    Q    That was it?  Where did you run into  2:52:52PM
18  her?
19    A    In the village office.            2:52:54PM
20    Q    Do you know what she was doing on the  2:52:57PM
21  beach, what business she was there for?
22    A    I believe she was there for some other  2:53:02PM
23  Civil Service issues that required her
24  attention, and she was meeting with Mary Ann
25  Minerva.

Page 242

GEORGE HESSE

1
2     Q    Do you know what the issues were?  2:53:14PM
3     A    No.                               2:53:15PM
4     Q    So how did you know she was meeting  2:53:18PM
5  with Maryann Minerva to discuss Civil Service
6  issues?
7     A    She was an employee of Civil Service,  2:53:25PM
8  she was there on business and Maryann Minerva is
9  the superintendent of the village.
10    Q    Did you ask Maryann what the issues  2:53:31PM
11  were that she was there for?
12    A    I don't recall.                   2:53:31PM
13    Q    Do you recall what month in '05 this  2:53:34PM
14  was?
15    A    I don't.                          2:53:36PM
16    Q    Did you ask Sanchez what she was doing  2:53:37PM
17  there?
18    A    I don't recall.                   2:53:41PM
19    Q    And sitting here today, you don't know  2:53:43PM
20  what they were discussing?
21       MR. NOVIKOFF:  Objection.          2:53:47PM
22    A    No.                               2:53:47PM
23    Q    What was the third time you dealt with  2:53:49PM
24  her face to face?
25    A    I ran into her one day.           2:53:53PM

Page 243

GEORGE HESSE

1
2     Q    Where was that?                   2:53:56PM
3     A    It was in Cherry Grove, Fire Island.  2:53:57PM
4     Q    Was she there on business?        2:54:04PM
5     A    No.                               2:54:06PM
6     Q    She was there for pleasure?       2:54:06PM
7     A    Yes.                              2:54:07PM
8     Q    And did you speak with her at all when  2:54:08PM
9  you ran into her?
10    A    Yes.                              2:54:12PM
11    Q    What was the substance of that    2:54:12PM
12  conversation?
13    A    I don't recall.                   2:54:16PM
14    Q    When was the conversation?        2:54:17PM
15    A    It was -- I don't have the exact date.  2:54:19PM
16    Q    What year was it?                 2:54:24PM
17    A    It was in August of 2005, the first  2:54:27PM
18  Wednesday in August of 2005.
19    Q    And what was the substance of the  2:54:51PM
20  conversation you had with her?
21    A    It was purely social.             2:54:54PM
22    Q    Do you recall what you discussed?  2:54:56PM
23    A    No.                               2:54:57PM
24    Q    Do you recall anything you discussed?  2:54:58PM
25    A    No.                               2:54:59PM

Page 244

GEORGE HESSE

1
2     Q    How long was the conversation?    2:54:59PM
3     A    Half hour, 45 minutes.            2:55:04PM
4     Q    Where was it?  I know it was in Cherry  2:55:10PM
5  Grove, but where in Cherry Grove?
6     A    It was at a bar, Ice Palace.      2:55:14PM
7     Q    Were you on duty?                 2:55:24PM
8     A    No.                               2:55:25PM
9     Q    Did you have any alcoholic beverages  2:55:30PM
10  while you were there?
11    A    Yes.                              2:55:33PM
12    Q    How many?                         2:55:34PM
13    A    I don't know.  Four.              2:55:36PM
14    Q    Did she have any alcoholic beverages?  2:55:38PM
15    A    Yes.                              2:55:40PM
16    Q    How many?                         2:55:40PM
17    A    I don't know.                     2:55:41PM
18    Q    More than one?                    2:55:43PM
19    A    It's possible.                    2:55:46PM
20    Q    More than two?                    2:55:47PM
21    A    It's possible.                    2:55:48PM
22    Q    More than three?                  2:55:48PM
23    A    It's possible.                    2:55:49PM
24    Q    More than four?                   2:55:50PM
25    A    Maybe.                            2:55:52PM

61 (Pages 241 to 244)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 245

GEORGE HESSE

1
2 Q You don't know? 2:55:53PM
3 A I don't know. 2:55:54PM
4 Q Were you with anyone else? 2:55:56PM
5 A Yes. 2:55:58PM
6 MR. CALLAHAN: Objection to form. 2:56:00PM
7 BY MR. GOODSTADT: 2:56:00PM
8 Q Who were you with? 2:56:01PM
9 A I was with Walter Muller. I was with 2:56:02PM
10 a Carl Muller. I don't know if anybody else
11 came with us. I think that was it.
12 Q Is Carl Muller and Walter Muller 2:56:16PM
13 related?
14 A No. 2:56:20PM
15 Q And was she with anybody else? 2:56:21PM
16 A Yes. 2:56:23PM
17 Q Who was she with? 2:56:23PM
18 A Her partner. 2:56:24PM
19 Q Anyone else? 2:56:28PM
20 A Not that I know of. 2:56:29PM
21 Q Did you eat any food while you were 2:56:30PM
22 there?
23 A Yes. 2:56:33PM
24 Q And what was it, a meal? 2:56:34PM
25 A Lunch. 2:56:37PM

Page 246

GEORGE HESSE

1
2 Q Lunch. Who paid for that meal? 2:56:38PM
3 A I believe the three gentlemen, all of 2:56:41PM
4 us together, we split it.
5 Q So Allison Sanchez and her partner 2:56:48PM
6 didn't pay anything?
7 A She didn't have lunch with us. 2:56:52PM
8 Q They didn't eat with you? 2:56:55PM
9 A No. 2:56:57PM
10 Q And when was the fourth time that you 2:56:57PM
11 had a face-to-face interaction with her?
12 A I believe I had to get some more 2:57:02PM
13 papers signed at her office, and we went to
14 lunch.
15 Q When was that? 2:57:18PM
16 A It was probably later in 2005. I 2:57:19PM
17 don't know the exact date.
18 Q How long did that interaction last? 2:57:25PM
19 A Hour and a half. 2:57:27PM
20 Q What paperwork were you bringing? 2:57:32PM
21 A More of those forms I stated earlier. 2:57:34PM
22 Q Was anyone else there? 2:57:50PM
23 A No. 2:57:51PM
24 Q Have you ever discussed any of the 2:57:54PM
25 plaintiffs with Allison Sanchez --

Page 247

GEORGE HESSE

1
2 A Yes. 2:57:59PM
3 Q -- or anything about the plaintiffs? 2:57:59PM
4 When was the first time you discussed 2:58:01PM
5 anything about the plaintiffs with Allison
6 Sanchez?
7 A March of 2006. 2:58:10PM
8 Q Was it in person or on the phone? 2:58:19PM
9 A Phone. 2:58:22PM
10 Q Do you recall when in March? 2:58:22PM
11 A No. 2:58:24PM
12 Q Did you call her or did she call you? 2:58:24PM
13 A Called her. 2:58:27PM
14 Q Just to discuss the plaintiffs or to 2:58:29PM
15 discuss other things as well?
16 MR. CALLAHAN: Objection to form. 2:58:34PM
17 A I don't recall. 2:58:35PM
18 Q And tell me everything you recall from 2:58:37PM
19 that phone conversation with respect to the
20 plaintiffs.
21 A I called her to ask advice in 2:58:41PM
22 reference to -- regarding employment with some
23 of the part-time seasonal officers, what their
24 rights were, what my rights -- what the
25 department's rights were and what the village's

Page 248

GEORGE HESSE

1
2 rights were if I were to decide to let someone
3 go.
4 Q Did you tell her who you were deciding 2:59:05PM
5 to let go?
6 A No. 2:59:08PM
7 Q What did she tell you? 2:59:09PM
8 A She said that she would find out. She 2:59:10PM
9 would ask her boss, and she'd get back to me.
10 Q Did you discuss anything else with her 2:59:20PM
11 on that call about the plaintiffs?
12 A No. 2:59:24PM
13 Q How long did that call last? 2:59:27PM
14 A I don't recall. 2:59:29PM
15 Q Did you discuss anything else other 2:59:30PM
16 than what you testified to with her on that
17 call?
18 A I don't recall. 2:59:34PM
19 Q Did she ever get back to you? 2:59:34PM
20 A Yes. 2:59:36PM
21 Q She called you? 2:59:37PM
22 A Yes. 2:59:38PM
23 Q And when was that? How long after the 2:59:38PM
24 first call?
25 A I don't recall. 2:59:44PM

62 (Pages 245 to 248)

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 249

GEORGE HESSE

1      GEORGE HESSE
2      Q    And what did she tell you?        2:59:44PM
3      A    She -- I believe she said she spoke to  2:59:47PM
4   Stan Pelk, but she explained to me that
5   part-time and seasonal employees, employees,
6   police officers are at-will employees and that
7   we could release them at any time without cause.
8      Q    Did she tell you what she was relying  3:00:12PM
9   on?
10      A    Just from what she was told by her    3:00:15PM
11  boss.
12      Q    Did she cite to you any provisions of  3:00:17PM
13  the Civil Service law that provided that?
14      A    No.                      3:00:22PM
15      Q    Did you discuss anything else with her  3:00:24PM
16  on that call?
17      A    I don't recall.            3:00:27PM
18      Q    Did you discuss that issue about what  3:00:32PM
19  your rights were with anyone other than for
20  Allison Sanchez in March 2006?
21      A    As far as the rights, no.        3:00:40PM
22      Q    So I guess that covers the first two  3:00:44PM
23  times you spoke to her about the plaintiffs.
24          Did you speak with her about the    3:00:48PM
25  plaintiffs at any time subsequent to that?

Page 250

1      GEORGE HESSE
2      A    Yes.                      3:00:52PM
3      Q    When?                    3:00:53PM
4      A    I believe it was April 4th or 5th.   3:00:56PM
5   I'm not exactly sure on the date.  She had
6   called me to say specifically that Frank
7   Fiorillo and, I believe it was Joe Nofi and
8   Kevin Lamm had come to her office to file a
9   complaint against the Village of Ocean Beach and
10  me for, you know, terminating them, and I
11  believe they wanted to know what their rights
12  were.
13      Q    Did she tell you what they're alleging  3:01:28PM
14  or the underlying allegation of the complaint?
15      A    Basically she told me that they wanted  3:01:38PM
16  to know what their rights were as police
17  officers and did I have a right to do what I
18  did; and I believe when she told them that they
19  didn't have any rights, I think Frank might have
20  gotten a little ornery with her, and he started
21  spouting off other stuff about, you know,
22  uncertified, unqualified police officers working
23  in Ocean Beach.  And I believe she told him,
24  don't worry about what they're doing, you don't
25  have a leg to stand on.

Page 251

1      GEORGE HESSE
2      Q    She told you that she said that?    3:02:21PM
3      A    Yes.                      3:02:22PM
4      Q    And it was your understanding that she  3:02:32PM
5   was referring to -- when she said you don't have
6   a leg to stand on, it was your understanding
7   that she was referring to what his rights were?
8          MR. CALLAHAN:  Objection to form.    3:02:41PM
9          MR. NOVIKOFF:  Yeah, objection.    3:02:42PM
10         MR. CONNOLLY:  Objection.        3:02:43PM
11      A   Yeah, that's what I believe.      3:02:43PM
12      Q    That was your understanding?      3:02:44PM
13      A   Yeah.                    3:02:46PM
14      Q    Did she tell you anything else about  3:02:46PM
15  that conversation?
16      A   I don't recall.            3:02:49PM
17      Q    What did you say to her during that  3:02:51PM
18  conversation?
19      A   I don't recall, other than -- that's  3:03:00PM
20  it.  I don't recall anything else.
21      Q    Were you in the -- were you in the   3:03:09PM
22  police station during this call?
23      A   I believe so.              3:03:12PM
24      Q    Was anyone else on the line at your  3:03:18PM
25  end?

Page 252

1      GEORGE HESSE
2      A    No, not that I'm aware of.        3:03:22PM
3      Q    Did you tell anybody, any current or  3:03:24PM
4   former employees of Ocean Beach, about Snyder,
5   Lamm -- strike that.
6          About Nofi, Lamm and Fiorillo's    3:03:31PM
7   decision to go file a complaint against you and
8   the beach?
9      A    Subsequent to that?          3:03:40PM
10      Q    Yeah.                    3:03:41PM
11      A   You know, I don't recall.        3:03:42PM
12      Q    Did you ever discuss that with Joe  3:03:44PM
13  Loeffler, the fact that Sanchez alerted you to
14  their decision to come file a complaint against
15  you and the beach?
16         MR. CALLAHAN:  Objection to form.    3:03:55PM
17      A   I don't recall.            3:03:56PM
18      Q    Is there anything that would refresh  3:03:57PM
19  your recollection as to whether you did or not?
20      A    Unless you have something, no.    3:04:01PM
21      Q    When was the next time you spoke with  3:04:06PM
22  Allison Sanchez about the plaintiffs, about any
23  of the plaintiffs?
24          Again, when I say "speak," I mean    3:04:18PM
25  communicate with her, whether it's verbally, in

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2 writing.
3   A   Uh-huh.                          3:04:26PM
4       I don't recall. I mean, I know I've   3:04:29PM
5 spoken to her after that. I just don't know in
6 regards to what.
7   Q   Do you recall the substance of any of   3:04:35PM
8 those conversations?
9   A   I think later on, when there was an   3:04:41PM
10 allegation made that I was having sexual
11 relations with her, that we talked about that a
12 little bit, and I think she laughed at the fact
13 that somebody would make that allegation.
14   Q   Well, did you ever tell Ed Carter that   3:04:59PM
15 you took her out to lunch?
16   A   Not that I recall.          3:05:03PM
17   Q   Did you ever tell Ed Carter that you   3:05:04PM
18 slept with her?
19   A   Definitely not.             3:05:07PM
20   Q   Did you tell Joe Nofi that you banged   3:05:08PM
21 her?
22   A   Definitely not.             3:05:11PM
23   Q   Did you ever see her other than for   3:05:12PM
24 the -- well, strike that.
25       Have you ever seen her in Ocean Beach   3:05:17PM

**GEORGE HESSE**

1
2 other than for the one time that she was meeting
3 with Minerva?
4   A   No.                         3:05:22PM
5       MR. CALLAHAN: I'm going to object to   3:05:29PM
6   the form. You have testimony that's not
7   supported -- your question is not supported
8   by the testimony.
9       MR. GOODSTADT: Okay. I'm not sure   3:05:43PM
10   what that means, but okay.
11 BY MR. GOODSTADT:                        3:05:47PM
12   Q   Now, we touched upon before an issue   3:05:47PM
13 about uncertified police officers working at the
14 beach.
15       Do you recall that?          3:05:56PM
16   A   Yes.                        3:05:57PM
17   Q   Now, were there officers working at   3:06:02PM
18 the beach that hadn't passed the battery of
19 tests that you and I discussed early this
20 morning?
21   A   Yes.                        3:06:09PM
22   Q   And who was that? Who are those   3:06:10PM
23 officers?
24   A   There was a Bill Walsh, Gary and   3:06:13PM
25 Richie Bosetti, Tommy Shaw, John Dyer, Pat

GEORGE HESSE

1
2 Cherry. That officer, I can't think of his
3 name. There may be some others.
4   Q   You said John Dyer?          3:06:47PM
5   A   Uh-huh.                     3:06:49PM
6   Q   Arnie Hardman?              3:06:57PM
7   A   Yes, Arnie Hardman. And there was   3:06:58PM
8 another one.
9   Q   John Bullis?                3:07:11PM
10   A   Yes.                       3:07:15PM
11   Q   Is that who you were thinking of?   3:07:16PM
12   A   No.                        3:07:19PM
13   Q   Daniel Shook?               3:07:24PM
14   A   That's him, Daniel Shook.    3:07:26PM
15   Q   And is it your understanding that if   3:07:38PM
16 you don't pass those battery of tests, that you
17 can't be a police officer in Suffolk County?
18       MR. NOVIKOFF: Objection.     3:07:44PM
19   A   Correct.                   3:07:45PM
20   Q   So if you don't pass those tests,   3:07:46PM
21 you're a civilian, correct?
22       MR. NOVIKOFF: Objection. I don't   3:07:50PM
23   know what you mean by "civilian."
24       MR. CONNOLLY: Objection.     3:07:52PM
25       MR. CALLAHAN: Objection.     3:07:53PM

GEORGE HESSE

1
2 BY MR. GOODSTADT:                       3:07:54PM
3   Q   Do you know what I mean when I say   3:07:54PM
4 "civilian"? You've heard that word?
5   A   Yes.                        3:07:57PM
6   Q   Do you know what I mean?      3:07:58PM
7   A   Yeah, I know what you mean.   3:08:00PM
8   Q   So I'll reask the question.   3:08:02PM
9       Is it your understanding that if you   3:08:03PM
10 don't pass those tests, then you are a civilian?
11       MR. NOVIKOFF: Objection.     3:08:09PM
12       MR. CALLAHAN: Objection to form.   3:08:11PM
13   A   It's a technicality, but yes.   3:08:13PM
14   Q   So those list of people we just went   3:08:17PM
15 over, during the time period that they were
16 working and being paid as police officers in
17 Ocean Beach, they were actually civilians,
18 correct?
19       MR. NOVIKOFF: Objection.     3:08:29PM
20       MR. CALLAHAN: Objection to form.   3:08:30PM
21       MR. CONNOLLY: Objection.     3:08:31PM
22   A   No.                        3:08:31PM
23   Q   They weren't civilians?      3:08:32PM
24   A   No.                        3:08:33PM
25   Q   So which ones weren't civilians?   3:08:33PM

053690b6-a7be-44d9-9835-90b3e21fffd8

**GEORGE HESSE**

1
2     A   All of them were sworn in as police     3:08:37PM
3  officers.
4     **Q   So it's your understanding that if     3:08:39PM**
5  **you're sworn in, that you're certified to be a**
6  **police officer?**
7          MR. NOVIKOFF: Objection. It's not     3:08:45PM
8  his testimony.
9          MR. CALLAHAN: Objection.          3:08:49PM
10         MR. CONNOLLY: Objection.          3:08:51PM
11 BY MR. GOODSTADT:                         3:08:51PM
12    **Q   Is that your understanding?     3:08:51PM**
13    A   They were all retired police officers. 3:08:53PM
14    **Q   Any of them retired from Suffolk     3:08:57PM**
15 **County police department?**
16    A   None of them, no.               3:08:59PM
17    **Q   So in terms of being in Suffolk     3:09:02PM**
18 **County, were they all civilians?**
19         MR. NOVIKOFF: Objection. Asked and 3:09:07PM
20 answered.
21    A   It's a technicality, but, you know,     3:09:09PM
22 I'll agree with you, yes.
23    **Q   Yes, they were?          3:09:13PM**
24    **When did you first learn of an issue     3:09:15PM**
25 **with respect to this group of guys' lack of**

**GEORGE HESSE**

1
2  **certification?**
3     A   I don't recall a specific date.     3:09:27PM
4     **Q   Do you recall what year it was?     3:09:30PM**
5     A   It was probably the end of 2004,     3:09:34PM
6  maybe.
7     **Q   How did you learn about it?     3:09:44PM**
8     A   I don't remember.          3:09:47PM
9     **Q   So when you heard about it at the end 3:09:54PM**
10 **of 2004 -- I believe I asked this question a**
11 **while ago; I'll just put it in a time frame --**
12 **ed Paradiso was the person in Ocean Beach**
13 **responsible for making sure that everybody that**
14 **was being paid as a police officer was**
15 **certified?**
16         MR. NOVIKOFF: Objection.          3:10:11PM
17    A   You know, I don't know if it was     3:10:13PM
18 really his job to make sure, but he was sure in
19 charge of hiring.
20    **Q   But when before I asked you who was in 3:10:21PM**
21 **charge for making sure that the people who are**
22 **hired are certified, you said up until January**
23 **of '06, it was Paradiso, and after that it was**
24 **you.**
25         MR. NOVIKOFF: Objection. I don't     3:10:34PM

**GEORGE HESSE**

1
2  know if that was your question. But if you
3  had asked the question already, then it's in
4  the record.  So why are we fighting with
5  him?
6          MR. GOODSTADT: I just want to make     3:10:41PM
7  sure that I understood his testimony.
8          MR. NOVIKOFF: Well, ask him again.     3:10:45PM
9  I'll object, but he'll still answer.
10 BY MR. GOODSTADT:                         3:10:48PM
11    **Q   Is the way I characterized it your     3:10:49PM**
12 **understanding?**
13         MR. NOVIKOFF: Objection.          3:10:52PM
14    A   I understand where you're coming from. 3:10:53PM
15 But I believe it's the Village of Ocean Beach,
16 Maryann Minerva who fills out the Civil Service
17 paperwork to make sure that it's accurate.
18    **Q   Okay.  So it's your understanding that 3:11:07PM**
19 **Miss Minerva was the person responsible for**
20 **making sure that the people who are hired and**
21 **paid as police officers were certified to be in**
22 **that position?**
23         MR. NOVIKOFF: Objection to the form,     3:11:18PM
24 more particularly to the word "responsible."
25 You're assuming that anyone was responsible

**GEORGE HESSE**

1
2  in that period of time.
3          MR. CONNOLLY: Objection.          3:11:30PM
4  You can answer.               3:11:30PM
5     A   You're going to have to repeat the     3:11:31PM
6  question.  I'm sorry.
7          MR. GOODSTADT: Yeah, why don't you     3:11:38PM
8  read it back.  That would be great.
9          (Whereupon, the requested portion was 3:11:41PM
10 read back by the court reporter:  Okay.  So
11 it's your understanding that Miss Minerva
12 was the person responsible for making sure
13 that the people who are hired and paid as
14 police officers were certified to be in that
15 position?)
16         MR. NOVIKOFF: Can we take a five     3:11:59PM
17 minute break?
18         MR. GOODSTADT: So you objected to a     3:12:06PM
19 word that wasn't even in the question.
20         MR. CONNOLLY: I thought he said     3:12:06PM
21 "responsible."
22         MR. GOODSTADT: Responsible for making 3:12:06PM
23 sure.
24         MR. NOVIKOFF: I have a problem with     3:12:09PM
25 the word "responsible" only because we

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 261

GEORGE HESSE

1    GEORGE HESSE
2    haven't established that anyone was
3    responsible, because clearly there was a
4    problem.
5         But note my objection.  You can --    3:12:16PM
6    A    That is my belief.         3:12:19PM
7    Q    What's the basis of that belief?    3:12:21PM
8    A    Because all applications and paperwork  3:12:23PM
9    is submitted to her for her approval; and
10   because it's a municipality, they have to report
11   to Civil Service and they have to report those
12   names to Civil Service.
13   Q    Does the chief of police have any    3:12:36PM
14   obligation with respect to that reporting
15   requirement?
16        MR. NOVIKOFF:  Objection.       3:12:42PM
17   A    I believe he has some responsibility.  3:12:43PM
18   Q    What is that responsibility?      3:12:46PM
19   A    To make sure that these men, these   3:12:48PM
20   officers are certified.
21        MR. NOVIKOFF:  Could we take that   3:12:54PM
22   break?
23        MR. GOODSTADT:  Yep.         3:12:56PM
24        THE VIDEOGRAPHER:  The time is now   3:12:57PM
25   3:13 p.m.  We are now off the record.

Page 262

1    GEORGE HESSE
2        (Whereupon, a discussion was held off  3:13:01PM
3    the record.)
4        THE VIDEOGRAPHER:  The time is now    3:29:04PM
5    3:29 p.m.  We are now back on the record.
6    BY MR. GOODSTADT:            3:29:07PM
7    Q    Now, just to go back to the issue with  3:29:10PM
8    the uncertified officers working in Ocean Beach.
9    How did you learn about the fact that there was
10   this problem?
11   A    I don't remember -- I think I stated I  3:29:23PM
12   don't remember how I found out.
13   Q    Did you ever speak with Ms. Minerva   3:29:30PM
14   about the issue?
15   A    Yes.              3:29:34PM
16   Q    When was the first time you spoke with  3:29:35PM
17   her about this issue?
18   A    I don't recall.          3:29:37PM
19   Q    Do you recall what year it was?     3:29:39PM
20   A    It may have been the end of 2004 into  3:29:41PM
21   2005. I don't know.
22   Q    And when were the Bosettis hired?    3:29:49PM
23   A    I believe they came on in -- this is   3:29:52PM
24   off the top of my head, 2003.
25   Q    Is it possible it was 2002?       3:29:57PM

Page 263

1    GEORGE HESSE
2    A    It's possible, yes.        3:30:00PM
3    Q    Were you at the -- were you at the   3:30:06PM
4    preseason meeting?  When I say that, do you know
5    what that mean when I say a preseason meeting?
6    A    Yes.              3:30:13PM
7    Q    Of the department?         3:30:13PM
8    A    Yes.              3:30:14PM
9    Q    Were you at the preseason meeting the  3:30:15PM
10   first year the Bosettis were hired?
11   A    I would say yes.          3:30:18PM
12   Q    And did you tell the Bosettis in front  3:30:20PM
13   of the group that they would have to take their
14   tests?
15   A    I don't recall.          3:30:28PM
16   Q    Did you ever speak with Catherine    3:30:38PM
17   Spies?  Do you know who that is, Catherine
18   Spies?
19   A    Yes.              3:30:43PM
20   Q    Who is she?            3:30:43PM
21   A    She was the deputy clerk.  She's not   3:30:45PM
22   there anymore.
23   Q    Did you ever speak with her about this  3:30:49PM
24   issue?
25   A    Yes.              3:30:51PM

Page 264

1    GEORGE HESSE
2    Q    When was the first time you spoke with  3:30:52PM
3    her about the issue?
4        MR. NOVIKOFF:  About the issue, the   3:30:54PM
5    certification?
6        MR. GOODSTADT:  About the        3:30:57PM
7    certification issue, yes.
8    A    I don't recall.          3:30:58PM
9    Q    Did you ever speak with Joe Loeffler   3:31:04PM
10   about the certification issue?
11   A    Yes.              3:31:07PM
12   Q    When was the first time you spoke with  3:31:09PM
13   him?
14   A    I don't recall.          3:31:11PM
15   Q    Who did you speak with first out of    3:31:13PM
16   those three people, Minerva, Loeffler, Spias,
17   about the issue?
18   A    I don't recall.          3:31:23PM
19   Q    You're sure you didn't speak with    3:31:30PM
20   Minerva in December of '03 about this
21   certification issue?
22   A    Yeah.              3:31:37PM
23        MR. NOVIKOFF:  Objection to the form.  3:31:38PM
24   A    It could've been.         3:31:39PM
25   Q    So it's possible that you knew about   3:31:40PM

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 265

GEORGE HESSE

1    **GEORGE HESSE**
2    **the fact that there were uncertified officers**
3    **working as early as December of '03?**
4        MR. NOVIKOFF:  Objection to the form    3:31:48PM
5    of the question.
6    A    Possible.                    3:31:50PM
7    **Q    Did you ever speak with Paradiso about    3:31:54PM**
8    **the issue?**
9    A    Yes.                    3:31:56PM
10    **Q    When is the first time you spoke with    3:31:57PM**
11    **him about the issue?**
12    A    I don't recall.                3:32:01PM
13    **Q    Did you ever speak with any other    3:32:07PM**
14    **trustees other than for Loeffler about the**
15    **issue?**
16        MR. NOVIKOFF:  Objection. He didn't    3:32:13PM
17    say he talked to Loeffler.
18    BY MR. GOODSTADT:                3:32:15PM
19    **Q    Did you ever speak to any trustees    3:32:16PM**
20    **about the issue?**
21        MR. CONNOLLY:  When they were    3:32:20PM
22    trustees?
23        MR. GOODSTADT:  When they were    3:32:21PM
24    trustees, yeah.
25    A    Just Trustee Loeffler, I believe.  I    3:32:23PM

Page 266

GEORGE HESSE

1        GEORGE HESSE
2    don't recall if I would've talked to anybody
3    else.
4    **Q    Did you ever speak to Natalie Rogers    3:32:28PM**
5    **about the issue?**
6    A    You know, I don't recall.        3:32:31PM
7    **Q    You don't recall one way or the other?    3:32:32PM**
8    A    No.                    3:32:35PM
9    **Q    Was there a plan put in place to fix    3:32:35PM**
10    **the problem when you first learned of it?**
11        MR. NOVIKOFF:  Objection.        3:32:42PM
12        MR. GOODSTADT:  Strike that. Strike    3:32:43PM
13    that.
14    BY MR. GOODSTADT:                3:32:44PM
15    **Q    Was there a plan put in place to fix    3:32:44PM**
16    **the problem?**
17        MR. NOVIKOFF:  Same objection.        3:32:48PM
18    A    I wouldn't say there was a plan.  I    3:32:49PM
19    would say there was a suggestion to fix the
20    problem.
21    **Q    Who made the suggestion?        3:32:53PM**
22    A    I don't know where it came from, but    3:32:58PM
23    it filtered to me.
24    **Q    How did it filter to you?        3:33:05PM**
25    A    Paradiso asked me to look into the    3:33:07PM

Page 267

GEORGE HESSE

1        GEORGE HESSE
2    matter and see what I could do to correct it.
3    **Q    Do you know when that conversation    3:33:15PM**
4    **occurred?**
5    A    I don't recall.                3:33:17PM
6    **Q    And did you do anything to correct the  3:33:20PM**
7    **matter?**
8    A    Yes.                    3:33:25PM
9    **Q    How long after Paradiso told you that    3:33:26PM**
10    **did you do something to correct the matter?**
11    A    I'm sure I started working on it right    3:33:30PM
12    away.
13    **Q    And at that point in time, when        3:33:33PM**
14    **Paradiso told you to correct the matter, had you**
15    **known there was a problem or was that the first**
16    **time you learned there was a problem?**
17    A    I don't recall.                3:33:41PM
18    **Q    What did you do to fix the problem?    3:33:42PM**
19    A    I believe I contacted Civil Service    3:33:46PM
20    and had to find out what these officers had to
21    do.
22    **Q    Who at Civil Service did you speak    3:33:53PM**
23    **with -- strike that.**
24        **Did you contact Civil Service?        3:33:57PM**
25    A    I may have.                3:33:58PM

Page 268

GEORGE HESSE

1        GEORGE HESSE
2    **Q    Do you recall actually contacting    3:33:59PM**
3    **Civil Service?**
4    A    I don't recall.                3:34:02PM
5    **Q    Do you recall speaking to anyone at    3:34:02PM**
6    **Civil Service about what they had to do to**
7    **correct the problem?**
8    A    At some point, I was in touch with    3:34:08PM
9    Allison Chester or Sanchez to correct the
10    problem.
11    **Q    Do you recall when that was?        3:34:16PM**
12    A    I don't recall.                3:34:17PM
13    **Q    Do you recall how long after Paradiso    3:34:19PM**
14    **suggested that you fix the problem, the time gap**
15    **between that and the time you spoke with Sanchez**
16    **about it?**
17    A    I'm not positive, no.            3:34:31PM
18    **Q    Was it days, weeks, months years?    3:34:34PM**
19    A    I don't recall.                3:34:37PM
20    **Q    Other than for you, who else was        3:34:39PM**
21    **involved with the plan to fix the problem?**
22    A    Maryann Minerva.            3:34:43PM
23    **Q    Anyone else in the village involved    3:34:49PM**
24    **with the plan to fix it?**
25        MR. NOVIKOFF:  Objection.        3:34:54PM

67 (Pages 265 to 268)

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2   A   Kathy Spies was part of it.         3:34:55PM
3   Q   Anyone else?                        3:35:06PM
4       MR. NOVIKOFF:  Note my objection.   3:35:10PM
5   A   I don't know when Kara a McKenna     3:35:14PM
6   started, but she also involved with the Civil
7   Service stuff, so --
8   Q   What was Minerva's role in the plan to   3:35:23PM
9   fix it?
10      MR. NOVIKOFF:  Objection to the form.   3:35:27PM
11  A   I don't know what her role was.      3:35:28PM
12  Q   Do you know anything that she did to   3:35:29PM
13  help fix the problem?
14  A   I don't know what she did, no.       3:35:35PM
15  Q   What was Spies's role?               3:35:37PM
16      MR. NOVIKOFF:  Objection.            3:35:39PM
17  A   I know she was in contact with Civil   3:35:40PM
18  Service.  I know there were some forms that
19  needed to be filled out.
20  Q   How do you know she was contact with   3:35:45PM
21  Civil Service?
22  A   She told me.                         3:35:49PM
23  Q   Do you recall when she told you, what   3:35:55PM
24  year it was?
25  A   I don't recall.                      3:35:57PM

GEORGE HESSE

1
2   Q   Did she fill out the forms?          3:35:59PM
3       MR. NOVIKOFF:  Objection.            3:36:04PM
4   A   I believe she typed and hand writ some   3:36:04PM
5   of them.  I don't know if she signs off on them
6   or Maryann Minerva signs off on them.
7   Q   How long did the process take from the   3:36:20PM
8   time that you learned of the problem to the time
9   that -- well, strike that.
10      Was the problem ever rectified?      3:36:25PM
11  A   Yes.                                 3:36:27PM
12  Q   How was it rectified?  What was done?   3:36:28PM
13  A   All our officers are now certified by   3:36:31PM
14  Civil Service.
15  Q   And the ones who weren't certified   3:36:35PM
16  stepped down or were fired or --
17  A   Yes.                                 3:36:39PM
18  Q   -- took different positions; is that   3:36:40PM
19  what happened?
20  A   Yes.                                 3:36:42PM
21  Q   Okay.  How long between the time that   3:36:42PM
22  you learned of the problem until rectifying the
23  problem?
24  A   It may have taken a year and a half,   3:36:52PM
25  almost two years to correct.

GEORGE HESSE

1
2   Q   And during that period of a year and a   3:37:04PM
3   half to two years, these people who were not
4   certified were still being paid as police
5   officers or did you suspend them for that
6   period?
7       MR. NOVIKOFF:  Objection again to the   3:37:16PM
8   form.
9       When you say "you," are you saying   3:37:17PM
10  Hesse or the village?
11      MR. GOODSTADT:  Good question.       3:37:21PM
12      MR. NOVIKOFF:  Because Hesse has said   3:37:22PM
13  at the time that he had no authority to hire
14  or fire.
15  BY MR. GOODSTADT:                        3:37:27PM
16  Q   Were these people employed by the   3:37:28PM
17  village as police officers and paid by the
18  village as police officers during that period?
19  A   Yes.                                 3:37:32PM
20  Q   Do you know whether anyone alerted   3:37:35PM
21  Civil Service to that fact?
22      MR. NOVIKOFF:  Objection.            3:37:44PM
23  A   I don't know.                        3:37:45PM
24  Q   When was Arnold Hardman certified?   3:37:55PM
25  A   He never completed certification.    3:37:58PM

GEORGE HESSE

1
2   Q   And when was he employed up until as a   3:38:09PM
3   police officer?
4   A   I don't know the exact date when he   3:38:18PM
5   was no longer employed.  I don't know the exact
6   date.
7   Q   Do you know what year it was?         3:38:24PM
8   A   It may -- I'm just guessing, but --   3:38:26PM
9   no, I don't recall.  I don't recall.
10  Q   Did he work at all in the season of   3:38:31PM
11  2006?
12  A   Yes.                                 3:38:35PM
13  Q   Okay.  So he was still working at the   3:38:36PM
14  beach as an uncertified police officer after the
15  plaintiffs in this case were let go?
16  A   Yes.                                 3:38:45PM
17  Q   And at that point in time, did you   3:38:47PM
18  know that he was not certified?
19  A   Yes.                                 3:38:51PM
20  Q   So the problem actually wasn't fully   3:38:58PM
21  rectified in the year and a half to two years,
22  correct?
23      MR. NOVIKOFF:  Objection to form.    3:39:03PM
24      MR. CALLAHAN:  Objection to the form.   3:39:06PM
25  A   It depends on when we started it.    3:39:07PM

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2      MR. NOVIKOFF:  Exactly.        3:39:09PM
3      A   But I don't know exactly what the     3:39:10PM
4   start date was, but I think it took somewhere in
5   the range of a year and a half to two years to
6   rectify it.
7      Q   Why did you let Arnold Hardman go if   3:39:19PM
8   he wasn't certified --
9      MR. NOVIKOFF:  Prior objection.     3:39:25PM
10  BY MR. GOODSTADT:                      3:39:26PM
11     Q   -- prior to the season of 2006?      3:39:26PM
12     MR. NOVIKOFF:  Now objection to     3:39:30PM
13  foundation because he testified that he had
14  no hiring or firing authority until he was
15  appointed deputy chief.
16     MR. GOODSTADT:  Which was January of   3:39:36PM
17  '06.  Now I'm talking about April '06.
18     MR. NOVIKOFF:  No.  I think you     3:39:39PM
19  mentioned before the season.
20     MR. GOODSTADT:  Yeah.         3:39:44PM
21     MR. NOVIKOFF:  Okay, I understand.    3:39:44PM
22  Okay, you're right.
23     MR. GOODSTADT:  The decision was made  3:39:45PM
24  after he was deputy chief.
25     MR. NOVIKOFF:  You're right.  You're    3:39:47PM

GEORGE HESSE

1
2   right.
3      MR. CONNOLLY:  I'm just going to ask   3:39:48PM
4   that we read the question back now.
5      MR. GOODSTADT:  Okay.         3:39:51PM
6      MR. CONNOLLY:  Or you can repeat it.    3:39:51PM
7      MR. GOODSTADT:  It's been so long ago,  3:39:51PM
8   I'm not even sure what the question was.
9   BY MR. GOODSTADT:                      3:40:04PM
10     Q   So why didn't you let Arnold Hardman   3:40:05PM
11  go at the same time that you let the plaintiffs
12  go if you knew that he was not certified?
13     MR. NOVIKOFF:  Objection, only to the  3:40:14PM
14  extent that we have the same stipulation.
15     MR. GOODSTADT:  We do.        3:40:18PM
16     MR. NOVIKOFF:  You say let go, we say  3:40:19PM
17  not rehired.
18     MR. GOODSTADT:  It's also the word    3:40:23PM
19  that he used in the memo.
20     MR. NOVIKOFF:  That's different,      3:40:26PM
21  Andrew.
22     A   Ready?             3:40:28PM
23     Q   Yes.               3:40:29PM
24     A   He was in the process of completing    3:40:30PM
25  his battery of tests.  He had one test to go,

GEORGE HESSE

1
2   which would be the polygraph; and for unknown
3   circumstances, polygraph would not let him take
4   the test.
5      Q   What do you mean by that?       3:40:46PM
6      A   We feel there was some interference   3:40:50PM
7   from the D.A.'s office, and they didn't permit
8   him to take the polygraph test.
9      Q   When did he apply to take the      3:41:02PM
10  polygraph test, if you know?
11     A   I don't know the exact date, but we   3:41:08PM
12  had three tentative dates set up.  We went to
13  two of them and we were turned away.
14     Q   What's the basis of your belief that   3:41:22PM
15  the D.A. interfered?
16     A   They wouldn't give us a reason why    3:41:25PM
17  they wouldn't let him take the test, and we were
18  under investigation at that point.
19     Q   So what leads you to the conclusion   3:41:31PM
20  that the D.A. actually interfered with the
21  ability of Mr. Hardman to take the test?
22     A   Because that's my feeling.      3:41:38PM
23     Q   Do you recall when he was scheduled,   3:41:41PM
24  what year it was he was scheduled to go take the
25  test?

GEORGE HESSE

1
2   A   I don't know the exact dates.  No.    3:41:46PM
3   Q   Do you recall what year it was?      3:41:52PM
4   A   2006.              3:41:53PM
5   Q   2006?              3:41:54PM
6   A   Yeah.              3:41:54PM
7   Q   Did he apply to take the test -- well,   3:42:01PM
8   strike that.
9      When was he hired?           3:42:04PM
10  A   2003, 2004 possibly.         3:42:06PM
11  Q   And when in 2006, was it before the    3:42:15PM
12  season or after the season that he applied?
13  A   Actually, I'm mistaken on the dates.    3:42:19PM
14  There was -- there was an opportunity for him to
15  take it in 2005; but then I think he couldn't
16  make that date, so I rescheduled someone else to
17  take it on that date.  And he may have been
18  rescheduled at a later date.  I don't know the
19  exact date.
20  Q   So he failed to appear in '05?      3:42:37PM
21  A   I wouldn't say he failed to appear.    3:42:40PM
22  It was a reschedule.
23  Q   And what date in '06 was he        3:42:47PM
24  rescheduled for?  Was it before the season or
25  after the season?

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2     A    It was in the heart of the season.  I   3:42:53PM
3  believe it might have been in the latter of
4  July, you know, one of the scheduled dates.
5  That might have been one of the last time that
6  we even tried.
7     Q    How often does the county administer   3:43:06PM
8  polygraph tests?
9        MR. NOVIKOFF:  Objection.        3:43:11PM
10 BY MR. GOODSTADT:                       3:43:11PM
11    Q    Back then, in '05.          3:43:12PM
12       MR. NOVIKOFF:  Same objection.   3:43:13PM
13    A    It's by appointment.        3:43:14PM
14    Q    Do they administer it all year round?  3:43:16PM
15       MR. NOVIKOFF:  Objection.        3:43:19PM
16    A    Yes.                        3:43:20PM
17    Q    So you can call and get on the   3:43:20PM
18 schedule any time of the year?
19       MR. NOVIKOFF:  Objection.        3:43:24PM
20 BY MR. GOODSTADT:                       3:43:25PM
21    Q    Or fill out a form and schedule any   3:43:27PM
22 time of the year?
23       MR. NOVIKOFF:  Objection.        3:43:31PM
24    A    I'm sure they could perform the test   3:43:32PM
25 at any time of the year.  It depends on their

GEORGE HESSE

1
2  availability.
3     Q    Did you -- when you say that you --   3:43:39PM
4  strike that.
5        Did you actually call and reschedule   3:43:42PM
6  someone in for Hardman's spot that he couldn't
7  make?
8     A    Yes.                        3:43:49PM
9     Q    Did you at that time ask to have him   3:43:49PM
10 rescheduled?
11    A    I don't know if I did or not.     3:43:53PM
12    Q    Do you know when the first time   3:43:54PM
13 somebody reached out to the county to reschedule
14 him after he didn't appear in the '05 test?
15    A    Repeat that.                3:44:02PM
16       MR. GOODSTADT:  Could you read that   3:44:04PM
17 back.
18       (Whereupon, the requested portion was   3:44:05PM
19       read back by the court reporter:  Do you
20       know when the first time somebody reached
21       out to the county to reschedule him after he
22       didn't appear in the '05 test?)
23    A    Read that one more time, I'm sorry.   3:44:19PM
24    Q    I'll reask it.              3:44:21PM
25       Do you know when the first time either   3:44:22PM

GEORGE HESSE

1
2  he or someone on his behalf reached out to the
3  county to reschedule the test after he didn't
4  appear in '05?
5     A    I don't know.  I would've been the   3:44:31PM
6  only one that would have rescheduled his test,
7  so I don't recall.
8     Q    Do you have anything that would   3:44:38PM
9  refresh your recollection?  Take any notes of
10 these calls?
11    A    Not that I recall.          3:44:42PM
12    Q    How did you alert the officers when   3:44:43PM
13 their scheduled dates were coming up?
14    A    Just by cell phone -- by telephone.   3:44:48PM
15    Q    So you would call them?     3:44:50PM
16    A    Yeah.                       3:44:52PM
17    Q    Did you ever do anything in writing,   3:44:52PM
18 either by E-mail or a memo or a letter?
19    A    Sometimes I would write it right on   3:44:55PM
20 the front of their application pack.  Maybe I'd
21 just write it down on a note.
22    Q    Do you know whether you wrote anything   3:45:02PM
23 down with respect to Hardman?
24    A    I may have wrote something on the face   3:45:05PM
25 of his application, but I did that sometimes.  I

GEORGE HESSE

1
2  didn't do it all the time.  I don't know.
3     Q    When you say "application," that was   3:45:13PM
4  the applicant investigation section that you
5  were running at the time?
6     A    Yes.                        3:45:17PM
7     Q    Okay.  Who replaced Hardman in the '05   3:45:18PM
8  spot?
9     A    I believe it was Greg Keghlian.     3:45:24PM
10 K-E-G-H-L-I-A-N, Keghlian.
11    Q    Was Keghlian a new hire in '05 or had   3:45:33PM
12 he been a person who had been working there not
13 certified?
14    A    He wasn't a new hire in '05.  He   3:45:43PM
15 started in, I believe, '06.  But I might have
16 given his spot to Keghlian or it might have been
17 Bill Embry.  It might have even been Joe
18 Dediminico.  I'm not real sure.
19    Q    Other than for -- well, strike that.   3:46:05PM
20       Which people who served as police   3:46:09PM
21 officers that were uncertified eventually did
22 not pass the test to become certified?  You
23 testified Hardman.  I think you testified Cherry
24 decided that he would drop down because he
25 didn't want to take the test.  Who else

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 281

GEORGE HESSE

1  GEORGE HESSE
2  eventually did not become certified?
3  A   Danny Shook, John Dyer.  Bill Walsh,   3:46:28PM
4  he was never scheduled to do anything.  He just
5  went on to work at the D.A.'s office in Nassau.
6      I said John Dyer?  Did I say him?   3:46:46PM
7  Q   You did.                          3:46:49PM
8  A   Bullis decided not to take the battery  3:46:51PM
9  of tests.  He stepped down.  I'm not sure who
10  else.
11  Q   What happened to Dyer?  Did he step   3:47:00PM
12  down or was he fired?
13  A   I let him go.                    3:47:03PM
14  Q   When did that happen?            3:47:04PM
15  A   In 2006.                         3:47:12PM
16  Q   When did you let him go in 2006?   3:47:15PM
17  A   Because he failed the polygraph.   3:47:17PM
18  Q   When did you let him go?          3:47:19PM
19  A   Well, he didn't work the whole winter  3:47:23PM
20  of '05 in through '06.  So I think officially
21  might have been April 4th by memo to the village
22  office.
23  Q   If he failed the polygraph, would he   3:47:44PM
24  have the opportunity to take it again?
25  A   Yes.                             3:47:49PM

Page 282

1  GEORGE HESSE
2  Q   And he elected not to or you      3:47:49PM
3  terminated him just because he failed it?
4  A   He pretty much elected not to do it   3:47:52PM
5  again.
6  Q   How about Dan Shook, did he step down,  3:47:55PM
7  did you let him go or did something else happen
8  with him?
9  A   He -- he moved -- well, he took a   3:48:03PM
10  different position within the police department.
11  Q   What position did he take?         3:48:07PM
12  A   Dispatcher.                      3:48:08PM
13  Q   How about Walsh?  Was he the one who   3:48:08PM
14  moved to the D.A.?
15  A   Yes.                             3:48:12PM
16  Q   How about Bullis?                 3:48:12PM
17  A   Dispatcher.                      3:48:14PM
18  Q   Did you get a copy of the          3:48:27PM
19  pre-polygraph questionnaire for your officers
20  prior to them taking the polygraph?
21  A   The pre-polygraph questionnaire is   3:48:34PM
22  part of the original packet.
23  Q   It's part of the packet?  How did you   3:48:38PM
24  get the pre-polygraph questionnaire?
25  A   That was part of -- when I was      3:48:43PM

Page 283

1  GEORGE HESSE
2  arranging this application, I found it online
3  for another job.  I don't remember what the
4  other job was.
5  Q   Eddie Carter didn't get you a copy of   3:48:50PM
6  that from somebody in Quogue?
7  A   That?  You know what, I don't know.  I   3:48:55PM
8  think I got it online.
9  Q   Did you ever allow any of the        3:49:03PM
10  uncertified officers to review the polygraph
11  questionnaire from Frank Fiorillo's personnel
12  jacket?
13  A   No.                              3:49:13PM
14  Q   Are the police officer personnel   3:49:16PM
15  jackets kept in the station?
16  A   Yes.                             3:49:20PM
17  Q   Where in the station?             3:49:20PM
18  A   Now they're kept in a locked filing   3:49:21PM
19  cabinet.
20  Q   How about in '05?                 3:49:24PM
21  A   In '05, they were kept in a filing   3:49:26PM
22  cabinet.
23  Q   Unlocked?                        3:49:29PM
24  A   Unlocked.                        3:49:29PM
25  Q   Did Allen Loeffler pass all tests that   3:49:41PM

Page 284

1  GEORGE HESSE
2  are required to be a police officer?
3  A   He's been a cop since 1973.  I would   3:49:45PM
4  assume so.
5  Q   Do you know whether he took the basic   3:49:49PM
6  course for police officers?
7  A   Yes, he did.                     3:49:52PM
8  Q   Do you know whether anyone looked in   3:50:03PM
9  Frank's jacket to look at the polygraph
10  questions?
11  A   Not that I recall.               3:50:09PM
12      (Whereupon, Bates document 5773 was   3:50:16PM
13  marked as Plaintiff's Exhibit 6 for
14  identification, as of this date.)
15      MR. NOVIKOFF:  Hesse 6?           3:50:46PM
16      MR. GOODSTADT:  Hesse 6.          3:50:48PM
17      I've placed in front of Mr. Hesse   3:50:56PM
18  what's been marked as Hesse 6.  It's a
19  one-page document bearing Bates No. 5773.
20  (Handing.)
21  BY MR. GOODSTADT:                     3:51:05PM
22  Q   Mr. Hesse, have you ever seen this   3:51:05PM
23  document?
24  A   I may have.                      3:51:07PM
25  Q   You see in the second paragraph -- and   3:51:08PM

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 285

GEORGE HESSE

1       GEORGE HESSE
2   this is a letter from the State of New York,
3   Division of Criminal Justice Services.  Second
4   paragraph, it says, "We've conducted a search of
5   our registry" records -- "registry and training
6   records, finding that Police Officer Allen
7   Loeffler, who is registered as a police officer
8   with the Ocean Beach Village Police Department,
9   has not successfully completed the basic course
10  for police officers."
11      Do you see that?          3:51:32PM
12  A   Yes.              3:51:33PM
13  Q   Do you know what that refers to?      3:51:34PM
14  A   It's stating that they say that he    3:51:35PM
15  never completed the police academy.
16  Q   Do you know whether this was ever     3:51:42PM
17  resolved one way or the other?
18      MR. NOVIKOFF:  Objection.  You haven't 3:51:46PM
19  asked him yet whether or not he was ever
20  aware of this since it was sent.  It went to
21  Paradiso.
22  BY MR. GOODSTADT:               3:51:51PM
23  Q   Well, have you ever heard of that     3:51:52PM
24  issue?
25  A   Yes.              3:51:53PM

Page 286

1       GEORGE HESSE
2       MR. NOVIKOFF:  Okay.      3:51:54PM
3   BY MR. GOODSTADT:               3:51:55PM
4   Q   When did you hear of it?      3:51:55PM
5   A   I don't recall.         3:51:56PM
6   Q   It was not in connection with this    3:51:58PM
7   case, right?
8       MR. NOVIKOFF:  Objection.  Form.      3:52:01PM
9   A   No.              3:52:02PM
10  Q   So you learned about it before this   3:52:03PM
11  case?
12  A   Yes.              3:52:05PM
13  Q   Okay.  Do you know whether this issue 3:52:05PM
14  was ever resolved one way or the other?
15  A   I believe there was an attempt to     3:52:10PM
16  resolve it; but in my recollection, it has never
17  been resolved.
18  Q   Do you know whether -- well, strike   3:52:21PM
19  that.
20      When did Loeffler stop working for the 3:52:24PM
21  beach?
22  A   Off the top of my head, I don't know  3:52:26PM
23  what year.
24  Q   He stop working because of this issue? 3:52:30PM
25      MR. NOVIKOFF:  Objection.      3:52:32PM

Page 287

1       GEORGE HESSE
2   A   I'm not sure.          3:52:32PM
3   Q   What was the attempt that was made to 3:52:41PM
4   resolve the issue?
5       MR. NOVIKOFF:  Objection.  Foundation. 3:52:44PM
6       Go ahead.          3:52:45PM
7       MR. CONNOLLY:  Objection.      3:52:47PM
8       You can answer.         3:52:48PM
9   A   Okay.  I actually called the police   3:52:49PM
10  academy -- academy to see if they could pull
11  some records from back then, 1973; and out of
12  all the class files, they could not the class
13  that he was in.
14  Q   Uh-huh.  So to this day, do you know  3:53:07PM
15  whether there's ever been any confirmation,
16  official confirmation that he graduated the
17  academy?
18  A   None that I've received.      3:53:17PM
19  Q   Did you ever discuss with Allen       3:53:41PM
20  Loeffler why he stopped working as a police
21  officer in Ocean Beach?
22  A   I don't recall.         3:53:49PM
23  Q   How many years did he work on the     3:53:51PM
24  Ocean Beach force?
25  A   I'd like to say on and off since 1970. 3:53:59PM

Page 288

1       GEORGE HESSE
2   Q   If he did not pass the academy or     3:54:02PM
3   graduate the academy, do you know whether that
4   would be a violation of New York State Civil
5   Service law?
6       MR. NOVIKOFF:  Objection.      3:54:17PM
7       MR. CALLAHAN:  Objection.      3:54:18PM
8       MR. CONNOLLY:  Objection.      3:54:19PM
9   A   I have no idea.         3:54:19PM
10      MR. GOODSTADT:  Please mark that.     3:54:26PM
11      (Whereupon, Bates document 5769 was   3:54:27PM
12  marked as Plaintiff's Exhibit 7 for
13  identification, as of this date.)
14      MR. GOODSTADT:  I've placed in front  3:54:52PM
15  of Mr. Hesse what's been marked as Hesse 7.
16  It's a one-page exhibit bearing Bates
17  No. 5769.  (Handing.)
18  BY MR. GOODSTADT:               3:55:00PM
19  Q   Mr. Hesse, have you ever seen this    3:55:01PM
20  letter from the Suffolk County Department of
21  Civil Service?
22  A   I may have.          3:55:09PM
23  Q   And do you see on the second paragraph 3:55:16PM
24  where it says, "Unless we receive notification
25  that Mr. Loeffler has satisfied the criteria for

053690b6-a7be-44d9-9835-90b3e21fffd8

1          **GEORGE HESSE**
2    **police officer certification, our records would**
3    **indicate that his appointment was disapproved.**
4    **Continued employment would be a violation of New**
5    **York State Civil Service law."**
6          **Do you see that?**          3:55:34PM
7     A    Yes.                    3:55:36PM
8          MR. NOVIKOFF:  Are you going to read  3:55:37PM
9    the next sentence?
10   BY MR. GOODSTADT:                3:55:39PM
11    **Q    "It is our understanding that    3:55:39PM**
12   **Mr. Loeffler is no longer employed by the**
13   **village, but that his termination has not been**
14   **reported to us."**
15         MR. NOVIKOFF:  Okay.  Thank you.    3:55:46PM
16   BY MR. GOODSTADT:                3:55:47PM
17    **Q    The question is:  Does this refresh    3:55:48PM**
18   **your recollection as to whether it would be a**
19   **Civil Service violation if he had worked there**
20   **without passing or without graduating the**
21   **academy?**
22         MR. NOVIKOFF:  I'm going to object to  3:55:57PM
23   the question as to form, and the basis for
24   my objection is he didn't say he doesn't
25   recall.  He says I have no clue.  So I'm

1          GEORGE HESSE
2    objecting to the form of the question.
3          MR. CONNOLLY:  Similar objection.    3:56:07PM
4    Please answer the question.      3:56:10PM
5     A    I wouldn't know.          3:56:11PM
6     **Q    Do you know how this certification    3:56:29PM**
7    **issue was brought to the Civil Service**
8    **attention?**
9          MR. NOVIKOFF:  Objection to form.  No  3:56:36PM
10   foundation.
11         MR. CALLAHAN:  Same.          3:56:39PM
12    A    On Allen Loeffler specifically?    3:56:41PM
13    **Q    No, just generally, that there were    3:56:44PM**
14   **people at Ocean Beach working as police officers**
15   **who were not certified.**
16         MR. NOVIKOFF:  Same objection.    3:56:50PM
17    A    I have an idea, yes.        3:56:51PM
18    **Q    And what's your idea?          3:56:52PM**
19    A    There was an issue with -- we picked  3:56:55PM
20   up a couple of police officers that once worked
21   for the state park police as part-time seasonal
22   police officers.  It should be seasonal.  They
23   were strictly seasonal.  And the New York State
24   park police decided to do away with their
25   part-time seasonal program, and a bunch of those

1          GEORGE HESSE
2    seasonal part-time, whatever you want to call
3    them, were let go.  They all were seeking other
4    part-time seasonal police jobs.  And I believe
5    we hired two of them.  And from what I recall
6    was that because Ocean Beach just employed them
7    and put them on, that other villages that came
8    in contact with these officers had made a gripe
9    that we, Ocean Beach, just employed these guys
10   without having to go through a battery of Civil
11   Service tests, and they protested it.  So I
12   believe someone contacted Civil Service and
13   said, well, if Ocean Beach doesn't do it, why do
14   we have to do it.
15    **Q    So you believe it was another village  3:58:15PM**
16   **police department?**
17    A    I believe so, yes.          3:58:19PM
18    **Q    Did you ever hear anyone allege that    3:58:20PM**
19   **it was Tommy Snyder who tipped off Civil Service**
20   **to that problem?**
21    A    I've heard allegations of such, but    3:58:27PM
22   not about Tom Snyder.
23    **Q    Who did you hear allegations about    3:58:31PM**
24   **that tipped off Civil Service?**
25    A    Eddie Carter.            3:58:35PM

1          GEORGE HESSE
2     **Q    Who told you that Ed Carter tipped off  3:58:44PM**
3    **Civil Service?**
4     A    I don't recall.          3:58:47PM
5     **Q    You don't recall who -- strike that.    3:58:48PM**
6          **Where were you when you learned about  3:58:51PM**
7    **that?**
8     A    I don't recall.          3:58:53PM
9     **Q    Was it people on the department who    3:58:54PM**
10   **mentioned that to you?**
11    A    It may have been, yes.        3:58:57PM
12    **Q    Did you ever discuss that issue with    3:59:00PM**
13   **the Bosettis?**
14         MR. NOVIKOFF:  What issue?        3:59:02PM
15         MR. GOODSTADT:  That Ed Carter tipped  3:59:03PM
16   off Civil Service, the claim that Ed Carter
17   tipped off the Civil Service to the fact
18   that there were uncertified officers working
19   there.
20         MR. NOVIKOFF:  I object to the form.    3:59:14PM
21    A    There were protests made by other    3:59:15PM
22   part-time seasonal police officers to that fact,
23   but I let it be known where I actually heard it
24   from.
25    **Q    Who issued or lodged these protests?  3:59:22PM**

TSG Reporting - Worldwide   (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

GEORGE HESSE

1
2    A    Gary Bosetti, Ty Bacon. I don't    3:59:28PM
3    recall if anybody else ever really protested it.
4    Q    Did you ever hear either Bosetti or    3:59:37PM
5    Bacon refer to Ed Carter as a rat?
6    A    I don't recall.    3:59:44PM
7    Q    Did you ever hear them refer to Ed    3:59:45PM
8    Carter as a Civil Service rat?
9    A    I don't recall.    3:59:49PM
10   Q    Did you ever hear them, either of    3:59:50PM
11   them, refer to any of the plaintiffs as a rat?
12   A    I don't recall.    3:59:54PM
13   Q    Did you ever hear them refer to any of    3:59:55PM
14   the plaintiffs as a Civil Service rat?
15   A    I really don't recall.    4:00:01PM
16   Q    Did you ever hear anyone refer to the    4:00:03PM
17   plaintiffs or any of the plaintiffs as a rat?
18   A    I don't recall.    4:00:07PM
19   Q    Did you ever hear anyone refer to any    4:00:07PM
20   of the plaintiffs as a Civil Service rat?
21   A    I don't recall.    4:00:12PM
22   Q    Do you have anything that would    4:00:12PM
23   refresh your recollection?
24   A    No.    4:00:15PM
25   Q    Did you ever refer to any of the    4:00:15PM

GEORGE HESSE

1
2    plaintiffs as a rat?
3    A    Yes.    4:00:22PM
4    Q    Which plaintiffs did you refer to as a    4:00:22PM
5    rat?
6    A    Frank Fiorillo.    4:00:25PM
7    Q    When did you refer to him as a rat?    4:00:28PM
8    A    I believe it was on a blog.    4:00:30PM
9    Q    So you posted on the blog referring to    4:00:38PM
10   Frank Fiorillo as a rat?
11   A    Yes.    4:00:41PM
12   Q    Which blog?    4:00:42PM
13   A    The Schwartz report,    4:00:43PM
14   LongIslandpolitics.com.
15   Q    What name did you post under?    4:00:49PM
16   A    For that entry, I don't know.    4:00:54PM
17   Q    How many times did you post on the    4:00:56PM
18   Schwartz report?
19   A    Oh God, 25, 30 times, maybe.    4:01:01PM
20   Q    Under what names have you posted    4:01:05PM
21   under?
22   A    Still Employed was one. Maybe Still    4:01:15PM
23   Employed 2. Dirty, Dirty 1, with the number
24   one, and maybe some other variations of that.
25   Others, I don't recall.

GEORGE HESSE

1
2    Q    Do you have a list anywhere of names    4:01:34PM
3    that you posted under?
4    A    I don't currently have a list, no.    4:01:38PM
5    Q    Did you ever have a list?    4:01:40PM
6    A    Just what was on the blog.    4:01:41PM
7    Q    And what -- where did you post these    4:01:43PM
8    25 to 30 -- I know you posted them on the
9    Schwartz report. But where physically were you
10   when you were posting these 25 to 30 posts?
11   A    From my house.    4:01:53PM
12   Q    Did you ever post from the Ocean Beach    4:01:54PM
13   Police Department?
14   A    A couple.    4:01:57PM
15   Q    How many times did you post from the    4:02:02PM
16   police department?
17   A    I don't recall.    4:02:05PM
18   Q    Which house did you post from?    4:02:06PM
19   A    191 The Helm.    4:02:08PM
20   Q    Are you aware of any other current or    4:02:17PM
21   former Ocean Beach police officers who post on
22   the blog?
23   A    Nobody that's openly admitted to me,    4:02:25PM
24   no.
25   Q    Did you ever see anyone post on the    4:02:29PM

GEORGE HESSE

1
2    blog in the police station, other than for
3    yourself?
4    A    No.    4:02:34PM
5        MR. GOODSTADT: Tape's over.    4:02:37PM
6        THE VIDEOGRAPHER: Yeah. The time is    4:02:39PM
7    now 4:02 p.m. We are now off the record.
8        (Whereupon, a discussion was held off    4:02:59PM
9    the record.)
10       MR. GOODSTADT: Back on the record.    4:04:20PM
11       Well, due to a scheduling problem,    4:04:25PM
12   we've decided to break for the day, but
13   Mr. Connolly has agreed to bring his client
14   back for an additional day, not a full day,
15   on another occasion to complete the
16   deposition. I still have two hours and 35
17   minutes under the federal rules. We plan to
18   make a motion to the court, unless we can
19   agree to some additional time prior to that.
20       MR. CONNOLLY: That is my    4:04:49PM
21   understanding.
22       MR. GOODSTADT: I also want to put on    4:04:50PM
23   the record, to the extent that Mr. Hesse has
24   not reviewed his E-mail accounts, which I
25   think he was required to do under the

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 297

GEORGE HESSE

1
2  discovery in his personal and professional
3  capacities, just to make sure nothing gets
4  destroyed, everything is preserved from here
5  on in his E-mails.
6      MR. CONNOLLY:  That will be taken      4:05:12PM
7  under advisement.  I'll look into that.
8      MR. GOODSTADT:  Great.      4:05:15PM
9      MR. NOVIKOFF:  And so we're clear with  4:05:17PM
10  regard to Mr. Hesse, we are coming back on
11  the 16th to complete his deposition, at
12  least complete the deposition of plaintiffs
13  of Mr. Hesse up to seven hours, unless
14  before that date the court grants more time
15  or there's an agreement.  And in addition,
16  certainly the village will have its
17  opportunity on the 16th or a date
18  thereafter to continue, and I presume the
19  county as well.
20      MR. GOODSTADT:  And his own lawyer,      4:05:49PM
21  for that matter.
22      (Continued on the next page to include  4:05:53PM
23  jurat.)
24
25

Page 298

GEORGE HESSE

1
2      MR. NOVIKOFF:  And his own lawyer, for  4:05:53PM
3  that matter.
4      MR. GOODSTADT:  I have no objections    4:05:53PM
5  to any of that.
6      (Time noted 4:05 p.m.)      4:05:55PM
7      _____
8              GEORGE HESSE
9
   Subscribed and sworn to before me
10  this      day of      , 2009
11  _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 299

PROCEEDINGS

1
2      C E R T I F I C A T E
3
4      I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Publi
5  and for the State of New York, do hereby certify:
6      THAT the witness whose testimony is hereinbefo
7  set forth, was duly sworn by me; and
8      THAT the within transcript is a true record
9  of the testimony given by said witness.  I further
10  certify that I am not related, either by blood or
11  marriage, to any of the parties to this action; and
12      THAT I am in no way interested in the outcome
13  this matter.
14      IN WITNESS WHEREOF, I have hereunto set
15  my hand this 8th day of June, 2009.
16
17      _____
18          JUDI JOHNSON, RPR, CRR, CLR
19
20
21
22
23
24
25

Page 300

PROCEEDINGS

1
2      INDEX
3  ATTORNEY                      PAGE
4      By Mr. Goodstadt          7
5
6
7
8
9
10
11
12      INDEX OF HESSE EXHIBITS
13  I.D.          DESCRIPTION          PAGE
14  Exhibit 1  Bates document 3856          122
15  Exhibit 2  Bates document 3847          140
16  Exhibit 3  Bates document 3845-46       155
17  Exhibit 4  Bates document 28            173
18  Exhibit 5  A letter dated January 2007  184
19  Exhibit 6  Bates document 5773          284
20  Exhibit 7  Bates document 5769          288
21
22
23
24
25

TSG Reporting - Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 301

```
1            ERRATA SHEET
2   NAME OF CASE:  CARTER V. OCEAN BEACH
3   DATE OF DEPOSITION: June 3, 2009
4   NAME OF WITNESS:  GEORGE HESSE
5
6   Reason codes:
7       1.  To clarify the record.
8       2.  To conform to the facts
9       3.  To correct the transcription
10       errors.
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
     GEORGE HESSE
25
```

TSG Reporting – Worldwide    (877) 702-9580

053690b6-a7be-44d9-9835-90b3e21fffd8

Page 302

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
EDWARD CARTER, FRANK FIORILO,      )
KEVIN LAMM, JOSEPH NOFI, and       )
THOMAS SNYDER,                     )
                                   )
            Plaintiffs,            )
                                   )
-against-                          )
                                   ) Index No.
                                   ) CV 07 1215
INCORPORATED VILLAGE OF OCEAN      )
BEACH; MAYOR JOSEPH C.             )
LOEFFLER, JR., individually        )
and in his Official capacity;      )
former mayor NATALIE K.ROGERS,     )
individually and in her            )
official capacity, OCEAN BEACH     )
POLICE DEPARTMENT; ACTING          )
DEPUTY POLICE CHIEF GEORGE B.      )
HESSE, individually and in his     )
official capacity; SUFFOLK         )
COUNTY; SUFFOLK COUNTY POLICE      )
DEPARTMENT OF CIVIL SERVICE;       )
and ALLISON SANCHEZ,               )
individually and in her            )
official capacity,                 )
                                   )
            Defendants.            )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
          ***VOLUME II***
CONTINUED DEPOSITION OF GEORGE HESSE
            Uniondale, New York
            June 16, 2009


Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 23331
```

Page 303

```
1
2              926 RexCorp Plaza
               Uniondale, New York
3
4              June 16, 2009
               10:00 A.M.
5
6
7
8
9
10
11
12
13        Deposition of GEORGE HESSE, held at
14   the offices of RIVKIN RADLER, LLP, 926
15   RexCorp Plaza, Uniondale, New York, pursuant
16   to Notice, before Judi Johnson, a Registered
17   Professional Reporter, a Certified Realtime
18   Reporter, a Certified LiveNote Reporter and
19   Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 304

```
1              GEORGE HESSE
2   APPEARANCES:
3      THOMPSON WIGDOR & GILLY, LLP
4      Attorneys for the Plaintiffs
5      85 Fifth Avenue
6      New York, New York 10003
7
       BY: ANDREW S. GOODSTADT, ESQ.
8
9      MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
10     Attorneys for GEORGE B. HESSE
11     530 Saw Mill Road
12     Elmsford, New York 10523
13
       BY: KEVIN W. CONNOLLY, ESQ.
14
15
16     RIVKIN RADLER, LLP
17
18     Attorneys for INCORPORATED VILLAGE OF OCEAN BEACH,
19     JOSEPH LOEFFLER, NATALIE ROGERS AND OCEAN BEACH
20     POLICE DEPARTMENT
21     926 RexCorp Plaza
22     Uniondale, New York 11556-0926
23
       BY: KENNETH A. NOVIKOFF, ESQ.
24       MICHAEL SCHNEPPER, ESQ. (A.M. SESSION ONLY)
25
```

Page 305

```
1              GEORGE HESSE
2
3      BEE READY FISHBEIN HATTER & DONOVAN, LLP
4
5      Attorneys for SUFFOLK COUNTY
6      170 Old Country Road
7      Mineola, New York 11501
8
9      BY: (NOT PRESENT)
10
11     SUFFOLK COUNTY DEPARTMENT OF LAW
12
13     Attorneys for the County
14     100 Veterans Memorial Highway
15     Hauppauge, New York 11788
16
17     BY: CHRIS TERMINI, ESQ.
18     ALSO PRESENT:
19     JORDAN MUMMERT - LEGAL VIDEO SPECIALIST
20     FRANK FIORILLO
21     KEVIN LAMM
22     JOE NOFI - A.M. SESSION ONLY
23
24
25
```

1 (Pages 302 to 305)

b929ea01-2563-408a-a7fc-adb794430749

Page 306

```
 1          GEORGE HESSE
 2          IT IS HEREBY STIPULATED AND AGREED by
 3   and between the attorneys for the respective
 4   parties herein, that filing and sealing and
 5   the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17          - oOo -
18
19
20
21
22
23
24
25
```

Page 307

```
 1          GEORGE HESSE
 2   GEORGE HESSE,
 3          Called as a witness herein, having
 4   first been duly sworn, was examined and
 5   testified as follows:
 6   BY THE REPORTER:
 7     Q   Please state your name and address for
 8   the record.
 9     A   George Hesse, 623 Bay Walk, P.O. Box
10   425, Ocean Beach, New York 11770.
11          THE VIDEOGRAPHER: This is the start  10:27:46AM
12   of the tape labeled Number 1 of the        10:27:47AM
13   continuation of the videotaped deposition of 10:27:49AM
14   George Hesse in the matter Carter, Fiorillo 10:27:52AM
15   versus Incorporated Village of Ocean Beach.  10:27:56AM
16   This deposition is being held at 92006       10:28:00AM
17   RexCorp Plaza in Uniondale, New York on      10:28:06AM
18   June 16th, 2009, at approximately            10:28:11AM
19   10:30 a.m.                                   10:28:12AM
20          My name is Jordan Mummert from TSG   10:28:13AM
21   Reporting, Inc. I'm the legal video         10:28:16AM
22   specialist. The court reporter is Judi      10:28:18AM
23   Johnson, in association with TGS Reporting.  10:28:19AM
24          Would counsel please introduce      10:28:20AM
25   yourself.                                    10:28:20AM
```

Page 308

```
 1          GEORGE HESSE
 2          MR. GOODSTADT:  Andrew Goodstadt,    10:28:20AM
 3   Thompson, Wigdor & Gilly, on behalf of the  10:28:25AM
 4   plaintiffs.                                  10:28:28AM
 5          MR. CONNOLLY:  Kevin W. Connolly of  10:28:28AM
 6   Marks, O'Neill, O'Brien & Courtney, on      10:28:29AM
 7   behalf of the Defendant Hesse.              10:28:31AM
 8          MR. NOVIKOFF:  On behalf of the      10:28:33AM
 9   village defendants, Ken Novikoff, and with  10:28:33AM
10   me is Michael Schnepper, Rivkin Radler.     10:28:35AM
11          MR. TERMINI:  And for Suffolk County 10:28:39AM
12   and the Suffolk County defendants, Assistant 10:28:40AM
13   County Attorney Chris P. Termini.           10:28:41AM
14          MR. NOVIKOFF:  Andrew, same stips as 10:28:55AM
15   in every other deposition?    10:28:57AM
16          MR. GOODSTADT:  Yes.        10:28:59AM
17          MR. NOVIKOFF:  And same agreement with 10:29:01AM
18   regard to the phrase of rehire versus       10:29:02AM
19   termination in your questioning and my      10:29:04AM
20   questioning?              10:29:06AM
21          MR. GOODSTADT:  Until we establish   10:29:08AM
22   something different possibly.       10:29:09AM
23          MR. NOVIKOFF:  Yes.         10:29:10AM
24          MR. CONNOLLY:  And objection by one  10:29:13AM
25   counsel is an objection by all?     10:29:15AM
```

Page 309

```
 1          GEORGE HESSE
 2          MR. NOVIKOFF:  Sure. I'm fine with   10:29:18AM
 3   that.             10:29:19AM
 4          Are you fine with that?      10:29:20AM
 5          MR. GOODSTADT:  Yeah, I'm fine with  10:29:21AM
 6   that. All objections other than as to form  10:29:22AM
 7   are preserved.            10:29:26AM
 8   EXAMINATION             10:29:27AM
 9   BY MR. GOODSTADT:            10:29:28AM
10     Q   Good morning, Mr. Hesse.      10:29:29AM
11     A   Good morning.        10:29:30AM
12     Q   Thank you for returning.      10:29:31AM
13          I just want to remind you that you are 10:29:32AM
14   under oath and that you're sworn to tell the 10:29:33AM
15   truth, and failure to do so can result in some 10:29:34AM
16   criminal sanctions.           10:29:36AM
17          Do you understand that?      10:29:36AM
18     A   I do.           10:29:37AM
19     Q   Between the first day of your     10:29:38AM
20   deposition on June 3rd and today, did you review 10:29:41AM
21   the transcript of your first deposition?    10:29:44AM
22     A   No.            10:29:47AM
23     Q   Did you review any excerpts of your  10:29:47AM
24   transcript --            10:29:48AM
25     A   No.            10:29:50AM
```

2  (Pages 306 to 309)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    Q   -- of your first deposition?        10:29:50AM
3        I just want to remind you to let me   10:29:52AM
4    finish my question before you answers, and I'll 10:29:54AM
5    let you finish your answer. Okay?        10:29:56AM
6    A   Yes.                    10:29:56AM
7    Q   Did you do anything to prepare for    10:29:57AM
8    today's deposition?            10:29:58AM
9    A   Yes.                    10:30:00AM
10   Q   What did you do to prepare for today's 10:30:00AM
11   deposition?                10:30:03AM
12   A   I met with my attorney, Kevin      10:30:03AM
13   Connolly, yesterday.            10:30:05AM
14   Q   For how long?                10:30:07AM
15   A   Maybe four hours.            10:30:09AM
16   Q   Where did you meet with him?        10:30:10AM
17   A   In Westchester -- Elmsford, at his   10:30:12AM
18   office.                    10:30:14AM
19   Q   And who was present during that     10:30:15AM
20   meeting?                    10:30:17AM
21   A   Just he and I.                10:30:17AM
22   Q   Did you review any documents during  10:30:18AM
23   that meeting?                10:30:21AM
24   A   Yes.                    10:30:23AM
25   Q   How many documents did you review?    10:30:24AM

GEORGE HESSE

1
2    A   Maybe five.                10:30:28AM
3    Q   Which ones?                10:30:29AM
4    A   They pertained to an incident that   10:30:31AM
5    took place October 31st of 2004 that dealt  10:30:33AM
6    with -- we all call the Halloween incident.  10:30:37AM
7    There may have been a couple of statements, a 10:30:43AM
8    few statements.                10:30:46AM
9    Q   Any other documents other than for the 10:30:47AM
10   statements from the Halloween incident that you 10:30:50AM
11   reviewed in preparation for today's deposition? 10:30:53AM
12   A   No.                    10:30:54AM
13   Q   Did you take the sergeant's test on   10:30:55AM
14   June 14th?                    10:30:57AM
15   A   Yes, I did.                10:30:58AM
16   Q   And when do you find out what your   10:30:59AM
17   score is, whether you passed or failed?    10:31:01AM
18   A   I'm not really sure. Maybe November.  10:31:04AM
19   Q   So you don't know as of today whether 10:31:07AM
20   you passed or failed?            10:31:08AM
21   A   No.                    10:31:10AM
22   Q   During your employment at Ocean Beach, 10:31:10AM
23   have you received any written performance    10:31:12AM
24   evaluations?                10:31:14AM
25   A   Have I received any?            10:31:16AM

GEORGE HESSE

1
2    Q   Yes.                    10:31:17AM
3        MR. NOVIKOFF: Objection.        10:31:18AM
4        Has he seen them or is he aware that 10:31:19AM
5    he's gotten any?                10:31:21AM
6    BY MR. GOODSTADT:                10:31:23AM
7    Q   Well, why don't we start with have you 10:31:23AM
8    seen any written performance evaluations.    10:31:25AM
9    A   For myself, no.                10:31:28AM
10   Q   Have you ever -- are you aware any of 10:31:30AM
11   performance evaluations that have ever been   10:31:34AM
12   prepared for you?                10:31:36AM
13   A   No.                    10:31:37AM
14       MR. GOODSTADT: Just mark this.     10:31:41AM
15       (Whereupon, Bates document 4547-488   10:31:43AM
16   was marked as Plaintiff's Exhibit 8 for     10:31:43AM
17   identification, as of this date.)        10:31:43AM
18       MR. GOODSTADT: I've placed in front  10:32:19AM
19   of Mr. Hesse what's been marked as Hesse 8.   10:32:21AM
20   It is a two-page exhibit bearing Bates     10:32:24AM
21   numbers 4547 and 4548.            10:32:26AM
22       MR. GOODSTADT:                10:32:29AM
23   Q   Mr. Hesse, have you ever seen this    10:32:30AM
24   document that's been marked as Hesse 8?    10:32:32AM
25   A   I've seen the document, but not this  10:32:35AM

GEORGE HESSE

1    particular document.            10:32:37AM
2    Q   You've seen the form?            10:32:37AM
3    A   I've seen the form, correct.        10:32:39AM
4    Q   What's is this form?            10:32:40AM
5    A   It's a yearly performance report.    10:32:41AM
6    Q   Is this something that you've        10:32:43AM
7    completed for other officers at Ocean Beach? 10:32:45AM
8    A   Yes.                    10:32:46AM
9    Q   What year did you start completing    10:32:47AM
10   these for other officers in Ocean Beach?    10:32:49AM
11   A   I started in 2007.            10:32:51AM
12   Q   And prior to 2007, do you know whether 10:32:53AM
13   there were any written performance evaluations 10:32:56AM
14   provided to any officers in Ocean Beach?    10:33:00AM
15   A   I am unaware of any forms.        10:33:02AM
16   Q   Who made the decision to start     10:33:06AM
17   providing officers with yearly performance   10:33:09AM
18   evaluations?                10:33:11AM
19       MR. NOVIKOFF: Objection to form.    10:33:13AM
20   A   I did.                    10:33:14AM
21   Q   And why did you make that decision?   10:33:15AM
22   A   Well, in light of recent events, I   10:33:17AM
23   thought it would be good to have some sort of a 10:33:20AM
24   documentation of officers' yearly performance. 10:33:24AM

Page 314

```
1            GEORGE HESSE
2     Q    What do you mean in light of recent   10:33:29AM
3   events?                          10:33:30AM
4     A    Of this lawsuit.              10:33:32AM
5     Q    Does Ocean Beach have a policy with   10:33:36AM
6   respect to written performance evaluations?   10:33:38AM
7        MR. NOVIKOFF: Objection.         10:33:42AM
8     A    You know, I believe something just   10:33:45AM
9   came up recently about doing yearly performance 10:33:47AM
10  reports for every employee in the village.  I   10:33:53AM
11  just received a copy of a new form that the   10:33:56AM
12  village would like to use.            10:33:59AM
13    Q    When did you receive that?       10:34:01AM
14    A    I believe last week.           10:34:02AM
15    Q    Who did you receive it from?     10:34:05AM
16    A    Maryanne Minerva.             10:34:06AM
17    Q    Other than for the form that you   10:34:11AM
18  received, do you know whether there's any   10:34:12AM
19  policy -- strike that.                10:34:14AM
20        Between 2000 and 2006, do you know   10:34:16AM
21  whether there was any policy in Ocean Beach with 10:34:19AM
22  respect to written performance evaluations?   10:34:21AM
23        MR. NOVIKOFF: Objection.         10:34:25AM
24    A    None that I'm aware of.         10:34:26AM
25    Q    Do you know whether Hesse 8, which   10:34:28AM
```

Page 315

```
1            GEORGE HESSE
2   appears to be a yearly performance report for   10:34:30AM
3   you, do you know whether that was ever       10:34:33AM
4   completed?                       10:34:35AM
5     A    I don't think so, no.          10:34:36AM
6     Q    Do you know who created this Hesse 8 10:34:37AM
7   that has your name and the year 2007 on there?  10:34:40AM
8     A    Yes.                       10:34:42AM
9     Q    Who created that?             10:34:43AM
10    A    Paul Trosco.               10:34:44AM
11    Q    Did he create them for all the   10:34:49AM
12  officers for '07?                  10:34:51AM
13        MR. NOVIKOFF: Objection.         10:34:53AM
14    A    Yes.                       10:34:53AM
15        MR. CONNOLLY: By "create," do you   10:35:01AM
16    mean fill in the officers' names?       10:35:01AM
17        MR. GOODSTADT: The names, exactly.   10:35:04AM
18  BY MR. GOODSTADT:                    10:35:06AM
19    Q    Who actually created this form, if you 10:35:06AM
20  know?                           10:35:10AM
21    A    Paul Trosco.               10:35:10AM
22    Q    Was that your suggestion, that he   10:35:13AM
23  create a form?                    10:35:14AM
24    A    Yes.                       10:35:15AM
25    Q    And who actually filled out the   10:35:21AM
```

Page 316

```
1            GEORGE HESSE
2   evaluations for each of the officers in '07?   10:35:24AM
3     A    I did.                     10:35:27AM
4     Q    Did anyone else have any input?   10:35:28AM
5     A    No.                        10:35:31AM
6        MR. GOODSTADT: Can you mark this.   10:36:04AM
7        (Whereupon, Bates document 8189 and   10:36:06AM
8   5326 was marked as Plaintiff's Exhibit 9 for 10:36:06AM
9   identification, as of this date.)           10:36:06AM
10        MR. GOODSTADT: I've placed in front   10:36:46AM
11  of Mr. Hesse what's now been marked as       10:36:46AM
12  Hesse 9.  It is a two-page exhibit, bearing   10:36:49AM
13  Bates numbers 8189 and 5326.  And I       10:36:53AM
14  represent these are not consecutively       10:36:57AM
15  paginated, and they appear to be two       10:37:00AM
16  separate performance evaluations, but I've   10:37:02AM
17  marked as a single exhibit.            10:37:04AM
18        MR. NOVIKOFF: One is G. Bosetti and   10:37:06AM
19  the other one is Kevin Nowaski?         10:37:08AM
20        MR. GOODSTADT: Yes.             10:37:14AM
21  BY MR. GOODSTADT:                    10:37:16AM
22    Q    Mr. Hesse, do you recognize the   10:37:16AM
23  documents that have been marked as Hesse 9?   10:37:18AM
24    A    Yes.                       10:37:21AM
25    Q    And what are these documents?     10:37:21AM
```

Page 317

```
1            GEORGE HESSE
2     A    Yearly performance reports for Gary   10:37:23AM
3   Bosetti and Kevin Nowaski.            10:37:27AM
4     Q    If you look at the first page of   10:37:32AM
5   Hesse 9, 8189.                    10:37:32AM
6     A    Yes.                       10:37:35AM
7     Q    Is this your handwriting on the   10:37:36AM
8   document?                        10:37:38AM
9     A    Yes.                       10:37:38AM
10    Q    Is there anybody else's handwriting on 10:37:38AM
11  the document or is it all yours?         10:37:41AM
12    A    It is all mine.              10:37:43AM
13    Q    And if you look at the bottom, it says 10:37:43AM
14  "supervisor's signature."  Is that your       10:37:46AM
15  signature?                       10:37:48AM
16    A    That is correct.             10:37:49AM
17    Q    And it's dated 1-31-08.          10:37:49AM
18        Do you see that?              10:37:52AM
19    A    Yes.                       10:37:53AM
20    Q    Is that the date that you completed   10:37:53AM
21  this?                           10:37:54AM
22    A    Okay.                      10:37:55AM
23    Q    What was your title at that time?   10:37:55AM
24        MR. NOVIKOFF: Objection.         10:37:57AM
25    A    Deputy chief of police.         10:38:01AM
```

4  (Pages 314 to 317)

b929ea01-2563-408a-a7fc-adb794430749

Page 318

GEORGE HESSE

1
2    Q    And again, just so the record is    10:38:06AM
3    clear, by that time, you had not passed your    10:38:08AM
4    sergeant's test or your chief's test?    10:38:11AM
5         MR. NOVIKOFF:  Objection.    10:38:15AM
6    A    That's correct.    10:38:16AM
7    Q    If you look up at the top, it's Gary    10:38:16AM
8    Bosetti.    10:38:19AM
9         Do you see that?    10:38:19AM
10   A    Yes, sir.    10:38:20AM
11   Q    And what was Mr. Bosetti's position in    10:38:20AM
12   the department at that time?    10:38:21AM
13   A    Part-time seasonal police officer.    10:38:23AM
14   Q    And if you look under the -- on the    10:38:26AM
15   first set of lines that has your handwriting on    10:38:30AM
16   it, the second line says, "Needs to write more    10:38:32AM
17   summons."    10:38:36AM
18        Do you see that?    10:38:37AM
19   A    Yes.    10:38:37AM
20   Q    What did you mean by that?    10:38:38AM
21   A    I think he only wrote two for the    10:38:39AM
22   year, and I thought -- I expect him to write more    10:38:42AM
23   more.    10:38:44AM
24   Q    Did you ever tell -- other than for    10:38:45AM
25   this written evaluation, did you ever tell the    10:38:46AM

Page 319

GEORGE HESSE

1
2    officers in Ocean Beach that they need to write    10:38:49AM
3    more summons?    10:38:52AM
4         MR. NOVIKOFF:  Objection to form.    10:38:54AM
5    A    Yes.    10:38:55AM
6    Q    Do you know whether Chief Paradiso    10:38:55AM
7    ever told the officers at any time between 2000    10:38:58AM
8    and 2006 that they need to write more summons?    10:39:01AM
9    A    I don't know.    10:39:04AM
10   Q    You never heard him say that?    10:39:04AM
11   A    I don't recall.    10:39:06AM
12   Q    Do you recall ever being in a meeting    10:39:08AM
13   where the chief put up on a board the number of    10:39:09AM
14   summons that people wrote?    10:39:12AM
15   A    I don't recall that.    10:39:15AM
16   Q    If you look at the second page of this    10:39:27AM
17   exhibit, 5226.    10:39:29AM
18        Do you see that?    10:39:32AM
19   A    Yes.    10:39:32AM
20   Q    Is this your handwriting again on this    10:39:33AM
21   document?    10:39:34AM
22   A    Yes.    10:39:35AM
23   Q    And that's your signature under    10:39:35AM
24   "supervisor's signature"?    10:39:36AM
25   A    Yes.    10:39:38AM

Page 320

GEORGE HESSE

1
2    Q    And again, you're telling Mr. Nowaski    10:39:38AM
3    that he needs to write more summons as well,    10:39:42AM
4    correct?    10:39:45AM
5    A    Yes.    10:39:45AM
6    Q    Was that a problem in the department,    10:39:46AM
7    that officers weren't writing enough summonses?    10:39:47AM
8         MR. NOVIKOFF:  Objection. Form.    10:39:50AM
9    A    I wouldn't say it was a problem, but I    10:39:51AM
10   thought guys needed to step up some of their    10:39:54AM
11   work.    10:39:56AM
12   Q    And what was Mr. Nowaski's position in    10:39:57AM
13   2007?    10:40:01AM
14   A    Part-time seasonal police officer.    10:40:01AM
15   Q    Did you actually deliver these reports    10:40:03AM
16   to the different officers -- strike that.    10:40:06AM
17        Did you actually deliver Gary    10:40:09AM
18   Bosetti's report to him?    10:40:11AM
19   A    I don't -- what do you mean by    10:40:16AM
20   "deliver"?    10:40:18AM
21   Q    Actually sit down, go over it him, let    10:40:18AM
22   him see a copy of it, discuss it with him.    10:40:22AM
23   A    No.    10:40:25AM
24   Q    Did he actually ever see a copy    10:40:25AM
25   of this?    10:40:27AM

Page 321

GEORGE HESSE

1
2    A    I don't know.    10:40:27AM
3    Q    So you never showed him a copy of it?    10:40:28AM
4    A    I really -- I don't recall if I did.    10:40:30AM
5    Q    What did you do with this after you    10:40:32AM
6    filled it out?    10:40:34AM
7    A    It went right into their employee    10:40:35AM
8    packets, their folders.    10:40:37AM
9    Q    Personnel files?    10:40:40AM
10   A    Yes.    10:40:40AM
11   Q    How about Mr. Nowaski, did you deliver    10:40:42AM
12   a copy of this to Mr. Nowaski?    10:40:44AM
13   A    No.    10:40:46AM
14   Q    Did you deliver a copy of the annual    10:40:47AM
15   reports to any of the officers in '07?    10:40:49AM
16   A    I don't recall if I did.    10:40:53AM
17   Q    Did you ever receive an employee    10:40:57AM
18   handbook at Ocean Beach?    10:40:59AM
19   A    I did, yes.    10:41:01AM
20   Q    When did you receive it?    10:41:03AM
21        MR. NOVIKOFF:  Objection. Form.    10:41:05AM
22   A    Officially, in -- I'd like to say    10:41:14AM
23   '97ish.    10:41:22AM
24   Q    What do you mean by officially?    10:41:24AM
25   A    I believe it was a document that was    10:41:28AM

5  (Pages 318 to 321)

b929ea01-2563-408a-a7fc-adb794430749

1          GEORGE HESSE
2    formulated by someone in the village and it was   10:41:28AM
3    floating around for a while.  It was never   10:41:28AM
4    officially approved.  And then one day it just   10:41:32AM
5    kind of showed up.  I still don't know if it was   10:41:35AM
6    approved.  And to tell you, to this date, I   10:41:38AM
7    don't think it was approved until somewhere in   10:41:40AM
8    early 2000, 2001, '2.          10:41:43AM
9       Q    Approved by who?          10:41:46AM
10      A    By the village board.          10:41:47AM
11      Q    The board actually voted on it,     10:41:49AM
12   approved it somewhere in 2000, 2002?     10:41:51AM
13      A    I'm guessing.  I don't recall.   10:41:53AM
14          MR. GOODSTADT:  Let's mark this.   10:41:58AM
15          (Whereupon, Bates document 1-25 was   10:41:59AM
16      marked as Plaintiff's Exhibit 10 for   10:41:59AM
17      identification, as of this date.)   10:41:59AM
18          MR. GOODSTADT:  I've placed in front   10:42:34AM
19      of Mr. Hesse what's been marked as Hesse 10.   10:42:35AM
20      It is a multiple-page exhibit bearing Bates   10:42:37AM
21      Numbers 1 through 25. (Handing.)   10:42:41AM
22   BY MR. GOODSTADT:          10:42:45AM
23      Q    Mr. Hesse, do you recognize this     10:42:46AM
24   document?          10:42:51AM
25      A    Yes.          10:42:51AM

1          GEORGE HESSE
2       Q    And is this the handbook that you   10:42:52AM
3    testified that you received?          10:42:53AM
4       A    It appears to be.          10:42:54AM
5       Q    Do you know whether this handbook was   10:42:56AM
6    distributed to all officers in Ocean Beach?     10:42:58AM
7          MR. NOVIKOFF:  Objection.   10:43:01AM
8       A    I don't believe so.          10:43:05AM
9       Q    Do you know if it was distributed to   10:43:05AM
10   any officers in Ocean Beach?          10:43:06AM
11          MR. NOVIKOFF:  Objection.   10:43:08AM
12      A    I believe it was only distributed to   10:43:09AM
13   full-time persons of the village.          10:43:10AM
14      Q    So it's your understanding that it was   10:43:15AM
15   not distributed to any of the part-time   10:43:17AM
16   officers?          10:43:19AM
17      A    To the best of my recollection, no.   10:43:20AM
18      Q    Or any of the seasonal officers?   10:43:22AM
19      A    No.          10:43:23AM
20      Q    How come?          10:43:24AM
21          MR. CONNOLLY:  Objection.   10:43:25AM
22          MR. NOVIKOFF:  Objection.   10:43:26AM
23      A    I don't know.          10:43:27AM
24      Q    Who distributed it to the full-time   10:43:31AM
25   officers?          10:43:32AM

1          GEORGE HESSE
2       A    The -- I believe Maryanne Minerva.   10:43:33AM
3       Q    Do you know whether the policies in   10:43:37AM
4    this handbook covered part-time or seasonal   10:43:38AM
5    employees?          10:43:41AM
6       A    I think very vaguely.  I'd have to   10:43:41AM
7    read through it.          10:43:43AM
8       Q    You don't know one way or the other,   10:43:44AM
9    sitting here?          10:43:45AM
10          MR. NOVIKOFF:  Objection.  Asked and   10:43:48AM
11      answered.          10:43:50AM
12      A    Right now, no.          10:43:50AM
13      Q    If you turn to Page 5 -- it's Page 5   10:43:55AM
14   of the book, but it's Bates numbered 9.     10:43:59AM
15      A    (Witness complies.)  Uh-huh.   10:44:02AM
16      Okay.          10:44:04AM
17      Q    Do you have that page?          10:44:08AM
18      A    Yes.          10:44:09AM
19      Q    Do you see up top where it says   10:44:10AM
20   "unacceptable job performance/disciplinary   10:44:11AM
21   action"?          10:44:15AM
22      A    Yes, I do.          10:44:16AM
23          MR. NOVIKOFF:  Are we on Page 5?   10:44:16AM
24          MR. GOODSTADT:  Bates stamped 9, but   10:44:19AM
25      it's Page 5 of the book.          10:44:20AM

1          GEORGE HESSE
2          MR. NOVIKOFF:  Bates stamped 9, but   10:44:23AM
3       Page 5 of the book?  Okay.  I got it.   10:44:28AM
4    BY MR. GOODSTADT:          10:44:30AM
5       Q    Now, do you see the second paragraph   10:44:30AM
6    down, it goes through a progressive disciplinary   10:44:31AM
7    system?          10:44:36AM
8       A    Yes.          10:44:38AM
9       Q    Says, "It upholds and maintains a   10:44:38AM
10   progressive disciplinary system which may   10:44:43AM
11   include all or part of the following steps   10:44:43AM
12   unless otherwise covered by law."   10:44:46AM
13      Do you see that?          10:44:49AM
14      A    Yes.          10:44:50AM
15      Q    Did you implement this disciplinary   10:44:50AM
16   system?          10:44:52AM
17          MR. NOVIKOFF:  Objection.   10:44:53AM
18      A    No.          10:44:53AM
19      Q    Do you know whether anyone in the   10:44:54AM
20   police department ever implemented this   10:44:56AM
21   disciplinary system?          10:45:00AM
22      A    I am unaware.          10:45:01AM
23      Q    So you don't know one way or the   10:45:02AM
24   other?          10:45:03AM
25      A    No.          10:45:05AM

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    Q   If you look at Page 6 of the book,        10:45:05AM
3  Bates stamp 10, do you see the employee        10:45:08AM
4  performance appraisals paragraph? It's like     10:45:12AM
5  halfway down the page.                          10:45:15AM
6        Do you see that?                          10:45:16AM
7    A   Yes.                    10:45:19AM
8    Q   Okay. It says, "Newly hired employees 10:45:20AM
9  may receive performance appraisals after 30    10:45:22AM
10 days."                                          10:45:26AM
11       Do you see that?                          10:45:26AM
12   A   Yes.                    10:45:27AM
13   Q   Did you ever administer performance     10:45:27AM
14 appraisals to any of your newly hired officers 10:45:30AM
15 after 30 days?                                  10:45:33AM
16       MR. NOVIKOFF: Objection. Foundation. 10:45:35AM
17   A   No.                     10:45:37AM
18       MR. NOVIKOFF: Form.              10:45:38AM
19 BY MR. GOODSTADT:                               10:45:38AM
20   Q   Do you know whether any performance   10:45:39AM
21 appraisals were ever given to newly hired      10:45:41AM
22 officers after 30 days?                         10:45:44AM
23       MR. NOVIKOFF: Form.              10:45:46AM
24   A   No.                     10:45:46AM
25   Q   And it says "and a more formal       10:45:47AM

GEORGE HESSE

1
2  evaluation at the end of six months."           10:45:49AM
3        Do you see that?                          10:45:52AM
4    A   Yes.                    10:45:52AM
5    Q   Did you ever give a performance       10:45:53AM
6  appraisal to any of the officers at the end of 10:45:55AM
7  six months?                                     10:45:58AM
8        MR. NOVIKOFF: Objection. Foundation. 10:46:00AM
9    A   No.                     10:46:01AM
10   Q   Do you know whether any officers were 10:46:01AM
11 ever any performance appraisals at the end of  10:46:02AM
12 six months?                                     10:46:06AM
13       MR. NOVIKOFF: Objection. Foundation. 10:46:07AM
14   A   No.                     10:46:08AM
15   Q   The last sentence says, "Thereafter,   10:46:09AM
16 all employees may receive a performance        10:46:11AM
17 appraisal annually."                            10:46:13AM
18       Do you see that?                          10:46:15AM
19   A   Yes.                    10:46:16AM
20   Q   And to your knowledge, that had not   10:46:17AM
21 been implemented until -- in the police        10:46:20AM
22 department until 2007; is that correct?        10:46:22AM
23       MR. NOVIKOFF: Objection. Form.      10:46:26AM
24 Foundation.                                     10:46:27AM
25   A   Correct.                10:46:28AM

GEORGE HESSE

1
2    Q   If you look at -- strike that.        10:46:33AM
3        Before you look at the next section  10:46:36AM
4  I'll ask you to look at.                        10:46:37AM
5        Did Ocean Beach Police Department or 10:46:39AM
6  the village have a policy with respect to      10:46:41AM
7  officers drinking on duty?                      10:46:45AM
8        MR. NOVIKOFF: Form. Foundation.     10:46:47AM
9    A   Repeat that question.               10:46:48AM
10   Q   Yeah. Did the Ocean Beach Police     10:46:50AM
11 Department or the village have any policy with 10:46:51AM
12 respect to officers drinking while on duty?    10:46:55AM
13       MR. NOVIKOFF: Objection. Same.      10:46:58AM
14   A   No policy.              10:46:59AM
15   Q   No policy?              10:47:00AM
16   A   Nothing writing -- in writing.      10:47:01AM
17   Q   Do you know whether the police       10:47:05AM
18 department had any policy -- the police        10:47:06AM
19 department or the village had any policy with  10:47:08AM
20 respect to off-duty police officers drinking in 10:47:11AM
21 Ocean Beach?                                    10:47:16AM
22       MR. NOVIKOFF: Objection.           10:47:16AM
23   A   Nothing formal.          10:47:17AM
24   Q   So you don't recall any directives   10:47:19AM
25 ever being posted with respect to officers who 10:47:20AM

GEORGE HESSE

1
2  were off duty drinking in Ocean Beach?          10:47:24AM
3    A   I don't recall.          10:47:27AM
4    Q   Do you know whether the beach had or  10:47:32AM
5  the department had any policy with respect to  10:47:34AM
6  officers who show up to work under the influence 10:47:40AM
7  of alcohol?                                     10:47:42AM
8    A   There was no written policies.      10:47:44AM
9    Q   Okay. Do you know whether there was  10:47:45AM
10 ever any verbal policies with respect to       10:47:49AM
11 officers drinking on duty?                      10:47:51AM
12       MR. NOVIKOFF: Note my objection.    10:47:53AM
13   A   Well, I'm sure it would be frowned   10:47:56AM
14 upon if somebody showed up intoxicated. I don't 10:47:59AM
15 think that was ever an issue. I believe        10:48:03AM
16 Paradiso, Chief Paradiso might have put out    10:48:06AM
17 there that he referred -- preferred that guys  10:48:08AM
18 didn't drink in the village off duty.          10:48:14AM
19   Q   When did he put that out there?      10:48:16AM
20   A   I don't recall. You know, that was   10:48:17AM
21 like a give-and-take type thing over the many  10:48:19AM
22 years I've been there.                          10:48:21AM
23   Q   When do you recall him actually      10:48:23AM
24 putting it out there, though, what years?      10:48:25AM
25   A   I don't recall which years.         10:48:28AM

7 (Pages 326 to 329)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    Q   When you say give and take, what did   10:48:29AM
3  you mean by that?                        10:48:30AM
4    A   When I first started there, there was   10:48:34AM
5  a policy that we were not supposed to be   10:48:36AM
6  drinking in the bars after we got off duty; but   10:48:38AM
7  then, I guess Ed Paradiso had lightened up on   10:48:45AM
8  that, and that was that.                 10:48:49AM
9    Q   What do you mean by Ed Paradiso   10:48:52AM
10  lightened up on that?                   10:48:53AM
11    A   You know, because guys would go out   10:48:54AM
12  for drinks after work. You know, we were a   10:48:56AM
13  little more mature, a little more adult than   10:48:59AM
14  police officers that they had there in the past   10:49:00AM
15  that worked there that couldn't control   10:49:01AM
16  themselves. And, you know, he would join us   10:49:03AM
17  sometimes, so...                        10:49:07AM
18    Q   When did he lighten up on it?   10:49:09AM
19    A   Probably around '95.               10:49:12AM
20    Q   Did he ever get harder on that policy   10:49:16AM
21  and reinstate it?                      10:49:21AM
22    A   Not that I recall.                10:49:23AM
23    Q   So from '95 until his last day of   10:49:25AM
24  employment at the beach, you don't recall him   10:49:28AM
25  ever verbally telling police officers that he   10:49:30AM

GEORGE HESSE

1
2  preferred that they not go out and drink in the   10:49:35AM
3  bars off duty?                          10:49:38AM
4    MR. NOVIKOFF: Objection. Form.   10:49:39AM
5    A   I don't recall any.               10:49:40AM
6    Q   Do you recall Paradiso ever expressing   10:49:41AM
7  that preference or policy when the Bosettis were   10:49:47AM
8  working?                                10:49:50AM
9    MR. NOVIKOFF: Objection.          10:49:52AM
10    A   I don't recall that.             10:49:53AM
11    Q   Did you ever hear him tell the   10:49:54AM
12  Bosettis that they shouldn't be going drinking   10:49:56AM
13  in bars in Ocean Beach when they're off duty?   10:49:59AM
14    A   I've never heard him tell me that.   10:50:02AM
15    Q   Did you ever tell the Bosettis that?   10:50:04AM
16    A   I don't recall if I did.         10:50:06AM
17    Q   Did you ever have a policy with   10:50:07AM
18  respect to -- a verbal policy with respect to   10:50:08AM
19  officers drinking in Ocean Beach while they're   10:50:12AM
20  off duty?                               10:50:15AM
21    A   I never had a policy, no.         10:50:16AM
22    Q   Did you ever have a policy with   10:50:18AM
23  respect to officers drinking while they're on   10:50:20AM
24  duty, a verbal policy?                  10:50:23AM
25    MR. NOVIKOFF: Objection.          10:50:25AM

GEORGE HESSE

1
2    A   I would've liked to think that they   10:50:31AM
3  wouldn't do that. I don't know of any policy   10:50:33AM
4  that was out there.                     10:50:36AM
5    Q   Did you ever speak to anybody or   10:50:37AM
6  discuss that issue with anybody, any officers?   10:50:39AM
7    A   About drinking on duty?           10:50:41AM
8    Q   Yes.                            10:50:43AM
9    A   I don't recall any conversation of   10:50:43AM
10  such.                                  10:50:45AM
11    Q   Do you ever recall any directives   10:50:49AM
12  being posted regarding drinking at the bars,   10:50:51AM
13  whether on duty or off duty?            10:50:54AM
14    A   I don't recall any policies that were   10:50:56AM
15  posted.                                10:50:58AM
16    Q   I asked for directive. Are you using   10:51:01AM
17  the term "policy" interchange- --       10:51:03AM
18    A   Policy or directive. I understand   10:51:06AM
19  what you're saying. No, not that I recall any   10:51:06AM
20  being posted.                          10:51:08AM
21    Q   But just to be clear, those two terms   10:51:09AM
22  are interchangeable, a directive and a policy?   10:51:09AM
23    MR. NOVIKOFF: Objection.          10:51:12AM
24  BY MR. GOODSTADT:                       10:51:12AM
25    Q   So if I use policy, that's going to   10:51:13AM

GEORGE HESSE

1
2  cover directive? If I use directly, it will   10:51:15AM
3  cover policy?                           10:51:15AM
4    MR. NOVIKOFF: Objection.          10:51:16AM
5    A   Actually, they can mean two different   10:51:17AM
6  things.                                10:51:19AM
7    Q   Did you ever have any alcoholic   10:51:27AM
8  beverages while on duty?                10:51:28AM
9    A   No.                             10:51:30AM
10    Q   Did you ever have any alcoholic   10:51:31AM
11  beverages while in uniform?             10:51:33AM
12    A   Yes.                            10:51:35AM
13    Q   How many times?                  10:51:35AM
14    A   I'd say in the range of six times.   10:51:44AM
15    Q   Where were you during those six times?   10:51:47AM
16    A   At least three times in the parade in   10:51:51AM
17  New York City for St. Patty's Day, and I think   10:51:54AM
18  the other three were funerals.          10:51:59AM
19    Q   Did you ever have an alcoholic   10:52:05AM
20  beverage in the station?               10:52:07AM
21    A   Yes.                            10:52:08AM
22    Q   While in uniform?                10:52:08AM
23    A   No.                             10:52:10AM
24    Q   While on duty?                   10:52:11AM
25    A   No.                             10:52:12AM

1          GEORGE HESSE
2     Q    What alcoholic beverages have you had   10:52:14AM
3   in the station?                          10:52:16AM
4     A    I've had a beer, and I had something   10:52:17AM
5   called a rocket fuel once or twice.         10:52:22AM
6     Q    Any other alcoholic beverages that you   10:52:29AM
7   drank in the station?                     10:52:32AM
8     A    No, not that I recall.              10:52:33AM
9     Q    Were you in uniform those times in the   10:52:34AM
10  station?                                 10:52:36AM
11         MR. NOVIKOFF: Objection. Asked and   10:52:36AM
12  answered.                                10:52:37AM
13    A    No.                              10:52:38AM
14    Q    When did you have the rocket fuels in   10:52:39AM
15  the station? What years were they?         10:52:41AM
16    A    2005, 2004. Maybe 2003.            10:52:47AM
17    Q    Where did you get the rocket fuels    10:52:55AM
18  from?                                   10:52:57AM
19    A    A bar called CJ's.                 10:52:57AM
20    Q    Did they deliver them? Someone picked   10:53:03AM
21  them up? How did they get to the station?   10:53:05AM
22    A    On occasion, sometimes they would just   10:53:09AM
23  deliver them at the end of -- the close of the   10:53:11AM
24  bar.                                    10:53:13AM
25    Q    Who would deliver them?            10:53:15AM

1          GEORGE HESSE
2     A    One of the barbacks.               10:53:16AM
3     Q    What was the name?                10:53:18AM
4     A    I believe one of the kids was Brian,   10:53:21AM
5   and another one -- another kid had the name of   10:53:24AM
6   Paul.                                   10:53:30AM
7     Q    Paul Conway?                     10:53:31AM
8     A    If that's his last name. I don't      10:53:33AM
9   know.                                   10:53:34AM
10    Q    Do you know Brian's last name?       10:53:36AM
11    A    Esop.                            10:53:38AM
12    Q    Did they charge you for the rocket    10:53:43AM
13  fuels?                                  10:53:45AM
14    A    Sometimes.                        10:53:45AM
15    Q    But sometimes they didn't?          10:53:46AM
16    A    Right.                           10:53:48AM
17    Q    Who else drank rocket fuels with you   10:53:49AM
18  in the police station?                    10:53:51AM
19    A    Let's see. I guess when we were      10:53:54AM
20  getting off duty, Dave Gurden. Who else? You   10:53:56AM
21  know, I don't recall anybody else because it   10:54:05AM
22  wasn't a very popular drink.               10:54:08AM
23    Q    Do you recall Gary Bosetti drinking   10:54:13AM
24  rocket fuel at the station?               10:54:15AM
25    A    No, I don't recall any.             10:54:16AM

1          GEORGE HESSE
2     Q    How about Rich Bosetti?            10:54:17AM
3     A    I don't recall.                   10:54:19AM
4     Q    Ty Bacon?                        10:54:20AM
5     A    No.                              10:54:21AM
6     Q    No, you don't recall or you definitely   10:54:23AM
7   did not see him?                         10:54:25AM
8     A    I've never seen him drink.          10:54:26AM
9     Q    At any point, you've never seen him    10:54:28AM
10  drink?                                  10:54:30AM
11    A    Yeah, you know what, yeah, you're     10:54:30AM
12  right. At a party, I've seen him have a beer or   10:54:32AM
13  something, but not in the station house, no.   10:54:35AM
14    Q    How about Walter Moeller, did you ever   10:54:37AM
15  see him drink a rocket fuel in the station?   10:54:40AM
16    A    No.                              10:54:42AM
17    Q    Did you ever see him drink in the     10:54:43AM
18  station?                                10:54:44AM
19    A    No.                              10:54:44AM
20    Q    Did you ever see him drink on duty?   10:54:45AM
21    A    No.                              10:54:47AM
22    Q    Do you know whether he's ever drank on   10:54:50AM
23  duty?                                   10:54:52AM
24    A    I don't know.                     10:54:53AM
25    Q    Did there ever come a time where      10:54:56AM

1          GEORGE HESSE
2   Moeller got into a car accident right after   10:54:59AM
3   leaving the beach?                       10:55:03AM
4     A    Yes.                             10:55:05AM
5     Q    Do you recall what year that was?    10:55:05AM
6     A    Was it 2004? No, it couldn't have    10:55:13AM
7   been 2004. Maybe 2006.                   10:55:17AM
8     Q    How long after his tour was the       10:55:27AM
9   accident?                               10:55:30AM
10    A    Maybe a half hour.                 10:55:32AM
11    Q    And you were called to the scene?    10:55:37AM
12    A    I got a phone call, yes.            10:55:39AM
13    Q    Who called you?                   10:55:41AM
14    A    It might have been Walter Moeller    10:55:44AM
15  himself.                                10:55:46AM
16    Q    Do you know why he called you?       10:55:47AM
17    A    He said he was just in a car accident.   10:55:49AM
18  And he couldn't find his shield; and he had his   10:55:51AM
19  weapon on him, and he was going to the hospital.   10:55:58AM
20  So he wanted me to come down and secure it.   10:56:01AM
21    Q    So you went -- did you go to the scene   10:56:04AM
22  of the accident?                         10:56:05AM
23    A    I went right to the scene, yes.      10:56:05AM
24    Q    Where was the accident?            10:56:07AM
25    A    It was at the corner of, I believe,   10:56:09AM

b929ea01-2563-408a-a7fc-adb794430749

Page 338

```
1              GEORGE HESSE
2  Fifth Avenue and Montauk Highway, in front of   10:56:11AM
3  St. Pat's church.                  10:56:15AM
4     Q   Was anyone injured in the accident?   10:56:16AM
5     A   Just him.            10:56:18AM
6     Q   And did you take his weapon from him?   10:56:19AM
7     A   Yes, I did.          10:56:21AM
8     Q   Did you ever find his shield?   10:56:22AM
9     A   Yes, I did.          10:56:24AM
10    Q   Was Walter Moeller drinking prior to   10:56:26AM
11 that accident?                 10:56:29AM
12    A   No, not that I know of.    10:56:30AM
13    Q   Did you ever see the PCR -- do you   10:56:32AM
14 know what a PCR is?            10:56:34AM
15    A   Yes.               10:56:37AM
16    Q   What is a PCR?          10:56:37AM
17    A   A pre-hospital care report.   10:56:40AM
18    Q   Did you ever see the PCR with respect 10:56:41AM
19 to that accident?             10:56:41AM
20    A   No.                10:56:42AM
21    Q   So you don't know one way or the other 10:56:41AM
22 whether the PCR indicated that he had alcohol on 10:56:42AM
23 his breath?                   10:56:44AM
24    A   I have no idea.       10:56:45AM
25    Q   Have you ever seen any officers in   10:57:01AM
```

Page 339

```
1              GEORGE HESSE
2  Ocean Beach drink while they're on duty?   10:57:03AM
3     A   No.                10:57:05AM
4     Q   Has anybody ever complained to you   10:57:10AM
5  that other officers were drinking while they   10:57:12AM
6  were on duty?                 10:57:14AM
7     A   Never.             10:57:15AM
8     Q   Is it true that Ed Carter complained   10:57:20AM
9  to you that he had to get the cell phone from   10:57:22AM
10 the Bosettis in CJ's?         10:57:26AM
11    A   Never.             10:57:28AM
12    Q   Did you ever see Arnold Hardman drink 10:57:31AM
13 the rocket fuel?              10:57:34AM
14    MR. NOVIKOFF: Objection. Asked and  10:57:36AM
15 answered.                   10:57:37AM
16    A   Arnold Hardman? Not that I recall,   10:57:38AM
17 no.                      10:57:40AM
18    Q   Did you ever see Hardman drink while  10:57:42AM
19 he was on duty?               10:57:44AM
20    A   Never.             10:57:45AM
21    Q   Would you agree that if officers were 10:57:50AM
22 drinking on duty, it would pose a public safety 10:57:53AM
23 threat?                    10:57:56AM
24    MR. NOVIKOFF: Objection.     10:57:57AM
25    MR. CONNOLLY: Objection.    10:57:57AM
```

Page 340

```
1              GEORGE HESSE
2     A   I do, in my opinion, yes.    10:57:58AM
3     Q   What public safety threat would it   10:58:03AM
4  pose?                      10:58:05AM
5     MR. NOVIKOFF: Objection.     10:58:05AM
6     A   It would severely hinder your   10:58:09AM
7  judgment, I think, to many respects on the job. 10:58:12AM
8     Q   It would be a public safety threat if 10:58:16AM
9  officers were drinking on duty and they were   10:58:19AM
10 carrying a weapon?            10:58:21AM
11    MR. NOVIKOFF: Objection.     10:58:22AM
12    A   Yes.               10:58:23AM
13    Q   Would it pose a public safety threat  10:58:27AM
14 if officers on duty were in the bars instead of 10:58:30AM
15 patrolling the neighborhood?   10:58:33AM
16    MR. NOVIKOFF: Objection. How about  10:58:35AM
17 if they were in the bars performing --   10:58:41AM
18    MR. GOODSTADT: In the bars drinking. 10:58:43AM
19    MR. NOVIKOFF: You didn't ask that.  10:58:45AM
20 In the bars drinking off duty?   10:58:46AM
21    MR. GOODSTADT: No, on duty.   10:58:49AM
22    MR. NOVIKOFF: Oh, okay.      10:58:51AM
23    A   You might as well repeat the entire   10:58:52AM
24 question.                   10:58:55AM
25    Q   The question is: Do you agree with me 10:58:55AM
```

Page 341

```
1              GEORGE HESSE
2  that it would be a public safety threat if   10:58:57AM
3  officers were drinking in the bars while on duty 10:59:01AM
4  instead of patrolling the village?   10:59:02AM
5     MR. NOVIKOFF: Objection.     10:59:03AM
6     A   In my opinion, yes.     10:59:03AM
7     Q   Do you think it would -- strike that. 10:59:10AM
8     Do you think it undermines police   10:59:12AM
9  officers' authority to be drinking off duty in 10:59:15AM
10 the bars in Ocean Beach?         10:59:19AM
11    MR. NOVIKOFF: Objection.     10:59:20AM
12    A   Undermines your authority? I don't   10:59:25AM
13 think so, no.               10:59:26AM
14    Q   You don't think there's a public   10:59:27AM
15 perception problem if officers off duty are   10:59:29AM
16 drinking in the bars that they are required to  10:59:34AM
17 patrol on duty?               10:59:39AM
18    MR. NOVIKOFF: Objection.     10:59:41AM
19    MR. CONNOLLY: Objection.    10:59:41AM
20    A   You're asking me to --     10:59:42AM
21    Q   I'm asking your opinion on that.   10:59:44AM
22    A   Yeah, I don't know.     10:59:46AM
23    MR. NOVIKOFF: Which is pantingly   10:59:49AM
24 irrelevant.                 10:59:52AM
25    Q   What was your answer?    10:59:55AM
```

10 (Pages 338 to 341)

b929ea01-2563-408a-a7fc-adb794430749

Page 342

GEORGE HESSE

1
2     THE WITNESS: I have no idea if it    10:59:56AM
3   would.                               10:59:57AM
4     MR. NOVIKOFF: Me either.           10:59:58AM
5     MR. GOODSTADT: Luckily you're not the 11:00:01AM
6   witness today.                       11:00:02AM
7   BY MR. GOODSTADT:                    11:00:03AM
8     Q   Isn't it true that Tommy Snyder   11:00:03AM
9   complained to you that the Bosettis took the   11:00:06AM
10  cell phone from him and went to the bars while   11:00:08AM
11  they were on duty?                   11:00:10AM
12    MR. NOVIKOFF: Objection. Leading.   11:00:13AM
13  A   He never complained to me.       11:00:14AM
14    Q   He never complained to you about   11:00:16AM
15  anything or just about that issue?   11:00:19AM
16  A   Never.                           11:00:20AM
17    MR. NOVIKOFF: Your question was any   11:00:21AM
18  issue --                             11:00:22AM
19    MR. GOODSTADT: I was going to ask him 11:00:22AM
20  if he meant just about that issue or any   11:00:22AM
21  issue.                               11:00:22AM
22    MR. CONNOLLY: Well, it wasn't       11:00:23AM
23  responsive to your question.         11:00:24AM
24    MR. GOODSTADT: And that's why I was   11:00:25AM
25  asking him to clarify.               11:00:26AM

Page 343

GEORGE HESSE

1
2   A   Repeat the question.             11:00:28AM
3     Q   Sure.                          11:00:29AM
4   You said he never complained to me.   11:00:31AM
5   My question -- my follow-up question was he   11:00:33AM
6   never complained to you about that issue or he   11:00:34AM
7   never complained to you about anything?   11:00:36AM
8   A   I gotta say, he's never complained to   11:00:38AM
9   me about anything. Specifically that issue.   11:00:40AM
10    Q   Would you agree with me that if   11:00:50AM
11  officers took the police cell phone into a bar   11:00:52AM
12  and were not answering the cell phone, that it   11:00:56AM
13  would pose a public safety threat?   11:00:59AM
14    MR. NOVIKOFF: Objection.           11:01:02AM
15  A   I could speculate, yeah, it would be   11:01:02AM
16  an issue.                            11:01:04AM
17    Q   Is it your testimony that Snyder   11:01:10AM
18  complained to you that there were messages that   11:01:14AM
19  went unanswered on the cell phone when the   11:01:17AM
20  Bosettis returned the cell phone back to him?   11:01:20AM
21    MR. CONNOLLY: Objection.           11:01:23AM
22    MR. NOVIKOFF: Objection. You didn't   11:01:23AM
23  answer ask him that question, so how could   11:01:25AM
24  it be his testimony.                 11:01:27AM
25    MR. GOODSTADT: He said he never   11:01:28AM

Page 344

GEORGE HESSE

1
2   complained to him.                   11:01:30AM
3     MR. NOVIKOFF: Well, then that would   11:01:31AM
4   cover everything. Objection to the form.   11:01:31AM
5   A   I don't recall anything of that nature 11:01:33AM
6   at all.                              11:01:35AM
7     Q   Is it true that Frank Fiorillo   11:01:42AM
8   complained to you that he had to relieve the   11:01:44AM
9   Bosettis on the next tour in the bar?   11:01:46AM
10    MR. NOVIKOFF: Objection. Form.      11:01:49AM
11  Leading.                             11:01:50AM
12  A   No.                              11:01:51AM
13    Q   Isn't it true that Ed Carter   11:01:54AM
14  complained about that as well?       11:01:55AM
15    MR. NOVIKOFF: Objection. Form.      11:01:57AM
16  A   No.                              11:01:58AM
17    Q   Did any of the plaintiffs in this case 11:02:01AM
18  ever complain to you about officers drinking in   11:02:03AM
19  the bars in Ocean Beach?             11:02:05AM
20    MR. NOVIKOFF: Objection. Asked and   11:02:07AM
21  answered.                            11:02:07AM
22  A   No.                              11:02:09AM
23    Q   Did Ed Carter ever complain to you   11:02:22AM
24  about officers bringing alcohol into the   11:02:24AM
25  station?                             11:02:26AM

Page 345

GEORGE HESSE

1
2   A   No.                              11:02:27AM
3     Q   Did Ed Carter ever complain about   11:02:30AM
4   officers drinking rocket fuel in the station?   11:02:32AM
5   A   No.                              11:02:34AM
6     Q   Did Ed Carter ever complain that he   11:02:34AM
7   was required to clean up after officers who were 11:02:36AM
8   drinking rocket fuels in the station?   11:02:39AM
9   A   Never.                           11:02:41AM
10    Q   Did anyone ever complain to you that   11:02:49AM
11  officers left dock masters in the station to   11:02:51AM
12  cover their shifts while they went out to the   11:02:54AM
13  bars?                                11:02:57AM
14  A   Never.                           11:02:57AM
15    Q   Did Joe Nofi complain to you that dock 11:03:09AM
16  masters were covering for officers?   11:03:13AM
17  A   Never.                           11:03:15AM
18    Q   Would you agree with me that it would   11:03:17AM
19  be inappropriate for dock masters to be covering 11:03:18AM
20  police officers' shifts?             11:03:22AM
21    MR. NOVIKOFF: Objection. Form.      11:03:24AM
22    MR. CONNOLLY: What do you mean?     11:03:26AM
23  Define "shift."                      11:03:28AM
24    MR. NOVIKOFF: Define "appropriate."   11:03:30AM
25

11 (Pages 342 to 345)

b929ea01-2563-408a-a7fc-adb794430749

1          GEORGE HESSE
2   BY MR. GOODSTADT:              11:03:31AM
3      Q   To cover for them while they were --  11:03:32AM
4   you know, while they were supposed to be on  11:03:34AM
5   duty?                     11:03:36AM
6      MR. NOVIKOFF: Objection.         11:03:37AM
7      A   To what respect? You know, a dock   11:03:38AM
8   master is not a police officer. He can't cover  11:03:41AM
9   the shift.                   11:03:44AM
10     Q   So it would be inappropriate for a   11:03:45AM
11  dock master to cover a police shift, right?   11:03:46AM
12     A   Yeah.                 11:03:49AM
13     MR. NOVIKOFF: Objection.         11:03:50AM
14  BY MR. GOODSTADT:              11:03:50AM
15     Q   Is it appropriate to dispatch as a   11:04:03AM
16  dock master?                 11:04:09AM
17     A   Was it appropriate?         11:04:11AM
18     Q   Yes.                 11:04:12AM
19     MR. NOVIKOFF: Objection.         11:04:13AM
20     A   It was only used in extreme       11:04:15AM
21  situations.                 11:04:17AM
22     Q   How about in -- well, what do you mean 11:04:18AM
23  by in extreme situations?           11:04:20AM
24     A   Whereas if we were shorthanded or   11:04:23AM
25  something on the street and we had a police   11:04:24AM

1          GEORGE HESSE
2   officer sitting on the desk and something, an  11:04:27AM
3   incident occurred in the street that required  11:04:29AM
4   some extra assistance, we would call the dock  11:04:30AM
5   master in to answer the phones.        11:04:33AM
6      Q   How about outside of that extreme   11:04:35AM
7   situation, would it be appropriate for a dock  11:04:37AM
8   master to dispatch?             11:04:39AM
9      MR. NOVIKOFF: Objection.         11:04:41AM
10     A   It was used on occasion just so it   11:04:43AM
11  could free up a police officer.        11:04:45AM
12     Q   In case of an emergency?        11:04:47AM
13     A   Most of the time, yes.         11:04:49AM
14     Q   How about outside of an emergency?   11:04:51AM
15     A   Not that I recall any.         11:04:53AM
16     Q   But I'm asking whether it would be   11:04:54AM
17  appropriate --               11:04:56AM
18     MR. NOVIKOFF: Objection.         11:04:56AM
19  BY MR. GOODSTADT:              11:04:57AM
20     Q   -- to have a dock master dispatch   11:04:57AM
21  outside of an emergency.           11:04:59AM
22     MR. NOVIKOFF: Objection.         11:05:02AM
23     A   It's tough answering the phones. It  11:05:03AM
24  really didn't matter.            11:05:05AM
25     Q   What do you mean?            11:05:06AM

1          GEORGE HESSE
2      A   Just somebody answering the phones.  11:05:08AM
3      Q   A dock master is trained to dispatch? 11:05:10AM
4      A   No.                  11:05:14AM
5      Q   A dock master is certified by Civil  11:05:15AM
6   Service to be on a dispatch position?      11:05:18AM
7      A   I don't think there's really a      11:05:22AM
8   certification for it, but no.         11:05:23AM
9      Q   Did Carter complain to you Labor Day  11:05:31AM
10  weekend 2005 that officers were drinking in the 11:05:34AM
11  bar?                      11:05:37AM
12     A   Did he complain? I don't recall any  11:05:39AM
13  complaint, no.               11:05:41AM
14     MR. NOVIKOFF: I'm sorry, what       11:05:42AM
15  weekend?                   11:05:43AM
16     MR. GOODSTADT: Labor Day 2005.      11:05:44AM
17     MR. NOVIKOFF: Okay.           11:05:47AM
18  BY MR. GOODSTADT:              11:05:47AM
19     Q   Did Kevin Lamm ever complain to you  11:05:52AM
20  that officers were drinking in the bar?     11:05:54AM
21     MR. NOVIKOFF: Objection. Asked and   11:05:57AM
22  answered.                  11:05:58AM
23     MR. CONNOLLY: Objection.         11:05:58AM
24     A   No.                  11:05:59AM
25     Q   Did Lamm ever complain to you about  11:05:59AM

1          GEORGE HESSE
2   officers drinking whether it was in the bars or 11:06:01AM
3   the station or anywhere else?         11:06:04AM
4      A   He never complained to me about that  11:06:05AM
5   stuff, no.                 11:06:07AM
6      Q   Did any officers ever drink while off 11:06:11AM
7   duty prior to going on shift?         11:06:15AM
8      MR. NOVIKOFF: Objection. Foundation. 11:06:18AM
9      A   I don't know.             11:06:20AM
10     Q   So you're not aware of any officers  11:06:21AM
11  drinking in the bar and then going on the eight 11:06:22AM
12  to four?                   11:06:24AM
13     MR. NOVIKOFF: Note my objection.    11:06:25AM
14     A   No.                  11:06:26AM
15     MR. NOVIKOFF: Unless he's present or  11:06:28AM
16  was told, I don't know how he would answer    11:06:29AM
17  that question.               11:06:31AM
18     MR. GOODSTADT: Maybe he was answered 11:06:32AM
19  or told.                   11:06:35AM
20     MR. NOVIKOFF: Ask that question.    11:06:37AM
21  That's my objection.            11:06:37AM
22     MR. GOODSTADT: If he's aware of it,  11:06:37AM
23  that would be a way he's aware of it. Maybe  11:06:37AM
24  he's aware of it some other way. I want to   11:06:37AM
25  know if he's aware of it.          11:06:40AM

b929ea01-2563-408a-a7fc-adb794430749

1          GEORGE HESSE
2    BY MR. GOODSTADT:                     11:06:42AM
3       Q   Did anyone ever complain to you about  11:06:42AM
4    officers drinking in bars and then going on the  11:06:44AM
5    eight-to-four shift?                 11:06:48AM
6       A   Never.                        11:06:49AM
7          MR. NOVIKOFF: Eight to four would  11:06:51AM
8    just be eight at night to four in the  11:06:52AM
9    morning, right?                      11:06:55AM
10          MR. GOODSTADT:  Eight in the  11:06:56AM
11    morning till -- who were drinking at night,  11:06:56AM
12    getting on the eight in the morning shift  11:06:58AM
13    and getting on tour.                 11:07:00AM
14          MR. NOVIKOFF: Got it. Okay. I just  11:07:01AM
15    wanted to clarify.                   11:07:01AM
16          MR. CONNOLLY:  Why don't we reask the  11:07:01AM
17    question.                           11:07:03AM
18    BY MR. GOODSTADT:                     11:07:03AM
19       Q   Did anyone ever complain to you that  11:07:04AM
20    officers were going out and drinking and then  11:07:07AM
21    working the 8 a.m. to 4 p.m. shift?  11:07:08AM
22       A   No.                          11:07:11AM
23       Q   What was done with beer that was  11:07:16AM
24    confiscated at Ocean Beach?          11:07:19AM
25       A   What was done with it?  Most of the  11:07:22AM

1          GEORGE HESSE
2    time it would just sit -- it depended on how  11:07:25AM
3    much was taken, I guess, but most of the time it  11:07:28AM
4    would just sit in the station house.  11:07:31AM
5       Q   Was there a process by which the beer  11:07:33AM
6    would have to be either, you know, memorialized  11:07:36AM
7    that beer had been taken or any evidence or  11:07:44AM
8    anything else that would have to be done with  11:07:47AM
9    the beer?                            11:07:49AM
10          MR. NOVIKOFF: Object to the form.  11:07:50AM
11          MR. CONNOLLY:  Objection to form.  11:07:52AM
12       A   I don't think there was anything in  11:07:53AM
13    place that really said what we had to do with  11:07:55AM
14    it.                                 11:07:58AM
15       Q   Was it appropriate for officers to  11:08:00AM
16    drink beer that was confiscated?     11:08:01AM
17       A   Sometimes we did.             11:08:04AM
18       Q   So you've drank beer that was  11:08:06AM
19    confiscated?                        11:08:08AM
20       A   Stuff that was in the refrigerator, I  11:08:09AM
21    didn't know if it was confiscated or not.  11:08:11AM
22       Q   If it was confiscated, would it be  11:08:14AM
23    appropriate to drink that beer?      11:08:17AM
24          MR. NOVIKOFF: Objection to form.  11:08:19AM
25       A   It was disposed of.          11:08:19AM

1          GEORGE HESSE
2       Q   That wasn't the question, sir.  The  11:08:21AM
3    question was whether it was appropriate to drink  11:08:23AM
4    beer that was confiscated.           11:08:25AM
5          MR. NOVIKOFF: Objection to form.  11:08:28AM
6       A   I don't know if it was appropriate.  11:08:29AM
7       Q   So as the chief of police, you don't  11:08:32AM
8    have an opinion one way or the other?  11:08:34AM
9       A   At that time?                 11:08:38AM
10       Q   Or as sergeant.  As a sergeant of the  11:08:38AM
11    Ocean Beach Police Department, you have no  11:08:40AM
12    opinion or had no opinion one way or the other  11:08:42AM
13    whether it was appropriate to drink beer that  11:08:47AM
14    was confiscated?                    11:08:49AM
15          MR. NOVIKOFF: Objection.       11:08:50AM
16       A   I don't think -- no.          11:08:51AM
17       Q   It was not appropriate or it was  11:08:52AM
18    appropriate?                        11:08:54AM
19          MR. NOVIKOFF: You asked if he had an  11:08:55AM
20    opinion, and he said no.             11:08:56AM
21    BY MR. GOODSTADT:                     11:08:57AM
22       Q   So you don't have an opinion one way  11:08:58AM
23    or the other?                       11:09:00AM
24       A   I really don't, no.          11:09:01AM
25       Q   Did you ever drink beer that you knew  11:09:02AM

1          GEORGE HESSE
2    was confiscated?                     11:09:04AM
3       A   I believe I did, yeah.        11:09:06AM
4       Q   Did you ever tell any of the  11:09:07AM
5    plaintiffs what brands of beer to confiscate?  11:09:08AM
6       A   No.                          11:09:11AM
7       Q   Do you know whether any officers told  11:09:11AM
8    the plaintiffs what brands of beer to  11:09:13AM
9    confiscate?                         11:09:15AM
10       A   No.                          11:09:16AM
11       Q   Have you ever disciplined or  11:09:24AM
12    reprimanded any officers for drinking on duty?  11:09:26AM
13          MR. NOVIKOFF: Objection.       11:09:30AM
14       A   No.                          11:09:31AM
15       Q   Have you ever disciplined or  11:09:31AM
16    reprimanded any officers for drinking off duty  11:09:33AM
17    in Ocean Beach?                      11:09:36AM
18          MR. NOVIKOFF: Objection.       11:09:38AM
19       A   Not that I recall any, no.    11:09:38AM
20       Q   Did you ever tell officers that it was  11:09:44AM
21    inappropriate to drink in the bars while off  11:09:47AM
22    duty?                               11:09:50AM
23          MR. NOVIKOFF: Objection.  Form.  11:09:51AM
24    Foundation.                         11:09:52AM
25       A   I don't recall.  I may have.  I don't  11:09:53AM

GEORGE HESSE

1
2 know.                                    11:09:55AM
3    Q    What's in a rocket fuel?         11:10:06AM
4    A    It's a souped-up pina colada.  I    11:10:09AM
5 believe it has -- it has some rum in it.  It has    11:10:17AM
6 151 rum in it, and I believe it's topped    11:10:20AM
7 off with, I believe, amaretto.  I'm not really    11:10:22AM
8 sure.                                    11:10:26AM
9    Q    Did you ever collect money from other    11:10:27AM
10 officers to pay for the rocket fuels?    11:10:29AM
11    A    Not that I recall.              11:10:31AM
12    Q    Is there any policy in Ocean Beach or    11:10:36AM
13 in the police department with respect to    11:10:39AM
14 drinking alcohol in the police truck?    11:10:41AM
15    MR. NOVIKOFF:  Objection.           11:10:44AM
16    A    No.                            11:10:46AM
17    Q    So it was okay for officers to drink    11:10:48AM
18 in the police truck?                    11:10:50AM
19    MR. NOVIKOFF:  Objection.  Is that a    11:10:52AM
20 question or a statement?                11:10:54AM
21    MR. GOODSTADT:  I asked was it okay --    11:10:56AM
22    MR. NOVIKOFF:  Well, objection to    11:10:58AM
23 form.                                   11:10:59AM
24    MR. GOODSTADT:  -- for officers to    11:10:59AM
25 drink in the police truck.              11:11:01AM

GEORGE HESSE

1
2    MR. NOVIKOFF:  Okay.                 11:11:03AM
3    A    No.                            11:11:03AM
4    Q    How about if they're off duty on their    11:11:04AM
5 way to the lighthouse, would it be appropriate    11:11:07AM
6 for an officer to have a drink in the police    11:11:09AM
7 truck?                                  11:11:12AM
8    MR. NOVIKOFF:  Objection.           11:11:13AM
9    A    No, not really.                11:11:13AM
10    Q    Did you ever speak to any officers    11:11:14AM
11 about that?                             11:11:16AM
12    A    No.                            11:11:16AM
13    Q    Any of the plaintiffs ever complain to    11:11:17AM
14 you that officers were drinking in the police    11:11:18AM
15 truck?                                  11:11:21AM
16    A    No.                            11:11:21AM
17    Q    Any of the plaintiffs ever complain to    11:11:22AM
18 you that they had to clean up the police truck    11:11:24AM
19 with beer bottles, caps and other refuse from    11:11:27AM
20 alcoholic beverages?                    11:11:32AM
21    A    Never.                         11:11:34AM
22    Q    Was it appropriate for police officers    11:11:37AM
23 to drink in the barracks?               11:11:40AM
24    MR. NOVIKOFF:  Objection.           11:11:42AM
25    A    Yes.                           11:11:44AM

GEORGE HESSE

1
2    Q    It was appropriate?             11:11:45AM
3    A    Sure.                          11:11:46AM
4    Q    Is there any policy with respect to    11:11:48AM
5 drinking in the barracks?               11:11:50AM
6    MR. NOVIKOFF:  Objection.           11:11:52AM
7    A    No.                            11:11:52AM
8    MR. CONNOLLY:  Again, are we making a    11:11:53AM
9 distinction between off duty and on duty?    11:11:55AM
10 BY MR. GOODSTADT:                       11:11:58AM
11    Q    Well, on duty, was it appropriate to    11:11:58AM
12 drink in the barracks?                  11:12:00AM
13    A    No.                            11:12:01AM
14    Q    How about before your tour, was it    11:12:01AM
15 appropriate to drink in the barracks?    11:12:04AM
16    MR. NOVIKOFF:  Objection.           11:12:06AM
17    A    I'd say no.                    11:12:07AM
18    MR. NOVIKOFF:  When you say before    11:12:09AM
19 tour, you mean within a few hours.       11:12:10AM
20    MR. GOODSTADT:  Yeah, within a few    11:12:12AM
21 hours of your tour.                     11:12:14AM
22    BY MR. GOODSTADT:                    11:12:15AM
23    Q    Was it appropriate to have any    11:12:15AM
24 alcoholic beverages within a few hours of your    11:12:17AM
25 tour?                                   11:12:19AM

GEORGE HESSE

1
2    MR. NOVIKOFF:  Objection.           11:12:20AM
3    A    My opinion is no.              11:12:20AM
4    Q    Were there any policies with respect    11:12:23AM
5 to drinking before coming on duty?       11:12:25AM
6    MR. NOVIKOFF:  Note my objection.    11:12:29AM
7    A    There were no policies.         11:12:30AM
8    Q    If you turn to Hesse 10, Page 7 of the    11:12:31AM
9 book, Bates Number 11.                  11:12:40AM
10    MR. NOVIKOFF:  Okay.                11:12:42AM
11    BY MR. GOODSTADT:                    11:12:48AM
12    Q    Do you see under "substance abuse"?    11:12:49AM
13    A    Yes, I do.                     11:12:51AM
14    Q    It says, "Incorporated Village of    11:12:52AM
15 Ocean Beach will not tolerate any substance    11:12:52AM
16 abuse on its premises.  Any employee reporting    11:12:56AM
17 for work under the influence of alcohol or    11:13:00AM
18 controlled drugs will be asked to leave    11:13:03AM
19 immediately."                           11:13:06AM
20    Do you see that?                     11:13:06AM
21    A    Yes.                           11:13:07AM
22    Q    Did you ever ask any officers who    11:13:07AM
23 reported under the influence of alcohol to    11:13:09AM
24 leave?                                  11:13:11AM
25    MR. NOVIKOFF:  Objection.  Foundation.    11:13:12AM

GEORGE HESSE

1
2     I don't think that he's testified that there 11:13:13AM
3     were ever officers that reported under the  11:13:15AM
4     influence.                          11:13:16AM
5        A   Yeah, I believe I was asked that  11:13:18AM
6     question, and no.                      11:13:20AM
7        MR. GOODSTADT: Could I just see that 11:13:35AM
8     question back.                       11:13:36AM
9     BY MR. GOODSTADT:                    11:13:46AM
10       Q   Did Tom Snyder ever complain to you  11:13:47AM
11    that officers were coming out to the checkpoint 11:13:48AM
12    late when he had to come in for his shift?   11:13:53AM
13       A   No.                          11:13:57AM
14       Q   Were firearms kept in the barracks?  11:14:05AM
15       A   I believe sometimes, yes.       11:14:08AM
16       Q   Okay. So even though firearms were  11:14:11AM
17    kept in the barracks, you thought it was      11:14:13AM
18    appropriate for officers to drink in the      11:14:15AM
19    barracks?                          11:14:17AM
20       MR. NOVIKOFF: Objection to the form  11:14:18AM
21    of the question.                      11:14:18AM
22       A   Sure.                        11:14:19AM
23       Q   Did any of the plaintiffs ever      11:14:31AM
24    complain to you that the barracks were unsecure? 11:14:33AM
25       A   Unsecure in what manner?        11:14:39AM

GEORGE HESSE

1
2        Q   Door unlocked?                 11:14:44AM
3        A   Yeah, I believe I had one complaint.  11:14:47AM
4        Q   Who complained about that?       11:14:50AM
5        A   I think it was Nofi, Joe Nofi, Tom  11:14:52AM
6     Snyder. I believe there was a dock master up  11:14:56AM
7     there that left the door unlocked once.      11:14:58AM
8        Q   When was that?                11:15:01AM
9        A   I don't recall the year or time frame.  11:15:01AM
10       Q   And it was Nofi and Snyder who      11:15:03AM
11    complained?                        11:15:05AM
12       A   Yeah. I believe so, yeah.       11:15:06AM
13       Q   What did they state in their       11:15:08AM
14    complaint?                         11:15:09AM
15       A   I believe that they said Dock Master  11:15:09AM
16    Hirsch, if I'm remembering his name correctly,  11:15:13AM
17    may have left the door open or unlocked.     11:15:17AM
18       Q   Did you do anything to discipline   11:15:22AM
19    Hirsch in response to that complaint?      11:15:26AM
20       MR. NOVIKOFF: Objection to form.    11:15:28AM
21       A   I don't recall a conversation I had  11:15:30AM
22    with him, but dock masters were banned from the 11:15:31AM
23    barracks after that point.             11:15:34AM
24       Q   So prior to that point, they weren't  11:15:36AM
25    banned; after that point, they were banned?   11:15:39AM

GEORGE HESSE

1
2        A   That's correct.               11:15:41AM
3        Q   And banning them, was that in response 11:15:42AM
4     to the complaint by Snyder and Nofi?       11:15:44AM
5        A   Yes.                        11:15:46AM
6        Q   Did Carter ever complain to you about  11:15:46AM
7     the barracks being unsecured?            11:15:48AM
8        A   Not that I'm aware of, no.       11:15:50AM
9        Q   Nofi and Snyder's complaint, was that  11:15:52AM
10    in writing or verbal?                 11:15:55AM
11       A   I believe it was in writing.     11:15:57AM
12       Q   And it's your testimony that Carter  11:15:59AM
13    never complained about that?            11:16:00AM
14       A   Not that I'm aware of, that I recall.  11:16:01AM
15       MR. GOODSTADT: Let's mark this,     11:16:13AM
16    please.                           11:16:14AM
17       (Whereupon, Bates document 2750 was  11:16:15AM
18    marked as Plaintiff's Exhibit 11 for        11:16:15AM
19    identification, as of this date.)         11:16:15AM
20       MR. GOODSTADT: I've placed in front  11:16:48AM
21    of Mr. Hesse what's been marked as Hesse 11. 11:16:49AM
22    It is a one-page document bearing Bates      11:16:52AM
23    Number 2750. (Handing.)              11:16:54AM
24    BY MR. GOODSTADT:                    11:16:57AM
25       Q   Mr. Hesse, do you recognize this   11:16:57AM

GEORGE HESSE

1
2     document marked as Hesse 11?            11:16:59AM
3        A   Actually, I don't -- I recognize it,  11:17:01AM
4     but I don't recall it.                 11:17:02AM
5        Q   What do you recognize this as?     11:17:05AM
6        A   As an Ocean Beach Police Department  11:17:07AM
7     internal correspondence, a 2042.         11:17:10AM
8        Q   And this doesn't refresh your       11:17:14AM
9     recollection as to whether Carter complained to 11:17:16AM
10    you about the barracks being unsecure?     11:17:19AM
11       MR. CONNOLLY: Objection.           11:17:22AM
12       MR. NOVIKOFF: Yeah.               11:17:24AM
13       A   Yeah, I don't recall this document.  11:17:25AM
14       MR. CONNOLLY: Also, this appears to  11:17:31AM
15    be a field report of some sort, not a       11:17:32AM
16    complaint.                         11:17:34AM
17       MR. GOODSTADT: Okay.              11:17:36AM
18       MR. NOVIKOFF: Well, I guess the      11:17:37AM
19    definition of complaint is what we're going  11:17:38AM
20    to be debating in the summary judgment       11:17:39AM
21    motion.                          11:17:41AM
22       THE WITNESS: And it's not signed     11:17:42AM
23    either. So I don't know where it came from. 11:17:44AM
24       MR. NOVIKOFF: This establishes that  11:17:51AM
25    they knew how to write complaints.       11:17:53AM

b929ea01-2563-408a-a7fc-adb794430749

```
1              GEORGE HESSE
2   BY MR. GOODSTADT:              11:18:05AM
3      Q   Did you ever direct any of the    11:18:11AM
4   plaintiffs to drive you on social visits in the  11:18:12AM
5   village while you were on duty?        11:18:19AM
6      A   No.              11:18:21AM
7      Q   Did you ever direct plaintiffs to    11:18:22AM
8   drive any off-duty officers while they were in  11:18:23AM
9   the village?            11:18:27AM
10     MR. NOVIKOFF: Objection to form.    11:18:32AM
11     A   What?            11:18:32AM
12     Q   Did you ever direct plaintiffs to    11:18:33AM
13  drive any off-duty officers to the checkpoint?  11:18:35AM
14     A   Yes.            11:18:38AM
15     MR. NOVIKOFF: Objection to form.    11:18:39AM
16     The answer was yes?          11:18:40AM
17     THE WITNESS: Yes.          11:18:42AM
18  BY MR. GOODSTADT:            11:18:43AM
19     Q   While they were on duty, the    11:18:44AM
20  plaintiffs?            11:18:45AM
21     MR. NOVIKOFF: Is the question did he  11:18:46AM
22  ever direct plaintiffs while on duty to    11:18:47AM
23  drive off-duty police officers to the    11:18:48AM
24  checkpoint?            11:18:51AM
25     MR. GOODSTADT: Yes.        11:18:51AM
```

```
1              GEORGE HESSE
2      MR. NOVIKOFF: Objection to form.    11:18:53AM
3      A   I may have, yes.          11:18:53AM
4      Q   Did you ever direct them to drive    11:18:55AM
5   off-duty officers after they came out of the    11:18:56AM
6   bars drinking to the checkpoint while the    11:19:00AM
7   plaintiffs were on duty?          11:19:04AM
8      MR. NOVIKOFF: Objection to form and  11:19:06AM
9   foundation.            11:19:06AM
10     A   I may have.          11:19:07AM
11     Q   You don't recall one way or the other? 11:19:08AM
12     A   Specifically, no.          11:19:10AM
13     Q   Did plaintiffs ever complain to you    11:19:11AM
14  about having to do that?          11:19:13AM
15     A   No.              11:19:14AM
16     Q   Plaintiffs ever complain to you that    11:19:14AM
17  they were leaving the village short on officers  11:19:16AM
18  when they had to drive out to the checkpoint to  11:19:18AM
19  drive off-duty officers who had been drinking to  11:19:21AM
20  the checkpoint?            11:19:23AM
21     A   Never.            11:19:25AM
22     Q   Did you ever direct Joe Nofi to take    11:19:30AM
23  Walter Moeller, Walter Moeller's girlfriend and  11:19:33AM
24  their dog to the checkpoint after they'd been    11:19:38AM
25  drinking?            11:19:41AM
```

```
1              GEORGE HESSE
2      A   I don't recall that.          11:19:42AM
3      MR. NOVIKOFF: Is the dog the problem? 11:19:47AM
4      MR. GOODSTADT: No, it's leaving the  11:19:48AM
5   village unsecure is the problem.        11:19:49AM
6      MR. NOVIKOFF: Oh, okay.        11:19:52AM
7   BY MR. GOODSTADT:            11:19:59AM
8      Q   Did Ed Carter ever complain to you the 11:20:00AM
9   village was left short of personnel when he was  11:20:02AM
10  required to chauffeur intoxicated off-duty    11:20:05AM
11  officers?            11:20:09AM
12     MR. NOVIKOFF: Objection -- no, no    11:20:10AM
13  objection.            11:20:12AM
14     A   He's never complained, no.      11:20:13AM
15     Q   Did you ever require off-duty officers 11:20:16AM
16  to wait until 5 a.m. to be taken to the    11:20:23AM
17  checkpoint?            11:20:28AM
18     A   I have done that, yes.        11:20:28AM
19     Q   When was -- strike that.      11:20:30AM
20     Was that a policy that you instituted  11:20:32AM
21  at some point?            11:20:34AM
22     A   No.              11:20:35AM
23     Q   And why did you require people to wait 11:20:36AM
24  until 5 a.m. to be taken to the checkpoint?    11:20:39AM
25     A   It may have been a busy night and    11:20:43AM
```

```
1              GEORGE HESSE
2   instead of taking one of my police officers and  11:20:45AM
3   sending them on a -- you know, out of the    11:20:48AM
4   village for a little while, I would let them    11:20:51AM
5   wait until we were making our relief, and they  11:20:53AM
6   could wait until our relief time.        11:20:56AM
7      Q   What do you mean by "our relief time"? 11:20:58AM
8      A   When guys were going off duty, they  11:21:01AM
9   could wait for the officers who were driving off 11:21:03AM
10  to go off duty.            11:21:07AM
11     Q   And the request to require the police  11:21:11AM
12  officers to wait until 5 a.m. to be driven off,  11:21:16AM
13  it's your testimony that was in response to    11:21:20AM
14  Carter complaining about having to drive    11:21:22AM
15  intoxicated officers off duty --        11:21:26AM
16     A   No.              11:21:29AM
17     Q   -- off the island?          11:21:29AM
18     A   No.              11:21:32AM
19     Q   It's your testimony that Carter on the 11:21:44AM
20  July 4th weekend 2005 didn't complain to you    11:21:46AM
21  about being required to chauffeur civilians    11:21:50AM
22  around while he was on duty?        11:21:53AM
23     MR. NOVIKOFF: I don't know.  I don't  11:21:55AM
24  think he's testified to that around yet.    11:21:56AM
25  Objection to form.            11:21:58AM
```

b929ea01-2563-408a-a7fc-adb794430749

Page 366

GEORGE HESSE

1           GEORGE HESSE
2      A    Chauffeur civilians around?  I don't  11:22:01AM
3   know what you're talking about.  I don't recall  11:22:04AM
4   that.                          11:22:05AM
5      Q    Did Carter ever complain to you that  11:22:05AM
6   he was required to chauffeur civilians around  11:22:07AM
7   and it left the village shorthanded?      11:22:07AM
8           MR. NOVIKOFF:  Objection.  Form.   11:22:10AM
9      A    No.                   11:22:11AM
10      Q    Did you ever put Carter on the back  11:22:12AM
11   streets to patrol?             11:22:14AM
12      A    I'm sure he's done that, yes.   11:22:16AM
13      Q    Is being put on the back streets a   11:22:18AM
14   form of discipline?            11:22:21AM
15      A    No.                   11:22:22AM
16      Q    How do you determine who patrols the  11:22:27AM
17   back streets?                  11:22:30AM
18      A    Sometimes I would ask for volunteers.  11:22:32AM
19      Q    How else?             11:22:35AM
20      A    Sometimes I would just post you there.  11:22:37AM
21      Q    Was the back streets a less desirable  11:22:39AM
22   post than the other areas of the village?   11:22:41AM
23           MR. CONNOLLY:  Objection.   11:22:44AM
24      A    In my opinion, yeah.        11:22:45AM
25      Q    Did you ever require Frank Fiorillo  11:22:50AM

Page 367

GEORGE HESSE

1           GEORGE HESSE
2   while he was on duty to drive you to Mitch   11:22:52AM
3   Burns' house?                  11:22:54AM
4      A    Not that I recall.        11:22:55AM
5      Q    Who's Mitch Burns?       11:22:56AM
6      A    Just a homeowner in the village.   11:22:58AM
7      Q    You're friends with Mr. Burns?   11:23:00AM
8      A    I'm an acquaintance.       11:23:02AM
9      Q    Have you ever been over his house?  11:23:03AM
10      A    Yeah.                 11:23:05AM
11      Q    In the village?          11:23:06AM
12      A    Yeah.                 11:23:07AM
13      Q    Where's his house located in the   11:23:08AM
14   village?                       11:23:10AM
15      A    It's on Evergreen Walk.     11:23:10AM
16      Q    How many times have you been to his  11:23:13AM
17   house?                         11:23:15AM
18      A    A handful of times.       11:23:16AM
19      Q    How many is a handful?    11:23:17AM
20      A    Five, six times.  I don't know.   11:23:19AM
21      Q    Were any of those five or six times on  11:23:21AM
22   police business?               11:23:23AM
23      A    Yeah.                 11:23:24AM
24      Q    What did you go to his house on police  11:23:26AM
25   business for?                  11:23:28AM

Page 368

GEORGE HESSE

1           GEORGE HESSE
2      A    I've been to his house for a noise   11:23:29AM
3   complaint or two.              11:23:31AM
4      Q    Did you ever issue him a summons?   11:23:32AM
5      A    No.                   11:23:34AM
6      Q    Did you ever issue a noise complaint  11:23:38AM
7   summons to anyone in the village?      11:23:40AM
8      A    Oh, sure.             11:23:43AM
9      Q    And why didn't you issue a summons to  11:23:44AM
10   Mitch Burns for the couple times that you were  11:23:47AM
11   called to his house for a noise violation?    11:23:49AM
12      A    I don't think it required a summons.  11:23:52AM
13      Q    What do you mean by that?    11:23:53AM
14      A    It wasn't as loud as it would normally  11:23:55AM
15   be to require a summons.          11:24:00AM
16      Q    Is there a certain decibel level or   11:24:02AM
17   something that requires a summons?      11:24:06AM
18      A    You could judge it by that, but no.   11:24:08AM
19      Q    Did you judge it that way?   11:24:10AM
20      A    It's a matter of discretion.  No, I   11:24:12AM
21   didn't judge it by decibel levels.     11:24:15AM
22      Q    Have you ever been at his house on   11:24:24AM
23   non-police business?           11:24:26AM
24      A    Yes.                  11:24:28AM
25      Q    How many times?          11:24:29AM

Page 369

GEORGE HESSE

1           GEORGE HESSE
2      A    Couple times.           11:24:31AM
3      Q    How many is a couple?     11:24:32AM
4      A    Two, three times maybe.    11:24:34AM
5      Q    And what were you at his house on for  11:24:37AM
6   non-police business?           11:24:39AM
7      A    My wife and I was invited over for a   11:24:41AM
8   barbecue.                      11:24:44AM
9      Q    Two or three times?       11:24:45AM
10      A    Yeah.                 11:24:46AM
11      Q    How about other than for a barbecue,  11:24:51AM
12   have you ever been over his house on non-police  11:24:53AM
13   business?                      11:24:55AM
14      A    Not that I recall.        11:24:56AM
15      Q    Have you ever been to his apartment in  11:24:58AM
16   Manhattan?                     11:25:02AM
17      A    Yes.                  11:25:03AM
18      Q    How many times?          11:25:04AM
19      A    Once.                 11:25:05AM
20      Q    On police business or non-police   11:25:06AM
21   business?                      11:25:08AM
22      A    Non-police business.      11:25:08AM
23      Q    Where's his apartment in Manhattan   11:25:09AM
24   that you've been to?           11:25:12AM
25      A    I don't know the exact address.   11:25:13AM

GEORGE HESSE

1
2    Q    Was it on the Upper East Side?    11:25:15AM
3    A    It may have been. I don't know.    11:25:17AM
4    Q    When were you at his apartment on    11:25:20AM
5    non-police business?    11:25:22AM
6    A    It was around Christmastime, God, I    11:25:24AM
7    don't know, maybe 2003ish.    11:25:28AM
8    Q    What were you at his apartment for?    11:25:31AM
9    A    We were meeting he and his wife to go    11:25:33AM
10   to a show and then to get drinks afterwards.    11:25:37AM
11       MR. CONNOLLY:  Who's "we"?    11:25:41AM
12       THE WITNESS:  My wife and I and he and    11:25:42AM
13   his wife.    11:25:45AM
14   BY MR. GOODSTADT:    11:25:46AM
15   Q    Was anybody else there?    11:25:46AM
16   A    No.    11:25:48AM
17   Q    What year was that?    11:25:49AM
18   A    I don't really recall.    11:25:50AM
19   Q    Did you go to a show with him and his    11:25:52AM
20   wife?    11:25:54AM
21   A    Yes.    11:25:55AM
22   Q    Did you guys go out drinking    11:25:55AM
23   afterwards?    11:25:57AM
24   A    Yeah.    11:25:59AM
25   Q    Did you ever tell Frank Fiorillo with    11:26:02AM

GEORGE HESSE

1
2    respect to Mitch Burns' place in Ocean Beach    11:26:05AM
3    that whatever happens here between the drugs and    11:26:08AM
4    the girls, we look the other way?    11:26:12AM
5    A    Never.    11:26:15AM
6    Q    Is it true that you told officers that    11:26:19AM
7    you slept with Elyse Miller in Mitch Burns' hot    11:26:22AM
8    tub?    11:26:26AM
9        MR. NOVIKOFF:  Objection.    11:26:28AM
10   A    Never.    11:26:28AM
11   Q    Did you ever sleep with Elyse Miller    11:26:29AM
12   in Mitch Burns' hot tub?    11:26:30AM
13   A    Never.    11:26:33AM
14   Q    Have you ever been over Mitch Burns'    11:26:33AM
15   house while Elyse Miller was there as well?    11:26:34AM
16   A    Yes.    11:26:41AM
17   Q    How many times?    11:26:42AM
18   A    One time.    11:26:43AM
19   Q    When was that?    11:26:43AM
20   A    I don't recall.    11:26:44AM
21   Q    How did you get home from there the    11:26:47AM
22   day that Elyse Miller was there?    11:26:49AM
23   A    I don't know. I believe my wife and I    11:26:50AM
24   walked down Evergreen northbound to Bay Walk,    11:26:52AM
25   made a left and got on the ferry and went home.    11:26:57AM

GEORGE HESSE

1
2    Q    Did you ever have Frank Fiorillo pick    11:27:01AM
3    you up from Mitch Burns' house?    11:27:03AM
4    A    Never.    11:27:06AM
5    Q    Did you ever sleep over his apartment    11:27:14AM
6    in New York City?    11:27:16AM
7    A    Never.    11:27:17AM
8    Q    Do you know whether he's ever sold any    11:27:23AM
9    narcotics?    11:27:25AM
10   A    I don't know.    11:27:26AM
11   Q    Did you ever hear that he was selling    11:27:27AM
12   narcotics?    11:27:29AM
13   A    No.    11:27:30AM
14   Q    Did you ever hear he was selling    11:27:30AM
15   Fentanyl lollipops?    11:27:32AM
16   A    No. I don't even know what that is.    11:27:34AM
17   Q    Do you know what Fentanyl is?    11:27:36AM
18   A    No.    11:27:39AM
19   Q    Who is Andrea Nimburger?    11:27:40AM
20   A    That's a woman who owns a house in the    11:27:42AM
21   village.    11:27:45AM
22   Q    Where is her house in the village?    11:27:46AM
23   A    I believe it's on Wilmot Walk,    11:27:48AM
24   W-I-L-M-O-T.    11:27:51AM
25   Q    Have you ever been over her house?    11:28:00AM

GEORGE HESSE

1
2    A    Yes.    11:28:02AM
3    Q    How many times?    11:28:02AM
4    A    A handful of times.    11:28:03AM
5    Q    Have you ever been over there on    11:28:05AM
6    non-police business?    11:28:07AM
7    A    Yes.    11:28:10AM
8    Q    How many times?    11:28:11AM
9    A    Handful of times.    11:28:13AM
10   Q    How many is a handful?    11:28:14AM
11   A    Five or six.    11:28:16AM
12   Q    What years did you go to her house on    11:28:18AM
13   non-police business?    11:28:21AM
14   A    God, over 16 years, you know, I don't    11:28:23AM
15   know.    11:28:26AM
16   Q    You don't know?    11:28:28AM
17   A    Could be more than five or six times.    11:28:28AM
18   Q    Did you ever require Frank Fiorillo to    11:28:31AM
19   take her -- take you to her house for non-police    11:28:32AM
20   business?    11:28:36AM
21   A    Not that I recall, no.    11:28:37AM
22   Q    Do you know her son, Andrea    11:28:41AM
23   Nimburger's son?    11:28:43AM
24   A    Yeah.    11:28:45AM
25   Q    Did you ever have a sexual    11:28:45AM

18  (Pages 370 to 373)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1          GEORGE HESSE
2   relationship with Andrea Nimburger?        11:28:47AM
3          MR. CONNOLLY: Objection.        11:28:49AM
4   A   No.                      11:28:50AM
5   Q   Isn't it true that you told Frank    11:28:51AM
6   Fiorillo that you did?            11:28:52AM
7          MR. CONNOLLY: Objection.        11:28:53AM
8   A   No.                      11:28:54AM
9   Q   It's not true?                 11:28:54AM
10  A   It's not true.                 11:28:55AM
11  Q   Is it true that Fiorillo complained to 11:28:58AM
12  you that the village was being left short when 11:29:00AM
13  he had to chauffeur you over there?        11:29:03AM
14  A   Never.                   11:29:05AM
15  Q   Did you ever tell Ed Carter that you  11:29:19AM
16  gave someone the, quote, German sausage?     11:29:21AM
17         MR. CONNOLLY: Objection.        11:29:25AM
18  A   Never.                   11:29:25AM
19  Q   Did you ever use that phrase, German  11:29:26AM
20  sausage?                    11:29:28AM
21  A   Yes.                     11:29:29AM
22         MR. NOVIKOFF: You mean from a deli? 11:29:30AM
23  A   Yes, I have.                 11:29:31AM
24  Q   What did you mean by German sausage? 11:29:32AM
25  A   I don't know. I read it in the     11:29:33AM

1          GEORGE HESSE
2   newspaper in the Post, and so now I use it on a 11:29:36AM
3   regular basis.                 11:29:37AM
4   Q   You use it on a regular basis?      11:29:38AM
5   A   Yeah, as a joke.             11:29:41AM
6   Q   Referring to what?            11:29:41AM
7   A   As the German sausage.          11:29:41AM
8   Q   What are you referring to as a German 11:29:43AM
9   sausage?                    11:29:44AM
10  A   I guess my penis.            11:29:44AM
11         MR. NOVIKOFF: I was thinking a    11:29:47AM
12  sandwich. Could be.             11:29:49AM
13         MR. GOODSTADT: I don't want to think 11:29:51AM
14  of anything.                 11:29:51AM
15  BY MR. GOODSTADT:                11:30:10AM
16  Q   Did you ever refer to Kevin Lamm as  11:30:11AM
17  being gay or homosexual?          11:30:15AM
18  A   I have not, no.              11:30:18AM
19  Q   Did you ever refer to Kevin Lamm as  11:30:27AM
20  Kevina, either in writing or verbally?     11:30:29AM
21  A   Not that I recall, no.          11:30:35AM
22  Q   Did you ever refer to Kevin Lamm as  11:30:36AM
23  his last name Lambo --            11:30:38AM
24  A   Oh, sure.                11:30:42AM
25  Q   -- either in writing or verbally?    11:30:43AM

1          GEORGE HESSE
2   A   Verbal, yeah.               11:30:45AM
3   Q   Is that his nickname, Lambo?       11:30:46AM
4   A   Yeah. Lambo Rambo, yeah.         11:30:49AM
5   Q   Did you ever give him a business card 11:30:51AM
6   that said Kevin Lambo?            11:30:57AM
7   A   No.                      11:30:59AM
8          (Whereupon, Bates document P 925 was 11:31:10AM
9   marked as Plaintiff's Exhibit 12 for       11:31:10AM
10  identification, as of this date.)        11:31:10AM
11  BY MR. GOODSTADT:                11:31:34AM
12  Q   I've placed in front of Hesse what's  11:31:41AM
13  been marked as Hesse 12. It's a one-page    11:31:42AM
14  exhibit Bates numbered P 925. (Handing.)    11:31:45AM
15         Mr. Hesse, have you ever seen what's 11:31:50AM
16  now been marked as Hesse 12?          11:31:52AM
17  A   Yes.                     11:31:54AM
18  Q   Where did you see this?          11:31:55AM
19  A   Actually, yesterday. One of the     11:31:56AM
20  documents I forgot that I reviewed with my   11:31:59AM
21  attorney, Mr. Connolly.            11:32:01AM
22  Q   Did you create this --          11:32:03AM
23  A   No.                      11:32:05AM
24  Q   -- business card?             11:32:05AM
25         Did you ever create business cards on 11:32:06AM

1          GEORGE HESSE
2   the police computer?             11:32:08AM
3   A   Yes.                     11:32:09AM
4   Q   For other officers?            11:32:10AM
5   A   Everyone had access to it to make    11:32:12AM
6   whatever they wanted.             11:32:15AM
7   Q   My question is, did you ever make them 11:32:17AM
8   for other officers?              11:32:19AM
9   A   I may have.                11:32:20AM
10  Q   You don't recall one way or the other? 11:32:20AM
11  A   I don't recall, no.            11:32:23AM
12  Q   Which computer do you make the      11:32:25AM
13  business cards on?              11:32:28AM
14  A   They were made on one of the station 11:32:30AM
15  house computers way back then on a program. I 11:32:31AM
16  think it was Microsoft Publisher at the time.  11:32:34AM
17  Q   Who created the template for the Ocean 11:32:39AM
18  Beach business card?             11:32:43AM
19  A   I may have.                11:32:44AM
20  Q   Is this the template for the Ocean   11:32:45AM
21  Beach business card? The top half of this, is 11:32:46AM
22  that the template?              11:32:49AM
23  A   It could've been back in the day.   11:32:51AM
24  This is old.                  11:32:53AM
25  Q   So you don't recall one way or the   11:32:54AM

GEORGE HESSE

1
2    other whether that was the template?      11:32:56AM
3       A   It may have been.          11:32:58AM
4       Q   And is that the phone number of the  11:32:59AM
5    station house?              11:33:02AM
6       A   No.              11:33:03AM
7       MR. CONNOLLY: When?          11:33:03AM
8       Q   Is that the address of the station  11:33:05AM
9    house?              11:33:08AM
10      A   Yes.              11:33:08AM
11      Q   Is that the fax number or was the fax  11:33:09AM
12   number of the station house?        11:33:09AM
13      A   It was, I guess, when 516 was the area 11:33:11AM
14   code. This is really old.          11:33:14AM
15      Q   And was that the telephone number?  11:33:16AM
16      A   Back in the day, yeah.        11:33:18AM
17      Q   Isn't it true that you handed this    11:33:21AM
18   card to Kevin Lamm?            11:33:22AM
19      MR. NOVIKOFF: Objection.        11:33:24AM
20      A   I didn't hand this to Kevin Lamm, no. 11:33:24AM
21      Q   Do you believe that Kevin Lamm is    11:33:35AM
22   homosexual?              11:33:37AM
23      MR. NOVIKOFF: Objection.        11:33:38AM
24      MR. CONNOLLY: Objection.        11:33:39AM
25      MR. NOVIKOFF: Objection.        11:33:40AM

GEORGE HESSE

1
2       MR. CONNOLLY: What's the relevance?  11:33:40AM
3       MR. GOODSTADT: Well, the relevance   11:33:42AM
4    is, you know --            11:33:43AM
5       MR. NOVIKOFF: Are you making a claim 11:33:44AM
6    of discrimination based on sexual      11:33:45AM
7    orientation?            11:33:47AM
8       MR. GOODSTADT: No. We're making a   11:33:49AM
9    claim of defamation. We're making a claim 11:33:50AM
10   of slander. And if we have to amend the   11:33:52AM
11   complaint, we will.          11:33:55AM
12      MR. NOVIKOFF: I look forward to you   11:33:57AM
13   amending the complaint, obviously.      11:33:58AM
14      It's your witness.          11:34:01AM
15      MR. CONNOLLY: I agree, but you can   11:34:03AM
16   answer.              11:34:04AM
17      MR. GOODSTADT: And your objections,  11:34:05AM
18   as we've gone over thousands of times,    11:34:06AM
19   patently irrelevant, are reserved.      11:34:08AM
20      MR. NOVIKOFF: Sometimes yes,      11:34:12AM
21   sometimes no.            11:34:12AM
22      MR. CONNOLLY: If you have an opinion. 11:34:14AM
23      A   I don't believe he is, but I don't   11:34:18AM
24   have an opinion, really.          11:34:19AM
25      Q   Did you ever call Kevin Lamm a rat?  11:34:25AM

GEORGE HESSE

1
2       A   I may have.            11:34:28AM
3       Q   How many times?          11:34:31AM
4       A   I don't know.          11:34:32AM
5       Q   What's your understanding of what a  11:34:35AM
6    rat is in police terminology?        11:34:36AM
7       MR. NOVIKOFF: Objection.        11:34:39AM
8       MR. CONNOLLY: In police terminology? 11:34:42AM
9       MR. GOODSTADT: Yeah.          11:34:44AM
10   BY MR. GOODSTADT:            11:34:44AM
11      Q   You know, when you call another police 11:34:44AM
12   officer a rat, what does that mean?      11:34:46AM
13      MR. NOVIKOFF: Objection.        11:34:48AM
14      MR. CONNOLLY: Objection.        11:34:49AM
15      A   It could be a tattletale. It could be 11:34:50AM
16   vermin, low, dirty down. You know.      11:34:53AM
17      Q   How about a mutt, did you ever use    11:34:57AM
18   that term?              11:34:59AM
19      A   Yes.              11:35:00AM
20      Q   What does a mutt mean?        11:35:00AM
21      MR. NOVIKOFF: In police parlance?    11:35:04AM
22      MR. GOODSTADT: Yeah, in police      11:35:06AM
23   parlance.              11:35:07AM
24      MR. NOVIKOFF: Objection.        11:35:08AM
25      A   Dirtbag.              11:35:09AM

GEORGE HESSE

1
2       Q   Is it different than a rat?      11:35:09AM
3       MR. NOVIKOFF: In police parlance?    11:35:12AM
4       MR. GOODSTADT: Yes.          11:35:14AM
5       MR. NOVIKOFF: Objection.        11:35:15AM
6       A   I guess you could use it different    11:35:16AM
7    ways, but yes. They're a little different.   11:35:17AM
8       Q   In police parlance, what's the      11:35:20AM
9    difference between a rat and a mutt?      11:35:22AM
10      MR. NOVIKOFF: Objection.        11:35:26AM
11      A   To differentiate the difference, a rat 11:35:26AM
12   could be a tattletale.          11:35:27AM
13      Q   Right.              11:35:29AM
14      A   A rat could be just vermin. And a    11:35:30AM
15   mutt could just be a dirtbag. I don't know. 11:35:34AM
16      Q   When you say you could've called Kevin 11:35:47AM
17   Lamm a rat, is there any incident that you're 11:35:49AM
18   referring to?            11:35:52AM
19      A   I may have written something on the   11:35:52AM
20   blog or something like that.        11:35:54AM
21      Q   What did you write on the blog?      11:35:56AM
22      A   I don't know. I'd have to go through 11:35:58AM
23   the blog.              11:35:59AM
24      Q   Did you ever verbally call Kevin Lamm 11:36:05AM
25   a rat?              11:36:07AM

b929ea01-2563-408a-a7fc-adb794430749

1            GEORGE HESSE
2     A    Not that I recall, no.          11:36:08AM
3     Q    Do you recall what your posting name  11:36:19AM
4  was on the blog when you called Kevin Lamm a  11:36:21AM
5  rat?                            11:36:24AM
6     A    Specifically, no.               11:36:24AM
7     Q    The last time you testified to four  11:36:25AM
8  names that thought that you used, Still    11:36:27AM
9  Employed, Still Employed 2, Dirty and Dirty 1.  11:36:29AM
10    A    Uh-huh.                       11:36:32AM
11    Q    Any other names that you can think of  11:36:33AM
12  that you used on the blog?            11:36:35AM
13    A    There are others, but I don't recall  11:36:36AM
14  them at this time.                  11:36:38AM
15    Q    Did you ever use Rat Hater?       11:36:48AM
16    A    I don't think so.               11:36:50AM
17    MR. NOVIKOFF: On the blog?         11:36:52AM
18    MR. GOODSTADT: On the blog.        11:36:53AM
19  BY MR. GOODSTADT:                    11:36:55AM
20    Q    Did you ever use Forever Employed?  11:36:55AM
21    A    I don't know.  I'd have to look at the  11:36:57AM
22  post.                            11:36:59AM
23    Q    Did you ever use Guest with 15 ones  11:36:59AM
24  after it?                        11:37:03AM
25    A    No, I don't think so.           11:37:04AM

1            GEORGE HESSE
2     Q    Or just the handle just 15 ones?   11:37:04AM
3     A    No, I don't think so.           11:37:07AM
4     Q    Did you ever use Guest 11770 or just  11:37:08AM
5  the number 11770?                    11:37:12AM
6     A    No.                          11:37:16AM
7     Q    Did you use Free the Four?        11:37:16AM
8     A    I may have.                    11:37:18AM
9     MR. NOVIKOFF:  Is it Free T-H-E      11:37:24AM
10  F-O-U-R?                          11:37:25AM
11    MR. GOODSTADT:  Yes.              11:37:29AM
12  BY MR. GOODSTADT:                    11:37:31AM
13    Q    Did you ever use Just the Facts Ma'am?  11:37:32AM
14    A    I don't think so.               11:37:34AM
15    Q    Did you ever use Your Turn Boys?   11:37:36AM
16    A    I don't think so.               11:37:38AM
17    Q    Did you ever use Misconduct?       11:37:39AM
18    A    No.                          11:37:41AM
19    Q    Did you ever use Frank the Fag?    11:37:42AM
20    A    No.                          11:37:44AM
21    Q    Did you ever use Miss You Guys?    11:37:44AM
22    A    No.                          11:37:47AM
23    Q    Did you ever use Hate the Five?    11:37:48AM
24    A    I don't think so, no.           11:37:50AM
25    Q    Did you ever use On the Level?     11:37:52AM

1            GEORGE HESSE
2     A    No.                          11:37:54AM
3     Q    Did you ever use Man Up Jerk-offs?  11:37:55AM
4     A    No.                          11:37:58AM
5     Q    Did you ever post --            11:37:58AM
6     MR. NOVIKOFF:  On the blog?        11:38:00AM
7     MR. GOODSTADT:  On the blog.       11:38:01AM
8  BY MR. GOODSTADT:                    11:38:03AM
9     Q    Did you ever use no name and just post  11:38:03AM
10  without putting in a name?            11:38:07AM
11    A    I don't think it lets you do that, but  11:38:08AM
12  no.  I don't think so, no.             11:38:10AM
13    Q    Have you ever seen Joe Nofi, Frank  11:38:17AM
14  Fiorillo or Kevin Lamm come into contact with  11:38:20AM
15  somebody who they did not beat up?     11:38:24AM
16    A    What?                         11:38:27AM
17    MR. NOVIKOFF:  Wait, wait.  Hold on.  11:38:28AM
18    MR. CONNOLLY:  Objection.          11:38:30AM
19    MR. NOVIKOFF:  You know, that may not  11:38:30AM
20  be objectionable to form.  I just want to  11:38:32AM
21  hear the question.                  11:38:34AM
22    If you can repeat that back for me.   11:38:35AM
23    (Whereupon, the referred to portion    11:38:45AM
24  was read back by the court reporter:  Have  11:38:45AM
25  you ever seen Joe Nofi, Frank Fiorillo or   11:38:45AM

1            GEORGE HESSE
2  Kevin Lamm come into contact with somebody  11:38:45AM
3  who they did not beat up?)            11:38:45AM
4     MR. NOVIKOFF:  You mean other than the  11:38:46AM
5  people at this table?                11:38:47AM
6     MR. GOODSTADT:  While they were police  11:38:52AM
7  officers.                         11:38:53AM
8     MR. CONNOLLY:  That's a simple yes or  11:38:57AM
9  no.                             11:38:59AM
10    THE WITNESS:  Yeah, I know.  I'm just  11:38:59AM
11  trying to figure that one out.         11:39:01AM
12    A    Yeah, I guess.                 11:39:03AM
13    Q    So a statement that the three of them  11:39:05AM
14  beat up everyone they came into contact with  11:39:08AM
15  would be false, correct?              11:39:11AM
16    A    Yeah.                         11:39:14AM
17    Q    Did you ever state or insinuate on the  11:39:18AM
18  blog that any of the plaintiffs were gay or  11:39:20AM
19  homosexual?                        11:39:23AM
20    A    I may have.                    11:39:25AM
21    Q    Do you recall which plaintiff you   11:39:27AM
22  stated that about on the blog?         11:39:29AM
23    A    I don't recall.                11:39:31AM
24    Q    Was it Kevin Lamm?              11:39:33AM
25    A    I might have.                  11:39:34AM

b929ea01-2563-408a-a7fc-adb794430749

```
1            GEORGE HESSE
2    Q    Frank Fiorillo?            11:39:35AM
3    A    I might have.              11:39:36AM
4    Q    Do you believe Frank Fiorillo to be   11:39:38AM
5  gay or homosexual?              11:39:40AM
6    A    Nah.                      11:39:42AM
7    Q    Any other plaintiffs you insinuated   11:39:46AM
8  were gay or homosexual other than Mr. Fiorillo  11:39:49AM
9  or Mr. Lamm?                    11:39:52AM
10   A    I'm sure all five of the plaintiffs at  11:39:54AM
11 some point.                      11:39:56AM
12   Q    Do you believe that any of the five   11:39:57AM
13 plaintiffs are gay or homosexual?   11:39:58AM
14   A    No, I don't.               11:40:00AM
15   Q    Did you ever call any of the   11:40:14AM
16 plaintiffs a mutt?               11:40:15AM
17        MR. NOVIKOFF:  On the blog?   11:40:16AM
18        MR. GOODSTADT:  At any point.  On the  11:40:18AM
19 blog, off the blog, verbally, in writing.   11:40:20AM
20   A    Yeah.                     11:40:23AM
21   Q    When?                     11:40:24AM
22   A    I don't recall.            11:40:25AM
23        MR. GOODSTADT:  Mark that.   11:40:54AM
24        (Whereupon, picture of writing on the  11:40:56AM
25 wall was marked as Plaintiff's Exhibit 13   11:40:56AM
```

```
1            GEORGE HESSE
2  for identification, as of this date.)   11:40:56AM
3        MR. GOODSTADT:  I've placed in front  11:41:48AM
4  of Mr. Hesse what's now been marked as   11:41:49AM
5  Hesse 13.  It is a two-page exhibit.  I   11:41:51AM
6  don't believe it bears any Bates numbers.   11:41:55AM
7  BY MR. GOODSTADT:                11:41:57AM
8    Q    Mr. Hesse, have you ever seen the   11:41:58AM
9  first page of what's been marked as Hesse 13?   11:42:00AM
10   A    Yes.                      11:42:03AM
11   Q    Okay.  And what is this depicting?   11:42:03AM
12   A    I believe it was in our bathroom stall  11:42:05AM
13 in the police station on a wood wall that you   11:42:08AM
14 would face.  If you were a man standing up and  11:42:13AM
15 urinating into the toilet, you could see   11:42:17AM
16 straight in front of you what was written on the  11:42:19AM
17 wall.                           11:42:23AM
18   Q    Do you know who wrote this?   11:42:23AM
19   A    I have no idea.            11:42:24AM
20   Q    Did Snyder ever complain to you about  11:42:25AM
21 the first page of Hesse 13?      11:42:27AM
22   A    It was never complained, no.   11:42:29AM
23   Q    And were you the author of what's on  11:42:34AM
24 Hesse 13?                       11:42:37AM
25   A    Absolutely not.            11:42:38AM
```

```
1            GEORGE HESSE
2    Q    How about Page 2 of Hesse 13, did you  11:42:38AM
3  ever see this?                   11:42:41AM
4    A    Yes.                      11:42:42AM
5    Q    And was this -- where was this --   11:42:43AM
6  strike that.                    11:42:46AM
7        What is Page 2 of Hesse 13?   11:42:47AM
8    A    Basically just what I described, same  11:42:51AM
9  exact thing in the same area, writing on the   11:42:53AM
10 wall in the bathroom.            11:42:56AM
11   Q    Were you the author of what's depicted  11:42:58AM
12 on the second page of Hesse 13?   11:42:59AM
13   A    Absolutely not, no.        11:43:01AM
14   Q    Do you know who wrote what was on the  11:43:02AM
15 second page of Hesse 13?         11:43:04AM
16   A    No, I don't.              11:43:05AM
17   Q    Did you ever speak to any of the   11:43:07AM
18 officers about marking up the walls in the   11:43:09AM
19 bathroom?                       11:43:11AM
20   A    At some point, I believe I wrote on  11:43:15AM
21 the wall and said "stop writing on the wall,"   11:43:17AM
22 and I told everybody to stop writing on the   11:43:19AM
23 wall.                           11:43:22AM
24   Q    What do you mean, you wrote "stop   11:43:22AM
25 writing on the wall"?  Was it a directive you   11:43:22AM
```

```
1            GEORGE HESSE
2  posted or you actually wrote it --   11:43:23AM
3    A    No.  I wrote it right underneath all  11:43:25AM
4  this stuff.  I said, "Stop writing on the wall,  11:43:27AM
5  103."                           11:43:31AM
6    Q    And who did you tell to stop writing  11:43:32AM
7  on the wall?                    11:43:32AM
8    A    I believe I made a general statement  11:43:33AM
9  to everybody that was working in the department.  11:43:35AM
10   Q    Do you recall when that was?   11:43:37AM
11   A    I don't, no.              11:43:39AM
12   Q    And when was the two pictures that are  11:43:39AM
13 depicted in Hesse 13, when were those things   11:43:43AM
14 written on the wall?             11:43:46AM
15   A    You know, I don't know.  I know -- I  11:43:47AM
16 believe Laminated and Snyderized was up for   11:43:50AM
17 quite a while.                  11:43:56AM
18   Q    Did you ever take any steps to have it  11:43:58AM
19 removed?                        11:44:01AM
20   A    Oh, I've removed it but, you know, not  11:44:01AM
21 then.                           11:44:05AM
22   Q    I'm talking about then.  Did you ever  11:44:06AM
23 take any steps to have it removed?  You said it  11:44:08AM
24 was there quite a while.         11:44:10AM
25   A    Yeah.  No.                11:44:12AM
```

GEORGE HESSE

1
2       MR. NOVIKOFF: Objection. That wasn't 11:44:13AM
3  what you asked him when he responded "quite 11:44:14AM
4  a while." Objection to form, but --       11:44:17AM
5  BY MR. GOODSTADT:                  11:44:19AM
6       Q   How long is quite a while?      11:44:19AM
7       MR. NOVIKOFF: He said he saw it quite 11:44:22AM
8  a while ago, I believe.            11:44:23AM
9       MR. GOODSTADT: Can you go back to the 11:44:26AM
10  answer "quite a while."            11:44:27AM
11      MR. CONNOLLY: Ask him.            11:44:29AM
12      MR. GOODSTADT: I want to see what he 11:44:30AM
13  said.                          11:44:31AM
14  BY MR. GOODSTADT:                  11:45:01AM
15      Q   You testified that it was up for quite 11:45:01AM
16  a while.                        11:45:03AM
17      A   Uh-huh.                  11:45:04AM
18      MR. NOVIKOFF: I don't recall it that 11:45:05AM
19  way, but it is what it is.            11:45:05AM
20      MR. GOODSTADT: I have the transcript. 11:45:08AM
21  You can play the video, if you want.      11:45:08AM
22      MR. NOVIKOFF: I don't see a         11:45:15AM
23  transcript. It's on the video.        11:45:15AM
24      My objection stands.              11:45:15AM
25

GEORGE HESSE

1
2  BY MR. GOODSTADT:                  11:45:17AM
3       Q   So during the -- strike that.    11:45:17AM
4       What did you mean by quite a while,   11:45:19AM
5  how long?                       11:45:22AM
6       A   I believe it was years. I believe 11:45:22AM
7  that this stuff was on the wall for       11:45:24AM
8       Q   And during those years, did you ever 11:45:27AM
9  do anything to take it down other than for write 11:45:28AM
10  "stop writing on the walls, 103"?        11:45:32AM
11      A   No.                      11:45:33AM
12      Q   Did Kevin Lamm ever complain to you 11:45:36AM
13  about Page 2 of Hesse 13?            11:45:37AM
14      A   No.                      11:45:42AM
15      MR. GOODSTADT: I want to take a       11:45:55AM
16  five-minute break here.              11:45:56AM
17      MR. NOVIKOFF: You got it.          11:45:58AM
18      THE VIDEOGRAPHER: The time is 11:47. 11:45:59AM
19  We're off the record.              11:46:00AM
20      (Whereupon, a discussion was held off 11:46:03AM
21  the record.)                    11:46:03AM
22      THE VIDEOGRAPHER: The time is 12:04. 12:02:16PM
23  We're on the record.              12:02:17PM
24  BY MR. GOODSTADT:                  12:02:20PM
25      Q   Mr. Hesse, do you know who Frank   12:02:21PM

GEORGE HESSE

1
2  Tutone is?                      12:02:24PM
3       A   Yes.                    12:02:25PM
4       Q   Who is Frank Tutone?          12:02:25PM
5       A   He's a local resident of Ocean Beach. 12:02:27PM
6       Q   Have you ever been to Mr. Tutone's  12:02:34PM
7  residence?                      12:02:37PM
8       MR. CONNOLLY: In what capacity?      12:02:38PM
9       MR. GOODSTADT: At any time.        12:02:40PM
10      A   Yes.                    12:02:40PM
11      Q   How many times have you been to his 12:02:42PM
12  residence?                      12:02:44PM
13      A   Maybe four times.            12:02:47PM
14      Q   Have you ever been there on non-police 12:02:49PM
15  business?                       12:02:51PM
16      A   Never.                  12:02:52PM
17      Q   So all four times was on police    12:02:54PM
18  business?                       12:02:56PM
19      A   Yes.                    12:02:56PM
20      Q   And what was the police business at  12:02:57PM
21  Mr. Tutone's residence that you were there for? 12:02:59PM
22      A   To arrest him.              12:03:02PM
23      Q   All four times?              12:03:03PM
24      A   I believe so, yes.            12:03:04PM
25      Q   What was he arrested for?        12:03:05PM

GEORGE HESSE

1
2       A   Hmm, God, so many things. Aggravated 12:03:08PM
3  harassment on several occasions. Domestic   12:03:11PM
4  violence type stuff.              12:03:18PM
5       Q   And domestic violence against whom? 12:03:27PM
6       A   That would be his on-and-off      12:03:29PM
7  girlfriend, Lisa Campbell.            12:03:32PM
8       Q   Are you aware of a time where      12:03:38PM
9  Ms. Campbell was in the station and Richard   12:03:42PM
10  Bosetti was giving her wine to drink?      12:03:45PM
11      MR. NOVIKOFF: Objection to form.      12:03:53PM
12      A   You know, I don't know. I've heard 12:03:55PM
13  the rumor, but I don't know for sure if that was 12:03:57PM
14  true or not.                    12:04:00PM
15      Q   When did you hear that rumor?      12:04:01PM
16      A   You know what, it may have been when 12:04:05PM
17  this proceeding started.            12:04:08PM
18      Q   You hadn't heard the rumor prior to  12:04:09PM
19  the proceeding?                   12:04:11PM
20      A   No. Not that I'm aware of.        12:04:12PM
21      Q   And if Mr. Bosetti had given her wine 12:04:16PM
22  to drink while she was there to file a domestic 12:04:21PM
23  violence complaint, would that have been    12:04:25PM
24  appropriate?                    12:04:28PM
25      MR. NOVIKOFF: Objection.          12:04:28PM

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    A   In my opinion, it's inappropriate.    12:04:29PM
3    **Q    Inappropriate?              12:04:31PM**
4    A   Yeah.                      12:04:31PM
5    **Q    It's something that would result in   12:04:32PM**
6    **discipline?                  12:04:37PM**
7        MR. CONNOLLY:  Objection.      12:04:38PM
8        MR. NOVIKOFF:  Objection.  Calls for  12:04:39PM
9    speculation.                  12:04:39PM
10   A   No.  Not necessarily.          12:04:40PM
11   **Q    What do you mean by not necessarily?  12:04:43PM**
12   A   I would probably just advise him not  12:04:45PM
13   to do that again.              12:04:47PM
14   **Q    Have you ever spoken to Richard    12:04:48PM**
15   **Bosetti about that incident?         12:04:50PM**
16       MR. NOVIKOFF:  Foundation.    12:04:53PM
17   A   I don't recall if I did or not.      12:04:54PM
18   **Q    You don't recall one way or the other? 12:04:55PM**
19   A   No.                      12:04:56PM
20   **Q    Have you ever spoken with anybody,   12:04:57PM**
21   **either former or current police officers at  12:04:59PM**
22   **Ocean Beach, with respect to that incident?  12:05:02PM**
23   A   I don't recall if I did or not.      12:05:04PM
24   **Q    So you don't know one way or the    12:05:05PM**
25   **other?                      12:05:06PM**

GEORGE HESSE

1
2    A   No.                      12:05:08PM
3    **Q    Did you ever speak to Kenny Bockelman 12:05:09PM**
4    **about that incident?             12:05:12PM**
5    A   You know, I don't recall.         12:05:14PM
6    **Q    Do you know who Kenny Bockelman is?   12:05:15PM**
7    A   Oh, sure.                  12:05:17PM
8    **Q    Who is that?                12:05:18PM**
9    A   He's a current part-time seasonal    12:05:18PM
10   police officer.  B-O-C-K-E-L-M-A-N.      12:05:21PM
11   **Q    Have you ever disciplined Rich     12:05:49PM**
12   **Bosetti?                     12:05:51PM**
13   A   Yes.                     12:05:51PM
14   **Q    What did you discipline Rich Bosetti  12:05:52PM**
15   **for?                        12:05:55PM**
16   A   A couple of different things.  One   12:05:55PM
17   time I felt that he wasn't getting to his post  12:06:01PM
18   in time, and we had a little bit of an argument.  12:06:04PM
19   So he was disciplined for that and sent home for  12:06:09PM
20   his tour of duty.  I believe there was another  12:06:13PM
21   time where he was caught sleeping by the mayor.  12:06:15PM
22   He was disciplined by the mayor and then me, and  12:06:20PM
23   then he was sent home for the tour of duty.  And  12:06:26PM
24   then he was pretty much not asked back for     12:06:29PM
25   employment proceeding that.         12:06:32PM

GEORGE HESSE

1
2    **Q    What was the incident about what you   12:06:37PM**
3    **guys had the argument over Bosetti not being at  12:06:40PM**
4    **his post on time?               12:06:43PM**
5    A   That night, early morning we had a   12:06:45PM
6    huge fire.  A building burnt to the ground.  And  12:06:48PM
7    that morning I had to call extra personnel in to  12:06:52PM
8    relieve some of the officers that were on all  12:06:55PM
9    night long.  They were soaking wet.  They had  12:06:58PM
10   debris all over them.  And I wanted him to get  12:07:02PM
11   to his post to relief one of those officers    12:07:05PM
12   to -- so they can go home, rest, change, shower,  12:07:09PM
13   whatever it is.  And I left the scene to go to  12:07:14PM
14   the police station for something, paperwork or  12:07:18PM
15   something.  And Rich Bosetti was sitting there  12:07:21PM
16   enjoying a cup of coffee and eating a bagel, and  12:07:24PM
17   I found that to be inappropriate under the    12:07:27PM
18   circumstances.                12:07:30PM
19   **Q    When was that incident?          12:07:31PM**
20   A   I don't recall the exact date.  I'm   12:07:36PM
21   sure you could show me something that will help  12:07:38PM
22   me recollect.                 12:07:42PM
23   **Q    Do you know what year it was?     12:07:43PM**
24   A   I believe it was 2007.  It may have   12:07:44PM
25   been in June.  June or July.  I'm not real     12:07:48PM

GEORGE HESSE

1
2    positive.                    12:07:51PM
3    **Q    And what was the incident where the   12:07:51PM**
4    **mayor caught him sleeping?          12:07:53PM**
5    A   I don't recall the exact date, but I  12:07:57PM
6    came into work about, I don't know, 9:30ish, and  12:08:01PM
7    I believe I asked the dispatcher where everybody  12:08:07PM
8    was.  Everybody was on patrol.  And all of a   12:08:10PM
9    sudden, I guess Rich Bosetti just comes      12:08:13PM
10   strolling into the police station.  And then I   12:08:16PM
11   get a phone call from the mayor that he wants to  12:08:18PM
12   see Rich Bosetti and myself in his office at    12:08:21PM
13   whatever time he designated, and we reported to  12:08:26PM
14   his office.                   12:08:30PM
15   **Q    Okay.  When was that?          12:08:30PM**
16   A   I don't remember the exact date of   12:08:32PM
17   that either.  I believe it's written down in his  12:08:33PM
18   personnel file somewhere.          12:08:37PM
19   **Q    And I believe you testified that he   12:08:38PM**
20   **was sent home on that tour?         12:08:40PM**
21   A   Yes, eventually he was sent home for  12:08:42PM
22   tour of duty.                 12:08:45PM
23   **Q    Who made the decision to send him   12:08:46PM**
24   **home?                       12:08:48PM**
25   A   I did.                    12:08:49PM

b929ea01-2563-408a-a7fc-adb794430749

Page 398

GEORGE HESSE

12:08:49PM

3  Q   And then was his employment terminated 12:08:59PM
4  after that?                           12:09:01PM
5  A   Yeah. There were no hours available 12:09:02PM
6  for him. It was the end of the season.   12:09:04PM
7  Q   What do you mean, yeah, but there were 12:09:07PM
8  no hours available for him?            12:09:09PM
9  A   I chose not to give him any more   12:09:11PM
10 hours.                                12:09:13PM
11 Q   Who made that decision to end his  12:09:13PM
12 employment?                           12:09:15PM
13 A   I did.                            12:09:16PM
14 Q   Did you have any -- did you have to 12:09:16PM
15 get any approval to end his employment? 12:09:19PM
16 A   No.                               12:09:22PM
17 Q   Did you seek anyone's approval to end 12:09:23PM
18 his employment?                       12:09:25PM
19 A   I don't recall if I did.          12:09:26PM
20 Q   Did you speak to anybody about that 12:09:27PM
21 decision prior to implementing it?    12:09:29PM
22 A   I don't recall if I did.          12:09:31PM
23 Q   Do you recall, did you speak with Joe 12:09:32PM
24 Loeffler about it?                    12:09:35PM
25 A   I may have. I don't recall.       12:09:36PM

Page 399

GEORGE HESSE

2  Q   Did you speak to anyone in Civil   12:09:39PM
3  Service about it?                     12:09:41PM
4  A   No.                               12:09:44PM
5  Q   At that time, did you have the     12:09:45PM
6  authority to terminate his employment? 12:09:46PM
7  MR. NOVIKOFF: Objection. Form.    12:09:48PM
8  A   I believe I did.                  12:09:50PM
9  Q   And what's the basis of that belief? 12:09:54PM
10 A   By my title and position.         12:09:56PM
11 Q   Your title was at that time?       12:09:59PM
12 A   Deputy acting -- acting -- who knows. 12:10:01PM
13 MR. CONNOLLY: Deputy acting chief. 12:10:06PM
14 A   Deputy acting chief of police.    12:10:08PM
15 Q   But you testified last time that you 12:10:10PM
16 held yourself out to be chief, correct? 12:10:13PM
17 A   Yes.                              12:10:15PM
18 MR. NOVIKOFF: Objection.          12:10:16PM
19 BY MR. GOODSTADT:                     12:10:17PM
20 Q   So during that period time?        12:10:17PM
21 A   2007, no. Paradiso was still employed 12:10:19PM
22 by the village, so I would be the deputy chief. 12:10:21PM
23 Q   When did the change happen between 12:10:25PM
24 deputy chief and chief?               12:10:27PM
25 A   I believe he retired officially July 12:10:29PM

Page 400

GEORGE HESSE

of 2008.                             12:10:34PM

3  Q   Did you need Paradiso's approval to 12:10:39PM
4  terminate Mr. Bosetti's employment at that time? 12:10:42PM
5  A   No.                               12:10:46PM
6  Q   Did you get his approval to terminate 12:10:46PM
7  Mr. Bosetti's employment at that time? 12:10:49PM
8  MR. NOVIKOFF: Objection to form.  12:10:51PM
9  A   No.                               12:10:52PM
10 Q   Did you discuss the decision with  12:10:52PM
11 Paradiso either before implementing it or after? 12:10:54PM
12 MR. NOVIKOFF: Objection to form.  12:10:57PM
13 A   No.                               12:10:58PM
14 Q   Sitting here today, you never      12:10:59PM
15 discussed that incident or decision to terminate 12:11:01PM
16 Rich Bosetti's employment with Chief Paradiso? 12:11:04PM
17 MR. NOVIKOFF: Objection to form.  12:11:08PM
18 A   No.                               12:11:09PM
19 Q   Now, there came a point in time where 12:11:35PM
20 there was a -- I believe you called it a 12:11:39PM
21 Halloween incident; is that correct?  12:11:40PM
22 A   Yes.                              12:11:41PM
23 Q   And that was -- just so we're clear, 12:11:42PM
24 that was the night of October 30th into the 12:11:44PM
25 morning of October 31, 2004?          12:11:47PM

Page 401

GEORGE HESSE

2  A   Yes.                              12:11:50PM
3  Q   Where did the Halloween incident take 12:11:51PM
4  place?                                12:11:53PM
5  A   At a bar called Houser's.         12:11:53PM
6  Q   Where is Houser's located?         12:11:56PM
7  A   It's on Bay Walk, and it's between 12:11:57PM
8  Ocean Breeze walk and Evergreen Walk. 12:12:02PM
9  Q   Had you ever been in Houser's prior to 12:12:07PM
10 the Halloween incident?               12:12:09PM
11 A   Yes.                              12:12:10PM
12 Q   Had you ever been in there on       12:12:11PM
13 non-police business prior to the Halloween 12:12:14PM
14 incident?                             12:12:17PM
15 A   Yes.                              12:12:17PM
16 Q   Had you ever drank at Houser's prior 12:12:18PM
17 to the Halloween incident?            12:12:20PM
18 MR. NOVIKOFF: Objection to form.  12:12:23PM
19 On police business or not on police 12:12:24PM
20 business?                             12:12:26PM
21 BY MR. GOODSTADT:                     12:12:27PM
22 Q   Did you ever drink on police business 12:12:27PM
23 or while you were on duty at Houser's prior to 12:12:28PM
24 October 31st, 2004?                   12:12:29PM
25 A   Never.                            12:12:31PM

25 (Pages 398 to 401)

b929ea01-2563-408a-a7fc-adb794430749

Page 402

GEORGE HESSE

1
2  Q  How about subsequent to October 31st,  12:12:32PM
3  2004?                              12:12:33PM
4  A  Never.                        12:12:36PM
5  Q  Did you ever drink off duty in      12:12:36PM
6  Houser's prior to October 31, 2004?     12:12:38PM
7  A  Yes.                          12:12:40PM
8  Q  Did you ever drink off duty subsequent 12:12:42PM
9  to October 31, 2004?              12:12:45PM
10  A  Yes.                         12:12:46PM
11  Q  Who was the owner of Houser's at the  12:12:47PM
12  time of the Halloween incident?      12:12:50PM
13  A  I believe there's partners involved in 12:12:51PM
14  the bar.  I think the major principals are Brian 12:12:53PM
15  O'Hanley and Alan Stillman.        12:12:58PM
16  Q  Did you know Mr. O'Hanley prior to   12:13:09PM
17  October 31, 2004?               12:13:13PM
18  A  Yes.                         12:13:14PM
19  Q  Were you friendly with him?      12:13:16PM
20  A  Not really.                   12:13:18PM
21  Q  Did you ever issue any summonses to  12:13:19PM
22  Houser's at any point in time?      12:13:21PM
23  A  Yes.                         12:13:23PM
24  Q  How many times?               12:13:23PM
25  A  Maybe three times.            12:13:27PM

Page 403

GEORGE HESSE

1
2  Q  Were they prior to Halloween '04 or  12:13:29PM
3  after?                           12:13:31PM
4  A  Prior.                       12:13:31PM
5  Q  Are you friends with Mr. Stillman?  12:13:34PM
6  A  No.                          12:13:36PM
7  Q  Did you know him prior to Halloween  12:13:37PM
8  2004?                           12:13:38PM
9  A  Yes.                         12:13:39PM
10  Q  Did you ever socialize with either of 12:13:42PM
11  them?                          12:13:44PM
12  A  No.                          12:13:45PM
13  Q  Okay.  Where were you the night of the 12:13:45PM
14  Halloween incident?             12:13:51PM
15  A  I was at a wedding.  I was in a     12:13:52PM
16  wedding party for a friend of mine.   12:13:54PM
17  Q  Where was that wedding?         12:13:58PM
18  A  Good question.  I believe the church 12:14:02PM
19  might have been in -- let me see, Bayport.  And 12:14:04PM
20  then the reception was Port Jeff somewhere.   12:14:10PM
21  Q  So you were in Suffolk County at the  12:14:18PM
22  time?                          12:14:19PM
23  A  Yes.                         12:14:19PM
24  Q  Were you in Ocean Beach at all that  12:14:22PM
25  day or night, October 30th?      12:14:24PM

Page 404

GEORGE HESSE

1
2  A  No.                          12:14:26PM
3  Q  And what was your title at that time? 12:14:33PM
4  A  Sergeant.                    12:14:37PM
5  Q  How did you first learn that there was 12:14:49PM
6  an incident on Halloween of 2004?   12:14:50PM
7  A  The early evening of Sunday, I     12:14:55PM
8  believe, the 31st, I received a call from Ed  12:14:58PM
9  Paradiso telling me that he had fired Gary   12:15:01PM
10  Bosetti for an incident that had taken place at 12:15:06PM
11  the bar, that Gary had gone berserk with a pool 12:15:09PM
12  cue and was hitting patrons of the bar.  12:15:14PM
13  Q  Do you recall anything else that was  12:15:18PM
14  discussed during that phone call?    12:15:19PM
15  A  I asked him what makes him think that 12:15:21PM
16  Gary went nuts and why, and he didn't know why. 12:15:23PM
17  Q  Did he tell you what made him think  12:15:30PM
18  that Gary went nuts?            12:15:33PM
19  A  No.  He just said that he was involved 12:15:34PM
20  in a fight, that he believes he was involved in 12:15:36PM
21  a fight, and that he picked up a pool stick and 12:15:39PM
22  just started hitting people with it.  12:15:42PM
23  Q  Was anything else discussed during  12:15:45PM
24  that phone call?               12:15:46PM
25  A  Yes.  He said that when I get in on 12:15:47PM

Page 405

GEORGE HESSE

1
2  Monday morning, he wants me to investigate what 12:15:50PM
3  was going on.                   12:15:54PM
4  Q  Anything else that was discussed    12:16:01PM
5  during that call?               12:16:02PM
6  A  Not that I recall.            12:16:04PM
7  Q  Did you speak with anybody else about 12:16:09PM
8  the Halloween incident prior to going in on that 12:16:11PM
9  Monday morning?                12:16:15PM
10  A  Yes.                         12:16:16PM
11  Q  Who did you speak with?         12:16:16PM
12  A  Frank Fiorillo and Kevin Lamm.     12:16:17PM
13  Q  Okay.  When did you speak with --   12:16:20PM
14  well, strike that.             12:16:23PM
15  Who did you speak with first, Frank  12:16:24PM
16  Fiorillo or Kevin Lamm?          12:16:26PM
17  A  Kevin Lamm, I believe.         12:16:27PM
18  Q  And when did you speak with him?    12:16:28PM
19  A  I'm sure it was shortly after I spoke 12:16:30PM
20  to Ed Paradiso.  I was standing in Home Depot 12:16:32PM
21  parking lot in Bay Shore when I made contact  12:16:37PM
22  with Kevin.                    12:16:40PM
23  Q  It was on the phone you made contact 12:16:41PM
24  with him?                      12:16:44PM
25  A  Yeah.                        12:16:44PM

26 (Pages 402 to 405)

b929ea01-2563-408a-a7fc-adb794430749

Page 406

GEORGE HESSE

1
2    Q   Did you reach out to him or did he    12:16:45PM
3    reach out to you?                          12:16:45PM
4    A   I called him.                  12:16:46PM
5    Q   Where was he located?          12:16:46PM
6    A   I have no idea.                12:16:46PM
7    Q   Did you call him on his cell phone,    12:16:47PM
8    his house phone, station phone?            12:16:49PM
9    A   I believe it was his cell phone.   12:16:52PM
10   Q   Tell me everything you recall being    12:16:55PM
11   discussed in that conversation.            12:16:57PM
12   A   I basically remember asking him what   12:16:58PM
13   had happened and, you know, what made him think  12:17:00PM
14   that Gary went berserk with the pool stick, and  12:17:05PM
15   he kept saying he didn't know why. He kept   12:17:08PM
16   saying, I don't know.              12:17:12PM
17   Q   Well, did he tell you that Gary went   12:17:14PM
18   berserk with a pool stick or is that something  12:17:17PM
19   that Paradiso said?                        12:17:20PM
20   A   I might be conflicting on the two, but  12:17:22PM
21   he did say that Gary struck these individuals.  12:17:24PM
22   I don't know if he named them specifically, but  12:17:28PM
23   he hit somebody with the pool stick.   12:17:30PM
24   Q   When you say didn't know the name of   12:17:32PM
25   the individuals, the people who were struck or  12:17:35PM

Page 407

GEORGE HESSE

1
2    did he name Gary?                          12:17:38PM
3    A   The people that were struck.       12:17:40PM
4    Q   And what else did he say during that   12:17:42PM
5    call?                                      12:17:44PM
6    A   He just kept saying he didn't know   12:17:45PM
7    what had happened.                 12:17:46PM
8    Q   Did he give you any other details     12:17:49PM
9    about what had happened other than just telling  12:17:51PM
10   you that he had struck some people with a pool  12:18:03PM
11   cue?                                       12:18:06PM
12   A   That's it. And he said the rest he   12:18:07PM
13   didn't know.                       12:18:09PM
14   Q   And what did you say during that       12:18:13PM
15   conversation?                              12:18:14PM
16   A   Okay.                          12:18:16PM
17   Q   How long did the conversation last?    12:18:17PM
18   A   A few minutes. Not long.           12:18:19PM
19   Q   Did you take any notes of that         12:18:22PM
20   conversation?                              12:18:23PM
21   A   No.                            12:18:23PM
22   Q   Now, I believe you testified that you  12:18:27PM
23   spoke with Frank Fiorillo as well prior to     12:18:29PM
24   coming in that Monday?                     12:18:31PM
25   A   Yes.                           12:18:33PM

Page 408

GEORGE HESSE

1
2    Q   How long after the Lamm call was the   12:18:33PM
3    Fiorillo discussion?                       12:18:35PM
4    A   Within minutes.                12:18:37PM
5    Q   Did you reach out to Fiorillo or did   12:18:38PM
6    he reach out to you?                       12:18:40PM
7    A   I believe I called him.            12:18:41PM
8    Q   Uh-huh. What phone did you call him   12:18:43PM
9    on?                                        12:18:45PM
10   A   You know, I don't recall.          12:18:46PM
11   Q   Do you know where he was at the time?  12:18:49PM
12   A   No.                            12:18:51PM
13   Q   Was he on duty at the time?            12:18:52PM
14   A   When I called him, I don't believe so.  12:18:54PM
15   Q   Was Lamm on duty when you spoke with   12:18:56PM
16   him?                                       12:18:57PM
17   A   I don't believe so.                12:18:58PM
18   Q   Okay. Tell me everything you recall    12:18:59PM
19   in your discussion with Fiorillo.          12:19:01PM
20   A   The phone conversation was pretty much  12:19:04PM
21   the same. They just -- Fiorillo said that he  12:19:06PM
22   just didn't know what had happened.    12:19:10PM
23   Q   Did he give you any details?           12:19:17PM
24   A   Not that I recall specifically other   12:19:20PM
25   than he didn't know what had happened.   12:19:21PM

Page 409

GEORGE HESSE

1
2    Q   What did you say other than for what   12:19:23PM
3    happened?                                  12:19:25PM
4    A   I really didn't say anything else. I   12:19:27PM
5    just asked him what had happened.      12:19:29PM
6    Q   He said he didn't know?            12:19:32PM
7    A   Right.                         12:19:33PM
8    Q   Anything else discussed in that phone  12:19:33PM
9    call?                                      12:19:35PM
10   A   Not that I recall, no.             12:19:35PM
11   Q   Did you take any notes of that call?   12:19:37PM
12   A   No.                            12:19:38PM
13   Q   How long did that call last?           12:19:40PM
14   A   Few minutes.                   12:19:42PM
15   Q   So during those few minutes, you don't  12:19:46PM
16   recall anything other than for you saying what  12:19:48PM
17   happened and him saying I don't know what    12:19:50PM
18   happened?                                  12:19:52PM
19   MR. CONNOLLY: Objection to the form.  12:19:52PM
20   A   Pretty much.                   12:19:54PM
21   Q   Did you take any notes of that call?   12:19:57PM
22   MR. NOVIKOFF: Objection. Asked and   12:19:59PM
23   answered.                          12:20:00PM
24   A   No.                            12:20:00PM
25   Q   Did you speak with anybody else about  12:20:04PM

Page 410

GEORGE HESSE

1
2  the Halloween incident prior to coming in on   12:20:05PM
3  Monday morning?                               12:20:09PM
4    A   No.                        12:20:10PM
5    Q   Did you have any other follow-up calls 12:20:11PM
6  with Paradiso prior to coming in Monday morning? 12:20:12PM
7    A   No.                        12:20:15PM
8    Q   Did you speak with Pat Cherry prior to 12:20:16PM
9  coming in Monday morning?                     12:20:19PM
10   A   I don't believe so, no.       12:20:20PM
11   Q   Did you speak with Gary Bosetti prior  12:20:21PM
12 to coming in Monday morning?                  12:20:23PM
13   A   No.                        12:20:25PM
14   Q   Did you speak with Rich Bosetti prior  12:20:26PM
15 to coming in Monday morning?                  12:20:27PM
16   A   No.                        12:20:29PM
17   Q   Did you have any communications or     12:20:39PM
18 correspondence with anybody about the Halloween 12:20:41PM
19 incident other than what you've testified to   12:20:43PM
20 prior to coming in that Monday morning?        12:20:45PM
21   A   Not that I recall, no.        12:20:47PM
22   Q   And then you came to work Monday? 12:20:53PM
23   A   Correct.            12:20:55PM
24   Q   Okay.  What was the first thing you    12:20:55PM
25 did with respect to the Halloween incident when 12:20:57PM

Page 411

GEORGE HESSE

1
2  you got to work that Monday?                   12:20:59PM
3    A   I read over the statements that were   12:21:01PM
4  taken by Officer Fiorillo, Lamm and Snyder and  12:21:04PM
5  the field report that was generated by Snyder.  12:21:07PM
6    Q   Okay.  Did you have a reaction to      12:21:15PM
7  statements in the field report?               12:21:17PM
8        MR. NOVIKOFF:  Objection.     12:21:20PM
9    A   A reaction?  No, I wouldn't say I had  12:21:21PM
10 a reaction.                    12:21:27PM
11   Q   What did you do after reviewing the    12:21:28PM
12 statements in the field report with respect to  12:21:30PM
13 the Halloween incident?                       12:21:32PM
14   A   I basically just sat there for a       12:21:33PM
15 little while, mulling them over, scratching my  12:21:35PM
16 head, reading them over and over again.  Just   12:21:38PM
17 waiting for something to pop.     12:21:41PM
18   Q   Did you speak with anybody else at     12:21:44PM
19 that time?                     12:21:47PM
20   A   That morning?  I received a call from  12:21:47PM
21 Chief Paradiso that morning.      12:21:51PM
22   Q   Do you know what time?        12:21:53PM
23   A   I'd like to say 8:30ish.      12:21:55PM
24   Q   What time did you get there?   12:21:58PM
25   A   I was there by 8.            12:21:59PM

Page 412

GEORGE HESSE

1
2    Q   Okay.  So between 8 and 8:30, had you  12:22:01PM
3  already read the statements in the field report? 12:22:03PM
4    A   Yes.                       12:22:06PM
5    Q   And you were waiting for something to  12:22:07PM
6  pop during that period?                       12:22:09PM
7    A   Yeah.                      12:22:11PM
8    Q   Between 8 and 8:30, did you speak with 12:22:11PM
9  anybody prior to this call from Paradiso coming 12:22:14PM
10 in about the Halloween incident?               12:22:18PM
11   A   No.                        12:22:20PM
12   Q   What do you recall -- tell me the      12:22:24PM
13 details of your call with Paradiso that morning. 12:22:26PM
14   A   Well, he called me, and I basically    12:22:29PM
15 said to him that there's not really much to go   12:22:33PM
16 on yet, you know.  The field report really      12:22:36PM
17 didn't contain many names other than the three  12:22:38PM
18 individuals that were claiming they were hit     12:22:42PM
19 with a pool stick.                12:22:45PM
20   Q   Anything else that was discussed       12:22:48PM
21 between you and Paradiso during that call?      12:22:50PM
22   A   Not that I recall.           12:22:52PM
23   Q   How long did that call last?   12:22:53PM
24   A   A few minutes.              12:22:55PM
25   Q   Do you recall anything he said during  12:22:58PM

Page 413

GEORGE HESSE

1
2  that call?                                    12:22:59PM
3    A   I don't recall exactly what he said,   12:23:00PM
4  no.                            12:23:02PM
5    Q   How about generally, sum and           12:23:02PM
6  substance?                                    12:23:04PM
7    A   He just said investigate it and see    12:23:05PM
8  what you can come up with.        12:23:06PM
9    Q   Okay.  What was the next thing you did 12:23:08PM
10 with respect to the Halloween incident after    12:23:13PM
11 that 8:30 call with Paradiso?                  12:23:15PM
12   A   I took a walk down to Houser's to see  12:23:17PM
13 if anybody was around.            12:23:21PM
14   Q   Did you go with anybody?      12:23:23PM
15   A   No.                        12:23:25PM
16   Q   Who was on duty that morning?  12:23:28PM
17   A   I was alone.                12:23:30PM
18   Q   And you took a walk down to Houser's.  12:23:40PM
19 What was the next thing you did?               12:23:42PM
20   A   I peered in the windows, looked around 12:23:44PM
21 to see if anybody was there.  Nobody was around, 12:23:46PM
22 and I just basically went back to the police    12:23:49PM
23 station.                       12:23:52PM
24   Q   Okay.  What was the next thing you did 12:23:56PM
25 with respect to Halloween?                     12:23:58PM

b929ea01-2563-408a-a7fc-adb794430749

Page 414

GEORGE HESSE

1
2      A   I sat in the station, and I think I   12:24:02PM
3   read the statements and everything again.  And   12:24:04PM
4   shortly thereafter, I believe it was around   12:24:08PM
5   9:30, I had received a fax from a gentlemen   12:24:11PM
6   named Bud Yager.                12:24:16PM
7      Q   Had you known Bud Yager prior to   12:24:24PM
8   receiving that fax?              12:24:28PM
9      A   Yeah.  Yes.                12:24:29PM
10      Q   Who was he?              12:24:29PM
11      A   He was a local resident that -- he   12:24:30PM
12   worked in the -- I think he and his wife ran the   12:24:33PM
13   movie theater.  He was a projectionist for the   12:24:37PM
14   movie theater.                 12:24:41PM
15      Q   Had you spoken to Bud Yager about   12:24:43PM
16   Halloween prior to receiving the fax?   12:24:46PM
17      A   No.                    12:24:48PM
18      Q   Had you known that Bud Yager was even   12:24:48PM
19   in the bar prior to receiving that fax?   12:24:50PM
20      A   No.                    12:24:53PM
21      Q   And the fax came to the police   12:24:59PM
22   station?                   12:25:00PM
23      A   Yes.                   12:25:01PM
24      Q   And what was the sum and substance of   12:25:01PM
25   that fax?                   12:25:03PM

Page 415

GEORGE HESSE

1
2      A   I guess he had heard that Gary Bosetti   12:25:03PM
3   was fired for the incident, and he felt that the   12:25:06PM
4   decision to fire Gary was incorrect.  He felt   12:25:11PM
5   that Gary Bosetti was a hero for saving his wife   12:25:13PM
6   from injury or possible injury from a man that   12:25:18PM
7   had attacked his wife.           12:25:22PM
8      Q   Prior to getting that fax, did you   12:25:24PM
9   know that his wife was at the bar?   12:25:26PM
10      A   No, I didn't.  No.            12:25:29PM
11      Q   What did you do with that fax other   12:25:41PM
12   than for reading it?  Did you disseminate it to   12:25:42PM
13   anybody else?                 12:25:45PM
14      A   No.  I believe I called him --   12:25:48PM
15   actually, I tried to call him.  Turns out he's a   12:25:48PM
16   New York City fireman, and I tried to call him   12:25:52PM
17   at the number that was listed on the fax.  I got   12:25:55PM
18   no response.  And what I did is took a piece of   12:25:58PM
19   paper and I wrote, you know, Bud, it's George   12:26:01PM
20   from the police department.  I just received   12:26:04PM
21   your fax or something like that.  Call me at   12:26:06PM
22   this number.  And I faxed it to the number that   12:26:09PM
23   the fax came from.             12:26:12PM
24      Q   Did the fax go through?        12:26:15PM
25      A   Yeah, I think so.            12:26:17PM

Page 416

GEORGE HESSE

1
2      Q   Did you keep a copy of that responding   12:26:18PM
3   fax that you sent?              12:26:21PM
4      A   No, I don't think I did.         12:26:23PM
5      Q   What did you do with it?        12:26:24PM
6      A   I don't remember.            12:26:26PM
7      Q   What was the next thing that you did   12:26:32PM
8   with respect to Halloween after sending the fax   12:26:34PM
9   back to Bud Yager?              12:26:36PM
10      A   I believe I got a call back within 5   12:26:39PM
11   or 10 minutes from Bud Yager, and we just talked   12:26:43PM
12   about what he had sent me.        12:26:50PM
13      Q   Okay.  What did Bud Yager tell you in   12:26:51PM
14   that call?                   12:26:53PM
15      A   Basically, he reiterated what was in   12:26:54PM
16   his letter to the police department; and I asked   12:26:57PM
17   if I could speak to his wife, if she would call   12:27:01PM
18   me.                        12:27:04PM
19      Q   Did you take any notes of that call   12:27:09PM
20   with Bud Yager?                12:27:11PM
21      A   No.                    12:27:12PM
22      Q   Why not?                12:27:12PM
23      A   I didn't.                12:27:14PM
24      Q   How come?                12:27:15PM
25         MR. CONNOLLY:  Objection.        12:27:21PM

Page 417

GEORGE HESSE

1
2   You can answer.                12:27:22PM
3      A   I didn't think it was necessary to   12:27:23PM
4   take notes.  I had his letter in front of me.   12:27:24PM
5      Q   Did you consider that call as part of   12:27:28PM
6   your investigation?             12:27:31PM
7      A   Yeah.                   12:27:32PM
8      Q   Do you recall anything else that was   12:27:36PM
9   discussed in that phone call?     12:27:38PM
10      A   I wanted to speak to his wife.     12:27:41PM
11      Q   Did you know his wife?         12:27:44PM
12      A   Just vaguely.              12:27:46PM
13      Q   How did you know her?          12:27:48PM
14      A   Like I said, he and his wife ran the   12:27:50PM
15   movie theater, and I just knew them in passing.   12:27:53PM
16      Q   Did you ask Bud Yager whether he had   12:28:10PM
17   been drinking that night?         12:28:14PM
18      A   I don't recall.  I don't think so.   12:28:17PM
19      Q   Would that be important to know,   12:28:19PM
20   whether somebody who sent you a facsimile   12:28:20PM
21   reiterating a story that happened was drinking?   12:28:24PM
22         MR. NOVIKOFF:  Was what?        12:28:27PM
23         MR. GOODSTADT:  Whether it was   12:28:28PM
24   important to know whether a person who faxed   12:28:29PM
25   you a story reiterating what happened,   12:28:32PM

29  (Pages 414 to 417)

b929ea01-2563-408a-a7fc-adb794430749

Page 418

```
1              GEORGE HESSE
2    whether that person was drinking or not.   12:28:34PM
3         MR. NOVIKOFF:  Objection to form.    12:28:37PM
4         MR. CONNOLLY:  I'm assuming drinking  12:28:38PM
5    alcoholic beverages.              12:28:40PM
6         MR. GOODSTADT:  Yeah.           12:28:42PM
7         MR. CONNOLLY:  To the point of      12:28:43PM
8    intoxication.                   12:28:44PM
9         MR. GOODSTADT:  Just drinking at all.  12:28:44PM
10   A    It may have been important.      12:28:45PM
11   Q    Why didn't you ask him?         12:28:47PM
12   A    I don't know why I didn't ask him.   12:28:49PM
13   Q    In fact, if he had been drinking to   12:28:51PM
14   the point of intoxication, it could've affected  12:28:52PM
15   his ability to recollect facts, correct?   12:28:55PM
16        MR. NOVIKOFF:  Objection.        12:28:58PM
17   A    It may have.                12:28:59PM
18   Q    Did Bud Yager mention anything about  12:29:01PM
19   Gary Bosetti using a pool cue?          12:29:05PM
20   A    No.  I don't recall.          12:29:09PM
21   Q    Did Bud Yager indicate that he      12:29:12PM
22   actually saw the altercation?         12:29:14PM
23   A    I believe he said that he did not see  12:29:16PM
24   the actual altercation in the beginning or the  12:29:18PM
25   beginning part of the altercation.       12:29:22PM
```

Page 419

```
1              GEORGE HESSE
2    Q    When you say the beginning part, what  12:29:24PM
3    part are you referring to?            12:29:26PM
4    A    The part where his wife was choked.   12:29:27PM
5    Q    Did you ask him where he got the    12:29:35PM
6    information from that his wife was being choked?  12:29:37PM
7         MR. NOVIKOFF:  Objection to form.    12:29:40PM
8    You mean to the extent it wasn't      12:29:41PM
9    contained in the statement?           12:29:42PM
10        MR. GOODSTADT:  He didn't personally  12:29:44PM
11   see it, so I want to know --         12:29:46PM
12        MR. NOVIKOFF:  Well, I'm saying to the  12:29:46PM
13   extent that that answer was not contained   12:29:47PM
14   within the statement.               12:29:49PM
15        MR. GOODSTADT:  Whether it is or     12:29:50PM
16   isn't, did you ask him the question.      12:29:51PM
17        MR. NOVIKOFF:  Fair enough.       12:29:54PM
18   A    He said his wife had told him what had  12:29:55PM
19   happened.                     12:29:57PM
20   Q    Did you ask whether his wife was    12:30:01PM
21   drinking?                     12:30:03PM
22   A    No, I don't think so.          12:30:05PM
23   Q    Sitting here today, do you know     12:30:07PM
24   whether Bud Yager was drinking that night?   12:30:08PM
25   A    I don't know.               12:30:11PM
```

Page 420

```
1              GEORGE HESSE
2    Q    Do you know whether Jeanne Yager was  12:30:11PM
3    drinking that night?              12:30:14PM
4    A    I don't know.               12:30:15PM
5    Q    Did he tell you he witnessed any part  12:30:15PM
6    of the altercation or the Halloween incident?   12:30:18PM
7    A    I don't recall.              12:30:22PM
8    Q    Did you ask him whether he witnessed  12:30:25PM
9    any of it?                    12:30:27PM
10   A    I believe I did.             12:30:28PM
11   Q    And you don't recall what his answer  12:30:29PM
12   was?                       12:30:31PM
13   A    No, I don't.               12:30:31PM
14   Q    How many investigations had you     12:30:32PM
15   performed prior to investigating the Halloween  12:30:34PM
16   incident?                     12:30:37PM
17   A    I don't know.               12:30:38PM
18   Q    Had you performed any investigations  12:30:40PM
19   prior to the Halloween incident?        12:30:42PM
20   A    Sure, I had.               12:30:43PM
21   Q    Did you ever investigate any incident  12:30:44PM
22   dealing with an off-duty police officer?   12:30:47PM
23   A    I don't think so, no.          12:30:51PM
24   Q    Had you ever investigated a fight?   12:30:52PM
25   A    Yes.                    12:30:57PM
```

Page 421

```
1              GEORGE HESSE
2    Q    How many times?              12:30:58PM
3    A    Hundreds.                 12:30:59PM
4    Q    Hundreds of times?            12:31:00PM
5    A    Hundreds of fights.           12:31:02PM
6    Q    Did you ever investigate any fights   12:31:04PM
7    not at the scene but afterwards?        12:31:07PM
8         MR. NOVIKOFF:  Objection to form.  I   12:31:10PM
9    have no idea what that question means.    12:31:11PM
10   BY MR. GOODSTADT:                 12:31:13PM
11   Q    Well, your investigation didn't happen  12:31:14PM
12   at the scene, right?              12:31:16PM
13   A    Yes.                    12:31:18PM
14   Q    It happened afterwards?          12:31:18PM
15   A    Right.                   12:31:18PM
16   Q    Do you understand the question I was   12:31:20PM
17   asking?                      12:31:21PM
18   A    I understand.               12:31:21PM
19        MR. NOVIKOFF:  Well, I think that an   12:31:22PM
20   investigation can only take place after the  12:31:23PM
21   event occurred.                  12:31:26PM
22        MR. GOODSTADT:  Or at the scene.    12:31:28PM
23        MR. NOVIKOFF:  After the event      12:31:30PM
24   occurred.                     12:31:31PM
25        MR. GOODSTADT:  Right.          12:31:31PM
```

30  (Pages 418 to 421)

b929ea01-2563-408a-a7fc-adb794430749

Page 422

GEORGE HESSE

1
2       MR. NOVIKOFF: Right. Okay.        12:31:31PM
3    A   Repeat your question.           12:31:31PM
4    Q   How many of those investigations      12:31:34PM
5  happened not at the scene but afterwards?    12:31:36PM
6       MR. NOVIKOFF: Objection.         12:31:40PM
7    A   I'd say a majority.             12:31:40PM
8    Q   A majority?                12:31:42PM
9    A   Yeah.                  12:31:43PM
10   Q   Does Ocean Beach have an internal     12:31:43PM
11 affairs?                   12:31:45PM
12   A   No.                   12:31:48PM
13   Q   Does --                 12:31:49PM
14      MR. CONNOLLY: Department, I assume.  12:31:50PM
15      MR. GOODSTADT: Department, yeah.    12:31:51PM
16 Bureau or whatever it is.           12:31:52PM
17 BY MR. GOODSTADT:               12:31:53PM
18   Q   Is there any -- does Suffolk County    12:31:54PM
19 internal affairs oversee Ocean Beach?     12:31:59PM
20   A   No.  Not that I'm aware of, no.     12:32:06PM
21   Q   Do you know whether there's ever been  12:32:09PM
22 an internal affairs investigation with respect  12:32:10PM
23 to any current or former officer in Ocean Beach? 12:32:12PM
24   A   With the internal affairs unit of    12:32:17PM
25 Suffolk County PD?  No.           12:32:20PM

Page 423

GEORGE HESSE

1
2    Q   Or any internal affairs unit.      12:32:21PM
3    A   Not that I'm aware of.          12:32:24PM
4    Q   Did you call anybody at Suffolk County 12:32:26PM
5  Police with respect to the Halloween incident?  12:32:28PM
6       MR. NOVIKOFF: Objection to form.   12:32:32PM
7    A   No.                   12:32:33PM
8    Q   Did you involve Suffolk County Police  12:32:34PM
9  at all with respect to Halloween incident?    12:32:35PM
10      MR. NOVIKOFF: Objection. Foundation. 12:32:38PM
11   A   No.                   12:32:39PM
12   Q   Did you involve the D.A., County     12:32:40PM
13 District Attorney, with respect to the Halloween 12:32:43PM
14 incident?                 12:32:45PM
15      MR. NOVIKOFF: Objection.        12:32:46PM
16   A   Yes.                  12:32:46PM
17   Q   In what capacity?            12:32:47PM
18   A   At the completion of the         12:32:48PM
19 investigation, I turned all documents over to   12:32:49PM
20 the D.A.'s office, the prosecutor that's     12:32:51PM
21 assigned to the village for review.       12:32:56PM
22   Q   Who was the prosecutor assigned to the 12:32:56PM
23 village at the time?             12:32:59PM
24   A   It may -- you know, I think it was -- 12:33:02PM
25 it's coming to me.  Natalie -- no.  Any other  12:33:09PM

Page 424

GEORGE HESSE

1
2  day I can remember her name.  Mallory Sullivan. 12:33:15PM
3    Q   She was an investigator or is she an  12:33:29PM
4  assistant District Attorney?          12:33:30PM
5    A   She's an ADA.  ADA.           12:33:32PM
6       You know what, I'm sorry.  It may have 12:33:37PM
7  been Beth Grasso.  Because they kind of work   12:33:39PM
8  back to back, but I think it was Beth Grasso.   12:33:45PM
9    Q   Were there any District Attorney     12:33:48PM
10 investigators involved in the Halloween     12:33:51PM
11 incident?                 12:33:53PM
12      MR. NOVIKOFF: Objection.        12:33:54PM
13   A   Not that I'm aware of.          12:33:55PM
14      MR. CONNOLLY: Andrew, after you    12:34:11PM
15 complete this line of questioning, it's     12:34:12PM
16 12:30.                    12:34:14PM
17      MR. NOVIKOFF: I don't think he's    12:34:17PM
18 completing this line of questioning for a    12:34:18PM
19 couple of hours.               12:34:20PM
20      MR. GOODSTADT: Yeah. Let me just    12:34:21PM
21 finish on Mr. Yager, and then we'll take our   12:34:23PM
22 break, call the court and do what we have to   12:34:26PM
23 do.                    12:34:30PM
24 BY MR. GOODSTADT:               12:34:38PM
25   Q   What was the next thing that happened  12:34:38PM

Page 425

GEORGE HESSE

1
2  with respect to the Halloween incident after you 12:34:39PM
3  told Bud Yager that you'd like to speak with his 12:34:42PM
4  wife?                   12:34:46PM
5    A   I believe his wife had called me.    12:34:46PM
6    Q   Okay.  And when was that?         12:34:48PM
7    A   That same day.  The time frame,     12:34:50PM
8  though, from when I was talking to him until she 12:34:52PM
9  called may have been within an hour.       12:34:56PM
10   Q   Okay.                  12:34:58PM
11      MR. GOODSTADT: Mark this, please.   12:35:01PM
12      (Whereupon, Bates document 3180 was   12:35:03PM
13 marked as Plaintiff's Exhibit 14 for      12:35:03PM
14 identification, as of this date.)        12:35:03PM
15      MR. GOODSTADT: I've placed in front   12:35:54PM
16 of Mr. Hesse what's been marked as Hesse 14.   12:35:55PM
17 It's a one-page exhibit bearing Bates 3180.    12:35:57PM
18 (Handing.)                 12:36:01PM
19 BY MR. GOODSTADT:               12:36:02PM
20   Q   Mr. Hesse, is this the fax that you   12:36:03PM
21 received or a copy of the fax that you received 12:36:04PM
22 from Bud Yager?               12:36:06PM
23   A   It looks like it, yes.          12:36:08PM
24   Q   And this is the document you testified 12:36:09PM
25 to before that you had reviewed before calling  12:36:12PM

31 (Pages 422 to 425)

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    him?                              12:36:15PM
3    A   Yes.                         12:36:15PM
4    Q   Or before faxing it over -- before   12:36:16PM
5    faxing a request for him to call you?   12:36:17PM
6    A   Yes.                         12:36:20PM
7    Q   And the -- if you look at the whole --   12:36:21PM
8    just the first paragraph up until the last four   12:36:25PM
9    lines, do you see that?  Did you read that?   12:36:31PM
10   A   Which part?                  12:36:35PM
11   Q   The part that starts -- you know, on   12:36:36PM
12   the first line that says "on Saturday night,"   12:36:38PM
13   all the way through to four lines up from the   12:36:40PM
14   end of that first paragraph.        12:36:43PM
15       MR. CONNOLLY:  You mean second   12:36:46PM
16   sentence?                         12:36:47PM
17       MR. GOODSTADT:  All of the sentences,   12:36:48PM
18   starting on the second sentences.    12:36:50PM
19   A   That entire paragraph you're talking   12:36:54PM
20   about?                            12:36:55PM
21   Q   Yeah, yeah.  Up until the sentence   12:36:56PM
22   that ends with the parenthetical that says "to   12:36:56PM
23   go to the ladies' room."            12:36:59PM
24   A   "Then she knocked on the door."  Okay.   12:37:04PM
25   Q   Okay.  You read that whole paragraph   12:37:07PM

GEORGE HESSE

1
2    up until that line?                12:37:11PM
3    A   You're talking about from "on   12:37:13PM
4    Saturday" to "she knocked on the door"?  Or you   12:37:14PM
5    want me to read the entire paragraph?   12:37:18PM
6    Q   Yeah, keep going.             12:37:20PM
7    A   Okay.                        12:37:37PM
8    Q   Now, up until that sentence that ends   12:37:38PM
9    "to go to the ladies' room" -- do you see that?   12:37:40PM
10   Bud Yager told you he did not witness any of   12:37:44PM
11   that, correct?                     12:37:46PM
12       MR. NOVIKOFF:  Objection.       12:37:48PM
13   A   Yeah, I believe that's what he said to   12:37:50PM
14   me.                               12:37:51PM
15   Q   And then the next sentence that says,   12:37:52PM
16   "With that, this man lunged at my wife with his   12:37:53PM
17   hands on my wife's throat.  Jeanne was knocked   12:37:55PM
18   into the men's room door."           12:37:57PM
19       Do you see that?               12:37:59PM
20   A   Yes.                         12:37:59PM
21   Q   Again, he did not -- he told you he   12:38:00PM
22   did not witness that, correct?       12:38:02PM
23   A   Right.                       12:38:03PM
24   Q   Then next sentence says, "Ocean Beach   12:38:04PM
25   Police Officer Gary Bosetti saw the situation   12:38:05PM

GEORGE HESSE

1
2    and immediately took action."        12:38:12PM
3       Do you see that?               12:38:13PM
4    A   Uh-huh.  Yes.                 12:38:14PM
5    Q   Did he tell you that he actually   12:38:14PM
6    saw -- did Bud Yager tell you he actually saw   12:38:14PM
7    Gary Bosetti take action?           12:38:17PM
8    A   No.                          12:38:18PM
9    Q   Did he tell you he didn't see Gary   12:38:18PM
10   Bosetti take action?                12:38:21PM
11   A   I believe he said he didn't see the   12:38:22PM
12   incident.                          12:38:24PM
13   Q   And the next sentence says, "He   12:38:25PM
14   subdued this drunken individual."    12:38:27PM
15       Do you see that?               12:38:29PM
16   A   Yes.                         12:38:29PM
17   Q   Did he tell you that he saw Gary   12:38:29PM
18   Bosetti subdue the drunken individual?   12:38:30PM
19   A   I believe he didn't.           12:38:33PM
20   Q   He told you that he did not see him?   12:38:33PM
21   A   He did not.                   12:38:36PM
22   Q   So is there any -- any facts that he's   12:38:37PM
23   stating about what happened the night before did   12:38:43PM
24   he actually see?                   12:38:48PM
25   A   I believe no.                 12:38:50PM

GEORGE HESSE

1
2       MR. CONNOLLY:  Based upon what he told   12:38:51PM
3    you?                              12:38:53PM
4       THE WITNESS:  Correct.          12:38:53PM
5    BY MR. GOODSTADT:                   12:38:55PM
6    Q   Did you ask him whether he saw Gary   12:38:55PM
7    Bosetti use a pool cue at any point?   12:38:59PM
8    A   I don't recall if I did or not.   12:39:01PM
9    Q   Did he mention anything about a pool   12:39:03PM
10   cue in your discussions?            12:39:04PM
11   A   I don't recall if he did or not.   12:39:06PM
12   Q   Did you ask Bud Yager why he hadn't   12:39:12PM
13   spoken to any of the police officers who showed   12:39:17PM
14   up that night?                     12:39:19PM
15       MR. NOVIKOFF:  Objection to form.   12:39:20PM
16   BY MR. GOODSTADT:                   12:39:21PM
17   Q   The on-duty police officers?      12:39:21PM
18       MR. NOVIKOFF:  Objection to form.   12:39:24PM
19   A   I don't recall if I asked him that or   12:39:25PM
20   not.                              12:39:27PM
21   Q   Did you ask him why he didn't give a   12:39:27PM
22   statement that night to the police?   12:39:29PM
23       MR. NOVIKOFF:  Objection to form.   12:39:32PM
24   A   I don't recall if I did or not.   12:39:33PM
25   Q   Do you know whether he gave a   12:39:35PM

b929ea01-2563-408a-a7fc-adb794430749

**GEORGE HESSE**

1
2    statement that night to the police?        12:39:37PM
3       A   I'm assuming no, because there's     12:39:39PM
4    though statement.                           12:39:41PM
5       Q   Now, I see that this memo is addressed 12:39:45PM
6    to Chief Paradiso.                          12:39:47PM
7          Do you see that?                      12:39:48PM
8       A   Yes.                  12:39:49PM
9       Q   Did you inform Chief Paradiso that    12:39:50PM
10   this memo came in?                          12:39:51PM
11      A   Yes.                  12:39:53PM
12      Q   When?                  12:39:54PM
13      A   I don't recall when.        12:39:54PM
14      Q   Was it on that day?              12:39:55PM
15      A   Yes.                  12:39:56PM
16      Q   Was it before you faxed back to Bud   12:39:56PM
17   Yager, please call me?                      12:40:00PM
18      A   I think it was after.        12:40:02PM
19      Q   Do you recall Paradiso's response when 12:40:04PM
20   you told him this fax came in?              12:40:06PM
21      A   I don't remember his response.   12:40:08PM
22      Q   Did you tell Paradiso about it before 12:40:10PM
23   or after you actually spoke with Bud Yager?   12:40:12PM
24      A   It may have been after I spoke to Bud. 12:40:16PM
25      Q   Did you ask him how he heard that Rich 12:40:21PM

**GEORGE HESSE**

1
2    Bosetti lost his job -- strike that.        12:40:23PM
3          Did you ask him how he learned that    12:40:26PM
4    Gary Bosetti lost his job?              12:40:29PM
5          MR. NOVIKOFF: You're talking about  12:40:32PM
6    Bud Yager now?                          12:40:33PM
7          MR. GOODSTADT: Bud Yeager.      12:40:34PM
8          MR. NOVIKOFF: Okay.          12:40:35PM
9       A   Now, I don't recall if I did.    12:40:35PM
10      Q   Did you tell you how he learned that? 12:40:36PM
11      A   I don't recall.              12:40:40PM
12      Q   Do you know whether anyone asked him  12:40:41PM
13   to send in a statement?                     12:40:43PM
14      A   No.                  12:40:46PM
15      Q   Did you take any notes of your phone  12:40:47PM
16   call with Yager?                            12:40:49PM
17         MR. CONNOLLY: Objection. Asked and  12:40:50PM
18   answered.                  12:40:51PM
19         MR. NOVIKOFF: Objection. Asked and  12:40:52PM
20   answered.                  12:40:53PM
21      A   No.                  12:40:54PM
22      Q   You didn't?              12:40:54PM
23         How long did that call last?        12:40:56PM
24         MR. CONNOLLY: Objection. Asked and  12:40:57PM
25   answered.                  12:40:58PM

GEORGE HESSE

1
2    But you can answer.                12:40:58PM
3       A   It was several minutes. I don't    12:41:00PM
4    really recall how long it was.              12:41:01PM
5       Q   Did you ask him what he did after   12:41:15PM
6    leaving Houser's that night?                12:41:18PM
7       A   You know, I don't recall if I did or 12:41:20PM
8    not.                  12:41:22PM
9       Q   Did he tell you what he did after he 12:41:22PM
10   left Houser's?                              12:41:25PM
11      A   I don't recall.              12:41:26PM
12      Q   Did you credit his statement as part 12:41:32PM
13   of your investigation?                      12:41:34PM
14      A   Did I credit?              12:41:36PM
15      Q   Yeah. Did you believe the statement? 12:41:38PM
16      A   I believed it, yes.        12:41:41PM
17      Q   Did you give it any weight in terms of 12:41:43PM
18   reaching a conclusion to your investigation?   12:41:45PM
19         MR. NOVIKOFF: Objection to form.   12:41:48PM
20      A   It gave me a way to go.        12:41:49PM
21      Q   What do you mean by that?        12:41:51PM
22      A   It gave me a lead on what may have   12:41:52PM
23   transpired that night to precipitate what    12:41:55PM
24   everybody was claiming about Gary Bosetti.     12:42:00PM
25      Q   And other than for that one phone   12:42:05PM

GEORGE HESSE

1
2    call, did you ever speak with Bud Yager on any 12:42:06PM
3    other occasion about Halloween?             12:42:09PM
4          MR. NOVIKOFF: About the Halloween   12:42:11PM
5    incident.                  12:42:12PM
6          MR. GOODSTADT: Yeah.          12:42:13PM
7          MR. NOVIKOFF: Okay.          12:42:16PM
8       A   You know, I don't believe I spoke to 12:42:17PM
9    him again after that day.              12:42:18PM
10      Q   About anything?              12:42:23PM
11      A   Yeah, I don't believe so.        12:42:25PM
12      Q   As the investigator -- strike that.   12:42:27PM
13         Were you the only investigator at this 12:42:30PM
14   time on the case?                           12:42:31PM
15      A   At this point, yes.        12:42:32PM
16      Q   Okay. As the sole investigator, how  12:42:33PM
17   come you didn't take any notes with respect to 12:42:36PM
18   your interaction with Mr. Yager?            12:42:38PM
19         MR. NOVIKOFF: Objection to form. I  12:42:41PM
20   think it's asked and answered, but form as   12:42:42PM
21   well.                  12:42:44PM
22      A   Yeah, like I said, I didn't think it  12:42:45PM
23   was necessary because all I would've been doing 12:42:46PM
24   was rewriting basically what he had already sent 12:42:49PM
25   me.                  12:42:53PM

b929ea01-2563-408a-a7fc-adb794430749

Page 434

GEORGE HESSE

1
2    MR. GOODSTADT: This would be a good  12:42:53PM
3  time to take that break.                    12:42:54PM
4    MR. CONNOLLY: Sure.                 12:42:55PM
5    MR. NOVIKOFF: Okay.                 12:42:56PM
6    THE VIDEOGRAPHER: The time is 12:44. 12:42:57PM
7  We're off the record.                       12:42:59PM
8    (Whereupon, a lunch break was taken.) 12:43:00PM
9    THE VIDEOGRAPHER: The time is 1:47.  1:45:52PM
10  We're on the record.                        1:45:52PM
11  BY MR. GOODSTADT:                      1:45:55PM
12    Q    Mr. Hesse, before our break, you had  1:45:56PM
13  mentioned that on the Sunday before going back  1:45:59PM
14  to the beach on Monday after Halloween, that you  1:46:02PM
15  reached out to Fiorillo, you spoke with him, and  1:46:07PM
16  you reached out to Lamm and spoke with him,  1:46:09PM
17  correct?                               1:46:13PM
18    A    Correct.                        1:46:13PM
19    Q    Okay.  Did you reach out to Snyder?  1:46:13PM
20    A    I believe I tried.  I was unable to  1:46:15PM
21  get into contact with him.                   1:46:20PM
22    Q    So did you speak with him at all  1:46:21PM
23  before coming back to the beach that Monday?  1:46:23PM
24    A    I don't recall.                  1:46:26PM
25    Q    You don't recall one way or the other?  1:46:26PM

Page 435

GEORGE HESSE

1
2    A    No.                            1:46:28PM
3    Q    Okay.  And I just point you back to  1:46:29PM
4  Hesse 14.  Do you see that there's an indicated  1:46:32PM
5  copy to Natalie Rogers?                    1:46:36PM
6      Do you see that?                    1:46:37PM
7    A    Yes, I do.                       1:46:38PM
8    Q    Do you know whether she ever received  1:46:39PM
9  a copy of this memo?                       1:46:41PM
10    A    I do not.                        1:46:43PM
11    Q    Did you ever speak to her about this  1:46:43PM
12  memo?                                 1:46:45PM
13    A    I don't think, no.                1:46:46PM
14    Q    Did you ever speak with Natalie Rogers  1:46:47PM
15  at all about the Halloween incident?          1:46:49PM
16    A    I don't recall.                  1:46:52PM
17    Q    So you don't recall one way or the  1:46:53PM
18  other?                                1:46:54PM
19    A    No.                            1:46:55PM
20    Q    Did you ever speak with Joe Loeffler  1:46:55PM
21  about the Halloween incident?               1:46:57PM
22    A    Yes.                           1:46:59PM
23    Q    When did you speak with him about  1:47:01PM
24  Halloween?                             1:47:02PM
25    A    I think it was a week after.       1:47:05PM

Page 436

GEORGE HESSE

1
2    Q    Was that on the phone or in person?  1:47:09PM
3    A    I believe it was in person.       1:47:11PM
4    Q    Where were you located?           1:47:13PM
5    A    In the police station.            1:47:15PM
6    Q    Was he there specifically to speak  1:47:19PM
7  about the Halloween incident or was he there on  1:47:21PM
8  some other business?                      1:47:24PM
9    MR. NOVIKOFF:  Objection.          1:47:26PM
10    A    I don't recall.                  1:47:27PM
11    Q    Tell me everything you recall      1:47:29PM
12  discussing with Joe Loeffler during that  1:47:30PM
13  conversation.                          1:47:33PM
14    A    I think I just pretty much told him  1:47:33PM
15  the story of what was going on with the incident  1:47:36PM
16  and basically what I had found out, and that was  1:47:40PM
17  pretty much it.  He just said good job, pretty  1:47:46PM
18  much, and walked out.                    1:47:49PM
19    Q    Did he tell you that he was at the  1:47:50PM
20  police station that night?                 1:47:52PM
21    A    You know, I don't recall if he did.  1:47:54PM
22    Q    Did you ever discuss with him the fact  1:47:56PM
23  that he was at the police station that night?  1:47:58PM
24    A    Yes.                           1:48:00PM
25    Q    When did you discuss that with him?  1:48:01PM

Page 437

GEORGE HESSE

1
2    A    Probably -- it was within the last two  1:48:08PM
3  years at some point.  I don't know specifically  1:48:09PM
4  with the dates.                          1:48:11PM
5    Q    After you were served with the      1:48:12PM
6  complaint in this lawsuit or before?          1:48:14PM
7    A    I think so, yes.                  1:48:16PM
8    Q    What did he say about that?        1:48:17PM
9    A    He said that he was in the police  1:48:19PM
10  station.  I guess he was running rescue that  1:48:20PM
11  night and he was the ambulance driver, and he  1:48:23PM
12  was inside the police station at some point.  1:48:25PM
13    Q    Did he tell you anything he witnessed  1:48:28PM
14  inside the police station or anything that was  1:48:29PM
15  said?                                 1:48:31PM
16    A    Not that I recall, no.            1:48:32PM
17    Q    What did he say to you about his     1:48:33PM
18  experience being at the police station that  1:48:35PM
19  night?                                1:48:36PM
20    A    He basically just said he walked in  1:48:37PM
21  and dropped off some bags, and he went back out  1:48:39PM
22  into the rig to watch the rig, just to watch the  1:48:42PM
23  ambulance.  He's the driver, so...          1:48:47PM
24    Q    Did he discuss with you at all the  1:48:49PM
25  injuries that were sustained by anybody who was  1:48:51PM

34  (Pages 434 to 437)

b929ea01-2563-408a-a7fc-adb794430749

Page 438

GEORGE HESSE

1
2 in the altercation. 1:48:53PM
3 MR. NOVIKOFF: Objection. Form. 1:48:55PM
4 A Not that I recall. 1:48:56PM
5 Q During the break that we just took, 1:49:04PM
6 did you speak with Ken Novikoff at all? 1:49:06PM
7 A I think so, yeah. 1:49:10PM
8 Q What was discussed between you and 1:49:11PM
9 Mr. Novikoff? 1:49:13PM
10 A I don't recall, to tell you the truth. 1:49:15PM
11 Small talk. 1:49:17PM
12 Q You don't recall anything that was 1:49:18PM
13 discussed in small talk? 1:49:20PM
14 A No. 1:49:21PM
15 Q So you don't recall a conversation 1:49:22PM
16 that happened between 10 and 40 minutes ago? 1:49:23PM
17 A No. I think we were just talking 1:49:28PM
18 about allowing you more time and calling the 1:49:30PM
19 judge. Most of the conversation was between 1:49:33PM
20 counsel. 1:49:34PM
21 Q Anything else you recall of a 1:49:37PM
22 discussion between you and Mr. Novikoff? 1:49:39PM
23 A No. 1:49:43PM
24 Q So after you spoke with Bud Yager, you 1:49:47PM
25 testified that his wife called back an hour 1:49:52PM

Page 439

GEORGE HESSE

1
2 later, approximately; is that correct? 1:49:55PM
3 A I think it was within an hour. 1:49:56PM
4 Q Okay. Did you do anything with 1:49:58PM
5 respect to the Halloween incident between the 1:49:59PM
6 time you hung up with Bud Yager and the time 1:50:01PM
7 that Jeanne Yager called? 1:50:04PM
8 A I believe I said I had walked down 1:50:05PM
9 to -- no, no, that was before Bud's fax. No. I 1:50:07PM
10 think I just -- I was waiting for her phone 1:50:10PM
11 call. 1:50:15PM
12 Q Did you reach out to Snyder at all 1:50:19PM
13 during that period? 1:50:21PM
14 A No. 1:50:22PM
15 Q When was the first time that another 1:50:24PM
16 officer came on duty that morning? 1:50:26PM
17 A I don't believe one did. 1:50:28PM
18 Q And then at some point Jeanne Yager 1:50:36PM
19 called you? 1:50:39PM
20 A Yes. 1:50:39PM
21 Q Tell me everything you recall during 1:50:40PM
22 that phone conversation. 1:50:41PM
23 A I basically just told her to tell me 1:50:43PM
24 what her story was, what happened. She 1:50:46PM
25 explained to me what had occurred, and I asked 1:50:50PM

Page 440

GEORGE HESSE

1
2 her to put that down in writing and fax it to me 1:50:54PM
3 if she could. 1:50:56PM
4 Q Did you take any notes of what she 1:51:01PM
5 explained to you occurred? 1:51:04PM
6 A No. 1:51:05PM
7 Q How long was the call? 1:51:05PM
8 A It was over the course of several 1:51:07PM
9 minutes. 1:51:09PM
10 Q Just so I'm clear, you're the sole 1:51:11PM
11 investigator on the case, you have a phone 1:51:14PM
12 conversation with an alleged victim of a 1:51:17PM
13 choking, and you didn't take any notes; is that 1:51:20PM
14 correct? 1:51:22PM
15 A That's correct. 1:51:23PM
16 MR. CONNOLLY: Objection. 1:51:24PM
17 BY MR. GOODSTADT: 1:51:25PM
18 Q What did she tell you on that call? 1:51:25PM
19 A She basically said that she was 1:51:29PM
20 standing first in line for the women's bathroom. 1:51:30PM
21 That she was waiting for a long time, several 1:51:35PM
22 minutes, maybe 15 minutes. She kept knocking on 1:51:37PM
23 the door with no response. A line had developed 1:51:41PM
24 behind her of other women waiting to go to the 1:51:44PM
25 bathroom. Eventually, the door flew open. A 1:51:47PM

Page 441

GEORGE HESSE

1
2 young lady came out and said something about 1:51:52PM
3 killing you, you old bitch or something like 1:51:54PM
4 that, to that effect, or you should die, 1:51:57PM
5 something like that. And then apparently a 1:52:01PM
6 boyfriend, a friend of this young female, had 1:52:05PM
7 come out of the bathroom and didn't say 1:52:08PM
8 anything, was holding onto the door, I believe, 1:52:12PM
9 and then lunged at Jeanne, grabbed her by the 1:52:14PM
10 throat and threw her into the wall or door of 1:52:18PM
11 the men's room and was banging her off the wall. 1:52:21PM
12 Then she said that Gary Bosetti came 1:52:25PM
13 over, grabbed the person off of her, put him 1:52:27PM
14 down on the floor and stopped him from choking 1:52:31PM
15 her. 1:52:34PM
16 Q Did she actually see Gary Bosetti put 1:52:35PM
17 him down on the floor? 1:52:37PM
18 MR. NOVIKOFF: Objection. 1:52:39PM
19 A I don't know. I'd have to read her 1:52:40PM
20 statement again. 1:52:42PM
21 Q Well, sitting here, do you recall one 1:52:42PM
22 way or the other whether she told you that? 1:52:44PM
23 A No, I don't recall. 1:52:46PM
24 Q Did you ask her whether she was 1:52:47PM
25 drinking that night? 1:52:49PM

Page 442

GEORGE HESSE

1
2    A    No, I don't recall if I did or not.    1:52:50PM
3    Q    Why wouldn't you ask her that?    1:52:52PM
4    A    I didn't think it was relevant.    1:52:55PM
5    Q    You don't think it was relevant that    1:52:57PM
6    somebody is giving you an eyewitness statement,    1:52:59PM
7    you don't think it was relevant whether that    1:53:01PM
8    person had been drinking during the incident    1:53:03PM
9    that they were giving you an eyewitness    1:53:05PM
10   statement about?    1:53:07PM
11       MR. CONNOLLY: Objection. Asked and    1:53:07PM
12   answered.    1:53:08PM
13   A    I didn't ask her that.    1:53:09PM
14   Q    I just want to be -- make sure I'm    1:53:10PM
15   clear that's your answer there?    1:53:10PM
16       MR. NOVIKOFF:  Oh, I think he's been    1:53:12PM
17   crystal clear three times already.    1:53:12PM
18       MR. CONNOLLY: Objection.    1:53:14PM
19   BY MR. GOODSTADT:    1:53:14PM
20   Q    You didn't think it was relevant; is    1:53:14PM
21   that correct?    1:53:16PM
22   A    I did not ask her.    1:53:16PM
23       MR. CONNOLLY: Objection.    1:53:17PM
24       MR. NOVIKOFF: Objection.    1:53:17PM
25

Page 443

GEORGE HESSE

1
2    BY MR. GOODSTADT:    1:53:17PM
3    Q    You didn't think it was relevant? You    1:53:18PM
4    can answer.    1:53:18PM
5       MR. NOVIKOFF: Objection.    1:53:18PM
6       You can answer.    1:53:18PM
7    A    I didn't think it was relevant, I    1:53:19PM
8    guess.    1:53:20PM
9    Q    And similar to the question I asked    1:53:22PM
10   you about her husband, do you think it could've    1:53:24PM
11   been -- that could have affected -- whether she    1:53:28PM
12   was drinking alcohol or not may have affected    1:53:29PM
13   her ability to recall events?    1:53:32PM
14       MR. CONNOLLY: Objection to form.    1:53:34PM
15       You can answer.    1:53:34PM
16   A    It may have.    1:53:35PM
17   Q    Did she eventually fax something to    1:53:41PM
18   you?    1:53:43PM
19   A    Yes.    1:53:44PM
20   Q    How long after you spoke with her did    1:53:45PM
21   she fax something to you?    1:53:47PM
22   A    I don't recall.    1:53:48PM
23   Q    Was it handwritten or typed, what she    1:53:49PM
24   faxed to you?    1:53:52PM
25   A    Handwritten.    1:53:53PM

Page 444

GEORGE HESSE

1
2    Q    Was it addressed to you, the fax?    1:53:54PM
3    A    You know, I don't recall if it was or    1:53:55PM
4    not.    1:53:57PM
5    Q    Do you recall anything else that was    1:54:03PM
6    discussed in the phone conversation that you had    1:54:04PM
7    with Jeanne Yager that you testified to before?    1:54:08PM
8    A    I don't recall at this time.    1:54:11PM
9    Q    Is there anything you can think of    1:54:13PM
10   that would refresh your recollection?    1:54:15PM
11   A    No.    1:54:16PM
12       (Whereupon, Bates document 3181-3182    1:54:29PM
13   was marked as Plaintiff's Exhibit 15 for    1:54:29PM
14   identification, as of this date.)    1:54:29PM
15   BY MR. GOODSTADT:    1:54:48PM
16   Q    Did Jeanne Yager tell you whether she    1:54:51PM
17   was in the bar when the on-duty officers    1:54:54PM
18   arrived?    1:54:56PM
19   A    I don't recall.  I'd have to read her    1:55:00PM
20   statement.    1:55:03PM
21   Q    Did you ask her whether she was at the    1:55:03PM
22   bar when the on-duty officers arrived?    1:55:05PM
23   A    You know, I believe I did.    1:55:10PM
24   Q    Do you recall what she said?    1:55:12PM
25   A    I believe -- I remember her saying    1:55:15PM

Page 445

GEORGE HESSE

1
2    that she was standing by the bathrooms when the    1:55:17PM
3    police officers walked through the bar with one    1:55:20PM
4    of the individuals in the altercation, but    1:55:23PM
5    that's all I recall about that.    1:55:27PM
6    Q    Did you ask her why she didn't give a    1:55:29PM
7    statement to the police officers that night?    1:55:31PM
8       MR. NOVIKOFF: Objection. Form.    1:55:34PM
9    A    Yeah, later on.  I believe she    1:55:35PM
10   attempted to walk to the police station; but    1:55:37PM
11   there was ambulance there, and she didn't want    1:55:39PM
12   to interfere.  She felt that she didn't want to    1:55:41PM
13   bother anybody.    1:55:45PM
14   Q    She told you that?    1:55:47PM
15   A    That's -- yeah, that's what I recall.    1:55:48PM
16   Q    When did she tell you that?    1:55:51PM
17   A    I don't recall, but I remember    1:55:52PM
18   her saying something to that effect.    1:55:54PM
19   Q    Was it during that phone conversation?    1:55:55PM
20   A    No.  No, it was after.    1:55:57PM
21   Q    How many times after that first phone    1:55:59PM
22   conversation did you speak with Jeanne Yager    1:56:01PM
23   about the Halloween incident?    1:56:03PM
24   A    Over the course of four and a half    1:56:05PM
25   years, I don't know, 20 times.    1:56:08PM

36 (Pages 442 to 445)

b929ea01-2563-408a-a7fc-adb794430749

Page 446

GEORGE HESSE

1
2     Q    And when was the first time she told   1:56:14PM
3   you that she didn't want to bother anybody?   1:56:16PM
4     A    It may have been at her house when   1:56:19PM
5   John Cherry and myself went there.   1:56:23PM
6     Q    Did she tell you who she tried to go   1:56:36PM
7   to the police station with, if anyone?   1:56:38PM
8     A    Yeah, I believe Rich Bosetti.   1:56:41PM
9     Q    She tried to go with Rich Bosetti?   1:56:43PM
10    A    Yes.   1:56:45PM
11    Q    Did she tell you where she went when   1:56:46PM
12  she didn't want to bother anyone and stop into   1:56:49PM
13  the police station?   1:56:51PM
14    A    Well, I think her and her husband had   1:56:52PM
15  walked down to CJ's.  And Richie, I believe,   1:56:54PM
16  approached them and said, you know, you should   1:56:57PM
17  really go tell the officers what had happened.   1:57:00PM
18  And they attempted to do so, and then they saw   1:57:02PM
19  the ambulance; and I think they just said, well,   1:57:06PM
20  we'll do it later or something.  I'm   1:57:08PM
21  speculating, but --   1:57:10PM
22    MR. CONNOLLY:  Don't speculate.   1:57:11PM
23    THE WITNESS:  Sorry.   1:57:13PM
24    MR. CONNOLLY:  Just testify upon your   1:57:13PM
25  knowledge.   1:57:14PM

Page 447

GEORGE HESSE

1
2     A    Yeah, they just turned around.   1:57:15PM
3     Q    Did she tell you how long after the   1:57:16PM
4   alleged choke that she tried to go to the police   1:57:19PM
5   station?   1:57:22PM
6     A    No, I don't recall.   1:57:22PM
7     Q    Did you ask her whether she had any   1:57:23PM
8   drinks in CJ's?   1:57:25PM
9     A    No, I don't recall.   1:57:28PM
10    Q    Did you ask her why she didn't try to   1:57:43PM
11  give a statement to the officers when she was in   1:57:46PM
12  the bar and the on-duty officers walked through   1:57:48PM
13  the bar?   1:57:51PM
14    A    Yeah.  At some point, Rich Bosetti had   1:57:53PM
15  gone outside to make contact with the three   1:57:55PM
16  police officers that were on duty, Fiorillo,   1:57:58PM
17  Lamm and Snyder, to address them and say that   1:58:01PM
18  Jean Yager was choked inside the bar, that they   1:58:03PM
19  may want to talk to them.  And I believe the   1:58:07PM
20  response was no one was choked.  I could never   1:58:09PM
21  ascertain who said it.  Tom Snyder denied it,   1:58:15PM
22  and Chris -- they said that Christopher   1:58:18PM
23  Shallick, who was one of the individuals   1:58:23PM
24  involved in this incident, said it.   1:58:25PM
25    Q    Said what?   1:58:27PM

Page 448

GEORGE HESSE

1
2     A    That no one was choked.   1:58:28PM
3     Q    Okay.   1:58:30PM
4     A    But I was told that Snyder said it.   1:58:30PM
5     Q    But just -- I guess I didn't get what   1:58:33PM
6   you meant.  Richard Bosetti went out and tried   1:58:35PM
7   to make contact with the on-duty officers?  How   1:58:40PM
8   do you know that?   1:58:43PM
9     A    Because that's what I was told.   1:58:44PM
10    Q    By who?   1:58:46PM
11    A    By the three of them at some point and   1:58:47PM
12  by Rich Bosetti.   1:58:49PM
13    Q    Do you know if Rich Bosetti was   1:58:51PM
14  drinking that night?   1:58:53PM
15    A    I don't know for sure.   1:58:53PM
16    Q    Did you ask him?   1:58:55PM
17    A    I don't recall.   1:58:56PM
18    Q    Okay.  And so Rich Bosetti tried to   1:58:56PM
19  make contact with them.  Did he make contact, to   1:58:59PM
20  your understanding?   1:59:02PM
21    A    Yes.   1:59:03PM
22    Q    How did you know he made contact?   1:59:03PM
23    A    I was told.   1:59:05PM
24    Q    By who?   1:59:06PM
25    A    By Officer Fiorillo and Gary Bos- --   1:59:07PM

Page 449

GEORGE HESSE

1
2   Rich Bosetti.   1:59:09PM
3     Q    Okay.  And what was the conversation   1:59:10PM
4   that was had outside the bar?   1:59:12PM
5     A    I believe Frank had said that we're   1:59:14PM
6   handling it, we'll take care of it.  And then   1:59:19PM
7   Richie had spoke to Snyder and tried to explain   1:59:23PM
8   to him that someone was choked.  I don't know if   1:59:26PM
9   he specifically used her name or not.  And the   1:59:30PM
10  term -- and, you know, someone blurted out, no   1:59:33PM
11  one was choked.  Now, Rich Bosetti says it was   1:59:37PM
12  Snyder that said it; and Snyder denies it, and   1:59:40PM
13  Snyder thinks that Christopher Shallick may have   1:59:43PM
14  said it.   1:59:47PM
15    Q    And what's the basis of your belief   1:59:47PM
16  that Snyder denied it and said Christopher   1:59:49PM
17  Shallick said it?   1:59:52PM
18    A    That's what they had told me.   1:59:53PM
19    Q    Who told you that?   1:59:56PM
20    A    I believe Snyder told me that.   1:59:57PM
21    Q    Did Snyder tell you that Rich   1:59:58PM
22  Bosetti -- that Snyder asked Rich Bosetti who   1:59:59PM
23  was choked?   2:00:00PM
24    A    I don't remember specifically.   2:00:01PM
25    Q    Did Rich Bosetti tell you that he   2:00:02PM

1          GEORGE HESSE
2    identified who was choked?            2:00:05PM
3       A   I don't remember specifically.    2:00:07PM
4       Q   Now, if you look at Hesse 15, is this  2:00:12PM
5    the facsimile that came in?            2:00:15PM
6       A   Yes.                    2:00:19PM
7       Q   If you look at the top corner, it says  2:00:19PM
8    10-29-04.                    2:00:22PM
9          Do you see that?              2:00:23PM
10      A   Right.                  2:00:24PM
11      Q   That date is not accurate, is it?    2:00:25PM
12      A   No, that can't be.            2:00:28PM
13      Q   That's before the incident actually  2:00:29PM
14   happened, right?                2:00:30PM
15      A   Yes.                    2:00:31PM
16      Q   Do you recall what time it actually  2:00:32PM
17   came in?                    2:00:33PM
18      A   I don't recall, no.            2:00:34PM
19         MR. NOVIKOFF:  Well, there is that  2:00:34PM
20   underlining line that appears --        2:00:36PM
21         THE WITNESS:  Oh, there is, yes.    2:00:38PM
22         MR. NOVIKOFF:  -- it says 10/3.  Can't  2:00:38PM
23   really make out the next space.          2:00:40PM
24      A   2964 and a 1951.            2:00:44PM
25         MR. GOODSTADT:  Either way, it doesn't  2:00:47PM

1          GEORGE HESSE
2    make sense, because that Monday was after   2:00:48PM
3    10-30 or 31.                  2:00:50PM
4          MR. NOVIKOFF:  Maybe the machine was  2:00:52PM
5    broken.                    2:00:53PM
6    BY MR. GOODSTADT:                2:00:55PM
7       Q   Do you know why she wrote it to Ed   2:00:55PM
8    Paradiso instead of you?            2:01:00PM
9       A   I don't know.              2:01:02PM
10      Q   Did you ever ask her?          2:01:02PM
11      A   No.                    2:01:03PM
12      Q   So this fax was in response to your   2:01:07PM
13   asking her to fax something in?          2:01:09PM
14      A   Yes.                    2:01:11PM
15      Q   Did she mention who else she was with  2:01:19PM
16   on that line?                  2:01:21PM
17      A   I believe she did, but she didn't know  2:01:26PM
18   who they were by name.              2:01:27PM
19      Q   So when you spoke to her, she told you  2:01:31PM
20   she didn't know who she was with by name?  2:01:33PM
21      A   She wasn't with anybody in particular,  2:01:36PM
22   just other women waiting on line.        2:01:38PM
23      Q   Okay.  That's what she told you?    2:01:40PM
24      A   That's what I recall.          2:01:44PM
25      Q   Do you know whether she sought medical  2:01:50PM

1          GEORGE HESSE
2    attention that night?              2:01:53PM
3       A   Repeat that.              2:01:56PM
4       Q   Did she -- did she indicate whether  2:01:58PM
5    she sought medical attention that night?   2:02:00PM
6       A   She did not.              2:02:02PM
7       Q   She did not.              2:02:03PM
8          Did you ask Richie Bosetti why he    2:02:04PM
9    didn't bring her into the station that night?  2:02:08PM
10      A   I believe I was told that they were  2:02:11PM
11   going to wait until the ambulance had left, but  2:02:17PM
12   then I don't think -- it never happened anyway,  2:02:20PM
13   so I don't know.                2:02:22PM
14      Q   So when the ambulance left, they    2:02:24PM
15   didn't go back; is that your testimony?   2:02:25PM
16      A   Right.                  2:02:27PM
17      Q   Okay.  Do you know why they didn't go  2:02:28PM
18   back?                      2:02:30PM
19      A   I don't -- I don't know.        2:02:30PM
20      Q   Did you ask Rich Bosetti why?      2:02:32PM
21      A   I don't recall if I did.        2:02:33PM
22      Q   Did you ask Jean Yager why?        2:02:34PM
23      A   I don't recall if I did or not.    2:02:38PM
24      Q   Did you ask Bud Yager why?        2:02:40PM
25      A   I don't recall if I did or not.    2:02:43PM

1          GEORGE HESSE
2       Q   Did you ask Rich Bosetti why he didn't  2:02:52PM
3    bring Jeanne Yager over to the on-duty officers  2:02:54PM
4    at Houser's?                  2:02:58PM
5       A   I don't recall if I did or not.    2:02:59PM
6       Q   So you don't know one way or the    2:03:02PM
7    other?                      2:03:03PM
8       A   No, I don't.              2:03:05PM
9       Q   Did he tell you why he didn't bring  2:03:06PM
10   her over to them at Houser's?          2:03:08PM
11      A   No.                    2:03:10PM
12         MR. CONNOLLY:  "Them" being the      2:03:10PM
13   officers at the scene?              2:03:11PM
14   BY MR. GOODSTADT:                2:03:12PM
15      Q   Rich Bosetti didn't bring Jean Yager  2:03:12PM
16   over to the on-duty officers at the scene.  2:03:15PM
17      A   Yeah, I don't recall.          2:03:18PM
18      Q   Did you ask him?            2:03:18PM
19      A   I don't recall if I did or not.    2:03:20PM
20         MR. GOODSTADT:  Why don't we take a  2:03:32PM
21   break here and try to get in touch with the  2:03:33PM
22   judge.                      2:03:35PM
23         THE VIDEOGRAPHER:  The time is 2:05.  2:03:36PM
24   We're off the record.              2:03:37PM
25         (Whereupon, a discussion was held off  2:03:40PM

b929ea01-2563-408a-a7fc-adb794430749

Page 454

GEORGE HESSE

1
2   the record.)                          2:03:40PM
3       THE VIDEOGRAPHER: The time is 2:09.   2:07:43PM
4   We're on the record.                  2:07:44PM
5   BY MR. GOODSTADT:                     2:07:49PM
6       Q   Now, when this fax came in from Jeanne  2:07:49PM
7   Yager, did you discuss it with anybody on that  2:07:52PM
8   day, other than for what you already testified  2:07:55PM
9   to with your conversation with her?   2:07:58PM
10      A   I don't recall.                2:08:01PM
11      Q   Did you speak to her after she faxed  2:08:02PM
12  it in on that day?                    2:08:05PM
13      A   I don't recall.                2:08:07PM
14      Q   And at the time this fax came in, had  2:08:09PM
15  you put anybody else on the investigation with  2:08:13PM
16  you or were you still the sole investigator?  2:08:15PM
17      A   I was still alone.             2:08:18PM
18      Q   And after this fax came in, what was  2:08:20PM
19  the next -- well, strike that.        2:08:24PM
20          How long was it between you got off  2:08:26PM
21  the phone with her and the fax came in?  2:08:29PM
22      A   I don't recall.                2:08:31PM
23      Q   Did you do anything with respect to  2:08:31PM
24  the investigation between getting off the phone  2:08:32PM
25  with Jeanne Yager and Hesse 15 being faxed in?  2:08:35PM

Page 455

GEORGE HESSE

1
2       A   I don't remember.             2:08:41PM
3       Q   So what was the next thing you recall  2:08:42PM
4   doing with respect to the Halloween incident  2:08:45PM
5   after receiving this fax?             2:08:47PM
6       A   You know what, I really don't recall  2:09:02PM
7   what I did right after.               2:09:04PM
8       Q   Do you recall anything else you did on  2:09:05PM
9   that day?                             2:09:07PM
10      A   I believe -- I think I called either  2:09:09PM
11  Bud or Jeanne back at some point, and I asked if  2:09:12PM
12  they remember if anybody else was at the bar and  2:09:17PM
13  who it was, who was bartending.       2:09:20PM
14      Q   You don't recall which person you  2:09:25PM
15  called back and asked that to?        2:09:27PM
16      A   It was probably Jeanne, because I  2:09:29PM
17  couldn't get in touch with Bud from the  2:09:30PM
18  beginning, so...                      2:09:33PM
19      Q   And what did she say in response to  2:09:36PM
20  that question?                        2:09:38PM
21      A   She gave me some names.        2:09:39PM
22      Q   What name did she give you?    2:09:42PM
23      A   I believe Dan McKenna was the  2:09:43PM
24  bartender. She said Ian Levine was there. She  2:09:46PM
25  said Cara McKenna was there. I don't recall too  2:09:56PM

Page 456

GEORGE HESSE

1
2   many other names. She said she didn't know a  2:09:59PM
3   lot of people there.                  2:10:03PM
4       Q   And had you known Don McKenna before  2:10:04PM
5   that time?                            2:10:08PM
6       A   Dan.                          2:10:09PM
7       Q   Dan McKenna? I apologize.     2:10:10PM
8       A   Yeah, I knew Dan.             2:10:11PM
9       Q   From being a bartender there or were  2:10:12PM
10  you personal friends?                 2:10:15PM
11      MR. NOVIKOFF: Objection.          2:10:16PM
12      MR. CONNOLLY: Objection, or something  2:10:17PM
13  else.                                 2:10:19PM
14      A   I'm not personal friends with Dan  2:10:19PM
15  McKenna. He's a member of the fire service over  2:10:19PM
16  there, ambulance corps.               2:10:23PM
17      Q   Had you known Cara McKenna prior to  2:10:24PM
18  then?                                 2:10:27PM
19      A   Yes.                          2:10:28PM
20      Q   How did you know her?         2:10:29PM
21      A   She is a long-time resident. She's  2:10:30PM
22  been born there. I know her parents. She also  2:10:32PM
23  works in the village office. She's also a  2:10:35PM
24  member of the fire service and ambulance corps.  2:10:38PM
25      Q   What did she do in the village office?  2:10:40PM

Page 457

GEORGE HESSE

1
2       A   Secretarial.                  2:10:43PM
3       Q   And Ian Levine you knew before then,  2:10:48PM
4   correct?                              2:10:51PM
5       A   Yes.                          2:10:51PM
6       Q   He's the same Ian Levine that you  2:10:52PM
7   worked for at Sky Cable?             2:10:54PM
8       A   Yes.                          2:10:56PM
9       Q   Did she tell you anything else during  2:10:56PM
10  that phone conversation other than for those  2:10:57PM
11  couple names?                         2:11:00PM
12      A   Not that I recall, no.         2:11:01PM
13      Q   Do you recall anything else that was  2:11:03PM
14  discussed between the two of you during that  2:11:04PM
15  phone conversation?                   2:11:06PM
16      A   I don't recall.               2:11:07PM
17      Q   Did you take any notes of that phone  2:11:07PM
18  conversation?                         2:11:09PM
19      MR. NOVIKOFF: The second conversation  2:11:12PM
20  with Jeanne Yager?                    2:11:13PM
21      MR. GOODSTADT: When he called her  2:11:15PM
22  back.                                 2:11:17PM
23      MR. NOVIKOFF: Got it.             2:11:18PM
24      MR. GOODSTADT: We already went  2:11:18PM
25  through the first, was no notes.      2:11:18PM

b929ea01-2563-408a-a7fc-adb794430749

Page 458

GEORGE HESSE

1
2    A   Yeah, I don't recall if I took notes.   2:11:18PM
3    Q   If you took some notes, where would   2:11:20PM
4  they be kept?                              2:11:22PM
5    A   They should be in the file.  If I took  2:11:24PM
6  any notes, they would be in the file.       2:11:26PM
7    Q   Did you keep like a notebook in       2:11:28PM
8  connection with this investigation?         2:11:30PM
9    A   No.                                   2:11:31PM
10   Q   So what would you have taken notes on?  2:11:33PM
11   A   Maybe just a piece of scrap paper or   2:11:35PM
12 something.                                 2:11:38PM
13   Q   Sitting here today, you don't recall   2:11:42PM
14 one way or the other whether there were notes of  2:11:43PM
15 that conversation?                          2:11:45PM
16   A   No, I don't recall.                   2:11:46PM
17   Q   What was the next thing you did after  2:11:50PM
18 speaking with Jeanne Yager that day with respect  2:11:52PM
19 to Halloween incident?                      2:11:54PM
20   A   Repeat that question.  I'm sorry.     2:11:58PM
21   Q   Yeah, after you spoke with Jeanne     2:12:00PM
22 Yager for the second time, what was the next  2:12:02PM
23 thing you did that day with respect to the  2:12:05PM
24 Halloween investigation?                    2:12:08PM
25   A   I believe I reached out to Ian Levine  2:12:10PM

Page 459

GEORGE HESSE

1
2  to find out if he had seen anything.        2:12:12PM
3    Q   Did you get in touch with him?        2:12:19PM
4    A   Yes.                                  2:12:20PM
5    Q   You called him or you went the to him  2:12:22PM
6  in person?                                  2:12:25PM
7    A   I called him.                         2:12:25PM
8    Q   Okay.  Tell me everything you recall   2:12:26PM
9  on that phone conversation.                 2:12:27PM
10   A   I asked him about the night, if he had  2:12:30PM
11 seen anything.  He said that he remembers that  2:12:32PM
12 one of the Bosetti brothers -- a lot of people  2:12:40PM
13 had a hard time telling between the two Bosetti  2:12:43PM
14 brothers.  But he said one of the Bosetti  2:12:46PM
15 brothers was in a fight.  He called the police  2:12:46PM
16 department's direct number to get somebody down  2:12:48PM
17 there quick to help out either Richie or Gary.  2:12:50PM
18 And he said the fight was getting broken up  2:12:53PM
19 after he hung up the phone.  He said          2:12:58PM
20 approximately, I think, 10 minutes had gone by  2:13:01PM
21 before the police had arrived.  And that's all I  2:13:03PM
22 recall at this time.  I know he gave a          2:13:06PM
23 statement.                                    2:13:08PM
24   Q   Did he tell you that he witnessed any  2:13:09PM
25 part of the fight?                           2:13:10PM

Page 460

GEORGE HESSE

1
2    A   Just the end part.  He didn't see the  2:13:11PM
3  beginning.                                  2:13:15PM
4    Q   What end part did he tell you he      2:13:15PM
5  witnessed?                                  2:13:18PM
6    A   That Bosetti was over -- either       2:13:19PM
7  standing over or squatting over.  I'd have to  2:13:24PM
8  read his statement to recall.  He remembers  2:13:26PM
9  seeing his shield out, and that's all I recall  2:13:28PM
10 at this time.                               2:13:30PM
11   Q   Did he tell you that he saw one of the  2:13:31PM
12 Bosettis use a pool cue?                     2:13:34PM
13   A   Not that I recall.                    2:13:36PM
14   Q   Did you ask him whether he was        2:13:44PM
15 drinking that night?                         2:13:45PM
16   A   No.                                   2:13:46PM
17   Q   How come?                             2:13:47PM
18   A   I don't recall why.                   2:13:48PM
19   Q   Do you think it would be relevant if   2:13:50PM
20 an eyewitness who was giving you a statement was  2:13:51PM
21 drinking that night?                         2:13:53PM
22      MR. NOVIKOFF:  Objection.              2:13:55PM
23   A   It could have been.                   2:13:55PM
24   Q   Did you take any notes of the phone    2:13:57PM
25 call you had with Mr. Levine?                2:13:58PM

Page 461

GEORGE HESSE

1
2    A   I don't believe I did.                2:14:00PM
3    Q   How come?                             2:14:01PM
4    A   Because I knew he was going to come in  2:14:01PM
5  and give a statement, and it was just I didn't  2:14:03PM
6  need to take notes.                          2:14:05PM
7    Q   Tell me everything else you recall     2:14:14PM
8  about the conversation you had with Mr. Levine  2:14:15PM
9  on the phone that day.                       2:14:17PM
10   A   I believe I asked him if he knew of    2:14:19PM
11 anybody else that was there that he remembers.  2:14:21PM
12 I think he gave me a couple more names.       2:14:26PM
13   Q   What names did he give you?           2:14:29PM
14   A   I believe he gave me Sean O'Rourke,    2:14:31PM
15 Doug Wyckoff.  I think he also -- because I     2:14:34PM
16 asked who was -- if there were any other      2:14:37PM
17 bartenders besides Dan.  I don't recall offhand  2:14:38PM
18 if he told me anybody else's names.          2:14:44PM
19   Q   Did you ask him why he didn't give a   2:14:48PM
20 statement to the police that night?          2:14:50PM
21   A   I don't recall.                       2:14:55PM
22   Q   Was he at the bar when the on-duty     2:14:56PM
23 police officers arrived?                     2:14:58PM
24   A   Yes.                                  2:15:02PM
25      MR. NOVIKOFF:  Was he told that by     2:15:04PM

40 (Pages 458 to 461)

TSG Reporting - Worldwide   (877) 702-9580

Page 462

GEORGE HESSE

1
2     Mr. Levine if he was at the bar.          2:15:06PM
3         MR. GOODSTADT:  Yeah.                 2:15:09PM
4     BY MR. GOODSTADT:                         2:15:09PM
5     Q    Did he tell you that he was there when 2:15:09PM
6     the on-duty police officers arrived?       2:15:11PM
7     A    Yes.                                 2:15:12PM
8     Q    Do you know whether he spoke with the 2:15:13PM
9     on-duty police officers?                   2:15:14PM
10    A    I don't recall.                      2:15:15PM
11    Q    Did you ask whether he spoke with the 2:15:15PM
12    on-duty police officers?                   2:15:17PM
13    A    I don't recall.                      2:15:19PM
14    Q    Just so I'm clear, to your          2:15:22PM
15    understanding or knowledge, he never reached out 2:15:24PM
16    to give a witness statement; you're the one that 2:15:29PM
17    reached out to him, correct?               2:15:31PM
18    A    That's correct, yes.                 2:15:33PM
19    Q    Do you recall anything else that was 2:15:39PM
20    discussed during that phone conversation?  2:15:40PM
21    A    I don't recall.                      2:15:46PM
22    Q    How did you know he was going to come 2:15:48PM
23    in and give a statement?                   2:15:49PM
24    A    Because I asked him to.              2:15:51PM
25    Q    Did he ever come in and give a      2:15:53PM

Page 463

GEORGE HESSE

1
2     statement?                                2:15:55PM
3     A    Yes.                                 2:15:55PM
4     Q    When?                               2:15:55PM
5     A    I don't know the exact date.  It may 2:15:56PM
6     have been the next day.                    2:15:58PM
7     Q    That Tuesday?                       2:16:00PM
8     A    It may have been.  I don't know.  I 2:16:01PM
9     know you have the statements, so...        2:16:02PM
10    Q    It's your recollection it was that  2:16:05PM
11    Tuesday?                                   2:16:07PM
12    A    No.  I don't recall.                 2:16:07PM
13    Q    Did you ask him whether he saw Gary 2:16:13PM
14    Bosetti use a pool cue?                    2:16:16PM
15    A    I didn't -- I didn't take his       2:16:18PM
16    statement, so I don't recall, no.          2:16:21PM
17    Q    During the phone conversation you had. 2:16:22PM
18    A    You know, I don't recall.            2:16:25PM
19    Q    So after the phone conversation you 2:16:34PM
20    had with Ian Levine, what was the next thing 2:16:35PM
21    that you did in connection with the        2:16:38PM
22    investigation?                             2:16:40PM
23    A    Now that I knew Doug Wyckoff was     2:16:41PM
24    there, I think I tried to locate him.      2:16:44PM
25    Q    Okay.  And this is Doug Wyckoff, the 2:16:47PM

Page 464

GEORGE HESSE

1
2     husband of Dale Wyckoff, the former husband of 2:16:50PM
3     Dale Wyckoff, father of Marissa Wyckoff, who 2:16:54PM
4     worked in the police department; is that   2:16:58PM
5     correct?                                   2:16:59PM
6     A    Yes.                                 2:17:00PM
7     Q    And did you reach out to Mr. Wyckoff? 2:17:01PM
8     A    I don't remember how I got in touch  2:17:07PM
9     with him.  I think I ran into him.         2:17:08PM
10    Q    You ran into him?                   2:17:11PM
11    A    Yeah.                                2:17:13PM
12    Q    Where?                              2:17:13PM
13    A    Outside the police station.          2:17:14PM
14    Q    So the next thing you did, you're   2:17:17PM
15    going to reach out to Doug Wyckoff and you just 2:17:19PM
16    happen to run into him?                    2:17:22PM
17    A    It's a small village.  Yeah.         2:17:25PM
18    Q    Did you go outside looking for him?  2:17:26PM
19    A    You know, I don't recall.            2:17:29PM
20    Q    Was anyone else with you when you ran 2:17:32PM
21    into Doug Wyckoff?                         2:17:33PM
22    A    I don't believe so, no.              2:17:35PM
23    Q    Was anyone else with him when you ran 2:17:36PM
24    into Doug Wyckoff?                         2:17:38PM
25    A    I don't know.  I don't recall.       2:17:40PM

Page 465

GEORGE HESSE

1
2     Q    And did you speak with Doug Wyckoff 2:17:40PM
3     when you ran into him?                      2:17:42PM
4     A    Yes.                                 2:17:44PM
5     Q    Tell me everything that you recall that was 2:17:44PM
6     stated during that discussion.             2:17:46PM
7     A    I asked him if he witnessed any of the 2:17:49PM
8     events of that night.  He said yes, that he 2:17:51PM
9     actually got involved.  And I asked if he would 2:17:54PM
10    be willing to give a statement, and he said yes. 2:17:59PM
11    And he came in and gave a statement.       2:18:01PM
12    Q    Did he tell you any of the events   2:18:03PM
13    during the conversation outside that he    2:18:07PM
14    witnessed?                                 2:18:09PM
15    A    I don't recall if he told me        2:18:11PM
16    specifics.                                 2:18:14PM
17    Q    And had he come forward with a      2:18:17PM
18    statement prior to you seeing him that     2:18:20PM
19    morning -- strike that.                    2:18:22PM
20         What time of day was it?            2:18:23PM
21    A    I don't recall what time.            2:18:25PM
22    Q    But it was still that same Monday?  2:18:26PM
23    A    I believe so, yeah.                  2:18:28PM
24    Q    And prior to you running into him, had 2:18:29PM
25    he reached out to the police department at all, 2:18:31PM

b929ea01-2563-408a-a7fc-adb794430749

1            **GEORGE HESSE**
2    **do you know, to give a statement?**          2:18:34PM
3        A    Not that I know of.          2:18:36PM
4        **Q    And had he given a statement prior to**  2:18:37PM
5    **that?**                    2:18:39PM
6        A    Not that I know of.          2:18:39PM
7        **Q    Did you ask him whether he was in the**  2:18:45PM
8    **bar at the time the on-duty officers got there?**  2:18:46PM
9        A    I don't recall if I asked him that  2:18:51PM
10   specific question.              2:18:53PM
11       **Q    Did you ask him why he didn't give a**  2:18:53PM
12   **statement that night?**          2:18:56PM
13       A    You know what, I think I did, and he  2:18:58PM
14   said that no one asked him what happened.    2:19:00PM
15       **Q    Did you ask him why he didn't go to**  2:19:02PM
16   **the police station?**            2:19:04PM
17       A    I don't recall if I did or not.  2:19:06PM
18       MR. GOODSTADT: Let's go off the  2:19:18PM
19   record for one second.            2:19:18PM
20       THE VIDEOGRAPHER: The time is 2:21.  2:19:20PM
21   We're off the record.             2:19:21PM
22       (Whereupon, a discussion was held off  2:22:14PM
23   the record.)                2:22:14PM
24       THE VIDEOGRAPHER: The time is 2:24.  2:22:16PM
25   We're on the record.              2:22:17PM

1            GEORGE HESSE
2    BY MR. GOODSTADT:              2:22:21PM
3        **Q    Do you recall anything else that was**  2:22:21PM
4    **discussed between you and Mr. Wyckoff in that**  2:22:22PM
5    **conversation outside?**          2:22:25PM
6        A    Specifically, no.          2:22:26PM
7        **Q    Did you take any notes of that**    2:22:28PM
8    **conversation?**              2:22:30PM
9        A    No.                2:22:30PM
10       **Q    Why not?**              2:22:30PM
11       A    I think I took his statement.    2:22:32PM
12       **Q    You took his statement outside?**   2:22:33PM
13       A    No.  I think we walked right into the  2:22:35PM
14   police station.                2:22:37PM
15       **Q    Okay.  So you took his statement on**  2:22:38PM
16   **that day?**                2:22:40PM
17       A    You know, I don't recall if it was  2:22:40PM
18   that day, to tell you the truth.        2:22:42PM
19       **Q    So your statement that we just walked**  2:22:43PM
20   **back to the police station and took his**      2:22:43PM
21   **statement may not be true?**        2:22:43PM
22       MR. NOVIKOFF: Objection.        2:22:48PM
23       MR. CONNOLLY: Objection.        2:22:48PM
24       A    I don't recall four and a half years  2:22:50PM
25   ago.                    2:22:52PM

1            GEORGE HESSE
2        **Q    You don't recall what day it was?**   2:22:59PM
3        A    No.                2:23:01PM
4        **Q    Did he definitely come into the police**  2:23:07PM
5    **station on the day that you saw him outside?**  2:23:09PM
6        A    You know, I don't recall.  I'm not  2:23:12PM
7    going to guess.                2:23:15PM
8        **Q    Did you ask whether he was drinking?**  2:23:18PM
9        A    I don't recall.            2:23:22PM
10       **Q    You don't recall one way or the other?**  2:23:23PM
11       A    No.                2:23:25PM
12       **Q    Do you think that would be an**      2:23:27PM
13   **important fact to know, whether Mr. Wyckoff was**  2:23:28PM
14   **drinking that night?**           2:23:31PM
15       MR. NOVIKOFF: Objection.        2:23:32PM
16       A    Could be.              2:23:33PM
17       **Q    What do you mean, it could be?**     2:23:35PM
18       A    It could be relevant.        2:23:37PM
19       **Q    Why would it be relevant?**        2:23:40PM
20       MR. NOVIKOFF: Objection.        2:23:42PM
21       A    May impair his judgment or his  2:23:43PM
22   recollection.                2:23:50PM
23       **Q    So don't you think it of would have**  2:23:54PM
24   **been important to ask him that question?**    2:23:56PM
25       MR. NOVIKOFF: Objection.        2:23:58PM

1            GEORGE HESSE
2        MR. CONNOLLY: Objection.        2:23:59PM
3        A    It could've been.          2:23:59PM
4        MR. GOODSTADT: Just mark that.    2:24:02PM
5        (Whereupon, Bates document 3165-3166  2:24:03PM
6    was marked as Plaintiff's Exhibit 16 for  2:24:03PM
7    identification, as of this date.)        2:24:03PM
8        MR. GOODSTADT: I've placed in front  2:24:26PM
9    of Mr. Hesse what's now been marked as    2:24:27PM
10   Hesse 16.  It is a two-page exhibit bearing  2:24:30PM
11   Bates 3165 and 3166.  (Handing.)        2:24:35PM
12   BY MR. GOODSTADT:              2:24:38PM
13       **Q    Mr. Hesse, is this the witness**      2:24:39PM
14   **statement that you took of Mr. Wyckoff?**    2:24:40PM
15       A    Yes.                2:24:42PM
16       **Q    Do you see on the bottom left it has**  2:24:45PM
17   **"name of preparing officer"?**        2:24:46PM
18       **Do you see that?**            2:24:48PM
19       A    Yes.                2:24:48PM
20       **Q    Is that your handwriting and**      2:24:50PM
21   **signature?**                2:24:51PM
22       A    Yes.                2:24:52PM
23       **Q    And you were sergeant at the time?**  2:24:55PM
24       A    Yes.                2:24:57PM
25       **Q    Okay.  And the -- on the bottom right,**  2:24:57PM

b929ea01-2563-408a-a7fc-adb794430749

GEORGE HESSE

1
2    you see he signed it 11-2-04.              2:25:01PM
3         Do you see that?                      2:25:04PM
4    A   Yes.                        2:25:05PM
5    Q   Is that the date that you actually     2:25:05PM
6    took the statement?                        2:25:07PM
7    A   Yes.                        2:25:08PM
8    Q   Does that refresh your recollection as 2:25:09PM
9    to whether that was the Monday?            2:25:12PM
10   A   That would have to be Tuesday, then.   2:25:14PM
11   Q   Tuesday. Okay.                         2:25:17PM
12        So just so I get a time line correct  2:25:17PM
13   here, did you have the conversation with him  2:25:19PM
14   outside the police station on Monday or Tuesday?  2:25:21PM
15   A   I don't recall.              2:25:24PM
16   Q   Okay.                                  2:25:25PM
17        MR. NOVIKOFF: I'm sorry, is two       2:25:26PM
18   minutes up?                     2:25:29PM
19        THE REPORTER: Yeah.                    2:25:31PM
20        MR. NOVIKOFF: I want to put on the    2:25:33PM
21   record that I believe Mr. Goodstadt's seven  2:25:33PM
22   hours has ended, but then again, I leave   2:25:34PM
23   that to Mr. Connolly to decide what to do  2:25:37PM
24   going forward.                  2:25:41PM
25        MR. CONNOLLY: Mr. Goodstadt, you can  2:25:42PM

1               GEORGE HESSE
2    finish questioning regarding this exhibit. 2:25:44PM
3         MR. GOODSTADT: Okay. Four and a half  2:25:47PM
4    hours on this exhibit, are you okay with   2:25:50PM
5    that?                          2:25:52PM
6         MR. NOVIKOFF: All right then.         2:25:55PM
7         MR. CONNOLLY: Yes, four and a half    2:25:56PM
8    hours limited to this exhibit.            2:25:58PM
9    BY MR. GOODSTADT:                          2:26:00PM
10   Q   So it's possible that there was a gap  2:26:01PM
11   of a day between your conversation outside and  2:26:03PM
12   the day you took his statement, correct?   2:26:05PM
13   A   Sure.                       2:26:08PM
14   Q   Okay. Did you ask Mr. Wyckoff why he   2:26:08PM
15   didn't give a statement at the bar that night?  2:26:13PM
16        MR. NOVIKOFF: Objection. Asked and    2:26:15PM
17   answered.                       2:26:16PM
18   A   I believe he said to me that no one    2:26:20PM
19   approached him or asked him what happened. 2:26:22PM
20   Q   Did you ask him whether he saw the     2:26:24PM
21   on-duty officers there that night?         2:26:26PM
22   A   I don't recall.              2:26:28PM
23   Q   Did you ask him whether any of the     2:26:29PM
24   officers went back into the bar and asked a 2:26:31PM
25   general question to everyone in the bar, did  2:26:33PM

1               GEORGE HESSE
2    anyone see what happened this evening?     2:26:36PM
3    A   Repeat that.                2:26:38PM
4    Q   Did you ask him whether about of the   2:26:39PM
5    on-duty officers went back into the bar that  2:26:40PM
6    evening and asked generally to everyone that was  2:26:44PM
7    there, did anyone see what happened?       2:26:46PM
8    A   I don't recall anything like that, no. 2:26:49PM
9    Q   Did you ever hear that Tom Snyder went 2:26:50PM
10   back in the bar and asked that question?   2:26:53PM
11   A   No.                        2:26:56PM
12   Q   Snyder never told you that?            2:26:58PM
13   A   No.                        2:26:59PM
14   Q   If you look down -- well, strike that. 2:27:00PM
15        Is this the -- this is the witness    2:27:03PM
16   statement that he gave you?               2:27:04PM
17   A   Yes.                        2:27:05PM
18   Q   And is this your handwriting? I know   2:27:06PM
19   that may be his signature on the bottom right.  2:27:06PM
20   But other than that, is this your handwriting?  2:27:08PM
21   A   Yes.                        2:27:12PM
22   Q   Second page also, other than for his   2:27:12PM
23   signature, is that your handwriting?       2:27:14PM
24   A   Yes.                        2:27:16PM
25   Q   Was anyone else there when you took    2:27:16PM

1               GEORGE HESSE
2    his statement?                  2:27:18PM
3    A   I don't recall either way.   2:27:19PM
4    Q   Do you recall what time on the 2nd he  2:27:20PM
5    gave you this statement?                  2:27:23PM
6    A   No, I don't recall.          2:27:23PM
7    Q   Do you recall what other statements    2:27:24PM
8    you had prior to Wyckoff giving you this    2:27:26PM
9    statement?                      2:27:28PM
10   A   Say that again.              2:27:28PM
11   Q   Do you recall what other -- which      2:27:29PM
12   other witness statements you had prior to taking  2:27:30PM
13   Wyckoff's?                      2:27:32PM
14   A   At this time, I don't recall, no.      2:27:33PM
15   Q   Is there anything that you can think   2:27:35PM
16   of that would refresh your recollection?   2:27:36PM
17   A   The entire Halloween file.   2:27:38PM
18   Q   Anything else?                         2:27:41PM
19   A   No.                        2:27:42PM
20   Q   Then if you look down the fourth line  2:27:45PM
21   down in the text there on Page 1 of Hesse 16, it  2:27:48PM
22   says, "I observed a large male, built like a  2:27:54PM
23   fireplug, now known to me as Christopher   2:27:57PM
24   Shallick."                      2:28:00PM
25        Do you see that?                      2:28:00PM

Page 474

```
1              GEORGE HESSE
2    A   Yes.              2:28:01PM
3    Q   "Of 63 Maple Place Huntington, New   2:28:02PM
4  York."                  2:28:07PM
5    Do you see that?        2:28:07PM
6    A   Yes.              2:28:07PM
7    Q   How did he learn that that was   2:28:09PM
8  Christopher Shallick of 63 Maple Place,   2:28:09PM
9  Huntington, New York?        2:28:09PM
10   A   I laid out a couple of licenses that   2:28:10PM
11 these officers had photo- -- I think   2:28:13PM
12 photocopied, and he said that was the guy right   2:28:15PM
13 there.                2:28:18PM
14   Q   Okay.  So the fact that you laid out   2:28:18PM
15 licenses and had like sort of a license   2:28:22PM
16 lineup --              2:28:25PM
17   A   Pretty much.         2:28:26PM
18   Q   -- that's not reflected anywhere in   2:28:27PM
19 here, is it?             2:28:29PM
20   A   No.               2:28:30PM
21   Q   In the statement?         2:28:30PM
22   A   No.               2:28:30PM
23   Q   How come?            2:28:31PM
24   A   I don't know.         2:28:33PM
25   Q   It says on this Page 2 of Exhibit   2:28:44PM
```

Page 475

```
1              GEORGE HESSE
2  Hesse 16, the one, two, three, four, fifth line   2:28:53PM
3  down, it says, "The doorman, Sean O'Rourke."   2:28:56PM
4    Do you see that?        2:28:58PM
5    A   Yes.              2:28:59PM
6    Q   "Doorman, Sean O'Rourke, came over to   2:28:59PM
7  help keep Christopher out of the bar."   2:29:03PM
8    Do you see that?        2:29:05PM
9    A   Yes.              2:29:06PM
10   Q   It says, "Sean phoned the police."   2:29:07PM
11   Do you see that?        2:29:09PM
12   A   Yes.              2:29:10PM
13   Q   Is it your understanding that Sean   2:29:11PM
14 O'Rourke called the police that night?   2:29:13PM
15   A   Yes.              2:29:15PM
16   Q   And that's a separate call than Ian   2:29:16PM
17 Levine's?               2:29:19PM
18   A   Yes.              2:29:21PM
19   Q   And then the last sentence that says,   2:29:21PM
20 "They never asked me or anyone if I could see   2:29:23PM
21 any questions about what happened."   2:29:26PM
22   Do you see that?        2:29:29PM
23   A   Yeah.             2:29:30PM
24   Q   Is that the statement that you   2:29:31PM
25 testified to before, that no one had asked him   2:29:32PM
```

Page 476

```
1              GEORGE HESSE
2  what happened?            2:29:34PM
3    MR. NOVIKOFF:  Objection.     2:29:35PM
4    A   That's what I recall.  That's what he   2:29:36PM
5  told me.               2:29:37PM
6    Q   And then in response to that, you did   2:29:38PM
7  or did not ask him why he didn't proactively   2:29:41PM
8  seek to give a statement to the on-duty   2:29:44PM
9  officers?               2:29:46PM
10   MR. CONNOLLY:  Objection to form.   2:29:47PM
11   MR. NOVIKOFF:  Objection.     2:29:49PM
12   A   I don't recall.          2:29:49PM
13   Q   You don't recall whether you did?   2:29:49PM
14   A   No.               2:29:51PM
15   MR. GOODSTADT:  I think I'm done with   2:30:07PM
16 this exhibit for now.         2:30:08PM
17   MR. CONNOLLY:  Okay.  Why don't we   2:30:09PM
18 take a two-minute break and figure out what   2:30:10PM
19 we're going to do.          2:30:12PM
20   THE VIDEOGRAPHER:  The time is 2:32.   2:30:15PM
21 We're off the record.         2:30:16PM
22   (Whereupon, a discussion was held off   2:30:18PM
23 the record.)              2:30:18PM
24   (Whereupon, Magistrate Boyle was   2:30:18PM
25 called.)                2:30:18PM
```

Page 477

```
1              GEORGE HESSE
2    MR. GOODSTADT:  We are -- as you   3:03:01PM
3  recall, we had made a motion to extend the   3:03:03PM
4  time to take Defendant George Hesse's   3:03:07PM
5  deposition beyond the seven hours.   3:03:09PM
6    THE COURT:  Yes.          3:03:11PM
7    MR. GOODSTADT:  And you had denied   3:03:12PM
8  that without prejudice with the right to   3:03:13PM
9  renew when we reached the seven-hour point.   3:03:16PM
10 And we've now reached the seven-hour point,   3:03:18PM
11 and we'd like to renew our request for an   3:03:21PM
12 additional four and a half hours.   3:03:24PM
13   THE COURT:  These are really elaborate   3:03:26PM
14 motions because you really have to justify   3:03:26PM
15 your -- what you have to cover and why you   3:03:30PM
16 didn't cover it in the time allotted.  And   3:03:34PM
17 I've done opinions on this, and, you know,   3:03:38PM
18 that's why I tried to set up a conference   3:03:42PM
19 call last week to urge you to do some kind   3:03:45PM
20 of a conference just to eliminate the   3:03:49PM
21 paperwork.  But if you can't agree on it,   3:03:53PM
22 make your motion.  But do your research on   3:03:55PM
23 it.  These are simple issues that you made   3:03:57PM
24 in your motion; and if you use your same old   3:04:02PM
25 motion, it would be denied.      3:04:04PM
```

GEORGE HESSE

1
2     MR. GOODSTADT: Okay. So we'll be      3:04:07PM
3  happy to submit a brief on the issue.      3:04:10PM
4     THE COURT: Read the case. Are the      3:04:15PM
5  defendants there?                3:04:16PM
6     MR. CONNOLLY: Yes, we are, Your      3:04:17PM
7  Honor.                    3:04:17PM
8     THE COURT: Is there any way you'll      3:04:18PM
9  consent to like an extension of two hours or 3:04:20PM
10 something? The defense should speak up to    3:04:22PM
11 that.                      3:04:22PM
12    MR. CONNOLLY: Your Honor, we had      3:04:25PM
13 offered earlier an extension of 90 minutes.    3:04:26PM
14 We're already 20 minutes beyond the seven    3:04:29PM
15 hours, and my understanding is we've already  3:04:31PM
16 gotten 475 pages of deposition transcript.    3:04:31PM
17    THE COURT: So you did your seven      3:04:37PM
18 hours, did you?                3:04:40PM
19    MR. CONNOLLY: And seven hours and 20  3:04:41PM
20 minutes.                    3:04:42PM
21    THE COURT: My suggestion would be to    3:04:45PM
22 see how you can work it out. Do you have      3:04:46PM
23 any offer at all or do you want to go      3:04:49PM
24 through a motion? Because you're probably    3:04:53PM
25 going to end up submitting your second      3:04:54PM

GEORGE HESSE

1
2  deposition.                  3:04:58PM
3     MR. CONNOLLY: Your Honor, we did      3:04:58PM
4  offer --                    3:04:58PM
5     THE COURT: The issue being -- you      3:04:58PM
6  know, being the length of time.          3:04:59PM
7     MR. CONNOLLY: Your Honor, the        3:05:01PM
8  defendant did offer an additional        3:05:02PM
9  90 minutes.                  3:05:04PM
10    THE COURT: Is that anything you're      3:05:08PM
11 interested in?                  3:05:09PM
12    MR. GOODSTADT: Well, Your Honor, any  3:05:10PM
13 extra time certainly helps, but this is, as    3:05:12PM
14 we wrote in our letter, certainly the most    3:05:14PM
15 important witness in the entire case, who is   3:05:16PM
16 involved with almost each and every        3:05:19PM
17 allegation in the 193-paragraph complaint.    3:05:21PM
18 There's thousands of pages of documents,    3:05:24PM
19 most of which relate to this witness. I      3:05:26PM
20 believe I've been, you know, pretty good    3:05:29PM
21 about getting through a lot of the topics.    3:05:33PM
22 I don't think that I've delayed or        3:05:35PM
23 procrastinated or spent much time on      3:05:37PM
24 anything that would be irrelevant, and      3:05:40PM
25 there's just a lot of to go through. I      3:05:41PM

GEORGE HESSE

1
2  mean, even Mr. Novikoff's letter to the      3:05:44PM
3  Court from weeks ago requesting extension of 3:05:46PM
4  the discovery schedule demonstrated that    3:05:48PM
5  this is a very important witness who -- you    3:05:51PM
6  know, who defendants plan to spend several    3:05:53PM
7  hours with as well questioning.          3:05:56PM
8     MR. NOVIKOFF: Your Honor, this is      3:05:58PM
9  Mr. Novikoff.                  3:05:59PM
10    I was going to hopefully remain quiet    3:06:00PM
11 for once in my life because Mr. Hesse is not  3:06:03PM
12 my client. But since I've been brought into   3:06:05PM
13 this, the only thing I will say is I've      3:06:08PM
14 taken each of the plaintiffs' depositions on  3:06:10PM
15 the same allegations in under seven hours,    3:06:12PM
16 and I have not asked for one extension of    3:06:14PM
17 time for any of the plaintiffs. And also in   3:06:16PM
18 my respectful opinion, Mr. Goodstadt has    3:06:19PM
19 spent a considerable amount of time on      3:06:22PM
20 either irrelevant issues or issues that      3:06:25PM
21 really were not in dispute in terms of what   3:06:27PM
22 he believes are relevant facts in this case.   3:06:31PM
23 But it's Mr. Connolly's client, so other      3:06:34PM
24 than just saying that, I'm out of it.      3:06:37PM
25    THE COURT: Mr. Connolly, do you want  3:06:41PM

GEORGE HESSE

1
2  to say something?                3:06:42PM
3     MR. CONNOLLY: Yes, Your Honor. I      3:06:43PM
4  feel what we've offered to do is more than    3:06:44PM
5  fair. And, you know, there's been no claim    3:06:47PM
6  that the questioning was impeded in any      3:06:49PM
7  manner, and I feel that if it was structured  3:06:51PM
8  in a different way, we could've been done    3:06:54PM
9  under the seven.                3:06:56PM
10    THE COURT: All right. My only        3:06:58PM
11 suggestion to you -- and I'm just saying      3:07:00PM
12 the obvious, so it's not going to be any      3:07:01PM
13 surprise. The plaintiff is looking for      3:07:04PM
14 another four and a half. You're offering    3:07:07PM
15 90 minutes. Why don't you split it down to   3:07:09PM
16 the middle and do two and a quarter hours,    3:07:12PM
17 and you can save yourselves a lot of      3:07:14PM
18 paperwork and indefiniteness and you can    3:07:17PM
19 wind this up today.                3:07:21PM
20    MR. CONNOLLY: Well, Your Honor, while 3:07:22PM
21 I appreciate the Court's suggestion, I feel    3:07:24PM
22 beyond 90 minutes --              3:07:30PM
23    THE COURT: You don't even have to      3:07:33PM
24 comment, okay. I can't do anything else    3:07:34PM
25 right now. So go ahead and make your motion 3:07:36PM

45 (Pages 478 to 481)

b929ea01-2563-408a-a7fc-adb794430749

Page 482

GEORGE HESSE

1
2  if you can't resolve it.                 3:07:39PM
3     MR. GOODSTADT:  Thank you, Your Honor.  3:07:41PM
4     MR. CONNOLLY:  Thank you.           3:07:42PM
5     MR. NOVIKOFF:  Thank you.           3:07:44PM
6     (Whereupon, a discussion was held off  3:07:44PM
7  the record.)                          3:07:44PM
8     MR. GOODSTADT:  After the conference   3:25:41PM
9  call we had with the Court where the Court   3:25:43PM
10  suggest we try to work something out without  3:25:46PM
11  having the need to submit written motions,   3:25:49PM
12  we have not been able to work out an       3:25:52PM
13  agreeable extension for Mr. Hesse's        3:25:56PM
14  deposition.  So we plan to make a motion to  3:25:58PM
15  the Court for additional time pursuant to   3:26:00PM
16  the Judge's directive.  And I guess based on  3:26:02PM
17  what the court rules, we'll determine when   3:26:06PM
18  and for how long we reconvene.            3:26:09PM
19     MR. NOVIKOFF:  Just so it's clear, you  3:26:13PM
20  are keeping the deposition open.          3:26:14PM
21     MR. GOODSTADT:  Yes.               3:26:16PM
22     MR. NOVIKOFF:  You're not ending it,   3:26:16PM
23  and it's open subject to your application to  3:26:18PM
24  Judge Boyle for additional time.  And      3:26:20PM
25  therefore, on behalf of the village        3:26:23PM

Page 483

GEORGE HESSE

1
2  defendants, I reserve my right to question  3:26:25PM
3  Mr. Hesse until such time as the deposition  3:26:28PM
4  is officially closed either by Mr. Goodstadt  3:26:31PM
5  indicating such or the Court indicating that  3:26:35PM
6  Mr. Goodstadt has no additional time.      3:26:36PM
7     MR. CONNOLLY:  And so the record is    3:26:39PM
8  clear, at this juncture, we have gone on for  3:26:41PM
9  seven hours and 20 minutes.             3:26:44PM
10     MR. GOODSTADT:  The record will       3:26:46PM
11  reflect how long we've gone on for.        3:26:47PM
12     MR. TERMINI:  I would just simply      3:26:51PM
13  reserve any rights when it finally becomes   3:26:52PM
14  the County of Suffolk's turn.             3:26:55PM
15     (Time noted 3:26 p.m.)               3:26:59PM
16                                   3:26:59PM
17            GEORGE HESSE          3:26:59PM
18                                   3:26:59PM
   Subscribed and sworn to before me        3:26:59PM
19  this         day of       , 2009       3:26:59PM
                                     3:26:59PM
20  _____         3:26:59PM
21                                   3:26:59PM
22
23
24
25

Page 484

1           PROCEEDINGS
2         C E R T I F I C A T E
3
4     I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Public in
5  and for the State of New York, do hereby certify:
6     THAT the witness whose testimony is hereinbefore
7  set forth, was duly sworn by me; and
8     THAT the within transcript is a true record
9  of the testimony given by said witness.  I further
10  certify that I am not related, either by blood or
11  marriage, to any of the parties to this action; and
12     THAT I am in no way interested in the outcome of
13  this matter.
14     IN WITNESS WHEREOF, I have hereunto set
15  my hand this 26th day of June, 2009.
16
17       _____
18         JUDI JOHNSON, RPR, CRR, CLR
19
20
21
22
23
24
25

Page 485

1           PROCEEDINGS
2              INDEX
3  ATTORNEY                        PAGE
4     By Mr. Goodstadt               309
5
6
7
8
9        INDEX OF HESSE EXHIBITS
10  I.D.        DESCRIPTION            PAGE
11  Exhibit 8  Bates document 4547-488    312
12  Exhibit 9  Bates document 8189 and 5326   316
13  Exhibit 10  Bates document 1-25       322
14  Exhibit 11  Bates document 2750       360
15  Exhibit 12  Bates document P 925      376
16  Exhibit 13  Picture of writing on the wall   386
17  Exhibit 14  Bates Document 3180      425
18  Exhibit 15  Bates document 3181-3182   444
19  Exhibit 16  Bates document 3165-3166   469
20
21
22
23
24
25

46 (Pages 482 to 485)

b929ea01-2563-408a-a7fc-adb794430749

Page 486

```
 1              ERRATA SHEET
 2  NAME OF CASE:  CARTER V. OCEAN BEACH
 3  DATE OF DEPOSITION: JUNE 16, 2009
 4  NAME OF WITNESS:  GEORGE HESSE
 5
 6  Reason codes:
 7     1.  To clarify the record.
 8     2.  To conform to the facts
 9     3.  To correct the transcription
10       errors.
11  Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
20  From _____ to _____
21  Page _____ Line _____ Reason _____
22  From _____ to _____
23
24  _____
    GEORGE HESSE
25
```

TSG Reporting - Worldwide   (877) 702-9580

b929ea01-2563-408a-a7fc-adb794430749

Page 487

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI and )
THOMAS SNYDER, )
                                    )
              Plaintiffs, )
                                    )
         vs.              ) CV 07 1215
                                    )
INCORPORATED VILLAGE OF OCEAN )
BEACH; MAYOR JOSEPH C. LOEFFLER )
JR., individually and in his )
Official capacity; former Mayor )
NATALIE K. ROGERS, individually )
and in her official capacity, )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF )
GEORGE B. HESSE, individually )
And in his official capacity; )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK )
COUNTY DEPARTMENT OF CIVIL )
SERVICE; and ALLISON SANCHEZ, )
Individually and in her )
Official capacity, )
                                    )
              Defendants. )
------------------------------)

CONTINUED VIDEOTAPED DEPOSITION OF
GEORGE HESSE
Uniondale, New York
Thursday, August 6, 2009

Reported by:
Philip Rizzuti
JOB NO. 24143

---

Page 488

1
2
3
4         August 6, 2009
5           9:07 a.m.
6
7        Continued videotaped deposition
8    of GEORGE HESSE, held at the offices
9    of Rivkin Radler, 926 Rexcorp Plaza,
10   Uniondale, New York, pursuant to
11   subpoena, before Philip Rizzuti, a
12   Notary Public of the State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 489

1
2   A P P E A R A N C E S :
3
4       THOMPSON WIGDOR & GILLY, LLP
5       Attorneys for Plaintiffs
6           85 Fifth Avenue
7           New York, New York 10003
8       BY:  ANDREW S. GOODSTADT, ESQ.
9
10      MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11      Attorneys for George B. Hesse
12          530 Saw Mill Road
13          Elmsford, New York 10523
14      BY:  KEVIN W. CONNOLLY, ESQ.
15
16      RIVKIN RADLER, LLP
17      Attorneys for Incorporated Village of
18      Ocean Beach, Joseph Loeffler, Natalie
19      Rogers and Ocean Beach Police Department
20          926 RexCorp Plaza
21          Uniondale, New York 11556
22      BY:  KENNETH A. NOVIKOFF, ESQ.
23
24
25

---

Page 490

1
2   A P P E A R A N C E S :
3
4       RUDOLPH M. BAPTISTE, ESQ.
5       Assistant County Attorney
6       Suffolk County, State of New York
7           H. Lee Dennison Building, 6th Floor
8           100 Veterans Memorial Highway - P.O. Box 6100
9           Hauppauge, New York 11788-0099
10
11  ALSO PRESENT:
12      FRANK FIORILLO
13      KEVIN LAMM
14      THOMAS SNYDER
15      JORDAN MUMMERT, Videographer
16
17
18
19
20
21
22
23
24
25

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2      THE VIDEOGRAPHER:  This is the
3   start of the tape labeled number 1 of the
4   continuation of the videotape deposition
5   of George Hesse in the matter of Carter     09:07:56
6   and Fiorillo versus Incorporated Village
7   of Ocean Beach.  The date is August 6,
8   2009, the time is approximately 9:09 a.m.
9   We are on the record.
10  G E O R G E   H E S S E, called as a          09:08:12
11     witness, having been previously duly
12     sworn by a Notary Public, was examined
13     and testified as follows:
14  EXAMINATION BY
15  MR. GOODSTADT:                                09:08:14
16     Q.   Good morning, Mr. Hesse.
17     A.   Good morning.
18     Q.   Thank you for coming back.  I want
19  to remind you that you are still under oath
20  from last time and that you are still sworn to  09:08:21
21  tell the truth.  Do you understand that?
22     A.   Yes.
23     Q.   The last time we were here you had
24  testified briefly about drinking Rocket Fuels
25  in the police station, do you recall that?   09:08:32

Hesse

1
2      A.   Uh-hum.
3      Q.   You testified that there were
4   times where people who worked in the bar, I
5   believe you identified Brian Easop and Paul   09:08:39
6   Conway as having delivered it to the police
7   station; is that correct?
8          MR. NOVIKOFF:  Objection to the
9   form.
10     A.   Yes.                                  09:08:48
11     Q.   They worked at CJ's?
12     A.   Yes.
13     Q.   Did CJ's have a license to serve
14  alcohol outside their premises?
15     A.   They had a license to sell outside  09:08:57
16  of the premise, yes, they had like an all
17  premise sale license.
18     Q.   So they were entitled to sell
19  alcohol or deliver alcohol to the police
20  station without violating their license?     09:09:09
21         MR. NOVIKOFF:  Objection to the
22  form.
23     A.   I am not so sure about that, but
24  they were able to sell closed containers off
25  premises.                                    09:09:20

Hesse

1
2      Q.   Well did the Rocket Fuels come in
3   a closed container?
4      A.   They did, yes.
5      Q.   When you say you are not so sure    09:09:23
6   about that, what are you not sure about?
7      A.   Well, like selling
8   over-the-counter, taking an open container
9   outside the bar, that is illegal to drink
10  outside of the -- in public, that is what I am  09:09:35
11  thinking along those lines.  But they could
12  sell alcohol over-the-counter and by the case,
13  by the bottle for off premises consumption.
14     Q.   How about a mixed drink?
15         MR. NOVIKOFF:  Objection.            09:09:51
16     A.   That is alcohol.
17     Q.   They could sell that off premises?
18     A.   I believe so.
19     Q.   What is the basis of your belief?
20     A.   I believe once I looked up their   09:09:58
21  license a while back, I don't recall what year
22  or when or why, but they do -- they had at
23  that time off premise sale license.
24     Q.   When did you look up their
25  license?                                     09:10:10

Hesse

1
2          MR. NOVIKOFF:  Objection.
3      Q.   Do you recall what year it was?
4      A.   I don't remember.
5      Q.   Last time -- strike that.          09:10:14
6          Just so I am clear you never wrote
7   CJ's or Mr. Easop or Mr. Conway a ticket for
8   delivering the alcohol, did you?
9          MR. NOVIKOFF:  Objection.
10         MR. CONNOLLY:  Objection.            09:10:32
11     (Record read.)
12     A.   No.
13     Q.   That is correct?
14     A.   That is correct.
15     Q.   The last time when we were here we  09:10:46
16  were discussing the Halloween incident, do you
17  recall that?
18     A.   Yes.
19     Q.   I believe that you testified, the
20  last thing you testified to was a statement, a  09:11:00
21  witness statement you had taken from Doug
22  Wyckoff, do you recall that?
23         MR. NOVIKOFF:  Objection to the
24  form.
25     A.   Yes.                                09:11:08

1        Hesse
2     Q.  Do you recall testifying that that
3  was on that next Tuesday morning?
4        MR. NOVIKOFF:  Objection to the
5     form.  His testimony is what it is.        09:11:28
6     A.  Yes, I believe it was the Tuesday
7  after the incident.
8     Q.  What do you recall doing in
9  connection with your investigation of the
10  Halloween incident after taking that witness   09:11:38
11  statement?
12        MR. CONNOLLY:  The next step?
13        MR. GOODSTADT:  Yes.  I believe he
14     walked us through his memory of the next
15     step.  So I want to know what the next      09:11:49
16     step is.
17     A.  I don't recall exactly what I did,
18  but I think I looked for more witnesses.
19     Q.  How did you go about doing that?
20     A.  I believe I asked Doug Wyckoff who   09:11:57
21  may have been there that he recalls.
22     Q.  Do you recall who if anybody he
23  told you may have been there?
24     A.  Off the top of my head, no.
25     Q.  Do you recall what you did after   09:12:10

1        Hesse
2  asking him that question who may have been
3  there?
4     A.  I don't recall.
5     Q.  Did there come a point in time      09:12:16
6  where you asked Pat Cherry to assist in the
7  investigation?
8     A.  Yes.
9     Q.  When was that?
10     A.  I don't know exactly.        09:12:30
11     Q.  Was it before or after the Tuesday
12  morning in which you spoke with Mr. Wyckoff?
13     A.  I don't recall.
14     Q.  How did you go about asking him;
15  ask you see him, call him, E-mail him, some   09:12:43
16  other form?
17     A.  I believe I called him.
18     Q.  Why did you call him?
19     A.  Because I thought he was a good
20  candidate to help me out.        09:12:51
21     Q.  You made the decision to appoint
22  him to the investigation?
23     A.  I believe I called Chief Paradiso
24  and asked him if it would be all right.
25     Q.  When did you call Chief Paradiso   09:12:59

1        Hesse
2  to ask if it would be all right?
3     A.  I don't recall.
4     Q.  What was Chief Paradiso's
5  response?                     09:13:07
6     A.  I think he thought it was a good
7  idea.
8     Q.  Do you recall what he said?
9     A.  No.
10     Q.  Was Pat Cherry scheduled to have a  09:13:13
11  tour on the days or times that he helped with
12  the investigation or did he come in
13  specifically to assist with the investigation?
14        MR. CONNOLLY:  Objection.
15        MR. NOVIKOFF:  Objection.        09:13:30
16     A.  I don't recall.
17     Q.  Was he paid for his time taking
18  part in the investigation?
19     A.  Yes.
20     Q.  Cherry was not on duty Halloween   09:13:35
21  night; is that correct?
22     A.  Correct.
23     Q.  Did the board have to approve
24  Cherry's involvement in the investigation?
25        MR. CONNOLLY:  Objection to the   09:13:48

1        Hesse
2     form.
3     A.  No.
4     Q.  Did the board approve his
5  assistance in the investigation?        09:13:53
6        MR. CONNOLLY:  Objection to the
7     form.
8     A.  I don't know.
9     Q.  Did you speak to anybody on the
10  board prior to asking Mr. Cherry to      09:14:01
11  investigate?
12     A.  No.
13        MR. NOVIKOFF:  Objection to the
14     form.
15     Q.  At that point in time Mr. Cherry   09:14:08
16  had not passed all the civil service tests; is
17  that correct?
18     A.  Correct.
19     Q.  Did you alert anybody at civil
20  service with respect to Cherry's -- strike   09:14:31
21  that.
22        Did you alert anybody at civil
23  service about your decision to ask Mr. Cherry
24  to assist in the investigation?
25        MR. NOVIKOFF:  Objection to the   09:14:42

Page 499

Hesse

1          Hesse
2    form.
3          MR. BAPTISTE: Objection.
4    A.   No.
5    Q.   By that point in time, that          09:14:47
6    Tuesday morning, had you spoken with anybody
7    on the board of trustees of Ocean Beach about
8    the Halloween incident?
9    A.   Not that I recall.
10   Q.   Did you speak with the mayor prior  09:14:56
11   to that Tuesday morning about the Halloween
12   incident?
13         MR. NOVIKOFF: Objection to the
14   form.
15   A.   No.  Not that I recall.          09:15:04
16   Q.   Who was the mayor at the time?
17   A.   Natalie Rogers.
18   Q.   Did you draft a plan for an
19   investigation prior to commencing your
20   investigation?                         09:15:16
21   A.   No.
22   Q.   Did you take any notes in
23   preparation for your investigation?
24   A.   No.  Not that I recall.
25   Q.   Do you recall what day -- strike  09:15:26

Page 500

Hesse

1          Hesse
2    that.
3          Did Pat Cherry ever come to the
4    island in connection with his assistance in
5    the investigation?                     09:15:38
6    A.   Yes.
7    Q.   Do you recall what day or days he
8    came to the island to assist in the
9    investigation?
10   A.   I don't recall, no.              09:15:44
11   Q.   Did you provide any documents to
12   Mr. Cherry before he commenced his role in the
13   investigation?
14   A.   I believe he reviewed all the
15   documents that we already had.          09:15:55
16   Q.   What documents were those?
17   A.   I believe it was, there were at
18   least three statements that were taken by the
19   officers that were on duty that night.  There
20   was a field report that was drafted that night  09:16:09
21   by Officer Snyder.  And I don't know if I had
22   any documents that I had drafted up.  Any
23   statements that I took he may have read one or
24   two that maybe that I took at that time.  And
25   I believe there was the letter from Budd  09:16:25

Page 501

Hesse

1          Hesse
2    Jaeger, the fax, and some notes that were
3    faxed to me by his wife.
4    Q.   Any other documentation that you
5    provided to Mr. Cherry prior to him commencing  09:16:41
6    his role in the investigation?
7    A.   Not that I recall.
8    Q.   What did you explain to Mr. Cherry
9    about the assignment?
10   A.   I don't recall exactly how I      09:16:53
11   explained it to him.
12   Q.   Do you recall anything that you
13   explained to him?
14   A.   No.
15   Q.   Were you ever told that one of the  09:17:02
16   people who were involved in the altercation
17   with Mr. Bosetti had claimed that he was
18   afraid there was going to be a cover up, had
19   you ever heard that?
20         MR. NOVIKOFF: Objection.          09:17:32
21         MR. CONNOLLY: At any time?
22   Q.   At any time?
23   A.   I don't specifically recall, no.
24   Q.   And did Cherry take any -- did Pat
25   Cherry take any witness statements as part of  09:17:47

Page 502

Hesse

1          Hesse
2    his role in the investigation?
3    A.   Yes.
4    Q.   How many witness statements did he
5    take?                                  09:17:55
6    A.   Possibly three.
7    Q.   Do you know whose witness
8    statements Mr. Cherry took?
9    A.   He did Jeannie Jaeger, the victim.
10   He did Sean O'Rourke, and I believe he      09:18:11
11   interviewed Elyse Miller over the phone.
12   Q.   Where did the interview with
13   Jeannie Jaeger take place?
14   A.   At her house in Smithtown.
15   Q.   Do you know when that interview  09:18:35
16   took place?
17   A.   The statement is dated, so it
18   would be on the date that is on the statement
19   itself.  I don't recall the actual date.
20   Q.   Did you attend the interview?    09:18:49
21   A.   Yes, I did.
22   Q.   Did you ask any questions during
23   the interview?
24   A.   I don't recall if I did.
25   Q.   Did Mr. Cherry ask any questions  09:18:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2  during the interview?
3      A.  Specifically I don't really think
4  so.
5      Q.  Do you recall anything that you      09:19:11
6  said during that interview?
7      A.  No, I don't recall.
8      Q.  Do you recall anything that
9  Mr. Cherry said during that interview?
10     A.  Yes.  In his own words I think he   09:19:18
11  asked her to say in her own words what
12  happened.
13     Q.  Did he say anything else during
14  that interview?
15     A.  Not that I recall specifically,    09:19:27
16  no.
17     Q.  So you don't recall if he had
18  asked her any questions?
19     A.  Not specifically, no.
20     Q.  What was Ed Paradiso's role in the  09:19:39
21  investigation?
22     A.  I don't think he had a role.
23     Q.  He was not involved at all?
24     A.  I think in the early, early stages
25  his involvement dealt with -- you know, to   09:19:55

Hesse

1
2  tell you the truth I don't know.  I mean he --
3  I know he spoke to Elyse Miller, he attempted
4  to talk to Gary Bosetti and Rich Rosetti.
5  Other than that he called me Sunday evening     09:20:13
6  and said investigate this.
7      Q.  What exactly did he say when he --
8  what exactly did he say when he called you
9  Sunday evening and told you that he wanted you
10  to investigate it?                 09:20:29
11     A.  He basically, you know, he told me
12  what he was told I guess what had happened
13  that night and said that when I come in Monday
14  morning he is going to put some documents for
15  me to read and try to figure out what         09:20:44
16  happened.
17     Q.  What did he tell you about what
18  had happened that night?
19         MR. CONNOLLY:  Read back the
20     question.                     09:21:02
21         (Record read.)
22         MR. CONNOLLY:  Objection.  But you
23     can answer.
24     A.  He said something about Gary
25  Bosetti possibly went crazy in a bar and       09:21:09

Hesse

1
2  started hitting people with a pool stick, and
3  that he had fired him, and that when I come in
4  Monday morning just figure out what happened.
5      Q.  Did he tell you where he learned    09:21:25
6  those facts from?
7          MR. NOVIKOFF:  Objection to the
8      form.
9      A.  I don't remember specifically if
10  he did.                         09:21:34
11     Q.  He told you that he fired Gary
12  Bosetti?
13     A.  He told me he fired Gary Bosetti.
14     Q.  Did he tell you why he fired Gary
15  Bosetti?                        09:21:45
16     A.  I don't recall specifically why.
17     Q.  Did you have any role in the
18  decision to fire Gary Bosetti?
19     A.  No.
20     Q.  Did you know about it prior to it  09:21:50
21  happening?
22     A.  No.
23     Q.  When Mr. Cherry came in as part of
24  the investigation did you tell him that Gary
25  Bosetti had been fired?               09:22:05

Hesse

1
2      A.  I don't recall specifically if I
3  told him when he came in.
4      Q.  How long did the investigation
5  take?                          09:22:15
6          MR. NOVIKOFF:  Before they -- take
7      before what?
8          MR. CONNOLLY:  Objection.
9      Q.  How long did your investigation
10  take?                          09:22:25
11         MR. NOVIKOFF:  Objection.
12     A.  Well, to get to the bottom of
13  things maybe five days, but from start to
14  finish to prosecution, it took a couple of
15  months.                         09:22:42
16     Q.  What do you mean by to get to the
17  bottom of things?
18     A.  To kind of figure out what really
19  happened.
20     Q.  So you were able to reach a        09:22:49
21  conclusion as to what really happened within
22  five days?
23     A.  I believe it was about five days,
24  yes.
25         MR. CONNOLLY:  Objection.          09:22:56

Page 507

Hesse

1
2       Q.   During those five days did you
3  speak with Kevin Lamm at all about his
4  involvement in the incident, or his
5  involvement in investigating that incident?   09:23:12
6          MR. NOVIKOFF:  Objection to the
7  form.  Foundation.
8       A.   Yes.
9       Q.   When did you speak with Lamm?
10      A.   Like I stated a few weeks ago,   09:23:20
11  when I got the phone call from Ed Paradiso
12  that he had fired Gary and that this incident
13  had happened, I called Kevin Lamm on his cell
14  phone and asked him what happened.
15      Q.   Did you speak to him at any time   09:23:38
16  after that call that you testified to already?
17      A.   Yes.  I believe I spoke to him one
18  other time.
19      Q.   When was that?
20      A.   I don't know the exact date.   09:23:47
21      Q.   Was it in person or on the phone?
22      A.   On the phone I believe.
23      Q.   Tell me everything that you recall
24  that was discussed between you and Mr. Lamm
25  during that telephone conference?   09:23:57

Page 508

Hesse

1
2       A.   I don't specifically remember the
3  contents of the phone call, but I asked him to
4  put a 42 together, a statement regarding what
5  he believes took place.   09:24:07
6       Q.   Do you recall anything else that
7  was discussed during that call?
8       A.   Not specifically, no.
9       Q.   Do you know whether Cherry ever
10  spoke with Lamm as part of his role in the   09:24:17
11  investigation?
12      A.   I don't know.
13      Q.   How many times did you speak with
14  Mr. Fiorillo in connection with the
15  investigation?   09:24:29
16      A.   Over the course of a couple of
17  years?
18      Q.   No, within the five day period
19  until you reached the conclusion?
20      A.   Like I stated with Kevin Lamm, I   09:24:39
21  also called Frank that Sunday, that Sunday
22  evening, early evening, I asked him basically
23  the same thing that I asked Kevin, what had
24  happened, what he thought what had happened.
25         I don't specifically recall what   09:24:56

Page 509

Hesse

1
2  he said and I asked him to just put a
3  statement together, a 42, just to tell me what
4  happened.
5       Q.   Do you recall anything that was   09:25:05
6  discussed, any of the details of what was
7  discussed?
8       A.   No, I don't recall the details
9  exactly, no.
10      Q.   Did you speak with Mr. Fiorillo at   09:25:13
11  any other time during the five day period in
12  which it took you to investigate and reach a
13  conclusion?
14         MR. CONNOLLY:  Objection.
15      A.   I believe one other time, yes.   09:25:26
16      Q.   When was that?
17      A.   I think I saw him in person at
18  the -- at the lighthouse parking lot where we
19  make our relief.  I believe he handed me a
20  handwritten 42.   09:25:37
21      Q.   Do you recall anything that was
22  stated by either you or Mr. Fiorillo during
23  that -- during that incident in which you met
24  with him at the lighthouse?
25      A.   I don't recall specifically   09:25:56

Page 510

Hesse

1
2  anything.
3       Q.   How about generally, do you recall
4  anything generally that was discussed?
5       A.   No, not really.   09:26:01
6       Q.   How about Mr. Snyder, how many
7  times did you speak with him during the five
8  day period in which you investigated and
9  reached a conclusion?
10         MR. CONNOLLY:  Objection.   09:26:12
11      A.   You know what, I don't think I
12  spoke to him at all that I can recall.
13      Q.   Did you try to speak to him?
14      A.   I believe I did, but I am not
15  sure, I can't speculate.   09:26:23
16      Q.   So you don't recall any efforts
17  that you made to speak to Mr. Snyder?
18      A.   I don't recall.
19      Q.   Do you know whether Mr. Cherry
20  spoke with Mr. Fiorillo at all?   09:26:31
21      A.   I don't know.
22      Q.   Do you know whether Mr. Cherry
23  spoke with Mr. Snyder at all?
24      A.   I don't know.
25      Q.   Do you think it would have been   09:26:37

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 511

```
1               Hesse
2  important for him to speak with either Mr.
3  Fiorillo, Mr. Lamm or Mr. Snyder in connection
4  with his role in the investigation?
5        MR. CONNOLLY:  Objection.        09:26:50
6        MR. NOVIKOFF:  Objection.
7     A.  No.
8     Q.  Why not?
9     A.  We already had statements that
10 were taken by these individuals and I asked    09:26:54
11 them already to write me up a 42 what they
12 thought happened, so there was no need to
13 speak to them further.
14    Q.  Did you speak to anybody from
15 Ocean Beach Rescue who was on duty that night  09:27:07
16 of the Halloween incident during your five day
17 period of investigating?
18        MR. CONNOLLY:  Objection.
19    A.  I don't recall.
20    Q.  Did you speak with Joe Loeffler    09:27:15
21 during that period; when I say Joe Loeffler I
22 mean Joe Loeffler Jr.?
23    A.  I don't recall specifically
24 speaking to him.
25    Q.  Did you speak with any of the    09:27:28
```

Page 512

```
1               Hesse
2  three people who provided a witness statement
3  to the on duty officers that night?
4     A.  At any time?
5     Q.  During the five day period in     09:27:39
6  which you reached a conclusion as to what
7  happened?
8        MR. CONNOLLY:  Objection.
9     A.  No.
10    Q.  Did you try to speak with any of  09:27:44
11 the three of them?
12    A.  No.
13    Q.  Why not?
14    A.  I had their statements.
15    Q.  You didn't have any follow up    09:27:53
16 questions from those statements?
17    A.  No.
18    Q.  So their statements were complete
19 in your mind?
20    A.  Yes.                             09:28:01
21    Q.  Just so I am clear you didn't deem
22 it necessary to speak with the other side, the
23 other individuals that were involved in the
24 fight?
25        MR. NOVIKOFF:  Objection.        09:28:14
```

Page 513

```
1               Hesse
2        MR. CONNOLLY:  Objection.
3     A.  They were already spoken to.
4     Q.  You didn't think it was necessary
5  or important to speak with them yourself?  09:28:20
6        MR. NOVIKOFF:  Objection.
7        MR. CONNOLLY:  Objection.
8     A.  No.
9     Q.  Do you believe that the on duty
10 officers did a sufficient job in taking their  09:28:28
11 statements?
12        MR. NOVIKOFF:  Objection to the
13 form.
14    A.  No.
15    Q.  Why not?                         09:28:34
16    A.  They were somewhat incoherent.
17 They were purely written.
18    Q.  Did they provide any other
19 statements other than the ones that they gave
20 to the three on duty officers?            09:28:59
21    A.  I believe they made some verbal
22 comments the next day to Paradiso.
23    Q.  How did you learn of those verbal
24 comments?
25    A.  I believe when I was called that  09:29:11
```

Page 514

```
1               Hesse
2  night by Ed Paradiso, now thinking about it,
3  he did tell me that they came back early that
4  Sunday morning to file a complaint I guess
5  against Officer Bosetti.                  09:29:24
6     Q.  Do you know whether they actually
7  filed a complaint against Officer Bosetti?
8     A.  I think it was all done verbally.
9     Q.  What was the basis of that belief?
10    A.  I was told that by Ed Paradiso.    09:29:37
11    Q.  Do you recall what Ed Paradiso
12 told you that they stated to him that Sunday
13 morning?
14    A.  I believe he told them that he had
15 already fired Officer Bosetti and an        09:29:47
16 investigation would be conducted.
17    Q.  Did he tell you anything that they
18 stated happened at the Halloween incident?
19    A.  I don't recall.
20    Q.  So I believe that you testified    09:29:59
21 that you thought that their statements were
22 complete, is that correct, is what you
23 testified to?
24        MR. CONNOLLY:  Objection.
25    A.  Yes.                             09:30:08
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 515

Hesse

1
2     Q.   You testified that the statements
3  that you read were incoherent and purely
4  written; correct?
5     A.   Yes.                    09:30:15
6     Q.   So how do you reconcile those two?
7     A.   I don't understand the question.
8     Q.   What was incoherent about the
9  statements?
10    A.   They just were just belligerent   09:30:21
11 lies from an intox person?
12    Q.   And did you know that as soon as
13 you read those statements that they were
14 belligerent lies from an intox person?
15    A.   You could tell just by reading   09:30:38
16 them.
17    Q.   So you didn't think it was
18 important for you to further question them
19 after you believed what they had given as a
20 statement were lies?               09:30:47
21    A.   No.
22    Q.   Why not?
23    A.   Because a victim came forward,
24 told me what really had happened.  And the
25 fact that the statements reflected the fact   09:30:59

Page 516

Hesse

1
2  that Gary Bosetti identified himself as a
3  police officer led me to believe that there
4  was no further questions I needed to ask these
5  individuals because they already knew what   09:31:12
6  they had done.
7     Q.   What does the fact that Gary
8  Bosetti identified himself as a police officer
9  lead you to that conclusion?
10    A.   One of the statements stated that   09:31:21
11 Gary Bosetti who identified himself as a
12 police officer at least ten times, I think
13 that is what the statement says.
14    Q.   What did that lead you to believe
15 that -- why did that lead you to believe that   09:31:34
16 you didn't need to speak with them any
17 further?
18    A.   Because flat out they admitted
19 what they had done.
20    Q.   So it is your conclusion that   09:31:46
21 their witness statements is an admission as to
22 what they had done; is that your testimony?
23       MR. CONNOLLY:  Objection.
24       MR. NOVIKOFF:  Objection.
25    A.   Yeah.                    09:31:55

Page 517

Hesse

1
2     Q.   Did you run a background check on
3  any of the three of them?
4     A.   I may have, I don't recall
5  specifically.                    09:32:07
6     Q.   Did you run a background check on
7  anybody other than for the three of them in
8  connection with the investigation of the
9  Halloween incident?
10       MR. CONNOLLY:  Objection.       09:32:15
11    A.   I don't specifically recall.
12    Q.   Why would you run a background
13 check on the three of them?
14    A.   Because they were suspects.
15    Q.   When did they become suspects?   09:32:23
16    A.   Probably after I had spoken to
17 Budd Jaeger and Jeannie Jaeger.
18    Q.   So they became suspects based on
19 the statements of Budd Jaeger and Jeannie
20 Jaeger?                         09:32:43
21    A.   Yes.
22    Q.   Was Gary Bosetti considered a
23 suspect in your mind?
24       MR. NOVIKOFF:  Objection as to
25 timeframe.                       09:32:51

Page 518

Hesse

1
2     Q.   While you were investigating?
3       MR. CONNOLLY:  Same objection.
4       MR. NOVIKOFF:  Objection.
5     A.   In the early stages I was not   09:32:56
6  sure.  It was possible, yes.
7     Q.   Did you attempt to speak with him
8  during the five days that you were
9  investigating?
10    A.   Speak with who?           09:33:06
11    Q.   Start with Gary Bosetti, did you
12 attempt to speak with Gary Bosetti during the
13 five days of your investigation?
14    A.   No.
15       MR. CONNOLLY:  Objection.       09:33:15
16    Q.   Did you attempt to speak with Rich
17 Bosetti during the five days of your
18 investigation?
19    A.   No.
20       MR. CONNOLLY:  Objection.       09:33:23
21    Q.   Did you speak with either of them
22 during those five days?
23       MR. CONNOLLY:  Objection.
24    A.   No.
25    Q.   Why didn't you attempt to speak   09:33:29

37f918e4-de29-4df9-9ef1-64f4ca0acd46

1              **Hesse**
2  with them?
3      A.   Because they too in the early
4  stages were suspect to possibly some
5  wrongdoing.                    09:33:38
6      **Q.   Was it your policy not to speak to**
7  **anybody who was suspect of doing wrongdoing?**
8      A.   Well I wanted to find some
9  independent witnesses to find out what had
10  happened.                     09:33:52
11      **Q.   You didn't answer the question.**
12  **The question was whether it was a policy at**
13  **any time not to speak to anybody who was a**
14  **suspect of doing wrongdoing?**
15          MR. CONNOLLY:  Objection.    09:34:01
16          MR. NOVIKOFF:  Objection.
17      A.   I found it not necessary to speak
18  to anybody at that time.
19      **Q.   Do you know what the three people**
20  **who gave witness statements that night were**  09:34:10
21  **drinking?**
22          MR. CONNOLLY:  You are talking
23      about the three --
24      **Q.   Schalik, Van Koot and Tesori.  The**
25  **question was do you know what they were**    09:34:29

1              **Hesse**
2  drinking?
3          MR. CONNOLLY:  Got it?
4      A.   I don't specifically recall, no.
5      **Q.   Do you know how many drinks they**  09:34:35
6  **had?**
7      A.   No.
8      **Q.   What was the basis of your belief**
9  **that they were intoxicated?**
10      A.   I was told by the three officers   09:34:43
11  that were there.
12      **Q.   Which are the three officers told**
13  **you?**
14      A.   Fiorillo, Snyder and Lamm.
15      **Q.   The fact that they were**        09:34:51
16  **intoxicated, did that have any role in your**
17  **assessment of their credibility?**
18      A.   No.
19      **Q.   Why did you testify before -- you**
20  **testified before that they were belligerent**  09:35:06
21  **lies by intox; is that correct?**
22      A.   Uh-hum.
23      **Q.   What does the fact that they were**
24  **intoxicated have to do with anything about the**
25  **belligerent lies, if anything?**        09:35:16

1              **Hesse**
2      A.   Poor judgment maybe.  I don't
3  know.
4      **Q.   Was Jeannie Jaeger drinking that**
5  **night?**                      09:35:21
6      A.   I don't recall.
7      **Q.   Do you know whether Cherry asked**
8  **her that as part of her interview?**
9      A.   I don't recall.
10      **Q.   Did you ask her that when you**    09:35:28
11  **spoke with her?**
12      A.   I don't believe I did.
13      **Q.   Do you think that that was a**
14  **question that should have been asked as part**
15  **of the investigation?**              09:35:40
16          MR. NOVIKOFF:  Objection.
17      A.   Not specifically, no.
18      **Q.   Do you think that if she was drunk**
19  **it could have affected her judgment?**
20      A.   Being a victim, no.          09:35:49
21      **Q.   Could it have affected her ability**
22  **to recall facts?**
23          MR. NOVIKOFF:  Objection.
24      A.   I don't know.
25      **Q.   You don't think if she is**       09:36:00

1              **Hesse**
2  intoxicated it may have affected her ability
3  to recall facts?
4          MR. NOVIKOFF:  Objection.
5      A.   It is speculating.  It is       09:36:10
6  possible.
7      **Q.   Well as a police officer for a**
8  **long time, in your experience as a police**
9  **officer do you believe that intoxicated**
10  **people -- strike that.**             09:36:26
11      **Do you believe that intoxication**
12  **can affect a witness' ability to recall facts?**
13          MR. CONNOLLY:  Objection.
14          MR. NOVIKOFF:  Objection.
15      A.   I believe so, yes.           09:36:34
16      **Q.   But yet you still didn't ask her**
17  **if she was drinking?**
18          MR. CONNOLLY:  Objection.
19      A.   I don't specifically recall.
20          MR. NOVIKOFF:  Before you ask the  09:36:46
21      next question, just to make clear on the
22      record, an objection by one party is an
23      objection for all?
24          MR. GOODSTADT:  Yes.
25          MR. NOVIKOFF:  Right.         09:36:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 523

1          Hesse
2     Q.   Are you aware of the injuries to
3  Brian Van Koot from that night?
4     A.   Partially, yes.
5     Q.   What do you mean by partially?   09:37:05
6     A.   I partially recall.
7     Q.   You partially recall now or you
8  were partially aware at the time; I am not
9  sure what you mean by partially?
10         MR. CONNOLLY:  Objection. Re-ask  09:37:19
11  the question.
12     Q.   At the time during those five days
13  were you aware of the injuries to Brian Van
14  Koot?
15         MR. CONNOLLY:  Objection. If you  09:37:32
16  understand the question.
17     A.   I know why he went to the
18  hospital, but I don't believe there were any
19  injuries sustained from what I recall.
20     Q.   Did you see any pictures of Brian  09:37:41
21  Van Koot from that night?
22         MR. CONNOLLY:  At any juncture?
23     Q.   At any juncture?
24     A.   Yes.
25     Q.   When did you see those?   09:37:52

Page 524

1          Hesse
2     A.   I may have saw them the day I came
3  in. I don't specifically recall.
4     Q.   You testified that you don't
5  believe there were any injuries sustained by  09:38:10
6  Mr. Van Koot.  What did you mean by that?
7     A.   He came in the next morning and I
8  believe he was okay.
9         MR. GOODSTADT:  Would you mark
10   this as Hesse Exhibit 17, photocopy of   09:38:28
11   photographs.
12         (Hesse Exhibit 17, photocopy of
13   photographs, marked for
14   identification, as of this date.)
15     Q.   I placed in front of Mr. Hesse   09:38:41
16  what has now been marked as Hesse 17,
17  three-page exhibit bearing Bates numbers 3187
18  through 3188, 3189.
19         Mr. Hesse, are these the pictures
20  that you saw the next morning?   09:39:14
21         MR. CONNOLLY:  Objection.
22     A.   Yes, I have seen these pictures,
23  yes.
24     Q.   Did you hear that at that time
25  that Mr. Van Koot had suffered an unaligned   09:39:27

Page 525

1          Hesse
2  trachea, or disaligned trachea as a result of
3  the Halloween incident?
4         MR. NOVIKOFF:  Objection to the
5    form.                      09:39:44
6     A.   Yes, I did hear that he had a
7  either deviated trachea or something, what the
8  EMT suspected, yes.
9     Q.   What do you mean by what the EMT
10  suspected?                   09:40:00
11     A.   If he had a deviated trachea I
12  doubt he would have been out of the hospital
13  within a couple of hours.  It was a
14  precautionary measure.
15     Q.   So do you know whether he actually  09:40:10
16  suffered that injury?
17     A.   I don't believe he did.
18     Q.   That was on the basis of your
19  understanding that he was out of the hospital
20  and came to the police station the next   09:40:19
21  morning?
22         MR. NOVIKOFF:  Objection to the
23    form.
24     A.   Yes.
25     Q.   Did you ever check to see whether  09:40:22

Page 526

1          Hesse
2  he had actually suffered those injuries?
3         MR. NOVIKOFF:  Objection.
4    Foundation.
5     A.   I don't recall.            09:40:30
6     Q.   Did you ever speak -- strike that.
7         How did you know that the EMT
8  suspected that?
9     A.   I think I read it on the PCR.
10     Q.   Did you ever speak with anyone who  09:40:44
11  was on EMT that night about those injuries?
12     A.   I don't recall if I did.
13     Q.   When was the first time that you
14  spoke with Joe Loeffler Jr. about the
15  Halloween incident?            09:40:57
16     A.   I don't recall when.
17     Q.   Do you recall how long after those
18  five days it was?
19     A.   I don't.
20     Q.   Joe Loeffler was part of the EMT   09:41:04
21  that night; is that correct?
22     A.   I believe he was, yes.
23     Q.   Did you ever hear the fact that he
24  stated that it was an assault second with a
25  dangerous instrument at the police station   09:41:15

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2  that night?
3       MR. CONNOLLY:  Objection.
4       MR. NOVIKOFF:  Objection.
5    A.  I heard a rumor about that, yes.   09:41:19
6    Q.  Who did you hear the rumor from?
7    A.  I don't recall.
8    Q.  Did you ever speak with
9  Mr. Loeffler about that statement?
10   A.  I don't recall.           09:41:26
11   Q.  Did you ever speak with any of the
12 on duty officers that night about that
13 statement?
14      MR. NOVIKOFF:  Objection.
15   Q.  The three on duty officers that   09:41:36
16 were on duty that night --
17      MR. CONNOLLY:  The three officers
18 that went to the scene?
19      MR. NOVIKOFF:  Objection to the
20 form.              09:41:45
21   Q.  Yes.
22   A.  I don't recall if I did
23 specifically.
24   Q.  Do you recall specifically
25 speaking to anybody about that statement being 09:41:51

**Hesse**

1
2  made?
3       MR. NOVIKOFF:  Objection to the
4  form.
5    A.  Specifically no.         09:41:54
6    Q.  Did you review the on duty
7  officers field report from that evening?
8    A.  Yes.
9    Q.  When did you review that for the
10 first time?              09:42:12
11   A.  I believe it was that Monday
12 morning.
13   Q.  And what was your reaction to
14 reading that report?
15   A.  I don't know if I really had a   09:42:22
16 reaction.  I don't really recall what I had
17 thought.
18   Q.  Did you read that at the same time
19 that you read the witness statements that had
20 been taken the night of the Halloween    09:42:39
21 incident?
22   A.  Yes, I read them as a packet.
23   Q.  And the photos that have been
24 marked as Hesse Exhibit 17, they were part of
25 that packet?           09:42:52

**Hesse**

1
2    A.  You know I don't recall if they
3  were or not.  I do remember seeing them.  I
4  don't remember when I first saw them though.
5    Q.  Were there any handwritten notes   09:43:01
6  or notes or documents prepared by Ed Paradiso
7  in that packet that you received?
8    A.  I don't recall if there was.
9       MR. GOODSTADT:  Would you mark
10 this document as Hesse Exhibit 18,      09:43:17
11 incident report.
12      (Hesse Exhibit 18, incident
13 report, marked for identification, as
14 of this date.)
15      MR. GOODSTADT:  Off the record for 09:43:40
16 one minute.
17      THE VIDEOGRAPHER:  The time is
18 9:45, we are off the record.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  The time is   09:51:48
21 9:53, we are on the record.
22   Q.  Mr. Hesse, I want to go back to
23 your discussions with Jeannie Jaeger both on
24 the phone and when you went to her house with
25 Mr. Cherry.  Did you ever ask her why she   09:52:06

**Hesse**

1
2  didn't provide a statement that night to the
3  on duty police officers?
4    A.  Yes, she felt that because she saw
5  an ambulance in front of the police station,   09:52:21
6  that she felt that they were busy and she
7  didn't want to bother anybody.
8    Q.  Do you know where she went after
9  Hauser's that night?
10   A.  I don't recall where she went.   09:52:38
11   Q.  You never heard that she went to
12 CJ's after Hauser's?
13   A.  I don't recall.  She might have.
14   Q.  Do you have to pass the police
15 station to get from Hauser's to CJ's?      09:52:49
16   A.  Yes.
17   Q.  Do you have to pass the police
18 station to get from CJ's back from their
19 residence?
20   A.  No.              09:52:57
21   Q.  How far is CJ's from the police
22 station?
23   A.  Maybe 50 steps.
24   Q.  50 steps?
25   A.  Maybe.            09:53:03

Page 531

Hesse

1   Hesse
2       Q.   Did you ask her whether the --
3   strike that.
4           You never spoke to her about
5   whether she was at CJ's that night after        09:53:08
6   Hauser's?
7           MR. CONNOLLY:  Objection.
8       A.   I don't recall.
9       Q.   Did you ask her why she didn't
10  give a statement to the on duty officers at      09:53:16
11  Hauser's?
12          MR. CONNOLLY:  Objection.
13          MR. NOVIKOFF:  Objection.
14      A.   I don't recall.
15      Q.   Do you know whether -- strike      09:53:24
16  that.
17          Did she tell you that she didn't
18  want to bother anybody when she saw the
19  ambulance, did she tell you that during the
20  phone call or did she tell you that during the  09:53:35
21  visit to her house?
22      A.   I don't recall.
23      Q.   Do you know whether it was
24  incorporated into her witness statement?
25      A.   I don't recall if it was or not.  09:53:44

Page 532

1   Hesse
2       Q.   Do you think that is an important
3   fact that should be incorporated into a
4   witness statement?
5           MR. NOVIKOFF:  Objection.       09:53:55
6       A.   May have.
7       Q.   It may have been important to
8   incorporate in a witness statement?
9       A.   May have.
10      Q.   What do you mean by that?       09:54:02
11      A.   We just told her to tell us what
12  happened.  You know, it is funny, I don't
13  recall whether or not she told me within those
14  first five days or when we took the statement
15  or after.  I must have seen her a hundred      09:54:18
16  times since then, so I don't recall.
17      Q.   So it is possible that you didn't
18  even ask her that during the five days?
19      A.   I don't recall.
20      Q.   The witness statements that were   09:54:28
21  prepared by, written by you and Mr. Cherry,
22  are those considered police property?
23          MR. NOVIKOFF:  Objection to the
24      form.
25      A.   I would say yes.              09:54:42

Page 533

1   Hesse
2       Q.   Would they be confidential?
3       A.   To a point.
4       Q.   What do you mean by to a point?
5       A.   They are not for the general      09:54:49
6   public to look at.
7       Q.   Were they for other officers to
8   look at other than for you and Mr. Cherry?
9       A.   I don't think I would have hid
10  them from anybody.               09:55:02
11      Q.   Did you leave them out for anybody
12  to look at?
13      A.   Not specifically that I recall.
14      Q.   Did you ever show them to Gary
15  Bosetti?                      09:55:11
16      A.   Yes.
17      Q.   When did you show them to Gary
18  Bosetti?
19      A.   I don't recall when.
20      Q.   Did you show them before or after  09:55:16
21  he provided his statement?
22      A.   It might have been after.
23      Q.   You don't recall showing them to
24  him before?
25      A.   No.                     09:55:24

Page 534

1   Hesse
2       Q.   Would it have been improper for
3   him to review the other witness' statements
4   before giving his own witness statement?
5           MR. CONNOLLY:  Objection.      09:55:33
6           MR. NOVIKOFF:  Objection.
7       A.   I don't believe so.
8       Q.   So you think it would have been
9   proper for him to review everybody else's
10  witness statement prior to his statement being  09:55:39
11  taken?
12          MR. NOVIKOFF:  Objection.
13      A.   You know at that point I don't
14  think it really would have mattered.
15      Q.   Why not?                09:55:50
16      A.   Because we felt that his actions
17  were correct.
18      Q.   So why did you ask him for a
19  statement?
20      A.   Because we actually wanted to see  09:55:57
21  what he had to say.
22      Q.   So again prior to actually seeing
23  what he had to say do you think it would have
24  been proper to show him all the other eye
25  witness statements that had been taken?      09:56:10

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 535

Hesse

1
2       MR. CONNOLLY:  Objection.
3       A.   Yeah, I don't recall whether or
4    not he did.  To tell you the truth I don't
5    believe he did until afterwards.         09:56:19
6       Q.   I am not asking whether he did or
7    didn't, I am asking whether it would have been
8    proper to have provided him with the other
9    witness statements prior to finding out what
10   he had to say?                           09:56:28
11      MR. NOVIKOFF:  Note my objection.
12      MR. CONNOLLY:  Objection.
13      A.   I don't think it would have been
14   proper, but like I said I don't recall whether
15   he did or not.  I don't think he did.    09:56:40
16      Q.   Would it have been proper for him
17   to just make photocopies of the statements and
18   take them home with him?
19      A.   I don't --
20      MR. NOVIKOFF:  Objection.         09:56:53
21      A.   I don't believe he did.
22      Q.   The question wasn't whether he did
23   or didn't.  The question was whether it would
24   have been proper for him to do so?
25      MR. NOVIKOFF:  Objection.          09:56:59

Page 536

Hesse

1
2       A.   If he asked permission I don't
3    think it would have been improper.
4       Q.   How about if he didn't ask
5    permission?                             09:57:05
6       A.   I think that would be improper.
7       Q.   Would it be grounds for
8    termination?
9       A.   Not specifically.
10      Q.   Why not?                       09:57:12
11      A.   Why should he be; I don't know.
12      Q.   Did you terminate David Gerbin
13   (phonetic) for making photocopies of police
14   documents?
15      A.   He did more than that.         09:57:28
16      Q.   Was that one of the reasons that
17   you terminated him?
18      A.   Yes.
19      Q.   What were the other reasons that
20   you terminated Gerbin?                  09:57:35
21      A.   He was in my desk going through my
22   personal documents, not just a file that was
23   left on a desk.
24      Q.   Anything else that Gerbin did that
25   you terminated him for?                 09:57:46

Page 537

Hesse

1
2       A.   He went through people's personnel
3    files and took copies of that stuff too, I
4    don't find that to be proper.
5       Q.   Anything else that you fired     09:57:54
6    Gerbin for?
7       A.   I believe that was it.
8       Q.   And that was -- you saw that on
9    the videotape, Gerbin taking the stuff?
10      A.   Yes.                            09:58:17
11      Q.   Did you keep a copy of that tape?
12      A.   Yes.
13      Q.   I believe you testified that
14   Mr. Paradiso had spoken to Elyse Miller; is
15   that correct?                           09:58:30
16      MR. NOVIKOFF:  Objection.
17      A.   Yes.
18      Q.   How did you learn that he spoke
19   with Elyse Miller?
20      A.   I believe he had stated to me that  09:58:43
21   he did and Elyse Miller had said that he came
22   up to the house.
23      Q.   What house is that?
24      A.   I don't specifically remember.
25      Q.   You don't know -- so she told you  09:58:49

Page 538

Hesse

1
2    that she spoke with Ed Paradiso when he came
3    up to the house?
4       A.   Yes, where she was staying that
5    night.                                  09:59:01
6       Q.   Did she tell you which house it
7    was?
8       A.   If I recall correctly I think it
9    was Michael Miller's house on Barberry Walk.
10      Q.   Was Gary Bosetti staying there    09:59:11
11   that night?
12      A.   I don't recall.
13      Q.   Did you ever ask him?
14      A.   I don't recall if I did or not.
15      Q.   Do you know whether Richard      09:59:18
16   Bosetti was staying there that night?
17      A.   I don't recall.
18      Q.   Did you ever ask him?
19      A.   Actually he made a statement that
20   he stayed in the barracks.             09:59:29
21      Q.   Do you know whether he was
22   planning to stay at Michael Miller's house
23   that evening?
24      A.   I don't know.
25      Q.   Did Ms. Miller provide -- strike  09:59:40

37f918e4-de29-4df9-9ef1-64f4ca0acd46

```
 1          Hesse
 2  that.
 3          What else did Mr. Paradiso tell
 4  you if anything about his discussion with
 5  Ms. Miller?                      09:59:49
 6     A.   I don't recall.
 7     Q.   Do you recall anything he told you
 8  about his discussion with Ms. Miller other
 9  than the fact that he spoke with her?
10     A.   No, I don't recall.    09:59:58
11     Q.   When was the first time that you
12  spoke with Elyse Miller about Halloween?
13     A.   I don't remember the exact date,
14  but I believe it was over the telephone.
15     Q.   Was it prior to or after your   10:00:10
16  discussion on that Monday or on that Tuesday
17  with Doug Wyckoff?
18     A.   Well, I know Officer Cherry was
19  present when I spoke to her on the phone
20  because he was listening in.  Actually I was   10:00:28
21  listening in to him.  So it had to be a couple
22  of days after.
23     Q.   So your discussion with Ms. Miller
24  was a couple of days after that Tuesday?
25     A.   A day or two possibly, I don't      10:00:41
```

```
 1          Hesse
 2  know.
 3     Q.   So your recollection it was either
 4  Wednesday or Thursday?
 5     A.   It is possible, I don't know.      10:00:48
 6     Q.   Did you call her or did she call
 7  you?
 8     A.   I don't remember.
 9     Q.   Tell me everything that you recall
10  that she said about what happened on Halloween   10:01:01
11  during that phone call?
12         MR. CONNOLLY:  That phone call
13  being?
14     Q.   The one that you testified to the
15  first time that you spoke with her?       10:01:09
16     A.   I think we just basically asked
17  her what she observed, and she said she was
18  waiting on line for the bathroom.  She
19  remembers being on line for quite a while,
20  possibly fifteen minutes or more.  She was   10:01:20
21  standing behind who she now knows as Jeannie
22  Jaeger who was the first one on line.  I guess
23  they were having a discussion about how long
24  they were waiting on line.
25         They kept knocking on the door.  I   10:01:34
```

```
 1          Hesse
 2  remember her saying that then a male and a
 3  female came out of the bathroom.  Next thing
 4  you know a fight broke out and her and Jeannie
 5  somehow got themselves into the bathroom to   10:01:51
 6  stay away from the fight.  That is basically
 7  what I recall.  I don't remember specifics.
 8     Q.   And who was -- who was on that
 9  call?
10     A.   I believe it was myself and John   10:02:04
11  Cherry, Pat Cherry.
12     Q.   Did you ask -- strike that.
13         Do you know whether Ms. Miller was
14  drinking that evening?
15     A.   I don't recall.          10:02:13
16     Q.   Did you ask her?
17     A.   I don't recall.
18     Q.   Do you think that would have been
19  an important question to ask Ms. Miller?
20         MR. NOVIKOFF:  Objection.       10:02:22
21     A.   May have.
22     Q.   What do you mean by may have?
23     A.   It just may have.  I think it was
24  irrelevant, but I don't recall her if we asked
25  her or not.                    10:02:32
```

```
 1          Hesse
 2     Q.   Why would it be irrelevant about
 3  whether an alleged eyewitness was drinking?
 4     A.   Because what she told us is what
 5  we believed happened, so.  And she was not   10:02:42
 6  intoxicated when we were asking her those
 7  questions.
 8     Q.   But if she was intoxicated at the
 9  time it could have affected her judgment?
10     A.   It is possible.          10:02:55
11     Q.   Could it have affected her ability
12  to recall facts?
13         MR. NOVIKOFF:  Objection.
14     A.   It is possible.
15     Q.   Could it have affected her        10:03:06
16  perception?
17         MR. NOVIKOFF:  Objection.
18     A.   Sure.
19     Q.   Yet you still think it is
20  irrelevant?                    10:03:15
21     A.   Yes.
22     Q.   Did she ever provide a witness
23  statement in writing?
24     A.   Yes.
25     Q.   Before we get to that, did you   10:03:22
```

Page 543

Hesse

1
2   take any notes of that phone conversation?
3       A.   I don't believe we did.
4       Q.   How come?
5       A.   I think we just asked her to write   10:03:31
6   down her recollection of what happened and
7   send it to us.
8       Q.   But she had already given you a
9   verbal recollection; is that correct?
10      A.   Yes.                    10:03:40
11      Q.   You didn't take any notes of what
12  she said verbally?
13          MR. CONNOLLY:  Objection.
14      A.   I specifically didn't.  I am
15  unaware if John Cherry did, or Patrick Cherry   10:03:47
16  he is known as.
17      Q.   Don't you think it would have been
18  important to write down what she said to you
19  in case her written statement contradicted it?
20      A.   No.                    10:04:00
21          MR. GOODSTADT:  Would you mark
22      this document as Hesse Exhibit 19,
23      handwritten statement dated November 1,
24      2004.
25          (Hesse Exhibit 19, handwritten   10:04:09

Page 544

Hesse

1
2       statement dated November 1, 2004,
3   marked for identification, as of this
4   date.)
5       Q.   I placed in front of Mr. Hesse   10:04:40
6   what has been marked as Hesse Exhibit 19.  It
7   is a multiple page exhibit bearing Bates
8   numbers 3169 through 3175.
9           Mr. Hesse, do you recall ever
10  reading or seeing the document that has been   10:05:02
11  marked as Hesse Exhibit 19?
12      A.   Yes.
13      Q.   This is -- what is this document?
14      A.   This is Elyse Miller's
15  recollection of what happened that night.   10:05:16
16      Q.   Do you see on the first page dated
17  November 1, 2004, do you see that?
18      A.   Yes.
19      Q.   That was actually Monday; is that
20  correct?                        10:05:24
21      A.   Yes.
22      Q.   Does this refresh your
23  recollection as to who when you spoke with
24  Ms. Miller?
25      A.   No.                    10:05:30

Page 545

Hesse

1
2       Q.   Any reason to believe that it was
3   not provided to you on that Monday?
4       A.   Say that again.
5       Q.   Any reason to believe that this   10:05:44
6   was not provided to you on that Monday?
7       A.   No.
8       Q.   Was Pat Cherry assisting you by
9   that Monday?
10      A.   You know, I don't recall if he   10:05:52
11  came in Monday, Tuesday or Wednesday.
12      Q.   How did this statement come into
13  the station?
14      A.   I believe originally it may have
15  been faxed first and then we asked her to take   10:06:05
16  it to a notary, have it notarized and send us
17  the original.
18      Q.   It came to the fax machine in the
19  police station?
20          MR. CONNOLLY:  Objection.       10:06:24
21      A.   I believe so.
22      Q.   Did you -- strike that.
23          Did she ever mention to you
24  anything about Gary Bosetti using a pool cue
25  to strike somebody?               10:06:40

Page 546

Hesse

1
2       A.   I don't recall if she did or not,
3   I would have to read this whole thing again.
4       Q.   I represent to you that there is
5   nothing in this statement that mentioned   10:06:49
6   anything about a pool cue.
7       A.   Okay.
8       Q.   Did you think that that would be
9   strange that an eyewitness who allegedly saw
10  the whole incident would leave out the fact   10:06:58
11  that Gary Bosetti used a pool cue to strike
12  somebody?
13          MR. CONNOLLY:  Objection.
14          MR. NOVIKOFF:  Objection.
15      A.   I never said that she saw the   10:07:04
16  whole incident, and we asked her in her best
17  recollection to give us a statement on what
18  she observed.
19      Q.   Out of all the witness statements
20  that you took do you recall any of the alleged   10:07:19
21  eyewitnesses mentioning that Gary Bosetti used
22  a pool cue to strike somebody?
23      A.   You know I don't think anybody
24  ever mentioned a pool cue.
25      Q.   Did you think that that was   10:07:32

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2  strange that nobody mentioned a pool cue?
3      MR. CONNOLLY:  Objection.
4      MR. NOVIKOFF:  Objection.
5      A.   Yes.                    10:07:36
6      Q.   It is an important fact that was
7  omitted by all the eyewitness statements that
8  you had taken?
9      MR. NOVIKOFF:  Objection.
10      A.   Everything was done in their    10:07:45
11  words, I am not going to put words in their
12  mouth.
13      Q.   Did you weigh -- strike that.
14          Did you use the fact that nobody
15  mentioned Gary Bosetti using a pool cue as    10:07:55
16  part of your credibility analysis?
17      A.   Credibility of who?
18      MR. NOVIKOFF:  Objection.
19      Q.   Of the eyewitnesses?
20      MR. NOVIKOFF:  Objection.        10:08:07
21      A.   Their statements are their
22  statements.
23      Q.   But you had to make a credibility
24  assessment as to whose statements were
25  accurate and whose were not; is that correct?  10:08:15

**Hesse**

1
2      A.   Their statements were this
3  statements.
4      Q.   Well did you make a credibility
5  assessment as part of your investigation?    10:08:21
6      A.   Not that I specifically recall.
7      Q.   Well, you already testified that
8  you thought that the three people who were
9  involved with the fight that gave statements
10  that night had blatant lies in their        10:08:37
11  statements; correct?
12      MR. CONNOLLY:  Objection.
13      A.   That is what I felt.
14      Q.   So that was making a credibility
15  determination about the three of them;      10:08:44
16  correct?
17      MR. NOVIKOFF:  Objection.
18      A.   In your opinion, yes.
19      Q.   How about your opinion?
20      A.   I thought they were lying.      10:08:52
21      Q.   And you didn't believe their
22  statements; right?
23      A.   Yes.
24      Q.   You did not believe they were
25  credible; is that correct?              10:09:00

**Hesse**

1
2      MR. CONNOLLY:  Objection.
3      A.   Correct.
4      Q.   So I will go back to the same
5  question.  So you did make a credibility    10:09:04
6  assessment as to the three people who gave
7  statements the night of the incident; correct?
8      A.   If you say so, yes.
9      Q.   I am not asking about what I say,
10  I am asking about you?                10:09:16
11      A.   I believe that they were lies.
12      Q.   Did you believe that any other
13  witnesses provided any lies in their
14  statements?
15      A.   Not that I recall, no.          10:09:32
16      Q.   So you view them as credible?
17      A.   Yes.
18      Q.   So I will go back to the question
19  again.  You did make a credibility assessment
20  as part of your investigation; is that        10:09:44
21  correct?
22      MR. NOVIKOFF:  Objection.
23      A.   At that time I don't recall.
24      Q.   And were you friends with Elyse
25  Miller at the time?                  10:09:59

**Hesse**

1
2      A.   We were acquaintances.
3      Q.   Was she ever a friend of yours on
4  Face Book?
5      A.   Yes, at one time.            10:10:06
6      Q.   What do you mean by at one time?
7      A.   I deleted her as a friend.
8      Q.   How come?
9      A.   Because we are not friends.
10      Q.   Were you friends during the period  10:10:16
11  that she was a friend on Face Book?
12      A.   No.
13      Q.   So why did you delete her --
14  strike that.
15          The reason that you deleted her is  10:10:25
16  because you are not friends?
17      A.   Correct.
18      Q.   So why didn't you delete her --
19  strike that?
20          How long was she a friend of yours  10:10:32
21  on Face Book?
22      A.   I barely had been on Face Book for
23  a year.  I just didn't find it necessary for
24  her to be a friend of mine on Face Book.
25      Q.   Anything else happen between the   10:10:44

Page 551

Hesse

1
2 two of you that caused you to delete her as a
3 friend in Face Book?
4        MR. BAPTISTE:  This is a surreal
5    line of questioning, but I am not        10:10:54
6    objecting.
7    A.  No.
8    Q.  Was she a friend of yours on your
9 My Space account?
10    A.  You know I don't think so.        10:11:02
11    Q.  Was she a friend of yours or an
12 acquaintance or whatever they call it on any
13 other social networking Internet site?
14    A.  No.
15    Q.  Did you ask her why she didn't    10:11:21
16 give a statement the night of the incident?
17    A.  I don't recall.
18    Q.  Did she tell you why she didn't
19 give a statement the night of the incident?
20    A.  I don't recall.        10:11:30
21    Q.  Did you ask her why she didn't go
22 to the police station that evening?
23    A.  I don't recall if we did or not.
24    Q.  Is it your testimony that you
25 don't know whether Gary Bosetti stayed at the  10:11:42

Page 552

Hesse

1
2 same house as Elyse Miller that night?
3    A.  I don't know.
4    Q.  If he did do you believe that that
5 would factor on her credibility at all?    10:11:53
6    A.  No.
7    Q.  Were they friends?
8    A.  I believe they are friends.
9    Q.  Did they have a sexual
10 relationship?            10:12:02
11        MR. NOVIKOFF:  Objection.
12    A.  I don't know.
13        MR. NOVIKOFF:  If you are going to
14    ask him did he personally witness or did
15    Gary tell him, that is fine.        10:12:10
16    Q.  Did you ever hear that they had a
17 sexual relationship?
18    A.  No.
19    Q.  Do you know whether -- well strike
20 that.            10:12:19
21        Did you ever take a witness
22 statement from Ian Levine about that evening?
23    A.  Yes.
24    Q.  You took his statement?
25    A.  I think I did.        10:12:28

Page 553

Hesse

1
2    Q.  Who else was there at the time of
3 the statement?
4    A.  I don't recall.
5    Q.  What day did you take his        10:12:36
6 statement?
7    A.  I don't recall.
8    Q.  Do you recall, do you know whether
9 Mr. Levine was drinking that evening?
10    A.  I don't know.        10:12:49
11    Q.  Did you ask him?
12    A.  I don't recall.
13    Q.  Is this the same Ian Levine that
14 you had worked for installing cable?
15    A.  Yes.            10:12:58
16    Q.  You testified I think the first
17 day of your deposition that he paid you in
18 cash; is that correct?
19    A.  Correct.
20    Q.  That you didn't pay taxes on that  10:13:09
21 money; right?
22    A.  Right.
23        MR. GOODSTADT:  Would you mark
24    this document as Hesse Exhibit 20,
25    handwritten statement dated November 2,  10:13:24

Page 554

Hesse

1
2    2004.
3        (Hesse Exhibit 20, handwritten
4    statement dated November 2, 2004,
5    marked for identification, as of this    10:13:25
6    date.)
7    Q.  I place in front of Mr. Hesse what
8 is marked as Hesse Exhibit 20.  It is a
9 two-page exhibit bearing Bates 3176 and 3177.
10        Mr. Hesse, do you recognize the    10:13:58
11 document marked as Hesse Exhibit 20?
12    A.  Yes.
13    Q.  What is this document?
14    A.  This is a statement by Ian Levine
15 that was taken by John Cherry.        10:14:04
16    Q.  Does this refresh your
17 recollection as to whether you took his
18 statement?
19    A.  Yes.
20    Q.  Were you with Mr. Cherry and    10:14:12
21 Mr. Levine at the time that this statement was
22 provided?
23    A.  No.
24    Q.  So your recollection before about
25 taking a witness statement from Mr. Levine is  10:14:19

Page 555

Hesse

1   **Hesse**
2   incorrect, or did you take a separate
3   statement?
4       A.   You are correct, I was mistaken.
5       **Q.   Did you review this witness**   **10:14:30**
6   **statement as part of your investigation?**
7       A.   Yes, at some point I did read it.
8       **Q.   And again you don't know if he was**
9   **drinking that evening?**
10      A.   I don't know.               10:14:39
11      **Q.   Did you take a statement of one**
12  **Mr. Sean O'Rourke as part of your**
13  **investigation?**
14      A.   We did, but I did not do it
15  personally.                       10:14:57
16      **Q.   Who took that statement?**
17      A.   John Cherry, Pat Cherry.
18      **Q.   Is Mr. O'Rourke -- who is Sean**
19  **O'Rourke?**
20      A.   Just a local resident.      10:15:14
21      **Q.   Does he work anywhere in the**
22  **village?**
23      MR. CONNOLLY:  Now?
24      **Q.   At the time?**
25      A.   At the time, yes, he did a lot of  10:15:20

Page 556

1          Hesse
2   different things.
3       **Q.   Was he working the night of the**
4   **Halloween incident?**
5       A.   I believe he was the doorman.    10:15:26
6       **Q.   The doorman of where?**
7       A.   Hauser's.
8       **Q.   Did you review his witness**
9   **statement as part of your investigation?**
10      A.   I believe I did.            10:15:36
11      **Q.   Was Mr. O'Rourke arrested for**
12  **cocaine possession?**
13      A.   At some point, yes.
14      **Q.   Was he prosecuted?**
15      A.   Yes, he was.               10:15:45
16      **Q.   Was he found guilty?**
17      A.   Yes, he was.
18      **Q.   Was it just for possession or was**
19  **there any other crimes?**
20      A.   It was intent to sell and    10:15:51
21  possession.
22      **Q.   Intent to sell was based on the**
23  **quantity or based on the fact that he had some**
24  **paraphernalia for selling or what was the**
25  **basis?**                          **10:16:02**

Page 557

1          **Hesse**
2       A.   It was based on a lot of things.
3   It was based on the packaging, the amount and
4   the paraphernalia.
5       **Q.   When was that arrest?**      **10:16:11**
6       A.   Good question.  It was in the
7   month of January, I don't know, 2004, 2005.
8       **Q.   Was it before or after you took**
9   **his statement?**
10      A.   I don't know.  You know what, it   10:16:26
11  was definitely before the statement.
12      **Q.   So at the time the statement was**
13  **taken you had known that he was a convicted**
14  **drug dealer; is that correct?**
15      A.   Yes.                       10:16:40
16      **Q.   What was he actually convicted**
17  **for?**
18      MR. CONNOLLY:  Objection to the
19      extent that we know that he was arrested
20      before.  I don't know if it was     10:16:45
21      established that he was convicted.
22      **Q.   Do you know when the conviction**
23  **was?**
24      A.   I don't remember exactly what the
25  date was.                         10:16:53

Page 558

1          Hesse
2       **Q.   Was it before or after the**
3   **Halloween statement that he gave to you?**
4       A.   The conviction was possibly before
5   this also.                        10:16:58
6       **Q.   What was he convicted for?**
7       A.   You know, I don't remember the
8   exact plea deal, what he was convicted on.  I
9   don't remember exactly.
10      **Q.   But it was a drug related**       **10:17:09**
11  **conviction?**
12      A.   Yes.
13      **Q.   So at the time he gave you this**
14  **witness statement you knew he had been**
15  **convicted of a drug related crime?**       **10:17:17**
16      A.   Yes.
17      **Q.   Did you -- did his statement play**
18  **any role in your conclusion that you reached**
19  **within those five days?**
20      A.   Did it play a role; to what      10:17:32
21  extent; I don't recall.
22      **Q.   Well did you believe his statement**
23  **to be credible?**
24      A.   Sure.
25      **Q.   Do you know whether Mr. O'Rourke**  **10:17:44**

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 559

Hesse

1
2   was drinking that night?
3       A.   I don't recall.
4       Q.   Did you ask him?
5       A.   I don't recall.          10:17:49
6       Q.   Do you know whether Mr. O'Rourke
7   was doing drugs that night?
8       A.   I don't know, I didn't interview
9   him, so I don't know.
10      Q.   Do you know whether Mr. Cherry    10:17:56
11  asked him whether he was doing drugs that
12  night?
13      A.   I don't know.
14      Q.   Do you know whether Mr. Cherry
15  asked him if he was drinking that night?    10:18:02
16      A.   I don't know.
17      Q.   Do you think it would have been
18  important to find out whether or not a
19  eyewitness was doing drugs on the night of the
20  alleged incident?                10:18:10
21      MR. NOVIKOFF:  Objection.
22      A.   Sure, I guess we could have asked.
23      Q.   Particularly after he has already
24  been convicted of a drug crime?
25      MR. NOVIKOFF:  Objection.      10:18:19

Page 560

Hesse

1
2       A.   I didn't interview him.
3       Q.   I am asking you whether you think
4   it was important to ask that question?
5       MR. NOVIKOFF:  Objection.      10:18:25
6       A.   It may have been.
7       Q.   You think it would have been
8   important to ask him whether he was drinking
9   that night?
10      MR. NOVIKOFF:  Objection.      10:18:30
11      A.   It could have been, yes.
12      Q.   I believe you testified before
13  that you got a statement from Gary Bosetti; is
14  that correct?
15      A.   At some point, yes.        10:18:39
16      Q.   When was that?
17      A.   I don't remember the exact date.
18      Q.   Was it before or after you had
19  gotten the statement from Sean O'Rourke?
20      A.   I believe it was after.      10:18:50
21      Q.   At some point was Gary rehired?
22      A.   Yes.
23      Q.   Who rehired him?
24      A.   Ed Paradiso.
25      Q.   Do you recall when that took    10:18:59

Page 561

Hesse

1
2   place?
3       A.   Specifically no.
4       Q.   Were you there when it happened?
5       A.   Yes.                10:19:09
6       Q.   Where was it?
7       A.   Police station.
8       Q.   Who was there?
9       A.   John Cherry was there, but he was
10  sitting at the front desk, myself, Gary      10:19:16
11  Bosetti, Richie Bosetti and Ed Paradiso was in
12  the squad room.
13      Q.   I believe you testified that you
14  got his statement because you wanted to hear
15  what he had to say; is that correct?        10:19:34
16      A.   Yes.
17      Q.   How come you did -- strike that.
18      Do you recall taking it during the
19  first five days in which you reached your
20  conclusions?                10:19:45
21      A.   I don't recall whether I did or
22  not.
23      MR. GOODSTADT:  Would you mark
24  this document as Hesse Exhibit 21,
25  internal correspondence, November 12,    10:20:09

Page 562

Hesse

1
2   2004.
3       (Hesse Exhibit 21, internal
4   correspondence, November 12, 2004,
5   marked for identification, as of this    10:20:10
6   date.)
7       Q.   I placed in front of Mr. Hesse
8   what is marked as Exhibit 21, Bates number
9   3158.  Mr. Hesse, do you recognize this
10  document?                10:20:45
11      A.   Yes.
12      Q.   What is this document?
13      A.   Typed statement given by Gary
14  Bosetti.
15      Q.   You see it is dated November 12,    10:20:51
16  2004, do you see that?
17      A.   Yes.
18      Q.   Do you know whether he provided
19  a -- strike that.
20      How did you receive this        10:21:01
21  statement?
22      A.   I believe he did this in the
23  police station.  I think we had him come to
24  the station house.
25      Q.   He typed it up in the police    10:21:11

Page 563

Hesse

1 Hesse
2 station?
3     A.   I don't recall if I typed it as he
4 said it or if he typed it himself.
5     Q.   But to your recollection there was  10:21:19
6 no handwritten version of this from you or him
7 or somebody else?
8     A.   No.
9     Q.   You see it is dated November 12,
10 2004?                              10:21:31
11     A.   Yes.
12     Q.   That is now just about two weeks
13 after the incident?
14     A.   Yes.
15     Q.   Why did you wait about two weeks   10:21:36
16 to get his statement?
17     A.   I don't know why.
18     Q.   Did you ask him why he didn't give
19 a statement the night of the incident?
20     A.   I think he was -- I believe I did  10:21:47
21 ask him why he didn't approach one of the
22 three officers and, you know, I remember him
23 saying that he was dazed from the fight
24 itself.  That Richie attempted to -- Rich
25 Bosetti, his brother, attempted to talk to the  10:22:03

Page 564

1         Hesse
2 three and none of them wanted to talk to him.
3     Q.   Did you ask him why he didn't come
4 to the police station the next day to give a
5 statement?                          10:22:15
6     A.   Well, in his opinion I think he
7 felt he was being railroaded --
8         MR. CONNOLLY:  That is not the
9     question.
10     A.   So he didn't want to talk to     10:22:25
11 anybody, he left.
12     Q.   He left.  What do you mean by he
13 left?
14     A.   I think he left the beach.
15     Q.   As a retired 20 year veteran of    10:22:34
16 the New York City Police Department who was
17 involved in an altercation, was it appropriate
18 that he left the beach without giving a
19 statement?
20         MR. CONNOLLY:  Objection.       10:22:48
21         MR. NOVIKOFF:  Objection.
22     A.   He felt it was, yes.
23     Q.   I am not asking what he felt.  I
24 am asking you whether you felt that a 20 year
25 New York City veteran police officer at the    10:22:55

Page 565

1         Hesse
2 time a current police officer in the Village
3 of Ocean Beach, do you think it was
4 appropriate for him to leave the island
5 without giving a statement?            10:23:08
6         MR. NOVIKOFF:  Objection.
7     A.   I felt it was inappropriate, and I
8 felt he should have come to either myself or
9 the chief.
10     Q.   Did you ever write him up for not   10:23:13
11 doing?
12         MR. NOVIKOFF:  Objection.
13     A.   No.
14     Q.   Did you ever discipline him for
15 not doing that?                       10:23:20
16         MR. NOVIKOFF:  Objection.
17     A.   I did talk to him about it.
18     Q.   When did you speak to him about
19 it?
20     A.   I don't remember exactly.         10:23:25
21     Q.   Was it before or after November
22 12, 2004?
23     A.   I don't remember exactly, no.
24     Q.   Did you memorialize the fact that
25 you spoke to him about that?           10:23:37

Page 566

1         Hesse
2     A.   No.
3     Q.   What was your reaction when you
4 heard that he had left the island without
5 giving a statement?                    10:23:47
6     A.   I don't know if I had a reaction.
7 I don't recall.
8     Q.   Do you know whether he was
9 drinking that night?
10     A.   I don't know.                    10:23:58
11     Q.   Did you ever ask him?
12     A.   I may have, I don't know.
13     Q.   And he took police action that
14 night?
15         MR. NOVIKOFF:  Objection.        10:24:07
16         MR. CONNOLLY:  Objection.
17     Q.   Do you believe he took police
18 action that night?
19     A.   In my opinion, yes.
20     Q.   Was he the first officer at the    10:24:11
21 scene?
22         MR. NOVIKOFF:  Objection.
23     A.   He was already there.
24     Q.   So how come he didn't make an
25 arrest that night; did you ever ask him?      10:24:23

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 567

**Hesse**

1
2     A.   I may have asked him, I don't
3  recall specifically.
4     Q.   Do you recall what his response
5  was?                              10:24:31
6     A.   Not specifically, no.
7     Q.   Did it surprise you that he didn't
8  make an arrest after what you now believe to
9  be the truth?
10         MR. NOVIKOFF:  Objection.      10:24:45
11    A.   Was I surprised; I wouldn't say I
12  was surprised.
13    Q.   Did you ever ask him why he left
14  the ocean without giving a statement?
15         MR. BAPTISTE:  Why he left the    10:25:07
16   bar or why he left --
17    Q.   The beach without giving a
18  statement?
19    A.   I don't specifically remember.
20    Q.   Did you ever ask him why he left   10:25:13
21  the bar without giving a statement?
22         MR. NOVIKOFF:  Objection.  Asked
23   and answered.
24    A.   I believe he was inside the bar
25  and Rich Bosetti went out to talk to the three  10:25:23

Page 568

Hesse

1
2  police officers, and they said they will take
3  care of it, they will do whatever,
4  specifically I don't recall.
5         Frank -- I believe it was Frank    10:25:33
6  Fiorillo had said to Rich specifically we are
7  handling it.  So Richie went back into the
8  bar.  So I don't know why they specifically
9  didn't talk to them.
10    Q.   And by November 12th you had       10:25:44
11  already reached a conclusion as to what
12  happened; correct?
13    A.   Yes.
14    Q.   By that point in time had any
15  other witness mentioned to you that Gary    10:25:56
16  Bosetti used a pool cue?
17         MR. CONNOLLY:  Objection.
18         MR. NOVIKOFF:  Objection to the
19   form.
20    A.   I don't believe any witness came   10:26:03
21  forward and said anything about a pool cue.
22    Q.   Did you ever take a statement from
23  Richard Bosetti?
24    A.   Yes.
25    Q.   When did you take that statement?  10:26:14

Page 569

**Hesse**

1
2     A.   I don't specifically remember.
3     Q.   Was it before or after Gary's?
4     A.   I don't know.
5     Q.   Did you ask him to provide a      10:26:23
6  statement or did he come forward voluntarily
7  to do it?
8     A.   I believe I asked him to write
9  something up.
10    Q.   When did you ask him that?        10:26:29
11    A.   I don't specifically remember.
12    Q.   Do you recall approximately when
13  it was?
14    A.   No.  I don't.
15    Q.   Do you recall what month it was?  10:26:36
16    A.   It was probably in November.
17    Q.   Why would you think that?
18    A.   Well, the incident took place on
19  the 31st, preceding month is November.
20         MR. GOODSTADT:  Would you mark    10:27:00
21   this document, internal correspondence,
22   December 10, 2004, as Hesse Exhibit 22.
23         (Hesse Exhibit 22, internal
24   correspondence, December 10, 2004,
25   marked for identification, as of this    10:27:02

Page 570

Hesse

1
2   date.)
3     Q.   I placed in front of Mr. Hesse
4  what has been marked as Hesse Exhibit 22, it
5  is a multiple page exhibit bearing Bates    10:27:38
6  numbers 3200 through 3204.
7         Do you recognize the exhibit that
8  has been marked as Hesse Exhibit 22?
9     A.   Yes.
10    Q.   What is this?                     10:27:54
11    A.   Statement that I took from Rich
12  Bosetti.
13    Q.   And the last three pages are, is
14  that your handwriting?
15    A.   Yes, that is my handwriting.      10:28:03
16    Q.   How come Rich Bosetti didn't sign
17  the statement, the last three page written
18  statement?
19    A.   I don't recall.
20    Q.   Do you usually have a witness sign  10:28:11
21  a statement that they give?
22    A.   Always, yes.
23    Q.   Do you know whether he actually
24  signed the handwritten statement at any point?
25    A.   According to this no, I don't      10:28:22

Page 571

Hesse

1        Hesse
2    recall.
3        Q.   Who typed the first two pages?
4        A.   I think I went back and I typed it
5    up after I wrote it.            10:28:32
6        Q.   Why would you type it up?
7        A.   Just so it was easier to read, no
8    other reason.
9        Q.   You see the date, December 10,
10   2004?                          10:28:42
11       A.   Yes.
12       Q.   Does that now refresh your
13   recollection as to when you took Rich
14   Bosetti's statement?
15       A.   Not specifically, no.        10:28:46
16       Q.   Any reason to believe it was not
17   December 10, 2004?
18       A.   No.
19       Q.   Why would you wait six weeks to
20   take a statement?              10:28:55
21       MR. NOVIKOFF:  Almost six weeks.
22       Q.   Approximately six weeks.
23       MR. CONNOLLY:  Objection to the
24   form.  You can answer.
25       A.   I don't specifically recall why.   10:29:03

Page 572

1        Hesse
2        Q.   Do you think that six week time
3    lapse could affect his ability to recall the
4    events that night?
5        A.   It could have.            10:29:14
6        Q.   Did you ask him whether he was
7    drinking that night?
8        A.   Not specifically, I don't
9    remember.
10       Q.   Do you know whether he was      10:29:20
11   drinking that night?
12       A.   I don't know.
13       Q.   Do you think it would have been
14   important to ask him?
15       MR. CONNOLLY:  Objection.        10:29:26
16       A.   Sure.
17       Q.   Did you ask Rich Bosetti if he
18   tried to get any statements from any
19   eyewitnesses that night?
20       A.   I don't recall if I did.        10:29:48
21       Q.   Do you know how Rich Bosetti got
22   off the island that next morning?
23       A.   I don't recall.
24       Q.   Do you know how Gary Bosetti got
25   off the island on the morning of the 31st?   10:30:02

Page 573

1        Hesse
2        A.   I don't recall.
3        Q.   I believe you testified before
4    about asking the on duty officers that evening
5    to put together 42's; is that correct?     10:30:17
6        MR. CONNOLLY:  Objection.  Do you
7    mean the officers who were on the scene?
8        Q.   Who were on duty that night?
9        MR. CONNOLLY:  We have not
10   established there were any other officers  10:30:28
11   on duty.  I know you are making reference
12   to the three officers that went to the
13   scene.
14       MR. GOODSTADT:  I will rephrase.
15       MR. NOVIKOFF:  I believe this        10:30:35
16   witness testified today that he asked
17   Mr. Lamm and Mr. Fiorillo for 42's.  I
18   don't believe he made any reference to a
19   42 for Mr. Snyder.
20       Q.   So did you ask Mr. Fiorillo to     10:30:48
21   provide a 42?
22       A.   Yes.
23       Q.   A 42 is what?
24       A.   Just a memo.
25       Q.   Did you ask Lamm to provide a 42?  10:30:54

Page 574

1        Hesse
2        A.   Yes.
3        Q.   Did you ask Snyder to provide a
4    42?
5        A.   At some point I did.          10:31:01
6        Q.   Do you recall when you asked
7    Snyder to provide a 42?
8        A.   I don't recall.
9        Q.   Is it possible that it was October
10   31st that you asked him to provide a 42?     10:31:09
11       MR. NOVIKOFF:  Objection.
12       A.   I don't think so.
13       Q.   When was the first time that you
14   recall speaking to Snyder about the Halloween
15   incident?                      10:31:25
16       A.   I don't recall.
17       Q.   Do you recall approximately how
18   many days after the event?
19       A.   No, I don't.
20       Q.   Do you recall when Snyder provided  10:31:25
21   his 42?
22       A.   I don't.
23       Q.   Do you recall how Snyder provided
24   his 42?
25       A.   I think he put it in writing.      10:31:37

Hesse

1
2      Q.   Do you recall how you received it?
3      A.   I don't know.  I don't know if it
4  was by E-mail or if he faxed it.
5      Q.   Do you recall whether -- was it   10:31:47
6  handwritten or typed?
7      A.   My best recollection is it was
8  typed.
9      Q.   Did you ever receive the 42 from
10  Lamm?                        10:31:58
11     A.   Yes.
12     Q.   Do you recall when that was
13  received?
14     A.   I don't recall, no.
15     Q.   Did you ever receive a 42 from Mr.  10:32:02
16  Fiorillo?
17     A.   Yes.
18     Q.   Do you recall how that was
19  received by you?
20     A.   Like I stated earlier I believe he  10:32:10
21  handed me a handwritten 42.
22     Q.   Why did you ask them for 42's?
23     A.   I just wanted to see what their
24  recollection of the night was.
25     Q.   I believe you testified that prior  10:32:31

Hesse

1
2  to asking for the 42 you discussed the
3  incident with Mr. Fiorillo and Mr. Lamm on the
4  telephone; is that correct?
5      A.   Yes.                   10:32:43
6      Q.   Do you recall whether you spoke
7  with Mr. Snyder at all about Halloween before
8  getting his 42?
9      A.   I must have if I asked for his 42.
10  I don't specifically -- specifically I don't   10:32:57
11  recall.
12     Q.   Did he tell you that Richard
13  Bosetti refused to answer questions that
14  evening?
15     A.   I don't recall.            10:33:06
16     Q.   Did he tell you that the people
17  who came to the station that night, Schalik,
18  Tesori or Van Koot claimed that they thought
19  the incident was going to be covered up?
20     MR. NOVIKOFF:  Objection.     10:33:28
21     MR. CONNOLLY:  Objection as to
22  timeframe.
23     Q.   At any point in time?
24     MR. NOVIKOFF:  My objection went
25  beyond that.                   10:33:34

Hesse

1
2      A.   I don't recall specifically, but
3  that came up a couple of times.  I don't know
4  when specifically though.
5      Q.   Who brought it up?          10:33:39
6      A.   I don't remember specifically.
7      Q.   Do you remember when you learned
8  of that allegation?
9      A.   No, I think it was a rumor that
10  was just circulating.            10:33:49
11     Q.   Did you learn that rumor during
12  the five days in which you reached your
13  conclusion?
14     MR. CONNOLLY:  Objection.
15     A.   I don't recall.            10:33:57
16     MR. GOODSTADT:  Would you mark
17  this document as Hesse Exhibit 23,
18  typewritten document dated 11/5/04 to
19  George Hesse.
20     (Hesse Exhibit 23, typewritten    10:34:24
21  document dated 11/5/04 to George Hesse,
22  marked for identification, as of this
23  date.)
24     Q.   I place in front of Mr. Hesse what
25  has been marked as Hesse Exhibit 23, a    10:35:01

Hesse

1
2  three-page exhibit bearing Bates numbers
3  3196, 3197 and 3198.
4      Mr. Hesse, do you recognize the
5  document marked as Hesse Exhibit 23?     10:35:13
6      A.   Yes.
7      Q.   What is this document?
8      A.   This is the statement or 42 from
9  Thomas Snyder to me.
10     Q.   Dated 11/5/04?            10:35:26
11     A.   Yes.
12     Q.   Do you recall if you actually
13  received it on 11/5/04?
14     A.   The fax is showing it is
15  11/6/2004.                    10:35:42
16     Q.   Do you recall if that is the date
17  that you received it?
18     A.   I don't recall, no.
19     Q.   Does this -- did you speak with
20  Snyder before he provided the 42?       10:35:50
21     A.   I don't recall specifically.  I
22  believe I did though.
23     Q.   You had asked him to provide it,
24  right?
25     A.   Yes.  I already stated that.    10:36:01

Page 579

Hesse

1
2     MR. NOVIKOFF:  Objection.  Without
3  telling him what to testify to, I would
4  presume that he has testified that he
5  asked for a 42 of Snyder, that he had to   10:36:08
6  have at least had a conversation as to
7  that.
8     MR. CONNOLLY:  I believe he
9  actually testified to that.
10    MR. GOODSTADT:  I believe he also   10:36:16
11  testified that he didn't speak to Snyder
12  during the five days.  I wanted to
13  refresh his recollection.  I want to get
14  a time line.
15    Q.   Does this refresh your         10:36:24
16  recollection as to whether you spoke with Mr.
17  Snyder during the five day interval in which
18  you reached your conclusions?
19    A.   No.
20    MR. NOVIKOFF:  Also let the record  10:36:35
21  reflect that I think his testimony wasn't
22  five days, I think he believes it was
23  around five days.
24    Q.   Does this refresh your
25  recollection -- strike that.            10:36:47

Page 580

Hesse

1
2     Sitting here now do you recall
3  anything that was discussed between you and
4  Mr. Snyder other than for asking him to
5  provide a 42?                            10:36:57
6     A.   I don't recall.
7     Q.   Do you recall telling him that Joe
8  Loeffler wanted you to turn around the
9  investigation?
10    A.   No.                             10:37:05
11    Q.   Do you recall telling Tom Snyder
12  that you were going to wrap up the
13  investigation on the day that he faxed in his
14  42?
15    MR. NOVIKOFF:  Objection.           10:37:17
16    A.   I don't recall.
17    Q.   What was your reaction when you
18  received Mr. Snyder's statement?
19    MR. CONNOLLY:  Objection.
20    MR. NOVIKOFF:  If any.              10:37:34
21    Q.   If any?
22    A.   I don't recall having any
23  reaction.
24    Q.   Did you think his statements was
25  accurate?                               10:37:43

Page 581

Hesse

1
2     MR. NOVIKOFF:  Objection.
3     MR. CONNOLLY:  Objection.
4     A.   I had no reason to believe it was
5  not.                                     10:37:49
6     Q.   Did you believe that Mr. Snyder
7  was not telling the truth in his statement?
8     MR. CONNOLLY:  Objection.
9     MR. NOVIKOFF:  Objection.
10    A.   No.                             10:37:59
11    Q.   Did you believe that Mr. Snyder
12  was corrupt based on this statement?
13    A.   No.
14    Q.   Did you speak to him at all about
15  his statement?                          10:38:07
16    A.   I don't specifically recall.
17    Q.   Do you recall telling Mr. Snyder
18  that there were discrepancies between what he
19  and Richard Bosetti had stated?
20    A.   I don't specifically recall.    10:38:16
21    Q.   So you don't recall one way or the
22  other?
23    A.   No.
24    MR. NOVIKOFF:  When did Bosetti
25  provide this statement; object to that  10:38:34

Page 582

Hesse

1
2  last question because I think Bosetti
3  provided it after this.  Foundation
4  objection.
5     Q.   Do you ever recall telling Mr.    10:38:37
6  Snyder that there were discrepancies between
7  what his statement said and what Mr. Bosetti
8  claimed?
9     MR. CONNOLLY:  At any time?
10    Q.   Yes.                            10:38:47
11    A.   I specifically don't recall.
12    Q.   You don't recall one way or the
13  other?
14    A.   No.
15    Q.   Do you recall speaking to Ed       10:38:51
16  Carter about Tommy Snyder's statement?
17    A.   No.
18    Q.   You don't recall one way or the
19  other?
20    A.   No.                             10:38:59
21    Q.   You don't recall telling
22  Mr. Carter that Tommy Snyder needed to protect
23  the Bosetti's rather than the victims?
24    A.   No.
25    Q.   You don't recall telling Mr. Frank  10:39:11

Page 583

Hesse

1
2 Fiorillo that Tommy Snyder needed to protect
3 the Bosetti's rather than the victims?
4       MR. NOVIKOFF:  Objection.
5    A.  No.              10:39:27
6    Q.  Isn't it true that you told
7 Mr. Carter that Snyder's report made you sick?
8    A.  No.
9    Q.  Isn't it true that -- strike that.
10 Did Frank Fiorillo -- how did Frank Fiorillo   10:39:39
11 provide his statement to you?
12    A.  For the third time he handed it to
13 me.
14    Q.  Where was that?
15    A.  It was at the checkpoint at the   10:39:48
16 lighthouse.
17    Q.  Isn't it true that when he handed
18 it to you that you told Mr. Fiorillo that
19 Tommy Snyder's report made you sick?
20    A.  No.              10:40:00
21    Q.  Isn't it true that you told him
22 that Tommy Snyder's 42 was a piece of shit?
23    A.  No.
24       MR. NOVIKOFF:  Objection.
25    Q.  Isn't it true that you told them   10:40:07

Page 584

Hesse

1
2 that -- that you told Mr. Carter and Mr.
3 Snyder that you thought that Tommy Snyder had
4 it in for the Bosetti's?
5       MR. CONNOLLY:  Objection.  Them   10:40:20
6 being Mr. Carter?
7    Q.  Yes.  That Mr. Hesse told
8 Mr. Carter and Mr. Snyder -- strike that.
9       Isn't it true that you told Mr.
10 Fiorillo and Mr. Carter that Tommy Snyder had   10:40:32
11 it in for the Bosetti's?
12    A.  No.
13    Q.  Did you believe that Tommy Snyder
14 had it in for the Bosetti's?
15    A.  No.              10:40:42
16    Q.  Did the Bosetti's and Mr. Snyder
17 get along prior to the Halloween incident?
18       MR. CONNOLLY:  Objection.
19    A.  I don't think specifically, no,
20 they didn't get along.        10:40:55
21    Q.  Had you heard a rumor prior to the
22 Halloween incident that Tommy Snyder is the
23 one who alerted Civil Service the summer
24 before to the fact that there were uncertified
25 officers at Ocean Beach?        10:41:07

Page 585

Hesse

1
2       MR. BAPTISTE:  Objection.
3       MR. CONNOLLY:  Objection.
4       MR. NOVIKOFF:  Just read back the
5 question.  I want to see if I have a   10:41:20
6 basis to object.
7       (Record read.)
8       MR. NOVIKOFF:  Actually that is
9 one of your few good questions, I have no
10 objection.              10:41:47
11    A.  No.
12    Q.  Do you know whether Tom Snyder
13 ever spoke with anyone at the District
14 Attorney's office about the Halloween
15 incident?              10:41:59
16       MR. CONNOLLY:  At any time?
17    Q.  At any time?
18       MR. CONNOLLY:  Does he know?
19    Q.  Do you know whether Tom Snyder
20 ever spoke to anybody at the District   10:42:05
21 Attorney's office about the Halloween
22 incident?
23       MR. CONNOLLY:  Does he have
24 personal knowledge?
25       MR. GOODSTADT:  Did he ever learn   10:42:13

Page 586

Hesse

1
2 from anyone --
3       MR. CONNOLLY:  Different question.
4       MR. BAPTISTE:  Objection.
5    A.  Ask the question again.      10:42:19
6    Q.  Had you ever heard that Tom Snyder
7 spoke to anyone at the District Attorney's
8 office about the Halloween incident?
9    A.  I don't think I specifically
10 heard, I think I read it somewhere.      10:42:30
11    Q.  Where did you read it?
12    A.  In one of their depositions.
13    Q.  What did you think of Tommy
14 Snyder's statement?
15    A.  Which statement?        10:42:56
16    Q.  The 42.
17    A.  I don't know if I really thought
18 anything of it other than this is his
19 recollection of what happened that night.
20    Q.  Did you think it was a complete 42  10:43:10
21 or a complete statement of what happened that
22 night?
23       MR. NOVIKOFF:  Objection.
24       MR. CONNOLLY:  Objection.
25    A.  In his opinion.        10:43:17

Page 587

Hesse

1
2     Q.   How about in your opinion, did you
3  think that was a complete 42?
4         MR. CONNOLLY:  His opinion when?
5     Q.   His opinion when you read it?    10:43:25
6     A.   I think it was complete to the
7  best of Mr. Snyder's knowledge of what
8  happened that night.
9     Q.   Did you doubt any of the
10  credibility of any of the statements in the 42  10:43:39
11  that Snyder provided?
12        MR. NOVIKOFF:  Objection.
13        MR. CONNOLLY:  Again you are
14  talking when he first read it?
15        MR. GOODSTADT:  Yes.        10:43:48
16     A.   I don't specifically remember.
17     Q.   How about sitting here today do
18  you doubt the credibility of any of the
19  statements made in the statement?
20     A.   I would have to read it entirely    10:43:59
21  again.
22        MR. CONNOLLY:  Objection.  You
23  want him to do so?
24        MR. GOODSTADT:  Maybe later.
25     Q.   I believe you testified that       10:44:12

Page 588

Hesse

1
2  Fiorillo handed you a statement, correct, a
3  42?
4     A.   From what I recall, yes.
5     Q.   Do you recall what date that was?  10:44:21
6     A.   No.
7         MR. GOODSTADT:  Would you mark
8  this document as Hesse Exhibit 24,
9  internal correspondence, November 7,
10  2004.                    10:44:35
11        (Hesse Exhibit 24, internal
12  correspondence, November 7, 2004,
13  marked for identification, as of this
14  date.)
15        THE VIDEOGRAPHER:  The time is    10:44:56
16  10:46, we are off the record.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  The time is
19  11:08, we are on the record.
20     Q.   Mr. Hesse, I placed in front of    11:06:25
21  you what is marked Exhibit 24, a multiple page
22  exhibit bearing Bates 3194 and 3195.  Do you
23  recognize the document marked as Hesse Exhibit
24  24?
25     A.   Yes.                11:06:38

Page 589

Hesse

1
2     Q.   What is this?
3     A.   This is Frank Fiorillo's
4  statement.
5     Q.   The handwritten statement on page  11:06:44
6  3195, is that the statement that he handed to
7  you at the checkpoint?
8     A.   I believe it is.
9     Q.   Who typed up the first page of
10  this exhibit?              11:06:55
11     A.   I did.
12     Q.   How come?
13     A.   Because the piece of paper that he
14  had written it on, it was like crammed on, so
15  I thought to be able to read it a little    11:07:03
16  better I would read it and type it out in case
17  I had to refer to it for anything.
18     Q.   Did you ever speak to Mr. Fiorillo
19  about his statement?
20     A.   Specifically I don't recall.    11:07:12
21        MR. NOVIKOFF:  You mean after --
22     Q.   After he gave it to him.
23        MR. NOVIKOFF:  Right.
24     Q.   Isn't it true that you told him
25  that he needed to file a new statement to    11:07:28

Page 590

Hesse

1
2  protect the Bosetti's?
3     A.   Absolutely not.
4         MR. CONNOLLY:  Objection.
5         I withdraw the objection.    11:07:36
6     A.   Absolutely not.
7     Q.   And you don't recall one way or
8  the other whether you actually ever spoke to
9  Mr. Fiorillo about his statement; is that
10  correct?                11:07:49
11     A.   Correct.
12     Q.   So had you spoken to him, if you
13  had spoken to him you wouldn't recall anything
14  that was stated during that conversation; is
15  that correct?              11:07:56
16        MR. CONNOLLY:  Objection.
17        MR. NOVIKOFF:  Objection.
18     A.   You asked me a specific question
19  of the statement I possibly made, and there is
20  no way I asked him to rewrite this.    11:08:01
21     Q.   That wasn't my question now.  The
22  question now was had you in fact spoken with
23  him, sitting here today you don't recall
24  anything that was discussed between the two of
25  you?                  11:08:13

Page 591

**Hesse**

1
2     A.   I don't recall specifically when,
3  where, why or what.  I remember receiving this
4  and reading it.
5     Q.   I am not talking about you      11:08:22
6  receiving this and reading it.  I am talking
7  about any conversations you had with Mr.
8  Fiorillo about his statement after you read it
9  and received it?
10    A.   Specifically no.              11:08:29
11    Q.   Did you ever show Mr. Fiorillo's
12 statement to Mr. Snyder?
13    A.   I don't recall if I did.
14    Q.   You don't recall one way or the
15 other?                              11:08:42
16    A.   No.
17    Q.   Do you recall telling Mr. Snyder
18 that it was similar to the piece of shit that
19 he had filed?
20       MR. NOVIKOFF:  Objection to the    11:08:50
21 form.
22    A.   No.
23       MR. NOVIKOFF:  Is the question
24 does he recall stating that or did he say
25 that?                               11:08:57

Page 592

1            Hesse
2     Q.   The question is do you recall
3  stating that?
4     A.   No.
5       MR. NOVIKOFF:  Objection to form    11:08:59
6  of the question.
7     Q.   Did you state that to him?
8     A.   No.
9     Q.   Do you recall ever speaking with
10 Mr. Snyder about Mr. Fiorillo's statement?    11:09:03
11    A.   I don't recall.
12    Q.   You don't recall one way or the
13 other?
14    A.   No.
15    Q.   And sitting here today if that    11:09:11
16 conversation actually occurred you don't
17 recall any of the details of what was said;
18 correct?
19       MR. NOVIKOFF:  Objection.
20       MR. CONNOLLY:  Objection.        11:09:18
21    A.   Specifically no.
22    Q.   Or generally?
23       MR. NOVIKOFF:  Objection.
24    A.   Specifically no.
25    Q.   Generally you don't recall either;  11:09:21

Page 593

1            Hesse
2  correct?
3     A.   I don't recall having a
4  conversation with Mr. Snyder, no.
5     Q.   Did you tell Mr. Fiorillo that    11:09:26
6  Cherry's investigation actually described what
7  happened that night?
8     A.   Specifically no.
9     Q.   Did you tell Mr. Snyder that
10 Cherry's investigation actually described what  11:09:44
11 happened that night?
12    A.   Specifically no.
13    Q.   Specifically you don't recall or
14 specifically you didn't say that?
15    A.   I don't specifically remember    11:09:51
16 saying it that way.
17    Q.   Do you recall saying it generally
18 in sum and substance that way?
19    A.   At some point I sat each one of
20 them down and had a conversation about the    11:10:04
21 investigation, yes.
22    Q.   When did you have that sit down
23 with Mr. Fiorillo?
24    A.   I believe it was after Mr. Schalik
25 and Mr. Van Koot had already been prosecuted.  11:10:13

Page 594

1            Hesse
2     Q.   What was the substance of that
3  conversation?
4     A.   I told him that I thought it was a
5  good idea that he reviewed the entire    11:10:23
6  investigation package from start to finish to
7  show him what had happened.
8     Q.   And do you recall anything else
9  that was stated in that conversation?
10    A.   Not specifically.            11:10:37
11    Q.   How about generally?
12    A.   I believe Mr. Fiorillo sat down
13 and actually enjoyed reading the entire
14 arrest.
15    Q.   What made you believe that?    11:10:48
16    A.   He sat there and he read the whole
17 thing and he was shaking his head, yes, yes,
18 yes, yes, and finished it and said that it was
19 good.
20    Q.   Where was that conversation?    11:11:00
21    A.   In the police station.
22    Q.   When?
23    A.   I don't remember the date.
24    Q.   Who else was there?
25    A.   I think Mr. Cherry was there.    11:11:07

Page 595

Hesse

1
2    Q.   Do you recall how long after the
3  plea was done in connection with Mr. Schalik
4  or Mr. Van Koot's arrest?
5    A.   It might have been the following    11:11:23
6  summer or season.
7    Q.   So you think it was the summer of
8  '05?
9    A.   Possible, yes.
10   Q.   Did you have a sit down with    11:11:32
11 Mr. Lamm?
12   A.   Yes.
13   Q.   When did you have that sit down?
14   A.   Probably around the same time.
15   Q.   What was the sum and substance of   11:11:39
16 that conversation you had with Mr. Lamm?
17   A.   He chose not to read it.
18   Q.   Do you recall what you said to him
19 in sum and substance?
20   A.   I told him this is what the    11:11:46
21 investigation produced, that he should read
22 it.
23   Q.   Anything else that you recall in
24 that conversation?
25   A.   Not specifically.    11:11:54

Page 596

Hesse

1
2    Q.   How about generally?
3    A.   No.  He just seemed very angry.
4    Q.   What do you mean by that?
5    A.   He just seemed like it was a joke.  11:12:00
6    Q.   What did he do that led you to
7  believe that he was angry?
8    A.   He took it and he looked at it
9  briefly and he said I am not reading that.
10   Q.   Did you respond to him when he    11:12:13
11 said that?
12   A.   Specifically I don't remember what
13 I said.
14   Q.   How about generally?
15   A.   Even generally I don't remember    11:12:20
16 anything else.
17   Q.   What made you believe or led you
18 to believe that he thought it was a joke?
19   A.   That is exactly what he said.
20   Q.   He said it is a joke?    11:12:28
21   A.   Yes, he said it is a joke.
22   Q.   What did you understand him to
23 mean when he said this was a joke?
24   MR. CONNOLLY:  Objection.
25   A.   I specifically remember him saying  11:12:42

Page 597

Hesse

1
2  that we are going to sweep this one under the
3  rug too.
4    Q.   When did he say that?
5    A.   During this little conversation    11:12:51
6  that we had when I asked him to read through
7  the investigative pack.
8    Q.   Do you know what he meant by that
9  when he said we are going to sweep this one
10 under the rug too?    11:12:49
11   A.   I think he felt that there was a
12 cover up.
13   Q.   So he was claiming that there was
14 a cover up at that time?
15   MR. CONNOLLY:  Objection.    11:13:08
16   A.   There were rumors that that is --
17 that he especially suspected.
18   Q.   I am not talking about rumors, I
19 am talking about what he said to you right
20 now?    11:13:15
21   A.   Well he said that we were going to
22 sweep this under the rug.
23   Q.   That led you to believe that he
24 was claiming that it was being covered up?
25   A.   Yes.    11:13:22

Page 598

Hesse

1
2    Q.   How about Mr. Snyder, did you ever
3  have a sit down with Mr. Snyder?
4    A.   At some point I did, yes.
5    Q.   When was that?    11:13:29
6    A.   I don't remember the specific
7  date.
8    Q.   When was the sit down with Lamm?
9    A.   It was around the same time I did
10 with Mr. Fiorillo.  I think it was early in    11:13:37
11 the season of 2005.
12   Q.   Now, when was the sit down with
13 Mr. Snyder?
14   A.   It was later, much later.  I don't
15 remember the date specifically.  But I thought  11:13:53
16 it would be a good idea that he come in with
17 both Bosetti brothers and have a sit down and
18 try to hash out some of this.
19   Q.   Was that after Mr. Snyder was let
20 go?    11:14:20
21   A.   I think it was just before.
22   Q.   Just before he was let go?
23   A.   Yes.
24   MR. NOVIKOFF:  When you say let
25 go, we have the same agreement --    11:14:38

28  (Pages 595 to 598)

Page 599

Hesse

1
2     MR. GOODSTADT:  We have the same
3  agreement.  Hopefully we will have time
4  to go through when Mr. Hesse said --
5     MR. NOVIKOFF:  Yes.          11:14:53
6     MR. GOODSTADT:  Would you mark
7  this document as Hesse Exhibit 25, Ocean
8  Beach Police Department, document dated
9  11/5/2004.
10     (Hesse Exhibit 25, Ocean Beach    11:15:02
11     Police Department, document dated
12     11/5/2004, marked for identification,
13  as of this date.)
14     Q.   Do you recall when you received
15  Mr. Lamm's 42?                 11:15:41
16     A.   I don't.
17     Q.   Why did you ask him to put this on
18  a 42?
19     A.   I just wanted him to write it down
20  and just give me an idea of what they thought  11:15:48
21  happened.
22     Q.   Is it standard to have a report of
23  an investigation done on a 42?
24     A.   They could have wrote it on a 42,
25  they could have wrote it on a blank piece of   11:16:04

Page 600

Hesse

1
2  paper.  I just wanted to know what they
3  thought happened.
4     Q.   Do you recall when you received
5  Mr. Lamm's statement?              11:16:11
6     A.   I don't.
7     Q.   Was it before or after you
8  received Fiorillo's?
9     A.   I don't recall.
10     Q.   How about was it before or after   11:16:15
11  you received Snyder's?
12     A.   I don't recall.
13     Q.   Do you recall how you received it?
14     A.   It might have been through E-mail
15  or fax, I am not sure.            11:16:23
16     Q.   I place in front of Mr. Hesse what
17  was marked as Hesse Exhibit 25, it is a
18  two-page exhibit bearing Bates 3192 and 3193.
19     Do you recognize the document
20  marked as Hesse Exhibit 25?          11:16:39
21     A.   Yes.
22     Q.   What is this?
23     A.   This is Mr. Lamm's statement.
24     Q.   It came in by E-mail?
25     A.   Yes.                11:16:52

Page 601

Hesse

1
2     Q.   That beach cop 03, that is your
3  E-mail address?
4     A.   Yes.
5     Q.   Do you recall it coming in around  11:16:56
6  November 5, 2004?
7     A.   I guess that is the date that I
8  received it, or he sent it, I am not sure.
9     Q.   What was your reaction when you
10  read Mr. Lamm's statement, if any?      11:17:09
11     A.   I don't remember having a
12  reaction.
13     Q.   Did you ever speak with Mr. Lamm
14  about his statement after you received it?
15     A.   I don't specifically remember.    11:17:18
16     Q.   You don't recall one way or the
17  other?
18     A.   No.
19     Q.   So if you had that conversation
20  with him, sitting here today you don't recall  11:17:26
21  anything that was stated?
22     A.   Not specifically about his
23  statement, no.
24     Q.   How about generally?
25     A.   I don't know.          11:17:32

Page 602

Hesse

1
2     Q.   What did you think of Mr. Lamm's
3  statement when you received it?
4     MR. CONNOLLY:  In what regard?
5     Q.   In any regard?           11:17:51
6     A.   Repeat that.
7     Q.   What did you think of his
8  statement when you received it?
9     MR. NOVIKOFF:  Objection.
10     A.   I took it for what it was worth.   11:17:58
11  I read it and added it to the pile of papers
12  that was part of the investigation.
13     Q.   What do you mean for what it was
14  worth?
15     A.   This is what his account was of    11:18:10
16  what happened that night.
17     Q.   Did you think it was worth
18  anything?
19     A.   I don't recall.  I would have to
20  read it again.              11:18:16
21     Q.   Sitting here today you don't
22  recall whether at that time you thought it was
23  worth anything?
24     A.   I specifically don't remember.
25     Q.   I believe you testified that at    11:18:23

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 603

Hesse

1
2  some point around five days of investigating
3  you reached a conclusion as to what happened;
4  is that correct?
5        MR. CONNOLLY:  Objection.        11:18:32
6     A.  I had an idea of what was going
7  on.
8     Q.  Did you prepare any report?
9     A.  At some point I think I did
10 another field report.              11:18:42
11    Q.  When did you do that?
12    A.  I don't specifically remember the
13 date.
14    Q.  Was it after you reached your
15 conclusion?                        11:18:54
16    A.  I don't recall.
17    Q.  Why would you do another field
18 report?
19    A.  Just to add to the investigation.
20    Q.  Just so we are clear, the      11:19:01
21 additional field report that you did is
22 something different than what has been marked
23 as -- what number was the field report?
24    A.  The original one?
25    Q.  Yes, the one that we marked today.  11:19:19

Page 604

Hesse

1
2     A.  It was number 18.
3     Q.  Just so it is clear for the
4  record, you did a field report that was
5  different than the one that has been marked as  11:19:35
6  Hesse Exhibit 18?
7     A.  Yes, it was a separate field
8  report.
9     Q.  Do you know where that field
10 report is kept?                    11:19:53
11    A.  What do you mean where it is kept?
12    Q.  Where it is stored?
13    A.  It is stored as an electronic
14 document in the computer.
15       MR. GOODSTADT:  Would you mark as  11:20:14
16 Hesse Exhibit 26, incident report,
17 12/11/2004.
18       (Hesse Exhibit 26, incident
19       report, 12/11/2004, marked for
20       identification, as of this date.)    11:20:46
21    Q.  I placed in front of Mr. Hesse
22 what is marked as Hesse Exhibit 26, one-page
23 exhibit bearing Bates 3150.  Mr. Hesse, is
24 this the field report that you are referring
25 to?                                11:20:58

Page 605

Hesse

1
2     A.  Yes.
3     Q.  So other than for the -- well,
4  strike that.
5        This field report doesn't reflect  11:21:04
6  the conclusions of your investigation, does
7  it?
8     A.  You mean our findings?
9     Q.  Yes.
10    A.  No.                          11:21:17
11    Q.  So when I ask you if you prepared
12 a report, I was referring to -- maybe you
13 misunderstood or I didn't ask the question
14 clearly.  Did you prepare a report that set
15 forth your findings or your conclusions?     11:21:29
16    A.  No.
17    Q.  How come?
18    A.  I don't specifically know why we
19 had to do that.
20    Q.  I am asking why you didn't?      11:21:39
21       MR. CONNOLLY:  Objection.
22    A.  I don't think it was what we
23 normally did.
24    Q.  Again just so I am clear for the
25 record, when you said another field report,   11:21:52

Page 606

Hesse

1
2  you are referring to Hesse Exhibit 26 and not
3  some other document?
4     A.  That is correct.
5     Q.  Now, other than for the witness    11:21:57
6  statements, the 42's that we went over, the
7  photos, the statements that were taken that
8  night from Schalik, to Tesori and Van Koot,
9  was there anything else that was placed into
10 the Halloween file?                 11:22:17
11       MR. CONNOLLY:  Objection.
12    A.  Not that I specifically know.
13    Q.  Isn't it true that you told Lamm
14 that what was in his statement wasn't what
15 happened?                           11:22:40
16       MR. CONNOLLY:  Objection.
17    A.  I don't recall that.
18    Q.  Isn't it true that you asked
19 Mr. Lamm to amend his statement?
20    A.  No.                           11:22:49
21    Q.  It is not true or you don't
22 recall?
23    A.  It is not true.
24    Q.  There came a point in time where
25 you -- strike that.                   11:23:05

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 607

Hesse

1    **Hesse**
2    **There came a point in time where**
3    **the five plaintiffs in this matter were**
4    **terminated from Ocean Beach; is that correct?**
5    A.   Yes.                    11:23:16
6    **Q.   When was that?**
7    A.   I believe they -- April 2nd for
8    four of them and it was later for Mr. Snyder.
9    **Q.   Do you recall when Mr. Snyder was**
10   **terminated?**              11:23:31
11   A.   Specifically I don't know the
12   date, no.
13   **Q.   Do you recall how many -- was it**
14   **weeks, days, months after April 2nd that Mr.**
15   **Snyder was terminated?**   11:23:42
16   A.   It may have been a couple of
17   weeks, I am not specifically sure.
18   **Q.   Who made the decision to terminate**
19   **their employment?**
20   A.   I did.                  11:23:55
21   **Q.   Did you consult with anybody in**
22   **making that decision?**
23   A.   I don't think so.
24   **Q.   When did you make the decision to**
25   **terminate their employment?**  11:24:04

Page 608

1    **Hesse**
2    A.   Sometime in I guess January of
3    '06.
4    **Q.   When did you first alert somebody**
5    **about the decision to terminate their**       11:24:22
6    **employment that you made in January of '06?**
7    A.   I believe what I did is, I didn't
8    know how to go about it, so I called Civil
9    Service and I asked them for a little
10   direction.                  11:24:37
11   **Q.   Who in Civil Service did you call?**
12   A.   I believe it was Allison Chester
13   at the time.
14   **Q.   And she was the person in Civil**
15   **Service assigned to the Ocean Beach account?**  11:24:54
16   A.   Yes.
17   **Q.   You dealt with her in the past on**
18   **Civil Service issues?**
19   A.   In the past, yes.
20   **Q.   When was that call?**        11:25:00
21   A.   I don't specifically know the
22   date.
23   **Q.   Do you recall what month it was?**
24   A.   It could have been January,
25   February, even March, I am not positive.   11:25:12

Page 609

1    Hesse
2    **Q.   Is there anything that you can**
3    **think of that would refresh your recollection?**
4    A.   No.
5    **Q.   Did you take any notes of the**      11:25:20
6    **call?**
7    A.   No.
8    **Q.   Did you put it on any calendar or**
9    **diary?**
10   A.   No.                       11:25:25
11   **Q.   Tell me what you recall about that**
12   **call?**
13   A.   I believe I stated it on the first
14   day of testimony that I called her.  I asked
15   her what their rights were as seasonal police  11:25:35
16   officers.  I asked her what the Village's
17   rights were and what my rights would be.
18   **Q.   What did she respond?**
19   A.   She said that she would have to
20   speak to her supervisor and find out some   11:25:50
21   details and that she would get back to me.
22   **Q.   Did she ever get back to you?**
23   A.   Yes.
24   **Q.   Do you recall who the supervisor**
25   was that she had to get in touch with?   11:25:59

Page 610

1    **Hesse**
2    A.   I don't know.
3    **Q.   What did she tell you when she got**
4    **back to you?**
5    A.   She told me that all part-time   11:26:06
6    seasonal officers are at will employees, and
7    that you could terminate or not rehire or just
8    not ask them back for any reason without
9    cause.
10   **Q.   Did she tell you that there are**   11:26:23
11   **any reasons that couldn't form the basis of**
12   **the decision to terminate their employment?**
13   A.   No.
14   **Q.   Just so I am clear at that point**
15   **in time what was your title?**       11:26:43
16   A.   At that time I was the -- I was
17   appointed Acting Deputy Chief.
18   MR. CONNOLLY:  We are talking
19   about when you are saying at that point
20   in --                      11:26:53
21   MR. GOODSTADT:  When he had this
22   conversation.
23   MR. CONNOLLY:  Yes.
24   **Q.   Just so I am clear for the record**
25   **at no point were you the mayor of Ocean Beach;**  11:26:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

1          **Hesse**
2    correct?
3          A.   No.
4          Q.   At no point were you the acting
5    mayor?                        11:27:03
6          MR. NOVIKOFF:  We can stipulate to
7    that.
8          A.   No.
9          MR. GOODSTADT:  We have some
10   testimony from Civil Service as to who    11:27:10
11   can make these decisions.
12         MR. NOVIKOFF:  But we can
13   stipulate that he was never the mayor,
14   acting mayor, trustee, acting trustee
15   member or clerk.                11:27:18
16         Q.   Were you ever the clerk of the
17   Village of Ocean Beach?
18         A.   No.
19         Q.   Acting clerk of the Village of
20   Ocean Beach?                   11:27:24
21         A.   No.
22         Q.   Do you recall anything else in
23   that conversation that you had with
24   Ms. Chester, the second conversation?
25         A.   No.                   11:27:33

1          Hesse
2          Q.   When was the first time that you
3    alerted anybody who was either an employee of
4    the Village of Ocean Beach or a member of
5    the Board of Trustees of Ocean Beach about your    11:27:46
6    decision to terminate the five plaintiffs?
7          A.   I believe I wrote a memo to the
8    Village Clerk and to I think I cc'd it to the
9    mayor and Trustee Loeffler.
10         Q.   Do you recall when that was?    11:28:03
11         A.   The specific date that I wrote it,
12   April 4th, somewhere in there.
13         Q.   It was after you had already
14   notified four of the five plaintiffs that they
15   were terminated?                11:28:16
16         A.   Yes.
17         MR. GOODSTADT:  Would you mark
18   this document as Hesse Exhibit 27, letter
19   dated March 11, 2006.
20         (Hesse Exhibit 27, letter dated    11:28:20
21   March 11, 2006, marked for
22   identification, as of this date.)
23         Q.   I place in front of Mr. Hesse what
24   has been marked as Hesse Exhibit 27, a
25   one-page exhibit bearing Bates 2662.    11:28:55

1          Hesse
2          Mr. Hesse, do you recognize the
3    document that has been marked as Hesse Exhibit
4    27?
5          A.   Yes.                   11:29:07
6          Q.   What is this document?
7          A.   This was a memo sent out to all
8    officers of the department to come for a
9    meeting.
10         Q.   Did you send this to the five    11:29:18
11   plaintiffs?
12         A.   Yes.
13         Q.   Why did you send it to the five
14   plaintiffs if you made the decision to
15   terminate their employment?          11:29:23
16         A.   Because I wanted them to come to
17   the meeting with all their equipment.
18         Q.   You see in the fourth line down in
19   this memo it says new ID will be issued to
20   all?                          11:29:37
21         A.   Yes.
22         Q.   Why did you send that to the
23   plaintiffs saying that new ID would be issued
24   to all?
25         A.   It was a generic letter that I    11:29:44

1          Hesse
2    sent to all members of the department.
3          Q.   So you didn't mean that new ID
4    would be issued to all of the people who were
5    invited to the meeting; is that correct?    11:29:54
6          A.   Yes.  You are correct.
7          Q.   Did you speak with any other --
8    strike that.
9          Did you alert any other police
10   officers at Ocean Beach that the plaintiffs    11:30:07
11   were going to be terminated prior to April 2,
12   2006?
13         A.   Yes.
14         Q.   Who did you speak with?
15         A.   Only one, Paul Trosko, who was my    11:30:14
16   full-time police officer.
17         Q.   What did you tell Paul Trosko?
18         A.   I told him what I was going to do.
19         Q.   Did you tell him why you were
20   going to do it?                  11:30:26
21         A.   I don't remember specifically.
22         Q.   This April 2006, that is the first
23   year, the first season in which you were the
24   Deputy Chief?
25         MR. NOVIKOFF:  Objection to the    11:30:37

Hesse

1
2     form only to the extent that the question
3     implies that April 2nd is part of the
4     season.
5         Q.   That is a good point.          11:30:47
6         The meeting on April 2nd, that was
7     the first preseason meeting that you presided
8     over as Deputy Chief or Acting Deputy Chief?
9         A.   Yes.
10        Q.   In all the other prior seasons Ed  11:30:59
11    Paradiso was still actively working as the
12    chief?
13        A.   Yes.
14        Q.   And as you understand it this was
15    the first year, 2006, in which you had the    11:31:13
16    authority to hire and fire?
17        A.   That is what I believed, yes.
18        Q.   Did you notify Ed Paradiso that
19    you had terminated the five plaintiffs
20    employment prior to telling them on April 2nd?  11:31:31
21        MR. CONNOLLY:  Objection to the
22    form.
23        A.   I don't think I did.
24        Q.   Why not?
25        A.   Well we were really not on      11:31:39

Hesse

1
2     speaking terms at that point.
3         Q.   What do you mean by that?
4         A.   We just didn't see eye-to-eye on
5     certain things, and I was told that I was put  11:31:57
6     in charge of the Police Department because he
7     was not expected to come back and I was in
8     charge.  I didn't have to check in with him.
9         Q.   Who told you that he was not
10    expected to come back?              11:32:06
11        A.   It was everybody's belief, the
12    village board, the mayors, everybody.
13        Q.   You said that you were told that
14    you were in charge of the police station, he
15    wasn't expected back.  Who told you that?    11:32:14
16        A.   It might have been Trustee
17    Loeffler.
18        Q.   When you say Trustee Loeffler,
19    Joseph Loeffler, Jr.?
20        A.   Yes.               11:32:21
21        Q.   Did he tell you that you didn't
22    need to check in with Ed Paradiso on decisions
23    affecting the police station?
24        MR. CONNOLLY:  Objection.
25        A.   Specifically no.          11:32:34

Hesse

1
2         Q.   Did you invite Ed Paradiso to the
3     meeting?
4         A.   No.
5         Q.   How come?               11:32:40
6         A.   I don't know.
7         Q.   Why did you terminate Frank
8     Fiorillo?
9         A.   Because of his regular
10    insubordination and I felt that now that I was  11:32:56
11    the chief that he would continue with his
12    insubordination.
13        Q.   Any other reasons?
14        A.   No.
15        Q.   What incidents of insubordination  11:33:10
16    led you to terminate him?
17        A.   Like I stated on the first day,
18    specifically one incident that sticks out is
19    we were driving in to work, it was myself,
20    John Dwyer, Paul Corolla and Mr. Fiorillo in   11:33:27
21    the car.  I had given an order to John Dwyer
22    who was a paramedic at the time to please go
23    over all the medical gear in the station house
24    to make sure that we have all our equipment
25    up-to-date, and I turned around and I asked     11:33:47

Hesse

1
2     Mr. Fiorillo if he could please wash the
3     windows, the front windshield of the car when
4     we got back to the station house, and he flat
5     out told me no.               11:34:00
6         I turned around, I said what do
7     you mean no.  His phrase to me is I am not
8     fucking doing it.  Get somebody else to do it.
9     I do enough around here.  I stopped the
10    vehicle and I said if he chose not to do it he  11:34:17
11    can go home.  He shut up and we drove the rest
12    of the way into work and then I told him not
13    to do it and I put him on a post.
14        Q.   Was Frank Fiorillo on duty when
15    you told him to wash the windows?       11:34:33
16        A.   Yes.
17        MR. NOVIKOFF:  Was he on duty when
18    he made the request to me, or was he
19    on duty when he was asked to actually
20    wash the car?               11:34:46
21        Q.   Was he on duty when you made the
22    request in the car?
23        A.   Yes.
24        Q.   Was he on duty at the time that
25    you wanted him to actually perform the washing  11:34:52

1              **Hesse**
2  of the window?
3       A.   He would have been on duty, yes.
4       **Q.   Was he getting paid for that time?**
5       A.   Yes.                    11:35:00
6          MR. NOVIKOFF:  Objection.
7          MR. CONNOLLY:  Which time?
8       **Q.   Was he getting paid for the time**
9  **that you wanted him to wash the window?**
10      A.   Yes.                    11:35:10
11      **Q.   Was he getting paid at the time**
12 **that you had directed him not to wash the**
13 **window?**
14      A.   Yes.
15      **Q.   Are you sure about that?        11:35:16**
16      A.   We were in the police car.
17      **Q.   Did you write Mr. Fiorillo up for**
18 **that?**
19      A.   Yes, I did.
20      **Q.   Did you put it in his personnel   11:35:27**
21 **file?**
22      A.   Yes.
23 RQ   Q.   I would like to mark the record to
24 request the production of the alleged
25 write-up, I don't think we have it.      11:35:42

1              Hesse
2          MR. CONNOLLY:  I am sure it was
3  requested.
4          THE WITNESS:  It was.
5       **Q.   Did you report Mr. Fiorillo to Ed  11:35:50**
6  **Paradiso?**
7       A.   Yes.
8       **Q.   Do you know whether Mr. Fiorillo**
9  **reported the incident to Ed Paradiso?**
10      A.   Yes, he did.           11:36:01
11      **Q.   Did Ed Paradiso tell you that**
12 **Fiorillo had complained to him about the**
13 **incident?**
14      A.   Yes, he did.
15      **Q.   Is it true that you placed Mr.    11:36:12**
16 **Fiorillo in the same post for three straight**
17 **tours and told him he couldn't move in**
18 **response to his complaint to Mr. Paradiso?**
19      A.   No, I did not.
20          MR. NOVIKOFF:  Your question was   11:36:27
21 kind of compound.  I didn't object, I
22 will take his answer, but you may want to
23 clarify.
24      **Q.   Did you ever place Mr. Fiorillo at**
25 **the same post for three straight tours and   11:36:35**

1              **Hesse**
2  direct him not to move?
3          MR. CONNOLLY:  At any time?
4       **Q.   At any time?**
5       A.   Pretty much the same compound      11:36:42
6  question, but he was put on a post for three
7  days, but he can move around.
8       **Q.   What post?**
9       A.   The corner of Denhoff and Bay
10 Walk.                       11:36:55
11      **Q.   Was that in response to his**
12 **complaint to Mr. Paradiso?**
13      A.   No.
14      **Q.   Was it at or about the same time**
15 **or shortly after his complaint to Mr.       11:37:04**
16 **Paradiso?**
17      A.   No.
18      **Q.   Was it before or after the**
19 **complaint to Mr. Paradiso that he was placed**
20 **on that corner?               11:37:12**
21      A.   It was before.
22      **Q.   Was it before or after he was told**
23 **to wash the windows?**
24      A.   It was after.
25      **Q.   So you put him at that post on    11:37:22**

1              **Hesse**
2  Denhoff in response to his refusal to wash the
3  windows?
4       A.   Yes.
5       **Q.   Did you tell him that?          11:37:31**
6       A.   Yes.
7       **Q.   Is that reflected in your write-up**
8  **of him?**
9       A.   I don't specifically remember.
10      **Q.   Did you tell anybody that you were  11:37:39**
11 **placing him, other than Mr. Fiorillo, did you**
12 **tell anyone else that you were placing him at**
13 **that corner for refusing to wash the windows?**
14      A.   I don't recall.
15      **Q.   What was the reason that you told  11:37:51**
16 **Mr. Fiorillo that he was being terminated?**
17      A.   Mr. Fiorillo's regular patrol duty
18 was the use of a G.E.M. car and residential
19 patrol, that was like his favorite thing to
20 do, and so I took it away from him and I put   11:38:09
21 him on a foot post.
22          MR. CONNOLLY:  Different question.
23      **Q.   My question is what reason did you**
24 **tell Mr. Fiorillo on April 2, 2006 was the**
25 **reason for his termination?          11:38:22**

Page 623

Hesse

1
2     MR. NOVIKOFF: Objection to the
3  form.
4     Q.   At some point on April 2, 2006 you
5  told Mr. Fiorillo -- at some point on April 2,   11:38:31
6  2006 you told Mr. Fiorillo that he was being
7  terminated; correct?
8     A.   Yes, I told him he was not coming
9  back to work.
10     Q.   What reason did you give him for   11:38:41
11  making that decision to terminate his
12  employment?
13     A.   I flat out told him because of his
14  insubordination on a regular basis is why I
15  felt it necessary that he did not any longer   11:38:55
16  work for us or me.
17     Q.   You didn't tell him that it was
18  due to budget cuts?
19     A.   Absolutely not.
20     Q.   And other than for the one   11:39:06
21  incident that you testified to what other
22  incidents of insubordination led you to
23  terminate his employment?
24     A.   There were other incidents that
25  were not written up because I felt it   11:39:15

Page 624

Hesse

1
2  justified enough to speak to the individual
3  officer. But one that -- there was one night
4  in particular, I don't remember the date, it
5  was probably in 2004, we had a possible rape   11:39:27
6  investigation going on, we were backed up on
7  paperwork and I asked him stop writing
8  summonses, you are backing up the log, you are
9  tying up the radio.
10        I had to take him off his post,   11:39:42
11  take a post in front of the police station,
12  and he subsequently started to write more
13  summonses. He just -- that was a regular type
14  of situation that would go on with Mr.
15  Fiorillo.   11:39:58
16     Q.   When was that incident?
17     A.   It might have been in 2004.
18     Q.   And did you ever speak to Chief
19  Paradiso about that?
20     A.   About that specifically, no.   11:40:04
21     Q.   How come?
22     A.   Because I didn't find it
23  necessary.
24     Q.   But that was one of the reasons
25  that you terminated his employed?   11:40:11

Page 625

Hesse

1
2     MR. NOVIKOFF: Objection.
3     A.   Why I didn't ask him back, yes.
4     Q.   I think you said you didn't write
5  him up; correct?   11:40:19
6     A.   That is correct.
7     Q.   Any other alleged incidents of
8  insubordination that led you to terminate his
9  employment?
10     A.   There were others, but   11:40:24
11  specifically I can't recall.
12     Q.   So the only two that you can
13  recall are the two that you testified to?
14     A.   Right now, yes.
15     Q.   Did you tell him that those two   11:40:35
16  specific instances led to his termination?
17     A.   I don't know if I said those two
18  incidents specifically, but I told him about
19  his insubordination. I told him that it was
20  best that he just move on with his life.   11:40:47
21     Q.   Anything else discussed during
22  that conversation that you had with Mr.
23  Fiorillo on April 2nd?
24     A.   Yes, he proceeded to state that he
25  would do whatever I asked him to do, and I   11:40:56

Page 626

Hesse

1
2  told him I didn't believe him, and that he
3  should just move on and we shook hands and
4  parted ways.
5     Q.   Anything else discussed during   11:41:08
6  that meeting?
7     A.   No.
8     Q.   Where was that meeting held?
9     A.   That was a one-on-one conversation
10  that he and I had in the what is called the   11:41:14
11  boat house in Ocean Beach.
12     Q.   So there was nobody else during
13  that conversation?
14     A.   Not inside the room, no.
15     Q.   What did you tell Mr. Carter the   11:41:28
16  reason for his layoff?
17     A.   Well, Mr. Carter did want a leave
18  of absence which he took on his own and, you
19  know, I explained to him that his -- he would
20  sleep on duty regularly and he would brag   11:41:53
21  about it. And I explained to him, you just
22  had twins, you have a full-time job, then you
23  come into Ocean Beach to sleep. It is not
24  fair to me and the other officers, that he
25  would brag about it and everything else.   11:42:10

Hesse

1       I just told him, I said maybe it
2 is best that you just concentrate on your
3 family life, concentrate on your job and just
4 move on.         11:42:19
5 **Q. Did you ever witness him sleeping**
6 **on the job?**
7     A. Yes.
8     **Q. How many times?**
9     A. Over 16 years of working with him, 11:42:24
10 I don't know, a handful.
11     **Q. Did you ever write him up for it?**
12     A. No.
13     **Q. How come?**
14     A. Because I didn't find it necessary 11:42:33
15 to write him up for it.
16     **Q. Did you ever speak with Ed**
17 **Paradiso about Mr. Carter's sleeping on the**
18 **job?**
19     A. I don't specifically recall.    11:42:45
20     **Q. Did you ever speak with any of the**
21 **prior chiefs that you worked under -- did you**
22 **work under any other prior chiefs?**
23     A. No.
24     **Q. So you don't recall ever speaking 11:42:53**

Hesse

1 with Mr. Paradiso about your allegation that
2 Mr. Carter slept?
3     A. No.
4     **Q. Did you ever counsel him about his 11:43:01**
5 **sleeping.**
6     A. I spoke to him about it.
7     **Q. How many times?**
8     A. I don't recall.
9     **Q. Was anybody present during these 11:43:09**
10 **alleged conversations?**
11     A. No.
12     **Q. Is that the reason why you**
13 **terminated Ed Carter?**
14     A. That is the reason why I let him 11:43:20
15 go, yes.
16     **Q. Isn't it true that you told him**
17 **that he was being terminated because of**
18 **directives?**
19     MR. CONNOLLY: Objection.    11:43:31
20     A. Well the directives being sleeping
21 on duty, yes.
22     **Q. You explained to him that that was**
23 **the directive that he was being terminated**
24 **for?**          11:43:40

Hesse

1     A. Specifically yes, he should not be
2 sleeping on duty.
3     **Q. I am asking is that what you told**
4 **him specifically?**       11:43:49
5     MR. CONNOLLY: Using that specific
6 word.
7     A. I may have used the word
8 directive, failed to follow directive of not
9 to sleep on duty. I may have said that, yes. 11:43:56
10     **Q. I just want to be clear, you told**
11 **him that his sleeping was the reason why you**
12 **were terminating him?**
13     A. Yes.
14     **Q. Was anybody else there when you 11:44:06**
15 **told him that?**
16     A. No, that was a one-on-one
17 conversation.
18     **Q. Did you tell Paul Trosko that that**
19 **was the reason that you were terminating Ed 11:44:16**
20 **Carter?**
21     A. Yes.
22     **Q. Did you tell Paul Trosko that that**
23 **was the reason why you were terminating Mr.**
24 **Fiorillo?**       11:44:29

Hesse

1     A. Yes.
2     **Q. Did you tell anyone on the Board**
3 **of Trustees to whom you sent the memo to that**
4 **the reason that you fired Ed Carter was 11:44:35**
5 **because he was sleeping?**
6     A. I don't know if I specifically.
7     **Q. Did you tell anyone on the Board**
8 **of Trustees that the reason why you fired**
9 **Frank Fiorillo was due to his insubordination? 11:44:45**
10     MR. CONNOLLY: Again making
11 reference to the memo?
12     **Q. The people that you sent the memo**
13 **to?**
14     A. Specifically I didn't write it in 11:44:52
15 the memo, no.
16     **Q. How about in any other way did you**
17 **communicate to the trustees to whom you wrote**
18 **that memo to that the reason that you fired**
19 **Fiorillo was due to his alleged 11:45:05**
20 **insubordination?**
21     MR. CONNOLLY: Again at any time?
22     A. I believe I did.
23     **Q. Who did you tell that to?**
24     A. Trustee Loeffler and Mayor Rogers, 11:45:13

Page 631

Hesse

1
2 and I believe in conversation I had said
3 something to Maryann Minerva, the Village
4 Clerk.
5     **Q.   As to the reason why?        11:45:28**
6     A.   Yes.
7     **Q.   When was that?**
8     A.   I don't recall the dates.
9     **Q.   Was it before or after you told**
10 **them that you were terminating him?     11:45:35**
11     A.   I believe it was after.
12     **Q.   How long after?**
13     A.   I don't know.
14     **Q.   Was it days, weeks, months, years?**
15     A.   It could have been.        11:45:40
16     **Q.   Which one?**
17     A.   It could have been all of them
18 over the course, time after time of talking
19 about this.  I don't know.
20     **Q.   When was the first time that you   11:45:49**
21 **informed Maryann Minerva of the reasons that**
22 **you terminated the five plaintiffs?**
23     A.   Probably after I wrote the memo
24 and sent the memo on to them.
25     **Q.   How long after?        11:46:04**

Page 632

Hesse

1
2     A.   I don't recall.
3     **Q.   Why did you terminate Kevin Lamm?**
4     A.   You know, Kevin is -- that is a
5 unique situation.  This guy left on his own,   11:46:14
6 never put anything in writing, took a
7 full-time job somewhere else.  I kind of heard
8 that he got a full-time job.  He didn't work
9 for six or eight months.  You know, he is an
10 angry individual.  He abuses the people that   11:46:31
11 he deals with, that he came in contact with.
12         He was another one that could be
13 insubordinate every once in a while.  I just
14 thought that it was best that he moved on with
15 his career and stayed at his full-time job.   11:46:46
16     **Q.   Did you ever report to Ed Paradiso**
17 **that Kevin Lamm allegedly abused people who he**
18 **came in contact with?**
19     A.   Specifically no, I don't remember.
20     **Q.   Do you think that would have been   11:46:57**
21 **important to tell the Chief of Police that one**
22 **of his police officers are abusing people?**
23     A.   Yes, we had conversations, we had
24 these conversations.  But Ed Paradiso kind of
25 liked these guys and had a soft spot for them.  11:47:11

Page 633

Hesse

1
2 So I guess he thought it wasn't a big deal, I
3 don't know.
4     **Q.   When was the first time that Kevin**
5 **Lamm abused somebody?        11:47:21**
6     A.   I don't know.  I don't recall.
7     **Q.   How come you didn't ask for his**
8 **termination at that point in time?**
9     A.   I worked with Kevin when I was
10 just a PO, it was not my job.        11:47:33
11     **Q.   How about when you became a**
12 **supervisor?**
13     A.   We had some conversations.
14     **Q.   How come you didn't ask for his**
15 **termination at that time?        11:47:41**
16     A.   Because I didn't find it necessary
17 and it was not my job to terminate him.
18     **Q.   Has Kevin ever been sued for any**
19 **alleged abuse?**
20     A.   I don't know.        11:47:50
21     **Q.   What was the reason that you told**
22 **Kevin Lamm that you were terminating him?**
23     A.   Just exactly how I explained it to
24 you.  He left, he didn't put anything in
25 writing.  He took a full-time job and I       11:48:03

Page 634

Hesse

1
2 thought it was best that he just move on.
3     **Q.   Is it true that you told him that**
4 **it was due to budget cuts?**
5     A.   No.        11:48:13
6     **Q.   Were there budget cuts that year?**
7     A.   No.
8     **Q.   Had you ever spoken to Ed Paradiso**
9 **that you wanted to terminate Kevin Lamm?**
10     A.   You know specifically I don't       11:48:30
11 remember.
12     **Q.   Why did you terminate Tom Snyder?**
13     A.   You know, Tommy at the end, at the
14 end of his employment he wasn't showing up to
15 work, he was giving other guys his tours   11:48:44
16 without calling in.  I think he had some
17 personal issues going on and, you know, it is
18 funny because I never had a specific
19 conversation with Tommy about saying that I
20 was letting him go or anything.  He just kind  11:49:00
21 of faded away, and I had no hours available
22 for him, and I just didn't put him back on the
23 schedule.  So we never had an official
24 conversation.
25     **Q.   Did you ever write Kevin Lamm up  11:49:14**

Page 635

Hesse

1   for his alleged abuse?
2      A.   I don't recall specifically.  I
3   don't think so.
4      Q.   Did you ever write him up for      11:49:22
5   insubordination?
6      A.   I don't think so.
7      Q.   Did you ever write him up for
8   being angry?
9      A.   I don't think so, no.           11:49:29
10      Q.   When did you tell Mr. Snyder that
11   he was being terminated?
12      A.   I think I just stated, I don't
13   think I ever actually told him that.
14      Q.   Did you meet with him on the dock  11:49:55
15   one night and asked for his shield and weapon?
16      A.   Yeah, we actually met up when I
17   was working for the harbor police and he was
18   working for the town.  I actually met him at
19   the Maple Avenue dock.  I needed -- I actually  11:50:11
20   needed his weapon back so I could get somebody
21   else qualified on the Glock, because I was
22   short weapons.  But I don't know if he
23   specifically turned in his shield that day
24   either.                                11:50:29

Page 636

Hesse

1      Q.   Did you schedule to meet him
2   there?
3      A.   I think it was like a chance
4   thing, that he was working, I was working and  11:50:35
5   we met up.
6      Q.   Did you run into each other?
7      A.   No, I think we communicated
8   somehow, because I might have asked him that I
9   needed the weapon back and he knew that I was  11:50:45
10   working this particular day, so we met up and
11   he handed over his weapon.
12      Q.   Why did you tell him that you were
13   terminating him?
14      A.   Well for the third time I don't   11:50:57
15   think I ever told him that he was being
16   terminated.
17      Q.   Isn't it true that you told him
18   that it was because he was the guy who ratted
19   to Civil Service about the uncertified      11:51:06
20   officers?
21      A.   Absolutely not.
22      Q.   Did he hand over his shield that
23   day?
24      A.   I don't remember.              11:51:22

Page 637

Hesse

1      Q.   Why did you terminate Joe Nofi?
2      A.   Joe Nofi, he was a unique person.
3   He just could never concentrate on one thing.
4   His summonses were poor, his appearance was    11:51:38
5   poor.  It was always a scheduling conflict
6   with him.  You know, he would be scheduled to
7   work, he wouldn't show up, he would have
8   somebody else take his tour.  I just didn't
9   want to tolerate it any more, so I asked him   11:51:55
10   to move on also.
11      Q.   What were the reasons that you
12   told him that he was being terminated?
13      A.   I just explained that, I gave him
14   the same jargon that I just give you.  That    11:52:05
15   his appearance was poor, his work was poor,
16   his attitude was poor.  His interaction with
17   people was really poor.
18      Q.   Did you ever write him up for his
19   poor summonses?                       11:52:23
20      A.   No.
21      Q.   Did you ever write him up for a
22   poor appearance?
23      A.   No.
24      Q.   Did you ever write him up for      11:52:29

Page 638

Hesse

1   scheduling conflicts?
2      A.   He has been written up for that.
3   I wouldn't say written up, but advised not to
4   do that.                              11:52:37
5      Q.   In writing?
6      A.   Yes.
7   RQ   Q.   I would like to mark the record to
8   request production of any alleged written
9   warning or writings that --             11:52:45
10      A.   It has been produced.
11      Q.   Did you ever write him up for his
12   poor interaction with people?
13      A.   No.
14      Q.   Did you ever discuss any of those  11:52:55
15   issues with Ed Paradiso?
16      A.   Yes.
17      Q.   Which ones?
18      A.   All of them.
19      Q.   What was Ed Paradiso's response?   11:53:03
20      A.   You know, I don't really recall.
21      Q.   Isn't it true that you told Joe
22   Nofi that he was being terminated due to
23   budget cuts?
24      A.   No.                           11:53:19

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 639

Hesse

1
2     Q.   Isn't it true that you told him on
3   that day that he is not like the other four
4   assholes that you were terminating?
5     A.   No way.                    11:53:30
6     Q.   You told him he was a good man and
7   a good father?
8     A.   No.
9     Q.   Was anyone else present when you
10   told Joe Nofi the reasons for his termination?  11:53:37
11    A.   No.
12        MR. NOVIKOFF:  I don't think you
13   asked that question with regard to the
14   other plaintiffs.
15    Q.   Was anyone else present when you   11:53:43
16   informed Mr. Lamm that he was terminated?
17    A.   No.
18    Q.   Was anyone else present when you
19   told Mr. Fiorillo that he was terminated?
20    A.   No.                        11:53:57
21    Q.   Was anyone else present on the
22   docks the night that you spoke to Mr. Snyder
23   about returning his weapon and shield?
24    A.   It was a day shift, but no.
25    Q.   Was anyone else present at the    11:54:07

Page 640

Hesse

1
2   time that you told Carter the reasons for his
3   termination?
4     A.   No.
5     Q.   Why did you wait for them to come  11:54:12
6   to the meeting on April 2nd to tell them that
7   you were terminating their employment?
8     A.   I thought it was the best way to
9   just get all the equipment back and be able to
10   just have a sit down with them and tell them   11:54:29
11   what was going on.
12    Q.   Did you think that it would be
13   humiliating in front of the other officers who
14   were assembled for the meeting?
15    A.   At the time, no.              11:54:39
16    Q.   How about now, do you think it was
17   humiliating?
18    A.   In retrospect I should have done
19   it a better way.
20    Q.   When did you decide to terminate   11:54:47
21   Snyder?
22    A.   You know, I always liked Tommy, he
23   is a good guy.  I always thought he was a hard
24   worker.  But I thought at the end he just had
25   some personal issues that were affecting his   11:55:06

Page 641

Hesse

1
2   job performance.  He seemed to be angry with
3   some of the other employees, and I thought it
4   was just best that he move on at that time.
5     Q.   Which other employees was he angry  11:55:16
6   with?
7     A.   Oh God.  Ty Bacon, the Bosetti
8   brothers, Arnie Hardman.  Anybody that came on
9   from the City job that came on to our job for
10   some reason he had some kind of disdain toward  11:55:32
11   City cops, and it was just becoming an issue.
12    Q.   Is that one of the reasons that
13   you terminated him?
14    A.   It was one of the reasons why,
15   yes.                           11:55:43
16    Q.   Did he tell you why he didn't like
17   the Bosetti's or Bacon or Hardman?
18    A.   Well there were comments being
19   made by him and Carter about City cops because
20   I think their boss on their job was a retired   11:55:54
21   City cop that just got in trouble on their
22   job, and for some reason they just hated City
23   cops.
24    Q.   They told you that?
25    A.   Who is they?              11:56:09

Page 642

Hesse

1
2     Q.   Mr. Snyder and I guess Ed Carter?
3     A.   Yes, they had told me that.
4     Q.   And they told you that they didn't
5   like the Bosetti's because of that reason?     11:56:19
6     A.   I don't know if it was entirely
7   specifically that reason, but that was
8   definitely part of it.
9     Q.   Did you ever speak to the
10   Bosetti's about their feelings for Snyder?     11:56:27
11        MR. NOVIKOFF:  Objection.
12   Foundation.
13    A.   I think it was known.
14    Q.   What was known?
15    A.   That they did not get along.  They  11:56:36
16   didn't like each other.
17    Q.   Why didn't the Bosetti's like
18   Snyder?
19        MR. CONNOLLY:  Objection.
20        MR. NOVIKOFF:  Objection.          11:56:44
21    A.   I think the Bosetti's felt that
22   Tommy Snyder and -- Tommy Snyder specifically
23   with the Halloween incident, they thought it
24   was a set up on them to get them into trouble.
25    Q.   Did you think it was a set up on   11:56:58

37f918e4-de29-4df9-9ef1-64f4ca0acd46

1              **Hesse**
2  them?
3      A.   No.
4      **Q.   When did the Bosetti's let you**
5  **know that they thought it was a set up?**      **11:57:03**
6      A.   I think when I finally started to
7  talk to them about the Halloween incident,
8  they kept feeling that they were being set up.
9      **Q.   Do you recall when the first time**
10 **that they told you that?**              **11:57:22**
11     A.   Specifically no.  I brushed it
12 off.
13     **Q.   Did there come a point in time**
14 **where you announced to the department the**
15 **termination of the five plaintiffs?**      **11:57:40**
16     A.   No.
17     **Q.   Did you tell them that day that**
18 **the five plaintiffs were being terminated?**
19         MR. CONNOLLY:  They being those
20     present at the meeting.          11:57:48
21         MR. GOODSTADT:  Yes.  Right.
22         MR. NOVIKOFF:  Well actually your
23     question I think he testified that he had
24     not made the decision about Snyder prior
25     to April 2nd.                  11:57:58

1              Hesse
2      **Q.   Did you announce to the officers**
3  **who were at the meeting that you had**
4  **terminated some of the plaintiffs?**
5      A.   I don't know --              11:58:09
6      **Q.   Or all of the plaintiffs?**
7      A.   I don't think I made an
8  announcement.
9      **Q.   Did you tell them, did you tell**
10 **anybody there that day that any of the**      **11:58:17**
11 **plaintiffs had been terminated?**
12     A.   I think I was specifically asked
13 and I said that they are going to move on with
14 their lives.
15     **Q.   Did you tell them why?**          **11:58:26**
16     A.   No.
17     **Q.   Isn't it true that you told the**
18 **assembled officers that you terminated Carter**
19 **and Snyder because you thought they were going**
20 **to wear a wire for the DA?**          **11:58:36**
21     A.   No.
22     **Q.   Do you recall what Gary Bosetti's**
23 **reaction was when you told him that the**
24 **plaintiffs were terminated?**
25     A.   What his specific reaction was,    11:58:49

1              Hesse
2  no.
3      **Q.   What Richard Bosetti's reaction**
4  **was?**
5      A.   I don't know.          11:58:51
6      **Q.   Isn't it true that they said its**
7  **about time that you got rid of those assholes?**
8      A.   No.
9      **Q.   Isn't it true that you told Gary**
10 **Bosetti that he owed you hours for making that  11:59:00**
11 **decision?**
12     A.   I don't understand what you mean
13 by that.
14     **Q.   That he owed you hours to work,**
15 **extra tours for terminating the plaintiffs?**    **11:59:11**
16     A.   That he, Gary, owes me hours?
17     **Q.   Yes.**
18     A.   I don't know what you mean by
19 that, no.
20     **Q.   Were other part-time officers**      **11:59:21**
21 **hired, newly hired for that summer?**
22     A.   Yes.
23     **Q.   How many?**
24     A.   Three I believe.
25     **Q.   Was Chris Moran at the meeting of  11:59:29**

1              **Hesse**
2  the remaining department?
3      A.   I think so.
4      **Q.   Were any full-time officers hired**
5  **that year?**                        **11:59:44**
6      A.   Yes.
7      **Q.   How many?**
8      A.   I think just one.
9      **Q.   Who was hired that year?**
10     A.   I think that was Paul Trosko.      11:59:50
11     **Q.   When was he hired?**
12     A.   I don't remember the exact date.
13     **Q.   Do you recall when he started**
14 **working?**
15     A.   I would have to look back in the    12:00:04
16 records, no.
17         MR. GOODSTADT:  Off the record.
18         MR. CONNOLLY:  The calendar year
19     2006, when you said that year?
20         MR. GOODSTADT:  Yes, I mean that    12:00:18
21     year, 2006.  Off the record for two
22     seconds.
23         THE VIDEOGRAPHER:  The time is
24     12:02, we are off the record.
25         (Recess taken.)              12:00:28

Hesse

1
2     THE VIDEOGRAPHER:  The time is
3  12:15, we are on the record.
4     Q.   Is there something that you wanted
5  to add?                        12:13:45
6     A.   You had asked about hiring
7  full-time police officers?
8     Q.   Right.
9     A.   Trosko was one, but we hired
10  another officer, Frank Foti, he might have   12:13:53
11  been at the end of 2006 or 2007.
12     Q.   Sir, isn't it true that after you
13  terminated the plaintiffs that you threatened
14  that Kevin Lamm, Frank Fiorillo and Joe Nofi's
15  law enforcement careers are over?        12:14:17
16     MR. NOVIKOFF:  That day or
17  subsequent?
18     Q.   At any point?
19     MR. NOVIKOFF:  Objection to the
20  form of the question.             12:14:25
21     MR. CONNOLLY:  Objection.
22     A.   Yes, I did say that.
23     Q.   When did you say that?
24     A.   I believe I said it to Eddie
25  Carter on the phone.             12:14:34

Hesse

1
2     Q.   When was that?
3     A.   I don't remember the date.
4     Q.   Why did you tell him that?
5     A.   I was just angry at their actions.  12:14:40
6     Q.   What actions?
7     A.   Going to Civil Service, trying to
8  get me in trouble.  You know, when is enough
9  enough.
10     Q.   I want to play the audio just to   12:14:54
11  identify that that is what you are referring
12  to.  This has been previously produced in this
13  case.
14     (Audio played).
15     Do you recognize the voices in      12:15:24
16  that conversation?
17     A.   Yes.
18     Q.   Who are those voices?
19     A.   That would be Eddie Carter and
20  myself.                        12:15:33
21     Q.   Did you ever call Mr. Fiorillo,
22  Mr. Nofi and Mr. Snyder mutts?
23     A.   Yes.  I think in my second day of
24  testimony I might have said that.
25     Q.   Why did you call them mutts?      12:15:52

Hesse

1
2     A.   Because I didn't like them very
3  much at that point.
4     Q.   Who did you call them mutts to?
5     A.   I don't recall.  I don't know.     12:16:02
6     Q.   I am going to play an audio again,
7  previously produced, I want to identify the
8  voices on the audio.
9     (Audio played.)
10     Q.   Do you recognize the voices on     12:16:38
11  that audio recording?
12     A.   Was that me, it didn't really
13  sound like me.
14     MR. CONNOLLY:  Can you play that
15  again?                        12:16:47
16     A.   You got to turn that up a little
17  bit.
18     Q.   Sure.
19     (Audio played.)
20     Q.   Do you recognize the voices in     12:17:15
21  that audio?
22     A.   Yes, it was Eddie Carter.
23     Q.   And who else?
24     A.   I believe it was me.
25     Q.   Any reason to believe it is not    12:17:30

Hesse

1
2  you?
3     A.   No.
4     Q.   Did you ever provide any
5  references, good or bad, for any of the       12:17:34
6  plaintiffs in the case subsequent to their
7  employment at Ocean Beach?
8     MR. NOVIKOFF:  Or neutral?
9     Q.   Or neutral?
10     MR. CONNOLLY:  Or did he respond   12:17:49
11  to any request for references?
12     Q.   Yes, or actively provide any
13  references.
14     MR. CONNOLLY:  Objection to the
15  form either way.                12:17:59
16     A.   Boy that is confusing.
17     Yes, I believe all my responses
18  were neutral.
19     Q.   How many responses did you provide
20  on behalf of Frank Fiorillo?        12:18:06
21     A.   Specifically maybe two.
22     Q.   Do you recall what jobs they were
23  for?
24     A.   Southhampton either village or
25  town.  Maybe Riverhead.  I don't specifically  12:18:22

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 651

Hesse

1  remember.
2      Q.   Who did you speak with in
3  Southampton with respect to Mr. Fiorillo?
4      A.   I believe there was a sergeant     12:18:32
5  that I spoke to.
6      Q.   Do you remember his name?
7      A.   No.
8      Q.   Was it Scott Foster, does that
9  ring a bell?                    12:18:38
10     A.   No.
11     Q.   What did you state to the sergeant
12  in Southampton about Mr. Fiorillo?
13     A.   I didn't state anything.  He had
14  asked me about him and I said that I cannot     12:18:45
15  give him any information.  I will only confirm
16  dates of employment.  And he asked me I think
17  to put that in writing which I did, and I sent
18  that out to Southampton.
19     Q.   Did you tell him that Mr. Fiorillo  12:19:01
20  was terminated?
21     A.   I don't think I did, no.
22     Q.   Did you tell him that Mr. Fiorillo
23  was suing you?
24     A.   No.                    12:19:11

Page 652

Hesse

1      Q.   Do you recall anything else that
2  you discussed with the sergeant from
3  Southampton?
4      A.   No.                    12:19:19
5      Q.   Do you recall when that
6  conversation happened?
7      A.   No, I don't.
8      Q.   Do you recall whether it was days,
9  weeks, months, years after you terminated Mr.  12:19:28
10  Fiorillo?
11     A.   Definitely was not years.  It
12  could have been a few weeks maybe.  I don't
13  know.  I don't recall.
14     Q.   Who at the Riverhead Police     12:19:39
15  Department did you speak with with respect to
16  Mr. Fiorillo?
17     A.   Like I said specifically Riverhead
18  I wasn't real positive about.  For some reason
19  I feel that I had a message from the Chief of  12:19:54
20  the Riverhead Police Department that I
21  responded back to.  I don't think I spoke to
22  him, it might have been a sergeant or a
23  lieutenant, I don't remember specifically.
24     Q.   Do you recall what you stated in   12:20:07

Page 653

Hesse

1  that conversation to the sergeant or
2  lieutenant who you spoke with?
3      A.   The conversations were very brief
4  and I stated dates of employment only, that is  12:20:16
5  it.  I don't believe I put anything in writing
6  for them.
7      Q.   Did you tell them that Mr.
8  Fiorillo was terminated?
9      A.   No.                    12:20:28
10     Q.   Did you explain to him why you
11  couldn't provide any additional information?
12     A.   No.
13     Q.   Did you explain to the person at
14  Southampton that you spoke with why you     12:20:35
15  wouldn't provide any additional information?
16     A.   I don't believe I ever did.
17     Q.   Did you ever speak to anyone or
18  communicate with anyone in the Northport Bay
19  Police Department with respect to Mr.     12:20:48
20  Fiorillo?
21     A.   Northport, no.
22     Q.   How about Huntington Bay Police
23  Department?
24     A.   Mr. Fiorillo, no.            12:20:54

Page 654

Hesse

1      Q.   How about Quogue Village Police
2  Department?
3      A.   No.  Quogue, no.
4      Q.   How about anyone with respect to  12:21:04
5  the Village of Babylon?
6      A.   No.
7      Q.   Code Enforcement Officer?
8      A.   No.
9      Q.   Did you ever speak with anyone at  12:21:11
10  the Town of Brookhaven with respect to Mr.
11  Fiorillo?
12     A.   No.
13     Q.   Did you ever provide any
14  references or respond to any request for     12:21:24
15  references on behalf of Mr. Snyder?
16     A.   I don't believe I got any from Mr.
17  Snyder.
18     Q.   How about with respect to the John
19  T. Mather Memorial Hospital?          12:21:41
20     A.   I never got anything from them.
21     Q.   How about the Town of Brookhaven?
22     A.   I don't believe I got anything
23  from them either.
24     Q.   I am not asking whether you got   12:21:54

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 655

**Hesse**

1
2    anything. I am asking whether you ever
3    communicated with anyone over there with
4    respect to Mr. Snyder?
5         MR. NOVIKOFF: Objection to the    12:22:00
6    form.
7    Q.   With respect to a potential
8    employment opportunity for Mr. Snyder?
9         MR. NOVIKOFF: Foundation.
10    Objection.                     12:22:05
11    A.   I understand what you are asking,
12   but when I say I have not gotten anything, I
13   don't think I received a phone call or any
14   documentation that said that he was applying
15   for the job.                   12:22:15
16    Q.   How about the Suffolk County Park
17   Rangers?
18    A.   Suffolk County Park Rangers; no.
19    Q.   Did you ever provide any reference
20   or respond to any request for a reference on    12:22:26
21   of Ed Carter?
22    A.   I believe there was only one thing
23   that came up with Mr. Carter.
24    Q.   What came up with Mr. Carter?
25    A.   He called me to ask me if I would   12:22:37

Page 656

**Hesse**

1
2    give him a reference, it had something to do
3    with the town and Chief Greg Decanio from the
4    Islip Airport Police was going to call me in
5    reference to something to do with Eddie    12:22:57
6    Carter, and I told Eddie that I would only
7    tell them the truth of why he was let go.
8    Q.   Did you speak to Decanio?
9    A.   At some point I did, yes.
10        MR. NOVIKOFF: Can you spell that? 12:23:14
11        THE WITNESS: I have no idea.
12        MR. NOVIKOFF: D-E-C-A-N-I-O.
13    Q.   Did you speak with Decanio before
14   or after you spoke to Carter about Decanio?
15    A.   After.                    12:23:35
16    Q.   So Ed didn't call you before and
17   say you need to speak with Decanio?
18    A.   I don't think so. He called me
19   first and said that Greg would be calling me
20   or to have me call Greg, and I talked to Greg  12:23:44
21   Decanio after I spoke to Decanio.
22    Q.   What did you tell Greg Decanio?
23    A.   I told Greg that Eddie Carter is a
24   good guy, that the reason why I had let him go
25   was because of his sleeping on duty. I said  12:24:00

Page 657

**Hesse**

1
2    that once again just like I reiterated before,
3    that he had just had twins, I think he over
4    exerted himself. I think he was doing too
5    much. That the best thing was to just move   12:24:13
6    on.
7    Q.   How come you told Decanio details
8    of why you terminated Carter, but didn't tell
9    for example the Southampton Police Department
10   details of your termination of Fiorillo?     12:24:26
11    A.   I know Greg, I am not going to
12   sugar coat it with Greg. Greg I know a long
13   time. We have done some training together,
14   and upon Eddie Carter's request I called him.
15    Q.   You called Decanio or he called    12:24:41
16   you?
17    A.   I believe I reached out to him. I
18   don't believe Greg ever called me.
19    Q.   Did you ever submit anything in
20   writing to Decanio?                  12:24:52
21    A.   No.
22    Q.   Did you ever submit anything in
23   writing with respect to Ed Carter at all in
24   connection with a reference or in response to
25   a reference to anyone?               12:25:05

Page 658

**Hesse**

1
2    A.   No.
3    Q.   Did you ever provide any
4    references or respond to any reference
5    requests with respect to Kevin Lamm?      12:25:10
6    A.   None.
7    Q.   Never spoke with anyone or
8    communicated with anyone at the Lloyd Harbor
9    Police Department?
10    A.   I did get a phone call from the    12:25:19
11   Chief in Lloyd Harbor.
12    Q.   So when you said none it is not
13   correct?
14    A.   It is correct.
15    Q.   You never spoke with the chief?   12:25:26
16    A.   I spoke to the chief.
17    Q.   Tell me about your call, tell me
18   everything you recall in that discussion with
19   the chief from Lloyd Harbor?
20    A.   I think he was served with a      12:25:36
21   subpoena in reference to this case, and he
22   wanted some details about what was going on,
23   he didn't understand why. I said that I was
24   being sued for some wrongful termination. And
25   I said these were the names that were involved 12:25:53

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 659

Hesse

1  with the suit, and he recognized I believe
2  Kevin Lamm's name because I think Kevin was on
3  their list for a full-time position.  And they
4  gave it to somebody else, but that was        12:26:07
5  previous to me speaking to them.
6      Q.   Had you spoken to anyone at Lloyd
7  Harbor prior to them calling you about the
8  subpoena?
9      A.   No.                    12:26:20
10      Q.   Did you tell them the reasons why
11  you were being sued other than for generically
12  wrongful termination?
13      MR. NOVIKOFF:  Objection to the
14      form.                   12:26:27
15      A.   No.
16      Q.   What else did you discuss with the
17  Lloyd Harbor Chief at that time?
18      A.   I forget what his name is, but it
19  turns out that he had his start in Ocean Beach 12:26:34
20  when he was a seasonal police officer.  So we
21  talked about the good old days with Joe
22  Loeffler as chief and the things that went on
23  back in the day.
24      Q.   Anything else?            12:26:58

Page 660

Hesse

1      A.   No.
2      Q.   Did you speak to anyone at
3  Huntington Bay Police Department about Kevin
4  Lamm?                       12:27:08
5      A.   No.
6      Q.   Did you speak to anyone in the
7  Ashroken Village Police Department?
8      A.   No.
9      Q.   How about Suffolk County Police   12:27:15
10  Department with respect to Kevin Lamm?
11      A.   I believe his investigator had
12  called me and wanted me to put something in
13  writing on why he no longer worked for the
14  department, and I told her the only thing that 12:27:29
15  I would do is confirm dates of employment.
16      Q.   Did you do that in writing?
17      A.   I don't believe I ever did, no.
18      Q.   How come?
19      A.   I don't think that is what she    12:27:38
20  wanted, so I would up not doing it.
21      Q.   Did you ever submit anything in
22  writing to Suffolk County Police Department
23  with respect to Kevin Lamm?
24      A.   No.                    12:27:51

Page 661

Hesse

1      Q.   How about the Southampton Village
2  Police Department, did you ever communicate
3  with them with respect to Kevin Lamm?
4      A.   No.                    12:28:02
5      Q.   How about the Northport Village
6  Police Department, did you ever communicate
7  with them or anyone there with respect to
8  Kevin Lamm?
9      A.   No.                    12:28:06
10      Q.   Did you ever communicate with
11  anyone at the Town of Islip Airport security
12  guard group with respect to Kevin Lamm?
13      A.   No.
14      Q.   How about Joe Nofi, did you ever  12:28:19
15  communicate with anyone with respect to a
16  reference or respond to a request for a
17  reference for Joe Nofi?
18      A.   Yes.
19      Q.   Who did you respond to or speak   12:28:28
20  with?
21      A.   I believe I spoke to an
22  investigator from the Collier County Sheriff's
23  Department in Florida.
24      Q.   Who did you speak with there?     12:28:42

Page 662

Hesse

1      A.   I don't recall his name.
2      Q.   How long was the conversation?
3      A.   A couple of minutes.
4      Q.   Tell me everything that you recall 12:28:51
5  that you spoke to him about?
6      A.   Well I was faxed a request to fill
7  out some kind of form for reference, and all I
8  did was confirm dates of employment and faxed
9  it back.                    12:29:12
10      Q.   Did you fill in any other
11  sections?
12      A.   Specifically I don't recall if I
13  filled out anything else other than that.
14      Q.   Did you cross out any of the      12:29:23
15  sections?
16      A.   No.
17      Q.   Did you ever speak with anyone
18  from Collier County?
19      A.   After I responded back by fax     12:30:03
20  there was an investigator who did call me.
21      Q.   Do you recall that investigators
22  name?
23      A.   No.
24      Q.   What did you discuss with the     12:30:10

37f918e4-de29-4df9-9ef1-64f4ca0acd46

1        **Hesse**
2    investigator?
3        A.   He had asked me if there was any
4    other information that I could provide.  I
5    told him no, but I did advise him about the     12:30:17
6    lawsuit against me.
7        Q.   Why did you advise him about the
8    lawsuit against you?
9        A.   Because I thought it was pertinent
10   to advise him.                     12:30:29
11       Q.   Why?
12       A.   Because it is public information
13   that I am being sued by this individual.
14       Q.   So is it your understanding that
15   at the time you spoke with the investigator     12:30:40
16   that it was public information that you were
17   being sued?
18       A.   Yes, it was.
19       Q.   You actually had been served with
20   a copy of the lawsuit?            12:30:51
21       A.   Yes.
22       Q.   Positive about that?
23       A.   I am pretty sure, yes.
24          MR. GOODSTADT:  Would you mark
25   this document as Hesse Exhibit 28,      12:31:03

1           Hesse
2    Employment, Collier County Sheriff's
3    Office, Employment Reference Prior
4    Experience.
5        (Hesse Exhibit 28, Employment,      12:31:04
6    Collier County Sheriff's Office,
7    Employment Reference Prior Experience,
8    marked for identification, as of this
9    date.)
10       Q.   I placed in front of Mr. Hesse      12:31:39
11   what has been marked as Exhibit 28, a
12   four-page exhibit bearing Bates CCSO 147
13   through 150.  I ask you to look at pages 149
14   and 150?
15       A.   Okay.                12:32:02
16       Q.   Do you recall, turn to page 150,
17   do you see a signature there?
18       A.   A signature.
19       Q.   On the bottom left, do you see
20   that, it says Denado or Donohoe, do you see     12:32:14
21   that signature?
22       A.   Yes, I do.
23       Q.   Does that refresh your
24   recollection as to the name of the person that
25   you spoke with?                 12:32:29

1           **Hesse**
2        A.   Yes.
3        Q.   Was it Donohoe?
4        A.   Yes.
5        Q.   He has a date of 9/15/2006, do you  12:32:31
6    see that?
7        A.   Yes.
8          MR. NOVIKOFF:  Where is that?
9          MR. GOODSTADT:  On the right side
10   next to Donohoe's signature; I am talking  12:32:42
11   about 150.
12          MR. NOVIKOFF:  I don't see a copy
13   on 150.
14          MR. GOODSTADT:  Let me see your
15   copy.                     12:32:54
16          MR. NOVIKOFF:  I see the comment,
17   I don't see the signature.  Okay, you got
18   it.
19       Q.   You see it is dated 9/15/2006, do
20   you see that?                12:33:09
21       A.   Yes.
22       Q.   Any reason to believe that that
23   was not the date that you spoke with him?
24       A.   I don't know.
25       Q.   In fact 9/15/2006 was six months   12:33:15

1           **Hesse**
2    before you were actually sued; is that
3    correct?
4          MR. NOVIKOFF:  Objection to the
5    form of the question.  To what you mean     12:33:25
6    by actually sued.
7        Q.   Sued by Mr. Nofi?
8          MR. CONNOLLY:  Same objection.
9        A.   Sued or served with a notice of
10   claim, I put them together.          12:33:36
11       Q.   Did you testify two times, two
12   sessions ago that you know the difference
13   between a lawsuit and a notice of claim?
14       A.   I might have put them together as
15   far as being served a notice of claim as being  12:33:47
16   sued.
17       Q.   Is a notice of claim publicly
18   available information?
19       A.   I don't know.
20       Q.   So what did you mean before when   12:33:53
21   you said I thought it was relevant because it
22   was publicly available information?
23       A.   Everybody was knowing about it,
24   everybody knew about it at that point.
25       Q.   Who is everybody?          12:34:02

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 667

Hesse

1
2      A.   I don't know, it was on the news,
3  it was everywhere.
4      Q.   It is your testimony that it was
5  on the news that by the time that you spoke      12:34:10
6  with Mr. Donohoe that you were being sued by
7  Joe Nofi; is that your testimony?
8      A.   I knew it was coming at least.
9      Q.   The question, sir, is at the time
10  that you spoke with Mr. Donohoe was it on the  12:34:23
11  news that you were being sued by Joe Nofi?
12      A.   You know what, I just don't
13  recall.
14      Q.   And here you testified -- here you
15  wrote or told him at least that you had      12:34:34
16  dismissed Mr. Nofi; is that correct?
17          MR. CONNOLLY:  Objection.
18          MR. NOVIKOFF:  Objection.
19      A.   No.
20      Q.   If you look on page 149, he checks  12:34:41
21  off dismissed?
22          MR. NOVIKOFF:  Okay, 149.
23          MR. GOODSTADT:  Yes.
24          MR. NOVIKOFF:  I will stipulate
25  that on 149 there is a check mark that      12:34:54

Page 668

Hesse

1
2  says dismissed.
3      Q.   Do you recall telling him that you
4  dismissed Joe Nofi?
5      A.   No.                            12:35:00
6      Q.   Then the explanation you see he
7  writes, dismissed, applicant presently suing
8  the Police Department for wrongful
9  termination.  Do you see that?
10      A.   I do see that, yes.            12:35:08
11      Q.   Do you recall telling him that you
12  dismissed Mr. Nofi and that he is presently
13  suing the Police Department for wrongful
14  termination?
15          MR. NOVIKOFF:  Objection.      12:35:20
16  Compound.
17          MR. CONNOLLY:  Objection.
18      A.   That is not what I recall telling
19  him.
20      Q.   What do you recall telling him?  12:35:24
21      A.   I told him that he no longer works
22  for the department, and I will confirm dates
23  of employment, and that he is suing the
24  department for wrongful termination.  But that
25  is not the reason why he was terminated, that  12:35:35

Page 669

Hesse

1
2  is not what I told him.
3          MR. NOVIKOFF:  You can add one
4  more minute based upon what I am about to
5  say.  But I would think it would be      12:35:45
6  logical that if one is no longer working
7  at the department and one is suing for
8  wrongful termination, that that person
9  has been dismissed or otherwise
10  constructively discharged.             12:35:58
11      You can have one more minute based
12  on the colloquy.
13          MR. GOODSTADT:  I don't know why
14  you added the colloquy.
15          MR. NOVIKOFF:  I couldn't help  12:36:07
16  myself.
17      Q.   Did you ever speak with Nofi about
18  your discussion with Donohoe or anyone at the
19  Collier County Sheriff's office?
20      A.   No.                            12:36:20
21      Q.   Did you ever let Nofi know that
22  someone had reached out to you to request a
23  reference on his before?
24          MR. NOVIKOFF:  Objection.
25      A.   No.                            12:36:32

Page 670

Hesse

1
2      Q.   Did you ever submit anything in
3  writing to Collier County with respect to
4  Mr. Nofi?
5      A.   I was sent a one-page reference,  12:36:45
6  questionnaire, and I think I only put on there
7  that I confirmed dates of employment.
8      Q.   Did you ever speak with
9  Mr. Donohoe other than for that one telephone
10  conference that you already testified to?  12:37:12
11      A.   No.  I believe that was the only
12  time.
13      Q.   Did you ever speak to anyone else
14  from Collier County on behalf of Mr. Nofi?
15      A.   No.                            12:37:23
16      Q.   Did you ever speak to anyone in
17  the Suffolk County Department of Health with
18  respect to Joe Nofi?
19      A.   Yes.
20      Q.   When?                          12:37:29
21      A.   I don't know when.
22      Q.   After his termination?
23      A.   Yes.
24      Q.   What did you speak to -- strike
25  that.                                   12:37:38

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 671

Hesse

1
2        **Do you know what year it was that**
3    **you spoke with that person?**
4        A.   No.
5        **Q.   Who was it that you spoke with?**   12:37:41
6        A.   It was a female, I believe -- I
7    don't know if they were in actual health
8    services or cigarette and tobacco section.
9    They wanted me to give a reference over the
10   phone which I didn't do, and I asked them if   12:38:03
11   they want a reference they would have to put
12   something on department letterhead and mail it
13   to me, and that was the extent of the
14   conversation.
15       **Q.   Have you ever given a reference**   12:38:17
16   **for any officers other than for the five**
17   **plaintiffs?**
18       A.   I may have over the years.
19       **Q.   Have you ever given any other**
20   **information other than for dates of**   12:38:25
21   **employment?**
22       A.   I may have.
23       **Q.   Did you provide Paul Trosko with a**
24   **reference?**
25       A.   I may have.               12:38:33

Page 672

Hesse

1
2        **Q.   Substantive reference other than**
3    **for dates of employment?**
4        A.   I may have.
5        **Q.   Was it a positive reference?**   12:38:38
6        A.   I would think so, yes.
7        **Q.   Did you ever have any**
8    **communications with anyone in the Suffolk**
9    **County Police Department with respect to Joe**
10   **Nofi?**               12:38:49
11       A.   In the Suffolk County Police
12   Department?
13       **Q.   Yes.**
14       MR. NOVIKOFF:  Independent of a
15   reference --            12:38:54
16       MR. GOODSTADT:  No, in connection
17   with a reference.
18       A.   No.
19       **Q.   How about anyone in the**
20   **Easthampton Bay Constable Police Department?**   12:39:02
21       A.   No.
22       **Q.   How about the Easthampton Marine**
23   **Patrol?**
24       A.   No.
25       **Q.   How about the Suffolk County SPCA?**  12:39:11

Page 673

Hesse

1
2        A.   I think somebody called in from
3    there too, but no reference was given.
4        **Q.   Tell me everything you recall on**
5    **the conversation you had with the Suffolk**   12:39:27
6    **County SPCA with respect to Nofi?**
7        A.   I just vaguely remember something
8    about him applying for the -- whatever it is,
9    SPCA.  But you know what, to tell you the
10   truth I don't think anybody called me directly  12:39:42
11   in reference to a reference.
12       **Q.   Did you ever provide a reference?**
13       A.   No.
14       **Q.   How about the Riverhead Police**
15   **Department, did you ever speak with anyone**   12:39:57
16   **there with respect to Joe Nofi?**
17       A.   I think somebody did call in.
18       **Q.   Tell me everything that you recall**
19   **about that conversation?**
20       A.   Just the fact that there was a   12:40:09
21   call.  I think it was the same time with Frank
22   Fiorillo, and no reference was given.
23       **Q.   What did you tell the person?**
24       A.   You know, I believe there was a
25   message left for me to call the chief back and  12:40:20

Page 674

Hesse

1
2    when I -- I called back, I didn't get the
3    chief and I never got a call back.  So I don't
4    think anything was ever said or done.
5        **Q.   So you never spoke with anyone?**   12:40:31
6        A.   No.
7        MR. CONNOLLY:  Who is this?
8        **Q.   Riverhead Police Department.**
9        A.   I don't really recall any
10   conversations that took place with them.   12:40:41
11       **Q.   Now about the Northport Police**
12   **Department with respect to Joe Nofi?**
13       A.   No.
14       **Q.   How about the Smithtown Bay**
15   **Constable with respect to Joe Nofi?**   12:40:53
16       A.   No.  Never.
17       **Q.   How about with the Shelter Island**
18   **Police with respect to Joe Nofi?**
19       A.   No.
20       **Q.   How about the Amtrak Police with**   12:41:00
21   **respect to Joe Nofi?**
22       A.   No, nothing.
23       **Q.   How about the Quogue Police with**
24   **respect to Joe Nofi?**
25       A.   Nothing.               12:41:11

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 675

```
 1              Hesse
 2      Q.  How about the North Hempstead Bay
 3  Constable with respect to Joe Nofi?
 4      A.  Nothing.
 5      Q.  How about the Babylon Bay        12:41:21
 6  Constable?
 7      A.  Nothing.
 8      Q.  Any others that you can recall and
 9  any other potential employers that you can
10  recall discussing Joe Nofi with?          12:41:30
11      A.  No.
12      Q.  How about Frank Fiorillo, do you
13  recall anybody else other than for the ones
14  that I asked you about?
15      A.  No.                 12:41:40
16      Q.  How about with respect to Ed
17  Carter, do you recall anybody else other than
18  for Decanio?
19      A.  No.
20      Q.  How about Kevin Lamm, do you      12:41:48
21  recall speaking with anybody on behalf of
22  Kevin Lamm's application for a job?
23      A.  Other than Suffolk County Police
24  Department, no.
25      Q.  How about Tommy Snyder?          12:42:00
```

Page 676

```
 1              Hesse
 2      A.  Never.
 3      Q.  I think we touched upon last time
 4  your post on the blog.  Do you know what I
 5  mean when I say the blog?                 12:42:21
 6      A.  Yes.
 7      Q.  Subsequently you provided
 8  information in response to interrogatories
 9  identifying this post that you made; is that
10  correct?                       12:42:30
11      A.  Yes.
12      Q.  Is that all the posts that you
13  made, the ones that were in response to the
14  interrogatories?
15      A.  Yes.                12:42:36
16      MR. NOVIKOFF:  How much time is
17  left.
18      THE VIDEOGRAPHER:  Eight minutes.
19      MR. NOVIKOFF:  Have you hit the
20  250 yet.                       12:42:53
21      MR. GOODSTADT:  I don't know.
22      MR. NOVIKOFF:  Off the record.
23      THE VIDEOGRAPHER:  The time is
24  12:44, we are off the record.
25      (Recess taken.)            12:43:09
```

Page 677

```
 1              Hesse
 2      THE VIDEOGRAPHER:  The time is
 3  12:45, we are on the record.
 4      Q.  Mr. Hesse, you have posted on the
 5  blog from your home computer; is that correct?  12:43:36
 6      A.  Yes.
 7      Q.  Do you know if anyone else has
 8  posted on the blog from your home computer
 9  other than for you?
10      A.  Not that I am aware of.          12:43:44
11      Q.  And the same thing about the Ocean
12  Beach Police Department computer, you posted
13  there on the blog?
14      A.  I may have, yes.
15      Q.  Are you aware of anybody else      12:43:53
16  posting on the blog from the Ocean Beach
17  Police Department computer other than for
18  yourself?
19      A.  Not yet.
20      Q.  What do you mean by not yet?      12:44:02
21      A.  I am assuming I will find out.
22      MR. GOODSTADT:  I have nothing
23  further at this time.
24      MR. CONNOLLY:  You can ask one
25  more, his responses are based upon his    12:44:13
```

Page 678

```
 1              Hesse
 2  recollection of blog entries.
 3      MR. GOODSTADT:  Okay.
 4      MR. NOVIKOFF:  Its up to Andrew if
 5  he wants to ask that question.           12:44:26
 6      MR. GOODSTADT:  I am going to
 7  leave his responses where they are and go
 8  through what I need to on redirect if
 9  necessary.
10      THE VIDEOGRAPHER:  The time is      12:44:38
11  12:46, we are off the record.
12      (Time noted 12:46 p.m.)
13      (Lunch recess taken.)
14
15
16
17
18
19
20
21
22
23
24
25
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 679

Hesse

1
2       A F T E R N O O N   S E S S I O N
3          (Time noted: 1:38 p.m.)
4   G E O R G E   H E S S E,   resumed and
5       testified as follows:
6   EXAMINATION BY (Cont'd.)
7   MR. NOVIKOFF:
8          THE VIDEOGRAPHER: The time is
9   1:38, we are on the record.
10      Q.   Good afternoon, Mr. Hesse, how are   13:36:34
11   you?
12      A.   Good.
13      Q.   As you probably are aware I
14   represent all the Village defendants besides
15   you. As you are probably aware I represent   13:36:43
16   all the Village defendants except you, you are
17   aware of that?
18      A.   Yes.
19      Q.   Have you and I ever had
20   discussions about the substance or the merits   13:37:00
21   or lack thereof of the action that brings us
22   here today?
23      A.   No.
24      Q.   Have we ever exchanged written
25   communications?                    13:37:08

Page 680

Hesse

1
2      A.   No.
3      Q.   I am going to ask you a series of
4   questions, I want to start off with asking you
5   some questions about the blog, but since Mr.   13:37:19
6   Goodstadt didn't ask you about any specific
7   blog entries, I am not going to. But let me
8   just ask you a few questions about the blog.
9          To the extent that you entered,
10   you made blog entries subsequent to the April   13:37:37
11   2nd meeting, and you understand what I am
12   talking about by the April 2nd meeting?
13      A.   Yes.
14      Q.   April 2, 2006?
15      A.   Yes.             13:37:51
16      Q.   Let me rephrase the question.
17          To the extent that you made blog
18   entries in the Schwartz Report subsequent to
19   April 2, 2006, were you doing that as part of
20   your official duties as Acting Chief of   13:38:03
21   Police?
22      A.   No.
23      Q.   With regard to any entries in the
24   Schwartz Report or any other blog concerning
25   Ocean Beach subsequent to April 2, 2006 were   13:38:14

Page 681

Hesse

1
2   you doing it in any capacity associated with
3   your position as Acting Chief of Police?
4          MR. GOODSTADT: Objection.
5      A.   No.             13:38:25
6      Q.   Did you advise Mayor Rogers while
7   she was still mayor but subsequent to April 2,
8   2006 that you were entering blog entries?
9      A.   No.
10      Q.   Did you advise Trustee Loeffler   13:38:37
11   subsequent to April 2nd and while he was still
12   a trustee member that you were entering blog
13   entries on the Schwartz Report concerning
14   Ocean Beach issues?
15      A.   No.             13:38:55
16      Q.   To your knowledge was anyone, to
17   your knowledge was any trustee ever aware
18   between April 2nd and the time that Mayor
19   Loeffler was -- withdrawn.
20          Between April 2nd and the time   13:39:12
21   that Mayor Loeffler was started as mayor in
22   the summer of 2006 are you aware of any
23   trustee that was aware that you were blogging
24   on the Schwartz Report concerning Ocean Beach?
25          MR. GOODSTADT: Objection.   13:39:28

Page 682

Hesse

1
2      A.   I was not aware of anybody that
3   would know, no.
4      Q.   You certainly didn't tell anyone,
5   did you?             13:39:33
6      A.   No.
7      Q.   Well, since there is an objection
8   let me rephrase the question.
9          Did you tell any trustee between
10   April 2nd and the date that Mayor Loeffler   13:39:40
11   started as mayor that you were blogging on the
12   Schwartz Report concerning Ocean Beach?
13      A.   No.
14      Q.   Prior to receiving the -- prior to
15   being served with the complaint, the Federal   13:39:57
16   court complaint in this matter did you ever
17   advise mayor -- former Mayor Rogers that you
18   were blogging on the Schwartz Report
19   concerning Ocean Beach?
20      A.   No.             13:40:10
21      Q.   Did you ever advise Mayor Loeffler
22   prior to serving -- getting served with the
23   summons and complaint in the action that you
24   were blogging on the Schwartz Report
25   concerning Ocean Beach?             13:40:26

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 683

Hesse

1
2    A.   No.
3    Q.   Did you advise any trustee member
4  prior to the time that you were served with
5  the summons and complaint that you were        13:40:31
6  blogging on the Schwartz Report concerning
7  Ocean Beach?
8    A.   No.
9    Q.   Let's look at the exhibit that Mr.
10  Goodstadt showed you, Exhibit 28, Deposition    13:41:09
11  Exhibit 28, CCSO 147 through CCSO 150.
12  Specifically let's look at 149 and 150?
13    A.   Yes.
14    Q.   Did you draft this document?
15    A.   No.                        13:41:34
16    Q.   Prior to today have you seen this
17  document?
18    A.   No.
19    Q.   So let's be more specific, the
20  line: Rate the applicant in the following      13:41:44
21  areas. You didn't draw that line; right?
22    A.   No.
23    Q.   Now, Mr. Goodstadt asked you a
24  question as to when you did this, when you
25  spoke -- when you spoke to the investigator,   13:42:02

Page 684

Hesse

1
2  when you filled out whatever form you
3  indicated that you filled out. Do you recall
4  those questions?
5    A.   Yes.                      13:42:09
6    Q.   Now, the date of this document,
7  150, is 9/15/2006. Would you agree with me
8  that given the fact that the Federal lawsuit
9  was not filed until March 2007, that you had
10  your conversation with Collier County prior to  13:42:30
11  the filing of the Federal lawsuit?
12    A.   Yes.
13    Q.   And if I represented to you that
14  the date of the notice of claim was on or
15  about June 30, 2006, would you agree with me    13:42:43
16  that based upon that representation you would
17  have had a conversation with Collier County
18  after becoming aware of the notice of claim?
19    A.   Yes.
20    Q.   In fact the notice of claim was in  13:42:56
21  part a claim that the five plaintiffs were
22  unlawfully terminated; correct?
23      MR. GOODSTADT: Objection.
24    A.   Yes.
25    Q.   What was your -- what is your      13:43:04

Page 685

Hesse

1
2  knowledge as you sit here today as to what
3  claims if any any of the plaintiffs were
4  making in their respective notice of claims?
5    A.   It was my belief that it was for   13:43:14
6  some kind of illegal termination of sorts, and
7  then many other accusations that just didn't
8  make sense.
9    Q.   A notice of claim is filed with
10  the village; correct?                13:43:36
11    A.   Yes.
12    Q.   And a notice of claim is filed
13  specifically with the clerk of the village; is
14  that correct?
15      MR. GOODSTADT: Objection.         13:43:43
16    A.   Yes.
17    Q.   To your knowledge is a notice of
18  claim a document that an individual could file
19  a FOIA request to ascertain?
20      MR. GOODSTADT: Objection.         13:43:56
21      MR. CONNOLLY: Objection.
22    A.   You know, I believe they can.
23    Q.   Are you aware of any law that
24  requires a notice of claim be kept
25  confidential and hidden from the public?      13:44:08

Page 686

Hesse

1
2    A.   Not that I am aware of.
3      MR. GOODSTADT: Objection.
4    Q.   Now, let's look at page 150?
5    A.   Uh-hum.                    13:44:40
6    Q.   Whoever wrote this document states
7  under the line: Please provide any additional
8  information that you feel is important.
9      And they write as follows: Deputy
10  Chief Hesse states quote, his Police        13:44:52
11  Department is being sued by the applicant for
12  quote wrongful (job) termination close quote.
13      Do you see that?
14    A.   Yes.
15    Q.   Did you state to whomever you      13:45:07
16  spoke to at Collier County that the Police
17  Department was being sued?
18    A.   Yes.
19    Q.   Did you state to the investigator
20  or whomever you spoke to at Collier County    13:45:17
21  that Mr. Nofi was suing the department for
22  wrongful termination?
23    A.   Yes.
24    Q.   Whoever wrote this document then
25  goes on to say: Chief Hesse states that he    13:45:28

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1 **Hesse**
2 cannot comment on the applicant's reason he
3 was let go or his job history at the PD due to
4 the ongoing lawsuit.
5     Do you see that?                13:45:40
6     A.   Yes.
7     Q.   Now, did you tell whomever you
8 spoke to at Collier County that you can't
9 comment on the applicant's reasons as to why
10 he was let go?                      13:45:51
11     A.   Yes.
12     Q.   Did you tell whomever you spoke to
13 at Collier County that you can't comment on
14 the applicant's job history at the Police
15 Department?                         13:46:00
16     A.   Yes.
17     Q.   And did you tell whomever you
18 spoke to at Collier County that you could not
19 discuss the reasons Mr. Nofi was let go or his
20 job history due to the ongoing lawsuit?   13:46:12
21     A.   Yes.
22     Q.   Now, did you speak with any lawyer
23 prior to giving this information to Collier
24 County as to what you could say with regard to
25 a reference request?                13:46:28

1     **Hesse**
2     A.   No.
3     Q.   Did you speak with Mayor Loeffler?
4     A.   No.
5     Q.   Did you speak with former Mayor   13:46:33
6 Rogers?
7     A.   No.
8     Q.   Did you speak with any trustee?
9     A.   No.
10     Q.   Now, you indicated in response to   13:46:38
11 Mr. Goodstadt's question that in your opinion
12 you gave neutral references; is that correct?
13     A.   Uh-hum.
14     MR. GOODSTADT:  Objection.  His
15 testimony is what it is.            13:46:50
16     MR. NOVIKOFF:  Okay.
17     Q.   Let me state this.  In your
18 opinion the references that you gave with
19 regard -- putting aside Mr. Carter for the
20 time being, the references that you gave with   13:46:59
21 regard to the other four plaintiffs, to the
22 extent that you gave any references -- you
23 know, withdrawn, reference is a bad word.
24     To the extent that you had any
25 communications with regard to any prospective   13:47:11

1     **Hesse**
2 employers of the plaintiffs with the exception
3 of Mr. Carter, would you characterize your
4 comments as being neutral?
5     MR. GOODSTADT:  Objection.      13:47:22
6     A.   Yes.
7     Q.   Sir, if in fact you wanted to give
8 a negative reference with regard to for
9 example Frank Fiorillo, what would you have
10 said to a prospective employer?      13:47:31
11     MR. GOODSTADT:  Objection.
12     A.   I would have said that he was
13 insubordinate and I would have gave him -- I
14 probably would have given him an example or
15 two.                            13:47:44
16     Q.   The same thing with regard to Mr.
17 Nofi, if you were to give a negative reference
18 with regard to Mr. Nofi what would you have
19 said?
20     MR. GOODSTADT:  Objection.      13:47:55
21     A.   I would have said that, like I
22 stated earlier, he had poor work performance,
23 poor appearance and so on, along those lines.
24     Q.   Let's stay with Mr. Nofi for a
25 minute.  To the extent and I don't recall your  13:48:09

1     **Hesse**
2 testimony, I am not going to try to repeat it
3 here, to the extent that you gave any
4 references at all with regard to Mr. Nofi
5 subsequent to April 2, 2006, did you give that  13:48:19
6 type of a negative reference?
7     A.   No.
8     MR. CONNOLLY:  Objection.
9     Q.   Did you give any type of negative
10 reference?                       13:48:31
11     A.   No.
12     Q.   Same question with regard to Mr.
13 Fiorillo?
14     MR. GOODSTADT:  Objection.
15     A.   No.                      13:48:37
16     Q.   With regard to Mr. Snyder, to the
17 extent that you gave any, made any
18 communications with any prospective employers
19 of Mr. Snyder after April 2, 2006, if you were
20 going to give a negative reference what would  13:48:51
21 you have said?
22     MR. GOODSTADT:  Objection.
23     A.   I would have said that he had
24 somewhat of a poor attitude.  His work
25 performance was slipping.  That tours that he  13:49:01

Hesse

1
2  was scheduled for he was not showing up for.
3      Q.   Did you give that type of -- did
4  you communicate those opinions to any
5  prospective employer to the best of your        13:49:13
6  recollection?
7      A.   No.
8      Q.   How about with regard to Mr. Lamm,
9  to the extent that you had any communications
10  with a prospective employer after April 2,      13:49:21
11  2006 and you were inclined to give a negative
12  reference, what would that negative have been?
13      MR. GOODSTADT:  Objection.
14      A.   I would have said that he had a
15  poor attitude, shows no discretion, generally   13:49:36
16  angry, and insubordinate.
17      Q.   Did you make -- did you
18  communicate those opinions to any prospective
19  employer that you were aware of?
20      A.   No.                                    13:49:54
21      Q.   So let's go back to what Mr.
22  Goodstadt brought out from you during his
23  testimony.  You acknowledged, and correct me
24  if I am wrong, that at least that on those
25  tapes -- withdrawn.                             13:50:06

Hesse

1
2      You acknowledged on those tapes
3  that Mr. Goodstadt played for you, for us in
4  the morning, that you did make statements
5  concerning Lamm, Fiorillo and Nofi's law        13:50:17
6  enforcement careers; correct?
7      A.   Yes.
8      Q.   And in fact in sum or substance
9  you had said to whoever you were speaking to
10  that those -- that their law enforcement        13:50:31
11  careers were over; is that correct?
12      A.   Yes.
13      Q.   What did you mean by that as you
14  heard it on the tape?
15      MR. GOODSTADT:  Objection.           13:50:40
16      A.   I was angry.
17      MR. CONNOLLY:  Objection.
18      Q.   I understand.
19      A.   I was angry at the things, at the
20  acquisitions that they were making.  But as      13:50:47
21  far as their law enforcement careers are over,
22  they are just going to remain where they are
23  and that is what I hoped.  And really that was
24  it.  There was no threats made.  I didn't do
25  anything that would hurt them.  I never said     13:51:00

Hesse

1
2  anything about them to any prospective
3  employer.  So, you know, I was just angry at
4  that moment.
5      MR. GOODSTADT:  Do we have an          13:51:12
6  agreement that I don't have to move to
7  strike anything?
8      MR. NOVIKOFF:  Yes, until such
9  time as you need to.
10      MR. GOODSTADT:  Well it is         13:51:21
11  preserved.  I don't have to do it today.
12      MR. NOVIKOFF:  Yes.
13      Q.   To the extent Mr. Goodstadt
14  believes that you were threatening to do
15  something in those tapes with regard to their   13:51:31
16  law enforcement careers, did you take any
17  action in furtherance of that?
18      MR. CONNOLLY:  Objection.
19      MR. GOODSTADT:  Objection.
20      A.   No.                             13:51:43
21      Q.   Was it your intent on those tapes
22  to communicate that you were going to
23  affirmatively take any action to harm their
24  careers?
25      A.   No.                             13:51:55

Hesse

1
2      Q.   Now, Mr. Goodstadt inquired with
3  you with regard to various eyewitness
4  statements that had been filed with the
5  village concerning the Halloween incident, do   13:52:42
6  you recall that?
7      A.   Yes.
8      Q.   I think he said, he asked you did
9  you think it was strange that no one who put
10  in an eyewitness statement made reference to a  13:52:53
11  pool cue; correct?
12      A.   Yes.
13      Q.   I don't recall what your answer is
14  and frankly for purposes of my question I
15  don't care what your answer was.  Let's look    13:53:03
16  at the Exhibit 14?
17      MR. GOODSTADT:  Which is Exhibit
18  14?
19      Q.   This is the memo from Steve Jaeger
20  to Ed Paradiso?                          13:53:34
21      MR. CONNOLLY:  You are going to
22  have to give him a copy.
23      MR. NOVIKOFF:  I thought the
24  reporter would have brought it.  So we
25  are continuing.                         13:53:54

Hesse

1
2      MR. GOODSTADT:  I don't know.
3      MR. NOVIKOFF:  Do you have a clean
4  copy?
5      MR. CONNOLLY:  It has my          13:54:02
6  handwriting on it.
7      MR. NOVIKOFF:  It says Exhibit 14.
8  Can you show Mr. Goodstadt, I just --
9      MR. GOODSTADT:  That is fine.
10     Q.   I am going to show you what I    13:54:17
11  represent to be marked as Exhibit 14, I will
12  note for the record that Mr. -- your counsel's
13  handwriting is on the bottom of that page
14  indicating that it is Exhibit 14.
15     Now, would you characterize this    13:54:29
16  as an eyewitness statement, or would you
17  characterize this as a complaint to the chief
18  concerning an action taken against Gary
19  Bosetti by the chief?
20     A.   I took it as a complaint filed to   13:54:43
21  the chief about the actions that the chief
22  took against Gary Bosetti.
23     Q.   Does Mr. Jaeger in this letter
24  indicate at all that he was a witness to the
25  entirety of the altercation involving those   13:54:56

1          Hesse
2  three individuals and Mr. Gary Bosetti?
3      MR. GOODSTADT:  Objection.
4      A.   No.
5      Q.   Does he indicate anywhere in this   13:55:04
6  letter that he was an eyewitness to anything
7  involving Gary Bosetti fighting these -- any
8  individual?
9      MR. GOODSTADT:  Objection.
10     A.   No.                    13:55:15
11     Q.   Now let's look at Exhibit 16?
12     MR. CONNOLLY:  Which we are going
13  to have the same problem.
14     MR. NOVIKOFF:  Yes.
15     Q.   It is the Doug Wyckoff, 3165 and   13:55:35
16  3166.
17     MR. GOODSTADT:  Looks good to me.
18     Q.   I am going to ask you to read,
19  same representation that what I am showing you
20  is 3165 and 3166. I represent that it was   13:56:04
21  marked as Exhibit 16 at your deposition
22  earlier and your counsel is handing you a copy
23  of his.
24     MR. CONNOLLY:  Which again notes
25  that it is Exhibit 16 in my handwriting?   13:56:15

1          Hesse
2      Q.   Now I am just going to ask you to
3  read Mr. Wyckoff's statement to yourself, on
4  the front and then it continues on the back.
5  Then I am going to ask you a series of   13:56:24
6  questions about that.
7      A.   Okay.
8      Q.   Did Mr. Wyckoff indicate in his
9  statement that he was a witness from the
10  entire altercation involving Gary Bosetti from   13:57:22
11  the moment it started to the moment it ended?
12     MR. GOODSTADT:  Objection.
13     A.   With Gary himself -- not entirely,
14  no.
15     Q.   In fact am I correct in my reading   13:57:34
16  of this that at some point in time Mr. Wyckoff
17  said that being that he was a bouncer for many
18  years he went and grabbed one of the alleged
19  victims and forced him out the front door;
20  yes?                          13:57:52
21     A.   Yes.
22     Q.   So I am correct in reading, that
23  is what I read?
24     A.   Yes.
25     MR. GOODSTADT:  Objection.         13:57:59

1          Hesse
2      Q.   Would you agree then that had he
3  been taking one of the individuals out the
4  front door while the altercation was still
5  going on involving Gary Bosetti that he might   13:58:07
6  not have seen Mr. Bosetti using a pool cue?
7      MR. GOODSTADT:  Objection.
8      A.   Yes.
9      Q.   Did Mr. Bosetti ever deny ever
10  using a pool cue?                 13:58:21
11     A.   No.
12     Q.   And in fact if I recall correctly
13  in his witness statement he acknowledged
14  specifically that he hit Mr. Schalik, or he
15  hit somebody with a pool cue; right?   13:58:28
16     A.   Yes.
17     Q.   Now, let's look at Exhibit 15, and
18  if Mr. Connolly doesn't mind I would like to
19  have him show to the extent that there is no
20  extraneous handwriting other than the exhibit   13:58:44
21  number.
22     Again I represent that Exhibit 15,
23  what I am handing you is document 3181 through
24  3182?
25     A.   Correct.                 13:59:04

Page 699

Hesse

1
2    Q.   And it was marked as Exhibit 15 by
3  Mr. Goodstadt when he was questioning you.  I
4  am going to ask you to read this one and then
5  tell me when you are done?          13:59:15
6    A.   Okay.
7       MR. CONNOLLY:  Just let me see it
8  for a second.  Okay.
9    Q.   Now, I have showed you Exhibit 15,
10  and whose signature -- whose eyewitness     14:01:20
11  statement is that; that is Jeannie Jaeger; is
12  that correct?
13    A.   Yes.
14    Q.   Does Ms. Jaeger in this eyewitness
15  statement or this statement indicate that at   14:01:29
16  some point in time she went into the woman's
17  bathroom after the altercation began?
18       MR. GOODSTADT:  Objection.
19    A.   Yes.
20    Q.   Why don't you tell the court what   14:01:41
21  Ms. Jaeger is saying with regard to when she
22  went back into the bathroom?
23    A.   You want me to read it?
24    Q.   Yes, please.
25       MR. GOODSTADT:  Objection.       14:01:50

Page 700

Hesse

1
2    A.   "The man then lunged towards Gary
3  and fell into the corner with the parking
4  meter, taking the girl dressed as a cop with
5  him.  They were both down and not moving when   14:02:08
6  I grabbed Elyse and ducked into the ladies
7  room."
8    Q.   Would you agree with me that if
9  Ms. Jaeger was in the ladies room at the time
10  that Mr. Bosetti had used the pool cue and the   14:02:23
11  bathroom door was closed, she could not have
12  seen Mr. Bosetti use the pool cue?
13       MR. GOODSTADT:  Objection.
14    A.   Yes.
15    Q.   Would you agree with me that if      14:02:33
16  she put in this statement that she put, that
17  she saw Mr. Bosetti use a pool cue in
18  fact she didn't, she would be committing a
19  perjurious act?
20    A.   Yes, she would be lying, yes.     14:02:45
21       MR. GOODSTADT:  Objection.
22    Q.   Does it seem strange to you that
23  based upon the fact that Ms. Jaeger went into
24  the ladies room at some point in time during
25  the altercation and she didn't put down in her   14:03:01

Page 701

Hesse

1
2  statement that she saw Mr. Bosetti use a pool
3  cue?
4    A.   No, I don't find it strange.
5    Q.   The same thing with Mr. Wyckoff,    14:03:12
6  given the fact that Mr. Wyckoff indicated that
7  at some point in time in the statement he took
8  one of the alleged victims and forced him out
9  of the bar, does it seem strange to you that
10  Mr. Wyckoff didn't see Mr. Bosetti use a pool   14:03:27
11  cue?
12    A.   No, I don't find it strange.
13    Q.   In fact if Mr. Wyckoff said he saw
14  Mr. Bosetti use a pool cue when in fact he
15  didn't, Mr. Wyckoff would be committing a     14:03:39
16  perjurious act; is that correct?
17    A.   Yes, he would be lying.
18    Q.   Let's look at Mr. Steven Jaeger.
19  Now if Mr. Steve Jaeger indicated in his
20  letter of complaint to Chief Paradiso that he   14:03:51
21  knew that Gary Bosetti used a pool cue when in
22  fact he never was an eyewitness to that, he
23  would be lying as well?
24    A.   Correct.
25    Q.   So to the extent that Mr.        14:04:06

Page 702

Hesse

1
2  Goodstadt showed you this letter of complaint
3  as a purported eyewitness statement, does it
4  seem strange to you now -- does it seem
5  strange to you that Mr. Budd Jaeger made no   14:04:18
6  reference to Gary Bosetti using a pool cue?
7       MR. GOODSTADT:  Objection.
8    A.   No.  At this time, no.
9    Q.   Let's look at Exhibit 19, and this
10  one I think he showed you today?         14:04:41
11    A.   Yes, it is somewhere in here.
12    Q.   Now, Exhibit 19 is a statement of
13  Elyse Miller; is that correct?
14    A.   Yes.
15    Q.   At least it purports to be a      14:04:57
16  statement of Elyse Miller?
17    A.   Yes.
18    Q.   Mr. Goodstadt asked you a series
19  of questions about that, do you recall?
20    A.   Yes.                  14:05:03
21    Q.   Let's go to the third page of this
22  document, 3171?
23    A.   Okay.
24    Q.   Actually it starts, the part I
25  want to focus on starts on 3170?        14:05:17

Page 703

Hesse

1
2     A.   Yes.
3     Q.   I am going to read it into the
4  record: "At that point the guy in the orange
5  jump suit reached for Jean's throat, he was      14:05:28
6  going to choke her.  Jean was trapped.  The
7  wall to the men's room was behind her and
8  there was no place to move in that little
9  bathroom waiting area.  I started to grab for
10  his wrist trying to get him off, but          14:05:45
11  thankfully Gary appeared and pushed him to the
12  ground and away from Jean.  The guy fell down
13  bringing Gary and the girl with him.  Suddenly
14  another guy appeared, I believe he had on a
15  gray shirt.  Gary told the guy that he was a    14:06:01
16  cop, telling him to step back, get out of the
17  way and to stay out of it.  But the guy said
18  he didn't care who Gary was and he went to
19  kick Gary in the head.  Gary blocked the kick
20  and Jean and I were pushed further back in the  14:06:16
21  tight space now trapped.  Jean pulled me into
22  the ladies room for safety."
23        Do you see that?
24     A.   Yes.
25     Q.   Let's assume, I wasn't there, you  14:06:26

Page 704

Hesse

1
2  were not there, no one in this room was there.
3  The only people -- well, actually none of the
4  police officers were there.
5        Let's assume for the purpose of    14:06:35
6  this question that Gary Bosetti used the pool
7  cue while Elyse Miller was in the bathroom,
8  and let's assume that the door was closed.
9  Could Elyse Miller have seen Gary Bosetti use
10  the pool cue while she was in the bathroom     14:06:52
11  with the door closed?
12     MR. GOODSTADT:  Objection.
13     A.   No.
14     Q.   Let's assume for the purpose of my
15  question that in fact Gary Bosetti used the    14:06:59
16  pool cue while Elyse Miller was in the
17  bathroom with the door closed.  Would it be
18  strange to you that Elyse Miller didn't put
19  down in her statement that Gary Bosetti had
20  used a pool cue?                14:07:13
21     A.   No.
22     Q.   In fact if Gary Bosetti had used
23  a pool cue -- I'm sorry, and in fact had Elyse
24  Miller put down in her statement that Gary
25  Bosetti had used a pool cue, when in fact she  14:07:22

Page 705

Hesse

1
2  didn't see him use a pool cue, that would have
3  been a perjurious statement; correct?
4     A.   Yes.  She would have been lying.
5     MR. GOODSTADT:  You don't want to  14:07:34
6  discuss the part when she opens the door
7  and discusses the rest of it?
8     MR. NOVIKOFF:  No.  You may.
9     Q.   Now let's look at Exhibit 20,
10  because you know these things happen in the     14:07:51
11  blink of an eye.
12     MR. GOODSTADT:  Recollections are
13  sketchy, right, they become snapshots.
14     MR. NOVIKOFF:  They do, especially
15  if there is alcohol involved.           14:08:02
16     MR. GOODSTADT:  Read the statement
17  yourself.
18     Q.   You know what, before we get to
19  that, you are looking at an exhibit with one
20  of the alleged victims that Mr. Goodstadt     14:08:12
21  showed you; right?
22     A.   Yes.
23     Q.   What exhibit number was that?
24     A.   17.
25     Q.   Is there a picture there with a    14:08:17

Page 706

Hesse

1
2  neck brace on?
3     A.   Yes.
4     Q.   Is that standard procedure for a
5  victim that you believe have injuries when you  14:08:23
6  want to move them to put them in a neck brace?
7     MR. GOODSTADT:  Objection.
8     A.   No.
9     Q.   Do you think he went to the bar
10  with a neck brace?               14:08:33
11     A.   No.
12     Q.   So at some point in time after he
13  left the bar that night somebody put him in a
14  neck brace?
15     A.   At some point, yes.        14:08:40
16     Q.   Do you know who did?
17     A.   I believe one of the EMTs did.
18     Q.   Let's go back to Exhibit 20, Ian
19  Levine, and read Mr. Levine's statement to
20  yourself and then tell me when you are done?  14:08:52
21     A.   I need a magnifying glass.
22        Okay.
23     Q.   Now, Mr. Levine makes no mention
24  of the fact that Gary Bosetti used a pool cue
25  at any time?               14:10:46

Page 707

```
              Hesse
 1
 2      A.  No, he did not.
 3      Q.  Did Mr. Levine indicate in this
 4  thing that he saw the entirety of the
 5  altercation involving Mr. Gary Bosetti?     14:10:52
 6      MR. GOODSTADT:  Objection.
 7      A.  No.
 8      Q.  In fact isn't it true that at
 9  least in this statement Mr. Levine said at
10  some point in time after the altercation     14:11:06
11  started he used his cell phone to make a call
12  to the police?
13      MR. GOODSTADT:  Objection.
14      A.  Yes, he did.
15      MR. NOVIKOFF:  Leading?     14:11:15
16      MR. GOODSTADT:  The document
17  speaks for itself.
18      MR. CONNOLLY:  And going forward
19  so we don't have any talk overs and drive
20  the reporter crazy, wait a second or two     14:11:22
21  to allow for any objections.
22      Q.  So now hypothetically, sir, if Mr.
23  Levine took his eyes away from the altercation
24  while he went to get his cell phone, dial the
25  number for the police, talked to whomever he     14:11:37
```

Page 708

```
              Hesse
 1
 2  talked to on the police, hang up the cell
 3  phone and put the cell phone back wherever it
 4  was, had he taken his eyes off the altercation
 5  he may not have seen Mr. Bosetti use a pool     14:11:58
 6  cue; correct?
 7      A.  That is correct.
 8      MR. GOODSTADT:  Objection.
 9      Q.  Hypothetically?
10      A.  Yes.     14:11:58
11      Q.  And you would agree with me then
12  that if Mr. Levine, had he not seen Gary
13  Bosetti use a pool cue, put in the statement
14  that he in fact did use a pool cue, that would
15  have been a perjurious statement?     14:12:10
16      A.  Yes.
17      Q.  Now based upon your review of Mr.
18  Levine's statement and the fact that he used a
19  cell phone to call the police at some point in
20  time after the altercation started, does it     14:12:21
21  seem strange that he didn't see Gary Bosetti
22  use a pool cue?
23      A.  No.
24      Q.  Now, a whole lot of questions
25  about a cover up involving the Halloween     14:12:36
```

Page 709

```
              Hesse
 1
 2  incident.  Do you recall questions about that?
 3      A.  Yes.
 4      Q.  Have you read the complaint in
 5  this matter?     14:12:42
 6      A.  Yes.
 7      Q.  There is a whole lot of -- in fact
 8  there is about 26 allegations I think about
 9  you covering up or the Ocean Beach Police
10  Department covering up something with regard     14:12:53
11  to the Halloween incident; correct?
12      A.  Yes.
13      Q.  And you had rumors that some of
14  the plaintiffs here thought that there was a
15  cover up; correct?     14:13:01
16      A.  Yes.
17      Q.  Let me ask you these questions,
18  did you cover up anything involving the
19  Halloween incident?
20      A.  Absolutely not.     14:13:06
21      Q.  Did Chief Paradiso cover up
22  anything?
23      A.  Absolutely not.
24      Q.  To your knowledge did Mr. Cherry
25  cover up anything?     14:13:13
```

Page 710

```
              Hesse
 1
 2      A.  Absolutely not.
 3      Q.  To your knowledge did any trustee
 4  member instruct you to cover up anything?
 5      A.  No.     14:13:19
 6      Q.  To your knowledge did Mayor Rogers
 7  instruct you to cover up anything involving
 8  the Halloween incident?
 9      A.  No.
10      Q.  To your knowledge was the issue of  14:13:25
11  covering up anything involving the Halloween
12  incident ever mentioned between you and any
13  person higher in authority than you?
14      A.  No.
15      MR. GOODSTADT:  Objection.     14:13:44
16      Q.  Did the issue of -- withdrawn.
17      At some point in time there were
18  arrests made with regard to the Halloween
19  incident; is that correct?
20      A.  Yes.     14:13:57
21      Q.  Was Gary Bosetti arrested?
22      A.  No.
23      Q.  Who was arrested?
24      A.  Brian Van Koot and Christopher
25  Schalik.     14:14:05
```

56 (Pages 707 to 710)

Page 711

Hesse

1
2      Q.   And what was Brian Van Koot
3   arrested for?
4      A.   Harassment on Jean Jaeger for
5   choking her, and assault third on Gary      14:14:11
6   Bosetti.
7      Q.   What was the -- who was the other
8   individual?
9      A.   Christopher Schalik.
10     Q.   So we have Van Koot and Schalik?   14:14:18
11     A.   Yes.
12     Q.   What was Mr. Schalik arrested for?
13     A.   Assault on Gary Bosetti.
14     Q.   Now, an arrest is a serious
15   matter; correct?                    14:14:35
16        MR. GOODSTADT:  Objection.
17     A.   Yes.
18     Q.   Just could you tell I guess the
19   jury may one day, hopefully not, but maybe one
20   day see this videotape with your deposition,   14:14:43
21   could you tell the jury what takes place after
22   someone is arrested?
23        MR. CONNOLLY:  Objection.
24        MR. GOODSTADT:  Objection.
25     Q.   In terms of the process and the    14:14:58

Page 712

Hesse

1
2   procedure?
3      A.   There is a process.
4      Q.   Okay.
5      A.   Information that we have to get    14:15:01
6   from the defendant, pedigree information, past
7   arrest information.  There are fingerprints
8   taken, pictures taken, and then subsequently
9   charges are drawn up and then therefore they
10  are arraigned on those charges.       14:15:16
11     Q.   Who draws up the charges?
12     A.   We do.
13     Q.   When you say they are arraigned,
14  what do you mean?
15     A.   They go before the judge and plead  14:15:25
16  guilty or not guilty.
17     Q.   Does the Village of Ocean Beach
18  have their own type of District Attorney's
19  office?
20     A.   We have our own village court.   14:15:37
21     Q.   Okay.
22     A.   And we have district attorneys
23  appointed by the District Attorney's office of
24  Suffolk County to prosecute.
25     Q.   Now is it up to the -- based upon   14:15:46

Page 713

Hesse

1
2   your experience at Ocean Beach -- is it up to
3   the Suffolk County District Attorney
4   Prosecutor's office to decide ultimately
5   whether or not to prosecute someone who is     14:15:58
6   arrested?
7      A.   Yes.
8      Q.   So if I understand correctly,
9   merely because Van Koot and Schalik were
10  arrested didn't automatically mean that they   14:16:07
11  were going to be prosecuted by the District
12  Attorney's office?
13     A.   Well, we could back up a little
14  bit if I may.
15     Q.   Okay.  Answer that question --    14:16:16
16  answer the way you want.  If Mr. Goodstadt
17  objects or makes a motion to strike later on
18  we will don't with it.
19     A.   They were not arrested until I had
20  the approval of the District Attorney's      14:16:30
21  office.
22     Q.   That is interesting.  I never knew
23  that, so let me then ask you this question.
24        Prior to arresting Van Koot and
25  Schalik did you seek the approval from any law  14:16:42

Page 714

Hesse

1
2   enforcement entity or District Attorney's
3   office?
4      A.   Yes.
5         MR. BAPTISTE:  Objection.  General  14:16:51
6   objection.
7         MR. NOVIKOFF:  To form?
8         MR. BAPTISTE:  Yes.
9      Q.   Let me try to narrow it down a
10  little bit.  Prior to arresting Van Koot and   14:17:06
11  Schalik did you have any communications with
12  the Suffolk County District Attorney's office
13  concerning arresting either of these two
14  individuals?
15     A.   Yes.                     14:17:20
16     Q.   Can you describe for the jury and
17  the court what communications you had
18  concerning arresting Van Koot and Schalik
19  prior to actually arresting them?
20     A.   I told them what I had.  I said I  14:17:32
21  had a lot of documents I would like to fax
22  over for review to make sure that this is
23  going correctly.  I faxed them over.  I spoke
24  to -- it was not Beth Grosso who was appointed
25  to us -- Mallory Sullivan was the prosecutor I  14:17:52

Page 715

Hesse

1 believe on this case, and I faxed everything
2 to her, she read it over.  She said she needed
3 to speak to her bureau chief which in turn she
4 did.  She got back to me and she said that the 14:18:08
5 charges look good.  And then I filed the
6 charges with the court.
7     Q.   How long was the process between
8 your first communication with Ms. Sullivan and
9 then her advising you as you just testified    14:18:21
10 that the charges looked good?
11     A.   Couple of days maybe.
12     Q.   You only had two conversations
13 with Mallory prior to arresting?
14     A.   That was it, yeah.            14:18:33
15     Q.   What did you fax over to her?
16     A.   The entire package.  It was all of
17 the plaintiff's statements.  Their reports, my
18 reports.  The charges that I was going to
19 draft up, the assault and harassment.  I    14:18:47
20 believe Officer Bosetti's statement, Rich
21 Bosetti's statements.  Basically every kit and
22 caboodle that you see her in front, all these
23 statements, I sent everything.
24     Q.   Did Ms. Sullivan ever advise you   14:19:05

Page 716

Hesse

1     that she thought any of the witness statements
2 were strange?
3     A.   No.
4     Q.   Did she ever question you as to    14:19:12
5 why no witness statement other than perhaps
6 the Bosetti's, Mr. Gary Bosetti's indicated --
7 didn't indicate a pool cue being used?
8     A.   Never asked.
9     Q.   Did she ever indicate to you that  14:19:30
10 she thought the charges were suspect?
11     A.   Not at all.
12     Q.   Did she ever indicate to you by
13 any words that she used that you all were
14 engaging in a cover up to protect Gary Bosetti 14:19:42
15 or Richie Bosetti?
16     A.   Absolutely not.
17     Q.   Has any district attorney involved
18 in the arrest and prosecution of Van Koot and
19 Schalik ever advised you that they thought    14:19:57
20 that there was a cover up?
21     A.   Never.
22     Q.   Now, this was October of 2004;
23 right?
24     A.   Yes.                    14:20:07

Page 717

Hesse

1     Q.   And we are now August of 2009, so
2 almost five years removed.  To your knowledge
3 have you ever been brought up on charges
4 concerning a cover up of the Halloween        14:20:17
5 incident?
6     A.   No.
7     Q.   Has anyone been brought up on
8 charges concerning the Halloween incident?
9     A.   No.                    14:20:26
10     Q.   To your knowledge has the village
11 been sued by Van Koot or Schalik concerning
12 the events surrounding that evening?
13     A.   No, they did not.
14     Q.   Are you aware if the District     14:20:34
15 Attorney is investigating you or the Ocean
16 Beach Police Department with regard to a cover
17 up of the Halloween incident?
18     A.   Am I aware of an investigation?
19     Q.   Yes.                    14:20:43
20     A.   I believe there is an
21 investigation done.
22     Q.   You believe that that
23 investigation has concluded?
24         MR. GOODSTADT:  Objection.       14:20:49

Page 718

Hesse

1     A.   I don't know.
2     Q.   But this is now five years ago;
3 correct?
4     A.   This was five years ago, yes.    14:20:55
5     Q.   What is the basis for your belief
6 that the Suffolk County District Attorney's
7 office was investigating an alleged cover up?
8     A.   Just from the plaintiff's comments
9 in their depositions, that they turned all    14:21:08
10 their stuff over to file a complaint that
11 there was a cover up.
12     Q.   So other than what you saw in the
13 depositions and what you read in the
14 depositions are you aware from any other    14:21:18
15 source that the District Attorney is
16 investigating the alleged cover up of anything
17 involving the Halloween incident?
18     A.   No.
19     Q.   So what happened after        14:21:33
20 Ms. Sullivan gave you the green light to
21 arrest Schalik and Van Koot?
22     A.   I took all the paperwork, I filed
23 it with the court.  The three -- I think it
24 was three court informations.  One harassment, 14:21:47

Page 719

Hesse

1    one assault for Van Koot, one assault for
2    Schalik.  I filed it with the court clerk.
3    She subsequently issued criminal summonses for
4    their appearance signed by the judge, and they   14:22:00
5    turned themselves in.
6        Q.   So if I understand your testimony
7    correctly, the judge had to sign off on the
8    criminal summonses; right?
9        A.   Yes.                    14:22:13
10       Q.   And presumably if the judge didn't
11   think that there was enough good cause he or
12   she would not have signed the summonses?
13           MR. GOODSTADT:  Objection.
14       A.   I would suspect, yeah.        14:22:20
15       Q.   You would suspect yes?
16       A.   Yes.
17       Q.   So now we have before the arrest
18   were made and correct me if I am wrong, the
19   DA -- you had done your investigation?       14:22:31
20       Q.   The DA had looked at whatever you
21   sent them?
22       A.   Yes.
23       Q.   And they gave you the green light?  14:22:39


1        Hesse
2    one assault for Van Koot, one assault for
3    Schalik.  I filed it with the court clerk.
4    She subsequently issued criminal summonses for
5    their appearance signed by the judge, and they   14:22:00
6    turned themselves in.
7        Q.   So if I understand your testimony
8    correctly, the judge had to sign off on the
9    criminal summonses; right?
10       A.   Yes.                    14:22:13
11       Q.   And presumably if the judge didn't
12   think that there was enough good cause he or
13   she would not have signed the summonses?
14           MR. GOODSTADT:  Objection.
15       A.   I would suspect, yeah.        14:22:20
16       Q.   You would suspect yes?
17       A.   Yes.
18       Q.   So now we have before the arrest
19   were made and correct me if I am wrong, the
20   DA -- you had done your investigation?       14:22:31
21       Q.   The DA had looked at whatever you
22   sent them?
23       Q.   And they gave you the green light?  14:22:39
24       A.   Yes.
25

Page 720

Hesse

1        Hesse
2        A.   Yes.
3        Q.   And the judge gave you the green
4    light?
5        A.   Yes.                    14:22:43
6        Q.   What happened after the judge gave
7    you the green light?
8        A.   They came into court I believe in
9    December sometime, and they were arraigned and
10   they showed with an attorney.  And from that    14:22:54
11   point on they plea bargained and end of story.
12   They pled guilty, they allocuted and --
13       Q.   Let's break it down.
14           Did you arrest them after the
15   judge gave you the green light?            14:23:15
16       A.   No.  After -- when they turned
17   themselves in and they were arraigned they
18   were remanded to police custody for pedigree
19   information, arrest paperwork and
20   fingerprints, pictures.               14:23:29
21       Q.   So if I understand the sequence of
22   events, after the judge gave you a green light
23   there was some type of communication made with
24   them that they were in fact charged with
25   certain crimes and they were offered an      14:23:40

Page 721

Hesse

1        Hesse
2    opportunity to come present themselves to the
3    court, and they did?
4        A.   Which they did, yes.
5        Q.   So no officer went to their house   14:23:50
6    to arrest them?
7        A.   No.
8        Q.   No one put them in handcuffs and
9    took them in a boat back to Ocean Beach;
10   right?                     14:23:59
11       A.   No.
12       Q.   And so they came into court, they
13   were arraigned.  How were they arraigned, were
14   you there?
15       A.   Yes.                    14:24:07
16       Q.   Describe for the court what took
17   place?
18       A.   Its funny because that year for
19   whatever reason the courtroom was shut down,
20   we had to use the village office which was   14:24:17
21   close to do the public except for court
22   purposes.  We set up a table, the judge sat
23   behind the table.  They stood before the judge
24   and they pled not guilty.
25       Q.   So the charges were read against   14:24:32

Page 722

Hesse

1        Hesse
2    them?
3        A.   Yes.
4        Q.   Who read the charges against them?
5        A.   The judge.                14:24:37
6        Q.   And they were represented by
7    counsel?
8        A.   By counsel, yes.
9        Q.   By one or two counsel?
10       A.   I believe at that time it was two.  14:24:43
11       Q.   So each one of them had their own
12   counsel?
13       A.   Yes.
14       Q.   The charges were read against them
15   and they pled not guilty?               14:24:50
16       A.   Correct.
17       Q.   When did that take place?
18       A.   I believe in December.  I don't
19   know the exact date.
20       Q.   You indicated in a prior answer    14:24:58
21   that they took a plea at some point in time
22   thereafter?
23       A.   Yes.
24       Q.   When did they take the plea?
25       A.   I don't know.                14:25:08

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 723

Hesse

1
2     Q.   Weeks later, months later?
3     A.   It was probably a month or two.
4  It could have been longer.
5     Q.   Had you had any communication with  14:25:17
6  the District Attorney's office between the
7  time of the arraignment and the time of the
8  plea?
9     A.   No.
10    Q.   Were you aware at all that there    14:25:24
11 were plea discussions going on?
12    A.   I was aware, but I didn't know
13 what they were.
14    Q.   How were you aware?
15    A.   I know because they had to make    14:25:31
16 motions for discovery and everything else.  So
17 I know they were communicating back and forth,
18 but other than an actual plea deal, I don't
19 know if I knew so until towards the end.
20    Q.   To your knowledge the defendant's  14:25:44
21 counsel made motions to get discovery?
22    A.   Sure.
23    Q.   What was your involvement?
24    A.   At this point?
25    Q.   How did you learn that they made   14:25:52

Page 724

Hesse

1
2  motions for discovery?
3     A.   I was in court when they made the
4  motions.  They were speaking to the judge and
5  working out what they needed to do.      14:26:01
6     Q.   Pursuant to that motion did the
7  village -- or did the District Attorney to
8  your knowledge produce any discovery?
9     A.   Yes.
10    Q.   Do you know what the District      14:26:09
11 Attorney produced?
12    A.   I believe all these documents that
13 are sitting in front of us too.
14    Q.   So at least to your knowledge now
15 the District Attorney had an opportunity to   14:26:17
16 look at the witness statements and everything
17 else that was in the file, and Van Koot and
18 Schalik's attorneys had the opportunity to
19 look at those same documents; right?
20    A.   Yes.                    14:26:30
21    Q.   Were you notified before the plea
22 was taken that there was going to be a plea?
23    A.   I don't recall whether I was
24 notified or not.
25    Q.   How did you learn that there was a  14:26:44

Page 725

Hesse

1
2  plea taken?
3     A.   I remember sitting in court and
4  listening to the plea and the allocution?
5     Q.   What did Van Koot to the best of   14:26:54
6  your recollection plea to?
7     A.   You know what, I don't know.
8  Disorderly conduct maybe.
9     Q.   Do you know what he allocuted to?
10    A.   He did admit to choking Jean       14:27:08
11 Jaeger.  He did admit to holding Gary Bosetti
12 while Chris Schalik kicked him in the face.
13    Q.   And what did Chris Schalik plea to
14 to the best of your recollection?
15    A.   Probably the same type of         14:27:26
16 disorderly conduct.
17    Q.   What did to the best of your
18 recollection Chris Schalik allocute to?
19    A.   He stated that he did kick Police
20 Officer Gary Bosetti, or attempted to kick him  14:27:37
21 in the face.
22    Q.   Now did these witnesses to your
23 recollection advise Officer Lamm that evening
24 that Schalik had in fact kicked Bosetti in the
25 face while Van Koot had him on the ground?    14:27:56

Page 726

Hesse

1
2     A.   Did Christopher Schalik advise him
3  that he did --
4     Q.   According to any statement that
5  Lamm provided you did he ever indicate in that  14:28:05
6  statement that Schalik admitted to kicking
7  Bosetti in the face while Van Koot had him on
8  the ground?
9     A.   No.
10    Q.   In any statement that you saw Lamm  14:28:17
11 provide you during the course of the
12 investigation or even from that evening did he
13 ever advise in that statement that Van Koot
14 admitted to holding Bosetti down while Schalik
15 kicked him in the face?                14:28:30
16    A.   No.
17    Q.   How about with regard to Snyder,
18 in any statement that Snyder presented to you
19 with regard to the Halloween incident did he
20 ever make reference in there to Van Koot       14:28:39
21 acknowledging that he held Bosetti down while
22 Schalik kicked him?
23    A.   No.
24    Q.   Did he ever acknowledge in that
25 statement that Schalik admitted to kicking     14:28:48

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2  Bosetti while Van Koot held him down?
3      A.   No.
4      Q.   Same question with regard to Nofi.
5  In any statement that Nofi ever -- Snyder,      14:28:58
6  excuse me.
7      A.   Nofi was not there.
8      Q.   With regard to Snyder -- excuse
9  me, Fiorillo.  With regard to Fiorillo, in any
10 statement that Fiorillo provided you did he      14:29:12
11 ever state in there that Van Koot acknowledged
12 that he held Bosetti down while Schalik kicked
13 him?
14     A.   No.
15     Q.   Same question now, did Fiorillo      14:29:27
16 ever acknowledge -- did Fiorillo ever state in
17 any statement that he gave you or any report
18 that he gave you that Schalik admitted to
19 kicking Gary Bosetti while he was being held
20 down by Van Koot?                   14:29:42
21     A.   No.
22     Q.   So would you agree with me that
23 assuming that Van Koot and Schalik truthfully
24 allocuted to the events that took place that
25 evening, that they had lied to the officers      14:29:56

Hesse

1
2  that evening?
3      MR. GOODSTADT:  Objection.
4      A.   Yes.
5      Q.   How would you describe, I am going  14:30:07
6  to go officer by officer now, and I am only
7  referring specifically to the hours
8  immediately after the incident took place.  So
9  from the time that the officers were called to
10 go to Hauser's to the time that Chief Paradiso  14:30:28
11 came into the station that morning, how would
12 you describe Fiorillo's investigation of the
13 events that took place?
14     MR. GOODSTADT:  Objection.
15     MR. CONNOLLY:  Objection.      14:30:43
16     Q.   You can answer.
17     A.   I just believe it was poorly done.
18     Q.   With regard to Fiorillo now why do
19 you believe it was poorly done?
20     A.   I just -- I don't believe that he  14:30:56
21 was aggressive enough to talk to the people he
22 thought were the complainant.  I don't think
23 that he was aggressive enough to go into the
24 bar and just get names and phone numbers.  You
25 know, where is the pool cue; nobody gathered   14:31:24

Hesse

1
2  evidence.  No names, no phone numbers, they
3  didn't secure the premise, they could have
4  shut the doors, turn the lights on, turn the
5  music on.  I think there was just a lot of bad  14:31:35
6  decisions made throughout the course of the
7  entire incident.
8      Q.   Now, how about Snyder -- well,
9  when I asked you about Fiorillo, do you
10 include Snyder and Lamm into that description  14:31:46
11 as well, or I could just ask you the questions
12 one by one if you want?
13     A.   Yes, I do.
14     Q.   So when you say you thought that
15 there were bad decisions made you are      14:31:55
16 referring to Fiorillo, Lamm and Snyder?
17     A.   Yes.
18     Q.   I'm going to try to do this
19 without boring everyone to death and going
20 line by line through the complaint for the      14:32:36
21 sake of expediency.  Did any of the plaintiffs
22 ever complain to you about having to drive you
23 to anyplace in Ocean Beach for something
24 unrelated to official duties?
25     A.   No.                14:33:00

Hesse

1
2      MR. CONNOLLY:  Objection.
3      Q.   Did the plaintiffs ever drive you
4  anywhere in Ocean Beach for duties unrelated
5  to you being a police officer?      14:33:06
6      A.   No.
7      Q.   Did any of the plaintiffs ever
8  drive you to anyplace off the beach for
9  reasons unrelated to official police duty?
10     A.   No.                14:33:22
11     MR. GOODSTADT:  When you say off
12 the beach you are referring to outside of
13 Ocean Beach or off of Fire Island?
14     MR. NOVIKOFF:  No, outside of
15 Ocean Beach which would include outside  14:33:28
16 of Fire Island as well, but it would also
17 include other towns on Fire Island.
18     A.   Never.
19     Q.   Did any of the plaintiffs ever
20 complain to you that any decision you made  14:33:39
21 created a public safety issue?
22     MR. GOODSTADT:  Objection.
23     A.   Never.
24     Q.   Okay.  Did any of the plaintiffs
25 ever complain to you that they witnessed any  14:33:59

37f918e4-de29-4df9-9ef1-64f4ca0acd46

**Hesse**

1
2  officers drinking in bars while in uniform?
3      A.   No.
4      Q.   Did any of the plaintiffs ever
5  complain to you with regard to their          14:34:11
6  eyewitnessing any officers drinking in the
7  bars when off duty?
8      A.   Not a complaint, but I knew.
9      Q.   All I care about is what the
10  plaintiffs said to you?                       14:34:27
11      A.   There was never a complaint.
12      Q.   That is what I am asking.  So
13  let's break it down a little bit and go back
14  so the record is clear.  Did any of the
15  plaintiffs ever complain to you about any     14:34:35
16  officers who off duty drinking in bars in
17  Ocean Beach?
18      A.   No complaints.
19      Q.   Did any of the plaintiffs ever
20  complain to you about the subject of you      14:34:57
21  selectively enforcing the laws?
22      A.   No.
23      Q.   Did any of the plaintiffs ever
24  complain to you about treating them
25  differently than any other police officer?    14:35:14

**Hesse**

1
2      A.   No.
3      Q.   Do you recall any complaints that
4  Mr. Fiorillo ever made to you concerning
5  anything involving the conduct of any police  14:35:33
6  officer including him at Ocean Beach other
7  than him complaining to you about washing the
8  windows?
9      A.   No.
10      Q.   Were there any other examples of   14:35:39
11  insubordination that you can think of with
12  regard to Frank Fiorillo other than what you
13  have testified to?
14      A.   Yes, there was you know at lunch I
15  started thinking about it a little bit and    14:35:50
16  there was one other incident that he and Kevin
17  Lamm both came to me and asked for whatever
18  reason if they could take bail, station house
19  bail outside the station house, and I told
20  them no.  That is why it is called station    14:36:13
21  house bail.  You bring somebody in, you are
22  going to bail them.  You do it inside the
23  confines of the station house.  You fill out a
24  receipt, you put it on the summons, you attach
25  both with the cash and you drop it in the lock  14:36:29

**Hesse**

1
2  box.
3          For whatever reason they disagreed
4  with me and they went to our judge at the
5  time, Joe Russell, who sat as a criminal judge  14:36:37
6  in our court, but was a civil attorney.  I
7  guess they asked him the same question, and he
8  was like sure, you can do that.  So they went
9  over my head to somebody else that is not part
10  of the Police Department to ask them          14:36:55
11  permission to do it, and subsequently they
12  started doing it.
13          One evening I caught them outside
14  the Police Department in the police car behind
15  closed doors taking cash off of somebody for  14:37:07
16  bail.  Now the money was accounted for, so
17  there was no suspect that they were stealing
18  or anything.  But as far as my previous wish
19  that they do not do it, they were told not to
20  do it, they did it anyway.  And I have caught  14:37:25
21  them since doing it.
22          So they were reprimanded,
23  counseled in personal by me.
24      Q.   Did Lamm ever complain to you
25  about anything going on concerning the Ocean  14:37:42

**Hesse**

1
2  Beach Police Department?
3          MR. GOODSTADT:  Objection.
4      A.   That is a little broad, but no, no
5  complaints.                                   14:37:53
6      Q.   I tried to make it as broad as I
7  can make it.  Did Lamm ever complain to you
8  about the Bosetti's?
9      A.   No.
10      Q.   Did Fiorillo ever complain to you  14:38:04
11  about the Bosetti's?
12      A.   No.
13      Q.   Did Snyder ever complain to you
14  about anything involving the conduct of any
15  person affiliated with the Ocean Beach Police  14:38:19
16  Department?
17      A.   No.
18      Q.   Same question with regard to
19  Carter?
20      A.   No.                                 14:38:24
21      Q.   Same question with regard to Nofi?
22      A.   No.
23      Q.   Did any of the plaintiffs ever
24  advise you that they were aware that there was
25  an individual in town selling -- carrying     14:38:38

Hesse

1 
2 lollipops that were laced with drugs?
3     A.   No, I never heard of that before.
4     Q.   Did the plaintiffs ever complain
5 to you that the bars in Ocean Beach were      14:38:55
6 permitting under age individuals drinking?
7     A.   Not specifically, no.
8     Q.   What about generally?
9     A.   We knew that it goes on, it is
10 just a matter of catching them.      14:39:11
11     Q.   What if anything did the Ocean
12 Beach Police Department do prior to April 2,
13 2006 to enforce the laws concerning under age
14 drinking in the bars on Ocean Beach?
15     A.   Specifically nothing.  It was a      14:39:23
16 case-by-case.  If you caught them, you did.
17 If you didn't, you didn't.  It was one of
18 those things.
19     Q.   If you saw what you believed --
20 not you, but police officers were instructed      14:39:35
21 that if they saw what they believed to be
22 under age drinking going on either in or out
23 of the bars they were to enforce the laws?
24     A.   Absolutely.
25     Q.   Did any of the plaintiffs ever      14:39:49

Hesse

1 
2 complain to you that the Bosetti's weren't
3 enforcing the laws with regard to under age
4 drinking?
5     A.   No.      14:39:54
6     Q.   Let me rephrase the question.
7         Did any of the plaintiffs ever
8 complain you to that the Bosetti's were not
9 enforcing the laws as it pertained to under
10 age drinking?      14:40:10
11     A.   No.
12     Q.   How about with -- did the
13 plaintiffs ever complain to you that any other
14 police officer wasn't enforcing the laws as to
15 under age drinking?      14:40:20
16     A.   No.
17     Q.   Did they ever complain to you that
18 you were not enforcing the laws as to under
19 age drinking?
20     A.   No.      14:40:29
21     Q.   Did you ever instruct any of the
22 plaintiffs not to issue a summons to any bar
23 owner because he or she was a friend of yours?
24     A.   No.
25     Q.   Well let me actually make it a      14:40:38

Hesse

1 
2 little bit more broader than that.  Did you
3 ever instruct the plaintiffs not to issue any
4 summonses to any bars on Ocean Beach?
5     A.   No.      14:40:44
6     Q.   Did you ever instruct any of the
7 plaintiffs to stay away from any particular
8 entity and not issue summonses to them?
9     A.   No.
10     Q.   Did you ever instruct the      14:40:55
11 plaintiffs not to -- any of the plaintiffs not
12 to issue summonses to friends of yours?
13     A.   No.
14     Q.   Did you ever call Mr. Lamm a loser
15 in front of any citizen at Ocean Beach?      14:41:07
16     A.   No.
17     Q.   Did you ever insult any of the
18 plaintiffs in front of any citizens of Ocean
19 Beach?
20     A.   No.      14:41:16
21         MR. GOODSTADT:  Objection.
22     Q.   Same question, did you ever insult
23 any of the plaintiffs in front of any visitors
24 to Ocean Beach?
25     A.   No.      14:41:25

Hesse

1 
2         MR. GOODSTADT:  Objection.
3     Q.   I will try to make it even
4 clearer.  Did there ever come a time that you
5 insulted, denigrated, cursed or embarrassed      14:41:38
6 any of the plaintiffs in front of anybody
7 other than police officers -- you know what,
8 take a step back.
9         Did he ever embarrass, denigrate,
10 insult or ridicule any of the plaintiffs in      14:41:54
11 front of anybody while they were police
12 officers at Ocean Beach?
13     A.   No.
14     Q.   In the complaint the plaintiffs
15 allege certain things regarding the Bosetti's      14:42:15
16 throwing a file cabinet into the bay.  Do you
17 recall reading that.  Do you recall reading
18 that in the complaint?
19     A.   Yes.
20     Q.   Do you have knowledge, any      14:42:31
21 knowledge as to what the plaintiffs were
22 referring to when they made those allegations?
23     A.   Yes.
24     Q.   Can you describe for the court
25 what your knowledge is with regard to those      14:42:39

Page 739

Hesse

1        Hesse
2  allegations?
3        A.   I was told the story by Ed
4  Paradiso.
5        Q.   That is what I want to know.      14:42:46
6        A.   Basically it was an empty filing
7  cabinet, two or three tears, you know like
8  just a short filing cabinet, and it was thrown
9  into the marina, the middle marina by I
10 believe Rich Bosetti.                 14:43:05
11       Q.   What else did Ed Paradiso tell
12 you?
13       A.   I remember that it was a
14 lifeguard, Johnny Bucksbaum, that was asked to
15 go in and retrieve it.  They retrieved it,      14:43:16
16 they opened it, it was empty.  I think there
17 was some blank fingerprint cards in it.
18       Q.   This is what Ed Paradiso told you?
19       A.   Yes, he did.
20       Q.   And were you in the village the      14:43:30
21 night or -- were you in the village at the
22 time that the Bosetti's through the file
23 cabinet in?
24       A.   No.
25       Q.   What involvement if any do you      14:43:37

Page 740

1        Hesse
2  have with regard to anything involving the
3  incident involving the file cabinet being
4  thrown in the bay?
5        MR. GOODSTADT:  Objection.      14:43:49
6        A.   Absolutely none.
7        Q.   Did you ever speak to Mr. Fiorillo
8  about that incident?
9        A.   No.
10       Q.   Ever speak with Lamm?      14:43:53
11       A.   No.
12       Q.   Nofi?
13       A.   No.
14       Q.   Lamm?
15       A.   No.              14:43:57
16       Q.   Carter?
17       A.   No.
18       Q.   Snyder?
19       A.   No.
20       Q.   Let's go to the incident -- not      14:44:02
21 the incident, let's go to the allegation
22 concerning you putting Fiorillo on the same
23 shift for three straight days, same tour three
24 straight days and he couldn't move a muscle.
25 Do you recall those allegations?      14:44:58

Page 741

Hesse

1        Hesse
2        A.   Yes.
3        Q.   Are those allegations true or
4  false?
5        A.   False.                 14:45:02
6        Q.   I think you admitted though you
7  did put Mr. Fiorillo on the same tour for
8  three state days?
9        A.   That was his scheduled tour by Ed
10 Paradiso.                           14:45:15
11       Q.   I am sorry, the same place?
12       A.   Yes, it was the general area.
13       Q.   So Mr. Paradiso had put Mr.
14 Fiorillo on the corner of Denhoff and Bay
15 Walk?                              14:45:25
16       A.   No, you misunderstand.  He
17 scheduled the shifts, but I put him on that
18 post.
19       Q.   The post, thank you, and the post
20 was Denhoff and Bay Walk?              14:45:33
21       A.   Yes.
22       Q.   What were the responsibilities of
23 the police officers who were assigned to this
24 post?
25       MR. GOODSTADT:  Objection.      14:45:43

Page 742

1        Hesse
2        A.   It is basically a west end post,
3  it is just not Denhoff and Bay Walk.  We just
4  called it that.  But you had everything from
5  the police station west of that area that      14:45:53
6  encompassed about four or five blocks.
7        Q.   So what was a police officer that
8  you assigned to that post supposed to do as
9  part of his duties and responsibilities
10 associated with that post?              14:46:05
11       A.   Generally a regular patrol.
12       Q.   I am not a police officer, so --
13       A.   Basically he walked the area.
14 There is about one, two, three, four, five
15 bars in that area and one, two, three -- about  14:46:18
16 ten storefronts in that area, and that was his
17 post.
18       Q.   And you categorically deny that
19 you told Mr. Fiorillo that he had to stand
20 under that light post for three straight days  14:46:37
21 without moving a muscle?
22       A.   Yes, that wasn't true.
23       MR. GOODSTADT:  We have a classic
24 material issue effect.
25       MR. NOVIKOFF:  Yes, but it is not  14:46:58

Page 743

Hesse

1   relevant.
2       MR. GOODSTADT: That is why we
3   asked questions.
4       MR. NOVIKOFF: You put it in your  14:47:09
5   complaint.
6   **Q. So Mr. Hesse, let me ask you this,**
7   **I think the jury would want to know. Why did**
8   **you do that?**
9       MR. GOODSTADT: Objection.  14:47:17
10  A.  Like I stated --
11      MR. NOVIKOFF: What?
12      MR. GOODSTADT: Do what?
13  **Q. I thought it was clear we were**
14  **referring back to the prior question. I will**  14:47:25
15  **make the question clear.**
16  **Why did you assign Mr. Fiorillo to**
17  **that post for three straight tours?**
18  A.  His regular duty performance was
19  to operate a golf cart. He liked it. That is  14:47:40
20  what he liked to do. It is called a G.E.M.
21  car, and he would go on residential patrol.
22  That is what he liked to do. So I would
23  assign him that regular post because like I
24  said that is what he liked to do.  14:48:00

Page 744

Hesse

1       Because of his actions that day of
2   insubordination I felt that a suitable
3   punishment would be to take him out of the
4   G.E.M. car and put him on a foot post.  14:48:12
5   **Q. You did that for three straight**
6   **tours?**
7   A.  I don't know if it was three
8   tours. They say it was three tours. It might
9   have been a tour and a half or two tours  14:48:24
10  maybe. I am a little bit of a lenient guy, I
11  don't know.
12  **Q. The plaintiffs make a number of**
13  **allegations about driving officers to**
14  **checkpoints?**  14:48:36
15  A.  Yes.
16  **Q. Either these officers being drunk**
17  **or some of them not being drunk. Do you**
18  **remember those allegations?**
19  A.  Yes.  14:48:47
20  **Q. Let's talk about that for a little**
21  **bit. Do you have an understanding as to what**
22  **the plaintiffs are talking about when they**
23  **make allegations about you directing them to**
24  **drive other police officers to the**  14:48:59

Page 745

Hesse

1   **checkpoints?**
2       MR. GOODSTADT: Objection.
3   A.  I know what they mean.
4   **Q. What do they mean?**  14:49:05
5   A.  Our checkpoint, the checkpoint --
6   **Q. Break it down. Have you ever**
7   **instructed officers to drive other officers to**
8   **checkpoints?**
9   A.  Yes.  14:49:18
10  **Q. Tell the jury why you would do**
11  **that?**
12  A.  End of tour, if a guy did overtime
13  and he had to get out of there we would
14  normally drive them out, and that was our  14:49:28
15  relief point, that is what we did every day
16  three, four to five times a day. That is what
17  we did.
18  **Q. When you say that was your relief**
19  **point, for the people who don't know what that**  14:49:39
20  **means, what do you mean?**
21  A.  That would be where we would pick
22  up the police car and we would relief guys
23  going on deputy and off duty, and that is
24  where we make the exchange.  14:49:47

Page 746

Hesse

1   **Q. Would the relief point be where**
2   **officers would drive their owns cars to start**
3   **their shifts?**
4   A.  Yes.  14:49:58
5   **Q. Unless they took a boat over?**
6   A.  Yes.
7   **Q. Were the plaintiffs the only**
8   **officers that you ever instructed to drive**
9   **other officers to the relief point?**  14:50:10
10  A.  No.
11  **Q. Did you ever instruct any of the**
12  **plaintiffs to drive a drunken police officer**
13  **who had just finished his tour to the**
14  **checkpoint?**  14:50:22
15  A.  No.
16      MR. GOODSTADT: Objection.
17  **Q. Did any of the plaintiffs ever**
18  **object to you directing them to drive any**
19  **police officer to a checkpoint?**  14:50:37
20  A.  No.
21  **Q. Did the plaintiffs ever complain**
22  **to you that you left the village shorthanded**
23  **by instructing them to drive any other off**
24  **duty police officer to the checkpoint?**  14:50:53

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 747

Hesse

1
2     A.  No.
3     Q.  In your opinion did you leave the
4  village shorthanded when you directed one
5  officer to drive an off duty police officer to  14:51:01
6  the checkpoint?
7     A.  No.
8     Q.  Let's talk about the termination a
9  little bit, but more specifically because I
10  think Mr. Goodstadt covered it with you this  14:51:32
11  morning.  Let's address specifically April 2,
12  2004.  What time did the meeting start?
13     A.  You mean 2006.
14     Q.  2006, sorry.  What time did the
15  meeting start?                     14:51:48
16     A.  11ish maybe.
17     Q.  What time did it end?
18     A.  I don't recall.  It could have
19  gone a couple of hours.
20     Q.  When in relation to 11 o'clock did  14:51:58
21  you begin the process of informing the
22  plaintiffs privately that they were not going
23  to be rehired?
24     A.  That was my first order of
25  business.                          14:52:08

Page 748

Hesse

1
2     Q.  And after you told them that they
3  were not rehired and you said whatever you
4  said and they said whatever they said did you
5  direct them to leave the island, the village?  14:52:14
6     A.  Yes.  I set up a water taxi to be
7  there so they didn't have to stand around and
8  be gawked at and, you know, I paid for the
9  water taxi and everything.
10     Q.  Now to your knowledge did they go  14:52:30
11  on the water taxi or did they stay and linger
12  in the village?
13     A.  They got on the water taxi.
14     Q.  So approximately if the meeting
15  started at 11 and that was the first order of  14:52:41
16  business, at what point in time do you recall
17  them being on the water taxi and going off the
18  island?
19     A.  By the time we settled in and I
20  started talking to them it could have been an  14:52:53
21  hour at most.
22     Q.  Then what did you do after you
23  spoke to the four plaintiffs that you spoke to
24  that morning?
25     A.  They left and the general meeting  14:53:01

Page 749

Hesse

1
2  started.
3     Q.  Where did the general meeting take
4  place?
5     A.  It was in the boat house in Ocean  14:53:08
6  Beach, or known as the boat house.
7     Q.  How long did that meeting go on
8  for?
9     A.  A few hours maybe.
10     Q.  Were you at a podium and was    14:53:15
11  everybody else sitting, or were you in seats
12  or in a circle?
13     A.  No, they all sat facing me and I
14  stood or sat behind the table.
15     Q.  Did you make any comments during  14:53:31
16  this meeting that you just described regarding
17  any of those four plaintiffs?
18     A.  No.
19     Q.  Did you make any derogatory
20  comments about those four plaintiffs?    14:53:45
21     A.  No.
22     Q.  Did you call them anything; did
23  you make reference to them at all in this
24  meeting?
25     A.  I was asked what happened.     14:53:52

Page 750

Hesse

1
2     Q.  Who asked you?
3     A.  Some of the other police officers.
4     Q.  Okay.  Do you recall who?
5     A.  Well, what had happened was I    14:54:01
6  started calling in officers one at a time
7  because I was doing a one-on-one with some
8  other guys, and I think a lot of people had
9  feared that they were going too.  So I was
10  asked what had happened and I basically    14:54:17
11  explained that they won't be returning this
12  year, and we just proceeded with our meeting
13  and I tried to stay off of it.
14     Q.  So other than in those one-on-ones
15  did you ever in front of the entire group make  14:54:29
16  any reference to the plaintiffs?
17     A.  No.
18     Q.  Direct or indirect?
19     A.  No.
20     MR. NOVIKOFF:  Off the record.    14:54:48
21     THE VIDEOGRAPHER:  The time is
22  2:56, we are off the record.
23     (Recess taken.)
24     THE VIDEOGRAPHER:  The time is
25  3:06, we are on the record.          15:04:38

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Hesse

1
2    Q.   Now, Mr. Hesse, let's go to
3  Exhibit 27.
4    A.   Okay.
5    Q.   This document was dated March 11,   15:05:10
6  2006; correct?
7    A.   Yes.
8    Q.   Did the 2006 season start as of
9  March 11, 2006?
10    A.   No.                    15:05:25
11    Q.   The meeting was held on April 2,
12  2006, had the season started as of April 2,
13  2006?
14    A.   No.
15    Q.   When did the season start in 2006?  15:05:34
16    A.   The season usually starts two
17  weeks before Memorial Day.
18    Q.   May 31st or around that time?
19    A.   28th, early, late, it depends.
20    Q.   Once you made the decisions as to  15:05:47
21  whom you were going to -- let me take a step
22  back.  You answered some questions by Mr.
23  Goodstadt concerning your communications with
24  Allison Chester concerning what your rights
25  were and what the plaintiff's rights were?   15:06:02

Hesse

1
2    A.   Yes.
3    Q.   Let's break it down.  Why did you
4  call Ms. Chester prior to March -- I'm sorry,
5  prior to April 2, 2006 with regard to what the  15:06:12
6  plaintiffs' rights were?
7    A.   I wanted to make sure that, you
8  know, that I did the right thing.
9    Q.   In terms of what?
10    A.   I didn't want to do anything that  15:06:24
11  was illegal.
12    Q.   What was the reason why you asked
13  Ms. Chester what your rights were?
14    A.   I wanted to make sure that once
15  again I didn't do anything illegal.      15:06:43
16    Q.   When you say anything illegal, you
17  mean with regard to your decision to not
18  rehire the plaintiffs for the season; is that
19  correct?
20    A.   Right, based on Civil Service law.  15:06:55
21    Q.   When were you appointed Acting
22  Deputy Chief?
23    A.   I think it was January either 8th
24  or 18th or 6th.  Somewhere in January of 2006.
25    Q.   Between the time that Chief   15:07:13

Hesse

1
2  Paradiso went out for good in September of
3  2005.
4    A.   Right.
5    Q.   And the time that you were      15:07:19
6  appointed by board resolution to be acting
7  chief, who was responsible for scheduling
8  tours?
9    A.   I was.
10    Q.   Now, did the season -- the 2005    15:07:30
11  season ended sometime in October?
12    A.   September it really ends, two
13  weeks after Labor Day.
14    Q.   So middle of September?
15    A.   Yes.                   15:07:48
16    Q.   Between the middle of September
17  and January did you have to schedule officers
18  to work part-time?
19    A.   Yes.
20    Q.   There is a difference between     15:07:59
21  being -- at least to your understanding for
22  Ocean Beach was there a difference between
23  being a seasonal officer and being an off
24  season part-time officer?
25    A.   Yes, it is a title thing.       15:08:11

Hesse

1
2    Q.   So with regard now only to the off
3  season in 2005 between mid September and the
4  end of December 2005 did you schedule to your
5  knowledge any of the plaintiffs to do       15:08:28
6  part-time shifts?
7    A.   Yes.
8    Q.   Who did you schedule?
9    A.   Tom Snyder, Eddie Carter.  I
10  believe Nofi did maybe one or two tours.  And  15:08:41
11  Frank Fiorillo did either one or two tours.
12    Q.   During that period of time had you
13  had any reason to consider whether or not --
14  well, withdrawn.
15    During that period of time were    15:08:56
16  you aware that you were going to be given the
17  responsibilities as Acting Deputy Chief in
18  2006?
19    A.   No.
20    Q.   When did you first learn that you  15:09:06
21  were going to be considered to be the Acting
22  Deputy Chief?
23    A.   I think in late December.
24    Q.   And when were you advised that you
25  were going to actually be voted upon to be the  15:09:18

Page 755

Hesse

1
2  **Acting Deputy Chief?**
3      A.   Maybe a week before.
4      **Q.   At what point in time did you**
5  **begin to formulate an opinion as to whether or**   15:09:28
6  **not you were going to rehire any of the five**
7  **plaintiffs for the 2006 season?**
8      A.   When the job became mine in
9  January through February and March I started
10  thinking about what I wanted to do and how I   15:09:49
11  wanted the department to go forward and I made
12  a decision.
13      **Q.   Let's talk about that.  How did**
14  **you want the department to go forward once you**
15  **learned that you were going to be the Acting**   15:10:00
16  **Deputy Chief?**
17      A.   I wanted the department to be a
18  little more respectful, a little more
19  understanding of the needs of the village.  We
20  are a very community service oriented Police   15:10:15
21  Department.  We handle everything from a
22  splinter in a baby, to a dog fighting, noise,
23  bar fights, to possibly rape, or being stab or
24  short of murder.  So I mean I wanted the
25  department to move in a different direction.   15:10:36

Page 756

Hesse

1
2      **Q.   Did Mr. Fiorillo fit within the**
3  **type of Police Department that you wanted**
4  **Ocean Beach to become upon your appointment to**
5  **Acting Chief?**   15:10:49
6      A.   In my opinion, no.
7      **Q.   Why not?**
8      A.   I think he was a little too abrupt
9  with the community and the people who
10  vacationed there.  I tried to instill in a lot   15:10:58
11  of these guys that people come there to have
12  fun, and we are there to make sure that they
13  do it safely and within the scope of the law.
14      **Q.   When you say too abrupt, can you**
15  **give me some examples?**   15:11:13
16      A.   Yeah, we have one of these silly
17  laws where you can't bike ride during the
18  summer season, and let's say Officer Fiorillo
19  would pull over this woman for riding her
20  bike, and because she failed to have   15:11:27
21  identification on her he would berate her and
22  yell at her, and that is not what we are
23  doing, that is not what we are there for.
24      **Q.   When you say berate and yell what**
25  **do you mean?**   15:11:43

Page 757

Hesse

1
2      A.   Where is your fucking ID, how come
3  you don't have your ID, this is illegal.
4      **Q.   Hold on, you got to go slowly.**
5  **What else?**   15:11:43
6      A.   You should know better.  You
7  should always have your ID on you.  But I mean
8  yelling at these people.
9      **Q.   How did you learn of this, this**
10  **specific example?**   15:12:02
11      A.   This specific example, I was
12  called to the scene.
13      **Q.   By whom?**
14      A.   By another police officer.
15      **Q.   Did the woman complain to you**   15:12:11
16  **about how she was spoken to?**
17      A.   Yes.
18      **Q.   What was Mr. Fiorillo's response**
19  **if any?**
20      A.   That she was a bitch and that, you   15:12:19
21  know, she disrespected him.
22      **Q.   Did Mr. Fiorillo indicate how she**
23  **disrespected him?**
24      A.   Just by talking back.
25      **Q.   Did Mr. Fiorillo explain to you**   15:12:30

Page 758

Hesse

1
2  **why he considered her to be a bitch?**
3      A.   He felt that she had an attitude,
4  a certain attitude.
5      **Q.   What if anything did you do with**   15:12:38
6  **regard to Mr. Fiorillo upon receipt of this**
7  **complaint by this woman?**
8      A.   Well, I let him continue to write
9  the summons.  I told him not to say another
10  word, that was between me and him, I didn't do   15:12:54
11  it in front of her, I pulled him aside a
12  little bit.  I said just calm down, it is a
13  bike riding ticket, write the ticket and let
14  her go, and that is it.
15      **Q.   Any other examples that you can**   15:13:06
16  **think of as you sit here today?**
17      A.   Similar complaints.  We had one
18  kid whose father came to talk to me who
19  happens to be a corrections officer, Tom
20  Foley, his son was stopped for riding his bike   15:13:22
21  at night.  The kid, maybe he mouth off a
22  little bit to him, but Frank threatened to
23  shoot him in the head.  The father came down
24  and complained with his son that Frank stated
25  he was going to shoot him in the head.   15:13:39

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 759

Hesse

1
2    Q.   Shoot him in the head or shoot him
3  in the face?
4    A.   I think it was shoot him in the
5  head.                          15:13:46
6    Q.   Did you speak to Mr. Fiorillo
7  concerning this?
8    A.   Yes.
9    Q.   What was Mr. Fiorillo's response
10  to you if any?                  15:13:52
11    A.   He said that the kid was irate, he
12  was throwing his bike around, and I told him,
13  I said Frank, you know what, I don't care, you
14  just don't talk to people like that.  I talked
15  to other witnesses that were there and they   15:14:07
16  said that is not what happened.  Frank just
17  went off on one of his regular tears and
18  started to yell and berate this guy in the
19  street.
20    Q.   When you say regular tears, what   15:14:19
21  do you mean?
22    A.   This was a usual thing with Frank.
23  You know, he carried the badge and he carried
24  a chip on his shoulder.  It was just a regular
25  occurrence.                     15:14:28

Page 760

Hesse

1
2    Q.   Let me ask you a question.  I am
3  sure Mr. Goodstadt will ask you this question
4  if he has not already.  How come you didn't
5  advice Mr. Paradiso that in your opinion   15:14:37
6  Fiorillo should not be rehired?
7    A.   He knew.  He knew.  He dealt with
8  him.  But you know what, Ed Paradiso had a
9  different outlook on things than I did.  He
10  enjoyed the misery of sending these guys out   15:14:54
11  there to do this kind of thing.  He was happy
12  they didn't have discretion, because we have
13  such silly laws that in our village code book,
14  eating on the beach, drinking on the beach,
15  not alcohol, but regular beverages on the   15:15:12
16  beach.  You can't eat or drink past a certain
17  point on a certain street.  The bike riding
18  laws.  You name it.  Ball playing on the
19  beach.  He is out there writing a father for
20  throwing a tennis ball to his son.   15:15:30
21         These are the kind of things that
22  went on on a regular basis.  He took this poor
23  86 year old woman who didn't have ID eating
24  peanuts on the beach and because she didn't
25  have ID he would escort her all the way to the   15:15:42

Page 761

Hesse

1
2  police station to verify who she was.  I mean
3  is that really a crime; what does it take.
4  How much does the village have to take.
5    Q.   Let me just clarify this.  There   15:15:53
6  was an occasion where an 86 year old woman was
7  on a bike, she --
8    A.   No, she was eating peanuts on the
9  beach.
10    Q.   She didn't have ID and Mr.   15:16:04
11  Fiorillo escorted this woman back to the
12  police station to verify that she was in fact
13  who she was?
14    A.   Yes.
15    Q.   You said that Paradiso knew all   15:16:13
16  this.  Now I am only concerned about Mr.
17  Fiorillo for the time being.  What do you mean
18  that Paradiso knew all about this?
19    A.   Frank worked split tours.  He
20  would partially for me and he would work   15:16:29
21  partially for Ed Paradiso, and Ed Paradiso
22  would encourage him to go out there and do
23  these types of summonses.
24    Q.   Did you ever discuss with Paradiso
25  why he was encouraging Fiorillo to do these   15:16:42

Page 762

Hesse

1
2  types of summonses?
3    A.   No, not really.
4    Q.   Did you -- I am trying to
5  understand.  Why didn't you ever tell Paradiso   15:16:53
6  hey, Fiorillo is just, you know, in my opinion
7  he should not be rehired?
8    A.   You know, it is such a small
9  village and in conversation I don't want to
10  say I never said it, I may have said it.  But,   15:17:07
11  you know, I don't know for sure if we talked
12  about it.  We talked about a lot of -- like I
13  said earlier I never saw eye to eye with Ed
14  Paradiso on a lot of things.  I would come in
15  for my tour he would already be done.  He   15:17:27
16  would come in late.
17         It was hard to talk to him.  I
18  mean towards the end of his rein it just --
19  the department was falling apart, and I blame
20  it on him and I blame it on type of   15:17:38
21  enforcement that was going on.  So...
22    Q.   So you thought for want of a
23  better term it would have been a futile act to
24  ask Ed not to rehire Fiorillo?
25    A.   Absolutely it was a futile act.   15:17:53

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 763

Hesse

1  Hesse
2  Absolutely.
3      Q.   **Because Paradiso knew what**
4  **Fiorillo was doing?**
5      A.   Yes.  Paradiso would go to these   15:17:57
6  board meetings and sit there, and people would
7  yell about certain things, noise, this, that
8  the other thing.  And he used Frank as a tool
9  of the Police Department to just go out there
10  and just hammer these people into submission,   15:18:11
11  and that is not what we are supposed to.
12      Q.   **In your opinion Mr. Fiorillo would**
13  **not have reflected the type of Police**
14  **Department that you wanted?**
15      A.   That is correct.            15:18:23
16      Q.   **So when you became in control of**
17  **who was to be rehired and who was not, you**
18  **made the decision not to hire Mr. Fiorillo?**
19      A.   That is correct.
20      Q.   **Now you talked about some silly**   15:18:32
21  **laws that were on the books.  Between the**
22  **season of 2006 when you first were the Acting**
23  **Chief and this season, 2009, has the**
24  **enforcement of those silly laws as you put it**
25  **increased or decreased?**            15:18:48

Page 764

1      Hesse
2      A.   Well I made a lot of changes.  It
3  was hard to establish a, you know, a statistic
4  because I changed all the paperwork.
5  Midstream through 2006 I changed the summons   15:19:02
6  format.  So I had to retrain and re-educate my
7  guys on how to write the summonses correctly.
8  There was a lot of issues.
9          Now I mean that we are in to 2009
10  it is up.  I mean we enforce, we still enforce   15:19:16
11  those silly laws, but we do it with respect.
12      Q.   **So when you say you had to retrain**
13  **your officers, what do you mean?**
14      A.   Basically a lot of the paperwork
15  changed.  So I had to sit down as a group and   15:19:34
16  explain what I expected on the summons, how to
17  issue the summons.  We even changed because it
18  is a four-page document which document you
19  give to the defendant.
20      Q.   **Let me ask you this, I am not**   15:19:46
21  **trying to be argumentative, I am trying to**
22  **understand.  How did the change in the summons**
23  **affect the amount of summonses up or down that**
24  **were issued with regard to these silly laws?**
25      A.   I think some of the guys were   15:20:03

Page 765

1      Hesse
2  afraid to write them because they didn't
3  really -- you know, there were getting the
4  idea how to write them, but I think they were
5  just cautious on how many they were writing   15:20:13
6  just to get the feel of it.
7      Q.   **Let's talk about Mr. Lamm.  Was**
8  **Mr. Lamm in your opinion the type of officer**
9  **that you wanted in the department as you saw**
10  **the department should be once you became the**   15:20:36
11  **Acting Chief?**
12      A.   No.
13      Q.   **He why not?**
14      A.   He was a lot like Fiorillo.
15  Showed no discretion.  You know, from time to   15:20:44
16  time he would have to be counseled, talked to
17  about certain actions that he took.
18  Specifically -- it started to get to the point
19  where under our village code he started
20  handcuffing individuals and bringing them to   15:21:05
21  the Police Department to issue summonses for a
22  Village violation where he should be doing it
23  out on his post where he was to begin with.
24      Q.   **I don't understand, what do you**
25  **mean?**               15:21:19

Page 766

1      Hesse
2      A.   So he would be walking down the
3  street where he would see some suspect pissing
4  in public.  He would throw the guy in
5  handcuffs, toss him, do an illegal search and   15:21:27
6  seizure because what the heck are you looking
7  for, number one you have no probable cause.
8  Bring the guy to the police station and issue
9  him a summons and then unhandcuff him and let
10  him go.                15:21:43
11      Q.   **What should he have done?**
12      A.   Wrote the summons right there.
13  Show me some ID, check it out, make sure it is
14  a valid ID, write the summons and send the guy
15  on his way.               15:21:51
16      Q.   **Did Paradiso instruct him to put**
17  **these people in handcuffs and take them to the**
18  **police station?**
19      A.   No.
20      Q.   **Did you ever instruct Kevin to**   15:22:00
21  **stop putting people in handcuffs for pissing**
22  **in public type violations?**
23      A.   Yes, I did.
24      Q.   **Did he listen to you?**
25      A.   No, he did not.            15:22:16

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 767

Hesse

Q.   Was that an act of insubordination?

A.   Yes, it was.

Q.   Did that have any impact on your   15:22:19 decision as to whether or not Mr. Lamm was the type of officer that you wanted on your police force going forward in light of the changes that you wanted to make?

A.   Right, I didn't want him any   15:22:26 longer with the department.

Q.   Are there any other examples that you can think of where you instructed Mr. Lamm while he was working on your shift to do something as it related to summonses that he   15:22:36 didn't do?

A.   To summonses that he didn't do; not that I can think of.

Q.   How about generally, do you recall any other examples where he just disregarded   15:22:47 one of your directions or instructions?

A.   Yes, there was one other time that I can think of, this is really towards the end of his employ.  We just got this big guy off the water taxi, the guy was probably 6 foot 2,  15:23:03

Page 768

Hesse

240 and huge.  And I was able to calm this individual down, I was able to get him off the water taxi.  I forget what the disturbance was on the taxi, whether he was not listening to   15:23:18 the captain's command to sit down, stop drinking, smoking or whatever it was, and we had about five officers in a line because this guy was so big and we were worried that maybe he may act inappropriate, attack us, punch   15:23:38 somebody, who knows, he was irate.

And I am talking to the guy and I am walking him down the street and Kevin out of nowhere says you fucking asshole, I will kick your ass and the guy steps at us, and I   15:23:56 actually had to reprimand Kevin right there on the spot, tell him to shut up, and step between him and the guy and get this guy to turn around and keep walking.  This is not a police officer that we needed working in the   15:24:09 department.

Q.   While we are on that subject, you talked about Mr. Fiorillo's demeanor with the public.  What was Mr. Lamm's demeanor in the public like; in your opinion based upon either   15:24:19

Page 769

Hesse

your observations or what you were told?

A.   His demeanor was abrupt also.  You know every time you stop somebody and write them a summons they are going to question your   15:24:33 authority, they are going to do something.  You know you take it as for what it is worth.  But Kevin Lamm, he would step right into you, almost provoke the guy into a fight.  That is not the demeanor that we need in this Police   15:24:46 Department.

Q.   What about Joe Nofi, in your opinion was he the type of officer that you wanted to be in your department given the changes that you wanted to make?   15:25:04

A.   No.

Q.   Why not?

A.   Simply put Joe Nofi was a goof ball.  You know, he was a nice guy, but he was just a goof ball.  I mean paperwork was shoddy  15:25:16 at best.  Summonses were horrible, illegible, illiterate.  And then if somebody was walking in front of him and he was not wearing a shirt, which is another one of our silly laws in town, he wouldn't walk up to the guy and   15:25:37

Page 770

Hesse

just say excuse me, sir, you can't walk around without a shirt on.  He would say hey asshole, come here.  That is what he would do.

I would have to tell him, counsel   15:25:46 him, Joe, don't talk to people like that.  Go over, excuse me, sir, this is what you need to do.  Same thing when it pertained to anything, he would act the same way all the time.  I did not want it to continue under my command.   15:26:02

Q.   Let me ask you, you said something about Joe Nofi's -- was it Joe Nofi's summonses were illiterate or that Joe Nofi was illiterate?

A.   The summonses.   15:26:12

Q.   Then let me ask you this.  Did you ever advise Paradiso, hey, you know what, I don't think Nofi should be rehired for the next season because of how he treated the public in your opinion?   15:26:31

A.   Specifically no.  Every year we were shorthanded, so we had to work with what we had.

Q.   Same question with regard to Lamm, did you ever speak to Paradiso about perhaps   15:26:41

Page 771

Hesse

1
2   **Paradiso not rehiring Lamm for the season?**
3       A.   Not specifically, no.
4       **Q.   For the same reason as Nofi?**
5       A.   Yes.  We just of went season to      15:26:53
6   season with what we had.
7       **Q.   Did Paradiso ever ask you your**
8   **opinion as to -- take a step back.**
9           **With regard to rehiring anyone for**
10  **any particular season did Paradiso ever ask      15:27:05**
11  **you what your opinion was with regard to a**
12  **particular officer?**
13      A.   Not that I recall, no.
14      **Q.   Let's talk about Carter.  Was**
15  **Carter the type of officer that you would have  15:27:16**
16  **been comfortable with on your department given**
17  **the changes that you were going to make?**
18      A.   No.
19      **Q.   Why not?**
20      A.   You know, he was kind of hidy      15:27:26
21  tidy, talks out of both side of his mouth
22  between cops.  You know, he just kind of
23  rubbed me the wrong way sometimes, and I just,
24  you know, the thing with the sleeping on duty,
25  bragging about it.  I would relieve him in the  15:27:43

Page 772

Hesse

1
2   morning, his hair is standing straight up.
3   Yeah, as soon as I got in I went upstairs, I
4   went to sleep.
5           You know, enough, I just didn't      15:27:52
6   want to deal with it any more.  I felt moving
7   forward he just wasn't a good candidate to
8   keep on.
9       **Q.   How about Snyder, was he the type**
10  **of officer that you would have been      15:28:02**
11  **comfortable with in your department given the**
12  **changes that you wanted to make?**
13      A.   You know Snyder was a difficult
14  decision for me.  Personally I always liked
15  Tommy.  We always got along, I thought we      15:28:15
16  worked pretty well together.  But he had -- he
17  had some issues.  He had some personal issues
18  which he rarely ever discussed with me, or
19  maybe he discussed it with other members of
20  the department, but he seemed towards the end  15:28:30
21  to start being angry a lot.  Whether it was
22  with himself or his other job or members of
23  our department.  So I thought moving forward
24  maybe it was best that he just moved on and
25  stayed at his full-time job.      15:28:49

Page 773

Hesse

1
2       **Q.   What were those personal issues?**
3       A.   I think he was sick for a while.
4   He had maybe some issues with his kids,
5   ex-wives, I don't know if he has one or two.  15:28:59
6   Money issues.  Everybody has issues in their
7   personal lives, you know.
8       **Q.   Let me ask you this.  We now -- in**
9   **January at some point in time you were**
10  **actually appointed.  At some point in time      15:29:18**
11  **prior to the actual appointment you knew you**
12  **were going to be Acting Chief?**
13      A.   Uh-hum.
14      **Q.   At that point in time when you**
15  **knew that you were going to become Acting      15:29:29**
16  **Chief did you schedule Lamm for any part-time**
17  **shifts?**
18      A.   You know, Lamm was working for the
19  Town of Islip Airport security, police,
20  whatever, I don't know what they call      15:29:45
21  themselves right now, law enforcement.  I was
22  really unaware of what his plans were, what he
23  wanted to do.  There was never any
24  communication between me and him.  I called
25  him once for his weapon because I needed to      15:29:59

Page 774

Hesse

1
2   issue it to somebody else so he can get
3   qualified because I was short weapons.  And
4   you think he would have said something to me
5   then about his other job.      15:30:10
6           But he didn't work for us for I
7   think it was eight or nine months.  So I
8   wasn't sure if he was going to plan on coming
9   back or what.  But then I just decided that
10  maybe it was best that he just moved on anyway  15:30:28
11  with all the other issues.
12      **Q.   What do you mean he had not worked**
13  **for you for eight or nine months?**
14      A.   I guess he must have said
15  something to Ed Paradiso about getting this      15:30:33
16  full-time job because there was an academy
17  involved, there was training and there was a
18  full-time job that he had received.
19      **Q.   Okay.**
20      A.   So he was not scheduled for      15:30:42
21  anything for us.
22      **Q.   To your knowledge was he scheduled**
23  **to work at all in August or September of 2005?**
24      A.   I don't recall.  I would have to
25  look at a schedule from back then.      15:30:51

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 775

Hesse

1
2    Q.   How about Fiorillo, from the time
3    that you became aware of the fact that you
4    were going to become the Acting Chief did you
5    schedule Fiorillo for any part-time shifts?    15:31:05
6    A.   I think he worked two tours
7    because I was strapped for guys, I didn't have
8    anybody available to work.  But they might
9    have been like either Christmas or Christmas
10   Eve and New Years or New Year's Eve.  But I    15:31:21
11   don't think subsequent to that there was any.
12   Q.   Why didn't you schedule him?
13   A.   Because I really didn't prefer him
14   to be on shift.
15   Q.   How about Nofi, same question?    15:31:30
16   A.   He may have worked one tour that
17   entire winter.  But, you know, I was inclined
18   to give the tours to the guys that could work
19   alone and seniority.
20   Q.   What do you mean that could work    15:31:48
21   alone?
22   A.   At that time of year there is one
23   cop on per shift.
24   Q.   What was your concern about Nofi
25   working alone?    15:31:55

Page 776

1        Hesse
2        MR. GOODSTADT:  Objection.
3    Q.   What concerns did you have if any
4    with regard to assigning Nofi a shift during
5    the winter when he would be working alone?    15:32:03
6    A.   Well if something happened you got
7    to know who to call, where to call, what radio
8    to use, what channel.  There is a lot of
9    variables.  So you know I really never thought
10   that he was capable of being alone.    15:32:16
11   Q.   You said you rather give it to
12   people with seniority?
13   A.   Seniority.
14   Q.   You mean seniority with Ocean
15   Beach or seniority in terms of police force    15:32:25
16   experience?
17   A.   Seniority with Ocean Beach.
18   Q.   So who did you give the majority
19   of the shifts to between the time that you
20   became or you learned that you were going to    15:32:34
21   be Acting Chief and the beginning of the
22   season; when I say shifts, I mean part-time
23   shifts?
24   A.   That is funny, I would have to
25   look at a schedule.  But I was in the process,  15:32:49

Page 777

Hesse

1
2    but I may have hired Paul Trosko full-time.
3    So he was working full-time.  I was working
4    full-time.  I know Walter Muller was on the
5    schedule.  I am trying to think who else I    15:33:03
6    had.
7        You know, Carter could work by
8    himself.  Tommy Snyder was on by himself on
9    the midnights.  Specifically, you know, I
10   don't recall right now anybody else, I would    15:33:24
11   have to really look at a schedule.
12   Q.   As you can tell from the complaint
13   there is a lot of allegations about the
14   Bosetti's?
15   A.   Yes.    15:33:36
16   Q.   So I feel obligated to ask you
17   about them.  Describe for me your opinion of
18   the Bosetti's -- of Gary Bosetti, let's start
19   with him, as a police officer for Ocean Beach,
20   independent of whatever he did for the city?    15:33:52
21   A.   Okay.  Police officer for Ocean
22   Beach, and I said this for a long time about
23   Gary and Richie both, that when they came on
24   that they changed, they started to help change
25   the persona of the Police Department.  Kinder,  15:34:09

Page 778

Hesse

1
2    friendlier, approachable.  They were easily
3    approachable.  Anybody can talk to them about
4    any issue that they had, and they would relay
5    that information on to either myself or Ed    15:34:23
6    Paradiso.
7        As far as their work, their
8    performance, you know, they were not summons
9    writers by any means.  They wrote one, two,
10   three when they actually had to.  But there    15:34:39
11   were times where because of them we solved a
12   burglary or two or three because people would
13   trust them and be able to come up to them and
14   give them the information that the Police
15   Department needed to make an arrest, or you    15:34:54
16   know...
17   Q.   What is the basis for your opinion
18   that the people of Ocean Beach trusted Gary
19   and Richie Bosetti?
20   A.   Everybody would come up to me and    15:35:06
21   say they are so nice, they are great officers.
22   It is nice to have somebody that we can talk
23   to if there is an issue.  I mean the community
24   just loved them.
25   Q.   Did people come up and tell you    15:35:18

Page 779

Hesse

1
2    how much they loved Kevin Lamm?
3        A.   No.
4        Q.   Did people come up to you and tell
5    you how much they liked or loved Frank    15:35:27
6    Fiorillo?
7        A.   No.
8        Q.   Joe Nofi?
9        A.   No.
10       Q.   Ed Carter?              15:35:33
11       A.   No.
12       Q.   Tom Snyder?
13       A.   No.
14       Q.   Correct me if I am wrong, none of
15   the five plaintiffs here have ever been a    15:35:41
16   full-time police officer?
17           MR. CONNOLLY:  Objection.
18           MR. GOODSTADT:  Objection.
19       Q.   Let me ask you.  To your knowledge
20   was Frank Fiorillo ever a full-time police    15:35:50
21   officer for any jurisdiction other than Ocean
22   Beach?
23       A.   No.
24       Q.   To your knowledge was Joe Nofi
25   ever a full-time police officer for any    15:36:00

Page 780

Hesse

1
2    jurisdiction other than Ocean Beach?
3        A.   No.
4        Q.   And same question with regard to
5    Snyder?                      15:36:08
6        A.   No.
7        Q.   Lamm?
8        A.   No.
9        Q.   Carter?
10       A.   No.                 15:36:15
11       Q.   And they were not -- none of the
12   plaintiffs were full-time for Ocean Beach
13   either; correct?
14       A.   Correct.
15       Q.   They were just either part-time    15:36:21
16   when it was off season?
17       A.   Correct.
18       Q.   Or seasonal?
19       A.   Yes.
20       Q.   And how many hours did a typical    15:36:26
21   police officer work on a weekly basis during
22   the season?
23           MR. GOODSTADT:  Objection.
24       A.   During the season?
25       Q.   Yes.                 15:36:36

Page 781

Hesse

1
2        A.   They could work one shift a week,
3    to 40 hours plus a week.
4        Q.   So it varied?
5        A.   It varied.             15:36:42
6        Q.   Depending on the schedules of the
7    particular officers?
8        A.   Correct.
9        Q.   Now to your knowledge how many
10   years experience did Gary Bosetti have?    15:37:00
11       A.   At the time he came to Ocean
12   Beach?
13       Q.   Yes.
14       A.   At least a minimum of 20.
15       Q.   Mr. Goodstadt asked you a lot of    15:37:08
16   questions about them not being certified by
17   Suffolk County.
18       A.   Correct.
19       Q.   Given their experience with the
20   New York City -- let's talk about Gary    15:37:19
21   Bosetti.  Given Gary Bosetti's experience with
22   the New York City Police Department were you
23   ever concerned that the public safety was at
24   risk because they were not certified by
25   Suffolk County?              15:37:30

Page 782

Hesse

1
2        A.   No.
3        Q.   Same question about Richie?
4        A.   No.
5        Q.   Same question about -- was Ty    15:37:35
6    Bacon certified?
7        A.   He was.  There was a mix up with
8    his paperwork.
9        Q.   Did you have any concern with
10   regard to any officer that was not certified    15:37:49
11   with regard to the public safety of Ocean
12   Beach?
13       A.   No.
14       Q.   Let's talk about Ty Bacon.  What
15   type of police officer was he?       15:37:59
16       A.   A good man, an honorable man,
17   takes a lot of pride in his job.  Good with
18   the community.  Good with the police.
19       Q.   As between the Bosetti's and the
20   five plaintiffs, who had -- who would you say    15:38:14
21   was the better police officer?
22           MR. GOODSTADT:  Objection.
23       A.   In my opinion the Bosetti brothers
24   were better police officers.
25       Q.   And were the Bosetti's the type of    15:38:27

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 783

Hesse

1
2  officers that you wanted to have in your
3  kinder and gentler Police Department?
4      A.  Yes.
5      Q.  How about Ty Bacon?          15:38:38
6      A.  Yes.
7      Q.  Let's go back to the Halloween
8  incident, I am just going through my notes
9  from this morning to see. Now Mr. Goodstadt
10  asked you some questions about your     15:39:00
11  communications with Frank Fiorillo, and
12  Fiorillo I think you indicated was angry when
13  you -- was angry when you gave him the results
14  of your investigation?
15      A.  No.                          15:39:13
16      Q.  Who was that?
17      A.  Kevin Lamm.
18      Q.  Kevin Lamm was angry. Now was it
19  Kevin Lamm who said are we going to sweep this
20  under the rug as well?              15:39:22
21      A.  Yes.
22      Q.  Did Lamm ask, advise you as to
23  what he meant by as well with regard to
24  sweeping something under the rug?
25      A.  No.                          15:39:32

Page 784

Hesse

1
2      Q.  Are you aware of anything that you
3  swept under the rug?
4      A.  No.
5      MR. GOODSTADT:  Objection.       15:39:36
6      Q.  To your knowledge did Lamm go to
7  Chief Paradiso with his concerns that I guess
8  the Halloween incident was being swept under
9  the rug?
10      A.  I don't know.                15:39:51
11      Q.  Did Chief Paradiso ever advise you
12  that he thought it was being swept under the
13  rug?
14      A.  No.  Never.
15      Q.  When did Lamm start working for  15:40:02
16  Ocean Beach?
17      A.  Late 90s.
18      Q.  Now, Mr. Goodstadt asked you some
19  questions about Gary Bosetti leaving the scene
20  of Hauser's Bar at some point in time after  15:40:18
21  the altercation.  Do you recall those
22  questions
23      A.  Yes.
24      Q.  And I believe you said that Richie
25  Bosetti told you that his brother was dazed?  15:40:32

Page 785

Hesse

1
2      A.  Yes.
3      Q.  Now in your opinion, I think Mr.
4  Goodstadt asked you this question, if he
5  didn't he will object, do you find it strange  15:40:39
6  that someone -- even an off duty police
7  officer who was involved in a physical
8  altercation when he was attacked by no less
9  than two individuals and who was dazed and
10  hurt, would have left the scene; do you find  15:40:53
11  that strange?
12      MR. CONNOLLY:  Objection.
13      MR. GOODSTADT:  Objection.
14      A.  No, I don't find that strange, no.
15      Q.  Why don't you find that strange?  15:41:00
16      A.  I think he wanted to go lay down.
17  I believe Richie had told me that he advised
18  him to go and go lay down.
19      Q.  So if I understand you correctly,
20  at least according to Richie, Richie told you  15:41:13
21  that he told his brother to leave and go lay
22  down?
23      A.  Correct.
24      Q.  Now, Mr. Goodstadt asked you some
25  questions about whether or not you disciplined  15:41:46

Page 786

Hesse

1
2  Gary Bosetti for leaving the scene or doing
3  anything as it related to the Halloween
4  incident when he was off duty, do you recall
5  that?                               15:42:03
6      A.  Yes.
7      Q.  Could you have disciplined Gary
8  Bosetti for something that he did while he was
9  off duty?
10      A.  Yes.                         15:42:09
11      Q.  Is there a policy at Ocean Beach
12  that talks about disciplining off duty police
13  officers?
14      MR. GOODSTADT:  Objection.
15      A.  At that time?                15:42:18
16      Q.  Yes.
17      A.  I don't believe we had any
18  policies.
19      Q.  Now Mr. Goodstadt asked you a
20  number of questions about your opinion of the  15:42:32
21  Lamm, Snyder, Fiorillo accounts of what went
22  on, do you recall that?
23      A.  Yes.
24      Q.  And those accounts were based upon
25  solely the accounts of the alleged victims; am  15:42:45

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 787

**Hesse**

1
2   I correct?
3       A.   Correct.
4           MR. GOODSTADT:   Objection.
5       Q.   And you said you believed that the   15:42:54
6   victims, the alleged victims' statements to
7   the three officers that night were lies, do
8   you recall that?
9       A.   Yes.
10      Q.   Did you initially believe that     15:43:02
11  they were lies when you first read them?
12      A.   No.
13      Q.   At what point in time did you come
14  to the conclusion that what Van Koot, Schalik
15  and I think Tesori stated to Lamm, Snyder     15:43:13
16  and/or Fiorillo that evening were lies?
17      A.   When I spoke to Budd Jaeger and
18  Jean Jaeger.
19      Q.   And why did what Jean and/or Budd
20  Jaeger say to you cause you to now believe     15:43:26
21  that what Schalik, Tesori and Van Koot said
22  were lies?
23      A.   Put a whole different perspective
24  on what we believed happened.
25      Q.   What was the different     15:43:39

Page 788

**Hesse**

1
2   perspective?
3       A.   Instead of Gary Bosetti just going
4   berserk in a bar in a drunken rage hitting
5   people in the bar with a pool stick, there     15:43:49
6   were other elements leading up to Mr. Gary
7   Bosetti defending himself and a third person
8   with the pool stick.
9       Q.   Was your opinion that the initial
10  three statements -- was it your opinion that   15:44:03
11  the accounts given by Tesori, Schalik and Van
12  Koot were lies, was that reinforced when you
13  received subsequent statements from other
14  witnesses?
15      A.   Yes.                     15:44:20
16      Q.   I know I'm flipping back, so I
17  apologize.  Let's go back to the April 2006
18  time period.  You had various police officers,
19  you asked them to come to the beach?
20      A.   Yes.                     15:44:52
21      Q.   You advised four of the plaintiffs
22  that they were not going to be rehired.  The
23  rest presumably if I am correct were going to
24  be rehired; right?
25      A.   Yes.                     15:45:00

Page 789

**Hesse**

1
2       Q.   Other than Mr. Snyder?
3       A.   Yes.
4       Q.   Did you notify the village at any
5   point in time after April 2nd as to those     15:45:08
6   officers that were going to be hired for the
7   2006 season, or did they just show up when the
8   season started and say here I am?
9       A.   There was no notification made
10  that they were going to be rehired.  They     15:45:23
11  basically got scheduled and started to work.
12      Q.   How did the village know to pay
13  them?
14      A.   I believe that twice, there is two
15  times a year that Civil Service sends out a     15:45:32
16  form that needs to be filled out by the
17  village that states which officers will be
18  working, and it gets verified by me, sent back
19  to the village office and sent on.
20      Q.   So at some point in time there is   15:45:45
21  a communication between you and the Village
22  Clerk's office as to which officers were being
23  hired for the 2006 season?
24      A.   Yes.
25      Q.   Did Mayor Rogers ever advise you   15:45:57

Page 790

**Hesse**

1
2   that she needed to approve which officers for
3   the 2006 season were going to be rehired?
4       A.   No.
5       Q.   Did Trustee Loeffler ever advise   15:46:06
6   you that he needed to approve of who you
7   rehired for the 2006 season?
8       A.   No.
9       Q.   Were you aware that you needed to
10  run the names by either Mayor Rogers or     15:46:18
11  Loeffler?
12      A.   I was never told that I had to do
13  that.
14      Q.   Or any trustee?
15      A.   No.                     15:46:24
16      Q.   To your knowledge did Paradiso
17  when he made the decision have to run the
18  names of the people that were being hired for
19  the particular season by either the mayor or
20  the trustees?                     15:46:36
21      A.   I was unaware.
22      Q.   Did Mayor Rogers ever advise you
23  that you acted improperly by not clearing the
24  seasonal police officer staff with her first?
25      A.   No.                     15:46:49

Page 791

```
 1              Hesse
 2    Q.  How about any trustee?
 3    A.  No.
 4    Q.  Now, you discussed with Mr.
 5  Goodstadt on the first day of your testimony   15:47:58
 6  with regard to certain comments that Mayor
 7  Rogers said with regard to Mr. Paradiso.  Do
 8  you recall being asked certain of those
 9  questions?
10    A.  Vaguely.                    15:48:11
11    Q.  Do you recall being advised that
12  Ms. Rogers believed that there was some
13  liabilities with regard to Chief Paradiso?
14    A.  Vaguely.
15    Q.  What did you mean by liabilities;   15:48:21
16  you would have to know what the question was?
17    A.  Yes, I would need to hear it.
18    Q.  Okay.
19        Well let me be more specific.  I
20  believe you testified and correct me if I am   15:48:34
21  wrong that Mayor Rogers expressed some
22  disappointment with the chief when you spoke
23  to her concerning the notice of claim?
24        MR. GOODSTADT:  Objection.
25    Q.  Did you ever speak to Mayor Rogers  15:48:45
```

Page 792

```
 1              Hesse
 2  about the notice of claim?
 3    A.  Yes.
 4    Q.  And in that conversation did you
 5  have -- did you discuss Chief Paradiso?   15:48:53
 6    A.  Yes.
 7    Q.  What did Mayor Rogers say to you
 8  concerning Chief Paradiso at that time?
 9    A.  I just remember her being unhappy
10  with the way he ran things.         15:49:04
11    Q.  Do you recall specifically what
12  Mayor Rogers said?
13    A.  Off the top of my head right now,
14  no.
15    Q.  Radio codes, again Mr. Goodstadt   15:49:12
16  asked you and you rolled your eyes, Mr.
17  Goodstadt asked you some questions about radio
18  codes?
19    A.  Yes.
20    Q.  Did Mr. Nofi ever advise you that  15:49:42
21  he had issued a 10-1 and that any police
22  officer failed to respond to the 10-1?
23    A.  He never complained, no.
24    Q.  Did he ever say anything to you,
25  even if it was not a complaint, that he had   15:49:58
```

Page 793

```
 1              Hesse
 2  issued a 10-1 and no one came to assist him?
 3    A.  No.
 4    Q.  Did you ever hear a rumor prior to
 5  seeing this lawsuit that Joe Nofi had issued a  15:50:07
 6  10-1 and no one came to help him?
 7    A.  No.
 8    Q.  Did you ever receive a
 9  communication, I am not even talking about a
10  complaint now, did you ever receive a         15:50:25
11  communication from any police officer that
12  another police officer didn't know a radio
13  code?
14        MR. GOODSTADT:  Objection.
15    A.  No.                         15:50:38
16    Q.  Did you ever receive a
17  communication from any resident of Ocean Beach
18  that the police didn't respond to something
19  involving that particular resident because a
20  particular officer did not know the right      15:50:54
21  radio code?
22        MR. GOODSTADT:  Objection.
23    A.  No.
24    Q.  Let me ask you something.  Was it
25  appropriate for a police officer at Ocean     15:51:07
```

Page 794

```
 1              Hesse
 2  Beach while in uniform to go into a private
 3  residence, sit down and drink a beer?
 4    A.  Would it be inappropriate?
 5    Q.  Yes.                        15:51:22
 6    A.  In my opinion yes.
 7    Q.  While they were on duty in
 8  uniform?
 9    A.  Absolutely, yes.
10    Q.  How about if they went into a      15:51:28
11  resident's house, had a woman sit on his lap,
12  drink a beer and have a picture taken?
13    A.  It is inappropriate.
14        MR. GOODSTADT:  I think we are --
15  you have no foundation that they even   15:51:49
16  drank a beer.  No foundation.
17        MR. NOVIKOFF:  Okay.  You could
18  have objected to form.
19        MR. GOODSTADT:  You are asking
20  hypotheticals.                    15:51:59
21        MR. NOVIKOFF:  That is true.
22        MR. GOODSTADT:  If you mentioned
23  one of my clients then maybe I would have
24  said objection.  But you are speaking
25  hypothetically.                   15:52:07
```

77 (Pages 791 to 794)

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 795

```
 1              Hesse
 2       MR. NOVIKOFF:  Well it is what it
 3   is.
 4       Q.   In response to I think Mr.
 5   Goodstadt's question again on the radio codes,  15:52:22
 6   I think you said that the officers always
 7   spoke the codes as well as plain talk, do you
 8   recall that?
 9       A.   Yes.
10       Q.   What does plain talk mean?       15:52:33
11       A.   Basically what we are doing now.
12   Just talking to each other.  Just give him the
13   type of call it was, you know, for what it
14   was.
15       Q.   Give me an example?       15:52:42
16       A.   Like we get a complaint of noise
17   somewhere.  So the dispatcher would pick up
18   the radio, he would assign it to an officer.
19   The officer would respond and he would say, we
20   have a 10-17, noise complaint at 668 Ocean    15:52:53
21   Breeze.
22       Q.   Okay.  Flipping back a little bit,
23   sorry, I don't think I asked you this
24   question.
25       Did Lamm or any other officer ever  15:53:04
```

Page 796

```
 1              Hesse
 2   advise you that people dumped beer near them
 3   when they were walking on the beach?
 4       A.   We had an incident.
 5       Q.   What is that incident?       15:53:18
 6       A.   We had an incident that Kevin Lamm
 7   and Tommy Snyder were standing on a foot post
 8   and Ocean Breeze and Bay Walk, and some punk
 9   took a beer, poured it down the ledge of the
10   building and it dripped on to Tom Snyder.   15:53:35
11       Q.   Now there is an allegation in the
12   complaint about beer being thrown from a
13   second or third floor story near Mr. Lamm.  Do
14   you recall seeing that?
15       A.   The complaint?       15:53:50
16       Q.   Yes.
17       A.   Yes.
18       Q.   To your understanding is that the
19   incident that you are discussing?
20       A.   That is the only one that I know    15:53:57
21   of.
22       Q.   Was the allegations in the
23   complaint about that incident accurate?
24       MR. GOODSTADT:  Objection.
25       A.   It was exaggerated.       15:54:06
```

Page 797

```
 1              Hesse
 2       Q.   How was it exaggerated?
 3       A.   I need you to read it to me so I
 4   can --
 5       Q.   Let me go find it.  You know what,  15:54:15
 6   let me mark the following complaint because I
 7   just want to make sure that we covered the
 8   allegations.  I apologize, I tried to do it a
 9   little expeditiously and I don't want to mess
10   it up.                        15:54:59
11       MR. CONNOLLY:  While this is being
12   marked let's go off the record.
13       THE VIDEOGRAPHER:  The time is
14   3:56, we are off the record.
15       (Recess taken.)       15:55:08
16       THE VIDEOGRAPHER:  The time is
17   4:05, we are on the record.
18       MR. NOVIKOFF:  We are going to
19   stop the deposition today after all
20   counsel have had a discussion off the    16:03:28
21   record.  We are going to continue with
22   the deposition of Mr. Hesse and hopefully
23   complete it on August 17th.
24       We are confirmed for Mr. Carollo
25   at this office here at 2 o'clock next    16:03:43
```

Page 798

```
 1
 2   Tuesday, and counsel will discuss the
 3   briefing schedule either tomorrow or
 4   early next week.
 5       MR. GOODSTADT:  No objection.    16:03:53
 6       MR. CONNOLLY:  With the request
 7   being that if he pushed back one week
 8   subject to court consent.
 9       MR. NOVIKOFF:  Okay.
10       THE VIDEOGRAPHER:  The time is    16:04:03
11   4:05.  We are off the record.
12       (Time noted:  4:05 p.m.)
13   _____
14       GEORGE HESSE
15
16   Subscribed and sworn to before me
17   this ___ day of _____, 2009
18
19   _____
20
21
22
23
24
25
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 799

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6
 7        I, Philip Rizzuti, a Notary
 8   Public within and for the State of New
 9   York, do hereby certify:
10        That GEORGE HESSE, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by the witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I am
18   in no way interested in the outcome of this
19   matter.
20        IN WITNESS WHEREOF, I have
21   hereunto set my hand this 18th day of
22   August, 2009.
23        _____
24          PHILIP RIZZUTI
25
```

Page 801

```
 1
 2   Hesse Exhibit 22, internal      569
 3   correspondence, December 10,
 4   2004,
 5   Hesse Exhibit 23, typewritten    577
 6   document dated 11/5/04 to George
 7   Hesse,
 8   Hesse Exhibit 24, internal       588
 9   correspondence, November 7,
10   2004,
11   Hesse Exhibit 25, Ocean Beach    599
12   Police Department, document
13   dated 11/5/2004,
14   Hesse Exhibit 26, incident       604
15   report, 12/11/2004,
16   Hesse Exhibit 27, letter dated   612
17   March 11, 2006,
18   Hesse Exhibit 28, Employment,    664
19   Collier County Sheriff's Office,
20   Employment Reference Prior
21   Experience,
22
23
24
25
```

Page 800

```
 1
 2   ----------------- I N D E X ----------------
 3   WITNESS        EXAMINATION BY       PAGE
 4   GEORGE HESSE    Mr. Goodstadt       491
 5        Mr. Novikoff      679
 6
 7   ------------- INFORMATION REQUESTS -----------
 8   DIRECTIONS:    None
 9   RULINGS:       None
10   TO BE FURNISHED:  None
11   REQUESTS:      619, 638
12   MOTIONS:       None
13
14   ------------------ EXHIBITS ------------------
15   Hesse Exhibit 17, photocopy of   524
16   photographs,
17   Hesse Exhibit 18, incident       529
18   report,
19   Hesse Exhibit 19, handwritten    543
20   statement, November 1, 2004,
21   Hesse Exhibit 20, handwritten    554
22   statement, November 2, 2004,
23   Hesse Exhibit 21, internal       562
24   correspondence, November 12,
25   2004,
```

Page 802

```
 1
 2          *** ERRATA SHEET ***
 3   NAME OF CASE: CARTER VS. OCEAN BEACH
     DATE OF DEPOSITION:  August 6, 2009
 4   NAME OF WITNESS:   GEORGE HESSE
     PAGE  LINE    FROM      TO
 5   ____|_____|_____|_____|
 6   ____|_____|_____|_____|
 7   ____|_____|_____|_____|
 8   ____|_____|_____|_____|
 9   ____|_____|_____|_____|
10   ____|_____|_____|_____|
11   ____|_____|_____|_____|
12   ____|_____|_____|_____|
13   ____|_____|_____|_____|
14   ____|_____|_____|_____|
15   ____|_____|_____|_____|
16   ____|_____|_____|_____|
17   ____|_____|_____|_____|
18   ____|_____|_____|_____|
19
20        _____
21          GEORGE HESSE
22   Subscribed and sworn to before me
23   this _____ day of _____, 2009.
24   _____  _____
25   (Notary Public)    My Commission Expires:
```

37f918e4-de29-4df9-9ef1-64f4ca0acd46

Page 803

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

EDWARD CARTER, FRANK FIORILLO, )
KEVIN LAMM, JOSEPH NOFI and    )
THOMAS SNYDER,                 )
                               )
          Plaintiffs,          )
                               )
          vs.                  ) CV 07 1215
                               )
INCORPORATED VILLAGE OF OCEAN  )
BEACH; MAYOR JOSEPH C. LOEFFLER)
JR., individually and in his   )
Official capacity; former Mayor)
NATALIE K. ROGERS, individually)
and in her official capacity,  )
OCEAN BEACH POLICE DEPARTMENT; )
ACTING DEPUTY POLICE CHIEF     )
GEORGE B. HESSE, individually  )
And in his official capacity;  )
SUFFOLK COUNTY; SUFFOLK COUNTY )
POLICE DEPARTMENT, SUFFOLK     )
COUNTY DEPARTMENT OF CIVIL     )
SERVICE; and ALLISON SANCHEZ,  )
Individually and in her        )
Official capacity,             )
                               )
          Defendants.          )
-------------------------------)


         CONTINUED VIDEOTAPED DEPOSITION OF
                    GEORGE HESSE
                 Uniondale, New York
                Monday, August 17, 2009

Reported by:
Philip Rizzuti
JOB NO. 24185
```

Page 804

```
 1
 2
 3              August 17, 2009
 4              10:22 a.m.
 5
 6         Continued videotaped deposition
 7     of GEORGE HESSE, held at the offices
 8     of Rivkin Radler, 926 Rexcorp Plaza,
 9     Uniondale, New York, pursuant to
10     subpoena, before Philip Rizzuti, a
11     Notary Public of the State of New York
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 805

```
 1
 2   A P P E A R A N C E S:
 3
 4       THOMPSON WIGDOR & GILLY, LLP
 5       Attorneys for Plaintiffs
 6          85 Fifth Avenue
 7          New York, New York 10003
 8       BY:  ANDREW S. GOODSTADT, ESQ.
 9
10       MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
11       Attorneys for George B. Hesse
12          530 Saw Mill Road
13          Elmsford, New York 10523
14       BY:  KEVIN W. CONNOLLY, ESQ.
15
16       RIVKIN RADLER, LLP
17       Attorneys for Incorporated Village of
18       Ocean Beach, Joseph Loeffler, Natalie
19       Rogers and Ocean Beach Police Department
20          926 RexCorp Plaza
21          Uniondale, New York 11556-0926
22       BY:  KENNETH A. NOVIKOFF, ESQ.
23
24
25
```

Page 806

```
 1
 2   A P P E A R A N C E S:
 3
 4       RUDOLPH M. BAPTISTE, ESQ.
 5       Assistant County Attorney
 6       Suffolk County, State of New York
 7          100 Veterans Memorial Highway
 8          P.O. Box 6100
 9          Hauppauge, New York 11788-4311
10
11   ALSO PRESENT:
12       JORDAN MUMMERT, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 803 to 806)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 807

Hesse

1
2    MR. NOVIKOFF:  Would you mark as
3  Hesse Exhibit 29, complaint.
4        (Hesse Exhibit 29, complaint,
5  marked for identification, as of this      10:08:44
6  date.)
7        THE VIDEOGRAPHER:  This is the
8  start of the tape labelled number 1 of
9  the continuation of George Hesse in the
10  matter of Carter and Fiorillo versus      10:21:20
11  Incorporated Village of Ocean Beach.  The
12  date is August 17th.  The time is 10:22
13  a.m., we are on the record.
14  G E O R G E   H E S S E, called as a
15    witness, having been duly sworn by a      10:21:33
16    Notary Public, was examined and
17    testified as follows:
18  EXAMINATION BY
19  MR. NOVIKOFF:
20    Q.   Good morning Mr. Hesse.      10:21:35
21    A.   Good morning.
22    Q.   How are you, welcome back for your
23  fourth day.  Hopefully we will be out of here
24  by noon.  Where I left off with you was we
25  were going to start going through some of the  10:21:42

Page 808

Hesse

1
2  allegations in the complaint.
3        In front of you is what has been
4  pre-marked as Exhibit 29.  I have left a copy
5  of Deposition Exhibit 29 for all counsel.  I    10:21:51
6  would ask you to turn your attention to page
7  9, paragraph 32.  In paragraph 32 plaintiffs
8  allege in part that you allowed your allies on
9  the force to spend their shifts drinking at
10  local bars while in uniform and officially on  10:22:28
11  duty.
12        Did you ever allow any officers to
13  drink in local bars while in uniform and
14  officially on duty?
15    A.   No.                      10:22:39
16    Q.   Plaintiffs then go on to allege in
17  paragraph 32 that you instructed other
18  officers under your command including the
19  plaintiffs to neglect their own duties in
20  order to chauffeur their intoxicated      10:22:56
21  colleagues both inside and out of Ocean Beach.
22        Did you ever order the plaintiffs
23  to chauffeur intoxicated police officers
24  around Ocean Beach?
25    A.   No.                      10:23:10

Page 809

Hesse

1
2    Q.   How about outside of Ocean Beach?
3    A.   No.
4    Q.   Paragraph 33 plaintiffs allege in
5  part that you encouraged and enabled on-duty  10:23:18
6  officers to drink alcohol in the police
7  station.
8        Sir, did you ever encourage or
9  enable any on-duty officers to drink alcohol
10  in the police station?              10:23:31
11    A.   No.
12    Q.   Plaintiffs allege that you would
13  collect money to have these on-duty police
14  officers have Rocket Fuel in the police
15  station.                      10:23:45
16        Sir, did you ever collect money so
17  that on-duty police officers could drink
18  Rocket Fuel in the police station?
19    A.   No.
20    Q.   Let's look at paragraph 35.      10:23:55
21  Plaintiffs allege in part that you hired
22  civilians as police dispatchers.
23        Did you, Mr. Hesse, hire civilians
24  to be civil dispatchers?
25    A.   I didn't hire anybody at that      10:24:17

Page 810

Hesse

1
2  time, no.
3    Q.   Paragraph 36.  Plaintiffs allege
4  that each one of them advised you on numerous
5  occasions that the department and the village  10:24:30
6  were left dangerously short of personnel while
7  plaintiffs were assigned to chauffeur
8  intoxicated officers and their civilian
9  friends.
10        Let me ask you this question,      10:24:42
11  putting aside the fact as to whether or not
12  you ordered anyone to chauffeur anyone, I
13  think you have spoken about that, did any of
14  the plaintiffs ever complain to you about the
15  subject of they having to chauffeur anyone    10:24:55
16  within or without of Ocean Beach?
17    A.   No.
18    Q.   Did they ever complain to you that
19  anything you did left the village dangerously
20  short of police personnel?            10:25:13
21    A.   Never.
22    Q.   Did they ever complain to you that
23  they personally witnessed on-duty police
24  officers drinking while in uniform in an Ocean
25  Beach bar?                    10:25:34

2  (Pages 807 to 810)

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 811

1           **Hesse**
2      A.  Never.
3      Q.  Let's look at the next page,
4  paragraph 39.  Plaintiffs allege in part that
5  you allowed uncertified officers to assign     10:25:49
6  dock masters to cover their shifts at the
7  Ocean Beach Police Department.
8           Did you ever allow uncertified
9  officers to assign dock masters to cover
10  shifts at the Ocean Beach Police Department?   10:26:07
11      A.  Never.
12      Q.  Did you ever allow any officer to
13  assign a dock master to cover shifts at the
14  Ocean Beach Police Department?
15      A.  No.                    10:26:19
16      Q.  Paragraph 40.  Plaintiffs allege
17  in part that you allowed uncertified officers
18  to drink beer while patrolling in police
19  vehicles.
20           Assuming that it really doesn't    10:26:33
21  matter whether someone is uncertified or
22  certified with regard to drinking in police
23  vehicles, let me ask you this question.  Did
24  you ever allow any officers to drink beer
25  while patrolling in police vehicles?     10:26:44

Page 812

1           **Hesse**
2      A.  Never.
3      Q.  Did any of the plaintiffs ever
4  advise you that they were aware that any
5  officer was drinking a beer in a police     10:26:51
6  vehicle while on duty?
7      A.  Never.
8      Q.  Would you tell officers what types
9  of beer to confiscate?
10      A.  No.                    10:27:06
11      Q.  Did the plaintiffs ever complain
12  to you about you -- about the subject of you
13  confiscating beer improperly?
14      A.  No.
15      Q.  Did the plaintiffs ever complain    10:27:24
16  to you about any officers drinking the
17  confiscated beer?
18      A.  Never.
19      Q.  Paragraph 41.  Plaintiffs allege
20  that you instructed them to remove empty beer    10:27:43
21  cans and other refuge that uncertified
22  officers abandoned in their vehicles and left
23  strewn about the police station after a night
24  on duty.
25           Did you ever instruct plaintiffs    10:27:58

Page 813

1           **Hesse**
2  to remove empty beer cans and other garbage
3  left by any other officer in the police
4  station?
5      A.  No.                    10:28:08
6      Q.  Did they ever complain to you that
7  they felt that they were required by you to
8  pick up beer cans and garbage left by other
9  officers in the police station?
10      A.  Never.                 10:28:17
11      Q.  Let's go to paragraph 43.  Did
12  Officer Snyder -- well, in 43 Officer Snyder's
13  complaint is alleging that on one or more
14  occasions other officers took away his police
15  radio phone.                    10:28:39
16           Did Snyder ever complain to you
17  that any other officer would take away his
18  emergency cell phone from him?
19           MR. GOODSTADT:  Objection.
20      A.  No.                    10:28:50
21      Q.  Did Snyder ever complain to you
22  that he felt that other officers were
23  mistreating him?
24      A.  No.
25           MR. GOODSTADT:  Just note my    10:29:04

Page 814

1           Hesse
2  objection to that as well.
3           MR. NOVIKOFF:  That question?
4           MR. GOODSTADT:  Yes.
5           MR. NOVIKOFF:  Okay.         10:29:09
6      Q.  Let's look at paragraph 43.  Tell
7  me when you are done reading it to yourself?
8      A.  Okay.
9      Q.  Did Officer Snyder ever complain
10  to you about anything that is referenced     10:29:56
11  within paragraph 43?
12      A.  No.
13      Q.  Read paragraphs 44 and 45 to
14  yourself please and then tell me when you are
15  done?                         10:30:07
16      A.  Okay.
17      Q.  In now in paragraph 45 Mr.
18  Fiorillo is alleging that you chided him in
19  the presence of Lamm and Nofi with regard to
20  his involvement in an altercation involving an  10:31:04
21  intoxicated off-duty police officer.
22           Did you ever chide Mr. Fiorillo
23  with regard to his involvement in an incident,
24  a physical altercation involving an off-duty
25  police officer?                 10:31:23

                          3 (Pages 811 to 814)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 815

```
1              Hesse
2         MR. GOODSTADT:  Objection.
3    Q.   As referenced in 44 and 45?
4    A.   As reference to this, no.
5    Q.   Do you recall what Mr. -- do you   10:31:27
6  have idea -- do you have an understanding as
7  to what Mr. Fiorillo is referencing in
8  paragraph 44 and 45?
9    A.   Yes.
10   Q.   Could you please tell me what he   10:31:35
11 is referencing?
12   A.   He is referencing an incident that
13 happened on the South Bay Water Taxi's.  We
14 got a call of a fight on the water taxi.  The
15 fight was between a Dr. Something Guida from   10:31:50
16 the Good Samaritan Hospital, he was punching
17 his girlfriend in the face, it was not Police
18 Officer Walter Muller who he is talking about
19 here.
20         Walter Muller identified himself   10:32:07
21 as a police officer, he was there with his
22 wife, they were out to dinner that night.  He
23 was not intoxicated.  He had taken police
24 action.  One of our civilian dock masters had
25 jumped on the boat and because of Officer   10:32:19
```

Page 816

```
1              Hesse
2  Fiorillo's actions that civilian also -- the
3  dock master had gotten hurt.
4         So when the incident was over we
5  arrested Dr. Guido for harassment on that   10:32:30
6  civilian dock master because the confrontation
7  that they had between them.  What happened
8  later was as a group I yelled at everybody,
9  especially the civilian dock master for
10 getting involved in police action.   10:32:48
11   Q.   Who was the civilian dock master?
12   A.   Kenny Lappena.
13   Q.   And when you said because of Mr.
14 Fiorillo's actions the dock master got hurt,
15 what was Mr. Fiorillo's actions that you are   10:32:57
16 referring to?
17   A.   What happened was because he put
18 Officer Muller in a head lock and prevented
19 him from restraining Dr. Guida, Dr. Guida was
20 aggressive toward the civilian dock master and  10:33:14
21 he got hurt.
22   Q.   So let me understand you
23 correctly.  Fiorillo put Muller in a head
24 lock?
25   A.   Yes, he did.            10:33:23
```

Page 817

```
1              Hesse
2    Q.   Did you ever question Fiorillo as
3  to why he did this?
4    A.   Yes.
5    Q.   And what did you ask him?       10:33:27
6    A.   He said he didn't recognize him.
7    Q.   But what did you ask him; before
8  you tell me what Fiorillo said what
9  specifically did you ask him if you can
10 recall?                       10:33:37
11   A.   I don't remember a specific
12 question that I asked.  But I made a statement
13 that you better know your officers before you
14 take action like that.
15   Q.   Is it usual for one officer to put  10:33:47
16 another officer in a head lock?
17   A.   Of course not, and the other thing
18 is Lamm and Nofi were not even on that night
19 that I believe.  I don't remember them being
20 there.                        10:33:57
21   Q.   Now where would there be a record
22 of what nights, what shifts Lamm and Nofi
23 worked in June of 2002?
24   A.   I am sure that the village has
25 provided all the schedules.         10:34:09
```

Page 818

```
1              Hesse
2    Q.   Where would I find it?
3    A.   On the schedules or maybe copies
4  of the blotters or something like that.
5    Q.   Where would there be a record of   10:34:15
6  the arrest of Dr. Guida?
7    A.   That was definitely turned over.
8  It is definitely in our files somewhere.
9    Q.   Let's look at paragraph 46 and 47
10 and 48.  Please read those and tell me when   10:34:34
11 you are done?
12   A.   Okay.
13   Q.   In 46 Mr. Fiorillo is alleging in
14 part that on one occasion you demanded of him
15 to transport you to a party at a private      10:35:14
16 residence in Ocean Beach.
17         Did you ever demand that Mr.
18 Fiorillo transport you to a private residence
19 in Ocean Beach for the purpose of attending a
20 party?                        10:35:25
21   A.   No.
22   Q.   Did you ever ask him to transport
23 you to a party on a private residence in Ocean
24 Beach?
25   A.   Not that I recall.          10:35:32
```

4 (Pages 815 to 818)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 819

Hesse

1
2     Q.   Did you ever require Mr. Fiorillo
3  to pick you up from a party at a private
4  residence?
5     A.   No.                        10:35:45
6     Q.   On Ocean Beach?
7     A.   No.
8     Q.   Let me ask you this question
9  because I asked Mr. Paradiso a couple of
10 questions.  How long would it take to drive   10:35:56
11 one of your police vehicles from the north to
12 the south part of Ocean Beach?
13    A.   About two minutes.
14    Q.   How about from east and west
15 within Ocean Beach?              10:36:06
16    A.   Ten blocks, and they are not
17 regular blocks, there are maybe 200 feet
18 between each block.
19    Q.   So taking a police vehicle from
20 east to west, how long would it take to drive?  10:36:16
21    A.   A minute or two.
22    Q.   And north to south?
23    A.   The same.
24    Q.   In paragraph 47 Mr. Fiorillo makes
25 some allegations concerning a known drug   10:36:36

Page 820

Hesse

1
2  dealer, although he doesn't identify who the
3  known drug dealer is anywhere in the
4  complaint.
5          Mr. Hesse, did Mr. Fiorillo ever   10:36:45
6  inquire with you with regard to any
7  relationship you have with a drug dealer?
8     A.   No.
9     Q.   Did you ever advise Mr. Fiorillo
10 that you have as a close personal friend a   10:36:59
11 drug dealer who lives in Ocean Beach?
12    A.   No.
13    Q.   Did you ever forbid Mr. Fiorillo
14 from interfering with any drug dealer's
15 activity in Ocean Beach?          10:37:16
16    A.   Never.
17    Q.   To your knowledge -- withdrawn.
18         Let's go to paragraph 49.  Did you
19 ever require any of the plaintiffs to
20 chauffeur you to various residences within   10:37:38
21 Ocean Beach for non-police business?
22    A.   No.
23    Q.   How about outside of Ocean Beach?
24    A.   No.
25    Q.   Let's go to paragraph 50.  Read   10:37:49

Page 821

Hesse

1
2  paragraph 50 to yourself and advise me when
3  you are done reading it.
4     A.   Okay.
5     Q.   Now in paragraph 50 it appears   10:38:16
6  that Mr. Fiorillo is alleging in part that you
7  interfered in the issuance of a summons by him
8  to the son of a business owner in Ocean Beach.
9          Do you have any recollection as to
10 what Mr. Fiorillo is referring to in paragraph  10:38:35
11 50?
12    A.   I have no idea.
13    Q.   Did you ever tear up a summons
14 that Fiorillo issued to anybody in Ocean
15 Beach?                         10:38:44
16    A.   Never.
17    Q.   Let's please read 51 and tell me
18 when you are done.
19    A.   Okay.
20    Q.   Did you ever instruct any of the   10:39:13
21 plaintiffs not to issue summonses to any bar
22 in Ocean Beach?
23    A.   No.
24    Q.   Did you ever advise any of the
25 plaintiffs that certain bars should not be --  10:39:25

Page 822

Hesse

1
2  withdrawn.
3          Did any of the plaintiffs ever
4  complain to you about you selectively
5  enforcing the law?              10:39:43
6     A.   No.
7          MR. GOODSTADT:  Objection.
8     Q.   Please read 52 and 53 and tell me
9  when you are done?
10    A.   Okay.                    10:40:00
11    Q.   Now in 52 plaintiffs are alleging
12 an incident involving Snyder and Lamm where
13 they witnessed a down pure of beer falling at
14 their feet.  Do you see where they are
15 referring to?                  10:40:56
16    A.   Yes.
17    Q.   Let's look at 53.  According to
18 the plaintiffs in 53 you, Mr. Hesse, directed
19 Officers Lamm and Snyder not to issue any
20 citations or make any arrest with regard to   10:41:12
21 these alleged under age individuals drinking
22 alcohol in that apartment building.
23         Did you ever direct Lamm and
24 Snyder not to issue any citations or make any
25 arrests to these youths who they say were   10:41:27

5 (Pages 819 to 822)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 823

1           **Hesse**
2   breaking the law?
3       A.   No.
4       Q.   Did Lamm or Snyder ever relay the
5   incident to you where they believed that beer   10:41:35
6   was thrown at them?
7       A.   Yes.
8       Q.   What did they say to you?
9       A.   Tommy Snyder -- well I was called
10  to the scene. Tommy Snyder said that some      10:41:45
11  beer had dripped on him, I don't know if it
12  was a down pure of beer, but I think he got a
13  few drips on his head, because there was some
14  intox kid dumping beer down the, I guess the
15  slope of the roof and it dripped on to Officer  10:41:59
16  Snyder.
17          So when I received we went up
18  there, we identified the kid, he was 21. His
19  father happened to be a lieutenant in Nassau
20  County PD. I asked Snyder what do you want me   10:42:14
21  to do with this. He said let's just call the
22  father, which we did, to let the father know
23  what his son just did.
24          We went up to the residence where
25  the renter of the residence John was on the    10:42:29

Page 824

1           Hesse
2   scene, I forget his last name. We wrote him a
3   summons for noise. We did find a small pipe
4   for smoking marijuana. There was not
5   extensive drugs or drug paraphernalia there.   10:42:46
6   There was one pipe that was sitting on a
7   counter. There was some empty beer cans
8   sitting around.
9          I believe John had maybe his
10  sister, younger sister and some of her friends 10:43:01
11  there which none of them were seen drinking
12  any alcohol, because I believe the officers
13  had checked because I was dealing with John.
14  I confiscated the pipe, I went out to the
15  balcony so everybody could see and I threw the 10:43:19
16  pipe into the bay. And that was the end of
17  the story.
18      Q.   Now who was the police officer of
19  Nassau County?
20      A.   I don't remember his name.        10:43:26
21      Q.   What was his title?
22      A.   He was a lieutenant, I remember
23  him being a lieutenant.
24      Q.   Now you made reference to an
25  extensive collection of illicit drug          10:43:38

Page 825

1           **Hesse**
2   paraphernalia not being present in that
3   apartment. You are referring to the
4   allegation in paragraph 52 when the plaintiffs
5   alleged that there was an extensive collection  10:43:52
6   of such paraphernalia; correct?
7       A.   Yes.
8       Q.   It is your testimony that that
9   allegation is incorrect?
10      A.   Correct.                   10:43:59
11      Q.   And it is your position with
12  regard to the incidents being described in 52
13  and 53 that you asked Tommy Snyder what he
14  wanted to do, and Snyder's response was to
15  call the father?                 10:44:17
16      A.   That is it.
17      Q.   Okay. Go to paragraph 54, please
18  read it and tell me when you are done.
19      A.   Okay.
20      Q.   There has been some confusion     10:44:49
21  among some of the witnesses who looked at this
22  paragraph. Is 54 in your opinion still
23  referring to the same evening in the same
24  apartment that 52 and 53 are referring to?
25          MR. GOODSTADT: Objection.       10:45:02

Page 826

1           Hesse
2          MR. CONNOLLY: Objection.
3       A.   My opinion; it could be. I don't
4   know.
5       Q.   Now did you ever prohibit the      10:45:05
6   plaintiffs from investigating any crime that
7   took place in that apartment that evening or
8   any other evening?
9       A.   No.
10      Q.   Did you ever instruct any of the   10:45:16
11  plaintiffs to stay away from that apartment
12  and not investigate any alleged act of
13  criminality?
14      A.   Never.
15      Q.   That night or any night          10:45:27
16  afterwards?
17      A.   Never.
18      Q.   Now in the last sentence of
19  paragraph 54 the plaintiffs allege as follows
20  and I will quote this: Indeed on another     10:45:39
21  occasion plaintiffs even observed certain of
22  the uncertified officers on the apartment
23  balcony drinking and socializing with the same
24  group of minors. Close quote.
25          Did any of the plaintiffs ever     10:45:58

Page 827

Hesse

1
2 advise you that they ever saw any other
3 officer drinking and socializing with anyone
4 on the balcony of that apartment?
5     A.  Never.                    10:46:12
6     Q.  Let's go to paragraph 55, please
7 read it and tell me when you are done?
8     A.  Okay.
9     Q.  Did you ever encourage minors to
10 abuse alcohol?                  10:46:39
11     MR. GOODSTADT:  Objection.
12     A.  No.
13     MR. NOVIKOFF:  What is the
14 objection, it is your allegation; in yet
15 another instance of Hesse encouraging    10:46:46
16 minors to abuse alcohol, so I am asking
17 him.  So what is the objection?
18     MR. GOODSTADT:  The allegation is
19 encouraging.  I don't know if he has the
20 same definition that we would have.  So   10:46:54
21 object to the form.
22     MR. NOVIKOFF:  Because you don't
23 think he has the same definition of what
24 you have as encouraging?
25     MR. GOODSTADT:  Maybe.       10:47:05

Page 828

Hesse

1
2     MR. NOVIKOFF:  Okay, that is fine.
3     Q.  What is your definition of
4 encouraging, Mr. Hesse?
5     A.  It could be that I permitted them   10:47:10
6 or I actually handed them the beer and said
7 drink it, drink it.
8     Q.  Under any definition that you may
9 have as to the word encouraging did you ever
10 encourage minors to abuse alcohol?     10:47:23
11     A.  No.
12     Q.  Did you ever encourage minors to
13 drink alcohol?
14     A.  No.
15     Q.  Did you ever permit minors to    10:47:31
16 drink alcohol in your presence?
17     A.  No.
18     Q.  Did you ever condone minors of
19 drinking alcohol in your presence?
20     A.  No.               10:47:40
21     Q.  Did you ever tell any of the
22 plaintiffs not to issue summonses to any
23 minors that they found to be drinking alcohol?
24     A.  No.
25     Q.  Did you ever intervene when      10:47:48

Page 829

Hesse

1
2 another officer issued a citation to any minor
3 carrying a case of beer?
4     A.  No.
5     Q.  Did you ever -- are you aware of   10:48:01
6 any incidents involving any officer issuing a
7 citation to a minor carrying a case of beer?
8     A.  I know the incident that they are
9 referring to.
10     Q.  In paragraph 55?          10:48:14
11     A.  Yes.
12     Q.  What is that incident?
13     A.  I believe we talked about it on
14 one of my other days.  There was a kid that
15 works for CJ's.  CJ's has an off premise    10:48:23
16 license, they have an off premise sale
17 license, and I believe he was delivering a
18 case of beer to -- of course it is to the
19 apartment where this other incident had taken
20 place.  But the kids were 21.  He was      10:48:45
21 delivering a case of beer.  I don't remember
22 if it was Lamm or Fiorillo who issued the
23 summons to him.  But I advised the kid bring
24 the receipt, bring the license, a copy of the
25 license, go to court, plead your case, he did,  10:49:02

Page 830

Hesse

1
2 and it was dismissed.
3     Q.  So when you say the kid was 21,
4 you are saying the kid who the beer was being
5 delivered to?             10:49:10
6     A.  Correct.  The kid that purchased
7 the beer was 21.
8     Q.  Okay.  So let me understand what
9 happened.  Some kid purchased -- the kid who
10 was 21 purchased the case of beer from CJ's?  10:49:23
11     A.  Yes.  He ordered it.
12     Q.  He ordered it?
13     A.  Yes.
14     Q.  And it was delivered to him?
15     A.  It was in the process of being    10:49:33
16 delivered to him.
17     Q.  Who was delivering it to him?
18     A.  Some kid Paul, I can't think of
19 the last name, he has been mentioned a couple
20 of times.               10:49:39
21     Q.  Was this kid Paul a minor?
22     A.  He was 20.
23     Q.  He was delivering the beer to your
24 knowledge on behalf of CJ's to the kid in the
25 apartment who was 21?          10:49:50

7 (Pages 827 to 830)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 831

**Hesse**
1
2      A.   Correct.
3      Q.   Okay, now, was the citation issued
4  to this Paul kid who was 20, or was the
5  citation issued to the 21 year old in the      10:49:57
6  apartment?
7      A.   It was issued to the kid Paul who
8  was making the delivery.
9      Q.   Okay, now, who issued the citation
10 to the kid making the delivery?      10:50:16
11     A.   It was either Lamm or -- actually,
12 no. It might have been John Dwyer. It was
13 either John Dwyer, Kevin Lamm or Frank
14 Fiorillo. Offhand I am not sure.
15     Q.   Now what communication if any did      10:50:27
16 you have with regard to the kid Paul who was
17 making the delivery concerning the citation
18 that was issued to him?
19     A.   I believe I was already in the
20 station house at my desk and they brought the      10:50:38
21 kid Paul into the station house to issue the
22 summons. And he was complaining, you know, I
23 work for CJ's, I am making a delivery. Okay,
24 well, if that is the truth bring all your
25 documentation to court and prove your case. I  10:50:51

Page 832

**Hesse**
1
2  wasn't sure.
3      Q.   And that was the extent of your
4  communication with that kid Paul?
5      A.   Yes.      10:51:00
6      Q.   So the citation was issued?
7      A.   Yes.
8      Q.   And your advice to the kid was
9  just prove your case in court?
10     A.   Exactly.      10:51:07
11     Q.   Now the plaintiffs then allege in
12 55 that you returned the case of beer to the
13 under aged youth. Did you return the case of
14 beer to this kid Paul?
15     A.   No.      10:51:25
16     Q.   Did you take the case of beer to
17 the other kid who was 21 in the apartment?
18     A.   No.
19     Q.   Do you have an understanding as to
20 what plaintiffs mean when they say that you      10:51:32
21 returned the case of beer to the under aged
22 youth?
23     A.   The person who ordered it came and
24 took it. He came and picked it up.
25     Q.   And he was 21 to the best of your  10:51:39

Page 833

**Hesse**
1
2  knowledge.
3      A.   He was.
4      Q.   And how do you know that?
5      A.   We checked his ID.      10:51:43
6      Q.   The plaintiffs then allege in the
7  last sentence that Hesse later ordered that
8  Officer Lamm refrain from issuing citations on
9  enforcing the law against this youth.
10     Since we now have two youths that  10:52:03
11 are being referenced in the story by you, did
12 you ever order Officer Lamm to refrain from
13 issuing a citation or enforcing a law, any law
14 against this guy Paul?
15     A.   No.      10:52:16
16     Q.   Same question with regard to the
17 21 year old that picked up the case of beer?
18     A.   No.
19     Q.   In paragraph 56, please read
20 paragraph 56 and then tell me when you are      10:52:29
21 done?
22     A.   Okay.
23     Q.   Now let's look at the first
24 sentence of paragraph 56. Here Snyder and
25 Lamm are alleging that you advised the youths  10:53:06

Page 834

**Hesse**
1
2  that were referenced in 54 and 55 -- I'm
3  sorry, in 55, that you advised these youths
4  that Officer Lamm was a loser.
5      Did you ever advise any youth that  10:53:23
6  Officer Lamm was a loser?
7      A.   No.
8      Q.   Did you ever advise any person
9  that was issued a citation that Officer Lamm
10 was a loser?      10:53:34
11     A.   No.
12     Q.   Did you ever advise these youths
13 that no one likes Lamm as Lamm alleged in 56?
14     A.   No.
15     Q.   Did you ever advise any individual  10:53:43
16 that was issued a citation that no one likes
17 Lamm?
18     A.   No.
19     Q.   Did you ever advise any individual
20 who was issued a citation that no one listens  10:53:55
21 to Lamm and therefore they should not listen
22 to Lamm?
23     A.   No.
24     Q.   Did you ever advise anybody --
25 withdrawn.      10:54:02

8 (Pages 831 to 834)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 835

Hesse

1
2        Did you ever advise any youth that
3    they should not listen to Officer Lamm's
4    lawful directives?
5        A.    No.                      10:54:13
6        Q.    Now please read 60 and 61 and tell
7    me when you are done?
8        A.    Okay.
9        Q.    Now, 60 is referring to an
10   incident, if I am correct, involving a file    10:55:14
11   cabinet being thrown in by one or both of the
12   Bosetti's into the bay?
13       A.    Right.
14       Q.    And I think you spoke about that
15   the last time, so I am not going to ask you    10:55:27
16   questions about that.
17       61 now if I understand it
18   correctly, tell me if your understanding is
19   differently, that in response to whatever
20   involvement Fiorillo was in this file cabinet  10:55:39
21   incident, you ordered him to spend three
22   consecutive shifts standing motionless beneath
23   a street like at the intersection of Denhoff
24   Walk and Bay Walk.
25       Do you have the same understanding  10:55:53

Page 836

Hesse

1
2    of 61 as I have?
3        MR. CONNOLLY:  Objection.
4        A.    He is trying to relate a couple of
5    different incidents into one.  That one thing   10:56:01
6    had nothing to do with the other.
7        Q.    So when you say that one thing had
8    nothing to do with the other, you are saying
9    that whether Fiorillo spent three shifts
10   standing motionless underneath a light had      10:56:17
11   nothing to do with what occurred with the file
12   cabinet with the Bosetti's?
13       MR. GOODSTADT:  Objection.
14       MR. CONNOLLY:  Objection.
15       A.    That is correct.             10:56:24
16       Q.    Let's stay on 61.  Did you ever
17   order Officer Fiorillo to spend three
18   consecutive shifts standing motionless beneath
19   a street light at the intersection of Denhoff
20   Walk and Bay Walk?                    10:56:35
21       A.    No.
22       Q.    I believe you did tell me at
23   least, I don't know if you told Mr. Goodstadt
24   in response to his questions, that you did
25   require Mr. Fiorillo to spend a number of      10:56:45

Page 837

Hesse

1
2    shifts in a row at the same location at
3    Denhoff Walk and Bay Walk.  Do you recall
4    that?
5        A.    Correct.                   10:56:55
6        Q.    Did that direction, putting
7    Fiorillo on the same shift for more than one
8    night in a row have anything to do with the
9    incident involving the Bosetti's throwing a
10   file cabinet in the water?              10:57:07
11       A.    Nothing.
12       Q.    Did you ever instruct Fiorillo on
13   any occasion that he was forbidden to move
14   from any assigned post during all of the times
15   that he worked on the same shift you worked?   10:57:21
16       A.    No.
17       Q.    Did you ever instruct any officer
18   during the time that you and Fiorillo worked
19   on the same shifts that that officer was not
20   permitted to speak with Fiorillo?            10:57:37
21       A.    No.
22       Q.    Paragraph 62 refers to an
23   instruction by you to Fiorillo to wash the
24   fleet of Ocean Beach Police Department
25   vehicles before the end of his shift.        10:57:51

Page 838

Hesse

1
2        Did you ever instruct Fiorillo to
3    wash the fleet of Ocean Beach Police
4    Department vehicles before the end of his
5    shift?                          10:58:00
6        A.    No.
7        Q.    How many vehicles are there in the
8    fleet of the Ocean Beach Police Department?
9        A.    Then or now?
10       Q.    How about before April 2006;        10:58:09
11   between the 2002 season and the 2005 season?
12       A.    We had two Expeditions, we had two
13   little golf card G.E.M. cars, and I think that
14   was it.
15       Q.    Did you ever instruct any of the    10:58:30
16   plaintiffs to ever wash the cars?
17       A.    I am sure I have over the years,
18   yes.
19       Q.    Have you ever instructed other
20   officers to wash the fleet of the Ocean Beach   10:58:39
21   Police Department?
22       A.    I have done it myself, yes.
23       Q.    And you have done it yourself?
24       A.    Absolutely.
25       MR. NOVIKOFF:  I have no further      10:59:03

9 (Pages 835 to 838)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 839

1          Hesse
2    questions, thank you.
3         MR. CONNOLLY:  I have no
4    questions.
5         MR. BAPTISTE:  Take a moment.    10:59:09
6         THE VIDEOGRAPHER:  The time is 11
7    o'clock.  We are off the record.
8         (Recess taken.)
9    EXAMINATION BY
10   MR. BAPTISTE:                  11:03:46
11        THE VIDEOGRAPHER:  The time is
12   11:06, we are on the record.
13        Q.   Good morning, Mr. Hesse, I just
14   have a few questions.
15        A.   Good morning.         11:05:19
16        Q.   I believe earlier you testified
17   that -- actually do you know who Allison
18   Sanchez is?
19        A.   Yes.
20        Q.   Who do you know her to be?    11:05:29
21        A.   She was an employee of Suffolk
22   County Civil Service and I believe she was the
23   account manager for Ocean Beach, the
24   incorporated village of.
25        Q.   Could you describe any        11:05:45

Page 840

1          Hesse
2    relationship that you had with Ms. Sanchez?
3         MR. CONNOLLY:  Objection.
4         A.   It was strictly professional.
5         MR. GOODSTADT:  We have an     11:05:55
6    agreement, just one objection --
7         MR. NOVIKOFF:  Yes, one objection
8    is for all.
9         Q.   During the time of covering this
10   complaint have you ever met with Ms. Sanchez   11:06:07
11   in a personal capacity?
12        A.   Well, I went to drop off some
13   paperwork to her once and we went to lunch.
14   But I would consider that a professional
15   meeting.                  11:06:22
16        Q.   When you say you went to lunch,
17   you went to lunch in Suffolk County?
18        A.   Yes.
19        Q.   In Hauppauge?
20        A.   Yes.                 11:06:28
21        Q.   Do you remember -- withdrawn.
22        Do you recall what was discussed
23   if anything during that lunch?
24        A.   Not really.  It was just a lot of
25   small talk.  Nothing about the job itself.    11:06:42

Page 841

1          Hesse
2         Q.   Previously you testified that you
3    dropped off paperwork.  Do you recall what
4    documents if any you did deliver?
5         A.   I believe -- I don't remember the   11:06:53
6    name of the document, but there were documents
7    that had to be filled out when a police
8    officer has passed his qualifying exams, the
9    four exams.  It has to be signed off on by
10   Civil Service so I can send to it the registry   11:07:09
11   of New York State.
12        Q.   At any time covered in this
13   complaint were you ever involved romantically
14   with Ms. Sanchez?
15        A.   Never.                 11:07:24
16        Q.   How about outside the time of this
17   complaint?
18        A.   No.
19        MR. BAPTISTE:  No further
20   questions.                  11:07:32
21        MR. CONNOLLY:  I have no
22   questions.
23        MR. GOODSTADT:  I do.
24   EXAMINATION BY
25   MR. GOODSTADT:                 11:07:44

Page 842

1          Hesse
2         MR. CONNOLLY:  You have had ten
3    hours, but that is fine.  Go ahead, and
4    if it becomes an issue I will deal with
5    it.                     11:08:07
6         Q.   Mr. Hesse, I just have some follow
7    up questions regarding some testimony that you
8    have given in response to questions asked by
9    the Ocean Beach defendant's attorney, as well
10   as the County's attorney.           11:08:19
11        You testified about your blogging
12   after April 2nd, do you recall your testimony
13   last time?
14        MR. CONNOLLY:  Objection.
15        A.   Just the fact that I made some     11:08:28
16   entries, yes.
17        Q.   You testified that you had not
18   spoken with any trustee about your blog; is
19   that correct?
20        MR. NOVIKOFF:  Objection.        11:08:38
21        MR. CONNOLLY:  Objection.  I don't
22   recall there being any question in that
23   regard, although admittedly there have
24   been thousands of questions.
25        A.   Yes.  I believe I was asked did I   11:08:51

Page 843

1           Hesse
2  discuss my blog entries with any trustee, no.
3       Q.   Sitting here today did you ever
4  discuss or have you spoken with any trustees
5  for the Village of Ocean Beach anything about  11:09:02
6  your blog entries?
7       A.   No.
8       Q.   Have you ever discussed or spoken
9  with any member of the board of trustees of
10 the Village of Ocean Beach just the fact that  11:09:12
11 you have blogged?
12      A.   No.
13      Q.   At the time that you blogged after
14 April 2, 2006 you were the top officer
15 actively working for the Village of Ocean      11:09:24
16 Beach; is that correct?
17      A.   Yes.
18      Q.   At that point in time you had the
19 authority to hire and fire?
20      A.   Yes.          11:09:33
21      Q.   At that point in time you had the
22 authority to make and administer policy with
23 respect to the Police Department?
24      A.   Yes.
25      MR. NOVIKOFF:  Note my objection   11:09:40

Page 844

1           Hesse
2  to that question.
3       Q.   Have you ever spoken with or
4  discussed your blog entries with Allison
5  Sanchez?              11:09:50
6       A.   No.
7       Q.   Has Ms. Sanchez ever spoken with
8  you or discussed with you any blog entries
9  that she made?
10      A.   No.          11:09:57
11      Q.   Do you know whether Allison
12 Sanchez has ever entered any post on the
13 blogs?
14      MR. CONNOLLY:  Does he know
15 personally --          11:10:05
16      Q.   I am asking if he knows, not
17 necessarily actually witness her type it in,
18 but has anyone ever told you?
19      A.   I found out today that apparently
20 she may have made some blog entries.     11:10:16
21      Q.   So prior to today you didn't know
22 that?
23      A.   No.
24      Q.   And I don't want to impede upon
25 the attorney/client privilege, but did you   11:10:24

Page 845

1           Hesse
2  hear that from anybody other than for perhaps
3  your attorney or an attorney that represents
4  you?
5       A.   No.          11:10:33
6       MR. NOVIKOFF:  Just so the record
7  is clear, I believe we can stipulate that
8  within the last week we all have been
9  served by the Suffolk County supplemental
10 response to your interrogatory requests   11:10:47
11 concerning whether or not Ms. Sanchez
12 posted any blogs, and in fact she did
13 identify some blog entries.  Just so to
14 put this question into context of what we
15 received.              11:11:03
16      MR. GOODSTADT:  Right, I just
17 wanted to know if he had a conversation
18 with her --
19      MR. NOVIKOFF:  No, legitimate, I
20 understand that.          11:11:08
21      Q.   I want to go back to some
22 questions that Mr. Novikoff asked you about
23 the Halloween incident?
24      A.   Uh-hum.
25      Q.   Do you recall testifying in    11:11:19

Page 846

1           Hesse
2  response to Mr. Novikoff's questions about
3  Halloween?
4       A.   Yes.
5       Q.   And he went through a series of   11:11:26
6  the eyewitness statements that were taken in
7  connection with the Halloween incident, do you
8  recall that?
9       A.   Yes.
10      Q.   Then he went through select    11:11:32
11 portions of some eyewitness statements and had
12 asked you whether you knew if this person,
13 meaning the eyewitnesss, had actually
14 witnessed the part in which Mr. Bosetti used a
15 pool cue to strike someone, do you recall   11:11:49
16 that.
17      MR. CONNOLLY:  Objection to the
18 form.
19      A.   Yes.
20      Q.   Do you recall testifying that in   11:11:53
21 fact the witnesses that Mr. Novikoff asked you
22 about, that you were not sure whether they
23 witnessed the point -- the time period where
24 Mr. Bosetti used the pool cue, do you recall
25 that?              11:12:10

11 (Pages 843 to 846)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 847

Hesse

1
2       MR. CONNOLLY: Objection.
3       MR. NOVIKOFF: Objection.
4    A.   Repeat that question.
5    Q.   Yes.                    11:12:16
6       Mr. Novikoff walked you through
7    certain witness statements, do you recall
8    that?
9    A.   Yes.
10    Q.   And there were the witness      11:12:23
11    statements that Mr. Novikoff walked you
12    through that did not contain any allegation
13    of, or contain any statement with respect to
14    Mr. Bosetti using a pool cue.  Do you recall
15    that?                          11:12:34
16    A.   Right.
17    Q.   Then he had asked you whether the
18    individuals that he walked you through,
19    whether they in fact told you that they even
20    eyewitnessed the incident in which Mr. Bosetti  11:12:42
21    used the pool cue, do you recall that?
22    A.   Yes.
23    Q.   In fact he even asked you if they
24    had not witnessed it and they said something
25    about it, and wrote something about it or gave  11:12:50

Page 848

Hesse

1
2    you the statement, that in fact it would be
3    perjurious, correct, do you recall that?
4       MR. CONNOLLY: Objection.
5    A.   Yes.                    11:12:57
6    Q.   And you said yes, it would be
7    perjurious?
8    A.   Yes.
9    Q.   Let me ask you, in the five days
10    that you took to reach a conclusion about what  11:13:01
11    happened at Halloween, did you speak to
12    anybody who witnessed the incident in which
13    Mr. Bosetti used a pool cue to strike
14    somebody?
15       MR. NOVIKOFF: Note my objection.  11:13:15
16       MR. CONNOLLY: Objection.
17    A.   I believe no.
18    Q.   And yet you still reached a
19    conclusion that Mr. Bosetti acted with
20    appropriate force; is that correct?      11:13:23
21    A.   Correct.
22    Q.   And yet the only statement that
23    you had in writing, verbally or otherwise
24    about the use of a pool cue was the statements
25    that the on-duty officers took; correct?    11:13:37

Page 849

Hesse

1
2    A.   No.
3    Q.   Well what other statements did you
4    have with respect to a pool cue by the time
5    you made your conclusions within five days of  11:13:43
6    investigating the incident?
7       MR. CONNOLLY: Objection.
8    A.   Well, the dates -- I understand
9    what you are saying, but Gary Bosetti himself
10    admitted to using a pool cue.            11:13:55
11    Q.   But sir you testified that you
12    didn't speak to Gary Bosetti during that five
13    day period?
14    A.   Correct.
15    Q.   So my question is during that five  11:14:00
16    day period the only witness statement that you
17    had from anybody with respect to the use of a
18    pool cue was from the statements that the
19    on-duty officers took that evening; is that
20    correct?                        11:14:15
21    A.   Correct.
22    Q.   And yet you still concluded that
23    Mr. Bosetti used proper force; correct?
24    A.   Correct.
25    Q.   Is it possible that all the other  11:14:24

Page 850

Hesse

1
2    statements that you got from all the other
3    eyewitnesses are correct, and yet Mr. Bosetti
4    still used excessive force with a pool cue?
5       MR. NOVIKOFF: Objection.      11:14:37
6       MR. CONNOLLY: Objection.
7    A.   I don't believe he used excessive
8    force.
9    Q.   I understand what your conclusion
10    is.  I understand what your conclusion is that  11:14:46
11    you don't believe that he used excessive
12    force.  My question to you is on the day that
13    you reached the conclusion five days after you
14    started the investigation, is it possible that
15    all the eyewitness statements that you      11:14:59
16    received from all the people who didn't
17    mention anything about a pool cue, is it
18    possible that even if that -- those statements
19    were correct and accurate, that Mr. Bosetti
20    still could have used excessive force with the  11:15:11
21    pool cue?
22       MR. NOVIKOFF: Objection to the
23       form because the eyewitness statements I
24       presume you are including are those of
25       the alleged victims.        11:15:23

12 (Pages 847 to 850)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 851

1           Hesse
2     Q.   Yes.
3     A.   Yes.  They mentioned the pool cue.
4  I never doubted that a pool cue was used.
5     Q.   I understand that.  But how did   11:15:29
6  you reach the conclusion that Mr. Bosetti had
7  not used excessive force within the five days
8  of starting the investigation when the only
9  statement that you had about the use of a pool
10 cue came from the victims of the -- who were   11:15:44
11 struck by the pool cue in which they were
12 alleging excessive force?
13        MR. NOVIKOFF:  Objection.
14        MR. CONNOLLY:  Objection.
15     A.   Well there was three of them, and   11:15:52
16 the way I felt they were attacking the police
17 officer at that point.  So I do not believe it
18 to be excessive.
19     Q.   Is is possible that a police
20 officer could be attacked by a civilian and   11:16:03
21 the police officer still use excessive force?
22        MR. CONNOLLY:  Objection.
23        MR. NOVIKOFF:  Objection.  Maybe
24     if they were midgets.
25     A.   You are speculating about   11:16:14

Page 852

1           Hesse
2  something that may or may not happen somewhere
3  in the world, I don't know, yes.
4        MR. CONNOLLY:  So the answer to
5     counsel's question regarding   11:16:25
6     possibilities, is it possible.
7     A.   Yes, why not.
8     Q.   And is it possible that Gary
9  Bosetti used excessive force, even taking all
10 the witness statements as true, at that point   11:16:31
11 in time is it possible in your mind that Gary
12 Bosetti used excessive force with that pool
13 cue?
14        MR. CONNOLLY:  Objection.
15        MR. NOVIKOFF:  Objection.   11:16:39
16     A.   That was the point of the
17 investigation, to get to the bottom of that.
18     Q.   And yet you didn't speak to a
19 single person and you didn't take a single
20 statement from anybody who actually witnessed   11:16:47
21 Mr. Bosetti use the pool cue; is that correct?
22        MR. NOVIKOFF:  Objection.
23        MR. CONNOLLY:  Objection.
24     A.   Their statements are their
25 statements.   11:16:54

Page 853

1           Hesse
2     Q.   That is not the question.  The
3  question was at the time that you reached your
4  conclusion you had not taken a single
5  statement from a witness who told you that   11:17:00
6  they actually witnessed Mr. Bosetti use the
7  pool cue?
8        MR. NOVIKOFF:  Objection.
9        MR. CONNOLLY:  Objection.
10     A.   I didn't have to take statements,   11:17:07
11 there were three of them there.
12        MR. CONNOLLY:  Simple yes or no
13     though.
14     A.   I did not, no.
15     Q.   Do you know whether Mr. Cherry   11:17:14
16 took any statements from any individual who
17 witnessed Mr. Bosetti use the pool cue?
18     A.   No.
19     Q.   You don't know or he didn't?
20     A.   I believe it is no.   11:17:23
21        MR. CONNOLLY:  Why don't you break
22 down the question.
23     Q.   Did Mr. Cherry --
24        MR. CONNOLLY:  And by the way I
25 believe he has been asked this.   11:17:34

Page 854

1           Hesse
2     Q.   Did Mr. Cherry take any statements
3  from any eyewitness who actually saw Gary
4  Bosetti use a pool cue to strike somebody?
5        MR. NOVIKOFF:  Objection.   11:17:43
6        MR. CONNOLLY:  Objection.
7     A.   No.
8     Q.   I believe you testified that you
9  heard some rumors that the plaintiffs thought
10 that there was a cover-up.  Do you recall   11:18:12
11 testifying to that?
12     A.   Yes.
13     Q.   What rumors did you hear?
14     A.   That there was a cover-up.
15     Q.   Who did you hear the rumors from?   11:18:21
16     A.   I don't recall.
17     Q.   When did you hear the rumors?
18     A.   I don't recall that either.
19     Q.   Do you recall what year it was?
20     A.   It was probably in 2004.   11:18:29
21     Q.   Do you recall what the rumors
22 were?
23        MR. CONNOLLY:  Objection.
24     A.   Not specifically, no.
25     Q.   How about generally?   11:18:38

13 (Pages 851 to 854)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 855

Hesse

1
2      A.   Generally that we were covering up
3  to save Gary Bosetti.
4      Q.   And do you recall any of the
5  plaintiffs in which you heard the rumor that   11:18:51
6  were -- strike that.
7          As part of these rumors do you
8  recall any of the plaintiffs who were alleging
9  that you were covering up the Halloween
10  incident to save Gary Bosetti?          11:19:09
11          MR. NOVIKOFF:  Objection.
12          MR. CONNOLLY:  Objection.
13      A.   You are going to have to rephrase
14  that or something.
15      Q.   Which plaintiffs were the ones   11:19:16
16  that you heard rumors about that were alleging
17  there to be a cover-up?
18          MR. CONNOLLY:  Objection.
19          MR. NOVIKOFF:  Objection.
20          MR. CONNOLLY:  There has not been  11:19:27
21  any testimony in that regard.
22          MR. GOODSTADT:  I think I led off
23  the question by saying rumors --
24          MR. CONNOLLY:  I think you made a
25  generalization that there were rumors, I   11:19:35

Page 856

Hesse

1
2  don't think you specifically said --
3      Q.   Did you hear a rumor that the
4  plaintiffs were claiming that there was an
5  allegation of cover-up?          11:19:42
6      A.   I heard rumors, yes.  I don't
7  recall specifically coming from them, but you
8  know I could speculate and say yes, but I
9  don't know.
10      Q.   I am not saying that you actually  11:19:53
11  heard the rumors from them.  I am talking
12  about whether you heard rumors that it was the
13  plaintiffs who were the ones that were stating
14  that there was a cover-up?
15      A.   I believe so.          11:20:03
16      Q.   Which plaintiffs?
17      A.   I don't know.
18      Q.   Do you recall any of the
19  plaintiffs that you heard were claiming that
20  there was a cover-up to save Gary Bosetti?   11:20:10
21      A.   I believe I did state in one of
22  the other three days that I was here that
23  Kevin Lamm had mentioned something about
24  sweeping this under the carpet, or another
25  situation of sweeping this under the carpet.   11:20:21

Page 857

Hesse

1
2  And what he meant by that I don't know.
3      Q.   But that is something that he said
4  to you directly; correct?
5      A.   You know, yes.          11:20:28
6      Q.   I am talking now about the rumors,
7  I am not talking about someone made the
8  allegation to you directly.  You testified to
9  rumors.  I want to know what rumors you are
10  referring to?          11:20:36
11          MR. NOVIKOFF:  Objection.
12          MR. CONNOLLY:  Objection.
13      A.   They were just rumors just like
14  any other rumor, how do they get around.  Word
15  of mouth.  I don't know.          11:20:43
16      Q.   Who did you hear the rumors from?
17      A.   I don't recall.
18          MR. CONNOLLY:  Objection.  He
19  indicated he doesn't know.
20      Q.   Did you respond to the rumors?   11:20:50
21      A.   Not that I recall.
22      Q.   Did you ever speak with any of the
23  plaintiffs about these rumors?
24      A.   Not specifically, no.
25      Q.   Did you ever speak with -- strike  11:20:59

Page 858

Hesse

1
2  that.
3          Did you ever speak to them
4  generally about the fact that there was an
5  allegation of a cover-up, other than for the   11:21:04
6  conversation you had with Lamm about sweeping
7  under the rug?
8          MR. NOVIKOFF:  Objection.
9      A.   No.
10      Q.   How come; why didn't you address   11:21:12
11  it with them when you heard these rumors?
12          MR. CONNOLLY:  Objection.
13          MR. NOVIKOFF:  Objection.
14      A.   Well because I heard the rumors I
15  did speak to them individually, but not about  11:21:21
16  the rumors.  Like I stated I think the last
17  time I was here that I sat down with each one
18  of them with the actual file for the whole
19  Halloween incident and I said read it, you
20  tell me what you see here.          11:21:35
21          Kevin Lamm like I said refused to
22  read it.  Fiorillo read through it and he
23  thought it was good at the time.  And Snyder
24  said that wow, I didn't know that, I didn't
25  know that, I didn't know that.  And he read   11:21:50

Page 859

Hesse

1
2  through it and he thought it was good.
3     MR. GOODSTADT: I think we have an
4  agreement that I don't have to move to
5  strike at this time?            11:21:59
6     MR. NOVIKOFF: No, not at all.
7     Q.  I will re-ask the question.
8         The question is why didn't you
9  raise the rumors that you heard with the
10 plaintiffs?              11:22:06
11    A.  I didn't see there was a point.
12    Q.  Did you ever speak with Gary
13 Bosetti about the rumors?
14    A.  Not specifically, no.
15    Q.  How about generally did you ever   11:22:15
16 speak with him about the rumors?
17    A.  I think there was some complaints
18 on his behalf that he felt that, you know,
19 that these guys were bad mouthing him saying
20 that there were cover-ups.  And I did tell   11:22:29
21 Gary that, you know, I didn't believe his
22 allegation that they were trying to hurt him
23 or anything else.  I just investigated what I
24 had.  Took what I had.  Presented it to the DA
25 and that was it.              11:22:42

Page 860

Hesse

1
2     Q.  So Gary Bosetti made an allegation
3  that he thought that the plaintiffs were
4  trying to hurt him?
5     A.  Yes.                11:22:49
6     Q.  Did you ever speak to Richie
7  Bosetti about the allegations of a cover-up or
8  the rumors of a cover-up?
9     A.  No.
10    MR. NOVIKOFF: Objection.   11:23:01
11    Q.  When did Gary Bosetti claim to you
12 or complain to you that the plaintiffs were
13 trying to hurt him?
14    A.  Specifically I don't remember.
15    Q.  Do you recall what year it was?   11:23:16
16    A.  It was probably at the end of 2004
17 at some point.
18    Q.  Did you ever discuss the rumors of
19 a cover-up after you heard them with anybody?
20    A.  I had spoken to Chief Paradiso   11:23:30
21 about the whole incident.
22    Q.  Tell me when was that?
23    A.  Specifically I don't have a date,
24 but it was right after I guess these rumors
25 had begun that I sat him down and had a little  11:23:50

Page 861

Hesse

1
2  chat with him about it.
3     Q.  Tell me what you recall being
4  stated during that chat?
5     A.  I told him what I guess both sides  11:24:01
6  were feeling, Gary and Richie, and then three
7  of the plaintiffs, Fiorillo, Lamm and Snyder
8  specifically.  And I thought it would be a
9  good idea that we get the group together and
10 we hash it out.  He refused to do so, he chose  11:24:16
11 not to do it.
12    Q.  The chief chose not to do it?
13    A.  Correct.
14    Q.  Did he tell you why?
15    A.  No.            11:24:25
16    Q.  You testified about the District
17 Attorney's involvement in the Halloween
18 incident, do you recall that?
19    A.  Yes.
20    Q.  You testified that Mallory   11:24:38
21 Sullivan reviewed it, do you recall that?
22    A.  Yes.
23    Q.  Did anyone in the DA's office
24 conduct an independent investigation to your
25 knowledge?              11:24:54

Page 862

Hesse

1
2     MR. NOVIKOFF: Objection.
3     MR. CONNOLLY: Objection.
4     A.  To my knowledge no.  I don't know.
5     Q.  And Mallory Sullivan is an   11:24:56
6  attorney in the DA's office?
7     A.  Yes, she was a prosecutor.
8     Q.  Do you know whether any of the
9  DA's investigators were involved in the
10 Halloween incident?          11:25:07
11    A.  Not that I am aware of.
12    Q.  Did you ever speak with any DA
13 investigator with respect to the Halloween
14 incident?
15    A.  I did not.            11:25:13
16    Q.  Did you ever speak with any of the
17 DA's investigators with respect to your
18 investigation of the Halloween incident?
19    A.  I did not.
20    Q.  Then you testified that Van Koot   11:25:25
21 and Schalik's attorneys received discovery, do
22 you recall that?
23    MR. NOVIKOFF: Objection.
24    A.  Yes.
25    Q.  What did they receive?      11:25:35

Page 863

**Hesse**

1
2      MR. CONNOLLY: Objection.
3      A.  I wouldn't know. I think the
4  court would have responded to that.
5      **Q.  So you don't know?**          **11:25:44**
6      A.  I don't know.
7      **Q.  How do you know that they actually**
8  **received discovery?**
9      A.  I think we had a discovery demand,
10 but specifically I don't know.          11:25:53
11     **Q.  You were involved with responding**
12 **to the demand?**
13     A.  You know I don't recall.
14     **Q.  Then you testified that you were**
15 **upset that Fiorillo and Lamm went to Judge**     **11:26:13**
16 **Russell with respect to the station house bail**
17 **issue, do you recall that?**
18     A.  Yes.
19     **Q.  Why were you upset that they went**
20 **to Judge Russell?**          **11:26:23**
21     A.  They went outside the confines of
22 the Police Department to get information about
23 Police Department procedures.
24     **Q.  So outside of the chain of**
25 **command?**          **11:26:32**

Page 864

**Hesse**

1
2      A.  Absolutely.
3      **Q.  Do you recall when that incident**
4  **was?**
5      A.  Specifically no.          11:26:34
6      **Q.  Do you recall what year it was?**
7      A.  May have been 2005.
8      **Q.  Do you recall when in 2005?**
9      A.  No.
10     **Q.  Did you discipline them for going**  **11:26:48**
11 **outside the chain of command?**
12     A.  I talked to them.
13     MR. CONNOLLY: Objection.
14     **Q.  Did you memorialize your talk with**
15 **them or any other discipline?**          **11:26:58**
16     A.  No.
17     **Q.  You testified that they had done**
18 **it again after you spoke with them; is that**
19 **correct?**
20     A.  Yes.          11:27:05
21     **Q.  Did you discipline them for doing**
22 **that?**
23     MR. CONNOLLY: Objection.
24     A.  I counseled them, I had a talk
25 with them.          11:27:10

Page 865

Hesse

1
2      **Q.  Did you write them up at all?**
3      A.  No.
4      **Q.  Did you tell anybody else that**
5  **they had violated your instruction with**     **11:27:14**
6  **respect to the station house bail?**
7      A.  I don't recall if I did.
8      **Q.  Do you recall what year it was**
9  **that they allegedly disobeyed your order?**
10     MR. CONNOLLY: Objection.          11:27:26
11     A.  I believe it was in a short
12 timeframe, so it would have been close to when
13 they did it the first time.
14     **Q.  2005?**
15     A.  Yes.          11:27:34
16     **Q.  Was that during the season or**
17 **off-season?**
18     A.  It would be during the season.
19     **Q.  Did you ever speak with Judge**
20 **Russell about the station house bail issue?**     **11:27:42**
21     A.  I don't believe so.
22     **Q.  Did you ever speak with any member**
23 **of the board of trustees about the station**
24 **house bail issue?**
25     A.  No.          11:27:52

Page 866

Hesse

1
2      **Q.  Did you ever speak with the mayor**
3  **about the station house bail issue?**
4      A.  No.
5      **Q.  The mayor at the time was**          **11:27:56**
6  **Ms. Rogers?**
7      A.  Yes.
8      **Q.  You testified last time in**
9  **response to Mr. Novikoff's questions about**
10 **instructing officers to drive other off-duty**     **11:28:12**
11 **officers at the end of their shift, do you**
12 **recall that?**
13     A.  Yes.
14     **Q.  Did you ever instruct any officers**
15 **to drive off-duty officers out to the**          **11:28:23**
16 **checkpoint when it was not the end of their**
17 **shift?**
18     MR. NOVIKOFF: Objection, form,
19     and I think we actually covered this
20     through your -- in your original direct   11:28:33
21     examination.
22     MR. GOODSTADT: Right, but I was
23     not sure what his response meant to your
24     question about yes, I instructed them to
25     do it at the end of their shift.     11:28:45

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 867

1          Hesse
2        MR. NOVIKOFF:  What is confusing
3    about that response?
4      Q.   Was it as their shift ended or was
5    it at some point later than that in which you   11:28:53
6    instructed the officers to drive the off-duty
7    officers to the checkpoint?
8        MR. NOVIKOFF:  Objection.
9        MR. CONNOLLY:  A point later
10   meaning --                  11:29:06
11       MR. GOODSTADT:  A couple of hours
12   later.
13       MR. CONNOLLY:  When they were off
14   duty?
15       MR. GOODSTADT:  Yes.        11:29:13
16       MR. CONNOLLY:  So instructing
17   off-duty officers --
18       MR. GOODSTADT:  Instructing
19   on-duty officers to drive off-duty
20   officers to the checkpoint.       11:29:17
21       MR. CONNOLLY:  Meaning making
22   reference to several hours later after
23   the officers who were driven got off the
24   shift?
25       MR. GOODSTADT:  The off-duty       11:29:26

Page 868

1          Hesse
2    officers, yes, several hours after their
3    becoming off duty.
4        MR. CONNOLLY:  I understand the
5    question now.                11:29:34
6      Q.   Because the testimony that I read
7    and I understood from last time was that
8    Mr. Hesse had instructed on-duty officers to
9    drive off-duty officers to the checkpoint at
10   the end of their shift, do you recall that?   11:29:47
11     A.   Yes.
12     Q.   Did you ever instruct on-duty
13   officers to drive off-duty officers to the
14   checkpoint when it was not at the end of the
15   off-duty officer's shift?        11:29:56
16     A.   Sometimes, yes.
17     Q.   Was it -- did you ever instruct
18   any on-duty officers to drive off-duty
19   officers to the checkpoint after they got out
20   of the bars in Ocean Beach?        11:30:08
21       MR. NOVIKOFF:  Objection to the
22   form.
23       MR. CONNOLLY:  Objection.
24     A.   I may have.
25     Q.   Did any of the plaintiffs ever     11:30:13

Page 869

1          Hesse
2    complain to you about doing that?
3      A.   Never.
4      Q.   Do you believe it was appropriate
5    for the on-duty officers to drive off-duty   11:30:21
6    officers to the checkpoint after they got out
7    of the bars?
8        MR. NOVIKOFF:  Objection.
9        MR. CONNOLLY:  Objection.
10     A.   Yes.                11:30:28
11     Q.   How many officers were on duty
12   generally on the weekends between 2 in the
13   morning and 6 in the morning?
14       MR. CONNOLLY:  What years?
15     Q.   Between 2003 and 2005; the seasons  11:30:48
16   of '03 to '05?
17     A.   They would not change much between
18   the years.  There could be -- well, between 2
19   and 4 normally there would be close to eight
20   officers, and usually minimum staffing we     11:31:02
21   would have four to five officers between those
22   time frames.
23     Q.   How about between 4 and 6 in the
24   morning?
25     A.   4 and 6 in the morning, usually a  11:31:17

Page 870

1          Hesse
2    tour would end at 4 o'clock and two or three
3    officers would go off duty.  And then from the
4    midnight to 8 shift there would generally be
5    three, sometimes four officers on duty.      11:31:28
6      Q.   I believe you testified that you
7    had learned that they intended to make you
8    acting chief or acting deputy chief in late
9    December of 2005, do you recall that?
10     A.   Yes, I believe so.        11:31:57
11     Q.   How did you learn of the board of
12   trustees intent?
13     A.   I believe Joe Loeffler came to
14   talk to me about it.
15     Q.   Do you recall what he stated?     11:32:07
16     A.   Specifically, no.
17     Q.   Do you recall generally what he
18   stated?
19     A.   He believed that because of the
20   absence of Ed Paradiso as the chief that the  11:32:15
21   Police Department needs to move forward and it
22   has to be somebody that can make the decisions
23   for the Police Department, so therefore they
24   were going to promote me to this deputy chief.
25     Q.   At that point in time do you know  11:32:30

17  (Pages 867 to 870)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Hesse

1
2  whether Mr. Loeffler had known that you had
3  not passed your sergeant's test?
4          MR. CONNOLLY: Objection.
5     A.   Yes.                    11:32:38
6     Q.   He knew that?
7     A.   Yes.
8     Q.   Did you speak to him about that at
9  that time?
10    A.   I don't remember specifically    11:32:43
11 about that time, but I have spoken to him
12 about it.
13    Q.   How about prior to the decision by
14 the board of trustees to promote you to deputy
15 chief or acting deputy chief, had you spoken   11:32:52
16 with Mr. Loeffler or anybody else on the board
17 of trustees about the fact that you had not
18 passed the sergeant's exam?
19         MR. CONNOLLY: Objection.
20    A.   I may have talked to Joe Loeffler   11:33:02
21 about it previous.  I don't know about anybody
22 else on the board.
23    Q.   Do you recall the sum and
24 substance of any of those conversations?
25    A.   No, not specifically.  No.    11:33:12

1              Hesse
2     Q.   How about generally?
3     A.   No, not really.
4     Q.   And you are sure that was late
5  December that you learned of the board's    11:33:24
6  intent to promote you that next January?
7          MR. CONNOLLY: Objection.
8     A.   I believe so.
9     Q.   You testified about I think you
10 called it Officer Fiorillo's or Officer Lamm's   11:33:39
11 discretion in writing summonses, do you recall
12 that?
13    A.   Uh-hum.
14    Q.   And you mentioned something about,
15 I think your quote was silly laws regarding   11:33:49
16 bike riding in the village, do you recall
17 that?
18    A.   Yes.
19    Q.   Did you ever petition the board to
20 change the law with respect to bike riding?    11:33:57
21    A.   Actually I never petitioned it,
22 but they have changed the laws a little bit
23 here and there.  They augmented them.
24    Q.   When did they change the laws with
25 respect to bike riding?            11:34:06

1              Hesse
2     A.   Specifically I don't remember the
3  year, but we used to go through the whole
4  summer with absolutely no bike riding any time
5  day or night.  Now they changed it to where   11:34:15
6  you can ride between certain times and certain
7  days.
8     Q.   Do you recall when they made that
9  change?
10    A.   Not specifically, no.        11:34:23
11    Q.   Was it before or after the
12 plaintiffs were terminated?
13         MR. CONNOLLY: Objection.
14    A.   I believe it was before.
15         MR. NOVIKOFF:  Same agreement on   11:34:32
16 use of the word?
17         MR. GOODSTADT:  Yes.
18         MR. NOVIKOFF:  Got it.
19    Q.   I believe you testified last time
20 about Kevin Lamm conducting an illegal search   11:34:46
21 and seizure, do you recall that?
22         MR. CONNOLLY:  Objection.  Last
23 time when --
24    Q.   In response to Mr. Novikoff's
25 questions?                11:35:01

1              Hesse
2     A.   Specifically no, I don't recall.
3     Q.   Do you recall Kevin Lamm ever
4  conducting an illegal search and seizure?
5     A.   Yes.  Are we talking about when he   11:35:11
6  put some guys in handcuffs or are we talking
7  about when he went into CJ's; you got to give
8  me a little more specific.
9     Q.   Well I am asking do you believe
10 that Mr. Lamm ever conducted an illegal search   11:35:24
11 and seizure?
12    A.   Yes.
13    Q.   How many times?
14    A.   I don't know.  A couple of
15 incidents off the top of my head, maybe three   11:35:29
16 or four times that I know of.
17    Q.   Did you ever discipline him for
18 doing that?
19    A.   Yes.
20    Q.   How did you discipline him?        11:35:38
21    A.   Verbally.
22    Q.   Did you ever do anything in
23 writing?
24    A.   No.
25    Q.   How many times did you discipline   11:35:42

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 875

| | |
|---|---|
| 1 | **Hesse** |
| 2 | him verbally? |
| 3 | A.   Off the top of my head maybe |
| 4 | twice. |
| 5 | **Q.   What was his response?**   11:35:49 |
| 6 | A.   He said he will never do it again. |
| 7 | **Q.   Did you ever investigate whether** |
| 8 | **he actually committed an illegal search and** |
| 9 | **seizure?** |
| 10 | MR. NOVIKOFF:  Objection.   11:36:05 |
| 11 | A.   One of them the complaint was |
| 12 | actually made by Tommy Snyder verbally to me, |
| 13 | and the other one I witnessed myself. |
| 14 | **Q.   How come you never wrote him up** |
| 15 | **for the illegal search and seizure?**   11:36:19 |
| 16 | MR. NOVIKOFF:  Objection. |
| 17 | A.   He was counseled verbally.  I |
| 18 | didn't need to put it in writing. |
| 19 | **Q.   Why not?** |
| 20 | MR. CONNOLLY:  Objection.   11:36:30 |
| 21 | A.   I didn't believe I had to. |
| 22 | **Q.   Did you ever tell Chief Paradiso** |
| 23 | **that Kevin Lamm performed an illegal search** |
| 24 | **and seizure?** |
| 25 | A.   I don't specifically remember if I 11:36:35 |

Page 876

| | |
|---|---|
| 1 | Hesse |
| 2 | did or not. |
| 3 | **Q.   Did any civilian ever complain** |
| 4 | **that Mr. Lamm engaged in an illegal search and** |
| 5 | **seizure?**   11:36:43 |
| 6 | A.   Yes. |
| 7 | **Q.   In writing?** |
| 8 | A.   He chose not to. |
| 9 | **Q.   Who was that?** |
| 10 | A.   His first name was Caleb.  I don't 11:36:46 |
| 11 | know what his last name is. |
| 12 | **Q.   So how did you learn that Caleb** |
| 13 | **was claiming that there was an illegal search** |
| 14 | **and seizure?** |
| 15 | A.   After Tommy Snyder had told me   11:37:00 |
| 16 | what was going on in reference to CJ's Bar, I |
| 17 | believe Caleb came to see me in the days |
| 18 | preceding Tommy telling me.  So I asked him |
| 19 | what happened, and he told me what happened. |
| 20 | **Q.   Is Caleb an owner or an employee**   11:37:17 |
| 21 | **of CJ's?** |
| 22 | A.   He was a bartender for a year or |
| 23 | two. |
| 24 | **Q.   Did you -- strike that.** |
| 25 | **Caleb came to see you about the**   11:37:27 |

Page 877

| | |
|---|---|
| 1 | Hesse |
| 2 | issue? |
| 3 | A.   Yes. |
| 4 | **Q.   At the police station?** |
| 5 | A.   It might have been out front.   11:37:31 |
| 6 | **Q.   Did you make a blotter entry?** |
| 7 | A.   No. |
| 8 | **Q.   How come?** |
| 9 | A.   I asked him if he wanted to put it |
| 10 | in writing and he chose not to.  So he just   11:37:40 |
| 11 | wanted to let me know what was going on. |
| 12 | **Q.   Does a complaint or an allegation** |
| 13 | **have to be in writing to make any -- for you** |
| 14 | **to put in a blotter entry?** |
| 15 | MR. CONNOLLY:  Objection.   11:37:54 |
| 16 | MR. NOVIKOFF:  Objection. |
| 17 | A.   I would prefer, yes. |
| 18 | **Q.   That wasn't the question.  The** |
| 19 | **question was does a complaint or allegation** |
| 20 | **have to be in writing to lead you to the**   11:38:00 |
| 21 | **decision to make a blotter entry?** |
| 22 | A.   Back then we didn't make many |
| 23 | blotter when it came to stuff like that.  We |
| 24 | didn't make blotter entries for complainants |
| 25 | coming in to make a complaint against the   11:38:12 |

Page 878

| | |
|---|---|
| 1 | Hesse |
| 2 | Police Department or a police officer. |
| 3 | **Q.   Have you ever discussed with** |
| 4 | **Paradiso your allegation that Mr. Lamm engaged** |
| 5 | **in an unlawful search or seizure?**   11:38:21 |
| 6 | MR. NOVIKOFF:  Objection. |
| 7 | MR. CONNOLLY:  Objection. |
| 8 | A.   I don't recall. |
| 9 | **Q.   I think you testified about** |
| 10 | **Mr. Carter allegedly sleeping while on duty,**   11:38:36 |
| 11 | **do you recall that?** |
| 12 | A.   Yes. |
| 13 | **Q.   Did you ever tell Chief Paradiso** |
| 14 | **that Ed Carter was sleeping on data?** |
| 15 | A.   I don't recall if I did or not.   11:38:44 |
| 16 | **Q.   Did you ever anyone on the board** |
| 17 | **of trustees that Ed Carter was sleeping on** |
| 18 | **duty?** |
| 19 | MR. NOVIKOFF:  Objection. |
| 20 | A.   No.   11:38:52 |
| 21 | **Q.   Did you ever write him up for** |
| 22 | **sleeping on duty?** |
| 23 | A.   No. |
| 24 | **Q.   So let me understand.  Mr. Carter** |
| 25 | **was sleeping while he was being paid as a**   11:38:59 |

19 (Pages 875 to 878)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 879

Hesse

1           **Hesse**
2  police officer; is that correct?
3      A.   That is correct.
4      **Q.   Do you consider that stealing time**
5  **from the department or from the village?**   11:39:06
6        MR. CONNOLLY:  Objection.
7      A.   You could look at it that way,
8  yes.
9      **Q.   I am asking whether you looked at**
10  **it that way?**   11:39:13
11      A.   I didn't at the time, no.
12      **Q.   You didn't look at it as he was**
13  **stealing time while he was sleeping?**
14      A.   No.
15      **Q.   Did you view it as he was stealing**   11:39:20
16  **money while being paid for sleeping?**
17        MR. NOVIKOFF:  Objection.  Isn't
18  this beyond --
19        MR. GOODSTADT:  It is an
20  allegation as to why he was terminated.   11:39:34
21        MR. NOVIKOFF:  Putting aside the
22  fact that you had ten hours, and I can't
23  speak for Kevin, but I think this is
24  improper.  Isn't this beyond the scope of
25  any questions that I asked?   11:39:44

Page 880

1           Hesse
2        MR. GOODSTADT:  I don't think so.
3        MR. NOVIKOFF:  If I went into the
4  issue of why he was terminated --
5        MR. GOODSTADT:  Which you did.   11:39:52
6        MR. NOVIKOFF:  Okay, you can ask
7  him about those reasons.
8        MR. GOODSTADT:  I am.
9        MR. NOVIKOFF:  But now you are
10  going into questions about why he didn't   11:39:59
11  report certain things to certain people.
12        MR. GOODSTADT:  I didn't think --
13  I believe the reasons are not true, so I
14  can question him about it.
15        MR. NOVIKOFF:  Okay.   11:40:10
16        MR. GOODSTADT:  Just as I can
17  question him at trial about it if it is
18  raised.  Go back to the last question.
19      (Record read.)
20        MR. CONNOLLY:  Objection.   11:40:41
21      A.   I never looked at it that way, no.
22      **Q.   Just to go back to the DA's**
23  **investigation of the Halloween incident, did**
24  **the DA -- strike that.**
25      **Before we get to the DA's**   11:41:05

Page 881

1           **Hesse**
2  **involvement in Halloween, you also mentioned**
3  **that the judge had to sign off on your**
4  **investigation before the arrests were made; is**
5  **that correct?**   11:41:19
6        MR. CONNOLLY:  Objection.
7      A.   I don't specifically think that
8  the judge has to sign off on an investigation.
9  No, I don't remember saying that.
10      **Q.   Did the judge have to sign off**   11:41:25
11  **before an arrest is made?**
12      A.   No.  I think you are
13  mis-understanding what the judge signed off
14  on.
15      **Q.   What did the judge sign off on?**   11:41:34
16      A.   The criminal summonses to be sent
17  to the alleged defendants.
18      **Q.   And the judge signed off on the**
19  **criminal summonses that were sent to**
20  **Mr. Schalik and Mr. Van Koot?**   11:41:49
21      A.   I believe so.  That is a court
22  document, it is done with the court.
23      **Q.   Was that same process of the court**
24  **signing off on the summons performed in the**
25  **Sam Gilbert matter when he was arrested?**   11:42:01

Page 882

1           **Hesse**
2        MR. CONNOLLY:  Objection.
3      A.   Correct, yes.
4      **Q.   How about the DA's involvement**
5  **that you testified to with respect to the**   11:42:12
6  **Halloween incident, did the DA have a similar**
7  **involvement with respect to the Sam Gilbert**
8  **matter?**
9        MR. CONNOLLY:  Objection.
10      A.   Yes.   11:42:18
11      **Q.   Has the judge ever -- strike that.**
12      **Has the judge in Ocean Beach ever**
13  **refused to sign a criminal summons that you**
14  **brought to the judge to sign?**
15      A.   Not that I am aware of, no, never.   11:42:34
16        MR. CONNOLLY:  Objection.
17      **Q.   I just want to go back again to a**
18  **statement that you made with respect to Mr.**
19  **Fiorillo's investigation of the Halloween**
20  **incident.  I believe in response to one of**   11:42:53
21  **Mr. Novikoff's questions you testified that it**
22  **was a poorly done investigation because he was**
23  **not aggressive enough to go back into the bar**
24  **to get statements, do you recall that?**
25      A.   Not specifically, but yes.   11:43:07

1          Hesse
2     Q.   But you believe that he was not
3  aggressive enough to go back into the bar to
4  get statements?
5     A.   I think that he could have been a   11:43:16
6  little more aggressive at speaking to people,
7  yes.
8     Q.   Do you believe that the on-duty
9  officers that didn't get statements from other
10  people because they were not aggressive        11:43:23
11  enough?
12        MR. CONNOLLY:  Objection.
13     A.  Yes.
14        MR. GOODSTADT:  Would you mark
15  this document, blog posting, Bates        11:43:43
16  numbers P 962 to P 1265, Hesse Exhibit
17  30.
18        (Hesse Exhibit 30, blog posting, P
19     962 to P 1265, marked for
20     identification, as of this date.)        11:44:40
21     Q.   I placed in front of Mr. Hesse
22  what has now been marked as Hesse Exhibit 30,
23  multiple page exhibit bearing Bates number P
24  962 to P 1265.
25        MR. CONNOLLY:  I have 64.        11:45:03

1          Hesse
2        MR. GOODSTADT:  It goes to the
3  back of that page.
4     Q.   Could you turn to page P 970, post
5  number 22.  Are you there?        11:45:29
6     A.  Yes.
7     Q.   Why don't you take a second to
8  read that post?
9        MR. CONNOLLY:  I am objecting to
10  any questioning regarding the postings.   11:45:51
11  You need to explain as to how they were
12  delved into on questioning by the village
13  attorney or the county attorney.  It is
14  beyond the scope of redirect.
15        MR. GOODSTADT:  First of all with   11:46:07
16  respect to this post he has testified in
17  response to questions by the beach's
18  attorney that he believed that the
19  officers didn't go inside to get -- or
20  didn't appropriately go inside to get   11:46:21
21  witness statements because they were not
22  aggressive enough.
23        This post clearly indicates that
24  do you ever wonder why no one would talk
25  to you -- did you ever notice why no one   11:46:36

1          Hesse
2  would talk to you guys during your shitty
3  investigation.  Everyone hates you.
4  Everyone knew that you were a rat.
5        I think that that is exactly in   11:46:46
6  response to, or at least contradicts what
7  he has testified to in response to
8  Mr. Novikoff.
9        MR. NOVIKOFF:  So obviously
10  Mr. Hesse has properly identified that he   11:47:00
11  was the author of the blog presumably
12  based upon the interrogatory.  His
13  testimony is what it is.  His blog says
14  what it says.  I am trying -- I am now
15  trying to figure out the purpose of going   11:47:12
16  through the blog.
17        MR. CONNOLLY:  It is duplicative.
18        MR. GOODSTADT:  It is not
19  duplicative.  It contradicts his
20  testimony.  That is exactly what redirect   11:47:27
21  is for.
22        MR. NOVIKOFF:  Me and Mr. Connolly
23  have different beliefs apparently as to
24  your ten hours and what it was for.  So I
25  can't tell Mr. Hesse not to answer the   11:47:40

1          Hesse
2  question.
3        MR. CONNOLLY:  I think it is --
4        MR. GOODSTADT:  Also another basis
5  is that he testified that in response to   11:47:46
6  his threats that my clients would never
7  get another job in law enforcement, that
8  he never took any steps to prevent them
9  from getting another job in law
10  enforcement, and I think that statements   11:48:01
11  on a blog where a community in law
12  enforcement is reading it is a step.
13        MR. NOVIKOFF:  Well on that note,
14  Andrew, I think it would be, putting
15  aside the ten hours, we get past that   11:48:10
16  issue, I think the question would be
17  appropriate that you would ask him since
18  he has admitted writing certain things on
19  the blog, in sum and substance do you
20  agree with the proposition that writing   11:48:24
21  something on the blog that was not nice
22  to your clients would be harmful to their
23  getting jobs in the future; that is a
24  very general question which would be
25  responsive to that statement.        11:48:34

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

1          Hesse
2      And I think there could be posed
3  other general questions that would be
4  responsive as opposed to going into
5  certain blogs and each and every blog and  11:48:41
6  going through it.  That is my position,
7  but it is Kevin's witness, so...
8      MR. GOODSTADT:  But in that case,
9  and I don't know what the answer to that
10  question --           11:48:55
11      MR. NOVIKOFF:  The answer would be
12  what it is and you would go from there.
13      MR. GOODSTADT:  But assuming he
14  says that posting something negative or
15  calling a police officer a rat and       11:49:02
16  telling them that they did a shitty
17  investigation in a forum in which other
18  people in the police community would be
19  reading it may affect their ability to
20  get another job, and I want to be able to  11:49:15
21  ask which ones he thinks would affect
22  their ability to get another job.
23      MR. CONNOLLY:  I will allow
24  general questions, general questions.  We
25  are not going through the blogs piece by  11:49:41

1          Hesse
2  piece.
3      MR. GOODSTADT:  I don't see why
4  not, I mean the door is open.
5      MR. CONNOLLY:  I disagree with    11:49:41
6  that.  I disagree that -- I still have
7  problems with the fact that you believe
8  the door was opened, I don't think it
9  was.
10      MR. GOODSTADT:  I want to ask    11:49:54
11  questions and see how open the door is.
12      MR. NOVIKOFF:  I don't know if a
13  codefendant asks the question of another
14  party, how that opens the door, presuming
15  that is even appropriate in a deposition,  11:50:10
16  to you asking questions of that witness.
17  I can see if Mr. Connolly asked Mr. Hesse
18  some questions that opened the door, but
19  merely because I asked questions, Hesse
20  is not my witness.          11:50:23
21      I object to the fact that anything
22  beyond ten hours is being used.  I think
23  the Judge Boyle was specific, he asked
24  ten hours.  If Mr. Goodstadt wants to
25  reserve some time to engage in redirect  11:50:35

1          Hesse
2  examination he certainly could have.
3      MR. GOODSTADT:  That is just not
4  true.
5      MR. NOVIKOFF:  I am just      11:50:44
6  objecting.  I can't tell you not to do
7  anything.
8      MR. GOODSTADT:  We had these
9  discussions off the record about the
10  positions on that.  That is not true.    11:50:52
11      MR. NOVIKOFF:  Judge Boyle has
12  issued whatever he has issued in terms of
13  the amount of the deposition.  Mr.
14  Goodstadt has taken those ten hours.  My
15  position is that is all he was entitled  11:51:05
16  to.  But Mr. Hesse is not my witness so I
17  can't, other than killing trees with my
18  speech, I can't do anything about it.
19      So it is between Kevin and Mr.
20  Goodstadt to decide what they want to do  11:51:21
21  with this, and that will be the last that
22  I speak on this issue.
23      MR. GOODSTADT:  Certainly this
24  question about directly contradicting
25  testimony that he has already given, you  11:51:38

1          Hesse
2  can let me ask with respect to that, and
3  then when we get to the other questions
4  we can narrow them down.
5      MR. CONNOLLY:  And it is your    11:51:52
6  position that it contradicts what?
7      MR. GOODSTADT:  His testimony that
8  the reason why he didn't get other
9  statements was because they were not
10  aggressive enough.  Here it says nobody  11:52:30
11  wants to speak to you because everybody
12  hates you.
13      MR. CONNOLLY:  I don't think that
14  was his testimony.  I thought or I
15  believe his testimony was something to   11:52:41
16  the effect that he believes they were not
17  aggressive as they could have been in
18  getting statements.  But I don't see what
19  is contained in the blog as a
20  contradiction to that statement.      11:53:01
21      MR. GOODSTADT:  Because it says do
22  you ever wonder why no one would talk to
23  you guys during your shitty
24  investigation.  The next sentence doesn't
25  say because you were not aggressive    11:53:13

Page 891

Hesse

1     enough, it says everybody hates you.
2     Everyone knew that you were a rat.
3         That is why I think it contradicts
4     it.                    11:53:23
5         MR. CONNOLLY:  I don't think it
6     contradicts it.  If you want to ask him
7     if he ever said something that he thought
8     contradicted their not being possibly
9     aggressive enough in obtaining      11:53:41
10    statements.
11        MR. GOODSTADT:  I am not sure I
12    understand what you are suggesting.
13        MR. CONNOLLY:  You can ask him if
14    he -- I am not seeing the contradiction.  11:53:55
15        MR. GOODSTADT:  I believe it is a
16    contradiction.  Definitely obviously
17    relates to the same issue that was asked.
18    Asked by Mr. Novikoff, it was not asked
19    by me originally.             11:54:21
20        MR. CONNOLLY:  What was the item
21    asked?
22        MR. GOODSTADT:  The question was
23    about his viewpoint on their
24    investigation, and he said they did not   11:54:27

*Note: line numbering above is 1-25 as printed; lines reproduced here.*

Page 892

Hesse

1     do a good investigation, and he thought
2     that Frank Fiorillo was not aggressive
3     enough in obtaining witness statements.
4         Here he is asking did you ever      11:54:36
5     wonder why no one would talk to you guys.
6     It has nothing to do with doing their
7     investigation.  His response isn't
8     because you were not aggressive enough,
9     his response is everyone hates you.      11:54:50
10    Everyone knew that you were a rat.
11        MR. CONNOLLY:  But they are not
12    contradictory and not mutually exclusive.
13    I am not following.
14        MR. GOODSTADT:  I want to know      11:55:01
15    what he meant by that.
16        MR. CONNOLLY:  Well if it is not a
17    contradiction I feel you are not entitled
18    to ask it.
19        MR. GOODSTADT:  Well even if it is  11:55:08
20    not a contradiction, it opens the door.
21        Let's go off the record now.
22        THE VIDEOGRAPHER:  The time is
23    11:36, we are off the record.
24        (Recess taken.)            11:55:22

Page 893

Hesse

1         THE VIDEOGRAPHER:  The time is
2     12:26, we are on the record.
3         Q.   Mr. Hesse, at the last date of
4     deposition you testified in response to one of  12:25:15
5     Mr. Novikoff's questions that you had not done
6     or taken any steps in furtherance of your
7     threat that plaintiffs law enforcement careers
8     would be over, do you recall that testimony?
9         A.   Yes.                 12:25:29
10        Q.   You also I believe testified to
11    and subsequently submitted some derogatory response to
12    interrogatories regarding some blog posts you
13    made, do you recall that?
14        A.   Yes.                 12:25:41
15        Q.   You would agree with me, would you
16    not, that the blog post that you admitted to
17    posting contained some derogatory statements
18    about the plaintiffs in this case?
19        MR. CONNOLLY: Objection.  You can  12:25:55
20    answer.
21        A.   Yes.
22        Q.   Would you agree with me that
23    posting the derogatory statements that you
24    made about the plaintiffs in this case on the  12:26:07

Page 894

Hesse

1     blog given the form that it is in would
2     negatively impact their careers in law
3     enforcement?
4         MR. CONNOLLY: Objection.          12:26:20
5         MR. NOVIKOFF: Objection.
6         A.   No.
7         Q.   Why not?
8         MR. CONNOLLY: Objection.
9         A.   Because to tell you the truth to  12:26:24
10    me this is a fantasy blog.  I have been
11    in law enforcement 16 years, I have never seen
12    this blog until somebody told me somebody
13    wrote something about me.  So why would
14    anybody read this garbage.          12:26:40
15        Q.   Well why would you post it if you
16    didn't intend people to read it?
17        A.   Maybe I was venting some
18    frustration.
19        Q.   Have you ever spoken with anybody  12:26:49
20    outside of Ocean Beach about the blog?
21        A.   No.
22        MR. CONNOLLY: Note my objection.
23        A.   Actually yes, I am sorry.
24        Q.   Who have you spoken with?      12:27:04

23  (Pages 891 to 894)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 895

Hesse

1
2    A.   Somebody from the Fire Island
3  Ferry Company advised me that this blog was
4  there, and that I should read it.
5    Q.   Who from the Fire Island Ferry    12:27:13
6  Company?
7    A.   George Haffele, he was the vice
8  president of the Ferry Company at the time.
9  H-A-F-F-E-L-E, something like that.
10   Q.   Mr. Haffele is the vice president   12:27:29
11 of the Ferry Company.  Is that the ferry that
12 takes the people back and forth to Fire
13 Island?
14   A.   Yes.
15   Q.   Have you spoken to anybody else    12:27:43
16 outside of Fire Island other than Mr. Haffele
17 about the blog?
18   A.   No.
19   Q.   What was your intention in posting
20 the negative statements about the plaintiffs   12:27:55
21 in this matter?
22      MR. NOVIKOFF:  Objection.
23      MR. CONNOLLY:  Objection.
24   A.   Well, these were posts directed at
25 other posts, maybe just to upset them a little   12:28:04

Page 896

Hesse

1
2  bit.
3    Q.   What do you mean by that, by
4  either one, posts directed at other posts,
5  what did you mean by that?           12:28:14
6    A.   Well most of these posts are
7  directed at posts that were previously made.
8    Q.   What did you mean to upset them?
9    A.   The plaintiffs.
10   Q.   Would you agree with me that if    12:28:22
11 another chief or a person of seniority in
12 another police department were to read the
13 negative statements that you made about my
14 clients that it could affect their decision on
15 whether to hire one of my clients?       12:28:42
16      MR. NOVIKOFF:  Objection.
17      MR. CONNOLLY:  Objection.
18   A.   To think of what somebody else
19 might think; I couldn't speculate.
20   Q.   So you have no opinion one way or   12:28:50
21 the other?
22      MR. CONNOLLY:  Objection.
23   A.   No.
24   Q.   Who within the department have you
25 spoken with about the blogs?           12:29:10

Page 897

Hesse

1
2    A.   Specifically John Cherry and I
3  recently have spoken about it.
4    Q.   Anybody else?
5    A.   No, not really.          12:29:25
6    Q.   You said that it was in response
7  to other posts, do you recall that?
8    A.   Yes.
9    Q.   Do you have any evidence or
10 information that any posts in the blog was    12:29:35
11 posted by any of the plaintiffs in this
12 matter?
13      MR. CONNOLLY:  Other than the
14    contents of the blog; I am not quite sure
15    I understand the question.         12:29:48
16   Q.   Well any contents of the blog?
17   A.   Do I have prove?
18   Q.   Any evidence, information, proof
19 or the like that any of the plaintiffs posted
20 on the blog?                12:29:59
21   A.   I have no proof.
22   Q.   I don't want to be narrowly
23 tailored just to the word proof because I
24 think that that has a sort of legal term.  I
25 want to know if you have any evidence or other   12:30:12

Page 898

Hesse

1
2  information that would lead you to conclude
3  that the plaintiffs posted -- any of the
4  plaintiffs posted on the blog?
5    A.   Well the only one that I know for   12:30:21
6  sure is the one that Tommy Snyder wrote
7  because he identified himself.  Other than
8  that no.
9    Q.   I want to go back to some of the
10 statements that you made -- strike that.     12:30:47
11      When said, I believe you
12 called it a fantasy, is that what you called
13 the blog?
14   A.   Yes.
15   Q.   Who did you understand would be    12:30:58
16 reading the blog?
17      MR. CONNOLLY:  Objection.
18      MR. NOVIKOFF:  Objection.
19   A.   I don't know.  I could probably
20 speculate that members of the Ocean Beach    12:31:05
21 Police Department and the plaintiffs.
22   Q.   Anybody else?
23   A.   I don't know.
24   Q.   It is publicly available the blog;
25 is that correct?               12:31:15

24 (Pages 895 to 898)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 899

Hesse

1
2     A.   Sure.
3     Q.   Did you ever discuss the blog with
4  any residents of Ocean Beach?
5     A.   No.                      12:31:20
6     Q.   I just want to go back again to
7  some of the statements that you made in
8  response to Mr. Novikoff's questions about the
9  reasons why you selected the plaintiffs for
10 termination.                    12:31:39
11        I believe you testified that you
12 selected Nofi in part because he approached
13 people inappropriately?
14    A.   That was part of it, yes.
15    Q.   Did you ever write him up for    12:31:51
16 that?
17    A.   No.
18    Q.   Did you ever speak with Chief
19 Paradiso about that?
20    A.   I don't recall.            12:31:56
21    Q.   Did you ever suggest to Chief
22 Paradiso that Joe Nofi should be terminated
23 for the way he approached people?
24    A.   You know I don't recall.
25    Q.   Is there anything that you could   12:32:05

Page 900

Hesse

1
2  think of that would refresh your recollection?
3     A.   No.
4     Q.   Did you ever discipline Nofi for
5  doing that, for inappropriately approaching   12:32:16
6  people?
7     A.   Verbally.
8     Q.   How many times?
9     A.   I don't know.
10    Q.   Was anyone else present?          12:32:24
11    A.   Not that I am aware of, no.
12    Q.   Why didn't you write him up for
13 it?
14        MR. CONNOLLY:   Objection.
15    A.   I didn't think he needed to be     12:32:30
16 written up.
17    Q.   You didn't think it was to a level
18 that needed to be written up.
19        MR. CONNOLLY:   Objection.
20    A.   No.                        12:32:37
21    Q.   I believe that you said one of the
22 reasons why you selected Mr. Carter for
23 termination was that he was hidy tidy, do you
24 recall using that phrase?
25    A.   Hidy tidy; no, I don't remember    12:32:47

Page 901

Hesse

1
2  using that phrase.
3     Q.   Do you know what that phrase
4  means, hidy tidy?
5     A.   I have no idea.               12:32:59
6     Q.   Did you ever personally witness Ed
7  Carter sleeping?
8     A.   Yes.
9     Q.   While he was not on break and
10 being paid?                       12:33:07
11    A.   Yes.
12    Q.   How many times?
13    A.   Repeat that, on break or --
14    Q.   Not on break and being paid?
15    A.   And being paid, yes.          12:33:14
16    Q.   How many times?
17    A.   I don't recall how many times.
18    Q.   Did you ever discuss it with the
19 chief, meaning Chief Paradiso?
20    A.   I don't recall if I did or not.   12:33:23
21    Q.   Is there anything that you can
22 think of that would refresh your recollection?
23    A.   No.
24    Q.   Did you ever discuss it or address
25 this issue with any members of the board of   12:33:30

Page 902

Hesse

1
2  trustees of Ocean Beach?
3     A.   No.
4     Q.   Did you ever discuss it with the
5  mayor, either the current mayor or any former   12:33:36
6  mayor of Ocean Beach the issue that you saw Ed
7  Carter sleeping?
8     A.   No.
9     Q.   Did you dock Mr. Carter pay for
10 the time that he was allegedly sleeping on    12:33:46
11 duty?
12    A.   No.
13    Q.   I believe you testified that the
14 reason why you selected Snyder for termination
15 was, you mentioned something about personal   12:34:03
16 issues and that he got sick and he had some
17 money issues, and at the end of his employment
18 he was angry.  Do you recall saying that?
19    A.   Yes.
20    Q.   What did you mean by that?        12:34:14
21    A.   He was not getting along with
22 members of the Police Department.  There were
23 problems between them.  And just the general
24 notion of the public, just dealings with them.
25 His attitude was just not right or conducive   12:34:29

25 (Pages 899 to 902)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 903

Hesse

1
2 to the community that we worked for.
3     Q.   Did you ever receive any
4 complaints from any members of the public
5 about Mr. Snyder?                12:34:39
6     A.   Yes.
7     Q.   How many times?
8     A.   I don't know, I don't recall.
9     Q.   Did you receive it in writing?
10     A.   No.                    12:34:43
11     Q.   Verbally?
12     A.   Yes.
13     Q.   Anybody else there when you
14 received complaints about Mr. Snyder verbally?
15     A.   I don't know.            12:34:49
16     Q.   Who complained about Mr. Snyder?
17     A.   I don't remember names.
18     Q.   When did you receive those
19 complaints?
20     A.   I guess towards the end of 2005   12:34:54
21 specifically.
22     Q.   Do you recall when in 2005?
23     A.   Maybe in the month of August.
24     Q.   What were the complaints?
25     A.   Just, you know, one guy in    12:35:05

Page 904

Hesse

1
2 particular he came up to me and said that --
3 he didn't know the officer's names, but he
4 described Snyder and Fiorillo specifically,
5 and he said, you know, I am walking down the   12:35:19
6 street and it was late, it was dark, and I
7 came around a bush, the two cops were standing
8 there. He said they, in his words, they
9 attacked him because they thought that he was
10 urinating in a bush.            12:35:37
11     Meanwhile he was just walking
12 around the corner and that they rousted him,
13 they threw him in the bushes. I don't even
14 remember his name, but I asked him do you want
15 to put it in writing. He stated no, and that   12:35:51
16 was it. I didn't even bring it to their
17 attention at the time.
18     Q.   So just let me understand this. A
19 civilian claimed that he was roughed up,
20 attacked, thrown in the bushes by Mr. Snyder   12:36:05
21 and Mr. Fiorillo, and you didn't even address
22 it with them; is that correct?
23     MR. CONNOLLY:  Objection.
24     A.   Yes. Correct.
25     Q.   Did you speak to Chief Paradiso    12:36:14

Page 905

Hesse

1
2 about it?
3     A.   I don't recall if I did or not.
4     Q.   Did you take any notes of your
5 conversation with the civilian who came in to   12:36:22
6 make the complaint?
7     A.   No, he didn't want to put it in
8 writing, he said no.
9     Q.   I am asking whether you put it in
10 writing?                      12:36:31
11     A.   No.
12     Q.   I assume you didn't address it
13 with Snyder and Fiorillo; you took no steps to
14 discipline them?
15     A.   No.                    12:36:38
16     Q.   Any other complaints about Snyder
17 from members of the public?
18     A.   Not that I specifically recall.
19     Q.   And is there anything that you
20 could think of that would refresh your    12:36:48
21 recollection?
22     A.   No, just my observations.
23     Q.   Did you ever receive anything in
24 writing from -- anything negative about Snyder
25 from anybody in the public?        12:36:59

Page 906

Hesse

1
2     A.   I don't recall. I don't know if
3 anything is in his file.
4     Q.   Which police officers was he not
5 getting along with?                12:37:04
6     A.   I believe there was -- well, let's
7 see. There would be Ty Bacon. There would be
8 Rich Bosetti, Gary Bosetti, Walter Muller. I
9 believe Paul Carollo had some issues with him.
10 I don't know about any others right now.    12:37:20
11     Q.   Do you know why they were not
12 getting along?
13     MR. CONNOLLY:  Objection.
14     A.   Specifically no, not really.
15     Q.   Generally?              12:37:38
16     A.   Generally no.
17     Q.   Did it have anything to do with
18 the Halloween incident?
19     A.   It could.
20     Q.   You don't know one way or the    12:37:43
21 other?
22     A.   No.
23     Q.   Now going back to, I believe you
24 mentioned Walter Muller. Is Mr. Muller a
25 friend of yours?                12:37:59

Page 907

Hesse

1
2     A.   Yes, we are friends.
3     Q.   Did you ever travel with
4  Mr. Muller?
5     A.   Sure.                    12:38:03
6     Q.   Did you ever go fishing together?
7     A.   Yes.
8     Q.   Did you ever go out socially with
9  the families?
10    A.   Yes.                      12:38:10
11    Q.   And I want to go back to the
12 incident with Dr. Guida that you testified to
13 before.  You testified after the incident you
14 yelled at the group of officers; is that
15 correct?                         12:38:27
16    A.   Yes.
17    Q.   Who was in that group?
18    A.   Lappena which was a dock master.
19 Fiorillo. I can't think of his name, Matt
20 O'Malley who happens to be a Suffolk County   12:38:40
21 police officer. I don't remember who else was
22 there.
23    Q.   Why did you yell at them?
24    A.   I just didn't like the way the
25 call went and the actions that they took.  I   12:38:59

Page 908

Hesse

1
2  think they should have been a little more
3  aware of what was going on around them before
4  they just jumped into a melee.
5     Q.   Do you recall what you said to     12:39:09
6  them about that?
7     A.   Specifically no.
8     Q.   Did you write anyone up for the
9  incident?
10    A.   No.                        12:39:15
11    Q.   You didn't write up Kenny Lappena?
12    A.   No.
13    Q.   Did you ever ask Frank Fiorillo
14 why he put Muller in a head lock if it was
15 somebody else who punched their girlfriend?   12:39:25
16    A.   You got to ask the question again.
17    Q.   The question is did you ever ask
18 Frank Fiorillo why he would put Walter Muller
19 in a head lock if it was Dr. Guida who punched
20 his own girlfriend?                 12:39:41
21    A.   I don't really recall.
22    Q.   You don't recall asking him?
23    A.   I just don't recall, no.
24    Q.   Do you know why he did that?
25        MR. CONNOLLY:  Objection.       12:39:50

Page 909

Hesse

1
2     A.   At this time right now I don't
3  remember.
4     Q.   Fiorillo ever tell you that it was
5  Muller who struck somebody?           12:39:54
6     A.   No.  Not until this.
7     Q.   Did you write up Fiorillo for
8  putting Walter Muller in a head lock?
9     A.   No.
10    Q.   I believe you testified that     12:40:07
11 Muller was not intoxicated, did you testify to
12 that?
13        MR. CONNOLLY:  Objection.
14    A.   I don't know either way if I did
15 or not.                          12:40:16
16    Q.   Do you whether he was intoxicated?
17    A.   I don't believe he was.
18    Q.   Did you take a breathalyzer?
19    A.   No.
20    Q.   Did you ask him if he was        12:40:23
21 intoxicated?
22    A.   No.
23    Q.   If Fiorillo actually witnessed
24 Muller punch his girlfriend or was told that
25 Muller had punched his girlfriend, would it be  12:40:36

Page 910

Hesse

1
2  improper for Fiorillo to put him in a head
3  lock to restrain him?
4         MR. CONNOLLY:  Objection.
5     A.   Just based on somebody telling     12:40:43
6  him, no.
7     Q.   How about if he witnessed it?
8     A.   Not necessarily.
9     Q.   Would it be necessarily improper
10 for him to do it?                   12:40:53
11    A.   Well you got to give me better
12 circumstances than just punching his
13 girlfriend.  Was there a previous punch, was
14 it after the fact, was it happening at that
15 time.  You are speculating on a lot of things  12:41:02
16 here, I don't know.
17    Q.   I want to know if it -- if it
18 would ever be improper -- well strike that.
19 Would it ever be proper for Fiorillo to put
20 somebody in a head lock that he had seen punch  12:41:15
21 his girlfriend?
22        MR. NOVIKOFF:  Objection.
23        MR. CONNOLLY:  Objection.
24    A.   If it was a way of restraining him
25 I guess it would be proper.          12:41:25

27 (Pages 907 to 910)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

1              Hesse
2       Q.   Does it matter whether Muller was
3  an officer or wasn't an officer if the level
4  of altercation required him to restrain the
5  person?                    12:41:37
6       A.   I don't think it would have
7  mattered, no.
8       Q.   Just so I am clear, it was not the
9  fact that Muller was an officer that you were
10 upset with Fiorillo, was it?        12:41:50
11      MR. CONNOLLY:  Objection.
12      A.   I never said I was upset with
13 Fiorillo.
14      Q.   You were upset with the way --
15      A.   It was a general with all of them  12:42:02
16 jumping into a melee that was going on the
17 boat.  And it really was directed at the
18 civilian employee, the dock master Kenny
19 Lappena, who happened to get hurt, and that is
20 why I yelled at them as a group.      12:42:15
21      Q.   So sitting here today do you know
22 why Fiorillo put Muller in a head lock?
23      MR. CONNOLLY:  Objection.
24      A.   I don't recall right now, no.
25      Q.   You testified in response to a     12:42:29

1              Hesse
2  question that Mr. Novikoff asked you about
3  whether Frank Fiorillo -- whether you ever
4  directed Frank Fiorillo to drive you to a
5  residence for a non-police business.  Do you   12:42:46
6  recall that?
7       A.   Yes.
8       Q.   You testified that you never
9  instructed him to do that; correct?
10      A.   No.              12:42:55
11      Q.   Did he ever actually drive you to
12 a residence for a non-police business?
13      MR. CONNOLLY:  Objection.
14      A.   He may have.
15      Q.   Well the question before was he     12:43:02
16 never instructed him, the question is now
17 whether he actually drove him?
18      A.   He may have, I don't recall him
19 ever driving me anywhere.
20      Q.   Do you recall him ever picking you  12:43:12
21 up from a residence for non-police business?
22      A.   No.
23      Q.   You testified before about an
24 incident where you went up to the apartment
25 that there was the beer pouring incident, do   12:43:27

1              Hesse
2  you recall that?
3       A.   Yes.
4       Q.   You testified that you found a
5  pipe -- you found a pipe used for smoking     12:43:32
6  marijuana, do you recall that?
7       A.   Yes.
8       Q.   Do you know whose pipe it was?
9       A.   No.
10      Q.   Did you attempt to find out whose  12:43:41
11 pipe it was?
12      A.   I asked.
13      Q.   Did you check to see if there was
14 any marijuana in the pipe?
15      A.   Yes.             12:43:51
16      Q.   Was there any marijuana in the
17 pipe?
18      A.   No.
19      Q.   Was there any remnants of
20 marijuana in the pipe?          12:43:54
21      A.   It looked like something was
22 smoked out of it -- no.
23      Q.   That give you probable cause to
24 search to see if there was drugs in the
25 apartment?                12:44:07

1              Hesse
2       A.   I didn't feel there was enough.
3       Q.   Did you search to see if there was
4  any drugs in the apartment?
5       A.   No.             12:44:12
6       Q.   Why would you throw a marijuana
7  pipe into the bay as opposed to taking it back
8  to the police station?
9       A.   Because if I took it back to the
10 police station it would be just sitting around 12:44:22
11 until I could dispose of it.  It was easier to
12 just show the kid that I took it and threw it
13 into the bay so he could no longer using.
14      Q.   What kid?
15      A.   I suspected it was this kid John   12:44:35
16 that I wrote a summons to.
17      Q.   Did you write him a summons for
18 possessing drug paraphernalia?
19      MR. NOVIKOFF:  Objection.
20      A.   No.             12:44:50
21      Q.   Did you record the incident
22 anywhere in writing?
23      MR. NOVIKOFF:  Objection.  What
24 incident?
25      Q.   The fact that you found a        12:44:55

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

**Hesse**

1
2 marijuana pipe and anything you may have done
3 with it?
4     A.   No, I don't believe so.
5     Q.   Why not?                    12:45:01
6     A.   I didn't think it was necessary.
7         MR. CONNOLLY:  Objection.
8     A.   You could buy those on any street
9 corner.
10     Q.   But this one wasn't a brand new    12:45:14
11 one bought on the street corner, you said
12 there was evidence that marijuana was smoked
13 in it; correct?
14     A.   I didn't say marijuana, I said
15 anything.                    12:45:23
16     Q.   Something?
17     A.   Yes.
18     Q.   Did you smell it?
19     A.   I smelled it.
20     Q.   What did it smell like?         12:45:27
21     A.   Burned ash.
22     Q.   Marijuana ash or cigarette ash?
23     A.   Not specifically that I remember.
24     Q.   Do you know what marijuana smells
25 like?                        12:45:35

**Hesse**

1
2     A.   Oh yeah.
3     Q.   Did you ever keep any drugs or
4 drug paraphernalia in your drawer?
5     A.   Oh yeah.                    12:45:45
6         MR. CONNOLLY:  Objection.
7     Q.   Did you lock that drawer every
8 time -- was that drawer always locked?
9         MR. CONNOLLY:  Objection.
10     A.   No.                    12:45:53
11     Q.   Why would you leave drugs or drug
12 paraphernalia in your drawer?
13     A.   That is the only place that we had
14 to store it.
15     Q.   Did you have an evidence box that    12:46:01
16 was locked?
17     A.   We had a safe, 50/50 chance to get
18 in it.  It was already overwhelmed with drugs.
19     Q.   What do you mean by 50/50
20 channels?                    12:46:15
21     A.   The thing is probably from the
22 1940s and when you turned the dial it doesn't
23 always set right.
24     Q.   So you may not be able to get into
25 it?                        12:46:25

**Hesse**

1
2     A.   Right.
3     Q.   Just so I am clear, you left drugs
4 or strike that -- you left drugs in your
5 drawer unsecured?                12:46:33
6         MR. CONNOLLY:  Objection.
7     A.   It was in the confines of the
8 Police Department, yes.
9     Q.   But it was not locked?
10     A.   It was not locked.  We didn't have  12:46:38
11 locking cabinets at the time.
12     Q.   You left drug paraphernalia in the
13 drawer as well?
14     A.   Yes, it was all in an evidence bag
15 sealed in my drawer.                12:46:48
16     Q.   I want to go back to one other
17 question, well a couple of questions, with
18 respect to the incident where Paul Conway was
19 delivering the beer, do you recall that?
20     A.   Yes.                    12:47:04
21     Q.   Is there a certain age minimum to
22 deliver beer or to sell beer?
23         MR. NOVIKOFF:  Objection.
24         MR. CONNOLLY:  Objection.
25     Q.   I will break it down.            12:47:11

**Hesse**

1
2     Is there an age minimum to deliver
3 beer?
4         MR. NOVIKOFF:  Objection.
5     A.   I don't believe there is an age    12:47:17
6 requirement for the delivery.  But to sell is
7 like a bartender or waiter or waitress I
8 believe you have to be 18.
9     Q.   And Paul Conway was 20?
10     A.   I believe he was 20 at the time,    12:47:31
11 yes.
12     Q.   And then there was some testimony
13 about the fact that you did not instruct any
14 of the plaintiffs not to issue citations to
15 minors, do you recall that?            12:47:48
16     A.   Yes.
17     Q.   If you were to instruct an officer
18 not to issue citation for minors, would you be
19 violating any laws?
20         MR. CONNOLLY:  Objection.        12:47:59
21         MR. NOVIKOFF:  Objection.
22         MR. CONNOLLY:  Hypothetical.
23     Q.   Yes.
24     A.   I don't think I would be violating
25 any laws.  I think it would be an immoral    12:48:07

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 919

```
 1          Hesse
 2   order.
 3       Q.   Do you recall an incident in 2005
 4   when Ed Carter brought a minor into the police
 5   station who he wanted to issue a summons to    12:48:39
 6   who was served alcohol at CJ's?
 7       A.   No.
 8       Q.   Do you recall an incident where
 9   Carter wanted to issue CJ's a citation for
10   serving alcohol to a minor in the fall of     12:48:59
11   2005?
12       A.   No.
13       Q.   Who owns McGuire's?
14          MR. GOODSTADT:  At which juncture?
15       Q.   In 2005?                12:49:14
16       A.   2005, I think there is a couple of
17   owners, Jimmy something.
18       Q.   Jimmy Betts?
19       A.   Yes.
20       Q.   Let's focus on Jimmy Betts --    12:49:23
21          MR. NOVIKOFF:  Can I ask one
22   question.  I don't recall ever talking to
23   him about McGuire's or anything involving
24   McGuire's.
25          MR. GOODSTADT:  Well you talked to  12:49:34
```

Page 920

```
 1          Hesse
 2   him about instructing officers not to
 3   issue summons when --
 4          MR. NOVIKOFF:  Fine.
 5   Notwithstanding my overall objection.    12:49:41
 6          MR. GOODSTADT:  Okay.
 7       Q.   Jimmy Betts was the owner of
 8   McGuire's in 2005?
 9       A.   I believe in 2005.
10       Q.   Do you recall an incident in the  12:49:53
11   summer of 2005 where Carter wanted to issue
12   Mr. Betts a summons for writing his bicycle
13   after hours without a light?
14       A.   Do I recall that?
15          MR. NOVIKOFF:  Objection.  That is  12:50:07
16   kind of what I am objecting to starting
17   the question off do you recall.  If he
18   answers no it can go both ways whether he
19   didn't recall it or it never happened.
20   So I object to the form of the question.  12:50:22
21       Q.   Would it be -- in the summer of
22   2005 I know you said there were some changes
23   in the rules with respect to the silly bicycle
24   riding rules.  In the summer of 2005 was there
25   an ordinance where if somebody was riding a    12:50:38
```

Page 921

```
 1          Hesse
 2   bicycle after hours they needed a light?
 3          MR. NOVIKOFF:  Objection.
 4       A.   Yes, when it was dark out.
 5          MR. CONNOLLY:  Assuming an        12:50:47
 6   operating light.
 7          MR. GOODSTADT:  Yes.
 8       A.   Flashlight.
 9       Q.   They could have a flashlight?
10       A.   It has to be in a holder.      12:50:54
11       Q.   Just going back to the question
12   that Mr. Novikoff objected to.  In response to
13   Mr. Novikoff's objection I just want to
14   rephrase a question.
15          Did there come a point in time in  12:51:42
16   the summer of 2005 where Ed Carter wanted to
17   issue a summons to Jimmy Betts for riding his
18   bicycle after hours without a light?
19          MR. CONNOLLY:  Objection.
20       A.   No.                12:51:57
21       Q.   It didn't happen?
22       A.   I don't think so.
23       Q.   Is it possible that it happened
24   and you don't recall it?
25          MR. CONNOLLY:  Objection.        12:52:03
```

Page 922

```
 1          Hesse
 2       A.   I don't think so.
 3       Q.   It is not possible?
 4       A.   No, it didn't happen.
 5       Q.   Did you ever accompany Ed Carter  12:52:14
 6   to an apartment on Bay Walk and Ocean Breeze,
 7   I believe those two streets cross each other?
 8       A.   Yes, they do, they intersect.
 9       Q.   Do you recall accompanying
10   Mr. Carter to an apartment on that corner    12:52:34
11   where there were under age drinkers?
12          MR. CONNOLLY:  Objection.
13       A.   No.
14       Q.   So you don't recall ever being in
15   that apartment with Mr. Carter?          12:52:46
16       A.   No.
17       Q.   Just go back to the incident with
18   the beer spilling, do you recall that
19   incident?
20       A.   Yes.                12:53:10
21       Q.   Who did you say the leaseholder
22   was?
23       A.   I didn't.
24       Q.   Do you know who the leaseholder
25   was on the apartment?          12:53:17
```

TSG Reporting - Worldwide (877) 702-9580

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

**Hesse**

2    A.  The leaseholder, no.
3    Q.  Do you know who the owner of the
4  apartment is?
5    A.  The owner of the building.        12:53:21
6    Q.  Yes.
7    A.  Billy Svingos.
8    Q.  He was the owner in 2003, 2004,
9  and 2005?
10    A.  Yes.                      12:53:30
11    Q.  I thought you mentioned a John who
12  was a leaseholder?
13        MR. CONNOLLY:  He didn't use the
14    phrase leaseholder.  I think the record
15    would correct me if I am mistaken,      12:53:37
16    renter.
17    Q.  Is it possible that there was a
18  renter named John up there?
19    A.  I believe he was one of the
20  renters.  I believe it was a group of them.    12:53:48
21    Q.  So it was like a share house?
22    A.  Something like that, yes.
23    Q.  So just so I understand, one
24  leaseholder and the leaseholder would sell out
25  shares to other renters; is that how it works?  12:53:56

**Hesse**

2        MR. CONNOLLY:  Objection.
3    A.  Yes, kind of how it works.
4    Q.  This guy John, he was one of the
5  renters?                      12:54:04
6    A.  I believe he was, yes.
7    Q.  What summons did you write?
8    A.  I believe it was for noise.  Noise
9  violation.
10    Q.  So you didn't write any kind of    12:54:11
11  summons with respect to spilling alcohol on
12  the officers?
13    A.  No.
14        MR. CONNOLLY:  Objection.
15    Q.  You didn't write any kind of      12:54:23
16  summons with respect to the fact that there
17  was drug paraphernalia in the apartment?
18    A.  The pipe; no.
19    Q.  Who did you enter the apartment
20  with?                      12:54:50
21    A.  Tom Snyder and Kevin Lamm.
22    Q.  Anyone else?
23    A.  I don't recall if anybody else was
24  there.
25    Q.  Ever been in that apartment with  12:54:58

**Hesse**

2  Paul Carollo?
3    A.  I don't recall if I was or not.
4    Q.  Who is Jason Maldonado?
5    A.  No idea.                  12:55:08
6    Q.  Do you know who Robert Steinhauser
7  is?
8    A.  No idea.
9    Q.  How about Brian Weinberg?
10    A.  No idea.                  12:55:14
11        MR. GOODSTADT:  Give me one minute
12    off the record just to review what I
13    have.
14        MR. NOVIKOFF:  Go off the record.
15        THE VIDEOGRAPHER:  The time is      12:55:32
16    12:57, we are off the record.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  The time is
19    12:58, we are on the record.
20        MR. GOODSTADT:  I have nothing      12:57:16
21    further at this time.
22  EXAMINATION BY
23  MR. NOVIKOFF:
24    Q.  Mr. Hesse, I think I have no less
25  than three minutes worth of questions, maybe  12:57:23

**Hesse**

2  more than three questions.
3        You mentioned in response to Mr.
4  Goodstadt that Mr. Snyder communicated to you
5  about an illegal search and seizure by Lamm,    12:57:33
6  do you recall that?
7    A.  Yes.
8    Q.  What did Mr. Snyder specifically
9  say about that?
10    A.  He said that Kevin Lamm went up    12:57:37
11  the back alley of CJ's behind the bar, came in
12  the bar door and made a statement that he was
13  going to -- he doesn't give a shit who you
14  people are, he is going to get all of you.  In
15  reference to what I don't know, he went into    12:57:56
16  the kitchen, he was looking for something.  He
17  went into the bathroom looking for something.
18  And Tom Snyder said that he didn't agree with
19  it.  He even said something to Kevin about it.
20    Q.  So this was Snyder telling you    12:58:08
21  that Lamm said in words and effect I don't
22  give a shit who you are?
23    A.  Correct.
24    Q.  Now Mr. Goodstadt asked you a
25  question with regard to showing -- well, Mr.  12:58:19

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 927

Hesse

1
2  Goodstadt asked you a question and you
3  responded with regard to you showing Lamm,
4  Snyder and Fiorillo at various times the file
5  of the investigation?                    12:58:35
6     A.   Yes.
7     Q.   I think Mr. Goodstadt would be
8  objecting based upon your non-responsiveness,
9  so let me ask you this question.
10        Did you ever show Mr. Lamm a copy  12:58:44
11 of the investigative file of the Halloween
12 incident?
13    A.   Yes.
14    Q.   And Mr. Lamm didn't want to look
15 at it?                                   12:58:51
16    A.   Correct.
17    Q.   At the time when you showed --
18 where did you show Lamm this?
19    A.   In the police station.
20    Q.   Did Lamm at the time that you     12:59:02
21 showed him make any reference to his belief
22 that you were covering up anything?
23    A.   I don't remember specifically.
24    Q.   With regard to you showing
25 Fiorillo the investigative file, let me ask  12:59:13

Page 928

Hesse

1
2  you this so there is no objection, did you
3  show Fiorillo the investigative file?
4     A.   Yes.
5     Q.   Where did you show it to him?     12:59:21
6     A.   In the same exact spot actually.
7     Q.   Was Mr. Fiorillo pleased or
8  displeased with regard to what he read?
9        MR. GOODSTADT:  Objection.
10    A.   He seemed to be very happy to read 12:59:32
11 it, and he said there was a lot of things that
12 they didn't know.
13    Q.   They being whom?
14    A.   The three officers.
15    Q.   Let me ask you this then.  What if 12:59:40
16 anything did Mr. Fiorillo say to you upon
17 subsequent to his reading of the investigative
18 file concerning the fact that he looked at the
19 file?
20        MR. GOODSTADT:  Objection.         12:59:49
21    A.   There was nothing derogatory other
22 than he made some statements that he didn't
23 know that certain things had transpired.
24    Q.   Certain things had transpired,
25 what he was referring to?                 12:59:58

Page 929

Hesse

1
2     A.   Like the biggest part of Jeannie
3  Jaeger being attached by this individual.
4     Q.   Now the question I have is at this
5  time when you showed Fiorillo the       13:00:06
6  investigative file and he made those comments,
7  did he make any comments to you that it was
8  his belief that you were covering up
9  something?
10    A.   No.                              13:00:16
11    Q.   With regard to Snyder did you show
12 him the investigative file?
13    A.   Yes.
14    Q.   Did he review it?
15    A.   Yes.                             13:00:22
16    Q.   Where did you show it to him?
17    A.   In the police station.
18    Q.   Where did he review it?
19    A.   He was sitting at Chief Paradiso's
20 desk.                                    13:00:30
21    Q.   What comment if any did he make to
22 you concerning his review of the investigative
23 file?
24    A.   I don't really recall to tell you
25 the truth.                              13:00:36

Page 930

Hesse

1
2     Q.   Did he make any reference to
3  his -- did he make any statement that led you
4  to believe that he believed that you were
5  covering up something?                  13:00:42
6     A.   Absolutely not, no.
7        MR. GOODSTADT:  Objection.
8        MR. NOVIKOFF:  I have nothing
9  further.
10       MR. CONNOLLY:  I have one          13:00:57
11 question.
12       MR. NOVIKOFF:  Don't open the
13 door.
14 EXAMINATION BY
15 MR. CONNOLLY:                            13:01:00
16    Q.   Earlier Mr. Goodstadt had asked
17 you if you had any proof that plaintiffs or a
18 plaintiff may have made blog entries.  Do you
19 recall being asked that question?
20    A.   Yes.                             13:01:18
21    Q.   And what was your response?
22    A.   I had no proof.
23       MR. GOODSTADT:  Objection.
24    Q.   Did you ever form a belief based
25 upon the contents of blog entries that one or  13:01:31

32  (Pages 927 to 930)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 931

1      **Hesse**
2  **more plaintiffs may have made blog entries?**
3      A.   Yes.
4          MR. CONNOLLY:  Nothing further.
5          MR. GOODSTADT:  You expect me not   13:01:45
6  to ask him which entries; there is now a
7  new allegation that plaintiffs have made
8  entries.  I don't see how I can't ask him
9  the question.
10         MR. CONNOLLY:  Go off the record.   13:02:14
11         THE VIDEOGRAPHER:  The time is
12 1:03, we are going off the record.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  The time is
15 1:07, we are on the record.        13:06:28
16         MR. GOODSTADT:  In lieu of an
17 agreement that all parties have reached
18 in response to -- strike that.
19         In connection with the last
20 question that Mr. Connolly asked        13:06:39
21 Mr. Hesse about his belief as to whether
22 any of the plaintiffs posted on the blog,
23 we have agreed that plaintiffs will serve
24 interrogatories requesting the identity
25 of which blog posts Mr. Hesse believes    13:06:54

Page 932

1          Hesse
2  were posted by the plaintiffs, or
3  individually which plaintiff, and the
4  basis of his belief that it was the
5  plaintiff that he identifies who posted    13:07:06
6  the blog.
7          MR. NOVIKOFF:  Fine.
8          MR. CONNOLLY:  So agreed.
9          MR. GOODSTADT:  And Mr.
10 Novikoff is --                13:07:15
11         MR. NOVIKOFF:  Well if those are
12 the only two questions that you are going
13 to pose to him I don't feel -- I don't
14 think then I need to serve anything.
15         MR. CONNOLLY:  I take it we are    13:07:28
16 done.
17         MR. GOODSTADT:  We are.
18         THE VIDEOGRAPHER:  The time is
19         (Continued on next page.)
20
21
22
23
24
25

Page 933

1          Hesse
2  1:09.  We are off the record.
3          (Time noted:  1:10 p.m.)
4  _____
5          GEORGE HESSE
6
7  Subscribed and sworn to before me
8  this ___ day of _____, 2009
9
10 _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 934

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                : ss.
5  COUNTY OF NEW YORK   )
6
7          I, Philip Rizzuti, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10         That GEORGE HESSE, the witness
11 whose deposition is hereinbefore set forth,
12 was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15         I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of this
19 matter.
20         IN WITNESS WHEREOF, I have
21 hereunto set my hand this 27th day of
22 August, 2009.
23 _____
24         PHILIP RIZZUTI
25

dbe4ad25-28cc-4b2b-b56a-9876e43d662d

Page 935

```
 1
 2    ----------------- I N D E X ----------------
 3    WITNESS         EXAMINATION BY      PAGE
 4    GEORGE HESSE    Mr. Novikoff     807, 925
 5            Mr. Baptiste      839
 6            Mr. Goodstadt     841
 7            Mr. Connolly      930
 8
 9    ------------ INFORMATION REQUESTS -----------
10    DIRECTIONS:      None
11    RULINGS:       None
12    TO BE FURNISHED:  None
13    REQUESTS:      None
14    MOTIONS:       None
15
16    ----------------- EXHIBITS -----------------
17     Hesse Exhibit 29, complaint,     807
18     Hesse Exhibit 30, blog posting,    883
19     P 962 to P 1265,
20
21
22
23
24
25
```

Page 936

```
 1
 2        *** ERRATA SHEET ***
 3    NAME OF CASE: CARTER VS. OCEAN BEACH
      DATE OF DEPOSITION:  August 17, 2009
 4    NAME OF WITNESS:  GEORGE HESSE
      PAGE  LINE    FROM      TO
 5    ____|_____|_____|_____
 6    ____|_____|_____|_____
 7    ____|_____|_____|_____
 8    ____|_____|_____|_____
 9    ____|_____|_____|_____
10    ____|_____|_____|_____
11    ____|_____|_____|_____
12    ____|_____|_____|_____
13    ____|_____|_____|_____
14    ____|_____|_____|_____
15    ____|_____|_____|_____
16    ____|_____|_____|_____
17    ____|_____|_____|_____
18    ____|_____|_____|_____
19
20        _____
21          GEORGE HESSE
22    Subscribed and sworn to before me
23    this _____ day of _____, 2009.
24    _____
25    (Notary Public)     My Commission Expires:
```

34 (Pages 935 to 936)

dbe4ad25-28cc-4b2b-b56a-9876e43d662d